Pages 1 - 73

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG, JUDGE

ANIBAL RODRIGUEZ, et al., Plaintiffs,

VS.

GOOGLE, LLC, Defendant.

NO. 20-cv-04688 RS

San Francisco, California
Thursday, March 4, 2021

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**: (By Zoom Videoconference)

For Plaintiffs:

MORGAN & MORGAN
Complex Litigation Group
711 Van Ness Avenue
Suite 500
San Francisco, California 94102
**BY: MICHAEL F. RAM, ESQ.**

SUSMAN GODFREY LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, California 90067-6029
**BY: AMANDA K. BONN, ESQ.**

BOIES SCHILLER FLEXNER LLP
44 Montgomery Street
41st Floor
San Francisco, California 94104
**BY: MARK C. MAO, ESQ.**

Reported By: **BELLE BALL, CSR 8785, CRR, RDR**
Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED:**

For Defendant:

WILLKIE FARR & GALLAGHER LLP
One Front Street
34th Floor
San Francisco, California 94111

**BY: EDUARDO E. SANTACANA, ESQ.**
**SIMONA A. AGNOLUCCI, ESQ.**
**BENEDICT Y. HUR, ESQ.**

**Thursday - March 4, 2021 2:23 p.m.**

**P R O C E E D I N G S**

**THE COURTROOM DEPUTY:** Case 20-CV 4688, Rodriguez versus Google. Counsel, please state your appearances.

**MR. RAM:** Good afternoon, Your Honor. Michael Ram of Morgan & Morgan for the plaintiffs. May I please introduce my colleagues. Amanda Bonn of Susman Godfrey will address the Federal Wiretap Act, the California Invasion of Privacy Act and consent.

And Mark Mao of Boies Schiller Flexner will cover the common law and constitutional claims. And Mr. Mao can also answer any questions about the technology the Court might have.

And then lastly, I will address the Computer Data Access and Fraud Act and the unfair competition law.

**THE COURT:** Okay. Well, I don't have problems with people splitting up arguments, but I may not give each of you unlimited time to go over each piece of what you have gone over. I have some specific questions and I will just expect you to -- whoever is talking, to answer my questions.

Okay. On the defense side?

**MR. SANTACANA:** Good afternoon, Your Honor. Eduardo Santacana of Willkie Farr & Gallagher for defendant Google. With me today are my partners Ben Hur and Simona Agnolucci.

**THE COURT:** Good afternoon to everyone.

All right, so this is our motion to dismiss the first

amended complaint. I have read through what you provided to me. And I am familiar with the six claims for relief. And so let me start with the moving party, whoever wants to begin the discussion.

**MR. SANTACANA:** Yes, Your Honor.

I'd like to start today by clarifying for the Court a dispute in the briefing about the scope of plaintiffs' allegations, and the products and features that Google has that are actually implicated by them.

Firebase SDK is a tool that helps app developers create and manage apps. It has a variety of features, a variety of products, and it's optional to use. All of this is publicly documented. And app developers are the ones who choose to use those tools.

On the home page for Firebase SDK --

(Document displayed)

**MR. SANTACANA:** -- which you can see here, I believe, Your Honor, you can see a list of all of the products and features that are encompassed by the software development kit.

Now, there is a red box around --

**THE COURT:** Let me stop you there, if I can. And this plays through this whole battle. Remember, I'm just reminding everyone, this is a motion to dismiss. And my focus has got to be on the complaint and the averments in the complaint. And anything that is properly judicially

noticeable or incorporated within the complaint.

And from the briefing, people are going all off on to all sorts of things that are outside of the pleadings. And now, some of the time, the other side doesn't object and, you know, okay, I can consider that. But even with this first demonstrative you're showing me, you're starting to talk about things that are not part of the question that is in front of me.

So, I appreciate you want to explain to me the way all of these different aspects of the technology work. But that may be for another day. This is a motion to dismiss. So focus on the averments of the complaint and why they do not present, under 12(b)(6), a claim that can proceed.

So I'm not suggesting necessarily that you were already in prohibited territory. But it certainly looked like you were getting there. So keep it in mind.

So, go ahead.

**MR. SANTACANA:** I will, Your Honor. And I agree with you. And actually, that is the purpose of the slide, which I will note is an identical to a slide the plaintiffs are -- intend to show today as well.

The point is to say that the averments in this complaint only talk about Google Analytics for Firebase. And in the briefing, the parties have gone back and forth about what to do about the fact that the plaintiffs chose to use the phrase

"Firebase SDK scripts" repeatedly to refer to what in Paragraphs 50 through 58 is clearly alleged to be functionality and Google Analytics for Firebase. So --

**THE COURT:** Is that right? I'm not saying that they're going to be able to prevail on this, but they are suggesting that there is a secret script in the sense that unbeknownst to the world, effectively, Google for its own purposes is running its own Google Analytics, and that all of the discussion about Firebase and all the rest and your arguments about you know, the agreements, terms of use and all of that is sort of besides the point that -- I mean, I understand that you say you're going to be able to show that this is not true, and that you don't have this shadow, if you will. But that's not something I can deal with on a -- on a dismissal motion.

**MR. SANTACANA:** I don't agree, Your Honor. In *Williams versus Facebook*, you did just that.

The issue is that the plaintiffs are alleging two things. First, they're alleging that Google Analytics for Firebase has violated their privacy. And then second, in their opposition, they've shifted to the theory that even if that's not violating their privacy, even if it's consented to by all of the parties involved, there's a shadow copy of that program that is running in the background and that is secretly doing the same thing for Google's own benefit.

Now, the problem with that allegation is that it's not good enough to pass Rule 8. And certainly not good enough to pass Rule 9(b). And this is why I would like to focus on the allegations of the complaint.

Just to give you one example Paragraph 54 talks about the secret transmission. Secretly copying and transmitting two parameters by Firebase SDK scripts. But Paragraph 54 is using quotations from public Google documentation. There are no secrets here, Your Honor.

The basis of this complaint, the only factual allegations in the 81 pages, appear in nine paragraphs. The rest is either complaints about unrelated conduct like a consent decree from 2011 --

**THE COURT:** The simple fact that it's only in nine paragraphs isn't of any particular consequence, if the nine paragraphs are adequate. So what --

**MR. SANTACANA:** Each --

**THE COURT:** -- is wrong with that section of the complaint?

**MR. SANTACANA:** Each of the nine paragraphs, if you start with Paragraph 50 and you move through Paragraph 58, each one is quoting public documentation about Google Analytics for Firebase. There aren't any facts here that allege -- there aren't any facts here that would demonstrate that there is a secret shadow copy out there.

What they're discussing in these paragraphs is the publicly documented and consented to product, Google Analytics for Firebase. And these Footnotes 11, 14 through 16, these are all websites about Google Analytics for Firebase.

So I think the problem -- and Paragraph 54 exemplifies it -- is that the plaintiffs are saying: There's a secret. How do I know there is a secret? Because I read it on Google's website.

That's not a secret, Your Honor. That's just a conclusory allegation. And it just -- it doesn't come close to passing the Rule 8 standard, much less the Rule 9(b) standard. It's no different than the standards set in *Iqbal*, where the plaintiff said: I believe that you have secretly come to an agreement to create policies that will injure me. How do I know that? Because I believe that you've done that. But there is no citation to public information that suggests it. And there's no citation to non-public information that suggests it. And so the Court said: Just because it's possible doesn't mean it's plausible.

Nothing in this complaint actually alleges a fact that it -- tends to make it more likely that Google has a secret shadow copy of Google Analytics for fire Firebase.

And I would like to take a step back, Your Honor, and point out this entire discussion is only because we filed a motion that demonstrated that Google Analytics is completely

consented to, up and down, left and right. There's no question that the plaintiffs consent to that. And that Web & App Activity, that toggle, doesn't come close to addressing whether Google Analytics for Firebase is going to work.

I mean, this is a tool so the *New York Times* can see on an aggregated, anonymized basis how popular their articles are. That's alleged in the complaint. That's not me testifying, that's in the complaint. That's what it's for.

So the question is: Okay, where in the complaint is there an allegation about a secret that no one else knows? I would point Your Honor to your decision, *Williams versus Facebook*. The issue there, Facebook said, was that it wasn't on adequate notice of what was -- what the complaint was actually reaching.

And Your Honor wrote that (As read):

> "Adequate notice is essential because it ensures that plaintiffs are deterred from filing complaints as a pretext for the discovery of unknown wrongs."

In other words, it isn't enough --

**THE COURT:** Here, you know exactly what they're alleging. You know exact- -- I mean, unless they tell me to the contrary, they are alleging that there is this -- secret scripts, in the sense that unbeknownst to the users and anybody else, that Google is, for its own purposes, retrieving this data.

So you're on notice -- I mean, the notice point doesn't

fly at all, because you know exactly what they're saying. You just say they have no basis for saying it.

