1   Mark C. Mao, CA Bar No. 236165
    Beko Reblitz-Richardson, CA Bar No. 238027
2   **BOIES SCHILLER FLEXNER LLP**
    44 Montgomery St., 41st Floor
3   San Francisco, CA 94104
4   Tel.: (415) 293-6800
    mmao@bsfllp.com
5   brichardson@bsfllp.com

6   Jesse Panuccio (admitted *pro hac vice*)
7   **BOIES SCHILLER FLEXNER LLP**
    1401 New York Ave, NW
8   Washington, DC 20005
    Tel.: (202) 237-2727
9   Fax: (202) 237-6131
    jpanuccio@bsfllp.com
10

11  Amanda K. Bonn, CA Bar No. 270891
    **SUSMAN GODFREY L.L.P**
12  1900 Avenue of the Stars, Suite 1400
    Los Angeles, CA 90067
13  Tel: (310) 789-3100
    Fax: (310) 789-3150
14  abonn@susmangodfrey.com

15  *Attorneys for Plaintiffs*

William Christopher Carmody
(admitted *pro hac vice*)
Shawn J. Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
Alexander Frawley (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas,
32nd Floor
New York, NY 10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

John A. Yanchunis (admitted *pro hac vice*)
Ryan J. McGee (admitted *pro hac vice*)
Michael F. Ram, CA Bar No. 104805
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com
mram@forthepeople.com

16                **UNITED STATES DISTRICT COURT**
17              **NORTHERN DISTRICT OF CALIFORNIA**

18  ANIBAL RODRIGUEZ, JULIEANNA
    MUNIZ, ELIZA CAMBAY, SAL                    Case No.: 3:20-cv-04688
19  CATALDO, EMIR GOENAGA, JULIAN
    SANTIAGO, HAROLD NYANJOM,                   **PLAINTIFFS' OPPOSITION TO**
20  KELLIE NYANJOM, and SUSAN LYNN              **GOOGLE'S MOTION TO DISMISS OR**
    HARVEY, individually and on behalf of all   **STRIKE PORTIONS OF THE SECOND**
21  others similarly situated,                  **AMENDED COMPLAINT**

22          Plaintiffs,                          The Honorable Richard Seeborg
                                                 Courtroom 3 – 17th Floor
23      vs.                                      Date: August 19, 2021
                                                 Time: 1:30 p.m.
24  GOOGLE LLC,
25
            Defendant.
26

27          **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

28

1

## **TABLE OF CONTENTS**

2    MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................1

3        I.    INTRODUCTION ..................................................................................................1

4        II.    FACTUAL BACKGROUND ...................................................................................2

5            A.    Google intercepts Plaintiffs' communications with third-party
             apps ..........................................................................................................2
6
            B.    Google promised users control over its collection of this app
7                 activity data ............................................................................................2

8            C.    This Court's denial in part of Google's Motion to Dismiss
                  Plaintiffs' First Amended Complaint, and Plaintiffs' subsequent
9                 amendment ...............................................................................................4

10   ARGUMENT .............................................................................................................................5

11       I.    Plaintiffs (Again) State a Claim Under CIPA Section 631 ...................................5

12            A.    Plaintiffs (again) plead that Google intercepted communications
                  in transit .................................................................................................5
13
            B.    Plaintiffs (again) plead that they did not consent .................................8
14
         II.    Plaintiffs State a Breach of Contract Claim .........................................................10
15
            A.    Google's contractual obligations are not limited to the Terms of
16                Service ....................................................................................................10

17            B.    Google breached a contractual obligation in Google's Privacy
                  Policy ......................................................................................................11
18
            C.    Google breached a contractual obligation in the WAA Materials
19                 ................................................................................................................14

20                1.    The WAA Materials are a standalone express contract.................15

21                2.    Alternatively, the WAA Materials form a standalone
                        implied contract ............................................................................16
22
                  3.    Alternatively, the WAA Materials are incorporated into
23                      the Privacy Policy and Terms of Service .....................................18

24       III.    Google's Motion to Strike Portions of Plaintiffs' Prayer for Relief
               Should Be Denied................................................................................................20
25
         IV.    Plaintiffs' Allegations About AdMob and Cloud Messaging Are
26               Sufficient .............................................................................................................23

27       V.    CONCLUSION ......................................................................................................25

28

i

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Allen v. Nextera Energy Operating Servs., LLC*,
5
    2012 WL 1918930 (N.D. Cal. May 25, 2012).........................................................................17

6

*Anderson v. Kimpton Hotel & Rest. Grp., LLC*,
    2019 WL 3753308 (N.D. Cal. Aug. 8, 2019).......................................................................25
7

8
*Ansanelli v. JP Morgan Chase Bank, N.A.*,
    2011 WL 1134451 (N.D. Cal. Mar. 28, 2011) ....................................................................16

9

*Ashcroft v. Iqbal*,
10
    556 U.S. 662 (2009) ......................................................................................................5, 23

11

*Bass v. Facebook, Inc.*,
    394 F. Supp. 3d 1024 (N.D. Cal. 2019)..............................................................................21
12

13
*Bassam v. Bank of Am.*,
    2015 WL 12697873 (C.D. Cal. Nov. 3, 2015) ...................................................................11

14

*Be In, Inc. v. Google Inc.*,
15
    2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ................................................................17, 18

16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................................5
17

18
*Berkla v. Corel Corp.*,
    302 F.3d 909 (9th Cir. 2002) ..............................................................................................18

19

*Block v. eBay, Inc.*,
20
    747 F.3d 1135 (9th Cir. 2014) ......................................................................................12, 13

21

*Brown v. Google LLC*,
    2021 WL 949372 (N.D. Cal. Mar. 12, 2021) .......................................................................9
22

23
*Bureerong v. Uvawas*,
    922 F. Supp. 1450 (C.D. Cal. 1996)...................................................................................21

24

*Cal. Spine & Neurosurgery Inst. v. United Healthcare Ins. Co.*,
25
    2019 WL 4450842 (N.D. Cal. Sept. 17, 2019)...................................................................25

26

*Calhoun v. Google LLC*,
    2021 WL 1056532 (N.D. Cal. Mar. 17, 2021) .............................................................*passim*

27

28

ii

1

2

*Coffen v. Home Depot U.S.A. Inc.*,
  2016 WL 4719273 (N.D. Cal. Sept. 9, 2016)........................................................17

3

*Darnaa, LLC v. Google LLC*,
  756 F. App'x 674 (9th Cir. 2018).........................................................................21

4

*Davis v. Facebook*,
  956 F.3d. 589 (9th Cir. 2020) ................................................................9, 13, 20

5

6

*Dunkel v. eBay Inc.*,
  2014 WL 1117886 (N.D. Cal. Mar. 19, 2014) ....................................................16

7

*Elan Microelectronics Corp. v. Apple, Inc.*,
  2009 WL 2972374 (N.D. Cal. Sept. 14, 2009) ....................................................25

8

9

*Fantasy Inc. v Fogerty*,
  984 F. 2d 1524 (9th Cir. 1993) ..........................................................................25

10

*Gonzalez v. Uber Techs, Inc.*,
  305 F. Supp. 3d 1078 (N.D. Cal. 2018).............................................................25

11

12

*Graham v. Noom, Inc.*,
  2021 WL 1312765 (N.D. Cal. Apr. 8, 2021)...................................................8, 9

13

14

*Hickcox-Huffman v. US Airways, Inc.*,
  2017 WL 4842021 (N.D. Cal. Oct. 26, 2017) ....................................................17

15

16

*Huynh v. Quora, Inc.*,
  2019 WL 11502875 (N.D. Cal. Dec. 19, 2019) ..................................................21

17

18

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
  402 F. Supp. 3d 767 (N.D. Cal. 2019)...............................................10, 11, 13, 19

19

20

*In re Google Assistant Privacy Litig.*,
  2021 WL 2711747 (N.D. Cal. July 1, 2021) ......................................................14

21

*In re Google Assistant Privacy Litig.*,
  457 F. Supp. 3d 797 (N.D. Cal. 2020)..........................................................20, 21

22

23

*In re Google Location History Litig.*,
  2021 WL 519380 (N.D. Cal. Jan. 25, 2021)..................................................12, 14

24

25

*In re Yahoo Mail Litig.*,
  7 F. Supp. 3d 1016 (N.D. Cal. 2014)..............................................................7, 22

26

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  313 F. Supp. 3d 1113 (N.D. Cal. 2018)..........................................................22, 23

27

28

iii

*In re Zoom Video Commc'ns Inc. Priv. Litig.*,
   2021 WL 930623 (N.D. Cal. Mar. 11, 2021) ........................................................17

*J. H. v. Cty. of San Mateo*,
   2021 WL 1516371 (N.D. Cal. Apr. 16, 2021) ......................................................21

*Lewis v. YouTube, LLC*,
   244 Cal. App. 4th 118 (2015).............................................................................21

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
   519 F.3d 1025 (9th Cir. 2008) ..............................................................................5

*Marchand v. Northrop Grumman Corp.*,
   2017 WL 2633132 (N.D. Cal. June 19, 2017).....................................................20

