Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com

Jesse Panuccio (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave, NW
Washington, DC 20005
Tel.: (202) 237-2727
Fax: (202) 237-6131
jpanuccio@bsfllp.com

Amanda K. Bonn, CA Bar No. 270891
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
abonn@susmangodfrey.com

William Christopher Carmody
(admitted *pro hac vice*)
Shawn J. Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
Alexander Frawley (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas,
32nd Floor
New York, NY  10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

John A. Yanchunis (admitted *pro hac vice*)
Ryan J. McGee (admitted *pro hac vice*)
Michael F. Ram, CA Bar No. 104805
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com
mram@forthepeople.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANIBAL RODRIGUEZ, JULIEANNA MUNIZ, ELIZA CAMBAY, SAL CATALDO, EMIR GOENAGA, JULIAN SANTIAGO, HAROLD NYANJOM, KELLIE NYANJOM, and SUSAN LYNN HARVEY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No.:  3:20-cv-04688<br><br>**PLAINTIFFS' OPPOSITION TO GOOGLE'S MOTION TO DISMISS PORTIONS OF THE THIRD AMENDED COMPLAINT**<br><br>The Honorable Richard Seeborg<br>Courtroom 3 – 17th Floor<br>Date: October 28, 2021<br>Time: 1:30 p.m.<br><br>**Oral Argument Requested** |

1

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.     Plaintiffs State a Claim Under CIPA Section 631 ................................................. 3

        A.    The   TAC   Alleges   That   Google   Intercepted   The Communications During Transit. ......................................................... 3

             1.    The TAC fixes the SAC's deficiency. ............................................ 3

             2.    The remaining allegations are consistent with Plaintiffs' theory. ........................................................................................... 5

        B.    Plaintiffs (Again) Plead A Lack of Consent. ............................................ 7

        C.    Google Is Not a "Party" To The User-App Communications. .................... 9

II.    Plaintiffs State a Breach-of-Contract Claim. ........................................................ 11

        A.    Plaintiffs'   New   Unilateral   Contract   Theory   Fixes   Prior Problems. ................................................................................................. 11

        B.    Google   Promised   To   Not   Collect   Third-Party   App   Activity Provided That Plaintiffs Turned Off WAA. ............................................. 13

        C.    Google   Breached   Its   Contractual   Obligation   To   Not   Collect Plaintiffs' App Activity While They Had WAA Turned Off. ................... 18

        D.    The Terms of Services' Limitation-of-Liability Clauses Do Not Apply. ..................................................................................................... 19

III.   Plaintiffs   Alternatively   State   a   Quasi-Contract   (Unjust   Enrichment) Claim. .................................................................................................................... 22

CONCLUSION ................................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*AdTrader, Inc. v. Google LLC*,
  2018 WL 3428525 (N.D. Cal. July 13, 2018) .......................................................................23

5

*Ashcroft v. Iqbal*,
6
  556 U.S. 662 (2009) ...............................................................................................................2

7

*Asmus v. Pac. Bell*,
  23 Cal. 4th 1 (Cal. 2000) ......................................................................................................12

8

9

*Bass v. Facebook, Inc.*,
  394 F. Supp. 3d 1024 (N.D. Cal. 2019)................................................................................21

10

*Bell Atl. Corp. v. Twombly*,
11
  550 U.S. 544 (2007) ...............................................................................................................2

12

*Block v. eBay, Inc.*,
  747 F.3d 1135 (9th Cir. 2014) ..............................................................................................16

13

14

*Brodsky v. Apple Inc.*,
  445 F. Supp. 3d 110 (N.D. Cal. 2020).....................................................................................5

15

*Brown v. Google LLC*,
16
  2021 WL 949372 (N.D. Cal. Mar. 12, 2021) ..........................................................................9

17

*Cal. Spine & Neurosurgery Inst. v. United Healthcare Ins. Co.*,
  2019 WL 4450842 (N.D. Cal. Sept. 17, 2019)......................................................................25

18

19

*Calhoun v. Google LLC*,
  2021 WL 1056532 (N.D. Cal. Mar. 17, 2021) ........................................................................9

20

*Cheung v. Wells Fargo Bank, N.A.*,
21
  987 F. Supp. 2d 972 (N.D. Cal. 2013) (Seeborg, J.) ............................................................22

22

*Dahl v. HEM Pharms. Corp.*,
  7 F.3d 1399 (9th Cir. 1993)...................................................................................................12

23

24

*Darnaa, LLC v. Google LLC*,
  756 F. App'x 674 (9th Cir. 2018)..........................................................................................21

25

*Davis v. Facebook*,
26
  956 F.3d 589 (9th Cir. 2020) .........................................................................................*passim*

27

*Donohue v. Apple, Inc.*,
  871 F. Supp. 2d 913 (N.D. Cal. 2012)...................................................................................16

28

*Elias v. Navasartian*,
  2017 WL 1013122 (E.D. Cal. Feb. 17, 2017) ........................................................................19

*Frezza v. Google Inc.*,
  2013 WL 1736788 (N.D. Cal. Apr. 22, 2013).........................................................................18

*Graham v. Noom, Inc.*,
  2021 WL 1312765 (N.D. Cal. Apr. 8, 2021)............................................................................9

*Harris v. Time, Inc.*,
  191 Cal. App. 3d 449 (Cal. Ct. App. 1987)....................................................................12, 17

*Huynh v. Quora, Inc.*,
  2019 WL 11502875 (N.D. Cal. Dec. 19, 2019) ....................................................................21

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
  402 F. Supp. 3d 767 (N.D. Cal. 2019)...........................................................................15, 17

*In re Google Assistant Privacy Litig.*,
  2021 WL 2711747 (N.D. Cal. July 1, 2021) ..................................................................16, 21

*In re Google Assistant Privacy Litig.*,
  457 F. Supp. 3d 797 (N.D. Cal. 2020).................................................................................21

*In re Yahoo Mail Litig.*,
  308 F.R.D. 577 (N.D. Cal. 2015) .........................................................................................7

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  313 F. Supp. 3d 1113 (N.D. Cal. 2018)...............................................................................22

*Konop v. Hawaiian Airlines, Inc.*,
  302 F.3d 868 (9th Cir. 2002)................................................................................................7

*Letizia v. Facebook Inc.*,
  267 F. Supp. 3d 1235 (N.D. Cal. 2017)...............................................................................23

*Lewis v. YouTube, LLC*,
  244 Cal. App. 4th 118 (Cal. Ct. App. 2015).........................................................................21

*London v. New Albertson's, Inc.*,
  2008 WL 4492642 (S.D. Cal. Sept. 30, 2008) .....................................................................19

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014)............................................................................................3, 4

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008)..............................................................................................2

iii

*Quigley v. Yelp, Inc.*,
  2018 WL 7204066 (N.D. Cal. Jan. 22, 2018) (Seeborg, J.) ...................................... 7

*Revitch v. New Moosejaw, LLC*,
  2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ........................................................ 10

*Rodman v. Safeway Inc.*,
  125 F. Supp. 3d 922 (N.D. Cal. 2015)................................................................... 20

*Rodman v. Safeway, Inc.*,
  2011 WL 5241113 (N.D. Cal. Nov. 1, 2011) ........................................................ 17

*Rogers v. Ulrich*,
  52 Cal. App. 3d 894 (1975) ................................................................................. 9

*Saleh v. Nike, Inc.*,
  2021 WL 4437734 (C.D. Cal. Sept. 27, 2021) ................................................ 9, 10

*Sateriale v. R.J. Reynolds Tobacco Co.*,
  697 F.3d 777 (9th Cir. 2012) ................................................................... 11, 12, 17

*Silicon Valley Self Direct, LLC v. Paychex, Inc.*,
  2015 WL 4452373 (N.D. Cal. July 20, 2015) ...................................................... 22

*Smith v. LoanMe, Inc.*,
  11 Cal. 5th 183 (2021) ........................................................................................ 10

*Whittlestone, Inc. v. Handi-Craft Co.*,
  618 F.3d 970 (9th Cir. 2010) ............................................................................... 19

*Williams v. Apple Inc.*,
  2021 WL 2186223 (N.D. Cal. May 28, 2021) ...................................................... 17

*Williams v. Facebook, Inc.*,
  498 F. Supp. 3d 1189 (N.D. Cal. 2019) (Seeborg, J.) .......................................... 25

**Statutes**

Cal. Penal Code § 631 ...............................................................................*passim*

**Rules**

Fed. R. Civ. P. 9(b).................................................................................................. 25

Fed. R. Civ. P. 12(f) ............................................................................................... 19

Fed. R. Civ. 12(b)(6) .............................................................................................. 19

iv

1

**Other Authorities**

2
1 Witkin, Summary 11th Contracts § 105 ...................................................................................12

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### **INTRODUCTION**

With the Court's leave and guidance, Plaintiffs amended their complaint to address specific issues identified by the Court in its prior motion to dismiss ruling. With these edits, the Third Amended Complaint (hereinafter "TAC", Dkt. 138) resolves all issues identified by the Court and adequately states a claim for each cause of action. Given the targeted amendments to the operative complaint, Google's third attempt to dispose of claims in this action should be denied, allowing discovery to proceed.

