WILLKIE FARR & GALLAGHER LLP

One Front Street
San Francisco, CA 94111
Tel: 415 858 7400
Fax: 415 858 7599

November 15, 2021

**Submitted via ECF**

Magistrate Judge Alex G. Tse
San Francisco Courthouse
Courtroom A - 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

**Re: Google's Response to Plaintiffs' Supplemental Letter Brief re: Google Custodians *Anibal Rodriguez, et al. v. Google LLC*, Case No. 3:20-CV-04688**

Dear Magistrate Judge Tse:

Google submits this response to Plaintiffs' supplemental letter brief (ECF No. 163), pursuant to the Court's order (ECF No. 157). This submission responds to Plaintiffs' (1) statement of disputed factual and legal issues, (2) request for custodial documents from nine of nineteen employees (which Google has also responded to at ECF No. 155), and (3) request for custodial documents from ten additional employees.

**Factual and Legal Disputes**

Plaintiffs' recitation of the "facts" of this case is unreliable. Judge Seeborg's decisions on Google's motion to dismiss, on the other hand, make clear what this case is and is not about. This is not a referendum on Google's business, nor on any one of a dozen of Google privacy controls, nor is it about what Google collects when WAA is set to "on." This case is about Google's receipt of data from third party app developers who use the Google Analytics for Firebase tool to analyze the performance of their apps. Plaintiffs' theory of the case—the one Judge Seeborg has permitted to proceed—is that when a user reads a specific disclosure about what WAA does, that user reasonably expects that one thing it will do is block the collection of data about them via GA for Firebase. Plaintiffs allege that despite that expectation, the WAA button does not change how GA for Firebase data is used; instead, Plaintiffs allege, Google ties GA for Firebase to users' identities and uses the data for personalized advertising when WAA is turned "off." *See* ECF No. 106 at 9.

The theory of the case is therefore narrow: (1) what Google told users about WAA, (2) how GA for Firebase works, and (3) the proper calculation of damages, if any. ***None*** of the material factual and legal questions are questions for which custodial ESI, *i.e.*, individual employees' e-mail, would be particularly relevant, and to the extent e-mail touches on these subjects, it is the least efficient source of discovery to answer the questions.

The theory of the case is also false, though of course this Court need not make that decision now. But it must be said that Plaintiffs have known since early August, when Google served its verified interrogatory response on this topic, that they are simply wrong about their allegations. The WAA button *does* affect how Google handles GA for Firebase data, and when a user sets the WAA button to "off," data collected from that user's mobile device on behalf of third party app developers (who disclose they are collecting analytics data to their users) is not associated with the user's identity. To the contrary, Google takes extraordinary and technologically sophisticated steps to (1) mask the data so it cannot be attributed to a specific Google user; (2) prohibits employees from re-associating the data with a user's Google Account; and (3) takes various steps to ensure access control and adequate encryption so that a hypothetical "bad actor" cannot re-associate the data. Plaintiffs' effort now, at the end of discovery, to quintuple the number of ESI custodians must be considered in view of the disclosure Google made to Plaintiffs that their entire case is fatally defective as a factual matter.

In any case, this Court ordered Plaintiffs to identify the legal and factual issues to which the custodial ESI of the particular individuals they seek will be relevant. Google addresses the particular custodians below, but the overarching problem with Plaintiffs' request is that they fail to provide any cogent explanation for why the focus of discovery in this case should be on troves of additional e-mail as opposed to about non-custodial functionality documents and other similar sources of information, such as the public disclosure Google made to Plaintiffs.

Google has nevertheless already provided substantial amounts of e-mail, and from their briefs to this Court, it seems Plaintiffs have no shortage of e-mail on which to rely to supply atmospherics to the case. But that is as far as the e-mail evidence goes. None of it will change (1) what Google said, (2) what Google's technology did, or (3) what the measure of damages should be, if any.

Plaintiffs argue that e-mail will provide "critical evidence" concerning their allegation that "Google collects information from users while WAA is off without disclosure or consent." But that's not how functionality is proven. Google has already produced the non-custodial documents that specify how GA for Firebase functions in addition to the verified interrogatory response discussed above. And Google has offered dates for the Rule 30(b)(6) deposition on functionality that Plaintiffs moved to compel before this Court in May. There is no serious argument that Plaintiffs have lingering questions about what GA for Firebase does that could be answered by a massive dump of e-mail messages.

