April 29, 2022

**Submitted via ECF**

Magistrate Judge Alex G. Tse
San Francisco Courthouse
Courtroom A - 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

      Re:    Joint Letter Brief re: Google Search Terms for Additional Nineteen Custodians
               *Rodriguez v. Google LLC*, Case No. 3:20-cv-04688-RS (N.D. Cal.)

Dear Magistrate Judge Tse:

      Plaintiffs and Google LLC ("Google") submit this joint letter brief regarding the search terms to be used on 19 additional Google custodians' ESI: Greg Fair, Arne de Booij, Sam Heft-Luthy, Xinyu Ye, Eric Miraglia, Dale Nil, Chris Ruemmler, Nick Linkow, Katie Brennan (Virk), Donald Harrison, Dan Stone, Jan Hannemann, Jason Titus, Keith Enright, Guemmy Kim, Stephan Micklitz, Sree Pothana, Mark Risher, and Rahul Roy-Chowdhury. The Court ordered Google to search and produce ESI documents corresponding to all 19 of these new custodians on December 1, 2021. Dkt. 184. Pursuant to that order, the parties began meeting and conferring on the details of collecting, reviewing, and producing ESI from the new custodians shortly thereafter and remain at an impasse after the exchange of many proposals. Plaintiffs accordingly request a Court Order requiring Google to run the identified search terms on those custodians' ESI. Counsel for the parties have exchanged meet-and-confer letters and met and conferred by videoconference on March 3, 2022. Exhibit A is Plaintiffs' proposed order, Exhibit B is Google's proposed order, and Exhibit C is Google's exhibit, and Exhibit D is the declaration of Lori Arakaki.

**PLAINTIFFS' STATEMENT**

Plaintiffs respectfully request a Court order compelling Google to use the search terms listed in Plaintiffs' Proposed Order (Exhibit A) in their review of the 19 additional custodians' ESI. The Court has recognized these custodians' importance, and Google should be required to treat them accordingly, without giving their productions short shrift. *See* ECF Nos. 184, 190. Plaintiffs would be on solid ground if they were to ask Google to run the same search terms it is using for the initial 5 custodians, whether by agreement or Court order. But in the spirit of compromise, Plaintiffs' request substantially narrows most of the original terms and removes others, such that only the strictly necessary terms remain. Plaintiffs' efforts paid off, reducing Google's review set by ***more than a million documents***, to just 343,000 total documents for these 19 custodians. But Google is not interested in conducting a reasonable review. It seeks to ***further*** reduce its review set by ***more than seventy percent***. It can do so only by excluding highly relevant documents—but perhaps that is the point. Google's improper attempts to hamstring Plaintiffs' ability to prove their claims should be rejected. The search terms at issue are addressed by category.

**I.     WAA**

Take, for example, Term 1, which includes "Web & App Activity" and its variants. This is the most important term in the case, and Google knows it. Google represents that it will not collect app activity data unless the user turns WAA on, but the truth is that Google collects users' app activity data no matter what. ECF No. 138 ("TAC"), ¶¶ 5-6. Plaintiffs are entitled to discovery on all aspects of WAA: what data Google collects, how the data is collected, and where it is saved; whether Google does or can link that data to a "pseudonymous" profile, or even identify the user; how Google uses and monetizes the app activity data it collects; what Google employees have said about Google's collection of and disclosures about WAA; whether Google's practices are consistent with user expectations; and much more. Virtually every document that mentions WAA is important to this case. That is why Google must run this term for all but one of the initial five custodians—Dave Monsees, whose entire "job is WAA-focused." ECF No. 201 at 4. For the same reasons, Google should be required to run this search for all of the new custodians except Greg Fair, whose responsibilities are similar to Mr. Monsees'. *See* ECF No. 201 at 1, 5.

