September 19, 2022

**Submitted via ECF**

Magistrate Judge Alex G. Tse
San Francisco Courthouse
Courtroom A - 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

<div style="margin-left:2em">

Re:     Joint Letter Brief re: Google's Objections to Certain Requests for Production
        *Rodriguez v. Google LLC*, Case No. 3:20-cv-04688-RS (N.D. Cal.)

</div>

Dear Magistrate Judge Tse:

Plaintiffs and Google LLC ("Google") submit this joint letter brief regarding Plaintiffs' request for an order compelling Google to produce certain damages-related documents in response to Plaintiffs' RFP No. 259. Counsel for the parties met and conferred in good faith, including by videoconference on July 26, July 28, August 9, and August 18. Exhibit A is Plaintiffs' proposed order and, Exhibit B is Google's proposed order. Exhibit C is a copy of Google's Responses and Objections to the disputed Request for Production.

## PLAINTIFFS' STATEMENT

Plaintiffs respectfully seek an order compelling Google to produce documents responsive to Request for Production 259, which seeks damages-focused documents, including data.

Chief Judge Seeborg denied Google's motion to dismiss Plaintiffs' claims for invasion of privacy, intrusion upon seclusion, and violation of the CDAFA (Dkt. 109), and the Ninth Circuit has recognized that unjust enrichment damages are available for these claims. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (holding that the plaintiffs who asserted the common-law and CDAFA claims would be "entitled … to profits unjustly earned" from defendant's alleged "unauthorized use of their [browsing] information"). Consistent with that Ninth Circuit precedent, Plaintiffs seek production of documents and data regarding all of the ways in which Google enriched itself by collecting, saving, and using of WAA-off data.

Discovery has demonstrated that Google collects WAA-off information despite knowing that users don't expect Google to do that.  As summarized by Google employee Chris Ruemmler:[1]

> ***Isn't WAA off supposed to NOT log at all? At least that is what is implied from the WAA page. So, if WAA is off, how are we able to log at all?***

A Google presentation from April 2020 regarding an internal study of users' understanding of the WAA setting yielded unequivocal results: "***All participants expected turning WAA toggle off to stop saving their activity***." GOOG-RDGZ-00152000 (emphasis added).[2] And "WAA must be on for sWAA to be on." GOOG-RDGZ-00061316.

Discovery has also shown that Google uses WAA-off data to enrich itself. For example, Google admits that it uses WAA-off data for "conversion tracking"—i.e., tracking whether an advertisement successfully moves a user to do something, like make a purchase—as well as "ad targeting." Google's Resp. to Interrog. 15. In fact, there are so many "downstream users" of WAA-off data that Google claims it would "not [be] practical . . . to account for every single potential data source (including logs) that may contain [WAA-off] data." Google's Resp. to Interrog. 14.

With RFP 259, Plaintiffs seek documents "relating to any efforts by Google to study, analyze, or quantify the financial benefit to Google from collecting, saving, or using information from users' activity on non-Google websites or apps." Google routinely conducts financial analyses to assess revenues associated with particular Google features, including WAA, and Plaintiffs reasonably seek documents and data relating to those efforts. Public filings in another

---

[1] *See* GOOG-RDGZ-00130381 (citing disclosures relied on by Chief Judge Seeborg in Dkt. 109). Google opposed Plaintiffs' motion to compel documents from Mr. Ruemmler's files, representing that "There is no reason to believe a broader search of Mr. Ruemmler's e-mail will yield relevant documents." Dkt. 155 at 5. Google was plainly wrong.

[2] Google produced this document in late July from the files of Eric Miraglia and Greg Fair, whose documents Google also objected to producing. Google sought to withhold Mr. Miraglia's documents because he is "too removed from the issues in this case to have relevant documents" and claimed that Mr. Fair's documents "would be duplicative or of marginal relevance." Dkt. 155.

case show that Google conducted "extensive financial modeling" to measure how a change to Incognito mode "would reduce Google's advertising revenues." *Brown v. Google*, Case No. 4:20-cv-03664, Dkt. 643-2 at 14-15. Google also modeled revenues generated from WAA-off data: "We are modeling out the financial impact of changes to user privacy controls . . . For example: *if 25% fewer users opted-in to WAA, what would be the financial impact?*" GOOG-RDGZ-00117919; *see also* Monsees Tr. ("I believe that the ads team has the ability to run [revenue] experiments."). At the very least, these analyses measure activity in the same category as the misconduct in this case: collection of (purportedly) unidentifiable data from users' activity on non-Google properties. Plaintiffs are entitled to discovery into those analyses and how they were conducted.

