October 17, 2022

**Submitted via ECF**

Magistrate Judge Alex G. Tse
San Francisco Courthouse
Courtroom A - 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

> Re:    Joint Letter Brief re: Google's Objections to Certain Requests for Production and
>        Interrogatories Regarding Google's Saving & Using of WAA-Off Data
>        *Rodriguez v. Google LLC*, Case No. 3:20-cv-04688-RS (N.D. Cal.)

Dear Magistrate Judge Tse:

Plaintiffs and Google LLC ("Google") submit this joint letter brief regarding Plaintiffs' request for an order compelling Google to produce documents and data in response to Requests for Production and Interrogatories focused on Google using and saving WAA-off data. Counsel for the parties met and conferred, including by videoconference on July 26, July 28, August 2, August 9, August 18, and September 1, and by email numerous times thereafter. Exhibit A is Plaintiffs' proposed order, and Exhibit B is Google's proposed order. Exhibit C is a copy of Google's Responses and Objections to the disputed Requests for Production. Exhibit D is a copy of Google's Responses and Objections to the disputed Interrogatories, and Exhibit E is a declaration by a Google employee, Nevin Kapur, in support of Google's portion of this letter brief. The parties respectfully request a hearing on this motion.

## PLAINTIFFS' STATEMENT

Plaintiffs respectfully request an order compelling Google to provide the requested discovery regarding how Google uses and saves "WAA-off" data in log fields and data sources. This case concerns not only Google's collection of information from users who had WAA and/or sWAA switched to "off" (the "WAA-off" data) but also how Google uses and saves that WAA-off data. Plaintiffs served these requests in May, and began meeting and conferring in July when Google served its responses and yet Google *still* has not finished its "investigation."

This letter concerns three interrogatories and two RFPs, focusing on Google dashboards, logs, and fields tied to WAA/sWAA. Plaintiffs seek an order requiring Google to:

1. *Identify and describe every Google dashboard, bit, field, or tracking tool that, at any point during the class period, (1) contained information related to the WAA status of any Google account, including aggregated statistics, or (2) tracked whether specific data was generated while WAA / sWAA was switched off.* **(RFPs 255, 266 and Rog 13)**

2. *Identify every data source or log that at any point during the class period contained WAA-off data or sWAA-off data, including a list of all field names and descriptions.* **(Rog 14)**

Fields are the entries in logs or other data sources that Google uses to save data (which will show how data is used), and dashboards are how Google tracks or uses that data in structured ways. The disputes can be broken into two categories.

### 1. WAA-Off / sWAA-Off Fields & Bits That Show How Data Is Used

"[M]ost of the logs" at Google have a "field" (or bit) which "determine[s] what the WAA state of a particular user was when the log entry was written." GOOG-RDGZ-00088573 at -74. Plaintiffs seek identification of all such fields, and the logs and sources where data can be queried to identify WAA-off or sWAA-off data collected and saved by Google, so that the parties can assess how Google actually uses and stores the data. To calculate damages, Plaintiffs also seek to quantify the proportion of WAA-off traffic relative to WAA-on traffic. In addition, Plaintiffs are in the midst of revising a proposal to a Google where Google will produce test data. The information at issue are all relevant to these discovery tasks to be completed.

During a meet-and-confer, Google represented that Google had identified "thousands" of potentially responsive fields/bits that might track and use WAA/sWAA status. Instead of providing that information to Plaintiffs, Google abandoned that investigation and has taken the position that it will not identify ***any of them***. Google instead believes that Plaintiffs should be satisfied with just ***four logs*** that Google previously identified and which do not even contain (s)WAA-off bits, and accept Google's say-so for how it uses WAA/sWAA-off data. Google's refusal to account for the data sources and logs is prejudicial to Plaintiffs because their identification and production would tend to illuminate certain disputes at issue in the case. For example, if the fields are found in the logs of products that provide monetization for Google, or in logs where users are identified (using Google IDs or third-party IDs), such identification would dispose of Google's defense that its use of WAA/sWAA-off data to monetize users is limited, or that it cannot identify certain class members. Plaintiffs are entitled to a fulsome production so they can complete discovery.

