November 7, 2022

**Submitted via ECF**

Magistrate Judge Alex G. Tse
San Francisco Courthouse
Courtroom A - 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

      Re:    Joint Letter Brief re: Additional Depositions
                *Rodriguez v. Google LLC*, Case No. 3:20-cv-04688-RS (N.D. Cal.)

Dear Magistrate Judge Tse:

      Plaintiffs and Google LLC ("Google") submit this joint letter brief regarding Plaintiffs' request for documents from the files of Micha Segeritz and Suneeti Vakharia, who worked on WAA-off revenue analyses according to Google's deponents, and Emil Ochotta, who appears to have considered how the Web & App Activity controls would affect Firebase when it was launched. Counsel for the parties previously met and conferred on this topic in good faith, including by videoconference on November 2, 2022. Exhibit A is Plaintiffs' proposed order and Exhibit B is Google's proposed order. Exhibit C is an exhibit from Francis Ma's deposition, Exhibit D is a declaration from Micha Segeritz, and Exhibit E is a declaration from Suneeti Vakharia.

**PLAINTIFFS' STATEMENT**

*Plaintiffs provided their portion of this letter-brief on November 1. Google did not provide its portion until 10:15 p.m. on November 7, the filing deadline. Given the hour and the number of disputes to be filed, Plaintiffs are unable to respond to Google's portion below. Plaintiffs are happy to supplement this filing if the Court has questions.*

Plaintiffs respectfully ask the Court to order Google to (1) conduct a targeted search and review of documents from the custodial files of Micha Segeritz, Suneeti Vakharia, and Emil Ochotta, and (2) negotiate parameters for those individuals' depositions in good faith, if warranted by the documents that process uncovers. These individuals—none of whom Google identified in its initial disclosures or interrogatory responses—likely have information about Google's efforts to study the value of data collected from users who turned off the Web & App Activity ("WAA") setting, as well as what if any discussions occurred regarding how to treat WAA-off users in connection with the Firebase launch. Google has produced little if any discovery about these topics, sometimes going so far as to deny that relevant material even exists—all while refusing to actually look. Plaintiffs should not be made to trust the blind assurances of Google's counsel.

1. **Micha Segeritz and Suneeti Vakharia**

Plaintiffs have long sought production of documents relating to any Google effort to study revenues associated with the WAA setting and WAA-off data, as well as efforts to study similar settings and data that Plaintiffs might analogize to the matters at issue in this case. *See, e.g.*, RFP 259 (requesting all documents relating to these efforts). Google began by dragging its feet, taking months to respond to Plaintiffs' requests, then offering only to meet and confer. *See* Google's R&Os to Plaintiffs' 8th Set of RFPs. After several meet-and-confers, Google's counsel disclosed the existence of a study relating to the "Google Ads Personalization" (GAP) control (which is similar to the WAA control), committed to producing related documents, and further represented they had found no study relating to WAA-off data. That representation is thin at best, especially because discovery in this case and public filings in other cases disclosed that Google conducts "extensive financial modeling" of the revenue impact associated with its privacy offerings. *Brown v. Google*, No. 4:20-CV-3664, Dkt. 643-2, at 14-15; *see also* Weng Tr. 203:15-18 (AdMob product manager testifying that there are "generally studies that happen that try and … attribute revenue to a certain feature or a certain team"). But without Google's cooperation, Plaintiffs lacked the information needed to direct the investigation that Google should have conducted on its own.

That missing information came after the Court's September 19, 2022 Order resolving the parties' dispute regarding the adequacy of Google's investigation. Dkt. 247. On October 3, 2022, Greg Fair, a former product manager at Google who played a key role in the development of the WAA control, *see* Dkts. 105 at 1, 5; Dkt. 163 at 4, testified at his deposition that Google conducted an "analysis" or "study" of "the revenue impacts of certain privacy settings," including "WAA." Fair Tr. 243:5-16. Mr. Fair recalled—without any documents—that this study entailed at least "a series of questions and explorations about how and whether" it was "possible" to determine the revenue impact of the WAA setting. *Id*. at 244:21-23. Mr. Fair remembered that the study was done "after 2015" and "before 2021." *Id*. at 245:3-4. Mr. Fair also remembered the individuals that ran the study: Micha Segeritz ("the analytics lead") and Suneeti Vakharia ("the product manager").

1

*Id*. at 243:3-10. Google had identified neither Mr. Segeritz nor Ms. Vakharia in its initial disclosures and interrogatory responses regarding individuals with knowledge relevant to this case.

In light of Mr. Fair's testimony, Plaintiffs asked Google to add Mr. Segeritz and Ms. Vakharia as document custodians and produce responsive documents from their files. Nearly two weeks later, Google declined Plaintiffs' request, representing that Google's counsel interviewed them instead and confirmed that the study Mr. Fair remembered was about the GAP control. But it is hard to believe that Mr. Fair, who was deeply involved with WAA, mistakenly believed that a study was related to WAA when it was in fact related to a different (even if similar) control.

