1

**WILLKIE FARR & GALLAGHER LLP**
BENEDICT Y. HUR (SBN: 224018)
  bhur@willkie.com
2

SIMONA AGNOLUCCI (SBN: 246943)
  sagnolucci@willkie.com
3

EDUARDO E. SANTACANA (SBN: 281668)
  esantacana@willkie.com
4

NOORJAHAN RAHMAN  (SBN: 330572)
  nrahman@willkie.com
5

ARGEMIRA FLÓREZ  (SBN: 331153)
  aflorez@willkie.com
6

HARRIS MATEEN (SBN: 335593)
  hmateen@willkie.com
7

One Front Street, 34th Floor
San Francisco, CA 94111
8

Telephone:  (415) 858-7400
Facsimile:  (415) 858-7599
9

10

Attorneys for Defendant
GOOGLE LLC
11

12

13

14

### UNITED STATES DISTRICT COURT

15

### NORTHERN DISTRICT OF CALIFORNIA

16

### SAN FRANCISCO DIVISION

17

ANIBAL RODRIGUEZ, et al. individually and on behalf of all others similarly situated,

Case No. 3:20-CV-04688-RS

18

               Plaintiff,

**GOOGLE LLC'S NOTICE OF MOTION AND MOTION TO EXCLUDE OPINION OF PLAINTIFFS' DAMAGES EXPERT MICHAEL J. LASINSKI**
19

   vs.

20

GOOGLE LLC,

21

               Defendant.

**Date:**      **October 5, 2023**
22

Time:     1:30 PM
Place:    Ctr,. 3, 17th Floor, SF
23

24

25

26

27

28

PLEASE TAKE NOTICE that on October 5, 2023, at 1:30 p.m., before the Honorable Richard Seeborg, in Courtroom 3 of the United States District Court for the Northern District of California, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Google LLC ("Google") will move the Court to exclude the opinions of Plaintiffs' Damages Expert Michael J. Lasinski pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). This Motion is based on this Notice of Motion, accompanying Memorandum of Points and Authorities, Declaration of Eduardo E. Santacana, dated August 24, 2023, and all other evidence in the record.

The Court should exclude Plaintiffs' expert Michael J. Lasinski's opinions. His two damages models fail to follow basic methodological principles and would confuse the jury. First, Mr. Lasinski's profit disgorgement model, which attempts to quantify "unjust enrichment," rests on unsupported assumptions with no factual foundation in the record. Second, Mr. Lasinski's "actual" damages model, an apparent measure of restitution, offers no methodology. It spitballs a damages estimate copied-and-pasted from another case against Google brought by the same Plaintiffs' counsel.

For these reasons, Mr. Lasinski's unreliable and irrelevant models should be excluded under Federal Rule of Evidence 702. They would confuse rather than aid the jury

## I.    INTRODUCTION

Plaintiffs' remaining claim of intrusion upon seclusion calls for damages such as emotional distress, mental anguish, and anxiety, and their remaining claim of violation of California's anti-hacking statute calls for compensatory damages related to the cost of repairing a hacked computer system. Implicitly acknowledging they could measure neither of these types of damage on a class-wide basis, Plaintiffs' counsel instructed damages expert Michael Lasinski to submit a facsimile of his expert opinion in an unrelated pending case, *Brown v. Google*, edited to appear related to this case. In *Brown*, and now here, Lasinski opined that class-wide damages could be measured in two ways—in terms of unjust enrichment, *i.e.* non-restitutionary disgorgement of Google's profits from the allegedly ill-gotten data, and in terms of restitution, a measure of "actual damages."

This Court should exclude both damages models. Neither measures the damages provided for by the remaining claims: a privacy tort and a California anti-hacking statute that doesn't authorize either form of relief. Further, the unjust enrichment model is premised on a fictitious but-for world with no evidentiary basis, and the actual damages model amounts to little more than a finger-in-the-wind selection of a random number with no methodology, no evidentiary basis, and no flexibility to account for alleged differences in the nature, extent, and severity of the alleged intrusions. Courts have repeatedly rejected similarly flawed damages models, including ones offered by Lasinski himself. This Court should follow.

## II.    BACKGROUND[1]

Plaintiffs no longer assert that Google uses sWAA-off data to target or personalize advertising. And while they assert that Google does use anonymized sWAA-off data for things like diagnostics and product improvement, they do not present any damages model tied to those uses of the data. Instead, Plaintiffs' new theory of liability is that Google contravenes its representations to its users because it engages in basic advertising record-keeping; in particular, even when a user's sWAA is turned off, Google will (1) still log the fact that it has served an ad alongside a device

---

[1] Google discusses the greater contextual background to this Motion in its Opposition to Plaintiffs' Motion for Class Certification, filed concurrently. Here, Google describes the particular facts necessary to decide this Motion.

identifier for accounting purposes, and (2) it will still attribute conversion events to those ad-serving records. Mot. for Class Cert., ECF 314-3, at 14:1–6.

To calculate damages from this theory of liability, Plaintiffs' counsel hired Michael Lasinski, with whom they had already worked on the *Brown v. Google* "incognito mode" case, to calculate damages for Plaintiffs' remaining claims of intrusion upon seclusion and violation of the Comprehensive Data Access and Fraud Act ("CDAFA"). Expert Report of Michael J. Lasinski ("Lasinski Rpt."), ECF 314, ¶¶11–12. Lasinski offers two alternative damages models: (1) "non-restitutionary disgorgement" of profits, which he terms a measure of "unjust enrichment;" and (2) "actual" damages, which he likens to a measure of restitution for, in effect, the unknowing collection of "app activity data," the "fair value" of which he purported to measure. Santacana Decl., Ex. 1, ("Lasinski Tr.") at 49:23–50:04. The difference between his two models is, in effect, that the disgorgement model seeks to identify the amount of money Google profited thanks to the sWAA-off record-keeping, whereas the actual damages model seeks to identify the economic value of the sWAA-off record-keeping data to the class.

## A.    Lasinski is an IP valuation specialist with no relevant expertise.

Lasinski is an "expert on financial aspects of intellectual property," who has consulted on "IP-centric transactions." Lasinski Rpt., at 66. He is not an expert in consumer fraud damages, having never served as an expert witness or consulted on the topic. *Id.* at 98:6–15. He has never employed the methodologies commonly used in consumer fraud cases, for example, to measure a defendant's ill-gotten profits from alleged misrepresentations as compared to the profits the defendant would have made in the but-for world absent the alleged falsehood. *Id.* at 98:16-23. And while Lasinski is experienced at performing "next-best alternative" damages analyses in IP matters, he conceded that he did not do anything like that type of analysis here; that is, without explanation, he decided not to analyze what would have been Google's next-best alternative in a world where Google could not have used the sWAA-off record-keeping data, *i.e.*, additional disclosure, changes in practices, or use of different technology. *Id.* at 131:25-132:15. Lasinski also lacks any experience in consumer privacy damages. He has never advised any company on consumer privacy issues or valued consumer data before. *Id.* 42:23–44:6. Nor can he cite authorities supporting valuation of

2

consumers' online data. *Id.* 48:22–49:9. *Cf.* Santacana Decl., Ex. 2, Expert Rebuttal Report of Anindya Ghose, Ph.D. ("Ghose Rpt."), ¶¶22–23.

Further, Lasinski is not familiar with the underlying business models or technology at issue in this case. By his own admission, he is not an expert on "the market dynamics of advertising within mobile apps." Lasinski Tr. 39:24–40:11. Apart from when he previously testified against Google for the same counsel on behalf of different plaintiffs in *Brown*, Lasinski's closest experience providing an expert opinion on the "online advertising industry" came from an "Amazon IRS case," which he admitted was "a tax case." *Id.* 37:23–24.

