**WILLKIE FARR & GALLAGHER LLP**
BENEDICT Y. HUR SBN: 224018
  bhur@willkie.com
SIMONA AGNOLUCCI SBN: 246943
  sagnolucci@willkie.com
EDUARDO E. SANTACANA SBN: 281668
  esantacana@willkie.com
NOORJAHAN RAHMAN  SBN: 330572
  nrahman@willkie.com
ARGEMIRA FLÓREZ  SBN: 331153
  aflorez@willkie.com
HARRIS MATEEN SBN: 335593
  hmateen@willkie.com
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone:  415 858-7400

Attorneys for Defendant
GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANIBAL RODRIGUEZ, et al. individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 3:20-CV-04688-RS<br><br>**DECLARATION OF KEVIN LAM IN SUPPORT OF GOOGLE LLC'S STATEMENT IN SUPPORT OF MOTION TO SEAL PORTIONS OF CLASS CERTIFICATION & *DAUBERT* BRIEFING (DKTS. 314 & 321)**<br><br>Judge:           Hon. Richard Seeborg<br>Courtroom:   3, 17th Floor<br>Action Filed:  07/14/2020<br>Trial Date:     Not Yet Set |

I, KEVIN LAM, respectfully submit this declaration in regard to the above captioned matter. I make this declaration based on my personal knowledge of the facts stated herein.

1. I am employed at Google LLC ("Google") as a Product Manager with supervisory authority concerning Google Analytics for Firebase ("GA for Firebase"). I joined Google in 2019 and have been a Product Manager since that time. Unless otherwise stated, the facts I set forth in this declaration are based on my personal knowledge or knowledge I obtained through my review of corporate records or other investigations. If called as a witness, I could and would testify competently to such facts under oath.

2. In my role as a Product Manager at Google, I have managed various areas across the GA for Firebase product. I am familiar with Google's practices regarding the treatment of sensitive business and technical information.

3. I submit this declaration in support of Google's Statement In Support of Motion to Seal Portions of Class Certification & *Daubert* Briefing (Dkts. 314 & 321). I have reviewed unredacted versions of Plaintiffs' Motion for Class Certification ("Motion") (Dkt. 314-3), Trial Plan ISO Motion for Class Certification ("Trial Plan"), the Declaration of Mark Mao In Support Of Plaintiffs' Motion for Class Certification And Appointment of Class Representatives and Class Counsel (Dkt. 315-14), and 3 of the corresponding exhibits filed therewith which have been designated for sealing: Exhibits 10, 15, and 65. I have also reviewed unredacted versions of Google's Opposition to Plaintiffs' Motion for Class Certification ("Opposition") (Dkt. 323) and the exhibits filed therewith which have been designated for sealing: 2, 3, 5, 6, 6A, 8, 14, and 21. I have reviewed Google's Motion to Exclude Opinion of Michael Lasinski ("*Daubert* Motion") (Dkt. 330) and Exhibits 1, 3, 5, 9, and 10 filed concurrently therewith. I have reviewed Plaintiffs' Opposition to Google's Motion to Exclude Opinion of Michael Lasinski ("*Daubert* Opposition") (Dkt. 331) and Exhibits 5 and 7; Lastly, I have reviewed Exhibit 70 to Plaintiffs' Class Certification Reply ("Reply") (Dkt. 333). These documents include highly technical, confidential, proprietary, and competitively sensitive information.

4. <u>Commercially Sensitive Proprietary Business Information (All exhibits).</u> Exhibit 10 (Motion) is an internal presentation regarding key privacy concepts within Google, specifically

1   with regards to the protection of Google's data.  It discusses highly sensitive, confidential, and
2   proprietary information regarding Google's internal infrastructure around data classification,
3   logging, and protection.  Google seeks to redact select portions of this presentation that contain
4   non-public and sensitive information such as, metrics regarding how Google categorizes and
5   apportions data internally (*see e.g.,* -367, -373), details about Google's data logging infrastructure
6   (*see e.g.*,-406, 409-412, 414, 417-418), internal log names (*see e.g,* -408, - 410), and details about
7   how Google protects its data (*see e.g.*, -392-399, 419).  It also contains highly sensitive
8   descriptions of its internal data storage systems (*see e.g.*, -398) and infrastructure and code (*see*
9   *e.g.*, -420), which are proprietary.  The information Google seeks to seal is highly sensitive and is
10  not disclosed in Google's regular course of business or in litigation.  Though general concepts
11  about Google's data classification, logging, and protection exist in the public domain, the detailed
12  descriptions about how they work within Google's backend infrastructure and as described in this
13  presentation does not.  Excerpts from this exhibit are quoted and characterized at pages 66-68 and
14  116 of the Hochman Report discussed at paragraph 26 below and should be sealed there as well.

