# EXHIBIT 1

## PUBLIC REDACTED VERSION

ATTORNEYS EYES ONLY

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    ANIBAL RODRIGUEZ, et al.,

5         Plaintiffs,

6              vs.              Case No. 3:20-cv-04688-RS

7    GOOGLE LLC,

8         Defendant.

     _____

9

10

11

12              ***ATTORNEYS' EYES ONLY***

13         VIDEO DEPOSITION OF MICHAEL J. LASINSKI

14              San Francisco, California

15              Thursday, June 29, 2023

16                   Volume 1

17

18

19

20

     STENOGRAPHICALLY REPORTED BY:

21   REBECCA L. ROMANO, RPR, CSR, CCR

     California CSR No. 12546

22   Nevada CCR No. 827

     Oregon CSR No. 20-0466

23   Washington CCR No. 3491

24   JOB NO. 5971107

25   PAGES 1 - 297

                                        Page 1

ATTORNEYS EYES ONLY

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    ANIBAL RODRIGUEZ, et al.,

5         Plaintiffs,

6              vs.              Case No. 3:20-cv-04688-RS

7    GOOGLE LLC,

8         Defendant.

     _____

9

10

11

12

13

14              DEPOSITION OF MICHAEL J. LASINSKI, taken

15    on behalf of the Defendant, at Willkie Farr &

16    Gallagher, LLP, One Front Street, 34th Floor,

17    San Francisco, California, commencing at

18    10:19 a.m., Thursday, June 29, 2023 before

19    REBECCA L. ROMANO, a Certified Shorthand Reporter,

20    Certified Court Reporter, Registered Professional

21    Reporter.

22

23

24

25

                                        Page  2

ATTORNEYS EYES ONLY

```
 1                 APPEARANCES  OF  COUNSEL

 2

 3    For the Plaintiffs:

 4         BOIES  SCHILLER  FLEXNER

 5         BY:  JAMES  LEE

 6         Attorney at Law

 7         100 SE Second Street

 8         Suite 2800

 9         Miami, Florida 33131

10         (305) 357-8434

11         jlee@bsfllp.com

12    and

13         BY:  HSIAO  (MARK) C.  MAO(via Web conference)

14         Attorney at Law

15         44 Montgomery Street

16         41st Floor

17         San Francisco, California 94104

18         (415) 293-6800

19         mmao@bsfllp.com

20

21

22

23

24

25    /////
```

Page  3

ATTORNEYS EYES ONLY

```
 1              APPEARANCES OF COUNSEL(cont'd)

 2

 3    For the Plaintiffs:

 4         MORGAN & MORGAN

 5         BY:  RYAN JOSEPH McGEE(via Web conference)

 6         BY:  JOHN A. YANCHUNIS(via Web conference)

 7         Attorneys at Law

 8         201 N. Franklin Street

 9         7th Floor

10         Tampa, Florida 33602

11         (813) 223-5505

12         rmcgee@forthepeople.com

13         jyanchunis@forthepeople.com

14    and

15         SUSMAN GODFREY LLP

16         BY:  RYAN SILA(via Web conference)

17         Attorney at Law

18         1301 6th Avenue

19         New York, New York 10019

20         (212) 336-8330

21         rsila@susmangodfrey.com

22

23

24

25    /////
```

                                              Page  4

ATTORNEYS EYES ONLY

```
 1              APPEARANCES OF COUNSEL(cont'd)

 2

 3    For the Defendant:

 4         WILLKIE FARR & GALLAGHER, LLP

 5         BY:  EDUARDO E. SANTACANA

 6         BY:  HARRIS MATEEN(via Web conference)

 7         Attorneys at Law

 8         One Front Street

 9         34th Floor

10         San Francisco, California 94111

11         (415) 858-7421

12         esantacana@willkie.com

13         hmateen@willkie.com

14

15

16

17

18

19    ALSO PRESENT:

20         Kevin Kuate-Fodouop, Summer Associate Susman &

21    Godfrey LLP

22         Shawna Hynes, Videographer

23

24

25    /////
```

Page 5

```
 1                    APPEARANCES(cont'd)

 2

 3   ALSO PRESENT:(via Web conference)

 4         Lillian Dai, Litigation Consulting, IP

 5   Analysis

 6         Diego A. Focanti, Analysis Group

 7         Anindya Ghose, Heinz Riehl Professor at New

 8   York University

 9         Christopher R. Knittel, Sloan School of

10   Management MIT

11         Niall H. MacMenamin, Executive Vice President,

12   Compass Lexecon

13         Celeste Peifer, Willkie Farr & Gallagher, LLP

14         Samit Warty, Ph.D., Analysis Group

15         Christopher L. Schulte, Managing Director,

16   Ankura

17

18

19

20

21

22

23

24

25   /////
```

ATTORNEYS EYES ONLY

```
1                    I N D E X

2     DEPONENT                              EXAMINATION

3     MICHAEL  J.  LASINSKI                      PAGE
      VOLUME 1

4

5     BY MR. SANTACANA                            12

6     BY MR. LEE                                 270

7     BY MR. SANTACANA                           276

8

9

10                  E X H I B I T S

11    NUMBER                                     PAGE

12                    DESCRIPTION

13    Exhibit 1      Expert Report of Michael J.   16

14                   Lasinski dated February 20,

15                   2023;

16

17    Exhibit 2      Native Excel Spreadsheet,    140

18                   GOOG-RDRZ-00188768;

19

20    Exhibit 3      Defendant Google LLC's       163

21                   Supplemental Objections and

22                   Responses to Plaintiffs'

23                   Interrogatories, Set Six (Nos.

24                   12, 16 & 17);

25    /////
```

1                    E X H I B I T S(cont'd)

2    NUMBER                                            PAGE

3                        DESCRIPTION

4    Exhibit 4      Defendant Google LLC's Second      174

5                   Supplemental Objections and

6                   Responses to Plaintiffs'

7                   Interrogatories, Set Six.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    /////

ATTORNEYS EYES ONLY

```
 1      San Francisco, California; Thursday, June 29, 2023

 2                      10:19 a.m.

 3                      ---o0o---

 4

 5           THE VIDEOGRAPHER:  We are going on the          10:20:29

 6      record at 10:19 a.m. on June 29th, 2023.

 7           Please note that the microphones are

 8      sensitive and may pick up whispering and private

 9      conversations.  Please mute your phones at this

10      time.  Audio and video recording will continue to   10:20:44

11      take place unless all parties agree to go off the

12      record.

13           This is Media Unit 1 of the

14      video-recorded deposition of Michael Lasinski in

15      the matter of Anibal Rodriguez, et al., versus      10:21:03

16      Google LLC, filed in the United States

17      District Court, Northern District of California.

18      Case No. 3:20-cv-04688-RS.

19           The location of the deposition is One

20      Front Street, 34th Floor, San Francisco, California 10:21:25

21      94111.

22           My name is Shawna Hynes, representing

23      Veritext Legal Solutions, and I'm the videographer.

24           The court reporter is Rebecca Romano from

25      the firm Veritext Legal Solutions.                  10:21:41
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

```
 1              I am not related to any party in this          10:21:45

 2     action nor am I financially interested in the

 3     outcome.

 4              If there are any objections to

 5     proceeding, please state them at the time of your      10:21:54

 6     appearance.

 7              Counsel present will now state their

 8     appearances and affiliations for the record

 9     beginning with the noticing attorney.  For those

10     appearing remotely, the court reporter has noted       10:22:06

11     your appearances for the record.

12              MR. SANTACANA:  Eduardo Santacana,

13     Willkie Farr & Gallagher, for Google.

14              MR. LEE:  James Lee, Boies Schiller

15     Flexner, for the plaintiffs.                           10:22:19

16              And I have with me a summer intern, who I

17     will allow him to introduce himself.

18              MR. KUATE-FODOUOP:  Kevin Kuate-Fodouop

19     with Susman Godfrey.

20              THE VIDEOGRAPHER:  Can you state that one      10:22:28

21     more time loud.

22              MR. KUATE-FODOUOP:  Kevin Kuate-Fodouop

23     with Susman Godfrey.

24              THE VIDEOGRAPHER:  Thank you.

25              Will the court reporter please swear in        10:22:36
```

Page 10

ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | the witness, and then counsel may proceed. | 10:22:37 |
| 2 | THE COURT REPORTER:  If you could raise | |
| 3 | your right hand for me, please. | |
| 4 | THE DEPONENT:  (Complies.) | |
| 5 | THE COURT REPORTER:  You do solemnly | 10:22:39 |
| 6 | state, under penalty of perjury, that the testimony | |
| 7 | you are about to give in this deposition shall be | |
| 8 | the truth, the whole truth and nothing but the | |
| 9 | truth? | |
| 10 | THE DEPONENT:  I do. | 10:22:40 |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | 10:22:40 |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | 10:22:40 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | ///// | 10:22:51 |

Page 11

```
 1                 MICHAEL J. LASINSKI,                10:22:51

 2    having been administered an oath, was examined and

 3    testified as follows:

 4

 5                    EXAMINATION                       10:22:51

 6    BY MR. SANTACANA:

 7         Q.   Good morning, Mr. Lasinski.  It's nice to

 8    meet you.  I will be asking you some questions

 9    today.

10              Have you testified before?             10:23:00

11         A.   I have, yes.

12         Q.   How many depositions have you sat for?

13         A.   I would estimate approximately 40.

14         Q.   Okay.  So you know the ropes.

15              MR. LEE:  Objection.  Form.             10:23:11

16              THE DEPONENT:  I've -- I have been

17    deposed many times.

18         Q.   (By Mr. Santacana)  Okay.  Any reason you

19    can't testify truthfully today?

20         A.   No.                                     10:23:18

21         Q.   How many expert engagements do you think

22    you've had over the course of your career?

23         A.   Probably 150, 200.

24         Q.   Who is representing you today in this

25    deposition?                                       10:23:43
```

Page 12

ATTORNEYS EYES ONLY

```
 1        A.   Mr. Lee.                                    10:23:44

 2        Q.   Have you retained Mr. Lee as your lawyer?

 3        A.   I have not retained him as my lawyer, no.

 4        Q.   Okay.  And have you paid him to represent

 5   you today?                                            10:23:55

 6        A.   I am not paying him to represent me.

 7        Q.   Do you have any other lawyers in this

 8   case?

 9        A.   Well, there are other lawyers in this

10   case, yes.  There are lawyers from Susman Godfrey,    10:24:05

11   and there are lawyers from Morgan & Morgan.

12        Q.   You haven't retained any of them?

13        A.   I have not.

14        Q.   Okay.  And did you retain any lawyers to

15   respond to the subpoena that you were issued?         10:24:16

16        A.   I did not, no.

17        Q.   Who handled the response to the subpoena?

18        A.   The lawyers in this matter did.

19        Q.   Did you review the subpoena?

20        A.   I did.                                       10:24:27

21        Q.   How many hours have you spent on this

22   engagement?

23        A.   I would have to estimate.

24        Q.   Sure.

25        A.   160, 200, somewhere in there.               10:24:41
```

Page 13

ATTORNEYS EYES ONLY

```
 1          Q.   Anyone else work with you on this expert     10:24:47

 2    engagement?

 3          A.   Yes.

 4          Q.   Who?

 5          A.   Chris Schulte from my firm.  Also Rujuta.    10:24:53

 6    I cannot remember her last name, also from my firm.

 7    And then Meryn Campbell from my firm.

 8          Q.   Did your hours estimate just now include

 9    their time?

10          A.   No.                                          10:25:14

11          Q.   Roughly how much time do you think they

12    together have spent on this?

13          A.   I mean, roughly, altogether, I would

14    imagine it's over a thousand hours, but maybe

15    closer to 1,500 hours.                                  10:25:26

16          Q.   What's your role at Ankura Consulting?

17          A.   I have two roles -- three roles.

18               I lead the intellectual group at Ankura

19    Consulting.  I have clients, like what I do here

20    today.  And then I also mentor staff people at         10:25:50

21    Ankura.

22          Q.   Do you own a share of Ankura's profits?

23          A.   I have shares in the firm.

24          Q.   So higher profits, you get paid more?

25          A.   No, that's not how it works.                10:26:14
```

Page 14

 1      Q.   Okay.  Apart from compensation related to          10:26:16

 2   your hourly rate, do you get any compensation from

 3   Ankura based on the performance of the consulting

 4   firm?

 5      A.   To -- actually, for me, it's a black box.          10:26:33

 6   So my -- my boss sets my bonus.  So I don't know

 7   how that -- how that works.

 8      Q.   Okay.  But you get paid a bonus at the

 9   end of the year, I guess?

10      A.   I -- it's possible that I would get paid          10:26:47

11   a bonus.

12      Q.   How many times have you been retained as

13   an expert by the lawyers in this case?

14      A.   Twice.

15      Q.   What was the other time?                          10:26:59

16      A.   For the Brown case.

17      Q.   You have no other current engagements

18   with them?

19      A.   No, I do not.

20      Q.   And you are including -- go ahead.                10:27:10

21      A.   Just to be -- there are different law

22   firms here.  I had been retained previously before

23   that by Susman Godfrey in other cases.

24      Q.   How many times, approximately?

25      A.   Approximately three other times.                 10:27:25

Page 15

ATTORNEYS EYES ONLY

1      Q.   Okay.  Were any of those cases consumer        10:27:27

2    class actions?

3      A.   Yes.

4      Q.   Which ones?

5      A.   There was one for Susman & Godfrey            10:27:41

6    against Qualcomm.

7      Q.   Okay.  And then you haven't been

8    otherwise retained for anything else by the

9    Boies Schiller firm?

10     A.   No.                                            10:27:56

11     Q.   Or the Morgan & Morgan firm?

12     A.   Not that I can remember, no.

13     Q.   Okay.  Can you describe for me or

14   summarize your assignment in this case?

15     A.   Sure.                                          10:28:16

16     Q.   Are you referring there to your report?

17     A.   I am, yes.

18     Q.   So why don't we mark it.

19          (Exhibit 1 was marked for identification

20   by the Court Reporter and is attached hereto.)      10:28:25

21     Q.   (By Mr. Santacana)  We've premarked the

22   digital version as Exhibit 1.  So I guess

23   afterward, we can just mark this as 1A or something

24   in case you draw on it or something like that.

25          But go ahead.                                  10:28:38

Page 16

ATTORNEYS EYES ONLY

```
1         A.   Okay.                                    10:28:40

2         Q.   Answer the question.

3         A.   Sure.  I describe what my assignment is

4    on Section 4 of my report.

5              And my assignment in this matter includes  10:28:44

6    "assessing the feasibility of identifying and

7    quantifying various measures of monetary relief

8    tied to Plaintiffs' claims," including those that I

9    discuss in my report, which include, in this case,

10   unjust enrichment and plaintiffs' actual damages.    10:29:04

11        Q.   And -- sorry -- could you say again where

12   you are reading from?

13        A.   This is Section 4 of my report.

14        Q.   Okay.  Thank you.

15             So apart from that description of your      10:29:15

16   assignment in Section 4 of your report, is there

17   anything else that you have done in this case in

18   your capacity as an expert witness?

19        A.   Well --

20             MR. LEE:  I'm sorry.  I may have missed     10:29:29

21   it.

22             Are you limiting to just Section 4, or

23   the whole report?

24        Q.   (By Mr. Santacana)  I'm saying, other

25   than the assignment described in Section 4 -- let    10:29:36
```

Page 17

```
 1   me ask it a different way.                      10:29:39

 2          Other than your assignment as described

 3   in Section 4 of your report, has there been any

 4   other assignment that you've needed to perform as

 5   an expert in this case?                          10:29:45

 6      A.   The other portion of the assignment that

 7   I performed is described in my report.  And it

 8   talks about the apportioning of monetary relief to

 9   the classes and the class members.

10          I provide examples of apportionment       10:30:08

11   methods that are available.  I think my report

12   explains what I did in great detail.  So, you know,

13   there's -- there's a lot that goes into that

14   assignment.

15      Q.   Is there any other --                    10:30:30

16      A.   And I --

17          MR. LEE:  Hold on -- hold on.

18          THE DEPONENT:  And I just want to make

19   sure.

20          So there's a lot that goes into that      10:30:34

21   assignment, so I've -- you know, to the extent that

22   there are other portions of my report that go into

23   my opinion, they're in my report.

24      Q.   (By Mr. Santacana)  Fair enough.

25          Have you reached any expert conclusions   10:30:44
```

Page 18

```
 1   or opinions in this case other than those embodied        10:30:47

 2   in your report?

 3        A.   Not at this time, I have not.

 4        Q.   And do you, sitting here now, have any

 5   intention of presenting expert opinion in this case       10:30:57

 6   other than those embodied or encompassed by your

 7   report?

 8        A.   No, I have not been asked to do so at

 9   this time.

10        Q.   Did you read the expert reports that            10:31:09

11   rebut your report that were served by Google's

12   counsel?

13        A.   I did, yes.

14        Q.   And those are the Knittel report and the

15   Ghose report?                                             10:31:18

16        A.   They are, yes.

17        Q.   You reviewed those?

18        A.   I did, yes.

19        Q.   Did members of your team review those as

20   well?                                                     10:31:24

21        A.   They did.

22        Q.   Is it your role in this case to provide

23   opinions that are favorable to the lawyers who have

24   retained you?

25             MR. LEE:  Objection.  Form.                     10:31:43
```

                                                    Page 19

```
1              THE DEPONENT:  That -- that is not how I      10:31:43

2    understand my role, no.

3         Q.   (By Mr. Santacana)  How do you understand

4    your role?

5         A.   My understand my role to provide an           10:31:48

6    independent opinion of my belief of what I talk

7    about in my report, which is my opinion of monetary

8    damages, specifically in this case unjust

9    enrichment and actual damages.

10        Q.   If it turns out that you've made mistakes     10:32:09

11   in your report, are you open to correcting them?

12        A.   Yes.

13        Q.   Did you attempt to perform your

14   assignment in this case truthfully, honestly, and

15   according to a sound methodology?                       10:32:21

16        A.   I have, yes.

17        Q.   And would you agree with me that your

18   obligation as an independent expert does not end

19   with your report; if you discover that there's

20   something wrong with it after you've served it, you    10:32:30

21   are obligated to admit that?

22        A.   I don't know if I'm specifically

23   obligated to admit that, but that would be my

24   professional practice.  I would never do anything

25   different than that.                                    10:32:45
```

Page 20

ATTORNEYS EYES ONLY

```
1        Q.   Fair enough.                               10:32:46

2            Did you read any other expert reports in

3    this case from the plaintiffs or from Google other

4    than your own, of course, Knittel and Ghose?

5        A.   I read Mr. Hochman's report.               10:33:01

6            I believe that there was another report,

7    if I'm remembering correct -- correctly, from a

8    Mr. Black.  Or it might have been just a

9    declaration.

10       Q.   Black had a report.                         10:33:20

11       A.   So -- so then it was -- then it was -- I

12   at least read parts of that report as well.

13       Q.   Any others?

14       A.   I may have, but I can't recall as I'm

15   sitting here.                                        10:33:30

16       Q.   Hoffman (phonetic)?

17       A.   I thought I said Mr. Hoffman.

18       Q.   Mr. Hochman, yes.  There's also a

19   Hoffman.

20       A.   Oh, I don't recall if I did -- did or      10:33:38

21   not.

22            Oh, I'm sorry.  I also -- Mr. Keegan's

23   report.

24       Q.   Snyder (phonetic)?

25       A.   I do not recall reading Mr. Snyder's       10:33:51
```

Page 21

ATTORNEYS EYES ONLY

```
1   report.                                           10:33:53
2        Q.   Okay.  Did you read Mr. Hochman's report
3   before finalizing your report?
4        A.   No, I did not.
5        Q.   The first time you had read it was after  10:34:03
6   you had finalized your report?
7        A.   Correct.
8        Q.   But you had conversations with him before
9   you finalized your report?
10       A.   Yes, I did.                              10:34:12
11       Q.   How long were those conversations in
12  total?
13       A.   Hours.  I don't know how long.
14       Q.   So --
15       A.   Specifically.                           10:34:19
16       Q.   Less than or more than five hours,
17  roughly?
18       A.   Probably less than five hours.
19       Q.   Okay.  And those were all before you
20  served your report?                               10:34:28
21       A.   Yes.  I had -- I have also had a
22  conversation with him since I've served my report.
23       Q.   One conversation?
24       A.   Yes.
25       Q.   What was it about?                       10:34:38
```

Page 22

```
 1        A.    It was about refreshing my recollection       10:34:39

 2   on his opinions as it relates to incremental costs

 3   and conversion tracking.

 4            Those were two.  I think that there might

 5   be other things that were -- that we discussed.       10:35:09

 6   But those were two things.

 7        Q.    How long was the conversation?

 8        A.    Probably about an hour.

 9        Q.    When?

10        A.    It was after I served my report.  I       10:35:16

11   can't -- I can't remember exactly when, but...

12        Q.    Was it in the last week?

13        A.    Probably was within the last week.

14        Q.    Was it in the last 48 hours?

15        A.    No, I don't so.       10:35:28

16        Q.    Were their lawyers on the call?

17        A.    Yes.

18        Q.    Who was on the call?

19        A.    Mr. Lee was on the call.

20        Q.    Did he speak?       10:35:40

21        A.    Yes.

22        Q.    So you and Mr. Lee and Mr. Hochman talked

23   about refreshing your recollection on Mr. Hochman's

24   opinion about incremental costs?

25        A.    Yes.       10:35:51
```

Page 23

ATTORNEYS EYES ONLY

```
 1        Q.   And his opinions about conversion           10:35:51

 2   tracking?

 3        A.   Correct.

 4        Q.   Were there any other subjects you

 5   discussed?                                            10:35:58

 6        A.   Those were the primary ones.  I don't

 7   recall any others.

 8        Q.   Okay.  What did he tell you about his

 9   opinion on incremental costs that refreshed your

10   recollection?                                         10:36:06

11        A.   So my opinion -- in my opinion in my

12   report, I consider one set of incremental costs,

13   ██████████████████████████████

14        I have also looked at the other costs

15   that have been provided on some of the financial      10:36:41

16   statements related to the various areas of damages

17   that I'm looking at.  And I -- and I discussed with

18   him those other costs and whether or not they would

19   be incremental.

20        Q.   So take a look at Footnote 156 of your      10:37:23

21   report.

22        A.   Yes.

23        Q.   I believe this is the only part of your

24   report that discusses the incremental costs

25   associated with the alleged wrongful conduct.         10:37:57
```

Page 24

1          Just assume for the moment that I'm right          10:38:02

2     about that.

3          Did your conversation with Mr. Hochman

4     involve a discussion of incremental costs other

5     than what's discussed in this footnote?          10:38:17

6          MR. LEE:  Objection.  Mischaracterizes

7     the footnote.

8          THE DEPONENT:  Well, I believe that this

9     footnote embodies what I talked about just now as

10    well with him.          10:38:54

11        Q.   (By Mr. Santacana)  Okay.  I think you

12    just said, in response to question before that,

13    that you've "looked at the other costs that have

14    been provided on some of the financial statements

15    related to the various areas of damages that I'm          10:39:06

16    looking at"?

17        A.   Yes.

18        Q.   And that you discussed "those other costs

19    and whether or not they would be incremental" with

20    Mr. Hochman?          10:39:16

21        A.   That is accurate, yes.

22        Q.   When you say "other costs that have been

23    provided on some of the financial statements," are

24    you referring to the financial statements that you

25    reviewed before serving your report?          10:39:28

                                        Page 25

ATTORNEYS EYES ONLY

```
 1        A.   Yes.                                    10:39:31

 2        Q.   Did you express an opinion as to whether

 3   those cost were or were not incremental in your

 4   report?

 5        A.   They are -- in my opinion is that they  10:39:41

 6   were not be -- that they would not be incremental.

 7        Q.   And which ones in particular are you

 8   talking about?

 9        A.   Well, I would have to have the documents

10   in front of me to -- to identify those.           10:39:51

11        Q.   So just so I understand, you -- go ahead.

12        A.   But I do remember, for example, there

13   were ███████████████   as part of those.   There

14   were ██████████████████████   in

15   some of those.  And I think that there were also   10:40:11

16   some ██████████████████   in those.

17             But I cannot remember fully all of the

18   costs that were in there as I sit here today.

19        Q.   Did you discuss ███████████████

20   ██████████████████████████                         10:40:28

21   ███████████████████   with Mr. Hochman after

22   serving your report in the conversation we've been

23   discussing?

24        A.   Well, I don't recall specifically if it

25   was after serving my report.  Certainly before     10:40:41
```

Page 26

1    serving my report.                                    10:40:46

2         Q.  So -- sorry.  I'm focused on the

3    conversation where your recollection was refreshed

4    as to his opinion on incremental cost.

5            And so keeping that conversation in           10:40:57

6    mind --

7         A.  Which -- which?  No.  Start over.

8            Which conversation are we talking about?

9         Q.  I'm keeping in mind the conversation you

10   had with Mr. Hochman after you served your report.    10:41:07

11        A.  Okay.

12        Q.  Which refreshed your recollection as to

13   his opinion on incremental costs.

14           You with me so far?

15        A.  Yes.                                          10:41:17

16        Q.  Okay.  So keeping that conversation in

17   mind, which specific costs did you discuss with

18   Mr. Hochman and whether or not they qualify as

19   incremental costs?

20           MR. LEE:  In that conversation.               10:41:28

21           THE DEPONENT:  In that conversation.

22           MR. LEE:  He's accepting that you've had

23   prior conversations, and this refreshes it.  But

24   he's limiting his question to the -- the

25   conversation you had after the -- the report was --   10:41:36

Page 27

ATTORNEYS EYES ONLY

1          MR. SANTACANA:  Right.  Your most recent          10:41:39

2    conversation.

3          THE DEPONENT:  I am not sure that I'll

4    remember all of it.  ████████████████████████

   ████████████████████████████████████████████          ████████

   ████████████████████████████████████████

   ████████████████████████████████████████████████

   ██████████████████████████████████████████

   ████████████████████████████████████████████████

   ██████████████████████████████████████                10:42:11

11         Q.   (By Mr. Santacana)  Okay.  And what did

12   Mr. Lee say about incremental costs during the

13   conversation?

14         A.   I don't recall Mr. Lee saying anything

15   about that.                                           10:42:27

16         Q.   Okay.

17         A.   During the conversation.

18         Q.   And then you said that he also refreshed

19   your recollection as to his opinion on conversion

20   tracking?                                             10:42:34

21         A.   Yes.

22         MR. LEE:  For the record, Mr. Santacana

23   means Mr. Hochman, not Mr. Lee.

24         MR. SANTACANA:  Mr. Hochman.

25   Mr. Hochman.                                          10:42:43

                                                    Page 28

1        Q.    (By Mr. Santacana)  What did he tell you          10:42:46

2    about conversion tracking during your most recent

3    conversation, Mr. Hochman?

4        A.    Well -- well, generally, he refreshed my

5    recollection on our earlier conversations on how          10:43:11

6    the information gathered by Google that relates to

7    conversion tracking is collected and then used by

8    Google in its algorithms and machine learning

9    techniques that ultimately go into its -- its

10   bidding, its automated bidding process that it            10:43:46

11   provides to advertisers.

12       Q.    What is the automated bidding process

13   that you're referring to?

14       A.    Well, I think we are starting to get into

15   a technical area here.                                     10:44:09

16            I understand that there are certain

17   situations where if -- if an ad is requested, there

18   would be automated bids, an automated bidding

19   process, such that advertisers can bid for the ad

20   in an automated fashion to actually serve the ad in       10:44:28

21   an automated fashion.

22       Q.    And what does it mean for a bid to be

23   automated as opposed to not automated?

24       A.    Well, my understanding is that there is

25   an automation -- again, this is getting into a             10:44:41

Page 29

ATTORNEYS EYES ONLY

1    technical area.                                              10:44:42

2            But my understanding is that there is

3    something called a manual bidding process, where

4    you can manually bid for ad -- where an advertiser

5    can manually -- manually bid for ads -- ad           10:44:50

6    placement, I should say -- versus automated.

7        Q.   So would you say that this -- I guess you

8    were speaking to Mr. Hochman because you're not

9    really an expert on this particular subject?

10       A.   I'm not a technical expert in this case.     10:45:06

11   That is correct.

12       Q.   Well, I know you're not a technical

13   expert.  But right now, we're talking about

14   advertisers' bidding processes.  So I just -- is

15   that a subject that you are an expert in?             10:45:16

16       A.   I -- I would say that I have familiarity

17   with it up to the point of being able to calculate

18   damages.

19           So I'm not an expert in the technology,

20   but I am expert -- I have enough familiarity to       10:45:30

21   calculate damages for those types of cases, for

22   these types of cases.

23       Q.   Has there been another expert engagement

24   in which you have calculated damages based on

25   automated advertisement bidding processes on the     10:45:45

                                                         Page 30

ATTORNEYS EYES ONLY

```
1    Internet?                                           10:45:51

2         A.   What was that last part?  I didn't hear

3    the last part of your question.

4         Q.   On the Internet?

5         A.   Yes.                                      10:45:56

6         Q.   Which case?

7         A.   Brown.

8         Q.   Has there been any other?

9         A.   Not that I can recall, no.

10        Q.   How did you become familiar with          10:46:02

11   automated bidding such that you could opine on

12   damages?

13        A.   Through my work in -- in this case, as

14   well as my work in the Brown case, and my

15   discussions with the technical experts.            10:46:15

16        Q.   Before you were retained in Brown, did

17   you have any familiarity with the automated bidding

18   process such that you could calculate damages?

19        A.   I never attempted to.  But I had heard --

20   I had heard of and read information on the          10:46:42

21   automated bidding process up until then.  But I had

22   never attempted to, so I don't know if I could have

23   or couldn't have.

24        Q.   You mentioned manual bidding.  Can you

25   tell me what that is?                               10:46:56
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1        A.   So my understanding is that that allows       10:46:57

 2    manual bidding -- again, this is a technical

 3    expert -- a technical area, and I'm not a technical

 4    expert in this case.

 5             But my understanding is that allows --        10:47:09

 6    manual bidding allows an advertiser to set a bid

 7    price in a manual -- set a price for their ad in a

 8    manual fashion versus an automated fashion.

 9        Q.   In a situation where an advertiser is

10    engaging in manual bidding, is it your               10:47:47

11    understanding that they are bidding on a particular

12    performance metric for the ad?

13        A.   I don't think I have an understanding of

14    that -- how that -- how that works in that much

15    detail.                                              10:48:03

16        Q.   What is the bid that is manual in your

17    example?  What is it for?

18        A.   Well, my understanding is that you would

19    be bidding for an ad placement to place an ad.

20        Q.   What is it called a "bid" as opposed to a   10:48:17

21    "price"?

22        A.   Well, my -- my understanding is that

23    you -- from a bidding standpoint that there are

24    multiple potential advertisers that could actually

25    place the ad.  And so one is placing an ad in a      10:48:33
```

Page 32

ATTORNEYS EYES ONLY

```
 1    potentially competitive situation.                    10:48:41

 2        Q.   And how do you understand the bid to be

 3    expressed in monetary terms?

 4        A.   I -- this is beyond my technical

 5    understanding of how that -- how that works.          10:48:56

 6        Q.   Fair enough.

 7             So suffice it to say, though, the bid

 8    that the advertiser is placing, whether it's manual

 9    or automated, your understanding is that that is in

10    exchange for the placing of ads?                      10:49:09

11        A.   That's roughly my understanding, yes.

12    Again, I'm not the technical expert here.

13        Q.   Apart from your work with Mr. Hochman and

14    your work on these cases -- well, actually, let me

15    start over.                                           10:49:31

16             Why don't you tell me, what is the basis

17    of your understanding of the testimony you just

18    gave about the automated and manual bidding

19    processes?

20        A.   It's reading the documents and here in my    10:49:40

21    discussion with Hochman.

22        Q.   Reading the documents that were produced

23    in this case?

24        A.   Correct.

25        Q.   Does it also include reading the             10:49:47
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1   documents produced in the Brown case?                    10:49:49

 2        A.   I don't -- I don't -- I mean, if I did

 3   learn something in the Brown case that I couldn't

 4   forget, there's potential -- that that potentially

 5   could be part of my memory as to how this -- how       10:50:01

 6   this works.

 7             But, certainly, I didn't use any Brown

 8   documents in my calculations here that were not

 9   also -- there were some overlaps.  So there were

10   some documents produced in this case as well as the   10:50:17

11   Brown case.

12        Q.   Right.  Of course.  And I understand that

13   you're only human.

14             My question is just, your understanding

15   of the automated bidding process that you've been     10:50:24

16   talking about, did that come from documents in this

17   case, or both documents in this case and in this

18   other case?

19        A.   I -- I don't recall as I sit here.

20        Q.   Other than documents, litigation            10:50:41

21   documents, produced by Google, your understanding

22   of the automated bidding process, is it based on

23   anything else?

24        A.   Well, I did do publicly -- public

25   research.                                               10:50:53
```

Page 34

ATTORNEYS EYES ONLY

```
 1        Q.   Okay.                                    10:50:53

 2        A.   But I don't recall if anything came in

 3   through public research on that particular topic.

 4        Q.   What do you mean, "if anything came in

 5   through public research"?                          10:51:00

 6        A.   That -- that would influence my opinion

 7   on the subject that we've just been talking about.

 8        Q.   If it did, would you have cited it in

 9   your report?

10        A.   If -- yeah, if there -- if there was     10:51:16

11   information that I relied upon that is public, I

12   cited it in my report.

13        Q.   Okay.  And then you said, in addition to

14   documents from the litigation, potentially public

15   research if you cited it in your report, also your  10:51:32

16   basis of your understanding comes from Hochman?

17        A.   Correct.

18        Q.   Okay.

19             (Discussion off the stenographic record.)

20             MR. LEE:  Eduardo, do you mind just       10:51:48

21   keeping your voice a little up.

22             THE DEPONENT:  Sure.

23             MR. LEE:  It's hard to hear.

24        Q.   (By Mr. Santacana)  And just to put a

25   fine point on it:  The understanding that comes     10:52:01
```

Page 35

ATTORNEYS EYES ONLY

```
 1   from Hochman with respect to the automated bidding      10:52:03

 2   process, that's from your conversations with him

 3   before you finalized your report, correct?

 4        A.   Correct.

 5        Q.   It is not from his report?                     10:52:12

 6        A.   That is correct.

 7        Q.   What about more generally the market

 8   dynamics of the online advertising industry?  You

 9   talk about that a little bit in your report.

10             What's the basis of your understanding of     10:52:32

11   that?

12        A.   The basis of my understanding of that is

13   twofold:  I've had cases, litigation, patent

14   infringement cases, in the online advertising

15   space; plus I've also helped companies license        10:53:07

16   patents in the online advertising space.

17             I should say online and mobile space,

18   generally.

19        Q.   Sure.  And I include mobile and online

20   for -- at least for purposes of today.                  10:53:33

21             Your reference to litigation patent

22   infringement cases, in those cases, you were

23   providing damages analyses relating to patent

24   infringement in the online advertising space?

25        A.   Yes.                                           10:53:48
```

Page 36

```
 1          Q.   And those analyses included licensing        10:53:48

 2     analysis?

 3          A.   Those -- in those cases, as best -- the

 4     best of my recollection, related to a reasonable

 5     royalty.                                                10:54:09

 6          Q.   Okay.  And do you happen to recall which

 7     cases those are?

 8          A.   I do not as sit here.  I could look at my

 9     CV to try to see if I could -- if any of them

10     actually went all the way to deposition and/or         10:54:22

11     trial.

12          Q.   Do you recall ever testifying about the

13     online advertising industry?

14               There's an Amazon IRS case, but I think

15     that's a tax case?                                      10:55:30

16               MR. LEE:  Is that a new question, or do

17     you want him to answer the first question?

18               MR. SANTACANA:  Just helping him.

19               MR. LEE:  Not a question at all?

20               THE DEPONENT:  As I'm sitting here, I         10:55:37

21     don't see any case that's gone to -- at least

22     deposition.

23               As it relates to that, that Amazon case

24     is a tax case.

25          Q.   (By Mr. Santacana)  Okay.  So you've          10:55:49
```

Page 37

1    looked at your expert testimony disclosure here.        10:55:50

2    You don't see any online advertising space cases

3    that made it to deposition or trial?

4        A.   Correct.

5        Q.   You've issued reports in such cases?        10:56:02

6        A.   I don't think so.  I don't think it's

7    gone all the way to a report.

8        Q.   Okay.  And so far, we've been talking

9    about the patent infringement cases.  You also

10   mentioned that you have helped companies with        10:56:18

11   licensing in the online advertising space?

12       A.   Yes.

13       Q.   That was a consulting-type arrangement?

14       A.   Correct.

15       Q.   For licensing patents relating to online        10:56:28

16   advertising?

17       A.   Correct.

18       Q.   Got it.

19            Again asking about the market dynamics in

20   the online advertising space, apart from the        10:56:46

21   consulting you did in patent infringement cases and

22   to help companies license patents, is there any

23   other basis for your understanding of the market

24   dynamics of the online advertising space?

25       A.   Not beyond what I've already talked about        10:57:05

Page 38

```
 1    in my previous testimony here today.              10:57:08

 2         Q.   Relating to the automated bidding

 3    process?

 4         A.   Well, related to my research.

 5         Q.   Right.                                   10:57:20

 6         A.   And preparation of my current report as

 7    well as my Brown report.

 8         Q.   Did you discuss the market dynamics of

 9    the online advertising industry with Mr. Hochman

10    before finalizing your report?                    10:57:32

11         MR. LEE:  Objection.  Vague.

12         THE DEPONENT:  As I sit here, I'm not

13    recalling specifically speaking about that, but it

14    may have come into our discussions.

15         Q.   (By Mr. Santacana)  You're aware that    10:58:28

16    Christopher Knittel's expert report discusses the

17    market dynamics of advertising in mobile apps,

18    right?

19         A.   Well, I have read his report.  So I'm

20    aware of what he talks about in his report.        10:58:45

21         Q.   And you're aware that's one subject he

22    discusses?

23         A.   He -- yes, he does.

24         Q.   Would you consider yourself an expert in

25    that area, the market dynamics of advertising in   10:58:55
```

Page 39

```
 1    mobile apps?                                    10:58:58

 2       A.   I would consider myself an economic

 3    expert that has the ability to look at the

 4    information here and provide an appropriate

 5    opinion.                                        10:59:16

 6            To the extent that that requires

 7    consideration of the documents that look at the

 8    market dynamics of the industry, yes, I'm -- I'm

 9    fully an expert to that level.

10            But I don't hold myself as an expert and   10:59:31

11    I don't -- don't do consulting in that field.

12       Q.   I'm having a little trouble parsing your

13    answer.

14            What is the difference between

15    considering yourself an economic expert with the  10:59:48

16    ability to look at the information here and provide

17    an opinion on the one hand; and, on the other hand,

18    holding yourself out as an expert in the field?

19       A.   Well, I don't -- I do not provide

20    companies -- I do not provide companies with -- or   11:00:04

21    do not hold myself out to provide companies with

22    consulting or strategy as it relates to the market

23    dynamics as you were discussing them.

24            I do provide economic analyses as it

25    relates to damages in this case or licensing in      11:00:22
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

```
 1    other cases that relate to -- that have related to        11:00:30
 2    this field.
 3         Q.   Do you see the damages calculations you
 4    did in this case analogous to licensing opinions
 5    you have issued in other cases in any way?              11:00:42
 6         A.   Could you repeat that?
 7         Q.   Do you see the damages opinion that you
 8    have given in this case analogous in any way to the
 9    licensing opinions you've given in other cases?
10         A.   Certainly from a -- certainly from a        11:01:30
11    methodology standpoint, there are certain areas
12    that are analogous.
13         Q.   What are those --
14         A.   Well, in cal- -- in licensing, one looks
15    at the profitability of products and isolates the     11:01:50
16    profitability of products, as I've done here in the
17    unjust enrichment case.  One looks at comparables
18    as I've done here in parts of my reports -- part of
19    my report as well.
20         Q.   By "comparables," you're referring to,      11:02:11
21    for example, other market transactions for data as
22    you describe them in your actual damages opinion?
23         A.   That -- that is in part correct, yes.
24         Q.   Is the structure of your actual damages
25    opinion with respect to its consideration of what a   11:02:27
```

Page 41

| | | |
|---|---|---|
| 1 | user would be willing to give up certain data for, | 11:02:32 |
| 2 | is that, in your mind, analogous to the | |
| 3 | hypothetical negotiation structure for a reasonable | |
| 4 | royalty? | |
| 5 | A.   No, it's not -- it's not analogous to | 11:02:48 |
| 6 | that.  That's a different -- that's a different | |
| 7 | analysis. | |
| 8 | Q.   As I read your actual damages opinion, | |
| 9 | you do seem to be imagining some type of | |
| 10 | hypothetical negotiation; is that fair to say? | 11:03:10 |
| 11 | MR. LEE:  Objection.  Form. | |
| 12 | THE DEPONENT:  I'm -- no, I don't know. | |
| 13 | I -- I wouldn't call it a "hypothetical | |
| 14 | negotiation." | |
| 15 | Q.   (By Mr. Santacana)  Why not? | 11:03:25 |
| 16 | A.   Because what I'm doing is calculating the | |
| 17 | fair -- the fair market value -- the fair value | |
| 18 | based on a market transaction. | |
| 19 | I don't -- I'm not imaging a hypothetical | |
| 20 | negotiation, if you would, like one does in a | 11:03:39 |
| 21 | patent infringement case. | |
| 22 | Q.   Okay.  I understand. | |
| 23 | How many expert reports have you issued | |
| 24 | related to consumer privacy damages -- consumer | |
| 25 | privacy damages? | 11:04:11 |

Page 42

1          A.    Two, if you -- this one as well as Brown.          11:04:17

2          Q.    Before that, you'd never done it before?

3          A.    I don't -- I don't believe I had issued

4     an expert report on consumer privacy damages, no.

5          Q.    Have you ever testified as to consumer          11:04:31

6     privacy damages other than right now and in Brown?

7          A.    I do not believe so, no.

8          Q.    Have you ever been retained to consult

9     with any company or other entity on the subject of

10    consumer privacy?          11:04:54

11         A.    I don't recall being retained in any case

12    like that -- other case like that.

13         Q.    Before you were retained in Brown, had

14    you ever before issued an expert opinion of any

15    kind as to the value of consumers' online activity          11:05:19

16    data?

17         A.    Could you repeat that?  I want to make

18    sure I answer that correctly.

19         Q.    I'm going to try to make it less of a

20    mouthful.          11:05:35

21              Before you were retained in Brown, had

22    you ever issued an expert opinion of any kind as to

23    the value of consumer data?

24         A.    Not -- no, not an expert -- I have not

25    issued an expert report on the value of consumer          11:06:01

Page  43

ATTORNEYS EYES ONLY

```
 1   data.                                            11:06:03

 2       Q.   Or provided expert opinion on that

 3   subject?

 4       A.   I have not provided expert opinion on

 5   that subject.  I have consulted on transactions   11:06:10

 6   related to that subject.

 7       Q.   What do you mean?

 8       A.   I worked on transactions where companies

 9   were acquired for access.  And my understanding of

10   the acquisition was that it was related -- or that  11:06:42

11   it related to the data that was being acquired.

12           MR. LEE:  Just one second.  I didn't

13   represent to you in any of that work, so I don't

14   know --

15           THE DEPONENT:  Yes.                        11:06:59

16           MR. LEE:  -- but to the extent any of

17   that work is governed by confidentiality agreements

18   or protective orders, I just want to be mindful of

19   that.  Okay?

20           THE DEPONENT:  Yeah.  I'm not going to be   11:07:06

21   able to say anything about that, because it is all

22   governed by...

23           MR. LEE:  I think you're fine now.

24           THE DEPONENT:  Yeah.

25           MR. LEE:  But I just want to issue that     11:07:13
```

Page 44

```
 1   warning, because I don't know -- I don't know what        11:07:14

 2   governs.

 3        Q.   (By Mr. Santacana)  So just to clarify,

 4   you said you have worked on transactions where the

 5   companies were acquired because the acquiring            11:07:22

 6   company wanted that -- the acquired company's data?

 7        A.   Correct.

 8        Q.   And the data in question was consumer

 9   data?

10        A.   That is my recollection, yes.                  11:07:37

11        Q.   Was it online data or some other type of

12   data?

13        A.   I really don't feel like I can go any

14   further than that.

15        Q.   Why?                                           11:07:46

16        A.   Because these are all -- these are all --

17   my case that I work on or my matter that I worked

18   is confidential, and so I'm not at liberty to say.

19        Q.   Well, I think you can tell me whether it

20   was online data or not.  I'm not sure that              11:08:00

21   specifies any particular entity.

22        A.   Well --

23             MR. LEE:  You have to be comfortable with

24   that, based on --

25             THE DEPONENT:  Yeah.                           11:08:15
```

Page 45

```
1              MR. LEE:  -- your understanding of your      11:08:15

2      agreements you entered into.  Obviously,

3      Mr. Santacana can't answer that for you because he

4      wasn't a party to any of that, nor was I.

5              So I think answer it if you can.  But if     11:08:23

6      you don't feel comfortable, that's fine too.

7              THE DEPONENT:  Yeah.  At this point I

8      just don't feel comfortable.

9              MR. SANTACANA:  Okay.  We'll have to talk

10     about that during the break.                          11:08:32

11         Q.  (By Mr. Santacana)  Did you -- I think

12     you said that, in those transactions, you were

13     valuing consumer data?

14         A.  No, I was not.

15         Q.  You were not.  Were you valuing the          11:08:44

16     companies to be acquired?

17         A.  Yeah.  Yes.

18         Q.  And part of valuing the company,

19     presumably, included valuing the value of the data

20     to be acquired?                                       11:08:59

21         A.  Correct.

22         Q.  Okay.  What methodology did you use to

23     appraise the data to be acquired?

24         A.  I -- I cannot say.

25         Q.  Your methodology was confidential?           11:09:15
```

Page 46

```
1        A.   I -- my methodology -- two things:  One        11:09:17

2   is I think the whole transaction is confidential;

3   my role in the transaction is confidential.

4            So I'm -- I'm not able to say any more

5   about that transaction.                                  11:09:33

6        Q.   Okay.  Well, let me ask you this:  Before

7   this case and Brown, had you ever applied any

8   methodology to valuing consumer data?

9        A.   You're testing the limits of my memory

10  in -- in addition to confidentiality.  So I do not       11:10:01

11  recall specifically how the valuation was done in

12  that case, in that -- I shouldn't say it's a case.

13  It's a matter.  It's a transaction.

14       Q.   I think you said earlier that your task

15  or your goal in the actual damages opinion was to        11:10:22

16  determine the fair market value of the data that's

17  at issue in this case; is that fair?

18       A.   A fair value, yes.

19       Q.   Is that different from fair market value?

20       A.   Yeah, I think -- I think I misspoke when       11:10:37

21  I said "fair market value."  That's a defined term

22  in accounting.

23       Q.   And you don't mean to assume the burden

24  of that term with respect to this opinion?

25       A.   I'm not even sure that -- fair market         11:10:47
```

Page 47

| | | |
|---|---|---|
| 1 | value is a different -- a different standard when | 11:10:49 |
| 2 | you're valuing a company or a transaction.  And I'm | |
| 3 | not -- I was not valuing a company in that -- in | |
| 4 | this case. | |
| 5 | Q.   Does the data in question in this case | 11:11:02 |
| 6 | have a fair market value? | |
| 7 | A.   I -- that would go beyond my assignment | |
| 8 | in this case, and I haven't -- I haven't determined | |
| 9 | that. | |
| 10 | Q.   Do you have an opinion as to whether the | 11:12:46 |
| 11 | data at issue in this case has a fair market value? | |
| 12 | A.   I don't have that opinion.  I have not | |
| 13 | formed an opinion on that. | |
| 14 | What I have calculated here is a fair | |
| 15 | price to incentivize this particular group of | 11:12:57 |
| 16 | people, the class members, to provide access to | |
| 17 | their data. | |
| 18 | Q.   Have you ever expressed an expert opinion | |
| 19 | in any engagement as to the fair market value of | |
| 20 | consumer data? | 11:13:20 |
| 21 | A.   I don't recall doing so. | |
| 22 | Q.   Are you aware of any authority that would | |
| 23 | suggest that there is a fair market value to | |
| 24 | consumers' online data? | |
| 25 | A.   I am not aware of -- of any authority on | 11:13:47 |

Page 48

ATTORNEYS EYES ONLY

```
 1    that as I sit here.                              11:13:50

 2        Q.   Are you aware of any authority that

 3    suggests how to value consumers' online data?

 4            MR. LEE:  Can you ask that again?  I'm

 5    sorry.                                           11:14:07

 6        Q.   (By Mr. Santacana)  Are you aware of any

 7    authority that suggests how to value consumers'

 8    online data?

 9        A.   Not as I sit here, no.

10        Q.   Is there a difference between the value  11:14:32

11    of a consumer's online data to that consumer and

12    the fair market value of the same data?

13        A.   Could you repeat that?

14        Q.   Is there a difference between the value

15    of a consumer's online data to that consumer in the 11:15:12

16    fair market value of the same data?

17        A.   I -- that -- that -- that would be

18    something I would need to investigate.  I have not

19    investigated that as part of my report.

20        Q.   Can you take a look at paragraph 130?    11:15:27

21        A.   Yes.

22        Q.   In that paragraph, you say, "actual

23    damages can be determined as a function of the

24    payments necessary to incentivize an individual to

25    knowingly surrender the choice to keep activity on  11:15:44
```

Page 49

1    mobile apps private and allow an organization to                11:15:47

2    track app activity data."

3            Do you see where I'm reading that?

4        A.    Yes.

5        Q.    How does that task of determining actual           11:15:59

6    damages differ from the task of determining the

7    fair market value of the data at issue in this

8    case?

9            MR. LEE:  Under the rule of completeness,

10   I'm going to finish the rest of that paragraph.             11:16:11

11            "I have therefore identified and

12   considered various indicators of both the payments

13   that Google and other organizations have paid to

14   individuals to track their online activity and the

15   fees that individuals have paid to various               11:16:24

16   organizations in their attempt to increase online

17   privacy and/or avoid tracking."

18            I think with that full reading, you can

19   try to answer counsel's question.

20            THE DEPONENT:  I -- I mean, in -- in this       11:16:55

21   case, fair -- fair market value, my understanding

22   of fair market value is that you have a willing

23   buyer and a willing seller.

24            In this case, these were not willing

25   participants.  What I have done here is to try to        11:17:10

Page 50

```
 1    determine a price based on comparables that          11:17:15

 2    participants have been willing to separate with

 3    their data for.  And so --

 4         Q.   (By Mr. Santacana)  Why --

 5              MR. LEE:  Hold on.                          11:17:25

 6              THE DEPONENT:  And so this, in my

 7    opinion, is a very conservative value relative to

 8    what they would have -- would have actually

 9    demanded, what these participants would have

10    actually demanded.                                   11:17:41

11         Q.   (By Mr. Santacana)  Why would you use

12    comparables in which the participants were willing

13    to part with their data to determine what an

14    unwilling participant would need to be paid to part

15    with that data?                                      11:17:55

16         A.   I think that that's a very conservative

17    view of what the actual damages would be.  And

18    so -- and it's the best available information to

19    make that calculation.

20              And so I believe that it's appropriate in  11:18:14

21    this case, given the information that's available,

22    as well as my task to calculate actual damages.

23         Q.   So as I understand your task, you were

24    essentially trying to determine the price at which

25    an unwilling seller of data would become a willing   11:18:39
```

Page 51

```
 1    seller, right?  The point at -- the fulcrum at            11:18:43

 2    which the person goes from no, I won't, to yes, I

 3    will, right?

 4         A.   I think that this is -- this is a floor,

 5    if you will, for what that would be.  I think it        11:18:57

 6    likely would be higher than this, so I think it's a

 7    very conservative view of what you're asking.

 8         Q.   I understand you think it's a

 9    conservative view.

10         When you say it's a "floor," is that              11:19:10

11    different than what I'm calling the fulcrum?  It's

12    the point at which the seller goes from unwilling

13    to willing?

14         A.   It's -- it's yes.  I guess -- I guess

15    we're talking in similar terms.                         11:19:22

16         Q.   So, in essence, you are trying to imagine

17    a transaction between a willing buyer and a willing

18    seller and determining at what price the buyer and

19    the seller are both willing to buy and sell, right?

20         MR. LEE:  Objection to form.                       11:19:42

21    Mischaracterizes.

22         THE DEPONENT:  No, I -- I don't believe

23    that that's correct.

24         Q.   (By Mr. Santacana)  How is that different

25    from determining the price at which the seller is       11:19:47
```

Page 52

ATTORNEYS EYES ONLY

```
 1   willing to sell?                                    11:19:50

 2       A.   In -- in this case, I believe that this

 3   is -- we -- we do have examples of willing -- of

 4   willing sellers.

 5       Q.   I know.                                     11:20:05

 6       A.   For -- for this particular transaction.

 7   However, the -- the class is not a willing seller.

 8   So I look at this as a floor.

 9       Q.   What do you mean --

10       A.   The price --                               11:20:18

11            MR. LEE:  Hold on.

12            THE DEPONENT:  The price would likely be

13   higher in -- in this case.

14            MR. LEE:  Just for the record, Eduardo, I

15   know you don't mean to do it, but I think           11:20:27

16   Mr. Lasinski is a very methodical speaker, so he's

17   not always finished with his answer even when

18   there's a pause.

19            So I think we should just slow it down

20   just a beat so that we're not talking over each     11:20:36

21   other.

22       Q.   (By Mr. Santacana)  You said in this

23   case, we have examples of willing sellers for this

24   particular transaction.

25            What did you mean by "this particular      11:20:48
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

1    transaction"?                                      11:20:51

2        A.    What I meant -- what I meant in this case

3    is the market study in which Google has paid

4    participants to access their information, in other

5    words, the Ipsos study.  Google itself has paid    11:21:08

6    willing participants a certain amount of money to

7    access their -- to access their data.

8            I look -- I look at that as a floor for

9    the actual damages because the participant groups

10   are different between willing -- a willing group    11:21:32

11   and an unwilling group.

12       Q.    How do you know they're different?

13       A.    Because in this case -- because in this

14   case, the participants in this study have signed up

15   to provide access to -- Google access to their      11:22:03

16   data.  And the class -- the class has specifically

17   indicated that it doesn't want Google to access its

18   data by turning -- turning its sWAA off.  So they

19   are an unwilling participant.

20       Q.    You posit that the class members in this   11:22:52

21   case who had turned WAA off would nevertheless

22   become willing sellers at a particular price,

23   namely at least $3 per device, right?

24       A.    No.  What I'm -- what I'm positing is

25   that they would -- that that is a very conservative  11:23:16

                                              Page 54

| | | |
|---|---|---|
| 1 | floor for actual damages.  And so that -- that | 11:23:19 |
| 2 | would be a floor for actual damages, a floor for | |
| 3 | what that calculation would looks like. | |
| 4 | Q.   Have you tried to calculate actual -- | |
| 5 | actual damages in the case, or just tried to | 11:23:35 |
| 6 | calculate the floor of actual damages? | |
| 7 | MR. LEE:  Objection to form. | |
| 8 | THE DEPONENT:  I -- I think it's an | |
| 9 | appropriate calculation for actual damages.  I | |
| 10 | think it could be higher.  But it's conservative. | 11:23:53 |
| 11 | Q.   (By Mr. Santacana)  You have said that | |
| 12 | it's conservative many times already today, and you | |
| 13 | have called it a floor multiple times.  So I'm just | |
| 14 | trying to understand. | |
| 15 | Was your task to calculate the floor, or | 11:24:06 |
| 16 | was your task to calculate the actual damages to | |
| 17 | the actual class members? | |
| 18 | A.   My task was to calculate the actual | |
| 19 | damages to the actual class members.  I believe | |
| 20 | I've done that in a conservative manner. | 11:24:19 |
| 21 | Q.   What does that mean?  Did you get it | |
| 22 | right or not? | |
| 23 | A.   I do -- I do have it right, yes. | |
| 24 | Q.   Then why do you say it's conservative? | |
| 25 | A.   Because it's -- because at the end of the | 11:24:33 |

Page 55

1    day, it -- there's a potential for it to be higher.        11:24:37

2            But I believe -- but I believe, based on

3    the information that I have available to me,

4    that -- that it is the best estimate of what would

5    be appropriate in this case.                               11:24:48

6        Q.   All right.  Is there a potential that

7    it's a lot higher?

8            MR. LEE:  Objection.  Form.

9            THE DEPONENT:  Not that I'm aware of, no.

10       Q.   (By Mr. Santacana)  You're not concerned        11:24:59

11   that your actual damages opinion is grossly

12   undercompensating the class?

13       A.   I am not.

14       Q.   Why not?

15       A.   Because I think, based on the information       11:25:13

16   available to me, that this is an appropriate

17   conservative estimate.

18       Q.   I know that's what you think.  That's

19   your conclusion.

20            I want to know why that's your              11:25:20

21   conclusion.

22       A.   I -- I think I just answered.

23       Q.   No, you didn't.

24       A.   Okay.  Well, I think I did.

25       Q.   Why do you think it's appropriate?        11:25:28

                                                    Page 56

ATTORNEYS EYES ONLY

```
1        A.    Based on the --                         11:25:29

2              MR. LEE:  Asked and answered.

3              Go ahead.

4              THE DEPONENT:  Based on the information

5    that's available to me, I think that it -- that --   11:25:34

6    that it is -- that it is appropriate.

7        Q.    (By Mr. Santacana)  The Ipsos study paid

8    $3 a month?

9        A.    In certain cases, yes.

10       Q.    But your actual damages opinion pays $3    11:25:47

11   just once?

12       A.    That is correct.

13       Q.    Why?

14       A.    Because based on the information that I

15   have, I am able to determine that -- I am able to    11:26:08

16   determine the number of devices that had sWAA off

17   at at least a given point in time.

18             I am not able to determine with certainty

19   that it had sWAA off for -- sWAA off and

20   actually -- and actually met with other            11:26:49

21   requirements for the damages calculation, such as

22   hitting third-party sites with Google trackers on

23   them, after that initial calculation -- after that

24   addition sWAA-off calculation.

25   ███  ████████████████████████   ███████████
```

Page 57

ATTORNEYS EYES ONLY

■ ██████████████████████████████  ████████

■ ████████████████████████████████████

■ ███████████████████████████████

■ ██████████

5        ██    ███████████████████████        ████████

■ ████████████████████████████████

■ ███████████    ██████████████

8        Q.    Let's assume that it's available.

9              Would that change your opinion?

10       A.    I -- I don't know, because I don't have        11:27:48

11    that --

12            MR. LEE:  Are you representing that

13    you'll -- you're going to make data available that

14    you've previously represented was deleted?

15            MR. SANTACANA:  James.                        11:27:55

16            MR. LEE:  I'm just trying to understand

17    your question.

18       Q.    (By Mr. Santacana)  My question is,

19    assume the data's available.  Would that change

20    your actual damages opinion?                          11:28:02

21            MR. LEE:  Are you making that

22    representation or not?

23            MR. SANTACANA:  I'm not answering your

24    question, James.  It's not my deposition.

25            MR. LEE:  I'll take that as a no.             11:28:09

Page 58

ATTORNEYS EYES ONLY

```
1          THE DEPONENT:  So I don't -- I don't have    11:28:11
2     that information, so I don't know if it would
3     change it.  I can't know unless I had that
4     information.
5          Q.  (By Mr. Santacana)  Well, I asked you why  11:28:20
6     you assigned $3 per device rather than $3 per
7     month, and you said ███████████████████████
      ███████████████████████████████████████
      █████████████████████████
10         And my question is, if you knew█████████   ██████████
      ███████████████████████████████████████
      ███████████████████████ then would it be $3
13    per month or some other calculation, or would it
14    still just be $3 per device?
15         A.  I don't know because I don't have that    11:28:48
16    information.  I would have to look at it, study it,
17    and analyze it with all the other factors of the
18    case.  And since I don't have it, I can't answer
19    that question.
20         Q.  Then why do you say that that information  11:28:58
21    is the reason why you have opined that actual
22    damages is the $3 once not $3 per month or $3 per
23    something else?
24         A.  You -- because you asked that question.
25    Again, I don't know -- I don't know the answer, and  11:29:17
```

Page 59

```
 1    I won't know the answer until I get -- unless I got        11:29:19

 2    the information.

 3         Q.   Is the Ipsos --

 4         A.   But that's -- but that's -- that's a

 5    potential reason why.  But I can't answer it in any        11:29:27

 6    more detail than I have.

 7         Q.   Is the Ipsos study comparable to the

 8    transaction you're imagining in paragraph 130?

 9              MR. LEE:  Objection to the use of -- the

10    continued use of "imagined."                              11:29:45

11         Q.   (By Mr. Santacana)  Hypothesizing.  I

12    don't mean to say it's make believe.

13         A.   I believe that the Ipsos study provides

14    the best data point --

15         Q.   Is it comparable --                             11:30:01

16         A.   -- for --

17              MR. LEE:  Hold on.

18         A.   -- provides the best data point for a --

19    for the actual damages calculation.

20         Q.   (By Mr. Santacana)  Is it comparable?          11:30:11

21         A.   Yes, it is sufficiently comparable for

22    what I'm using it for.  Yes.

23         Q.   Then why did you change the payment from

24    $3 per month to $3 per device?

25              Actually, let me strike that for a             11:30:27
```

Page 60

1    second.                                                    11:30:29

2              ████████████████████████████

██    ███████████████████████████████████

4        A.   Yes.

5        ██  ████████████████████                            11:30:38

6        A.   Yes.

7        ██  ██████████████████████████

██    ███████████████████████████████

9        A.   I did do that, yes.

10       Q.   You did do that.                                11:30:49

11             ████████████████████████████

██    ███████████████████████████

13       A.   I mean, ultimately, I thought it was more

14   appropriate and -- and conservative to do it -- to

15   do a one-time calculation based on the information     11:31:02

16   that I had available to me.

17       Q.   Why was it more appropriate to do a

18   one-time calculation?

19            MR. LEE:  Asked and answered.

20            THE DEPONENT:  Yeah.                            11:31:16

21            MR. LEE:  Go ahead and answer it again if

22   you want.

23            THE DEPONENT:  Again, even if I -- even

24   if ████████████████████████████████████████

██    ████████████████████████████████████████,        11:31:28

                                                     Page 61

ATTORNEYS EYES ONLY

1    ████████████████████████████████████    ███████

2    ██  ████████████████████████████ .

3            And so in this case, to be, as I've said

4    in the past, appropriate and conservative, I did

5    it -- I calculated a one-time payment per device.        11:31:52

6        Q.   (By Mr. Santacana)  And why would you pay

7    a sWAA-off device if they never hit a third-party

8    tracker site at all?

9        A.   I think it's unlikely that a

10    third-party -- that -- it's unlikely that a third        11:32:16

11    party -- that a sWAA-off device would not hit a

12    third-party tracker.  It's -- it's very likely that

13    it would based on usage as well as the amount of

14    trackers that are out there.

15        Q.   You would agree that different people        11:32:36

16    would hit third-party trackers different amounts

17    depending on their usage patterns?

18        A.   That may be -- that may be accurate.

19        Q.   It may be accurate?

20            You think it's possible that every member        11:32:58

21    of the class has hit the exact same number of

22    third-party trackers?

23        A.   No.

24        Q.   Okay.  So it is accurate?

25        A.   It is -- that is accurate.        11:33:05

Page 62

ATTORNEYS EYES ONLY

```
 1        Q.   Okay.  So is it fair to say, then, that        11:33:06

 2   your actual damages opinion is that each device

 3   should be compensated $3 once because it is

 4   extremely unlikely -- excuse me -- it is extremely

 5   likely that they were exposed to the allegedly        11:33:30

 6   wrongful conduct at least once?

 7        A.   Yes.

 8        Q.   What if they were exposed to the

 9   allegedly wrongful conduct a thousand times?  How

10   could their actual damages only be $3, but somebody   11:33:44

11   who is exposed once also has damage of $3?

12             MR. LEE:  Asked and answered.

13             Go ahead and answer it again.

14             THE DEPONENT:  I -- again, I don't think

15   that you could calculate with certainty which        11:34:04

16   member, based on the data available to me, would

17   hit it once or a thousand times.

18             I think to incentivize someone to give up

19   their information, whether it's once or a thousand

20   times, you would have to pay them.                    11:34:23

21             And so...

22        Q.   (By Mr. Santacana)  A nonzero amount?

23        A.   You -- you would have to pay them.  And

24   in my opinion, a fair price -- a fair value for

25   that is $3.                                           11:34:37
```

Page 63

ATTORNEYS EYES ONLY

```
 1        Q.   And is that fair value regardless of the      11:34:39
 2    amount of data in question?
 3        A.   Yeah, in this case, I think -- I think
 4    that a uniform amount per device is appropriate.
 5    Yes.                                                    11:35:00
 6        Q.   Why?
 7             MR. LEE:  Asked and answered.
 8             Go ahead.
 9             THE DEPONENT:  Well, for example, the --
10    the Ipsos study, that's what they pay.  They --         11:35:10
11    they pay a user $3 per device per month, no matter
12    how much usage.
13             There -- there certainly is difference --
14    differences between Ipsos users, but they are not
15    getting compensated differently per device.             11:35:29
16        Q.   (By Mr. Santacana)  They're not.  That's
17    true.
18             How do you know that the $3 per month is
19    not grossly over-incentivizing users in order to
20    get a representative sample into the survey?            11:35:42
21        A.   If -- based on -- based on a market
22    transaction or a comparable of what -- what needs
23    to be paid to get someone to provide their
24    information, that price -- the $3 -- is set not
25    only based -- not only based on the Ipsos study,        11:36:37
```

Page 64

1    but there are other studies that are out there          11:36:39

2    that -- for example, that I talk about in my report

3    that actually provide more value than three

4    bucks -- $3 per device.

5          So it's not only the Ipsos study in which          11:36:52

6    Google has actually paid users, but there are other

7    studies that pay more per device than $3.  So I

8    think $3 is an appropriate and a conservative

9    amount for actual damages.

10          MR. LEE:  We've been going about an hour.          11:37:12

11          MR. SANTACANA:  I have a couple more on

12    the Ipsos study, and then --

13          MR. LEE:  Okay.

14          MR. SANTACANA:  -- we'll switch to a

15    different subject and --                                 11:37:18

16          MR. LEE:  Sure.

17          MR. SANTACANA:  -- we can take a break

18    first.

19      Q.  (By Mr. Santacana)  Are you opining in

20    this case that none of the participants in the          11:37:24

21    Ipsos study would have accepted less than $3 to

22    participate?

23          MR. LEE:  Objection to form.

24          THE DEPONENT:  Well, certainly none of

25    the -- none of the participants did accept less.        11:37:43

                                                    Page 65

| | | |
|---|---|---|
| 1 | In fact, they got significantly more than $3. | 11:37:46 |
| 2 | Q.   (By Mr. Santacana)  They weren't | |
| 3 | negotiating one-on-one with Google to participate | |
| 4 | in the study, right?  They were just offered a | |
| 5 | one-size-fits-all amount? | 11:37:57 |
| 6 | A.   That is correct.  But their -- their | |
| 7 | compensation was significantly higher than $3. | |
| 8 | Q.   It was $3 per month? | |
| 9 | A.   Plus, on top of that, they got paid for | |
| 10 | their other devices, plus potentially a bonus, plus | 11:38:10 |
| 11 | a sign-up fee, plus they got a router. | |
| 12 | So there was significantly more | |
| 13 | compensation. | |
| 14 | Q.   So back to my question. | |
| 15 | Are you opining in this case that none of | 11:38:24 |
| 16 | the participants in the Ipsos study would have | |
| 17 | accepted less than $3 to participate, had that been | |
| 18 | offered, per month? | |
| 19 | MR. LEE:  Calls for speculation. | |
| 20 | THE DEPONENT:  I have not formed that | 11:38:39 |
| 21 | opinion, no. | |
| 22 | Q.   (By Mr. Santacana)  Then how do you know | |
| 23 | that it's comparable to the opinion you did form | |
| 24 | with respect to the incentivization required to get | |
| 25 | a class member to give up the data in question in | 11:38:49 |

Page 66

ATTORNEYS EYES ONLY

```
 1    this case?                                     11:38:51

 2         A.   Because -- because in that -- what was --

 3    a market transaction such as this, plus the other

 4    information that I discussed in my report that

 5    actually is higher per device, plus incentivize --   11:39:03

 6    plus, as you said, incentivizing a variety of folks

 7    to actually sign up to the study, plus the fact

 8    that they're willing participants as opposed to the

 9    class, which would be unwilling, I think $3 is an

10    appropriate price.                              11:39:27

11         I don't think it gross -- would be

12    grossly overstating a price.  That would be

13    appropriate.

14         Q.   I appreciate your answer, but my question

15    was a little bit different.                     11:39:37

16         The question was:  How do you know that

17    the Ipsos study's payments are comparable to the

18    opinion you formed in this case with respect to the

19    incentive required to get a class member to give up

20    their data if you do not know whether the        11:39:54

21    participants in the Ipsos study would have accepted

22    less money?

23         A.   I don't believe that it -- I believe that

24    there is a chance that they would have accepted --

25    that certain would have accepted less money.     11:40:14
```

Page 67

| | | |
|---|---|---|
| 1 | But I think overall, to get it -- Google, | 11:40:16 |
| 2 | as indicated, to get a fair sample or | |
| 3 | representative sample, that this is the | |
| 4 | compensation, that this is the compensation that is | |
| 5 | necessary to actually incent users. | 11:40:28 |
| 6 | It's greater than the $3 that we talked | |
| 7 | about.  It's not just the $3.  It's -- it's more | |
| 8 | than that. | |
| 9 | And in this case, I calculated an | |
| 10 | appropriate amount for unwilling participants.  So | 11:40:44 |
| 11 | I think that that's -- it's the right amount. | |
| 12 | Q.  Why should the price paid to the | |
| 13 | unwilling participants be lower than the price paid | |
| 14 | to the Ipsos participants? | |
| 15 | A.  Well, at the end of the day, I'm using | 11:41:06 |
| 16 | that as a comparable.  It's -- it ultimately is the | |
| 17 | same amount.  It's the same amount per device. | |
| 18 | Q.  But, it's a lot less, right?  Because | |
| 19 | Ipsos is per month, and this is one time. | |
| 20 | So my question is, why do you propose to | 11:41:20 |
| 21 | pay this class less money than Google pays Ipsos | |
| 22 | participants? | |
| 23 | A.  I think -- as I said before, I think that | |
| 24 | that's a conservative value -- | |
| 25 | Q.  I know -- | 11:41:32 |

Page 68

ATTORNEYS EYES ONLY

```
 1        A.    -- to get them to sign up.              11:41:32

 2              MR. LEE:  Hold on.

 3              THE DEPONENT:  To get --

 4              MR. LEE:  Please let him finish.

 5              THE DEPONENT:  To get them to sign up.   11:41:33

 6        Q.    (By Mr. Santacana)  I know the number is

 7   lower, which I think is what you mean by

 8   "conservative."

 9              My question is why should be lower or not

10   equal or higher?                                   11:41:44

11              MR. LEE:  Asked and answered.

12              THE DEPONENT:  I don't -- I don't have

13   another answer besides what I have said before.

14        Q.    (By Mr. Santacana)  Is the data

15   worthless?                                         11:41:55

16        A.    No, the data -- in my opinion, the data

17   would not be worthless.

18        Q.    Is the seller in question more willing

19   than the Ipsos participants?

20        A.    No, they are not.                       11:42:07

21        Q.    Were the sellers in question aware of the

22   data being taken?

23        A.    My understanding is that they're not

24   aware of it being taken -- that it was taken.

25        Q.    Can you name any factor that would weigh  11:42:20
```

Page 69

ATTORNEYS EYES ONLY

```
 1    in favor of lowering the Ipsos payment in this          11:42:23

 2    case?

 3              MR. LEE:  Objection.  Mischaracterizes

 4    Ipsos.

 5              THE DEPONENT:  Yeah, I don't -- I don't        11:42:33

 6    think I'm lowering the Ipsos payment.  It is $3 --

 7    it is $3 per device.  And, in fact, you can get $3

 8    per device per month.

 9              But I think that that's an appropriate

10    amount, a conservative amount, for this case.           11:42:45

11         Q.   (By Mr. Santacana)  You said earlier that

12    a participant in Ipsos would get more money for

13    data than a class member in this case.  You are

14    setting a conservative floor of $3 one time, not $3

15    every month, right?                                     11:43:01

16         A.   That is how the calculation works.  That

17    is correct.

18         Q.   Okay.  Can you name any factor that went

19    into your calculation that weighed in favor of

20    lowering the total amount of money the class           11:43:14

21    members would receive as compared to the

22    participants in the Ipsos study?

23         A.   At the end of the day, I -- the -- the

24    factor that I considered, we've talked about

25    already, which is, in the Ipsos study, they're        11:43:37
```

Page 70

```
 1    collecting data every single month based on the app        11:43:42
 2    tracker that is -- the tracker that is put on their
 3    phone.
 4    ████████████████████████
      ██████████████████████████████      ██████████
      ████████████        ██████████████████
      ████████████████████████████
      ████████████████████████████
      ██████████████████
10            MR. SANTACANA:  Okay.  Let's take a                11:44:28
11    break.
12            (Discussion off the stenographic record.)
13            THE VIDEOGRAPHER:  This marks the end of
14    the Media No. 1.  Going off the record.  The time
15    is 11:44.                                                  11:44:38
16            (Recess taken.)
17            THE VIDEOGRAPHER:  This marks the
18    beginning of Media No. 2 in the deposition of
19    Michael Lasinski.  We're back on record.  The time
20    is 12:04.                                                  12:05:05
21       Q.   (By Mr. Santacana)  Mr. Lasinski, I want
22    to talk about the WAA control for a moment.
23            What is -- and actually, really, the sWAA
24    control.
25            What are the WAA and sWAA controls, as            12:05:27
```

Page 71

1    you understand them?                              12:05:29

2        A.   I talk about this in my report on.

3        Q.   Where are you reading from?

4        A.   In Section 6.

5             WAA relates to Web -- Web and app       12:05:59

6    activity.  And that is a Google setting or activity

7    control related to Google's collection and saving

8    of the user's activity on Google sites and apps.

9             Do you want me to go future than that

10   and --                                           12:06:16

11       Q.   No.  I can read the report.

12       A.   Okay.

13            And then sWAA, I understand, is

14   supplemental Web and app activity.  And that will

15   allow the collection of information on sites and   12:06:29

16   apps that partner with Google and show ads for

17   sites and apps that use Google services, including

18   data that apps share with Google:  Chrome browsing

19   history, diagnostics, battery level, and that type

20   of thing.                                         12:06:56

21       Q.   Did you write your report?

22       A.   Yes.

23       Q.   Every word?

24       A.   I had sections that my staff wrote, but

25   then I relooked at every single word and would have  12:07:06

                                            Page 72

```
 1   edited it if I thought -- if I thought it needed to      12:07:08

 2   be edited.

 3        Q.   How many time did you spend writing it?

 4        A.   40 hours or so.

 5        Q.   How much time did you spend reviewing          12:07:21

 6   documents in the case?

 7        A.   I mean, it's really -- that's really hard

 8   to say, because the whole case is about the

 9   documents.  So when I'm writing my report, I'm also

10   reviewing documents and stuff like that, so...          12:07:39

11           Of about 200 hours I've spent on this

12   case, probably 120 I was looking at documents, or

13   maybe more.

14        Q.   Okay.  Do you have an opinion as to

15   whether Google has invaded user privacy in this        12:07:57

16   case?

17        A.   I --

18        Q.   Let me withdraw the question and ask it a

19   different way.

20        A.   Yeah.                                          12:08:21

21        Q.   You're not rendering an expert opinion

22   here that Google has misled users, are you?

23        A.   No.  My -- my opinion -- my opinion is

24   that liability is found in this case, and if -- if

25   liability is found, then my damages are at issue.       12:08:39
```

Page 73

ATTORNEYS EYES ONLY

```
1              So I -- I don't have an opinion one way          12:08:46

2    or another whether or not liability will be found.

3    But if liability is found, that's when my opinions,

4    I understand, come into play.

5        Q.   Okay.  And just to make it crystal clear,          12:08:58

6    you're not opining as to whether liability should

7    be found either?

8        A.   I am not.

9        Q.   In your report, you discuss contemporary

10   analogous financial analyses that you consulted in          12:09:24

11   formulating your opinions relating to unjust

12   enrichment.

13             What did you do to validate whether those

14   analyses were sufficiently analogous to be relied

15   on in this case?                                             12:09:46

16       A.   I think you are talking about the, for

17   example, ███████████████████████████

██   ████████████████, ███████████████████████

██   ████████.

20       Q.   I am.                                              12:10:33

21       A.   ██████ ██████████████████████████

██   ███████████████████████████████

██   ████████████████████████████████

██   ██████████████████████████████████

██   ██████████████████████████                                 12:10:58
```

                                                        Page  74

```
 1            And I looked at -- I looked at that        12:11:03

 2   information that they relied upon.  I considered

 3   the information that they relied upon.  I

 4   considered the fact that those analyses were

 5   considered by multiple people within Google and    12:11:24

 6   used to provide estimates for business purposes

 7   within Google.

 8        Q.   Anything else?

 9        A.   I -- to be -- to be clear, I used certain

10   inputs from those documents.  I don't use those    12:11:49

11   document in -- or -- or analyses in whole.  I use

12   them in part.

13            And so in my calculations, I'm most

14   interested in certain aspects of those documents,

15   because I also rely upon documents that were       12:12:06

16   provided in this case in -- in the form of

17   financial -- financial data as well.

18        Q.   Would you agree with me that, in order to

19   rely on the parts of those documents that you did

20   rely on, you would first need to be sure that the  12:12:34

21   methodology used to arrive at the numbers in those

22   documents was sound?

23        A.   In part yes and in part no.

24        Q.   Explain.

25        A.   Well, so, again, I'm not using the        12:13:01
```

Page 75

1   documents in whole.  So to the extent that there's                12:13:04

2   a methodology that's part -- that's not something

3   that I'm using or relying upon, I'm not as worried

4   about that piece of the document.

5           As far as the -- the overall methodology             12:13:19

6   being reliable, those parts that I use I believe

7   are -- are reliable and I understand to be reliable

8   based on my review of the documents.

9       Q.   Would you also agree with me that parts

10  that you did rely on would need to be analogous to         12:13:41

11  what you're analyzing here in order to rely on

12  them?

13      A.   I don't really know what you mean by

14  "analogous."

15          I would say that they need to be                   12:13:58

16  appropriate to rely upon, and that's what they are.

17      Q.   Okay.  Well, we can take them piece by

18  piece.

19          Let's start with paragraph 72.

20      A.   Okay.                                              12:14:23

21      Q.   And here, as you said, you identify some

22  analyses, including the ███████████████ , the

23  ███████████████████ --

24      A.   Yes.

25      Q.   -- a ChromeGuard study?                           12:14:37

Page 76

1      A.   Yes.                                    12:14:40

2      Q.   So my first question is about this phrase

3    in the first sentence of this paragraph 72.





Page  78

ATTORNEYS EYES ONLY



```
15          But the second half of my answer is, my        12:20:55
16    understanding is that sWAA -- my understanding is
17    that Google has represented that sWAA-off users do
18    not receive personalized ads.
19          And so in calculating my unjust
20    enrichment, I looked at -- what I was looking for   12:21:18
21    there was the relationship between personalized and
22    unpersonalized ads.
```

Page 79

ATTORNEYS EYES ONLY

████  ████████████████████  ████

████  ████████████████████

████  ██████████████████

4        I think I said that correctly.

5        Q.    (By Mr. Santacana)  Your starting point          12:22:13

6    for your unjust enrichment analysis was that sWAA

7    users did not receive personalized ads?  Excuse me.

8    Let me -- strike that.

9        Your starting point for your unjust

10   enrichment analysis was that sWAA-off users did not          12:22:32

11   receive personalized ads?  Or was your starting

12   point that they did but should not have?

13       A.    No.  My starting point for Scenario 2,

14   because this only impacts Scenario 2, is that they

15   did not receive personalized ads -- I'm sorry.          12:22:52

16   Yes.  That they -- my understanding is they do not

17   receive personalized ads.

18       To the extent that they did receive

19   personalized ads and those were inappropriate, then

20   my calculations would be -- would be conservative.          12:23:09

21   I would have calculated too little unjust

22   enrichment.

23       And just to be clear, I think we're

24   talking about sWAA-off users here.

25       Q.    We are.          12:23:28

Page 80

1            In -- you said that was for Scenario 2.        12:23:33

2            For Scenario 1, did you assume that

3     sWAA-off users received personalized ads from

4     sWAA-off data?

5         A.   No.                                          12:23:49

6         Q.   So for neither scenario did you assume

7     that sWAA-off users were receiving personalized ads

8     that relied on sWAA-off data?

9         A.   Correct.

Page 81



Page 82



```
 7        Q.   I think I understand.

 8             So in -- you're trying to measure, in

 9    Scenario 2 of your unjust enrichment opinion, if,

10    in the but-for world, Google could not serve ads to      12:28:17

11    sWAA-off users at all, what is the value to Google

12    of nonpersonalized advertising?

13             That's what you were trying to determine?

14        A.   That's what I determined for -- for

15    those -- for -- for that scenario.                        12:28:42
```

Page 83



```
 6        Q.   So let's stick with Scenario 2 for a
 7   moment.
 8             I'm looking at the paragraph 116.
 9             MR. LEE:   Paragraph 116.
10             THE DEPONENT:   Okay.                    12:30:06
11        Q.   (By Mr. Santacana)   So just so I
12   understand, 116 means -- paragraph 116 means that
13
```

12:31:14

Page 84

```
1        Q.   So I'm looking at Figure 38 and, I guess,      12:31:16

2   paragraph 121.

3        A.   Yes.

4        Q.   Actually, let's back up for a moment to

5   120.                                                     12:31:36

6             So let me know when you've read it.

7        A.   120?

8        Q.   Uh-huh.

9             MR. LEE:  I think there's a figure on the

10  next page, Mike.                                         12:32:02

11            THE DEPONENT:  Uh-huh.

12            MR. LEE:  Yeah.

13       Q.   (By Mr. Santacana)  So at the end of it,

14  you say ██████████████████████████████

    ████████████████████████████████████████    ██████████

    ████████████████████████████████████████

    ██████████████████████████████████████████████

    █████████████████████████████████████

19            Do you see that?

20       A.   Yes.                                           12:33:00

21       Q.   And Figure 37 summarizes that and bolds

22  the "████████████" row.

23       A.   Yes.

24       Q.   So as I understand it, what you

25  understood from the ████████████████, in part,          12:33:11
```

Page 85

ATTORNEYS EYES ONLY



```
 1   was that ████████████████████████████   ████████

 █   ██████████████████████████████████

 █   ████

 4          I think I said that wrong.

 5          MR. LEE:  Yeah.                        12:33:32

 6      Q.  (By Mr. Santacana)  The way you

 7   understood it was that the ████████████████

 █   ██████████████████████████████████

 █   ██████████████████████████████████

 █   ████                                         12:33:55

11      A.  Yes.

12      Q.  And then in 121, you say you applied that

13   ██████████████████████████████████

 █   ██████████████████████████████████

 █   ████                                         12:34:18

16          And that is where I get confused.

17          Why are you measuring ████████████

 █   ██████████████████████████████████

19      A.  Okay.  So if -- ███████████████  I'm

20   trying -- I'm trying to explain this the best way I    12:34:43

21   can, and I think -- I think I understanded your

22   question.

23      Q.  Okay.

24          ██   ████████████████████████████

 █   ██████████████████████████████            12:34:53
```

Page 86

ATTORNEYS EYES ONLY



7        My job in this matter is to calculate

8   what -- my job in this matter is to calculate what

9   Google's unjust enrichment is in Scenario 2.

10        That job requires, in Scenario 2, for me      12:35:27

11   to figure out what the value of the ads were that

12   they served, meaning that Google served, when sWAA

13   was off, because the assumption is that if sWAA

14   were off under Scenario 2, they could serve no ad.

15

12:36:38

Page 87



1      Q.   That is very helpful.  I understand now.          12:36:43

2           So looking at Figure 38, by this point in

3      your report,

10     A.   Correct.                                           12:37:27

11     Q.   Did I get that right?

12     A.   Yes.

13     Q.   And then you reduced that --

14     A.   Wait.

15          MR. LEE:  Wait.                                    12:37:32

16          THE DEPONENT:  I just want make sure.

17     Are you talking about -- you're talking about the

18     first line of -- okay.  Yeah.  That's where I'm at.

19

22          MR. LEE:  Where are you -- I'm sorry.  I

23     don't know where you're indicating, Eduardo.

                                                               12:38:01

                                                               Page 88



1          MR. LEE:  Okay.  That second line.  Got        12:38:01

2    it.

18        Q.    Okay.  That is very, very helpful.  Thank

19   you.

20            So coming back to the -- as you said, the   12:38:48

21   job on Scenario 2,

Page 89

ATTORNEYS EYES ONLY



Page 90

ATTORNEYS EYES ONLY



Page 91

ATTORNEYS EYES ONLY



6          If you go to Figure -- I'm sorry; not

7     figure -- schedule 53.

8          Q.   I'm there.

9          A.   Okay.

Page 92



Page 93

ATTORNEYS EYES ONLY

```
2          Q.   Got it.  Okay.  I understand.
3               So we've been talking about Scenario 2
4      because we were talking about the assumption that
5      Google did not use sWAA-off data to serve           12:48:21
6      personalized ads.
7               Do you recall that back-and-forth?
8          A.   I do recall that.  My understanding is
9      that it's not an assumption.  That it, in fact,
10     is --                                                12:48:35
11         Q.   Sure.
12         A.   -- Google -- Google has -- Google has
13     informed us that that is the case.
14         Q.   And I'm not disputing that that's true.
15     I just meant it's one of the assumptions of your    12:48:45
16     model.  That's all.
17         A.   Okay.
18         Q.   With respect to Scenario 1, does that
19     assumption play any role?
20         A.   No.  I -- I mean, I do not have to create  12:49:03
21     a deduct for that in that case.
22         Q.   Okay.  And I think I understand why, but
23     we'll come back to that.
24               So now stepping back to your unjust
25     enrichment opinion more generally, you opine at     12:49:19
```

Page 94

ATTORNEYS EYES ONLY

```
1    paragraph 71 --                                    12:49:25

2        A.   Could you hold on for one second?

3        Q.   Sure.

4        A.   Yes.

5        Q.   -- that "the most appropriate and        12:49:39

6    reliable bases for quantifying Google's unjust

7    enrichment from the alleged wrongful conduct are"

8    essentially Google's income statements for App

9    Promo and AdMob, the financial analyses, and then

10   you say -- actually, just strike the question.     12:50:03

11        Let me instead focus your attention on

12   paragraph 73, where there are two bullet points.

13       A.   Okay.

14       Q.   These two bullet points correspond to

15   Scenarios 1 and 2.                                 12:50:33

16       A.   I need a second to read it.

17       Q.   Sure.

18       A.   Okay.  Yes, I do.

19       Q.   They do correspond?

20       A.   To -- yeah.  One is Scenario 1, and one   12:51:05

21   is Scenario 2.

22       Q.   Okay.  So how did you arrive at this

23   method of calculating unjust enrichment by Google

24   from sWAA-off data as opposed to any other method?

25       A.   Wait.  Are you -- are you talking about   12:51:50
```

                                                    Page 95

1   the Scenario 1 now, or Scenario 2 or...                    12:51:52

2        Q.   Well, both scenarios are attempting to

3   measure -- I believe they are attempting to measure

4   profits that Google earned from sWAA-off data?

5        A.   From the use of sWAA-off data, yes.          12:52:09

6        Q.   And I assume the -- the assumption behind

7   that is that Google, had it not been able to use

8   the sWAA-off data, would not have made these

9   profits, right?

10       A.   Correct.                                     12:52:21

11       Q.   Did you take into consideration how

12  Google's behavior would change in the but-for world

13  if it could not have used sWAA-off data in your

14  scenarios?

15       A.   I -- so two answers to that.                 12:53:41

16            One is, my understanding is, in

17  calculating unjust enrichment, they did not make

18  any changes in their behavior.  They, in fact,

19  continued to use the sWAA-off -- the sWAA-off data.

20            To the extent that they would have been     12:54:02

21  able to make a change, I'm not aware of any change

22  that they would have been able to make that would

23  have resulted in less profits to them.

24       Q.   Less profits or more profits?

25       A.   Well, I'm calculating unjust enrichment.     12:54:25

Page 96

```
1    So if they -- if they were to have made less        12:54:26

2    profits, I would have had to deduct less here.

3         Q.   Okay.

4         A.   Maybe we should -- maybe we should

5    reframe the question, because --                     12:54:43

6              MR. LEE:  Yeah.

7              THE DEPONENT:  Maybe I'm -- maybe I'm

8    answering the wrong question there.

9              MR. LEE:  I think you guys are talking

10   about two slightly different things.                 12:54:50

11        Q.   (By Mr. Santacana)  So I understand that

12   your unjust enrichment opinion is effectively a

13   disgorgement of profits opinion, right?

14        A.   That is correct.

15        Q.   Okay.  Does it take into account at all    12:54:59

16   what would have happened in the but-for world if,

17   at the start of the class period, Google had been

18   prohibited from using sWAA-off data for the

19   purposes that you find to be sources of profit?

20        A.   I'm not -- so that is something I          12:55:38

21   considered.  I'm not aware of anything that they

22   would have done -- that they did do or would have

23   done differently if they had been prohibited from

24   using that data.

25              So I'm not aware of any alternative, if   12:55:55
```

Page 97

ATTORNEYS EYES ONLY

1    you will, that was available to Google.                    12:55:57

2        Q.   You've done consumer products damages

3    cases before?

4        A.   I have done damages cases where there

5    were consumer products involved.                           12:56:09

6        Q.   So in, let's say -- let's just take the

7    hypothetical that you are working on an all-natural

8    juice consumer fraud case.  The juice says on the

9    label it's all natural.  Turns out it's not.  You

10   are measuring the damages.  Right?                         12:56:27

11          Have you done anything like that?

12       A.   No, I have not.

13       Q.   Okay.  So not any -- you haven't done,

14   like, consumer fraud cases?

15       A.   Correct.                                          12:56:36

16       Q.   Okay.  Are you familiar with the

17   methodologies that go into account in measuring the

18   difference between what the defendant gained in

19   profit from a false representation and what it

20   would have gained in the but-for world had the             12:56:47

21   false representation been, instead, accurate?

22       A.   I have a familiarity with it, but I'm

23   not -- I have not done one of those cases.

24       Q.   Okay.  Did you consider anywhere in your

25   opinion in this case the difference between what           12:57:09

Page 98

```
1    Google would have gained in profit -- excuse me.       12:57:13

2    Let's start over.

3            Did you consider anywhere in your opinion

4    in this case the difference between what Google

5    earned in profit from the allegedly false            12:57:23

6    representation relating to sWAA and what it would

7    have earned in a but-for world had Google not made

8    the false representation or made the representation

9    accurate?

10           MR. LEE:  Objection to form.  Misstates       12:57:41

11   the claim in the case, the legal issues in the case

12   and the methodology of the report.

13           THE DEPONENT:  I guess you're going to

14   have to reask that in a different way.  I'm not

15   quite understanding.                                 12:57:54

16       Q.  (By Mr. Santacana)  You understand the

17   claim in the case is that the plaintiffs understand

18   one thing from the sWAA button, but, in fact, it is

19   alleged Google did another thing that deviates from

20   their understanding, right?                          12:58:07

21       A.  Correct.

22       Q.  And you are trying to measure the damage,

23   in your unjust enrichment opinion at least, that

24   the -- you're trying to measure the profits that

25   Google gained thanks to its alleged misleading of    12:58:17
```

Page 99

ATTORNEYS EYES ONLY

```
1    those plaintiffs?                              12:58:21

2            MR. LEE:  Objection to form.

3    Mischaracterizes the claim.

4            THE DEPONENT:  I think you're

5    generally -- that's generally somewhat accurate,   12:58:30

6    yes.

7        Q.   (By Mr. Santacana)  And to measure that,

8    you tried to measure the profits that Google earned

9    from its use of the data it got thanks to the

10   alleged misrepresentation, right?              12:58:43

11       A.   That is correct.

12       Q.   And the assumption baked into that

13   opinion that you have rendered is that had Google

14   not made the alleged misrepresentation but instead

15   told the truth, then it would not have been able to   12:58:57

16   use the data in question to earn a profit, right?

17       A.   Yes.

18       Q.   Did you ever consider that if Google had

19   not made the alleged misrepresentation but instead

20   told truth that it still would have been able to   12:59:10

21   use the data because the user may have turned, for

22   example, WAA on?

23           MR. LEE:  Same objections.

24   Mischaracterizes the claim and the methodology.

25       Q.   (By Mr. Santacana)  Let me ask it a   12:59:42
```

Page 100

1    different way.  I'll withdraw the question.          12:59:44

2          Why did you assume that if Google had

3    disclosed to users at the start of the class period

4    that even when they turned sWAA off, it will still

5    use sWAA-off data to serve ads and measure          01:00:08

6    conversions, that the consequence of that would be

7    that Google would simply not receive the sWAA-off

8    data?

9          The user will still see ads, right?

10     A.   My understanding is that the user might      01:00:36

11   still see ads.

12     Q.   The user will still buy stuff sometimes,

13   right?

14     A.   That's true.  But, for example, like in

15   Scenario 2, they wouldn't be seeing Google Ads       01:00:46

16   because Google wouldn't know to serve them.

17     Q.   What do you mean "Google wouldn't know to

18   serve them"?

19     A.   Well, there would be -- my understanding,

20   for example, in Scenario 2 is there would be no ad    01:00:59

21   requests that Google would -- would receive.

22          Now, this is -- this is tech -- this is a

23   technical area.  I'm not -- I'm not 100 percent

24   sure on the exact right terminology.

25          But my understanding is that under          01:01:12

                                                          Page 101

ATTORNEYS EYES ONLY

```
1    Scenario 2, which I think is an example that is          01:01:16

2    illustrative to what you are asking me, is Google

3    would not receive a signal to serve an ad, and so

4    they would not know to serve an ad.

5            So if an ad were to be on that page, you          01:01:34

6    said -- you said that they would just see an ad.

7    If -- if that -- that would have to come from some

8    different source.

9        Q.   Couldn't Google just serve a randomly

10   selected ad?                                              01:01:48

11       A.   No.

12       Q.   Why not?

13       A.   Because Google wouldn't receive a signal

14   to put an ad out in the first place.

15       Q.   Why?                                             01:01:56

16       A.   Because it wouldn't get the data.

17       Q.   What data?

18       A.   I -- you're asking me a technical

19   question now at this point, where I -- I don't know

20   technically what data that it needs to get to serve      01:02:08

21   an ad.

22           My understanding is that it wouldn't

23   receive that signal, so Google would not serve an

24   ad.

25       Q.   I see.                                           01:02:19
```

Page 102

1        A.    Someone else would have to serve that ad.        01:02:20

2    Or maybe it was just an ad that's just always on

3    that page, always on that app.

4            One thing is -- for me, it's like

5    4:00 o'clock.  So I don't know if we could take a        01:02:31

6    lunch -- I know we've been going about an hour.

7            MR. SANTACANA:  Of course.

8            THE DEPONENT:  I don't want to take a

9    super long lunch break, but --

10           MR. SANTACANA:  Yeah.  Can I just ask one        01:02:38

11   or two more questions?  And then, yeah, we should

12   take lunch.

13           THE DEPONENT:  Sure.

14           MR. SANTACANA:  It should be here.

15           MR. LEE:  I think it's already here.        01:02:45

16           MR. SANTACANA:  Okay.

17           MR. LEE:  It was up there when we got up

18   there.

19           MR. SANTACANA:  Oh, good.

20       Q.  (By Mr. Santacana) So I think I        01:02:50

21   understand.

22           In rendering your unjust enrichment

23   opinion, one of the assumptions that you made was

24   that, for Scenario 2 at least, I guess, it would be

25   technologically infeasible for Google to serve ads        01:03:12

                                                        Page 103

ATTORNEYS EYES ONLY

```
 1    to apps on devices where the user had sWAA turned        01:03:15

 2    off.

 3            Is that fair to say?

 4       A.   That is my understanding.

 5       Q.   So no part of your opinion takes into           01:03:26

 6    account the possibility that Google could serve ads

 7    by some technological means that do not engage in

 8    the alleged unlawful conduct?

 9       A.   That -- that's my understanding, that --

10    that under Scenario 2, under that Scenario 2, they       01:03:47

11    would not be able to.

12       Q.   And Scenario 1, I think?

13       A.   Well, under -- under Scenario 1, it's

14    conversion -- that Scenario 1 relates to conversion

15    tracking.  So they wouldn't get the conversion           01:04:03

16    tracking data, so they wouldn't have the ability to

17    conversion track the way they do.

18       Q.   Let's say that we live in that but-for

19    world, where Google cannot receive the sWAA-off

20    data at issue in the case.                               01:04:22

21            Couldn't Google still serve golf club

22    related ads in the PGA's mobile app without

23    receiving any sWAA-off data about the user who is

24    using it?

25       A.   So my understanding in Scenario -- this         01:04:50
```

Page 104

```
 1   relates -- what you're now talking about is          01:04:52

 2   Scenario 2, because you're talking about the actual

 3   serving of an ad, not the conversion tracking

 4   data --

 5        Q.   Okay.                                       01:05:00

 6        A.   -- that is related.

 7        Q.   I will accept that for now.

 8        A.   In -- in Scenario 2, no, it would not be

 9   able to serve that ad.

10        Q.   Why not?                                    01:05:07

11        A.   Because it would not be technologically

12   feasible to do that.  It would not get -- you're --

13   you're asking me a technical question why it would

14   not be able to.  I'm not 100 percent sure of the

15   exact technical terms.                               01:05:19

16            But my understanding is that it would not

17   get the signal -- nontechnical -- to serve the ad

18   in the first place.

19        Q.   I'm almost done, and we'll take lunch.

20   But I just want to make sure I understand you.       01:05:31

21            Take a look at your report -- I just need

22   a moment to find it.

23            Paragraph 41.

24            MR. LEE:  Just let me get there.  Hold

25   on.                                                  01:06:18
```

Page 105

ATTORNEYS EYES ONLY

```
 1              THE DEPONENT:  I'm at paragraph 41.          01:06:30

 2       Q.   (By Mr. Santacana)  Okay.  In paragraph

 3   41, you describe the Web & App Activity, or WAA

 4   setting, we've been discussing.

 5              And you say that's a setting that's      01:06:44

 6   "related to Google's collection and saving of a

 7   user's 'activity on Google sites and apps,

 8   including associated information like location, to

 9   give users faster searches, better

10   recommendations,'" et cetera, et cetera.           01:06:58

11              And in paragraph 42, you describe sWAA,

12   which is similar but applies to activity on sites,

13   apps and devices that use Google services.

14              You with me so far?

15       A.   I'm with you, yes.                         01:07:17

16       Q.   So what I'm trying to understand is, why

17   can't the PGA contract with Google to serve

18   golf-related ads in its app without Google ever

19   saving a user's activity data from apps that use

20   Google services?                                    01:07:38

21              Why didn't you consider that as a

22   possibility?

23              MR. LEE:  I'm a little confused.

24              Are you -- are you representing that

25   that's -- or suggesting -- I don't -- I'm not       01:08:05
```

Page 106

| | | |
|---|---|---|
| 1 | trying to pin, but I just want -- is it a | 01:08:07 |
| 2 | hypothetical question you're asking?  Or is it -- | |
| 3 | are you representing that that's what Google does? | |
| 4 | MR. SANTACANA:  I don't even understand | |
| 5 | what you're asking me, but -- | 01:08:16 |
| 6 | MR. LEE:  Can you ask the question again, | |
| 7 | then?  Because I just want to make sure whether to | |
| 8 | object or not. | |
| 9 | Q.   (By Mr. Santacana)  Do you understand my | |
| 10 | question? | 01:08:24 |
| 11 | A.    Not really.  I'm trying to understand -- | |
| 12 | I mean, I think we're talking about technical | |
| 13 | issues here, and I want to make that sure I'm | |
| 14 | not -- | |
| 15 | Q.   Yeah.  Let's take it piece by piece. | 01:08:32 |
| 16 | You told me that you believe it would be | |
| 17 | technologically infeasible for Google to serve golf | |
| 18 | club ads in the PGA without using sWAA-off data, | |
| 19 | right? | |
| 20 | A.   I -- | 01:08:49 |
| 21 | Q.   Or at least that's an assumption of your | |
| 22 | unjust enrichment? | |
| 23 | A.    That's -- that's an assumption that -- | |
| 24 | and I don't know how that works -- | |
| 25 | Q.   So I'm trying -- | 01:08:57 |

Page 107

```
 1        A.    -- from a technical perspective.              01:08:58

 2        Q.    I'm just trying to test that assumption a

 3   little bit to see if you considered that it might

 4   be more complicated than that.

 5             For example, couldn't the PGA app ask          01:09:06

 6   Google to serve golf club-related ads in its app

 7   without ever involving a user's Web and app

 8   activity sWAA-off data?

 9             MR. LEE:  And my question is, are you

10   suggesting that that is something that PGA does?         01:09:24

11             MR. SANTACANA:  You can ask me during the

12   lunch.

13        Q.    (By Mr. Santacana)  Go ahead and answer

14   the question.

15             MR. LEE:  Yeah, I object as improper           01:09:30

16   hypothetical.  Lack of foundation.

17             THE DEPONENT:  I guess -- from my

18   understanding for Scenario 2, I understand that

19   that would not be technologically feasible to do.

20        Q.    (By Mr. Santacana)  Let's say that the        01:09:49

21   Court rules that sWAA-off data is limited to data

22   about a user.  Okay?

23             MR. LEE:  Objection.  Vague.

24        Q.    (By Mr. Santacana)  Are you with me so

25   far?                                                     01:10:06
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
1        A.   I'm with you.                              01:10:07

2        Q.   It does not include, for example, data

3   that PGA sends to Google about its own app so

4   Google can select PGA-related ads.  That would be

5   outside scope.                                       01:10:18

6        A.   Okay.

7        Q.   In that scenario, would your unjust

8   enrichment Scenario 2 opinion need to be altered?

9        A.   Not that I'm aware of as I sit here.

10           You're talking about a technical issue      01:10:40

11  that I'd have to -- I'd have to think about, and I

12  would also have to get technical input on.  So I

13  don't know the answer to that.

14           MR. LEE:  And I didn't have a chance to

15  object.  Same objection.  Improper hypothetical.     01:10:50

16           There's two in there.

17       Q.   (By Mr. Santacana)  Well, what I am

18  positing is that the Court rules that Google can

19  serve what's called contextual advertising, which

20  is ads that relate to the app in which the ad is     01:10:58

21  being served, basically, without ever using

22  sWAA-off data.

23           If you assume the Court rules that, then

24  doesn't your but-for world need to be take into

25  account that Google could have served such ads       01:11:14
```

Page 109

ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | during the class period? | 01:11:16 |
| 2 | A.   If you're asking me to assume something | |
| 3 | different than I understood, I would have to | |
| 4 | analyze that.  I cannot sit here and answer that as | |
| 5 | I sit here. | 01:11:28 |
| 6 | MR. SANTACANA:  Okay.  We can take lunch. | |
| 7 | THE VIDEOGRAPHER:  This marks the end of | |
| 8 | Media No. 2.  Off the record.  The time is 1:11. | |
| 9 | (Recess taken.) | |
| 10 | THE VIDEOGRAPHER:  This marks the | 01:11:44 |
| 11 | beginning of Media No. 3 in the deposition of | |
| 12 | Michael Lasinski.  We are back on the record.  The | |
| 13 | time is 2:06. | |
| 14 | Q.   (By Mr. Santacana)  Sir, when we left | |
| 15 | off, we were talking about your unjust enrichment | 02:06:57 |
| 16 | opinion and the but-for world in which Google was | |
| 17 | prohibited from using sWAA-off data to serve ads. | |
| 18 | Do you recall that? | |
| 19 | A.   Yes. | |
| 20 | Q.   I want to just understand a little more | 02:07:16 |
| 21 | of that but-for scenario for a moment. | |
| 22 | So as I understand what you're saying, in | |
| 23 | that but-for world, the users who have sWAA off | |
| 24 | would not be served any ads by Google in -- via | |
| 25 | AdMob or Ad Manager, right? | 02:07:35 |

Page 110

ATTORNEYS EYES ONLY

```
 1        A.   That is my understanding, yes.              02:07:38

 2        Q.   And I guess what I'm curious about is

 3   what would happen, if that were the case, to the

 4   money that advertisers were devoting to placing ads

 5   on Google's Display Network if, as you say, Google     02:08:00

 6   could not serve any ads to sWAA-off users.

 7             MR. LEE:  Calls for speculation.  Lack of

 8   foundation.

 9             THE DEPONENT:  I guess I'm not

10   understanding what you're -- what you're trying to     02:08:22

11   ask there.

12        Q.   (By Mr. Santacana)  I'll break it down.

13             So Google makes money from placing ads,

14   right?

15        A.   In part, yes.                                02:08:29

16        Q.   That's what we talked about earlier.

17             So an advertiser pays Google and expects

18   that Google show ads to people in return, right?

19        A.   That is their business model.

20        Q.   So all of sudden now, Google says, "Sure     02:08:45

21   we'll show ads to people, but we won't show any to

22   sWAA-off users."

23             Right?  Under your unjust enrichment

24   theory.

25        A.   Well, my -- my understanding is that you     02:08:58
```

                                                    Page 111

ATTORNEYS EYES ONLY

```
 1    couldn't -- they would not be able to serve ads on        02:09:01

 2    third-party app sites to sWAA-off users.

 3          Q.    Right.

 4                So there's apps that have AdMob in them,

 5    right?                                                     02:09:19

 6          A.    That is my understanding, yes.

 7          Q.    AdMob shows ads that Google serves,

 8    right?

 9          A.    That is my understanding.

10          Q.    And then those ads were bought by some         02:09:25

11    other advertiser who said, "Can you please place

12    these ads on your Display Network?"

13                Right?

14          A.    That is my understanding.

15          Q.    So Google says, all of a sudden, "We'll        02:09:37

16    still place your ads, but we can't place them in --

17    for any sWAA-off users.  If the user is sWAA-off,

18    we can't show your ad to them."

19                Are you with me?

20          A.    I understand what you're saying, yes.          02:09:55

21          Q.    I think your opinion posits that the

22    advertiser would pay less than in a world where

23    they thought the sWAA-off user was going to receive

24    ads; is that fair to say?

25          A.    The advertiser would pay less because          02:10:14
```

1    they did not -- to Google.  The advertiser would          02:10:16

2    pay less to Google because Google did not -- would

3    not serve an ad in those cases.

4         Q.   But only to sWAA-off users.  It would

5    still serve ads to sWAA-on users and signed-out          02:10:27

6    users, right?

7         A.   That is -- whether -- whether or not it

8    did or it did not doesn't concern me, because I'm

9    only concerned with sWAA-off users.  So what it

10   does outside of that --                                  02:10:40

11        Q.   Right.

12        A.   -- that's its business.

13        Q.   So why would the advertiser pay Google

14   less?  Why wouldn't it pay Google the same amount

15   to place ads, and the ads would just be shown to a       02:10:51

16   different mix of people, namely, people who don't

17   have sWAA turned off?

18             MR. LEE:  Calls for speculation.  Lack of

19   foundation.

20             THE DEPONENT:  They would -- they would         02:11:08

21   pay them less because those ads that are currently

22   being shown to sWAA-off users would not be shown to

23   sWAA-off users.  They may go to a different

24   advertising firm or a different -- different

25   company that could serve those ads, but they             02:11:25

Page 113

ATTORNEYS EYES ONLY

```
 1    wouldn't go to Google.  Google would not be able to      02:11:28

 2    serve those ads.

 3         Q.   (By Mr. Santacana)  So remember when we

 4    were talking about the automated bid process?

 5         A.   I do.                                          02:11:40

 6         Q.   And you said the advertiser sets a bid.

 7    Then there's a competition for whose ad gets shown

 8    to people.  You're not an expert in that, but

 9    somehow that bid gets translated into the delivery

10    of advertising, right?                                  02:11:53

11         A.   That is my understanding.

12         Q.   So if the advertiser is engaging in the

13    automated bidding process on Google's website,

14    right, they have gone into the portal to do that,

15    and there's a message there that says, "Hey,           02:12:09

16    Advertiser, just take into account when you make

17    your bid, your ads will only be shown to sWAA-on

18    and signed-out users.  If the user is sWAA-off, I

19    will not show them your ad."

20              Okay?                                         02:12:25

21         A.   Yes.

22         Q.   That -- that would -- because that would

23    be addressing -- that is your unjust enrichment

24    but-for world, right?

25         A.   It --                                         02:12:33
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1              MR. LEE:  Hold on.                      02:12:34

 2         Objection.  Improper hypothetical.  Calls

 3    for speculation.  Lack of foundation.

 4         Go ahead.

 5         THE DEPONENT:  If -- if you are asking if    02:12:43

 6    my but-for world in the case of the Scenario 2 is

 7    that Google would not serve ads to sWAA-off users

 8    as it relates to AdMob and Ad Manager, that portion

 9    is accurate.

10      Q.   (By Mr. Santacana)  Okay.                  02:13:01

11         So Google tells the advertiser that.  Is

12    it your opinion that the advertiser's response is

13    to lower their bid amount rather than to simply

14    accept that their ads won't be shown to sWAA-off

15    users but can still be shown to other users?       02:13:18

16              MR. LEE:  Same objections.

17         THE DEPONENT:  My -- my assumption is not

18    that it would necessarily lower its bids in other

19    situations.  But in a situation where there's a

20    sWAA-off user, then they don't get a signal that   02:13:38

21    they would certainly serve less ads.

22      Q.   (By Mr. Santacana)  So are you positing

23    that advertisers are bidding per ad?  They are

24    saying, "To this user, show this ad; to that user,

25    show that ad"?                                     02:14:11
```

                                              Page 115

ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   No. | 02:14:12 |
| 2 | Q.   Okay.  So you understand that the | |
| 3 | advertiser's saying to Google, "Here's a bucket of | |
| 4 | money; here's what I want to do with it."  Right? | |
| 5 | A.   I do understand that. | 02:14:19 |
| 6 | Q.   And there's lots of different ways they | |
| 7 | can prioritize.  They can say, "I want to | |
| 8 | prioritize cost per click; I want you to prioritize | |
| 9 | cost per impression; I want you to prioritize | |
| 10 | conversions."  Right? | 02:14:27 |
| 11 | A.   Yes.  That's -- I mean, but that's my | |
| 12 | understanding is they have the options available to | |
| 13 | them. | |
| 14 | Q.   Okay.  So Nike is on Google's website. | |
| 15 | They're going to place some ads in apps.  They want | 02:14:38 |
| 16 | ads to go across Google's Display Network.  And | |
| 17 | they say, "My budget is $5,000 for this ad | |
| 18 | campaign, and I want to prioritize impressions." | |
| 19 | Okay.  With me? | |
| 20 | A.   I'm with you. | 02:14:56 |
| 21 | Q.   Google says, "That sounds good.  I'm | |
| 22 | going to place the ads for you.  Just so you know, | |
| 23 | when I place them, no sWAA-off users will see this | |
| 24 | ad campaign." | |
| 25 | Okay? | 02:15:09 |

Page 116

ATTORNEYS EYES ONLY

```
 1        A.    I understand what you're saying.              02:15:09

 2        Q.    Is it your opinion that Nike would reduce

 3   the $5,000 budget at that point?

 4             MR. LEE:   Same objections.

 5             Go ahead.                                       02:15:22

 6             THE DEPONENT:   I would not -- I don't

 7   know that it would be a one by each advertiser.   I

 8   didn't look at it by -- on advertiser by

 9   advertiser.

10             But certainly, if Nike had the ability to      02:15:32

11   place less ads, and Nike had -- I'm sorry; Nike --

12   Google had the ability to place less ads and were

13   to go to its advertisers and tell them you

14   cannot -- I can't serve ads to sWAA-off users, and

15   its -- it's a significant percentage of the number     02:15:54

16   of people that one would try to go to, yes, I do

17   think that there would be a lowering of the value

18   that Google receives.

19        Q.    (By Mr. Santacana)  Under your opinion,

20   there would have to be, right?  Otherwise Google        02:16:18

21   would still make the same amount of revenue in that

22   scenario?

23        A.    Under -- under my opinion, yes, they

24   do -- they do receive less revenue and -- and,

25   ultimately, less profits.                               02:16:31
```

                                                        Page 117

1        Q.   And the mechanism by which they receive          02:16:33

2   less revenue necessarily is that advertisers decide

3   to spend less money?

4        A.   They do decide -- they do spend less

5   money, yes.                                                02:16:43

6        Q.   Do you, in your report, analyze the

7   factors that those advertisers take into account in

8   the but-for world where they are deciding to spend

9   less money thanks to the sWAA-off data prohibition?

10       A.   I do not do advertiser-by-advertiser             02:17:18

11  analysis in my report.  I think it's -- I think,

12  based on the information available to me, my report

13  was -- is appropriate given the Scenario 2

14  assumptions that there would be less ads that would

15  be able to be served.                                      02:17:41

16       Q.   Just so I'm clear, in Scenario 1, are you

17  saying the ads can still be served, but the

18  conversions cannot be measured; whereas Scenario 2,

19  you're saying the ads can't be served at all?

20       A.   Yes.  In Scenario 1, the ads -- the ads          02:18:10

21  can be -- the ads can be served.

22       Q.   And so there, the source of profit that

23  you're disgorging is the successful measurement of

24  a conversion?

25       A.   The -- what I'm actually -- the source of        02:18:31

Page 118

```
 1    value in that is actually Google's use of that          02:18:37

 2    information, Google's use of conversion tracking

 3    information, in its -- in its algorithms,

 4    machine-learning algorithms.

 5         Q.    Sorry.  What do you mean by that?              02:18:57

 6         A.    So my understanding is that when Google

 7    tracks conversions, that -- that data goes into

 8    their -- goes into their algorithms that they use

 9    for, for example, autobidding.  And then that data

10    is important for them to be able to make those        02:19:24

11    algorithms work.

12         ▪    ████████████████████████████

▪    ████████████████████████

▪    ████████████████████████████

▪    ██████████████████████████████████    █████

▪    ██████████████████████████████

17         Q.    Okay.  We'll come back to that.

18              But just sticking with what we were just

19    discussing, you assume, necessarily, that

20    advertisers would lower the amount of money that       02:20:13

21    they spend with Google in response to a prohibition

22    on the use of sWAA-off data, right?

23         A.    I believe that that's accurate, yes.

24         Q.    And the amount of money by which those

25    advertisers -- that's not a sentence.  Let's try       02:20:35
```

ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | that again. | 02:20:40 |
| 2 | The difference that those advertisers | |
| 3 | spend with Google, that drop in the amount of money | |
| 4 | they're willing to spend, corresponds one-to-one | |
| 5 | with the amount of revenue Google makes for the | 02:20:55 |
| 6 | service of sWAA-off user advertising, right? | |
| 7 | A.   For AdMob and for Ad Manager, that is | |
| 8 | correct. | |
| 9 | Q.   All things being equal, your assumption | |
| 10 | in your unjust enrichment Scenario 2 model is that, | 02:21:21 |
| 11 | in all, Google's revenue will drop by the amount | |
| 12 | that it earns for serving ads to sWAA-off users | |
| 13 | because advertisers will choose to spend in total | |
| 14 | what they used to spend minus that amount? | |
| 15 | A.   Well, I mean, to be clear, that -- that | 02:22:02 |
| 16 | is accurate, but then also Google would save | |
| 17 | ██████████████████████ as well.  So the | |
| 18 | profits -- the profits are not equal to the | |
| 19 | revenues in this case. | |
| 20 | Q.   Understood.  Let's -- that's a very good | 02:22:17 |
| 21 | point, and we'll come back to costs later.  So I'll | |
| 22 | try and remember to stick to revenue for now -- | |
| 23 | A.   Okay. | |
| 24 | Q.   -- in my questions. | |
| 25 | So here's what I don't understand, then, | 02:22:32 |

Page 120

ATTORNEYS EYES ONLY

```
 1    about your assumptions behind Scenario 2.              02:22:34

 2          If an advertiser wants to reach a certain

 3    number of people or achieve a certain number of

 4    conversions, why would they care whether Google

 5    will show their ad to all users or all users except   02:22:49

 6    sWAA-off users?

 7          What difference does it make to the

 8    advertiser such that they will lower their budget

 9    by a corresponding amount?

10    A.   Well, I mean, here's an example:  If --          02:23:13

11    if an advertiser knows that it's not going to -- to

12    reach a significant amount of people through

13    Google's ad network -- you know, we know in -- in

14    the most recent ███████████████████████  ████

      ████████████████████████████████████████p████████  █████████

      █████████████████████████  █████████████████

17          If one went to -- went to that advertiser

18    and said, "We're not going to reach those people,"

19    it is very likely that they would reduce -- reduce

20    their spending and go to someone that could reach.    02:23:53

21    That's -- that could reach those people.

22    Q.   Why?

23    A.   Because they know.  Because Google is now

24    telling them that our universe is incomplete.

25    Google is now telling them that we don't have         02:24:11
```

Page 121

ATTORNEYS EYES ONLY

```
1    complete data; we don't have -- we don't have          02:24:14

2    information on a significant portion of the -- of

3    the people that could be purchasers.  We can't get

4    that information.

5            And so, therefore, you know, our model --      02:24:25

6    ultimately, our models are not as robust and they

7    once were.  Our reach is not as high as we have

8    explained it to be.

9            I think that those would have both

10   first-order -- I think the documents show that         02:24:47

11   those would have both first-order impacts and

12   second-order impacts.  And first order relates to

13   advertising revenue, and second order relates to

14   their overall model being less efficient.

15   ██  ██████████████████████████████  ██████████

██  █████████████████████

██  ██  ██████████████████████████████

██  ██████████████████████████████

██  ████████████████████████████████████

██  ████████████████████████████████████  ██████████

██  ██████████████████████████████████

██  ███████████████████████████

██  ████████

██  ██  ███████████████████████████

██  █████████                                            02:25:52

                                                          Page 122
```

ATTORNEYS EYES ONLY



```
1
```

```
9      Q.   You do not know if those hypotheses were
10   correct or not?                              02:26:13
11      A.   I don't -- I don't know for sure if they
12   were correct or not.  They seem like they would be
13
25      Q.   Okay.  We'll try and find the document.   02:27:15
```

Page 123

```
1    Unless you happen to know which one it is.        02:27:21

2         A.   I don't.  I mean, that's just one

3    document I can think of as I'm sitting here.  There

4    may be others.

5              THE DEPONENT:  One thing I'm just going   02:27:29

6    to mention before we -- it is getting --

7              MR. LEE:  A little hot in here?

8              THE DEPONENT:  It is going to get hot in

9    here if they turned up the heat too much.  I'm the

10   one sitting in -- here in a tie, so...             02:27:38

11             (Discussion off the stenographic record.)

12        Q.   (By Mr. Santacana)  Okay.  So back to the

13   advertiser in the but-for world who is being told

14   that some percentage of the audience will not be

15   reached by the ad campaign.                        02:28:16

16             And you say the natural response, then,

17   is to lower the amount of money they are willing to

18   spend with Google and perhaps reallocate some money

19   to other advertising networks?

20        A.   That -- that is one way of looking at it,  02:28:30

21   yes.

22        Q.   Did you measure the amount of impact that

23   that disclosure would have on advertisers'

24   decisions on where to allocate their advertising

25   budgets?                                           02:28:50
```

Page 124

```
 1              MR. LEE:  What disclosure?                    02:28:52

 2              MR. SANTACANA:  The disclosure by Google

 3     to the advertiser that their ads will not reach

 4     sWAA-off users.

 5              MR. LEE:  Okay.                               02:29:01

 6              Objection.  Improper hypothetical.  Calls

 7     for speculation.  Lack of foundation.

 8              THE DEPONENT:  I mean, I'm not aware of

 9     any disclosure like that.  I think -- I don't -- I

10     don't know that any disclosure like that was made.  02:29:16

11     So I'm -- I did not measure that.

12         Q.   (By Mr. Santacana)  So -- right.

13              What we're talking about is your but-for

14     world where Google is prohibited from serving ads

15     to sWAA-off users, right?                            02:29:30

16         A.   Well, that is -- that is the but-for

17     world for Scenario 2.

18         Q.   And in that world --

19         A.   And let's just be clear:  SWAA-off users

20     on third-party apps.                                 02:29:41

21         Q.   Yes.

22              And in that world, you posit that

23     advertisers' response to that prohibition will be

24     to lower their ad budget with Google because they

25     will understand that their ads will not reach the   02:29:56
```

Page 125

```
 1   entire potential audience.  SWAA-off users can't be        02:29:59

 2   reached anymore, right?

 3        A.   That is right.

 4        Q.   Did you attempt to measure how much lower

 5   the ad budgets would be in response to those               02:30:10

 6   advertisers learning that they would not reach

 7   sWAA-off users?

 8             MR. LEE:  Same objections.  Improper

 9   hypothetical.  Calls for speculation.  Lack of

10   foundation.                                                02:30:24

11             THE DEPONENT:  Again, I'm not aware of

12   any -- you're -- you're asking me about a world in

13   which that could have happened.  I gave you an

14   example.  There may be others -- other examples in

15   which advertisers would have -- would have spent          02:30:35

16   less.  That's just one example.

17             And so no, I did not attempt to -- to

18   measure that.  I don't think I needed to, because I

19   think it's pretty clear that there would have been

20   less spending, and I quantified that as such.             02:30:52

21        Q.   (By Mr. Santacana)  Well, that's my

22   question.

23             You quantified it as such.  How?

24        A.   I -- exactly as I explained in my report.

25   There's going to be less ad requests, so then less        02:31:08
```

Page 126

| | | |
|---|---|---|
| 1 | of an ability to serve those ads, and, therefore, | 02:31:11 |
| 2 | advertisers would spend less. | |
| 3 | Q.   But the amount that you quantified it as | |
| 4 | is the exact amount that Google has earned from | |
| 5 | sWAA-off users.  It assumes a one-for-one drop in | 02:31:25 |
| 6 | budget, right? | |
| 7 | A.   For -- for Scenario 2, yes. | |
| 8 | Q.   So in Scenario 2, an advertiser that | |
| 9 | would have spent $100 to reach the entire audience, | |
| 10 | if they are told that 10 percent of the audience | 02:31:45 |
| 11 | won't be reached because they are sWAA-off, that | |
| 12 | advertiser chooses to spend $90 instead. | |
| 13 | Is that a fair characterization? | |
| 14 | A.   I think that that is -- yeah, I think | |
| 15 | that that's how the mechanics of it how would work. | 02:32:04 |
| 16 | Well, not -- not quite.  Not quite. | |
| 17 | Because that -- that only relates to the ad -- | |
| 18 | advertising percentage of it.  They still would | |
| 19 | get -- Google is still earning money on the | |
| 20 | conversion element of it. | 02:32:18 |
| 21 | So I have to take it into consideration, | |
| 22 | it's -- the conversion information.  But for | |
| 23 | Scenario 2, that is correct.  That is accurate. | |
| 24 | Q.   So keeping just Scenario 2 in mind -- | |
| 25 | A.   Correct. | 02:32:32 |

Page 127

| | | |
|---|---|---|
| 1 | Q.   -- that's the scenario where Google can't | 02:32:33 |
| 2 | serve ads.  They can still serve ads in Scenario 1? | |
| 3 | A.   That is my understanding, yes. | |
| 4 | Q.   Okay.  So keeping Scenario 2 in mind, | |
| 5 | Google can't serve ads, advertiser understands that | 02:32:43 |
| 6 | 10 percent of their audience has been excluded from | |
| 7 | the pool -- | |
| 8 | A.   More than that. | |
| 9 | Q.   I'm just saying it's 10 -- let's say it's | |
| 10 | 10 percent for a round number. | 02:32:53 |
| 11 | A.   Okay. | |
| 12 | Q.   The sWAA-off people are excluded from the | |
| 13 | pool? | |
| 14 | A.   Yes. | |
| 15 | Q.   They lower their ad budget one for one by | 02:32:58 |
| 16 | the percentage of people who are excluded from the | |
| 17 | pool?  That's your opinion? | |
| 18 | A.   No, not one for one by the percentage | |
| 19 | of -- not one for one by the people that were | |
| 20 | excluded from the pool.  That's not right. | 02:33:12 |
| 21 | Q.   Okay.  Why not? | |
| 22 | A.   Because what -- what it is, actually, is | |
| 23 | it's those ads that were actually served to those | |
| 24 | people -- those ads that were actually served to | |
| 25 | those people, I'm actually lowering -- I'm actually | 02:33:27 |

Page 128

ATTORNEYS EYES ONLY

```
 1    looking at the actual unjust enrichment in that --        02:33:32

 2    in that case.

 3            I'm actually looking at what they

 4    actually earned, what was actually paid to them in

 5    that case.                                                 02:33:43

 6        Q.   Right.

 7        A.   And they -- in the but-for world, they

 8    would not have been able to serve those ads.

 9            They did serve those ads, so that's what

10    they actually earned.  That's my -- that's the             02:33:56

11    calculation that I'm making.

12        Q.   So, then, is it fair to say that you are

13    not trying to hypothesize how consumer and

14    advertiser and Google behavior would have changed

15    in the but-for world?  Your task really was to            02:34:13

16    measure the exact amount of profits Google did make

17    from sWAA-off advertising?

18        A.   Yes.  So in the but-for world, Google

19    actually served those ads and actually profited

20    from the information that it collected.  And              02:34:35

21    that's --

22        Q.   In the real world?

23        A.   In the real world, they did.

24            In the but-for world, they should have

25    not been able to.                                         02:34:43
```

Page 129

ATTORNEYS EYES ONLY

```
 1              And so in that world, they actually        02:34:44
 2      earned that money, and I am calculating the amount
 3      of profits that should have been disgorged.
 4              That's the calculation.  And maybe we
 5      were talking past each other earlier, because     02:34:54
 6      that's what I was telling you is what had happened.
 7          Q.   I think we were.  So here's where I get
 8      confused.
 9              You've done IP cases, lots of them,
10      right?                                            02:35:06
11          A.   Yes.
12          Q.   And in those cases, sometimes you
13      calculate a reasonable royalty, right?
14          A.   Correct.
15          Q.   And you calculate disgorgement of        02:35:17
16      profits, right?
17          A.   Correct.
18          Q.   For example, in a patent case, where
19      infringement is found on a component of a laptop,
20      let's say the RAM chip, one calculation you might  02:35:28
21      do is how much profit would the laptop seller have
22      made if they could not have used that RAM chip as
23      designed?
24          A.   Okay.
25          Q.   Right?                                    02:35:44
```

Page 130

ATTORNEYS EYES ONLY

```
 1          A.   Okay.  I'm following your hypothetical.       02:35:44

 2          Q.   Have you done that kind of an analysis

 3     before?

 4          A.   Yes.

 5          Q.   When you do that analysis, you start with      02:35:52

 6     how much revenue the laptop seller made, right?

 7          A.   Correct.

 8          Q.   You deduct costs?

 9          A.   Correct.

10          Q.   And you take into account how consumer         02:36:10

11     behavior would have changed in the but-for world

12     where the laptop seller could not use that RAM

13     chip, right?

14          A.   Correct.

15          Q.   And you take into account what the laptop      02:36:24

16     seller could have done to design around the claims

17     of the patent that were found to be infringed,

18     right?

19               MR. LEE:  Objection.  Lack of foundation.

20               THE DEPONENT:  I understand.  I'm             02:36:37

21     following your hypothetical.

22          Q.   (By Mr. Santacana)  Have you done that?

23          A.   In cases?

24               MR. LEE:  Objection.

25          Q.   (By Mr. Santacana)  Have you done an          02:36:42
```

Page 131

ATTORNEYS EYES ONLY

1    analysis like that before?                          02:36:43

2        A.   I mean, I'm -- I think I'm following it,

3    but I think -- I think what you're talking about is

4    the next-best alternative.  But I'm not quite sure.

5        Q.   In part, I am.  Yes.                        02:36:54

6        A.   Okay.

7        Q.   Did you take into account a next-best

8    alternative here, in this case?

9        A.   Well, my understanding in this case is

10   that liability is based on what actually happened    02:37:05

11   in the real world versus what should have happened

12   in the but-for world.

13          And what actually happened in this world

14   was Google actually used the -- collected and used

15   the data.  And in the but-for world, they should    02:37:22

16   not have done that.

17       Q.   Just like an infringer actually sold

18   infringing products, and in the but-for world, they

19   should not have done that?

20       A.   I don't know if I can make that analogy,   02:37:34

21   because I'm not a lawyer, and if it's just like the

22   same thing.

23          That's -- that's a different standard.

24       Q.   I'm asking --

25       A.   There's a different legal --            02:37:43

Page 132

ATTORNEYS EYES ONLY

```
 1        Q.    -- perspective.                          02:37:44

 2        A.    -- different legal cases.

 3        Q.    I'm asking from your perspective as a

 4   damages expert who's done that countless times,

 5   right, you've considered what happens when a        02:37:50

 6   component of a product is infringing, right?

 7        A.    I have, yes.

 8        Q.    And when you do that analysis, you don't

 9   only take into account the profits made on the

10   product that was sold and the costs involved in     02:38:06

11   making the infringing component.  You also take

12   into account the possibility that the infringer

13   could have used a different component, right?

14        A.    That's one mechanism.  That's one way to

15   look at it, correct.                                02:38:20

16        Q.    So, for example, in the case, if Nike has

17   a $100 budget, and Google says you are not going to

18   reach sWAA-off users through apps, Nike could

19   reallocate the budget to other Google advertising

20   properties, right?                                  02:38:31

21             MR. LEE:  Calls for speculation.

22             THE DEPONENT:  I think you're just --

23             MR. LEE:  Hold on.  Calls for

24   speculation.  Lack of foundation.  Improper

25   hypothetical.                                       02:38:40
```

                                                 Page 133

ATTORNEYS EYES ONLY

```
1              Go ahead.                              02:38:40

2              THE DEPONENT:  I mean, I think you're

3    asking me to just speculate on what they would do.

4    And I'm -- I didn't do that in my report.  I'm not

5    here to do that.                                 02:38:47

6         Q.   (By Mr. Santacana)  Okay.

7         A.   What I'm doing is calculating what the

8    actual but-for world would have been.

9         Q.   Well, I don't -- but you're not, right?

10   Because you're not trying to -- to hypothesize how  02:38:57

11   the parties in the transaction would react to the

12   constraint that you're placing on the market, which

13   is Google cannot use sWAA-off data to serve ads.

14             You did not attempt to hypothesize, model

15   or otherwise study how the parties in the          02:39:14

16   transaction would react to that constraint, right?

17        A.   My understanding -- my understanding is

18   the but-for world is actually -- Google actually

19   made a promise -- layman's terms -- made a promise,

20   did not live up to promise, and then actually used  02:39:34

21   the information and actually profited from that

22   information -- from that data.

23             And I calculated the profits that they

24   made from that data, you know, because I have

25   assumed that liability -- assumed that there's      02:39:46
```

Page 134

ATTORNEYS EYES ONLY

1    liability.                                            02:39:50

2        Q.   You've assumed there's a liability, and

3    you've assumed that the parties to the advertising

4    transaction would not have changed their behavior

5    in response to the prohibition on the use of          02:40:03

6    sWAA-off data for advertising?

7        A.   I mean, no.  My understanding of the

8    but-for world is that they did profit from this

9    information.

10        And my job is calculate how they profited         02:40:19

11    from the information that they took in an

12    ill-gotten way, not to speculate on what they could

13    have done differently.  And I'm not aware of

14    anything that they could have done differently.

15        Q.   With respect to Scenario 2?                   02:40:40

16        A.   Correct.  I mean, I think that that's

17    what we're talking about is Scenario 2.

18        Q.   Yeah.

19        In effect, as I understand it, among

20    other things, you assume that the sWAA button was    02:41:00

21    meant to function as an ad blocker on Google's

22    AdMob and Ad Manager SDKs; is that fair to say?

23        A.   No, I -- I have not assumed that.

24        Q.   Well, you're saying that -- that you

25    assume that it's impossible for Google to serve ads  02:41:26

                                                    Page 135

```
1    through AdMob and Ad Manager when the user has sWAA        02:41:28
2    off, right?
3         A.   For Scenario 2.
4         Q.   Right?
5         A.   Correct.                                         02:41:36
6         Q.   So in effect, what you're saying is that
7    when the user turns sWAA off, it functions in part
8    like an ad blocker.  If they use an app that uses
9    AdMob, where there might have been ad, now there's
10   none?                                                      02:41:50
11             MR. LEE:  Objection to form.
12             THE DEPONENT:  No, I -- I don't agree
13   with that.
14        Q.   (By Mr. Santacana)  Why not?
15        A.   Because I understand that Google would           02:42:04
16   not be able to serve an ad, but I'm not aware that
17   there wouldn't be some other way to -- to have an
18   ad served to them.
19        Q.   I see.  So the app developer could
20   integrate a different advertising platform and so         02:42:18
21   that for sWAA-off users, instead of showing a
22   Google ad, they show a Facebook ad?
23        A.   I -- I'm not sure the mechanism for which
24   it would happen, but I have not assumed that they
25   would -- I have not assumed that they would -- that       02:42:32
```

Page 136

ATTORNEYS EYES ONLY

```
 1    they've switched an ad blocker on.                  02:42:37

 2            I've assumed -- I've assumed that their

 3    data is not available for Google to serve an ad in

 4    Scenario 2.

 5       Q.   So it's not an ad blocker; it's a Google    02:42:49

 6    ad blocker?

 7            MR. LEE:  Objection to form.

 8            THE DEPONENT:  My understanding is, based

 9    on input given to me, is that Google would not be

10    able to serve an ad in those situations.            02:43:06

11            Whether or not you want to call it an ad

12    blocker, I've never called it that, but Google

13    would not be able to serve an ad in those

14    situations.

15       Q.   (By Mr. Santacana)  Okay.                   02:43:19

16            Take a look at paragraph 87 of your

17    report.

18       A.   Okay.

19       Q.   And then 88, please.

20       A.   Okay.                                        02:45:17

21    ██    ████████████████████████████████

██    ██████████████████████████████████████

██    ██████████████████████████████████████████

██    ███████████████████████████████████████████████

██    ██████████████████████████                         02:45:37
```

Page 137

ATTORNEYS EYES ONLY

1

2

3

4

5

6

7          MR. LEE:  Objection.

8          I don't understand the question.

9          Answer if you know.

10          THE DEPONENT:  Well, I don't -- I          02:46:10

11   don't -- I, in fact, don't understand what you're

12   trying to ask me, because I think it's...

13          Q.  (By Mr. Santacana)  I just don't

14   understand the phrase.  What does it mean?

15          A.  Could you -- could you reask the          02:46:18

16   question, then?

17          Q.  Yes.  Let me see if I can find -- take a

18   look at paragraph 63.

19          A.  Okay.

20          Q.  So paragraph 63 is referring to Figure          02:46:59

21   15, right?

22          A.  Paragraph -- no.  Paragraph 63 is

23   referring to Schedule 15.1.

24          MR. LEE:  I think he's referring to the

25   first phrase in the 63.  You're right, but...          02:47:24

Page 138

```
 1        Q.    (By Mr. Santacana)  It says --              02:47:27

 2              MR. LEE:  You're focusing -- you're both

 3    right.

 4        Q.    (By Mr. Santacana)  Yeah.  Not the

 5    footnote.  I'm just saying it starts "as indicated    02:47:30

 6    in figure above," which I think means Figure 15?

 7        A.    I see.  Yes.  That is correct.

 8    ▆  ▆▆▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

 ▆    ▆▆▆▆▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆

 ▆    ▆▆▆▆▆▆▆▆▆▆                       ▆▆

 ▆    ▆  ▆▆▆

 ▆    ▆  ▆▆▆▆▆▆▆

 ▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆

 ▆    ▆▆▆▆▆▆▆▆▆▆▆

 ▆    ▆▆▆▆▆▆▆                        ▆▆

 ▆    ▆  ▆▆▆▆▆  ▆▆▆▆▆▆

 ▆    ▆▆▆▆

 ▆    ▆  ▆▆▆▆▆▆▆

 ▆    ▆▆▆▆▆▆▆

 ▆    ▆  ▆▆▆▆▆▆▆                     ▆▆

 ▆    ▆▆▆▆

 ▆        ▆▆▆▆▆▆

 ▆    ▆▆▆▆▆▆▆

 ▆    ▆▆▆▆▆▆▆

 ▆    ▆▆▆▆                                02:49:21

                                         Page 139
```

ATTORNEYS EYES ONLY



1

8        Q.    Okay.  So in a moment, it should be

9    available to you on that device as Exhibit 2.

10            (Exhibit 2 was marked for identification        02:50:04

11    by the Court Reporter and is attached hereto.)

12            MR. SANTACANA:  While we wait for it, I

13    want to clarify something else about that

14    paragraph 63.

19            Did I get that right?

20    A.    Well, not -- no.                                   02:50:56

21    Q.    No.  Okay.  Help me out.

25    Q.    Period.                                            02:51:13

Page 140

ATTORNEYS EYES ONLY

4        Q.   I see what you're saying.  I see what

5   you're saying.  Right.                              02:51:28

15       Q.   Fair enough.                              02:52:23

16            THE DEPONENT:  Nothing has popped up

17   here, by the way.

18            MR. LEE:  Oh, you've got to hit the

19   "refresh" button.  See that one right there?  You

20   should get something.                              02:52:33

21            THE DEPONENT:  Okay.

22            MR. LEE:  There's two things that popped

23   up, and one doesn't have an exhibit number.  I

24   don't know if it's the same document or not.

25            (Discussion off the stenographic record.)  02:52:43

                                                        Page 141

ATTORNEYS EYES ONLY

```
 1            MR. LEE:  That was very hard to deal with      02:52:54
 2    on the browser.  So just take your time and make
 3    sure you scroll all the way through.  Sometimes
 4    it's not always there.
 5            THE DEPONENT:  Okay.  Okay.  I've got it       02:53:30
 6    open.
 7        Q.  (By Mr. Santacana)  Great.  Okay.
 8    ██████████████████████████████████
      ███████████████████████████████████
      ████████████████████████████████               02:53:45
11        A.  I think I have to point us to three.
12        Q.  Sure.
    ██   ██  █████████████████████
    ██   ██  ███████████
    ██   ██  ██████████████████████████████████   ██████
    ██  ██████████████████
    ██   ██  ████
    ██   ██  ████████████████████
    ██   ██  ████
    ██   ██  ██████████████████████████████████   ██████
    ██  ███████████████████████
    ██   ██  ████
23        A.  I can't do this on this machine, I don't
24    think.  But I'm pretty sure...
25            (Discussion off the stenographic record.)   02:54:52
```

Page 142

ATTORNEYS EYES ONLY

```
1           THE DEPONENT:  As I'm clicking on these     02:54:54
2     cells, I'm not seeing what I normally see with my
3     Excel.
4           MR. LEE:  Yeah.  I think that's because
5     it's in browser instead of the file.             02:54:59
6           THE DEPONENT:  But if you go to the
7     "Matrix" tab --
8           (Discussion off the stenographic record.)
9           MR. SANTACANA:  I'm there.
10    A.    Okay.  So if you go to the -- the           02:55:25
11    "Matrix" tab, the first number that I'll point you
12    to is B4 -- B43.
```

02:56:26

Page 143

ATTORNEYS EYES ONLY

```
 1              MR. SANTACANA:  Can we go off for a          02:56:36

 2    second?

 3              MR. LEE:  Yeah.

 4              THE VIDEOGRAPHER:  This marks the end of

 5    Media No. 3.  Off the record.  The time is 2:56.      02:56:39

 6              (Recess taken.)

 7              THE VIDEOGRAPHER:  This marks the

 8    beginning of Media No. 4 in the deposition of

 9    Michael Lasinski.  We're back on the record.  The

10    time is 3:05.                                          03:06:11

11    ████  ███████████  ████████████

      ██████████████████  ████████████████

      ████████████████████████  █████████

      ██████████████████████████

      ████████████                      ████████

      ████  ████

      ████  █████████████████████████████

      █████████████████████████████

      ████████████████████████████

      █████████████████                 ████████

      ████  ████████████████████████████

      ████████████████████████████████████

      ████████████████████████████

      ████████████

      █████████████████████████████       ████████
```

                                          Page 144

ATTORNEYS EYES ONLY

███████████████████████████████    ████████

███████████████████████████    ██████

███████████████████████████████

███████████████████████████████

████████████  ████████████            03:07:39

6        Q.    Okay.  I got it.  All right.

7              So you read Knittel's report?

8              MR. LEE:  Asked and answered.

9              MR. SANTACANA:  It's a segue.

10             THE DEPONENT:  I did.  I did.  I did.    03:08:06

11             MR. LEE:  I couldn't even keep a straight

12    face.

13             Go ahead.

14             THE DEPONENT:  I did read Knittel's

15    report, yes.                                  03:08:12

16       Q.    (By Mr. Santacana)  You saw that one of

17    his criticisms of your analysis is that it did not

18    take into account the impact of iOS 14 and its

19    release in September of 2020.

20             Do you recall reading about that?        03:08:25

21       A.    Yes, I do recall reading that about.

22             I don't agree with his conclusions, but I

23    do recall reading about that.

24       Q.    Tell me why.

25       A.    So, first of all, just from a very        03:08:47

                                              Page 145

```
 1    technical standpoint, I don't -- I understand that       03:08:50

 2    iOS 14 actually was not where there was any sort

 3    of -- this is a layperson's version of -- of the

 4    technical discussion.

 5            iOS 14 is not where there was an actual          03:09:10

 6    change.  I understand there was iOS14.5.  So it --

 7    so the -- the date that he -- he says things should

 8    have changed, my understanding is it's actually

 9    later than that date.

10        Q.   Okay.                                           03:09:29

11        A.   Then, secondly, I understand that Google

12    could have known what iOS 14.5 and beyond users

13    sWAA status was.  There's technically a way that

14    they could have known that, technically a way that

15    Google could have known that.                            03:09:59

16            So that's the second thing.

17            And it's --

18        Q.   Go ahead.

19        A.   Go ahead.

20        Q.   Go ahead.  Finish.                              03:10:11

21        A.   And then the third is, just because

22    Google, in -- in Knittel's world, if I understand

23    it correctly, he's saying Google could not know or

24    did not know the sWAA-off/sWAA-on status for iOS

25    14 and beyond.                                           03:10:43
```

Page 146

```
 1            That, in my opinion, does not alleviate        03:10:44
 2   Google's promise, if you will, to those that click
 3   sWAA off.  They shouldn't be able to just put
 4   blinders on and say, oh, we couldn't know this
 5   information; therefore, we have no -- we have no      03:11:09
 6   duty to uphold someone's sWAA-off status.
 7       Q.   Okay.  Well, I think you disclaimed
 8   expressing any expert opinion, at least, in the
 9   case about what Google or should or shouldn't do,
10   right?                                                03:11:30
11       A.   That is correct.
12       Q.   Okay.  So let's stick to -- let's stick
13   to our hypotheticals and our assumptions and leave
14   what Google should and shouldn't do out of it for a
15   minute.                                               03:11:38
16            You said, as a technical matter, that
17   Google could still have known after iOS 14.5 the
18   sWAA status of its users who use iOS devices.
19            What is the basis for your understanding?
20       A.   The basis of my understanding is that --    03:11:54
21   through discussions with Mr. Hochman.
22       Q.   When did you have those discussions?
23       A.   That was after I reviewed Mr. Knittel's
24   report.
25       Q.   Who was present for those discussions?      03:12:12
```

```
 1        A.   I don't recall as I sit here.  I know      03:12:17

 2   Mr. Hochman and I were.

 3        Q.   Was there a lawyer?

 4        A.   Yes.

 5        Q.   Who?                                        03:12:23

 6        A.   Probably -- probably Alex.

 7        Q.   Frawley?

 8        A.   Frawley, probably.

 9        Q.   So what did Mr. Hochman tell you about

10   Google's ability to determine the sWAA status of      03:12:39

11   iOS users after iOS 14.5?

12        A.   So my understanding is that there is a

13   device -- some way to do some device-level

14   information that Google could get that would enable

15   them to determine whether or not the sWAA-on or       03:12:58

16   sWAA-off statuses were on.

17        Q.   Do you have any further understanding

18   other than what you just said?

19        A.   No, it was -- it's technical.  He -- he

20   said it's possible they could have known.             03:13:14

21        Q.   Okay.

22        A.   Meaning -- "they" meaning Google.

23        Q.   Right.  Understood.

24             Did you read the named plaintiffs'

25   depositions in this case?                             03:13:39
```

Page 148

1          A.    I flipped through them.  I didn't read                    03:13:42

2     them word for word, but I did flip through at least

3     some of them.

4          Q.    Would you agree that their own words is

5     at least a useful data point in how consumers value        03:13:54

6     their sWAA-off data?

7          A.    I -- I don't believe that that's

8     necessarily probative, but I would have no reason

9     to believe that it isn't something that one could

10    look to.                                                    03:14:28

11         Q.    Did you do anything in this case to

12    model, estimate or study how consumers would have

13    responded at the start of the class period if

14    Google had fully disclosed what Plaintiffs alleged

15    it failed to disclose about sWAA?                           03:14:57

16         A.    I did not do a consumer study, if that's

17    what you're asking.  My understanding is -- from my

18    job from a monetary -- from a monetary compensation

19    standpoint is I have accepted the premise that

20    Google didn't do that.                                      03:15:22

21         Q.    So have you done anything to analyze, as

22    an expert, what would have happened in the but-for

23    world if Google had disclosed that sWAA off would

24    work the way that it works according to

25    Mr. Hochman?                                                03:15:51

                                                        Page 149

ATTORNEYS EYES ONLY

```
1              MR. LEE:  Objection.  Form.  Vague.        03:15:53

2              THE DEPONENT:  I -- I did not do any.  I

3       did not do an analysis of that sort, if that's what

4       you're asking me.

5         Q.  (By Mr. Santacana)  Okay.                   03:16:20

6         A.  I did not.

7         Q.  Okay.

8              Returning to iOS 14 for a moment,

9       assume for me that Google cannot decipher the sWAA

10      status of a user on an iOS device who does not      03:17:12

11      consent to it.

12             Okay?

13        A.  Well, can you repeat that?  Because now

14      I've lost you.

15        Q.  Assume that Google cannot decipher the        03:17:22

16      sWAA status of a user on an iOS device who does not

17      consent to that.

18        A.  Are you -- are you specifying a sWAA-off

19      user then?

20        Q.  It's a sWAA-off user, but they do not         03:17:35

21      consent to Google obtaining their device

22      identifier.

23             And so I'm asking you to assume that, as

24      a result, Google is disabled from understanding

25      that user's sWAA status.                           03:17:50
```

                                                    Page 150

ATTORNEYS EYES ONLY

```
1        A.    Okay.                              03:17:54

2        Q.    Okay.  Is it fair to say that for some of

3    the conversions that you measure in Scenario 1 as

4    unjust enrichment would have been conversions that

5    were initiated or consummated by one of those users   03:18:12

6    I just mentioned?

7        A.    I don't -- I don't think so.  I -- no.

8    That would not -- that would not have come into my

9    model.

10       Q.    Why not?                           03:19:05

11       ██    ████████████████████████████████

     ██  ████████████████████████████  ██████████████

     ██  ████████████████████████████████████

     ██  ███████  ██████████████████████████████████

     ██  ██████████████                              03:19:38

16       Q.    Sure.

17             MR. LEE:  Take your time.

18             THE DEPONENT:  It would -- that would not

19   have come into my analysis.

20       Q.    (By Mr. Santacana)  Please elaborate.  03:20:31

21       A.    So if I understand your question

22   correctly, you're asking me if Google could not

23   know whether a user's sWAA status was off or not

24   because of iOS 14.5 or later.

25              ████████████████████████████  ████████████
```

Page 151

ATTORNEYS EYES ONLY



```
 9        A.   Well, if you look at -- if you look at

10   Schedule 14.1.                                    03:21:41

11        Q.   I'm there.

12        A.   No.  I pointed you to the wrong schedule.

13

14

15

16

17

18

19        For example, if you go to Schedule 2.2 of

20   my analysis.  So --                               03:22:50

21        Q.   Got it.

22        MR. LEE:  Wait.  I think he's still --

23        THE DEPONENT:

24

25                                                     03:23:11
```

Page 152

ATTORNEYS EYES ONLY



03:24:30

Page 153

ATTORNEYS EYES ONLY



03:25:50

Page 154

1        Q.    I'm on Schedule 13.1.  Where are you?        03:25:54

2        A.    I'm -- oh, I'm on Schedule 13.2.  13.2 is

3    the data that feeds this.



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

```
 1    your previous question correctly.                03:27:42

 2         Q.   Right.

 3         A.   Okay.

 4         Q.   You're -- to be clear, when you say

 5    "calculations," what I mean is, are there         03:27:49

 6    conversions that you say the revenue from which

 7    should be disgorged that come from iOS 14.5 or

 8    later users who did not consent to share their

 9    identity with third parties.

10         But go ahead.                                03:28:10

11         A.   My understanding of -- of the

12    hypothetical is that -- the premise here is that

13    Google does not know whether their sWAA is off or

14    not.

15         Q.   At the time that they are using an app on  03:28:29

16    their iOS device, of course Google knows for all

17    of its Google accounts if sWAA is on or off at any

18    given time, as you point out in 13.2.

19         A.   Uh-huh.

20         Q.   But in the moment where the user is using  03:28:45

21    an iOS device, and they happen to have a Google

22    account, and they happen to see an ad on an

23    AdMob-enabled app on an iOS device in iOS 15,

24    and they convert, are you proposing to disgorge

25    that conversion?                                  03:29:04
```

Page 156

1      A.   It seems like a very complex                03:29:53

2  hypothetical.  I'm not 100 percent sure if I can

3  answer it as I sit here.  I'd have -- I'd have to

4  think about that more.

5      Q.   Let me see if I can make it less           03:30:03

6  complicated.  Sorry.

7           I think you said the technical limitation

8  at issue started with iOS 14.5?

9      A.   That is my understanding.

10     Q.   Okay.  So the Internet says that was       03:30:19

11 released in April 2021.  I don't know if that's

12 true, but let's just assume for a minute that's

13 true.  Okay?

14          Assume further that, starting in April of

15 2021, though Google knows the sWAA status of their  03:30:38

16 users in their Google account, when their users use

17 an iOS device, Google is disabled from knowing

18 that they are a Google user and that they have a

19 sWAA status at all by Apple's operating system.

20          In your calculations of conversion         03:31:01

21 measurement revenue that should be disgorged, are

22 there -- is there conversion measurement revenue

23 post April 2021 that you're proposing be disgorged

24 in the situation where Google doesn't know its

25 users are using an iOS device or that they have a   03:31:18

Page 157

ATTORNEYS EYES ONLY

1    sWAA-off status?                                              03:31:30

2         A.   Answering to the best of my ability as I

3    sit here, that would be likely be in.  But I'm

4    not -- I can't just -- as I sit here, I'm not

5    100 percent sure.  That could take me, like, hours    03:31:46

6    to figure out for sure if that's -- if that's right

7    or not.

8         Q.   Okay.  To be clear, you did not attempt

9    at any point in your analysis to exclude post iOS

10   14 users' conversions from the denominator of        03:32:02

11   conversion measurement revenue that you were

12   looking at for disgorgement, right?

13        A.   I -- that is correct.  I did not.

14        Q.   If the Court were to rule that Google was

15   not obligated to honer the sWAA setting of a user    03:32:29

16   on iOS who had not consented to be identified by

17   a third party, like Google, wouldn't you need to

18   cut out the conversions that would have been

19   consummated in those situations from your

20   Scenario 1 damages figure?                           03:32:55

21            MR. LEE:  Incomplete hypothetical.

22            Answer if you can.

23            THE DEPONENT:  I -- I don't know the

24   answer to that, because I can't -- because I would

25   have -- I would have to go back.  I would have to    03:33:14

                                              Page 158

| | | |
|---|---|---|
| 1 | try to figure that out.  I can't -- I did not cut | 03:33:16 |
| 2 | out any iOS users.  I said that they may likely | |
| 3 | be in, but I am not 100 percent sure.  I would have | |
| 4 | to -- I would have to analyze that.  I can't answer | |
| 5 | that as I sit here. | 03:33:28 |
| 6 | Q.   (By Mr. Santacana)  Why aren't you sure? | |
| 7 | If you didn't cut them out, then they must be in, | |
| 8 | right? | |
| 9 | A.   They are highly likely in, but I'm not -- | |
| 10 | I would need to -- I just need to understand that | 03:33:37 |
| 11 | hypothetical a little bit better to make sure that | |
| 12 | they were, in fact, in. | |
| 13 | I don't -- I can't think of a reason as | |
| 14 | sit here that they're not in, but they may not be | |
| 15 | in. | 03:33:48 |
| 16 | The information is certainly available. | |
| 17 | I've made estimates as to iOS -- non- -- in my | |
| 18 | calculations, if one were to need to cut certain | |
| 19 | things out, one could do -- one could do that based | |
| 20 | on market share percentages and shared-in | 03:34:05 |
| 21 | percentages.  That's -- that's available if, in | |
| 22 | fact, it were necessary. | |
| 23 | Q.   Fair enough. | |
| 24 | And as you know, you have an opportunity | |
| 25 | to review the transcript and correct errors.  If | 03:34:16 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
1    you conclude that this testimony is erroneous, of        03:34:18

2    course you can always correct that.

3            That's not a question.  You're just --

4        A.   Well, no.  I'm not -- I'm not thinking

5    that any of my testimony is erroneous.                   03:34:29

6        Q.   I know.  No, no, no.  I know.

7            I'm saying, you'd need you hours to check

8    to be sure.  So if you choose to take the time to

9    check and conclude that what you've just said is

10   wrong, you will have a chance to correct that.  So       03:34:41

11   you don't need to be worried about it right now.

12           MR. LEE:  Yeah, he's not trying to trick

13   you or anything.

14           THE DEPONENT:  No, no, no.  No.  I'm just

15   saying -- I'm just saying the hypothetical to begin      03:34:50

16   with, my understanding is not -- is not accurate

17   because I understand that Google knows how to check

18   or has the ability to check their -- the sWAA

19   status.  But --

20       Q.   (By Mr. Santacana)  Well, let me --           03:35:06

21       A.   But you're saying if they didn't check,

22   and they weren't allowed to check, then I would

23   need to -- I'd need to analyze that.

24       Q.   Yeah.

25           So that's -- all I'm saying is, you think       03:35:16
```

Page 160

ATTORNEYS EYES ONLY

```
 1   it's highly likely you included that.  That's fine.        03:35:17

 2   I understand you think it should be included.

 3           I'm just saying, if later you conclude

 4   that you did deduct it somehow -- you counted for

 5   it in some way or the numbers you used               03:35:30

 6   automatically accounted for it -- you'll have a

 7   chance to put that on the record.

 8       A.   I understand that.

 9       Q.   Okay.  All right.  Let's switch gears for

10   a sec.                                               03:35:45

11           So you used these percentage in --

12       A.   Can you just -- now what we are talking

13   about, these percentage here now?

14       Q.   In Schedule 13.1.

15       A.   Okay.                                       03:35:57

16       Q.   Is what I was about to say.

17           ████████████████████████████████

     ██  ████████████████████████████████████

     ██  ████████████████████████████████████

     ██  ██████████████████████████████               03:36:43

21       A.   Yes.

22       ██  ████████████████████████████████████

     ██  ██████████████████████████████████

     ██  ████████████████████████████████████

     ██  ██████████████████████                       03:37:02
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

1          A.    I think -- I think you're talking about          03:37:08

2     an interrogatory response.

3          Q.    I am.

4          A.    Yes, I know -- I know the document that

5     you're talking about.                                        03:37:14

6          Q.    Did you review that document in preparing

7     your expert opinion?

8          A.    Yes.

9          Q.    ████████████████████████████████

██   ████████████████████████████████████          ████████

██      ████   ████████████████████████████████

██   ██████████████████████████████████████

██   ████████████████

██      ████████████████████████████████████

██   ████████████████████████████████████████          ████████

██   ████████████████████████████████████████

██      ████████████████████████████████████

██   ██████████   ████████████████████████████████

██   ████████████████████████████████   ████████

██   ████████████████████   ████████████████████          ████████

██   ████████████████████████████   ██

22          Whereas this data here that I'm relying

23     upon seems like it came from a more reliable source

24     given the nature of the information that was

25     provided, as well as the consistency and -- the          03:38:38

                                                     Page 162

ATTORNEYS EYES ONLY

```
 1    consistency of the data and the expectations one         03:38:46

 2    would have from reviewing an analysis like -- like

 3    this.

 4          ██    ███████████████████████████████████

 █    ████████████████████████████████████      ██████████

 █    ████████████████████████████████████

 █    ████████████████████████████████████

 8          A.   Yes, that is -- that is correct.

 9          Q.   Those two sets of data were measuring

10    different things, fair to say, right?                    03:39:28

11          MR. LEE:  Objection to form.

12          ████████████    █████████████████████

 █    ██████████████████████████████████████

 █    ████████████████████████████████████

 █    ████████████████████████████████         03:39:49

16          Q.   (By Mr. Santacana)  If the interrogatory

17    data you're referring to -- one second.

18          MR. SANTACANA:  I'm just going to mark it

19    to make this easier.

20          (Exhibit 3 was marked for identification          03:40:10

21    by the Court Reporter and is attached hereto.)

22          Q.   (By Mr. Santacana)  But while we wait for

23    that, if the -- █████████████████████████

 █    ██████████████████████████████████████

 █    ██████████████████████████████████      ██████████
```

Page 163

ATTORNEYS EYES ONLY

```
 4              MR. LEE:  Objection to form.

 5              THE DEPONENT:  Well, no.                    03:40:51

 6         Q.   (By Mr. Santacana)  Why not?

 7         A.   Well, in my -- the way that I did it, I

 8    relied on the most reliable data.  And I understand

 9    the hypothetical to be, if this other data that

10    you're saying that may pop up at some point were     03:41:12

11    more reliable, would -- would one use that.

12              I don't know the answer to -- to how much

13    more reliable it's going to be.  I don't know if

14    it's going to be as reliable as this data.

15
```

03:42:05

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY



1

2

3

4

5

6

7          ████████████████████ data in the record

8     related to traffic.

9          Q.   (By Mr. Santacana)   Look at paragraph 89

10    of your report.                                03:42:32

11          You there?

12          A.   Yes.

13

Page 165

ATTORNEYS EYES ONLY



                                                          03:44:19

16      Q.   Did you rely on those documents that you

17   were just talking about that ████████████████████

                                                          03:44:38

21      A.   I don't know that I relied on those

22   documents.

23      Q.   If you had relied on them, wouldn't you

24   have cited them here?

25      A.   I would have cited them -- if I had      03:44:51

                                                 Page 166

ATTORNEYS EYES ONLY

1    relied on them, then I would have cited them in my          03:44:52

2    report, or at least I would have attempted to.

3              I try to be as complete with documents

4    that I rely upon --

5         Q.   So is it --                                        03:45:02

6         A.   -- for this analysis.

7         Q.   Is it fair to say that those documents

8    did not form the basis of your conclusion that

9    ████████████████████████████████████████████

     ████████████████████████████████████████████        ████████████

     ██████████████████

12             I can try it again.

13        A.   Yeah, I'm not quite sure now what you're

14   asking.

15        Q.   Is it fair to say that those documents         03:45:31

16   did not form the basis of the -- strike that.

17             Let me try it a completely different way.

18             I'm looking at page 32 of your report,

19   paragraph 89, 90, Figure 21, the footnotes.

20             This is where you conclude what              03:45:57

21   █████████████████████████████████████████████

     ███████████████████████████████    ████████████

     ██████████████████████████.

24        A.   This is where I write about what I --

25   where I write about it.                                03:46:16

                                                    Page 167

ATTORNEYS EYES ONLY

```
 1          Q.    This is where you explain your reasoning?      03:46:17

 2          A.    That is correct.

 3          Q.    And in that explanation, you do not say

 4     that your conclusion is supported by other

 5     documents other than the ones cited here, right?        03:46:27

 6          A.    That is accurate.  I do not say that in

 7     that particular -- in those particular paragraphs.

 8     Those other documents did not go specifically into

 9     my calculations.

10          Q.    Fair enough.                                    03:47:23

11                As a conceptual matter, your goal in

12     paragraph 89 and the supporting schedules is to

13     determine ████████████████████████████████

██     ████████████████████████████████

15          A.    ███████████████████████████████      █████████

██     ██████████████████████████████████████

17     That's accurate.

18          Q.    Is it fair to say that an assumption of

19     your conclusion in paragraph 89 is that ███████████

██     ████████████████████████████████████████      █████████

██     ████████████████████████████████

22          A.    As I sit here, I think that that's fair

23     to say.  I haven't made an adjustment for any

24     material differences between WAA-off or sWAA-off

25     users as it relates ████████████████████████        03:49:32
```

Page 168

ATTORNEYS EYES ONLY

██ ██████████████████████████████    ████████

██ ██████████████████████████████████

██ ████

██        Take a look at Figure 15 of your report,

5   ████████████████████ we've been discussing.        03:49:51

6   There's a note in a black box on that slide that

7   you rely on.

8            Would you just read that into the record

9   for me?

██    ████  ██████  ██████████████    ████████

██  ██████████████████  ██████

██  ████████████████████████

██  ████████████████████

██  ██████████  ████████████████

██  ██████████████  ████████    ████████

██  ██  ██████████████  ████████████

██  ████████████████████████████

██  ████████████

██  ██  ████████  ██  ████████████

██  ████████████████    ████████

██    ████████  ████████████

██  ██████████████  ████████

██  ████████████████████████

██  ████████████████  ████████

██  ████████████████████    ████████

Page 169

ATTORNEYS EYES ONLY



Page 170

ATTORNEYS EYES ONLY



for

25    me.                                                03:53:57

Page 171

ATTORNEYS EYES ONLY

```
1        A.   I'm there.                              03:54:20

2             MR. LEE:  Page 3?

3             MR. SANTACANA:  I'm on page 16,

4   Exhibit 3.

5             MR. LEE:  Got it.  Thanks.              03:54:29

6             MR. SANTACANA:  Let me know when you're

7   there.

8             MR. LEE:  Just give me a second.

9             THE DEPONENT:  Page 16, you said?

10       Q.   (By Mr. Santacana)  Yup.                03:54:47

11       A.   Okay.  Okay.  I'm there.

12       ██    ████    ████████████████

    ██  ████████████████████████████

    ██    ██    ████

    ██    ██    ██████████████████████  ████████

    ██  ██████████████████████████████

    ██  ████████████████████████████

    ██  ████████████████████████████

    ██  ██████

    ██    ██    ██████████████        ████████

    ██    ██    ████████████████████

    ██  ██████████████████████████████

    ██  ████████

    ██        ██████████████████████

    ██  ████████████████            ████████
```

Page 172

ATTORNEYS EYES ONLY



14            MR. LEE:  Mike, how are you feeling in

15    terms of energy?  Do you need to stretch your legs?        03:58:03

16    We've been going about 55 minutes.

17            THE DEPONENT:  Yeah, I mean, I think we

18    just took that one short break.  So I guess soon, I

19    wouldn't mind taking a break.

20            And unfortunately, it's warming back up        03:58:10

21    in here again too.

22            MR. LEE:  That's sort of what I was

23    thinking is it's just -- some fresh air outside.

24            MR. SANTACANA:  Let's take a break.

25            MR. LEE:  I can sense you're getting        03:58:21

                                                              Page 173

ATTORNEYS EYES ONLY

```
 1    warm.                                              03:58:23

 2          THE VIDEOGRAPHER:  This marks the end of

 3    Media No. 4.  Off the record.  The time is 3:57.

 4          (Recess taken.)

 5          THE VIDEOGRAPHER:  This marks the          04:06:47

 6    beginning of Media No. 5 in the deposition of

 7    Michael Lasinski.  We are back on the record.  The

 8    time is 4:06.

 9          (Exhibit 4 was marked for identification

10    by the Court Reporter and is attached hereto.)     04:06:54

11      Q.  (By Mr. Santacana)  Okay.  Take a look at

12    Exhibit 4.

13      A.  Okay.
```

Page 174

ATTORNEYS EYES ONLY



Page 175

ATTORNEYS EYES ONLY

15          All right.  Let's switch gears.  Let's          04:12:09

16   talk about conversion measurement for a minute.

17          I think you said earlier that -- I think

18   you distinguished earlier revenue that Google makes

19   from placing advertising from revenue that Google

20   makes from conversion measurement.          04:12:28

21          Is that -- did I mishear you?

22     A.   No, I think that there are -- there is --

23   there are distinct revenue pockets.

24     Q.   What is the difference between those two

25   revenue pockets?          04:12:44

Page 176

```
 1        A.   What I understand is that there are          04:12:46

 2    situations in which Google charges based on a

 3    specific conversion event, an actual conversion.

 4            And then my -- I also understand that

 5    Google uses conversion tracking information to      04:13:01

 6    inform its algorithms that it uses in its analysis,

 7    if you will, for bidding for ads, advertisers

 8    bidding for ads.

 9        Q.   In what situations does Google charge

10    based on a specific conversion event?               04:13:32

11        A.   My -- my understanding is that there

12    are -- my understanding is that there are certain

13    situations where advertisers can pay for their

14    campaigns when customers actually convert on the

15    app's -- on the apps's website or the app.          04:14:37

16        Q.   What are you reading from there?

17        A.   I'm reading from my own report, and I'm

18    on page 9.

19        Q.   Okay.  Okay.

20            On page 9, at the top, this is the          04:15:08

21    tail-end of paragraph 23, you say "Advertisers can

22    choose to finance their campaigns based on

23    conversions, paying Google 'when customers convert

24    on the advertiser's website or app.'"

25            And the phrase -- what I should have said   04:15:24
```

Page 177

```
1   is "paying Google," quote, when customers convert        04:15:31

2   on the advertiser's website or app, closed quote.

3           And there, you are quoting a Google Ads

4   help page titled "Use pay for conversions in

5   Display campaigns," right?                               04:15:46

6       A.   That is correct.

7       Q.   And it's on that basis that -- that you

8   just testified that you understand that there are

9   certain situations where advertisers can pay for

10  campaigns when customers actually convert on the         04:15:59

11  app?

12      A.   Yeah, that basis as well as there are

13  other documents in the case that seem to indicate

14  that.
```

Page 178

ATTORNEYS EYES ONLY



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY



Page 180



```
 1          MR. SANTACANA:  Uh-huh.                    04:20:37

 2          MR. LEE:  Okay.  Are you there too?

 3          THE DEPONENT:  Yes.
```

ATTORNEYS EYES ONLY



24      Q.   So what does it mean to bid against a

25   conversion if it is not paying per conversion?         04:23:39

Page 182

ATTORNEYS EYES ONLY

```
1        A.   So what my understanding there is is          04:23:56

2   bidding against the -- the Google Analytics for

3   Firebase data there at -- it's bidding it in an --

4   based on an algorithm or information available to

5   it.                                                     04:24:10

6        Q.   But how is that different from paying per

7   conversion?  If they are not paying for conversion,

8   what are they paying for?

9        A.   They are paying -- my understanding is

10  that they're -- they're paying for ad placements.      04:24:21
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY



Q.   Are you familiar with AppsFlyer and

Kochava?

A.   I am not, no.

Q.   So if the advertiser is paying Google to          04:26:22

place the ad but, as you say, they wouldn't be

allowed to track the conversion using Google, why

in Scenario 1 do you conclude that they simply

wouldn't place the ad rather than track the

conversion some other way?                             04:26:44

MR. LEE:   Sorry.   Who is the "they" in

that sentence?

MR. SANTACANA:   The advertiser.

THE DEPONENT:   I -- I think if -- in that

case, I'm not sure that Google -- well, Google         04:26:58

Page 184

```
1     needs to charge them for that ad.  So Google needs        04:27:08

2     to track the ad and track the conversion.

3             So it's -- it's Google's side that I'm

4     looking at here, not the advertiser's side.

5             So if the advertiser wants to use another          04:27:19

6     mechanism to track conversions, they may be able

7     to.  But I still think that Google, in this case,

8     tracks that -- tracks that as well.

9         Q.   (By Mr. Santacana)  You think that Google

10    tracks conversions regardless of whether -- you           04:27:38

11    think that Google tracks conversions and App Promo

12    campaigns regardless of whether the advertiser uses

13    GA4F?

14            MR. LEE:  Mischaracterizes.

15            THE DEPONENT:  No.  If they use GA4F,              04:27:53

16    they do.
```

Page 185

ATTORNEYS EYES ONLY



```
 8        Q.    Right.

 9              So Scenario 1 is focused on GA4F, and --

10        well, no.  Strike that.                        04:28:46

11              Your Scenario 1 is focused on the

12        measurement of the conversion; and Scenario 2 is

13        focused on the service of the ad?

14              Is that -- am I right about that?

15        A.    Yes.                                      04:29:00

16        Q.    So, again, sticking with Scenario 1 and

17        measurement of the conversion, you posit that if

18        Google couldn't measure the conversion, then it

19        could not make the ad revenue that it makes for App

20        Promo campaigns, right?                         04:29:09

21        A.    Correct.

22
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

18       Q.   Well, then, what you just said cannot

19  possibly be true.

20       A.   Yes, it can.                    04:30:12

21       Q.   Advertisers pay to place advertising with

22  Google, right?

23       A.   Yes.

24       Q.   I give you money; you place the ad,

25  right?                                  04:30:21

Page 187

ATTORNEYS EYES ONLY

1        A.    Correct.                                         04:30:23

2        Q.    I can measure whether the ad converted

3    using a Google tool, right?

4        A.    That's my understanding, yes.

5        Q.    I can also measure whether the ad           04:30:34

6    converted using a nonGoogle tool, right?

7        A.    That maybe accurate.

8        Q.    And I can use the nonGoogle tool to

9    integrate with Google Ads so that the nonGoogle

10   party tells Google when I get a conversion, right?    04:30:48

11            MR. LEE:   Objection to form.

12            THE DEPONENT:   I don't know -- I don't

13   know the answer to that.   That's beyond the scope

14   of my technical ability.

15       Q.    (By Mr. Santacana)  Okay.  Well, assume      04:31:02

16   for me that that's possible, or even common.

17            Why do you posit that the measurement of

18   the conversion by Google, as opposed to some other

19   party, is a but-for cause of the revenue?

20       A.    Because -- because that -- because Google    04:31:29

21   used the data, the information that it had

22   gotten -- that it had gotten inappropriately, to

23   actually measure those conversions.   And -- and

24   this is the amount of data that they used to do

25   that.                                                  04:31:48

                                                  Page 188

ATTORNEYS EYES ONLY

1      Q.   I understand that completely.              04:31:48

2           My question is, in the but-for world --

3      so you agree with me that -- let's back up for a

4      second.

5           Okay?                                       04:31:58

6      A.   Sure.

7      Q.   Advertisers, when they place ads tell

8      Google when they want an App Promo campaign that

9      they want a certain kind of conversion, right?

10     A.   That -- that certainly is possible.        04:32:17

11     Q.   Well, aren't you assuming that in this

12     opinion?

13     A.   Yes.  Yes.

14     Q.   It's not possible.  It's what you believe

15     to be true?                                      04:32:34

16     A.   Correct.

17     Q.   So they also tell Google to serve a

18     particular creative, right?  Here's the language

19     that should be in my ad, right?

20     A.   I -- I don't know -- I don't know what      04:32:48

21     advertisers do at that level.

22     Q.   Why did you choose conversions rather

23     than impressions as the focus of your disgorgement

24     of profit Scenario 1?

25     A.   Because my understanding is that Google     04:33:29

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

```
1    would not have access to the conversion data when        04:33:30

2    sWAA is off.

3        Q.   So part of the assumption behind

4    Scenario 1 of your disgorgement of profit opinion

5    is that if Google could not have used sWAA-off data      04:33:48

6    to measure conversions, then it would have been

7    impossible to measure the conversions from the ads

8    that were served?

9        A.   I'm not saying -- I don't think I made

10   the assumption that it would have been impossible        04:34:09

11   but, in fact, that that's what they did.  That's

12   what they used the data for, to measure the

13   conversions.  And, therefore, they would not --

14   they used that data to generate that revenue.  They

15   used sWAA-off users' data to generate that revenue.      04:34:31

16   That, I calculate in Scenario 1.

17       ██    ████████████████████████

     ██   ██████████████████████████████

     ██    ██    ████████████████████████

20       Q.   Your task was to determine how much          04:35:09

21   profit Google made thanks to its use of that

22   sWAA-off data to measure conversions, right?

23       A.   In part, yes.

24       Q.   You told me that advertisers pay to place

25   advertisements, right?                                   04:35:24
```

Page 190

ATTORNEYS EYES ONLY

```
1        A.   Correct.                                    04:35:26

2        Q.   They're not paying per conversion in

3   these App Promo campaigns, right?

4        A.   There may be some situations in which

5   they do.  But certainly, there are some situations    04:35:34

6   in which they're not.

7        Q.   How can you attribute the entirety of the

8   ad revenue for the placement of an ad campaign to

9   the use of sWAA-off data to measure conversions

10  when the payment is for the placement of ads?          04:36:19

11       A.   Because -- for two reasons.

12       ███████████████████████████████████

    ██  ████████████████████████████████████████

    ██  ██████████████████████████████████                ████████

    ██  ███████████████████████                           

    ██          ██████████████████████████████

    ██  ████████████████████████████████

    ██  ██████████████████████

19       Q.   The document you're referring to, that's

20  the ChromeGuard study?                                 04:37:07

21       A.   That is correct.

22       Q.   Is there any other bases or situation --

23  is there any other measurement like that that

24  Google has performed that you're referring to here?

25       A.   Above and beyond the ChromeGuard study?      04:37:19
```

                                                    Page 191

ATTORNEYS EYES ONLY

```
 1    They may have.  That's the one that I'm aware of      04:37:21

 2    that's available in this case.  I don't know if

 3    they've done other studies as well.

 4         Q.   Okay.  So here's what I don't understand.

 5              An advertiser can pay Google to place        04:37:46

 6    advertising for an App Promo campaign and not rely

 7    on GA4F to measure conversions from that campaign,

 8    right?

 9         A.   That certainly may be possible.

10         Q.   Do you have any reason to doubt that        04:38:10

11    that's true?

12         A.   No, I do not.

13         Q.   So given that, why do you assume that the

14    ability to measure conversions with Google's

15    product is a but-for cause of the ad spend as        04:38:22

16    opposed to something else?

17              MR. LEE:  Asked and answered.

18              THE DEPONENT:  I think -- I think I

19    answered that before.

20              Google used that information to track      04:38:32

21    that revenue, to -- to generate -- to analyze and

22    track that revenue.  And, therefore, they should

23    not have been able to, because they should not have

24    had that information.

25         Q.   (By Mr. Santacana)  But how do you know      04:38:52
```

Page 192

ATTORNEYS EYES ONLY

```
 1    it's not a completely irrelevant piece of              04:38:53

 2    information?

 3            MR. LEE:  Objection.

 4        Q.   (By Mr. Santacana)  So, for example, an

 5    advertiser places an ad campaign.  They don't just     04:39:01

 6    say "Use GA4F to track conversions."  They also

 7    say, "Here's my phone number and my contact."

 8    Okay?

 9            Google presumably keeps those phone

10    numbers in a database.                                 04:39:12

11            If a Court ruled that Google's not

12    allowed to keep the phone numbers for the

13    advertisers in a database, would you conclude that

14    all of the ad revenue would have been ill-gotten,

15    because if they didn't have the phone number, then     04:39:21

16    they couldn't have run the ad?

17            It would be ridiculous, right?

18        A.   I don't even understand what you're

19    talking about at that point.

20        Q.   I don't really understand what you're         04:39:33

21    talking about either.

22            MR. LEE:  Same objection.

23        Q.   (By Mr. Santacana)  I mean, it would be a

24    ridiculous thing to say that the phone number of

25    the contact at the advertiser is a but-for cause of    04:39:39
```

Page 193

```
 1    the advertising revenue, right?                      04:39:41

 2           MR. LEE:  Objection.  Improper and

 3    incomplete hypothetical.  Lack of foundation.

 4           THE DEPONENT:  I -- I don't understand

 5    what you're talking about.                           04:39:50

 6       Q.   (By Mr. Santacana)  In order to disgorge

 7    profit, there needs to be a connection between the

 8    alleged unlawful conduct and the profit that's

 9    being disgorged, right?

10       A.   That is my understanding, yes.               04:40:05

11       Q.   A causal connection, right?

12       A.   That is my understanding.

13       Q.   So when you have done a patent

14    infringement case, and you do a disgorgement of

15    profit analysis, and there's an infringing          04:40:18

16    component of a larger product -- right?  You with

17    me so far?

18       A.   I think so, yes.

19       Q.   The job of the damages expert in that

20    situation is to determine the proportion of profit   04:40:30

21    for the whole product that the infringing component

22    contributed, right?

23       A.   I mean, in -- in a royalty case, that is

24    correct.

25       Q.   Sometimes the component is really            04:40:49
```

Page 194

ATTORNEYS EYES ONLY

```
 1    important, so important that you couldn't even sell      04:40:50

 2    the device if it weren't for that component which

 3    infringes, right?  In which case, damages would be

 4    the whole revenue for the infringing product?

 5        A.   I'm not sure that that's accurate.  But I       04:41:07

 6    don't even know -- I guess if you're talking about

 7    a sales -- two-competitor -- a two-competitor

 8    market, that could be possible.

 9        Q.   Sometimes a component is completely

10    unimportant.  It happens to infringe, but the          04:41:18

11    seller could have used any number of the other

12    options, right?

13             There's lots of RAM chips.  If this one

14    infringes, we'll use a different one.  I still

15    would have sold my laptops, just as many as I would    04:41:28

16    have otherwise, right?

17             You hear what I'm saying?

18        A.   I do understand what you're saying.

19        Q.   So why doesn't that same analysis apply

20    here?                                                  04:41:38

21             How -- where -- where in here did you

22    evaluate whether the ability to measure conversions

23    with a Google tool is more like the RAM chip in a

24    laptop that doesn't really drive the revenue or is

25    more like some component that can't -- that you        04:41:57
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

```
 1   can't live without?                              04:42:02

 2          How do you know that's what's driving the

 3   revenue?

 4          MR. LEE:  Incomplete hypothetical.  Asked

 5   and answered.                                    04:42:10

 6          You can answer again.

 7          THE DEPONENT:  I don't even know if I --

 8   if I said yes to you or no to you, based on all the

 9   things that just happened, if I'd be agreeing with

10   you or disagreeing with you.                     04:42:23

11          I think we're -- I guess I'm just not

12   understanding where you're trying to go.  You had

13   like a four-paragraph question, so...

14          And I want to you know, take a break at

15   some point again.                                04:42:36

16          MR. LEE:  Yeah.

17          THE DEPONENT:  It's getting hot again in

18   here.

19          MR. LEE:  I agree.  It's got to be like

20   85 degrees in here.                              04:42:41

21          MR. SANTACANA:  Okay.  Well, can we

22   just -- can we just finish this quick, then?  I'll

23   be quick.

24      Q.  (By Mr. Santacana)  To put it a different

25   way, if at the start of the class period Google had  04:42:52
```

Page 196

ATTORNEYS EYES ONLY

```
 1    said, "You may not use Google Analytics for          04:42:56

 2    Firebase to track conversions on App Promo

 3    campaigns."

 4            Okay?  At all.  Not allowed.  We're

 5    discontinuing the product.                            04:43:08

 6        A.   Okay.

 7        Q.   Is it -- doesn't it follow from your

 8    analysis here that all App Promo advertising would

 9    immediately cease?

10        A.   So are you asking me to assume that --       04:43:28

11            MR. LEE:  Let me object as improper and

12    incomplete hypothetical first.

13            THE DEPONENT:  Okay.

14            MR. LEE:  Calls for speculation.  Lack of

15    foundation.                                           04:43:41

16            Go ahead.

17            THE DEPONENT:  That Google would -- would

18    tell people to use other...

19        Q.   (By Mr. Santacana)  Yeah.

20        A.   To use other and not -- and not live up      04:43:48

21    to their promise on the sWAA data, and still give

22    those --

23        Q.   No.  Let me try again.

24            MR. LEE:  Well, let him finish, and then

25    we can try again.                                     04:44:03
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

```
 1              THE DEPONENT:  Well -- okay.              04:44:03

 2       Q.   (By Mr. Santacana)  Imagine that at the

 3   start of the class period, Google said, "Hey, App

 4   Promo advertisers, we're getting out of the

 5   analytics game.  No more GA4F.  Not for sWAA-on      04:44:14

 6   users, not for sWAA-off users, not for anybody.

 7   Goodbye GA4F."

 8              Right?  You with me so far?

 9       A.   Yes.

10       Q.   You have percentages here on conversion     04:44:26

11   types bid against GA4F which you rely on, right?

12       A.   Yes.

13       Q.   Is it -- are you saying that Google's ad

14   revenue for App Promo campaigns would drop by the

15   percentages that were bid against GA4F in those     04:44:41

16   years if Google discontinued GA4F?

17       A.   Well, that didn't happen.

18       Q.   I understand.

19       A.   So I don't know -- I don't know what

20   would happen.                                       04:44:52

21       Q.   Well, you're trying to determine how much

22   profit Google made, right, from this component,

23   which is alleged to be unlawful, as opposed to

24   other things?

25       A.   Which I did.                               04:45:05
```

Page 198

ATTORNEYS EYES ONLY

1    Q.   So I'm just trying to understand how you          04:45:06

2    know that this component is what drove the revenue

3    and not other things.  Because I don't see in your

4    report anywhere where it says, "This component is

5    the but-for cause of the revenue."                     04:45:17

6

20          MR. LEE:  Now I'm going to actually say         04:46:03

21   that we're taking a break, because his neck is

22   getting red, and his ears are getting red.

23          And I know we don't want him to be

24   uncomfortable.  He asked for a break a while ago.

25   So let's go off the record.                            04:46:12

                                                    Page 199

ATTORNEYS EYES ONLY

```
 1              MR. SANTACANA:  Sure.  It was one        04:46:14

 2     question ago, but sure.

 3              THE VIDEOGRAPHER:  Off the record.  The

 4     time is 4:45.

 5              (Recess taken.)                          04:46:19

 6              THE VIDEOGRAPHER:  This marks the

 7     beginning of Media No. 6 in the deposition of

 8     Michael Lasinski.  We are back on the record, the

 9     time is 5:09.

10     Q.   (By Mr. Santacana)  When we left off, you    05:10:03

11     had mentioned the ChromeGuard study.

12              Do you recall that?

13     A.   Correct.

14              So on what basis did you conclude that

15     the measurements done in the ChromeGuard study were 05:10:22

16     analogous to the measurement you were trying to

17     accomplish here?

18              MR. LEE:  Objection to form.  Vague as to

19     "here."

20              THE DEPONENT:  So in ChromeGuard -- in    05:10:45

21     the ChromeGuard study, it analyzes a ████████

      ██████████████████████████████████████████

      ██████████████████████████████████████████████

      ████████████████████████████████████████

25              My understanding here, similarly, is     05:11:21
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY



1    there ████████████████████████████████    ████████

█    █████████████████████████, and this relates to a

3    privacy setting as well, as -- ████████████████

█    ███████████

5        ██    ██████████████    ████████████    ████████

█    ███████████████████████████████████

█        ██    ████

█        ██    █████████████████████████

█    █████████████████████████████████████

█    ██████                                    ████████

█        ██    ████████

█        ██    ████████████████████

█    ███████████████████████████████████

█    ████

█        ██    ████████████████            ████████

█        ██    ██████████████████████

█    ███████████████████████████████████

█    ████████████████████████████████

█    ██████████

█        ██    ██████████████████████    ████████

█    ███████████████████████████████████

█    ███████████████████████████

█    ████████████████████████████████

█    ███████████████████████

05:13:30

Page 201

ATTORNEYS EYES ONLY



Page 202

ATTORNEYS EYES ONLY



Page 203

ATTORNEYS EYES ONLY



16       Q.   (By Mr. Santacana)  What are you looking

17   at right now?  Figure --

18       A.   I'm not --

19       Q.   -- 28?

20       A.   I wasn't actually looking at anything.  I        05:17:27

21   have it open to Figure -- to Figure 28, but I

22   wasn't looking at anything as I was answering that.

23

Page 204



Page 205

ATTORNEYS EYES ONLY



Page 206

ATTORNEYS EYES ONLY



23          You understand my question?

24     A.   Yeah, I understand your question, I

25   think.                                        05:23:37

                                            Page 207

ATTORNEYS EYES ONLY

1          From -- from my analysis in sWAA off, I          05:23:37

2    did not need to make a calculation of that.

7    Q.   Sorry.  I'm not -- I don't understand

8    your answer.  I'm just -- I'm going to repeat my

9    question, and maybe you can help me understand your

10   answer.                                               05:24:35

                                                           05:25:30

                                                      Page 208

ATTORNEYS EYES ONLY



14        Q.   So on the Web, Google Display ads can be

15   placed and paid for in a variety of ways, right?        05:26:44

16        A.   I believe that that's accurate.

17        Q.   That includes, for example, cost per

18   click, right?

19        A.   I believe that that's accurate.

20        Q.   It can include cost per impression?        05:27:02

21        A.   I believe that that's accurate as well.

22        Q.   It can include cost per conversion?

23        A.   Correct.

24        Q.   And there are other ways to pay as well,

25   right?        05:27:20

Page 209



1      A.   That's consistent with my understanding.      05:27:24

8      A.   Could you repeat that question?

Page 210

1    Mischaracterizes.                                      05:29:02

2         THE DEPONENT:  I don't think I testified

3    to that.



ATTORNEYS EYES ONLY

```
1        A.   My --                                    05:30:31

2             MR. LEE:  Objection to form.

3   Mischaracterizes.

■       ████████████    ████████████████

■       ██████████████████████████  ████████      ██████████

■       ███████

■       ██  ████████████    ████████████

■       ████████████████████████

■       ██████████████████████████████

■       ██████████████████████████████████      ████████████

■       ██████████████████████████████

■       ██████████████████████████████

■       ████████████████████████

■       ██  ████████████████  ██████████████████

■       ██████████                                   05:31:14

16       Q.   And so that helped you determine

17  accurately, as a historical matter, how much

18  revenue you believe is attributable to Google's

19  conversion measurements using GA4F in App Promo

20  campaigns, right?                                 05:31:34

21       A.   Maybe I'm misunderstanding what you're

22  trying to ask, but Google provided that information

23  itself.  So it's not an assumption of mine.  Google

24  actually provided that information, the amount of

25  revenue that's attributable to GA4F conversions.   05:31:48
```

Page 212

ATTORNEYS EYES ONLY

```
1        Q.   Well, maybe we're using the word          05:31:53

2   "attributable" in different ways.

3            You conclude that that is a fair way to

4   determine how much of Google's revenue from App

5   Promo campaigns is attributable to the alleged        05:32:06

6   unlawful conduct, right?

7        A.   Yes, that is correct.  For App Promo.

8        Q.   Did you do anything to consider how much

9   revenue Google would have made if it had not been

10  able to measure conversions using GA4F?               05:32:34

11       A.   Well, I leave that revenue -- you know,

12  revenue that is not related to GA4F, I -- is

13  untouched in my analysis under Scenario 1.

14       Q.   As a historical matter.  I understand.

15           My question is:  Did you take the           05:32:57

16  additional step in your report of analyzing what

17  would have happened in the but-for world if Google

18  had not been permitted to measure conversions using

19  GA4F?

20           Did you do anything to think about that     05:33:14

21  as a methodological exercises?

22       A.   So you're saying shut off GA4F

23  completely?

24       Q.   For sWAA users.

25       A.   Well, I haven't seen anything in the       05:33:34
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1   record that would indicate that that's something        05:33:35

 2   that they're doing.

 3        Q.   Well, I understand that --

 4        A.   So --

 5        Q.   -- but, for example, Mr. Hochman opines       05:33:41

 6   that that's what Google should do, right?

 7             So I'm just asking, have you -- have you

 8   done anything to measure what would happen in the

 9   world if that happened?

10        A.   I'm not aware of an alternative scenario       05:33:57

11   that one would use to measure that if that were to

12   happen.  So I did not measure that.

13        Q.   Okay.  And you are aware -- let's --

14   let's take Mr. Hochman's opinion -- you've read his

15   report, right?                                           05:34:12

16        A.   Yes, I did.  But I -- to say that I'm

17   aware of Mr. Hochman's opinions will probably

18   require me to go back and look at Mr. Hochman's

19   report.

20        Q.   Well, I'm not going to get too deep into       05:34:22

21   it.  I'm just interested right now in his opinion

22   near the end of his report where he says going

23   forward, Google could just stop measuring

24   conversions from sWAA-off users.  Okay?

25             Have you done anything to consider, if         05:34:37
```

Page 214

```
 1   Google did that, what would happen to Google's ad        05:34:41

 2   revenue?

 3        A.   I mean, the information that I'm

 4   reading -- that I've read in this case indicates

 5   that that's not something that Google is going to        05:35:05

 6   do.  They, in fact, think that it's -- GA4F is

 7   critically important to them going forward.  So I

 8   don't think that that's something that they're

 9   going to do.

10        I have not measured an impact of what               05:35:18

11   would do if that, in fact, did happen, if they shut

12   off GA4F.

13        Q.   Right.  Okay.

14        I mean, you understand that one of the

15   things that Mr. Hochman is saying is the Court          05:35:30

16   could order Google to not measure conversions from

17   sWAA-off users, right?

18        I mean, the plaintiffs alleged that's

19   illegal, so the Court may say, "Don't do that

20   anymore," right?                                        05:35:44

21        A.   The Court may say that.

22        Q.   Okay.  So if the Court were to do that,

23   don't measure conversions for sWAA-off users

24   anymore, it's illegal, what, in your mind, would

25   happen to the ad spend that formerly had been spent     05:36:06
```

Page 215

1    and bid against GA4F conversions?  Would it                05:36:11

2    disappear?

3         A.   I mean, that's a hypothetical that I

4    don't need to calculate.  If, going forward, they

5    don't use it, my damages calculation only goes up          05:36:28

6    through 2022.  So if they don't -- don't use it in

7    the future, I'm not -- I have not analyzed what

8    would happen in that case.

9         Q.   Have you analyzed that question with

10   respect to what would have happened if a Court had         05:36:45

11   issued that ruling at the start of the class

12   period?

13        A.   My -- no.  My -- my assumption -- not my

14   assumption.

15             My assignment here is to calculate what          05:37:05

16   Google, in fact, did do.  And they use -- oh, I

17   think you used ill-gotten information or something

18   like that.  They used the ill-gotten information to

19   actually track conversions --

20        Q.   Right.                                            05:37:19

21        A.   -- during the period.

22        Q.   Right.

23        A.   And I calculated the profit associated

24   with that.

25        Q.   So you did not see it as part of your            05:37:26

Page 216

```
 1    assignment to measure the proportion of Google's        05:37:28

 2    App Promo revenue that was garnered thanks to the

 3    ill-gotten data as opposed to other factors, like

 4    quality of the ad service, or the speed of the ad

 5    network, or other metrics that Google can provide?      05:37:51

 6        A.   I did not -- I did not analysis other

 7    metrics.  I looked at what the actual ill-gotten

 8    gains were in this case.

 9        Q.   And you did not see it as part of your

10    assignment to analyze how Google advertisers or         05:38:10

11    users would have responded to a change in

12    circumstances at the start of the class period

13    where a Court ordered that Google could not measure

14    conversions using GA4F for sWAA-off users?

15            That was not part of your assignment,           05:38:36

16    right?

17            MR. LEE:  You mean other than Scenario 1?

18    Maybe I'm not following.

19            MR. SANTACANA:  I'm not either.

20        Q.   (By Mr. Santacana)  Can you answer my          05:38:47

21    question?

22        A.   I just don't even know -- if you're not

23    following your own question, I don't know how to

24    answer it, then.

25        Q.   No.  I'm following Mr. Lee's attempt to        05:38:52
```

Page 217

ATTORNEYS EYES ONLY

```
1    testify for you.                                    05:38:55

2           Did you see as part of your assignment to

3    analyze how Google advertisers -- excuse me -- how

4    Google advertisers or users would have responded to

5    a change in circumstances at the start of the class   05:39:08

6    period where Google was no longer able to use

7    WAA-off data to measure conversions?

8           MR. LEE:  I have the same question and

9    objection.

10          THE DEPONENT:  I have not analyzed that       05:39:23

11   with the exception of what I did for my scenarios,

12   Scenario 1 and Scenario 2.

13      Q.   (By Mr. Santacana)  So okay.

14          With respect to Scenario 1, how -- what

15   was the result of your analysis as to how Google      05:39:37

16   would have responded to that change of

17   circumstances?  What do you conclude Google would

18   have done in that situation?

19      A.   I have not made a conclusion about what

20   Google would have done.  I analyzed what they         05:39:53

21   actually did do.

22      Q.   And what did you conclude as to what

23   advertisers would have done in those changed

24   circumstances at the start of the class period?

25      A.   I analyzed what -- what the actual world      05:40:12
```

Page 218

```
1    was, not what they -- not what they would have done        05:40:14

2    in some different but-for world.

3         Q.   And what did you conclude, if anything,

4    as to what users would have done in those changed

5    circumstances at the start of the class period?         05:40:24

6         A.   I mean, ultimately, I analyzed what they,

7    in fact, did do.  Now, I don't even know what

8    the -- what the hypothetical means, what users

9    would have done in that case.

10        Q.   Okay.  So you didn't reach any             05:40:49

11   conclusions about whether and how users would

12   change their behavior in a situation, at the start

13   of the class period, where the Court had said

14   Google cannot measure conversions with GA4F for

15   sWAA-off users?                                       05:41:06

16             There's no opinions about that in your

17   report, right?

18             MR. LEE:  I'm sorry.  You lost me.  Can

19   you ask that one more time?

20             THE DEPONENT:  So I'm trying to            05:41:15

21   understand what you're saying.

22             MR. LEE:  I need to hear the question one

23   more time.

24             MR. SANTACANA:  Do you have real time?

25             MR. LEE:  I don't.                          05:41:22
```

Page 219

```
 1              MR. SANTACANA:  Can you pull it up?        05:41:23

 2              MR. LEE:  I don't have real time.

 3              MR. SANTACANA:  You're just not paying

 4   for it?

 5              MR. LEE:  I don't use real time as a       05:41:26

 6   practice.

 7              MR. SANTACANA:  Okay.  Well, I need you

 8   to use either real time or --

 9              MR. LEE:  I think I've asked you to

10   repeat a question maybe twice today, so --           05:41:30

11              MR. SANTACANA:  I don't agree with you.

12              MR. LEE:  You have real time.  Do you

13   want to hand it to me, and I can read it again?  Or

14   you can just reask the question as a courtesy to

15   me.  I'd appreciate it.  I need to know whether to   05:41:39

16   lodge an objection or not.

17        Q.   (By Mr. Santacana)  You didn't reach any

18   conclusions about whether and how users would

19   change their behavior in a situation at the start

20   of the class period where the Court had said Google  05:41:50

21   cannot measure conversions with GA4F for sWAA-off

22   users?

23              MR. LEE:  Same objections as before.  And

24   asked and answered.

25              THE DEPONENT:  I believe I answered that,  05:42:11
```

Page 220

ATTORNEYS EYES ONLY

```
 1    but I don't know -- I don't really follow that        05:42:12

 2    hypothetical, because that did not happen.  So I'm

 3    not sure --

 4        Q.   (By Mr. Santacana)  I know it didn't

 5    happen.                                                05:42:18

 6        A.   -- how to answer that.

 7        Q.   So Google would have --

 8        A.   I don't understand, like, how would

 9    Google have communicated this information to users?

10        Q.   (By Mr. Santacana)  My question is just,      05:42:28

11    that's not part of your opinions in the case,

12    right?  I just want to understand the limits of

13    your opinions.

14             You did not undertake that assignment?

15             MR. LEE:  Same question.  Same objection.     05:42:37

16             THE DEPONENT:  Of -- of what?

17        Q.   (By Mr. Santacana)  Of how users'

18    behavior would have changed, if at all, in the

19    situation at the start of the class period where

20    the Court ordered that Google could not use           05:42:53

21    sWAA-off data to measure conversions with GA4F?

22        A.   I -- I think I'm following the

23    hypothetical.  I don't -- I did not --

24        Q.   Okay.

25        A.   -- measure that.                              05:43:12
```

Page 221

ATTORNEYS EYES ONLY

```
1         Q.   It's not -- it's not a trick question.        05:43:13

2         A.   I'm not --

3         Q.   I'm just, like, confirming that that's

4    not something you did, or that you did and you

5    didn't write it down.                                   05:43:20

6         A.   I think -- I think you've read my report,

7    so I'm not trying to trick you either.

8         Q.   Okay.  Did you discuss conversion-based

9    autobidding with Mr. Hochman?

10        A.   Yes.                                           05:43:48

11        Q.   What did he tell you about

12   conversion-based autobidding?

13             Let me withdraw.

14             You're looking at your report.  Is it

15   fair to say anything Mr. Hochman told you about          05:44:40

16   conversion-based autobidding is reflected in your

17   report?

18        A.   No, it's not.

19             MR. LEE:  If you need to consult your

20   report or -- to refresh your recollection about          05:44:53

21   Mr. Santacana's question, feel free to do that.  I

22   don't think he's limiting you.

23             THE DEPONENT:  I don't know that I

24   identify in my report where Mr. Hochman and I spoke

25   about conversion-based autobidding.                      05:45:27
```

Page 222

```
 1        Q.   (By Mr. Santacana)  But you know that you      05:45:33
 2   did?
 3        A.   Yes.
 4        Q.   Did you document your conversation with
 5   Mr. Hochman about conversion-based autobidding in       05:45:40
 6   any way?
 7        A.   Any -- any documentation about -- from
 8   any of my discussions with Mr. Hochman is -- is in
 9   my report.  I didn't -- I don't have any other
10   documents besides my report.                            05:46:03
11        Q.   Okay.  Did you rely on your conversation
12   with Mr. Hochman and what told you about
13   conversion-based autobidding in rendering your
14   opinions?
15        A.   I mean -- I mean, yes.  And to the extent      05:46:21
16   that they would have flown -- flowed, not flown --
17   flowed into my calculations, I would have
18   identified that in my report.
19             But I can't see where they did
20   specifically flow into my calculations.  So I           05:46:52
21   didn't -- I don't know that I have a specific cite
22   back to that discussion, that portion of my
23   discussion with Mr. Hochman.
24        Q.   Maybe I misunderstood.
25             But are you saying that yes, you did rely      05:47:09
```

Page 223

```
 1    on what Mr. Hochman told you about conversion-based        05:47:12

 2    autobidding in rendering your opinions; but no, you

 3    did not document where you made that reliance --

 4              MR. LEE:  Objection.

 5        Q.   (By Mr. Santacana)  -- for what he told          05:47:24

 6    you?

 7              MR. LEE:  Objection.  Mischaracterizes

 8    his testimony.

 9              You can answer again.

10              THE DEPONENT:  No.  What I'm saying is,          05:47:29

11    to the extent we had a conversation on

12    conversion-based autobidding, I don't have any

13    other documents besides my report.

14              To the extent that it was -- it was -- it

15    would be necessary to document that in my report, I       05:47:47

16    would only see it being -- as being necessary to

17    document in my report if it flowed into my

18    calculations.

19              I don't -- I don't know specifically that

20    that discussion would flow directly into my               05:48:08

21    calculations, so I don't know that -- I don't know

22    if I have a cite in my report that would represent

23    that discussion.

24    ████  ████████████  ████████████

      ████████████████████████████████████  ████████████
```

Page 224

ATTORNEYS EYES ONLY

5      Q.   Was your understanding of that ███████  ███████

       ███████████████████████ informed at all

7      by your conversations with Mr. Hochman?

8           A.   As I'm sitting here, I cannot recall if

9      Mr. Hochman and I talked specifically about the

10     ████████   in this case.  I can't -- I can't recall          05:49:50

11     that I did speak to him specifically about

12     ██████████

13          Q.   I appreciate that.  My question was a

14     little different, which is, ████████████████

23               As it relates to that specific document

24     for that specific purpose, I don't recall if I

25     talked to him specifically about that or not.          05:50:45

Page 225

ATTORNEYS EYES ONLY

1       Q.   What did Mr. Hochman tell you about          05:50:48

2    conversion-based autobidding?

3       A.   I -- I don't remember specifically what

4    he told me versus what I've learned in -- in the

5    case.                                                05:51:00

6       Q.   What do you mean?

7       A.   Well, there are -- there is information

8    on conversion-based autobidding in documents in the

9    case.

10       Q.   Are you sure about that?                    05:51:18

11       A.   I believe -- yes, I believe that there

12    are.

13       Q.   Have you cited those documents?

14       A.   To the extent that I would have relied

15    upon them, yes, I would have cited them.            05:51:31

16       Q.   So if none of the documents that you

17    cited contain the phrase "conversion-based

18    autobidding," is it fair to say that none of the

19    documents you cited informed your understanding of

20    conversion-based autobidding?                       05:51:54

21       A.   That would be fair to say, I think.

22       Q.   And if the only document that you cited

23    that contains that phrase is the ChromeGuard study

24    document, and apart from that, your understanding

25    came from your conversations with Mr. Hochman, is   05:52:14

Page 226

1    it fair to say that I cannot tell from your report         05:52:17

2    what you learned about conversion-based

3    autobidding?

4          A.    I don't know the answer to that.  I'd

5    have to read my entire report, which I'm happy to          05:52:41

6    do right now, to answer that question.

7          Q.    Well, I can tell you that it does not

8    define the term.

9          A.    Are you asking me a question?

10         Q.    Do you disagree?                               05:53:04

11         A.    What does not define the term?

12         Q.    Your report.

13         A.    I don't disagree.  It may not define the

14    term.

15         Q.    And sitting here now, you cannot recall        05:53:22

16    what Mr. Hochman told you about conversion-based

17    autobidding?

18         A.    Not specifically, no.

19         Q.    Okay.  Your Footnote 219 is on page --

20    sorry.  Wrong one.  Strike that.                          05:54:08

21          Take another look at Figure 28.

22         A.    Figure 28 in my report?

23         Q.    Uh-huh.

24         A.    Okay.

25         Q.    Okay.  Do you see the references in this       05:54:27

Page 227

ATTORNEYS EYES ONLY

```
 1      ChromeGuard study screenshot to ███████████        05:54:37

 2          A.   Yes.

 3          Q.   And to ████████████████

 4          A.   Yes.

 5          Q.   Do you have an understanding of what      05:54:46

 6      those terms mean?

 7          A.   As I'm sitting here, I don't.  I don't

 8      recall what those terms mean.

 9          Q.   A little higher there, there's a term

10      ████████████████████████████████████████          05:55:14

11          A.   Yes.

12       ██      ██████████████

██       ██      █████████████████████████

██       ████████████████

██       ██      ████████████████████         █████████

██       ██      ████████████████████████

██       ████████████████████████████████████

██       ██████████████████████████

19          Q.   Okay.  Is there any basis for your

20      conclusion that user behavior with respect to      05:56:40

21      advertising on the Web is analogous to user

22      behavior with respect to advertising on mobile

23      devices?

24       ██      ████████████████████████████████

██       █████████████████████                            05:57:05
```

Page 228

ATTORNEYS EYES ONLY



```
 1      Q.   Yes.                                    05:57:07

 2      ██   ██████    █████

 3      Q.   What's the basis?

 4      ██   ████████████████████

        █   ████   ████████████████████       ██████

        █   ████████████████████████

        █   ████████████████████████

        █   ████████████████████████

        █   ████████████████████████████

        █   ██   ██████████████████████       ██████

        █   ████████████████████████

        █   ██████████████

        █   ██   █████   ████████████████

        █   ██   ████████████████

        █   ████████████████████████████       ██████

        █   ██   ████████████████████

        █   ████████████

18      Q.   Okay.

19            MR. LEE:   I think we need another break

20      soon.  How are you holding up, Mike?         05:58:20

21            THE DEPONENT:   Well, I mean, it feels

22      like somebody turned the heat on in here.  To be

23      honest, it feels a little unfair.

24            MR. SANTACANA:   Okay.  We can take a

25      break.                                    05:58:32
```

Page 229

ATTORNEYS EYES ONLY

```
 1              THE VIDEOGRAPHER:  This marks the end of      05:58:36

 2   Media No. 6.  Off the record.  The time is 5:58.

 3              (Recess taken.)

 4              THE VIDEOGRAPHER:  This marks the

 5   beginning of Media No. 7 in the deposition of         06:16:15

 6   Michael Lasinski.  We're back on the record.  The

 7   time is 6:15.

 8       Q.   (By Mr. Santacana)  Mr. Lasinski, I want

 9   to call your attention to your "Actual Damages"

10   opinion.                                              06:16:30

11       A.   Okay.

12       Q.   And just flip to that section of your

13   report.

14              MR. LEE:  It's 47.

15              THE DEPONENT:  Yup.                         06:16:47

16       Q.   (By Mr. Santacana)  All right.  So as we

17   discussed earlier, you determined actual damages as

18   a function of the payments necessary to incentivize

19   a class member to knowingly surrender the choice to

20   keep the activity on their mobile apps private,      06:17:03

21   right?

22       A.   That is correct, yes.

23       Q.   Do you agree or disagree with Dr.

24   Knittel -- I was informed it's "Knittel."

25       A.   Okay.                                        06:17:19
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

```
1              MR. LEE:  That changes everything.        06:17:21

2         Q.  (By Mr. Santacana)  Do you disagree with

3    Dr. Knittel that economic damages should measure

4    the difference between the plaintiffs' economic

5    position if the harmful event had not occurred and  06:17:27

6    the plaintiffs' actual economic position?

7         A.   I believe that that's accurate.

8         Q.   And just to be clear again on the limits

9    of your opinion, you did not attempt to measure any

10   emotional distress damages, right?                  06:17:52

11        A.   My -- my understanding of what's

12   necessary here is for me to calculate what is an

13   appropriate price paid to incentivize an individual

14   to knowingly surrender the choice to keep that app

15   activity private.                                   06:18:24

16             So when I think of that, I think of,

17   you know, what -- what would -- what would an

18   appropriate price be for someone to give up a peace

19   of mind.  In other words, if I don't know if I'd

20   call it emotional distress, but I think of it more  06:18:37

21   as like peace of mind for giving up that

22   information.

23        Q.   So I just want to be clear.  The analysis

24   you conducted here is an economic analysis, right?

25   You're measuring economic damages?                  06:18:51
```

1          A.    Monetary damages, correct.  Yes.          06:18:54

2          Q.    Okay.  So if we accept the premise that

3     that and emotional distress damages are different

4     things, would you agree with me that you're not

5     opining on what emotional distress damages would     06:19:06

6     be?

7          A.    If -- if you accept the premise that

8     those are different things, then yes.

9          Q.    Okay.

10         A.    I would agree with that.                  06:19:16

11         Q.    Are there any other forms of actual

12    damage that you attempted to measure other than

13    what is in your report?

14         A.    No, I did not.  Nothing more than what is

15    in my report.                                        06:19:29

16         Q.    You did, for example, attempt to measure

17    the cost to class members of the risk of identity

18    theft or some other privacy risk?

19         A.    That is correct.  I did not.

20         Q.    And you did not attempt to measure the    06:19:42

21    cost of a raised risk of data leaks from a data

22    breach?

23         A.    That -- that is correct.  I did not

24    calculate that.

25         Q.    Okay.  So --                              06:19:57

                                            Page 232

ATTORNEYS EYES ONLY

```
 1        A.   Well --                              06:20:00

 2        Q.   Go ahead.

 3        A.   Now, just to be clear, to the extent that

 4   people are worried about that, I believe that that

 5   is captured in the $3 here.                    06:20:10

 6             And so to me, that calculation -- a

 7   market-based price captures what a person would be

 8   worried about.  And those are two things that make

 9   sense for a person to be worried about if they're

10   giving up more data.                           06:20:24

11        Q.   Fair.  Fair point.

12             So did you do anything to analyze the

13   named plaintiffs' testimony to determine whether

14   they indicated what a market price would be for

15   their data?                                    06:20:49

16        A.   I did not look at the named plaintiffs'

17   testimony as it related to that.

18        Q.   You would agree with me that the best

19   measure of a market price or a fair price here --

20   by the way, "market price" is a term you just used.   06:21:13

21   Is that different from "fair market value" and

22   "fair price," which are terms we described before?

23        A.   I think that -- I think "fair price" is

24   different than -- from "fair market value."

25             So I think -- I think, thinking about     06:21:26
```

Page 233

| | | |
|---|---|---|
| 1 | this, as far as an appropriate price like I | 06:21:29 |
| 2 | described it in my report is the way to -- the way | |
| 3 | to say it. | |
| 4 | I may slip up every once a while because | |
| 5 | I use "market value" and "fair market value" in | 06:21:37 |
| 6 | other contexts.  But I'm using what I'm -- what I'm | |
| 7 | talking about here in my report. | |
| 8 | Q.   Okay.  So would you agree with me that | |
| 9 | the best measure of the fair price in your actual | |
| 10 | damages opinion is going to be prior economic | 06:21:50 |
| 11 | transactions that are similar to the one that | |
| 12 | you're hypothesizing? | |
| 13 | A.   Based on data available in this case, | |
| 14 | yes, I agree that that is -- like the study that | |
| 15 | I'm relying upon in this case. | 06:22:13 |
| 16 | Q.   You are aware that Google Analytics for | |
| 17 | Firebase is not the only conversion tracking or | |
| 18 | analytics product on the market for mobile apps? | |
| 19 | A.   I am aware of that, yes. | |
| 20 | Q.   There are others that are produced and | 06:22:27 |
| 21 | serviced by companies other than Google? | |
| 22 | A.   That is my understanding, yes. | |
| 23 | Q.   You're aware that sometimes mobile apps | |
| 24 | will use multiple analytics products in the same | |
| 25 | app? | 06:22:40 |

Page 234

1    A.   That is consistent with my understanding.        06:22:43

2    Q.   So fair to say at least some of the class

3    members in this class, for example, used apps that

4    used both Google Analytics for Firebase and a

5    third-party analytics solution?                       06:22:58

6    A.   I don't know if that's fair to say or

7    not.  That may have happened.

8    Q.   Well, it's a class of 90 million people.

9    Do you have any reason to doubt that that -- some

10   people in the class are in that category?            06:23:14

11   A.   No, I do not.

12   Q.   People in that category who used an app

13   that used both Google Analytics for Firebase and,

14   let's say, AppsFlyer as an example of a third-party

15   analytics solution, is it fair to say that those     06:23:32

16   people have entered into a transaction with the app

17   that uses both of those analytics solutions, they

18   are giving up data in exchange for using the app?

19        And assume for me that the app is

20   disclosing it, so it is not hidden to them.          06:24:05

21   A.   So the app -- the app is disclosing that

22   they're giving up their data in exchange for using

23   the app?

24   Q.   Yeah.  So, I mean, you use a mobile

25   phone, right?                                        06:24:21

Page 235

ATTORNEYS EYES ONLY

1        A.    Yes, I do.                                    06:24:22

2        Q.    Sometimes you download an app, you

3    install it, you open it up, it says "click here to

4    agree to our privacy policy and terms of use," you

5    say yes, and now you use the app, right?            06:24:30

6        A.    Correct.

7        Q.    So assume for me that some of those

8    privacy policies disclosed the use of analytic

9    solutions from Google, from other companies,

10   sometimes more than one at once, sometimes just     06:24:41

11   Google, sometimes other companies.  Okay?

12           Assume that for the moment.

13       A.    I think -- I think I'm following you.

14       Q.    With respect to the data generated in

15   those apps that do that, isn't the user agreeing to  06:24:56

16   give up their analytics data in exchange for using

17   the app?

18           As an economic matter, isn't that the

19   transaction that's occurring?

20       A.    To -- to that specific app?            06:25:22

21       Q.    Uh-huh.

22       A.    If -- if -- I think I'm following you.

23   But if it was disclosed and it said you're giving

24   up your data, and the user downloaded the app and

25   used it, then yes.  They are giving their data --   06:25:36

Page 236

1    they are allowing that data to use their -- they                06:25:40

2    are allowing that app to use their data in exchange

3    for using the app.

4             I mean, I hope you're not trying to trick

5    me here.  You're just telling me, like, assume                  06:25:50

6    these four facts.

7        Q.   Yes.  I'm not trying to trick --

8        A.   And I'm just assuming them.

9        Q.   You should.

10       A.   Okay.                                                   06:25:59

11       Q.   I mean, I could show a privacy policy

12   from a random app if you want, but I think you can

13   just assume it, and it's easier that way.

14            MR. LEE:  Is WAA on or off in this

15   scenario?                                                        06:26:09

16            MR. SANTACANA:  I didn't specify for that

17   user.  That's where we'll go now, next.

18            MR. LEE:  Right.  Okay.  Well, then, no

19   objection so far.

20       Q.   (By Mr. Santacana)  So now imagine the                  06:26:17

21   same user we were just talking about has a Google

22   account, and their sWAA is set to off.

23       A.   Okay.

24       Q.   And they install this app on their

25   Android phone.  The app says we use                              06:26:32

                                                      Page 237

```
 1     Google Analytics and we use this other third-party      06:26:36

 2     as well for analytics.  Okay?

 3            With me so far?

 4        A.   I think so.

 5        Q.   So this sWAA-off user, according to the         06:26:44

 6     plaintiffs, has indicated that they do not want

 7     that analytics data to be used by Google, but

 8     there's no such restriction on the use of the

 9     third-party analytics service by the app.  Right?

10     That's not a claim the plaintiffs are making; fair      06:27:04

11     to say?

12        A.   I think I'm following you.

13        Q.   Isn't the user's decision in that moment

14     to use the app a fair indication of how much the

15     user values the data in question, given that they      06:27:24

16     would be providing the same data, or the app would,

17     to the two different analytics providers?

18            MR. LEE:  Objection to form.

19            THE DEPONENT:  No.

20        Q.   (By Mr. Santacana)  Why not?                    06:27:36

21        A.   Well, one person may -- one person may,

22     in this hypothetical, choose to allow the app to

23     use their private information, knowing certain

24     things about the app, knowing certain things about

25     how the app would that data.                            06:27:57
```

Page 238

```
 1              But then they could still have a deal       06:27:59

 2    where they don't want someone else to use that

 3    information.  And if they have a deal, in this

 4    case, with Google, for example, they may say no,

 5    that information is not something that I'm willing    06:28:11

 6    to share with Google.

 7              And there would be a price -- before I

 8    would share that information with Google, there

 9    would be a price that someone would charge for that

10    information.                                          06:28:24

11       Q.   So it's possible for the same sWAA-off

12    user to, in this hypothetical, demand a price from

13    Google for their analytics data but no price from

14    the app or the third-party analytics provider that

15    the app also uses.  Fair?                             06:28:41

16       A.   No, that's not -- that's not fair.

17    They -- they are -- they are getting value.

18       Q.   By using the app?

19       A.   Correct.

20       Q.   Okay.  So when this user chooses to use      06:28:51

21    the app, there is a bargain with the app where they

22    agree to the app's usage of analytics providers in

23    exchange for using the app and no money, right?

24       A.   This is the hypothetical that you're

25    posing to me.  So you're -- you're saying "right,"    06:29:21
```

Page 239

| | | |
|---|---|---|
| 1 | but you telling me to assume that. So yes. | 06:29:24 |
| 2 | Q. Well, but -- right. | |
| 3 | So my curiosity is about your answer | |
| 4 | where you said that it's not possible that the same | |
| 5 | sWAA-off user in this hypothetical will demand a | 06:29:37 |
| 6 | price from Google but not from the app or from the | |
| 7 | third-party analytics provider. | |
| 8 | And you said the reason it's different is | |
| 9 | because they are getting value out of the app. | |
| 10 | So now I'm just trying to put the value | 06:29:48 |
| 11 | of the app into the hypothetical. | |
| 12 | Does that make sense? | |
| 13 | A. I think so. | |
| 14 | Q. So what is the difference, as an economic | |
| 15 | matter, between the user providing their data to | 06:30:05 |
| 16 | Google and the user providing their data to a | |
| 17 | third-party analytics provider that is not Google? | |
| 18 | A. So, again, that third -- that | |
| 19 | third-party, depending on -- depending on the | |
| 20 | disclosure, may believe that they're getting a | 06:30:35 |
| 21 | value for the app. | |
| 22 | Like, for example, I know if I sign up to | |
| 23 | some of these policies, sometimes they won't charge | |
| 24 | me for the app. It would be like -- | |
| 25 | Q. Right. | 06:30:53 |

Page 240

```
 1        A.    -- or it's ten bucks if I want to          06:30:53

 2   download the app.  Well, I didn't get any money,

 3   but I saved $10.

 4            So to me, when you saved $10, you'd say,

 5   wait, okay, I got value for my data.                 06:31:05

 6        Q.    Yes.

 7        A.    And so I don't -- economically, it's

 8   similar.

 9            And in this case, when you brought Google

10   into -- into the equation, they signed up for a      06:31:21

11   privacy policy with Google knowing that they signed

12   that policy, in this case, sWAA off.  And my

13   understanding is the expectation of that is they

14   would not collect, save, or use that data then.

15        Q.    So what I'm focused on is the language in  06:31:47

16   your paragraph 130 where you say that you're trying

17   to identify the payment necessary to incentivize

18   the individual "to knowingly surrender the choice

19   to keep activity on mobile apps private and allow

20   an organization to track app activity data."         06:32:06

21            Was your task here generic as to who

22   receives the data, or was it specific as to Google?

23   And is there a difference?

24        A.    Here, I think it is specific as to

25   Google.  And certainly, there could be --            06:32:30
```

Page 241

ATTORNEYS EYES ONLY

```
 1    certainly, there could be a difference in what        06:32:38

 2    someone is willing to accept for providing the

 3    information.

 4         Q.   Depending on who they are providing it

 5    to?                                                    06:32:48

 6         A.   That -- yes.

 7         Q.   So the same user may demand $3 per device

 8    from Google, but nothing from AppsFlyer, for

 9    example?  That's possible --

10         A.   Well --                                      06:33:02

11         Q.   -- as an economic matter?

12         A.   I don't know that that's possible.  I

13    mean, at -- at the end of the day -- at the end of

14    the day, when people share their data, oftentimes

15    they are assuming that they're going to get value     06:33:15

16    for that.

17              So -- so you say you're getting nothing,

18    but if you provide -- if you go through that policy

19    that you're talking about -- if you go through that

20    policy that you're talking about with a third-party   06:33:30

21    app that uses that service, they got value for

22    that.

23              I -- in your hypothetical, I think what

24    you're saying is, well, if that -- that analytics

25    company called them up and said, "Hey, give me your   06:33:45
```

Page 242

```
 1    data," I can't imagine that there would be anyone        06:33:48

 2    that would just say, "Here, here's some free data."

 3        Q.   I see.  Fair enough.  It's not quite what

 4    I was imaging, but that's helpful.

 5            I guess where I'm confused is that you           06:34:00

 6    are attempting to measure the difference between

 7    that class member's economic position in real life

 8    and in a world where the plaintiffs' view of sWAA

 9    had been honored, right?

10            What is the difference in their economic         06:34:56

11    position; that's how you're determining actual

12    damages?

13        A.   I think you're saying -- yeah, where it

14    was taken for free, for nothing.

15        Q.   Right.  Or against -- allegedly against         06:35:13

16    their will according to their sWAA setting?

17        A.   That is correct.  That's -- that's what

18    my understanding is.

19        Q.   But the exact same data could have been

20    taken by a third-party analytics company with whom      06:35:24

21    the user has no relationship, and the user accepted

22    that in exchange for using the app?

23        A.   Under your scenario --

24        Q.   Yes.

25        A.   -- yes.                                         06:35:39
```

Page 243

ATTORNEYS EYES ONLY

1       Q.   Do you see any contradiction there?          06:35:40

2       A.   No.

3       Q.   Why not?

4       A.   Because, again, for -- for a number of

5    reasons.                                              06:35:47

6            First, a user can enter into a

7    transaction with one entity and another entity for

8    that exact same data and charge different amounts.

9    That's the user's prerogative.  That happens all

10   the time in transactions.                             06:36:06

11           You -- you seem to be keep indicating

12   that they gave it away for free, but they did

13   not --

14       Q.   Well, for the app.

15       A.   Yeah.  But the app is not free.             06:36:16

16       Q.   Go ahead.

17       A.   The app might be free, but they got value

18   for that.  And so it's not -- it's -- it's a

19   transaction.  It's -- it's a bargain.  It's a

20   transaction.  And there's a monetary value for       06:36:35

21   being able to use an app.

22       Q.   How do you measure that value?

23           Or do you, in this case, measure that

24   value?

25       A.   Now, what value are you talking about       06:36:51

                                                          Page 244

ATTORNEYS EYES ONLY

1    there?                                                06:36:53

2        Q.   The monetary value for being able to use

3    an app.

4        A.   I have not measured it in this -- in this

5    case.  I mean, I know one way that way people         06:37:02

6    measure those such things is some apps -- some apps

7    have free versions.  Some apps will give you

8    additional features, and they'll make -- charge you

9    more.  Some apps just charge right out of gate.

10            So how do you measure the value -- how do     06:37:17

11   you measure the value of the app?  You can look to

12   market transactions, just like what I did here is

13   look to a market-based transaction.

14       Q.   Well, the market-based transaction you

15   looked at here is very different in kind than the     06:37:33

16   market-based transaction that's happening every day

17   when users download apps, agree to privacy policies

18   that disclose analytics services, and use the app

19   and get that value.

20            And I guess what I'm trying to get at is,     06:37:48

21   why didn't you consider that in your analysis of

22   market transactions?

23            Every day, there are probably of hundreds

24   of millions of agreements entered into between end

25   users and app developers where the user agrees to     06:38:11

Page 245

```
 1    give up data to analytics in exchange for using the      06:38:15
 2    app.
 3            Why didn't you take those market
 4    transactions into account when looking for a
 5    comparable?                                              06:38:24
 6        A.    For two -- for two reasons.
 7            One is, I have a very good comparable
 8    here with -- with Ipsos Screenwise, as well as the
 9    other ones that I talked about here.  You're --
10    you're talking about going out and analyzing            06:38:46
11    hundreds of millions of transactions, which would
12    cost a significant amount of money and I'm not sure
13    that would end up with any better information than
14    what I had here.
15            And in those cases, you would have to           06:39:02
16    make assumptions about how each individual valued
17    the app that they downloaded and gave up their data
18    for.  That is -- in my opinion, as I sit here
19    today, that would probably be a less valuable
20    exercise than relying upon what I did -- than what      06:39:25
21    I did here.
22            I would say it would rely -- would result
23    in less reliable data than what I did here.
24        Q.    In the negotiation that you posit in your
25    actual damages opinion, you theorize that Google        06:39:52
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

| | | |
|---|---|---|
| 1 | and the user would reach the amount of $3.  The | 06:39:59 |
| 2 | user gives up certain data and, in exchange, | |
| 3 | Google Pays $3, and you believe that's the fair | |
| 4 | price for the certain data, right? | |
| 5 | A.   Per device. | 06:40:12 |
| 6 | Q.   Per device.  That's right. | |
| 7 | Did you take into account in analyzing | |
| 8 | this hypothetical transaction between Google and a | |
| 9 | user the restrictions that there would be on | |
| 10 | Google's use of the data the user is giving up or | 06:40:33 |
| 11 | the degree to which it is restricted, if at all? | |
| 12 | MR. LEE:  Objection.  Form. | |
| 13 | Q.   (By Mr. Santacana)  I'll come back to it. | |
| 14 | Let me ask you this:  You understand | |
| 15 | Google doesn't personalize ads with sWAA-off data, | 06:41:03 |
| 16 | right? | |
| 17 | A.   That is my understanding, yes. | |
| 18 | Q.   What it does do, according to the | |
| 19 | plaintiffs and Mr. Hochman, is recordkeeping | |
| 20 | surrounding advertising.  It takes account of the | 06:41:17 |
| 21 | ads that it shows, the ads that get clicked on, and | |
| 22 | conversions that are made, even if the user has | |
| 23 | sWAA off. | |
| 24 | That's the claim in the case, right? | |
| 25 | A.   Well, that's certainly part of the claim. | 06:41:35 |

Page 247

ATTORNEYS EYES ONLY

```
 1    That's correct.                                      06:41:37

 2        Q.   But it's not the case that Google does

 3    personalizing of advertising or targeting with that

 4    same information, right?

 5             That's your understanding?                  06:41:44

 6        A.   That -- for sWAA-off --

 7        Q.   Right.

 8        A.   -- users.  That is -- that is correct.

 9        Q.   For sWAA-on users, it can personalize

10    advertising, right?                                  06:41:57

11        A.   For sWAA-on -- I believe that it can,

12    yes.  I'm not 100 percent sure.  I guess it would

13    depend on the -- on the particular user.  If the

14    user had GAP off, then no, I guess it couldn't.

15        Q.   Does your hypothetical $3 fair price take   06:42:14

16    into account that distinction, that Google, even

17    though it's getting the data from that user, can

18    only use it for this accounting purpose.  It cannot

19    use it to personalize ads?

20             Is that a restriction on the use of the     06:42:30

21    data that you've taken into account in arriving at

22    your $3?

23        A.   Yes.

24        Q.   So if Google could use it for

25    personalization, presumably the $3 figure would be   06:42:38
```

Page 248

ATTORNEYS EYES ONLY

```
 1   higher?                                              06:42:43

 2        A.   It certainly could be higher.  That is

 3   correct.

 4        Q.   Okay.  And if Google couldn't use it for

 5   anything, it was just, "Here's my data," and then    06:42:53

 6   Google just lights it on fire and throws it in the

 7   ocean, then presumably the price would be lower

 8   than $3?

 9            I'm just trying to understand the

10   dynamics of this transaction.                        06:43:07

11        A.   I guess I'm really not understanding,

12   like -- like, if you give someone your data, and

13   they light it on fire and send it into the ocean --

14   and send it into the ocean.

15        Q.   Then you'd probably agree to that for      06:43:20

16   less money?

17        A.   I -- that is possible.  I am not

18   100 percent sure.  That seems like a weird

19   hypothetical that I can't really fathom anyone

20   would enter into, but --                             06:43:36

21        Q.   No pun intended.

22        A.   -- possible.

23        Q.   I guess what I'm trying to get at is, it

24   seems to me, at least, that in this transaction you

25   hypothesize, one of factors that would drive the     06:43:51
```

Page 249

```
 1    price up or down is what Google's going to do with      06:43:54

 2    the data, right?

 3              MR. LEE:  Objection to form.

 4    Mischaracterizes.

 5              THE DEPONENT:  I -- I mean, I don't -- I       06:44:07

 6    don't necessarily think that would drive it up or

 7    down, what Google is going to do to the data.

 8              I think that what I'm talking about here

 9    is you need to incent someone to part --

10    incentivize someone to part with their data.  And       06:44:25

11    to part with that data is what I'm talking about

12    here.

13        Q.   (By Mr. Santacana)  Well, okay.  But a

14    moment ago, you said if Google is going to use it

15    for personalization, that would drive the price up?     06:44:35

16        A.   It could.  You're asking about a

17    hypothetical.  It could -- it could drive it up.

18    I -- I'm trying to answer your questions.

19              I did a specific analysis based on what

20    actually happened.  That didn't actually happen.        06:44:47

21    But...

22        Q.   Well --

23        A.   You're asking me about hypotheticals, and

24    I'm trying to answer them as best I can.

25        Q.   Your opinion attempts to characterize           06:44:55
```

Veritext Legal Solutions

Calendar-CA@veritext.com 866-299-5127

```
 1    what a user who does not exist would be willing to      06:45:01

 2    accept in dollars in exchange for data that in real

 3    life was collected and used by Google, right?

 4           That's your task here?

 5      A.   Well, I think that the users do -- I             06:45:16

 6    mean, there's -- there's a large class of users

 7    that do exist.

 8      Q.   I'm sorry.

 9           A user who exists but who didn't actually

10    have a chance to have this negotiation with Google,      06:45:24

11    right?

12      A.   That is correct.

13      Q.   And you're trying to figure out what

14    would it take to get them to part with the data?

15      A.   That -- that's what I'm calculating here        06:45:35

16    is what it would take for them to part with the

17    data.

18      Q.   So if Google says, I'll pay you $3, and

19    then I'm going to publish the data on Reddit, okay,

20    isn't that a different deal than I'll give you $3,      06:45:49

21    but I'm only going to use it for advertising and

22    bookkeeping purposes?

23           MR. LEE:  Objection.  Incomplete

24    hypothetical.

25      Q.   (By Mr. Santacana)  It matters what           06:46:08
```

Page 251

1    Google is going to use it for?                          06:46:09

2         A.   To some -- to some extent, yes, that

3    makes sense.

4         Q.   Okay.  So did you describe in your report

5    or come to any reasoning about what impact Google's     06:46:16

6    use of the data would have on the price, this $3

7    price?

8              MR. LEE:  Asked and answered.

9              THE DEPONENT:  I mean, again, I know how

10   they're -- I know how they're using the data.  I        06:46:33

11   have, obviously, the information that was provided

12   to me.

13             So yes, I -- I looked at that.  I looked

14   at that, and I compared it to the Ipsos study.

15        Q.   (By Mr. Santacana)  Right.                     06:46:47

16        A.   And then I determined that a $3 price was

17   appropriate per device --

18        Q.   The Ipsos study --

19        A.   -- in this case.

20        Q.   I'm sorry.  Go ahead.                          06:46:53

21        A.   For this case.

22        Q.   The Ipsos study terms allow Google to use

23   the participants' data for personalized

24   advertising, right?

25        A.   That is correct.                               06:47:08

                                                   Page 252

1       Q.   And those terms allow Google to join the    06:47:08

2   data with other data Google has about that person,

3   right?

4       A.   That is correct.  Yes.

5       Q.   Okay.  The terms of the transaction that    06:47:16

6   you're hypothesizing in paragraph 130, 131 and 132

7   would not permit that, right?

8       A.   Well, that -- that is my assumption, yes.

9   No, it would not.  They do not -- they do not get

10   personalized ads right now, so I would not expect    06:47:49

11   that they would expect that they would all of a

12   sudden start receiving personalized ads.  That's

13   correct.

14       Q.   So did you adjust the Ipsos price

15   downward to reflect that greater restriction on the    06:47:59

16   use of the data?

17       A.   No, one wouldn't -- I would not need to

18   do that, no.

19       Q.   Why not?

20       A.   Because here, again, in the Ipsos -- we    06:48:05

21   talked about this earlier.

22       In Ipsos study, we are talking about

23   willing participants versus unwilling participants.

24       So the WAA-off/sWAA-off users are

25   unwilling participants in this.    06:48:21

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

```
1          They are collecting, meaning Google is          06:48:25
2    collecting, data that participants believe --
3    participants believe that is -- that participants
4    have gone through the steps that indicate that that
5    data is important to them, and they do not want it     06:48:52
6    shared.  That's not the case in the Ipsos study.
7          So making an additional adjustment to
8    what I've made, where here, we're talking about the
9    device, specifically the device, and Ipsos pays $3
10   for the device but then pays -- but then pays          06:49:12
11   additional dollars on top of that for some of the
12   information that you were talking about earlier, I
13   don't believe that I need to make any adjustments,
14   because here we're talking about device to device.
15   Q.   I don't understand your answer.                   06:49:41
16         The transaction in Ipsos gives Google a
17   wider latitude for what it can do with the data
18   than the transaction you're hypothesizing.
19         Did that play any role in the amount of
20   money that you ultimately concluded this               06:49:55
21   hypothetical transaction would arrive at as a fair
22   price?
23   A.   I don't know how to answer that other
24   than what I've answered before.  In this -- in the
25   Ipsos study, Google pays market participants in a      06:50:12
```

Page 254

```
 1    number of different ways, not just on a -- not just        06:50:19

 2    on a per device.

 3            They pay money for their Web browser.

 4    They pay money for devices.  They pay money for

 5    using a router.  They pay money for all these other       06:50:31

 6    things.

 7            But once you get down to the device

 8    level, you're -- what -- in my opinion collecting

 9    similar information.  And that similar -- and that

10    similar information, the best market data point is        06:50:45

11    the $3 -- the $3.  They've already been compensated

12    for those -- that other use of the data.

13        Q.   Okay.  I need you to listen carefully to

14    this question, because I understand your answer,

15    but then my question's different.                          06:51:05

16            Did the difference in the terms of the

17    transaction regarding what Google could do with the

18    data, did it play a role in the amount of money you

19    ultimately concluded the hypothetical transaction

20    in this case would arrive at?                              06:51:23

21            Did it play a role?  I just want to know.

22        A.   Well, I think I just answered that with

23    what I just said, but --

24        Q.   Well, what you said summarized your whole

25    opinion.                                                   06:51:34
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

1     A.   -- yes.                                       06:51:34

2     Q.   I want to know if this was one of the

3   factors that you considered, and, if so, what role

4   it played.

5     A.   I -- I just said.  But yes, it -- it is      06:51:42

6   one of the things that I considered in my -- in my

7   analysis.

8     Q.   And what role did it play?  Did it drive

9   the price up or did it drive it down?

10         MR. LEE:  Objection to form.                  06:51:57

11         THE DEPONENT:  Well, as we know, in -- in

12   this case, they -- I am assuming that these users

13   will get paid less than what they get paid in the

14   Ipsos study.

15         So there are -- there certainly is a         06:52:09

16   lower amount of compensation that I put to a user

17   relative to what they would get in the Ipsos study.

18   And so that -- yes, that is one of things that I

19   considered when I was selecting the $3 in this

20   case.                                               06:52:27

21     Q.   (By Mr. Santacana)  How much lower did it

22   drive the price?

23     A.   I did not quantify specifically how much

24   lower that particular aspect drove the price.

25     Q.   Did you quantify in your report or in       06:52:44

                                                        Page 256

```
 1    some other way how much any factor in particular        06:52:47

 2    affected the price?

 3         A.   Yes.

 4         Q.   Where?

 5         A.   I mean, it's in -- it's what I talk about      06:53:00

 6    in my "Actual Damages" --

 7         Q.   Show me.

 8         A.   -- section.

 9              So, again, ultimately what I'm -- what

10    I'm selecting here is mobile phone price, $3, and        06:53:23

11    tablet price of $3.  I'm not including the router.

12    I'm not including the browser.  I'm not including

13    the $2 bonus.  I'm not including the hundred

14    dollars for installing a router.

15              Any of those -- any of those additional        06:53:43

16    compensations -- compensation that is paid to a

17    user, I'm not including that.

18         Q.   My question was a little different.

19              Let me -- let me try and ask it a

20    different way.                                           06:53:58

21              In any negotiation, there are factors

22    that will drive the price up and factors that will

23    drive it down, right?

24         A.   That -- yes.

25         Q.   Fair to say?                                   06:54:12
```

Page 257

ATTORNEYS EYES ONLY

```
1        A.   That is correct.                          06:54:12

2        Q.   Okay.  So as you are trying to determine

3   how to incentivize a class member to part with the

4   data, there will be factors that come into that,

5   right?                                              06:54:21

6        A.   I -- I think -- I think you're talking

7   about any transaction, whether or not it's this

8   transaction or any other transaction.

9        Q.   Did you quantify any specific factor as

10  to its impact on the ultimate price for this        06:54:36

11  transaction, or was it more of a totality of the

12  circumstances-type conclusion about the $3?

13            MR. LEE:  Asked and answered.

14       Q.   (By Mr. Santacana)  I mean, I don't think

15  you did.  I don't think there's a table that says   06:54:55

16  this factor, minus $1; this factor, minus 12 cents.

17  That's not in here.

18            I'm just asking you if it's somewhere

19  else or if I misread it.

20            THE DEPONENT:  No, if you're asking if     06:55:04

21  there's a table like that that's in my report, it's

22  not in my report, as you know.

23            And I don't have any similar table

24  somewhere else.

25       Q.   (By Mr. Santacana)  How did you calculate  06:55:13
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    the $3 payment per device?                          06:55:14

 2        A.   Again, as we -- we talked about, I looked

 3    at this -- this analysis, the Ipsos study, as well

 4    as the other studies that I talk about in my actual

 5    damages.  I determined, based on the comparability   06:55:36

 6    of specifically the Ipsos study as it relates to

 7    mobile phones and tablets, so devices, of $3 as --

 8    I believe that that's an appropriate one-time

 9    payment per device based on the information that

10    was available to me here.                           06:55:58

11        Q.   Why isn't the $3-per-device price that

12    you arrived at higher than what the Ipsos study

13    pays participants?

14             You say the Ipsos study is willing

15    participants.  This is unwilling --                 06:56:31

16        A.   Yes.

17        Q.   -- participants.

18             So shouldn't these unwilling participants

19    get paid more?

20             MR. LEE:  Asked and answered.              06:56:38

21             THE DEPONENT:  I think I answered that

22    before.  But I do believe that this is a

23    conservative value for those -- for the Ipsos

24    studies.

25        Q.   (By Mr. Santacana)  What does              06:56:45
```

Page 259

ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | "conservative" mean in that sentence? | 06:56:45 |
| 2 |     A.   It means that it could be -- it could, in | |
| 3 | fact, be higher.  But I think that this is an | |
| 4 | appropriate price to incentivize based on what I | |
| 5 | said -- based on what I said before, to incentivize | 06:56:55 |
| 6 | those users to part with their data. | |
| 7 |     Q.   Would $4 be an appropriate price? | |
| 8 |         MR. LEE:  Objection to form. | |
| 9 |         THE DEPONENT:  I -- I did not do an | |
| 10 | analysis of $4, so I don't know the answer to that. | 06:57:06 |
| 11 |     Q.   (By Mr. Santacana)  What do you mean you | |
| 12 | did not do -- you did an analysis and came up with | |
| 13 | a number.  So presumably, you considered all | |
| 14 | numbers that exist, and you arrived at one of them | |
| 15 | and said, "This is the answer." | 06:57:16 |
| 16 |         So I'm just saying, why did you rule out | |
| 17 | $4? | |
| 18 |     A.   Ultimately, I've got a market transaction | |
| 19 | here that shows $3. | |
| 20 |     Q.   Per month, which you deviated from? | 06:57:25 |
| 21 |     A.   Correct. | |
| 22 |     Q.   So why didn't you say $4? | |
| 23 |     A.   Because -- | |
| 24 |         MR. LEE:  Asked and answered. | |
| 25 |         Go ahead. | 06:57:37 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

```
1          THE DEPONENT:  Because based on the       06:57:37

2     totality of the information available to me, as we

3     talked about earlier in the deposition, I think

4     that -- I think that $3 is an appropriate amount.

5     A one-time payment of $3 is an appropriate amount.    06:57:48

6          Q.   (By Mr. Santacana)  So you would agree

7     with me that $4 is too much?

8             MR. LEE:  Mischaracterizes testimony.

9             THE DEPONENT:  Again, I think $3 is

10    conservative.  Could be it higher than $3?  Yes.    06:58:03

11    It could be --

12         Q.   (By Mr. Santacana)  Could be it lower?

13             MR. LEE:  Hold on.  Let him finish.

14             THE DEPONENT:  Could it be higher than

15    $3?  Yes.  No, I do think it could be lower than    06:58:09

16    $3.

17         Q.   (By Mr. Santacana)  So $3 is the lowest

18    number that you could come up with?

19         A.   $3 per device.  I don't think that I

20    would come up with a number lower than that.  I    06:58:19

21    did -- I would not come up with a number lower than

22    that.

23         Q.   Are there members of the class who you

24    would expect would demand more than $3 if they had

25    the opportunity to engage in this negotiation?    06:58:34
```

Page 261

ATTORNEYS EYES ONLY

```
 1              MR. LEE:  Calls for speculation.        06:58:42

 2              THE DEPONENT:  I don't -- I don't know

 3      the answer to that.  I didn't analyze that.

 4      Certainly, I think $3 is an appropriate price to

 5      incentivize the class members to part with their    06:58:58

 6      data, as I said.

 7          Q.   (By Mr. Santacana)  Does that mean that

 8      there is no member of the class, in your opinion,

 9      who would require more than $3 to be incentivized

10      to part with their data?                         06:59:16

11              MR. LEE:  Calls for speculation.

12              THE DEPONENT:  I don't -- I don't -- I

13      mean, again, I didn't do an analysis of that, so I

14      don't -- I don't know the answer to that.

15          Q.   (By Mr. Santacana)  Well, you said $3 is    06:59:24

16      an appropriate price to incentivize the class

17      members.

18          A.   That is correct.

19          Q.   Doesn't that imply that there can't be a

20      class member who would need $3.01?  Otherwise, your    06:59:32

21      number would be wrong, right?

22          A.   I think -- I think if you're -- if you're

23      talking about the precision of $3 versus $3.01 --

24          Q.   Okay.  $3 versus $3 trillion.  How do you

25      know there isn't a class member who requires        06:59:48
```

Page 262

ATTORNEYS EYES ONLY

```
 1    $3 trillion?                                           06:59:51

 2            MR. LEE:  Objection --

 3       Q.   (By Mr. Santacana)  You understand my

 4    question, right?

 5            MR. LEE:  Objection -- hold on.               06:59:54

 6            Objection.  Mischaracterizes the model.

 7            THE DEPONENT:  I don't -- I'm not aware

 8    of Google offering anyone $3 trillion for their

 9    data.

10       Q.   (By Mr. Santacana)  But part --              07:00:08

11       A.   But --

12            MR. LEE:  Hold on.

13       Q.   (By Mr. Santacana)  Go ahead.

14       A.   But if they did, I -- I would assume that

15    someone would likely take that.                      07:00:14

16       Q.   So in paragraph 132, you say that the

17    factors that matter are Google's payments,

18    historical payments, for user data; users'

19    willingness to pay to prevent data collection; and

20    research organizations' willingness to pay for data  07:00:32

21    collection.

22            Did you take into account at all what

23    users accept in exchange for data collection?  Or

24    is that just implied in the payments Google makes?

25       A.   What users accept, I know what users -- I    07:00:53
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

```
1    know at least some set of users --                    07:00:55

2         Q.   Okay.

3         A.   -- are willing to accept, because I know

4    what's going on in the Ipsos study.

5         Q.   Okay.  And in your mind, is the Ipsos       07:01:01

6    study representative of all similarly situated

7    users?

8         A.   I don't know if it's all similarly

9    situated users, but I do think it's -- it's a good

10   comparable to use in this case.                       07:01:22

11        Q.   So then I return to my question, which

12   is, how do you know that there aren't some

13   significant chunk of the class -- let's say,

14   privacy fundamentalists -- who would refuse to part

15   with their data at $3, just flat-out refuse,          07:01:44

16   absolutely not.  Not $4.  Not $5.  Maybe $100.

17             How do you know there aren't people like

18   that in the class?

19        A.   Well, if you're asking me if I did a

20   study of the class, I did not do a study of the       07:01:57

21   class.  So I think --

22        Q.   I'm asking --

23        A.   So I think -- I think, when you look at

24   the class as a whole, and you think about what

25   would be appropriate to incentivize class members     07:02:09
```

Page 264

ATTORNEYS EYES ONLY

```
1   to part with their data, the data points that are        07:02:15

2   most important or that are most reliable, based on

3   the information available, are the Ipsos study data

4   points.

5        Q.   Do you know what a privacy fundamentalist      07:02:27

6   is?

7        A.   Yes.

8        Q.   Do you think they would take $3?

9             MR. LEE:  Calls for speculation.

10            THE DEPONENT:  I don't know what they           07:02:35

11  would take.  I -- I have not surveyed them, as I

12  stated earlier in my case.

13       Q.   (By Mr. Santacana)  Do you doubt --

14       A.   In -- in my testimony, I should say.

15       Q.   Do you doubt that there are privacy            07:02:47

16  fundamentalist in this class?

17       A.   No, I do not.

18       Q.   Is it your opinion that a privacy

19  fundamentalist in this class would accept $3 in

20  exchange for the at-issue data?                          07:02:59

21            MR. LEE:  Calls for speculation.

22            THE DEPONENT:  I -- I mean, I just can't

23  speculate on that.  I don't know the answer to

24  that.  I did not do a survey.

25       Q.   (By Mr. Santacana)  So your opinion on $3      07:03:09
```

Page 265

1    is meant to capture sort of a population average,       07:03:11

2    conservative floor fair price; is that a fair

3    characterization?

4         A.   I think it's a conservative floor,

5    appropriate price for the class -- for the class.       07:03:29

6    Yes, I agree with that.

7         Q.   But there may be people in the class who,

8    if they could do it themselves, they'd negotiate a

9    different price, maybe even a very different price?

10            MR. LEE:  Calls for speculation.              07:03:45

11            THE DEPONENT:  I don't know the answer to

12    that.

13            MR. LEE:  Can we get a time check,

14    please?

15            THE VIDEOGRAPHER:  Time is running, so I       07:03:52

16    can give an approximation, which is 6 hours and

17    28-ish minutes.

18            MR. LEE:  Okay.  Thanks.

19         Q.   (By Mr. Santacana)  Would you accept $3

20    for the at-issue data?                                 07:04:01

21         A.   No, because I can't be part of the class.

22    So --

23         Q.   I said would you, not will you.

24            MR. LEE:  Objection to form.

25            THE DEPONENT:  I'm not -- I'm not going       07:04:13

Page 266

ATTORNEYS EYES ONLY

```
 1    to answer what I would personally do or not do.        07:04:14

 2         Q.   (By Mr. Santacana)   Why?

 3         A.   Because that's not none of your business.

 4    That's not part of my report.

 5         Q.   Well, you're here under subpoena, and        07:04:22

 6    it's a perfectly relevant question.

 7              Would you accept $3 in exchange for the

 8    sWAA-off data at issue in the case?

 9              MR. LEE:  Beyond the scope.

10              THE DEPONENT:  I'm not -- I'm not going        07:04:34

11    to answer that question.  It's not part of my

12    report.

13         Q.   (By Mr. Santacana)   It doesn't matter if

14    it's part of your report or not.  It's a relevant

15    question that goes to your credibility.               07:04:41

16              If you're opining in your report that $3

17    is a fair price, but you yourself wouldn't accept

18    it, that is relevant.

19              So I'm going to ask it again:  Would you

20    personally accept $3 in exchange for the at-issue     07:04:51

21    data to Google?

22              MR. LEE:  Beyond the scope.

23         Q.   (By Mr. Santacana)   Go ahead.

24              MR. LEE:  I just said beyond the scope.

25              THE DEPONENT:  I do not think that it's      07:05:01
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

```
 1    relevant.                                      07:05:02

 2         Q.   (By Mr. Santacana)  It's not for you to

 3    decide.

 4              MR. LEE:  It's not for you decide either.

 5              THE DEPONENT:  It's certainly not for you  07:05:06

 6    to decide.  I do not think it's relevant.  It's

 7    beyond of the scope of my report.

 8         Q.   (By Mr. Santacana)  Do you have sWAA on

 9    or off?

10         A.   Again, that's also -- that's also not   07:05:15

11    part of my report, and that is not relevant.

12         Q.   Do you have a Google account?

13         A.   None of that is -- that is not relevant

14    here.

15              MR. LEE:  This is all beyond the scope.   07:05:25

16         Q.   (By Mr. Santacana)  Are you refusing to

17    answer?

18         A.   I'm refusing to answer questions that I

19    think are beyond the scope of my report.

20         Q.   Okay.  You understand you're under        07:05:33

21    subpoena, right?

22              MR. LEE:  Are you trying to intimidate

23    the witness?  I mean, he's already told you his

24    position.  You've already told him he's under

25    subpoena.  He's aware of that.  He's -- he's been   07:05:45
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
1    deposed before.  He's told you his position.         07:05:47

2         Ask another question.

3      Q.   (By Mr. Santacana)  Do you understand

4    you're under subpoena?

5      A.   I understand that there's a subpoena in       07:05:55

6    this case, yes.

7      Q.   Did you review it?

8      A.   Yes, I did.

9      Q.   Was it limited in scope for subject

10   matter?                                              07:06:01

11     A.   I -- you would have to show me the

12   subpoena again.  I don't -- I don't recall.

13     Q.   Okay.

14         MR. SANTACANA:  I pass the witness.

15         MR. LEE:  Okay.  Let's take a break.           07:06:17

16         THE VIDEOGRAPHER:  Off the record.  The

17   time is 7:05.

18         (Recess taken.)

19         THE VIDEOGRAPHER:  This marks the

20   beginning of Media No. 8 in the deposition of        07:30:52

21   Michael Lasinski.  We're back on the record.  The

22   time is 7:30.

23

24

25   /////                                                07:31:00
```

Page 269

ATTORNEYS EYES ONLY

```
 1                    EXAMINATION                    07:31:00

 2    BY MR. LEE:

 3        Q.   Good afternoon, Mr. Lasinski.  Again, my

 4    name James Lee for Boies Schiller.  And I just have

 5    a few questions for you.  Okay?                 07:31:07

 6        A.   Okay.

 7        Q.   All right.  Earlier today, you testified

 8    that you understood ChromeGuard to relate ███

 ▮    ███████████████████████████████████████████████

 ▮    ███████████████████████████████               07:31:16

11             Do you remember that?

12        A.   Yes.

13        Q.   Here in this case, however, we're talking

14    about situations where an advertiser bids on a

15    conversion that is specifically tracked by         07:31:26

16    Google Analytics for Firebase.

17             Do you understand that?

18        A.   Yes.

19        Q.   And if that's the case, is it even

20    possible for another third party to track a        07:31:33

21    Google Analytics for Firebase conversion?

22        A.   My understanding is it's not.

23        Q.   I think you mentioned this earlier in the

24    day, but just to make sure that we have it clear,

25    does personalization of ads at all affect your     07:31:49
```

Page 270

ATTORNEYS EYES ONLY

```
1    calculation of unjust enrichment relating to        07:31:53

2    conversion tracking, which is your Scenario 1?

3         A.   It does not, no.

4         Q.   Okay.

5              Now, earlier today, you testified that     07:31:59

6    advertisers would spend less with Google if they

7    knew Google could not serve ads to sWAA-off users.

8              Do you remember that?

9         A.   Yes.

10        Q.   Is that because Google would not charge     07:32:12

11   advertisers to serve ads to sWAA-off users?

12        A.   Yes.

13        Q.   Now, Google's lawyer invited to imagine

14   how advertisers react if Google couldn't serve ads

15   to sWAA-off users.                                   07:32:26

16             Do you remember that?

17        A.   Yes.

18        Q.   And he asked you whether advertisers

19   would continue to spend the same amount of money

20   with Google by increasing their ad spend on sWAA-on  07:32:32

21   users.

22             Do you remember that?

23        A.   I do, yes.

24        Q.   Are you aware of any evidence suggesting

25   that advertisers would increase how much they would  07:32:41
```

Page 271

```
 1    spend for sWAA-on ads in a but-for world?          07:32:44

 2         A.   No, I am not.

 3         Q.   Is it fair to say that sWAA-on users

 4    don't necessarily get more ads just because Google

 5    wants to serve them more ads?                       07:32:54

 6              MR. SANTACANA:  Objection.  Vague.

 7              THE DEPONENT:  That is my understanding,

 8    yes.

 9         Q.   (By Mr. Lee)  And is that because sWAA-on

10    users would only see more ads if they visit more    07:33:01

11    apps or spend more time in apps?

12         A.   Yes, that is correct.

13              MR. SANTACANA:  Incomplete hypothetical.

14         Q.   (By Mr. Lee)  Did Google conduct any

15    study suggesting advertisers would spend more for   07:33:10

16    sWAA-on ads in a but-for world?

17         A.   Not that was produced in this case --

18         Q.   Are you aware --

19         A.   -- no.

20         Q.   -- any of Google's rebuttal experts       07:33:21

21    preparing such a study?

22         A.   No, I'm not.

23         Q.   As far as you -- as far as you're aware,

24    does any such analysis exist?

25         A.   It -- it does not.                         07:33:30
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

```
1          Q.   Do you remember when, earlier today,        07:33:32

2     Google's lawyer asked you whether you were trying

3     to measure the damage in your unjust enrichment

4     opinion -- you're trying to measure the profits

5     that Google gained thanks to its alleged misleading  07:33:43

6     of those plaintiffs?

7          A.   Yes.

8          Q.   And do you remember answering that's

9     generally somewhat accurate?

10         A.   Yes, I do.                                  07:33:53

11         Q.   So I want to understand what part isn't

12    accurate so that we're all clear.  So let me ask

13    you the following:  Do your unjust enrichment

14    models measure how much money Google made from

15    making misrepresentations to Plaintiffs, or from    07:34:04

16    collecting WAA- or sWAA-off data without their

17    permission?

18         A.   The latter.

19         Q.   Is it fair to say the but-for world that

20    your unjust enrichment models contemplate is the    07:34:16

21    impact on Google's profits if it had not collected

22    the WAA- or sWAA-off data that it's collected

23    without permission?

24         A.   Yes, it is.

25         Q.   Okay.  You were asked by Google's lawyer   07:34:26
```

Page 273

ATTORNEYS EYES ONLY

```
1    whether you considered what would have happened in        07:34:29

2    a but-for world if a court did not allow GA for

3    Firebase for sWAA-off users at the beginning of the

4    class period.

5           Do you remember that?                              07:34:40

6       A.   Yes.

7       Q.   And you said, "not beyond the scenarios,

8    in your opinion."

9           Do you remember testifying to that?

10      A.   I did, yes.                                        07:34:45

11      Q.   All right.  I want to talk about

12   Scenario 1.

13          Is the measure of damages in Scenario 1

14   the difference between Google using sWAA-off data

15   for conversion tracking and Google not being able     07:34:55

16   to use that data?

17      A.   Yes, it is.

18      Q.   Is the latter the but-for world you

19   considered?

20          MR. SANTACANA:  Vague.                          07:35:05

21          THE DEPONENT:  Yes, it is.

22      Q.   (By Mr. Lee)  Okay.  Now, counsel for

23   Google asked what advertisers would have done if

24   Google could not perform a conversion tracking for

25   sWAA-off users.                                        07:35:22
```

                                                           Page 274

ATTORNEYS EYES ONLY

```
 1            Do you remember that?                    07:35:23

 2       A.   I do, yes.

 3       Q.   Now, if advertisers did not have to pay

 4   Google for these untracked conversions, do you

 5   think they would take any steps to track those     07:35:29

 6   conversions just to pay Google more money?

 7       A.   No, they would not.

 8       Q.   If Google hired third-party trackers to

 9   do the tracking for it in that scenario, do you

10   think that would be appropriate given Google's WAA  07:35:39

11   and sWAA disclosures?

12            MR. SANTACANA:  Calls for a legal

13   conclusion.  Vague.  Compound.

14            THE DEPONENT:  I do not.

15       Q.   (By Mr. Lee)  Do you recall being asked    07:35:49

16   today some questions about the Ipsos study?

17       A.   Yes, I do.

18       Q.   Now, Google's lawyers suggested that the

19   Ipsos study's terms allowed Google to use the data

20   more broadly than -- than the sWAA-off button.      07:36:02

21            Do you remember that?

22       A.   Yes.

23       Q.   Did Google Pay Ipsos respondents an

24   up-front fee for agreeing to the terms of the study

25   beyond the $3 that you isolated for your opinions?   07:36:12
```

Page 275

```
 1        A.   Yes, it did.  It was $20.              07:36:14

 2        Q.   And did you exclude that $20 up-front fee

 3   in your damages calculation?

 4        A.   I did, yes.

 5             MR. LEE:  Thank you, Mr. Lasinski.  I    07:36:21

 6   have no more further questions for now.

 7                  FURTHER EXAMINATION

 8   BY MR. SANTACANA:

 9        Q.   Mr. Lasinski, you just testified that

10   personalization of ads played no role in your     07:36:30

11   Scenario 1 opinion?

12        A.   That is correct, yes.

13        Q.   Did personalization of ads play any role

14   in any of your damages calculations?

15        A.   No, it did not.                         07:36:44

16        Q.   Okay.  Just making sure.

17             You were just asked the following

18   question:  "Do your unjust enrichment models

19   measure money Google earned from misrepresentations

20   or money Google earned from collecting data without  07:37:02

21   users' permission?"  [as read]

22             Do you recall that question?

23        A.   I do recall that.

24        Q.   And you said they measure the latter?

25        A.   Correct.                                07:37:12
```

Page 276

1      Q.   Which is to say, money Google earned from          07:37:13

2   collecting data without users' permission, right?

3      A.   Correct.

4      Q.   How do you know it was without users'

5   permission?                                                07:37:23

6      A.   Because my starting point for the class

7   is WAA-off/sWAA-off users.  So they did not have

8   permission.

9      Q.   How do you know that the data Google

10  collected falls within the scope of what the sWAA          07:37:41

11  button says it applies to?

12     A.   Because I was informed technically what

13  my scenarios should look like from Mr. Hochman.

14  And so he provided me with the information on how

15  to make my -- make those assumptions.                      07:38:08

16     Q.   Okay.  So just to clear this up, you told

17  me at the start of day that you wouldn't opine on

18  what Google should or shouldn't do.

19          Do you remember that?

20          That's not your role here.                         07:38:23

21     A.   I don't -- I didn't -- I don't remember

22  my testimony.  But what Google or shouldn't do, I

23  don't believe that that's necessarily my role.

24     Q.   Nor is it whether Google is liable for

25  anything in particular, right?                             07:38:37

Page 277

```
1        A.   Yeah, I'm not the liability expert, if      07:38:41

2   that's what you're asking.

3        Q.   On that subject, you were just asked

4   something about if Google were to hire

5   third parties to track conversions, would that be     07:38:48

6   appropriate in light of the sWAA and WAA

7   descriptions?

8            MR. LEE:  Disclosures.

9        Q.   (By Mr. Santacana)  Disclosures.

10           Do you recall that question?                  07:39:00

11       A.   Yes, I do.

12       Q.   You answered that question, right?

13       A.   I do, yes.  I did.

14       Q.   Are you now opining on what would or

15   would not be appropriate for Google to do given the   07:39:12

16   way that the sWAA and WAA disclosure are written?

17           MR. LEE:  Objection.  Form.

18   Mischaracterizes.

19           THE DEPONENT:  My -- what I'm -- what I'm

20   testifying here is, I understand that they couldn't   07:39:27

21   collect that information.  So just hiring a

22   third party to collect that information doesn't

23   seem appropriate.

24       Q.   (By Mr. Santacana)  Why?

25       A.   Because I don't know that that -- getting    07:39:36
```

Page 278

```
 1   around the actual disclosures in that way to try to        07:39:39

 2   serve -- to try to use the information seems

 3   appropriate from a legal perspective -- from a

 4   common-sense perspective, I should say.

 5       Q.   Why?                                              07:39:51

 6       A.   That's my opinion.

 7       Q.   But why is -- is it an expert opinion

 8   you're offering in this case?

 9       A.   I was asked the question, so I don't

10   believe that that's -- that is necessarily             07:40:04

11   appropriate to do that.

12       Q.   Okay.  So you offered an answer to that

13   question that's outside the scope of your expert

14   opinions?

15       A.   It's not -- that's not inside my report.       07:40:15

16       Q.   That's just your personal opinion?

17       A.   That's my personal opinion as an expert,

18   yes.

19       Q.   I don't understand what that means.

20            Is it an expert opinion in the case or          07:40:27

21   not?

22       A.   Well, I'm not a legal expert, so it's not

23   a legal expert opinion.  It's -- I'm the damages

24   person, so that's what it -- it's my opinion.

25       Q.   The question you were asked was:  "If           07:41:04
```

Page 279

1    Google hired third-party trackers to do the          07:41:06

2    tracking for it in that scenario, do you think that

3    would be appropriate given Google's WAA and sWAA

4    disclosures?"

5           And you answered, "I do not."                  07:41:15

6           Is your answer to that question an answer

7    you're providing as an expert in this case or as a

8    person and private citizen who has a lay opinion?

9           MR. LEE:   Asked and answered.

10          Go ahead.                                        07:41:31

11          THE DEPONENT:   I mean, it's -- I'm -- I'm

12   not an expert in that area, so it's not an expert

13   opinion.

14       Q.   (By Mr. Santacana)  It's just your

15   personal belief?                                        07:41:37

16       A.   It's my personal opinion based on my

17   information -- the information available to me in

18   this case.

19       Q.   Okay.  If Google hired third-party

20   trackers to do the tracking, and those third-party     07:41:45

21   companies could not share any data with Google

22   other than the number of conversions, would that be

23   appropriate?

24          In other words, Google never sees the

25   user data, just gets an accounting from an             07:42:02

                                                    Page 280

```
 1   accountant.                                        07:42:04

 2       A.   I think you're -- you're asking -- you're

 3   asking me a question I -- I don't know the answer

 4   to that, as I sit here.

 5       Q.   Well, what more do you need to know to     07:42:14

 6   know if it's appropriate?

 7       A.   Well, you asked me a question whether or

 8   not Google hired a third party to collect data that

 9   they were told that they could not collect.  That

10   doesn't seem appropriate to me.                     07:42:28

11       Q.   That's the question that Mr. Lee asked

12   you.

13            The question I'm asking you is, what if

14   Google hired a third party to do conversion

15   accounting for it and for its advertisers, and that 07:42:42

16   third party counts up conversions and tells the

17   advertisers how many conversions they have, and

18   Google never sees the data.

19            In your view, is that appropriate in

20   light of the WAA and sWAA disclosure?               07:42:55

21            MR. LEE:  Objection.  Incomplete

22   hypothetical.  Impossible hypothetical.

23       Q.   (By Mr. Santacana)  Go ahead.  Is that

24   appropriate in light of the disclosures?

25       A.   I don't know how to answer that.           07:43:07
```

Page 281

ATTORNEYS EYES ONLY

```
1        Q.   Well, you had no trouble answering        07:43:08
2    Mr. Lee's hypothetical.  Did you and --
3        A.   Correct.
4        Q.   -- Mr. Lee discuss that hypothetical
5    during the break?                                  07:43:13
6        A.   No.
7             MR. LEE:  Mine made sense.
8        Q.   (By Mr. Santacana)  Okay.  Do you think
9    it's an appropriate price in exchange for sWAA-off
10   data to be paid $3?                                07:43:35
11       A.   For a class member, yes.
12       Q.   And for you?
13       A.   If I were a class member, I would accept
14   $3.  I cannot be a class member, but if I were a
15   class member, I would.                             07:43:53
16       Q.   Did you talk about that question you
17   refused to answer earlier with your lawyer during
18   the break?
19       A.   No, I did not.
20       Q.   You just decided to answer it now?        07:44:00
21       A.   Yes, that is correct.
22       Q.   Why did you change your mind?
23       A.   Because I -- I thought of if I could say
24   it as if I were a class member, then I would agree.
25   Then I could answer.                               07:44:11
```

Page 282

ATTORNEYS EYES ONLY

```
 1              But I wasn't -- I wasn't thinking of          07:44:13
 2    myself as a class member, because I couldn't be a
 3    class member before.  Or I can't be a class member
 4    now.  So I didn't think of that way to answer it.
 5              MR. SANTACANA:  Okay.  I want to take         07:44:24
 6    five minutes, and then we'll see where we can end
 7    up.
 8              THE VIDEOGRAPHER:  Off the record.  The
 9    time is 7:43.
10              (Recess taken.)                               07:47:48
11              THE VIDEOGRAPHER:  We are back on the
12    record.  The time is 7:48.
13        Q.   (By Mr. Santacana)  Okay.  I just have a
14    few more questions for you.
15              So first, keeping with the last thing we     07:48:51
16    were talking about, do you have sWAA turned on our
17    off on your Google accounts?
18        A.   I don't know the answer to that.
19        Q.   Do you know if you checked it at any
20    point since you were retained for this case?         07:49:07
21        A.   I do.
22        Q.   You did check it?
23        A.   I do know that -- I do know if I checked
24    it.
25        Q.   Did you change the setting when you          07:49:13
```

Page 283

1  checked it?                                               07:49:15

2      A.   No.  I didn't -- I did not check it.  I

3  purposely did not check it.

4      Q.   I see.

5      A.   Once I was retained on this case.               07:49:21

6      Q.   Because you wanted to remain independent?

7      A.   Because I just thought it would be better

8  off not to mess with any data -- with anything that

9  Google might be collecting.

10     Q.   Why?                                             07:49:35

11     A.   Because I'm -- I'm an expert in this

12  case, and so I don't -- I don't want to, like,

13  change any settings or do anything.

14     Q.   Does it concern you that Google may be

15  collecting data about you that you did not consent      07:49:46

16  to?

17          MR. LEE:  Beyond the scope.

18          Answer if you can.

19          THE DEPONENT:  Yes, but I'm not going to

20  change any behaviors because I'm -- as a member of      07:49:57

21  this expert team.

22     Q.   (By Mr. Santacana)  Okay.  Relating to

23  your actual damages opinion, $3 per device, do you

24  recognize that the opinion, as you've rendered it,

25  could result in class members who had lots and lots     07:50:15

                                                            Page 284

ATTORNEYS EYES ONLY

1    of data transmitted to Google being paid less than          07:50:18

2    class members who had very little data transmitted

3    to Google?

4        A.   Yes, I do.

5        Q.   That's a possibility in your opinion?              07:50:27

6        A.   Yes, it is.

7        Q.   Why are you comfortable with that?

8        A.   I'm comfortable with that because if you

9    look at market-to-market transaction in the Ipsos

10   study, it does not -- it does not pay users based        07:50:38

11   on the amount of -- the amount of data that they

12   transmit to Google.  And that's, I think, the best

13   comparable transaction to -- to use for my actual

14   damages.

15       Q.   Is it fair to say, then, that you do not        07:51:03

16   believe actual damages varies depending on the

17   severity of the privacy intrusion on a

18   class-member-by-class-member basis?

19       A.   I don't think that that's fair to say.  I

20   think that it -- what's fair to say is my            07:51:17

21   calculation is, at the -- at the end of the day,

22   conservative and is the best available calculation

23   based on the information that was available.

24           We talked about this earlier, that

25   there's not information available as it relates to        07:51:33

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    that in this case.  And so it's not something I          07:51:36

 2    could have studied.

 3         Q.   Okay.

 4         A.   Even -- even if -- even -- even if it's

 5    something that I needed to.                              07:51:47

 6         Q.   So leaving your personal beliefs aside, I

 7    will ask it differently.

 8              Your opinion on actual damages, in fact,

 9    does not vary depending on the severity of the

10    privacy intrusion that a class member experienced;      07:52:04

11    is that fair to say?

12              MR. LEE:  Objection.  Asked and answered.

13              THE DEPONENT:  It -- it does not -- it

14    does not vary based on the data, the amount of data

15    that was ill-gotten, as you -- as you had put it         07:52:15

16    earlier.

17         Q.   (By Mr. Santacana)  And it does not vary

18    based on the nature of the ill-gotten data, right?

19         A.   Well, I feel like we're always talking

20    about sWAA data here, so --                              07:52:29

21              MR. LEE:  SWAA-off data?

22              THE DEPONENT:  SWAA-off data.

23         Q.   (By Mr. Santacana)  I'll be more

24    specific.

25         A.   So there's no variance in my opinion.         07:52:36
```

Page 286

ATTORNEYS EYES ONLY

1      Q.   It does not vary based on the degree to        07:52:38

2    which the ill-gotten sWAA-off data is more or less

3    private to that person?

4             MR. LEE:  Objection.  Vague as to

5    "private."                                            07:52:49

6             THE DEPONENT:  It -- I mean, I think -- I

7    think you understand, my -- my calculation does not

8    vary based on -- based on a particular person.

9    It -- it only varies based on the number of devices

10    that someone might have.                             07:53:06

11     Q.   (By Mr. Santacana)  On that subject, why

12    did you decide to make it per device, since people

13    don't usually use, except for me, two devices at

14    once?

15             MR. LEE:  I was going to say.               07:53:19

16             THE DEPONENT:  I think that -- I think

17    that it's most similar to the Ipsos study, and I

18    think that that -- that that's an appropriate way

19    to consider that.

20             If people -- if people do have multiple     07:53:34

21    devices, and they use them for different things,

22    then they may look at their privacy as it relates

23    to those different devices --

24     Q.   (By Mr. Santacana)  I see.

25     A.   -- on a device-by-device basis.                07:53:47

Page 287

ATTORNEYS EYES ONLY

```
1        Q.   You opined in the Brown case that you          07:53:55

2   referred to earlier that the actual damages in that

3   case was $3 per device, right?

4        A.   In the Brown case?

5        Q.   Uh-huh.                                          07:54:09

6        A.   No, I don't think that that's correct.

7        Q.   What was your actual damages opinion in

8   that case?

9        A.   Can I --

10       Q.   Wasn't it based on the Ipsos panel?             07:54:22

11       A.   Yes, it was.

12       Q.   But the number was not $3 per device that

13   you arrived at?

14            MR. LEE:  You were going to ask me a

15   question -- you were going to say something --           07:54:34

16            THE DEPONENT:  Yeah.  I'm worried -- I

17   don't know, like, what I can say or what I can't

18   say.

19            MR. LEE:  That's what I thought you were

20   concerned about.  So there are protective orders in      07:54:40

21   both cases, and I think we have to be very careful,

22   because I don't want to have Mr. Lasinski

23   inadvertently reveal something that he shouldn't.

24            When you talked about some areas that I

25   thought there was overlap and there wasn't any           07:54:59
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1   confidentiality concerns, I let it go.  But I don't      07:55:02

 2   know where this is going.

 3           But I think Mr. Lasinski seems concerned,

 4   so --

 5           MR. SANTACANA:  Well, you're using my            07:55:13

 6   time right now.  If you don't have an objection,

 7   then I'm going to keep going.

 8           MR. LEE:  Okay.  I might -- I might have

 9   him not answer.  But -- but keep going, and we'll

10   see.                                                     07:55:21

11       Q.   (By Mr. Santacana)  Okay.  Your opinion

12   in that case was actual damages was $3 per device

13   per month; is that right?

14           MR. LEE:  Go ahead.

15           THE DEPONENT:  I don't think so.  I don't        07:55:36

16   think that's right.

17       Q.   (By Mr. Santacana)  What do you think it

18   was?

19       A.   I think -- I think, if I remember

20   correctly, it was $3 per Web extension per month.        07:55:47

21       Q.   Okay.  Well, it wasn't.

22       A.   Okay.

23       Q.   But --

24       A.   Well, I don't -- I don't remember,

25   obviously.                                               07:56:08
```

Page 289

ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Sounds like. | 07:56:10 |
| 2 | But you relied on that same Ipsos study | |
| 3 | to evaluate actual damages in the Brown case, | |
| 4 | right? | |
| 5 | A.   I did, yes. | 07:56:18 |
| 6 | Q.   And the -- the figure that you came up | |
| 7 | with was $3, and it was per something? | |
| 8 | A.   Correct. | |
| 9 | Q.   And to your memory, it was not per | |
| 10 | device; it was per something other than per device? | 07:56:28 |
| 11 | A.   I don't really remember, to be honest, | |
| 12 | what it was. | |
| 13 | Q.   Why in that case did you arrive at $3 as | |
| 14 | the amount?  Was that a coincidence, or did your | |
| 15 | calculations in that case mirror your calculations | 07:56:41 |
| 16 | here? | |
| 17 | MR. LEE:  Beyond the scope of redirect. | |
| 18 | Go ahead and answer. | |
| 19 | THE DEPONENT:  I think -- I think in that | |
| 20 | case, I believe -- I think in that case, it was -- | 07:56:54 |
| 21 | there's $3 in the Ipsos study that relates to the | |
| 22 | Web browser -- to Web browser.  And I think that | |
| 23 | that's what I was using in that case, not -- not | |
| 24 | device. | |
| 25 | But I -- to be honest, I don't -- I don't | 07:57:13 |

Page 290

ATTORNEYS EYES ONLY

```
 1    recall.                                          07:57:17

 2        Q.   (By Mr. Santacana)  Okay.  Then I --

 3    thank you for that clarification.

 4           What I was asking was just, was the fact

 5    that you ended up at $3 per something, just the   07:57:24

 6    fact of the number 3, was it a coincidence that

 7    that was 3, and it's 3 in this case?  Or is there a

 8    reason that they mirror each other?

 9           MR. LEE:  Beyond the scope of redirect.

10           Go ahead.                                  07:57:38

11           THE DEPONENT:  I don't know that it's

12    actually -- I don't know that it's actually a

13    coincidence.  I think if you look at -- it's not a

14    coincidence, because the Ipsos study has $3 per Web

15    browser, if I remember correctly.  And in this     07:57:50

16    case, it has $3 per device, mobile phone and

17    tablet.

18           So I was looking at different data points

19    within the study, if I remember correctly.

20           The fact that they're paying -- the fact    07:58:02

21    that it ends up being $3 is because those users are

22    being paid $3 based on the study.

23        Q.   (By Mr. Santacana)  I see.  Okay.

24           MR. SANTACANA:  That is all I have.

25           MR. LEE:  Me, as well.                      07:58:26
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS EYES ONLY

```
 1           THE VIDEOGRAPHER:  Okay.                    07:58:27

 2           MR. SANTACANA:  I will designate

 3    "Attorneys' Eyes Only."  And you can take your time

 4    on the transcript.

 5           THE VIDEOGRAPHER:  We are off the record     07:58:36

 6    at 7:58 p.m., and this concludes today's testimony

 7    given by Michael Lasinski.

 8           The total number of media used was eight

 9    and will be retained by Veritext Legal Solutions.

10           (TIME NOTED:  7:58 P.M.)                     07:58:51

11

12

13                    ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 292

ATTORNEYS EYES ONLY

1        I, MICHAEL J. LASINSKI, do hereby declare

2    under penalty of perjury that I have read the

3    foregoing transcript; that I have made any

4    corrections as appear notes; that my testimony as

5    contained herein, as corrected, is true and

6    correct.

7        Executed this _____ day of _____,

8    2020, at  _____,_____.

9

10

11

12                    _____

                      MICHAEL J. LASINSKI

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 293

ATTORNEYS EYES ONLY

1    I, Rebecca L. Romano, a Stenographic Certified

2    Shorthand Reporter of the State of California, do

3    hereby certify:

4    That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath;

8    that a record of the proceedings was made by me

9    using machine shorthand which was thereafter

10   transcribed under my direction; that the foregoing

11   transcript is true record of the testimony given.

12   Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [ ] was [X] was not requested.

16   I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or any party to this action.

19   IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21   Dated:  July 5, 2023

22

23

24

   Rebecca L. Romano, RPR,

25   CSR. No 12546

Page 294

ATTORNEYS EYES ONLY

1    Eduardo Santacana

2    esantacana@willkie.com

3                                    July 5, 2023

4    RE: Rodriguez, et al. v. Google, LLC

5    6/29/23, MICHAEL J. LASINSKI, JOB NO. 5971107

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, notating the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21      Counsel - Original transcript to be released for signature

22      as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24      time of the deposition.

25

                                              Page 295

ATTORNEYS EYES ONLY

1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, notating the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    _X_ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    Page 296

1    Rodriguez, et al. v. Google, LLC

2    MICHAEL J. LASINSKI (#5971107)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   WITNESS                                  Date

25

                                            Page 297

**[& - 2.1.]**

| & |
|---|
| **&**   2:15 4:4 5:4 5:20 6:13 7:24 10:13 13:11 16:5,11 106:3 295:23 296:9 |

| 0 |
|---|
| **0.3**   206:24<br>**0.5918**   205:22 206:7<br>**00188768**   7:18<br>**04688**   1:6 2:6 9:18 |

| 1 |
|---|
| **1**   1:16,25 7:3 7:13 9:13 16:19,22 71:14 81:2 84:15 88:9 94:18 95:15,20 96:1 104:12,13,14 118:16,20 128:2 151:3 158:20 178:20 184:18 186:9 186:11,16 189:24 190:4 190:16 203:10 203:12,19 207:10 211:23 212:8 213:13 217:17 218:12 218:14 258:16 271:2 274:12 |

274:13 276:11 296:1
**1,500**   14:15
**1.57**   172:18 173:6
**10**   127:10 128:6,9,10 241:3,4
**100**   3:7 101:23 105:14 127:9 133:17 157:2 158:5 159:3 162:19 248:12 249:18 264:16
**10019**   4:19
**10:19**   2:18 9:2 9:6
**116**   84:8,9,12 84:12
**11:44**   71:15
**12**   7:5,24 181:6 258:16
**12/1/2022**   155:10
**120**   73:12 85:5 85:7 89:7
**121**   85:2 86:12
**12546**   1:21 294:25
**12:04**   71:20
**13**   121:14,15,15 173:3 175:11
**13.1**   152:14 153:11 154:3 155:6 165:16

165:21
**13.1.**   153:13 155:1 161:14
**13.2**   155:2
**13.2.**   155:2 156:18
**13.87**   173:4 175:2
**130**   49:20 60:8 241:16 253:6
**1301**   4:18
**131**   253:6
**132**   253:6 263:16
**14**   121:15 145:18 146:2,5 146:25 150:8 158:10
**14.1.**   152:10
**14.5**   146:12 147:17 148:11 151:24 155:24 156:7 157:8
**140**   7:17
**15**   121:15 138:21 139:6,8 140:5,7 156:23 169:4 180:17 180:21,25 181:16
**15.1.**   138:23
**150**   12:23
**156**   24:20
**16**   7:13,24 172:3,9 180:17

**160**   13:25
**163**   7:20
**166**   165:18
**17**   7:24 172:16 180:17
**174**   8:4
**18**   142:21
**1:11**   110:8
**1a**   16:23

| 2 |
|---|
| **2**   7:17 71:18 80:13,14 81:1 81:17 82:4,5,7 82:8,9 83:9 84:6,14,16 87:9,10,14,16 89:21 94:3 95:15,21 96:1 101:15,20 102:1 103:24 104:10,10 105:2,8 108:18 109:8 110:8 115:6 118:13 118:18 120:10 121:1 125:17 127:7,8,23,24 128:4 135:15 135:17 136:3 137:4 140:9,10 186:12 218:12 257:13<br>**2.1**   180:11<br>**2.1.**   179:25 180:9 |

Page 1

**[2.2 - 5]**

**2.2**  152:19
153:5,22
161:17 164:2
**20**  7:14 123:21
276:1,2
**20-0466**  1:22
**200**  12:23
13:25 73:11
**201**  4:8
**2016**  153:15
154:23
**2019**  92:12,14
93:13,14
**2020**  145:19
293:8
**2021**  157:11,15
157:23
**2022**  165:24
172:17,22
173:3 174:21
216:6
**2023**  1:15 2:18
7:15 9:1,6
294:21 295:3
**2025.520**  295:9
295:12
**21**  167:9,19
174:14,16
175:3
**212**  4:20
**215**  154:23,25
**219**  227:19
**223-5505**  4:11
**23**  175:25
177:21

**25**  123:22
**270**  7:6
**276**  7:7
**28**  204:19,21
205:1,2 210:3
210:10 227:21
227:22 266:17
**2800**  3:8
**29**  1:15 2:18
9:1
**293-6800**  3:18
**297**  1:25
**29th**  9:6
**2:06**  110:13
**2:56**  144:5

**3**

**3**  7:20 54:23
57:8,10 59:6,6
59:12,14,22,22
59:22 60:24,24
63:3,10,11,25
64:11,18,24
65:4,7,8,21
66:1,7,8,17
67:9 68:6,7
70:6,7,7,14,14
110:11 144:5
163:20 171:24
172:2,4 233:5
242:7 247:1,3
248:15,22,25
249:8 251:18
251:20 252:6
252:16 254:9
255:11,11

256:19 257:10
257:11 258:12
259:1,7,11
260:19 261:4,5
261:9,10,15,16
261:17,19,24
262:4,9,15,23
262:24,24
263:1,8 264:15
265:8,19,25
266:19 267:7
267:16,20
275:25 282:10
282:14 284:23
288:3,12
289:12,20
290:7,13,21
291:5,6,7,7,14
291:16,21,22
**3.01**  262:20,23
**30**  296:1
**305**  3:10
**32**  167:18
**33131**  3:9
**336-8330**  4:20
**33602**  4:10
**3491**  1:23
**34th**  2:16 5:9
9:20
**357-8434**  3:10
**37**  85:21
**38**  85:1 88:2
89:22 90:16,17
91:6,8

**39**  90:25 91:1
**3:05**  144:10
**3:20**  1:6 2:6
9:18
**3:57**  174:3

**4**

**4**  8:4 17:4,13
17:16,22,25
18:3 144:8
174:3,9,12
175:25 180:20
260:7,10,17,22
261:7 264:16
**40**  12:13 73:4
**41**  91:2,20 93:1
105:23 106:1,3
**415**  3:18 5:11
**41st**  3:16
**42**  106:11
**44**  3:15
**45**  183:20,23
185:18,20,20
185:24 187:15
**47**  230:14
**48**  23:14
**49.58**  89:3
**49.78**  88:20
**4:00**  103:5
**4:06**  174:8
**4:45**  200:4

**5**

**5**  174:6 209:2
264:16 294:21
295:3

**[5,000 - account]**

**5,000**   116:17 117:3
**50**   86:9
**50.24**   86:13
**50.4**   88:20
**50.42**   85:17 88:25 89:5,9 89:13
**52**   87:3 204:9 204:10,13,24 205:5,11,13 206:16,19 207:1,1,11,19 208:3,11 209:5 209:9 210:2,9 210:21 211:5 211:11 224:24 225:5,10,12,15 229:2,15
**53**   92:7,10
**55**   173:16 182:4 185:21 186:22 204:12 209:3,8,9 212:9,11,12
**5971107**   1:24 295:5 297:2
**5:09**   200:9
**5:58**   230:2

**6**

**6**   72:4 200:7 230:2 266:16
**6/29/23**   295:5
**63**   138:18,20,22 138:25 140:14

**6:15**   230:7
**6th**   4:18

**7**

**7**   230:5
**71**   95:1
**72**   76:19 77:3
**73**   95:12
**7321**   294:24
**75**   82:7
**78.77**   89:16
**7:05**   269:17
**7:30**   269:22
**7:43**   283:9
**7:48**   283:12
**7:58**   292:6,10
**7th**   4:9

**8**

**8**   269:20
**813**   4:11
**82**   142:20 143:24
**82.18**   143:25
**82.2**   137:22 138:3 139:19 140:16 141:10 142:9 144:12 144:17 145:3
**827**   1:22
**85**   196:20
**858-7421**   5:11
**87**   137:16,21
**88**   137:19,21 141:7 144:13

**89**   165:9 166:5 167:19 168:12 168:19

**9**

**9**   177:18,20
**9.39**   174:23 175:25
**9/1/2022**   155:9
**90**   127:12 167:19 235:8
**94104**   3:17
**94111**   5:10 9:21

**a**

**a.m.**   2:18 9:2,6
**ability**   40:3,16 77:23 78:13 104:16 117:10 117:12 119:14 127:1 148:10 158:2 160:18 188:14 192:14 195:22 201:23
**able**   30:17 44:21 47:4 57:15,15,18 78:24 84:23 87:18,18,19,22 92:14 96:7,21 96:22 100:15 100:20 104:11 105:9,14 112:1 114:1 118:15 119:10 129:8

129:25 136:16 137:10,13 147:3 183:16 185:6 187:5,11 192:23 202:1 213:10 218:6 244:21 245:2 274:15
**above**   139:6 191:25 295:6
**absolutely**   264:16
**accept**   65:25 105:7 115:14 232:2,7 242:2 251:2 263:23 263:25 264:3 265:19 266:19 267:7,17,20 282:13
**accepted**   65:21 66:17 67:21,24 67:25 149:19 243:21
**accepting**   27:22
**access**   44:9 48:16 54:4,7,7 54:15,15,17 123:1 190:1
**accomplish**   200:17
**account**   97:15 98:17 104:6 109:25 114:16

**[account - ad]**

| | | | |
|---|---|---|---|
| 118:7 131:10 | 163:24 167:11 | 241:20 | 119:1 128:22 |
| 131:15 132:7 | 168:6,17 | **actual** 17:10 | 128:23,24,25 |
| 133:9,12 | 170:15 171:6 | 20:9 41:22,24 | 128:25 129:3,4 |
| 145:18 154:15 | 175:1 188:7 | 42:8 47:15 | 129:4,10,19,19 |
| 156:22 157:16 | 195:5 202:10 | 49:22 50:5 | 130:1 132:10 |
| 178:25 180:3 | 202:24 208:21 | 51:17,22 54:9 | 132:13,14,17 |
| 181:20 203:16 | 209:16,19,21 | 55:1,2,4,5,6,9 | 134:18,18,20 |
| 210:3,10 | 229:15 231:7 | 55:16,17,18,19 | 134:21 140:6 |
| 237:22 246:4 | 273:9,12 | 56:11 57:10 | 141:12 143:23 |
| 247:7,20 | **accurately** | 58:3,20 59:21 | 145:1 146:2,8 |
| 248:16,21 | 171:15 212:17 | 60:19 61:12 | 172:22 176:8 |
| 263:22 268:12 | **achieve** 121:3 | 63:2,10 65:9 | 177:14 178:10 |
| **accountant** | **aci** 172:12 | 92:23 105:2 | 179:21 188:23 |
| 281:1 | **acquired** 44:9 | 123:1 129:1 | 199:20 204:20 |
| **accounted** | 44:11 45:5,6 | 134:8 146:5 | 212:24 216:19 |
| 161:6 | 46:16,20,23 | 177:3 207:1,3 | 218:21 250:20 |
| **accounting** | **acquiring** 45:5 | 217:7 218:25 | 250:20 251:9 |
| 47:22 83:3 | **acquisition** | 230:9,17 231:6 | 291:12,12 |
| 248:18 280:25 | 44:10 81:20 | 232:11 234:9 | **ad** 29:17,19,20 |
| 281:15 | 88:6 93:20,21 | 243:11 246:25 | 30:4,5 32:7,12 |
| **accounts** | 120:17 141:13 | 257:6 259:4 | 32:19,19,25,25 |
| 152:15,25 | 161:18 168:16 | 279:1 284:23 | 78:18 82:15 |
| 153:6,15,18 | **acquisitions** | 285:13,16 | 84:2,23 86:14 |
| 154:2,9,11,14 | 24:13 | 286:8 288:2,7 | 86:18 87:1,14 |
| 154:23,24 | **action** 10:2 | 289:12 290:3 | 90:12,12,16,17 |
| 155:5,18,21 | 294:17,18 | **actually** 15:5 | 90:19,20,21,22 |
| 156:17 161:20 | **actions** 16:2 | 29:20 32:24 | 91:3,4,11,17,19 |
| 163:5 165:22 | **active** 153:14 | 33:14 37:10 | 91:22,23 92:1 |
| 167:10 283:17 | 154:2,23 155:5 | 51:8,10 57:20 | 92:12,15,17,22 |
| **accurate** 25:21 | **activity** 43:15 | 57:20 59:8,11 | 92:23,25 93:6 |
| 62:18,19,24,25 | 49:25 50:2,14 | 60:25 65:3,6 | 93:10,18,24 |
| 98:21 99:9 | 72:6,6,8,14 | 67:5,7 68:5 | 101:20 102:3,4 |
| 100:5 115:9 | 106:3,7,12,19 | 71:23 83:23 | 102:5,6,10,14 |
| 119:23 120:16 | 108:8 230:20 | 85:4 93:17 | 102:21,24 |
| 127:23 160:16 | 231:15 241:19 | 95:10 118:25 | 103:1,2 105:3 |

**[ad - advertiser]**

| | | | |
|---|---|---|---|
| 105:9,17 | 229:5 | **ads** 30:5 33:10 | 118:20,20,21 |
| 109:20 110:25 | **additional** | 72:16 74:18 | 120:12 125:3 |
| 112:18 113:3 | 213:16 245:8 | 77:23 78:13,15 | 125:14,25 |
| 114:7,19 115:8 | 254:7,11 | 78:22,24 79:2 | 127:1 128:2,2 |
| 115:23,24,25 | 257:15 | 79:3,4,4,7,18 | 128:5,23,24 |
| 116:17,24 | **additive** 84:16 | 79:22,24 80:3 | 129:8,9,19 |
| 120:7 121:5,13 | **address** 79:10 | 80:7,11,15,17 | 134:13 135:25 |
| 124:15 125:24 | **addressing** | 80:19 81:3,7 | 140:18 166:7 |
| 126:5,25 | 114:23 | 81:18 82:1,3 | 168:21 170:22 |
| 127:17 128:15 | **adjust** 167:22 | 82:22,23,24 | 170:25 171:3,4 |
| 135:21,22 | 253:14 | 83:4,5,6,10 | 177:7,8 178:3 |
| 136:1,8,9,16,18 | **adjusted** | 84:19,23 87:2 | 182:2 187:8,10 |
| 136:22,22 | 167:10 | 87:11,19,20,21 | 188:9 189:7 |
| 137:1,3,5,6,10 | **adjustment** | 87:23 88:5 | 190:7 191:10 |
| 137:11,13 | 81:24 168:23 | 89:21,22,24 | 191:15 199:6 |
| 140:18 156:22 | 254:7 | 90:1,5 91:10 | 205:15,20 |
| 163:25 176:1 | **adjustments** | 91:12,22,24 | 206:20 209:14 |
| 181:21,25 | 254:13 | 92:1 94:6 | 210:13 212:12 |
| 182:4,9,13,21 | **administered** | 101:5,9,11,15 | 228:25 229:5 |
| 182:22,22 | 12:2 294:7 | 103:25 104:6 | 247:15,21,21 |
| 183:10 184:16 | **administrative** | 104:22 106:18 | 248:19 253:10 |
| 184:19 185:1,2 | 26:16,21 | 107:18 108:6 | 253:12 270:25 |
| 186:13,19,22 | **admit** 20:21,23 | 109:4,20,25 | 271:7,11,14 |
| 187:24 188:2,5 | **admob** 82:16 | 110:17,24 | 272:1,4,5,10,16 |
| 189:19 191:8,8 | 84:23 88:5 | 111:4,6,13,18 | 276:10,13 |
| 191:18 192:15 | 89:22 90:19,20 | 111:21 112:1,7 | **advertise** |
| 193:5,14,16 | 90:22 91:11,16 | 112:10,12,16 | 183:21 |
| 198:13 202:12 | 92:11,15,17 | 112:24 113:5 | **advertisement** |
| 206:12,16 | 93:1,3,20 95:9 | 113:15,15,21 | 30:25 |
| 208:6 209:5 | 110:25 112:4,7 | 113:25 114:2 | **advertisements** |
| 210:4,11,22 | 115:8 120:7 | 114:17 115:7 | 82:14 190:25 |
| 212:9 215:1,25 | 135:22 136:1,9 | 115:14,21 | **advertiser** 30:4 |
| 217:4,4 271:20 | 140:18 156:23 | 116:15,16,22 | 32:6,9 33:8 |
| **addition** 35:13 | 191:17 208:5 | 117:11,12,14 | 111:17 112:11 |
| 47:10 57:24 | 209:5 | 118:14,17,19 | 112:22,25 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[advertiser - allowing]**

113:1,13 114:6
114:12,16
115:11 117:7,8
117:9 118:10
118:10 121:2,8
121:11,17
124:13 125:3
127:8,12 128:5
129:14 179:4
181:21,24
182:17 184:15
184:23 185:5
185:12 187:7
192:5 193:5,25
270:14

**advertiser's**
115:12 116:3
177:24 178:2
185:4

**advertisers**
29:11,19 30:14
32:24 111:4
115:23 117:13
118:2,7 119:20
119:25 120:2
120:13 124:23
125:23 126:6
126:15 127:2
177:7,13,21
178:9 187:3,4
187:21 189:7
189:21 190:24
193:13 198:4
203:1,13
217:10 218:3,4

218:23 271:6
271:11,14,18
271:25 272:15
274:23 275:3
281:15,17

**advertising**
36:8,14,16,24
37:13 38:2,11
38:16,20,24
39:9,17,25
83:12,17,18,19
83:24 86:8
109:19 113:24
114:10 120:6
122:13 124:19
124:24 127:18
129:17 133:19
135:3,6 136:20
171:8,12,14
172:18 174:22
175:8 176:19
187:21 192:6
194:1 197:8
201:6,9 228:21
228:22 247:20
248:3,10
251:21 252:24

**affect**   200:23
270:25

**affected**   257:2

**affiliations**
10:8

**afternoon**
270:3

**afterward**
16:23

**ago**   199:24
200:2 250:14

**agree**   9:11
20:17 62:15
75:18 76:9
136:12 145:22
149:4 163:23
189:3 196:19
210:18 220:11
230:23 232:4
232:10 233:18
234:8,14 236:4
239:22 245:17
249:15 261:6
266:6 282:24

**agreeing**   196:9
236:15 275:24

**agreements**
44:17 46:2
245:24

**agrees**   245:25

**ahead**   15:20
16:25 26:11
57:3 61:21
63:13 64:8
108:13 115:4
117:5 134:1
145:13 146:18
146:19,20
156:10 197:16
233:2 244:16
252:20 260:25
263:13 267:23

280:10 281:23
289:14 290:18
291:10

**air**   173:23

**al**   1:4 2:4 9:15
295:4 297:1

**alex**   148:6

**algorithm**
183:4

**algorithms**
29:8 119:3,4,8
119:11,16
177:6

**allege**   203:1,3

**alleged**   24:25
95:7 99:19,25
100:10,14,19
104:8 149:14
194:8 198:23
203:8 213:5
215:18 273:5

**allegedly**   63:5,9
99:5 243:15

**alleviate**   147:1

**allocate**   124:24

**allow**   10:17
50:1 72:15
92:19 238:22
241:19 252:22
253:1 274:2

**allowed**   160:22
184:17 193:12
197:4 275:19

**allowing**   237:1
237:2

**[allows - answer]**

**allows** 32:1,5,6
  91:25
**altered** 109:8
**alternative**
  97:25 132:4,8
  214:10
**altogether**
  14:13
**amazon** 37:14
  37:23
**amount** 54:6
  62:13 63:22
  64:2,4 65:9
  66:5 68:10,11
  68:17,17 70:10
  70:10,20
  113:14 115:13
  117:21 119:20
  119:24 120:3,5
  120:11,14
  121:9,12
  124:17,22
  127:3,4 129:16
  130:2 140:23
  164:18 188:24
  207:3,3 212:24
  246:12 247:1
  254:19 255:18
  256:16 261:4,5
  271:19 285:11
  285:11 286:14
  290:14
**amounts** 62:16
  244:8

**analogous** 41:4
  41:8,12 42:2,5
  74:10,14 76:10
  76:14 200:16
  201:18 228:21
**analogy** 132:20
**analyses** 36:23
  37:1 40:24
  74:10,14 75:4
  75:11 76:22
  91:18 95:9
  122:20 152:1
  203:7
**analysis** 6:5,6
  6:14 37:2 42:7
  77:15,16,16
  78:7,10 80:6
  80:10 91:25
  92:5 93:22
  118:11 131:2,5
  132:1 133:8
  140:23 141:14
  145:17 150:3
  151:19 152:16
  152:17,20
  158:9 163:2
  167:6 173:10
  177:6 180:2
  194:15 195:19
  197:8 199:13
  199:16 208:1
  213:13 217:6
  218:15 229:9
  231:23,24
  245:21 250:19

  256:7 259:3
  260:10,12
  262:13 272:24
**analytic** 236:8
**analytics**
  170:23 180:5
  183:2 197:1
  198:5 234:16
  234:18,24
  235:4,5,13,15
  235:17 236:16
  238:1,2,7,9,17
  239:13,14,22
  240:7,17
  242:24 243:20
  245:18 246:1
  270:16,21
**analyze** 59:17
  110:4 118:6
  149:21 159:4
  160:23 176:7
  192:21 217:10
  218:3 233:12
  262:3
**analyzed** 216:7
  216:9 218:10
  218:20,25
  219:6
**analyzes**
  191:12 200:21
**analyzing**
  76:11 213:16
  246:10 247:7
**android** 237:25

**anibal** 1:4 2:4
  9:15
**anindya** 6:7
**ankura** 6:16
  14:16,18,21
  15:3
**ankura's** 14:22
**annual** 165:22
**answer** 17:2
  37:17 40:13
  43:18 46:3,5
  50:19 53:17
  59:18,25 60:1
  60:5 61:21
  63:13 67:14
  69:13 79:12,15
  108:13 109:13
  110:4 123:2
  138:9 151:14
  157:3 158:22
  158:24 159:4
  164:12 185:19
  188:13 196:6
  208:8,10
  217:20,24
  221:6 224:9
  225:18 227:4,6
  240:3 250:18
  250:24 254:15
  254:23 255:14
  260:10,15
  262:3,14
  265:23 266:11
  267:1,11
  268:17,18

**[answer - appropriate]**

| | | | |
|---|---|---|---|
| 279:12 280:6,6 | 90:20 91:12,13 | 235:21,21,23 | **apply** 161:17 |
| 281:3,25 | 91:16,16,19 | 236:2,5,17,20 | 166:19 167:21 |
| 282:17,20,25 | 92:11,12 93:2 | 236:24 237:2,3 | 195:19 |
| 283:4,18 | 93:7,10,19 | 237:12,24,25 | **applying** |
| 284:18 289:9 | 95:8 103:3 | 238:9,14,16,22 | 191:16 209:4 |
| 290:18 | 104:22 106:3 | 238:24,25 | **apportioning** |
| **answered** | 106:18 108:5,6 | 239:14,15,18 | 18:8 |
| 56:22 57:2 | 108:7 109:3,20 | 239:21,21,23 | **apportionment** |
| 61:19 63:12 | 112:2 136:8,19 | 240:6,9,11,21 | 18:10 141:2,3 |
| 64:7 69:11 | 137:23 138:4 | 240:24 241:2 | 165:14,24 |
| 79:8,14 145:8 | 140:3,4 141:9 | 241:20 242:21 | 167:9,21 |
| 192:17,19 | 141:12 142:18 | 243:22 244:14 | 211:17 |
| 196:5 220:24 | 143:14,21 | 244:15,17,21 | **apportionme...** |
| 220:25 252:8 | 144:18 145:4 | 245:3,11,18,25 | 81:21 |
| 254:24 255:22 | 152:17 156:15 | 246:2,17 | **appraise** 46:23 |
| 258:13 259:20 | 156:23 161:18 | **app's** 177:15 | **appreciate** |
| 259:21 260:24 | 162:10 164:2 | 239:22 | 67:14 220:15 |
| 278:12 280:5,9 | 166:20 167:21 | **appear** 90:20 | 225:13 |
| 286:12 | 168:13,25 | 91:19 293:4 | **appropriate** |
| **answering** | 171:3 177:15 | **appearance** | 40:4 51:20 |
| 58:23 97:8 | 177:24 178:2 | 10:6 | 55:9 56:5,16 |
| 158:2 204:22 | 178:11,16,20 | **appearances** | 56:25 57:6 |
| 273:8 282:1 | 178:21 179:3 | 3:1 4:1 5:1 6:1 | 61:14,17 62:4 |
| **answers** 96:15 | 180:2,3 181:21 | 10:8,11 | 64:4 65:8 |
| **anybody** 198:6 | 182:1,4 185:11 | **appearing** | 67:10,13 68:10 |
| **anymore** 126:2 | 186:19 189:8 | 10:10 295:18 | 70:9 76:16 |
| 215:20,24 | 190:18 191:3 | 296:7 | 77:14,17 78:10 |
| **apart** 15:1 | 191:17 192:6 | **apple's** 157:19 | 78:11 95:5 |
| 17:15 33:13 | 197:2,8 198:3 | **applicable** | 118:13 199:19 |
| 38:20 226:24 | 198:14 203:25 | 199:11 | 208:4 209:12 |
| **app** 50:2 71:1,8 | 208:24 212:19 | **applied** 47:7 | 229:16 231:13 |
| 72:5,14 84:14 | 213:4,7 217:2 | 86:12 165:15 | 231:18 234:1 |
| 84:18,22 85:17 | 229:9 231:14 | **applies** 106:12 | 252:17 259:8 |
| 85:22 86:2,8 | 234:25 235:12 | 277:11 | 260:4,7 261:4 |
| 88:7 89:23 | 235:16,18,19 | | 261:5 262:4,16 |

**[appropriate - assumption]**

264:25 266:5
275:10 278:6
278:15,23
279:3,11 280:3
280:23 281:6
281:10,19,24
282:9 287:18
**approximate**
205:14,19
**approximately**
12:13 15:24,25
86:9 182:3
206:24
**approximation**
209:13 266:16
**apps** 39:17
40:1 50:1 72:8
72:16,17,18
92:2 93:3
104:1 106:7,13
106:19 112:4
116:15 125:20
133:18 230:20
234:18,23
235:3 236:15
241:19 245:6,6
245:7,9,17
272:11,11
**apps's** 177:15
**appsflyer** 184:9
184:12 235:14
242:8
**april** 157:11,14
157:23

**area** 29:15 30:1
32:3 39:25
101:23 280:12
**areas** 24:16
25:15 41:11
82:15 288:24
**arrangement**
38:13
**arrive** 75:21
89:14 95:22
254:21 255:20
290:13
**arrived** 259:12
260:14 288:13
**arriving** 248:21
**aside** 286:6
**asked** 19:8 57:2
59:5,24 61:19
63:12 64:7
69:11 90:13
93:17,17 145:8
192:17 196:4
199:24 220:9
220:24 252:8
258:13 259:20
260:24 271:18
273:2,25
274:23 275:15
276:17 278:3
279:9,25 280:9
281:7,11
286:12
**asking** 12:8
38:19 52:7
102:2,18

105:13 107:2,5
110:2 115:5
123:8,23
126:12 132:24
133:3 134:3
149:17 150:4
150:23 151:22
167:14 173:5
174:21 175:10
175:13 197:10
214:7 227:9
250:16,23
258:18,20
264:19,22
278:2 281:2,3
281:13 291:4
**aspect** 256:24
**aspects** 75:14
**assessing** 17:6
**assessment**
74:18 76:23
77:4
**assigned** 59:6
**assignment**
16:14 17:3,5
17:16,25 18:2
18:4,6,14,21
20:14 48:7
216:15 217:1
217:10,15
218:2 221:14
**associate** 5:20
**associated**
24:25 106:8
216:23

**assume** 25:1
47:23 58:8,19
81:2,6 96:6
101:2 109:23
110:2 119:19
135:20,25
150:9,15,23
157:12,14
188:15 192:13
197:10 203:12
203:15 235:19
236:7,12 237:5
237:13 240:1
263:14
**assumed**
134:25,25
135:2,3,23
136:24,25
137:2,2 203:7
**assumes** 127:5
**assuming**
189:11 237:8
242:15 256:12
**assumption**
78:21 87:13
94:4,9,19 96:6
100:12 107:21
107:23 108:2
115:17 120:9
168:18 169:11
169:22 190:3
190:10 202:18
207:19 208:11
209:6,8 212:23
216:13,14

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[assumption - based]**

| | | | |
|---|---|---|---|
| 253:8 | 212:12,18,25 | **automation** | 271:24 272:18 |
| **assumptions** | 213:2,5 | 29:25 | 272:23 |
| 94:15 103:23 | **attribute**  191:7 | **available**  18:11 | **b** |
| 118:14 121:1 | **attributes** | 51:18,21 56:3 | **b**  7:10 8:1 |
| 147:13 246:16 | 119:13 | 56:16 57:5 | 296:1 |
| 277:15 | **attribution** | 58:7,8,13,19 | **b25**  143:20,21 |
| **attached**  16:20 | 181:17 | 61:16 63:16 | **b4**  143:12 |
| 140:11 163:21 | **audience** | 74:25 81:21 | **b43**  143:12 |
| 174:10 | 124:14 126:1 | 83:24 84:24 | **back**  66:14 |
| **attempt**  20:13 | 127:9,10 128:6 | 94:1 98:1 | 71:19 85:4 |
| 50:16 126:4,17 | **audio**  9:10 | 116:12 118:12 | 89:20 94:7,23 |
| 134:14 158:8 | **authority**  48:22 | 137:3 140:4,9 | 94:24 110:12 |
| 217:25 231:9 | 48:25 49:2,7 | 159:16,21 | 119:17 120:21 |
| 232:16,20 | **autobidding** | 183:4 192:2 | 124:12 144:9 |
| **attempted** | 119:9 205:6,16 | 201:2 208:24 | 144:13 158:25 |
| 31:19,22 167:2 | 207:12,14,16 | 234:13 259:10 | 173:20 174:7 |
| 232:12 | 207:20,21 | 261:2 265:3 | 174:20 181:16 |
| **attempting** | 208:13,14 | 280:17 285:22 | 189:3 200:8 |
| 84:13 96:2,3 | 222:9,12,16,25 | 285:23,25 | 214:18 223:22 |
| 243:6 | 223:5,13 224:2 | **avenue**  4:18 | 230:6 247:13 |
| **attempts** | 224:12,25 | **average**  165:21 | 269:21 283:11 |
| 250:25 | 225:6,15,17,20 | 266:1 | **baked**  100:12 |
| **attention**  95:11 | 225:21 226:2,8 | **avoid**  50:17 | **bargain**  239:21 |
| 230:9 | 226:18,20 | **aware**  39:15,20 | 244:19 |
| **attorney**  3:6,14 | 227:3,17 229:7 | 39:21 48:22,25 | **based**  15:3 |
| 4:17 10:9 | **automated** | 49:2,6 56:9 | 30:24 34:22 |
| 294:18 | 29:10,12,18,18 | 61:2 69:21,24 | 42:18 45:24 |
| **attorneys**  1:12 | 29:20,21,23,23 | 86:25 96:21 | 51:1 56:2,15 |
| 4:7 5:7 292:3 | 30:6,25 31:11 | 97:21,25 109:9 | 57:1,4,14 |
| **attributable** | 31:17,21 32:8 | 125:8 126:11 | 61:15 62:13 |
| 88:8 89:24 | 33:9,18 34:15 | 135:13 136:16 | 63:16 64:21,21 |
| 90:5,8,10 | 34:22 36:1 | 192:1 214:10 | 64:25,25 71:1 |
| 168:14,15 | 39:2 114:4,13 | 214:13,17 | 76:8 77:15 |
| 179:21 180:7 | **automatically** | 234:16,19,23 | 82:19 91:15 |
| 180:12 182:5 | 161:6 | 263:7 268:25 | 93:25,25 |

**[based - bit]**

118:12 132:10
137:8 140:23
159:19 169:10
169:21 170:14
177:2,10,22
182:22,23
183:4 196:8
200:24 204:11
205:6,15
207:12,13,16
207:20,21
208:13,14
209:8 210:5,12
210:19 222:8
222:12,16,25
223:5,13 224:1
224:12,25
225:6,15,17,19
225:21,22
226:2,8,17,20
227:2,16 229:7
233:7 234:13
245:13,14,16
250:19 259:5,9
260:4,5 261:1
265:2 280:16
285:10,23
286:14,18
287:1,8,8,9
288:10 291:22
**bases**  81:19,19
95:6 191:22
**basically**
109:21

**basis**  33:16
35:16 36:10,12
38:23 77:18
147:19,20
167:8,16 170:3
170:7 178:7,12
200:14 201:16
228:19 229:3,4
285:18 287:25
**bates**  171:22
**battery**  72:19
**beat**  53:20
**beginning**  10:9
71:18 110:11
144:8 174:6
200:7 230:5
269:20 274:3
**behalf**  2:15
**behavior**  96:12
96:18 129:14
131:11 135:4
219:12 220:19
221:18 228:20
228:22
**behaviors**
284:20
**belief**  20:6
280:15
**beliefs**  286:6
**believe**  21:6
24:23 25:8
43:3,7 51:20
52:22 53:2
55:19 56:2,2
60:12,13 67:23

67:23 76:6
88:21 90:23
91:2 96:3
107:16 119:23
149:7,9 154:24
162:14,19
171:18 189:14
202:10,24
203:6 205:11
208:4,21
209:16,19,21
210:21 212:18
220:25 226:11
226:11 231:7
233:4 240:20
247:3 248:11
254:2,3,13
259:8,22
277:23 279:10
285:16 290:20
**belonged**
202:21
**best**  37:3,4
51:18 56:4
60:14,18 81:21
86:20 93:25
132:4,7 158:2
233:18 234:9
250:24 255:10
285:12,22
**better**  106:9
159:11 164:1
246:13 284:7
**beyond**  33:4
38:25 48:7

93:24 146:12
146:25 188:13
191:25 267:9
267:22,24
268:7,15,19
274:7 275:25
284:17 290:17
291:9
**bid**  29:19,22
30:4,5 32:6,16
32:20 33:2,7
114:4,6,9,17
115:13 180:13
182:2,5,10,13
182:24 198:11
198:15 212:13
216:1
**bidding**  29:10
29:10,12,18
30:3,14,25
31:11,17,21,24
32:2,6,10,11,19
32:23 33:18
34:15,22 36:1
39:2 114:13
115:23 119:16
177:7,8 183:2
183:3
**bids**  29:18
115:18 179:22
183:17 270:14
**billing**  210:13
**bit**  36:9 67:15
108:3 159:11
164:19

Page 11

**[black - california]**

**black** 15:5 21:8
21:10 169:6
**blinders** 147:4
**blocked** 211:19
211:25 212:5
270:9
**blocker** 135:21
136:8 137:1,5
137:6,12
**blocking** 206:8
**boies** 3:4 10:14
16:9 270:4
**bolds** 85:21
**bonus** 15:6,8
15:11 66:10
257:13
**bookkeeping**
251:22
**boss** 15:6
**bottom** 152:24
180:21,25
181:6,16
**bought** 112:10
**box** 15:5 169:6
205:5
**breach** 232:22
**break** 46:10
65:17 71:11
103:9 111:12
173:18,19,24
196:14 199:21
199:24 229:19
229:25 269:15
282:5,18

**broadly** 275:20
**brought** 241:9
**brown** 15:16
31:7,14,16
34:1,3,7,11
39:7 43:1,6,13
43:21 47:7
288:1,4 290:3
**browser** 142:2
143:5 255:3
257:12 290:22
290:22 291:15
**browsers** 201:9
**browsing** 72:18
**bsfllp.com** 3:11
3:19
**bucket** 116:3
**bucks** 65:4
241:1
**budget** 116:17
117:3 121:8
125:24 127:6
128:15 133:17
133:19
**budgets** 124:25
126:5
**bullet** 82:7
95:12,14
**bullets** 181:13
**burden** 47:23
**business** 75:6
111:19 113:12
267:3
**button** 99:18
135:20 141:19

275:20 277:11
**buy** 52:19
101:12
**buyer** 50:23
52:17,18

**c**

**c** 3:13
**ca** 295:9,12,20
**cal** 41:14
**calculate** 30:17
30:21 31:18
51:22 55:4,6
55:15,16,18
61:7 63:15
74:22 87:7,8
130:13,15
135:10 139:23
171:15 190:16
199:17 207:5
216:4,15
231:12 232:24
258:25
**calculated**
30:24 48:14
62:5 68:9
80:21 81:17
134:23 175:25
216:23
**calculates**
140:2 175:21
**calculating**
42:16 79:19
95:23 96:17,25
130:2 134:7
210:16 251:15

**calculation**
51:19 55:3,9
57:21,23,24
59:13 60:19
61:15,18 70:16
70:19 78:19,21
83:23,25 84:17
84:18 92:11,24
129:11 130:4
130:20 141:2
143:23 153:16
166:2 179:20
199:7 207:7,8
208:2 212:15
216:5 229:17
233:6 271:1
276:3 285:21
285:22 287:7
**calculations**
34:8 41:3
75:13 79:25
80:20 83:3
92:18 152:7,18
155:25 156:5
157:20 159:18
161:23 168:9
169:1 207:9
223:17,20
224:18,21
276:14 290:15
290:15
**california** 1:2
1:14,21 2:2,17
3:17 5:10 9:1
9:17,20 294:2

[call - ccr]

| | | | |
|---|---|---|---|
| **call** 23:16,18,19 | **capture** 266:1 | 71:4 73:6,8,12 | 267:8 269:6 |
| 28:6 42:13 | **captured** 89:21 | 73:16,24 74:15 | 270:13,19 |
| 137:11 230:9 | 233:5 | 75:16 77:10,15 | 272:17 279:8 |
| 231:20 | **captures** 233:7 | 78:16 82:11 | 279:20 280:7 |
| **called** 30:3 | **care** 121:4 | 94:13,21 98:8 | 280:18 283:20 |
| 32:20 55:13 | **career** 12:22 | 98:25 99:4,11 | 284:5,12 286:1 |
| 109:19 137:12 | **careful** 288:21 | 99:11,17 | 288:1,3,4,8 |
| 181:17 242:25 | **carefully** | 104:20 111:3 | 289:12 290:3 |
| **calling** 52:11 | 255:13 | 115:6 120:19 | 290:13,15,20 |
| **calls** 66:19 | **case** 1:6 2:6 | 122:18 123:5 | 290:20,23 |
| 111:7 113:18 | 9:18 13:8,10 | 129:2,5 130:18 | 291:7,16 |
| 115:2 125:6 | 15:13,16 16:14 | 132:8,9 133:16 | 294:14 |
| 126:9 133:21 | 16:24 17:9,17 | 147:9 148:25 | **cases** 15:23 |
| 133:23 197:14 | 18:5 19:1,5,22 | 149:11 152:7 | 16:1 30:21,22 |
| 262:1,11 265:9 | 20:8,14 21:3 | 161:23 170:10 | 33:14 36:13,14 |
| 265:21 266:10 | 30:10 31:6,13 | 173:1 178:13 | 36:22,22 37:3 |
| 275:12 | 31:14 32:4 | 184:25 185:7 | 37:7 38:2,5,9 |
| **campaign** | 33:23 34:1,3 | 186:2 192:2 | 38:21 41:1,5,9 |
| 116:18,24 | 34:10,11,17,17 | 194:14,23 | 57:9 98:3,4,14 |
| 124:15 181:25 | 34:18 37:14,15 | 195:3 199:11 | 98:23 113:3 |
| 182:1,4 189:8 | 37:21,23,24 | 201:19,21,25 | 130:9,12 |
| 191:8 192:6,7 | 40:25 41:4,8 | 203:6,9 204:6 | 131:23 133:2 |
| 193:5 | 41:17 42:21 | 208:17,22 | 186:7,7 246:15 |
| **campaigns** | 43:11,12 45:17 | 209:13 215:4 | 288:21 |
| 90:22 177:14 | 47:7,12,12,17 | 216:8 217:8 | **category** |
| 177:22 178:5 | 48:4,5,8,11 | 219:9 221:11 | 235:10,12 |
| 178:10,17 | 50:8,21,24 | 225:10 226:5,9 | **causal** 194:11 |
| 179:4,15,19,23 | 51:21 53:2,13 | 234:13,15 | **cause** 188:19 |
| 185:12 186:20 | 53:23 54:2,13 | 239:4 241:9,12 | 192:15 193:25 |
| 190:18 191:3 | 54:14,21 55:5 | 244:23 245:5 | 199:5 |
| 197:3 198:14 | 56:5 59:18 | 247:24 248:2 | **causes** 85:16 |
| 212:20 213:5 | 62:3 64:3 | 252:19,21 | 89:9 |
| **campbell** 14:7 | 65:20 66:15 | 254:6 255:20 | **ccp** 295:9,12 |
| **capacity** 17:18 | 67:1,18 68:9 | 256:12,20 | **ccr** 1:21,22,23 |
| | 70:2,10,13 | 264:10 265:12 | |

Page 13

**[cease - clarity's]**

| | | | |
|---|---|---|---|
| **cease** 197:9 | 165:25 166:1 | 239:9 240:23 | 202:5,18 |
| **celeste** 6:13 | 179:1 | 244:8 245:8,9 | 203:17,23,23 |
| **cell** 142:9 | **chance** 67:24 | 271:10 | 204:9 205:3,12 |
| **cells** 139:23 | 109:14 160:10 | **charges** 177:2 | 206:6,15 |
| 143:2 | 161:7 251:10 | **check** 160:7,9 | 208:12 211:16 |
| **cents** 258:16 | **change** 58:3,9 | 160:17,18,21 | 225:1 226:23 |
| **certain** 29:16 | 58:19 59:3 | 160:22 266:13 | 228:1 270:8 |
| 41:11 42:1 | 60:23 84:5 | 283:22 284:2,3 | **chunk** 264:13 |
| 54:6 57:9 | 96:12,21,21 | **checked** 283:19 | **circumstances** |
| 67:25 74:23 | 145:3 146:6 | 283:23 284:1 | 217:12 218:5 |
| 75:9,14 121:2 | 173:4 175:16 | **chip** 130:20,22 | 218:17,24 |
| 121:3 159:18 | 199:18 201:17 | 131:13 195:23 | 219:5 258:12 |
| 162:15,18 | 201:18 217:11 | **chips** 195:13 | **cite** 223:21 |
| 170:21 177:12 | 218:5,16 | **choice** 49:25 | 224:22 |
| 178:9 189:9 | 219:12 220:19 | 230:19 231:14 | **cited** 35:8,12 |
| 201:13 238:23 | 282:22 283:25 | 241:18 | 35:15 166:24 |
| 238:24 247:2,4 | 284:13,20 | **choose** 120:13 | 166:25 167:1 |
| **certainly** 26:25 | 297:4,7,10,13 | 160:8 177:22 | 168:5 226:13 |
| 34:7 41:10,10 | 297:16,19 | 189:22 238:22 | 226:15,17,19 |
| 64:13 65:24 | **changed** 93:16 | **chooses** 127:12 | 226:22 |
| 115:21 117:10 | 129:14 131:11 | 239:20 | **cites** 184:7 |
| 159:16 184:2 | 135:4 146:8 | **chose** 183:12 | **citizen** 280:8 |
| 189:10 191:5 | 218:23 219:4 | **chris** 14:5 | **civil** 295:19,20 |
| 192:9 211:9 | 221:18 | **christopher** 6:9 | **claim** 99:11,17 |
| 241:25 242:1 | **changes** 77:5 | 6:15 39:16 | 100:3,24 |
| 247:25 249:2 | 96:18 139:14 | **chrome** 72:18 | 238:10 247:24 |
| 256:15 262:4 | 231:1 | 200:22 | 247:25 |
| 268:5 | **changing** | **chrome's** | **claims** 17:8 |
| **certainty** 57:18 | 201:13 | 201:13 206:9 | 131:16 |
| 63:15 | **characterizati...** | **chromeguard** | **clarification** |
| **certified** 2:19 | 127:13 266:3 | 76:25 191:20 | 291:3 |
| 2:20 294:1 | **characterize** | 191:25 199:9 | **clarify** 45:3 |
| **certify** 294:3,16 | 250:25 | 199:10 200:11 | 140:13 |
| **cetera** 106:10 | **charge** 177:9 | 200:15,20,21 | **clarity's** 155:8 |
| 106:10 165:25 | 185:1 187:12 | 201:8,17,21 | |

**[class - compensation]**

**class** 16:2 18:9 48:16 53:7 54:16,16,20 55:17,19 56:12 57:25 62:21 66:25 67:9,19 68:21 70:13,20 88:4 97:17 101:3 110:1 149:13 181:12 196:25 198:3 216:11 217:12 218:5,24 219:5 219:13 220:20 221:19 230:19 232:17 235:2,3 235:8,10 243:7 251:6 258:3 261:23 262:5,8 262:16,20,25 264:13,18,20 264:21,24,25 265:16,19 266:5,5,7,21 274:4 277:6 282:11,13,14 282:15,24 283:2,3,3 284:25 285:2 285:18,18 286:10

**classes** 18:9

**clear** 74:5 75:9 80:23 81:13 90:3 91:15,25

118:16 120:15 123:14 125:19 126:19 141:11 154:18 156:4 158:8 207:10 231:8,23 233:3 270:24 273:12 277:16

**clearer** 90:13

**click** 116:8 147:2 209:18 210:14 236:3

**clicked** 247:21

**clicking** 143:1

**clicks** 82:17

**clients** 14:19

**close** 209:9 229:10

**closed** 178:2

**closer** 14:15

**club** 104:21 107:18 108:6

**code** 295:9,12 295:19,20

**coincidence** 290:14 291:6 291:13,14

**collect** 82:16 241:14 278:21 278:22 281:8,9

**collected** 29:7 129:20 132:14 251:3 273:21 273:22 277:10

**collecting** 71:1 82:12 254:1,2 255:8 273:16 276:20 277:2 284:9,15

**collection** 72:7 72:15 106:6 181:9 263:19 263:21,23

**collects** 187:16

**column** 153:21 172:17

**come** 34:16 39:14 74:4 94:23 102:7 119:17 120:21 151:8,19 155:24,25 156:7 247:13 252:5 258:4 261:18,20,21

**comes** 35:16,25 78:25 139:19 141:9

**comfortable** 45:23 46:6,8 164:25 285:7,8

**coming** 89:20 171:9

**commencing** 2:17

**common** 188:16 279:4

**communicated** 221:9

**companies** 36:15 38:10,22 40:20,20,21 44:8 45:5 46:16 234:21 236:9,11 280:21

**company** 43:9 45:6 46:18 48:2,3 113:25 202:14 242:25 243:20

**company's** 45:6

**comparability** 259:5

**comparable** 60:7,15,20,21 64:22 66:23 67:17 68:16 246:5,7 264:10 285:13

**comparables** 41:17,20 51:1 51:12

**compared** 70:21 153:17 229:8 252:14

**compass** 6:12

**compensated** 63:3 64:15 255:11

**compensation** 15:1,2 66:7,13 68:4,4 149:18

**[compensation - constant]**

256:16 257:16
**compensations**
257:16
**competition**
114:7
**competitive**
33:1
**competitor**
195:7,7
**complete** 122:1
163:6 167:3
**completed**
144:23,24
295:7,17 296:6
**completely**
167:17 189:1
193:1 195:9
213:23
**completeness**
50:9 144:25
**completion**
294:14 296:10
**complex** 157:1
**complicated**
108:4 157:6
**complies** 11:4
**component**
130:19 133:6
133:11,13
194:16,21,25
195:2,9,25
198:22 199:2,4
**compound**
275:13

**conceptual**
168:11
**concern** 113:8
284:14
**concerned**
56:10 113:9
288:20 289:3
**concerning**
181:8
**concerns** 289:1
**conclude** 77:18
141:10 160:1,9
161:3 167:20
184:18 193:13
200:14 201:16
213:3 218:17
218:22 219:3
**concluded**
83:16,17 86:8
254:20 255:19
**concludes**
292:6
**conclusion**
56:19,21 78:14
79:6 88:3
167:8 168:4,19
170:4 209:7
218:19 228:20
258:12 275:13
**conclusions**
18:25 145:22
219:11 220:18
**conduct** 24:25
63:6,9 95:7
104:8 194:8

203:8 213:6
272:14
**conducted**
231:24
**conference**
3:13 4:5,6,16
5:6 6:3
**confident**
229:14,16
**confidential**
45:18 46:25
47:2,3
**confidentiality**
44:17 47:10
289:1
**confirming**
222:3
**confused** 86:16
106:23 130:8
243:5
**connection**
194:7,11
**consent** 85:16
85:18 89:7,10
139:9,15
150:11,17,21
156:8 169:13
169:24 170:5
284:15
**consented**
158:16
**consequence**
101:6
**conservative**
51:7,16 52:7,9

54:25 55:10,12
55:20,24 56:17
61:14 62:4
65:8 68:24
69:8 70:10,14
80:20 84:21
259:23 260:1
261:10 266:2,4
285:22
**consider** 24:12
39:24 40:2
98:24 99:3
100:18 106:21
213:8 214:25
245:21 287:19
**consideration**
40:7 41:25
87:17 96:11
127:21
**considered**
50:12 70:24
75:2,4,5 97:21
108:3 133:5
256:3,6,19
260:13 274:1
274:19
**considering**
40:15 81:19
**consistency**
162:25 163:1
**consistent** 78:1
78:1,7 210:1
235:1
**constant** 145:5
155:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[constraint - conversions]**

| | | | |
|---|---|---|---|
| **constraint** | **contains** | 36:2 225:7,16 | 207:13,16,20 |
| 134:12,16 | 226:23 | 226:25 | 207:22 208:5 |
| **consult** 43:8 | **contemplate** | **conversion** | 208:13,14,24 |
| 222:19 | 273:20 | 23:3 24:1 | 208:25 209:22 |
| **consulted** 44:5 | **contemporary** | 28:19 29:2,7 | 210:6,12,16,17 |
| 74:10 | 74:9 | 88:8 89:24 | 210:19,23 |
| **consulting** 6:4 | **context** 170:10 | 90:6,8 104:14 | 211:7,17 |
| 14:16,19 15:3 | 205:12,16 | 104:14,15,17 | 212:19 222:8 |
| 38:13,21 40:11 | **contexts** 234:6 | 105:3 118:24 | 222:12,16,25 |
| 40:22 | **contextual** | 119:2,14,14 | 223:5,13 224:1 |
| **consumer** 16:1 | 109:19 | 127:20,22 | 224:12,25 |
| 42:24,24 43:4 | **continue** 9:10 | 156:25 157:20 | 225:6,15,17,19 |
| 43:5,10,23,25 | 187:7,8 271:19 | 157:22 158:11 | 225:21 226:2,8 |
| 45:8 46:13 | **continued** | 171:13 176:16 | 226:17,20 |
| 47:8 48:20 | 60:10 96:19 | 176:20 177:3,3 | 227:2,16 |
| 49:11,15 98:2 | **contract** | 177:5,10 179:5 | 228:10 229:7,7 |
| 98:5,8,14 | 106:17 | 179:15,19,22 | 234:17 270:15 |
| 129:13 131:10 | **contradiction** | 179:22,23 | 270:21 271:2 |
| 149:16 | 244:1 | 180:6,13 | 274:15,24 |
| **consumer's** | **contributed** | 181:18,22 | 281:14 |
| 49:11,15 | 194:22 | 182:5,18,20,22 | **conversions** |
| **consumers** | **control** 71:22 | 182:23,25,25 | 101:6 116:10 |
| 43:15 48:24 | 71:24 72:7 | 183:7,7,13,15 | 118:18 119:7 |
| 49:3,7 149:5 | **controls** 71:25 | 184:4,17,20 | 121:4 151:3,4 |
| 149:12 | **conversation** | 185:2 186:12 | 156:6 158:10 |
| **consummated** | 22:22,23 23:7 | 186:17,18 | 158:18 177:23 |
| 151:5 158:19 | 25:3 26:22 | 188:10,18 | 178:4 180:4 |
| **cont'd** 4:1 5:1 | 27:3,5,8,9,16 | 189:9 190:1 | 182:3,6,10,14 |
| 6:1 8:1 | 27:20,21,25 | 191:2,12,13 | 183:21 184:1,9 |
| **contact** 193:7 | 28:2,13,17 | 198:10 200:24 | 185:6,10,11 |
| 193:25 295:9 | 29:3 223:4,11 | 201:1,23 202:1 | 186:24,25 |
| **contain** 226:17 | 224:11 | 202:7,8,12 | 187:1,5,6,8,12 |
| **contained** | **conversations** | 203:9,19,20 | 187:13 188:23 |
| 293:5 | 9:9 22:8,11 | 204:1 205:6,15 | 189:22 190:6,7 |
| | 27:23 29:5 | 205:17 207:12 | 190:13,18,22 |

**[conversions - court]**

| | | | |
|---|---|---|---|
| 191:9 192:7,14 | 70:17 81:9 | 260:21 262:18 | 246:12 |
| 193:6 195:22 | 83:22 88:10 | 272:12 276:12 | **costs** 23:2,24 |
| 197:2 203:2,14 | 89:25 90:23,24 | 276:25 277:3 | 24:9,12,13,14 |
| 207:18 211:12 | 96:10 97:14 | 282:3,21 288:6 | 24:18,24 25:4 |
| 211:24 212:13 | 98:15 99:21 | 290:8 293:6 | 25:13,18,22 |
| 212:25 213:10 | 100:11 120:8 | **corrected** 293:5 | 26:13,14,16,18 |
| 213:18 214:24 | 123:10,12,13 | **correcting** | 26:19,20,21 |
| 215:16,23 | 127:23,25 | 20:11 | 27:13,17,19 |
| 216:1,19 | 130:14,17 | **correction** | 28:6,7,9,12 |
| 217:14 218:7 | 131:7,9,14 | 169:16 | 81:20 88:6 |
| 219:14 220:21 | 133:15 135:16 | **corrections** | 93:20,21 |
| 221:21 247:22 | 136:5 139:7,16 | 293:4 295:14 | 120:17,21 |
| 270:10 275:4,6 | 147:11 153:20 | 295:15 296:3,4 | 131:8 133:10 |
| 278:5 280:22 | 158:13 159:25 | **correctly** 21:7 | 141:13 161:19 |
| 281:16,17 | 160:2,10 | 43:18 80:4 | 168:16 179:1 |
| **convert** 156:24 | 161:25 163:8 | 123:21 146:23 | **counsel** 3:1 4:1 |
| 177:14,23 | 166:11 168:2 | 151:22 156:1 | 5:1 10:7 11:1 |
| 178:1,10 | 178:6 179:2 | 175:7,9,22 | 19:12 274:22 |
| **converted** | 180:14,18 | 176:6 206:3 | 295:18,21 |
| 188:2,6 | 186:21 188:1 | 211:22 228:17 | 296:7 |
| **cookie** 202:14 | 189:16 190:19 | 289:20 291:15 | **counsel's** 50:19 |
| 210:24 211:7 | 191:1,21 | 291:19 | **count** 176:11 |
| 211:10,12,13 | 194:24 200:13 | **correspond** | **counted** 161:4 |
| 211:18,19 | 201:11,15 | 95:14,19 175:2 | **countless** 133:4 |
| 228:10 | 202:9 203:14 | **corresponding** | **counts** 281:16 |
| **cookies** 202:20 | 203:15 209:23 | 82:18 121:9 | **couple** 65:11 |
| 206:9 228:18 | 211:10,13,25 | 172:21 173:2 | **coupled** 164:23 |
| **correct** 21:7 | 212:6,14 213:7 | 173:10 | **course** 12:22 |
| 22:7 24:3 | 229:13 230:22 | **corresponds** | 21:4 34:12 |
| 30:11 33:24 | 232:1,19,23 | 120:4 | 103:7 156:16 |
| 35:17 36:3,4,6 | 236:6 239:19 | **cost** 26:3 27:4 | 160:2 |
| 38:4,14,17 | 243:17 248:1,8 | 116:8,9 209:17 | **court** 1:1 2:1 |
| 41:23 45:7 | 249:3 251:12 | 209:20,22 | 2:20 9:17,24 |
| 46:21 52:23 | 252:25 253:4 | 210:5,12,14 | 10:10,25 11:2 |
| 57:12 66:6 | 253:13 258:1 | 232:17,21 | 11:5 16:20 |

[court - data]

108:21 109:18
109:23 140:11
158:14 163:21
174:10 193:11
215:15,19,21
215:22 216:10
217:13 219:13
220:20 221:20
274:2
**courtesy**
220:14
**covered**  84:15
**create**  94:20
**created**  139:13
**creative**  189:18
**credibility**
267:15
**critically**  215:7
**criticisms**
145:17
**crystal**  74:5
**csr**  1:21,21,22
294:25
**curiosity**  240:3
**curious**  111:2
**current**  15:17
39:6
**currently**  82:21
82:21 113:21
186:23
**customers**
177:14,23
178:1,10
**cut**  158:18
159:1,7,18

175:21
**cv**  1:6 2:6 9:18
37:9

**d**

**d**  7:1
**dai**  6:4
**damage**  63:11
99:22 232:12
273:3
**damages**  17:10
20:8,9 24:16
25:15 28:9,10
30:18,21,24
31:12,18 36:23
40:25 41:3,7
41:22,24 42:8
42:24,25 43:4
43:6 47:15
49:23 50:6
51:17,22 54:9
55:1,2,5,6,9,16
55:19 56:11
57:10,21 58:3
58:20 59:22
60:19 61:12
63:2,10 65:9
73:25 81:17
98:2,4,10
133:4 158:20
194:19 195:3
203:10 216:5
230:9,17 231:3
231:10,25
232:1,3,5
234:10 243:12

246:25 257:6
259:5 274:13
276:3,14
279:23 284:23
285:14,16
286:8 288:2,7
289:12 290:3
**data**  41:21 42:1
43:16,23 44:1
44:11 45:6,8,9
45:11,12,20
46:13,19,23
47:8,16 48:5
48:11,17,20,24
49:3,8,11,12,15
49:16 50:2,7
51:3,13,15,25
54:7,16,18
58:13 59:7
60:14,18 63:16
64:2 66:25
67:20 69:14,16
69:16,22 70:13
71:1 72:18
75:17 78:4,7
81:4,8,21
82:13,13 84:24
86:24 91:16
94:1,5 95:24
96:4,5,8,13,19
97:18,24 100:9
100:16,21
101:5,8 102:16
102:17,20
104:16,20,23

105:4 106:19
107:18 108:8
108:21,21
109:2,22
110:17 118:9
119:7,9,22
122:1 132:15
134:13,22,24
135:6 137:3
145:1 149:5,6
151:11,12
152:3,14 153:9
154:2,8,8
155:3,12,13,14
162:20,22
163:1,5,9,17
164:8,9,14,22
164:22,25
165:1,7,25
169:10,12,14
169:21,23,25
170:14,16
173:2 175:7
176:5 181:10
183:3 188:21
188:24 190:1,5
190:12,14,15
190:17,22
191:9 197:21
202:2 208:23
217:3 218:7
221:21 232:21
232:21 233:10
233:15 234:13
235:18,22

**[data - deponent]**

| | | | |
|---|---|---|---|
| 236:14,16,24 | 287:2 291:18 | **deduct** 81:18 | 240:19,19 |
| 236:25 237:1,2 | **data's** 58:19 | 82:2 94:21 | 242:4 285:16 |
| 238:7,15,16,25 | **database** | 97:2 131:8 | 286:9 |
| 239:13 240:15 | 193:10,13 | 161:4 178:24 | **deponent** 7:2 |
| 240:16 241:5 | **date** 146:7,9 | **deducted** 81:25 | 11:4,10 12:16 |
| 241:14,20,22 | 169:12,17 | 87:15 | 18:18 20:1 |
| 242:14 243:1,2 | 294:19 295:16 | **deduction** | 25:8 27:21 |
| 243:19 244:8 | 296:5 297:24 | 83:20 92:3,4 | 28:3 35:22 |
| 246:1,17,23 | **dated** 7:14 | 175:20 179:3,8 | 37:20 39:12 |
| 247:2,4,10,15 | 294:21 | 179:9,12 | 42:12 44:15,20 |
| 248:17,21 | **day** 56:1 68:15 | **deep** 214:20 | 44:24 45:25 |
| 249:5,12 250:2 | 70:23 242:13 | **defendant** 1:8 | 46:7 50:20 |
| 250:7,10,11 | 242:14 245:16 | 2:8,15 5:3 7:20 | 51:6 52:22 |
| 251:2,14,17,19 | 245:23 270:24 | 8:4 98:18 | 53:12 55:8 |
| 252:6,10,23 | 277:17 285:21 | **define** 227:8,11 | 56:9 57:4 59:1 |
| 253:2,2,16 | 293:7 | 227:13 | 61:20,23 63:14 |
| 254:2,5,17 | **days** 162:16 | **defined** 47:21 | 64:9 65:24 |
| 255:10,12,18 | **deal** 142:1 | 181:11 | 66:20 69:3,5 |
| 258:4 260:6 | 239:1,3 251:20 | **degree** 247:11 | 69:12 70:5 |
| 262:6,10 263:9 | **decide** 118:2,4 | 287:1 | 79:13 84:10 |
| 263:18,19,20 | 268:3,4,6 | **degrees** 196:20 | 85:11 88:16 |
| 263:23 264:15 | 287:12 | **deleted** 58:6,14 | 89:4 97:7 |
| 265:1,1,3,20 | **decided** 282:20 | **delivery** 114:9 | 99:13 100:4 |
| 266:20 267:8 | **deciding** 118:8 | **demand** 239:12 | 103:8,13 106:1 |
| 267:21 273:16 | **decipher** 150:9 | 240:5 242:7 | 108:17 111:9 |
| 273:22 274:14 | 150:15 | 261:24 | 113:20 115:5 |
| 274:16 275:19 | **decision** 238:13 | **demanded** 51:9 | 115:17 117:6 |
| 276:20 277:2,9 | **decisions** | 51:10 | 124:5,8 125:8 |
| 280:21,25 | 124:24 | **denominator** | 126:11 131:20 |
| 281:8,18 | **declaration** | 158:10 175:24 | 133:22 134:2 |
| 282:10 284:8 | 21:9 | 176:9 178:19 | 136:12 137:8 |
| 284:15 285:1,2 | **declare** 293:1 | 179:19 | 138:10 141:16 |
| 285:11 286:14 | **deduce** 93:6 | **depend** 248:13 | 141:21 142:5 |
| 286:14,18,20 | **deduced** 93:1 | **depending** | 143:1,6 145:10 |
| 286:21,22 | | 62:17 170:12 | 145:14 150:2 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[deponent - differ]**

| | | | |
|---|---|---|---|
| 151:18 152:23 | **deposition** 1:13 | **determine** | 60:24 62:5,7 |
| 158:23 160:14 | 2:14 9:14,19 | 47:16 51:1,13 | 62:11 63:2 |
| 163:12 164:5 | 11:7 12:25 | 51:24 57:15,16 | 64:4,11,15 |
| 164:21 172:9 | 37:10,22 38:3 | 57:18 83:13 | 65:4,7 67:5 |
| 173:17 181:3 | 58:24 71:18 | 93:15 140:17 | 68:17 70:7,8 |
| 184:24 185:15 | 110:11 144:8 | 141:6,8 148:10 | 140:9 148:13 |
| 188:12 192:18 | 174:6 200:7 | 148:15 168:13 | 148:13 150:10 |
| 194:4 196:7,17 | 230:5 261:3 | 190:20 194:20 | 150:16,21 |
| 197:13,17 | 269:20 294:13 | 198:21 202:11 | 156:16,21,23 |
| 198:1 200:20 | 295:19,22,24 | 212:16 213:4 | 157:17,25 |
| 204:3 211:2 | 296:8,10 | 233:13 258:2 | 181:23 195:2 |
| 212:4 218:10 | **depositions** | **determined** | 242:7 247:5,6 |
| 219:20 220:25 | 12:12 148:25 | 48:8 49:23 | 252:17 254:9,9 |
| 221:16 222:23 | **describe** 16:13 | 83:14 165:21 | 254:10,14,14 |
| 224:10 229:21 | 17:3 41:22 | 230:17 252:16 | 255:2,7 259:1 |
| 230:15 238:19 | 106:3,11 166:2 | 259:5 295:18 | 259:9,11 |
| 250:5 252:9 | 181:7 252:4 | 295:22 296:7 | 261:19 284:23 |
| 256:11 258:20 | **described** | **determines** | 287:12,25,25 |
| 259:21 260:9 | 17:25 18:2,7 | 78:25 | 288:3,12 |
| 261:1,9,14 | 233:22 234:2 | **determining** | 289:12 290:10 |
| 262:2,12 263:7 | **description** | 50:5,6 52:18 | 290:10,24 |
| 265:10,22 | 7:12 8:3 17:15 | 52:25 181:21 | 291:16 |
| 266:11,25 | **descriptions** | 243:11 | **devices** 57:16 |
| 267:10,25 | 278:7 | **developed** | 61:3 66:10 |
| 268:5 272:7 | **design** 131:16 | 74:22 | 71:5 104:1 |
| 274:21 275:14 | **designate** 292:2 | **developer** | 106:13 147:18 |
| 278:19 280:11 | **designed** | 136:19 181:21 | 228:23 255:4 |
| 284:19 286:13 | 130:23 | 181:24 | 259:7 287:9,13 |
| 286:22 287:6 | **detail** 18:12 | **developers** | 287:21,23 |
| 287:16 288:16 | 32:15 60:6 | 245:25 | **devoting** 111:4 |
| 289:15 290:19 | **detailed** 165:20 | **deviated** | **diagnostics** |
| 291:11 | **details** 181:14 | 260:20 | 72:19 |
| **deposed** 12:17 | **determination** | **deviates** 99:19 | **diego** 6:6 |
| 269:1 | 137:23 | **device** 54:23 | **differ** 50:6 |
| | | 59:6,8,14 | 78:14 79:6 |

**[differ - display]**

168:20 170:12
170:15
**difference**
40:14 49:10,14
64:13 98:18,25
99:4 120:2
121:7 176:24
231:4 240:14
241:23 242:1
243:6,10
255:16 274:14
**differences**
64:14 168:24
**different** 15:21
18:1 20:25
42:6,6 47:19
48:1,1 52:11
52:24 54:10,12
62:15,16 65:15
67:15 73:19
97:10 99:14
101:1 102:8
110:3 113:16
113:23,24,24
116:6 132:23
132:25 133:2
133:13 136:20
139:24 163:10
163:13 167:17
182:2,14 183:6
195:14 196:24
213:2 219:2
225:14 232:3,8
233:21,24
238:17 240:8

244:8 245:15
251:20 255:1
255:15 257:18
257:20 266:9,9
287:21,23
291:18
**differently**
64:15 97:23
135:13,14
202:17 286:7
**digital** 16:22
**diminished**
86:14,18 87:1
**direction**
294:10
**directly** 152:14
224:20
**director** 6:15
**disabled**
150:24 157:17
202:6,8 203:1
203:3,13,18,20
**disagree** 170:7
227:10,13
230:23 231:2
**disagreeing**
196:10
**disappear**
216:2
**disclaimed**
147:7
**disclose** 149:15
245:18
**disclosed** 101:3
149:14,23

236:8,23
**disclosing**
235:20,21
**disclosure** 38:1
124:23 125:1,2
125:9,10
240:20 278:16
281:20
**disclosures**
275:11 278:8,9
279:1 280:4
281:24
**discontinued**
198:16
**discontinuing**
197:5
**discount**
161:17,19
164:2 166:19
**discounted**
180:2
**discover** 20:19
**discuss** 17:9
26:19 27:17
39:8 74:9 88:9
165:14 166:5
166:12,17
222:8 282:4
**discussed** 23:5
24:5,17 25:5
25:18 67:4
85:15 87:2
230:17
**discusses** 24:24
39:16,22

**discussing**
26:23 40:23
106:4 119:19
169:5
**discussion** 25:4
33:21 35:19
71:12 124:11
141:25 142:25
143:8 146:4
204:2 223:22
223:23 224:20
224:23
**discussions**
31:15 39:14
123:24 147:21
147:22,25
223:8 225:22
**disgorge**
156:24 194:6
**disgorged**
130:3 156:7
157:21,23
194:9
**disgorgement**
97:13 130:15
158:12 189:23
190:4 194:14
**disgorging**
118:23
**display** 85:17
85:22 86:2,9
111:5 112:12
116:16 137:23
138:4 140:3,4
142:18 143:14

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[display - eduardo]**

143:21 144:18
145:4 172:18
174:22 178:5
200:22,23
201:4,5,6,9
205:15,20
206:12,16,20
209:14 210:5
210:12,22
211:6 228:25
229:4
**displays** 207:6
**dispute** 170:3
**disputing** 94:14
**distinct** 176:23
**distinction**
203:17 248:16
**distinguished**
176:18
**distress** 231:10
231:20 232:3,5
**distribution**
169:11,22
**district** 1:1,2
2:1,2 9:17,17
**document**
74:19 75:11
76:4 122:17
123:18,25
124:3 141:24
162:4,6,11,12
170:2,17,18,19
171:17 184:8
191:15,19
199:7 205:3,17

210:15 223:4
224:3,15,17
225:23 226:22
226:24
**documentation**
223:7
**documents**
26:9 33:20,22
34:1,8,10,16,17
34:20,21 35:14
40:7 73:6,9,10
73:12 75:10,14
75:15,19,22
76:1,8 77:24
122:10,15
164:24 166:6
166:16,22
167:3,7,15
168:5,8 178:13
184:7 206:11
223:10 224:13
226:8,13,16,19
**doing** 42:16
48:21 134:7
140:22 141:13
199:13,16,16
203:18,20
214:2
**dollars** 251:2
254:11 257:14
**double** 176:11
**doubt** 192:10
235:9 265:13
265:15

**download**
236:2 241:2
245:17
**downloaded**
236:24 246:17
**downward**
81:24 253:15
**dr** 230:23
231:3
**draw** 16:24
**drive** 195:24
249:25 250:6
250:15,17
256:8,9,22
257:22,23
**driving** 196:2
**drop** 120:3,11
127:5 198:14
**drops** 86:9
**drove** 199:2
256:24
**due** 199:18
**duty** 147:6
**dv3** 228:1,3
**dynamics** 36:8
38:19,24 39:8
39:17,25 40:8
40:23 249:10

**e**

**e** 5:5 7:1,10 8:1
295:9,12 296:1
297:3,3,3
**earlier** 29:5
47:14 70:11
111:16 121:16

130:5 174:21
176:17,18
230:17 253:21
254:12 261:3
265:12 270:7
270:23 271:5
273:1 282:17
285:24 286:16
288:2
**earn** 85:18
100:16
**earned** 88:4
89:10 96:4
99:5,7 100:8
127:4 129:4,10
130:2 276:19
276:20 277:1
**earning** 127:19
**earns** 120:12
**ears** 199:22
**easier** 163:19
237:13
**economic** 40:2
40:15,24 74:21
74:23 199:13
199:16 231:3,4
231:6,24,25
234:10 236:18
240:14 242:11
243:7,10
**economically**
241:7
**edited** 73:1,2
**eduardo** 5:5
10:12 35:20

Page 23

**[eduardo - example]**

53:14 88:23
295:1
**effect** 135:19
136:6 171:7
**effectively**
97:12
**effectiveness**
181:25
**efficient** 122:14
**eight** 292:8
**either** 74:7,24
84:5 193:21
217:19 220:8
222:7 268:4
**elaborate** 79:9
151:20
**element** 127:20
**eliminate** 176:4
**eliminates**
191:14
**emails** 122:18
122:19,21
**embodied** 19:1
19:6
**embodies** 25:9
**emotional**
231:10,20
232:3,5
**employee**
294:17
**enable** 148:14
**enabled** 153:17
154:10 156:23
**encompassed**
19:6

**ended** 291:5
**ends** 145:1
291:21
**energy** 173:15
**engage** 104:7
140:17 261:25
**engagement**
13:22 14:2
30:23 48:19
**engagements**
12:21 15:17
**engaging** 32:10
114:12
**engineering**
26:13,19
**enrichment**
17:10 20:9
41:17 74:12
79:20 80:6,10
80:22 81:12
83:9 87:9
94:25 95:7,23
96:17,25 97:12
99:23 103:22
107:22 109:8
110:15 111:23
114:23 120:10
129:1 151:4
271:1 273:3,13
273:20 276:18
**ensure** 81:25
**enter** 244:6
249:20
**entered** 46:2
235:16 245:24

**entire** 126:1
127:9 227:5
**entirety** 191:7
**entity** 43:9
45:21 244:7,7
**equal** 69:10
120:9,18
**equation**
241:10
**equivalent** 91:3
91:4,5,8
137:22
**errata** 295:14
295:16 296:3,5
**erroneous**
160:1,5 162:12
**erroneously**
152:3
**errors** 159:25
**esantacana**
5:12 295:2
**essence** 52:16
**essentially**
51:24 90:21
95:8
**estimate** 12:13
13:23 14:8
56:4,17 123:18
149:12 228:25
**estimates** 75:6
159:17
**estimating**
162:9
**et** 1:4 2:4 9:15
106:10,10

165:25,25
166:1 179:1
295:4 297:1
**evaluate**
195:22 290:3
**evaluating**
202:5
**event** 177:3,10
231:5
**evidence**
271:24
**exact** 62:21
101:24 105:15
127:4 129:16
243:19 244:8
**exactly** 23:11
126:24
**examination**
7:2 12:5 270:1
276:7
**examined** 12:2
77:5
**example** 26:12
32:17 41:21
61:7 64:9 65:2
74:17 90:16
93:19 100:22
101:14,20
102:1 108:5
109:2 119:9
121:10 126:14
126:16 130:18
133:16 152:17
152:19 153:23
184:3 193:4

ATTORNEYS EYES ONLY

**[example - factors]**

209:17 214:5
232:16 235:3
235:14 239:4
240:22 242:9
**examples** 18:10
53:3,23 126:14
**excel** 7:17
139:21,22
140:1,2,7
143:3
**except** 121:5
287:13
**exception**
155:9 169:2
218:11
**exchange** 33:10
235:18,22
236:16 237:2
239:23 243:22
246:1 247:2
251:2 263:23
265:20 267:7
267:20 282:9
**exclude** 84:14
155:18,21
158:9 276:2
**excluded** 128:6
128:12,16,20
152:6
**excluding** 88:7
88:7
**excuse** 63:4
80:7 99:1
218:3

**executed** 293:7
**executive** 6:11
**exercise** 246:20
**exercises**
213:21
**exhibit** 7:13,17
7:20 8:4 16:19
16:22 140:9,10
141:23 163:20
171:24 172:4
174:9,12
175:25 180:20
**exist** 251:1,7
260:14 272:24
**exists** 251:9
**expect** 253:10
253:11 261:24
**expectation**
241:13
**expectations**
163:1
**expects** 111:17
**experienced**
286:10
**expert** 7:13
12:21 14:1
15:13 17:18
18:5,25 19:5
19:10 20:18
21:2 30:9,10
30:13,15,19,20
30:23 32:3,4
33:12 38:1
39:16,24 40:3
40:9,10,15,18

42:23 43:4,14
43:22,24,25
44:2,4 48:18
73:21 114:8
133:4 147:8
149:22 162:7
194:19 278:1
279:7,13,17,20
279:22,23
280:7,12,12
284:11,21
**experts** 31:15
272:20
**explain** 75:24
86:20 168:1
205:10
**explained**
122:8 126:24
**explains** 18:12
**explanation**
168:3
**explanatory**
182:16
**exposed** 63:5,8
63:11
**express** 26:2
**expressed** 33:3
48:18
**expressing**
147:8
**extension**
289:20
**extent** 18:21
40:6 44:16
76:1 80:18

96:20 163:13
178:16 223:15
224:11,14
226:14 233:3
252:2
**extremely** 63:4
63:4
**eyes** 1:12 292:3

**f**

**face** 145:12
**facebook**
136:22
**fact** 66:1 67:7
70:7 75:4
87:17 94:9
96:18 99:18
138:11 159:12
159:22 164:15
164:24 190:11
209:9 212:8
215:6,11
216:16 219:7
260:3 286:8
291:4,6,20,20
**factor** 69:25
70:18,24
165:14,24
167:21 257:1
258:9,16,16
**factors** 59:17
118:7 167:9
217:3 249:25
256:3 257:21
257:22 258:4
263:17

Page 25

**[facts - firebase]**

| | | | |
|---|---|---|---|
| **facts** 181:7 | 273:19 285:15 | **feeds** 155:3 | **file** 143:5 |
| 237:6 | 285:19,20 | **feel** 45:13 46:6 | **filed** 9:16 |
| **failed** 149:15 | 286:11 | 46:8 79:9 | **final** 172:16 |
| **fair** 18:24 21:1 | **falls** 277:10 | 222:21 286:19 | 179:8 |
| 33:6 42:10,17 | **false** 98:19,21 | **feeling** 173:14 | **finalized** 22:6,9 |
| 42:17,17 47:16 | 99:5,8 | **feelings** 78:1 | 36:3 |
| 47:17,18,19,21 | **familiar** 31:10 | **feels** 229:21,23 | **finalizing** 22:3 |
| 47:25 48:6,11 | 98:16 184:12 | **fees** 50:15 | 39:10 |
| 48:14,19,23 | **familiarity** | **field** 40:11,18 | **finance** 177:22 |
| 49:12,16 50:7 | 30:16,20 31:17 | 41:2 | **financial** 24:15 |
| 50:21,21,22 | 98:22 | **figure** 85:1,9 | 25:14,23,24 |
| 63:1,24,24 | **far** 27:14 38:8 | 85:14,21 87:11 | 74:10 75:17,17 |
| 64:1 68:2 | 76:5 106:14 | 88:2 89:22 | 77:5 86:13,17 |
| 104:3 112:24 | 108:25 194:17 | 90:16,17,25,25 | 95:9 |
| 123:6 127:13 | 198:8 234:1 | 91:2,4,5,8,9,20 | **financially** 10:2 |
| 129:12 135:22 | 237:19 238:3 | 92:6,7 93:1,7 | 294:16 |
| 141:15 151:2 | 272:23,23 | 93:12 137:21 | **financials** |
| 159:23 163:10 | **farr** 2:15 5:4 | 138:20 139:6,6 | 93:24 |
| 167:7,15 | 6:13 10:13 | 139:8,16,18 | **find** 97:19 |
| 168:10,18,22 | **fashion** 29:20 | 140:5,7,16 | 105:22 123:25 |
| 202:15,23 | 29:21 32:8,8 | 144:12,14 | 138:17 |
| 203:5 211:16 | **faster** 106:9 | 158:6,20 159:1 | **fine** 35:25 |
| 213:3 222:15 | **fathom** 249:19 | 167:9,19 169:4 | 44:23 46:6 |
| 226:18,21 | **favor** 70:1,19 | 171:8 175:3 | 161:1 |
| 227:1 233:11 | **favorable** | 203:11 204:17 | **finish** 50:10 |
| 233:11,19,21 | 19:23 | 204:21,21 | 69:4 146:20 |
| 233:22,23,24 | **feasibility** 17:6 | 205:1,2 210:3 | 196:22 197:24 |
| 234:5,9 235:2 | **feasible** 105:12 | 210:10 211:16 | 261:13 |
| 235:6,15 | 108:19 | 227:21,22 | **finished** 53:17 |
| 238:10,14 | **features** 245:8 | 248:25 251:13 | **fire** 249:6,13 |
| 239:15,16 | **february** 7:14 | 290:6 | **firebase** 180:5 |
| 243:3 247:3 | **federal** 294:13 | **figures** 93:2,2 | 183:3 197:2 |
| 248:15 254:21 | 296:1,8,9 | 93:20,21 | 209:1 234:17 |
| 257:25 266:2,2 | **fee** 66:11 | 155:18 174:14 | 235:4,13 |
| 267:17 272:3 | 275:24 276:2 | | 270:16,21 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[firebase - full]**

274:3

**firm** 9:25 14:5
14:6,7,23 15:4
16:9,11 113:24

**firms** 15:22

**first** 22:5 37:17
65:18 75:20
77:2,3 83:23
88:18 89:22
91:3 102:14
105:18 122:10
122:11,12,22
138:25 143:11
145:25 197:12
205:22 244:6
283:15

**fits** 66:5

**five** 22:16,18
283:6

**flat** 264:15

**flexner** 3:4
10:15

**flip** 149:2
230:12

**flipped** 149:1

**floor** 2:16 3:16
4:9 5:9 9:20
52:4,10 53:8
54:8 55:1,2,2,6
55:13,15 70:14
266:2,4

**florida** 3:9 4:10

**flow** 223:20
224:20 225:3

**flowed** 223:16
223:17 224:17

**flowing** 207:4

**flown** 223:16
223:16

**focanti** 6:6

**focus** 95:11
189:23

**focused** 27:2
186:9,11,13
241:15

**focusing** 139:2

**fodouop** 5:20
10:18,18,22,22

**folks** 67:6

**follow** 197:7
221:1

**following** 131:1
131:21 132:2
145:4 169:14
169:24 170:1
199:15 217:18
217:23,25
221:22 236:13
236:22 238:12
273:13 276:17

**follows** 12:3
295:8

**footnote** 24:20
25:5,7,9 139:5
165:18 166:4
227:19

**footnotes**
167:19

**foregoing**
293:3 294:4,6
294:10,12

**forget** 34:4

**form** 12:15
19:25 42:11
52:20 55:7
56:8 65:23
66:23 75:16
99:10 100:2
136:11 137:7
150:1 163:11
164:4 167:8,16
188:11 200:18
210:25 212:2
238:18 247:12
250:3 256:10
260:8 266:24
278:17

**formed** 48:13
66:20 67:18

**formerly**
215:25

**forms** 232:11

**formulating**
74:11

**forth** 94:7
294:5

**forthepeople....**
4:12,13

**forward** 92:19
145:2 182:21
214:23 215:7
216:4

**found** 73:24,25
74:2,3,7
130:19 131:17
163:5

**foundation**
108:16 111:8
113:19 115:3
125:7 126:10
131:19 133:24
194:3 197:15

**four** 196:13
237:6

**fraction** 206:3
228:10

**francisco** 1:14
2:17 3:17 5:10
9:1,20

**franklin** 4:8

**fraud** 98:8,14

**frawley** 148:7,8

**frcp** 296:1

**free** 79:9
222:21 243:2
243:14 244:12
244:15,17
245:7

**fresh** 173:23

**front** 2:16 5:8
9:20 26:10
275:24 276:2

**fulcrum** 52:1
52:11

**full** 50:18
178:21

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [fully - goes]

| | | | |
|---|---|---|---|
| **fully** 26:17 40:9 | **gains** 217:8 | 196:17 198:4 | 45:13 48:7 |
| 149:14 | **gallagher** 2:16 | 199:22,22 | 57:3 61:21 |
| **function** 49:23 | 5:4 6:13 10:13 | 239:17 240:9 | 63:13 64:8 |
| 135:21 230:18 | **game** 198:5 | 240:20 242:17 | 72:9 92:6,10 |
| **functions** 136:7 | **gap** 77:6,11,11 | 248:17 278:25 | 98:17 108:13 |
| **fundamentalist** | 77:14,14,18,21 | **ghose** 6:7 19:15 | 113:23 114:1 |
| 265:5,16,19 | 77:21,25 78:17 | 21:4 | 115:4 116:16 |
| **fundamentali...** | 78:25 79:6,9 | **give** 11:7 42:1 | 117:5,13,16 |
| 264:14 | 79:23,23 85:16 | 63:18 66:25 | 121:20 134:1 |
| **further** 45:14 | 86:1,2,9 89:7 | 67:19 90:15 | 142:13,15 |
| 148:17 157:14 | 122:16,20 | 106:9 172:8 | 143:6,10,19 |
| 276:6,7 294:12 | 139:9,15 170:6 | 180:23 187:24 | 144:1 145:13 |
| 294:16 | 248:14 | 197:21 231:18 | 146:18,19,20 |
| **future** 72:9 | **gap's** 79:23 | 236:16 242:25 | 152:19 153:23 |
| 216:7 | **garnered** 217:2 | 245:7 246:1 | 156:10 158:25 |
| | **gate** 245:9 | 249:12 251:20 | 168:8 196:12 |
| **g** | **gathered** 29:6 | 266:16 | 197:16 199:25 |
| | **gears** 161:9 | **given** 41:8,9 | 214:18 233:2 |
| **ga** 274:2 | 176:15 | 51:21 57:17 | 237:17 242:18 |
| **ga4f** 180:13 | **general** 225:20 | 118:13 137:9 | 242:19 244:16 |
| 181:22 182:5 | **generally** 29:4 | 156:18 162:24 | 252:20 260:25 |
| 182:10 183:22 | 36:7,18 94:25 | 192:13 238:15 | 263:13 267:23 |
| 184:4 185:13 | 100:5,5 273:9 | 275:10 278:15 | 280:10 281:23 |
| 185:15 186:7,9 | **generate** 85:17 | 280:3 292:7 | 289:1,14 |
| 187:15 192:7 | 86:1 89:9 | 294:11 | 290:18 291:10 |
| 193:6 198:5,7 | 190:14,15 | **gives** 247:2 | **goal** 47:15 |
| 198:11,15,16 | 192:21 | 254:16 | 140:15,22 |
| 204:1,10 | **generated** 79:3 | **giving** 231:21 | 168:11 |
| 212:13,19,25 | 183:13 236:14 | 233:10 235:18 | **godfrey** 4:15 |
| 213:10,12,19 | **generates** | 235:22 236:23 | 5:21 10:19,23 |
| 213:22 215:6 | 181:9 | 236:25 247:10 | 13:10 15:23 |
| 215:12 216:1 | **generic** 241:21 | **gma** 186:7 | 16:5 |
| 217:14 219:14 | **getting** 29:25 | **go** 9:11 15:20 | **goes** 18:13,20 |
| 220:21 221:21 | 64:15 124:6 | 16:25 18:22 | 52:2,12 119:7 |
| **gained** 98:18 | 173:7,25 | 26:11 29:9 | 119:8 152:17 |
| 98:20 99:1,25 | | | |
| 273:5 | | | |

**[goes - google]**

| | | | |
|---|---|---|---|
| 153:9 216:5 | **goodbye** 198:7 | 111:20 112:7 | 158:17 160:17 |
| 267:15 | **goog** 7:18 | 112:15 113:1,2 | 172:17 174:22 |
| **going** 9:5 43:19 | **google** 1:7 2:7 | 113:2,13,14 | 176:18,19 |
| 44:20 50:10 | 7:20 8:4 9:16 | 114:1,1 115:7 | 177:2,5,9,23 |
| 58:13 65:10 | 10:13 21:3 | 115:11 116:3 | 178:1,3 180:5 |
| 71:14 92:18 | 29:6,8 34:21 | 116:21 117:12 | 181:8,20 182:1 |
| 99:13 103:6 | 50:13 54:3,5 | 117:18,20 | 183:2,13 184:8 |
| 112:23 116:15 | 54:15,17 57:22 | 119:6,13,21 | 184:15,17,25 |
| 116:22 121:11 | 58:1 61:2 62:1 | 120:3,5,16 | 184:25 185:1,7 |
| 121:18 124:5,8 | 62:2 65:6 66:3 | 121:4,23,25 | 185:9,11,23 |
| 126:25 133:17 | 68:1,21 71:9 | 123:8 124:18 | 186:18,23,24 |
| 162:17 163:18 | 72:6,8,16,17,18 | 125:2,14,24 | 187:5,9,11,12 |
| 164:13,14 | 73:15,22 74:22 | 127:4,19 128:1 | 187:12,13,14 |
| 173:16 175:17 | 75:5,7 77:5 | 128:5 129:14 | 187:16,22 |
| 199:20 206:2,4 | 78:2 79:17 | 129:16,18 | 188:3,9,10,18 |
| 208:8 214:20 | 82:12,16,20 | 132:14 133:17 | 188:20 189:8 |
| 214:22 215:5,7 | 83:10,11 85:16 | 133:19 134:13 | 189:17,25 |
| 215:9 216:4 | 87:12,25 88:4 | 134:18 135:25 | 190:5,17,21 |
| 234:10 242:15 | 89:9 94:5,12 | 136:15,22 | 191:12,24 |
| 246:10 250:1,7 | 94:12,12 95:23 | 137:3,5,9,12 | 192:5,20 193:9 |
| 250:14 251:19 | 96:4,7 97:17 | 139:13,25 | 195:23 196:25 |
| 251:21 252:1 | 98:1 99:1,4,7 | 146:11,15,22 | 197:1,17 198:3 |
| 264:4 266:25 | 99:19,25 100:8 | 146:23 147:9 | 198:16,22 |
| 267:10,19 | 100:13,18 | 147:14,17 | 199:13,15 |
| 284:19 287:15 | 101:2,7,15,16 | 148:14,22 | 201:6,9 202:1 |
| 288:14,15 | 101:17,21 | 149:14,20,23 | 202:6,21 203:3 |
| 289:2,7,7,9 | 102:2,9,13,23 | 150:9,15,21,24 | 204:5 207:6,17 |
| **golf** 104:21 | 103:25 104:6 | 151:12,22 | 207:21 208:14 |
| 106:18 107:17 | 104:19,21 | 152:2,2,4 | 208:15,18 |
| 108:6 | 106:7,13,17,18 | 153:2,8,10 | 209:14 210:5 |
| **good** 12:7 | 106:20 107:3 | 154:8,10,11 | 210:12,23,24 |
| 103:19 116:21 | 107:17 108:6 | 156:13,16,17 | 211:6,7,9,13,18 |
| 120:20 246:7 | 109:3,4,18,25 | 156:21 157:15 | 212:22,23 |
| 264:9 270:3 | 110:16,24 | 157:16,17,18 | 213:9,17 214:6 |
| | 111:5,13,17,18 | 157:24 158:14 | 214:23 215:1,5 |

**[google - hard]**

| | | | h |
|---|---|---|---|
| 215:16 216:16 | 280:19,21,24 | **gotten** 135:12 | **h** 6:11 7:10 8:1 |
| 217:5,10,13 | 281:8,14,18 | 188:22,22 | 297:3 |
| 218:3,4,6,15,17 | 283:17 284:9 | 193:14 216:17 | **half** 79:15 86:2 |
| 218:20 219:14 | 284:14 285:1,3 | 216:18 217:3,7 | **hand** 11:3 |
| 220:20 221:7,9 | 285:12 295:4 | 286:15,18 | 40:17,17 |
| 221:20 234:16 | 297:1 | 287:2 | 220:13 |
| 234:21 235:4 | **google's** 19:11 | **governed** 44:17 | **handled** 13:17 |
| 235:13 236:9 | 28:6 72:7 | 44:22 | 295:8 |
| 236:11 237:21 | 82:19 86:8 | **governs** 45:2 | **happen** 37:6 |
| 238:1,7 239:4 | 87:9 95:6,8 | **great** 18:12 | 111:3 123:15 |
| 239:6,8,13 | 96:12 106:6 | 142:7 | 124:1 136:24 |
| 240:6,16,17 | 111:5 114:13 | **greater** 68:6 | 156:21,22 |
| 241:9,11,22,25 | 116:14,16 | 253:15 | 186:6 198:17 |
| 242:8 246:25 | 119:1,2 120:11 | **gross** 67:11 | 198:20 202:6 |
| 247:3,8,15 | 121:13 135:21 | 92:11,12 | 202:12 214:8 |
| 248:2,16,24 | 137:22 139:14 | **grossly** 56:11 | 214:12 215:1 |
| 249:4,6 250:7 | 141:7,9 147:2 | 64:19 67:12 | 215:11,25 |
| 250:14 251:3 | 148:10 152:15 | **group** 6:6,14 | 216:8 221:2,5 |
| 251:10,18 | 154:11 168:13 | 14:18 48:15 | 250:20 |
| 252:1,22 253:1 | 171:8 180:16 | 54:10,11 | **happened** |
| 253:2 254:1,16 | 180:21 185:3 | **groups** 54:9 | 97:16 126:13 |
| 254:25 255:17 | 186:5,6 192:14 | **guess** 15:9 | 130:6 132:10 |
| 263:8,24 | 193:11 198:13 | 16:22 30:7 | 132:11,13 |
| 267:21 268:12 | 201:23 202:12 | 52:14,14 85:1 | 149:22 196:9 |
| 270:9,16,21 | 203:9,25 208:5 | 90:15 99:13 | 213:17 214:9 |
| 271:6,7,10,14 | 210:22 212:18 | 103:24 108:17 | 216:10 235:7 |
| 271:20 272:4 | 213:4 215:1 | 111:2,9 173:18 | 250:20 274:1 |
| 272:14 273:5 | 217:1 247:10 | 182:15 195:6 | **happening** |
| 273:14 274:14 | 250:1 252:5 | 196:11 229:11 | 245:16 |
| 274:15,23,24 | 263:17 271:13 | 243:5 245:20 | **happens** 133:5 |
| 275:4,6,8,19,23 | 272:20 273:2 | 248:12,14 | 195:10 244:9 |
| 276:19,20 | 273:21,25 | 249:11,23 | **happy** 227:5 |
| 277:1,9,18,22 | 275:10,18 | **guys** 97:9 | **hard** 35:23 |
| 277:24 278:4 | 280:3 | | 73:7 142:1 |
| 278:15 280:1 | | | |

**[harmful - hypothetical]**

| | | | |
|---|---|---|---|
| **harmful** 231:5 | 66:7 67:5 | 225:16,19,22 | 266:16 |
| **harris** 5:6 | 69:10 206:14 | 226:1,25 | **hr** 26:16,21 |
| **head** 87:6,6 | 228:9 249:1,2 | 227:16 247:19 | **hsiao** 3:13 |
| 171:23 | 259:12 260:3 | 277:13 | **huh** 85:8,11 |
| **heading** 205:19 | 261:10,14 | **hochman's** | 156:19 181:1 |
| **hear** 31:2 35:23 | **highly** 159:9 | 21:5 22:2 | 227:23 236:21 |
| 195:17 219:22 | 161:1 | 23:23 214:14 | 288:5 |
| **heard** 31:19,20 | **hire** 278:4 | 214:17,18 | **human** 34:13 |
| **heat** 124:9 | **hired** 275:8 | **hoffman** 21:16 | **hundred** |
| 229:22 | 280:1,19 281:8 | 21:17,19 | 257:13 |
| **heavy** 169:12 | 281:14 | **hold** 18:17,17 | **hundreds** |
| 169:19,23 | **hiring** 278:21 | 40:10,21 51:5 | 245:23 246:11 |
| 170:5 | **historical** 212:9 | 53:11 60:17 | **hynes** 5:22 9:22 |
| **heinz** 6:7 | 212:17 213:14 | 69:2 95:2 | **hypotheses** |
| **held** 155:14 | 263:18 | 105:24 115:1 | 122:20,24 |
| **help** 38:22 | **history** 72:19 | 133:23 261:13 | 123:9,15,20 |
| 140:21 178:4 | **hit** 58:1 62:1,7 | 263:5,12 | **hypothesize** |
| 208:9 | 62:11,16,21 | **holding** 40:18 | 129:13 134:10 |
| **helped** 36:15 | 63:17 71:8 | 229:20 | 134:14 249:25 |
| 38:10 179:18 | 141:18 | **honer** 158:15 | **hypothesizing** |
| 212:16 | **hitting** 57:22 | **honest** 229:23 | 60:11 234:12 |
| **helpful** 88:1 | **hmateen** 5:13 | 290:11,25 | 253:6 254:18 |
| 89:18 155:4 | **hochman** 21:18 | **honestly** 20:14 | **hypothetical** |
| 176:14 243:4 | 23:22 25:3,20 | **honored** 243:9 | 42:3,10,13,19 |
| **helping** 37:18 | 26:21 27:10,18 | **hope** 237:4 | 98:7 107:2 |
| **hereto** 16:20 | 28:23,24,25 | **hot** 124:7,8 | 108:16 109:15 |
| 140:11 163:21 | 29:3 30:8 | 196:17 | 115:2 125:6 |
| 174:10 | 33:13,21 35:16 | **hour** 23:8 | 126:9 131:1,21 |
| **hey** 114:15 | 36:1 39:9 | 65:10 103:6 | 133:25 156:12 |
| 198:3 242:25 | 147:21 148:2,9 | **hourly** 15:2 | 157:2 158:21 |
| **hidden** 235:20 | 149:25 214:5 | **hours** 13:21 | 159:11 160:15 |
| **high** 122:7 | 215:15 222:9 | 14:8,14,15 | 164:9 194:3 |
| **higher** 14:24 | 222:15,24 | 22:13,16,18 | 196:4 197:12 |
| 52:6 53:13 | 223:5,8,12,23 | 23:14 73:4,11 | 216:3 219:8 |
| 55:10 56:1,7 | 224:1 225:7,9 | 158:5 160:7 | 221:2,23 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[hypothetical - incognito]**

238:22 239:12
239:24 240:5
240:11 242:23
247:8 248:15
249:19 250:17
251:24 254:21
255:19 272:13
281:22,22
282:2,4
**hypotheticals**
147:13 250:23

**i**

**i.e.** 77:6,10
**identification**
16:19 140:10
163:20 174:9
**identified**
50:11 158:16
223:18
**identifier**
150:22
**identify** 26:10
76:21 137:21
140:23 222:24
241:17
**identifying**
17:6 140:16
142:8
**identity** 156:9
232:17
**illegal** 215:19
215:24
**illustrative**
102:2

**imagine** 14:14
52:16 198:2
237:20 243:1
271:13
**imagined** 60:10
**imaging** 42:19
243:4
**imagining** 42:9
60:8
**immediately**
197:9
**impact** 74:17
74:18,18,23
76:22,23 77:4
77:5,23 78:5
78:13,15 79:7
81:22,22 85:15
85:25 86:7,14
86:18 87:2
124:22 137:25
138:5 139:9,10
139:14 145:18
169:5,15,25
191:15 199:6
201:12 205:14
205:15,19
206:20,23
207:2,5,6
215:10 252:5
258:10 273:21
**impacted** 206:4
206:8 207:9
**impacts** 80:14
122:11,12,22
122:23

**implied** 263:24
**imply** 262:19
**importance**
78:2
**important**
119:10 195:1,1
215:7 254:5
265:2
**impossible**
135:25 190:7
190:10 202:13
281:22
**impression**
116:9 209:20
211:5
**impressions**
82:17 116:18
172:13 176:1
189:23
**improper**
108:15 109:15
115:2 125:6
126:8 133:24
194:2 197:11
**inability** 83:4,5
84:19
**inadvertently**
288:23
**inappropriate**
80:19
**inappropriately**
188:22
**incent** 68:5
250:9

**incentive** 67:19
**incentivization**
66:24
**incentivize**
48:15 49:24
63:18 67:5
230:18 231:13
241:17 250:10
258:3 260:4,5
262:5,16
264:25
**incentivized**
262:9
**incentivizing**
64:19 67:6
**include** 14:8
17:9 33:25
36:19 109:2
176:9 209:20
209:22
**included** 37:1
46:19 90:16,17
161:1,2 211:11
295:14 296:3
**includes** 17:5
176:1,9 209:17
**including** 15:20
17:8 72:17
76:22 84:13
106:8 181:11
184:7 257:11
257:12,12,13
257:17
**incognito**
201:13,24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[incognito - intended]**

202:7,9,13,20
206:9
**income** 95:8
**incomplete**
121:24 158:21
194:3 196:4
197:12 251:23
272:13 281:21
**increase** 50:16
271:25
**increasing**
271:20
**incremental**
23:2,24 24:9
24:12,19,24
25:4,19 26:3,6
27:4,13,19
28:8,12
**independent**
20:6,18 284:6
**indicate** 77:25
164:16 170:19
178:13 214:1
254:4
**indicated** 28:7
54:17 68:2
139:5 233:14
238:6
**indicates** 85:15
169:12,23
215:4
**indicating**
88:23 244:11
**indication**
238:14

**indicators**
50:12
**individual**
49:24 231:13
241:18 246:16
**individuals**
50:14,15
**industry** 36:8
37:13 39:9
40:8
**infeasible**
103:25 107:17
**influence** 35:6
**inform** 177:6
**information**
29:6 31:20
35:11 40:4,16
51:18,21 54:4
56:3,15 57:4
57:14 58:6
59:2,4,16,20
60:2 61:15
63:19 64:24
67:4 71:7
72:15 75:2,3
78:24 93:18
94:1 106:8
118:12 119:2,3
119:15 122:2,4
127:22 129:20
134:21,22
135:9,11 140:4
147:5 148:14
159:16 162:13
162:24 163:7

165:6 175:21
177:5 179:10
179:11,14,17
181:15 182:23
183:4,16
187:14 188:21
192:20,24
193:2 200:24
201:1,22
203:24 204:5
204:11 207:17
208:5,25
212:22,24
215:3 216:17
216:18 221:9
226:7 229:9
231:22 238:23
239:3,5,8,10
242:3 246:13
248:4 252:11
254:12 255:9
255:10 259:9
261:2 265:3
277:14 278:21
278:22 279:2
280:17,17
285:23,25
**informed** 94:13
201:25 225:6
225:16 226:19
230:24 277:12
**infrastructure**
26:14,20 28:6
28:7,9

**infringe** 195:10
**infringed**
131:17
**infringement**
36:14,22,24
38:9,21 42:21
130:19 194:14
**infringer**
132:17 133:12
**infringes** 195:3
195:14
**infringing**
132:18 133:6
133:11 194:15
194:21 195:4
**initial** 57:23
169:12,23
**initiated** 151:5
**input** 109:12
137:9
**inputs** 75:10
**inquiry** 93:23
**inside** 139:22
279:15
**install** 236:3
237:24
**installing**
257:14
**integrate**
136:20 188:9
**intellectual**
14:18
**intended**
139:13 249:21

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[intention - knittel's]

intention  19:5
interact  168:21
interaction
  181:22
interested  10:2
  75:14 214:21
  294:17
intern  10:16
internet  31:1,4
  157:10 168:21
  170:22
interrogatories
  7:23 8:7
interrogatory
  162:2 163:7,16
  180:16 181:5
intimidate
  268:22
introduce
  10:17
intrusion
  285:17 286:10
intuition
  229:11
invaded  73:15
inverse  88:24
investigate
  49:18
investigated
  49:19 185:25
invited  271:13
involve  25:4
involved  98:5
  133:10

involving  108:7
ios  145:18
  146:2,5,12,24
  147:17,18
  148:11,11
  150:8,10,16
  151:24 155:18
  155:21,23,24
  156:7,16,21,23
  156:23 157:8
  157:17,25
  158:9,16 159:2
  159:17
ios14.5.  146:6
ip  6:4 130:9
ipsos  54:5 57:7
  60:3,7,13
  64:10,14,25
  65:5,12,21
  66:16 67:17,21
  68:14,19,21
  69:19 70:1,4,6
  70:12,22,25
  246:8 252:14
  252:18,22
  253:14,20,22
  254:6,9,16,25
  256:14,17
  259:3,6,12,14
  259:23 264:4,5
  265:3 275:16
  275:19,23
  285:9 287:17
  288:10 290:2
  290:21 291:14

irrelevant
  193:1
irs  37:14
ish  266:17
isolate  183:13
isolated  275:25
isolates  41:15
issue  44:25
  47:17 48:11
  50:7 73:25
  104:20 109:10
  157:8 265:20
  266:20 267:8
  267:20
issued  13:15
  38:5 41:5
  42:23 43:3,14
  43:22,25
  216:11
issues  99:11
  107:13
items  77:15

j

j  1:13 2:14 7:3
  7:13 12:1
  181:14 293:1
  293:12 295:5
  297:2
james  3:5 10:14
  58:15,24 270:4
jlee  3:11
job  1:24 87:7,8
  87:10 89:21
  135:10 149:18
  194:19 295:5

john  4:6
join  253:1
joseph  4:5
juice  98:8,8
july  294:21
  295:3
june  1:15 2:18
  9:1,6
jyanchunis
  4:13

k

keegan's  21:22
keep  49:25
  145:11 172:24
  193:12 230:20
  231:14 241:19
  244:11 289:7,9
keeping  27:5,9
  27:16 35:21
  127:24 128:4
  283:15
keeps  193:9
kevin  5:20
  10:18,22
kind  43:15,22
  131:2 170:23
  189:9 245:15
knew  59:10,12
  171:14 271:7
knittel  6:9
  19:14 21:4
  163:24 230:24
  230:24 231:3
knittel's  39:16
  145:7,14

Page 34

**[knittel's - leaks]**

| | | | |
|---|---|---|---|
| 146:22 147:23 | 162:4 164:12 | 283:18,19,23 | 195:24 |
| **know** 12:14 | 164:13,15,22 | 283:23 288:17 | **laptops** 195:15 |
| 15:6 18:12,21 | 165:3 166:14 | 289:2 291:11 | **large** 251:6 |
| 20:22 22:13 | 166:14,21 | 291:12 | **larger** 194:16 |
| 30:12 31:22 | 171:5,10 172:6 | **knowing** | **lasinski** 1:13 |
| 42:12 44:14 | 178:15 183:23 | 157:17 238:23 | 2:14 7:3,14 |
| 45:1,1 53:5,15 | 185:19 187:13 | 238:24 241:11 | 9:14 12:1,7 |
| 54:12 56:18,20 | 188:12,13 | **knowingly** | 53:16 71:19,21 |
| 58:10 59:2,3 | 189:20,20 | 49:25 230:19 | 110:12 144:9 |
| 59:15,25,25 | 192:2,25 195:6 | 231:14 241:18 | 174:7 200:8 |
| 60:1 64:18 | 196:2,7,14 | **known** 146:12 | 230:6,8 269:21 |
| 66:22 67:16,20 | 198:19,19 | 146:14,15 | 270:3 276:5,9 |
| 68:25 69:6 | 199:2,23 | 147:17 148:20 | 288:22 289:3 |
| 71:4,5,6,8 | 202:16 204:3,3 | **knows** 121:11 | 292:7 293:1,12 |
| 76:13 85:6 | 208:19 210:2,9 | 156:16 157:15 | 295:5 297:2 |
| 88:23 90:4 | 213:11 217:22 | 160:17 | **latitude** 254:17 |
| 92:14 93:2 | 217:23 219:7 | **kochava** 184:9 | **law** 3:6,14 4:7 |
| 101:16,17 | 220:15 221:1,4 | 184:13 | 4:17 5:7 15:21 |
| 102:4,19 103:5 | 222:23 223:1 | **kuate** 5:20 | **lawyer** 13:2,3 |
| 103:6 107:24 | 223:21 224:19 | 10:18,18,22,22 | 132:21 148:3 |
| 109:13 116:22 | 224:21,21 | | 271:13 273:2 |
| 117:7 121:13 | 227:4 231:17 | **l** | 273:25 282:17 |
| 121:13,23 | 231:19 235:6 | **l** 1:21 2:19 6:15 | **lawyers** 13:7,9 |
| 122:5 123:2,9 | 240:22 242:12 | 294:1,24 | 13:10,11,14,18 |
| 123:11,13 | 245:5 252:9,10 | **label** 98:9 | 15:13 19:23 |
| 124:1 125:10 | 254:23 255:21 | **lack** 108:16 | 23:16 275:18 |
| 132:20 134:24 | 256:2,11 | 111:7 113:18 | **lay** 280:8 |
| 138:9 141:24 | 258:22 260:10 | 115:3 125:7 | **layman's** |
| 146:23,24 | 262:2,14,25 | 126:9 131:19 | 134:19 |
| 147:4 148:1 | 263:25 264:1,3 | 133:24 194:3 | **layperson's** |
| 151:23 152:2,4 | 264:8,12,17 | 197:14 | 146:3 |
| 153:2 156:13 | 265:5,10,23 | **language** | **lead** 14:18 |
| 157:11,24 | 266:11 277:4,9 | 189:18 241:15 | 171:17 |
| 158:23 159:24 | 278:25 281:3,5 | **laptop** 130:19 | **leaks** 232:21 |
| 160:6,6 162:4 | 281:6,25 | 130:21 131:6 | |
| | | 131:12,15 | |

Page 35

**[learn - limited]**

| | | | |
|---|---|---|---|
| **learn**  34:3 | 105:24 106:23 | 237:14,18 | **legs**  173:15 |
| **learned**  226:4 | 107:6 108:9,15 | 238:18 247:12 | **level**  40:9 72:19 |
| 227:2 | 108:23 109:14 | 250:3 251:23 | 84:25 148:13 |
| **learning**  29:8 | 111:7 113:18 | 252:8 256:10 | 189:21 255:8 |
| 119:4 126:6 | 115:1,16 117:4 | 258:13 259:20 | **lexecon**  6:12 |
| **leave**  147:13 | 124:7 125:1,5 | 260:8,24 261:8 | **liability**  73:24 |
| 213:11 | 126:8 131:19 | 261:13 262:1 | 73:25 74:2,3,6 |
| **leaving**  286:6 | 131:24 133:21 | 262:11 263:2,5 | 132:10 134:25 |
| **lee**  3:5 7:6 | 133:23 136:11 | 263:12 265:9 | 135:1,2 278:1 |
| 10:14,14 12:15 | 137:7 138:7,24 | 265:21 266:10 | **liable**  277:24 |
| 13:1,2 17:20 | 139:2 141:18 | 266:13,18,24 | **liberty**  45:18 |
| 18:17 19:25 | 141:22 142:1 | 267:9,22,24 | **license**  36:15 |
| 23:19,22 25:6 | 143:4 144:3 | 268:4,15,22 | 38:22 |
| 27:20,22 28:12 | 145:8,11 150:1 | 269:15 270:2,4 | **licensing**  37:1 |
| 28:14,22,23 | 151:17 152:22 | 272:9,14 | 38:11,15 40:25 |
| 35:20,23 37:16 | 158:21 160:12 | 274:22 275:15 | 41:4,9,14 |
| 37:19 39:11 | 163:11 164:4 | 276:5 278:8,17 | **life**  243:7 251:3 |
| 42:11 44:12,16 | 164:20 172:2,5 | 280:9 281:11 | **light**  249:13 |
| 44:23,25 45:23 | 172:8 173:14 | 281:21 282:4,7 | 278:6 281:20 |
| 46:1 49:4 50:9 | 173:22,25 | 284:17 286:12 | 281:24 |
| 51:5 52:20 | 180:23,25 | 286:21 287:4 | **lights**  249:6 |
| 53:11,14 55:7 | 181:2 184:21 | 287:15 288:14 | **likely**  52:6 |
| 56:8 57:2 | 185:14 188:11 | 288:19 289:8 | 53:12 62:12 |
| 58:12,16,21,25 | 192:17 193:3 | 289:14 290:17 | 63:5 121:19 |
| 60:9,17 61:19 | 193:22 194:2 | 291:9,25 | 158:3 159:2,9 |
| 61:21 63:12 | 196:4,16,19 | **lee's**  217:25 | 161:1 169:13 |
| 64:7 65:10,13 | 197:11,14,24 | 282:2 | 169:14,24,25 |
| 65:16,23 66:19 | 199:20 200:18 | **left**  110:14 | 170:5 263:15 |
| 69:2,4,11 70:3 | 210:25 212:2 | 200:10 | **lillian**  6:4 |
| 79:11 84:9 | 217:17 218:8 | **legal**  9:23,25 | **limit**  179:18 |
| 85:9,12 86:5 | 219:18,22,25 | 99:11 132:25 | **limitation** |
| 88:15,22 89:1 | 220:2,5,9,12,23 | 133:2 275:12 | 157:7 |
| 97:6,9 99:10 | 221:15 222:19 | 279:3,22,23 | **limited**  108:21 |
| 100:2,23 | 224:4,7 229:19 | 292:9 295:7 | 179:14 201:23 |
| 103:15,17 | 230:14 231:1 | | 269:9 |

**[limiting - made]**

**limiting** 17:22 27:24 222:22
**limits** 47:9 221:12 231:8
**line** 88:18 89:1 295:15 296:4 297:4,7,10,13 297:16,19
**linear** 169:11 169:22
**listen** 255:13
**lists** 142:16,18
**litigation** 6:4 34:20 35:14 36:13,21
**little** 35:21 36:9 40:12 67:15 80:21 106:23 108:3 110:20 124:7 159:11 164:19 225:14 228:9 229:23 257:18 285:2
**live** 104:18 134:20 196:1 197:20
**llc** 1:7 2:7 9:16 295:4 297:1
**llc's** 7:20 8:4
**llp** 2:16 4:15 5:4,21 6:13
**location** 9:19 106:8
**locations** 91:24

**locked** 295:12 296:1
**lodge** 220:16
**long** 22:11,13 23:7 61:5 103:9
**longer** 82:23 218:6
**look** 24:20 37:8 40:3,7,16 49:20 53:8 54:8,8 59:16 78:11 86:25 105:21 117:8 123:17 133:15 137:16 138:18 144:13 149:10 151:14 152:9,9 152:13,13 154:22 165:3,9 169:4 171:24 173:13 174:11 180:19 183:24 203:23 204:8,8 204:23 206:13 208:23,25 214:18 227:21 233:16 245:11 245:13 264:23 277:13 285:9 287:22 291:13
**looked** 24:14 25:13 38:1 75:1,1 79:20 199:6 203:23

203:24 217:7 229:6,6 245:15 252:13,13 259:2
**looking** 24:17 25:16 73:12 79:20 83:22 84:8 85:1 88:2 90:11 124:20 129:1,3 152:8 158:12 167:18 185:4 204:16 204:20,22 209:1 222:14 246:4 291:18
**looks** 41:14,17 55:3 92:1 199:14
**loss** 85:16 89:7 89:8
**lost** 87:25 150:14 219:18
**lot** 18:13,20 56:7 68:18 162:20
**lots** 116:6 130:9 195:13 284:25,25
**loud** 10:21
**lower** 68:13 69:7,9 115:13 115:18 119:20 121:8 124:17 125:24 126:4 128:15 249:7

256:16,21,24 261:12,15,20 261:21
**lowering** 70:1,6 70:20 117:17 128:25
**lowest** 261:17
**lunch** 103:6,9 103:12 105:19 108:12 110:6

**m**

**machine** 26:14 26:20 29:8 119:4 142:23 294:9
**macmenamin** 6:11
**made** 20:10 38:3 84:17,18 96:8 97:1 99:7 99:8 100:14,19 103:23 125:10 130:22 131:6 133:9 134:19 134:19,24 159:17 168:23 169:1 179:8 181:23 190:9 190:21 198:22 213:9 218:19 224:3 247:22 254:8 273:14 282:7 293:3 294:8

**[magic - mean]**

| | | | |
|---|---|---|---|
| **magic** 171:10 | 273:15 276:16 | 42:17,18 47:16 | 147:16 168:11 |
| **make** 18:18 | **management** | 47:19,21,25 | 212:9,17 |
| 43:17,19 51:19 | 6:10 | 48:6,11,19,23 | 213:14 236:18 |
| 58:13 60:12 | **manager** 82:15 | 49:12,16 50:7 | 240:15 242:11 |
| 74:5 78:19 | 84:24 91:3,4 | 50:21,22 54:3 | 263:17 267:13 |
| 82:8 83:2,23 | 91:11,17,19,22 | 64:21 67:3 | 269:10 |
| 83:25,25 87:24 | 91:24 92:1,12 | 134:12 159:20 | **matters** 251:25 |
| 88:16 96:17,21 | 92:15,22,23,25 | 195:8 233:7,14 | **mcgee** 4:5 |
| 96:22 105:20 | 93:18,24 | 233:19,20,21 | **mean** 14:13 |
| 107:7,13 | 110:25 115:8 | 233:24 234:5,5 | 29:22 34:2 |
| 114:16 117:21 | 120:7 135:22 | 234:18 245:12 | 35:4 44:7 |
| 119:10 121:7 | 136:1 140:18 | 245:13,14,16 | 47:23 50:20 |
| 129:16 132:20 | 191:18 208:6 | 245:22 246:3 | 53:9,15,25 |
| 142:2 143:22 | 209:6 | 254:25 255:10 | 55:21 60:12 |
| 143:23 144:14 | **manager's** | 260:18 285:9,9 | 61:13 69:7 |
| 151:14 157:5 | 92:17 93:6,10 | **marks** 71:13,17 | 73:7 76:13 |
| 159:11 163:19 | **managing** 6:15 | 110:7,10 144:4 | 77:8 83:21 |
| 179:3,9 186:19 | **manner** 55:20 | 144:7 174:2,5 | 94:20 101:17 |
| 199:8 208:2 | **manual** 30:3 | 200:6 230:1,4 | 107:12 116:11 |
| 233:8 240:12 | 31:24 32:2,6,7 | 269:19 | 119:5 120:15 |
| 245:8 246:16 | 32:8,10,16 | **mateen** 5:6 | 121:10 123:17 |
| 254:13 270:24 | 33:8,18 | **material** | 124:2 125:8 |
| 277:15,15 | **manually** 30:4 | 168:24 | 132:2 134:2 |
| 287:12 295:14 | 30:5,5 | **materially** | 135:7,16 138:3 |
| 296:3 | **mao** 3:13 | 168:20 | 138:14 154:6,7 |
| **makes** 28:8 | **mark** 3:13 | **math** 84:4,4,4 | 154:22 156:5 |
| 111:13 120:5 | 16:18,23 | **mathematically** | 173:17 175:6 |
| 153:1 155:17 | 163:18 | 175:16 | 175:15 182:11 |
| 176:18,20 | **marked** 16:19 | **matrix** 143:7 | 182:12,17,24 |
| 186:19 191:18 | 140:10 163:20 | 143:11 | 193:23 194:23 |
| 252:3 263:24 | 174:9 | **matter** 9:15 | 201:6 209:11 |
| **making** 58:21 | **market** 36:7 | 13:18 17:5 | 215:3,14,18 |
| 81:24 129:11 | 38:19,23 39:8 | 28:10 45:17 | 216:3 217:17 |
| 133:11 185:23 | 39:17,25 40:8 | 47:13 64:11 | 219:6 223:15 |
| 238:10 254:7 | 40:22 41:21 | 84:3 87:7,8 | 223:15 226:6 |

**[mean - methodology]**

228:6,8 229:21
235:24 237:4
237:11 242:13
245:5 250:5
251:6 252:9
257:5 258:14
260:1,11 262:7
262:13 265:22
268:23 280:11
287:6
**meaning**  28:6
87:12 148:22
148:22 201:21
254:1
**means**  28:23
84:12,12 104:7
139:6 182:12
208:20,23
219:8 260:2
279:19
**meant**  54:2,2
90:15 94:15
135:21 210:3
210:10 266:1
**measure**  81:10
83:8 96:3,3
99:22,24 100:7
100:8 101:5
124:22 125:11
126:4,18
129:16 139:13
151:3 152:1
163:25 181:24
183:12,21
184:9 186:18

186:23,25
187:1,4,6,8
188:2,5,23
190:6,7,12,17
190:22 191:9
192:7,14
195:22 203:14
213:10,18
214:8,11,12
215:16,23
217:1,13 218:7
219:14 220:21
221:21,25
231:3,9 232:12
232:16,20
233:19 234:9
243:6 244:22
244:23 245:6
245:10,11
273:3,4,14
274:13 276:19
276:24
**measured**
81:13,14,14
118:18 180:4
210:23 211:7,9
211:12 215:10
245:4
**measurement**
118:23 157:21
157:22 158:11
172:21 176:16
176:20 180:6
181:18 186:12
186:17 188:17

191:23 200:16
202:13 211:24
**measurements**
161:22 200:15
212:19
**measures**  17:7
164:16
**measuring**
86:17 98:10,17
163:9,13,14,15
183:25 214:23
231:25
**mechanics**
127:15
**mechanism**
118:1 133:14
136:23 185:6
**media**  9:13
71:14,18 110:8
110:11 144:5,8
174:3,6 200:7
230:2,5 269:20
292:8
**meet**  12:8
**member**  62:20
63:16 66:25
67:19 70:13
230:19 258:3
262:8,20,25
282:11,13,14
282:15,24
283:2,3,3
284:20 285:18
285:18 286:10

**member's**
243:7
**members**  18:9
19:19 48:16
54:20 55:17,19
58:1 70:21
232:17 235:3
261:23 262:5
262:17 264:25
284:25 285:2
**memory**  34:5
47:9 162:18
290:9
**mention**  124:6
**mentioned**
31:24 38:10
78:12 151:6
200:11 210:7
270:23
**mentor**  14:20
**meryn**  14:7
**mess**  284:8
**message**  114:15
**met**  57:20
**method**  95:23
95:24 210:13
**methodical**
53:16
**methodologi...**
213:21
**methodologies**
98:17
**methodology**
20:15 41:11
46:22,25 47:1

**[methodology - month]**

| | | | |
|---|---|---|---|
| 47:8 75:21 | **mindful** 44:18 | **misunderstood** | 276:18 |
| 76:2,5 78:8 | **mine** 212:23 | 223:24 | **moment** 25:1 |
| 99:12 100:24 | 282:7 | **mit** 6:10 | 71:22 84:7 |
| 191:16 | **minus** 120:14 | **mix** 113:16 | 85:4 105:22 |
| **methods** 18:11 | 258:16,16 | **mmao** 3:19 | 110:21 140:8 |
| 210:6 | **minute** 147:15 | **mobile** 36:17 | 150:8 156:20 |
| **metric** 32:12 | 157:12 176:16 | 36:19 39:17 | 173:8 236:12 |
| **metrics** 217:5,7 | **minutes** 173:16 | 40:1 50:1 | 238:13 250:14 |
| **miami** 3:9 | 266:17 283:6 | 104:22 228:22 | **monetary** 17:7 |
| **michael** 1:13 | **mirror** 290:15 | 230:20 234:18 | 18:8 20:7 33:3 |
| 2:14 7:3,13 | 291:8 | 234:23 235:24 | 149:18,18 |
| 9:14 12:1 | **mischaracteri...** | 241:19 257:10 | 232:1 244:20 |
| 71:19 110:12 | 25:6 52:21 | 259:7 291:16 | 245:2 |
| 144:9 174:7 | 70:3 100:3,24 | **mode** 201:14 | **monetizing** |
| 200:8 230:6 | 185:14 211:1 | 201:24 202:7,9 | 82:14 |
| 269:21 292:7 | 212:3 224:7 | 202:13,20 | **money** 54:6 |
| 293:1,12 295:5 | 250:4 261:8 | 206:9 | 67:22,25 68:21 |
| 297:2 | 263:6 278:18 | **model** 74:17,18 | 70:12,20 111:4 |
| **microphones** | **mishear** 176:21 | 76:22,23 77:4 | 111:13 116:4 |
| 9:7 | **misleading** | 78:5 81:23,25 | 118:3,5,9 |
| **mid** 123:21 | 99:25 273:5 | 85:15,25 86:7 | 119:20,24 |
| **mike** 85:10 | **misled** 73:22 | 87:3 90:3 | 120:3 124:17 |
| 173:14 229:20 | **misread** 258:19 | 94:16 111:19 | 124:18 127:19 |
| **million** 89:16 | **misrepresent...** | 120:10 122:5 | 130:2 185:23 |
| 154:23,25 | 100:10,14,19 | 122:14 134:14 | 187:24 239:23 |
| 235:8 | **misrepresent...** | 137:25 138:6 | 241:2 246:12 |
| **millions** 245:24 | 273:15 276:19 | 139:10,13,21 | 249:16 254:20 |
| 246:11 | **missed** 17:20 | 139:21,22 | 255:3,4,4,5,18 |
| **mind** 27:6,9,17 | **missing** 59:7 | 140:1,2,6,7 | 271:19 273:14 |
| 35:20 42:2 | 172:25 | 144:19,23,25 | 275:6 276:19 |
| 127:24 128:4 | **misspoke** 47:20 | 149:12 151:9 | 276:20 277:1 |
| 142:8 173:19 | **misstates** 99:10 | 169:5 263:6 | **montgomery** |
| 215:24 231:19 | **mistakes** 20:10 | **models** 74:21 | 3:15 |
| 231:21 264:5 | **misunderstan...** | 122:6 145:5 | **month** 57:8 |
| 282:22 | 212:21 | 273:14,20 | 59:7,13,22 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[month - nos]**

60:24 61:12
64:11,18 66:8
66:18 68:19
70:8,15 71:1,7
155:6,9 182:3
260:20 289:13
289:20
**monthly**
152:25 153:6
153:14,18
154:2,9 161:20
163:5 165:25
167:10
**months** 61:8,24
155:13
**morgan** 4:4,4
13:11,11 16:11
16:11
**morning** 12:7
**mouthful** 43:20
**multiple** 32:24
55:13 75:5
91:24 234:24
287:20
**multiplication**
153:1
**multiply** 89:13
207:2
**mute** 9:9

**n**

**n** 4:8 7:1
**name** 9:22 14:6
69:25 70:18
270:4 294:20

**named** 148:24
233:13,16
**native** 7:17
**natural** 98:7,9
124:16
**nature** 162:24
286:18
**near** 214:22
**necessarily**
61:24 115:18
118:2 119:19
123:19 149:8
154:19 182:20
212:5 250:6
272:4 277:23
279:10
**necessary**
49:24 68:5
159:22 224:15
224:16 230:18
231:12 241:17
295:14 296:3
**neck** 199:21
**need** 49:18
51:14 75:20
76:10,15 95:16
105:21 109:8
109:24 141:1
158:17 159:10
159:10,18
160:7,11,23,23
173:15 179:6,9
208:2 216:4
219:22 220:7
220:15 222:19

229:19 250:9
253:17 254:13
255:13 262:20
281:5
**needed** 18:4
73:1 81:18
83:2 126:18
286:5
**needs** 64:22
102:20 185:1,1
194:7
**negotiate** 266:8
**negotiating**
66:3
**negotiation**
42:3,10,14,20
246:24 251:10
257:21 261:25
**neither** 81:6
89:23 294:16
**net** 88:6 141:12
143:18,18,21
161:18 168:16
**network** 111:5
112:12 116:16
121:13 201:6,9
210:5,12,22
217:5
**networks**
124:19
**nevada** 1:22
**never** 20:24
31:19,22 43:2
62:7 90:4
92:19 122:24

137:12 280:24
281:18
**nevertheless**
54:21
**new** 4:19,19 6:7
37:16
**niall** 6:11
**nice** 12:7
**nike** 116:14
117:2,10,11,11
133:16,18
**non** 159:17
228:3
**nonattributable**
90:6
**nongoogle**
188:6,8,9
211:19
**nonpersonal**
79:1
**nonpersonali...**
78:23 79:4
81:18 82:1,3
82:22 83:1,4
83:12,17 84:2
87:19,20,21,23
90:19,19
**nontechnical**
105:17
**nonzero** 63:22
**normally** 143:2
**northern** 1:2
2:2 9:17
**nos** 7:23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[notating - okay]**

notating
  295:15 296:4
note   9:7 169:6
  169:10,21
  170:4
noted   10:10
  292:10
notes   293:4
noticing   10:9
null   162:20
number   7:11
  8:2 57:16 61:8
  62:21 69:6
  71:5,5 83:24
  89:14 117:15
  121:3,3 128:10
  139:23 141:23
  143:11 154:22
  155:18,20
  162:16 171:11
  171:14,15,22
  172:16 173:2,5
  173:10 175:1
  178:25 181:13
  193:7,15,24
  195:11 204:10
  205:22,24
  206:24 208:4
  208:20,21,22
  209:2,4,5,10
  224:25 225:2,6
  225:16 229:8
  229:11,15
  244:4 255:1
  260:13 261:18

261:20,21
262:21 280:22
287:9 288:12
291:6 292:8
295:15 296:4
numbers   75:21
  83:19 92:25
  161:5 174:17
  193:10,12
  205:18 212:10
  229:10 260:14
nutshell   163:4

**o**

o'clock   103:5
o0o   9:3 292:13
oath   12:2 294:7
object   107:8
  108:15 109:15
  197:11
objection   12:15
  19:25 25:6
  39:11 42:11
  52:20 55:7
  56:8 60:9
  65:23 70:3
  79:11 99:10
  100:2 108:23
  109:15 115:2
  125:6 131:19
  131:24 136:11
  137:7 138:7
  150:1 163:11
  164:4 188:11
  193:3,22 194:2
  200:18 210:25

212:2 218:9
220:16 221:15
224:4,7 237:19
238:18 247:12
250:3 251:23
256:10 260:8
263:2,5,6
266:24 272:6
278:17 281:21
286:12 287:4
289:6
objections   7:21
  8:5 10:4
  100:23 115:16
  117:4 126:8
  220:23
obligated   20:21
  20:23 158:15
obligation
  20:18
obtaining
  150:21
obviously   46:2
  252:11 289:25
occurred   231:5
occurring
  236:19
ocean   249:7,13
  249:14
odd   175:11
offered   66:4,18
  279:12
offering   263:8
  279:8

office   295:11
oftentimes
  242:14
oh   21:20,22
  103:19 141:18
  147:4 155:2
  216:16
okay   12:14,18
  13:4,14 15:1,8
  16:1,7,13 17:1
  17:14 22:2,19
  24:8 25:11
  27:11,16 28:11
  28:16 35:1,13
  35:18 37:6,25
  38:8 42:22
  44:19 46:9,22
  47:6 56:24
  62:24 63:1
  65:13 70:18
  71:10 72:12
  73:14 74:5,21
  76:17,20 84:10
  86:19,23 88:18
  89:1,6,13,18
  91:23 92:9
  94:2,17,22
  95:13,18,22
  97:3,15 98:13
  98:16,24
  103:16 105:5
  106:2 108:22
  109:6 110:6
  114:20 115:10
  116:2,14,19,25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[okay - opinion]**

| | | | |
|---|---|---|---|
| 119:17 120:23 | 215:13,22 | **ones**   16:4 24:6 | 47:24 48:10,12 |
| 123:25 124:12 | 218:13 219:10 | 26:7 168:5 | 48:13,18 51:7 |
| 125:5 128:4,11 | 220:7 221:24 | 246:9 | 56:11 57:10 |
| 128:21 130:24 | 222:8 223:11 | **online**   36:8,14 | 58:4,9,20 |
| 131:1 132:6 | 227:19,24,25 | 36:16,17,19,24 | 61:12 63:2,24 |
| 134:6 137:15 | 228:19 229:18 | 37:13 38:2,11 | 66:21,23 67:18 |
| 137:18,20 | 229:24 230:11 | 38:15,20,24 | 69:16 73:14,21 |
| 138:19 139:8 | 230:25 232:2,9 | 39:9 43:15 | 73:23,23 74:1 |
| 140:8,21 | 232:25 234:8 | 45:11,20 48:24 | 81:12 83:9 |
| 141:21 142:5,5 | 236:11 237:10 | 49:3,8,11,15 | 94:25 97:12,13 |
| 142:7 143:10 | 237:18,23 | 50:14,16 | 98:25 99:3,23 |
| 143:13 145:6 | 238:2 239:20 | 161:24 | 100:13 103:23 |
| 146:10 147:7 | 241:5 249:4 | **open**   20:11 | 104:5 109:8 |
| 147:12 148:21 | 250:13 251:19 | 142:6 180:20 | 110:16 112:21 |
| 150:5,7,12 | 252:4 253:5 | 204:21 236:3 | 115:12 117:2 |
| 151:1,2 154:17 | 255:13 258:2 | **operating** | 117:19,23 |
| 155:4,11,16 | 262:24 264:2,5 | 157:19 | 128:17 147:1,8 |
| 156:3 157:10 | 266:18 268:20 | **opine**   31:11 | 162:7,21 |
| 157:13 158:8 | 269:13,15 | 94:25 277:17 | 166:18 182:19 |
| 161:9,15 | 270:5,6 271:4 | **opined**   59:21 | 189:12 190:4 |
| 170:25 171:16 | 273:25 274:22 | 288:1 | 214:14,21 |
| 172:11,11,12 | 276:16 277:16 | **opines**   214:5 | 230:10 231:9 |
| 173:11 174:11 | 279:12 280:19 | **opining**   65:19 | 234:10 246:18 |
| 174:13,19,20 | 282:8 283:5,13 | 66:15 74:6 | 246:25 250:25 |
| 176:3,13 | 284:22 286:3 | 232:5 267:16 | 255:8,25 262:8 |
| 177:19,19 | 289:8,11,21,22 | 278:14 | 265:18,25 |
| 180:1,19 181:2 | 291:2,23 292:1 | **opinion**   18:23 | 273:4 274:8 |
| 182:9 188:15 | **once**   57:11 | 19:5 20:6,7 | 276:11 279:6,7 |
| 189:5 192:4 | 59:22 63:3,6 | 23:24 24:9,11 | 279:16,17,20 |
| 193:8 196:21 | 63:11,17,19 | 24:11 26:2,5 | 279:23,24 |
| 197:4,6,13 | 83:16 122:7 | 27:4,13 28:19 | 280:8,13,16 |
| 198:1 204:23 | 234:4 236:10 | 35:6 40:5,17 | 284:23,24 |
| 205:2 206:7 | 255:7 284:5 | 41:7,22,25 | 285:5 286:8,25 |
| 211:4,15 | 287:14 | 42:8 43:14,22 | 288:7 289:11 |
| 214:13,24 | | 44:2,4 47:15 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[opinions - part]**

| | | | |
|---|---|---|---|
| **opinions**  19:1 | **organizations** | 174:14,16 | 165:9,13 166:5 |
| 19:23 23:2 | 50:13,16 | 175:25 177:18 | 167:19 168:12 |
| 24:1 41:4,9 | 263:20 | 177:20 178:4 | 168:19 177:21 |
| 74:3,11 214:17 | **origin**  154:1,7 | 180:21 181:6 | 184:3,10 |
| 219:16 221:11 | 180:15 | 181:16 227:19 | 196:13 241:16 |
| 221:13 223:14 | **original**  294:13 | 295:15 296:4 | 253:6 263:16 |
| 224:2 225:3 | 295:10,21 | 297:4,7,10,13 | **paragraphs** |
| 275:25 279:14 | **outcome**  10:3 | 297:16,19 | 168:7 |
| **opportunity** | **outside**  109:5 | **pages**  1:25 | **parentheses** |
| 159:24 261:25 | 113:10 173:23 | 180:17 295:14 | 205:6 207:11 |
| **opposed**  29:23 | 279:13 | 295:17,17 | **parenthetical** |
| 32:20 67:8 | **overall**  68:1 | 296:3,6,6 | 165:23 |
| 95:24 169:18 | 76:5 122:14 | **paid**  13:4 14:24 | **parse**  84:25 |
| 180:5 182:6 | 205:14,19 | 15:8,10 50:13 | 90:4 |
| 188:18 192:16 | 207:6 | 50:15 51:14 | **parsing**  40:12 |
| 198:23 210:6 | **overcounting** | 54:3,5 57:7 | **part**  24:23 |
| 210:13 217:3 | 87:24 | 64:23 65:6 | 26:13 31:2,3 |
| **opt**  172:13,17 | **overlap**  88:7 | 66:9 68:12,13 | 34:5 41:18,23 |
| 173:1,3 174:15 | 91:15 288:25 | 129:4 209:15 | 46:18 49:19 |
| 174:22 175:7 | **overlaps**  34:9 | 231:13 256:13 | 51:13,14 75:12 |
| **options**  116:12 | **overstates** | 256:13 257:16 | 75:23,23 76:2 |
| 195:12 | 169:15 | 259:19 282:10 | 78:20,21 85:25 |
| **order**  64:19 | **overstating** | 285:1 291:22 | 87:16 92:23 |
| 75:18 76:11 | 67:12 | **panel**  288:10 | 93:1,4,4 104:5 |
| 122:10,11,12 | **own**  14:22 21:4 | **paragraph** | 111:15 132:5 |
| 122:12,13,22 | 109:3 119:16 | 49:20,22 50:10 | 136:7 186:1 |
| 122:22 194:6 | 149:4 152:15 | 60:8 76:19 | 190:3,23 |
| 215:16 | 177:17 199:13 | 77:3 82:6,7 | 216:25 217:9 |
| **ordered**  217:13 | 199:16 217:23 | 84:8,9,12 85:2 | 217:15 218:2 |
| 221:20 | **p** | 89:7 95:1,12 | 221:11 229:13 |
| **orders**  44:18 | | 105:23 106:1,2 | 229:13 247:25 |
| 288:20 | **p.m.**  292:6,10 | 106:11 137:16 | 250:9,10,11 |
| **oregon**  1:22 | **page**  7:3,11 8:2 | 138:18,20,22 | 251:14,16 |
| **organization** | 85:10 102:5 | 138:22 140:14 | 258:3 260:6 |
| 50:1 241:20 | 103:3 167:18 | 141:7 144:13 | 262:5,10 |
| | 172:2,3,9,16 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[part - percent]**

263:10 264:14
265:1 266:21
267:4,11,14
268:11 273:11
**participant**
51:14 54:9,19
70:12
**participants**
50:25 51:2,9
51:12 54:4,6
54:14 65:20,25
66:16 67:8,21
68:10,13,14,22
69:19 70:22
252:23 253:23
253:23,25
254:2,3,3,25
259:13,15,17
259:18
**participate**
65:22 66:3,17
**particular**  26:7
30:9 32:11
35:3 45:21
48:15 53:6,24
53:25 54:22
59:8 122:18
168:7,7 189:18
199:11 202:2
248:13 256:24
257:1 277:25
287:8
**parties**  9:11
59:11 134:11
134:15 135:3

156:9 203:2,14
203:18 278:5
**partner**  72:16
**parts**  21:12
41:18 75:19
76:6,9
**party**  10:1 46:4
57:22 58:1
59:9 62:1,7,10
62:11,12,16,22
71:8 112:2
125:20 158:17
181:23 184:5
188:10,19
202:14,14,20
202:22 206:9
208:16 211:12
211:18,24
228:18 235:5
235:14 238:1,9
239:14 240:7
240:17,19
242:20 243:20
270:10,20
275:8 278:22
280:1,19,20
281:8,14,16
294:18
**pass**  269:14
**past**  62:4 130:5
**patent**  36:13,21
36:23 38:9,21
42:21 130:18
131:17 194:13

**patents**  36:16
38:15,22
**patterns**  62:17
170:11
**pause**  53:18
172:22
**pay**  61:11 62:6
63:20,23 64:10
64:11 65:7
68:21 112:22
112:25 113:2
113:13,14,21
177:13 178:4,9
179:4,15,19,23
182:20,20
187:21 190:24
192:5 209:24
251:18 255:3,4
255:4,5 263:19
263:20 275:3,6
275:23 285:10
**paying**  13:6
177:23 178:1
182:25 183:6,7
183:8,9,10,11
184:15 187:9
191:2 220:3
291:20
**payment**  60:23
62:5 70:1,6
191:10 241:17
259:1,9 261:5
**payments**
49:24 50:12
67:17 230:18

263:17,18,24
**pays**  57:10
68:21 111:17
182:17 247:3
254:9,10,10,25
259:13
**pdf**  295:12
296:1
**peace**  231:18
231:21
**peifer**  6:13
**penalty**  11:6
293:2 295:16
296:5
**people**  14:20
48:16 62:15
75:5 111:18,21
113:16,16
114:8 117:16
121:3,12,18,21
122:3 128:12
128:16,19,24
128:25 154:14
154:15,20,25
184:8 197:18
233:4 235:8,10
235:12,16
242:14 245:5
264:17 266:7
287:12,20,20
**percent**  85:17
86:9,13 87:3
88:20 89:3,5,9
89:14 101:23
105:14 121:14

Page 45

**[percent - pin]**

121:15,15
123:21,22
127:10 128:6
128:10 137:22
138:3 139:19
140:16 141:10
142:9,20,21
143:25 144:12
144:17 145:3
157:2 158:5
159:3 162:19
172:18 173:3,4
173:6 174:23
175:2,11,25
182:4 183:20
183:23 185:18
185:20,20,21
185:24 186:22
187:15 204:9
204:10,12,13
204:24 205:5
205:11,13,22
206:7,16,19,24
207:1,11,19
208:3,11 209:3
209:5,8,9,9
210:2,9,21
211:5,11 212:9
212:11,12
224:24 225:5
225:10,12,15
229:15 248:12
249:18
**percentage**
86:13 92:15,16

92:17 117:15
121:16 124:14
127:18 128:16
128:18 141:7,8
144:17 153:18
161:11,13
182:13 204:15
**percentages**
153:7,10,21
159:20,21
198:10,15
**perfectly** 267:6
**perform** 18:4
20:13 92:3
207:8 274:24
**performance**
15:3 32:12
**performed** 18:7
153:16 191:24
207:21,22
208:13,15,18
**period** 88:4
93:22 97:17
101:3 110:1
140:25 149:13
162:16,16
165:22 181:12
196:25 198:3
209:3 216:12
216:21 217:12
218:6,24 219:5
219:13 220:20
221:19 274:4
295:18 296:7

**periods** 121:14
170:21
**perjury** 11:6
293:2 295:17
296:6
**permission**
273:17,23
276:21 277:2,5
277:8
**permit** 253:7
**permitted**
213:18
**person** 52:2
233:7,9 238:21
238:21 253:2
279:24 280:8
287:3,8
**personal**
279:16,17
280:15,16
286:6
**personalization**
77:23 78:13,15
78:17,18 79:7
81:11,15 89:8
89:11 248:25
250:15 270:25
276:10,13
**personalize**
247:15 248:9
248:19
**personalized**
79:2,3,4,18,21
79:24 80:2,3,7
80:11,15,17,19

81:3,7 83:5,6
94:6 252:23
253:10,12
**personalizing**
248:3
**personally**
267:1,20
**perspective**
108:1 133:1,3
279:3,4
**pertains** 294:12
**pga** 106:17
107:18 108:5
108:10 109:3,4
**pga's** 104:22
**ph.d.** 6:14
**phone** 71:3
193:7,9,12,15
193:24 235:25
237:25 257:10
291:16
**phones** 9:9
259:7
**phonetic** 21:16
21:24
**phrase** 77:2,8
138:14,25
177:25 226:17
226:23
**pick** 9:8
**piece** 76:4,17
76:18 107:15
107:15 193:1
**pin** 107:1

**[place - premarked]**

place   9:11
  32:19,25
  102:14 105:18
  112:11,16,16
  113:15 116:15
  116:22,23
  117:11,12
  183:17 184:16
  184:19 187:8
  187:21,24
  189:7 190:24
  192:5 294:5
placed   209:15
placement   30:6
  32:19 183:11
  187:10 191:8
  191:10
placements
  183:10
places   153:23
  193:5
placing   32:25
  33:8,10 111:4
  111:13 134:12
  176:19
plaintiffs   1:5
  2:5 3:3 4:3
  7:22 8:6 10:15
  17:8,10 21:3
  99:17 100:1
  148:24 149:14
  202:25 215:18
  231:4,6 233:13
  233:16 238:6
  238:10 243:8

247:19 273:6
  273:15
platform
  136:20
play   74:4 94:19
  254:19 255:18
  255:21 256:8
  276:13
played   256:4
  276:10
please   9:7,9
  10:5,25 11:3
  69:4 112:11
  137:19 151:20
  181:7 266:14
plugged   153:22
plus   36:15 66:9
  66:10,10,11
  67:3,5,6,7
  228:10
pockets   176:23
  176:25
point   30:17
  35:25 46:7
  52:1,12 57:17
  60:14,18 80:1
  80:5,9,12,13
  81:21 88:2
  91:21 93:8,11
  93:14 94:1
  102:19 117:3
  120:21 142:11
  143:11,24
  144:18 145:1
  149:5 151:13

151:13,25
  156:18 158:9
  164:10 175:11
  193:19 196:15
  202:3 233:11
  255:10 277:6
  283:20
pointed   152:12
points   78:4,7
  86:24 95:12,14
  265:1,4 291:18
policies   236:8
  240:23 245:17
policy   236:4
  237:11 241:11
  241:12 242:18
  242:20
pool   128:7,13
  128:17,20
pop   164:10
popped   141:16
  141:22
population
  266:1
portal   114:14
portion   18:6
  90:7,9 115:8
  122:2 223:22
portions   18:22
posed   181:5
posing   239:25
posit   54:20
  125:22 186:17
  186:22 188:17
  246:24

positing   54:24
  109:18 115:22
position   231:5
  231:6 243:7,11
  268:24 269:1
posits   112:21
possibility
  104:6 106:22
  133:12 285:5
possible   15:10
  62:20 148:20
  170:9 178:16
  188:16 189:10
  189:14 192:9
  195:8 239:11
  240:4 242:9,12
  249:17,22
  270:20
possibly   187:19
post   157:23
  158:9
potential   32:24
  34:4 56:1,6
  60:5 126:1
potentially
  33:1 34:4
  35:14 66:10
practice   20:24
  220:6
precision
  262:23
precluded
  82:12
premarked
  16:21

Page 47

**[premise - profits]**

premise 149:19
156:12 232:2,7
preparation
39:6
preparing
162:6 272:21
prerogative
244:9
present 5:19
6:3 10:7
147:25
presentation
139:20 140:2
presenting 19:5
president 6:11
presumably
46:19 193:9
248:25 249:7
260:13
pretty 126:19
142:24 229:12
prevent 263:19
previous 39:1
85:15 156:1
previously
15:22 58:14
price 32:7,7,21
48:15 51:1,24
52:18,25 53:10
53:12 54:22
63:24 64:24
67:10,12 68:12
68:13 231:13
231:18 233:7
233:14,19,19

233:20,22,23
234:1,9 239:7
239:9,12,13
240:6 247:4
248:15 249:7
250:1,15 252:6
252:7,16
253:14 254:22
256:9,22,24
257:2,10,11,22
258:10 259:11
260:4,7 262:4
262:16 266:2,5
266:9,9 267:17
282:9
primary 24:6
prior 27:23
184:3,10
234:10 294:7
prioritize 116:7
116:8,8,9,18
privacy 42:24
42:25 43:4,6
43:10 50:17
73:15 74:23
77:11,19,21,22
78:3 199:18
200:21,23
201:3,17
232:18 236:4,8
237:11 241:11
245:17 264:14
265:5,15,18
270:9 285:17
286:10 287:22

private 9:8
50:1 230:20
231:15 238:23
241:19 280:8
287:3,5
probably 12:23
22:18 23:8,13
73:12 148:6,6
148:8 214:17
245:23 246:19
249:15
probative
149:8
procedure
295:19,20
proceed 11:1
proceeding
10:5
proceedings
294:4,6,8,14
process 29:10
29:12,19 30:3
31:18,21 34:15
34:22 36:2
39:3 114:4,13
181:17
processes 30:14
30:25 33:19
119:16
produced
33:22 34:1,10
34:21 91:16
123:4 154:7,8
154:10 155:13
155:14 234:20

272:17
product 133:6
133:10 142:16
192:15 194:16
194:21 195:4
197:5 210:23
234:18
products 41:15
41:16 98:2,5
132:18 139:25
234:24
professional
2:20 20:24
professor 6:7
profit 90:12
97:19 98:19
99:1,5 100:16
118:22 130:21
135:8 189:24
190:4,21 194:7
194:8,15,20
198:22 216:23
profitability
41:15,16
profited 129:19
134:21 135:10
profits 14:22
14:24 96:4,9
96:23,24,24
97:2,13 99:24
100:8 117:25
120:18,18
129:16 130:3
130:16 133:9
134:23 181:8

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[profits - question]**

| | | | q |
|---|---|---|---|
| 273:4,21 | **proportion** | **providers** | |
| **prohibited** | 83:18 137:23 | 238:17 239:22 | **qualcomm**  16:6 |
| 97:18,23 | 138:4 140:17 | **provides**  29:11 | **qualify**  27:18 |
| 110:17 125:14 | 161:24 166:7 | 60:13,18 | **quality**  217:4 |
| **prohibition** | 168:13 180:3 | **providing** | **quantified** |
| 118:9 119:21 | 194:20 205:7 | 36:23 238:16 | 126:20,23 |
| 125:23 135:5 | 206:17 207:12 | 240:15,16 | 127:3 |
| **projects**  145:2 | 210:4,11,21 | 242:2,4 280:7 | **quantify** |
| **promise**  134:19 | 211:6 217:1 | **public**  34:24 | 256:23,25 |
| 134:19,20 | **propose**  68:20 | 35:3,5,11,14 | 258:9 |
| 147:2 197:21 | **proposing** | **publicly**  34:24 | **quantifying** |
| **promo**  84:14 | 156:24 157:23 | **publish**  251:19 | 17:7 95:6 |
| 84:18,22 88:7 | **protective** | **pull**  204:25 | **quantities** |
| 89:23 90:20 | 44:18 288:20 | 220:1 | 171:21 |
| 91:12,13,16,17 | **provide**  18:10 | **pun**  249:21 | **question**  17:2 |
| 91:19 93:19 | 19:22 20:5 | **purchasers** | 25:12 27:24 |
| 95:9 141:9,12 | 40:4,16,19,20 | 122:3 | 31:3 34:14 |
| 152:17 161:18 | 40:21,24 48:16 | **purports** | 37:16,17,19 |
| 162:10 164:2 | 54:15 64:23 | 162:15 | 45:8 48:5 |
| 166:20 167:21 | 65:3 75:6 | **purpose**  225:24 | 50:19 58:17,18 |
| 168:13,25 | 119:15 217:5 | 248:18 | 58:24 59:10,19 |
| 178:16,20,21 | 242:18 | **purposely** | 59:24 64:2 |
| 179:3 180:2,3 | **provided**  24:15 | 284:3 | 66:14,25 67:14 |
| 185:11 186:20 | 25:14,23 44:2 | **purposes**  36:20 | 67:16 68:20 |
| 189:8 190:18 | 44:4 75:16 | 75:6 81:11 | 69:9,18,21 |
| 191:3,17 192:6 | 93:22,24 | 82:14 91:20 | 73:18 77:2 |
| 197:2,8 198:4 | 161:22 162:25 | 97:19 203:10 | 79:5 86:22 |
| 198:14 203:25 | 163:7 203:24 | 251:22 | 90:14 95:10 |
| 208:24 212:19 | 204:5,6 212:22 | **put**  35:24 71:2 | 97:5,8 100:16 |
| 213:5,7 217:2 | 212:24 252:11 | 102:14 147:3 | 101:1 102:19 |
| 229:9 | 277:14 295:19 | 161:7 182:21 | 105:13 107:2,6 |
| **proof**  57:25 | 296:8 | 196:24 240:10 | 107:10 108:9 |
| **properties** | **provider** | 256:16 286:15 | 108:14 126:22 |
| 133:20 | 239:14 240:7 | | 138:8,16 |
| | 240:17 | | 151:21 155:22 |

Page 49

**[question - rebut]**

155:23 156:1
160:3 174:20
178:15 189:2
196:13 200:2
207:23,24
208:9 210:8
213:15 216:9
217:21,23
218:8 219:22
220:10,14
221:10,15
222:1,21
225:13 227:6,9
238:15 255:14
257:18 263:4
264:11 267:6
267:11,15
269:2 276:18
276:22 278:10
278:12 279:9
279:13,25
280:6 281:3,7
281:11,13
282:16 288:15
**question's**
255:15
**questions** 12:8
103:11 120:24
250:18 268:18
270:5 275:16
276:6 283:14
**quick** 196:22
196:23
**quickly** 181:5

**quite** 99:15
127:16,16
132:4 167:13
243:3
**quote** 178:1,2
**quoting** 178:3

**r**

**r** 6:9 297:3,3
**r&s** 296:1,9
**raise** 11:2
**raised** 232:21
**ram** 130:20,22
131:12 195:13
195:23
**random** 162:14
162:15 237:12
**randomly**
102:9
**rate** 15:2
139:15 172:17
173:1 174:22
175:7
**rates** 204:4
**rather** 59:6
115:13 184:19
189:22
**ratio** 92:5,20
93:16 205:15
205:19
**rdrz** 7:18
**reach** 78:14
121:2,12,18,20
121:21 122:7
125:3,25 126:6
127:9 133:18

219:10 220:17
247:1
**reached** 18:25
79:5 88:3
124:15 126:2
127:11
**react** 134:11,16
271:14
**read** 19:10 21:2
21:5,12 22:2,5
31:20 39:19
42:8 72:11
85:6 95:16
145:7,14
148:24 149:1
165:22 169:8
169:15 181:4
214:14 215:4
220:13 222:6
227:5 276:21
293:2
**reading** 17:12
21:25 33:20,22
33:25 50:3,18
72:3 145:20,21
145:23 177:16
177:17 179:24
179:25 180:12
215:4 295:23
296:9
**real** 129:22,23
132:11 219:24
220:2,5,8,12
243:7 251:2

**reallocate**
124:18 133:19
**really** 30:9
45:13 71:23
73:7,7 76:13
107:11 129:15
171:4 174:17
193:20 194:25
195:24 221:1
249:11,19
290:11
**reask** 99:14
138:15 220:14
**reason** 12:18
59:21 60:5
81:16 149:8
159:13 192:10
211:15 235:9
240:8 291:8
297:6,9,12,15
297:18,21
**reasonable**
37:4 42:3
130:13 204:14
209:6,7
**reasoning**
168:1 252:5
**reasons** 78:9
191:11 244:5
246:6
**rebecca** 1:21
2:19 9:24
294:1,24
**rebut** 19:11

Page 50

**[rebuttal - related]**

**rebuttal** 272:20
**recall** 21:14,20
  21:25 24:7
  26:24 28:14
  31:9 34:19
  35:2 37:6,12
  43:11 47:11
  48:21 94:7,8
  110:18 145:20
  145:21,23
  148:1 170:18
  170:24 171:16
  171:22,23
  200:12 225:8
  225:10,24
  227:15 228:8
  228:13 269:12
  275:15 276:22
  276:23 278:10
  291:1
**recalling** 39:13
**receive** 70:21
  79:18 80:7,11
  80:15,17,18
  101:7,21 102:3
  102:13,23
  104:19 112:23
  117:24 118:1
**received** 81:3
**receives** 117:18
  181:9 241:22
**receiving** 80:3
  81:7 104:23
  253:12

**recent** 28:1
  29:2 121:14
  212:11 229:8
**recess** 71:16
  110:9 144:6
  174:4 200:5
  230:3 269:18
  283:10
**recognize**
  284:24
**recollection**
  23:1,23 24:10
  27:3,12 28:19
  29:5 37:4
  45:10 222:20
**recommendat...**
  106:10
**record** 9:6,12
  10:8,11 28:22
  35:19 53:14
  71:12,14,19
  77:24 86:25
  91:14 110:8,12
  124:11 141:25
  142:10,25
  143:8 144:5,9
  161:7 164:16
  164:25 165:2,7
  169:8 174:3,7
  199:25 200:3,8
  204:2 214:1
  230:2,6 269:16
  269:21 283:8
  283:12 292:5
  294:8,11

**recorded** 9:14
  181:22 184:4
**recording** 9:10
**recordkeeping**
  247:19
**records** 61:2
  154:11
**red** 199:22,22
  205:5
**reddit** 251:19
**redirect** 290:17
  291:9
**reduce** 117:2
  121:19,19
**reduced** 88:13
  88:19,20 89:5
**reference** 36:21
**referenced**
  295:6
**references**
  227:25
**referencing**
  166:6
**referred** 288:2
**referring** 16:16
  25:24 29:13
  41:20 122:15
  122:17 138:20
  138:23,24
  163:17 171:17
  180:1 191:19
  191:24 204:24
  205:8
**refers** 169:17

**reflect** 86:13
  253:15
**reflected**
  222:16
**reflects** 144:17
  165:25
**reframe** 97:5
**refresh** 141:19
  222:20
**refreshed** 24:9
  27:3,12 28:18
  29:4
**refreshes** 27:23
**refreshing** 23:1
  23:23
**refuse** 264:14
  264:15
**refused** 282:17
**refusing** 268:16
  268:18
**regarding**
  255:17
**regardless** 64:1
  185:10,12
**registered** 2:20
**relate** 41:1
  109:20 186:5
  270:8
**related** 10:1
  15:1 24:16
  25:15 26:14,20
  37:4 39:4 41:1
  42:24 44:6,10
  44:11 72:7
  77:6,8,17 92:1

Page 51

**[related - report]**

| | | | |
|---|---|---|---|
| 93:18 104:22 | **relevance** | **remains** 87:16 | 21:5,6,10,12,23 |
| 105:6 106:6,18 | 86:14,18 87:1 | **remember** 14:6 | 22:1,2,3,6,9,20 |
| 108:6 109:4 | **relevant** 170:25 | 16:12 23:11 | 22:22 23:10 |
| 165:8 171:2,3 | 186:2 267:6,14 | 26:12,17 28:4 | 24:12,21,24 |
| 181:9 201:8,12 | 267:18 268:1,6 | 28:4 114:3 | 25:25 26:4,22 |
| 213:12 233:17 | 268:11,13 | 120:22 206:2 | 26:25 27:1,10 |
| **relates** 23:2 | **reliable** 76:6,7 | 211:21 226:3 | 27:25 35:9,12 |
| 28:5,9 29:6 | 76:7 95:6 | 228:16 270:11 | 35:15 36:3,5,9 |
| 37:23 40:22,25 | 162:23 163:6 | 271:8,16,22 | 38:7 39:6,7,10 |
| 72:5 104:14 | 163:25 164:8 | 273:1,8 274:5 | 39:16,19,20 |
| 105:1 115:8 | 164:11,13,14 | 274:9 275:1,21 | 41:19 43:4,25 |
| 122:12,13,19 | 164:23 165:2,4 | 277:19,21 | 49:19 65:2 |
| 127:17 139:17 | 246:23 265:2 | 289:19,24 | 67:4 72:2,11 |
| 139:18 168:25 | **reliance** 224:3 | 290:11 291:15 | 72:21 73:9 |
| 171:13 173:6 | **relied** 35:11 | 291:19 | 74:9 78:19 |
| 201:2 206:12 | 74:14 75:2,3 | **remembering** | 88:3 99:12 |
| 225:23 228:17 | 81:8 164:8 | 21:7 123:21 | 105:21 118:6 |
| 259:6 285:25 | 166:21,23 | **remotely** 10:10 | 118:11,12 |
| 287:22 290:21 | 167:1 226:14 | **rendered** | 126:24 134:4 |
| **relating** 36:23 | 290:2 | 100:13 284:24 | 137:17 144:13 |
| 38:15 39:2 | **relief** 17:7 18:8 | **rendering** | 145:7,15 |
| 74:11 99:6 | **relooked** 72:25 | 73:21 103:22 | 147:24 165:10 |
| 161:23 166:6 | **rely** 75:15,19 | 166:18 223:13 | 165:13 166:13 |
| 170:4 201:3 | 75:20 76:10,11 | 224:2 | 167:2,18 169:4 |
| 271:1 284:22 | 76:16 78:6 | **repeat** 41:6 | 175:2 177:17 |
| **relationship** | 162:9 166:16 | 43:17 49:13 | 199:4 213:16 |
| 79:21,23 | 167:4 169:7 | 150:13 208:8 | 214:15,19,22 |
| 243:21 | 192:6 198:11 | 210:8 220:10 | 219:17 222:6 |
| **relative** 51:7 | 212:8 223:11 | **replace** 175:10 | 222:14,17,20 |
| 81:14 92:16,17 | 223:25 246:22 | **report** 7:13 | 222:24 223:9 |
| 166:9 256:17 | **relying** 76:3 | 16:16 17:4,9 | 223:10,18 |
| 294:17 | 154:2 162:22 | 17:13,16,23 | 224:13,15,17 |
| **release** 145:19 | 234:15 246:20 | 18:3,7,11,22,23 | 224:22 227:1,5 |
| **released** 157:11 | **remain** 284:6 | 19:2,7,11,14,15 | 227:12,22 |
| 295:21 | | 20:7,11,19 | 230:13 232:13 |

**[report - revenue]**

232:15 234:2,7
252:4 256:25
258:21,22
267:4,12,14,16
268:7,11,19
279:15
**reported** 1:20
152:3,3,5
**reporter** 2:19
2:20,21 9:24
10:10,25 11:2
11:5 16:20
140:11 163:21
174:10 294:2
**reports** 19:10
21:2 38:5
41:18 42:23
**represent** 13:4
13:6 44:13
144:22 205:25
224:22
**representation**
58:22 98:19,21
99:6,8,8
152:15
**representations**
82:20
**representative**
64:20 68:3
264:6
**represented**
58:14 79:17
137:24
**representing**
9:22 12:24

58:12 106:24
107:3
**represents**
205:11,13
206:17,19
207:20 208:12
**requested**
29:17 294:15
296:1,9,10
**requests** 82:17
101:21 126:25
181:14
**require** 214:18
262:9
**required** 66:24
67:19 179:11
**requirements**
57:21
**requires** 40:6
87:10 262:25
**reread** 169:20
**research** 34:25
35:3,5,15 39:4
263:20
**respect** 36:1
41:25 47:24
66:24 67:18
79:7 94:18
135:15 216:10
218:14 228:20
228:22 236:14
**respond** 13:15
**responded**
149:13 217:11
218:4,16

**respondents**
275:23
**response** 13:17
25:12 115:12
119:21 124:16
125:23 126:5
135:5 162:2
180:16,22
**responses** 7:22
8:6
**rest** 50:10
**restricted**
247:11
**restriction**
238:8 248:20
253:15
**restrictions**
247:9
**result** 79:1
150:24 218:15
246:22 284:25
**resulted** 96:23
**retain** 13:14
**retained** 13:2,3
13:12 15:12,22
16:8 19:24
31:16 43:8,11
43:13,21
283:20 284:5
292:9
**return** 111:18
264:11 295:17
296:6
**returning**
150:8

**reveal** 288:23
**revenue** 79:3
79:25 81:19,19
81:25 82:2
83:20 84:14
85:17 86:2,8
87:15,25 88:4
88:8 89:10
90:3,7,8,9,11
91:18 92:11,13
92:25 93:19,21
117:21,24
118:2 119:13
120:5,11,22
122:13 131:6
137:24 138:4
140:3,23,24
141:1,2,9,12
144:18,20
152:18 156:6
157:21,22
158:11 161:18
162:10 164:2
166:20 167:21
167:23 168:14
168:25 171:9
171:12,13
175:19 176:18
176:19,23,25
178:19,20,21
179:18,21
180:3,4,12
181:8 182:4
183:13 186:19
187:16 188:19

Page 53

**[revenue - role]**

190:14,15
191:8,13,13,13
191:14 192:21
192:22 193:14
194:1 195:4,24
196:3 198:14
199:2,5,18
200:23 202:12
205:14,19
206:19,23
207:2,3,5,6,9
210:4,11,17,22
211:6 212:18
212:25 213:4,9
213:11,12
215:2 217:2
**revenues** 92:22
92:23 120:19
139:14,24
**review** 13:19
19:19 76:8
159:25 162:6
269:7 294:14
295:8,10,13
296:2
**reviewed** 19:17
25:25 147:23
**reviewing** 73:5
73:10 163:2
**rid** 175:19
**riddled** 162:12
**ridiculous**
193:17,24
**riehl** 6:7

**right** 11:3 25:1
28:1 30:13
34:12 39:5,18
43:6 52:1,3,19
54:23 55:22,23
56:6 61:8 66:4
68:11,18 70:15
84:16 86:24
87:5 88:11,21
89:12 91:12
93:9 96:9
97:13 98:10
99:20 100:10
100:16 101:9
101:13,24
107:19 110:25
111:14,18,23
112:3,5,8,13
113:6,11
114:10,14,24
116:4,10
117:20 119:22
120:6 122:25
125:12,15
126:2,3 127:6
128:20 129:6
130:10,13,16
130:25 131:6
131:13,18
133:5,6,13,20
134:9,16 136:2
136:4 138:21
138:25 139:3
140:19 141:5
141:19 144:20

145:6 147:10
148:23 151:15
153:8,19
154:11,15
155:7 156:2
158:6,12 159:8
160:11 161:9
161:20 163:10
165:16 166:8
167:22 168:5
168:14 171:1,5
171:24 172:19
173:3 176:2,15
178:5,22
180:13 181:18
182:16 184:5
184:10 185:17
185:18 186:8
186:14,20
187:22,25
188:3,6,10
189:9,18,19
190:18,22,25
191:3 192:8
193:17 194:1,9
194:11,16,22
195:3,12,16
198:8,11,22
201:10 204:17
206:1 209:15
209:18,25
210:24 211:19
212:13,20
213:6 214:6,15
214:21 215:13

215:17,20
216:20,22
217:16 219:17
221:12 227:6
230:16,21
231:10,24
235:25 236:5
237:18 238:9
239:23,25
240:2,25 243:9
243:15 245:9
247:4,6,16,24
248:4,7,10
250:2 251:3,11
252:15,24
253:3,7,10
257:23 258:5
262:21 263:4
268:21 270:7
274:11 277:2
277:25 278:12
286:18 288:3
289:6,13,16
290:4
**risk** 232:17,18
232:21
**rmcgee** 4:12
**robust** 122:6
**rodriguez** 1:4
2:4 9:15 295:4
297:1
**role** 14:16
19:22 20:2,4,5
47:3 94:19
254:19 255:18

**[role - santacana]**

255:21 256:3,8
276:10,13
277:20,23
**roles** 14:17,17
**rolled** 155:6
**romano** 1:21
2:19 9:24
294:1,24
**ropes** 12:14
**roughly** 14:11
14:13 22:17
33:11 86:1
**round** 128:10
**router** 66:11
255:5 257:11
257:14
**row** 85:22
89:22 153:5
**royalty** 37:5
42:4 130:13
194:23
**rpr** 1:21 294:24
**rs** 1:6 2:6 9:18
**rsila** 4:21
**rujuta** 14:5
**rule** 50:9
158:14 260:16
**ruled** 193:11
**rules** 108:21
109:18,23
296:8
**ruling** 216:11
**run** 90:22
193:16

**running** 266:15
**ryan** 4:5,16

**s**

**s** 7:10 8:1 297:3
**sake** 155:8
**sales** 195:7
**samit** 6:14
**sample** 64:20
68:2,3 162:15
**sampledadev...**
172:13
**san** 1:14 2:17
3:17 5:10 9:1
9:20
**santacana** 5:5
7:5,7 10:12,12
12:6,18 16:21
17:24 18:24
20:3 25:11
28:1,11,22,24
29:1 35:24
37:18,25 39:15
42:15 45:3
46:3,9,11 49:6
51:4,11 52:24
53:22 55:11
56:10 57:7
58:15,18,23
59:5 60:11,20
62:6 63:22
64:16 65:11,14
65:17,19 66:2
66:22 69:6,14
70:11 71:10,21
80:5 84:11

85:13 86:6
88:19,24 89:3
89:6 97:11
99:16 100:7,25
103:7,10,14,16
103:19,20
106:2 107:4,9
108:11,13,20
108:24 109:17
110:6,14
111:12 114:3
115:10,22
117:19 124:12
125:2,12
126:21 131:22
131:25 134:6
136:14 137:15
138:13 139:1,4
140:12,15
142:7 143:9,13
144:1,11 145:9
145:16 150:5
151:20 153:4
159:6 160:20
163:16,18,22
164:6 165:9
172:3,6,10
173:24 174:11
180:24 181:1,4
184:23 185:9
185:17 188:15
192:25 193:4
193:23 194:6
196:21,24
197:19 198:2

200:1,10 201:5
204:16 211:4
212:7 217:19
217:20 218:13
219:24 220:1,3
220:7,11,17
221:4,10,17
223:1 224:5,24
229:24 230:8
230:16 231:2
237:16,20
238:20 247:13
250:13 251:25
252:15 256:21
258:14,25
259:25 260:11
261:6,12,17
262:7,15 263:3
263:10,13
265:13,25
266:19 267:2
267:13,23
268:2,8,16
269:3,14 272:6
272:13 274:20
275:12 276:8
278:9,24
280:14 281:23
282:8 283:5,13
284:22 286:17
286:23 287:11
287:24 289:5
289:11,17
291:2,23,24
292:2 295:1

Page 55

**[santacana's - section]**

| | | | |
|---|---|---|---|
| **santacana's** 222:21 | 181:17 182:1 182:15 184:4 | 203:12,19 207:10 211:23 | 268:7,15,19 269:9 277:10 |
| **sat** 12:12 | 199:4 205:17 | 212:8 213:13 | 279:13 284:17 |
| **save** 82:16 | 214:22 236:3 | 214:10 217:17 | 290:17 291:9 |
| 120:16 241:14 | 237:25 251:18 | 218:12,12,14 | **screenshot** |
| **saved** 241:3,4 | 258:15 277:11 | 237:15 243:23 | 205:2 208:12 |
| **saving** 72:7 | **scenario** 80:13 | 271:2 274:12 | 228:1 |
| 82:12 106:6,19 | 80:14 81:1,2,6 | 274:13 275:9 | **screenwise** |
| **saw** 145:16 | 81:17 82:4,5,8 | 276:11 280:2 | 246:8 |
| 170:14 | 82:9 83:9,15 | **scenarios** 78:20 | **scroll** 142:3 |
| **saying** 17:24 | 84:6,14,15,16 | 95:15 96:2,14 | **scrolling** |
| 28:14 110:22 | 87:9,10,14,16 | 218:11 274:7 | 172:24 |
| 112:20 115:24 | 88:9 89:21 | 277:13 | **sdk** 181:23 |
| 116:3 117:1 | 94:3,18 95:20 | **schedule** 92:7 | 184:5 |
| 118:17,19 | 95:21 96:1,1 | 92:10 138:23 | **sdks** 135:22 |
| 128:9 135:24 | 101:15,20 | 152:8,10,12,14 | 186:7 211:24 |
| 136:6 139:5 | 102:1 103:24 | 152:19,24 | **se** 3:7 |
| 141:4,5 146:23 | 104:10,10,12 | 153:5,11,24 | **searches** 106:9 |
| 160:7,15,15,21 | 104:13,14,25 | 154:3 155:1,2 | **sec** 161:10 |
| 160:25 161:3 | 105:2,8 108:18 | 161:14,17 | **second** 3:7 8:4 |
| 164:10 175:23 | 109:7,8 110:21 | 164:2 165:15 | 44:12 61:1 |
| 176:14 190:9 | 115:6 117:22 | 165:20 179:25 | 79:15 89:1 |
| 195:17,18 | 118:13,16,18 | 180:8,9,11 | 95:2,16 122:12 |
| 198:13 213:22 | 118:20 120:10 | 295:10 | 122:13,22 |
| 215:15 219:21 | 121:1 125:17 | **schedules** | 144:2 146:16 |
| 223:25 224:10 | 127:7,8,23,24 | 168:12 | 163:17 172:8 |
| 239:25 242:24 | 128:1,2,4 | **schiller** 3:4 | 172:23 180:10 |
| 243:13 260:16 | 135:15,17 | 10:14 16:9 | 180:23 189:4 |
| **says** 87:3 98:8 | 136:3 137:4 | 270:4 | **secondly** |
| 111:20 112:15 | 151:3 158:20 | **school** 6:9 | 146:11 |
| 114:15 116:21 | 178:20,21 | **schulte** 6:15 | **section** 17:4,13 |
| 133:17 139:1 | 184:18 186:9 | 14:5 | 17:16,22,25 |
| 142:20 143:14 | 186:11,12,16 | **scope** 109:5 | 18:3 72:4 |
| 146:7 152:24 | 189:24 190:4 | 188:13 267:9 | 230:12 257:8 |
| 157:10 181:7 | 190:16 203:10 | 267:22,24 | |

**[sections - settings]**

| | | | |
|---|---|---|---|
| **sections** 72:24 | 289:3 | **separately** 77:4 | 128:24 129:19 |
| **see** 37:9,21 | **seen** 164:24 | **september** | 136:18 190:8 |
| 38:2 41:3,7 | 213:25 | 145:19 | **serves** 112:7 |
| 50:3 85:19 | **sees** 280:24 | **serve** 29:20 | 181:20 |
| 101:9,11 102:6 | 281:18 | 82:23 83:4,5 | **service** 120:6 |
| 102:25 108:3 | **segue** 145:9 | 83:10 84:19,23 | 186:13 217:4 |
| 116:23 136:19 | **select** 109:4 | 87:14,18,18,20 | 238:9 242:21 |
| 138:1,17 139:7 | **selected** 102:10 | 87:21,23 94:5 | **serviced** 234:21 |
| 141:4,4,19 | **selecting** | 101:5,16,18 | **services** 72:17 |
| 142:15,20 | 256:19 257:10 | 102:3,4,9,20,23 | 106:13,20 |
| 143:2,14 153:5 | **self** 182:16 | 103:1,25 104:6 | 245:18 |
| 156:22 157:5 | **sell** 52:19 53:1 | 104:21 105:9 | **serving** 25:25 |
| 169:13,24 | 195:1 | 105:17 106:17 | 26:22,25 27:1 |
| 172:12 173:11 | **seller** 50:23 | 107:17 108:6 | 78:22 82:14,21 |
| 174:21,24,25 | 51:25 52:1,12 | 109:19 110:17 | 82:22,24 83:6 |
| 199:3 216:25 | 52:18,19,25 | 111:6 112:1 | 105:3 120:12 |
| 217:9 218:2 | 53:7 69:18 | 113:3,5,25 | 125:14 |
| 223:19 224:16 | 130:21 131:6 | 114:2 115:7,21 | **set** 7:23 8:7 |
| 227:25 243:3 | 131:12,16 | 117:14 127:1 | 24:12 32:6,7 |
| 244:1 272:10 | 195:11 | 128:2,2,5 | 64:24 237:22 |
| 283:6 284:4 | **sellers** 53:4,23 | 129:8,9 134:13 | 264:1 294:5 |
| 287:24 289:10 | 54:22 69:21 | 135:25 136:16 | **sets** 15:6 114:6 |
| 291:23 | **send** 249:13,14 | 137:3,10,13 | 163:9 |
| **seeing** 101:15 | **sends** 109:3 | 189:17 271:7 | **setting** 70:14 |
| 143:2 | **sense** 28:8 | 271:11,14 | 72:6 77:6,9,12 |
| **seem** 42:9 | 173:25 191:18 | 272:5 279:2 | 77:19,21,22 |
| 123:12 164:16 | 233:9 240:12 | **served** 19:11 | 106:4,5 158:15 |
| 178:13 244:11 | 252:3 279:4 | 20:20 22:20,22 | 199:18 200:22 |
| 278:23 281:10 | 282:7 | 23:10 27:10 | 200:23 201:3 |
| **seemed** 170:19 | **sensitive** 9:8 | 87:12,12 88:5 | 243:16 270:9 |
| 204:14 | **sentence** 77:3 | 89:22 91:10,22 | 283:25 |
| **seems** 157:1 | 119:25 184:22 | 91:24 109:21 | **settings** 74:23 |
| 162:23 209:6 | 260:1 | 109:25 110:24 | 77:22 78:12 |
| 209:12 249:18 | **separate** 51:2 | 118:15,17,19 | 201:13,17 |
| 249:24 279:2 | | 118:21 128:23 | 284:13 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[severity - sold]**

severity  285:17
  286:9
share  14:22
  72:18 152:25
  153:5 156:8
  159:20 161:19
  162:10 163:25
  165:21 167:10
  175:19 179:21
  180:12 239:6,8
  242:14 280:21
shared  159:20
  254:6
shares  14:23
  166:18
shawna  5:22
  9:22
short  173:18
shorthand  2:19
  294:2,9
show  72:16
  92:5 111:18,21
  111:21 112:18
  114:19 115:24
  115:25 121:5
  122:10 136:22
  237:11 257:7
  269:11
showing  136:21
shown  113:15
  113:22,22
  114:7,17
  115:14,15
shows  112:7
  247:21 260:19

shut  213:22
  215:11
side  185:3,4
sign  66:11 67:7
  69:1,5 240:22
  295:16 296:5
signal  102:3,13
  102:23 105:17
  115:20
signature
  294:24 295:21
  295:23,23
  296:9
signed  54:14
  88:5 89:23
  91:11 113:5
  114:18 137:24
  138:5 139:23
  139:24 140:2,3
  140:18,24,24
  141:9 142:21
  142:21 143:16
  143:18,21
  144:19,21,21
  152:18 161:18
  168:15 175:20
  175:21 176:1,5
  176:9 178:25
  241:10,11
significant
  117:15 121:12
  122:2 246:12
  264:13
significantly
  66:1,7,12

sila  4:16
similar  52:15
  77:12,19
  106:12 170:20
  171:19 191:16
  199:7,17 202:3
  204:10 207:8
  209:3,11
  229:12 234:11
  241:8 255:9,9
  255:10 258:23
  287:17
similarly  84:23
  200:25 264:6,8
simply  101:7
  115:13 184:18
  187:1
single  71:1
  72:25 151:25
sir  110:14
sit  26:18 28:5
  34:19 37:8
  39:12 49:1,9
  109:9 110:4,5
  148:1 157:3
  158:3,4 159:5
  159:14 168:22
  170:24 246:18
  281:4
site  62:1,8
sites  57:22 58:1
  59:9,11 72:8
  72:15,17 106:7
  106:12 112:2

sitewide  228:15
  228:17
sitting  19:4
  21:15 37:20
  124:3,10 225:8
  227:15 228:7
  228:13
situated  264:6
  264:9
situation  32:9
  33:1 115:19
  157:24 191:22
  194:20 218:18
  219:12 220:19
  221:19
situations
  29:17 84:21
  115:19 137:10
  137:14 158:19
  162:18 177:2,9
  177:13 178:9
  191:4,5 270:14
six  7:23 8:7
size  66:5
slide  169:6,14
  169:24 170:1,4
slightly  97:10
slip  234:4
sloan  6:9
slow  53:19
snyder  21:24
snyder's  21:25
sold  132:17
  133:10 195:15

**[solemnly - state]**

solemnly 11:5
solution 235:5
  235:15
solutions 9:23
  9:25 235:17
  236:9 292:9
  295:7
somebody
  63:10 229:22
someone's
  147:6
somewhat
  100:5 273:9
soon 173:18
  229:20
sorry 17:11,20
  21:22 27:2
  49:5 80:15
  84:2 87:21
  88:22 90:25
  92:6 117:11
  119:5 153:11
  155:13 157:6
  169:19 180:8
  180:10 184:21
  205:10 208:7
  219:18 227:20
  251:8 252:20
sort 146:2
  150:3 173:22
  266:1
sound 20:15
  75:22
sounds 116:21
  290:1

source 102:8
  118:22,25
  162:23
sources 97:19
  182:6
space 36:15,16
  36:17,24 38:2
  38:11,20,24
speak 23:20
  225:11
speaker 53:16
speaking 30:8
  39:13
specific 27:17
  177:3,10 203:8
  223:21 225:23
  225:24 236:20
  241:22,24
  250:19 258:9
  286:24
specifically
  20:8,22 22:15
  26:24 39:13
  47:11 54:16
  168:8 223:20
  224:19 225:9
  225:11,25
  226:3 227:18
  254:9 256:23
  259:6 270:15
specifics
  202:16
specifies 45:21
specify 237:16

specifying
  150:18
speculate 134:3
  135:12 265:23
speculation
  66:19 111:7
  113:18 115:3
  125:7 126:9
  133:21,24
  197:14 262:1
  262:11 265:9
  265:21 266:10
speed 217:4
spend 73:3,5
  118:3,4,8
  119:21 120:3,4
  120:13,14
  124:18 127:2
  127:12 182:2
  182:10,13,23
  186:23 192:15
  212:9,12
  215:25 271:6
  271:19,20
  272:1,11,15
spending
  121:20 126:20
spent 13:21
  14:12 73:11
  126:15 127:9
  215:25
spoke 222:24
spreadsheet
  7:17

ssct 228:10,12
  228:14
stack 172:18
  174:22 175:8
staff 14:20
  72:24
stand 89:8
standard 48:1
  132:23
standpoint
  32:23 41:11
  79:25 90:12,12
  146:1 149:19
stands 228:14
start 27:7
  33:15 76:19
  97:17 99:2
  101:3 131:5
  149:13 174:14
  196:25 198:3
  216:11 217:12
  218:5,24 219:5
  219:12 220:19
  221:19 253:12
  277:17
started 157:8
starting 29:14
  80:1,5,9,11,13
  93:7 151:12,13
  151:25 157:14
  277:6
starts 139:5
  210:15
state 10:5,7,20
  11:6 294:2

**[state - supplemental]**

295:9,12
**stated** 265:12
**statements**
24:16 25:14,23
25:24 95:8
**states** 1:1 2:1
9:16 169:25
**status** 146:13
146:24 147:6
147:18 148:10
150:10,16,25
151:23 157:15
157:19 158:1
160:19
**statuses** 148:16
**stenographic**
35:19 71:12
124:11 141:25
142:25 143:8
204:2 294:1
**stenographic...**
1:20
**step** 180:1
213:16
**stepping** 94:24
**steps** 207:7
254:4 275:5
**stick** 84:6
120:22 147:12
147:12 153:13
**sticking** 119:18
153:4 186:16
**stipulation**
295:20

**stop** 78:17,18
214:23
**storage** 181:10
**straight** 145:11
**strategy** 40:22
**street** 2:16 3:7
3:15 4:8 5:8
9:20
**stretch** 173:15
**strike** 60:25
80:8 95:10
151:13 167:16
170:2 186:10
227:20
**structure** 41:24
42:3
**stub** 153:15
**studied** 122:24
123:3,4,4
286:2
**studies** 65:1,7
123:1 192:3
259:4,24
**study** 54:3,5,14
57:7 59:16
60:7,13 64:10
64:25 65:5,12
65:21 66:4,16
67:7,21 70:22
70:25 76:25
123:7 134:15
149:12,16
191:20,25
200:11,15,21
201:12,17,21

202:5,11,19
203:17 204:9
205:3,12
208:12 225:1
226:23 228:1
234:14 252:14
252:18,22
253:22 254:6
254:25 256:14
256:17 259:3,6
259:12,14
264:4,6,20,20
265:3 272:15
272:21 275:16
275:24 285:10
287:17 290:2
290:21 291:14
291:19,22
**study's** 67:17
275:19
**stuff** 73:10
101:12
**sub** 181:13
**subject** 30:9,15
35:7 39:21
43:9 44:3,5,6
65:15 269:9
278:3 287:11
**subjects** 24:4
**subpoena**
13:15,17,19
267:5 268:21
268:25 269:4,5
269:12

**subscribed**
294:20
**successful**
118:23
**sudden** 111:20
112:15 253:12
**suddenly**
186:24
**suffice** 33:7
183:25
**sufficiently**
60:21 74:14
**suggest** 48:23
**suggested**
275:18
**suggesting**
106:25 108:10
271:24 272:15
**suggests** 49:3,7
**suite** 3:8
**summarize**
16:14
**summarized**
85:14 255:24
**summarizes**
85:21
**summary** 139:9
142:13,15
**summer** 5:20
10:16
**super** 103:9
**supplemental**
7:21 8:5 72:14
180:16

Page 60

**[supported - swaa]**

| | | | |
|---|---|---|---|
| **supported** | **surrender** | 97:18 99:6,18 | 153:2,6,16,17 |
| 168:4 | 49:25 230:19 | 101:4,5,7 | 153:18 154:9 |
| **supporting** | 231:14 241:18 | 104:1,19,23 | 156:13,17 |
| 168:12 | **surrounding** | 106:11 107:18 | 157:15,19 |
| **sure** 13:24 | 247:20 | 108:8,21 | 158:1,15 |
| 16:15 17:3 | **survey** 64:20 | 109:22 110:17 | 160:18 161:20 |
| 18:19 28:3 | 265:24 | 110:23 111:6 | 161:25 162:10 |
| 35:22 36:19 | **surveyed** | 111:22 112:2 | 162:19 163:5 |
| 43:18 45:20 | 265:11 | 112:17,17,23 | 164:1,17 |
| 47:25 65:16 | **susman** 4:15 | 113:4,5,9,17,22 | 165:15,21 |
| 71:6 75:20 | 5:20 10:19,23 | 113:23 114:17 | 166:7,9,17,18 |
| 82:9 83:2 | 13:10 15:23 | 114:18 115:7 | 166:20 167:10 |
| 87:24 88:16 | 16:5 | 115:14,20 | 167:22,22 |
| 93:17 94:11 | **susmangodfr...** | 116:23 117:14 | 168:14,16,19 |
| 95:3,17 101:24 | 4:21 | 118:9 119:22 | 168:20,24 |
| 103:13 105:14 | **suspect** 162:21 | 120:6,12 121:6 | 170:11,20,21 |
| 105:20 107:7 | **swaa** 54:18 | 121:15,16 | 171:9,18,18 |
| 107:13 111:20 | 57:16,19,19,24 | 122:16,19,19 | 173:3,6,7 |
| 123:11,13 | 61:8,11,24 | 123:2,7,16,21 | 174:14,15,21 |
| 132:4 136:23 | 62:7,11 71:23 | 123:22 125:4 | 175:7 178:25 |
| 142:3,12,24 | 71:25 72:13 | 125:15,19 | 186:25 190:2,5 |
| 144:14 151:14 | 77:13,20,22,25 | 126:1,7 127:5 | 190:15,17,22 |
| 151:16 157:2 | 78:8 79:6,10 | 127:11 128:12 | 191:9 197:21 |
| 158:5,6 159:3 | 79:16,17 80:1 | 129:17 133:18 | 198:5,6 201:2 |
| 159:6,11 160:8 | 80:3,6,10,24 | 134:13 135:6 | 201:18 202:1 |
| 167:13 169:17 | 81:3,4,7,8 | 135:20 136:1,7 | 208:1 213:24 |
| 175:17 180:24 | 82:13,13,20,21 | 136:21 146:13 | 214:24 215:17 |
| 183:18 184:25 | 83:11,18 84:1 | 146:24,24 | 215:23 217:14 |
| 189:6 195:5 | 84:2,19,22,22 | 147:3,6,18 | 219:15 220:21 |
| 200:1,2 206:21 | 86:14,18,19 | 148:10,15,16 | 221:21 237:22 |
| 221:3 226:10 | 87:12,13,18 | 149:6,15,23 | 238:5 239:11 |
| 246:12 248:12 | 88:5 89:23 | 150:9,16,18,20 | 240:5 241:12 |
| 249:18 270:24 | 91:11 94:5 | 150:25 151:11 | 243:8,16 |
| 276:16 | 95:24 96:4,5,8 | 151:12,23 | 247:15,23 |
| | 96:13,19,19 | 152:1,15,18,25 | 248:6,9,11 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[swaa - technical]

| | | | |
|---|---|---|---|
| 253:24 267:8 | 76:17 87:17 | **takes** 104:5 | 169:2 170:10 |
| 268:8 271:7,11 | 91:18 96:11 | 247:20 | 193:19,21 |
| 271:15,20 | 97:15 98:6 | **talk** 20:6 36:9 | 194:5 195:6 |
| 272:1,3,9,16 | 103:5,8,12 | 46:9 65:2 | 225:1 228:24 |
| 273:16,22 | 105:19,21 | 71:22 72:2 | 234:7 237:21 |
| 274:3,14,25 | 107:15 109:24 | 176:16 257:5 | 242:19,20 |
| 275:11,20 | 110:6 114:16 | 259:4 274:11 | 244:25 246:10 |
| 277:7,10 278:6 | 118:7 127:21 | 282:16 | 250:8,11 |
| 278:16 280:3 | 131:10,15 | **talked** 23:22 | 253:22 254:8 |
| 281:20 282:9 | 132:7 133:9,11 | 25:9 38:25 | 254:12,14 |
| 283:16 286:20 | 137:16 138:17 | 68:6 70:24 | 258:6 262:23 |
| 286:21,22 | 142:2 145:18 | 111:16 203:22 | 270:13 283:16 |
| 287:2 | 151:17 158:5 | 204:6 225:9,19 | 286:19 |
| **swear** 10:25 | 160:8 169:4 | 225:25 229:6 | **talks** 18:8 |
| **switch** 65:14 | 171:24 172:16 | 246:9 253:21 | 39:20 203:25 |
| 161:9 176:15 | 173:24 174:11 | 259:2 261:3 | **tampa** 4:10 |
| **switched** 137:1 | 180:19 196:14 | 285:24 288:24 | **targeting** 248:3 |
| **system** 157:19 | 213:15 214:14 | **talking** 26:8 | **task** 47:14 50:5 |
| **t** | 227:21 229:24 | 27:8 30:13 | 50:6 51:22,23 |
| | 246:3 247:7 | 34:16 35:7 | 55:15,16,18 |
| **t** 7:10 8:1 297:3 | 248:15 251:14 | 38:8 52:15 | 129:15 190:20 |
| 297:3 | 251:16 263:15 | 53:20 74:16 | 241:21 251:4 |
| **tab** 142:13,15 | 263:22 265:8 | 77:12,19 78:6 | **tax** 37:15,24 |
| 143:7,11 | 265:11 269:15 | 80:24 82:5,9 | **team** 19:19 |
| **table** 172:12,15 | 275:5 283:5 | 88:17,17 91:5 | 284:21 |
| 174:18 258:15 | 292:3 | 94:3,4 95:25 | **tech** 101:22 |
| 258:21,23 | **taken** 2:14 | 97:9 105:1,2 | **technical** 29:15 |
| **tablet** 257:11 | 69:22,24,24 | 107:12 109:10 | 30:1,10,12 |
| 291:17 | 71:16 110:9 | 110:15 114:4 | 31:15 32:2,3,3 |
| **tablets** 259:7 | 144:6 152:14 | 123:23 125:13 | 33:4,12 101:23 |
| **tagging** 228:15 | 174:4 200:5 | 130:5 132:3 | 102:18 105:13 |
| 228:17,17 | 230:3 243:14 | 135:17 138:1 | 105:15 107:12 |
| **tail** 177:21 | 243:20 248:21 | 142:10 144:11 | 108:1 109:10 |
| **take** 9:11 24:20 | 269:18 283:10 | 161:12 162:1,5 | 109:12 146:1,4 |
| 49:20 58:25 | 294:4 | 163:15 166:17 | 147:16 148:19 |
| 65:17 71:10 | | | |

Page 62

[technical - think]

| | | | |
|---|---|---|---|
| 157:7 188:14 | **terms** 33:3 | 217:2 266:18 | 56:22,24,25 |
| **technically** | 52:15 105:15 | 273:5 | 57:5 62:9,20 |
| 61:25,25 | 134:19 173:15 | **theft** 232:18 | 63:14,18 64:3 |
| 102:20 146:13 | 228:6,8 233:22 | **theorize** 246:25 | 64:3 65:8 67:9 |
| 146:14 277:12 | 236:4 252:22 | **theory** 111:24 | 67:11 68:1,11 |
| **techniques** | 253:1,5 255:16 | **thing** 72:20 | 68:23,23 69:7 |
| 29:9 | 275:19,24 | 99:18,19 103:4 | 70:6,9 74:16 |
| **technological** | **test** 108:2 | 124:5 132:22 | 78:5,9 79:9 |
| 104:7 | **testified** 12:3 | 146:16 181:18 | 80:4,23 82:10 |
| **technologically** | 12:10 43:5 | 193:24 283:15 | 83:7,21,22,23 |
| 103:25 105:11 | 178:8 210:20 | **things** 23:5,6 | 84:3 85:9 86:4 |
| 107:17 108:19 | 211:2,23 270:7 | 47:1 97:10 | 86:21,21 87:5 |
| **technology** | 271:5 276:9 | 120:9 135:20 | 89:4 94:22 |
| 30:19 | **testify** 12:19 | 141:22 146:7 | 97:9 100:4 |
| **tell** 24:8 29:1 | 218:1 | 159:19 163:10 | 102:1 103:15 |
| 31:25 33:16 | **testifying** 37:12 | 163:13 178:25 | 103:20 104:12 |
| 45:19 61:25 | 274:9 278:20 | 196:9 198:24 | 107:12 109:11 |
| 117:13 145:24 | 294:7 | 199:3 215:15 | 112:21 117:17 |
| 148:9 189:7,17 | **testimony** 11:6 | 232:4,8 233:8 | 118:11,11 |
| 197:18 222:11 | 33:17 38:1 | 238:24,24 | 122:9,10,21 |
| 226:1 227:1,7 | 39:1 160:1,5 | 245:6 255:6 | 123:18,19,20 |
| **telling** 121:24 | 224:8 233:13 | 256:6,18 | 124:3 125:9 |
| 121:25 130:6 | 233:17 261:8 | 287:21 | 126:18,19 |
| 184:8 237:5 | 265:14 277:22 | **think** 12:21 | 127:14,14 |
| 240:1 | 292:6 293:4 | 14:11 18:11 | 130:7 132:2,3 |
| **tells** 115:11 | 294:11 | 23:4 25:11 | 132:3 133:22 |
| 188:10 281:16 | **testing** 47:9 | 26:15 29:14 | 134:2 135:16 |
| **ten** 241:1 | 211:20 | 32:13 37:14 | 138:12,24 |
| **term** 47:21,24 | **thank** 10:24 | 38:6,6 44:23 | 139:6 142:11 |
| 181:11 227:8 | 17:14 89:18 | 45:19 46:5,11 | 142:24 143:4 |
| 227:11,14 | 155:4 276:5 | 47:2,14,20,20 | 143:24 144:12 |
| 228:9 233:20 | 291:3 | 50:18 51:16 | 147:7 151:7 |
| **terminology** | **thanks** 99:25 | 52:4,5,6,8 | 152:22 155:17 |
| 101:24 | 100:9 118:9 | 53:15,19 55:8 | 155:19,20 |
| | 172:5 190:21 | 55:10 56:15,18 | 157:4,7 159:13 |

**[think - told]**

| | | | |
|---|---|---|---|
| 160:25 161:2 | 264:24 265:8 | 242:20 243:20 | 200:9 209:3 |
| 162:1,1 168:22 | 266:4 267:25 | 270:10,20 | 219:19,23,24 |
| 171:2,6 172:24 | 268:6,19 | 275:8 278:5,22 | 220:2,5,8,12 |
| 173:17 175:6,8 | 270:23 275:5 | 280:1,19,20 | 230:2,7 244:10 |
| 175:8,16,18,18 | 275:10 280:2 | 281:8,14,16 | 259:8 261:5 |
| 175:20,23,24 | 281:2 282:8 | **thought**  21:17 | 266:13,15 |
| 176:13,17,17 | 283:4 285:12 | 61:13 73:1,1 | 269:17,22 |
| 176:22 182:16 | 285:19,20 | 79:13 112:23 | 272:11 283:9 |
| 184:24 185:7,9 | 287:6,7,16,16 | 282:23 284:7 | 283:12 289:6 |
| 185:11 190:9 | 287:18 288:6 | 288:19,25 | 292:3,10 294:5 |
| 192:18,18 | 288:21 289:3 | **thousand**  14:14 | 295:10,18,24 |
| 194:18 196:11 | 289:15,16,17 | 63:9,17,19 | 296:7 |
| 199:15 204:12 | 289:19,19 | **three**  14:17 | **times**  12:17 |
| 206:1,10,11,13 | 290:19,19,20 | 15:25 65:3 | 15:12,24,25 |
| 206:13,14 | 290:22 291:13 | 142:11 205:18 | 55:12,13 58:3 |
| 207:25 210:20 | **thinking**  160:4 | **throws**  249:6 | 63:9,17,20 |
| 211:2 213:20 | 162:11 173:23 | **thursday**  1:15 | 133:4 |
| 215:6,8 216:17 | 233:25 283:1 | 2:18 9:1 | **titled**  139:8 |
| 220:9 221:22 | **third**  57:22 | **tie**  124:10 | 178:4 |
| 222:6,6,22 | 58:1 59:9,11 | **tied**  17:8 | **today**  12:9,19 |
| 226:21 229:19 | 62:1,7,10,10,12 | 210:21 | 12:24 13:5 |
| 231:16,16,20 | 62:16,22 71:8 | **time**  9:10 10:5 | 14:20 26:18 |
| 233:23,23,25 | 112:2 125:20 | 10:21 14:9,11 | 36:20 39:1 |
| 233:25 236:13 | 146:21 156:9 | 15:15 19:3,9 | 55:12 220:10 |
| 236:13,22 | 158:17 181:23 | 22:5 57:17 | 246:19 270:7 |
| 237:12 238:4 | 184:5 202:14 | 61:15,18 62:5 | 271:5 273:1 |
| 238:12 240:13 | 202:20,22 | 68:19 70:14 | 275:16 |
| 241:24 242:23 | 203:2,14,18 | 71:14,19 73:3 | **today's**  292:6 |
| 243:13 250:6,8 | 206:9,23 | 73:5 93:11,14 | **together**  14:12 |
| 251:5 255:22 | 208:16 211:12 | 93:16 110:8,13 | 83:19 |
| 258:6,6,14,15 | 211:18,24 | 142:2 144:5,10 | **told**  100:15,20 |
| 259:21 260:3 | 228:18 235:5 | 144:18,23 | 107:16 124:13 |
| 261:3,4,9,15,19 | 235:14 238:1,9 | 151:17 156:15 | 127:10 186:24 |
| 262:4,22,22 | 239:14 240:7 | 156:18 160:8 | 190:24 222:15 |
| 264:9,21,23,23 | 240:17,18,19 | 174:3,8 200:4 | 223:12 224:1,5 |

Page 64

**[told - trouble]**

| | | | |
|---|---|---|---|
| 226:4 227:16 | **tracker** 62:2,8 | **tracks** 119:7 | 255:17,19 |
| 229:11 268:23 | 62:12 71:2,2,9 | 182:1 185:8,8 | 258:7,8,8,11 |
| 268:24 269:1 | 74:17 76:22 | 185:10,11 | 260:18 285:9 |
| 277:16 281:9 | 78:5,25 79:23 | **traffic** 24:13 | 285:13 |
| **took** 77:16 | 81:22 85:15,25 | 81:20 88:6 | **transactions** |
| 135:11 153:14 | 86:7 137:25 | 93:20,21 | 41:21 44:5,8 |
| 173:18 | 138:5 139:10 | 120:17 141:12 | 45:4 46:12 |
| **tool** 180:6 | 169:5 191:13 | 161:24,25 | 234:11 244:10 |
| 188:3,6,8 | **trackers** 57:22 | 163:6,15,25 | 245:12,22 |
| 195:23 | 58:2 62:14,16 | 164:1,18,19 | 246:4,11 |
| **top** 66:9 87:5 | 62:22 275:8 | 165:1,8 166:7 | **transcribed** |
| 171:23 177:20 | 280:1,20 | 166:7,18,20 | 294:10 |
| 254:11 | **tracking** 23:3 | 168:16 170:20 | **transcript** |
| **topic** 35:3 | 24:2 28:20 | 170:20,21,22 | 159:25 292:4 |
| **total** 22:12 | 29:2,7 50:17 | 170:22,23,23 | 293:3 294:11 |
| 70:20 83:24 | 88:8 89:24 | 170:25 171:3,3 | 294:13,15 |
| 87:15 89:16 | 90:6,9 104:15 | 171:4,21 206:3 | 295:6,8,10,13 |
| 120:13 144:21 | 104:16 105:3 | 206:7,12,14,16 | 295:13,21 |
| 206:7 292:8 | 119:2,14 | 206:17,22 | 296:2,2 |
| **totality** 258:11 | 171:13 177:5 | 207:3,4 228:1 | **translated** |
| 261:2 | 182:23 183:14 | 228:3,10 | 114:9 |
| **track** 50:2,14 | 183:16 186:5,6 | **transaction** | **transmit** |
| 62:1 104:17 | 200:24 201:1 | 42:18 47:2,3,5 | 285:12 |
| 119:15 184:17 | 202:7,8 203:4 | 47:13 48:2 | **transmitted** |
| 184:19 185:2,2 | 203:10,19,21 | 52:17 53:6,24 | 285:1,2 |
| 185:6 192:20 | 204:1 205:17 | 54:1 60:8 | **trial** 37:11 38:3 |
| 192:22 193:6 | 207:17,18,20 | 64:22 67:3 | **trick** 160:12 |
| 197:2 201:23 | 207:22 208:5 | 134:11,16 | 222:1,7 237:4 |
| 202:2 203:2 | 208:13,15,24 | 135:4 235:16 | 237:7 |
| 216:19 241:20 | 208:25 210:16 | 236:19 244:7 | **tried** 55:4,5 |
| 270:20 275:5 | 210:17,19 | 244:19,20 | 100:8 176:7 |
| 278:5 | 211:17 234:17 | 245:13,14,16 | **trillion** 262:24 |
| **tracked** 71:7 | 270:10 271:2 | 247:8 249:10 | 263:1,8 |
| 270:15 | 274:15,24 | 249:24 253:5 | **trouble** 40:12 |
| | 275:9 280:2,20 | 254:16,18,21 | 282:1 |

**[true - understand]**

true  64:17
94:14 101:14
157:12,13
187:19 189:15
192:11 293:5
294:11
**trustworthiness**
78:2
**truth**  11:8,8,9
100:15,20
**truthfully**
12:19 20:14
**try**  37:9 43:19
50:19,25 84:25
93:15 117:16
119:25 120:22
123:25 159:1
167:3,12,17
197:23,25
257:19 279:1,2
**trying**  51:24
52:16 55:14
58:16 83:8,13
86:20,20 99:22
99:24 106:16
107:1,11,25
108:2 111:10
129:13 134:10
138:12 141:6,8
160:12 171:7
171:15 196:12
198:21 199:1
199:17 200:16
212:22 219:20
222:7 237:4,7

240:10 241:16
245:20 249:9
249:23 250:18
250:24 251:13
258:2 268:22
273:2,4
**turned**  54:21
74:24 100:21
101:4 104:1
113:17 123:16
124:9 154:10
229:22 283:16
**turning**  54:18
54:18
**turns**  20:10
98:9 136:7
143:24 209:2
**twice**  15:14
220:10
**two**  14:17 23:4
23:6 43:1 47:1
81:18 82:15
86:24 87:4
95:12,14 96:15
97:10 103:11
109:16 141:22
163:9 176:24
191:11 195:7,7
233:8 238:17
246:6,6 287:13
**twofold**  36:13
**type**  38:13 42:9
45:11 72:19
90:17 170:12
179:22 182:21

258:12
**types**  30:21,22
90:21 180:13
182:2,5,14
198:11

| u |
| --- |

**u.s.**  154:14,20
154:25 155:5
174:15
**uh**  85:8,11
156:19 181:1
227:23 236:21
288:5
**ultimate**  207:6
225:3 258:10
**ultimately**  29:9
61:13 68:16
117:25 122:6
162:21 219:6
254:20 255:19
257:9 260:18
**uncomfortable**
199:24
**under**  11:6
50:9 78:20
82:4,8 84:21
84:22 87:14
101:25 104:10
104:10,13,13
111:23 117:19
117:23,23
205:18 211:4
213:13 243:23
267:5 268:20
268:24 269:4

293:2 294:10
**undercompen...**
56:12
**underlies**  140:1
140:6
**underlying**
139:20 206:11
**understand**
20:2,3,5 26:11
29:16 33:2
34:12 42:22
51:23 52:8
55:14 58:16
72:1,13 74:4
74:22 76:7
83:7 84:12
85:24 88:1
90:14 94:2,22
97:11 99:16,17
103:21 105:20
106:16 107:4,9
107:11 108:18
110:20,22
112:20 116:2,5
117:1 120:25
125:25 131:20
135:19 136:15
138:8,11,14
139:12 144:14
146:1,6,11,22
151:21 154:1
159:10 160:17
161:2,8 163:4
164:8 165:5
175:6,9,22,23

**[understand - use]**

| | | | |
|---|---|---|---|
| 176:6,13 177:1 | 101:10,19,25 | 270:22 272:7 | 271:1 273:3,13 |
| 177:4 178:8 | 102:22 104:4,9 | **understands** | 273:20 276:18 |
| 189:1 192:4 | 104:25 105:16 | 128:5 | **unlawful**  104:8 |
| 193:18,20 | 108:18 111:1 | **understood** | 194:8 198:23 |
| 194:4 195:18 | 111:10,25 | 85:25 86:7 | 203:9 213:6 |
| 198:18 199:1 | 112:6,9,14 | 110:3 120:20 | **unpersonalized** |
| 202:19 205:24 | 114:11 116:12 | 148:23 155:25 | 79:22,24 |
| 207:23,24 | 119:6 128:3 | 202:4 270:8 | **untouched** |
| 208:7,9 213:14 | 132:9 134:17 | **undertake** | 213:13 |
| 214:3 215:14 | 134:17 135:7 | 221:14 | **untracked** |
| 219:21 221:8 | 137:8 146:8 | **unfair**  229:23 | 275:4 |
| 221:12 247:14 | 147:19,20 | **unfortunately** | **unwilling**  51:14 |
| 249:9 254:15 | 148:12,17 | 173:20 | 51:25 52:12 |
| 255:14 263:3 | 149:17 150:24 | **uniform**  64:4 | 54:11,19 67:9 |
| 268:20 269:3,5 | 154:12,16 | **unimportant** | 68:10,13 |
| 270:17 273:11 | 155:22,23 | 195:10 | 253:23,25 |
| 278:20 279:19 | 156:11 157:9 | **unit**  9:13 | 259:15,18 |
| 287:7 | 160:16 176:5,8 | **united**  1:1 2:1 | **uphold**  147:6 |
| **understanded** | 177:11,12 | 9:16 | **usage**  62:13,17 |
| 86:21 | 182:9,15 183:1 | **universe** | 64:12 170:11 |
| **understanding** | 183:9,19 186:1 | 121:24 | 239:22 |
| 29:24 30:2 | 186:4 188:4 | **university**  6:8 | **use**  34:7 46:22 |
| 32:1,5,11,13,18 | 189:25 190:19 | **unjust**  17:10 | 51:11 60:9,10 |
| 32:22 33:5,9 | 194:10,12 | 20:8 41:17 | 72:17 75:10,11 |
| 33:11,17 34:14 | 196:12 200:25 | 74:11 79:19 | 76:6 78:17,24 |
| 34:21 35:16,25 | 201:20 207:15 | 80:6,9,21 | 79:22 94:5 |
| 36:10,12 38:23 | 210:1 211:8,14 | 81:11 83:9 | 96:5,7,19 |
| 44:9 46:1 | 211:21 212:4 | 87:9 94:24 | 100:9,16,21 |
| 50:21 58:5 | 225:2,5,14,21 | 95:6,23 96:17 | 101:5 106:13 |
| 69:23 77:11 | 226:19,24 | 96:25 97:12 | 106:19 119:1,2 |
| 78:16,23 79:8 | 228:5 229:15 | 99:23 103:22 | 119:8,15,22 |
| 79:16,16 80:16 | 231:11 234:22 | 107:22 109:7 | 131:12 134:13 |
| 82:11,19 84:20 | 235:1 241:13 | 110:15 111:23 | 135:5 136:8 |
| 91:14,23 94:8 | 243:18 247:17 | 114:23 120:10 | 140:3 147:18 |
| 96:16 99:15,20 | 248:5 249:11 | 129:1 151:4 | 157:16 164:11 |

Page 67

**[use - users]**

| | | | |
|---|---|---|---|
| 171:11 178:4 | 132:14 133:13 | 240:15,16 | 126:1,7 127:5 |
| 178:20 181:10 | 134:20 138:5 | 242:7 243:21 | 133:18 136:21 |
| 183:12 184:8 | 161:5,11 | 243:21 244:6 | 137:24 140:17 |
| 185:5,15 | 179:10,11,14 | 245:25 247:1,2 | 140:24 141:10 |
| 186:24 187:15 | 179:18,20,21 | 247:9,10,22 | 146:12 147:18 |
| 188:8 190:21 | 188:21,24 | 248:13,14,17 | 148:11 151:5 |
| 191:9 193:6 | 190:5,12,14,15 | 251:1,9 256:16 | 155:18,21,24 |
| 195:14 197:1 | 190:17 192:20 | 257:17 263:18 | 155:24 156:8 |
| 197:18,20 | 195:11 208:3 | 280:25 | 157:16,16,25 |
| 208:22 211:16 | 216:17,18 | **user's** 72:8 | 158:10 159:2 |
| 212:11,14 | 233:20 235:3,4 | 106:7,19 108:7 | 163:14 164:17 |
| 214:11 216:5,6 | 235:12,13 | 150:25 151:23 | 164:17,19,20 |
| 216:16 218:6 | 236:25 238:7 | 238:13 244:9 | 164:21 165:15 |
| 220:5,8 221:20 | 251:3 292:8 | **users** 61:3 | 167:22 168:14 |
| 228:24 234:5 | **useful** 149:5 | 64:14,19 65:6 | 168:16,20,25 |
| 234:24 235:24 | **user** 42:1 61:8 | 68:5 73:22 | 169:13,23 |
| 236:4,5,8 | 64:11 73:15 | 74:25 77:25 | 170:5,11 171:9 |
| 237:1,2,25 | 77:6,9 82:21 | 79:17 80:3,7 | 171:18 175:20 |
| 238:1,8,14,23 | 84:1 100:21 | 80:10,24 81:3 | 186:25 190:15 |
| 239:2,20 | 101:9,10,12 | 81:7 82:18 | 198:6,6 201:2 |
| 241:14 244:21 | 104:1,23 | 83:11 84:19 | 213:24 214:24 |
| 245:2,18 | 108:22 112:17 | 86:1,2 88:6 | 215:17,23 |
| 247:10 248:18 | 112:23 114:18 | 89:23 91:11 | 217:11,14 |
| 248:19,20,24 | 115:20,24,24 | 101:3 106:9 | 218:4 219:4,8 |
| 249:4 250:14 | 120:6 136:1,7 | 110:23 111:6 | 219:11,15 |
| 251:21 252:1,6 | 141:3 150:10 | 111:22 112:2 | 220:18,22 |
| 252:22 253:16 | 150:16,19,20 | 112:17 113:4,5 | 221:9,17 |
| 255:12 264:10 | 156:20 157:18 | 113:6,9,22,23 | 245:17,25 |
| 274:16 275:19 | 158:15 170:12 | 114:18 115:7 | 248:8,9 251:5 |
| 279:2 285:13 | 181:24 228:20 | 115:15,15 | 251:6 253:24 |
| 287:13,21 | 228:21 236:15 | 116:23 117:14 | 256:12 260:6 |
| **used** 29:7 75:6 | 236:24 237:17 | 120:12 121:5,5 | 263:18,23,25 |
| 75:9,21 94:1 | 237:21 238:5 | 121:6 123:15 | 263:25 264:1,7 |
| 96:13 120:14 | 238:15 239:12 | 123:19 125:4 | 264:9 271:7,11 |
| 130:22 132:14 | 239:20 240:5 | 125:15,19 | 271:15,21 |

Page 68

**[users - wait]**

272:3,10 274:3
274:25 276:21
277:2,4,7
285:10 291:21
**uses**  136:8
177:5,6 185:12
186:23 235:17
239:15 242:21
**using**  60:22
68:15 75:25
76:3 82:13
83:19 97:18,24
104:24 107:18
109:21 110:17
145:1 156:15
156:20 157:25
164:25 184:17
188:3,6 202:3
203:2,13
208:18,18
212:19 213:1
213:10,18
217:14 234:6
235:18,22
236:16 237:3
239:18,23
243:22 246:1
252:10 255:5
274:14 289:5
290:23 294:9
**usually**  287:13

**v**

**v**  295:4 297:1
**vague**  39:11
79:11 108:23

150:1 200:18
272:6 274:20
275:13 287:4
**validate**  74:13
**valuable**
246:19
**valuation**  47:11
**value**  42:17,17
43:15,23,25
46:19 47:16,18
47:19,21 48:1
48:6,11,19,23
49:3,7,10,12,14
49:16 50:7,21
50:22 51:7
63:24 64:1
65:3 68:24
79:1,2 81:10
81:14,15 83:11
83:16 84:1
87:11 117:17
119:1 149:5
233:21,24
234:5,5 239:17
240:9,10,21
241:5 242:15
242:21 244:17
244:20,22,24
244:25 245:2
245:10,11,19
259:23
**valued**  246:16
**values**  162:20
238:15

**valuing**  46:13
46:15,18,19
47:8 48:2,3
**variable**  211:20
**variance**
286:25
**varies**  285:16
287:9
**variety**  67:6
139:24 209:15
**various**  17:7
24:16 25:15
50:12,15
**vary**  92:19
286:9,14,17
287:1,8
**veritext**  9:23,25
292:9 295:7,9
295:11
**version**  16:22
146:3
**versions**  245:7
**versus**  9:15
30:6 32:8 79:2
79:4 90:12
132:11 144:21
144:21 226:4
253:23 262:23
262:24
**vice**  6:11
**video**  1:13 9:10
9:14
**videographer**
5:22 9:5,23
10:20,24 71:13

71:17 110:7,10
144:4,7 174:2
174:5 200:3,6
230:1,4 266:15
269:16,19
283:8,11 292:1
292:5
**view**  51:17 52:7
52:9 243:8
281:19
**viewed**  165:2
**visit**  272:10
**voice**  35:21
**volume**  1:16
7:3
**vs**  1:6 2:6

**w**

**waa**  54:21 61:3
61:3 71:6,22
71:25 72:5
82:13 86:14
100:22 106:3
161:24 163:6
164:17,17,19
164:20,21
168:24 172:12
172:17 173:1,6
181:10 218:7
237:14 253:24
273:16,22
275:10 277:7
278:6,16 280:3
281:20
**wait**  88:14,15
95:25 140:12

Page 69

**[wait - works]**

152:22 163:22
241:5
**waived**  295:23
295:23
**waiving**  295:20
**wand**  171:10
**want**  18:18
37:17 43:17
44:18,25 54:17
56:20 61:22
71:21 72:9
82:2,8 87:24
88:16 103:8
105:20 107:1,7
107:13 110:20
116:4,7,8,9,15
116:18 137:11
140:13 141:2
144:14 171:4
189:8,9 196:14
199:23 220:13
221:12 230:8
231:23 237:12
238:6 239:2
241:1 254:5
255:21 256:2
273:11 274:11
283:5 284:12
288:22
**wanted**  45:6
284:6
**wants**  121:2
185:5 272:5
**warm**  174:1

**warming**
173:20
**warning**  45:1
**warty**  6:14
**washington**
1:23
**wave**  171:10
**way**  18:1 37:10
38:7 41:5,8
73:19 74:1
83:22 84:5
86:6,20 99:14
101:1 104:17
124:20 133:14
135:12 136:17
141:17 142:3
146:13,14
148:13 149:24
161:5 164:2,3
164:7 167:17
183:17 184:1
184:20 196:25
208:17 213:3
223:6 225:18
233:20 234:2,2
237:13 245:5,5
257:1,20
278:16 279:1
283:4 287:18
**ways**  116:6
209:15,24
213:2 255:1
**we've**  16:21
26:22 35:7
38:8 65:10

70:24 94:3
103:6 106:4
169:5 173:16
204:6 229:5
**web**  3:13 4:5,6
4:16 5:6 6:3
72:5,5,14
106:3 108:7
201:9 209:14
210:4,11 211:6
228:21 255:3
289:20 290:22
290:22 291:14
**website**  114:13
116:14 177:15
177:24 178:2
228:18
**week**  23:12,13
**weigh**  69:25
**weighed**  70:19
**weird**  249:18
**went**  37:10
59:8 70:18
121:17,17
**whereof**  294:19
**whispering**  9:8
**wider**  254:17
**willing**  42:1
50:22,23,24
51:2,12,25
52:13,17,17,19
53:1,3,4,7,23
54:6,10,10,22
67:8 69:18
120:4 124:17

239:5 242:2
251:1 253:23
259:14 264:3
**willingness**
263:19,20
**willkie**  2:15 5:4
6:13 10:13
**willkie.com**
5:12,13 295:2
**withdraw**
73:18 101:1
222:13
**witness**  11:1
17:18 268:23
269:14 294:19
295:13,16
296:2,5 297:24
**witnesses**  294:6
**word**  72:23,25
149:2,2 213:1
**words**  54:5
149:4 231:19
280:24
**work**  14:1
31:13,14 33:13
33:14 44:13,17
45:17 119:11
127:15 149:24
**worked**  44:8
45:4,17
**working**  98:7
**works**  14:25
15:7 32:14
33:5 34:6
70:16 107:24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[works - yup]**

149:24 201:18
**world** 82:25
83:10 96:12
97:16 98:20
99:7 104:19
109:24 110:16
110:23 112:22
114:24 115:6
118:8 124:13
125:14,17,18
125:22 126:12
129:7,15,18,22
129:23,24
130:1 131:11
132:11,12,13
132:15,18
134:8,18 135:8
146:22 149:23
189:2 213:17
214:9 218:25
219:2 243:8
272:1,16
273:19 274:2
274:18
**worried** 76:3
160:11 233:4,8
233:9 288:16
**worthless**
69:15,17
**write** 72:21
167:24,25
222:5
**writing** 73:3,9
**written** 278:16

**wrong** 20:20
86:4 97:8
152:12 160:10
227:20 262:21
**wrongful** 24:25
63:6,9 95:7
**wrote** 72:24

| x |
| --- |

**x** 7:1,10 8:1
294:15 296:9

| y |
| --- |

**yanchunis** 4:6
**yeah** 35:10
44:20,24 45:25
46:7,17 47:20
61:20 64:3
70:5 73:20
83:21 85:12
86:5 88:18
93:5 95:20
97:6 103:10,11
107:15 108:15
127:14 135:18
139:4 143:4
144:3 153:25
155:5 160:12
160:24 163:12
167:13 168:15
173:17 175:12
175:14 176:10
178:12 185:20
196:16 197:19
206:2 207:24
235:24 243:13

244:15 278:1
288:16
**year** 15:9
153:15 155:7
169:12,17
181:11 212:10
212:11
**years** 145:2,4
154:13,19,20
155:12 198:16
**york** 4:19,19
6:8
**youtube** 139:9
139:17,18
169:18 170:5
**yt** 169:16,23
**yup** 143:15,17
172:10 174:17
230:15

Page 71

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.