Pages 1 - 78

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,        )
                                 )
            Plaintiffs,          )
                                 )
   VS.                           )     NO. C 20-04688 RS
                                 )
GOOGLE, LLC,                     )
                                 )
            Defendant.           )
_____   )

                         San Francisco, California
                         Thursday, October 5, 2023

                 **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    BOIES, SCHILLER & FLEXNER LLP
                    44 Montgomery Street - 41st Floor
                    San Francisco, California  94104
            BY:  **MARK C. MAO, ATTORNEY AT LAW**

                    BOIES, SCHILLER & FLEXNER LLP
                    100 SE 2nd Street - 28th Floor
                    Miami, Florida  33131
            BY:  **JAMES LEE, ATTORNEY AT LAW**

                    MORGAN & MORGAN
                    201 North Franklin Street - 7th Floor
                    Tampa, Florida  33602
            BY:  **JOHN A. YANCHUNIS, ATTORNEY AT LAW**

         **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

```
 1   APPEARANCES:  (continued)

 2                          BOIES, SCHILLER & FLEXNER LLP
                            725 South Figueroa Street - 31st Floor
 3                          Los Angeles, California  90017
                       BY:  M. LOGAN WRIGHT, ATTORNEY AT LAW
 4
                            SUSAN GODFREY, L.L.P.
 5                          1301 Avenue of the Americas - 32nd Floor
                            New York, New York  10019
 6                     BY:  RYAN SILA, ATTORNEY AT LAW

 7   For Defendant:
                            WILLKIE FARR & GALLAGHER LLP
 8                          One Front Street - 34th Floor
                            San Francisco, California  94111
 9                     BY:  BENEDICT Y. HUR, ATTORNEY AT LAW
                            ARGEMIRA FLOREZ, ATTORNEY AT LAW
10                          EDUARDO E. SANTACANA, ATTORNEY AT LAW
                            NOORJAHAN RAHMAN, ATTORNEY AT LAW
11                          SIMONA A. AGNOLUCCI, ATTORNEY AT LAW
                            HARRIS MATEEN, ATTORNEY AT LAW
12

13

14   REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                    United States District Court - Official Reporter
15

16

17

18

19

20

21

22

23

24

25
```

<u>**Thursday - October 5, 2023**</u>                              <u>**1:28 p.m.**</u>

## <u>P R O C E E D I N G S</u>

---oOo---

**THE CLERK:**  Calling case 20-CV-4688, Rodriguez versus Google.

Counsel, please come forward and state your appearances.

**MR. MAO:**  Good afternoon, Your Honor, Mark Mao, Boies Schiller Flexner, for the Plaintiff.  And with me is -- are my colleagues James Lee, Mr. -- sorry, Mr. Yanchunis from Morgan and Morgan, Mr. Ryan Sila over at Susman Godfrey, and also my colleague Logan over at Boies Schiller Flexner.

**THE COURT:**  Good morning or good afternoon.

**MR. HUR:**  Good afternoon, Your Honor, Ben Hur from Willkie Farr & Gallagher for Defendant Google.  I'm here with my colleagues Simona Agnolucci, Eduardo Santacana, Noorjahan Rahman, Argemira Florez and Harris Mateen.

Mr. Santacana will be handling the argument this afternoon.

**THE COURT:**  Good afternoon.  Let me start on -- I don't mean to start on a sour note, but I'm compelled to bring this up.

Sealing, one of my least favorite things.  You know, the rule in the Ninth Circuit is quite clear that sealing is very limited.  It is limited to sensitive personal information, real trade secrets, social security numbers, things of that nature.

1  It is not, simply what parties would prefer, is not publicly

2  out there.

3       And it is really frustrating for -- on the Court's side of

4  things when people just seal everything and don't go through

5  the process of really trying to explain why certain things need

6  to be sealed.

7       In this case an entire, as I understand it, expert report

8  was sealed.  Well, that's ridiculous.

9       So, what I'm going to do is I'm going to deny all of the

10 sealing requests, but I will give you a chance to come back and

11 give me an appropriate request limited to really appropriately

12 sealed material with an explanation.  And you all know it

13 cannot be "Well, the parties have designated this as highly

14 confidential."  That is expressly disfavored as an argument.

15      And so, I will let you have another chance at it.  My

16 colleague Judge Hamilton just denies all sealing requests.  And

17 I have to say the more I deal with this, the more I find that

18 an attractive option.

19      But you have got to start over again.  I'm not going to

20 spend the time to try to glean really what is appropriately

21 sealable or not.

22      So, it also makes it very difficult for me to write an

23 order on some of these when vast swaths of this are sealed.

24 So, we leave it there okay.

25         **MR. SANTACANA:**  Sure, Your Honor.  I just wanted to

1    clarify one point.

2         **THE COURT:**  Yes.

3         **MR. SANTACANA:**  So I think there may be a

4    misunderstanding.  We -- in furtherance of sealing as little as

5    possible, we filed a stipulation with the Court so that we

6    could take a little bit more time to make sure we were only

7    sealing what was absolutely necessary.  So there is no pending

8    sealing request, I think, at this point.

9         **THE COURT:**  I thought there was a sealing request from

10   the Plaintiffs, wasn't there?

11        **MR. SILA:**  Your Honor, I think that our only sealing

12   request was on behalf of Google's confidential material which

13   we wanted to allow Google the time to go through the

14   necessary --

15        **THE COURT:**  All right.  Great.

16        **MR. SILA:**  So we will take your words to heart and

17   make our submissions.

18        **THE COURT:**  All right.  Okay.  So I don't need to deny

19   anything but the admonitions hold true.  I want a very limited

20   sealing.

21        **MR. MAO:**  Understood, Your Honor.  Thanks.

22        **MR. SILA:**  Thank you.

23        **THE COURT:**  Now, let me talk a bit about the motions

24   that are pending.  We have a motion to certify.  Then we also

25   have a Daubert motion to exclude Mr. Lasinski.

1          As to the second motion, while the Defendants have

2   identified, you know, various areas that are ripe for robust

3   cross-examination, my view is that what the expert is offering

4   is not beyond the pale as to warrant closing the gate.

5          So, you know, certainly I will let the Defendants have an

6   opportunity to say what they want; but to give you the benefit

7   of my tentative views, I think almost -- I think the arguments

8   you make are arguments as to where you think there are problems

9   that you can elucidate on cross-examination, but it is not a

10  Daubert problem in my view.

11         As to the motion to certify, the principal battle, as is

12  often the case, seems to go to whether Plaintiffs have

13  sufficiently demonstrated under (b)(3) whether or not common

14  issues will predominate with respect to the two classes that

15  they propose.

16         Candidly my view is that they have done so, but the

17  parties can focus on that question in our discussion.

18         Because I'm inclined in favor of the Plaintiffs, let me

19  let the Defendants start.

20         I recognize the Plaintiffs have the burden, at least the

21  initial burden with respect to class cert.  But that said, let

22  me go ahead and let the Defense start the process.

23              MR. MAO:  Sorry, Your Honor.  May I ask?  Do you want

24  to know who is going to be arguing?

25              THE COURT:  Not particularly.

1        **MR. MAO:**  Okay.  Thank you, Your Honor.

2        **THE COURT:**  So, go ahead.

3                      (Pause in proceedings.)

4        **THE COURT:**  And it's okay to have PowerPoints or that.

5   I don't like PowerPoints in arguments.  I know it is

6   antiquated, perhaps, approach because this is not a lecture.

7        So I will let you use them.  But for future reference,

8   don't give me PowerPoints on every argument that we have.  I

9   don't prefer them.

10       **MR. MAO:**  Your Honor, may I just -- just make a real

11  quick record, which is that we provided our PowerPoint about an

12  hour or 45 minutes before the hearing so that they had a chance

13  to examine that.  We were literally just handed that, so I have

14  not had --

15       **THE COURT:**  That's precisely why I don't like these

16  PowerPoints.

17       **MR. MAO:**  I understand.

18       **THE COURT:**  I don't want to have a fight about the

19  PowerPoints in this.  This is a motion argument.  This is a

20  back-and-forth about these issues.  It's not, you know, a claim

21  construction where people are going through -- and no one has

22  ever in my experience gone through their whole thing because I

23  stop them and ask questions.

24       So I'm not going to entertain any discussion about you

25  guys fighting about a PowerPoint.  I don't care.

1          **MR. MAO:**  Understand.

2          **THE COURT:**  So, we will put that aside.  Okay.  Go

3    ahead.

4          **MR. SANTACANA:**  Good afternoon, Your Honor.  And just

5    to clarify, you want me to shut off the PowerPoint or --

6          **THE COURT:**  If there are specific things you want to

7    show me, do that and that's fine.

8          **MR. SANTACANA:**  Just a couple of screenshots.

9          **THE COURT:**  People show me exhibits and that's okay.

10   What I don't like is people saying:  "Okay, now we are going to

11   go through the lecture."  That I don't like.

12         **MR. SANTACANA:**  I wouldn't presume to lecture you,

13   Your Honor.

14         **THE COURT:**  Okay.  Go ahead.

15         **MR. SANTACANA:**  So, Your Honor, I understand your

16   tentatives, so I would like to walk through the main critical

17   reasons why we think predominance is lacking here.

18         **THE COURT:**  Okay.

19         **MR. SANTACANA:**  This case is not like any of the other

20   cases cited in the parties' briefs in that encompasses the use

21   of analytics and ads products by one-and-a-half million apps

22   and a hundred million people virtually.

23        And the theory of the case that Plaintiffs are pressing

24   now is not the theory of the case that Your Honor allowed to

25   proceed at the motion to dismiss stage.

1     So I want to make sure we are all clear on that they need

2   to prove at a class trial if the class were to be certified.

3     They are arguing that the expectations that Google set up

4   with the WAA button were uniform and that Google's technology

5   contravened it, regardless of what each app told its users

6   about how the technology would be implemented, regardless of

7   how those apps actually implemented the technology, regardless

8   of how each user behaved in the apps that they were using or

9   even the types of apps that they were using, and regardless of

10  how or even whether Google used the data at all.

11    At the start of the case the allegation was that Google

12  was building marketing profiles with data collected from WAA

13  off.

14    We are now at a point where the claim is --

15    **THE COURT:**  Is there any question that Google is

16  treating different customers differently?  I mean, in other

17  words -- again, our focus has got to be what's going to rise or

18  fall on a class basis, not whether or not they have good

19  arguments.

20    They may fail at summary judgment or various other points

21  along the path.  Why aren't we going to get classwide answers?

22  That's what's not clear to me.

23    **MR. SANTACANA:**  Okay.  Well, I'm happy to walk through

24  that, Your Honor.  The classwide answers are the first place I

25  would start are on the question of consent.

```
 1        And a number of the courts in this district have held that
 2   express or implied consent can become problems for
 3   predominance.
 4        THE COURT:  Judge Gonzalez Rogers did.  Who else has
 5   done that?
 6        MR. SANTACANA:  So on the consent question I would
 7   point Your Honor not just to Judge Gonzalez Rogers.  I would
 8   point you to the Google/Gmail case that Judge Koh decided in
 9   2014.
10        In that case she certified some subclasses, but she
11   refused to certify the one where universities were using
12   Google's Gmail technology branded as their own e-mail for their
13   students because the universities were making their own
14   disclosures as required by --
15        THE COURT:  Let me ask you:  Who is -- the consents we
16   are talking about, just so we are clear, are they consents with
17   respect to Google or the third parties?  Whose consents are you
18   talking about?
19        MR. SANTACANA:  The consent that will be an
20   individualized inquiry is the consent that end users gave for
21   the use of an app developer -- the app developer using Google's
22   technology, right, to send Google data.
23        THE COURT:  Right.  And your contention is that they
24   are consenting implicitly or explicitly to the third parties or
25   to Google?
```

1      **MR. SANTACANA:** To both actually. So I don't think

2  there is actually a dispute in the case that the class did

3  consent to the underlying conduct, which is keeping records of

4  advertising and keeping basic records of conversions, servicing

5  analytics accounts.

