# EXHIBIT 5

# Publicly Filed Version

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1   ** C O N F I D E N T I A L **
2   ** ATTORNEYS' EYES ONLY **
3   UNITED STATES DISTRICT COURT
4   NORTHERN DISTRICT OF CALIFORNIA
5   SAN FRANCISCO DIVISION
6   Case No. 3:20-CV-04688-RS
7   ----------------------------------x
    ANIBAL RODRIGUEZ, et al. individually
8   and on behalf of all others similarly
    situated,
9
            Plaintiff,
10
11
        - against -
12
13
    GOOGLE LLC,
14
            Defendant.
15  ----------------------------------x
                June 26, 2023
16              10:05 a.m.
17
18      Videotaped Deposition of JONATHAN
19  HOCHMAN, taken by Defendant, pursuant to
20  Notice, held at the offices of Willkie Farr
21  & Gallagher LLP, 787 Seventh Avenue, New
22  York, New York, before Todd DeSimone, a
23  Registered Professional Reporter and Notary
24  Public of the State of New York.
25
```

Page 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    A P P E A R A N C E S :
 2    BOIES SCHILLER FLEXNER LLP
      725 South Figueroa Street
 3    31st Floor
      Los Angeles, California 90017
 4            Attorneys for Plaintiff
      BY:    HSIAO (MARK) C. MAO, ESQ.
 5             mmao@bsfllp.com
 6
 7    MORGAN & MORGAN LLP
      201 North Franklin Street
 8    7th Floor
      Tampa, Florida 33602
 9            Attorneys for Plaintiff
      BY:    JOHN A. YANCHUNIS, ESQ. (Via Zoom)
10             jyanchunis@forthepeople.com
               RYAN JOSEPH McGEE, ESQ. (Via Zoom)
11             rmcgee@forthepeople.com
12
13    WILLKIE FARR & GALLAGHER LLP
      One Front Street
14    34th Floor
      San Francisco, California 94111
15            Attorneys for Defendant
      BY:    EDUARDO SANTACANA, ESQ.
16             esantacana@willkie.com
               NOORJAHAN RAHMAN, ESQ. (Via Zoom)
17             nrahman@willkie.com
18
      ALSO PRESENT:
19      CARA HUNT, Summer Associate, Willkie (Via
        Zoom)
20
        JOHN BLACK (Via Zoom)
21
        PAUL BAKER, Videographer
22
23
24
25

                                          Page  2
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                THE VIDEOGRAPHER: Good morning.
 2        We are going on the record at 10:05
 3        a.m. eastern daylight time on Monday,
 4        June 26th, 2023.  Please note that the
 5        microphones are sensitive and may pick
 6        up whispering and private
 7        conversations.  Please turn off all
 8        cell phones at this time.
 9                This is media unit one of the
10        video-recorded deposition of Jonathan
11        Hochman in the matter of Anibal
12        Rodriguez, et al., versus Google LLC,
13        filed in the United States District
14        Court, Northern District of California.
15        This deposition is being held at
16        Willkie Farr & Gallagher LLP located at
17        787 Seventh Avenue, New York, New York.
18                My name is Paul Baker and I am
19        the videographer, the court reporter is
20        Todd DeSimone, and we are both from
21        Veritext.
22                Appearances have been noted on
23        the stenographic record.  Would the
24        court reporter please swear in the
25        witness.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              *    *    *
 2         J O N A T H A N    H O C H M A N,
 3         called as a witness, having been first
 4         duly sworn, was examined and testified
 5         as follows:
 6    EXAMINATION BY MR. SANTACANA:
 7         Q.    Good morning, Mr. Hochman.  Our
 8    appearances are already on the record, so
 9    we will just get started.
10              You have been deposed before?
11         A.    Yes.
12         Q.    How many times?
13         A.    Over 50.
14         Q.    Okay.  And you have served as a
15    litigation expert before?
16         A.    Yes.
17         Q.    How many engagements roughly?
18         A.    Hundreds.
19         Q.    Hundreds.  You are currently
20    retained by the plaintiffs in this action?
21         A.    Yes, I believe so, the class.
22         Q.    And how many hours have you
23    spent roughly on this engagement?
24         A.    I'm not quite sure of my
25    personal hours, but I know that between
```

Page 4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Julie Burns and I it's a total of about I
 2    think 900 hours.
 3         Q.    Does she bill at your same
 4    rate?
 5         A.    No.
 6         Q.    What's her rate?
 7         A.    I don't remember exactly what
 8    it is for this case, but it's substantially
 9    less than mine.
10         Q.    Roughly half?
11         A.    Roughly a third.
12         Q.    Roughly a third, okay.  So
13    blended, in total, do you have a sense of
14    how much you're looking at in terms of
15    revenue from the case at this point?
16         A.    I'm not sure of the revenue.
17    I'm not quite sure.
18         Q.    How would you break down the
19    900 hours between you and Julie?
20         A.    I'm not sure.  I think she has
21    probably put in more hours than I have, and
22    that's my sense of it.
23         Q.    60/40, 70/30?
24         A.    I'm not sure.
25         Q.    Roughly how many hours do you
```

Page 5

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    think you've put in, order of magnitude?

2        A.      Hundreds.

3        Q.      Hundreds.  Did you review John

4    Black's report?

5        A.      Yes.

6        Q.      Did you review the backup for

7    the report?

8        A.      Yes.

9        Q.      What's Julie's role in all

10   this?

11       A.      Julie has been assisting me and

12   she's especially good at fact checking.

13   She is very detail-oriented and I have

14   asked her to check all the references, and

15   I think this report that I wrote, because

16   of her help, has fewer little errors in it

17   than the typical report.

18              I tried to get all the line

19   numbers right, all the page numbers right,

20   get every word right.  She made a lot of

21   little corrections where things were maybe

22   not quite right, and she can also flag

23   something if she sees something that is

24   unclear, then I can go and pay attention to

25   it and make sure it is more clear.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Well, my compliments to Julie,

2  I think she did a good job.

3    A.    Oh, good.

4    Q.    Did Julie do any of the

5  programming, coding, test app type work, or

6  was that all you?

7    A.    That was me and other people.

8    Q.    What other people?

9    A.    The ones identified in the

10  report.  I have listed the other

11  consultants who assisted me.

12    Q.    Okay.  Do they have separate --

13  a separate hours bucket than you and Julie?

14    A.    So they're not billed through

15  my firm, so I don't have insight into that.

16    Q.    They are billed directly to the

17  plaintiffs or the plaintiffs' lawyers?

18    A.    I would assume so.

19    Q.    Are those the Concur IP folks?

20    A.    They are some of them.

21    Q.    And is there another shop

22  involved?

23    A.    Well, the report lists the

24  names of the various people and I'm not --

25  it is sort of -- I'm not sure who is

Page  7

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   necessarily connected, how they are

 2   billing.

 3         Q.      Okay.  But you directed their

 4   work?

 5         A.      Yes.

 6         Q.      And did you personally review

 7   the code that they wrote?

 8         A.      Yes, I reviewed everything that

 9   they did.

10         Q.      Okay.  Do you have a sense of

11   how many hours they put into this?

12         A.      I'm sure it's hundreds to

13   thousands.

14         Q.      How would you characterize

15   their role on the case other than what's

16   written in your report?

17         A.      I mean, I think I've tried in

18   the report to give an explanation.

19         Q.      Okay.

20         A.      And I think that that's, you

21   know, a good explanation, what I wrote.

22         Q.      Okay.  So who is representing

23   you in this deposition?

24         A.      Mark Mao.  He is I guess the

25   plaintiff for the -- the plaintiffs'
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  counsel, and, well, it may be a legal

2  question, is he representing me or is he

3  just here, but he is defending my

4  deposition.

5      Q.    Okay.  Well, have you retained

6  him as your lawyer to respond to the

7  subpoena, for example?

8      A.    I know that one of the firms

9  put together a response, I know that there

10 was a subpoena, and I know that there was a

11 response.

12     Q.    Did you review the subpoena?

13     A.    Yes.

14     Q.    Did you review the response?

15     A.    Yes.

16     Q.    Did you approve it?

17     A.    Yes.

18     Q.    So have you retained any of

19 those lawyers to be your lawyer in response

20 to the subpoena?

21     A.    That may be like a legal

22 question, but essentially they're

23 responding on my behalf.

24     Q.    Let me ask it a different way.

25         Did you sign any retention

Page 9

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   agreement or any engagement letter with any
2   lawyers in response -- in relation to that
3   subpoena?
4        A.    I don't recall if there was
5   something at an earlier stage in this
6   process.  I didn't sign anything within the
7   last week or two.  I don't remember signing
8   anything in the last week or two.  But it
9   may be covered by some prior agreement.
10       Q.    And you didn't pay anybody to
11   respond to the subpoena for you or to
12   defend your deposition?
13       A.    I mean, that's not how it
14   generally works, so no.
15       Q.    Okay.  Have you been retained
16   by the Boies Schiller firm before?
17       A.    No, other than the Brown case.
18       Q.    So there is Brown and there is
19   this.  No other engagements with Boies
20   Schiller?
21       A.    No.
22       Q.    What about Susman Godfrey?
23       A.    I worked on a prior case with
24   Susman Godfrey on a patent case for them.
25       Q.    When?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          A.       Several years ago.
 2          Q.       Retained by any other lawyers
 3   in this case for any other engagements?
 4          A.       No.
 5          Q.       Your report, I have a paper
 6   copy of your report here, or at least the
 7   written parts, the non-native parts of it,
 8   and there is also one on there.  I don't
 9   think your report had a description of your
10   assignment in the case.  On page 7 it says
11   Engagement.  Paragraphs 9 through 12, would
12   you say that's a fair, let me hand this to
13   you, would you say that's a fair summary of
14   your assignment in the case?
15          A.       Okay, so before you asked the
16   question you made an assertion, and I feel
17   like the assertion wasn't in accord with
18   what's in here.
19          Q.       I'll withdraw it.
20                   (Hochman Exhibit 1 marked for
21   identification.)
22          Q.       Let me instead just say I'm
23   looking at paragraphs 9 through 12 of your
24   report, which is Exhibit 1, which we have
25   premarked.  Is this a fair summary of your
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   assignment in the case?

2        A.     Yes, I think this is a fair

3   summary.

4        Q.     Great, okay.  And then looking

5   at your table of contents now, just for the

6   structure of your report, there is a

7   Section VII, Opinions, and that has major

8   headings under letters A through K.  I

9   understand there are sub-opinions to each

10  one of those opinions, but is that a fair

11  summary of the opinions you've rendered in

12  the case?

13       A.     I think so.

14       Q.     And are there any opinions

15  you've rendered in this case or conclusions

16  you've come to that are not reflected --

17  I'm sorry, let's pause there.  All right,

18  let me try again.

19            Have you rendered any opinions

20  or come to any expert conclusions in this

21  case other than those reflected in your

22  report?

23       A.     I think all of them are

24  documented in the report.

25       Q.     Did you, coming back to your

Page 12

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    assignment there on paragraph 9, did you do

2    your best to complete that assignment

3    truthfully, honestly and according to a

4    sound methodology?

5         A.    Yes.

6         Q.    Is it your role in the case to

7    provide opinions that are favorable to

8    either party?

9         A.    No.

10        Q.    How would you describe your

11   role as an expert witness?

12        A.    I'm a neutral, so my job is to

13   explain the facts as accurately as I can

14   and to provide opinions that are as

15   accurate as I can.

16        Q.    And that's the case even if

17   those facts turn out to lead to a

18   conclusion less favorable to the people who

19   retained you, right?

20        A.    That may happen sometimes.

21        Q.    Did it happen in this case?

22        A.    I don't recall it happening,

23   but if I did find something I would have

24   told the attorneys about it.  I would have

25   said oh, there's a problem with your

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    argument here, you need to adjust it.

2         Q.    Okay.  But sitting here today,

3    you don't recall coming to any conclusions

4    that are less favorable to the people who

5    retained you; is that fair to say?

6         A.    Well, I'm not necessarily

7    thinking about what's favorable or

8    unfavorable, I'm thinking about what's

9    accurate, and I don't necessarily even know

10   what's favorable or not because part of

11   that may turn on legal questions, which I'm

12   not opining about.

13        Q.    Okay.  So when you say there's

14   a problem with your argument, you may want

15   to adjust it, is a better way to say that

16   there is a problem with the facts as you

17   believe them to be, this is what the facts

18   really are?

19        A.    If I were to say something like

20   that to a client, which does happen, you

21   know, regularly, it's usually that I've

22   seen some additional fact that they're

23   unaware of or they have misinterpreted

24   something.  It is really fairly common when

25   a law firm comes in to me with a case that

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  they've not completely accurately assessed
2  it.
3       Q.     Sure.
4       A.     And sometimes there are
5  adjustments.  I explain it, what I've seen,
6  and I investigate and I tell them, okay,
7  here's, you know, an issue with your theory
8  where it's not exactly right, you know, the
9  real situation is a little different.
10      Q.     Okay.
11      A.     And that's part I think of what
12 a good expert will do.
13      Q.     If it turns out that you have
14 made mistakes in your report, are you open
15 to correcting those mistakes?
16      A.     I'm all about the accuracy, so
17 if there are mistakes, I would, in general,
18 with all reports, endeavor to correct them.
19      Q.     And would you agree with me
20 that your obligation to provide neutral
21 expertise here doesn't end with your
22 report, if you discover something after the
23 report is done that indicates you were
24 wrong about something, you are obligated to
25 admit that, right?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.      I would issue a correction or
2   supplementation if there is a problem, if a
3   problem is discovered, because, as you can
4   see, the report is voluminous, it is quite
5   huge, and I'm not so proud that I wouldn't
6   admit an error, especially with something
7   so large.  There is -- there is -- well, it
8   is hard to be perfect as a human.  There is
9   usually some kind of error rate with all --
10  with human-mediated process there is
11  usually an error rate.
12      Q.      I think you said you did review
13  the Black report and the backups?
14      A.      Yes.
15      Q.      You did that review personally?
16      A.      Yes.
17      Q.      And what about Julie Burns, did
18  she do any fact checking of that report?
19      A.      I had -- I did ask Julie to
20  read over that report and give me her
21  impressions of it.
22      Q.      Sitting here today, is there
23  anything, based on anything you've learned
24  since you served your final report, is
25  there anything that you want to correct in

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  this report?

2       A.      Not yet.

3       Q.      Okay.  I want to ask you some

4  questions about the limits of your opinions

5  in the case, if I can.

6              So are you offering any opinion

7  in this case as to what consumers believed

8  or expected?

9       A.      I don't think so.  That doesn't

10  sound like something I've opined about.

11  Maybe as we go through the report we will

12  find something I've said, but that doesn't

13  seem to be one of the main things I was

14  opining about, no.

15       Q.      Are you an expert in consumer

16  expectations?

17       A.      Well, I have expertise in

18  internet marketing, internet security, so I

19  know something about consumers and consumer

20  behavior online, and, well, I will give you

21  an example, if you have a setting in a

22  piece of software, I might sometimes

23  comment, you know, most people will use

24  software with the default settings, all

25  right, because that's kind of a well-known

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  fact, and if you're in this field you
2  should know that.
3      Q.      Have you developed any
4  expertise about consumer behavior online
5  apart from what are otherwise well-known
6  facts about consumer behavior online?
7      A.      I mean, when I say well-known
8  facts, these are well known to people who
9  are experts in this stuff, they are not
10  necessarily well known to the layperson.
11  But I have understandings about how
12  consumers, you know, interact with ads, how
13  they interact with web pages, how they
14  interact with apps, I have to have some
15  knowledge of that in order to do my job.
16      Q.      Sure.  Well, and I just want to
17  be clear, my question is not if you have
18  some knowledge about it.  My question is do
19  you consider yourself to be an expert in
20  this case about consumer expectations?
21      A.      Well, I think I answered it
22  before, and the way I answered it before, I
23  think that was a good answer.  I would just
24  sort of repeat that, you know, that doesn't
25  seem to be one of my main opinions.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    Q.    Well, okay, I mean, with
2 respect, your answer was basically I don't
3 know, I would have to look at my report.
4    A.    Well, no, that's not exactly
5 what I said.  What I said was I don't think
6 that's one of the opinions I'm giving, not
7 one of the main opinions.  There might be
8 something tangential somewhere which
9 touches upon that, so I don't want to be
10 categorical and say absolutely nothing at
11 all, but that's not the thrust of my
12 opinions.
13    Q.    Fair enough.  Would you
14 consider yourself to be a consumer privacy
15 expert?
16    A.    I have expertise in the issue
17 of privacy.  I have done academic work in
18 that area.  As far as consumer privacy, I
19 don't think I'm here as the consumer
20 privacy expert.
21    Q.    Okay.  Are you offering any
22 opinion in this case as to whether Google
23 misled its users?
24    A.    So I think in this case I've
25 talked about how the, technically, for

Page 19

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    example, the WAA/sWAA switch, I have called
2    it a fake control, because it doesn't do --
3    technically doesn't do what it seems it
4    should do.  So I have to -- there is
5    some -- I guess there is a little bit of
6    overlap into that, but I'm not giving you a
7    legal opinion about, you know, about that,
8    I'm simply opining about the technology,
9    how does the technology work.
10        Q.     Is another way to say that that
11   you see your role here as comparing what
12   Google said it would do and at a technical
13   level what Google does or did?
14        A.     It may even be simpler than
15   that.  It just is I am going to explain
16   what this control does, what it does, and
17   if I comment on what impression this is
18   going to give people or what impression
19   even Google's own staff have about this or
20   their confusion about it, I think I have a
21   number of paragraphs that talk about how
22   even the Google insiders are confused about
23   how these controls work.  It looks like
24   even Sundar Pichai is confused about how
25   this control works because he testified in

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   front of Congress and told them something
 2   that is just wrong from a technical
 3   perspective, you know, I am commenting on
 4   the technology, but I may make some other
 5   comments about people's impressions because
 6   it helps to establish the relevance of the
 7   technical analysis.
 8        Q.    What relevance do Sundar
 9   Pichai's comments at Congress have to have
10   with the way the control works or doesn't
11   work?
12        A.    Well, it's in my report.  We
13   can -- we can go down, it's towards the end
14   of the report I think.
15        Q.    I'm asking about your answer.
16   You said that it helps establish the
17   relevance of the technical analysis to make
18   comments about what Googlers think or what
19   Sundar Pichai said.  I'm curious what the
20   connection is between, for example, the
21   CEO's testimony in Congress and how the
22   button actual works at a technical level.
23        A.    Well, I think it's going to be
24   relevant to help resolve the case to
25   observe what the public statements by
```

Page 21

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  Google are, that this is the way this thing

2  works, versus how it actually works, which

3  is what I'm providing, how does this thing

4  actually work.

5      Q.    Okay.  So that brings us back

6  to my original question, which is you

7  looked at both what Google said about how

8  it works and also how it works in your

9  report?

10     A.    My report is primarily about

11 how it actually works.  I have some

12 comments along the way noting things that

13 Google has said on its web pages, things

14 that Google -- how the user interface

15 looks, what Google's inside staff have said

16 about it, what Sundar Pichai said about it,

17 and I think all these facts are pertinent

18 and relevant and that the factfinder should

19 take them into consideration.

20     Q.    In deciding what?

21     A.    The ultimate issues in dispute.

22     Q.    Why do you think the factfinder

23 should take them into consideration?

24     A.    Because they seem relevant.

25     Q.    Why do they seem relevant?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.      Because they seem to shed light

2  on the issues that are in dispute.

3      Q.      What do you mean by that?

4      A.      Well, I've read the complaint

5  and I've read the answer and I've read a

6  bunch of other documents in the case and I

7  have a general idea of what the dispute is

8  about.

9      Q.      Okay.  So then can you tell me

10  how it sheds light on the dispute?

11      A.      I mean, to me it's sort of just

12  logic, it's someone should understand is

13  this control working as advertised, does

14  this control work the way it's supposed to.

15      Q.      How did you come to a

16  conclusion about what the control is

17  supposed to do?

18      A.      Well, I think that may be

19  something that, you know, the factfinder

20  needs to determine, because I think that

21  that might be in dispute.  Google might

22  have one position, this is what the control

23  is supposed to do, and the plaintiffs might

24  have a different position there.

25      Q.      So I think you said earlier a

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 few minutes ago that you came to the
2 conclusion that the WAA control is a fake
3 control because it doesn't do, quote, "what
4 it seems it should do."  I assume by that
5 you meant what it seems to you it should
6 do?
7          A.     Well, it's not just me.
8          Q.     Sure.  But -- well, what did
9 you mean when you said "what it seems it
10 should do"?  That's based on your
11 understanding of it?
12          A.     Well, it's based on my
13 understanding of it and it's also based on
14 the understanding of the various people
15 I've quoted and cited in the report who
16 have also made comments, and it is also
17 based on looking at the user interface and
18 seeing what's shown to the user.
19          Q.     On you looking at the
20 interface?
21          A.     I have looked at the interface
22 and other people who are quoted have also
23 looked at the interface and it's -- it
24 looks like it is a control that allows
25 users to have some privacy and to not have

Page 24

CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1   their sensitive information, what is the
 2   word I want here, to not have their
 3   sensitive information harvested and saved.
 4        Q.    What does "harvested" mean in
 5   that sentence?
 6        A.    It means -- another way to look
 7   at it is the user is in some app and they
 8   are doing some activity and they would like
 9   that activity to remain private.  They
10   don't want that activity recorded, copied
11   off somewhere else, or the expectation is
12   not to have that information copied off
13   somewhere else and stored somewhere else,
14   especially when that activity is being
15   stored with Google identifiers that link to
16   them.
17        Q.    Okay.  So back to your prior
18   answer, and, again, for now I'm just trying
19   to understand the limits of your opinion,
20   apart from what it seems to you the control
21   should do and the quotations you referenced
22   that are in your report, is there any other
23   basis for your conclusion about what the
24   WAA control should do?
25        A.    I mean, I have my experience in

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  working with technology and working as a
2  security technologist for many years. I
3  have my academic study of the topic.
4      Q.    So, sorry, when I say what it
5  seems to you, I'm including all of your
6  expertise, all of your experience,
7  everything. I'm just saying, again, I'm
8  just trying to understand what you are and
9  aren't opining on.
10          So you said that it seems the
11 WAA control should do something, and we
12 will get into what that something is. What
13 it seems the WAA control should do to you
14 and the people you quote in the report, I
15 understand that. Is there any other
16 opinion, basis, like a consumer survey,
17 other documents that are not cited in the
18 report, other experts you are relying on,
19 is there anything like that informing your
20 statement that the WAA control seems it
21 should do something in particular?
22     A.    Okay. So, well, I'm going to
23 go through the list that you gave and I
24 don't mind if the question was compound,
25 but you have asked about a number of

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   different things and I will try to remember
 2   them all, and remind me if I miss any.
 3        Q.     Well, the question is, is there
 4   anything other than you and what's in your
 5   report?
 6        A.     So I'm not relying on other
 7   experts' opinions.  For example, I'm not
 8   relying on anything Bruce Schneier has said
 9   because I know he has covered some of these
10   topics extensively.
11        Q.     All right.
12        A.     And I'm not being redundant
13   with his opinions.  He's got his opinions
14   and my opinions are designed to be
15   technical and to not be redundant with his.
16             I am not relying on documents
17   that I haven't cited into the report other
18   than, you know, sort of education and
19   expertise and everything I have absorbed
20   from everything I have ever read, but I'm
21   not relying on specific citations that I
22   haven't disclosed here.
23             And there was I think a third
24   thing you mentioned, which I have now
25   forgotten.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     Q.     Surveys.

2     A.     Surveys.  I am not a survey

3  expert, so I have not done surveys and I

4  don't do surveys.

5     Q.     And you don't cite any in your

6  report as a basis for your opinion on what

7  WAA should do, right?

8     A.     I don't necessarily -- I don't

9  necessarily want to make a categorical

10  statement like that, but I don't recall

11  citing such a thing.  Whatever is in the

12  report speaks for itself.

13     Q.     Okay, good.

14            And I assume you're not

15  offering any opinion as to whether Google

16  has violated any law in particular?

17     A.     No, I am not a lawyer.

18     Q.     And you are not offering any

19  opinion as to whether Google has committed

20  any particular invasion of privacy or

21  violation of the California constitution?

22     A.     I am not giving any sort of

23  legal opinion.

24     Q.     And you're not offering any

25  opinion as to the damages that Google

Page 28

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    should pay in this case?

2         A.    I haven't put forward a damages

3    number.  I believe that the damages experts

4    may be relying on some of the statements

5    that I've made in my report or in

6    conversation they had with me.

7         Q.    Yeah, that reminds me, you had

8    some conversations with the damages expert,

9    Mr. Lasinsky, prior to him serving his

10   expert report in the case, right?

11        A.    I believe so.

12        Q.    How long were those

13   conversations?

14        A.    It was a while ago, so I don't

15   remember the exact length, but it was long

16   enough to go over the issues and have a

17   sort of complete discussion of them and

18   make sure he understood.

19        Q.    So can you give me a sense of

20   what "long enough" means?  Five minutes?

21   Five hours?  Five days?

22        A.    Well, more than five minutes,

23   and less than five hours.

24        Q.    Okay.  In total?

25        A.    I believe so.

Page 29

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     Q.     And have you had any
2  conversations with him since he served his
3  report?
4     A.     I don't recall, because I don't
5  necessarily have it in mind when exactly he
6  served his report and when exactly I had
7  conversations with him.
8     Q.     Have you had any conversations
9  with him since you served your report?
10    A.     I'm not sure.  I wouldn't say
11 for sure that I haven't, but I don't recall
12 having a conversation with him after
13 serving my report, but I'm not sure,
14 because I don't recall if he served his
15 report after my report.  I don't remember.
16    Q.     Do you remember the last
17 conversation you had with him?
18    A.     I'm not sure I remember with
19 specificity the last conversation.  I just
20 remember having spoken with him on a few
21 occasions.
22    Q.     What did you talk about?
23    A.     It would have been this case,
24 the things that I would have spoken about
25 with him recently.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.      Did you relay anything to him

2    that is not reflected in your report about

3    the technology in this case?

4       A.      I don't think so.  I think that

5    what I explained to him was just sort of a

6    summary of what's already in the report.

7    But the report, as you can imagine, is very

8    detailed and goes into great depth, and for

9    a nontechnical person it's not certain that

10   they could understand the whole thing.

11      Q.      Did he seem to understand it?

12      A.      He seemed to understand what I

13   explained to him.

14      Q.      Do you know if he has reviewed

15   your report?

16      A.      I don't recall.  He might have.

17   I don't recall.

18      Q.      Did you express any opinion to

19   him about the damages Google should pay in

20   the case?

21      A.      No.

22      Q.      Let's talk about injunctive

23   relief.  Did you -- well, first, let me ask

24   you, there is an opinion in your report, a

25   set of opinions, about how Google could

Page 31

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    change its practices and other things

2    Google could do.  It's the last major

3    opinion in the report.

4        A.     Are you referring to K?

5        Q.     Yes.  My question is about the

6    limits of this opinion.  Are you opining

7    that Google should do these things or are

8    you opining about what Google could do?

9        A.     I'm opining about what is

10   technologically feasible.

11       Q.     Okay.  You're not opining as to

12   what you think Google should do?

13       A.     That seems to be more of a

14   legal question, so no.

15       Q.     Okay.  And are you in this

16   opinion, were you responding to a prompt

17   about -- strike that.

18         You list three major things

19   Google could do.  It could change how WAA

20   functions, it could purge certain things,

21   and it could delete certain things, is how

22   I would describe your opinion.  So just

23   stick with me for a second.  My question is

24   how did you come up with those items of

25   things Google could do?  Were you asked can

Page 32

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   Google do one of the following things, or
 2   were you asked a more general question and
 3   you came up with your own?
 4              MR. MAO:   Just objection to the
 5        form of the question.  The document
 6        speaks for itself.  Go ahead.
 7        A.     All right.  So let me just take
 8   a quick look through it, because the answer
 9   might be in here in fact.
10        Q.     Sure.  It's at 168.
11        A.     Yes, I'm there.
12              (Witness perusing document.)
13        Q.     And just generally speaking,
14   Mr. Hochman, I will try not to waste your
15   time and ask you questions that are
16   answered by the report today.
17        A.     Fair enough.
18        Q.     I may not succeed, but I will
19   try.
20        A.     And in response to that
21   courtesy, I will also try to give you the
22   information you are seeking even if you
23   don't ask the question exactly the right
24   way, because I prefer to take the high
25   road.
```

Page 33

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.      Well, as you've said, you're

2   not a lawyer.

3      A.      So I don't recall exactly how,

4   you know, there is, obviously in this case,

5   there is a discussion between me and my

6   clients.  They asked me what I think, I

7   asked them what their questions are, and

8   I'm not sure exactly whether they asked me

9   a general question, whether they asked me

10  specifics on each of these points.  I just

11  don't recall.

12     Q.      Yeah.  It's just as a reader of

13  your report, right, paragraph 9 says you

14  were retained to develop opinions

15  concerning the technology and practices at

16  issue, and you get to page 168 and that's

17  all you've talked about, and then just

18  right out of nowhere you say I think Google

19  could change the following things, and it

20  is just kind of jarring, like it is unclear

21  why you are even considering whether Google

22  could change those things.

23          Do you recall where that came

24  from?

25     A.      I mean, I think what it arises

1   from is that I'm aware that the plaintiffs

2   are asking for injunctive relief and then

3   so it becomes well, what sort of injunction

4   should we ask for, like what can they do,

5   what's feasible or not.  Because I would

6   imagine the plaintiffs don't want to ask

7   Google to do something that's impossible,

8   because that would be silly.

9       Q.    Okay.  So fair to say, then,

10  that this is not meant to be an exhaustive

11  list of what I will say -- what I will call

12  corrective measures that might exist in

13  this case or injunctive relief that would

14  satisfy the plaintiffs' claims, it's a

15  list, but it's not exhaustive?

16      A.    The way I look at this section,

17  these are examples.  These are examples of

18  things that Google could do.

19      Q.    Okay.

20      A.    That are feasible, that Google

21  could do what's in 409, Google could do

22  what's in 410.

23      Q.    Okay.

24      A.    So that's the purpose of that

25  section.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.      Got it.  All right, let's talk
2  about the phrase "Google account."  So your
3  report defines this phrase at paragraph
4  111.  If you could just flip to that for
5  me.
6      A.      One minute.  Give me a second
7  to read it just before you ask the question
8  because it will -- it will work better that
9  way.  111, are you sure that's the right
10 paragraph?
11     Q.      No, I'm not.  136.
12     A.      Okay.
13     Q.      And in particular the footnote,
14 104.
15     A.      Okay, just a second.
16             (Witness perusing document.)
17     A.      Okay, yes, I see that.
18     Q.      Okay.  So just to put it in the
19 record, your footnote says that "Google
20 Account" means the trove of data that
21 Google collects and saves regarding a user,
22 including data that Google characterizes as
23 pseudonymous.  Do you see that?
24     A.      Yes.
25     Q.      Okay.  The first question is

Page 36

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    just throughout your report wherever you

2    say "Google Account" with a capital A on

3    "Account," is it fair to assume that's the

4    definition you were using?

5        A.    That's a great question,

6    because this term "Google Account" is sort

7    of like the word golf club, it could refer

8    to the building and the golf course, like

9    the Hartford Golf Club, but it could also

10   refer to the implement of destruction that

11   you use to tear up the grass when you flub

12   the ball.

13       Q.    How many times have you used

14   that one?

15       A.    Never.  First use.

16       Q.    It's pretty good.

17       A.    Thank you.  In internet

18   terminology, an account can sometimes mean

19   a log-in, right?  So I have two Google

20   accounts, I have a personal log-in and I

21   have a Yale University log-in which is

22   powered by Google, all right?  So I'm

23   talking about log-ins there.

24            An account, in internet

25   terminology, when you think of an account

Veritext Legal Solutions

Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   on a platform, that is the -- includes the
 2   data related to that user, that's their
 3   account, or their account data is the whole
 4   trove of information that relates to that
 5   user.
 6              So I tried to be controlled in
 7   my language, but that one I'm pretty sure I
 8   may have crossed the wires at some point in
 9   the report.  So we should probably look at
10   instances that concern you and clarify
11   them, if there is any instance that you
12   think I may have said Google account when I
13   really meant Google log-in, we should -- we
14   can clear that up.
15        Q.    Okay.  That's good to know.
16   Because I do -- I want to understand what
17   you mean whenever you mention Google
18   account in the report, which is mentioned a
19   lot, and sometimes it is capitalized and
20   sometimes it's not.  Is it -- would you
21   say, generally speaking, the definition in
22   104 is the one you were working with but
23   sometimes the wires might have gotten
24   crossed and you used log-in instead?
25        A.    Well, I'm not sure that the
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  wires ever got crossed.  It could be the

2  case that it was all done perfectly, but it

3  is also -- I'm just aware of the potential

4  for confusion on that issue.

5       Q.    Yes.

6       A.    So I just want to be -- alert

7  you to that and make sure we are all clear.

8  Because I think it is fair to be -- and we

9  want to be clear.  I don't want -- I don't

10 want there to be confusion.

11      Q.    Yeah.  And, well, it is an

12 important phrase because it appears in the

13 description of the WAA control, right?

14      A.    Well, where it appears in the

15 description of the WAA control, that is

16 Google's use of the phrase.  What they

17 think it means may be different than what I

18 think it means.

19      Q.    Understood.  I'm just saying

20 it's an important phrase in the case.  So

21 just to ask it again, generally speaking,

22 when you used this term in your report, is

23 the definition in 104, should that be the

24 definition?  I will cover maybe potential

25 ambiguities, but I'm trying to figure out

Page 39

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    what your default is.

2          A.     Okay.  So I'm saying here I am

3    referring collectively to the trove of data

4    that Google collects and saves regarding a

5    user.  So I'm aware that Google may save

6    data in different locations, depending on

7    where that WAA/sWAA switch is set.  It is

8    still collecting the same data and still

9    saving it, but it may save it in different

10   places, okay? Logically, it's -- the user's

11   account, the accounting of the user's

12   activity includes all their activity that

13   relates to them.

14         Q.     I understand the definition

15   that you have written here.  What I am --

16   what I am asking about is when you use the

17   phrase "Google account" elsewhere in your

18   report, is the default assumption -- the

19   default assumption be that this is the

20   definition that you were using or did you

21   use different definitions in different

22   contexts intentionally?  I should say did

23   you use different definitions in different

24   contexts intentionally?

25         A.     Let's put it this way, I

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   intended to be consistent, but there may be
 2   something where I'm saying Google, you
 3   know, if your sWAA and WAA setting is off,
 4   your history will not show up in your -- I
 5   might have said won't show up in your
 6   Google account, in other words, the page
 7   that Google displays to the user, which I
 8   think is how they described the Google
 9   account.
10            So I think you have to -- it's
11   safest to look at the context, but you
12   understand what my idea is, and then you
13   should also look at the context and you've
14   got a couple of hints there.
15       Q.     Agreed.
16       A.     About what's going on.
17       Q.     I agree to do that and I'm
18   not -- this is not an, oh, you used it here
19   and it means something else, that's not
20   what I'm trying to do, but I want to make
21   sure that I understand the schema in your
22   mind of "Google account" when you're
23   opining in this report and using that
24   phrase or, for example -- well, let's just
25   say when you're using the phrase for now.
```

Page 41

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1            So when you're using the
2   phrase, just to be clear, the definition in
3   104 is what you intended for the most part
4   to be using unless the context indicates
5   otherwise?
6        A.    I think that's a pretty fair
7   summary of what I've just said.
8        Q.    Great, okay.  There may be a
9   few points where I want to clarify an
10  ambiguity in the report, but I will come
11  back to those later in the day.
12           So you are aware that your
13  definition in 104 of "Google Account"
14  differs from the definition that Google
15  uses in its privacy policy, right?
16       A.    So I'm aware that Google has a
17  different idea of what that means.  I've
18  actually looked pretty hard all over
19  Google's public-facing web pages to find an
20  exact definition of Google account, and I
21  don't believe there's a clear definition
22  anywhere that I've found.  I've looked for
23  it.
24       Q.    So the definitions that you've
25  found on Google's web pages you think may

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  be confusing?

2      A.      Well, I would say that I've

3  looked for a precise definition and I

4  haven't, because I would like to cite it,

5  but I haven't -- it sort of is one of those

6  terms that's just used but it kind of --

7  it's not necessarily made clear.

8      Q.      Is that different than what I

9  said?  You find that Google's use of the

10  term "Google account" on its web pages may

11  be confusing?

12          MR. MAO:  Objection to the form

13      of the question.  Go ahead.

14      A.      So I don't want to opine about

15  someone else's state of mind.  What I'm

16  saying is that in looking for this, it's --

17  "Google account" is a term that doesn't

18  necessarily have a definition that's

19  publicly facing that answers -- or that is

20  responsive to the definition I'm providing

21  in footnote 104.

22      Q.      So when Google uses the phrase

23  "Google account" on its web pages, is it

24  confusing to you what precisely it means?

25      A.      In the context of the WAA and

Page 43

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    sWAA control, the idea that Google is --
 2    when WAA is set one way is collecting and
 3    saving my data in my Google account for
 4    presentation to me in what they call the
 5    Google account or the pages that are made
 6    available to the user, that's one
 7    possibility, if the control is set that
 8    way.  If those controls are turned off,
 9    Google is still collecting and saving that
10    data with Google identifiers that link to
11    me, but they are saving that data in some
12    other place where I can't see it.  So
13    that's, in my opinion, counterintuitive.
14         Q.     Understood, and I understand
15    that from your report.  I actually meant a
16    slightly different question.
17              When Google uses the phrase
18    "Google account," not just in the WAA page,
19    it uses it in the privacy policy,
20    elsewhere, you said you reviewed web pages
21    that say that, right?
22         A.     I look for the clearest
23    definition I could find of "Google account"
24    and I didn't find anything that was
25    completely satisfactory to me in explaining
```

Page 44

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    that, defining that.
 2              And also just this whole golf
 3    club issue, I mean, there may be some cases
 4    where Google is also using that term to
 5    mean log-in.  It is possible.  And, I mean,
 6    maybe I should pose this back to you, which
 7    is if you think there is a good definition
 8    of it somewhere, like please do show it to
 9    me, let's discuss it, because I'm, as I
10    said, all about the accuracy.  I would like
11    to be accurate and get to the bottom of
12    this.
13        Q.      Yeah, and I will give you the
14    one from the privacy policy which John
15    Black quotes in his report.  But a couple
16    more clarifying questions on sort of the
17    terminology you used in your report.
18              Sometimes you quote Google
19    employees in your report, and in those
20    quotations sometimes the phrase "account"
21    or "Google account" appear.  When you
22    did -- when you read those mentions of the
23    phrase "Google account," did you understand
24    the definition those employees to be using
25    to be the same as yours or different or you
```

Page 45

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     just weren't sure?

2          A.     Okay, so I at least had in mind

3     that they might use the term differently

4     than I would, and I also had in mind that

5     that term could depend on the context, were

6     they referring to a log-in, are they

7     referring to a specific web page that

8     displays the user history, or were they

9     referring to the actual trove of data that

10    Google collects about each user.

11         Q.     And is it fair to say that at

12    least sometimes Google employees in the

13    documents you reviewed were using the

14    phrase "Google account" and GAIA ID

15    interchangeably?

16         A.     I mean, I considered that a

17    possibility.  We would have to go look at

18    each one probably because it's, you know,

19    it is highly dependent on context.

20         Q.     Okay.  You reviewed Google's

21    interrogatory responses?

22         A.     Yes.

23         Q.     All of them or only certain

24    ones?

25         A.     I asked for them and I listed

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   the ones that I have received.  I mean,
 2   there may be interrogatory responses that
 3   are just not even relevant to what I'm
 4   doing so I wouldn't want to be spammed with
 5   a bunch of irrelevant data, but I would
 6   have asked for and received everything that
 7   was relevant.
 8             MR. SANTACANA:  Okay.  Let's go
 9       off for one second.
10             THE VIDEOGRAPHER:  The time is
11       10:52 a.m.  We are off the record.
12             (Recess taken.)
13             THE VIDEOGRAPHER:  The time is
14       10:53 a.m.  We are back on the record.
15   BY MR. SANTACANA:
16       Q.    In the interrogatory responses
17   you reviewed sometimes Google used the
18   phrase "Google account," right?
19       A.    Yes.
20       Q.    In those instances did you
21   understand the phrase "Google account" to
22   be the same or different than your
23   definition in footnote 104?
24       A.    Oh, I understood it to be used
25   the way Google uses it.
```

Page 47

 1        Q.      And what is that -- what is the
 2   way that Google uses it?
 3        A.      I believe that Google considers
 4   the Google account to be the subset of the
 5   trove of data related to the user that is
 6   stored with their GAIA ID.
 7        Q.      Okay.  And what is that belief
 8   based on?
 9        A.      Everything I looked at in this
10   case.
11        Q.      If you hadn't looked at
12   nonpublic information, would that have been
13   your belief?  Well, let me strike that.
14              Before you started -- before
15   you were engaged in this case or in the
16   Brown case, before you were engaged by
17   anybody who was suing Google, did you have
18   an understanding what the phrase "Google
19   account" meant?
20        A.      I mean, I think I had a general
21   understanding that it's oh, I can log in to
22   Google and, oh, my account has some
23   collection of data about me.  But that's
24   just a general -- it's not something I
25   necessarily gave a lot of thought to and I

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1   certainly didn't understand prior to
 2   studying everything in this case how the
 3   WAA and sWAA controls actually work.  I had
 4   no idea that they behaved the way they do.
 5        Q.     At some point you were retained
 6   to work on these cases, these pair of cases
 7   against Google and you hadn't yet seen any
 8   nonpublic information, right?  You reviewed
 9   the complaint, probably reviewed some web
10   pages.  At that point did you develop any
11   preliminary opinions or understandings of
12   what the phrase "Google account" meant?
13        A.     I don't -- I think I was
14   open-minded at the beginning and I looked
15   at the information and tried to form my
16   opinions after having reviewed things.
17        Q.     Okay.  So when you were first
18   retained in this case, I assume you
19   reviewed pretty early on the description of
20   the WAA control, including the part which
21   uses the phrase "Google account"; fair to
22   say?
23        A.     I don't know that I would put
24   it that way just because early on I was
25   focusing on the Brown case and I had a lot
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  to think about with that case, a lot to pay

2  attention to there, and I don't know that I

3  was thinking so much about this case at

4  that point.

5       Q.     I think the WAA control comes

6  up in that case in some tangential way too,

7  right?  Had you reviewed it in that case

8  before you were retained in this case?

9       A.     I don't recall.

10       Q.     Okay.  So at some point you

11  reviewed the complaint in this case, right?

12       A.     Yes.

13       Q.     And that includes descriptions

14  about what Google tells users about what

15  WAA does, right?

16       A.     Yes.

17       Q.     At that point did you have any

18  sort of preconceived notions about what the

19  WAA control should and shouldn't do or

20  would and wouldn't do at a technological

21  level?

22            MR. MAO:  Objection to the form

23       of the question.  Go ahead.

24       A.     I don't think so, no.

25       Q.     You've used Google Analytics

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  before professionally, right?

2       A.     Yes.

3       Q.     And you have had Google

4  accounts for a while?

5       A.     Yes.

6       Q.     Had you ever used the WAA

7  button before?

8       A.     I don't recall when I first

9  used it.  I do have it today set to off and

10 I have sort of turned off a lot of the

11 privacy things with Google and others.  But

12 there's -- I have a different reason for

13 that.

14      Q.     When you joined the case, was

15 your WAA control on or off?

16      A.     I don't remember.

17      Q.     Did you have your Google

18 account in 2016?

19      A.     Yes.  We should be clear, I

20 have my personal Google account then.

21      Q.     So I guess my question is at

22 some point you reviewed the complaint and

23 the allegations that the complaint makes?

24      A.     Let me add one more thing.  I

25 also believe I have -- I may have even more

Page 51

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   than two Google accounts because I have a
2   few that are -- I have a startup that uses
3   G Suite.
4         Q.    Okay.
5         A.    So I don't know that I have an
6   exact count on how many different I have.
7         Q.    That's okay.  I don't need to
8   know about them all.
9         A.    Okay.
10        Q.    So at some point in this case
11  you had not yet reviewed any nonpublic
12  information, no deposition transcripts,
13  interrogatory responses, anything like
14  that, but you had read the complaint; is
15  that fair to say?
16        A.    Yes.
17        Q.    And at that point you saw that
18  the plaintiffs alleged that the WAA control
19  means a particular thing and that Google
20  does not live up to that description; is
21  that fair to say?
22        A.    Well, I understand that that's
23  an allegation, but I don't give too much
24  credit to allegations.  I don't really
25  credit them because it's just an

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    allegation.

2         Q.      Fair enough.  Neither do I.

3               But, nevertheless, the WAA

4    control has a description, right, that you

5    reviewed?

6         A.      Yes.

7         Q.      Did you have any idea at that

8    point what the WAA control should do

9    vis-à-vis pseudonymous data?

10        A.      I hadn't thought about it, so

11   that's something -- these opinions were

12   formed upon careful study and thought and

13   consideration.

14        Q.      Well, you had thought about

15   pseudonymous data before, right?

16        A.      Yes, I have thought about

17   pseudonymous data.

18        Q.      And you know that Google has

19   data that is tied to a pseudonymous

20   identifier and Google has data that is tied

21   to a GAIA identifier, you knew that before

22   you joined the case?

23        A.      Okay, so I have to disagree

24   with how you've put the question together,

25   because GAIA is also a pseudonym and there

Page 53

```
 1   is no -- this idea of pseudonymous data and
 2   GAIA data, it's a false dichotomy.
 3        Q.     Okay.  Let's use the terms GAIA
 4   and non-GAIA for now.  We will come back to
 5   pseudonymous.
 6             So before you joined this case,
 7   you knew that Google had data tied to GAIA
 8   identifiers and you knew that Google had
 9   identifiers tied to non-GAIA identifiers;
10   is that fair to say?
11        A.     I'm not sure I thought about it
12   prior to this case.  I'm not sure that I
13   had given it consideration.
14        Q.     Well, you must have.  I mean,
15   at that point you were pretty deep into the
16   Brown case.
17        A.     Oh, well, I'm thinking -- we
18   are talking about different start points.
19   I'm talking about before I heard about
20   these cases, I hadn't thought about it.
21        Q.     So I will ask it again.  When
22   you joined this case, you already knew that
23   Google had data tied to GAIA identifiers
24   and data tied to non-GAIA identifiers, that
25   was a concept you already knew about,
```

Page 54

1    right?

2          A.      Okay, well, so, so the question

3    is wrong, because I joined both cases at

4    essentially the same time.  I was retained

5    for both cases together.

6          Q.      You were retained for both

7    cases together?

8          A.      I believe so.

9          Q.      Okay.  When were you retained?

10         A.      I don't have -- I don't

11   remember exact date.

12         Q.      Is that in your report?

13         A.      I don't believe I have the date

14   in here, I might, but I don't have it

15   there.

16         Q.      Is that something you can

17   figure out during a break, the date of your

18   retention?

19         A.      Possibly.

20         Q.      Okay.  So before you joined

21   either case, even then you were aware that

22   there's something called AdID and there is

23   something called IDFA, right?

24         A.      Yes.

25         Q.      And you were -- you understood

Page 55

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   well how online marketing works?
 2        A.     I do have some understanding of
 3   online marketing, mobile marketing, yes.
 4        Q.     You have been in that business
 5   for 20 years, right?
 6        A.     Yes.
 7        Q.     So you had a pretty good
 8   understanding of how online marketing
 9   works?
10        A.     Yes.
11        Q.     How tracking pixels work,
12   right?
13        A.     I have some understanding -- I
14   had some understanding of how tracking
15   pixels work, but what I could glean from
16   public view.
17        Q.     Right.  And you had an
18   understanding of how Google Analytics
19   works, from public view again?
20        A.     Yes.
21        Q.     How it works from say the
22   developer's perspective or the advertiser's
23   perspective?
24        A.     Yes.
25        Q.     And then at some point you read
```

Page 56

1  the description of WAA, right?

2       A.     At some point I read the

3  description of WAA, yes.

4       Q.     When you read it, what did you

5  think would happen to data that Google was

6  sent tied to AdID and IDFA if you turned it

7  off, WAA off?

8       A.     When I first looked at the

9  information about WAA and sWAA I don't

10 think I had an opinion or a belief about

11 what would happen, because I hadn't thought

12 about it yet.  It's not -- it's just not

13 something that jumps to the front of my

14 mind.

15      Q.     Well, sorry, you reviewed the

16 complaint in the case, so presumably at

17 that point the allegations are in the front

18 of your mind, right?

19      A.     Yes.  But bear in mind -- bear

20 in mind that I read that at some point just

21 to understand what it was about, do I have

22 the necessary expertise to get involved

23 here, do I have any conflicts, can I get

24 involved in this or not, that's what I'm

25 thinking about.  I'm not thinking about the

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  ultimate issues in dispute in forming

2  opinions right from the get-go.  That is

3  kind of the reverse of how I work.

4      Q.    Okay.  I mean, but you're not a

5  robot, you are a human being, you have been

6  using Google Analytics for a decade, you

7  have been in internet marketing for 20

8  years, and you read a complaint that says

9  here is this WAA button and when it turns

10  off it should do this, but Google has

11  Google Analytics, it still collects data

12  from Google Analytics even when WAA is off.

13  My question is just did that seem like out

14  of the ordinary to you?  Did you think

15  Google was dumping all that data when WAA

16  was off?

17      A.    I don't know.  I mean, I think

18  I have said in my -- we just looked at the

19  section of the report on the injunctive

20  relief technical possibilities.  I mean,

21  one of the things I highlighted in there

22  was that Google could note when WAA and

23  sWAA are set, and exactly that, send that

24  data down the memory hole, don't collect

25  it, don't save it.  If the person is asking

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    for privacy, that's one way to handle it.
2         Q.     Is that what you thought was
3    going on when you turned WAA off, once you
4    had familiarized yourself with the
5    allegations in the complaint?
6         A.     I don't know that I had a
7    mental model of what was going on.  I think
8    I was just looking at this and saying okay,
9    I got this case, this is going to be some
10   big case, and I need to -- we will need to
11   sort it out and we will need to study this
12   and figure out what is going on.  But I
13   didn't necessarily form an opinion.  It
14   didn't -- I didn't immediately see a
15   contradiction there.
16        Q.     Contradiction in what?
17        A.     In other words, the
18   contradiction that you are trying to point
19   out, which is I think what you are trying
20   to get at, and forgive me if I summarize
21   this wrong, but what I think you are trying
22   to get at is when you read this shouldn't
23   it have been obvious to you that the
24   control couldn't work the way you seem to
25   think it should work because of the way
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   Google Analytics works, and I didn't have
 2   that contradiction, no.
 3        Q.     So I'm not trying to get at
 4   anything, and this will definitely work
 5   better if you don't try to get ahead of me.
 6        A.     Okay.
 7        Q.     And I promise that I will be
 8   straightforward and direct with you.  I'm
 9   just trying to understand what you
10   thought -- what your understanding of the
11   control was, you know, what people think
12   the control does is kind of an important
13   issue in the case.  And you have this
14   unique perspective because you used Google
15   Analytics for at least a decade and then
16   you read the complaint in this case, and it
17   sort of to me defies -- it sort of boggles
18   the mind to think you had no thoughts about
19   all that data you had been collecting all
20   those years, was it being deleted when
21   people had WAA off, was it being kept but
22   made anonymous.  What did you think was
23   going on with all that data?
24        A.     I hadn't considered the issue
25   before this case.  I just had not
```

Page 60

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    considered the issue because it hadn't come
 2    up.  I hadn't thought about it.
 3         Q.     Agreed.
 4         A.     I was essentially sort of
 5    placated and happy with the status quo and
 6    I didn't know -- I didn't know that this
 7    was working the way it does.
 8         Q.     But then you read the
 9    complaint?
10         A.     Yes.
11         Q.     And then you understood what
12    the plaintiffs were alleging, and my
13    question is just at that point what did you
14    think about all the data you had collected,
15    did you think it should have been deleted
16    in the past?  Did you think Google must
17    have not deleted it?  Did you think that's
18    not the way I would read this control?
19    What did you think?
20         A.     So there is a few things in
21    there that are -- I don't know how much
22    you've used Google Analytics, but let me
23    tell you a little about it.
24         Q.     Not as much as you.
25         A.     Okay.  When you go into Google
```

Page 61

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   Analytics, Google doesn't show stuff
 2   related to -- that's personally
 3   identifiable, they don't show you, for
 4   example, and the tools work differently at
 5   different points in time, but in general
 6   today I would say that Google is
 7   endeavoring not to show the Google
 8   Analytics customer data about specific
 9   users.  And the reason I know this has been
10   that way is that over time lots of my
11   clients have asked me hey, can you tell us
12   who is visiting our website, can you look
13   in Google Analytics and see, and I said no,
14   no, Google Analytics provides aggregate
15   data to me, it doesn't provide me with
16   individual stuff.
17           In fact, there was a time when
18   we used to get the search keywords that
19   people would use to come to a website.  We
20   could look at organic traffic and see
21   traffic volume on different keywords, and
22   the people who did website optimization
23   liked having that information.  At some
24   point Google took that away from us.  They
25   came to say keyword not provided.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.      Why?

2      A.      We were told that it was

3   related to privacy, that we couldn't have

4   that information because it could be used

5   by us to essentially connect some sort of

6   keyword usage to individual, and there

7   might be -- maybe there are other ways to

8   get that, but that's been -- this has been

9   sort of an evolving thing over time.

10     Q.      So I have used an analytics

11  console a little bit, really not very much

12  at all, but it does show device IDs in

13  there, right?

14     A.      If you are using GA4F I think

15  it may show some of that information.  I

16  think we have got some copies of reports.

17     Q.      But not on the -- not for web

18  analytics, but does it show like cookie

19  IDs?

20     A.      It is different at different

21  points in time.  It's been evolving.  It

22  has changed a lot.  I have been using

23  Google Analytics since it was called

24  Urchin, I actually ended up once calling

25  for tech support and got to talk to one of

Page 63

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  the founders of Urchin who like picked up

2  the phone and was doing tech support.  So I

3  have used it all along through history, and

4  there has been a lot of change over time.

5      Q.    Okay.  Do you still use Google

6  Analytics on your website?

7      A.    I do.

8      Q.    Coming back to your definition

9  of Google account at 104, the trove of data

10  Google collects and saves regarding the

11  user, including data that Google

12  characterizes as pseudonymous, under that

13  definition, is all data sent to Google by

14  Google Analytics for Firebase pertaining to

15  a Google account?

16          MR. MAO:  I'm sorry, can you

17      read the question back again?

18      Q.    I can ask it again.

19          Under your definition, is all

20  of the data that is sent to Google by

21  Google Analytics for Firebase data that

22  pertains to a Google account?

23      A.    I don't know that I've said

24  that.  So I don't think I've rendered that

25  opinion in that way, and therefore I don't

Page 64

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  know that I've thought it through
2  completely.
3      Q.      Sure.
4      A.      And I don't want to make any
5  sort of leap here.  I don't want to give
6  some kind of different opinion than what
7  I've already given, which were all done
8  thoughtfully and carefully checked.  I
9  don't want to just shoot from the hip.
10      Q.      That's fair enough.  You could
11  see why I'm asking.  I am trying to
12  understand, again, the limits of the
13  definition.  So your definition says
14  regarding a user.  So another way to ask it
15  is all Google Analytics for Firebase event
16  data, data regarding a user?
17      A.      I mean, that question could get
18  pretty hairy because it is conceivable that
19  there could be bots that are triggering
20  things to shoot data in, and Google has
21  systems to detect bot activity and filter
22  out, it is one of the settings, you could
23  say filter out bot activity.
24      Q.      Well, let's assume a human was
25  using it.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.      If a human was using it when
2   the data was sent in, I believe that data
3   is related to that device that's doing the
4   transmission, and I think I've said as
5   much.  Beyond that, I'm not sure -- I would
6   have to think more about the whole question
7   just to understand if there is some
8   exception, something I haven't considered
9   yet.  I'm comfortable with the opinions
10  I've rendered.  I don't feel the need to
11  give any new ones today.
12      Q.      Okay.  We must be pretty close,
13  I have just a couple more on this.
14      A.      Sure.
15          MR. SANTACANA:  Actually, why
16      don't we pause here.
17          THE VIDEOGRAPHER:  The time is
18      11:12 a.m.  We are off the record.
19          (Recess taken.)
20          THE VIDEOGRAPHER:  The time is
21      11:34 a.m.  We are back on the record.
22  BY MR. SANTACANA:
23      Q.      Here is the privacy policy at
24  Google effective May 25, 2018.
25      A.      Okay, thank you.

Page 66

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    And we will mark it on Exhibit

2  Share as Exhibit 2.  We were -- we left off

3  talking about the definition of Google

4  account, so I wanted to pull your attention

5  to how it's discussed in here.

6          MR. MAO:  Sorry, Eduardo, is

7      there a place you're on, a page?

8          MR. SANTACANA:  I think I might

9      have given you the wrong document.

10     Yes, okay, we will get to that one.

11     That's the wrong document.  Just a

12     second.  Can we go off for a second.

13         THE VIDEOGRAPHER:  The time is

14     11:36 a.m.  We are off the record.

15         (Discussion off the record.)

16         (Hochman Exhibit 2 marked for

17     identification.)

18         THE VIDEOGRAPHER:  The time is

19     11:42 a.m.  We are back on the record.

20  BY MR. SANTACANA:

21     Q.    So you've got the new Exhibit

22  2, which corresponds to the Black report's

23  Exhibit X6, excuse me, the Black report's

24  Appendix X6, which is a spreadsheet.  If

25  you could just open up that spreadsheet on

Page 67

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   your computer.
 2        A.     Yes, I have.
 3        Q.     So in here there's -- it is
 4   just listing historical definitions from
 5   various Google privacy policies, and for
 6   the moment I just want to look at the
 7   Google account definitions.  There is other
 8   ones in there we will get to later, or
 9   maybe not at all.
10              For the Google account
11   definitions, which I've filtered for on
12   mine, you can see ones going from May 2018
13   to December 2022 on here.  Do you see that?
14        A.     Yes.
15        Q.     Okay.  So we were talking
16   earlier about how Google defines Google
17   account and you wanted to look at one such
18   definition that Google uses.  This is one
19   such definition, it's in its privacy policy
20   and has been since May 2018.  I think let's
21   start with the 2018 one.
22              MR. MAO:  Objection.  The
23         documents speak for themselves.  I just
24         disagree -- there is a disagreement on
25         the form of the question.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.      The definition is "You may
 2   access some of our services by signing up
 3   for a Google account and providing us with
 4   some personal information, typically your
 5   name, e-mail address and a password.  This
 6   account information is used to authenticate
 7   you when you access Google's services and
 8   protect your account from unauthorized
 9   access by others.  You can edit or delete
10   your account at any time through your
11   Google account settings."
12              Do you see that?
13        A.      Yes.
14        Q.      Okay.  How do you perceive this
15   definition to differ from your definition
16   in footnote 104, if it does?
17        A.      Sure.  This, the way I read
18   this, looks a lot like signing up for
19   log-in.  You know, you can get a Google
20   account which sounds like a log-in.  You
21   have to provide some personal information
22   and you get this log-in that lets you
23   access some Google services and thereby
24   save some state.
25        Q.      I see.  Whereas your definition
```

Page 69

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  in your report would be broader than that,

2  or would cover more data than that?

3      A.    Well, this doesn't necessarily

4  speak to the scope of the data that Google

5  is collecting about me.  It doesn't talk

6  about what all my private data is, what all

7  data Google has, so it's a little -- I

8  think it's just a little different.

9      Q.    Can you tell me a little bit

10  more about what you mean by that answer?

11      A.    This isn't really addressing

12  the question of the scope of the data that

13  Google is collecting on me and how that

14  data associated with me is treated, this

15  definition here.  I mean, that -- those

16  issues may be addressed elsewhere, but this

17  is just talking about how to get a Google

18  account, how to get a log-in to access

19  Google services.

20      Q.    So what I'm mindful of is the

21  use of the phrase "Google account" in the

22  description of WAA where it says "saved in

23  your Google account."  So when you think of

24  that disclosure, I'm happy to bring it out

25  if you need it, and you read this

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  definition, in your mind does that combined

2  mean the same thing as your definition or

3  does it mean something different?

4        A.    I mean, to my mind, this is

5  kind of squishy.  This is just operational

6  information for a consumer that talks in

7  kind of broad terms about getting an

8  account, you give some personal

9  information, we are going to use that to

10  authenticate you when you access, and we

11  are going to use it to protect your account

12  from unauthorized access, and it says you

13  can edit or delete your account at any

14  time, right, through Google account

15  settings.

16        Q.    That is what it says, and then

17  the phrase is used in the WAA disclosure.

18  Do you want me to pull that out?

19        A.    Yeah, we should.

20        Q.    Okay.  So we will mark this 3.

21              (Hochman Exhibit 3 marked for

22  identification.)

23        Q.    This is the Activity Controls

24  PDF, activity controls.pdf.

25              MR. SANTACANA:  Noor, so when

Page 71

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      you have a chance, just mark that 3 on

2      Exhibit Share.

3              MR. MAO:   Sorry, Counsel, what

4      is it?   Is there a Bates stamp for

5      this?

6              MR. SANTACANA:   No, this is a

7      screen shot from what it looks like

8      right now.

9              MS. RAHMAN:   The Activity

10     Controls PDF?   It was a little muffled,

11     I couldn't hear.

12             MR. SANTACANA:   The Activity

13     Controls PDF is Exhibit 3.

14             MS. RAHMAN:   Okay, got it,

15     thank you.

16             MR. SANTACANA:   And, Mark, what

17     was your question?

18             MR. MAO:   I could just set this

19     aside?

20             MR. SANTACANA:   Uh-huh.

21     Q.     Okay, Mr. Hochman, so now you

22 have Exhibit 2 on the computer, you have

23 Exhibit 3 in front of you, right?

24     A.     Yes.

25     Q.     Exhibit 2 has some definitions

Page 72

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   of the term "Google account" and Exhibit 3

2   uses the term "Google account" in the

3   following sentence:  "The data saved in

4   your account helps give you more

5   personalized experiences across all of

6   Google's services.  Choose which settings

7   will save data in your Google account."

8           You see that, right?

9       A.    Yes.

10      Q.    Okay.  So my question is, given

11  the definition of "Google account" that's

12  in the May 2018 privacy policy, is the way

13  that Google account is used in this

14  sentence the same that you use it in your

15  report in footnote 104 or is it different?

16          MR. MAO:  Objection, the

17      document speaks for itself.  I think

18      you're asking our expert something

19      beyond what we designated him for.  But

20      go ahead.

21      A.    Sure.  So this -- what I was

22  looking for, remember I told you I was

23  looking for kind of a precise definition?

24      Q.    Yeah.

25      A.    So as a security technologist,

Page 73

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   what I'm interested in here is knowing what
 2   is the scope of this Google account, in
 3   other words, what data goes in the Google
 4   account, what of my personal data goes in
 5   the Google account and what, if any, of my
 6   personal data is getting saved anywhere
 7   else.
 8               I don't think it is clarified
 9   by this.  It doesn't make it clear to me.
10   I certainly wouldn't, from reading this,
11   come to the conclusion that that sWAA
12   control only affects the location where all
13   my personal information is being saved.  It
14   doesn't control the collection of that
15   data.  That seems very counterintuitive,
16   when the behavior, the technical behavior
17   that I have observed, seems very
18   counterintuitive when stacked up against
19   this sort of friendly definition.
20        Q.      And I understand that that is
21   your opinion, and I'm not trying to change
22   that.  I just want to understand, again,
23   the scope of your definition in 104 as it
24   compares to the definition in the privacy
25   policy, and you said well, that doesn't
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   address data and where it is saved and how

2   it is used.

3              So I have given you a sentence

4   where it is addressed, which is the

5   disclosure of activity controls, and my

6   question for you is if you were to take the

7   privacy policy definition of "Google

8   account" and insert it in parentheses at

9   the end of the sentence at the top of

10  Exhibit 3, right, it says Google account,

11  parentheses, insert the definition, is that

12  consistent with your definition in footnote

13  104 or is it different in any way?

14       A.      Okay.  So that --

15              MR. MAO:   Sorry, just objection

16       to the form of the question.  The

17       documents speak for themselves.

18       A.       Okay.  So if you take this

19  Exhibit 3, which I should have numbered, if

20  we don't mind, if someone has got a pen,

21  could we just number it, so I don't get

22  confused?

23              So I've got Exhibit 3, and if I

24  take the definition here from the

25  spreadsheet cell D38, is that the one we

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    want, May 25th, 2018?

2         Q.      Yes.

3         A.      And, by the way, on Exhibit 3,

4    do we have a date on this?  Like what's the

5    provenance of this one?  What is the date

6    of this as of?

7         Q.      Yesterday.

8         A.      So it might not be the same as

9    it was on May 25th, 2018.

10        Q.      Correct.

11        A.      So we might be combining two

12   things to form a non sequitur.  Okay, so

13   even if we did form that potential non

14   sequitur, that doesn't -- if I read this

15   and I put that definition in here, it

16   doesn't disabuse me of my notion that

17   Google is putting all the personal

18   information related to me into my account.

19   It doesn't tell me that Google is also

20   storing that information somewhere on the

21   side where I can't see it, control it, or

22   affect it.

23        Q.      Okay.  Speaking of non

24   sequitur, that answer is a non sequitur.

25               My question is, if you take the

Page 76

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    May 2018 definition of "Google account" and

2    you insert it into this sentence at the top

3    of Exhibit 3, which uses the term "Google

4    account," is that definition as it is used

5    here, if you assume that's the definition

6    that it means, that's what it means, is

7    that the same or different than your

8    definition in footnote 104?

9             MR. MAO:   Sorry, calls for

10        incomplete hypothetical.   Go ahead.

11        A.      This is -- this is kind of a

12    great example of double think, which is two

13    opposing ideas being put together in a way

14    that sort of prevents any kind of serious

15    critical evaluation, because on the one

16    hand this document is telling me I have

17    ability to have control, and this other

18    word here --

19        Q.      Mr. Hochman, I'm happy for you

20    to provide an explanatory answer, but it's

21    going to be easier for me and the court

22    reporter and the jury to understand it if

23    you start by answering the question, which

24    is if you take the definition from May 2018

25    and you insert it into the top of Exhibit

Page 77

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   3, in that sentence is the definition

2   meaning the same or different than the

3   definition you give in footnote 104 at a

4   technical level?

5            MR. MAO:   Objection, incomplete

6       hypothetical, asked and answered.

7       A.      So there is so much wrong with

8   the question that I'm not sure I can answer

9   it, because the problem is you're asking me

10  to take a definition from 2018 and insert

11  it into a document that's a version from

12  five years later.

13      Q.      That's what I've asked you to

14  do.

15      A.      And the definition is not a

16  technical definition, and you're asking me

17  to draw some technical conclusion from a

18  nontechnical definition, and so it sort of

19  is just -- the whole thing is kind of

20  beside the point.

21      Q.      Well, actually, it's not beside

22  the point, because this is what Google told

23  its users, and the case is what the users

24  thought about it, right?  They didn't have

25  the ability to read your report or your

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   definition of "Google account."  This is
 2   what they got to read.  This is if you go
 3   online today, this is what they can read.
 4              So I'm just trying to -- I'm
 5   just trying to understand if your
 6   definition in footnote 104, which makes an
 7   assertion about the difference between
 8   WAA-on data and WAA-off data is consistent
 9   with the definition given in the Google
10   privacy policy in May of 2018.
11              MR. MAO:  Objection,
12         incomplete, actually false
13         hypothetical, but form of the question.
14         Go ahead.
15         A.    So you're asking if two things
16   that are different are consistent, and they
17   are sort of -- these two things are kind of
18   talking past each other.
19              What I'm talking about is the
20   data, the scope of the data that Google is
21   collecting about me, where is all that
22   data, and what this is talking about is how
23   you go about getting a Google log-in so you
24   can access some Google services.  So these
25   two things are kind of talking past each
```

Page 79

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   other.
 2        Q.     Okay.  The top of Exhibit 3
 3   says "save data in your Google account."  I
 4   think that that is a phrase about the scope
 5   of data that Google is collecting about me
 6   and where it is.  Do you agree?
 7        A.     One second.  Let me read this.
 8               (Witness perusing document.)
 9        A.     So this is in fact talking
10   about saving data in your account, which
11   is, as I pointed out, it's a bit of a non
12   sequitur, because this is talking about the
13   account as a log-in.  No one has disclosed
14   to me what this account data structure
15   looks like. It is not disclosed to me what
16   the scope of that is, okay?
17               It's not explained that my
18   personal data can be stored in my account
19   but your personal data can also be stored
20   on the side, and these settings won't
21   affect our side storage of your personal
22   data, they are only going to affect the
23   storage of the data in the view that we
24   provide to you.  That's not part of this
25   disclosure.  So it's all kind of beside the
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   point for that reason.
 2        Q.      Take a look at paragraph 136 of
 3   your report.  Just read it through for me.
 4   Let me know when you're done.
 5               (Witness perusing document.)
 6        A.      Yes.
 7        Q.      You read it?
 8        A.      Yes.
 9        Q.      Okay.  In the paragraph 136 of
10   your report you say "Not only is Google
11   saving WAA-off and sWAA-off data to class
12   members' Google accounts," footnote 104,
13   "Google also marks some of the data as
14   WAA-off or sWAA-off."
15               Do you see that sentence?
16        A.      Yes.
17        Q.      And the footnote, which then
18   leads to the definition we have been
19   discussing that you give in footnote 104 of
20   "Google account"?
21        A.      Yes.
22        Q.      And that definition is the
23   trove of data that Google collects and
24   saves, including data Google characterizes
25   as pseudonymous, right?
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.      Yes.

2      Q.      So you've made an assertion

3  about whether or not Google saves WAA and

4  sWAA-off data to Google accounts; is that

5  fair to say?

6      A.      So I'm talking about my

7  understanding, okay, my intuition of what

8  this means.  The best way I think I can put

9  this is that Exhibit 3, if you insert in

10 the definition from five years earlier,

11 doesn't disclaim my version.  There is

12 nothing in there, it is silent on what the

13 scope is.  It doesn't say there is a side

14 storage area where we store your personal

15 data and we don't show it to you when you

16 flip this fake switch.

17     Q.      You're skipping ahead, which is

18 not recommended.  So let's stick with the

19 question.

20             You've made an assertion in

21 your report, you don't need to look at the

22 exhibits for that, in your report you

23 assert whether or not Google saves sWAA-off

24 data to Google accounts, true or false?

25     A.      I have made an assertion and I

Page 82

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   have defined what I mean by Google account,

2   what my understanding is absent that clear

3   definition from Google, which I looked for

4   and did not find and which you still

5   haven't shown to me.

6         Q.      Okay.  So you make the

7   assertion that Google does save sWAA-off

8   data to Google accounts, that's one of the

9   opinions you give in this case?

10        A.      Bear in mind, my definition of

11  Google accounts, I understand Google is

12  asserting that the Google account is this

13  arbitrarily limited data structure that

14  doesn't include some stuff that they save

15  about me, and that's a semantic game.

16        Q.      Okay.  Mr. Hochman, please

17  don't indict my entire profession.  If we

18  didn't have semantic games, then I wouldn't

19  be able to pay my mortgage.  Just answer

20  the question.  We will get to that.  We are

21  going to come back to the exhibit, I

22  promise.  You are going to have plenty of

23  opportunities to impugn Google.

24              The question is, isn't it your

25  opinion in this case that Google saves

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    sWAA-off data to Google accounts as you

2    define it in footnote 104?

3        A.    Well, I think my report says

4    that.

5        Q.    Okay.  So that is an opinion

6    you give?

7        A.    Yes, but subject to of course

8    my definition, and I recognize -- I

9    recognize Google's definition is different

10   than mine.

11       Q.    Okay.

12       A.    And I'm not asserting that

13   statement under Google's definition, I'm

14   asserting it under my definition.  I just

15   want to be clear, because I don't want you

16   to -- I don't want you to take away the

17   wrong understanding of this.

18       Q.    I really appreciate the

19   clarity.

20             You said Google's definition is

21   different than yours.  How is it different

22   than yours other than that it uses

23   different words?

24             MR. MAO:  Again, I will just

25       lodge a standing objection to your use

Page 84

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              of the word of "Google definition,"
2         the form of the question.  I don't want
3         to raise it again, but I just disagree
4         with the framing.  Go ahead.
5              MR. SANTACANA:  Sorry, I just
6         want to understand the objection.
7              MR. MAO:  Sure.  You said this
8         is a Google definition.  I don't
9         believe that's a definition and I think
10        he has made that very clear.  That's my
11        standing objection.  When I say form of
12        the question, that's what I mean.
13        That's it.
14        Q.    Okay.  So for this deposition
15   let's just all understand when I say
16   Google's definition what I'm referring to
17   is Exhibit 2, the list of phrases in column
18   D that correspond to Google account in
19   column A which come from different
20   historical privacy policies, okay?  Just so
21   we're all on the same page about what I
22   mean.  We can fight later about whether it
23   counts as a definition.
24             MR. MAO:  Or the time period it
25        came from.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              MR. SANTACANA:  Yes.  I'm sure
 2      we can fight about lots of things.
 3              MR. MAO:  Sure.
 4      Q.      You said that Google's
 5  definition, which we're talking about D38
 6  in Exhibit 2 at the time, D38 differs from
 7  your definition.  Other than the words that
 8  are used in the definitions, is there -- do
 9  you have an understanding as to at a data
10  level how they differ?
11      A.      Okay.  So I've got to unpack
12  that, because there is a few different
13  points there.  The definition, when I say
14  "Google definition," what I'm really
15  thinking about is Google's position in this
16  litigation.  Google is taking a position
17  that the Google account only includes some
18  arbitrary data that's tagged with the GAIA
19  ID and it doesn't include the data that
20  they store with other equally identifying
21  what they call pseudonyms --
22      Q.      I want you to leave out of your
23  mind Google's litigating positions in the
24  case.  What I want you to focus on is D38
25  in Exhibit 2.
```

Page 86

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.        Okay.  So I don't see a real

2    definition of the Google account data

3    structure in D38.  I don't see a definition

4    of what data is included.  There is not a

5    clear scope definition there.  That is just

6    some operational information about how you

7    go sign up for a log-in.

8        Q.        Okay.  So I guess is it fair to

9    say your opinion is that if I were to

10   insert D38 in Exhibit 2, Google's

11   definition of "Google account" into the

12   disclosure in Exhibit 3 about activity

13   controls, that it would leave you unclear

14   as to the data structure?

15               MR. MAO:  Objection,

16        mischaracterizes the testimony.  But go

17        ahead, please.

18        A.        No, what I would say is it

19   doesn't contradict my intuition which I

20   stated in 104 of what that data structure

21   includes.

22        Q.        What do you mean by intuition?

23        A.        Understanding, that if someone

24   says account on a system we are going to

25   store some data in your account, I'm

Page 87

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  thinking aha, they've got a place to store

2  data about me.  I'm not jumping immediately

3  to the conclusion that they have also got a

4  shadow account, which I think is a term

5  that has been used elsewhere.

6          I don't have, in my report, I

7  don't have any intuition that there is a

8  shadow account where they are collecting a

9  secret dossier about me which they don't

10 show me and don't tell me about.  I have no

11 idea that that exists and that's actually

12 what is happening.  That's what the report

13 documents is the creation of this shadow

14 account and how this is a fake control

15 because it is just a switch pointing out

16 where this firehose of personal data Google

17 is collecting about me, whether it is going

18 into someplace that they show it to me or

19 whether it is going into someplace where

20 they don't show it to me.

21     Q.     So it's your -- that definition

22 in 104, footnote 104, that definition comes

23 from your intuition and experience as an

24 expert in this area?

25     A.     I'm choosing the most natural

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   definition I can, because absent Google
 2   telling me specifically what's in my Google
 3   account and where else it is storing my
 4   personal information, absent that specific
 5   clarity, I'm going with what's the most
 6   natural definition, which is that I've got,
 7   simple, I've got an account and you're
 8   dumping all the data about me into that
 9   account where I can see it and control it.
10   That's the most natural, simple, it is like
11   Occam's razor, it is the simplest
12   explanation.
13        Q.    So I want to understand, when
14   you say it is the most natural definition,
15   what you are -- first of all, are you
16   opining that it is the most natural
17   definition of Google account?
18        A.    I'm telling you how I came to
19   that.
20        Q.    Okay.  Is it your opinion in
21   the case that footnote 104 is the most
22   natural definition of Google account?
23        A.    I haven't given that opinion.
24        Q.    And sitting here today, do you
25   intend to?
```

Page 89

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.      I mean, I've told you what it
2   means to me.
3      Q.      Okay.
4      A.      So that's in my testimony now.
5   So I've told you what it means to me, and
6   if someone wants to make use of that
7   testimony, they can.  I haven't written in
8   my report -- my report isn't really
9   addressing consumer impressions.  That's
10  not the focus of my report.  I understand
11  that somebody else may be addressing that.
12     Q.      So what it means to you, what
13  "Google account" means to you as reflected
14  in footnote 104 of your report, that is
15  based on your experience in the field as an
16  expert and nothing else, or is it also
17  based on documents or something else you
18  reviewed?
19     A.      I mean, it's based on
20  everything I've reviewed and understood,
21  because I wrote this after reviewing all
22  these materials, and I came to understand
23  that Google saves personal information
24  about me in a shadow account, which I've
25  called the shadow account, the area where I

Page 90

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    can't see it and I can't control it.

2         Q.    I think I understand what

3    you're saying.  Just a couple more

4    questions about this.

5               In your review of materials,

6    did you review any disclosures made by

7    Google about what it considers personal

8    information and what it considers

9    nonpersonal information?

10        A.    I can't give you specific

11   documents here, but I reviewed an awful lot

12   of documents and I would imagine that that

13   has been addressed in some of those

14   documents.

15        Q.    Did you take that into account

16   in crafting the definition in footnote 104

17   of "Google account"?

18        A.    I mean, without looking at some

19   specific document, I would have to -- you

20   would have to show me a document for me to

21   say one way or the other.

22        Q.    Well, the problem I have is

23   that you don't cite any documents in

24   footnote 104, so I'm asking you about the

25   basis for the definition.  I understand

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   your intuition is one of them, your
 2   experience, what is most natural to you is
 3   one basis.  I'm just trying to establish
 4   what the other bases are.  You said
 5   everything I've read.
 6         A.      I would say the absence of -- I
 7   went looking to see if there was a clear
 8   public definition from Google that would
 9   explain aha, this is what's -- so that
10   someone coming would understand what data
11   is collected about them, where that data is
12   going to be put.
13              The situation I found upon the
14   technical investigation was
15   counterintuitive, it was not what I
16   expected to find, and it is, frankly, kind
17   of Orwellian, it is just very strange that
18   you have a privacy switch that when you
19   flip it, it just means we don't tell you
20   that we're spying on you.  It is almost
21   like the party slogan from 1984, you know,
22   ignorance is strength, that's like what
23   this is.  That's what this control is.  You
24   flip the switch, you can remain ignorant of
25   the fact that you're being spied on.
```

Page 92

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.      Does your definition in
 2   footnote 104 include both personal
 3   information and nonpersonal information?
 4               MR. MAO:  Objection to the form
 5        of the question.  Go ahead, please.
 6        A.      I think that the information
 7   that's being collected becomes personal
 8   information when it is identified in a way,
 9   for example, using a Google identifier that
10   connects it to a person.
11        Q.      Okay.  And so given your
12   definition there that you just gave, does
13   your definition of "Google account" in
14   footnote 104 include both personal
15   information or nonpersonal information?
16               MR. MAO:  Objection, incomplete
17        hypothetical, form of the question.  Go
18        ahead, please.
19        A.      I mean, to my mind, when I say
20   Google collects and saves information, that
21   word is not there, but Google collects and
22   saves, in brackets, information, regarding
23   a user, that's personal information.
24   That's information about that user and
25   their activities.
```

Page 93

1     Q.     Okay.  So the part of your

2   definition that says "regarding a user" is

3   the part that limits the definition to

4   information that's personal information?

5              MR. MAO:  Objection, asked and

6         answered, misstates his testimony.  But

7         go ahead.

8     A.     Yeah, one way to look at it is

9   the personal information is information

10  that can be linked or that is linked to a

11  person.

12    Q.     Which, is or can be?

13    A.     Is.

14             MR. MAO:  Objection, incomplete

15        hypothetical.

16    Q.     If the information is not

17  linked but could be linked to a person,

18  does that information constitute

19  information pertaining to a Google account?

20    A.     I want to be clear, I mentioned

21  subjunctive in there, and there shouldn't

22  be any subjunctive, it just is the

23  information is linked to a person or it's

24  not linked to a person.  Those should be

25  the two choices, it is linked or is not

Page 94

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    linked.  There is no could, there is no

2    should, it is just it is or it isn't linked

3    to a person.

4         Q.    What is an example of

5    information that is not linked to a person?

6         A.    So I would consider, for

7    example, the fact that 47 people visited

8    your website today, that doesn't tell you

9    which 47 people.

10        Q.    So aggregated information, if

11   aggregated properly, is not linked to a

12   person?

13             MR. MAO:  Objection, incomplete

14        hypothetical, assumes facts not in

15        evidence, form of the question.  Go

16        ahead, please.

17        A.    So I'm giving you that as just

18   an example off the top of my head, because

19   it's actually something I'm thinking about

20   a lot in the context of medical research,

21   how to give information, useful statistics,

22   without revealing individual data.

23        Q.    Right.  You have a startup,

24   right, that is working on this?

25        A.    I have an academic project and

Page 95

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    there is also a startup, yes.

2         Q.      So can you give an example of

3    analytics data that is not personal

4    information, whether it is Google or not,

5    just a generic example?

6         A.      I mean, most of the data that I

7    see in Google Analytics as a user of Google

8    Analytics, in other words, as a website

9    operator, it doesn't look like personal

10   information, it is just aggregate data

11   about behavior.  It is behavior by a group

12   of people of which I don't know who those

13   individuals are.

14        Q.      As a website operator, when you

15   open the Analytics console, well, actually,

16   strike that.

17              As a website operator who uses

18   Google Analytics you could also use

19   BigQuery to export event-level data, right?

20        A.      Yes, I believe so.

21        Q.      If you were to use BigQuery to

22   export event-level data -- well, have you

23   ever used BigQuery to export data on your

24   website's users?

25        A.      I have not used BigQuery

Page 96

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    personally to do that.

2         Q.    But your company has?

3         A.    I am not sure.  We -- a while

4    ago we were using Firebase for developing a

5    prototype.  We have subsequently moved to

6    Cloudflare Workers.

7         Q.    Firebase for an app?

8         A.    Yes.

9         Q.    When did you move to

10   Cloudflare?

11        A.    Years ago.

12        Q.    So you've seen what the

13   BigQuery exports look like, right?  You

14   discuss them in your report?

15        A.    Yes, I guess so, because

16   I've -- I mean, I don't remember it sitting

17   here now, we should probably look at one if

18   you want to talk about it.

19        Q.    You recognize that it is

20   event-level data, the BigQuery export?

21        A.    I believe so.

22        Q.    And the event-level data can

23   contain device ID, right?

24        A.    I mean, we should just take a

25   look at some, if there is an example of it,

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    we should take a look at that just to

2    confirm it.  Maybe I documented it here

3    somewhere in the appendices.  The report is

4    huge.  I just don't remember.

5         Q.    Well, just assume for me that

6    device ID is included in BigQuery exports.

7         A.    Sure.

8         Q.    And it's event-level data.

9         A.    Yes.

10        Q.    So you as a website operator

11   have had access to that if you wanted it,

12   right?

13        A.    Okay.

14        Q.    You would agree with that?

15        A.    Yes, but I haven't done this

16   personally, yes, but a website operator

17   could in theory do this.

18        Q.    Is that -- does that constitute

19   personal information pertaining to a Google

20   account?

21             MR. MAO:  Objection, incomplete

22        hypothetical.  Go ahead.

23        A.    If it has a device identifier,

24   that's -- that is -- that is linked to the

25   person, because if you happen to go get the

Page 98

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   person -- if you suspect someone, for

2   example, you have some data, you suspect

3   someone, you go grab their phone, you can

4   pull that identifier off the phone and now

5   that data is linked to them because there's

6   the data, there's the device ID, and

7   there's the device ID on their phone which

8   was in their pocket and you know that's

9   their data.

10        Q.      That makes sense.  But at the

11  time that you export the data, before

12  you've gotten the phone out of the person's

13  pocket, that data is not linked to a

14  person, right?

15        A.      I disagree.

16        Q.      Okay.  Explain.

17        A.      That data is linked to a

18  person.  That ID is very specific and it

19  links to one person.  So, for example --

20        Q.      One device, to be fair?

21        A.      Devices are one-to-one with

22  people.  People are very possessive of

23  their devices.  There is a very strong

24  signal, if you have a device.  Like if I

25  get a clue, let's say I'm an intelligence

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    officer and I'm trying to track down a
 2    dissident who I want to assassinate, this
 3    has happened --
 4          Q.     Sure.
 5          A.     If you give me a name, and you
 6    gave me the name Mark Mao, I may have
 7    trouble finding the right Mark Mao because
 8    there are multiple people named Mark Mao.
 9    But if you give me a device identifier and
10    say this is the guy who has been spying
11    against us and we need to go get rid of
12    him, if I suspect this is the Mark Mao you
13    are talking about and I go grab him and
14    check his phone, I can confirm it.
15          Q.     If you check his phone?
16          A.     Because it links to him, that's
17    the link.  The link is the ID in the phone.
18    Also --
19          Q.     What if his phone is at the
20    bottom of the ocean?
21          A.     Okay, now there is a problem
22    for Mark Mao, because that device ID is
23    located in lots of different datasets.
24          Q.     Okay.
25          A.     And if any of those --
```

Page 100

1     Q.     If you don't have access to any

2     other datasets, you just get the device ID.

3     A.     But that's not the way the real

4     world works.  There is data breaches all

5     over the place.  All kind of datasets have

6     been compromised.  They are all over the

7     place.  You can go out and harvest lots of

8     datasets, and I'm sure intelligence

9     services are actively doing this, they are

10    gathering this stuff up and now they can

11    see, you know, the Washington Post has

12    maybe a little leak in the way they put

13    their app together, they made a mistake,

14    they've gone and logged an e-mail address.

15    We've seen this happen in the wild.  If one

16    person anywhere who has got your device

17    identifier logs something like that, your

18    cover is blown, and that's the problem,

19    that's a huge problem, because the

20    probability of that happening becomes

21    nearly certain when the perfusion of data

22    is very large.

23    Q.     So the privacy concern you're

24    articulating right now, as I understand it,

25    is a concern about, as you said it, the

Page 101

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    cover being blown, the person being

2    unmasked due to the leakage of data or data

3    being stored somewhere where it shouldn't

4    be, it's a risk that you consider to be a

5    privacy risk?

6          A.     So this is just one example,

7    and there are many scenarios, there are

8    many scenarios that are less dramatic than

9    that, okay?  But the personal identifier or

10   the Google identifier, like a device ID,

11   like an app instance ID, these things

12   relate to a person, they are personal, and

13   they link to that person, and with the

14   necessary set of data, that person can be

15   found or a suspicion can be confirmed, and

16   that's just an example of what can and does

17   happen in the world.

18          Q.     Now, the linkage that you're

19   concerned about depends on there being data

20   linked to that device ID, right?  If you

21   bought the phone, opened it up, haven't

22   used it yet, it means nothing, device ID

23   means nothing at that point, right?

24          A.     Okay.  So I guess if you have a

25   pristine new device, the device ID is --

Page 102

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    there is no information associated with it

2    at that moment.

3         Q.      And then as you use it more

4    data is generated, goes into different

5    places in the world, and that's what's

6    creating this privacy risk?

7         A.      That's not the only thing

8    creating the privacy risk.  This is just

9    one potential -- one little pathway among

10   many.

11        Q.      To what?  Pathway to what?

12        A.      Failure to preserve privacy.

13   So the user has set a switch which says I

14   want to be private, and they have some

15   expectation of privacy.  They have been

16   primed for that.  They have been told you

17   can be private, you can have private

18   activity.

19             They flip the switch, they want

20   privacy, and yet this trove of data is

21   being gathered, and whenever there is a

22   trove of data, it is usually only a matter

23   of time until it leaks.  There are leaks.

24   There are data breaches.  They have

25   happened.  It doesn't matter how careful

Page 103

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   you are.  There are breaches.  There are

2   leaks.  There is insider threat.  All kinds

3   of problems.  And the person who asks for

4   privacy and expected privacy didn't bargain

5   for that.

6        Q.    If Google purged right now its

7   records of all the data that you say in

8   your report Google could purge, sWAA-off

9   data, would that eliminate the privacy risk

10  you're discussing?

11       A.    It's a great question.  I don't

12  know if I have said that in the report and

13  I don't -- that's kind of a big opinion to

14  ask and I would want to think it over

15  carefully, okay, in order to answer it.  I

16  just don't want to shoot from the hip a new

17  opinion like that.

18       Q.    But it would ameliorate the

19  risk presumably, otherwise you wouldn't

20  have suggested it?

21       A.    Well, I think it's -- let's

22  take a look exactly what I said.  So just

23  to try to be clear.  We're in Section K,

24  right?

25       Q.    Section K.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1      A.      And do you remember the page?

2      Q.      168 I think.

3      A.      This is really at the end.

4   Okay.  So I've said in K Google could purge

5   its system of WAA-off and sWAA-off data.

6   So I'm saying that -- and I guess there is

7   a presumption that somehow that would be

8   helpful.  I haven't said that's a complete

9   solution, but I think you can read in

10  between the lines that it would be -- I'm

11  suggesting it because it would be helpful.

12     Q.      But just in terms, focusing for

13  a moment on your concerns relating to data

14  breach, which is to say data sent to Google

15  that then gets out of Google into the wild.

16     A.      Some threat actor comes in and

17  exfiltrates that data?

18     Q.      Yeah.  Are you opining in this

19  case, I don't see it in your report, but

20  just to be clear, you're not opining that

21  that has happened to anyone in particular,

22  right?

23     A.      So I haven't issued that

24  opinion.  I'm aware that other experts in

25  this case may say things to that effect.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Okay.  But that's not on your
2  plate, that may be on someone else's?
3    A.    That's not on my plate.
4    Q.    What about insider risk, it's
5  not somebody exfiltrating data from Google,
6  it is somebody at Google attempts to unmask
7  somebody by connecting their device ID to
8  their name or e-mail or whatever, in this
9  case are you -- have you rendered an
10  opinion in this report that that has
11  happened before to anyone in particular?
12    A.    So I'm not -- again, just like
13  with the last question, it is symmetrical.
14  Somebody else might talk about it.  I'm not
15  saying it has happened.  I'm just aware of
16  it as a risk.  I mean, I'm a security
17  technologist, so I'm aware of these various
18  kinds of risks.  I've studied them.  So I'm
19  pointing it out.
20    Q.    Okay.  That's helpful.  Okay.
21       MR. MAO:  At some point,
22    Eduardo, let's take another break.  I
23    just need to get the blood circulating.
24    I have red-eye lag.
25       MR. SANTACANA:  Yeah.  Can I

Page 106

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          just -- I just want to do one more
 2          module.
 3                   MR. MAO:  Do what you need.  In
 4          the next 10, 15 minutes or whatever.
 5          Q.      So let's talk more about K, so
 6   you should probably flip to it.
 7          A.      Sure.
 8          Q.      These are your opinions
 9   concerning what the changes, it is called
10   WAA Changes, Google could change WAA and
11   sWAA to ensure they function as described.
12   Google could also purge its systems of
13   WAA-off and sWAA-off data.
14                   MR. MAO:  For the transcript, I
15          believe Mr. Santacana is referring to
16          Exhibit 1, Section K.
17                   MR. SANTACANA:  Yes, page 168.
18          Q.      And that's the summary of
19   your -- that's the heading of the opinion.
20   There is also an opinion, as I see it, at
21   paragraph 418 that's not summarized by that
22   heading which is that Google could delete
23   products, services or algorithms that it
24   built in whole or in part with WAA- or
25   sWAA-off data.
```

Page 107

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          So in my mind, Section K here

2    is proposing that Google stop a certain

3    kind of collection, purge a certain kind of

4    data, and delete certain products, services

5    or algorithms.  Is that a fair --

6          A.     I have said that these things

7    are technologically possible.

8          Q.     Oh, did I say -- yeah, that it

9    is technologically possible.  So let's

10   start with Google could stop collecting,

11   okay?  You say at 411 and 412, and take a

12   moment to review them -- actually, just

13   take a moment to review them.

14              (Witness perusing document.)

15         A.     Yes, I have read this very

16   recently, so I'm up to speed on it.

17         Q.     Great.  In effect, I think what

18   you are arguing here is that Google should,

19   excuse me, that it is technologically

20   possible for Google to check for a user's

21   sWAA setting on device rather than at the

22   server level, and if sWAA is off, then it

23   will not transmit any user data via

24   analytics?

25         A.     It is possible for Google to

Page 108

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   detect the WAA/sWAA status as needed and
 2   decide either not to transmit anything or
 3   to somehow transmit only things that are --
 4   I haven't thought through completely, but
 5   perhaps Google could design some system to
 6   transmit something that has no personal
 7   identifier and no link to the person.
 8        Q.     So as a user of analytics, you
 9   know that one of the values of analytics is
10   analysis relating to what the same user or
11   device does over time, right, even if it is
12   presented anonymously to the website
13   operator or the app developer?
14        A.     Yes.
15        Q.     If Google were to implement 411
16   and 412, paragraphs 411 and 412 of your
17   report, would that type of analysis that
18   Google provides to developers through
19   Google Analytics be possible?
20        A.     It for sure would be possible
21   for the people who leave sWAA and WAA
22   turned on, enabled, for data collection,
23   which is, I think I document in the report,
24   it is over 90 percent for WAA and over 80
25   percent for sWAA.
```

Page 109

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1               I guess maybe Google has some

2    challenges.  I'm not sitting here -- it's

3    not my job to engineer -- reengineer things

4    for Google.  Google has to engineer it.

5    But they have the ability to stop

6    collecting data that ties to an individual

7    user if they want to, because they have,

8    they do it with certain products but not

9    with others.

10        Q.    So my question is about the

11   nature of what you just said.  Is it

12   possible in your mind to tie data together

13   longitudinally from the same device without

14   violating what you have described to be

15   something that constitutes personal

16   information or raising the privacy risks

17   that you discuss in your report?

18        A.    I think there may be

19   potentially some solution might be

20   engineerable.  I don't want to say it is

21   impossible to engineer, okay?  I haven't

22   sat down and tried to engineer that and I

23   haven't expressed an opinion this is what

24   Google should do in order to continue

25   having this functionality that they want.

Page 110

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           You know, that's really the
2    next step in the process, is if Google
3    decides -- let's say Google decides, after
4    hearing this, and I really hope they do
5    decide this, let's just say they decide you
6    know what, let's be white knights here,
7    let's purge this data, let's stop
8    collecting it, and now let's figure out how
9    do we continue, how can this sort of useful
10   analytics service continue to be provided
11   to vendors, that's the next step, and I
12   haven't gone there yet.  I haven't opined
13   about that.
14        Q.     Your startup is working on that
15   question, isn't it?
16        A.     I was approached by a professor
17   at the Yale School of Medicine who was
18   affiliated with the American College of
19   Surgeons, and he runs -- he chairs the
20   Committee on Quality, which determines the
21   treatment algorithms for all cancer
22   patients in the United States.  So if you
23   get cancer, you go to the doctor and the
24   doctor has an algorithm that they follow,
25   and this committee is the one who sets the

Page 111

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    standard of care.

2         Q.    I know what they are.

3         A.    And they also are custodians of

4    the National Cancer Database and they have

5    the ability to influence what data is

6    collected through federal policy, and that

7    database research is very important, and

8    are having extreme problems because of

9    essentially HIPAA, they can't join the data

10   together the way they would like, so they

11   need what is called privacy preserving

12   record linking, a way that you can link

13   records and maintain privacy.

14              And it requires, under the

15   system I designed over the last number of

16   years, starting in 2018, it requires a

17   considerable amount of effort to do that.

18        Q.    Is there a name for the system

19   you designed?

20        A.    So it has alternate names

21   depending on the context.  The project,

22   sometimes we call it Just Enough Trust,

23   Dr. Boffa calls it the Fischer-Hochman

24   solution, and there is a commercial entity

25   called UNS.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.      If Google adopted the

2   Fischer-Hochman solution that you developed

3   for the National Cancer Database for Google

4   Analytics, would that satisfy the privacy

5   risks that you raise in your report?

6        A.      A great question, but a couple

7   of things.  One, this isn't a sales pitch.

8   I'm not trying to pressure Google.  This is

9   totally separate.  It's not being developed

10  to try to sell it to Google.

11       Q.      Google is not going to pay you

12  money anyway, so I know it's not a sales

13  pitch.

14       A.      I'm not trying to do that.

15  That's not my purpose.  The research is

16  published.  If Google for some reason wants

17  to read that research and try to get

18  something out of it, they are welcome to do

19  so.  It's public.

20       Q.      Yeah.  I'm just trying to

21  understand the technology, that's all.

22       A.      I don't know.  I haven't done

23  that analysis.  I don't know if it would

24  help Google or not.  I'm not sure.  That

25  would require some careful analysis and I

Page 113

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    haven't gone there.  That's not the --

2    that's not the initial use case that we are

3    thinking about.

4         Q.     Okay.  But the technology that

5    you have developed for this National Cancer

6    Database, presumably the purpose is to

7    comply with HIPAA?

8         A.     It is a combination of people

9    have concerns about HIPAA, the hospitals

10   have archaic technology and the security is

11   really bad.  Even Google has released a

12   study recently that said that most data

13   breaches start with healthcare data leaks.

14            So in some sense we're on the

15   same side of this problem, Google and me.

16   It is a big problem, because you're getting

17   this one-size-fits-all treatment when you

18   get cancer and what we really want is for

19   personalized medicine, we want people to

20   get a treatment that is best for them based

21   on their characteristics, and the only way

22   to do that is to have better data hygiene,

23   eliminating duplicate data shards, joining

24   together data shards about the same person,

25   and doing it in a way that that data is

Page 114

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  retained and doesn't compromise privacy.

2          We have the government behind

3  us.  So the government can rewrite the

4  rules to make it -- whatever rules need to

5  be rewritten, there is commitments that

6  they will be fixed up and rewritten.

7          The issue is not to trigger

8  political backlash, not to make people

9  think this is some kind of universal

10  tracking system that's going to be used to

11  take away their guns or be used to label

12  political dissidents as psychiatric

13  patients or whatever.  There are historical

14  problems with medical data tracking.

15  That's why the United States doesn't have a

16  national healthcare number the way they do

17  in other countries.  So there is political

18  concerns.

19          I probably told you more about

20  that topic than you wanted to hear, but

21  it's interesting.

22      Q.      It is very interesting.  But I

23  take it, then, you would agree that it is

24  possible to link data about people that is

25  collected over time without invading their

Page 115

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   privacy?

2        A.      I have designed a system that

3   does it, but the system involves the use of

4   some independent agents, one of which is

5   chosen by the person.  That's why it is

6   called Just Enough Trust.  You kind of pick

7   the person you want to trust and that data

8   fiduciary works for you.  There is a

9   different data fiduciary working for the

10  service who is processing your data.

11           So in some sense maybe part of

12  the problem Google is having here, and I'm

13  just going to share this as a helpful

14  thought, Google has gotten itself involved

15  in both sides of this.  Google is working

16  for the user and Google is working for the

17  website or the app vendor, and that sets up

18  a conflict, and that creates -- that

19  creates some trouble for them.  It puts

20  them in a difficult position.  And that if

21  they were to kind of choose and work for

22  one side exclusively or the other side

23  exclusively they might not run into this

24  problem.  So maybe just take that as a

25  thought.

Page 116

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. MAO:  Maybe during a break

2      you can pull up the publication that

3      you can evaluate for yourself.

4          MR. SANTACANA:  Pull up the?

5          MR. MAO:  Publication.

6          THE WITNESS:  Which

7      publication?

8          MR. MAO:  Oh, sorry, the

9      sources that you are talking about.

10     Q.     Now, returning to this

11 technology, Google Analytics for Firebase,

12 if Google set up a separate data storage

13 mechanism that stores analytics data and

14 that's it, it just sits in that silo, it

15 can't be used for anything else, it can't

16 be used by Google, it is only used to

17 service analytics accounts like the account

18 that your website has or the account that

19 some app has, the New York Times app, in

20 your mind could it continue to service

21 those accounts, including for sWAA-off

22 users data?

23         MR. MAO:  Objection, incomplete

24     hypothetical.  Go ahead.

25     A.     So you may be getting into some

                                    Page 117

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    areas that are studied in cryptography like

2    secure multiparty computing and homomorphic

3    encryption.  I mean, there are strategies

4    for sort of being able to process data

5    without actually being able to read the

6    data.  I'm not going to assert that any of

7    this is impossible.  There may be some way

8    that Google can engineer a workable

9    solution.  I don't know. I haven't done

10   that analysis yet.  That is downstream.

11       Q.    I think you may be overreading

12   my hypothetical.  Let me try it a little

13   bit differently.

14            You are familiar with the

15   concept of data processor and data

16   controller?

17       A.    Yes.  I think that's something

18   that comes out of the EU; does it not?

19       Q.    Yes.  Data processor, let's

20   just say for purposes of today, is where

21   the data processor acts solely as a vendor

22   and does not use the data for its own aims,

23   it only uses it to do whatever it has been

24   asked to do by the person that has provided

25   it to them, okay?

Page 118

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.      Yes.

2          Q.      If Google acts solely as a data

3    processor for Google Analytics data and

4    never as a data controller, in your mind

5    could it do that for sWAA-off users data?

6                  MR. MAO:   Objection, incomplete

7          hypothetical.   Go ahead.

8          A.      I'm not sure, because I haven't

9    done that analysis, and you may also be

10   getting into issues which also require

11   legal advice, because those are -- those

12   are legal definitions under like GDPR.  So

13   I'm not --

14         Q.      That's why I gave you a

15   definition.  I'm trying to understand,

16   again, the limits of your opinion, right?

17   So you understand, you opine that Google

18   does a number of things with Analytics

19   data.  One of the things it does is service

20   Analytics accounts, right?

21         A.      Yes.

22         Q.      Like your website or the New

23   York Times app?

24         A.      Yes.

25         Q.      Provide information to those

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    developers about how people are using the

2    app or the website?

3        A.    Yes.

4        Q.    Okay.  You opine that Google

5    also uses the same Analytics data to do

6    other things, like advertising, right?

7        A.    Yes.

8        Q.    Okay.  I'm trying to understand

9    where you see the problem.  So is it a

10   problem if Google is only doing the

11   Analytics provision to the website or the

12   app, is that a problem for sWAA-off users

13   Analytics data?

14       A.    I have a very clear answer to

15   that, where is the problem.  The problem is

16   that when the user is given the impression

17   that their activity is private and then

18   their data is collected, that's where the

19   problem is.  It is right at the collection

20   logging.  That's where the problem occurs.

21   And all this downstream stuff, you are kind

22   of trying to ask me, is there a way to

23   throw out the bath water without throwing

24   out the baby, because, you know, I think we

25   both agree that Analytics is a useful

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    product to merchants and they want to have

2    access to it.  You know, website operators

3    want to have analytics.

4              And I already commented that

5    Google has kind of put itself into a

6    difficult position by being on both sides

7    of it.  They are telling the user, hey,

8    here is your chance for privacy and then

9    they are also telling the website operator

10   hey, here is this great analytics product

11   that you can use to track, and I think I

12   have sort of said their life might be

13   simpler if they would pick one or the other

14   and not try to do both at the same time.

15   That might be easier.

16         Q.    But that's not what I'm asking

17   you, right?  I understand that's your

18   advice.  But my question is if Google

19   collects and saves sWAA-off GA4F data and

20   only uses it to service the Analytics

21   account that generated the data, so it came

22   from the New York Times, somebody used the

23   New York Times, the New York Times sends it

24   to Google, Google saves it and analyzes it

25   for the New York Times, that's it, that's

Page 121

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the whole lifecycle of the data, in your

2    mind for the sWAA-off users in that

3    lifecycle, is the description of the button

4    misleading then?  Are they --

5         A.      Whether the button is

6    misleading I guess is maybe an opinion that

7    someone else is going to delve into in

8    depth.  I told you, I just mentioned that

9    in passing to establish the relevance of my

10   technical analysis.

11              I think it's -- what I found is

12   entirely consistent with that button being

13   misleading, and I've said that this is a

14   fake control, because it doesn't do what it

15   seems to say it's going to do, and I've

16   said that the problem is collecting and

17   saving the data.  It's the collecting and

18   logging where the problem is.

19              Now, you are saying well, what

20   if Google was just acting as an agent for

21   somebody else in order to do this, would

22   that be allowable?  That may really get

23   into more of a legal question.  I'm not

24   sure, I haven't opined about that

25   hypothetical you're putting forward and I

Page 122

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    don't think I'm going to shoot from the hip

2    and do it now.

3         Q.    Okay.  I think I understand

4    what you're saying.

5              So you're aware that there are

6    other analytics providers, right?

7         A.    Yes.

8         Q.    With respect to the opinions

9    you've rendered in this case, what in your

10   mind is the difference between an app

11   developer using Google Analytics for

12   Firebase as opposed to, for example,

13   AppsFlyer?

14              MR. MAO:  So, Eduardo, you are

15         going on to a different module now.

16              THE WITNESS:  I was just about

17         to say that, that this would be a great

18         time to take a break, if we are going

19         to go to a different module.

20              MR. SANTACANA:  It's not, well,

21         at least not in my outline, it is not a

22         different module.  But I will wrap it

23         up soon.

24         A.    So, yes, an app developer could

25    use some other analytics package, sure.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.      So what's the difference, why
2   does it matter that, to you, that it was
3   Google Analytics for Firebase rather than
4   AppsFlyer?
5       A.      Well, one thing is that
6   AppsFlyer hasn't made any privacy
7   representations to the users.
8       Q.      Is there any other difference?
9       A.      Google Analytics for Firebase
10  integrates really well with Google's
11  advertising products and it powers some
12  additional features that I don't think you
13  could get with third-party analytics.
14      Q.      Have you rendered that opinion
15  in this case?
16      A.      Well, I just told you that
17  because you asked me, but --
18      Q.      But it's not in your report,
19  right?
20      A.      It's not in my report, but I
21  understand that Mr. Black put that as a
22  rebuttal to me that, you know, these
23  vendors could use this third-party tool,
24  and so I'm sort of criticizing Black by
25  saying yeah, but it's not equivalent, it's

Page 124

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    not an equivalent substitute.  It is
 2    different.  It is qualitatively different.
 3         Q.     You have not undertaken any
 4    study of the competitors of Google
 5    Analytics for Firebase and the extent to
 6    which they offer similar or the same
 7    features, right?
 8         A.     I haven't opined about that in
 9    my report.  I mean, I'm generally aware of
10    these other companies.
11         Q.     But you have not undertaken to
12    study it in order to render an expert
13    opinion to the jury in this case?
14         A.     My computer just logged me out.
15         Q.     That's okay.  You don't need it
16    to answer this question.
17         A.     Sure.  I haven't done that
18    study here, again, because Mr. Black has
19    rebutted me and I haven't had a chance to
20    respond to him.
21         Q.     Sure.  But you're just shooting
22    from the hip now?
23              MR. MAO:  Objection,
24         mischaracterizes the procedural
25         allowances in a case in response to a
```

Page 125

1        rebuttal.  I mean, come on, let's not

2        do that.  Go ahead.

3        A.      I wouldn't -- I wouldn't say

4    that this is shooting from the hip.  I'm

5    just telling you what I know about the

6    topic, okay?  That I am a user of Google's

7    marketing technology and I see what Google

8    tells us about how to pitch this

9    technology, how to sell it to customers.

10   They encourage everyone very strongly use

11   use Google Analytics -- Google Analytics 4,

12   the current version, they want everyone to

13   upgrade.  You get the best access to

14   features.  You get the best integration.  I

15   mean, that's clear and sort of

16   noncontroversial.  I don't need to do a big

17   study to tell you that because that's

18   everywhere.

19        Q.      Well, with all due respect,

20   this is a lawsuit, you are here as an

21   expert, this is clear and noncontroversial

22   is not an expert opinion.  So I need to

23   understand the basis of what you're saying,

24   okay?  You did not undertake a study of

25   Google Analytics' competitors in the

Page 126

1  market, right?

2      A.      I did not undertake a study of

3  the Google Analytics competitors.

4      Q.      You did not apply any

5  methodology in this case as an expert that

6  you intend to present to a jury comparing

7  the features of Google Analytics and its

8  competitors, right?

9      A.      You know, what I would say is

10  that I have experience with these products,

11  and I can tell you for sure that if someone

12  has to go set up a second product, a lot of

13  the smaller advertisers will look at this

14  and say, you know, too much work, too much

15  trouble, I can just use Google Analytics,

16  that is easier.

17      Q.      Okay.  Well, we will get to

18  that, but that's not my question.

19          You did not apply any

20  methodology in this case as an expert that

21  you intend to present to the jury comparing

22  the features of Google Analytics to the

23  features of its competitors?

24      A.      I haven't set up a feature

25  comparison study.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.      Okay.

2              MR. SANTACANA:  We can take

3      lunch.

4              THE VIDEOGRAPHER:  The time is

5      12:48 p.m.  We are off the record.

6              (Luncheon recess:  12:48 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 128

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1           A F T E R N O O N    S E S S I O N
 2                    1:34 p.m.
 3   J O N A T H A N    H O C H M A N, resumed.
 4                THE VIDEOGRAPHER:   The time is
 5       1:34 p.m.   We are back on the record.
 6   CONTINUED EXAMINATION
 7   BY MR. SANTACANA:
 8       Q.       So we left off talking about
 9   your opinion about Google's changes it
10   could make to how WAA and sWAA function.
11       A.       Yes.
12       Q.       And I want to talk about your
13   opinions relating to what Google could
14   purge from its systems, okay?
15       A.       Yes.
16       Q.       So you reviewed some Baseview
17   data in this case?
18       A.       Yes.
19       Q.       And you propose, among other
20   things, that Google purge sWAA-off Baseview
21   data, right?
22       A.       I believe so.
23       Q.       In the Baseview data that you
24   reviewed, was there a sWAA bit in there
25   indicating whether the entries were
```

Page 129

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  collected while sWAA was on or off?

2      A.    I believe that -- I think I've

3  said something to the effect that there is

4  enough data in there in terms of

5  identifiers that it could be determined, it

6  could be calculated, if Google had held on

7  to a sufficient amount of data.  I know

8  there was a dispute in this case where

9  Google wanted to delete some data in the

10  ordinary course and plaintiffs said no,

11  don't delete that, and then Google deleted

12  it.  So that may come into play I suppose.

13      Q.    Well, I'm not sure what you're

14  referring to, but I'm just asking what you

15  saw in the data that you had.

16      A.    I mean, I have documented that

17  carefully in the report.  I have written it

18  down.  I don't want to speak from memory on

19  that because it is kind of a nitty-gritty

20  point.  I don't want to -- I stated it -- I

21  wrote it as clearly as I could, so I don't

22  want to change what I wrote.

23      Q.    Okay.  So let's look at your

24  paragraph 416.  It says "I have not

25  observed a WAA or sWAA bit in non-GAIA,

Page 130

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    GA4F logs."

2         What does that phrase, can you

3    explain what that phrase means?

4         A.    Yeah, so the non-GAIA logs are

5    those, probably the data that's stored in

6    Sawmill or data that's not stored in what

7    Google calls the Google account, and so the

8    WAA and sWAA bits, those bits are

9    everywhere in Google's data, because I

10   think Google commented that they had more

11   than a million hits when they searched for

12   those field names, but in the limited

13   amount of logs that were provided by

14   Google, you know, less than we asked for, I

15   didn't see those bits in that data.  So

16   that's what that means.

17        Q.    Okay.  And Baseview, in this

18   scenario, Baseview is one of the non-GAIA

19   GA4F logs, at least the Baseview that you

20   reviewed?

21        A.    My understanding -- I'm sorry.

22        Q.    That's all right.

23        A.    So my understanding, there is a

24   bit of a dichotomy between footprints,

25   which is the GAIA logs, GAIA key logs, and

Page 131

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   the Baseview, which are non-GAIA.

2         Q.      Okay.  I think I understand

3   this phrase now.

4               So in 416 I think what you're

5   saying is there are sWAA bits in GAIA logs

6   at Google but you didn't find any sWAA bits

7   in non-GAIA logs, that's 416; is that fair

8   to say?

9         A.      Yes, because the

10  user-controlled field I believe encodes

11  those bits.

12        Q.      So then the last sentence of

13  416 says "Google could populate non-GAIA

14  logs with user control field for the

15  purpose of identifying sWAA-off traffic."

16        A.      Let me just take a look at this

17  again.

18        Q.      Sure.

19        A.      Yes, and I think we probably

20  need to delve into Appendix 6, because that

21  is mentioned here.  So there is more

22  explanations and data there.

23        Q.      Appendix G?

24        A.      Sorry, yes, G, not 6.

25        Q.      Section 2.1.2?

Page 132

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          A.      Yes.
 2          Q.      Okay, all right.  In 417 you
 3   propose an alternative way to identify
 4   sWAA-off traffic, or, excuse me, sWAA-off
 5   data, which involves -- you say "Google
 6   could search its systems for all
 7   identifiers associated with that user,"
 8   referring to users that we know had sWAA
 9   off at any particular time during the class
10   period, right?
11          A.      Yes.
12          Q.      Did you find in your work on
13   this case -- well, strike that.
14               Are there particular systems
15   that you have in mind in this sentence,
16   "Google could search its systems for all
17   identifiers associated with that user"?
18          A.      Yeah, I think I've documented a
19   few of them in this --
20          Q.      Appendix G?
21          A.      Not Appendix G.  I think there
22   is section in the report where I go
23   through, I think it is Constellation, there
24   is another system, it is called Rambo, and
25   there are a few of those which are mapping
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    essentially between identifiers.

2         Q.      I recall that section.

3         A.      So I think if you were to look

4    in those mappings, Google stores mappings

5    and they have ways -- also if you just look

6    in your GAIA logs, you will find sometimes

7    some of these other identifiers might be --

8    might be in there, so there is linkages.

9              So I think it would be possible

10   to just search for the links that are

11   already there webbed throughout all the

12   data and find -- find all that WAA-off and

13   sWAA-off data, or at least most of it or as

14   much of it as is feasible to find.

15        Q.      We will come back to that.  I

16   think I understand what you're saying now.

17             At least with respect to the

18   data you reviewed in the case, were you

19   able to make -- create a mapping between

20   GAIA ID and what Google calls pseudonymous

21   identifiers like device ID?

22        A.      I mean, we have to go into the

23   appendices where that work is documented.

24        Q.      Which one?

25        A.      Good question.  Let me take a

Page 134

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   look at the table of contents, because I
 2   don't know myself.  Okay, oops, this table
 3   of contents -- let me go into -- let me
 4   check in one other location here.
 5        Q.     I think you mean Appendix G,
 6   tab 4, but I could be wrong.
 7        A.     Yeah, let's take a look at
 8   that.
 9        Q.     It is pretty long, so maybe
10   I'll break down the question for a moment.
11        A.     Sure.
12        Q.     My first question is just did
13   you attempt in this case to join -- strike
14   that.  Let me try again.
15             Did you attempt in this case to
16   find evidence that Google had joined in the
17   same log device ID and GAIA ID?  Was that
18   one of the things you did?
19        A.     I think that had we noticed
20   that, had I noticed that, I would have
21   documented it.
22        Q.     Okay.
23        A.     So I --
24        Q.     I don't think you did.
25        A.     Yeah, I don't think I
```

Page 135

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    necessarily found an indication of joining.
 2                So just to be clear, joining
 3    and linking are two different things.
 4    Joining means putting the two pieces
 5    together in the same place.  Linking means
 6    that there is just a logical connection
 7    between the two pieces of data, okay?
 8    There is a common identifier or there is a
 9    common fingerprint, okay?  There might
10    be -- data might be stored in separate
11    places but there is a common -- there is a
12    link between them.
13         Q.    Got it.
14         A.    Okay?  So I'm using the
15    standard of linking, not of joining.
16         Q.    I understand.  So I hadn't
17    heard that distinction before, but join we
18    will use to mean actually joined together
19    in the same place, whereas linking is about
20    the availability of a mapping that may or
21    may not have been used to join.  Is that
22    fair to say?
23         A.    We don't know whether -- we
24    don't know whether someone has joined it or
25    not, we just know that it is linked, there
```

Page 136

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    is a link.  Think of it as quantum

2    entanglement.  You've got two particles,

3    they are entangled, they can go as far

4    apart as you want but they are still

5    linked.

6         Q.     Right.  But if you can only

7    observe one --

8         A.     Whatever you observe in one you

9    are going to observe in the other.

10        Q.     Well, actually if you observe

11   it, it will screw it up, is so --

12        A.     Well, it collapses the quantum

13   state, so you get one or the other,

14   outputs, if it is zero or 1.

15        Q.     So I want to be really clear

16   though -- well, okay, so if you had seen a

17   join you would have documented it.  You

18   didn't document a join that Google had

19   performed.  Did you attempt to perform any

20   joins of linked GAIA and non-GAIA data

21   together?

22        A.     So I'm not actually needing to

23   join, I'm just looking for links, because

24   the idea is if there is a link somebody who

25   gets both pieces of data can know that that

Page 137

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    data is associated with that user.

2        Q.      Right.  So like --

3        A.      And also, by the way, you don't

4    necessarily need to even link -- you don't

5    need to join the data within Google's

6    system.  If you get some data out of

7    Google's system that has an identifier and

8    then you go to some third-party system and

9    get some data, it can be linked there, or

10   you can get, off the person's phone, you

11   can get it.

12            So the problem, as I have been

13   saying from the start, occurs at the moment

14   that sensitive information is collected

15   when the user has indicated they don't want

16   that sensitive information collected,

17   because the actual collection hurts the

18   user.

19            Minimally it hurts the user by,

20   you know, chewing up their mobile device

21   battery and tying up their bandwidth and

22   deteriorating the performance of their

23   device.  But, additionally, it hurts them

24   by putting them at risk of their data being

25   exposed when they have said I don't want

Page 138

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  this data collected because I'm afraid for

2  it to be exposed, if someone collects it,

3  that is a problem.  I can even give you

4  another analogy --

5       Q.    Well, I think I understand what

6  you're saying, but we can come back to your

7  analogy later.  Maybe you can slip it into

8  a different answer.

9            My next question is -- what I'm

10 trying to understand is just what you did

11 and didn't do, that's all, in this --

12 Appendix G is about your data testing and

13 your procedures and all that.  In this case

14 you received what we've discussed are GAIA

15 logs and non-GAIA logs, right?

16      A.    Yes.

17      Q.    Did you undertake any attempts

18 to find a match between entries in one of

19 those and the other?

20      A.    I mean, I think we've

21 documented some ways that this stuff can be

22 matched up, okay?  You know, it doesn't

23 necessarily mean I found evidence that

24 Google joined them.

25      Q.    Right.  I'm not saying Google,

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    I'm saying you.  Did you successfully match

2    any of them up?

3          A.     I mean, we have to look through

4    all the reports to -- I don't remember

5    actually every detail of this.

6          Q.     Well, I don't think you did

7    actually do that.  But I'm trying to

8    understand, you know, I don't know what

9    went on behind the scenes.  Did you try

10   to -- I'll tell you what I'm asking.  In

11   Brown you testified that you tried to and

12   did join what Google calls pseudonymous

13   data and a person's identity, but you

14   didn't say that in your report here, and so

15   I don't know if that's because you tried

16   and it didn't happen or if it's because you

17   didn't try.

18              MR. MAO:  Assumes facts not in

19         evidence.  You are assuming that the

20         analogies are one-for-one in one case

21         versus the other.

22              MR. SANTACANA:  I'm not

23         assuming anything.

24         Q.     I'm just trying to understand

25   what you did and didn't do, and that's

Page 140

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  context for my question.

2       A.     Sure.  So a couple of things.

3  One, I didn't prepare Brown, I haven't

4  reread my Brown report for this.  And I

5  have also kind of avoided talking about

6  Brown in this case and you have sort of

7  opened the door up there.

8            I think that we, in this case,

9  I and my assistants, did the analysis on

10 what data we had.  We may have had less

11 data here than we had in Brown.  It is --

12 it is a different case, different

13 circumstances.

14      Q.     So, but did you try to match

15 together entries in a GAIA log to entries

16 in a non-GAIA log to show that they

17 belonged to the same person or the same

18 device?  Did you attempt to do that,

19 yourself or your team?

20      A.     I mean, I think we were able to

21 do that with fingerprinting.  I think we

22 did find some ability to match up like

23 using some timestamp combined with some

24 other data we were able to correlate things

25 I believe.  I think there is a test in

Page 141

1  there that talks about that.  I'm aware

2  that the timestamps are fuzzed a little bit

3  but that fuzzing doesn't appear to have

4  been enough to stop us from doing that.

5       Q.     Okay.  So you're saying you

6  believe that you did use timestamps to

7  match together entries?

8       A.     I'm just -- I haven't found it

9  in the report yet.  I'm speaking from

10 memory.  I believe that there was some

11 point at which we were able to match stuff

12 up just using fingerprinting at minimum,

13 and whether we were able to match up with

14 identifiers is something else.  But it's

15 documented in here.  If we did, we did.  If

16 you're saying it's not there, then it's not

17 there.  I can -- I can accept your

18 representation, although the document will

19 ultimately speak for itself.

20      Q.     I don't think it's there, but I

21 also don't want to sit here for an hour

22 while you read it.  So maybe during a break

23 you can try and find that spot.

24      A.     I will -- during a break maybe

25 I will figure out if I can find that or

Page 142

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    not.

2        Q.    Okay.  But you -- but suffice

3    to say then it sounds like you do recall

4    attempting to conduct such a match?

5        A.    I think that for thoroughness I

6    have looked into that and it may be the

7    case that the way the data was presented to

8    us in the selection of data, which was

9    pretty limited, it didn't pan out.

10       Q.    But if whatever you did find,

11   it would be documented here, right?

12       A.    Yeah, whatever I did find is

13   documented, and I don't have anything to

14   change at this moment.

15       Q.    Okay.

16             MR. MAO:  I will --

17             MR. SANTACANA:  It is not an

18       objection.  You can complain during a

19       break.  I already know what you are

20       going to say.

21             MR. MAO:  The objection is to

22       the form of the question.

23             MR. SANTACANA:  Okay, if you

24       say so.

25       Q.    So part of your purging opinion

Page 143

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  has to do with joining that user control

2  field from a GAIA log to a log that doesn't

3  contain GAIA?

4              MR. MAO:  Objection to the form

5      of the question, mischaracterizes the

6      evidence.  But go ahead.

7      A.    Let's go take a look at that.

8  What paragraph are you looking at?

9      Q.    I think it is 416.  Yeah, so

10  416, "Google could populate non-GAIA GA4F

11  logs with this user controls field for the

12  purpose of identifying user

13  data/identifiers associated with sWAA-off

14  traffic."

15              Do you see that?

16      A.    Yes.

17      Q.    So my question about that is

18  did you attempt to develop a method to

19  figure out how to match up the user control

20  field from a GAIA log to entries in a

21  non-GAIA log?

22      A.    So I believe that Appendix G,

23  which I haven't read through, will have

24  some information about that, if that -- if

25  that has -- if I did figure that out.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                    I would also just comment that

2       there are some identifiers in here that

3       Google constructs via cryptographic methods

4       for which Google has a key and we don't.

5       So Google may have some additional

6       capability using its keys to be able to

7       match things up better than I could.

8            Q.      You said Google may have

9       additional capabilities using its keys.

10      Did you render the opinion in the case that

11      it can do that?

12           A.      I think that all the details

13      are in Appendix G, which is cited here.  So

14      I think I would have to read through that

15      carefully and I could probably sort it out.

16      I just don't have it at the top of my head.

17           Q.      Okay.

18                   MR. MAO:  Just one point of

19           clarification.  I do think the way you

20           used the word "joined" here is

21           different than Brown.  In Brown the

22           definition of "join" was talking about

23           Google joining.  You asking about

24           Jonathan to join is kind of a strange

25           thing.  I'm just noting that as a

Page 145

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       standing objection.

2               MR. SANTACANA:  Okay.  I'm

3       using Jonathan's definition of "join"

4       for today.

5               MR. MAO:  Let's just let you

6       finish, because I'm pretty -- very,

7       very confident that's not how that was

8       used in Brown.

9               MR. SANTACANA:  Okay.  Well,

10      this is not Brown, but that's helpful

11      to know.

12              MR. MAO:  Well, you are

13      analogizing the two.  That's the only

14      reason why I was trying to make a point

15      of clarification.

16              MR. SANTACANA:  I get it.

17      Q.      Okay.  Did you undertake in

18  this case to populate a non-GAIA GA4F log

19  with a user control field from a GAIA log

20  to identify user data associated with

21  sWAA-off traffic?

22      A.      Unless I presented it in that

23  Appendix G, which I haven't read recently,

24  I didn't, okay?  But if I did, it would be

25  documented.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1      Q.      I didn't see it there.  I mean,
2  this sentence says Google could do this,
3  but it's not citing anything.  I mean, we
4  can look -- you do cite Section 2.1.2 to
5  discuss user controls.  So we can take a
6  look at that.  I will take a look during a
7  break, but I don't think it's in there.
8      A.      Well, why don't you take a look
9  and then we'll take a look and then we will
10  see if we can get to the bottom of it.
11      Q.      Great.  Then I'll move on for
12  now.
13          You also reviewed ads data from
14  ads logs in the case, right?
15      A.      Yes.
16      Q.      Do those logs contain any sWAA
17  bit, the ones that you reviewed?
18      A.      I don't recall.  I mean, it's
19  sort of a very big set of data that was
20  reviewed and a lot of analysis, so I would
21  just cling to the report and what I've
22  documented in the report, because that has
23  all the answers.
24      Q.      Okay.  Were the ads logs that
25  you reviewed in your mind GAIA logs or

1    non-GAIA logs?

2         A.      I think the ads logs seemed

3    like they are something separate from GAIA,

4    but, again, I think I've documented it

5    clearly in the report, so whatever I've

6    said holds.

7         Q.      Okay.  Now moving to paragraph

8    418, you say that "It is not possible at

9    this point to 'unbake the cake,'" so Google

10   would need to delete internal products,

11   services or algorithms it built in whole or

12   in part with sWAA-off data.

13            Are you rendering an opinion in

14   this case as to which products, services or

15   algorithms those are?

16        A.      No, because you could see in

17   footnote 183 I have said that an

18   independent assessor could look into that.

19        Q.      Okay.  So that would be like a

20   future project?

21        A.      Future work.

22        Q.      Okay.  And you do not identify

23   in this report a list or a partial list or

24   even examples of products, services or

25   algorithms that Google built in whole or in

Page 148

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    part with sWAA-off data?

 2         A.     No.

 3                MR. MAO:  Just a standing

 4         objection, that I don't want to -- I

 5         don't want to get bogged down with the

 6         discovery history in this case.

 7                MR. SANTACANA:  I appreciate

 8         that.

 9                MR. MAO:  Yeah, just my

10         objection, a standing one, but I will

11         let you ask your questions.

12         A.     Can I answer it now?

13         Q.     I thought you did.

14         A.     I didn't really answer.

15         Q.     My transcript says you said

16    "no."

17         A.     Yeah, I was going to say more.

18         Q.     Well, that's okay.  I got my

19    answer.

20                All right, let's talk about app

21    developers.  So app developers are the ones

22    who install Google Analytics for Firebase

23    into their app, right?

24         A.     Yes.

25         Q.     Google doesn't install it?
```

Page 149

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1         A.      That's an interesting question.
 2   That's a really interesting philosophical
 3   question, because one thing I covered in
 4   the report was the migration from AdMob to
 5   AdMob+ when Google sort of inserted the
 6   Google Analytics for Firebase essentially
 7   code and functionality into the advertising
 8   SDK and deployed that essentially as an
 9   update to the advertising SDK so that
10   everyone who had the advertising SDK
11   suddenly had the Google Analytics for
12   Firebase functionality in there.  So that's
13   just a caveat I would put into that answer.
14         Q.      Okay.  We will get to AdMob in
15   a moment.  I'm trying to keep the record
16   clean.  My question was about Google
17   Analytics for Firebase, that's the GA4F
18   SDK.
19         A.      That SDK is installed by the
20   developer.  I just noted that Google did
21   slip essentially that code into another SDK
22   by way of an update.
23         Q.      Yeah.  We will get to that,
24   because I don't think that's what your
25   report says, but we will get to that.  GA4F
```

Page 150

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  is an optional feature of the Firebase SDK

2  which has other features in it too, right?

3       A.    Let me take a look, because I

4  have actually documented this pretty

5  carefully in the report, a section that

6  talks about the SDKs.

7       Q.    Yeah, I think that is 62.

8       A.    Yeah, and I don't want to

9  change what I said there.

10      Q.    Paragraph 62.

11      A.    Okay.  It's in the background

12  section I think.

13      Q.    Yes, page 28.

14      A.    All right, so I just would

15  point out in paragraph 63 for app

16  developers that use Firebase GA4F is

17  enabled by default.  I also want to note

18  here it says that GA4F is tightly

19  integrated with ads, which is one of the

20  points I was making previously.

21      Q.    Okay.  But you're not asserting

22  in this case that developers are using

23  Google Analytics for Firebase by accident,

24  right?  They are all intending to do it,

25  you have to take steps to make it work?

Page 151

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.          I think that I don't feel like

2     I need to fight you on this point.

3          Q.          I don't think you do.

4          A.          So I would just let my report

5     speak for itself.  Whatever I've said

6     stands.

7          Q.          Okay.  Now let's talk about the

8     AdMob or GMA SDK for a moment.  So

9     paragraph 71 says "In order to use AdMob,

10    app developers must embed the Google Mobile

11    Ads SDK in their apps."

12               That at least is accurate,

13    right, that SDK doesn't appear by accident,

14    an app developer has to incorporate it?

15         A.          Yes.

16         Q.          Now, 73 -- so I think you just

17    asserted that Google slipped AdMob+ into

18    AdMob with an update that meant that

19    developers were suddenly using it without

20    knowing it I think is what you were

21    implying, but I don't think that your

22    footnote 60 supports that.  So just take a

23    look and let me know if you want to

24    recharacterize your testimony.

25               MR. MAO:  I object to the

Page 152

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      characterization.

2           A.      No, I think I like the

3    testimony, but you should look at paragraph

4    74 which quotes and cites Google created

5    AdMob+ to ensure we are collecting

6    analytics data for all AdMob publishers.

7           Q.      That's a quotation from some

8    Google document, right?

9           A.      We should look at the document,

10   yeah.

11          Q.      Okay.  Well, what I'm looking

12   at is paragraph 73 which says ███████

███   ██████████████ ███████ ████████ ██████████████ █████████

███   ███████████ █████████████ ████ █████████████ ████████ ██████

███   ██████████████ ████████████████   And then in the

16   footnote to that sentence it says -- it

17   cites a document and in parentheses quotes

18   the document saying that █████ ████████ ██████

███   ██████████████ ████████████████ █████████ ██████ ████ ███████████████

███   ████████████████

21               I think, I mean, this is just

22   kind of basic logic, but I assume that

23   means then that ██████ ████████ ██████ ████████████ ██████

███   ████████ ███████ ████████████ ██████████████   so obviously the

25   developer has to take some step to do it,

Page 153

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  right?

2       A.     No, because you can see in

3  paragraph 74 and 75, well, in 75 I say

4  "Google neither used the term 'AdMob+'

5  externally nor marketed its new

6  capabilities as a separate product.

7  Instead, in the summer of 2019 Google

8  simply updated the existing Google Mobile

9  Ads SDK, so that analytics functionality

10  was automatically available," and that

11  "According, to documents Google produced in

12  this litigation Google aimed 'to achieve

13  100 percent of analytics data collection

14  for AdMob publishers.'"

15           So all that to me reads a

16  little bit like force-feeding.

17       Q.    Okay.  Well, I mean, we're here

18  for your expert testimony, so I just want

19  to make sure you're being as accurate as

20  you can be, okay?  Are you opining in the

21  case that AdMob+ functionality was

22  force-fed to app developers?

23       A.    I think someone could draw that

24  conclusion, but what I would testify about

25  in court is what it says here in the

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    report.

2         Q.    Which is that Google aimed to

3    achieve 100 percent adoption, and that the

4    functionality was automatically available,

5    right?

6         A.    Well, here's the thing, when

7    you have an SDK --

8         Q.    I'm just saying you said that

9    in here, right?

10        A.    But I want to clarify to you

11   that when there is an update to an SDK,

12   generally developers will install updates,

13   they will uptake the updates, because the

14   updates may be needed for security reasons.

15   You know, keeping your software up to date

16   and patched is generally an important thing

17   to do.

18        Q.    Did you evaluate the patch in

19   question?

20        A.    I did not evaluate the patch in

21   question.  I've just noted that this was an

22   update that was made and this was part of

23   Google's statement that they want to

24   achieve 100 percent analytics data

25   collection for AdMob publishers, and this

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ██████ ████████ ██████ ██████ ██████ ██████ ██████ ██ ████████

██ ████████

3        Q.     Try and -- try and just stick

4   to the question.  Did you evaluate the

5   update patch that you're talking about?

6        A.     No.

7        Q.     Did you evaluate the

8   documentation that came with it?

9        A.     I think I've cited some of it

10  here.

11       Q.     You cited the documentation to

12  the update in question?

13       A.     Well, that becomes a boundary

14  issue of what do you mean by

15  "documentation"?  You have correspondence

16  around it.

17       Q.     I'm talking about

18  correspondence with developers.

19       A.     I've cited to a bunch of

20  documents.  So those are the ones I've

21  cited and until we look at them I can't off

22  the top of my head remember what's in each

23  one of these Bates numbered documents.

24            MR. MAO:  Yeah, belated

25         objection, mischaracterizes the

Page 156

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    document.

2    Q.    Okay.  So if you haven't cited

3    documentation that was provided to

4    developers in this report about the AdMob+

5    update, then you didn't review it; is that

6    fair to say?

7    A.    I've cited everything that I've

8    reviewed regarding this issue.

9    Q.    Okay.  Now, back to GA4F,

10   Google Analytics for Firebase features of

11   the Firebase SDK can be customized by app

12   developers; is that fair to say?

13   A.    What paragraph are you

14   referring to here, if any?

15   Q.    Just generally.

16   A.    I don't know if I have given

17   that opinion or not.  If I said so, then I

18   said so, and if not, I want to check what

19   your source is.

20   Q.    Okay.  Well, you're aware that

21   there are custom events?

22   A.    Yes.

23   Q.    And those are customizable by

24   the developer?

25   A.    Okay, now I understand what you

Page 157

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   are talking about, yes.

2       Q.      You yourself in this case made

3   some custom events for the test app that

4   you created, right?

5       A.      Yes.

6       Q.      And then there is also what's

7   called automatically collected events?

8       A.      Yes.

9       Q.      And those are customizable but

10  to a lesser degree I guess?

11      A.      Okay.  Yeah, I think that might

12  be a fair way to describe it.

13      Q.      So part of the customization

14  that's possible with Google Analytics for

15  Firebase is choosing the types of

16  information to send to Google?

17      A.      Yes.

18      Q.      And part of that is choosing,

19  for example, which custom events to log in

20  your app, if any?

21      A.      Yes.

22      Q.      You or your team configured

23  your test app to log certain custom events,

24  right?

25      A.      Yes.

Page 158

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    And those events would have a
2    name and also parameters associated with
3    them?
4    A.    Yes.
5    Q.    And the parameters can also be
6    customized?
7    A.    You can choose what parameters
8    to send.
9    Q.    And what they say?
10   A.    Yes.
11   Q.    Okay.  And your team made the
12   choice to test out whether you could send
13   an e-mail address as a parameter of a
14   custom event for the test app you made for
15   this case?
16   A.    Oh, yes, because we observed
17   that in the wild and we were looking to
18   recreate and so we could say this is the
19   process by how such a thing we have
20   observed in the wild has occurred.
21   Q.    Got it.
22   A.    It is scientific to try to
23   reproduce an observed phenomenon.
24   Q.    And you were able to do it, you
25   were able to customize your test app to

Page 159

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    send those e-mail addresses?

2        A.      Yes, and I'm also aware that

3    there is various terms of service that seek

4    to guide developers about what kind of data

5    they should and shouldn't log.  I'm aware

6    of that.

7        Q.      Okay.  We will come to that.

8            MR. MAO:  Sorry to interrupt,

9        I'm just letting you know, can we take

10       a break at 11:30?  About 23 minutes.

11           MR. SANTACANA:  2:30?

12           MR. MAO:  Yeah, sorry, I just

13       have a quick call, personal call.

14           MR. SANTACANA:  No problem.

15       Q.      Okay.  Had you not customized

16   your test app to send e-mail addresses,

17   those e-mail addresses would not have been

18   sent to Google, right?

19       A.      Correct.  That's not a default

20   behavior.

21       Q.      Okay.  Do any of the

22   automatically collected events for Google

23   Analytics for Firebase send e-mail

24   addresses?

25       A.      Not that I'm aware of.

Page 160

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.     Do any of them send any

2   personally identifiable information?

3      A.     Yes, because they send

4   identifiers that can be linked to an

5   individual -- I'm sorry, I used that

6   subjunctive but I shouldn't have.  They

7   send identifiers that are linked to an

8   individual.

9      Q.     To an individual device?

10     A.     Yeah, and the device is linked

11  to the individual.

12     Q.     Okay.  Setting aside device

13  identifiers and other similar unique

14  identifiers, is there any other personally

15  identifiable information that is sent with

16  the Google Analytics for Firebase

17  automatically collected events?

18     A.     As far as I know, the

19  automatically collected events, as far as

20  it concerns the issues here, relate to the

21  personal identifiers that are sent, in

22  other words, identifiers that link to a

23  person.  I'm not asserting that these

24  automatic events will automatically send an

25  e-mail address or a phone number or a

Page 161

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    license plate number.  I'm not asserting

2    that and I don't want to sort of overcharge

3    Google in this case.

4         Q.    Okay.  So Google didn't design

5    Google Analytics for Firebase to have

6    people send them names or e-mail addresses

7    through automatically collected events?

8         A.    Yeah.  What I will observe is

9    that we did observe it happen, and I

10   understand Dr. Black's rebuttal, which is

11   that that's not according to the terms of

12   service, that the developers shouldn't do

13   that, I understand that.

14              My retort to him is that in any

15   policy there is always some rate of

16   compliance and some rate of noncompliance.

17   With something that is very, very widely

18   used there will inevitably be some

19   noncompliance even by legitimate,

20   good-faith parties who we observed who did

21   this probably erroneously, accidentally,

22   unintentionally, it has happened.

23              And I think that the other

24   insight from this is that when it does

25   happen, of course automatically identifying

Page 162

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    an e-mail address as a piece of data is a
 2    very easy thing to do.  There is like
 3    functions -- canned functions that do that
 4    for you, is this a valid e-mail address, is
 5    this string a valid e-mail address.  A
 6    quick test, you can know.
 7                 I just would comment that
 8    Google upon receiving the data doesn't seem
 9    to run that test to say hey, is this an
10    e-mail address, is this a phone number, is
11    this something, you know, likely to be very
12    sensitive, and maybe we should redact this
13    and not log it.  I just would note that
14    Google isn't doing that, and that might be
15    a good thing for them to do.
16         Q.     That is understood.  So just so
17    we're super clear, when you talk about rate
18    of compliance with the policy, you're not
19    opining in this case that Google, even
20    though it has that policy with developers
21    to not send names and e-mail addresses and
22    the like, that Google wants them to be sent
23    to Google anyway, that's not one of the
24    things you're opining on?
25         A.     No, I'm not -- I'm not saying
```

Page 163

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   that.
 2        Q.     Okay.  And you're not opining
 3   that Google is capitalizing on the
 4   noncompliance of developers who do send
 5   things like name and e-mail address?
 6              MR. MAO:  So, sorry, just --
 7              MR. SANTACANA:  Objection to
 8        form works.
 9              MR. MAO:  Yeah, objection to
10        form.
11        Q.     Go ahead.
12        A.     Can you read back the question?
13   Sorry.
14        Q.     I'll do it.  You're not opining
15   that Google is capitalizing on the
16   noncompliance of developers who do send
17   things like name and e-mail address?
18        A.     No.
19        Q.     Okay.
20        A.     Also, I would just also comment
21   that the policy is -- the policy documents
22   and the terms of service are kind of
23   lengthy and complex things and I'm not
24   trying to give you a legal opinion even to
25   say this is compliant or noncompliant, I'm
```

Page 164

1   just sort of taking his word for it that

2   I'm assuming it's noncompliant.

3        Q.     Understood.

4        A.     I'm assuming what he says is

5   right, but maybe somebody is going to argue

6   that that is actually wrong.

7        Q.     An app developer might show up

8   with a different view, understood.  But in

9   this room we can agree it's not compliant

10  to send e-mail addresses that way?

11       A.     I'm taking it as an assumption.

12       Q.     Okay.  So in that test app did

13  you also incorporate the GMA SDK?

14       A.     I've documented whatever is

15  incorporated in there, because there are

16  two test apps and we should just look,

17  because that's an interesting question and

18  I don't remember it off the top of my head.

19       Q.     Okay.  We will look -- I will

20  look during a break and come back to GMA.

21  Okay.

22             When you were configuring your

23  test app and the Google Analytics account

24  that went with it, did you enable Google

25  Signals; do you know?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.      I don't recall, but it may be

2  documented.

3      Q.      Okay.  I don't think it is, but

4  I will check.

5              And then you're familiar with

6  the check box developers have access to to

7  enable or not enable data sharing, quote,

8  "data sharing" with Google?

9      A.      You should just show it to me

10  so I'm sure we're talking about the same

11  box.

12     Q.      Okay.  I could do that.

13             All right.  Now, you are -- you

14  said you are familiar that there are terms

15  of service.  Did you review them for this

16  case?

17     A.      I've looked at them.

18     Q.      These are the terms of service

19  between Google and the users, the app

20  developers of Google Analytics for

21  Firebase?

22     A.      Yes.

23     Q.      Are you opining in this case

24  about the rate of compliance or

25  noncompliance with those terms of service?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.      No.

2        Q.      Are you rendering any opinion

3   in the case about Google's efforts to

4   enforce or failure to enforce its terms of

5   service against app developers?

6        A.      I mean, I just made an

7   observation that they take e-mail addresses

8   and don't seem to be scanning for them, so

9   that's kind of an interesting data point.

10  But, in general, I haven't issued opinions

11  about Google attempting to enforce terms of

12  service or not.  Someone might draw a

13  conclusion from the fact I noted.

14       Q.      You've said that Google doesn't

15  seem to be scanning for them.  Is that just

16  because you found some in there so you

17  concluded they are not scanning for them?

18       A.      Well, I found some in there and

19  I was able to insert some and they weren't

20  blocked.

21       Q.      To your knowledge.

22       A.      To my knowledge.  And I guess

23  Google could of course, you know, they

24  could clarify that if they wanted to.

25       Q.      Sure, okay.  Apart from that,

Page 167

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    are you rendering any opinion in the case

2    about Google's efforts to enforce or not

3    enforce its terms of service?

4         A.    No, I'm trying to render

5    technical opinions, not something like

6    that.

7         Q.    And you haven't done anything

8    to measure or quantify or test Google's

9    enforcement measures?

10        A.    No, I haven't done a survey to

11   quantify that.  All I would say is it's a

12   commonly known principle in security, in

13   computer security, that there's no such

14   thing as perfect security and there is no

15   such thing as perfect compliance.  When you

16   try to get humans involved in a system,

17   they make mistakes, it is just inevitable.

18        Q.    Sure.

19        A.    So when I say there is a

20   noncompliance rate, there is going to be

21   some noncompliance, but I haven't sought to

22   quantify that.

23        Q.    Okay.  In those terms of

24   service, Google does require developers to

25   disclose the use of Google Analytics for

                                    Page 168

1    Firebase to their end users, right?

2         A.      I will take your word for it.

3         Q.      Okay.

4              MR. MAO:  Just standing

5         objection here in this area that you're

6         asking him about disclosures of things

7         which he has not been designated for.

8         But go ahead.

9              MR. SANTACANA:  Well, that may

10        help speed things up actually.

11        Q.      Did you -- did you, just to

12   sort of close this out, did you review any

13   privacy policies from third-party app

14   developers to determine the degree to which

15   they mention or don't mention Google

16   Analytics?

17        A.      That's outside the scope of my

18   report.

19              MR. MAO:  Eduardo, I'm not

20        saying that, you know, as part of your

21        questions to understand how they did

22        the setup and the testing that you're

23        not entitled to it.

24              MR. SANTACANA:  Right.

25              MR. MAO:  But I view that as

                              Page 169

CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1      being part of the mechanics in his

 2      personal capacity as opposed to a

 3      disclosed expert for the subject area.

 4            MR. SANTACANA:  Right.  No, I'm

 5      just closing him out.  If you are not

 6      going to present him on it, that's

 7      great.

 8            THE WITNESS:  No.

 9      Q.     Okay.  I think you do have an

10  opinion that Google does not provide users

11  with control over Google's collection and

12  saving of sWAA-off data, right?

13      A.     Yes, I think I've said that.

14      Q.     And I think that's on page 115

15  of your report.

16      A.     Yes.

17      Q.     It's a couple of -- three

18  paragraphs here.  You say in 251 "There is

19  no way to prevent Google from saving WAA

20  and sWAA-off data once it is logged."

21  Sorry, wrong paragraph.  Let's go to the

22  top.  249 you say "It is my opinion that

23  Google, throughout the class period, has

24  uniformly not provided users with any

25  control that stops Google from collecting

1   and saving the WAA-off and sWAA-off data at

2   issue in this case."

3        A.     Yes.

4        Q.     Setting aside whether Google

5   has presented a control in my account for

6   that, to the extent users review a privacy

7   policy from a developer that discloses the

8   use of Google Analytics, isn't one way for

9   them to avoid the collection to not use the

10  app?

11       A.     I think that that is a very

12  heavy lift for the user to understand,

13  using Google Analytics -- we are using

14  Google Analytics for Firebase and the user

15  would now need to understand that that SDK

16  is ignoring their WAA-off and sWAA-off

17  settings.  The simplest explanation there

18  is for the user to just imagine, that's

19  okay, you can use that because I have set

20  WAA and sWAA-off, and I'm not being

21  tracked.

22       Q.     So in your view a user who

23  reviewed a privacy policy that disclosed

24  the use of Google Analytics for Firebase

25  would conclude that the sWAA button

Page 171

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   overrides that?

2               MR. MAO:  Objection, vague.

3       But go ahead.

4       A.      So, one, I'm not here I don't

5   think to testify about user perceptions.  I

6   mean, I mentioned it in passing a few

7   places.  We have covered this.

8       Q.      I didn't think so, but you did

9   just kind of say something about it, so I

10  just want to understand.

11      A.      Yeah, so, no, what this is

12  saying is from a technical perspective

13  there is no button there that will stop

14  that data collection.

15      Q.      Okay.  That's the extent of the

16  opinion?

17      A.      That's the extent of the

18  opinion.

19      Q.      Okay.  Let's talk about --

20      A.      I've just lost my connection,

21  which is going to hinder people on Zoom

22  from watching.

23              MR. SANTACANA:  Let's go off

24      for a second.

25              THE VIDEOGRAPHER:  The time is

                                    Page 172

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           2:22 p.m.  We are off the record.

2                 (Recess taken.)

3                 THE VIDEOGRAPHER:  The time is

4           2:41 p.m.  We are back on the record.

5           A.     If I can say something, because

6      you asked me during a break to look into

7      it.

8           Q.     Yes, please.

9           A.     So I did look at that and kind

10     of refreshed my own memory, but we didn't

11     really seek to join, in other words,

12     discover links between the identifiers that

13     are collected and logged and GAIA, because

14     there is no need to.  Okay?  What we did to

15     find the users' data was to just harvest

16     the identifiers off their device and

17     request that data, and that's -- that's the

18     linkage that's of interest.

19          Q.     Right, understood, or the test

20     device you were using.

21          A.     Right.  So I hope that

22     clarifies what I said previously in that

23     line of questions.

24          Q.     Yeah, that sounds consistent to

25     me with what you said.  I just want to make

                                        Page 173

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   sure I understand.  So you requested -- you

2   used the device identifiers that you took

3   off of either plaintiffs' devices or test

4   devices to request data from Google?

5        A.    Yes.

6        Q.    And the identifier in question

7   was a device ID?

8        A.    Some sort of device ID, yes, or

9   an app instance ID, something you could

10  find on the device.

11       Q.    Yeah, I think app instance ID

12  never resulted in anything, we just used

13  device ID.

14             So then you got your data.

15  Those were all non-GAIA logs, but you also

16  got GAIA logs which were used -- which you

17  got because e-mail addresses were queried,

18  right?

19       A.    Okay.

20       Q.    So I guess my question is you

21  had those GAIA logs, you had those non-GAIA

22  logs, so just to be perfectly clear, you

23  didn't attempt to like find a line in the

24  GAIA log that matched a line in the

25  non-GAIA log and put them together?

Page 174

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.        I do remember at some point
2    finding some correspondence just by using
3    fingerprinting techniques.  So I don't know
4    if that made it into the report or not.
5    But let's just say that the report -- the
6    report explains everything very completely.
7        Q.        Okay.  Sorry, correspondence,
8    you mean in a technical sense?
9        A.        I did find at some point, and I
10   remember finding a technical correspondence
11   by using some fingerprinting technique.  I
12   was able to match a couple of different log
13   sets of data up using fingerprinting.
14       Q.        And using fingerprinting, that
15   means trying to match one field in one log
16   to the same field in another log?
17       A.        Like some data -- some data in
18   one log with data.  Because the actual data
19   provides a lot of matches sometimes.
20       Q.        And did you document those
21   matches in the report?
22       A.        I just remember doing it, and I
23   don't remember whether we put it in the
24   report or not.  Maybe it got left on the
25   cutting room floor, I don't know.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.      I don't think it is there, but

2   that's what I would like to talk about if

3   you do find it.

4       A.      Okay.

5               MR. MAO:  So just real quick,

6       this will be quick, so my understanding

7       in Brown was that when -- they were

8       talking about -- let me just say my

9       objection.  When they are talking about

10      joining, they are talking about joining

11      to GAIA.  So however you are comparing

12      it to, just please make it clear on the

13      record or else I'm going to make sure

14      that we rehab it and it unnecessarily

15      stretches this out, okay?  Thank you.

16              MR. SANTACANA:  Could we go off

17      for a second?

18              MR. MAO:  Yeah.

19              THE VIDEOGRAPHER:  The time is

20      2:44 p.m.  We are off the record.

21              (Recess taken.)

22              THE VIDEOGRAPHER:  The time is

23      2:46 p.m.  We are back on the record.

24  BY MR. SANTACANA:

25      Q.      I want to jump back for a

                                    Page 176

CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1    moment, Mr. Hochman, to when we were

 2    discussing your three changes that Google

 3    could make; stop collecting, purge, and

 4    delete, okay, as I call them, and I want to

 5    focus on the stop collecting one.  So I

 6    think the way you phrased it at paragraph

 7    409, let me know when you're there.

 8         A.    Yes.

 9         Q.    So paragraph 409, the first

10    sentence is "It is my opinion that Google

11    could change WAA and sWAA so they match

12    their function as described in Google's

13    disclosures.  Put differently, Google could

14    change WAA and sWAA so that WAA and sWAA

15    actually do the work that Google says they

16    do."

17              And my question is, keeping in

18    mind that you're not opining on sort of

19    what the words are supposed to mean or all

20    of that, I'm not asking you about that,

21    isn't it also fair to say that another

22    change that Google could make would be to

23    describe WAA and sWAA differently to match

24    the function that you observed in the case,

25    and that would also sort of do away with

Page 177

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  the problem?

2          A.      I don't think that this is

3  really a solution, because the users --

4  users want to have privacy, and I think

5  Google has undertaken some commitments to

6  allow users to have some control over their

7  privacy and that would sort of defeat, you

8  know, the bigger purpose of all of this,

9  which is to give people some option.

10                Because, you know, that's

11  really sort of the point of these controls

12  is to give someone -- if you change the

13  description and say these are fake

14  controls, that doesn't really solve the

15  problem of them being fake controls.

16          Q.      Well, if the description of WAA

17  said we're still going to have Google

18  Analytics even when you turn WAA off, but

19  when WAA is off we won't tie analytics data

20  to your GAIA, which is the unique

21  identifier associated with your Google

22  account, that would be accurate?

23          A.      No, that wouldn't be accurate.

24          Q.      Okay.  Why not?

25          A.      Because you are saying it

Page 178

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1  wouldn't tie to your GAIA, and the problem
 2  is that this stuff tends to tie together
 3  because there is data collected in both
 4  scenarios which correlates strongly and it
 5  ties, it links.
 6       Q.    Okay.  So what if instead it
 7  said we won't join your analytics data to
 8  your GAIA using the definition of "join" we
 9  have been using today?
10       A.    I don't really think that's a
11  solution either, because essentially what
12  you're proposing to do is to tell people,
13  hey, we are going to give you this control
14  which actually does nothing to improve your
15  privacy.
16       Q.    Well, again, I'm just -- I'm
17  just trying to understand, the control does
18  something, right?  It does impact the way
19  Google stores the data, right?
20       A.    Google still stores the same
21  data, it just stores it in a different
22  place.
23       Q.    And with different things
24  associated with it?
25       A.    I'm not sure about that.  I
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  think the way I would describe it is they
2  are storing the same data but just in a
3  different place and that data is still
4  linked to you.  It has personal
5  identifiers.  It has your device IDs in it.
6  It is essentially like a license plate on
7  your device.  Like a license plate on your
8  car and device ID on your phone are kind of
9  analogous.
10      Q.      That is fine.  So let's use --
11  well, I don't know how they are analogous.
12  But because the license plate is tied to
13  your name at the DMV's database, right, on
14  a mapping table, right?
15      A.      Well, I don't want to -- I
16  mean, we may be getting into too much
17  detail there, but the idea is that it is --
18      Q.      It is your analogy.
19      A.      The license plate is a unique
20  identifier for a car.  Do you follow me
21  there?  It is a unique identifier for your
22  car.
23      Q.      Okay.
24      A.      Your VIN number is a unique
25  identifier for your car.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.      Okay.

2       A.      So they are unique identifiers

3   for your car.  And your phone has unique

4   identifiers, okay?  So the problem is that

5   those unique identifiers are persistent,

6   they are stable over time, they point to a

7   single person, they are personal

8   identifiers, and that becomes a problem.

9   Using those identifiers and spreading them

10  all over the place in logs is a problem

11  because all that data is linked back to the

12  user.

13      Q.      So I understand that you

14  consider that to be a privacy problem.  My

15  question is about this part of your report

16  where you say "Google could change WAA and

17  sWAA so that WAA and sWAA do the work

18  Google says they do," I'm just pointing

19  out, or they could change how they describe

20  WAA and sWAA to match up with the work they

21  are doing?

22      A.      So I considered that

23  possibility and did not write about that.

24  I did not say that because I don't think

25  that solves the problem.

Page 181

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.      Okay.  I understand.  Now,

2   turning back to app developers, did you

3   incorporate any other analytics products in

4   the test apps for this case other than

5   Google Analytics for Firebase?

6        A.      Not that I'm aware of.

7        Q.      App developers can incorporate

8   multiple analytics SDKs from multiple

9   providers in the same app, right?

10       A.      In theory, they could.

11       Q.      Why do you say "in theory"?

12       A.      I mean, I just haven't -- I

13  haven't expressed an opinion about that.

14       Q.      Okay.

15       A.      And I haven't -- I mean, what

16  you're saying, I don't know of a reason why

17  they couldn't.  Let's leave it at that.

18       Q.      And you're not expressing any

19  opinion as to how often developers

20  incorporate multiple analytics SDKs into

21  the same app?

22       A.      No.

23       Q.      And you are not expressing any

24  opinion in the case about how hard it would

25  be to have multiple analytics SDKs in the

                              Page 182

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  same app at the same time?

2      A.      No.  I mean, the only thought I

3  have on that is it starts to gum things up.

4  You know, it is going to chew up more

5  battery and tie up more bandwidth.

6      Q.      Okay.  I meant how hard it

7  would be for the developer to have multiple

8  analytics SDKs in the same app.

9      A.      It doesn't strike me as

10  something that would be particularly hard

11  from a programming standpoint, but from a

12  software engineering standpoint it is

13  probably desirable to keep it light, you

14  know, not to gum it up with too much

15  different technology.

16      Q.      Okay, I see, I understand that,

17  okay.

18          So we were talking a moment ago

19  about persistent identifiers, right, and

20  that the persistence is the problem.  Go

21  ahead.

22      A.      No, I should let you finish the

23  question.

24      Q.      The same device IDs that are

25  persistent unique identifiers for a device

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    that Google gets from Google Analytics are

2    also sent to other places on websites and

3    apps if they use other analytics providers,

4    right?

5         A.    I don't have any disagreement

6    with that.

7         Q.    So the same event data from

8    let's say -- let's just use the event first

9    open as an event example, right, first open

10   standard event you would have in any

11   analytics SDK, right?

12        A.    Yes.

13        Q.    So first open gets triggered,

14   and the app developer has AppsFlyer and

15   Google Analytics and Facebook SDK all

16   integrated into the same app.  All three of

17   those are going to get the device ID and

18   the fact that the event occurred, right?

19        A.    Presumably.

20        Q.    So let's say the sWAA button

21   works the way that you want it to work,

22   which is that if the person has sWAA off,

23   Google will -- well, let me first ask, is

24   this the way you think it should work, if

25   the person has sWAA off Google will reject

Page 184

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   the device ID tied first open event?

2        A.     I mean, I think that a better

3   way would be, let's just keep it simple, if

4   WAA or sWAA are set, then the SDK will

5   learn about that and remember that and

6   whenever the app runs, the SDK just won't

7   transmit data back to Google.

8        Q.     At all, right, okay.  Not even

9   -- so it's not rejecting it, it is just not

10  transmitting it in the first place?

11       A.     I mean, maybe it sends

12  something, you know, could it send

13  something?  Yeah, there might be something

14  it can send as long as it doesn't include

15  anything that ties to the user.

16       Q.     Okay.  So the user in this

17  hypothetical is a sWAA-off user, they have

18  Google Analytics, Facebook and AppsFlyer

19  all integrated into the app, so the Google

20  Analytics SDK in your world will not

21  transmit at all for that user, right?

22       A.     Let's say that that was the

23  case, yes.

24       Q.     Okay.  And then -- but

25  AppsFlyer will, right?  AppsFlyer doesn't

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1   have a sWAA button?
 2         A.      Assume it doesn't.
 3         Q.      I don't think it does.
 4   Facebook doesn't have a sWAA button as far
 5   as I know.
 6         A.      I'm not sure about that.  I
 7   haven't looked into it.
 8         Q.      Okay.  Let's actually stick
 9   with AppsFlyer.  Like you said, they're not
10   on the both sides of the thing.  So the
11   device ID in first open gets sent to
12   AppsFlyer but doesn't get sent to Google
13   because that user has sWAA turned off,
14   right?
15         A.      Okay.
16         Q.      Why would a developer like you
17   use the Google Analytics for Firebase SDK
18   at all if the sWAA-off data is not going to
19   get sent, but they could use AppsFlyer and
20   get all of it?
21         A.      I don't know.  That's an
22   interesting question, and I haven't opined
23   about that and I haven't done, you know,
24   that analysis.  This is sort of a further
25   down the road question, isn't it?
```

Page 186

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.        I suppose.   I'm thinking about

2    the privacy risk of the device ID being out

3    there, right?   Isn't it basically the same

4    risk if that user's app won't send to

5    Google but it will continue to send to

6    AppsFlyer, same persistent -- same license

7    plate as you say, isn't it the same

8    problem?

9        A.        I'm not sure, because, I mean,

10   just thinking it over, one of the things I

11   think I noted right in the preface sort of

12   of the report, the introduction, I talked

13   about the very large amount of activity

14   that Google collects.

15               Google has a really big, you

16   know, sort of wrap-around view of a lot of

17   stuff.   AppsFlyer may have a more narrow

18   view and that data may not be saved by

19   AppsFlyer, it might just be sent to the

20   individual app owner.   So now you've got

21   this kind of very fragmented world where

22   there is data spread out in a bunch of

23   little silos, it is not all in one juicy

24   target.

25       Q.        Okay.

Page 187

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.     So that could qualitatively be

2  different.

3      Q.     So because they are in

4  different silos, the fragmenting of the

5  data across different silos makes the

6  privacy risk lower than in Google's

7  scenario where it's all under the same

8  roof?

9      A.     I don't know that even I would

10  go so far to say lower.  I would say it may

11  create a different risk profile.  It may

12  create a different set of risks and

13  probabilities.

14      Q.     Would it be less concerning to

15  you?

16      A.     I don't know.  Because I'm not

17  here to evaluate AppsFlyer, so I haven't

18  thought that all through and all I can say

19  is that it's a different scenario.

20      Q.     Well, what if Google spun out

21  Google Analytics for Firebase, right, it

22  bought Firebase, what if it spun it out

23  into its own separate entity?

24      A.     I don't know.  Someone would

25  have to do an analysis of that.  I mean,

Page 188

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    maybe that solves your problem, maybe it

2    doesn't.  I don't know.  I mean, could that

3    be a viable solution?  Maybe.  I think you

4    would have to investigate it.

5         Q.    Okay.  Let's talk about

6    personalization.  So speaking of semantics,

7    there is some back and forth with you,

8    between you and Black about this word

9    "personalization," so I want to ground it

10   in your report.  So I'm going to have you

11   compare two paragraphs for me.  First,

12   paragraph 278, really the first four lines

13   of that, and then 277.

14        A.    Okay.

15        Q.    So just review those for a

16   moment.

17        A.    Yeah, I was already back at

18   277.

19              (Witness perusing document.)

20              MR. MAO:  Let's go off the

21        record.

22              THE VIDEOGRAPHER:  The time is

23        3:01 p.m.  We are off the record.

24              (Discussion off the record.)

25              THE VIDEOGRAPHER:  The time is

                                    Page 189

1      3:08 p.m.  We are back on the record.

2  BY MR. SANTACANA:

3      Q.      Okay.  So you have had a chance

4  to look at 277 and 278?

5      A.      Yeah, and I looked at the

6  paragraph before them also which had some

7  enlightening stuff in it, 276.

8      Q.      Okay, yeah.  So we'll get to

9  276.  Thank you for pointing that out.  I

10  actually want to start at 278 and work

11  backwards.

12          So in 278 you say "Ad

13  personalization is impacted by two

14  additional user controls:  GAP and NAC.

15  Because Google does not use data collected

16  by GA4F from WAA and sWAA-off users to

17  serve personalized ads, such WAA and

18  SWAA-off data is not used for ads

19  personalization regardless of whether GAP

20  and NAC are turned on or off."

21          So just hold that in your mind

22  for a moment.

23      A.      Okay.

24      Q.      And then in 277 you talk about

25  the distinction between personalization and

Page 190

1    targeting, right?

2         A.      Yeah, based on the evidence in

3    276.  I don't think you can read 277

4    without reading 276.

5         Q.      Well, let me just ask you this:

6    Is your statement in 278 about ad

7    personalization incorporating the

8    distinction that you draw in 277 between

9    personalization and targeting?

10        A.      The answer is yes, and I would

11   just adjust the question slightly, or the

12   assumption in the question slightly, which

13   is that I'm pointing out that Google is

14   making a distinction between

15   personalization and targeting, and I'm sort

16   of adopting that in my further analysis,

17   and the basis for that opinion is what I've

18   outlined in 276, which actually follows

19   from 275.

20        Q.      Right, yeah, and we'll get to

21   276, which I think has certain errors baked

22   into it.  But I want to stick with 277 for

23   a moment to make sure we're using the

24   right -- the same terminology, you and I.

25              So "Google seems to consider

Page 191

1   advertising as targeted but

2   non-personalized when it is based on

3   information associated with a user's

4   non-GAIA IDs as opposed to the GAIA ID,"

5   and then you give some examples of what

6   that might be.  Then you say -- or before

7   that you say "Google defines

8   'personalization' as altering a user's

9   experience based on information associated

10  with their user ID."

11          Just one clarifying point, do

12  you understand the phrase "user ID" in that

13  sentence to mean GAIA ID in the next

14  sentence, do you understand them to be

15  interchangeable or different?

16      A.    I believe -- I believe that,

17  yeah, user ID is referring to the GAIA ID,

18  although to be 100 percent sure I would

19  have to take a look at that document just

20  to be sure.

21      Q.    Isn't one of the elements of

22  personalization in this distinction that's

23  being drawn here that personalization

24  requires the leveraging of historical

25  information about -- or associated with the

Page 192

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  user ID and then for targeting it relies on

2  information that is nonhistorical?

3       A.     I mean, I think that's one way

4  to look at it.  Historical is certainly a

5  category of information that's in the --

6  associated with the GAIA ID, but there

7  might be some other settings there or

8  something, you know, that maybe is not

9  necessarily historical, but just a

10  configuration.

11       Q.     Got it.  Persistent settings?

12       A.     Something like that, yeah.

13  Maybe you wouldn't view it as historical,

14  you would just view it as a setup.

15       Q.     The reason I'm asking is you

16  give three examples of what targeting

17  includes.  You say "such as language, type

18  of device, and content of the app being

19  viewed."

20            So those three examples are all

21  pieces of information about the --

22       A.     Let me help you, current

23  context.

24       Q.     Yes, current context of the

25  advertisement that's being served?

Page 193

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.      Yes.

2        Q.      And then in your definition of

3   personalization, when you say "information

4   associated with their user ID," there I

5   think you are referring to, and I can pull

6   up the document, but I think you are

7   referring to information that is in what

8   you called earlier a dossier about the

9   user, right?

10       A.      Yes, and in this case it would

11  be the dossier of data collected in what

12  Google calls the user's account, in other

13  words, the area that's associated -- the

14  data structure that's associated with a

15  GAIA ID, or the data stored that is

16  associated with the GAIA ID.

17       Q.      Got it, okay.  So with that

18  clarification in mind, you're not -- you're

19  not disputing in this case that Google will

20  not personalize ads, as we have just

21  defined it in this back and forth, with

22  sWAA-off Google analytics for Firebase

23  data?

24       A.      That's correct.  I only said

25  that Google, just because they are not

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  personalizing, they still might target, but

2  targeting is different than personalizing.

3        Q.      And one difference is you could

4  do targeting without keeping a dossier?

5        A.      In theory, yes.

6        Q.      You could even do it without

7  saving the information at all presumably?

8        A.      I mean, I could think of ways

9  to do it without even transmitting that

10  information.  If you just had that

11  information at the device, I could imagine

12  a way to architect it that you might, for

13  example, say give me a set of ads with some

14  specs and I'll hold the specs here and I'll

15  match the ads you send me with the specs

16  and I will display the one that matches up

17  the best.  I mean, whether --

18        Q.      That sounds really slow.

19        A.      Well, yeah, that might be

20  troublesome, but maybe not.  You know, the

21  app during idle time could download all

22  kinds of ads and just, you know,

23  selectively display them.  I mean, there

24  are different ways to design a system and

25  there might be some ways to do this.  I

Page 195

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1　think this is all beyond the scope of the

2　report and it is more of a curiosity than

3　anything we really need to focus on.

4　　　　Q.　　　Yeah, I am curious about it

5　though.　Is, in your mind, is the targeting

6　referred to in 277 at odds with the

7　representations made in the WAA control?

8　　　　A.　　　I don't -- well, I think that

9　the issue is that the WAA control, if the

10　representation is interpreted, let's just

11　say that the Court is going to figure out

12　what that is promising, let's say the Court

13　finds or the factfinder finds that the WAA

14　control is promising the user not to send

15　the data and not to store the data.　If

16　that were the case, targeting is impossible

17　under the current architecture of the

18　system without sending the data.　The

19　system would have to be some completely

20　different system to maybe do that.

21　　　　　　　　I'm thinking about some of the

22　patents that I have reviewed in other

23　matters, public patent documents from the

24　early internet where they actually did have

25　ad systems where, you know, the server

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   would load up a whole bunch of ads to the

2   computer and then the computer would just

3   pick which one to show, so, I mean, people

4   have tried to design ad systems that way.

5        Q.    I think I know what you're

6   saying.  So --

7        A.    There is always -- there is

8   always a dichotomy between the server and

9   the client and you can sort of shift the

10  workload between them, and obviously there

11  is a better way to do it.

12       Q.    Yeah.  But does it -- would it

13  make a difference to you if the data were

14  used in short-term memory and discarded,

15  the data used for targeting, so it's not

16  saved?

17            MR. MAO:  Objection, vague and

18       compound.  Go ahead.

19       A.    What difference would it be, if

20  the data was sent to the ad server and was

21  transient and it wasn't stored, I mean,

22  that might be -- that might improve some of

23  the privacy and security properties, but it

24  doesn't necessarily comply with the user's

25  expectations on that control, because I

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  have already told you that not sending the
2  data at all may be what the user is
3  expecting.
4           If that's what they are
5  expecting, they are also, you know, the
6  users can have different concerns.  Some
7  users -- well, let me -- let me walk it
8  back.
9           I don't know what the users are
10 thinking.  I haven't studied or surveyed
11 that, okay?  I really shouldn't even
12 speculate about it.  The user -- if the
13 user's expectation is nothing is to be sent
14 and nothing is to be saved, then obviously
15 sending doesn't really work, okay?  But if
16 somehow someone finds a different way, you
17 know, is it better to save only for a short
18 time versus saving for a longer time versus
19 saving permanently?  You know, the longer
20 you save the data, potentially the greater
21 the risk.  But I don't think that's
22 determinative in this case at all.
23      Q.    Did you say I don't think
24 that's determinative?
25      A.    Determinative.  Because I don't

Page 198

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   think this is a case about how long Google
 2   is saving the data.
 3              My understanding is what is in
 4   dispute is that WAA and sWAA is a switch
 5   that is for privacy, you can do your
 6   activity in private.  A good example would
 7   be if I go into a hotel room, I expect
 8   privacy.  I don't expect a peeping Tom with
 9   a secret camera to record my activity in
10   that hotel room.  And if the peeping Tom
11   says hey, don't worry about it, I recorded
12   this but I deleted it 15 minutes later,
13   that's still not okay.  If he says I
14   recorded it and I put the tape in a safe
15   and I'm never showing it to anyone and I'm
16   not looking at it myself, don't worry, it's
17   fine, that's still not okay.  It's the
18   actual peeping on me that's the problem.
19        Q.     I see.  There is that concept
20   of spying again.  Are you in your mind
21   analogizing the sWAA and WAA buttons to
22   what Google represents to be incognito mode
23   in Chrome browsers or what Safari calls
24   private browsing mode, is that analogous in
25   your mind?
```

Page 199

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.     I'm not thinking of it in that
2  way.  I'm thinking of it as I want privacy,
3  don't watch me.
4     Q.     Well, there are different
5  degrees of privacy, and the degree that you
6  just analogized was locking the door in a
7  hotel room and knowing nothing about what
8  goes inside -- on inside the box, right,
9  the room?
10     A.     Well, that's one way I look at
11  it.
12     Q.     And that made me think of
13  incognito mode.  Like is that why you're
14  making that analogy is because those are --
15     A.     I'm not trying to connect this
16  to incognito mode.
17     Q.     Okay.  Leave incognito out of
18  it.  I'm not trying to bring Brown into
19  this.
20          You are familiar with Safari
21  private browsing mode?
22     A.     Yes.
23     Q.     So like is your conception of
24  the WAA and sWAA switch that it is similar
25  to in the browsing context activating

Page 200

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  private browsing mode in Safari, or that's

2  what --

3       A.    That's not the way I have been

4  thinking about it.  I have been trying to

5  think about this just on its own,

6  standalone.  This is a switch, allows my

7  web and app activity to remain private, it

8  is a privacy control.  I'm thinking about

9  it in a very simple way.

10      Q.    Maybe too simple.  The switch

11  has a description.  It doesn't say this is

12  a privacy switch.  There is actually like

13  15 privacy switches that do different

14  things, right?

15      A.    I mean, we can go back and look

16  at the page and look at what it all says,

17  but I'm not analogizing it to some browser.

18  I'm just telling you that that's not how I

19  thought about it.

20      Q.    There is -- there is a switch

21  on Android devices and a switch on iOS

22  devices that's a device-level switch that

23  blocks the device ID from being used by any

24  apps.  You are familiar with those?

25      A.    I believe so.  What's the name

Page 201

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of that switch?

2        Q.      On Android I think they used to

3    call it OOOAP, opt out of ads, or

4    something, and --

5        A.      Triple O something.

6        Q.      Yeah.  And on iOS it is now

7    called app tracking transparency, and

8    before that it had a different name.

9        A.      Was it called LAT?

10       Q.      Yes.  So you are familiar with

11   those switches?

12       A.      I have to admit it now, because

13   I just gave you the name of one, yes.

14       Q.      You would admit it truthfully

15   regardless, right?

16       A.      Of course.

17       Q.      So what in your mind is the

18   distinction between the sWAA switch as you

19   believe it functions or should function and

20   the device ID disabling switch on mobile

21   devices?

22       A.      Well, okay, so I can, even off

23   the top of my head, give you a distinction

24   between these two things.  Because the

25   device ID switch, which limits the access

Page 202

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    to that identifier, is just one thing, but
2    the SDK, Firebase SDK, has access to a
3    variety of different pieces of identifying
4    information on the device, so that it's a
5    question of a narrow control or a broad
6    control.
7         Q.     Okay.  Do you opine in your
8    report that Google uses data from a user's
9    past app activity to personalize
10   advertising even when the user has sWAA
11   turned off?
12        A.     I believe Google has
13   represented that when sWAA and WAA are
14   turned off, the past app activity is not
15   used to personalize ads, and I accept that.
16   I am not disputing that.
17        Q.     Okay.  So back to targeting,
18   would it be fair to then call targeting as
19   you are talking about it here contextual
20   targeting?
21        A.     So I like the more general just
22   targeting because it might admit some other
23   things, because someone might quibble about
24   what is contextual and what is not.  So
25   targeting is general.  It might devolve
```

Page 203

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   into being contextual, but maybe there is
 2   something else that we haven't thought of.
 3        Q.     Okay.  But as far as you know,
 4   you're familiar that Google uses the term
 5   "contextual targeting" in their
 6   developer-facing pages?
 7        A.     Yeah, I'm aware of contextual
 8   targeting from the ad platform side and
 9   often that was referring to like based on
10   what words are in a content page on the
11   display network and what words the user --
12   the advertiser has specified in an ad
13   campaign, and they might say oh, okay, you
14   want to target people searching for white
15   sneakers and here is an article about white
16   sneakers, even though it is not a search,
17   it is just a context page, maybe we will
18   show your ad here because we think it is
19   especially relevant in this context.
20        Q.     Right.
21        A.     So that is kind of maybe a
22   little bit more specific than showing an ad
23   based on someone's language or their
24   general course location.
25        Q.     Right.  And from an internet
```

Page 204

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   marketing standpoint, in order to

2   effectuate contextual targeting in a

3   responsible way, Google has to say

4   something about its serving of ads, some

5   type of information?

6          A.      I would even go further than

7   that.  I would say that in order to serve

8   ads, Google needs to retain some data in

9   order to comply with industry standards.  I

10  think Google is a member of the Media

11  Rating Council and they are certified for

12  generalized and valid traffic detection and

13  sophisticated and valid traffic detection,

14  and that's ad fraud detection.

15         Q.      Okay.

16         A.      So when you want to charge

17  someone for ads, you actually have to

18  retain some data in order to prove good

19  delivery of the ads.  You can't just say

20  hey, I have shown your ad a million times,

21  give me the money.  You actually have to

22  have some proof from a vendor who is MRC --

23  ideally MRC certified who can provide some

24  reliable statistics.

25                 This MRC was set up in the

Page 205

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    1960s by the Congress because there at the

2    time had been a lot of lying about

3    advertising on like television, radio,

4    newspapers, like lying about the reach of

5    the advertising.  So Congress sort of

6    decided to put an end to that and said

7    let's certify the distribution of these

8    ads.  So that has moved into the online

9    era, and Google and Google Analytics are a

10   couple of the certified vendors.

11        Q.     Okay.

12        A.     That is more than what you

13   wanted to know about that, but it might be

14   helpful.

15        Q.     In the context of this case,

16   when we are talking about -- what's the

17   term you would use, bookkeeping,

18   recordkeeping, Ratings Council compliance?

19        A.     I would just say you want to

20   retain evidence of good delivery.  Because

21   one of the things as an advertiser that I

22   like Google for is that they try to

23   maintain a clean network.  They try to

24   protect me as an advertiser from ad fraud.

25   They tell us that they conduct proactive

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    investigations.  They have automatic

2    systems that detect fraudulent activity and

3    try to protect the advertiser from that.

4         Q.     Isn't one of the ways they

5    effectuate that by analyzing device ID and

6    IP address?

7         A.     Look, I can help you a little

8    bit there.  I've done a bunch of ad fraud

9    cases, and one of the things to do is to

10   look at the device ID and some of this

11   collected data.  So it is a known method

12   for detecting ad fraud.

13        Q.     Would Google have to drop that

14   detection method for sWAA-off users to

15   resolve the problems you've identified in

16   your report?

17        A.     I don't know.  Would there be

18   some way to work it out that these things

19   could coexist?  I'm not sure.  Again, I

20   would point back to my original

21   observation, which is Google has put itself

22   into a very difficult position by promising

23   the user, hey, we are going to be your

24   advocate for privacy and the vendors they

25   work with.  They've got some overlapping

Page  207

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    and conflicting obligations, and that
 2    creates a problem for them and maybe they
 3    ought to focus on one business or the other
 4    in order to do the best possible job for
 5    each constituency.
 6         Q.    Okay.  Well, but for now let's
 7    assume that they are not going to drop
 8    users or drop advertisers in the immediate
 9    future.  The fraud detection mechanism that
10    you were just talking about it sounds like
11    relies on certain persistent or
12    non-temporary, non-transient identifiers,
13    right?
14         A.    This ends up being a deep
15    rabbit hole that we are going into here
16    about like how would Google do this.  I
17    mean, maybe there is some way that they can
18    work it out.  You know, maybe they can talk
19    to the advertisers and, you know, talk to
20    the industry standards and say hey, you
21    know, in order to respect privacy, we can't
22    collect this data for certain segment of
23    people who turn this off, but we know these
24    are real people because they've got Google
25    accounts.  You know, you have to have a
```

Page 208

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Google account in order to have a WAA and

2    sWAA set.  So there is already some level

3    of authentication there.

4              Like if Google authenticates

5    these people that these are real people who

6    have real Google accounts, you know, maybe

7    that is a substitute for the telemetry,

8    perhaps, I don't know.  That's a really

9    detailed thing that someone is going to

10   have to work out afterwards.

11        Q.    But if Google doesn't save

12   anything from the transaction, then that

13   would -- then it can't prove that it told

14   the truth that it was a Google account and

15   therefore a real person?

16        A.    Again, I don't know.  Like

17   could they work out some better

18   arrangement?  They might be able to work

19   out a better arrangement.  But looking back

20   retrospectively, you know, it was

21   essentially if you didn't collect this

22   data, you would have a lot of problems

23   charging for those ads.

24        Q.    And I think you say in your

25   report that if sWAA functioned the way that

                                    Page 209

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1  you read it to function or should function,
2  Google wouldn't be able to serve ads at
3  all, right?
4       A.    Again, which part of the report
5  are we looking at?
6       Q.    I'll come back to it.  It is in
7  here somewhere.
8            Does contextual targeting in
9  your mind deviate from the representations
10 made on the WAA page or is it just the
11 saving of the records that the targeting
12 occurred?
13      A.    My gripe is with the
14 collection -- the transmission and saving
15 of the information while the user has
16 indicated that this is sensitive
17 information and they want to keep it
18 private.  It is the sending and saving,
19 that's the issue.
20      Q.    Okay, understood.  Let's look
21 at 144, paragraph 144 of your report.  Just
22 review it for a moment.
23            (Witness perusing document.)
24      A.    Yes.
25      Q.    So you say in this paragraph
```

Page 210

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  that Google can pull the wool over its

2  users' eyes by refraining from using

3  sWAA-off data to personalize the user

4  experience which would cause the user to

5  catch on, but nevertheless storing it.

6          A.     Yes.

7          Q.     Just a couple of follow-ups

8  about that.

9                 First, you were not intending

10  to opine as to Google's intent in this

11  case?

12          A.     No.

13          Q.     Okay.  Because the phrase "pull

14  the wool over its users' eyes" is pretty

15  colorful.  I'm just making sure that is not

16  an opinion about Google's intent.

17          A.     I do like to be colorful

18  sometimes because these reports could be

19  dry, and I like them to be interesting to

20  read.  But it is a description of the

21  effect.  It's not a description of Google's

22  intent, okay?  I'm sure that that's just --

23  maybe it's overly colorful, but it's clear

24  now.

25          Q.     Okay.  And you're not opining,

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  I think we covered this already, I

2  apologize if we did, but you're not opining

3  that Google is nevertheless secretly using

4  sWAA-off data to personalize the user's

5  experience anyway?

6          A.     I don't think I've said that.

7          Q.     Okay.  Let's talk about PII.  I

8  think I gave you the privacy policy from

9  May 2018 earlier.

10         A.     I have it.

11         Q.     You can mark that number 4.

12                (Hochman Exhibit 4 marked for

13  identification.)

14         A.     And you said this is from

15  May --

16         Q.     It says right there on the top,

17  May 25, 2018.

18         A.     Okay.

19         Q.     So you are aware that the

20  privacy policy has definitions in it for

21  key terms, what Google calls key terms?

22         A.     Yes, I see that.

23         Q.     Let me first ask you actually,

24  maybe to make this easier, your report

25  actually doesn't use the phrase "personal

                              Page 212

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    information" or "personally identifiable
2    information" or "PII," at least not in your
3    own words.  There is a couple of quotes
4    from somewhere else.  Was it your intention
5    in this report to express an opinion about
6    which pieces of the data at issue in the
7    case are or are not PII?
8         A.    No, that sounds like a legal
9    conclusion.
10        Q.    Okay.  So you have no opinion
11   as to whether -- you're not trying to
12   express an expert opinion as to whether the
13   data at issue in the case comprises in
14   whole or in part personally identifiable
15   information?
16              MR. MAO:  Objection,
17        misrepresents his testimony.  Go ahead.
18        A.    I mean, I've said at some
19   points that various identifiers link to a
20   person.  So someone could draw a conclusion
21   or form a legal conclusion based on the
22   technical opinion, but I'm not here to give
23   a legal opinion.
24        Q.    Okay.  By the way, you talk
25   about IP addresses a couple of times in
```

Page 213

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     here.  I just want to make sure we're all

2     on the same page.  Did you find any IP

3     addresses in the logs you were provided?

4          A.     I don't recall.

5          Q.     Okay.  Do you have a basis to

6     dispute that Google -- that Google

7     Analytics does not store IP addresses in

8     logs?

9          A.     Well, in the logs that aren't

10    shown to the Google Analytics website

11    operator, in other words, the website

12    operator who installs Google Analytics or

13    the app publisher who deploys Google

14    Analytics for Firebase, I, in having

15    reviewed those reports, I know that

16    generally you're not seeing IP addresses.

17    There is some privacy concerns around them.

18    So I haven't asserted that.

19              What's in the logs, I mean, I

20    have documented what's in the logs.  From

21    what I've seen, I don't recall in this case

22    whether we have got IPs.  It's documented,

23    whatever I've said, it stands.

24         Q.     Fair enough.

25              MR. MAO:  Just to make sure,

                              Page 214

1        what was the answer, the last part, the
2        last sentence?  I just want to make
3        sure it actually made it into the
4        record.
5             MR. SANTACANA:  "It's
6        documented, whatever I've said, it
7        stands."
8             MR. MAO:  Thanks.
9        Q.    Now, you're aware that
10   Dr. Black did some work to try and quantify
11   different types of pieces of information in
12   the logs that you analyzed, right?
13        A.    I'm aware of that, and I of
14   course have retorts to him.
15        Q.    And you what?
16        A.    I have retorts.
17        Q.    You have retorts?  Okay.  Well,
18   have you conducted any studies or
19   experiments or attempted to recreate the
20   statistics that he created to determine
21   whether they were accurate?
22        A.    Oh, I'm not disputing
23   necessarily how he counted.
24        Q.    Okay.
25        A.    But I think my issue would be

                                    Page 215

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    that the sample data we got was not large
 2    and apparently not representative, so it
 3    sort of is not really amenable to that kind
 4    of statistical analysis.  You can't -- you
 5    need to have a statistically valid sample
 6    and a representative sample in order to do
 7    statistical analysis.  So I wouldn't draw
 8    the conclusions that he's trying to draw by
 9    doing an analysis on that small sample set.
10        Q.      Fair enough.  My question was
11    actually about -- or where I was headed was
12    you note in I think Appendix G that there's
13    some age and gender information in some of
14    these data entries, in some of the logs
15    from Google Analytics that you reviewed.
16    Do you recall that?
17        A.      Yes.
18        Q.      Can you say whether that
19    demographic information came from Google or
20    from the app developer?
21        A.      A great question, and all I
22    have observed is that data was there in the
23    logs.
24        Q.      Okay.  But you're not sure
25    whether it's because Google supplied it to
```

Page 216

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  the developer based on some other
2  information Google had or whether the
3  developer supplied it to Google based on
4  some other information the developer had?
5       A.    Yeah, in general I have
6  additional questions about these logs that
7  I would love to be able to ask someone
8  knowledgeable about them, and I just
9  haven't had the opportunity to get all the
10  discovery that I would like to have.  But
11  that is what it is.
12       Q.    Okay.  The web and app activity
13  control I think you say should only cover
14  app activity data, right?
15       A.    I think I've talked about web
16  view data also.
17       Q.    Web views inside of apps?
18       A.    Correct.
19       Q.    I'll include that in app
20  activity.  But really all I'm asking is --
21       A.    I think you should also include
22  the ad activity within the app.
23       Q.    Okay.  So the app activity in
24  your mind includes any advertising activity
25  within that app?

Page  217

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.      They are all just activities.

2   It is a remote transaction occurring

3   between the app and the server, and data is

4   going back and forth.

5       Q.      Right, okay.  So we will come

6   back to ads.

7               We talked about the first open

8   analytics event earlier.

9       A.      Yes.

10      Q.      So when Google logs a device ID

11  in the first open event, did you see any of

12  those in the logs?

13      A.      Yeah, probably we did, because

14  we would have had first open events.  I'm

15  just sort of inferring it.  Whatever we

16  found, we've documented.

17      Q.      Okay.  Did you see any evidence

18  that Google leveraged those events, just to

19  use them as an example, from sWAA-off users

20  to perform advertising?

21      A.      I think my inference is that

22  those events would be -- it would be very

23  important to count those as conversions.

24  If someone had been running an app

25  promotion campaign, they want to get people

Page 218

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    to install apps, so as soon as someone does

2    that first open, the software development

3    kit, which seems to behave the same --

4    transmit the same information with sWAA and

5    WAA on or off, the only difference I've

6    documented is where that information seems

7    to be stored according to Google's

8    explanation.

9              The conversion tracking is very

10   important there, because that's the

11   justification for the advertiser, it is the

12   justification to charge the advertiser

13   money for advertising is that hey, this

14   advertising works.

15        Q.    Apart from the recordkeeping

16   associated with charging the advertiser

17   that you're talking about, did you see any

18   evidence of Google using sWAA-off

19   conversion events for any other purpose?

20        A.    I mean, I think that using the

21   sWAA-off conversion events to track

22   conversions is the big use of them.  I

23   didn't necessarily --

24        Q.    Understood.

25        A.    -- look for them to be used for

Page 219

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  anything else.  Just knowing they are used

2  to track conversions is the significant

3  thing.

4       Q.    Okay, understood.  But apart

5  from the recordkeeping associated with

6  charging the advertiser, did you see

7  evidence of Google using sWAA-off

8  conversion events to personalize

9  advertising?

10      A.    Okay, so I have a couple of

11  different questions, a couple of different

12  answers to that question.

13           One answer, the simple answer,

14  the first-order answer is that I didn't see

15  that being used to further personalize ads,

16  although I do know from having been an

17  advertiser that Google seems to keep

18  statistics on users about their propensity

19  to convert and that there are some what

20  Google reps have told me are safe settings

21  in the ad platform that you can use to try

22  to essentially allow Google to boost your

23  bids in the auction when they observe a

24  user who is more likely to convert, and

25  that these options have been available at

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    least in the past and maybe still.

2              So there is potentially some

3    second-order effect beyond just the

4    immediate conversion.  I mean, if you know

5    that somebody is converting, that

6    information is valuable in more ways -- in

7    more ways than just the immediate

8    conversion and immediate ad revenue that's

9    justified by that conversion.

10        Q.      So you skipped ahead, that's

11   where I was going next.  Did you see

12   evidence in the case that Google uses

13   sWAA-off conversion measurements to inform

14   what you were just talking about, which is

15   user propensity to convert?

16        A.      Well, I think there is some

17   indirect evidence in that I've cited a

18   variety of Google documents that talk about

19   how data is used to improve their products,

20   you know, data that is collected, including

21   sWAA and WAA-off data can be used to

22   improve Google products, it can be used for

23   machine learning.  So that's sort of an

24   indirect use.

25              But I didn't investigate

Page 221

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    those -- I didn't observe those algorithms

2    within the system.  Like you had asked me

3    well, what algorithm should Google delete

4    or what product should Google delete, and I

5    said, you know, we need a surveyor to come

6    and figure that out.

7              So there is a scope of my

8    investigation.  I looked at certain parts

9    of the system and I have seen indications

10   that this data is flowing out to other

11   parts of the system and being used there.

12   I haven't inspected all those other parts

13   of the sort of vast Google technology

14   infrastructure.

15        Q.     This feature of -- this feature

16   relating to user propensity to convert is a

17   Google Analytics feature, right?

18        A.     The one I'm thinking of is in

19   Google Ads.

20        Q.     In Google Ads, okay.  Maybe the

21   word "predictive" is associated with it?

22        A.     The word "enhanced" was

23   associated with it a while back.  It was

24   sort of like you could enhance bid

25   enhancement, like if you see someone who is

Page 222

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    kind of a likely converter, then it will

2    enhance your bid, and I was advised by a

3    Google ad rep that that is a safe option,

4    that you enable that and it will improve

5    your ROI.

6         Q.    What does the word, I'm just

7    curious, what does the word "safe" in that

8    mean?

9         A.    I think what it means is that

10   it is sort of conservative in that it is

11   making a good prediction.  When it enhances

12   your bid, you are not just paying more, you

13   are paying more with good reason.

14        Q.    Because it costs more?

15        A.    Yeah.

16        Q.    Okay.  So I think fair to say

17   in order to do that predictive work about a

18   particular user converting, there would

19   need to be some dossier about that user's

20   historical conversions, right?

21        A.    I guess there would need to be

22   some data or some model somehow, and I

23   could imagine that this might be

24   implemented in different ways, and I'm not

25   exactly sure how Google has implemented

Page 223

1  that internally.

2      Q.    Okay.  And so fair to say

3  whether Google keeps such a model for

4  sWAA-off, that includes sWAA-off data, is

5  outside the scope of what you've examined

6  here?

7      A.    I believe that it's uncertain

8  whether Google has that model or not.  And,

9  again, in the corrective measures section

10  of the report, K, I talked about having

11  somebody assess or figure out, so that

12  would probably come out in the assessment.

13      Q.    Okay.  Did you see any evidence

14  in the case or express any opinion as to

15  whether Google has made any attempt to

16  decipher the meaning of app developer's

17  custom analytics events?

18      A.    I don't recall that.

19      Q.    Are you -- are you, sitting

20  here, aware of any evidence to that effect

21  that Google is trying to figure out what

22  those custom events mean?

23          MR. MAO:  Objection, vague.

24      But go ahead, sorry.

25      A.    Well, I can tell you what I

Page 224

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    know about automatic interpretation of

2    computer code is a tricky problem.  It's a

3    rough problem to get someone's program and

4    to evaluate what it is doing, you know, say

5    is this program safe or not, is this

6    program bugged or not, is this program

7    correct or not.  All those things are

8    actually proven to be unsolvable,

9    theoretically unsolvable.  So that's --

10        Q.      Until AI takes care of it all.

11        A.      No, AI can't take care of it

12   either.  It is actually unsolvable on a

13   theoretical basis, deeper than that.  It is

14   not just hard, it is actually at least

15   contradictions, illogical contradictions,

16   so these are unsolvable problems.

17           In computing there are some

18   problems that are unsolvable.  Like have

19   your heard of the halting problem?  That's

20   an unsolvable problem.  Given an arbitrary

21   program, determine whether this program

22   when it runs will stop or run forever,

23   unsolvable problem.  You can't solve it.

24        Q.      Interesting.  Now you have

25   piqued my interest, but we are on the

Page 225

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  clock.

2              So in-app purchase event is

3  another sort of standard conversion event

4  in analytics and in ads, right, in-app

5  purchase?

6      A.    Yes.

7      Q.    So I guess first focusing only

8  on in-app purchase events that are

9  triggered by sWAA-off users, did you see

10 any evidence that Google is compiling the

11 in-app purchase events of sWAA-off users to

12 enhance the advertising that's delivered to

13 that user, i.e., personalizing the ads for

14 that user?

15     A.    I don't recall documenting that

16 in my report.  I mean, if it's in there,

17 it's in there; if it's not, it's not.

18     Q.    No, I don't think it's in

19 there.

20              Okay.  And then even for

21 sWAA-on users, did you come across any

22 evidence that Google is deciphering and

23 making personalization decisions based on

24 what the user purchased as opposed to just

25 the fact that a purchase occurred?

Page 226

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.      I haven't been evaluating

2  personalization based on WAA-on data.

3  That's outside the scope.

4      Q.      Okay.  I think you give an

5  example which Google gives on its website

6  about the favorite food custom event

7  parameter.  Do you know what I'm talking

8  about?

9      A.      Yeah, I remember mentioning

10  that in the report. Maybe we will go look

11  at the spot if you have a follow-up

12  question.

13      Q.      Well, it's honestly maybe

14  redundant of a question I just asked, but

15  it sounds like you're saying to Google at

16  least at a programmatic level it's not

17  going to know what that means if it is a

18  custom event parameter about a person's

19  favorite food?

20          MR. MAO:   Objection,

21      argumentative.  But go ahead.

22      Q.      I'm not meaning to argue with

23  you.

24      A.      I didn't take it that way.  I'm

25  not sure.  I mean, I don't know if Google

Page 227

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  is trying to decode what these things mean

2  or not, but I haven't opined that they are.

3       Q.    What about to the extent that

4  like URLs or page view names are being

5  transmitted to Google, URLs with stuff

6  stuffed into them, right?

7       A.    Yes.

8       Q.    Parameters, or page view names

9  in an app that have names like AI Article.

10      A.    Okay.

11      Q.    Did you come across any

12  evidence that Google is attempting to

13  decipher the parameters and URLs or the

14  page view names or screen view names to

15  determine something about that user?

16            MR. MAO:  I will just lodge a

17       standing objection here and then I will

18       stand down.

19            This is argumentative because

20       you are tempting me to go into the

21       procedural history in this case and I'm

22       trying not to do so.  So I will just

23       leave that.  I mean, the discovery

24       procedural history.  Go ahead.  I will

25       leave that standing objection.

Page 228

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.      Okay.  So I don't think I've

2  opined about that, although I do recall

3  there may be perhaps another expert will

4  talk about how in privacy analysis if you

5  see the URLs that someone is looking at,

6  that can tell you an awful lot about that

7  person's interests, proclivities, sexual

8  orientation, etc., and --

9      Q.      If a human sees it?

10     A.      Yes.  It can be sensitive

11 information.

12     Q.      Yeah.  My question is about

13 Google's operation at a programmatic level

14 or systematic level.  You know, I

15 understand that if I handed you all the

16 URLs and a person could read them, then you

17 may come to certain conclusions.  But I'm

18 asking about how the system is designed

19 sort of across everybody.

20     A.      So one thing I would just

21 advise you is that Google crawls the web,

22 so Google knows a lot of URLs and

23 classifies all these web pages.  Google

24 understands --

25     Q.      Yeah, I'm familiar with that.

Page 229

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.      Not to talk about state of

2    mind, but they are machine learning and

3    indexing the web.  They are crawling the

4    web, acquiring pages, saving copies of them

5    and then they index them, catalog them,

6    like a librarian would, in an automatic

7    way.

8            So if Google sees a URL, it

9    would be kind of child's play for them to

10   go into their index and extract, you know,

11   okay, what is that URL about, what are the

12   topics of interest, and then to use that

13   information to maybe, you know, generate

14   some inferences about what that person is

15   interested in.

16           So I'm not saying that they are

17   looking at the URL and analyzing the text

18   of the URL to extract information, but you

19   could use the URL, a URL is actually a

20   unique identifier for a piece of web

21   content.  So if you have a URL you can go

22   look up in your files, hey, what's this web

23   content all about, and you can extract a

24   lot of structured information.

25       Q.      So it sounds like you could

Page 230

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   think of a way that it could be done, for
2   purposes of the opinions that you are
3   rendering in the case, you aren't rendering
4   an opinion that Google is doing that with
5   sWAA-off URLs or screen view names or
6   things like that?
7              MR. MAO:  Same objection on the
8        procedural history of this case.  But
9        go ahead.
10       A.    I mean, it strikes me now that
11  you raised it, I haven't thought about
12  this, but now that you have raised it,
13  if --
14       Q.    Well, let me stop you there.
15  You haven't thought about it before right
16  now?
17       A.    Well, but what I -- what I can
18  say is if you have a URL, you could take
19  that URL and combine it with some other
20  information you have, Google could, its web
21  index, and it could generate a very nice
22  prediction of what topics that person might
23  be interested in if it wanted to serve an
24  ad to that person, without having to
25  reference that person's history in any way.

Page 231

1      Q.      Yeah, I believe that.  My
2  question is have you opined that Google is
3  doing that with sWAA-off data?
4      A.      I don't know for sure if they
5  are doing that or not, but sort of as an
6  inference it would be kind of surprising to
7  me if they wouldn't take advantage of that
8  because it is sort of so easy and obvious.
9      Q.      Okay.  I think you note in your
10  report that these logs that you examined
11  contain geolocation data?
12      A.      Yes.
13      Q.      You don't disagree that the
14  geolocation data is to some degree
15  coarsened from the precise location of the
16  device when it was collected, right?
17      A.      I do believe that it is
18  coarsened to something like minimum of one
19  square kilometer or minimum of 1,000
20  people.
21      Q.      Okay.  Let's talk about --
22  well, where are we in time?
23      A.      Why don't we take a quick
24  break.
25      Q.      Okay.  Let's take a break.

Page 232

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1            THE VIDEOGRAPHER:  The time is

2       3:58 p.m.  We are off the record.

3            (Recess taken.)

4            THE VIDEOGRAPHER:  The time is

5       4:20 p.m.  We are back on the record.

6  BY MR. SANTACANA:

7       Q.     Okay.  I think you mentioned

8  earlier that the Washington Post app had

9  been sending e-mail addresses to Google,

10  right?

11       A.     What I remember is it was one

12  of their reputable newspaper apps, maybe it

13  wasn't the Washington Post, maybe it was

14  the New York Times.

15       Q.     It was.

16       A.     Was it?

17       Q.     Yes.

18       A.     Oh, I got it right.

19       Q.     So, and I think you said that

20  you assume that's essentially against the

21  terms of service for using Google

22  Analytics?

23       A.     Well, I know that Black

24  highlighted it, and I will just take his

25  word for it on that issue for the sake of

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   discussion.
 2        Q.     Dr. Black does some
 3   calculations in his report about which apps
 4   included something that might be an e-mail
 5   address and which did not.  Do you have any
 6   calculations in rebuttal to that?  Did you
 7   perform any calculations?  Or did you just
 8   sort of take that as is?
 9        A.     I don't accept his analysis.  I
10   just am not addressing it.
11        Q.     Okay, sure.  So you're not --
12   you're not going to dispute the math I
13   guess?
14        A.     I'm not going to dispute the
15   math.  I think I said earlier that the logs
16   that I was given through discovery were
17   sort of sparse and maybe not a
18   representative sample, maybe not a
19   statistically significant sample.  So, you
20   know, subject to those concerns, I'm not
21   disputing his math.
22        Q.     Okay.  So let's talk about
23   joinability.  What in your mind does
24   joinability risk refer to?
25        A.     So I understand joinability
```

Page 234

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   risk as sort of a terminology that Google

2   seems to be using, so I can say that I

3   understand what they mean by that.

4          Q.      Please.

5          A.      The joinability risk is that

6   somebody, in trying to run a report or

7   generate some data, pulls together data, it

8   uses one of these Google identifiers as a

9   key, as a join key, and joins together two

10  tables using one of these keys as a field,

11  and thereby reidentifies a bunch of data

12  relative to a GAIA ID.

13         Q.      Using that understanding of

14  joinability risk, did you identify any

15  instances in which that risk was realized?

16         A.      So I considered that way of

17  assessing the privacy situation to be not

18  the methodology of choice because the

19  problem with privacy is that there are

20  persistent identifiers that are personal

21  identifiers.

22             These Google identifiers are in

23  fact personal to individual people and that

24  the real risk is that that data with that

25  identifier leaks, is exfiltrated, is

Page 235

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    accidentally supplied to a vendor, however

2    that might happen, and that that directly

3    is identifying to a person.  Even if you

4    don't have the person's name, that data

5    specifies an individual device, which

6    someone who has that trove of data can

7    extract the data from that of an individual

8    person.

9         Q.     So completely understood.  Just

10   the question is, though, you just outlined

11   the risks, right, the concerns, did you

12   find in the evidence an instance of such a

13   risk to date having been realized with

14   respect to sWAA-off Google data?

15             MR. MAO:  I have an objection

16        on this area of questioning on the

17        procedural discovery -- the discovery

18        procedural history in this case.  Go

19        ahead.

20        A.     I did not have access to data

21   showing evidence of Google's data breaches,

22   whatever may have happened.  So I guess my

23   answer is I will be more succinct:  No.

24        Q.     Okay.  Take a look at paragraph

25   137.  Just read that to yourself for a

1    moment.

2              (Witness perusing document.)

3         A.    Yes.

4         Q.    So the first sentence says

5    "Within Google's non-GAIA logs, Google

6    intermixes both WAA-on and sWAA-on data

7    with WAA-off and sWAA-off data."

8              Do you see that?

9         A.    Yes.

10        Q.    And then later in the same

11   paragraph you say that Google does not --

12   it does not appear that Google treats the

13   WAA-off and sWAA-off data in Google's

14   non-GAIA logs any differently than it

15   treats the WAA-on and SWAA-on data in those

16   logs?

17        A.    Yes.

18        Q.    Okay.  So when you say that

19   Google doesn't treat the on and off data

20   any differently, is that -- actually, never

21   mind.  Strike that.  I now understand.

22        A.    Glad to have been of service.

23        Q.    All right.  Now take a look at,

24   I'm whipping you back and forth, look at

25   paragraph 303.

                                    Page 237

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.        I don't mind that, because I'm
2    a nonlinear thinker.
3        Q.        Perfect.  You have an objective
4    see brain.
5        A.        Okay, I'm there.
6        Q.        So in paragraph 303 you address
7    a Google engineer's comments about
8    joinability risk.  Do you see that?
9        A.        Yes.
10       Q.        And that engineer provided in
11   the document that you are quoting examples
12   of joinability risk.  Do you see that?
13       A.        Yes.
14       Q.        This is the document that was
15   authored by Xinyu Ye.  Do you recall that?
16       A.        I don't recall that name, but
17   let's just see.  There is a document Bates
18   number here, so we could look at it.
19       Q.        Before we do, let me just ask
20   you, Dr. Black addresses that document in
21   his report, and what he says is that Steve
22   Ganem testified about this document and
23   said that the joinability risk that was
24   being identified was hypothetical and that
25   the identifier in question is not stored

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    unless assigned end user has consented to
2    sWAA.  Do you have any basis to dispute
3    that?
4         A.    Okay.  So one issue there,
5    there is a couple of issues there, one
6    issue is when you say some sort of computer
7    security risk is hypothetical, this field
8    is a little different than some other
9    fields in that analysis of hypothetical
10   risks is very important in computer
11   security, especially because computers
12   operate at high speed, over high volumes of
13   data.  Even something that's a, you know,
14   one in very small number risk turns out to
15   be quite serious over a large body of
16   transactions, in fact it statistically will
17   come up.
18        Q.    I don't mean to interrupt, but
19   I think you -- I wasn't clear enough in my
20   question.  That's not what I meant.
21        A.    Okay.
22        Q.    So what I meant by hypothetical
23   is that the engineer in question was
24   commenting as to the risks that would arise
25   if a particular course of action were
```

Page 239

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  taken, but that particular course of action

2  was never taken by Google.

3      A.    Okay.

4      Q.    Maybe perhaps because of those

5  joinability risks.  So my -- that's my

6  understanding of the record on this.  Do

7  you have any greater understanding other

8  than what you said in your report?

9      A.    What I have in my report is

10 what my understanding is, and we can go

11 look at the detail of the documents and try

12 to reconcile what Mr. Ganem and what

13 Mr. Black are saying and what I'm saying,

14 if you wish to, or we can just leave them,

15 you know, stand as they are.

16     Q.    Let's come back to it.

17     Sitting here now, though, you

18 do not know whether the joinability risks

19 discussed in paragraph 303 related to an

20 existing course of conduct or a proposed

21 course of conduct, right?

22     MR. MAO:  Objection, assumes

23     facts not in evidence.

24     A.    Okay.  So, look, in 303 the

25 most important thing is the first sentence.

Page 240

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    "Internal documents are consistent with
 2    Mr. Miraglia's testimony revealing that
 3    Google employees acknowledge that so-called
 4    pseudonymous data is linked to users."  So
 5    that's the point I have been making all
 6    along, all right?
 7            And then there is a document
 8    here which I really can't give you further
 9    comments unless I were to actually sit and
10    reread that document to refresh my memory
11    about what it says, because I just -- I
12    haven't memorized all these documents.
13    There is far too many of them.
14       Q.    Okay. All right, let's look at
15    202.  At 202 you say that "Google's
16    production of data from a collection log of
17    Google Analytics for Firebase shows that
18    Google saves GA4F data in non-GAIA logs
19    using substantially the same structure and
20    content as the data it saves in non-GAIA
21    logs."  I think maybe that is a typo.
22            But, anyway, "Because Google
23    stores a copy of consented data in both
24    GAIA and non-GAIA logs, the timestamps,
25    identifiers and data stored in both types
```

Page 241

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of logs make GAIA and non-GAIA data and ID

2    joining straightforward."

3              Are you with me?

4         A.    Yes.

5         Q.    Not to belabor the point, but

6    just to be perfectly clear, though you

7    opine that doing the -- performing that

8    joining would be straightforward, you are

9    not opining that Google does in fact

10   perform that join?

11        A.    No.  So my assumption is that

12   Google is trying to not join data.  When

13   they have a policy and they say we don't

14   join this data, my assumption is that they

15   aren't joining that data.  Unfortunately,

16   the problem is a threat actor who gets hold

17   of this data from Google is not bound by

18   Google's good intentions and policies.  So

19   that's my concern.

20        Q.    Okay.  My other question about

21   that sentence was just about the

22   straightforward joining part.  Your report

23   does not document that you were able to

24   perform such a join, right?  Have you had a

25   chance to take another look?

Page 242

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.        I haven't found it, but I
2    remember seeing an example where for sure
3    we found I think it was even a timestamp
4    and maybe it was an IP address.  It was a
5    timestamp plus something else, and I was
6    able to see how records joined across these
7    logs.
8        Q.        It's not documented here in the
9    report, right?
10       A.        It might be somewhere.  I just
11   -- the report is huge and the appendices
12   are huge.  It is more than I can remember
13   the location of everything.  So it's --
14       Q.        Did you take time during a
15   break to look for it?
16       A.        I didn't have enough time to
17   find it yet, but maybe it will turn up
18   later.
19       Q.        Okay.  And just to be clear,
20   that join that you performed, did you say
21   you thought it was with timestamp?
22       A.        I think timestamp was one of
23   the elements, and I think there was
24   something else if my memory is correct.
25       Q.        You were operating with a GAIA

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   log and a device ID log that you knew came
 2   from the same device and user, right?
 3        A.     The datasets were not gigantic.
 4        Q.     Well, and they were limited in
 5   scope to only the test devices, right?
 6        A.     They were limited to whatever
 7   was produced to us.  Yeah, I assume that
 8   that's the test devices or the user
 9   devices, yes.
10        Q.     So you have no way of telling
11   if you were looking at the entirety of all
12   of Google's analytics data if you could
13   perform such a deterministic join between
14   those timestamps?  I mean, for all you
15   know, there could be a hundred million
16   entries at the same timestamp.
17        A.     Well, so I'm going to correct
18   what you said a little bit.
19        Q.     Sure.
20        A.     It is actually a probabilistic
21   match, okay?  So fingerprinting is a
22   probabilistic endeavor.
23        Q.     Okay.
24        A.     And so if I were to have a huge
25   set of data, the computational complexity
```

Page 244

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of doing that essentially is that you take

2    all the data, you calculate some

3    fingerprint from the data, you have a

4    fingerprint function, you have some inputs

5    and you calculate a fingerprint function,

6    however that is, and then you look for

7    matching fingerprints.

8              This can be done with pretty

9    good efficiency.  It's not computationally

10   a difficult task.  And fingerprinting is

11   actually done and clustering is done in

12   order to gather up data like this and do

13   probabilistic matching.  It is a common

14   practice and it is feasible, okay?  So I'm

15   not opining out of thin air.  I'm using my

16   experience in knowing what people actually

17   do in these sort of large-scale internet

18   identity systems.

19       Q.     People other than Google?

20       A.     People, in general, state of

21   the art, state of the art is that it is

22   feasible to do this.  You can do

23   probabilistic matching with a good, I have

24   read academic papers, you can do

25   probabilistic matching with a good degree

Page 245

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of success.  There is no technical

2    impediment to doing it.  You may have some

3    failure rate.  You may not match all of

4    them.  But you match a high percentage of

5    them.

6         Q.    I see, okay.  That's helpful.

7    Take a look at 248.

8              MR. MAO:  By the way, Eduardo,

9         let's take a break when we are done

10        with this mod.

11             MR. SANTACANA:  Didn't we just

12        take one?

13             MR. MAO:  I need to use the

14        restroom.

15             MR. SANTACANA:  Okay.

16        A.    By the way, your last question

17   just shook loose something in my mind.  If

18   I remember, you were asking me if I had

19   seen any IP addresses in the logs.  I do

20   remember seeing, I think that there is

21   maybe some IP addresses that were encoded.

22   They don't necessarily look like IP

23   addresses, but I seem to recall encoded IP

24   addresses, or IP addresses, but now I have

25   a memory of that.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    I didn't see that in your

2    report.  So could you put that on your list

3    of things to look for?

4    A.    Sure.

5    Q.    That would be really helpful.

6          All right.  So paragraph 248,

7    you -- well, you just answered my question

8    actually.  Never mind.

9          Well, one question on this.  On

10   this ██ ██████ █ that you talk about in

11   248, so Dr. Black looked at the ██

12   ██████ █ of entries from the same

13   devices and found that they did not match

14   and must have been ████████ ██████

15   ██████ █████ Do you have any basis to

16   dispute that?

17   A.    I understand that there is

18   some -- and even in 248 it says that.

19   There is some ██████ █ ████ ██████ █

20   is going on it would appear.  Also 248 does

21   that have disclosure of the IP address and

22   user agent found in both GAIA and non-GAIA

23   logs.  I think you saw that, but I will

24   just state it for the record that that

25   answers prior questions about that.

Page 247

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. MAO:  Sorry, Eduardo, you
2      said that 248 says that some things
3      match and some things don't match?  I'm
4      not seeing that.
5          MR. SANTACANA:  No, I was
6      saying that Dr. Black's report says he
7      wasn't able to ███████ ████ ████████ ███
8      from GAIA logs to non-GAIA logs because
9      they must ██████ ██████ ███████████ ███████
10     ████████████ ███████
11     A.     And I have actually said that
12 they are ████████████ ████ █████ ███ █ ██████
██ ██████████████ ██████ █████ █████ ██████████ ██████ ██████
14 So he and I therefore agree on that point.
15     Q.     Okay.  Let's look at 310,
16 paragraph 310.
17          By the way, did you personally
18 draft this report?
19     A.     Yes.
20     Q.     So paragraph 310 says that
21 Google in effect associates WAA-off and
22 sWAA-off data with GAIA by measuring
23 conversions using DSID.  Is that a fair
24 summary of this paragraph?
25     A.     Let me just read it one second.

Page 248

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.      Sure.

2              (Witness perusing document.)

3      A.      So for context, let's look at

4   309, just the first sentence there.

5   ██████████ ████ ███████ ██ ████████ ███████

    █ █████ █ █████ ████ ██████ ████ ███ █████

    █ ██████ ████ ██████ ████ ███ ██ ██ ████

    █  ████ ███████ ██████   So that's not under

9   dispute.  That's been admitted.  And let me

10  just read 310 now.

11             (Witness perusing document.)

12             MR. SANTACANA:  I just

13      remembered you wanted a break, I'm

14      sorry.

15      A.      So 310 is pointing out that

16  there is a direct link between sWAA-off and

17  GAIA through this DSID, which is an

18  encrypted, the encrypted GAIA ID.

19      Q.      So I want to be very clear

20  about that.  DSID is an encrypted GAIA ID,

21  understood.  Without the decryption key you

22  could not determine whose GAIA the DSID

23  refers to, right?

24      A.      So the encryption key

25  presumably is strong enough, I'm assuming

                                  Page 249

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   it is strong enough, I'm assuming that
 2   somebody doesn't figure out a way to break
 3   the crypto system, so someone would have to
 4   get possession of the key in order to do
 5   it.
 6                 So that, in theory, okay, it
 7   speaks to the risk, right?  So if someone
 8   exfiltrates that piece of data, if they
 9   don't get the encryption key also the
10   exfiltrator may have trouble with that
11   piece of data.  They may use other pieces
12   of data to link things up.
13                 If, in a different scenario, if
14   some government agency comes to Google and
15   says give us data matching certain
16   specifications, it is conceivable that
17   Google could be ordered to use their
18   decryption key to connect that and hand
19   over the data.  So that's also a risk.  And
20   of course, I mean, I like law enforcement,
21   I support law enforcement, but they
22   sometimes make mistakes, and, you know,
23   that's a risk that a user is exposed to,
24   that they could be maybe falsely accused of
25   something based on some data that's
```

Page 250

CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1   obtained from Google.

 2       Q.      And you don't dispute that the

 3   encryption key that generates DSID is

 4   temporary and trashed periodically, right?

 5       A.      If the key is rotated, I would

 6   anticipate that it might be rotated

 7   periodically.  You know, there's a lot of

 8   detail here, such as how long is -- how

 9   long is the data retained, how often is the

10   key rotated, you know, all these things can

11   affect the analysis of the magnitude of

12   that risk, but they don't -- they don't

13   affect the sort of basic gripe I have,

14   which is that data is being collected and

15   saved contrary to users' wishes.

16               MR. SANTACANA:  Okay.  Let's go

17       off.

18               THE VIDEOGRAPHER:  The time is

19       4:45 p.m.  We are off the record.

20               (Recess taken.)

21               THE VIDEOGRAPHER:  The time is

22       5:00 p.m.  We are back on the record.

23   BY MR. SANTACANA:

24       Q.      All right.  Switching gears

25   here for a little bit, there is -- there is

                              Page 251

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1  a few places in your report where you use
 2  the word "uniform."  Do you know what I'm
 3  talking about?
 4        A.      Yes.
 5        Q.      Was part of your assignment in
 6  the case to measure uniformity?
 7        A.      Of the class members or of
 8  something else?
 9        Q.      Of anything.
10        A.      I don't recall that.
11        Q.      Okay.  And of class members?
12        A.      I mean, I'm just aware that the
13  class may be an issue.  In any class
14  action, the definition of the class, are
15  the class members uniform, is sometimes a
16  legal issue.
17        Q.      Were you asked to opine on
18  uniformity for that purpose?
19        A.      I don't think I was
20  specifically asked to opine on uniformity.
21        Q.      Are you -- would you say you're
22  offering an opinion with respect to
23  uniformity in the class or of the class?
24        A.      That sounds like a legal
25  opinion.  I just have -- I'm just opining
```

Page 252

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    about the technology.  So if you want, we
 2    can go look at the specific instances and I
 3    can tell you more about them, because I'm
 4    not sure what you're referring to because I
 5    don't remember where I've used that word,
 6    if anywhere.
 7         Q.     That's fair.  Let me ask you
 8    this:  Did you use any particular
 9    methodology or calculation to test
10    uniformity in the data that you received
11    and analyzed?
12         A.     I think that I did look at some
13    of the data and saw that it wasn't
14    particularly representative.  There was
15    some -- it was sort of skewed.
16         Q.     What do you mean?
17         A.     I think it's documented in one
18    of the appendices, but I seem to recall
19    there was some data that just didn't look
20    like it was a natural distribution.
21         Q.     A natural distribution of what?
22         A.     Values.  Of course it wouldn't
23    be, because we are talking about test data
24    which is data generated by our apps and our
25    devices and our people, so we're not
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1    looking at a uniform distribution there.

 2         Q.     Okay.  So nevertheless --

 3         A.     Sorry, we're not looking at a

 4    representative distribution.  I've got that

 5    word on my mind now because you mentioned

 6    it.

 7         Q.     Did you apply any methodology

 8    to determine the degree of uniformity in

 9    the data you were analyzing, was that one

10    of the experiments that you did, or

11    calculations?

12         A.     I mean, so I'm not sure, I

13    would have to look at which experiment, we

14    would have to be more specific, because my

15    memory is not -- I don't have a compartment

16    in my mind of these are the uniformity

17    experiments.  That's not how I organized

18    the data in my own mind.

19         Q.     Right.  And I don't think you

20    call anything a uniformity experiment.

21              You also did not calculate any

22    numbers that were meant to represent

23    uniformity in the data that you saw, right?

24    That's not --

25                   MR. MAO:  Objection,

                                        Page 254

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        argumentative.  I'm sorry.
 2        Q.      You are not trying to represent
 3   uniformity with math in this case?
 4        A.      I don't recall that anywhere.
 5   I mean, if it's there, it's there, but I
 6   don't recall it.
 7        Q.      You did not offer any opinion
 8   in here about the language of the
 9   disclosures that third-party apps used with
10   their end users, fair to say?
11        A.      No, I wasn't evaluating the
12   third-party disclosures.
13        Q.      Nor their sufficiency or
14   frequency or wording, none of that?
15        A.      That sounds like all things
16   that are outside the scope of my report.
17        Q.      Okay.
18        A.      Which is already big enough
19   given the size of the report.
20        Q.      Dr. Black calculated that of
21   the 16,163 events triggered in the
22   datasets, 16,009 of them had no e-mail
23   address in them.  Do you have any other
24   calculation that would deviate from that?
25                MR. MAO:  Objection, vague.
```

Page 255

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.      That is sort of an absurd
2    statistic, because it's looking at a small
3    sample set of test data and he is somehow
4    trying to extrapolate what the rate of
5    e-mail addresses is, which is just -- okay,
6    that's just absurd.
7          Q.      I'm not making a statement of
8    rate.  I'm just saying did you -- I'm
9    literally just saying did he count it
10   correctly, incorrectly, or you have no
11   opinion?
12         A.      I have not verified his number,
13   but I also have no reason to doubt his
14   number, and I also don't think his number
15   is meaningful in any way or useful in any
16   way.
17         Q.      Okay.  A conversion event, the
18   way it is recorded, do you recall seeing
19   those in the data, in Google's conversion
20   log?
21         A.      Good question.  As I sit here
22   now, I don't recall it off the top of my
23   head.  The appendices are kind of long and
24   very, very detailed and dense, and I would
25   just have to look at them and refresh my

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  memory on that point.

2          MR. MAO:  At some point you are

3      going to have to let him do that and

4      then we can get on the record all the

5      ones that we have held as a flag.  So

6      it doesn't have to be now, just at some

7      point.

8          MR. SANTACANA:  Okay.

9          MR. MAO:  We probably should

10     have done that during lunch.

11     Q.    So let's talk about HitBundles

12  for a moment. ████ ████ ████ █ ████████

██ ████████████ ███ ██████ ███ ███████ ███

██ ██████████ ████████ █ █?

15     A.    Why don't we go to the

16  paragraph that you're talking about.

17     Q.    That one is 116.

18     A.    Okay.

19     Q.    Do you have it?

20     A.    Yes.

21     Q.    So you opine that ████████

██ ████ ████ ████████ ████ ████████ ████

██ ███ ████ ████ ███ ████ █ ██ ████ ███

██ ████████ ████ ███████ ███ █ ████

██ ████ ████ ████ ████████ █ ███ ███████ █

Page 257

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ████ ████ ██ ████ █████ ████ ███ ████

2   ████████ █████

3        A.     Well, I think that that's the

4   sort of logical conclusion based on what

5   I've cited here are Google's 4th

6   Supplemental Responses to Interrogatories

7   1, 3 and 4.

8        Q.     ████ ████ ██ ███ ████ ██ ████

9   ████ ████ ████ ████ ████ ████ █████

10  ████ ████ █ █ ████ ████ ████ ████ ██ ███

11  ████ ██ ██ ██ ████

12       A.     So this is actually an instance

13  of the ████████ █████████ ██████.

14       Q.     Okay.

15       A.     In other words, there is ████

16  ████ ████ ████ ████ ████ ████ ███

17  ████ ████ ██ ██ ████ ██ █ ████ █████

18  ████

19       Q.     Right.  As a result of that,

20  for some unidentifiable portion of the

21  analytics data that has been sent to

22  Google, ████ ████ ████ █████ ██

23  ████ ████ ████ ██ ████ ████ ████ ██

24  ██ █████ ███ ██ █ ; is that your

25  opinion?

Page 258

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.      I don't know that I have used

2    those words, ███████ ██████████ █████ ████████

|    ██████████████  in this paragraph.  Do you see

4    them somewhere else?  Because I don't

5    remember using those words.

6      Q.      No, those are my words.

7      A.      Those are your words, okay.

8    Let me read what I've written.

9      Q.      Sure.

10            (Witness perusing document.)

11      A.      I mean, this is again sort of a

12    deduction based on Google's answers to

13    these questions.

14      Q.      Right.  And I'm just -- so my

15    question is just for some unidentifiable

16    portion of analytics data that's been sent

17    to Google, ██████ ██████ ███ ████████ █████████ ████ ███

██  ████████████ █████████ ██████ █████ ████████ █████████ ███████ █████████

██  ██████████ ████████ ████ ████ █████████ ████████ ██████ █████?

20      A.      I'm not sure I want to go that

21    far.

22      Q.      Okay.

23      A.      Because, you know, I think

24    just -- I only want to go as far as what I

25    said here.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.      Okay.  That's fine.

2       A.      I will tell you why I say that.

3       ████████  ████  ██████  ████  ████  █  ████

   █  █  ██████  ███████  ██████  █████  ██████

   █  ████  ████  ███████  ███  ██  █████

   █  ██████  ████  ████  ████  ██████  ████  ████

   █  ████  ████

8       Q.      Retrospectively?

9       A.      I would imagine that they've

10  had that capability.  I have no way to

11  verify whether they have done that or not.

12      Q.      Okay.  Back to conversion

13  events for a moment.  The conversion events

14  that would be stored by Google from a

15  particular device will vary depending on

16  that user's engagement with apps; is that

17  fair to say?

18      A.      Each app may have a different

19  conversion action, or in-apps can have more

20  than one conversion action.

21      Q.      And they may have custom ones

22  too?

23      A.      Yes.

24      Q.      So the degree of information

25  about conversions that is sent to Google by

Page 260

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Google Analytics for Firebase varies from
2    user to user depending on the apps they
3    choose to use?
4         A.    I don't know that I would put
5    it that way, because I think you have --
6    you have a population of users, and the
7    users, there will be some sort of
8    statistical distribution in terms of the
9    number of conversions recorded per user.  I
10   mean, I wouldn't expect every user to have
11   the same number of conversions as every
12   other.  That would be unrealistic.
13        Q.    Right.  Some may only have one
14   type, some may have different types, some
15   may have a lot, some may have a little,
16   right?
17        A.    There is some -- I mean,
18   users -- there will be some statistical --
19   there will be a mean, there will be some
20   standard deviation in terms of the number
21   you get per user.
22        Q.    Sorry, I'm not understanding
23   your question.  I was just trying to
24   establish that some users are going to have
25   more conversion events than others and

Page 261

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  different conversion events too, right?

2      A.    Yes, there will be some

3  variation.

4      Q.    And, as I recall, you are not

5  opining in this case that Google uses

6  sWAA-off conversions that it logs for any

7  purpose other than the recordkeeping

8  associated with evidence of good delivery

9  of ads?

10     A.    And it is also a way to charge

11 advertisers.  You show them conversions,

12 and that enables you to collect money from

13 your advertiser.

14     Q.    But apart from that, you're not

15 opining that there is some other thing

16 Google is using those for?

17     A.    Well, I think we covered this

18 before and I think I said that the

19 information about conversions can also be

20 used, sort of second-order way can be used

21 to help train algorithms to help make

22 predictions, to help improve Google

23 products.  So there is some additional uses

24 for that beyond immediately monetizing

25 getting revenue from advertisers.

Page 262

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.      Does that -- does that include
2   sWAA-off data?
3      A.      I mean, because as far as I can
4   tell, the conversions that are tracked with
5   sWAA-off are treated just like any other
6   conversion, they are -- they would -- I
7   would expect that they would be fed into
8   all these machine learning algorithms sort
9   of the same way.
10     Q.      And what if a user has sWAA off
11  but the app developer has not enabled data
12  sharing with Google, what impact does that
13  have?
14             MR. MAO:  Objection, vague,
15        argumentative, and assumes facts not in
16        evidence.
17     A.      Okay, so --
18             MR. MAO:  Part of that is also
19        just wrong.  But go ahead.
20     A.      So I don't remember the answer
21  to that question, and I might have
22  documented it somewhere, but I just don't
23  remember it off the top of my head.
24     Q.      I don't see a reference to it
25  in your report.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              MR. MAO:  Wait, sorry, on

2      publisher conversions or advertiser

3      conversions?  Which one are you talking

4      about in his report?

5              MR. SANTACANA:  I'm talking

6      about data sharing, the data sharing

7      side.

8              MR. MAO:  Of the public

9      conversion side?

10     A.      So my understanding of your

11 question is that you asked me if the app

12 publisher declines data sharing with

13 Google, how does that affect this, and the

14 answer is I don't recall.

15     Q.      Okay.  Are you opining in this

16 case that Google uses a record of a

17 device's conversions that were sWAA-off

18 conversions to choose which ad to show to

19 that device?

20             MR. MAO:  I'm sorry, can you

21     read the question back again?

22             (The record was read.)

23     A.      I don't think I've rendered

24 that, but I'm not going to take a position

25 on that question.

Page 264

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Q.    Why?

2   A.    Unless I figured it out already

3   and documented it somewhere, I don't

4   remember it being something I figured out.

5   But maybe I did figure it out and forgot

6   about it.  But I don't remember it, and I'm

7   not going to be able to answer it now.

8   Q.    Okay.  That's fine.  I don't

9   think you did opine on that.  I'm just

10  clarifying.

11          Now, on the number of times

12  that any particular user has been subjected

13  to the privacy risks that you identify in

14  your report when they have sWAA turned off,

15  that is something that will vary depending

16  on a number of factors, let's start there,

17  is that fair to say?

18  A.    I think that some users are on

19  their phones and apps more than others.

20  Q.    Will it also vary -- well, let

21  me just say, will the severity of the

22  privacy risk in question also vary from

23  user to user?

24  A.    I don't know, because the users

25  that we are interested in are people that

Page 265

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1   have Google accounts that flip those
2   switches to the off position, and one of
3   them or both of them, either the first one
4   only or the first and second one, right,
5   because you can't flip sWAA-off unless --
6   you can't flip -- one you can't do without
7   the other, okay?  So, I mean, those people
8   designated I want this to be private and it
9   is not really up to me or anyone else to
10  second-guess them.
11       Q.      Sorry, my question was just you
12  identify privacy risks you have today, you
13  do in your report.  Does the severity of
14  the privacy risks for those sWAA-off users
15  vary from user to user?
16       A.      I don't know a way to quantify
17  that and differentially explain for this
18  user it is much more risky than for that
19  user.  Because each user has their own --
20  they are people, they are individuals,
21  right?  And they all have made a decision,
22  and I'm not going to say that your opinion
23  is worth more than his opinion.  We both
24  made a decision to have this thing shut off
25  and you deserve equal respect for that
```

Page 266

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  decision.

2       Q.     Completely understood.  But if

3  you say -- well, forget the analogy.  You

4  have said today that, for example, one

5  factor that goes into severity is how much

6  data is collected about a particular --

7  tied to a particular identifier, more data,

8  more risk; less data, less risk.  Another

9  factor might be how fragmented the data is.

10 Another factor might be how detailed the

11 data is.

12            My question is, aren't all

13 those factors going to factor in to how

14 severe the risks are for any particular

15 user in this class?

16            MR. MAO:  Objection, misstates

17      his testimony.  Go ahead.

18      A.     I don't think you can make a

19 function where you take these numbers as

20 inputs and say -- and calculate, say, for

21 this person it is really severe, for that

22 person it is not severe at all.  Because

23 even one little leak can have drastic

24 consequences, and it is sort of no way

25 of -- there is no way for me to know that,

Page 267

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  you know, who is going to be hurt by some

2  privacy leak.  I don't feel like I could

3  calculate that and I don't think anyone

4  else could calculate that.  I think each

5  person who sets that switch should have

6  their wishes respected, and I don't know

7  the way to distinguish this one is worth

8  more than that one.

9      Q.    So you don't -- you don't think

10 that you could calculate based on how much

11 data there is and what kinds of data they

12 are, how risky it is to a particular member

13 of the class?

14         MR. MAO:  Are you asking him on

15     a technical basis within the scope

16     of --

17         MR. SANTACANA:  I've asked my

18     question.

19         MR. MAO:  Okay. Then my

20     objection is you are asking him

21     questions which may be outside the

22     scope of his designation.  But you can

23     go ahead.

24         MR. SANTACANA:  There is no

25     designation.  He is under subpoena.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. MAO:  I disagree.

2          MR. SANTACANA:  Okay.  There is

3    no such thing as a designation.

4          THE WITNESS:  This goes over my

5    head.

6          MR. MAO:  What do you mean,

7    what he has been designated as an

8    expert for?  Yes, there is.

9          MR. SANTACANA:  What is his

10   designation?

11         MR. MAO:  He is our technical

12   expert, so you are asking something

13   that might be reserved for another

14   expert.

15         MR. SANTACANA:  Is there a

16   document that designates him?

17         MR. MAO:  Yeah, the scope of

18   his work, his opinions.  You are asking

19   him something outside the scope of his

20   opinions.

21         MR. SANTACANA:  Sorry, have you

22   served some document that designates

23   him for some topics and not others?

24         MR. MAO:  It is there on his

25   document, isn't it?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. SANTACANA:  This is a

2      disclosure of expert opinions.

3          MR. MAO:  Yeah.

4          MR. SANTACANA:  This is not a

5      designation of topics.  So I'm just

6      trying to understand what you're

7      saying.

8          MR. MAO:  He is not going

9      outside the scope of his opinions.  You

10     are the one that was trying to say that

11     he was limited to what he had testified

12     to and opined on.  Are you asking him

13     to opine on other subjects?  That's not

14     what we retained him for.

15         MR. SANTACANA:  I'm asking him

16     my question.

17         MR. MAO:  You know what, I'm

18     not sure this is fruitful.  Just go

19     ahead.

20     A.     Sure.  Could you reask the

21  question?

22     Q.     You don't think you could

23  calculate based on how much data there is

24  and what kinds of data they are how risky

25  these practices are to a particular class

Page 270

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   member?

2        A.     I don't have a methodology for

3   doing that.

4        Q.     Okay.  Well, and I think what

5   you are saying is they should be treated

6   the same, because no one member's WAA-off

7   decision is worth more than another class

8   member's?

9        A.     Well, I mean, that's my view of

10  it based on my sort of technical opinion

11  that this is a switch that somebody set and

12  Google has gone and violated their wishes

13  and collected data that shouldn't be

14  collected and saved data that shouldn't be

15  saved.

16       Q.     You have opined before that

17  user data has a market value, right?

18       A.     I have.

19       Q.     Have you done that in the

20  context of litigation only or also

21  publicly?

22       A.     I've said it publicly, I've

23  said it in litigation, data is a commodity

24  that has value.

25       Q.     The market value of the data in

Page 271

1    question here, the sWAA-off data, would it

2    be the same as to every class member or

3    would it have to vary from class member to

4    class member?

5         A.     I can tell you that the way

6    that such data is typically traded, you buy

7    a population and you pay an average price

8    per, and some, you know, you are just

9    paying per unit, and some may have more,

10   some may have less data.

11        Q.     Some may have more data, some

12   may have less data, but you just sort of

13   pay per population?

14        A.     I mean, I think that's the way

15   it is commonly traded.

16        Q.     Okay, yeah.  So this is a class

17   action, so that's not an option.

18             My question I guess is what are

19   the factors that would go into the fair

20   market value of the user data in question

21   if you were to pay each class member an

22   amount that is tied to the fair market

23   value of their specific user data?

24             MR. MAO:  Just objection,

25        outside the scope of the expert

Page 272

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        opinion.

2        A.      I'm not prepared to answer that

3   question.  I have no basis to answer that

4   question.

5        Q.      Well, I'm not -- I'm just

6   asking you, you have opined about fair

7   market value before, you have talked about

8   it publicly, you believe that data has

9   value, right?

10       A.      Yes.

11       Q.      More data has more value than

12  less data, right, bigger population is

13  worth more than a smaller one?

14       A.      Yes.

15       Q.      Detailed population is worth

16  more than a less detailed one?

17       A.      Potentially.

18       Q.      Population with Social Security

19  numbers is worth more than population that

20  just has device identifiers?

21       A.      Maybe, it depends.  I mean,

22  again, this is getting into a lot of

23  details which I haven't done that analysis

24  here, so I'm not ready to give you any

25  opinion about the relative value of

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   different pieces of data.

2        Q.      Sure.

3        A.      Data brokering, I would have to

4   research it and work on it before I could

5   say anything more.

6        Q.      Well, you have identified today

7   that there is a privacy risk that you are

8   worried about and the privacy risk is that

9   data will be exfiltrated from Google,

10  right?

11       A.      That's one risk.

12       Q.      That's one risk.  Why would

13  somebody exfiltrate this data from Google?

14           MR. MAO:  Objection, calls for

15      speculation.

16       Q.      How do you even know it is a

17  risk to begin with?

18       A.      Okay.  So I have -- I'm aware

19  that data has value not only in legitimate

20  commerce, it also has value to criminals.

21  People doing online crime and scams will

22  try to acquire data.  And where there is a

23  willing buyer with money, then there may be

24  someone who is going to make a play to get

25  a hold of some dataset that is unique that

Page 274

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    they can sell for a good amount of money.
2        Q.    So back to the topic at hand,
3    which is the privacy risks that you've
4    identified, right, you've talked about
5    those risks extensively today, my question
6    is, doesn't the severity of the risk vary
7    depending on the nature of the data from
8    class member to class member, how much it
9    is, how detailed it is, what kind of data
10   it is?
11       A.    I don't know how to ascertain
12   that.
13       Q.    Okay.  Your report, look at
14   paragraph 206 for a second, I'm focused
15   really on this part where you say Google
16   admitted in its response to RFA 25 that ████
     ██ ██████ ██████ ██████ ██████ ██████ ███ ███
     ██ ██████ █████ ████ █████ ████ ██████ █████
     ██ ██████ █████ ███████ ██████ ██████ ████
     ██ ██████ █████ ████ ████ █████    Do you see
21   that?
22       A.    Yes.
23       Q.    You quote that admission a few
24   times in your report.  My question is do
25   you know ██████ █████ █████ ███?
```

Page 275

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.      I don't remember.
 2        Q.      Do you identify ██████  ████  ██  ██
 3   in the report?
 4        A.      Well, I point to admission
 5   number 25.
 6        Q.      Okay.  So if it's not there,
 7   then you don't know?
 8        A.      I don't remember, and that's
 9   where I would go to look, and that's what I
10   can tell you.
11        Q.      Fair enough.  All right.  Now
12   let's look at 163.  So in this report --
13   actually, I will just show you.  First,
14   actually, just flip to 101.
15             MR. MAO:  I'm sorry, his
16        report, 101?
17             MR. SANTACANA:  His report,
18        paragraph 101.
19             MR. MAO:  Got it, thank you.
20        Q.      So at paragraph 101 there is a
21   phrase "Google collects the user's GAIA ID
22   regardless of their WAA or sWAA status."
23             Let me know when you see it.
24        A.      Yes.
25        Q.      I think you clarify at the end
```

Page 276

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of that paragraph Google logs and uses DSID

2    even when the user has WAA or sWAA off.  I

3    just want to be clear, you are not opining

4    that Google is collecting the user's GAIA

5    ID in analytics HitBundles, what it is

6    collecting is DSID, which is an encrypted

7    form of GAIA ID, right?

8         A.    I'm not asserting -- I don't

9    think that this asserts that the GAIA ID is

10   collected in the clear.  It seems to be

11   collected in an encrypted form.  It is an

12   equivalent information, but it is in

13   encrypted form.

14        Q.    Okay.  Just making sure that's

15   where we're at.

16              Now, I think you touched on

17   this a little bit earlier, but talking

18   about the consent check process now, you

19   are aware that when Google performs a

20   consent check on analytics data, █ █

█ █ █ █ █ ▌ █ █ █ █ █

█ █ █ █ █ █ █ █ █ █

█ █ █ ?

24        A.    That's the impression I had,

25   yes.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.      For Android devices?

2       A.      That's consistent with my

3   understanding.

4       Q.      As a result of that, ███ ███

███ ████ ████ ████ ████ ████ ████ ████

███ ████ ████ ████ ████ ████ ████ ████

███ ████ ██ ███ ███ ████ ████ ████ ██████

███ ████ ████ ████ ████ ████ ████ ████ ███

███ ████ ████ ████ ████ ████ ████ ████

███  ██████    Is that also consistent with your

11  understanding of the --

12      A.      I'm not sure that's right.

13      Q.      Okay.  What do you mean?

14      A.      I'm not sure that's right.

15      Q.      You're just not sure?

16      A.      Well, ██████ ██████ ██████ █

███ ████ ████ ████ ████ ████ ████ █████

███ ████ ████ ████ ████ ████ ████ ████ █████

███ ████ ████ ████

20      Q.      Yeah.

21      A.      So ████████ ███ █ ███ ████ ████

███ █ ████ █ ████ ████ ████ ████ ████ ███ ████

███ ████ ████ ████ ████ ███ ████

24      Q.      Right.

25      A.      So █ ████ ████ ████ ███ █.

Page 278

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.       Right.

2        A.       And ████ ████ ████ ██████████ ████.

3    Yes, under that scenario, I see what you're

4    saying.

5        Q.       Okay.  My question is why is it

6    designed that way?  Do you have any opinion

7    about that?

8        A.       I recognize the design pattern.

9        Q.       What does it look like to you?

10       A.       Well, that's a tactic called

11   isolation.

12       Q.       Okay.  What is -- can you

13   explain just briefly what that means?

14       A.       By trying to separate the data

15   this can make it more difficult for an

16   attacker to get hold of the two pieces of

17   data.

18       Q.       Is there any cost to

19   implementing an isolation pattern in

20   something like this?

21       A.       I mean, for somebody like

22   Google, they have data centers full of

23   servers.  They have plenty of servers.

24   This is not an extremely resource-intensive

25   calculation.

Page 279

1            So I'm not sure, I mean, the
2    incremental cost, I mean, it may be that it
3    is all sunk cost for Google.  I'm just not
4    sure.  I don't think I've performed that
5    analysis and I haven't really thought about
6    that because this is the first time I have
7    heard about this process that you're
8    mentioning here or at least the first time
9    I've focused on it in terms of cost as far
10   as I can tell.
11        Q.    Well, the process, ██  ██
     ██████ ██  ██ █ █████████  ████████  we were
13   just talking about, that is detailed in
14   Google's interrogatory response and you
15   describe it in your --
16        A.    Can we take a look at where I
17   describe it just to refresh my memory?
18        Q.    Sure.  Why don't you take a
19   moment to read 162 through 164, which is a
20   few pages, 165, excuse me.
21            MR. SANTACANA:  If we could
22   just go off, I need to use the restroom
23   real quick.
24            THE VIDEOGRAPHER:  The time is
25       5:36 p.m.  We are off the record.

                                    Page 280

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                   (Recess taken.)
 2                   THE VIDEOGRAPHER:  The time is
 3        5:41 p.m.  We are back on the record.
 4   BY MR. SANTACANA:
 5        Q.     Have you had a chance to review
 6   those paragraphs?
 7        A.     I've looked at 162.  Is that
 8   the right one?
 9        Q.     And what about 163 and 164 and
10   165?
11        A.     No, I haven't gotten to those
12   yet.  Just a minute.
13        Q.     I think 163 is the key.
14                   (Witness perusing document.)
15        A.     Okay, yes, this thing here.  So
16   what I can see is I haven't formed any
17   opinion about cost in this.
18        Q.     Okay.  Just, sorry, I'm just
19   trying to refresh your recollection as to
20   this idea that ███  ███  ██  ████  ██  ██ █
     █  ████████  ████  ████  ███  ████  █ ██████  ███████
     █  ██  █████  █████  █████     I thought you were
23   saying that you hadn't thought about that
24   before.
25        A.     No, I knew about that but I
```

Page 281

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    hadn't thought about cost.

2         Q.     Okay.  So going back to my

3    question about cost, I want to clarify, I

4    actually did not mean in terms of money,

5    what I meant was the isolation, is it a

6    technique is what you would call it,

7    isolation pattern?

8         A.     Isolation is one way to try to

9    improve security.

10        Q.     Okay.  So does isolation come

11   at any cost from a computing perspective?

12   Is there any reason not to do it, you know,

13   from let's say Google's perspective?

14        A.     I'm not sure.  I mean, that's

15   sort of a detailed engineering question

16   that may be specific to the circumstance.

17        Q.     Okay.  So talking about the

18   consent check, do you have any basis to

19   dispute that this isolation process we were

20   just talking about was designed to separate

21   what Google calls pseudonymous data from

22   GAIA keyed data?

23        A.     I understand that Google is

24   trying to separate data, divide between

25   data that is stored with the GAIA ID and

Page 282

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    data that's not stored with the GAIA ID.  I
 2    understand they are trying to separate
 3    that.
 4         Q.    All right.  Now let's talk
 5    about iOS for a moment.  So for iOS the
 6    process is different, right?
 7         A.    Yes.
 8         Q.    And you talk about this at 164
 9    and 165.  One of the things you talk about
10    is a █████  █████  █████  █████  █████
      █ ██████████ █ ████████ █████ ██████
      █ ██████
13         A.    Let me take a quick look here
14    and refresh my memory.
15         Q.    Sure.
16               (Witness perusing document.)
17         A.    Yes, okay, so I've looked at
18    that.  Do you want to reask the question?
19         Q.    All right.  One of the things
20    you talk about is █ █████  █████  █████
      █ █████ ████████ █ ██████ ██████ ██████?
22         A.    Yes.
23         Q.    Okay.  One just clarifying
24    question, you don't, sitting here today,
25    know whether ████  █████  █████ ██ █████
```

Page 283

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     ███████ ██████, do you?
2              MR. MAO:  Sorry, can you read
3        back the last -- the end of that
4        question?  Sorry, Eduardo, you just
5        covered your mouth a little bit.
6              MR. SANTACANA:  That's all
7        right.
8        Q.     Sitting here today, you don't
9     know whether ██████ ████████ ███████ ██ ██████
██    ██████ ██████, do you?
11       A.     I don't recall.
12       Q.     ████████ ██ ██ ██ ██████ █████ █████
██ ██████ ████ ████████ ███ █████ ██ █████ ████ █████ █████
██ ██████ ██████ ██████ ██ ██████ ██████?
15       A.     I don't recall.
16       Q.     What do you mean, you don't
17    recall?
18       A.     I don't recall the answer to
19    that question.  If it is documented in the
20    report, so be it, and if it's not in the
21    report, then it's not.
22       Q.     I don't think it's documented
23    in the report.  I'm just trying to
24    establish, you're not opining that Google
25    ██████ █████ ██████ █████ ████ █ ██████

                              Page 284

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       ███████ ███████ ███ ███████ █████████, right?

2                   MR. MAO:   Objection,

3          argumentative.

4          A.      Okay.   So I think the point --

5       the key takeaway here is that ███   ████████

6       ████ ████████   There is a ██████ █████ █████

7   ██ █████ ██ █████ ████.

8          Q.      Understood.

9          A.      ███ ██ ██████ ████ ████ ███ █████

10  ██ █████ ██ █████ █████.

11         Q.      Understood.   █████ █████ █████

12  ██ ████ █████ █████ ████ █████ █████ █████ █████

13  ██ █████ █████ ███ █████ █████ █████ █████ ███

14  ██ █████ ████████.

15                  MR. MAO:   Objection, incomplete

16         hypothetical and argumentative.   Go

17         ahead.

18         A.      I don't recall saying anything

19  like that.

20         Q.      Okay.   Now, the iOS consent

21  check process has changed since iOS 14,

22  right?

23         A.      I understand that Apple has

24  made some policy changes regarding use of

25  identifiers over time.

                                    Page 285

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.      And that includes its

2   incorporation of the app tracking

3   transparency protocol?

4      A.      I believe I have mentioned that

5   somewhere in here.

6      Q.      I think it is mentioned once or

7   twice.  But you do not really analyze in

8   this report how that affects Google's

9   ability to check consents, right?

10     A.      I mean, whatever I've said

11  about it is there for you to see.  This

12  sounds like a detail which I just don't --

13  I can't put all these details in my head at

14  once, so I've got the report.

15     Q.      That's fine.  Is it your

16  opinion in this case that Google should

17  honor the sWAA control even in

18  circumstances where it does not know who

19  the user is?

20     A.      If Google doesn't know who the

21  user is, if the user has asked and said I

22  don't want to be tracked, that should be

23  honored.  I don't see any reason why it

24  shouldn't be honored.

25     Q.      Did you render any opinion in

Page 286

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   the case as to the technical limitations
 2   that iOS 14 imposed on Google's ability to
 3   identify Google users?
 4        A.     I'm aware that there has been
 5   somewhat of an ongoing cat and mouse game
 6   between Apple and the data brokers and
 7   advertising networks where Apple seems to
 8   be making moves to try to promote privacy
 9   and the data brokers and ad networks seem
10   to be trying to retain their capabilities.
11   So that has just been an ongoing trend.
12        Q.     Are you rendering -- did you
13   render any opinion in the case on how the
14   app tracking transparency protocol affects
15   Google Analytics?
16        A.     I don't recall saying anything
17   about that.  I don't recall that being part
18   of my opinions.
19        Q.     Okay.  I had something but I
20   lost it.
21             MR. MAO:  It happens to all of
22        us.  It happens more with age.
23             THE WITNESS:  We might need a
24        dinner break here for everyone to
25        refresh and regain.
```

Page 287

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. SANTACANA:  I might try to

2     make that flight.

3          MR. MAO:  Okay, let's do it.

4     Is it shown on time?

5          MR. SANTACANA:  Different

6     flight, JFK.

7     Q.     I have a question about

8  paragraph 71.

9     A.     Speed round.  Okay, go ahead.

10    Q.     It's the last sentence.

11 "████████████ ██ ████ ████ ████ ██

   █ █████ ████ ████ █ █ ████ ████ █

   █ █████ ██ █ █████ █ ████████ ███

   █ █ ████ ████ ████ █████ █████ ██

   █ ████████ █ █ █████," and you cite a

16 document.

17          You know, sometimes people make

18 approximations in e-mails and internal

19 documents.  Did you do anything to confirm

20 whether that breakdown is precise or

21 accurate?

22    A.     I'm relying on that document.

23    Q.     Okay.  And nothing else?

24    A.     I'm relying just on that

25 document.

Page 288

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Okay.  So you're at least open

2  to the possibility that number is wrong or

3  even really wrong, it is just one document?

4    A.    I mean, yeah, it's a

5  possibility that the person who -- I would

6  have to look at the document really before

7  I -- I shouldn't opine about a document in

8  the blind.  But I can confirm that that's

9  the document I'm relying on and I'm not

10  relying on something else.

11    Q.    Okay.  App developers who use

12  Google Analytics for Firebase to measure

13  conversions could instead use some other

14  SDK to measure conversions, right?

15    A.    Yes.

16    Q.    And they could do that even

17  while continuing to place advertising on

18  Google's display network, right?

19    A.    In theory, they could, and they

20  could also in theory use both SDKs at the

21  same time.  I think we have covered that,

22  if you want to use the mobile ads, you need

23  the mobile ad SDK, GMA, and therefore you

24  get that Firebase -- Google Analytics for

25  Firebase functionality which is bundled in

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  with that now.

2          Q.      Well, I think you may be

3  conflating two things.  So an app that

4  doesn't serve ads would have no need for

5  the GMA SDK, right?

6          A.      Correct.

7          Q.      So for apps that are ad buyers

8  only and are using Google Analytics for

9  Firebase in their app, they could instead

10 use some other analytics provider and

11 continue to buy ads on Google's display

12 network?

13              MR. MAO:  Objection.  I think

14      that hypothetical is just wrong, your

15      hypothetical.

16         A.      I'm sorry, so I didn't

17 understand it, the first time you asked the

18 question, I didn't understand it the way

19 you asked it.  The second time I was in

20 fact mixed up.

21         Q.      Okay.

22         A.      So we shouldn't rely on my

23 first answer, and what we should do --

24         Q.      Let's start over.

25         A.      Yeah, start over and we will

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   try to get a clean answer.

2          Q.      App developers who use Google

3   Analytics for Firebase to measure

4   conversions could instead use some other

5   SDK to measure conversions, right?

6          A.      In theory they could.

7          Q.      Including SDKs offered by

8   companies other than Google?

9          A.      In theory I think they could.

10         Q.      And they could use an SDK from

11  a company other than Google to measure

12  conversions on Google's display network,

13  right?

14         A.      I would want to verify that

15  just to be sure, because these technologies

16  are kind of changing and it might even be a

17  dependent thing depending on when.

18  Something that is true now might not have

19  been true several years ago and vice versa.

20              The other thing I would say is

21  that the reason I have said theoretically

22  they could is that I don't know that any

23  significant number of people are doing it

24  that way because the Google Analytics

25  integrates so nicely with the Google ad

Page 291

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   platforms that it is very beneficial to use

 2   them together.

 3        Q.      So take a look at Appendix E.

 4        A.      Is that tab 3?

 5        Q.      Tab 3.  █████  ████████  ████████

 █   ████?

 7        A.      Yes.

 8        Q.      That was a project at Google to

 9   ████████  █████  ██████████  ██  █████████  ████████

 █   ███  ████  ████████  █  ████  ████████  ████████  ████

 █   ████████████  ███  ████  █████  ███████████, right?

12        A.      Let me take a look at what I

13   said about that, but, I mean, the way I

14   think of it is the idea is to have one

15   Google Analytics, like one ring to rule

16   them all, but the Google Analytics 4 is the

17   evolution of Google Analytics for Firebase

18   as it is then extended to apply to the web

19   also, so that there is one analytics

20   platform that covers all of it.  That's the

21   way I think of it.

22        Q.      So take a look at paragraph 26

23   of this appendix.  It says "█████████  ████  ████

 █   █████  ██████  ██████  █████████  ██████  ██████  ███

 █   █  ██████  ██████  and it quotes an interrogatory
```

Page 292

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    response from Google.  "Google tracks app

2    campaign ad spend that is bid against

3    different types of conversions.  As of last

4    month (October 2022) ███████████ █

     █  ██████  of app campaign ad revenue was

6    attributable to conversion types bid

7    against GA4F (as opposed to other sources

8    of conversions)."

9              Do you see all of that?

10        A.    Yes.

11        Q.    And then it says "When ████

12   launched in the first half of 2019, the

13   percentage was █ ████████ ██ █████, and then

14   it ██████████ ███████ ███████ █████ █████ ████ ████

     █  ████████ ██ ████████  in October of 2022."

16             Do you see all of that?

17        A.    Yes.

18        Q.    So do you understand that the

19   remainder of the 100 percent not

20   represented by conversions bid against GA4F

21   are being bid against some other conversion

22   measurement system?

23        A.    Well, that would seem to be

24   implied, although I'm not sure that you

25   could infer that the other ████ ████████ were

                              Page 293

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    non-Google systems, because Google also has
2    Universal Analytics, their legacy product,
3    that is being phased out presently.
4        Q.     So some of it may be Google,
5    some of it, though, may be non-Google?
6        A.     And maybe some of it is not
7    tracked at all, in theory.  Some people may
8    just not set up conversion tracking.  I do
9    run across these kind of advertisers with
10   regularity, shockingly.
11       Q.     Well, so let's clarify
12   something about that.  The types of ad
13   campaigns at issue in this case, as I
14   understand it, is app ads campaigns, right?
15       A.     Yes.
16       Q.     And can you run an app ads
17   campaign without conversion measurement at
18   all?
19       A.     I would have to double-check
20   that.  It may be that it is not possible,
21   it may be that it is mandatory.
22       Q.     I'm not sure either.
23       A.     I would just take -- that's the
24   kind of thing I don't memorize.  I just
25   look at the documentation.

Page 294

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Okay.

2              MR. MAO:  I just note for the

3      record that we have a fundamental

4      disagreement between you and I on what

5      an app campaign promo is.

6              MR. SANTACANA:  That's fine.

7      Q.    When an app developer places an

8    ad with Google for an app promo campaign or

9    an app ads campaign, do they pay per

10   conversion?

11     A.    I think there -- I haven't used

12   this product recently.  I would have to

13   look it up to be sure, but I've used it

14   sort of in the past some number of years

15   ago.  But, again, I would just direct you

16   to the documentation which will answer that

17   question.  I'm not sure I recorded it here

18   in the report.

19     Q.    I think you did.  Look at

20   paragraph 5.

21     A.    Okay.  I record this stuff

22   because I don't want to have to memorize

23   it.

24              See, the other problem is that

25   these products have an ever rotating set of

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    names and features.

2         Q.     Sure.

3         A.     So there are actually two

4    different kinds of app campaigns, there is

5    the install, the app install campaigns, the

6    app engagement campaigns where you try to

7    reengage some user who has lapsed, hasn't

8    used the app in, I don't know, 30 days.

9         Q.     Right, okay, understood.

10        A.     Okay.  So I've noted Google

11   required app developers to implement app

12   conversion tracking and deep linking it to

13   have a minimum of 250,000 app installs in

14   order to run, I believe that is for the

15   ACE.

16        Q.     Uh-huh.  That's the engagement

17   campaign you are talking about?

18        A.     Yeah, so I see that.  There is

19   something about -- that is one note about

20   mandatory conversion.

21        Q.     Right.  You're not saying it

22   has to be with a Google product, you are

23   just saying that the advertiser has to

24   track conversion somehow?

25        A.     I would just look it up in the

Page 296

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  documentation to know for sure what systems

2  would satisfy that requirement.

3      Q.    Okay.

4      A.    Read the manual.

5      Q.    Exactly.  So back to my

6  question about how the advertisers pay for

7  all of this.  How do they pay for all of

8  this?

9      A.    Well, I believe it is sold per

10  install or per engagement.  I believe the

11  advertiser is able to make a bid.

12      Q.    The advertiser makes a bid.

13  What do you mean by that?

14      A.    They specify the amount of

15  money they are willing to pay for a result.

16      Q.    Okay.

17      A.    This program -- these programs

18  have changed over time.  So I may be

19  recalling how something was in the past and

20  it may be different at different points in

21  time.  Probably the best thing to do is

22  actually just to look it up for whatever

23  era you are interested in and know for sure

24  for that era what it was.

25      Q.    Okay, fair enough.  Dr. Black

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   says at some point in his report that if
 2   Google Analytics for Firebase were to just
 3   disappear, right, snap your fingers, it's
 4   gone, that advertisers, app developers who
 5   advertise their apps, they would just
 6   choose some other analytics SDK and keep
 7   advertising with Google, they wouldn't just
 8   stop advertising.  I mean, you have done
 9   internet marketing work with clients
10   before.  Does that seem fair?
11              MR. MAO:  Objection, incomplete
12         hypothetical, argumentative, and just
13         completely wrong, but go ahead.
14         A.    Okay.  So my concerns with that
15   hypothetical are, one, if users switch to
16   another conversion or analytics package,
17   that package may start pushing on them a
18   different ad platform.  It might have a
19   really slick integration with a different
20   ad platform, which causes Google to lose
21   market share.  So I wouldn't conclude that
22   everything -- they would just switch and
23   advertising with Google would proceed all
24   the same, I don't think you can draw that
25   conclusion.
```

Page 298

1      Q.      And I didn't mean to say it
2  would proceed all the same.  I was just
3  saying they wouldn't stop advertising
4  altogether?
5      A.      You know, there could be --
6  there could be some sort of seismic shift.
7  And also I'm not sure how realistic it is
8  that something like that would happen.
9      Q.      Well, okay.  We were just
10  looking at paragraph 26 of Appendix E of
11  your report.  It says that in the first
12  half of 2019, ▮▮▮▮▮▮ of app ad spend at
13  Google was bid against GA4F conversions,
14  right?
15      A.      Yes.
16      Q.      So at least as recently as the
17  first half of 2019 ▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮
▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮
▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮
▮▮ ▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮?
21      A.      The thing is in technology
22  times move fast and things move fast and
23  you can't necessarily stuff the genie back
24  in the bottle.  Like if you took away this
25  product I don't know that you can conclude

                                    Page 299

1    things would just revert back to how they

2    were in 2019.

3        Q.      And I'm not suggesting that

4    they would revert back to the way they were

5    in 2019. I'm just saying as recently as the

6    first half of 2019, ████████████ ██████

████ ██████████ █████ ███ ████ ███████ ████

█ ████████ ████ █████ ███████ ██████ █████

█ ████ █████████ ████ ████████████ █████ ████?

10       A.      Well, there is also something

11   absent there which is how much money are

12   they spending with Google.  Is that -- has

13   Google's market share of the app ad market

14   gone up or changed over this time period?

15   I think that's another thing.  So I'm not

16   ready to make some sort of economic

17   judgment I don't think about, you know,

18   whether -- if people switch, Google's

19   revenue just keeps on the same.  I wouldn't

20   draw that conclusion.

21       Q.      Do you advertise your website

22   on Google's ad network?

23       A.      I did until recently.

24       Q.      When did you stop?

25       A.      Not too long ago, like a month

Page 300

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ago maybe.
 2        Q.     Who do you advertise with now,
 3   or do you just not advertise anymore?
 4        A.     I have some term contract that
 5   I continue advertising with a SEEK
 6   directory, which is a specialized website
 7   for expert witnesses.  It seems to produce
 8   the best results for me.  I have been
 9   watching my ROI on Google erode, so I kind
10   of just pulled it.
11        Q.     Got it.
12        A.     I have been a big fan of Google
13   advertising over the years though.
14        Q.     So you advertised your website
15   up until a month ago with Google, you used
16   Google Analytics, you also have advised
17   clients on using Google Analytics, right?
18        A.     Yes.
19        Q.     With websites?
20        A.     Yes.
21        Q.     And you have advised clients on
22   internet marketing, how to run ads and make
23   sure that they are doing it in the most
24   optimal way, right?
25        A.     Yes.
```

Page 301

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.       How many of those types of
 2   consultations have you done?
 3        A.       Hundreds.
 4        Q.       Hundreds.  Hundreds of
 5   entities?
 6        A.       Probably, yeah.
 7        Q.       So let's say one of those
 8   entities came to you now and said Google
 9   Analytics, they just turned it off
10   yesterday, and now I can't tell if my ads
11   are converting or not.  Would you say to
12   them you should stop advertising on Google
13   or would you say just measure your
14   conversions using some other tool?
15        A.       I mean, it's sort of a -- it's
16   sort of a counterfactual assumption that
17   this product would just disappear
18   overnight.  I would think that, for
19   example, if the Court would order an
20   injunction, somehow that impacted this, I
21   would hope that there would be some fair
22   notice to all the third parties that depend
23   on it, not to leave people high and dry,
24   that there should be a chance for -- a
25   chance for orderly migration.
```

Page 302

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.      It is disappearing in six
2   months.
3       A.      I don't know.  This is -- it
4   gets into something very speculative.  I
5   just don't know where that would go or how
6   I would deal with that because it has never
7   come up before like that.
8       Q.      Have you ever advised anyone
9   not to use Google Analytics on their
10  website?
11      A.      I have at times talked about
12  the pros and cons of using -- tracking
13  pixels on websites.
14      Q.      Have you ever advised that
15  someone use a tracking pixel other than
16  Google Analytics?
17      A.      I mean, in addition in the past
18  I used other products, but Google Analytics
19  has become very dominant in the market.
20      Q.      If one of your clients said to
21  you I just got a notice that Google
22  Analytics will remain working just as it
23  always has, but for any of the users who
24  visit my website who have sWAA off, their
25  data will just not appear, won't be there,

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  won't contribute, what would you advise

2  them to do?

3      A.      I would say that's fine, and I

4  will tell you why, because the Google

5  Analytics as it is does not give you an

6  exact count of anything.  It actually uses

7  statistical sampling.  They don't actually

8  measure every interaction, they measure a

9  sampling of them, and then extract from the

10 sampling.

11            So if there are WAA-off and

12 sWAA-off users it is possible to use

13 statistical methods to essentially replace

14 the missing data.  So I think it's

15 something that one can use statistics to

16 correct for.  Either Google could build

17 that into the product or the company using

18 it could know, okay, this has some

19 measurement error, and in fact we already

20 know that this has some potential for

21 measurement error because some users in the

22 past, you know, there have been issues with

23 people, for example, they might use Privacy

24 Badger and they might disable the tracking

25 beacons.  You know, sometimes -- sometimes

Page 304

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    there are things that affect the accuracy
 2    of all the tracking.
 3              If you get a good statistical
 4    sample, if you get a read on three-quarters
 5    of your visitors, you can extrapolate from
 6    that and know what is going on, as long as
 7    -- as long as there is not too much bias in
 8    the data.  In other words, if you are
 9    selling -- I mean, there might be some
10    weird counterexample, for example, like if
11    Bruce Schneier is trying to sell his book
12    on the web and all the people coming to buy
13    the book are privacy hawks, like they might
14    all have Privacy Badger installed, so that
15    might be a little weird.  But that is kind
16    of an unusual circumstance.
17              I mean, if you are just selling
18    sneakers or belts or whatever, those kind
19    of people are just kind of run of the
20    internet and there is not going to be any
21    sort of correlation between desire for
22    privacy and whether people have a
23    propensity to buy shoes, because everybody
24    wears shoes.
25              MR. MAO:  Can we get a clock
```

Page 305

1          check on that?  I would like to at
2          least take a break before the last hour
3          just so we can kind of finish.
4               THE VIDEOGRAPHER:  Five hours,
5          46 minutes.
6               MR. MAO:  I'm going to need
7          about ten minutes with him for my part.
8               MR. SANTACANA:  Sure.
9               MR. MAO:  Just to be clear,
10         because I don't want you to complain
11         that you miss your plane.  I'm not
12         trying to jam you on your time, I'm
13         simply saying if you are trying to make
14         your last flight, I'm going to insist
15         on having my ten minutes.
16              MR. SANTACANA:  I understand.
17         I won't be surprised.
18         Q.     So sticking with this for a
19    moment, wouldn't it be kind of difficult
20    for Google Analytics to tell your
21    hypothetical client in this scenario what
22    sWAA-off users would have done on the
23    website if the data has no sWAA-off users
24    in it at all?
25         A.     I'm not sure exactly how to

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    best approach that, because this is, again,

2    one step into the future.  It is sort of

3    presuming some sort of result in this case

4    and then what do we do next.  I think it is

5    best to get there first and then figure

6    out -- everyone can figure out what that

7    next step is.  That is hopefully not too

8    disruptive to the marketplace.

9         Q.    So if let's say Google had

10   honored the sWAA setting the way that you

11   interpret it from the beginning, you don't

12   think that would have hampered Google

13   Analytics for Firebase in a way that really

14   like made it not work for app developers?

15        A.    I'm not sure, but I think that

16   doing the right thing is usually a good

17   business decision, because the way I look

18   at business, the trust of your customers is

19   your most valuable asset and you want your

20   customers to trust you and be happy with

21   you.

22             So I think doing the right

23   thing for customers, even if there is some

24   immediate apparent cost and then there is

25   maybe some hard to determine future

Page 307

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     benefit, I think it is always a good idea
2     to try to build up your customer trust.
3     But that's just my philosophy.  You asked,
4     I answered, but make of it -- make of it
5     what you will.
6          Q.     That is perfectly fine.  I just
7     -- I want to really understand what you
8     meant when you were talking about analytics
9     and statistical sampling and the way that
10    you would react if your client said to you
11    I'm really upset, all of my -- all of the
12    sWAA-off users are being excluded from
13    Analytics now, this is a disaster, you
14    know, what are we supposed to do, this
15    thing is not working.
16         A.     I have actually documented in
17    the report that something like ██  ████████
18    ██  ████  are sWAA on.  So you have got ██
██   ████████  of your population, you are
20    collecting data on them.  So if you are
21    missing████████  of the data you can just
22    sort of extrapolate that.  If that
23    ██████████  is -- behavior of ██  ████████
24    -- if the behavior of ███  ████████████  is
25    representative of the behavior of the

                                   Page 308

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      ████████████, you can just extrapolate and

2      have a pretty good idea.

3          Q.      So you wouldn't -- so you would

4      not necessarily tell them you need to stop

5      using Google Analytics, this isn't accurate

6      anymore?

7          A.      I would have to evaluate the

8      circumstance and the situation at the time.

9      I think there is more to the hypothetical

10     that I would have to evaluate.

11         Q.      Wouldn't, I mean, wouldn't in

12     this hypothetical, if the sWAA-off data was

13     excluded from web analytics and your

14     customer is upset about it and they come to

15     you for advice, wouldn't it drive down the

16     value to the customer of advertising with

17     Google?

18         A.      I'm not sure.  I mean, again,

19     it depends all on implementation details,

20     and, again, the going forward is different

21     than the history.

22         Q.      So is that -- I mean, are you

23     saying I guess that going forward there's a

24     way in which Google could exclude sWAA-off

25     data from Analytics entirely, never get

Page 309

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  sent, but the Analytics product could still

2  sort of work just as well for the app

3  developers who rely on it?

4       A.     I mean, I'm not sure.  I would

5  have to see the details of that

6  implementation.  There is sort of unknowns

7  in this hypothetical that might guide that.

8       Q.     Okay.  I mean, you expressed a

9  little bit about it.  I mean, I'm just

10  trying to understand what you're saying.

11       A.     I'm saying there are some

12  scenarios under which you could do

13  extrapolation.  I pointed that out.  So I

14  don't know that I could give you a hard and

15  fast rule on this.  I think it really

16  depends.

17       Q.     I will just ask you something

18  quick about paragraph 182 on a completely

19  different topic.

20       A.     Okay.  Let's go like five

21  minutes and then take our break and then

22  try to finish.

23       Q.     Sure.  There is some blue

24  highlighting in here which I think was for

25  redaction purposes.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.        That's my understanding as
 2   well.
 3        Q.        So I'm actually looking at the
 4   blue highlight in this case.  It says "I
 5   understand that," and then a little later
 6   it says "Anibal Rodriguez was signed in to
 7   his peteysake@gmail.com account."
 8                  Do you see that?
 9        A.        Yes.
10        Q.        And then you cite his
11   deposition transcript?
12        A.        Yes.
13        Q.        You're aware that Dr. Black
14   talks about this in his report, the
15   possibility that Mr. Rodriguez was signed
16   in to a different account at different
17   points in time during the class period?
18        A.        I don't recall that section of
19   Dr. Black's report.
20        Q.        Okay.
21        A.        But I also would just comment
22   that the last sentence in blue is that he
23   says "As shown in Appendix A, all three
24   plaintiffs' signed-in accounts had WAA and
25   sWAA turned off when the Baseview data was
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    generated."  So I know that Appendix A was

2    actually a list of status at different

3    dates.

4         Q.     Right.  I'm very familiar with

5    Appendix A.

6         A.     Yeah, that could be -- the fact

7    that he was -- the sWAA and WAA status

8    could be verified as of when that data was

9    collected.

10        Q.     Okay.  Apart from the

11   deposition transcript cite that you have

12   here for Mr. Rodriguez and Ms. Harvey and

13   Mr. Cataldo, you cite each of their

14   transcripts, is there anything else that

15   you are relying on for your understanding

16   as to which accounts were signed in to

17   these devices at which times?  And to be

18   clear, did you talk to them or did the

19   lawyers tell you something that's not

20   documented here?

21             MR. MAO:  And you are not

22        referring to what else you may have

23        produced to us, you are just talking

24        about like other sources outside of the

25        formal discovery process?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          MR. SANTACANA:  No, or anything
2      that's not documented in this
3      paragraph.
4      A.    I mean, what I would suggest is
5   I'm not going to be able to do it now live,
6   but I will check the records that were
7   collected and there may be something in the
8   actual record itself that corroborates that
9   information that they were signed in.
10     Q.    Okay.  There's -- but you
11   didn't talk to them, these plaintiffs?
12     A.    I don't recall talking to them.
13     Q.    Okay.  And you're not relying
14   on something the lawyers told you about
15   which device -- which account was signed in
16   to which device at what time?
17     A.    I'm relying on what's cited and
18   also the data itself.
19          MR. MAO:  One other thing,
20      Eduardo, I know you are trying to get
21      out of here, but I do have on the
22      record a number of things that you
23      asked him that he agreed to follow up
24      on the appendix for the record.  So I
25      don't know if you want to propose

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      something other than -- I can use my

2      time to do it.  I don't care to hold

3      you to that.  I'm just noting that that

4      is going to hold us over, okay?

5           MR. SANTACANA:  I understand.

6           MR. MAO:  Okay.

7           MR. SANTACANA:  It's fine if I

8      miss it.  It is completely fine.  Let's

9      just do it right one time.

10          MR. MAO:  I understand.

11    Q.    So iOS 14 deprived third

12 parties of device ID if the user declined

13 the app tracking transparency prompt in

14 iOS.  You're familiar with that?

15    A.    Yeah, I recall that.

16    Q.    You've gotten that prompt

17 yourself on an iPhone?

18    A.    Probably.

19    Q.    I would say almost certainly.

20    A.    I don't remember it, but

21 probably I did.

22    Q.    Well, it's a prompt that says

23 do you want to let this app track you for

24 advertising, and you say yes or no, and

25 sometimes it is worded differently, but

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   you've seen that before?

2       A.      Probably.

3       Q.      Okay.

4       A.      I mean, maybe I have some other

5   setting somewhere in my phone that just

6   suppresses it and says like no, never.

7       Q.      Not possible?

8       A.      No, it's not possible.

9       Q.      But you're a computer privacy

10  expert, you didn't notice the prompts when

11  they came up?

12      A.      I don't recall seeing them

13  recently.

14      Q.      Okay.  Maybe you just haven't

15  installed apps a lot.

16      A.      Actually, I am kind of paranoid

17  about apps, and I will only install certain

18  kinds of apps.

19      Q.      Got it.  And actually I take it

20  back, it may be possible that if you turn

21  something off, it is off for all of them.

22  I'm not sure.  In any case, are you

23  familiar with Apple's SKAD network?

24      A.      Yeah, I don't remember the

25  acronym, but if you tell me what it spells

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1  out or what it means, I probably -- I

2  probably have heard of it.  I just don't

3  necessarily remember the name.

4       Q.     I don't think I have ever seen

5  it -- what it stands for, if anything.  But

6  do you have any understanding of what it

7  does or what it's for?

8       A.     Again, I have to just connect

9  the thing to the name, because I may know

10  about the thing, I just don't know what it

11  is called.

12       Q.     SKAD network is the thing that

13  Apple has to provide analytics and

14  conversion information to third parties

15  without giving them device ID.  Are you

16  familiar with that?

17       A.     Okay, so it is some sort of

18  privacy preserving analytics solution.

19       Q.     Yeah.

20       A.     Okay, yeah, I think I have

21  heard something about it.

22       Q.     Or so they market it as.  Okay.

23              Are you particularly familiar

24  with it or you just heard about it?

25       A.     I mean, I think I follow the

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1  press, so I see, you know, all the articles
 2  come across my inbox and I see them, but I
 3  don't -- I haven't looked at it in detail
 4  yet.
 5      Q.     Okay.  And in your
 6  professional -- in the course of your
 7  professional life you haven't needed to --
 8  you don't advise people on app advertising?
 9      A.     I do at times.  I just haven't
10  had to look into it recently, and as I said
11  before, the field moves kind of quickly, so
12  I kind of do fresh investigation each time,
13  because things change.
14      Q.     All right.
15           MR. MAO:  That break, Eduardo,
16      at some point?
17           MR. SANTACANA:  Sure, we can
18      break.
19           THE WITNESS:  Now would be a
20      good time.
21           THE VIDEOGRAPHER:  The time is
22      6:25 p.m.  We are off the record.
23           (Recess taken.)
24           THE VIDEOGRAPHER:  The time is
25      6:45 p.m.  We are back on the record.

Page 317

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. SANTACANA:

2         Q.      Can you take a look at

3    paragraph 269 of your report.

4         A.      Yes.

5         Q.      Sir, in this paragraph you make

6    an assertion about marginal cost?

7         A.      Yes.

8         Q.      Other than what you have cited

9    here in this paragraph, was there any other

10   basis for this assertion?

11        A.      Sure.  So within my experience

12   I know elsewhere in the report I mention

13   that Google stated that they have ▇ ▇▇▇▇

▇▇   ▇▇▇▇▇ ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇ and I'm aware of

15   Google's activities in storing video,

16   storing images, storing Gmail, storing an

17   index of the web.  They have got some

18   pretty data-intensive applications there

19   that require a tremendous amount of

20   storage.

21              So what I'm thinking is that

22   the amount of storage required to store

23   this WAA-off and sWAA-off user data, which

24   is, you know, some of it is deleted

25   quickly, some of it is saved for a longer

                                   Page 318

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   period of time, presumably Google tries to
2   be a little bit efficient about how they
3   store things.  You know, when they are
4   going to store it for long term, they kind
5   of, you know, filter out what they don't
6   need and keep what they need.
7           So I have in mind an inference
8   that this is a -- this amount of storage is
9   a rounding error in their whole scheme of
10  things.  And I also have an idea of what
11  storage costs at Google, because I actually
12  buy storage from Google.  I pay Google $2 a
13  month for premium Gmail storage.  I pay
14  them $2 a month to get 100 gigabytes of
15  storage.
16          Q.     That's less than I pay.
17          A.     Okay.  Well, and I also have,
18  you know, cloud storage with some other
19  providers like Dropbox, you know, I think
20  it is 150 bucks a year for 2 terabytes.
21  I'm aware of what the Amazon storage rates
22  are, especially cold storage is really
23  cheap, live storage is more money.  But I
24  have some sort of general sense of what
25  cloud storage costs, and storage is pretty

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   cheap.  So that's where all that opinion is
 2   coming from.
 3        Q.     Okay.  So I guess the word
 4   material incremental cost, the word
 5   "material" is doing some work there?
 6        A.     The word "material" is
 7   definitely doing some work.
 8        Q.     Have you quantified the degree
 9   to which a cost is material or not?
10        A.     So generally my understanding
11   in these kind of situations, you know, the
12   difference between material and de minimus,
13   the threshold is somewhere around 5
14   percent.  You know, when you get something
15   that is like 1 percent, that is pretty
16   minor.
17             I think this is -- if Google is
18   sitting down to plan out, okay, we need to
19   build more data centers, we need to
20   allocate storage, you know, what are our
21   forecast needs, they are looking at how
22   much video do they have to store, how much,
23   you know, images, how much mail they have
24   got to store, Google Docs, I mean, they
25   have got huge storage things.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          I don't think the

2    WAA-off/sWAA-off data makes that list.  I

3    don't think it factors into any sort of

4    calculation or projection of how much

5    storage one is going to need because I

6    think it is extremely small in the whole

7    scheme of things.

8          Q.     Did you see any documents or

9    other evidence to that effect?

10          A.     No, it is just an inference

11    from knowing how cloud computing platforms

12    work.  And of course Google is welcome to

13    rebut me if they have an actual document

14    that shows otherwise, I'm totally happy to

15    take that document and see the facts.

16    Facts are friends.

17          Q.     But you didn't see a document

18    either way?

19          A.     They haven't produced that

20    document, but they certainly know what

21    their storage needs are and what their

22    storage use is for all this data.  They

23    could, you know, if I'm wrong, they can put

24    the facts on the table.

25          Q.     Got it.  Okay.  I have a

Page 321

1  question about Firebase cloud messaging.

2  Any user that is receiving a notification

3  via Firebase cloud messaging has consented

4  to receive notifications on this device

5  from that app, right?

6       A.     You know, I think that the

7  messaging, there is a setting that controls

8  whether apps can push messages.

9       Q.     So to get such a message, a

10  user would have to expressly agree to get

11  messages from that app?

12      A.     Well, it might be the other way

13  around.  In order to not get messages a

14  user might have to turn it off.

15      Q.     Do you know one way or the

16  other?

17      A.     My impression is these things

18  could be opted in.  I mean, we could

19  double-check it.  I mean, you can check it,

20  I can check it.  That is just something

21  that ought to be looked up.

22      Q.     So is it your understanding

23  that when a user turns sWAA off that that

24  should disable the Firebase cloud messaging

25  function of the Firebase SDK?

Page 322

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.      I'm not sure.  I haven't

2  considered that, I don't think.  And that's

3  something that maybe Google could address,

4  you know, as a setting.  You know, do you

5  want messaging to continue to work or not

6  if you flip this setting.

7           I mean, this is I think

8  something that some of the Google employees

9  have observed that is part of the issue

10  with the WAA and sWAA setting, which is

11  that it is dealt with inconsistently about

12  Google's range of products.  It is hard,

13  very hard to understand what the behavior

14  is going to be.

15      Q.      Okay.  Do you opine that Google

16  has monetized the sWAA-off Firebase cloud

17  messaging data that you identify in your

18  report?

19      A.      I know that cloud messaging is

20  a relatively minor product compared to, you

21  know, the Google Analytics for Firebase and

22  AdMob.  Those are the two big ones.  Cloud

23  messaging is a lesser -- lesser thing, less

24  significant.

25      Q.      All right.  Now, you opine in

```
 1    your report that you could identify class
 2    members using Google's data, right?
 3         A.    Yes.
 4         Q.    I think you start talking about
 5    this in Section I, page 147.
 6         A.    Yes, okay.
 7         Q.    So one of the methods you
 8    propose here, given that historical
 9    records, not all of them exist anymore, is
10    that class members could identify
11    themselves to Google and that, combined
12    with records Google has, could identify
13    them as a class member?
14         A.    I think I have said something
15    like that.
16         Q.    And I think what you said was
17    that to do that, they would identify which
18    apps they use and then Google would confirm
19    whether that app uses Google Analytics for
20    Firebase or the ads SDK, right?
21         A.    I believe I said something like
22    that.
23         Q.    Even if a user who has sWAA off
24    has in the past used an app that has used
25    GA4F, that does not necessarily imply that
```

Page 324

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Google saved sWAA-off data about that user
2    from GA4F, right?
3         A.     I think if Google had saved the
4    data that plaintiffs asked them to save
5    somewhere near to the front of this
6    litigation, they would have the data that
7    they needed to answer that question, and
8    Google decided that they didn't want to
9    save that data, and I think they made a
10   motion that they wouldn't have to save it
11   and they didn't have to save it.
12        Q.     What data are you referring to?
13        A.     I think these logs of all the
14   app activity data.
15        Q.     Which logs?
16        A.     I think I might have discussed
17   it somewhere in the report here, but what
18   I'm thinking of are the ██████ ██████ ██████
     ██ ██████ ██████ ██████ ██████ ██████ ██ ██████
     ██ ██████ ██████ ██████ ██████ ██████ ██ ██████
     ██ ██████ ██████ ██████ ██████ █ ██████ ██████ ██████
     ██ ██████ ██████ ██████ ██████ ██████ ██████ ██████
     ██ ██████ ██████ ██████ ██████ ██████ ██████ ██████
     ██ ██████ ██████ ██████ ██████ ██████ ██████
     ██ ██████ ██████ ██████ ██████ ██████ ██████ ██████ .

                                    Page 325

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1          Q.      Okay.  So but you are here to

2     offer expert opinions, so I want to be

3     specific.  Which logs in particular are you

4     saying could have been used had they not

5     been deleted to identify class members

6     during the class period?

7          A.      I don't know off the top of my

8     head.

9          Q.      Do you say so in your report?

10         A.      I may say something about that

11    in the report.

12         Q.      Well, you may say, you may not

13    say, I need to know if you do.

14         A.      Again, I mean, this kind of

15    question, we have struggled with it all day

16    because I've got, you know, like it looks

17    like 600 pages worth of report and

18    appendices in front of me here and I can't

19    possibly like index all that with my brain

20    and remember where each and every little

21    fact is within that.

22         Q.      Well, I'm not asking you to

23    index anything.  I mean, there is a table

24    of contents.  You have been holding this

25    report all day.  I'm just asking you --
```

Page 326

 1              MR. MAO:  While you are asking
 2       him questions, if you want him to take
 3       the time to look through that, look for
 4       it --
 5       Q.     The time to look through your
 6  report was before you sat down today.
 7       A.     Which I did actually.
 8       Q.     Good.  So my question is which
 9  logs, right, you have this Section I, Class
10  Member Identification, you are welcome to
11  look at it right now, it is eight pages
12  long, okay, does it identify the specific
13  logs that you would have used had they not
14  been deleted to identify class members?
15       A.     I mean, the report either does
16  or does not identify the logs, and also it
17  may mention some docket action which may
18  have lists, and I think there was also
19  motions or requests in this case for lists
20  of logs and additional logs which Google
21  didn't produce.  So, I mean, if Google has
22  resisted discovery and refused to provide
23  the relevant data, it doesn't seem cricket
24  that my client should be put at a
25  disadvantage for not having that which

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  Google has refused to produce.

2       Q.     Your client being whom?

3       A.     The plaintiffs in this case.

4       Q.     So I honestly don't really know

5  what you're talking about.  But this

6  section of your report does not discuss

7  motions or discovery.  What it talks about

8  is methods for identifying class members

9  using data that Google has or data that the

10 users would have, okay?  And I just want to

11 be really clear about what you're saying

12 right now.

13            You are claiming that there is

14 data that was deleted that could be -- that

15 could have been used to identify class

16 members and now it doesn't exist anymore.

17      A.     Why don't we -- why don't we go

18 to the exact statement here, if I can find

19 it.

20      Q.     Sure.

21            MR. MAO:  Sorry, when you are

22      saying "sure," we are starting out with

23      page 147, this section?

24            MR. SANTACANA:  Page 147.  Why

25      don't we go off while you look for it.

Page 328

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                  THE VIDEOGRAPHER:  The time is
 2        6:58 p.m.  We are off the record.
 3                  (Recess taken.)
 4                  THE VIDEOGRAPHER:  The time is
 5        7:00 p.m.  We are back on the record.
 6   BY MR. SANTACANA:
 7        Q.     Okay.  So you are ready to
 8   address this?
 9        A.     Yeah.
10        Q.     Go ahead.
11        A.     So I will just point you to
12   paragraphs 357, 358 and 359.  That explains
13   it.
14        Q.     Okay.  I am looking at that
15   exact thing.  So 357 says "Google could use
16   the data stored within its voluminous logs
17   to verify membership in the class.  The
18   same records provide information about the
19   volume of WAA and sWAA-off data Google has
20   collected and saved, to the extent Google
21   did not destroy and delete such data."
22                  But that paragraph does not
23   identify any log or logs in particular,
24   right?
25        A.     Keep reading.
```

Page 329

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.      Okay.  But that one doesn't.

2  I'm going to keep reading in a moment.  Am

3  I right?

4      A.      Well, I told you there is three

5  paragraphs together that describe where

6  this data would have been found if it had

7  been retained.

8      Q.      Okay.  So paragraph 358, as I

9  see it, mentions 16 AdMob related logs,

10  eight of which are GAIA and I guess eight

11  of which are not GAIA logs?

12      A.      Yeah, that's the microscopic

13  quantity of logs that Google produced.

14      Q.      And then you identify the

15  ██████  ████████████  log that contains a sWAA

16  bit in GAIA data, right?

17      A.      Yeah, so there are sWAA and WAA

18  bits in some of these logs.  I mean, Google

19  themselves said there was something like a

20  million hits when they searched through the

21  logs to find out how many fields mention

22  WAA or sWAA.

23      Q.      And then it says

24  ██████████████████████████  which does contain

25  WAA and sWAA bits.

Page 330

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.      Right.  And then 359 has the

2   sort of the payload here, "but Google has

3   withheld providing information about the

4   vast majority of logs that contain such a

5   bit," okay?  That's the sWAA/WAA bit.

6      Q.      Well, Mr. Hochman, my

7   questioning of you today is about what you

8   did do, not what you didn't do.  So I just

9   need to know what you did do and what you

10  did opine on.  I don't need to know about

11  the world of things that you may have never

12  seen that may or may not exist and that may

13  or may not be helpful to you, right?

14          So I think what you're saying

15  is at least with respect to the logs you

16  identify in 358, Google did not in your

17  view retain them long enough to identify

18  class membership?

19      A.      So Google had the data, Google

20  had the data, and if Google says they no

21  longer have the data, then that's because

22  they didn't retain it, and the Court will

23  have to determine what to do about that.

24  That's not my question.  I can't give you a

25  legal answer.

Page 331

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.      Well, on that we agree.
 2                Let's talk about the ████
 3     ████████   log.  That's the only analytics
 4     log in paragraph 358, right?  The others
 5     are ads logs.
 6        A.      Let's take a look.  Yes.
 7        Q.      The retention period on that
 8     log is ██  ███?
 9        A.      Okay.
10        Q.      You're aware of that?
11        A.      It doesn't surprise me.
12        Q.      So on the day this case was
13     filed, at most there was ██  ███ of data in
14     it going back ██  ███, right?
15        A.      For that log, but there are
16     other logs.
17        Q.      Okay.  But that log couldn't
18     help you figure out who was a class member
19     in 2018 or 2019 if the case was filed in
20     the spring of 2020, right?
21        A.      But there may be other logs.  I
22     mean, Google has said that they had a
23     million hits.  You can see it there at 359.
24        Q.      I'm asking you about this one
25     log that you identified, ██████
```

Page 332

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    ███████████   I will ask about the other

2    ones in a moment.

3              MR. MAO:  Objection, asked and

4         answered.  Go ahead.

5              MR. SANTACANA:  Well, I don't

6         think he answered it.

7         Q.    The question is you could not

8    use the ████████  ██████████  log on the date

9    this case was filed to figure out who was a

10   class member in 2018 or 2019, right?

11        A.    That log, if it only had a

12   ███-███ retention period, that wouldn't have

13   gone back that far, but there may be other

14   logs that do go back further.

15        Q.    So the ████████████████████

16   log, do you know what the retention period

17   was on that one?

18        A.    As I said, there is a

19   microscopic number of logs that Google

20   produced and I'm really not interested in

21   the retention policy on this very small

22   number of logs out of the total huge mass

23   of data which was hidden from us.

24        Q.    Well, you should be interested.

25   I mean, if on the day the case was filed

                              Page 333

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   there was no data older than ███ ████ that
2   you could use to identify a class member,
3   that would be pretty relevant to your
4   opinion, wouldn't it?
5        A.    I think that the people who
6   have set this can say if they set it and
7   Google can use what data they have to try
8   to verify it.  That's one of the things I
9   said.  And I also said that if Google had
10  retained data they would be able to use
11  that data to ascertain who the class
12  members were.
13       Q.    I understand.  I'm just saying
14  that depends in part on what the retention
15  period was for the logs in question on the
16  day the case was filed.
17       A.    And Google has resisted
18  providing us information about all these
19  million different fields and all the
20  relevant logs because some of these things
21  are kept indefinitely as I understand it.
22       Q.    You're not answering my
23  question though.  I didn't ask you about
24  the other logs.  I said -- well, let me
25  just ask it a different way actually.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           You just said if Google had

2    retained data they would be able to use it

3    to ascertain who the class members were,

4    right?  That's an expert opinion you have

5    given in the case?

6        A.     Well, because I have shown that

7    these logs contain information that is

8    identifying and that links to a user, so

9    that's really the thrust of my opinion.

10   Now, if you all want to argue about

11   retentions and discovery and all that, you

12   can.  All I'm pointing out is that had

13   these things been retained, these people

14   would be identifiable.

15       Q.     Based on your review of the

16   logs that were produced in the case?

17       A.     And also documents and

18   testimony which talk about how Google

19   continues to collect and store data when

20   the WAA and sWAA settings are turned off.

21           Now, bear in mind if Google

22   honored that setting and didn't store and

23   retain that data, then, one, there would be

24   no case, and, two, the class members

25   wouldn't be ascertainable because Google

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    wouldn't have that data.
 2         Q.    When you say "that data" --
 3         A.    The data that -- let's call it
 4    the contraband data, the data that was
 5    collected while the switches were shut off.
 6         Q.    I don't think I will call it
 7    that.
 8         A.    I may.
 9         Q.    But I'm just going to -- I need
10    to be clear about something.  This is an
11    opinion that the Court may rely on one day,
12    okay, a federal judge is going to read
13    this, they may rely on it, they may ask you
14    to testify.  It says "Google has collected
15    and saved data in ways that identify class
16    members," and you opine in here that that
17    data could have been used to identify class
18    members had it not been destroyed.
19         A.    Yes.
20         Q.    I just want to be clear, when
21    you say "that data," as an expert, what you
22    are opining on is the data that corresponds
23    to data that was produced to you in the
24    case, that had it been kept indefinitely --
25         A.    I think the data that is
```

Page 336

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  relevant, to the extent that it still

2  exists, or ever existed, would be found in

3  the non-GAIA logs that have WAA and

4  sWAA-off activity. ███ █ █████  ██████  ███

   █  ████  ████  ████████  ███  █████  ████  ███

   █  ████████  █████

7          So all those logs, whatever

8  they are, that have WAA and sWAA-off data,

9  preferably the ones that have some of these

10 ████  ████  █████  ████  ████  █████  ████  ████

11 ████  █████  so they are identified as having

12 been collected with that setting, one of

13 those settings off.

14     Q.     Okay, thank you.  One

15 clarifying point.  ████  ██████  ██████

16 ███████  ███████  ████  ███████  █████  ██████

17 ██████  █████

18          MR. MAO:  Objection.  This is

19     not a memory test.  The document speaks

20     for itself.  Go ahead.

21     Q.     No, I'm just asking what you

22 meant.  Are you referring to Analytics

23 non-GAIA logs?

24     A.     I would say generally any log

25 that is recording web and app activity of

Page 337

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   this nature with WAA-off and sWAA-off data.
 2   Additionally, I think there are some ████
     █ ██████ ████ █ ██████ ██████ ████ █████
     █ ██████  If you remember in Section A,
 5   Appendix A, I reproduced some data that
 6   shows when the users turned WAA and sWAA
 7   off.  So that information is obviously
 8   useful also.
 9        Q.    ████ ████ ██████ ██████
     ██ ██████  I think I understand your
11   opinion now.
12        A.    I just would point out, if you
13   look at 354, there is also some explanation
14   there of -- essentially I'm summing up the
15   prior paragraphs that talk about three
16   categories of information.
17        Q.    Right.  No, and I understand
18   those.
19        A.    Okay.
20        Q.    I do.  Okay.  Did you get a
21   chance to check whether you ever performed
22   a join of GAIA/non-GAIA log entries?
23            MR. MAO:  As I stated, we would
24        do that when you are done.  Sorry, I
25        just thought there would be some type
```

Page 338

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      of a pissy fight over it.  I know you
2      want to get out of here.
3              MR. SANTACANA:  No, I
4      misunderstood.
5      Q.      You are still using Google
6  Analytics on your website?
7      A.      Yes.
8      Q.      I can't remember if I asked
9  this, do you know if the data sharing
10  setting is turned on?
11      A.      I don't remember.
12      Q.      Do you know if Google Signals
13  is turned on?
14      A.      I don't remember.  I mean, if
15  there is some data sharing thing -- my
16  recollection on that one is that there was
17  some setting which allowed essentially
18  Google's staff to go in there and take a
19  look and use that to counsel me, and I
20  don't recall if I have turned that off.  I
21  mean, my nature would be to turn that off.
22  But I haven't looked at it lately.
23      Q.      If your opinion in this report
24  is accurate, does that mean in your mind
25  that Google Analytics is actively deviating

Page 339

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   from the sWAA description in users'

2   accounts when they turn it off?

3              MR. MAO:   Objection to form.

4        Go ahead.

5        A.     So I'm using GAIA on a website,

6   I'm not using it on an app.

7        Q.     Right.  No, I understand.  I

8   think you said it's all unified now?

9        A.     Yes, I believe that it is

10  moving towards that, but I just haven't --

11  I honestly haven't looked at it lately.  I

12  have been sort of working on these cases

13  and not looking at my own web marketing.

14  So at some point I will sit back and

15  reevaluate like do I want to continue using

16  this product or not.  But I can wait for

17  the Court to render an opinion about

18  whether Google has done something wrong or

19  not.  I mean, I have my feelings, but I

20  will also defer to the Court and let the

21  Court decide.

22       Q.     Okay.  But, I mean, your

23  feelings have not risen to the level of

24  feeling like you need to discontinue your

25  use of Google Analytics immediately?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.      The thing is I use all of

2   Google's risky, privacy-invading products.

3   I mean, I use some Google Home products.  I

4   use all kinds of Google stuff, because I

5   also want to know how it works.  I use

6   Google Analytics because I also want to

7   keep on top of how it works.  So I'm doing

8   that and also --

9        Q.      Even at the cost of your

10  website visitors' privacy?

11       A.      You know, my website visitors

12  who have privacy concerns have probably

13  much bigger concerns than what's going on

14  on my website, because my website is

15  targeted towards law firms, so the main

16  visitors to my site are lawyers.  I have

17  some people come in to read articles on web

18  marketing.

19              I don't -- I am not here to

20  tell the Court what final decision should

21  be made.  I've got my technical analysis,

22  I've got my beliefs, I'm using Google

23  Analytics because I have been using it

24  since 2005, and I just haven't spent the

25  time to figure out what other product I

Page 341

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  could use that would fill that need,

2  because Google Analytics has kind of driven

3  most of the other products out of the

4  market.  There is not really a lot of

5  choices for me.  I'm open to your

6  suggestion, if you think there is some

7  other analytics package I can use, but I'm

8  not sure where else I could go.

9          Q.      Well, I'm just trying to

10 understand how to square your opinion about

11 the privacy risks that users are facing as

12 a consequence of the way Google treats

13 sWAA-off data on the one hand and your

14 decision to continue to expose people to

15 those risks on the other.  I mean, you have

16 said one single piece of data could ruin

17 somebody's life.

18         A.      Yes.

19         Q.      You don't disagree with that

20 now?

21         A.      No.

22         Q.      So you're okay taking that

23 risk?

24         A.      People who have -- I have

25 documented here that people are spending

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   like four hours a day in apps and they are

2   using lots and lots of apps --

3       Q.      But it could be your site that

4   gets hacked?

5       A.      Well, I don't have an app.

6       Q.      I understand.  But it still

7   could be your site that gets hacked?

8       A.      But my site doesn't have any

9   sensitive information from my visitors. I

10  don't record any sensitive information on

11  my site.

12      Q.      You have tracking pixels on

13  your site, right?

14      A.      And the tracking is done by

15  Google Analytics.  Google is holding that

16  data.

17      Q.      Okay.

18      A.      And I don't think that that

19  materially increases anyone's risk, because

20  the amount of -- percent of browsing that

21  someone does when they come on the web on

22  my site is minuscule as a part of their

23  total browsing, their total risk profile,

24  okay?  Because Google Analytics beacons are

25  located everywhere.  They are all over the

Page 343

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    place.   Me taking that beacon off my
2    website does not materially reduce any
3    person's risk.
4         Q.     Okay.
5         A.     Because there is so many
6    beacons everywhere else.
7              MR. SANTACANA:  All right.
8         Let's take a quick break.
9              THE VIDEOGRAPHER:  The time is
10        7:16 p.m.  We are off the record.
11             (Recess taken.)
12             THE VIDEOGRAPHER:  The time is
13        8:03 p.m.  We are back on the record.
14             MR. SANTACANA:  So I'm passing
15        the witness.
16   EXAMINATION BY MR. MAO:
17        Q.     So, Mr. Hochman, I just want to
18   make sure, you were given a number of
19   questions during this deposition regarding
20   whether or not you could find things like
21   your joinability analysis, whether or not
22   IP addresses were being collected, you
23   know, what the retention periods were for
24   permanent logs versus nonpermanent logs.
25   You agree a lot of that is either written
```

Page 344

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   in your report or written in the appendix
 2   to the report, correct?
 3         A.      Yes.
 4         Q.      You understand that the Exhibit
 5   No. 1 that was provided to you is actually
 6   an incomplete copy of your report, I'm not
 7   pointing fingers, I'm just saying that it
 8   was missing some parts of the appendices;
 9   is that correct?
10         A.      Yes, some of the appendices
11   weren't here because they were Excel files.
12         Q.      Which appendices were not in
13   here?
14         A.      One of them was H2.
15         Q.      Any others that you saw?
16         A.      Well, probably H1 wasn't in
17   there either.
18         Q.      So there is a number of
19   appendices missing in there, correct?
20         A.      Yes.  And let's see.  Yeah, the
21   H1s are not there, all of the H appendices
22   are not there.
23                 MR. SANTACANA:  And you want me
24         to just read out which ones are there?
25         When I first introduced it I explained
```

Page 345

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          the native files wouldn't be in there.
 2          So Exhibit A, Appendix E, Appendix G,
 3          Appendix I, Appendix K, and Appendix L
 4          are in this paper volume that I handed
 5          you at the start of the day.
 6                MR. MAO:  I think the problem
 7          is just we are going to have to make
 8          that a part of the record because
 9          what's in the record is just the core
10          report itself.
11          Q.     In other words, you only had in
12    front of you during the examination
13    selected parts that counsel was going to
14    use, but some of the other stuff that you
15    needed in order to fully refresh your
16    recollection wasn't available to you; is
17    that correct?
18          A.     Yes.
19          Q.     Okay.  And then you believe
20    that once you have those available, you are
21    going to be able to answer some of the
22    previous questions; is that correct?
23          A.     Yes.
24          Q.     Okay.  Second area of
25    questioning that I wanted to ask you, and
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1  you can put I guess Exhibit 1 plus
2  appendices away for now.
3        A.     Okay.
4        Q.     Is you were asked a number of
5  questions today regarding joinability and
6  also, you know, reidentification of users?
7        A.     Yes.
8        Q.     Are those two concepts the same
9  thing?
10       A.     No.  They can operate in
11 different ways.
12       Q.     Okay.  So in terms of what you
13 understood what was being discussed back
14 and forth between you and counsel, how
15 would you define these respective terms in
16 your own words?
17       A.     Sure.  Joinability is if you
18 have two sets of data is there an
19 overlapping identifier or fingerprintable
20 fields that can be matched up in order to
21 link two tables together.  It literally
22 joined two tables of data together.  So you
23 have two tables and there is an identifier
24 in each table and now those tables can be
25 joined together using that identifier.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    Q.    Okay.  What about

2  reidentification, is that different, the

3  same?  How would you define that?

4    A.    Reidentification is different.

5  If you have a record where some sort of

6  identifying information has been stripped

7  away, is there remaining data that can be

8  used to reestablish an identification of

9  that record.  So that could be even just a

10  single table that's taken.  If some

11  additional piece of information is supplied

12  the record may be reidentified.

13           So, for example, if there is a

14  table of app activity and it has some app

15  instance IDs in it, if there is a suspect,

16  and the suspect's phone is seized, the app

17  ID can be taken off the phone and that can

18  be used to reidentify that record and say

19  aha, this record belongs to this suspect,

20  because it has a matching instance ID in

21  it.

22    Q.    You heard counsel previously

23  talk about how Google ██████ ██████

██ ███████ ███████ █████ ████████ █████ ███

██ ██████ ████████          Assuming that is true,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    does that mean that Google is not able to

2    reidentify the user?

3         A.     No, because Google, having

4    separated them, can also put them back

5    together.  Even though they may have a

6    policy not to do that, they still have the

7    technical capability to do that, and they

8    might in fact do it under some sort of

9    external pressure or legal process.

10        Q.     In your report you refer to a

11   number of things you called Google IDs; is

12   that correct?

13        A.     Yes.

14        Q.     Is Google able to reidentify

15   users who have been given a Google ID?

16        A.     Yes.

17        Q.     And that was part of your point

18   with regard to pseudonymous versus a name

19   and how pseudonymous does not necessarily

20   mean that it is less identifying than a

21   name, correct?

22        A.     Yes, pseudonymous does not

23   mean --

24               MR. SANTACANA:  Sorry,

25        objection, vague.

                                    Page 349

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.      Pseudonymous does not mean
2  anonymous.
3      Q.      You were previously asked a
4  number of questions regarding conversions,
5  and I heard in there conversions and ad
6  promo and also Google Ads.  Am I correct in
7  understanding that in your report there was
8  more than one type of ad that was being
9  discussed with regard to conversions?
10          MR. SANTACANA:  Vague.
11     A.      Yes, so in mobile conversions,
12  there can be mobile app ads, app promotion
13  ads.  We talked about two different kinds,
14  the app install ad and the app engagement
15  ad, and those can have conversions that are
16  tracked.
17          But there is something that is
18  even let's say more common and bigger,
19  there are display ads that appear inside of
20  apps and those can also lead to
21  conversions, okay?  So that they track --
22  so, for example, someone is in an app, they
23  see a display ad, they click it, and some
24  data is recorded, the app interaction data
25  is recorded, and then later on that person

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  goes to the website of the advertiser and

2  makes a purchase, and that conversion is

3  recorded, okay?  So there can be

4  conversions going out of the app world and

5  there can be conversions coming in to the

6  app world.

7       Q.     Right.  And then for display

8  ads, whether or not Google can attribute a

9  conversion event within the conversion

10 window absolutely makes a difference to its

11 bottom line; isn't that correct?

12      A.     Yes.  I have testified about

13 that, that if the conversions are not

14 trackable, then the advertiser won't want

15 to pay for the ad.

16      Q.     When you say pay for the ad,

17 how are the different ways in which an ad

18 can be paid?

19      A.     The ad --

20      Q.     And I'm talking about display

21 ads, not, you know, like a search ad or

22 something else that may be a nondisplay ad

23 within the network.

24      A.     Well, so it gets complicated

25 because display ads can be paid for.  In

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   the past there have been methods of bidding
2   on them by paying for the click or paying
3   for a thousand impressions or paying for a
4   conversion, and there is also automated bid
5   strategies which I think I have documented
6   in one of these appendices that the
7   automated bidding is a heavily-used
8   feature, which is only available in fact if
9   you use the Google Analytics for conversion
10  tracking. So there are a variety of ways
11  to pay.
12          But for the advertiser,
13  commonly conversions are the key
14  performance indicator of the advertising
15  campaign, is it converting. And if
16  conversions are not tracked, then the
17  advertiser is not going to want to pay for
18  the ads.
19      Q.    So in your experience, have you
20  seen within Google's display ad system a
21  Google customer allowing a third-party
22  attribution to be the ultimate verifier as
23  to whether or not that advertiser would pay
24  Google or not?
25      A.    I haven't seen that. For the

Page 352

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    automated bid strategies, you have to use
2    Google Analytics.
3        Q.    Probably my last area before I
4    turn it back to Mr. Santacana, and then I
5    will reserve my right to do a redirect,
6    with regard to the class members in this
7    case, whether they have WAA off or not,
8    Google treats them all the same with regard
9    to whether or not that data is collected;
10   is that correct?
11              MR. SANTACANA:  Vague.
12       A.    Yes.  When a user has WAA
13   and/or sWAA off, they are all treated the
14   same way.  Google collects the data
15   regardless for all the people.
16       Q.    Actually, I have one more
17   question.  You reviewed Mr. Black's report;
18   isn't that correct?
19       A.    Yes.
20       Q.    Did you see Mr. Black do any
21   type of sampling across Google's data at
22   all?
23       A.    No.
24              MR. MAO:  Back to you,
25   Mr. Santacana.  I reserve my right to

Page 353

1           do a further redirect.

2     EXAMINATION BY MR. SANTACANA:

3           Q.     Mr. Hochman --

4                  MR. MAO:  By the way, if you

5           are looking at appendices that is not

6           part of what you give him --

7                  MR. SANTACANA:  I'm not.

8                  MR. MAO:  I ask that you put

9           that in the record.  Thank you.

10          Q.     I have a question about one of

11    the last questions you were just asked.

12    The question was "Have you seen within

13    Google's display ad system a Google

14    customer allowing a third-party attribution

15    to be the ultimate verifier as to whether

16    or not that advertiser would pay Google or

17    not?"

18                 I have to confess, I don't

19    understand that question.  Your answer was

20    "I haven't seen that.  For the automated

21    bid strategies, you have to use Google

22    Analytics."

23          A.     Right.  In other words, if you

24    are paying for conversions or acquisitions

25    app, you know, if you have -- if you are

                                    Page 354

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    trying to pay for an acquisition, CPA, you

2    have to use Google Analytics to track that

3    conversion.  I'm not aware of Google

4    accepting third-party conversion data for

5    that purpose.  And also, likewise, for the

6    automated bidding, you have to use Google

7    Analytics to take advantage of automated

8    bidding.

9        Q.    I see.  So what you are saying

10   is that there are certain types of methods

11   of bidding or measuring performance of ad

12   campaigns that Google only permits

13   advertisers to do when they are using

14   Google Analytics?

15       A.    Yes.

16       Q.    And there are other types where

17   they can use Google Analytics or something

18   else?

19       A.    Yes.

20       Q.    Okay.  I understand now.  All

21   right.

22            Mr. Mao asked you about

23   appendices that are not in this paper

24   volume I handed you at the start of the

25   day, right?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          A.     Yes.

2          Q.     And I think he asked you

3    something like once you have those other

4    appendices, you are going to be able to

5    answer some of the previous questions you

6    weren't able to answer, and you said yes.

7    Do you recall that?

8          A.     Yes.

9          Q.     I just want to be clear,

10   because I don't want to have to spend

11   another seven hours with you, you are not

12   saying that any question you weren't able

13   to answer today you could somehow magically

14   answer if I give you all of the Excel

15   files, right?

16               MR. MAO:  Objection,

17        argumentative.  Go ahead, answer.

18         A.     There were certain questions,

19   there were select questions where if I were

20   to have those in front of me I would be

21   able to answer them.

22         Q.     Which ones?

23               MR. MAO:  Can we just say the

24        ones that he said he wanted to look at

25        the appendices?

                                   Page 356

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.      So there was a question about
 2   have you ever performed a join.
 3        A.      Yes, and that is in Appendix
 4   H2, and while we were off the record I
 5   showed you that file and showed you how
 6   that worked and I think you accepted my
 7   explanation.
 8        Q.      And there was a question about
 9   IP addresses.
10        A.      Yes, and I think I pointed
11   to --
12        Q.      Just yes or no, please.
13        A.      I'm sorry.
14        Q.      That was -- I'm just trying to
15   get the list.  That's another question you
16   could have answered if you had had the
17   Excel spreadsheets?
18        A.      I think so.
19        Q.      Okay.  And then --
20        A.      I haven't seen them yet so I'm
21   not 100 percent sure, but I did mention the
22   IP address question, I did have a reference
23   to it in the report, so I think if you look
24   around there, it may actually have the
25   actual appendix that we need.
```

Page 357

CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1      Q.      Okay.  And we will get to that.
 2   You're not representing that, apart from
 3   those two questions you had promised to
 4   look into, and we'll look at the Excel
 5   sheets, there aren't any other questions
 6   today that you said I don't know or I can't
 7   answer that where you're now representing
 8   if you had the Excel sheets you could now
 9   answer them?
10      A.      I'm not sure I should be closed
11   off there, because there might be something
12   else we're just not thinking of right now.
13   But essentially if later on you were to
14   come in some motion and assert Mr. Hochman
15   didn't know the answer to this question and
16   then we answer and say well, the answer is
17   right here in this document that wasn't
18   shown to him during the deposition, you
19   should accept that.
20      Q.      See, there is a problem with
21   that, which is at any point today you could
22   have said the answer is in this part of my
23   report and if I checked it I could give you
24   the answer.  So now I have to comb the
25   record to find every time you said I don't

Page 358

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  know and determine whether or not that was

2  because you didn't have Excel sheets in

3  front of you or if that was because you

4  don't know and you are closing yourself off

5  as to your knowledge, which I think you did

6  legitimately as to a number of things.

7           So I just -- I'm kind of stuck

8  in a difficult position here where you are

9  ending this seven-hour deposition by saying

10 well, if you had just given me some stuff

11 that I authored that you didn't give me

12 then I could answer all your questions.

13          So I have got a list of two

14 questions.  Can you think of any other

15 questions that you weren't able to answer

16 today but if I were to hand you the other

17 appendices of your report which are Excel

18 spreadsheets that you would now be able to

19 answer them?

20     A.     It is difficult for me to

21 answer that question without having those

22 sheets in front of me to remind me what's

23 in them, because I'm not looking at them

24 and I don't recall off the top of my head

25 what's in, is it B and C and --

1      Q.    Okay.  So you want me to just

2  mark all of them and then you're going to

3  look at them to see if there is any

4  other -- because, look, you and your

5  lawyer, right, you talked about what you

6  were going to do for this redirect.  This

7  doesn't need to be overly complicated.  I

8  just need to understand if you came in here

9  to talk about these two questions in

10  Appendix H2 or if you are reopening the

11  entire deposition.

12           MR. MAO:  And just to be clear,

13      this, like what's in the appendices, is

14      not something that we knew until he

15      started looking through everything and

16      trying to take an inventory.

17           MR. SANTACANA:  I'm not saying

18      you are trying to trick me.  I'm saying

19      it is his expert report, not mine.

20           MR. MAO:  Well, yeah, come on.

21      It is part of the preliminary

22      instructions that this is not a memory

23      test.  So let's try to find a way to

24      fix it.  How do you propose that we fix

25      it?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1         A.      I think you can look at the
 2    record and there are times where I said I
 3    don't know or I don't have a way to do
 4    that.  There are some that are pretty clear
 5    that it is just I don't know.
 6         Q.      I agree.
 7         A.      There are some that I think it
 8    is in there somewhere, it may be in the
 9    report, and I can't find it.  So if I said
10    it may be in the report and I can't find it
11    that is indicating that it might be in one
12    of these pieces that hasn't been introduced
13    yet, and I think I was pretty clear when I
14    answered to distinguish between I don't
15    know versus I think it may be somewhere in
16    there, and if it's in the report, it is,
17    and I don't know exactly where it is.  So I
18    gave two different kinds of answers, so I
19    think you can look at that and it should be
20    pretty clear.
21         Q.      Okay.  I will -- I will think
22    on that.  Thank you for that answer.  I
23    appreciate it.
24              MR. MAO:  I'm totally fine with
25         taking a break so that if you want to
```

Page 361

```
 1        get that in order.
 2               MR. SANTACANA:  Yeah, let's go
 3        off for a second.
 4               THE VIDEOGRAPHER:  The time is
 5        8:20 p.m.  We are off the record.
 6               (Recess taken.)
 7               THE VIDEOGRAPHER:  The time is
 8        8:23 p.m.  We are back on the record.
 9   BY MR. SANTACANA:
10        Q.     Mr. Hochman, I have uploaded
11   all of these Excel files that were part of
12   your report, I think.  I have done my best
13   anyway.  None of them are currently marked.
14   I just threw them all in that marked
15   exhibits folder.  We will deal with that
16   later.  But you can see their titles.  Some
17   of them are quite voluminous.  What I want
18   you to do is just take a look at their
19   titles for a moment to refamiliarize
20   yourself with what each one is.
21        A.     Yes.
22        Q.     Let me know when you're done.
23        A.     Okay.
24        Q.     Okay.  Sitting here right now,
25   can you recall any questions from the day
```

Page 362

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  that you were unable to answer that you

2  would now be able to answer given your

3  access to these Excel files other than the

4  two questions you already listed for me?

5       A.     Nothing immediately comes to

6  mind.

7       Q.     Okay.  So we will get to H2 in

8  a minute.  You had a colloquy with your

9  attorney about reidentification as

10 distinguished from joinability.

11      A.     Yes.

12      Q.     I understand the difference, I

13 think, of what you defined to be

14 reidentification is what you defined to be

15 joinability.

16            My question is, that definition

17 of reidentification doesn't appear, I don't

18 think, in your report, or really any

19 mention of it in your own words, though you

20 do quote one witness as using the word.  So

21 I'm trying to just process like in your

22 mind what relevance does that distinction

23 have to your expert opinions in the case.

24      A.     Well, throughout the day today

25 I haven't been using that word because it

1   is a little bit jargony.

2        Q.      Well, and because you didn't

3   use it in your report.

4        A.      Well, but I talked about -- I

5   talked about it.  I talked about the idea

6   that the data that includes identifiers

7   someone can extract an identifier from a

8   phone and they can now match it to the

9   data.  So joinability is like taking two

10  pieces of data and putting them together,

11  whereas reidentification is you have some

12  external source of knowledge and you

13  combine it with a piece of data and now you

14  have reidentified the data.

15       Q.      Got it.  Are you opining in the

16  case that Google has engaged in

17  reidentification of sWAA data?

18       A.      No, I'm not saying that Google

19  is doing this.  I'm assuming that Google

20  has the best intentions here, but that the

21  problem is from threat actors or external

22  pressure applied to Google.  Some foreign

23  government goes and puts pressure on Google

24  to release some data or something else

25  happens that causes that data to go out of

Page 364

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   Google's control and somebody else is
 2   exploiting it, and of course, I mean, there
 3   is always insider risk, and maybe Google
 4   changed its policy, maybe Google is nice
 5   today but they become evil in the future.
 6        Q.    Okay.  So on that subject, you
 7   said something about Google having
 8   separated them, "them" being I guess GAIA
 9   logs and non-GAIA logs, they can put them
10   back together.  Do you recall that?
11        A.    Yes.
12        Q.    And I think you said, for
13   example, under some type of legal pressure.
14   Do you recall that?
15        A.    That's a possibility, sort of a
16   risk as a security technologist that one
17   would analyze and recognize.
18        Q.    Just to be clear, you do not in
19   this case render the opinion that Google
20   has for any particular member of the class
21   or named plaintiff put them back together
22   under legal pressure or for any other
23   reason?
24        A.    No, I haven't given that
25   opinion.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1      Q.     Okay.  Then you guys talked

2   about mobile app ads and display ads.  I

3   just want to clarify something.  So mobile

4   app ads is a buy-side concept, right, it is

5   a type of ad campaign that an ad buyer

6   would run?

7      A.     Yes.

8      Q.     And then when you were talking

9   about display ads, was that whole back and

10  forth about from the sell side perspective,

11  if you are selling space in your app?

12              MR. MAO:  Objection to the form

13      of the question.  Go ahead.

14      A.     Yeah.  So I think that's a very

15  nice way of putting it, that as an app

16  publisher, you could be a buyer of

17  advertising and want to track conversions

18  for your campaigns to drive people into

19  your app and use it, but you also could be

20  hosting ads within your app and that

21  conversion needs to be tracked for those

22  ads so that the advertiser is willing to

23  continue paying for that space.

24      Q.     Right.  And I think if you

25  could look at paragraph 281 of your main

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  report, you outline two attribution

2  scenarios.  Does that ring a bell?

3       A.     Yes, so that I think roughly

4  corresponds to these two scenarios.

5       Q.     Okay.  So I think, then, what

6  you're saying is from the sell-side display

7  ad perspective, like AdMob as an example of

8  display network on the sell side, from that

9  perspective, the measurement that is

10  occurring is the measurement of the ad

11  render or click or impression, right, even

12  if -- even if that ad buyer uses something

13  other than analytics to measure

14  conversions?

15            MR. MAO:  Objection, incomplete

16       hypothetical, misstates his testimony,

17       incomplete.  But go ahead.

18       Q.     If I'm confused, please

19  straighten me out.

20       A.     You might be.  I'm not sure I

21  fully understand it.

22       Q.     Okay.

23       A.     So maybe you want to reask

24  that.

25       Q.     Well, scenario 1, "When an ad

Page 367

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  is served through the GMA SDK in a

2  third-party publisher app, Google's ability

3  to connect this ad with a later conversion

4  event relies on Google's collection of app

5  ads data (ad impressions, clicks and

6  similar data) via the GMA SDK and the

7  saving of this data in its logs for later

8  attribution."

9          Do you see that?

10     A.    Sorry, I just stumbled across

11 the answer to another unanswered question,

12 so I was distracted.  I'm very sorry.

13     Q.    That's all right.  Enlighten

14 me.

15     A.    ████ ██ █ ██ ████ ███ ███
██ ██ ███ ███ ██ ██ ███ ██ ███ ████
██ ████ ██ ██ ███ ████ ████ ███
██ █████ █ █ ███ █ ████ ███ ████ ████
██ ██ █ ██ ███ █ ████ ████
██ ████ ██ ███ ██ ████ ████
██ ████ ███ █ ████ ███ ████ ████
██ ████ ████ ██ █ ███ ████ █
██ ███ ████ ██ █ █ ████ █
██ ██ ██ ███ ███ █ ██ ███
██ ███ ███ ███ ████ ███ ███ ██

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    these are some of the ones I was thinking

2    of.

3          Q.     Those are all GAIA logs, right?

4          MR. MAO: ███████ ███████ ██ ████

     ██   ███████████ ███ ██ ████████ ███████ ██████

     ██   ███████ ██████ ██ ███████ ███████ ██████

     ██   ███████ ██████

8          Q.     Right.  The ones that are

9    listed as ████████ --

10         MR. MAO: ████ █ ██████ ██████ ██

     ██  █ ████████ ███████ ██ █████ ██████ ████████

     ██  ██████ ██████ ██████ ██████ ██████ ██ ███

     ██  ███████ ██████ ██████ ██ █ ███████████

     ██  ██████ ████████ █

15         MR. SANTACANA:  Oh,██ ███ ███

16   ██████ ██████ ██████ ████████ ██████ ██████

17         MR. MAO: ██████ ██ ██████ ██ ███

     ██  ██████████ █

19         MR. SANTACANA:  Got it, okay.

20   Let's stick with that for a second.  We

21   will come back to 281.

22         Q.     ████ █████ ██ ██ █████ ██ ████

     ██  █████████ ████ ██████ ████ ████ ███████

     ██  ███████ ██████ ██████ ██████ ██ ████

     ██  ███████ ██████ ██████ ████████ ██████ ████

                                    Page 369

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ███████ ██ ████ ████ ████ ██ ███ ████

2   ██ ██████ ████ ████?

3        A.      I haven't found it yet, but

4   yeah, I take your word for it.  Yeah, I see

5   them, sorry, at the bottom -- at the top of

6   the next page.

7        Q.      Okay.  So in terms of

8   identifying class members with respect to

9   the GMA SDK, collecting and saving sWAA-off

10  data, your proposal would be to ███ ███

Page 370

CONFIDENTIAL - ATTORNEYS' EYES ONLY

9            THE VIDEOGRAPHER:  Just a heads

10      up, Counsel, ten minutes remaining.

11            MR. SANTACANA:  Thank you.

12      Q.    So let's look at 281.

13      A.    Okay.  Sorry about my

14  distraction there.

15      Q.    That's all right.  Paragraph

16  281, we were talking about ad impressions,

17  clicks and similar data in scenario 1.

18      A.    Yes.

19            MR. MAO:  I thought that was

20      scenario 2.  That's okay, whatever you

21      want to ask.

22      Q.    And then scenario 2 appears to

23  be focused on analytics data and the

24  recording of a conversion event as opposed

25  to an ad interaction; is that fair to say?

                                    Page 371

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1          A.      Hold on.  Let me just read it,
2    because it has been a long day.
3                  (Witness perusing document.)
4          A.      So this is -- scenario 2 is a
5    conversion coming in to app world and
6    scenario 1 is an ad served in the Google
7    Mobile Ad SDK, or via the Google Mobile Ad
8    SDK, which then converts somewhere else,
9    like on a publisher's web or app.  So
10   someone sees an ad, for example, for Amazon
11   and they go to the Amazon website or the
12   Amazon app and make a purchase.
13         Q.    ██ ████████████  ████████  ██████████
     ██  ████ ████ █ ████ █ █ ████ ████  ████████ ██████ █████████
     ██  ██████ ████ ████    ████ ████ ███ ████ ████ ████
     ██     ██
     ██       ████   ██████ ████ █ ████        ██████
     ██       ████ ████████     █████ ████ ████ ████ █████
     ██   ██████ ██████  █████ ██████ █ ████ ████ ████ ████
     ██   ██████ ██████ █████ ████ ████ ████████
     ██     ██   ██████ ████████ ███████ █████████ ████ █
     ██   ██████ ████ ██ █ ████ ████
23         Q.      Sure.
24                 (Witness perusing document.)
25         A.      It is a little bit hard to see
```

Page 372

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   on this tiny screen.  Let me see if I can
2   open -- I might need to download this and
3   open it in Excel.  Let me do that.  Because
4   in Exhibit Share it's not clear enough.
5   Okay, I'm getting nagged by Microsoft.
6   Yes, this is it.
7        Q.      There is something like, I
8   don't know, a dozen joins in here I think,
9   a dozen pairs that you lined up of data.
10  Do you see what I'm talking about?
11       A.      I mean, I'm not sure that the
12  count is exactly right, because, okay, so
13  there's three lines per pair and it starts
14  at line 2 and it goes down through line 69,
15  so maybe there's more than that.
16       Q.      Okay.
17               MR. MAO:  Sorry, time check
18       real fast?
19               THE VIDEOGRAPHER:  Total time,
20       five minutes and nine seconds
21       remaining.
22       Q.      So you received data from
23  Google that was quite voluminous relating
24  to your test devices, I think that's what
25  you call it in your report.  Was this all

Page 373

1 | of the joins you were able to perform or
2 | did you stop trying at some point once you
3 | hit a certain threshold?
4 |     A.    I mean, these are the -- these
5 | are the joins that we did here and I'm just
6 | taking a quick look at the data to refresh
7 | my memory. I mean, I think these are the
8 | ones that we were able to do.
9 |     Q.    I noticed that in column F you
10 | have under WAA/sWAA, it is listed as on for
11 | all of these joins. Do you see what I'm
12 | talking about?
13 |     A.    I see that.
14 |     Q.    Were you able to perform any
15 | joins of GAIA and non-GAIA data for
16 | sWAA-off data?
17 |     A.    I think I would have to go back
18 | and review everything again to clarify
19 | that. I'm sorry, I just -- I need to dig
20 | through this again to refresh my memory.
21 |     Q.    Okay. But this does not
22 | document any sWAA-off joins that you were
23 | able to perform, right?
24 |     MR. MAO: Objection, misstates
25 |     the document. Go ahead.

Page 374

1      A.      Just let me have another minute
2  with this, okay?
3      Q.      Well, let me ask you this a
4  different way for a second.  If you're
5  trying to perform a join at the event level
6  as you've done here, matching up two events
7  in two different logs to each other, right,
8  one in a GAIA log, one in a non-GAIA log,
9  isn't it by definition only possible if the
10  event was a sWAA-on event, because if it
11  was a sWAA-off event it wouldn't be in a
12  GAIA log?
13      A.      Yes, of course.  If sWAA is off
14  it's not going to be in a GAIA log.  ████ █
   ████ ████ ████ ████ ████ █████ ████ ████
   ████ ████ ████ ████ ████ █████████ ████
   ████ ████ ██ ████████ ██ █ ████ ████  Now, if
18  someone has WAA and sWAA on and they do
19  some activity and this is logged in both
20  places, now it can be joined.
21      Q.      Right.
22      A.      Now, if they turn WAA and sWAA
23  off --
24      Q.      Then subsequently they could be
25  reidentified?

                                    Page 375

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.      Subsequently they could be
 2   reidentified because there will be an
 3   overlap between the different entries.
 4        Q.      So your project here was to
 5   show that you could create a mapping
 6   between GAIA and device ID?
 7        A.      Yes, and that later could be
 8   used to reidentify other stuff after sWAA
 9   had been turned off.
10        Q.      Now this is from the ████████
11   ████████████ █████, right?  Look at the title.
12        A.      Yeah, hold on a second.  Yes.
13        Q.      Now, you're aware that Google
14   altered the ████████ ██████████████ ██████
15   specifically for this litigation in order
16   to provide you with these pseudonymous
17   entries, device IDs otherwise encrypted in
18   that log, right?
19        A.      Yes.  Of course Google,
20   whatever they encrypt, they can also
21   decrypt.
22        Q.      Well, actually, I don't know
23   that that's exactly correct.  Google
24   altered the way this data was logged ex
25   ante and then you started your experiment
```

Page 376

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   process, and only during that time, because
 2   there was a special field that referred to
 3   the Rodriguez litigation in the log, was
 4   Google even able to give you those entries.
 5        A.    Yes, so this is getting deeper
 6   and probably I need to go back and read
 7   everything around this to make sure I
 8   have -- to make sure I have it clear.  I
 9   don't know that in the next three minutes
10   I'm going to get clarity for you.
11              MR. MAO:  Do you want to save a
12        minute or two?  Because I'm going to
13        have questions.
14              MR. SANTACANA:  What's that?
15              MR. MAO:  Do you want to save a
16        minute or two?  Because I'm going to
17        have questions on these two areas you
18        are asking about.  I'm just letting you
19        know.  Your choice.
20              MR. SANTACANA:  I don't
21        understand what you're saying.  You are
22        saying you want me to ask more
23        questions after you ask questions?
24              MR. MAO:  It's up to you.  I
25        have got two questions on your
```

Page 377

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          questions.
 2                  MR. SANTACANA:  Sure, go for
 3          it.
 4   EXAMINATION BY MR. MAO:
 5          Q.     All right, sorry, so back on
 6   the record, this is Mr. Mao.
 7                  On this issue of
 8   reidentification, I just want to make sure
 9   I understand.  You agree there is a
10   difference between trying to map two
11   tables, i.e. join, versus reidentifying a
12   user, right?
13          A.     Yes.
14          Q.     When a user has a persistent
15   identifier, regardless of whether we call
16   it a pseudonymous identifier or not, that
17   user can be readily reidentified, right?
18                  MR. SANTACANA:  Vague,
19          incomplete hypothetical.
20          A.     It is often the case that the
21   user can be reidentified.  It is not
22   necessary to do a join to reidentify them.
23          Q.     Okay.  And that is a point in
24   which you made in the report and that you
25   believe you made clear today in this
```

Page 378

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   deposition; is that correct?

2        A.    Yes.

3        Q.    Second thing, Mr. Santacana

4   asked you a number of questions regarding

5   the buy/sell side of app promo and display

6   ads, assuming that they are -- let's just

7   assume that they are different, okay?  You

8   agree in both of those transactions there

9   is both a buy and a sell side on both

10  sides?

11       A.    Yes.

12       Q.    Okay.  So when we're talking

13  about display ad side, yes, the app

14  developer is tracking attribution for ads

15  that are sold but there is also an

16  advertiser that's tracking -- or being

17  given tracking, right, for the app, sorry,

18  for the ad that was bought; isn't that

19  correct?

20       A.    Yes.

21       Q.    Okay.  And Google is tracking

22  both of those transactions when we are

23  talking about things like AdMob, for

24  example; is that correct?

25       A.    Yes.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1      Q.      So when we were asking

2   questions regarding the ability to do

3   attributions and we were asking about

4   whether or not Google would allow a

5   third-party competitor to come in and do

6   the attribution, you understood that that

7   applied equally to the buy and sell side

8   for display ads; is that correct?

9      A.      Yes.

10      Q.      Okay.  So here is the reason

11   why I'm asking this, okay?  For the

12   purposes of these conversion measurements,

13   whether it be on the buy side or the sell

14   side, okay, what is your typical conversion

15   window for a display ad as to when, for

16   example, you can have a conversion by

17   action, a cost per action, CPA?

18      A.      I mean, I think it may be

19   redefinable, but the typical window is

20   something like seven to 30 days.  But I

21   think you maybe could change that too.

22      Q.      Okay.  So within that seven to

23   30 days, is there any doubt as to whether

24   or not Google reidentifies that user if

25   there is a conversion event?

Page 380

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              MR. SANTACANA:  Objection,
 2       vague, misstates prior testimony.
 3       Q.     Okay.  Well, I'm just going on
 4  definitions right now, but go ahead.
 5       A.     Look, so if a user comes in and
 6  clicks on an ad and then 15 days later they
 7  convert, Google has to reidentify that user
 8  in order to say oh, it's the same person
 9  who clicked on this ad is the person who
10  has made the conversion.
11       Q.     Okay.  Last question and then I
12  will hand it back to Mr. Santacana for
13  whatever the remaining balance of his time,
14  give him a chance.
15              You were asked a lot of
16  questions today about ad personalization
17  and then we also talked about attribution,
18  okay?  Is ad personalization for display
19  ads the same thing as ad attribution for
20  display ads?
21       A.     No.
22       Q.     How are they different?
23       A.     Personalization is selecting an
24  ad for someone based on their, according to
25  Google's definition, based on some data
```

Page 381

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    that is saved in their GAIA logs, in the
2    Google account, what Google calls the
3    Google account.
4              Ad attribution is tracking
5    conversions, and conversion can be
6    allocated to a single ad, but sometimes
7    conversions are allocated to a different
8    conversion attribution model to multiple
9    ads, because the person might click on
10   three or four ads and then convert and some
11   credit is given to each one of those ads.
12        Q.    Okay.  Just so that we
13   understand the significance of your word
14   "credit," and then I'm handing it off,
15   okay, handing you off, the difference in
16   credit to Google, their bottom line, right,
17   between an impression that's unattributed,
18   i.e. CPM, okay, just an impression that is
19   served, versus an attribution in which an
20   action is given, it could be millions of
21   folds in terms of the profit, right?  This
22   is like a sliver of a cent versus dollars,
23   right?  So the proportion between the two
24   in terms of attribution is millions of
25   times more; is that correct?
```

Page 382

```
 1                    MR. SANTACANA:  Calls for
 2          speculation, incomplete hypothetical.
 3          A.      I have experience buying ads
 4   and I will tell you that financial
 5   institutions will pay $300 CPA for a
 6   qualified mortgage application, 350 maybe,
 7   whereas CPMs, you know, people are paying
 8   fractions of a penny to have an ad display.
 9   So the ad that is displayed and nothing
10   happens is fractions of a penny.  The ad
11   that is displayed, someone clicks and fills
12   out a mortgage application is worth $350.
13          Q.      And that is why ad attribution
14   is important for Google for the purposes of
15   conversions; isn't that correct?
16          A.      Yes.
17                    MR. MAO:  Back to you.
18   EXAMINATION BY MR. SANTACANA:
19          Q.      You disclaimed issuing any
20   opinion on what is important to Google.
21   Are you opining now on what is important to
22   Google?
23          A.      I think that Google has said
24   that conversion tracking is very important.
25   That's part of the training that they have
```

Page 383

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    given us over the years which I have taken

2    many times.  Google says conversion

3    tracking is very important.  It is one of

4    the unique defining features of the Google

5    ads program.

6         Q.    But you are not opining as to

7    Google's intent?

8         A.    I'm not opining, I'm only

9    opining about what they have said, what

10   they have told and taught, which is that

11   attribution and conversion tracking is very

12   important.  It is a defining feature of

13   this kind of advertising.

14        Q.    And you have done nothing in

15   this case to study the difference between

16   Google Analytics for Firebase and other

17   analytics SDKs, right?

18             MR. MAO:  Objection, misstates

19        the documents.  Go ahead.

20        A.    My report doesn't address other

21   analytics packages.

22        Q.    Have you, just while we're on

23   it, have you done anything to address other

24   ads packages, like from Meta?

25        A.    My report does not talk about

Page 384

1    Meta or other ads platforms.

2        Q.    Looking back at Appendix H2 for

3    a second --

4            THE VIDEOGRAPHER:  We're at

5        seven hours.

6            MR. MAO:  Why don't you finish

7        your question.

8            MR. SANTACANA:  Oh, you are not

9        going to give me your time?

10           MR. MAO:  What do you mean?

11           MR. SANTACANA:  The time you

12       used?

13           MR. MAO:  No, no, did you count

14       my time?

15           THE VIDEOGRAPHER:  No, it is

16       separate.

17           MR. SANTACANA:  Oh, it is

18       separate.

19           MR. MAO:  Don't question me on

20       goodwill.  I could stop it here.  I

21       want you to finish your question.

22           MR. SANTACANA:  Well, I didn't

23       know he had separated your time.

24           MR. MAO:  Go ahead, finish your

25       question.

                                    Page 385

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1         Q.      Were you able to perform any
 2   joins like the ones in the tab we were
 3   talking about in H2 using the named
 4   plaintiffs' data, not test device data?
 5         A.      I have to go back to the record
 6   and look and see, because, again, the
 7   report speaks for itself.
 8               MR. MAO:  Your time is up.
 9         Your time is up.
10               MR. SANTACANA:  Well, he is
11         asking me for clarification.
12         Q.      It says --
13               MR. MAO:  Let me just get my
14         objection then.  The report speaks for
15         itself.  But go ahead and ask your
16         question.
17         Q.      In H2 it says Android 1 and
18   Android 2 are the JH phones that you found
19   matches on GAIA and pseudonymous.  Neither
20   of those were nomenclature you used for a
21   named plaintiffs' phone, right?
22         A.      Correct.
23               MR. SANTACANA:  Okay, that's
24         all I have.
25               MR. MAO:  Thank you.
```

Page 386

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              THE VIDEOGRAPHER:  Stand by.
2         The time is --
3              MR. SANTACANA:  I will just do
4         it on the record.  I will designate
5         this attorneys' eyes only.  Did you
6         want to cross-designate as to I think
7         very briefly we talked about one of the
8         named plaintiffs' e-mail addresss?
9              MR. MAO:  Yeah, but you
10        already -- yeah, I mean, I'll agree to
11        that.
12             Sorry, just for the record, do
13        we have now all the appendices in
14        there?  Can we just call that Exhibit
15        4?
16             MR. SANTACANA:  5 I think.
17             MR. MAO:  5, let's call it
18        Exhibit 5.  Jointly?
19             MR. SANTACANA:  All of them
20        are Exhibit 5.
21             MR. MAO:  I'm fine with like
22        5A, B, C, D, that way you have them
23        all.  Is that all right?
24             MR. SANTACANA:  Sounds good.
25             MR. MAO:  Thank you.
```

Page 387

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           (Hochman Exhibits 5A through 5J
2       marked for identification.)
3           THE VIDEOGRAPHER:  Stand by.
4       The time is 8:53 p.m. and this
5       concludes today's testimony given by
6       Jonathan Hochman.
7
8           [TIME NOTED:  8:53 p.m.]
9

          _____
10          JONATHAN HOCHMAN
11

   _____
12  Subscribed and sworn to
   before me this _____
13  day of _____, 2023.
14  _____
       Notary Public
15
16
17
18
19
20
21
22
23
24
25

                              Page 388

```
1              I N D E X
2
   WITNESS          EXAMINATION BY          PAGE
3
   HOCHMAN        SANTACANA          4, 354, 383
4                 MAO                344, 378
5
            E X H I B I T S
6
   HOCHMAN          DESCRIPTION          PAGE
7  Exhibit 1   Expert Report of Hochman    11
   Exhibit 2   Appendix X6 to Black        67
8              Rebuttal Report
   Exhibit 3   Document entitled           71
9              Activity Controls
   Exhibit 4   Privacy policy from        212
10             May 2018
   Exhibit 5A  Appendix A to Hochman      388
11             report
   Exhibit 5B  Appendix B.1 to Hochman    388
12             report
   Exhibit 5C  Appendix B.2 to Hochman    388
13             report
   Exhibit 5D  Appendix B.3 to Hochman    388
14             report
   Exhibit 5E  Appendix C to Hochman      388
15             report
   Exhibit 5F  Appendix DA to Hochman     388
16             report
   Exhibit 5G  Appendix F to Hochman      388
17             report
   Exhibit 5H  Appendix H.1 to Hochman    388
18             report
   Exhibit 5I  Appendix H.2  to Hochman   388
19             report
   Exhibit 5J  Appendix J to Hochman      388
20             report
21 (Exhibit 4 was retained by counsel.)
22
23
24
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    DIRECTIONS NOT TO ANSWER
2    Page      Line
          (NONE)
3

4

5    REQUESTS
6    Page      Line
          (NONE)
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 390

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                    CERTIFICATION

2

3     I,   TODD DeSIMONE, a Notary Public for

4   and within the State of New York, do hereby

5   certify:

6     That the witness whose testimony as

7   herein set forth, was duly sworn by me; and

8   that the within transcript is a true record

9   of the testimony given by said witness.

10    I further certify that I am not related

11  to any of the parties to this action by

12  blood or marriage, and that I am in no way

13  interested in the outcome of this matter.

14    IN WITNESS WHEREOF, I have hereunto set

15  my hand this 26th day of June, 2023.

16

17

18          TODD DESIMONE

19

20              *       *       *

21

22

23

24

25

                                    Page 391

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              E R R A T A   S H E E T
        V E R I T E X T / N E W   Y O R K   R E P O R T I N G ,   L L C
2
   C A S E   N A M E :   R O D R I G U E Z   v .   G O O G L E
3  D A T E   O F   D E P O S I T I O N :   6 / 2 6 / 2 3
   W I T N E S S '   N A M E :   J O N A T H A N   H O C H M A N
4
   P A G E / L I N E ( S ) /      C H A N G E              R E A S O N
5  ____/_____/_____/_____
   ____/_____/_____/_____
6  ____/_____/_____/_____
   ____/_____/_____/_____
7  ____/_____/_____/_____
   ____/_____/_____/_____
8  ____/_____/_____/_____
   ____/_____/_____/_____
9  ____/_____/_____/_____
   ____/_____/_____/_____
10 ____/_____/_____/_____
   ____/_____/_____/_____
11 ____/_____/_____/_____
   ____/_____/_____/_____
12 ____/_____/_____/_____
   ____/_____/_____/_____
13 ____/_____/_____/_____
   ____/_____/_____/_____
14 ____/_____/_____/_____
   ____/_____/_____/_____
15 ____/_____/_____/_____
   ____/_____/_____/_____
16 ____/_____/_____/_____
   ____/_____/_____/_____
17 ____/_____/_____/_____
   ____/_____/_____/_____
18 ____/_____/_____/_____
19
              _____
20             J O N A T H A N   H O C H M A N
21 S U B S C R I B E D   A N D   S W O R N   T O
   B E F O R E   M E   T H I S _____D A Y
22 O F _____ ,   2 0 2 3 .
23 _____
         N O T A R Y   P U B L I C
24 M Y   C O M M I S S I O N   E X P I R E S _____
25
```

Page 392

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    EDUARDO SANTACANA, ESQ.

2    esantacana@willkie.com

3                                      June 29, 2023

4    RE: RODRIGUEZ vs. GOOGLE LLC

5    June 26, 2023, JONATHAN HOCHMAN, JOB NO. 5971096

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, noting the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21      Counsel - Original transcript to be released for signature

22      as determined at the deposition.

23   __ Signature Waived – Reading & Signature was waived at the

24      time of the deposition.

25

                                              Page 393

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, noting the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9   _x_ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 394

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1   RODRIGUEZ vs. GOOGLE LLC

2   JONATHAN HOCHMAN (#5971096)

3                  E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____      _____

24  WITNESS                              Date

25
```

Page 395

**[& - 25th]**

| | | | |
|---|---|---|---|
| **&** | 93:14 | **162** 280:19 | 212:9,17 |

**&** 1:21 2:7,13
3:16 393:23
394:9

**0**

**04688** 1:6

**1**

**1** 11:20,24
107:16 137:14
258:7 320:15
337:10 345:5
347:1 367:25
371:17 372:6
386:17 389:7
394:1
**1,000** 232:19
**10** 107:4
**100** 154:13
155:3,24
192:18 293:19
319:14 357:21
**101** 276:14,16
276:18,20
**104** 36:14
38:22 39:23
42:3,13 43:21
47:23 64:9
69:16 73:15
74:23 75:13
77:8 78:3 79:6
81:12,19 84:2
87:20 88:22,22
89:21 90:14
91:16,24 93:2

93:14
**107** 368:23
369:22 370:12
**108** 368:24
370:12
**10:52** 47:11
**10:53** 47:14
**11** 389:7
**111** 36:4,9
**115** 170:14
**116** 257:17
**11:12** 66:18
**11:30** 160:10
**11:34** 66:21
**11:36** 67:14
**11:42** 67:19
**12** 11:11,23
**12:48** 128:5,6
**136** 36:11 81:2
81:9
**137** 236:25
**14** 285:21
287:2 314:11
**144** 210:21,21
**147** 324:5
328:23,24
**15** 107:4
153:19 156:1
199:12 201:13
381:6
**150** 319:20
**16** 330:9
**16,009** 255:22
**16,163** 255:21

**162** 280:19
281:7
**163** 276:12
281:9,13
**164** 280:19
281:9 283:8
**165** 280:20
281:10 283:9
**168** 33:10
34:16 105:2
107:17
**182** 310:18
**183** 148:17
**1960s** 206:1
**1984** 92:21
**1:34** 129:2,5

**2**

**2** 67:2,16,22
72:22,25 85:17
86:6,25 87:10
319:12,14,20
371:20,22
372:4 373:14
386:18 389:7
**2.1.2** 132:25
147:4
**20** 56:5 58:7
**2005** 341:24
**201** 2:7
**2016** 51:18
**2018** 66:24
68:12,20,21
73:12 76:1,9
77:1,24 78:10
79:10 112:16

212:9,17
332:19 333:10
389:10
**2019** 154:7
292:25 293:12
299:12,17
300:2,5,6
332:19 333:10
**202** 241:15,15
**2020** 332:20
**2022** 68:13
293:4,15
**2023** 1:15 3:4
388:13 391:15
392:22 393:3,5
**2023-01-31**
372:14
**2025.520** 393:9
393:12
**206** 275:14
**212** 389:9
**23** 160:10
**232** 368:20
**235** 368:18
**248** 246:7
247:6,11,18,20
248:2,13
**249** 170:22
**25** 66:24
212:17 275:16
276:5
**250,000** 296:13
**251** 170:18
**25th** 76:1,9

Page 1

[26 - 71]

**26** 1:15 292:22
299:10 393:5
**269** 318:3
**26th** 3:4 391:15
**275** 191:19
**276** 190:7,9
191:3,4,18,21
**277** 189:13,18
190:4,24 191:3
191:8,22 196:6
**278** 189:12
190:4,10,12
191:6
**28** 151:13
**281** 366:25
369:21 371:12
371:16
**29** 393:3
**2:22** 173:1
**2:30** 160:11
**2:41** 173:4
**2:44** 176:20
**2:46** 176:23

**3**

**3** 71:20,21 72:1
72:13,23 73:1
75:10,19,23
76:3 77:3 78:1
80:2 82:9
87:12 258:7
292:4,5 389:8
**30** 296:8
380:20,23
394:1

**300** 383:5
**303** 237:25
238:6 240:19
240:24
**309** 249:4
**310** 248:15,16
248:20 249:10
249:15
**31st** 2:3
**33602** 2:8
**344** 389:4
**34th** 2:14
**350** 383:6,12
**354** 338:13
389:3
**357** 329:12,15
**358** 329:12
330:8 331:16
332:4
**359** 329:12
331:1 332:23
**378** 389:4
**383** 389:3
**3879** 391:17
**388** 389:10,11
389:12,13,14
389:15,16,17
389:18,19
**3:01** 189:23
**3:08** 190:1
**3:20** 1:6
**3:58** 233:2

**4**

**4** 126:11 135:6
212:11,12
258:7 292:16
387:15 389:3,9
389:21
**409** 35:21
177:7,9
**410** 35:22
**411** 108:11
109:15,16
**412** 108:11
109:16,16
**416** 130:24
132:4,7,13
144:9,10
**417** 133:2
**418** 107:21
148:8
**45** 293:25
**46** 306:5
**47** 95:7,9
**4:20** 233:5
**4:45** 251:19
**4th** 258:5

**5**

**5** 295:20
320:13 387:16
387:17,18,20
**50** 4:13
**55** 293:4,15
**56** 332:8,13,14
333:12
**5971096** 393:5
395:2

**5:00** 251:22
**5:36** 280:25
**5:41** 281:3
**5a** 387:22
388:1 389:10
**5b** 389:11
**5c** 389:12
**5d** 389:13
**5e** 389:14
**5f** 389:15
**5g** 389:16
**5h** 389:17
**5i** 389:18
**5j** 388:1 389:19

**6**

**6** 132:20,24
293:13 299:12
**6/26/23** 392:3
**60** 152:22
334:1
**60/40** 5:23
**600** 326:17
**62** 151:7,10
**63** 151:15
**67** 389:7
**69** 373:14
**6:25** 317:22
**6:45** 317:25
**6:58** 329:2

**7**

**7** 11:10
**70/30** 5:23
**71** 152:9 288:8
389:8

## [725 - accurate]

**725** 2:2
**73** 152:16
153:12
**74** 153:4 154:3
**75** 154:3,3
**787** 1:21 3:17
**7:00** 329:5
**7:16** 344:10
**7th** 2:8

**8**

**80** 109:24
**85** 153:23
308:17,18
**8:03** 344:13
**8:20** 362:5
**8:23** 362:8
**8:53** 388:4,8

**9**

**9** 11:11,23 13:1
34:13
**90** 109:24
**900** 5:2,19
**90017** 2:3
**94111** 2:14

**a**

**a.m.** 1:16 3:3
47:11,14 66:18
66:21 67:14,19
**ability** 77:17
78:25 110:5
112:5 141:22
260:5 286:9
287:2 368:2
380:2

**able** 83:19
118:4,5 134:19
141:20,24
142:11,13
145:6 159:24
159:25 167:19
175:12 209:18
210:2 217:7
242:23 243:6
248:7 265:7
297:11 313:5
334:10 335:2
346:21 349:1
349:14 356:4,6
356:12,21
359:15,18
363:2 374:1,8
374:14,23
377:4 386:1
**above** 393:6
**absence** 92:6
**absent** 83:2
89:1,4 300:11
**absolutely**
19:10 351:10
**absorbed** 27:19
**absurd** 256:1,6
**academic** 19:17
26:3 95:25
245:24
**accept** 142:17
203:15 234:9
358:19
**accepted** 357:6

**accepting**
355:4
**access** 69:2,7,9
69:23 70:18
71:10,12 79:24
98:11 101:1
121:2 126:13
166:6 202:25
203:2 236:20
363:3
**accident**
151:23 152:13
**accidentally**
162:21 236:1
**accord** 11:17
**account** 36:2
36:20 37:2,3,6
37:18,24,25
38:3,3,12,18
40:11,17 41:6
41:9,22 42:13
42:20 43:10,17
43:23 44:3,5
44:18,23 45:20
45:21,23 46:14
47:18,21 48:4
48:19,22 49:12
49:21 51:18,20
64:9,15,22
67:4 68:7,10
68:17 69:3,6,8
69:10,11,20
70:18,21,23
71:8,11,13,14
73:1,2,4,7,11

73:13 74:2,4,5
75:8,10 76:18
77:1,4 79:1
80:3,10,13,14
80:18 81:20
83:1,12 85:18
86:17 87:2,11
87:24,25 88:4
88:8,14 89:3,7
89:9,17,22
90:13,24,25
91:15,17 93:13
94:19 98:20
117:17,18
121:21 131:7
165:23 171:5
178:22 194:12
209:1,14 311:7
311:16 313:15
382:2,3
**accounting**
40:11
**accounts** 37:20
51:4 52:1
81:12 82:4,24
83:8,11 84:1
117:17,21
119:20 208:25
209:6 266:1
311:24 312:16
340:2
**accuracy** 15:16
45:10 305:1
**accurate** 13:15
14:9 45:11

Page 3

**[accurate - address]**

152:12 154:19
178:22,23
215:21 288:21
309:5 339:24
**accurately**
13:13 15:1
**accused** 250:24
**ace** 296:15
**achieve** 154:12
155:3,24
**acknowledge**
241:3
**acquire** 274:22
**acquiring**
230:4
**acquisition**
355:1
**acquisitions**
354:24
**acronym**
315:25
**acting** 122:20
**action** 4:20
239:25 240:1
252:14 260:19
260:20 272:17
327:17 380:17
380:17 382:20
391:11
**activating**
200:25
**actively** 101:9
339:25
**activities** 93:25
218:1 260:3

318:15
**activity** 25:8,9
25:10,14 40:12
40:12 65:21,23
71:23,24 72:9
72:12 75:5
87:12 103:18
120:17 187:13
199:6,9 201:7
203:9,14 207:2
217:12,14,20
217:22,23,24
325:14 337:4
337:16,25
348:14 375:19
389:9
**actor** 105:16
242:16
**actors** 364:21
**acts** 118:21
119:2
**actual** 21:22
46:9 138:17
175:18 199:18
313:8 321:13
357:25
**actually** 22:2,4
22:11 42:18
44:15 49:3
63:24 66:15
78:21 79:12
88:11 95:19
96:15 108:12
118:5 136:18
137:10,22

140:5,7 151:4
165:6 169:10
177:15 179:14
186:8 190:10
191:18 196:24
201:12 205:17
205:21 212:23
212:25 215:3
216:11 225:8
225:12,14
230:19 237:20
241:9 244:20
245:11,16
247:8 248:11
258:12 276:13
276:14 282:4
296:3 297:22
304:6,7 308:16
311:3 312:2
315:16,19
319:11 327:7
334:25 345:5
353:16 357:24
368:18 376:22
**ad** 190:12
191:6 196:25
197:4,20 204:8
204:12,18,22
205:14,20
206:24 207:8
207:12 217:22
220:21 221:8
223:3 231:24
264:18 287:9
288:15 289:23

290:7 291:25
293:2,5 294:12
295:8 298:18
298:20 299:12
300:13,22
350:5,8,14,15
350:23 351:15
351:16,17,19
351:21,22
352:20 354:13
355:11 366:5,5
367:7,10,12,25
368:3,5,16
371:16,25
372:6,7,7,10
379:13,18
380:15 381:6,9
381:16,18,19
381:24 382:4,6
383:8,9,10,13
**add** 51:24
**addition**
303:17
**additional**
14:22 124:12
145:5,9 190:14
217:6 262:23
327:20 348:11
370:19
**additionally**
138:23 338:2
**address** 69:5
75:1 101:14
159:13 161:25
163:1,4,5,10

**[address - advised]**

| | | | |
|---|---|---|---|
| 164:5,17 207:6 | **admitted** 249:9 | 226:13 262:9 | 351:14 352:12 |
| 234:5 238:6 | 275:16 | 288:13 289:22 | 352:17,23 |
| 243:4 247:21 | **admob** 150:4,5 | 290:4,11 | 354:16 366:22 |
| 255:23 323:3 | 150:14 152:8,9 | 292:11 294:14 | 379:16 |
| 329:8 357:22 | 152:17,18 | 294:16 295:9 | **advertiser's** |
| 384:20,23 | 153:5,6,14,18 | 301:22 302:10 | 56:22 |
| **addressed** | 153:24 154:4 | 324:20 332:5 | **advertisers** |
| 70:16 75:4 | 154:14,21 | 350:6,12,13,19 | 127:13 208:8 |
| 91:13 | 155:25 157:4 | 351:8,21,25 | 208:19 262:11 |
| **addresses** | 288:14 323:22 | 352:18 366:2,2 | 262:25 294:9 |
| 160:1,16,17,24 | 330:9 367:7 | 366:4,9,20,22 | 297:6 298:4 |
| 162:6 163:21 | 379:23 | 368:5 369:23 | 300:6 355:13 |
| 165:10 167:7 | **adopted** 113:1 | 369:24 379:6 | **advertising** |
| 174:17 213:25 | 153:24 | 379:14 380:8 | 120:6 124:11 |
| 214:3,7,16 | **adopters** | 381:19,20 | 150:7,9,10 |
| 233:9 238:20 | 153:14 | 382:9,10,11 | 192:1 203:10 |
| 246:19,21,23 | **adopting** | 383:3 384:5,24 | 206:3,5 217:24 |
| 246:24,24 | 191:16 | 385:1 | 218:20 219:13 |
| 256:5 344:22 | **adoption** | **advantage** | 219:14 220:9 |
| 357:9 | 153:20 155:3 | 232:7 355:7 | 226:12 287:7 |
| **addressing** | 156:2 292:9 | **advertise** 298:5 | 289:17 298:7,8 |
| 70:11 90:9,11 | **ads** 18:12 | 300:7,21 301:2 | 298:23 299:3 |
| 234:10 | 147:13,14,24 | 301:3 | 301:5,13 |
| **addresss** 387:8 | 148:2 151:19 | **advertised** | 302:12 309:16 |
| **adid** 55:22 57:6 | 152:11 154:9 | 23:13 301:14 | 314:24 317:8 |
| 249:6 | 190:17,18 | **advertisement** | 352:14 366:17 |
| **adjust** 14:1,15 | 194:20 195:13 | 193:25 | 384:13 |
| 191:11 | 195:15,22 | **advertiser** | **advice** 119:11 |
| **adjustments** | 197:1 202:3 | 204:12 206:21 | 121:18 309:15 |
| 15:5 | 203:15 205:4,8 | 206:24 207:3 | **advise** 229:21 |
| **admission** | 205:17,19 | 219:11,12,16 | 304:1 317:8 |
| 275:23 276:4 | 206:8 209:23 | 220:6,17 | **advised** 223:2 |
| **admit** 15:25 | 210:2 218:6 | 262:13 264:2 | 301:16,21 |
| 16:6 202:12,14 | 220:15 222:19 | 296:23 297:11 | 303:8,14 |
| 203:22 | 222:20 226:4 | 297:12 351:1 | |

**[advocate - analogous]**

**advocate**
207:24
**affect** 76:22
80:21,22
251:11,13
264:13 305:1
**affects** 74:12
286:8 287:14
**affiliated**
111:18
**afraid** 139:1
**age** 216:13
287:22
**agency** 250:14
**agent** 122:20
247:22
**agents** 116:4
**aggregate**
62:14 96:10
**aggregated**
95:10,11
**ago** 11:1 24:1
29:14 97:4,11
183:18 291:19
295:15 300:25
301:1,15
**agree** 15:19
41:17 80:6
98:14 115:23
120:25 165:9
248:14 322:10
332:1 344:25
361:6 378:9
379:8 387:10

**agreed** 41:15
61:3 313:23
**agreement** 10:1
10:9
**aha** 88:1 92:9
348:19
**ahead** 33:6
43:13 50:23
60:5 73:20
77:10 79:14
82:17 85:4
87:17 93:5,18
94:7 95:16
98:22 117:24
119:7 126:2
144:6 164:11
169:8 172:3
183:21 197:18
213:17 221:10
224:24 227:21
228:24 231:9
236:19 263:19
267:17 268:23
270:19 285:17
288:9 298:13
329:10 333:4
337:20 340:4
356:17 366:13
367:17 374:25
381:4 384:19
385:24 386:15
**ai** 225:10,11
228:9
**aimed** 154:12
155:2

**aims** 118:22
**air** 245:15
**al** 1:7 3:12
**alert** 39:6
**algorithm**
111:24 222:3
**algorithms**
107:23 108:5
111:21 148:11
148:15,25
222:1 262:21
263:8
**allegation**
52:23 53:1
**allegations**
51:23 52:24
57:17 59:5
**alleged** 52:18
**alleging** 61:12
**allocate** 320:20
**allocated** 382:6
382:7
**allow** 178:6
220:22 380:4
**allowable**
122:22
**allowances**
125:25
**allowed** 339:17
**allowing**
352:21 354:14
**allows** 24:24
201:6
**altered** 376:14
376:24

**altering** 192:8
**alternate**
112:20
**alternative**
133:3
**altogether**
299:4
**amazon** 319:21
372:10,11,12
**ambiguities**
39:25
**ambiguity**
42:10
**ameliorate**
104:18
**amenable**
216:3
**american**
111:18
**amount** 112:17
130:7 131:13
187:13 272:22
275:1 297:14
318:19,22
319:8 343:20
**analogies**
140:20
**analogized**
200:6
**analogizing**
146:13 199:21
201:17
**analogous**
180:9,11
199:24

Page 6

[analogy - answered]

| | | | |
|---|---|---|---|
| **analogy**   139:4 | 127:3,7,15,22 | 301:16,17 | **anonymous** |
| 139:7 180:18 | 149:22 150:6 | 302:9 303:9,16 | 60:22 350:2 |
| 200:14 267:3 | 150:11,17 | 303:18,22 | **anonymously** |
| **analysis**   21:7 | 151:23 153:6 | 304:5 306:20 | 109:12 |
| 21:17 109:10 | 154:9,13 | 307:13 308:8 | **answer**   18:23 |
| 109:17 113:23 | 155:24 157:10 | 308:13 309:5 | 19:2 21:15 |
| 113:25 118:10 | 158:14 160:23 | 309:13,25 | 23:5 25:18 |
| 119:9 122:10 | 161:16 162:5 | 310:1 316:13 | 33:8 70:10 |
| 141:9 147:20 | 165:23 166:20 | 316:18 323:21 | 76:24 77:20 |
| 186:24 188:25 | 168:25 169:16 | 324:19 325:20 | 78:8 83:19 |
| 191:16 216:4,7 | 171:8,13,14,24 | 332:3 337:17 | 104:15 120:14 |
| 216:9 229:4 | 178:18,19 | 337:22 339:6 | 125:16 139:8 |
| 234:9 239:9 | 179:7 182:3,5 | 339:25 340:25 | 149:12,14,19 |
| 251:11 273:23 | 182:8,20,25 | 341:6,23 342:2 | 150:13 191:10 |
| 280:5 341:21 | 183:8 184:1,3 | 342:7 343:15 | 215:1 220:13 |
| 344:21 | 184:11,15 | 343:24 352:9 | 220:13,14 |
| **analytics**   50:25 | 185:18,20 | 353:2 354:22 | 236:23 263:20 |
| 56:18 58:6,11 | 186:17 188:21 | 355:2,7,14,17 | 264:14 265:7 |
| 58:12 60:1,15 | 194:22 206:9 | 367:13 371:23 | 273:2,3 284:18 |
| 61:22 62:1,8 | 214:7,10,12,14 | 384:16,17,21 | 290:23 291:1 |
| 62:13,14 63:10 | 216:15 218:8 | **analyze**   286:7 | 295:16 325:7 |
| 63:18,23 64:6 | 222:17 224:17 | 365:17 | 331:25 346:21 |
| 64:14,21 65:15 | 226:4 233:22 | **analyzed** | 354:19 356:5,6 |
| 96:3,7,8,15,18 | 241:17 244:12 | 215:12 253:11 | 356:13,14,17 |
| 108:24 109:8,9 | 257:12 258:21 | **analyzes** | 356:21 358:7,9 |
| 109:19 111:10 | 259:16 261:1 | 121:24 | 358:15,16,16 |
| 113:4 117:11 | 277:5,20 278:5 | **analyzing** | 358:22,24 |
| 117:13,17 | 278:7,9 279:2 | 207:5 230:17 | 359:12,15,19 |
| 119:3,18,20 | 287:15 289:12 | 254:9 | 359:21 361:22 |
| 120:5,11,13,25 | 289:24 290:8 | **android**   201:21 | 363:1,2 368:11 |
| 121:3,10,20 | 290:10 291:3 | 202:2 278:1 | 390:1 |
| 123:6,11,25 | 291:24 292:9 | 386:17,18 | **answered** |
| 124:3,9,13 | 292:15,16,17 | **angeles**   2:3 | 18:21,22 33:16 |
| 125:5 126:11 | 292:19 294:2 | **anibal**   1:7 3:11 | 78:6 94:6 |
| 126:11,25 | 298:2,6,16 | 311:6 | 247:7 308:4 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[answered - applied]**

333:4,6 357:16
361:14
**answering**
77:23 334:22
**answers** 43:19
147:23 220:12
247:25 259:12
361:18
**ante** 376:25
**anticipate**
251:6
**anybody** 10:10
48:17
**anymore** 301:3
309:6 324:9
328:16
**anyone's**
343:19
**anyway** 113:12
163:23 212:5
241:22 362:13
**apart** 18:5
25:20 137:4
167:25 219:15
220:4 262:14
312:10 358:2
**apologize** 212:2
**app** 7:5 25:7
97:7 101:13
102:11 109:13
116:17 117:19
117:19 119:23
120:2,12
123:10,24
149:20,21,23

151:15 152:10
152:14 154:22
157:11 158:3
158:20,23
159:14,25
160:16 165:7
165:12,23
166:19 167:5
169:13 171:10
174:9,11 182:2
182:7,9,21
183:1,8 184:14
184:16 185:6
185:19 187:4
187:20 193:18
195:21 201:7
202:7 203:9,14
214:13 216:20
217:12,14,19
217:22,23,25
218:3,24
224:16 226:2,4
226:8,11 228:9
233:8 247:10
247:11,19
248:7 260:18
263:11 264:11
286:2 287:14
288:13 289:11
290:3,9 291:2
292:11 293:1,5
294:14,16
295:5,7,8,9
296:4,5,6,8,11
296:11,13

298:4 299:12
299:17 300:13
307:14 310:2
314:13,23
317:8 322:5,11
324:19,24
325:14,24
337:25 340:6
343:5 348:14
348:14,16
350:12,12,14
350:14,22,24
351:4,6 354:25
366:2,4,11,15
366:19,20
368:2,4 372:5
372:9,12 379:5
379:13,17
**apparent**
307:24
**apparently**
216:2
**appear** 45:21
142:3 152:13
237:12 247:20
303:25 350:19
363:17
**appearances**
3:22 4:8
**appearing**
393:18 394:7
**appears** 39:12
39:14 371:22
**appendices**
98:3 134:23

243:11 253:18
256:23 326:18
345:8,10,12,19
345:21 347:2
352:6 354:5
355:23 356:4
356:25 359:17
360:13 387:13
**appendix** 67:24
132:20,23
133:20,21
135:5 139:12
144:22 145:13
146:23 216:12
292:3,23
299:10 311:23
312:1,5 313:24
338:5 345:1
346:2,2,3,3,3
357:3,25
360:10 372:13
385:2 389:7,10
389:11,12,13
389:14,15,16
389:17,18,19
**apple** 285:23
287:6,7 316:13
**apple's** 315:23
**application**
383:6,12
**applications**
318:18
**applied** 364:22
380:7

**[apply - assessment]**

| | | | |
|---|---|---|---|
| **apply**   127:4,19 | **arbitrarily** | **articulating** | 140:10 145:23 |
| 254:7 292:18 | 83:13 | 101:24 | 169:6 177:20 |
| **appreciate** | **arbitrary**   86:18 | **ascertain** | 193:15 217:20 |
| 84:18 149:7 | 225:20 | 275:11 334:11 | 229:18 246:18 |
| 361:23 | **archaic**   114:10 | 335:3 | 268:14,20 |
| **approach** | **architect** | **ascertainable** | 269:12,18 |
| 307:1 | 195:12 | 335:25 | 270:12,15 |
| **approached** | **architecture** | **aside**   72:19 | 273:6 326:22 |
| 111:16 | 196:17 | 161:12 171:4 | 326:25 327:1 |
| **approve**   9:16 | **area**   19:18 | **asked**   6:14 | 332:24 337:21 |
| **approximately** | 82:14 88:24 | 11:15 26:25 | 377:18 380:1,3 |
| 293:4 | 90:25 169:5 | 32:25 33:2 | 380:11 386:11 |
| **approximatio...** | 170:3 194:13 | 34:6,7,8,9 | **asks**   104:3 |
| 288:18 | 236:16 346:24 | 46:25 47:6 | **assassinate** |
| **apps**   18:14 | 353:3 | 62:11 78:6,13 | 100:2 |
| 152:11 165:16 | **areas**   118:1 | 94:5 118:24 | **assert**   82:23 |
| 182:4 184:3 | 377:17 | 124:17 131:14 | 118:6 358:14 |
| 201:24 217:17 | **argue**   165:5 | 173:6 222:2 | **asserted**   152:17 |
| 219:1 233:12 | 227:22 335:10 | 227:14 252:17 | 214:18 |
| 234:3 253:24 | **arguing**   108:18 | 252:20 264:11 | **asserting**   83:12 |
| 255:9 260:16 | **argument**   14:1 | 268:17 286:21 | 84:12,14 |
| 260:19 261:2 | 14:14 | 290:17,19 | 151:21 161:23 |
| 265:19 290:7 | **argumentative** | 308:3 313:23 | 162:1 277:8 |
| 298:5 315:15 | 227:21 228:19 | 325:4 333:3 | **assertion**   11:16 |
| 315:17,18 | 255:1 263:15 | 339:8 347:4 | 11:17 79:7 |
| 322:8 324:18 | 285:3,16 | 350:3 354:11 | 82:2,20,25 |
| 343:1,2 350:20 | 298:12 356:17 | 355:22 356:2 | 83:7 318:6,10 |
| **appsflyer** | **arises**   34:25 | 368:16 379:4 | **asserts**   277:9 |
| 123:13 124:4,6 | **arrangement** | 381:15 | **assess**   224:11 |
| 184:14 185:18 | 209:18,19 | **asking**   21:15 | **assessed**   15:1 |
| 185:25,25 | **art**   245:21,21 | 35:2 40:16 | **assessing** |
| 186:9,12,19 | **article**   204:15 | 58:25 65:11 | 235:17 |
| 187:6,17,19 | 228:9 | 73:18 78:9,16 | **assessment** |
| 188:17 | **articles**   317:1 | 79:15 91:24 | 224:12 |
| | 341:17 | 121:16 130:14 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[assessor - back]**

assessor  148:18
asset  307:19
assigned  239:1
assignment
  11:10,14 12:1
  13:1,2 252:5
assistants
  141:9
assisted  7:11
assisting  6:11
associate  2:19
associated
  70:14 103:1
  133:7,17 138:1
  144:13 146:20
  159:2 178:21
  179:24 192:3,9
  192:25 193:6
  194:4,13,14,16
  219:16 220:5
  222:21,23
  260:4 262:8
associates
  248:21
assume  7:18
  24:4 28:14
  37:3 49:18
  65:24 77:5
  98:5 153:22
  186:2 208:7
  233:20 244:7
  379:7
assumes  95:14
  140:18 240:22
  263:15

assuming
  140:19,23
  165:2,4 249:25
  250:1 348:25
  364:19 379:6
assumption
  40:18,19
  165:11 191:12
  242:11,14
  302:16
attacker
  279:16
attempt  135:13
  135:15 137:19
  141:18 144:18
  174:23 224:15
attempted
  215:19
attempting
  143:4 167:11
  228:12
attempts  106:6
  139:17
attention  6:24
  50:2 67:4
attorney  363:9
attorneys  1:2
  2:4,9,15 13:24
  387:5
attributable
  288:13,15
  293:6
attribute  351:8
attribution
  352:22 354:14

367:1 368:8
379:14 380:6
381:17,19
382:4,8,19,24
383:13 384:11
attributions
380:3
auction  220:23
authenticate
69:6 71:10
authenticates
209:4
authentication
209:3
authored
238:15 359:11
automated
352:4,7 353:1
354:20 355:6,7
automatic
161:24 207:1
225:1 230:6
automatically
154:10 155:4
158:7 160:22
161:17,19,24
162:7,25
availability
136:20
available  44:6
154:10 155:4
220:25 346:16
346:20 352:8
avenue  1:21
3:17

average  272:7
avoid  171:9
avoided  141:5
aware  35:1
39:3 40:5
42:12,16 55:21
105:24 106:15
106:17 123:5
125:9 142:1
157:20 160:2,5
160:25 182:6
204:7 212:19
215:9,13
224:20 252:12
274:18 277:19
287:4 311:13
318:14 319:21
332:10 355:3
376:13
awful  91:11
229:6

**b**

b  278:21,22,25
280:11,12
359:25 387:22
389:5 394:1
b.1  389:11
b.2  389:12
b.3  389:13
baby  120:24
back  12:25
22:5 25:17
42:11 45:6
47:14 54:4
64:8,17 66:21

**[back - best]**

| | | | |
|---|---|---|---|
| 67:19 83:21 | **backlash** 115:8 | **basically** 19:2 | **beliefs** 341:22 |
| 129:5 134:15 | **backup** 6:6 | 187:3 | **believe** 4:21 |
| 139:6 157:9 | **backups** 16:13 | **basis** 25:23 | 14:17 29:3,11 |
| 164:12 165:20 | **backwards** | 26:16 28:6 | 29:25 42:21 |
| 173:4 176:23 | 190:11 | 91:25 92:3 | 48:3 51:25 |
| 176:25 181:11 | **bad** 114:11 | 126:23 191:17 | 55:8,13 66:2 |
| 182:2 185:7 | **badger** 304:24 | 214:5 225:13 | 85:9 96:20 |
| 189:7,17 190:1 | 305:14 | 239:2 247:15 | 97:21 107:15 |
| 194:21 198:8 | **baked** 191:21 | 268:15 273:3 | 129:22 130:2 |
| 201:15 203:17 | **baker** 2:21 3:18 | 282:18 318:10 | 132:10 141:25 |
| 207:20 209:19 | **balance** 381:13 | **bates** 72:4 | 142:6,10 |
| 210:6 218:4,6 | **ball** 37:12 | 156:23 238:17 | 144:22 192:16 |
| 222:23 233:5 | **bandwidth** | **bath** 120:23 | 192:16 201:25 |
| 237:24 240:16 | 138:21 183:5 | **battery** 138:21 | 202:19 203:12 |
| 251:22 260:12 | **bargain** 104:4 | 183:5 | 224:7 232:1,17 |
| 264:21 275:2 | **based** 16:23 | **beacon** 344:1 | 273:8 286:4 |
| 277:22 278:19 | 24:10,12,13,17 | **beacons** 304:25 | 296:14 297:9 |
| 278:23 281:3 | 48:8 90:15,17 | 343:24 344:6 | 297:10 324:21 |
| 281:22 282:2 | 90:19 114:20 | **bear** 57:19,19 | 338:3 340:9 |
| 284:3 297:5 | 191:2 192:2,9 | 83:10 335:21 | 346:19 378:25 |
| 299:23 300:1,4 | 204:9,23 | **beginning** | **believed** 17:7 |
| 315:20 317:25 | 213:21 217:1,3 | 49:14 307:11 | **bell** 367:2 |
| 329:5 332:14 | 226:23 227:2 | **behalf** 1:8 9:23 | **belonged** |
| 333:13,14 | 250:25 258:4 | **behave** 219:3 | 141:17 |
| 340:14 344:13 | 259:12 268:10 | **behaved** 49:4 | **belongs** 348:19 |
| 347:13 349:4 | 270:23 271:10 | **behavior** 17:20 | **belts** 305:18 |
| 353:4,24 362:8 | 335:15 381:24 | 18:4,6 74:16 | **beneficial** |
| 365:10,21 | 381:25 | 74:16 96:11,11 | 292:1 |
| 366:9 368:19 | **bases** 92:4 | 160:20 308:23 | **benefit** 308:1 |
| 369:21 374:17 | **baseview** | 308:24,25 | **best** 13:2 82:8 |
| 377:6 378:5 | 129:16,20,23 | 323:13 | 114:20 126:13 |
| 381:12 383:17 | 131:17,18,19 | **belabor** 242:5 | 126:14 195:17 |
| 385:2 386:5 | 132:1 311:25 | **belated** 156:24 | 208:4 297:21 |
| **background** | **basic** 153:22 | **belief** 48:7,13 | 301:8 307:1,5 |
| 151:11 | 251:13 | 57:10 | 362:12 364:20 |

**[better - brown]**

| | | | |
|---|---|---|---|
| **better** 14:15 | **billing** 8:2 | **blocked** 167:20 | **breach** 105:14 |
| 36:8 60:5 | **biscotti** 369:16 | **blocks** 201:23 | **breaches** 101:4 |
| 114:22 145:7 | **bit** 20:5 63:11 | **blood** 106:23 | 103:24 104:1 |
| 185:2 197:11 | 70:9 80:11 | 391:12 | 114:13 236:21 |
| 198:17 209:17 | 118:13 129:24 | **blown** 101:18 | **break** 5:18 |
| 209:19 | 130:25 131:24 | 102:1 | 55:17 106:22 |
| **beyond** 66:5 | 142:2 147:17 | **blue** 310:23 | 117:1 123:18 |
| 73:19 196:1 | 154:16 204:22 | 311:4,22 | 135:10 142:22 |
| 221:3 262:24 | 207:8 244:18 | **body** 239:15 | 142:24 143:19 |
| **bias** 305:7 | 251:25 277:17 | **boffa** 112:23 | 147:7 160:10 |
| **bid** 222:24 | 284:5 310:9 | **bogged** 149:5 | 165:20 173:6 |
| 223:2,12 293:2 | 319:2 330:16 | **boggles** 60:17 | 232:24,25 |
| 293:6,20,21 | 331:5,5 364:1 | **boies** 2:2 10:16 | 243:15 246:9 |
| 297:11,12 | 372:25 | 10:19 | 249:13 250:2 |
| 299:13 352:4 | **bits** 131:8,8,15 | **book** 305:11,13 | 287:24 306:2 |
| 353:1 354:21 | 132:5,6,11 | **bookkeeping** | 310:21 317:15 |
| **bidding** 352:1 | 275:18 330:18 | 206:17 | 317:18 344:8 |
| 352:7 355:6,8 | 330:25 | **boost** 220:22 | 361:25 |
| 355:11 | **black** 2:20 | **bot** 65:21,23 | **breakdown** |
| **bids** 220:23 | 16:13 45:15 | **bots** 65:19 | 288:20 |
| **big** 59:10 | 67:22,23 | **bottle** 299:24 | **briefly** 279:13 |
| 104:13 114:16 | 124:21,24 | **bottom** 45:11 | 387:7 |
| 126:16 147:19 | 125:18 189:8 | 100:20 147:10 | **bring** 70:24 |
| 187:15 219:22 | 215:10 233:23 | 351:11 370:5 | 200:18 |
| 255:18 301:12 | 234:2 238:20 | 382:16 | **brings** 22:5 |
| 323:22 | 240:13 247:11 | **bought** 102:21 | **broad** 71:7 |
| **bigger** 178:8 | 255:20 297:25 | 188:22 379:18 | 203:5 |
| 273:12 341:13 | 311:13 353:20 | **bound** 242:17 | **broader** 70:1 |
| 350:18 | 389:7 | **boundary** | **brokering** |
| **bigquery** 96:19 | **black's** 6:4 | 156:13 | 274:3 |
| 96:21,23,25 | 162:10 248:6 | **box** 166:6,11 | **brokers** 287:6 |
| 97:13,20 98:6 | 311:19 353:17 | 200:8 | 287:9 |
| **bill** 5:3 | **blended** 5:13 | **brackets** 93:22 | **brown** 10:17 |
| **billed** 7:14,16 | **blind** 289:8 | **brain** 238:4 | 10:18 48:16 |
| | | 326:19 | 49:25 54:16 |

**[brown - case]**

140:11 141:3,4
141:6,11
145:21,21
146:8,10 176:7
200:18
**browser** 201:17
**browsers**
199:23
**browsing**
199:24 200:21
200:25 201:1
343:20,23
**bruce** 27:8
305:11
**bsfllp.com** 2:5
**bucket** 7:13
**bucks** 319:20
**bugged** 225:6
**build** 304:16
308:2 320:19
**building** 37:8
**built** 107:24
148:11,25
**bunch** 23:6
47:5 156:19
187:22 197:1
207:8 235:11
**bundle** 257:24
257:25
**bundled** 289:25
**burns** 5:1
16:17
**business** 56:4
208:3 307:17
307:18

**button** 21:22
51:7 58:9
122:3,5,12
171:25 172:13
184:20 186:1,4
**buttons** 199:21
**buy** 272:6
290:11 305:12
305:23 319:12
366:4 379:5,9
380:7,13
**buyer** 274:23
366:5,16
367:12
**buyers** 290:7
**buying** 383:3
**byte** 318:13

**c**

**c** 1:1 2:1,4 4:2
129:3 359:25
387:22 389:14
**ca** 393:9,12,20
**cake** 148:9
**calculate** 245:2
245:5 254:21
267:20 268:3,4
268:10 270:23
**calculated**
130:6 255:20
**calculation**
253:9 255:24
279:25 321:4
**calculations**
234:3,6,7
254:11

**california** 1:4
2:3,14 3:14
28:21
**call** 35:11 44:4
86:21 112:22
160:13,13
177:4 202:3
203:18 254:20
282:6 336:3,6
373:25 378:15
387:14,17
**called** 4:3 20:1
55:22,23 63:23
90:25 107:9
112:11,25
116:6 133:24
158:7 194:8
202:7,9 241:3
279:10 316:11
349:11 372:14
**calling** 63:24
**calls** 77:9
112:23 131:7
134:20 140:12
194:12 199:23
212:21 274:14
282:21 382:2
383:1
**camera** 199:9
**campaign**
204:13 218:25
293:2,5 294:17
295:5,8,9
296:17 352:15
366:5

**campaigns**
292:11 294:13
294:14 296:4,5
296:6 355:12
366:18
**cancer** 111:21
111:23 112:4
113:3 114:5,18
**canned** 163:3
**capabilities**
145:9 154:6
287:10
**capability**
145:6 260:10
349:7 375:15
**capacity** 170:2
**capital** 37:2
**capitalized**
38:19
**capitalizing**
164:3,15
**car** 180:8,20,22
180:25 181:3
**cara** 2:19
**care** 112:1
225:10,11
314:2
**careful** 53:12
103:25 113:25
**carefully** 65:8
104:15 130:17
145:15 151:5
**case** 1:6 5:8,15
8:15 10:17,23
10:24 11:3,10

**[case - characterization]**

| | | | |
|---|---|---|---|
| 11:14 12:1,12 | 166:16,23 | **catch** 211:5 | **certify** 206:7 |
| 12:15,21 13:6 | 167:3 168:1 | **categorical** | 391:5,10 |
| 13:16,21 14:25 | 171:2 177:24 | 19:10 28:9 | **chairs** 111:19 |
| 17:5,7 18:20 | 182:4,24 | **categories** | **challenges** |
| 19:22,24 21:24 | 185:23 194:10 | 338:16 | 110:2 |
| 23:6 29:1,10 | 194:19 196:16 | **category** 193:5 | **chance** 72:1 |
| 30:23 31:3,20 | 198:22 199:1 | **cause** 211:4 | 121:8 125:19 |
| 34:4 35:13 | 206:15 211:11 | 258:8 | 190:3 242:25 |
| 39:2,20 48:10 | 213:7,13 | **causes** 298:20 | 281:5 302:24 |
| 48:15,16 49:2 | 214:21 221:12 | 364:25 | 302:25 338:21 |
| 49:18,25 50:1 | 224:14 228:21 | **caveat** 150:13 | 381:14 |
| 50:3,6,7,8,11 | 231:3,8 236:18 | **ccp** 393:9,12 | **change** 32:1,19 |
| 51:14 52:10 | 252:6 255:3 | **cell** 3:8 75:25 | 34:19,22 64:4 |
| 53:22 54:6,12 | 262:5 264:16 | **cent** 382:22 | 74:21 107:10 |
| 54:16,22 55:21 | 286:16 287:1 | **centers** 279:22 | 130:22 143:14 |
| 57:16 59:9,10 | 287:13 288:12 | 320:19 | 151:9 177:11 |
| 60:13,16,25 | 294:13 307:3 | **ceo's** 21:21 | 177:14,22 |
| 78:23 83:9,25 | 311:4 315:22 | **certain** 31:9 | 178:12 181:16 |
| 86:24 89:21 | 327:19 328:3 | 32:20,21 46:23 | 181:19 317:13 |
| 105:19,25 | 332:12,19 | 101:21 108:2,3 | 380:21 392:4 |
| 106:9 114:2 | 333:9,25 | 108:4 110:8 | 395:4,7,10,13 |
| 123:9 124:15 | 334:16 335:5 | 158:23 191:21 | 395:16,19 |
| 125:13,25 | 335:16,24 | 208:11,22 | **changed** 63:22 |
| 127:5,20 | 336:24 353:7 | 222:8 229:17 | 285:21 297:18 |
| 129:17 130:8 | 363:23 364:16 | 250:15 315:17 | 300:14 365:4 |
| 133:13 134:18 | 365:19 378:20 | 355:10 356:18 | **changes** 107:9 |
| 135:13,15 | 384:15 392:2 | 374:3 | 107:10 129:9 |
| 139:13 140:20 | **cases** 45:3 49:6 | **certainly** 49:1 | 177:2 285:24 |
| 141:6,8,12 | 49:6 54:20 | 74:10 193:4 | **changing** |
| 143:7 145:10 | 55:3,5,7 207:9 | 314:19 321:20 | 291:16 |
| 146:18 147:14 | 340:12 | **certification** | **characteristics** |
| 148:14 149:6 | **cat** 287:5 | 391:1 | 114:21 |
| 151:22 154:21 | **cataldo** 312:13 | **certified** | **characterizati...** |
| 158:2 159:15 | **catalog** 230:5 | 205:11,23 | 153:1 |
| 162:3 163:19 | | 206:10 | |

**[characterize - click]**

| | | | |
|---|---|---|---|
| **characterize** 8:14 | **choices** 94:25 342:5 | **claims** 35:14 | 336:17 353:6 365:20 368:17 370:8 |
| **characterizes** 36:22 64:12 81:24 | **choose** 73:6 116:21 159:7 261:3 264:18 298:6 | **clarification** 145:19 146:15 194:18 386:11 | **classifies** 229:23 |
| **charge** 205:16 219:12 262:10 | **choosing** 88:25 158:15,18 | **clarified** 74:8 | **clean** 150:16 206:23 291:1 |
| **charging** 209:23 219:16 220:6 | **chosen** 116:5 | **clarifies** 173:22 | **clear** 6:25 18:17 38:14 39:7,9 42:2,21 43:7 51:19 74:9 83:2 84:15 85:10 87:5 92:7 94:20 104:23 105:20 120:14 126:15,21 136:2 137:15 163:17 174:22 176:12 211:23 239:19 242:6 243:19 249:19 277:3,10 306:9 312:18 328:11 336:10,20 356:9 360:12 361:4,13,20 365:18 373:4 377:8 378:25 |
| **cheap** 319:23 320:1 | **chrome** 199:23 | **clarify** 38:10 42:9 155:10 167:24 276:25 282:3 294:11 366:3 374:18 | |
| **check** 6:14 100:14,15 108:20 135:4 157:18 166:4,6 257:24 277:18 277:20 278:6 282:18 284:14 285:1,14,21 286:9 294:19 306:1 313:6 322:19,19,20 338:21 373:17 | **circulating** 106:23 | **clarifying** 45:16 192:11 265:10 283:23 337:15 | |
| | **circumstance** 282:16 305:16 309:8 | **clarity** 84:19 89:5 377:10 | |
| | **circumstances** 141:13 286:18 | **class** 4:21 81:11 133:9 170:23 252:7 252:11,13,13 252:14,15,23 252:23 267:15 268:13 270:25 271:7 272:2,3 272:4,16,21 275:8,8 311:17 324:1,10,13 326:5,6 327:9 327:14 328:8 328:15 329:17 331:18 332:18 333:10 334:2 334:11 335:3 335:24 336:15 | |
| | **citations** 27:21 | | |
| | **cite** 28:5 43:4 91:23 147:4 288:15 311:10 312:11,13 | | |
| **checked** 65:8 358:23 | **cited** 24:15 26:17 27:17 145:13 156:9 156:11,19,21 157:2,7 221:17 258:5 313:17 318:8 | | |
| **checking** 6:12 16:18 | | | |
| **checks** 283:11 283:21 | **cites** 153:4,17 | | **clearest** 44:22 |
| **chew** 183:4 | **citing** 28:11 147:3 | | **clearly** 130:21 148:5 |
| **chewing** 138:20 | | | |
| **child's** 230:9 | **civil** 393:19,20 | | **click** 350:23 352:2 367:11 382:9 |
| **choice** 159:12 235:18 377:19 | **claiming** 328:13 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[clicked - coming]**

clicked  381:9

clicks  368:5
369:25 371:17
381:6 383:11

client  14:20
197:9 306:21
308:10 327:24
328:2

clients  34:6
62:11 298:9
301:17,21
303:20

cling  147:21

clock  226:1
305:25

close  66:12
169:12

closed  358:10

closing  170:5
359:4

cloud  319:18
319:25 321:11
322:1,3,24
323:16,19,22

cloudflare  97:6
97:10

club  37:7,9
45:3

clue  99:25

clustering
245:11

coarsened
232:15,18

code  8:7 150:7
150:21 225:2

393:9,12,19,20

coding  7:5

coexist  207:19

cold  319:22

collapses
137:12

collect  58:24
208:22 209:21
262:12 335:19

collected  61:14
92:11 93:7
112:6 115:25
120:18 130:1
138:14,16
139:1 158:7
160:22 161:17
161:19 162:7
173:13 179:3
190:15 194:11
207:11 221:20
232:16 251:14
267:6 271:13
271:14 277:10
277:11 312:9
313:7 329:20
336:5,14
337:12 344:22
353:9

collecting  40:8
44:2,9 60:19
70:5,13 79:21
80:5 88:8,17
108:10 110:6
111:8 122:16
122:17 153:5

170:25 177:3,5
277:4,6 308:20
370:9

collection
48:23 74:14
108:3 109:22
120:19 138:17
154:13 155:25
170:11 171:9
172:14 210:14
241:16 368:4

collectively
40:3

collects  36:21
40:4 46:10
58:11 64:10
81:23 93:20,21
121:19 139:2
187:14 276:21
353:14

college  111:18

colloquy  363:8

colorful  211:15
211:17,23

column  85:17
85:19 370:25
371:1 374:9

columns  369:5
369:5,6 370:13

comb  358:24

combination
114:8

combine
231:19 364:13

combined  71:1
141:23 324:11

combining
76:11

come  12:16,20
23:15 32:24
42:10 54:4
61:1 62:19
74:11 83:21
85:19 126:1
130:12 134:15
139:6 160:7
165:20 210:6
218:5 222:5
224:12 226:21
228:11 229:17
239:17 240:16
282:10 303:7
309:14 317:2
341:17 343:21
358:14 360:20
369:21 380:5

comes  14:25
50:5 88:22
105:16 118:18
250:14 363:5
381:5

comfortable
66:9

coming  12:25
14:3 64:8
92:10 305:12
320:2 351:5
372:5

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[comment - concerns]**

comment  17:23
20:17 145:1
163:7 164:20
311:21
commented
121:4 131:10
commenting
21:3 239:24
comments  21:5
21:9,18 22:12
24:16 238:7
241:9
commerce
274:20
commercial
112:24
commission
392:24
commitments
115:5 178:5
committed
28:19
committee
111:20,25
commodity
271:23
common  14:24
136:8,9,11
245:13 350:18
commonly
168:12 272:15
352:13
companies
125:10 291:8

companion
369:11,14
company  97:2
291:11 304:17
compare
189:11
compared
323:20
compares
74:24
comparing
20:11 127:6,21
176:11
comparison
127:25
compartment
254:15
competitor
380:5
competitors
125:4 126:25
127:3,8,23
compiling
226:10
complain
143:18 306:10
complaint  23:4
49:9 50:11
51:22,23 52:14
57:16 58:8
59:5 60:16
61:9
complete  13:2
29:17 105:8

completed
393:7,17 394:6
completely
15:1 44:25
65:2 109:4
175:6 196:19
236:9 267:2
298:13 310:18
314:8
completion
394:10
complex
164:23
complexity
244:25
compliance
162:16 163:18
166:24 168:15
206:18
compliant
164:25 165:9
complicated
351:24 360:7
compliments
7:1
comply  114:7
197:24 205:9
compound
26:24 197:18
comprises
213:13
compromise
115:1
compromised
101:6

computational
244:25
computationa...
245:9
computer  68:1
72:22 125:14
168:13 197:2,2
225:2 239:6,10
315:9
computers
239:11
computing
118:2 225:17
282:11 321:11
conceivable
65:18 250:16
concept  54:25
118:15 199:19
366:4
conception
200:23
concepts  347:8
concern  38:10
101:23,25
242:19
concerned
102:19
concerning
34:15 107:9
188:14
concerns
105:13 114:9
115:18 161:20
198:6 214:17
234:20 236:11

**[concerns - contain]**

298:14 341:12
341:13
**conclude**
171:25 298:21
299:25
**concluded**
167:17
**concludes**
388:5
**conclusion**
13:18 23:16
24:2 25:23
74:11 78:17
88:3 154:24
167:13 213:9
213:20,21
258:4 298:25
300:20
**conclusions**
12:15,20 14:3
216:8 229:17
**concur** 7:19
**conduct** 143:4
206:25 240:20
240:21
**conducted**
215:18
**confess** 354:18
**confident** 146:7
**configuration**
193:10
**configured**
158:22
**configuring**
165:22

**confirm** 98:2
100:14 288:19
289:8 324:18
**confirmed**
102:15 249:5
**conflating**
290:3
**conflict** 116:18
**conflicting**
208:1
**conflicts** 57:23
**confused** 20:22
20:24 75:22
367:18
**confusing** 43:1
43:11,24
**confusion**
20:20 39:4,10
**congress** 21:1,9
21:21 206:1,5
**connect** 63:5
200:15 250:18
316:8 368:3
**connected** 8:1
375:17
**connecting**
106:7
**connection**
21:20 136:6
172:20
**connects** 93:10
**cons** 303:12
**consensus**
258:13

**consent** 257:24
277:18,20,22
278:6,9 281:21
282:18 283:11
283:21 284:14
285:20
**consented**
239:1 241:23
257:22,22
322:3
**consents** 285:1
285:14 286:9
**consequence**
342:12
**consequences**
267:24
**conservative**
223:10
**consider** 18:19
19:14 95:6
102:4 181:14
191:25
**considerable**
112:17
**consideration**
22:19,23 53:13
54:13
**considered**
46:16 60:24
61:1 66:8
181:22 235:16
323:2
**considering**
34:21

**considers** 48:3
91:7,8
**consistent** 41:1
75:12 79:8,16
122:12 173:24
241:1 278:2,10
**console** 63:11
96:15
**constellation**
133:23
**constituency**
208:5
**constitute**
94:18 98:18
**constitutes**
110:15
**constitution**
28:21
**constructs**
145:3
**consultants**
7:11
**consultations**
302:2
**consumer**
17:15,19 18:4
18:6,20 19:14
19:18,19 26:16
71:6 90:9
**consumers** 17:7
17:19 18:12
**contact** 393:9
**contain** 97:23
144:3 147:16
232:11 257:13

Page 18

**[contain - convert]**

330:24 331:4
335:7
**contains**
275:17 330:15
**content**   193:18
204:10 230:21
230:23 241:20
**contents**   12:5
135:1,3 326:24
**context**   41:11
41:13 42:4
43:25 46:5,19
95:20 112:21
141:1 193:23
193:24 200:25
204:17,19
206:15 249:3
271:20
**contexts**   40:22
40:24
**contextual**
203:19,24
204:1,5,7
205:2 210:8
**continue**
110:24 111:9
111:10 117:20
187:5 290:11
301:5 323:5
340:15 342:14
366:23
**continued**
129:6
**continues**
335:19

**continuing**
289:17
**contraband**
336:4
**contract**   301:4
**contradict**
87:19
**contradiction**
59:15,16,18
60:2
**contradictions**
225:15,15
**contrary**
251:15
**contribute**
304:1
**control**   20:2,16
20:25 21:10
23:13,14,16,22
24:2,3,24
25:20,24 26:11
26:13,20 39:13
39:15 44:1,7
49:20 50:5,19
51:15 52:18
53:4,8 59:24
60:11,12 61:18
74:12,14 76:21
77:17 88:14
89:9 91:1
92:23 122:14
132:14 144:1
144:19 146:19
170:11,25
171:5 178:6

179:13,17
196:7,9,14
197:25 201:8
203:5,6 217:13
286:17 365:1
**controlled**   38:6
132:10
**controller**
118:16 119:4
**controls**   20:23
44:8 49:3
71:23 72:10,13
75:5 87:13
144:11 147:5
178:11,14,15
190:14 322:7
389:9
**controls.pdf.**
71:24
**conversation**
29:6 30:12,17
30:19
**conversations**
3:7 29:8,13
30:2,7,8
**conversion**
219:9,19,21
220:8 221:4,8
221:9,13 226:3
256:17,19
260:12,13,19
260:20 261:25
262:1 263:6
264:9 293:6,21
294:8,17

295:10 296:12
296:20,24
298:16 316:14
351:2,9,9
352:4,9 355:3
355:4 366:21
368:3 371:24
372:5 380:12
380:14,16,25
381:10 382:5,8
383:24 384:2
384:11
**conversions**
218:23 219:22
220:2 223:20
248:23 249:7
260:25 261:9
261:11 262:6
262:11,19
263:4 264:2,3
264:17,18
289:13,14
291:4,5,12
292:11 293:3,8
293:20 299:13
299:20 300:9
302:14 350:4,5
350:9,11,15,21
351:4,5,13
352:13,16
354:24 366:17
367:14 369:25
382:5,7 383:15
**convert**   220:19
220:24 221:15

**[convert - creates]**

| | | | |
|---|---|---|---|
| 222:16 381:7 | 394:3,4 | 346:13 347:14 | 250:20 253:22 |
| 382:10 | **corrective** | 348:22 371:10 | 317:6 321:12 |
| **converter** | 35:12 224:9 | 389:21 393:18 | 365:2 375:13 |
| 223:1 | **correctly** | 393:21 394:7 | 376:19 |
| **converting** | 256:10 | **count** 52:6 | **court** 1:3 3:14 |
| 221:5 223:18 | **correlate** | 218:23 256:9 | 3:19,24 77:21 |
| 302:11 352:15 | 141:24 | 304:6 373:12 | 154:25 196:11 |
| **converts** 372:8 | **correlates** | 385:13 | 196:12 302:19 |
| **cookie** 63:18 | 179:4 | **counted** 215:23 | 331:22 336:11 |
| **copied** 25:10,12 | **correlation** | **counterexam...** | 340:17,20,21 |
| **copies** 63:16 | 305:21 | 305:10 | 341:20 |
| 230:4 | **correspond** | **counterfactual** | **courtesy** 33:21 |
| **copy** 11:6 | 85:18 | 302:16 | **cover** 39:24 |
| 241:23 345:6 | **corresponden...** | **counterintuiti...** | 70:2 101:18 |
| **core** 346:9 | 156:15,18 | 44:13 74:15,18 | 102:1 217:13 |
| **correct** 15:18 | 175:2,7,10 | 92:15 | **covered** 10:9 |
| 16:25 76:10 | **corresponding** | **counterpart** | 27:9 150:3 |
| 160:19 194:24 | 370:25 | 369:16,18 | 172:7 212:1 |
| 217:18 225:7 | **corresponds** | **countries** | 262:17 284:5 |
| 243:24 244:17 | 67:22 336:22 | 115:17 | 289:21 |
| 290:6 304:16 | 367:4 | **counts** 85:23 | **covers** 292:20 |
| 345:2,9,19 | **corroborates** | **couple** 41:14 | **cpa** 355:1 |
| 346:17,22 | 313:8 | 45:15 66:13 | 380:17 383:5 |
| 349:12,21 | **cost** 279:18 | 91:3 113:6 | **cpm** 382:18 |
| 350:6 351:11 | 280:2,3,9 | 141:2 170:17 | **cpms** 383:7 |
| 353:10,18 | 281:17 282:1,3 | 175:12 206:10 | **crafting** 91:16 |
| 376:23 379:1 | 282:11 307:24 | 211:7 213:3,25 | **crawling** 230:3 |
| 379:19,24 | 318:6 320:4,9 | 220:10,11 | **crawls** 229:21 |
| 380:8 382:25 | 341:9 380:17 | 239:5 368:19 | **create** 134:19 |
| 383:15 386:22 | **costs** 223:14 | **course** 37:8 | 188:11,12 |
| **correcting** | 319:11,25 | 84:7 130:10 | 376:5 |
| 15:15 | **council** 205:11 | 162:25 167:23 | **created** 153:4 |
| **correction** 16:1 | 206:18 | 202:16 204:24 | 158:4 215:20 |
| **corrections** | **counsel** 9:1 | 215:14 239:25 | **creates** 116:18 |
| 6:21 393:14,15 | 72:3 339:19 | 240:1,20,21 | 116:19 208:2 |

**[creating - data]**

| | | | |
|---|---|---|---|
| **creating**  103:6 | **customer**  62:8 | 58:24 60:19,23 | 115:14,24 |
| 103:8 | 308:2 309:14 | 61:14 62:8,15 | 116:7,9,10 |
| **creation**  88:13 | 309:16 352:21 | 64:9,11,13,20 | 117:12,13,22 |
| **credit**  52:24,25 | 354:14 | 64:21 65:16,16 | 118:4,6,15,15 |
| 382:11,14,16 | **customers** | 65:20 66:2,2 | 118:19,21,22 |
| **cricket**  327:23 | 126:9 307:18 | 70:2,4,6,7,12 | 119:2,3,4,5,19 |
| **crime**  274:21 | 307:20,23 | 70:14 73:3,7 | 120:5,13,18 |
| **criminals** | **customizable** | 74:3,4,6,15 | 121:19,21 |
| 274:20 | 157:23 158:9 | 75:1 79:8,8,20 | 122:1,17 |
| **critical**  77:15 | **customization** | 79:20,22 80:3 | 129:17,21,23 |
| **criticizing** | 158:13 | 80:5,10,14,18 | 130:4,7,9,15 |
| 124:24 | **customize** | 80:19,22,23 | 131:5,6,9,15 |
| **cross**  387:6 | 159:25 | 81:11,13,23,24 | 132:22 133:5 |
| **crossed**  38:8,24 | **customized** | 82:4,15,24 | 134:12,13,18 |
| 39:1 | 157:11 159:6 | 83:8,13 84:1 | 136:7,10 |
| **crypto**  250:3 | 160:15 | 86:9,18,19 | 137:20,25 |
| **cryptographic** | **cutting**  175:25 | 87:2,4,14,20,25 | 138:1,5,6,9,24 |
| 145:3 | **cv**  1:6 | 88:2,16 89:8 | 139:1,12 |
| **cryptography** | | 92:10,11 95:22 | 140:13 141:10 |
| 118:1 | **d** | 96:3,6,10,19,22 | 141:11,24 |
| **curiosity**  196:2 | **d**  1:1 85:18 | 96:23 97:20,22 | 143:7,8 144:13 |
| **curious**  21:19 | 387:22 389:1 | 98:8 99:2,5,6,9 | 146:20 147:13 |
| 196:4 223:7 | **d38**  75:25 86:5 | 99:11,13,17 | 147:19 148:12 |
| **current**  126:12 | 86:6,24 87:3 | 101:4,21 102:2 | 149:1 153:6 |
| 193:22,24 | 87:10 | 102:2,14,19 | 154:13 155:24 |
| 196:17 | **da**  389:15 | 103:4,20,22,24 | 160:4 163:1,8 |
| **currently**  4:19 | **damages**  28:25 | 104:7,9 105:5 | 166:7,8 167:9 |
| 362:13 | 29:2,3,8 31:19 | 105:13,14,17 | 170:12,20 |
| **custodians** | **data**  36:20,22 | 106:5 107:13 | 171:1 172:14 |
| 112:3 | 38:2,3 40:3,6,8 | 107:25 108:4 | 173:15,17 |
| **custom**  157:21 | 44:3,10,11 | 108:23 109:22 | 174:4,14 |
| 158:3,19,23 | 46:9 47:5 48:5 | 110:6,12 111:7 | 175:13,17,17 |
| 159:14 224:17 | 48:23 53:9,15 | 112:5,9 114:12 | 175:18,18 |
| 224:22 227:6 | 53:17,19,20 | 114:13,22,23 | 178:19 179:3,7 |
| 227:18 260:21 | 54:1,2,7,23,24 | 114:24,25 | 179:19,21 |
| | 57:5 58:11,15 | | |

**[data - decided]**

| | | | |
|---|---|---|---|
| 180:2,3 181:11 | 253:10,13,19 | 328:14 329:16 | **date** 55:11,13 |
| 184:7 185:7 | 253:23,24 | 329:19,21 | 55:17 76:4,5 |
| 186:18 187:18 | 254:9,18,23 | 330:6,16 | 155:15 236:13 |
| 187:22 188:5 | 256:3,19 | 331:19,20,21 | 333:8 392:3 |
| 190:15,18 | 258:21 259:16 | 332:13 333:23 | 393:16 394:5 |
| 194:11,14,15 | 263:2,11 264:6 | 334:1,7,10,11 | 395:24 |
| 194:23 196:15 | 264:6,12 267:6 | 335:2,19,23 | **dates** 312:3 |
| 196:15,18 | 267:7,8,9,11 | 336:1,2,3,4,4 | **day** 42:11 |
| 197:13,15,20 | 268:11,11 | 336:15,17,21 | 326:15,25 |
| 198:2,20 199:2 | 270:23,24 | 336:22,23,25 | 332:12 333:12 |
| 203:8 205:8,18 | 271:13,14,17 | 337:8 338:1,5 | 333:25 334:16 |
| 207:11 208:22 | 271:23,25 | 339:9,15 | 336:11 343:1 |
| 209:22 211:3 | 272:1,6,10,11 | 342:13,16 | 346:5 355:25 |
| 212:4 213:6,13 | 272:12,20,23 | 343:16 347:18 | 362:25 363:24 |
| 216:1,14,22 | 273:8,11,12 | 347:22 348:7 | 372:2 388:13 |
| 217:14,16 | 274:1,3,9,13,19 | 350:24,24 | 391:15 392:21 |
| 218:3 221:19 | 274:22 275:7,9 | 353:9,14,21 | **daylight** 3:3 |
| 221:20,21 | 277:20 278:7 | 355:4 364:6,9 | **days** 29:21 |
| 222:10 223:22 | 278:10 279:2 | 364:10,13,14 | 296:8 332:8,13 |
| 224:4 227:2 | 279:14,17,22 | 364:17,24,25 | 332:14 334:1 |
| 232:3,11,14 | 282:21,22,24 | 368:5,6,7 | 380:20,23 |
| 235:7,7,11,24 | 282:25 283:1 | 370:10 371:17 | 381:6 |
| 236:4,6,7,14,20 | 287:6,9 303:25 | 371:23 372:20 | **de** 320:12 |
| 236:21 237:6,7 | 304:14 305:8 | 373:9,22 374:6 | **deal** 303:6 |
| 237:13,15,19 | 306:23 308:20 | 374:15,16 | 362:15 |
| 239:13 241:4 | 308:21 309:12 | 375:16 376:24 | **dealt** 323:11 |
| 241:16,18,20 | 309:25 311:25 | 381:25 386:4,4 | **decade** 58:6 |
| 241:23,25 | 312:8 313:18 | **database** 112:4 | 60:15 |
| 242:1,12,14,15 | 318:18,23 | 112:7 113:3 | **december** |
| 242:17 244:12 | 320:19 321:2 | 114:6 180:13 | 68:13 |
| 244:25 245:2,3 | 321:22 323:17 | **dataset** 274:25 | **decide** 109:2 |
| 245:12 248:22 | 324:2 325:1,4 | **datasets** 100:23 | 111:5,5 340:21 |
| 250:8,11,12,15 | 325:6,9,12,14 | 101:2,5,8 | **decided** 206:6 |
| 250:19,25 | 325:19,22,25 | 244:3 255:22 | 325:8 |
| 251:9,14 | 327:23 328:9,9 | | |

**[decides - deposition]**

| | | | |
|---|---|---|---|
| **decides** 111:3,3 | **defending** 9:3 | 85:1,8,9,16,23 | **delivered** |
| **deciding** 22:20 | **defer** 340:20 | 86:5,7,13,14 | 226:12 |
| **decipher** | **defies** 60:17 | 87:2,3,5,11 | **delivery** 205:19 |
| 224:16 228:13 | **define** 84:2 | 88:21,22 89:1 | 206:20 262:8 |
| **deciphering** | 347:15 348:3 | 89:6,14,17,22 | **delve** 122:7 |
| 226:22 | **defined** 83:1 | 91:16,25 92:8 | 132:20 |
| **decision** 266:21 | 194:21 363:13 | 93:1,12,13 | **demographic** |
| 266:24 267:1 | 363:14 | 94:2,3 119:15 | 216:19 |
| 271:7 307:17 | **defines** 36:3 | 145:22 146:3 | **demonstrating** |
| 341:20 342:14 | 68:16 192:7 | 179:8 194:2 | 375:15 |
| **decisions** | **defining** 45:1 | 252:14 363:16 | **dense** 256:24 |
| 226:23 | 384:4,12 | 375:9 381:25 | **depend** 46:5 |
| **declined** | **definitely** 60:4 | **definitions** | 302:22 |
| 314:12 | 320:7 | 40:21,23 42:24 | **dependent** |
| **declines** 264:12 | **definition** 37:4 | 68:4,7,11 | 46:19 291:17 |
| **decode** 228:1 | 38:21 39:23,24 | 72:25 86:8 | **depending** 40:6 |
| **decrypt** 376:21 | 40:14,20 42:2 | 119:12 212:20 | 112:21 260:15 |
| **decryption** | 42:13,14,20,21 | 381:4 | 261:2 265:15 |
| 249:21 250:18 | 43:3,18,20 | **degree** 158:10 | 275:7 291:17 |
| **decrypts** | 44:23 45:7,24 | 169:14 200:5 | **depends** 102:19 |
| 278:17,22 | 47:23 64:8,13 | 232:14 245:25 | 273:21 309:19 |
| **deduction** | 64:19 65:13,13 | 254:8 260:24 | 310:16 334:14 |
| 259:12 | 67:3 68:18,19 | 320:8 | **deployed** 150:8 |
| **deep** 54:15 | 69:1,15,15,25 | **degrees** 200:5 | **deploys** 214:13 |
| 208:14 296:12 | 70:15 71:1,2 | **delete** 32:21 | **deposed** 4:10 |
| **deeper** 225:13 | 73:11,23 74:19 | 69:9 71:13 | **deposition** 1:18 |
| 377:5 | 74:23,24 75:7 | 107:22 108:4 | 3:10,15 8:23 |
| **default** 17:24 | 75:11,12,24 | 130:9,11 | 9:4 10:12 |
| 40:1,18,19 | 76:15 77:1,4,5 | 148:10 177:4 | 52:12 85:14 |
| 151:17 160:19 | 77:8,24 78:1,3 | 222:3,4 329:21 | 311:11 312:11 |
| **defeat** 178:7 | 78:10,15,16,18 | **deleted** 60:20 | 344:19 358:18 |
| **defend** 10:12 | 79:1,6,9 81:18 | 61:15,17 | 359:9 360:11 |
| **defendant** 1:14 | 81:22 82:10 | 130:11 199:12 | 379:1 392:3 |
| 1:19 2:15 | 83:3,10 84:8,9 | 318:24 326:5 | 393:19,22,24 |
| | 84:13,14,20 | 327:14 328:14 | 394:8,10 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[deprived - device]**

| | | | |
|---|---|---|---|
| deprived | designation | 207:14 208:9 | developers |
| 314:11 | 268:22,25 | deteriorating | 109:18 120:1 |
| depth  31:8 | 269:3,10 270:5 | 138:22 | 149:21,21 |
| 122:8 | designed  27:14 | determinative | 151:16,22 |
| describe  13:10 | 112:15,19 | 198:22,24,25 | 152:10,19 |
| 32:22 158:12 | 116:2 229:18 | determine | 154:22 155:12 |
| 177:23 180:1 | 279:6 282:20 | 23:20 169:14 | 156:18 157:4 |
| 181:19 280:15 | desimone  1:22 | 215:20 225:21 | 157:12 160:4 |
| 280:17 330:5 | 3:20 391:3,18 | 228:15 249:22 | 162:12 163:20 |
| described  41:8 | desirable | 254:8 307:25 | 164:4,16 166:6 |
| 107:11 110:14 | 183:13 | 331:23 359:1 | 166:20 167:5 |
| 177:12 | desire  305:21 | determined | 168:24 169:14 |
| description | destroy  329:21 | 130:5 393:18 | 182:2,7,19 |
| 11:9 39:13,15 | destroyed | 393:22 394:7 | 289:11 291:2 |
| 49:19 52:20 | 336:18 | determines | 296:11 298:4 |
| 53:4 57:1,3 | destruction | 111:20 | 299:17 307:14 |
| 70:22 122:3 | 37:10 | deterministic | 310:3 |
| 178:13,16 | detail  6:13 | 244:13 | developing |
| 201:11 211:20 | 140:5 180:17 | develop  34:14 | 97:4 |
| 211:21 340:1 | 240:11 251:8 | 49:10 144:18 | development |
| 389:6 | 286:12 317:3 | developed  18:3 | 219:2 |
| descriptions | detailed  31:8 | 113:2,9 114:5 | deviate  210:9 |
| 50:13 | 209:9 256:24 | developer | 255:24 |
| deserve  266:25 | 267:10 273:15 | 109:13 123:11 | deviating |
| design  109:5 | 273:16 275:9 | 123:24 150:20 | 339:25 |
| 162:4 195:24 | 280:13 282:15 | 152:14 153:25 | deviation |
| 197:4 279:8 | details  145:12 | 157:24 165:7 | 261:20 |
| designate  387:4 | 273:23 286:13 | 171:7 183:7 | device  63:12 |
| 387:6 | 309:19 310:5 | 184:14 186:16 | 66:3 97:23 |
| designated | detect  65:21 | 204:6 216:20 | 98:6,23 99:6,7 |
| 73:19 169:7 | 109:1 207:2 | 217:1,3,4 | 99:20,24 100:9 |
| 266:8 269:7 | detecting | 263:11 295:7 | 100:22 101:2 |
| designates | 207:12 | 379:14 | 101:16 102:10 |
| 269:16,22 | detection | developer's | 102:20,22,25 |
| | 205:12,13,14 | 56:22 224:16 | 102:25 106:7 |

**[device - disclaimed]**

| | | | |
|---|---|---|---|
| 108:21 109:11 | **difference** 79:7 | 198:16 200:4 | 359:20 |
| 110:13 134:21 | 123:10 124:1,8 | 201:13 202:8 | **dig** 374:19 |
| 135:17 138:20 | 195:3 197:13 | 203:3 215:11 | **dinner** 287:24 |
| 138:23 141:18 | 197:19 219:5 | 220:11,11 | **direct** 60:8 |
| 161:9,10,12 | 320:12 351:10 | 223:24 239:8 | 249:16 295:15 |
| 173:16,20 | 363:12 378:10 | 247:15 248:10 | **directed** 8:3 |
| 174:2,7,8,10,13 | 382:15 384:15 | 250:13 260:18 | **directions** |
| 180:5,7,8 | **different** 9:24 | 261:14 262:1 | 390:1 |
| 183:24,25 | 15:9 23:24 | 274:1 283:6 | **directly** 7:16 |
| 184:17 185:1 | 27:1 39:17 | 288:5 293:3 | 236:2 |
| 186:11 187:2 | 40:6,9,21,21,23 | 296:4 297:20 | **directory** 301:6 |
| 193:18 195:11 | 40:23 42:17 | 297:20 298:18 | **disable** 304:24 |
| 201:22,23 | 43:8 44:16 | 298:19 309:20 | 322:24 |
| 202:20,25 | 45:25 47:22 | 310:19 311:16 | **disabling** |
| 203:4 207:5,10 | 51:12 52:6 | 311:16 312:2 | 202:20 |
| 218:10 232:16 | 54:18 62:5,21 | 325:22 334:19 | **disabuse** 76:16 |
| 236:5 244:1,2 | 63:20,20 65:6 | 334:25 347:11 | **disadvantage** |
| 260:15 264:19 | 70:8 71:3 | 348:2,4,24 | 327:25 |
| 273:20 313:15 | 73:15 75:13 | 350:13 351:17 | **disagree** 53:23 |
| 313:16 314:12 | 77:7 78:2 | 361:18 375:4,7 | 68:24 85:3 |
| 316:15 322:4 | 79:16 84:9,21 | 376:3 379:7 | 99:15 232:13 |
| 376:6,17 386:4 | 84:21,23 85:19 | 381:22 382:7 | 269:1 342:19 |
| **device's** 264:17 | 86:12 100:23 | **differentially** | **disagreement** |
| **devices** 99:21 | 103:4 116:9 | 266:17 | 68:24 184:5 |
| 99:23 174:3,4 | 123:15,19,22 | **differently** 46:3 | 295:4 |
| 201:21,22 | 125:2,2 136:3 | 62:4 118:13 | **disappear** |
| 202:21 244:5,8 | 139:8 141:12 | 177:13,23 | 298:3 302:17 |
| 244:9 247:13 | 141:12 145:21 | 237:14,20 | **disappearing** |
| 253:25 278:1 | 165:8 175:12 | 314:25 | 303:1 |
| 312:17 373:24 | 179:21,23 | **differs** 42:14 | **disaster** 308:13 |
| **devolve** 203:25 | 180:3 183:15 | 86:6 | **discarded** |
| **dichotomy** 54:2 | 188:2,4,5,11,12 | **difficult** 116:20 | 197:14 |
| 131:24 197:8 | 188:19 192:15 | 121:6 207:22 | **disclaim** 82:11 |
| **differ** 69:15 | 195:2,24 | 245:10 279:15 | **disclaimed** |
| 86:10 | 196:20 198:6 | 306:19 359:8 | 383:19 |

**[disclose - documented]**

| | | | |
|---|---|---|---|
| **disclose** 168:25 | **discussing** | **disruptive** | 67:9,11 73:17 |
| **disclosed** 27:22 | 81:19 104:10 | 307:8 | 77:16 78:11 |
| 80:13,15 170:3 | 177:2 | **dissident** 100:2 | 80:8 81:5 |
| 171:23 | **discussion** | **dissidents** | 91:19,20 |
| **discloses** 171:7 | 29:17 34:5 | 115:12 | 108:14 109:23 |
| **disclosure** | 67:15 189:24 | **distinction** | 137:18 142:18 |
| 70:24 71:17 | 234:1 371:5 | 136:17 190:25 | 153:8,9,17,18 |
| 75:5 80:25 | **display** 195:16 | 191:8,14 | 157:1 175:20 |
| 87:12 247:21 | 195:23 204:11 | 192:22 202:18 | 189:19 192:19 |
| 270:2 | 289:18 290:11 | 202:23 363:22 | 194:6 210:23 |
| **disclosures** | 291:12 350:19 | **distinguish** | 237:2 238:11 |
| 91:6 169:6 | 350:23 351:7 | 268:7 361:14 | 238:14,17,20 |
| 177:13 255:9 | 351:20,25 | **distinguished** | 238:22 241:7 |
| 255:12 | 352:20 354:13 | 363:10 | 241:10 242:23 |
| **discontinue** | 366:2,9 367:6 | **distracted** | 249:2,11 |
| 340:24 | 367:8 379:5,13 | 368:12 | 259:10 269:16 |
| **discover** 15:22 | 380:8,15 | **distraction** | 269:22,25 |
| 173:12 | 381:18,20 | 371:14 | 281:14 283:16 |
| **discovered** | 383:8 | **distributed** | 288:16,22,25 |
| 16:3 | **displayed** | 258:13 | 289:3,6,7,9 |
| **discovery** | 383:9,11 | **distribution** | 321:13,15,17 |
| 149:6 217:10 | **displays** 41:7 | 206:7 253:20 | 321:20 337:19 |
| 228:23 234:16 | 46:8 | 253:21 254:1,4 | 358:17 372:3 |
| 236:17,17 | **dispute** 22:21 | 261:8 | 372:24 374:22 |
| 249:5 312:25 | 23:2,7,10,21 | **district** 1:3,4 | 374:25 389:8 |
| 327:22 328:7 | 58:1 130:8 | 3:13,14 | **documentation** |
| 335:11 | 199:4 214:6 | **divide** 282:24 | 156:8,11,15 |
| **discuss** 45:9 | 234:12,14 | **division** 1:5 | 157:3 294:25 |
| 97:14 110:17 | 239:2 247:16 | **dmv's** 180:13 | 295:16 297:1 |
| 147:5 328:6 | 249:9 251:2 | **docket** 327:17 | **documented** |
| **discussed** 67:5 | 282:19 | **docs** 320:24 | 12:24 98:2 |
| 139:14 240:19 | **disputing** | **doctor** 111:23 | 130:16 133:18 |
| 325:16 347:13 | 194:19 203:16 | 111:24 | 134:23 135:21 |
| 350:9 | 215:22 234:21 | **document** 33:5 | 137:17 139:21 |
| | | 33:12 36:16 | 142:15 143:11 |

**[documented - effect]**

143:13 146:25
147:22 148:4
151:4 165:14
166:2 214:20
214:22 215:6
218:16 219:6
243:8 253:17
263:22 265:3
284:19,22
308:16 312:20
313:2 342:25
352:5
**documenting**
226:15
**documents**
23:6 26:17
27:16 46:13
68:23 75:17
88:13 90:17
91:11,12,14,23
154:11 156:20
156:23 164:21
196:23 221:18
240:11 241:1
241:12 288:11
288:19 321:8
335:17 372:19
384:19
**doing** 25:8 47:4
64:2 66:3
101:9 114:25
120:10 142:4
163:14 175:22
181:21 216:9
225:4 231:4

232:3,5 242:7
245:1 246:2
271:3 274:21
291:23 301:23
307:16,22
320:5,7 341:7
364:19
**dollars** 382:22
**dominant**
303:19
**door** 141:7
200:6
**dossier** 88:9
194:8,11 195:4
223:19
**double** 77:12
294:19 322:19
**doubt** 256:13
380:23
**download**
195:21 373:2
**downstream**
118:10 120:21
**dozen** 373:8,9
**dr** 112:23
162:10 215:10
234:2 238:20
247:11 248:6
255:20 297:25
311:13,19
**draft** 248:18
**dramatic** 102:8
**drastic** 267:23
**draw** 78:17
154:23 167:12

191:8 213:20
216:7,8 298:24
300:20
**drawn** 192:23
**drive** 309:15
366:18
**driven** 342:2
**drop** 207:13
208:7,8
**dropbox**
319:19
**dry** 211:19
302:23
**dsid** 248:23
249:6,17,20,22
251:3 277:1,6
277:21
**due** 102:2
126:19
**duly** 4:4 391:7
**dumping** 58:15
89:8
**duplicate**
114:23

| e |
| --- |

**e** 1:1 2:1,1 69:5
101:14 106:8
129:1,1 159:13
160:1,16,17,23
161:25 162:6
163:1,4,5,10,21
164:5,17
165:10 167:7
174:17 233:9
234:4 255:22

256:5 288:18
292:3 299:10
346:2 387:8
389:1,5 393:9
393:12 394:1
395:3,3,3
**earlier** 10:5
23:25 68:16
82:10 194:8
212:9 218:8
233:8 234:15
277:17
**early** 49:19,24
153:14 196:24
292:25
**easier** 77:21
121:15 127:16
212:24
**eastern** 3:3
**easy** 163:2
232:8
**economic**
300:16
**edit** 69:9 71:13
**eduardo** 2:15
67:6 106:22
123:14 169:19
246:8 248:1
284:4 313:20
317:15 393:1
**education**
27:18
**effect** 105:25
108:17 130:3
211:21 221:3

**[effect - errors]**

224:20 248:21
321:9
**effective**  66:24
**effectuate**
205:2 207:5
**efficiency**
245:9
**efficient**  319:2
**effort**  112:17
**efforts**  167:3
168:2 372:19
**eight**  327:11
330:10,10
**either**  13:8
55:21 109:2
174:3 179:11
225:12 266:3
294:22 304:16
321:18 327:15
344:25 345:17
**elements**
192:21 243:23
**eliminate**  104:9
**eliminating**
114:23
**else's**  43:15
106:2
**embed**  152:10
**employees**
45:19,24 46:12
241:3 323:8
**enable**  165:24
166:7,7 223:4
**enabled**  109:22
151:17 263:11

**enables**  262:12
**encoded**  246:21
246:23
**encodes**  132:10
**encourage**
126:10
**encrypt**  277:21
376:20
**encrypted**
247:14 248:9
248:12,13
249:18,18,20
277:6,11,13
376:17
**encrypting**
247:19
**encryption**
118:3 249:24
250:9 251:3
**endeavor**  15:18
244:22
**endeavoring**
62:7
**ended**  63:24
**ends**  208:14
**enforce**  167:4,4
167:11 168:2,3
**enforcement**
168:9 250:20
250:21
**engaged**  48:15
48:16 364:16
**engagement**
4:23 10:1
11:11 260:16

296:6,16
297:10 350:14
**engagements**
4:17 10:19
11:3
**engineer**  110:3
110:4,21,22
118:8 238:10
239:23
**engineer's**
238:7
**engineerable**
110:20
**engineering**
183:12 282:15
**enhance**  222:24
223:2 226:12
**enhanced**
222:22
**enhancement**
222:25
**enhances**
223:11
**enlighten**
368:13
**enlightening**
190:7
**ensure**  107:11
153:5
**entangled**
137:3
**entanglement**
137:2
**entire**  83:17
360:11

**entirely**  122:12
309:25
**entirety**  244:11
**entities**  302:5,8
**entitled**  169:23
389:8
**entity**  112:24
188:23
**entries**  129:25
139:18 141:15
141:15 142:7
144:20 216:14
244:16 247:12
338:22 376:3
376:17 377:4
**equal**  266:25
**equally**  86:20
380:7
**equivalent**
124:25 125:1
277:12
**era**  206:9
297:23,24
**erode**  301:9
**errata**  392:1
393:14,16
394:3,5
**erroneously**
162:21
**error**  16:6,9,11
304:19,21
319:9
**errors**  6:16
191:21

Page 28

**[esantacana - exfiltrates]**

| | | | |
|---|---|---|---|
| **esantacana** | 184:9,10,18 | 263:16 284:13 | 158:19 184:9 |
| 2:16 393:2 | 185:1 218:8,11 | 321:9 | 195:13 199:6 |
| **especially**  6:12 | 226:2,3 227:6 | **evil**  365:5 | 218:19 227:5 |
| 16:6 25:14 | 227:18 256:17 | **evolution** | 243:2 267:4 |
| 204:19 239:11 | 275:19 351:9 | 292:17 | 302:19 304:23 |
| 319:22 | 368:4 371:24 | **evolving**  63:9 | 305:10 348:13 |
| **esq**  2:4,9,10,15 | 375:5,10,10,11 | 63:21 | 350:22 365:13 |
| 2:16 393:1 | 380:25 | **ex**  376:24 | 367:7 372:10 |
| **essentially**  9:22 | **events**  157:21 | **exact**  29:15 | 379:24 380:16 |
| 55:4 61:4 63:5 | 158:3,7,19,23 | 42:20 52:6 | **examples**  35:17 |
| 112:9 134:1 | 159:1 160:22 | 55:11 304:6 | 35:17 148:24 |
| 150:6,8,21 | 161:17,19,24 | 328:18 329:15 | 192:5 193:16 |
| 179:11 180:6 | 162:7 218:14 | **exactly**  5:7 15:8 | 193:20 238:11 |
| 209:21 220:22 | 218:18,22 | 19:4 30:5,6 | 370:16,17 |
| 233:20 245:1 | 219:19,21 | 33:23 34:3,8 | **excel**  345:11 |
| 304:13 338:14 | 220:8 224:17 | 58:23 104:22 | 356:14 357:17 |
| 339:17 358:13 | 224:22 226:8 | 223:25 297:5 | 358:4,8 359:2 |
| **establish**  21:6 | 226:11 255:21 | 306:25 361:17 | 359:17 362:11 |
| 21:16 92:3 | 257:14,22,23 | 373:12 376:23 | 363:3 373:3 |
| 122:9 261:24 | 260:13,13 | **examination** | **exception**  66:8 |
| 284:24 | 261:25 262:1 | 4:6 129:6 | **exclude**  309:24 |
| **et**  1:7 3:12 | 375:6 | 344:16 346:12 | **excluded** |
| **eu**  118:18 | **everybody** | 354:2 378:4 | 308:12 309:13 |
| **evaluate**  117:3 | 229:19 305:23 | 383:18 389:2 | **exclusively** |
| 155:18,20 | **evidence**  95:15 | **examined**  4:4 | 116:22,23 |
| 156:4,7 188:17 | 135:16 139:23 | 224:5 232:10 | **excuse**  67:23 |
| 225:4 309:7,10 | 140:19 144:6 | **example**  9:7 | 108:19 133:4 |
| **evaluating** | 191:2 206:20 | 17:21 20:1 | 280:20 |
| 227:1 255:11 | 218:17 219:18 | 21:20 27:7 | **exfiltrate** |
| **evaluation** | 220:7 221:12 | 41:24 62:4 | 274:13 |
| 77:15 | 221:17 224:13 | 77:12 93:9 | **exfiltrated** |
| **event**  65:15 | 224:20 226:10 | 95:4,7,18 96:2 | 235:25 274:9 |
| 96:19,22 97:20 | 226:22 228:12 | 96:5 97:25 | **exfiltrates** |
| 97:22 98:8 | 236:12,21 | 99:2,19 102:6 | 105:17 250:8 |
| 159:14 184:7,8 | 240:23 262:8 | 102:16 123:12 | |

**[exfiltrating - extent]**

| | | | |
|---|---|---|---|
| **exfiltrating** | **exists** 88:11 | 18:19 19:15,20 | **explanation** |
| 106:5 | 285:6 337:2 | 28:3 29:8,10 | 8:18,21 89:12 |
| **exfiltrator** | **expect** 199:7,8 | 73:18 88:24 | 171:17 219:8 |
| 250:10 | 261:10 263:7 | 90:16 125:12 | 338:13 357:7 |
| **exhaustive** | 337:4 | 126:21,22 | **explanations** |
| 35:10,15 | **expectation** | 127:5,20 | 132:22 |
| **exhibit** 11:20 | 25:11 103:15 | 154:18 170:3 | **explanatory** |
| 11:24 67:1,2 | 198:13 | 213:12 229:3 | 77:20 |
| 67:16,21,23 | **expectations** | 269:8,12,14 | **exploiting** |
| 71:21 72:2,13 | 17:16 18:20 | 270:2 272:25 | 365:2 |
| 72:22,23,25 | 197:25 | 301:7 315:10 | **export** 96:19,22 |
| 73:1 75:10,19 | **expected** 17:8 | 326:2 335:4 | 96:23 97:20 |
| 75:23 76:3 | 92:16 104:4 | 336:21 360:19 | 99:11 |
| 77:3,25 80:2 | 153:13 | 363:23 389:7 | **exports** 97:13 |
| 82:9 83:21 | **expecting** | **expertise** 15:21 | 98:6 |
| 85:17 86:6,25 | 198:3,5 | 17:17 18:4 | **expose** 342:14 |
| 87:10,12 | **experience** | 19:16 26:6 | **exposed** 138:25 |
| 107:16 212:12 | 25:25 26:6 | 27:19 57:22 | 139:2 250:23 |
| 345:4 346:2 | 88:23 90:15 | **experts** 18:9 | **express** 31:18 |
| 347:1 373:4 | 92:2 127:10 | 26:18 27:7 | 213:5,12 |
| 387:14,18,20 | 192:9 211:4 | 29:3 105:24 | 224:14 |
| 389:7,7,8,9,10 | 212:5 245:16 | **expires** 392:24 | **expressed** |
| 389:11,12,13 | 318:11 352:19 | **explain** 13:13 | 110:23 182:13 |
| 389:14,15,16 | 383:3 | 15:5 20:15 | 310:8 |
| 389:17,18,19 | **experiences** | 92:9 99:16 | **expressing** |
| 389:21 | 73:5 | 131:3 266:17 | 182:18,23 |
| **exhibits** 82:22 | **experiment** | 279:13 371:8 | **expressly** |
| 362:15 388:1 | 254:13,20 | **explained** 31:5 | 322:10 |
| **exist** 35:12 | 376:25 | 31:13 80:17 | **extended** |
| 324:9 328:16 | **experiments** | 345:25 | 292:18 |
| 331:12 370:17 | 215:19 254:10 | **explaining** | **extensively** |
| **existed** 337:2 | 254:17 | 44:25 | 27:10 275:5 |
| **existing** 154:8 | **expert** 4:15 | **explains** 175:6 | **extent** 125:5 |
| 240:20 | 12:20 13:11 | 329:12 | 171:6 172:15 |
| | 15:12 17:15 | | 172:17 228:3 |

**[extent - feeling]**

329:20 337:1
**external** 349:9
364:12,21
**externally**
154:5
**extract** 230:10
230:18,23
236:7 304:9
364:7
**extrapolate**
256:4 305:5
308:22 309:1
**extrapolation**
310:13
**extreme** 112:8
**extremely**
279:24 321:6
**eye** 106:24
**eyes** 1:2 211:2
211:14 387:5

**f**

**f** 1:1 129:1
374:9 389:16
**facebook**
184:15 185:18
186:4
**facilities**
318:14
**facing** 42:19
43:19 204:6
342:11
**fact** 6:12 14:22
16:18 18:1
33:9 62:17
80:9 92:25

95:7 167:13
184:18 226:25
235:23 239:16
242:9 290:20
304:19 312:6
326:21 349:8
352:8
**factfinder**
22:18,22 23:19
196:13
**factor** 267:5,9
267:10,13
**factors** 265:16
267:13 272:19
321:3
**facts** 13:13,17
14:16,17 18:6
18:8 22:17
95:14 140:18
240:23 263:15
321:15,16,24
**failure** 103:12
167:4 246:3
**fair** 11:12,13
11:25 12:2,10
14:5 19:13
33:17 35:9
37:3 39:8 42:6
46:11 49:21
52:15,21 53:2
54:10 65:10
82:5 87:8
99:20 108:5
132:7 136:22
157:6,12

158:12 177:21
203:18 214:24
216:10 223:16
224:2 248:23
253:7 255:10
260:17 265:17
272:19,22
273:6 276:11
297:25 298:10
302:21 371:25
**fairly** 14:24
370:22
**faith** 162:20
**fake** 20:2 24:2
82:16 88:14
122:14 178:13
178:15
**false** 54:2 79:12
82:24 258:1,1
258:9,9,22,23
259:2,2,17,18
**falsely** 250:24
**familiar** 118:14
166:5,14
200:20 201:24
202:10 204:4
229:25 312:4
314:14 315:23
316:16,23
**familiarized**
59:4
**fan** 301:12
**far** 19:18 137:3
161:18,19
186:4 188:10

204:3 241:13
259:21,24
263:3 280:9
333:13
**farr** 1:20 2:13
3:16
**fast** 299:22,22
310:15 373:18
**favorable** 13:7
13:18 14:4,7
14:10
**favorite** 227:6
227:19
**feasible** 32:10
35:5,20 134:14
245:14,22
**feature** 127:24
151:1 222:15
222:15,17
352:8 384:12
**features** 124:12
125:7 126:14
127:7,22,23
151:2 157:10
296:1 384:4
**fed** 154:22
263:7
**federal** 112:6
336:12 394:1,8
394:9
**feeding** 154:16
**feel** 11:16 66:10
152:1 268:2
**feeling** 340:24

**[feelings - first]**

**feelings** 340:19
340:23
**fewer** 6:16
153:12
**fiduciary** 116:8
116:9
**field** 18:1 90:15
131:12 132:10
132:14 144:2
144:11,20
146:19 175:15
175:16 235:10
239:7 317:11
377:2
**fields** 239:9
275:18 330:21
334:19 337:10
347:20
**fight** 85:22
86:2 152:2
339:1
**figueroa** 2:2
**figure** 39:25
55:17 59:12
111:8 142:25
144:19,25
196:11 222:6
224:11,21
250:2 265:5
285:10,12
307:5,6 332:18
333:9 341:25
**figured** 265:2,4
**file** 357:5

**filed** 3:13
332:13,19
333:9,25
334:16
**files** 230:22
345:11 346:1
356:15 362:11
363:3
**fill** 342:1
**fills** 383:11
**filter** 65:21,23
319:5
**filtered** 68:11
**final** 16:24
341:20
**financial** 383:4
**find** 13:23
17:12 42:19
43:9 44:23,24
83:4 92:16
132:6 133:12
134:6,12,12,14
135:16 139:18
141:22 142:23
142:25 143:10
143:12 173:15
174:10,23
175:9 176:3
214:2 236:12
243:17 328:18
330:21 337:5
344:20 358:25
360:23 361:9
361:10 371:4

**finding** 100:7
175:2,10
**finds** 196:13,13
198:16
**fine** 180:10
199:17 260:1
265:8 286:15
295:6 304:3
308:6 314:7,8
361:24 387:21
**fingerprint**
136:9 245:3,4
245:5
**fingerprintable**
347:19
**fingerprinting**
141:21 142:12
175:3,11,13,14
244:21 245:10
**fingerprints**
245:7
**fingers** 298:3
345:7
**finish** 146:6
183:22 306:3
310:22 385:6
385:21,24
**firebase** 64:14
64:21 65:15
97:4,7 117:11
123:12 124:3,9
125:5 149:22
150:6,12,17
151:1,16,23
153:15,19

157:10,11
158:15 160:23
161:16 162:5
166:21 169:1
171:14,24
182:5 186:17
188:21,22
194:22 203:2
214:14 241:17
261:1 289:12
289:24,25
290:9 291:3
292:10,17
298:2 307:13
322:1,3,24,25
323:16,21
324:20 325:20
384:16
**firehose** 88:16
**firm** 7:15 10:16
14:25
**firms** 9:8
341:15
**first** 4:3 31:23
36:25 37:15
49:17 51:8
57:8 89:15
135:12 177:9
184:8,9,13,23
185:1,10
186:11 189:11
189:12 211:9
212:23 218:7
218:11,14
219:2 220:14

**[first - front]**

226:7 237:4
240:25 249:4
266:3,4 276:13
280:6,8 290:17
290:23 293:12
299:11,17
300:6 307:5
345:25 370:13
370:24
**fischer**   112:23
113:2
**fits**   114:17
**five**   29:20,21
29:21,22,23
78:12 82:10
306:4 308:24
310:20 373:20
**fix**   360:24,24
**fixed**   115:6
**flag**   6:22 257:5
**flexner**   2:2
**flight**   288:2,6
306:14
**flip**   36:4 82:16
92:19,24
103:19 107:6
266:1,5,6
276:14 323:6
**flipped**   258:10
**floor**   2:3,8,14
175:25
**florida**   2:8
**flowing**   222:10
**flub**   37:11

**focus**   86:24
90:10 177:5
196:3 208:3
**focused**   275:14
280:9 371:23
**focusing**   49:25
105:12 226:7
**folder**   362:15
**folds**   382:21
**folks**   7:19
**follow**   111:24
180:20 211:7
227:11 313:23
316:25
**following**   33:1
34:19 73:3
**follows**   4:5
191:18 393:8
**food**   227:6,19
**footnote**   36:13
36:19 43:21
47:23 69:16
73:15 75:12
77:8 78:3 79:6
81:12,17,19
84:2 88:22
89:21 90:14
91:16,24 93:2
93:14 148:17
152:22 153:16
**footprints**
131:24 337:6
**force**   154:16,22
**forecast**   320:21

**foreign**   364:22
**forever**   225:22
**forget**   267:3
**forgive**   59:20
**forgot**   265:5
**forgotten**   27:25
**form**   33:5
43:12 49:15
50:22 59:13
68:25 75:16
76:12,13 79:13
85:2,11 93:4
93:17 95:15
143:22 144:4
164:8,10
213:21 277:7
277:11,13
340:3 366:12
**formal**   312:25
**formed**   53:12
281:16
**forming**   58:1
**forth**   189:7
194:21 218:4
237:24 347:14
366:10 391:7
**forthepeople....**
2:10,11
**forward**   29:2
122:25 309:20
309:23
**found**   42:22,25
92:13 102:15
122:11 136:1
139:23 142:8

167:16,18
218:16 243:1,3
247:13,22
330:6 337:2
370:3,20
386:18
**founders**   64:1
**four**   189:12
343:1 382:10
**fractions**   383:8
383:10
**fragmented**
187:21 267:9
**fragmenting**
188:4
**framing**   85:4
**francisco**   1:5
2:14
**franklin**   2:7
**frankly**   92:16
**fraud**   205:14
206:24 207:8
207:12 208:9
**fraudulent**
207:2
**frcp**   394:1
**frequency**
255:14
**fresh**   317:12
**friendly**   74:19
**friends**   321:16
**front**   2:13 21:1
57:13,17 72:23
325:5 326:18
346:12 356:20

**[front - generates]**

359:3,22
**fruitful** 270:18
**full** 279:22
**fully** 346:15
367:21
**function**
107:11 129:10
177:12,24
202:19 210:1,1
245:4,5 267:19
322:25
**functionality**
110:25 150:7
150:12 154:9
154:21 155:4
289:25
**functioned**
209:25
**functions** 32:20
163:3,3 202:19
**fundamental**
295:3
**further** 186:24
191:16 205:6
220:15 241:8
333:14 354:1
391:10
**future** 148:20
148:21 208:9
307:2,25 365:5
**fuzzed** 142:2
**fuzzing** 142:3

**g**

**g** 52:3 132:23
132:24 133:20
133:21 135:5
139:12 144:22
145:13 146:23
216:12 346:2
**ga4f** 63:14
121:19 131:1
131:19 144:10
146:18 150:17
150:25 151:16
151:18 157:9
190:16 241:18
293:7,20
299:13,19
300:8 324:25
325:2
**gaia** 46:14 48:6
53:21,25 54:2
54:3,4,7,9,23
54:24 86:18
130:25 131:4
131:18,25,25
132:1,5,7,13
134:6,20
135:17 137:20
137:20 139:14
139:15 141:15
141:16 144:2,3
144:10,20,21
146:18,19
147:25 148:1,3
173:13 174:15
174:16,21,21

174:24,25
176:11 178:20
179:1,8 192:4
192:4,13,17
193:6 194:15
194:16 235:12
237:5,14
241:18,20,24
241:24 242:1,1
243:25 247:22
247:22 248:8,8
248:22 249:17
249:18,20,22
276:21 277:4,7
277:9 278:8,25
282:22,25
283:1 285:7
330:10,11,16
337:3,15,23
338:2,22,22
340:5 365:8,9
369:3,6,7,11,13
369:14 370:24
370:25 372:15
372:19 374:15
374:15 375:8,8
375:12,14,17
376:6 382:1
386:19
**gallagher** 1:21
2:13 3:16
**game** 83:15
287:5
**games** 83:18

**ganem** 238:22
240:12
**gap** 190:14,19
**gather** 245:12
**gathered**
103:21
**gathering**
101:10
**gdpr** 119:12
**gears** 251:24
**gender** 216:13
**general** 15:17
23:7 33:2 34:9
48:20,24 62:5
167:10 203:21
203:25 204:24
217:5 245:20
319:24 370:15
**generalized**
205:12
**generally** 10:14
33:13 38:21
39:21 125:9
155:12,16
157:15 214:16
320:10 337:24
**generate**
230:13 231:21
235:7
**generated**
103:4 121:21
253:24 275:20
312:1
**generates**
251:3

**[generic - going]**

**generic** 96:5
**genie** 299:23
**geolocation**
  232:11,14
**getting** 71:7
  74:6 79:23
  114:16 117:25
  119:10 180:16
  262:25 273:22
  373:5 377:5
**gigabytes**
  319:14
**gigantic** 244:3
**give** 8:18 16:20
  17:20 20:18
  29:19 33:21
  36:6 45:13
  52:23 65:5
  66:11 71:8
  73:4 78:3
  81:19 83:9
  84:6 91:10
  95:21 96:2
  100:5,9 139:3
  164:24 178:9
  178:12 179:13
  192:5 193:16
  195:13 202:23
  205:21 213:22
  227:4 241:8
  250:15 273:24
  304:5 310:14
  331:24 354:6
  356:14 358:23
  359:11 372:22

377:4 381:14
385:9
**given** 54:13
  65:7 67:9
  73:10 75:3
  79:9 89:23
  93:11 120:16
  157:16 225:20
  234:16 255:19
  324:8 335:5
  344:18 349:15
  359:10 363:2
  365:24 379:17
  382:11,20
  384:1 388:5
  391:9
**gives** 227:5
**giving** 19:6
  20:6 28:22
  95:17 316:15
**glad** 237:22
**glean** 56:15
**gma** 152:8
  165:13,20
  289:23 290:5
  368:1,6 370:9
**gmail** 318:16
  319:13
**gmail.com**
  311:7
**go** 6:24 17:11
  21:13 26:23
  29:16 33:6
  43:13 46:17
  47:8 50:23

58:2 61:25
67:12 73:20
77:10 79:2,14
79:23 85:4
87:7,16 93:5
93:17 94:7
95:15 98:22,25
99:3 100:11,13
101:7 111:23
117:24 119:7
123:19 126:2
127:12 133:22
134:22 135:3
137:3 138:8
144:6,7 164:11
169:8 170:21
172:3,23
176:16 183:20
188:10 189:20
197:18 199:7
201:15 205:6
213:17 224:24
227:10,21
228:20,24
230:10,21
231:9 236:18
240:10 251:16
253:2 257:15
259:20,24
263:19 267:17
268:23 270:18
272:19 276:9
280:22 285:16
288:9 298:13
303:5 310:20

328:17,25
329:10 333:4
333:14 337:20
339:18 340:4
342:8 356:17
362:2 364:25
366:13 367:17
368:19 372:11
374:17,25
377:6 378:2
381:4 384:19
385:24 386:5
386:15
**godfrey** 10:22
  10:24
**goes** 31:8 74:3
  74:4 103:4
  200:8 267:5
  269:4 278:21
  351:1 364:23
  373:14
**going** 3:2 20:15
  20:18 21:23
  26:22 41:16
  59:3,7,9,12
  60:23 68:12
  71:9,11 77:21
  80:22 83:21,22
  87:24 88:17,19
  89:5 92:12
  113:11 115:10
  116:13 118:6
  122:7,15 123:1
  123:15,18
  137:9 143:20

**[going - google]**

| | | | |
|---|---|---|---|
| 149:17 165:5 | 28:13 37:16 | 46:10,12,14 | 86:14,16,17 |
| 168:20 170:6 | 38:15 45:7 | 47:17,18,21,25 | 87:2,11 88:16 |
| 172:21 176:13 | 56:7 134:25 | 48:2,3,4,17,18 | 89:1,2,17,22 |
| 178:17 179:13 | 162:20 163:15 | 48:22 49:7,12 | 90:13,23 91:7 |
| 183:4 184:17 | 199:6 205:18 | 49:21 50:14,25 | 91:17 92:8 |
| 186:18 189:10 | 206:20 223:11 | 51:3,11,17,20 | 93:9,13,20,21 |
| 196:11 207:23 | 223:13 242:18 | 52:1,19 53:18 | 94:19 96:4,7,7 |
| 208:7,15 209:9 | 245:9,23,25 | 53:20 54:7,8 | 96:18 98:19 |
| 218:4 221:11 | 256:21 262:8 | 54:23 56:18 | 102:10 104:6,8 |
| 227:17 234:12 | 275:1 305:3 | 57:5 58:6,10 | 105:4,14,15 |
| 234:14 244:17 | 307:16 308:1 | 58:11,12,15,22 | 106:5,6 107:10 |
| 247:20 257:3 | 309:2 317:20 | 60:1,14 61:16 | 107:12,22 |
| 261:24 264:24 | 327:8 387:24 | 61:22,25 62:1 | 108:2,10,18,20 |
| 265:7 266:22 | **goodwill** | 62:6,7,13,14,24 | 108:25 109:5 |
| 267:13 268:1 | 385:20 | 63:23 64:5,9 | 109:15,18,19 |
| 270:8 274:24 | **google**   1:13 | 64:10,11,13,14 | 110:1,4,4,24 |
| 282:2 305:6,20 | 3:12 19:22 | 64:15,20,21,22 | 111:2,3 113:1 |
| 306:6,14 | 20:12,13,22 | 65:15,20 66:24 | 113:3,8,10,11 |
| 309:20,23 | 22:1,7,13,14 | 67:3 68:5,7,10 | 113:16,24 |
| 313:5 314:4 | 23:21 25:15 | 68:16,16,18 | 114:11,15 |
| 319:4 321:5 | 28:15,19,25 | 69:3,11,19,23 | 116:12,14,15 |
| 323:14 330:2 | 31:19,25 32:2 | 70:4,7,13,17,19 | 116:16 117:11 |
| 332:14 336:9 | 32:7,8,12,19,25 | 70:21,23 71:14 | 117:12,16 |
| 336:12 341:13 | 33:1 34:18,21 | 73:1,2,7,11,13 | 118:8 119:2,3 |
| 346:7,13,21 | 35:7,18,20,21 | 74:2,3,5 75:7 | 119:17 120:4 |
| 351:4 352:17 | 36:2,19,21,22 | 75:10 76:17,19 | 120:10 121:5 |
| 356:4 360:2,6 | 37:2,6,19,22 | 77:1,3 78:22 | 121:18,24,24 |
| 375:14 377:10 | 38:12,13,17 | 79:1,9,20,23,24 | 122:20 123:11 |
| 377:12,16 | 40:4,5,17 41:2 | 80:3,5 81:10 | 124:3,9 125:4 |
| 381:3 385:9 | 41:6,7,8,22 | 81:12,13,20,23 | 126:7,11,11,25 |
| **golf**   37:7,8,9 | 42:13,14,16,20 | 81:24 82:3,4 | 127:3,7,15,22 |
| 45:2 | 43:10,17,22,23 | 82:23,24 83:1 | 129:13,20 |
| **good**   3:1 4:7 | 44:1,3,5,9,10 | 83:3,7,8,11,11 | 130:6,9,11 |
| 6:12 7:2,3 8:21 | 44:17,18,23 | 83:12,23,25 | 131:7,7,10,14 |
| 15:12 18:23 | 45:4,18,21,23 | 84:1 85:1,8,18 | 132:6,13 133:5 |

**[google - google]**

| | | | |
|---|---|---|---|
| 133:16 134:4 | 185:7,18,19 | 237:11,12,19 | 301:17 302:8 |
| 134:20 135:16 | 186:12,17 | 238:7 240:2 | 302:12 303:9 |
| 137:18 139:24 | 187:5,14,15 | 241:3,17,18,22 | 303:16,18,21 |
| 139:25 140:12 | 188:20,21 | 242:9,12,17 | 304:4,16 |
| 144:10 145:3,4 | 190:15 191:13 | 245:19 248:21 | 306:20 307:9 |
| 145:5,8,23 | 191:25 192:7 | 249:5 250:14 | 307:12 309:5 |
| 147:2 148:9,25 | 194:12,19,22 | 250:17 251:1 | 309:17,24 |
| 149:22,25 | 194:25 199:1 | 258:22 259:17 | 318:13 319:1 |
| 150:5,6,11,16 | 199:22 203:8 | 260:4,14,25 | 319:11,12,12 |
| 150:20 151:23 | 203:12 204:4 | 261:1 262:5,16 | 320:17,24 |
| 152:10,17 | 205:3,8,10 | 262:22 263:12 | 321:12 323:3,8 |
| 153:4,8,13 | 206:9,9,22 | 264:13,16 | 323:15,21 |
| 154:4,7,8,11,12 | 207:13,21 | 266:1 271:12 | 324:11,12,18 |
| 155:2 157:10 | 208:16,24 | 274:9,13 | 324:19 325:1,3 |
| 158:14,16 | 209:1,4,6,11,14 | 275:15,17 | 325:8,20 |
| 160:18,22 | 210:2 211:1 | 276:21 277:1,4 | 327:20,21 |
| 161:16 162:3,4 | 212:3,21 214:6 | 277:19 279:22 | 328:1,9 329:15 |
| 162:5 163:8,14 | 214:6,10,12,13 | 280:3 282:21 | 329:19,20 |
| 163:19,22,23 | 216:15,19,25 | 282:23 283:10 | 330:13,18 |
| 164:3,15 | 217:2,3 218:10 | 283:20 284:24 | 331:2,16,19,19 |
| 165:23,24 | 218:18 219:18 | 285:12 286:16 | 331:20 332:22 |
| 166:8,19,20 | 220:7,17,20,22 | 286:20 287:3 | 333:19 334:7,9 |
| 167:11,14,23 | 221:12,18,22 | 287:15 288:11 | 334:17 335:1 |
| 168:24,25 | 222:3,4,13,17 | 289:12,24 | 335:18,21,25 |
| 169:15 170:10 | 222:19,20 | 290:8 291:2,8 | 336:14 339:5 |
| 170:19,23,25 | 223:3,25 224:3 | 291:11,24,25 | 339:12,25 |
| 171:4,8,13,14 | 224:8,15,21 | 292:8,9,15,16 | 340:18,25 |
| 171:24 174:4 | 226:10,22 | 292:17 293:1,1 | 341:3,4,6,22 |
| 177:2,10,13,15 | 227:5,15,25 | 294:1,1,4,5 | 342:2,12 |
| 177:22 178:5 | 228:5,12 | 295:8 296:10 | 343:15,15,24 |
| 178:17,21 | 229:21,22,23 | 296:22 298:2,7 | 348:23 349:1,3 |
| 179:19,20 | 230:8 231:4,20 | 298:20,23 | 349:11,14,15 |
| 181:16,18 | 232:2 233:9,21 | 299:13,18 | 350:6 351:8 |
| 182:5 184:1,1 | 235:1,8,22 | 300:8,12 301:9 | 352:9,21,24 |
| 184:15,23,25 | 236:14 237:5 | 301:12,15,16 | 353:2,8,14 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[google - happens]**

| | | | |
|---|---|---|---|
| 354:13,16,21 | 256:19 257:25 | **gritty**  130:19 | **hairy**  65:18 |
| 355:2,3,6,12,14 | 258:5 259:12 | **ground**  189:9 | **half**  5:10 |
| 355:17 364:16 | 280:14 282:13 | **group**  96:11 | 293:12 299:12 |
| 364:18,19,22 | 286:8 287:2 | **guess**  8:24 20:5 | 299:17 300:6 |
| 364:23 365:3,4 | 288:13 289:18 | 51:21 87:8 | **halting**  225:19 |
| 365:7,19 | 290:11 291:12 | 97:15 102:24 | **hampered** |
| 368:16 370:20 | 300:13,18,22 | 105:6 110:1 | 307:12 |
| 372:6,7 373:23 | 318:15 323:12 | 122:6 158:10 | **hand**  11:12 |
| 376:13,19,23 | 324:2 339:18 | 167:22 174:20 | 77:16 250:18 |
| 377:4 379:21 | 341:2 352:20 | 223:21 226:7 | 275:2 342:13 |
| 380:4,24 381:7 | 353:21 354:13 | 234:13 236:22 | 359:16 381:12 |
| 382:2,2,3,16 | 365:1 368:2,4 | 266:10 272:18 | 391:15 |
| 383:14,20,22 | 381:25 384:7 | 309:23 320:3 | **handed**  229:15 |
| 383:23 384:2,4 | **googlers**  21:18 | 330:10 347:1 | 346:4 355:24 |
| 384:16 392:2 | **gotten**  38:23 | 365:8 | **handing**  382:14 |
| 393:4 395:1 | 99:12 116:14 | **guide**  160:4 | 382:15 |
| **google's**  20:19 | 281:11 314:16 | 310:7 | **handle**  59:1 |
| 22:15 39:16 | **government** | **gum**  183:3,14 | **handled**  393:8 |
| 42:19,25 43:9 | 115:2,3 250:14 | **guns**  115:11 | **happen**  13:20 |
| 46:20 69:7 | 364:23 | **guy**  100:10 | 13:21 14:20 |
| 73:6 84:9,13 | **grab**  99:3 | **guys**  366:1 | 57:5,11 98:25 |
| 84:20 85:16 | 100:13 | **h** | 101:15 102:17 |
| 86:4,15,23 | **grass**  37:11 | | 140:16 162:9 |
| 87:10 124:10 | **great**  12:4 31:8 | **h**  4:2,2,2 129:3 | 162:25 236:2 |
| 126:6 129:9 | 37:5 42:8 | 129:3,3 345:21 | 299:8 |
| 131:9 138:5,7 | 77:12 104:11 | 389:5 395:3 | **happened** |
| 153:14 155:23 | 108:17 113:6 | **h.1**  389:17 | 100:3 103:25 |
| 167:3 168:2,8 | 121:10 123:17 | **h.2**  389:18 | 105:21 106:11 |
| 170:11 177:12 | 147:11 170:7 | **h1**  345:16 | 106:15 162:22 |
| 188:6 211:10 | 216:21 | **h1s**  345:21 | 236:22 |
| 211:16,21 | **greater**  198:20 | **h2**  345:14 | **happening** |
| 219:7 229:13 | 240:7 | 357:4 360:10 | 13:22 88:12 |
| 236:21 237:5 | **greatly**  299:19 | 363:7 372:14 | 101:20 |
| 237:13 241:15 | **gripe**  210:13 | 385:2 386:3,17 | **happens** |
| 242:18 244:12 | 251:13 | **hacked**  343:4,7 | 287:21,22 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[happens - hopefully]**

364:25 383:10
**happy** 61:5
70:24 77:19
307:20 321:14
**hard** 16:8
42:18 182:24
183:6,10
225:14 307:25
310:14 323:12
323:13 372:25
**hartford** 37:9
**harvest** 101:7
173:15
**harvested** 25:3
25:4
**harvey** 312:12
**hawks** 305:13
**head** 95:18
145:16 156:22
165:18 202:23
256:23 263:23
269:5 286:13
326:8 359:24
**headed** 216:11
**heading** 107:19
107:22
**headings** 12:8
**heads** 371:9
**healthcare**
114:13 115:16
**hear** 72:11
115:20
**heard** 54:19
136:17 225:19
280:7 316:2,21

316:24 348:22
350:5
**hearing** 111:4
**heavily** 352:7
**heavy** 171:12
**held** 1:20 3:15
130:6 257:5
**help** 6:16 21:24
113:24 169:10
193:22 207:7
262:21,21,22
332:18
**helpful** 105:8
105:11 106:20
116:13 146:10
206:14 246:6
247:5 331:13
**helps** 21:6,16
73:4
**hereunto**
391:14
**hey** 62:11
121:7,10 163:9
179:13 199:11
205:20 207:23
208:20 219:13
230:22
**hidden** 333:23
**high** 33:24
239:12,12
246:4 302:23
**highlight** 311:4
**highlighted**
58:21 233:24

**highlighting**
310:24
**highly** 46:19
**hinder** 172:21
**hints** 41:14
**hip** 65:9 104:16
123:1 125:22
126:4
**hipaa** 112:9
114:7,9
**historical** 68:4
85:20 115:13
192:24 193:4,9
193:13 223:20
324:8
**history** 41:4
46:8 64:3
149:6 228:21
228:24 231:8
231:25 236:18
309:21
**hit** 374:3
**hitbundle**
257:13
**hitbundles**
257:11,21
277:5
**hits** 131:11
330:20 332:23
**hochman** 1:19
3:11 4:7 11:20
33:14 67:16
71:21 72:21
77:19 83:16
112:23 113:2

177:1 212:12
331:6 344:17
354:3 358:14
362:10 388:1,6
388:10 389:3,6
389:7,10,11,12
389:13,14,15
389:16,17,18
389:19 392:3
392:20 393:5
395:2
**hold** 190:21
195:14 242:16
274:25 279:16
314:2,4 372:1
376:12
**holding** 326:24
343:15
**holds** 148:6
**hole** 58:24
208:15
**home** 341:3
**homomorphic**
118:2
**honestly** 13:3
227:13 328:4
340:11
**honor** 286:17
**honored**
286:23,24
307:10 335:22
**hope** 111:4
173:21 302:21
**hopefully** 307:7

[hospitals - ids]

**hospitals** 114:9
**host** 325:21
**hosting** 366:20
**hotel** 199:7,10
  200:7
**hour** 142:21
  306:2 359:9
**hours** 4:22,25
  5:2,19,21,25
  7:13 8:11
  29:21,23 306:4
  343:1 356:11
  385:5
**hsiao** 2:4
**huge** 16:5 98:4
  101:19 243:11
  243:12 244:24
  320:25 333:22
**huh** 72:20
  296:16
**human** 16:8,10
  58:5 65:24
  66:1 229:9
**humans** 168:16
**hundred**
  244:15
**hundreds** 4:18
  4:19 6:2,3 8:12
  302:3,4,4
**hunt** 2:19
**hurt** 268:1
**hurts** 138:17
  138:19,23
**hygiene** 114:22

**hypothetical**
  77:10 78:6
  79:13 93:17
  94:15 95:14
  98:22 117:24
  118:12 119:7
  122:25 185:17
  238:24 239:7,9
  239:22 285:16
  290:14,15
  298:12,15
  306:21 309:9
  309:12 310:7
  367:16 378:19
  383:2

**i**

**i.e.** 226:13
  378:11 382:18
**idea** 23:7 41:12
  42:17 44:1
  49:4 53:7 54:1
  88:11 137:24
  180:17 281:20
  292:14 308:1
  309:2 319:10
  364:5 370:15
**ideally** 205:23
**ideas** 77:13
**identifiable**
  62:3 161:2,15
  213:1,14
  335:14
**identification**
  11:21 67:17
  71:22 212:13

327:10 348:8
  388:2
**identified** 7:9
  93:8 207:15
  238:24 274:6
  275:4 332:25
  337:11
**identifier** 53:20
  53:21 93:9
  98:23 99:4
  100:9 101:17
  102:9,10 109:7
  136:8 138:7
  174:6 178:21
  180:20,21,25
  203:1 230:20
  235:25 238:25
  267:7 347:19
  347:23,25
  364:7 378:15
  378:16
**identifiers**
  25:15 44:10
  54:8,9,9,23,24
  130:5 133:7,17
  134:1,7,21
  142:14 144:13
  145:2 161:4,7
  161:13,14,21
  161:22 173:12
  173:16 174:2
  180:5 181:2,4
  181:5,8,9
  183:19,25
  208:12 213:19

235:8,20,21,22
  241:25 273:20
  285:25 325:22
  364:6
**identify** 133:3
  146:20 148:22
  235:14 265:13
  266:12 276:2
  287:3 323:17
  324:1,10,12,17
  325:23 326:5
  327:12,14,16
  328:15 329:23
  330:14 331:16
  331:17 334:2
  336:15,17
  368:17
**identifying**
  86:20 132:15
  144:12 162:25
  203:3 236:3
  328:8 335:8
  348:6 349:20
  370:8
**identity** 140:13
  245:18 348:23
**idfa** 55:23 57:6
  249:6
**idfas** 285:7
**idle** 195:21
**ids** 63:12,19
  180:5 183:24
  192:4 247:12
  285:7 348:15
  349:11 376:17

Page 40

**[ignorance - indict]**

| | | | |
|---|---|---|---|
| **ignorance** 92:22 | **implied** 293:24 | 217:21 263:1 | **incorporating** 191:7 |
| **ignorant** 92:24 | **imply** 324:25 | 325:19 338:3 | **incorporation** 286:2 |
| **ignoring** 171:16 | **implying** 152:21 | **included** 87:4 | **incorrectly** 256:10 |
| **illogical** 225:15 | **important** 39:12,20 60:12 | 98:6 234:4 | **increase** 292:9 |
| **images** 318:16 320:23 | 112:7 155:16 | 393:14 394:3 | **increased** 293:14 |
| **imagine** 31:7 | 218:23 219:10 | **includes** 38:1 40:12 50:13 | **increases** 343:19 |
| 35:6 91:12 171:18 195:11 | 239:10 240:25 383:14,20,21 | 86:17 87:21 193:17 217:24 | **incremental** 280:2 320:4 |
| 223:23 260:9 | 383:24 384:3 384:12 | 224:4 286:1 325:21 364:6 | **indefinitely** 334:21 336:24 |
| **immediate** 208:8 221:4,7 | **imposed** 287:2 | **including** 26:5 36:22 49:20 | **independent** 116:4 148:18 |
| 221:8 307:24 | **impossible** 35:7 110:21 118:7 | 64:11 81:24 117:21 221:20 | **index** 230:5,10 231:21 318:17 |
| **immediately** 59:14 88:2 | 196:16 | 249:7 291:7 | 326:19,23 |
| 262:24 340:25 363:5 | **impression** 20:17,18 | **incognito** 199:22 200:13 | **indexing** 230:3 |
| **impact** 179:18 263:12 | 120:16 277:24 322:17 367:11 | 200:16,17 | **indicated** 138:15 210:16 |
| **impacted** 190:13 302:20 | 382:17,18 | **incomplete** 77:10 78:5 | **indicates** 15:23 42:4 |
| **impediment** 246:2 | **impressions** 16:21 21:5 | 79:12 93:16 94:14 95:13 | **indicating** 129:25 361:11 |
| **implement** 37:10 109:15 | 90:9 352:3 368:5 371:16 | 98:21 117:23 119:6 285:15 | **indication** 136:1 |
| 296:11 | **improve** 179:14 197:22 | 298:11 345:6 367:15,17 | **indications** 222:9 |
| **implementati...** 309:19 310:6 | 221:19,22 223:4 262:22 | 378:19 383:2 | **indicator** 352:14 |
| **implemented** 223:24,25 | 282:9 | **inconsistently** 323:11 | **indict** 83:17 |
| **implementing** 279:19 | **impugn** 83:23 | **incorporate** 152:14 165:13 | |
| | **inbox** 317:2 | 182:3,7,20 | |
| | **include** 83:14 86:19 93:2,14 | **incorporated** 165:15 | |
| | 185:14 217:19 | | |

**[indirect - intending]**

| | | | |
|---|---|---|---|
| **indirect** 221:17 221:24 | 71:9 74:13 76:18,20 87:6 | **informing** 26:19 | **installed** 150:19 305:14 315:15 |
| **individual** 62:16 63:6 95:22 110:6 161:5,8,9,11 187:20 235:23 236:5,7 | 89:4 90:23 91:8,9 93:3,3,6 93:8,15,15,20 93:22,23,24 94:4,4,9,9,16 94:18,19,23 | **infrastructure** 222:14 **initial** 114:2 **injunction** 35:3 302:20 | **installs** 214:12 296:13 **instance** 38:11 102:11 174:9 174:11 236:12 247:10,12,19 |
| **individually** 1:7 | 95:5,10,21 96:4,10 98:19 | **injunctive** 31:22 35:2,13 58:19 | 248:7 258:12 348:15,20 |
| **individuals** 96:13 266:20 | 103:1 110:16 119:25 138:14 | **inputs** 245:4 267:20 | **instances** 38:10 47:20 235:15 253:2 |
| **industry** 205:9 208:20 | 138:16 144:24 158:16 161:2 | **ins** 37:23 **insert** 75:8,11 | **institutions** 383:5 |
| **inevitable** 168:17 | 161:15 192:3,9 192:25 193:2,5 | 77:2,25 78:10 82:9 87:10 | **instructions** 360:22 |
| **inevitably** 162:18 | 193:21 194:3,7 195:7,10,11 | 167:19 **inserted** 150:5 | **integrated** 151:19 184:16 185:19 |
| **infer** 293:25 | 203:4 205:5 | **inside** 22:15 | **integrates** |
| **inference** 218:21 232:6 319:7 321:10 | 210:15,17 213:1,2,15 215:11 216:13 | 200:8,8 217:17 350:19 **insider** 104:2 | 124:10 291:25 **integration** 126:14 153:19 |
| **inferences** 230:14 | 216:19 217:2,4 219:4,6 221:6 | 106:4 365:3 **insiders** 20:22 | 298:19 **intelligence** |
| **inferring** 218:15 | 229:11 230:13 230:18,24 | **insight** 7:15 162:24 | 99:25 101:8 **intend** 89:25 |
| **influence** 112:5 | 231:20 260:24 262:19 277:12 | **insist** 306:14 **inspected** | 127:6,21 **intended** 41:1 |
| **inform** 221:13 | 313:9 316:14 | 222:12 | 42:3 |
| **information** 25:1,3,12 33:22 38:4 48:12 49:8,15 52:12 57:9 62:23 63:4,15 69:4,6,21 71:6 | 329:18 331:3 334:18 335:7 338:7,16 343:9 343:10 348:6 348:11 368:23 | **install** 149:22 149:25 155:12 219:1 296:5,5 297:10 315:17 350:14 | **intending** 151:24 211:9 |

**[intensive - john]**

intensive
  279:24 318:18
intent 211:10
  211:16,22
  384:7
intention 213:4
intentionally
  40:22,24
intentions
  242:18 364:20
interact 18:12
  18:13,14
interaction
  304:8 350:24
  371:25
interchangea...
  192:15
interchangea...
  46:15
interest 173:18
  225:25 230:12
interested 74:1
  230:15 231:23
  265:25 297:23
  333:20,24
  391:13
interesting
  115:21,22
  150:1,2 165:17
  167:9 186:22
  211:19 225:24
interests 229:7
interface 22:14
  24:17,20,21,23

intermixes
  237:6
internal 148:10
  241:1 288:18
internally
  224:1
internet 17:18
  17:18 37:17,24
  58:7 196:24
  204:25 245:17
  298:9 301:22
  305:20
interpret
  307:11
interpretation
  225:1
interpreted
  196:10
interrogatories
  258:6
interrogatory
  46:21 47:2,16
  52:13 280:14
  292:25
interrupt 160:8
  239:18
introduced
  345:25 361:12
introduction
  187:12
intuition 82:7
  87:19,22 88:7
  88:23 92:1
invading
  115:25 341:2

invasion 28:20
inventory
  360:16
investigate
  15:6 189:4
  221:25
investigation
  92:14 222:8
  317:12
investigations
  207:1
involved 7:22
  57:22,24
  116:14 168:16
involves 116:3
  133:5
ios 201:21
  202:6 283:5,5
  285:20,21
  287:2 314:11
  314:14
ip 7:19 207:6
  213:25 214:2,7
  214:16 243:4
  246:19,21,22
  246:23,24
  247:21 344:22
  357:9,22
iphone 314:17
ips 214:22
irrelevant 47:5
isolation
  279:11,19
  282:5,7,8,10,19

issue 15:7 16:1
  19:16 34:16
  39:4 45:3
  60:13,24 61:1
  115:7 156:14
  157:8 171:2
  196:9 210:19
  213:6,13
  215:25 233:25
  239:4,6 252:13
  252:16 294:13
  323:9 378:7
issued 105:23
  167:10
issues 22:21
  23:2 29:16
  58:1 70:16
  119:10 161:20
  239:5 304:22
issuing 383:19
items 32:24

**j**

j 4:2 129:3
  389:19
jam 306:12
jargony 364:1
jarring 34:20
jfk 288:6
jh 386:18
job 7:2 13:12
  18:15 110:3
  208:4 393:5
john 2:9,20 6:3
  45:14

[join - kinds]

| join 112:9 | joins 137:20 | k | kilometer |
|---|---|---|---|
| 135:13 136:17 | 235:9 373:8 | | 232:19 |
| 136:21 137:17 | 374:1,5,11,15 | k 12:8 32:4 | kind 16:9 17:25 |
| 137:18,23 | 374:22 386:2 | 104:23,25 | 34:20 43:6 |
| 138:5 140:12 | jointly 387:18 | 105:4 107:5,16 | 58:3 60:12 |
| 145:22,24 | jonathan 1:18 | 108:1 224:10 | 65:6 71:5,7 |
| 146:3 173:11 | 3:10 145:24 | 346:3 | 73:23 77:11,14 |
| 179:7,8 235:9 | 388:6,10 392:3 | keep 150:15 | 78:19 79:17,25 |
| 242:10,12,14 | 392:20 393:5 | 183:13 185:3 | 80:25 92:16 |
| 242:24 243:20 | 395:2 | 210:17 220:17 | 101:5 104:13 |
| 244:13 338:22 | jonathan's | 298:6 319:6 | 108:3,3 115:9 |
| 357:2 370:23 | 146:3 | 329:25 330:2 | 116:6,21 |
| 371:4 372:19 | joseph 2:10 | 341:7 | 120:21 121:5 |
| 375:5 378:11 | judge 336:12 | keeping 155:15 | 130:19 141:5 |
| 378:22 | judgment | 177:17 195:4 | 145:24 153:22 |
| joinability | 300:17 | keeps 224:3 | 160:4 164:22 |
| 234:23,24,25 | juicy 187:23 | 300:19 | 167:9 172:9 |
| 235:5,14 238:8 | julie 5:1,19 | kept 60:21 | 173:9 180:8 |
| 238:12,23 | 6:11 7:1,4,13 | 334:21 336:24 | 187:21 204:21 |
| 240:5,18 | 16:17,19 | key 131:25 | 216:3 223:1 |
| 344:21 347:5 | julie's 6:9 | 145:4 212:21 | 230:9 232:6 |
| 347:17 363:10 | jump 176:25 | 212:21 235:9,9 | 256:23 260:6 |
| 363:15 364:9 | jumping 88:2 | 249:21,24 | 275:9 291:16 |
| joined 51:14 | jumps 57:13 | 250:4,9,18 | 294:9,24 301:9 |
| 53:22 54:6,22 | june 1:15 3:4 | 251:3,5,10 | 305:15,18,19 |
| 55:3,20 135:16 | 391:15 393:3,5 | 281:13 285:5 | 306:3,19 |
| 136:18,24 | jury 77:22 | 352:13 370:24 | 315:16 317:11 |
| 139:24 145:20 | 125:13 127:6 | 371:4 | 317:12 319:4 |
| 243:6 347:22 | 127:21 | keyed 282:22 | 320:11 326:14 |
| 347:25 375:20 | justification | keys 145:6,9 | 342:2 359:7 |
| joining 114:23 | 219:11,12 | 235:10 247:15 | 384:13 |
| 136:1,2,4,15 | justified 221:9 | 248:10 | kinds 104:2 |
| 144:1 145:23 | jyanchunis | keyword 62:25 | 106:18 195:22 |
| 176:10,10 | 2:10 | 63:6 | 268:11 270:24 |
| 242:2,8,15,22 | | keywords | 296:4 315:18 |
| | | 62:18,21 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[kinds - large]**

341:4 350:13
361:18
**kit**   219:3
**knew**   53:21
54:7,8,22,25
244:1 281:25
360:14
**knights**   111:6
**know**   4:25 8:21
9:8,9,10 14:9
14:21 15:7,8
17:19,23 18:2
18:12,24 19:3
20:7 21:3
23:19 27:9,18
31:14 34:4
38:15 41:3
46:18 49:23
50:2 52:5,8
53:18 58:17
59:6 60:11
61:6,6,21 62:9
64:23 65:1
69:19 81:4
92:21 96:12
99:8 101:11
104:12 109:9
111:1,6 112:2
113:12,22,23
118:9 120:24
121:2 124:22
126:5 127:9,14
130:7 131:14
133:8 135:2
136:23,24,25

137:25 138:20
139:22 140:8,8
140:15 143:19
146:11 152:23
155:15 157:16
160:9 161:18
163:6,11
165:25 167:23
169:20 175:3
175:25 177:7
178:8,10
180:11 182:16
183:4,14
185:12 186:5
186:21,23
187:16 188:9
188:16,24
189:2 193:8
195:20,22
196:25 197:5
198:5,9,17,19
204:3 206:13
207:17 208:18
208:19,21,23
208:25 209:6,8
209:16,20
214:15 220:16
221:4,20 222:5
225:1,4 227:7
227:17,25
229:14 230:10
230:13 232:4
233:23 234:20
239:13 240:15
240:18 244:15

250:22 251:7
251:10 252:2
259:1,23 261:4
265:24 266:16
267:25 268:1,6
270:17 272:8
274:16 275:11
275:25 276:7
276:23 282:12
283:25 284:9
286:18,20
288:17 291:22
296:8 297:1,23
299:5,25
300:17 303:3,5
304:18,20,22
304:25 305:6
308:14 310:14
312:1 313:20
313:25 316:9
316:10 317:1
318:12,24
319:3,5,18,19
320:11,14,20
320:23 321:20
321:23 322:6
322:15 323:4,4
323:19,21
325:21 326:7
326:13,16
328:4 331:9,10
333:16 339:1,9
339:12 341:5
341:11 344:23
347:6 348:25

351:21 354:25
358:6,15 359:1
359:4 361:3,5
361:15,17
362:22 370:23
372:15 373:8
376:22 377:9
377:19 383:7
385:23
**knowing**   74:1
152:20 200:7
220:1 245:16
321:11
**knowledge**
18:15,18
167:21,22
359:5 364:12
**knowledgeable**
217:8
**known**   17:25
18:5,7,8,10
168:12 207:11
**knows**   229:22

**l**

**l**   1:1 346:3
**label**   115:11
**lag**   106:24
**language**   38:7
193:17 204:23
255:8
**lapsed**   296:7
**large**   16:7
101:22 187:13
216:1 239:15
245:17

[lasinsky - linking]

| | | | |
|---|---|---|---|
| **lasinsky** 29:9 | **leave** 86:22 | 108:22 201:22 | 174:24 351:11 |
| **lat** 202:9 | 87:13 109:21 | 209:2 227:16 | 373:14,14 |
| **lately** 339:22 | 182:17 200:17 | 229:13,14 | 382:16 390:2,6 |
| 340:11 | 228:23,25 | 257:25 275:19 | 392:4 393:15 |
| **launch** 292:24 | 240:14 302:23 | 340:23 375:5 | 394:4 395:4,7 |
| **launched** | **left** 67:2 129:8 | **leveraged** | 395:10,13,16 |
| 293:12 | 175:24 | 218:18 | 395:19 |
| **law** 14:25 | **legacy** 294:2 | **leveraging** | **lined** 373:9 |
| 28:16 250:20 | **legal** 9:1,21 | 192:24 | **lines** 105:10 |
| 250:21 341:15 | 14:11 20:7 | **librarian** 230:6 | 189:12 373:13 |
| **lawsuit** 126:20 | 28:23 32:14 | **license** 162:1 | **link** 25:15 |
| **lawyer** 9:6,19 | 119:11,12 | 180:6,7,12,19 | 44:10 100:17 |
| 28:17 34:2 | 122:23 164:24 | 187:6 | 100:17 102:13 |
| 360:5 | 213:8,21,23 | **life** 121:12 | 109:7 112:12 |
| **lawyers** 7:17 | 252:16,24 | 317:7 342:17 | 115:24 136:12 |
| 9:19 10:2 11:2 | 331:25 349:9 | **lifecycle** 122:1 | 137:1,24 138:4 |
| 312:19 313:14 | 365:13,22 | 122:3 | 161:22 213:19 |
| 341:16 | 393:7 | **lift** 171:12 | 249:16 250:12 |
| **layperson** | **legitimate** | **light** 23:1,10 | 347:21 |
| 18:10 | 162:19 274:19 | 183:13 | **linkage** 102:18 |
| **lead** 13:17 | **legitimately** | **liked** 62:23 | 173:18 |
| 350:20 | 359:6 | **likely** 163:11 | **linkages** 134:8 |
| **leads** 81:18 | **length** 29:15 | 220:24 223:1 | **linked** 94:10,10 |
| **leak** 101:12 | **lengthy** 164:23 | **likewise** 355:5 | 94:17,17,23,24 |
| 267:23 268:2 | **lesser** 158:10 | **limitations** | 94:25 95:1,2,5 |
| **leakage** 102:2 | 323:23,23 | 287:1 | 95:11 98:24 |
| **leaks** 103:23,23 | **letter** 10:1 | **limited** 83:13 | 99:5,13,17 |
| 104:2 114:13 | **letters** 12:8 | 131:12 143:9 | 102:20 136:25 |
| 235:25 | **letting** 160:9 | 244:4,6 270:11 | 137:5,20 138:9 |
| **leap** 65:5 | 377:18 | **limits** 17:4 | 161:4,7,10 |
| **learn** 185:5 | **level** 20:13 | 25:19 32:6 | 180:4 181:11 |
| **learned** 16:23 | 21:22 50:21 | 65:12 94:3 | 241:4 |
| **learning** | 78:4 86:10 | 119:16 202:25 | **linking** 112:12 |
| 221:23 230:2 | 96:19,22 97:20 | **line** 6:18 | 136:3,5,15,19 |
| 263:8 | 97:22 98:8 | 173:23 174:23 | 296:12 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[links - logs]**

links  99:19
  100:16 134:10
  137:23 173:12
  179:5 335:8
list  26:23 32:18
  35:11,15 85:17
  148:23,23
  247:2 312:2
  321:2 357:15
  359:13 368:20
listed  7:10
  46:25 363:4
  369:9 374:10
listing  68:4
lists  7:23
  327:18,19
  368:24
literally  256:9
  347:21
litigating  86:23
litigation  4:15
  86:16 154:12
  271:20,23
  325:6 376:15
  377:3
little  6:16,21
  15:9 20:5
  61:23 63:11
  70:7,8,9 72:10
  101:12 103:9
  118:12 142:2
  154:16 187:23
  204:22 207:7
  239:8 244:18
  251:25 261:15

267:23 277:17
284:5 305:15
310:9 311:5
319:2 326:20
364:1 372:25
live  52:20
  313:5 319:23
llc  1:13 3:12
  392:1 393:4
  395:1
llp  1:21 2:2,7
  2:13 3:16
load  197:1
located  3:16
  100:23 343:25
location  74:12
  135:4 204:24
  232:15 243:13
locations  40:6
locked  393:12
  394:1
locking  200:6
lodge  84:25
  228:16
log  37:19,20,21
  37:23 38:13,24
  45:5 46:6
  48:21 69:19,20
  69:22 70:18
  79:23 80:13
  87:7 135:17
  141:15,16
  144:2,2,20,21
  146:18,19
  158:19,23

160:5 163:13
174:24,25
175:12,15,16
175:18 241:16
244:1,1 256:20
275:17,25
276:2 329:23
330:15 332:3,4
332:8,15,17,25
333:8,11,16
337:24 338:22
369:12,24
370:24,25
372:20 375:8,8
375:12,14,16
375:17 376:11
376:14,18
377:3
logged  101:14
  125:14 170:20
  173:13 375:19
  376:24
logging  120:20
  122:18
logic  23:12
  153:22
logical  136:6
  258:4
logically  40:10
logs  101:17
  131:1,4,13,19
  131:25,25
  132:5,7,14
  134:6 139:15
  139:15 144:11

147:14,16,24
147:25 148:1,2
174:15,16,21
174:22 181:10
214:3,8,9,19,20
215:12 216:14
216:23 217:6
218:10,12
232:10 234:15
237:5,14,16
241:18,21,24
242:1 243:7
246:19 247:23
248:8,8 262:6
277:1 325:13
325:15,18,18
326:3 327:9,13
327:16,20,20
329:16,23
330:9,11,13,18
330:21 331:4
331:15 332:5
332:16,21
333:14,19,22
334:15,20,24
335:7,16 337:3
337:7,15,17,23
338:3 344:24
344:24 365:9,9
368:7,16,21,24
368:25 369:3,6
369:7,13,23,24
370:2,11,12,14
370:17,19,21
375:7 382:1

**[long - made]**

**long** 29:12,15
29:20 135:9
185:14 199:1
251:8,9 256:23
300:25 305:6,7
319:4 327:12
331:17 372:2
**longer** 198:18
198:19 318:25
331:21
**longitudinally**
110:13
**look** 19:3 25:6
33:8 35:16
38:9 41:11,13
44:22 46:17
62:12,20 68:6
68:17 81:2
82:21 94:8
96:9 97:13,17
97:25 98:1
104:22 127:13
130:23 132:16
134:3,5 135:1
135:7 140:3
144:7 147:4,6
147:6,8,9
148:18 151:3
152:23 153:3,9
156:21 165:16
165:19,20
173:6,9 190:4
192:19 193:4
200:10 201:15
201:16 207:7

207:10 210:20
219:25 227:10
230:22 236:24
237:23,24
238:18 240:11
240:24 241:14
242:25 243:15
245:6 246:7,22
247:3 248:15
249:3 253:2,12
253:19 254:13
256:25 260:5
275:13 276:9
276:12 278:18
279:9 280:16
283:13 289:6
292:3,12,22
294:25 295:13
295:19 296:25
297:22 307:17
317:10 318:2
327:3,3,5,11
328:25 332:6
338:13 339:19
356:24 357:23
358:4,4 360:3
360:4 361:1,19
362:18 366:25
371:12 374:6
376:11 381:5
386:6
**looked** 22:7
24:21,23 42:18
42:22 43:3
48:9,11 49:14

57:8 58:18
83:3 143:6
166:17 186:7
190:5 222:8
247:11 281:7
283:17 317:3
322:21 339:22
340:11
**looking** 5:14
11:23 12:4
24:17,19 43:16
59:8 73:22,23
91:18 92:7
137:23 144:8
153:11 159:17
199:16 209:19
210:5 229:5
230:17 244:11
254:1,3 256:2
299:10 311:3
320:21 329:14
340:13 354:5
359:23 360:15
368:15 372:21
385:2
**looks** 20:23
22:15 24:24
69:18 72:7
80:15 278:22
326:16
**loose** 246:17
**los** 2:3
**lose** 298:20
**lost** 172:20
287:20

**lot** 6:20 38:19
48:25 49:25
50:1 51:10
63:22 64:4
69:18 91:11
95:20 127:12
147:20 175:19
187:16 206:2
209:22 229:6
229:22 230:24
251:7 261:15
273:22 315:15
342:4 344:25
381:15
**lots** 62:10 86:2
100:23 101:7
300:7 343:2,2
**love** 217:7
**lower** 188:6,10
**lunch** 128:3
257:10
**luncheon** 128:6
**lying** 206:2,4

**m**

**m** 4:2 129:3
**machine**
221:23 230:2
258:16 263:8
**made** 6:20
11:16 15:14
24:16 29:5
43:7 44:5
60:22 82:2,20
82:25 85:10
91:6 101:13

Page 48

**[made - mao]**

| | | | |
|---|---|---|---|
| 124:6 155:22 | **major**   12:7 | 226:23 241:5 | 213:16 214:25 |
| 158:2 159:11 | 32:2,18 | 256:7 277:14 | 215:8 224:23 |
| 159:14 167:6 | **majority**   331:4 | 287:8 | 227:20 228:16 |
| 175:4 196:7 | **make**   6:25 21:4 | **manager** | 231:7 236:15 |
| 200:12 210:10 | 21:17 28:9 | 288:15 | 240:22 246:8 |
| 215:3 224:15 | 29:18 39:7 | **mandatory** | 246:13 248:1 |
| 266:21,24 | 41:20 65:4 | 294:21 296:20 | 254:25 255:25 |
| 285:24 307:14 | 74:9 83:6 90:6 | **manual**   297:4 | 257:2,9 263:14 |
| 325:9 341:21 | 115:4,8 129:10 | **mao**   2:4 8:24 | 263:18 264:1,8 |
| 378:24,25 | 134:19 146:14 | 33:4 43:12 | 264:20 267:16 |
| 381:10 | 151:25 154:19 | 50:22 64:16 | 268:14,19 |
| **magically** | 168:17 173:25 | 67:6 68:22 | 269:1,6,11,17 |
| 356:13 | 176:12,13 | 72:3,18 73:16 | 269:24 270:3,8 |
| **magnitude**   6:1 | 177:3,22 | 75:15 77:9 | 270:17 272:24 |
| 251:11 | 191:23 197:13 | 78:5 79:11 | 274:14 276:15 |
| **mail**   69:5 | 212:24 214:1 | 84:24 85:7,24 | 276:19 284:2 |
| 101:14 106:8 | 214:25 215:2 | 86:3 87:15 | 285:2,15 |
| 159:13 160:1 | 242:1 250:22 | 93:4,16 94:5 | 287:21 288:3 |
| 160:16,17,23 | 262:21 267:18 | 94:14 95:13 | 290:13 295:2 |
| 161:25 162:6 | 274:24 279:15 | 98:21 100:6,7 | 298:11 305:25 |
| 163:1,4,5,10,21 | 288:2,17 | 100:8,12,22 | 306:6,9 312:21 |
| 164:5,17 | 297:11 300:16 | 106:21 107:3 | 313:19 314:6 |
| 165:10 167:7 | 301:22 306:13 | 107:14 117:1,5 | 314:10 317:15 |
| 174:17 233:9 | 308:4,4 318:5 | 117:8,23 119:6 | 327:1 328:21 |
| 234:4 255:22 | 344:18 346:7 | 123:14 125:23 | 333:3 337:18 |
| 256:5 320:23 | 372:12 377:7,8 | 140:18 143:16 | 338:23 340:3 |
| 387:8 | 378:8 393:14 | 143:21 144:4 | 344:16 346:6 |
| **mails**   288:18 | 394:3 | 145:18 146:5 | 353:24 354:4,8 |
| **main**   17:13 | **makes**   51:23 | 146:12 149:3,9 | 355:22 356:16 |
| 18:25 19:7 | 79:6 99:10 | 152:25 156:24 | 356:23 360:12 |
| 341:15 366:25 | 188:5 297:12 | 160:8,12 164:6 | 360:20 361:24 |
| **maintain** | 321:2 351:2,10 | 164:9 169:4,19 | 366:12 367:15 |
| 112:13 206:23 | **making**   151:20 | 169:25 172:2 | 369:4,10,17 |
| **maintained** | 191:14 200:14 | 176:5,18 | 371:19 373:17 |
| 283:11,21 | 211:15 223:11 | 189:20 197:17 | 374:24 377:11 |

Page 49

**[mao - mean]**

377:15,24
378:4,6 383:17
384:18 385:6
385:10,13,19
385:24 386:8
386:13,25
387:9,17,21,25
389:4
**map**   378:10
**mapping**
133:25 134:19
136:20 180:14
283:10,20,25
284:9,25 285:5
376:5
**mappings**
134:4,4
**marginal**   318:6
**mark**   2:4 8:24
67:1 71:20
72:1,16 100:6
100:7,8,12,22
212:11 360:2
**marked**   11:20
67:16 71:21
212:12 362:13
362:14 388:2
**market**   127:1
271:17,25
272:20,22
273:7 298:21
300:13,13
303:19 316:22
342:4

**marketed**
154:5
**marketing**
17:18 56:1,3,3
56:8 58:7
126:7 205:1
298:9 301:22
340:13 341:18
**marketplace**
307:8
**marks**   81:13
**marriage**
391:12
**mass**   333:22
**match**   139:18
140:1 141:14
141:22 142:7
142:11,13
143:4 144:19
145:7 175:12
175:15 177:11
177:23 181:20
195:15 244:21
246:3,4 247:13
248:3,3,7
364:8
**matched**
139:22 174:24
347:20
**matches**   175:19
175:21 195:16
386:19
**matching**   245:7
245:13,23,25
250:15 348:20

375:6
**material**   320:4
320:5,6,9,12
**materially**
343:19 344:2
**materials**   90:22
91:5
**math**   234:12,15
234:21 255:3
**matter**   3:11
103:22,25
124:2 391:13
**matters**   196:23
**mcgee**   2:10
**mean**   8:17
10:13 18:7
19:1 23:3,11
24:9 25:4,25
34:25 37:18
38:17 45:3,5,5
46:16 47:1
48:20 54:14
58:4,17,20
65:17 70:10,15
71:2,3,4 83:1
85:12,22 87:22
90:1,19 91:18
93:19 96:6
97:16,24
106:16 118:3
125:9 126:1,15
130:16 134:22
135:5 136:18
139:20,23
140:3 141:20

147:1,3,18
153:21 154:17
156:14 167:6
172:6 175:8
177:19 180:16
182:12,15
183:2 185:2,11
187:9 188:25
189:2 192:13
193:3 195:8,17
195:23 197:3
197:21 201:15
208:17 213:18
214:19 219:20
221:4 223:8
224:22 226:16
227:25 228:1
228:23 231:10
235:3 239:18
244:14 250:20
252:12 253:16
254:12 255:5
259:11 261:10
261:17,19
263:3 266:7
269:6 271:9
272:14 273:21
278:13 279:21
280:1,2 282:4
282:14 284:16
286:10 289:4
292:13 297:13
298:8 299:1
302:15 303:17
305:9,17

Page 50

**[mean - methodology]**

309:11,18,22
310:4,8,9
313:4 315:4
316:25 320:24
322:18,19
323:7 326:14
326:23 327:15
327:21 330:18
332:22 333:25
339:14,21,24
340:19,22
341:3 342:15
349:1,20,23
350:1 365:2
373:11 374:4,7
380:18 385:10
387:10
**meaning** 78:2
224:16 227:22
**meaningful**
256:15
**means** 25:6
29:20 36:20
39:17,18 41:19
42:17 43:24
52:19 77:6,6
82:8 90:2,5,12
90:13 92:19
102:22,23
131:3,16 136:4
136:5 153:23
175:15 223:9
227:17 279:13
316:1

**meant** 24:5
35:10 38:13
44:15 48:19
49:12 152:18
183:6 239:20
239:22 254:22
282:5 308:8
337:22
**measure** 168:8
252:6 289:12
289:14 291:3,5
291:11 292:10
299:20 300:9
302:13 304:8,8
367:13
**measurement**
293:22 294:17
304:19,21
330:15 332:3
333:1,8 367:9
367:10 376:11
376:14
**measurements**
221:13 380:12
**measures** 35:12
168:9 224:9
**measuring**
248:22 355:11
**mechanics**
170:1
**mechanism**
117:13 208:9
**media** 3:9
205:10

**mediated** 16:10
**medical** 95:20
115:14
**medicine**
111:17 114:19
**member** 205:10
268:12 271:1
272:2,3,4,21
275:8,8 324:13
327:10 332:18
333:10 334:2
365:20
**member's**
271:6,8
**members** 81:12
252:7,11,15
324:2,10 326:5
327:14 328:8
328:16 334:12
335:3,24
336:16,18
353:6 368:17
370:8
**membership**
329:17 331:18
**memorize**
294:24 295:22
**memorized**
241:12
**memory** 58:24
130:18 142:10
173:10 197:14
241:10 243:24
246:25 254:15
257:1 280:17

283:14 337:19
360:22 374:7
374:20
**mental** 59:7
**mention** 38:17
169:15,15
318:12 327:17
330:21 357:21
363:19 368:18
**mentioned**
27:24 38:18
94:20 122:8
132:21 172:6
233:7 248:13
254:5 286:4,6
**mentioning**
227:9 280:8
**mentions** 45:22
330:9
**merchants**
121:1
**message** 322:9
**messages** 322:8
322:11,13
**messaging**
322:1,3,7,24
323:5,17,19,23
**meta** 384:24
385:1
**method** 144:18
207:11,14
**methodology**
13:4 127:5,20
235:18 253:9
254:7 271:2

**[methods - month]**

| | | | |
|---|---|---|---|
| **methods** 145:3 | 238:1 246:17 | **misinterpreted** | **model** 59:7 |
| 304:13 324:7 | 247:8 254:5,16 | 14:23 | 223:22 224:3,8 |
| 328:8 352:1 | 254:18 319:7 | **misleading** | 382:8 |
| 355:10 | 335:21 339:24 | 122:4,6,13 | **module** 107:2 |
| **microphones** | 363:6,22 | **misled** 19:23 | 123:15,19,22 |
| 3:5 | **minded** 49:14 | **misrepresents** | **moment** 68:6 |
| **microscopic** | **mindful** 70:20 | 213:17 | 103:2 105:13 |
| 330:12 333:19 | **mine** 5:9 68:12 | **missing** 304:14 | 108:12,13 |
| **microsoft** | 84:10 360:19 | 308:21 345:8 | 135:10 138:13 |
| 373:5 | **minimally** | 345:19 | 143:14 150:15 |
| **migration** | 138:19 | **misstates** 94:6 | 152:8 177:1 |
| 150:4 302:25 | **minimum** | 267:16 367:16 | 183:18 189:16 |
| **million** 131:11 | 142:12 232:18 | 374:24 381:2 | 190:22 191:23 |
| 205:20 244:15 | 232:19 296:13 | 384:18 | 210:22 237:1 |
| 330:20 332:23 | **minimus** | **mistake** 101:13 | 257:12 260:13 |
| 334:19 337:10 | 320:12 | **mistakes** 15:14 | 278:7 280:19 |
| **millions** 382:20 | **minor** 320:16 | 15:15,17 | 283:5 306:19 |
| 382:24 | 323:20 | 168:17 250:22 | 330:2 333:2 |
| **mind** 26:24 | **minuscule** | **misunderstood** | 362:19 |
| 30:5 41:22 | 343:22 | 339:4 | **monday** 3:3 |
| 43:15 46:2,4 | **minute** 36:6 | **misused** 284:25 | **monetized** |
| 57:14,18,19,20 | 281:12 363:8 | **mixed** 290:20 | 323:16 |
| 60:18 71:1,4 | 375:1 377:12 | **mmao** 2:5 | **monetizing** |
| 75:20 83:10 | 377:16 | **mobile** 56:3 | 262:24 |
| 86:23 93:19 | **minutes** 24:1 | 138:20 152:10 | **money** 113:12 |
| 108:1 110:12 | 29:20,22 107:4 | 154:8 202:20 | 205:21 219:13 |
| 117:20 119:4 | 160:10 199:12 | 289:22,23 | 262:12 274:23 |
| 122:2 123:10 | 306:5,7,15 | 350:11,12 | 275:1 282:4 |
| 133:15 147:25 | 310:21 371:10 | 366:2,3 372:7 | 297:15 299:18 |
| 177:18 190:21 | 373:20 377:9 | 372:7 | 300:7,11 |
| 194:18 196:5 | **miraglia's** | **mod** 246:10 | 319:23 |
| 199:20,25 | 241:2 | **mode** 199:22 | **month** 293:4 |
| 202:17 210:9 | **mischaracteri...** | 199:24 200:13 | 300:25 301:15 |
| 217:24 230:2 | 87:16 125:24 | 200:16,21 | 319:13,14 |
| 234:23 237:21 | 144:5 156:25 | 201:1 | |

**[months - never]**

| | | | |
|---|---|---|---|
| **months** 303:2 | **nac** 190:14,20 | **near** 325:5 | 319:6,6 320:18 |
| **morgan** 2:7,7 | **nagged** 373:5 | **nearly** 101:21 | 320:19 321:5 |
| **morning** 3:1 | **name** 3:18 69:5 | **necessarily** 8:1 | 326:13 331:9 |
| 4:7 | 100:5,6 106:8 | 14:6,9 18:10 | 331:10 336:9 |
| **mortgage** | 112:18 159:2 | 28:8,9 30:5 | 340:24 342:1 |
| 83:19 383:6,12 | 164:5,17 | 43:7,18 48:25 | 357:25 360:7,8 |
| **motion** 325:10 | 180:13 201:25 | 59:13 70:3 | 373:2 374:19 |
| 358:14 | 202:8,13 236:4 | 136:1 138:4 | 377:6 |
| **motions** 327:19 | 238:16 316:3,9 | 139:23 193:9 | **needed** 109:1 |
| 328:7 | 349:18,21 | 197:24 215:23 | 155:14 317:7 |
| **mouse** 287:5 | 368:24 392:2,3 | 219:23 246:22 | 325:7 346:15 |
| **mouth** 284:5 | **named** 100:8 | 299:23 309:4 | **needing** 137:22 |
| **move** 97:9 | 365:21 386:3 | 316:3 324:25 | **needs** 23:20 |
| 147:11 299:22 | 386:21 387:8 | 337:5 349:19 | 205:8 320:21 |
| 299:22 | **names** 7:24 | **necessary** | 321:21 366:21 |
| **moved** 97:5 | 112:20 131:12 | 57:22 102:14 | **negatives** 258:2 |
| 206:8 | 162:6 163:21 | 378:22 393:14 | 258:9,23 259:3 |
| **moves** 287:8 | 228:4,8,9,14,14 | 394:3 | 259:19 |
| 317:11 | 231:5 296:1 | **need** 14:1 52:7 | **neither** 53:2 |
| **moving** 148:7 | 368:21 | 59:10,10,11 | 154:4 386:19 |
| 340:10 | **narrow** 187:17 | 66:10 70:25 | **network** |
| **mrc** 205:22,23 | 203:5 370:22 | 82:21 100:11 | 204:11 206:23 |
| 205:25 | **national** 112:4 | 106:23 107:3 | 289:18 290:12 |
| **muffled** 72:10 | 113:3 114:5 | 112:11 115:4 | 291:12 300:22 |
| **multiparty** | 115:16 | 125:15 126:16 | 315:23 316:12 |
| 118:2 | **native** 11:7 | 126:22 132:20 | 351:23 367:8 |
| **multiple** 100:8 | 346:1 | 138:4,5 148:10 | **networks** 287:7 |
| 182:8,8,20,25 | **natural** 88:25 | 152:2 171:15 | 287:9 |
| 183:7 369:5 | 89:6,10,14,16 | 173:14 196:3 | **neutral** 13:12 |
| 382:8 | 89:22 92:2 | 216:5 222:5 | 15:20 |
| | 253:20,21 | 223:19,21 | **never** 37:15 |
| **n** | **nature** 110:11 | 246:13 260:7 | 119:4 174:12 |
| **n** 1:1,1 2:1 4:2 | 275:7 338:1 | 280:22 287:23 | 199:15 237:20 |
| 4:2,2 129:1,1,1 | 339:21 | 289:22 290:4 | 240:2 247:8 |
| 129:3,3,3 | | 306:6 309:4 | 303:6 309:25 |
| 389:1 | | | |

**[never - objection]**

315:6 331:11
**nevertheless**
53:3 211:5
212:3 254:2
**new** 1:21,22,24
3:17,17 66:11
67:21 102:25
104:16 117:19
119:22 121:22
121:23,23,25
154:5 233:14
391:4 392:1
**newspaper**
233:12
**newspapers**
206:4
**nice** 231:21
365:4 366:15
**nicely** 291:25
**nine** 373:20
**nitty** 130:19
**nomenclature**
386:20
**non** 11:7 54:4,9
54:24 76:12,13
76:23,24 80:11
130:25 131:4
131:18 132:1,7
132:13 137:20
139:15 141:16
144:10,21
146:18 148:1
174:15,21,25
192:2,4 208:12
208:12 237:5

237:14 241:18
241:20,24
242:1 247:22
248:8 257:22
294:1,5 337:3
337:15,23
338:22 365:9
369:7,11,14
370:25 374:15
375:8
**noncompliance**
162:16,19
164:4,16
166:25 168:20
168:21
**noncompliant**
164:25 165:2
**noncontrover...**
126:16,21
**nondisplay**
351:22
**nonhistorical**
193:2
**nonlinear**
238:2
**nonpermanent**
344:24
**nonpersonal**
91:9 93:3,15
**nonpublic**
48:12 49:8
52:11
**nontechnical**
31:9 78:18

**noor** 71:25
**noorjahan** 2:16
**north** 2:7
**northern** 1:4
3:14
**notary** 1:23
388:14 391:3
392:23
**notating**
393:15 394:4
**note** 3:4 58:22
151:17 163:13
216:12 232:9
295:2 296:19
**noted** 3:22
150:20 155:21
167:13 187:11
296:10 388:8
**notice** 1:20
302:22 303:21
315:10
**noticed** 135:19
135:20 374:9
**notification**
322:2
**notifications**
322:4
**noting** 22:12
145:25 314:3
**notion** 76:16
**notions** 50:18
**nrahman** 2:17
**number** 20:21
26:25 29:3
75:21 112:15

115:16 119:18
161:25 162:1
163:10 180:24
212:11 238:18
239:14 256:12
256:14,14
261:9,11,20
265:11,16
276:5 289:2
291:23 295:14
313:22 333:19
333:22 344:18
345:18 347:4
349:11 350:4
359:6 379:4
393:15 394:4
**numbered**
75:19 156:23
**numbers** 6:19
6:19 254:22
267:19 273:19

**o**

**o** 1:1 4:2,2
129:1,1,1,3,3
202:5
**object** 152:25
**objection** 33:4
43:12 50:22
68:22 73:16
75:15 78:5
79:11 84:25
85:6,11 87:15
93:4,16 94:5
94:14 95:13
98:21 117:23

**[objection - okay]**

| | | | |
|---|---|---|---|
| 119:6 125:23 | **observed**  74:17 | 48:21,22 54:17 | 85:20 86:11 |
| 143:18,21 | 130:25 159:16 | 108:8 117:8 | 87:1,8 89:20 |
| 144:4 146:1 | 159:20,23 | 159:16 204:13 | 90:3 93:11 |
| 149:4,10 | 162:20 177:24 | 215:22 233:18 | 94:1 98:13 |
| 156:25 164:7,9 | 216:22 323:9 | 368:15 369:15 | 99:16 100:21 |
| 169:5 172:2 | **obtained**  251:1 | 381:8 385:8,17 | 100:24 102:9 |
| 176:9 197:17 | **obvious**  59:23 | **okay**  4:14 5:12 | 102:24 104:15 |
| 213:16 224:23 | 232:8 | 7:12 8:3,10,19 | 105:4 106:1,20 |
| 227:20 228:17 | **obviously**  34:4 | 8:22 9:5 10:15 | 106:20 108:11 |
| 228:25 231:7 | 153:24 197:10 | 11:15 12:4 | 110:21 114:4 |
| 236:15 240:22 | 198:14 338:7 | 14:2,13 15:6 | 118:25 120:4,8 |
| 254:25 255:25 | **occam's**  89:11 | 15:10 17:3 | 123:3 125:15 |
| 263:14 267:16 | **occasions**  30:21 | 19:1,21 22:5 | 126:6,24 |
| 268:20 272:24 | **occurred** | 23:9 25:17 | 127:17 128:1 |
| 274:14 285:2 | 159:20 184:18 | 26:22 28:13 | 129:14 130:23 |
| 285:15 290:13 | 210:12 226:25 | 29:24 32:11,15 | 131:17 132:2 |
| 298:11 333:3 | **occurring** | 35:9,19,23 | 133:2 135:2,22 |
| 337:18 340:3 | 218:2 367:10 | 36:12,15,17,18 | 136:7,9,14 |
| 349:25 356:16 | **occurs**  120:20 | 36:25 38:15 | 137:16 139:22 |
| 366:12 367:15 | 138:13 | 40:2,10 42:8 | 142:5 143:2,15 |
| 374:24 381:1 | **ocean**  100:20 | 46:2,20 47:8 | 143:23 145:17 |
| 384:18 386:14 | **october**  293:4 | 48:7 49:17 | 146:2,9,17,24 |
| **objective**  238:3 | 293:15 | 50:10 52:4,7,9 | 147:24 148:7 |
| **obligated**  15:24 | **odds**  196:6 | 53:23 54:3 | 148:19,22 |
| **obligation** | **offer**  125:6 | 55:2,9,20 58:4 | 149:18 150:14 |
| 15:20 | 255:7 326:2 | 59:8 60:6 | 151:11,21 |
| **obligations** | **offered**  291:7 | 61:25 64:5 | 152:7 153:11 |
| 208:1 | **offering**  17:6 | 66:12,25 67:10 | 154:17,20 |
| **observation** | 19:21 28:15,18 | 68:15 69:14 | 157:2,9,20,25 |
| 167:7 207:21 | 28:24 252:22 | 71:20 72:14,21 | 158:11 159:11 |
| **observe**  21:25 | **office**  393:11 | 73:10 75:14,18 | 160:7,15,21 |
| 137:7,8,9,10 | **officer**  100:1 | 76:12,23 80:2 | 161:12 162:4 |
| 162:8,9 220:23 | **offices**  1:20 | 80:16 81:9 | 164:2,19 |
| 222:1 | **oh**  7:3 13:25 | 82:7 83:6,16 | 165:12,19,21 |
| | 41:18 47:24 | 84:5,11 85:14 | 166:3,12 |

**[okay - open]**

| | | | |
|---|---|---|---|
| 167:25 168:23 | 233:7 234:11 | 310:20 311:20 | 380:22 381:3 |
| 169:3 170:9 | 234:22 236:24 | 312:10 313:10 | 381:11,18 |
| 171:19 172:15 | 237:18 238:5 | 313:13 314:4,6 | 382:12,15,18 |
| 172:19 173:14 | 239:4,21 240:3 | 315:3,14 | 386:23 |
| 174:19 175:7 | 240:24 241:14 | 316:17,20,22 | **older**  334:1 |
| 176:4,15 177:4 | 242:20 243:19 | 317:5 319:17 | **once**  59:3 63:24 |
| 178:24 179:6 | 244:21,23 | 320:3,18 | 170:20 286:6 |
| 180:23 181:1,4 | 245:14 246:6 | 321:25 323:15 | 286:14 346:20 |
| 182:1,14 183:6 | 246:15 248:15 | 324:6 326:1 | 356:3 374:2 |
| 183:16,17 | 250:6 251:16 | 327:12 328:10 | **ones**  7:9 46:24 |
| 185:8,16,24 | 252:11 254:2 | 329:7,14 330:1 | 47:1 66:11 |
| 186:8,15 | 255:17 256:5 | 330:8 331:5 | 68:8,12 147:17 |
| 187:25 189:5 | 256:17 257:8 | 332:9,17 | 149:21 156:20 |
| 189:14 190:3,8 | 257:18 258:14 | 336:12 337:14 | 257:5 260:21 |
| 190:23 194:17 | 259:7,22 260:1 | 338:19,20 | 323:22 333:2 |
| 198:11,15 | 260:12 263:17 | 340:22 342:22 | 337:9 345:24 |
| 199:13,17 | 264:15 265:8 | 343:17,24 | 356:22,24 |
| 200:17 202:22 | 266:7 268:19 | 344:4 346:19 | 369:1,8 374:8 |
| 203:7,17 204:3 | 269:2 271:4 | 346:24 347:3 | 386:2 |
| 204:13 205:15 | 272:16 274:18 | 347:12 348:1 | **ongoing**  287:5 |
| 206:11 208:6 | 275:13 276:6 | 350:21 351:3 | 287:11 |
| 210:20 211:13 | 277:14 278:13 | 355:20 357:19 | **online**  17:20 |
| 211:22,25 | 279:5,12 | 358:1 360:1 | 18:4,6 56:1,3,8 |
| 212:7,18 | 281:15,18 | 361:21 362:23 | 79:3 206:8 |
| 213:10,24 | 282:2,10,17 | 362:24 363:7 | 274:21 |
| 214:5 215:17 | 283:17,23 | 365:6 366:1 | **oooap**  202:3 |
| 215:24 216:24 | 285:4,20 | 367:5,22 | **oops**  135:2 |
| 217:12,23 | 287:19 288:3,9 | 369:19 370:7 | **open**  15:14 |
| 218:5,17 220:4 | 288:23 289:1 | 371:13,20 | 49:14 67:25 |
| 220:10 222:20 | 289:11 290:21 | 372:13,17,18 | 96:15 184:9,9 |
| 223:16 224:2 | 295:1,21 296:9 | 373:5,12,16 | 184:13 185:1 |
| 224:13 226:20 | 296:10 297:3 | 374:21 375:2 | 186:11 218:7 |
| 227:4 228:10 | 297:16,25 | 378:23 379:7 | 218:11,14 |
| 229:1 230:11 | 298:14 299:9 | 379:12,21 | 219:2 289:1 |
| 232:9,21,25 | 304:18 310:8 | 380:10,11,14 | 342:5 373:2,3 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[opened - ordered]**

| | | | |
|---|---|---|---|
| **opened** 102:21 | 32:11 41:23 | 170:10,22 | 326:2 363:23 |
| 141:7 | 89:16 105:18 | 172:16,18 | **opportunities** |
| **operate** 239:12 | 105:20 154:20 | 177:10 182:13 | 83:23 |
| 347:10 | 163:19,24 | 182:19,24 | **opportunity** |
| **operating** | 164:2,14 | 191:17 211:16 | 217:9 |
| 243:25 | 166:23 177:18 | 213:5,10,12,22 | **opposed** 123:12 |
| **operation** | 211:25 212:2 | 213:23 224:14 | 170:2 192:4 |
| 229:13 | 242:9 245:15 | 231:4 252:22 | 226:24 293:7 |
| **operational** | 252:25 262:5 | 252:25 255:7 | 371:24 |
| 71:5 87:6 | 262:15 264:15 | 256:11 258:25 | **opposing** 77:13 |
| **operator** 96:9 | 277:3 284:24 | 266:22,23 | **opt** 202:3 |
| 96:14,17 98:10 | 285:12 336:22 | 271:10 273:1 | **opted** 322:18 |
| 98:16 109:13 | 364:15 383:21 | 273:25 279:6 | **optimal** 301:24 |
| 121:9 214:11 | 384:6,8,9 | 281:17 286:16 | **optimization** |
| 214:12 | **opinion** 17:6 | 286:25 287:13 | 62:22 |
| **operators** | 19:22 20:7 | 320:1 334:4 | **option** 178:9 |
| 121:2 | 25:19 26:16 | 335:4,9 336:11 | 223:3 272:17 |
| **opine** 43:14 | 28:6,15,19,23 | 338:11 339:23 | **optional** 151:1 |
| 119:17 120:4 | 28:25 31:18,24 | 340:17 342:10 | **options** 220:25 |
| 203:7 211:10 | 32:3,6,16,22 | 365:19,25 | **order** 6:1 18:15 |
| 242:7 252:17 | 44:13 57:10 | 383:20 | 104:15 110:24 |
| 252:20 257:12 | 59:13 64:25 | **opinions** 12:7,9 | 122:21 125:12 |
| 257:21 265:9 | 65:6 74:21 | 12:10,11,14,19 | 152:9 205:1,7 |
| 270:13 289:7 | 83:25 84:5 | 13:7,14 17:4 | 205:9,18 208:4 |
| 323:15,25 | 87:9 89:20,23 | 18:25 19:6,7 | 208:21 209:1 |
| 331:10 336:16 | 104:13,17 | 19:12 27:7,13 | 216:6 220:14 |
| **opined** 17:10 | 105:24 106:10 | 27:13,14 31:25 | 221:3 223:17 |
| 111:12 122:24 | 107:19,20 | 34:14 49:11,16 | 245:12 250:4 |
| 125:8 186:22 | 110:23 119:16 | 53:11 58:2 | 262:20 296:14 |
| 228:2 229:2 | 122:6 124:14 | 66:9 83:9 | 302:19 322:13 |
| 232:2 270:12 | 125:13 126:22 | 107:8 123:8 | 346:15 347:20 |
| 271:16 273:6 | 129:9 143:25 | 129:13 167:10 | 362:1 376:15 |
| **opining** 14:12 | 145:10 148:13 | 168:5 231:2 | 381:8 |
| 17:14 20:8 | 157:17 164:24 | 269:18,20 | **ordered** 250:17 |
| 26:9 32:6,8,9 | 167:2 168:1 | 270:2,9 287:18 | |

**[orderly - parameters]**

orderly   302:25
ordinary   58:14
  130:10
organic   62:20
organized
  254:17
orientation
  229:8
oriented   6:13
original   22:6
  207:20 393:10
  393:21
orwellian   92:17
ought   208:3
  322:21
outcome
  391:13
outline   123:21
  367:1
outlined   191:18
  236:10
outputs   137:14
outside   169:17
  224:5 227:3
  255:16 268:21
  269:19 270:9
  272:25 312:24
overcharge
  162:2
overlap   20:6
  278:6 376:3
overlapping
  207:25 347:19
overly   211:23
  360:7

overnight
  302:18
overreading
  118:11
overrides   172:1
own   20:19 33:3
  118:22 173:10
  188:23 201:5
  213:3 254:18
  266:19 340:13
  347:16 363:19
owner   187:20

**p**

p   2:1,1
p.m.   128:5,6
  129:2,5 173:1
  173:4 176:20
  176:23 189:23
  190:1 233:2,5
  251:19,22
  280:25 281:3
  317:22,25
  329:2,5 344:10
  344:13 362:5,8
  388:4,8
package   123:25
  298:16,17
  342:7
packages
  384:21,24
page   6:19
  11:10 34:16
  41:6 44:18
  46:7 67:7
  85:21 105:1

107:17 151:13
170:14 201:16
204:10,17
210:10 214:2
228:4,8,14
324:5 328:23
328:24 369:22
370:6 389:2,6
390:2,6 392:4
393:15 394:4
395:4,7,10,13
395:16,19
pages   18:13
  22:13 42:19,25
  43:10,23 44:5
  44:20 49:10
  204:6 229:23
  230:4 280:20
  326:17 327:11
  368:23 370:12
  393:14,17,17
  394:3,6,6
paid   351:18,25
pair   49:6
  373:13
pairs   373:9
pan   143:9
paper   11:5
  346:4 355:23
papers   245:24
paragraph
  13:1 34:13
  36:3,10 81:2,9
  107:21 130:24
  144:8 148:7

151:10,15
152:9 153:3,12
154:3 157:13
170:21 177:6,9
189:12 190:6
210:21,25
236:24 237:11
237:25 238:6
240:19 247:6
248:16,20,24
257:16 259:3
275:14 276:18
276:20 277:1
288:8 292:22
295:20 299:10
310:18 313:3
318:3,5,9
329:22 330:8
332:4 366:25
368:18,20
371:15
paragraphs
  11:11,23 20:21
  109:16 170:18
  189:11 281:6
  329:12 330:5
  338:15 368:19
  371:7
parameter
  159:13 227:7
  227:18
parameters
  159:2,5,7
  228:8,13

**[paranoid - percent]**

paranoid
315:16
parentheses
75:8,11 153:17
part 14:10
15:11 42:3
49:20 80:24
94:1,3 107:24
116:11 143:25
148:12 149:1
155:22 158:13
158:18 169:20
170:1 181:15
210:4 213:14
215:1 242:22
252:5 263:18
275:15 287:17
306:7 323:9
334:14 343:22
346:8 349:17
354:6 358:22
360:21 362:11
383:25
partial 148:23
particles 137:2
particular
26:21 28:16,20
36:13 52:19
105:21 106:11
133:9,14
223:18 239:25
240:1 253:8
260:15 265:12
267:6,7,14
268:12 270:25

326:3 329:23
365:20
particularly
183:10 253:14
316:23
parties 162:20
302:22 314:12
316:14 391:11
parts 11:7,7
222:8,11,12
345:8 346:13
party 13:8
92:21 124:13
124:23 138:8
169:13 255:9
255:12 352:21
354:14 355:4
368:2 380:5
passing 122:9
172:6 344:14
password 69:5
past 61:16
79:18,25 203:9
203:14 221:1
295:14 297:19
303:17 304:22
324:24 352:1
patch 155:18
155:20 156:5
patched 155:16
patent 10:24
196:23
patents 196:22
pathway 103:9
103:11

patients 111:22
115:13
pattern 279:8
279:19 282:7
paul 2:21 3:18
pause 12:17
66:16
pay 6:24 10:10
29:1 31:19
50:1 83:19
113:11 272:7
272:13,21
295:9 297:6,7
297:15 319:12
319:13,16
351:15,16
352:11,17,23
354:16 355:1
383:5
paying 223:12
223:13 272:9
352:2,2,3
354:24 366:23
383:7
payload 331:2
pdf 71:24 72:10
72:13 393:12
394:1
peeping 199:8
199:10,18
pen 75:20
penalty 393:16
394:5
penny 383:8,10

people 7:7,8,24
13:18 14:4
17:23 18:8
20:18 24:14,22
26:14 60:11,21
62:19,22 95:7
95:9 96:12
99:22,22 100:8
109:21 114:8
114:19 115:8
115:24 120:1
162:6 172:21
178:9 179:12
197:3 204:14
208:23,24
209:5,5 218:25
232:20 235:23
245:16,19,20
253:25 265:25
266:7,20
274:21 288:17
291:23 294:7
300:18 302:23
304:23 305:12
305:19,22
317:8 334:5
335:13 341:17
342:14,24,25
353:15 366:18
383:7
people's 21:5
perceive 69:14
percent 109:24
109:25 153:19
153:23 154:13

**[percent - perusing]**

155:3,24 156:1
192:18 293:5
293:13,15,19
293:25 299:12
308:17,19
320:14,15
343:20 357:21
**percentage**
246:4 293:13
**perceptions**
172:5
**perfect**   16:8
168:14,15
238:3
**perfectly**   39:2
174:22 242:6
308:6
**perform**   137:19
218:20 234:7
242:10,24
244:13 283:11
283:21 374:1
374:14,23
375:5 386:1
**performance**
138:22 352:14
355:11
**performed**
137:19 243:20
280:4 338:21
357:2
**performing**
242:7
**performs**
277:19

**perfusion**
101:21
**period**   85:24
133:10 170:23
300:14 311:17
319:1 326:6
332:7 333:12
333:16 334:15
393:18 394:7
**periodically**
251:4,7
**periods**   344:23
**perjury**   393:17
394:6
**permanent**
344:24 368:25
369:9,11,13,13
369:23
**permanently**
198:19 368:22
370:14,18
**permits**   355:12
**persistence**
183:20
**persistent**
181:5 183:19
183:25 187:6
193:11 208:11
235:20 378:14
**person**   31:9
58:25 93:10
94:11,17,23,24
95:3,5,12
98:25 99:1,14
99:18,19

101:16 102:1
102:12,13,14
104:3 109:7
114:24 116:5,7
118:24 141:17
161:23 181:7
184:22,25
209:15 213:20
229:16 230:14
231:22,24
236:3,8 267:21
267:22 268:5
289:5 350:25
381:8,9 382:9
**person's**   99:12
138:10 140:13
227:18 229:7
231:25 236:4
344:3
**personal**   4:25
37:20 51:20
69:4,21 71:8
74:4,6,13
76:17 80:18,19
80:21 82:14
88:16 89:4
90:23 91:7
93:2,7,14,23
94:4,9 96:3,9
98:19 102:9,12
109:6 110:15
160:13 161:21
170:2 180:4
181:7 212:25
235:20,23

**personalization**
189:6,9 190:13
190:19,25
191:7,9,15
192:8,22,23
194:3 226:23
227:2 381:16
381:18,23
**personalize**
194:20 203:9
203:15 211:3
212:4 220:8,15
**personalized**
73:5 114:19
190:17 192:2
**personalizing**
195:1,2 226:13
**personally**   8:6
16:15 62:2
97:1 98:16
161:2,14 213:1
213:14 248:17
**perspective**
21:3 56:22,23
60:14 172:12
282:11,13
366:10 367:7,9
**pertaining**
64:14 94:19
98:19
**pertains**   64:22
**pertinent**   22:17
**perusing**   33:12
36:16 80:8
81:5 108:14

Page 60

**[perusing - point]**

189:19 210:23
237:2 249:2,11
259:10 281:14
283:16 372:3
372:24
**peteysake**
311:7
**phased** 294:3
**phenomenon**
159:23
**philosophical**
150:2
**philosophy**
308:3
**phone** 64:2
99:3,4,7,12
100:14,15,17
100:19 102:21
138:10 161:25
163:10 180:8
181:3 315:5
348:16,17
364:8 386:21
**phones** 3:8
265:19 386:18
**phrase** 36:2,3
39:12,16,20
40:17 41:24,25
42:2 43:22
44:17 45:20,23
46:14 47:18,21
48:18 49:12,21
70:21 71:17
80:4 131:2,3
132:3 192:12

211:13 212:25
276:21
**phrased** 177:6
**phrases** 85:17
**pichai** 20:24
21:19 22:16
**pichai's** 21:9
**pick** 3:5 116:6
121:13 197:3
**picked** 64:1
**piece** 17:22
163:1 230:20
250:8,11
342:16 348:11
364:13
**pieces** 136:4,7
137:25 193:21
203:3 213:6
215:11 250:11
274:1 279:16
361:12 364:10
**pii** 212:7 213:2
213:7
**piqued** 225:25
**pissy** 339:1
**pitch** 113:7,13
126:8
**pixel** 303:15
**pixels** 56:11,15
303:13 343:12
**placated** 61:5
**place** 44:12
67:7 88:1
101:5,7 136:5
136:19 179:22

180:3 181:10
185:10 289:17
344:1
**places** 40:10
103:5 136:11
172:7 184:2
252:1 295:7
375:20
**plaintiff** 1:9 2:4
2:9 8:25
365:21
**plaintiffs** 4:20
7:17,17 8:25
23:23 35:1,6
35:14 52:18
61:12 130:10
174:3 311:24
313:11 325:4
328:3 386:4,21
387:8
**plan** 320:18
**plane** 306:11
**plate** 106:2,3
162:1 180:6,7
180:12,19
187:7
**platform** 38:1
204:8 220:21
292:20 298:18
298:20
**platforms**
292:1 321:11
385:1
**play** 130:12
230:9 274:24

**please** 3:4,7,24
45:8 83:16
87:17 93:5,18
95:16 173:8
176:12 235:4
357:12 367:18
**plenty** 83:22
279:23
**plus** 243:5
347:1
**pocket** 99:8,13
**point** 5:15 38:8
49:5,10 50:4
50:10,17 51:22
52:10,17 53:8
54:15 56:25
57:2,17,20
59:18 61:13
62:24 78:20,22
81:1 102:23
106:21 130:20
142:11 145:18
146:14 148:9
151:15 152:2
167:9 175:1,9
178:11 181:6
192:11 207:20
241:5 242:5
248:14 257:1,2
257:7 276:4
285:4 298:1
317:16 329:11
337:15 338:12
340:14 349:17
358:21 374:2

Page 61

**[point - pretty]**

378:23
**pointed** 80:11
310:13 357:10
**pointing** 88:15
106:19 181:18
190:9 191:13
249:15 335:12
345:7
**points** 34:10
42:9 54:18
62:5 63:21
86:13 151:20
213:19 297:20
311:17 325:22
**policies** 68:5
85:20 169:13
242:18
**policy** 42:15
44:19 45:14
66:23 68:19
73:12 74:25
75:7 79:10
112:6 162:15
163:18,20
164:21,21
171:7,23 212:8
212:20 242:13
285:24 333:21
349:6 365:4
389:9
**political** 115:8
115:12,17
**populate**
132:13 144:10
146:18

**population**
261:6 272:7,13
273:12,15,18
273:19 308:19
**portion** 258:20
259:16
**pose** 45:6
**position** 23:22
23:24 86:15,16
116:20 121:6
207:22 264:24
266:2 359:8
**positions** 86:23
**positives** 258:1
258:9,22 259:2
259:17
**possession**
250:4
**possessive**
99:22
**possibilities**
58:20
**possibility** 44:7
46:17 181:23
289:2,5 311:15
365:15
**possible** 45:5
108:7,9,20,25
109:19,20
110:12 115:24
134:9 148:8
158:14 208:4
294:20 304:12
315:7,8,20
375:9

**possibly** 55:19
326:19
**post** 101:11
233:8,13
**potential** 39:3
39:24 76:13
103:9 304:20
**potentially**
110:19 198:20
221:2 273:17
**powered** 37:22
**powers** 124:11
**practice** 245:14
**practices** 32:1
34:15 270:25
**precise** 43:3
73:23 232:15
288:20
**precisely** 43:24
**preconceived**
50:18
**prediction**
223:11 231:22
**predictions**
262:22
**predictive**
222:21 223:17
**preface** 187:11
**prefer** 33:24
**preferably**
337:9
**preliminary**
49:11 360:21
**premarked**
11:25

**premium**
319:13
**prepare** 141:3
**prepared** 273:2
**present** 2:18
127:6,21 170:6
**presentation**
44:4
**presented**
109:12 143:7
146:22 171:5
**presently** 294:3
**preserve**
103:12
**preserving**
112:11 316:18
**press** 317:1
**pressure** 113:8
349:9 364:22
364:23 365:13
365:22
**presumably**
57:16 104:19
114:6 184:19
195:7 249:25
319:1
**presuming**
307:3
**presumption**
105:7
**pretty** 37:16
38:7 42:6,18
49:19 54:15
56:7 65:18
66:12 135:9

**[pretty - processor]**

143:9 146:6
151:4 211:14
245:8 309:2
318:18 319:25
320:15 334:3
361:4,13,20
**prevent** 170:19
**prevents** 77:14
**previous**
346:22 356:5
**previously**
151:20 173:22
348:22 350:3
**price** 272:7
**primarily**
22:10
**primed** 103:16
**principle**
168:12
**prior** 10:9,23
25:17 29:9
49:1 54:12
247:25 338:15
381:2
**pristine** 102:25
**privacy** 19:14
19:17,18,20
24:25 28:20
42:15 44:19
45:14 51:11
59:1 63:3
66:23 68:5,19
73:12 74:24
75:7 79:10
85:20 92:18

101:23 102:5
103:6,8,12,15
103:20 104:4,4
104:9 110:16
112:11,13
113:4 115:1
116:1 121:8
124:6 169:13
171:6,23 178:4
178:7 179:15
181:14 187:2
188:6 197:23
199:5,8 200:2
200:5 201:8,12
201:13 207:24
208:21 212:8
212:20 214:17
229:4 235:17
235:19 265:13
265:22 266:12
266:14 268:2
274:7,8 275:3
287:8 304:23
305:13,14,22
315:9 316:18
341:2,10,12
342:11 389:9
**private** 3:6
25:9 70:6
103:14,17,17
120:17 199:6
199:24 200:21
201:1,7 210:18
266:8

**proactive**
206:25
**probabilistic**
244:20,22
245:13,23,25
**probabilities**
188:13
**probability**
101:20
**probably** 5:21
38:9 46:18
49:9 97:17
107:6 115:19
131:5 132:19
145:15 162:21
183:13 218:13
224:12 257:9
297:21 302:6
314:18,21
315:2 316:1,2
341:12 345:16
353:3 377:6
**problem** 13:25
14:14,16 16:2
16:3 78:9
91:22 100:21
101:18,19
114:15,16
116:12,24
120:9,10,12,15
120:15,19,20
122:16,18
138:12 139:3
160:14 178:1
178:15 179:1

181:4,8,10,14
181:25 183:20
187:8 189:1
199:18 208:2
225:2,3,19,20
225:23 235:19
242:16 258:13
295:24 346:6
358:20 364:21
**problems** 104:3
112:8 115:14
207:15 209:22
225:16,18
**procedural**
125:24 228:21
228:24 231:8
236:17,18
**procedure**
393:19,20
**procedures**
139:13
**proceed** 298:23
299:2
**process** 10:6
16:10 111:2
118:4 159:19
277:18 280:7
280:11 282:19
283:6 285:21
312:25 349:9
363:21 377:1
**processing**
116:10
**processor**
118:15,19,21

**[processor - pseudonymous]**

119:3
**proclivities**
229:7
**produce**  301:7
327:21 328:1
370:20
**produced**
154:11 244:7
288:11 312:23
321:19 330:13
333:20 335:16
336:23 370:21
**product**  121:1
121:10 127:12
154:6 222:4
294:2 295:12
296:22 299:25
302:17 304:17
310:1 323:20
340:16 341:25
**production**
241:16
**products**
107:23 108:4
110:8 124:11
127:10 148:10
148:14,24
182:3 221:19
221:22 262:23
295:25 303:18
323:12 341:2,3
342:3
**profession**
83:17

**professional**
1:23 317:6,7
**professionally**
51:1
**professor**
111:16
**profile**  188:11
343:23
**profit**  382:21
**program**  225:3
225:5,6,6,21,21
297:17 384:5
**programmatic**
227:16 229:13
**programming**
7:5 183:11
**programs**
297:17
**project**  95:25
112:21 148:20
292:5,8,23
376:4
**projection**
321:4
**promise**  60:7
83:22
**promised**  358:3
**promising**
196:12,14
207:22
**promo**  295:5,8
350:6 379:5
**promote**  287:8
**promotion**
218:25 350:12

**prompt**  32:16
314:13,16,22
**prompts**
315:10
**proof**  205:22
**propensity**
220:18 221:15
222:16 305:23
**properly**  95:11
**properties**
197:23 288:13
**proportion**
382:23
**proposal**
370:10,11
**propose**  129:19
133:3 313:25
324:8 360:24
**proposed**
240:20
**proposing**
108:2 179:12
**pros**  303:12
**protect**  69:8
71:11 206:24
207:3
**protocol**  286:3
287:14
**prototype**  97:5
**proud**  16:5
**prove**  205:18
209:13 325:23
**proven**  225:8
**provenance**
76:5

**provide**  13:7,14
15:20 62:15
69:21 77:20
80:24 119:25
170:10 205:23
316:13 327:22
329:18 376:16
**provided**  62:25
111:10 118:24
131:13 157:3
170:24 214:3
238:10 345:5
393:19 394:8
**provider**
290:10
**providers**
123:6 182:9
184:3 319:19
**provides**  62:14
109:18 175:19
**providing**  22:3
43:20 69:3
331:3 334:18
**provision**
120:11
**pseudo**  372:14
**pseudonym**
53:25
**pseudonymous**
36:23 53:9,15
53:17,19 54:1
54:5 64:12
81:25 134:20
140:12 241:4
282:21 349:18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[pseudonymous - question]**

349:19,22
350:1 372:20
375:16 376:16
378:16 386:19
**pseudonyms**
86:21
**psychiatric**
115:12
**public**  1:24
21:25 42:19
56:16,19 92:8
113:19 196:23
264:8 388:14
391:3 392:23
**publication**
117:2,5,7
**publicly**  43:19
271:21,22
273:8
**published**
113:16
**publisher**
214:13 264:2
264:12 366:16
368:2
**publisher's**
372:9
**publishers**
153:6,13
154:14 155:25
**pull**  67:4 71:18
99:4 117:2,4
194:5 211:1,13
**pulled**  301:10

**pulls**  235:7
**purchase**  226:2
226:5,8,11,25
351:2 372:12
**purchased**
226:24
**purge**  32:20
104:8 105:4
107:12 108:3
111:7 129:14
129:20 177:3
**purged**  104:6
**purging**  143:25
**purpose**  35:24
113:15 114:6
132:15 144:12
178:8 219:19
252:18 262:7
284:14,25
285:13 355:5
**purposes**
118:20 231:2
310:25 380:12
383:14
**pursuant**  1:19
**push**  322:8
**pushing**  298:17
**put**  5:21 6:1
8:11 9:9 29:2
36:18 40:25
49:23 53:24
76:15 77:13
82:8 92:12
101:12 121:5
124:21 150:13

174:25 175:23
177:13 199:14
206:6 207:21
247:2 261:4
286:13 321:23
327:24 347:1
349:4 354:8
365:9,21
**puts**  116:19
364:23
**putting**  76:17
122:25 136:4
138:24 364:10
366:15

**q**

**qualified**  383:6
**qualitatively**
125:2 188:1
**quality**  111:20
**quantified**
320:8
**quantify**  168:8
168:11,22
215:10 266:16
**quantity**
330:13
**quantum**  137:1
137:12
**quarters**  305:4
**queried**  174:17
**queries**  369:25
**question**  9:2,22
11:16 18:17,18
22:6 26:24
27:3 32:5,14

32:23 33:2,5
33:23 34:9
36:7,25 37:5
43:13 44:16
50:23 51:21
53:24 55:2
58:13 61:13
64:17 65:17
66:6 68:25
70:12 72:17
73:10 75:6,16
76:25 77:23
78:8 79:13
82:19 83:20,24
85:2,12 93:5
93:17 95:15
104:11 106:13
110:10 111:15
113:6 121:18
122:23 125:16
127:18 134:25
135:10,12
139:9 141:1
143:22 144:5
144:17 150:1,3
150:16 155:19
155:21 156:4
156:12 164:12
165:17 174:6
174:20 177:17
181:15 183:23
186:22,25
191:11,12
203:5 216:10
216:21 220:12

Page 65

**[question - read]**

227:12,14
229:12 232:2
236:10 238:25
239:20,23
242:20 246:16
247:7,9 256:21
259:15 261:23
263:21 264:11
264:21,25
265:22 266:11
267:12 268:18
270:16,21
272:1,18,20
273:3,4 275:5
275:24 279:5
282:3,15
283:18,24
284:4,19 288:7
290:18 295:17
297:6 322:1
325:7 326:15
327:8 331:24
333:7 334:15
334:23 353:17
354:10,12,19
356:12 357:1,8
357:15,22
358:15 359:21
363:16 366:13
368:11 381:11
385:7,19,21,25
386:16
**questioning**
236:16 331:7
346:25

**questions**  14:11
17:4 33:15
34:7 45:16
91:4 149:11
169:21 173:23
217:6 220:11
247:25 259:13
268:21 327:2
344:19 346:22
347:5 350:4
354:11 356:5
356:18,19
358:3,5 359:12
359:14,15
360:9 362:25
363:4 377:13
377:17,23,23
377:25 378:1
379:4 380:2
381:16
**quibble**  203:23
**quick**  33:8
160:13 163:6
176:5,6 232:23
280:23 283:13
310:18 344:8
374:6
**quickly**  317:11
318:25
**quite**  4:24 5:17
6:22 16:4
239:15 292:24
362:17 373:23
**quo**  61:5

**quotation**
153:7
**quotations**
25:21 45:20
**quote**  24:3
26:14 45:18
166:7 275:23
363:20
**quoted**  24:15
24:22
**quotes**  45:15
153:4,17 213:3
292:25
**quoting**  238:11

## r

**r**  2:1 129:1
395:3,3
**r&s**  394:1,9
**rabbit**  208:15
**radio**  206:3
**rahman**  2:16
72:9,14
**raise**  85:3
113:5
**raised**  231:11
231:12
**raising**  110:16
**rambo**  133:24
**range**  323:12
**rate**  5:4,6 16:9
16:11 162:15
162:16 163:17
166:24 168:20
246:3 256:4,8

**rates**  319:21
**rather**  108:21
124:3
**rating**  205:11
**ratings**  206:18
**razor**  89:11
**reach**  206:4
**react**  308:10
**read**  16:20 23:4
23:5,5 27:20
36:7 45:22
52:14 56:25
57:2,4,20 58:8
59:22 60:16
61:8,18 64:17
69:17 70:25
76:14 78:25
79:2,3 80:7
81:3,7 92:5
105:9 108:15
113:17 118:5
142:22 144:23
145:14 146:23
164:12 191:3
210:1 211:20
229:16 236:25
245:24 248:25
249:10 259:8
264:21,22
280:19 284:2
297:4 305:4
336:12 341:17
345:24 372:1
377:6

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[reader - record]**

| | | | |
|---|---|---|---|
| **reader** 34:12 | 275:15 280:5 | 214:4,21 | 281:1 317:23 |
| **readily** 378:17 | 286:7 289:3,6 | 216:16 224:18 | 329:3 344:11 |
| **reading** 74:10 | 298:19 307:13 | 226:15 229:2 | 362:6 |
| 191:4 329:25 | 308:7,11 | 238:15,16 | **recharacterize** |
| 330:2 393:23 | 310:15 319:22 | 246:23 252:10 | 152:24 |
| 394:9 | 328:4,11 | 253:18 255:4,6 | **recognize** 84:8 |
| **reads** 154:15 | 333:20 335:9 | 256:18,22 | 84:9 97:19 |
| **ready** 273:24 | 342:4 363:18 | 262:4 264:14 | 279:8 365:17 |
| 300:16 329:7 | **reask** 270:20 | 284:11,15,17 | **recollection** |
| **real** 15:9 87:1 | 283:18 367:23 | 284:18 285:18 | 281:19 339:16 |
| 101:3 176:5 | **reason** 51:12 | 287:16,17 | 346:16 |
| 208:24 209:5,6 | 62:9 81:1 | 292:5 311:18 | **recommended** |
| 209:15 235:24 | 113:16 146:14 | 313:12 314:15 | 82:18 |
| 280:23 373:18 | 182:16 193:15 | 315:12 339:20 | **reconcile** |
| **realistic** 299:7 | 223:13 256:13 | 356:7 359:24 | 240:12 |
| **realized** 235:15 | 282:12 286:23 | 362:25 365:10 | **record** 3:2,23 |
| 236:13 | 291:21 365:23 | 365:14 | 4:8 36:19 |
| **really** 14:18,24 | 380:10 392:4 | **recalling** | 47:11,14 66:18 |
| 38:13 52:24 | 395:6,9,12,15 | 297:19 | 66:21 67:14,15 |
| 63:11 70:11 | 395:18,21 | **receive** 322:4 | 67:19 112:12 |
| 84:18 86:14 | **reasons** 155:14 | **received** 47:1,6 | 128:5 129:5 |
| 90:8 105:3 | **rebut** 321:13 | 139:14 253:10 | 150:15 173:1,4 |
| 111:1,4 114:11 | **rebuttal** 124:22 | 373:22 | 176:13,20,23 |
| 114:18 122:22 | 126:1 162:10 | **receiving** 163:8 | 189:21,23,24 |
| 124:10 137:15 | 234:6 389:8 | 322:2 | 190:1 199:9 |
| 149:14 150:2 | **rebutted** | **recently** 30:25 | 215:4 233:2,5 |
| 173:11 178:3 | 125:19 | 108:16 114:12 | 240:6 247:24 |
| 178:11,14 | **recall** 10:4 | 146:23 295:12 | 251:19,22 |
| 179:10 187:15 | 13:22 14:3 | 299:16 300:5 | 257:4 260:6 |
| 189:12 195:18 | 28:10 30:4,11 | 300:23 315:13 | 264:16,22 |
| 196:3 198:11 | 30:14 31:16,17 | 317:10 | 280:25 281:3 |
| 198:15 209:8 | 34:3,11,23 | **recess** 47:12 | 295:3,21 313:8 |
| 216:3 217:20 | 50:9 51:8 | 66:19 128:6 | 313:22,24 |
| 241:8 247:5 | 134:2 143:3 | 173:2 176:21 | 317:22,25 |
| 266:9 267:21 | 147:18 166:1 | 233:3 251:20 | 329:2,5 343:10 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[record - relay]**

344:10,13
346:8,9 348:5
348:9,12,18,19
354:9 357:4
358:25 361:2
362:5,8 369:24
378:6 386:5
387:4,12 391:8
**recorded**   3:10
25:10 199:11
199:14 256:18
261:9 295:17
325:24 350:24
350:25 351:3
**recording**
337:25 371:24
**recordkeeping**
206:18 219:15
220:5 262:7
**records**   104:7
112:13 210:11
243:6 313:6
324:9,12
329:18
**recreate**   159:18
215:19
**red**   106:24
**redact**   163:12
**redaction**
310:25
**redefinable**
380:19
**redirect**   353:5
354:1 360:6

**reduce**   344:2
**redundant**
27:12,15
227:14
**reengage**   296:7
**reengineer**
110:3
**reestablish**
348:8
**reevaluate**
340:15
**refamiliarize**
362:19
**refer**   37:7,10
234:24 349:10
**reference**
231:25 263:24
357:22
**referenced**
25:21 393:6
**references**   6:14
**referred**   196:6
377:2
**referring**   32:4
40:3 46:6,7,9
85:16 107:15
130:14 133:8
157:14 192:17
194:5,7 204:9
253:4 312:22
325:12 337:22
**refers**   249:23
**reflected**   12:16
12:21 31:2
90:13

**refraining**
211:2
**refresh**   241:10
256:25 280:17
281:19 283:14
287:25 346:15
374:6,20
**refreshed**
173:10
**refused**   327:22
328:1
**regain**   287:25
**regard**   349:18
350:9 353:6,8
**regarding**
36:21 40:4
64:10 65:14,16
93:22 94:2
157:8 285:24
344:19 347:5
350:4 379:4
380:2
**regardless**
190:19 202:15
276:22 353:15
378:15
**registered**   1:23
**regularity**
294:10
**regularly**   14:21
**rehab**   176:14
**reidentification**
347:6 348:2,4
363:9,14,17
364:11,17

378:8
**reidentified**
348:12 364:14
375:25 376:2
378:17,21
**reidentifies**
235:11 380:24
**reidentify**
348:18 349:2
349:14 370:12
376:8 378:22
381:7
**reidentifying**
378:11
**reject**   184:25
**rejecting**   185:9
**relate**   102:12
161:20
**related**   38:2
48:5 62:2 63:3
66:3 76:18
240:19 330:9
391:10
**relates**   38:4
40:13
**relating**   105:13
109:10 129:13
222:16 373:23
**relation**   10:2
**relative**   235:12
273:25
**relatively**
323:20
**relay**   31:1

**[release - report]**

| | | | |
|---|---|---|---|
| **release** 364:24 | 381:13 | 264:23 | 82:21,22 84:3 |
| **released** 114:11 | **remember** 5:7 | **rendering** | 88:6,12 90:8,8 |
| 393:21 | 10:7 27:1 | 148:13 167:2 | 90:10,14 97:14 |
| **relevance** 21:6 | 29:15 30:15,16 | 168:1 231:3,3 | 98:3 104:8,12 |
| 21:8,17 122:9 | 30:18,20 51:16 | 287:12 | 105:19 106:10 |
| 363:22 | 55:11 73:22 | **reopening** | 109:17,23 |
| **relevant** 21:24 | 97:16 98:4 | 360:10 | 110:17 113:5 |
| 22:18,24,25 | 105:1 140:4 | **rep** 223:3 | 124:18,20 |
| 47:3,7 204:19 | 156:22 165:18 | **repeat** 18:24 | 125:9 130:17 |
| 325:18 327:23 | 175:1,10,22,23 | **replace** 304:13 | 133:22 140:14 |
| 334:3,20 337:1 | 185:5 227:9 | **report** 6:4,7,15 | 141:4 142:9 |
| 368:23 | 233:11 243:2 | 6:17 7:10,23 | 147:21,22 |
| **reliable** 205:24 | 243:12 246:18 | 8:16,18 11:5,6 | 148:5,23 150:4 |
| **reliably** 275:18 | 246:20 253:5 | 11:9,24 12:6 | 150:25 151:5 |
| **relief** 31:23 | 259:5 263:20 | 12:22,24 15:14 | 152:4 155:1 |
| 35:2,13 58:20 | 263:23 265:4,6 | 15:22,23 16:4 | 157:4 169:18 |
| **relies** 193:1 | 276:1,8 314:20 | 16:13,18,20,24 | 170:15 175:4,5 |
| 208:11 368:4 | 315:24 316:3 | 17:1,11 19:3 | 175:6,21,24 |
| **rely** 290:22 | 326:20 338:4 | 21:12,14 22:9 | 181:15 187:12 |
| 310:3 336:11 | 339:8,11,14 | 22:10 24:15 | 189:10 196:2 |
| 336:13 | **remembered** | 25:22 26:14,18 | 203:8 207:16 |
| **relying** 26:18 | 249:13 | 27:5,17 28:6 | 209:25 210:4 |
| 27:6,8,16,21 | **remind** 27:2 | 28:12 29:5,10 | 210:21 212:24 |
| 29:4 288:22,24 | 359:22 | 30:3,6,9,13,15 | 213:5 224:10 |
| 289:9,10 | **reminds** 29:7 | 30:15 31:2,6,7 | 226:16 227:10 |
| 299:19 312:15 | **remote** 218:2 | 31:15,24 32:3 | 232:10 234:3 |
| 313:13,17 | **render** 125:12 | 33:16 34:13 | 235:6 238:21 |
| **remain** 25:9 | 145:10 168:4 | 36:3 37:1 38:9 | 240:8,9 242:22 |
| 92:24 201:7 | 286:25 287:13 | 38:18 39:22 | 243:9,11 247:2 |
| 303:22 | 340:17 365:19 | 40:18 41:23 | 248:6,18 252:1 |
| **remainder** | 367:11 | 42:10 44:15 | 255:16,19 |
| 293:19 | **rendered** 12:11 | 45:15,17,19 | 263:25 264:4 |
| **remaining** | 12:15,19 64:24 | 55:12 58:19 | 265:14 266:13 |
| 288:14 348:7 | 66:10 106:9 | 70:1 73:15 | 275:13,24 |
| 371:10 373:21 | 123:9 124:14 | 78:25 81:3,10 | 276:3,12,16,17 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[report - retained]**

284:20,21,23
286:8,14
295:18 298:1
299:11 308:17
311:14,19
318:3,12
323:18 324:1
325:17 326:9
326:11,17,25
327:6,15 328:6
339:23 345:1,2
345:6 346:10
349:10 350:7
353:17 357:23
358:23 359:17
360:19 361:9
361:10,16
362:12 363:18
364:3 367:1
369:23 371:5
373:25 378:24
384:20,25
386:7,14 389:7
389:8,11,12,13
389:14,15,16
389:17,18,19
389:20
**report's**   67:22
67:23
**reporter**   1:23
3:19,24 77:22
**reporting**
392:1
**reports**   15:18
63:16 140:4

211:18 214:15
**represent**
254:22 255:2
**representation**
142:18 196:10
**representations**
124:7 196:7
210:9
**representative**
216:2,6 234:18
253:14 254:4
308:25
**represented**
203:13 293:20
**representing**
8:22 9:2 358:2
358:7
**represents**
199:22
**reproduce**
159:23
**reproduced**
338:5
**reps**   220:20
**reputable**
233:12
**request**   173:17
174:4
**requested**
174:1 394:1,9
394:10
**requests**
327:19 390:5
**require**   113:25
119:10 168:24

318:19
**required**
296:11 318:22
**requirement**
297:2
**requires**
112:14,16
192:24
**reread**   141:4
241:10
**research**   95:20
112:7 113:15
113:17 274:4
**reserve**   353:5
353:25
**reserved**
269:13
**resisted**   327:22
334:17
**resolve**   21:24
207:15
**resource**
279:24
**respect**   19:2
123:8 126:19
134:17 208:21
236:14 252:22
266:25 331:15
370:8
**respected**
268:6
**respective**
347:15
**respond**   9:6
10:11 125:20

**responding**
9:23 32:16
**response**   9:9,11
9:14,19 10:2
33:20 125:25
275:16 280:14
293:1
**responses**
46:21 47:2,16
52:13 258:6
**responsible**
205:3
**responsive**
43:20
**restroom**
246:14 280:22
**result**   258:19
278:4 281:21
297:15 307:3
**resulted**   174:12
**results**   301:8
**resumed**   129:3
**retain**   205:8,18
206:20 287:10
331:17,22
335:23
**retained**   4:20
9:5,18 10:15
11:2 13:19
14:5 34:14
49:5,18 50:8
55:4,6,9 115:1
251:9 270:14
330:7 334:10
335:2,13

**[retained - right]**

| | | | |
|---|---|---|---|
| 368:22 370:14 | 393:10,13 | 55:1,23 56:5 | 182:9 183:19 |
| 370:18 389:21 | 394:2 | 56:12,17 57:1 | 184:4,9,11,18 |
| **retention** 9:25 | **reviewed** 8:8 | 57:18 58:2 | 185:8,21,25 |
| 55:18 332:7 | 31:14 44:20 | 63:13 71:14 | 186:14 187:3 |
| 333:12,16,21 | 46:13,20 47:17 | 72:8,23 73:8 | 187:11 188:21 |
| 334:14 344:23 | 49:8,9,16,19 | 75:10 78:24 | 191:1,20,24 |
| 368:25 369:24 | 50:7,11 51:22 | 81:25 95:23,24 | 194:9 200:8 |
| **retentions** | 52:11 53:5 | 96:19 97:13,23 | 201:14 202:15 |
| 335:11 | 57:15 90:18,20 | 98:12 99:14 | 204:20,25 |
| **retort** 162:14 | 91:11 129:16 | 100:7 101:24 | 208:13 210:3 |
| **retorts** 215:14 | 129:24 131:20 | 102:20,23 | 212:16 215:12 |
| 215:16,17 | 134:18 147:13 | 104:6,24 | 217:14 218:5 |
| **retrospectively** | 147:17,20,25 | 105:22 109:11 | 222:17 223:20 |
| 209:20 260:8 | 157:8 171:23 | 119:16,20 | 226:4 228:6 |
| **return** 277:22 | 196:22 214:15 | 120:6,19 | 231:15 232:16 |
| 393:17 394:6 | 216:15 353:17 | 121:17 123:6 | 233:10,18 |
| **returning** | **reviewing** | 124:19 125:7 | 236:11 237:23 |
| 117:10 | 90:21 | 127:1,8 129:21 | 240:21 241:6 |
| **revealing** 95:22 | **rewrite** 115:3 | 131:22 133:2 | 241:14 242:24 |
| 241:2 | **rewritten** 115:5 | 133:10 137:6 | 243:9 244:2,5 |
| **revenue** 5:15 | 115:6 | 138:2 139:15 | 247:6 249:23 |
| 5:16 221:8 | **rfa** 275:16 | 139:25 143:11 | 250:7 251:4,24 |
| 262:25 293:5 | **rid** 100:11 | 147:14 149:20 | 254:19,23 |
| 300:19 | **right** 6:19,19 | 149:23 151:2 | 258:2,19 |
| **reverse** 58:3 | 6:20,22 12:17 | 151:14,24 | 259:14 261:13 |
| **revert** 300:1,4 | 13:19 15:8,25 | 152:13 153:8 | 261:16 262:1 |
| **review** 6:3,6 | 17:25 27:11 | 154:1 155:5,9 | 266:4,21 |
| 8:6 9:12,14 | 28:7 29:10 | 158:4,24 | 271:17 273:9 |
| 16:12,15 91:5 | 33:7,23 34:13 | 160:18 165:5 | 273:12 274:10 |
| 91:6 108:12,13 | 34:18 36:1,9 | 166:13 169:1 | 275:4 276:11 |
| 157:5 166:15 | 37:19,22 39:13 | 169:24 170:4 | 277:7,23 |
| 169:12 171:6 | 42:15 44:21 | 170:12 173:19 | 278:12,14,24 |
| 189:15 210:22 | 47:18 49:8 | 173:21 174:18 | 279:1 281:8 |
| 281:5 335:15 | 50:7,11,15 | 179:18,19 | 283:4,6,12,19 |
| 374:18 393:8 | 51:1 53:4,15 | 180:13,14 | 284:7 285:1,22 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[right - santacana]**

| | | | |
|---|---|---|---|
| 286:9 289:14 | 384:17 386:21 | **rmcgee**   2:11 | 305:19 366:6 |
| 289:18 290:5 | 387:23 | **road**   33:25 | **running**   218:24 |
| 291:5,13 | **ring**   292:15 | 186:25 | **runs**   111:19 |
| 292:11 294:14 | 367:2 | **robot**   58:5 | 185:6 225:22 |
| 296:9,21 298:3 | **risen**   340:23 | **rodriguez**   1:7 | **ryan**   2:10 |
| 299:14 301:17 | **risk**   102:4,5 | 3:12 311:6,15 | **s** |
| 301:24 307:16 | 103:6,8 104:9 | 312:12 377:3 | **s**   2:1 129:1,1,1 |
| 307:22 312:4 | 104:19 106:4 | 392:2 393:4 | 389:5 392:4 |
| 314:9 317:14 | 106:16 138:24 | 395:1 | 395:3 |
| 322:5 323:25 | 187:2,4 188:6 | **roi**   223:5 301:9 | **safari**   199:23 |
| 324:2,20 325:2 | 188:11 198:21 | **role**   6:9 8:15 | 200:20 201:1 |
| 327:9,11 | 234:24 235:1,5 | 13:6,11 20:11 | **safe**   199:14 |
| 328:12 329:24 | 235:14,15,24 | **roof**   188:8 | 220:20 223:3,7 |
| 330:3,16 331:1 | 236:13 238:8 | **room**   165:9 | 225:5 |
| 331:13 332:4 | 238:12,23 | 175:25 199:7 | **safest**   41:11 |
| 332:14,20 | 239:7,14 250:7 | 199:10 200:7,9 | **sake**   233:25 |
| 333:10 335:4 | 250:19,23 | **rotated**   251:5,6 | **sales**   113:7,12 |
| 337:6 338:9,17 | 251:12 265:22 | 251:10 | **sample**   216:1,5 |
| 340:7 343:13 | 267:8,8 274:7 | **rotating**   295:25 | 216:6,9 234:18 |
| 344:7 351:7 | 274:8,11,12,17 | **rough**   225:3 | 234:19 256:3 |
| 353:5,25 | 275:6 342:23 | **roughly**   4:17 | 305:4 |
| 354:23 355:21 | 343:19,23 | 4:23 5:10,11 | **sampledadev...** |
| 355:25 356:15 | 344:3 365:3,16 | 5:12,25 367:3 | 330:24 333:15 |
| 358:12,17 | **risks**   106:18 | **round**   288:9 | **sampling**   304:7 |
| 360:5 362:24 | 110:16 113:5 | **rounding**   319:9 | 304:9,10 308:9 |
| 366:4,24 | 188:12 236:11 | **rs**   1:6 | 353:21 |
| 367:11 368:13 | 239:10,24 | **ruin**   342:16 | **san**   1:5 2:14 |
| 369:3,8 370:2 | 240:5,18 | **rule**   292:15 | **santacana**   2:15 |
| 371:15 373:12 | 265:13 266:12 | 310:15 | 4:6 47:8,15 |
| 374:23 375:7 | 266:14 267:14 | **rules**   115:4,4 | 66:15,22 67:8 |
| 375:21 376:11 | 275:3,5 342:11 | 394:8 | 67:20 71:25 |
| 376:18 378:5 | 342:15 | **run**   116:23 | 72:6,12,16,20 |
| 378:12,17 | **risky**   266:18 | 163:9 225:22 | 85:5 86:1 |
| 379:17 381:4 | 268:12 270:24 | 235:6 294:9,16 | 106:25 107:15 |
| 382:16,21,23 | 341:2 | 296:14 301:22 | 107:17 117:4 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[santacana - says]**

| | | | |
|---|---|---|---|
| 123:20 128:2 | 385:11,17,22 | 80:10 81:11 | 287:16 296:21 |
| 129:7 140:22 | 386:10,23 | 122:17 170:12 | 296:23 299:3 |
| 143:17,23 | 387:3,16,19,24 | 170:19 171:1 | 300:5 306:13 |
| 146:2,9,16 | 389:3 393:1 | 195:7 198:18 | 309:23 310:10 |
| 149:7 160:11 | **sat** 110:22 | 198:19 199:2 | 310:11 326:4 |
| 160:14 164:7 | 327:6 | 210:11,14,18 | 328:11,22 |
| 169:9,24 170:4 | **satisfactory** | 230:4 368:7 | 331:14 334:13 |
| 172:23 176:16 | 44:25 | 370:9 | 345:7 355:9 |
| 176:24 190:2 | **satisfy** 35:14 | **saw** 52:17 | 356:12 359:9 |
| 215:5 233:6 | 113:4 297:2 | 130:15 247:23 | 360:17,18 |
| 246:11,15 | **save** 40:5,9 | 253:13 254:23 | 364:18 367:6 |
| 248:5 249:12 | 58:25 69:24 | 345:15 | 369:16 377:21 |
| 251:16,23 | 73:7 80:3 83:7 | **sawmill** 131:6 | 377:22 |
| 257:8 264:5 | 83:14 198:17 | 337:5,16 | **says** 11:10 |
| 268:17,24 | 198:20 209:11 | **saying** 26:7 | 34:13 36:19 |
| 269:2,9,15,21 | 325:4,9,10,11 | 39:19 40:2 | 58:8 65:13 |
| 270:1,4,15 | 377:11,15 | 41:2 43:16 | 70:22 71:12,16 |
| 276:17 280:21 | **saved** 25:3 | 59:8 91:3 | 75:10 80:3 |
| 281:4 284:6 | 70:22 73:3 | 105:6 106:15 | 84:3 87:24 |
| 288:1,5 295:6 | 74:6,13 75:1 | 122:19 123:4 | 94:2 103:13 |
| 306:8,16 313:1 | 187:18 197:16 | 124:25 126:23 | 130:24 132:13 |
| 314:5,7 317:17 | 198:14 251:15 | 132:5 134:16 | 147:2 149:15 |
| 318:1 328:24 | 271:14,15 | 138:13 139:6 | 150:25 151:18 |
| 329:6 333:5 | 318:25 325:1,3 | 139:25 140:1 | 152:9 153:12 |
| 339:3 344:7,14 | 329:20 336:15 | 142:5,16 | 153:16 154:25 |
| 345:23 349:24 | 382:1 | 153:18 155:8 | 165:4 177:15 |
| 350:10 353:4 | **saves** 36:21 | 163:25 169:20 | 181:18 199:11 |
| 353:11,25 | 40:4 64:10 | 172:12 178:25 | 199:13 201:16 |
| 354:2,7 360:17 | 81:24 82:3,23 | 182:16 197:6 | 212:16 237:4 |
| 362:2,9 369:15 | 83:25 90:23 | 227:15 230:16 | 238:21 241:11 |
| 369:19 371:11 | 93:20,22 | 240:13,13 | 247:18 248:2,6 |
| 377:14,20 | 121:19,24 | 248:6 256:8,9 | 248:20 250:15 |
| 378:2,18 379:3 | 241:18,20 | 270:7 271:5 | 278:21 292:23 |
| 381:1,12 383:1 | **saving** 40:9 | 278:16 279:4 | 293:11 298:1 |
| 383:18 385:8 | 44:3,9,11 | 281:23 285:18 | 299:11 311:4,6 |

**[says - see]**

| | | | |
|---|---|---|---|
| 311:23 314:22 | 80:4,16 82:13 | **searched** | 155:14 168:12 |
| 315:6 329:15 | 87:5 169:17 | 131:11 330:20 | 168:13,14 |
| 330:23 331:20 | 196:1 222:7 | **searching** | 197:23 239:7 |
| 336:14 384:2 | 224:5 227:3 | 204:14 | 239:11 273:18 |
| 386:12,17 | 244:5 255:16 | **second**  32:23 | 282:9 365:16 |
| **scale**  245:17 | 268:15,22 | 36:6,15 47:9 | **see**  16:4 20:11 |
| 318:14 | 269:17,19 | 67:12,12 80:7 | 36:17,23 44:12 |
| **scams**  274:21 | 270:9 272:25 | 127:12 172:24 | 59:14 62:13,20 |
| **scanning**  167:8 | **screen**  72:7 | 176:17 221:3 | 65:11 68:12,13 |
| 167:15,17 | 228:14 231:5 | 248:25 262:20 | 69:12,25 73:8 |
| **scenario** | 373:1 | 266:4,10 | 76:21 81:15 |
| 131:18 188:7 | **screw**  137:11 | 275:14 290:19 | 87:1,3 89:9 |
| 188:19 250:13 | **sdk**  150:8,9,10 | 346:24 362:3 | 91:1 92:7 96:7 |
| 279:3 306:21 | 150:18,19,21 | 369:20 370:13 | 101:11 105:19 |
| 367:25 371:17 | 151:1 152:8,11 | 371:1 372:22 | 107:20 120:9 |
| 371:20,22 | 152:13 154:9 | 375:4 376:12 | 126:7 131:15 |
| 372:4,6 | 155:7,11 | 379:3 385:3 | 144:15 147:1 |
| **scenarios**  102:7 | 157:11 165:13 | **seconds**  373:20 | 147:10 148:16 |
| 102:8 179:4 | 171:15 184:11 | **secret**  88:9 | 154:2 183:16 |
| 310:12 367:2,4 | 184:15 185:4,6 | 199:9 | 199:19 212:22 |
| **scenes**  140:9 | 185:20 186:17 | **secretly**  212:3 | 218:11,17 |
| **schedule** | 203:2,2 289:14 | **section**  12:7 | 219:17 220:6 |
| 393:10 | 289:23 290:5 | 35:16,25 58:19 | 220:14 221:11 |
| **schema**  41:21 | 291:5,10 298:6 | 104:23,25 | 222:25 224:13 |
| **scheme**  319:9 | 322:25 324:20 | 107:16 108:1 | 226:9 229:5 |
| 321:7 | 368:1,6 370:9 | 132:25 133:22 | 237:8 238:4,8 |
| **schiller**  2:2 | 372:7,8 | 134:2 147:4 | 238:12,17 |
| 10:16,20 | **sdks**  151:6 | 151:5,12 224:9 | 243:6 246:6 |
| **schneier**  27:8 | 182:8,20,25 | 311:18 324:5 | 247:1 259:3 |
| 305:11 | 183:8 289:20 | 327:9 328:6,23 | 263:24 275:20 |
| **school**  111:17 | 291:7 384:17 | 338:4 | 276:23 279:3 |
| **scientific** | **search**  62:18 | **secure**  118:2 | 281:16 284:13 |
| 159:22 | 133:6,16 | **security**  17:18 | 286:11,23 |
| **scope**  70:4,12 | 134:10 204:16 | 26:2 73:25 | 293:9,16 |
| 74:2,23 79:20 | 351:21 370:19 | 106:16 114:10 | 295:24 296:18 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[see - sequitur]**

| | | | |
|---|---|---|---|
| 310:5 311:8 | 122:15 191:25 | **semantic** 83:15 | 186:11,12,19 |
| 317:1,2 321:8 | 219:3,6 220:17 | 83:18 | 187:19 197:20 |
| 321:15,17 | 235:2 277:10 | **semantics** | 198:13 258:21 |
| 330:9 332:23 | 287:7 301:7 | 189:6 | 259:16 260:25 |
| 345:20 350:23 | **seen** 14:22 15:5 | **send** 58:23 | 278:17 281:20 |
| 353:20 355:9 | 49:7 97:12 | 158:16 159:8 | 281:22 310:1 |
| 358:20 360:3 | 101:15 137:16 | 159:12 160:1 | 325:19 |
| 362:16 368:9 | 214:21 222:9 | 160:16,23 | **sentence** 25:5 |
| 368:18 369:15 | 246:19 315:1 | 161:1,3,7,24 | 73:3,14 75:3,9 |
| 370:4 372:17 | 316:4 331:12 | 162:6 163:21 | 77:2 78:1 |
| 372:25 373:1 | 352:20,25 | 164:4,16 | 81:15 132:12 |
| 373:10 374:11 | 354:12,20 | 165:10 185:12 | 133:15 147:2 |
| 374:13 386:6 | 357:20 | 185:14 187:4,5 | 153:16 177:10 |
| **seeing** 24:18 | **sees** 6:23 229:9 | 195:15 196:14 | 192:13,14 |
| 214:16 243:2 | 230:8 372:10 | **sending** 196:18 | 215:2 237:4 |
| 246:20 248:4 | **segment** 208:22 | 198:1,15 | 240:25 242:21 |
| 256:18 315:12 | **seismic** 299:6 | 210:18 233:9 | 249:4 288:10 |
| **seek** 160:3 | **seized** 348:16 | **sends** 121:23 | 311:22 |
| 173:11 301:5 | **select** 356:19 | 185:11 277:20 | **separate** 7:12 |
| **seeking** 33:22 | **selected** 292:10 | 278:18,23 | 7:13 113:9 |
| **seem** 17:13 | 346:13 | **sense** 5:13,22 | 117:12 136:10 |
| 18:25 22:24,25 | **selecting** | 8:10 29:19 | 148:3 154:6 |
| 23:1 31:11 | 381:23 | 99:10 114:14 | 188:23 277:21 |
| 58:13 59:24 | **selection** 143:8 | 116:11 175:8 | 279:14 281:21 |
| 163:8 167:8,15 | 370:22 | 319:24 | 282:20,24 |
| 246:23 253:18 | **selectively** | **sensitive** 3:5 | 283:2 385:16 |
| 260:3 287:9 | 195:23 | 25:1,3 138:14 | 385:18 |
| 327:23 | **sell** 113:10 | 138:16 163:12 | **separated** |
| **seemed** 31:12 | 126:9 275:1 | 210:16 229:10 | 349:4 365:8 |
| 148:2 | 305:11 366:10 | 343:9,10 | 385:23 |
| **seems** 20:3 24:4 | 367:6,8 379:5 | **sent** 57:6 64:13 | **separates** |
| 24:5,9 25:20 | 379:9 380:7,13 | 64:20 66:2 | 348:23 |
| 26:5,10,13,20 | **selling** 305:9,17 | 105:14 160:18 | **sequitur** 76:12 |
| 32:13 74:15,17 | 366:11 | 161:15,21 | 76:14,24,24 |
| | | 163:22 184:2 | 80:12 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[serious - shut]**

| | | | |
|---|---|---|---|
| **serious** 77:14 | **serving** 29:9 | **setup** 169:22 | **shoes** 305:23 |
| 239:15 | 30:13 205:4 | 193:14 | 305:24 |
| **serve** 190:17 | **set** 31:25 40:7 | **seven** 356:11 | **shook** 246:17 |
| 205:7 210:2 | 44:2,7 51:9 | 359:9 380:20 | **shoot** 65:9,20 |
| 231:23 290:4 | 58:23 72:18 | 380:22 385:5 | 104:16 123:1 |
| **served** 4:14 | 102:14 103:13 | **seventh** 1:21 | **shooting** |
| 16:24 30:2,6,9 | 117:12 127:12 | 3:17 | 125:21 126:4 |
| 30:14 193:25 | 127:24 147:19 | **several** 11:1 | **shop** 7:21 |
| 269:22 368:1 | 171:19 185:4 | 291:19 | **short** 197:14 |
| 372:6 382:19 | 188:12 195:13 | **severe** 267:14 | 198:17 |
| **server** 108:22 | 205:25 209:2 | 267:21,22 | **shot** 72:7 |
| 196:25 197:8 | 216:9 244:25 | **severity** 265:21 | **show** 41:4,5 |
| 197:20 218:3 | 256:3 271:11 | 266:13 267:5 | 45:8 62:1,3,7 |
| 277:21 278:5,6 | 294:8 295:25 | 275:6 | 63:12,15,18 |
| 278:8,9,17 | 334:6,6 391:7 | **sexual** 229:7 | 82:15 88:10,18 |
| 280:12,12,12 | 391:14 | **shadow** 88:4,8 | 88:20 91:20 |
| 281:21 | **sets** 111:25 | 88:13 90:24,25 | 141:16 165:7 |
| **servers** 257:25 | 116:17 175:13 | **shards** 114:23 | 166:9 197:3 |
| 278:5 279:23 | 268:5 347:18 | 114:24 | 204:18 262:11 |
| 279:23 | **setting** 17:21 | **share** 67:2 72:2 | 264:18 276:13 |
| **service** 111:10 | 41:3 108:21 | 116:13 298:21 | 376:5 |
| 116:10 117:17 | 161:12 171:4 | 300:13 373:4 | **showed** 357:5,5 |
| 117:20 119:19 | 307:10 315:5 | **sharing** 166:7,8 | **showing** 199:15 |
| 121:20 160:3 | 322:7 323:4,6 | 263:12 264:6,6 | 204:22 236:21 |
| 162:12 164:22 | 323:10 335:22 | 264:12 339:9 | **shown** 24:18 |
| 166:15,18,25 | 337:12 339:10 | 339:15 | 83:5 205:20 |
| 167:5,12 168:3 | 339:17 | **shed** 23:1 | 214:10 288:4 |
| 168:24 233:21 | **settings** 17:24 | **sheds** 23:10 | 311:23 335:6 |
| 237:22 | 65:22 69:11 | **sheet** 392:1 | 358:18 |
| **services** 69:2,7 | 71:15 73:6 | **sheets** 358:5,8 | **shows** 241:17 |
| 69:23 70:19 | 80:20 171:17 | 359:2,22 | 275:18 321:14 |
| 73:6 79:24 | 193:7,11 | **shift** 197:9 | 338:6 |
| 101:9 107:23 | 220:20 277:22 | 299:6 | **shut** 266:24 |
| 108:4 148:11 | 278:23 335:20 | **shockingly** | 336:5 |
| 148:14,24 | 337:13 338:4,9 | 294:10 | |

**[side - somewhat]**

side  76:21
  80:20,21 82:13
  114:15 116:22
  116:22 204:8
  264:7,9 366:4
  366:10 367:6,8
  379:5,9,13
  380:7,13,14
sides  116:15
  121:6 186:10
  379:10
sign  9:25 10:6
  87:7 393:16
  394:5
signal  99:24
signals  165:25
  339:12
signature
  391:17 393:21
  393:23,23
  394:9
signed  311:6,15
  311:24 312:16
  313:9,15
significance
  382:13
significant
  220:2 234:19
  291:23 323:24
signing  10:7
  69:2,18
silent  82:12
silly  35:8
silo  117:14

silos  187:23
  188:4,5
similar  125:6
  161:13 200:24
  368:6 371:17
similarly  1:8
simple  89:7,10
  185:3 201:9,10
  220:13
simpler  20:14
  121:13
simplest  89:11
  171:17
simply  20:8
  154:8 306:13
single  181:7
  342:16 348:10
  369:12 382:6
sir  318:5
sit  142:21
  241:9 256:21
  340:14
site  341:16
  343:3,7,8,11,13
  343:22
sits  117:14
sitting  14:2
  16:22 89:24
  97:16 110:2
  224:19 240:17
  283:24 284:8
  320:18 362:24
situated  1:8
situation  15:9
  92:13 235:17

309:8
situations
  320:11
six  303:1
sixth  308:21,23
  308:23
sixths  308:24
  309:1
size  114:17
  255:19
skad  315:23
  316:12
skewed  253:15
skipped  221:10
skipping  82:17
slick  298:19
slightly  44:16
  191:11,12
slip  139:7
  150:21
slipped  152:17
sliver  382:22
slogan  92:21
slow  195:18
small  216:9
  239:14 256:2
  321:6 333:21
smaller  127:13
  273:13
snap  298:3
sneakers
  204:15,16
  305:18
social  273:18

software  17:22
  17:24 155:15
  183:12 219:2
sold  297:9
  379:15
solely  118:21
  119:2
solution  105:9
  110:19 112:24
  113:2 118:9
  153:15 178:3
  179:11 189:3
  316:18
solutions  393:7
solve  178:14
  225:23
solves  181:25
  189:1
somebody
  90:11 106:5,6
  106:7,14
  121:22 122:21
  137:24 165:5
  221:5 224:11
  235:6 250:2
  271:11 274:13
  279:21 365:1
somebody's
  342:17
someone's
  204:23 225:3
someplace
  88:18,19
somewhat
  287:5

**[soon - speed]**

| | | | |
|---|---|---|---|
| **soon** 123:23 | 61:4 63:5,9 | 348:5 349:8 | **special** 377:2 |
| 219:1 | 65:5 74:19 | 365:15 | **specialized** |
| **sophisticated** | 77:14 78:18 | **sought** 168:21 | 301:6 |
| 205:13 | 79:17 111:9 | **sound** 13:4 | **specific** 27:21 |
| **sorry** 12:17 | 118:4 121:12 | 17:10 | 46:7 62:8 89:4 |
| 26:4 57:15 | 124:24 126:15 | **sounds** 69:20 | 91:10,19 99:18 |
| 64:16 67:6 | 141:6 145:15 | 143:3 173:24 | 204:22 253:2 |
| 72:3 75:15 | 147:19 150:5 | 195:18 208:10 | 254:14 272:23 |
| 77:9 85:5 | 162:2 165:1 | 213:8 227:15 | 275:19 282:16 |
| 117:8 131:21 | 169:12 174:8 | 230:25 252:24 | 326:3 327:12 |
| 132:24 160:8 | 177:18,25 | 255:15 286:12 | 368:20 |
| 160:12 161:5 | 178:7,11 | 387:24 | **specifically** |
| 164:6,13 | 186:24 187:11 | **source** 157:19 | 89:2 252:20 |
| 170:21 175:7 | 187:16 191:15 | 364:12 | 376:15 |
| 224:24 248:1 | 197:9 206:5 | **sources** 117:9 | **specifications** |
| 249:14 254:3 | 216:3 218:15 | 293:7 312:24 | 250:16 |
| 255:1 261:22 | 221:23 222:13 | **south** 2:2 | **specificity** |
| 264:1,20 | 222:24 223:10 | **space** 366:11 | 30:19 |
| 266:11 269:21 | 226:3 229:19 | 366:23 | **specifics** 34:10 |
| 276:15 281:18 | 232:5,8 234:8 | **spam** 370:1,2 | **specified** |
| 284:2,4 290:16 | 234:17 235:1 | **spammed** 47:4 | 204:12 |
| 328:21 338:24 | 239:6 245:17 | **sparse** 234:17 | **specifies** 236:5 |
| 349:24 357:13 | 251:13 253:15 | **speak** 68:23 | **specify** 297:14 |
| 368:10,12 | 256:1 258:4 | 70:4 75:17 | **specs** 195:14,14 |
| 370:5 371:13 | 259:11 261:7 | 130:18 142:19 | 195:15 |
| 373:17 374:19 | 262:20 263:8 | 152:5 | **speculate** |
| 378:5 379:17 | 267:24 271:10 | **speaking** 33:13 | 198:12 |
| 387:12 | 272:12 282:15 | 38:21 39:21 | **speculation** |
| **sort** 7:25 18:24 | 295:14 299:6 | 76:23 142:9 | 274:15 383:2 |
| 23:11 27:18 | 300:16 302:15 | 189:6 | **speculative** |
| 28:22 29:17 | 302:16 305:21 | **speaks** 28:12 | 303:4 |
| 31:5 35:3 37:6 | 307:2,3 308:22 | 33:6 73:17 | **speed** 108:16 |
| 43:5 45:16 | 310:2,6 316:17 | 250:7 337:19 | 169:10 239:12 |
| 50:18 51:10 | 319:24 321:3 | 386:7,14 | 288:9 |
| 59:11 60:17,17 | 331:2 340:12 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[spells - store]**

| | | | |
|---|---|---|---|
| **spells** 315:25 | 388:3 | 111:14 | **stenographic** |
| **spend** 293:2 | **standalone** | **state** 1:24 | 3:23 |
| 299:12 356:10 | 201:6 | 43:15 69:24 | **step** 111:2,11 |
| **spending** | **standard** 112:1 | 137:13 230:1 | 153:25 307:2,7 |
| 299:18 300:7 | 136:15 184:10 | 245:20,21 | **steps** 151:25 |
| 300:12 342:25 | 226:3 261:20 | 247:24 258:15 | **steve** 238:21 |
| **spent** 4:23 | **standards** | 258:16 391:4 | **stick** 32:23 |
| 341:24 | 205:9 208:20 | 393:9,12 | 82:18 156:3 |
| **spied** 92:25 | **standing** 84:25 | **stated** 87:20 | 186:8 191:22 |
| **spoken** 30:20 | 85:11 146:1 | 130:20 318:13 | 369:20 |
| 30:24 | 149:3,10 169:4 | 338:23 | **sticking** 306:18 |
| **spot** 142:23 | 228:17,25 | **statement** | **stipulation** |
| 227:11 | **standpoint** | 26:20 28:10 | 393:20 |
| **spread** 187:22 | 183:11,12 | 84:13 155:23 | **stop** 108:2,10 |
| **spreading** | 205:1 | 191:6 256:7 | 110:5 111:7 |
| 181:9 | **stands** 152:6 | 328:18 | 142:4 172:13 |
| **spreadsheet** | 214:23 215:7 | **statements** | 177:3,5 225:22 |
| 67:24,25 75:25 | 316:5 | 21:25 29:4 | 231:14 298:8 |
| **spreadsheets** | **start** 54:18 | **states** 1:3 3:13 | 299:3 300:24 |
| 357:17 359:18 | 68:21 77:23 | 111:22 115:15 | 302:12 309:4 |
| **spring** 332:20 | 108:10 114:13 | **statistic** 256:2 | 374:2 385:20 |
| **spun** 188:20,22 | 138:13 190:10 | **statistical** | **stops** 170:25 |
| **spying** 92:20 | 265:16 290:24 | 216:4,7 261:8 | **storage** 80:21 |
| 100:10 199:20 | 290:25 298:17 | 261:18 304:7 | 80:23 82:14 |
| **square** 232:19 | 324:4 346:5 | 304:13 305:3 | 117:12 318:14 |
| 342:10 | 355:24 | 308:9 | 318:20,22 |
| **squishy** 71:5 | **started** 4:9 | **statistically** | 319:8,11,12,13 |
| **stable** 181:6 | 48:14 360:15 | 216:5 234:19 | 319:15,18,21 |
| **stacked** 74:18 | 376:25 | 239:16 | 319:22,23,25 |
| **staff** 20:19 | **starting** 112:16 | **statistics** 95:21 | 319:25 320:20 |
| 22:15 339:18 | 328:22 | 205:24 215:20 | 320:25 321:5 |
| **stage** 10:5 | **starts** 183:3 | 220:18 304:15 | 321:21,22 |
| **stamp** 72:4 | 373:13 | **status** 61:5 | **store** 82:14 |
| **stand** 228:18 | **startup** 52:2 | 109:1 276:22 | 86:20 87:25 |
| 240:15 387:1 | 95:23 96:1 | 278:19 312:2,7 | 88:1 196:15 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[store - sundar]**

214:7 318:22
319:3,4 320:22
320:24 335:19
335:22
**stored**  25:13,15
48:6 80:18,19
102:3 131:5,6
136:10 194:15
197:21 219:7
238:25 241:25
260:14 282:25
283:1 329:16
**stores**  117:13
134:4 179:19
179:20,21
241:23
**storing**  76:20
89:3 180:2
211:5 318:15
318:16,16,16
**straighten**
367:19
**straightforward**
60:8 242:2,8
242:22
**strange**  92:17
145:24
**strategies**
118:3 352:5
353:1 354:21
**street**  2:2,7,13
**strength**  92:22
**stretches**
176:15

**strike**  32:17
48:13 96:16
133:13 135:13
183:9 237:21
**strikes**  231:10
**string**  163:5
**stripped**  348:6
**strong**  99:23
249:25 250:1
**strongly**  126:10
179:4
**structure**  12:6
80:14 83:13
87:3,14,20
194:14 241:19
**structured**
230:24
**struggled**
326:15
**stuck**  359:7
**studied**  106:18
118:1 198:10
**studies**  215:18
**study**  26:3
53:12 59:11
114:12 125:4
125:12,18
126:17,24
127:2,25
384:15
**studying**  49:2
**stuff**  18:9 62:1
62:16 83:14
101:10 120:21
139:21 142:11

179:2 187:17
190:7 228:5
295:21 299:23
341:4 346:14
359:10 370:1
376:8
**stuffed**  228:6
**stumbled**
368:10
**sub**  12:9
**subject**  84:7
170:3 234:20
365:6
**subjected**
265:12
**subjects**  270:13
**subjunctive**
94:21,22 161:6
**subpoena**  9:7
9:10,12,20
10:3,11 268:25
**subscribed**
388:12 392:21
**subsequent**
371:7
**subsequently**
97:5 375:24
376:1
**subset**  48:4
**substantially**
5:8 241:19
**substitute**
125:1 209:7
**succeed**  33:18

**success**  246:1
**successful**
292:24
**successfully**
140:1
**succinct**  236:23
**suddenly**
150:11 152:19
**suffice**  143:2
**sufficiency**
255:13
**sufficient**  130:7
**suggest**  313:4
**suggested**
104:20
**suggesting**
105:11 300:3
**suggestion**
342:6
**suing**  48:17
**suite**  52:3
**summarize**
59:20
**summarized**
107:21
**summary**  11:13
11:25 12:3,11
31:6 42:7
107:18 248:24
**summer**  2:19
154:7
**summing**
338:14
**sundar**  20:24
21:8,19 22:16

Page 80

**[sunk - swaa]**

| | | | |
|---|---|---|---|
| **sunk**  280:3 | 107:7 109:20 | 317:17 318:11 | 57:9 58:23 |
| **super**  163:17 | 113:24 119:8 | 323:1 328:20 | 74:11 81:11,14 |
| **supplemental** | 122:24 123:25 | 328:22 342:8 | 82:4,23 83:7 |
| 258:6 | 125:17,21 | 344:18 347:17 | 84:1 104:8 |
| **supplementat...** | 127:11 130:13 | 357:21 358:10 | 105:5 107:11 |
| 16:2 | 132:18 135:11 | 367:20 372:23 | 107:13,25 |
| **supplied** | 141:2 154:19 | 373:11 377:7,8 | 108:21,22 |
| 216:25 217:3 | 166:10 167:25 | 378:2,8 | 109:1,21,25 |
| 236:1 348:11 | 168:18 174:1 | **surgeons** | 117:21 119:5 |
| **support**  63:25 | 176:13 179:25 | 111:19 | 120:12 121:19 |
| 64:2 250:21 | 186:6 187:9 | **surprise**  332:11 | 122:2 129:10 |
| **supports** | 191:23 192:18 | **surprised** | 129:20,24 |
| 152:22 | 192:20 207:19 | 306:17 | 130:1,25 131:8 |
| **suppose**  130:12 | 211:15,22 | **surprising** | 132:5,6,15 |
| 187:1 | 214:1,25 215:3 | 232:6 | 133:4,4,8 |
| **supposed**  23:14 | 216:24 223:25 | **surrounding** | 134:13 144:13 |
| 23:17,23 | 227:25 232:4 | 371:7 | 146:21 147:16 |
| 177:19 308:14 | 234:11 243:2 | **survey**  26:16 | 148:12 149:1 |
| **suppresses** | 244:19 247:4 | 28:2 168:10 | 170:12,20 |
| 315:6 | 249:1 253:4 | **surveyed** | 171:1,16,20,25 |
| **sure**  4:24 5:16 | 254:12 259:9 | 198:10 | 177:11,14,14 |
| 5:17,20,24 | 259:20 270:18 | **surveyor**  222:5 | 177:23 181:17 |
| 6:25 7:25 8:12 | 270:20 274:2 | **surveys**  28:1,2 | 181:17,20 |
| 15:3 18:16 | 277:14 278:12 | 28:3,4 | 184:20,22,25 |
| 24:8 29:18 | 278:14,15 | **susman**  10:22 | 185:4,17 186:1 |
| 30:10,11,13,18 | 280:1,4,18 | 10:24 | 186:4,13,18 |
| 33:10 34:8 | 282:14 283:15 | **suspect**  99:1,2 | 190:16,18 |
| 36:9 38:7,25 | 291:15 293:24 | 100:12 348:15 | 194:22 199:4 |
| 39:7 41:21 | 294:22 295:13 | 348:19 | 199:21 200:24 |
| 46:1 54:11,12 | 295:17 296:2 | **suspect's** | 202:18 203:10 |
| 65:3 66:5,14 | 297:1,23 299:7 | 348:16 | 203:13 207:14 |
| 69:17 73:21 | 301:23 306:8 | **suspicion** | 209:2,25 211:3 |
| 78:8 85:7 86:1 | 306:25 307:15 | 102:15 | 212:4 218:19 |
| 86:3 97:3 98:7 | 309:18 310:4 | **swaa**  20:1 40:7 | 219:4,18,21 |
| 100:4 101:8 | 310:23 315:22 | 41:3 44:1 49:3 | 220:7 221:13 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[swaa - take]**

221:21 224:4,4
226:9,11,21
231:5 232:3
236:14 237:6,7
237:13,15
239:2 248:22
249:7,16
257:13,14
258:10,23,24
259:18,19
260:5 262:6
263:2,5,10
264:17 265:14
266:5,14 272:1
276:22 277:2
278:23 286:17
303:24 304:12
306:22,23
307:10 308:12
308:18 309:12
309:24 311:25
312:7 318:23
321:2 322:23
323:10,16
324:23 325:1
325:25 329:19
330:15,17,22
330:25 331:5
335:20 337:4,8
337:11,16
338:1,6 340:1
342:13 353:13
364:17 370:9
374:10,16,22
375:10,11,13

375:18,22
376:8
**swear**   3:24
**switch**   20:1
40:7 82:16
88:15 92:18,24
103:13,19
199:4 200:24
201:6,10,12,20
201:21,22
202:1,18,20,25
268:5 271:11
298:15,22
300:18
**switches**
201:13 202:11
266:2 336:5
**switching**
251:24
**sworn**   4:4
388:12 391:7
392:21
**symmetrical**
106:13
**synchronize**
258:17
**system**   87:24
105:5 109:5
112:15,18
115:10 116:2,3
133:24 138:6,7
138:8 168:16
195:24 196:18
196:19,20
222:2,9,11

229:18 250:3
293:22 352:20
354:13
**systematic**
229:14
**systems**   65:21
107:12 129:14
133:6,14,16
196:25 197:4
207:2 245:18
294:1 297:1
348:25

**t**

**t**   1:1 4:2 129:1
129:3 389:5
395:3,3
**tab**   135:6 292:4
292:5 372:14
372:18 386:2
**table**   12:5
135:1,2 180:14
283:10,20,25
284:9,25 285:6
285:6 321:24
326:23 347:24
348:10,14
**tables**   235:10
347:21,22,23
347:24 348:24
378:11
**tactic**   279:10
**tagged**   86:18
337:10
**take**   22:19,23
33:7,24 75:6

75:18,24 76:25
77:24 78:10
81:2 84:16
91:15 97:24
98:1 104:22
106:22 108:11
108:13 115:11
115:23 116:24
123:18 128:2
132:16 134:25
135:7 144:7
147:5,6,8,9
151:3,25
152:22 153:25
160:9 167:7
169:2 192:19
225:11 227:24
231:18 232:7
232:23,25
233:24 234:8
236:24 237:23
242:25 243:14
245:1 246:7,9
246:12 264:24
267:19 280:16
280:18 283:13
292:3,12,22
294:23 306:2
310:21 315:19
318:2 321:15
327:2 332:6
339:18 344:8
355:7 360:16
362:18 370:4

**[takeaway - tell]**

| | | | |
|---|---|---|---|
| **takeaway** | 217:15 218:7 | **tampa** 2:8 | **technically** |
| 285:5 | 224:10 273:7 | **tangential** 19:8 | 19:25 20:3 |
| **taken** 1:19 | 275:4 303:11 | 50:6 | **technique** |
| 47:12 66:19 | 350:13 360:5 | **tape** 199:14 | 175:11 282:6 |
| 173:2 176:21 | 364:4,5,5 | **target** 187:24 | **techniques** |
| 233:3 240:1,2 | 366:1 381:17 | 195:1 204:14 | 175:3 |
| 251:20 281:1 | 387:7 | **targeted** 192:1 | **technological** |
| 317:23 329:3 | **talking** 37:23 | 341:15 | 50:20 |
| 344:11 348:10 | 54:18,19 67:3 | **targeting** 191:1 | **technologically** |
| 348:17 362:6 | 68:15 70:17 | 191:9,15 193:1 | 32:10 108:7,9 |
| 384:1 | 79:18,19,22,25 | 193:16 195:2,4 | 108:19 |
| **takes** 225:10 | 80:9,12 82:6 | 196:5,16 | **technologies** |
| 258:17 | 86:5 100:13 | 197:15 203:17 | 291:15 |
| **talk** 20:21 | 117:9 129:8 | 203:18,20,22 | **technologist** |
| 30:22 31:22 | 141:5 145:22 | 203:25 204:5,8 | 26:2 73:25 |
| 36:1 63:25 | 156:5,17 158:1 | 205:2 210:8,11 | 106:17 365:16 |
| 70:5 97:18 | 166:10 176:8,9 | **task** 245:10 | **technology** |
| 106:14 107:5 | 176:10 183:18 | **taught** 384:10 | 20:8,9 21:4 |
| 129:12 149:20 | 203:19 206:16 | **team** 141:19 | 26:1 31:3 |
| 152:7 163:17 | 208:10 219:17 | 158:22 159:11 | 34:15 113:21 |
| 172:19 176:2 | 221:14 227:7 | **tear** 37:11 | 114:4,10 |
| 189:5 190:24 | 252:3 253:23 | **tech** 63:25 64:2 | 117:11 126:7,9 |
| 208:18,19 | 257:16 264:3,5 | **technical** 20:12 | 183:15 222:13 |
| 212:7 213:24 | 277:17 280:13 | 21:2,7,17,22 | 253:1 299:21 |
| 221:18 229:4 | 282:17,20 | 27:15 58:20 | **telemetry** 209:7 |
| 230:1 232:21 | 296:17 308:8 | 74:16 78:4,16 | **television** 206:3 |
| 234:22 247:10 | 312:23 313:12 | 78:17 92:14 | **tell** 15:6 23:9 |
| 257:11 283:4,8 | 324:4 328:5 | 122:10 168:5 | 61:23 62:11 |
| 283:9,20 | 351:20 366:8 | 172:12 175:8 | 70:9 76:19 |
| 312:18 313:11 | 371:16 373:10 | 175:10 213:22 | 88:10 92:19 |
| 332:2 335:18 | 374:12 379:12 | 246:1 268:15 | 95:8 126:17 |
| 338:15 348:23 | 379:23 386:3 | 269:11 271:10 | 127:11 140:10 |
| 360:9 384:25 | **talks** 71:6 | 287:1 341:21 | 179:12 206:25 |
| **talked** 19:25 | 142:1 151:6 | 349:7 | 224:25 229:6 |
| 34:17 187:12 | 311:14 328:7 | | 253:3 260:2 |

**[tell - things]**

| | | | |
|---|---|---|---|
| 263:4 272:5 | 160:3 162:11 | 391:6,9 | 220:3 229:20 |
| 276:10 280:10 | 164:22 166:14 | **testing** 139:12 | 240:25 262:15 |
| 302:10 304:4 | 166:18,25 | 169:22 | 266:24 269:3 |
| 306:20 309:4 | 167:4,11 168:3 | **text** 230:17 | 281:15 291:17 |
| 312:19 315:25 | 168:23 212:21 | **thank** 37:17 | 291:20 294:24 |
| 341:20 383:4 | 212:21 233:21 | 66:25 72:15 | 297:21 299:21 |
| **telling** 77:16 | 261:8,20 280:9 | 176:15 190:9 | 300:15 307:16 |
| 89:2,18 121:7 | 282:4 347:12 | 276:19 337:14 | 307:23 308:15 |
| 121:9 126:5 | 347:15 370:7 | 354:9 361:22 | 313:19 316:9 |
| 201:18 244:10 | 382:21,24 | 371:11 386:25 | 316:10,12 |
| **tells** 50:14 | **test** 7:5 141:25 | 387:25 | 323:23 329:15 |
| 126:8 | 158:3,23 | **thanks** 215:8 | 339:15 341:1 |
| **temporary** | 159:12,14,25 | **theoretical** | 347:9 379:3 |
| 208:12 251:4 | 160:16 163:6,9 | 225:13 | 381:19 |
| **tempting** | 165:12,16,23 | **theoretically** | **things** 6:21 |
| 228:20 | 168:8 173:19 | 225:9 291:21 | 17:13 22:12,13 |
| **ten** 306:7,15 | 174:3 182:4 | **theory** 15:7 | 27:1 30:24 |
| 371:10 | 244:5,8 253:9 | 98:17 182:10 | 32:1,7,18,20,21 |
| **tends** 179:2 | 253:23 256:3 | 182:11 195:5 | 32:25 33:1 |
| **terabytes** | 337:19 360:23 | 250:6 289:19 | 34:19,22 35:18 |
| 319:20 | 373:24 386:4 | 289:20 291:6,9 | 49:16 51:11 |
| **term** 37:6 | **testified** 4:4 | 294:7 | 58:21 61:20 |
| 39:22 43:10,17 | 20:25 140:11 | **thin** 245:15 | 65:20 76:12 |
| 45:4 46:3,5 | 238:22 270:11 | **thing** 22:1,3 | 79:15,17,25 |
| 73:1,2 77:3 | 351:12 | 27:24 28:11 | 86:2 102:11 |
| 88:4 154:4 | **testify** 154:24 | 31:10 51:24 | 105:25 108:6 |
| 197:14 204:4 | 172:5 336:14 | 52:19 63:9 | 109:3 110:3 |
| 206:17 301:4 | **testimony** | 71:2 78:19 | 113:7 119:18 |
| 319:4 | 21:21 87:16 | 103:7 124:5 | 119:19 120:6 |
| **terminology** | 90:4,7 94:6 | 145:25 150:3 | 129:20 135:18 |
| 37:18,25 45:17 | 152:24 153:3 | 155:6,16 | 136:3 141:2,24 |
| 191:24 235:1 | 154:18 213:17 | 159:19 163:2 | 145:7 163:24 |
| **terms** 5:14 43:6 | 241:2 267:17 | 163:15 168:14 | 164:5,17,23 |
| 54:3 71:7 | 335:18 367:16 | 168:15 186:10 | 169:6,10 |
| 105:12 130:4 | 381:2 388:5 | 203:1 209:9 | 179:23 183:3 |

**[things - think]**

| | | | |
|---|---|---|---|
| 187:10 201:14 | 50:1,5,24 57:5 | 154:23 156:9 | 262:17,18 |
| 202:24 203:23 | 57:10 58:14,17 | 158:11 162:23 | 264:23 265:9 |
| 206:21 207:9 | 59:7,19,21,25 | 166:3 170:9,13 | 265:18 267:18 |
| 207:18 225:7 | 60:11,18,22 | 170:14 171:11 | 268:3,4,9 |
| 228:1 231:6 | 61:14,15,16,17 | 172:5,8 174:11 | 270:22 271:4 |
| 247:3 248:2,3 | 61:19 63:14,16 | 176:1 177:6 | 272:14 276:25 |
| 250:12 251:10 | 64:24 66:4,6 | 178:2,4 179:10 | 277:9,16 280:4 |
| 255:15 260:6 | 67:8 68:20 | 180:1 181:24 | 281:13 284:22 |
| 283:9,19 290:3 | 70:8,23 73:17 | 184:24 185:2 | 285:4 286:6 |
| 299:22 300:1 | 74:8 77:12 | 186:3 187:11 | 289:21 290:2 |
| 305:1 313:22 | 80:4 82:8 84:3 | 189:3 191:3,21 | 290:13 291:9 |
| 317:13 319:3 | 85:9 88:4 91:2 | 193:3 194:5,6 | 292:14,21 |
| 319:10 320:25 | 93:6 104:14,21 | 195:8 196:1,8 | 295:11,19 |
| 321:7 322:17 | 105:2,9 108:17 | 197:5 198:21 | 298:24 300:15 |
| 331:11 334:8 | 109:23 110:18 | 198:23 199:1 | 300:17 302:18 |
| 334:20 335:13 | 115:9 118:11 | 200:12 201:5 | 304:14 307:4 |
| 344:20 349:11 | 118:17 120:24 | 202:2 204:18 | 307:12,15,22 |
| 359:6 379:23 | 121:11 122:11 | 205:10 209:24 | 308:1 309:9 |
| **think**   5:2,20 | 123:1,3 124:12 | 212:1,6,8 | 310:15,24 |
| 6:1,15 7:2 8:17 | 130:2 131:10 | 215:25 216:12 | 316:4,20,25 |
| 8:20 11:9 12:2 | 132:2,4,19 | 217:13,15,21 | 319:19 320:17 |
| 12:13,23 15:11 | 133:18,21,23 | 218:21 219:20 | 321:1,3,6 |
| 16:12 17:9 | 134:3,9,16 | 221:16 223:9 | 322:6 323:2,7 |
| 18:21,23 19:5 | 135:5,19,24,25 | 223:16 226:18 | 324:4,14,16 |
| 19:19,24 20:20 | 137:1 139:5,20 | 227:4 229:1 | 325:3,9,13,16 |
| 21:14,18,23 | 140:6 141:8,20 | 231:1 232:9 | 327:18 331:14 |
| 22:17,22 23:18 | 141:21,25 | 233:7,19 | 333:6 334:5 |
| 23:20,25 27:23 | 142:20 143:5 | 234:15 239:19 | 336:6,25 338:2 |
| 31:4,4 32:12 | 144:9 145:12 | 241:21 243:3 | 338:10 340:8 |
| 34:6,18,25 | 145:14,19 | 243:22,23 | 342:6 343:18 |
| 37:25 38:12 | 147:7 148:2,4 | 246:20 247:23 | 346:6 352:5 |
| 39:8,17,18 | 150:24 151:7 | 252:19 253:12 | 356:2 357:6,10 |
| 41:8,10 42:6 | 151:12 152:1,3 | 253:17 254:19 | 357:18,23 |
| 42:25 45:7 | 152:16,20,21 | 256:14 258:3 | 359:5,14 361:1 |
| 48:20 49:13 | 153:2,21 | 259:23 261:5 | 361:7,13,15,19 |

**[think - timestamp]**

361:21 362:12
363:13,18
365:12 366:14
366:24 367:3,5
368:22 369:10
373:8,24 374:7
374:17 375:15
380:18,21
383:23 387:6
387:16
**thinker**  238:2
**thinking**  14:7,8
50:3 54:17
57:25,25 86:15
88:1 95:19
114:3 187:1,10
196:21 198:10
200:1,2 201:4
201:8 222:18
318:21 325:18
358:12 369:1
**third**  5:11,12
27:23 124:13
124:23 138:8
169:13 255:9
255:12 288:14
302:22 314:11
316:14 352:21
354:14 355:4
368:2 380:5
**thirds**  288:12
**thorough**
370:19
**thoroughness**
143:5

**thought**  48:25
53:10,12,14,16
54:11,20 57:11
59:2 60:10
61:2 65:1
78:24 109:4
116:14,25
149:13 183:2
188:18 201:19
204:2 231:11
231:15 243:21
280:5 281:22
281:23 282:1
338:25 371:19
**thoughtfully**
65:8
**thoughts**  60:18
**thousand**  352:3
**thousands**  8:13
**threat**  104:2
105:16 242:16
364:21
**three**  32:18
170:17 177:2
184:16 193:16
193:20 305:4
311:23 330:4
338:15 373:13
377:9 382:10
**threshold**
320:13 374:3
**threw**  362:14
**throw**  120:23
**throwing**
120:23

**thrust**  19:11
335:9
**tie**  110:12
178:19 179:1,2
183:5
**tied**  53:19,20
54:7,9,23,24
57:6 180:12
185:1 267:7
272:22
**ties**  110:6 179:5
185:15 285:6
**tightly**  151:18
**time**  3:3,8
33:15 47:10,13
55:4 62:5,10
62:17 63:9,21
64:4 66:17,20
67:13,18 69:10
71:14 85:24
86:6 99:11
103:23 109:11
115:25 121:14
123:18 128:4
129:4 133:9
172:25 173:3
176:19,22
181:6 183:1
189:22,25
195:21 198:18
198:18 206:2
232:22 233:1,4
243:14,16
251:18,21
280:6,8,24

281:2 285:25
288:4 289:21
290:17,19
297:18,21
300:14 306:12
309:8 311:17
313:16 314:2,9
317:12,20,21
317:24 319:1
327:3,5 329:1
329:4 341:25
344:9,12
358:25 362:4,7
373:17,19
377:1 381:13
385:9,11,14,23
386:8,9 387:2
388:4,8 393:10
393:18,24
394:7
**times**  4:12
37:13 117:19
119:23 121:22
121:23,23,25
205:20 213:25
233:14 265:11
275:24 299:22
303:11 312:17
317:9 361:2
382:25 384:2
**timestamp**
141:23 243:3,5
243:21,22
244:16 260:4

**[timestamps - transmit]**

| | | | |
|---|---|---|---|
| **timestamps** | 235:7,9 292:2 | **topics** 27:10 | 379:16,17,21 |
| 142:2,6 241:24 | 330:5 347:21 | 230:12 231:22 | 382:4 383:24 |
| 244:14 | 347:22,25 | 269:23 270:5 | 384:3,11 |
| **tiny** 373:1 | 349:5 364:10 | **total** 5:1,13 | **tracks** 293:1 |
| **title** 376:11 | 365:10,21 | 29:24 333:22 | **traded** 272:6 |
| **titles** 362:16,19 | 372:20 | 343:23,23 | 272:15 |
| **tmpapp** 330:15 | **token** 278:17 | 373:19 | **traffic** 62:20,21 |
| 332:2,25 333:8 | 278:18,22,22 | **totally** 113:9 | 132:15 133:4 |
| 376:10,14 | 281:20 | 321:14 361:24 | 144:14 146:21 |
| **today** 14:2 | **told** 13:24 21:1 | **touched** 277:16 | 205:12,13 |
| 16:22 33:16 | 63:2 73:22 | **touches** 19:9 | 275:19 288:12 |
| 51:9 62:6 | 78:22 90:1,5 | **towards** 21:13 | **train** 262:21 |
| 66:11 79:3 | 103:16 115:19 | 340:10 341:15 | **training** 383:25 |
| 89:24 95:8 | 122:8 124:16 | **track** 100:1 | **transaction** |
| 118:20 146:4 | 198:1 209:13 | 121:11 219:21 | 209:12 218:2 |
| 179:9 266:12 | 220:20 313:14 | 220:2 249:6 | **transactions** |
| 267:4 274:6 | 330:4 384:10 | 296:24 314:23 | 239:16 379:8 |
| 275:5 283:24 | **tom** 199:8,10 | 350:21 355:2 | 379:22 |
| 284:8 327:6 | **took** 62:24 | 366:17 | **transcript** |
| 331:7 347:5 | 174:2 299:24 | **trackable** | 107:14 149:15 |
| 356:13 358:6 | **tool** 124:23 | 351:14 | 311:11 312:11 |
| 358:21 359:16 | 302:14 | **tracked** 171:21 | 391:8 393:6,8 |
| 363:24 365:5 | **tools** 62:4 | 263:4 286:22 | 393:10,13,13 |
| 378:25 381:16 | **top** 75:9 77:2 | 294:7 350:16 | 393:21 394:2,2 |
| **today's** 388:5 | 77:25 80:2 | 352:16 366:21 | **transcripts** |
| **todd** 1:22 3:20 | 95:18 145:16 | **tracking** 56:11 | 52:12 312:14 |
| 391:3,18 | 156:22 165:18 | 56:14 115:10 | **transient** |
| **together** 9:9 | 170:22 202:23 | 115:14 202:7 | 197:21 208:12 |
| 53:24 55:5,7 | 212:16 256:22 | 219:9 286:2 | **transmission** |
| 77:13 101:13 | 263:23 326:7 | 287:14 294:8 | 66:4 210:14 |
| 110:12 112:10 | 341:7 359:24 | 296:12 303:12 | **transmit** |
| 114:24 136:5 | 370:5 | 303:15 304:24 | 108:23 109:2,3 |
| 136:18 137:21 | **topic** 26:3 | 305:2 314:13 | 109:6 185:7,21 |
| 141:15 142:7 | 115:20 126:6 | 343:12,14 | 219:4 |
| 174:25 179:2 | 275:2 310:19 | 352:10 379:14 | |

Page 87

**[transmitted - two]**

| | | | |
|---|---|---|---|
| **transmitted** | **triple** 202:5 | 291:1 296:6 | **turn** 3:7 13:17 |
| 228:5 | **trouble** 100:7 | 308:2 310:22 | 14:11 178:18 |
| **transmitting** | 116:19 127:15 | 334:7 360:23 | 208:23 243:17 |
| 185:10 195:9 | 250:10 | **trying** 25:18 | 315:20 322:14 |
| **transparency** | **troublesome** | 26:8 39:25 | 339:21 340:2 |
| 202:7 286:3 | 195:20 | 41:20 59:18,19 | 353:4 375:22 |
| 287:14 314:13 | **trove** 36:20 | 59:21 60:3,9 | **turned** 44:8 |
| **trashed** 251:4 | 38:4 40:3 46:9 | 65:11 74:21 | 51:10 57:6 |
| **treat** 237:19 | 48:5 64:9 | 79:4,5 92:3 | 59:3 109:22 |
| **treated** 70:14 | 81:23 103:20 | 100:1 113:8,14 | 186:13 190:20 |
| 263:5 271:5 | 103:22 236:6 | 113:20 119:15 | 203:11,14 |
| 353:13 | **true** 82:24 | 120:8,22 | 249:8 265:14 |
| **treatment** | 260:6 291:18 | 139:10 140:7 | 302:9 311:25 |
| 111:21 114:17 | 291:19 348:25 | 140:24 146:14 | 335:20 338:6 |
| 114:20 | 391:8 | 150:15 164:24 | 339:10,13,20 |
| **treats** 237:12 | **trust** 112:22 | 168:4 175:15 | 376:9 |
| 237:15 342:12 | 116:6,7 307:18 | 179:17 200:15 | **turning** 182:2 |
| 353:8 | 307:20 308:2 | 200:18 201:4 | **turns** 15:13 |
| **tremendous** | **truth** 209:14 | 213:11 216:8 | 58:9 239:14 |
| 318:19 | **truthfully** 13:3 | 224:21 228:1 | 322:23 |
| **trend** 287:11 | 202:14 | 228:22 235:6 | **twice** 286:7 |
| **trick** 360:18 | **try** 12:18 27:1 | 242:12 255:2 | **two** 10:7,8 |
| **tricky** 225:2 | 33:14,19,21 | 256:4 261:23 | 37:19 52:1 |
| **tried** 6:18 8:17 | 60:5 104:23 | 270:6,10 | 76:11 77:12 |
| 38:6 49:15 | 113:10,17 | 279:14 281:19 | 79:15,17,25 |
| 110:22 140:11 | 118:12 121:14 | 282:24 283:2 | 94:25 136:3,4 |
| 140:15 197:4 | 135:14 140:9 | 284:23 287:10 | 136:7 137:2 |
| **tries** 319:1 | 140:17 141:14 | 305:11 306:12 | 146:13 165:16 |
| **trigger** 115:7 | 142:23 156:3,3 | 306:13 310:10 | 189:11 190:13 |
| **triggered** | 159:22 168:16 | 313:20 342:9 | 202:24 235:9 |
| 184:13 226:9 | 206:22,23 | 355:1 357:14 | 278:4 279:16 |
| 255:21 | 207:3 215:10 | 360:16,18 | 288:12 290:3 |
| **triggering** | 220:21 240:11 | 363:21 374:2 | 296:3 323:22 |
| 65:19 | 274:22 282:8 | 375:5 378:10 | 335:24 347:8 |
| | 287:8 288:1 | | 347:18,21,22 |

Page 88

**[two - undertake]**

| | | | |
|---|---|---|---|
| 347:23 348:24 | **unanswered** | 91:25 92:10 | **understanding** |
| 350:13 358:3 | 368:11 | 101:24 113:21 | 24:11,13,14 |
| 359:13 360:9 | **unattributed** | 119:15,17 | 48:18,21 56:2 |
| 361:18 363:4 | 382:17 | 120:8 121:17 | 56:8,13,14,18 |
| 364:9 367:1,4 | **unauthorized** | 123:3 124:21 | 60:10 82:7 |
| 375:6,7 377:12 | 69:8 71:12 | 126:23 132:2 | 83:2 84:17 |
| 377:16,17,25 | **unaware** 14:23 | 134:16 136:16 | 86:9 87:23 |
| 378:10 382:23 | **unbake** 148:9 | 139:5,10 140:8 | 131:21,23 |
| **tying** 138:21 | **uncertain** | 140:24 157:25 | 176:6 199:3 |
| **type** 7:5 109:17 | 224:7 | 162:10,13 | 235:13 240:6,7 |
| 193:17 205:5 | **unclear** 6:24 | 169:21 171:12 | 240:10 261:22 |
| 261:14 338:25 | 34:20 87:13 | 171:15 172:10 | 264:10 278:3 |
| 350:8 353:21 | **under** 12:8 | 174:1 179:17 | 278:11 311:1 |
| 365:13 366:5 | 64:12,19 84:13 | 181:13 182:1 | 312:15 316:6 |
| **types** 158:15 | 84:14 112:14 | 183:16 192:12 | 320:10 322:22 |
| 215:11 241:25 | 119:12 188:7 | 192:14 229:15 | 350:7 |
| 261:14 293:3,6 | 196:17 249:8 | 234:25 235:3 | **understandings** |
| 294:12 302:1 | 268:25 279:3 | 237:21 247:17 | 18:11 49:11 |
| 348:24 355:10 | 310:12 349:8 | 270:6 282:23 | **understands** |
| 355:16 | 365:13,22 | 283:2 285:23 | 229:24 |
| **typical** 6:17 | 374:10 | 290:17,18 | **understood** |
| 380:14,19 | **understand** | 293:18 294:14 | 29:18 39:19 |
| **typically** 69:4 | 12:9 23:12 | 306:16 308:7 | 44:14 47:24 |
| 272:6 | 25:19 26:8,15 | 310:10 311:5 | 55:25 61:11 |
| **typo** 241:21 | 31:10,11,12 | 314:5,10 | 90:20 163:16 |
| **u** | 38:16 40:14 | 323:13 334:13 | 165:3,8 173:19 |
| | 41:12,21 44:14 | 334:21 338:10 | 210:20 219:24 |
| **uh** 72:20 | 45:23 47:21 | 338:17 340:7 | 220:4 236:9 |
| 296:16 | 49:1 52:22 | 342:10 343:6 | 249:21 267:2 |
| **ultimate** 22:21 | 57:21 60:9 | 345:4 354:19 | 285:8,11 296:9 |
| 58:1 352:22 | 65:12 66:7 | 355:20 360:8 | 338:10 347:13 |
| 354:15 | 74:20,22 77:22 | 363:12 367:21 | 380:6 |
| **ultimately** | 79:5 83:11 | 372:13 377:21 | **undertake** |
| 142:19 | 85:6,15 89:13 | 378:9 382:13 | 126:24 127:2 |
| **unable** 363:1 | 90:10,22 91:2 | | 139:17 146:17 |

**[undertaken - used]**

| | | | |
|---|---|---|---|
| **undertaken** | **unmask** 106:6 | 231:19 | 291:2,4,10 |
| 125:3,11 178:5 | **unmasked** | **urls** 228:4,5,13 | 292:1 303:9,15 |
| **unfavorable** | 102:2 | 229:5,16,22 | 304:12,15,23 |
| 14:8 | **unnecessarily** | 231:5 | 314:1 321:22 |
| **unfortunately** | 176:14 | **usage** 63:6 | 324:18 325:23 |
| 242:15 | **uno** 292:6,23 | **use** 17:23 37:11 | 329:15 333:8 |
| **unidentifiable** | 293:11 | 37:15 39:16 | 334:2,7,10 |
| 258:20 259:15 | **unpack** 86:11 | 40:16,21,23 | 335:2 339:19 |
| **unified** 340:8 | **unrealistic** | 43:9 46:3 54:3 | 340:25 341:1,3 |
| **uniform** 252:2 | 261:12 | 62:19 64:5 | 341:4,5 342:1 |
| 252:15 254:1 | **uns** 112:25 | 70:21 71:9,11 | 342:7 346:14 |
| **uniformity** | **unsolvable** | 73:14 84:25 | 352:9 353:1 |
| 252:6,18,20,23 | 225:8,9,12,16 | 90:6 96:18,21 | 354:21 355:2,6 |
| 253:10 254:8 | 225:18,20,23 | 103:3 114:2 | 355:17 364:3 |
| 254:16,20,23 | **unusual** 305:16 | 116:3 118:22 | 366:19 368:17 |
| 255:3 | **update** 150:9 | 121:11 123:25 | 370:10,11 |
| **uniformly** | 150:22 152:18 | 124:23 126:10 | **used** 37:13 |
| 170:24 | 155:11,22 | 126:11 127:15 | 38:24 39:22 |
| **unintentionally** | 156:5,12 157:5 | 136:18 142:6 | 41:18 43:6 |
| 162:22 | **updated** 154:8 | 151:16 152:9 | 45:17 47:17,24 |
| **unique** 60:14 | **updates** 155:12 | 168:25 171:8,9 | 50:25 51:6,9 |
| 161:13 178:20 | 155:13,14 | 171:19,24 | 60:14 61:22 |
| 180:19,21,24 | **upgrade** | 180:10 184:3,8 | 62:18 63:4,10 |
| 181:2,3,5 | 126:13 | 186:17,19 | 64:3 69:6 |
| 183:25 230:20 | **uploaded** | 190:15 206:17 | 71:17 73:13 |
| 274:25 384:4 | 362:10 | 212:25 218:19 | 75:2 77:4 86:8 |
| **unit** 3:9 272:9 | **ups** 211:7 | 219:22 220:21 | 88:5 96:23,25 |
| **united** 1:3 3:13 | **upset** 308:11 | 221:24 230:12 | 102:22 115:10 |
| 111:22 115:15 | 309:14 | 230:19 246:13 | 115:11 117:15 |
| **universal** 115:9 | **uptake** 155:13 | 250:11,17 | 117:16,16 |
| 294:2 | **urchin** 63:24 | 252:1 253:8 | 121:22 136:21 |
| **university** | 64:1 | 261:3 280:22 | 145:20 146:8 |
| 37:21 | **url** 230:8,11,17 | 284:12 285:24 | 154:4 161:5 |
| **unknowns** | 230:18,19,19 | 289:11,13,20 | 162:18 174:2 |
| 310:6 | 230:21 231:18 | 289:22 290:10 | 174:12,16 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[used - using]**

| | | | |
|---|---|---|---|
| 190:18 197:14 | 133:7,17 138:1 | 335:8 338:3 | 306:22,23 |
| 197:15 201:23 | 138:15,18,19 | 349:2 353:12 | 308:12,18 |
| 202:2 203:15 | 144:1,11,12,19 | 378:12,14,17 | 328:10 338:6 |
| 219:25 220:1 | 146:19,20 | 378:21 380:24 | 340:1 342:11 |
| 220:15 221:19 | 147:5 171:12 | 381:5,7 | 347:6 349:15 |
| 221:21,22 | 171:14,18,22 | **user's** 40:10,11 | 370:13 |
| 222:11 253:5 | 172:5 181:12 | 108:20 187:4 | **uses** 42:15 |
| 255:9 259:1 | 185:15,16,17 | 192:3,8 194:12 | 43:22 44:17,19 |
| 262:20,20 | 185:21 186:13 | 197:24 198:13 | 47:25 48:2 |
| 284:1,10,13 | 190:14 192:10 | 203:8 212:4 | 49:21 52:2 |
| 285:12 295:11 | 192:12,17 | 223:19 260:16 | 68:18 73:2 |
| 295:13 296:8 | 193:1 194:4,9 | 276:21 277:4 | 77:3 84:22 |
| 301:15 303:18 | 196:14 198:2 | **users** 19:23 | 96:17 118:23 |
| 324:24,24 | 198:12 203:10 | 24:25 50:14 | 120:5 121:20 |
| 326:4 327:13 | 204:11 207:23 | 62:9 78:23,23 | 203:8 204:4 |
| 328:15 336:17 | 210:15 211:3,4 | 96:24 117:22 | 221:12 235:8 |
| 348:8,18 352:7 | 220:24 221:15 | 119:5 120:12 | 249:6 262:5,23 |
| 376:8 385:12 | 222:16 223:18 | 122:2 124:7 | 264:16 277:1 |
| 386:20 | 226:13,14,24 | 133:8 166:19 | 304:6 324:19 |
| **useful** 95:21 | 228:15 239:1 | 169:1 170:10 | 367:12 |
| 111:9 120:25 | 244:2,8 247:22 | 170:24 171:6 | **using** 37:4 |
| 256:15 338:8 | 250:23 258:10 | 173:15 178:3,4 | 40:20 41:23,25 |
| **user** 22:14 | 261:2,2,9,10,21 | 178:6 190:16 | 42:1,4 45:4,24 |
| 24:17,18 25:7 | 263:10 265:12 | 198:6,7,9 | 46:13 58:6 |
| 36:21 38:2,5 | 265:23,23 | 207:14 208:8 | 63:14,22 65:25 |
| 40:5 41:7 44:6 | 266:15,15,18 | 211:2,14 | 66:1 93:9 97:4 |
| 46:8,10 48:5 | 266:19,19 | 218:19 220:18 | 120:1 123:11 |
| 64:11 65:14,16 | 267:15 271:17 | 226:9,11,21 | 136:14 141:23 |
| 93:23,24 94:2 | 272:20,23 | 241:4 251:15 | 142:12 145:6,9 |
| 96:7 103:13 | 277:2,23 | 255:10 261:6,7 | 146:3 151:22 |
| 108:23 109:8 | 286:19,21,21 | 261:18,24 | 152:19 171:13 |
| 109:10 110:7 | 296:7 314:12 | 265:18,24 | 171:13 173:20 |
| 116:16 120:16 | 318:23 322:2 | 266:14 287:3 | 175:2,11,13,14 |
| 121:7 126:6 | 322:10,14,23 | 298:15 303:23 | 179:8,9 181:9 |
| 132:10,14 | 324:23 325:1 | 304:12,21 | 191:23 211:2 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[using - vs]**

212:3 219:18
219:20 220:7
233:21 235:2
235:10,13
241:19 245:15
247:14 248:23
259:5 262:16
290:8 300:8
301:17 302:14
303:12 304:17
309:5 324:2
325:24 328:9
339:5 340:5,6
340:15 341:22
341:23 343:2
347:25 355:13
363:20,25
370:13 386:3
**usually**  14:21
16:9,11 103:22
307:16

**v**

**v**  392:2
**vague**  172:2
197:17 224:23
255:25 263:14
349:25 350:10
353:11 378:18
381:2
**valid**  163:4,5
205:12,13
216:5
**valuable**  221:6
307:19

**value**  271:17
271:24,25
272:20,23
273:7,9,11,25
274:19,20
309:16
**values**  109:9
253:22
**variation**  262:3
**varies**  261:1
**variety**  203:3
221:18 352:10
**various**  7:24
24:14 68:5
106:17 160:3
213:19
**vary**  260:15
265:15,20,22
266:15 272:3
275:6
**vast**  222:13
331:4
**vendor**  116:17
118:21 205:22
236:1
**vendors**  111:11
124:23 206:10
207:24
**verified**  256:12
312:8
**verifier**  352:22
354:15
**verify**  260:11
291:14 329:17
334:8

**veritext**  3:21
392:1 393:7,9
393:11
**versa**  291:19
**version**  78:11
82:11 126:12
**versus**  3:12
22:2 140:21
198:18,18
344:24 349:18
361:15 378:11
382:19,22
**viable**  189:3
**vice**  291:19
**video**  3:10
318:15 320:22
**videographer**
2:21 3:1,19
47:10,13 66:17
66:20 67:13,18
128:4 129:4
172:25 173:3
176:19,22
189:22,25
233:1,4 251:18
251:21 280:24
281:2 306:4
317:21,24
329:1,4 344:9
344:12 362:4,7
371:9 373:19
385:4,15 387:1
388:3
**videotaped**
1:18

**view**  56:16,19
80:23 165:8
169:25 171:22
187:16,18
193:13,14
217:16 228:4,8
228:14,14
231:5 271:9
331:17
**viewed**  193:19
**views**  217:17
369:25
**vii**  12:7
**vin**  180:24
**violated**  28:16
271:12
**violating**
110:14
**violation**  28:21
**vis**  53:9,9
**visit**  303:24
**visited**  95:7
**visiting**  62:12
**visitors**  305:5
341:10,11,16
343:9
**volume**  62:21
329:19 346:4
355:24
**volumes**  239:12
**voluminous**
16:4 329:16
362:17 373:23
**vs**  372:15 393:4
395:1

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[waa - way]**

| w |
|---|

**waa**  20:1 24:2
25:24 26:11,13
26:20 28:7
32:19 39:13,15
40:7 41:3
43:25 44:2,18
49:3,20 50:5
50:15,19 51:6
51:15 52:18
53:3,8 57:1,3,7
57:9 58:9,12
58:15,22 59:3
60:21 70:22
71:17 79:8,8
81:11,14 82:3
105:5 107:10
107:10,13,24
109:1,21,24
129:10 130:25
131:8 134:12
170:19 171:1
171:16,20
177:11,14,14
177:23 178:16
178:18,19
181:16,17,20
185:4 190:16
190:17 196:7,9
196:13 199:4
199:21 200:24
203:13 209:1
210:10 219:5
221:21 227:2
237:6,7,13,15

248:21 249:7
257:23,23
271:6 275:20
276:22 277:2
278:23 304:11
311:24 312:7
318:23 321:2
323:10 325:25
329:19 330:17
330:22,25
331:5 335:20
337:3,8,10
338:1,6 353:7
353:12 374:10
375:18,22
**wait**  264:1
340:16
**waived**  393:23
393:23
**waiving**  393:20
**walk**  198:7
**want**  14:14
16:25 17:3
18:16 19:9
25:2,10 28:9
35:6 38:16
39:6,9,9,10
41:20 42:9
43:14 47:4
65:4,5,9 68:6
71:18 74:22
76:1 84:15,15
84:16 85:2,6
86:22,24 89:13
94:20 97:18

100:2 103:14
103:19 104:14
104:16 107:1
110:7,20,25
114:18,19
116:7 121:1,3
126:12 129:12
130:18,20,22
137:4,15
138:15,25
142:21 149:4,5
151:8,17
152:23 154:18
155:10,23
157:18 162:2
172:10 173:25
176:25 177:4
178:4 180:15
184:21 189:9
190:10 191:22
200:2 204:14
205:16 206:19
210:17 214:1
215:2 218:25
249:19 253:1
259:20,24
266:8 277:3
282:3 283:18
286:22 289:22
291:14 295:22
306:10 307:19
308:7 313:25
314:23 323:5
325:8 326:2
327:2 328:10

335:10 336:20
339:2 340:15
341:5,6 344:17
345:23 351:14
352:17 356:9
356:10 360:1
361:25 362:17
366:3,17
367:23 371:21
377:11,15,22
378:8 385:21
387:6
**wanted**  67:4
68:17 98:11
115:20 130:9
167:24 206:13
231:23 249:13
346:25 356:24
**wants**  90:6
113:16 163:22
**washington**
101:11 233:8
233:13
**waste**  33:14
**watch**  200:3
**watching**
172:22 301:9
**water**  120:23
**way**  9:24 14:15
18:22 20:10
21:10 22:1,12
23:14 25:6
33:24 35:16
36:9 40:25
44:2,8 47:25

Page 93

**[way - witness]**

| | | | |
|---|---|---|---|
| 48:2 49:4,24 | 263:9 266:16 | 230:3,4,20,22 | **whereof** 391:14 |
| 50:6 59:1,24 | 267:24,25 | 231:20 292:18 | **whipping** |
| 59:25 61:7,18 | 268:7 272:5,14 | 305:12 309:13 | 237:24 |
| 62:10 64:25 | 279:6 282:8 | 318:17 337:25 | **whispering** 3:6 |
| 65:14 69:17 | 290:18 291:24 | 340:13 341:17 | **white** 111:6 |
| 73:12 75:13 | 292:13,21 | 343:21 372:9 | 204:14,15 |
| 76:3 77:13 | 293:14 300:4 | **webbed** 134:11 | **widely** 162:17 |
| 82:8 91:21 | 301:24 307:10 | **website** 62:12 | **wild** 101:15 |
| 93:8 94:8 | 307:13,17 | 62:19,22 64:6 | 105:15 159:17 |
| 101:3,12 | 308:9 309:24 | 95:8 96:8,14 | 159:20 |
| 112:10,12 | 321:18 322:12 | 96:17 98:10,16 | **willing** 274:23 |
| 114:21,25 | 322:15 334:25 | 109:12 116:17 | 297:15 366:22 |
| 115:16 118:7 | 342:12 353:14 | 117:18 119:22 | **willkie** 1:20 |
| 120:22 133:3 | 354:4 360:23 | 120:2,11 121:2 | 2:13,19 3:16 |
| 138:3 143:7 | 361:3 366:15 | 121:9 214:10 | **willkie.com** |
| 145:19 150:22 | 375:4 376:24 | 214:11 227:5 | 2:16,17 393:2 |
| 158:12 165:10 | 387:22 391:12 | 300:21 301:6 | **window** 351:10 |
| 170:19 171:8 | **ways** 63:7 | 301:14 303:10 | 380:15,19 |
| 177:6 179:18 | 134:5 139:21 | 303:24 306:23 | **wires** 38:8,23 |
| 180:1 184:21 | 195:8,24,25 | 339:6 340:5 | 39:1 |
| 184:24 185:3 | 207:4 221:6,7 | 341:10,11,14 | **wish** 240:14 |
| 193:3 195:12 | 223:24 336:15 | 341:14 344:2 | **wishes** 251:15 |
| 197:4,11 | 347:11 351:17 | 351:1 372:11 | 268:6 271:12 |
| 198:16 200:2 | 352:10 | **website's** 96:24 | **withdraw** |
| 200:10 201:3,9 | **we've** 101:15 | **websites** 184:2 | 11:19 |
| 205:3 207:18 | 139:14,20 | 301:19 303:13 | **withheld** 331:3 |
| 208:17 209:25 | 218:16 | **week** 10:7,8 | **witness** 3:25 |
| 213:24 227:24 | **wears** 305:24 | **weird** 305:10 | 4:3 13:11 |
| 230:7 231:1,25 | **web** 18:13 | 305:15 | 33:12 36:16 |
| 235:16 244:10 | 22:13 42:19,25 | **welcome** | 80:8 81:5 |
| 246:8,16 | 43:10,23 44:20 | 113:18 321:12 | 108:14 117:6 |
| 248:17 250:2 | 46:7 49:9 | 327:10 | 123:16 170:8 |
| 256:15,16,18 | 63:17 201:7 | **went** 92:7 | 189:19 210:23 |
| 260:10 261:5 | 217:12,15,17 | 140:9 165:24 | 237:2 249:2,11 |
| 262:10,20 | 229:21,23 | | 259:10 269:4 |

**[witness - yeah]**

| | | | |
|---|---|---|---|
| 281:14 283:16 | 347:16 354:23 | 340:12 | 135:6 165:6 |
| 287:23 317:19 | 363:19 | **workload** | 170:21 263:19 |
| 344:15 363:20 | **work**  7:5 8:4 | 197:10 | 289:2,3 290:14 |
| 372:3,24 389:2 | 19:17 20:9,23 | **works**  10:14 | 298:13 321:23 |
| 391:6,9,14 | 21:11 22:4 | 20:25 21:10,22 | 340:18 |
| 392:3 393:13 | 23:14 36:8 | 22:2,2,8,8,11 | **wrote**  6:15 8:7 |
| 393:16 394:2,5 | 49:3,6 56:11 | 56:1,9,19,21 | 8:21 90:21 |
| 395:24 | 56:15 58:3 | 60:1 101:4 | 130:21,22 |
| **witnesses**  301:7 | 59:24,25 60:4 | 116:8 164:8 | **x** |
| **wool**  211:1,14 | 62:4 116:21 | 184:21 219:14 | **x**  1:7,15 318:13 |
| **word**  6:20 25:2 | 127:14 133:12 | 341:5,7 | 389:1,5 394:9 |
| 37:7 77:18 | 134:23 148:21 | **world**  101:4 | **x6**  67:23,24 |
| 85:1 93:21 | 151:25 177:15 | 102:17 103:5 | 389:7 |
| 145:20 165:1 | 181:17,20 | 185:20 187:21 | **xinyu**  238:15 |
| 169:2 189:8 | 184:21,24 | 331:11 351:4,6 | **y** |
| 222:21,22 | 190:10 198:15 | 372:5 | **yale**  37:21 |
| 223:6,7 233:25 | 207:18,25 | **worried**  274:8 | 111:17 |
| 252:2 253:5 | 208:18 209:10 | **worry**  199:11 | **yanchunis**  2:9 |
| 254:5 320:3,4 | 209:17,18 | 199:16 | **ye**  238:15 |
| 320:6 363:20 | 215:10 223:17 | **worth**  266:23 | **yeah**  29:7 |
| 363:25 370:4 | 269:18 274:4 | 268:7 271:7 | 34:12 39:11 |
| 382:13 | 298:9 307:14 | 273:13,15,19 | 45:13 71:19 |
| **worded**  314:25 | 310:2 320:5,7 | 326:17 383:12 | 73:24 94:8 |
| **wording** | 321:12 323:5 | **wrap**  123:22 | 105:18 106:25 |
| 255:14 | 371:8 | 187:16 | 108:8 113:20 |
| **words**  41:6 | **workable**  118:8 | **write**  181:23 | 124:25 131:4 |
| 59:17 74:3 | **worked**  10:23 | **written**  8:16 | 133:18 135:7 |
| 84:23 86:7 | 357:6 | 11:7 40:15 | 135:25 143:12 |
| 96:8 161:22 | **workers**  97:6 | 90:7 130:17 | 144:9 149:9,17 |
| 173:11 177:19 | **working**  23:13 | 249:5 259:8 | 150:23 151:7,8 |
| 194:13 204:10 | 26:1,1 38:22 | 344:25 345:1 | 153:10 156:24 |
| 204:11 213:3 | 61:7 95:24 | **wrong**  15:24 | 158:11 160:12 |
| 214:11 258:15 | 111:14 116:9 | 21:2 55:3 | 161:10 162:8 |
| 259:2,5,6,7 | 116:15,16 | 59:21 67:9,11 | 164:9 172:11 |
| 305:8 346:11 | 303:22 308:15 | 78:7 84:17 | |

Page 95

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[yeah - à]**

| | |
|---|---|
| 173:24 174:11 | **york**   1:22,22,24 |
| 176:18 185:13 | 3:17,17 117:19 |
| 189:17 190:5,8 | 119:23 121:22 |
| 191:2,20 | 121:23,23,25 |
| 192:17 193:12 | 233:14 391:4 |
| 195:19 196:4 | 392:1 |
| 197:12 202:6 | **z** |
| 204:7 217:5 | |
| 218:13 223:15 | **zero**   137:14 |
| 227:9 229:12 | **zoom**   2:9,10,16 |
| 229:25 232:1 | 2:19,20 172:21 |
| 244:7 269:17 | **à** |
| 270:3 272:16 | |
| 278:20 289:4 | **à**   53:9 |
| 290:25 296:18 | |
| 302:6 312:6 | |
| 314:15 315:24 | |
| 316:19,20 | |
| 329:9 330:12 | |
| 330:17 345:20 | |
| 360:20 362:2 | |
| 366:14 369:17 | |
| 370:4,4,15 | |
| 376:12 387:9 | |
| 387:10 | |
| **year**   319:20 | |
| **years**   11:1 26:2 | |
| 56:5 58:8 | |
| 60:20 78:12 | |
| 82:10 97:11 | |
| 112:16 291:19 | |
| 295:14 301:13 | |
| 384:1 | |
| **yesterday**   76:7 | |
| 302:10 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.