# EXHIBIT A

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 10/26/2023 4:44 PM
Reviewed By: R. Walker
Case #19CV352557
Envelope: 13423692

ORDER ON SUBMITTED MATTER

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| ATTILA CSUPO, et al.,<br><br>        Plaintiffs,<br><br>  v.<br><br>GOOGLE LLC, et al.,<br><br>        Defendants. | Case No.: 19CV352557<br><br>ORDER CONCERNING: (1) THE PARTIES' EXPERT EXCLUSION MOTIONS; AND (2) PLAINTIFFS' CLASS CERTIFICATION MOTION |

This is a putative class action for conversion and quantum meruit, alleging that Defendant Alphabet, Inc.'s ("Google") Android operating system and mobile phone applications passively transfer data using class members' cellular data allowances without the consent of these individuals. Plaintiffs Attila Csupo, Andrew Burke, and Kerry Hecht, both individually and on behalf of a putative class, now move for class certification, and Google opposes the motion. In addition, each side has filed various motions to exclude certain experts and expert reports.

As explained below, the Court DENIES both sides' attempts to exclude certain expert opinions and GRANTS Plaintiffs' motion for class certification.

1

# I. BACKGROUND

## A. Factual Allegations in Operative Complaint

In Plaintiffs' Fourth Amended Complaint ("4AC"), Plaintiffs allege the following: Google owns and programs the most popular mobile platform in the world, the Android operating system. (4AC, ¶ 17.) Android works on a variety of mobile devices, including smartphones and tablets. (*Ibid*.) Many of the most popular mobile device manufacturers preinstall Android and a suite of Google's mobile applications ("apps" in common parlance) on devices they sell. (*Id*., ¶ 22.)

Plaintiffs are California residents who purchased Android mobile devices that they use with monthly cellular data plans from different carriers (namely, AT&T, T-Mobile, Verizon, and Sprint). (4AC, ¶¶ 8-10.) The devices they purchased were preloaded with Google's Android operating system and a suite of its mobile apps and widgets. (*Id*., ¶ 23.)

Under their cellular data plans, plaintiffs pay their carriers each month for data allowances, which are either unlimited or fixed. (4AC, ¶ 26.) When users have a fixed cellular data allowance and exceed it, they are typically charged an overage fee; with a so-called "unlimited" plan, they are still typically subject to usage quotas and will have their cellular connection speeds throttled. (*Id*., ¶ 26.) Such throttling can destroy some functionality (e.g., video streaming) and significantly impair overall performance. (*Ibid*.)

When users do not wish to use their cellular networks or are unable to use them, mobile devices can also transfer and receive information over the internet through Wi-Fi connections. (4AC, ¶ 25.) Many cost-conscious users maximize their time on Wi-Fi and use their cellular networks only when Wi-Fi connections are unavailable in order to "save" the cellular data allowances available under their monthly carrier plans. (*Ibid*.)

Plaintiffs allege that they have property interests in their cellular data allowances. (4AC, ¶ 27.) Each quantum of an allowance has a fair market value determined by market forces, and plaintiffs have the right to exclude others from using their allowances and to determine how to use their allowances and grant access to others through their mobile device activity. (*Ibid*.)

