**BOIES SCHILLER FLEXNER LLP**
David Boies (admitted pro hac vice)
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200
dboies@bsfllp.com

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com

James Lee (admitted pro hac vice)
Rossana Baeza (admitted pro hac vice)
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Alison L. Anderson, CA Bar No. 275334
M. Logan Wright, CA Bar No. 349004
725 S Figueroa St., 31st Floor
Los Angeles, CA 90017
Tel.: (213) 995-5720
alanderson@bsfllp.com
mwright@bsfllp.com

**SUSMAN GODFREY L.L.P.**
Bill Carmody (admitted pro hac vice)
Shawn J. Rabin (admitted pro hac vice)
Steven M. Shepard (admitted pro hac vice)
Alexander Frawley (admitted pro hac vice)
Ryan Sila (admitted pro hac vice)
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com
rsila@susmangodfrey.com

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: (310) 789-3100
abonn@susmangodfrey.com

**MORGAN & MORGAN**
John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)
Michael F. Ram, CA Bar No. 104805
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com
mram@forthepeople.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIBAL RODRIGUEZ, SAL CATALDO, JULIAN SANTIAGO, and SUSAN LYNN HARVEY, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br>    vs.<br><br>GOOGLE LLC,<br>        Defendant. | Case No.:  3:20-cv-04688-RS<br><br>**PLAINTIFFS' OPPOSITION TO GOOGLE'S MOTION TO EXCLUDE OPINION OF MICHAEL J. LASINSKI**<br><br>The Honorable Richard Seeborg<br>Courtroom 3 – 17th Floor<br>Date: October 5, 2023<br>Time: 1:30 P.M. |

i

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................... 1

II. BACKGROUND ........................................................................................................ 2

    A.  Mr. Lasinski is highly qualified to render expert opinions. ........................ 2

    B.  Mr. Lasinski calculates Google's unjust enrichment from (s)WAA-off data. ........................................................................................... 2

    C.  Mr. Lasinski's actual damages model calculates the fair value of the data. ........................................................................................................ 4

III. LEGAL STANDARDS .............................................................................................. 5

IV. ARGUMENT ............................................................................................................. 6

    A.  Mr. Lasinski's unjust enrichment models are relevant and reliable. ........................................................................................................ 6

        1.  Disgorgement of profits is an available remedy. ............................. 6

        2.  Google's criticisms regarding Mr. Lasinski's unjust enrichment models and the but-for world are legally and factually baseless. ........................................................................... 10

            a.  Mr. Lasinski's Scenario One model reasonably approximates Google's profits attributable to its use of (s)WAA-off data to track and attribute conversions. ................................................................. 12

            b.  Mr. Lasinski's Scenario Two model reasonably approximates Google's profits attributable to its use of (s)WAA off data to serve and monetize advertisements. .......................................................... 14

    B.  Mr. Lasinski's actual damages model is relevant and reliable. ............... 16

        1.  Mr. Lasinski uses a widely accepted methodology. ...................... 16

            a.  Mr. Lasinski's actual damages model is independently supported. .................................................... 17

            b.  Mr. Lasinski chose conservative inputs, not cherrypicked outliers. ...................................................... 20

        2.  Google's claims of variance among class members are meritless. ...................................................................................... 23

V.  CONCLUSION ........................................................................................................ 25

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Acree v. Gen. Motors Acceptance Corp.*,
    92 Cal. App. 4th 385 (2001) ............................................................................................. 20, 24

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
    738 F.3d 960 (9th Cir. 2013) .................................................................................................. *passim*

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
    225 Cal. App. 4th 1451 (2014) ................................................................................................. 7

*In re Apple iPhone Antitrust Litigation*
    2022 WL 1284104 (N.D. Cal. Mar. 29, 2022). ..................................................................... 21

*Area 55, Inc. v. Amazon.com*,
    2012 WL 12846975 (S.D. Cal. Jul. 24, 2012) ....................................................................... 24

*Astiana v. Hain Celestial Grp., Inc.*,
    783 F.3d 753 (9th Cir. 2015) ................................................................................................... 9

*Bass v. Facebook, Inc.*,
    394 F. Supp. 3d 1024 (N.D. Cal. 2019) ................................................................................ 25

*Batis v. Dun & Bradstreet Holdings, Inc.*,
    2023 WL 1870057 (N.D. Cal. Feb 9, 2023) ............................................................................. 8

*Bautista v. Mktg. & Supply Co.*,
    2018 WL 7142094 (N.D. Cal. Dec. 4, 2018) (Seeborg, C.J.) ............................................... 5, 6

*BJB Elec. LP v. Bridgelux, Inc.*,
    2023 WL 4849764 (N.D. Cal. Jul. 28, 2023) (Seeborg, C.J.) ....................................... 1, 14, 17

*Brown v. Google*,
    2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ................................................................ *passim*

*Brown v. Google*,
    2023 WL 5029899, at *6-7 (N.D. Cal. Aug. 7, 2023)......................................................... *passim*

*Brown v. Google LLC*,
    2021 WL 6064009 (N.D. Cal. Dec. 22, 2021) ........................................................................ 1

*CTC Real Estate Servs. v. Lepe*,
    140 Cal. App. 4th 856 (2006) .................................................................................................. 7

ii

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579, 597 (1993) ............................................................................. 5, 6, 18, 21

*Dreyfuss v. Union Bank of Cal.*,
  24 Cal.4th 400 (2000) ........................................................................................... 8

*Eastman Kodak Co. v. S. Photo Mats. Co.*,
  273 U.S. 359 (1927) ............................................................................................. 19

*ESG Cap. Partners, LP v. Stratos*,
  828 F.3d 1023 (9th Cir. 2016) .............................................................................. 9

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020) ..................................................................... 1, 7, 8, 9

*FTC v. BurnLounge, Inc.*,
  753 F.3d 878 (9th Cir. 2014) ............................................................................... 17

*Greenley v. Kochava, Inc.*,
  2023 WL 4833466 (S.D. Cal. Jul. 27, 2023) ......................................................... 8

*Hart v. TWC Product and Technology LLC*
  2023 WL 3568078, at *12 (N.D. Cal. Mar. 30, 2023). ..................................... 9, 24

*Hoffman v. L&M Arts*,
  2013 WL 432771 (N.D. Tex. Feb. 5, 2013) ......................................................... 16

*Ji v. Naver Corp.*,
  2022 WL 4624898 (N.D. Cal. Sept. 30, 2022) ..................................................... 25

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) .............................................................................. 23

*In re Juul Labs, Inc.*,
  2022 WL 1814440 (N.D. Cal. Jun. 2, 2022) ......................................................... 22

*Katz-Lacabe v. Oracle Am. Inc.*,
  2023 WL 2838118 (N.D. Cal. Apr. 6, 2023) (Seeborg, C.J.) ................................ 9

*Kumho Tire Co. Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ........................................................................................ 6, 17

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
  589 F. Supp. 3d 302 (S.D.N.Y. 2022) ................................................................. 16

*Looksmart Group v. Microsoft*
  2019 WL 4009263, at *3 (N.D. Cal. Aug. 5, 2019). .......................................... 11

iii

*McCrary v. Elations Co.*,
   2014 WL 12589137 (C.D. Cal. Dec. 2, 2014)..................................................................23, 24

*Meister v. Mensinger*,
   230 Cal. App. 4th 381 (2014)...........................................................................................*passim*

*In re NFL's Sunday Ticket Antitrust Litig.*,
   2023 WL 1813530 (C.D. Cal. Feb. 7, 2023) .............................................................................22

*Opperman v. Path*,
   2016 WL 3844326 (N.D. Cal. Jul. 15, 2016) .............................................................................24

*Oracle Am., Inc. v. Google Inc.*,
   2016 WL 1743154 (N.D. Cal. May 2, 2016)................................................................10, 11, 12

*Pet Food Exp. Ltd. v. Royal Canin USA, Inc.*,
   2011 WL 6140874 (N.D. Cal. Dec. 8, 2011) .............................................................................20

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) .......................................................................................................6, 21

*Raffin v. Medicredit, Inc.*,
   2017 WL 131745 (C.D. Cal. Jan. 3, 2017).................................................................................20

*Russell v. Walmart, Inc.*,
   2023 WL 4341460 (N.D. Cal. Jul. 5, 2023) .................................................................................9

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
   580 U.S. 328 (2017) ........................................................................................................................12

*SEC v. Nutmeg Grp., LLC*,
   2017 WL 1545721 (N.D. Ill. Apr. 28, 2017)..............................................................................19

*Sheldon v. Metro-Goldwyn Pics. Corp.*,
   106 F.2d 45 (2d Cir. 1939) (Hand, J.) .........................................................................................11

*Silva v. B&G Foods*
   2022 WL 4596615, at *2 (N.D. Cal. Aug. 26, 2022) ..............................................................11

*In re Tobacco Cases II*,
   240 Cal. App. 4th 779 (2015)........................................................................................................24

*Tunick v. Takara Sake USA Inc.*,
   2023 WL 3958363 (N.D. Cal. Jun. 12, 2023) ..............................................................................9

*TVIIM, LLC v. McAfee, Inc.*,
   2015 WL 4148354 (N.D. Cal. Jul. 9, 2015) ...............................................................................16

iv

*Upstate Jobs Party v. Kosinski*,
   559 F. Supp. 3d 93 (N.D.N.Y. 2021) ................................................................. 18

