# EXHIBIT 17

# MAO DECLARATION
# ISO PLAINTIFFS'
# MOTION FOR CLASS CERTIFICATION

# DOCUMENT SOUGHT TO BE SEALED

# WILLKIE FARR & GALLAGHER LLP

One Front Street
San Francisco, CA 94111
Tel: 415 858 7400
Fax: 415 858 7599

April 23, 2021

**SENT VIA EMAIL**

Boise Schiller Flexner LLP
Mark C. Mao
(mmao@bsfllp.com)
Beko Reblitz-Richardson
(brichardson@bsfllp.com)
James Lee
(jlee@bsfllp.com)
Rossana Baeza
(rbaeza@bsfllp.com)
Jesse Panuccio
(jpanuccio@bsfllp.com)

Re: **Anibal Rodriguez, et al., v. Google LLC, Case No. 3:20-CV-04688**
 **Custodians and Search Terms**

Counsel:

I write concerning Plaintiffs' April 1 letter concerning custodians and search terms.

### I.   Google's Three Proposed Custodians: Ganem, Ma, and Monsees

Google has identified three custodians covering the main issues in this case: Steve Ganem (Google Analytics for Firebase); Francis Ma (Firebase SDK); and David Monsees (the Web & App Activity control).

For **Ganem and Ma**, your letter proposes, as we discussed during our call, that "[b]ecause their responsibilities focus on Firebase (including SDK and Google Analytics), Google would search for and produce documents that relate to Web & App Activity, using the Web & App Activity terms [Plaintiffs] proposed in [their] February 24 letter." Those search terms are:

> WAA! or W&AA! or "Web/App"
> ~~web! /3 app!~~
> "app activity"
> "allow Google to save"
> "activity controls"
> "activities and info you allow Google to save"
> "your Google Account"

42430469.1

>   "your searches and activity"

Google agrees to apply these search terms with the exception of the crossed-out term "web! /3 app!" to Ganem and Ma's ESI in order to identify responsive documents. The crossed-out term appears to hit on a number of false positives. If you'd like us to test a more narrowed version, we can.

For **Monsees**, similarly, your letter proposes that "[b]ecause his responsibilities focus on Web & App Activity, Google would search for and produce documents that relate to Firebase, using the Firebase SDK & Analytics terms" that follow:

>   Firebase
>   "Firebase SDK" or "Firebase Software Development Kit"
>   "Google Analytics for Firebase"
>   "GA for Firebase"
>   "apps using Google Analytics"

Google agrees to apply these search terms to Monsees' ESI in order to identify responsive documents.

In order to identify responsive documents other than those expected to be found by the above search terms for these three custodians, based on our investigation of potential search-term hits, likely false positives, and the types of documents these custodians are expected to have, Google is willing to apply the following terms to the ESI of Ganem, Ma, and Monsees:

>   "what we collect"
>   "data we collect"
>   "Google Dashboard"
>   "on/off /5 control"
>   "activities and info you allow Google to save"
>   "your searches and activity"
>   "apps using Google Analytics"
>   "data about app users"
>   automatic* /2 collect*
>   page_title
>   page_referrer
>   page_location
>   screen_resolution
>   correlate* /5 data
>   associate /2 account
>   "Screenwise Trends"
>   "Firebase Terms of Service"
>   "use policy"
>   "Google Analytics browser add-on"
>   "non-Google branded"
>   "defaulted to on"
>   (safeguard* /2 "your data")

- 2 -

42430469.1

    wiretap*
    "on-device search"
    "Google Data Collection"

Google reserves the right to object to the use of these terms with any other custodians later used in this case. Google also reserves the right to use other search terms of its own design in order to identify potentially responsive documents. The search terms that are not on this list were overbroad. Terms like "PII," "privacy," "profit*" and "My Account" are overbroad on their face. Others result in false positives that are extremely unlikely to be relevant in this case. Yet others are irrelevant on their face, such as GDPR, CCPA, and the name of Plaintiffs' expert, Doug Schmidt.

We look forward to your thoughts on this proposed compromise for search terms for these three custodians.

    **II.    Plaintiffs' Other Proposed Custodians**

Thank you for outlining Plaintiffs' position as to the ten additional custodians whose ESI Plaintiffs request that Google search for responsive documents in this case. As you know, Google believes that this case could be litigated without custodial ESI at all, since the central questions in the case are what Google represented to users and the actual technical functioning of the accused technology. Google has nevertheless sought to compromise by committing to searching the custodial ESI of the three custodians discussed above, who collectively cover the products and services implicated by Plaintiffs' allegations.

