# EXHIBIT 8

# MAO DECLARATION

# OPPOSITION TO GOOGLE'S MOTION TO EXCLUDE LASINSKI

# DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ** C O N F I D E N T I A L **
 2   ** ATTORNEYS' EYES ONLY **
 3   UNITED STATES DISTRICT COURT
 4   NORTHERN DISTRICT OF CALIFORNIA
 5   SAN FRANCISCO DIVISION
 6   Case No. 3:20-CV-04688-RS
 7   -----------------------------------x
     ANIBAL RODRIGUEZ, et al. individually
 8   and on behalf of all others similarly
     situated,
 9
             Plaintiff,
10
11
        - against -
12
13
     GOOGLE LLC,
14
             Defendant.
15   -----------------------------------x
                June 26, 2023
16              10:05 a.m.
17
18      Videotaped Deposition of JONATHAN
19   HOCHMAN, taken by Defendant, pursuant to
20   Notice, held at the offices of Willkie Farr
21   & Gallagher LLP, 787 Seventh Avenue, New
22   York, New York, before Todd DeSimone, a
23   Registered Professional Reporter and Notary
24   Public of the State of New York.
25
```

Page 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   A P P E A R A N C E S :
 2   BOIES SCHILLER FLEXNER LLP
     725 South Figueroa Street
 3   31st Floor
     Los Angeles, California 90017
 4         Attorneys for Plaintiff
     BY:    HSIAO (MARK) C. MAO, ESQ.
 5            mmao@bsfllp.com
 6
 7   MORGAN & MORGAN LLP
     201 North Franklin Street
 8   7th Floor
     Tampa, Florida 33602
 9        Attorneys for Plaintiff
     BY:   JOHN A. YANCHUNIS, ESQ. (Via Zoom)
10           jyanchunis@forthepeople.com
             RYAN JOSEPH McGEE, ESQ. (Via Zoom)
11            rmcgee@forthepeople.com
12
13   WILLKIE FARR & GALLAGHER LLP
     One Front Street
14   34th Floor
     San Francisco, California 94111
15         Attorneys for Defendant
     BY:    EDUARDO SANTACANA, ESQ.
16            esantacana@willkie.com
              NOORJAHAN RAHMAN, ESQ. (Via Zoom)
17             nrahman@willkie.com
18
     ALSO PRESENT:
19     CARA HUNT, Summer Associate, Willkie (Via
       Zoom)
20
       JOHN BLACK (Via Zoom)
21
       PAUL BAKER, Videographer
22
23
24
25
                                              Page 2
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  into being contextual, but maybe there is
2  something else that we haven't thought of.
3      Q.    Okay.  But as far as you know,
4  you're familiar that Google uses the term
5  "contextual targeting" in their
6  developer-facing pages?
7      A.    Yeah, I'm aware of contextual
8  targeting from the ad platform side and
9  often that was referring to like based on
10 what words are in a content page on the
11 display network and what words the user --
12 the advertiser has specified in an ad
13 campaign, and they might say oh, okay, you
14 want to target people searching for white
15 sneakers and here is an article about white
16 sneakers, even though it is not a search,
17 it is just a context page, maybe we will
18 show your ad here because we think it is
19 especially relevant in this context.
20     Q.    Right.
21     A.    So that is kind of maybe a
22 little bit more specific than showing an ad
23 based on someone's language or their
24 general course location.
25     Q.    Right.  And from an internet

```
 1   marketing standpoint, in order to
 2   effectuate contextual targeting in a
 3   responsible way, Google has to say
 4   something about its serving of ads, some
 5   type of information?
 6        A.    I would even go further than
 7   that.  I would say that in order to serve
 8   ads, Google needs to retain some data in
 9   order to comply with industry standards.  I
10   think Google is a member of the Media
11   Rating Council and they are certified for
12   generalized and valid traffic detection and
13   sophisticated and valid traffic detection,
14   and that's ad fraud detection.
15        Q.    Okay.
16        A.    So when you want to charge
17   someone for ads, you actually have to
18   retain some data in order to prove good
19   delivery of the ads.  You can't just say
20   hey, I have shown your ad a million times,
21   give me the money.  You actually have to
22   have some proof from a vendor who is MRC --
23   ideally MRC certified who can provide some
24   reliable statistics.
25              This MRC was set up in the
```

Page 205