**MR. SANTACANA:** Well, I don't think that's right. I mean, in *Williams*, the plaintiff had a very similar allegation. But the problem was that the plaintiff didn't include any specific facts about the accused program. Here, sure, I'm on notice of the conclusion that they have alleged. But I can tell you, Your Honor, I have personally pleaded with plaintiffs' counsel for hours on the phone, in discovery, saying: What other than Google Analytics is at issue in this case? Because I read your complaint; it says Google Analytics. So, I'm investigating Google Analytics, I'm going to produce documents about Google Analytics.

And they're saying: No. I want documents about everything because I called it a Firebase SDK script.

Well, if that's the logic of it, Your Honor, why didn't they just call it a Google script, and ask for every document at Google? The scope of this is not an academic question; it's a practical question. And it's an essential question under the pleading standard.

**THE COURT:** Go ahead.

**MR. SANTACANA:** The other case I would point Your Honor to is *Smith versus Facebook*, and the Yahoo! mail case. In both of those, the question was: Has the defendant fully disclosed the scope of what is alleged by the

plaintiffs?

The courts analyzed the complaint, as alleged, only the facts that were alleged about those programs, and compared them to the privacy disclosures. That's what the Court's task should be here.

If we were to ignore every factual allegation in the complaint, and only look at what Your Honor is suggesting, which is: Google has a secret script that is stealing my data, that's it. I mean, there's nothing else. That's it. I can't imagine how that would get past the pleading stage under any standard, much less the Rule 9(b) standard, which we believe does have to apply here. Because the allegation is --

**THE COURT:** Do you say it applies to every single claim for relief, or just certain of them? Or which one?

**MR. SANTACANA:** No, what we're saying is under the *Vess* case, the Ninth Circuit case that Judge Fletcher wrote, it applies to the averments of fraudulent conduct. So it applies across claims, but not to every allegation.

That's why we're saying for example, 50 through 58, these allegations about Google Analytics, they're specific, we understand how to defend those, we're on notice of Google Analytics, we get that. We think we have a winning case on that, and we also think that on the -- on the face of the complaint, there's no merit to that claim.

For the rest of the allegations that say there's a secret

shadow copy, Google is doing this behind the scenes, that have no factual content other than that conclusory assertion, for those allegations, the Court should require the who, what, when, where and why. Just like in any other case, just like Your Honor did in *Williams versus Facebook*.

And, and even if the 9(b) standard didn't apply, at a minimum, the "what" would be nice. Because to say that Google, which is a very large organization, is doing something in secret is not enough to put us on notice of what to look for or where to look for it.

**THE COURT:** Okay.

**MR. SANTACANA:** So I would like to jump back, Your Honor, to the Google Analytics allegations, to the extent Your Honor has questions about them. I think obviously our discussion so far has demonstrated that the plaintiffs don't -- don't really want to focus on the portion of their complaint that deals with Google Analytics. And that's because Google has a judicially-noticeable terms of service, terms of service the plaintiffs relied on in their complaint, with the app developers.

And the app developers have agreed to do two things. One, use this service in order to analyze their traffic on their site, on their app. They learn about which articles are popular, and how long people spend on them, and all of those things. And second, they agree to obtain the consent of every

single one of their end users for the use of this product. So -- to -- to avoid this exact situation.

And there's no dispute the plaintiffs have never --

**THE COURT:** So is it your position that the -- the users of the apps are consenting to Google Analytics?

**MR. SANTACANA:** Yes, Your Honor. The users are consenting in two ways. First, the users of the apps consent when they agree to the privacy policy of the apps, themselves. And that -- those, we have a few examples of those, because those privacy policies were brought at issue in the complaint, nine of them. The complaint alleges certain things about those apps. And we showed them.

And I mean, one great example is the Alibaba one which says --

**THE COURT:** I can get to that point. But how do the users who are using the apps have any idea they're consenting to Google Analytics?

**MR. SANTACANA:** Sure.

So, I mean, when the user uses the Alibaba app and they agree -- when they open that app and they agree to the privacy policy, that privacy policy says (As read):

"Our platform uses Google Analytics, an internet analytics service provided by Google. Google's cookies allow us to analyze use of the platform. The data generated by it is going to be transmitted to

Google and stored by Google on servers in the United States."

These are the types of the disclosures we're dealing --

**THE COURT:** Where is the consent that -- in addition to the use that the app developer is going to make of this information that is being analyzed through Google Analytics, where is the consent that Google can, for its own purposes, retain the data, and use it for any purpose?

**MR. SANTACANA:** Well, so, again, I think this is the problem, is that we have two different worlds of allegations. There's -- there's the Google Analytics world. And I think in that world, there's no dispute that Google's contract with the app developers, its privacy policy with the users, makes clear that it is not just copying this data and using it for its own purposes without permission. The terms of service say the data belongs to the app developer, not to Google.

There's a limited set of circumstances where if a user has consented in a number of different ways, and the app developer has, too, then --

**THE COURT:** I guess I misunderstood. I didn't think you were disputing the notion that Google does retain the -- gets the data, and doesn't exclusively use it for the purposes of the developer, but reserves the right to use that information.

**MR. SANTACANA:** No, Your Honor. We're very much

disputing that.

**THE COURT:** All right.

**MR. SANTACANA:** Because that allegation is false. The -- the -- again, there's two worlds. There's the world where Google Analytics for Firebase is simply telling the *New York Times* how their app is performing. That data belongs to the *New York Times*. Google is a data processor under the GDPR and the CCPA for that data. It is not using it for its own purposes.

Now --

**THE COURT:** Are you, as Google, taking the same position in this case as you are in Judge Koh's case, of what service that constitutes?

Is it the same position?

**MR. SANTACANA:** I don't -- I don't believe there's any inconsistency between Google's position in this case and the two cases that Judge Koh is overseeing.

**THE COURT:** The *Brown* case? Okay.

**MR. SANTACANA:** Yeah. The *Brown* case and the *Calhoun* case. This question of service, you know, now we're talking about the Web & App Activity toggle. And I think the issue there is the plaintiffs are ignoring the vast context of disclosure that's given to them in the privacy policy that Google gives them, and focusing on one word, the word "services" which they see appears in two documents, and giving

it the most aggressive reading they can to try to create ambiguity where this is none.

(Document displayed)

**MR. SANTACANA:** But I would show Your Honor what I think is the most important part of the privacy policy for this case. It is the part plaintiffs have never alleged anything about. It's the part that says: Your Activity on Other Sites and Apps.

And as you can see here, it does very clearly disclose that your activity on other sites and apps is going to be analyzed in part by Google Analytics if the app is using Google Analytics. And there's a button that says (As read):

""Learn more about how Google uses this data when you use our partners' sites or apps."

You won't find this anywhere in the complaint. But this links to a page that is in the record, and that forms part of the privacy portal that Google provides to users.

(Document displayed)

**MR. SANTACANA:** And that page explains that sites and web -- and apps use Google Analytics to learn more about their users. And that depending on certain settings, Google might use it for other purposes. Including if you consent.

But here's the most -- I think most important piece in the entire record.

(Document displayed)

**MR. SANTACANA:** That same web page says:

"If you want to change or withdraw your consent, you should visit the site or app in question to do so."

Nowhere in the --

**THE COURT:** Isn't that the essence of what the plaintiffs are alleging, is that people do that, and they go to the -- you know, to the WhatsApp point -- the Web & App Activity option, and they say "I don't want to share it," and then it nonetheless gets shared?

**MR. SANTACANA:** So Web & App Activity is a Google toggle that deals with Google services.

(Document displayed)

**MR. SANTACANA:** This is saying if you want to change or withdraw your consent, visit the app in question. That is, go to the *New York Times* app and tell them you don't won't them to use Google Analytics for you. Go to the Uber app and tell them you don't want them to use Google Analytics for you.

It's saying you cannot control this through Google. This is something between the app developer and Google, and you should go to the app developer to discuss it with them.

Now, some apps have little toggles in their apps for this exact type of data, and some don't. They have a privacy policy like Alibaba, that says: We're going to use this; we want to understand how our users are using our app. And so you agree to it, or you don't install it.

And, and, and again, to take a step back, Your Honor, publishers of content have been doing this for over a century. Right? Magazines and newspapers want to know how their articles are performing. They want to know how they're being referred to those subscriptions. All websites are doing this. All apps are doing this. Google is simply one vendor among many that provides this service to businesses.

And the idea that the Web & App Activity toggle would somehow override the consent that users give to these apps directly, including proactively, because according to the plaintiffs they can turn the toggle off.

And then, they say, a reasonable user could read the privacy policy I just read to you from Alibaba and conclude: Well, that doesn't apply to me because I turned off this toggle called "Web & App Activity." Even though nowhere in that description does it explicitly say it is going to turn Google Analytics off.

To the contrary, it links the user to the privacy policy which says Google Analytics is going to be used.

**THE COURT:** You honestly think that a downstream user that goes to the effort of doing that and says "I want out of this, I don't want this used," thinks it's only limited to the app's use of it and that there's no suggestion or no intention that's expressed there that they want out from under the use of their data by anybody?

I mean, really? Is that what you contend?