*McCoy v. Alphabet, Inc.*,
   2021 WL 405816 (N.D. Cal. Feb. 2, 2021) .........................................................14

*Mountain View Surgical Center. v. Cigna Health Corp.*,
   2015 WL 5456592 (C.D. Cal. Sept. 17, 2015) ....................................................18

*Ottolini v. Bank of Am.*,
   2011 WL 8583133 (N.D. Cal. Dec. 6, 2011) .......................................................17

*Pallen Martial Arts, LLC v. Shir Martial Arts, LLC*,
   2014 WL 2191378 (N.D. Cal. May 23, 2014).....................................................21

*Revitch v. New Moosejaw, LLC*,
   2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) .......................................................9

*Rodman v. Safeway Inc.*,
   125 F. Supp. 3d 922 (N.D. Cal. 2015)................................................................22

*Rodman v. Safeway, Inc.*,
   2011 WL 5241113 (N.D. Cal. Nov. 1, 2011) ......................................................12

*Rogers v. Ulrich*,
   52 Cal. App. 3d 894 (1975) ..................................................................................8

*ROTFL Prods., LLC v Gzebb*,
   2013 WL 1218111763 (N.D. Cal. Aug. 5, 2013) ................................................23

*Shaw v. Regents of Univ. of Cal.*,
   58 Cal. App. 4th 44 (1997)..................................................................................19

*Silicon Valley Self Direct, LLC v. Paychex, Inc.*,
   2015 WL 4452373 (N.D. Cal. July 20, 2015) .....................................................22

iv

*Smith v. LoanMe, Inc.*,
    11 Cal. 5th 183 (2021) ............................................................................................................ 9

*Steiner v. Thexton*,
    48 Cal. 4th 411 (Cal. 2010) ................................................................................................. 16

*Total Coverage, Inc. v. Cendant Settlement Servs. Group, Inc.*,
    252 F. App'x 123 (9th Cir. 2007) ......................................................................................... 18

*Warden v. Kahn*,
    99 Cal. App. 3d 805 (1979) ................................................................................................... 8

*Whittlestone, Inc. v. Handi-Craft Co.*,
    618 F.3d 970 (9th Cir. 2010) ................................................................................ 2, 20, 21, 25

*Williams v. Apple Inc.*,
    2021 WL 2186223 (N.D. Cal. May 28, 2021) ..................................................................... 11

*Wiskind v. JPMorgan Chase Bank, N.A.*,
    2015 WL 1798962 (N.D. Cal. Apr. 17, 2015) ..................................................................... 16

*Woods v. Google Inc.*,
    2011 WL 3501403 (N.D. Cal. Aug. 10, 2011) ..................................................................... 19

*Worldwide Media, Inc. v. Twitter, Inc.*,
    2018 WL 5304852 (N.D. Cal. Oct. 24, 2018) ..................................................................... 17

*Young v. Facebook, Inc.*,
    790 F. Supp. 2d 1110 (N.D. Cal. 2011) .............................................................................. 10

**Statutes**

Cal. Penal Code § 631 ....................................................................................................*passim*

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

## I.    INTRODUCTION

3      After this Court denied in part Google's motion to dismiss Plaintiffs' First Amended

4  Complaint (Dkt. 109), leaving intact a majority of Plaintiffs' claims—including Plaintiffs' CIPA

5  section 631 claim—Plaintiffs filed a Second Amended Complaint ("SAC", Dkt. 113), adding a

6  breach of contract claim and identifying two additional Google services at issue.  There is no basis

7  for Google's current motion to dismiss or strike, and it should be denied in its entirety.

8      First, Plaintiffs still plead the elements of a CIPA section 631 claim.  Google tries to

9  relitigate this Court's holding by mischaracterizing Plaintiffs' allegations, wrongly suggesting that

10  Plaintiffs' factual theory has changed.  Google is wrong.  As before, Plaintiffs unmistakably plead

11  that Google intercepts users' communications with third-party apps by simultaneously duplicating

12  and transmitting communications to Google without users' consent.  There is no basis for this

13  Court to revisit its prior holding.

14      Second, Plaintiffs state a valid breach of contract claim.  This new claim turns on the same

15  conduct and representations this Court considered when it denied Google's motion to dismiss the

16  majority of Plaintiffs' initial claims.  Google promised users "control" over Google's collection of

17  their app activity data, and Google invited users to exercise that "control" by toggling off Google's

18  Web & App Activity ("WAA") switch.  SAC ¶¶ 68-69.  According to Google, WAA "must be on"

19  for Google to "save" "[i]nfo[rmation] about [users'] browsing and other activity on . . . apps . . .

20  that use Google services."  SAC ¶¶ 71-72.  Relying on these Google statements, this Court held

21  that "Plaintiffs offer a cogent account of why they saw WAA as capable of turning off GA for

22  Firebase's collection of their third-party app data."  Dkt. 109 at 10.  Google's promises are

23  contractual because they were made in Google's Privacy Policy, which was incorporated into

24  Google's Terms of Service.  Google also made these promises in a separate Google webpage that

25  constitutes a standalone contract or is incorporated into the Privacy Policy.

26      Third, Google's Rule 12(f) motion to strike portions of Plaintiffs' requested relief is

27  foreclosed by basic Ninth Circuit law.  "Rule 12(f) does not authorize district courts to strike claims

28

1

1    for damages on the ground that such claims are precluded as a matter of law." *Whittlestone, Inc.*

2    *v. Handi-Craft Co.*, 618 F.3d 970, 974-75 (9th Cir. 2010).

3        Fourth, there is no basis to dismiss or strike Plaintiffs' additional allegations regarding

4    Google's data collection with Google's AdMob and Cloud Messaging.  As the Court stated, this

5    case is about a "Google technology that, when functioning as advertised in a given app,

6    contravenes the company's user-facing privacy representations." Dkt. 109 at 1.  The SAC merely

7    clarifies the scope of the relevant Google technologies.  They include, at a minimum, GA for

8    Firebase, AdMob, and Cloud Messaging.  Further discovery is needed to assess the full scope of

9    Google's impermissible app activity data collection.  In the meantime, there is no basis to dismiss

10   or strike any of these allegations.

11   **II.    FACTUAL BACKGROUND**

12       **A.    Google intercepts Plaintiffs' communications with third-party apps**

13       This case is about Google's interception and collection of highly personal data from

14   consumers' use of over a million software applications ("apps") on their mobile devices.  SAC ¶¶

15   10, 43-44.  Google intercepts communications between users, on the one hand, and third-party

16   (non-Google) app publishers, on the other hand, using software scripts (bits of code) that Google's

17   Firebase Software Development Kit ("SDK") embeds in apps that developers configure to access

18   Google services.  SAC ¶¶ 3, 44-59.  These services include at least GA for Firebase, Firebase

19   Cloud Messaging, and AdMob.  SAC ¶¶ 6-7, 44, 58, 245.  For these services, the Firebase SDK

20   scripts intercept, duplicate, and simultaneously transmit to Google data reflecting users'

21   communications with third-party apps, including communications that disclose content that users

22   are requesting an app to display.  SAC ¶¶ 49-58; Dkt. 109 at 4.

23       **B.    Google promised users control over its collection of this app activity data**

24       Plaintiffs are Google account holders who sought to exercise control over the data

25   generated by their interactions with apps using controls that Google claims to provide for that

26   purpose.  SAC ¶¶ 9-10, 202.  This data is very valuable to companies like Google.  SAC ¶¶ 8, 121-

27   22, 126.  But it may also reveal intensely private information, such as health information, sexual

28

1    interests, and political views that users like Plaintiffs do not want collected.  SAC ¶ 202.   To

2    induce such users to continue interacting with apps that use Google services, such as GA for

3    Firebase, Google promised users that they can stop Google from collecting information about those

4    interactions by switching off the WAA toggle.  SAC ¶¶ 1-2, 4, 243.

5         Google made this promise in its Privacy Policy.  "[A]cross [Google's] services, [users] can

6    adjust [their] privacy settings to control what [Google] collects and how [their] information is

7    used."  SAC ¶¶ 67-68.  To exercise this "control," Google specifically directed users to its "My

8    Activity" webpage—where the WAA toggle is located.  SAC ¶¶ 69-71.  "My Activity" is a feature

9    that "allows [users] to review and control data that's created when [they] use Google services,"

10   which Google defined to include "[p]roducts that are integrated into third-party apps" (e.g., GA

11   for Firebase).  *Id.*

12        Google made similar promises in a Google webpage called "See & control your Web &

13   App Activity."  SAC ¶ 71.  The Privacy Policy directed users to this webpage through a hyperlink

14   inviting users to "learn more here" about the "Web & App Activity control."  SAC Ex. A at 26.

15   On the "See & control" webpage, Google represented that WAA "must be on" to "let Google save"

16   "info about your browsing and other activity on . . . apps . . . that use Google services."  SAC ¶ 71.

17   Users with Android devices were also presented with the option to switch off WAA using their

18   devices' Settings menu.  SAC ¶ 72.  Google required Android manufacturers such as Samsung to

19   include the same language about WAA.  SAC ¶¶ 4, 61, 63 & n.18.