*First*, for purposes of Plaintiffs' California Invasion of Privacy Act Section 631 claim (hereinafter "the CIPA claim"), Plaintiffs amended their allegations to plead that Google intercepted Plaintiffs' communications with third-party apps' servers while those communications were in transit. *See* TAC ¶¶ 3 n.2, 48, 51-52, 278. Even Google concedes that Plaintiffs cured the issue identified by the Court. Mot. at 3 (admitting that Plaintiffs "added back in the allegation of simultaneity"). Google now attempts to muddy these clear waters by recycling stale arguments from its prior motion that are inapplicable and provide no basis for dismissal. Google then presents its own rendition of the facts that is entirely consistent with Plaintiffs' theory of in-transit interception. Using the analogy of a phone call, Google admits that it "is there," "listening," and "logging the details of the conversation." Mot. at 9. Google's Motion thus makes clear that the parties do not have a factual dispute after all; instead, Google improperly seeks to relitigate this Court's rejection of its consent defense and the Ninth Circuit's ruling on the party exception. The Court should reject those efforts.

*Second*, to address the issues identified by the Court regarding the prior breach of contract allegations, Plaintiffs now allege facts establishing a claim for breach of a unilateral contract. This claim is based on the Google "Activity controls" webpage where Google's WAA button is located. As alleged, Plaintiffs accepted Google's offer not by making a commitment to Google, but rather through their performance (here, switching off the WAA button). Google does not contest that Plaintiffs switched off the WAA button; instead, Google argues that although Google's "Activity controls" webpage made promises associated with Google's WAA button and offered the button's

1

1    use, those actions were meaningless and the promises inconsequential since Google was somehow

2    not inviting users to click that button. Google's parsing logic makes no sense and should be

3    rejected.

4        The contract claim is also sufficiently plead under Plaintiffs' alterative quasi-contract

5    theory. Even if this Court concludes that Google's promises about WAA are not covered by any

6    enforceable contract, the claim survives. Relief under a quasi-contract theory is available because

7    Google's Terms of Service do not purport to cover Google's privacy features and, to the contrary,

8    disclaim them. And the TAC cites key admissions by Google employees, uncovered through

9    discovery, admitting that "we don't accurately describe what happens when WAA is off" and that

10    "[w]e need to change the description to indicate even with the control off, Google retains this data

11    and uses it for X purposes." TAC ¶¶ 260-61. Google knew that it should not be collecting app-

12    activity data while users had WAA turned off, and yet Google continued doing so.

13        Google's arguments are unavailing and provide no basis for any dismissal. Plaintiffs

14    respectfully request that the Court deny Google's motion and permit the parties to proceed with

15    discovery on these claims.

16    **ARGUMENT**

17        Google provides insufficient grounds to dismiss any claim in this case. It is well-settled

18    that a motion to dismiss must be denied if the complaint "state[s] a claim to relief that is plausible

19    on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*,

20    550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content

21    that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

22    alleged." *Id.* The court must "accept factual allegations in the complaint as true and construe the

23    pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine*

24    *Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Plaintiffs have satisfied this low burden and are

25    entitled to move forward on both the CIPA and breach-of-contract, or alternative quasi-contract,

26    claims.

27

28

## I.    Plaintiffs State a Claim Under CIPA Section 631.

After initially permitting Plaintiffs' CIPA claim to move forward, this Court dismissed the claim as pleaded in the SAC on the basis that the amended complaint did not clearly allege that the communications were intercepted while in transit. Dkt. 127 at 7. The Court granted Plaintiffs leave to amend their allegations to correct this issue and Plaintiffs promptly did so. As Google admits, the TAC fixes the problem by adding allegations to explain how and why in-transit interception happens. Mot. at 3. But Google inexplicably still seeks to derail this claim by relitigating previously rejected arguments and defenses. Motions to dismiss are not opportunities to seek reconsideration. The law of the case already establishes that Plaintiffs did not consent to having their information collected, and the Ninth Circuit settled the party-exception issue in Plaintiffs' favor. The Court should allow this claim to move forward for the following reasons: (A) the TAC alleges that Google intercepted the communications during transit; (B) the TAC once again adequately alleges the lack of user consent; and (C) the TAC makes clear that Google is not a "party" to the user-app communications.

### A.    The TAC Alleges That Google Intercepted The Communications During Transit.

#### 1.    The TAC fixes the SAC's deficiency.

Any deficiency that previously existed has been indisputably corrected by the TAC, which explicitly and clearly pleads that the communications were intercepted while in transit. TAC ¶¶ 3 n.2, 48, 51-52, 278. This Court dismissed the CIPA claim in the SAC because "whereas the FAC alleged Google simultaneously copied and acquired users' third-party app communications, the SAC replaces that specific simultaneity with simultaneity between post-copying conduct and the data's transmission to Google." Dkt. 127 at 7 (comparing FAC, Dkt. 60 ¶ 49 with SAC, Dkt. 113 ¶ 49). The TAC, modeled after the FAC, alleges that "Google intercepts the communications as the communications are in transit to the app server, and Google simultaneously transmits a copy of the communications to Google." TAC ¶ 278; *see also id.* ¶¶ 3 n.2, 48, 51-52. Google concedes that Plaintiffs have corrected the problem identified by the Court. Mot. at 3. And Google offers no argument why that correction doesn't render the clam valid. The only case cited by Google, *Loos*

3

1    *v. Immersion Corp.*, is distinguishable. Mot. at 6. In that case, unlike here, the plaintiff "failed to

2    correct the deficiencies identified [by the Court] in his original complaint." 762 F.3d 880, 890 (9th

3    Cir. 2014).

4         Beyond fixing the sole issue identified by the Court, the TAC bolsters the claims by adding

5    new allegations explaining how and why Google intercepts the communications while they are in

6    transit. *See* TAC ¶¶ 51-52. Google's statement that Plaintiffs "simply added back in the allegation

7    of simultaneity without a single additional factual allegation," Mot. at 3, is false and proven so by

8    the redline comparing the complaint versions. *See* Dkt. 138-2 at 19-20. Google's decision to spend

9    over three pages discussing the new allegations also belies any suggestion that the TAC lacks "a

10   single additional factual allegation."  Mot. at 6-9.

11        Google's other attacks on the revised allegations are also hollow and should be rejected.

12        First, Google's "line of communication" argument is a straw man. Mot. at 7-8. Plaintiffs

13   nowhere allege that an open line of communication is sufficient in and of itself. Plaintiffs instead

14   allege that Google intercepts a user's "request" to the app server for "content to be delivered to the

15   user." TAC ¶ 51; *see also id.* ¶ 47 (intercepted communications contain information including

16   "what content the user has requested from the app").