Next, Plaintiffs argue that e-mail will be relevant to class certification because e-mail will show that "Google's own employees recognize that users are unaware of Google's collection of information while WAA is off, and that Google is concealing this fact." That's not a factor at class certification, and the cited authority does not say otherwise. In *Grace v. Apple, Inc.*, the quotation Plaintiffs rely on came from a summary of the plaintiffs' allegations in the background section of Judge Koh's opinion. She never again referred to it as relevant to any class certification factor. The same is true of *In re Yahoo Mail Litig.*, in which Judge Koh again noted the plaintiffs' allegation that executives were aware of the issue in the factual background section and never again referred to it as relevant to any class certification factor. This argument also

defies common sense. Plaintiffs themselves do not note which factor of class certification such e-mail would be relevant to. There is none.

Plaintiffs also complain that the discovery they've received thus far suggests that Google has only made a "limited use" of GA for Firebase data collected while WAA was turned off. Plaintiffs say they "dispute" this, but they have delayed taking the Rule 30(b)(6) deposition they moved to compel in May that would answer their questions. The reality here is that Plaintiffs don't like the answers to their questions—that Google honored user expectations when it anonymized GA for Firebase data to ensure it could not be associated with a user's Google Account. In any case, whether data is actually anonymized or not is not a question to be answered with the e-mail of senior-level employees; it is a technical question of what Google actually does. Google has searched for and produced the documents that demonstrate this.

Then, Plaintiffs argue that they need more custodial ESI to demonstrate how Google uses GA for Firebase data. Google disputes this. But the bulk of the custodians Plaintiffs have listed have nothing to do with how Google uses the data; they are either too senior and uninvolved in the details regarding use of the data, or their work relates just to the WAA feature, which doesn't make use of the data even if Plaintiffs' allegations are taken as true (because WAA is off). Google has designated a custodian for the AdMob and Firebase integration so that Plaintiffs can review his e-mail discussing how the GA for Firebase data is used by AdMob. That should be more than enough, but in any case, no custodian on Plaintiffs' list of nineteen even works on AdMob.

Next, Plaintiffs argue that custodial ESI is relevant to whether Google's conduct is "highly offensive and egregious" because it may show that Google "knew that users were misled." Even if the Court assumes for the moment that Plaintiffs' allegation is correct (and all evidence in this case points to the opposite), that is no justification for forcing Google to search two dozen individuals' e-mail. Google has designated five custodians who are relevant to Plaintiffs' claims. That should be more than enough for them to identify e-mail that they can use rhetorically when they argue to the factfinder that Google's conduct was highly offensive and egregious under the *objective* standard the law requires.

Finally, Plaintiffs argue that custodial ESI is highly relevant in terms of assessing the extent to which Google knew users misunderstood WAA. This is sleight of hand. WAA is an expansive control that affects myriad types of data. Plaintiffs have *never* pointed to a single piece of evidence suggesting that Google knew users misunderstood WAA *vis-à-vis GA for Firebase*; the evidence they rely on in this motion, in past motions, in their complaints, and in their pending motion for relief from the case schedule relates to aspects of WAA that are not at issue in this case, such as what users expect when WAA is on vis-à-vis the separate Location History feature.

Expanding the custodian count won't change any of this. The key custodians on that question are Steve Ganem, who is responsible for GA for Firebase, and Dave Monsees, who is responsible for the aspects of WAA at issue here and Google has already produced their e-mail. Meanwhile, the burden of providing custodial ESI is famously crushing. Google has already spent thousands of hours reviewing potentially responsive e-mail from the five custodians

already in the case to ensure it is both responsive and not privileged, and its counsel have spent hundreds of hours reviewing those decisions to ensure that Google abides by its discovery obligations and that its attorney-client privilege is adequately protected. Each additional custodian multiplies this massive effort for, as discussed, very little evidentiary gain.

**First Nine Custodians**

Plaintiffs' arguments for the first nine custodians are identical to their opening brief. They add nothing. To the extent they identify disputed legal or factual issues, Google has addressed above why custodial ESI is unduly burdensome on those questions. Google otherwise has nothing to add to its prior brief on these nine custodians.