Google, on the other hand, has agreed to run this term against ***just five*** custodians' ESI. Although it once represented that Jan Hannemann, Guemmy Kim, Mark Risher, and Rahul Roy-Chowdhury did not "work[] closely with WAA," ECF No. 171 at 4, it now characterizes their responsibilities as "WAA-related" because it would prefer to use this term on as few custodians as possible. Google also refuses to run this term against documents belonging to Keith Enright (Google's Chief Privacy Officer), members of Google's privacy team, and Arne de Booij (who studies users' understanding of Google's practices, including relating to WAA). Even their job descriptions suggest that these documents' relevance, and other documents that Google has produced to date confirm as much. *See* GOOG-RDGZ-00037579 (de Booij study of user comprehension of settings) ECF No. 155 at 1-2 (citing important WAA-related documents belonging to "privacy" custodians Heft-Luthy and Miraglia); ECF No. 163 at 7 (Enright testified that Google has "made mistakes in the past" on privacy). This is a case about privacy; any document in which Google's privacy team discusses WAA is likely to be highly relevant.

1

Google's proposed alternative is plainly inadequate. In Terms 2-5 and A1, Google proposes searching for documents in which some Google-selected term appears near a WAA term. But the terms selected would not cover the vast majority of relevant topics relating to WAA. Most obviously, none of Google's proposed limiting terms (e.g., "consent," "feature," "launch," "benefits") relate to the monetization of the data. Very few of them relate to the types of data that Google collects, and none relate to the locations in which data is stored. Google's proposed term also would not surface documents that relate to the possibility that WAA-off data could be attributed to a specific user. *See*, *e.g.*, GOOG-RDGZ-00033245 (describing "the ability to link app events" to a user "even if end users turn off WAA," but including none of the terms included in Google's proposed limiting strings). Although Google constructed especially useless limiting strings, even a facially sound limiting string would be woefully insufficient. The truth is that *all aspects* of WAA are or might be critically important to this litigation, and Google should be required to review every document mentioning it for responsiveness. Google claims that this term would yield some purportedly irrelevant documents about web activity, but there are no search terms that would adequately disentangle the two types of data. Google can do that in its responsiveness review. Term 1 is not overbroad: It yields only about 50,000 documents. Google cannot persuasively argue that its responsiveness review would be unduly burdensome.

## II.  Google's Representations to Users

Many of Plaintiffs' proposed search terms are direct, multi-word quotes from the relevant disclosures. *See* Terms 10-12, 17-18, 21, 23, 30-31 33; TAC ¶¶ 5, 87, 92, 256-59. Although Google argues on the merits that its disclosures are clear and accurate, it refuses to search for portions of those disclosures in documents belonging to the so-called "WAA-related" custodians and the custodians focused on privacy (including Mr. Enright). Inexplicably, it also refuses to search these terms on the custodian responsible for studying user understanding, Mr. de Booij.

## III.  The Relevant Google Products and Services

Other terms relate to the products and features at issue in this case, including Firebase, Google Analytics for Firebase (or "GA4F," "scion," or "Gold"), AdMob, Cloud Messaging, and others. Most of these terms include highly restrictive limiting strings comprising other terms important to this litigation. *See* Terms 7-9, 19, 37, 56, 57-61, 63-71. Terms in those strings relate to user consent, the data that Google collects (*e.g.*, "event," "gaia"), where Google stores that data (*e.g.*, "my account," "appmeasurement"), or how Google uses or monetizes app activity data (*e.g.*, "conversion," "audience"). The few terms that lack a limiting string return very few documents. *See* Terms 56, 62. Term 62, is limited only to Jason Titus's documents, because Plaintiffs believe his documents will best demonstrate Firebase's expansion and valuation. *See* ECF No. 163 at 6-7.

## IV.  Consent

Some terms relate to user consent, which Google contends it obtained. *See* Terms 9, 38-40. Strikingly, Google refuses to run the term "wiretap" (Term 40) against *any* of these custodians' documents. While Plaintiffs' wiretapping claims have been dismissed, normal people (and especially non-lawyers) do not communicate in strict conformity with the elements of a claim. If someone was talking about wiretapping (and many custodians apparently were), they were probably talking about collecting data without authorization—conduct plainly relevant to

2

Plaintiffs' remaining privacy and CDAFA claims. Most concerning is Google's steadfast refusal to run Term 38, the only term relating to user confusion, against documents belonging to the purportedly "WAA-related" custodians, Mr. Enright and the rest of the privacy-related custodians, or Mr. de Booij. Tellingly, Google agreed to run Term 39a, which would yield documents describing what users understand, not what they are confused about. This is a transparent attempt to conceal the most damaging documents.