### 1.   The Financial Analysis Addressed in *Brown*

Plaintiffs seek limited discovery into Google's analysis of the revenue it derives from Incognito traffic. These documents may shed light on the methodologies that Google's financial team uses to quantify revenues attributable to Google's collection of purportedly non-identifiable data from users' interactions with non-Google properties. That is the exact same exercise that Plaintiffs' experts seek to engage in here. Google unfairly criticizes Plaintiffs for not identifying a specific "factual contention" about the analysis, which of course has not yet been produced in this case. Google also conveniently fails to mention that Google Analytics is relevant to both cases.

Google's objections to producing the financial modeling analysis addressed in *Brown* read like a *Daubert* motion—not a discovery brief. Google, in effect, is seeking to exclude opinions that Plaintiffs' experts have not even had the opportunity to develop, primarily because Google is withholding these documents. Google's lawyers do not get to decide whether a financial analysis is "relevant" to Plaintiffs' damages in this case. *If* Plaintiffs' experts rely on these analyses in constructing a damages model, and *if* Google remains of the belief that these analyses cannot support a damages model, then Google may file a *Daubert* motion in due course. But Google's say-so regarding relevance is not a valid reason to withhold discovery. Courts "reject defendants' attempt[s] to unilaterally designate [] documents as irrelevant." *In re Subpoena to PayPal Holdings, Inc.*, 2020 WL 3073221, at *4 (N.D. Cal. June 10, 2020) (Tse, M.J.).

Plaintiffs are also tired of Google's empty rhetoric regarding the Protective Order. Plaintiffs have relied only on public information, and any attorney worth their salt would be aware of the million-dollar sanction imposed on Google—in which this analysis featured. *Brown* Dkt. 593-3 ¶¶ 24-25. There is no basis for Google's offensive suggestion that Plaintiffs' attorneys made the existence of the analysis public to evade the Protective Order. Even setting aside the right of public access, ***Google itself*** filed an expert report discussing it. *Brown*, Dkt. 666-23 at 31-56.

Plaintiffs' request involves zero burden, and Google does not suggest otherwise. Google should make the limited requested production and save its "relevance" arguments for later.

### 2.   Financial Analyses That Measured Revenues Attributable to WAA-Off Data

Plaintiffs reasonably seek any study that bears on the value of WAA-off data, including studies that went beyond Google Analytics or even studies of web traffic, so that Plaintiffs' experts may assess Google's methodologies and, if appropriate, adjust and use them. If Google has already done that work, even in distinct but similar contexts like web analytics, Google should produce it.

The documents reflect that Google has, in fact, conducted relevant analyses. For example, in connection with a WAA-off revenue analysis, one Google employee asked about "the best way" to identify and "exclude app traffic from ads logs" (data relevant here), and another confirmed that Google can filter data to "get only web traffic." GOOG-RDGZ-00159387. This document illustrates that an analysis relating to a different scenario may still be highly useful for a damages model here. If one can exclude data before conducting analysis, one can also isolate it and subject it to the same analysis. "[T]he fact that the requested valuation documents might incorporate information not pertinent to a damages calculation . . . does not offset the relevance of other responsive information contained in those documents." *PayPal Holdings,* 2020 WL 3073221, *3.

Google objects to producing or even *identifying* any financial analysis unless it is focused narrowly on revenues associated with WAA-off data collected via Google Analytics for Firebase. But Plaintiffs' allegations are not so limited, and regardless, other analyses may prove helpful for reasons already explained. Once again, Google's say-so relevance objection is better suited for an expert report or a *Daubert* motion, not a discovery brief. Google should be required to diligently search for *all* WAA-off financial analyses and produce anything it finds.

Finally, Google incorrectly suggests that it produced the analyses discussed in the above Bates-stamped documents. Not so. Google claimed that this specific analysis was not carried through to completion, and it has not agreed to produce whatever analysis was done. Instead, Google committed to producing (but has not yet produced) an analysis *not* focused on WAA-off traffic. If there is no WAA-off financial analysis, then Google should say so. But it tellingly hasn't. Such analyses clearly exist, and Google should produce them.

## GOOGLE'S STATEMENT

This case is about whether an analytics service that Google provides to third party app developers ("Firebase") violates the privacy of the apps' users.  An app's use of Firebase is disclosed to users. But Plaintiffs claim that if some of the app's users are also Google account holders who have disabled a Google account "Web & App Activity" setting, Google cannot use the data from their devices sent by the third party app.  While convoluted, this much is clear: WAA is only relevant to this case when it is "off" and to the extent it relates to Firebase or Firebase's integration with AdMob and Cloud Messaging.