Google attempts to avoid production by mischaracterizing Plaintiffs' theory of the case. Plaintiffs' case is not "founded on the notion that Google does not de-identify the data." *This case is about Google's improper use of data that Google promised never to save in the first place.* As

Chief Judge Seeborg held when he rejected Google's consent defense (as applied to users), "Google, through the WAA Materials, set an expectation that it would not save plaintiffs' 'activity on . . . apps . . . that use Google services' unless plaintiffs turned WAA 'on.'" Dkt. 109 at 16. The "critical fact" for these claims is "that the online entity represented to the plaintiffs that their information would not be collected, but then proceeded to collect it anyway." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 603 (9th Cir. 2020).

In any event, Plaintiffs seek this discovery because Google has implied that it will later make arguments about what can and cannot be done with Google's massive trove of data, despite opposing Plaintiffs' requests for that very data. In an effort to avoid or narrow this dispute, Plaintiffs proposed that Google stipulate to certain positions, including that (1) Google can identify WAA-off data, (2) such data can be linked with users' Google accounts, and (3) Google profits attributable to WAA-off data can be apportioned to individual users. Google declined.[1] The upshot is that Google may oppose class certification and file *Daubert* motions with what it is withholding.

Finally, the Court should disregard Google's burden arguments, which boil down to: "We are saving (and using) so much WAA-off data that it would be too hard to respond."[2] Plaintiffs served these requests in May; so even if they took "months" to investigate, Google had time. Google also exaggerates the little work it did; the paragraph summarizing "several answers" is highly misleading. Three relate to financial documents (5, 6, 7), one is a punt to 30(b)(6) testimony (8), another takes credit for what Plaintiffs found (3), and the remaining three (1, 2, 4) seek to limit Plaintiffs to just ***four logs out of thousands*** without providing any information about what is outstanding, and where the ***four provided do not contain any (s)WAA bits / fields.***

The problem is that Google has confirmed that "thousands" of logs use WAA-off bits/fields, and yet Google ***has provided no information about any of them***—thus entirely closing them off from discovery. Google instead seeks to limit discovery to just four logs, and without any justification. ***None of these four logs contain a (s)WAA-off bit / field.*** Google is also withholding information about the "various downstream users" of WAA-off, GA4F data, including logs relevant to "conversion tracking and ad targeting." Google's Responses to Interrogatory Nos. 14-15. Plaintiffs seek discovery about how the data is admittedly used and stored "downstream," including to unjustly enrich Google. Some of the thousands of logs that Google has identified will contain and/or leverage Firebase data (Google does not suggest otherwise) and yet Google seeks to conceal all logs on the ground that some of the logs may be specific to other products. ***What logs are specific to what products and use is actually the whole point.*** There may be possible compromises, but Google has proposed no alternative, while being the only party in the know.

Plaintiffs are particularly concerned about Google's efforts to play hide-the-ball given Google's sanctioned "discovery misconduct" in the *Brown* case, where Judge van Keulen sanctioned Google for concealing Incognito-detection fields and logs. Case 4:20-cv-03664, Dkt. 593-3 at 26. Google in that case withheld discovery, including based on Google's say-so on whether the data was "relevant" to the plaintiffs' claims. *Id.* at 25-26. Judge van Keulen explained that "Google was not justified in unilaterally deciding not to provide discovery regarding the bits." *Id.* Plaintiffs are concerned that Google is taking the same improper approach to discovery.

---

[1] Contrary to Google's claim below, Google did not admit any of these in the Interrogatory.

[2] The Court should also disregard Exhibit E—a declaration submitted by an undisclosed witness. *See* Fed. R. Civ. P. 37(c)(1). This motion is the first time Plaintiffs heard of this employee.