Plaintiffs reiterated their request for a custodial production and offered a single, limited search string targeted specifically at the material that Mr. Fair referenced: *\*WAA\* AND (revenue\* OR profit\*)*. On October 19, Google again rejected Plaintiffs' proposal, refusing even to provide the hit counts for that string. As justification, Google cited only the "late hour."[1]

Plaintiffs' suspicions were confirmed during the October 25 deposition of Eric Miraglia, the founder of Google's Privacy and Data Protection Office. Mr. Miraglia agreed with Mr. Fair: Google did, in fact, carry out "efforts" to "study revenues associated with WAA." Miraglia Rough Tr. 212:2-11. As Mr. Miraglia recalled it, the "advertising team did business analyses as part of" a Google program designed to convince more users to consent to data collection, which Google internally referred to as "Na\*\*\*\*2." *Id.* at 212:13-15. Mr. Miraglia testified that these analyses "involved a number of different settings," and that "WAA was one of them." *Id.* at 212:15-17. Mr. Miraglia recalled a *separate* study of the "[G]oogle ads personalization control." *Id.* at 212:18-21. Neither Mr. Miraglia nor Mr. Fair mixed up WAA and GAP.

Against all of this testimonial evidence that Google studied the revenue associated with the WAA control—not to mention documentary evidence, *see, e.g.*, GOOG-RDGZ-00117919 (referring to Google employees' efforts to "model[] out the financial impact of changes to user privacy controls," including changes that impact the number of users "opted-in to WAA")— Google offers only the assurances of its counsel. There is no revenue study relating to WAA, Google's counsel says. All of these witnesses are just confused, they say. All while refusing to conduct simple searches that would shed light on the issue or confirm counsel's assurances.

Plaintiffs should not be made to rely only on the word of Google's litigation counsel, especially in light of the independent corroborating evidence to the contrary. Plaintiffs respectfully ask the Court to order Google to search Mr. Segeritz's and Ms. Vakharia's documents using the search string, *(WAA\* OR "(s)WAA\*" OR sWAA\*) AND (revenue\* OR profit\*)*, provide hit counts for those searches, and to produce any responsive documents within that set. Even if Google never

---

[1] The timing of the request is attributable entirely to Google's delays. Plaintiffs requested Mr. Fair's deposition on June 13, 2022—*six weeks before Google even produced his documents*. Three months later (and after many reminders) on September 10, Google informed Plaintiffs that Mr. Fair would be available for deposition on October 3. Plaintiffs took Mr. Fair's deposition on that date, and when Mr. Fair's testimony revealed deficiencies in Google's productions, Plaintiffs promptly followed up with Google's counsel. As even Google has otherwise recognized, it is entirely normal to make requests that arise out of deposition testimony.

conducted the analysis about which Mr. Fair and Mr. Miraglia testified, any emails or other documents regarding a potential analysis would be relevant and responsive to Plaintiffs' requests. Google should also be ordered to negotiate the parameters of possible depositions in good faith, in the event that these searches yield relevant documents. Google need not boil the ocean to find these studies, but it must do more than dip a toe in the water.

2. **Emil Ochotta**

Google should also be required to conduct a similarly limited search of the documents of Emil Ochotta, a software engineer employed by Google.

Plaintiffs have diligently sought discovery regarding what, if any, consideration Google paid to users' WAA settings when it launched Firebase. Plaintiffs' efforts have been impeded by the minimal documentation that Google has produced from before Firebase launched in May 2016. Among the few documents that Google produced from this period is a document from the files of Francis Ma, who has been Firebase's Director of Product Management since its inception. The document is titled "Footprints Sync," and it purports to describe the ways in which the WAA and sWAA "controls actually manifest"—in other words, what effect those controls have on the ways in which user data is saved and used. GOOG-RDGZ-00026710. This document demonstrates the team that launched Firebase was specifically aware of the WAA and sWAA settings and decided to collect and save data from users who disabled those settings.

But when presented with this document during his deposition, Mr. Ma—who was one of just three witnesses that Google included on its initial disclosures until very recently (when it added another three)—professed to have no knowledge of this document whatsoever or even the words it uses, including, incredibly, "sWAA," one of two settings at the heart of this case. Ma Rough Tr. 38:22-23 (testifying that this document is "completely foreign" to him); *id.* at 42:11-12 ("I … have no idea what sWAA is."). Instead, Mr. Ma deferred to the author of the document, a Google engineer named Emil Ochotta. *See id.* at 40:4-12; 45:23-24. To allow Plaintiffs to determine what Mr. Ochotta knows, Google should search his documents using the string, *(WAA\* OR "(s)WAA\*" OR sWAA\*) AND Firebase,* and to present him for deposition if appropriate.