**B.    Lasinski's first damages model claims to calculate disgorgement of either all profits Google earned "from" conversion attribution by sWAA-off users, or alternatively, that amount plus all profits Google earned "from" keeping records of having served ads to sWAA-off users.**

Lasinski was instructed that non-restitutionary disgorgement of unjust enrichment could provide relief for the alleged wrongs here. Lasinski Rpt. ¶69. Based on that instruction, Lasinski developed a disgorgement-of-profits model under two "liability scenarios" defined by counsel and Plaintiff's technical expert Jonathan Hochman. *Id.* ¶73; *see also* Expert Report of Jonathan E. Hochman, ECF 314, ("Hochman Rpt.") ¶281. Lasinski's disgorgement **Scenario 1** envisions a world where Google does not "attribute" conversion events generated by the Firebase SDK to ad events that occurred earlier in time if the user of the app that is using the Firebase SDK is also a Google account holder with sWAA turned off. Lasinski Rpt. ¶75. Google performs this attribution by matching the pseudonymous device ID logged when an ad is served or clicked on to the same device ID performing a conversion event later in time. Santacana Decl., Ex. 3, Expert Rebuttal Report of Christopher R. Knittel, Ph.D., ¶¶36–38. This provides a rough approximation of the success of an ad campaign: when ads advertise apps and app installs go up, generating more "conversions," that indicates the campaign was successful, and the specific numbers make it possible to measure one campaign to another.[2] This record-keeping function is accomplished

---

[2] *See generally* https://en.wikipedia.org/wiki/Attribution_(marketing). Here, conversion measurement allows app developers to measure what happens when users interact with their apps. Lasinski Rpt. ¶29. Potential conversions for an app developer could include a user "making a purchase, signing up for a newsletter, or downloading an app." *Id.*

without identifying the user, and, as explained in Google's Opposition to Class Certification, Google segregates device IDs from identifiers that can be used to identify individuals and takes several steps to prevent bad actors from tying them together. *See* Hochman Rpt. ¶139.

Lasinski targets what he purports is all of Google's ad revenue for ads served to sWAA-off users who were using an app that used the Firebase SDK to measure and then attribute a conversion event. Lasinski Rpt., ¶¶77–80. The relevant ad campaign type implicated by this scenario is called App Promo, *i.e.* apps placing ads to persuade users to install their app, served by the AdMob and Ad Manager SDKs, and the conversions subsequently measured by the Firebase SDK. *Id.* ¶¶77–80. Lasinski pegs disgorgement under this first scenario at ████████████ *Id.* ¶79.

Lasinski's disgorgement **Scenario 2** adds into the first the additional revenue Lasinski asserts Google would not have earned but for its ability to record that an ad was served in the first place, via AdMob or Ad Manager SDKs. *Id.* ¶113. This scenario treats sWAA as a total "Google ad blocker," meaning Google could not serve sWAA-off users any ads whatsoever. *Id.; see also* Lasinski Tr. 137:5–14. This is because, as Plaintiffs' technical expert posits, "[i]f Google did not collect and save ad requests, it could not serve ads. And without data regarding both ad requests and the ads that Google served, Google would lack the records it needs to charge advertisers for its services." Hochman Rpt. ¶122. Lasinski says this resulted in ████████████ of profit.

## C. Lasinski's one-size-only "actual" damages model awards class members $3.

Lasinski opines that "actual" damages, which he also calls "restitution," comprise $3 per class-member device. Lasinski Rpt. ¶¶130–31. This amount, which he deems is the "fair value" of the data on an open market, is the dollar figure which he opines would "incentivize an individual to knowingly surrender the choice to keep activity on mobile apps private and allow an organization to track app activity." *Id.* The $3 figure is borrowed wholesale from the Ipsos Screenwise Panel, a consumer research program that pays Internet users $3 per month for using a Screenwise meter app on a mobile device. *Id.* ¶131. Google has worked with Ipsos members, who "are paid to voluntarily link their devices, operate a special router, and recruit other members of the household to participate in a comprehensive online data collection process." *Id.* ¶135. Panel members must consent to the Screenwise meter app's privacy policy, which discloses that the app can "record everything" on the

screen, including all webpages visited, apps used, games played, anything viewed, and any information input, like a user's "name, email address, home/work address, telephone number, Social Security number, or credit card number." *Id.* ¶138.

Lasinski multiplied a class size of ███████ members with ███████ mobile devices by $3 to get to "actyual damages" of ███████. *Id.* § 1. In *Brown v. Google*, Lasinski performed the exact same calculation, and concluded that class members should receive $3 each, per unique monthly browsing instance.  Santacana Decl., Ex. 4, Lasinski Rpt., *Brown v. Google*.

## III.    STANDARD OF LAW

For expert testimony to be admissible, the witness must be qualified as an expert by knowledge, skill, experience, training, or education, and the testimony must be based on sufficient facts or data, be the product of reliable principles and methods, and reflect a reliable application of the principles and methods to the facts of the case. FRE 702. "[T]he trial judge must ensure that any and all scientific testimony and evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 580 (1993). "[E]xpert testimony is not admissible under Rule 702 if it is based on assumptions that are unsubstantiated by the record." *BJB Elec. LP v. Bridgelux, Inc.*, 2023 WL 4849764, at *2 (N.D. Cal. July 28, 2023) (Seeborg, C.J.). "Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all." *Id.* (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996). *See also Maheu v. Hughes Tool Co.*, 569 F.2d 459, 475 (9th Cir. 1977) (rejecting damages assessment based on "sheer fantasy").

Beginning on December 1, 2023, unless Congress rejects the Supreme Court's approval of **proposed amendments to the Federal Rules of Evidence, FRE 702** will newly include a requirement that the Court resolve disputes over expert witness admissibility according to the preponderance of the evidence standard. *See* "Proposed Amendments to F.R.E. 106, 615, and 702 Absent Contrary Congressional Action," 344 F.R.D. 850, 857 (April 24, 2023). That amendment was proposed because "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," and, in the Rules Committee's view, "[t]hese rulings are an incorrect application of

Rules 702 and 104(a)." *Id.*, Cttee. Note to F.R.E. 702 Am. To illustrate, the Committee explained that "if the court finds it more likely than not that an expert has a sufficient basis to support an opinion, the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility." *Id.* But at all times, "expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology" because "jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." *Id.* Simply put, "[t]he Rule 104(a) standard does not require perfection" but it also "does not permit the expert to make claims that are unsupported." *Id.*

## IV.   ARGUMENT

### A.    Lasinski's disgorgement of profits model should be excluded.

Plaintiffs' counsel directed Lasinski to propose a "non-restitutionary disgorgement" model of unjust enrichment. Lasinski Rpt. ¶69. Unjust enrichment requires that, "at the plaintiff's expense," the defendant "received and unjustly retained" some benefit. *Hart v. TWC Prod. & Tech. LLC*, 2023 WL 3568078, at *5 (N.D. Cal. Mar. 30, 2023); *Oracle Am., Inc.*, 2023 WL 2838118, at *10 (N.D. Cal. Apr. 6, 2023) (Seeborg, C.J.); *ESG Cap. Partners, LP*, 828 F.3d1023, 1038 (9th Cir. 2016)); *see also Tunick v. Takara Sake USA Inc.*, 2023 WL 3958363, at *7. Importantly, for unjust enrichment "a plaintiff must show that the defendant received and unjustly retained a benefit ***at the plaintiff's expense*.**" *TWC Prod.*, 2023 WL 3568078, at *5 (emphasis added); see also *Oracle Am., Inc.*, 2023 WL 2838118, at *10 (same); *ESG Cap. Partners, LP*, 828 F.3d at 1038 (9th Cir. 2016) (same). "The fact that a recipient has obtained a benefit without paying for it does not itself establish that the recipient has been unjustly enriched."[3] 1 Witkin, Summary 11th Contracts § 1050 (2023).