15        5.     Revealing any of the information on the slides that Google has designated for
16  sealing would risk causing Google, and potentially its users, irreparable harm.  For example, if an
17  outsider wanted to improperly access Google's systems, and target particular products for theft or
18  other improper purposes, having Google's confidential, internal code, project, log and data storage
19  names would allow them to more readily find Google's proprietary documents, information, and
20  code.  Furthermore, disclosure of this information could make it easier for a bad actor to
21  circumvent or evade Google's detection systems.  It is, therefore, very important that these
22  internal names not be revealed outside of Google.

23        6.     This document also discloses proprietary details regarding how it anonymizes its
24  data  (*see e.g.,* -378) that are disclosed within Google on a need-to-know basis and should not be
25  revealed for the aforementioned reasons.  Furthermore, this presentation contains internal
26  observations regarding challenges that Google has encountered and overcome in its creation and
27  management of user data controls that are competitively sensitive (*see e.g.,* -384-385).  This is
28  precisely the type of information that would be financially beneficial to competitors who could

improve their products according to Google's observations about challenges in developing its own features.

7. **Exhibit 15** (Motion)[1] is a presentation providing an overview of Google's application campaigns that Google designated as Highly Confidential – Attorneys' Eyes Only. And for good reason. It contains commercially sensitive business information, including sensitive revenue metrics (*see e.g.*, -805) and long-term product plans and action items informed by targeted studies (*see e.g.*, -806) that are confidential and not shared in Google's ordinary course of business. It also includes various internal code names and descriptions of internal projects that are still underway (*see e.g.*, 787–8). The information in this presentation highlights the status of current work, the specific benefits to the rest of the ads organizations to incorporate certain changes, and specific, detailed action items to be implemented. This information is competitively sensitive and is precisely the type of information competitors seek. For example, competitors could unfairly capitalize on these metrics by targeting Google's advertising products according to the volume of users who use those products. Competitors could also gain insight into Google's various proposals for how to address specific advertiser needs using Google's products. Competitors could use this information to enhance their own products to meet advertiser needs as reflected in Google's internal research. Google seeks to seal only 7 of 30 slides in their entirety and discrete portions of the rest where no less restrictive redactions would have appropriately protected the sensitive data.

8. **Exhibit 65** (Motion) is a short presentation with strategic business information, including the identification of top Firebase customers, which is the type of information that I have learned has previously been sealed by this court (*see* Dkt. 272-4). It also discloses metrics regarding the top apps that use Firebase that are not disclosed in the regular course of business and litigation (*see, e.g.,* -097-8). Similar metrics appear in the Lasinski Report at the second bullet point on page 57 (discussed at paragraph 18 below). Furthermore, at pages -099 through -101, this presentation details specific ongoing challenges within the Firebase suite of products and

---

[1] Identical to Exhibit 6 (*Daubert* Opposition).

1. Google's prioritization of goals and strategies for addressing them, which are also characterized in the Motion at page 17, lines 25-26. Though this presentation is dated 2016, it contains internal assessments regarding the growth of the Firebase product and related challenges that inform Google's strategies pertaining to the app development sector today. This information is confidential and competitively sensitive. It is information that, if released, would result in a competitive disadvantage for Google because competitors could use it to capitalize on Google's growth strategies and perceived weaknesses and unfairly compete with Google's product offerings to Google's detriment.