6      The --

7      **THE COURT:** Let me stop you there. On that: Why

8  isn't that a classwide question, whether or not the consents

9  effectively get you off the hook or don't?

10      **MR. SANTACANA:** That question -- that question can be

11  a classwide question, but that's not the theory of the case.

12      The theory of the case is that even though they gave those

13  consents, they subsequently turned (s)WAA off which they say by

14  conduct revoked their consent.

15      And they argue that we should read that WAA -- that WAA

16  button as undoing the consent they had given in --

17      **THE COURT:** Isn't your reaction to that undoing

18  classwide?

19      **MR. SANTACANA:** No.

20      **THE COURT:** You are not taking particular customers

21  and saying we are going to treat them this way and other

22  customers a different way with respect to the consent question,

23  are you?

24      **MR. SANTACANA:** By "a customer," you are referring to

25  app developers?

1          **THE COURT:**  Yes.

2          **MR. SANTACANA:**  So, I guess I don't totally understand

3  your question.

4          **THE COURT:**  Well, what I'm trying to understand is

5  again this classwide idea.  You're contending that this

6  vitiating of consent, which you say they are now -- they turn

7  on the off button and then they say that's being ignored;

8  correct?

9              **MR. SANTACANA:**  They say that.  That's right.

10          **THE COURT:**  That's what they say.

11          **MR. SANTACANA:**  That's their theory.

12          **THE COURT:**  Okay.  And you are contending to me that

13  that can't be answered -- that whether or not there's an

14  actualable claim associated with that cannot be answered on a

15  classwide basis.

16          **MR. SANTACANA:**  Not based on the theory they are

17  bringing.

18          **THE COURT:**  Well, okay.  Tell me why.  I'm not sure

19  I'm following.

20          **MR. SANTACANA:**  So, clearly there is a way -- maybe

21  this is what Your Honor is thinking.  There is a way to simply

22  look at the button, look at the contract, decide what they mean

23  as a matter of law and move on.  That can be done classwide.

24  That's why contract classes are often certified.

25      This is not a contract class.  This is a privacy class.

And in addition to that, the -- even in a contract case where there is extrinsic evidence that bears on the question of consent, courts refuse to certify.  It's not just Judge Gonzalez Rogers or *Google/Gmail*.

It's Judge Tigar in *Hart* as well as Judge Tigar in *Opperman versus Path*, which is a case about the collection of data from an app on a phone.

And the reason is because we, Google, have a defense that is viable as to people who agreed to the terms of use which say "we keep records of things," then turned off WAA; and then agreed over and over again to binding terms of service with app after app after app where the app said:  "In order to use our service, you agree to be bound by this and what I'm binding you by is that I'm going to use Google Analytics."

And the user says:  "Yes, I would like to use the Lyft app, and I'm okay with you using Google Analytics."

Now, when the case started, the Plaintiffs' argument was this wasn't good enough because Google was secretly making marketing profiles and doing advertising and things.  That's not the claim anymore.

The claim now is that Google is doing Google Analytics, which Plaintiffs agree to before and after they turn the WAA button off.

So I think the problem with saying we can just decide what it means and moving on is twofold.  One is what I have just

1    discussed, which is that there is a lot of surrounding conduct

2    that is going to bear for the fact-finder on that question.

3        And these -- these disclosures vary, *Lyft versus Alibaba*.

4    Some of them say we will use analytics but they don't name

5    Google.

6        Here is NPR.  The Plaintiffs are effectively saying that

7    NPR's agreement with its users on its app is overridden by an

8    earlier revocation of consent the users had given to Google.

9        Now, I understand that's how they want to argue it.  We

10    have a right to question that Plaintiff about that, about their

11    understanding.  Why would they agree over and over and over and

12    over again to the terms of use like this if they did not intend

13    to allow basic recordkeeping and analytic services to move

14    forward?

15        The second problem I wanted to mention is:  The Court can

16    determine what written instruments mean if they are

17    unambiguous.

18        But there's really not an argument that the WAA button

19    unambiguously says what the Plaintiffs thought or what they say

20    they thought.  That's not really their argument anymore.  It

21    was when they were talking about personalized advertising

22    because that's what WAA is talking about.

23        The WAA button says saved in your Google account.  Turn it

24    on, I save it in your Google account.  Turn it off and I don't.

25        And Google defines over and over and over again what that

 1  means.  So these are just from the privacy policy, just the

 2  privacy policy.  And yellow is the language that refers to the

 3  WAA button.  Review and update your Google activity controls.

 4  That's going to control what is saved with your account.  Click

 5  on that blue button.  It takes you to the WAA page.

 6      Here are some other things that Google says in the privacy

 7  policy.  It says (as read:) "Associated with your Google

 8  account means we treat it as personal information."

 9      There is no claim in this case -- in fact, their expert

10  said Google has the best of intentions in attempting not to

11  treat this data as personal information when WAA is turned off.

12      We say in the privacy policy that non-personally

13  identifiable information is information that no longer reflects

14  or references an individual.

15      We say that depending on your account settings, your

16  activity and other sites and apps may be associated with your

17  personal information.

18      These are the types of disclosures that are all over this

19  case where Google is explaining its view of the world.  I

20  understand some people may be confused about it but Google's

21  explaining its view.

22      They are saved to your Google account, which means it's

23  about you; and then there is non-personal information which is

24  psuedonomized.

25          THE COURT:  I'm still perplexed at why -- just the way

1    you've described this clear, from your perspective, disclosure

2    by Google.

3                **MR. SANTACANA:**  Right.

4          **THE COURT:**  You are not differentiating -- why is that

5    not something that then again is going to be subject to some

6    sort of classwide determination?

7                **MR. SANTACANA:**  So this is why:  In addition to what I

8    just said, which is that the app disclosures from third-party

9    apps --

10          **THE COURT:**  I understand that.

11          **MR. SANTACANA:**  -- are all variable.

12          **THE COURT:**  I gotcha on that.

13          **MR. SANTACANA:**  The question is:  Has Google presented

14    evidence that there's going to be varying understandings of the

15    WAA button.  And that's why it's talking about whether it is

16    ambiguous.

17        It is not ambiguously in support of Plaintiffs' view --

18    I'm sorry -- unambiguously.  It can only support Plaintiffs'

19    view on the merits if it is considered ambiguous.

20        So, Sal Cataldo, one of the four Plaintiffs, testified,

21    and he said this is what he thought the button would do.  He

22    thought that if he turned the button off, Google wouldn't use

23    WAA. --

24          **THE COURT:**  But are you saying we think our

25    disclosures are all unambiguous but at the same time certain

1  users, we need to determine whether or not they are

2  individually confused by our unambiguous disclosures?

3      I mean, I don't -- I don't follow how if the argument is

4  that Google's disclosures are so clear and unambiguous, then I

5  don't see where this individualized perception comes into play.

6      **MR. SANTACANA:**  Apart from the third-party app

7  disclosures.

8      **THE COURT:**  The third party -- I understand that

9  argument.  You are saying there are all these different third

10  parties and they all have different, you know, caveats to use.

11  And, you know, you can't -- you can't have a common -- because

12  some people are at NPR and some people are at, whatever the

13  other ones that you were showing me, I understand that

14  argument.

15      **MR. SANTACANA:**  Yeah.

16      **THE COURT:**  But you now moved to another.

17      **MR. SANTACANA:**  On the other argument.  Just making

18  sure we are on the same page.

19      **THE COURT:**  Yeah.

20      **MR. SANTACANA:**  So the reason is because of how

21  California courts weigh invasion of privacy, and I think

22  focusing on the claims -- the actual claims is critical.

23      *Kight* and *Hataishi* are two California Court of Appeal

24  cases that look at this exact thing and they say --

25      **THE COURT:**  Are these questions about what to certify?

1          **MR. SANTACANA:**  They were.

2          **THE COURT:**  Okay.

3          **MR. SANTACANA:**  They were questions about whether

4    to -- I mean, the Judge's Benchbook in California says don't

5    certify invasion of privacy claims.  It is not a good idea.

6    There is no mass torts.

7          **THE COURT:**  We are that simple.  Go ahead.

8          **MR. SANTACANA:**  Well, understood.  And you have a

9    different reading of Rule 23, but I don't think California is

10   known to be less forgiving on class actions than federal court.

11        In any case, in *Kight* and *Hataishi* you have people whose

12   actual phone calls are recorded.  It's against the law.

13   Everybody agrees it would be against the law if they were

14   recorded without consent.  There is a CIPA Section 632 claim.

15        The Court says:  Well, hold on a second.  Some of these

16   people made 13 phone calls to the mortgager -- mortgage

17   company, and in the first 12 times they were told it was going

18   to be recorded but they forgot to tell them on the 13th time or

19   some of these people have worked at call centers or some of

20   these people -- and there is evidence in the case, like I'm

21   showing right now on the screen, where individual Plaintiffs

22   had different levels of understanding based on the surrounding

23   circumstances.

24        And the Court said:  When it comes to the expectation of

25   privacy and when it comes to the severity of the intrusion, the

1  surrounding circumstances are not just important, they are

2  critical.  They are really what tells us the difference between

3  you and me and anybody else and what we consider to be private.

4      And while some privacy cases can proceed as a --

5          **THE COURT:**  So your -- your position is essentially

6  the -- sort of the position that you say California Benchbook

7  says.  You are effectively telling me you can't certify a

8  privacy case.

9          **MR. SANTACANA:**  You know, I wouldn't go that far.

10  What I can tell you is that the Plaintiffs --

11          **THE COURT:**  What could you?

12          **MR. SANTACANA:**  Well, I haven't seen one, Your Honor.

13          **THE COURT:**  Okay.

14          **MR. SANTACANA:**  There isn't one cited in the briefs

15  where the invasion of privacy tort is certified for damages

16  classwide.  Not one.  Okay.

17      Last night the Plaintiffs sent me a case they said they

18  were going to mention today.  That one doesn't work either.

19  I'm happy to talk about it, but I don't know if they are going

20  to bring it up, relating to the *Theranos* case.

21      But, you know, we hit them pretty hard in the briefs for

22  not citing one; and they still didn't cite one in their reply.

23  There isn't a case that has presented it quite right, and the

24  closest it ever came is Judge Tigar in *Opperman versus Path*

25  where he says:  We don't have predominance here on -- in that

1    case it is about harm, which is one of our arguments which I

2    will go to next.  He says (as read:) "We don't have

3    predominance here on that measurement of classwide harm, but I

4    have carefully constructed subclasses and only certified the

5    one where we all agree everyone was harmed.  And for that

6    subclass on this one app on this one type of data, we can do a

7    nominal damages class."

8        That is as far as this Court has ever gotten, as close as

9    it has ever gotten to certifying on this claim.

10       So that would be my answer, Your Honor.

11           **THE COURT:**  All right.

12           **MR. SANTACANA:**  I'm sure it is possible but it would

13   have to be the right kind of case.  And California law says

14   that the reason for that is because invasion of privacy is a

15   personal harm.  It's about really what happened to you.  It is

16   about mental anguish.