1  Users can grant others access to their data allowances and even can sell their unused data
2  allowances to others. (*Id.*, ¶ 28.)
3      It is true that users impliedly consent to the use of their cellular data allowances in many
4  situations—for example, when they actively engage with applications that require Internet access
5  while connected only by their cellular plan. (4AC, ¶ 29.) But here, at least according to
6  Plaintiffs, Google misappropriates their data allowances without permission through "passive
7  transfers," meaning information transfers that occur in the background and do not result from
8  users' direct engagement with Google products on their devices. (*Id.*, ¶ 31.)
9      These passive transfers occur in a variety of ways, including when mobile devices are in
10 a completely idle state, meaning they are stationary, untouched, and with all apps closed. (4AC,
11 ¶ 31.) Such transfers are significantly more frequent on Android devices than during comparable
12 use of an iPhone without Android or Google applications installed. (*Id.*, ¶¶ 42-47.) Although
13 Google could program its software to allow users to enable passive transfers only when they are
14 on Wi-Fi connections, it instead has chosen to simply take advantage of users' cellular data
15 allowances without user consent. (*Id.*, ¶ 40.)
16     Plaintiffs allege that *none* of the policies governing individuals' use of Google's
17 operating system, apps, or widgets disclose that Google appropriates users' cellular data
18 allowances to transmit information when users are not actively using Google products. (4AC, ¶¶
19 32-37.) Nevertheless, Google designed its operating system and applications to extract large
20 volumes of information from users' devices in this fashion. (*Id.*, ¶ 38.) The information Google
21 acquires through this practice supports the company's product development and lucrative
22 targeted advertising business. (*Id.*, ¶ 7.)
23     **B.    Relevant Procedural History of Case**
24     Based on these allegations, Plaintiffs bring claims for: (1) conversion; and (2) quantum
25 meruit on behalf of a putative class of Californians "who have used mobile devices running the
26 Android operating system to access the internet through cellular data plans provided by mobile
27 carriers." (4AC, ¶ 51.) Plaintiffs seek several types of relief, including: (1) "the fair market
28 value of the cellular data allowances converted by Google"; (2) "[t]he reasonable value of the

3

cellular data allowances used by Google to provide information that benefited Google"; and (3) "[i]njunctive relief directing Google to stop using cellular data allowances purchased by consumers without their consent." (*Id*., ¶ 74.)

Plaintiff filed both their original complaint and their amended complaint in August 2019. The Court (Judge Walsh) overruled, in its entirety, Google's demurrer to the first amended complaint in August 2020. Through various stipulations, Plaintiffs filed further amended complaints, with the 4AC (filed in February 2022) being the operative one.

Now before the Court are: (1) Plaintiffs' motion for class certification; (2) Google's motion to exclude the opinions of Dr. Jon Krosnick, one of Plaintiffs' experts; and (3) Plaintiffs' motion to exclude the opinions of Dr. Natalie Mizik, one of Google's experts. In addition, Google has objected to the admission of opinions of other Plaintiff experts; the Court construes these objections as motions to exclude. The Court held oral argument on all of these motions on August 17, 2023, and took the matters under submission as of that date.

## II.    MOTIONS TO EXCLUDE EXPERTS

A court may consider only *admissible* expert opinion evidence at class certification. (*Apple Inc. v. Superior Court* (2018) 19 Cal.App.5th 1101, 1117, italics added (*Apple*).) Any motions filed by the parties to exclude allegedly-unreliable expert opinion relating to class certification should be evaluated by the court under the "*Sargon* standard."[1] (*Id*. at p. 1119.)

What is the "*Sargon* standard"? Well, under California law, "trial courts have a substantial 'gatekeeping' responsibility in determining whether a matter relied on by an expert is reliable so as to assist the trier of fact or is speculative, thus rendering the expert's opinion inadmissible." (*Sargon, supra,* 55 Cal.4th at p. 769.) The trial court must exclude from evidence expert opinion that is not logically sound or "based on assumptions of fact without evidentiary support, or on speculative or conjectural factors." (*Sanchez v. Kern Emergency Med Transp. Corp.* (2017) 8 Cal.App.5th 146, 155; see also *Onglyza Prod. Cases* (2023) 90 Cal.App.5th 776, 785.)

---

[1] *Sargon*, of course, is *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*).

4

But a court "must . . . be cautious in excluding expert testimony." (*Sargon, supra*, 55 Cal.4th at p. 772.) The court should not "weigh an opinion's probative value or substitute its own opinion for the expert's opinion." (*Id.*) Rather, the trial court should "conduct[] a circumscribed inquiry to determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid." (*Id.*, citations and internal quotation marks omitted.) Thus, the court should focus on the expert's methodology and underlying principles, not the expert's results. Only if the expert opinion is "clearly invalid and unreliable" should it be excluded. (See *id.*) Otherwise, the finder of fact should decide the weight and probativeness of the expert opinion. (See *Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 593.)