*Utne v. Home Depot U.S.A., Inc.*
   2022 WL 16857061, at *5 (N.D. Cal. Nov. 10, 2022). ....................................... 24

*Uzyel v. Kadisha*,
   188 Cal. App. 4th 866 (2010) ..................................................................... 1, 10

**Statutes**

Cal. Civ. Code § 1708.8(d) .................................................................................... 8, 25

Cal. Civ. Code § 3517 .................................................................................................. 6

Cal. Penal Code § 502(c)(2) ....................................................................................... 7

Cal. Penal Code § 502(e)(1) ....................................................................................... 8

California Consumer Privacy Act ............................................................................. 25

Unfair Competition Law and False Advertising Law ............................................. 25

**Other Authorities**

California Constitution ................................................................................................ 7

Restatement of Restitution §§ 1, 3, 44, 49, and 51 ..........................................*passim*

Rule 23(b)(3) ............................................................................................................. 23

v

## I.    INTRODUCTION

Google has offered no basis to exclude Mr. Lasinski's unjust enrichment and actual damages opinions.[1] For decades, Mr. Lasinski advised countless clients on asset valuation across a range of industries, offered expert opinions in dozens of cases, and led professional organizations focused on financial analysis. Dkt. 314-7 ("Lasinski Rep.") ¶¶ 1-5. In this case, Mr. Lasinski calculated (a) Google's unjust enrichment from (s)WAA-off data and devices collected via Google Analytics for Firebase ("GA4F") and the Google Mobile Ads ("GMA") SDK and (b) actual damages from Google's collection of that data. *Id.* §§ 7-8. Mr. Lasinski's analysis uses financial analyses developed by Google in the ordinary course of business, as well as Google's actual, payments for data. It is therefore unsurprising that Judge Gonzalez Rogers approved a similar damages approach in *Brown v. Google*, 2022 WL 17961497, at *2-7 (N.D. Cal. Dec. 12, 2022).

Google offers no reason to reach a different result in this case. Google first argues that Plaintiffs cannot seek disgorgement of profits, but the Ninth Circuit has clearly held otherwise. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020) ("This unauthorized use of their information would entitle Plaintiffs to profits unjustly earned."). Google then contends that Mr. Lasinski failed to account for profits Google says it might have earned had it behaved lawfully, overlooking that "[t]he presence or absence of but-for causation is not necessarily determinative of unjust enrichment." *Uzyel v. Kadisha*, 188 Cal. App. 4th 866, 894 (2010). Regardless, Mr. Lasinski's unjust enrichment models are "'tied to the facts' in the record," and Google fails to carry its burden to prove any appropriate deduction. *BJB Elec. LP v. Bridgelux, Inc.*, 2023 WL 4849764, at *4 (N.D. Cal. Jul. 28, 2023) (Seeborg, C.J.). Just as a thief cannot argue a victim would have been willing to give away the stolen goods, Google cannot escape liability by speculating that maybe class members would have given permission had Google asked.

Google's criticisms of Mr. Lasinski's actual damages methodology are equally flawed. Far from a "finger in the wind," Mot. 1, Mr. Lasinski applied an industry-accepted, market-based

---

[1] Google's Motion exceeds the 25-page limit set by the Local Rules, in disregard of prior warnings that the Notice of Motion must be included in the page count. Dkt. 326 ("Mot."); *see Brown v. Google LLC*, 2021 WL 6064009, at *1 n.1 (N.D. Cal. Dec. 22, 2021).

1  analysis and calculated damages using Google's own real-world payments for mobile activity data.

2  Mot. 1; Lasinski Rep. § 8. Google pays study participants a uniform rate, regardless of their activity

3  level or views about privacy. Google's arguments are contradicted by the law and its own records,

4  and in any event, could only go to weight, not admissibility. *Alaska Rent-A-Car, Inc. v. Avis Budget*

5  *Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). Google's motion should be denied.

6  **II.       BACKGROUND**

7          **A.       Mr. Lasinski is highly qualified to render expert opinions.**

8          Mr. Lasinski is certified in public accounting, financial forensics, and licensing, with a

9  Bachelor of Science in Electrical Engineering and a Master of Business Administration from the

10  University of Michigan. Lasinski Rep. ¶ 5. His consulting practice has thrived for nearly 30 years,

11  during which he has provided valuation services to significant clients in a wide range of industries.

12  *Id.* ¶ 2. Mr. Lasinski specializes in valuing intangible assets across industries, and his past work

13  includes valuation of consumer data assets. Mao Ex. 1 ("Lasinski Tr.") at 45:3-45:10. He has

14  offered expert opinions in more than 60 cases, involving industries as wide-ranging as insecticides,

15  network routing, and, yes, data privacy. Lasinski Rep. Appx. A at 4-12. He has served in a variety

16  of leadership roles in his field, including President of the Licensing Executives Society USA &

17  Canada, as well as Chair of its Valuation and Taxation Committee. *Id.* ¶ 3. Under any definition,

18  Mr. Lasinski is qualified. *See Brown*, 2022 WL 17961497, at *2 (finding Lasinski qualified).

19          **B.       Mr. Lasinski calculates Google's unjust enrichment from (s)WAA-off data.**

20          Mr. Lasinski estimates profits Google earns from using (s)WAA-off app activity data in

21  two ways: (1) to track and attribute so-called "conversions" to Google-placed ads, and (2) to serve

22  ads and charge advertisers accordingly. Mr. Lasinski offered a separate model for each type of use.

23          Mr. Lasinski's **Scenario One** model concerns profits from conversion tracking and

24  attribution. Lasinski Rep. § 7.1. Google is not just an ad broker: It actually purchases ad space

25  from publishers, then sells it to advertisers. Mao Ex. 2 at 3 (Google webpage explaining that "we

26  always pay publishers for their ad space"). Google's ability to turn a profit depends on its ability

27  to collect more from advertisers than Google pays publishers for ad space. *Id.* (describing how

28  Google "tak[es] on the risk of showing ads to users"). Generally speaking, advertisers are

2

interested in more than simply serving ads. Advertisers want to persuade the audience to take some type of action, often a purchase or download, after seeing an advertisement. These actions ("conversions," in advertising-speak) are far more valuable than the simple brand awareness an ad supports, and advertisers are willing to pay accordingly. *Id.* ("[T]he vast majority [of Google's advertisers] only pay Google when a user takes an action after seeing their ad"); *see* Lasinski Rep. ¶ 32; Dkt. 314-5 ("Hochman Rep.") ¶ 280. Advertisers may literally pay a defined amount each time a conversion occurs, or they may use an algorithmic strategy that achieves that price on average. Lasinski Rep. ¶ 32 (citing Google Help Center articles); Mao Ex. 3 ("Knittel Rep.") ¶ 27 (describing algorithmic strategies). Either way, ad networks like Google earn these prices only for conversions caused by *that ad network's* ad placement.

The process of determining causation between a placement and a subsequent action is called "attribution." Hochman Rep. ¶¶ 279-282. Attribution involves connecting (a) detailed app activity data about each ad served to the user (including date, time, host app, and much more), which is collected and saved by the ad network, here Google (via the GMA SDK); with (b) detailed data about the user's other activity, which is often collected and saved by an app analytics provider, usually Google (via GA4F). *Id.*; *see also* Dkt. 329 (Class Cert. Opp.) at 6. App analytics companies (e.g., Kochava) can collect some of this data for advertisers, but as Google's experts conceded, all analytics providers depend on Google's trove of user data. *See* Mao Ex. 4 ("Black Tr.") at 34:3-35:10 (these providers have only "half of what you need" for attribution and rely on "the ad network," i.e., Google, to save the rest). Knittel Rep. ¶ 35; Mao Ex. 5 ("Knittel Tr.") at 177:1-10; *see also* Hochman Rep. ¶¶ 280-282. The financial rewards of attributed conversions—and the risk of failing to capture them—create a powerful incentive for Google to collect app activity data, with or without user permission. *See, e.g.*, Mao Ex. 6 at -89 (Facebook had "competitive edge" because it tracked "10x more app conversions").

Mr. Lasinski uses Google's own data and methods to calculate Google's profits earned by using (s)WAA-off data for conversion tracking. Google provided its total revenue from App Promo and the percent of that revenue "attributable to conversion types bid against GA4F." Lasinski Rep. ¶¶ 83, 91. That means what it sounds like: revenues from conversion-based bidding,

where the conversion is tracked and attributed by GA4F. *See Attributable*, Oxford English Dictionary ("owing to, produced by"). Mr. Lasinski then isolated the revenues attributable to (s)WAA-off users and deducted incremental costs. Lasinski Rep. ¶¶ 83-90. This is the very same method Google used to estimate its revenues from conversion tracking. *See* Mao Ex. 7 at -75.