I will address each of the ten custodians below, but at a more general level, after seeing Plaintiffs' proposal, Google's position is that the parties should proceed with the three custodians identified above for now so that the parties can collectively decide if there are any gaps that need to be filled, and if so, by whose custodial ESI, rather than guessing in the abstract as to which custodians might fill those gaps. We understand that Plaintiffs' concern in this regard is a timing one – namely, that the fact discovery cutoff is in November, so Plaintiffs fear the whole process will take too long to play out. We understand that concern and are willing to work with Plaintiffs in moving expeditiously, and if necessary, in seeking an adjustment to the schedule to accommodate Google's proposal.

We look forward to hearing your thoughts as to this proposal.

    **a.    Sundar Pichai**

We understand Plaintiffs' main argument for seeking the custodial ESI of Google CEO Sundar Pichai is that "he has been involved in key decisions relating to the Web & App Activity controls at issue in this lawsuit," because "in internal Google emails discussing user controls, one Google employee noted that Google 'went through a bunch of rounds on what the control should cover' and 'the strong feedback from PDPO & Sundar was to simplify and have fewer controls covering more things. The proposal now has a single control that covers all of WAA and SWAA.'" (quoting GOOG-RDGZ-00014262)).

42430469.1

We have reviewed this document and do not understand the connection between the decision this particular Google employee credits to Mr. Pichai and the claims at play in this case. It is clear from context that the decision at issue in the 2019 e-mail, long after Firebase was acquired, concerns whether there should be more or fewer controls over Google's *user data retention*, including data retained by WAA when it is turned on. The data retention control at issue is *separate* from the WAA control at issue in this case. There is nothing in the e-mail that suggests the decision at issue concerned the WAA control itself.

There is no reason to believe that the feedback this Google employee credits to Mr. Pichai had any relationship to Plaintiffs' claims that the WAA control was represented to users as controlling the flow of data from app developers to Google about the app activity on their apps. Plaintiffs' allegation is that the WAA control does not stop the flow of data from app developers via Google Analytics for Firebase to Google servers. Google's interrogatory responses have confirmed that it doesn't. Those data are anonymized, and they are sent to Google servers in a manner that is not linked to user profiles whether WAA is turned on or off.

Likewise, Plaintiffs' claim that Mr. Pichai made decisions concerning the overall data retention period for WAA is irrelevant to Plaintiffs' claims in this case. Regardless of the data retention period of WAA data, Plaintiffs' claim is that WAA doesn't affect the separate sending of data to Google servers via Google Analytics for Firebase.

As for the representations Mr. Pichai has made in public that Plaintiffs include in their complaint, they are all true, and none of them address the specific issues identified by Plaintiffs in this case. That Mr. Pichai has represented that Google has privacy controls, and that those controls give users control over their data, does not make his custodial ESI relevant to every case related to Google and privacy, no matter how tenuous the allegations. Plaintiffs have never identified a connection between Mr. Pichai and the functioning of GA for Firebase even while WAA is turned off. And we are aware of none.

Google is open to discussing this issue further if other documents produced in the litigation shed further light on Plaintiffs' claims about Mr. Pichai, but at this point, Plaintiffs' argument is simply far short of the required belief that Mr. Pichai's custodial ESI is likely to contain responsive documents.

And, as you know, there are significant reasons established in the law for avoiding the unnecessary production of the e-mail of a high-ranking official, in this case Google's CEO, based on a tenuous connection between that official and the subject of the case.

    b. **Jason Titus**

Your letter identifies the reason that Plaintiffs believe Jason Titus has unique responsive documents: that he headed Google's developer product group and worked on the development of the Firebase SDK. Google has identified the person most likely to contain responsive documents on this subject: Francis Ma, Director of Product Management for Firebase. If there are gaps in Mr. Ma's documents that you have reason to believe could be filled by Mr. Titus' custodial ESI, that is a bridge we can cross *after* Plaintiffs have reviewed Mr. Ma's e-mail.

    c. **Guemmy Kim**

42430469.1

Plaintiffs seek Guemmy Kim's documents because she is "a Product Manager of Account Controls and Settings at Google and offers unique, highly relevant, and non-duplicative discovery regarding the Web & App Activity feature that is at issue in this lawsuit." Mr. Monsees is most likely to have the custodial ESI bearing on the accused aspects of the WAA control. Google does not believe Ms. Kim is likely to have responsive documents that are not also duplicative of Mr. Monsees' documents, or of marginal additional relevance. We suggest Plaintiffs review Mr. Monsees' documents first.