```
 1   1960s by the Congress because there at the
 2   time had been a lot of lying about
 3   advertising on like television, radio,
 4   newspapers, like lying about the reach of
 5   the advertising.  So Congress sort of
 6   decided to put an end to that and said
 7   let's certify the distribution of these
 8   ads.  So that has moved into the online
 9   era, and Google and Google Analytics are a
10   couple of the certified vendors.
11        Q.     Okay.
12        A.     That is more than what you
13   wanted to know about that, but it might be
14   helpful.
15        Q.     In the context of this case,
16   when we are talking about -- what's the
17   term you would use, bookkeeping,
18   recordkeeping, Ratings Council compliance?
19        A.     I would just say you want to
20   retain evidence of good delivery.  Because
21   one of the things as an advertiser that I
22   like Google for is that they try to
23   maintain a clean network.  They try to
24   protect me as an advertiser from ad fraud.
25   They tell us that they conduct proactive
```

1  investigations.  They have automatic
2  systems that detect fraudulent activity and
3  try to protect the advertiser from that.
4       Q.    Isn't one of the ways they
5  effectuate that by analyzing device ID and
6  IP address?
7       A.    Look, I can help you a little
8  bit there.  I've done a bunch of ad fraud
9  cases, and one of the things to do is to
10 look at the device ID and some of this
11 collected data.  So it is a known method
12 for detecting ad fraud.
13      Q.    Would Google have to drop that
14 detection method for sWAA-off users to
15 resolve the problems you've identified in
16 your report?
17      A.    I don't know.  Would there be
18 some way to work it out that these things
19 could coexist?  I'm not sure.  Again, I
20 would point back to my original
21 observation, which is Google has put itself
22 into a very difficult position by promising
23 the user, hey, we are going to be your
24 advocate for privacy and the vendors they
25 work with.  They've got some overlapping

1  and conflicting obligations, and that
2  creates a problem for them and maybe they
3  ought to focus on one business or the other
4  in order to do the best possible job for
5  each constituency.
6      Q.   Okay.  Well, but for now let's
7  assume that they are not going to drop
8  users or drop advertisers in the immediate
9  future.  The fraud detection mechanism that
10 you were just talking about it sounds like
11 relies on certain persistent or
12 non-temporary, non-transient identifiers,
13 right?
14      A.   This ends up being a deep
15 rabbit hole that we are going into here
16 about like how would Google do this.  I
17 mean, maybe there is some way that they can
18 work it out.  You know, maybe they can talk
19 to the advertisers and, you know, talk to
20 the industry standards and say hey, you
21 know, in order to respect privacy, we can't
22 collect this data for certain segment of
23 people who turn this off, but we know these
24 are real people because they've got Google
25 accounts.  You know, you have to have a

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1  that you were unable to answer that you
2  would now be able to answer given your
3  access to these Excel files other than the
4  two questions you already listed for me?
5       A.    Nothing immediately comes to
6  mind.
7       Q.    Okay.  So we will get to H2 in
8  a minute.  You had a colloquy with your
9  attorney about reidentification as
10 distinguished from joinability.
11      A.    Yes.
12      Q.    I understand the difference, I
13 think, of what you defined to be
14 reidentification is what you defined to be
15 joinability.
16            My question is, that definition
17 of reidentification doesn't appear, I don't
18 think, in your report, or really any
19 mention of it in your own words, though you
20 do quote one witness as using the word.  So
21 I'm trying to just process like in your
22 mind what relevance does that distinction
23 have to your expert opinions in the case.
24      A.    Well, throughout the day today
25 I haven't been using that word because it

Page 363

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   is a little bit jargony.
 2          Q.     Well, and because you didn't
 3   use it in your report.
 4          A.     Well, but I talked about -- I
 5   talked about it.  I talked about the idea
 6   that the data that includes identifiers
 7   someone can extract an identifier from a
 8   phone and they can now match it to the
 9   data.  So joinability is like taking two
10   pieces of data and putting them together,
11   whereas reidentification is you have some
12   external source of knowledge and you
13   combine it with a piece of data and now you
14   have reidentified the data.
15          Q.     Got it.  Are you opining in the
16   case that Google has engaged in
17   reidentification of sWAA data?
18          A.     No, I'm not saying that Google
19   is doing this.  I'm assuming that Google
20   has the best intentions here, but that the
21   problem is from threat actors or external
22   pressure applied to Google.  Some foreign
23   government goes and puts pressure on Google
24   to release some data or something else
25   happens that causes that data to go out of
```

Page 364

```
 1   Google's control and somebody else is
 2   exploiting it, and of course, I mean, there
 3   is always insider risk, and maybe Google
 4   changed its policy, maybe Google is nice
 5   today but they become evil in the future.
 6        Q.    Okay.  So on that subject, you
 7   said something about Google having
 8   separated them, "them" being I guess GAIA
 9   logs and non-GAIA logs, they can put them
10   back together.  Do you recall that?
11        A.    Yes.
12        Q.    And I think you said, for
13   example, under some type of legal pressure.
14   Do you recall that?
15        A.    That's a possibility, sort of a
16   risk as a security technologist that one
17   would analyze and recognize.
18        Q.    Just to be clear, you do not in
19   this case render the opinion that Google
20   has for any particular member of the class
21   or named plaintiff put them back together
22   under legal pressure or for any other
23   reason?
24        A.    No, I haven't given that
25   opinion.
```

Page 365

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1         Q.    Okay.  Then you guys talked
 2   about mobile app ads and display ads.  I
 3   just want to clarify something.  So mobile
 4   app ads is a buy-side concept, right, it is
 5   a type of ad campaign that an ad buyer
 6   would run?
 7         A.    Yes.
 8         Q.    And then when you were talking
 9   about display ads, was that whole back and
10   forth about from the sell side perspective,
11   if you are selling space in your app?
12               MR. MAO:  Objection to the form
13      of the question.  Go ahead.
14         A.    Yeah.  So I think that's a very
15   nice way of putting it, that as an app
16   publisher, you could be a buyer of
17   advertising and want to track conversions
18   for your campaigns to drive people into
19   your app and use it, but you also could be
20   hosting ads within your app and that
21   conversion needs to be tracked for those
22   ads so that the advertiser is willing to
23   continue paying for that space.
24         Q.    Right.  And I think if you
25   could look at paragraph 281 of your main
```

Page 366