**MR. SANTACANA:** Well, here's the problem, Your Honor. Again, we go back to the two worlds of allegations.

In the Google Analytics world, the data's anonymized. Under the *Low versus LinkedIn* case and the *Moreno versus San Francisco BART* case which dealt with a BART app, the questions were: Does a user really have an expectation of privacy, if the data that is being sent to the defendant is anonymized and scrubbed?

This data is anonymized and scrubbed. Google is not using it for other purposes without consent. When Web & App Activity is turned off, there is no fact in the -- in the complaint, no factual allegation that suggests that it's being used for any purpose other than that in the contract and the disclosures that have been given to the third-party app developers and the users.

So to answer your question directly, yes. That is exactly what I'm saying. That these users, these downstream users, don't -- it wouldn't be reasonable for them to expect that the *New York Times* cannot learn, in an aggregate anonymized basis, which articles they're reading. They're never going to be able to look up which article Eduardo Santacana read this morning in the *New York Times*. They just know that 100,000 people read this one, and 200,000 people read that one.

And to the extent that that data is ever personalized, it

is only done when there's a toggle that -- a consent that's given by the user.

**MR. MAO:** Your Honor, if I may -- this is Mr. Mao for the plaintiffs.

If I may just point out really quickly Your Honor, Mr. Santacana just stated that when Web & App Activity is turned off, the data --

**THE COURT:** You know, it's not helpful for me for you to interrupt the other counsel who is -- it's his time, and he's making your argument. It's very disruptive. I don't -- I don't appreciate it. And it's not professional. So, you'll have your opportunity to speak. But don't interrupt him. When he's done, the professional way to approach this is then you'll have your time.

I don't know -- you -- you lucked in; you've now disrupted what he was saying. I don't know what you're talking about, frankly, right now. So please exit the screen, and let counsel whose time it is argue the case.

Okay?

**MR. MAO:** (Nods head)

**THE COURT:** Thank you.

Go ahead, Mr. Santacana.

**MR. SANTACANA:** Your Honor, I -- I think I've addressed this question of anonymized data. What I want to do is bring it back to the allegations of the complaint. Because

I agree that the briefing on both sides, it creates an impression that we are beyond the scope of the record. We're not.

The complaint relies -- Paragraph 5, right up front, says: I'm basing my case on Google's privacy policy. That's how I know Google did something wrong. And I'm a plaintiff who really cares about privacy. I read everything very carefully.

So this case is premised on that document.

(Document displayed)

**MR. SANTACANA:** But when you look at the document, nowhere in the complaint does it include the one section about the thing plaintiffs care about. What happens when I visit someone else's app?

Nor do they mention that there's a whole other web page that it links to --

(Documents displayed)

**MR. SANTACANA:** -- that talks about Google Analytics. Specifically, Google Analytics. It doesn't use the word "services" in a layperson sense. It's using the term that's at issue in the case. And it is telling the plaintiffs in the most explicit way possible what they can do to turn it off if they want to turn it off.

What this case is about is not whether the plaintiffs consented. There's no question that they consented. There's no question the app developers consented. The question is:

Does this Web & App Activity button, does it amount to a revocation of that consent?

And in this way, I think this case does stand apart a little bit from a lot of the other privacy cases the parties have discussed in the briefing. Because in those cases, the question is: Was there consent in the first place?

In this case, the question is: Was the consent undone, both retroactively and proactively? And I would submit, Your Honor, that the language in the Web & App Activity description isn't specific enough to overcome the specific disclosure I just showed you. And the general canon of interpretation would say that the specifics should overcome the general.

The fact that Web & App Activity uses the word "services" and has a phrase that, in isolation, plaintiffs could make ambiguous for purposes of lawyer-created argument doesn't mean that in the constellation of privacy disclosures Google has taken the trouble to create, a reasonable user would walk away thinking what plaintiffs say they were thinking.

**THE COURT:** You've now spent time on consent, which I understand applies across the board on the claims for relief. But now, can you just walk through your position on the claims for relief? The Wiretap Act, and then the California statutes, as well.

**MR. SANTACANA:** Yes, Your Honor. So on the Wiretap

Act, I think this case is indistinguishable from the Facebook privacy litigation that Judge Ware decided in 2011. That was a case where Facebook was sending refer headers to advertisers when users clicked on ads. And Judge Ware reasoned, I think correctly, that it was impossible for there to be a Wiretap Act claim because it's a one-party consent statute.

And a lot of these privacy cases, plaintiffs try to push that one-party consent statute into the baby wiretap acts that have two consent requirements. This is a one-party-consent statute. There is no question that app developers purposefully integrated Google Analytics for Firebase for the express purpose of collecting information about their users, to understand how the apps are being used.

So I just think the Wiretap Act is an easy one for Your Honor to decide, regardless of the larger consent questions.

And I know the plaintiffs brought up the crime tort exception. Unless Your Honor has questions about that, I don't think I need to spend a lot of time on it.

The *Susman* Ninth Circuit case is as clear as it could be. Unless Google was acting with the intent to engage in a separate and independent crime or tort, that exception doesn't apply. And there is no allegations like that in this case.

Moving on to the -- the CIPA claim, Your Honor, again, mutual consent is our primary argument. There is this other

issue that was brought up in the briefing about who the agent is, for purposes of this statute. So we wrote in our briefs that in some ways, Google Analytics is like the Dictaphone.

It matters for this statute, because the statute is focused on the person who uses the recording device. Google doesn't use this device. App developers do. It's optional; it's free. No one is required to use it.

Even if they are required to use Firebase SDK, as the plaintiffs allege, the plaintiffs have also conceded that Google Analytics for Firebase is optional.

So the person who is using the quote-unquote recording device is not Google, it's the app developer. And of course, doing it with full consent.

I can move on, if you'd like, to the tort claims.

**THE COURT:** Move on to the next one, CDAFA.

**MR. SANTACANA:** Sure. So the CDAFA claim, the question on this one, apart from mutual consent, is whether Google acted without permission under the statute. And there's a dispute about whether certain -- there's a certain bar for proving what without permission looks like.

The issue that I have with the entire argument the plaintiffs are bringing is that even if Google acted without -- just for the sake of argument. We don't agree with this. But even if it acted without the permission of the users, it acted with the permission of the app developers. In fact, with their

express invitation.

And so I think a lot of the doctrinal dispute about the phrase "without permission" and the word "access" in the statute is irrelevant. Google was there, because it was invited. Its code was installed because that's what the developers wanted to do.

And once you set aside under Rule 8 or Rule 9(b) the secret scripts allegations, and you focus on the only factual matter in the complaint, then there's no question that Google is acting with permission.

**THE COURT:** Is it fair to say -- and I understand your overarching point that you think there's inadequate averments with respect to the -- to use the shorthand, the secret scripts argument.

**MR. SANTACANA:** Yeah.

**THE COURT:** If I think -- if I determine that there are adequate averments that there is such activity, then these arguments aren't applicable. Correct?

These arguments are all going to the assumption that I won't -- that I don't find the secret scripts contentions to be sufficient.

Right? Is that right?

**MR. SANTACANA:** I think that's right, Your Honor. And I think, if --

**THE COURT:** I mean in other words -- let me -- let me

rephrase that.

If I were to determine that they have made an adequate set of averments to allege -- which I know you vigorously deny -- that there is an undisclosed secret scripts activity going on out here, these flaws in the various claims for relief that we are reviewing wouldn't be applicable flaws. They wouldn't be a basis to dismiss.

Is that fair?

**MR. SANTACANA:** I think that for -- it depends. It's claim by claim, Your Honor.

**THE COURT:** Yeah.

**MR. SANTACANA:** So, I mean --

**THE COURT:** What I guess I'm saying is that in each of these claims, if one were to assume that they have adequately averred the secret script aspect of the complaint, would -- would there be still a basis to dismiss these claims?

**MR. SANTACANA:** I mean, I think that part of the problem is that the complaint is very unclear about the app developers' role in this. So there's a paragraph that says the app developers were coerced, but the plaintiffs have dropped that argument from the briefing. And I think for good reason, because there's not really any argument to say that. And so which flavor of secret scripts I think is going to determine how Your Honor would write the order.

And it is important to us because again, as I said, the

scope of the case is very unclear to Google. Other than Google Analytics, we don't know what to investigate. And, and so the way that such an order would be written would be very important to us. Because we think this case could be eliminated in an expeditious way, if that was the basis of a denial.

**THE COURT:** Okay. Go ahead. So we're -- we're still on the -- the acts -- abuse -- computer abuse law. But I don't know if there is anything more you wanted to say on that.

**MR. SANTACANA:** The only other piece on that law, Your Honor, is that again, in *Williams*, you applied Rule 9(b) for allegations about CDAFA. And I think that's exactly the right analysis to use here.

I don't have anything to add on our -- on our briefing about the UCL. I think it's clear under the case law, and there is a very large number of cases. But the most recent would be the Consumer Privacy User Profile Litigation before Judge Chhabria, that this does not qualify as lost money or property because the plaintiffs didn't lose anything.

And so whatever may be said about other claims, Prop 64 narrowed the scope of people who can sue under this, and it just doesn't include these plaintiffs.