20        Based on these promises, Plaintiffs objectively believed that turning off WAA would

21   prevent Google from collecting their third-party app activity data.  SAC ¶ 76.  Yet Google, through

22   GA for Firebase and other services, continued intercepting users' communications with apps and

23   collecting this data regardless of whether WAA was switched off.  SAC ¶¶ 6, 58, 245.  Google

24   thereby overrode express controls offered to consumers, making Google's promise of "control"

25   just an illusion.  As Google now admits, *nothing* stops Google from collecting this data.  SAC ¶

26   10; Motion to Dismiss ("Mot."), Dkt. 115 at 1-2.

27

28                                           3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.     This Court's denial in part of Google's Motion to Dismiss Plaintiffs' First Amended Complaint, and Plaintiffs' subsequent amendment

Google previously moved to dismiss Plaintiffs' First Amended Complaint ("FAC").  Dkt. 62.  Plaintiffs' FAC (Dkt. 60) concerned the same data-collection practices and the same Google promises at issue in this Second Amended Complaint.  In ruling on Google's prior motion, this Court held that Google "'set an expectation' that it would not save plaintiffs' 'activity on . . . apps . . . that use Google services' unless plaintiffs turned WAA 'on.'"  Dkt. 109 at 16 (citations omitted).  This Court accordingly denied Google's motion as to the majority of Plaintiffs' claims, including section 631 of the California Invasion of Privacy Act ("CIPA").[1]

Plaintiffs' Second Amended Complaint ("SAC"), according to Google, concerns the "same" "factual allegations" as the FAC.  Mot. at 2.  That is mostly true.  The SAC clarifies which scripts are at issue, and focuses on how Google collects data from users' interactions with third-party apps created with Firebase SDK, notwithstanding Google's promises to users that switching off WAA prevents such data collection.  Limited discovery so far shows that the relevant services include at least GA for Firebase, Firebase Cloud Messaging, and AdMob.  SAC ¶¶ 6, 58, 245.  The SAC identifies the specific Firebase SDK scripts that report to such services, for example, by reference to Google's own documentation about the information those services report.  *See, e.g.*, *id.* ¶¶ 50–57.[2]  And Plaintiffs' new breach of contract claim relies on the same Google promises at issue in the First Amended Complaint.  SAC ¶¶ 236-49.

---

[1] Plaintiffs' Wiretap Act claim was dismissed on the ground that app developers consented to Google's collection of the data.  Dkt. 109 at 10.  And Plaintiffs' UCL claim was dismissed on the ground that Plaintiffs did not allege the requisite lost money or property for UCL standing.  Dkt. 109 at 17.

[2] Plaintiffs' FAC, perhaps inartfully, used the term "secret scripts" to denote that Google's Firebase SDK causes users' devices to send their app activity to Google without their permission or knowledge.  Based on the Court's ruling, the SAC omits the term "secret scripts" and instead explains with the requisite particularity how Google intercepts users' communications with third-party apps and collects their app activity data without their consent through, without limitation, GA for Firebase, Firebase Cloud Messaging, and AdMob.

4

1

2    **ARGUMENT**

3    A motion to dismiss must be denied if the complaint "state[s] a claim to relief that is

4    plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v.*

5    *Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

6    factual content that allows the court to draw the reasonable inference that the defendant is liable

7    for the misconduct alleged." *Id.* The court must "accept factual allegations in the complaint as

8    true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v.*

9    *St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

**I.    Plaintiffs (Again) State a Claim Under CIPA Section 631**

**A.    Plaintiffs (again) plead that Google intercepted communications in transit**

Section 631 of CIPA applies to "[a]ny person who, by means of any machine, instrument,

or contrivance, or in any other manner, . . . willfully and without the consent of all parties to the

communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents

or meaning of any message, report, or communication while the same is in transit or passing over

any wire, line, or cable, or is being sent from, or received at any place within this state . . . ." *See*

*also* Dkt. 109 at 13. This Court has already held that "Plaintiffs—as parties to communications

that were intentionally intercepted without their consent—state a viable § 631 basis for relief."

Dkt. 109 at 13.

Seeking to relitigate this claim, Google raises a factual dispute about how the interceptions

occur. According to Google, GA for Firebase does not "intercept" anything but rather

"subsequently uploads information to Google." Mot. at 18. Google tries to get around this Court's

holding by claiming that Plaintiffs have changed their theory about the "path of the alleged

communication." Mot. at 19. That is not true. Plaintiffs' theory has not changed.

Google's Motion characterizes the path as follows:

User Device → App Developer's Server → User Device → Duplication → Google.

Here is Plaintiffs' actual theory of the path, as alleged in *both* the FAC and SAC:

~~User Device → App Developer's Server →~~ User Device → Duplication → Google.

5

1  | *See* FAC ¶ 119 and SAC ¶ 120 (showing the below graphic).



As shown in the graphic, the communication between the user and the app (blue arrow) is intercepted while it is in transit, and the information is simultaneously sent to Google from the *device* (red arrow). *See also* SAC ¶¶ 3, 44, 46, 49, 50, 52, 55, 56, 118.

Google's principal basis for suggesting that Plaintiffs have changed their theory is an edit to paragraph 46 of the SAC. *See* Mot. at 18. Here is the edit:

"The Firebase SDK scripts cause the ~~apps~~ device to intercept these communications . . . ." This edit does not reflect a new theory. This edit clarifies that an app cannot communicate with an app server without going through the mobile device.[3] Paragraph 46 is consistent with the above graphic insofar as both allege that the intercepted communication is duplicated from the device to Google. *See also* FAC ¶ 11 ("The Class Period begins on the date Google first received data . . . *from the device* of a user who had turned off [WAA]." (emphasis added)); *see also* FAC ¶ 119 ("Google collects information from a mobile *device* . . . ." (emphasis added)). Plaintiffs' initial

---

[3] Surely Google does not dispute that a mobile app cannot request content from the application's app server without going through the mobile device.

1  Opposition brief made this nuance clear, too: "Google's embedded code ultimately causes the

2  user's *device, not the apps' servers*, to independently send the data to Google." Dkt. 71 at 21.[4]

3      Google also points out that Plaintiffs removed FAC ¶ 245, which alleged that the

4  "communications between Plaintiffs and Class members and apps were simultaneous to, but

5  separate from, the channel through which Google" intercepted them. This paragraph was part of

6  the Wiretap Act (Count I in the FAC), which was dismissed, and so this paragraph was deleted

7  along with the rest of the paragraphs in that count to make the SAC consistent with this Court's

8  Order. *See* Dkt. 112-5 (FAC-SAC redline). Plaintiffs could amend their complaint to add back

9  this allegation, which Google concedes "alleged simultaneous interception." Mot. at 19.

10      But doing so is unnecessary. Plaintiffs have squarely pled that the interceptions involve

11  simultaneous duplication and transmission to Google. *See* SAC ¶ 49 (alleging that "Google . . .

12  intercepts the app user's request for that content . . . and . . . *simultaneously* transmits the browsing

13  data to Google servers in California"); *see also id.* ¶¶ 46-58, 118-21. Google's Motion is grounded

14  entirely on a factual dispute that cannot be resolved at this stage. *See In re Yahoo Mail Litig.*, 7 F.

15  Supp. 3d 1016, 1036 (N.D. Cal. 2014) ("Yahoo moves to dismiss first on the grounds that § 631

16  only applies to communications intercepted 'in transit,' and that here the communications at issue

17  were not 'in transit' . . . because the emails were already on Yahoo's servers when Yahoo accessed

18  the emails. . . . The Court must defer resolution . . . until after discovery makes clear where and

19  how Yahoo's scanning technology intercepted the emails.").

20

21  ---

22  [4] Google similarly misrepresents Plaintiffs' allegations about the Google Mobile Service ("GMS") process. These allegations provide no basis to dismiss Plaintiffs' claim. Plaintiffs do not allege

23  that GMS involves a "separate transmission" that "occurs not while the original communication is in transit." Mot. at 18. Instead, Plaintiffs allege that GMS "concurrently aggregate[s] . . .

24  intercepted messages across all the apps using Firebase SDK, so that user identity can be easily tracked across the apps, and so that browsing activity can be immediately associated and correlated

25  for meaningful real-time context." SAC ¶ 54. In any event, Google's arguments about GMS only apply to Android devices, not iOS devices, the latter of which are an additional subclass. SAC ¶¶

26  54, 226. The absence of GMS on iOS devices underscores that GMS is not essential to Plaintiffs' allegations that GA for Firebase and other Google services simultaneously duplicate and transmit

27  to Google users' app activity data.