17        Second, Google's argument that Real-Time Bidding (hereinafter "RTB") "does not imply

18   anything concerning the simultaneity or lack thereof of the collection of Google Analytics for

19   Firebase on behalf of app developers," is erroneous. Mot. at 9 n.3. Google does not deny that data

20   collected through GA for Firebase can be used for RTB purposes. And strikingly absent from

21   Google's discussion is any mention of the two other accused products, Cloud Messaging and

22   AdMob, i.e., a product relevant to in-app advertising. Google's insinuation that paragraph 52 of

23   the TAC "fails to allege the use of the 'contents' of any electronic communication in conjunction

24   with" RTB is also flat wrong. Mot. at 9. Google appears to be looking at a different document

25   since Paragraph 52 says the following:

26
              The duplicated communications delivered simultaneously to Google
27            include the user's personal information, from the communication between
              the user and the third-party apps, ***such as the mobile app page being
28            requested*** and the device from which the request is being made. This

                                        4

1

2

3

4

> simultaneous interception and transmission to Google enables Google to target the user with a targeted advertisement in real time. This means that when a user communicates with a third-party app to, for example, ***request app content related to flat screen televisions***, through the process described above, Google will simultaneously intercept the user's communication and ***use it in real time to earn money by generating and serving the user an advertisement for flat screen televisions***, in the third-party app.

5  TAC ¶ 52 (emphases added). Google's reliance on *Brodsky v. Apple Inc.* also hurts rather than

6  helps it since, in that case, plaintiffs merely alleged that Apple intercepted their "user names and

7  passwords." 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020), Google's last RTB complaint positing

8  that Plaintiffs never discussed RTB during any meet and confer is perplexing. Mot. at 9. Plaintiffs

9  are not aware of any authority requiring parties to preview potential amendments for opposing

10  counsel, and Google does not cite any.

11               2.    The remaining allegations are consistent with Plaintiffs' theory.

12          Because the TAC indisputably pleads that the communications were intercepted while in

13  transit and even provides examples of how this is done, Google resorts to repeating meritless

14  attacks from its prior motion to dismiss—arguments that the Court correctly ignored. Mot. at 4-5.

15  The factual allegations Google identifies are consistent with Plaintiffs' theory, and there was no

16  need to change them. For example, as explained in the last opposition brief and within the TAC

17  itself, Plaintiffs added the "through the device" allegations to the SAC to clarify that an app cannot

18  communicate with an app server without going through the mobile device, Dkt. 121 at 6; TAC ¶ 3

19  n.2, a technical point that Google conceded in the last Reply Brief, Dkt. 122 at 12. In its current

20  Motion, Google does not even try to explain how these allegations undermine simultaneity, nor

21  could Google because they are consistent with simultaneity.

22          The Google Mobile Service ("GMS") allegations are also consistent with Plaintiffs' theory.

23  Google distorts these allegations to suggest that it only receives aggregated and already completed

24  communications. Mot. at 4. But the TAC does not say that, and the SAC did not say that, either.

25  Rather, Plaintiffs allege that GMS "concurrently aggregate[s] . . . intercepted messages across all

26  the apps using Firebase SDK, so that user identity can be easily tracked across the apps, and so

27  that browsing activity can be immediately associated and correlated for meaningful real-time

28

1    context." TAC ¶ 56. The fact that Google uses GMS for, among other things, post-interception

2    processes involving certain aggregation in no way undermines the clear allegation that Google first

3    intercepts the communications while they are in transit, while WAA is off, to obtain that

4    information. In any event, Google's arguments about GMS only apply to Android devices, not iOS

5    devices, the latter of which are an additional subclass. TAC ¶¶ 56, 231.

6         The basis of Plaintiffs' CIPA claim is how Google's Firebase SDK scripts intercept user-

7    app communications while the same are in transit. *See* TAC ¶ 48 ("Through the Firebase SDK

8    scripts, Google intercepts these communications while the same are in transit and simultaneously

9    sends surreptitious copies of them to Google . . . ."); *see also id.* ¶¶ 3, 15, 46, 49-53, 55, 57, 58,

10   60, 68, 123-24, 126, 231 (repeatedly referring to communications intercepted by way of the

11   embedded Firebase scripts). After Plaintiffs explained all of this in the prior Opposition brief,

12   Google's Reply Brief had no answer, neglecting to even mention GMS. *See* Dkt. 122. Google's

13   recycled GMS argument is, again, meritless.

14        Google next tries to rewrite (and redraw) Plaintiffs' allegations, seeking dismissal based

15   on Google's say-so regarding the facts in this case. Mot. at 5. The diagram to which Google refers

16   was included in the First Amended Complaint, Dkt. 60, FAC ¶ 119, and yet Google tellingly did

17   not argue that the FAC failed to allege in-transit interception. Google now alters the diagram,

18   inserting the words "Time 1" and "Time 2" and omitting other parts. *Compare* Mot. at 5, *with* TAC

19   ¶ 125. Google then adds a second diagram (created by Google) to depict the technical process at

20   issue in *Davis v. Facebook*, 956 F.3d 589 (9th Cir. 2020), and Google criticizes the TAC insofar

21   as the two diagrams look somewhat different.

22        Ironically, Plaintiffs' first opposition brief cited the FAC's diagram to show that the

23   technical process here "resembles the challenged conduct in *Davis* [*v Facebook*]." Dkt. 71 at 21

24   n.8. More fundamentally, the technical process described in the TAC, like the FAC, is consistent

25   with the technical process in *Davis*. *See also* Dkt. 71 (Pls.' Opp'n to MTD FAC) at 19 ("Like

26   Google, Facebook received copies of the communications through bits of embedded code, which

27   caused the users' browsers to generate copies of the communications and transmit them to

28

6

Facebook 'through a separate, but simultaneous, channel in a manner undetectable by the user.'" (quoting *Davis*, 956 F.3d at 596, 607-08)). Plaintiffs here allege that the Firebase scripts cause their devices to duplicate and forward to Google communications intended only for the apps' servers, just like the *Davis* plaintiffs alleged that Facebook code caused their browsers to duplicate and forward messages intended only for websites' servers. *Id.* at 607-608; *see also* TAC ¶¶ 48-61, 125. The parties' apparent dispute about how to draw the process alleged in *Davis* is an artistic dispute, which, like a factual dispute, is not a basis for dismissal.

Google's remaining cases do not support the Motion. *Quigley v. Yelp, Inc.*, 2018 WL 7204066, at *4 (N.D. Cal. Jan. 22, 2018) (Seeborg, J.), addressed "bare allegations" of "surreptitious surveillance" that lacked any explanation of "how or when any defendant became aware of his communications." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002) is further afield, particularly because the plaintiff did not even purport to allege an in-transit interception.[1] And *In re Yahoo Mail Litigation*, 308 F.R.D. 577, 590-91 (N.D. Cal. 2015), supports Plaintiffs. "[T]he parties dispute[d] whether Yahoo intercepts emails while 'in transit or passing over any wire, line, or cable'" and yet the Court denied the motion to dismiss and subsequently certified a class on the CIPA § 631 claim. *Id.* Regardless, Google's version of the facts is consistent with CIPA § 631 liability, as explained just below.

**B.   Plaintiffs (Again) Plead A Lack of Consent.**

After telling the Court that Plaintiffs' revised allegations show bad faith, Google proceeds to frame the facts in a way that actually reinforces Plaintiffs' wiretapping theory. In its own words, Google "is there," "listening" to users' communications with app developers. Mot. at 10. Google acknowledges that it cannot do so "without the knowledge of all parties," so Google assures the Court that "[e]veryone on the phone knows Google is there," citing "disclosure[s] made to users by app developers." *Id.* But Plaintiffs did not "know[] Google is there," and the Court has already

---

[1] The plaintiff asserted a federal Wiretap claim on the ground that his employer accessed his personal website without permission and thus learned about posts he published that were critical of the employer. There were no allegations that the posts were intercepted while in transit, nor could there have been. The issue for the Court was a legal question about whether the statute applied to a communication "while it is in electronic storage," and the court said "no." *Id.*

1   ruled for Plaintiffs on this question. Dkt. 109 at 10. This Court credited Plaintiffs' theory that

2   Google's user-facing WAA disclosures "supersed[e] those app-specific disclosures." *Id.* at 8.

3   Plaintiffs "offer a cogent account of why ***they saw WAA as capable of turning off GA for***

4   ***Firebase's collection*** of their third-party app data." *Id.* at 10 (emphasis added). Google therefore

5   "intentionally taps, or makes [an] unauthorized connection" with a "telegraph or telephone wire,

6   line, cable, or instrument" or "willfully and without the consent of all parties to the communication,

7   or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of

8   [a] . . . communication while the same is in transit or passing over any wire, line, or cable." CIPA

9   § 631(a).