**Additional Ten Custodians**

There is a reason Plaintiffs did not focus on the additional ten custodians in their initial request to this Court: the likelihood that these custodians will have non-duplicative, relevant documents in their e-mail is vastly outweighed by the burden of adding ten custodians to the case and disproportionate to the needs of the Action. Six of them are high-level executives who sit many layers above the employees with knowledge about the products at issue and are therefore inappropriate custodians in a case primarily about the inner workings of a handful of products within Google's umbrella of offerings. All they can add is a superficial 80,000-foot view on tangential—and often irrelevant—topics. That these "additional" ten proposed custodians are unlikely to have relevant information is underscored by Plaintiffs' strained justifications for trawling through the files of these employees. In each case, Plaintiffs do little more than offer general assertions or citations that demonstrate the proposed custodians have only superficial involvement with relevant issues. All miss the mark.

**WAA-related documents.** Plaintiffs seek documents from six of the ten additional custodians (Jan Hanneman, Guemmy Kim, Mark Risher, Rahul Roy-Chowdhury, Stephan Micklitz, and Keith Enright) for information "concerning the functionality of and disclosures tied to WAA." But this eleventh-hour request is no more than a pretext for casting a dragnet over Google's documents hoping to find some (nonexistent) smoking gun (about WAA or any other product). None of these individuals worked closely with WAA. Plaintiffs know that. Indeed, Plaintiffs' own descriptions and citations confirm these individuals are not directly responsible for WAA. What's more, over six months ago, Google informed Plaintiffs that David Monsees, an existing custodian and Product Manager responsible for WAA, had assistance developing and maintaining WAA from a handful of software developers and a user experience designer. Tellingly, Plaintiffs have asked for none of their documents, nor would they be likely to have non-duplicative ones of significant relevance because Mr. Monsees was uniquely and intimately involved with all aspects of WAA, and Plaintiffs also already have WAA-related documents from the Arizona location history litigation. Unsurprisingly, therefore, none of Plaintiffs' custodian-specific arguments have merit.[1]

[1] Additionally, Messrs. Hannemann and Micklitz are in Germany, which could complicate discovery.

1. Plaintiffs seek **Jan Hanneman**'s documents because he helped develop My Account and **Guemmy Kim's** documents because she once published a blog post on My Account. But My Account is far broader than WAA and involves features such as Google Pay, account storage, subscriptions, flight, hotel, and event reservations, purchase information, location sharing, and YouTube history, along with WAA. Although My Account is the front-end host of the WAA toggle, it is Mr. Monsees who knows about the specific WAA sub-product. That is why none of the documents Plaintiffs cite establish either Mr. Hanneman's or Ms. Kim's unique knowledge.

Mr. Hanneman. Plaintiffs contend an October 2015 e-mail shows Mr. Hanneman was "looped in" to answer "questions about past user experience research regarding WAA." But later-in-time e-mails in the thread show he didn't actually have any knowledge on the topic. GOOG-RDGZ-00013980. And more importantly, Google has *already produced* user study reports relating to WAA from its Arizona litigation production. Those reports contain all information concerning study type, design, assumptions, results, and findings because the user experience team did not use e-mails as a standard method to do research, so custodial documents would be of little value even if Mr. Hanneman was involved in WAA user research (he was not).

Ms. Kim. As for Ms. Kim, the documents Plaintiffs cite underscore that Mr. Monsees is the appropriate WAA custodian. One e-mail thread reveals that a sWAA question was initially directed at Ms. Kim, but she and others in the thread identified Mr. Monsees as the one who would have the answers, and he indeed explained how sWAA works. GOOG-RDGZ-00036282. That thread is irrelevant in any case because it concerns data collected through a first-party product, not third-party apps as implicated by the TAC. The only other document Plaintiffs cite lists Ms. Kim as an "[i]nfrastructure: [i]dentity" product manager for an Android user data control setting change—but Mr. Monsees is listed as the launch "*creator*," and "owner" of "*Global*" "product manage[ment]." GOOG-RDGZ-20684.

2. **Mark Risher** is a Senior Director of Product Management and **Rahul Roy-Chowdhury** is a VP of Product Management. Both are indisputably high-level executives for whom WAA is but a small part of their job portfolios. They are thus far too removed from the issues in this case to have relevant documents, and Plaintiffs' reason for seeking their e-mails has no relationship to the issues in this case. To start, Plaintiffs believe they are entitled to Messrs. Risher's and Roy-Chowdhury's documents because of their knowledge of statements Google made concerning the retention period for data collected when a user is signed in and WAA is ***on***. ECF No. 163 at 8, 9. But Plaintiffs' case concerns whether turning WAA "*off*" controls data collected through GA for Firebase, or, more broadly as Plaintiffs argue, what GA for Firebase data is collected, retained, and used when WAA is ***off***. Plaintiffs acknowledge this distinction, contending for example that Mr. Risher "will have relevant documents concerning . . . Google's storage and use of the data collected from users who switched *off* WAA." ECF No. 163 at 8. That is why Google's retention of signed-in WAA-on data, whether for seconds or indefinitely, is irrelevant to Plaintiffs' case. Even if it were relevant, Plaintiffs already have documents from Mr. Monsees' custodial ESI, Google's non-custodial productions, and from the Arizona litigation.