### V. Google's Storage and Use of Data

Finally, other terms relate to how and where Google stores and uses the data it unlawfully collects. *See* Terms 9, 10, 13, 19, 31, 41-49, 50-55, 60-61, 63-71. Google contends it stores WAA-off data pseudonymously, and therefore its data collection is perfectly lawful. Setting aside the dubiousness of that legal claim, Plaintiffs seek discovery about whether "pseudonymous" data is attributed to a "pseudonymous" profile that follows the user across the web, or if that data ever is (or can be) tied to a user. But Google refuses to search *any* custodian's documents for the term "pseudony*." Term 51; *see also* Terms 50, 53. Google also cannot justify its refusal to search for documents relating to the use of the data, whether to track conversions (*e.g.*, Terms 60-61, 63-65, 69-70), serve advertisements (*e.g.*, Term 55), or otherwise.

Given the sheer number of the search-term disputes, Plaintiffs cannot meaningfully address all of them in the space allotted. Many of these terms and custodians—and even some of the exact strings—were addressed in previous filings. *See* ECF Nos. 155, 163, 201, 211. Plaintiffs will provide further briefing if the Court would find it helpful but seek these documents immediately.

### GOOGLE'S STATEMENT

Google has spent hours thoughtfully crafting a principled proposal tailored to each custodian. That approach makes good sense because the custodians have different relevance depending on their job duties. Plaintiffs ignore these important distinctions and insist on a one-size-fits all approach that would have Google employ the same 70+ searches for all 19 custodians with limited deviation. Google's proposal results in the review of ~105,000 additional documents. Plaintiffs label that as unreasonable by comparison to their starting number of "more than a million documents." That number was artificially inflated: Plaintiffs started this process by proposing one string that returned ~550,000 documents, and others of significant magnitude, that in total yielded over one million documents; those strings were quickly abandoned. Perhaps that was an anchoring negotiation tactic, or an effort to set up their argument in this brief; in either case, it is a sideshow. Plaintiffs' tired refrain that Google is hiding relevant documents is likewise meritless. Google has repeatedly implored Plaintiffs to explain what about the relevant products it does not understand so Google can search for or craft searches to identify those documents. All Plaintiffs offer, as they've done here, is the conclusory assertion that all aspects of all products named in their complaint are important. That is insufficient to warrant Google's manual review of ~340,000 additional documents, which will take ~10,000 hours. By contrast, Google's proposal (**Exhibit C**) is meaningfully tailored as explained below and won't require unnecessary burden.

**WAA (Ex. C at 2–3)**. Plaintiffs seek an order requiring Google to employ stand-alone WAA terms on the 13 custodians who work on WAA, privacy, or as legal counsel. Plaintiffs either misunderstand basic aspects of WAA or seek to mislead the Court. They contend that "[v]irtually

every document that mentions WAA is important" because "all aspects of WAA" are relevant. Not so. Plaintiffs' case is limited to (third-party) mobile app-interaction data, but WAA has broader functionality: WAA can include web browsing data, YouTube viewing data, audio recording data, and location data from certain Google products. None of that is relevant and Plaintiffs know it. Stripped of this erroneous description, Plaintiffs have no argument for why they are entitled to review "all" mentions of WAA. Nor do they explain why Google's tailored approach is inadequate.

Google's proposal for WAA terms falls into two categories based on the fact that WAA is more than mobile app-interaction data. *First,* stand-alone terms are not appropriate for custodians who frequently discuss WAA. Those custodians will have many irrelevant emails that use WAA without discussing app data (e.g., discussing only YouTube history). For those custodians, Google agreed to employ WAA terms as long as the ESI also included one of 17 other terms. Ex. C at Terms 2, 4, 6–7. Most of the other terms are extremely broad (e.g., function\*, feature, launch, disclos\*, consent, "privacy policy"). That is by design. If a document doesn't discuss functionality, disclosures, consent, privacy, or any of the other limiters, it's hard to see how it could be relevant to Plaintiffs' case. And although Plaintiffs complain the limiters are "Google-selected," they neglect to propose their own. *Second*, for the remaining custodians, all of whom work on Firebase, Google agreed to employ stand-alone WAA terms because those custodians are unlikely to regularly discuss WAA. (Term 1) Indeed, that is how Google *identified* the WAA document (GOOG-RDGZ-00033245) that Plaintiffs cite as one that "would not [be] surface[d]." This two-tier approach is consistent with the Court's prior ruling that Google need not employ stand-alone WAA terms on the WAA-product-manager (Monsees)'s ESI. The same logic should apply here.