Years into discovery, Plaintiffs are where they started, having discovered mountains of evidence that what Google told them in its first interrogatory response was accurate: When a user turns off WAA, Google de-identifies the data and Google policies forbid any rejoining of it with the user's identity; by contrast, if the user turns WAA on and other conditions are met, Google will associate certain data with the user's identity. Contrary to Plaintiffs' allegations,  when a user turns WAA off, Firebase does not personally identify the users of third party apps when measuring the users' interactions with the apps. Indeed, the bulk of Plaintiffs' letter brief is not a request at all, but a narrative attempt to color the Court's view of the merits of this case with out-of-context quotations from documents written by people who either weren't talking about anything related to this case, or who were asking questions and seeking answers to ensure Google was following its principles and respecting user privacy.

Plaintiffs seek damages-related documents, but Google has not resisted producing such

documents. In response to RFP 259, Google conducted a reasonably diligent search for documents "relating to any efforts by Google to study, analyze, or quantify the financial benefit to Google from collecting, saving, or using information from users' activity on non-Google . . . apps" when those users have turned WAA off. The results of Google's search yielded some documents, and Google produced them to Plaintiffs. Plaintiffs then asked follow-up questions, prompting Google to produce yet more documents. That includes information concerning each purported analysis Plaintiffs identify above by Bates number. And Google is in the process of producing two more documents that discuss the value of Google Analytics for Firebase to the company.

But Plaintiffs aren't satisfied with what Google produced. Knowing they cannot attack the reasonableness of Google's search, Plaintiffs' counsel borrow from information they know solely as a result of their role as Plaintiffs' counsel in the co-pending *Brown v. Google* case, asking for a specific financial study that has nothing to do with this case. In meet-and-confer calls, Plaintiffs' counsel made clear their intention to provide the study to their damages expert (who also provided an expert damages opinion in the *Brown* case) so he can argue that the financial impact considered by that study can be analogized to a measure of unjust profits obtained by Google as a result of the unrelated, allegedly wrongful conduct in this case. But Plaintiffs know their expert cannot lawfully use the document here without a Court Order relieving them of their obligations under the protective order entered by a different judge in *Brown*.

As excuse for this manipulation of the protective order in the *Brown* case, which forbids Plaintiffs' counsel (as the model protective order in this District does) from using confidential information they obtain in that case to prosecute a separate, unrelated case (such as this one), Plaintiffs offer up a single sentence from a public filing that references the study they're after:

> 3  projections. In 2020, shortly before this lawsuit was filed, Google began considering blocking
> 4  "third-party cookies" (one of Google's tracking methods) by default in Chrome's Incognito
> 5  mode. Google's extensive financial modeling (project ▇▇▇▇▇▇) demonstrated that
> 6  modifying just this one form of tracking would reduce Google's advertising revenues by
> 7  approximately ▇▇▇▇▇ in 2021—a "lower bound" projection. Ex. 31 at -07. Mr. Lasinski

*Brown*, Dkt. 643 at 15.

Plaintiffs' counsel did not *happen* to read this public excerpt in the *Brown* class certification motion and wonder if that might be relevant in this case, and so requested it. They *wrote* this excerpt of the class certification motion in *Brown*, and then, after writing it, told Google that since the existence of the document is now public (thanks to their public reference to it in this filing), they have every right to seek it here. Google has steadfastly raised the risks of having the same counsel and experts in both cases. Here, Plaintiffs found an unrelated study that they like, and now want to use that here, whether it's relevant to this case or not.

And, to be clear: the study isn't relevant. This has nothing to do with whether a damages expert could reasonably rely on it under *Daubert*; it simply isn't relevant, and would never be produced in this case, but for the coincidence that *Brown* is co-pending in this District with the same Plaintiffs' counsel.

4

In *Brown*, the plaintiffs allege that Google unlawfully collects information from Chrome browsers through cookies when users have engaged Incognito, or "private browsing," mode on the browser. WAA plays no role in that case. Nor does Android, iOS, any other mobile devices, Firebase, or Google Analytics for Firebase.[3] Plaintiffs do not dispute this. The study measured what would happen if a particular type of cookie were blocked from working in Incognito mode. Plaintiffs' portion of this letter brief contains no argument that such a hypothetical is relevant to this case, because it's clearly not. And regardless of whether this document was produced in *Brown,* if this document would have been reviewed in this matter because of a search term hit (which it was not),  Google would have excluded it from production on the basis of non-responsiveness, because Google has never agreed to produce irrelevant financial analyses and Plaintiffs never moved to compel such a broad scope of discovery.