## 2. Google Dashboards That Show Google's Structured Use of WAA/sWAA-Off Data

Plaintiffs also seek relevant information regarding specific Google dashboards, which Plaintiffs have become aware of through Google documents. For example, one document describes "Magic Eye Activity" tables where Google tracks information for "signed-in **WAA-off users**," including "revenue tables." GOOG-RDGZ-00042769 at -70 (emphasis added). Another document describes "R***a," which Google uses to track various aggregate metrics specific to WAA-off data, including "Queries(Ads)", "Ads/Q" and "Revenue(ads)." GOOG-RDGZ-00044641.R at -44.R. Another describes D***av, which "automatically provided 'All WAA Logging.'" GOOG-RDGZ-00045425 at -54. These and similar documents are of course helpful, but they are no substitute for substantive responses to these Interrogatories and a fulsome production by Google, where Plaintiffs reasonably asked Google to identify and describe all responsive dashboards and to produce screenshots showing how these dashboards can be queried, so that Plaintiffs may follow-up and ask Google to run specific queries and determine how data is used.

Google has so far produced screenshots for just one dashboard: the go/d**le dashboard. Google below claims it produced screenshots for others, but that is incorrect. Plaintiffs reasonably seek the same production for *all* dashboards that contain WAA-off information, or any dashboards built upon this data, including the other dashboards above. Producing screenshots for these dashboards involves virtually no burden, and yet Google continues to refuse, insisting that the dashboards Plaintiffs have identified are "irrelevant," including within Google's response below.

## GOOGLE'S STATEMENT

Google has, through great effort, produced to Plaintiffs an enormous volume of information about its storage and use of data collected via Google Analytics for Firebase. None of that information undermines the central, undisputed fact that governs Plaintiffs' remaining claims: that Google de-identifies user data collected from devices whose users have turned WAA off. Plaintiffs' case is founded on the notion that Google does *not* de-identify the data, and that it instead re-identifies data secretly; for that reason, their case has foundered.

To compensate, Plaintiffs now ask Google to boil the ocean for every grain of sand that relates to any user's WAA status, without any connection to the products at issue in this case. The burden of this request, which touches a wide range of products having nothing to do with Firebase, would be enormous. And the only relevant questions Plaintiffs have identified—how does WAA affect Firebase data and what proportion of traffic is WAA-off traffic—have been answered repeatedly by Google. Neither in this letter nor in extensive meet-and-confer efforts have Plaintiffs identified any other relevant question that the sought-after data could or would answer.

Indeed, the vast majority of the data in question encompasses logs that would contain a user's WAA status when that user uses Google Maps, Gmail, Google Docs, Google Shopping, and dozens of other irrelevant data paths, products, and features. Others simply note WAA status to ensure Google follows its policy of not saving data to a user's account without consent. The fact that a log contains information about a user's WAA state is not, by itself, probative of anything.

In all, counsel for Google investigated how app usage data makes its way to Google from user devices that have third party apps using Firebase, how Google treats the data depending on the user's WAA status, and how and under what circumstances Google leverages the data to

facilitate advertising. Google also provided a verified interrogatory response stating that, as it relates to Google Analytics for Firebase, WAA controls whether data is saved to a user's Google account, just as the control's description discloses; and, when WAA is off, certain data related to a user's app activity is de-identified. Google also traced for Plaintiffs in a verified interrogatory response the data flow from a device to Google to Google's internal systems. And Google identified the logs where the GA4F data go and produced to Plaintiffs the entries in those logs associated with the device IDs that Plaintiffs represented belong to them: in all, tens of thousands of pieces of data. And, of course, a Rule 30(b)(6) designee will soon provide binding answers for Google on the data flow, too.