## GOOGLE'S STATEMENT

This motion is part of a larger strategy to upend this case because the original theory of the case did not pan out. Plaintiffs extended the discovery schedule (once over Google's objection) three times for a total of 11 extra discovery months. They secured from this Court, also over Google's objection, documents from 24 custodians instead of 10. They persisted in taking depositions from former Google employees only to then complain that their memories were faulty, and persisted in deposing Frances Ma about WAA, which is outside his area of expertise. Discovery closed a week ago, yet Plaintiffs seek from Judge Seeborg another discovery deadline extension and leave to file a new complaint that adds new products to their legal claims and an entirely new class based on information they've known for over a year, and which, in any case, doesn't make their far-fetched accusation that Google lied to its users about its privacy controls any more true.

But one fact Plaintiffs have never disputed in any filing before this Court is indisputably true: When WAA is off, Firebase Analytics data is not written to marketing profiles, nor used by Google for personalized advertising. The central claim of this case—that Google uses Firebase SDK data from WAA-off users to "build[] and maintain[] 'profiles' relating to each individual . . . and to each of their devices . . . to effectively target advertisements"—was a wild guess, nothing more; and it was wrong. *See* 3d Am. Compl., Dkt. 131 ¶¶ 121–22.

Discovery has to end at some point. Left to roam, Plaintiffs will metastasize their claims endlessly. Indeed, after promising Judge Seeborg repeatedly during the pleading stage that Google's "secret scripts" stole user data to target advertisements, Plaintiffs' case has been reduced to seeking leave from the Court to let them proceed on an invasion of privacy theory that when a user asks Google to process a web search query, if their WAA control is turned to "off," Google should not be able to save the search query, even in anonymized form, even if just for non-advertising product improvement purposes. *See* Plaintiffs' Motion for Leave to Amend Compl., Dkt. 258. This is a far cry from plaintiffs' allegations relating to Firebase, targeted ads, and secret invasions of privacy.

Currently pending before this Court are letter briefs seeking virtually unlimited rummaging in Google's data stores, Dkt. 250, and three depositions past the ten-deposition limit, Dkt. 256. This brief seeks three more custodians past the 24 Plaintiffs already got, and yet three more depositions. There's no reason for any of this.

Google thoroughly investigated Plaintiffs' apparently unshakeable belief that Google conducted a study that will tell them the value of WAA-off Google Analytics for Firebase data. Google's outside counsel, in-house counsel, and many Google employees have chased down lead after lead after lead over the course of a year, including many provided by Plaintiffs themselves. Plaintiffs' mythical WAA-off study has not been found.

Micha Segeritz and Suneeti Vakharia don't have it, either. As their declarations, filed herewith, attest, Greg Fair's memory as an ex-Google employee about a study done at the "tail end of the 2010s" was just wrong. The study he thought he remembered was a 2020 study about the financial impact of the Google Ads Personalization (GAP) button, a completely different privacy control, and Google produced those results already. Indeed, Fair couched his memory by saying "I believe so," not that he knew so. Eric Miraglia's testimony was even more circumspect; when asked about WAA-related studies, Miraglia said he "believe[s] there have been efforts to do that," that the advertising team did "business analyses as part of the Na****2 program that involved a number of different settings," and then repeatedly, that he "wasn't involved in any way in creating them." Miraglia Tr. at 212–14. Mr. Miraglia was *not* asked about WAA-off studies and the program he refers to is from 2016.

Plaintiffs' pursuit of Segeritz and Vakharia's documents and depositions would also circumvent this Court's ruling on September 26 that "To the extent that Google performed WAA-off financial analyses unrelated to Firebase, plaintiffs haven't persuaded the Court that those analyses are relevant or that their disclosure would be proportional to the needs of the case." Dkt. 248. Plaintiffs make no attempt to connect their suspicion of Segeritz and Vakharia knowledge of Firebase, nor can they. Neither Fair, Miraglia, Segeritz, nor Vakharia worked on GA

4

for Firebase. All of them work or worked on privacy issues more generally, cutting across various products.

Further, Plaintiffs have not missed out on these two individuals' documents. Google produced almost 700 documents from their files because they were responsive search-term hits in other custodians' files (130 of which were produced before Plaintiffs asked to expand the custodian roster from 10 to 24). One of those documents, GOOG-RDGZ-00117919, relied on by Plaintiffs above, is one of those leads that Google chased down; as Google told Plaintiffs, it was a dead end—the anticipated analysis was related to a user flow that was never adopted and it was never performed. *See* Decl. of Segeritz; Decl. of Vakharia.