### 1.    Plaintiffs cannot recover disgorgement on their remaining claims.

Lasinski's disgorgement model does not show any actual loss to class members. Plaintiffs never lost any money or property, and Google never invaded any property right. *See* ECF No. 109,

---

[3] Google moved on different grounds to exclude Lasinski's unjust enrichment model in *Brown v. Google*, and Judge Gonzalez Rogers denied that motion. None of that Court's Order on Lasinksi's unjust enrichment model applies here.

GOOGLE LLC'S MOTION TO EXCLUDE OPINION OF MICHAEL J. LASINSKI
Case No. 3:20-CV-04688-RS

at 17. Pointedly, Plaintiffs' fraud theory of the case failed at the motion-to-dismiss stage; they have since gone so far as to say they never intended for their "secret scripts" theory to be an allegation of fraud at all. *See id.*, at 11 (comparing the "most sensational accusation" with "plaintiffs' counsel careful[ly] walk[ing] it back."). And Plaintiffs' technical expert, in discussing Google's alleged misconduct, conceded that Google "has the best intentions here" to keep pseudonymous and identifiable data separate, and explains that his real complaint is that "maybe Google is nice today but they become evil in the future" and decides to re-unify data for a government or for profit. Santacana Decl., Ex. 5, ("Hochman Tr."),, at 364:15–65:5. This is far from the "mistake, fraud, coercion, or request" required to be entitled to unjust enrichment damages. Consequently, non-restitutionary disgorgement is not "a theory of damages consistent with Plaintiffs' theory of liability in the case." *Philips v. Ford Motor Co.*, 2016 WL 7428810, at *26 (N.D. Cal. Dec. 22, 2016), *aff'd*, 726 F. App'x 608 (9th Cir. 2018).

Plaintiffs thus do not establish disgorgement of profits as a permissible remedy for their privacy claims or CDAFA claim.[4] For constitutional and tort-based privacy claims, "the primary damage . . . is the mental distress from having been exposed to public view." *Time, Inc. v. Hill*, 385 U.S. 374 384 n.9 (1967) (as quoted in CACI 1820 (2023)). The "gist of a cause of action in a privacy case is . . . injury to the feelings without regard to any effect which the publication may have" on economic interests because the "right of privacy concerns one's own peace of mind," so "the injury is mental and subjective," as opposed to, say, the right of publicity. *Selleck v. Globe Int'l, Inc.*, 166 Cal. App. 3d 1123, 1135 (1985) (as quoted in CACI 1820 (2023)); *see also* CACI 1820 (2023) (listing damages for intrusion upon seclusion only as "Mental suffering /anxiety /humiliation /emotional distress," and special damages); BAJI 7.26 (listing "harm to the plaintiff's interest in privacy," "mental or emotional distress" and "Special damages caused by the invasion," *i.e.*, "economic losses which the plaintiff has sustained to date . . . in respect to property, business, trade,

---

[4] Academic commentators have highlighted the inadequacy of privacy tort claims for modern privacy harms. *E.g.*, B. Chao, "Privacy Losses as Wrongful Gains," 106 Iowa L. Rev. 555, 564–65 (2021) ("Tort law is also not a good fit for the problems privacy victims have . . . . in today's data driven society.")

profession, or occupation"); Rest. 2d of Torts § 652H (as adopted by California courts; listing same elements). None of these are measures of disgorgement of profits, and none of these authorities admit the possibility that an invasion of privacy tort gives rise to an unjust enrichment award. To the contrary, typically plaintiffs are required to choose between an action in tort or in quasi-contract; the former gives rise to damages, while the latter gives rise to an unjust enrichment remedy. *See* 1 Witkin, Summary 11th Contracts § 1077, "Where Tort Remedy Is Adequate" (2023). While certain of Plaintiffs' tort claims survived Google's Motions to Dismiss, its contractual and quasi-contractual claims did not.

CDAFA, meanwhile, limits recovery to those remedies defined by statute: "compensatory damages and injunctive relief or other equitable relief." Cal. Penal Code (s) (e)(1). And those compensatory damages are limited to costs incurred "to verify" whether a "computer system" was damaged. *Id.*; *see Facebook, Inc. v. Power Ventures, Inc.*, 844 F. Supp. 2d 1025, 1039 (N.D. Cal. 2012) ("[L]osses within the meaning of the statute" include "costs associated with investigating intrusions into a computer network and taking subsequent remedial measures[.]").

Plaintiffs hint at two losses for unjust enrichment under CDAFA. Dkt. 314-3, at 17. They first claim a market for the unlawfully collected data exists, and class members lost the chance to sell their data within that market. *Id.* But Lasinski did not claim to show class members actually tried selling their data or valued their data equivalently (there is no such evidence in the record). And as this Court has recognized, "the weight of the authority in the district and state" holds that "mere misappropriation of personal information does not establish compensable damages."[5] *Oracle*, 2023 WL 2838118 at *8 (quoting *Pruchnicki v. Envision Healthcare Corp.*, 845 Fed. App'x. 613, 615 (9th Cir. 2021)). *See also id.* (citing *Facebook Consumer Privacy*, 402 F. Supp. 3d at 804 (distinguishing a company's gain of money through sharing or use of Plaintiffs' information from a claim that Plaintiffs actually lost money and dismissing Plaintiffs' theory of economic loss as

---

[5] Plaintiffs also claim in passing that advertising and analytics "drain" battery resources. *Id.* But Lasinski's model does not address any costs to the class or to any individual associated with "verify[ing]" that alleged "drain."  The attorney argument that the class is entitled to compensatory damages for drained battery resources (read: *not* actually unjust enrichment damages) plays no part whatsoever in Lasinski's unjust enrichment model.

1   "purely hypothetical"); *Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 730 (N.D. Cal. 2014) (finding

2   that Plaintiff could not proceed with UCL claim because she had "not alleged any facts showing

3   that Defendants' business practice—disclosing users' Contact Information to third-party App

4   vendors—changed her economic position at all").

5        As such, Plaintiffs here are like those in *Oracle America*, where this Court dismissed a

6   disgorgement claim because plaintiffs and putative class members had not "directly expended their

7   own resources" nor "shown that their property has become less valuable." 2023 WL 2838118, at

8   *10. And, as this case involves the alleged collection of sWAA-off data from third-party apps, "to

9   the extent [Google] has data . . . it was received and/or collected with permission from the third-

10  party [apps]." *Id.* at *10 & n.11. Google requires those apps to disclose their use of Google Analytics

11  services to the app users, and Plaintiffs read those apps' disclosures of the use of Google Analytics.

12  *E.g.*, Ex. 6 (Harvey Tr.), at 203:5–13. Because "Plaintiffs challenge unjust enrichment based on the

13  monetization of that data, they must explain why the access they received to those [apps] would not

14  defeat the unjust enrichment claim." *Oracle*, at *10 & n.11. Lasinksi's model doesn't attempt to do

15  that, either.

16       Plaintiffs try to sidestep calculating actual class member harm by hitching their model to the

17  Ninth Circuit decision in  *Facebook Tracking*, 956 F.3d at 599, where the court, in passing,

18  mentioned that the plaintiffs there had Article III standing to assert a CDAFA claim. In so holding,

19  the Ninth Circuit reasoned that unjust enrichment required the plaintiffs to have "retain[ed] a stake

20  in the profits garnered from their personal browsing histories," because it would be "unjust for

21  Facebook to retain it." *Id.* at 600. But in determining whether it is or isn't "unjust" to retain the

22  profits, the Ninth Circuit looked at the plaintiffs' alleged losses. The Court held that the plaintiffs

23  could potentially be entitled to Facebook's profits because they showed that "their browsing

24  histories carry financial value." *Id.* It also held that Facebook's profits could have been unjustly

25  earned because "the platform charges users by acquiring the users' sensitive and valuable personal

26  information and sell[s] it to advertisers for a profit." *Id.* at 601.