9. **Exhibit 2** (Opposition) is an Interrogatory response that discloses highly confidential, technical, and proprietary information regarding Google's process for collecting, storing, logging, and processing data received through GA for Firebase. Google seeks to seal excerpts on pages 15-25 because they reveal the technical underpinnings of the Google infrastructure that supports these processes—*e.g.,* Google's consent check, anonymization, and logging processes—and explains the processes in great detail, including with non-public diagrams (*see, e.g.*, pg. 18). The response further reveals the functionality of each process and their touchpoints within Google's back-end data flow system. For example, the response identifies the fields Google has programmed its systems to log on both Android and iOS devices. It describes how Google bundles app measurement data on the server side to other data and back-end processes for allowing developers to send data to Google in bundled packets. It also describes the steps Google takes to conduct consent checks and what it does upon receiving the results of the checks. This information is highly sensitive and confidential. Google protects information concerning its data log storage systems and backend data processing infrastructure because failure to do so would risk causing Google irreparable harm as discussed in paragraph 5 above.

10. If disclosed, competitors could infer from the excerpts in Exhibit 2 how the GA for Firebase product functions and exploit Google's approach to data processing, organization, and storage to unfairly compete with Google's product offerings. Furthermore, revealing such sensitive details about Google's internal infrastructure and data storage systems would put Google, and potentially its customers, at risk for the reasons described in paragraph 5 above.

Google's proposed redactions are narrowly tailored and no limited sealing would appropriately protect its confidential information. In fact, as part of its motion, Google seeks to seal only select portions on pages 15-25 because earlier this year, this Court ordered that the remaining portions of this document be kept under seal (*see* Dkt. 284 (Ex. 37) and Dkt. 293-4).

11. **Exhibit 3** (Opposition) is an internal document that contains competitively sensitive business information regarding App campaigns and internal deliberations and strategizing around Google's App attribution features. It contains competitively sensitive business information including expected revenue from specific product campaigns (*see, e.g.*, -518, 528), metrics revealing commercial goals (*see e.g.,* -523), descriptions of and proposed changes to confidential projects to enhance certain product features (*see, e.g.*, -520), and strategies for how to ensure consistent user experiences when extending services across various platforms and how to process data most responsibly and efficiently (*see e.g.*, 522-3, 525). It contains various diagrams and explanatory descriptions revealing the flow of app data throughout Google's internal infrastructure and in doing so reveals highly sensitive names of Google's data repositories (*see, e.g.*, -519, 520). Public disclosure of this information would cause Google competitive harm. As discussed in connection with Exhibit 65 discussed in paragraph 8 above, this type of confidential business information and discussion of strategic business considerations is precisely the type of information that Google's competitors could use to unfairly compete with Google's product offerings to its detriment. There is no way to disentangle portions of the information in this document that are highly competitively sensitive from others that are not, so no more limited sealing would appropriately protect Google's confidential information.

12. **Exhibit 5** (Opposition) and **Exhibit 70** (Class Cert Reply) are excerpts from deposition transcripts where Google employees were asked to discuss the backend flow of GA for Firebase data. Google seeks to seal three sentences in Exhibit 5 and narrowly tailored portions of three pages of Exhibit 70 discussing internal data identifiers and details about the number and

types of data logs within Google that should be sealed for the same reasons discussed in connection with Exhibit 2 above at paragraphs 9-10.

13.   **Exhibit 6** (Opposition) is the rebuttal expert report of Google's technical expert, Dr. John Black. His report describes Google's data logging systems and repositories, and the flow of GA for Firebase data to and within Google. In doing so, he reveals highly confidential and proprietary information regarding Google's backend processes for user consent checks (*see, e.g.,* pgs. 38-39, 41, 52, 70, 75). He also discloses non-public, technical details regarding Google's data logging and storage structure (*see, e.g.,* pgs. 50, 55, 60, 70-71, 93) and data mapping processes (*see, e.g.,* 30-31). In describing these processes, Dr. Black reveals metrics pulled from Google's Baseview data that can reveal the manner in which Google stores information on its servers (*see, e.g.,* pgs. 28, 33-35, 48, 55-57, 62) and discloses internal code names that map to internal mechanisms for data processing that are not publicly known (*see, e.g.,* pg. 32, 42, 55, 57-59, 64, 73) internal classifications for specific types of Google accounts (pgs. 12, 24), and an internal classification for a user privacy setting (pg. 81). He describes specific scenarios of how data may appear within Google's backend system and that may also reveal the custom events that specific Google customers enabled within their apps (*see, e.g.,* pg. 33-35). Furthermore, he reveals internal financial data related to Google's infrastructure expenses (*see* pg. 91), internal metrics reflecting user' WAA/sWAA statuses over time (pg. 12), and information regarding Google's strategic thinking underlying nonpublic projects. For example, on page 69, he describes a nonpublic proposal for information storage on Google's backend servers. On page 86, he describes an internal project regarding Google's conversion measurement strategy. He does the same on pages 13, 21, and 24 when describing the function of one of Google's more sensitive internal projects. This information is not only competitively sensitive, but it risks causing Google and its users irreparable harm. For example, competitors could use these descriptions of Google's