17       And the Plaintiffs damages don't try to measure that but

18   that is really what it's -- what it's for.  And the CDAFA claim

19   is not about mental anguish.  It is about damage or loss, and

20   the Plaintiffs aren't seeking compensatory damages either.

21   They are seeking restitution on one hand or disgorgement on the

22   other.

23       There is a total mismatch.  And it may be that they wish

24   they had some of the other claims still but they don't.  These

25   are the two that are here.

1    On implied consent there is also this other problem, which

2  is that you can have implied consent from the conduct of a

3  user.

4    And in this class as they have defined it, we have

5  millions of people who -- you have probably seen this if you

6  have an iPhone -- where they have been prompted.  Would you

7  like this app to be able to track you?  And that's for

8  conversion tracking purposes.  And since April 2021, all apps

9  on iPhone had to do that and all apps on iPad.

10    So, we have people in this class who said:  "Yes, it's

11  okay with me.  They are allowed to track me."  And even still

12  these Plaintiffs would compensate them on the grounds of either

13  disgorgement of profit or on restitution.

14    So, again, if we had that person in the chair at the trial

15  in front of a jury of the fact-finder, we could say:  "Really,

16  you pressed yes on that?  You agreed to this.  You agreed to

17  this.  You agreed to this.  But seven years ago when you

18  created an account while you were doing ten different things

19  and you clicked the button over and over again so you could get

20  to the end of it, that's what overrides everything you have

21  done for the last seven years."

22    That's an argument we want to make but it is an argument

23  we can't make classwide.

24            (Pause in proceedings.)

25      **MR. SANTACANA:**  One last point on this, Your Honor, is

1   what I have on the screen.  The four Plaintiffs had different

2   understandings.  Three of them had a similar understanding.  No

3   means no.  Zero data, period.

4       But this one at the time that he was sitting for his

5   deposition believed that Google was personalizing advertising

6   with WAA off data.

7       And when I questioned him, what he said was he had the ads

8   personalization button on and the WAA button off.  And I said:

9   "I don't understand.  Do you want ads or don't you want ads?"

10      And he said:  "Yeah, I want personalized ads.  They are

11  really helpful.  I just don't want them to be informed by the

12  WAA off data.  So I turned WAA off when I search certain

13  things, and then I" -- okay, fine.  That's exactly how the

14  button works.  He understood perfectly how the button works and

15  the other three did not or at least said they did not.

16      So, again, this is an individualized issue.  If he were

17  sitting here at trial before the fact-finder, he would have to

18  admit that the way that the button works is also what he

19  expected.

20      By the way, I know your tentative thoughts on the Daubert

21  and I would like to discuss them when the time comes; but the

22  premise of the damages figures in this case that the Plaintiffs

23  have put forward is in part that Google shouldn't even be able

24  to keep the receipt for serving the ad.  Okay.

25      Their client under oath said:  "No.  I want to see the ads

1    from Google."

2        Those two things cannot both be true.  And if I could

3    question each class member, all hundred million of them, maybe

4    they would fall into buckets; but we don't know which buckets

5    they are in right now.  We can't know that in advance.

6        And if I could show them the Lyft privacy policy and I

7    could -- so that's the argument, Your Honor.  I'm happy to move

8    on or --

9        **THE COURT:**  You have to swim up against the current

10   that says the damages aspect is generally not the reason to

11   refuse to certify that -- although I acknowledge that there may

12   be -- and I take your argument to effectively be more of a

13   manageability argument that it can't -- there is no effective

14   way to ever get to damages and, therefore, it can be something

15   we address at class certification -- but generally, damages --

16   problems with proving up the damages is -- even if there is

17   some individual issues and you have to figure out do you do a

18   claims proceeding or some other mechanism, it is usually not

19   the basis under which you say you can't certify this class;

20   right.

21       **MR. SANTACANA:**  That is correct.

22       **THE COURT:**  So is your argument that this is -- while

23   acknowledging that, problems with the damage analysis is not

24   going to be the basis not to certify.

25       You are saying this is just so unmanageable from the

damages perspective that I should take it into account at
certification?

      **MR. SANTACANA:**  No, Your Honor.  I want to be clear.

      **THE COURT:**  Okay.

      **MR. SANTACANA:**  The argument I was just making was
about consent.

      **THE COURT:**  Oh, all right.

      **MR. SANTACANA:**  Implied consent by conduct.  If I had
Sal Cataldo in the chair before the fact-finder, he understood
the button just fine.

      **THE COURT:**  I thought you were making an argument that
somehow there was going to be so much difficulty in determining
how any individual putative class member was harmed and what
recovery they could have that that hurt certification.

      **MR. SANTACANA:**  No, that's not the argument I was just
making, and I will address your point in a moment; but just to
be really clear, my argument was:  I can't tell the Sals from
the Sams in the class.  I don't know who is who.

    But some of them got it just fine and others clicked yes
on the Apple prompt and others -- Google Android has a button
for zeroing out the conversion tracking ID.  It has a button.

    There's people in this class who pressed the button who
would still be counted in the class.  That makes no sense.
There is a button for the thing they say WAA was supposed to be
for.  And so by conduct those people clearly understood or they

1    wouldn't have pressed it.

2        In any case to address the question you just asked, I

3    would recommend to the Court the *Bowerman* decision in the Ninth

4    Circuit and the *Castillo* decision in the Ninth Circuit.

5        There is a difference between predominance problems based

6    on individual awards and a problem with measuring damages fully

7    classwide.

8        What is the classwide damage?  Sometimes the model that's

9    presented can't even do that, and that's what happened in those

10   cases and the Ninth Circuit acknowledged the rule.

11       **THE COURT:**  Doesn't that -- that then dovetails into

12   your Daubert argument.

13       **MR. SANTACANA:**  It does dovetail.  But it is primarily

14   in the Ninth Circuit *Bowerman* and *Castillo* cases, those are

15   predominance is what they are saying.

16       I don't think we have to win the Daubert argument for that

17   to make sense, right, just to address the legal doctrine that

18   you were intoning.

19       So, I think that the next place I would like to go,

20   Your Honor, is to talk about the harm arguments and

21   predominance in our briefs.

22       **THE COURT:**  Go ahead.

23       **MR. SANTACANA:**  So, again, focusing on the claims that

24   are at issue which doesn't include contract or wire tap act or

25   any of that, both claims require a showing of damage or loss

1  for CDAFA or harm for invasion of privacy.

2      In looking at the case law, on what is and is not private

3  and what is and is not harm and what does and does not rise to

4  the level, the dozens of court cases we cite come out in all

5  different kinds of ways depending on the precise nature of data

6  at issue.

7      And here, the Plaintiffs are accusing a range of conduct.

8  They are saying some people, there's a receipt that an ad was

9  served to an alphanumeric string that means nothing to anyone.

10  I think under Northern District law that is not an actionable

11  claim.  It's just not.

12      And Your Honor has held as such in *Katz-Lacabe*.

13          **THE COURT:**  We don't have any Northern District law

14  but okay.  We have Ninth Circuit law that the Northern District

15  tries to follow.

16          **MR. SANTACANA:**  Sure.

17          **THE COURT:**  But there's --

18          **MR. SANTACANA:**  Well, in the Ninth Circuit -- if we

19  want to talk about the Ninth Circuit, there is a distinction,

20  for example, between Facebook internet tracking where the

21  allegation is profiles that are tied to a person and URLs that

22  reveal search terms and IP addresses, which in the Ninth

23  Circuit do not have -- there's no expectation of privacy in the

24  IP address because it is just how the internet works, right.

25      So here we have another just how the internet works claim.

 1    There is a receipt.

 2            **THE COURT:**  Isn't this kind of, though, a retooled

 3    standing argument you are making to me?

 4            **MR. SANTACANA:**  No.  Because these Plaintiffs can

 5    establish what I would say is Article III injury without

 6    meeting the element of the claim required for the tort or for

 7    CDAFA.

 8        And there are plenty of cases that hold as much, right,

 9    where the Court isn't dismissing on standing grounds.  It's

10    saying -- I think it's the -- so *Hammerling* is an example and

11    *Heeger* is another example where the Court says it looks like --

12    you know, it could be private under certain circumstances but

13    it is not highly offensive, so you have no invasion of privacy

14    claim.

15        So on the screen now is one of the three types of conduct

16    that Plaintiffs have grouped together which is the serving of

17    ads.

18        So a user who is identified as pseudonymous 723 uses the

19    Nike app.  The Nike app serves New York Times ad.  It is

20    recorded on a piece of paper somewhere, digital piece of paper,

21    this pseudo ID and this ad ID.  It's a receipt.  Nothing more.

22        They are saying that conduct is equally injurious to the

23    next one which is then at time 2:00, the user installs the New

24    York Times app.  They saw the ad.  They clicked on it and they

25    installed it.  The ad worked.

 1          So now there is a third piece of information.  You

 2     installed it.  But by "you," we still just mean

 3     pseudonymous 723.  Nobody has any idea who that is.  There is

 4     no evidence in this case that Google has ever made any effort

 5     to figure out who that is.

 6          So those are the -- two of the three in the range of

 7     conduct.  And then the third I am a little unclear on from the

 8     briefing; but every time Plaintiffs talk about sensitive

 9     information, political leanings, sexual orientation, this is --

10     this third bucket is what they are talking about, Google

11     Analytics customer data.

12          And I have here these two red bars.  On the right we have

13     the WAA off world where information is kept separate and apart

14     from information that could identify a person.

15          Now, Plaintiffs' expert says maybe they could reidentify

16     if they change their code.  They are not saying that we

17     actually reidentify it.

18          And all of that sensitive information that they talk about

19     in their briefs, that's in the green box associated with

20     pseudo 723.

21          So they are saying this one where they are -- they argue

22     there is political leanings, and this one which is just a

23     receipt for advertising, those are both in the class.  And the

24     question of whether that's harmful predominates.

25          I would submit to Your Honor that there's no question that

1   this is not actionable right here on the screen.  Can't be

2   highly offensive.  Can't be -- can't cause damage or loss.

3   What interest does anyone have in this from a privacy

4   perspective?  It's a receipt.

5       Here is where they like to talk about:  Well, you are

6   going to know who I'm dating or you are going to know my health

7   conditions.  So now we have a predominance problem.

8       Are you using the health app or are you just using the New

9   York Times or the NPR app or are you shopping on the Nike app?

10      There are cases in this district that are about a single

11  app or a single website.  And even there, like in *Opperman*

12  *versus Path*, the Court says even on the single one it is too

13  variable within one app what the data is.

14      We are dealing with one-and-a-half million apps of all

15  kinds that do all kinds of things, and we have a right with the

16  fact-finder to say:  Okay, fine.  Even if we lose on the health

17  app and even if we lose on this particular part of the health

18  app, do we really lose on the Nike app?  The receipt of an ad

19  shown in the Nike app for the New York Times is an invasion of

20  privacy regardless of what WAA says; really?

21      That's an argument we can't make with all of this grouped

22  together.  It's an argument that Judge Tigar believed couldn't

23  be made in *Opperman versus Path*.

24      It is an argument that he also believed couldn't be made

25  in the *Hart versus Weather Channel* case where the Weather

1    Channel was accused of using location data.

2        And it's an argument that -- it's an argument that has

3    led -- at the pleading stage has led courts to say some of this

4    rises to the level and some of this doesn't.

5        To group it all together is to deprive us of the

6    opportunity to sort those out.