Also, for certain experts, the parties also attack their qualifications. The only "foundation required to establish the expert's qualifications is a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in a sufficient number of transactions involving the subject matter of the opinion." (*Howard Entm't, Inc. v. Kudrow* (2012), 208 Cal.App.4th 1102, 1115.) "Once this threshold has been met, questions regarding the degree of an expert's knowledge go more to the *weight* of the evidence presented than to its admissibility." (*ABM Indus. Overtime Cases* (2017) 19 Cal.App.5th 277, 294, emphasis in original.)

**A.     Google's Expert:  Dr. Mizik**

On behalf of Google, Dr. Natalie Mizik provided expert opinions concerning:  (1) "the extent to which putative class members were aware that smartphones in general, and Android smartphones specifically, perform passive transfers"; (2) "the extent to which putative class members were aware that smartphones in general, and Android smartphones in particular, can sometimes perform passive transfers using their cellular data networks"; and (3) "whether receiving information that Android smartphones may perform passive transfers using their cellular networks would make putative class members more or less likely to purchase a new Android smartphone or would influence their selection of a data plan for a new phone." She based her opinions in large part on a survey of current Android users that she designed.

After reviewing her report and opinions, the Court rejects Plaintiffs' challenge to her opinions. Dr. Mizik's qualifications are appropriate for her work at issue. Plaintiffs have not shown that her methodology (specifically, using a non-random online survey) is so far out of the mainstream in her field that opinions flowing from the methodology should be excluded. While she could have supervised the administration of the survey in a more hands-on way, Plaintiffs have not shown that such hands-on supervision is necessary for reliable results. In any event, Dr. Mizik designed the survey and carefully analyzed its results. Plaintiffs' other criticisms of the survey go to weight, not admissibility, as they are not so fundamental as to render Dr. Mizik's methodology unreliable under *Sargon*.

Finally, the Court finds Dr. Mizik's opinions at least somewhat relevant to the factual question of consent. The Court need not decide at this time whether Google's legal arguments concerning consent are correct.

Therefore, the Court OVERRULES Plaintiffs' objections to Dr. Mizik's opinions.

**B.      Plaintiffs' Experts**

　　　　　1.      *Dr. Krosnick*

On behalf of Plaintiffs, Dr. Krosnick provided an expert report rebutting Dr. Mizik's survey-based opinions. Google seeks to exclude Dr. Krosnick's opinion for three reasons: a) it was submitted late and in violation of the Court's scheduling order; b) he lacks qualifications for his opinions; and c) it fails to meet *Sargon* standards.

*First*, the Court finds that the March 2023 scheduling order permits Dr. Krosnick's "late" report. The order states that "[i]f Google produces new Google internal documents or new Google data, or *if Google's experts rely on new documents or data not produced reasonably in advance of the due date for Plaintiffs' filings*, then the Parties agree that Plaintiffs may file rebuttal expert reports limited in scope to the newly produced discovery and its effect on the expert's prior report . . . ." (Italics added.) Google's expert Dr. Mizik provided her report and survey data two months after Plaintiffs' expert reports were due. Those surveys are "new documents or data" not previously produced. Therefore, Plaintiffs were entitled to a rebuttal expert report responding to Dr. Mizik's report.

*Second*, the Court finds that Dr. Krosnick is qualified to provide survey-related opinions based on his extensive experience with consumer surveys and use of surveys in his work.

*Third*, the Court finds that Dr. Krosnick's methodology passes muster under *Sargon*. He is entitled to rely upon another expert's work if routine in that field, and that appears to be the situation here. In any case, Dr. Krosnick worked with Dr. Lawson on the statistical analysis in his report. The Court finds that Google's other criticisms of Dr. Krosnick's work are not so foundational as to warrant exclusion of his opinion. And as with Dr. Mizik, Dr. Krosnick's work has some relevance to consent; again, the Court is not deciding at this time which side's legal conception of "consent" is correct.

The Court thus OVERRULES Google's objections to Dr. Krosnick's expert opinion.

### 2. Dr. Schmidt

On behalf of Plaintiffs, Dr. Eric Schmidt provided expert opinions about "passive network transfers" allegedly experienced by the putative class (namely, the type, volume, and pervasiveness of these transfers). Google attacks his opinions (but not his qualifications) in many ways.