Contrary to Google's representation, Google's unjust profits are not limited to "App Promo," meaning ads for apps. Lasinski Rep. ¶¶ 77-78, 92-112. Google also profits from AdMob and Ad Manager, which serve all kinds of ads using the GMA SDK. Google produced its total revenues from AdMob, from which Mr. Lasinski also derived Google's Ad Manager app-based revenues using other discovery material. Lasinski Rep. ¶¶ 94, 106-07. Both AdMob and Ad Manager serve "Display Ads," and according to Google's documentation, 52% of Google's Display Ads revenue is attributable to advertisers' conversion-based bids. *Id.* ¶ 102 & fig.28. That gave Mr. Lasinski Google's AdMob and Ad Manager revenues from conversion tracking and attribution, from which he similarly isolated revenue from (s)WAA-off users on apps and deducted incremental costs. *Id.* ¶¶ 94-101, 107-09. Through 2022, Google generated profits totaling **$558.8 million** using (s)WAA-off app activity data to track and attribute conversions. *Id.* ¶ 112 & fig.34.

Mr. Lasinski's **Scenario Two** model includes the ad revenue Google earns from (s)WAA-off users, from conversions and otherwise. *Id.* ¶ 113. Google serves ads to (s)WAA-off users by taking their app activity data without permission, in a detailed packet called an "ad request." *Id.*; Hochman Rep. ¶¶ 130, 270-72. And Google charges advertisers for these (s)WAA-off ads only because it saves (s)WAA-off app activity data. *See* Hochman Rep. ¶ 122. Accordingly, Mr. Lasinski began with Google's total U.S. App Promo, AdMob, and Ad Manager app-based revenues, isolated the portion earned by serving ads to (s)WAA-off users on apps, and deducted incremental costs. Lasinski Rep. ¶¶ 116-128. Through 2022, Google earned about **$664.3 million** using (s)WAA-off app activity data to serve and monetize advertisements. *Id.* ¶ 129 & fig.43.

## C.    Mr. Lasinski's actual damages model calculates the fair value of the data.

To calculate actual damages (which includes restitution), Mr. Lasinski determined the payments that would compensate class members for giving up the choice to keep app activity private from Google. Lasinski Rep. ¶ 130. Mr. Lasinski applied a market-based approach, in which

4

he used comparable transactions to estimate the value of an asset—here, app activity data and the peace of mind associated with privacy from Google. Mr. Lasinski searched for comparable, real-world market transactions that reflect on Google's willingness to pay for user data, research organizations' willingness to pay for user data, and users' willingness to pay to prevent data collection. *Id.* ¶ 132. He identified four: (1) Google's Ipsos Screenwise Panel, in which Google pays participants up to $120 to enroll and up to $16 per month to collect activity data; (2) AT&T's GigaPower Campaign & Internet Preferences Program, which allowed customers to pay $29 per month to prevent AT&T from collecting and using data; (3) the Nielsen Computer & Mobile Panel, which pays participants up to $50 per year to collect mobile activity data; and (4) SavvyConnect, which pays users up to $5 per device per month to collect web browsing data. *Id.* ¶¶ 134-50.

Considering these market transactions, Mr. Lasinski selected Google's Screenwise program (and Google's own payments to participants) as the most reliable evidence of both the payment necessary for a user to willingly relinquish their app data privacy from Google, and Google's willingness to pay for mobile activity data. *Id.* ¶ 151. Mr. Lasinski then arrived at his $3-per-device estimate by adjusting Google's Screenwise payments to fit the data at issue in this case. First, Mr. Lasinski excluded enrollment payments, which require the participant to provide additional information and an agreement to abide by certain rules set forth by Screenwise, and are not compensation for activity data. *Id.* ¶¶ 140 fig.45, 151. Second, Mr. Lasinski excluded monthly payments for other types of data, namely activity on a web browser (for which Google pays $3 per month) and data sent via a special Screenwise WiFi router (for which Google pays $5 per month). *Id.* ¶¶ 141, 151. Mr. Lasinski then isolated two Screenwise payments for data similar to the app activity data at issue in this case: Google pays $3 per month for a mobile phone and $3 per tablet, regardless of the user's activity level or beliefs about privacy. *Id.* For reasons described below, Mr. Lasinski applied a conservative, single $3-per-device payment, rather than a monthly payment. *Id.* ¶ 151. He calculates that classwide actual damages equal **$486 million**. *Id.* ¶ 161 fig.50.

## III.     LEGAL STANDARDS

Expert testimony is admissible if it is "both relevant and reliable." *Bautista v. Mktg. & Supply Co.*, 2018 WL 7142094, at *1 (N.D. Cal. Dec. 4, 2018) (Seeborg, C.J.) (citing *Daubert v.*

*Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The Court "enjoys broad discretion in determining both how to assess reliability and whether particular testimony is reliable." *Id.* (citing *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 151-52 (1999)). This inquiry is a "flexible" one, which should be tailored to the expert testimony offered. *Kumho Tire*, 526 U.S at 141. Neither the opposing party's nor even the Court's disagreement with the expert's conclusion is a basis for exclusion; the focus "must remain on the principles and methodology at issue, not the expert's conclusions." *Bautista*, 2018 WL 7142094, at *1. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), as amended (Apr. 27, 2010); *see Alaska Rent-A-Car*, 738 F.3d at 969.

## IV.     ARGUMENT

### A.     Mr. Lasinski's unjust enrichment models are relevant and reliable.

Mr. Lasinski calculates Google's unjust enrichment using two separate models. Lasinski Rep. § 7. The first measures the profits Google earned by using the at-issue data to determine the impact its advertisements had on (s)WAA-off users' behavior, a process called conversion tracking and attribution. *Id.* § 7.1. The second measures the profits Google earned by using the at-issue data to serve advertisements to (s)WAA-off users. *Id.* § 7.2. Google does not argue that Mr. Lasinski's models do not reliably measure the profits Google earned through those unlawful practices. Instead, Google argues that it is entitled to keep its profits, no matter how unjustly it earned them. Mot. 6-10. Google then criticizes Mr. Lasinski for failing to make deductions based on a nonsensical alternate reality, in which Google could have made similar profits through assertedly lawful means. Mot. 10-15. Neither of Google's arguments are legally sound, and regardless, Google offers no evidence capable of satisfying its burden to quantify purportedly appropriate deductions from Mr. Lasinski's determination of Google's unjustly earned profits.

### 1.     Disgorgement of profits is an available remedy.

In California, wrongdoers may not retain profits they earn when they break the law. *Meister v. Mensinger*, 230 Cal. App. 4th 381, 398-99 (2014); Cal. Civ. Code § 3517 (enshrining as a "maxim of jurisprudence" the proposition that "[n]o one can take advantage of his own wrong").

6

Those who "suffer[] an interference with protected interests" are entitled to the wrongdoer's profits, regardless of whether they suffered a "measurable loss." Restatement (Third) of Restitution (hereinafter, "Restatement") § 3, rptr.'s note a (2011); *see CTC Real Estate Servs. v. Lepe*, 140 Cal. App. 4th 856, 860-61 (2006) (awarding plaintiff profits from unlawful use of identity). "California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable." *Facebook Tracking Litig.*, 956 F.3d at 600-01 (rejecting argument that unjust enrichment is not damages, including for purposes of privacy and CDAFA claims, citing *Lepe*, *supra*). Indeed, the "eliminati[on] of "the possibility of profit from conscious wrongdoing … is one of the cornerstones of the law of restitution and unjust enrichment." *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1486 (2014). California public policy provides for disgorgement not only to "benefit[] the injured parties," but also "deter[] improper conduct" even when that conduct is "more profitable than lawful conduct." *Meister*, 230 Cal. App. 4th at 399 (citation omitted).

In this case, Plaintiffs allege that Google unlawfully interfered with their legally protected interests, namely their right to privacy (enshrined in the California Constitution and the common law) and their right to prohibit others from collecting and using their devices and data (codified in the CDAFA). If the factfinder agrees, Google will be required to disgorge its profits. That was the result in *Lepe*, in which a wrongdoer armed with information about the plaintiff's identity used the plaintiff's identity for profit. 140 Cal. App. 4th at 860-61 (cited by *Facebook Tracking*, 956 F.3d at 600). Similarly, Google uses Plaintiffs' devices to track and sell advertisers on the effectiveness of its advertising machine. Hochman Rep. ¶¶ 280-82.

The Ninth Circuit has made it crystal-clear: "[U]nauthorized use of their information for profit would entitle Plaintiffs to profits unjustly earned." *Facebook Tracking*, 956 F.3d at 601. The Ninth Circuit's conclusion is well-grounded in the text of the CDAFA, which makes it a "public offense" to "[k]nowingly access[] and without permission … take[], cop[y], or make[] use of any data from a computer system." Cal. Penal Code § 502(c)(2). It is utterly implausible that the California Legislature intended for violators to retain the profits earned through the very "use" the

1   CDAFA prohibits, especially because it granted victims a right of action to sue for "compensatory

2   damages and injunctive relief or other equitable relief." Cal. Penal Code § 502(e)(1)[2]; *Dreyfuss v.*

3   *Union Bank of Cal.*, 24 Cal.4th 400, 413 (2000) (describing "unjust enrichment" as "equitable

4   relief"). Hornbook law similarly allows disgorgement for invasion of privacy. Restatement § 44,

5   cmt. b ("Profitable interference with other protected interests, *such as the claimant's right of*

6   *privacy*, gives rise to a claim [for unjust enrichment]" (emphasis added)); *see also* Cal. Civ. Code

7   § 1708.8(d) (statutory privacy claims allow for "disgorgement to the plaintiff of any proceeds").