      d. **Greg Fair**

Plaintiffs seek Greg Fair's documents "because he is a Google Product Manager who appears to have been involved in the development of My Account control settings (including Web & App Activity)." For the same reasons as stated above, Mr. Monsees is most likely to have responsive ESI on this subject, and Mr. Fair is unlikely to have relevant non-duplicative responsive material. Plaintiffs also allege that Mr. Fair made misrepresentations concerning Google Chrome in 2014, but this case is not about Google Chrome, and 2014 pre-dates the launch of Firebase SDK and the integration of GA for Firebase. To the extent Plaintiffs are looking for a general understanding of WAA's initial launch and development, we expect there will be sufficient documents to provide that understanding from Mr. Monsees' emails.

      e. **Jan Hannemann**

Plaintiffs seek Mr. Hannemann's documents because he is "a Google Product Manager who for many years has had a 'leading role on topics relating to only security and data privacy.'" Mr. Hannemann's role at issue is high level, and Plaintiffs haven't identified any reason to believe he was ever involved in decision-making that relates directly to the specific claim in this case concerning the connection or lack thereof between WAA and GA for Firebase.

      f. **Donald Harrison**

Plaintiffs seek Mr. Harrison's documents because he testified at the U.S. Senate concerning "consent" in general. But Plaintiffs don't identify any aspect of Mr. Harrison's testimony specifically concerning the issue in this case, nor do they explain why the sheer fact of that testimony would alone justify searching his documents. Plaintiffs' letter also surmises that Mr. Harrison will have documents "that bear on how Google has monetized the data that Google collects while users have Web & App Activity turned off and the critical strategic importance to Google of collecting that data with the Firebase SDK." But, as we have explained repeatedly, Google doesn't monetize users' activity data using Firebase SDK when WAA is turned off because the only such data collection is anonymized. Plaintiffs provide no reasons why they would believe Mr. Harrison has such documents, in any case, apart from his job title.

      g. **Eric Miraglia**

Plaintiffs seek Eric Miraglia's documents because he is the "Director of Product Management, Privacy, and Data Protection Office at Google," and because "a 2018 Google email contained notes from Mr. Miraglia concerning privacy issues involving Activity Controls (with Web & App Activity), where Mr. Miraglia reportedly stated that the 'Privacy Policy was hard to understand.'" (quoting GOOG-RDGZ-00015110). This is a mischaracterization of the document. The note attributed to Mr. Miraglia is vague, and there is no reason to believe he was referring to the specific portions of the Privacy Policy that expressly disclose information about Google Analytics. To the

42430469.1

contrary, it appears Mr. Miraglia was referring to something hypothetical. In any case, here again Plaintiffs aim too generally. It is not enough that a person has worked on "data protection and privacy issues," since that encompasses far more than what's at issue in this case. There is no reason to believe Mr. Miraglia's custodial ESI will contribute non-duplicative and relevant material.

### h. Rahul Roy-Chowdhury

Plaintiffs seek Mr. Roy-Chowdhury's documents because he is "the Vice President of Product Privacy at Google and served as a 'Product & UX lead for user trust, safety and privacy at Google.'" Here again, Plaintiffs' aim is too abstract. None of the articles by Mr. Roy-Chowdhury identified by Plaintiffs touch on the specific claim in this case – the connection or lack thereof between WAA and GA for Firebase. Mr. Monsees's documents will include responsive information concerning the WAA control, including about its design, and we are confident he is most likely to have the documents responsive to Plaintiffs' document requests.

### i. Keith Enright

For the reasons identified by Judge Van Keulen, among others, Google objects to a search of Mr. Enright's files for responsive documents, which would require an enormous privilege logging exercise and yield nothing relevant. Moreover, Mr. Enright's responsibilities are too high-level to bear on the specific issue raised by Plaintiffs' complaint.

### j. Stephan Micklitz

Plaintiffs seek Mr. Micklitz's documents because he is "the 'head' of Google's 'privacy hub' in Germany focusing on user controls." Plaintiffs surmise, based on Mr. Micklitz's job title, that he is "likely has highly relevant and non-duplicative information about Google's privacy efforts, including users' understanding of Google privacy controls." But there is no reason to believe Mr. Micklitz has custodial ESI responsive to the specific issue identified by Plaintiffs in their complaint, which relates solely to the functioning of GA for Firebase while WAA is off. That Mr. Micklitz's work relates to privacy issues is not enough to justify searching his e-mail.

Sincerely,

*/s/ Eduardo E. Santacana*
Eduardo E. Santacana