**THE COURT:** How about invasion of privacy and intrusion on seclusion?

**MR. SANTACANA:** So I think what's -- the interaction

between the tort claims and the statutory claims is an interesting one. The *Smith versus Facebook* case sort of got into that question. And I think a number of cases since it have held that the bar on intrusion upon seclusion is higher. It's significantly higher than just the plain question of whether there was express consent.

There needs to be a question about whether the behavior was egregious, and breaches social norms. And we don't think that's been done here.

There's also a big problem with the plaintiffs' personal allegations. In the entire complaint, we have very few allegations about the plaintiffs, themselves. Which apps were they using that they believe contained particularly private information. They list every app on their phone. But they don't necessarily say much about what it is that gave rise to a reasonable expectation of privacy, and what it is they believe Google has done to violate it.

And as I've said, the factual allegations are that Google has anonymized this data, unless there's consent for it to be personalized.

Other than that, Your Honor, I don't have anything to add on that claim.

**THE COURT:** Let me ask you just, on a definitional issue, when you refer to a "Google account," people having a Google account, what is that? I mean, I'm not sure I know how

that's defined.

**MR. SANTACANA:** So a Google account is -- is typically created at Google.com. There are some organizations in schools and public entities that also have Google accounts for their employees. But there's an account creation process at Google.com, and it involves assigning an email address and making certain disclosures. And then after that, that account is active.

Those disclosures, of course, include agreeing to a number of different terms of use, and learning about Google's privacy policies.

**THE COURT:** But presumably someone who's using the *New York Times* app or one of the other apps that are discussed in the complaint -- and I recognize one of your arguments is all those apps are free apps, and you think that implicates the -- various of the claims, UCL and others. That's not a Google account.

Even if the app has used Firebase and developed its app and all the rest, and may have some internal -- you know, the app, itself, may internally connect up to, say, Google Maps or something like that, the user of the app you don't deem to have a Google account.

Correct? Is that correct?

**MR. SANTACANA:** So if I'm following your question, the user of the app may have a Google account or may not.

**THE COURT:** Right.

**MR. SANTACANA:** They are not required to have one.

**THE COURT:** Right, understood.

**MR. SANTACANA:** Yeah. Okay.

**THE COURT:** If they do, it's not because they have that app. It's because they have a separate free-standing, if you will, Google account.

**MR. SANTACANA:** That's correct. And so that example of Maps being embedded in an app, like the Lyft app, for example, --

**THE COURT:** Yep.

**MR. SANTACANA:** -- the Web & App Activity log will show activities from that maps, from those maps searches. But it's not showing this anonymized scrubbed data about who's reading -- you know, how many people are reading *New York Times*'s articles.

So that -- I mean, that also gets to this other problem, which is that the plaintiffs could verify for themselves, if we're talking about pleading standards, this is something they could have verified for themselves what was and wasn't being saved by Web & App Activity. But there's literally no allegations in the complaint about what was in there.

There's no allegations about them visiting the log and saying: Oh, when I had it on, I saw Google Analytics data, and then when I turned it off I still saw it. Or: I turned it off

and I didn't see it, but for this reason I believe you're still getting it.

So I think that's -- that's the problem that we have. But in any case, to answer your question directly, Web & App Activity is a setting that is only available to Google users.

Google Analytics for Firebase analyzes all of the traffic on an app on behalf of an app developer, whether that's an Apple user or a Google user or neither.

**THE COURT:** Okay. Okay. On the plaintiffs' side, I want -- the first question I want answered -- so I don't care which of you wants to answer it -- is to get to this question of what exactly the gravamen of this complaint is.

Is it -- is it about this secret script notion? And if so I want you to point me to where I can look to determine if it's an adequate set of averments. Or is it something different, or is it both?

What's -- what's the focus of this complaint?

**MS. BONN:** Thank you, Your Honor. My name is Amanda Bonn, and I'll be addressing that argument. I'm going to share my screen briefly to walk through where in the complaint we think we make this very clear.

(Document displayed)

**MS. BONN:** Number one, if you just look at our complaint, there are 105 references to the Firebase SDK scripts, which are what our complaint is focused on.

There are about 16 references to Google Analytics or Google Analytics for Firebase, which is simply one service in a sweep of services.

**THE COURT:** Can I stop you?

**MS. BONN:** Yes.

**THE COURT:** My question was quite simple. This is all nice.

But what I want to know is: Is the premise of your complaint that there is a set of secret scripts activity that is going on for Google's benefit that nobody knows about, or not?

This is all fine and nice. But just answer that question for me.

**MS. BONN:** Yes, Your Honor. The answer to the question is yes.

**THE COURT:** Okay.

**MS. BONN:** And here's where in the complaint we have specific allegations that talk about it.

(Document displayed)

**MS. BONN:** So number one, if you look at Paragraphs 52 to 55, we explain in detail how the Google Firebase SDK script causes user's device to send dozens of events which describe their interaction with third-party apps, including numerous parameters for each event -- and we give specific examples of what the events are, and what the parameters are

that are sent to Google -- even when users have toggled off the Web & App Activity. So that's where the secrecy is really an issue.

**THE COURT:** Wait a minute. There's traffic between -- through the Firebase, between Google and the app developers. That's hardly -- that's hardly a revolutionary concept.

(Documents displayed)

**THE COURT:** So, where are the averments about Google taking this material, unbeknownst to everyone, and using it for its own purposes? Where is that?

**MS. BONN:** Yes, Your Honor. So among other things, in Paragraphs 52 through 55, we talk about how Google directs the user's device to send a duplicate copy of this information to Google.

And in Paragraph 118, we talk about how Google combines that information with additional information. Number one, device identifiers that are unique to the user's phone. Number two, persistent identifiers, such as what's called the "X-Client Data Header." And number three, geolocation data.

And what's important here --

**THE COURT:** How to do we know that that is anything but the -- the traffic between the -- the app developer and Google, to advise the app developer of the traffic for the app to the app developer's site and all of that?

Where is this secret use by Google of this material?

**MS. BONN:** In Paragraph 118, Your Honor, we talk specifically about how Google uses that information in order to target users with targeted advertisement.

So it's not merely as part of a service that Google is providing to the app, but Google is using that information, itself, to enrich a user profile and target the user with advertising. And they do that, even when the Web & App Activity button is turned off.

(Documents displayed)

**MS. BONN:** And Your Honor, I think what that kind of brings us to is the core of Google's arguments is about: What does it mean to turn the Web & App Activity button off? Is that enough to override what Google describes as other forms of disclosures they have made about Google Analytics?

And so what I'd like to do briefly, if I may, is walk through our allegations in the complaint that specifically show why users understood that if they turned the Web & App Activity button off, it would stop Google from collecting that information.

(Documents displayed)

**MS. BONN:** So number one --

**THE COURT:** But again, this is where it gets completely garbled as to what you're averring.

This activity could be vis-à-vis the app developer and

what the ultimate user thinks they are doing. And you may be alleging that -- and then, if it's that -- your contention is that the ultimate user thinks through turning off Web & App Activity, that they have stopped the flow and use of the information, and then Google comes back and gives me all sorts of the aspects of the agreements and the privacy policy, and the like. That's one set of issues.

The other set of issues is: Is there meat to the bones of the idea that the information is -- not -- not that it's being analyzed by the web developer contrary to the user turning off Web & App Activity, but is it being used for this nefarious -- according to you -- undisclosed use by Google?

And you -- you keep merging the two things together. And I can't follow which one is which. Because one has a whole different set of possible arguments with respect to the privacy policy and the like. The other, if you are -- if you have adequately alleged it, sort of completely renders the consent issue no longer of concern for you, in a sense. Because, you know, your contention is they're doing something that they're absolutely not entitled to do.

But the problem is that there -- I can never tell in this complaint which thing you're -- which thing you're complaining about.

**MS. BONN:** And Your Honor, I think our point is it's really both. And let me explain what that means. So number

one --

**THE COURT:** Well, let me then tell you if it's both, then you've got to redo this complaint. Because I cannot fathom, this complaint, which thing at any one time you're talking about.

Are you talking about, you know, turning off Web & App Activity by the ultimate consumer, who you then contend is -- you've got a viable claim because they -- they are being defrauded into thinking that their information is not being used. And we're going to get all sorts of defenses from Google about: No, no, that's perfectly appropriate, look at this policy, look at this policy, it's all fine. So that's one set of issues.

But it's not the same -- if your contention is that there's secret activity going on, it's very different. And you need to -- you need to set these things apart. Because otherwise, at any one moment in this complaint, I don't know which thing you're talking about, is the bottom line.

**MS. BONN:** Understood, Your Honor. And I do think our -- our class definition is specifically limited to users who turned off the Web & App Activity button. So our class definition is limited in that sense. It's not just everybody who --

**THE COURT:** Yes, but the consequences of doing that will be very different under the different scenarios,

potentially, that you are averring.

If the -- the act of turning off and what the ultimate consumer thinks that has accomplished is very different, depending upon which road you're taking. It may be that you have claims under both roads. I'm not saying you don't.