28                                        7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.     Plaintiffs (again) plead that they did not consent

Next, Google again distorts Plaintiffs' theory and misrepresents the Court's Order, suggesting that "Google's presence is known to the user" and that "[b]oth participants [i.e., the app and the user] know Google is transcribing the conversation for the app developer."  Mot. at 20-21.  Google relies on disclosures made by app developers regarding their use of the GA for Firebase service. Mot. at 20.  But these disclosures were presented to this Court on Google's prior motion to dismiss, and the Court only credited them with respect to Google's argument that app developers consented to Google's collection of the data.  Dkt. 109 at 10.  On the other hand, this Court credited Plaintiffs' understanding that the WAA disclosures "supersed[e] those app-specific disclosures." *Id.* at 8. And Plaintiffs "offer[ed] a cogent account of why they saw WAA as capable of turning off GA for Firebase's collection of their third-party app data." *Id.* at 10.  This Court therefore denied Google's motion to dismiss the CIPA section 631 claim.  *See id.* at 13 Google's cases are inapposite because they did not involve third parties.[5]

Google tries to evade Plaintiffs' allegations and the Court's Order by claiming that "the logging of user activity data by GA for Firebase on the user's device is not the issue," but it is "whether the recorded communication is sent not only to the app developer but also saved by Google for its own purposes."  Mot. at 22 (citing SAC ¶ 50).  Plaintiffs, however, allege that Google uses the intercepted data for its own purposes, including to generate profiles on users and direct targeted advertising to them. SAC ¶¶ 112-36.  *Graham v. Noom, Inc.*, 2021 WL 1312765, at *5 (N.D. Cal. Apr. 8, 2021), is inapposite because there were no allegations in that case that the third-party "used the [intercepted] data itself."  More importantly, *Noom* is distinguishable because the third-party there did not tell the plaintiffs that it would not save their data.   "[U]nder section 631(a), if a person secretly listens to another's conversation, the person is liable." *Noom,* 2021 WL 1312765, at *4.  Here, Google was a secret listener when WAA was switched off.

Google also takes the wrong lesson from *Noom*.  *Noom* does not hold that liability under

---

[5] *See Warden v. Kahn*, 99 Cal. App. 3d 805, 808-09 (1979) (attorney recorded and used telephone conversations between him and his client); *Rogers v. Ulrich*, 52 Cal. App. 3d 894, 898-99 (1975) (defendant recorded conversations between himself and plaintiff).

1    CIPA is predicated on the interception "serv[ing] no purpose at all for the primary participant to

2    the communication."  Mot. at 21.  Nor could *Noom*.  That holding would foreclose a CIPA claim

3    any time the interception is achieved by way of embedded code.  Yet, as Google acknowledges,

4    *Noom* discussed two other cases involving CIPA claims based on embedded code, just like this

5    case.  First, in *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *1 (N.D. Cal. Oct. 23, 2019),

6    the plaintiffs stated a CIPA section 631 claim based on allegations that a third-party service

7    provider "eavesdropped on [plaintiff's] communications with [the] Moosejaw [website] because

8    the code embedded into the Moosejaw.com pages functioned as a wiretap that redirected his

9    communications to [the service provider] while [the plaintiff] browsed the site."  The factual

10   allegations here are analogous, and the same outcome is (again) warranted.

11          This case is also analogous to *Davis v. Facebook*, 956 F.3d. 589 (9th Cir. 2020), which

12   *Noom* also discussed.  *Davis* was about Facebook code that caused the users' browsers to generate

13   copies of the user-website communications and transmit them to Facebook "through a separate,

14   but simultaneous channel in a manner undetectable by the user."  956 F.3d at 596, 608.  Here, what

15   Google is doing on users' devices mirrors what Facebook was doing on users' browsers.  Plaintiffs

16   here allege that the Firebase scripts cause their devices to duplicate and forward to Google's

17   servers communications intended only for the app servers, just like the *Davis* plaintiffs alleged that

18   Facebook code caused their browsers to duplicate and forward messages intended only for website

19   servers.  *Id.* at 607-608; *see also* SAC ¶¶ 46-59, 120; *Calhoun v. Google LLC*, 2021 WL 1056532,

20   at *8 (N.D. Cal. Mar. 17, 2021) (plaintiffs stated CIPA section 631 claim based on allegations that

21   embedded Google code copied user-website communications and directed them to Google

22   servers); *Brown v. Google LLC*, 2021 WL 949372, at *15 (N.D. Cal. Mar. 12, 2021) (same).

23   Finally, to the extent Google is arguing that it is a party to the intercepted communications, (Mot.

24   at 19), that argument fails under well-settled law.  *See Davis*, 956 F.3d at 608 ("Facebook is not

25   exempt from liability as a matter of law under the Wiretap Act or CIPA as a party to the

26

27

28

9

1    communication.").[6]

2    **II.      Plaintiffs State a Breach of Contract Claim**

3          "The elements for breach of contract under California law are: (i) the existence of a

4    contract; (ii) the plaintiff's performance or excuse for nonperformance of its side of the agreement;

5    (iii) the defendant's breach; and (iv) resulting damage to the plaintiff." *In re Facebook, Inc.,*

6    *Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 801 (N.D. Cal. 2019).  Google does not

7    deny that its relationship with Plaintiffs is governed by contract, nor contest Plaintiffs'

8    interpretation of many of the provisions comprising the claim.  Instead, Google argues that the

9    promises it made in its Privacy Policy and WAA Materials to induce Plaintiffs to use Google's

10   privacy controls and services are not really promises at all.

11          **A.      Google's contractual obligations are not limited to the Terms of Service**

12          Google first argues that Plaintiffs' claim should be dismissed because it does not rely on a

13   specific provision within the Google Terms of Service.  Mot. at 10.  This argument incorrectly

14   assumes that Google's Terms of Service is the only document that establishes Google's contractual

15   obligations.  But, as just one example, Google's Terms of Service expressly incorporates other

16   documents, including Google's Privacy Policy—through at least March 31, 2020.  *See* Santacana

17   Decl. Ex. 2 at 2 ("Google's *privacy policies* explain how we treat your personal data and protect

18   your privacy when you use our Services.  By using our Services, you agree that Google can use

19   such data in accordance with our privacy policies" (italics signifies hyperlink to Privacy Policy));

20   *id.* Ex. 3 at 2 (same).  In another pending case, Google recently confirmed that it "does not dispute

21   that the Privacy Policy was incorporated in the Terms of Service until March 31, 2020."  *Brown v.*

22   *Google*, No. 20-CV-03664-LHK Dkt. No. 208 at 8 n.8 (N.D. Cal. June 29, 2021).   When

23   convenient, Google even uses its Privacy Policy as a sword.  *E.g.*, *Calhoun*, 2021 WL 1056532, at

24   *8 ("Google contends that Plaintiffs 'consented to Google's [Terms of Service], which

25

26   ───────────────
     [6] Google correctly describes itself as a "third party."  Mot. at 19.  Regardless, the Supreme Court
27   of California recently clarified that all of CIPA's prohibitions apply to both participants and non-
     participants.  *See Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 192-93 (2021).

28                                                    10

1    incorporated Google's Privacy Policy.'  Google further argues that Google's Privacy Policy

2    disclosed the alleged data collection.").  This Court should reject Google's opportunistic reversal.

3         Google's cases are inapposite.  The plaintiff in *Young v. Facebook, Inc.*, 790 F. Supp. 2d

4    1110, 1117 (N.D. Cal. 2011), based her claim on Facebook's Statement of Rights and

5    Responsibilities ("SRR").  The plaintiff did not argue, and so the court did not consider, whether

6    Facebook breached an obligation in a document either incorporated into the SRR or that stood on

7    its own as an additional agreement.  *Bassam v. Bank of America*, 2015 WL 12697873, at *10 (C.D.

8    Cal. Nov. 3, 2015), is even further afield because the plaintiffs did not "specifically plead the terms

9    of the Agreement . . . [n]or . . . attach a copy of the Agreement to the complaint."

10        **B.    Google breached a contractual obligation in Google's Privacy Policy**

11        Plaintiffs state a contract claim based on Google's Privacy Policy, which is incorporated

12   into the Terms of Service.  The Privacy Policy has, since May 25, 2018,[7] promised users control

13   over the data that Google collects from users' third-party app activity.

- "[A]cross *our services*, you can adjust your privacy settings to *control what we collect* and how your information is used."
- "*Our services* include . . . [p]roducts that are integrated into third-party apps and sites, like ads . . . ."
- "My Activity allows you to review and *control data that's created* when you use *Google services* . . . .  Go to My Activity."

18   SAC ¶¶ 5, 66-69, 238-39, SAC Ex. A at 1, 9 (emphases added).  As this Court has already held,

19   the definition of Google services "permits the inference that GA for Firebase is a 'Google

20   service'—that is, a '[p]roduct[] that [is] integrated into third party apps.'"  Dkt. 109 at 8.  And the

21   "Go to My Activity" language in the third bullet contains a hyperlink that brings users directly to

22   the WAA control.  SAC ¶ 69.

23        "[C]ourts in construing and applying a standardized contract seek to effectuate the

24   reasonable expectations of the average member of the public who accepts it."  *Williams v. Apple*

25   *Inc.*, 2021 WL 2186223, at *5 (N.D. Cal. May 28, 2021); *see also In re Facebook, Inc., Consumer*

26   *Privacy User Profile Litig.*, 402 F. Supp. 3d at 789 ("[T]he contract language must be assessed

27   _____

28   [7] Earlier versions of Google's Privacy Policy contained similar promises.  SAC ¶ 68 & n.20.