10   Google's suggestion that Plaintiffs have "never taken issue with" GA for Firebase's

11   collection of data (Mot. at 10) is also belied by this Court's Order. Dkt. 109 at 1. In the Court's

12   words, this case is about a "Google technology that, ***when functioning as advertised*** in a given

13   app, contravenes the company's user-facing privacy representations." *Id.* (emphasis added).

14   "[P]laintiffs allege Google's ***capture and analysis of data via GA for Firebase, on behalf of app***

15   ***developers who knowingly utilize that service***, violates the WAA Materials' representations to

16   individuals who have disabled the WAA feature. Under this theory of liability*, **GA for Firebase**—*

17   ***when running as marketed***—allows Google to collect information about an individual's 'activity

18   on . . . apps . . . that use Google services,' notwithstanding the WAA Materials' statement that '[t]o

19   let Google save this information . . . Web & App Activity must be on.'" *Id.* at 6 (emphases added).

20   Google improperly tries to conflate Plaintiffs' in-transit interception allegations with their

21   allegations about Google's subsequent use of the data. Mot. at 11; *see also* TAC ¶¶ 117-41

22   (alleging that "Google profits from the data it collects . . . in at least three ways," namely, creating

23   user profiles, directing targeted advertisements to users, and improving Google products). CIPA

24   separately applies both to the initial collection and the subsequent use. *See* CIPA § 631(a) (also

25   applying to any person "who uses, or attempts to use, in any manner, or for any purpose, or to

26   communicate in any way, any information so obtained"). Plaintiffs' post-collection "use"

27   allegations also support Plaintiffs' CDAFA, common law, and constitutional claims. *See* Dkt. 71

28

8

1    at 13, 19-21.

2        The upshot is that Google lacks "the consent of *all* parties to the communication" (i.e., both

3    the app developers and the users). CIPA § 631(a). "[U]nder section 631(a), if a person secretly

4    listens to another's conversation, the person is liable." *Graham v. Noom, Inc.*, 2021 WL 1312765,

5    at *4 (N.D. Cal. Apr. 8, 2021). Here, when WAA was switched off, Google was a secret listener.

6        **C.**    **Google Is Not a "Party" To The User-App Communications.**

7        Finally, Google's attempt to relitigate the party exception accomplishes nothing other than

8    to confirm Plaintiffs' theory on Google's simultaneous interception. Google's argument depends

9    on Google receiving the communications *at the same time* as the apps' servers. Accordingly, the

10    parties appear not to have a factual dispute, but rather a legal dispute that courts have resolved in

11    Plaintiffs' favor.

12        The party exception does not apply to companies like Google and Facebook that embed

13    their code into third-party websites and apps for purposes of causing the browser or device to

14    redirect communications. *See Davis v. Facebook*, 956 F.3d 589, 608 (9th Cir. 2020) ("Facebook

15    is not exempt from liability as a matter of law under the Wiretap Act or CIPA as a party to the

16    communication."); *Calhoun v. Google LLC*, 2021 WL 1056532, at *8 (N.D. Cal. Mar. 17, 2021)

17    (plaintiffs stated CIPA section 631 claim based on allegations that embedded Google code caused

18    browsers to redirect user-website communications to Google servers); *Brown v. Google LLC*, 2021

19    WL 949372, at *15 (N.D. Cal. Mar. 12, 2021) (same). Despite citing *Davis* five times within the

20    Motion's CIPA section, Google somehow omits this key part of *Davis*'s holding. Google instead

21    cites a 1975 case, which is also inapposite because the defendant in that case recorded

22    conversations between *himself* and the plaintiff. *See Rogers v. Ulrich*, 52 Cal. App. 3d 894, 898-

23    99 (1975).

24        Courts have also repeatedly rejected Google's "vendor" immunity argument. *Saleh v. Nike,*

25    *Inc.*, 2021 WL 4437734, at *1 (C.D. Cal. Sept. 27, 2021), is squarely on point. *Saleh* was about

26    FullStory, a software company that "embeds snippets of code that . . . record, in real time, 'a

27    visitor's every move on a website.'" *Id.* FullStory made the exact same argument that Google

28

9

1    makes here. *Compare id.* at *10 ("According to Defendants, because FullStory provides a service

2    to Nike, 'FullStory cannot be considered a third party to Plaintiff's alleged communications with

3    Nike.'"), *with* Mot. at 4 (arguing that Google cannot be liable under section 631 insofar as "Google

4    is acting as a transcribing vendor for the app developer").

5        The *Saleh* court rejected Google's argument, reasoning that accepting it would destroy

6    CIPA's protections:

7            Defendants' argument would imply that any third party who surreptitiously
             recorded a conversation between two parties would not violate § 631(a) so
8            long as it was recording the conversation at the direction and for the benefit
             of a party. The text of section 631(a), however, does not contain any such
9            exception, and indeed, Defendants invite an interpretation that would vitiate
             the statute's protections.
10

11   *Id.* at *11. "FullStory did not become a 'party' to the communication simply because it was

12   providing recording and transmission services for Nike." *Id.* [2]  The same is true for Google vis-à-

13   vis third-party apps, as alleged in this case.

14       *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *1 (N.D. Cal. Oct. 23, 2019), is also

15   on point. The plaintiffs stated a CIPA section 631 claim based on allegations that a third-party

16   service provider "eavesdropped on [plaintiff's] communications with [the] Moosejaw [website]

17   because the code embedded into the Moosejaw.com pages functioned as a wiretap that redirected

18   his communications to [the service provider] while [the plaintiff] browsed the site." *Id. Saleh*

19   specifically relied on *New Moosejaw*, reiterating the latter's holding "that a third-party

20   eavesdropper does not become a party to a communication merely by directly receiving the

21   communication." 2021 WL 44377344, at *11.[3]  The same outcome is warranted here. So long as

22   WAA is switched off, Google is eavesdropping on Plaintiffs' communications with third-party

23   ───────────────
     [2] The plaintiff alleged CIPA § 631 claims against both Nike and FullStory. The claims against
24   FullStory were dismissed for lack of personal jurisdiction. *Id.* at *6. The court dismissed the
     § 631 claim as to Nike on the ground that Nike was a party to the communications. *Id.* at *10. The
25   court's holding that FullStory is a third-party to the communications was relevant to the plaintiff's
     claim against Nike for aiding and abetting FullStory's § 631 violation, and the court ruled for the
26   plaintiff on that claim.

27   [3] The Supreme Court of California also recently clarified that CIPA's prohibitions apply to both
28   participants and non-participants. *See Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 192-93 (2021).

1   apps, unbeknownst to users and without their consent, and therefore in violation of CIPA § 631.

2   **II.      Plaintiffs State a Breach-of-Contract Claim.**

3          The TAC's new contract theory, which clearly articulates a claim for breach-of-contract

4   under a unilateral acceptance theory, is based on a different Google webpage and a different type

5   of contract than the theory presented in the SAC. The SAC alleged that a particular WAA Help

6   Page constitutes a standalone bilateral contract. Dkt. 127 at 5. The TAC, by contrast, alleges breach

7   of a *unilateral* contract, relying on a different Google webpage (the "Activity controls" webpage)

8   as well as the identical Android settings menu. TAC ¶¶ 242-48. The key difference between the

9   SAC's WAA Help Page and the TAC's "Activity controls" page is that the latter contains the

10  actual WAA button. TAC ¶¶ 245-48. As alleged, Google was contractually required to stop

11  collecting third-party app data from users who switched off WAA, but Google continued to do so.

12  TAC ¶¶ 244, 262-63. Plaintiffs' new theory does not "circumvent the Court's ruling." Mot. at 11.

13  The Court granted Plaintiffs leave to amend, and Plaintiffs have done just that. The new theory

14  (A) fixes prior problems by alleging the existence of a unilateral contract; (B) alleges that Google

15  made promises not to collect third-party app data when WAA is off; and (C) alleges that Google

16  breached those promises.