Further, because Messrs. Risher and Roy-Chowdhury are high-level executives, they have little granular knowledge on WAA, which is underscored by the documents Plaintiffs cite. Plaintiffs rely on an e-mail between the two where Mr. Roy-Chowdhury references general "guiding principles for our privacy work" and efforts to "be transparent about data collection, storage, and use" discussed at an executive meeting. GOOG-RDGZ-0026172 (at ECF No. 163 at 8, 9). But those general company goals say nothing about disclosures related specifically to WAA, or either employee's knowledge. Indeed, Mr. Risher's response concerns Google's statements about a first-party cloud storage application (Google One), which is not at issue in this case. *Id.* In another e-mail thread, Mr. Risher acknowledges his limited knowledge: "just sharing [my thoughts] as [] peanut gallery commentary." GOOG-RDGZ-0043427. Plaintiffs also cite to a launch e-mail concerning changes to user data control (UDC) text to comply with European Union GDPR regulations. ECF No. 163 at 8. Setting aside that compliance with EU laws is irrelevant to this case brought under California law, the document Plaintiffs cite once again identifies Mr. Monsees as the "*creator*," "owner," and "*Global*" "product manager" for the UDC text change while Mr. Risher is only responsible for "[i]dentity." GOOG-RDGZ-14876.

3. **Stephan Micklitz**, Director of Engineering on Google's Privacy Team, is similarly removed from the relevant details concerning WAA. Plaintiffs claim to seek Mr. Micklitz's documents because he has "knowledge of the misrepresentations [Google] made regarding WAA" which will be "unique given . . . his engineering background and privacy focus." But the documents Plaintiffs cite confirm Mr. Micklitz has little if any detailed knowledge about WAA disclosures. Plaintiffs again cite an Android UDC setting launch e-mail (discussed above with reference to Ms. Kim) which identifies Mr. Micklitz as an "identity" "infrastructure" engineer, but Mr. Monsees is identified as the UDC language "*creator*," and "owner" of "*Global*" "product manage[ment]." GOOG-RDGZ-20684. The same is true of two other launch e-mails Plaintiffs cite, which are separately irrelevant because one concerns compliance with European Union GDPR laws (GOOG-RDGZ-0017647) and the other concerns data retention when WAA is on (GOOG-RDGZ-00044065). Plaintiffs' last citation is even further afield as it not only relates to WAA-on data retention, but Mr. Micklitz's involvement is limited to being sent the thread. GOOG-RDGZ-00043358.R.

4. **Keith Enright** is an attorney and Google's Chief Privacy Officer. Collecting and searching his files will result in a massive, burdensome privilege-logging exercise and limited production of documents. This alone is reason to reject Plaintiffs' request. But it fails on the merits too. Mr. Enright, like other executives from whom Plaintiffs seek e-mails, is similarly removed from relevant details concerning WAA. Plaintiffs advance two justifications: (a) they hope to obtain "documents provided to and reflecting Google's interactions with regulators" and (b) they seek to "understand[] the development and functionality of WAA" including its "creation." The first is improper; the second is duplicative; and Plaintiffs' citations offer no support for either request in any case. *First*, Plaintiffs' request is a transparent end-run around this Court's Order. When Plaintiffs previously sought "[a]ll [d]ocuments Google has provided to any [r]egulator since January 1, 2014, concerning Firebase and its collection . . . of user data," this Court found that the scope of the request "is not proportional to the needs of the case." ECF No. 85 at 1:17-18. That is in accord with federal authorities which prohibit "cloned" or