Next, Plaintiffs argue WAA as a stand-alone term is necessary to understand the (a) "types of data that Google collects," (b) "locations … data is stored," and (c) "monetization of [] data." Those three topics suffer from the same fundamental problem as Plaintiffs' overall argument: "'[t]his is a case about a *particular* Google practice [(data collected through GA for Firebase)], not *any* Google privacy practice [(all data collected)].'" 2/8/2021 Order on RFP Nos. 1–3, ECF No. 85 at 2:3-5. Even if those topics were relevant, custodial searches are not appropriate. Plaintiffs know the type of app-interaction data Google receives (e.g., ad_click) because it's public on Firebase help pages and because Google produced logs of Plaintiffs' data. Google has explained its storage of GA for Firebase data in a lengthy interrogatory response. And Google has not agreed to conduct custodial searches for monetization data, which Plaintiffs have known for nearly a year.

**Representations (Ex. C at 4–5)**. Plaintiffs argue Google refuses to employ "direct, multi-word quotes from the relevant disclosures." For good reason: those short quotes are so generic they are unlikely to yield relevant documents. For example, "your Google Account" (#12) appears on every help page that directs a user to "sign into your Google Account" (e.g., "Change your language"), and pages about accounts generally (e.g., "Avoid getting locked out of your Google Account"). If the goal is to identify discussions about relevant disclosures, less generic terms are necessary. And, indeed, those are the ones Google has agreed to employ. *See* Ex. C at 4–5.

**Consent**. Google has agreed to numerous "consent" terms for all 19 custodians. *See* Terms 4, 6, 9, 39a, 58 (containing "consent"). Plaintiffs argue there are three "consent" terms at issue: wiretap\* (#40), user confusion (#38-39a), and new ads control (NAC) (#9). None concerns Google's defense that users consented with developers to Google's receipt of user data, nor do they contain "consent." And Google's position on each is reasonable. The "wiretap\*" term is only

on the table because Google agreed to employ it for the first five custodians *before* Plaintiffs' Wiretap Act claim was dismissed. Plaintiffs try to save their term by arguing "normal," "non-lawyers" do not subscribe to the legal definition of wiretap. Nonsense. Wiretapping is traditionally viewed as eavesdropping on a phone call; it has nothing to do with mobile app data. For Term 38, Google agreed to employ the string for Firebase custodians. It is overbroad for the WAA-related, privacy, and legal custodians because they have responsibility for irrelevant products. That is why Google agreed to employ a related user comprehension string (#39a) for *all* 19 custodians because it is limited to relevant products. Term 9 is likewise irrelevant because Google's consent defense is agnostic to a user's NAC setting. And, in any event, Google has treated the NAC terms like WAA ones by employing it for the Firebase custodians.

**Data Storage (Ex. C at 6)**. Plaintiffs insist on searching for the broad term "pseudony*" (#54). Once again, Plaintiffs ignore that Google deals with many data sources and products. Employing this term for all custodians is likely to yield many irrelevant documents (e.g. pseudonymous web browser data). Plaintiffs also point to other terms as relevant (at 3, § 5, but those are improper for other reasons. Term 63, for example, concerns "Firebase" writ large—a factual theory Judge Seeborg dismissed—and Google has already employed similar terms provided they were limited to relevant products (*see, e.g.*, Terms 64-65 (limited to FCM, AdMob)).