The sole justification Plaintiffs offer for demanding production of the study is not that it's relevant, but that the study "may shed light" on how Google values the "collection of purportedly non-identifiable data from users' interactions with non-Google properties." This phrase hides a multitude of false equivalencies. First, "may shed light" is not the relevance standard. Plaintiffs cannot identify a factual contention that is more or less likely to be true based on the contents of the *Brown* study (which they have already read, so they should be able to identify one). Second, how much money Google makes from third party cookies on web browsers is fundamentally different from whether and how much money Google makes from Google Analytics for Firebase, which exclusively deals in users' activity on third party apps on Android and iOS devices, *not* the web. Third, Plaintiffs are analogizing the blocking of a third party cookie to turning off WAA, but those are not analogous, either, for many reasons.

Nor do Plaintiffs justify their broader request for all WAA-related analyses generally,. Unsatisfied with the studies Google produced that do focus on the value of Firebase data to the ads business, Plaintiffs argue that Google should find all financial analyses that might touch on "WAA-off" data, *i.e.*, data Google receives from anyone on any platform when a user might have WAA turned off, even though this case is limited by Plaintiffs' complaint and Judge Seeborg's orders to Google Analytics for Firebase and its integrations with AdMob and Cloud Messaging. This Court should reject this broader, vague request for damages-related documents because Google already conducted the search it needed to conduct, and produced what it found, whether that helps Plaintiffs' damages case or not. *See, e.g.*, *Caliper Techs. Corp. v. Molecular Devices Corp.*, 213 F.R.D. 555, 561 (N.D. Cal. 2003) (denying motion to compel financial documents that had "little or nothing to do with the technology" at issue in patent infringement case); *Sound View Innovations, LLC v. Hulu, LLC*, No. CV174146JAKPLAX, 2018 WL 6164271, at *2 (C.D. Cal. June 12, 2018) (narrowing request for patent licensing agreements to

---

[3] Plaintiffs' portion of this letter accuses Google of misleading the Court by failing to disclose that *Brown* involves Google Analytics. But this case is about Google Analytics for Firebase, a mobile operating system SDK; it has *nothing* to do with Google Analytics, a web analytics service. Web Analytics has never been in scope for discovery in this case. It is Plaintiffs who are misleading the Court by playing word games. Likewise, Plaintiffs' attempted victory lap regarding Mr. Ruemmler's documents falls flat—they leave out that Mr. Ruemmler spent hours explaining at his deposition that the documents Plaintiffs believe are so relevant were discussing completely unrelated products and circumstances that have no probative value here.

those involving the accused technology only).

Respectfully,

WILLKIE FARR & GALLAGHER, LLP

By: */s/ Eduardo E. Santacana*
    Eduardo E. Santacana (SBN: 281668)
    esantacana@willkie.com
    Benedict Y. Hur (SBN:  224018)
    bhur@willkie.com
    Simona Agnolucci (SBN:  246943)
    sagnolucci@willkie.com
    Lori Arakaki (SBN:  315119)
    larakaki@willkie.com
    One Front Street, 34th Floor
    San Francisco, CA  94111
    Telephone:  (415) 858-7400
    Facsimile:  (415) 858-7599

    *Attorneys for Defendant Google LLC*

BOIES SCHILLER FLEXNER LLP

/s/ *Mark Mao*
Mark C. Mao (CA Bar No. 236165)
mmao@bsfllp.com
Beko Reblitz-Richardson (CA Bar No. 238027)
brichardson@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293 6858
Facsimile (415) 999 9695

James W. Lee (*pro hac vice*)
jlee@bsfllp.com
Rossana Baeza (*pro hac vice*)
rbaeza@bsfllp.com
100 SE 2nd Street, Suite 2800
Miami, FL 33130
Telephone: (305) 539-8400
Facsimile: (305) 539-1304

William Christopher Carmody (*pro hac vice*)
bcarmody@susmangodfrey.com
Shawn J. Rabin (*pro hac vice*)
srabin@susmangodfrey.com
Steven Shepard (*pro hac vice*)
sshepard@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019
Telephone: (212) 336-8330

Amanda Bonn (CA Bar No. 270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400

Los Angeles, CA 90067
Telephone: (310) 789-3100

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

*Attorneys for Plaintiffs*

**ATTESTATION**

I, Mark Mao, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.


DATED:  September 19, 2022                    By:    /s/ *Mark Mao*_____