Moreover, Google provided several answers to Plaintiffs' questions about WAA-off traffic. *First*, Google preserved the WAA status of every Google user in the country at every relevant point in time and has it available for use if a class is certified (which answers questions 1 and 2 of Plaintiffs' purported stipulations they desire). *Second*, Google has explained that Firebase logs themselves contain a flag for whether WAA or another privacy signal is turned off. *Third*, Google located a "d\*\*le" dashboard that provides aggregate statistics about the proportion of Google search queries that take place with WAA turned off. *Fourth*, Google identified an ads log that contains the WAA status of signed-in users who viewed or interacted with ads on various surfaces, allowing Plaintiffs to extrapolate the proportion of ads events involving users who have WAA off. *Fifth*, Google has produced presentations and other custodial documents that characterize the proportion of WAA-off traffic as well as WAA-off revenue. *Sixth*, Google searched for and produced documents purporting to estimate the financial value of Firebase and AdMob to Google's advertising business. *Seventh*, Google produced profit and loss statements covering the relevant revenue streams. *Eighth*, Google will designate a corporate witness to testify as to all of these items. Collectively, these data points will allow the experts on both sides to render their opinions on impacted revenue. Plaintiffs' third purported stipulation they seek—that damages can be apportioned to individual users—is a fool's errand; they can't be for a variety of reasons Google would be happy to explain in a live hearing or supplemental briefing with a longer page limit, but Google has produced heaps of documents, at Plaintiffs' request, relating to the value of the data in question so their experts can render their opinions using the same base of evidence Google will have. And, Plaintiffs also fail to mention that there are other ways to measure aspects of their alleged damages without burdensome logs discovery: for example, they seek to know what proportion of conversion tracking is done using GA4F, and they know that is information Google is preparing to provide imminently.

Plaintiffs dismiss these efforts because Google identified four logs out of thousands. But those are the relevant ones, and they fail to mention Google also identified the ads query log discussed above and ruled out over a dozen logs identified by Plaintiffs after they reviewed Google's documents as containing any relevant fields. This case is about Firebase and its relation to WAA—not WAA writ large—and Google has identified the logs that answer their questions. Plaintiffs haven't yet deposed Google's Rule 30(b)(6) designee on these logs. And Plaintiffs have otherwise failed to identify any answerable question that cannot be answered by the logs or the non-log discovery already produced.

Plaintiffs nonetheless plead that if they could pop open the data hood at Google and poke around, they might find something else of value that Google overlooked. That request is the purest form of a disfavored fishing expedition. And the burden would be crushing, too. Taking Plaintiffs

4

literally, there is nearly no limit to what they've requested. Even with an army of engineers, months of effort, and millions of responsive data types, Google could not find everything Plaintiffs seek.

To be specific: Plaintiffs' request for information from logs that contain any fields that may relate to WAA status would require Google to, at a minimum, (1) query logs repositories for all potentially WAA-related fields, regardless of their relationship to Firebase, (2) identify all logs in which those fields reside, (3) identify all other fields in those logs, (4) search all of Google's codebase to determine how each field is calculated and see if there is a comment in the code describing it, then, for those determined potentially relevant, (5) ask each engineer who created the field in the codebase what it actually does. Google's repositories contain tens of thousands of logs and some logs can, by themselves, contain thousands of fields, many of which are not even in use. Indeed, initial searches indicate that, just in the S*****l repository, one such repository, logs that include the phrases "waa," "swaa," or "smh," contain, in total, over 1 million fields. And Google's codebase has undergone, in the last five years, at least 100 million changes. *See* Declaration of Nevin Kapur, Ex. E. The scope of the task Plaintiffs are proposing is, in short, gargantuan. And, in the end, the only answers of value to Plaintiffs will be related to the logs that Google already identified.[3] Plaintiffs know this, and Google is concerned that Plaintiffs' request is *intended* to be impossible so that they can later assert non-compliance. Indeed, their only response to Mr. Kapur's declaration is that they've never heard of him, so the Court should ignore him. That's not a basis to cast aside a sworn declaration from someone whose job it would be to comply with this Court's Order if it were to grant Plaintiffs' request.