Finally, documents identifying Segeritz and Vakharia were produced five months ago, and none suggested that they worked on any "WAA-off" analysis. And if such an analysis exists, it should have been identified and produced from the custodial files of employees who had some relationship to WAA, including because Google searched their files using dozens of search strings that included WAA terms. Moreover, Plaintiffs have known that Google at least considered studying the revenue impact of WAA-off data since August 2021. *See* GOOG-RDGZ-00042542 ("[W]e have already run experiments turning GAP off to get the revenue impact of doing so . . . Our goal now is to understand . . . turning off both GAP and WAA. Eventually, we want to know what will happen to users who don't consent to a redesigned consent UI."). There are no surprises here, only last-minute excuses for more fishing expeditions.

Plaintiffs' request for the custodial files of Emil Ochotta is a completely unrelated issue, but it suffers from the same problems. Plaintiffs complain that Francis Ma was unable to testify regarding an inscrutable document called "Footprints Sync" that Plaintiffs say is evidence of Google's malfeasance. The document is attached hereto as Exhibit C. It does not suggest malfeasance nor does it justify adding Ochotta as a custodian. In fact, it acknowledges what Google has been telling plaintiffs all along–when WAA is off, GA for Firebase data is not associated with a user and stored in Footprints (when "WAA is opted out" the "write is just attempted and fails.") It's not clear why Plaintiffs find it so interesting.

Nor is Mr. Ochotta's existence or work a surprise to Plaintiffs. In response to queries from Plaintiffs about the names on Google's privilege log back in December 2021, Google disclosed Emil Ochotta to Plaintiffs. Given that he is a Senior Director of Privacy Governance and Data Protection Officer, Mr. Ochotta appears on various privilege log entries. Nevertheless, Google produced 136 emails with him on them. And the document in question had many other Google employees on it, too, not just Ochotta. One of those was Dave Monsees, who is the lead for the WAA button overall. Nobody asked Mr. Monsees at his deposition about this document. But he did testify extensively about how Footprints, WAA, and Firebase interact with one another, both in his personal capacity and as Google's Rule 30(b)(6) designee on this topic. There are no factual gaps to fill here. Plaintiff's request to add Mr. Ochotta as a custodian, and their disguised request for yet another deposition by asking that Mr. Ochotta be presented for deposition "if appropriate" should be denied as late, unnecessary, and unjustified.

Respectfully,

| WILLKIE FARR & GALLAGHER, LLP | SUSMAN GODFREY LLP |
|---|---|
| By: */s/ Eduardo Santacana*<br>   Eduardo E. Santacana (SBN: 281668)<br>   esantacana@willkie.com<br>   Benedict Y. Hur (SBN: 224018)<br>   bhur@willkie.com<br>   Simona Agnolucci (SBN: 246943)<br>   sagnolucci@willkie.com<br>   Lori Arakaki (SBN: 315119)<br>   larakaki@willkie.com<br>   One Front Street, 34th Floor<br>   San Francisco, CA 94111<br>   Telephone: (415) 858-7400<br>   Facsimile: (415) 858-7599<br><br>   *Attorneys for Defendant Google LLC* | /s/ *Mark Mao*<br>Mark C. Mao (CA Bar No. 236165)<br>mmao@bsfllp.com<br>Beko Reblitz-Richardson (CA Bar No. 238027)<br>brichardson@bsfllp.com<br>BOIES SCHILLER FLEXNER LLP<br>44 Montgomery Street, 41st Floor<br>San Francisco, CA 94104<br>Telephone: (415) 293 6858<br>Facsimile (415) 999 9695<br><br>James W. Lee (*pro hac vice*)<br>jlee@bsfllp.com<br>Rossana Baeza (*pro hac vice*)<br>rbaeza@bsfllp.com<br>100 SE 2nd Street, Suite 2800<br>Miami, FL 33130<br>Telephone: (305) 539-8400<br>Facsimile: (305) 539-1304<br><br>William Christopher Carmody (*pro hac vice*)<br>bcarmody@susmangodfrey.com<br>Shawn J. Rabin (*pro hac vice*)<br>srabin@susmangodfrey.com<br>Steven Shepard (*pro hac vice*)<br>sshepard@susmangodfrey.com<br>SUSMAN GODFREY L.L.P.<br>1301 Avenue of the Americas, 32nd Floor<br>New York, NY 10019<br>Telephone: (212) 336-8330<br><br>Amanda Bonn (CA Bar No. 270891)<br>abonn@susmangodfrey.com<br>SUSMAN GODFREY L.L.P.<br>1900 Avenue of the Stars, Suite 1400<br>Los Angeles, CA 90067<br>Telephone: (310) 789-3100 |

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

*Attorneys for Plaintiffs*

## ATTESTATION

I, Mark Mao, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED: November 7, 2022                    By:     /s/ *Mark Mao*