27       The *Facebook Tracking* court did not purport to make new law in California as to the

28  availability of disgorgement-of-profits damages for intrusion upon seclusion (which it was not even

addressing), nor violations of CDAFA. Nor did it overturn precedents limiting unjust enrichment in this Circuit. *See Oracle*, 2023 WL 2838118, at \*10 & n.10 (holding that "*Astiana*, which continues to be applied in this Circuit" is "good law" and relying on "the direction from the Ninth Circuit, as conveyed in *Astiana* and *ESG Capital Partners*.").[6] Courts in this district still require harm for unjust enrichment. *E.g., id.*; *see also Russell v. Walmart, Inc.*, 2023 WL 4341460, at \*2 (N.D. Cal. July 5, 2023) (Tigar, J.) ("[I]t is not enough that Russell have provided Walmart with a beneficial service; Russell must also allege that Walmart unjustly secured that benefit through qualifying conduct. Absent qualifying mistake, fraud, coercion, or request by Walmart, there is no injustice."). And they still require that the plaintiff suffer a measurable loss. *Id.* Here, Lasinski provides neither. And as discussed below, the benefit he measures—Google's entire ad revenue for sWAA-off users—bears no causal connection to the alleged misconduct, anyway.

### 2. The disgorgement model seeks impermissible "full restitution" by relying on fictitious but-for scenarios.

Even if disgorgement were available here, Lasinski presents a "full restitution model" similar to those rejected in this District. *Silva v. B&G Foods, Inc.*, 2022 WL 4596615, at \*2 (N.D. Cal. Aug. 26, 2022). Neither scenario is grounded in reality; and thanks to Lasinski's lack of relevant expertise, both scenarios ignore the technologies and business models at issue. For **Scenario 1**, Lasinski purports to measure Google's profits earned *as a result of* Google attributing a conversion event logged by the Firebase SDK to an earlier-in-time ad event logged by AdMob or Ad Manager. Rpt. ¶73. For **Scenario 2**, Lasinski adds to that his assessment of all profits Google earned by serving ads to sWAA-off users through AdMob or Ad Manager. *Id.* ¶75.

Both scenarios presume 100% forfeiture without considering (1) user reactions if Google

---

[6] The recent decision in *Brown* denying Google's motion for summary judgment appears to be the first to find unjust enrichment for harms arising from a CDAFA claim. 2023 WL 5029899, at \*6. (N.D. Cal. Aug. 7, 2023). Google respectfully disagrees with the Court's analysis, but regardless, it did not analyze whether the plaintiffs actually incurred any costs associated with investigating or remedying any damage to their devices. This conflicts with *TransUnion v. Ramirez*, 141 S. Ct. 2190 (2021), in which the Supreme Court made clear that the "mere risk of future harm, standing alone, cannot qualify as a concrete harm." *Id.* at 2211. Further, the decision ignores binding Ninth Circuit precedent requiring that plaintiffs establish that the defendant unjustly secured some benefit "through mistake, fraud, coercion, or request." *E.g.*, *Astiana*, 783 F.3d 753, 762 (9th Cir. 2015).

had provided users with the disclosures Plaintiffs allege it should have provided; or (2) changes in behavior by Google or advertisers if Google could no longer use the record-keeping data. Courts disallow this sort of reach. In *Silva*, for example, the court denied class certification for claims alleging that a food company misrepresented the trans fat content in its products. The plaintiffs sought "full restitution," that was "based on the amount of money [B&G] received from the sale of the taco shells at issue as calculated from B&G's sales figures." 2022 WL 4596615, at *2. Judge Tigar rejected the model because plaintiffs lacked evidence that any person suffered the economic harm asserted, particularly since the plaintiffs could not prove either that properly disclosing trans fat levels would have changed the number of consumers purchasing the products or that consumers would have paid less absent the false disclosure. *Id.*

In fact, Judge Tigar excluded Lasinski himself for engaging in an unrealistic hypothetical damages scenario in another case. In a patent case, Lasinski calculated a "reasonable royalty" rate to determine damages from alleged infringement, but the court excluded him for positing an unrealistic scenario where Microsoft would "bargain away all of its avoided costs." *Looksmart Grp., Inc. v. Microsoft Corp.*, 2019 WL 4009263, No. 17-cv-04709-JST at *3 (N.D. Cal. Aug. 5, 2019). The *Looksmart* court noted that the goal is to determine "the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before the infringement began." *Id.* Thus, "[e]ven if a mathematical theorem suggests [the proffered] outcome as a matter of game theory, the expert must first establish that the preconditions for that theorem are present in that specific case." *Id.* Lasinski thus has a history of simply labeling the harm 100% of the pool.

Here, Lasinski conceded that he "did not do an analysis" or otherwise evaluate how consumers might have reacted had Google, at the outset, disclosed what Plaintiffs alleged it concealed about sWAA. Lasinski Tr. 149:11–50:4. This is critical because if the class would not have changed its behavior (just like the named Plaintiffs didn't), then the status quo and the but-for world are identical, and there is no reason to believe, then, that the allegedly ill-gotten data was a but-for cause of Google's enrichment.

Likewise, Lasinski admitted that he did not "take into account" the potential reactions of advertisers or Google if Google had been barred from using sWAA-off record-keeping data. *Id.* at

97:15–24; 214:20–22:7. This, too, is critical, because if advertisers would have placed just as many ads with Google even in the absence of sWAA-off data provided by Google (as opposed to another analytics provider), then the sWAA-off record-keeping data obviously wasn't a but-for cause of Google's enrichment. *BJB Elec. LP*, 2023 WL 4849764, at *2 ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all."). In other words, Lasinski assumes without evidence that the record-keeping data in question is a but-for cause of Google's ad revenue, and that absent it, advertisers would have stopped placing ads.

### a. Scenario 1 imagines a world where Google did not perform conversion attribution for advertisers.

When trying to calculate Google's profits from sWAA-off conversion attribution, Lasinski relied on Google's interrogatory response indicating that, in 2022, "approximately ██ of app campaign revenue was ***attributable*** to conversion types bid against GA4F[.]" Lasinski Rpt. ¶91 (quoting Google's 2d Supp. Objs. & Resps. To Interrog., Set Six, at 15–16). Lasinski interpreted this single word in a single interrogatory response as implying causation—that Google's ad revenue was earned ***as a result of*** "conversion types bid against GA4F." Lasinski woefully misunderstood the term "attributable," just as he does the entire advertising business.[7]

Lasinski provides no other evidence that Google earns ad revenue for performing conversion attribution—that is, measuring for an advertiser how many times an ad interaction resulted in a conversion event like installing the advertised app. Google doesn't earn ad revenue that way. Advertisers don't pay Google for its accounting and record-keeping; they pay Google for placing ads on its ad network and (irrelevant to this case) for providing ad targeting. The word "attributable" in the interrogatory response refers to *which analytics provider, i.e.*, which accountant (Google, or a competitor like Kochava or AppsFlyer) the *advertiser selected* to measure the conversion event so that a conversion could be attributed. Google earns money by placing ads, no matter which analytics company attributes the interaction, which Google explained in the immediately preceding paragraph: "In a process called attribution, Google serves as an accountant for the app

---

[7] Lasinski's confusion became apparent during his deposition, as he insisted it was Google itself provided the data on revenue "attributable" to GA4F conversions. Lasinski Tr. at 212:7–13:7.

developer/advertiser, determining if the ad interaction and the conversion recorded by GA4F or by a third party SDK were made by the same device or user so the developer/advertiser can measure the effectiveness of the ad campaign" and then cites a Google Help Center article "discussing how to track conversions with Firebase and third-party providers such as AppsFlyer and Kochava." Ex. 10, ROG Set Six Resp, at 15–16. Plaintiffs' technical expert agrees on how this process works (though he also repeatedly asserts without evidence that this means Google earns ad revenue *as a result of* its ability to perform conversion attribution).[8]

Indeed, the interrogatory response itself explains, that in 2022, ██ percent of App Promo campaign revenue involved ads for which the advertiser decided to measure conversions using third-party attribution tools (like AppsFlyer and Kochava). Tr. at 184:7–14. Lasinski admitted that he "do[es]n't know what the ██ percent do," and that he "didn't look into that." *Id.* 183:20–24. When presented with the possibility that third-party app attribution tools could measure conversions (as was the case ██% of the time), he conceded that how conversions are tracked for ad attribution is "beyond the scope of my technical ability." *See* 182:9–188:14.