infrastructure and data processing preferences and related proposals for potential changes to Google's Analytics products, to determine the structure of Google's Analytics business and mimic its processes to unfairly compete with its business. Furthermore, revealing confidential internal project names like those Dr. Black discloses could cause irreparable harm as described in paragraph 5 above.

14. **Exhibit 6-A** (Opposition) and **Exhibit 8** (*Daubert* Motion) are identical documents that contain appendices to Dr. Black's report. These appendices are an extension of Dr. Black's technical explanations that contain additional, detailed information on how Google stores data at the backend. They contain competitively sensitive information pertaining to the business relationship between Google and app developers, including how those developers have integrated GA4F (*see, e.g.,* pgs. 38-44, 49-51). If disclosed, competitors can use these insights to gain an unfair competitive advantage against Google and its customer app developers. This discussion further references specific app developers who bypassed Google Analytics' Terms of Service. If disclosed, bad actors can use this information to further breach the Google Analytics' Terms to collect and share data in violation of them.

15. **Exhibit 14** (Opposition) contains excerpts from Google's response to Plaintiffs' Interrogatory No. 18. Google only seeks to seal select portions on pages 6:24-28; 7:1-5, and 10-16 that reveal confidential descriptions regarding the flow of GA for Firebase data within Google's infrastructure, including how and where Google logs data internally. These excerpts reveal sensitive information that is not disclosed in such detail in Google's regular course of business and should be sealed for the same reasons discussed in connection with Exhibit 2 in paragraph 9 above.

16. **Exhibit 21 (**Opposition) contains excerpts from Google's response to Plaintiffs' Interrogatory No. 17. In its response, Google provides highly confidential and competitively

1. sensitive information regarding advertising functions supported by GA for Firebase and technical discussions of Google's processing of GA for Firebase conversion events, including confidential log names (*see, e.g.,* pgs. 14:23, 15:13, 17-18). It also discloses statistics, P&L and revenue data, and analyses of that data that are not compiled or disclosed in Google's regular course of business (*see, e.g.,* pgs. 14:5-14, 15:24-19:8). Disclosing the information in this response would risk causing Google competitive harm. Competitors could unfairly capitalize on these metrics and revenue information by targeting Google's advertising services according to the volume of users who use those services.

17. **Exhibit 10** (*Daubert* Motion) contains excerpts from Google's response to Plaintiffs' Interrogatories, Set Six, and at pages 12-19 overlaps with Exhibit 21 at pages 14-19. Exhibit 10 is similar to Exhibit 21 in that it contains competitively sensitive business information that Google does not produce in its regular course of business. In fact, it contains a "second supplemental response" with additional metrics (*see, e.g.*, pgs. 5-6, 20-24) and technical descriptions regarding Google's processing of GA for Firebase conversion events and consent checks, similar to those discussed in Ex. 21 (*see, e.g.,* pgs. 9-11). Disclosing this information would cause Google harm for the same reasons discussed in paragraph 16 above.

18. **Michael J. Lasinski's Expert Report** is a document that I understand was provided to Google's attorneys by Plaintiffs to explain how much money Plaintiffs should recover if this case were to be resolved in their favor. As part of this explanation and throughout his report, appendices, and the discussion of his report during his deposition at **Exhibit 1 (***Daubert* Motion)[2], at pages 24 26, 28, 57-59, 61-62, 72, 74, 76, 77-93, 119-21, 137-45, 151-55, 161-76, 178-82, 183-87, 190-91, 199-212, 224-25, 228-29, 270, 272, 289-90–which are quoted and characterized at

---

[2] Excerpts from this deposition transcript at Exhibit 1 (Pl.'s Opposition to *Daubert*) seal the same material on the overlapping pages: 57-59, 61-62, 290. Excerpts from this deposition transcript at Exhibit 11 (Google's Class Cert. Opposition) seal the same material on the overlapping pages: 79, 81-82, 137-38.