7                        (Pause in proceedings.)

8        **MR. SANTACANA:**  The Plaintiffs' response on the

9    argument that I just made in their reply brief is that -- well,

10   first, their response is the *Kight* and *Hataishi* cases are no

11   good because they are about CIPA Section 632.

12       The California Supreme Court in *Hernandez versus Hillside*

13   has said for expectation of privacy the elements are the same.

14   It's not -- they are comparable in that respect.

15       They say *Opperman* supports them.  On that ground they say

16   it supports them because Judge Tigar did certify a nominal

17   damages class.

18       I recommend the case to Your Honor if you haven't read it

19   already.  I think he analyzed the issues very carefully and

20   concluded on that one app, which was one type of data, the

21   person's contact book.

22       There were lots of people who weren't harmed.  There were

23   some people he thought were harmed.  He didn't certify as to

24   the unharmed.  He wouldn't even certify damages for the ones

25   everyone acknowledged were harmed and even when they proposed

doing a survey to measure the damages classwide.

     And after all of that, that's when he says so because it's
that hard, maybe we will do nominal damages for one app for
contact books.

     Here they are saying there is all of this mix of
information coming from all of these different apps.  They are
not telling you exactly what it is.  They don't display
anywhere what the sensitivity is.  So I think that -- that case
really is a guidepost.

     Okay.  So the last piece on harm, I would say, Your Honor,
is that we deposed the Plaintiffs.  There used to be a lot more
of them actually.  We deposed a lot of Plaintiffs.  There's
four remaining now.

     And each one of them was pretty clear about just how
insubstantial Google's conduct was to them.  Even when they
believe they were receiving personalized ads with WAA off data,
each one of them says:  "I don't like it.  It is creepy to me
but I still use all the apps.  I'm not going to change my
fantasy football app because my friends, that's the one they
use."

     They are saying essentially "here is the cost benefit I
have come to on this question."

     Well, we should be able to do that with each Plaintiff.
These are substantial defenses that may even rise to the level
of summary judgment, but only because we got to depose them,

 1    right -- only because we got to depose them.

 2        Now, if the Plaintiffs will stipulate that testimony is

 3    typical of everyone, then that means everybody in the class

 4    would say the same thing; and I'm not sure why we are here.

 5        What they are saying is there were people in the class who

 6    were really hurt, and we have Plaintiffs who really effectively

 7    were not apart from the creepiness factor which enters into

 8    Article III but doesn't enter into either one of their damages

 9    model at all.  Their damages models are measuring economic

10    damages.

11        So because class members had these vastly different

12    experiences, they saw different disclosures, because their data

13    was captured in vastly different ways, we believe we have a

14    right to assert our viable defenses just as we do as to these

15    four Plaintiffs as against the rest of the class.  We can't do

16    that fairly at a class trial.

17        Now, there are some defenses that may be decided

18    classwide, but we have a right to present all of our defenses

19    and class treatment will deprive us from being able to do that.

20        I would like to address the Daubert briefly, Your Honor.

21        **THE COURT:**  Why don't -- I will let you do it, but

22    let's have the other side talk about certification issues, and

23    then I will let you get back up and talk about Daubert.

24        **MR. SANTACANA:**  Sounds good.

25        **THE COURT:**  Okay.

1          **MR. MAO:**  Sorry, Your Honor, we do have -- I

2    apologize.  We have slides and we have paper copies.  May we

3    approach the bench, Your Honor?

4          **THE COURT:**  Yep.

5                    (Pause in proceedings.)

6          **MR. MAO:**  Yeah, Your Honor, just quickly on the roles,

7    Mr. Sila will address the Daubert.  It is his -- it is his

8    first merits argument.

9          **THE COURT:**  Great.

10          **MR. MAO:**  So Mr. Lee may back him up to the extent

11    that you allow it.

12          **THE COURT:**  Okay.

13          **MR. MAO:**  Yep, thank you, Your Honor.

14      So with our presentation, what I want to start off by is

15    really just overall arching framing, Your Honor, which is that

16    Mr. Santacana, you know, who stated that privacy cases don't

17    get certified, I'm sure, Your Honor, you remember the TCPA

18    cases, FCRA cases, and then recently the Biometric Information

19    Protection Act [sic] cases, all of those cases receive

20    certification as early as the 1990s.  So even the *Transunion*

21    versus --

22          **THE COURT:**  But they probably wouldn't characterize

23    those as privacy cases, would they?

24          **MR. MAO:**  The TCPA cases or the FCRA cases?

25          **THE COURT:**  Any of those cases.  I mean, in the sense

1    of the claims you are bringing here.

2        The bottom line is there -- they have said that no one has

3    certified in the context of the claims that you are bringing.

4    Now, are they right or wrong?

5            **MR. MAO:**  They are wrong.  We cited four cases.

6            **THE COURT:**  Four?

7            **MR. MAO:**  We did.  We cited *Williams v. Apple*, which

8    is Judge Koh's case in our reply brief.  We cited *Romero versus*

9    *Securus* in our opening brief.  There was also -- sorry, I'm

10   blanking out.  There is --

11           **THE COURT:**  Well, they have acknowledged that Judge

12   Tigar certified and they talked about why that -- I shouldn't

13   view that as one in your favor, so --

14           **MR. MAO:**  Well, my point is actually this, Your Honor,

15   like the *Transunion versus Ramirez* case in which they cite in

16   support of their position is a FCRA case that was certified

17   that went all the way up to the Supreme Court.  And FCRA cases

18   have been certified for decades and that is a privacy case

19   because it is about the wrongful disclosure of information.

20       So there absolutely is precedence in essence of the newer

21   industries have come through, and there is different

22   technologies and different statutes.

23       The credit bureau industry is much older, right, than the

24   new online search and data broker industries.  Of course it is

25   going to take time.  That's why you are seeing the FCRA cases

getting certified as biometric information comes along.

But my point on that is actually this:  There is one glaring thing you did not hear from the other side which is regarding CDAFA.

We said this in the opening.  We said this in the reply. And Your Honor actually mentioned this in the motion to dismiss, which is that CDAFA requires that the Defendant has obtained permission.  There's two elements there.  There is the permission and there is the obtaining.

And when you look at the architecture -- even Google's own technical architecture -- it absolutely treats these signals as unpermitted.  The actual bits, right, in which, you know, may have been subject to a slight sealing issue so I can't mention the name; but if you look at the presentation, the one that is unredacted in front of you, Your Honor, page 13, Google's own bits call these things private.

In other words, the bits associated with the data that's being logged, they are called private bits; and they are also characterized as unconsented within the technical architecture itself.

Why is that important?  Because under the CDAFA statute, under 502(c)(2), which is what we have sued on, in order for Google to actually be able to record this when they know they have obtained not actually a permitted signal -- they received an unpermitted signal -- they can't circumvent the permissions,

1    in fact, when it is the very button in which they proffer;

2    right.

3        And they are talking about how the button -- an on/off

4    button -- is ambiguous.  Your Honor, if you said a light

5    switch -- everybody should turn off the lights in this

6    courtroom, I don't think that would be unambiguous -- I don't

7    think that would be ambiguous.  It is either on or it's off,

8    and you would expect everybody to understand, have a reasonable

9    interpretation of what that means.

10       And actually, Defendant's own opposition, the presentation

11   which they gave you, actually tells you exactly what Your Honor

12   had explained.  The question at issue in front of us is whether

13   or not this can be resolved on a common base, on a classwide

14   basis.

15       Their own demonstration, they can't help but resist coming

16   up here and talking about this as if this were a contract

17   dispute.

18       In fact, in the *Williams versus Apple* case, that's exactly

19   how Judge Koh certified the (b)(3) class.  It is precisely

20   because she viewed the whole contractual exercise -- in other

21   words, the disclosure exercise in which the court is given --

22   as an objective one.

23       And Google actually agreed just now and in their briefs.

24   When you read their briefs, they can't resist talking about the

25   contractual principles because they know that is something that

 1   can be resolved on a classwide basis.

 2         THE COURT:  Can you address the arguments with respect

 3   to the third parties in the consent issue with respect to all

 4   of the NPRs of the world as they presented it.  Doesn't that

 5   present a big problem for you?

 6         MR. MAO:  It does not, Your Honor.  And this is

 7   something that you, yourself, had noted also in the motion to

 8   dismiss orders, right, which is that these disclosures -- and

 9   this is also something which Judge YGR had mentioned and I will

10   address that quickly.

11         THE COURT:  What?

12         MR. MAO:  That she had mentioned this in *Brown* so --

13         THE COURT:  Gonzalez Rogers?

14         MR. MAO:  Yes, Gonzalez Rogers.  And she has said:  In

15   order for consent to be actual, the disclosures must explicitly

16   notify users of the practice at issue.

17      Okay.  And here, you have seen nothing in the briefs.

18         THE COURT:  She refused to certify, though, didn't

19   she?

20         MR. MAO:  Well, there is a dissolution of factors.  In

21   that case you had actual articles in which Google cited to

22   too -- and we dispute.  There is a factual dispute on that --

23   and we may seek recertification on that; okay.

24      But the issue there is Google pointed to two articles in

25   which they claim disclosed the tracking at issue.  Here you see

nothing in the opposition.  You have seen nothing proffered just now.

In fact, to the contrary, you have seen Plaintiffs present Google's own demonstrations that their CEO -- taking the same interpretation which the Plaintiffs had; their own employees taking the same interpretation -- and they're conducting studies which show that people unanimously believed that it was not going to be saved.

And then when they are talking about these two cases -- *Hataishi* and *Kight* -- those cases, when you read the cases -- and Mr. Santacana actually just explained it.  He said that the reason why *Hataishi* did not get certified was because the class was dealing with people who had received disclosures when they called in versus people who did not receive disclosures, and sometimes people received disclosures in inbound calls as opposed to the outbound calls.  And, therefore, that created inconsistencies.

Here, neither in the opposition nor in the presentation, even after they received our second challenge on the reply for them to proffer actual evidence of notification, they did not present you any third-party privacy policies which says and "we or Google," neither, okay, "will not respect the privacy signal that Google is collecting," consented or unconsented.  It is on or it is off.

That is exactly how Mr. Rimler (phonetic) interpreted what

1    an on/off button means.  It is either collected or it is not.

2        Two other things, Your Honor, we also noted in the briefs

3    which they have not responded.  First of all, Google themselves

4    in their privacy policy committed to explicit consent; right.

5    We noted that in the reply, and Mr. Santacana has not addressed

6    that.

7        Explicit consent means notifying exactly what is being

8    done.  And Mr. Santacana when he came up here, he, himself,

9    conceded maybe, maybe the language is ambiguous, Your Honor;

10   but nonetheless, he is going on and talking about

11   individualized issues.

12       If that is true, Your Honor, how can that be explicit

13   consent in which they, themselves, have conceded to is through

14   a contractual requirement.  You are getting up and talking

15   about the contract while saying that this is really a privacy

16   claim.  You can't have your cake and eat it too.

17       And here is the second thing, Your Honor, you have not

18   heard a single statement -- a single statement from the other

19   side saying how would Google actually turn off the saving.

20       In order for you to have consent -- even implied consent,

21   as the Judge said in *Brown*, the consent must be actual -- how

22   can you have consent if you are not presented a choice of on

23   and off?

24       So Google on the one hand wants to tell you they have

25   consent because they offered a choice.  On the other hand, they

1   want to tell you the choice is not real.  That's okay because

2   they gave consent.  That's a circular argument, Your Honor.