After reviewing Google's objections and Plaintiffs' responses, the Court finds that there is a logical path from Dr. Schmidt's methodology to his final opinions, and there is no "analytical gap." The Court also finds that the reliability of NetStats data is not so obviously lacking as to render Dr. Schmidt's use of that data fatal to his opinions; issues about the data are merits questions. Google's other technical criticisms likewise don't rise to the level of requiring exclusion of Dr. Schmidt's opinions. The Court agrees with Plaintiffs that Dr. Schmidt was not interpreting contract language in arriving at his opinions, but rather was discussing technical terms with his expertise.

In addition, the Court sees nothing wrong with Dr. Schmidt's citation to Professor Leith's work, given that experts can use other reputable work to corroborate their own work. That is what happened here. If Google believes Professor Leith's work is untrustworthy, it can make that case to the jury.

Overall, the Court DENIES Google's challenge to Dr. Schmidt's opinions.

3. *Dr. Entner*

Dr. Roger Entner is an experienced telecommunications analyst (but not an economist). He provided, on Plaintiffs' behalf, an opinion on the fair market value of cellular data during and leading up to the proposed class period, finding that the fair market value is the average value of such data.

After reviewing Google's objections and Plaintiffs' responses, the Court finds that Dr. Entner is qualified to offer this opinion, given his experience in this industry. He is not purporting to calculate damages—that is Dr. Stec's job. All Dr. Entner is doing is providing inputs for Dr. Stec's work.

As for those "inputs," whether the average price or the marginal price is the correct measure of fair market value is a quintessential merits question. Google has not shown that Dr. Entner's choice to use average price was so far out of bounds or something so foreign to the industry that exclusion of his opinions is justified. And Google's other criticisms of his opinion don't go to the fundamental reliability of his methods or analysis choices; rather, they are proper subjects of cross-examination.

The Court denies Google's motion to exclude Dr. Entner's opinion.

4. *Dr. Stec*

Dr. Jeffrey Stec is an economist and veteran expert witness. He provided an expert opinion on classwide damages on behalf of Plaintiffs, based on data and information provided by Dr. Schmidt and Dr. Entner.

*First*, an expert can rely upon information from other experts if the opposing party can investigate that information adequately and such information is typically relied in that expert's field. That is true here: Google was able to cross-examine Dr. Schmidt and Dr. Entner, and economists preparing damages estimates often rely upon work of other experts. Therefore, the Court sees no problem with Dr. Stec relying on these other experts' work.

*Second*, Plaintiffs have sufficiently rebutted Google's critiques of Dr. Stec's work. In other words, Google has not shown that Dr. Stec's methodology or choice of inputs is so clearly invalid that his ultimate opinion should be disregarded.

8

The Court therefore rejects Google's request to exclude Dr. Stec's opinions.

## III. PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

### A. Legal Standard

As explained by the California Supreme Court,

> The certification question is essentially a procedural one that does not ask whether an action is legally or factually meritorious. A trial court ruling on a certification motion determines whether the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.

(*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326, internal quotation marks, ellipses, and citations omitted (*Sav-on Drug Stores*).)

California Code of Civil Procedure section 382 authorizes certification of a class "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court …." As interpreted by the California Supreme Court, section 382 requires: (1) a numerous, ascertainable class; and (2) a well-defined community of interest among the class members. (See *Sav-On Drug Stores, supra*, 34 Cal.4th at p. 326; *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 313.)

The plaintiff has the burden of establishing that class treatment will yield "substantial benefits" to both "the litigants and to the court," and that a class action will be manageable from a judicial perspective. (*Blue Chip Stamps v. Superior Court* (1976) 18 Cal.3d 381, 385; *Duran v. U.S. Bank National Assn*. (2014) 59 Cal.4th 1, 28-29.) The court must examine all the evidence submitted in support of and in opposition to the motion "in light of the plaintiffs' theory of recovery." (*Department of Fish and Game v. Superior Court* (2011) 197 Cal.App.4th 1323, 1349.) The evidence is considered "together": there is no burden-shifting as in other contexts. (*Ibid.*)

**B.     Numerosity**

There is no minimum number of potential plaintiffs required for a class action. (*Hendershot v. Ready to Roll Transportation, Inc.* (2014) 228 Cal.App.4th 1213, 1222.)  The proper inquiry is whether the proposed class is large enough to make joinder impracticable.  (*Id.*)

Here, the proposed class has over 13 million members.  That is certainly large enough to meet the numerosity requirement.