8           In asking the Court to disregard the Ninth Circuit's clear instruction, Google invites error.

9   Mot. 9-10. Other district courts have wisely declined such invitations. In *Brown v. Google*, for

10  example, Judge Gonzalez Rogers held that unjust enrichment is an available remedy for CDAFA

11  claims. 2023 WL 5029899, at *6-7 (N.D. Cal. Aug. 7, 2023) (citing *Facebook Tracking*, 956 F.3d

12  at 600).[3] Judge Chesney held that plaintiffs asserting privacy torts, if successful, have "a right to

13  disgorgement." *Batis v. Dun & Bradstreet Holdings, Inc.*, 2023 WL 1870057, at *4 (N.D. Cal. Feb

14  9, 2023) (citing *Facebook Tracking*, 956 F.3d at 600). Judge Bashant similarly held that plaintiffs

15  asserting claims for invasion of privacy may seek disgorgement of profits. *Greenley v. Kochava,*

16  *Inc.*, 2023 WL 4833466, at *4, 11-12 (S.D. Cal. Jul. 27, 2023). These judges recognized what

17  Google refuses to accept: *Facebook Tracking* is binding law. As in *Facebook Tracking*, the facts

18  _____

19  [2] There is no textual or logical basis for Google's assertion that the CDAFA limits compensatory
    damages "to costs incurred 'to verify' whether a 'computer system' was damaged." Mot. 8. Under
20  Google's interpretation, victims could recover costs incurred to determine whether their systems
    were damaged, but would be unable to recover compensation for the injury itself—a nonsensical
21  result. And if compensatory damages were meant to include *only* these costs, the statute's separate
    reference to "compensatory damages" would be superfluous. Instead, the CDAFA *expands* the
22  damages available beyond more common forms of injury, to also include costs incurred to confirm
    that the wrongful conduct did *not* cause injury. Cal. Penal Code § 502(e)(1) (allowing recovery of
23  costs to verify that computers and data were "not altered, damaged, or deleted").

24  [3] Google's efforts to distinguish *Brown* are unconvincing. Mot. 10 n.6. There is no reason a
    plaintiff's entitlement to disgorgement would turn on whether that plaintiff had incurred costs to
25  determine whether its computers were damaged. Such costs are recoverable as compensatory
    damages, a distinct remedy. *TransUnion* is consistent with *Brown*, because those plaintiffs, like
26  these, suffered actual injuries to traditionally protected interests—not the mere risk of one. *See*
    Dkt. 314-3 (Class Cert. Mot.) at 22-23. And as explained *infra*, any requirement to show mistake,
27  fraud, coercion, or request applies when unjust enrichment is asserted as an independent cause of
    action, not when plaintiffs seek disgorgement as a remedy for unlawful conduct.
28

8

will show that Plaintiffs' app activity data "carr[ies] financial value," that Google took their data without authorization, and that Google's advertising business profited from its "unauthorized use of [class members'] data." 956 F.3d at 600-01. Plaintiffs are entitled to seek disgorgement.

Google's principal counterargument rests on a severe misunderstanding of the law of unjust enrichment. Google claims that California law requires plaintiffs seeking unjust enrichment to prove their own injury, and that the defendant earned the profits at issue through mistake, fraud, coercion, or request. As an initial matter, Plaintiffs *have* suffered injuries to their legally protected interests—that is the basis of this lawsuit. More fundamentally, this standard only applies when plaintiffs assert unjust enrichment as an "*independent cause of action*," alternatively called quasi-contract. *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038-39 (9th Cir. 2016); *see also Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). These requirements are appropriate to ensure that the defendant's profits were in fact unjustly acquired, and that the plaintiff has a claim to them. *See,* Restatement § 1 cmt. b (such claims arise when the defendant earned profits through "a transaction that the law treats as ineffective to work a conclusive alteration in ownership rights," even if not tortious). By contrast, when plaintiffs seek disgorgement of profits as a *remedy* for tortious or wrongful acts—as they do here—that predicate is necessarily established by the defendant's liability. *Meister*, 230 Cal. App. 4th at 398-99 ("The public policy of this state does not permit one to take advantage of his own wrong regardless of whether the other party suffers actual damage." (cleaned up)); *see also* Restatement § 44 cmt. a (distinguishing restitution claims without "separately identifiable misconduct on the part of the defendant"). Google's cases involve unjust enrichment as a cause of action, not a remedy.[4]

Google's remaining arguments fare no better. First, Google suggests that Plaintiffs have not suffered damage or loss sufficient to sustain a claim under the CDAFA. *See* Mot. 8-9 & n.5.

---

[4] *See Russell v. Walmart, Inc.*, 2023 WL 4341460, at *2 (N.D. Cal. Jul. 5, 2023) ("independent cause of action"); *Tunick v. Takara Sake USA Inc.*, 2023 WL 3958363, at *7 (N.D. Cal. Jun. 12, 2023) ("independent cause of action"); *Katz-Lacabe v. Oracle Am. Inc.*, 2023 WL 2838118, at *10 (N.D. Cal. Apr. 6, 2023) (Seeborg, C.J.) (dismissing "independent cause of action," but suggesting a different result where the defendant collects information "in a manner contrary to expectations created by the consent process"); *Hart v. TWC Prod. & Tech. LLC*, 2023 WL 3568078, at *5 (N.D. Cal. Mar. 30, 2023) ("independent cause of action").

9

1   Google is wrong, for reasons explained in Plaintiffs' motion for class certification. Class Cert.

2   Mot. at 17 (Google drained battery and resources from class members' devices, took data for which

3   there is a market, and earned substantial sums from its wrongful activities). Regardless, this is an

4   argument about Google's liability, not the availability of disgorgement if liability is established.

5   Second, Google contends that compensatory damages for invasion of privacy do not include

6   disgorgement of profits. Mot. 7-8. Of course not: "Disgorgement as a remedy is broader than

7   restitution or restoration of what the plaintiff lost." *Meister*, 230 Cal. App. 4th at 398. Plenty of

8   authority supports the distinct remedy of disgorgement in cases involving privacy torts, as

9   explained above. Finally, and although irrelevant, Google mischaracterizes Mr. Hochman's

10  testimony. Mot. 7. Mr. Hochman merely stated his "assum[ption]" that after Google wrongfully

11  collects and uses the data and devices at issue, it "has the best intentions" not to engage in one type

12  of data misuse. Mao Ex. 8 ("Hochman Tr.") at 364:2-365:5. His testimony does not suggest that

13  Google did not consciously violate Plaintiffs' rights.

14              **2.    Google's criticisms regarding Mr. Lasinski's unjust enrichment models
                       and the but-for world are legally and factually baseless.**

15          Mr. Lasinski's unjust enrichment models amply satisfy Plaintiffs' burden, which is to

16  "present evidence of the *total or gross amount* of the [defendant's] benefit, or a *reasonable*

17  *approximation thereof*." *Meister*, 230 Cal. App. 4th at 399 (emphasis added). Google faults Mr.

18  Lasinski for purportedly failing to consider the amount of ill-gotten profits that Google might have

19  recouped had it engaged in other hypothetical activities while refraining from the unlawful

20  conduct. But under black-letter law, the scope of disgorgement is not defined by "[t]he presence

21  or absence of but-for causation." *Uzyel*, 188 Cal. App. 4th at 894; Restatement § 51 cmt. f ("[A]

22  finding that the defendant would have realized the profit in any event does not compel the

23  conclusion that the defendant, under the circumstances, has not been unjustly enriched."). If

24  wrongdoers could evade disgorgement by hypothesizing some reason they might have earned the

25  profits regardless, restitution would become a cap on liability, and defendants "would rarely be

26  discouraged" from violating the law. *See Oracle Am., Inc. v. Google Inc.*, 2016 WL 1743154, at

27  *4 (N.D. Cal. May 2, 2016) (excluding defendant's expert opinion regarding profits defendant

28

10

might have earned if it had acted lawfully). "[T]he purpose of the disgorgement remedy would be eviscerated." *Id.* Plaintiffs are entitled to seek disgorgement of tainted profits that Google *actually* earned from Google's unlawful conduct.

To the extent but-for profits in some way could constrain an unjust enrichment award (and they do not), *Google* would bear the burden of quantifying the profits it might have recouped. Under California law, it is on the defendant to offer "evidence of costs, expenses, and other deductions to show the actual or net benefit the defendant received," and "the residual risk of uncertainty in calculating net profit is assigned to the wrongdoer." *Meister*, 230 Cal. App. 4th at 399 (cleaned up); *see also Sheldon v. Metro-Goldwyn Pics. Corp.*, 106 F.2d 45, 48 (2d Cir. 1939) (Hand, J.) (the wrongdoer "carries the burden of disentangling the contributions of the several factors which he has confused").[5] Google has utterly failed to carry this burden. At most, Google and its experts toss out some possible mitigating factors; they do not even claim to measure the appropriate adjustments. Knittel Tr. 176:8-21, 185:18-186:4, 218:6-11 (speculating that Google's "very smart people" could "potentially think of a way" to recoup lost profits). Regardless, any appropriate adjustment would not require exclusion of Mr. Lasinski's disgorgement models, which Google tacitly concedes at least calculate Google's gross benefit from (s)WAA-off data.