But you -- you -- you can't leave it for me to guess which thing you're talking about at any one time because they may have very different analytical scenarios, is my point.

**MS. BONN:** Understood, Your Honor. And to sort of address what you've just said, I think our view is we do have claims under both scenarios for this reason.

So -- you know, number one, because these users specifically turned off the Web & App Activity --

(Document displayed)

**MS. BONN:** And this is an image that's copied from our complaint.

Users essentially toggle this Web & App Activity button. And what does it say, you know, on their phone as they're doing that is the effect.

(Document displayed)

**MS. BONN:** What it says is: What's saved as Web & App Activity is info about your browsing on apps that use Google services. And it says: To let Google save this information, Web & App Activity must be on.

So these users that are, you know, our class definition

are people who made the election, seeing these disclosures, to specifically turn that button off. Denying consent.

(Document displayed)

**MS. BONN:** And even for users who didn't have an Android device, which is where this screen shows up for other users who wanted to turn off their Web & App Activity, here's what they would see.

(Document displayed)

**MS. BONN:** So Google's privacy policy tells them: Across our services, you can control what we collect. "Services" means products that are integrated into third-party apps. It tells them how to do that.

(Documents displayed)

**MS. BONN:** It says: Use the My Activity screen which allows you to control the data.

And that brings them to this, --

(Document displayed)

**MS. BONN:** -- which is, again, copied from our complaint. And likewise, it tells them: We can save info about your browsing on apps that use Google services. But to let Google save this information, Web & App Activity must be on.

So our allegation is these users that our class is limited to specifically elected to turn the Web & App Activity button off, and Google is telling these users through uniform

disclosures that their browsing activity on apps is not going to be saved, as a consequence of that.

(Document displayed)

**MS. BONN:** So that's our core allegation. Now, separate and apart from that, I think -- I think, if I understand Your Honor's point, there may be, frankly, a broader and more fundamental violation here, which is that Google just simply doesn't adequately disclose to people that it has this embedded Firebase SDK script, and that that script is going to direct their device to send all kinds of information to Google. Not only to help Google, you know, act as an agent for the app, but rather, for Google to enrich its own user profile data for its own advertising purposes.

And that, frankly, is, I think, a broader and even more fundamental problem with Google's argument that there's consent. Because none of the --

**THE COURT:** Well, yes. But just the way you've phrased that maybe this is going on. You've got to do more than: Maybe this is going to on. Is that what you're contending or not? And if it is what you're contending, what's your basis for contending it?

And while I pushed back, you know, with your counterpart, it is correct that it is not very well spelled out what the basis for your conclusion that this -- this activity may be going on. I mean, you're saying it does, but you're not giving

me a whole lot of basis to conclude that you -- you have facts to support it.

**MS. BONN:** Yeah. And I think, Your Honor, number one -- and this is part of what I think opposing counsel was saying -- in part, there are disclosures that Google has made in various forms of documentation to app developers that show -- and that's part of what we quote in Paragraph 52 to 55 -- exactly the type of data that they're collecting.

And Your Honor's question is, you know: Do we have specific additional allegations that we might add to show the second piece, which is Google is using that data for the purpose of targeted advertising? And I think our view is we have had an expert who's analyzed this; we do think that we have specific evidence that that is what they're using the data for.

So if Your Honor said: I want to see additional allegations; how do you know they are using this information to enrich their profile and do targeted advertising, I think that that's something that we can add more detail on, if Your Honor thinks that that is something that we need to do. And we absolutely can.

So, you know, I think that's -- that's really what it comes down to. We do allege --

**THE COURT:** Because some of these averments that you're even pointing to, 52 through 55 and some of the other

ones, if you assume for a moment that Google could -- can respond to those by saying: Oh, this is covered by the -- the privacy policy and the degree of consent that users give, then the simple fact of this collection of information may -- may be non-actionable.

All you're saying to me in these averments right now is this -- I use the term "traffic" -- this traffic is going on. Not -- you know. And if Google is correct, they'd say: It's perfectly appropriate. We can get this information so that we can assist our app developers in --

(Documents displayed)

**THE COURT:** You know, giving them understanding of how their sites are being used and the like. So that's why it's important. You know, these averments beg the question, to some extent.

**MS. BONN:** Understood, Your Honor. And I think on that issue, to the extent Your Honor thinks there's more detail we could allege on use, completely understood. And I think we can get there.

To go to the point Your Honor just made, I think our position is and we think Google's own documents show that even in the various documents that Google attempted to put into the record that are outside the complaint, those documents, too, show that even when they made various disclosures about Google Analytics to users and to apps, they also represented that that

could be overridden through the Web & App Activity button, which is what's really at the core of our complaint.

(Document displayed)

**MS. BONN:** And so for example, Google put into the record as their motion-to-dismiss Exhibit 2-A, the Google Analytics for Firebase Use Policy. And if Your Honor looks at it, there's a section that says:

"How App Users can opt-out of the Google Analytics for Firebase features you use, including through applicable device settings..."

So again, even this disclosure that Google points to about Analytics says: Hey, but users are allowed to opt out of it.

This is the Google Analytics for Firebase terms of service.

(Document displayed)

**MS. BONN:** And Google points out: Hey, we require the apps to explain to users about what our services are, and that they're consenting to our services.

What they do is they say: And you could do that, apps, by pointing to this website of ours, how we use information from the sites and apps that use our services.

(Document displayed)

**MS. BONN:** Google showed Your Honor a portion of what that site says. But what they didn't show Your Honor is that elsewhere in that same policy, it once again says how you can

control the information that's collected by Google on these sites and apps through your "My Activity" screen.

It says: My Activity allows you to review and control the data that's created when you use Google Services.

What's My Activity?

(Document displayed)

**MS. BONN:** It's this Web & App Activity button.

So even in Google's own documents about their disclosures to the apps, they are telling the apps that users can opt out of the Google Analytics feature connected to Firebase through the Web & App Activity button. And yet, our allegation is Google continues to collect the data, regardless. And I don't think, frankly, they disagree with that.

(Document displayed)

**MS. BONN:** This is yet another example. Google put this into the record as their Reply Exhibit A. And this is a document about a different feature of Firebase SDK called App Indexing.

And in this document, too -- if you look at the little blue box in the upper left that's part of the document, it says (As read):

"By default, action data is uploaded to Google servers with the user's consent. (Learn more about user consent)."

And if you click on it again, it takes you to Web & App

Activity. So Google is saying: Look, Firebase SDK by default may send us this data, but users can opt out by turning off the Web & App Activity button.

(Document displayed)

**MS. BONN:** This is another document Google put into the record. It's an article that they published to -- they direct to site and app owners using Google Analytics. They say it's a useful resources.

And again, they say that Google privacy policy and principles describes how we treat personal information when you use Google's services.

Well once again, the privacy policy says that users can control the data --

(Document displayed)

**MS. BONN:** -- through My Activity, which is the Web & App Activity button.

So, part of our argument, Your Honor, I think is even in Google's own documents and their best-case scenario which is, you know, narrowing the complaint only to Google Analytics for Firebase despite all of the broader allegations about Firebase SDK as a whole, but even living in Google's universe, the very documents that they have put in the record and cited to the Court demonstrate that Google's position is that users can opt out of this with the Web & App Activity switch.

And yet, what they're now saying to the Court is:

Regardless of what the user does with that switch, you know, we're still collecting the data, and they should have known that. That's really the core of their argument. And that's -- and that's, frankly, what we think is unsupported by the very documents that they have put into the record.

And I think for that reason, that's why --

(Document displayed)

**MS. BONN:** -- what we think Google's really doing here in their briefing is trying to sort of twist the complaint into something different. They, number one, want to say it's only about Google Analytics, not Firebase SDK. But, you know --

(Document displayed)

**MS. BONN:** -- we give just a few examples here. But overwhelming, we talk about Firebase SDK as a whole. Paragraph 6, Paragraph 11. Here's Paragraph 52 that gives specific examples of the kind of information --

(Document displayed)

**MS. BONN:** -- that Firebase SDK copies and transmits and sends to Google.

Paragraph 64. The secret scripts.

(Document displayed)

**MS. BONN:** And part of why we think Google is so focused on trying to narrow the case to Google Analytics is they like some of these general disclosures that they make

about Google Analytics. But what they don't like is the fact that the very same documents describe Google Analytics as a service, and say users can opt out.

(Document displayed)

**MS. BONN:** So Google, in their reply brief, kind of changed their mind. And they say: Well, Google Analytics isn't an embedded Google service at all. So all those disclosures you like about turning off Web & App Activity affecting our services, it doesn't apply.

And that's completely inconsistent with Google's opening brief, their internal documents, and positions they have taken in three other cases that are currently pending before other judges on this Court.

So number one, in their privacy policy, it defines "services" to include: Products that are integrated into third-party apps.

(Document displayed)

**MS. BONN:** And in the Google Analytics for Firebase terms of service which Google put into the record, they specifically say that Firebase SDK is the software development kit which is incorporated in an app.