11

PLAINTIFFS' OPPOSITION TO GOOGLE'S MOTION TO DISMISS OR STRIKE
PORTIONS OF SECOND AMENDED COMPLAINT
Case No. 3:20-CV-04688-RS

1    objectively, from the perspective of a reasonable . . . user").  Here, a reasonable user could interpret

2    these provisions to promise that My Activity (WAA) can be used to control the data that Google

3    collects through Google's services.  That is sufficient.  *See Calhoun*, 2021 WL 1056532, at *18

4    (denying motion to dismiss breach of contract claim because statements in the Chrome Privacy

5    Notice "could have led a reasonable user to conclude that, because they did not sync, Google would

6    not receive their personal information"); *Rodman v. Safeway, Inc.*, 2011 WL 5241113, at *2 (N.D.

7    Cal. Nov. 1, 2011) (denying motion to dismiss "[b]ecause Plaintiff adequately alleges the existence

8    of a contract . . . which is susceptible to Plaintiff's reasonable construction").

9        Google counters that these Privacy Policy provisions "[a]t most . . . inform[] users that they

10   can adjust their data settings when they use Google services and can review that data; it doesn't

11   commit Google to providing any settings in particular."  Mot. at 12.  Google errs by seemingly

12   focusing only on the first bullet above while ignoring the others.  If that were the only relevant

13   statement in the Privacy Policy, then cases like *In re Google Location History Litigation*, 2021

14   WL 519380, at *8 (N.D. Cal. Jan. 25, 2021) might be more on point.[8]  But the Privacy Policy also

15   identifies "My Activity" (which includes WAA) as a specific feature "allow[ing]" users to "control

16   data that's created" when they use Google services.  And a hyperlink in that provision brings users

17   directly to the WAA control.  Unlike in *In re Google Location History*, this case is not about

18   whether Google is bound to offer a "particular privacy setting."  2021 WL 519380, at *9.  There

19   is no dispute that Google offers the My Activity feature, and Google even admits that "My

20   Activity" includes "the settings" that "form the basis of Plaintiffs' other claims" (i.e., WAA).  Mot.

21   at 13.  Google breached its contractual obligations because it promised a particular setting (My

22   Activity and WAA) would work a particular way (offering control over data collected by Google),

23   but that was false.

24   _____

25   [8] The plaintiffs in that case alleged that "they were misled about the effect of [Google's] Location
     History setting."  *Id.* at *9.  But the "only [contractual] provision" they cited was the Privacy

26   Policy's statement that users can "adjust [their] privacy settings to control what [Google] collect[s]
     and how [their] information is used."  *Id.*  The Court dismissed the contract claim because that

27   provision "does not actually bind Google to offer any particular privacy settings," let alone apply
     to the location setting specifically at issue.  *Id.*

28                                                        12

1    *Block v. eBay, Inc.*, 747 F.3d 1135, 1139 (9th Cir. 2014), is also off point. *Block* considered

2    a challenge to eBay's process of repeatedly entering bids for a user at predetermined increments

3    until the user reaches a predetermined maximum bid. *Id.* at 1137. The plaintiff claimed that this

4    process breached a provision in the user agreement stating that "We are not involved in the actual

5    transaction between buyers and sellers." *Id.* The court disagreed, reasoning that this provision

6    was part of a Limitation of Liability section that provided a "broad description of the eBay

7    marketplace [] to explain to eBay's users why its liability is more limited than that of a 'traditional

8    auctioneer.'" *Id.* at 1139. Far from attempting to distance Google from responsibility for

9    interactions that users engage in with third parties, the provisions here, by contrast, promised to

10   honor users' choices about the information collected about such interactions by Google.

11       Google's reliance on *Davis v. Facebook*, 956 F.3d at 610, is also misplaced. The plaintiffs

12   in that case grounded their breach of contract claim on language from Facebook's Data Use Policy,

13   and the court dismissed the claim after concluding that this document was not incorporated into

14   Facebook's SRR. Here, on the other hand, as conceded by Google in other actions, the Google

15   Terms of Service expressly incorporated the Privacy Policy for most of the class period. This case

16   is more like *In re Facebook, Inc., Consumer Privacy User Profile Litigation*, 402 F. Supp. 3d at

17   801. Those plaintiffs stated a breach of contract claim based on a provision resembling the ones

18   here: "You own all of the content and information you post on Facebook, and *you can control* how

19   it is shared through your privacy and application settings." *Id.* (emphasis added). The promise

20   here is even more explicit, particularly because it identifies My Activity (i.e., WAA) as a specific

21   feature promising control over app activity data. Like the defendant in the *Consumer Privacy User

22   Profile* case, Google breached its promise by "disclos[ing] user information to . . . apps . . . without

23   permission, and without giving the plaintiffs the ability to prevent this disclosure." *Id.*

24       That Google's Privacy Policy "is meant to help [users] understand what information

25   [Google] collect[s]" does not make it non-contractual. Mot. at 12 (citing SAC Ex. A at 2). Judge

26   Koh rejected that exact argument in *Calhoun v. Google*. The contract claim there relied on the

27   Chrome Privacy Notice, which like the Privacy Policy, describes itself as a resource to "learn how

28
                                                      13

1    to control the information that's collected, stored, and shared when you use the Google Chrome

2    browser on your computer."  *See Calhoun*, 2021 WL 1056532, at *4.  "Google argue[d] that

3    Google did not make promises but rather provided information in [the] Chrome[] Privacy Notice."

4    *Id.* at *19.  Judge Koh disagreed, reasoning that the Terms of Service incorporate the Chrome

5    Privacy Notice and explain to users that "[t]hose additional terms become part of your agreement

6    with us if you use those services."  *Id.*  Here, the Terms of Service likewise incorporated the

7    Privacy Policy: "By using our Services, you agree that Google can use such data in accordance

8    with our privacy policies." Santacana Decl. Ex. 2 at 2; *id.* Ex. 3 at 2. "This language demonstrates

9    that, rather than being an informational resource, the [Privacy Policy] is part of the contract

10   between Plaintiffs and Google."  *Calhoun*, 2021 WL 1056532, at *19.  Most recently, this Court

11   held that plaintiffs stated a breach of contract claim based on a provision in the Google Privacy

12   Policy describing how "We collect information about your activity in our services."  *In re Google*

13   *Assistant Privacy Litig.*, 2021 WL 2711747, at *11 (N.D. Cal. July 1, 2021); *see also, e.g.*, *McCoy*

14   *v. Alphabet, Inc.*, 2021 WL 405816, at *12 (N.D. Cal. Feb. 2, 2021) (plaintiffs stated breach of

15   contract claim based on Google's Privacy Policy).

16       Finally, Google argues that there is a "mismatch between the alleged promise and the

17   alleged breach" because Plaintiffs "don't 'allege that they had no control whatsoever over their'

18   data." Mot. at 13 (quoting *In re Google Location History Litig.*, 2021 WL 519380, at *9).  Google

19   once again overlooks the second and third bullets above, which identify My Activity (WAA) as a

20   specific feature allowing users to control Google's collection of their app activity data.  "The truth

21   is that Google's so-called 'controls' are meaningless.  Nothing stops Google from collecting this

22   data."  SAC ¶ 10.

23       **C.    Google breached a contractual obligation in the WAA Materials**

24       Plaintiffs separately state a contract claim based on Google's breach of commitments made

25   in the WAA Materials:

26   •    "Info about your browsing and other activity on sites, ***apps***, and devices ***that use Google***
          ***services***" is "saved as Web & App Activity."

27   •    "To let Google save this information: Web & App Activity must be on."

28                                                    14

1   SAC ¶¶ 71, 240 (emphases added).  These commitments appear (1) on a Google webpage titled

2   "See & control your Web & App Activity,"[9] and (2) in the settings menu of Android devices.  SAC

3   ¶¶ 240-41.

4        As this Court has already held in this case: "Google, through the WAA Materials, set an

5   expectation that it would not save plaintiffs' 'activity on . . . apps . . . that use Google services'

6   unless plaintiffs turned WAA on."  Dkt. 109 at 16 (alterations in original); *see also id.* at 13

7   ("[P]laintiffs, pointing to the WAA Materials, plausibly demonstrate an objectively reasonable

8   expectation that their communications with third-party apps would not be recorded by Google"

9   (internal quotation marks omitted)); *id.* at 8 (the Privacy Policy's definition of "Google services"

10  "permits the inference that GA for Firebase is a 'Google service'—that is, a '[p]roduct[] that [is]

11  integrated into third party apps[]'" (alterations in original)).

12       Because Google can no longer challenge Plaintiffs' interpretation of the WAA Materials,

13  Google now shuns them, arguing that these promises are not part of any contract.  Google is wrong.

14  The WAA Materials constitute a freestanding agreement, whether express or implied.

15  Alternatively, they are incorporated into the Privacy Policy and Terms of Service.

16            1.    <u>The WAA Materials are a standalone express contract</u>

17       Google argues that Plaintiffs did not provide additional consideration for the WAA

18  Materials' commitments beyond what Plaintiffs provided when they agreed to the Terms of

19  Service.  Mot. at 14-15.  But the Terms of Service did not obligate Plaintiffs to interact with apps

20  that use Google services, let alone apps that may reveal private information such as sexual interests

21  and political or religious views.  SAC ¶¶ 202, 243.  The promises in the WAA Materials were

22  directed at users who did not wish to have such activity collected by Google, and these promises

23  induced those users to turn off WAA and continue interacting with apps that use Google services.