17          **A.      Plaintiffs' New Unilateral Contract Theory Fixes Prior Problems.**

18          The TAC's revised breach-of-contract theory fixes the problems identified by this Court in

19  the prior ruling. The SAC alleged that a Google WAA Help Page constitutes a standalone bilateral

20  contract. This Court dismissed that claim because "'for a contract to exist' in this context, the

21  document needs to 'outline shared commitments to which users must abide.'"  Dkt. 127 at 5-6

22  (quoting *Davis*, 956 F.3d at 610). "That the WAA Help Page fails to do so (indeed, it asks *nothing*

23  of users) precludes it from functioning as a standalone contract . . . ." *Id.*; *see also id.* at 5

24  ("[P]laintiffs do not allege their having secured that document's terms with valid consideration.").

25          That mutuality principle does not apply to Plaintiffs' revised theory—breach of *unilateral*

26  contract. "In contrast to a bilateral contract, a unilateral contract involves the exchange of a

27  promise for a performance." *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 785 (9th Cir.

28

11

1    2012); *see also* 1 Witkin, Summary 11th Contracts § 105 (distinguishing bilateral contracts, "in

2    which there are mutual promises, a promise being given in consideration of another promise," from

3    unilateral contracts, "in which a promise is given in exchange for some act, forbearance or thing").

4    Here, Google promised not to collect Plaintiffs' third-party app data if Plaintiffs took a specific

5    action (switching off WAA). Plaintiffs allege acceptance of that offer "by rendering a performance

6    rather than providing a promise," namely, switching off WAA. *Sateriale*, 697 F.3d at 785.

7        *Sateriale* is instructive. The plaintiffs in *Sateriale* failed to allege an enforceable bilateral

8    contract because although "the plaintiffs have identified an alleged promise by [the defendant] . .

9    . they have not pointed to any promise they made to [the defendant.]"  697 F.3d at 785. But the

10   court rejected the defendant's "reliance on mutuality of obligation" as applied to the plaintiffs'

11   unilateral theory because "that doctrine does not apply to unilateral contracts."  *Id.* at 791.

12       Here, Plaintiffs likewise allege a unilateral contract. In a unilateral contract, "any act or

13   forbearance . . . may constitute consideration for the promise." *Asmus v. Pac. Bell*, 23 Cal. 4th 1,

14   10 (Cal. 2000). Plaintiffs provided such consideration by switching off WAA and continuing to

15   use Google services, including third-party apps that use GA for Firebase, AdMob, and Cloud

16   Messaging. TAC ¶¶ 250-53. That is sufficient. "Courts will not require equivalence in the values

17   exchanged or otherwise question the adequacy of the consideration. If a performance is bargained

18   for, there is no further requirement of benefit to the promisor or detriment to the promisee." *Harris*

19   *v. Time, Inc.*, 191 Cal. App. 3d 449, 456 (Cal. Ct. App. 1987) (citation omitted); *see also Dahl v.*

20   *HEM Pharms. Corp.*, 7 F.3d 1399, 1404-05 (9th Cir. 1993) ("[Defendant] argues that because

21   petitioners participated voluntarily and were free to withdraw, they had no binding obligation and

22   so gave no consideration. Somehow the category of unilateral contracts appears to have escaped

23   [Defendant's] notice.").

24

25

26

27

28

12

1

**B.** **Google Promised To Not Collect Third-Party App Activity Provided That Plaintiffs Turned Off WAA.**

2

Google's WAA button is located in the Android settings menu and in the identical

3

"Activity controls" Google webpage. In both places, Google promised (and still promises) to stop

4

collecting third-party app data provided that users switched off WAA:

5
6

<u>Android Settings Menu</u> (TAC ¶¶ 65-66, 245-46)

7
8
9
10
11
12
13
14
15
16
17
18
19



20
21
22
23
24
25
26
27
28

13

1

"Activity controls" Google Webpage (TAC ¶¶ 247-48)

2

17     In the Android settings menu, Google promised that "you can [c]hoose the activities and

18 info you allow Google to save." On Google's "Activity controls" webpage, Google similarly

19 promised that "you control what data gets saved to your account." In both places, Google's WAA

20 button is presented as the control, and users may switch WAA "on" or "off." Google also promised

21 that the "control" applies to "activity from . . . apps . . . that use Google services." And the box

22 next to that subsetting cannot be checked so long as WAA is switched to "off." TAC ¶¶ 246, 248.

23 Google thus promised users that if they switched off WAA, Google would not collect their activity

24 on apps that use Google services, which according to the Privacy Policy, include "[p]roducts that

25 are integrated into third-party apps" (e.g., GA for Firebase). TAC Ex. A at 1.

26     Google's argument that it "promise[]d nothing about precisely how the WAA setting will

27 or will not function, or what data Google will or will not receive" (Mot. at 14) contradicts this

28

14

1    Court's prior Order, and is also a remarkable claim given how central this WAA control is in terms

2    of Google's privacy promises. This Court already held that Google "'set an expectation' that it

3    would not save plaintiffs' 'activity on . . . apps . . . that use Google services' unless plaintiffs turned

4    WAA 'on.'"  Dkt. 109 at 16 (alterations in original) (citation omitted); *id.* at 13 ("[P]laintiffs,

5    pointing to the WAA [Help Page], plausibly demonstrate an objectively reasonable expectation

6    that their communications with third-party apps would not be recorded by Google." (internal

7    quotation marks omitted)); *id.* at 8 (the Privacy Policy's definition of "Google services" "permits

8    the inference that GA for Firebase is a 'Google service'—that is, a '[p]roduct[] that [is] integrated

9    into third party apps[]'" (alterations in original)). True, this Court was evaluating the WAA Help

10    Page and not the same "Activity controls" page at issue here. But Google concedes that the

11    documents share "nearly identical language." Mot. at 11; *see also* TAC ¶¶ 256-57 (WAA Help

12    Page). With these disclosures, Google intended for users to interpret WAA exactly as plaintiffs

13    did, and Google knew that users were misled. TAC ¶¶ 8-9, 37, 83, 255, 260-61. Plaintiffs ask that

14    the Court, again, reject Google's claim that Google's promises were just meaningless words.

15         Even Google's own employees disagree with its counsel's argument that Google's WAA

16    disclosures "promise nothing" about how WAA works or the data Google receives. Mot. at 14:

17         Today, ***we don't accurately describe what happens when WAA is off***.

18         [G]iven the way on/off works, one has to then assume that disabled (off)
          would be the exact opposite of what is described for what happens when the
19         WAA bit is on.

20         The ***WAA and other controls imply we don't log the data, but obviously
          we do***.

21    TAC ¶ 261 (citing GOOG-RDGZ-00024698-99) (emphases added).

22         *In re Facebook, Inc., Consumer Privacy User Profile Litigation*, 402 F. Supp. 3d 767, 801

23    (N.D. Cal. 2019) is instructive. Those plaintiffs stated a breach of contract claim based on a

24    provision resembling the one here: "You own all of the content and information you post on

25    Facebook, and *you can control* how it is shared through your privacy and application settings."  *Id.*

26    (emphasis added). The promise here is even more explicit, particularly because it identifies WAA

27    as the specific feature that controls Google's collection of app-activity data. Like Facebook,

28

15

1    Google breached its promises—here, by collecting and using app activity information without

2    permission. *See also In re Google Assistant Privacy Litig.*, 2021 WL 2711747, at *11 (N.D. Cal.

3    July 1, 2021) (plaintiffs stated contract claim based on provision in the Google Privacy Policy

4    describing how "We collect information about your activity in our services").

5          *Block v. eBay, Inc.*, 747 F.3d 1135, 1139 (9th Cir. 2014), is inapposite. Mot. at 13-14. The

6    plaintiff claimed that eBay breached a provision in the user agreement stating that "We are not

7    involved in the actual transaction between buyers and sellers." *Id.* The court disagreed, reasoning

8    that this provision was part of a Limitation of Liability section that provided a "broad description

9    of the eBay marketplace [] to explain to eBay's users why its liability is more limited than that of

10   a 'traditional auctioneer.'" *Id.* at 1139. Here, by contrast, the operative statements are not part of

11   any limitation-of-liability provision. Another key difference is the statements here make a

12   commitment to *users* about what they can do. *See* TAC ¶¶ 247-48 (promising that "*you control*

13   what data gets saved to your account . . . [,] [i]nclud[ing] activity from . . . apps . . . that use Google

14   services," and providing the WAA button as the control (emphasis added)).