"piggyback" discovery.[2] To be sure, Google does not dispute that Plaintiffs are entitled to relevant documents. But Plaintiffs have those documents, which were produced in the normal course of discovery. Since that February 8, 2021 order, Google has produced thousands of custodial and non-custodial documents—including documents and written discovery responses produced to Arizona regulators—that concern WAA. Those productions make it even more burdensome to search Mr. Enright's ESI in light of the low probability he will have non-duplicative and relevant information concerning "documents given to regulators regarding WAA and Google's WAA-off data collection." ECF No. 163 at 7. *Second*, the document Plaintiffs cite to establish Mr. Enright's "understanding [of] the development and functionality of WAA" does not reference him *at all*. *See* GOOG-RDGZ-00019095 at -99. Instead, it is a document that summarizes all the projects Mr. Monsees (Google's WAA custodian) worked on between 2013 and 2019, including WAA and My Activity. Finally, Mr. Enright's Congressional Testimony on data privacy does not establish he has any specific knowledge about WAA; in fact, Plaintiffs cite to a portion concerning Google Accounts generally, which, as discussed above, cover far more than WAA. ECF No. 163 at 7 n.5.

**Firebase acquisition documents.** **Donald Harrison** is President of Global Partnership and Corporate Development; **Jason Titus** is VP of Google's Developer Products Group. Neither has ever had responsibility for the issues relevant to this case. Yet Plaintiffs seek their documents to obtain information about Google's "valuation of Firebase" during the 2014 acquisition. ECF No. 163 at 5, 6–7. Plaintiffs claim such information could be relevant to "disputed issues regarding the calculation of damages" generally, and specifically to their theory of "unjust enrichment." But they tellingly omit *how* that could be so. It cannot. Google's 2014 assessment of Firebase's valuation—regardless of whether it was $0 or many millions—has no bearing on Plaintiffs' damages theories. Firebase is not a platform for selling user data; it is a suite of tools for developing, releasing, and monitoring mobile apps. Accordingly, Google's valuation of the intellectual property, proprietary technology, and market knowledge powering that back-end service during the acquisition in 2014 (or the amount actually paid) has no bearing on the value of Plaintiffs' data, the monetary harm they've allegedly suffered, or Google's purported financial gain. Plaintiffs also add that Mr. Harrison "*possibly* . . . discuss[ed] . . . how WAA would or would not impact . . . revenue[]" from Firebase. But that suspicion is far from what is required to force Google to undertake the burden of custodial document collection, production, and review when it has already produced documents from custodians with responsibility for each of the products at issue in the case. Plaintiffs' fall-back reasons for trawling through Messrs. Harrison's and Titus's custodial ESI are even more strained.

[2] *E.g., Goro v. Flowers Foods, Inc.*, No. 17-CV-02580-JLS-JLB, 2019 WL 6252499, at *18 (S.D. Cal. Nov. 22, 2019) (denying request for cloned discovery because "the appropriate thing to do is to request those documents" specifically); *King Cty. v. Merrill Lynch & Co.*, No. C10-1156-RSM, 2011 WL 3438491, at *3 (W.D. Wash. Aug. 5, 2011) (denying motion to compel production of documents from other investigations or litigations); *Wollam v. Wright Med. Grp., Inc.*, No. 10-CV-03104-DME-BNB, 2011 WL 1899774, at *1 (D. Colo. May 18, 2011) (collecting cases and "agree[ing] with the many courts that have considered the question and have held that cloned discovery is not necessarily relevant and discoverable").

Mr. Harrison. Plaintiffs contend Mr. Harrison will have information related to Google's consent defense based on his testimony at a Senate hearing stating that although Google wants "our users to be able to make a decision on how they control their data . . . .," consent at times "appears confusing." ECF No. 163 at 5 (citing TAC ¶ 107). But that stray quote is far from enough to manufacture the need to review custodial data. It says nothing about whether Mr. Harrison understands what users consent to when utilizing third-party applications that use Firebase, which is the consent at issue here.

Mr. Titus. Plaintiffs contend Mr. Titus has knowledge on the broad topics of general Firebase SDK "development," "expansion," and "efforts to get app developers to use" the products. To support this claim, Plaintiffs rely on Mr. Titus's leadership of a "'Developer Product Group' . . . to help third party app developers navigate Google APIs and SDKs." But as the document Plaintiffs cite confirms, Google has hundreds of APIs and dozens of SDK tools meaning Mr. Titus at most has high-level and superficial involvement in the Firebase developer products. GOOG-RDGZ-00056947 (Google has "over 150+ external APIs [for] developers).[3] In any event, the general "development" and "expansion" of Firebase SDK is not at issue. Plaintiffs' TAC implicates the functionality of GA for Firebase and its interaction with certain other Google products, topics on which Google has already completed custodial production, including from Steve Ganem, the Product Lead for GA for Firebase. To the extent more general Firebase SDK topics are relevant, Google has also produced those documents too—from Francis Ma, a product executive for the full Firebase SDK suite.