**Product-Specific Terms (Ex. C at 7–8)**. Google's position on the remaining product-specific terms is based on the same principles this Court has already endorsed. For GA for Firebase terms, Google agreed to employ the stand-alone term for custodians that do not work on Firebase (#56), and with limiters for ones who do (##57-60). Google applied the same approach to FCM and AdMob, agreeing to employ those terms for all custodians except those with responsibility for the products (##64-65). Some terms are facially overbroad; for example, "analytics" and "gold" concern much more data than app-interaction data (##61, 66-69). Others like GMS and GMP (##66-71) are not implicated by Plaintiffs' complaint, and Google will provide supplemental briefing explaining why if the Court would find it helpful on this (or any other) topic. Finally, Plaintiffs' claim their limiting strings are "highly restrictive" is belied by those remaining in dispute; many would surface any document that lists Google products. *See, e.g.*, Term 71.

**Arne de Booij (Ex. C at 9–12)**. Mr. de Booij's ESI merits a unique approach. He is a user experience researcher whose job involves designing and overseeing studies of user preferences and views. Plaintiffs told Google they seek Mr. de Booij's ESI because he "conducts surveys to ascertain how users understand WAA settings." Google investigated his work and determined that relevant information will be in non-custodial ESI, specifically in final reports of the user studies. Those reports will be produced in this matter because they were searched for and produced in *Arizona v. Google*, from which the Court ordered limited production. *See* ECF No. 85. If they did not fall within that search, Google will produce them. The reports reflect each study's design, participant details, results, insights, and conclusions. This is therefore a textbook case for non-custodial search—not a tedious review of irrelevant emails. Nonetheless, in the interest of compromise, Google agreed to employ searches that combine WAA terms with broad terms designed to isolate studies writ large (e.g., "study," "participant*"), study results (e.g., "confus*," "understanding,") study topics (e.g., consent, "disclos", "privacy policy"), and more. *See* Ex. C at 9, A1, B1. Tellingly, several of these terms would surface the example Plaintiffs point to as a relevant de Booij document (at 2), even though it had already been identified and produced from Mr. Monsees's ESI. Google's proposal is tailored and proportional, and the Court should adopt it.

Respectfully,

| WILLKIE FARR & GALLAGHER, LLP | SUSMAN GODFREY LLP |
|---|---|
| By: */s/ Simona Agnolucci* | /s/ *Amanda Bonn* |
| Simona Agnolucci (SBN: 246943) | Amanda Bonn (CA Bar No. 270891) |
| Eduardo E. Santacana (SBN: 281668) esantacana@willkie.com Benedict Y. Hur (SBN: 224018) bhur@willkie.com Simona Agnolucci (SBN: 246943) sagnolucci@willkie.com Lori Arakaki (SBN: 315119) larakaki@willkie.com One Front Street, 34th Floor San Francisco, CA 94111 Telephone: (415) 858-7400 Facsimile: (415) 858-7599  *Attorneys for Defendant Google LLC* | Mark C. Mao (CA Bar No. 236165) mmao@bsfllp.com Beko Reblitz-Richardson (CA Bar No. 238027) brichardson@bsfllp.com BOIES SCHILLER FLEXNER LLP 44 Montgomery Street, 41st Floor San Francisco, CA 94104 Telephone: (415) 293 6858 Facsimile (415) 999 9695  James W. Lee (*pro hac vice*) jlee@bsfllp.com Rossana Baeza (*pro hac vice*) rbaeza@bsfllp.com 100 SE 2nd Street, Suite 2800 Miami, FL 33130 Telephone: (305) 539-8400 Facsimile: (305) 539-1304  William Christopher Carmody (*pro hac vice*) bcarmody@susmangodfrey.com Shawn J. Rabin (*pro hac vice*) srabin@susmangodfrey.com Steven Shepard (*pro hac vice*) sshepard@susmangodfrey.com SUSMAN GODFREY L.L.P. 1301 Avenue of the Americas, 32nd Floor New York, NY 10019 Telephone: (212) 336-8330  Amanda Bonn (CA Bar No. 270891) abonn@susmangodfrey.com SUSMAN GODFREY L.L.P. 1900 Avenue of the Stars, Suite 1400 Los Angeles, CA 90067 |

Telephone: (310) 789-3100

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

*Attorneys for Plaintiffs*

## ATTESTATION

I, Amanda Bonn, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED: April 29, 2022                By:   /s/ *Amanda Bonn*
                                            Amanda Bonn