As for dashboards, Plaintiffs fail to mention that Google offered every dashboard Plaintiffs requested. But, they say, Google should commit that no other dashboards that have *anything* to do with WAA *at all* exist at Google. Accounting for every single dashboard will be a similar waste of effort. Plaintiffs identified d**le, d***av, and R***a as potentially relevant. Google offered information from all three, and Plaintiffs never requested a specific report be run from any of them, nor have they identified any missing dashboards. Plaintiffs questioned every Google witness (four so far) about dashboards, too. If Plaintiffs identify any other dashboards, Google can follow the same process. But Google itself has not identified any others relevant to this case.[4]

Finally, though it doesn't matter to this motion, Google must respond to the insinuation that because Judge van Keulen ordered sanctions in the *Brown* case, by extension Google must be engaging in misconduct here. These are baseless accusations, particularly because Google is not denying there are thousands of fields relating to WAA status, including countless WAA bits. Google keeps close track of WAA status because it wants to honor users' privacy choices when they interact with products and services. But this case is about *one* such product, and Google opposes production of *all* WAA fields because it will be hugely burdensome, unhelpful to the case, confusing to everyone, and ultimately a waste of time and effort by all. Though Plaintiffs wish to assure themselves they've left no stone unturned here, the reality is that the logs discovery they seek just isn't worth the candle.

---

[3] Google would be happy to provide the Court with further explanation and detail at a hearing.

[4] R***a is a dashboard for viewing live experiments, and neither Google nor Plaintiffs have identified any Firebase-related experiments of relevance.

Respectfully,

WILLKIE FARR & GALLAGHER, LLP          BOIES SCHILLER FLEXNER LLP

By: */s/ Eduardo E. Santacana*          /s/ *Mark Mao*
    Eduardo E. Santacana (SBN: 281668)          Mark C. Mao (CA Bar No. 236165)
    esantacana@willkie.com          mmao@bsfllp.com
    Benedict Y. Hur (SBN:  224018)          Beko Reblitz-Richardson (CA Bar No.
    bhur@willkie.com          238027)
    Simona Agnolucci (SBN:  246943)          brichardson@bsfllp.com
    sagnolucci@willkie.com          BOIES SCHILLER FLEXNER LLP
    Lori Arakaki (SBN:  315119)          44 Montgomery Street, 41st Floor
    larakaki@willkie.com          San Francisco, CA 94104
    One Front Street, 34th Floor          Telephone: (415) 293 6858
    San Francisco, CA  94111          Facsimile (415) 999 9695
    Telephone:  (415) 858-7400
    Facsimile:  (415) 858-7599          James W. Lee (*pro hac vice*)
          jlee@bsfllp.com
    *Attorneys for Defendant Google LLC*          Rossana Baeza (*pro hac vice*)
          rbaeza@bsfllp.com
          100 SE 2nd Street, Suite 2800
          Miami, FL 33130
          Telephone: (305) 539-8400
          Facsimile: (305) 539-1304

          William Christopher Carmody (*pro hac
          vice*)
          bcarmody@susmangodfrey.com
          Shawn J. Rabin (*pro hac vice*)
          srabin@susmangodfrey.com
          Steven Shepard (*pro hac vice*)
          sshepard@susmangodfrey.com
          SUSMAN GODFREY L.L.P.
          1301 Avenue of the Americas, 32nd Floor
          New York, NY  10019
          Telephone: (212) 336-8330

          Amanda Bonn (CA Bar No. 270891)
          abonn@susmangodfrey.com
          SUSMAN GODFREY L.L.P.
          1900 Avenue of the Stars, Suite 1400
          Los Angeles, CA 90067
          Telephone: (310) 789-3100

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

*Attorneys for Plaintiffs*

**ATTESTATION**

I, Mark Mao, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

| | | |
|---|---|---|
| DATED:  October 17, 2022 | By: | /s/ *Mark Mao* |