Lasinski's self-serving misinterpretation fatally poisons the entire model. Scenario 1 uses the faulty ██% "attributable" figure to calculate ██ million in sWAA-off revenue "from conversion tracking." But this would simply pay the class *all* of Google's ad revenue for sWAA-off users if they converted on an ad by using an app that used Firebase SDK, without regard to what role the record-keeping data played in Google garnering that ad revenue. It allows for no portion of the revenue being attributable, for example, to the serving of the ads themselves, or to Google's ad network, or to the reliability of that network, or the ease of use of that network, or myriad other reasons advertisers place ads through Google. *See* Knittel Rpt., ¶¶19–21. And it rests on the fictitious assumption that, where Google's ad revenue for converted sWAA-off users is 100% in the status

---

[8] *See, e.g.*, Hochman Rpt., App'x E ¶ 15 ("Conversion events may also be tracked by Google's App Attribution Partners (AAPs). Developers tracking conversions using AAP SDKs wouldn't go through Google Analytics but can still notify Google Ads when conversions happen."). *See also id.* n.18 ("The App Attribution Partner (AAP) Program is a formal partnership program between 3rd party app tracking providers and Google to measure the performance of app campaigns in AdWords") (quoting GOOG-RDGZ-00193001) & ¶ 23 ("Conversion tracking can be set up in Google Ads with conversion data imported from measurement SDKs such as GA4F or AAPs.").

1   quo, it would become ■% overnight if Google had told advertisers it could not perform conversion

2   attribution anymore.

3        This dispute does not go to the weight of Lasinski's opinion. Though reasonable parties can

4   disagree about exactly *how* the absence of sWAA-off conversion data would have affected user and

5   advertiser behavior, it is no answer to simply pretend the question cannot be answered and instead

6   ask for full restitution. And though it was unnecessary, as Google doesn't carry the burden, Google's

7   damages and technical experts *did* explain the many reasons why Plaintiffs' assumptions about user

8   and advertiser behavior were unrealistic, including because advertisers would still wish to advertise,

9   and would simply work around the absence of sWAA-off conversion data *from Google* because

10  they'd get it themselves from a third party provider (and indeed, they do, approximately ■ the

11  time as of 2022). Knittel Rpt., ¶¶29–38, 80–85, 121–125; Ex. 7 ("Black Rpt."), ¶¶193–209 & Ex. 8

12  ("Black Rpt. App'x"), at 53–67. In fact, Google and advertisers already do this in a variety of ways,

13  including by performing conversion modeling rather than using actual conversion data: a fact

14  Plaintiffs' technical expert also concedes. Hochman Rpt. ¶295; *see also* Knittel Rpt. ¶85. To simply

15  ignore this makes Lasinski's full restitution model too dangerous to present to a fact-finder, for fear

16  the fact-finder may conclude from Lasinki's "expertise" that he may be right when basic

17  fundamental principles and the record dictate his view is fictitious. *See Gamevice, Inc. v. Nintendo

18  Co.*, 2020 WL 13739193, at *12–13 (N.D. Cal. June 4, 2020) (Seeborg, C.J) (citing *Kumho Tire

19  Co. v. Carmichael*, 526 U.S. 137, 157 (1999).

20       Finally, Lasinski relied in part on an internal Google study relating to incognito mode in the

21  Chrome browser. Lasinski Rpt. § 6.7.2. That study purported to measure the revenue impact to

22  Google of blocking *all third party cookies* on the browser in incognito mode (which is not the default

23  in Chrome). *Id.* ¶69. Lasinski concluded that he could analogize that result to this case by using a

24  ■% figure instead of a ■% figure, but he made a fatal error in his analogy: Plaintiffs do not request

25  that Google disable *all third party* conversion measurement SDKs, only Google's own. *See* Lasinski

26  Tr. at 211–12. Advertisers could still measure, in Plaintiffs' but-for world, which conversions can

27  be traced to which ads using third-party tools. But, in any case, the study Lasinski relies on proves

28  the point, as it does not measure anything close to a "full restitution," but instead posits that complete

14

third-party cookie blocking on incognito mode would have reduced Google's ad revenue on Chrome by a miniscule amount. *Id.* 206:16–06:25.

### b. Scenario 2 assumes without evidence that absent deviceID-tied records of ads served, Google could not serve ads.

Scenario 2 inhabits an even more fanciful but-for realm, in which "Google could not serve ads to sWAA-off users at all." *Id.* 83:8–15. In other words, sWAA operates as a "Google ad blocker." *Id.* 137:5–14. Lasinski's assumption here—unsupported by anything in the record—is that "it would be technologically infeasible for Google to serve ads to apps on devices where the user had sWAA turned off." *Id.* 103:20–04:4. When asked, he could not explain why. When asked if Google could "serve golf club related ads in the PGA's mobile app without receiving any sWAA-off data about the user," Lasinski responded that "it would not be technologically feasible to do that." Yet he conceded being "not 100 percent sure of the exact technical terms." *Id.* 104:21–05:15. Nothing in the record supports Lasinski's assumptions, yet he refused to consider any other possibility. *Id.* 104:5–11.

In fact, Google already serves ads without receiving sWAA-off data in the real world, as Plaintiffs' technical expert was forced to admit. In Spring 2021, Apple instituted a system for users to opt in to the sending of a device ID (which is used to measure ad events and conversions) from an app rather than opt out. Black Rpt. ¶208. This widely covered change in iOS caused advertisers and ad networks to innovate new solutions. Since the changes went into effect, Google has received no deviceID-tied data on ads served on iOS through the AdMob SDK, and yet, the AdMob SDK continues to serve ads on iOS. *Id.* Lasinski could not explain this, never considered it, and utterly failed to take it into account. Lasinski Tr. at 150:15-51:15. Instead, as instructed, he simply concluded that if Google could not log ad events alongside an identifier, then it could not serve ads at all. This assumption, wholly without evidence, is too unrealistic and unfounded to present to a fact-finder.

### B. Lasinski's "actual damages" model should be excluded.

Lasinski's "actual damages" model imagines the price at which a class member would be willing to agree to the challenged data collection. Lasinski Rpt., ¶151. This model is rife with

fundamental flaws that render it inadmissible. At the highest level, it cannot be offered as expert testimony, because it relies on absolutely no methodology, reliable or otherwise, to justify its conclusions. Additionally, it completely fails to account for differences in the class relating to the nature and extent of the alleged harm. Instead, Lasinski proposes a damages payment of $3 per device, regardless of whether, what, or how much data was collected from that device.