*Daubert* Motion p. 13, lines 8, 11, 13, p. 14, lines 1 and 24–Mr. Lasinski relies on a significant amount of highly sensitive and confidential information that Google does not disclose in its ordinary course of business dealings or in litigation. This is information that is also quoted and characterized in the Motion at p. 6, line 24, p. 17, line 12, p.18, lines 22-24, p. 19, lines 1-24, p. 21, lines 12-18, p. 22, lines 6-7, 10-13; Trial Plan at p. 5, lines 19-22, 25-26; *Daubert* Motion at p. 4, line 17, p. 5, lines 4-5, p. 12, line 10; and *Daubert* Opposition at p. 3, lines 25-28 to 4, line 3, p. 4, lines 5-17, 21-24, 25, p. 12, lines 19-20, p. 13, lines 16-17, and p. 14, lines 22-24. This includes Google's internal metrics reflecting users' Web & App Activity ("WAA") and Supplemental Web & App Activity ("sWAA") setting preferences. Specifically, numerical figures disclosing the number of active Google accounts in the United States that had turned off the WAA and sWAA settings during an identified time period, charts reflecting trends on projected revenue based on this data (*see, e.g.,* pgs. 55-62). Mr. Lasinski also reveals non-public details about financial impact analyses and internal projects that Google has conducted as part of its internal business strategies (*see, e.g.,* pgs. 22-26, 27-47). He quotes from and characterizes several internal Google documents that disclose confidential financial data, like Google's gross revenue and revenue classifications for various products, and Google's strategic concerns and proposals for how to enhance its business in light of these metrics (*see, e.g.*, pgs. 1 ns.1-2, 2, 10-12, 17-19; 27-47).[3] He references internal documents that reveal internal deliberations between Google employees with proposals for the types of experiments that they would be interested in conducting with regards to WAA to better understand its strategic importance within the company (*see e.g.*, pgs. 20-22). These are experiments that Google may implement in the future as part of its product development strategies. Thus, this information is highly confidential and competitively sensitive. For example,

---

[3] The Schedules appended to Mr. Lasinski's Report incorporate many of the confidential revenue numbers and projections discussed above (*see* pgs. 81-152).

competitors could use Google's framework for its financial analysis experiments to conduct their own and to adjust their strategies for what products to prioritize or invest more money in.

19. Mr. Lasinski's analysis for quantifying the different types of recovery throughout Sections 7 and 8 of his Report are informed by Google's highly confidential internal projects and studies which have not been previously disclosed and are not shared in the course of Google's business. He states so himself throughout the Report (*see e.g.*, pg. 27 ¶ 72,).

20. The first pair of Google analyses that Mr. Lasinski relies upon to conduct his unjust enrichment analysis in Section 7 were conducted as part of a confidential program. The details surrounding it are highly sensitive and confidential (pgs. 22-25, 59). They are not publicly discussed because doing so would disclose aspects of Google's proprietary consent framework and its underlying strategies that are competitively sensitive. As described in paragraph 63 of his report, Mr. Lasinski relied on these analyses to determine what users to identify and what apportionments to make to attribute certain profits to specific groups of users. He also relied on this analysis to determine what adjustments needed to be made at specific points during his analysis to avoid any unnecessary revenue overlap (*see e.g.*, ¶¶. pgs. 24, 35-36).

21. Mr. Lasinski relies on elements from another internal Google study, Chrome Guard, that is mostly confidential but has been discussed publicly in a limited capacity. Google does not seek to seal information about that study that has already been disclosed (*see e.g.*, pgs. 25-26) and only seeks to seal the elements from that study that are so indiscriminately intertwined with elements applied from Google's internal study that there are no less restrictive means of protecting Google's information than to seal information from that study as well (*see e.g.*, pg. 37-38). This study is the subject of **Exhibit 7 t**o Plaintiffs' *Daubert* Opposition. **Exhibit 7** is an internal document that Google designated as Highly Confidential - Attorneys' Eyes Only when it was produced to Plaintiffs. It discusses this confidential project in great detail and provides

information that Google has not disclosed in its regular course of business. It contains Google's highly confidential and proprietary information regarding highly sensitive features of Google's internal systems and operations, including various types of Google's internal projects, identifiers, data signals, and logs, and their proprietary functionalities. In fact, when a version of this document came up in other litigation against Google, a court in this district ordered that it remain entirely under seal (*see Brown v. Google*, 4:20-cv-03664-YGR, Dkt. 804 at page 9 (Ex. 64)).