3   And that absolutely makes no sense.

4        And you have not heard any answer on the other side how

5   that is true.  It is not provided in any third-party

6   disclosure.  They pointed to none.

7        Please, examine the record.  Examine the disclosures in

8   which they put in their presentation.  Not a single ones says:

9   When (s)WAA is off, we are still going to collect your

10  information anyways or when (s)WAA is off, Google is still

11  going to collect your information.

12       Instead, they are arguing over what people could have

13  speculated or could have potentially done or thought; but,

14  Your Honor, first of all, that is not the element under CDAFA.

15       CDAFA is as soon as you received an unpermitted signal,

16  you need a permitted signal in order for you to collect.  They

17  have not addressed that; okay.

18       Secondly, their own architecture says that that is

19  unconsented that goes to all of the elements, all of the

20  elements; and they have given you a rebuttal as to how that is

21  actually overridden.

22       Insofar as they disagree, Your Honor, that is still -- as

23  you said, that is a common issue to be resolved classwide.

24       I want to just talk real quickly, Your Honor, if you look

25  at my presentation, we gave you very, very clear framing.  And

1    I will start with page 4 so that we can, perhaps, just move

2    through this much quicker.

3        Since the beginning of the case, Your Honor -- and they

4    keep saying that we have changed our case theory.  In fact, we

5    have not because you can see, they also agreed to the same

6    framing since the beginning of the case.

7        This is a February 12th, 2021 letter from Google -- and

8    there's actually more letters like this.  We cover this at

9    page 9 of our opposition -- Google itself agrees that this case

10   is a perfect case for class certification.

11       The two questions are:  What does Google say publicly and

12   what do its products do.  And you have heard nothing up here

13   regarding how there's any variance regarding what Google says

14   and then secondly what Google's products do.  Okay.

15       Let's first start with what Google's products -- sorry,

16   what Google actually says.  And this is on page 5, the next

17   page.  You have not heard any disagreement, Your Honor, that

18   these are the relevant screens and representations -- as you,

19   Your Honor, pointed out in the motion to dismiss; right --

20   choose the activities that allow Google to save.  This is the

21   only Android screen and other two are on the IOS screens; okay.

22       On the Android screen it says:  Choose the activities that

23   you allow to save under the privacy settlings which is the

24   device setting.  And by the way, this is a Samsung phone,

25   Samsung Android phone.

1    And the third screen -- this is exactly what Your Honor

2 had pointed out in the motion to dismiss -- to let Google save

3 this information web and app activity must be turned on.

4    Now, they take variance with this language.  But, Your

5 Honor, what we have not heard is how is that an individualized

6 issue as opposed to something that can be resolved on a

7 classwide basis?  Nothing from the other side.

8    Well, let's just take that issue for a moment.  Let's

9 suspend our disbelief and just say:  What do these disclosures

10 really say?  How do people interpret them?

11    Google's own employees on page 6 and page 7, multiple

12 employees throughout different times throughout the class

13 period, they all believe that WAA is an on-and-off signal.

14 It's binary.  Just like when Your Honor says "turn off the

15 lights," you expect everybody here to understand what that

16 binary signal actually means.  Off means off.  Don't collect

17 means don't collect.  Private means private.

18    Critically, we also twice challenged how Mr. Sundar

19 Pichai, Google's head of state, he, himself, interpreted these

20 controls to be collecting while Google -- whether or not Google

21 collects information on you and what we have on you.

22    In other words, exactly the way Defendants -- okay, is

23 contrary to the way in which Defendants have actually

24 represented that people should understand this.

25    You want more?  Page 10 of our slide -- so I skipped over

 1   another slide and almost done, Your Honor, okay -- two months

 2   before we filed a lawsuit, Google conducted a study; and their

 3   own study says all participants expect when turning WAA toggle

 4   off to stop saving their activity; okay.  No ambiguity.  No

 5   variance, and you have heard nothing from the other side to the

 6   contrary.

 7        Now, I just want to address briefly their second

 8   element --

 9        **THE COURT:**  Why don't you address for me the harm

10   issue that Mr. Santacana spent some time on?  You know, the

11   notion that some of the putative class members even confronted

12   with learning of these -- of the way this all operates says:

13   "I don't care."  I -- you know, "I'm going to keep using it,

14   you know, okay, I have been mistreated.  This outweighs it.  I

15   want to keep using."

16        Other class members say:  "Oh, this is a terrible invasion

17   of my privacy and I'm emotionally distraught."

18        What do you do with that?

19        **MR. MAO:**  So, Your Honor, that's not what they said;

20   but I will address, first, the actual and I will address the

21   hypothetical just to entertain the hypothetical; okay.

22        First of all, on the actual, I don't understand what ad

23   personalization has to do with whether or not Google saves

24   data.

25        **THE COURT:**  That Google did what?

1    **MR. MAO:**  Whether or not Google saves data from

2    third-party sites.

3    **THE COURT:**  If putative class members have very

4    disparate views on whether or not that practice makes any

5    difference at all to them is -- is potentially a question for

6    purposes of analyzing certification.

7    You are saying:  Listen, if they have engaged in conduct

8    that results in taking this information when they shouldn't,

9    then why does it matter?

10   Well, that may be a basis for an individual claim against

11   Google, but why then is it not a problem for you when you are

12   trying to put them all together on a certification basis if

13   there are very disparate views among putative class members

14   about whether or not they were harmed in the first place?

15   **MR. MAO:**  So that's why I take issue with the fact

16   that that's not what they said.  We need to review the record

17   very carefully; okay.  Again, going back to the analogy --

18   **THE COURT:**  I don't really -- maybe it's

19   mischaracterizing what they said.  That is my question:  So

20   whether or not they said it, why is that not a problem for you?

21   **MR. MAO:**  First of all, right, the truth held in the

22   Ninth Circuit is it is their burden, right, to show that there

23   are individualized issues.  This is a hypothetical in which --

24   **THE COURT:**  But your initial burden is to establish

25   predominance amongst other things, all the other 23(a) factors.

```
 1   And this is a question of whether or not if everybody has

 2   different views on whether or not they have been harmed, isn't

 3   that a predominance problem?

 4            MR. MAO:  No, Your Honor.

 5            THE COURT:  That --

 6            MR. MAO:  Because the harm --

 7            THE COURT:  You are entitled to your opinion but I

 8   want to know why.

 9            MR. MAO:  Sure.  The harm here has been calculated in

10   accordance to -- what they are talking about is emotional

11   distress damages; okay.  That is one type of --

12            THE COURT:  They are -- okay.  Go ahead.

13            MR. MAO:  I disagree, Your Honor, because if you look

14   at the way it's been briefed, right, we talked about four

15   different categories of damages, none of which are emotional

16   distress damages.

17       And this is something which I will leave for Mr. Sila

18   because that's part of the Daubert.  Maybe you want me to

19   address that right now, which is totally fine.

20       Your Honor, we talked about unjust enrichment.  We talked

21   about actual damages and restitution based upon the market data

22   which Google itself defined and paid.  Then we talked about

23   punitives and then we talked about nominal.

24       For nominal and for punitives, I don't believe that any of

25   the questions in which we are asking about regarding how much
```

1    individuals value privacy impacts either of those, neither does

2    disgorgement, Your Honor, okay, because disgorgement is about

3    the Defendant and it is not about the Plaintiff.

4        So Your Honor's questions is actually about the

5    Plaintiffs, which is in the bucket of restitution, putting the

6    Plaintiff back to the place in which they used to be.

7        And on that, Your Honor -- unless I'm wrong -- I believe

8    that our model is based upon the very same payment -- albeit a

9    conservative payment -- that is paid by Google.

10        **THE COURT:**  Your punitive damage argument, I get you.

11    Plainly that wouldn't be dependent upon individualized

12    valuation of privacy, but I'm not sure that your other damages

13    theory why it is utterly irrelevant -- I mean, in assessing

14    whether or not there is any value here, isn't it relevant at

15    all whether or not Plaintiffs think there is anything to this?

16        **MR. MAO:**  Yeah, but, Your Honor, that is within the

17    class; right.  They all turn off the button to not be saved and

18    Google has not shown any variance that when people set off, it

19    actually means something else.

20        The analogy they use -- again, as Your Honor conceded --

21        **THE COURT:**  It does turn on your Daubert -- your

22    expert's -- your expert is saying they have to disgorge their

23    ill-gotten gains; right?

24        **MR. MAO:**  But that is how much money they made.  It is

25    not how much the money -- the data is worth for the

individuals.

    **THE COURT:**  You went through the damages model.  What I'm trying to get at is that what you are really suggesting to me, if I'm hearing you correctly, is that the reason that individual putative class members' perceptions of the importance of privacy to them is -- you are effectively saying that is irrelevant for certification purposes; right?

    **MR. MAO:**  No.  I'm saying that it's established by a common record across an entire class as established by Google's own evidence, Your Honor.

    That -- out of the four buckets, the one that we are talking about, the restitution, that's based upon Google's own payments for that data.

    **THE COURT:**  That's not what I'm asking.  You are -- what I'm trying to get you to address for me is -- because I'm trying to understand how you think recovery seems to be disengaged from the perception of the Plaintiffs about whether or not they were harmed.

    And is that what you are saying?  It did not matter whether or not any Plaintiff -- all of them, none of them, half of them -- think they have been harmed at all by this.  It doesn't matter; is that right?

    **MR. MAO:**  Let me -- I will answer that question but like, Your Honor, we are talking as if there is an established record that any of the Plaintiffs don't think that they have

 1   been harmed.  They are talking about ad personalization as that

 2   one example.  Here we are talking about whether data is saved.

 3   That's like saying --

 4        THE COURT:  Whether data is saved -- wait, wait.

 5   Whether data is saved in the abstract, you -- that doesn't

 6   automatically mean -- of course, that means there has been

 7   ill-gotten gains that must be disgorged.

 8      You are almost saying all you have to answer -- the only

 9   answer -- the only thing we need to determine here is whether

10   or not there -- information was saved.  Once we determine that,

11   end of case?

12        MR. MAO:  For CDAFA certainly, Your Honor.  Those are

13   the elements of CDAFA.

14      Now, the questions you are asking --

15        THE COURT:  Doesn't it have to be highly offensive?

16        MR. MAO:  It does, right.  But, Your Honor, this is

17   why I was pointing out the bits that Google treats all the data

18   uniformally.  They are all flagged as unconsented with privacy

19   bits across the entire class.  We have not heard anything to

20   the contrary.  They treat the class commonly, typically and

21   with predominance.

22        THE COURT:  Okay.  All right.  I think we are a bit

23   ships that are passing in the night but keep going.

24        MR. MAO:  Setting that aside, Your Honor, the highly

25   offensive determination as you have pointed out and Google

1    agrees is actually an objective standard.

2          **THE COURT:**  Okay.

3          **MR. MAO:**  Right.  And my point is this:  They are

4    saying essentially the following with regard to contract and

5    contract-like cases:  It is possible that, you know, juries may

6    look at an ambiguous statement and conclude different things or

7    something like that.

8          That's not the way in which our system operates; right.

9    There are ambiguities and we resolve that on an objective basis

10   based upon that of a reasonable person.

11         So here for the privacy torts, both sides agree and the

12   opinions agree it's an objective standard.

13         So, again, Your Honor, while I appreciate your question,

14   that's a merits argument in my view; okay.

15         And honestly, the way you have heard the other side both

16   brief, argue and present, they are all merits based argument.