**C.     Ascertainability**

"The trial court must determine whether the class is ascertainable by examining (1) the class definition, (2) the size of the class and (3) the means of identifying class members." (*Miller v. Woods* (1983) 148 Cal.App.3d 862, 873.)  A class is ascertainable "when it is defined in terms of objective characteristics and common transactional facts that make the ultimate identification of class members possible when that identification becomes necessary."  (*Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 980 (*Noel*).)

> A class definition satisfying these requirements
>
> puts members of the class on notice that their rights may be adjudicated in the proceeding, so they must decide whether to intervene, opt out, or do nothing and live with the consequences.  This kind of class definition also advances due process by supplying a concrete basis for determining who will and will not be bound by (or benefit from) any judgment.

(*Noel, supra,* 7 Cal.5th at p. 980, citation omitted.)  "As a rule, a representative plaintiff in a class action need not introduce evidence establishing how notice of the action will be communicated to individual class members in order to show an ascertainable class."  (*Id.* at p. 984.)

Here, the putative class numbers will be identifiable through Google's own records and through self-identification.  Objective characteristics (i.e., owning/using an Android phone and

using cellular data to access the Internet) will make identification of the putative class members possible. The Court finds that Plaintiffs have satisfied the ascertainability requirement.

**D.     Community of Interest**

The "community-of-interest" requirement encompasses three factors: (1) predominant questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. (*Sav-On Drug Stores*, *supra*, 34 Cal.4th at p. 326.)

           1.     *Predominant Questions of Law or Fact*

For the first community of interest factor, "[i]n order to determine whether common questions of fact predominate the trial court must examine the issues framed by the pleadings and the law applicable to the causes of action alleged." (*Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 916 (*Hicks*).) The court must also give due weight to any evidence of a conflict of interest among the proposed class members. (See *J.P. Morgan & Co., Inc. v. Superior Court* (2003) 113 Cal.App.4th 195, 215.) The ultimate question is whether the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants. (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1104–1105 (*Lockheed Martin*).) "As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages." (*Hicks*, *supra,* 89 Cal.App.4th at p. 916.)

> Plaintiffs' burden on moving for class certification . . . is not merely to show that some common issues exist, but, rather, to place substantial evidence in the record that common issues predominate. As we previously have explained, this means each member must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those

1    requiring separate adjudication, must be sufficiently numerous and substantial to
2    make the class action advantageous to the judicial process and to the litigants.

(*Lockheed*, *supra*, 29 Cal.4th at p. 1108, citations and quotation marks omitted.)

The Court finds there are numerous common legal and factual issues, and that these issues predominate. To start, the types of data transfers focused on by Plaintiffs affect all or virtually all Android users because they are triggered by the same software present on all or virtually all Android devices: GMC Core. (See Schmidt Decl., ¶¶ 14-16, 30-31.) While there may be types of network transfers that affect different users differently, those are not the transfers at issue in this class certification motion. Whether putative class members experienced these data transfers to the same degree is not dispositive.

The transfers that are at issue are Clearcut transfers, CheckIn transfers, and NLP/GLS uploads. Google's arguments about these transfers primarily address the merits of Plaintiffs' claims, as opposed to whether the transfers are present for a large proportion of Android users (which is the key question for this class certification prong). In fact, Google stipulated that "all or nearly all" Android users experienced Clearcut and CheckIn transfers. Thus, there is a "centralized practice[]" that exhibits "common behavior toward similarly situated plaintiffs." (*Sav-On Drug Stores*, *supra*, 34 Cal.4th at p. 333.) Whether these transfers are truly "passive" is a merits question, to the extent it is relevant.

Similarly, the legal theory relied upon by Plaintiffs for its conversion claim applies uniformly to Android users. Plaintiffs are relying solely on Google's misappropriation of cellular data to show harm, not throttling or overages (both of which concededly might require individualized inquiries). Plaintiffs' theory may be shown to be legally wrong down the road, but this is not the time for the Court to analyze the correctness of the theory.