Unsurprisingly, Google offers no authority that would justify upending these established principles of unjust enrichment. Google relies heavily on *Silva v. B&G Foods*, in which the plaintiffs sought the remedy of "restitution," not unjust enrichment (i.e., *nonrestitutionary* disgorgement). 2022 WL 4596615, at *2 (N.D. Cal. Aug. 26, 2022). Those plaintiffs sought refunds for products they would not have purchased but for the defendant's misrepresentations— without evidence that their purchases were caused by that unlawful conduct. *Id.* Here, by contrast, Plaintiffs seek disgorgement of profits Google earned by using data it was not authorized to collect. The only other case Google cites is *Looksmart Group v. Microsoft*, in which the plaintiff sought compensatory damages for patent infringement, in the form of a reasonable royalty. 2019 WL 4009263, at *3 (N.D. Cal. Aug. 5, 2019). Unjust enrichment is not even available in utility patent

---

[5] Even though the burden is Google's, Mr. Lasinski adjusted his calculations to account for Google's incremental costs. *See* Lasinski Rep. ¶¶ 84-85, 94, 106-07.

11

1    cases. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 341

2    (2017). To put it simply, Google's authorities have nothing to do with unjust enrichment.

3         The fundamental error in Google's doctrinal position is clearly demonstrated by its

4    argument that in calculating unjust enrichment, Mr. Lasinski should have considered how

5    "consumers might have reacted" if Google had simply disclosed that it collects and uses (s)WAA-

6    off app activity data. Mot. 11. The thrust of Google's argument—unsupported by any evidence—

7    is that maybe Google could have obtained Plaintiffs' permission for free, or at low cost. Notice

8    that Google's argument simply transforms unjust enrichment into restitution, a distinct remedy.

9    As Judge Alsup explained in *Oracle*, accepting this sleight of hand would "eviscerate[]" the

10   deterrent "purpose of the disgorgement remedy." *Oracle*, 2016 WL 1743154, at *4 (Google's

11   version of unjust enrichment would be equivalent to "actual damages" instead). Moreover,

12   Google's argument would allow powerful companies to disregard users' permission (or lack

13   thereof) with impunity knowing they could later suggest, however dubious, that they could have

14   gotten those permissions for free anyway. All of Google's criticisms relating to Mr. Lasinski's

15   unjust enrichment models are plagued by this doctrinal error. As set forth below, Google

16   compounds the problem with additional legal and factual errors.

17
18
        **a. Mr. Lasinski's Scenario One model reasonably approximates Google's profits attributable to its use of (s)WAA-off data to track and attribute conversions.**

19        In Scenario One, Mr. Lasinski calculates the profits Google earned from using the at-issue

20   data to track conversions and attribute them to Google-placed ads. Lasinski Rep. § 7.1. As

21   explained above (*see* Section II.B) advertisers pay ad networks not just to show ads, but to show

22   ads that cause viewers to take some desired action (e.g., purchases, downloads), called a

23   "conversion." Lasinski Rep. ¶ 23; Hochman Rep. ¶ 280. The more conversions Google or another

24   ad network attributes to its ads, the more revenue that ad network collects from advertisers. *Id.*;

25   Knittel Rep. ¶ 38 ("Attribution is thus a fundamental step for advertisers to understand the value

26   of ads and conversions."). To attribute conversions to its ads, Google needs two types of app

27   activity data: (1) detailed data regarding which ads were shown to which users, as well as when

28

1    and where; and (2) detailed data regarding those users' later behavior. Hochman Rep. ¶¶ 281-282.

2    Google collects this data from (s)WAA-on and -off users alike, across multiple mobile apps and

3    devices. In the but-for world, Google would not have collected either type of data from (s)WAA-

4    off users, and therefore it would not have attributed conversions—or earned any associated

5    profits—from (s)WAA-off users. Lasinski Rep. ¶ 78; Hochman Rep. ¶¶ 280-282; Knittel Rep.

6    ¶ 35. Mr. Lasinski reliably measures these profits.

7        Google's counterarguments begin with a misleadingly incomplete description of its

8    business model.[6] Google claims it does not charge for the *literal service* of tracking and attributing

9    conversions. Mot. 12-13. But even Google cannot escape the simple fact that this service generates

10   advertising revenue, because advertisers pay Google for *conversions Google attributed to its ad*

11   *placements*. Google keeps (s)WAA-off records to feed its bottom line. In the ordinary course of

12   business, Google recognizes that losing the ability to attribute conversions means losing money.

13   Before Google rolled out a new feature that blocked one type of conversion-tracking on one

14   category of internet traffic (a feature it called "ChromeGuard"), Google estimated its anticipated

15   revenue loss using the very same analysis Mr. Lasinski employs here.[7] *See* Mao Ex. 7 at -72-75

16   (calculating "revenue impact ratio[s]" by multiplying impacted traffic percentage by percentage

17   of revenue attributable to "conversion-based autobidding"); Lasinski Rep. ¶ 102 (citing analysis).

18       Google attempts to distinguish its ChromeGuard analysis by claiming that in this case,

19   unlike with ChromeGuard, third parties other than Google could still track conversions. Mot. 14.

20   But once again, Google speaks in misleadingly narrow terms. Third-party analytics providers like

21   Kochava can collect *some* data regarding users' behavior, but they do not collect app activity data

22   reflecting the ads Google serves and places. Only Google, as the ad network, collects that critical

23   _____

24   [6] Google appears not to challenge the reliability of Mr. Lasinski's Scenario One model as it pertains
     to AdMob and Ad Manager. The Motion references only App Promo and associated unjust
     enrichment ($332 million), neglecting to mention Mr. Lasinski's other calculations.

25   [7] Google says that the ChromeGuard analysis "does not measure anything close to a 'full
     restitution,'" apparently because Google estimated that the lost revenues would be only a

26   "miniscule amount." Mot. 10-11. But the ChromeGuard analysis estimated *greater* lost revenues

27   than Mr. Lasinski's models in this case. Mao Ex. 7 at -470 ($200 million annual revenue loss);
     Lasinski Rep. ¶ 114 ($332 million App Promo revenue loss over more than six years). In any event,

28   these results are due to the *percent of traffic affected*, not any methodological difference.

piece of the attribution puzzle. *See* Hochman Rep. ¶¶ 280-82 (attribution requires data collected via GMA SDK); Black Tr. 34:3-35:10 (app analytics companies rely on data saved by ad networks). In fact, *Google's own experts agreed* that third-party analytics providers perform attribution only by asking Google to review its own records of ads served. Black Tr. 34:3-34:16; Knittel Rep. ¶ 35; Knittel Tr. 177:1-10. In the but-for world, Google would have no (s)WAA-off app activity data, and third-party analytics providers could not attribute (s)WAA-off users' conversions to Google's ads. The upshot is that whichever analytics provider an advertiser uses, Google would earn nothing from (s)WAA-off conversions—just like with <mark>ChromeGuard</mark>.

Regardless, Google's vision of the but-for world is speculation, unsupported by even the thinnest of reeds. Consider what Google suggests regarding the behavior of the advertisers that bid against GA4F in the real world. Google suggests that in the but-for world, these advertisers would bid instead on other conversion types, which Google (erroneously) claims would enable Google to earn the same profits from (s)WAA-off conversions. Google offers no reason why its inability to attribute (s)WAA-off conversions would cause advertisers to change their entire bidding strategy to help Google's bottom line. Worse, Google offers zero evidence that any advertiser would actually react in this way.

Mr. Lasinski's analysis is plainly "'tied to the facts' in the record," and is accordingly admissible. *BJB Elec.*, 2023 WL 4849764, at *4 (Seeborg, C.J.). Google's contention that Mr. Lasinski's "facts [are] incorrect or inappropriate to use is an argument best left for trial." *Id.*

### b. Mr. Lasinski's Scenario Two model reasonably approximates Google's profits attributable to its use of (s)WAA off data to serve and monetize advertisements.

In Scenario Two, Mr. Lasinski calculates the profits Google earned from advertisements it served to (s)WAA-off users during the Class Period, on the assumption that Google depends on (s)WAA-off data to serve and charge advertisers for these ads. Lasinski Rep. ¶ 113; Lasinski Tr. 103:20-104:4. Although Google asserts that Mr. Lasinski's assumption is "unsupported by anything in the record," the truth is quite the opposite: There is so much evidence in the record that there can be no genuine dispute that Mr. Lasinski's assumption is correct. Mot. 15.

14

Mr. Hochman, Plaintiffs' technical expert, explained at length why Google depends on (s)WAA-off data to serve and charge advertisements to (s)WAA-off users. Hochman Rep. ¶¶ 6, 118-31, 270-72; Hochman Tr. at 205:6-207:3. When a user visits a page in an app, Google uses the GMA SDK to collect an "ad request," which conveys an avalanche of valuable data. Hochman Rep. ¶ 130 (reproducing sample ad request, containing the user's IP address, the type and version of the user's device and operating system, the app the user visited, additional unique cookie values and identifiers, and much more information). This ad request spurs Google to select an ad from one of its advertisers, then close out the request by serving the ad to the user. *Id.* ¶ 271-272. Google knows when and where to serve ads because it collects ad requests. *Id.* And Google can charge advertisers because it maintains records of ads requested and served. *Id.* ¶ 122; Hochman Tr. 205:6-207:3. Google cannot even argue with Mr. Hochman's opinions: Google's own technical expert corroborates them. *See* Black Tr. at 216:19-217:3, 219:20-221:14; *see also* Mao Ex. 9 at -74 (explaining the "[l]ife of an ad request," from collection through ad selection). Mr. Lasinski *did* explain all this during his deposition, but Google apparently wasn't listening. Lasinski Tr. 101:19-102:8 (Google could not serve ads to (s)WAA-off users because "there would be no ad requests that Google would [] receive," meaning that Google would lack a "signal to serve an ad"). Mr. Lasinski's eloquence when explaining the full technical details is irrelevant; that is Mr. Hochman's territory. Lasinski Rep. ¶ 113 & n.207 (relying on Mr. Hochman); Lasinski Tr. 277:12-23.