(Document displayed)

**MS. BONN:** In Google's opening brief in this case on this very motion, they described Google Analytics for Firebase and Google's Firebase Service. So they said in their opening

brief it's a service. In their reply brief, they said it's not a service.

(Document displayed)

**MS. BONN:** In the *Brown* case before Judge Koh, Google put in one of their briefs that its privacy policies apply to all of the services offered by Google Inc., and services offered on other sites, e.g. Google Analytics.

(Document displayed)

**MS. BONN:** In the *Calhoun* case also pending before Judge Koh, just two weeks ago, Google said in oral argument the privacy policy expressly describes the type of data collected by Google's third party services, including Google Analytics.

(Document displayed)

**MS. BONN:** In *McCoy*, which is currently pending before Judge van Keulen, they put in a brief that touted the Web & App Activity button, as controlling what is collected through these third-party apps, and they attached the Web & App Activity disclosure that's at issue in our case.

(Document displayed)

**MS. BONN:** And then, Google is contradicting its own exhibits in this case. So in their Reply Exhibit A, they specifically point out that this disclosure to apps about app indexing points to the fact that users can override Google's collection of data through Firebase SDK, through the Web & App

Activity button.

(Document displayed)

**MS. BONN:** So frankly, I think our view is that Google is tying itself in knots, making tortured arguments to say number one, the complaint is only Google Analytics. Sometimes Google Analytics is a service, other times it's not.

And the fact that they have to engage in such -- what I can only say is tortured readings of documents, and sort of twisting themselves in knots compared to what they've said in other cases, I think demonstrates the fact that consent is far from clear here. In fact, it's quite the opposite.

And at the end of the day, I think the fundamental problem with their argument is they're basically saying the Web & App Activity switch is meaningless. What they're saying is that all of these disclosures on Web & App Activity are about what Google stores in someone's Google account. So when you log in to Google.com, what you see.

And then here, they say in their motion that these disclosures don't apply to what they call an entirely separate practice. Collection of third-party app data.

(Document displayed)

**MS. BONN:** And so what they're really saying is when you turn off the Web & App Activity button, all you're really doing is preventing yourself, when you log in, from seeing that this is the data we have about you. But you're not

actually doing anything to stop Google from collecting the data, and keeping it, and using it for our own advertising purposes. We're just not going to link it formally with your My Account.

But Your Honor, you know, they use the term "anonymized." They said that: Oh, well, this data is anonymized. And that is contrary to our complaint's allegations. We allege that this data is far from anonymized, because they not only collect the app activity, but they collect a unique device identifier.

So it identifies not just: Oh, you're using a cellphone, but the specific device that you're using. They collect geolocation data. And then they collect other unique identifiers, including the X-Client Data Header.

So for instance -- and this is just a hypothetical. But if I used my iPhone, and used a variety of apps that had this embedded Firebase SDK, Google is collecting data, under our complaint's allegations, about My Activity on those apps, my geolocation data, so the fact that maybe at other times I'm going to Susman Godfrey's Century City office every day at a certain time. And that information is identifiable. And they do use it for targeted advertising. Whether it's linked in your, quote, My Account that you can actually see or not.

So that's really, I think, the core of our argument, the core of our consent argument, which is really at the heart of the wiretap and CIPA claims.

The other point I wanted to mention briefly on CIPA, because it is a two-party consent statute, so I think it's an even tougher burden for Google to meet. They haven't met it. They do allege a couple of things.

They allege, number one, that these aren't confidential communications. And they cite some other cases that, you know, talk about the fact that sometimes when it comes to internet browsing, it's not really confidential.

Here, our allegation is that it is, because these users specifically went to the trouble of switching off the Web & App Activity button. They expressed that view that it would be turned off. And Google's own privacy policy and other documents told the users if they did that, Google would not save this data. And yet, they did it anyway.

Number two, you know, they do make this argument that just came up about the idea that somehow Google is not the right defendant, they're not the right agent here. But we allege that the script that's sending this data to Google is Firebase SDK. That's a creation of Google's.

And as we kind of walked through those documents, even though perhaps Google talks to the fact that in general, this data might be sent to them, what they don't disclose, and in fact they make contrary disclosures, is the idea that that happens even when the Web & App Activity button is off. They don't disclose to apps or users that users actually can't opt

out of this. And in fact, they tell the apps and the users precisely the contrary.

So unless Your Honor has other questions for me --

**THE COURT:** Well, let me ask you. You showed me various documents that Google had -- had included in their briefing. And I take it by pointing me to those and showing me that material -- do you have any problem with my considering it on motions to dismiss?

**MS. BONN:** I think our point, Your Honor, is number one, it's probably improper. A lot of it isn't really what's in our complaint. So frankly, I think the --

**THE COURT:** Well, that's my question. It may be arguably improper, but you've joined the debate on those, and haven't -- so I need to know --

**MS. BONN:** Well, I would never want to be accused of abandoning an argument, Your Honor. So I think our point is number one, it's not proper; it's improper. And what should be the focus is what's in our complaints.

But to the extent --

**THE COURT:** Just to alert you, I think you have abandoned the argument, by using the materials. I mean, I would have heard the argument that you can't consider this material. But once you embrace it and use it in an affirmative fashion to convince me that it supports your position, you've waived the argument. In my view. So, you

can't have it both ways.

And, you know, I just want to alert you to the fact that I, right now, even though I think there may have been arguments that -- on both sides -- materials that have been presented to me are not properly considered on this motion, I think nobody has perfected those objections. And so I'm going to consider the materials that were submitted to me. Even though I think you might have -- both sides might have had an argument with respect to the other side's materials. But, you appear to have abandoned it, wittingly or unwittingly.

So, okay. Very good. I don't think I need to have further discussion on each claim for relief. It's fully briefed, and I've reviewed the briefs. And we don't need to go through it all again.

Let me go back to Mr. Santacana. And as the moving party, you can respond to what Ms. Bonn has reviewed.

**MR. SANTACANA:** Sure. Thank you for the opportunity, Your Honor. I would like to start with this issue of secret scripts. So again, as Your Honor noted, we see some merging in the difference between the scripts that are publicly disclosed and the allegation that there may be a secret script, separate and apart.

Now, the reason the plaintiffs haven't alleged any facts to support the claim that there are secret scripts is because they don't have any. There would -- if you were to give them

leave to amend, they're not going to allege additional facts. There's no evidence that this happens. This case wasn't born from the disclosure of previously-unknown facts. You don't see any of that in this complaint. It's just a bare assertion made by the plaintiffs.

Now, I heard --

**THE COURT:** Well, Ms. Bonn did suggest that they do have --

**MR. SANTACANA:** She did.

**THE COURT:** Alluded to expert information. I'm not sure what form it takes. But on the question of whether or not they would have another crack at it, they have indicated that if I were to go down the path of saying that your motion should be granted, they want another crack at it.

And at this stage of the game, why shouldn't they get one?

**MR. SANTACANA:** Well, they have had two cracks at it, Your Honor. But this is the first time we've heard of this expert information. I don't know if that -- if that was done before or after the complaint was filed. But they filed a complaint; we moved to dismiss. Rather than oppose that motion, which made all the same arguments we're dealing with here, they amended it and doubled its size.

And yet, if I could point Your Honor to really the nub of their argument on secret scripts --

(Document displayed)

**MR. SANTACANA:** -- it is this slide of theirs. They're saying: This is it. If you want to open the complaint and see where I've alleged secret scripts, you look at these paragraphs.

Okay. Let's look at those paragraphs, then. That's I think exactly what we should all be doing. Because I think if you read them, you will see --

(Document displayed)

**MR. SANTACANA:** If you read them closely and parse them, everywhere where they mention -- you know, Ms. Bonn said: "Firebase SDK scripts" is such an important phrase in this case because that means I'm not talking about Google Analytics. And she points to 52 through 55.

Paragraph 52 is taken from --

**THE COURT:** Actually, actually, I think they're selling themselves short. I think there are more paragraphs in the complaint that do make the allegation.

Now, you will characterize them as conclusory, I understand that. But I don't think that slide was presented to me to say those are the only places they do it.

You know, for example, Paragraph 64 is a paragraph that -- I know your answer to me and you don't even have to say it is that that doesn't add anything; that's conclusory. But it is -- I mean, I don't think it's fair to say those are the only paragraphs in which this concept is -- is averred.

**MR. SANTACANA:** Honestly, Your Honor, I would urge you to ask that question of the plaintiffs: List for me the paragraphs where facts are alleged, not just conclusions, that there are secret scripts.

Because in our opening motion we said -- and in the motion that we filed on the first complaint, we said: Look. This is it. These two pages right here is basically all you say about the facts. And if you look at the footnotes, every single one is citing public documentation. So obviously this isn't about secrets.

They read Google's website, they learned how Google Analytics works. They put it on these two pages. And then they said: It's secret. That's not -- I mean, that's not enough to get past it. So we have to look somewhere else in the complaint.

And the only point I'm making is: Where? Where are we supposed to find the facts that say: I learned about this this way, or I read a news report about it, or I did an analysis of it? If they have an expert, let's hear it. We -- we have never heard of them having expert analysis before.