24  SAC ¶ 243.  Google thus gained and retained users who are concerned about their privacy.  *Id.*

25  ───────────────

26  [9] Google's Motion points out that the name of this webpage has been changed to "Find & control
    your Web & App Activity."  Mot. at 5 & n.3.  The relevant provisions, however, have not been

27  altered in any way.  Google does not claim otherwise.

28                                    15

1   Relatedly, Google accrued goodwill by claiming that it was facilitating and respecting users'

2   privacy choices. *Id.*; *see Ansanelli v. JP Morgan Chase Bank, N.A.*, 2011 WL 1134451, at *4

3   (N.D. Cal. Mar. 28, 2011) ("Under California law, consideration exists even if . . . some small

4   additional performance is bargained for and given. . . . [It is sufficient] if the act or forebearance

5   given or promised as consideration differs *in any way* from what was previously due." (second and

6   third alterations in original) (emphasis added)).

7        "[T]here are two requirements in order to find consideration." *Steiner v. Thexton*, 48 Cal.

8   4th 411, 420-21 (2010).  First, "[t]he promisee must confer (or agree to confer) a benefit or must

9   suffer (or agree to suffer) prejudice." *Id.* at 421.  "[T]he second requirement is that the benefit or

10  prejudice must actually be bargained for as the exchange for the promise." *Id.*  Both requirements

11  are met here.  Plaintiffs' decision to switch off WAA and continue interacting with apps that use

12  Google services conferred a "benefit" on Google that Google "actually . . . bargained for" in

13  exchange for Google's promise to not collect Plaintiffs' data when WAA was off.  *Id.*

14       *Wiskind v. JPMorgan Chase Bank, N.A.*, 2015 WL 1798962, at *7 (N.D. Cal. Apr. 17,

15  2015), is distinguishable.  That case concerned an alleged breach of a mortgage modification

16  agreement.  The plaintiff "fail[ed] to allege consideration" because "he d[id] not state how [the

17  purportedly modified] payments differed from—if at all—the terms of the original [] loan

18  agreement." *Id.*  And *Dunkel v. eBay Inc.*, 2014 WL 1117886, at *4 (N.D. Cal. Mar. 19, 2014), is

19  inapposite because the plaintiffs did not even allege how the supposed contractual documents were

20  "incorporated into the User Agreement or how the [documents] themselves constitute a contract."

21  The court therefore did not even mention, let alone discuss, consideration.

22              2.    <u>Alternatively, the WAA Materials form a standalone implied contract</u>

23       As Google's Motion notes, an implied contract claim has the same elements as an express

24  contract claim.  Mot. at 16.  "The distinction between express and implied in fact contracts relates

25  only to the manifestation of assent."  1 Witkin, Contracts § 102 (11th ed.).  Here, Plaintiffs' conduct

26  (turning off WAA and browsing apps that use Google services) manifested Plaintiffs' acceptance

27  of the deal that Google proposed in the WAA Materials—that users continue interacting with apps

28                                      16

1   that use certain Google services so long as Google agree not to collect their data.  SAC ¶ 244.

2   Google's written commitments in the WAA Materials inform the terms of this implied contract.

3   *See In re Zoom Video Commc'ns Inc. Priv. Litig.*, 2021 WL 930623, at *17 (N.D. Cal. Mar. 11,

4   2021) (plaintiffs adequately alleged that they and Zoom "entered into implied contracts, separate

5   and apart from Zoom's terms of service," which included alleged misstatements by Zoom about

6   its security capabilities); *Ottolini v. Bank of America*, 2011 WL 8583133, at *3 (N.D. Cal. Dec. 6,

7   2011) ("[T]here is sufficient information from the parties' alleged conduct and communications

8   . . . from which to infer a contract as alleged by Plaintiff").  The claims in the cases that Google

9   cites were dismissed for reasons that do not apply here.[10]

10         Google argues that there cannot be an implied contract because an express contract covers

11   the same subject matter.  Mot. at 16-17.  Yet, in arguing against an express contract, Google claims

12   that the Privacy Policy "doesn't commit Google to providing any settings in particular."  Mot. at

13   12, 14.  Google cannot "have it both ways."  *See Hickcox-Huffman v. US Airways, Inc.*, 2017 WL

14   4842021, at *5 (N.D. Cal. Oct. 26, 2017) (rejecting defendant's attempt to argue, on the one hand,

15   that an express contract precluded an implied contract claim while, on the other hand, arguing that

16   the express contract did not bind the company to fulfill the alleged promise).  If Google is correct

17   that the Terms of Service and Privacy Policy do not make any enforceable commitments about

18   WAA, then the implied contract does not cover the same subject matter.

19         *Be In, Inc. v. Google Inc.*, 2013 WL 5568706, at *5 (N.D. Cal. Oct. 9, 2013), which Google

20   ───────────────

21   [10] The plaintiff in *Coffen v. Home Depot U.S.A. Inc.*, 2016 WL 4719273, at *5 (N.D. Cal. Sept. 9, 2016), claimed at the hearing that there was a written contract between the parties, but she did not even reference that contract in her pleadings.  The plaintiff in *Allen v. Nextera Energy Operating*

22   *Services, LLC*, 2012 WL 1918930, at *2 (N.D. Cal. May 25, 2012), alleged that his employer breached an implied contract not to fire him without good cause, but the plaintiff failed to allege

23   "any facts regarding when the implied contract took effect, how it was formed, or its specific terms."  Here, by contrast, Plaintiffs describe the commitments Google made in the WAA

24   Materials and how Plaintiffs manifested their assent by switching off WAA.  And the plaintiffs in *Worldwide Media, Inc. v. Twitter, Inc.*, 2018 WL 5304852, at *6 (N.D. Cal. Oct. 24, 2018), argued

25   that "because they complied with the express terms of their obligations under the [Terms of Service], their compliance require[d] Twitter to comply with [additional] implied obligations."

26   Here, on the other hand, Plaintiffs provided separate consideration for the implied contract.

27

28
                                    17

1   cites, illustrates the fallacy in Google's argument.  In that case, an NDA prohibited Google from

2   "using . . . [the plaintiff's] confidential information . . . except as expressly permitted by the

3   agreement." *Id.*  Yet the plaintiff argued that there was also an implied contract that conditioned

4   Google's use of the same information on a separate commitment to license the plaintiff's

5   technology.  *Id.*   The court dismissed the implied contract claim because the plaintiff's theory

6   resulted in "two competing contracts" covering "the scope of [Google's] permissible use of the

7   information." *Id.* at *6.  Here, Plaintiffs reasonably allege alternative theories.  If the Court credits

8   Google's position that the Privacy Policy does not make any commitments about WAA, Plaintiffs'

9   implied contract theory does not result in "two competing contracts."[11]

10         Google's remaining cases are even further afield.  The implied contract claim in *Mountain*

11  *View Surgical Center. v. Cigna Health Corp.*, 2015 WL 5456592, at *2 (C.D. Cal. Sept. 17, 2015),

12  merely "reiterat[ed]" the plaintiff's claim for breach of an oral contract.  And Google's citations

13  to *Berkla v. Corel Corp.*, 302 F.3d 909, 918 (9th Cir. 2002) and *Total Coverage, Inc. v. Cendant*

14  *Settlement Servs. Group, Inc.*, 252 F. App'x 123, 126 (9th Cir. 2007), suggest that Google is

15  confusing quasi-contract (or contracts at law) with implied-in-fact contracts.  They are different.[12]

16              3.   Alternatively, the WAA Materials are incorporated into the Privacy Policy
                     and Terms of Service

17

18         "For the terms of another document to be incorporated into the document executed by the

19  parties the reference must be clear and unequivocal, the reference must be called to the attention

20  of the other party and he must consent thereto, and the terms of the incorporated document must

21

22  [11] *Be In, Inc.* is further distinguishable because the court relied on a merger clause in the NDA:
    "This NDA is the parties' entire agreement on this topic, superseding any other agreements.  Any
23  amendments must be in writing."  *Id.* at *5.  Google does not (and cannot) point to an analogous
    merger clause in the Terms of Service.

24
    [12] "Implied contracts . . . should be distinguished from contracts implied in law, or quasi-contracts."
25  Witkin, Contracts § 103 (11th ed.)  "Quasi-contracts have often been called implied contracts or
    contracts implied in law; but, unlike true contracts, quasi-contracts are not based on the apparent
26  intention of the parties to undertake the performances in question, nor are they promises.  They are
    obligations created by law for reasons of justice."  *Id.*
27

28                                              18

1    be known or easily available to the contracting parties." *Shaw v. Regents of Univ. of Cal.*, 58 Cal.