15         *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 918 (N.D. Cal. 2012) is also distinguishable.

16   Mot. at 14-15. That case was about a "defective" signal meter in various iPhone models. *Id.* The

17   plaintiff argued that Apple breached a contractual commitment within the "instructional manual"

18   that accompanies every iPhone insofar as the manual explained what the signal meter was

19   supposed to do. *Id.* at 930. The court disagreed, reasoning that "[o]n these facts, adopting the

20   position that an instructional manual is a contract would vastly expand the scope of a

21   manufacturer's express and implied warranties." *Id.* at 931. Unlike *Donohue*, this is not a warranty

22   case about a defective product. WAA is functioning as Google designed it to function. The problem

23   is that Google over-promised. Once again, Google employees acknowledge this problem with

24   Google's promises: "We need to change the description to indicate even with the control off,

25   Google retains this data and uses it for X purposes. . . . If we are storing data that the user does not

26   have access to, we need to be clear about that fact." TAC ¶ 261 (citing GOOG-RDGZ-00024698).

27         Google next argues that its "Activity controls" webpage did not invite performance of a

28

16

specific act. Mot. at 15-16 (pointing out that the statements in *Sateriale* "invited the performance of specific acts," and attempting to distinguish this case). This is specious logic. Google was of course inviting Plaintiffs to use the WAA button. Why provide it if Plaintiffs were not supposed to use it?  Google's "Activity controls" page contained the actual WAA button, and allowed users to "turn on" WAA or "off."  TAC ¶¶ 245-48. And Google promised users that the WAA button provides "control" over the data that Google "[s]aves" from "your activity" on "apps that use Google services."   Plaintiffs reasonably understood Google to be inviting them to exercise that control by turning "off" WAA. *See Rodman v. Safeway, Inc.*, 2011 WL 5241113, at *2 (N.D. Cal. Nov. 1, 2011) (denying motion to dismiss "[b]ecause Plaintiff adequately alleges the existence of a contract . . . which is susceptible to Plaintiff's reasonable construction").

"[C]ourts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it." *Williams v. Apple Inc.*, 2021 WL 2186223, at *5 (N.D. Cal. May 28, 2021); *see also In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d at 789 ("[T]he contract language must be assessed objectively, from the perspective of a reasonable . . . user"). Google even agrees that the language should be interpreted based on "[a] reasonable person" standard. Mot. at 16 (arguing about what "[a] reasonable person would . . . take [the language] to mean"). True, these cases concerned bilateral contracts. But in Google's own words, "[t]he fact that [a case] concerned a bilateral contract does not change this conclusion." Mot. at 14.

Google's reliance on *Harris* and *Sateriale* is misplaced. Mot. at 15-16. Those cases support Plaintiffs. Like the promises in *Harris* and *Sateriale*, the "Activity controls" page "invited the performance of specific acts [turning off WAA] without further communication, and leaving nothing for negotiation." *Sateriale*, 697 F.3d at 788. The "surrounding circumstances" also support Plaintiffs' interpretation. Mot. at 16. This Court already credited Plaintiffs' interpretation of the WAA Help Page, which is linked to Google's "Activity controls" page. *See* ¶¶ 256-57; Dkt. 109 at 8, 13, 16. Other Google disclosures reinforce Plaintiffs' understanding, including a separate Google webpage that describes WAA as a "powerful privacy control[] . . . which allow[s] you to

17

1    *switch the collection and use of data on or off*" "across Google services." TAC ¶ 258 (emphasis

2    added). The only "surrounding circumstances" that Google mentions are unidentified explanations

3    of "various [Google] settings" that are not addressed in the Complaint. Mot. at 16.

4    *Frezza v. Google Inc.*, 2013 WL 1736788, at *3 (N.D. Cal. Apr. 22, 2013) is inapposite.

5    Mot. at 16. The contract claim in that case was based on blog postings advertising a "Google Tags"

6    free-trial promotion, which directed customers to the "signup page" and a "help center" webpage

7    "for more details." *Id.* at *1. The court held that it was unreasonable for the plaintiffs to interpret

8    the blog postings to mean that they could enroll in the free trial merely by visiting the "signup

9    page" or "help center" page. *Id.* at *3. More was plainly required; for example, "the plaintiffs

10   acknowledge[d] that '[i]n order to commence enrollment . . . , Google required the customers to

11   first provide a credit card.'" *Id.* (second alteration in original). Here, on the other hand, Google's

12   "Activity controls" page presented Google's WAA button to users and permitted them to switch it

13   on or off. There was nothing more for Plaintiffs to do.

14           **C.      Google Breached Its Contractual Obligation To Not Collect Plaintiffs' App
                       Activity While They Had WAA Turned Off.**

15
       The TAC finally states a claim by alleging that Google breached its commitment by

16   continuing to collect and use users' app activity after they switched off WAA, including by way

17   of Google's Firebase SDK with Google products such as GA for Firebase, AdMob, and Cloud

18   Messaging. TAC ¶¶ 260-62. Google admits to this conduct for at least GA for Firebase. *See, e.g.*,

19   Dkt. 62 at 4. Internal emails among Google employees likewise substantiate the breach: "WAA

20   (or any of the other controls) does not actually control what is stored by Google, but simply what

21   the user has access to."  TAC ¶ 260 (quoting GOOG-RDGZ-00024698).

22
       Grasping at straws, Google falls back on an argument this Court already rejected, namely,

23   that Google's "Activity controls" page only described "what can be *saved* to a users' account"

24   (Mot. at 16 (emphasis in original)), with Google free to collect and otherwise save app activity

25   information while WAA is off using all types of "digital buckets" and "spigots" for that data

26   collection. In its first motion to dismiss, Google made the same argument about the WAA Help

27   Page. *See* Dkt. 62 at 7. This Court disagreed: "That plaintiffs did not first perceive the precise

28

                                                   18
─────────────────────────────────────────────

1    contours of a Google Account, before arriving at their averred understanding of the WAA feature,

2    does not doom their claim." Dkt. 109 at 9 (Opinion denying in part MTD FAC).

3    > [T]he WAA Materials' statement that turning WAA on or off governs
   > whether data is "saved in" a user's "Google Account" does not clearly

4    > exclude GA for Firebase from the WAA feature's operative scope. This
   > finding follows another: the concept of a "Google Account" is, at best,

5    > nebulous. . . . The average internet user is not a full-stack engineer; he or
   > she should not be treated as one when Google explains which digital data

6    > goes into which digital buckets, and where the corresponding spigots might

7    > be found.

8    *Id.* at 8-9. The same outcome is warranted here, particularly because Google concedes that the

9    WAA Help Page is "nearly identical" to the "Activity controls" page. Mot. at 11.

10    Google's cases are inapposite. The footnote quoted from *Davis v. Facebook*, 956 F.3d at

11    610 n.11, explained that the plaintiffs could not state a claim concerning *Facebook*'s collection of

12    information based on a provision addressing the information "third-party websites" would receive.

13    Mot. at 17. The claim here is based on statements about *Google's* collection of data. And the claim

14    in *London v. New Albertson's, Inc.*, 2008 WL 4492642, at *6 (S.D. Cal. Sept. 30, 2008) was

15    dismissed because the plaintiff's allegations about the defendant's conduct were "conclusory."

16    **D.    The Terms of Services' Limitation-of-Liability Clauses Do Not Apply.**

17    Google's request to limit Plaintiffs' damages for their breach-of-contract claim is

18    procedurally improper and substantively meritless. In the prior motion to dismiss, Google moved

19    to strike Plaintiffs' request for non-restitutionary disgorgement and consequential damages under

20    Rule 12(f). Dkt. 115 at 21. Plaintiffs pointed out that "Rule 12(f) does not authorize district courts

21    to strike claims for damages on the ground that such claims are precluded as a matter of law."