**Google Analytics.** **Dan Stone** was and **Sree Pothana** is on the general Google Analytics (not just GA for Firebase) team. Plaintiffs seek their documents to obtain information about all Google analytics products and data storage writ large. ECF No. 163 at 6, 8. But this case is about Firebase, and, specifically, data collected from the GA for Firebase developer tool. It has nothing to do with, for example, analytics of web traffic or mobile web searches (that's the subject of Plaintiffs' counsel's other case against Google). And that is why custodians who work on analytics writ large are not appropriate, particularly since Google has already completed production of non-custodial documents on GA for Firebase, as well as custodial productions from the GA for Firebase Product Lead and the Firebase SDK product executive, and Google is in the process of reviewing documents from a Firebase Cloud Messaging custodian based on Plaintiffs' recent additions to their allegations. Any more would be disproportionate to the needs of the case and unlikely to yield documents that resolve disputed issues. *See* Fed. R. Civ. P. 26(b). Plaintiffs' specific arguments do not alter this conclusion.

Ms. Pothana. Nothing in the documents Plaintiffs cite suggest Ms. Pothana would have relevant, non-duplicative information. For example, Plaintiffs cite two e-mail threads that they characterize as showing Ms. Pothana was "substantively involved in discussions concerning Google's Firebase-based collection and processing of various identifiers." But in reality, she did

[3] *See also* https://developers.google.com/apis-explorer (Google API Explorer listing 150+ APIs ranging from ones concerning "information about web fonts" to webpage speed APIs); https://developers.google.com/products (listing Google SDKs including ones for Google Assistant, Cloud, and Maps).

not participate in either thread, one of which comprises discussion over 35 e-mails (GOOG-RDGZ-00028616) and the other 15 e-mails (GOOG-RDGZ-00033699). That she was sent those e-mails is far from enough to establish that her ESI must be searched. Plaintiffs fare no better with their remaining two citations, which do not specifically concern GA for Firebase. As for Plaintiffs' contention that "Ms. Pothana's ESI is relevant to identifying WAA-off data tied to class members," Google has already told Plaintiffs in a verified interrogatory response that it does not store personally-identifiable information tied to specific users when WAA is off and nothing Plaintiffs have cited undermines that statement.

Mr. Stone. Plaintiffs take a kitchen sink approach for why they should get Mr. Stone's documents, but all of their arguments are meritless. Plaintiffs' citations confirm only that Mr. Ganem is the proper custodian—they are otherwise irrelevant or Plaintiffs' reliance on them is misplaced. For example, Plaintiffs rely on a launch document (GOOG-RDGZ-00029866) to establish Mr. Stone was "responsible for tasks related to Firebase." But that document confirms Mr. Ganem is more knowledgeable. In it, both Mr. Stone and Mr. Ganem, along with others, are identified as "Global" product managers, but Mr. Ganem is the one identified as the specific manager for "Analytics," while Mr. Stone has no specific responsibility. And, most notably, Mr. Stone had to ask Mr. Ganem for information ("[t]his launched right?") demonstrating that even he thinks Mr. Ganem is the authority.[4] Other documents Plaintiffs cite plainly have nothing to do with this case, *see, e.g.*, GOOG-RDGZ-00030532 (discussing Firebase "for web," not apps), and are unavailing in any case because they demonstrate Mr. Ganem is the person with the most knowledge of GA for Firebase, *see id*. (Ganem responding to Stone's question concerning how the product works). Put simply, Mr. Ganem is the authority on GA for Firebase and Plaintiffs have his documents.

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP

*/s/ Eduardo E. Santacana*

Eduardo E. Santacana

cc: All counsel of record via ECF

[4] Plaintiffs also cite the same document they offered in support of their claim for Mr. Ye as a custodian. GOOG-RDGZ-00033245 (continuation of GOOG-RDGZ-00033244, cited at ECF No. 163 at 4). That document details how to *mitigate* the risk of anonymized data being joined together to identify users while implementing a new GA for Firebase feature. And it shows that Mr. Ye was the employee who had the relevant knowledge, and he is supervised by Steve Ganem, who is a custodian, and whose documents include the document in question, including back-and-forth on its drafting.