### 1. The "actual" damages model has no methodology.

*Daubert* and its progeny have mapped out a number of factors to gauge the reliability of an expert's methods: Has the methodology undergone testing and peer review? What is its error rate? Is it generally accepted in the relevant scientific community? *See Gamevice, Inc. v. Nintendo Co.*, 2020 WL 13739193, at *12–13 (N.D. Cal. June 4, 2020) (Seeborg, C.J) (citing *Wagner v. Cty. of Maricopa*, 673 F.3d 977, 989 (9th Cir. 2012) & *Daubert*, 509 U.S. at 593–94). Here, the answer to any and all of those factors is: no. Lasinski offers a damages figure of $3-per-device for each class member, recycled from the same consumer survey he relied on for the same counsel in another lawsuit against Google. Lasinski Rpt. ¶131. But he offers no methodology behind his choice, and a methodology cannot be deemed reliable where none exists at all.

### a. Lasinski cribbed the model from another case.

Lasinski copied and pasted in this case nearly the same damages model he gave the same set of lawyers in *Brown v. Google*—something Plaintiffs puzzlingly brag about. *See* Class Cert. Mot., at 19:11-16. *Brown* is a very different case: different facts, legal claims, products implicated, data practices, and revenue sources.[9] Judge Gonzalez Rogers ruled that Lasinski's $3 opinion was admissible in *Brown* because Google's challenge went to the weight of the model, not its admissibility, and "[t]he $3 rate is derived from looking at what Google actually pays Screenwise participants for agreeing to allow Google to collect their browsing data." But the plaintiffs in *Brown* allege Google unlawfully collected "private browsing history," sensitive enough to "reveal their sexual orientation," and sometimes mixed with "regular" data in "the same logs" to be used to "send

---

[9] *Brown* also involves four causes of action not at issue here: violations of the Federal Wiretap Act, California Invasion of Privacy Act, breach of contract, and UCL. 2023 WL 5029899 at *2. And it involves a first-party product, Google Chrome, also not at issue here. *Id.*

users personalized ads[.]"*Brown v. Google*, 2023 WL 5029899, at *6. (N.D. Cal. Aug. 7, 2023). Here, Plaintiffs relented (albeit very belatedly) on their false accusation that Google was personalizing ads with sWAA-off data. And they do not claim the data at issue was particularly sensitive, focusing on basic record-keeping like an ad being served or clicked, an app being installed or other similar conversion events. Indeed, while the *Brown* plaintiffs allege Google used private browsing history to "offer better, more targeted, advertisements to users," 2023 WL 5029899 at *2, the same attorneys here argue that it was nefarious for Google ***not*** to use sWAA-off data for personalizing ads because doing so would have "tip[ped] off" the class to Google's sWAA-off record-keeping practices. Mot., at 3.That Lasinski was permitted to present his $3 opinion in one case against Google is not license to copy-paste it into every case the lawyers who retained him bring against Google. The model should be evaluated as to its "fit," in the parlance of the *Daubert* decision, to the specific case it's presented in.

And it *was* a copy-paste job. In *Brown*, Lasinski relied on "the monthly compensation structure for participants in the Ipsos Screenwise Panel" to determine that "the baseline payment to Screenwise Panel participants of $3 per month" is a "conservative indicator" of the alleged harm. *See* Ex. 4, ¶165. Here, Lasinski relied on "the monthly compensation structure for participants in the Ipsos Screenwise Panel" to determine that "the baseline payment to Screenwise Panel participants of $3 per month" is a "conservative indicator" of the alleged harm. *See* Lasinski Rpt., ¶151. The sole difference is that here Lasinski inexplicably proposed a one-time $3 payment per class member's device, whereas there he proposed $3 per "unique monthly private browsing instance":

> Based on the above, it is my opinion that the most probative indicator of the ~~value of data that Google obtained from users' private browsing activities without remuneration to those users~~ harm to WAA/sWAA-Off users from Google's collection, saving, and/or use WAA/sWAA-Off Data, and the value of that WAA/sWAA Off Data, is derived from the monthly compensation structure for participants in the Ipsos Screenwise Panel. More specifically, it is my opinion that the baseline payment to Screenwise Panel participants of $3 per month for ~~their use of~~ using a Screenwise ~~browser extension or a Screenwise~~ meter app on a single mobile device (including both smartphones and tablets) represents a conservative indicator of the monthly payment necessary for an individual to knowingly ~~relinquish~~ surrender the choice to keep ~~certain browsing~~ app activity private and allow Google to track ~~all of their online activity~~ app activity data, regardless of ~~browsing mode~~ that individual's WAA or sWAA settings. ~~To calculate total actual damages, this $3 monthly rate can be multiplied by the number of unique monthly private browsing instances during the Class Period for the two Classes, as discussed~~ While the Screenwise compensation structure applies this $3 payment per device per month, it is my opinion that actual damages through December 2022 can be conservatively measured by applying this $3 payment on a one-time basis to the number of Class Member Devices, where a single Class Member Device represents a mobile device (smartphone or tablet) used with WAA/sWAA off at least once during the Class Period through December 2022. I describe my analysis of Class Member Devices in Section 8.2 below.

*Figure 1: Comparison Between § 8.1.4. of Lasinski's Rodriguez Expert Report and § 8.1.4. of Ex. 4, Lasinski's Brown Expert Report*

It really is inexplicable: Lasinski provides no rationale for pegging actual damages to a one-time $3 payment per device. This is the entirety of his reasoning (before he was deposed):

> "*While the Screenwise compensation structure applies this $3 payment per device per month, it is my opinion that actual damages through December 2022 can be conservatively measured by applying this $3 payment on a one-time basis to the number of Class Member Devices, where a single Class Member Device represents a mobile device (smartphone or tablet) used with WAA/sWAA off at least once during the Class Period through December 2022.*"

Lasinski Rpt. ¶161. Pressed at his deposition, he floated that he chose a one-time payment because he couldn't know for each sWAA-off month whether a user "hit a third-party site with a Google tracker on it." Lasinski Tr. 61:23–62:2. But he backtracked, admitting "it's unlikely that . . . a sWAA-off device would not hit a third-party tracker." *Id.* at 62:9–14. This testimony underlines Lasinski's lack of creativity: this case isn't about websites or third party trackers at all—*Brown* is.

GOOGLE LLC'S MOTION TO EXCLUDE OPINION OF MICHAEL J. LASINSKI
CASE NO. 3:20-CV-04688-RS

Absent any other explanation, Lasinski's damages model here amounts to a cheap imitation of Lasinski's prior work.

       **b.  Courts reject "cherry-picked" and "outcome determinative" models.**

There needs to be more "there" there. Courts in this district reject "outcome determinative" "cherry picking." *See In re Apple iPhone Antitrust Litigation*, 2022 WL 1284104 (2022) at *2. In *iPhone Antitrust*, Judge Gonzalez Rogers excluded the opinion of McFadden, who on behalf of antitrust plaintiffs seeking damages for alleged anticompetitive behavior on Apple's App Store, claimed to use a "benchmark analysis" to determine a "but-for" commission rate of 10–12%. *Id.* at *3. McFadden conducted "no analysis" and instead "cherry-picked" from a few convenient data points, like the 12% rate from Apple's litigation adversary Epic's Game Store and the 10% rate from the failed Discord platform, while ignoring more relevant commission rates from Apple, Google, and Steam. *Id.* He offered "no mathematical equation or analysis to justify these findings." *Id.* The court found McFadden's opinion outcome determinative, criticizing the "lack of foundation and analysis" underlying his proposed range. As the court queried, if 10–12 percent was proper, "[w]hy not 12-15% as a range?" or "[w]hy not a baseline of 13% or 14%?" *Id.* at *4.