22. In addition to revealing highly sensitive metrics, these internal analyses reveal strategic and confidential business considerations that continue to apply to internal assessments of Google's products today. This information is confidential and highly sensitive, and revealing it could harm Google's competitive standing if released.

23. Given that Mr. Lasinski's framework for quantifying Plaintiffs' recovery is based on highly confidential and sensitive internal analyses, large sections of Mr. Lasinski's Report should be sealed. However, Google seeks to seal only the portions of Mr. Lasinski's analysis that expose sensitive and proprietary information at those pages and lines referenced above and overlapping material at Exhibit 5 (*Daubert* Opposition) (sealing name of confidential and competitively sensitive internal revenue analysis).

24. **Exhibit 3** (*Daubert Motion*)[4] is a report written by Google's damages expert, **Christopher Knittel,** in this litigation to respond to Mr. Lasinski's Report. Mr. Knittel's report sets out to provide an expert opinion as to Mr. Lasinski's methodologies to calculate damages in this matter and the damages estimates themselves (*see* pg. 2). In doing so, Mr. Knittel reveals large swaths of confidential financial information that Google does not disclose in its regular

---

[4] Excerpts from this expert report at Ex. 19 (Google's Class Cert. Opposition) seal the same material on the overlapping pages: 36; Excerpts from this expert report at Ex. 3 (Pl.'s Opposition to *Daubert*) seal the same material on the overlapping pages: 22, 73-74, 76–79, 83, 86-88, 90.

course of business. This includes Google's non-public statistics noting trends in product usage (*see, e.g.,* pgs. 22,32), non-public methods for tracking financials for its products (*see e.g,*, pgs. 25-28, 76), the resulting confidential financial analyses, and profit disgorgement figures and analyses for this case that rely on these confidential internal financial analyses (*see e.g,*, pgs. 5, 34-36, 51; *see also*, Exs. 1A–8).

25. Relatedly, Mr. Knittel's report includes confidential internal metrics reflecting the size of Google's customer base and a method for allocating damages that reveals the manner in which Google analyzes its userbase over time (*see, e.g.,* pgs. 32, 78, 79). The Report also includes confidential internal estimates of user traffic across various ad products and includes details about a confidential project regarding the use of GA for Firebase for conversion measurement data (*see, e.g.,* pgs. 50, 54-55, 77). Specifically, it describes financial metrics for App Promo, AdMob, and Ad Manager, and reveals the nonpublic method and manner in which Google tracks financials for these products (*e.g.*, pgs. 26-30, 35, 54-55, 60, 62-63, 66-73). It also describes internal figures regarding WAA usage and ad interaction rates, and specific metrics revealing the number of active Google accounts in the United States that have turned off the WAA and sWAA settings during an identified time period (*see, e.g.,* pgs. 45, 54-55, 86-88). This information is very competitively sensitive and not shared in Google's regular course of business. Competitors could use it to their advantage to unfairly capitalize on these metrics by understanding the volume of users who use the products discussed and targeting Google products that rely on these settings. Finally, it reveals detailed information about the technical process by which Google logs events collected through GA for Firebase (pg. 78 n. 21), as well as a description on Google's backend process for checking account consents (*e.g.*, pg. 83). As discussed above, Google does not publicly disclose its backend processes, as doing so could grant a bad actor an opportunity to compromise Google's systems.

Quotes and characterizations from this report, which disclose the same sensitive information at Motion*Daubert* Motion at p. 13, line 16, and p. 14, line 10, should be sealed for the same reasons.