17   Those are Rule 56 arguments they want to make based upon, by

18   the way, Your Honor, hypotheticals which have not been

19   presented with actual evidence which is actually their burden

20   under *True Health* for the Ninth Circuit.

21         And they have not presented you a single shred.  The best

22   they can muster after spending 30 minutes up here was telling

23   you something about a completely different setting, ad

24   personalization.  Where is the study correlating ad

25   personalization with (s)WAA nothing?  Right.

1    So --

2        **THE COURT:**  You are right that if it was -- just

3    technically a merits argument isn't the focus on class cert but

4    merits do enter into the class certification analysis.

5        So it is not as easy as saying:  "Oh, I'm going to label

6    that a merits argument and, therefore, I need not -- "you need

7    not be worried about that, Your Honor, in trying to assess

8    class cert."

9        There are aspects of what I need to consider that are

10   merit related in terms of the -- and this may be one of them.

11   But, okay, I get it.

12       **MR. MAO:**  So let me just deal with the merits; right.

13   Again, Google can't have their -- they can't have their cake

14   and eat it too.

15       On the one hand they want to treat this like this is a

16   contract case.  Not my words.  Their words, their brief, you

17   know, their examples, all contract based.

18       Their contract base says:  We require express consent --

19   your explicit consent, okay, to treat you differently.  And

20   then secondly, they present it as if they were presenting you

21   an actual choice.

22       Even if there are some weird interpretations on contract,

23   different people think differently, those two things are

24   objective promises, Your Honor.

25       Is there an actual choice?  They have not shown you a

1    single example where Google offers you some actual choice.

2    They are, in fact, actually telling you "off" does not mean

3    off.  So my lights are staying on indefinitely.  It is an empty

4    light switch like I give to my two-year-old.

5        Secondly, where is the explicit consent?  They point --

6    they give you -- they spend -- I believe I counted.  It was

7    like seven pages -- examples from third-party disclosures none

8    of which talk about WAA or (s)WAA or what Google is not doing

9    when you are obeying their settlings with regard to that.

10       So there is no evidence in front of you, Your Honor, and

11   that was their burden to carry.  We have already demonstrated

12   not only according to Google's own framing, right, what are the

13   disclosures and what do we actually do.

14       You are actually not hearing them dispute the disclosures

15   in terms of what it says.  They may have a different

16   interpretation as to what that says -- I'm sorry -- what that

17   means, but that's a common question; okay.  No dispute there.

18       What does Google actually do?  As we show, okay, on

19   page 12 of our slides, Google arbitrarily chose for my account

20   just one identifier.

21       All these Google identifiers are saving everything to,

22   they are saying that when it's GAIA, that means that we are

23   signed in and we have consented and when we were not consented,

24   we are under an encrypted GAIA.

25       Nonetheless, I'm still going to save you according to your

 1   Google assigned app ID -- and app instance ID technically --

 2   Google device ID, the Google Firebase ID.  And there are no

 3   disclosures regarding how in the world any of this would not be

 4   associated with a Google account when they are Google

 5   identifiers.

 6        They don't even dispute that, Your Honor, in their

 7   opposition.  So it -- in a way if we are going to talk about

 8   expectations insofar as that may be dealing with consent, that

 9   has nothing to do with any of this because there is no actual

10   choice, and there is no explicit notification of what they are

11   actually doing.  They have shown you zero evidence on that,

12   Your Honor.

13        And, again, going back to your damages question, okay, if

14   you look at our model, Your Honor, four buckets.

15        Nominal punitives, those, I believe, are actually, you

16   know, within -- nominal, I think there is some debate on the

17   law as to how that is determined.  Punitives, I believe is

18   particular under the CDAFA, that's within your discretion;

19   okay.  Unjust enrichment, that's about the Defendant, what the

20   Defendant unjustly earned.  Restitution, I think is, perhaps,

21   your question.  On that, we have used a very conservative model

22   based upon Google own numbers.

23        If you have a question on that for Daubert, I would --

24             **THE COURT:**  Let me first just kind of address your

25   points and then we will go -- I will keep him up here.  He can

1  talk about Daubert, and then I will let your colleagues

2  respond.

3          **MR. MAO:**  Okay.  Sorry, Your Honor.  I think I'm

4  stepping off; right?  Just making sure.

5          **THE COURT:**  Okay.  Mr. Santacana, you can respond to,

6  briefly, the points that have been made, and then you can talk

7  about Daubert.

8          **MR. SANTACANA:**  Okay.  It was a lot, Your Honor.  I'm

9  going to be as brief as I reasonably can.

10          **THE COURT:**  Okay.

11          **MR. SANTACANA:**  So I want to start by kind of trying

12  to take a look at this case from a bird's eye view for a

13  moment.

14      The Plaintiffs are saying there is a light switch, and

15  there is a label on the light switch.  When I turn it off, it

16  should do the opposite of what the label says.  So kitchen

17  lights on, off.  Okay, great.

18      But the way they've constructed this case is they are

19  saying this light switch when I turn it off, the label

20  shouldn't just say, "I'm turning the kitchen off."  It should

21  also say, "I'm leaving the living room on, and I'm leaving the

22  bathroom on, and I'm leaving the neighbor's house on, and the

23  power will still run to the house."

24      The kitchen lights are off.  The switch does work but I'm

25  not going to list out everything that it doesn't do.

1        **THE COURT:**  Right.  All of those things are -- can be

2    answered on a classwide basis.

3        **MR. SANTACANA:**  I don't agree, Your Honor.  And that's

4    where I think -- that's where I think Mr. Mao and I diverge is

5    he says all of this is just contract; right.  And Google says

6    it's all contract.  Contract principles --

7        **THE COURT:**  Let me stop you a minute and tell you what

8    troubles me about your argument and you can clear it up.

9        On the one hand in the very simplistic way, you are saying

10   this is -- you know, this is just so obvious that Google's

11   approach here is -- they have misinterpreted it.  It's very

12   clear, you know, end of story.

13       And then when it gets to the question of class

14   certification, you say:  Oh, well, it is not subject to some

15   sort of clear yeah or nay we are doing something right.

16       It seems to be somewhat inconsistent in how you are

17   arguing this to me.  You know, no one could consider what we

18   have done to be wrong.  It's just so clear but it's so murky

19   that we can't have class certification.  So I don't -- I'm

20   having trouble with that.

21       **MR. SANTACANA:**  Yeah.  So, here is, I guess, how I

22   guess I square that circle because I do think there is sort of

23   a mental hurdle there.

24       If the case were only about the Google terms of use and

25   the WAA button's description, then I think you would be

 1  absolutely right; and there are a lot of cases in the district

 2  where classes get certified because the only question is what

 3  does the contract mean.

 4       **THE COURT:**  And you are kind of saying, at the

 5  beginning of your presentation, how strong your argument is in

 6  that respect.

 7       **MR. SANTACANA:**  Well, what I said was it doesn't say

 8  I'm going to turn off the neighbors house.  Mr. Mao says, "You

 9  never told me the neighbor's house was going to be on in the

10  first place."  They have to say that or they have a problem

11  because what really happened is what I showed you on these

12  slides in the peach colored slides is that Google says in a

13  variety of places and then also app developers in the red

14  slides say in a variety of places "neighbor's house is going to

15  be on.  We are going to keep records" -- if you look at

16  slide -- just as one example, slide 14.  (As read:) "We give

17  advertisers data about their ads' performance but we do so

18  without revealing any of your personal information."

19       Mr. Mao said Google has never disclosed that to anybody

20  but there it is right there.  Every single one of those pages

21  is disclosing it over and over.  Of course, that's how the

22  internet works.  We have to keep a receipt.  We are not just

23  serving ads and then not keeping a log of it.

24       So at a minimum there has to be a server log, which is the

25  bottom one.  We store a record of the ads we save.  We

anonimize this log data.  We anonimize this log data.  It is
undisputed that that's what Google did.

The question is:  Does the kitchen light switch mean that
all of this is overridden?  That's the question.  And to answer
that question, we can't just look to the terms of use, and we
can't just look to the WAA button.

One of the things I just read to you is from a supporting
privacy policy page.  There is also the privacy policy itself.
There is also people's basic understanding of how the internet
works like Mr. Cataldo.

There's also the third-party app disclosures which say,
"I'm going to collect some basic anonymous information from you
so I know how well my ads perform."  And people repeatedly
agree to that.

So, even if this were a contract class, I'm not sure it
could be certified.  Contract cases get certified when there's
one contract.

Here, I think part of the problem is there are thousands
of written instruments that people are clicking through and
saying "this is fine with me," and then there is this one
button that says "kitchen lights."

And their argument has to be -- in order to certify the
class, their argument has to be "ignore everything around it.
Ignore the neighbor's house.  Ignore the living room.  Just
focus on the kitchen."

1        That's not reality.  And that's why, Your Honor, again

2    courts have repeatedly held that this isn't class cert material

3    in very similar circumstances where a Defendant says, "Here's

4    what I'm going to do" and then it says something else that

5    causes someone to believe --

6        **THE COURT:**  What is the clearest expression of these

7    myriad of cases you are talking about?  Which one -- if you

8    could only pick one that I'm going to look at that is going to

9    be compelling in terms of what you just said, which one should

10   I look at?  Judge Tigar's case in, is it, Oppenheimer or --

11       **MR. SANTACANA:**  *Opperman versus Path*.  No.  *Opperman*

12   is not a consent predominance issue.

13       **THE COURT:**  Give me one.  I'm only going to read one.

14   Which one is it?

15       **MR. SANTACANA:**  I think that if you are only going to

16   read one --

17       **THE COURT:**  I will give you two.

18       **MR. SANTACANA:**  I have to give you two.

19       **THE COURT:**  Go ahead.  Give me two.

20       **MR. SANTACANA:**  Okay.  The *Google/Gmail* case because

21   in it Judge Koh distinguishes the yeses and the nos.  This is

22   certifiable.  This is not.  So there is helpful analysis there.

23       **THE COURT:**  Okay.

24       **MR. SANTACANA:**  And then I think -- I think the *Hart*

25   versus --

1          **THE COURT:**  That's Judge Tigar.

2          **MR. SANTACANA:**  *Hart versus Weather Channel* case,

3    there is actually a quote from it right here, Your Honor.

4          **THE COURT:**  No.  I will look -- I always love to read

5    Judge Tigar's, they are always well done and very instructive.

6    So I will take a look at it -- that case.

7          **MR. SANTACANA:**  Okay.  Well, in that case -- we

8    haven't talked about it a lot -- in that case the issue was the

9    Weather Channel did say -- and I just want to -- when we talk

10   about what did they say, was it disclosed, what are the

11   different disclosures?  Again, a lot of their case none of

12   those disclosures mention WAA so you can ignore them.

13        So on slide 17 -- this is straight from their reply

14   brief -- their argument is everywhere where the kitchen light

15   switch is, it must also list all the things that it isn't.

16        And their reply brief kind of with a straight face

17   suggests, well, the third-party app disclosures don't say that

18   Google won't honor its user privacy settings.

19        Even the cases that we have cited where implied consent

20   precluded class certification, it doesn't have a disclosure

21   like the one in red here.  It says:  And by the way, some other

22   party is not going to honor their settings -- is not going to

23   honor their promises.  That's not what's required.

24        And in the privacy context what is required is a holistic

25   evaluation of what that person knows and understands.  It is an

1  objectable -- objective expectation of privacy but based on the

2  circumstances of the person.

3      So in *Hart versus Weather Channel* it is one website

4  location data.  In *Opperman v. Path* it is one app and its

5  contacts books.