Google focuses on consent as an affirmative defense that is so individualized that class treatment is inappropriate. There are two types of consent: express consent and implied consent. As for the former, such consent would be reflected in accepting, in some fashion, Google's terms of use (or various submenus). But those terms or submenus do not vary materially across

1  putative class members. Thus, what these disclosures mean for consent purposes is a common
2  question and well-suited for class treatment. (See *Sarun v. Dignity Health* (2019) 41
3  Cal.App.5th 1119, 1136.)
4        For implied consent, Google posits various ways in which putative class members could
5  have known about these network transfers, but tacitly agreed to them. These ways include, for
6  instance, exposure to newspaper or Internet articles about this practice (or exposure to cellular
7  carrier disclosures) but continued use of the Android phone thereafter. Even assuming *arguendo*
8  that some putative class members heard about these allegations, Google denied these allegations.
9  These putative class members could have believed Google and kept on using their devices
10 because of Google's denials. The Court does not construe such continued phone use as implied
11 consent, as these putative class members didn't have all relevant, material facts in order to make
12 an informed decision to consent.
13       Dr. Mizik's survey fares no better. Continued use of an Android phone by a respondent
14 who may have had vague knowledge of data transfers—as opposed to information more closely
15 tied to the exemplar data transfers at issue—is not enough to show implied consent. Google
16 needs to show that: a) there were putative class members knew all relevant, material facts and
17 then tacitly consented; and b) so many putative class members fall into this category that class
18 treatment is inappropriate. Google has not done either of these things.
19       The Court need not decide at this time whether implied consent occurs when putative
20 class members continue to use their Android phones after learning all relevant, material facts
21 about the exemplar data transfers at issue. To the extent Google argues that putative class
22 members knew all relevant, material facts based on the terms of Google's disclosures, that is a
23 common merits question. (If the factfinder finds the disclosures to be adequate, then the Court
24 then may need to decide whether continued phone use counts as "consent.") To the extent
25 Google argues adequate information about the specific exemplar data transfers (as opposed to
26 "generic" data transfers) was "out in the world" for putative class members to absorb, Google
27 has failed to make that factual showing. Google also has failed to show that such "super-
28

informed" putative class members (if any exist) are so numerous as to render class treatment improper.²

As for damages, the fact that different class members may suffer different damages—perhaps wildly different damages—is not a reason to deny class certification. "[I]ndividualized issues regarding proof of the amount of damages class members may recover does not defeat a class action so long as there are common questions of liability amenable to class resolution." *ABM Indus. Overtime Cases* (2017) 19 Cal.App.5th 277, 308.) Moreover, Plaintiffs have proferred expert evidence (through Dr. Stec and Dr. Schmidt) ostensibly showing the fair market value of data misappropriated by Google—this information can be used to calculate damages. That Plaintiffs cannot establish at this stage in the litigation how damages will be allocated is not fatal to Plaintiffs' class certification motion. (See *State of California v. Levi Strauss & Co.* (1986) 41 Cal.3d 460, 479 [courts can be creative in devising procedures to allocate damages to class members].)

The Court finds Plaintiffs have met this prong of the class certification analysis.

### 2.    *Typicality*

The typicality requirement is meant to ensure that the class representative is able
to adequately represent the class and focus on common issues. It is only when a
defense unique to the class representative will be a major focus of the litigation,
or when the class representative's interests are antagonistic to or in conflict with
the objectives of those she purports to represent that denial of class certification is
appropriate. But even then, the court should determine if it would be feasible to
divide the class into subclasses to eliminate the conflict and allow the class action
to be maintained.

(*Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 99, internal citations, brackets, and quotation marks omitted.)

---

² The Court finds Google's cited cases concerning implied consent distinguishable for the reasons stated in Plaintiffs' reply. (See 7/3/23 Reply at pp. 18-19, fn. 16.)

"Although the questions whether a plaintiff has claims typical of the class and will be able to adequately represent the class members are related, they are not synonymous." (*Martinez v. Joe's Crab Shack Holdings* (2014) 231 Cal.App.4th 362, 375 (*Martinez*).) "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." (*Ibid.*, quoting *Seastrom v. Neways, Inc.* (2007) 149 Cal.App.4th 1496, 1502.)