Google's next argument is another cheap trick. Google misconstrues Plaintiffs' claims to relate only to the collection of one particular identifier, called "device ID." Mot. 15. Because Google serves ads to some users without collecting device ID, Google claims that it can serve ads without engaging in the conduct at issue in this case. But as Google knows, Plaintiffs allege that Google lacks permission to save ***any app activity data at all***. *See, e.g.*, Dkt. 289 ("FAC"), ¶ 1 ("This case is about Google's surreptitious interception, collection, saving, and use of consumers' highly personal browsing histories on their mobile devices."). ***Plaintiffs' claims are not limited to Google's collection of device ID or any other specific identifier***, of which there are many. *See* Hochman Rep. ¶¶ 100-113, 123-131 (describing dozens upon dozens). Google fails to cite anything even remotely suggesting its made-up limitation exists anywhere in the record.

15

### B.    Mr. Lasinski's actual damages model is relevant and reliable.

Mr. Lasinski's quantification of actual damages and restitution is well-supported. Lasinski Rep. ¶ 69. As explained (*see* Section II.C), Mr. Lasinski used an industry-recognized, market-based approach, relying on market-tested evidence to reach a fair value for the at-issue (s)WAA-off app activity data. Mr. Lasinski canvassed the market for real-world transactions suggesting Google's willingness to pay for app activity data, and users' willingness to relinquish the privacy of their app activity from Google. Lasinski Rep. ¶ 132. Mr. Lasinski identified four comparable transactions, involving AT&T, Nielsen, a company called SavvyConnect—and Google. *Id.* ¶¶ 132-51. Through its Screenwise program, Google actually pays users to monitor their activity. *Id.* ¶¶ 135-42. Two particular payments stand out: Google pays users $3 per month to track their activity on a mobile phone and an additional $3 per month to track their activity on a tablet. *Id.* ¶ 141. Notably, with both devices the primary tracking activity is done over apps. Accordingly, in Mr. Lasinski's judgment, this is the most reliable evidence of Google's willingness to pay for data and users' willingness to relinquish their privacy from Google. *Id.* ¶ 151. Mr. Lasinski arrives at a classwide damages estimate by multiplying $3 by the number of class-member devices. *Id.* ¶¶ 160-61. The basis of Mr. Lasinski's opinion is no "mystery." Mot. 20. That is how much Google itself is actually willing to pay, and users are willing to accept. Google's criticisms are theater.

#### 1.    Mr. Lasinski uses a widely accepted methodology.

Every day in boardrooms and courtrooms, businesspeople and experts value assets by reference to payments made in real-world transactions in which a comparable asset was exchanged. *See Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 333-34 (S.D.N.Y. 2022) (expert valuation based on comparable transactions was reliable); *TVIIM, LLC v. McAfee, Inc.*, 2015 WL 4148354, at *3-4 (N.D. Cal. Jul. 9, 2015) (same); *Hoffman v. L&M Arts*, 2013 WL 432771, at *12-14 (N.D. Tex. Feb. 5, 2013) (same). The International Valuation Standards Council calls this the "Market Approach" and explains that "comparing the asset with identical or comparable (that is[,] similar) assets for which price information is available" "provides an indication of value." Mao Ex. 10 at 34-35 (International Valuation Standards (Jan. 2022)). The Organization for Economic Co-Operation and Development explains that personal data (and the

choice to expose it) can be valued using observed "[m]arket prices for data." Mao Ex. 11 at 19-20. Since the days of Adam Smith, market-based analysis has been "a well-known and fundamental principle used in a variety of financial calculations." *BJB Elec.*, 2023 WL 4849764, at *3. Google's own expert recognizes that Mr. Lasinski uses a "methodology." *See, e.g.*, Knittel Rep. § X (repeatedly discussing "Mr. Lasinski's methodology for calculating 'actual damages'").

Mr. Lasinski is well-qualified to perform this analysis. Mr. Lasinski is an expert in valuation, finance, and accounting. Mr. Lasinski has been trusted by clients in the Internet technology, wireless communications, and software industries (among many others) to perform valuation analysis just like this one, in litigation and otherwise. Mr. Lasinski has successfully valued consumer data, too: He offered a reliable expert opinion in *Brown v. Google*, and he also valued a consumer data asset in the context of an acquisition. Lasinski Tr. 43:21-45:7. In this case, Mr. Lasinski applied "the same level of intellectual rigor that characterizes the practice of an expert in" valuation. *Kumho Tire*, 526 U.S. at 152. Mr. Lasinski even went further and incorporated Google's "own data," which "show[s] how [Google's] business work[s] in practice." *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 888-89 (9th Cir. 2014) (holding expert opinion based on such data to be "relevant and reliable"). His methodology and opinion are reliable.

### a. Mr. Lasinski's actual damages model is independently supported.

Google complains that Mr. Lasinski offered (and Judge Gonzalez Rogers accepted) a similar model in *Brown*, 2022 WL 17961497, at *5. Give points for creativity: Rarely is a litigant brave enough to argue that the *acceptance* of an expert's model in one case warrants the *exclusion* of that expert's similar model in another. Of course, there is a reason litigants do not normally feature this argument—it highlights the model's reliability.

In determining whether a particular methodology is reliable, judges routinely cite to their peers' opinions in other cases, the more similar the better. And make no mistake—the data in this case is quite similar to the data Mr. Lasinski valued in *Brown*. Like Incognito users in *Brown*, (s)WAA-off users in this case did not give Google permission to collect their app activity. As in Incognito mode, Google collects the data anyway, using its trackers embedded in third-party apps (or, as in *Brown*, websites). To be sure, this case involves app activity rather than web history, but

17

for these purposes that is a distinction without a difference: Apps are the primary way mobile users access the internet. *See* Hochman Rep. ¶ 1 & n.4. Like web history, app activity data reveals a host of personal information about the user, including medical history, sexual orientation, political leanings, religious affiliations, and reproductive cycles. *See, e.g.*, FAC ¶¶ 13, 227; Hochman Rep. ¶¶ 188, 311; Dkt. 314-6 ("Schneier Rep.") ¶¶ 89-99. Google argues that the data in *Brown* is different because it is "mixed with 'regular' data in 'the same logs,'" but Google neglects to mention that it concealed that information until months after Mr. Lasinski issued his *Brown* report (and even after *Daubert* briefing and argument concluded). Mot. 16-17.[8] These mixed logs are unnecessary to both the *Brown* model and the *Brown* court's analysis. And while Google contends that only the data in *Brown* is used for personalized advertising, Google does not explain how that factored into Mr. Lasinski's *Brown* opinions, nor does Google offer any citation reflecting that it even does.[9] Finally, Google claims in both cases that it keeps the data at issue separate from the user's identity. *See, e.g.*, *Brown*, Dkt. 908 at 9-10. The similarities dwarf the differences.

In light of these similarities, Mr. Lasinski has every reason to determine that the closest comparator is the same in both cases. Nobody but Google would argue, for example, that one house's sale price cannot be used to estimate the value of two or more other properties in the same neighborhood. Google's own expert, Dr. Donna Hoffman, disagrees with Google's unusual view that consistency amounts to unreliability.[10] In any event, the relevance of any factual differences between cases should be explored through cross-examination, not disqualification. *Upstate Jobs*

---

[8] *See Brown v. Google LLC*, No. 4:20-CV-3664-YGR (N.D. Cal.), Dkt. 521 (ordering service of opening expert reports by April 15, 2022); Dkt. 772 (minute entry for October 11, 2022 argument on Google's motion to strike Mr. Lasinski's opinions); Dkt. 844-2 at 6 (explaining that Google revealed that it stores "unauthenticated" Incognito data in the same log as "authenticated" data tied to a Google account in response an October 27, 2022 Order to Show Cause).

[9] Google argued in *Brown* that Mr. Lasinski *failed* to account for personalized ads, which Google characterized as a "benefit." *See Brown v. Google*, No. 4:20-CV-3664-YGR, Dkt. 662 at 17-18.

[10] When Dr. Hoffman was told significant portions of her report in this case are word-for-word identical to a report she offered in another case, she was not surprised. Mao Ex. 12 ("Hoffman Tr.") at 127:20-25. Dr. Hoffman explained that she would expect "fragments or sentences" to appear across reports because she "ha[s] opinions that [she] ha[s] formulated," and she has offered them in more than one case. *Id.* at 128:1-16. She explained that the same opinion "could be relevant to dozens of cases," and repeating material is just "doing [her] job." *Id.* at 130:24-131:17.

18

1  *Party v. Kosinski*, 559 F. Supp. 3d 93, 126 (N.D.N.Y. 2021), *appealed on other grounds*; *SEC v.*

2  *Nutmeg Grp., LLC*, 2017 WL 1545721, at *5 (N.D. Ill. Apr. 28, 2017).