And this is part of the problem, Your Honor, that we've had in this case, is that every time they identify a product that is at issue, like Google Analytics, we point out that it's fully consented to and that we've done everything we need to do. So then what do they do, is they say: Well, but it's not

that, then. It's secret scripts.

They pointed out in one footnote in the complaint, app indexing. Okay? Well, now they're telling you that -- once they learned that app indexing actually is responsive to the Web & App Activity toggle, they're telling you: Oh, well, in that case, that helps my case, because it shows you're misleading people.

App indexing is a different product, Your Honor. It's not the same as Google Analytics, and it's not the same as any of the other 16.

So if they tell us what they're accusing, then we can have a litigation. What we can't have is for them to jump from one product to the next; every time they name one we show them it's fully consented to. And then they say: Well, then, in that case it's just -- it's a secret. I will tell you that I know it's a secret, but I won't tell you how I know.

The other, I think, critical piece of this secret scripts debate is that the plaintiffs haven't really pushed back on the question of Rule 9(b). You didn't hear Ms. Bonn mention that at all. And there isn't a convincing argument to say that you shouldn't apply Rule 9(b).

If the allegation is that Google is, behind the scenes, violating all of its contracts, all of its privacy policies, everything that it tells everybody about how this product works, let's get the who, what, when, where and why of what

they're alleging. Because --

**THE COURT:** Well, let's take invasion of privacy and intrusion on seclusion. Those aren't 9(b) claims for relief, are they?

**MR. SANTACANA:** Again, Your Honor, under the *Vess* case, Judge Fletcher distinguished three categories of claims. There's claims that have fraud as an essential element. Obviously, those are subject to 9(b). There's claims where there's a uniform course of fraud that is alleged to be underlying everything. And he said those -- that means the entire complaint is subject to 9(b).

We're -- I think that we could make that argument here. But we're just going for the third category, which is: There are specific averments in the complaints that allege fraudulent conduct. And those averments must be subject --

**THE COURT:** Is it your position that if they incorporate those averments into, say, an invasion-of-privacy claim, they've now found themselves in 9(b)?

I don't know if I think there's legal support for that notion.

**MR. SANTACANA:** That is precisely --

**THE COURT:** There may be all sorts of averments, some of which may allege some fraudulent conduct. But if the -- if the elements of the claim for relief don't require any showing of fraud, the fact that you may have incorporated some part of

your -- of your, you know, factual material may have some reference to fraud in it, doesn't mean you are in a 9(b) world.

**MR. SANTACANA:** With respect, Your Honor, I don't think that's correct. And I would encourage the Court to read the *Vess* case, because it discusses this exact issue. The plaintiffs made that exact argument. And Judge Fletcher, writing for the Court, said no.

**THE COURT:** Nobody respects Judge Fletcher more than me. But I will go back and look at the decision.

But I find it -- I'll tell you, just my reaction is I think if you just have a tort claim and you properly identify it as a tort claim, and within your complaint you're also alleging fraudulent conduct and you incorporate some of those averments in there, you would -- that would effectively mean -- if your reading of that case is right, and I'll go back and look at it -- that if you have a fraud claim at all in the case, everything then becomes a 9(b) pleading standard. Because we often have complaints --

**MR. SANTACANA:** No.

**THE COURT:** -- that have, you know, tort claims -- we have negligence in there with fraud. And you often will incorporate the same set of averments into both the claims. So it cannot be that if there's, you know, some fraud alleged in there, that everything is 9(b). It can't be.

**MR. SANTACANA:** Judge, you're absolutely right, and I want to make sure that I'm being as clear as I can be.

So in the *Vess* case, the way it's explained is that the Court must disregard the averments of fraud if they are inadequately alleged, and then evaluate the claim based on what's left. So, so, it's not -- you're right. It doesn't convert the entire case into a fraud case. Of course not.

What it means is that we must shield our eyes to inadequate conclusory assertions of fraud, and look only to the factual allegations in the complaint, and see if they suffice under Rule 8. Leaving aside these -- so that's -- okay.

**THE COURT:** If I'm looking at invasion of privacy and intrusion on seclusion, which is 4 and 5, and -- don't I look at that through, again, a Rule 8 lens? Because I would go back and go through the complaint, and see if there are sufficient plausible, factual -- you know, *Iqbal/Twombly* averments. And, and if there are, then those are viable claims.

I mean --

**MR. SANTACANA:** It depends on which -- which version -- I mean, really, the problem is we have for every claim, we have two claims. We have the Google Analytics for Firebase claim. On that one, I agree with you. That's a Rule 8 standard. They are saying this -- this program is not the way it should be.

**THE COURT:** Right.

**MR. SANTACANA:** On the secret scripts world, that's a 9(b) standard. And so for intrusion upon seclusion, if Your Honor were, for example --

**THE COURT:** Okay, I don't think we disagree. I understand your point.

**MR. SANTACANA:** Okay. Great. Okay.

**THE COURT:** And again, what sort of overarches a lot of this is -- is, at the very least, to get a clearer sense of what is being -- which of these are being alleged.

But, you know, to Ms. Bonn's point, she was quite clear in answer to my questions that -- she said: We're going -- we're doing both. We're doing both things.

**MR. SANTACANA:** I know they want to do both. That's why the briefing is the way that it is. But one of them is -- is completely conclusory, and the other one lacks merit on the documents that they, themselves, submitted to the Court.

On the conclusory piece, again, they want to do both. But, that's fine. Then tell us the who, what, when, where and why of it. They haven't done that. And every time you asked her: Show me what the who, what -- show me the allegation, she pointed to an allegation that is footnoted to public documentation. That's not a secret. That's Google Analytics for Firebase.

On the question of the merits of the Google Analytics

piece, --

(Document displayed)

**MR. SANTACANA:** -- these green slides, this is the privacy policy that the plaintiffs attached to their complaint. We are not -- we're not relying on a bunch of documents that are far afield of the complaint. The foundation of their claim is the privacy policy. These words are in their complaint.

And what they say is: Hey, when you are on other sites and apps, if they use Google Analytics, they're going to be sending us information about you. Click here to learn more about it.

Now, they allege that the plaintiffs are -- care a lot about privacy, that they read this privacy policy, and that they read the description of Web & App Activity, which is in no way as specific as this. And then they complain that: Well, the button where it says "Learn more," they complain you shouldn't rely on that document, because I didn't put in it my complaint.

But, it's incorporated into this privacy policy. And that's the document --

(Documents displayed)

**MR. SANTACANA:** You didn't hear one word from Ms. Bonn addressing this. That's the document that says: For Google Analytics, talk to the app in question. That is a specific instruction.

Nothing -- none of the general language in the Web & App Activity control that the plaintiffs are relying on should be held to overrule the specific instruction in a document the plaintiffs say they read.

(Documents displayed)

**MR. SANTACANA:** That, I think, is the biggest problem with their case. And then, the privacy policy discloses Google Analytics, many times.

I think Ms. Bonn said, herself, quote: There are disclosures showing the exact information they are collecting. That's true. We disclose it, I think, at least four times. It's here in the privacy policy.

(Document displayed)

**MR. SANTACANA:** Here, there's a link to that yellow page I was just showing you: How Google uses information from sites or apps that use our services. You can see that on the last page of their complaint.

Then you have -- sorry, I'll just skip to more green.

(Documents displayed)

**MR. SANTACANA:** You have -- well, I guess I don't have that slide. But there are two others that we point out in our briefing that, in the same privacy policy, talk about Google Analytics in particular.

Now, Ms. Bonn said: Okay, but you also told me Web & App Activity would help me control this. And she pointed, among

other things, --

(Documents displayed)

**MR. SANTACANA:** -- to this bullet point right here, this second bullet point, which she showed you, by itself. And she said: This is telling me how you can control the information collected by Google is by going to My Activity.

She didn't show you the other bullet points on this same, this yellow page that is linked directly from the question: What are you getting from third-party apps about me?

The third bullet -- again, specific over the general. The third bullet says: Websites and apps use Google Analytics. This is separate from Web & App Activity. It is not in the same category as Web & App Activity.

Also, the first bullet is about ad settings. Do you want us to target ads to you or not? Why don't you click here? That's not discussed in the complaint.

So I think this is the problem, is we -- we don't know how to defend the case, because we don't know what's at issue other than the specific disclosures that we've identified, which couldn't be more on point.

**THE COURT:** Could you respond to her point or suggestion that in the different cases that are pending in our district, Judge van Keulen, Judge Koh, me, that you are getting squirrely on what Google services constitute? And that if I go back and consult with my colleagues, I'm going to

find that there are -- and I alluded to this question, I asked you earlier, are you taking contrary positions.

**MR. SANTACANA:** You did.

**THE COURT:** So you can assume that I will go back and look. So, why, why is she wrong that -- her contention that you are taking inconsistent positions about what your services are?

**MR. SANTACANA:** Yeah. So, so, Your Honor, it's a two-part answer. First, on this question of what our services are. As I said at the beginning, the plaintiffs have taken a phrase from our reply brief, and twisted it into something it was never meant to be.