2    App. 4th 44, 54 (1997). "The contract need not recite that it 'incorporates' another document, so

3    long as it guides the reader to the incorporated document." *Id.* "Indeed, California case law makes

4    it quite easy to incorporate a document by reference." *In re Facebook, Inc., Consumer Priv. User*

5    *Profile Litig.*, 402 F. Supp. 3d at 791 (N.D. Cal. 2019).

6          Here, for a large portion of the class period, Google's Terms of Service required users to

7    allow Google to collect data "in accordance with our privacy polic*ie*s." Santacana Decl. Ex. 2 at

8    2 (emphasis on plural); *id.* Ex. 3 at 3 (same). And a hyperlink on "privacy policies" brought users

9    to the Google Privacy Policy, which itself "guide[d] the reader" to the "See & control" webpage,

10   thus incorporating it. *Id.*; *Shaw*, 58 Cal. App. 4th at 54. The Privacy Policy did so by inviting

11   users to click a hyperlink to "Learn more here" about the "Web & App Activity control." SAC

12   Ex. A at 26.[13] That hyperlink brings users directly to the "See & control" webpage. *Id.* Google's

13   claim that the Privacy Policy is "at least three hyperlinks" away from the "See & control" page

14   and that any connection "is far too attenuated" is based on a false premise. Mot. at 15 & n.10. In

15   fact, the "See & control" webpage is just one click away from the Privacy Policy.

16           Terms of Service → Privacy Policy → "See & control" webpage

17   In any event, the path Google describes provides another basis for incorporation.[14]

18         Google's reliance on *Woods v. Google Inc.*, 2011 WL 3501403, at *4 (N.D. Cal. Aug. 10,

19   2011) is misplaced. The plaintiffs in that case also grounded their breach of contract claim on

20

21   [13] The Privacy Policy contained the same language guiding readers to the "See & control" webpage
22   from May 25, 2018 through June 30, 2021—until Google changed the Privacy Policy shortly after
     Google filed the motion to dismiss the SAC.

23   [14] The "Go to My Activity" hyperlink in the Privacy Policy brings users to the WAA control,
24   where a "Learn more" hyperlink brings users to the "See & control" page. SAC ¶¶ 69-71.

25   Also unavailing is Google's claim that Plaintiffs make no effort to show how the Terms of Service
26   is linked to the "See & control" page. Mot. at 15 & n.10. More fundamentally, the Privacy Policy,
     which is part of the contract, incorporates the "See & control" page. Google does not argue that
27   the Terms of Service must independently incorporate the "See & control" page for that page to
     become part of the contract.

28

                                     19

1    language in the Google "Help Center"—which includes the "See & control" webpage.  The court

2    dismissed the claim, but only because "[t]he complaint refer[red] to more than a dozen [web]pages

3    in . . . [the] Help Center that allegedly identify Google's obligations[,]" which "ma[d]e it difficult

4    to identify the terms of any actual and unambiguous contractual obligations."  *Id.*  Similarly, in *In*

5    *re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 832 (N.D. Cal. 2020), the court recognized

6    that it is "certainly possible that statements" on Google Help Center webpages can be incorporated

7    into the Privacy Policy and Terms of Service.  But the plaintiffs in that case also relied on "various

8    provisions from different [Help Center] websites."  *Id.*  And their sole ground for incorporation

9    was a "vague" statement in the Terms of Service, which was "hardly sufficient to establish that

10   the particular websites cited by Plaintiffs" are incorporated.  *Id.*  Plaintiffs here do not rely on that

11   same "vague" Terms of Service provision, nor do Plaintiffs rely on provisions spread across

12   numerous Help Center pages.  Plaintiffs rely on just one Help Center webpage, and thoroughly

13   explain how Google's Privacy Policy guides users directly to that particular webpage.

14        Google's reliance on *Davis v. Facebook*, 956 F.3d at 610 is also misplaced.  The *Davis*

15   court ruled that Facebook's SRR did not incorporate a new Data Use Policy because the SRR

16   directed users to an older version of the Data Use Policy called the "Privacy Policy."  *Id.*  The

17   problem in *Davis*, a mismatch between the document relied on and the document actually

18   incorporated, is not a problem here.  Finally, that Google's Privacy Policy does not identify the

19   "See & control" webpage by its full name is of no moment.  "Regardless of how the document is

20   titled, it is enough that the [Privacy Policy] directed [Plaintiffs] to it."  *Marchand v. Northrop*

21   *Grumman Corp.*, 2017 WL 2633132, at *5 (N.D. Cal. June 19, 2017).

22   **III.    Google's Motion to Strike Portions of Plaintiffs' Prayer for Relief Should Be Denied**

23        Google's Rule 12(f) motion to strike Plaintiffs' request for non-restitutionary disgorgement

24   and consequential damages is procedurally improper under well-settled Ninth Circuit law.  "Rule

25   12(f) does not authorize district courts to strike claims for damages on the ground that such claims

26   are precluded as a matter of law."  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974-75

27   (9th Cir. 2010); *J. H. v. Cty. of San Mateo*, 2021 WL 1516371, at *4 (N.D. Cal. Apr. 16, 2021)

28

20

1    ("The defendants' motion to strike the plaintiff's request for punitive and treble damages on the

2    grounds that there are no factual allegations supporting these damages and that they are unavailable

3    as a matter of law is denied." (citing *Whittlestone*, 618 F.3d at 974-75)).   Google relies on

4    *Bureerong v. Uvawas*, 922 F. Supp. 1450 (C.D. Cal. 1996), which was decided fourteen years

5    before *Whittlestone*.  "In light of *Whittlestone*, *Bureerong* is no longer good law."  *Pallen Martial*

6    *Arts, LLC v. Shir Martial Arts, LLC*, 2014 WL 2191378, at *8 n.2. (N.D. Cal. May 23, 2014).

7    Google's four other cases did not even involve Rule 12(f) motions to strike.   No reference to

8    "strike" nor Rule 12(f) appears anywhere in these cases.  *See Darnaa, LLC v. Google LLC*, 756 F.

9    App'x 674 (9th Cir. 2018); *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024 (N.D. Cal. 2019); *Huynh*

10   *v. Quora, Inc.*, 2019 WL 11502875 (N.D. Cal. Dec. 19, 2019); *Lewis v. YouTube, LLC*, 244 Cal.

11   App. 4th 118 (2015).  Google admits that Plaintiffs here are at least entitled to nominal damages.

12   *See* Mot. at 1.  Google therefore does not move to dismiss the contract claim on the basis of the

13   limitation-of-liability clauses.

14          Even if the Court could strike portions of the prayer for relief, there would be no grounds

15   to do so.  The clauses Google cites do not apply to Plaintiffs' claims.  The current Terms of Service

16   provides:

17          Other than the rights and responsibilities described in this section (In case of
             problems or disagreements), Google won't be responsible *for any other losses*,
18          unless they're caused by our breach of these terms or service-specific additional
             terms.
19
20   Santacana Decl. Ex. 1 at 11 (emphasis added).  Non-restitutionary disgorgement is not a "loss."

21   *See In re Google Assistant*, 457 F. Supp. 3d at 840 ("[N]onrestitutionary disgorgement focuses on

22   the defendant's unjust enrichment.").  Google's argument also ignores that the WAA Materials

23   constitute a separate standalone contract.

24          Equally unavailing is Google's reliance on the pre-March 2020 Terms of Service.  *See* Mot.

25   at 23.  Google relies entirely on a portion of the second paragraph that purports to limit Google's

26   liability "to the amount you paid us to use the services (or if we choose, to supplying you the

27   services again)."  This provision does not apply to users, like Plaintiffs, who do not pay money

28                                                  21

1    directly to Google, and Google instead profits from its collection and use of data. Google's

2    interpretation "would render [the first and third paragraphs of the limitations provisions]

3    surplusage." *Rodman v. Safeway Inc.*, 125 F. Supp. 3d 922, 930 (N.D. Cal. 2015), *aff'd*, 694 F.