22    *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974-75 (9th Cir. 2010). Google now

23    recharacterizes their request as a Rule 12(b)(6) motion. But "[r]ecent court decisions have held

24    that because a prayer for relief is a remedy and not a claim, a Rule 12(b)(6) motion to dismiss for

25    failure to state a claim is not a proper vehicle to challenge a plaintiff's prayer for [certain] damages,

26    because Rule 12(b)(6) only countenances dismissal for failure to state a claim." *Elias v.*

27    *Navasartian*, 2017 WL 1013122, at *4 (E.D. Cal. Feb. 17, 2017) (citing cases).

28

19

1    Even if the Court could dismiss portions of Plaintiffs' damages, there would be no grounds

2    to do so. First, the clause Google cites only applies to breaches of Google's Terms of Service:

3    > To the extent permitted by law, the total liability of Google, and its suppliers
     > and distributors, *for any claims under these terms*, including for any implied

4    > warranties, is limited to the amount you paid us to use the services (or, if
     > we choose, to supplying you the services again).

5

6    Santacana Ex. B at 5 (pre-March 2020 Terms of Service) (capitalization omitted and emphasis

7    added). Unlike with the SAC, the claim here is not based on "these terms." Plaintiffs' claim is for

8    breach of a separate, standalone unilateral contract. The Terms of Service could have added "or

9    additional terms" to the limitation-of-liability clause, but it did not, despite distinguishing "these

10   terms" from "additional terms" elsewhere. *See, e.g.*, Ex. B at 4 (referencing what is "set out in

11   these terms or additional terms"). "Although [Google (perhaps)] could have drafted its limitation

12   provision to achieve the result it now seeks, it did not." *Rodman v. Safeway Inc.*, 125 F. Supp. 3d

13   922, 930 (N.D. Cal. 2015), *aff'd*, 694 F. App'x 612 (9th Cir. 2017). Instead, the Terms of Service

14   contemplated that Google and users could enter into separate contracts. *See* Ex. B at 1 ("Our

15   Services are very diverse, so sometimes additional terms or product requirements (including age

16   requirements) may apply."). The limitation clause does not apply to the contract at issue here. At

17   best, Google's argument raises an ambiguity as to whether the limitation applies. But "contractual

18   clauses seeking to limit liability will be strictly construed and any ambiguities resolved against the

19   party seeking to limit its liability." *Safeway*, 125 F. Supp. 3d at 928.

20   Google makes a different argument about the post-March 2020 Terms of Service, but that

21   argument fails too. Mot. at 19. That version states that "Other than the rights and responsibilities

22   described in this section (In case of problems or disagreements), Google won't be responsible for

23   any other losses, unless they're caused by our breach of these terms or service-specific additional

24   terms"). Santacana Ex. A at 11. Google interprets this provision as a sort of damages-focused

25   merger clause, arguing that "Plaintiffs cannot recover damages for alleged breaches of terms other

26   than those in the Terms of Service." Mot. at 19. Google does not make the same argument about

27   the prior versions of the Terms of Service so, at best, Google's argument only precludes non-

28   restitutionary disgorgement as of March 2020. In any event, Google's argument fails because non-

20

1    restitutionary disgorgement is not a "loss." *See In re Google Assistant Privacy Litig.*, 457 F. Supp.

2    3d 797, 840 (N.D. Cal. 2020) ("[N]onrestitutionary disgorgement focuses on the defendant's

3    unjust enrichment."). The provision Google cites is limited to Google's responsibility for "losses."

4    Tellingly, Google's argument here is one that Google has not even made in other recent

5    cases. In *In re Google Assistant Privacy Litigation*, the plaintiffs likewise requested non-

6    restitutionary disgorgement from Google for breach of contract, but Google did not argue that the

7    Terms of Service preclude such relief. Dkt. 5:19-cv-04286, ECF No. 120 at 18. The Court

8    ultimately held that plaintiffs adequately pleaded an entitlement to disgorgement of profits for

9    Google's breach of its Privacy Policy (as incorporated into the Terms of Service). *In re Google*

10   *Assistant Privacy Litig.*, 2021 WL 2711747, at *14 (N.D. Cal. July 1, 2021). If non-restitutionary

11   disgorgement is available for breach of the Google Terms of Service, then it is certainly available

12   for breach of the separate, standalone contract at issue in this case.

13   Google's cases are also distinguishable. *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024,

14   1037 (N.D. Cal. 2019), was a data breach case, and the court ruled that Facebook's Terms of

15   Service precluded liability because it stated that "we make no guarantees that [our products] always

16   will be safe, secure, or error-free." *Huynh v. Quora, Inc.*, 2019 WL 11502875, at *1 (N.D. Cal.

17   Dec. 19, 2019) was also data breach case for which a limitation-of-liability clause precluded

18   liability. The operative clause in *Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 125 (Cal. Ct.

19   App. 2015) precluded liability for "errors or omissions in any content," which the court interpreted

20   to encompass the plaintiff's claim for deleting content. *Darnaa, LLC v. Google LLC*, 756 F. App'x

21   674 (9th Cir. 2018) addressed a similar content-removal challenge, which turned on the same

22   "errors or omissions in any content" exclusion. By contrast, the Google Terms of Service does not

23   preclude liability for the challenged conduct here. Nor could it. No limitation-of-liability clause

24   permits Google to lie about its privacy controls.

25   Relatedly, the current Terms of Service clarifies that it does not limit Google's liability for

26   "willful misconduct," Ex. A at 11, which is what Plaintiffs have alleged here, *see* TAC ¶¶ 8-9, 37,

27   83, 251, 255, 260-61, 269 (alleging with examples that Google knew users misunderstood WAA

28

21

1   and yet did nothing to correct the problem). To the extent either version of the Terms of Service is

2   interpreted to prohibit Plaintiffs from recovering any of the damages they seek, the provisions

3   should be disregarded as unconscionable.[4]

4   **III.**    **Plaintiffs Alternatively State a Quasi-Contract (Unjust Enrichment) Claim.**

5        Should the Court reject Plaintiffs' unilateral contract theory, Plaintiffs alternatively plead

6   a valid quasi-contract (unjust enrichment) claim. TAC ¶¶ 266-71. Google's accusation that

7   Plaintiffs "exceed the spirit of the Court's authorization" is unwarranted. Mot. at 20. This Court

8   granted Plaintiffs leave to amend their contract claim, Dkt. 127 at 8, and Plaintiffs have done so,

9   including by alleging two alternative theories: unilateral contract and quasi-contract.

10       If the Court rejects Plaintiffs' unilateral contract theory, then there is no contract governing

11   the same subject matter, and Plaintiffs are entitled to relief under a quasi-contract theory. *See*

12   *Cheung v. Wells Fargo Bank, N.A.*, 987 F. Supp. 2d 972, 979 (N.D. Cal. 2013) (Seeborg, J.) (quasi-

13   contract claim appropriate when there is no "contract governing the same subject matter"). Google

14   claims that the Terms of Service cover the same subject matter, but the argument fails.

15       First, Google only cites the post-March 2020 Terms of Service. Mot. at 21 (claiming that

16   the Terms of Service "governs the same topic: users who 'interact with [Google's] services.'"

17   (alteration in original) (citing Santacana Ex. A at 1)). And Google omits the full text: the Terms

18

---

19   [4] "The Ninth Circuit has held that a contract is procedurally unconscionable under California law
if it is a standardized contract, drafted by the party of superior bargaining strength, that relegates

20   to the subscribing party only the opportunity to adhere to the contract or reject it." *In re Yahoo!
Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1136-37 (N.D. Cal. 2018). Here,

21   exactly as in *In re Yahoo*, the "liability limitations appear near the end of the 12-page legal Terms
of Service document where the Terms of Service are contained in an adhesion contract and

22   customers may not negotiate or modify any terms." *Id.*

23   Google's interpretation also renders the clauses substantively unconscionable because they would

24   preclude "nearly every type of damages claim." *Silicon Valley Self Direct, LLC v. Paychex, Inc.*,
2015 WL 4452373, at *6 (N.D. Cal. July 20, 2015). "California courts have . . . concluded that

25   limitations are substantively unconscionable when they guarantee[] that plaintiffs could not
possibly obtain anything approaching full recompense for their harm." *In re Yahoo*, 313 F. Supp.