There is no daylight between Lasinski and *iPhone Antitrust*'s McFadden. Just like McFadden, Lasinski "cherry-picked" his actual damages figure from a single survey.[10] *Id.* at *3. "There is no mathematical equation or analysis to justify these findings." *Id.* Lasinski's failure was perhaps more egregious than McFadden's. McFadden at least tried to find commission rates for other online app stores, albeit "cherry-picked" and "outcome determinative" ones. *Id.* at *4. Lasinski didn't even bother. He did not evaluate any reasonable proxies for what Google's app analytics competitors—companies like Kochava, AppsFlyer, and Branch—may pay consumers or charge advertisers for similar pseudonymized conversion data.[11] Instead, he looked at something

---

[10] Lasinski does summarize other programs that pay users for data from various other entities in various fields, but he performs no analysis on any of them, does not derive any methodology from any of them, does not rely on any of them to conclude that $3 per device is the right damages figure to use, and in deposition simply adverted to them as evidence that others have paid more than $3. Lasinski Rpt. Section 8.1.2.

[11] As discussed above, Lasinski has not heard of some of the key companies in this field and does not know what they do. To that end, he is also similar to McFadden. Judge Gonzalez Rogers noted

completely unrelated: Google paying members of a pilot research program $3 to measure any activities or keystrokes on mobile devices—the websites viewed, the calls made, the photos taken, the emails drafted, the melancholic pause before one taps "send" on a text message they'll later regret. See Ghose Rpt. ¶40. And unlike the sWAA-off data whose value he purports to measure, the information collected by the Ipsos Screenwise survey is saved to users' Google accounts and combined with their account data. *Id.* ¶41.

During his deposition, Lasinski himself revealed how "outcome determinative" his actual damages figure was. He claimed that $3 per user device was a "conservative" amount since it reflected data from "unwilling participants." Lasinski Tr. at 259:11–24. But, he acknowledged that "it could, in fact, be higher." *Id.* 249:2. How much higher? He can't say.

**Q.** Would $4 be an appropriate price? [objection]

**A.** I – – I did not do an analysis of $4, so I don't know the answer to that.

**Q.** What do you mean you did not do – – you did an analysis and came up with a number. So presumably, you considered all numbers that exist, and you arrived at one of them and said, "This is the answer." So I'm just saying, why did you rule out $4?

**A.** Ultimately, I've got a market transaction here that shows $3.

*Id.* 260:7–19. *Cf id.* 261:14–22 ("Could it be higher than $3? Yes. No, I do not think it could be lower than $3 . . . I don't think that I would come up with a number lower than that.").

"How [the expert] arrives at this conclusion remains a mystery." *iPhone Antitrust*, 2022 WL 1284104 at *3. He repeatedly characterized $3 as a "floor." Lasinski Tr. at 52. When pressed, he claimed that actually, since the class would be unwilling sellers of the data, "[t]he price would likely be higher in – in this case." *Id.* at 53. That is, "higher" than the number he himself puts forward as the measure of damages. When asked point blank if his $3 opinion is "that class members in this case who had turned WAA off would nevertheless become willing sellers at a particular price, namely at least $3 per device," he demurred, saying "No. What I'm -- what I'm posting is  that they

---

that, while it is "laudable" that "[McFadden] is a Nobel laureate" economist, he did not have "relevant expertise" in "app development, app pricing, IAP transactions or payment processing." 2022 WL 1284104 at *3. Similarly, Lasinski has many years of experience in IP licensing, but has no expertise in digital advertising, app analytics, pricing consumer data, consumer fraud, or consumer privacy.  "[W]ithout any relevant expertise, specifically as to this issue, the basis of his opinion eludes." *Id.*

would -- that that is a very conservative floor for actual damages. And so that -- that would be a floor for actual damages, a floor for what that calculation would looks like." Tr. at 55. Because this answer is incomprehensible, Lasinski was pressed again, for hours. He was given countless opportunities to provide an explanation—any explanation—for how he arrived at $3 as opposed to, say, $1 or $4 or $40. He always reverted back to his opaque response that he believed in light of the use of $3 in the Ipsos Screenwise survey that $3 was an "appropriate" and "conservative" figure, and never explained further:

Q. Have you tried to calculate actual -- actual damages in the case, or just tried to calculate the floor of actual damages? [objection]

A. I -- I think it's an appropriate calculation for actual damages. I think it could be higher. But it's conservative.

Q. You have said that it's conservative many times already today, and you have called it a floor multiple times. So I'm just trying to understand. Was your task to calculate the floor, or was your task to calculate the actual damages to the actual class members?

A. My task was to calculate the actual damages to the actual class members. I believe I've done that in a conservative manner.

Q. What does that mean? Did you get it right or not?

A. I do -- I do have it right, yes.

Q. Then why do you say it's conservative?

A. Because it's -- because at the end of the day, it – – there's a potential for it to be higher. But I believe -- but I believe, based on the information that I have available to me, that -- that it is the best estimate of what would be appropriate in this case.

Q. All right. Is there a potential that it's a lot higher? [objection]

A. Not that I'm aware of, no.

Q. You're not concerned that your actual damages opinion is grossly undercompensating the class?

A. I am not.

Q. Why not?

A. Because I think, based on the information available to me, that this is an appropriate conservative estimate.

Q. I know that's what you think. That's your conclusion. I want to know why that's your conclusion.

A. I -- I think I just answered.

Q. No, you didn't.

A. Okay. Well, I think I did.

Q. Why do you think it's appropriate? [objection]

A. Based on the information that's available to me, I think that it -- that – that it is -- that it is appropriate.

[. . .]

Q. What does "conservative" mean in that sentence?

A. It means that it could be -- it could, in fact, be higher. But I think that this is an appropriate price to incentivize based on what I said -- based on what I said before, to incentivize those users to part with their data.

[. . .]

Q. So you would agree with me that $4 is too much? [objection]

A. Again, I think $3 is conservative. Could be it higher than $3? Yes. It could be –

Q. Could be it lower?

A. Could it be higher than $3? Yes. No, I do[n't] think it could be lower than $3.

Q. So $3 is the lowest number that you could come up with?

A. $3 per device. I don't think that I would come up with a number lower than that. I did -- I would not come up with a number lower than that.

Lasinski Tr. at 55:4-57:6, 258:25-259:10, 259:25-260:6; 261:6-22; see also 68:12-69:13, 70:18-71:9, 258:25-259.

21

### 2. The "actual" damages model does not account for wide variances amongst class members.

To meet class certification requirements, Lasinski needed to provide "a model of damages and restitution demonstrating that each [claim] is capable of measurement on a classwide basis." *TWC Prod.*, 2023 WL 3568078, at *12 (quoting *Comcast v. Behrend*, 569 U.S. 27, 34 (2013)). After all, Rule 23 mandates Plaintiffs to "show a classwide method for damages calculations as a part of the assessment of whether common questions predominate over individual questions."). *Id.* (citing *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd and remanded on other grounds*, 139 S. Ct. 710 (2019).

This requirement holds true in privacy cases. This District excludes experts who "failed to provide any damage models showing how [they] could plausibly calculate the inherent privacy interests of the class." *Opperman v. Path, Inc.*, 2016 WL 3844326, at *14 (N.D. Cal. July 15, 2016) (denying certification where the class damages model would "overcompensate some class members, while undercompensating others"). As in *Opperman*, Plaintiffs here "failed to provide any damage models showing how [they] could plausibly calculate the inherent privacy interests of the class." 2016 WL 3844326, at *14 (N.D. Cal. July 15, 2016). Calculating a rough average dollar amount class members would be willing to accept for data is not scientific or adequate. "It may be that the average damages that [the expert's] model would predict will be very close to the damages actually suffered by every class member, but there is no way of knowing this. It is equally or more likely that his model would overcompensate some class members, while undercompensating others.". *Id.* Thus, as in *Opperman*, Plaintiffs' actual damages model cannot support class certification. *See also Campbell*, 315 F.R.D. at 267 ("the key flaw . . . is that it assumes that every message intercepted by Facebook resulted in an equal amount of profit to Facebook."). For example,. When questioned, Lasinski testified as follows:

Q. So your opinion on $3 is meant to capture sort of a population average, conservative floor fair price; is that a fair characterization?
A. I think it's a conservative floor, appropriate price for the class -- for the class. Yes, I agree with that.  Lasinski Tr. at 265:25-266:6
Q. Is it fair to say, then, that you do not believe

actual damages varies depending on the severity of the privacy intrusion on a class-member-by-class-member basis?
A. I don't think that that's fair to say. I think that it -- what's fair to say is my calculation is, at the -- at the end of the day, conservative and is the best available calculation based on the

information that was available.