26.     **Jonathan Hochman's Report** is a document that I understand was provided to Google's attorneys by Plaintiffs to understand their perspective on how the inner workings of Google's technology supports their claims.  As part of this explanation, Mr. Hochman quotes and characterizes from a number of Google's confidential internal documents to describe highly confidential, technical, and proprietary details about the flow of GA for Firebase data from app developer customers to and within Google.  His Report, quoted and characterized in the Motion at p. 2, lines 4-5, 20-22; p. 3, lines 10-16; p. 11, lines 14-15, p. 13, lines 14-18, 21-22, 27-28, p. 14, lines 2-4, 13-14, p. 16, lines 6-7, 12-13, p. 24, lines 6-7, 10-15; the Trial Plan at p. 4, lines 20-26, p. 5, lines 1-2; the *Daubert* Opposition at p. 23, lines 1-3, and Reply at p. 12, lines 9-11, reveals technical details about Google's back-end data flow, and details about its processes for data generation, bundling, consent checks, and storage decisions.  The Report exposes non-public information about how data flows through Google's data pipelines, including the names of proprietary data identifiers, (*see, e.g.,* pgs. 50-53, 137-141) and descriptions of the various data repositories that are potential touch points for this data (*see, e.g.,* pgs. 66-69).  He also imports quotes and characterizations from Google's internal documentation depicting the construction of Google's data packets/HitBundles (*see, e.g.,* 53) and how they flow within Google's infrastructure (*see, e.g.,* 75-79).  For example, on pages 81-84, 94, 96-98, 100-114, 116, 151, and 154 of his Report, Mr. Hochman reveals highly sensitive, technical details regarding the five components that make up Google's pipeline for GA for Firebase data.  At times, his Report includes tables and descriptions of subsets of app analytics and WAA-off data that Google produced to Plaintiffs that reveal sensitive information about Google's internal logging infrastructure (*see, e.g.,* pgs. 90-92,

98, Appendix G at -1, -11-37, -39, 41-45, Appendix G-1, Appendix I at 5, 10, 28-29, and Appendix K)[5].

27.  Mr. Hochman also injects various discussions of Google's competitively sensitive business information regarding its Firebase products, including non-public metrics regarding app install trends and Google's internal deliberations regarding strategic responses to these trends and more generally on how to enhance its product offerings (*see, e.g.*, pgs. 5, 22, 27, 33, 125, 136, 150). Mr. Hochman also discusses sensitive information related to Google's analytics business including its processes for conversion modeling and attribution and the company's internal view of its analytics products' competitive positions (*see, e.g.*, App'x E, pgs. 3-14). It is particularly important for a document like this Report to remain confidential because it compiles in one location confidential technical information that would facilitate a bad actor in improperly using the information to harm Google.

28.  Mr. Hochman was deposed and asked to discuss several portions of his Report covering the highly technical and competitively sensitive information discussed in paragraphs 27 and 28 above. As such, these discussions in his deposition at **Exhibit 5** (*Daubert Motion*)[6] at pages 153, 156, 247-249, 257-260, 275-281, 283-285, 288, 292-293, 299-300, 308-309, 318, 325, 330, 332-334, 337-338, 348, 368-372, 375-376 should be kept under seal for the same reasons I believe the overlapping content in his Report should be sealed.

29.  <u>Internal Code Names</u>.  The aforementioned exhibits include reference to Google's internal code names. Revealing Google's internal code names would present a risk of harm to Google. Specifically, a malicious actor

---

[5] Google also seeks to seal Plaintiffs' *Daubert* opposition at pg. 23, lines 1-3, which reference the internal logging infrastructure described in Mr. Hochman's report.

[6] Excerpts from this deposition transcript at Ex. 9 (Class Cert. Opposition) seal the same material on the overlapping pages: 348, 368.

interested in improperly accessing Google's systems could target particular proprietary data storage systems and information for improper uses if he or she knew the internal names Google seeks to seal in these documents. Thus, it is very important that internal code names not be revealed outside of Google. Google has narrowly tailored the information to be sealed to allow the first or second letter in each name to be filed publicly, and no more limited sealing would appropriately protect Google's confidential and proprietary information. Google carefully maintains the confidentiality of the information, both within Google by restricting access to certain teams with access rights, and externally, including in litigation.

30. <u>Non-Public Employee Email Addresses (Exhibit 65 (Motion), Exs. 8, 17[7] (Opposition))</u>. Google seeks to redact the non-public employee email addresses contained within the aforementioned exhibits. This information should be redacted because those employees' privacy would be placed at risk if their confidential email addresses were to be filed publicly.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed October <u>12</u>, 2023, at Irvine, California.

_____
KEVIN LAM

---

[7] Identical to Ex. 9 (*Daubert* Motion).