6      This is one-and-a-half million apps.  This is both a

7  receipt because I saw an ad for a sneaker, and it is other

8  types of data relating to all of the sensitives they raise.

9      All right.  The other point I want to make from what he

10  said is that this question of highly offensive conduct, some

11  judges have said it's a policy question and yet repeatedly they

12  are denying class cert in part on that basis.

13      The problem is that this is not -- the policy decision

14  about Google's conduct -- it's not just Google's conduct at

15  issue; right.  The apps are the ones who implement the

16  technology in various ways.

17      And so in order for there to be a holding of highly

18  offensiveness, you would have to look at the specific nature of

19  the data at issue.  And we cite in our briefs those cases which

20  say that.

21      With that, I'm ready to turn to the Daubert.

22          **THE COURT:**  Go ahead.

23          **MR. SANTACANA:**  Okay.  So, there's two damages models.

24  I will start with sort of an overarching point with our problem

25  with this expert report.

1    And the overarching point is that you can tell that these

2 damages models are outcome determinative and unreliable because

3 if you test them to see how malleable they are, the answer is

4 always the same.

5    For the unjust enrichment model, what Lasinski did was he

6 said every ad that was served to a person with WAA off, I want

7 all of the money back, all of it.

8    So imagine for a moment, that Google accepted the data at

9 issue on the servers.  You heard Mr. Mao say the harm is that

10 it was saved, just that it was saved, the app itself.

11    Okay.  So Google saves it, locks it up, encrypts it, puts

12 it in the woods and buries it.  And he says, okay, I want the

13 half billion dollars for that.

14    Or Google personalizes advertising.  It reidentifies who

15 people are.  It figures out what their preferences are using

16 the same exact data.  It doesn't just say that it uses it and

17 exploits it to that degree.  And Lasinksi says:  "Yep, same

18 number.  I want the same number."

19    It does not matter what Google does with it.  It doesn't

20 matter whether Google profits from it at all.  If ads were

21 shown, then he wants the money back.  It is a one hundred

22 percent non-restitutionary disgorgement opinion.

23    So I'm not saying -- I understand that some things go to

24 the weight, but the Supreme Court has new rules on this coming

25 out December 1st that emphasize that judges too often say it

1   goes to the weight and too often allow things that are so --
2   that lack heft.  The opinions that lack heft are going to
3   juries because it goes to the weight.
4        And on the 3-dollar opinion, which is an actual -- it is a
5   restitutionary disgorgement opinion, the argument or the
6   problem is identical.
7        So he says it's $3 per device and the fault is that it was
8   saved.  So if I save it and I put it in the woods, I get $3.
9   If I publish it on the New York Times, I still get $3.  If I
10  personalize ads with it, it's $3.  If I'm in *Brown* and my claim
11  is incognito browser stuff unrelated to this, I get $3; right.
12       The next case they bring in this series of cases they are
13  bringing, they are going to say it's $3 if Your Honor blesses
14  this.
15       When you read the one paragraph that Mr. Lasinski has
16  explaining why it is $3 and it is reproduced in its entirety,
17  at slide 19 -- and really, you can look at slide 20.  It's the
18  same paragraph redlined to what he said in *Brown* -- there is
19  actually one sentence in his whole report that explains why $3
20  is appropriate.  It's the blue sentence at the bottom.  And it
21  just says it's appropriate because it's appropriate.
22       And I deposed Mr. Lasinski -- we put some of his testimony
23  in the brief -- and he was not able to identify a single factor
24  that would push that number up or down.
25       Again, if you test the reliability of an opinion to see

1    how malleable it is, that's how you know if it is outcome

2    determinative.  So he said:  Well, it doesn't matter how many

3    times you suffer.  It doesn't matter how severe the intrusion.

4    It doesn't matter what you did with the data.  In effect, it is

5    $3 regardless.

6              **THE COURT:**  Okay.

7              **MR. SANTACANA:**  A couple more specific things on each

8    model if you will indulge me.

9         So with respect to the disgorgement model, the courts in

10   *Hart, Campbell, Apple iPhone Antitrust* case and *Silva* all

11   excluded damages models with the same problem.

12        Those were easily cases where the judges -- and Your Honor

13   did it in *Gamevice versus Nintendo*.  It was a patent case with

14   a similar issue.

15        Judges in those cases could easily have said this goes to

16   the weight, but the models were just so fundamentally flawed

17   that it didn't even rise to the level of expert opinion.

18        Anybody -- anybody can just say:  "That's your ad revenue,

19   give it back to me;" right.  Their Plaintiffs can get on the

20   stand and say that.  Their lawyers can say that in closing

21   argument.

22        What did the expert do?  What is the expert opinion?  How

23   does he know how much this tiny cog in the ad machine is

24   contributing to that bottom line?  He says it is a but-for

25   cause.  It is just all of it.

1    In addition to that problem, Your Honor, the report relies

2    really very heavily -- like the whole concept behind it is that

3    Google studied what might happen if the Incognito mode in

4    Chrome shut off all third-party cookies entirely.

5    And he said:  Well, that's comparable.  And Your Honor is

6    familiar with patent cases and Daubert opinions relating to

7    comparable market transactions.

8    Sometimes people get excluded for choosing a transaction

9    that's not comparable.  And in his report there's two problems.

10   One is he doesn't explain why it should be comparable, but two

11   the lawyers' explanation on why it should be comparable just

12   doesn't pass the smell test because what he is saying is it is

13   a but-for cause because in Incognito it would be a but-for

14   cause.

15   But in Incognito there is no data flowing at all in this

16   hypothetical world.  And in the Plaintiffs' hypothetical world,

17   it is just Google that's not saving the data.  The advertisers

18   can still save data.  They can still see what's going on.

19   Plus, we already live in a world where Google is operating

20   without the very data that Lasinski says is a but-for cause.

21   Since April 2021 Google is not receiving the exact

22   receipts from Apple sort of -- from ads served on Apple's

23   operating system.  Google is not getting those receipts at all.

24   So, again, yes, I'm addressing the merits of his opinion

25   but some opinions are -- lack merit to a degree that makes them

1    unreliable.  And I think that is the problem with this piece of

2    his disgorgement opinion.  It's the same problem that these

3    other cases found.

4        On the 3-dollar payment, Your Honor -- I just want you to

5    consider this for a moment, the 3-dollar payment is based upon

6    the Screenwise study that Google does.  They pay people and the

7    people have to fill some things out and they get an app and

8    they give all of their information.  They give all of their

9    information, their whole phone.  Everything the person types on

10   the phone goes to Google.

11       And Google says:  "I'm going to personally identify you.

12   I'm going to learn things about you.  I'm going to give you

13   surveys, and I'm going to personalize advertising for you.  And

14   here is what I will pay you in exchange."

15       And Lasinski says, well, that's -- you have set a market

16   value for the data.  It's that amount.  What he is doing is

17   setting up a license; right.  He is setting up an idea of --

18   just as the restitution restatement says, what would the

19   license be for the data if the Plaintiffs had had the chance to

20   negotiate with Google.

21       So I asked him:  If we were at the negotiating table --

22   the Plaintiffs on one side, Google on the other -- does it make

23   a difference if there are constraints on what Google can do

24   with the data?

25       Because remember, WAA is a light switch.  You flip it off,

1    I can't use it to identify your personalized advertising.  He

2    said, no, it doesn't make a difference.

3        Does it make a difference if Google publicly discloses the

4    data?  No, it doesn't make a difference.  Does it make a

5    difference -- nothing made a difference, Your Honor.  It was $3

6    no matter what.  That's what he said in his deposition.

7        So, if that's the opinion, again, Plaintiffs can say that.

8    The Plaintiffs' lawyers can say that in closing argument.

9    Where is the expert opinion?  We can all see what Screenwise is

10   paying people as lay witnesses.  We do not need an expert to

11   tell a fact-finder --

12       **THE COURT:**  Well, presumably he will say there is some

13   significance to that from an expert perspective.

14       **MR. SANTACANA:**  He can't.

15       **THE COURT:**  Why not?

16       **MR. SANTACANA:**  Because it is not in his report.

17                    (Pause in proceedings.)

18       **MR. SANTACANA:**  In order for him to testify as to --

19   right --

20       **THE COURT:**  In answer to your examination question of

21   why do you deem it significant.

22       **MR. SANTACANA:**  I'm sorry?

23       **THE COURT:**  I'm not sure it would be beyond his

24   report.  If he is opining that $3 is the appropriate figure and

25   you are suggesting, well, you don't need an expert to say that

1  because they just pulled it out from --

2        **MR. SANTACANA:**  Right.

3        **THE COURT:**  -- what you just said.

4        **MR. SANTACANA:**  With no additional --

5        **THE COURT:**  You would say -- and he could not explain

6  why he would deem the fact that you have identified it in that

7  fashion to be -- to be of significance from an expert's

8  analysis perspective.  He wouldn't be allowed to do that

9  because that wasn't elaborated upon in his report?

10        **MR. SANTACANA:**  Well, let me -- I will rephrase it.

11  He wouldn't tell me when I asked him and he didn't say why in

12  his report.

13        **THE COURT:**  It is very different, though, than some

14  hidden opinion that suddenly gets thrown upon you.  You know

15  what his opinion is, and you think his explanation is pretty

16  feeble.  Okay.

17      You are suggesting to me this doesn't even need -- you

18  don't need -- under Rule 702 you don't need an expert to talk

19  about this because they are just taking a figure that's

20  floating around in the Google sphere and they are pointing to

21  it and saying that.

22        **MR. SANTACANA:**  Yeah.

23        **THE COURT:**  Okay.  I think it would not be

24  inappropriate for him to elaborate upon -- even -- you can

25  impeach him and say if he has -- if he comes up and says,

1    "Well, I think this is the most critical figure that one would

2    have when you are trying to formulate, from an expert's

3    perspective, what's important."

4        Then you can say, "Well, you didn't tell me that when I

5    asked you that question in your deposition," fair enough, but

6    the idea that somehow that is self evident, that it is not

7    proper subject of expert testimony, I don't quite follow you on

8    that.

9            MR. SANTACANA:  Let me try it this way then -- I think

10   I may have confused the issue -- Lasinski's opinion is

11   Screenwise pays people $3 a month so we should pay them $3

12   once.  He never, by the way, explains why that should be

13   either.

14       Okay.  I understand that's his opinion.

15           THE COURT:  Very conclusory -- it's a very conclusory

16   opinion in this regard.

17           MR. SANTACANA:  I mean, it is -- very conclusory, Your

18   Honor, is an understatement.  Okay.  This is his entire

19   opinion.

20           THE COURT:  I understand.

21           MR. SANTACANA:  It is the whole thing.

22           THE COURT:  On the 3-dollar point.

23           MR. SANTACANA:  On the 3-dollar point.  This man

24   provides no explanation -- there is no calculation.  Why isn't

25   it $2?  Why isn't it $4, as Judge Gonzalez Rogers mused with

respect to a different expert.  Why isn't it 14 percent?  Why isn't it 15 percent?

I asked him why isn't it 3 and not 4?  He said, "I don't know.  Maybe it is 4."

I said, "Hold on a second.  You presumably considered 4 and you chose 3."  And his answer every time was, "Well, 3 is appropriate."

Why is it appropriate?

Because I think it is appropriate.

Why do you think it's appropriate?

This is right there in the deposition Your Honor.  So that's the fundamental problem with that.