Here, as discussed above, other putative class members suffered the same alleged injury (whether it is an actual injury is a merits question), Google's conduct is not unique to the named plaintiffs, and other putative class members were injured by Google's actions. There has been no showing that these plaintiffs are somehow uniquely positioned vis-à-vis Google so that they don't have typical claims. Again, Plaintiffs may not be able to prove injury or other elements of their claims at trial, but that is a merits question.

### 3. *Adequacy of Representation*

"Adequacy of representation depends on whether the plaintiff's attorney is qualified to conduct the proposed litigation and the plaintiff's interests are not antagonistic to the interests of the class." (*McGhee v. Bank of America* (1976) 60 Cal.App.3d 442, 450.) The fact that a class representative does not personally incur all of the damages suffered by each different class member does not necessarily preclude the representative from providing adequate representation to the class. (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 238, disapproved of on another ground by *Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260.) Only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status. (*Ibid.*)

Here, Plaintiffs' counsel is experienced in consumer class actions and there is no evidence that Plaintiffs' interests are antagonistic to the interests of the class. The Court finds the adequacy requirement has been satisfied.

E.     **Superiority**

"[A] class action should not be certified unless substantial benefits accrue both to litigants and the courts. . . ." (*Basurco v. 21st Century Ins.* (2003) 108 Cal.App.4th 110, 120, internal quotation marks omitted.)  The question is whether a class action would be superior to individual lawsuits. (*Ibid*.)  "Thus, even if questions of law or fact predominate, the lack of superiority provides an alternative ground to deny class certification." (*Ibid*.)  Generally, "a class action is proper where it provides small claimants with a method of obtaining redress and when numerous parties suffer injury of insufficient size to warrant individual action." (*Id*. at pp. 120-121, internal quotation marks omitted.)

Here, the Court finds that 1 class action would be superior to 13 million (or even 13) individual lawsuits.  If Plaintiffs succeed on the merits of their claims, this class action will give individuals a chance for compensation for small harms—small enough that individual actions are unlikely.  And if Plaintiffs don't succeed, then Google will not need to face hundreds or thousands of follow-on suits (assuming the number of opt-outs is low.)

The Court finds this factor has been met.

F.     **Manageability**

"The proponent of class certification must demonstrate that the proposed class action is manageable." (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 922.)  Also, "[i]n certifying a class action, the court must . . . conclude that litigation of individual issues . . . can be managed fairly and efficiently." (*Duran v. U.S. Bank National Assn*. (2014) 59 Cal.4th 1, 28-29.)  If necessary in a particular case, the trial court should consider trial plans submitted in connection with the class certification question to determine how individual issues will be managed in the litigation; and b) whether such management will be fair and efficient.  (See *Duran*, *supra*, 59 Cal.4th at p. 32.)

Based on the information before the Court at this time, the Court believes that the class action is manageable, and that litigation of individual issues (like damages) will not overwhelm litigation of common issues, as discussed previously.  The Court did not mandate that the parties provide trial plans as part of their class certification briefing, so the Court will not penalize either

16

side for not doing so. However, the Court believes that an exchange and filing—much closer to trial— of trial plans by the parties would be helpful to the Court in designing trial. It is premature, however, to schedule that exchange/filing at this time.

## IV. CONCLUSION

For the foregoing reasons, the Court:

1. DENIES each side's attempts to exclude certain expert opinions from the other side.

2. GRANTS Plaintiffs' motion for class certification.[3]

The parties shall meet and confer regarding a procedure for providing notice to the class and a form of notice. If they come to agreement, Plaintiff shall file a stipulation along with a statement and proposed order, pursuant to California Rules of Court, rule 3.766. If there is any dispute regarding these issues, the parties shall advance their next case management conference to a mutually-agreeable date so that the issues may be promptly addressed.

**IT IS SO ORDERED.**

Date: 10/26/2023

The Honorable Sunil R. Kulkarni
Judge of the Superior Court

---

[3] While the Court focused on Plaintiffs' conversion claim in this order, the Court believes the same reasoning supports class certification for Plaintiffs' quantum meruit claim. The Court also agrees with Plaintiffs that in this setting, Plaintiffs' quantum meruit claim is an independent claim from Plaintiffs' conversion claim.