3      Google focuses so much attention on *Brown* that it fails to appreciate the ways in which

4  Mr. Lasinski's model is further tailored to *this* case. For example, Google contends that Mr.

5  Lasinski simply "copy-paste[d]" his $3 estimate from *Brown* into this case. That is false. Mr.

6  Lasinski's model is based on wholly distinct payments to Screenwise participants. Google pays

7  participants $3 per month to track their activity in web browsers (the input Mr. Lasinski used in

8  *Brown*), and pays an *additional* $3 to track activity on a mobile device (the input used here):



Figure 46
Ipsos Screenwise Panel – Summary of Rewards and Payments per Recruitment Survey[235]

14  Lasinski Rep. ¶ 141 & fig.46. That Google pays the same amount for two different types of tracking

15  cannot be used to criticize Mr. Lasinski, other than to erroneously suggest he recycled an input.

16  Mr. Lasinski confirmed he didn't copy the $3 figure—Screenwise did. Lasinski Tr. 291:4-17.

17      Google next criticizes Mr. Lasinski for suggesting a one-time payment, even though

18  Screenwise payments were monthly. Google says this suggestion is "inexplicable," but once again,

19  Mr. Lasinski's testimony provides the answer Google claims is missing: ***Google deleted the data***

20  ***necessary to conclusively determine whether it collected (s)WAA-off data from a particular***

21  ***device in a given month***. Lasinski Tr. 57:14-58:7. Early in the litigation, Plaintiffs asked Google

22  to preserve (s)WAA-off activity data, which would have done the job. But Google refused, arguing

23  that "***the actual data Google received … cannot possibly bear on the viability of Plaintiffs' claims***

24  ***or Google's defenses***." Mao Ex. 13 at 5. When the parties briefed the dispute, Google's position

25  carried the day. *See* Dkt. 185. Now that the trap has been laid, Google weaponizes the absence of

26  data it insisted was irrelevant and could be deleted without prejudicing Plaintiffs. Google's

27  gamesmanship should not be countenanced. *See Eastman Kodak Co. v. S. Photo Mats. Co.*, 273

28  U.S. 359, 379 (1927) ("[A] defendant whose wrongful conduct has rendered difficult the

19

ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."); *cf. Raffin v. Medicredit, Inc.*, 2017 WL 131745, at *6 n.5 (C.D. Cal. Jan. 3, 2017) (rejecting argument against class certification that was affected by the "defendant's own destruction of records").

As Mr. Lasinski explained during his deposition, at least a single $3 payment is justified because the Firebase and GMA SDKs are so prevalent that it is effectively certain Google collected app activity data from each (s)WAA-off mobile device during one period or another. Lasinski Tr. 62:6-14; *see also* Hochman Rep. ¶¶ 2, 59, 355-56. But without the data that Google deleted (over Plaintiffs' objection), Mr. Lasinski was not equally certain about the *precise number* of months during which Google collected (s)WAA-off app activity data from a mobile device. Lasinski Tr. 61:17-62:2. *See Pet Food Exp. Ltd. v. Royal Canin USA, Inc*., 2011 WL 6140874, at *5 (N.D. Cal. Dec. 8, 2011) ("'mathematical precision' is not required in calculating the extent of damages."). So Mr. Lasinski did what trustworthy experts do: He erred on the side of caution, calculating these damages with only a one-time payment. Lasinski Tr. 62:3-5. Google's suggestion that Mr. Lasinski should have gotten more "creativ[e]" and that conservatism is "no rationale" at all reflects on Google, not Mr. Lasinski. Mot. 18. What Google is really saying, with a straight face, is that Mr. Lasinski's actual damage opinions should be stricken because the actual damages he prescribes are not high enough. If Google honestly believes a $3 payment is inadequate, that problem is easily solved: Plaintiffs welcome a stipulation that Mr. Lasinski's estimated payment should apply on a per-month basis over the class period, based on class members' (s)WAA settings. Either way, Google should not be permitted to benefit even more from its deletion of data than it already has.

**b.  Mr. Lasinski chose conservative inputs, not cherrypicked outliers.**

California law does not demand that damages be determined with mathematical precision. That is because damages calculations often involve counterfactuals, and counterfactuals create uncertainty. Instead, the law asks plaintiffs to offer only a "reasonable approximation" of damages, based on "some reasonable basis of computation." *Acree v. Gen. Motors Acceptance Corp.*, 92 Cal. App. 4th 385, 398 (2001). Notwithstanding that license, cautious and fair experts often resolve uncertainty in the opposing party's favor, to ensure that their opinions do not stray onto shaky

20

ground. Even if not required for admissibility, that conservative approach strengthens the expert's opinion. *See Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

As is his practice, Mr. Lasinski selected conservative inputs for his actual damages model. Mr. Lasinski identified four real-world transactions that reflect on the value of the data at issue. In addition to Google's Screenwise Panel, Mr. Lasinski considered transactions involving AT&T, Nielsen, and SavvyConnect. Lasinski Rep. ¶¶ 135-50. Each might support a higher valuation of the at-issue data. *See* Lasinski Rep. ¶ 144 (AT&T: $29 per month); *id.* ¶ 149 (Nielsen: $50 per year); *id.*at ¶ 150 (SavvyConnect: $5 per month, per device). Still, Mr. Lasinski determined the most reliable indicator is the Screenwise Panel. *Id.* ¶ 151. As the only one involving Google itself, Screenwise is the best evidence of Google's willingness to pay and users' willingness to divulge information to Google. Lasinski Tr. 263:16-264:4. In Mr. Lasinski's experience in valuation, the seller's demands may differ based on the identity of the buyer. Lasinski Tr. 243:19-244:10 ("That happens all the time in transactions."). The identity of the buyer matters, especially when the seller has a continuing interest in the asset being sold—as sellers of personal information do. Applying his expert judgment, Mr. Lasinski relied on Screenwise. And because that is the lowest-paying comparable, any uncertainty is resolved in Google's favor.

Google relies heavily on *In re Apple iPhone Antitrust Litigation*, but that case could hardly be more different. 2022 WL 1284104 (N.D. Cal. Mar. 29, 2022). There, Judge Gonzalez Rogers excluded an expert who selected *aggressive* but-for commission rates that were *not* supported by true market evidence. *Id.* at *4-5 (expert relied on an unprofitable rate set as part of a "litigation decision" and a briefly-discounted rate used by a "failed company" that "closed its doors less than a year later"). Where McFadden cherrypicked favorable outliers divorced from market forces, Mr. Lasinski looked to true market transactions and relied on the best, most conservative indicators— most notably, transactions *with Google*. Judge Gonzalez Rogers recognized the difference: She denied Google's substantially similar *Daubert* motion less than nine months later. *Brown*, 2022 WL 17961497, at *5 (Mr. Lasinski's analysis was "logical and reliable" because it uses "what Google actually pays Screenwise participants," which is a "conservative" rate).

21

Google claims that Mr. Lasinski "didn't even bother" reviewing comparable transactions, but of course that is not true, as Google concedes in a footnote. *See* Mot. 19 & n.10. What Google means is that Google would have identified *different* comparators, namely app analytics companies. Mot. 19. Arguments about the "comparator" selected "go to the weight of the testimony and its credibility, not its admissibility." *Alaska Rent-A-Car*, 738 F.3d at 970; *In re NFL's Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *9 (C.D. Cal. Feb. 7, 2023); *In re Juul Labs, Inc.*, 2022 WL 1814440, at *20 (N.D. Cal. Jun. 2, 2022) (criticisms about "inputs used" "go to weight, not admissibility"). Besides, app analytics companies are bad comparators. Unlike app analytics companies, Google saves what we search for on the web (via Search), what videos we watch (YouTube), what emails we send (Gmail), what websites we visit (Ads & Analytics), what documents we save (Drive), what photos we take (Photos), and what text messages we send (Messages). Calling Google an "app analytics company" is like calling Amazon a virtual bookstore. Google offers no reason to believe users' willingness to provide app activity data to app analytics companies, which see only a sliver of that sensitive data, is reliable evidence of their willingness to provide that data to *Google*, which knows so much about them—and it is doubtful, as these users specifically sought to keep this data private from Google. Plus, the indirect relationship between users and app analytics companies makes it difficult to reliably measure the value exchanged. Lasinski Tr. 246:15-21. Google's preferred comparators are unlikely to yield "any better information" than Google's own prices. Lasinski Tr. 246:3-14.

There is no basis for Google's representation that Screenwise data is "completely unrelated" to app activity data. In Screenwise, Google pays for mobile data—the great majority of which is app activity data. *See* Hochman Rep. ¶ 1 & nn. 3-4 (87% of mobile users' usage time occurs in apps). Google uses class members' devices in the same way here. Google's lawyers call it "record-keeping," but a banal label cannot mask the sensitivity of the data collected. Even Google recognizes that seemingly mundane data can be as revealing as melodrama. Mot. 20 (timestamps reveal a "melancholic pause" and the anticipation of "later regret"). If that is true of Screenwise, it is also true of app activity data. Consider what it reveals about a user who makes a purchase, checks a budgeting app, then returns the item; or a user who uses the Bible app every

22

1    night, then suddenly stops; or a user of a dating app focused on same-sex relationships. Google

2    also claims that (s)WAA-off data is not linked to an "account," but Mr. Hochman explains how

3    (s)WAA-off data is saved alongside persistent, unique identifiers and other data linked to users.

4    *See* Hochman Rep. ¶¶ 301-34. Screenwise does involve some data not at issue here, such as web

5    browser activity or communications sent by WiFi. *See* Lasinski Rep. ¶ 141 & fig. 46 (showing

6    separate payments for tracking via a router or web browser). But Mr. Lasinski accounted for these

7    differences by *excluding* those separate components from his model.

8         Boiled down, Google's argument is that Mr. Lasinski's selected comparators are not the

9    ones Google would have chosen. The law is clear: That type of argument "go[es] to the weight of

10   the testimony … not its admissibility." *Alaska Rent-A-Car*, 738 F.3d at 970.

11              **2.    Google's claims of variance among class members are meritless.**

12        Google's assertions regarding variations in class members' app usage and attitudes towards

13   privacy likewise provide no basis for exclusion. Rule 23(b)(3) requires plaintiffs to "show that

14   'damages are capable of measurement on a classwide basis,' in the sense that the whole class

15   suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal

16   theory." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017). But it does not follow that

17   variance among class members forecloses class certification or renders a damages model

18   unreliable. *See, e.g.*, *McCrary v. Elations Co.*, 2014 WL 12589137, at *9-10 (C.D. Cal. Dec. 2,

19   2014) (rejecting argument that "restitution models are unreliable because they fail to account for

20   individualized differences in decision-making among class members").

21        Restitution may be measured by "the price [Google] has expressed a willingness to pay"

22   or "the market value of the benefit," neither of which implicates users' subjective feelings and

23   unique activities. *Brown*, 2022 WL 17961497, at *5 (quoting Restatement § 49). Google pays all

24   Screenwise participants who register a mobile device the same $3, without regard to their online

25   activities, extent of use, or personal beliefs about privacy. Lasinski Rep. ¶¶ 141-42. According to

26   Google's expert, Google pays this amount to attract users "representative of the online population,"

27   which includes so-called "privacy fundamentalists" and non-fundamentalists alike. Knittel Rep.

28   ¶ 147. In sum: Google is willing to pay $3 even for data belonging to non-privacy fundamentalists,

23

1   and even ==privacy fundamentalists== are willing to accept $3 in exchange for the injury to their peace

2   of mind. Google offers no evidence of outliers, but regardless, Mr. Lasinski's model provides a

3   "reasonable approximation" of damages and restitution. *Acree*, 92 Cal. App. 4th at 398. Google's

4   contention that Mr. Lasinski "fail[ed] to include variables" at most affects "probativeness, not …

5   admissibility." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002).

6       Google discusses *Opperman v. Path*, 2016 WL 3844326 (N.D. Cal. Jul. 15, 2016), but that

7   expert's opinion is easily distinguishable. There, the expert offered a damages opinion based

8   entirely on a survey of class members' subjective valuations. *Id.* at *14. Even though subjective

9   valuations were the exclusive source for the model, the expert offered only a single, average

10  figure—hypothesizing without evidence that the average is fair compensation. *Id.* ("there [was] no

11  way of knowing" whether the average would approximate damages). By contrast, Mr. Lasinski's

12  key input was the market-tested, uniform rate Google paid and users accepted for their data. Mr.

13  Lasinski does not speculate on the fair and reasonable value: The market proves it. *See Area 55,*

14  *Inc. v. Amazon.com*, 2012 WL 12846975, at *6 (S.D. Cal. Jul. 24, 2012) (defendant's "sales data

15  and business practices" "constitute[e] a sound economic and factual predicate" for expert opinion);

16  *see also McCrary*, 2014 WL 12589137, at *9 (damage models may use "average price").

17      Google's other cases are equally unpersuasive. In *Hart v. TWC Product and Technology*

18  *LLC*, the defendant's practices "were not uniform with respect to the members of the proposed

19  class," meriting differing restitution awards. 2023 WL 3568078, at *12 (N.D. Cal. Mar. 30,

20  2023).[11] Google, on the other hand, uniformly pays Screenwise participants $3 regardless of their

21  app usage and privacy beliefs. *Utne v. Home Depot U.S.A., Inc.* also did not involve uniform

22  market transactions. 2022 WL 16857061, at *5 (N.D. Cal. Nov. 10, 2022). There, Home Depot

23  did not pay part of its employees' wages, in amounts that varied between class members (some of

24  whom had not been underpaid at all). *Id.* Screenwise values class members' data equally.

25

26  [11] Google also incorrectly intimates that restitution must account for any "benefit the user got in
    exchange for providing the data." Mot. 23; *see In re Tobacco Cases II*, 240 Cal. App. 4th 779, 792

27  (2015) ("the difference between the price paid and actual value received is *a* measure of
    restitution" but not "the exclusive measure"). In any event, Google fails to articulate any benefit

28  class members receive from Google's unauthorized collection of their data, and there is none.

1    Google's remaining arguments are easily dismissed. First, Google regurgitates its earlier

2    argument regarding comparable transactions, Mot. 19, 23, which has nothing to do with variation

3    between class members and goes only to weight. *Alaska Rent-A-Car*, 738 F.3d at 970. Second,

4    Google argues that Mr. Lasinski has not shown that plaintiffs have "lost money or property." Mot.

5    25. "[L]ost money or property" is an element of statutory standing to sue under the Unfair

6    Competition Law and False Advertising Law—claims not at issue here. *Compare Ji v. Naver*

7    *Corp.*, 2022 WL 4624898, at *9 (N.D. Cal. Sept. 30, 2022) ("FAL claim," requiring "economic

8    injury"), *and Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1040 (N.D. Cal. 2019) (UCL claim,

9    requiring "lost money or property"), *with* Cal. Civ. Code § 1708.8(d) (providing for

10   "disgorgement" in analogous statutory privacy claims). As explained above, restitution can be

11   measured by the defendant's "willingness to pay" or "the market value of the benefit." Restatement

12   § 49. Regardless, users' data "has monetary value for which they were not paid," and the California

13   Consumer Privacy Act confers "a property interest in their data." *Brown*, 2023 WL 5029899 at

14   *21.

15   Consider the audacity of Google's position. In the ordinary course of business, Google

16   pays willing users a flat fee for data. When caught taking similar user data without permission,

17   Google suddenly believes a flat fee (and certainly *its* flat fee) is actually an unreasonable way to

18   compensate users for data. Google says this would not account for "the amount of data Google

19   received" from each user. Mot. 23. But recall that **Google deleted the data it received from each**

20   **class member because, in Google's words, "the actual data Google received … cannot possibly**

21   **bear on the viability of Plaintiffs' claims or Google's defenses."** Mao Ex. 13 at 5. To top it off,

22   Google argues that if someone is not planning to sell their data, Google can simply take it and pay

23   nothing. Google's interest is not in getting the law right, but in getting away with robbery.

24   **V.    CONCLUSION**

25   For these reasons, Google's motion to exclude Mr. Lasinski's opinions should be denied.

26

27

28

25

1

Dated:  September 7, 2023                         Respectfully submitted,

2

                                                  By:  /s/Mark C. Mao

3

                                                  Mark C. Mao (CA Bar No. 236165)
4                                                 mmao@bsfllp.com
                                                  Beko Reblitz-Richardson (CA Bar No. 238027)
5                                                 brichardson@bsfllp.com
                                                  BOIES SCHILLER FLEXNER LLP
6                                                 44 Montgomery Street, 41st Floor
                                                  San Francisco, CA 94104
7                                                 Telephone: (415) 293 6858
                                                  Facsimile (415) 999 9695
8

9                                                 David Boies (admitted *pro hac vice*)
                                                  dboies@bsfllp.com
10                                                BOIES SCHILLER FLEXNER LLP
                                                  333 Main Street
11                                                Armonk, NY 10504
                                                  Telephone: (914) 749-8200
12

13                                                James Lee (admitted *pro hac vice*)
                                                  jlee@bsfllp.com
14                                                Rossana Baeza (admitted *pro hac vice*)
                                                  rbaeza@bsfllp.com
15                                                BOIES SCHILLER FLEXNER LLP
                                                  100 SE 2nd Street, Suite 2800
16                                                Miami, FL 33131
                                                  Telephone: (305) 539-8400
17                                                Facsimile: (305) 539-1307
18

19                                                Alison L. Anderson, CA Bar No. 275334
                                                  alanderson@bsfllp.com
20                                                M. Logan Wright
                                                  mwright@bsfllp.com
21                                                BOIES SCHILLER FLEXNER LLP
                                                  725 S. Figueroa Street, 31st Floor
22                                                Los Angeles, CA 90017
                                                  Telephone: (813) 482-4814
23

24                                                Bill Carmody (*pro hac vice*)
                                                  bcarmody@susmangodfrey.com
25                                                Shawn J. Rabin (*pro hac vice*)
                                                  srabin@susmangodfrey.com
26                                                Steven Shepard (*pro hac vice*)
                                                  sshepard@susmangodfrey.com
27                                                Alexander P. Frawley
                                                  afrawley@susmangodfrey.com
28

26

Ryan Sila
rsila@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330

Amanda Bonn (CA Bar No. 270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
Michael F. Ram (CA Bar No. 238027)
mram@forthepeople.com
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

*Attorneys for Plaintiffs*

27