Obviously, Google Analytics for Firebase is a service that is provided to businesses. The purpose of our argument with respect to that word is simply to say that when a user is on the Web & App Activity portal, and they read this phrase about services -- and I'll just bring it back up so we're all looking at the same thing.

(Document displayed)

**MR. SANTACANA:** They read this phrase about services. That when they read this, the plaintiffs say they think this applies to everything Google does in the world. Including the anonymized and scrubbed data that Google is holding in trust for app developers like the *New York Times*.

And we're saying: Well, I suppose if all you do is read

the phrase "Google Services," maybe somebody, somewhere, could think that that's fair, subjectively. But a reasonable user under the reasonable-user standard isn't only going to read those two words. They're going to look at the privacy policy. They're going to look at the descriptions that Web & App Activity is given. And they're going to look at what Web & App Activity is actually doing. Because if they had it on, they could see exactly what was being saved. It didn't include Google Analytics for Firebase. And when they turned it off, it still doesn't include Google Analytics for Firebase.

And as a matter of fact, Your Honor, and I just want to be very clear about this. When Web & App Activity is turned off, Google does not target ads to users based on data collected via Google Analytics for Firebase. And if Your Honor were to give them an opportunity to amend their complaint, and if they were to allege that specifically, which they haven't, then I think, Your Honor, this case would be over very quickly. Because it would just be factually wrong.

But because they've avoided making those types of allegations, and instead, relied on secret scripts, now they are saying: All I have to do is tell you there's a conspiracy. I don't have to tell you anything else about it.

And of course, you know, everything else I went through is separate and apart from the consents that are given. Right? Web & App Activity, even if you turn it off, then you go --

then you go get the *New York Times* app, and the *New York Times* says: I'm using Google Analytics. You are opting into that by installing this app. If you don't like it, please don't install this app. Because I want to know which articles are popular.

I don't think there is any authority cited in the briefing that suggests that a user control could proactively revoke that consent given to an app in the future.

Going back to your -- the direct question on inconsistencies, though, there's nothing inconsistent about what Google's counsel is saying in these cases. And I'll just give you one example from their slides that they showed you.

And I will say Your Honor, I object strenuously to the excerpts that were made here from other litigation that Your Honor doesn't have a grounding in. And I do encourage you to check it out, yourself. Because what you'll see is far different from what you are seeing on these slides.

(Documents displayed)

**MR. SANTACANA:** But just as an example --

**THE COURT:** You're talking about the reference to the other cases in the district?

**MR. SANTACANA:** Yeah. These slides in the 30s and 40s.

**THE COURT:** Go ahead.

**MR. SANTACANA:** For example, here it says -- Ms. Bonn

says this contradicts what we've said in this case (As read):

"The privacy policy describes the type of data collected by Google's third party services Ad Manager and Google Analytics."

That's exactly what we're saying in this case. It does describe that. It describes it right here.

(Documents displayed)

**MR. SANTACANA:** It describes it right here. They're looking at the portion of the privacy policy that talks about the services Google provides to users. Maps, search bars, YouTube. Those are user services. This is the part of the privacy policy about third-party apps and sites.

So, how come the complaint doesn't talk about this?

Why are we focused on the word "services" rather than on the phrase "Google Analytics" which is used, I think, five times in the privacy policy, and then links to another page --

(Documents displayed)

**MR. SANTACANA:** -- which specifically tells you how to turn it off. That, I think, should be the question that plaintiffs need to answer, and I don't think they've answered that. I don't think they have ever even responded to that sentence I've just showed you that says: This is how you turn it off.

Every time you ask that question, instead what you get is: Well, but there are also secret scripts. They are also doing

it behind the scenes.

Lastly, Your Honor, I do want to say one more thing, and then I'll leave it there. The plaintiffs have this -- this category of argument that says that Google is technologically capable of merging data, and that means the data is not anonymous.

The *Low versus LinkedIn* case and the *Moreno versus San Francisco BART* case -- there's also the *iPhone Application* litigation case -- they all say the same thing. That that technological capability is not the same thing as actually doing it. And if you don't allege that it was actually done, then you are not in the world of liability.

And the reason this is important is because --

**THE COURT:** I thought that they were averring that it was actually done. That they were actually taking geographic information and other information, that they -- that you were retrieving that material.

**MR. SANTACANA:** So, well, let's look at that allegation. I think, again --

**THE COURT:** (Inaudible)

**MR. SANTACANA:** Sorry?

**THE COURT:** Go ahead.

**MR. SANTACANA:** Those -- well, I don't have it ready here. But those allegations are, each one of them, conclusory. And if Your Honor -- if the Court parses each one

of them, the paragraphs that they showed you, 118, what you'll see is there's no -- there are no facts alleged there. They're just alleging the conclusion: You -- you did this behind the scenes. But where are the facts that would nudge the possible to the plausible? Of course it's possible. Anything is possible. The question is: Is it plausible?

And just because they said it in one paragraph in a complaint or even in a hundred paragraphs in the complaint doesn't make it enough to get past the pleading stage. It's just -- it's not enough.

And so once you leave that aside, all they're left with is their secondary argument, which is: Well, it's not meaningfully anonymous, because you could combine it, and so give me a break. One arm of Google knows this, the other arm of Google knows that. That's not anonymous.

But what they're saying there is, first, completely at odds with the truth, completely at odds with the terms of service. But also, there's no basis to say under the case law, under *Low* and *Moreno* and *iPhone Application*, that that gives rise to liability. Because if Google is holding this information, anonymized, in trust, for the *New York Times*, and they have no competent allegation to suggest that it is merging that information without permission and unbeknownst to everyone, then if there's no competent allegation of that, then it's simply not enough to say: Well, my scrubbed information

is private to me. No, it's not. The law in this district is that it's not.

**THE COURT:** Okay, thank you.

Ms. Bonn, you can have two minutes, and then we're going to wrap it up.

**MS. BONN:** Thank Your Honor.

Very briefly, I think in Paragraph 118, we talk about why this isn't scrubbed. It's not anonymous data. It's combined by Google with unique device identifiers, geolocation data, and persistent identifiers.

So Google is arguing today: Oh, we scrubbed the data, we put in it a silo, we only use it for the apps. We don't use it for our own targeted advertising purposes. That is totally contrary to the allegations in our complaint, number one.

Number two -- and I'll go back to be certain after this hearing, and I can put it in the record. But I believe last week during a similar argument that we had before Judge Koh in the *Brown* case, Google's counsel specifically represented that when there are third-party sites that use Google Analytics, they don't just use the data to help the website analyze their activity. They use it for their own targeted advertising purposes. And that's what triggered Judge Koh into demanding a declaration from Google explaining what they do. So I think they're taking contrary positions on that very issue, simultaneously.

And finally, you know, we do cite the privacy policy specifically in our complaint. And, you know, we are not the ones who are making up some fanciful notion that Google Analytics is a service within the meaning of Google's privacy policy and their other disclosures.

(Document displayed)

**MS. BONN:** This is Google's privacy policy, cited in our complaint that says: Our services includes products that are integrated into third-party apps.

Now, Mr. Santacana said: Well, we're only talking about services for users, like search bars. Well, look what it says (As read):

"Products that are integrated into third-party apps and sites like ads..."

I respectfully submit, Your Honor, that Google's advertising is not a service offered to users. It is a service offered to those who purchase their advertising products.

So Google's own disclosures make clear that "services" doesn't mean "user services." It is any service that is integrated into a third-party app. Google's various documents describe Google Analytics for Firebase and Firebase as a Google service. That's the position Google has taken in numerous cases before this Court.

Thank you, Your Honor.

**THE COURT:** Thank you. Very helpful.

**MR. SANTACANA:** Your Honor, can I just say two very quick things? There's some new argument there.

**THE COURT:** All right.

**MR. SANTACANA:** So first, with respect to the *Brown* hearing, I just -- what I'd like to say, separate and aside from everything else Ms. Bonn said, the Google Analytics at issue in that case is not Google Analytics for Firebase. That case deals with websites. And so I'm not sure what she believes she heard, and I guess she'll go back and check. But it doesn't have anything to do with mobile apps using Google Analytics for Firebase.

Second, on this slide which she still has up, "like ads and embedded Google Maps," this is precisely our point, Your Honor. Ads are things that users interact with. Google Maps are things that users interact with. And in this section of the privacy policy, Google is saying: The things you interact with that are ours that are Google things that we're providing that you're interacting with, we track that stuff.

Then at the very end of the policy when you -- if click on the question: Where does my -- What happens to my activity on other sites and apps, if you go to that portion of the policy, that's where the specific disclosure is of how to do -- of how to opt out of this collection of information.

And again, I'll point out, the plaintiffs have never responded to that. That is far more specific than this one

phrase.

**THE COURT:** Okay. Thank you very much. Very helpful argument. I'll go back and review it. And we'll go from there. So, thank you very much.

**MS. BONN:** Thank you.

**MR. SANTACANA:** Thank Your Honor.

**THE COURT:** Bye-bye.

(Proceedings concluded)

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Monday, March 8, 2021