4    App'x 612 (9th Cir. 2017). If all users were limited to recovering what they paid to Google, there

5    would be no need to separately clarify that Google is not liable for "lost profits," "indirect"

6    damages, or unforeseeable damage.[15]

7        Moreover, the phrase, "or, if we choose, to supplying you the services again"—clarifies

8    that the clause only applies to entities that pay Google for services. The GA for Firebase service

9    cannot be "suppl[ied]" to Plaintiffs "again." At best, Google's argument raises an ambiguity as to

10    whether the limitation applies to users like Plaintiffs. But "contractual clauses seeking to limit

11    liability will be strictly construed and any ambiguities resolved against the party seeking to limit

12    its liability." *Safeway*, 125 F. Supp. 3d at 928. Finally, to the extent these clauses are interpreted

13    to prohibit Plaintiffs from recovering any form of damages, they should be disregarded as

14    unconscionable.[16]

---

15    [15] And even if those other paragraphs apply to users like Plaintiffs, they are still irrelevant here

16    because they do not address nonrestitutionary disgorgement. "Although [Google perhaps] could
      have drafted its limitation provision to achieve the result it now seeks, it did not." *Safeway*, 125

17    F. Supp. 3d at 930.

18    [16] "The Ninth Circuit has held that a contract is procedurally unconscionable under California law

19    if it is a standardized contract, drafted by the party of superior bargaining strength, that relegates
      to the subscribing party only the opportunity to adhere to the contract or reject it." *In re Yahoo!*

20    *Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1136-37 (N.D. Cal. 2018). Here,
      exactly as in *In re Yahoo*, the "liability limitations appear near the end of the 12-page legal Terms

21    of Service document where the Terms of Service are contained in an adhesion contract and
      customers may not negotiate or modify any terms." *Id.* And with all due respect to Yahoo, it

22    would be far more difficult to navigate today's world without a Google account. Google's
      interpretation also renders the clauses substantively unconscionable because they would preclude

23    "nearly every type of damages claim." *Silicon Valley Self Direct, LLC v. Paychex, Inc.*, 2015 WL

24    4452373, at *6 (N.D. Cal. July 20, 2015). "California courts have . . . concluded that limitations
      are substantively unconscionable when they guarantee[] that plaintiffs could not possibly obtain

25    anything approaching full recompense for their harm." *In re Yahoo*, 313 F. Supp. 3d at 1137.
      Google's interpretation would preclude not only nonrestitutionary disgorgement and consequential

26    damages, but also Plaintiffs' prayer for compensatory damages, including the value of the data that

27    Google wrongfully collected. SAC ¶¶ 137-58, 248-49, 258.

28                                            22

1    **IV.    Plaintiffs' Allegations About AdMob and Cloud Messaging Are Sufficient**

2          Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain

3    statement of the claim showing that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 677-78.

4    Claims need only be "sufficiently detailed to give fair notice to the opposing party of the nature of

5    the claim so that the party may effectively defend against it."  *ROTFL Prods., LLC v Gzebb*, 2013

6    WL 12181763, at *2 (N.D. Cal. Aug. 5, 2013).  The SAC provides notice to Google that Plaintiffs'

7    claims concern Google's interception and data collection while WAA is turned off in connection

8    with at least three Google services: Google Analytics, Cloud Messaging, and AdMob.

9          Google still collects data from users who turn off the "Web & App Activity"
10         feature.  Google collects this data through various backdoors made available
           through and in connection with Google's Firebase Software Development Kit,
11         including not only Google Analytics for Firebase but also without limitation
           AdMob and Cloud Messaging for Firebase.

12   SAC ¶ 6; *see also id.* ¶ 245 (Google intercepted the communications "including without limitation

13   by way of Firebase SDK products such as Google Analytics for Firebase, AdMob, and Cloud

14   Messaging for Firebase . . . ."); *id.* ¶ 58.  These allegations are sufficient to allow Google to defend

15   against them just as the FAC's parallel allegations concerning Google Analytics were sufficient.

16   Google is of course familiar with AdMob and Cloud Messaging.  Google knows what they are and

17   what they do.  Google does not deny intercepting communications and collecting Plaintiffs' app

18   activity data with AdMob and Cloud Messaging when WAA is switched off, just like Google has

19   never denied it for GA for Firebase.

20         Google's focus on whether AdMob is a "Firebase product" is both misleading and

21   misplaced.  Mot. at 1, 7.  Google's Motion cites a Firebase website, which explains that AdMob

22   is "easily integrate[d] with Firebase."  *See* Mot. at 7 n.5 (citing https://firebase.google.com/).

23   Google's reliance on a webpage that supports Plaintiffs' allegations undermines its argument that

24   the allegations "are insufficient to put Google on notice of its wrongdoing."  Mot. at 8.  Internal

25   Google documents also show that ███████████████████████████████████████

26   ████████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████████

28

                                                    23

1    ███████████████████████████████ GOOG-RDGZ-00021696. ██████

2    ████████████████████████████████████████████████████████████n

3    ███████████████████████████████████ GOOG-RDGZ-00028345.

4    ████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ████████████████████████████ GOOG-RDGZ-00028759.

8      ██████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   █████████████ GOOG-RDGZ-00022340. ██████████████████████

11   ████████████████████████████████████████████████████████

12   ████ GOOG-RDGZ-00022342. ████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████ GOOG-RDGZ-00035067.

15         To be clear, Plaintiffs do not believe these quotes are necessary to give fair notice to Google

16   about two of its own products that are ████████████████████████████████████████

17   Plaintiffs merely clarify that the allegations are fairly based on public and internal Google

18   documents describing the functionality of AdMob and Cloud Messaging.  These allegations are

19   not, as Google suggests, "an attempt to resurrect the[] 'secret scripts' theory" and they are not

20   subject to Rule 9(b).  Mot. at 8.  The secret scripts allegations rose "to the level of outright fraud"

21   insofar as they were "undetectable to anyone but Google" and for Google's "exclusive benefit."

22   Dkt. 109 at 6, 11.  Plaintiffs' allegations about AdMob and Cloud Messaging mirror the FAC's

23   allegations about GA for Firebase, which were not subject to Rule 9(b): "Under this theory of

24   liability, GA for Firebase [as well as AdMob and Cloud Messaging]—when running as

25   marketed—allow[] Google to collect information about an individual's 'activity on . . . apps . . .

26

27

28
                                        24

1  that use Google services,' notwithstanding" Google's representations about WAA.  Dkt. 109 at

2  6.[17]

3         Nor are there grounds to strike the AdMob and Cloud Messaging allegations.  They are

4  neither "impertinent" nor "immaterial," as Google conclusorily suggests.  Mot. at 9.  Rather, they

5  "relate[] directly to [Plaintiffs'] underlying claim for relief."  *Whittlestone*, 618 F.3d at 974.

6  *Fantasy, Inc. v Fogerty*, 984 F. 2d 1524, 1527 (9th Cir. 1993), is inapposite because the stricken

7  allegations there related to claims that were "barred by the statute of limitations and by res

8  judicata."

9  **V.     CONCLUSION**

10        For the foregoing reasons, this Court should deny Google's Motion in its entirety.  To the

11  extent this Court believes that certain allegations are deficient, Plaintiffs should be granted leave

12  to amend to correct those deficiencies.[18]

13

14  Dated: July 16, 2021

                                       By: */s/ Amanda Bonn*_____
15                                         Amanda Bonn (CA Bar No. 270891)

16                                         SUSMAN GODFREY L.L.P.

17  _____

18  [17] Because Plaintiffs allege sufficient facts to support their claims, cases such as *Anderson v.
    Kimpton Hotel & Rest. Grp., LLC*, 2019 WL 3753308, at *5 (N.D. Cal. Aug. 8, 2019), and
19  *Gonzalez v. Uber Techs, Inc.*, 305 F. Supp. 3d 1078, 1090 (N.D. Cal. 2018), where plaintiffs did
    not plead any facts to support their boilerplate conclusions, are not applicable.  Nor is this case
20  like the indirect patent infringement case, *Elan Microelectronics Corp. v. Apple, Inc.*, 2009 WL
    2972374, at *2 (N.D. Cal. Sept. 14, 2009).  *Elan* involved only "a bare assertion, made 'on
21  information and belief' that Elan 'has been and is currently, directly and/or indirectly infringing,
    in violation of 35 U.S.C. § 271' the specified patents 'through its design, marketing, manufacture
22  and/or sale of touch sensitive input devices or touchpads, including but not limited to the Smart–
    Pad.'"  *Id.*
23

24  [18] "[L]eave to amend shall be freely given when justice so requires, bearing in mind the underlying
    purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or
25  technicalities. . . ."  *Cal. Spine & Neurosurgery Inst. v. United Healthcare Ins. Co.*, 2019 WL
    4450842, at *3 (N.D. Cal. Sept. 17, 2019).  "Accordingly, leave to amend generally shall be denied
26  only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be
    futile, or if the moving party has acted in bad faith."  *Id.*  Google's Motion does not claim that any
27  of these reasons are present here.  Mot. at 25.

28                                          25

1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

Mark C. Mao (CA Bar No. 236165)
mmao@bsfllp.com
Beko Rebitz-Richardson (CA Bar No. 238027)
brichardson@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293 6858
Facsimile (415) 999 9695

Jesse Panuccio (admitted *pro hac vice*)
jpanuccio@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Tel.: (202) 237-2727
Fax: (202) 237-6131

James Lee (admitted *pro hac vice*)
jlee@bsfllp.com
Rossana Baeza (*pro hac vice*)
rbaeza@bsfllp.com
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street, Suite 2800
Miami, FL 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

William Christopher Carmody (*pro hac vice*)
bcarmody@susmangodfrey.com
Shawn J. Rabin (*pro hac vice*)
srabin@susmangodfrey.com
Steven Shepard (*pro hac vice*)
sshepard@susmangodfrey.com
Alexander P. Frawley (*pro hac vice*)
afrawley@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)

26

1

rmcgee@forthepeople.com
Michael F. Ram, CA Bar No. 104805
mram@forthepeople.com
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

*Attorneys for Plaintiffs*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO GOOGLE'S MOTION TO DISMISS OR STRIKE
PORTIONS OF SECOND AMENDED COMPLAINT
Case No. 3:20-CV-04688-RS