26   3d at 1137. Google's interpretation would preclude not only nonrestitutionary disgorgement and
consequential damages, but also Plaintiffs' prayer for compensatory damages, including the value

27   of the data that Google wrongfully collected. TAC ¶¶ 143-63, 265.

28

1  "*help* define Google's relationship with you as you interact with our services." (emphasis added).

2  The use of "help" shows that the Terms do not even purport to fully govern that relationship.

3  Moreover, Google tellingly does not mention the prior versions of the Terms of Service. That's

4  because the prior versions in no way purport to address the entirety of users' interactions with

5  Google services. To the contrary, those versions recognize that "[o]ur Services are very diverse,

6  so sometimes additional terms or product requirements . . . may apply."  Santacana Ex. B at 1; Ex.

7  C at 1. Even if the Court were to rule that the current Terms of Service cover the "same subject

8  matter," Plaintiffs may still state a claim for Google's pre-March 2020 conduct.

9      Regardless, the current Terms of Service do not cover the same subject matter. The "subject

10  matter" of Plaintiffs' claim, even broadly construed, is Google's privacy features. Google

11  mischaracterizes the relevant "subject matter" as Plaintiffs' interaction with Google services

12  generally. Mot. at 20. That is far too broad, as shown by the cases Google cites. *Letizia v. Facebook*

13  *Inc.*, 267 F. Supp. 3d 1235, 1253 (N.D. Cal. 2017), for example, addressed a claim that Facebook

14  improperly calculated two specific advertising metrics and thus caused the plaintiffs-advertisers to

15  pay more than they otherwise would have. The court construed the subject matter to be

16  "Facebook's advertising services," as opposed to the "two advertising metrics at issue here."  *Id.*

17  The court reached a similar conclusion in *AdTrader, Inc. v. Google LLC*, 2018 WL 3428525, at

18  *11 (N.D. Cal. July 13, 2018). "The subject matter of the parties' agreement is Google's

19  advertisement services," not Google's obligation "to provide refunds for invalid activity."  *Id.*

20      The thread holding these cases together is that there was already an agreement about the

21  defendant's advertising services, so the plaintiffs could not rewrite those agreements to add a new

22  commitment about the advertising services. But here, the March 2020 Terms state that the Privacy

23  Policy (which discusses some privacy features) is "not part of these terms."  Ex. A at 1. Google is

24  trying to have its cake and eat it too: on the one hand, disclaiming all privacy-related disclosures

25  from the Terms of Service, while, on the other hand, arguing that the Terms cover privacy features.

26      Plaintiffs also plead the elements of a quasi-contract claim, namely, that Plaintiffs

27  unwittingly conferred a benefit which Google knowingly accepted under circumstances that make

28

23

it inequitable for Google to accept and retain the benefit. TAC ¶¶ 268-69. Google knew people misunderstood Google's promises regarding WAA, and that it was collecting app-activity information without consent, and yet Google did nothing but continue collecting that information from unsuspecting users. The TAC cites key admissions by Google employees that have come to light through discovery in this case: (emphases are added).

- "WAA (or any of the other controls) does not actually control what is stored by Google, but simply what the user has access to. ***This is really bad***. . . . I for one didn't realize Google actually stored all of my activity even if those controls were off and I work at Google! ***Seems sort of silly to turn them off as I'm not any safer with them off than on.***" TAC ¶ 260.

- "The WAA and other controls imply we don't log the data, but obviously we do. ***We need to change the description*** to indicate even with the control off, Google retains this data and uses it for X purposes. . . . If we are storing data that the user does not have access to, we need to be clear about that fact." TAC ¶ 261.

- "Today, ***we don't accurately describe what happens when WAA is off***. [G]iven the way on/off works, one has to then assume that disabled (off) would be the exact opposite of what is described for what happens when the WAA bit is on." TAC ¶ 261.

- Turning WAA off leaves users with a "***false sense of security*** that their data is not being stored at Google, when in fact it is." TAC ¶ 9.

- Describing WAA as "not clear to users," "nebulous," "not well understood," and noting that WAA "confuses users." TAC ¶ 8.

- Google employees know that Google's promise of control is "***just not true.***" *Id.*

The TAC also quotes documents that have come to light through proceedings with the Arizona Attorney General, including admissions by Google employees that its privacy disclosures are a "mess" with regard to obtaining "consent" for its data-collection practices. TAC ¶ 37; *see also id.* ¶ 83 (WAA is something "difficult enough that people won't figure it out").

Plaintiffs further allege in detail that Google "profits from the communications it intercepts," including by associating the data with user profiles, directing targeted advertisements to consumers, and using the data to modify its own algorithms and technology, including for Google search. TAC ¶¶ 117-41. Plaintiffs likewise allege in detail why the intercepted communications are valuable to Google, including by citing specific studies and surveys. TAC ¶¶ 142-63. And Plaintiffs allege that their third-party app activity data was impermissibly intercepted by Google every time they visited an app that uses Google's Firebase SDK products,

24

1    including GA for Firebase, AdMob, and Cloud Messaging. TAC ¶¶ 6, 60, 262. Plaintiffs even

2    identify the specific apps they visited. TAC ¶¶ 213, 215, 217, 219, 221, 223, 225, 227, 229. Even

3    if Rule 9(b) applies, Plaintiffs' allegations more than suffice.

4         This case is like *Williams v. Facebook, Inc.*, 498 F. Supp. 3d 1189, 1200 (N.D. Cal. 2019)

5    (Seeborg, J.), in which the plaintiffs stated an unjust enrichment claim based on Facebook's

6    unauthorized scraping of call and text data. This Court rejected Facebook's argument that Plaintiffs

7    failed to plead particularized facts showing when they were presented with the misleading prompt,

8    reasoning that "[s]uch exacting specificity is not required, however, as the SAC contains sufficient

9    facts to aver that Plaintiffs downloaded" the relevant apps before Facebook stopped the challenged

10   practice. *Id.* at 1201. The same outcome is warranted here, particularly because Google admits that

11   it collected Plaintiffs' app-activity data while they had WAA off throughout the Class Period.

12                                            **CONCLUSION**

13        For these reasons, Plaintiffs respectfully request that this Court deny Google's Motion in

14   its entirety. Alternatively, Plaintiffs request leave to amend to correct any deficiencies.[5]

15   Dated: October 6, 2021

16                                    By: */s/ Amanda Bonn*
                                      Amanda Bonn (CA Bar No. 270891)

17

18                                    SUSMAN GODFREY L.L.P.
                                      1900 Avenue of the Stars, Suite 1400
19                                    Los Angeles, CA 90067
                                      Telephone: (310) 789-3100

20
                                      Mark C. Mao (CA Bar No. 236165)
21                                    mmao@bsfllp.com
                                      Beko Reblitz-Richardson (CA Bar No. 238027)
22                                    brichardson@bsfllp.com
                                      BOIES SCHILLER FLEXNER LLP
23                                    44 Montgomery Street, 41st Floor
                                      San Francisco, CA 94104
24                                    Telephone: (415) 293 6858
                                      Facsimile (415) 999 9695
25

26   [5] "[L]eave to amend shall be freely given when justice so requires, bearing in mind the underlying
     purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or
27   technicalities. . . ." *Cal. Spine & Neurosurgery Inst. v. United Healthcare Ins. Co.*, 2019 WL
     4450842, at *3 (N.D. Cal. Sept. 17, 2019).
28
                                            25

Jesse Panuccio (admitted *pro hac vice*)
jpanuccio@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Tel.: (202) 237-2727
Fax: (202) 237-6131

James Lee (admitted *pro hac vice*)
jlee@bsfllp.com
Rossana Baeza (*pro hac vice*)
rbaeza@bsfllp.com
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street, Suite 2800
Miami, FL 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

William Christopher Carmody (*pro hac vice*)
bcarmody@susmangodfrey.com
Shawn J. Rabin (*pro hac vice*)
srabin@susmangodfrey.com
Steven Shepard (*pro hac vice*)
sshepard@susmangodfrey.com
Alexander P. Frawley (*pro hac vice*)
afrawley@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019
Telephone: (212) 336-8330

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
Michael F. Ram, CA Bar No. 104805
mram@forthepeople.com
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

*Attorneys for Plaintiffs*

26