[. . .]

Q. . . . .Your opinion on actual damages, in fact, does not vary depending on the severity of the privacy intrusion that a class member experienced; is that fair to say? [objection]

A. It -- it does not -- it does not vary based on the data, the amount of data that was ill-gotten, as you -- as you had put it earlier.

[. . .]

Q. It does not vary based on the degree to which the ill-gotten sWAA-off data is more or less private to that person? [objection]

A. It -- I mean, I think -- I think you understand, my -- my calculation does not vary based on -- based on a particular person. It -- it only varies based on the number of devices that someone might have.

Lasinski Tr. at 285:15-23; 286:8-16, 287:1-10. In proposing to give class members a fixed amount (which Lasinski admits could be higher for certain users), Lasinski fails to consider the wide variances in: (1) the amount of data Google received from each class member; (2) the extent to which Google profited from each class member's data (if at all); (3) the value each class member places on their data, and (4) the benefit the user got in exchange for providing the data. Knittel Rpt., ¶117. *See TWC Prod.*, 2023 WL 3568078, at *5 (N.D. Cal. Mar. 30, 2023) (individual issues of emotional distress from the offensive intrusion overwhelm class certification.)

**First,** the actual damages model assumes all users require a specific amount to give up pseudonymized recordkeeping data ($3), when in truth, users let multiple analytics providers access the same data for free. Apps often use Firebase and another provider (*i.e.*, AppsFlyer, Kochava, Branch) and disclose this usage in privacy policies. *See*. Ex. 9 (Black Rpt. App'x. X5)[12].

Under Lasinski's theory, Google should pay $3 for the exact same conversion data that AppsFlyer collects for free. When confronted with this contradiction in his deposition, Lasinski conceded that "a user can enter into a transaction with one entity and another entity for that exact same data and charge different amounts." Lasinski Tr. 244:6–10. That's the "user's prerogative," Lasinski said, explaining that it "happens all the time in transactions." *Id.* While "[t]he app might be free," the user got "a monetary value for being able to use an app[.]" *Id.* 244:20–21. Lasinski thus admitted he "ha[s] not measured it in this case." Id. at 245:4–5.

**Second**, Lasinski's analysis also overlooks the diversity of user attitudes toward privacy.

---

[12] *Accord Oracle Am.*, 2023 WL 2838118, at n.11 ("To the extent Defendant has data, moreover, it was received and/or collected with permission from the third-party websites. If Plaintiffs challenge unjust enrichment based on the monetization of that data, they must explain why the access they received to those websites would not defeat the unjust enrichment claim.")

Privacy preferences differ.[13] The choice to opt out of sWAA does not reliably indicate blanket opposition to data collection. As Google's expert, Dr. Anindya Ghose, explains, scholars have identified varying privacy orientations among consumers - from "privacy fundamentalists" who object categorically to data gathering, to the "privacy unconcerned" who freely share information, to "privacy pragmatists" who make context-specific judgments about the advantages and risks of disclosure. Ghose Rpt. ¶22 (quoting Alan F. Westin (2003) "Social and Political Dimensions of Privacy," Journal of Social Issues, 59(2):431-453). And research indicates that the most guarded of these groups, privacy fundamentalists comprise only a minority of consumers. *Id.* ¶23.

Lasinski knows, at the minimum, about "privacy fundamentalists," and conceded that some may be in the class. But he declined to say whether they would accept $3 for their data. Lasinski Tr. 265:5-24. ("I did not do a survey."). Although he offered $3 as a "conservative" minimum, he could not state whether some class members would want a different, much higher amount if negotiating for themselves. *Id.* 264:8-21 ("I did not do a study of the class."). And while he calls the Ipsos Screenwise survey "a good comparable," he added, "I don't know if it's [representative of] all similarly situated users[.]" *Id.* Tr. 264:8-9.

Further, Plaintiffs' liability theory asserts that every time a user opens an app and GA4F measures conversions, the user is harmed. Yet, Lasinski admits that his actual damages figure "does not vary based on the amount of data that was ill-gotten." Lasinski Tr. at 285:13–15. Although he conceded it's "possible" that "class members who had lots of data transmitted could be paid less than those with little data" *id.* at 294:22–295:6, he absolved himself from further inquiry, claiming it's "not something I could have studied." *Id.* 286:1–2.

In *TWC*, the court excluded a damages model in a data privacy case for neglecting heterogeneity among users. *TWC*, 2023 WL 3568078, at *13. Lasinski overlooked the same variables here. This Court has excluded expert damages calculations failing to adequately

---

[13] Google's own user studies show that some users opt out inadvertently because they "just want to use [their new phone]" so they rush and click through the initial privacy setup stages. *See* GOOG-RDGZ-00209974, at -993. Indeed, ▆▆ of people who opted-out of consents did not even remember what their choices were. *Id.*, at -052.

differentiate injured and uninjured class members, too. *See Utne v. Home Depot U.S.A. Inc.*, 2022 WL 16857061, at *1 (N.D. Cal. Nov. 10, 2022) (Seeborg, C.J.). In *Home Depot*, a wage and hour class action alleging improper compensation for pre- and post-shift work, expert Krosnick's statistical and survey-based models calculated aggregate damages. *Id.* But Krosnick's model did not "provide enough specificity as to the class members" to determine who suffered injury or deserved damages, and did not "offer a formula or methodology on which the jury could independently base its own award." *Id.* at *5.

Similarly here, like Krosnick, Lasisnki offers an expansive aggregate award that fails to distinguish between the injured; it simply awards everybody, and equally. Given that the actual damages model does not "purport[] to derive a total award from a sum of individual class members' awards," and that Lasinski offers no "formula or methodology" to determine a proper award, Lasinski's model cannot distinguish between injured and uninjured members, and must also be excluded. *Id.*

**Third**, while Lasinski has fashioned his actual damages model as "restitution," Lasinski Rpt. ¶69, he never showed economic injury to Plaintiffs or the class. *See Ji v. Naver Corp.*, 2022 WL 4624898, at *9 (N.D. Cal. Sept. 30, 2022) ("Courts in this District have held that to proceed on an economic injury theory, data privacy plaintiffs must allege the existence of a market for their data and the impairment of the ability to participate in that market."). "It is not enough to merely say the information was taken and therefore it has lost value . . . That the information has external value, but no economic value to plaintiff, cannot serve to establish that plaintiff has personally lost money or property." *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1040 (N.D. Cal. 2019).

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Google's Motion to Exclude the Expert Opinion of Michael J. Lasinski.

1    Dated: August 24, 2023                    **WILLKIE FARR & GALLAGHER LLP**

2

3                                              By: */s/ Eduardo E. Santacana*
                                                    Benedict Y. Hur
4                                                   Simona Agnolucci
                                                    Eduardo Santacana
5                                                   Noorjahan Rahman
                                                    Argemira Flórez
6                                                   Harris Mateen

7

8                                              *Attorneys for Defendant*
                                               *Google LLC*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOOGLE LLC'S MOTION TO EXCLUDE OPINION OF MICHAEL J. LASINSKI
CASE NO. 3:20-CV-04688-RS