I think there is just one more thing I would like to say about this -- about this 3-dollar opinion, which is that this hypothetical license that he is setting up, as I was saying earlier, if that's the exercise that the restatement asks us to do -- just like in patent, we do it all the time -- to be an expert opinion, there must be an input not just an output.  And the input can't be a block box.

On December 1st there is -- the advisory committee notes to Rule 702 will make this additionally clear although they say it is not a change in the law that there is a difference between a feeble expert opinion and an expert opinion that doesn't have a foundation at all and is really just speculation.

1          So he presents this as actual damages.  This is what

2     compensatory damages this class suffered, and he says it's $3,

3     and he never says why.  That is classic Daubert material.

4          **THE COURT:**  Thank you.  So on the Daubert point, it's

5     Mr. Sila.

6          **MR. SILA:**  Sila, Your Honor, yes.

7          **THE COURT:**  Okay, go ahead.

8          **MR. SILA:**  Your Honor, I would like to just begin for

9     a moment talking about mental anguish, which we have talked

10    about a bit today and how it relates to the damages analysis

11    and the motions that are currently pending.

12         First, I want to make clear that mental anguish is not an

13    element of the CDAFA claim.  It is not a part of damages lost.

14    It doesn't have to be something that Plaintiffs seek in terms

15    of compensatory damages under that statute.

16         And as much as Google spends time talking about variations

17    between individuals in terms of their sensation of emotional

18    distress, we are actually not seeking damages on that basis,

19    and we don't have to.  If Your Honor is interested, I have a

20    case --

21         **THE COURT:**  You would agree that that wouldn't be

22    subject to classwide --

23         **MR. SILA:**  It might but they haven't presented

24    evidence that shows that variation.  I can imagine why you

25    might think that there would be such variation.  We have not

submitted a model that's on that basis precisely for that

reason so that we can have a classwide model.

The Ninth Circuit in a case called *BP versus Balwani* says

that Plaintiffs are allowed to make choices like that to

abandon models that might raise class certification issues in

order to certify the class and create a classwide damages

model.  So that's the first point that I would like to make.

Google's most significant argument, I think, is that

Mr. Lasinski -- at least with respect to the disgorgement

opinion, that Mr. Lasinski attributes one hundred percent of

Google's profits to Google's use of supplemental web and app

activity data, its use of (s)WAA off data for whatever

purposes.

So the truth is that Mr. Lasinski actually calculates the

money that Google actually earned by using (s)WAA off data in

order to make money, and that's two type of uses, and this is

well grounded in the record from technical experts from both

sides.

Scenario one, he calculates and isolates the specific

dollars that Google earned by using (s)WAA off app activity

data to do something called conversion tracking and

attribution.  Now that requires saving this app activity data

in a location and then looking back once a later activity

occurs to ask:  Well, was this purchase caused by an ad that

Google served recently or was it caused by something else?

1       It is about measuring effectiveness of the ad.  So when

2   Google says that Mr. Lasinski's models are unaffected about

3   whether Google took the data and buried it out in the woods.

4   That's not what Google did.  And if it did, it would not be

5   able to make this kind of money.

6       The same thing is true with scenario two which relates to

7   a related but different kind of revenue generating activity,

8   which is service and charging for ads.

9       It's not simply saving receipts.  This is the data that

10  Google actually uses in its systems to serve the ads and then

11  to go back to advertisers and say "Hey, pay me this money."

12  These are their billing records, and they have detailed

13  information as we lay out in our -- as we cite in our class

14  certification motion to the report of Plaintiffs' technical

15  expert Jonathan Hochman.  I believe that request and all of the

16  data that is included there is at paragraph 130 of his

17  technical report.

18      So it is simply not true that Mr. Lasinski is attributing

19  dollars that do not relate to the wrongful conduct in this

20  case, and it's not true that he is attributing full sweep of

21  Google's recommendations to a tiny cog in the machine.

22      Now, Google's arguments on this point I personally find a

23  little hard to follow, and I think I have been able to distill

24  two types of arguments from Google's arguments today and in the

25  briefing.

1      One relates to but-for causation.  Google says, yes, that

2  Mr. Lasinski should have considered a but-for world and how it

3  might have nonetheless made this money in a but-for world where

4  it doesn't collect (s)WAA off app activity data.

5      That's not the law.  California courts are clear that a

6  disgorgement remedy does not have to depend on but-for

7  causation.  Plaintiffs are entitled to seek every dollar that

8  Google actually made by using (s)WAA off app activity data.

9  That's what Mr. Lasinski does.

10     And regardless, evidence from both parties' technical

11  experts supports the conclusion that the dollars that

12  Mr. Lasinski calculates are the dollars that Google would not

13  have earned if it had not used (s)WAA off app activity data.

14  So there is plenty of basis in the record for that argument.

15     And finally, I want to be clear that even if there were

16  deductions that were appropriate from a disgorgement model, it

17  is Google's burden to prove that deduction.  It is not

18  Plaintiffs' burden.  It is certainly not Mr. Lasinski's.

19     And Google's own cases support this fact.  In reply Google

20  cites a case called *Frank Music Corp.*, the Ninth Circuit case

21  from 1985.  In that case the Ninth Circuit said, quote, "the

22  burden of attribution" -- and there it's talking about

23  allocation of profits to non-wrongful causes -- "is the

24  Defendant's."

25     Now, it's not Mr. Lasinski's burden and Google has not

1    presented evidence that it's capable of making that kind of a

2    deduction any way.

3        Google also cites to a case called *Moonbug Entertainment*

4    in which I believe it was Judge Chen --

5            **THE COURT:**  Right.

6            **MR. SILA:**  -- who looked at an expert's opinion.  That

7    expert's opinion was the Defendant's expert.  It was not the

8    Plaintiffs' expert.

9        Google is free to present evidence of an appropriate

10   deduction if it believes there is one, but it is not

11   Mr. Lasinski's job and it is not a basis for the exclusion of

12   his opinions.

13       Turning to Mr. Lasinski's actual damages model,

14   Mr. Lasinski explained the basis for his model at length in his

15   report and at his deposition.

16       He conducted a market based approach.  He looked across

17   the market.  He found comparable transactions that actually put

18   a dollar value on the kinds of data at issue here.

19       I understand that Google has arguments about differences

20   between the kinds of data that were at issue in those

21   comparable transactions, in Screenwise, for example.  Those are

22   all arguments that go to weight, not admissibility and can be

23   the basis of cross-examination if Google so chooses.

24       I think it might be most helpful, Your Honor, is if you

25   had a specific questions regarding either --

1            **THE COURT:**  You know, Mr. Santacana spent a lot of

2    time on the 3-dollar point.  Why don't you talk about the

3    explanation or lack thereof in Mr. Lasinski's report.

4            **MR. SILA:**  Mr. Lasinski's report laid out the detail

5    of the analysis of the market.  He looked at four transactions,

6    and he described the compensation structures for each of those

7    transactions and the kinds of data that were at issue in those

8    transactions.

9            And he looked specifically to try to find Google's

10   willingness -- evidence of Google's willingness to pay for the

11   data at issue and users willingness to accept payment from

12   Google in order to give up their data to Google.

13           And it is almost self evident, Your Honor, that -- and

14   Mr. Lasinski, in fact, states he relies on Google's own

15   payments in the Screenwise program as indicative of its own

16   willingness to pay and indicative of user's willingness to

17   accept from Google.

18           Now, the truth is in that program and in here Google

19   actually saved the data at issue.  It kept -- it held onto it.

20   It held it in its logs.  It saved the data.  It didn't bury it

21   out in the woods.

22           **THE COURT:**  The point that Counsel was trying to make

23   is with respect to whether or not one needs an expert, if, in

24   fact, the analysis is as simple as pulling a number from Google

25   and saying there it is, that's the number, the argument for

1   needing to do that through an expert is the expert presumably

2   would then explain the reason that we can look at that number

3   and that it bears significance and it's the one we should all

4   focus on is in my expert opinion based on the fact that

5   whatever.

6       And they are suggesting there is no -- there is nothing

7   like that here.  There is only -- there is the number and I

8   took it because that's what I think is the right number without

9   an appropriate explanation.  So why should I not be troubled by

10  that?

11      **MR. SILA:**  The 3-dollar figure is the conclusion it's

12  true.  If we can just present that conclusion without having

13  conducted market based approach, then maybe we could do that.

14      Of course, Mr. Lasinski, who has decades of experience

15  valuing assets of all types in all kinds of industries and

16  doing analyses just like this, can explain and did explain at

17  his deposition why the 3-dollar payment in Google's own

18  willingness to pay is indicative.

19      For one thing, Mr. Lasinski explained that, of course,

20  Google's actual payments are the best evidence of its

21  willingness to pay.  That is something that he explained in his

22  deposition, and then it's something that you would need a

23  valuation expert to do.

24      Now, if Google's position is that we can simply introduce

25  evidence at trial of the 3-dollar payment and say that's what's

1    appropriate without Mr. Lasinski's expert testimony, then we

2    would expect them not to object if Your Honor were to exclude

3    Mr. Lasinski and we try to do that at trial.

4        I don't think that's really the argument that Google wants

5    to make, and it's -- it certainly doesn't account for the full

6    analysis that Mr. Lasinski made in his --

7            THE COURT:  Well, the concern that they have and the

8    concern that sometimes Daubert is trying to address is you take

9    something that really doesn't require any expertise and you put

10   a nice -- you wrap it up in an expert label and that has the

11   danger of suggesting to the jury that this brilliant person

12   with all this expertise has come up with this and, therefore,

13   it is entitled to a great deal of deference.

14       And the concern is a legitimate one that if it really

15   isn't something you need an expert for, you shouldn't allow an

16   expert to testify about it.

17       So that's the nature of the argument and it's not a -- you

18   know, it's a real argument.  So why should I not be troubled by

19   that in this case?

20       Whether or not they would stipulate to let you do whatever

21   you do without an expert is not really the focus of whether or

22   not I should let you have this expert say that.

23           MR. SILA:  Understood, Your Honor.  I do want to come

24   back to the point that Mr. Lasinski conducted on his own

25   initiative -- well, obviously, you know, he was retained for

 1    the purpose.  He conducted a market based approach.  We didn't

 2    just put this number in front of him and say: "Hey,

 3    Mr. Lasinski, can you go testify about why this 3-dollar figure

 4    is the right one?"

 5        He reviewed other market transactions looking specifically

 6    for transactions that are the most comparable, what is the best

 7    possible evidence.

 8        And with respect to the Screenwise program in particular,

 9    this 3-dollar payment that Mr. Lasinski relies on is not the

10    only payment in the program.

11        There are enrollment fees.  There are monthly payments for

12    use of a Screenwise router.  Google referred to -- to the

13    opinion in *Brown*.  There are separate fees for browser related

14    monitoring, and then there are specific 3-dollar payments for

15    mobile activity and activity on tablets, the bulk of which

16    occurs on apps.

17        And Mr. Lasinski helps to narrow the focus away from that

18    market wide -- the market wide scope of transactions -- any

19    possible transaction that could be out there away from the

20    various components of the Screenwise program and on

21    specifically to the relevant and most applicable payment from

22    the Screenwise program.

23            **THE COURT:**  All right.  Okay.  Thank you very much.

24    It is very helpful.  I will take all that you have said and go

25    back and work on an order, and I will look at the supplemental

1    materials that you provided to me.  Despite my reaction at the

2    beginning, I will look at them.  So, thank you very much.

3              (Proceedings adjourned at 3:09 p.m.)

**<u>CERTIFICATE OF REPORTER</u>**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    October 10, 2023




<u>_Marla Knox_____</u>

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter