# EXHIBIT 5

** C O N F I D E N T I A L **

** ATTORNEYS' EYES ONLY **

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Case No. 3:20-CV-04688-RS

-----------------------------------x

ANIBAL RODRIGUEZ, et al. individually and on behalf of all others similarly situated,

Plaintiff,

- against -

GOOGLE LLC,

Defendant.

-----------------------------------x

June 26, 2023

10:05 a.m.

Videotaped Deposition of JONATHAN HOCHMAN, taken by Defendant, pursuant to Notice, held at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York, before Todd DeSimone, a Registered Professional Reporter and Notary Public of the State of New York.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

A P P E A R A N C E S :

BOIES SCHILLER FLEXNER LLP
725 South Figueroa Street
31st Floor
Los Angeles, California 90017
Attorneys for Plaintiff
BY: HSIAO (MARK) C. MAO, ESQ.
mmao@bsfllp.com

MORGAN & MORGAN LLP
201 North Franklin Street
7th Floor
Tampa, Florida 33602
Attorneys for Plaintiff
BY: JOHN A. YANCHUNIS, ESQ. (Via Zoom)
jyanchunis@forthepeople.com
RYAN JOSEPH McGEE, ESQ. (Via Zoom)
rmcgee@forthepeople.com

WILLKIE FARR & GALLAGHER LLP
One Front Street
34th Floor
San Francisco, California 94111
Attorneys for Defendant
BY: EDUARDO SANTACANA, ESQ.
esantacana@willkie.com
NOORJAHAN RAHMAN, ESQ. (Via Zoom)
nrahman@willkie.com

ALSO PRESENT:

CARA HUNT, Summer Associate, Willkie (Via Zoom)

JOHN BLACK (Via Zoom)

PAUL BAKER, Videographer

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:05 a.m. eastern daylight time on Monday, June 26th, 2023. Please note that the microphones are sensitive and may pick up whispering and private conversations. Please turn off all cell phones at this time.

This is media unit one of the video-recorded deposition of Jonathan Hochman in the matter of Anibal Rodriguez, et al., versus Google LLC, filed in the United States District Court, Northern District of California. This deposition is being held at Willkie Farr & Gallagher LLP located at 787 Seventh Avenue, New York, New York.

My name is Paul Baker and I am the videographer, the court reporter is Todd DeSimone, and we are both from Veritext.

Appearances have been noted on the stenographic record. Would the court reporter please swear in the witness.

* * *

J O N A T H A N H O C H M A N,
called as a witness, having been first
duly sworn, was examined and testified
as follows:

EXAMINATION BY MR. SANTACANA:

Q. Good morning, Mr. Hochman. Our appearances are already on the record, so we will just get started.
You have been deposed before?
A. Yes.
Q. How many times?
A. Over 50.
Q. Okay. And you have served as a litigation expert before?
A. Yes.
Q. How many engagements roughly?
A. Hundreds.
Q. Hundreds. You are currently retained by the plaintiffs in this action?
A. Yes, I believe so, the class.
Q. And how many hours have you spent roughly on this engagement?
A. I'm not quite sure of my personal hours, but I know that between

Julie Burns and I it's a total of about I think 900 hours.

Q. Does she bill at your same rate?

A. No.

Q. What's her rate?

A. I don't remember exactly what it is for this case, but it's substantially less than mine.

Q. Roughly half?

A. Roughly a third.

Q. Roughly a third, okay. So blended, in total, do you have a sense of how much you're looking at in terms of revenue from the case at this point?

A. I'm not sure of the revenue. I'm not quite sure.

Q. How would you break down the 900 hours between you and Julie?

A. I'm not sure. I think she has probably put in more hours than I have, and that's my sense of it.

Q. 60/40, 70/30?

A. I'm not sure.

Q. Roughly how many hours do you

think you've put in, order of magnitude?

A. Hundreds.

Q. Hundreds. Did you review John Black's report?

A. Yes.

Q. Did you review the backup for the report?

A. Yes.

Q. What's Julie's role in all this?

A. Julie has been assisting me and she's especially good at fact checking. She is very detail-oriented and I have asked her to check all the references, and I think this report that I wrote, because of her help, has fewer little errors in it than the typical report.

I tried to get all the line numbers right, all the page numbers right, get every word right. She made a lot of little corrections where things were maybe not quite right, and she can also flag something if she sees something that is unclear, then I can go and pay attention to it and make sure it is more clear.

Q. Well, my compliments to Julie, I think she did a good job.

A. Oh, good.

Q. Did Julie do any of the programming, coding, test app type work, or was that all you?

A. That was me and other people.

Q. What other people?

A. The ones identified in the report. I have listed the other consultants who assisted me.

Q. Okay. Do they have separate -- a separate hours bucket than you and Julie?

A. So they're not billed through my firm, so I don't have insight into that.

Q. They are billed directly to the plaintiffs or the plaintiffs' lawyers?

A. I would assume so.

Q. Are those the Concur IP folks?

A. They are some of them.

Q. And is there another shop involved?

A. Well, the report lists the names of the various people and I'm not -- it is sort of -- I'm not sure who is

necessarily connected, how they are billing.

Q. Okay. But you directed their work?

A. Yes.

Q. And did you personally review the code that they wrote?

A. Yes, I reviewed everything that they did.

Q. Okay. Do you have a sense of how many hours they put into this?

A. I'm sure it's hundreds to thousands.

Q. How would you characterize their role on the case other than what's written in your report?

A. I mean, I think I've tried in the report to give an explanation.

Q. Okay.

A. And I think that that's, you know, a good explanation, what I wrote.

Q. Okay. So who is representing you in this deposition?

A. Mark Mao. He is I guess the plaintiff for the -- the plaintiffs'

counsel, and, well, it may be a legal question, is he representing me or is he just here, but he is defending my deposition.

Q. Okay. Well, have you retained him as your lawyer to respond to the subpoena, for example?

A. I know that one of the firms put together a response, I know that there was a subpoena, and I know that there was a response.

Q. Did you review the subpoena?

A. Yes.

Q. Did you review the response?

A. Yes.

Q. Did you approve it?

A. Yes.

Q. So have you retained any of those lawyers to be your lawyer in response to the subpoena?

A. That may be like a legal question, but essentially they're responding on my behalf.

Q. Let me ask it a different way.

Did you sign any retention

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

agreement or any engagement letter with any lawyers in response -- in relation to that subpoena?

A. I don't recall if there was something at an earlier stage in this process. I didn't sign anything within the last week or two. I don't remember signing anything in the last week or two. But it may be covered by some prior agreement.

Q. And you didn't pay anybody to respond to the subpoena for you or to defend your deposition?

A. I mean, that's not how it generally works, so no.

Q. Okay. Have you been retained by the Boies Schiller firm before?

A. No, other than the Brown case.

Q. So there is Brown and there is this. No other engagements with Boies Schiller?

A. No.

Q. What about Susman Godfrey?

A. I worked on a prior case with Susman Godfrey on a patent case for them.

Q. When?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

A. Several years ago.

Q. Retained by any other lawyers in this case for any other engagements?

A. No.

Q. Your report, I have a paper copy of your report here, or at least the written parts, the non-native parts of it, and there is also one on there. I don't think your report had a description of your assignment in the case. On page 7 it says Engagement. Paragraphs 9 through 12, would you say that's a fair, let me hand this to you, would you say that's a fair summary of your assignment in the case?

A. Okay, so before you asked the question you made an assertion, and I feel like the assertion wasn't in accord with what's in here.

Q. I'll withdraw it.

(Hochman Exhibit 1 marked for identification.)

Q. Let me instead just say I'm looking at paragraphs 9 through 12 of your report, which is Exhibit 1, which we have premarked. Is this a fair summary of your

assignment in the case?

A. Yes, I think this is a fair summary.

Q. Great, okay. And then looking at your table of contents now, just for the structure of your report, there is a Section VII, Opinions, and that has major headings under letters A through K. I understand there are sub-opinions to each one of those opinions, but is that a fair summary of the opinions you've rendered in the case?

A. I think so.

Q. And are there any opinions you've rendered in this case or conclusions you've come to that are not reflected -- I'm sorry, let's pause there. All right, let me try again.

Have you rendered any opinions or come to any expert conclusions in this case other than those reflected in your report?

A. I think all of them are documented in the report.

Q. Did you, coming back to your

assignment there on paragraph 9, did you do your best to complete that assignment truthfully, honestly and according to a sound methodology?

A. Yes.

Q. Is it your role in the case to provide opinions that are favorable to either party?

A. No.

Q. How would you describe your role as an expert witness?

A. I'm a neutral, so my job is to explain the facts as accurately as I can and to provide opinions that are as accurate as I can.

Q. And that's the case even if those facts turn out to lead to a conclusion less favorable to the people who retained you, right?

A. That may happen sometimes.

Q. Did it happen in this case?

A. I don't recall it happening, but if I did find something I would have told the attorneys about it. I would have said oh, there's a problem with your

argument here, you need to adjust it.

Q. Okay. But sitting here today, you don't recall coming to any conclusions that are less favorable to the people who retained you; is that fair to say?

A. Well, I'm not necessarily thinking about what's favorable or unfavorable, I'm thinking about what's accurate, and I don't necessarily even know what's favorable or not because part of that may turn on legal questions, which I'm not opining about.

Q. Okay. So when you say there's a problem with your argument, you may want to adjust it, is a better way to say that there is a problem with the facts as you believe them to be, this is what the facts really are?

A. If I were to say something like that to a client, which does happen, you know, regularly, it's usually that I've seen some additional fact that they're unaware of or they have misinterpreted something. It is really fairly common when a law firm comes in to me with a case that

they've not completely accurately assessed it.

Q. Sure.

A. And sometimes there are adjustments. I explain it, what I've seen, and I investigate and I tell them, okay, here's, you know, an issue with your theory where it's not exactly right, you know, the real situation is a little different.

Q. Okay.

A. And that's part I think of what a good expert will do.

Q. If it turns out that you have made mistakes in your report, are you open to correcting those mistakes?

A. I'm all about the accuracy, so if there are mistakes, I would, in general, with all reports, endeavor to correct them.

Q. And would you agree with me that your obligation to provide neutral expertise here doesn't end with your report, if you discover something after the report is done that indicates you were wrong about something, you are obligated to admit that, right?

A. I would issue a correction or supplementation if there is a problem, if a problem is discovered, because, as you can see, the report is voluminous, it is quite huge, and I'm not so proud that I wouldn't admit an error, especially with something so large. There is -- there is -- well, it is hard to be perfect as a human. There is usually some kind of error rate with all -- with human-mediated process there is usually an error rate.

Q. I think you said you did review the Black report and the backups?

A. Yes.

Q. You did that review personally?

A. Yes.

Q. And what about Julie Burns, did she do any fact checking of that report?

A. I had -- I did ask Julie to read over that report and give me her impressions of it.

Q. Sitting here today, is there anything, based on anything you've learned since you served your final report, is there anything that you want to correct in

this report?

A. Not yet.

Q. Okay. I want to ask you some questions about the limits of your opinions in the case, if I can.

So are you offering any opinion in this case as to what consumers believed or expected?

A. I don't think so. That doesn't sound like something I've opined about. Maybe as we go through the report we will find something I've said, but that doesn't seem to be one of the main things I was opining about, no.

Q. Are you an expert in consumer expectations?

A. Well, I have expertise in internet marketing, internet security, so I know something about consumers and consumer behavior online, and, well, I will give you an example, if you have a setting in a piece of software, I might sometimes comment, you know, most people will use software with the default settings, all right, because that's kind of a well-known

fact, and if you're in this field you should know that.

Q. Have you developed any expertise about consumer behavior online apart from what are otherwise well-known facts about consumer behavior online?

A. I mean, when I say well-known facts, these are well known to people who are experts in this stuff, they are not necessarily well known to the layperson. But I have understandings about how consumers, you know, interact with ads, how they interact with web pages, how they interact with apps, I have to have some knowledge of that in order to do my job.

Q. Sure. Well, and I just want to be clear, my question is not if you have some knowledge about it. My question is do you consider yourself to be an expert in this case about consumer expectations?

A. Well, I think I answered it before, and the way I answered it before, I think that was a good answer. I would just sort of repeat that, you know, that doesn't seem to be one of my main opinions.

Q. Well, okay, I mean, with respect, your answer was basically I don't know, I would have to look at my report.

A. Well, no, that's not exactly what I said. What I said was I don't think that's one of the opinions I'm giving, not one of the main opinions. There might be something tangential somewhere which touches upon that, so I don't want to be categorical and say absolutely nothing at all, but that's not the thrust of my opinions.

Q. Fair enough. Would you consider yourself to be a consumer privacy expert?

A. I have expertise in the issue of privacy. I have done academic work in that area. As far as consumer privacy, I don't think I'm here as the consumer privacy expert.

Q. Okay. Are you offering any opinion in this case as to whether Google misled its users?

A. So I think in this case I've talked about how the, technically, for

example, the WAA/sWAA switch, I have called it a fake control, because it doesn't do -- technically doesn't do what it seems it should do. So I have to -- there is some -- I guess there is a little bit of overlap into that, but I'm not giving you a legal opinion about, you know, about that, I'm simply opining about the technology, how does the technology work.

Q. Is another way to say that that you see your role here as comparing what Google said it would do and at a technical level what Google does or did?

A. It may even be simpler than that. It just is I am going to explain what this control does, what it does, and if I comment on what impression this is going to give people or what impression even Google's own staff have about this or their confusion about it, I think I have a number of paragraphs that talk about how even the Google insiders are confused about how these controls work. It looks like even Sundar Pichai is confused about how this control works because he testified in

front of Congress and told them something that is just wrong from a technical perspective, you know, I am commenting on the technology, but I may make some other comments about people's impressions because it helps to establish the relevance of the technical analysis.

Q. What relevance do Sundar Pichai's comments at Congress have to have with the way the control works or doesn't work?

A. Well, it's in my report. We can -- we can go down, it's towards the end of the report I think.

Q. I'm asking about your answer. You said that it helps establish the relevance of the technical analysis to make comments about what Googlers think or what Sundar Pichai said. I'm curious what the connection is between, for example, the CEO's testimony in Congress and how the button actual works at a technical level.

A. Well, I think it's going to be relevant to help resolve the case to observe what the public statements by

Google are, that this is the way this thing works, versus how it actually works, which is what I'm providing, how does this thing actually work.

Q. Okay. So that brings us back to my original question, which is you looked at both what Google said about how it works and also how it works in your report?

A. My report is primarily about how it actually works. I have some comments along the way noting things that Google has said on its web pages, things that Google -- how the user interface looks, what Google's inside staff have said about it, what Sundar Pichai said about it, and I think all these facts are pertinent and relevant and that the factfinder should take them into consideration.

Q. In deciding what?

A. The ultimate issues in dispute.

Q. Why do you think the factfinder should take them into consideration?

A. Because they seem relevant.

Q. Why do they seem relevant?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

A. Because they seem to shed light on the issues that are in dispute.

Q. What do you mean by that?

A. Well, I've read the complaint and I've read the answer and I've read a bunch of other documents in the case and I have a general idea of what the dispute is about.

Q. Okay. So then can you tell me how it sheds light on the dispute?

A. I mean, to me it's sort of just logic, it's someone should understand is this control working as advertised, does this control work the way it's supposed to.

Q. How did you come to a conclusion about what the control is supposed to do?

A. Well, I think that may be something that, you know, the factfinder needs to determine, because I think that that might be in dispute. Google might have one position, this is what the control is supposed to do, and the plaintiffs might have a different position there.

Q. So I think you said earlier a

few minutes ago that you came to the conclusion that the WAA control is a fake control because it doesn't do, quote, "what it seems it should do." I assume by that you meant what it seems to you it should do?

A. Well, it's not just me.

Q. Sure. But -- well, what did you mean when you said "what it seems it should do"? That's based on your understanding of it?

A. Well, it's based on my understanding of it and it's also based on the understanding of the various people I've quoted and cited in the report who have also made comments, and it is also based on looking at the user interface and seeing what's shown to the user.

Q. On you looking at the interface?

A. I have looked at the interface and other people who are quoted have also looked at the interface and it's -- it looks like it is a control that allows users to have some privacy and to not have

their sensitive information, what is the word I want here, to not have their sensitive information harvested and saved.

Q. What does "harvested" mean in that sentence?

A. It means -- another way to look at it is the user is in some app and they are doing some activity and they would like that activity to remain private. They don't want that activity recorded, copied off somewhere else, or the expectation is not to have that information copied off somewhere else and stored somewhere else, especially when that activity is being stored with Google identifiers that link to them.

Q. Okay. So back to your prior answer, and, again, for now I'm just trying to understand the limits of your opinion, apart from what it seems to you the control should do and the quotations you referenced that are in your report, is there any other basis for your conclusion about what the WAA control should do?

A. I mean, I have my experience in

working with technology and working as a security technologist for many years. I have my academic study of the topic.

Q. So, sorry, when I say what it seems to you, I'm including all of your expertise, all of your experience, everything. I'm just saying, again, I'm just trying to understand what you are and aren't opining on.

So you said that it seems the WAA control should do something, and we will get into what that something is. What it seems the WAA control should do to you and the people you quote in the report, I understand that. Is there any other opinion, basis, like a consumer survey, other documents that are not cited in the report, other experts you are relying on, is there anything like that informing your statement that the WAA control seems it should do something in particular?

A. Okay. So, well, I'm going to go through the list that you gave and I don't mind if the question was compound, but you have asked about a number of

different things and I will try to remember them all, and remind me if I miss any.

Q. Well, the question is, is there anything other than you and what's in your report?

A. So I'm not relying on other experts' opinions. For example, I'm not relying on anything Bruce Schneier has said because I know he has covered some of these topics extensively.

Q. All right.

A. And I'm not being redundant with his opinions. He's got his opinions and my opinions are designed to be technical and to not be redundant with his.

I am not relying on documents that I haven't cited into the report other than, you know, sort of education and expertise and everything I have absorbed from everything I have ever read, but I'm not relying on specific citations that I haven't disclosed here.

And there was I think a third thing you mentioned, which I have now forgotten.

Q. Surveys.

A. Surveys. I am not a survey expert, so I have not done surveys and I don't do surveys.

Q. And you don't cite any in your report as a basis for your opinion on what WAA should do, right?

A. I don't necessarily -- I don't necessarily want to make a categorical statement like that, but I don't recall citing such a thing. Whatever is in the report speaks for itself.

Q. Okay, good.

And I assume you're not offering any opinion as to whether Google has violated any law in particular?

A. No, I am not a lawyer.

Q. And you are not offering any opinion as to whether Google has committed any particular invasion of privacy or violation of the California constitution?

A. I am not giving any sort of legal opinion.

Q. And you're not offering any opinion as to the damages that Google

CONFIDENTIAL - ATTORNEYS' EYES ONLY

should pay in this case?

A. I haven't put forward a damages number. I believe that the damages experts may be relying on some of the statements that I've made in my report or in conversation they had with me.

Q. Yeah, that reminds me, you had some conversations with the damages expert, Mr. Lasinsky, prior to him serving his expert report in the case, right?

A. I believe so.

Q. How long were those conversations?

A. It was a while ago, so I don't remember the exact length, but it was long enough to go over the issues and have a sort of complete discussion of them and make sure he understood.

Q. So can you give me a sense of what "long enough" means? Five minutes? Five hours? Five days?

A. Well, more than five minutes, and less than five hours.

Q. Okay. In total?

A. I believe so.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. And have you had any conversations with him since he served his report?

A. I don't recall, because I don't necessarily have it in mind when exactly he served his report and when exactly I had conversations with him.

Q. Have you had any conversations with him since you served your report?

A. I'm not sure. I wouldn't say for sure that I haven't, but I don't recall having a conversation with him after serving my report, but I'm not sure, because I don't recall if he served his report after my report. I don't remember.

Q. Do you remember the last conversation you had with him?

A. I'm not sure I remember with specificity the last conversation. I just remember having spoken with him on a few occasions.

Q. What did you talk about?

A. It would have been this case, the things that I would have spoken about with him recently.

Q. Did you relay anything to him that is not reflected in your report about the technology in this case?

A. I don't think so. I think that what I explained to him was just sort of a summary of what's already in the report. But the report, as you can imagine, is very detailed and goes into great depth, and for a nontechnical person it's not certain that they could understand the whole thing.

Q. Did he seem to understand it?

A. He seemed to understand what I explained to him.

Q. Do you know if he has reviewed your report?

A. I don't recall. He might have. I don't recall.

Q. Did you express any opinion to him about the damages Google should pay in the case?

A. No.

Q. Let's talk about injunctive relief. Did you -- well, first, let me ask you, there is an opinion in your report, a set of opinions, about how Google could

change its practices and other things Google could do. It's the last major opinion in the report.

A. Are you referring to K?

Q. Yes. My question is about the limits of this opinion. Are you opining that Google should do these things or are you opining about what Google could do?

A. I'm opining about what is technologically feasible.

Q. Okay. You're not opining as to what you think Google should do?

A. That seems to be more of a legal question, so no.

Q. Okay. And are you in this opinion, were you responding to a prompt about -- strike that.

You list three major things Google could do. It could change how WAA functions, it could purge certain things, and it could delete certain things, is how I would describe your opinion. So just stick with me for a second. My question is how did you come up with those items of things Google could do? Were you asked can

Google do one of the following things, or were you asked a more general question and you came up with your own?

MR. MAO: Just objection to the form of the question. The document speaks for itself. Go ahead.

A. All right. So let me just take a quick look through it, because the answer might be in here in fact.

Q. Sure. It's at 168.

A. Yes, I'm there.

(Witness perusing document.)

Q. And just generally speaking, Mr. Hochman, I will try not to waste your time and ask you questions that are answered by the report today.

A. Fair enough.

Q. I may not succeed, but I will try.

A. And in response to that courtesy, I will also try to give you the information you are seeking even if you don't ask the question exactly the right way, because I prefer to take the high road.

Q. Well, as you've said, you're not a lawyer.

A. So I don't recall exactly how, you know, there is, obviously in this case, there is a discussion between me and my clients. They asked me what I think, I asked them what their questions are, and I'm not sure exactly whether they asked me a general question, whether they asked me specifics on each of these points. I just don't recall.

Q. Yeah. It's just as a reader of your report, right, paragraph 9 says you were retained to develop opinions concerning the technology and practices at issue, and you get to page 168 and that's all you've talked about, and then just right out of nowhere you say I think Google could change the following things, and it is just kind of jarring, like it is unclear why you are even considering whether Google could change those things.

Do you recall where that came from?

A. I mean, I think what it arises

from is that I'm aware that the plaintiffs are asking for injunctive relief and then so it becomes well, what sort of injunction should we ask for, like what can they do, what's feasible or not. Because I would imagine the plaintiffs don't want to ask Google to do something that's impossible, because that would be silly.

Q. Okay. So fair to say, then, that this is not meant to be an exhaustive list of what I will say -- what I will call corrective measures that might exist in this case or injunctive relief that would satisfy the plaintiffs' claims, it's a list, but it's not exhaustive?

A. The way I look at this section, these are examples. These are examples of things that Google could do.

Q. Okay.

A. That are feasible, that Google could do what's in 409, Google could do what's in 410.

Q. Okay.

A. So that's the purpose of that section.

Q. Got it. All right, let's talk about the phrase "Google account." So your report defines this phrase at paragraph 111. If you could just flip to that for me.

A. One minute. Give me a second to read it just before you ask the question because it will -- it will work better that way. 111, are you sure that's the right paragraph?

Q. No, I'm not. 136.

A. Okay.

Q. And in particular the footnote, 104.

A. Okay, just a second.

(Witness perusing document.)

A. Okay, yes, I see that.

Q. Okay. So just to put it in the record, your footnote says that "Google Account" means the trove of data that Google collects and saves regarding a user, including data that Google characterizes as pseudonymous. Do you see that?

A. Yes.

Q. Okay. The first question is

just throughout your report wherever you say "Google Account" with a capital A on "Account," is it fair to assume that's the definition you were using?

A. That's a great question, because this term "Google Account" is sort of like the word golf club, it could refer to the building and the golf course, like the Hartford Golf Club, but it could also refer to the implement of destruction that you use to tear up the grass when you flub the ball.

Q. How many times have you used that one?

A. Never. First use.

Q. It's pretty good.

A. Thank you. In internet terminology, an account can sometimes mean a log-in, right? So I have two Google accounts, I have a personal log-in and I have a Yale University log-in which is powered by Google, all right? So I'm talking about log-ins there.

An account, in internet terminology, when you think of an account

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

on a platform, that is the -- includes the data related to that user, that's their account, or their account data is the whole trove of information that relates to that user.

So I tried to be controlled in my language, but that one I'm pretty sure I may have crossed the wires at some point in the report. So we should probably look at instances that concern you and clarify them, if there is any instance that you think I may have said Google account when I really meant Google log-in, we should -- we can clear that up.

Q. Okay. That's good to know. Because I do -- I want to understand what you mean whenever you mention Google account in the report, which is mentioned a lot, and sometimes it is capitalized and sometimes it's not. Is it -- would you say, generally speaking, the definition in 104 is the one you were working with but sometimes the wires might have gotten crossed and you used log-in instead?

A. Well, I'm not sure that the

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

wires ever got crossed. It could be the case that it was all done perfectly, but it is also -- I'm just aware of the potential for confusion on that issue.

Q. Yes.

A. So I just want to be -- alert you to that and make sure we are all clear. Because I think it is fair to be -- and we want to be clear. I don't want -- I don't want there to be confusion.

Q. Yeah. And, well, it is an important phrase because it appears in the description of the WAA control, right?

A. Well, where it appears in the description of the WAA control, that is Google's use of the phrase. What they think it means may be different than what I think it means.

Q. Understood. I'm just saying it's an important phrase in the case. So just to ask it again, generally speaking, when you used this term in your report, is the definition in 104, should that be the definition? I will cover maybe potential ambiguities, but I'm trying to figure out

what your default is.

A. Okay. So I'm saying here I am referring collectively to the trove of data that Google collects and saves regarding a user. So I'm aware that Google may save data in different locations, depending on where that WAA/sWAA switch is set. It is still collecting the same data and still saving it, but it may save it in different places, okay? Logically, it's -- the user's account, the accounting of the user's activity includes all their activity that relates to them.

Q. I understand the definition that you have written here. What I am -- what I am asking about is when you use the phrase "Google account" elsewhere in your report, is the default assumption -- the default assumption be that this is the definition that you were using or did you use different definitions in different contexts intentionally? I should say did you use different definitions in different contexts intentionally?

A. Let's put it this way, I

intended to be consistent, but there may be something where I'm saying Google, you know, if your sWAA and WAA setting is off, your history will not show up in your -- I might have said won't show up in your Google account, in other words, the page that Google displays to the user, which I think is how they described the Google account.

So I think you have to -- it's safest to look at the context, but you understand what my idea is, and then you should also look at the context and you've got a couple of hints there.

Q. Agreed.

A. About what's going on.

Q. I agree to do that and I'm not -- this is not an, oh, you used it here and it means something else, that's not what I'm trying to do, but I want to make sure that I understand the schema in your mind of "Google account" when you're opining in this report and using that phrase or, for example -- well, let's just say when you're using the phrase for now.

So when you're using the phrase, just to be clear, the definition in 104 is what you intended for the most part to be using unless the context indicates otherwise?

A. I think that's a pretty fair summary of what I've just said.

Q. Great, okay. There may be a few points where I want to clarify an ambiguity in the report, but I will come back to those later in the day.

So you are aware that your definition in 104 of "Google Account" differs from the definition that Google uses in its privacy policy, right?

A. So I'm aware that Google has a different idea of what that means. I've actually looked pretty hard all over Google's public-facing web pages to find an exact definition of Google account, and I don't believe there's a clear definition anywhere that I've found. I've looked for it.

Q. So the definitions that you've found on Google's web pages you think may

be confusing?

A. Well, I would say that I've looked for a precise definition and I haven't, because I would like to cite it, but I haven't -- it sort of is one of those terms that's just used but it kind of -- it's not necessarily made clear.

Q. Is that different than what I said? You find that Google's use of the term "Google account" on its web pages may be confusing?

MR. MAO: Objection to the form of the question. Go ahead.

A. So I don't want to opine about someone else's state of mind. What I'm saying is that in looking for this, it's -- "Google account" is a term that doesn't necessarily have a definition that's publicly facing that answers -- or that is responsive to the definition I'm providing in footnote 104.

Q. So when Google uses the phrase "Google account" on its web pages, is it confusing to you what precisely it means?

A. In the context of the WAA and

sWAA control, the idea that Google is -- when WAA is set one way is collecting and saving my data in my Google account for presentation to me in what they call the Google account or the pages that are made available to the user, that's one possibility, if the control is set that way. If those controls are turned off, Google is still collecting and saving that data with Google identifiers that link to me, but they are saving that data in some other place where I can't see it. So that's, in my opinion, counterintuitive.

Q. Understood, and I understand that from your report. I actually meant a slightly different question.

When Google uses the phrase "Google account," not just in the WAA page, it uses it in the privacy policy, elsewhere, you said you reviewed web pages that say that, right?

A. I look for the clearest definition I could find of "Google account" and I didn't find anything that was completely satisfactory to me in explaining

that, defining that.

And also just this whole golf club issue, I mean, there may be some cases where Google is also using that term to mean log-in. It is possible. And, I mean, maybe I should pose this back to you, which is if you think there is a good definition of it somewhere, like please do show it to me, let's discuss it, because I'm, as I said, all about the accuracy. I would like to be accurate and get to the bottom of this.

Q. Yeah, and I will give you the one from the privacy policy which John Black quotes in his report. But a couple more clarifying questions on sort of the terminology you used in your report.

Sometimes you quote Google employees in your report, and in those quotations sometimes the phrase "account" or "Google account" appear. When you did -- when you read those mentions of the phrase "Google account," did you understand the definition those employees to be using to be the same as yours or different or you

just weren't sure?

A. Okay, so I at least had in mind that they might use the term differently than I would, and I also had in mind that that term could depend on the context, were they referring to a log-in, are they referring to a specific web page that displays the user history, or were they referring to the actual trove of data that Google collects about each user.

Q. And is it fair to say that at least sometimes Google employees in the documents you reviewed were using the phrase "Google account" and GAIA ID interchangeably?

A. I mean, I considered that a possibility. We would have to go look at each one probably because it's, you know, it is highly dependent on context.

Q. Okay. You reviewed Google's interrogatory responses?

A. Yes.

Q. All of them or only certain ones?

A. I asked for them and I listed

the ones that I have received. I mean, there may be interrogatory responses that are just not even relevant to what I'm doing so I wouldn't want to be spammed with a bunch of irrelevant data, but I would have asked for and received everything that was relevant.

MR. SANTACANA: Okay. Let's go off for one second.

THE VIDEOGRAPHER: The time is 10:52 a.m. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 10:53 a.m. We are back on the record.

BY MR. SANTACANA:

Q. In the interrogatory responses you reviewed sometimes Google used the phrase "Google account," right?

A. Yes.

Q. In those instances did you understand the phrase "Google account" to be the same or different than your definition in footnote 104?

A. Oh, I understood it to be used the way Google uses it.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. And what is that -- what is the way that Google uses it?

A. I believe that Google considers the Google account to be the subset of the trove of data related to the user that is stored with their GAIA ID.

Q. Okay. And what is that belief based on?

A. Everything I looked at in this case.

Q. If you hadn't looked at nonpublic information, would that have been your belief? Well, let me strike that.

Before you started -- before you were engaged in this case or in the Brown case, before you were engaged by anybody who was suing Google, did you have an understanding what the phrase "Google account" meant?

A. I mean, I think I had a general understanding that it's oh, I can log in to Google and, oh, my account has some collection of data about me. But that's just a general -- it's not something I necessarily gave a lot of thought to and I

certainly didn't understand prior to studying everything in this case how the WAA and sWAA controls actually work. I had no idea that they behaved the way they do.

Q. At some point you were retained to work on these cases, these pair of cases against Google and you hadn't yet seen any nonpublic information, right? You reviewed the complaint, probably reviewed some web pages. At that point did you develop any preliminary opinions or understandings of what the phrase "Google account" meant?

A. I don't -- I think I was open-minded at the beginning and I looked at the information and tried to form my opinions after having reviewed things.

Q. Okay. So when you were first retained in this case, I assume you reviewed pretty early on the description of the WAA control, including the part which uses the phrase "Google account"; fair to say?

A. I don't know that I would put it that way just because early on I was focusing on the Brown case and I had a lot

to think about with that case, a lot to pay attention to there, and I don't know that I was thinking so much about this case at that point.

Q. I think the WAA control comes up in that case in some tangential way too, right? Had you reviewed it in that case before you were retained in this case?

A. I don't recall.

Q. Okay. So at some point you reviewed the complaint in this case, right?

A. Yes.

Q. And that includes descriptions about what Google tells users about what WAA does, right?

A. Yes.

Q. At that point did you have any sort of preconceived notions about what the WAA control should and shouldn't do or would and wouldn't do at a technological level?

MR. MAO: Objection to the form of the question. Go ahead.

A. I don't think so, no.

Q. You've used Google Analytics

before professionally, right?

A. Yes.

Q. And you have had Google accounts for a while?

A. Yes.

Q. Had you ever used the WAA button before?

A. I don't recall when I first used it. I do have it today set to off and I have sort of turned off a lot of the privacy things with Google and others. But there's -- I have a different reason for that.

Q. When you joined the case, was your WAA control on or off?

A. I don't remember.

Q. Did you have your Google account in 2016?

A. Yes. We should be clear, I have my personal Google account then.

Q. So I guess my question is at some point you reviewed the complaint and the allegations that the complaint makes?

A. Let me add one more thing. I also believe I have -- I may have even more

than two Google accounts because I have a few that are -- I have a startup that uses G Suite.

Q. Okay.

A. So I don't know that I have an exact count on how many different I have.

Q. That's okay. I don't need to know about them all.

A. Okay.

Q. So at some point in this case you had not yet reviewed any nonpublic information, no deposition transcripts, interrogatory responses, anything like that, but you had read the complaint; is that fair to say?

A. Yes.

Q. And at that point you saw that the plaintiffs alleged that the WAA control means a particular thing and that Google does not live up to that description; is that fair to say?

A. Well, I understand that that's an allegation, but I don't give too much credit to allegations. I don't really credit them because it's just an

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

allegation.

Q. Fair enough. Neither do I.

But, nevertheless, the WAA control has a description, right, that you reviewed?

A. Yes.

Q. Did you have any idea at that point what the WAA control should do vis-à-vis pseudonymous data?

A. I hadn't thought about it, so that's something -- these opinions were formed upon careful study and thought and consideration.

Q. Well, you had thought about pseudonymous data before, right?

A. Yes, I have thought about pseudonymous data.

Q. And you know that Google has data that is tied to a pseudonymous identifier and Google has data that is tied to a GAIA identifier, you knew that before you joined the case?

A. Okay, so I have to disagree with how you've put the question together, because GAIA is also a pseudonym and there

 is no -- this idea of pseudonymous data and GAIA data, it's a false dichotomy.

Q. Okay. Let's use the terms GAIA and non-GAIA for now. We will come back to pseudonymous.

So before you joined this case, you knew that Google had data tied to GAIA identifiers and you knew that Google had identifiers tied to non-GAIA identifiers; is that fair to say?

A. I'm not sure I thought about it prior to this case. I'm not sure that I had given it consideration.

Q. Well, you must have. I mean, at that point you were pretty deep into the Brown case.

A. Oh, well, I'm thinking -- we are talking about different start points. I'm talking about before I heard about these cases, I hadn't thought about it.

Q. So I will ask it again. When you joined this case, you already knew that Google had data tied to GAIA identifiers and data tied to non-GAIA identifiers, that was a concept you already knew about,

right?

A. Okay, well, so, so the question is wrong, because I joined both cases at essentially the same time. I was retained for both cases together.

Q. You were retained for both cases together?

A. I believe so.

Q. Okay. When were you retained?

A. I don't have -- I don't remember exact date.

Q. Is that in your report?

A. I don't believe I have the date in here, I might, but I don't have it there.

Q. Is that something you can figure out during a break, the date of your retention?

A. Possibly.

Q. Okay. So before you joined either case, even then you were aware that there's something called AdID and there is something called IDFA, right?

A. Yes.

Q. And you were -- you understood

well how online marketing works?

A. I do have some understanding of online marketing, mobile marketing, yes.

Q. You have been in that business for 20 years, right?

A. Yes.

Q. So you had a pretty good understanding of how online marketing works?

A. Yes.

Q. How tracking pixels work, right?

A. I have some understanding -- I had some understanding of how tracking pixels work, but what I could glean from public view.

Q. Right. And you had an understanding of how Google Analytics works, from public view again?

A. Yes.

Q. How it works from say the developer's perspective or the advertiser's perspective?

A. Yes.

Q. And then at some point you read

the description of WAA, right?
A. At some point I read the description of WAA, yes.
Q. When you read it, what did you think would happen to data that Google was sent tied to AdID and IDFA if you turned it off, WAA off?
A. When I first looked at the information about WAA and sWAA I don't think I had an opinion or a belief about what would happen, because I hadn't thought about it yet. It's not -- it's just not something that jumps to the front of my mind.
Q. Well, sorry, you reviewed the complaint in the case, so presumably at that point the allegations are in the front of your mind, right?
A. Yes. But bear in mind -- bear in mind that I read that at some point just to understand what it was about, do I have the necessary expertise to get involved here, do I have any conflicts, can I get involved in this or not, that's what I'm thinking about. I'm not thinking about the

ultimate issues in dispute in forming opinions right from the get-go. That is kind of the reverse of how I work.

Q. Okay. I mean, but you're not a robot, you are a human being, you have been using Google Analytics for a decade, you have been in internet marketing for 20 years, and you read a complaint that says here is this WAA button and when it turns off it should do this, but Google has Google Analytics, it still collects data from Google Analytics even when WAA is off. My question is just did that seem like out of the ordinary to you? Did you think Google was dumping all that data when WAA was off?

A. I don't know. I mean, I think I have said in my -- we just looked at the section of the report on the injunctive relief technical possibilities. I mean, one of the things I highlighted in there was that Google could note when WAA and sWAA are set, and exactly that, send that data down the memory hole, don't collect it, don't save it. If the person is asking

for privacy, that's one way to handle it.

Q. Is that what you thought was going on when you turned WAA off, once you had familiarized yourself with the allegations in the complaint?

A. I don't know that I had a mental model of what was going on. I think I was just looking at this and saying okay, I got this case, this is going to be some big case, and I need to -- we will need to sort it out and we will need to study this and figure out what is going on. But I didn't necessarily form an opinion. It didn't -- I didn't immediately see a contradiction there.

Q. Contradiction in what?

A. In other words, the contradiction that you are trying to point out, which is I think what you are trying to get at, and forgive me if I summarize this wrong, but what I think you are trying to get at is when you read this shouldn't it have been obvious to you that the control couldn't work the way you seem to think it should work because of the way

Google Analytics works, and I didn't have that contradiction, no.

Q. So I'm not trying to get at anything, and this will definitely work better if you don't try to get ahead of me.

A. Okay.

Q. And I promise that I will be straightforward and direct with you. I'm just trying to understand what you thought -- what your understanding of the control was, you know, what people think the control does is kind of an important issue in the case. And you have this unique perspective because you used Google Analytics for at least a decade and then you read the complaint in this case, and it sort of to me defies -- it sort of boggles the mind to think you had no thoughts about all that data you had been collecting all those years, was it being deleted when people had WAA off, was it being kept but made anonymous. What did you think was going on with all that data?

A. I hadn't considered the issue before this case. I just had not

considered the issue because it hadn't come up. I hadn't thought about it.

Q. Agreed.

A. I was essentially sort of placated and happy with the status quo and I didn't know -- I didn't know that this was working the way it does.

Q. But then you read the complaint?

A. Yes.

Q. And then you understood what the plaintiffs were alleging, and my question is just at that point what did you think about all the data you had collected, did you think it should have been deleted in the past? Did you think Google must have not deleted it? Did you think that's not the way I would read this control? What did you think?

A. So there is a few things in there that are -- I don't know how much you've used Google Analytics, but let me tell you a little about it.

Q. Not as much as you.

A. Okay. When you go into Google

Analytics, Google doesn't show stuff related to -- that's personally identifiable, they don't show you, for example, and the tools work differently at different points in time, but in general today I would say that Google is endeavoring not to show the Google Analytics customer data about specific users. And the reason I know this has been that way is that over time lots of my clients have asked me hey, can you tell us who is visiting our website, can you look in Google Analytics and see, and I said no, no, Google Analytics provides aggregate data to me, it doesn't provide me with individual stuff.

In fact, there was a time when we used to get the search keywords that people would use to come to a website. We could look at organic traffic and see traffic volume on different keywords, and the people who did website optimization liked having that information. At some point Google took that away from us. They came to say keyword not provided.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. Why?

A. We were told that it was related to privacy, that we couldn't have that information because it could be used by us to essentially connect some sort of keyword usage to individual, and there might be -- maybe there are other ways to get that, but that's been -- this has been sort of an evolving thing over time.

Q. So I have used an analytics console a little bit, really not very much at all, but it does show device IDs in there, right?

A. If you are using GA4F I think it may show some of that information. I think we have got some copies of reports.

Q. But not on the -- not for web analytics, but does it show like cookie IDs?

A. It is different at different points in time. It's been evolving. It has changed a lot. I have been using Google Analytics since it was called Urchin, I actually ended up once calling for tech support and got to talk to one of

the founders of Urchin who like picked up the phone and was doing tech support. So I have used it all along through history, and there has been a lot of change over time.

Q. Okay. Do you still use Google Analytics on your website?

A. I do.

Q. Coming back to your definition of Google account at 104, the trove of data Google collects and saves regarding the user, including data that Google characterizes as pseudonymous, under that definition, is all data sent to Google by Google Analytics for Firebase pertaining to a Google account?

MR. MAO: I'm sorry, can you read the question back again?

Q. I can ask it again.

Under your definition, is all of the data that is sent to Google by Google Analytics for Firebase data that pertains to a Google account?

A. I don't know that I've said that. So I don't think I've rendered that opinion in that way, and therefore I don't

know that I've thought it through completely.

Q. Sure.

A. And I don't want to make any sort of leap here. I don't want to give some kind of different opinion than what I've already given, which were all done thoughtfully and carefully checked. I don't want to just shoot from the hip.

Q. That's fair enough. You could see why I'm asking. I am trying to understand, again, the limits of the definition. So your definition says regarding a user. So another way to ask it is all Google Analytics for Firebase event data, data regarding a user?

A. I mean, that question could get pretty hairy because it is conceivable that there could be bots that are triggering things to shoot data in, and Google has systems to detect bot activity and filter out, it is one of the settings, you could say filter out bot activity.

Q. Well, let's assume a human was using it.

A. If a human was using it when the data was sent in, I believe that data is related to that device that's doing the transmission, and I think I've said as much. Beyond that, I'm not sure -- I would have to think more about the whole question just to understand if there is some exception, something I haven't considered yet. I'm comfortable with the opinions I've rendered. I don't feel the need to give any new ones today.

Q. Okay. We must be pretty close, I have just a couple more on this.

A. Sure.

MR. SANTACANA: Actually, why don't we pause here.

THE VIDEOGRAPHER: The time is 11:12 a.m. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 11:34 a.m. We are back on the record.

BY MR. SANTACANA:

Q. Here is the privacy policy at Google effective May 25, 2018.

A. Okay, thank you.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. And we will mark it on Exhibit Share as Exhibit 2. We were -- we left off talking about the definition of Google account, so I wanted to pull your attention to how it's discussed in here.

MR. MAO: Sorry, Eduardo, is there a place you're on, a page?

MR. SANTACANA: I think I might have given you the wrong document. Yes, okay, we will get to that one. That's the wrong document. Just a second. Can we go off for a second.

THE VIDEOGRAPHER: The time is 11:36 a.m. We are off the record.

(Discussion off the record.)

(Hochman Exhibit 2 marked for identification.)

THE VIDEOGRAPHER: The time is 11:42 a.m. We are back on the record.

BY MR. SANTACANA:

Q. So you've got the new Exhibit 2, which corresponds to the Black report's Exhibit X6, excuse me, the Black report's Appendix X6, which is a spreadsheet. If you could just open up that spreadsheet on

your computer.

A. Yes, I have.

Q. So in here there's -- it is just listing historical definitions from various Google privacy policies, and for the moment I just want to look at the Google account definitions. There is other ones in there we will get to later, or maybe not at all.

For the Google account definitions, which I've filtered for on mine, you can see ones going from May 2018 to December 2022 on here. Do you see that?

A. Yes.

Q. Okay. So we were talking earlier about how Google defines Google account and you wanted to look at one such definition that Google uses. This is one such definition, it's in its privacy policy and has been since May 2018. I think let's start with the 2018 one.

MR. MAO: Objection. The documents speak for themselves. I just disagree -- there is a disagreement on the form of the question.

Q. The definition is "You may access some of our services by signing up for a Google account and providing us with some personal information, typically your name, e-mail address and a password. This account information is used to authenticate you when you access Google's services and protect your account from unauthorized access by others. You can edit or delete your account at any time through your Google account settings."

Do you see that?

A. Yes.

Q. Okay. How do you perceive this definition to differ from your definition in footnote 104, if it does?

A. Sure. This, the way I read this, looks a lot like signing up for log-in. You know, you can get a Google account which sounds like a log-in. You have to provide some personal information and you get this log-in that lets you access some Google services and thereby save some state.

Q. I see. Whereas your definition

in your report would be broader than that, or would cover more data than that?

A. Well, this doesn't necessarily speak to the scope of the data that Google is collecting about me. It doesn't talk about what all my private data is, what all data Google has, so it's a little -- I think it's just a little different.

Q. Can you tell me a little bit more about what you mean by that answer?

A. This isn't really addressing the question of the scope of the data that Google is collecting on me and how that data associated with me is treated, this definition here. I mean, that -- those issues may be addressed elsewhere, but this is just talking about how to get a Google account, how to get a log-in to access Google services.

Q. So what I'm mindful of is the use of the phrase "Google account" in the description of WAA where it says "saved in your Google account." So when you think of that disclosure, I'm happy to bring it out if you need it, and you read this

definition, in your mind does that combined mean the same thing as your definition or does it mean something different?

A. I mean, to my mind, this is kind of squishy. This is just operational information for a consumer that talks in kind of broad terms about getting an account, you give some personal information, we are going to use that to authenticate you when you access, and we are going to use it to protect your account from unauthorized access, and it says you can edit or delete your account at any time, right, through Google account settings.

Q. That is what it says, and then the phrase is used in the WAA disclosure. Do you want me to pull that out?

A. Yeah, we should.

Q. Okay. So we will mark this 3.

(Hochman Exhibit 3 marked for identification.)

Q. This is the Activity Controls PDF, activity controls.pdf.

MR. SANTACANA: Noor, so when

CONFIDENTIAL - ATTORNEYS' EYES ONLY

you have a chance, just mark that 3 on Exhibit Share.

MR. MAO: Sorry, Counsel, what is it? Is there a Bates stamp for this?

MR. SANTACANA: No, this is a screen shot from what it looks like right now.

MS. RAHMAN: The Activity Controls PDF? It was a little muffled, I couldn't hear.

MR. SANTACANA: The Activity Controls PDF is Exhibit 3.

MS. RAHMAN: Okay, got it, thank you.

MR. SANTACANA: And, Mark, what was your question?

MR. MAO: I could just set this aside?

MR. SANTACANA: Uh-huh.

Q. Okay, Mr. Hochman, so now you have Exhibit 2 on the computer, you have Exhibit 3 in front of you, right?

A. Yes.

Q. Exhibit 2 has some definitions

of the term "Google account" and Exhibit 3 uses the term "Google account" in the following sentence: "The data saved in your account helps give you more personalized experiences across all of Google's services. Choose which settings will save data in your Google account."

You see that, right?

A. Yes.

Q. Okay. So my question is, given the definition of "Google account" that's in the May 2018 privacy policy, is the way that Google account is used in this sentence the same that you use it in your report in footnote 104 or is it different?

MR. MAO: Objection, the document speaks for itself. I think you're asking our expert something beyond what we designated him for. But go ahead.

A. Sure. So this -- what I was looking for, remember I told you I was looking for kind of a precise definition?

Q. Yeah.

A. So as a security technologist,

what I'm interested in here is knowing what is the scope of this Google account, in other words, what data goes in the Google account, what of my personal data goes in the Google account and what, if any, of my personal data is getting saved anywhere else.

I don't think it is clarified by this. It doesn't make it clear to me. I certainly wouldn't, from reading this, come to the conclusion that that sWAA control only affects the location where all my personal information is being saved. It doesn't control the collection of that data. That seems very counterintuitive, when the behavior, the technical behavior that I have observed, seems very counterintuitive when stacked up against this sort of friendly definition.

Q. And I understand that that is your opinion, and I'm not trying to change that. I just want to understand, again, the scope of your definition in 104 as it compares to the definition in the privacy policy, and you said well, that doesn't

address data and where it is saved and how it is used.

So I have given you a sentence where it is addressed, which is the disclosure of activity controls, and my question for you is if you were to take the privacy policy definition of "Google account" and insert it in parentheses at the end of the sentence at the top of Exhibit 3, right, it says Google account, parentheses, insert the definition, is that consistent with your definition in footnote 104 or is it different in any way?

A. Okay. So that --

MR. MAO: Sorry, just objection to the form of the question. The documents speak for themselves.

A. Okay. So if you take this Exhibit 3, which I should have numbered, if we don't mind, if someone has got a pen, could we just number it, so I don't get confused?

So I've got Exhibit 3, and if I take the definition here from the spreadsheet cell D38, is that the one we

CONFIDENTIAL - ATTORNEYS' EYES ONLY

want, May 25th, 2018?

Q. Yes.

A. And, by the way, on Exhibit 3, do we have a date on this? Like what's the provenance of this one? What is the date of this as of?

Q. Yesterday.

A. So it might not be the same as it was on May 25th, 2018.

Q. Correct.

A. So we might be combining two things to form a non sequitur. Okay, so even if we did form that potential non sequitur, that doesn't -- if I read this and I put that definition in here, it doesn't disabuse me of my notion that Google is putting all the personal information related to me into my account. It doesn't tell me that Google is also storing that information somewhere on the side where I can't see it, control it, or affect it.

Q. Okay. Speaking of non sequitur, that answer is a non sequitur.

My question is, if you take the

May 2018 definition of "Google account" and you insert it into this sentence at the top of Exhibit 3, which uses the term "Google account," is that definition as it is used here, if you assume that's the definition that it means, that's what it means, is that the same or different than your definition in footnote 104?

MR. MAO: Sorry, calls for incomplete hypothetical. Go ahead.

A. This is -- this is kind of a great example of double think, which is two opposing ideas being put together in a way that sort of prevents any kind of serious critical evaluation, because on the one hand this document is telling me I have ability to have control, and this other word here --

Q. Mr. Hochman, I'm happy for you to provide an explanatory answer, but it's going to be easier for me and the court reporter and the jury to understand it if you start by answering the question, which is if you take the definition from May 2018 and you insert it into the top of Exhibit

3, in that sentence is the definition meaning the same or different than the definition you give in footnote 104 at a technical level?

MR. MAO: Objection, incomplete hypothetical, asked and answered.

A. So there is so much wrong with the question that I'm not sure I can answer it, because the problem is you're asking me to take a definition from 2018 and insert it into a document that's a version from five years later.

Q. That's what I've asked you to do.

A. And the definition is not a technical definition, and you're asking me to draw some technical conclusion from a nontechnical definition, and so it sort of is just -- the whole thing is kind of beside the point.

Q. Well, actually, it's not beside the point, because this is what Google told its users, and the case is what the users thought about it, right? They didn't have the ability to read your report or your

definition of "Google account." This is what they got to read. This is if you go online today, this is what they can read.

So I'm just trying to -- I'm just trying to understand if your definition in footnote 104, which makes an assertion about the difference between WAA-on data and WAA-off data is consistent with the definition given in the Google privacy policy in May of 2018.

MR. MAO: Objection, incomplete, actually false hypothetical, but form of the question. Go ahead.

A. So you're asking if two things that are different are consistent, and they are sort of -- these two things are kind of talking past each other.

What I'm talking about is the data, the scope of the data that Google is collecting about me, where is all that data, and what this is talking about is how you go about getting a Google log-in so you can access some Google services. So these two things are kind of talking past each

other.

Q. Okay. The top of Exhibit 3 says "save data in your Google account." I think that that is a phrase about the scope of data that Google is collecting about me and where it is. Do you agree?

A. One second. Let me read this.

(Witness perusing document.)

A. So this is in fact talking about saving data in your account, which is, as I pointed out, it's a bit of a non sequitur, because this is talking about the account as a log-in. No one has disclosed to me what this account data structure looks like. It is not disclosed to me what the scope of that is, okay?

It's not explained that my personal data can be stored in my account but your personal data can also be stored on the side, and these settings won't affect our side storage of your personal data, they are only going to affect the storage of the data in the view that we provide to you. That's not part of this disclosure. So it's all kind of beside the

point for that reason.

Q. Take a look at paragraph 136 of your report. Just read it through for me. Let me know when you're done.

(Witness perusing document.)

A. Yes.

Q. You read it?

A. Yes.

Q. Okay. In the paragraph 136 of your report you say "Not only is Google saving WAA-off and sWAA-off data to class members' Google accounts," footnote 104, "Google also marks some of the data as WAA-off or sWAA-off."

Do you see that sentence?

A. Yes.

Q. And the footnote, which then leads to the definition we have been discussing that you give in footnote 104 of "Google account"?

A. Yes.

Q. And that definition is the trove of data that Google collects and saves, including data Google characterizes as pseudonymous, right?

A. Yes.

Q. So you've made an assertion about whether or not Google saves WAA and sWAA-off data to Google accounts; is that fair to say?

A. So I'm talking about my understanding, okay, my intuition of what this means. The best way I think I can put this is that Exhibit 3, if you insert in the definition from five years earlier, doesn't disclaim my version. There is nothing in there, it is silent on what the scope is. It doesn't say there is a side storage area where we store your personal data and we don't show it to you when you flip this fake switch.

Q. You're skipping ahead, which is not recommended. So let's stick with the question.

You've made an assertion in your report, you don't need to look at the exhibits for that, in your report you assert whether or not Google saves sWAA-off data to Google accounts, true or false?

A. I have made an assertion and I

have defined what I mean by Google account, what my understanding is absent that clear definition from Google, which I looked for and did not find and which you still haven't shown to me.

Q. Okay. So you make the assertion that Google does save sWAA-off data to Google accounts, that's one of the opinions you give in this case?

A. Bear in mind, my definition of Google accounts, I understand Google is asserting that the Google account is this arbitrarily limited data structure that doesn't include some stuff that they save about me, and that's a semantic game.

Q. Okay. Mr. Hochman, please don't indict my entire profession. If we didn't have semantic games, then I wouldn't be able to pay my mortgage. Just answer the question. We will get to that. We are going to come back to the exhibit, I promise. You are going to have plenty of opportunities to impugn Google.

The question is, isn't it your opinion in this case that Google saves

sWAA-off data to Google accounts as you define it in footnote 104?

A. Well, I think my report says that.

Q. Okay. So that is an opinion you give?

A. Yes, but subject to of course my definition, and I recognize -- I recognize Google's definition is different than mine.

Q. Okay.

A. And I'm not asserting that statement under Google's definition, I'm asserting it under my definition. I just want to be clear, because I don't want you to -- I don't want you to take away the wrong understanding of this.

Q. I really appreciate the clarity.

You said Google's definition is different than yours. How is it different than yours other than that it uses different words?

MR. MAO: Again, I will just lodge a standing objection to your use

of the word of "Google definition," the form of the question. I don't want to raise it again, but I just disagree with the framing. Go ahead.

MR. SANTACANA: Sorry, I just want to understand the objection.

MR. MAO: Sure. You said this is a Google definition. I don't believe that's a definition and I think he has made that very clear. That's my standing objection. When I say form of the question, that's what I mean. That's it.

Q. Okay. So for this deposition let's just all understand when I say Google's definition what I'm referring to is Exhibit 2, the list of phrases in column D that correspond to Google account in column A which come from different historical privacy policies, okay? Just so we're all on the same page about what I mean. We can fight later about whether it counts as a definition.

MR. MAO: Or the time period it came from.

MR. SANTACANA: Yes. I'm sure we can fight about lots of things.

MR. MAO: Sure.

Q. You said that Google's definition, which we're talking about D38 in Exhibit 2 at the time, D38 differs from your definition. Other than the words that are used in the definitions, is there -- do you have an understanding as to at a data level how they differ?

A. Okay. So I've got to unpack that, because there is a few different points there. The definition, when I say "Google definition," what I'm really thinking about is Google's position in this litigation. Google is taking a position that the Google account only includes some arbitrary data that's tagged with the GAIA ID and it doesn't include the data that they store with other equally identifying what they call pseudonyms --

Q. I want you to leave out of your mind Google's litigating positions in the case. What I want you to focus on is D38 in Exhibit 2.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

A. Okay. So I don't see a real definition of the Google account data structure in D38. I don't see a definition of what data is included. There is not a clear scope definition there. That is just some operational information about how you go sign up for a log-in.

Q. Okay. So I guess is it fair to say your opinion is that if I were to insert D38 in Exhibit 2, Google's definition of "Google account" into the disclosure in Exhibit 3 about activity controls, that it would leave you unclear as to the data structure?

MR. MAO: Objection, mischaracterizes the testimony. But go ahead, please.

A. No, what I would say is it doesn't contradict my intuition which I stated in 104 of what that data structure includes.

Q. What do you mean by intuition?

A. Understanding, that if someone says account on a system we are going to store some data in your account, I'm

thinking aha, they've got a place to store data about me. I'm not jumping immediately to the conclusion that they have also got a shadow account, which I think is a term that has been used elsewhere.

I don't have, in my report, I don't have any intuition that there is a shadow account where they are collecting a secret dossier about me which they don't show me and don't tell me about. I have no idea that that exists and that's actually what is happening. That's what the report documents is the creation of this shadow account and how this is a fake control because it is just a switch pointing out where this firehose of personal data Google is collecting about me, whether it is going into someplace that they show it to me or whether it is going into someplace where they don't show it to me.

Q. So it's your -- that definition in 104, footnote 104, that definition comes from your intuition and experience as an expert in this area?

A. I'm choosing the most natural

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

definition I can, because absent Google telling me specifically what's in my Google account and where else it is storing my personal information, absent that specific clarity, I'm going with what's the most natural definition, which is that I've got, simple, I've got an account and you're dumping all the data about me into that account where I can see it and control it. That's the most natural, simple, it is like Occam's razor, it is the simplest explanation.

Q. So I want to understand, when you say it is the most natural definition, what you are -- first of all, are you opining that it is the most natural definition of Google account?

A. I'm telling you how I came to that.

Q. Okay. Is it your opinion in the case that footnote 104 is the most natural definition of Google account?

A. I haven't given that opinion.

Q. And sitting here today, do you intend to?

A. I mean, I've told you what it means to me.

Q. Okay.

A. So that's in my testimony now. So I've told you what it means to me, and if someone wants to make use of that testimony, they can. I haven't written in my report -- my report isn't really addressing consumer impressions. That's not the focus of my report. I understand that somebody else may be addressing that.

Q. So what it means to you, what "Google account" means to you as reflected in footnote 104 of your report, that is based on your experience in the field as an expert and nothing else, or is it also based on documents or something else you reviewed?

A. I mean, it's based on everything I've reviewed and understood, because I wrote this after reviewing all these materials, and I came to understand that Google saves personal information about me in a shadow account, which I've called the shadow account, the area where I

can't see it and I can't control it.

Q. I think I understand what you're saying. Just a couple more questions about this.

In your review of materials, did you review any disclosures made by Google about what it considers personal information and what it considers nonpersonal information?

A. I can't give you specific documents here, but I reviewed an awful lot of documents and I would imagine that that has been addressed in some of those documents.

Q. Did you take that into account in crafting the definition in footnote 104 of "Google account"?

A. I mean, without looking at some specific document, I would have to -- you would have to show me a document for me to say one way or the other.

Q. Well, the problem I have is that you don't cite any documents in footnote 104, so I'm asking you about the basis for the definition. I understand

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

your intuition is one of them, your experience, what is most natural to you is one basis. I'm just trying to establish what the other bases are. You said everything I've read.

A. I would say the absence of -- I went looking to see if there was a clear public definition from Google that would explain aha, this is what's -- so that someone coming would understand what data is collected about them, where that data is going to be put.

The situation I found upon the technical investigation was counterintuitive, it was not what I expected to find, and it is, frankly, kind of Orwellian, it is just very strange that you have a privacy switch that when you flip it, it just means we don't tell you that we're spying on you. It is almost like the party slogan from 1984, you know, ignorance is strength, that's like what this is. That's what this control is. You flip the switch, you can remain ignorant of the fact that you're being spied on.

Q. Does your definition in footnote 104 include both personal information and nonpersonal information?

MR. MAO: Objection to the form of the question. Go ahead, please.

A. I think that the information that's being collected becomes personal information when it is identified in a way, for example, using a Google identifier that connects it to a person.

Q. Okay. And so given your definition there that you just gave, does your definition of "Google account" in footnote 104 include both personal information or nonpersonal information?

MR. MAO: Objection, incomplete hypothetical, form of the question. Go ahead, please.

A. I mean, to my mind, when I say Google collects and saves information, that word is not there, but Google collects and saves, in brackets, information, regarding a user, that's personal information. That's information about that user and their activities.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. Okay. So the part of your definition that says "regarding a user" is the part that limits the definition to information that's personal information?

MR. MAO: Objection, asked and answered, misstates his testimony. But go ahead.

A. Yeah, one way to look at it is the personal information is information that can be linked or that is linked to a person.

Q. Which, is or can be?

A. Is.

MR. MAO: Objection, incomplete hypothetical.

Q. If the information is not linked but could be linked to a person, does that information constitute information pertaining to a Google account?

A. I want to be clear, I mentioned subjunctive in there, and there shouldn't be any subjunctive, it just is the information is linked to a person or it's not linked to a person. Those should be the two choices, it is linked or is not

linked. There is no could, there is no should, it is just it is or it isn't linked to a person.

Q. What is an example of information that is not linked to a person?

A. So I would consider, for example, the fact that 47 people visited your website today, that doesn't tell you which 47 people.

Q. So aggregated information, if aggregated properly, is not linked to a person?

MR. MAO: Objection, incomplete hypothetical, assumes facts not in evidence, form of the question. Go ahead, please.

A. So I'm giving you that as just an example off the top of my head, because it's actually something I'm thinking about a lot in the context of medical research, how to give information, useful statistics, without revealing individual data.

Q. Right. You have a startup, right, that is working on this?

A. I have an academic project and

there is also a startup, yes.

Q. So can you give an example of analytics data that is not personal information, whether it is Google or not, just a generic example?

A. I mean, most of the data that I see in Google Analytics as a user of Google Analytics, in other words, as a website operator, it doesn't look like personal information, it is just aggregate data about behavior. It is behavior by a group of people of which I don't know who those individuals are.

Q. As a website operator, when you open the Analytics console, well, actually, strike that.

As a website operator who uses Google Analytics you could also use BigQuery to export event-level data, right?

A. Yes, I believe so.

Q. If you were to use BigQuery to export event-level data -- well, have you ever used BigQuery to export data on your website's users?

A. I have not used BigQuery

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

personally to do that.
Q. But your company has?
A. I am not sure. We -- a while ago we were using Firebase for developing a prototype. We have subsequently moved to Cloudflare Workers.
Q. Firebase for an app?
A. Yes.
Q. When did you move to Cloudflare?
A. Years ago.
Q. So you've seen what the BigQuery exports look like, right? You discuss them in your report?
A. Yes, I guess so, because I've -- I mean, I don't remember it sitting here now, we should probably look at one if you want to talk about it.
Q. You recognize that it is event-level data, the BigQuery export?
A. I believe so.
Q. And the event-level data can contain device ID, right?
A. I mean, we should just take a look at some, if there is an example of it,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

we should take a look at that just to confirm it. Maybe I documented it here somewhere in the appendices. The report is huge. I just don't remember.

Q. Well, just assume for me that device ID is included in BigQuery exports.

A. Sure.

Q. And it's event-level data.

A. Yes.

Q. So you as a website operator have had access to that if you wanted it, right?

A. Okay.

Q. You would agree with that?

A. Yes, but I haven't done this personally, yes, but a website operator could in theory do this.

Q. Is that -- does that constitute personal information pertaining to a Google account?

MR. MAO: Objection, incomplete hypothetical. Go ahead.

A. If it has a device identifier, that's -- that is -- that is linked to the person, because if you happen to go get the

person -- if you suspect someone, for example, you have some data, you suspect someone, you go grab their phone, you can pull that identifier off the phone and now that data is linked to them because there's the data, there's the device ID, and there's the device ID on their phone which was in their pocket and you know that's their data.

Q. That makes sense. But at the time that you export the data, before you've gotten the phone out of the person's pocket, that data is not linked to a person, right?

A. I disagree.

Q. Okay. Explain.

A. That data is linked to a person. That ID is very specific and it links to one person. So, for example --

Q. One device, to be fair?

A. Devices are one-to-one with people. People are very possessive of their devices. There is a very strong signal, if you have a device. Like if I get a clue, let's say I'm an intelligence

officer and I'm trying to track down a dissident who I want to assassinate, this has happened --

Q. Sure.

A. If you give me a name, and you gave me the name Mark Mao, I may have trouble finding the right Mark Mao because there are multiple people named Mark Mao. But if you give me a device identifier and say this is the guy who has been spying against us and we need to go get rid of him, if I suspect this is the Mark Mao you are talking about and I go grab him and check his phone, I can confirm it.

Q. If you check his phone?

A. Because it links to him, that's the link. The link is the ID in the phone. Also --

Q. What if his phone is at the bottom of the ocean?

A. Okay, now there is a problem for Mark Mao, because that device ID is located in lots of different datasets.

Q. Okay.

A. And if any of those --

Q. If you don't have access to any other datasets, you just get the device ID.

A. But that's not the way the real world works. There is data breaches all over the place. All kind of datasets have been compromised. They are all over the place. You can go out and harvest lots of datasets, and I'm sure intelligence services are actively doing this, they are gathering this stuff up and now they can see, you know, the Washington Post has maybe a little leak in the way they put their app together, they made a mistake, they've gone and logged an e-mail address. We've seen this happen in the wild. If one person anywhere who has got your device identifier logs something like that, your cover is blown, and that's the problem, that's a huge problem, because the probability of that happening becomes nearly certain when the perfusion of data is very large.

Q. So the privacy concern you're articulating right now, as I understand it, is a concern about, as you said it, the

cover being blown, the person being unmasked due to the leakage of data or data being stored somewhere where it shouldn't be, it's a risk that you consider to be a privacy risk?

A. So this is just one example, and there are many scenarios, there are many scenarios that are less dramatic than that, okay? But the personal identifier or the Google identifier, like a device ID, like an app instance ID, these things relate to a person, they are personal, and they link to that person, and with the necessary set of data, that person can be found or a suspicion can be confirmed, and that's just an example of what can and does happen in the world.

Q. Now, the linkage that you're concerned about depends on there being data linked to that device ID, right? If you bought the phone, opened it up, haven't used it yet, it means nothing, device ID means nothing at that point, right?

A. Okay. So I guess if you have a pristine new device, the device ID is --

there is no information associated with it at that moment.

Q. And then as you use it more data is generated, goes into different places in the world, and that's what's creating this privacy risk?

A. That's not the only thing creating the privacy risk. This is just one potential -- one little pathway among many.

Q. To what? Pathway to what?

A. Failure to preserve privacy. So the user has set a switch which says I want to be private, and they have some expectation of privacy. They have been primed for that. They have been told you can be private, you can have private activity.

They flip the switch, they want privacy, and yet this trove of data is being gathered, and whenever there is a trove of data, it is usually only a matter of time until it leaks. There are leaks. There are data breaches. They have happened. It doesn't matter how careful

you are. There are breaches. There are leaks. There is insider threat. All kinds of problems. And the person who asks for privacy and expected privacy didn't bargain for that.

Q. If Google purged right now its records of all the data that you say in your report Google could purge, sWAA-off data, would that eliminate the privacy risk you're discussing?

A. It's a great question. I don't know if I have said that in the report and I don't -- that's kind of a big opinion to ask and I would want to think it over carefully, okay, in order to answer it. I just don't want to shoot from the hip a new opinion like that.

Q. But it would ameliorate the risk presumably, otherwise you wouldn't have suggested it?

A. Well, I think it's -- let's take a look exactly what I said. So just to try to be clear. We're in Section K, right?

Q. Section K.

A. And do you remember the page?

Q. 168 I think.

A. This is really at the end. Okay. So I've said in K Google could purge its system of WAA-off and sWAA-off data. So I'm saying that -- and I guess there is a presumption that somehow that would be helpful. I haven't said that's a complete solution, but I think you can read in between the lines that it would be -- I'm suggesting it because it would be helpful.

Q. But just in terms, focusing for a moment on your concerns relating to data breach, which is to say data sent to Google that then gets out of Google into the wild.

A. Some threat actor comes in and exfiltrates that data?

Q. Yeah. Are you opining in this case, I don't see it in your report, but just to be clear, you're not opining that that has happened to anyone in particular, right?

A. So I haven't issued that opinion. I'm aware that other experts in this case may say things to that effect.

Q. Okay. But that's not on your plate, that may be on someone else's?

A. That's not on my plate.

Q. What about insider risk, it's not somebody exfiltrating data from Google, it is somebody at Google attempts to unmask somebody by connecting their device ID to their name or e-mail or whatever, in this case are you -- have you rendered an opinion in this report that that has happened before to anyone in particular?

A. So I'm not -- again, just like with the last question, it is symmetrical. Somebody else might talk about it. I'm not saying it has happened. I'm just aware of it as a risk. I mean, I'm a security technologist, so I'm aware of these various kinds of risks. I've studied them. So I'm pointing it out.

Q. Okay. That's helpful. Okay.

MR. MAO: At some point, Eduardo, let's take another break. I just need to get the blood circulating. I have red-eye lag.

MR. SANTACANA: Yeah. Can I

just -- I just want to do one more module.

MR. MAO: Do what you need. In the next 10, 15 minutes or whatever.

Q. So let's talk more about K, so you should probably flip to it.

A. Sure.

Q. These are your opinions concerning what the changes, it is called WAA Changes, Google could change WAA and sWAA to ensure they function as described. Google could also purge its systems of WAA-off and sWAA-off data.

MR. MAO: For the transcript, I believe Mr. Santacana is referring to Exhibit 1, Section K.

MR. SANTACANA: Yes, page 168.

Q. And that's the summary of your -- that's the heading of the opinion. There is also an opinion, as I see it, at paragraph 418 that's not summarized by that heading which is that Google could delete products, services or algorithms that it built in whole or in part with WAA- or sWAA-off data.

So in my mind, Section K here is proposing that Google stop a certain kind of collection, purge a certain kind of data, and delete certain products, services or algorithms. Is that a fair --

A. I have said that these things are technologically possible.

Q. Oh, did I say -- yeah, that it is technologically possible. So let's start with Google could stop collecting, okay? You say at 411 and 412, and take a moment to review them -- actually, just take a moment to review them.

(Witness perusing document.)

A. Yes, I have read this very recently, so I'm up to speed on it.

Q. Great. In effect, I think what you are arguing here is that Google should, excuse me, that it is technologically possible for Google to check for a user's sWAA setting on device rather than at the server level, and if sWAA is off, then it will not transmit any user data via analytics?

A. It is possible for Google to

detect the WAA/sWAA status as needed and decide either not to transmit anything or to somehow transmit only things that are -- I haven't thought through completely, but perhaps Google could design some system to transmit something that has no personal identifier and no link to the person.

Q. So as a user of analytics, you know that one of the values of analytics is analysis relating to what the same user or device does over time, right, even if it is presented anonymously to the website operator or the app developer?

A. Yes.

Q. If Google were to implement 411 and 412, paragraphs 411 and 412 of your report, would that type of analysis that Google provides to developers through Google Analytics be possible?

A. It for sure would be possible for the people who leave sWAA and WAA turned on, enabled, for data collection, which is, I think I document in the report, it is over 90 percent for WAA and over 80 percent for sWAA.

I guess maybe Google has some challenges. I'm not sitting here -- it's not my job to engineer -- reengineer things for Google. Google has to engineer it. But they have the ability to stop collecting data that ties to an individual user if they want to, because they have, they do it with certain products but not with others.

Q. So my question is about the nature of what you just said. Is it possible in your mind to tie data together longitudinally from the same device without violating what you have described to be something that constitutes personal information or raising the privacy risks that you discuss in your report?

A. I think there may be potentially some solution might be engineerable. I don't want to say it is impossible to engineer, okay? I haven't sat down and tried to engineer that and I haven't expressed an opinion this is what Google should do in order to continue having this functionality that they want.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

You know, that's really the next step in the process, is if Google decides -- let's say Google decides, after hearing this, and I really hope they do decide this, let's just say they decide you know what, let's be white knights here, let's purge this data, let's stop collecting it, and now let's figure out how do we continue, how can this sort of useful analytics service continue to be provided to vendors, that's the next step, and I haven't gone there yet. I haven't opined about that.

Q. Your startup is working on that question, isn't it?

A. I was approached by a professor at the Yale School of Medicine who was affiliated with the American College of Surgeons, and he runs -- he chairs the Committee on Quality, which determines the treatment algorithms for all cancer patients in the United States. So if you get cancer, you go to the doctor and the doctor has an algorithm that they follow, and this committee is the one who sets the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

standard of care.

Q. I know what they are.

A. And they also are custodians of the National Cancer Database and they have the ability to influence what data is collected through federal policy, and that database research is very important, and are having extreme problems because of essentially HIPAA, they can't join the data together the way they would like, so they need what is called privacy preserving record linking, a way that you can link records and maintain privacy.

And it requires, under the system I designed over the last number of years, starting in 2018, it requires a considerable amount of effort to do that.

Q. Is there a name for the system you designed?

A. So it has alternate names depending on the context. The project, sometimes we call it Just Enough Trust, Dr. Boffa calls it the Fischer-Hochman solution, and there is a commercial entity called UNS.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q. If Google adopted the Fischer-Hochman solution that you developed for the National Cancer Database for Google Analytics, would that satisfy the privacy risks that you raise in your report?

A. A great question, but a couple of things. One, this isn't a sales pitch. I'm not trying to pressure Google. This is totally separate. It's not being developed to try to sell it to Google.

Q. Google is not going to pay you money anyway, so I know it's not a sales pitch.

A. I'm not trying to do that. That's not my purpose. The research is published. If Google for some reason wants to read that research and try to get something out of it, they are welcome to do so. It's public.

Q. Yeah. I'm just trying to understand the technology, that's all.

A. I don't know. I haven't done that analysis. I don't know if it would help Google or not. I'm not sure. That would require some careful analysis and I

haven't gone there. That's not the -- that's not the initial use case that we are thinking about.

Q. Okay. But the technology that you have developed for this National Cancer Database, presumably the purpose is to comply with HIPAA?

A. It is a combination of people have concerns about HIPAA, the hospitals have archaic technology and the security is really bad. Even Google has released a study recently that said that most data breaches start with healthcare data leaks.

So in some sense we're on the same side of this problem, Google and me. It is a big problem, because you're getting this one-size-fits-all treatment when you get cancer and what we really want is for personalized medicine, we want people to get a treatment that is best for them based on their characteristics, and the only way to do that is to have better data hygiene, eliminating duplicate data shards, joining together data shards about the same person, and doing it in a way that that data is

retained and doesn't compromise privacy.

We have the government behind us. So the government can rewrite the rules to make it -- whatever rules need to be rewritten, there is commitments that they will be fixed up and rewritten.

The issue is not to trigger political backlash, not to make people think this is some kind of universal tracking system that's going to be used to take away their guns or be used to label political dissidents as psychiatric patients or whatever. There are historical problems with medical data tracking. That's why the United States doesn't have a national healthcare number the way they do in other countries. So there is political concerns.

I probably told you more about that topic than you wanted to hear, but it's interesting.

Q. It is very interesting. But I take it, then, you would agree that it is possible to link data about people that is collected over time without invading their

privacy?

A. I have designed a system that does it, but the system involves the use of some independent agents, one of which is chosen by the person. That's why it is called Just Enough Trust. You kind of pick the person you want to trust and that data fiduciary works for you. There is a different data fiduciary working for the service who is processing your data.

So in some sense maybe part of the problem Google is having here, and I'm just going to share this as a helpful thought, Google has gotten itself involved in both sides of this. Google is working for the user and Google is working for the website or the app vendor, and that sets up a conflict, and that creates -- that creates some trouble for them. It puts them in a difficult position. And that if they were to kind of choose and work for one side exclusively or the other side exclusively they might not run into this problem. So maybe just take that as a thought.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MR. MAO: Maybe during a break you can pull up the publication that you can evaluate for yourself.

MR. SANTACANA: Pull up the?

MR. MAO: Publication.

THE WITNESS: Which publication?

MR. MAO: Oh, sorry, the sources that you are talking about.

Q. Now, returning to this technology, Google Analytics for Firebase, if Google set up a separate data storage mechanism that stores analytics data and that's it, it just sits in that silo, it can't be used for anything else, it can't be used by Google, it is only used to service analytics accounts like the account that your website has or the account that some app has, the New York Times app, in your mind could it continue to service those accounts, including for sWAA-off users data?

MR. MAO: Objection, incomplete hypothetical. Go ahead.

A. So you may be getting into some

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

areas that are studied in cryptography like secure multiparty computing and homomorphic encryption. I mean, there are strategies for sort of being able to process data without actually being able to read the data. I'm not going to assert that any of this is impossible. There may be some way that Google can engineer a workable solution. I don't know. I haven't done that analysis yet. That is downstream.

Q. I think you may be overreading my hypothetical. Let me try it a little bit differently.

You are familiar with the concept of data processor and data controller?

A. Yes. I think that's something that comes out of the EU; does it not?

Q. Yes. Data processor, let's just say for purposes of today, is where the data processor acts solely as a vendor and does not use the data for its own aims, it only uses it to do whatever it has been asked to do by the person that has provided it to them, okay?

A. Yes.

Q. If Google acts solely as a data processor for Google Analytics data and never as a data controller, in your mind could it do that for sWAA-off users data?

MR. MAO: Objection, incomplete hypothetical. Go ahead.

A. I'm not sure, because I haven't done that analysis, and you may also be getting into issues which also require legal advice, because those are -- those are legal definitions under like GDPR. So I'm not --

Q. That's why I gave you a definition. I'm trying to understand, again, the limits of your opinion, right? So you understand, you opine that Google does a number of things with Analytics data. One of the things it does is service Analytics accounts, right?

A. Yes.

Q. Like your website or the New York Times app?

A. Yes.

Q. Provide information to those

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

developers about how people are using the app or the website?

A. Yes.

Q. Okay. You opine that Google also uses the same Analytics data to do other things, like advertising, right?

A. Yes.

Q. Okay. I'm trying to understand where you see the problem. So is it a problem if Google is only doing the Analytics provision to the website or the app, is that a problem for sWAA-off users Analytics data?

A. I have a very clear answer to that, where is the problem. The problem is that when the user is given the impression that their activity is private and then their data is collected, that's where the problem is. It is right at the collection logging. That's where the problem occurs. And all this downstream stuff, you are kind of trying to ask me, is there a way to throw out the bath water without throwing out the baby, because, you know, I think we both agree that Analytics is a useful

product to merchants and they want to have access to it. You know, website operators want to have analytics.

And I already commented that Google has kind of put itself into a difficult position by being on both sides of it. They are telling the user, hey, here is your chance for privacy and then they are also telling the website operator hey, here is this great analytics product that you can use to track, and I think I have sort of said their life might be simpler if they would pick one or the other and not try to do both at the same time. That might be easier.

Q. But that's not what I'm asking you, right? I understand that's your advice. But my question is if Google collects and saves sWAA-off GA4F data and only uses it to service the Analytics account that generated the data, so it came from the New York Times, somebody used the New York Times, the New York Times sends it to Google, Google saves it and analyzes it for the New York Times, that's it, that's

the whole lifecycle of the data, in your mind for the sWAA-off users in that lifecycle, is the description of the button misleading then? Are they --

A. Whether the button is misleading I guess is maybe an opinion that someone else is going to delve into in depth. I told you, I just mentioned that in passing to establish the relevance of my technical analysis.

I think it's -- what I found is entirely consistent with that button being misleading, and I've said that this is a fake control, because it doesn't do what it seems to say it's going to do, and I've said that the problem is collecting and saving the data. It's the collecting and logging where the problem is.

Now, you are saying well, what if Google was just acting as an agent for somebody else in order to do this, would that be allowable? That may really get into more of a legal question. I'm not sure, I haven't opined about that hypothetical you're putting forward and I

don't think I'm going to shoot from the hip and do it now.

Q. Okay. I think I understand what you're saying.

So you're aware that there are other analytics providers, right?

A. Yes.

Q. With respect to the opinions you've rendered in this case, what in your mind is the difference between an app developer using Google Analytics for Firebase as opposed to, for example, AppsFlyer?

MR. MAO: So, Eduardo, you are going on to a different module now.

THE WITNESS: I was just about to say that, that this would be a great time to take a break, if we are going to go to a different module.

MR. SANTACANA: It's not, well, at least not in my outline, it is not a different module. But I will wrap it up soon.

A. So, yes, an app developer could use some other analytics package, sure.

Q. So what's the difference, why does it matter that, to you, that it was Google Analytics for Firebase rather than AppsFlyer?

A. Well, one thing is that AppsFlyer hasn't made any privacy representations to the users.

Q. Is there any other difference?

A. Google Analytics for Firebase integrates really well with Google's advertising products and it powers some additional features that I don't think you could get with third-party analytics.

Q. Have you rendered that opinion in this case?

A. Well, I just told you that because you asked me, but --

Q. But it's not in your report, right?

A. It's not in my report, but I understand that Mr. Black put that as a rebuttal to me that, you know, these vendors could use this third-party tool, and so I'm sort of criticizing Black by saying yeah, but it's not equivalent, it's

not an equivalent substitute. It is different. It is qualitatively different.

Q. You have not undertaken any study of the competitors of Google Analytics for Firebase and the extent to which they offer similar or the same features, right?

A. I haven't opined about that in my report. I mean, I'm generally aware of these other companies.

Q. But you have not undertaken to study it in order to render an expert opinion to the jury in this case?

A. My computer just logged me out.

Q. That's okay. You don't need it to answer this question.

A. Sure. I haven't done that study here, again, because Mr. Black has rebutted me and I haven't had a chance to respond to him.

Q. Sure. But you're just shooting from the hip now?

MR. MAO: Objection, mischaracterizes the procedural allowances in a case in response to a

rebuttal. I mean, come on, let's not do that. Go ahead.

A. I wouldn't -- I wouldn't say that this is shooting from the hip. I'm just telling you what I know about the topic, okay? That I am a user of Google's marketing technology and I see what Google tells us about how to pitch this technology, how to sell it to customers. They encourage everyone very strongly use use Google Analytics -- Google Analytics 4, the current version, they want everyone to upgrade. You get the best access to features. You get the best integration. I mean, that's clear and sort of noncontroversial. I don't need to do a big study to tell you that because that's everywhere.

Q. Well, with all due respect, this is a lawsuit, you are here as an expert, this is clear and noncontroversial is not an expert opinion. So I need to understand the basis of what you're saying, okay? You did not undertake a study of Google Analytics' competitors in the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

market, right?

A. I did not undertake a study of the Google Analytics competitors.

Q. You did not apply any methodology in this case as an expert that you intend to present to a jury comparing the features of Google Analytics and its competitors, right?

A. You know, what I would say is that I have experience with these products, and I can tell you for sure that if someone has to go set up a second product, a lot of the smaller advertisers will look at this and say, you know, too much work, too much trouble, I can just use Google Analytics, that is easier.

Q. Okay. Well, we will get to that, but that's not my question.

You did not apply any methodology in this case as an expert that you intend to present to the jury comparing the features of Google Analytics to the features of its competitors?

A. I haven't set up a feature comparison study.

Q. Okay.

MR. SANTACANA: We can take lunch.

THE VIDEOGRAPHER: The time is 12:48 p.m. We are off the record.

(Luncheon recess: 12:48 p.m.)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

A F T E R N O O N S E S S I O N

1:34 p.m.

J O N A T H A N H O C H M A N, resumed.

THE VIDEOGRAPHER: The time is 1:34 p.m. We are back on the record.

CONTINUED EXAMINATION

BY MR. SANTACANA:

Q. So we left off talking about your opinion about Google's changes it could make to how WAA and sWAA function.

A. Yes.

Q. And I want to talk about your opinions relating to what Google could purge from its systems, okay?

A. Yes.

Q. So you reviewed some Baseview data in this case?

A. Yes.

Q. And you propose, among other things, that Google purge sWAA-off Baseview data, right?

A. I believe so.

Q. In the Baseview data that you reviewed, was there a sWAA bit in there indicating whether the entries were

collected while sWAA was on or off?

A. I believe that -- I think I've said something to the effect that there is enough data in there in terms of identifiers that it could be determined, it could be calculated, if Google had held on to a sufficient amount of data. I know there was a dispute in this case where Google wanted to delete some data in the ordinary course and plaintiffs said no, don't delete that, and then Google deleted it. So that may come into play I suppose.

Q. Well, I'm not sure what you're referring to, but I'm just asking what you saw in the data that you had.

A. I mean, I have documented that carefully in the report. I have written it down. I don't want to speak from memory on that because it is kind of a nitty-gritty point. I don't want to -- I stated it -- I wrote it as clearly as I could, so I don't want to change what I wrote.

Q. Okay. So let's look at your paragraph 416. It says "I have not observed a WAA or sWAA bit in non-GAIA,

GA4F logs."

What does that phrase, can you explain what that phrase means?

A. Yeah, so the non-GAIA logs are those, probably the data that's stored in Sawmill or data that's not stored in what Google calls the Google account, and so the WAA and sWAA bits, those bits are everywhere in Google's data, because I think Google commented that they had more than a million hits when they searched for those field names, but in the limited amount of logs that were provided by Google, you know, less than we asked for, I didn't see those bits in that data. So that's what that means.

Q. Okay. And Baseview, in this scenario, Baseview is one of the non-GAIA GA4F logs, at least the Baseview that you reviewed?

A. My understanding -- I'm sorry.

Q. That's all right.

A. So my understanding, there is a bit of a dichotomy between footprints, which is the GAIA logs, GAIA key logs, and

the Baseview, which are non-GAIA.

Q. Okay. I think I understand this phrase now.

So in 416 I think what you're saying is there are sWAA bits in GAIA logs at Google but you didn't find any sWAA bits in non-GAIA logs, that's 416; is that fair to say?

A. Yes, because the user-controlled field I believe encodes those bits.

Q. So then the last sentence of 416 says "Google could populate non-GAIA logs with user control field for the purpose of identifying sWAA-off traffic."

A. Let me just take a look at this again.

Q. Sure.

A. Yes, and I think we probably need to delve into Appendix 6, because that is mentioned here. So there is more explanations and data there.

Q. Appendix G?

A. Sorry, yes, G, not 6.

Q. Section 2.1.2?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

A. Yes.
Q. Okay, all right. In 417 you propose an alternative way to identify sWAA-off traffic, or, excuse me, sWAA-off data, which involves -- you say "Google could search its systems for all identifiers associated with that user," referring to users that we know had sWAA off at any particular time during the class period, right?
A. Yes.
Q. Did you find in your work on this case -- well, strike that.
Are there particular systems that you have in mind in this sentence, "Google could search its systems for all identifiers associated with that user"?
A. Yeah, I think I've documented a few of them in this --
Q. Appendix G?
A. Not Appendix G. I think there is section in the report where I go through, I think it is Constellation, there is another system, it is called [REDACTED], and there are a few of those which are mapping

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

essentially between identifiers.

Q. I recall that section.

A. So I think if you were to look in those mappings, Google stores mappings and they have ways -- also if you just look in your GAIA logs, you will find sometimes some of these other identifiers might be -- might be in there, so there is linkages.

So I think it would be possible to just search for the links that are already there webbed throughout all the data and find -- find all that WAA-off and sWAA-off data, or at least most of it or as much of it as is feasible to find.

Q. We will come back to that. I think I understand what you're saying now.

At least with respect to the data you reviewed in the case, were you able to make -- create a mapping between GAIA ID and what Google calls pseudonymous identifiers like device ID?

A. I mean, we have to go into the appendices where that work is documented.

Q. Which one?

A. Good question. Let me take a

look at the table of contents, because I don't know myself. Okay, oops, this table of contents -- let me go into -- let me check in one other location here.

Q. I think you mean Appendix G, tab 4, but I could be wrong.

A. Yeah, let's take a look at that.

Q. It is pretty long, so maybe I'll break down the question for a moment.

A. Sure.

Q. My first question is just did you attempt in this case to join -- strike that. Let me try again.

Did you attempt in this case to find evidence that Google had joined in the same log device ID and GAIA ID? Was that one of the things you did?

A. I think that had we noticed that, had I noticed that, I would have documented it.

Q. Okay.

A. So I --

Q. I don't think you did.

A. Yeah, I don't think I

necessarily found an indication of joining.

So just to be clear, joining and linking are two different things. Joining means putting the two pieces together in the same place. Linking means that there is just a logical connection between the two pieces of data, okay? There is a common identifier or there is a common fingerprint, okay? There might be -- data might be stored in separate places but there is a common -- there is a link between them.

Q. Got it.

A. Okay? So I'm using the standard of linking, not of joining.

Q. I understand. So I hadn't heard that distinction before, but join we will use to mean actually joined together in the same place, whereas linking is about the availability of a mapping that may or may not have been used to join. Is that fair to say?

A. We don't know whether -- we don't know whether someone has joined it or not, we just know that it is linked, there

is a link. Think of it as quantum entanglement. You've got two particles, they are entangled, they can go as far apart as you want but they are still linked.

Q. Right. But if you can only observe one --

A. Whatever you observe in one you are going to observe in the other.

Q. Well, actually if you observe it, it will screw it up, is so --

A. Well, it collapses the quantum state, so you get one or the other, outputs, if it is zero or 1.

Q. So I want to be really clear though -- well, okay, so if you had seen a join you would have documented it. You didn't document a join that Google had performed. Did you attempt to perform any joins of linked GAIA and non-GAIA data together?

A. So I'm not actually needing to join, I'm just looking for links, because the idea is if there is a link somebody who gets both pieces of data can know that that

data is associated with that user.

Q. Right. So like --

A. And also, by the way, you don't necessarily need to even link -- you don't need to join the data within Google's system. If you get some data out of Google's system that has an identifier and then you go to some third-party system and get some data, it can be linked there, or you can get, off the person's phone, you can get it.

So the problem, as I have been saying from the start, occurs at the moment that sensitive information is collected when the user has indicated they don't want that sensitive information collected, because the actual collection hurts the user.

Minimally it hurts the user by, you know, chewing up their mobile device battery and tying up their bandwidth and deteriorating the performance of their device. But, additionally, it hurts them by putting them at risk of their data being exposed when they have said I don't want

this data collected because I'm afraid for it to be exposed, if someone collects it, that is a problem. I can even give you another analogy --

Q. Well, I think I understand what you're saying, but we can come back to your analogy later. Maybe you can slip it into a different answer.

My next question is -- what I'm trying to understand is just what you did and didn't do, that's all, in this -- Appendix G is about your data testing and your procedures and all that. In this case you received what we've discussed are GAIA logs and non-GAIA logs, right?

A. Yes.

Q. Did you undertake any attempts to find a match between entries in one of those and the other?

A. I mean, I think we've documented some ways that this stuff can be matched up, okay? You know, it doesn't necessarily mean I found evidence that Google joined them.

Q. Right. I'm not saying Google,

I'm saying you. Did you successfully match any of them up?

A. I mean, we have to look through all the reports to -- I don't remember actually every detail of this.

Q. Well, I don't think you did actually do that. But I'm trying to understand, you know, I don't know what went on behind the scenes. Did you try to -- I'll tell you what I'm asking. In Brown you testified that you tried to and did join what Google calls pseudonymous data and a person's identity, but you didn't say that in your report here, and so I don't know if that's because you tried and it didn't happen or if it's because you didn't try.

MR. MAO: Assumes facts not in evidence. You are assuming that the analogies are one-for-one in one case versus the other.

MR. SANTACANA: I'm not assuming anything.

Q. I'm just trying to understand what you did and didn't do, and that's

context for my question.

A. Sure. So a couple of things. One, I didn't prepare Brown, I haven't reread my Brown report for this. And I have also kind of avoided talking about Brown in this case and you have sort of opened the door up there.

I think that we, in this case, I and my assistants, did the analysis on what data we had. We may have had less data here than we had in Brown. It is -- it is a different case, different circumstances.

Q. So, but did you try to match together entries in a GAIA log to entries in a non-GAIA log to show that they belonged to the same person or the same device? Did you attempt to do that, yourself or your team?

A. I mean, I think we were able to do that with fingerprinting. I think we did find some ability to match up like using some timestamp combined with some other data we were able to correlate things I believe. I think there is a test in

there that talks about that. I'm aware that the timestamps are fuzzed a little bit but that fuzzing doesn't appear to have been enough to stop us from doing that.

Q. Okay. So you're saying you believe that you did use timestamps to match together entries?

A. I'm just -- I haven't found it in the report yet. I'm speaking from memory. I believe that there was some point at which we were able to match stuff up just using fingerprinting at minimum, and whether we were able to match up with identifiers is something else. But it's documented in here. If we did, we did. If you're saying it's not there, then it's not there. I can -- I can accept your representation, although the document will ultimately speak for itself.

Q. I don't think it's there, but I also don't want to sit here for an hour while you read it. So maybe during a break you can try and find that spot.

A. I will -- during a break maybe I will figure out if I can find that or

not.

Q. Okay. But you -- but suffice to say then it sounds like you do recall attempting to conduct such a match?

A. I think that for thoroughness I have looked into that and it may be the case that the way the data was presented to us in the selection of data, which was pretty limited, it didn't pan out.

Q. But if whatever you did find, it would be documented here, right?

A. Yeah, whatever I did find is documented, and I don't have anything to change at this moment.

Q. Okay.

MR. MAO: I will --

MR. SANTACANA: It is not an objection. You can complain during a break. I already know what you are going to say.

MR. MAO: The objection is to the form of the question.

MR. SANTACANA: Okay, if you say so.

Q. So part of your purging opinion

has to do with joining that user control field from a GAIA log to a log that doesn't contain GAIA?

MR. MAO: Objection to the form of the question, mischaracterizes the evidence. But go ahead.

A. Let's go take a look at that. What paragraph are you looking at?

Q. I think it is 416. Yeah, so 416, "Google could populate non-GAIA GA4F logs with this user controls field for the purpose of identifying user data/identifiers associated with sWAA-off traffic."

Do you see that?

A. Yes.

Q. So my question about that is did you attempt to develop a method to figure out how to match up the user control field from a GAIA log to entries in a non-GAIA log?

A. So I believe that Appendix G, which I haven't read through, will have some information about that, if that -- if that has -- if I did figure that out.

I would also just comment that there are some identifiers in here that Google constructs via cryptographic methods for which Google has a key and we don't. So Google may have some additional capability using its keys to be able to match things up better than I could.

Q. You said Google may have additional capabilities using its keys. Did you render the opinion in the case that it can do that?

A. I think that all the details are in Appendix G, which is cited here. So I think I would have to read through that carefully and I could probably sort it out. I just don't have it at the top of my head.

Q. Okay.

MR. MAO: Just one point of clarification. I do think the way you used the word "joined" here is different than Brown. In Brown the definition of "join" was talking about Google joining. You asking about Jonathan to join is kind of a strange thing. I'm just noting that as a

standing objection.

MR. SANTACANA: Okay. I'm using Jonathan's definition of "join" for today.

MR. MAO: Let's just let you finish, because I'm pretty -- very, very confident that's not how that was used in Brown.

MR. SANTACANA: Okay. Well, this is not Brown, but that's helpful to know.

MR. MAO: Well, you are analogizing the two. That's the only reason why I was trying to make a point of clarification.

MR. SANTACANA: I get it.

Q. Okay. Did you undertake in this case to populate a non-GAIA GA4F log with a user control field from a GAIA log to identify user data associated with sWAA-off traffic?

A. Unless I presented it in that Appendix G, which I haven't read recently, I didn't, okay? But if I did, it would be documented.

Q. I didn't see it there. I mean, this sentence says Google could do this, but it's not citing anything. I mean, we can look -- you do cite Section 2.1.2 to discuss user controls. So we can take a look at that. I will take a look during a break, but I don't think it's in there.

A. Well, why don't you take a look and then we'll take a look and then we will see if we can get to the bottom of it.

Q. Great. Then I'll move on for now.

You also reviewed ads data from ads logs in the case, right?

A. Yes.

Q. Do those logs contain any sWAA bit, the ones that you reviewed?

A. I don't recall. I mean, it's sort of a very big set of data that was reviewed and a lot of analysis, so I would just cling to the report and what I've documented in the report, because that has all the answers.

Q. Okay. Were the ads logs that you reviewed in your mind GAIA logs or

non-GAIA logs?

A. I think the ads logs seemed like they are something separate from GAIA, but, again, I think I've documented it clearly in the report, so whatever I've said holds.

Q. Okay. Now moving to paragraph 418, you say that "It is not possible at this point to 'unbake the cake,'" so Google would need to delete internal products, services or algorithms it built in whole or in part with sWAA-off data.

Are you rendering an opinion in this case as to which products, services or algorithms those are?

A. No, because you could see in footnote 183 I have said that an independent assessor could look into that.

Q. Okay. So that would be like a future project?

A. Future work.

Q. Okay. And you do not identify in this report a list or a partial list or even examples of products, services or algorithms that Google built in whole or in

part with sWAA-off data?

A. No.

MR. MAO: Just a standing objection, that I don't want to -- I don't want to get bogged down with the discovery history in this case.

MR. SANTACANA: I appreciate that.

MR. MAO: Yeah, just my objection, a standing one, but I will let you ask your questions.

A. Can I answer it now?

Q. I thought you did.

A. I didn't really answer.

Q. My transcript says you said "no."

A. Yeah, I was going to say more.

Q. Well, that's okay. I got my answer.

All right, let's talk about app developers. So app developers are the ones who install Google Analytics for Firebase into their app, right?

A. Yes.

Q. Google doesn't install it?

A. That's an interesting question. That's a really interesting philosophical question, because one thing I covered in the report was the migration from AdMob to AdMob+ when Google sort of inserted the Google Analytics for Firebase essentially code and functionality into the advertising SDK and deployed that essentially as an update to the advertising SDK so that everyone who had the advertising SDK suddenly had the Google Analytics for Firebase functionality in there. So that's just a caveat I would put into that answer.

Q. Okay. We will get to AdMob in a moment. I'm trying to keep the record clean. My question was about Google Analytics for Firebase, that's the GA4F SDK.

A. That SDK is installed by the developer. I just noted that Google did slip essentially that code into another SDK by way of an update.

Q. Yeah. We will get to that, because I don't think that's what your report says, but we will get to that. GA4F

is an optional feature of the Firebase SDK which has other features in it too, right?

A. Let me take a look, because I have actually documented this pretty carefully in the report, a section that talks about the SDKs.

Q. Yeah, I think that is 62.

A. Yeah, and I don't want to change what I said there.

Q. Paragraph 62.

A. Okay. It's in the background section I think.

Q. Yes, page 28.

A. All right, so I just would point out in paragraph 63 for app developers that use Firebase GA4F is enabled by default. I also want to note here it says that GA4F is tightly integrated with ads, which is one of the points I was making previously.

Q. Okay. But you're not asserting in this case that developers are using Google Analytics for Firebase by accident, right? They are all intending to do it, you have to take steps to make it work?

A. I think that I don't feel like I need to fight you on this point.

Q. I don't think you do.

A. So I would just let my report speak for itself. Whatever I've said stands.

Q. Okay. Now let's talk about the AdMob or GMA SDK for a moment. So paragraph 71 says "In order to use AdMob, app developers must embed the Google Mobile Ads SDK in their apps."

That at least is accurate, right, that SDK doesn't appear by accident, an app developer has to incorporate it?

A. Yes.

Q. Now, 73 -- so I think you just asserted that Google slipped AdMob+ into AdMob with an update that meant that developers were suddenly using it without knowing it I think is what you were implying, but I don't think that your footnote 60 supports that. So just take a look and let me know if you want to recharacterize your testimony.

MR. MAO: I object to the

characterization.

A. No, I think I like the testimony, but you should look at paragraph 74 which quotes and cites Google created AdMob+ to ensure we are collecting analytics data for all AdMob publishers.

Q. That's a quotation from some Google document, right?

A. We should look at the document, yeah.

Q. Okay. Well, what I'm looking at is paragraph 73 which says "Fewer publishers than Google expected became early adopters of Google's AdMob and Firebase solution." And then in the footnote to that sentence it says -- it cites a document and in parentheses quotes the document saying that the AdMob+ and Firebase integration only has ██ ████████ adoption.

I think, I mean, this is just kind of basic logic, but I assume that means then that the other ██ ████████ had not yet adopted AdMob+, so obviously the developer has to take some step to do it,

right?

A. No, because you can see in paragraph 74 and 75, well, in 75 I say "Google neither used the term 'AdMob+' externally nor marketed its new capabilities as a separate product. Instead, in the summer of 2019 Google simply updated the existing Google Mobile Ads SDK, so that analytics functionality was automatically available," and that "According, to documents Google produced in this litigation Google aimed 'to achieve 100 percent of analytics data collection for AdMob publishers.'"

So all that to me reads a little bit like force-feeding.

Q. Okay. Well, I mean, we're here for your expert testimony, so I just want to make sure you're being as accurate as you can be, okay? Are you opining in the case that AdMob+ functionality was force-fed to app developers?

A. I think someone could draw that conclusion, but what I would testify about in court is what it says here in the

report.

Q. Which is that Google aimed to achieve 100 percent adoption, and that the functionality was automatically available, right?

A. Well, here's the thing, when you have an SDK --

Q. I'm just saying you said that in here, right?

A. But I want to clarify to you that when there is an update to an SDK, generally developers will install updates, they will uptake the updates, because the updates may be needed for security reasons. You know, keeping your software up to date and patched is generally an important thing to do.

Q. Did you evaluate the patch in question?

A. I did not evaluate the patch in question. I've just noted that this was an update that was made and this was part of Google's statement that they want to achieve 100 percent analytics data collection for AdMob publishers, and this

is after they said they only had ██ ████████ adoption.

Q. Try and -- try and just stick to the question. Did you evaluate the update patch that you're talking about?

A. No.

Q. Did you evaluate the documentation that came with it?

A. I think I've cited some of it here.

Q. You cited the documentation to the update in question?

A. Well, that becomes a boundary issue of what do you mean by "documentation"? You have correspondence around it.

Q. I'm talking about correspondence with developers.

A. I've cited to a bunch of documents. So those are the ones I've cited and until we look at them I can't off the top of my head remember what's in each one of these Bates numbered documents.

MR. MAO: Yeah, belated objection, mischaracterizes the

document.

Q. Okay. So if you haven't cited documentation that was provided to developers in this report about the AdMob+ update, then you didn't review it; is that fair to say?

A. I've cited everything that I've reviewed regarding this issue.

Q. Okay. Now, back to GA4F, Google Analytics for Firebase features of the Firebase SDK can be customized by app developers; is that fair to say?

A. What paragraph are you referring to here, if any?

Q. Just generally.

A. I don't know if I have given that opinion or not. If I said so, then I said so, and if not, I want to check what your source is.

Q. Okay. Well, you're aware that there are custom events?

A. Yes.

Q. And those are customizable by the developer?

A. Okay, now I understand what you

are talking about, yes.

Q. You yourself in this case made some custom events for the test app that you created, right?

A. Yes.

Q. And then there is also what's called automatically collected events?

A. Yes.

Q. And those are customizable but to a lesser degree I guess?

A. Okay. Yeah, I think that might be a fair way to describe it.

Q. So part of the customization that's possible with Google Analytics for Firebase is choosing the types of information to send to Google?

A. Yes.

Q. And part of that is choosing, for example, which custom events to log in your app, if any?

A. Yes.

Q. You or your team configured your test app to log certain custom events, right?

A. Yes.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q. And those events would have a name and also parameters associated with them?

A. Yes.

Q. And the parameters can also be customized?

A. You can choose what parameters to send.

Q. And what they say?

A. Yes.

Q. Okay. And your team made the choice to test out whether you could send an e-mail address as a parameter of a custom event for the test app you made for this case?

A. Oh, yes, because we observed that in the wild and we were looking to recreate and so we could say this is the process by how such a thing we have observed in the wild has occurred.

Q. Got it.

A. It is scientific to try to reproduce an observed phenomenon.

Q. And you were able to do it, you were able to customize your test app to

send those e-mail addresses?

A. Yes, and I'm also aware that there is various terms of service that seek to guide developers about what kind of data they should and shouldn't log. I'm aware of that.

Q. Okay. We will come to that.

MR. MAO: Sorry to interrupt, I'm just letting you know, can we take a break at 11:30? About 23 minutes.

MR. SANTACANA: 2:30?

MR. MAO: Yeah, sorry, I just have a quick call, personal call.

MR. SANTACANA: No problem.

Q. Okay. Had you not customized your test app to send e-mail addresses, those e-mail addresses would not have been sent to Google, right?

A. Correct. That's not a default behavior.

Q. Okay. Do any of the automatically collected events for Google Analytics for Firebase send e-mail addresses?

A. Not that I'm aware of.

Q. Do any of them send any personally identifiable information?

A. Yes, because they send identifiers that can be linked to an individual -- I'm sorry, I used that subjunctive but I shouldn't have. They send identifiers that are linked to an individual.

Q. To an individual device?

A. Yeah, and the device is linked to the individual.

Q. Okay. Setting aside device identifiers and other similar unique identifiers, is there any other personally identifiable information that is sent with the Google Analytics for Firebase automatically collected events?

A. As far as I know, the automatically collected events, as far as it concerns the issues here, relate to the personal identifiers that are sent, in other words, identifiers that link to a person. I'm not asserting that these automatic events will automatically send an e-mail address or a phone number or a

license plate number. I'm not asserting that and I don't want to sort of overcharge Google in this case.

Q. Okay. So Google didn't design Google Analytics for Firebase to have people send them names or e-mail addresses through automatically collected events?

A. Yeah. What I will observe is that we did observe it happen, and I understand Dr. Black's rebuttal, which is that that's not according to the terms of service, that the developers shouldn't do that, I understand that.

My retort to him is that in any policy there is always some rate of compliance and some rate of noncompliance. With something that is very, very widely used there will inevitably be some noncompliance even by legitimate, good-faith parties who we observed who did this probably erroneously, accidentally, unintentionally, it has happened.

And I think that the other insight from this is that when it does happen, of course automatically identifying

an e-mail address as a piece of data is a very easy thing to do. There is like functions -- canned functions that do that for you, is this a valid e-mail address, is this string a valid e-mail address. A quick test, you can know.

I just would comment that Google upon receiving the data doesn't seem to run that test to say hey, is this an e-mail address, is this a phone number, is this something, you know, likely to be very sensitive, and maybe we should redact this and not log it. I just would note that Google isn't doing that, and that might be a good thing for them to do.

Q. That is understood. So just so we're super clear, when you talk about rate of compliance with the policy, you're not opining in this case that Google, even though it has that policy with developers to not send names and e-mail addresses and the like, that Google wants them to be sent to Google anyway, that's not one of the things you're opining on?

A. No, I'm not -- I'm not saying

that.

Q. Okay. And you're not opining that Google is capitalizing on the noncompliance of developers who do send things like name and e-mail address?

MR. MAO: So, sorry, just --

MR. SANTACANA: Objection to form works.

MR. MAO: Yeah, objection to form.

Q. Go ahead.

A. Can you read back the question? Sorry.

Q. I'll do it. You're not opining that Google is capitalizing on the noncompliance of developers who do send things like name and e-mail address?

A. No.

Q. Okay.

A. Also, I would just also comment that the policy is -- the policy documents and the terms of service are kind of lengthy and complex things and I'm not trying to give you a legal opinion even to say this is compliant or noncompliant, I'm

just sort of taking his word for it that I'm assuming it's noncompliant.

Q. Understood.

A. I'm assuming what he says is right, but maybe somebody is going to argue that that is actually wrong.

Q. An app developer might show up with a different view, understood. But in this room we can agree it's not compliant to send e-mail addresses that way?

A. I'm taking it as an assumption.

Q. Okay. So in that test app did you also incorporate the GMA SDK?

A. I've documented whatever is incorporated in there, because there are two test apps and we should just look, because that's an interesting question and I don't remember it off the top of my head.

Q. Okay. We will look -- I will look during a break and come back to GMA. Okay.

When you were configuring your test app and the Google Analytics account that went with it, did you enable Google Signals; do you know?

A. I don't recall, but it may be documented.

Q. Okay. I don't think it is, but I will check.

And then you're familiar with the check box developers have access to to enable or not enable data sharing, quote, "data sharing" with Google?

A. You should just show it to me so I'm sure we're talking about the same box.

Q. Okay. I could do that.

All right. Now, you are -- you said you are familiar that there are terms of service. Did you review them for this case?

A. I've looked at them.

Q. These are the terms of service between Google and the users, the app developers of Google Analytics for Firebase?

A. Yes.

Q. Are you opining in this case about the rate of compliance or noncompliance with those terms of service?

A. No.

Q. Are you rendering any opinion in the case about Google's efforts to enforce or failure to enforce its terms of service against app developers?

A. I mean, I just made an observation that they take e-mail addresses and don't seem to be scanning for them, so that's kind of an interesting data point. But, in general, I haven't issued opinions about Google attempting to enforce terms of service or not. Someone might draw a conclusion from the fact I noted.

Q. You've said that Google doesn't seem to be scanning for them. Is that just because you found some in there so you concluded they are not scanning for them?

A. Well, I found some in there and I was able to insert some and they weren't blocked.

Q. To your knowledge.

A. To my knowledge. And I guess Google could of course, you know, they could clarify that if they wanted to.

Q. Sure, okay. Apart from that,

are you rendering any opinion in the case about Google's efforts to enforce or not enforce its terms of service?

A. No, I'm trying to render technical opinions, not something like that.

Q. And you haven't done anything to measure or quantify or test Google's enforcement measures?

A. No, I haven't done a survey to quantify that. All I would say is it's a commonly known principle in security, in computer security, that there's no such thing as perfect security and there is no such thing as perfect compliance. When you try to get humans involved in a system, they make mistakes, it is just inevitable.

Q. Sure.

A. So when I say there is a noncompliance rate, there is going to be some noncompliance, but I haven't sought to quantify that.

Q. Okay. In those terms of service, Google does require developers to disclose the use of Google Analytics for

Firebase to their end users, right?

A. I will take your word for it.

Q. Okay.

MR. MAO: Just standing objection here in this area that you're asking him about disclosures of things which he has not been designated for. But go ahead.

MR. SANTACANA: Well, that may help speed things up actually.

Q. Did you -- did you, just to sort of close this out, did you review any privacy policies from third-party app developers to determine the degree to which they mention or don't mention Google Analytics?

A. That's outside the scope of my report.

MR. MAO: Eduardo, I'm not saying that, you know, as part of your questions to understand how they did the setup and the testing that you're not entitled to it.

MR. SANTACANA: Right.

MR. MAO: But I view that as

being part of the mechanics in his personal capacity as opposed to a disclosed expert for the subject area.

MR. SANTACANA: Right. No, I'm just closing him out. If you are not going to present him on it, that's great.

THE WITNESS: No.

Q. Okay. I think you do have an opinion that Google does not provide users with control over Google's collection and saving of sWAA-off data, right?

A. Yes, I think I've said that.

Q. And I think that's on page 115 of your report.

A. Yes.

Q. It's a couple of -- three paragraphs here. You say in 251 "There is no way to prevent Google from saving WAA and sWAA-off data once it is logged." Sorry, wrong paragraph. Let's go to the top. 249 you say "It is my opinion that Google, throughout the class period, has uniformly not provided users with any control that stops Google from collecting

and saving the WAA-off and sWAA-off data at issue in this case."

A. Yes.

Q. Setting aside whether Google has presented a control in my account for that, to the extent users review a privacy policy from a developer that discloses the use of Google Analytics, isn't one way for them to avoid the collection to not use the app?

A. I think that that is a very heavy lift for the user to understand, using Google Analytics -- we are using Google Analytics for Firebase and the user would now need to understand that that SDK is ignoring their WAA-off and sWAA-off settings. The simplest explanation there is for the user to just imagine, that's okay, you can use that because I have set WAA and sWAA-off, and I'm not being tracked.

Q. So in your view a user who reviewed a privacy policy that disclosed the use of Google Analytics for Firebase would conclude that the sWAA button

overrides that?

MR. MAO: Objection, vague.

But go ahead.

A. So, one, I'm not here I don't think to testify about user perceptions. I mean, I mentioned it in passing a few places. We have covered this.

Q. I didn't think so, but you did just kind of say something about it, so I just want to understand.

A. Yeah, so, no, what this is saying is from a technical perspective there is no button there that will stop that data collection.

Q. Okay. That's the extent of the opinion?

A. That's the extent of the opinion.

Q. Okay. Let's talk about --

A. I've just lost my connection, which is going to hinder people on Zoom from watching.

MR. SANTACANA: Let's go off for a second.

THE VIDEOGRAPHER: The time is

2:22 p.m. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 2:41 p.m. We are back on the record.

A. If I can say something, because you asked me during a break to look into it.

Q. Yes, please.

A. So I did look at that and kind of refreshed my own memory, but we didn't really seek to join, in other words, discover links between the identifiers that are collected and logged and GAIA, because there is no need to. Okay? What we did to find the users' data was to just harvest the identifiers off their device and request that data, and that's -- that's the linkage that's of interest.

Q. Right, understood, or the test device you were using.

A. Right. So I hope that clarifies what I said previously in that line of questions.

Q. Yeah, that sounds consistent to me with what you said. I just want to make

sure I understand. So you requested -- you used the device identifiers that you took off of either plaintiffs' devices or test devices to request data from Google?

A. Yes.

Q. And the identifier in question was a device ID?

A. Some sort of device ID, yes, or an app instance ID, something you could find on the device.

Q. Yeah, I think app instance ID never resulted in anything, we just used device ID.

So then you got your data. Those were all non-GAIA logs, but you also got GAIA logs which were used -- which you got because e-mail addresses were queried, right?

A. Okay.

Q. So I guess my question is you had those GAIA logs, you had those non-GAIA logs, so just to be perfectly clear, you didn't attempt to like find a line in the GAIA log that matched a line in the non-GAIA log and put them together?

A. I do remember at some point finding some correspondence just by using fingerprinting techniques. So I don't know if that made it into the report or not. But let's just say that the report -- the report explains everything very completely.

Q. Okay. Sorry, correspondence, you mean in a technical sense?

A. I did find at some point, and I remember finding a technical correspondence by using some fingerprinting technique. I was able to match a couple of different log sets of data up using fingerprinting.

Q. And using fingerprinting, that means trying to match one field in one log to the same field in another log?

A. Like some data -- some data in one log with data. Because the actual data provides a lot of matches sometimes.

Q. And did you document those matches in the report?

A. I just remember doing it, and I don't remember whether we put it in the report or not. Maybe it got left on the cutting room floor, I don't know.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. I don't think it is there, but that's what I would like to talk about if you do find it.

A. Okay.

MR. MAO: So just real quick, this will be quick, so my understanding in Brown was that when -- they were talking about -- let me just say my objection. When they are talking about joining, they are talking about joining to GAIA. So however you are comparing it to, just please make it clear on the record or else I'm going to make sure that we rehab it and it unnecessarily stretches this out, okay? Thank you.

MR. SANTACANA: Could we go off for a second?

MR. MAO: Yeah.

THE VIDEOGRAPHER: The time is 2:44 p.m. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 2:46 p.m. We are back on the record.

BY MR. SANTACANA:

Q. I want to jump back for a

moment, Mr. Hochman, to when we were discussing your three changes that Google could make; stop collecting, purge, and delete, okay, as I call them, and I want to focus on the stop collecting one. So I think the way you phrased it at paragraph 409, let me know when you're there.

A. Yes.

Q. So paragraph 409, the first sentence is "It is my opinion that Google could change WAA and sWAA so they match their function as described in Google's disclosures. Put differently, Google could change WAA and sWAA so that WAA and sWAA actually do the work that Google says they do."

And my question is, keeping in mind that you're not opining on sort of what the words are supposed to mean or all of that, I'm not asking you about that, isn't it also fair to say that another change that Google could make would be to describe WAA and sWAA differently to match the function that you observed in the case, and that would also sort of do away with

the problem?

A. I don't think that this is really a solution, because the users -- users want to have privacy, and I think Google has undertaken some commitments to allow users to have some control over their privacy and that would sort of defeat, you know, the bigger purpose of all of this, which is to give people some option.

Because, you know, that's really sort of the point of these controls is to give someone -- if you change the description and say these are fake controls, that doesn't really solve the problem of them being fake controls.

Q. Well, if the description of WAA said we're still going to have Google Analytics even when you turn WAA off, but when WAA is off we won't tie analytics data to your GAIA, which is the unique identifier associated with your Google account, that would be accurate?

A. No, that wouldn't be accurate.

Q. Okay. Why not?

A. Because you are saying it

wouldn't tie to your GAIA, and the problem is that this stuff tends to tie together because there is data collected in both scenarios which correlates strongly and it ties, it links.

Q. Okay. So what if instead it said we won't join your analytics data to your GAIA using the definition of "join" we have been using today?

A. I don't really think that's a solution either, because essentially what you're proposing to do is to tell people, hey, we are going to give you this control which actually does nothing to improve your privacy.

Q. Well, again, I'm just -- I'm just trying to understand, the control does something, right? It does impact the way Google stores the data, right?

A. Google still stores the same data, it just stores it in a different place.

Q. And with different things associated with it?

A. I'm not sure about that. I

think the way I would describe it is they are storing the same data but just in a different place and that data is still linked to you. It has personal identifiers. It has your device IDs in it. It is essentially like a license plate on your device. Like a license plate on your car and device ID on your phone are kind of analogous.

Q. That is fine. So let's use -- well, I don't know how they are analogous. But because the license plate is tied to your name at the DMV's database, right, on a mapping table, right?

A. Well, I don't want to -- I mean, we may be getting into too much detail there, but the idea is that it is --

Q. It is your analogy.

A. The license plate is a unique identifier for a car. Do you follow me there? It is a unique identifier for your car.

Q. Okay.

A. Your VIN number is a unique identifier for your car.

Q. Okay.

A. So they are unique identifiers for your car. And your phone has unique identifiers, okay? So the problem is that those unique identifiers are persistent, they are stable over time, they point to a single person, they are personal identifiers, and that becomes a problem. Using those identifiers and spreading them all over the place in logs is a problem because all that data is linked back to the user.

Q. So I understand that you consider that to be a privacy problem. My question is about this part of your report where you say "Google could change WAA and sWAA so that WAA and sWAA do the work Google says they do," I'm just pointing out, or they could change how they describe WAA and sWAA to match up with the work they are doing?

A. So I considered that possibility and did not write about that. I did not say that because I don't think that solves the problem.

Q. Okay. I understand. Now, turning back to app developers, did you incorporate any other analytics products in the test apps for this case other than Google Analytics for Firebase?

A. Not that I'm aware of.

Q. App developers can incorporate multiple analytics SDKs from multiple providers in the same app, right?

A. In theory, they could.

Q. Why do you say "in theory"?

A. I mean, I just haven't -- I haven't expressed an opinion about that.

Q. Okay.

A. And I haven't -- I mean, what you're saying, I don't know of a reason why they couldn't. Let's leave it at that.

Q. And you're not expressing any opinion as to how often developers incorporate multiple analytics SDKs into the same app?

A. No.

Q. And you are not expressing any opinion in the case about how hard it would be to have multiple analytics SDKs in the

same app at the same time?

A. No. I mean, the only thought I have on that is it starts to gum things up. You know, it is going to chew up more battery and tie up more bandwidth.

Q. Okay. I meant how hard it would be for the developer to have multiple analytics SDKs in the same app.

A. It doesn't strike me as something that would be particularly hard from a programming standpoint, but from a software engineering standpoint it is probably desirable to keep it light, you know, not to gum it up with too much different technology.

Q. Okay, I see, I understand that, okay.

So we were talking a moment ago about persistent identifiers, right, and that the persistence is the problem. Go ahead.

A. No, I should let you finish the question.

Q. The same device IDs that are persistent unique identifiers for a device

that Google gets from Google Analytics are also sent to other places on websites and apps if they use other analytics providers, right?

A. I don't have any disagreement with that.

Q. So the same event data from let's say -- let's just use the event first open as an event example, right, first open standard event you would have in any analytics SDK, right?

A. Yes.

Q. So first open gets triggered, and the app developer has AppsFlyer and Google Analytics and Facebook SDK all integrated into the same app. All three of those are going to get the device ID and the fact that the event occurred, right?

A. Presumably.

Q. So let's say the sWAA button works the way that you want it to work, which is that if the person has sWAA off, Google will -- well, let me first ask, is this the way you think it should work, if the person has sWAA off Google will reject

the device ID tied first open event?

A. I mean, I think that a better way would be, let's just keep it simple, if WAA or sWAA are set, then the SDK will learn about that and remember that and whenever the app runs, the SDK just won't transmit data back to Google.

Q. At all, right, okay. Not even -- so it's not rejecting it, it is just not transmitting it in the first place?

A. I mean, maybe it sends something, you know, could it send something? Yeah, there might be something it can send as long as it doesn't include anything that ties to the user.

Q. Okay. So the user in this hypothetical is a sWAA-off user, they have Google Analytics, Facebook and AppsFlyer all integrated into the app, so the Google Analytics SDK in your world will not transmit at all for that user, right?

A. Let's say that that was the case, yes.

Q. Okay. And then -- but AppsFlyer will, right? AppsFlyer doesn't

have a sWAA button?

A. Assume it doesn't.

Q. I don't think it does. Facebook doesn't have a sWAA button as far as I know.

A. I'm not sure about that. I haven't looked into it.

Q. Okay. Let's actually stick with AppsFlyer. Like you said, they're not on the both sides of the thing. So the device ID in first open gets sent to AppsFlyer but doesn't get sent to Google because that user has sWAA turned off, right?

A. Okay.

Q. Why would a developer like you use the Google Analytics for Firebase SDK at all if the sWAA-off data is not going to get sent, but they could use AppsFlyer and get all of it?

A. I don't know. That's an interesting question, and I haven't opined about that and I haven't done, you know, that analysis. This is sort of a further down the road question, isn't it?

Q. I suppose. I'm thinking about the privacy risk of the device ID being out there, right? Isn't it basically the same risk if that user's app won't send to Google but it will continue to send to AppsFlyer, same persistent -- same license plate as you say, isn't it the same problem?

A. I'm not sure, because, I mean, just thinking it over, one of the things I think I noted right in the preface sort of of the report, the introduction, I talked about the very large amount of activity that Google collects.

Google has a really big, you know, sort of wrap-around view of a lot of stuff. AppsFlyer may have a more narrow view and that data may not be saved by AppsFlyer, it might just be sent to the individual app owner. So now you've got this kind of very fragmented world where there is data spread out in a bunch of little silos, it is not all in one juicy target.

Q. Okay.

A. So that could qualitatively be different.

Q. So because they are in different silos, the fragmenting of the data across different silos makes the privacy risk lower than in Google's scenario where it's all under the same roof?

A. I don't know that even I would go so far to say lower. I would say it may create a different risk profile. It may create a different set of risks and probabilities.

Q. Would it be less concerning to you?

A. I don't know. Because I'm not here to evaluate AppsFlyer, so I haven't thought that all through and all I can say is that it's a different scenario.

Q. Well, what if Google spun out Google Analytics for Firebase, right, it bought Firebase, what if it spun it out into its own separate entity?

A. I don't know. Someone would have to do an analysis of that. I mean,

maybe that solves your problem, maybe it doesn't. I don't know. I mean, could that be a viable solution? Maybe. I think you would have to investigate it.

Q. Okay. Let's talk about personalization. So speaking of semantics, there is some back and forth with you, between you and Black about this word "personalization," so I want to ground it in your report. So I'm going to have you compare two paragraphs for me. First, paragraph 278, really the first four lines of that, and then 277.

A. Okay.

Q. So just review those for a moment.

A. Yeah, I was already back at 277.

(Witness perusing document.)

MR. MAO: Let's go off the record.

THE VIDEOGRAPHER: The time is 3:01 p.m. We are off the record.

(Discussion off the record.)

THE VIDEOGRAPHER: The time is

3:08 p.m. We are back on the record.

BY MR. SANTACANA:

Q. Okay. So you have had a chance to look at 277 and 278?

A. Yeah, and I looked at the paragraph before them also which had some enlightening stuff in it, 276.

Q. Okay, yeah. So we'll get to 276. Thank you for pointing that out. I actually want to start at 278 and work backwards.

So in 278 you say "Ad personalization is impacted by two additional user controls: GAP and NAC. Because Google does not use data collected by GA4F from WAA and sWAA-off users to serve personalized ads, such WAA and SWAA-off data is not used for ads personalization regardless of whether GAP and NAC are turned on or off."

So just hold that in your mind for a moment.

A. Okay.

Q. And then in 277 you talk about the distinction between personalization and

targeting, right?

A. Yeah, based on the evidence in 276. I don't think you can read 277 without reading 276.

Q. Well, let me just ask you this: Is your statement in 278 about ad personalization incorporating the distinction that you draw in 277 between personalization and targeting?

A. The answer is yes, and I would just adjust the question slightly, or the assumption in the question slightly, which is that I'm pointing out that Google is making a distinction between personalization and targeting, and I'm sort of adopting that in my further analysis, and the basis for that opinion is what I've outlined in 276, which actually follows from 275.

Q. Right, yeah, and we'll get to 276, which I think has certain errors baked into it. But I want to stick with 277 for a moment to make sure we're using the right -- the same terminology, you and I.

So "Google seems to consider

CONFIDENTIAL - ATTORNEYS' EYES ONLY

advertising as targeted but non-personalized when it is based on information associated with a user's non-GAIA IDs as opposed to the GAIA ID," and then you give some examples of what that might be. Then you say -- or before that you say "Google defines 'personalization' as altering a user's experience based on information associated with their user ID."

Just one clarifying point, do you understand the phrase "user ID" in that sentence to mean GAIA ID in the next sentence, do you understand them to be interchangeable or different?

A. I believe -- I believe that, yeah, user ID is referring to the GAIA ID, although to be 100 percent sure I would have to take a look at that document just to be sure.

Q. Isn't one of the elements of personalization in this distinction that's being drawn here that personalization requires the leveraging of historical information about -- or associated with the

user ID and then for targeting it relies on information that is nonhistorical?

A. I mean, I think that's one way to look at it. Historical is certainly a category of information that's in the -- associated with the GAIA ID, but there might be some other settings there or something, you know, that maybe is not necessarily historical, but just a configuration.

Q. Got it. Persistent settings?

A. Something like that, yeah. Maybe you wouldn't view it as historical, you would just view it as a setup.

Q. The reason I'm asking is you give three examples of what targeting includes. You say "such as language, type of device, and content of the app being viewed."

So those three examples are all pieces of information about the --

A. Let me help you, current context.

Q. Yes, current context of the advertisement that's being served?

A. Yes.

Q. And then in your definition of personalization, when you say "information associated with their user ID," there I think you are referring to, and I can pull up the document, but I think you are referring to information that is in what you called earlier a dossier about the user, right?

A. Yes, and in this case it would be the dossier of data collected in what Google calls the user's account, in other words, the area that's associated -- the data structure that's associated with a GAIA ID, or the data stored that is associated with the GAIA ID.

Q. Got it, okay. So with that clarification in mind, you're not -- you're not disputing in this case that Google will not personalize ads, as we have just defined it in this back and forth, with sWAA-off Google analytics for Firebase data?

A. That's correct. I only said that Google, just because they are not

personalizing, they still might target, but targeting is different than personalizing.

Q. And one difference is you could do targeting without keeping a dossier?

A. In theory, yes.

Q. You could even do it without saving the information at all presumably?

A. I mean, I could think of ways to do it without even transmitting that information. If you just had that information at the device, I could imagine a way to architect it that you might, for example, say give me a set of ads with some specs and I'll hold the specs here and I'll match the ads you send me with the specs and I will display the one that matches up the best. I mean, whether --

Q. That sounds really slow.

A. Well, yeah, that might be troublesome, but maybe not. You know, the app during idle time could download all kinds of ads and just, you know, selectively display them. I mean, there are different ways to design a system and there might be some ways to do this. I

CONFIDENTIAL - ATTORNEYS' EYES ONLY

think this is all beyond the scope of the report and it is more of a curiosity than anything we really need to focus on.

Q. Yeah, I am curious about it though. Is, in your mind, is the targeting referred to in 277 at odds with the representations made in the WAA control?

A. I don't -- well, I think that the issue is that the WAA control, if the representation is interpreted, let's just say that the Court is going to figure out what that is promising, let's say the Court finds or the factfinder finds that the WAA control is promising the user not to send the data and not to store the data. If that were the case, targeting is impossible under the current architecture of the system without sending the data. The system would have to be some completely different system to maybe do that.

I'm thinking about some of the patents that I have reviewed in other matters, public patent documents from the early internet where they actually did have ad systems where, you know, the server

would load up a whole bunch of ads to the computer and then the computer would just pick which one to show, so, I mean, people have tried to design ad systems that way.

Q. I think I know what you're saying. So --

A. There is always -- there is always a dichotomy between the server and the client and you can sort of shift the workload between them, and obviously there is a better way to do it.

Q. Yeah. But does it -- would it make a difference to you if the data were used in short-term memory and discarded, the data used for targeting, so it's not saved?

MR. MAO: Objection, vague and compound. Go ahead.

A. What difference would it be, if the data was sent to the ad server and was transient and it wasn't stored, I mean, that might be -- that might improve some of the privacy and security properties, but it doesn't necessarily comply with the user's expectations on that control, because I

have already told you that not sending the data at all may be what the user is expecting.

If that's what they are expecting, they are also, you know, the users can have different concerns. Some users -- well, let me -- let me walk it back.

I don't know what the users are thinking. I haven't studied or surveyed that, okay? I really shouldn't even speculate about it. The user -- if the user's expectation is nothing is to be sent and nothing is to be saved, then obviously sending doesn't really work, okay? But if somehow someone finds a different way, you know, is it better to save only for a short time versus saving for a longer time versus saving permanently? You know, the longer you save the data, potentially the greater the risk. But I don't think that's determinative in this case at all.

Q. Did you say I don't think that's determinative?

A. Determinative. Because I don't

think this is a case about how long Google is saving the data.

My understanding is what is in dispute is that WAA and sWAA is a switch that is for privacy, you can do your activity in private. A good example would be if I go into a hotel room, I expect privacy. I don't expect a peeping Tom with a secret camera to record my activity in that hotel room. And if the peeping Tom says hey, don't worry about it, I recorded this but I deleted it 15 minutes later, that's still not okay. If he says I recorded it and I put the tape in a safe and I'm never showing it to anyone and I'm not looking at it myself, don't worry, it's fine, that's still not okay. It's the actual peeping on me that's the problem.

Q. I see. There is that concept of spying again. Are you in your mind analogizing the sWAA and WAA buttons to what Google represents to be incognito mode in Chrome browsers or what Safari calls private browsing mode, is that analogous in your mind?

A. I'm not thinking of it in that way. I'm thinking of it as I want privacy, don't watch me.

Q. Well, there are different degrees of privacy, and the degree that you just analogized was locking the door in a hotel room and knowing nothing about what goes inside -- on inside the box, right, the room?

A. Well, that's one way I look at it.

Q. And that made me think of incognito mode. Like is that why you're making that analogy is because those are --

A. I'm not trying to connect this to incognito mode.

Q. Okay. Leave incognito out of it. I'm not trying to bring Brown into this.

You are familiar with Safari private browsing mode?

A. Yes.

Q. So like is your conception of the WAA and sWAA switch that it is similar to in the browsing context activating

private browsing mode in Safari, or that's what --

A. That's not the way I have been thinking about it. I have been trying to think about this just on its own, standalone. This is a switch, allows my web and app activity to remain private, it is a privacy control. I'm thinking about it in a very simple way.

Q. Maybe too simple. The switch has a description. It doesn't say this is a privacy switch. There is actually like 15 privacy switches that do different things, right?

A. I mean, we can go back and look at the page and look at what it all says, but I'm not analogizing it to some browser. I'm just telling you that that's not how I thought about it.

Q. There is -- there is a switch on Android devices and a switch on iOS devices that's a device-level switch that blocks the device ID from being used by any apps. You are familiar with those?

A. I believe so. What's the name

of that switch?

Q. On Android I think they used to call it OOOAP, opt out of ads, or something, and --

A. Triple O something.

Q. Yeah. And on iOS it is now called app tracking transparency, and before that it had a different name.

A. Was it called LAT?

Q. Yes. So you are familiar with those switches?

A. I have to admit it now, because I just gave you the name of one, yes.

Q. You would admit it truthfully regardless, right?

A. Of course.

Q. So what in your mind is the distinction between the sWAA switch as you believe it functions or should function and the device ID disabling switch on mobile devices?

A. Well, okay, so I can, even off the top of my head, give you a distinction between these two things. Because the device ID switch, which limits the access

to that identifier, is just one thing, but the SDK, Firebase SDK, has access to a variety of different pieces of identifying information on the device, so that it's a question of a narrow control or a broad control.

Q. Okay. Do you opine in your report that Google uses data from a user's past app activity to personalize advertising even when the user has sWAA turned off?

A. I believe Google has represented that when sWAA and WAA are turned off, the past app activity is not used to personalize ads, and I accept that. I am not disputing that.

Q. Okay. So back to targeting, would it be fair to then call targeting as you are talking about it here contextual targeting?

A. So I like the more general just targeting because it might admit some other things, because someone might quibble about what is contextual and what is not. So targeting is general. It might devolve

into being contextual, but maybe there is something else that we haven't thought of.

Q. Okay. But as far as you know, you're familiar that Google uses the term "contextual targeting" in their developer-facing pages?

A. Yeah, I'm aware of contextual targeting from the ad platform side and often that was referring to like based on what words are in a content page on the display network and what words the user -- the advertiser has specified in an ad campaign, and they might say oh, okay, you want to target people searching for white sneakers and here is an article about white sneakers, even though it is not a search, it is just a context page, maybe we will show your ad here because we think it is especially relevant in this context.

Q. Right.

A. So that is kind of maybe a little bit more specific than showing an ad based on someone's language or their general course location.

Q. Right. And from an internet

marketing standpoint, in order to effectuate contextual targeting in a responsible way, Google has to say something about its serving of ads, some type of information?

A. I would even go further than that. I would say that in order to serve ads, Google needs to retain some data in order to comply with industry standards. I think Google is a member of the Media Rating Council and they are certified for generalized and valid traffic detection and sophisticated and valid traffic detection, and that's ad fraud detection.

Q. Okay.

A. So when you want to charge someone for ads, you actually have to retain some data in order to prove good delivery of the ads. You can't just say hey, I have shown your ad a million times, give me the money. You actually have to have some proof from a vendor who is MRC -- ideally MRC certified who can provide some reliable statistics.

This MRC was set up in the

1960s by the Congress because there at the time had been a lot of lying about advertising on like television, radio, newspapers, like lying about the reach of the advertising. So Congress sort of decided to put an end to that and said let's certify the distribution of these ads. So that has moved into the online era, and Google and Google Analytics are a couple of the certified vendors.

Q. Okay.

A. That is more than what you wanted to know about that, but it might be helpful.

Q. In the context of this case, when we are talking about -- what's the term you would use, bookkeeping, recordkeeping, Ratings Council compliance?

A. I would just say you want to retain evidence of good delivery. Because one of the things as an advertiser that I like Google for is that they try to maintain a clean network. They try to protect me as an advertiser from ad fraud. They tell us that they conduct proactive

investigations. They have automatic systems that detect fraudulent activity and try to protect the advertiser from that.

Q. Isn't one of the ways they effectuate that by analyzing device ID and IP address?

A. Look, I can help you a little bit there. I've done a bunch of ad fraud cases, and one of the things to do is to look at the device ID and some of this collected data. So it is a known method for detecting ad fraud.

Q. Would Google have to drop that detection method for sWAA-off users to resolve the problems you've identified in your report?

A. I don't know. Would there be some way to work it out that these things could coexist? I'm not sure. Again, I would point back to my original observation, which is Google has put itself into a very difficult position by promising the user, hey, we are going to be your advocate for privacy and the vendors they work with. They've got some overlapping

and conflicting obligations, and that creates a problem for them and maybe they ought to focus on one business or the other in order to do the best possible job for each constituency.

Q. Okay. Well, but for now let's assume that they are not going to drop users or drop advertisers in the immediate future. The fraud detection mechanism that you were just talking about it sounds like relies on certain persistent or non-temporary, non-transient identifiers, right?

A. This ends up being a deep rabbit hole that we are going into here about like how would Google do this. I mean, maybe there is some way that they can work it out. You know, maybe they can talk to the advertisers and, you know, talk to the industry standards and say hey, you know, in order to respect privacy, we can't collect this data for certain segment of people who turn this off, but we know these are real people because they've got Google accounts. You know, you have to have a

Google account in order to have a WAA and sWAA set. So there is already some level of authentication there.

Like if Google authenticates these people that these are real people who have real Google accounts, you know, maybe that is a substitute for the telemetry, perhaps, I don't know. That's a really detailed thing that someone is going to have to work out afterwards.

Q. But if Google doesn't save anything from the transaction, then that would -- then it can't prove that it told the truth that it was a Google account and therefore a real person?

A. Again, I don't know. Like could they work out some better arrangement? They might be able to work out a better arrangement. But looking back retrospectively, you know, it was essentially if you didn't collect this data, you would have a lot of problems charging for those ads.

Q. And I think you say in your report that if sWAA functioned the way that

you read it to function or should function, Google wouldn't be able to serve ads at all, right?

A. Again, which part of the report are we looking at?

Q. I'll come back to it. It is in here somewhere.

Does contextual targeting in your mind deviate from the representations made on the WAA page or is it just the saving of the records that the targeting occurred?

A. My gripe is with the collection -- the transmission and saving of the information while the user has indicated that this is sensitive information and they want to keep it private. It is the sending and saving, that's the issue.

Q. Okay, understood. Let's look at 144, paragraph 144 of your report. Just review it for a moment.

(Witness perusing document.)

A. Yes.

Q. So you say in this paragraph

that Google can pull the wool over its users' eyes by refraining from using sWAA-off data to personalize the user experience which would cause the user to catch on, but nevertheless storing it.

A. Yes.

Q. Just a couple of follow-ups about that.

First, you were not intending to opine as to Google's intent in this case?

A. No.

Q. Okay. Because the phrase "pull the wool over its users' eyes" is pretty colorful. I'm just making sure that is not an opinion about Google's intent.

A. I do like to be colorful sometimes because these reports could be dry, and I like them to be interesting to read. But it is a description of the effect. It's not a description of Google's intent, okay? I'm sure that that's just -- maybe it's overly colorful, but it's clear now.

Q. Okay. And you're not opining,

I think we covered this already, I apologize if we did, but you're not opining that Google is nevertheless secretly using sWAA-off data to personalize the user's experience anyway?

A. I don't think I've said that.

Q. Okay. Let's talk about PII. I think I gave you the privacy policy from May 2018 earlier.

A. I have it.

Q. You can mark that number 4.

(Hochman Exhibit 4 marked for identification.)

A. And you said this is from May --

Q. It says right there on the top, May 25, 2018.

A. Okay.

Q. So you are aware that the privacy policy has definitions in it for key terms, what Google calls key terms?

A. Yes, I see that.

Q. Let me first ask you actually, maybe to make this easier, your report actually doesn't use the phrase "personal

information" or "personally identifiable information" or "PII," at least not in your own words. There is a couple of quotes from somewhere else. Was it your intention in this report to express an opinion about which pieces of the data at issue in the case are or are not PII?

A. No, that sounds like a legal conclusion.

Q. Okay. So you have no opinion as to whether -- you're not trying to express an expert opinion as to whether the data at issue in the case comprises in whole or in part personally identifiable information?

MR. MAO: Objection, misrepresents his testimony. Go ahead.

A. I mean, I've said at some points that various identifiers link to a person. So someone could draw a conclusion or form a legal conclusion based on the technical opinion, but I'm not here to give a legal opinion.

Q. Okay. By the way, you talk about IP addresses a couple of times in

here. I just want to make sure we're all on the same page. Did you find any IP addresses in the logs you were provided?

A. I don't recall.

Q. Okay. Do you have a basis to dispute that Google -- that Google Analytics does not store IP addresses in logs?

A. Well, in the logs that aren't shown to the Google Analytics website operator, in other words, the website operator who installs Google Analytics or the app publisher who deploys Google Analytics for Firebase, I, in having reviewed those reports, I know that generally you're not seeing IP addresses. There is some privacy concerns around them. So I haven't asserted that.

What's in the logs, I mean, I have documented what's in the logs. From what I've seen, I don't recall in this case whether we have got IPs. It's documented, whatever I've said, it stands.

Q. Fair enough.

MR. MAO: Just to make sure,

what was the answer, the last part, the last sentence? I just want to make sure it actually made it into the record.

MR. SANTACANA: "It's documented, whatever I've said, it stands."

MR. MAO: Thanks.

Q. Now, you're aware that Dr. Black did some work to try and quantify different types of pieces of information in the logs that you analyzed, right?

A. I'm aware of that, and I of course have retorts to him.

Q. And you what?

A. I have retorts.

Q. You have retorts? Okay. Well, have you conducted any studies or experiments or attempted to recreate the statistics that he created to determine whether they were accurate?

A. Oh, I'm not disputing necessarily how he counted.

Q. Okay.

A. But I think my issue would be

that the sample data we got was not large and apparently not representative, so it sort of is not really amenable to that kind of statistical analysis. You can't -- you need to have a statistically valid sample and a representative sample in order to do statistical analysis. So I wouldn't draw the conclusions that he's trying to draw by doing an analysis on that small sample set.

Q. Fair enough. My question was actually about -- or where I was headed was you note in I think Appendix G that there's some age and gender information in some of these data entries, in some of the logs from Google Analytics that you reviewed. Do you recall that?

A. Yes.

Q. Can you say whether that demographic information came from Google or from the app developer?

A. A great question, and all I have observed is that data was there in the logs.

Q. Okay. But you're not sure whether it's because Google supplied it to

the developer based on some other information Google had or whether the developer supplied it to Google based on some other information the developer had?

A. Yeah, in general I have additional questions about these logs that I would love to be able to ask someone knowledgeable about them, and I just haven't had the opportunity to get all the discovery that I would like to have. But that is what it is.

Q. Okay. The web and app activity control I think you say should only cover app activity data, right?

A. I think I've talked about web view data also.

Q. Web views inside of apps?

A. Correct.

Q. I'll include that in app activity. But really all I'm asking is --

A. I think you should also include the ad activity within the app.

Q. Okay. So the app activity in your mind includes any advertising activity within that app?

A. They are all just activities. It is a remote transaction occurring between the app and the server, and data is going back and forth.

Q. Right, okay. So we will come back to ads.

We talked about the first open analytics event earlier.

A. Yes.

Q. So when Google logs a device ID in the first open event, did you see any of those in the logs?

A. Yeah, probably we did, because we would have had first open events. I'm just sort of inferring it. Whatever we found, we've documented.

Q. Okay. Did you see any evidence that Google leveraged those events, just to use them as an example, from sWAA-off users to perform advertising?

A. I think my inference is that those events would be -- it would be very important to count those as conversions. If someone had been running an app promotion campaign, they want to get people

to install apps, so as soon as someone does that first open, the software development kit, which seems to behave the same -- transmit the same information with sWAA and WAA on or off, the only difference I've documented is where that information seems to be stored according to Google's explanation.

The conversion tracking is very important there, because that's the justification for the advertiser, it is the justification to charge the advertiser money for advertising is that hey, this advertising works.

Q. Apart from the recordkeeping associated with charging the advertiser that you're talking about, did you see any evidence of Google using sWAA-off conversion events for any other purpose?

A. I mean, I think that using the sWAA-off conversion events to track conversions is the big use of them. I didn't necessarily --

Q. Understood.

A. -- look for them to be used for

anything else. Just knowing they are used to track conversions is the significant thing.

Q. Okay, understood. But apart from the recordkeeping associated with charging the advertiser, did you see evidence of Google using sWAA-off conversion events to personalize advertising?

A. Okay, so I have a couple of different questions, a couple of different answers to that question.

One answer, the simple answer, the first-order answer is that I didn't see that being used to further personalize ads, although I do know from having been an advertiser that Google seems to keep statistics on users about their propensity to convert and that there are some what Google reps have told me are safe settings in the ad platform that you can use to try to essentially allow Google to boost your bids in the auction when they observe a user who is more likely to convert, and that these options have been available at

least in the past and maybe still.

So there is potentially some second-order effect beyond just the immediate conversion. I mean, if you know that somebody is converting, that information is valuable in more ways -- in more ways than just the immediate conversion and immediate ad revenue that's justified by that conversion.

Q. So you skipped ahead, that's where I was going next. Did you see evidence in the case that Google uses sWAA-off conversion measurements to inform what you were just talking about, which is user propensity to convert?

A. Well, I think there is some indirect evidence in that I've cited a variety of Google documents that talk about how data is used to improve their products, you know, data that is collected, including sWAA and WAA-off data can be used to improve Google products, it can be used for machine learning. So that's sort of an indirect use.

But I didn't investigate

those -- I didn't observe those algorithms within the system. Like you had asked me well, what algorithm should Google delete or what product should Google delete, and I said, you know, we need a surveyor to come and figure that out.

So there is a scope of my investigation. I looked at certain parts of the system and I have seen indications that this data is flowing out to other parts of the system and being used there. I haven't inspected all those other parts of the sort of vast Google technology infrastructure.

Q. This feature of -- this feature relating to user propensity to convert is a Google Analytics feature, right?

A. The one I'm thinking of is in Google Ads.

Q. In Google Ads, okay. Maybe the word "predictive" is associated with it?

A. The word "enhanced" was associated with it a while back. It was sort of like you could enhance bid enhancement, like if you see someone who is

kind of a likely converter, then it will enhance your bid, and I was advised by a Google ad rep that that is a safe option, that you enable that and it will improve your ROI.

Q. What does the word, I'm just curious, what does the word "safe" in that mean?

A. I think what it means is that it is sort of conservative in that it is making a good prediction. When it enhances your bid, you are not just paying more, you are paying more with good reason.

Q. Because it costs more?

A. Yeah.

Q. Okay. So I think fair to say in order to do that predictive work about a particular user converting, there would need to be some dossier about that user's historical conversions, right?

A. I guess there would need to be some data or some model somehow, and I could imagine that this might be implemented in different ways, and I'm not exactly sure how Google has implemented

CONFIDENTIAL - ATTORNEYS' EYES ONLY

that internally.

Q. Okay. And so fair to say whether Google keeps such a model for sWAA-off, that includes sWAA-off data, is outside the scope of what you've examined here?

A. I believe that it's uncertain whether Google has that model or not. And, again, in the corrective measures section of the report, K, I talked about having somebody assess or figure out, so that would probably come out in the assessment.

Q. Okay. Did you see any evidence in the case or express any opinion as to whether Google has made any attempt to decipher the meaning of app developer's custom analytics events?

A. I don't recall that.

Q. Are you -- are you, sitting here, aware of any evidence to that effect that Google is trying to figure out what those custom events mean?

MR. MAO: Objection, vague.

But go ahead, sorry.

A. Well, I can tell you what I

know about automatic interpretation of computer code is a tricky problem. It's a rough problem to get someone's program and to evaluate what it is doing, you know, say is this program safe or not, is this program bugged or not, is this program correct or not. All those things are actually proven to be unsolvable, theoretically unsolvable. So that's --

Q. Until AI takes care of it all.

A. No, AI can't take care of it either. It is actually unsolvable on a theoretical basis, deeper than that. It is not just hard, it is actually at least contradictions, illogical contradictions, so these are unsolvable problems.

In computing there are some problems that are unsolvable. Like have your heard of the halting problem? That's an unsolvable problem. Given an arbitrary program, determine whether this program when it runs will stop or run forever, unsolvable problem. You can't solve it.

Q. Interesting. Now you have piqued my interest, but we are on the

clock.

So in-app purchase event is another sort of standard conversion event in analytics and in ads, right, in-app purchase?

A. Yes.

Q. So I guess first focusing only on in-app purchase events that are triggered by sWAA-off users, did you see any evidence that Google is compiling the in-app purchase events of sWAA-off users to enhance the advertising that's delivered to that user, i.e., personalizing the ads for that user?

A. I don't recall documenting that in my report. I mean, if it's in there, it's in there; if it's not, it's not.

Q. No, I don't think it's in there.

Okay. And then even for sWAA-on users, did you come across any evidence that Google is deciphering and making personalization decisions based on what the user purchased as opposed to just the fact that a purchase occurred?

A. I haven't been evaluating personalization based on WAA-on data. That's outside the scope.

Q. Okay. I think you give an example which Google gives on its website about the favorite food custom event parameter. Do you know what I'm talking about?

A. Yeah, I remember mentioning that in the report. Maybe we will go look at the spot if you have a follow-up question.

Q. Well, it's honestly maybe redundant of a question I just asked, but it sounds like you're saying to Google at least at a programmatic level it's not going to know what that means if it is a custom event parameter about a person's favorite food?

MR. MAO: Objection, argumentative. But go ahead.

Q. I'm not meaning to argue with you.

A. I didn't take it that way. I'm not sure. I mean, I don't know if Google

is trying to decode what these things mean or not, but I haven't opined that they are.

Q. What about to the extent that like URLs or page view names are being transmitted to Google, URLs with stuff stuffed into them, right?

A. Yes.

Q. Parameters, or page view names in an app that have names like AI Article.

A. Okay.

Q. Did you come across any evidence that Google is attempting to decipher the parameters and URLs or the page view names or screen view names to determine something about that user?

MR. MAO: I will just lodge a standing objection here and then I will stand down.

This is argumentative because you are tempting me to go into the procedural history in this case and I'm trying not to do so. So I will just leave that. I mean, the discovery procedural history. Go ahead. I will leave that standing objection.

A. Okay. So I don't think I've opined about that, although I do recall there may be perhaps another expert will talk about how in privacy analysis if you see the URLs that someone is looking at, that can tell you an awful lot about that person's interests, proclivities, sexual orientation, etc., and --

Q. If a human sees it?

A. Yes. It can be sensitive information.

Q. Yeah. My question is about Google's operation at a programmatic level or systematic level. You know, I understand that if I handed you all the URLs and a person could read them, then you may come to certain conclusions. But I'm asking about how the system is designed sort of across everybody.

A. So one thing I would just advise you is that Google crawls the web, so Google knows a lot of URLs and classifies all these web pages. Google understands --

Q. Yeah, I'm familiar with that.

A. Not to talk about state of mind, but they are machine learning and indexing the web. They are crawling the web, acquiring pages, saving copies of them and then they index them, catalog them, like a librarian would, in an automatic way.

So if Google sees a URL, it would be kind of child's play for them to go into their index and extract, you know, okay, what is that URL about, what are the topics of interest, and then to use that information to maybe, you know, generate some inferences about what that person is interested in.

So I'm not saying that they are looking at the URL and analyzing the text of the URL to extract information, but you could use the URL, a URL is actually a unique identifier for a piece of web content. So if you have a URL you can go look up in your files, hey, what's this web content all about, and you can extract a lot of structured information.

Q. So it sounds like you could

think of a way that it could be done, for purposes of the opinions that you are rendering in the case, you aren't rendering an opinion that Google is doing that with sWAA-off URLs or screen view names or things like that?

MR. MAO: Same objection on the procedural history of this case. But go ahead.

A. I mean, it strikes me now that you raised it, I haven't thought about this, but now that you have raised it, if --

Q. Well, let me stop you there. You haven't thought about it before right now?

A. Well, but what I -- what I can say is if you have a URL, you could take that URL and combine it with some other information you have, Google could, its web index, and it could generate a very nice prediction of what topics that person might be interested in if it wanted to serve an ad to that person, without having to reference that person's history in any way.

Q. Yeah, I believe that. My question is have you opined that Google is doing that with sWAA-off data?

A. I don't know for sure if they are doing that or not, but sort of as an inference it would be kind of surprising to me if they wouldn't take advantage of that because it is sort of so easy and obvious.

Q. Okay. I think you note in your report that these logs that you examined contain geolocation data?

A. Yes.

Q. You don't disagree that the geolocation data is to some degree coarsened from the precise location of the device when it was collected, right?

A. I do believe that it is coarsened to something like minimum of one square kilometer or minimum of 1,000 people.

Q. Okay. Let's talk about -- well, where are we in time?

A. Why don't we take a quick break.

Q. Okay. Let's take a break.

THE VIDEOGRAPHER: The time is 3:58 p.m. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 4:20 p.m. We are back on the record.

BY MR. SANTACANA:

Q. Okay. I think you mentioned earlier that the Washington Post app had been sending e-mail addresses to Google, right?

A. What I remember is it was one of their reputable newspaper apps, maybe it wasn't the Washington Post, maybe it was the New York Times.

Q. It was.

A. Was it?

Q. Yes.

A. Oh, I got it right.

Q. So, and I think you said that you assume that's essentially against the terms of service for using Google Analytics?

A. Well, I know that Black highlighted it, and I will just take his word for it on that issue for the sake of

discussion.

Q. Dr. Black does some calculations in his report about which apps included something that might be an e-mail address and which did not. Do you have any calculations in rebuttal to that? Did you perform any calculations? Or did you just sort of take that as is?

A. I don't accept his analysis. I just am not addressing it.

Q. Okay, sure. So you're not -- you're not going to dispute the math I guess?

A. I'm not going to dispute the math. I think I said earlier that the logs that I was given through discovery were sort of sparse and maybe not a representative sample, maybe not a statistically significant sample. So, you know, subject to those concerns, I'm not disputing his math.

Q. Okay. So let's talk about joinability. What in your mind does joinability risk refer to?

A. So I understand joinability

risk as sort of a terminology that Google seems to be using, so I can say that I understand what they mean by that.

Q. Please.

A. The joinability risk is that somebody, in trying to run a report or generate some data, pulls together data, it uses one of these Google identifiers as a key, as a join key, and joins together two tables using one of these keys as a field, and thereby reidentifies a bunch of data relative to a GAIA ID.

Q. Using that understanding of joinability risk, did you identify any instances in which that risk was realized?

A. So I considered that way of assessing the privacy situation to be not the methodology of choice because the problem with privacy is that there are persistent identifiers that are personal identifiers.

These Google identifiers are in fact personal to individual people and that the real risk is that that data with that identifier leaks, is exfiltrated, is

accidentally supplied to a vendor, however that might happen, and that that directly is identifying to a person. Even if you don't have the person's name, that data specifies an individual device, which someone who has that trove of data can extract the data from that of an individual person.

Q. So completely understood. Just the question is, though, you just outlined the risks, right, the concerns, did you find in the evidence an instance of such a risk to date having been realized with respect to sWAA-off Google data?

MR. MAO: I have an objection on this area of questioning on the procedural discovery -- the discovery procedural history in this case. Go ahead.

A. I did not have access to data showing evidence of Google's data breaches, whatever may have happened. So I guess my answer is I will be more succinct: No.

Q. Okay. Take a look at paragraph 137. Just read that to yourself for a

moment.

(Witness perusing document.)

A. Yes.

Q. So the first sentence says "Within Google's non-GAIA logs, Google intermixes both WAA-on and sWAA-on data with WAA-off and sWAA-off data."

Do you see that?

A. Yes.

Q. And then later in the same paragraph you say that Google does not -- it does not appear that Google treats the WAA-off and sWAA-off data in Google's non-GAIA logs any differently than it treats the WAA-on and SWAA-on data in those logs?

A. Yes.

Q. Okay. So when you say that Google doesn't treat the on and off data any differently, is that -- actually, never mind. Strike that. I now understand.

A. Glad to have been of service.

Q. All right. Now take a look at, I'm whipping you back and forth, look at paragraph 303.

A. I don't mind that, because I'm a nonlinear thinker.

Q. Perfect. You have an objective see brain.

A. Okay, I'm there.

Q. So in paragraph 303 you address a Google engineer's comments about joinability risk. Do you see that?

A. Yes.

Q. And that engineer provided in the document that you are quoting examples of joinability risk. Do you see that?

A. Yes.

Q. This is the document that was authored by Xinyu Ye. Do you recall that?

A. I don't recall that name, but let's just see. There is a document Bates number here, so we could look at it.

Q. Before we do, let me just ask you, Dr. Black addresses that document in his report, and what he says is that Steve Ganem testified about this document and said that the joinability risk that was being identified was hypothetical and that the identifier in question is not stored

unless assigned end user has consented to sWAA. Do you have any basis to dispute that?

A. Okay. So one issue there, there is a couple of issues there, one issue is when you say some sort of computer security risk is hypothetical, this field is a little different than some other fields in that analysis of hypothetical risks is very important in computer security, especially because computers operate at high speed, over high volumes of data. Even something that's a, you know, one in very small number risk turns out to be quite serious over a large body of transactions, in fact it statistically will come up.

Q. I don't mean to interrupt, but I think you -- I wasn't clear enough in my question. That's not what I meant.

A. Okay.

Q. So what I meant by hypothetical is that the engineer in question was commenting as to the risks that would arise if a particular course of action were

taken, but that particular course of action was never taken by Google.

A. Okay.

Q. Maybe perhaps because of those joinability risks. So my -- that's my understanding of the record on this. Do you have any greater understanding other than what you said in your report?

A. What I have in my report is what my understanding is, and we can go look at the detail of the documents and try to reconcile what Mr. Ganem and what Mr. Black are saying and what I'm saying, if you wish to, or we can just leave them, you know, stand as they are.

Q. Let's come back to it.

Sitting here now, though, you do not know whether the joinability risks discussed in paragraph 303 related to an existing course of conduct or a proposed course of conduct, right?

MR. MAO: Objection, assumes facts not in evidence.

A. Okay. So, look, in 303 the most important thing is the first sentence.

"Internal documents are consistent with Mr. Miraglia's testimony revealing that Google employees acknowledge that so-called pseudonymous data is linked to users." So that's the point I have been making all along, all right?

And then there is a document here which I really can't give you further comments unless I were to actually sit and reread that document to refresh my memory about what it says, because I just -- I haven't memorized all these documents. There is far too many of them.

Q. Okay. All right, let's look at 202. At 202 you say that "Google's production of data from a collection log of Google Analytics for Firebase shows that Google saves GA4F data in non-GAIA logs using substantially the same structure and content as the data it saves in non-GAIA logs." I think maybe that is a typo.

But, anyway, "Because Google stores a copy of consented data in both GAIA and non-GAIA logs, the timestamps, identifiers and data stored in both types

of logs make GAIA and non-GAIA data and ID joining straightforward."

Are you with me?

A. Yes.

Q. Not to belabor the point, but just to be perfectly clear, though you opine that doing the -- performing that joining would be straightforward, you are not opining that Google does in fact perform that join?

A. No. So my assumption is that Google is trying to not join data. When they have a policy and they say we don't join this data, my assumption is that they aren't joining that data. Unfortunately, the problem is a threat actor who gets hold of this data from Google is not bound by Google's good intentions and policies. So that's my concern.

Q. Okay. My other question about that sentence was just about the straightforward joining part. Your report does not document that you were able to perform such a join, right? Have you had a chance to take another look?

A. I haven't found it, but I remember seeing an example where for sure we found I think it was even a timestamp and maybe it was an IP address. It was a timestamp plus something else, and I was able to see how records joined across these logs.

Q. It's not documented here in the report, right?

A. It might be somewhere. I just -- the report is huge and the appendices are huge. It is more than I can remember the location of everything. So it's --

Q. Did you take time during a break to look for it?

A. I didn't have enough time to find it yet, but maybe it will turn up later.

Q. Okay. And just to be clear, that join that you performed, did you say you thought it was with timestamp?

A. I think timestamp was one of the elements, and I think there was something else if my memory is correct.

Q. You were operating with a GAIA

log and a device ID log that you knew came from the same device and user, right?

A. The datasets were not gigantic.

Q. Well, and they were limited in scope to only the test devices, right?

A. They were limited to whatever was produced to us. Yeah, I assume that that's the test devices or the user devices, yes.

Q. So you have no way of telling if you were looking at the entirety of all of Google's analytics data if you could perform such a deterministic join between those timestamps? I mean, for all you know, there could be a hundred million entries at the same timestamp.

A. Well, so I'm going to correct what you said a little bit.

Q. Sure.

A. It is actually a probabilistic match, okay? So fingerprinting is a probabilistic endeavor.

Q. Okay.

A. And so if I were to have a huge set of data, the computational complexity

of doing that essentially is that you take all the data, you calculate some fingerprint from the data, you have a fingerprint function, you have some inputs and you calculate a fingerprint function, however that is, and then you look for matching fingerprints.

This can be done with pretty good efficiency. It's not computationally a difficult task. And fingerprinting is actually done and clustering is done in order to gather up data like this and do probabilistic matching. It is a common practice and it is feasible, okay? So I'm not opining out of thin air. I'm using my experience in knowing what people actually do in these sort of large-scale internet identity systems.

Q. People other than Google?

A. People, in general, state of the art, state of the art is that it is feasible to do this. You can do probabilistic matching with a good, I have read academic papers, you can do probabilistic matching with a good degree

of success. There is no technical impediment to doing it. You may have some failure rate. You may not match all of them. But you match a high percentage of them.

Q. I see, okay. That's helpful. Take a look at 248.

MR. MAO: By the way, Eduardo, let's take a break when we are done with this mod.

MR. SANTACANA: Didn't we just take one?

MR. MAO: I need to use the restroom.

MR. SANTACANA: Okay.

A. By the way, your last question just shook loose something in my mind. If I remember, you were asking me if I had seen any IP addresses in the logs. I do remember seeing, I think that there is maybe some IP addresses that were encoded. They don't necessarily look like IP addresses, but I seem to recall encoded IP addresses, or IP addresses, but now I have a memory of that.

Q. I didn't see that in your report. So could you put that on your list of things to look for?

A. Sure.

Q. That would be really helpful.

All right. So paragraph 248, you -- well, you just answered my question actually. Never mind.

Well, one question on this. On this app instance ID that you talk about in 248, so Dr. Black looked at the app instance IDs of entries from the same devices and found that they did not match and must have been encrypted using different keys. Do you have any basis to dispute that?

A. I understand that there is some -- and even in 248 it says that. There is some encrypting of app instance ID is going on it would appear. Also 248 does that have disclosure of the IP address and user agent found in both GAIA and non-GAIA logs. I think you saw that, but I will just state it for the record that that answers prior questions about that.

MR. MAO: Sorry, Eduardo, you said that 248 says that some things match and some things don't match? I'm not seeing that.

MR. SANTACANA: No, I was saying that Dr. Black's report says he wasn't able to match app instance ID from GAIA logs to non-GAIA logs because they must have been encrypted with different keys.

A. And I have actually said that they are encrypted in the -- I have mentioned that they are encrypted in 248. So he and I therefore agree on that point.

Q. Okay. Let's look at 310, paragraph 310.

By the way, did you personally draft this report?

A. Yes.

Q. So paragraph 310 says that Google in effect associates WAA-off and sWAA-off data with GAIA by measuring conversions using DSID. Is that a fair summary of this paragraph?

A. Let me just read it one second.

Q. Sure.

(Witness perusing document.)

A. So for context, let's look at 309, just the first sentence there. "Google has confirmed in written discovery that it uses IDFA, AdID and DSID to track conversions, including when WAA and sWAA are turned off." So that's not under dispute. That's been admitted. And let me just read 310 now.

(Witness perusing document.)

MR. SANTACANA: I just remembered you wanted a break, I'm sorry.

A. So 310 is pointing out that there is a direct link between sWAA-off and GAIA through this DSID, which is an encrypted, the encrypted GAIA ID.

Q. So I want to be very clear about that. DSID is an encrypted GAIA ID, understood. Without the decryption key you could not determine whose GAIA the DSID refers to, right?

A. So the encryption key presumably is strong enough, I'm assuming

it is strong enough, I'm assuming that somebody doesn't figure out a way to break the crypto system, so someone would have to get possession of the key in order to do it.

So that, in theory, okay, it speaks to the risk, right? So if someone exfiltrates that piece of data, if they don't get the encryption key also the exfiltrator may have trouble with that piece of data. They may use other pieces of data to link things up.

If, in a different scenario, if some government agency comes to Google and says give us data matching certain specifications, it is conceivable that Google could be ordered to use their decryption key to connect that and hand over the data. So that's also a risk. And of course, I mean, I like law enforcement, I support law enforcement, but they sometimes make mistakes, and, you know, that's a risk that a user is exposed to, that they could be maybe falsely accused of something based on some data that's

CONFIDENTIAL - ATTORNEYS' EYES ONLY

obtained from Google.

Q. And you don't dispute that the encryption key that generates DSID is temporary and trashed periodically, right?

A. If the key is rotated, I would anticipate that it might be rotated periodically. You know, there's a lot of detail here, such as how long is -- how long is the data retained, how often is the key rotated, you know, all these things can affect the analysis of the magnitude of that risk, but they don't -- they don't affect the sort of basic gripe I have, which is that data is being collected and saved contrary to users' wishes.

MR. SANTACANA: Okay. Let's go off.

THE VIDEOGRAPHER: The time is 4:45 p.m. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 5:00 p.m. We are back on the record.

BY MR. SANTACANA:

Q. All right. Switching gears here for a little bit, there is -- there is

a few places in your report where you use the word "uniform." Do you know what I'm talking about?

A. Yes.

Q. Was part of your assignment in the case to measure uniformity?

A. Of the class members or of something else?

Q. Of anything.

A. I don't recall that.

Q. Okay. And of class members?

A. I mean, I'm just aware that the class may be an issue. In any class action, the definition of the class, are the class members uniform, is sometimes a legal issue.

Q. Were you asked to opine on uniformity for that purpose?

A. I don't think I was specifically asked to opine on uniformity.

Q. Are you -- would you say you're offering an opinion with respect to uniformity in the class or of the class?

A. That sounds like a legal opinion. I just have -- I'm just opining

about the technology. So if you want, we can go look at the specific instances and I can tell you more about them, because I'm not sure what you're referring to because I don't remember where I've used that word, if anywhere.

Q. That's fair. Let me ask you this: Did you use any particular methodology or calculation to test uniformity in the data that you received and analyzed?

A. I think that I did look at some of the data and saw that it wasn't particularly representative. There was some -- it was sort of skewed.

Q. What do you mean?

A. I think it's documented in one of the appendices, but I seem to recall there was some data that just didn't look like it was a natural distribution.

Q. A natural distribution of what?

A. Values. Of course it wouldn't be, because we are talking about test data which is data generated by our apps and our devices and our people, so we're not

looking at a uniform distribution there.

Q. Okay. So nevertheless --

A. Sorry, we're not looking at a representative distribution. I've got that word on my mind now because you mentioned it.

Q. Did you apply any methodology to determine the degree of uniformity in the data you were analyzing, was that one of the experiments that you did, or calculations?

A. I mean, so I'm not sure, I would have to look at which experiment, we would have to be more specific, because my memory is not -- I don't have a compartment in my mind of these are the uniformity experiments. That's not how I organized the data in my own mind.

Q. Right. And I don't think you call anything a uniformity experiment.

You also did not calculate any numbers that were meant to represent uniformity in the data that you saw, right? That's not --

MR. MAO: Objection,

argumentative. I'm sorry.

Q. You are not trying to represent uniformity with math in this case?

A. I don't recall that anywhere. I mean, if it's there, it's there, but I don't recall it.

Q. You did not offer any opinion in here about the language of the disclosures that third-party apps used with their end users, fair to say?

A. No, I wasn't evaluating the third-party disclosures.

Q. Nor their sufficiency or frequency or wording, none of that?

A. That sounds like all things that are outside the scope of my report.

Q. Okay.

A. Which is already big enough given the size of the report.

Q. Dr. Black calculated that of the 16,163 events triggered in the datasets, 16,009 of them had no e-mail address in them. Do you have any other calculation that would deviate from that?

MR. MAO: Objection, vague.

A. That is sort of an absurd statistic, because it's looking at a small sample set of test data and he is somehow trying to extrapolate what the rate of e-mail addresses is, which is just -- okay, that's just absurd.

Q. I'm not making a statement of rate. I'm just saying did you -- I'm literally just saying did he count it correctly, incorrectly, or you have no opinion?

A. I have not verified his number, but I also have no reason to doubt his number, and I also don't think his number is meaningful in any way or useful in any way.

Q. Okay. A conversion event, the way it is recorded, do you recall seeing those in the data, in Google's conversion log?

A. Good question. As I sit here now, I don't recall it off the top of my head. The appendices are kind of long and very, very detailed and dense, and I would just have to look at them and refresh my

memory on that point.

MR. MAO: At some point you are going to have to let him do that and then we can get on the record all the ones that we have held as a flag. So it doesn't have to be now, just at some point.

MR. SANTACANA: Okay.

MR. MAO: We probably should have done that during lunch.

Q. So let's talk about HitBundles for a moment. You opine that an analytics HitBundle can contain both sWAA-on and sWAA-off events in it?

A. Why don't we go to the paragraph that you're talking about.

Q. That one is 116.

A. Okay.

Q. Do you have it?

A. Yes.

Q. So you opine that HitBundles can have consented and non-consented events or WAA-on and WAA-off events in the same bundle, but that the consent check is done at the bundle level by Google's servers, so

there could be false positives and false negatives, right?

A. Well, I think that that's the sort of logical conclusion based on what I've cited here are Google's 4th Supplemental Responses to Interrogatories 1, 3 and 4.

Q. And those -- the cause of those false positives and false negatives would be that a user has flipped sWAA from on to off or off to on?

A. So this is actually an instance of the distributed consensus problem.

Q. Okay.

A. In other words, there is state on one machine and there is state on another and it takes a while to synchronize them.

Q. Right. As a result of that, for some unidentifiable portion of the analytics data that has been sent to Google, there will be false positives on whether sWAA was on and false negatives as to whether sWAA was on; is that your opinion?

A. I don't know that I have used those words, "false positives" and "false negatives" in this paragraph. Do you see them somewhere else? Because I don't remember using those words.

Q. No, those are my words.

A. Those are your words, okay. Let me read what I've written.

Q. Sure.

(Witness perusing document.)

A. I mean, this is again sort of a deduction based on Google's answers to these questions.

Q. Right. And I'm just -- so my question is just for some unidentifiable portion of analytics data that's been sent to Google, there will be false positives on whether sWAA was on and there will be false negatives as to whether sWAA was on?

A. I'm not sure I want to go that far.

Q. Okay.

A. Because, you know, I think just -- I only want to go as far as what I said here.

Q. Okay. That's fine.

A. I will tell you why I say that. Because these activities will seem to have a timestamp associated with them, Google should have the ability to look at the sWAA record and kind of true things up if they need to.

Q. Retrospectively?

A. I would imagine that they've had that capability. I have no way to verify whether they have done that or not.

Q. Okay. Back to conversion events for a moment. The conversion events that would be stored by Google from a particular device will vary depending on that user's engagement with apps; is that fair to say?

A. Each app may have a different conversion action, or in-apps can have more than one conversion action.

Q. And they may have custom ones too?

A. Yes.

Q. So the degree of information about conversions that is sent to Google by

Google Analytics for Firebase varies from user to user depending on the apps they choose to use?

A. I don't know that I would put it that way, because I think you have -- you have a population of users, and the users, there will be some sort of statistical distribution in terms of the number of conversions recorded per user. I mean, I wouldn't expect every user to have the same number of conversions as every other. That would be unrealistic.

Q. Right. Some may only have one type, some may have different types, some may have a lot, some may have a little, right?

A. There is some -- I mean, users -- there will be some statistical -- there will be a mean, there will be some standard deviation in terms of the number you get per user.

Q. Sorry, I'm not understanding your question. I was just trying to establish that some users are going to have more conversion events than others and

different conversion events too, right?

A. Yes, there will be some variation.

Q. And, as I recall, you are not opining in this case that Google uses sWAA-off conversions that it logs for any purpose other than the recordkeeping associated with evidence of good delivery of ads?

A. And it is also a way to charge advertisers. You show them conversions, and that enables you to collect money from your advertiser.

Q. But apart from that, you're not opining that there is some other thing Google is using those for?

A. Well, I think we covered this before and I think I said that the information about conversions can also be used, sort of second-order way can be used to help train algorithms to help make predictions, to help improve Google products. So there is some additional uses for that beyond immediately monetizing getting revenue from advertisers.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. Does that -- does that include sWAA-off data?

A. I mean, because as far as I can tell, the conversions that are tracked with sWAA-off are treated just like any other conversion, they are -- they would -- I would expect that they would be fed into all these machine learning algorithms sort of the same way.

Q. And what if a user has sWAA off but the app developer has not enabled data sharing with Google, what impact does that have?

MR. MAO: Objection, vague, argumentative, and assumes facts not in evidence.

A. Okay, so --

MR. MAO: Part of that is also just wrong. But go ahead.

A. So I don't remember the answer to that question, and I might have documented it somewhere, but I just don't remember it off the top of my head.

Q. I don't see a reference to it in your report.

MR. MAO: Wait, sorry, on publisher conversions or advertiser conversions? Which one are you talking about in his report?

MR. SANTACANA: I'm talking about data sharing, the data sharing side.

MR. MAO: Of the public conversion side?

A. So my understanding of your question is that you asked me if the app publisher declines data sharing with Google, how does that affect this, and the answer is I don't recall.

Q. Okay. Are you opining in this case that Google uses a record of a device's conversions that were sWAA-off conversions to choose which ad to show to that device?

MR. MAO: I'm sorry, can you read the question back again?

(The record was read.)

A. I don't think I've rendered that, but I'm not going to take a position on that question.

Q. Why?

A. Unless I figured it out already and documented it somewhere, I don't remember it being something I figured out. But maybe I did figure it out and forgot about it. But I don't remember it, and I'm not going to be able to answer it now.

Q. Okay. That's fine. I don't think you did opine on that. I'm just clarifying.

Now, on the number of times that any particular user has been subjected to the privacy risks that you identify in your report when they have sWAA turned off, that is something that will vary depending on a number of factors, let's start there, is that fair to say?

A. I think that some users are on their phones and apps more than others.

Q. Will it also vary -- well, let me just say, will the severity of the privacy risk in question also vary from user to user?

A. I don't know, because the users that we are interested in are people that

have Google accounts that flip those switches to the off position, and one of them or both of them, either the first one only or the first and second one, right, because you can't flip sWAA-off unless -- you can't flip -- one you can't do without the other, okay? So, I mean, those people designated I want this to be private and it is not really up to me or anyone else to second-guess them.

Q. Sorry, my question was just you identify privacy risks you have today, you do in your report. Does the severity of the privacy risks for those sWAA-off users vary from user to user?

A. I don't know a way to quantify that and differentially explain for this user it is much more risky than for that user. Because each user has their own -- they are people, they are individuals, right? And they all have made a decision, and I'm not going to say that your opinion is worth more than his opinion. We both made a decision to have this thing shut off and you deserve equal respect for that

decision.

Q. Completely understood. But if you say -- well, forget the analogy. You have said today that, for example, one factor that goes into severity is how much data is collected about a particular -- tied to a particular identifier, more data, more risk; less data, less risk. Another factor might be how fragmented the data is. Another factor might be how detailed the data is.

My question is, aren't all those factors going to factor in to how severe the risks are for any particular user in this class?

MR. MAO: Objection, misstates his testimony. Go ahead.

A. I don't think you can make a function where you take these numbers as inputs and say -- and calculate, say, for this person it is really severe, for that person it is not severe at all. Because even one little leak can have drastic consequences, and it is sort of no way of -- there is no way for me to know that,

you know, who is going to be hurt by some privacy leak. I don't feel like I could calculate that and I don't think anyone else could calculate that. I think each person who sets that switch should have their wishes respected, and I don't know the way to distinguish this one is worth more than that one.

Q. So you don't -- you don't think that you could calculate based on how much data there is and what kinds of data they are, how risky it is to a particular member of the class?

MR. MAO: Are you asking him on a technical basis within the scope of --

MR. SANTACANA: I've asked my question.

MR. MAO: Okay. Then my objection is you are asking him questions which may be outside the scope of his designation. But you can go ahead.

MR. SANTACANA: There is no designation. He is under subpoena.

MR. MAO: I disagree.

MR. SANTACANA: Okay. There is no such thing as a designation.

THE WITNESS: This goes over my head.

MR. MAO: What do you mean, what he has been designated as an expert for? Yes, there is.

MR. SANTACANA: What is his designation?

MR. MAO: He is our technical expert, so you are asking something that might be reserved for another expert.

MR. SANTACANA: Is there a document that designates him?

MR. MAO: Yeah, the scope of his work, his opinions. You are asking him something outside the scope of his opinions.

MR. SANTACANA: Sorry, have you served some document that designates him for some topics and not others?

MR. MAO: It is there on his document, isn't it?

MR. SANTACANA: This is a disclosure of expert opinions.

MR. MAO: Yeah.

MR. SANTACANA: This is not a designation of topics. So I'm just trying to understand what you're saying.

MR. MAO: He is not going outside the scope of his opinions. You are the one that was trying to say that he was limited to what he had testified to and opined on. Are you asking him to opine on other subjects? That's not what we retained him for.

MR. SANTACANA: I'm asking him my question.

MR. MAO: You know what, I'm not sure this is fruitful. Just go ahead.

A. Sure. Could you reask the question?

Q. You don't think you could calculate based on how much data there is and what kinds of data they are how risky these practices are to a particular class

member?

A. I don't have a methodology for doing that.

Q. Okay. Well, and I think what you are saying is they should be treated the same, because no one member's WAA-off decision is worth more than another class member's?

A. Well, I mean, that's my view of it based on my sort of technical opinion that this is a switch that somebody set and Google has gone and violated their wishes and collected data that shouldn't be collected and saved data that shouldn't be saved.

Q. You have opined before that user data has a market value, right?

A. I have.

Q. Have you done that in the context of litigation only or also publicly?

A. I've said it publicly, I've said it in litigation, data is a commodity that has value.

Q. The market value of the data in

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

question here, the sWAA-off data, would it be the same as to every class member or would it have to vary from class member to class member?

A. I can tell you that the way that such data is typically traded, you buy a population and you pay an average price per, and some, you know, you are just paying per unit, and some may have more, some may have less data.

Q. Some may have more data, some may have less data, but you just sort of pay per population?

A. I mean, I think that's the way it is commonly traded.

Q. Okay, yeah. So this is a class action, so that's not an option.

My question I guess is what are the factors that would go into the fair market value of the user data in question if you were to pay each class member an amount that is tied to the fair market value of their specific user data?

MR. MAO: Just objection, outside the scope of the expert

 opinion.

A. I'm not prepared to answer that question. I have no basis to answer that question.

Q. Well, I'm not -- I'm just asking you, you have opined about fair market value before, you have talked about it publicly, you believe that data has value, right?

A. Yes.

Q. More data has more value than less data, right, bigger population is worth more than a smaller one?

A. Yes.

Q. Detailed population is worth more than a less detailed one?

A. Potentially.

Q. Population with Social Security numbers is worth more than population that just has device identifiers?

A. Maybe, it depends. I mean, again, this is getting into a lot of details which I haven't done that analysis here, so I'm not ready to give you any opinion about the relative value of

different pieces of data.

Q. Sure.

A. Data brokering, I would have to research it and work on it before I could say anything more.

Q. Well, you have identified today that there is a privacy risk that you are worried about and the privacy risk is that data will be exfiltrated from Google, right?

A. That's one risk.

Q. That's one risk. Why would somebody exfiltrate this data from Google?

MR. MAO: Objection, calls for speculation.

Q. How do you even know it is a risk to begin with?

A. Okay. So I have -- I'm aware that data has value not only in legitimate commerce, it also has value to criminals. People doing online crime and scams will try to acquire data. And where there is a willing buyer with money, then there may be someone who is going to make a play to get a hold of some dataset that is unique that

they can sell for a good amount of money.

Q. So back to the topic at hand, which is the privacy risks that you've identified, right, you've talked about those risks extensively today, my question is, doesn't the severity of the risk vary depending on the nature of the data from class member to class member, how much it is, how detailed it is, what kind of data it is?

A. I don't know how to ascertain that.

Q. Okay. Your report, look at paragraph 206 for a second, I'm focused really on this part where you say Google admitted in its response to RFA 25 that at least one Google log contains one or more bits and/or fields that reliably shows whether specific event-level traffic was generated while WAA was off. Do you see that?

A. Yes.

Q. You quote that admission a few times in your report. My question is do you know which log that is?

A. I don't remember.

Q. Do you identify which log it is in the report?

A. Well, I point to admission number 25.

Q. Okay. So if it's not there, then you don't know?

A. I don't remember, and that's where I would go to look, and that's what I can tell you.

Q. Fair enough. All right. Now let's look at 163. So in this report -- actually, I will just show you. First, actually, just flip to 101.

MR. MAO: I'm sorry, his report, 101?

MR. SANTACANA: His report, paragraph 101.

MR. MAO: Got it, thank you.

Q. So at paragraph 101 there is a phrase "Google collects the user's GAIA ID regardless of their WAA or sWAA status."

Let me know when you see it.

A. Yes.

Q. I think you clarify at the end

of that paragraph Google logs and uses DSID even when the user has WAA or sWAA off. I just want to be clear, you are not opining that Google is collecting the user's GAIA ID in analytics HitBundles, what it is collecting is DSID, which is an encrypted form of GAIA ID, right?

A. I'm not asserting -- I don't think that this asserts that the GAIA ID is collected in the clear. It seems to be collected in an encrypted form. It is an equivalent information, but it is in encrypted form.

Q. Okay. Just making sure that's where we're at.

Now, I think you touched on this a little bit earlier, but talking about the consent check process now, you are aware that when Google performs a consent check on analytics data, it sends the DSID to a separate server to encrypt and return back the consent settings of the user, right?

A. That's the impression I had, yes.

Q. For Android devices?

A. That's consistent with my understanding.

Q. As a result of that, the two servers, the Analytics server and the consent check server, do not overlap the data in the moment, that is the Analytics server doesn't get the GAIA ID and the consent server doesn't get the Analytics data. Is that also consistent with your understanding of the --

A. I'm not sure that's right.

Q. Okay. What do you mean?

A. I'm not sure that's right.

Q. You're just not sure?

A. Well, you're saying that a token is sent to a server which decrypts the token and does a look-up and then sends back the status.

Q. Yeah.

A. So A goes to B and says here's a token, B decrypts the token, looks up the sWAA/WAA settings and sends them back to A.

Q. Right.

A. So B has the GAIA ID.

Q. Right.

A. And A has the Analytics data. Yes, under that scenario, I see what you're saying.

Q. Okay. My question is why is it designed that way? Do you have any opinion about that?

A. I recognize the design pattern.

Q. What does it look like to you?

A. Well, that's a tactic called isolation.

Q. Okay. What is -- can you explain just briefly what that means?

A. By trying to separate the data this can make it more difficult for an attacker to get hold of the two pieces of data.

Q. Is there any cost to implementing an isolation pattern in something like this?

A. I mean, for somebody like Google, they have data centers full of servers. They have plenty of servers. This is not an extremely resource-intensive calculation.

So I'm not sure, I mean, the incremental cost, I mean, it may be that it is all sunk cost for Google. I'm just not sure. I don't think I've performed that analysis and I haven't really thought about that because this is the first time I have heard about this process that you're mentioning here or at least the first time I've focused on it in terms of cost as far as I can tell.

Q. Well, the process, the A/B server -- the A server/B server we were just talking about, that is detailed in Google's interrogatory response and you describe it in your --

A. Can we take a look at where I describe it just to refresh my memory?

Q. Sure. Why don't you take a moment to read 162 through 164, which is a few pages, 165, excuse me.

MR. SANTACANA: If we could just go off, I need to use the restroom real quick.

THE VIDEOGRAPHER: The time is 5:36 p.m. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 5:41 p.m. We are back on the record.

BY MR. SANTACANA:

Q. Have you had a chance to review those paragraphs?

A. I've looked at 162. Is that the right one?

Q. And what about 163 and 164 and 165?

A. No, I haven't gotten to those yet. Just a minute.

Q. I think 163 is the key.

(Witness perusing document.)

A. Okay, yes, this thing here. So what I can see is I haven't formed any opinion about cost in this.

Q. Okay. Just, sorry, I'm just trying to refresh your recollection as to this idea that the token is being sent to a separate server and then a consent result is being sent back. I thought you were saying that you hadn't thought about that before.

A. No, I knew about that but I

hadn't thought about cost.

Q. Okay. So going back to my question about cost, I want to clarify, I actually did not mean in terms of money, what I meant was the isolation, is it a technique is what you would call it, isolation pattern?

A. Isolation is one way to try to improve security.

Q. Okay. So does isolation come at any cost from a computing perspective? Is there any reason not to do it, you know, from let's say Google's perspective?

A. I'm not sure. I mean, that's sort of a detailed engineering question that may be specific to the circumstance.

Q. Okay. So talking about the consent check, do you have any basis to dispute that this isolation process we were just talking about was designed to separate what Google calls pseudonymous data from GAIA keyed data?

A. I understand that Google is trying to separate data, divide between data that is stored with the GAIA ID and

data that's not stored with the GAIA ID. I understand they are trying to separate that.

Q. All right. Now let's talk about iOS for a moment. So for iOS the process is different, right?

A. Yes.

Q. And you talk about this at 164 and 165. One of the things you talk about is a mapping table that Google had maintained to perform consent checks, right?

A. Let me take a quick look here and refresh my memory.

Q. Sure.

(Witness perusing document.)

A. Yes, okay, so I've looked at that. Do you want to reask the question?

Q. All right. One of the things you talk about is a mapping table Google had maintained to perform consent checks?

A. Yes.

Q. Okay. One just clarifying question, you don't, sitting here today, know whether that mapping table is still

being used, do you?

MR. MAO: Sorry, can you read back the last -- the end of that question? Sorry, Eduardo, you just covered your mouth a little bit.

MR. SANTACANA: That's all right.

Q. Sitting here today, you don't know whether that mapping table is still being used, do you?

A. I don't recall.

Q. While it was in use, did you see any evidence that it was used for any purpose other than to check consent?

A. I don't recall.

Q. What do you mean, you don't recall?

A. I don't recall the answer to that question. If it is documented in the report, so be it, and if it's not in the report, then it's not.

Q. I don't think it's documented in the report. I'm just trying to establish, you're not opining that Google misused that mapping table for a purpose

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

other than to check consents, right?

MR. MAO: Objection, argumentative.

A. Okay. So I think the point -- the key takeaway here is that this mapping table exists. There is a table that ties IDFAs to GAIA IDs.

Q. Understood.

A. So if you've got one, you can figure out the other.

Q. Understood. But you are not opining that Google used one to figure out the other for any purpose other than to check consents?

MR. MAO: Objection, incomplete hypothetical and argumentative. Go ahead.

A. I don't recall saying anything like that.

Q. Okay. Now, the iOS consent check process has changed since iOS 14, right?

A. I understand that Apple has made some policy changes regarding use of identifiers over time.

Q. And that includes its incorporation of the app tracking transparency protocol?

A. I believe I have mentioned that somewhere in here.

Q. I think it is mentioned once or twice. But you do not really analyze in this report how that affects Google's ability to check consents, right?

A. I mean, whatever I've said about it is there for you to see. This sounds like a detail which I just don't -- I can't put all these details in my head at once, so I've got the report.

Q. That's fine. Is it your opinion in this case that Google should honor the sWAA control even in circumstances where it does not know who the user is?

A. If Google doesn't know who the user is, if the user has asked and said I don't want to be tracked, that should be honored. I don't see any reason why it shouldn't be honored.

Q. Did you render any opinion in

the case as to the technical limitations that iOS 14 imposed on Google's ability to identify Google users?

A. I'm aware that there has been somewhat of an ongoing cat and mouse game between Apple and the data brokers and advertising networks where Apple seems to be making moves to try to promote privacy and the data brokers and ad networks seem to be trying to retain their capabilities. So that has just been an ongoing trend.

Q. Are you rendering -- did you render any opinion in the case on how the app tracking transparency protocol affects Google Analytics?

A. I don't recall saying anything about that. I don't recall that being part of my opinions.

Q. Okay. I had something but I lost it.

MR. MAO: It happens to all of us. It happens more with age.

THE WITNESS: We might need a dinner break here for everyone to refresh and regain.

MR. SANTACANA: I might try to make that flight.

MR. MAO: Okay, let's do it. Is it shown on time?

MR. SANTACANA: Different flight, JFK.

Q. I have a question about paragraph 71.

A. Speed round. Okay, go ahead.

Q. It's the last sentence. "According to documents Google produced in this case, two-thirds of the traffic on Google's app ads properties is attributable to AdMob, while the remaining one-third is attributable to Ad Manager," and you cite a document.

You know, sometimes people make approximations in e-mails and internal documents. Did you do anything to confirm whether that breakdown is precise or accurate?

A. I'm relying on that document.

Q. Okay. And nothing else?

A. I'm relying just on that document.

Q. Okay. So you're at least open to the possibility that number is wrong or even really wrong, it is just one document?

A. I mean, yeah, it's a possibility that the person who -- I would have to look at the document really before I -- I shouldn't opine about a document in the blind. But I can confirm that that's the document I'm relying on and I'm not relying on something else.

Q. Okay. App developers who use Google Analytics for Firebase to measure conversions could instead use some other SDK to measure conversions, right?

A. Yes.

Q. And they could do that even while continuing to place advertising on Google's display network, right?

A. In theory, they could, and they could also in theory use both SDKs at the same time. I think we have covered that, if you want to use the mobile ads, you need the mobile ad SDK, GMA, and therefore you get that Firebase -- Google Analytics for Firebase functionality which is bundled in

with that now.

Q. Well, I think you may be conflating two things. So an app that doesn't serve ads would have no need for the GMA SDK, right?

A. Correct.

Q. So for apps that are ad buyers only and are using Google Analytics for Firebase in their app, they could instead use some other analytics provider and continue to buy ads on Google's display network?

MR. MAO: Objection. I think that hypothetical is just wrong, your hypothetical.

A. I'm sorry, so I didn't understand it, the first time you asked the question, I didn't understand it the way you asked it. The second time I was in fact mixed up.

Q. Okay.

A. So we shouldn't rely on my first answer, and what we should do --

Q. Let's start over.

A. Yeah, start over and we will

try to get a clean answer.

Q. App developers who use Google Analytics for Firebase to measure conversions could instead use some other SDK to measure conversions, right?

A. In theory they could.

Q. Including SDKs offered by companies other than Google?

A. In theory I think they could.

Q. And they could use an SDK from a company other than Google to measure conversions on Google's display network, right?

A. I would want to verify that just to be sure, because these technologies are kind of changing and it might even be a dependent thing depending on when. Something that is true now might not have been true several years ago and vice versa.

The other thing I would say is that the reason I have said theoretically they could is that I don't know that any significant number of people are doing it that way because the Google Analytics integrates so nicely with the Google ad

platforms that it is very beneficial to use them together.

Q. So take a look at Appendix E.

A. Is that tab 3?

Q. Tab 3. Do you recall [redacted] [redacted]?

A. Yes.

Q. That was a project at Google to increase the adoption of Google Analytics for Firebase as the selected measure of conversions in app ads campaigns, right?

A. Let me take a look at what I said about that, but, I mean, the way I think of it is the idea is to have one Google Analytics, like one ring to rule them all, but the Google Analytics 4 is the evolution of Google Analytics for Firebase as it is then extended to apply to the web also, so that there is one analytics platform that covers all of it. That's the way I think of it.

Q. So take a look at paragraph 26 of this appendix. It says "[redacted] [redacted] has been quite successful since its launch in early 2019," and it quotes an interrogatory

response from Google. "Google tracks app campaign ad spend that is bid against different types of conversions. As of last month (October 2022) approximately ██ ███████ of app campaign ad revenue was attributable to conversion types bid against GA4F (as opposed to other sources of conversions)."

Do you see all of that?

A. Yes.

Q. And then it says "When ███ launched in the first half of 2019, the percentage was █ ███████ or less, and then it increased from there all the way to almost ██ ███████ in October of 2022."

Do you see all of that?

A. Yes.

Q. So do you understand that the remainder of the 100 percent not represented by conversions bid against GA4F are being bid against some other conversion measurement system?

A. Well, that would seem to be implied, although I'm not sure that you could infer that the other ██ ███████ were

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

non-Google systems, because Google also has Universal Analytics, their legacy product, that is being phased out presently.

Q. So some of it may be Google, some of it, though, may be non-Google?

A. And maybe some of it is not tracked at all, in theory. Some people may just not set up conversion tracking. I do run across these kind of advertisers with regularity, shockingly.

Q. Well, so let's clarify something about that. The types of ad campaigns at issue in this case, as I understand it, is app ads campaigns, right?

A. Yes.

Q. And can you run an app ads campaign without conversion measurement at all?

A. I would have to double-check that. It may be that it is not possible, it may be that it is mandatory.

Q. I'm not sure either.

A. I would just take -- that's the kind of thing I don't memorize. I just look at the documentation.

Q. Okay.

MR. MAO: I just note for the record that we have a fundamental disagreement between you and I on what an app campaign promo is.

MR. SANTACANA: That's fine.

Q. When an app developer places an ad with Google for an app promo campaign or an app ads campaign, do they pay per conversion?

A. I think there -- I haven't used this product recently. I would have to look it up to be sure, but I've used it sort of in the past some number of years ago. But, again, I would just direct you to the documentation which will answer that question. I'm not sure I recorded it here in the report.

Q. I think you did. Look at paragraph 5.

A. Okay. I record this stuff because I don't want to have to memorize it.

See, the other problem is that these products have an ever rotating set of

names and features.

Q. Sure.

A. So there are actually two different kinds of app campaigns, there is the install, the app install campaigns, the app engagement campaigns where you try to reengage some user who has lapsed, hasn't used the app in, I don't know, 30 days.

Q. Right, okay, understood.

A. Okay. So I've noted Google required app developers to implement app conversion tracking and deep linking it to have a minimum of 250,000 app installs in order to run, I believe that is for the ACE.

Q. Uh-huh. That's the engagement campaign you are talking about?

A. Yeah, so I see that. There is something about -- that is one note about mandatory conversion.

Q. Right. You're not saying it has to be with a Google product, you are just saying that the advertiser has to track conversion somehow?

A. I would just look it up in the

documentation to know for sure what systems would satisfy that requirement.

Q. Okay.

A. Read the manual.

Q. Exactly. So back to my question about how the advertisers pay for all of this. How do they pay for all of this?

A. Well, I believe it is sold per install or per engagement. I believe the advertiser is able to make a bid.

Q. The advertiser makes a bid. What do you mean by that?

A. They specify the amount of money they are willing to pay for a result.

Q. Okay.

A. This program -- these programs have changed over time. So I may be recalling how something was in the past and it may be different at different points in time. Probably the best thing to do is actually just to look it up for whatever era you are interested in and know for sure for that era what it was.

Q. Okay, fair enough. Dr. Black

says at some point in his report that if Google Analytics for Firebase were to just disappear, right, snap your fingers, it's gone, that advertisers, app developers who advertise their apps, they would just choose some other analytics SDK and keep advertising with Google, they wouldn't just stop advertising. I mean, you have done internet marketing work with clients before. Does that seem fair?

MR. MAO: Objection, incomplete hypothetical, argumentative, and just completely wrong, but go ahead.

A. Okay. So my concerns with that hypothetical are, one, if users switch to another conversion or analytics package, that package may start pushing on them a different ad platform. It might have a really slick integration with a different ad platform, which causes Google to lose market share. So I wouldn't conclude that everything -- they would just switch and advertising with Google would proceed all the same, I don't think you can draw that conclusion.

Q. And I didn't mean to say it would proceed all the same. I was just saying they wouldn't stop advertising altogether?

A. You know, there could be -- there could be some sort of seismic shift. And also I'm not sure how realistic it is that something like that would happen.

Q. Well, okay. We were just looking at paragraph 26 of Appendix E of your report. It says that in the first half of 2019, █ ████████ of app ad spend at Google was bid against GA4F conversions, right?

A. Yes.

Q. So at least as recently as the first half of 2019 app developers were still spending money with Google even though they weren't relying greatly on GA4F to measure conversions?

A. The thing is in technology times move fast and things move fast and you can't necessarily stuff the genie back in the bottle. Like if you took away this product I don't know that you can conclude

things would just revert back to how they were in 2019.

Q. And I'm not suggesting that they would revert back to the way they were in 2019. I'm just saying as recently as the first half of 2019, advertisers were spending lots of money to advertise with Google even though they weren't using GA4F to measure the conversions very much?

A. Well, there is also something absent there which is how much money are they spending with Google. Is that -- has Google's market share of the app ad market gone up or changed over this time period? I think that's another thing. So I'm not ready to make some sort of economic judgment I don't think about, you know, whether -- if people switch, Google's revenue just keeps on the same. I wouldn't draw that conclusion.

Q. Do you advertise your website on Google's ad network?

A. I did until recently.

Q. When did you stop?

A. Not too long ago, like a month

ago maybe.

Q. Who do you advertise with now, or do you just not advertise anymore?

A. I have some term contract that I continue advertising with a SEEK directory, which is a specialized website for expert witnesses. It seems to produce the best results for me. I have been watching my ROI on Google erode, so I kind of just pulled it.

Q. Got it.

A. I have been a big fan of Google advertising over the years though.

Q. So you advertised your website up until a month ago with Google, you used Google Analytics, you also have advised clients on using Google Analytics, right?

A. Yes.

Q. With websites?

A. Yes.

Q. And you have advised clients on internet marketing, how to run ads and make sure that they are doing it in the most optimal way, right?

A. Yes.

Q. How many of those types of consultations have you done?

A. Hundreds.

Q. Hundreds. Hundreds of entities?

A. Probably, yeah.

Q. So let's say one of those entities came to you now and said Google Analytics, they just turned it off yesterday, and now I can't tell if my ads are converting or not. Would you say to them you should stop advertising on Google or would you say just measure your conversions using some other tool?

A. I mean, it's sort of a -- it's sort of a counterfactual assumption that this product would just disappear overnight. I would think that, for example, if the Court would order an injunction, somehow that impacted this, I would hope that there would be some fair notice to all the third parties that depend on it, not to leave people high and dry, that there should be a chance for -- a chance for orderly migration.

Q. It is disappearing in six months.

A. I don't know. This is -- it gets into something very speculative. I just don't know where that would go or how I would deal with that because it has never come up before like that.

Q. Have you ever advised anyone not to use Google Analytics on their website?

A. I have at times talked about the pros and cons of using -- tracking pixels on websites.

Q. Have you ever advised that someone use a tracking pixel other than Google Analytics?

A. I mean, in addition in the past I used other products, but Google Analytics has become very dominant in the market.

Q. If one of your clients said to you I just got a notice that Google Analytics will remain working just as it always has, but for any of the users who visit my website who have sWAA off, their data will just not appear, won't be there,

won't contribute, what would you advise them to do?

A. I would say that's fine, and I will tell you why, because the Google Analytics as it is does not give you an exact count of anything. It actually uses statistical sampling. They don't actually measure every interaction, they measure a sampling of them, and then extract from the sampling.

So if there are WAA-off and sWAA-off users it is possible to use statistical methods to essentially replace the missing data. So I think it's something that one can use statistics to correct for. Either Google could build that into the product or the company using it could know, okay, this has some measurement error, and in fact we already know that this has some potential for measurement error because some users in the past, you know, there have been issues with people, for example, they might use Privacy Badger and they might disable the tracking beacons. You know, sometimes -- sometimes

there are things that affect the accuracy of all the tracking.

If you get a good statistical sample, if you get a read on three-quarters of your visitors, you can extrapolate from that and know what is going on, as long as -- as long as there is not too much bias in the data. In other words, if you are selling -- I mean, there might be some weird counterexample, for example, like if Bruce Schneier is trying to sell his book on the web and all the people coming to buy the book are privacy hawks, like they might all have Privacy Badger installed, so that might be a little weird. But that is kind of an unusual circumstance.

I mean, if you are just selling sneakers or belts or whatever, those kind of people are just kind of run of the internet and there is not going to be any sort of correlation between desire for privacy and whether people have a propensity to buy shoes, because everybody wears shoes.

MR. MAO: Can we get a clock

check on that? I would like to at least take a break before the last hour just so we can kind of finish.

THE VIDEOGRAPHER: Five hours, 46 minutes.

MR. MAO: I'm going to need about ten minutes with him for my part.

MR. SANTACANA: Sure.

MR. MAO: Just to be clear, because I don't want you to complain that you miss your plane. I'm not trying to jam you on your time, I'm simply saying if you are trying to make your last flight, I'm going to insist on having my ten minutes.

MR. SANTACANA: I understand. I won't be surprised.

Q. So sticking with this for a moment, wouldn't it be kind of difficult for Google Analytics to tell your hypothetical client in this scenario what sWAA-off users would have done on the website if the data has no sWAA-off users in it at all?

A. I'm not sure exactly how to

best approach that, because this is, again, one step into the future. It is sort of presuming some sort of result in this case and then what do we do next. I think it is best to get there first and then figure out -- everyone can figure out what that next step is. That is hopefully not too disruptive to the marketplace.

Q. So if let's say Google had honored the sWAA setting the way that you interpret it from the beginning, you don't think that would have hampered Google Analytics for Firebase in a way that really like made it not work for app developers?

A. I'm not sure, but I think that doing the right thing is usually a good business decision, because the way I look at business, the trust of your customers is your most valuable asset and you want your customers to trust you and be happy with you.

So I think doing the right thing for customers, even if there is some immediate apparent cost and then there is maybe some hard to determine future

benefit, I think it is always a good idea to try to build up your customer trust. But that's just my philosophy. You asked, I answered, but make of it -- make of it what you will.

Q. That is perfectly fine. I just -- I want to really understand what you meant when you were talking about analytics and statistical sampling and the way that you would react if your client said to you I'm really upset, all of my -- all of the sWAA-off users are being excluded from Analytics now, this is a disaster, you know, what are we supposed to do, this thing is not working.

A. I have actually documented in the report that something like [redacted] [redacted] of users are sWAA on. So you have got [redacted] [redacted] of your population, you are collecting data on them. So if you are missing one-sixth of the data you can just sort of extrapolate that. If that one-sixth is -- behavior of the one-sixth -- if the behavior of the five-sixths is representative of the behavior of the

 one-sixths, you can just extrapolate and have a pretty good idea.

Q. So you wouldn't -- so you would not necessarily tell them you need to stop using Google Analytics, this isn't accurate anymore?

A. I would have to evaluate the circumstance and the situation at the time. I think there is more to the hypothetical that I would have to evaluate.

Q. Wouldn't, I mean, wouldn't in this hypothetical, if the sWAA-off data was excluded from web analytics and your customer is upset about it and they come to you for advice, wouldn't it drive down the value to the customer of advertising with Google?

A. I'm not sure. I mean, again, it depends all on implementation details, and, again, the going forward is different than the history.

Q. So is that -- I mean, are you saying I guess that going forward there's a way in which Google could exclude sWAA-off data from Analytics entirely, never get

sent, but the Analytics product could still sort of work just as well for the app developers who rely on it?

A. I mean, I'm not sure. I would have to see the details of that implementation. There is sort of unknowns in this hypothetical that might guide that.

Q. Okay. I mean, you expressed a little bit about it. I mean, I'm just trying to understand what you're saying.

A. I'm saying there are some scenarios under which you could do extrapolation. I pointed that out. So I don't know that I could give you a hard and fast rule on this. I think it really depends.

Q. I will just ask you something quick about paragraph 182 on a completely different topic.

A. Okay. Let's go like five minutes and then take our break and then try to finish.

Q. Sure. There is some blue highlighting in here which I think was for redaction purposes.

A. That's my understanding as well.

Q. So I'm actually looking at the blue highlight in this case. It says "I understand that," and then a little later it says "Anibal Rodriguez was signed in to his peteysake@gmail.com account."

Do you see that?

A. Yes.

Q. And then you cite his deposition transcript?

A. Yes.

Q. You're aware that Dr. Black talks about this in his report, the possibility that Mr. Rodriguez was signed in to a different account at different points in time during the class period?

A. I don't recall that section of Dr. Black's report.

Q. Okay.

A. But I also would just comment that the last sentence in blue is that he says "As shown in Appendix A, all three plaintiffs' signed-in accounts had WAA and sWAA turned off when the Baseview data was

generated." So I know that Appendix A was actually a list of status at different dates.

Q. Right. I'm very familiar with Appendix A.

A. Yeah, that could be -- the fact that he was -- the sWAA and WAA status could be verified as of when that data was collected.

Q. Okay. Apart from the deposition transcript cite that you have here for Mr. Rodriguez and Ms. Harvey and Mr. Cataldo, you cite each of their transcripts, is there anything else that you are relying on for your understanding as to which accounts were signed in to these devices at which times? And to be clear, did you talk to them or did the lawyers tell you something that's not documented here?

MR. MAO: And you are not referring to what else you may have produced to us, you are just talking about like other sources outside of the formal discovery process?

MR. SANTACANA: No, or anything that's not documented in this paragraph.

A. I mean, what I would suggest is I'm not going to be able to do it now live, but I will check the records that were collected and there may be something in the actual record itself that corroborates that information that they were signed in.

Q. Okay. There's -- but you didn't talk to them, these plaintiffs?

A. I don't recall talking to them.

Q. Okay. And you're not relying on something the lawyers told you about which device -- which account was signed in to which device at what time?

A. I'm relying on what's cited and also the data itself.

MR. MAO: One other thing, Eduardo, I know you are trying to get out of here, but I do have on the record a number of things that you asked him that he agreed to follow up on the appendix for the record. So I don't know if you want to propose

something other than -- I can use my time to do it. I don't care to hold you to that. I'm just noting that that is going to hold us over, okay?

MR. SANTACANA: I understand.

MR. MAO: Okay.

MR. SANTACANA: It's fine if I miss it. It is completely fine. Let's just do it right one time.

MR. MAO: I understand.

Q. So iOS 14 deprived third parties of device ID if the user declined the app tracking transparency prompt in iOS. You're familiar with that?

A. Yeah, I recall that.

Q. You've gotten that prompt yourself on an iPhone?

A. Probably.

Q. I would say almost certainly.

A. I don't remember it, but probably I did.

Q. Well, it's a prompt that says do you want to let this app track you for advertising, and you say yes or no, and sometimes it is worded differently, but

you've seen that before?

A. Probably.

Q. Okay.

A. I mean, maybe I have some other setting somewhere in my phone that just suppresses it and says like no, never.

Q. Not possible?

A. No, it's not possible.

Q. But you're a computer privacy expert, you didn't notice the prompts when they came up?

A. I don't recall seeing them recently.

Q. Okay. Maybe you just haven't installed apps a lot.

A. Actually, I am kind of paranoid about apps, and I will only install certain kinds of apps.

Q. Got it. And actually I take it back, it may be possible that if you turn something off, it is off for all of them. I'm not sure. In any case, are you familiar with Apple's SKAD network?

A. Yeah, I don't remember the acronym, but if you tell me what it spells

out or what it means, I probably -- I probably have heard of it. I just don't necessarily remember the name.

Q. I don't think I have ever seen it -- what it stands for, if anything. But do you have any understanding of what it does or what it's for?

A. Again, I have to just connect the thing to the name, because I may know about the thing, I just don't know what it is called.

Q. SKAD network is the thing that Apple has to provide analytics and conversion information to third parties without giving them device ID. Are you familiar with that?

A. Okay, so it is some sort of privacy preserving analytics solution.

Q. Yeah.

A. Okay, yeah, I think I have heard something about it.

Q. Or so they market it as. Okay.

Are you particularly familiar with it or you just heard about it?

A. I mean, I think I follow the

press, so I see, you know, all the articles come across my inbox and I see them, but I don't -- I haven't looked at it in detail yet.

Q. Okay. And in your professional -- in the course of your professional life you haven't needed to -- you don't advise people on app advertising?

A. I do at times. I just haven't had to look into it recently, and as I said before, the field moves kind of quickly, so I kind of do fresh investigation each time, because things change.

Q. All right.

MR. MAO: That break, Eduardo, at some point?

MR. SANTACANA: Sure, we can break.

THE WITNESS: Now would be a good time.

THE VIDEOGRAPHER: The time is 6:25 p.m. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 6:45 p.m. We are back on the record.

BY MR. SANTACANA:

Q. Can you take a look at paragraph 269 of your report.

A. Yes.

Q. Sir, in this paragraph you make an assertion about marginal cost?

A. Yes.

Q. Other than what you have cited here in this paragraph, was there any other basis for this assertion?

A. Sure. So within my experience I know elsewhere in the report I mention that Google stated that they have X byte scale storage facilities, and I'm aware of Google's activities in storing video, storing images, storing Gmail, storing an index of the web. They have got some pretty data-intensive applications there that require a tremendous amount of storage.

So what I'm thinking is that the amount of storage required to store this WAA-off and sWAA-off user data, which is, you know, some of it is deleted quickly, some of it is saved for a longer

period of time, presumably Google tries to be a little bit efficient about how they store things. You know, when they are going to store it for long term, they kind of, you know, filter out what they don't need and keep what they need.

So I have in mind an inference that this is a -- this amount of storage is a rounding error in their whole scheme of things. And I also have an idea of what storage costs at Google, because I actually buy storage from Google. I pay Google $2 a month for premium Gmail storage. I pay them $2 a month to get 100 gigabytes of storage.

Q. That's less than I pay.

A. Okay. Well, and I also have, you know, cloud storage with some other providers like Dropbox, you know, I think it is 150 bucks a year for 2 terabytes. I'm aware of what the Amazon storage rates are, especially cold storage is really cheap, live storage is more money. But I have some sort of general sense of what cloud storage costs, and storage is pretty

cheap. So that's where all that opinion is coming from.

Q. Okay. So I guess the word material incremental cost, the word "material" is doing some work there?

A. The word "material" is definitely doing some work.

Q. Have you quantified the degree to which a cost is material or not?

A. So generally my understanding in these kind of situations, you know, the difference between material and de minimus, the threshold is somewhere around █ █████████. You know, when you get something that is like █ █████████, that is pretty minor.

I think this is -- if Google is sitting down to plan out, okay, we need to build more data centers, we need to allocate storage, you know, what are our forecast needs, they are looking at how much video do they have to store, how much, you know, images, how much mail they have got to store, Google Docs, I mean, they have got huge storage things.

I don't think the WAA-off/sWAA-off data makes that list. I don't think it factors into any sort of calculation or projection of how much storage one is going to need because I think it is extremely small in the whole scheme of things.

Q. Did you see any documents or other evidence to that effect?

A. No, it is just an inference from knowing how cloud computing platforms work. And of course Google is welcome to rebut me if they have an actual document that shows otherwise, I'm totally happy to take that document and see the facts. Facts are friends.

Q. But you didn't see a document either way?

A. They haven't produced that document, but they certainly know what their storage needs are and what their storage use is for all this data. They could, you know, if I'm wrong, they can put the facts on the table.

Q. Got it. Okay. I have a

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

question about Firebase cloud messaging. Any user that is receiving a notification via Firebase cloud messaging has consented to receive notifications on this device from that app, right?

A. You know, I think that the messaging, there is a setting that controls whether apps can push messages.

Q. So to get such a message, a user would have to expressly agree to get messages from that app?

A. Well, it might be the other way around. In order to not get messages a user might have to turn it off.

Q. Do you know one way or the other?

A. My impression is these things could be opted in. I mean, we could double-check it. I mean, you can check it, I can check it. That is just something that ought to be looked up.

Q. So is it your understanding that when a user turns sWAA off that that should disable the Firebase cloud messaging function of the Firebase SDK?

A. I'm not sure. I haven't considered that, I don't think. And that's something that maybe Google could address, you know, as a setting. You know, do you want messaging to continue to work or not if you flip this setting.

I mean, this is I think something that some of the Google employees have observed that is part of the issue with the WAA and sWAA setting, which is that it is dealt with inconsistently about Google's range of products. It is hard, very hard to understand what the behavior is going to be.

Q. Okay. Do you opine that Google has monetized the sWAA-off Firebase cloud messaging data that you identify in your report?

A. I know that cloud messaging is a relatively minor product compared to, you know, the Google Analytics for Firebase and AdMob. Those are the two big ones. Cloud messaging is a lesser -- lesser thing, less significant.

Q. All right. Now, you opine in

your report that you could identify class members using Google's data, right?

A. Yes.

Q. I think you start talking about this in Section I, page 147.

A. Yes, okay.

Q. So one of the methods you propose here, given that historical records, not all of them exist anymore, is that class members could identify themselves to Google and that, combined with records Google has, could identify them as a class member?

A. I think I have said something like that.

Q. And I think what you said was that to do that, they would identify which apps they use and then Google would confirm whether that app uses Google Analytics for Firebase or the ads SDK, right?

A. I believe I said something like that.

Q. Even if a user who has sWAA off has in the past used an app that has used GA4F, that does not necessarily imply that

Google saved sWAA-off data about that user from GA4F, right?

A. I think if Google had saved the data that plaintiffs asked them to save somewhere near to the front of this litigation, they would have the data that they needed to answer that question, and Google decided that they didn't want to save that data, and I think they made a motion that they wouldn't have to save it and they didn't have to save it.

Q. What data are you referring to?

A. I think these logs of all the app activity data.

Q. Which logs?

A. I think I might have discussed it somewhere in the report here, but what I'm thinking of are the relevant logs, logs that would include whatever data is sent from Google Analytics for Firebase, that includes this, you know, a whole host of different identifiers and data points that you could use to identify and prove up that someone was using an app that recorded their data while they had sWAA or WAA off.

Q. Okay. So but you are here to offer expert opinions, so I want to be specific. Which logs in particular are you saying could have been used had they not been deleted to identify class members during the class period?

A. I don't know off the top of my head.

Q. Do you say so in your report?

A. I may say something about that in the report.

Q. Well, you may say, you may not say, I need to know if you do.

A. Again, I mean, this kind of question, we have struggled with it all day because I've got, you know, like it looks like 600 pages worth of report and appendices in front of me here and I can't possibly like index all that with my brain and remember where each and every little fact is within that.

Q. Well, I'm not asking you to index anything. I mean, there is a table of contents. You have been holding this report all day. I'm just asking you --

MR. MAO: While you are asking him questions, if you want him to take the time to look through that, look for it --

Q. The time to look through your report was before you sat down today.

A. Which I did actually.

Q. Good. So my question is which logs, right, you have this Section I, Class Member Identification, you are welcome to look at it right now, it is eight pages long, okay, does it identify the specific logs that you would have used had they not been deleted to identify class members?

A. I mean, the report either does or does not identify the logs, and also it may mention some docket action which may have lists, and I think there was also motions or requests in this case for lists of logs and additional logs which Google didn't produce. So, I mean, if Google has resisted discovery and refused to provide the relevant data, it doesn't seem cricket that my client should be put at a disadvantage for not having that which

Google has refused to produce.

Q. Your client being whom?

A. The plaintiffs in this case.

Q. So I honestly don't really know what you're talking about. But this section of your report does not discuss motions or discovery. What it talks about is methods for identifying class members using data that Google has or data that the users would have, okay? And I just want to be really clear about what you're saying right now.

You are claiming that there is data that was deleted that could be -- that could have been used to identify class members and now it doesn't exist anymore.

A. Why don't we -- why don't we go to the exact statement here, if I can find it.

Q. Sure.

MR. MAO: Sorry, when you are saying "sure," we are starting out with page 147, this section?

MR. SANTACANA: Page 147. Why don't we go off while you look for it.

THE VIDEOGRAPHER: The time is 6:58 p.m. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 7:00 p.m. We are back on the record.

BY MR. SANTACANA:

Q. Okay. So you are ready to address this?

A. Yeah.

Q. Go ahead.

A. So I will just point you to paragraphs 357, 358 and 359. That explains it.

Q. Okay. I am looking at that exact thing. So 357 says "Google could use the data stored within its voluminous logs to verify membership in the class. The same records provide information about the volume of WAA and sWAA-off data Google has collected and saved, to the extent Google did not destroy and delete such data."

But that paragraph does not identify any log or logs in particular, right?

A. Keep reading.

Q. Okay. But that one doesn't. I'm going to keep reading in a moment. Am I right?

A. Well, I told you there is three paragraphs together that describe where this data would have been found if it had been retained.

Q. Okay. So paragraph 358, as I see it, mentions 16 AdMob related logs, eight of which are GAIA and I guess eight of which are not GAIA logs?

A. Yeah, that's the microscopic quantity of logs that Google produced.

Q. And then you identify the tmpapp measurement log that contains a sWAA bit in GAIA data, right?

A. Yeah, so there are sWAA and WAA bits in some of these logs. I mean, Google themselves said there was something like a million hits when they searched through the logs to find out how many fields mention WAA or sWAA.

Q. And then it says SampledAdEventsQueries which does contain WAA and sWAA bits.

A. Right. And then 359 has the sort of the payload here, "but Google has withheld providing information about the vast majority of logs that contain such a bit," okay? That's the sWAA/WAA bit.

Q. Well, Mr. Hochman, my questioning of you today is about what you did do, not what you didn't do. So I just need to know what you did do and what you did opine on. I don't need to know about the world of things that you may have never seen that may or may not exist and that may or may not be helpful to you, right?

So I think what you're saying is at least with respect to the logs you identify in 358, Google did not in your view retain them long enough to identify class membership?

A. So Google had the data, Google had the data, and if Google says they no longer have the data, then that's because they didn't retain it, and the Court will have to determine what to do about that. That's not my question. I can't give you a legal answer.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. Well, on that we agree.

Let's talk about the tmpapp measurement log. That's the only analytics log in paragraph 358, right? The others are ads logs.

A. Let's take a look. Yes.

Q. The retention period on that log is 56 days?

A. Okay.

Q. You're aware of that?

A. It doesn't surprise me.

Q. So on the day this case was filed, at most there was 56 days of data in it going back 56 days, right?

A. For that log, but there are other logs.

Q. Okay. But that log couldn't help you figure out who was a class member in 2018 or 2019 if the case was filed in the spring of 2020, right?

A. But there may be other logs. I mean, Google has said that they had a million hits. You can see it there at 359.

Q. I'm asking you about this one log that you identified, tmpapp

measurement. I will ask about the other ones in a moment.

MR. MAO: Objection, asked and answered. Go ahead.

MR. SANTACANA: Well, I don't think he answered it.

Q. The question is you could not use the tmpapp measurement log on the date this case was filed to figure out who was a class member in 2018 or 2019, right?

A. That log, if it only had a 56-day retention period, that wouldn't have gone back that far, but there may be other logs that do go back further.

Q. So the SampledAdEventsQueries log, do you know what the retention period was on that one?

A. As I said, there is a microscopic number of logs that Google produced and I'm really not interested in the retention policy on this very small number of logs out of the total huge mass of data which was hidden from us.

Q. Well, you should be interested. I mean, if on the day the case was filed

there was no data older than 60 days that you could use to identify a class member, that would be pretty relevant to your opinion, wouldn't it?

A. I think that the people who have set this can say if they set it and Google can use what data they have to try to verify it. That's one of the things I said. And I also said that if Google had retained data they would be able to use that data to ascertain who the class members were.

Q. I understand. I'm just saying that depends in part on what the retention period was for the logs in question on the day the case was filed.

A. And Google has resisted providing us information about all these million different fields and all the relevant logs because some of these things are kept indefinitely as I understand it.

Q. You're not answering my question though. I didn't ask you about the other logs. I said -- well, let me just ask it a different way actually.

You just said if Google had retained data they would be able to use it to ascertain who the class members were, right? That's an expert opinion you have given in the case?

A. Well, because I have shown that these logs contain information that is identifying and that links to a user, so that's really the thrust of my opinion. Now, if you all want to argue about retentions and discovery and all that, you can. All I'm pointing out is that had these things been retained, these people would be identifiable.

Q. Based on your review of the logs that were produced in the case?

A. And also documents and testimony which talk about how Google continues to collect and store data when the WAA and sWAA settings are turned off.

Now, bear in mind if Google honored that setting and didn't store and retain that data, then, one, there would be no case, and, two, the class members wouldn't be ascertainable because Google

wouldn't have that data.

Q. When you say "that data" --

A. The data that -- let's call it the contraband data, the data that was collected while the switches were shut off.

Q. I don't think I will call it that.

A. I may.

Q. But I'm just going to -- I need to be clear about something. This is an opinion that the Court may rely on one day, okay, a federal judge is going to read this, they may rely on it, they may ask you to testify. It says "Google has collected and saved data in ways that identify class members," and you opine in here that that data could have been used to identify class members had it not been destroyed.

A. Yes.

Q. I just want to be clear, when you say "that data," as an expert, what you are opining on is the data that corresponds to data that was produced to you in the case, that had it been kept indefinitely --

A. I think the data that is

relevant, to the extent that it still exists, or ever existed, would be found in the non-GAIA logs that have WAA and sWAA-off activity. So I would expect to find them in Sawmill, not necessarily in Footprints, right?

So all those logs, whatever they are, that have WAA and sWAA-off data, preferably the ones that have some of these 1 million fields that are tagged with WAA and sWAA, so they are identified as having been collected with that setting, one of those settings off.

Q. Okay, thank you. One clarifying point. The non-GAIA logs sWAA-off activity in Sawmill, are those Analytics logs?

MR. MAO: Objection. This is not a memory test. The document speaks for itself. Go ahead.

Q. No, I'm just asking what you meant. Are you referring to Analytics non-GAIA logs?

A. I would say generally any log that is recording web and app activity of

this nature with WAA-off and sWAA-off data. Additionally, I think there are some GAIA logs that I believe include the user settings. If you remember in Section A, Appendix A, I reproduced some data that shows when the users turned WAA and sWAA off. So that information is obviously useful also.

Q. For the settings, right, understood. I think I understand your opinion now.

A. I just would point out, if you look at 354, there is also some explanation there of -- essentially I'm summing up the prior paragraphs that talk about three categories of information.

Q. Right. No, and I understand those.

A. Okay.

Q. I do. Okay. Did you get a chance to check whether you ever performed a join of GAIA/non-GAIA log entries?

MR. MAO: As I stated, we would do that when you are done. Sorry, I just thought there would be some type

of a pissy fight over it. I know you want to get out of here.

MR. SANTACANA: No, I misunderstood.

Q. You are still using Google Analytics on your website?

A. Yes.

Q. I can't remember if I asked this, do you know if the data sharing setting is turned on?

A. I don't remember.

Q. Do you know if Google Signals is turned on?

A. I don't remember. I mean, if there is some data sharing thing -- my recollection on that one is that there was some setting which allowed essentially Google's staff to go in there and take a look and use that to counsel me, and I don't recall if I have turned that off. I mean, my nature would be to turn that off. But I haven't looked at it lately.

Q. If your opinion in this report is accurate, does that mean in your mind that Google Analytics is actively deviating

from the sWAA description in users' accounts when they turn it off?

MR. MAO: Objection to form.

Go ahead.

A. So I'm using GAIA on a website, I'm not using it on an app.

Q. Right. No, I understand. I think you said it's all unified now?

A. Yes, I believe that it is moving towards that, but I just haven't -- I honestly haven't looked at it lately. I have been sort of working on these cases and not looking at my own web marketing. So at some point I will sit back and reevaluate like do I want to continue using this product or not. But I can wait for the Court to render an opinion about whether Google has done something wrong or not. I mean, I have my feelings, but I will also defer to the Court and let the Court decide.

Q. Okay. But, I mean, your feelings have not risen to the level of feeling like you need to discontinue your use of Google Analytics immediately?

A. The thing is I use all of Google's risky, privacy-invading products. I mean, I use some Google Home products. I use all kinds of Google stuff, because I also want to know how it works. I use Google Analytics because I also want to keep on top of how it works. So I'm doing that and also --

Q. Even at the cost of your website visitors' privacy?

A. You know, my website visitors who have privacy concerns have probably much bigger concerns than what's going on on my website, because my website is targeted towards law firms, so the main visitors to my site are lawyers. I have some people come in to read articles on web marketing.

I don't -- I am not here to tell the Court what final decision should be made. I've got my technical analysis, I've got my beliefs, I'm using Google Analytics because I have been using it since 2005, and I just haven't spent the time to figure out what other product I

could use that would fill that need, because Google Analytics has kind of driven most of the other products out of the market. There is not really a lot of choices for me. I'm open to your suggestion, if you think there is some other analytics package I can use, but I'm not sure where else I could go.

Q. Well, I'm just trying to understand how to square your opinion about the privacy risks that users are facing as a consequence of the way Google treats sWAA-off data on the one hand and your decision to continue to expose people to those risks on the other. I mean, you have said one single piece of data could ruin somebody's life.

A. Yes.

Q. You don't disagree with that now?

A. No.

Q. So you're okay taking that risk?

A. People who have -- I have documented here that people are spending

like four hours a day in apps and they are using lots and lots of apps --

Q. But it could be your site that gets hacked?

A. Well, I don't have an app.

Q. I understand. But it still could be your site that gets hacked?

A. But my site doesn't have any sensitive information from my visitors. I don't record any sensitive information on my site.

Q. You have tracking pixels on your site, right?

A. And the tracking is done by Google Analytics. Google is holding that data.

Q. Okay.

A. And I don't think that that materially increases anyone's risk, because the amount of -- percent of browsing that someone does when they come on the web on my site is minuscule as a part of their total browsing, their total risk profile, okay? Because Google Analytics beacons are located everywhere. They are all over the

place. Me taking that beacon off my website does not materially reduce any person's risk.

Q. Okay.

A. Because there is so many beacons everywhere else.

MR. SANTACANA: All right. Let's take a quick break.

THE VIDEOGRAPHER: The time is 7:16 p.m. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 8:03 p.m. We are back on the record.

MR. SANTACANA: So I'm passing the witness.

EXAMINATION BY MR. MAO:

Q. So, Mr. Hochman, I just want to make sure, you were given a number of questions during this deposition regarding whether or not you could find things like your joinability analysis, whether or not IP addresses were being collected, you know, what the retention periods were for permanent logs versus nonpermanent logs. You agree a lot of that is either written

in your report or written in the appendix to the report, correct?

A. Yes.

Q. You understand that the Exhibit No. 1 that was provided to you is actually an incomplete copy of your report, I'm not pointing fingers, I'm just saying that it was missing some parts of the appendices; is that correct?

A. Yes, some of the appendices weren't here because they were Excel files.

Q. Which appendices were not in here?

A. One of them was H2.

Q. Any others that you saw?

A. Well, probably H1 wasn't in there either.

Q. So there is a number of appendices missing in there, correct?

A. Yes. And let's see. Yeah, the H1s are not there, all of the H appendices are not there.

MR. SANTACANA: And you want me to just read out which ones are there? When I first introduced it I explained

the native files wouldn't be in there. So Exhibit A, Appendix E, Appendix G, Appendix I, Appendix K, and Appendix L are in this paper volume that I handed you at the start of the day.

MR. MAO: I think the problem is just we are going to have to make that a part of the record because what's in the record is just the core report itself.

Q. In other words, you only had in front of you during the examination selected parts that counsel was going to use, but some of the other stuff that you needed in order to fully refresh your recollection wasn't available to you; is that correct?

A. Yes.

Q. Okay. And then you believe that once you have those available, you are going to be able to answer some of the previous questions; is that correct?

A. Yes.

Q. Okay. Second area of questioning that I wanted to ask you, and

you can put I guess Exhibit 1 plus appendices away for now.

A. Okay.

Q. Is you were asked a number of questions today regarding joinability and also, you know, reidentification of users?

A. Yes.

Q. Are those two concepts the same thing?

A. No. They can operate in different ways.

Q. Okay. So in terms of what you understood what was being discussed back and forth between you and counsel, how would you define these respective terms in your own words?

A. Sure. Joinability is if you have two sets of data is there an overlapping identifier or fingerprintable fields that can be matched up in order to link two tables together. It literally joined two tables of data together. So you have two tables and there is an identifier in each table and now those tables can be joined together using that identifier.

Q. Okay. What about reidentification, is that different, the same? How would you define that?

A. Reidentification is different. If you have a record where some sort of identifying information has been stripped away, is there remaining data that can be used to reestablish an identification of that record. So that could be even just a single table that's taken. If some additional piece of information is supplied the record may be reidentified.

So, for example, if there is a table of app activity and it has some app instance IDs in it, if there is a suspect, and the suspect's phone is seized, the app ID can be taken off the phone and that can be used to reidentify that record and say aha, this record belongs to this suspect, because it has a matching instance ID in it.

Q. You heard counsel previously talk about how Google separates identity tables perhaps into two different types of, you know, systems. Assuming that is true,

does that mean that Google is not able to reidentify the user?

A. No, because Google, having separated them, can also put them back together. Even though they may have a policy not to do that, they still have the technical capability to do that, and they might in fact do it under some sort of external pressure or legal process.

Q. In your report you refer to a number of things you called Google IDs; is that correct?

A. Yes.

Q. Is Google able to reidentify users who have been given a Google ID?

A. Yes.

Q. And that was part of your point with regard to pseudonymous versus a name and how pseudonymous does not necessarily mean that it is less identifying than a name, correct?

A. Yes, pseudonymous does not mean --

MR. SANTACANA: Sorry, objection, vague.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

A. Pseudonymous does not mean anonymous.

Q. You were previously asked a number of questions regarding conversions, and I heard in there conversions and ad promo and also Google Ads. Am I correct in understanding that in your report there was more than one type of ad that was being discussed with regard to conversions?

MR. SANTACANA: Vague.

A. Yes, so in mobile conversions, there can be mobile app ads, app promotion ads. We talked about two different kinds, the app install ad and the app engagement ad, and those can have conversions that are tracked.

But there is something that is even let's say more common and bigger, there are display ads that appear inside of apps and those can also lead to conversions, okay? So that they track -- so, for example, someone is in an app, they see a display ad, they click it, and some data is recorded, the app interaction data is recorded, and then later on that person

goes to the website of the advertiser and makes a purchase, and that conversion is recorded, okay? So there can be conversions going out of the app world and there can be conversions coming in to the app world.

Q. Right. And then for display ads, whether or not Google can attribute a conversion event within the conversion window absolutely makes a difference to its bottom line; isn't that correct?

A. Yes. I have testified about that, that if the conversions are not trackable, then the advertiser won't want to pay for the ad.

Q. When you say pay for the ad, how are the different ways in which an ad can be paid?

A. The ad --

Q. And I'm talking about display ads, not, you know, like a search ad or something else that may be a nondisplay ad within the network.

A. Well, so it gets complicated because display ads can be paid for. In

the past there have been methods of bidding on them by paying for the click or paying for a thousand impressions or paying for a conversion, and there is also automated bid strategies which I think I have documented in one of these appendices that the automated bidding is a heavily-used feature, which is only available in fact if you use the Google Analytics for conversion tracking. So there are a variety of ways to pay.

But for the advertiser, commonly conversions are the key performance indicator of the advertising campaign, is it converting. And if conversions are not tracked, then the advertiser is not going to want to pay for the ads.

Q. So in your experience, have you seen within Google's display ad system a Google customer allowing a third-party attribution to be the ultimate verifier as to whether or not that advertiser would pay Google or not?

A. I haven't seen that. For the

automated bid strategies, you have to use Google Analytics.

Q. Probably my last area before I turn it back to Mr. Santacana, and then I will reserve my right to do a redirect, with regard to the class members in this case, whether they have WAA off or not, Google treats them all the same with regard to whether or not that data is collected; is that correct?

MR. SANTACANA: Vague.

A. Yes. When a user has WAA and/or sWAA off, they are all treated the same way. Google collects the data regardless for all the people.

Q. Actually, I have one more question. You reviewed Mr. Black's report; isn't that correct?

A. Yes.

Q. Did you see Mr. Black do any type of sampling across Google's data at all?

A. No.

MR. MAO: Back to you, Mr. Santacana. I reserve my right to

do a further redirect.

EXAMINATION BY MR. SANTACANA:

Q. Mr. Hochman --

MR. MAO: By the way, if you are looking at appendices that is not part of what you give him --

MR. SANTACANA: I'm not.

MR. MAO: I ask that you put that in the record. Thank you.

Q. I have a question about one of the last questions you were just asked. The question was "Have you seen within Google's display ad system a Google customer allowing a third-party attribution to be the ultimate verifier as to whether or not that advertiser would pay Google or not?"

I have to confess, I don't understand that question. Your answer was "I haven't seen that. For the automated bid strategies, you have to use Google Analytics."

A. Right. In other words, if you are paying for conversions or acquisitions app, you know, if you have -- if you are

trying to pay for an acquisition, CPA, you have to use Google Analytics to track that conversion. I'm not aware of Google accepting third-party conversion data for that purpose. And also, likewise, for the automated bidding, you have to use Google Analytics to take advantage of automated bidding.

Q. I see. So what you are saying is that there are certain types of methods of bidding or measuring performance of ad campaigns that Google only permits advertisers to do when they are using Google Analytics?

A. Yes.

Q. And there are other types where they can use Google Analytics or something else?

A. Yes.

Q. Okay. I understand now. All right.

Mr. Mao asked you about appendices that are not in this paper volume I handed you at the start of the day, right?

A. Yes.

Q. And I think he asked you something like once you have those other appendices, you are going to be able to answer some of the previous questions you weren't able to answer, and you said yes. Do you recall that?

A. Yes.

Q. I just want to be clear, because I don't want to have to spend another seven hours with you, you are not saying that any question you weren't able to answer today you could somehow magically answer if I give you all of the Excel files, right?

MR. MAO: Objection, argumentative. Go ahead, answer.

A. There were certain questions, there were select questions where if I were to have those in front of me I would be able to answer them.

Q. Which ones?

MR. MAO: Can we just say the ones that he said he wanted to look at the appendices?

Q. So there was a question about have you ever performed a join.

A. Yes, and that is in Appendix H2, and while we were off the record I showed you that file and showed you how that worked and I think you accepted my explanation.

Q. And there was a question about IP addresses.

A. Yes, and I think I pointed to --

Q. Just yes or no, please.

A. I'm sorry.

Q. That was -- I'm just trying to get the list. That's another question you could have answered if you had had the Excel spreadsheets?

A. I think so.

Q. Okay. And then --

A. I haven't seen them yet so I'm not 100 percent sure, but I did mention the IP address question, I did have a reference to it in the report, so I think if you look around there, it may actually have the actual appendix that we need.

Q. Okay. And we will get to that. You're not representing that, apart from those two questions you had promised to look into, and we'll look at the Excel sheets, there aren't any other questions today that you said I don't know or I can't answer that where you're now representing if you had the Excel sheets you could now answer them?

A. I'm not sure I should be closed off there, because there might be something else we're just not thinking of right now. But essentially if later on you were to come in some motion and assert Mr. Hochman didn't know the answer to this question and then we answer and say well, the answer is right here in this document that wasn't shown to him during the deposition, you should accept that.

Q. See, there is a problem with that, which is at any point today you could have said the answer is in this part of my report and if I checked it I could give you the answer. So now I have to comb the record to find every time you said I don't

know and determine whether or not that was because you didn't have Excel sheets in front of you or if that was because you don't know and you are closing yourself off as to your knowledge, which I think you did legitimately as to a number of things.

So I just -- I'm kind of stuck in a difficult position here where you are ending this seven-hour deposition by saying well, if you had just given me some stuff that I authored that you didn't give me then I could answer all your questions.

So I have got a list of two questions. Can you think of any other questions that you weren't able to answer today but if I were to hand you the other appendices of your report which are Excel spreadsheets that you would now be able to answer them?

A. It is difficult for me to answer that question without having those sheets in front of me to remind me what's in them, because I'm not looking at them and I don't recall off the top of my head what's in, is it B and C and --

Q. Okay. So you want me to just mark all of them and then you're going to look at them to see if there is any other -- because, look, you and your lawyer, right, you talked about what you were going to do for this redirect. This doesn't need to be overly complicated. I just need to understand if you came in here to talk about these two questions in Appendix H2 or if you are reopening the entire deposition.

MR. MAO: And just to be clear, this, like what's in the appendices, is not something that we knew until he started looking through everything and trying to take an inventory.

MR. SANTACANA: I'm not saying you are trying to trick me. I'm saying it is his expert report, not mine.

MR. MAO: Well, yeah, come on. It is part of the preliminary instructions that this is not a memory test. So let's try to find a way to fix it. How do you propose that we fix it?

A. I think you can look at the record and there are times where I said I don't know or I don't have a way to do that. There are some that are pretty clear that it is just I don't know.

Q. I agree.

A. There are some that I think it is in there somewhere, it may be in the report, and I can't find it. So if I said it may be in the report and I can't find it that is indicating that it might be in one of these pieces that hasn't been introduced yet, and I think I was pretty clear when I answered to distinguish between I don't know versus I think it may be somewhere in there, and if it's in the report, it is, and I don't know exactly where it is. So I gave two different kinds of answers, so I think you can look at that and it should be pretty clear.

Q. Okay. I will -- I will think on that. Thank you for that answer. I appreciate it.

MR. MAO: I'm totally fine with taking a break so that if you want to

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

get that in order.

MR. SANTACANA: Yeah, let's go off for a second.

THE VIDEOGRAPHER: The time is 8:20 p.m. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 8:23 p.m. We are back on the record.

BY MR. SANTACANA:

Q. Mr. Hochman, I have uploaded all of these Excel files that were part of your report, I think. I have done my best anyway. None of them are currently marked. I just threw them all in that marked exhibits folder. We will deal with that later. But you can see their titles. Some of them are quite voluminous. What I want you to do is just take a look at their titles for a moment to refamiliarize yourself with what each one is.

A. Yes.

Q. Let me know when you're done.

A. Okay.

Q. Okay. Sitting here right now, can you recall any questions from the day

that you were unable to answer that you would now be able to answer given your access to these Excel files other than the two questions you already listed for me?

A. Nothing immediately comes to mind.

Q. Okay. So we will get to H2 in a minute. You had a colloquy with your attorney about reidentification as distinguished from joinability.

A. Yes.

Q. I understand the difference, I think, of what you defined to be reidentification is what you defined to be joinability.

My question is, that definition of reidentification doesn't appear, I don't think, in your report, or really any mention of it in your own words, though you do quote one witness as using the word. So I'm trying to just process like in your mind what relevance does that distinction have to your expert opinions in the case.

A. Well, throughout the day today I haven't been using that word because it

CONFIDENTIAL - ATTORNEYS' EYES ONLY

is a little bit jargony.

Q. Well, and because you didn't use it in your report.

A. Well, but I talked about -- I talked about it. I talked about the idea that the data that includes identifiers someone can extract an identifier from a phone and they can now match it to the data. So joinability is like taking two pieces of data and putting them together, whereas reidentification is you have some external source of knowledge and you combine it with a piece of data and now you have reidentified the data.

Q. Got it. Are you opining in the case that Google has engaged in reidentification of sWAA data?

A. No, I'm not saying that Google is doing this. I'm assuming that Google has the best intentions here, but that the problem is from threat actors or external pressure applied to Google. Some foreign government goes and puts pressure on Google to release some data or something else happens that causes that data to go out of

Google's control and somebody else is exploiting it, and of course, I mean, there is always insider risk, and maybe Google changed its policy, maybe Google is nice today but they become evil in the future.

Q. Okay. So on that subject, you said something about Google having separated them, "them" being I guess GAIA logs and non-GAIA logs, they can put them back together. Do you recall that?

A. Yes.

Q. And I think you said, for example, under some type of legal pressure. Do you recall that?

A. That's a possibility, sort of a risk as a security technologist that one would analyze and recognize.

Q. Just to be clear, you do not in this case render the opinion that Google has for any particular member of the class or named plaintiff put them back together under legal pressure or for any other reason?

A. No, I haven't given that opinion.

Q. Okay. Then you guys talked about mobile app ads and display ads. I just want to clarify something. So mobile app ads is a buy-side concept, right, it is a type of ad campaign that an ad buyer would run?

A. Yes.

Q. And then when you were talking about display ads, was that whole back and forth about from the sell side perspective, if you are selling space in your app?

MR. MAO: Objection to the form of the question. Go ahead.

A. Yeah. So I think that's a very nice way of putting it, that as an app publisher, you could be a buyer of advertising and want to track conversions for your campaigns to drive people into your app and use it, but you also could be hosting ads within your app and that conversion needs to be tracked for those ads so that the advertiser is willing to continue paying for that space.

Q. Right. And I think if you could look at paragraph 281 of your main

report, you outline two attribution scenarios. Does that ring a bell?

A. Yes, so that I think roughly corresponds to these two scenarios.

Q. Okay. So I think, then, what you're saying is from the sell-side display ad perspective, like AdMob as an example of display network on the sell side, from that perspective, the measurement that is occurring is the measurement of the ad render or click or impression, right, even if -- even if that ad buyer uses something other than analytics to measure conversions?

MR. MAO: Objection, incomplete hypothetical, misstates his testimony, incomplete. But go ahead.

Q. If I'm confused, please straighten me out.

A. You might be. I'm not sure I fully understand it.

Q. Okay.

A. So maybe you want to reask that.

Q. Well, scenario 1, "When an ad

is served through the GMA SDK in a third-party publisher app, Google's ability to connect this ad with a later conversion event relies on Google's collection of app ads data (ad impressions, clicks and similar data) via the GMA SDK and the saving of this data in its logs for later attribution."

Do you see that?

A. Sorry, I just stumbled across the answer to another unanswered question, so I was distracted. I'm very sorry.

Q. That's all right. Enlighten me.

A. Oh, no, I was just looking at, you had asked me about what ad logs Google could use to identify class members. Actually, I see -- I mention paragraph 235, but if you go back a couple of paragraphs, paragraph 232 has a list with the specific names of some logs, some of which are permanently retained. So I think that is relevant information. It's on pages 107 and 108. There are lists of logs, name logs that have permanent retention. So

these are some of the ones I was thinking of.

Q. Those are all GAIA logs, right?

MR. MAO: Well, there is other columns. There is multiple columns. Those columns are both GAIA logs and non-GAIA logs.

Q. Right. The ones that are listed as permanent --

MR. MAO: No, I think there is a non-GAIA companion to each permanent log there. Every single one of the permanent GAIA logs has a permanent non-GAIA companion.

MR. SANTACANA: Oh, I see what you are saying, Biscotti counterpart.

MR. MAO: Yeah, or other ID counterpart.

MR. SANTACANA: Got it, okay. Let's stick with that for a second. We will come back to 281.

Q. So you are on page 107 of your report. These ads logs that have permanent retention are ads logs that record, or log, queries, views, clicks and conversions, and

there is some spam stuff in here too, right, spam logs?

A. I haven't found it yet, but yeah, I take your word for it. Yeah, I see them, sorry, at the bottom -- at the top of the next page.

Q. Okay. So in terms of identifying class members with respect to the GMA SDK, collecting and saving sWAA-off data, your proposal would be to use the logs -- one proposal would be to use the logs on pages 107 and 108 to reidentify users using the first and second columns of the logs that are retained permanently?

A. Yeah, that's the general idea, although these are examples. These are examples that some logs exist that are retained permanently, and upon a more thorough search perhaps additional logs can be found, because Google did not produce all the logs they have, they just produced a fairly narrow selection.

Q. How do you know there is a join key between the GAIA log in the first column and the corresponding non-GAIA log

in the second column?

A. I would have to --

Q. Well, let me ask you this: If there were a join key, would I find a discussion of that in this report?

A. There should be a -- the surrounding and subsequent paragraphs should explain how that all would work.

THE VIDEOGRAPHER: Just a heads up, Counsel, ten minutes remaining.

MR. SANTACANA: Thank you.

Q. So let's look at 281.

A. Okay. Sorry about my distraction there.

Q. That's all right. Paragraph 281, we were talking about ad impressions, clicks and similar data in scenario 1.

A. Yes.

MR. MAO: I thought that was scenario 2. That's okay, whatever you want to ask.

Q. And then scenario 2 appears to be focused on analytics data and the recording of a conversion event as opposed to an ad interaction; is that fair to say?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

A. Hold on. Let me just read it, because it has been a long day.

(Witness perusing document.)

A. So this is -- scenario 2 is a conversion coming in to app world and scenario 1 is an ad served in the Google Mobile Ad SDK, or via the Google Mobile Ad SDK, which then converts somewhere else, like on a publisher's web or app. So someone sees an ad, for example, for Amazon and they go to the Amazon website or the Amazon app and make a purchase.

Q. I understand, okay. Appendix H2 has a tab in it called 2023-01-31 Pseudo vs. GAIA. Let me know when you have that up.

A. Okay, yes, I see that.

Q. Okay. So is this the tab that documents your efforts to join GAIA and pseudonymous log data together?

A. I'm just looking through it, so just give me a second here.

Q. Sure.

(Witness perusing document.)

A. It is a little bit hard to see

on this tiny screen. Let me see if I can open -- I might need to download this and open it in Excel. Let me do that. Because in Exhibit Share it's not clear enough. Okay, I'm getting nagged by Microsoft. Yes, this is it.

Q. There is something like, I don't know, a dozen joins in here I think, a dozen pairs that you lined up of data. Do you see what I'm talking about?

A. I mean, I'm not sure that the count is exactly right, because, okay, so there's three lines per pair and it starts at line 2 and it goes down through line 69, so maybe there's more than that.

Q. Okay.

MR. MAO: Sorry, time check real fast?

THE VIDEOGRAPHER: Total time, five minutes and nine seconds remaining.

Q. So you received data from Google that was quite voluminous relating to your test devices, I think that's what you call it in your report. Was this all

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

of the joins you were able to perform or did you stop trying at some point once you hit a certain threshold?

A. I mean, these are the -- these are the joins that we did here and I'm just taking a quick look at the data to refresh my memory. I mean, I think these are the ones that we were able to do.

Q. I noticed that in column F you have under WAA/sWAA, it is listed as on for all of these joins. Do you see what I'm talking about?

A. I see that.

Q. Were you able to perform any joins of GAIA and non-GAIA data for sWAA-off data?

A. I think I would have to go back and review everything again to clarify that. I'm sorry, I just -- I need to dig through this again to refresh my memory.

Q. Okay. But this does not document any sWAA-off joins that you were able to perform, right?

MR. MAO: Objection, misstates the document. Go ahead.

A. Just let me have another minute with this, okay?

Q. Well, let me ask you this a different way for a second. If you're trying to perform a join at the event level as you've done here, matching up two events in two different logs to each other, right, one in a GAIA log, one in a non-GAIA log, isn't it by definition only possible if the event was a sWAA-on event, because if it was a sWAA-off event it wouldn't be in a GAIA log?

A. Yes, of course. If sWAA is off it's not going to be in a GAIA log. But I think this is demonstrating the capability that data that's in the pseudonymous log can be connected to a GAIA log. Now, if someone has WAA and sWAA on and they do some activity and this is logged in both places, now it can be joined.

Q. Right.

A. Now, if they turn WAA and sWAA off --

Q. Then subsequently they could be reidentified?

A. Subsequently they could be reidentified because there will be an overlap between the different entries.

Q. So your project here was to show that you could create a mapping between GAIA and device ID?

A. Yes, and that later could be used to reidentify other stuff after sWAA had been turned off.

Q. Now this is from the tmpapp measurement log, right? Look at the title.

A. Yeah, hold on a second. Yes.

Q. Now, you're aware that Google altered the tmpapp measurement log specifically for this litigation in order to provide you with these pseudonymous entries, device IDs otherwise encrypted in that log, right?

A. Yes. Of course Google, whatever they encrypt, they can also decrypt.

Q. Well, actually, I don't know that that's exactly correct. Google altered the way this data was logged ex ante and then you started your experiment

process, and only during that time, because there was a special field that referred to the Rodriguez litigation in the log, was Google even able to give you those entries.

A. Yes, so this is getting deeper and probably I need to go back and read everything around this to make sure I have -- to make sure I have it clear. I don't know that in the next three minutes I'm going to get clarity for you.

MR. MAO: Do you want to save a minute or two? Because I'm going to have questions.

MR. SANTACANA: What's that?

MR. MAO: Do you want to save a minute or two? Because I'm going to have questions on these two areas you are asking about. I'm just letting you know. Your choice.

MR. SANTACANA: I don't understand what you're saying. You are saying you want me to ask more questions after you ask questions?

MR. MAO: It's up to you. I have got two questions on your

questions.

MR. SANTACANA: Sure, go for it.

EXAMINATION BY MR. MAO:

Q. All right, sorry, so back on the record, this is Mr. Mao.

On this issue of reidentification, I just want to make sure I understand. You agree there is a difference between trying to map two tables, i.e. join, versus reidentifying a user, right?

A. Yes.

Q. When a user has a persistent identifier, regardless of whether we call it a pseudonymous identifier or not, that user can be readily reidentified, right?

MR. SANTACANA: Vague, incomplete hypothetical.

A. It is often the case that the user can be reidentified. It is not necessary to do a join to reidentify them.

Q. Okay. And that is a point in which you made in the report and that you believe you made clear today in this

deposition; is that correct?

A. Yes.

Q. Second thing, Mr. Santacana asked you a number of questions regarding the buy/sell side of app promo and display ads, assuming that they are -- let's just assume that they are different, okay? You agree in both of those transactions there is both a buy and a sell side on both sides?

A. Yes.

Q. Okay. So when we're talking about display ad side, yes, the app developer is tracking attribution for ads that are sold but there is also an advertiser that's tracking -- or being given tracking, right, for the app, sorry, for the ad that was bought; isn't that correct?

A. Yes.

Q. Okay. And Google is tracking both of those transactions when we are talking about things like AdMob, for example; is that correct?

A. Yes.

Q. So when we were asking questions regarding the ability to do attributions and we were asking about whether or not Google would allow a third-party competitor to come in and do the attribution, you understood that that applied equally to the buy and sell side for display ads; is that correct?

A. Yes.

Q. Okay. So here is the reason why I'm asking this, okay? For the purposes of these conversion measurements, whether it be on the buy side or the sell side, okay, what is your typical conversion window for a display ad as to when, for example, you can have a conversion by action, a cost per action, CPA?

A. I mean, I think it may be redefinable, but the typical window is something like seven to 30 days. But I think you maybe could change that too.

Q. Okay. So within that seven to 30 days, is there any doubt as to whether or not Google reidentifies that user if there is a conversion event?

MR. SANTACANA: Objection, vague, misstates prior testimony.

Q. Okay. Well, I'm just going on definitions right now, but go ahead.

A. Look, so if a user comes in and clicks on an ad and then 15 days later they convert, Google has to reidentify that user in order to say oh, it's the same person who clicked on this ad is the person who has made the conversion.

Q. Okay. Last question and then I will hand it back to Mr. Santacana for whatever the remaining balance of his time, give him a chance.

You were asked a lot of questions today about ad personalization and then we also talked about attribution, okay? Is ad personalization for display ads the same thing as ad attribution for display ads?

A. No.

Q. How are they different?

A. Personalization is selecting an ad for someone based on their, according to Google's definition, based on some data

that is saved in their GAIA logs, in the Google account, what Google calls the Google account.

Ad attribution is tracking conversions, and conversion can be allocated to a single ad, but sometimes conversions are allocated to a different conversion attribution model to multiple ads, because the person might click on three or four ads and then convert and some credit is given to each one of those ads.

Q. Okay. Just so that we understand the significance of your word "credit," and then I'm handing it off, okay, handing you off, the difference in credit to Google, their bottom line, right, between an impression that's unattributed, i.e. CPM, okay, just an impression that is served, versus an attribution in which an action is given, it could be millions of folds in terms of the profit, right? This is like a sliver of a cent versus dollars, right? So the proportion between the two in terms of attribution is millions of times more; is that correct?

MR. SANTACANA: Calls for speculation, incomplete hypothetical.

A. I have experience buying ads and I will tell you that financial institutions will pay $300 CPA for a qualified mortgage application, 350 maybe, whereas CPMs, you know, people are paying fractions of a penny to have an ad display. So the ad that is displayed and nothing happens is fractions of a penny. The ad that is displayed, someone clicks and fills out a mortgage application is worth $350.

Q. And that is why ad attribution is important for Google for the purposes of conversions; isn't that correct?

A. Yes.

MR. MAO: Back to you.

EXAMINATION BY MR. SANTACANA:

Q. You disclaimed issuing any opinion on what is important to Google. Are you opining now on what is important to Google?

A. I think that Google has said that conversion tracking is very important. That's part of the training that they have

given us over the years which I have taken many times. Google says conversion tracking is very important. It is one of the unique defining features of the Google ads program.

Q. But you are not opining as to Google's intent?

A. I'm not opining, I'm only opining about what they have said, what they have told and taught, which is that attribution and conversion tracking is very important. It is a defining feature of this kind of advertising.

Q. And you have done nothing in this case to study the difference between Google Analytics for Firebase and other analytics SDKs, right?

MR. MAO: Objection, misstates the documents. Go ahead.

A. My report doesn't address other analytics packages.

Q. Have you, just while we're on it, have you done anything to address other ads packages, like from Meta?

A. My report does not talk about

Meta or other ads platforms.

Q. Looking back at Appendix H2 for a second --

THE VIDEOGRAPHER: We're at seven hours.

MR. MAO: Why don't you finish your question.

MR. SANTACANA: Oh, you are not going to give me your time?

MR. MAO: What do you mean?

MR. SANTACANA: The time you used?

MR. MAO: No, no, did you count my time?

THE VIDEOGRAPHER: No, it is separate.

MR. SANTACANA: Oh, it is separate.

MR. MAO: Don't question me on goodwill. I could stop it here. I want you to finish your question.

MR. SANTACANA: Well, I didn't know he had separated your time.

MR. MAO: Go ahead, finish your question.

Q. Were you able to perform any joins like the ones in the tab we were talking about in H2 using the named plaintiffs' data, not test device data?

A. I have to go back to the record and look and see, because, again, the report speaks for itself.

MR. MAO: Your time is up. Your time is up.

MR. SANTACANA: Well, he is asking me for clarification.

Q. It says --

MR. MAO: Let me just get my objection then. The report speaks for itself. But go ahead and ask your question.

Q. In H2 it says Android 1 and Android 2 are the JH phones that you found matches on GAIA and pseudonymous. Neither of those were nomenclature you used for a named plaintiffs' phone, right?

A. Correct.

MR. SANTACANA: Okay, that's all I have.

MR. MAO: Thank you.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

THE VIDEOGRAPHER: Stand by. The time is --

MR. SANTACANA: I will just do it on the record. I will designate this attorneys' eyes only. Did you want to cross-designate as to I think very briefly we talked about one of the named plaintiffs' e-mail addresss?

MR. MAO: Yeah, but you already -- yeah, I mean, I'll agree to that.

Sorry, just for the record, do we have now all the appendices in there? Can we just call that Exhibit 4?

MR. SANTACANA: 5 I think.

MR. MAO: 5, let's call it Exhibit 5. Jointly?

MR. SANTACANA: All of them are Exhibit 5.

MR. MAO: I'm fine with like 5A, B, C, D, that way you have them all. Is that all right?

MR. SANTACANA: Sounds good.

MR. MAO: Thank you.

(Hochman Exhibits 5A through 5J marked for identification.)

THE VIDEOGRAPHER: Stand by. The time is 8:53 p.m. and this concludes today's testimony given by Jonathan Hochman.

[TIME NOTED: 8:53 p.m.]

____________________________
JONATHAN HOCHMAN

________________________
Subscribed and sworn to
before me this _________
day of _________________, 2023.
_______________________
Notary Public

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
| --- | --- | --- |
| HOCHMAN | SANTACANA | 4, 354, 383 |
| | MAO | 344, 378 |

E X H I B I T S

| HOCHMAN | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | Expert Report of Hochman | 11 |
| Exhibit 2 | Appendix X6 to Black Rebuttal Report | 67 |
| Exhibit 3 | Document entitled Activity Controls | 71 |
| Exhibit 4 | Privacy policy from May 2018 | 212 |
| Exhibit 5A | Appendix A to Hochman report | 388 |
| Exhibit 5B | Appendix B.1 to Hochman report | 388 |
| Exhibit 5C | Appendix B.2 to Hochman report | 388 |
| Exhibit 5D | Appendix B.3 to Hochman report | 388 |
| Exhibit 5E | Appendix C to Hochman report | 388 |
| Exhibit 5F | Appendix DA to Hochman report | 388 |
| Exhibit 5G | Appendix F to Hochman report | 388 |
| Exhibit 5H | Appendix H.1 to Hochman report | 388 |
| Exhibit 5I | Appendix H.2 to Hochman report | 388 |
| Exhibit 5J | Appendix J to Hochman report | 388 |

(Exhibit 4 was retained by counsel.)

DIRECTIONS NOT TO ANSWER

Page Line

(NONE)

REQUESTS

Page Line

(NONE)

CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of June, 2023.

TODD DESIMONE

* * *

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: RODRIGUEZ v. GOOGLE
DATE OF DEPOSITION: 6/26/23
WITNESS' NAME: JONATHAN HOCHMAN

PAGE/LINE(S)/ CHANGE REASON
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________
____/________/___________________/____________

________________________
JONATHAN HOCHMAN

SUBSCRIBED AND SWORN TO
BEFORE ME THIS______DAY
OF_______________, 2023.

_______________________
NOTARY PUBLIC

MY COMMISSION EXPIRES__________________

EDUARDO SANTACANA, ESQ.

esantacana@willkie.com

June 29, 2023

RE: RODRIGUEZ vs. GOOGLE LLC

June 26, 2023, JONATHAN HOCHMAN, JOB NO. 5971096

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_x_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

RODRIGUEZ vs. GOOGLE LLC

JONATHAN HOCHMAN (#5971096)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

________________________________   _______________

WITNESS                                     Date

**&**

**&** 1:21 2:7,13 3:16 393:23 394:9

**0**

**04688** 1:6

**1**

**1** 11:20,24 107:16 137:14 258:7 320:15 337:10 345:5 347:1 367:25 371:17 372:6 386:17 389:7 394:1
**1,000** 232:19
**10** 107:4
**100** 154:13 155:3,24 192:18 293:19 319:14 357:21
**101** 276:14,16 276:18,20
**104** 36:14 38:22 39:23 42:3,13 43:21 47:23 64:9 69:16 73:15 74:23 75:13 77:8 78:3 79:6 81:12,19 84:2 87:20 88:22,22 89:21 90:14 91:16,24 93:2 93:14
**107** 368:23 369:22 370:12
**108** 368:24 370:12
**10:52** 47:11
**10:53** 47:14
**11** 389:7
**111** 36:4,9
**115** 170:14
**116** 257:17
**11:12** 66:18
**11:30** 160:10
**11:34** 66:21
**11:36** 67:14
**11:42** 67:19
**12** 11:11,23
**12:48** 128:5,6
**136** 36:11 81:2 81:9
**137** 236:25
**14** 285:21 287:2 314:11
**144** 210:21,21
**147** 324:5 328:23,24
**15** 107:4 153:19 156:1 199:12 201:13 381:6
**150** 319:20
**16** 330:9
**16,009** 255:22
**16,163** 255:21
**162** 280:19 281:7
**163** 276:12 281:9,13
**164** 280:19 281:9 283:8
**165** 280:20 281:10 283:9
**168** 33:10 34:16 105:2 107:17
**182** 310:18
**183** 148:17
**1960s** 206:1
**1984** 92:21
**1:34** 129:2,5

**2**

**2** 67:2,16,22 72:22,25 85:17 86:6,25 87:10 319:12,14,20 371:20,22 372:4 373:14 386:18 389:7
**2.1.2** 132:25 147:4
**20** 56:5 58:7
**2005** 341:24
**201** 2:7
**2016** 51:18
**2018** 66:24 68:12,20,21 73:12 76:1,9 77:1,24 78:10 79:10 112:16 212:9,17 332:19 333:10 389:10
**2019** 154:7 292:25 293:12 299:12,17 300:2,5,6 332:19 333:10
**202** 241:15,15
**2020** 332:20
**2022** 68:13 293:4,15
**2023** 1:15 3:4 388:13 391:15 392:22 393:3,5
**2023-01-31** 372:14
**2025.520** 393:9 393:12
**206** 275:14
**212** 389:9
**23** 160:10
**232** 368:20
**235** 368:18
**248** 246:7 247:6,11,18,20 248:2,13
**249** 170:22
**25** 66:24 212:17 275:16 276:5
**250,000** 296:13
**251** 170:18
**25th** 76:1,9

**26** 1:15 292:22 299:10 393:5
**269** 318:3
**26th** 3:4 391:15
**275** 191:19
**276** 190:7,9 191:3,4,18,21
**277** 189:13,18 190:4,24 191:3 191:8,22 196:6
**278** 189:12 190:4,10,12 191:6
**28** 151:13
**281** 366:25 369:21 371:12 371:16
**29** 393:3
**2:22** 173:1
**2:30** 160:11
**2:41** 173:4
**2:44** 176:20
**2:46** 176:23

**3**

**3** 71:20,21 72:1 72:13,23 73:1 75:10,19,23 76:3 77:3 78:1 80:2 82:9 87:12 258:7 292:4,5 389:8
**30** 296:8 380:20,23 394:1
**300** 383:5
**303** 237:25 238:6 240:19 240:24
**309** 249:4
**310** 248:15,16 248:20 249:10 249:15
**31st** 2:3
**33602** 2:8
**344** 389:4
**34th** 2:14
**350** 383:6,12
**354** 338:13 389:3
**357** 329:12,15
**358** 329:12 330:8 331:16 332:4
**359** 329:12 331:1 332:23
**378** 389:4
**383** 389:3
**3879** 391:17
**388** 389:10,11 389:12,13,14 389:15,16,17 389:18,19
**3:01** 189:23
**3:08** 190:1
**3:20** 1:6
**3:58** 233:2

**4**

**4** 126:11 135:6 212:11,12 258:7 292:16 387:15 389:3,9 389:21
**409** 35:21 177:7,9
**410** 35:22
**411** 108:11 109:15,16
**412** 108:11 109:16,16
**416** 130:24 132:4,7,13 144:9,10
**417** 133:2
**418** 107:21 148:8
**45** 293:25
**46** 306:5
**47** 95:7,9
**4:20** 233:5
**4:45** 251:19
**4th** 258:5

**5**

**5** 295:20 320:13 387:16 387:17,18,20
**50** 4:13
**55** 293:4,15
**56** 332:8,13,14 333:12
**5971096** 393:5 395:2
**5:00** 251:22
**5:36** 280:25
**5:41** 281:3
**5a** 387:22 388:1 389:10
**5b** 389:11
**5c** 389:12
**5d** 389:13
**5e** 389:14
**5f** 389:15
**5g** 389:16
**5h** 389:17
**5i** 389:18
**5j** 388:1 389:19

**6**

**6** 132:20,24 293:13 299:12
**6/26/23** 392:3
**60** 152:22 334:1
**60/40** 5:23
**600** 326:17
**62** 151:7,10
**63** 151:15
**67** 389:7
**69** 373:14
**6:25** 317:22
**6:45** 317:25
**6:58** 329:2

**7**

**7** 11:10
**70/30** 5:23
**71** 152:9 288:8 389:8

**[725 - accurate]**

**725** 2:2
**73** 152:16 153:12
**74** 153:4 154:3
**75** 154:3,3
**787** 1:21 3:17
**7:00** 329:5
**7:16** 344:10
**7th** 2:8

**8**

**80** 109:24
**85** 153:23 308:17,18
**8:03** 344:13
**8:20** 362:5
**8:23** 362:8
**8:53** 388:4,8

**9**

**9** 11:11,23 13:1 34:13
**90** 109:24
**900** 5:2,19
**90017** 2:3
**94111** 2:14

**a**

**a.m.** 1:16 3:3 47:11,14 66:18 66:21 67:14,19
**ability** 77:17 78:25 110:5 112:5 141:22 260:5 286:9 287:2 368:2 380:2
**able** 83:19 118:4,5 134:19 141:20,24 142:11,13 145:6 159:24 159:25 167:19 175:12 209:18 210:2 217:7 242:23 243:6 248:7 265:7 297:11 313:5 334:10 335:2 346:21 349:1 349:14 356:4,6 356:12,21 359:15,18 363:2 374:1,8 374:14,23 377:4 386:1
**above** 393:6
**absence** 92:6
**absent** 83:2 89:1,4 300:11
**absolutely** 19:10 351:10
**absorbed** 27:19
**absurd** 256:1,6
**academic** 19:17 26:3 95:25 245:24
**accept** 142:17 203:15 234:9 358:19
**accepted** 357:6
**accepting** 355:4
**access** 69:2,7,9 69:23 70:18 71:10,12 79:24 98:11 101:1 121:2 126:13 166:6 202:25 203:2 236:20 363:3
**accident** 151:23 152:13
**accidentally** 162:21 236:1
**accord** 11:17
**account** 36:2 36:20 37:2,3,6 37:18,24,25 38:3,3,12,18 40:11,17 41:6 41:9,22 42:13 42:20 43:10,17 43:23 44:3,5 44:18,23 45:20 45:21,23 46:14 47:18,21 48:4 48:19,22 49:12 49:21 51:18,20 64:9,15,22 67:4 68:7,10 68:17 69:3,6,8 69:10,11,20 70:18,21,23 71:8,11,13,14 73:1,2,4,7,11 73:13 74:2,4,5 75:8,10 76:18 77:1,4 79:1 80:3,10,13,14 80:18 81:20 83:1,12 85:18 86:17 87:2,11 87:24,25 88:4 88:8,14 89:3,7 89:9,17,22 90:13,24,25 91:15,17 93:13 94:19 98:20 117:17,18 121:21 131:7 165:23 171:5 178:22 194:12 209:1,14 311:7 311:16 313:15 382:2,3
**accounting** 40:11
**accounts** 37:20 51:4 52:1 81:12 82:4,24 83:8,11 84:1 117:17,21 119:20 208:25 209:6 266:1 311:24 312:16 340:2
**accuracy** 15:16 45:10 305:1
**accurate** 13:15 14:9 45:11

152:12 154:19 178:22,23 215:21 288:21 309:5 339:24
**accurately** 13:13 15:1
**accused** 250:24
**ace** 296:15
**achieve** 154:12 155:3,24
**acknowledge** 241:3
**acquire** 274:22
**acquiring** 230:4
**acquisition** 355:1
**acquisitions** 354:24
**acronym** 315:25
**acting** 122:20
**action** 4:20 239:25 240:1 252:14 260:19 260:20 272:17 327:17 380:17 380:17 382:20 391:11
**activating** 200:25
**actively** 101:9 339:25
**activities** 93:25 218:1 260:3 318:15
**activity** 25:8,9 25:10,14 40:12 40:12 65:21,23 71:23,24 72:9 72:12 75:5 87:12 103:18 120:17 187:13 199:6,9 201:7 203:9,14 207:2 217:12,14,20 217:22,23,24 325:14 337:4 337:16,25 348:14 375:19 389:9
**actor** 105:16 242:16
**actors** 364:21
**acts** 118:21 119:2
**actual** 21:22 46:9 138:17 175:18 199:18 313:8 321:13 357:25
**actually** 22:2,4 22:11 42:18 44:15 49:3 63:24 66:15 78:21 79:12 88:11 95:19 96:15 108:12 118:5 136:18 137:10,22 140:5,7 151:4 165:6 169:10 177:15 179:14 186:8 190:10 191:18 196:24 201:12 205:17 205:21 212:23 212:25 215:3 216:11 225:8 225:12,14 230:19 237:20 241:9 244:20 245:11,16 247:8 248:11 258:12 276:13 276:14 282:4 296:3 297:22 304:6,7 308:16 311:3 312:2 315:16,19 319:11 327:7 334:25 345:5 353:16 357:24 368:18 376:22
**ad** 190:12 191:6 196:25 197:4,20 204:8 204:12,18,22 205:14,20 206:24 207:8 207:12 217:22 220:21 221:8 223:3 231:24 264:18 287:9 288:15 289:23 290:7 291:25 293:2,5 294:12 295:8 298:18 298:20 299:12 300:13,22 350:5,8,14,15 350:23 351:15 351:16,17,19 351:21,22 352:20 354:13 355:11 366:5,5 367:7,10,12,25 368:3,5,16 371:16,25 372:6,7,7,10 379:13,18 380:15 381:6,9 381:16,18,19 381:24 382:4,6 383:8,9,10,13
**add** 51:24
**addition** 303:17
**additional** 14:22 124:12 145:5,9 190:14 217:6 262:23 327:20 348:11 370:19
**additionally** 138:23 338:2
**address** 69:5 75:1 101:14 159:13 161:25 163:1,4,5,10

**[address - advised]**

164:5,17 207:6 234:5 238:6 243:4 247:21 255:23 323:3 329:8 357:22 384:20,23
**addressed** 70:16 75:4 91:13
**addresses** 160:1,16,17,24 162:6 163:21 165:10 167:7 174:17 213:25 214:3,7,16 233:9 238:20 246:19,21,23 246:24,24 256:5 344:22 357:9
**addressing** 70:11 90:9,11 234:10
**addresss** 387:8
**adid** 55:22 57:6 249:6
**adjust** 14:1,15 191:11
**adjustments** 15:5
**admission** 275:23 276:4
**admit** 15:25 16:6 202:12,14 203:22
**admitted** 249:9 275:16
**admob** 150:4,5 150:14 152:8,9 152:17,18 153:5,6,14,18 153:24 154:4 154:14,21 155:25 157:4 288:14 323:22 330:9 367:7 379:23
**adopted** 113:1 153:24
**adopters** 153:14
**adopting** 191:16
**adoption** 153:20 155:3 156:2 292:9
**ads** 18:12 147:13,14,24 148:2 151:19 152:11 154:9 190:17,18 194:20 195:13 195:15,22 197:1 202:3 203:15 205:4,8 205:17,19 206:8 209:23 210:2 218:6 220:15 222:19 222:20 226:4 226:13 262:9 288:13 289:22 290:4,11 292:11 294:14 294:16 295:9 301:22 302:10 324:20 332:5 350:6,12,13,19 351:8,21,25 352:18 366:2,2 366:4,9,20,22 368:5 369:23 369:24 379:6 379:14 380:8 381:19,20 382:9,10,11 383:3 384:5,24 385:1
**advantage** 232:7 355:7
**advertise** 298:5 300:7,21 301:2 301:3
**advertised** 23:13 301:14
**advertisement** 193:25
**advertiser** 204:12 206:21 206:24 207:3 219:11,12,16 220:6,17 262:13 264:2 296:23 297:11 297:12 351:1 351:14 352:12 352:17,23 354:16 366:22 379:16
**advertiser's** 56:22
**advertisers** 127:13 208:8 208:19 262:11 262:25 294:9 297:6 298:4 300:6 355:13
**advertising** 120:6 124:11 150:7,9,10 192:1 203:10 206:3,5 217:24 218:20 219:13 219:14 220:9 226:12 287:7 289:17 298:7,8 298:23 299:3 301:5,13 302:12 309:16 314:24 317:8 352:14 366:17 384:13
**advice** 119:11 121:18 309:15
**advise** 229:21 304:1 317:8
**advised** 223:2 301:16,21 303:8,14

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**advocate** 207:24
**affect** 76:22 80:21,22 251:11,13 264:13 305:1
**affects** 74:12 286:8 287:14
**affiliated** 111:18
**afraid** 139:1
**age** 216:13 287:22
**agency** 250:14
**agent** 122:20 247:22
**agents** 116:4
**aggregate** 62:14 96:10
**aggregated** 95:10,11
**ago** 11:1 24:1 29:14 97:4,11 183:18 291:19 295:15 300:25 301:1,15
**agree** 15:19 41:17 80:6 98:14 115:23 120:25 165:9 248:14 322:10 332:1 344:25 361:6 378:9 379:8 387:10
**agreed** 41:15 61:3 313:23
**agreement** 10:1 10:9
**aha** 88:1 92:9 348:19
**ahead** 33:6 43:13 50:23 60:5 73:20 77:10 79:14 82:17 85:4 87:17 93:5,18 94:7 95:16 98:22 117:24 119:7 126:2 144:6 164:11 169:8 172:3 183:21 197:18 213:17 221:10 224:24 227:21 228:24 231:9 236:19 263:19 267:17 268:23 270:19 285:17 288:9 298:13 329:10 333:4 337:20 340:4 356:17 366:13 367:17 374:25 381:4 384:19 385:24 386:15
**ai** 225:10,11 228:9
**aimed** 154:12 155:2
**aims** 118:22
**air** 245:15
**al** 1:7 3:12
**alert** 39:6
**algorithm** 111:24 222:3
**algorithms** 107:23 108:5 111:21 148:11 148:15,25 222:1 262:21 263:8
**allegation** 52:23 53:1
**allegations** 51:23 52:24 57:17 59:5
**alleged** 52:18
**alleging** 61:12
**allocate** 320:20
**allocated** 382:6 382:7
**allow** 178:6 220:22 380:4
**allowable** 122:22
**allowances** 125:25
**allowed** 339:17
**allowing** 352:21 354:14
**allows** 24:24 201:6
**altered** 376:14 376:24
**altering** 192:8
**alternate** 112:20
**alternative** 133:3
**altogether** 299:4
**amazon** 319:21 372:10,11,12
**ambiguities** 39:25
**ambiguity** 42:10
**ameliorate** 104:18
**amenable** 216:3
**american** 111:18
**amount** 112:17 130:7 131:13 187:13 272:22 275:1 297:14 318:19,22 319:8 343:20
**analogies** 140:20
**analogized** 200:6
**analogizing** 146:13 199:21 201:17
**analogous** 180:9,11 199:24

**analogy** 139:4 139:7 180:18 200:14 267:3
**analysis** 21:7 21:17 109:10 109:17 113:23 113:25 118:10 119:9 122:10 141:9 147:20 186:24 188:25 191:16 216:4,7 216:9 229:4 234:9 239:9 251:11 273:23 280:5 341:21 344:21
**analytics** 50:25 56:18 58:6,11 58:12 60:1,15 61:22 62:1,8 62:13,14 63:10 63:18,23 64:6 64:14,21 65:15 96:3,7,8,15,18 108:24 109:8,9 109:19 111:10 113:4 117:11 117:13,17 119:3,18,20 120:5,11,13,25 121:3,10,20 123:6,11,25 124:3,9,13 125:5 126:11 126:11,25 127:3,7,15,22 149:22 150:6 150:11,17 151:23 153:6 154:9,13 155:24 157:10 158:14 160:23 161:16 162:5 165:23 166:20 168:25 169:16 171:8,13,14,24 178:18,19 179:7 182:3,5 182:8,20,25 183:8 184:1,3 184:11,15 185:18,20 186:17 188:21 194:22 206:9 214:7,10,12,14 216:15 218:8 222:17 224:17 226:4 233:22 241:17 244:12 257:12 258:21 259:16 261:1 277:5,20 278:5 278:7,9 279:2 287:15 289:12 289:24 290:8 290:10 291:3 291:24 292:9 292:15,16,17 292:19 294:2 298:2,6,16 301:16,17 302:9 303:9,16 303:18,22 304:5 306:20 307:13 308:8 308:13 309:5 309:13,25 310:1 316:13 316:18 323:21 324:19 325:20 332:3 337:17 337:22 339:6 339:25 340:25 341:6,23 342:2 342:7 343:15 343:24 352:9 353:2 354:22 355:2,7,14,17 367:13 371:23 384:16,17,21
**analyze** 286:7 365:17
**analyzed** 215:12 253:11
**analyzes** 121:24
**analyzing** 207:5 230:17 254:9
**android** 201:21 202:2 278:1 386:17,18
**angeles** 2:3
**anibal** 1:7 3:11 311:6
**anonymous** 60:22 350:2
**anonymously** 109:12
**answer** 18:23 19:2 21:15 23:5 25:18 33:8 70:10 76:24 77:20 78:8 83:19 104:15 120:14 125:16 139:8 149:12,14,19 150:13 191:10 215:1 220:13 220:13,14 236:23 263:20 264:14 265:7 273:2,3 284:18 290:23 291:1 295:16 325:7 331:25 346:21 354:19 356:5,6 356:13,14,17 356:21 358:7,9 358:15,16,16 358:22,24 359:12,15,19 359:21 361:22 363:1,2 368:11 390:1
**answered** 18:21,22 33:16 78:6 94:6 247:7 308:4

**[answered - applied]**

333:4,6 357:16 361:14
**answering** 77:23 334:22
**answers** 43:19 147:23 220:12 247:25 259:12 361:18
**ante** 376:25
**anticipate** 251:6
**anybody** 10:10 48:17
**anymore** 301:3 309:6 324:9 328:16
**anyone's** 343:19
**anyway** 113:12 163:23 212:5 241:22 362:13
**apart** 18:5 25:20 137:4 167:25 219:15 220:4 262:14 312:10 358:2
**apologize** 212:2
**app** 7:5 25:7 97:7 101:13 102:11 109:13 116:17 117:19 117:19 119:23 120:2,12 123:10,24 149:20,21,23 151:15 152:10 152:14 154:22 157:11 158:3 158:20,23 159:14,25 160:16 165:7 165:12,23 166:19 167:5 169:13 171:10 174:9,11 182:2 182:7,9,21 183:1,8 184:14 184:16 185:6 185:19 187:4 187:20 193:18 195:21 201:7 202:7 203:9,14 214:13 216:20 217:12,14,19 217:22,23,25 218:3,24 224:16 226:2,4 226:8,11 228:9 233:8 247:10 247:11,19 248:7 260:18 263:11 264:11 286:2 287:14 288:13 289:11 290:3,9 291:2 292:11 293:1,5 294:14,16 295:5,7,8,9 296:4,5,6,8,11 296:11,13 298:4 299:12 299:17 300:13 307:14 310:2 314:13,23 317:8 322:5,11 324:19,24 325:14,24 337:25 340:6 343:5 348:14 348:14,16 350:12,12,14 350:14,22,24 351:4,6 354:25 366:2,4,11,15 366:19,20 368:2,4 372:5 372:9,12 379:5 379:13,17
**apparent** 307:24
**apparently** 216:2
**appear** 45:21 142:3 152:13 237:12 247:20 303:25 350:19 363:17
**appearances** 3:22 4:8
**appearing** 393:18 394:7
**appears** 39:12 39:14 371:22
**appendices** 98:3 134:23 243:11 253:18 256:23 326:18 345:8,10,12,19 345:21 347:2 352:6 354:5 355:23 356:4 356:25 359:17 360:13 387:13
**appendix** 67:24 132:20,23 133:20,21 135:5 139:12 144:22 145:13 146:23 216:12 292:3,23 299:10 311:23 312:1,5 313:24 338:5 345:1 346:2,2,3,3,3 357:3,25 360:10 372:13 385:2 389:7,10 389:11,12,13 389:14,15,16 389:17,18,19
**apple** 285:23 287:6,7 316:13
**apple's** 315:23
**application** 383:6,12
**applications** 318:18
**applied** 364:22 380:7

**[apply - assessment]**

**apply** 127:4,19 254:7 292:18
**appreciate** 84:18 149:7 361:23
**approach** 307:1
**approached** 111:16
**approve** 9:16
**approximately** 293:4
**approximatio...** 288:18
**apps** 18:14 152:11 165:16 182:4 184:3 201:24 217:17 219:1 233:12 234:3 253:24 255:9 260:16 260:19 261:2 265:19 290:7 298:5 315:15 315:17,18 322:8 324:18 343:1,2 350:20
**appsflyer** 123:13 124:4,6 184:14 185:18 185:25,25 186:9,12,19 187:6,17,19 188:17
**arbitrarily** 83:13
**arbitrary** 86:18 225:20
**archaic** 114:10
**architect** 195:12
**architecture** 196:17
**area** 19:18 82:14 88:24 90:25 169:5 170:3 194:13 236:16 346:24 353:3
**areas** 118:1 377:17
**argue** 165:5 227:22 335:10
**arguing** 108:18
**argument** 14:1 14:14
**argumentative** 227:21 228:19 255:1 263:15 285:3,16 298:12 356:17
**arises** 34:25
**arrangement** 209:18,19
**art** 245:21,21
**article** 204:15 228:9
**articles** 317:1 341:17
**articulating** 101:24
**ascertain** 275:11 334:11 335:3
**ascertainable** 335:25
**aside** 72:19 161:12 171:4
**asked** 6:14 11:15 26:25 32:25 33:2 34:6,7,8,9 46:25 47:6 62:11 78:6,13 94:5 118:24 124:17 131:14 173:6 222:2 227:14 252:17 252:20 264:11 268:17 286:21 290:17,19 308:3 313:23 325:4 333:3 339:8 347:4 350:3 354:11 355:22 356:2 368:16 379:4 381:15
**asking** 21:15 35:2 40:16 58:25 65:11 73:18 78:9,16 79:15 91:24 121:16 130:14 140:10 145:23 169:6 177:20 193:15 217:20 229:18 246:18 268:14,20 269:12,18 270:12,15 273:6 326:22 326:25 327:1 332:24 337:21 377:18 380:1,3 380:11 386:11
**asks** 104:3
**assassinate** 100:2
**assert** 82:23 118:6 358:14
**asserted** 152:17 214:18
**asserting** 83:12 84:12,14 151:21 161:23 162:1 277:8
**assertion** 11:16 11:17 79:7 82:2,20,25 83:7 318:6,10
**asserts** 277:9
**assess** 224:11
**assessed** 15:1
**assessing** 235:17
**assessment** 224:12

**assessor** 148:18
**asset** 307:19
**assigned** 239:1
**assignment** 11:10,14 12:1 13:1,2 252:5
**assistants** 141:9
**assisted** 7:11
**assisting** 6:11
**associate** 2:19
**associated** 70:14 103:1 133:7,17 138:1 144:13 146:20 159:2 178:21 179:24 192:3,9 192:25 193:6 194:4,13,14,16 219:16 220:5 222:21,23 260:4 262:8
**associates** 248:21
**assume** 7:18 24:4 28:14 37:3 49:18 65:24 77:5 98:5 153:22 186:2 208:7 233:20 244:7 379:7
**assumes** 95:14 140:18 240:22 263:15
**assuming** 140:19,23 165:2,4 249:25 250:1 348:25 364:19 379:6
**assumption** 40:18,19 165:11 191:12 242:11,14 302:16
**attacker** 279:16
**attempt** 135:13 135:15 137:19 141:18 144:18 174:23 224:15
**attempted** 215:19
**attempting** 143:4 167:11 228:12
**attempts** 106:6 139:17
**attention** 6:24 50:2 67:4
**attorney** 363:9
**attorneys** 1:2 2:4,9,15 13:24 387:5
**attributable** 288:13,15 293:6
**attribute** 351:8
**attribution** 352:22 354:14 367:1 368:8 379:14 380:6 381:17,19 382:4,8,19,24 383:13 384:11
**attributions** 380:3
**auction** 220:23
**authenticate** 69:6 71:10
**authenticates** 209:4
**authentication** 209:3
**authored** 238:15 359:11
**automated** 352:4,7 353:1 354:20 355:6,7
**automatic** 161:24 207:1 225:1 230:6
**automatically** 154:10 155:4 158:7 160:22 161:17,19,24 162:7,25
**availability** 136:20
**available** 44:6 154:10 155:4 220:25 346:16 346:20 352:8
**avenue** 1:21 3:17
**average** 272:7
**avoid** 171:9
**avoided** 141:5
**aware** 35:1 39:3 40:5 42:12,16 55:21 105:24 106:15 106:17 123:5 125:9 142:1 157:20 160:2,5 160:25 182:6 204:7 212:19 215:9,13 224:20 252:12 274:18 277:19 287:4 311:13 318:14 319:21 332:10 355:3 376:13
**awful** 91:11 229:6

**b**

**b** 278:21,22,25 280:11,12 359:25 387:22 389:5 394:1
**b.1** 389:11
**b.2** 389:12
**b.3** 389:13
**baby** 120:24
**back** 12:25 22:5 25:17 42:11 45:6 47:14 54:4 64:8,17 66:21

**[back - best]**

67:19 83:21
129:5 134:15
139:6 157:9
164:12 165:20
173:4 176:23
176:25 181:11
182:2 185:7
189:7,17 190:1
194:21 198:8
201:15 203:17
207:20 209:19
210:6 218:4,6
222:23 233:5
237:24 240:16
251:22 260:12
264:21 275:2
277:22 278:19
278:23 281:3
281:22 282:2
284:3 297:5
299:23 300:1,4
315:20 317:25
329:5 332:14
333:13,14
340:14 344:13
347:13 349:4
353:4,24 362:8
365:10,21
366:9 368:19
369:21 374:17
377:6 378:5
381:12 383:17
385:2 386:5
**background**
151:11

**backlash** 115:8
**backup** 6:6
**backups** 16:13
**backwards**
190:11
**bad** 114:11
**badger** 304:24
305:14
**baked** 191:21
**baker** 2:21 3:18
**balance** 381:13
**ball** 37:12
**bandwidth**
138:21 183:5
**bargain** 104:4
**based** 16:23
24:10,12,13,17
48:8 90:15,17
90:19 114:20
191:2 192:2,9
204:9,23
213:21 217:1,3
226:23 227:2
250:25 258:4
259:12 268:10
270:23 271:10
335:15 381:24
381:25
**bases** 92:4
**baseview**
129:16,20,23
131:17,18,19
132:1 311:25
**basic** 153:22
251:13

**basically** 19:2
187:3
**basis** 25:23
26:16 28:6
91:25 92:3
126:23 191:17
214:5 225:13
239:2 247:15
268:15 273:3
282:18 318:10
**bates** 72:4
156:23 238:17
**bath** 120:23
**battery** 138:21
183:5
**beacon** 344:1
**beacons** 304:25
343:24 344:6
**bear** 57:19,19
83:10 335:21
**beginning**
49:14 307:11
**behalf** 1:8 9:23
**behave** 219:3
**behaved** 49:4
**behavior** 17:20
18:4,6 74:16
74:16 96:11,11
160:20 308:23
308:24,25
323:13
**belabor** 242:5
**belated** 156:24
**belief** 48:7,13
57:10

**beliefs** 341:22
**believe** 4:21
14:17 29:3,11
29:25 42:21
48:3 51:25
55:8,13 66:2
85:9 96:20
97:21 107:15
129:22 130:2
132:10 141:25
142:6,10
144:22 192:16
192:16 201:25
202:19 203:12
224:7 232:1,17
273:8 286:4
296:14 297:9
297:10 324:21
338:3 340:9
346:19 378:25
**believed** 17:7
**bell** 367:2
**belonged**
141:17
**belongs** 348:19
**belts** 305:18
**beneficial**
292:1
**benefit** 308:1
**best** 13:2 82:8
114:20 126:13
126:14 195:17
208:4 297:21
301:8 307:1,5
362:12 364:20

[better - brown]

**better** 14:15 36:8 60:5 114:22 145:7 185:2 197:11 198:17 209:17 209:19
**beyond** 66:5 73:19 196:1 221:3 262:24
**bias** 305:7
**bid** 222:24 223:2,12 293:2 293:6,20,21 297:11,12 299:13 352:4 353:1 354:21
**bidding** 352:1 352:7 355:6,8 355:11
**bids** 220:23
**big** 59:10 104:13 114:16 126:16 147:19 187:15 219:22 255:18 301:12 323:22
**bigger** 178:8 273:12 341:13 350:18
**bigquery** 96:19 96:21,23,25 97:13,20 98:6
**bill** 5:3
**billed** 7:14,16
**billing** 8:2
**biscotti** 369:16
**bit** 20:5 63:11 70:9 80:11 118:13 129:24 130:25 131:24 142:2 147:17 154:16 204:22 207:8 244:18 251:25 277:17 284:5 310:9 319:2 330:16 331:5,5 364:1 372:25
**bits** 131:8,8,15 132:5,6,11 275:18 330:18 330:25
**black** 2:20 16:13 45:15 67:22,23 124:21,24 125:18 189:8 215:10 233:23 234:2 238:20 240:13 247:11 255:20 297:25 311:13 353:20 389:7
**black's** 6:4 162:10 248:6 311:19 353:17
**blended** 5:13
**blind** 289:8
**blocked** 167:20
**blocks** 201:23
**blood** 106:23 391:12
**blown** 101:18 102:1
**blue** 310:23 311:4,22
**body** 239:15
**boffa** 112:23
**bogged** 149:5
**boggles** 60:17
**boies** 2:2 10:16 10:19
**book** 305:11,13
**bookkeeping** 206:17
**boost** 220:22
**bot** 65:21,23
**bots** 65:19
**bottle** 299:24
**bottom** 45:11 100:20 147:10 351:11 370:5 382:16
**bought** 102:21 188:22 379:18
**bound** 242:17
**boundary** 156:13
**box** 166:6,11 200:8
**brackets** 93:22
**brain** 238:4 326:19
**breach** 105:14
**breaches** 101:4 103:24 104:1 114:13 236:21
**break** 5:18 55:17 106:22 117:1 123:18 135:10 142:22 142:24 143:19 147:7 160:10 165:20 173:6 232:24,25 243:15 246:9 249:13 250:2 287:24 306:2 310:21 317:15 317:18 344:8 361:25
**breakdown** 288:20
**briefly** 279:13 387:7
**bring** 70:24 200:18
**brings** 22:5
**broad** 71:7 203:5
**broader** 70:1
**brokering** 274:3
**brokers** 287:6 287:9
**brown** 10:17 10:18 48:16 49:25 54:16

**[brown - case]**

140:11 141:3,4
141:6,11
145:21,21
146:8,10 176:7
200:18
**browser**  201:17
**browsers**
199:23
**browsing**
199:24 200:21
200:25 201:1
343:20,23
**bruce**  27:8
305:11
**bsfllp.com**  2:5
**bucket**  7:13
**bucks**  319:20
**bugged**  225:6
**build**  304:16
308:2 320:19
**building**  37:8
**built**  107:24
148:11,25
**bunch**  23:6
47:5 156:19
187:22 197:1
207:8 235:11
**bundle**  257:24
257:25
**bundled**  289:25
**burns**  5:1
16:17
**business**  56:4
208:3 307:17
307:18

**button**  21:22
51:7 58:9
122:3,5,12
171:25 172:13
184:20 186:1,4
**buttons**  199:21
**buy**  272:6
290:11 305:12
305:23 319:12
366:4 379:5,9
380:7,13
**buyer**  274:23
366:5,16
367:12
**buyers**  290:7
**buying**  383:3
**byte**  318:13

**c**

**c**  1:1 2:1,4 4:2
129:3 359:25
387:22 389:14
**ca**  393:9,12,20
**cake**  148:9
**calculate**  245:2
245:5 254:21
267:20 268:3,4
268:10 270:23
**calculated**
130:6 255:20
**calculation**
253:9 255:24
279:25 321:4
**calculations**
234:3,6,7
254:11

**california**  1:4
2:3,14 3:14
28:21
**call**  35:11 44:4
86:21 112:22
160:13,13
177:4 202:3
203:18 254:20
282:6 336:3,6
373:25 378:15
387:14,17
**called**  4:3 20:1
55:22,23 63:23
90:25 107:9
112:11,25
116:6 133:24
158:7 194:8
202:7,9 241:3
279:10 316:11
349:11 372:14
**calling**  63:24
**calls**  77:9
112:23 131:7
134:20 140:12
194:12 199:23
212:21 274:14
282:21 382:2
383:1
**camera**  199:9
**campaign**
204:13 218:25
293:2,5 294:17
295:5,8,9
296:17 352:15
366:5

**campaigns**
292:11 294:13
294:14 296:4,5
296:6 355:12
366:18
**cancer**  111:21
111:23 112:4
113:3 114:5,18
**canned**  163:3
**capabilities**
145:9 154:6
287:10
**capability**
145:6 260:10
349:7 375:15
**capacity**  170:2
**capital**  37:2
**capitalized**
38:19
**capitalizing**
164:3,15
**car**  180:8,20,22
180:25 181:3
**cara**  2:19
**care**  112:1
225:10,11
314:2
**careful**  53:12
103:25 113:25
**carefully**  65:8
104:15 130:17
145:15 151:5
**case**  1:6 5:8,15
8:15 10:17,23
10:24 11:3,10

**[case - characterization]**

11:14 12:1,12 12:15,21 13:6 13:16,21 14:25 17:5,7 18:20 19:22,24 21:24 23:6 29:1,10 30:23 31:3,20 34:4 35:13 39:2,20 48:10 48:15,16 49:2 49:18,25 50:1 50:3,6,7,8,11 51:14 52:10 53:22 54:6,12 54:16,22 55:21 57:16 59:9,10 60:13,16,25 78:23 83:9,25 86:24 89:21 105:19,25 106:9 114:2 123:9 124:15 125:13,25 127:5,20 129:17 130:8 133:13 134:18 135:13,15 139:13 140:20 141:6,8,12 143:7 145:10 146:18 147:14 148:14 149:6 151:22 154:21 158:2 159:15 162:3 163:19 166:16,23 167:3 168:1 171:2 177:24 182:4,24 185:23 194:10 194:19 196:16 198:22 199:1 206:15 211:11 213:7,13 214:21 221:12 224:14 228:21 231:3,8 236:18 252:6 255:3 262:5 264:16 286:16 287:1 287:13 288:12 294:13 307:3 311:4 315:22 327:19 328:3 332:12,19 333:9,25 334:16 335:5 335:16,24 336:24 353:7 363:23 364:16 365:19 378:20 384:15 392:2

**cases** 45:3 49:6 49:6 54:20 55:3,5,7 207:9 340:12

**cat** 287:5

**cataldo** 312:13

**catalog** 230:5

**catch** 211:5

**categorical** 19:10 28:9

**categories** 338:16

**category** 193:5

**cause** 211:4 258:8

**causes** 298:20 364:25

**caveat** 150:13

**ccp** 393:9,12

**cell** 3:8 75:25

**cent** 382:22

**centers** 279:22 320:19

**ceo's** 21:21

**certain** 31:9 32:20,21 46:23 101:21 108:2,3 108:4 110:8 158:23 191:21 208:11,22 222:8 229:17 250:15 315:17 355:10 356:18 374:3

**certainly** 49:1 74:10 193:4 314:19 321:20

**certification** 391:1

**certified** 205:11,23 206:10

**certify** 206:7 391:5,10

**chairs** 111:19

**challenges** 110:2

**chance** 72:1 121:8 125:19 190:3 242:25 281:5 302:24 302:25 338:21 381:14

**change** 32:1,19 34:19,22 64:4 74:21 107:10 130:22 143:14 151:9 177:11 177:14,22 178:12 181:16 181:19 317:13 380:21 392:4 395:4,7,10,13 395:16,19

**changed** 63:22 285:21 297:18 300:14 365:4

**changes** 107:9 107:10 129:9 177:2 285:24

**changing** 291:16

**characteristics** 114:21

**characterizati...** 153:1

**[characterize - click]**

**characterize** 8:14

**characterizes** 36:22 64:12 81:24

**charge** 205:16 219:12 262:10

**charging** 209:23 219:16 220:6

**cheap** 319:23 320:1

**check** 6:14 100:14,15 108:20 135:4 157:18 166:4,6 257:24 277:18 277:20 278:6 282:18 284:14 285:1,14,21 286:9 294:19 306:1 313:6 322:19,19,20 338:21 373:17

**checked** 65:8 358:23

**checking** 6:12 16:18

**checks** 283:11 283:21

**chew** 183:4

**chewing** 138:20

**child's** 230:9

**choice** 159:12 235:18 377:19

**choices** 94:25 342:5

**choose** 73:6 116:21 159:7 261:3 264:18 298:6

**choosing** 88:25 158:15,18

**chosen** 116:5

**chrome** 199:23

**circulating** 106:23

**circumstance** 282:16 305:16 309:8

**circumstances** 141:13 286:18

**citations** 27:21

**cite** 28:5 43:4 91:23 147:4 288:15 311:10 312:11,13

**cited** 24:15 26:17 27:17 145:13 156:9 156:11,19,21 157:2,7 221:17 258:5 313:17 318:8

**cites** 153:4,17

**citing** 28:11 147:3

**civil** 393:19,20

**claiming** 328:13

**claims** 35:14

**clarification** 145:19 146:15 194:18 386:11

**clarified** 74:8

**clarifies** 173:22

**clarify** 38:10 42:9 155:10 167:24 276:25 282:3 294:11 366:3 374:18

**clarifying** 45:16 192:11 265:10 283:23 337:15

**clarity** 84:19 89:5 377:10

**class** 4:21 81:11 133:9 170:23 252:7 252:11,13,13 252:14,15,23 252:23 267:15 268:13 270:25 271:7 272:2,3 272:4,16,21 275:8,8 311:17 324:1,10,13 326:5,6 327:9 327:14 328:8 328:15 329:17 331:18 332:18 333:10 334:2 334:11 335:3 335:24 336:15

336:17 353:6 365:20 368:17 370:8

**classifies** 229:23

**clean** 150:16 206:23 291:1

**clear** 6:25 18:17 38:14 39:7,9 42:2,21 43:7 51:19 74:9 83:2 84:15 85:10 87:5 92:7 94:20 104:23 105:20 120:14 126:15,21 136:2 137:15 163:17 174:22 176:12 211:23 239:19 242:6 243:19 249:19 277:3,10 306:9 312:18 328:11 336:10,20 356:9 360:12 361:4,13,20 365:18 373:4 377:8 378:25

**clearest** 44:22

**clearly** 130:21 148:5

**click** 350:23 352:2 367:11 382:9

**[clicked - coming]**

**clicked** 381:9
**clicks** 368:5 369:25 371:17 381:6 383:11
**client** 14:20 197:9 306:21 308:10 327:24 328:2
**clients** 34:6 62:11 298:9 301:17,21 303:20
**cling** 147:21
**clock** 226:1 305:25
**close** 66:12 169:12
**closed** 358:10
**closing** 170:5 359:4
**cloud** 319:18 319:25 321:11 322:1,3,24 323:16,19,22
**cloudflare** 97:6 97:10
**club** 37:7,9 45:3
**clue** 99:25
**clustering** 245:11
**coarsened** 232:15,18
**code** 8:7 150:7 150:21 225:2 393:9,12,19,20
**coding** 7:5
**coexist** 207:19
**cold** 319:22
**collapses** 137:12
**collect** 58:24 208:22 209:21 262:12 335:19
**collected** 61:14 92:11 93:7 112:6 115:25 120:18 130:1 138:14,16 139:1 158:7 160:22 161:17 161:19 162:7 173:13 179:3 190:15 194:11 207:11 221:20 232:16 251:14 267:6 271:13 271:14 277:10 277:11 312:9 313:7 329:20 336:5,14 337:12 344:22 353:9
**collecting** 40:8 44:2,9 60:19 70:5,13 79:21 80:5 88:8,17 108:10 110:6 111:8 122:16 122:17 153:5 170:25 177:3,5 277:4,6 308:20 370:9
**collection** 48:23 74:14 108:3 109:22 120:19 138:17 154:13 155:25 170:11 171:9 172:14 210:14 241:16 368:4
**collectively** 40:3
**collects** 36:21 40:4 46:10 58:11 64:10 81:23 93:20,21 121:19 139:2 187:14 276:21 353:14
**college** 111:18
**colloquy** 363:8
**colorful** 211:15 211:17,23
**column** 85:17 85:19 370:25 371:1 374:9
**columns** 369:5 369:5,6 370:13
**comb** 358:24
**combination** 114:8
**combine** 231:19 364:13
**combined** 71:1 141:23 324:11
**combining** 76:11
**come** 12:16,20 23:15 32:24 42:10 54:4 61:1 62:19 74:11 83:21 85:19 126:1 130:12 134:15 139:6 160:7 165:20 210:6 218:5 222:5 224:12 226:21 228:11 229:17 239:17 240:16 282:10 303:7 309:14 317:2 341:17 343:21 358:14 360:20 369:21 380:5
**comes** 14:25 50:5 88:22 105:16 118:18 250:14 363:5 381:5
**comfortable** 66:9
**coming** 12:25 14:3 64:8 92:10 305:12 320:2 351:5 372:5

**comment** 17:23 20:17 145:1 163:7 164:20 311:21
**commented** 121:4 131:10
**commenting** 21:3 239:24
**comments** 21:5 21:9,18 22:12 24:16 238:7 241:9
**commerce** 274:20
**commercial** 112:24
**commission** 392:24
**commitments** 115:5 178:5
**committed** 28:19
**committee** 111:20,25
**commodity** 271:23
**common** 14:24 136:8,9,11 245:13 350:18
**commonly** 168:12 272:15 352:13
**companies** 125:10 291:8
**companion** 369:11,14
**company** 97:2 291:11 304:17
**compare** 189:11
**compared** 323:20
**compares** 74:24
**comparing** 20:11 127:6,21 176:11
**comparison** 127:25
**compartment** 254:15
**competitor** 380:5
**competitors** 125:4 126:25 127:3,8,23
**compiling** 226:10
**complain** 143:18 306:10
**complaint** 23:4 49:9 50:11 51:22,23 52:14 57:16 58:8 59:5 60:16 61:9
**complete** 13:2 29:17 105:8
**completed** 393:7,17 394:6
**completely** 15:1 44:25 65:2 109:4 175:6 196:19 236:9 267:2 298:13 310:18 314:8
**completion** 394:10
**complex** 164:23
**complexity** 244:25
**compliance** 162:16 163:18 166:24 168:15 206:18
**compliant** 164:25 165:9
**complicated** 351:24 360:7
**compliments** 7:1
**comply** 114:7 197:24 205:9
**compound** 26:24 197:18
**comprises** 213:13
**compromise** 115:1
**compromised** 101:6
**computational** 244:25
**computationa...** 245:9
**computer** 68:1 72:22 125:14 168:13 197:2,2 225:2 239:6,10 315:9
**computers** 239:11
**computing** 118:2 225:17 282:11 321:11
**conceivable** 65:18 250:16
**concept** 54:25 118:15 199:19 366:4
**conception** 200:23
**concepts** 347:8
**concern** 38:10 101:23,25 242:19
**concerned** 102:19
**concerning** 34:15 107:9 188:14
**concerns** 105:13 114:9 115:18 161:20 198:6 214:17 234:20 236:11

298:14 341:12 341:13
**conclude** 171:25 298:21 299:25
**concluded** 167:17
**concludes** 388:5
**conclusion** 13:18 23:16 24:2 25:23 74:11 78:17 88:3 154:24 167:13 213:9 213:20,21 258:4 298:25 300:20
**conclusions** 12:15,20 14:3 216:8 229:17
**concur** 7:19
**conduct** 143:4 206:25 240:20 240:21
**conducted** 215:18
**confess** 354:18
**confident** 146:7
**configuration** 193:10
**configured** 158:22
**configuring** 165:22
**confirm** 98:2 100:14 288:19 289:8 324:18
**confirmed** 102:15 249:5
**conflating** 290:3
**conflict** 116:18
**conflicting** 208:1
**conflicts** 57:23
**confused** 20:22 20:24 75:22 367:18
**confusing** 43:1 43:11,24
**confusion** 20:20 39:4,10
**congress** 21:1,9 21:21 206:1,5
**connect** 63:5 200:15 250:18 316:8 368:3
**connected** 8:1 375:17
**connecting** 106:7
**connection** 21:20 136:6 172:20
**connects** 93:10
**cons** 303:12
**consensus** 258:13
**consent** 257:24 277:18,20,22 278:6,9 281:21 282:18 283:11 283:21 284:14 285:20
**consented** 239:1 241:23 257:22,22 322:3
**consents** 285:1 285:14 286:9
**consequence** 342:12
**consequences** 267:24
**conservative** 223:10
**consider** 18:19 19:14 95:6 102:4 181:14 191:25
**considerable** 112:17
**consideration** 22:19,23 53:13 54:13
**considered** 46:16 60:24 61:1 66:8 181:22 235:16 323:2
**considering** 34:21
**considers** 48:3 91:7,8
**consistent** 41:1 75:12 79:8,16 122:12 173:24 241:1 278:2,10
**console** 63:11 96:15
**constellation** 133:23
**constituency** 208:5
**constitute** 94:18 98:18
**constitutes** 110:15
**constitution** 28:21
**constructs** 145:3
**consultants** 7:11
**consultations** 302:2
**consumer** 17:15,19 18:4 18:6,20 19:14 19:18,19 26:16 71:6 90:9
**consumers** 17:7 17:19 18:12
**contact** 393:9
**contain** 97:23 144:3 147:16 232:11 257:13

330:24 331:4 335:7
**contains** 275:17 330:15
**content** 193:18 204:10 230:21 230:23 241:20
**contents** 12:5 135:1,3 326:24
**context** 41:11 41:13 42:4 43:25 46:5,19 95:20 112:21 141:1 193:23 193:24 200:25 204:17,19 206:15 249:3 271:20
**contexts** 40:22 40:24
**contextual** 203:19,24 204:1,5,7 205:2 210:8
**continue** 110:24 111:9 111:10 117:20 187:5 290:11 301:5 323:5 340:15 342:14 366:23
**continued** 129:6
**continues** 335:19
**continuing** 289:17
**contraband** 336:4
**contract** 301:4
**contradict** 87:19
**contradiction** 59:15,16,18 60:2
**contradictions** 225:15,15
**contrary** 251:15
**contribute** 304:1
**control** 20:2,16 20:25 21:10 23:13,14,16,22 24:2,3,24 25:20,24 26:11 26:13,20 39:13 39:15 44:1,7 49:20 50:5,19 51:15 52:18 53:4,8 59:24 60:11,12 61:18 74:12,14 76:21 77:17 88:14 89:9 91:1 92:23 122:14 132:14 144:1 144:19 146:19 170:11,25 171:5 178:6 179:13,17 196:7,9,14 197:25 201:8 203:5,6 217:13 286:17 365:1
**controlled** 38:6 132:10
**controller** 118:16 119:4
**controls** 20:23 44:8 49:3 71:23 72:10,13 75:5 87:13 144:11 147:5 178:11,14,15 190:14 322:7 389:9
**controls.pdf.** 71:24
**conversation** 29:6 30:12,17 30:19
**conversations** 3:7 29:8,13 30:2,7,8
**conversion** 219:9,19,21 220:8 221:4,8 221:9,13 226:3 256:17,19 260:12,13,19 260:20 261:25 262:1 263:6 264:9 293:6,21 294:8,17 295:10 296:12 296:20,24 298:16 316:14 351:2,9,9 352:4,9 355:3 355:4 366:21 368:3 371:24 372:5 380:12 380:14,16,25 381:10 382:5,8 383:24 384:2 384:11
**conversions** 218:23 219:22 220:2 223:20 248:23 249:7 260:25 261:9 261:11 262:6 262:11,19 263:4 264:2,3 264:17,18 289:13,14 291:4,5,12 292:11 293:3,8 293:20 299:13 299:20 300:9 302:14 350:4,5 350:9,11,15,21 351:4,5,13 352:13,16 354:24 366:17 367:14 369:25 382:5,7 383:15
**convert** 220:19 220:24 221:15

222:16 381:7 382:10
**converter** 223:1
**converting** 221:5 223:18 302:11 352:15
**converts** 372:8
**cookie** 63:18
**copied** 25:10,12
**copies** 63:16 230:4
**copy** 11:6 241:23 345:6
**core** 346:9
**correct** 15:18 16:25 76:10 160:19 194:24 217:18 225:7 243:24 244:17 290:6 304:16 345:2,9,19 346:17,22 349:12,21 350:6 351:11 353:10,18 376:23 379:1 379:19,24 380:8 382:25 383:15 386:22
**correcting** 15:15
**correction** 16:1
**corrections** 6:21 393:14,15
394:3,4
**corrective** 35:12 224:9
**correctly** 256:10
**correlate** 141:24
**correlates** 179:4
**correlation** 305:21
**correspond** 85:18
**corresponden...** 156:15,18 175:2,7,10
**corresponding** 370:25
**corresponds** 67:22 336:22 367:4
**corroborates** 313:8
**cost** 279:18 280:2,3,9 281:17 282:1,3 282:11 307:24 318:6 320:4,9 341:9 380:17
**costs** 223:14 319:11,25
**council** 205:11 206:18
**counsel** 9:1 72:3 339:19
346:13 347:14 348:22 371:10 389:21 393:18 393:21 394:7
**count** 52:6 218:23 256:9 304:6 373:12 385:13
**counted** 215:23
**counterexam...** 305:10
**counterfactual** 302:16
**counterintuiti...** 44:13 74:15,18 92:15
**counterpart** 369:16,18
**countries** 115:17
**counts** 85:23
**couple** 41:14 45:15 66:13 91:3 113:6 141:2 170:17 175:12 206:10 211:7 213:3,25 220:10,11 239:5 368:19
**course** 37:8 84:7 130:10 162:25 167:23 202:16 204:24 215:14 239:25 240:1,20,21
250:20 253:22 317:6 321:12 365:2 375:13 376:19
**court** 1:3 3:14 3:19,24 77:21 154:25 196:11 196:12 302:19 331:22 336:11 340:17,20,21 341:20
**courtesy** 33:21
**cover** 39:24 70:2 101:18 102:1 217:13
**covered** 10:9 27:9 150:3 172:7 212:1 262:17 284:5 289:21
**covers** 292:20
**cpa** 355:1 380:17 383:5
**cpm** 382:18
**cpms** 383:7
**crafting** 91:16
**crawling** 230:3
**crawls** 229:21
**create** 134:19 188:11,12 376:5
**created** 153:4 158:4 215:20
**creates** 116:18 116:19 208:2

**[creating - data]**

**creating** 103:6 103:8
**creation** 88:13
**credit** 52:24,25 382:11,14,16
**cricket** 327:23
**crime** 274:21
**criminals** 274:20
**critical** 77:15
**criticizing** 124:24
**cross** 387:6
**crossed** 38:8,24 39:1
**crypto** 250:3
**cryptographic** 145:3
**cryptography** 118:1
**curiosity** 196:2
**curious** 21:19 196:4 223:7
**current** 126:12 193:22,24 196:17
**currently** 4:19 362:13
**custodians** 112:3
**custom** 157:21 158:3,19,23 159:14 224:17 224:22 227:6 227:18 260:21
**customer** 62:8 308:2 309:14 309:16 352:21 354:14
**customers** 126:9 307:18 307:20,23
**customizable** 157:23 158:9
**customization** 158:13
**customize** 159:25
**customized** 157:11 159:6 160:15
**cutting** 175:25
**cv** 1:6

**d**

**d** 1:1 85:18 387:22 389:1
**d38** 75:25 86:5 86:6,24 87:3 87:10
**da** 389:15
**damages** 28:25 29:2,3,8 31:19
**data** 36:20,22 38:2,3 40:3,6,8 44:3,10,11 46:9 47:5 48:5 48:23 53:9,15 53:17,19,20 54:1,2,7,23,24 57:5 58:11,15 58:24 60:19,23 61:14 62:8,15 64:9,11,13,20 64:21 65:16,16 65:20 66:2,2 70:2,4,6,7,12 70:14 73:3,7 74:3,4,6,15 75:1 79:8,8,20 79:20,22 80:3 80:5,10,14,18 80:19,22,23 81:11,13,23,24 82:4,15,24 83:8,13 84:1 86:9,18,19 87:2,4,14,20,25 88:2,16 89:8 92:10,11 95:22 96:3,6,10,19,22 96:23 97:20,22 98:8 99:2,5,6,9 99:11,13,17 101:4,21 102:2 102:2,14,19 103:4,20,22,24 104:7,9 105:5 105:13,14,17 106:5 107:13 107:25 108:4 108:23 109:22 110:6,12 111:7 112:5,9 114:12 114:13,22,23 114:24,25 115:14,24 116:7,9,10 117:12,13,22 118:4,6,15,15 118:19,21,22 119:2,3,4,5,19 120:5,13,18 121:19,21 122:1,17 129:17,21,23 130:4,7,9,15 131:5,6,9,15 132:22 133:5 134:12,13,18 136:7,10 137:20,25 138:1,5,6,9,24 139:1,12 140:13 141:10 141:11,24 143:7,8 144:13 146:20 147:13 147:19 148:12 149:1 153:6 154:13 155:24 160:4 163:1,8 166:7,8 167:9 170:12,20 171:1 172:14 173:15,17 174:4,14 175:13,17,17 175:18,18 178:19 179:3,7 179:19,21

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[data - decided]**

180:2,3 181:11 184:7 185:7 186:18 187:18 187:22 188:5 190:15,18 194:11,14,15 194:23 196:15 196:15,18 197:13,15,20 198:2,20 199:2 203:8 205:8,18 207:11 208:22 209:22 211:3 212:4 213:6,13 216:1,14,22 217:14,16 218:3 221:19 221:20,21 222:10 223:22 224:4 227:2 232:3,11,14 235:7,7,11,24 236:4,6,7,14,20 236:21 237:6,7 237:13,15,19 239:13 241:4 241:16,18,20 241:23,25 242:1,12,14,15 242:17 244:12 244:25 245:2,3 245:12 248:22 250:8,11,12,15 250:19,25 251:9,14 253:10,13,19 253:23,24 254:9,18,23 256:3,19 258:21 259:16 263:2,11 264:6 264:6,12 267:6 267:7,8,9,11 268:11,11 270:23,24 271:13,14,17 271:23,25 272:1,6,10,11 272:12,20,23 273:8,11,12 274:1,3,9,13,19 274:22 275:7,9 277:20 278:7 278:10 279:2 279:14,17,22 282:21,22,24 282:25 283:1 287:6,9 303:25 304:14 305:8 306:23 308:20 308:21 309:12 309:25 311:25 312:8 313:18 318:18,23 320:19 321:2 321:22 323:17 324:2 325:1,4 325:6,9,12,14 325:19,22,25 327:23 328:9,9 328:14 329:16 329:19,21 330:6,16 331:19,20,21 332:13 333:23 334:1,7,10,11 335:2,19,23 336:1,2,3,4,4 336:15,17,21 336:22,23,25 337:8 338:1,5 339:9,15 342:13,16 343:16 347:18 347:22 348:7 350:24,24 353:9,14,21 355:4 364:6,9 364:10,13,14 364:17,24,25 368:5,6,7 370:10 371:17 371:23 372:20 373:9,22 374:6 374:15,16 375:16 376:24 381:25 386:4,4

**database** 112:4 112:7 113:3 114:6 180:13

**dataset** 274:25

**datasets** 100:23 101:2,5,8 244:3 255:22

**date** 55:11,13 55:17 76:4,5 155:15 236:13 333:8 392:3 393:16 394:5 395:24

**dates** 312:3

**day** 42:11 326:15,25 332:12 333:12 333:25 334:16 336:11 343:1 346:5 355:25 362:25 363:24 372:2 388:13 391:15 392:21

**daylight** 3:3

**days** 29:21 296:8 332:8,13 332:14 334:1 380:20,23 381:6

**de** 320:12

**deal** 303:6 362:15

**dealt** 323:11

**decade** 58:6 60:15

**december** 68:13

**decide** 109:2 111:5,5 340:21

**decided** 206:6 325:8

**decides** 111:3,3
**deciding** 22:20
**decipher** 224:16 228:13
**deciphering** 226:22
**decision** 266:21 266:24 267:1 271:7 307:17 341:20 342:14
**decisions** 226:23
**declined** 314:12
**declines** 264:12
**decode** 228:1
**decrypt** 376:21
**decryption** 249:21 250:18
**decrypts** 278:17,22
**deduction** 259:12
**deep** 54:15 208:14 296:12
**deeper** 225:13 377:5
**default** 17:24 40:1,18,19 151:17 160:19
**defeat** 178:7
**defend** 10:12
**defendant** 1:14 1:19 2:15
**defending** 9:3
**defer** 340:20
**defies** 60:17
**define** 84:2 347:15 348:3
**defined** 83:1 194:21 363:13 363:14
**defines** 36:3 68:16 192:7
**defining** 45:1 384:4,12
**definitely** 60:4 320:7
**definition** 37:4 38:21 39:23,24 40:14,20 42:2 42:13,14,20,21 43:3,18,20 44:23 45:7,24 47:23 64:8,13 64:19 65:13,13 67:3 68:18,19 69:1,15,15,25 70:15 71:1,2 73:11,23 74:19 74:23,24 75:7 75:11,12,24 76:15 77:1,4,5 77:8,24 78:1,3 78:10,15,16,18 79:1,6,9 81:18 81:22 82:10 83:3,10 84:8,9 84:13,14,20 85:1,8,9,16,23 86:5,7,13,14 87:2,3,5,11 88:21,22 89:1 89:6,14,17,22 91:16,25 92:8 93:1,12,13 94:2,3 119:15 145:22 146:3 179:8 194:2 252:14 363:16 375:9 381:25
**definitions** 40:21,23 42:24 68:4,7,11 72:25 86:8 119:12 212:20 381:4
**degree** 158:10 169:14 200:5 232:14 245:25 254:8 260:24 320:8
**degrees** 200:5
**delete** 32:21 69:9 71:13 107:22 108:4 130:9,11 148:10 177:4 222:3,4 329:21
**deleted** 60:20 61:15,17 130:11 199:12 318:24 326:5 327:14 328:14
**delivered** 226:12
**delivery** 205:19 206:20 262:8
**delve** 122:7 132:20
**demographic** 216:19
**demonstrating** 375:15
**dense** 256:24
**depend** 46:5 302:22
**dependent** 46:19 291:17
**depending** 40:6 112:21 260:15 261:2 265:15 275:7 291:17
**depends** 102:19 273:21 309:19 310:16 334:14
**deployed** 150:8
**deploys** 214:13
**deposed** 4:10
**deposition** 1:18 3:10,15 8:23 9:4 10:12 52:12 85:14 311:11 312:11 344:19 358:18 359:9 360:11 379:1 392:3 393:19,22,24 394:8,10

**[deprived - device]**

**deprived** 314:11
**depth** 31:8 122:8
**describe** 13:10 32:22 158:12 177:23 180:1 181:19 280:15 280:17 330:5
**described** 41:8 107:11 110:14 177:12
**description** 11:9 39:13,15 49:19 52:20 53:4 57:1,3 70:22 122:3 178:13,16 201:11 211:20 211:21 340:1 389:6
**descriptions** 50:13
**deserve** 266:25
**design** 109:5 162:4 195:24 197:4 279:8
**designate** 387:4 387:6
**designated** 73:19 169:7 266:8 269:7
**designates** 269:16,22
**designation** 268:22,25 269:3,10 270:5
**designed** 27:14 112:15,19 116:2 229:18 279:6 282:20
**desimone** 1:22 3:20 391:3,18
**desirable** 183:13
**desire** 305:21
**destroy** 329:21
**destroyed** 336:18
**destruction** 37:10
**detail** 6:13 140:5 180:17 240:11 251:8 286:12 317:3
**detailed** 31:8 209:9 256:24 267:10 273:15 273:16 275:9 280:13 282:15
**details** 145:12 273:23 286:13 309:19 310:5
**detect** 65:21 109:1 207:2
**detecting** 207:12
**detection** 205:12,13,14 207:14 208:9
**deteriorating** 138:22
**determinative** 198:22,24,25
**determine** 23:20 169:14 215:20 225:21 228:15 249:22 254:8 307:25 331:23 359:1
**determined** 130:5 393:18 393:22 394:7
**determines** 111:20
**deterministic** 244:13
**develop** 34:14 49:10 144:18
**developed** 18:3 113:2,9 114:5
**developer** 109:13 123:11 123:24 150:20 152:14 153:25 157:24 165:7 171:7 183:7 184:14 186:16 204:6 216:20 217:1,3,4 263:11 295:7 379:14
**developer's** 56:22 224:16
**developers** 109:18 120:1 149:21,21 151:16,22 152:10,19 154:22 155:12 156:18 157:4 157:12 160:4 162:12 163:20 164:4,16 166:6 166:20 167:5 168:24 169:14 182:2,7,19 289:11 291:2 296:11 298:4 299:17 307:14 310:3
**developing** 97:4
**development** 219:2
**deviate** 210:9 255:24
**deviating** 339:25
**deviation** 261:20
**device** 63:12 66:3 97:23 98:6,23 99:6,7 99:20,24 100:9 100:22 101:2 101:16 102:10 102:20,22,25 102:25 106:7

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

108:21 109:11 110:13 134:21 135:17 138:20 138:23 141:18 161:9,10,12 173:16,20 174:2,7,8,10,13 180:5,7,8 183:24,25 184:17 185:1 186:11 187:2 193:18 195:11 201:22,23 202:20,25 203:4 207:5,10 218:10 232:16 236:5 244:1,2 260:15 264:19 273:20 313:15 313:16 314:12 316:15 322:4 376:6,17 386:4
**device's** 264:17
**devices** 99:21 99:23 174:3,4 201:21,22 202:21 244:5,8 244:9 247:13 253:25 278:1 312:17 373:24
**devolve** 203:25
**dichotomy** 54:2 131:24 197:8
**differ** 69:15 86:10
**difference** 79:7 123:10 124:1,8 195:3 197:13 197:19 219:5 320:12 351:10 363:12 378:10 382:15 384:15
**different** 9:24 15:9 23:24 27:1 39:17 40:6,9,21,21,23 40:23 42:17 43:8 44:16 45:25 47:22 51:12 52:6 54:18 62:5,21 63:20,20 65:6 70:8 71:3 73:15 75:13 77:7 78:2 79:16 84:9,21 84:21,23 85:19 86:12 100:23 103:4 116:9 123:15,19,22 125:2,2 136:3 139:8 141:12 141:12 145:21 165:8 175:12 179:21,23 180:3 183:15 188:2,4,5,11,12 188:19 192:15 195:2,24 196:20 198:6 198:16 200:4 201:13 202:8 203:3 215:11 220:11,11 223:24 239:8 247:15 248:10 250:13 260:18 261:14 262:1 274:1 283:6 288:5 293:3 296:4 297:20 297:20 298:18 298:19 309:20 310:19 311:16 311:16 312:2 325:22 334:19 334:25 347:11 348:2,4,24 350:13 351:17 361:18 375:4,7 376:3 379:7 381:22 382:7
**differentially** 266:17
**differently** 46:3 62:4 118:13 177:13,23 237:14,20 314:25
**differs** 42:14 86:6
**difficult** 116:20 121:6 207:22 245:10 279:15 306:19 359:8 359:20
**dig** 374:19
**dinner** 287:24
**direct** 60:8 249:16 295:15
**directed** 8:3
**directions** 390:1
**directly** 7:16 236:2
**directory** 301:6
**disable** 304:24 322:24
**disabling** 202:20
**disabuse** 76:16
**disadvantage** 327:25
**disagree** 53:23 68:24 85:3 99:15 232:13 269:1 342:19
**disagreement** 68:24 184:5 295:4
**disappear** 298:3 302:17
**disappearing** 303:1
**disaster** 308:13
**discarded** 197:14
**disclaim** 82:11
**disclaimed** 383:19

**[disclose - documented]**

**disclose** 168:25
**disclosed** 27:22 80:13,15 170:3 171:23
**discloses** 171:7
**disclosure** 70:24 71:17 75:5 80:25 87:12 247:21 270:2
**disclosures** 91:6 169:6 177:13 255:9 255:12
**discontinue** 340:24
**discover** 15:22 173:12
**discovered** 16:3
**discovery** 149:6 217:10 228:23 234:16 236:17,17 249:5 312:25 327:22 328:7 335:11
**discuss** 45:9 97:14 110:17 147:5 328:6
**discussed** 67:5 139:14 240:19 325:16 347:13 350:9
**discussing** 81:19 104:10 177:2
**discussion** 29:17 34:5 67:15 189:24 234:1 371:5
**display** 195:16 195:23 204:11 289:18 290:11 291:12 350:19 350:23 351:7 351:20,25 352:20 354:13 366:2,9 367:6 367:8 379:5,13 380:8,15 381:18,20 383:8
**displayed** 383:9,11
**displays** 41:7 46:8
**dispute** 22:21 23:2,7,10,21 58:1 130:8 199:4 214:6 234:12,14 239:2 247:16 249:9 251:2 282:19
**disputing** 194:19 203:16 215:22 234:21
**disruptive** 307:8
**dissident** 100:2
**dissidents** 115:12
**distinction** 136:17 190:25 191:8,14 192:22 202:18 202:23 363:22
**distinguish** 268:7 361:14
**distinguished** 363:10
**distracted** 368:12
**distraction** 371:14
**distributed** 258:13
**distribution** 206:7 253:20 253:21 254:1,4 261:8
**district** 1:3,4 3:13,14
**divide** 282:24
**division** 1:5
**dmv's** 180:13
**docket** 327:17
**docs** 320:24
**doctor** 111:23 111:24
**document** 33:5 33:12 36:16 67:9,11 73:17 77:16 78:11 80:8 81:5 91:19,20 108:14 109:23 137:18 142:18 153:8,9,17,18 157:1 175:20 189:19 192:19 194:6 210:23 237:2 238:11 238:14,17,20 238:22 241:7 241:10 242:23 249:2,11 259:10 269:16 269:22,25 281:14 283:16 288:16,22,25 289:3,6,7,9 321:13,15,17 321:20 337:19 358:17 372:3 372:24 374:22 374:25 389:8
**documentation** 156:8,11,15 157:3 294:25 295:16 297:1
**documented** 12:24 98:2 130:16 133:18 134:23 135:21 137:17 139:21 142:15 143:11

143:13 146:25 147:22 148:4 151:4 165:14 166:2 214:20 214:22 215:6 218:16 219:6 243:8 253:17 263:22 265:3 284:19,22 308:16 312:20 313:2 342:25 352:5
**documenting** 226:15
**documents** 23:6 26:17 27:16 46:13 68:23 75:17 88:13 90:17 91:11,12,14,23 154:11 156:20 156:23 164:21 196:23 221:18 240:11 241:1 241:12 288:11 288:19 321:8 335:17 372:19 384:19
**doing** 25:8 47:4 64:2 66:3 101:9 114:25 120:10 142:4 163:14 175:22 181:21 216:9 225:4 231:4 232:3,5 242:7 245:1 246:2 271:3 274:21 291:23 301:23 307:16,22 320:5,7 341:7 364:19
**dollars** 382:22
**dominant** 303:19
**door** 141:7 200:6
**dossier** 88:9 194:8,11 195:4 223:19
**double** 77:12 294:19 322:19
**doubt** 256:13 380:23
**download** 195:21 373:2
**downstream** 118:10 120:21
**dozen** 373:8,9
**dr** 112:23 162:10 215:10 234:2 238:20 247:11 248:6 255:20 297:25 311:13,19
**draft** 248:18
**dramatic** 102:8
**drastic** 267:23
**draw** 78:17 154:23 167:12 191:8 213:20 216:7,8 298:24 300:20
**drawn** 192:23
**drive** 309:15 366:18
**driven** 342:2
**drop** 207:13 208:7,8
**dropbox** 319:19
**dry** 211:19 302:23
**dsid** 248:23 249:6,17,20,22 251:3 277:1,6 277:21
**due** 102:2 126:19
**duly** 4:4 391:7
**dumping** 58:15 89:8
**duplicate** 114:23

**e**

**e** 1:1 2:1,1 69:5 101:14 106:8 129:1,1 159:13 160:1,16,17,23 161:25 162:6 163:1,4,5,10,21 164:5,17 165:10 167:7 174:17 233:9 234:4 255:22 256:5 288:18 292:3 299:10 346:2 387:8 389:1,5 393:9 393:12 394:1 395:3,3,3
**earlier** 10:5 23:25 68:16 82:10 194:8 212:9 218:8 233:8 234:15 277:17
**early** 49:19,24 153:14 196:24 292:25
**easier** 77:21 121:15 127:16 212:24
**eastern** 3:3
**easy** 163:2 232:8
**economic** 300:16
**edit** 69:9 71:13
**eduardo** 2:15 67:6 106:22 123:14 169:19 246:8 248:1 284:4 313:20 317:15 393:1
**education** 27:18
**effect** 105:25 108:17 130:3 211:21 221:3

**[effect - errors]**

224:20 248:21
321:9
**effective**  66:24
**effectuate**
205:2 207:5
**efficiency**
245:9
**efficient**  319:2
**effort**  112:17
**efforts**  167:3
168:2 372:19
**eight**  327:11
330:10,10
**either**  13:8
55:21 109:2
174:3 179:11
225:12 266:3
294:22 304:16
321:18 327:15
344:25 345:17
**elements**
192:21 243:23
**eliminate**  104:9
**eliminating**
114:23
**else's**  43:15
106:2
**embed**  152:10
**employees**
45:19,24 46:12
241:3 323:8
**enable**  165:24
166:7,7 223:4
**enabled**  109:22
151:17 263:11

**enables**  262:12
**encoded**  246:21
246:23
**encodes**  132:10
**encourage**
126:10
**encrypt**  277:21
376:20
**encrypted**
247:14 248:9
248:12,13
249:18,18,20
277:6,11,13
376:17
**encrypting**
247:19
**encryption**
118:3 249:24
250:9 251:3
**endeavor**  15:18
244:22
**endeavoring**
62:7
**ended**  63:24
**ends**  208:14
**enforce**  167:4,4
167:11 168:2,3
**enforcement**
168:9 250:20
250:21
**engaged**  48:15
48:16 364:16
**engagement**
4:23 10:1
11:11 260:16

296:6,16
297:10 350:14
**engagements**
4:17 10:19
11:3
**engineer**  110:3
110:4,21,22
118:8 238:10
239:23
**engineer's**
238:7
**engineerable**
110:20
**engineering**
183:12 282:15
**enhance**  222:24
223:2 226:12
**enhanced**
222:22
**enhancement**
222:25
**enhances**
223:11
**enlighten**
368:13
**enlightening**
190:7
**ensure**  107:11
153:5
**entangled**
137:3
**entanglement**
137:2
**entire**  83:17
360:11

**entirely**  122:12
309:25
**entirety**  244:11
**entities**  302:5,8
**entitled**  169:23
389:8
**entity**  112:24
188:23
**entries**  129:25
139:18 141:15
141:15 142:7
144:20 216:14
244:16 247:12
338:22 376:3
376:17 377:4
**equal**  266:25
**equally**  86:20
380:7
**equivalent**
124:25 125:1
277:12
**era**  206:9
297:23,24
**erode**  301:9
**errata**  392:1
393:14,16
394:3,5
**erroneously**
162:21
**error**  16:6,9,11
304:19,21
319:9
**errors**  6:16
191:21

**esantacana** 2:16 393:2
**especially** 6:12 16:6 25:14 204:19 239:11 319:22
**esq** 2:4,9,10,15 2:16 393:1
**essentially** 9:22 55:4 61:4 63:5 112:9 134:1 150:6,8,21 179:11 180:6 209:21 220:22 233:20 245:1 304:13 338:14 339:17 358:13
**establish** 21:6 21:16 92:3 122:9 261:24 284:24
**et** 1:7 3:12
**eu** 118:18
**evaluate** 117:3 155:18,20 156:4,7 188:17 225:4 309:7,10
**evaluating** 227:1 255:11
**evaluation** 77:15
**event** 65:15 96:19,22 97:20 97:22 98:8 159:14 184:7,8 184:9,10,18 185:1 218:8,11 226:2,3 227:6 227:18 256:17 275:19 351:9 368:4 371:24 375:5,10,10,11 380:25
**events** 157:21 158:3,7,19,23 159:1 160:22 161:17,19,24 162:7 218:14 218:18,22 219:19,21 220:8 224:17 224:22 226:8 226:11 255:21 257:14,22,23 260:13,13 261:25 262:1 375:6
**everybody** 229:19 305:23
**evidence** 95:15 135:16 139:23 140:19 144:6 191:2 206:20 218:17 219:18 220:7 221:12 221:17 224:13 224:20 226:10 226:22 228:12 236:12,21 240:23 262:8 263:16 284:13 321:9
**evil** 365:5
**evolution** 292:17
**evolving** 63:9 63:21
**ex** 376:24
**exact** 29:15 42:20 52:6 55:11 304:6 328:18 329:15
**exactly** 5:7 15:8 19:4 30:5,6 33:23 34:3,8 58:23 104:22 223:25 297:5 306:25 361:17 373:12 376:23
**examination** 4:6 129:6 344:16 346:12 354:2 378:4 383:18 389:2
**examined** 4:4 224:5 232:10
**example** 9:7 17:21 20:1 21:20 27:7 41:24 62:4 77:12 93:9 95:4,7,18 96:2 96:5 97:25 99:2,19 102:6 102:16 123:12 158:19 184:9 195:13 199:6 218:19 227:5 243:2 267:4 302:19 304:23 305:10 348:13 350:22 365:13 367:7 372:10 379:24 380:16
**examples** 35:17 35:17 148:24 192:5 193:16 193:20 238:11 370:16,17
**excel** 345:11 356:14 357:17 358:4,8 359:2 359:17 362:11 363:3 373:3
**exception** 66:8
**exclude** 309:24
**excluded** 308:12 309:13
**exclusively** 116:22,23
**excuse** 67:23 108:19 133:4 280:20
**exfiltrate** 274:13
**exfiltrated** 235:25 274:9
**exfiltrates** 105:17 250:8

**[exfiltrating - extent]**

**exfiltrating** 106:5
**exfiltrator** 250:10
**exhaustive** 35:10,15
**exhibit** 11:20 11:24 67:1,2 67:16,21,23 71:21 72:2,13 72:22,23,25 73:1 75:10,19 75:23 76:3 77:3,25 80:2 82:9 83:21 85:17 86:6,25 87:10,12 107:16 212:12 345:4 346:2 347:1 373:4 387:14,18,20 389:7,7,8,9,10 389:11,12,13 389:14,15,16 389:17,18,19 389:21
**exhibits** 82:22 362:15 388:1
**exist** 35:12 324:9 328:16 331:12 370:17
**existed** 337:2
**existing** 154:8 240:20
**exists** 88:11 285:6 337:2
**expect** 199:7,8 261:10 263:7 337:4
**expectation** 25:11 103:15 198:13
**expectations** 17:16 18:20 197:25
**expected** 17:8 92:16 104:4 153:13
**expecting** 198:3,5
**experience** 25:25 26:6 88:23 90:15 92:2 127:10 192:9 211:4 212:5 245:16 318:11 352:19 383:3
**experiences** 73:5
**experiment** 254:13,20 376:25
**experiments** 215:19 254:10 254:17
**expert** 4:15 12:20 13:11 15:12 17:15 18:19 19:15,20 28:3 29:8,10 73:18 88:24 90:16 125:12 126:21,22 127:5,20 154:18 170:3 213:12 229:3 269:8,12,14 270:2 272:25 301:7 315:10 326:2 335:4 336:21 360:19 363:23 389:7
**expertise** 15:21 17:17 18:4 19:16 26:6 27:19 57:22
**experts** 18:9 26:18 27:7 29:3 105:24
**expires** 392:24
**explain** 13:13 15:5 20:15 92:9 99:16 131:3 266:17 279:13 371:8
**explained** 31:5 31:13 80:17 345:25
**explaining** 44:25
**explains** 175:6 329:12
**explanation** 8:18,21 89:12 171:17 219:8 338:13 357:7
**explanations** 132:22
**explanatory** 77:20
**exploiting** 365:2
**export** 96:19,22 96:23 97:20 99:11
**exports** 97:13 98:6
**expose** 342:14
**exposed** 138:25 139:2 250:23
**express** 31:18 213:5,12 224:14
**expressed** 110:23 182:13 310:8
**expressing** 182:18,23
**expressly** 322:10
**extended** 292:18
**extensively** 27:10 275:5
**extent** 125:5 171:6 172:15 172:17 228:3

**[extent - feeling]**

329:20 337:1
**external** 349:9
364:12,21
**externally**
154:5
**extract** 230:10
230:18,23
236:7 304:9
364:7
**extrapolate**
256:4 305:5
308:22 309:1
**extrapolation**
310:13
**extreme** 112:8
**extremely**
279:24 321:6
**eye** 106:24
**eyes** 1:2 211:2
211:14 387:5

**f**

**f** 1:1 129:1
374:9 389:16
**facebook**
184:15 185:18
186:4
**facilities**
318:14
**facing** 42:19
43:19 204:6
342:11
**fact** 6:12 14:22
16:18 18:1
33:9 62:17
80:9 92:25

95:7 167:13
184:18 226:25
235:23 239:16
242:9 290:20
304:19 312:6
326:21 349:8
352:8
**factfinder**
22:18,22 23:19
196:13
**factor** 267:5,9
267:10,13
**factors** 265:16
267:13 272:19
321:3
**facts** 13:13,17
14:16,17 18:6
18:8 22:17
95:14 140:18
240:23 263:15
321:15,16,24
**failure** 103:12
167:4 246:3
**fair** 11:12,13
11:25 12:2,10
14:5 19:13
33:17 35:9
37:3 39:8 42:6
46:11 49:21
52:15,21 53:2
54:10 65:10
82:5 87:8
99:20 108:5
132:7 136:22
157:6,12

158:12 177:21
203:18 214:24
216:10 223:16
224:2 248:23
253:7 255:10
260:17 265:17
272:19,22
273:6 276:11
297:25 298:10
302:21 371:25
**fairly** 14:24
370:22
**faith** 162:20
**fake** 20:2 24:2
82:16 88:14
122:14 178:13
178:15
**false** 54:2 79:12
82:24 258:1,1
258:9,9,22,23
259:2,2,17,18
**falsely** 250:24
**familiar** 118:14
166:5,14
200:20 201:24
202:10 204:4
229:25 312:4
314:14 315:23
316:16,23
**familiarized**
59:4
**fan** 301:12
**far** 19:18 137:3
161:18,19
186:4 188:10

204:3 241:13
259:21,24
263:3 280:9
333:13
**farr** 1:20 2:13
3:16
**fast** 299:22,22
310:15 373:18
**favorable** 13:7
13:18 14:4,7
14:10
**favorite** 227:6
227:19
**feasible** 32:10
35:5,20 134:14
245:14,22
**feature** 127:24
151:1 222:15
222:15,17
352:8 384:12
**features** 124:12
125:7 126:14
127:7,22,23
151:2 157:10
296:1 384:4
**fed** 154:22
263:7
**federal** 112:6
336:12 394:1,8
394:9
**feeding** 154:16
**feel** 11:16 66:10
152:1 268:2
**feeling** 340:24

**feelings** 340:19 340:23
**fewer** 6:16 153:12
**fiduciary** 116:8 116:9
**field** 18:1 90:15 131:12 132:10 132:14 144:2 144:11,20 146:19 175:15 175:16 235:10 239:7 317:11 377:2
**fields** 239:9 275:18 330:21 334:19 337:10 347:20
**fight** 85:22 86:2 152:2 339:1
**figueroa** 2:2
**figure** 39:25 55:17 59:12 111:8 142:25 144:19,25 196:11 222:6 224:11,21 250:2 265:5 285:10,12 307:5,6 332:18 333:9 341:25
**figured** 265:2,4
**file** 357:5
**filed** 3:13 332:13,19 333:9,25 334:16
**files** 230:22 345:11 346:1 356:15 362:11 363:3
**fill** 342:1
**fills** 383:11
**filter** 65:21,23 319:5
**filtered** 68:11
**final** 16:24 341:20
**financial** 383:4
**find** 13:23 17:12 42:19 43:9 44:23,24 83:4 92:16 132:6 133:12 134:6,12,12,14 135:16 139:18 141:22 142:23 142:25 143:10 143:12 173:15 174:10,23 175:9 176:3 214:2 236:12 243:17 328:18 330:21 337:5 344:20 358:25 360:23 361:9 361:10 371:4
**finding** 100:7 175:2,10
**finds** 196:13,13 198:16
**fine** 180:10 199:17 260:1 265:8 286:15 295:6 304:3 308:6 314:7,8 361:24 387:21
**fingerprint** 136:9 245:3,4 245:5
**fingerprintable** 347:19
**fingerprinting** 141:21 142:12 175:3,11,13,14 244:21 245:10
**fingerprints** 245:7
**fingers** 298:3 345:7
**finish** 146:6 183:22 306:3 310:22 385:6 385:21,24
**firebase** 64:14 64:21 65:15 97:4,7 117:11 123:12 124:3,9 125:5 149:22 150:6,12,17 151:1,16,23 153:15,19 157:10,11 158:15 160:23 161:16 162:5 166:21 169:1 171:14,24 182:5 186:17 188:21,22 194:22 203:2 214:14 241:17 261:1 289:12 289:24,25 290:9 291:3 292:10,17 298:2 307:13 322:1,3,24,25 323:16,21 324:20 325:20 384:16
**firehose** 88:16
**firm** 7:15 10:16 14:25
**firms** 9:8 341:15
**first** 4:3 31:23 36:25 37:15 49:17 51:8 57:8 89:15 135:12 177:9 184:8,9,13,23 185:1,10 186:11 189:11 189:12 211:9 212:23 218:7 218:11,14 219:2 220:14

**[first - front]**

226:7 237:4 240:25 249:4 266:3,4 276:13 280:6,8 290:17 290:23 293:12 299:11,17 300:6 307:5 345:25 370:13 370:24
**fischer** 112:23 113:2
**fits** 114:17
**five** 29:20,21 29:21,22,23 78:12 82:10 306:4 308:24 310:20 373:20
**fix** 360:24,24
**fixed** 115:6
**flag** 6:22 257:5
**flexner** 2:2
**flight** 288:2,6 306:14
**flip** 36:4 82:16 92:19,24 103:19 107:6 266:1,5,6 276:14 323:6
**flipped** 258:10
**floor** 2:3,8,14 175:25
**florida** 2:8
**flowing** 222:10
**flub** 37:11
**focus** 86:24 90:10 177:5 196:3 208:3
**focused** 275:14 280:9 371:23
**focusing** 49:25 105:12 226:7
**folder** 362:15
**folds** 382:21
**folks** 7:19
**follow** 111:24 180:20 211:7 227:11 313:23 316:25
**following** 33:1 34:19 73:3
**follows** 4:5 191:18 393:8
**food** 227:6,19
**footnote** 36:13 36:19 43:21 47:23 69:16 73:15 75:12 77:8 78:3 79:6 81:12,17,19 84:2 88:22 89:21 90:14 91:16,24 93:2 93:14 148:17 152:22 153:16
**footprints** 131:24 337:6
**force** 154:16,22
**forecast** 320:21
**foreign** 364:22
**forever** 225:22
**forget** 267:3
**forgive** 59:20
**forgot** 265:5
**forgotten** 27:25
**form** 33:5 43:12 49:15 50:22 59:13 68:25 75:16 76:12,13 79:13 85:2,11 93:4 93:17 95:15 143:22 144:4 164:8,10 213:21 277:7 277:11,13 340:3 366:12
**formal** 312:25
**formed** 53:12 281:16
**forming** 58:1
**forth** 189:7 194:21 218:4 237:24 347:14 366:10 391:7
**forthepeople....** 2:10,11
**forward** 29:2 122:25 309:20 309:23
**found** 42:22,25 92:13 102:15 122:11 136:1 139:23 142:8 167:16,18 218:16 243:1,3 247:13,22 330:6 337:2 370:3,20 386:18
**founders** 64:1
**four** 189:12 343:1 382:10
**fractions** 383:8 383:10
**fragmented** 187:21 267:9
**fragmenting** 188:4
**framing** 85:4
**francisco** 1:5 2:14
**franklin** 2:7
**frankly** 92:16
**fraud** 205:14 206:24 207:8 207:12 208:9
**fraudulent** 207:2
**frcp** 394:1
**frequency** 255:14
**fresh** 317:12
**friendly** 74:19
**friends** 321:16
**front** 2:13 21:1 57:13,17 72:23 325:5 326:18 346:12 356:20

**[front - generates]**

359:3,22
**fruitful** 270:18
**full** 279:22
**fully** 346:15 367:21
**function** 107:11 129:10 177:12,24 202:19 210:1,1 245:4,5 267:19 322:25
**functionality** 110:25 150:7 150:12 154:9 154:21 155:4 289:25
**functioned** 209:25
**functions** 32:20 163:3,3 202:19
**fundamental** 295:3
**further** 186:24 191:16 205:6 220:15 241:8 333:14 354:1 391:10
**future** 148:20 148:21 208:9 307:2,25 365:5
**fuzzed** 142:2
**fuzzing** 142:3

**g**

**g** 52:3 132:23 132:24 133:20 133:21 135:5 139:12 144:22 145:13 146:23 216:12 346:2
**ga4f** 63:14 121:19 131:1 131:19 144:10 146:18 150:17 150:25 151:16 151:18 157:9 190:16 241:18 293:7,20 299:13,19 300:8 324:25 325:2
**gaia** 46:14 48:6 53:21,25 54:2 54:3,4,7,9,23 54:24 86:18 130:25 131:4 131:18,25,25 132:1,5,7,13 134:6,20 135:17 137:20 137:20 139:14 139:15 141:15 141:16 144:2,3 144:10,20,21 146:18,19 147:25 148:1,3 173:13 174:15 174:16,21,21 174:24,25 176:11 178:20 179:1,8 192:4 192:4,13,17 193:6 194:15 194:16 235:12 237:5,14 241:18,20,24 241:24 242:1,1 243:25 247:22 247:22 248:8,8 248:22 249:17 249:18,20,22 276:21 277:4,7 277:9 278:8,25 282:22,25 283:1 285:7 330:10,11,16 337:3,15,23 338:2,22,22 340:5 365:8,9 369:3,6,7,11,13 369:14 370:24 370:25 372:15 372:19 374:15 374:15 375:8,8 375:12,14,17 376:6 382:1 386:19
**gallagher** 1:21 2:13 3:16
**game** 83:15 287:5
**games** 83:18
**ganem** 238:22 240:12
**gap** 190:14,19
**gather** 245:12
**gathered** 103:21
**gathering** 101:10
**gdpr** 119:12
**gears** 251:24
**gender** 216:13
**general** 15:17 23:7 33:2 34:9 48:20,24 62:5 167:10 203:21 203:25 204:24 217:5 245:20 319:24 370:15
**generalized** 205:12
**generally** 10:14 33:13 38:21 39:21 125:9 155:12,16 157:15 214:16 320:10 337:24
**generate** 230:13 231:21 235:7
**generated** 103:4 121:21 253:24 275:20 312:1
**generates** 251:3

**[generic - going]**

**generic** 96:5
**genie** 299:23
**geolocation** 232:11,14
**getting** 71:7 74:6 79:23 114:16 117:25 119:10 180:16 262:25 273:22 373:5 377:5
**gigabytes** 319:14
**gigantic** 244:3
**give** 8:18 16:20 17:20 20:18 29:19 33:21 36:6 45:13 52:23 65:5 66:11 71:8 73:4 78:3 81:19 83:9 84:6 91:10 95:21 96:2 100:5,9 139:3 164:24 178:9 178:12 179:13 192:5 193:16 195:13 202:23 205:21 213:22 227:4 241:8 250:15 273:24 304:5 310:14 331:24 354:6 356:14 358:23 359:11 372:22 377:4 381:14 385:9
**given** 54:13 65:7 67:9 73:10 75:3 79:9 89:23 93:11 120:16 157:16 225:20 234:16 255:19 324:8 335:5 344:18 349:15 359:10 363:2 365:24 379:17 382:11,20 384:1 388:5 391:9
**gives** 227:5
**giving** 19:6 20:6 28:22 95:17 316:15
**glad** 237:22
**glean** 56:15
**gma** 152:8 165:13,20 289:23 290:5 368:1,6 370:9
**gmail** 318:16 319:13
**gmail.com** 311:7
**go** 6:24 17:11 21:13 26:23 29:16 33:6 43:13 46:17 47:8 50:23 58:2 61:25 67:12 73:20 77:10 79:2,14 79:23 85:4 87:7,16 93:5 93:17 94:7 95:15 98:22,25 99:3 100:11,13 101:7 111:23 117:24 119:7 123:19 126:2 127:12 133:22 134:22 135:3 137:3 138:8 144:6,7 164:11 169:8 170:21 172:3,23 176:16 183:20 188:10 189:20 197:18 199:7 201:15 205:6 213:17 224:24 227:10,21 228:20,24 230:10,21 231:9 236:18 240:10 251:16 253:2 257:15 259:20,24 263:19 267:17 268:23 270:18 272:19 276:9 280:22 285:16 288:9 298:13 303:5 310:20 328:17,25 329:10 333:4 333:14 337:20 339:18 340:4 342:8 356:17 362:2 364:25 366:13 367:17 368:19 372:11 374:17,25 377:6 378:2 381:4 384:19 385:24 386:5 386:15
**godfrey** 10:22 10:24
**goes** 31:8 74:3 74:4 103:4 200:8 267:5 269:4 278:21 351:1 364:23 373:14
**going** 3:2 20:15 20:18 21:23 26:22 41:16 59:3,7,9,12 60:23 68:12 71:9,11 77:21 80:22 83:21,22 87:24 88:17,19 89:5 92:12 113:11 115:10 116:13 118:6 122:7,15 123:1 123:15,18 137:9 143:20

149:17 165:5 168:20 170:6 172:21 176:13 178:17 179:13 183:4 184:17 186:18 189:10 196:11 207:23 208:7,15 209:9 218:4 221:11 227:17 234:12 234:14 244:17 247:20 257:3 261:24 264:24 265:7 266:22 267:13 268:1 270:8 274:24 282:2 305:6,20 306:6,14 309:20,23 313:5 314:4 319:4 321:5 323:14 330:2 332:14 336:9 336:12 341:13 346:7,13,21 351:4 352:17 356:4 360:2,6 375:14 377:10 377:12,16 381:3 385:9
**golf** 37:7,8,9 45:2
**good** 3:1 4:7 6:12 7:2,3 8:21 15:12 18:23 28:13 37:16 38:15 45:7 56:7 134:25 162:20 163:15 199:6 205:18 206:20 223:11 223:13 242:18 245:9,23,25 256:21 262:8 275:1 305:3 307:16 308:1 309:2 317:20 327:8 387:24
**goodwill** 385:20
**google** 1:13 3:12 19:22 20:12,13,22 22:1,7,13,14 23:21 25:15 28:15,19,25 31:19,25 32:2 32:7,8,12,19,25 33:1 34:18,21 35:7,18,20,21 36:2,19,21,22 37:2,6,19,22 38:12,13,17 40:4,5,17 41:2 41:6,7,8,22 42:13,14,16,20 43:10,17,22,23 44:1,3,5,9,10 44:17,18,23 45:4,18,21,23 46:10,12,14 47:17,18,21,25 48:2,3,4,17,18 48:22 49:7,12 49:21 50:14,25 51:3,11,17,20 52:1,19 53:18 53:20 54:7,8 54:23 56:18 57:5 58:6,10 58:11,12,15,22 60:1,14 61:16 61:22,25 62:1 62:6,7,13,14,24 63:23 64:5,9 64:10,11,13,14 64:15,20,21,22 65:15,20 66:24 67:3 68:5,7,10 68:16,16,18 69:3,11,19,23 70:4,7,13,17,19 70:21,23 71:14 73:1,2,7,11,13 74:2,3,5 75:7 75:10 76:17,19 77:1,3 78:22 79:1,9,20,23,24 80:3,5 81:10 81:12,13,20,23 81:24 82:3,4 82:23,24 83:1 83:3,7,8,11,11 83:12,23,25 84:1 85:1,8,18 86:14,16,17 87:2,11 88:16 89:1,2,17,22 90:13,23 91:7 91:17 92:8 93:9,13,20,21 94:19 96:4,7,7 96:18 98:19 102:10 104:6,8 105:4,14,15 106:5,6 107:10 107:12,22 108:2,10,18,20 108:25 109:5 109:15,18,19 110:1,4,4,24 111:2,3 113:1 113:3,8,10,11 113:16,24 114:11,15 116:12,14,15 116:16 117:11 117:12,16 118:8 119:2,3 119:17 120:4 120:10 121:5 121:18,24,24 122:20 123:11 124:3,9 125:4 126:7,11,11,25 127:3,7,15,22 129:13,20 130:6,9,11 131:7,7,10,14 132:6,13 133:5

**[google - google]**

| | | | |
|---|---|---|---|
| 133:16 134:4 | 185:7,18,19 | 237:11,12,19 | 301:17 302:8 |
| 134:20 135:16 | 186:12,17 | 238:7 240:2 | 302:12 303:9 |
| 137:18 139:24 | 187:5,14,15 | 241:3,17,18,22 | 303:16,18,21 |
| 139:25 140:12 | 188:20,21 | 242:9,12,17 | 304:4,16 |
| 144:10 145:3,4 | 190:15 191:13 | 245:19 248:21 | 306:20 307:9 |
| 145:5,8,23 | 191:25 192:7 | 249:5 250:14 | 307:12 309:5 |
| 147:2 148:9,25 | 194:12,19,22 | 250:17 251:1 | 309:17,24 |
| 149:22,25 | 194:25 199:1 | 258:22 259:17 | 318:13 319:1 |
| 150:5,6,11,16 | 199:22 203:8 | 260:4,14,25 | 319:11,12,12 |
| 150:20 151:23 | 203:12 204:4 | 261:1 262:5,16 | 320:17,24 |
| 152:10,17 | 205:3,8,10 | 262:22 263:12 | 321:12 323:3,8 |
| 153:4,8,13 | 206:9,9,22 | 264:13,16 | 323:15,21 |
| 154:4,7,8,11,12 | 207:13,21 | 266:1 271:12 | 324:11,12,18 |
| 155:2 157:10 | 208:16,24 | 274:9,13 | 324:19 325:1,3 |
| 158:14,16 | 209:1,4,6,11,14 | 275:15,17 | 325:8,20 |
| 160:18,22 | 210:2 211:1 | 276:21 277:1,4 | 327:20,21 |
| 161:16 162:3,4 | 212:3,21 214:6 | 277:19 279:22 | 328:1,9 329:15 |
| 162:5 163:8,14 | 214:6,10,12,13 | 280:3 282:21 | 329:19,20 |
| 163:19,22,23 | 216:15,19,25 | 282:23 283:10 | 330:13,18 |
| 164:3,15 | 217:2,3 218:10 | 283:20 284:24 | 331:2,16,19,19 |
| 165:23,24 | 218:18 219:18 | 285:12 286:16 | 331:20 332:22 |
| 166:8,19,20 | 220:7,17,20,22 | 286:20 287:3 | 333:19 334:7,9 |
| 167:11,14,23 | 221:12,18,22 | 287:15 288:11 | 334:17 335:1 |
| 168:24,25 | 222:3,4,13,17 | 289:12,24 | 335:18,21,25 |
| 169:15 170:10 | 222:19,20 | 290:8 291:2,8 | 336:14 339:5 |
| 170:19,23,25 | 223:3,25 224:3 | 291:11,24,25 | 339:12,25 |
| 171:4,8,13,14 | 224:8,15,21 | 292:8,9,15,16 | 340:18,25 |
| 171:24 174:4 | 226:10,22 | 292:17 293:1,1 | 341:3,4,6,22 |
| 177:2,10,13,15 | 227:5,15,25 | 294:1,1,4,5 | 342:2,12 |
| 177:22 178:5 | 228:5,12 | 295:8 296:10 | 343:15,15,24 |
| 178:17,21 | 229:21,22,23 | 296:22 298:2,7 | 348:23 349:1,3 |
| 179:19,20 | 230:8 231:4,20 | 298:20,23 | 349:11,14,15 |
| 181:16,18 | 232:2 233:9,21 | 299:13,18 | 350:6 351:8 |
| 182:5 184:1,1 | 235:1,8,22 | 300:8,12 301:9 | 352:9,21,24 |
| 184:15,23,25 | 236:14 237:5 | 301:12,15,16 | 353:2,8,14 |

**[google - happens]**

354:13,16,21 355:2,3,6,12,14 355:17 364:16 364:18,19,22 364:23 365:3,4 365:7,19 368:16 370:20 372:6,7 373:23 376:13,19,23 377:4 379:21 380:4,24 381:7 382:2,2,3,16 383:14,20,22 383:23 384:2,4 384:16 392:2 393:4 395:1

**google's** 20:19 22:15 39:16 42:19,25 43:9 46:20 69:7 73:6 84:9,13 84:20 85:16 86:4,15,23 87:10 124:10 126:6 129:9 131:9 138:5,7 153:14 155:23 167:3 168:2,8 170:11 177:12 188:6 211:10 211:16,21 219:7 229:13 236:21 237:5 237:13 241:15 242:18 244:12 256:19 257:25 258:5 259:12 280:14 282:13 286:8 287:2 288:13 289:18 290:11 291:12 300:13,18,22 318:15 323:12 324:2 339:18 341:2 352:20 353:21 354:13 365:1 368:2,4 381:25 384:7

**googlers** 21:18

**gotten** 38:23 99:12 116:14 281:11 314:16

**government** 115:2,3 250:14 364:23

**grab** 99:3 100:13

**grass** 37:11

**great** 12:4 31:8 37:5 42:8 77:12 104:11 108:17 113:6 121:10 123:17 147:11 170:7 216:21

**greater** 198:20 240:7

**greatly** 299:19

**gripe** 210:13 251:13

**gritty** 130:19

**ground** 189:9

**group** 96:11

**guess** 8:24 20:5 51:21 87:8 97:15 102:24 105:6 110:1 122:6 158:10 167:22 174:20 223:21 226:7 234:13 236:22 266:10 272:18 309:23 320:3 330:10 347:1 365:8

**guide** 160:4 310:7

**gum** 183:3,14

**guns** 115:11

**guy** 100:10

**guys** 366:1

**h**

**h** 4:2,2,2 129:3 129:3,3 345:21 389:5 395:3

**h.1** 389:17

**h.2** 389:18

**h1** 345:16

**h1s** 345:21

**h2** 345:14 357:4 360:10 363:7 372:14 385:2 386:3,17

**hacked** 343:4,7

**hairy** 65:18

**half** 5:10 293:12 299:12 299:17 300:6

**halting** 225:19

**hampered** 307:12

**hand** 11:12 77:16 250:18 275:2 342:13 359:16 381:12 391:15

**handed** 229:15 346:4 355:24

**handing** 382:14 382:15

**handle** 59:1

**handled** 393:8

**happen** 13:20 13:21 14:20 57:5,11 98:25 101:15 102:17 140:16 162:9 162:25 236:2 299:8

**happened** 100:3 103:25 105:21 106:11 106:15 162:22 236:22

**happening** 13:22 88:12 101:20

**happens** 287:21,22

**[happens - hopefully]**

364:25 383:10
**happy** 61:5
70:24 77:19
307:20 321:14
**hard** 16:8
42:18 182:24
183:6,10
225:14 307:25
310:14 323:12
323:13 372:25
**hartford** 37:9
**harvest** 101:7
173:15
**harvested** 25:3
25:4
**harvey** 312:12
**hawks** 305:13
**head** 95:18
145:16 156:22
165:18 202:23
256:23 263:23
269:5 286:13
326:8 359:24
**headed** 216:11
**heading** 107:19
107:22
**headings** 12:8
**heads** 371:9
**healthcare**
114:13 115:16
**hear** 72:11
115:20
**heard** 54:19
136:17 225:19
280:7 316:2,21

316:24 348:22
350:5
**hearing** 111:4
**heavily** 352:7
**heavy** 171:12
**held** 1:20 3:15
130:6 257:5
**help** 6:16 21:24
113:24 169:10
193:22 207:7
262:21,21,22
332:18
**helpful** 105:8
105:11 106:20
116:13 146:10
206:14 246:6
247:5 331:13
**helps** 21:6,16
73:4
**hereunto**
391:14
**hey** 62:11
121:7,10 163:9
179:13 199:11
205:20 207:23
208:20 219:13
230:22
**hidden** 333:23
**high** 33:24
239:12,12
246:4 302:23
**highlight** 311:4
**highlighted**
58:21 233:24

**highlighting**
310:24
**highly** 46:19
**hinder** 172:21
**hints** 41:14
**hip** 65:9 104:16
123:1 125:22
126:4
**hipaa** 112:9
114:7,9
**historical** 68:4
85:20 115:13
192:24 193:4,9
193:13 223:20
324:8
**history** 41:4
46:8 64:3
149:6 228:21
228:24 231:8
231:25 236:18
309:21
**hit** 374:3
**hitbundle**
257:13
**hitbundles**
257:11,21
277:5
**hits** 131:11
330:20 332:23
**hochman** 1:19
3:11 4:7 11:20
33:14 67:16
71:21 72:21
77:19 83:16
112:23 113:2

177:1 212:12
331:6 344:17
354:3 358:14
362:10 388:1,6
388:10 389:3,6
389:7,10,11,12
389:13,14,15
389:16,17,18
389:19 392:3
392:20 393:5
395:2
**hold** 190:21
195:14 242:16
274:25 279:16
314:2,4 372:1
376:12
**holding** 326:24
343:15
**holds** 148:6
**hole** 58:24
208:15
**home** 341:3
**homomorphic**
118:2
**honestly** 13:3
227:13 328:4
340:11
**honor** 286:17
**honored**
286:23,24
307:10 335:22
**hope** 111:4
173:21 302:21
**hopefully** 307:7

**[hospitals - ids]**

**hospitals** 114:9
**host** 325:21
**hosting** 366:20
**hotel** 199:7,10 200:7
**hour** 142:21 306:2 359:9
**hours** 4:22,25 5:2,19,21,25 7:13 8:11 29:21,23 306:4 343:1 356:11 385:5
**hsiao** 2:4
**huge** 16:5 98:4 101:19 243:11 243:12 244:24 320:25 333:22
**huh** 72:20 296:16
**human** 16:8,10 58:5 65:24 66:1 229:9
**humans** 168:16
**hundred** 244:15
**hundreds** 4:18 4:19 6:2,3 8:12 302:3,4,4
**hunt** 2:19
**hurt** 268:1
**hurts** 138:17 138:19,23
**hygiene** 114:22
**hypothetical** 77:10 78:6 79:13 93:17 94:15 95:14 98:22 117:24 118:12 119:7 122:25 185:17 238:24 239:7,9 239:22 285:16 290:14,15 298:12,15 306:21 309:9 309:12 310:7 367:16 378:19 383:2

**i**

**i.e.** 226:13 378:11 382:18
**idea** 23:7 41:12 42:17 44:1 49:4 53:7 54:1 88:11 137:24 180:17 281:20 292:14 308:1 309:2 319:10 364:5 370:15
**ideally** 205:23
**ideas** 77:13
**identifiable** 62:3 161:2,15 213:1,14 335:14
**identification** 11:21 67:17 71:22 212:13 327:10 348:8 388:2
**identified** 7:9 93:8 207:15 238:24 274:6 275:4 332:25 337:11
**identifier** 53:20 53:21 93:9 98:23 99:4 100:9 101:17 102:9,10 109:7 136:8 138:7 174:6 178:21 180:20,21,25 203:1 230:20 235:25 238:25 267:7 347:19 347:23,25 364:7 378:15 378:16
**identifiers** 25:15 44:10 54:8,9,9,23,24 130:5 133:7,17 134:1,7,21 142:14 144:13 145:2 161:4,7 161:13,14,21 161:22 173:12 173:16 174:2 180:5 181:2,4 181:5,8,9 183:19,25 208:12 213:19 235:8,20,21,22 241:25 273:20 285:25 325:22 364:6
**identify** 133:3 146:20 148:22 235:14 265:13 266:12 276:2 287:3 323:17 324:1,10,12,17 325:23 326:5 327:12,14,16 328:15 329:23 330:14 331:16 331:17 334:2 336:15,17 368:17
**identifying** 86:20 132:15 144:12 162:25 203:3 236:3 328:8 335:8 348:6 349:20 370:8
**identity** 140:13 245:18 348:23
**idfa** 55:23 57:6 249:6
**idfas** 285:7
**idle** 195:21
**ids** 63:12,19 180:5 183:24 192:4 247:12 285:7 348:15 349:11 376:17

**ignorance** 92:22
**ignorant** 92:24
**ignoring** 171:16
**illogical** 225:15
**images** 318:16 320:23
**imagine** 31:7 35:6 91:12 171:18 195:11 223:23 260:9
**immediate** 208:8 221:4,7 221:8 307:24
**immediately** 59:14 88:2 262:24 340:25 363:5
**impact** 179:18 263:12
**impacted** 190:13 302:20
**impediment** 246:2
**implement** 37:10 109:15 296:11
**implementati...** 309:19 310:6
**implemented** 223:24,25
**implementing** 279:19
**implied** 293:24
**imply** 324:25
**implying** 152:21
**important** 39:12,20 60:12 112:7 155:16 218:23 219:10 239:10 240:25 383:14,20,21 383:24 384:3 384:12
**imposed** 287:2
**impossible** 35:7 110:21 118:7 196:16
**impression** 20:17,18 120:16 277:24 322:17 367:11 382:17,18
**impressions** 16:21 21:5 90:9 352:3 368:5 371:16
**improve** 179:14 197:22 221:19,22 223:4 262:22 282:9
**impugn** 83:23
**inbox** 317:2
**include** 83:14 86:19 93:2,14 185:14 217:19 217:21 263:1 325:19 338:3
**included** 87:4 98:6 234:4 393:14 394:3
**includes** 38:1 40:12 50:13 86:17 87:21 193:17 217:24 224:4 286:1 325:21 364:6
**including** 26:5 36:22 49:20 64:11 81:24 117:21 221:20 249:7 291:7
**incognito** 199:22 200:13 200:16,17
**incomplete** 77:10 78:5 79:12 93:16 94:14 95:13 98:21 117:23 119:6 285:15 298:11 345:6 367:15,17 378:19 383:2
**inconsistently** 323:11
**incorporate** 152:14 165:13 182:3,7,20
**incorporated** 165:15
**incorporating** 191:7
**incorporation** 286:2
**incorrectly** 256:10
**increase** 292:9
**increased** 293:14
**increases** 343:19
**incremental** 280:2 320:4
**indefinitely** 334:21 336:24
**independent** 116:4 148:18
**index** 230:5,10 231:21 318:17 326:19,23
**indexing** 230:3
**indicated** 138:15 210:16
**indicates** 15:23 42:4
**indicating** 129:25 361:11
**indication** 136:1
**indications** 222:9
**indicator** 352:14
**indict** 83:17

**[indirect - intending]**

**indirect** 221:17 221:24
**individual** 62:16 63:6 95:22 110:6 161:5,8,9,11 187:20 235:23 236:5,7
**individually** 1:7
**individuals** 96:13 266:20
**industry** 205:9 208:20
**inevitable** 168:17
**inevitably** 162:18
**infer** 293:25
**inference** 218:21 232:6 319:7 321:10
**inferences** 230:14
**inferring** 218:15
**influence** 112:5
**inform** 221:13
**information** 25:1,3,12 33:22 38:4 48:12 49:8,15 52:12 57:9 62:23 63:4,15 69:4,6,21 71:6 71:9 74:13 76:18,20 87:6 89:4 90:23 91:8,9 93:3,3,6 93:8,15,15,20 93:22,23,24 94:4,4,9,9,16 94:18,19,23 95:5,10,21 96:4,10 98:19 103:1 110:16 119:25 138:14 138:16 144:24 158:16 161:2 161:15 192:3,9 192:25 193:2,5 193:21 194:3,7 195:7,10,11 203:4 205:5 210:15,17 213:1,2,15 215:11 216:13 216:19 217:2,4 219:4,6 221:6 229:11 230:13 230:18,24 231:20 260:24 262:19 277:12 313:9 316:14 329:18 331:3 334:18 335:7 338:7,16 343:9 343:10 348:6 348:11 368:23
**informing** 26:19
**infrastructure** 222:14
**initial** 114:2
**injunction** 35:3 302:20
**injunctive** 31:22 35:2,13 58:19
**inputs** 245:4 267:20
**ins** 37:23
**insert** 75:8,11 77:2,25 78:10 82:9 87:10 167:19
**inserted** 150:5
**inside** 22:15 200:8,8 217:17 350:19
**insider** 104:2 106:4 365:3
**insiders** 20:22
**insight** 7:15 162:24
**insist** 306:14
**inspected** 222:12
**install** 149:22 149:25 155:12 219:1 296:5,5 297:10 315:17 350:14
**installed** 150:19 305:14 315:15
**installs** 214:12 296:13
**instance** 38:11 102:11 174:9 174:11 236:12 247:10,12,19 248:7 258:12 348:15,20
**instances** 38:10 47:20 235:15 253:2
**institutions** 383:5
**instructions** 360:22
**integrated** 151:19 184:16 185:19
**integrates** 124:10 291:25
**integration** 126:14 153:19 298:19
**intelligence** 99:25 101:8
**intend** 89:25 127:6,21
**intended** 41:1 42:3
**intending** 151:24 211:9

**[intensive - john]**

**intensive**
279:24 318:18
**intent** 211:10
211:16,22
384:7
**intention** 213:4
**intentionally**
40:22,24
**intentions**
242:18 364:20
**interact** 18:12
18:13,14
**interaction**
304:8 350:24
371:25
**interchangea...**
192:15
**interchangea...**
46:15
**interest** 173:18
225:25 230:12
**interested** 74:1
230:15 231:23
265:25 297:23
333:20,24
391:13
**interesting**
115:21,22
150:1,2 165:17
167:9 186:22
211:19 225:24
**interests** 229:7
**interface** 22:14
24:17,20,21,23

**intermixes**
237:6
**internal** 148:10
241:1 288:18
**internally**
224:1
**internet** 17:18
17:18 37:17,24
58:7 196:24
204:25 245:17
298:9 301:22
305:20
**interpret**
307:11
**interpretation**
225:1
**interpreted**
196:10
**interrogatories**
258:6
**interrogatory**
46:21 47:2,16
52:13 280:14
292:25
**interrupt** 160:8
239:18
**introduced**
345:25 361:12
**introduction**
187:12
**intuition** 82:7
87:19,22 88:7
88:23 92:1
**invading**
115:25 341:2

**invasion** 28:20
**inventory**
360:16
**investigate**
15:6 189:4
221:25
**investigation**
92:14 222:8
317:12
**investigations**
207:1
**involved** 7:22
57:22,24
116:14 168:16
**involves** 116:3
133:5
**ios** 201:21
202:6 283:5,5
285:20,21
287:2 314:11
314:14
**ip** 7:19 207:6
213:25 214:2,7
214:16 243:4
246:19,21,22
246:23,24
247:21 344:22
357:9,22
**iphone** 314:17
**ips** 214:22
**irrelevant** 47:5
**isolation**
279:11,19
282:5,7,8,10,19

**issue** 15:7 16:1
19:16 34:16
39:4 45:3
60:13,24 61:1
115:7 156:14
157:8 171:2
196:9 210:19
213:6,13
215:25 233:25
239:4,6 252:13
252:16 294:13
323:9 378:7
**issued** 105:23
167:10
**issues** 22:21
23:2 29:16
58:1 70:16
119:10 161:20
239:5 304:22
**issuing** 383:19
**items** 32:24

**j**

**j** 4:2 129:3
389:19
**jam** 306:12
**jargony** 364:1
**jarring** 34:20
**jfk** 288:6
**jh** 386:18
**job** 7:2 13:12
18:15 110:3
208:4 393:5
**john** 2:9,20 6:3
45:14

**join** 112:9 135:13 136:17 136:21 137:17 137:18,23 138:5 140:12 145:22,24 146:3 173:11 179:7,8 235:9 242:10,12,14 242:24 243:20 244:13 338:22 357:2 370:23 371:4 372:19 375:5 378:11 378:22
**joinability** 234:23,24,25 235:5,14 238:8 238:12,23 240:5,18 344:21 347:5 347:17 363:10 363:15 364:9
**joined** 51:14 53:22 54:6,22 55:3,20 135:16 136:18,24 139:24 145:20 243:6 347:22 347:25 375:20
**joining** 114:23 136:1,2,4,15 144:1 145:23 176:10,10 242:2,8,15,22
**joins** 137:20 235:9 373:8 374:1,5,11,15 374:22 386:2
**jointly** 387:18
**jonathan** 1:18 3:10 145:24 388:6,10 392:3 392:20 393:5 395:2
**jonathan's** 146:3
**joseph** 2:10
**judge** 336:12
**judgment** 300:17
**juicy** 187:23
**julie** 5:1,19 6:11 7:1,4,13 16:17,19
**julie's** 6:9
**jump** 176:25
**jumping** 88:2
**jumps** 57:13
**june** 1:15 3:4 391:15 393:3,5
**jury** 77:22 125:13 127:6 127:21
**justification** 219:11,12
**justified** 221:9
**jyanchunis** 2:10

**k**

**k** 12:8 32:4 104:23,25 105:4 107:5,16 108:1 224:10 346:3
**keep** 150:15 183:13 185:3 210:17 220:17 298:6 319:6 329:25 330:2 341:7
**keeping** 155:15 177:17 195:4
**keeps** 224:3 300:19
**kept** 60:21 334:21 336:24
**key** 131:25 145:4 212:21 212:21 235:9,9 249:21,24 250:4,9,18 251:3,5,10 281:13 285:5 352:13 370:24 371:4
**keyed** 282:22
**keys** 145:6,9 235:10 247:15 248:10
**keyword** 62:25 63:6
**keywords** 62:18,21
**kilometer** 232:19
**kind** 16:9 17:25 34:20 43:6 58:3 60:12 65:6 71:5,7 73:23 77:11,14 78:19 79:17,25 80:25 92:16 101:5 104:13 108:3,3 115:9 116:6,21 120:21 121:5 130:19 141:5 145:24 153:22 160:4 164:22 167:9 172:9 173:9 180:8 187:21 204:21 216:3 223:1 230:9 232:6 256:23 260:6 275:9 291:16 294:9,24 301:9 305:15,18,19 306:3,19 315:16 317:11 317:12 319:4 320:11 326:14 342:2 359:7 384:13
**kinds** 104:2 106:18 195:22 268:11 270:24 296:4 315:18

341:4 350:13 361:18
**kit** 219:3
**knew** 53:21 54:7,8,22,25 244:1 281:25 360:14
**knights** 111:6
**know** 4:25 8:21 9:8,9,10 14:9 14:21 15:7,8 17:19,23 18:2 18:12,24 19:3 20:7 21:3 23:19 27:9,18 31:14 34:4 38:15 41:3 46:18 49:23 50:2 52:5,8 53:18 58:17 59:6 60:11 61:6,6,21 62:9 64:23 65:1 69:19 81:4 92:21 96:12 99:8 101:11 104:12 109:9 111:1,6 112:2 113:12,22,23 118:9 120:24 121:2 124:22 126:5 127:9,14 130:7 131:14 133:8 135:2 136:23,24,25 137:25 138:20 139:22 140:8,8 140:15 143:19 146:11 152:23 155:15 157:16 160:9 161:18 163:6,11 165:25 167:23 169:20 175:3 175:25 177:7 178:8,10 180:11 182:16 183:4,14 185:12 186:5 186:21,23 187:16 188:9 188:16,24 189:2 193:8 195:20,22 196:25 197:5 198:5,9,17,19 204:3 206:13 207:17 208:18 208:19,21,23 208:25 209:6,8 209:16,20 214:15 220:16 221:4,20 222:5 225:1,4 227:7 227:17,25 229:14 230:10 230:13 232:4 233:23 234:20 239:13 240:15 240:18 244:15 250:22 251:7 251:10 252:2 259:1,23 261:4 265:24 266:16 267:25 268:1,6 270:17 272:8 274:16 275:11 275:25 276:7 276:23 282:12 283:25 284:9 286:18,20 288:17 291:22 296:8 297:1,23 299:5,25 300:17 303:3,5 304:18,20,22 304:25 305:6 308:14 310:14 312:1 313:20 313:25 316:9 316:10 317:1 318:12,24 319:3,5,18,19 320:11,14,20 320:23 321:20 321:23 322:6 322:15 323:4,4 323:19,21 325:21 326:7 326:13,16 328:4 331:9,10 333:16 339:1,9 339:12 341:5 341:11 344:23 347:6 348:25 351:21 354:25 358:6,15 359:1 359:4 361:3,5 361:15,17 362:22 370:23 372:15 373:8 376:22 377:9 377:19 383:7 385:23
**knowing** 74:1 152:20 200:7 220:1 245:16 321:11
**knowledge** 18:15,18 167:21,22 359:5 364:12
**knowledgeable** 217:8
**known** 17:25 18:5,7,8,10 168:12 207:11
**knows** 229:22

**l**

**l** 1:1 346:3
**label** 115:11
**lag** 106:24
**language** 38:7 193:17 204:23 255:8
**lapsed** 296:7
**large** 16:7 101:22 187:13 216:1 239:15 245:17

**[lasinsky - linking]**

**lasinsky** 29:9
**lat** 202:9
**lately** 339:22 340:11
**launch** 292:24
**launched** 293:12
**law** 14:25 28:16 250:20 250:21 341:15
**lawsuit** 126:20
**lawyer** 9:6,19 28:17 34:2 360:5
**lawyers** 7:17 9:19 10:2 11:2 312:19 313:14 341:16
**layperson** 18:10
**lead** 13:17 350:20
**leads** 81:18
**leak** 101:12 267:23 268:2
**leakage** 102:2
**leaks** 103:23,23 104:2 114:13 235:25
**leap** 65:5
**learn** 185:5
**learned** 16:23
**learning** 221:23 230:2 263:8
**leave** 86:22 87:13 109:21 182:17 200:17 228:23,25 240:14 302:23
**left** 67:2 129:8 175:24
**legacy** 294:2
**legal** 9:1,21 14:11 20:7 28:23 32:14 119:11,12 122:23 164:24 213:8,21,23 252:16,24 331:25 349:9 365:13,22 393:7
**legitimate** 162:19 274:19
**legitimately** 359:6
**length** 29:15
**lengthy** 164:23
**lesser** 158:10 323:23,23
**letter** 10:1
**letters** 12:8
**letting** 160:9 377:18
**level** 20:13 21:22 50:21 78:4 86:10 96:19,22 97:20 97:22 98:8 108:22 201:22 209:2 227:16 229:13,14 257:25 275:19 340:23 375:5
**leveraged** 218:18
**leveraging** 192:24
**librarian** 230:6
**license** 162:1 180:6,7,12,19 187:6
**life** 121:12 317:7 342:17
**lifecycle** 122:1 122:3
**lift** 171:12
**light** 23:1,10 183:13
**liked** 62:23
**likely** 163:11 220:24 223:1
**likewise** 355:5
**limitations** 287:1
**limited** 83:13 131:12 143:9 244:4,6 270:11
**limits** 17:4 25:19 32:6 65:12 94:3 119:16 202:25
**line** 6:18 173:23 174:23 174:24 351:11 373:14,14 382:16 390:2,6 392:4 393:15 394:4 395:4,7 395:10,13,16 395:19
**lined** 373:9
**lines** 105:10 189:12 373:13
**link** 25:15 44:10 100:17 100:17 102:13 109:7 112:12 115:24 136:12 137:1,24 138:4 161:22 213:19 249:16 250:12 347:21
**linkage** 102:18 173:18
**linkages** 134:8
**linked** 94:10,10 94:17,17,23,24 94:25 95:1,2,5 95:11 98:24 99:5,13,17 102:20 136:25 137:5,20 138:9 161:4,7,10 180:4 181:11 241:4
**linking** 112:12 136:3,5,15,19 296:12

**links** 99:19 100:16 134:10 137:23 173:12 179:5 335:8
**list** 26:23 32:18 35:11,15 85:17 148:23,23 247:2 312:2 321:2 357:15 359:13 368:20
**listed** 7:10 46:25 363:4 369:9 374:10
**listing** 68:4
**lists** 7:23 327:18,19 368:24
**literally** 256:9 347:21
**litigating** 86:23
**litigation** 4:15 86:16 154:12 271:20,23 325:6 376:15 377:3
**little** 6:16,21 15:9 20:5 61:23 63:11 70:7,8,9 72:10 101:12 103:9 118:12 142:2 154:16 187:23 204:22 207:7 239:8 244:18 251:25 261:15 267:23 277:17 284:5 305:15 310:9 311:5 319:2 326:20 364:1 372:25
**live** 52:20 313:5 319:23
**llc** 1:13 3:12 392:1 393:4 395:1
**llp** 1:21 2:2,7 2:13 3:16
**load** 197:1
**located** 3:16 100:23 343:25
**location** 74:12 135:4 204:24 232:15 243:13
**locations** 40:6
**locked** 393:12 394:1
**locking** 200:6
**lodge** 84:25 228:16
**log** 37:19,20,21 37:23 38:13,24 45:5 46:6 48:21 69:19,20 69:22 70:18 79:23 80:13 87:7 135:17 141:15,16 144:2,2,20,21 146:18,19 158:19,23 160:5 163:13 174:24,25 175:12,15,16 175:18 241:16 244:1,1 256:20 275:17,25 276:2 329:23 330:15 332:3,4 332:8,15,17,25 333:8,11,16 337:24 338:22 369:12,24 370:24,25 372:20 375:8,8 375:12,14,16 375:17 376:11 376:14,18 377:3
**logged** 101:14 125:14 170:20 173:13 375:19 376:24
**logging** 120:20 122:18
**logic** 23:12 153:22
**logical** 136:6 258:4
**logically** 40:10
**logs** 101:17 131:1,4,13,19 131:25,25 132:5,7,14 134:6 139:15 139:15 144:11 147:14,16,24 147:25 148:1,2 174:15,16,21 174:22 181:10 214:3,8,9,19,20 215:12 216:14 216:23 217:6 218:10,12 232:10 234:15 237:5,14,16 241:18,21,24 242:1 243:7 246:19 247:23 248:8,8 262:6 277:1 325:13 325:15,18,18 326:3 327:9,13 327:16,20,20 329:16,23 330:9,11,13,18 330:21 331:4 331:15 332:5 332:16,21 333:14,19,22 334:15,20,24 335:7,16 337:3 337:7,15,17,23 338:3 344:24 344:24 365:9,9 368:7,16,21,24 368:25 369:3,6 369:7,13,23,24 370:2,11,12,14 370:17,19,21 375:7 382:1

**long** 29:12,15 29:20 135:9 185:14 199:1 251:8,9 256:23 300:25 305:6,7 319:4 327:12 331:17 372:2
**longer** 198:18 198:19 318:25 331:21
**longitudinally** 110:13
**look** 19:3 25:6 33:8 35:16 38:9 41:11,13 44:22 46:17 62:12,20 68:6 68:17 81:2 82:21 94:8 96:9 97:13,17 97:25 98:1 104:22 127:13 130:23 132:16 134:3,5 135:1 135:7 140:3 144:7 147:4,6 147:6,8,9 148:18 151:3 152:23 153:3,9 156:21 165:16 165:19,20 173:6,9 190:4 192:19 193:4 200:10 201:15 201:16 207:7 207:10 210:20 219:25 227:10 230:22 236:24 237:23,24 238:18 240:11 240:24 241:14 242:25 243:15 245:6 246:7,22 247:3 248:15 249:3 253:2,12 253:19 254:13 256:25 260:5 275:13 276:9 276:12 278:18 279:9 280:16 283:13 289:6 292:3,12,22 294:25 295:13 295:19 296:25 297:22 307:17 317:10 318:2 327:3,3,5,11 328:25 332:6 338:13 339:19 356:24 357:23 358:4,4 360:3 360:4 361:1,19 362:18 366:25 371:12 374:6 376:11 381:5 386:6
**looked** 22:7 24:21,23 42:18 42:22 43:3 48:9,11 49:14 57:8 58:18 83:3 143:6 166:17 186:7 190:5 222:8 247:11 281:7 283:17 317:3 322:21 339:22 340:11
**looking** 5:14 11:23 12:4 24:17,19 43:16 59:8 73:22,23 91:18 92:7 137:23 144:8 153:11 159:17 199:16 209:19 210:5 229:5 230:17 244:11 254:1,3 256:2 299:10 311:3 320:21 329:14 340:13 354:5 359:23 360:15 368:15 372:21 385:2
**looks** 20:23 22:15 24:24 69:18 72:7 80:15 278:22 326:16
**loose** 246:17
**los** 2:3
**lose** 298:20
**lost** 172:20 287:20
**lot** 6:20 38:19 48:25 49:25 50:1 51:10 63:22 64:4 69:18 91:11 95:20 127:12 147:20 175:19 187:16 206:2 209:22 229:6 229:22 230:24 251:7 261:15 273:22 315:15 342:4 344:25 381:15
**lots** 62:10 86:2 100:23 101:7 300:7 343:2,2
**love** 217:7
**lower** 188:6,10
**lunch** 128:3 257:10
**luncheon** 128:6
**lying** 206:2,4

**m**

**m** 4:2 129:3
**machine** 221:23 230:2 258:16 263:8
**made** 6:20 11:16 15:14 24:16 29:5 43:7 44:5 60:22 82:2,20 82:25 85:10 91:6 101:13

**[made - mao]**

124:6 155:22 158:2 159:11 159:14 167:6 175:4 196:7 200:12 210:10 215:3 224:15 266:21,24 285:24 307:14 325:9 341:21 378:24,25 381:10

**magically** 356:13

**magnitude** 6:1 251:11

**mail** 69:5 101:14 106:8 159:13 160:1 160:16,17,23 161:25 162:6 163:1,4,5,10,21 164:5,17 165:10 167:7 174:17 233:9 234:4 255:22 256:5 320:23 387:8

**mails** 288:18

**main** 17:13 18:25 19:7 341:15 366:25

**maintain** 112:13 206:23

**maintained** 283:11,21

**major** 12:7 32:2,18

**majority** 331:4

**make** 6:25 21:4 21:17 28:9 29:18 39:7 41:20 65:4 74:9 83:6 90:6 115:4,8 129:10 134:19 146:14 151:25 154:19 168:17 173:25 176:12,13 177:3,22 191:23 197:13 212:24 214:1 214:25 215:2 242:1 250:22 262:21 267:18 274:24 279:15 288:2,17 297:11 300:16 301:22 306:13 308:4,4 318:5 344:18 346:7 372:12 377:7,8 378:8 393:14 394:3

**makes** 51:23 79:6 99:10 188:5 297:12 321:2 351:2,10

**making** 151:20 191:14 200:14 211:15 223:11 226:23 241:5 256:7 277:14 287:8

**manager** 288:15

**mandatory** 294:21 296:20

**manual** 297:4

**mao** 2:4 8:24 33:4 43:12 50:22 64:16 67:6 68:22 72:3,18 73:16 75:15 77:9 78:5 79:11 84:24 85:7,24 86:3 87:15 93:4,16 94:5 94:14 95:13 98:21 100:6,7 100:8,12,22 106:21 107:3 107:14 117:1,5 117:8,23 119:6 123:14 125:23 140:18 143:16 143:21 144:4 145:18 146:5 146:12 149:3,9 152:25 156:24 160:8,12 164:6 164:9 169:4,19 169:25 172:2 176:5,18 189:20 197:17 213:16 214:25 215:8 224:23 227:20 228:16 231:7 236:15 240:22 246:8 246:13 248:1 254:25 255:25 257:2,9 263:14 263:18 264:1,8 264:20 267:16 268:14,19 269:1,6,11,17 269:24 270:3,8 270:17 272:24 274:14 276:15 276:19 284:2 285:2,15 287:21 288:3 290:13 295:2 298:11 305:25 306:6,9 312:21 313:19 314:6 314:10 317:15 327:1 328:21 333:3 337:18 338:23 340:3 344:16 346:6 353:24 354:4,8 355:22 356:16 356:23 360:12 360:20 361:24 366:12 367:15 369:4,10,17 371:19 373:17 374:24 377:11

**[mao - mean]**

377:15,24
378:4,6 383:17
384:18 385:6
385:10,13,19
385:24 386:8
386:13,25
387:9,17,21,25
389:4
**map** 378:10
**mapping**
133:25 134:19
136:20 180:14
283:10,20,25
284:9,25 285:5
376:5
**mappings**
134:4,4
**marginal** 318:6
**mark** 2:4 8:24
67:1 71:20
72:1,16 100:6
100:7,8,12,22
212:11 360:2
**marked** 11:20
67:16 71:21
212:12 362:13
362:14 388:2
**market** 127:1
271:17,25
272:20,22
273:7 298:21
300:13,13
303:19 316:22
342:4

**marketed**
154:5
**marketing**
17:18 56:1,3,3
56:8 58:7
126:7 205:1
298:9 301:22
340:13 341:18
**marketplace**
307:8
**marks** 81:13
**marriage**
391:12
**mass** 333:22
**match** 139:18
140:1 141:14
141:22 142:7
142:11,13
143:4 144:19
145:7 175:12
175:15 177:11
177:23 181:20
195:15 244:21
246:3,4 247:13
248:3,3,7
364:8
**matched**
139:22 174:24
347:20
**matches** 175:19
175:21 195:16
386:19
**matching** 245:7
245:13,23,25
250:15 348:20

375:6
**material** 320:4
320:5,6,9,12
**materially**
343:19 344:2
**materials** 90:22
91:5
**math** 234:12,15
234:21 255:3
**matter** 3:11
103:22,25
124:2 391:13
**matters** 196:23
**mcgee** 2:10
**mean** 8:17
10:13 18:7
19:1 23:3,11
24:9 25:4,25
34:25 37:18
38:17 45:3,5,5
46:16 47:1
48:20 54:14
58:4,17,20
65:17 70:10,15
71:2,3,4 83:1
85:12,22 87:22
90:1,19 91:18
93:19 96:6
97:16,24
106:16 118:3
125:9 126:1,15
130:16 134:22
135:5 136:18
139:20,23
140:3 141:20

147:1,3,18
153:21 154:17
156:14 167:6
172:6 175:8
177:19 180:16
182:12,15
183:2 185:2,11
187:9 188:25
189:2 192:13
193:3 195:8,17
195:23 197:3
197:21 201:15
208:17 213:18
214:19 219:20
221:4 223:8
224:22 226:16
227:25 228:1
228:23 231:10
235:3 239:18
244:14 250:20
252:12 253:16
254:12 255:5
259:11 261:10
261:17,19
263:3 266:7
269:6 271:9
272:14 273:21
278:13 279:21
280:1,2 282:4
282:14 284:16
286:10 289:4
292:13 297:13
298:8 299:1
302:15 303:17
305:9,17

**[mean - methodology]**

309:11,18,22
310:4,8,9
313:4 315:4
316:25 320:24
322:18,19
323:7 326:14
326:23 327:15
327:21 330:18
332:22 333:25
339:14,21,24
340:19,22
341:3 342:15
349:1,20,23
350:1 365:2
373:11 374:4,7
380:18 385:10
387:10
**meaning** 78:2
224:16 227:22
**meaningful**
256:15
**means** 25:6
29:20 36:20
39:17,18 41:19
42:17 43:24
52:19 77:6,6
82:8 90:2,5,12
90:13 92:19
102:22,23
131:3,16 136:4
136:5 153:23
175:15 223:9
227:17 279:13
316:1

**meant** 24:5
35:10 38:13
44:15 48:19
49:12 152:18
183:6 239:20
239:22 254:22
282:5 308:8
337:22
**measure** 168:8
252:6 289:12
289:14 291:3,5
291:11 292:10
299:20 300:9
302:13 304:8,8
367:13
**measurement**
293:22 294:17
304:19,21
330:15 332:3
333:1,8 367:9
367:10 376:11
376:14
**measurements**
221:13 380:12
**measures** 35:12
168:9 224:9
**measuring**
248:22 355:11
**mechanics**
170:1
**mechanism**
117:13 208:9
**media** 3:9
205:10

**mediated** 16:10
**medical** 95:20
115:14
**medicine**
111:17 114:19
**member** 205:10
268:12 271:1
272:2,3,4,21
275:8,8 324:13
327:10 332:18
333:10 334:2
365:20
**member's**
271:6,8
**members** 81:12
252:7,11,15
324:2,10 326:5
327:14 328:8
328:16 334:12
335:3,24
336:16,18
353:6 368:17
370:8
**membership**
329:17 331:18
**memorize**
294:24 295:22
**memorized**
241:12
**memory** 58:24
130:18 142:10
173:10 197:14
241:10 243:24
246:25 254:15
257:1 280:17

283:14 337:19
360:22 374:7
374:20
**mental** 59:7
**mention** 38:17
169:15,15
318:12 327:17
330:21 357:21
363:19 368:18
**mentioned**
27:24 38:18
94:20 122:8
132:21 172:6
233:7 248:13
254:5 286:4,6
**mentioning**
227:9 280:8
**mentions** 45:22
330:9
**merchants**
121:1
**message** 322:9
**messages** 322:8
322:11,13
**messaging**
322:1,3,7,24
323:5,17,19,23
**meta** 384:24
385:1
**method** 144:18
207:11,14
**methodology**
13:4 127:5,20
235:18 253:9
254:7 271:2

**[methods - month]**

**methods** 145:3 304:13 324:7 328:8 352:1 355:10
**microphones** 3:5
**microscopic** 330:12 333:19
**microsoft** 373:5
**migration** 150:4 302:25
**million** 131:11 205:20 244:15 330:20 332:23 334:19 337:10
**millions** 382:20 382:24
**mind** 26:24 30:5 41:22 43:15 46:2,4 57:14,18,19,20 60:18 71:1,4 75:20 83:10 86:23 93:19 108:1 110:12 117:20 119:4 122:2 123:10 133:15 147:25 177:18 190:21 194:18 196:5 199:20,25 202:17 210:9 217:24 230:2 234:23 237:21 238:1 246:17 247:8 254:5,16 254:18 319:7 335:21 339:24 363:6,22
**minded** 49:14
**mindful** 70:20
**mine** 5:9 68:12 84:10 360:19
**minimally** 138:19
**minimum** 142:12 232:18 232:19 296:13
**minimus** 320:12
**minor** 320:16 323:20
**minuscule** 343:22
**minute** 36:6 281:12 363:8 375:1 377:12 377:16
**minutes** 24:1 29:20,22 107:4 160:10 199:12 306:5,7,15 310:21 371:10 373:20 377:9
**miraglia's** 241:2
**mischaracteri...** 87:16 125:24 144:5 156:25
**misinterpreted** 14:23
**misleading** 122:4,6,13
**misled** 19:23
**misrepresents** 213:17
**missing** 304:14 308:21 345:8 345:19
**misstates** 94:6 267:16 367:16 374:24 381:2 384:18
**mistake** 101:13
**mistakes** 15:14 15:15,17 168:17 250:22
**misunderstood** 339:4
**misused** 284:25
**mixed** 290:20
**mmao** 2:5
**mobile** 56:3 138:20 152:10 154:8 202:20 289:22,23 350:11,12 366:2,3 372:7 372:7
**mod** 246:10
**mode** 199:22 199:24 200:13 200:16,21 201:1
**model** 59:7 223:22 224:3,8 382:8
**module** 107:2 123:15,19,22
**moment** 68:6 103:2 105:13 108:12,13 135:10 138:13 143:14 150:15 152:8 177:1 183:18 189:16 190:22 191:23 210:22 237:1 257:12 260:13 278:7 280:19 283:5 306:19 330:2 333:2 362:19
**monday** 3:3
**monetized** 323:16
**monetizing** 262:24
**money** 113:12 205:21 219:13 262:12 274:23 275:1 282:4 297:15 299:18 300:7,11 319:23
**month** 293:4 300:25 301:15 319:13,14

**months** 303:2
**morgan** 2:7,7
**morning** 3:1 4:7
**mortgage** 83:19 383:6,12
**motion** 325:10 358:14
**motions** 327:19 328:7
**mouse** 287:5
**mouth** 284:5
**move** 97:9 147:11 299:22 299:22
**moved** 97:5 206:8
**moves** 287:8 317:11
**moving** 148:7 340:10
**mrc** 205:22,23 205:25
**muffled** 72:10
**multiparty** 118:2
**multiple** 100:8 182:8,8,20,25 183:7 369:5 382:8

**n**

**n** 1:1,1 2:1 4:2 4:2,2 129:1,1,1 129:3,3,3 389:1
**nac** 190:14,20
**nagged** 373:5
**name** 3:18 69:5 100:5,6 106:8 112:18 159:2 164:5,17 180:13 201:25 202:8,13 236:4 238:16 316:3,9 349:18,21 368:24 392:2,3
**named** 100:8 365:21 386:3 386:21 387:8
**names** 7:24 112:20 131:12 162:6 163:21 228:4,8,9,14,14 231:5 296:1 368:21
**narrow** 187:17 203:5 370:22
**national** 112:4 113:3 114:5 115:16
**native** 11:7 346:1
**natural** 88:25 89:6,10,14,16 89:22 92:2 253:20,21
**nature** 110:11 275:7 338:1 339:21
**near** 325:5
**nearly** 101:21
**necessarily** 8:1 14:6,9 18:10 28:8,9 30:5 43:7,18 48:25 59:13 70:3 136:1 138:4 139:23 193:9 197:24 215:23 219:23 246:22 299:23 309:4 316:3 324:25 337:5 349:19
**necessary** 57:22 102:14 378:22 393:14 394:3
**need** 14:1 52:7 59:10,10,11 66:10 70:25 82:21 100:11 106:23 107:3 112:11 115:4 125:15 126:16 126:22 132:20 138:4,5 148:10 152:2 171:15 173:14 196:3 216:5 222:5 223:19,21 246:13 260:7 280:22 287:23 289:22 290:4 306:6 309:4 319:6,6 320:18 320:19 321:5 326:13 331:9 331:10 336:9 340:24 342:1 357:25 360:7,8 373:2 374:19 377:6
**needed** 109:1 155:14 317:7 325:7 346:15
**needing** 137:22
**needs** 23:20 205:8 320:21 321:21 366:21
**negatives** 258:2 258:9,23 259:3 259:19
**neither** 53:2 154:4 386:19
**network** 204:11 206:23 289:18 290:12 291:12 300:22 315:23 316:12 351:23 367:8
**networks** 287:7 287:9
**neutral** 13:12 15:20
**never** 37:15 119:4 174:12 199:15 237:20 240:2 247:8 303:6 309:25

315:6 331:11
**nevertheless** 53:3 211:5 212:3 254:2
**new** 1:21,22,24 3:17,17 66:11 67:21 102:25 104:16 117:19 119:22 121:22 121:23,23,25 154:5 233:14 391:4 392:1
**newspaper** 233:12
**newspapers** 206:4
**nice** 231:21 365:4 366:15
**nicely** 291:25
**nine** 373:20
**nitty** 130:19
**nomenclature** 386:20
**non** 11:7 54:4,9 54:24 76:12,13 76:23,24 80:11 130:25 131:4 131:18 132:1,7 132:13 137:20 139:15 141:16 144:10,21 146:18 148:1 174:15,21,25 192:2,4 208:12 208:12 237:5 237:14 241:18 241:20,24 242:1 247:22 248:8 257:22 294:1,5 337:3 337:15,23 338:22 365:9 369:7,11,14 370:25 374:15 375:8
**noncompliance** 162:16,19 164:4,16 166:25 168:20 168:21
**noncompliant** 164:25 165:2
**noncontrover...** 126:16,21
**nondisplay** 351:22
**nonhistorical** 193:2
**nonlinear** 238:2
**nonpermanent** 344:24
**nonpersonal** 91:9 93:3,15
**nonpublic** 48:12 49:8 52:11
**nontechnical** 31:9 78:18
**noor** 71:25
**noorjahan** 2:16
**north** 2:7
**northern** 1:4 3:14
**notary** 1:23 388:14 391:3 392:23
**notating** 393:15 394:4
**note** 3:4 58:22 151:17 163:13 216:12 232:9 295:2 296:19
**noted** 3:22 150:20 155:21 167:13 187:11 296:10 388:8
**notice** 1:20 302:22 303:21 315:10
**noticed** 135:19 135:20 374:9
**notification** 322:2
**notifications** 322:4
**noting** 22:12 145:25 314:3
**notion** 76:16
**notions** 50:18
**nrahman** 2:17
**number** 20:21 26:25 29:3 75:21 112:15 115:16 119:18 161:25 162:1 163:10 180:24 212:11 238:18 239:14 256:12 256:14,14 261:9,11,20 265:11,16 276:5 289:2 291:23 295:14 313:22 333:19 333:22 344:18 345:18 347:4 349:11 350:4 359:6 379:4 393:15 394:4
**numbered** 75:19 156:23
**numbers** 6:19 6:19 254:22 267:19 273:19

**o**

**o** 1:1 4:2,2 129:1,1,1,3,3 202:5
**object** 152:25
**objection** 33:4 43:12 50:22 68:22 73:16 75:15 78:5 79:11 84:25 85:6,11 87:15 93:4,16 94:5 94:14 95:13 98:21 117:23

**[objection - okay]**

119:6 125:23 143:18,21 144:4 146:1 149:4,10 156:25 164:7,9 169:5 172:2 176:9 197:17 213:16 224:23 227:20 228:17 228:25 231:7 236:15 240:22 254:25 255:25 263:14 267:16 268:20 272:24 274:14 285:2 285:15 290:13 298:11 333:3 337:18 340:3 349:25 356:16 366:12 367:15 374:24 381:1 384:18 386:14
**objective** 238:3
**obligated** 15:24
**obligation** 15:20
**obligations** 208:1
**observation** 167:7 207:21
**observe** 21:25 137:7,8,9,10 162:8,9 220:23 222:1
**observed** 74:17 130:25 159:16 159:20,23 162:20 177:24 216:22 323:9
**obtained** 251:1
**obvious** 59:23 232:8
**obviously** 34:4 153:24 197:10 198:14 338:7
**occam's** 89:11
**occasions** 30:21
**occurred** 159:20 184:18 210:12 226:25
**occurring** 218:2 367:10
**occurs** 120:20 138:13
**ocean** 100:20
**october** 293:4 293:15
**odds** 196:6
**offer** 125:6 255:7 326:2
**offered** 291:7
**offering** 17:6 19:21 28:15,18 28:24 252:22
**office** 393:11
**officer** 100:1
**offices** 1:20
**oh** 7:3 13:25 41:18 47:24 48:21,22 54:17 108:8 117:8 159:16 204:13 215:22 233:18 368:15 369:15 381:8 385:8,17
**okay** 4:14 5:12 7:12 8:3,10,19 8:22 9:5 10:15 11:15 12:4 14:2,13 15:6 15:10 17:3 19:1,21 22:5 23:9 25:17 26:22 28:13 29:24 32:11,15 35:9,19,23 36:12,15,17,18 36:25 38:15 40:2,10 42:8 46:2,20 47:8 48:7 49:17 50:10 52:4,7,9 53:23 54:3 55:2,9,20 58:4 59:8 60:6 61:25 64:5 66:12,25 67:10 68:15 69:14 71:20 72:14,21 73:10 75:14,18 76:12,23 80:2 80:16 81:9 82:7 83:6,16 84:5,11 85:14 85:20 86:11 87:1,8 89:20 90:3 93:11 94:1 98:13 99:16 100:21 100:24 102:9 102:24 104:15 105:4 106:1,20 106:20 108:11 110:21 114:4 118:25 120:4,8 123:3 125:15 126:6,24 127:17 128:1 129:14 130:23 131:17 132:2 133:2 135:2,22 136:7,9,14 137:16 139:22 142:5 143:2,15 143:23 145:17 146:2,9,17,24 147:24 148:7 148:19,22 149:18 150:14 151:11,21 152:7 153:11 154:17,20 157:2,9,20,25 158:11 159:11 160:7,15,21 161:12 162:4 164:2,19 165:12,19,21 166:3,12

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[okay - open]**

167:25 168:23 169:3 170:9 171:19 172:15 172:19 173:14 174:19 175:7 176:4,15 177:4 178:24 179:6 180:23 181:1,4 182:1,14 183:6 183:16,17 185:8,16,24 186:8,15 187:25 189:5 189:14 190:3,8 190:23 194:17 198:11,15 199:13,17 200:17 202:22 203:7,17 204:3 204:13 205:15 206:11 208:6 210:20 211:13 211:22,25 212:7,18 213:10,24 214:5 215:17 215:24 216:24 217:12,23 218:5,17 220:4 220:10 222:20 223:16 224:2 224:13 226:20 227:4 228:10 229:1 230:11 232:9,21,25 233:7 234:11 234:22 236:24 237:18 238:5 239:4,21 240:3 240:24 241:14 242:20 243:19 244:21,23 245:14 246:6 246:15 248:15 250:6 251:16 252:11 254:2 255:17 256:5 256:17 257:8 257:18 258:14 259:7,22 260:1 260:12 263:17 264:15 265:8 266:7 268:19 269:2 271:4 272:16 274:18 275:13 276:6 277:14 278:13 279:5,12 281:15,18 282:2,10,17 283:17,23 285:4,20 287:19 288:3,9 288:23 289:1 289:11 290:21 295:1,21 296:9 296:10 297:3 297:16,25 298:14 299:9 304:18 310:8 310:20 311:20 312:10 313:10 313:13 314:4,6 315:3,14 316:17,20,22 317:5 319:17 320:3,18 321:25 323:15 324:6 326:1 327:12 328:10 329:7,14 330:1 330:8 331:5 332:9,17 336:12 337:14 338:19,20 340:22 342:22 343:17,24 344:4 346:19 346:24 347:3 347:12 348:1 350:21 351:3 355:20 357:19 358:1 360:1 361:21 362:23 362:24 363:7 365:6 366:1 367:5,22 369:19 370:7 371:13,20 372:13,17,18 373:5,12,16 374:21 375:2 378:23 379:7 379:12,21 380:10,11,14 380:22 381:3 381:11,18 382:12,15,18 386:23

**older** 334:1

**once** 59:3 63:24 170:20 286:6 286:14 346:20 356:3 374:2

**ones** 7:9 46:24 47:1 66:11 68:8,12 147:17 149:21 156:20 257:5 260:21 323:22 333:2 337:9 345:24 356:22,24 369:1,8 374:8 386:2

**ongoing** 287:5 287:11

**online** 17:20 18:4,6 56:1,3,8 79:3 206:8 274:21

**oooap** 202:3

**oops** 135:2

**open** 15:14 49:14 67:25 96:15 184:9,9 184:13 185:1 186:11 218:7 218:11,14 219:2 289:1 342:5 373:2,3

**[opened - ordered]**

**opened** 102:21 141:7
**operate** 239:12 347:10
**operating** 243:25
**operation** 229:13
**operational** 71:5 87:6
**operator** 96:9 96:14,17 98:10 98:16 109:13 121:9 214:11 214:12
**operators** 121:2
**opine** 43:14 119:17 120:4 203:7 211:10 242:7 252:17 252:20 257:12 257:21 265:9 270:13 289:7 323:15,25 331:10 336:16
**opined** 17:10 111:12 122:24 125:8 186:22 228:2 229:2 232:2 270:12 271:16 273:6
**opining** 14:12 17:14 20:8 26:9 32:6,8,9 32:11 41:23 89:16 105:18 105:20 154:20 163:19,24 164:2,14 166:23 177:18 211:25 212:2 242:9 245:15 252:25 262:5 262:15 264:15 277:3 284:24 285:12 336:22 364:15 383:21 384:6,8,9
**opinion** 17:6 19:22 20:7 25:19 26:16 28:6,15,19,23 28:25 31:18,24 32:3,6,16,22 44:13 57:10 59:13 64:25 65:6 74:21 83:25 84:5 87:9 89:20,23 104:13,17 105:24 106:10 107:19,20 110:23 119:16 122:6 124:14 125:13 126:22 129:9 143:25 145:10 148:13 157:17 164:24 167:2 168:1 170:10,22 172:16,18 177:10 182:13 182:19,24 191:17 211:16 213:5,10,12,22 213:23 224:14 231:4 252:22 252:25 255:7 256:11 258:25 266:22,23 271:10 273:1 273:25 279:6 281:17 286:16 286:25 287:13 320:1 334:4 335:4,9 336:11 338:11 339:23 340:17 342:10 365:19,25 383:20
**opinions** 12:7,9 12:10,11,14,19 13:7,14 17:4 18:25 19:6,7 19:12 27:7,13 27:13,14 31:25 34:14 49:11,16 53:11 58:2 66:9 83:9 107:8 123:8 129:13 167:10 168:5 231:2 269:18,20 270:2,9 287:18 326:2 363:23
**opportunities** 83:23
**opportunity** 217:9
**opposed** 123:12 170:2 192:4 226:24 293:7 371:24
**opposing** 77:13
**opt** 202:3
**opted** 322:18
**optimal** 301:24
**optimization** 62:22
**option** 178:9 223:3 272:17
**optional** 151:1
**options** 220:25
**order** 6:1 18:15 104:15 110:24 122:21 125:12 152:9 205:1,7 205:9,18 208:4 208:21 209:1 216:6 220:14 221:3 223:17 245:12 250:4 262:20 296:14 302:19 322:13 346:15 347:20 362:1 376:15 381:8
**ordered** 250:17

**orderly** 302:25
**ordinary** 58:14 130:10
**organic** 62:20
**organized** 254:17
**orientation** 229:8
**oriented** 6:13
**original** 22:6 207:20 393:10 393:21
**orwellian** 92:17
**ought** 208:3 322:21
**outcome** 391:13
**outline** 123:21 367:1
**outlined** 191:18 236:10
**outputs** 137:14
**outside** 169:17 224:5 227:3 255:16 268:21 269:19 270:9 272:25 312:24
**overcharge** 162:2
**overlap** 20:6 278:6 376:3
**overlapping** 207:25 347:19
**overly** 211:23 360:7
**overnight** 302:18
**overreading** 118:11
**overrides** 172:1
**own** 20:19 33:3 118:22 173:10 188:23 201:5 213:3 254:18 266:19 340:13 347:16 363:19
**owner** 187:20

**p**

**p** 2:1,1
**p.m.** 128:5,6 129:2,5 173:1 173:4 176:20 176:23 189:23 190:1 233:2,5 251:19,22 280:25 281:3 317:22,25 329:2,5 344:10 344:13 362:5,8 388:4,8
**package** 123:25 298:16,17 342:7
**packages** 384:21,24
**page** 6:19 11:10 34:16 41:6 44:18 46:7 67:7 85:21 105:1 107:17 151:13 170:14 201:16 204:10,17 210:10 214:2 228:4,8,14 324:5 328:23 328:24 369:22 370:6 389:2,6 390:2,6 392:4 393:15 394:4 395:4,7,10,13 395:16,19
**pages** 18:13 22:13 42:19,25 43:10,23 44:5 44:20 49:10 204:6 229:23 230:4 280:20 326:17 327:11 368:23 370:12 393:14,17,17 394:3,6,6
**paid** 351:18,25
**pair** 49:6 373:13
**pairs** 373:9
**pan** 143:9
**paper** 11:5 346:4 355:23
**papers** 245:24
**paragraph** 13:1 34:13 36:3,10 81:2,9 107:21 130:24 144:8 148:7 151:10,15 152:9 153:3,12 154:3 157:13 170:21 177:6,9 189:12 190:6 210:21,25 236:24 237:11 237:25 238:6 240:19 247:6 248:16,20,24 257:16 259:3 275:14 276:18 276:20 277:1 288:8 292:22 295:20 299:10 310:18 313:3 318:3,5,9 329:22 330:8 332:4 366:25 368:18,20 371:15
**paragraphs** 11:11,23 20:21 109:16 170:18 189:11 281:6 329:12 330:5 338:15 368:19 371:7
**parameter** 159:13 227:7 227:18
**parameters** 159:2,5,7 228:8,13

**[paranoid - percent]**

**paranoid** 315:16
**parentheses** 75:8,11 153:17
**part** 14:10 15:11 42:3 49:20 80:24 94:1,3 107:24 116:11 143:25 148:12 149:1 155:22 158:13 158:18 169:20 170:1 181:15 210:4 213:14 215:1 242:22 252:5 263:18 275:15 287:17 306:7 323:9 334:14 343:22 346:8 349:17 354:6 358:22 360:21 362:11 383:25
**partial** 148:23
**particles** 137:2
**particular** 26:21 28:16,20 36:13 52:19 105:21 106:11 133:9,14 223:18 239:25 240:1 253:8 260:15 265:12 267:6,7,14 268:12 270:25 326:3 329:23 365:20
**particularly** 183:10 253:14 316:23
**parties** 162:20 302:22 314:12 316:14 391:11
**parts** 11:7,7 222:8,11,12 345:8 346:13
**party** 13:8 92:21 124:13 124:23 138:8 169:13 255:9 255:12 352:21 354:14 355:4 368:2 380:5
**passing** 122:9 172:6 344:14
**password** 69:5
**past** 61:16 79:18,25 203:9 203:14 221:1 295:14 297:19 303:17 304:22 324:24 352:1
**patch** 155:18 155:20 156:5
**patched** 155:16
**patent** 10:24 196:23
**patents** 196:22
**pathway** 103:9 103:11
**patients** 111:22 115:13
**pattern** 279:8 279:19 282:7
**paul** 2:21 3:18
**pause** 12:17 66:16
**pay** 6:24 10:10 29:1 31:19 50:1 83:19 113:11 272:7 272:13,21 295:9 297:6,7 297:15 319:12 319:13,16 351:15,16 352:11,17,23 354:16 355:1 383:5
**paying** 223:12 223:13 272:9 352:2,2,3 354:24 366:23 383:7
**payload** 331:2
**pdf** 71:24 72:10 72:13 393:12 394:1
**peeping** 199:8 199:10,18
**pen** 75:20
**penalty** 393:16 394:5
**penny** 383:8,10
**people** 7:7,8,24 13:18 14:4 17:23 18:8 20:18 24:14,22 26:14 60:11,21 62:19,22 95:7 95:9 96:12 99:22,22 100:8 109:21 114:8 114:19 115:8 115:24 120:1 162:6 172:21 178:9 179:12 197:3 204:14 208:23,24 209:5,5 218:25 232:20 235:23 245:16,19,20 253:25 265:25 266:7,20 274:21 288:17 291:23 294:7 300:18 302:23 304:23 305:12 305:19,22 317:8 334:5 335:13 341:17 342:14,24,25 353:15 366:18 383:7
**people's** 21:5
**perceive** 69:14
**percent** 109:24 109:25 153:19 153:23 154:13

155:3,24 156:1 192:18 293:5 293:13,15,19 293:25 299:12 308:17,19 320:14,15 343:20 357:21
**percentage** 246:4 293:13
**perceptions** 172:5
**perfect** 16:8 168:14,15 238:3
**perfectly** 39:2 174:22 242:6 308:6
**perform** 137:19 218:20 234:7 242:10,24 244:13 283:11 283:21 374:1 374:14,23 375:5 386:1
**performance** 138:22 352:14 355:11
**performed** 137:19 243:20 280:4 338:21 357:2
**performing** 242:7
**performs** 277:19
**perfusion** 101:21
**period** 85:24 133:10 170:23 300:14 311:17 319:1 326:6 332:7 333:12 333:16 334:15 393:18 394:7
**periodically** 251:4,7
**periods** 344:23
**perjury** 393:17 394:6
**permanent** 344:24 368:25 369:9,11,13,13 369:23
**permanently** 198:19 368:22 370:14,18
**permits** 355:12
**persistence** 183:20
**persistent** 181:5 183:19 183:25 187:6 193:11 208:11 235:20 378:14
**person** 31:9 58:25 93:10 94:11,17,23,24 95:3,5,12 98:25 99:1,14 99:18,19 101:16 102:1 102:12,13,14 104:3 109:7 114:24 116:5,7 118:24 141:17 161:23 181:7 184:22,25 209:15 213:20 229:16 230:14 231:22,24 236:3,8 267:21 267:22 268:5 289:5 350:25 381:8,9 382:9
**person's** 99:12 138:10 140:13 227:18 229:7 231:25 236:4 344:3
**personal** 4:25 37:20 51:20 69:4,21 71:8 74:4,6,13 76:17 80:18,19 80:21 82:14 88:16 89:4 90:23 91:7 93:2,7,14,23 94:4,9 96:3,9 98:19 102:9,12 109:6 110:15 160:13 161:21 170:2 180:4 181:7 212:25 235:20,23
**personalization** 189:6,9 190:13 190:19,25 191:7,9,15 192:8,22,23 194:3 226:23 227:2 381:16 381:18,23
**personalize** 194:20 203:9 203:15 211:3 212:4 220:8,15
**personalized** 73:5 114:19 190:17 192:2
**personalizing** 195:1,2 226:13
**personally** 8:6 16:15 62:2 97:1 98:16 161:2,14 213:1 213:14 248:17
**perspective** 21:3 56:22,23 60:14 172:12 282:11,13 366:10 367:7,9
**pertaining** 64:14 94:19 98:19
**pertains** 64:22
**pertinent** 22:17
**perusing** 33:12 36:16 80:8 81:5 108:14

**[perusing - point]**

189:19 210:23 237:2 249:2,11 259:10 281:14 283:16 372:3 372:24
**peteysake** 311:7
**phased** 294:3
**phenomenon** 159:23
**philosophical** 150:2
**philosophy** 308:3
**phone** 64:2 99:3,4,7,12 100:14,15,17 100:19 102:21 138:10 161:25 163:10 180:8 181:3 315:5 348:16,17 364:8 386:21
**phones** 3:8 265:19 386:18
**phrase** 36:2,3 39:12,16,20 40:17 41:24,25 42:2 43:22 44:17 45:20,23 46:14 47:18,21 48:18 49:12,21 70:21 71:17 80:4 131:2,3 132:3 192:12 211:13 212:25 276:21
**phrased** 177:6
**phrases** 85:17
**pichai** 20:24 21:19 22:16
**pichai's** 21:9
**pick** 3:5 116:6 121:13 197:3
**picked** 64:1
**piece** 17:22 163:1 230:20 250:8,11 342:16 348:11 364:13
**pieces** 136:4,7 137:25 193:21 203:3 213:6 215:11 250:11 274:1 279:16 361:12 364:10
**pii** 212:7 213:2 213:7
**piqued** 225:25
**pissy** 339:1
**pitch** 113:7,13 126:8
**pixel** 303:15
**pixels** 56:11,15 303:13 343:12
**placated** 61:5
**place** 44:12 67:7 88:1 101:5,7 136:5 136:19 179:22 180:3 181:10 185:10 289:17 344:1
**places** 40:10 103:5 136:11 172:7 184:2 252:1 295:7 375:20
**plaintiff** 1:9 2:4 2:9 8:25 365:21
**plaintiffs** 4:20 7:17,17 8:25 23:23 35:1,6 35:14 52:18 61:12 130:10 174:3 311:24 313:11 325:4 328:3 386:4,21 387:8
**plan** 320:18
**plane** 306:11
**plate** 106:2,3 162:1 180:6,7 180:12,19 187:7
**platform** 38:1 204:8 220:21 292:20 298:18 298:20
**platforms** 292:1 321:11 385:1
**play** 130:12 230:9 274:24
**please** 3:4,7,24 45:8 83:16 87:17 93:5,18 95:16 173:8 176:12 235:4 357:12 367:18
**plenty** 83:22 279:23
**plus** 243:5 347:1
**pocket** 99:8,13
**point** 5:15 38:8 49:5,10 50:4 50:10,17 51:22 52:10,17 53:8 54:15 56:25 57:2,17,20 59:18 61:13 62:24 78:20,22 81:1 102:23 106:21 130:20 142:11 145:18 146:14 148:9 151:15 152:2 167:9 175:1,9 178:11 181:6 192:11 207:20 241:5 242:5 248:14 257:1,2 257:7 276:4 285:4 298:1 317:16 329:11 337:15 338:12 340:14 349:17 358:21 374:2

[point - pretty]

378:23
**pointed** 80:11 310:13 357:10
**pointing** 88:15 106:19 181:18 190:9 191:13 249:15 335:12 345:7
**points** 34:10 42:9 54:18 62:5 63:21 86:13 151:20 213:19 297:20 311:17 325:22
**policies** 68:5 85:20 169:13 242:18
**policy** 42:15 44:19 45:14 66:23 68:19 73:12 74:25 75:7 79:10 112:6 162:15 163:18,20 164:21,21 171:7,23 212:8 212:20 242:13 285:24 333:21 349:6 365:4 389:9
**political** 115:8 115:12,17
**populate** 132:13 144:10 146:18
**population** 261:6 272:7,13 273:12,15,18 273:19 308:19
**portion** 258:20 259:16
**pose** 45:6
**position** 23:22 23:24 86:15,16 116:20 121:6 207:22 264:24 266:2 359:8
**positions** 86:23
**positives** 258:1 258:9,22 259:2 259:17
**possession** 250:4
**possessive** 99:22
**possibilities** 58:20
**possibility** 44:7 46:17 181:23 289:2,5 311:15 365:15
**possible** 45:5 108:7,9,20,25 109:19,20 110:12 115:24 134:9 148:8 158:14 208:4 294:20 304:12 315:7,8,20 375:9
**possibly** 55:19 326:19
**post** 101:11 233:8,13
**potential** 39:3 39:24 76:13 103:9 304:20
**potentially** 110:19 198:20 221:2 273:17
**powered** 37:22
**powers** 124:11
**practice** 245:14
**practices** 32:1 34:15 270:25
**precise** 43:3 73:23 232:15 288:20
**precisely** 43:24
**preconceived** 50:18
**prediction** 223:11 231:22
**predictions** 262:22
**predictive** 222:21 223:17
**preface** 187:11
**prefer** 33:24
**preferably** 337:9
**preliminary** 49:11 360:21
**premarked** 11:25
**premium** 319:13
**prepare** 141:3
**prepared** 273:2
**present** 2:18 127:6,21 170:6
**presentation** 44:4
**presented** 109:12 143:7 146:22 171:5
**presently** 294:3
**preserve** 103:12
**preserving** 112:11 316:18
**press** 317:1
**pressure** 113:8 349:9 364:22 364:23 365:13 365:22
**presumably** 57:16 104:19 114:6 184:19 195:7 249:25 319:1
**presuming** 307:3
**presumption** 105:7
**pretty** 37:16 38:7 42:6,18 49:19 54:15 56:7 65:18 66:12 135:9

**[pretty - processor]**

143:9 146:6 151:4 211:14 245:8 309:2 318:18 319:25 320:15 334:3 361:4,13,20
**prevent** 170:19
**prevents** 77:14
**previous** 346:22 356:5
**previously** 151:20 173:22 348:22 350:3
**price** 272:7
**primarily** 22:10
**primed** 103:16
**principle** 168:12
**prior** 10:9,23 25:17 29:9 49:1 54:12 247:25 338:15 381:2
**pristine** 102:25
**privacy** 19:14 19:17,18,20 24:25 28:20 42:15 44:19 45:14 51:11 59:1 63:3 66:23 68:5,19 73:12 74:24 75:7 79:10 85:20 92:18 101:23 102:5 103:6,8,12,15 103:20 104:4,4 104:9 110:16 112:11,13 113:4 115:1 116:1 121:8 124:6 169:13 171:6,23 178:4 178:7 179:15 181:14 187:2 188:6 197:23 199:5,8 200:2 200:5 201:8,12 201:13 207:24 208:21 212:8 212:20 214:17 229:4 235:17 235:19 265:13 265:22 266:12 266:14 268:2 274:7,8 275:3 287:8 304:23 305:13,14,22 315:9 316:18 341:2,10,12 342:11 389:9
**private** 3:6 25:9 70:6 103:14,17,17 120:17 199:6 199:24 200:21 201:1,7 210:18 266:8
**proactive** 206:25
**probabilistic** 244:20,22 245:13,23,25
**probabilities** 188:13
**probability** 101:20
**probably** 5:21 38:9 46:18 49:9 97:17 107:6 115:19 131:5 132:19 145:15 162:21 183:13 218:13 224:12 257:9 297:21 302:6 314:18,21 315:2 316:1,2 341:12 345:16 353:3 377:6
**problem** 13:25 14:14,16 16:2 16:3 78:9 91:22 100:21 101:18,19 114:15,16 116:12,24 120:9,10,12,15 120:15,19,20 122:16,18 138:12 139:3 160:14 178:1 178:15 179:1 181:4,8,10,14 181:25 183:20 187:8 189:1 199:18 208:2 225:2,3,19,20 225:23 235:19 242:16 258:13 295:24 346:6 358:20 364:21
**problems** 104:3 112:8 115:14 207:15 209:22 225:16,18
**procedural** 125:24 228:21 228:24 231:8 236:17,18
**procedure** 393:19,20
**procedures** 139:13
**proceed** 298:23 299:2
**process** 10:6 16:10 111:2 118:4 159:19 277:18 280:7 280:11 282:19 283:6 285:21 312:25 349:9 363:21 377:1
**processing** 116:10
**processor** 118:15,19,21

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

119:3
**proclivities** 229:7
**produce** 301:7 327:21 328:1 370:20
**produced** 154:11 244:7 288:11 312:23 321:19 330:13 333:20 335:16 336:23 370:21
**product** 121:1 121:10 127:12 154:6 222:4 294:2 295:12 296:22 299:25 302:17 304:17 310:1 323:20 340:16 341:25
**production** 241:16
**products** 107:23 108:4 110:8 124:11 127:10 148:10 148:14,24 182:3 221:19 221:22 262:23 295:25 303:18 323:12 341:2,3 342:3
**profession** 83:17
**professional** 1:23 317:6,7
**professionally** 51:1
**professor** 111:16
**profile** 188:11 343:23
**profit** 382:21
**program** 225:3 225:5,6,6,21,21 297:17 384:5
**programmatic** 227:16 229:13
**programming** 7:5 183:11
**programs** 297:17
**project** 95:25 112:21 148:20 292:5,8,23 376:4
**projection** 321:4
**promise** 60:7 83:22
**promised** 358:3
**promising** 196:12,14 207:22
**promo** 295:5,8 350:6 379:5
**promote** 287:8
**promotion** 218:25 350:12
**prompt** 32:16 314:13,16,22
**prompts** 315:10
**proof** 205:22
**propensity** 220:18 221:15 222:16 305:23
**properly** 95:11
**properties** 197:23 288:13
**proportion** 382:23
**proposal** 370:10,11
**propose** 129:19 133:3 313:25 324:8 360:24
**proposed** 240:20
**proposing** 108:2 179:12
**pros** 303:12
**protect** 69:8 71:11 206:24 207:3
**protocol** 286:3 287:14
**prototype** 97:5
**proud** 16:5
**prove** 205:18 209:13 325:23
**proven** 225:8
**provenance** 76:5
**provide** 13:7,14 15:20 62:15 69:21 77:20 80:24 119:25 170:10 205:23 316:13 327:22 329:18 376:16
**provided** 62:25 111:10 118:24 131:13 157:3 170:24 214:3 238:10 345:5 393:19 394:8
**provider** 290:10
**providers** 123:6 182:9 184:3 319:19
**provides** 62:14 109:18 175:19
**providing** 22:3 43:20 69:3 331:3 334:18
**provision** 120:11
**pseudo** 372:14
**pseudonym** 53:25
**pseudonymous** 36:23 53:9,15 53:17,19 54:1 54:5 64:12 81:25 134:20 140:12 241:4 282:21 349:18

**[pseudonymous - question]**

349:19,22 350:1 372:20 375:16 376:16 378:16 386:19
**pseudonyms** 86:21
**psychiatric** 115:12
**public** 1:24 21:25 42:19 56:16,19 92:8 113:19 196:23 264:8 388:14 391:3 392:23
**publication** 117:2,5,7
**publicly** 43:19 271:21,22 273:8
**published** 113:16
**publisher** 214:13 264:2 264:12 366:16 368:2
**publisher's** 372:9
**publishers** 153:6,13 154:14 155:25
**pull** 67:4 71:18 99:4 117:2,4 194:5 211:1,13
**pulled** 301:10
**pulls** 235:7
**purchase** 226:2 226:5,8,11,25 351:2 372:12
**purchased** 226:24
**purge** 32:20 104:8 105:4 107:12 108:3 111:7 129:14 129:20 177:3
**purged** 104:6
**purging** 143:25
**purpose** 35:24 113:15 114:6 132:15 144:12 178:8 219:19 252:18 262:7 284:14,25 285:13 355:5
**purposes** 118:20 231:2 310:25 380:12 383:14
**pursuant** 1:19
**push** 322:8
**pushing** 298:17
**put** 5:21 6:1 8:11 9:9 29:2 36:18 40:25 49:23 53:24 76:15 77:13 82:8 92:12 101:12 121:5 124:21 150:13 174:25 175:23 177:13 199:14 206:6 207:21 247:2 261:4 286:13 321:23 327:24 347:1 349:4 354:8 365:9,21
**puts** 116:19 364:23
**putting** 76:17 122:25 136:4 138:24 364:10 366:15

**q**

**qualified** 383:6
**qualitatively** 125:2 188:1
**quality** 111:20
**quantified** 320:8
**quantify** 168:8 168:11,22 215:10 266:16
**quantity** 330:13
**quantum** 137:1 137:12
**quarters** 305:4
**queried** 174:17
**queries** 369:25
**question** 9:2,22 11:16 18:17,18 22:6 26:24 27:3 32:5,14 32:23 33:2,5 33:23 34:9 36:7,25 37:5 43:13 44:16 50:23 51:21 53:24 55:2 58:13 61:13 64:17 65:17 66:6 68:25 70:12 72:17 73:10 75:6,16 76:25 77:23 78:8 79:13 82:19 83:20,24 85:2,12 93:5 93:17 95:15 104:11 106:13 110:10 111:15 113:6 121:18 122:23 125:16 127:18 134:25 135:10,12 139:9 141:1 143:22 144:5 144:17 150:1,3 150:16 155:19 155:21 156:4 156:12 164:12 165:17 174:6 174:20 177:17 181:15 183:23 186:22,25 191:11,12 203:5 216:10 216:21 220:12

**[question - read]**

227:12,14 229:12 232:2 236:10 238:25 239:20,23 242:20 246:16 247:7,9 256:21 259:15 261:23 263:21 264:11 264:21,25 265:22 266:11 267:12 268:18 270:16,21 272:1,18,20 273:3,4 275:5 275:24 279:5 282:3,15 283:18,24 284:4,19 288:7 290:18 295:17 297:6 322:1 325:7 326:15 327:8 331:24 333:7 334:15 334:23 353:17 354:10,12,19 356:12 357:1,8 357:15,22 358:15 359:21 363:16 366:13 368:11 381:11 385:7,19,21,25 386:16
**questioning** 236:16 331:7 346:25
**questions** 14:11 17:4 33:15 34:7 45:16 91:4 149:11 169:21 173:23 217:6 220:11 247:25 259:13 268:21 327:2 344:19 346:22 347:5 350:4 354:11 356:5 356:18,19 358:3,5 359:12 359:14,15 360:9 362:25 363:4 377:13 377:17,23,23 377:25 378:1 379:4 380:2 381:16
**quibble** 203:23
**quick** 33:8 160:13 163:6 176:5,6 232:23 280:23 283:13 310:18 344:8 374:6
**quickly** 317:11 318:25
**quite** 4:24 5:17 6:22 16:4 239:15 292:24 362:17 373:23
**quo** 61:5
**quotation** 153:7
**quotations** 25:21 45:20
**quote** 24:3 26:14 45:18 166:7 275:23 363:20
**quoted** 24:15 24:22
**quotes** 45:15 153:4,17 213:3 292:25
**quoting** 238:11

**r**

**r** 2:1 129:1 395:3,3
**r&s** 394:1,9
**rabbit** 208:15
**radio** 206:3
**rahman** 2:16 72:9,14
**raise** 85:3 113:5
**raised** 231:11 231:12
**raising** 110:16
[redacted] 133:24
**range** 323:12
**rate** 5:4,6 16:9 16:11 162:15 162:16 163:17 166:24 168:20 246:3 256:4,8
**rates** 319:21
**rather** 108:21 124:3
**rating** 205:11
**ratings** 206:18
**razor** 89:11
**reach** 206:4
**react** 308:10
**read** 16:20 23:4 23:5,5 27:20 36:7 45:22 52:14 56:25 57:2,4,20 58:8 59:22 60:16 61:8,18 64:17 69:17 70:25 76:14 78:25 79:2,3 80:7 81:3,7 92:5 105:9 108:15 113:17 118:5 142:22 144:23 145:14 146:23 164:12 191:3 210:1 211:20 229:16 236:25 245:24 248:25 249:10 259:8 264:21,22 280:19 284:2 297:4 305:4 336:12 341:17 345:24 372:1 377:6

**[reader - record]**

**reader** 34:12
**readily** 378:17
**reading** 74:10 191:4 329:25 330:2 393:23 394:9
**reads** 154:15
**ready** 273:24 300:16 329:7
**real** 15:9 87:1 101:3 176:5 208:24 209:5,6 209:15 235:24 280:23 373:18
**realistic** 299:7
**realized** 235:15 236:13
**really** 14:18,24 38:13 52:24 63:11 70:11 84:18 86:14 90:8 105:3 111:1,4 114:11 114:18 122:22 124:10 137:15 149:14 150:2 173:11 178:3 178:11,14 179:10 187:15 189:12 195:18 196:3 198:11 198:15 209:8 216:3 217:20 241:8 247:5 266:9 267:21 275:15 280:5 286:7 289:3,6 298:19 307:13 308:7,11 310:15 319:22 328:4,11 333:20 335:9 342:4 363:18
**reask** 270:20 283:18 367:23
**reason** 51:12 62:9 81:1 113:16 146:14 182:16 193:15 223:13 256:13 282:12 286:23 291:21 365:23 380:10 392:4 395:6,9,12,15 395:18,21
**reasons** 155:14
**rebut** 321:13
**rebuttal** 124:22 126:1 162:10 234:6 389:8
**rebutted** 125:19
**recall** 10:4 13:22 14:3 28:10 30:4,11 30:14 31:16,17 34:3,11,23 50:9 51:8 134:2 143:3 147:18 166:1 214:4,21 216:16 224:18 226:15 229:2 238:15,16 246:23 252:10 253:18 255:4,6 256:18,22 262:4 264:14 284:11,15,17 284:18 285:18 287:16,17 292:5 311:18 313:12 314:15 315:12 339:20 356:7 359:24 362:25 365:10 365:14
**recalling** 297:19
**receive** 322:4
**received** 47:1,6 139:14 253:10 373:22
**receiving** 163:8 322:2
**recently** 30:25 108:16 114:12 146:23 295:12 299:16 300:5 300:23 315:13 317:10
**recess** 47:12 66:19 128:6 173:2 176:21 233:3 251:20 281:1 317:23 329:3 344:11 362:6
**recharacterize** 152:24
**recognize** 84:8 84:9 97:19 279:8 365:17
**recollection** 281:19 339:16 346:16
**recommended** 82:18
**reconcile** 240:12
**record** 3:2,23 4:8 36:19 47:11,14 66:18 66:21 67:14,15 67:19 112:12 128:5 129:5 150:15 173:1,4 176:13,20,23 189:21,23,24 190:1 199:9 215:4 233:2,5 240:6 247:24 251:19,22 257:4 260:6 264:16,22 280:25 281:3 295:3,21 313:8 313:22,24 317:22,25 329:2,5 343:10

**[record - relay]**

344:10,13
346:8,9 348:5
348:9,12,18,19
354:9 357:4
358:25 361:2
362:5,8 369:24
378:6 386:5
387:4,12 391:8
**recorded** 3:10
25:10 199:11
199:14 256:18
261:9 295:17
325:24 350:24
350:25 351:3
**recording**
337:25 371:24
**recordkeeping**
206:18 219:15
220:5 262:7
**records** 104:7
112:13 210:11
243:6 313:6
324:9,12
329:18
**recreate** 159:18
215:19
**red** 106:24
**redact** 163:12
**redaction**
310:25
**redefinable**
380:19
**redirect** 353:5
354:1 360:6

**reduce** 344:2
**redundant**
27:12,15
227:14
**reengage** 296:7
**reengineer**
110:3
**reestablish**
348:8
**reevaluate**
340:15
**refamiliarize**
362:19
**refer** 37:7,10
234:24 349:10
**reference**
231:25 263:24
357:22
**referenced**
25:21 393:6
**references** 6:14
**referred** 196:6
377:2
**referring** 32:4
40:3 46:6,7,9
85:16 107:15
130:14 133:8
157:14 192:17
194:5,7 204:9
253:4 312:22
325:12 337:22
**refers** 249:23
**reflected** 12:16
12:21 31:2
90:13

**refraining**
211:2
**refresh** 241:10
256:25 280:17
281:19 283:14
287:25 346:15
374:6,20
**refreshed**
173:10
**refused** 327:22
328:1
**regain** 287:25
**regard** 349:18
350:9 353:6,8
**regarding**
36:21 40:4
64:10 65:14,16
93:22 94:2
157:8 285:24
344:19 347:5
350:4 379:4
380:2
**regardless**
190:19 202:15
276:22 353:15
378:15
**registered** 1:23
**regularity**
294:10
**regularly** 14:21
**rehab** 176:14
**reidentification**
347:6 348:2,4
363:9,14,17
364:11,17

378:8
**reidentified**
348:12 364:14
375:25 376:2
378:17,21
**reidentifies**
235:11 380:24
**reidentify**
348:18 349:2
349:14 370:12
376:8 378:22
381:7
**reidentifying**
378:11
**reject** 184:25
**rejecting** 185:9
**relate** 102:12
161:20
**related** 38:2
48:5 62:2 63:3
66:3 76:18
240:19 330:9
391:10
**relates** 38:4
40:13
**relating** 105:13
109:10 129:13
222:16 373:23
**relation** 10:2
**relative** 235:12
273:25
**relatively**
323:20
**relay** 31:1

**[release - report]**

**release** 364:24
**released** 114:11 393:21
**relevance** 21:6 21:8,17 122:9 363:22
**relevant** 21:24 22:18,24,25 47:3,7 204:19 325:18 327:23 334:3,20 337:1 368:23
**reliable** 205:24
**reliably** 275:18
**relief** 31:23 35:2,13 58:20
**relies** 193:1 208:11 368:4
**rely** 290:22 310:3 336:11 336:13
**relying** 26:18 27:6,8,16,21 29:4 288:22,24 289:9,10 299:19 312:15 313:13,17
**remain** 25:9 92:24 201:7 303:22
**remainder** 293:19
**remaining** 288:14 348:7 371:10 373:21 381:13
**remember** 5:7 10:7 27:1 29:15 30:15,16 30:18,20 51:16 55:11 73:22 97:16 98:4 105:1 140:4 156:22 165:18 175:1,10,22,23 185:5 227:9 233:11 243:2 243:12 246:18 246:20 253:5 259:5 263:20 263:23 265:4,6 276:1,8 314:20 315:24 316:3 326:20 338:4 339:8,11,14
**remembered** 249:13
**remind** 27:2 359:22
**reminds** 29:7
**remote** 218:2
**render** 125:12 145:10 168:4 286:25 287:13 340:17 365:19 367:11
**rendered** 12:11 12:15,19 64:24 66:10 106:9 123:9 124:14 264:23
**rendering** 148:13 167:2 168:1 231:3,3 287:12
**reopening** 360:10
**rep** 223:3
**repeat** 18:24
**replace** 304:13
**report** 6:4,7,15 6:17 7:10,23 8:16,18 11:5,6 11:9,24 12:6 12:22,24 15:14 15:22,23 16:4 16:13,18,20,24 17:1,11 19:3 21:12,14 22:9 22:10 24:15 25:22 26:14,18 27:5,17 28:6 28:12 29:5,10 30:3,6,9,13,15 30:15 31:2,6,7 31:15,24 32:3 33:16 34:13 36:3 37:1 38:9 38:18 39:22 40:18 41:23 42:10 44:15 45:15,17,19 55:12 58:19 70:1 73:15 78:25 81:3,10 82:21,22 84:3 88:6,12 90:8,8 90:10,14 97:14 98:3 104:8,12 105:19 106:10 109:17,23 110:17 113:5 124:18,20 125:9 130:17 133:22 140:14 141:4 142:9 147:21,22 148:5,23 150:4 150:25 151:5 152:4 155:1 157:4 169:18 170:15 175:4,5 175:6,21,24 181:15 187:12 189:10 196:2 203:8 207:16 209:25 210:4 210:21 212:24 213:5 224:10 226:16 227:10 232:10 234:3 235:6 238:21 240:8,9 242:22 243:9,11 247:2 248:6,18 252:1 255:16,19 263:25 264:4 265:14 266:13 275:13,24 276:3,12,16,17

**[report - retained]**

284:20,21,23
286:8,14
295:18 298:1
299:11 308:17
311:14,19
318:3,12
323:18 324:1
325:17 326:9
326:11,17,25
327:6,15 328:6
339:23 345:1,2
345:6 346:10
349:10 350:7
353:17 357:23
358:23 359:17
360:19 361:9
361:10,16
362:12 363:18
364:3 367:1
369:23 371:5
373:25 378:24
384:20,25
386:7,14 389:7
389:8,11,12,13
389:14,15,16
389:17,18,19
389:20
**report's**   67:22
67:23
**reporter**   1:23
3:19,24 77:22
**reporting**
392:1
**reports**   15:18
63:16 140:4

211:18 214:15
**represent**
254:22 255:2
**representation**
142:18 196:10
**representations**
124:7 196:7
210:9
**representative**
216:2,6 234:18
253:14 254:4
308:25
**represented**
203:13 293:20
**representing**
8:22 9:2 358:2
358:7
**represents**
199:22
**reproduce**
159:23
**reproduced**
338:5
**reps**   220:20
**reputable**
233:12
**request**   173:17
174:4
**requested**
174:1 394:1,9
394:10
**requests**
327:19 390:5
**require**   113:25
119:10 168:24

318:19
**required**
296:11 318:22
**requirement**
297:2
**requires**
112:14,16
192:24
**reread**   141:4
241:10
**research**   95:20
112:7 113:15
113:17 274:4
**reserve**   353:5
353:25
**reserved**
269:13
**resisted**   327:22
334:17
**resolve**   21:24
207:15
**resource**
279:24
**respect**   19:2
123:8 126:19
134:17 208:21
236:14 252:22
266:25 331:15
370:8
**respected**
268:6
**respective**
347:15
**respond**   9:6
10:11 125:20

**responding**
9:23 32:16
**response**   9:9,11
9:14,19 10:2
33:20 125:25
275:16 280:14
293:1
**responses**
46:21 47:2,16
52:13 258:6
**responsible**
205:3
**responsive**
43:20
**restroom**
246:14 280:22
**result**   258:19
278:4 281:21
297:15 307:3
**resulted**   174:12
**results**   301:8
**resumed**   129:3
**retain**   205:8,18
206:20 287:10
331:17,22
335:23
**retained**   4:20
9:5,18 10:15
11:2 13:19
14:5 34:14
49:5,18 50:8
55:4,6,9 115:1
251:9 270:14
330:7 334:10
335:2,13

**[retained - right]**

368:22 370:14 370:18 389:21
**retention** 9:25 55:18 332:7 333:12,16,21 334:14 344:23 368:25 369:24
**retentions** 335:11
**retort** 162:14
**retorts** 215:14 215:16,17
**retrospectively** 209:20 260:8
**return** 277:22 393:17 394:6
**returning** 117:10
**revealing** 95:22 241:2
**revenue** 5:15 5:16 221:8 262:25 293:5 300:19
**reverse** 58:3
**revert** 300:1,4
**review** 6:3,6 8:6 9:12,14 16:12,15 91:5 91:6 108:12,13 157:5 166:15 169:12 171:6 189:15 210:22 281:5 335:15 374:18 393:8 393:10,13 394:2
**reviewed** 8:8 31:14 44:20 46:13,20 47:17 49:8,9,16,19 50:7,11 51:22 52:11 53:5 57:15 90:18,20 91:11 129:16 129:24 131:20 134:18 147:13 147:17,20,25 157:8 171:23 196:22 214:15 216:15 353:17
**reviewing** 90:21
**rewrite** 115:3
**rewritten** 115:5 115:6
**rfa** 275:16
**rid** 100:11
**right** 6:19,19 6:20,22 12:17 13:19 15:8,25 17:25 27:11 28:7 29:10 33:7,23 34:13 34:18 36:1,9 37:19,22 39:13 42:15 44:21 47:18 49:8 50:7,11,15 51:1 53:4,15 55:1,23 56:5 56:12,17 57:1 57:18 58:2 63:13 71:14 72:8,23 73:8 75:10 78:24 81:25 95:23,24 96:19 97:13,23 98:12 99:14 100:7 101:24 102:20,23 104:6,24 105:22 109:11 119:16,20 120:6,19 121:17 123:6 124:19 125:7 127:1,8 129:21 131:22 133:2 133:10 137:6 138:2 139:15 139:25 143:11 147:14 149:20 149:23 151:2 151:14,24 152:13 153:8 154:1 155:5,9 158:4,24 160:18 165:5 166:13 169:1 169:24 170:4 170:12 173:19 173:21 174:18 179:18,19 180:13,14 182:9 183:19 184:4,9,11,18 185:8,21,25 186:14 187:3 187:11 188:21 191:1,20,24 194:9 200:8 201:14 202:15 204:20,25 208:13 210:3 212:16 215:12 217:14 218:5 222:17 223:20 226:4 228:6 231:15 232:16 233:10,18 236:11 237:23 240:21 241:6 241:14 242:24 243:9 244:2,5 247:6 249:23 250:7 251:4,24 254:19,23 258:2,19 259:14 261:13 261:16 262:1 266:4,21 271:17 273:9 273:12 274:10 275:4 276:11 277:7,23 278:12,14,24 279:1 281:8 283:4,6,12,19 284:7 285:1,22

**[right - santacana]**

286:9 289:14 289:18 290:5 291:5,13 292:11 294:14 296:9,21 298:3 299:14 301:17 301:24 307:16 307:22 312:4 314:9 317:14 322:5 323:25 324:2,20 325:2 327:9,11 328:12 329:24 330:3,16 331:1 331:13 332:4 332:14,20 333:10 335:4 337:6 338:9,17 340:7 343:13 344:7 351:7 353:5,25 354:23 355:21 355:25 356:15 358:12,17 360:5 362:24 366:4,24 367:11 368:13 369:3,8 370:2 371:15 373:12 374:23 375:7 375:21 376:11 376:18 378:5 378:12,17 379:17 381:4 382:16,21,23 384:17 386:21 387:23

**ring** 292:15 367:2
**risen** 340:23
**risk** 102:4,5 103:6,8 104:9 104:19 106:4 106:16 138:24 187:2,4 188:6 188:11 198:21 234:24 235:1,5 235:14,15,24 236:13 238:8 238:12,23 239:7,14 250:7 250:19,23 251:12 265:22 267:8,8 274:7 274:8,11,12,17 275:6 342:23 343:19,23 344:3 365:3,16
**risks** 106:18 110:16 113:5 188:12 236:11 239:10,24 240:5,18 265:13 266:12 266:14 267:14 275:3,5 342:11 342:15
**risky** 266:18 268:12 270:24 341:2
**rmcgee** 2:11
**road** 33:25 186:25
**robot** 58:5
**rodriguez** 1:7 3:12 311:6,15 312:12 377:3 392:2 393:4 395:1
**roi** 223:5 301:9
**role** 6:9 8:15 13:6,11 20:11
**roof** 188:8
**room** 165:9 175:25 199:7 199:10 200:7,9
**rotated** 251:5,6 251:10
**rotating** 295:25
**rough** 225:3
**roughly** 4:17 4:23 5:10,11 5:12,25 367:3
**round** 288:9
**rounding** 319:9
**rs** 1:6
**ruin** 342:16
**rule** 292:15 310:15
**rules** 115:4,4 394:8
**run** 116:23 163:9 225:22 235:6 294:9,16 296:14 301:22 305:19 366:6
**running** 218:24
**runs** 111:19 185:6 225:22
**ryan** 2:10

**s**

**s** 2:1 129:1,1,1 389:5 392:4 395:3
**safari** 199:23 200:20 201:1
**safe** 199:14 220:20 223:3,7 225:5
**safest** 41:11
**sake** 233:25
**sales** 113:7,12
**sample** 216:1,5 216:6,9 234:18 234:19 256:3 305:4
**sampledadev...** 330:24 333:15
**sampling** 304:7 304:9,10 308:9 353:21
**san** 1:5 2:14
**santacana** 2:15 4:6 47:8,15 66:15,22 67:8 67:20 71:25 72:6,12,16,20 85:5 86:1 106:25 107:15 107:17 117:4

**[santacana - says]**

123:20 128:2 129:7 140:22 143:17,23 146:2,9,16 149:7 160:11 160:14 164:7 169:9,24 170:4 172:23 176:16 176:24 190:2 215:5 233:6 246:11,15 248:5 249:12 251:16,23 257:8 264:5 268:17,24 269:2,9,15,21 270:1,4,15 276:17 280:21 281:4 284:6 288:1,5 295:6 306:8,16 313:1 314:5,7 317:17 318:1 328:24 329:6 333:5 339:3 344:7,14 345:23 349:24 350:10 353:4 353:11,25 354:2,7 360:17 362:2,9 369:15 369:19 371:11 377:14,20 378:2,18 379:3 381:1,12 383:1 383:18 385:8 385:11,17,22 386:10,23 387:3,16,19,24 389:3 393:1

**sat** 110:22 327:6

**satisfactory** 44:25

**satisfy** 35:14 113:4 297:2

**save** 40:5,9 58:25 69:24 73:7 80:3 83:7 83:14 198:17 198:20 209:11 325:4,9,10,11 377:11,15

**saved** 25:3 70:22 73:3 74:6,13 75:1 187:18 197:16 198:14 251:15 271:14,15 318:25 325:1,3 329:20 336:15 382:1

**saves** 36:21 40:4 64:10 81:24 82:3,23 83:25 90:23 93:20,22 121:19,24 241:18,20

**saving** 40:9 44:3,9,11 80:10 81:11 122:17 170:12 170:19 171:1 195:7 198:18 198:19 199:2 210:11,14,18 230:4 368:7 370:9

**saw** 52:17 130:15 247:23 253:13 254:23 345:15

**sawmill** 131:6 337:5,16

**saying** 26:7 39:19 40:2 41:2 43:16 59:8 91:3 105:6 106:15 122:19 123:4 124:25 126:23 132:5 134:16 138:13 139:6 139:25 140:1 142:5,16 153:18 155:8 163:25 169:20 172:12 178:25 182:16 197:6 227:15 230:16 240:13,13 248:6 256:8,9 270:7 271:5 278:16 279:4 281:23 285:18 287:16 296:21 296:23 299:3 300:5 306:13 309:23 310:10 310:11 326:4 328:11,22 331:14 334:13 345:7 355:9 356:12 359:9 360:17,18 364:18 367:6 369:16 377:21 377:22

**says** 11:10 34:13 36:19 58:8 65:13 70:22 71:12,16 75:10 80:3 84:3 87:24 94:2 103:13 130:24 132:13 147:2 149:15 150:25 151:18 152:9 153:12 153:16 154:25 165:4 177:15 181:18 199:11 199:13 201:16 212:16 237:4 238:21 241:11 247:18 248:2,6 248:20 250:15 278:21 292:23 293:11 298:1 299:11 311:4,6

**[says - see]**

311:23 314:22 315:6 329:15 330:23 331:20 336:14 384:2 386:12,17
**scale** 245:17 318:14
**scams** 274:21
**scanning** 167:8 167:15,17
**scenario** 131:18 188:7 188:19 250:13 279:3 306:21 367:25 371:17 371:20,22 372:4,6
**scenarios** 102:7 102:8 179:4 310:12 367:2,4
**scenes** 140:9
**schedule** 393:10
**schema** 41:21
**scheme** 319:9 321:7
**schiller** 2:2 10:16,20
**schneier** 27:8 305:11
**school** 111:17
**scientific** 159:22
**scope** 70:4,12 74:2,23 79:20 80:4,16 82:13 87:5 169:17 196:1 222:7 224:5 227:3 244:5 255:16 268:15,22 269:17,19 270:9 272:25
**screen** 72:7 228:14 231:5 373:1
**screw** 137:11
**sdk** 150:8,9,10 150:18,19,21 151:1 152:8,11 152:13 154:9 155:7,11 157:11 165:13 171:15 184:11 184:15 185:4,6 185:20 186:17 203:2,2 289:14 289:23 290:5 291:5,10 298:6 322:25 324:20 368:1,6 370:9 372:7,8
**sdks** 151:6 182:8,20,25 183:8 289:20 291:7 384:17
**search** 62:18 133:6,16 134:10 204:16 351:21 370:19
**searched** 131:11 330:20
**searching** 204:14
**second** 32:23 36:6,15 47:9 67:12,12 80:7 127:12 172:24 176:17 221:3 248:25 262:20 266:4,10 275:14 290:19 346:24 362:3 369:20 370:13 371:1 372:22 375:4 376:12 379:3 385:3
**seconds** 373:20
**secret** 88:9 199:9
**secretly** 212:3
**section** 12:7 35:16,25 58:19 104:23,25 107:16 108:1 132:25 133:22 134:2 147:4 151:5,12 224:9 311:18 324:5 327:9 328:6,23 338:4
**secure** 118:2
**security** 17:18 26:2 73:25 106:16 114:10 155:14 168:12 168:13,14 197:23 239:7 239:11 273:18 282:9 365:16
**see** 16:4 20:11 36:17,23 44:12 59:14 62:13,20 65:11 68:12,13 69:12,25 73:8 76:21 81:15 87:1,3 89:9 91:1 92:7 96:7 101:11 105:19 107:20 120:9 126:7 131:15 144:15 147:1 147:10 148:16 154:2 183:16 199:19 212:22 218:11,17 219:17 220:6 220:14 221:11 222:25 224:13 226:9 229:5 237:8 238:4,8 238:12,17 243:6 246:6 247:1 259:3 263:24 275:20 276:23 279:3 281:16 284:13 286:11,23 293:9,16 295:24 296:18

**[see - sequitur]**

310:5 311:8 317:1,2 321:8 321:15,17 330:9 332:23 345:20 350:23 353:20 355:9 358:20 360:3 362:16 368:9 368:18 369:15 370:4 372:17 372:25 373:1 373:10 374:11 374:13 386:6
**seeing** 24:18 214:16 243:2 246:20 248:4 256:18 315:12
**seek** 160:3 173:11 301:5
**seeking** 33:22
**seem** 17:13 18:25 22:24,25 23:1 31:11 58:13 59:24 163:8 167:8,15 246:23 253:18 260:3 287:9 293:23 298:10 327:23
**seemed** 31:12 148:2
**seems** 20:3 24:4 24:5,9 25:20 26:5,10,13,20 32:13 74:15,17 122:15 191:25 219:3,6 220:17 235:2 277:10 287:7 301:7
**seen** 14:22 15:5 49:7 97:12 101:15 137:16 214:21 222:9 246:19 315:1 316:4 331:12 352:20,25 354:12,20 357:20
**sees** 6:23 229:9 230:8 372:10
**segment** 208:22
**seismic** 299:6
**seized** 348:16
**select** 356:19
**selected** 292:10 346:13
**selecting** 381:23
**selection** 143:8 370:22
**selectively** 195:23
**sell** 113:10 126:9 275:1 305:11 366:10 367:6,8 379:5 379:9 380:7,13
**selling** 305:9,17 366:11
**semantic** 83:15 83:18
**semantics** 189:6
**send** 58:23 158:16 159:8 159:12 160:1 160:16,23 161:1,3,7,24 162:6 163:21 164:4,16 165:10 185:12 185:14 187:4,5 195:15 196:14
**sending** 196:18 198:1,15 210:18 233:9
**sends** 121:23 185:11 277:20 278:18,23
**sense** 5:13,22 8:10 29:19 99:10 114:14 116:11 175:8 319:24
**sensitive** 3:5 25:1,3 138:14 138:16 163:12 210:16 229:10 343:9,10
**sent** 57:6 64:13 64:20 66:2 105:14 160:18 161:15,21 163:22 184:2 186:11,12,19 187:19 197:20 198:13 258:21 259:16 260:25 278:17 281:20 281:22 310:1 325:19
**sentence** 25:5 73:3,14 75:3,9 77:2 78:1 81:15 132:12 133:15 147:2 153:16 177:10 192:13,14 215:2 237:4 240:25 242:21 249:4 288:10 311:22
**separate** 7:12 7:13 113:9 117:12 136:10 148:3 154:6 188:23 277:21 279:14 281:21 282:20,24 283:2 385:16 385:18
**separated** 349:4 365:8 385:23
**separates** 348:23
**sequitur** 76:12 76:14,24,24 80:12

**[serious - shut]**

**serious** 77:14 239:15
**serve** 190:17 205:7 210:2 231:23 290:4
**served** 4:14 16:24 30:2,6,9 30:14 193:25 269:22 368:1 372:6 382:19
**server** 108:22 196:25 197:8 197:20 218:3 277:21 278:5,6 278:8,9,17 280:12,12,12 281:21
**servers** 257:25 278:5 279:23 279:23
**service** 111:10 116:10 117:17 117:20 119:19 121:20 160:3 162:12 164:22 166:15,18,25 167:5,12 168:3 168:24 233:21 237:22
**services** 69:2,7 69:23 70:19 73:6 79:24 101:9 107:23 108:4 148:11 148:14,24
**serving** 29:9 30:13 205:4
**set** 31:25 40:7 44:2,7 51:9 58:23 72:18 102:14 103:13 117:12 127:12 127:24 147:19 171:19 185:4 188:12 195:13 205:25 209:2 216:9 244:25 256:3 271:11 294:8 295:25 334:6,6 391:7 391:14
**sets** 111:25 116:17 175:13 268:5 347:18
**setting** 17:21 41:3 108:21 161:12 171:4 307:10 315:5 322:7 323:4,6 323:10 335:22 337:12 339:10 339:17
**settings** 17:24 65:22 69:11 71:15 73:6 80:20 171:17 193:7,11 220:20 277:22 278:23 335:20 337:13 338:4,9
**setup** 169:22 193:14
**seven** 356:11 359:9 380:20 380:22 385:5
**seventh** 1:21 3:17
**several** 11:1 291:19
**severe** 267:14 267:21,22
**severity** 265:21 266:13 267:5 275:6
**sexual** 229:7
**shadow** 88:4,8 88:13 90:24,25
**shards** 114:23 114:24
**share** 67:2 72:2 116:13 298:21 300:13 373:4
**sharing** 166:7,8 263:12 264:6,6 264:12 339:9 339:15
**shed** 23:1
**sheds** 23:10
**sheet** 392:1
**sheets** 358:5,8 359:2,22
**shift** 197:9 299:6
**shockingly** 294:10
**shoes** 305:23 305:24
**shook** 246:17
**shoot** 65:9,20 104:16 123:1
**shooting** 125:21 126:4
**shop** 7:21
**short** 197:14 198:17
**shot** 72:7
**show** 41:4,5 45:8 62:1,3,7 63:12,15,18 82:15 88:10,18 88:20 91:20 141:16 165:7 166:9 197:3 204:18 262:11 264:18 276:13 376:5
**showed** 357:5,5
**showing** 199:15 204:22 236:21
**shown** 24:18 83:5 205:20 214:10 288:4 311:23 335:6 358:18
**shows** 241:17 275:18 321:14 338:6
**shut** 266:24 336:5

**side** 76:21 80:20,21 82:13 114:15 116:22 116:22 204:8 264:7,9 366:4 366:10 367:6,8 379:5,9,13 380:7,13,14
**sides** 116:15 121:6 186:10 379:10
**sign** 9:25 10:6 87:7 393:16 394:5
**signal** 99:24
**signals** 165:25 339:12
**signature** 391:17 393:21 393:23,23 394:9
**signed** 311:6,15 311:24 312:16 313:9,15
**significance** 382:13
**significant** 220:2 234:19 291:23 323:24
**signing** 10:7 69:2,18
**silent** 82:12
**silly** 35:8
**silo** 117:14
**silos** 187:23 188:4,5
**similar** 125:6 161:13 200:24 368:6 371:17
**similarly** 1:8
**simple** 89:7,10 185:3 201:9,10 220:13
**simpler** 20:14 121:13
**simplest** 89:11 171:17
**simply** 20:8 154:8 306:13
**single** 181:7 342:16 348:10 369:12 382:6
**sir** 318:5
**sit** 142:21 241:9 256:21 340:14
**site** 341:16 343:3,7,8,11,13 343:22
**sits** 117:14
**sitting** 14:2 16:22 89:24 97:16 110:2 224:19 240:17 283:24 284:8 320:18 362:24
**situated** 1:8
**situation** 15:9 92:13 235:17 309:8
**situations** 320:11
**six** 303:1
**sixth** 308:21,23 308:23
**sixths** 308:24 309:1
**size** 114:17 255:19
**skad** 315:23 316:12
**skewed** 253:15
**skipped** 221:10
**skipping** 82:17
**slick** 298:19
**slightly** 44:16 191:11,12
**slip** 139:7 150:21
**slipped** 152:17
**sliver** 382:22
**slogan** 92:21
**slow** 195:18
**small** 216:9 239:14 256:2 321:6 333:21
**smaller** 127:13 273:13
**snap** 298:3
**sneakers** 204:15,16 305:18
**social** 273:18
**software** 17:22 17:24 155:15 183:12 219:2
**sold** 297:9 379:15
**solely** 118:21 119:2
**solution** 105:9 110:19 112:24 113:2 118:9 153:15 178:3 179:11 189:3 316:18
**solutions** 393:7
**solve** 178:14 225:23
**solves** 181:25 189:1
**somebody** 90:11 106:5,6 106:7,14 121:22 122:21 137:24 165:5 221:5 224:11 235:6 250:2 271:11 274:13 279:21 365:1
**somebody's** 342:17
**someone's** 204:23 225:3
**someplace** 88:18,19
**somewhat** 287:5

**[soon - speed]**

**soon** 123:23 219:1
**sophisticated** 205:13
**sorry** 12:17 26:4 57:15 64:16 67:6 72:3 75:15 77:9 85:5 117:8 131:21 132:24 160:8 160:12 161:5 164:6,13 170:21 175:7 224:24 248:1 249:14 254:3 255:1 261:22 264:1,20 266:11 269:21 276:15 281:18 284:2,4 290:16 328:21 338:24 349:24 357:13 368:10,12 370:5 371:13 373:17 374:19 378:5 379:17 387:12
**sort** 7:25 18:24 23:11 27:18 28:22 29:17 31:5 35:3 37:6 43:5 45:16 50:18 51:10 59:11 60:17,17 61:4 63:5,9 65:5 74:19 77:14 78:18 79:17 111:9 118:4 121:12 124:24 126:15 141:6 145:15 147:19 150:5 162:2 165:1 169:12 174:8 177:18,25 178:7,11 186:24 187:11 187:16 191:15 197:9 206:5 216:3 218:15 221:23 222:13 222:24 223:10 226:3 229:19 232:5,8 234:8 234:17 235:1 239:6 245:17 251:13 253:15 256:1 258:4 259:11 261:7 262:20 263:8 267:24 271:10 272:12 282:15 295:14 299:6 300:16 302:15 302:16 305:21 307:2,3 308:22 310:2,6 316:17 319:24 321:3 331:2 340:12 348:5 349:8 365:15
**sought** 168:21
**sound** 13:4 17:10
**sounds** 69:20 143:3 173:24 195:18 208:10 213:8 227:15 230:25 252:24 255:15 286:12 387:24
**source** 157:19 364:12
**sources** 117:9 293:7 312:24
**south** 2:2
**space** 366:11 366:23
**spam** 370:1,2
**spammed** 47:4
**sparse** 234:17
**speak** 68:23 70:4 75:17 130:18 142:19 152:5
**speaking** 33:13 38:21 39:21 76:23 142:9 189:6
**speaks** 28:12 33:6 73:17 250:7 337:19 386:7,14
**special** 377:2
**specialized** 301:6
**specific** 27:21 46:7 62:8 89:4 91:10,19 99:18 204:22 253:2 254:14 272:23 275:19 282:16 326:3 327:12 368:20
**specifically** 89:2 252:20 376:15
**specifications** 250:16
**specificity** 30:19
**specifics** 34:10
**specified** 204:12
**specifies** 236:5
**specify** 297:14
**specs** 195:14,14 195:15
**speculate** 198:12
**speculation** 274:15 383:2
**speculative** 303:4
**speed** 108:16 169:10 239:12 288:9

**spells** 315:25
**spend** 293:2 299:12 356:10
**spending** 299:18 300:7 300:12 342:25
**spent** 4:23 341:24
**spied** 92:25
**spoken** 30:20 30:24
**spot** 142:23 227:11
**spread** 187:22
**spreading** 181:9
**spreadsheet** 67:24,25 75:25
**spreadsheets** 357:17 359:18
**spring** 332:20
**spun** 188:20,22
**spying** 92:20 100:10 199:20
**square** 232:19 342:10
**squishy** 71:5
**stable** 181:6
**stacked** 74:18
**staff** 20:19 22:15 339:18
**stage** 10:5
**stamp** 72:4
**stand** 228:18 240:15 387:1 388:3
**standalone** 201:6
**standard** 112:1 136:15 184:10 226:3 261:20
**standards** 205:9 208:20
**standing** 84:25 85:11 146:1 149:3,10 169:4 228:17,25
**standpoint** 183:11,12 205:1
**stands** 152:6 214:23 215:7 316:5
**start** 54:18 68:21 77:23 108:10 114:13 138:13 190:10 265:16 290:24 290:25 298:17 324:4 346:5 355:24
**started** 4:9 48:14 360:15 376:25
**starting** 112:16 328:22
**starts** 183:3 373:13
**startup** 52:2 95:23 96:1 111:14
**state** 1:24 43:15 69:24 137:13 230:1 245:20,21 247:24 258:15 258:16 391:4 393:9,12
**stated** 87:20 130:20 318:13 338:23
**statement** 26:20 28:10 84:13 155:23 191:6 256:7 328:18
**statements** 21:25 29:4
**states** 1:3 3:13 111:22 115:15
**statistic** 256:2
**statistical** 216:4,7 261:8 261:18 304:7 304:13 305:3 308:9
**statistically** 216:5 234:19 239:16
**statistics** 95:21 205:24 215:20 220:18 304:15
**status** 61:5 109:1 276:22 278:19 312:2,7
**stenographic** 3:23
**step** 111:2,11 153:25 307:2,7
**steps** 151:25
**steve** 238:21
**stick** 32:23 82:18 156:3 186:8 191:22 369:20
**sticking** 306:18
**stipulation** 393:20
**stop** 108:2,10 110:5 111:7 142:4 172:13 177:3,5 225:22 231:14 298:8 299:3 300:24 302:12 309:4 374:2 385:20
**stops** 170:25
**storage** 80:21 80:23 82:14 117:12 318:14 318:20,22 319:8,11,12,13 319:15,18,21 319:22,23,25 319:25 320:20 320:25 321:5 321:21,22
**store** 82:14 86:20 87:25 88:1 196:15

214:7 318:22 319:3,4 320:22 320:24 335:19 335:22
**stored** 25:13,15 48:6 80:18,19 102:3 131:5,6 136:10 194:15 197:21 219:7 238:25 241:25 260:14 282:25 283:1 329:16
**stores** 117:13 134:4 179:19 179:20,21 241:23
**storing** 76:20 89:3 180:2 211:5 318:15 318:16,16,16
**straighten** 367:19
**straightforward** 60:8 242:2,8 242:22
**strange** 92:17 145:24
**strategies** 118:3 352:5 353:1 354:21
**street** 2:2,7,13
**strength** 92:22
**stretches** 176:15
**strike** 32:17 48:13 96:16 133:13 135:13 183:9 237:21
**strikes** 231:10
**string** 163:5
**stripped** 348:6
**strong** 99:23 249:25 250:1
**strongly** 126:10 179:4
**structure** 12:6 80:14 83:13 87:3,14,20 194:14 241:19
**structured** 230:24
**struggled** 326:15
**stuck** 359:7
**studied** 106:18 118:1 198:10
**studies** 215:18
**study** 26:3 53:12 59:11 114:12 125:4 125:12,18 126:17,24 127:2,25 384:15
**studying** 49:2
**stuff** 18:9 62:1 62:16 83:14 101:10 120:21 139:21 142:11
179:2 187:17 190:7 228:5 295:21 299:23 341:4 346:14 359:10 370:1 376:8
**stuffed** 228:6
**stumbled** 368:10
**sub** 12:9
**subject** 84:7 170:3 234:20 365:6
**subjected** 265:12
**subjects** 270:13
**subjunctive** 94:21,22 161:6
**subpoena** 9:7 9:10,12,20 10:3,11 268:25
**subscribed** 388:12 392:21
**subsequent** 371:7
**subsequently** 97:5 375:24 376:1
**subset** 48:4
**substantially** 5:8 241:19
**substitute** 125:1 209:7
**succeed** 33:18
**success** 246:1
**successful** 292:24
**successfully** 140:1
**succinct** 236:23
**suddenly** 150:11 152:19
**suffice** 143:2
**sufficiency** 255:13
**sufficient** 130:7
**suggest** 313:4
**suggested** 104:20
**suggesting** 105:11 300:3
**suggestion** 342:6
**suing** 48:17
**suite** 52:3
**summarize** 59:20
**summarized** 107:21
**summary** 11:13 11:25 12:3,11 31:6 42:7 107:18 248:24
**summer** 2:19 154:7
**summing** 338:14
**sundar** 20:24 21:8,19 22:16

**[sunk - swaa]**

**sunk** 280:3
**super** 163:17
**supplemental** 258:6
**supplementat...** 16:2
**supplied** 216:25 217:3 236:1 348:11
**support** 63:25 64:2 250:21
**supports** 152:22
**suppose** 130:12 187:1
**supposed** 23:14 23:17,23 177:19 308:14
**suppresses** 315:6
**sure** 4:24 5:16 5:17,20,24 6:25 7:25 8:12 15:3 18:16 24:8 29:18 30:10,11,13,18 33:10 34:8 36:9 38:7,25 39:7 41:21 46:1 54:11,12 65:3 66:5,14 69:17 73:21 78:8 85:7 86:1 86:3 97:3 98:7 100:4 101:8 107:7 109:20 113:24 119:8 122:24 123:25 125:17,21 127:11 130:13 132:18 135:11 141:2 154:19 166:10 167:25 168:18 174:1 176:13 179:25 186:6 187:9 191:23 192:18 192:20 207:19 211:15,22 214:1,25 215:3 216:24 223:25 227:25 232:4 234:11 243:2 244:19 247:4 249:1 253:4 254:12 259:9 259:20 270:18 270:20 274:2 277:14 278:12 278:14,15 280:1,4,18 282:14 283:15 291:15 293:24 294:22 295:13 295:17 296:2 297:1,23 299:7 301:23 306:8 306:25 307:15 309:18 310:4 310:23 315:22 317:17 318:11 323:1 328:20 328:22 342:8 344:18 347:17 357:21 358:10 367:20 372:23 373:11 377:7,8 378:2,8
**surgeons** 111:19
**surprise** 332:11
**surprised** 306:17
**surprising** 232:6
**surrounding** 371:7
**survey** 26:16 28:2 168:10
**surveyed** 198:10
**surveyor** 222:5
**surveys** 28:1,2 28:3,4
**susman** 10:22 10:24
**suspect** 99:1,2 100:12 348:15 348:19
**suspect's** 348:16
**suspicion** 102:15
**swaa** 20:1 40:7 41:3 44:1 49:3 57:9 58:23 74:11 81:11,14 82:4,23 83:7 84:1 104:8 105:5 107:11 107:13,25 108:21,22 109:1,21,25 117:21 119:5 120:12 121:19 122:2 129:10 129:20,24 130:1,25 131:8 132:5,6,15 133:4,4,8 134:13 144:13 146:21 147:16 148:12 149:1 170:12,20 171:1,16,20,25 177:11,14,14 177:23 181:17 181:17,20 184:20,22,25 185:4,17 186:1 186:4,13,18 190:16,18 194:22 199:4 199:21 200:24 202:18 203:10 203:13 207:14 209:2,25 211:3 212:4 218:19 219:4,18,21 220:7 221:13

221:21 224:4,4 226:9,11,21 231:5 232:3 236:14 237:6,7 237:13,15 239:2 248:22 249:7,16 257:13,14 258:10,23,24 259:18,19 260:5 262:6 263:2,5,10 264:17 265:14 266:5,14 272:1 276:22 277:2 278:23 286:17 303:24 304:12 306:22,23 307:10 308:12 308:18 309:12 309:24 311:25 312:7 318:23 321:2 322:23 323:10,16 324:23 325:1 325:25 329:19 330:15,17,22 330:25 331:5 335:20 337:4,8 337:11,16 338:1,6 340:1 342:13 353:13 364:17 370:9 374:10,16,22 375:10,11,13 375:18,22 376:8

**swear** 3:24

**switch** 20:1 40:7 82:16 88:15 92:18,24 103:13,19 199:4 200:24 201:6,10,12,20 201:21,22 202:1,18,20,25 268:5 271:11 298:15,22 300:18

**switches** 201:13 202:11 266:2 336:5

**switching** 251:24

**sworn** 4:4 388:12 391:7 392:21

**symmetrical** 106:13

**synchronize** 258:17

**system** 87:24 105:5 109:5 112:15,18 115:10 116:2,3 133:24 138:6,7 138:8 168:16 195:24 196:18 196:19,20 222:2,9,11 229:18 250:3 293:22 352:20 354:13

**systematic** 229:14

**systems** 65:21 107:12 129:14 133:6,14,16 196:25 197:4 207:2 245:18 294:1 297:1 348:25

**t**

**t** 1:1 4:2 129:1 129:3 389:5 395:3,3

**tab** 135:6 292:4 292:5 372:14 372:18 386:2

**table** 12:5 135:1,2 180:14 283:10,20,25 284:9,25 285:6 285:6 321:24 326:23 347:24 348:10,14

**tables** 235:10 347:21,22,23 347:24 348:24 378:11

**tactic** 279:10

**tagged** 86:18 337:10

**take** 22:19,23 33:7,24 75:6 75:18,24 76:25 77:24 78:10 81:2 84:16 91:15 97:24 98:1 104:22 106:22 108:11 108:13 115:11 115:23 116:24 123:18 128:2 132:16 134:25 135:7 144:7 147:5,6,8,9 151:3,25 152:22 153:25 160:9 167:7 169:2 192:19 225:11 227:24 231:18 232:7 232:23,25 233:24 234:8 236:24 237:23 242:25 243:14 245:1 246:7,9 246:12 264:24 267:19 280:16 280:18 283:13 292:3,12,22 294:23 306:2 310:21 315:19 318:2 321:15 327:2 332:6 339:18 344:8 355:7 360:16 362:18 370:4

**[takeaway - tell]**

**takeaway**
285:5
**taken** 1:19
47:12 66:19
173:2 176:21
233:3 240:1,2
251:20 281:1
317:23 329:3
344:11 348:10
348:17 362:6
384:1
**takes** 225:10
258:17
**talk** 20:21
30:22 31:22
36:1 63:25
70:5 97:18
106:14 107:5
129:12 149:20
152:7 163:17
172:19 176:2
189:5 190:24
208:18,19
212:7 213:24
221:18 229:4
230:1 232:21
234:22 247:10
257:11 283:4,8
283:9,20
312:18 313:11
332:2 335:18
338:15 348:23
360:9 384:25
**talked** 19:25
34:17 187:12

217:15 218:7
224:10 273:7
275:4 303:11
350:13 360:5
364:4,5,5
366:1 381:17
387:7
**talking** 37:23
54:18,19 67:3
68:15 70:17
79:18,19,22,25
80:9,12 82:6
86:5 100:13
117:9 129:8
141:5 145:22
156:5,17 158:1
166:10 176:8,9
176:10 183:18
203:19 206:16
208:10 219:17
221:14 227:7
252:3 253:23
257:16 264:3,5
277:17 280:13
282:17,20
296:17 308:8
312:23 313:12
324:4 328:5
351:20 366:8
371:16 373:10
374:12 379:12
379:23 386:3
**talks** 71:6
142:1 151:6
311:14 328:7

**tampa** 2:8
**tangential** 19:8
50:6
**tape** 199:14
**target** 187:24
195:1 204:14
**targeted** 192:1
341:15
**targeting** 191:1
191:9,15 193:1
193:16 195:2,4
196:5,16
197:15 203:17
203:18,20,22
203:25 204:5,8
205:2 210:8,11
**task** 245:10
**taught** 384:10
**team** 141:19
158:22 159:11
**tear** 37:11
**tech** 63:25 64:2
**technical** 20:12
21:2,7,17,22
27:15 58:20
74:16 78:4,16
78:17 92:14
122:10 168:5
172:12 175:8
175:10 213:22
246:1 268:15
269:11 271:10
287:1 341:21
349:7

**technically**
19:25 20:3
**technique**
175:11 282:6
**techniques**
175:3
**technological**
50:20
**technologically**
32:10 108:7,9
108:19
**technologies**
291:15
**technologist**
26:2 73:25
106:17 365:16
**technology**
20:8,9 21:4
26:1 31:3
34:15 113:21
114:4,10
117:11 126:7,9
183:15 222:13
253:1 299:21
**telemetry** 209:7
**television** 206:3
**tell** 15:6 23:9
61:23 62:11
70:9 76:19
88:10 92:19
95:8 126:17
127:11 140:10
179:12 206:25
224:25 229:6
253:3 260:2

**[tell - things]**

263:4 272:5 276:10 280:10 302:10 304:4 306:20 309:4 312:19 315:25 341:20 383:4

**telling** 77:16 89:2,18 121:7 121:9 126:5 201:18 244:10

**tells** 50:14 126:8

**temporary** 208:12 251:4

**tempting** 228:20

**ten** 306:7,15 371:10

**tends** 179:2

**terabytes** 319:20

**term** 37:6 39:22 43:10,17 45:4 46:3,5 73:1,2 77:3 88:4 154:4 197:14 204:4 206:17 301:4 319:4

**terminology** 37:18,25 45:17 191:24 235:1

**terms** 5:14 43:6 54:3 71:7 105:12 130:4 160:3 162:11 164:22 166:14 166:18,25 167:4,11 168:3 168:23 212:21 212:21 233:21 261:8,20 280:9 282:4 347:12 347:15 370:7 382:21,24

**test** 7:5 141:25 158:3,23 159:12,14,25 160:16 163:6,9 165:12,16,23 168:8 173:19 174:3 182:4 244:5,8 253:9 253:23 256:3 337:19 360:23 373:24 386:4

**testified** 4:4 20:25 140:11 238:22 270:11 351:12

**testify** 154:24 172:5 336:14

**testimony** 21:21 87:16 90:4,7 94:6 152:24 153:3 154:18 213:17 241:2 267:17 335:18 367:16 381:2 388:5 391:6,9

**testing** 139:12 169:22

**text** 230:17

**thank** 37:17 66:25 72:15 176:15 190:9 276:19 337:14 354:9 361:22 371:11 386:25 387:25

**thanks** 215:8

**theoretical** 225:13

**theoretically** 225:9 291:21

**theory** 15:7 98:17 182:10 182:11 195:5 250:6 289:19 289:20 291:6,9 294:7

**thin** 245:15

**thing** 22:1,3 27:24 28:11 31:10 51:24 52:19 63:9 71:2 78:19 103:7 124:5 145:25 150:3 155:6,16 159:19 163:2 163:15 168:14 168:15 186:10 203:1 209:9 220:3 229:20 240:25 262:15 266:24 269:3 281:15 291:17 291:20 294:24 297:21 299:21 300:15 307:16 307:23 308:15 313:19 316:9 316:10,12 323:23 329:15 339:15 341:1 347:9 379:3 381:19

**things** 6:21 17:13 22:12,13 27:1 30:24 32:1,7,18,20,21 32:25 33:1 34:19,22 35:18 49:16 51:11 58:21 61:20 65:20 76:12 79:15,17,25 86:2 102:11 105:25 108:6 109:3 110:3 113:7 119:18 119:19 120:6 129:20 135:18 136:3 141:2,24 145:7 163:24 164:5,17,23 169:6,10 179:23 183:3

**[things - think]**

187:10 201:14 202:24 203:23 206:21 207:9 207:18 225:7 228:1 231:6 247:3 248:2,3 250:12 251:10 255:15 260:6 283:9,19 290:3 299:22 300:1 305:1 313:22 317:13 319:3 319:10 320:25 321:7 322:17 331:11 334:8 334:20 335:13 344:20 349:11 359:6 379:23

**think** 5:2,20 6:1,15 7:2 8:17 8:20 11:9 12:2 12:13,23 15:11 16:12 17:9 18:21,23 19:5 19:19,24 20:20 21:14,18,23 22:17,22 23:18 23:20,25 27:23 31:4,4 32:12 34:6,18,25 37:25 38:12 39:8,17,18 41:8,10 42:6 42:25 45:7 48:20 49:13 50:1,5,24 57:5 57:10 58:14,17 59:7,19,21,25 60:11,18,22 61:14,15,16,17 61:19 63:14,16 64:24 66:4,6 67:8 68:20 70:8,23 73:17 74:8 77:12 80:4 82:8 84:3 85:9 88:4 91:2 93:6 104:14,21 105:2,9 108:17 109:23 110:18 115:9 118:11 118:17 120:24 121:11 122:11 123:1,3 124:12 130:2 131:10 132:2,4,19 133:18,21,23 134:3,9,16 135:5,19,24,25 137:1 139:5,20 140:6 141:8,20 141:21,25 142:20 143:5 144:9 145:12 145:14,19 147:7 148:2,4 150:24 151:7 151:12 152:1,3 152:16,20,21 153:2,21 154:23 156:9 158:11 162:23 166:3 170:9,13 170:14 171:11 172:5,8 174:11 176:1 177:6 178:2,4 179:10 180:1 181:24 184:24 185:2 186:3 187:11 189:3 191:3,21 193:3 194:5,6 195:8 196:1,8 197:5 198:21 198:23 199:1 200:12 201:5 202:2 204:18 205:10 209:24 212:1,6,8 215:25 216:12 217:13,15,21 218:21 219:20 221:16 223:9 223:16 226:18 227:4 229:1 231:1 232:9 233:7,19 234:15 239:19 241:21 243:3 243:22,23 246:20 247:23 252:19 253:12 253:17 254:19 256:14 258:3 259:23 261:5 262:17,18 264:23 265:9 265:18 267:18 268:3,4,9 270:22 271:4 272:14 276:25 277:9,16 280:4 281:13 284:22 285:4 286:6 289:21 290:2 290:13 291:9 292:14,21 295:11,19 298:24 300:15 300:17 302:18 304:14 307:4 307:12,15,22 308:1 309:9 310:15,24 316:4,20,25 319:19 320:17 321:1,3,6 322:6 323:2,7 324:4,14,16 325:3,9,13,16 327:18 331:14 333:6 334:5 336:6,25 338:2 338:10 340:8 342:6 343:18 346:6 352:5 356:2 357:6,10 357:18,23 359:5,14 361:1 361:7,13,15,19

**[think - timestamp]**

361:21 362:12
363:13,18
365:12 366:14
366:24 367:3,5
368:22 369:10
373:8,24 374:7
374:17 375:15
380:18,21
383:23 387:6
387:16
**thinker** 238:2
**thinking** 14:7,8
50:3 54:17
57:25,25 86:15
88:1 95:19
114:3 187:1,10
196:21 198:10
200:1,2 201:4
201:8 222:18
318:21 325:18
358:12 369:1
**third** 5:11,12
27:23 124:13
124:23 138:8
169:13 255:9
255:12 288:14
302:22 314:11
316:14 352:21
354:14 355:4
368:2 380:5
**thirds** 288:12
**thorough**
370:19
**thoroughness**
143:5

**thought** 48:25
53:10,12,14,16
54:11,20 57:11
59:2 60:10
61:2 65:1
78:24 109:4
116:14,25
149:13 183:2
188:18 201:19
204:2 231:11
231:15 243:21
280:5 281:22
281:23 282:1
338:25 371:19
**thoughtfully**
65:8
**thoughts** 60:18
**thousand** 352:3
**thousands** 8:13
**threat** 104:2
105:16 242:16
364:21
**three** 32:18
170:17 177:2
184:16 193:16
193:20 305:4
311:23 330:4
338:15 373:13
377:9 382:10
**threshold**
320:13 374:3
**threw** 362:14
**throw** 120:23
**throwing**
120:23

**thrust** 19:11
335:9
**tie** 110:12
178:19 179:1,2
183:5
**tied** 53:19,20
54:7,9,23,24
57:6 180:12
185:1 267:7
272:22
**ties** 110:6 179:5
185:15 285:6
**tightly** 151:18
**time** 3:3,8
33:15 47:10,13
55:4 62:5,10
62:17 63:9,21
64:4 66:17,20
67:13,18 69:10
71:14 85:24
86:6 99:11
103:23 109:11
115:25 121:14
123:18 128:4
129:4 133:9
172:25 173:3
176:19,22
181:6 183:1
189:22,25
195:21 198:18
198:18 206:2
232:22 233:1,4
243:14,16
251:18,21
280:6,8,24

281:2 285:25
288:4 289:21
290:17,19
297:18,21
300:14 306:12
309:8 311:17
313:16 314:2,9
317:12,20,21
317:24 319:1
327:3,5 329:1
329:4 341:25
344:9,12
358:25 362:4,7
373:17,19
377:1 381:13
385:9,11,14,23
386:8,9 387:2
388:4,8 393:10
393:18,24
394:7
**times** 4:12
37:13 117:19
119:23 121:22
121:23,23,25
205:20 213:25
233:14 265:11
275:24 299:22
303:11 312:17
317:9 361:2
382:25 384:2
**timestamp**
141:23 243:3,5
243:21,22
244:16 260:4

**[timestamps - transmit]**

**timestamps** 142:2,6 241:24 244:14
**tiny** 373:1
**title** 376:11
**titles** 362:16,19
**tmpapp** 330:15 332:2,25 333:8 376:10,14
**today** 14:2 16:22 33:16 51:9 62:6 66:11 79:3 89:24 95:8 118:20 146:4 179:9 266:12 267:4 274:6 275:5 283:24 284:8 327:6 331:7 347:5 356:13 358:6 358:21 359:16 363:24 365:5 378:25 381:16
**today's** 388:5
**todd** 1:22 3:20 391:3,18
**together** 9:9 53:24 55:5,7 77:13 101:13 110:12 112:10 114:24 136:5 136:18 137:21 141:15 142:7 174:25 179:2 235:7,9 292:2 330:5 347:21 347:22,25 349:5 364:10 365:10,21 372:20
**token** 278:17 278:18,22,22 281:20
**told** 13:24 21:1 63:2 73:22 78:22 90:1,5 103:16 115:19 122:8 124:16 198:1 209:13 220:20 313:14 330:4 384:10
**tom** 199:8,10
**took** 62:24 174:2 299:24
**tool** 124:23 302:14
**tools** 62:4
**top** 75:9 77:2 77:25 80:2 95:18 145:16 156:22 165:18 170:22 202:23 212:16 256:22 263:23 326:7 341:7 359:24 370:5
**topic** 26:3 115:20 126:6 275:2 310:19
**topics** 27:10 230:12 231:22 269:23 270:5
**total** 5:1,13 29:24 333:22 343:23,23 373:19
**totally** 113:9 321:14 361:24
**touched** 277:16
**touches** 19:9
**towards** 21:13 340:10 341:15
**track** 100:1 121:11 219:21 220:2 249:6 296:24 314:23 350:21 355:2 366:17
**trackable** 351:14
**tracked** 171:21 263:4 286:22 294:7 350:16 352:16 366:21
**tracking** 56:11 56:14 115:10 115:14 202:7 219:9 286:2 287:14 294:8 296:12 303:12 303:15 304:24 305:2 314:13 343:12,14 352:10 379:14 379:16,17,21 382:4 383:24 384:3,11
**tracks** 293:1
**traded** 272:6 272:15
**traffic** 62:20,21 132:15 133:4 144:14 146:21 205:12,13 275:19 288:12
**train** 262:21
**training** 383:25
**transaction** 209:12 218:2
**transactions** 239:16 379:8 379:22
**transcript** 107:14 149:15 311:11 312:11 391:8 393:6,8 393:10,13,13 393:21 394:2,2
**transcripts** 52:12 312:14
**transient** 197:21 208:12
**transmission** 66:4 210:14
**transmit** 108:23 109:2,3 109:6 185:7,21 219:4

**[transmitted - two]**

**transmitted** 228:5
**transmitting** 185:10 195:9
**transparency** 202:7 286:3 287:14 314:13
**trashed** 251:4
**treat** 237:19
**treated** 70:14 263:5 271:5 353:13
**treatment** 111:21 114:17 114:20
**treats** 237:12 237:15 342:12 353:8
**tremendous** 318:19
**trend** 287:11
**trick** 360:18
**tricky** 225:2
**tried** 6:18 8:17 38:6 49:15 110:22 140:11 140:15 197:4
**tries** 319:1
**trigger** 115:7
**triggered** 184:13 226:9 255:21
**triggering** 65:19
**triple** 202:5
**trouble** 100:7 116:19 127:15 250:10
**troublesome** 195:20
**trove** 36:20 38:4 40:3 46:9 48:5 64:9 81:23 103:20 103:22 236:6
**true** 82:24 260:6 291:18 291:19 348:25 391:8
**trust** 112:22 116:6,7 307:18 307:20 308:2
**truth** 209:14
**truthfully** 13:3 202:14
**try** 12:18 27:1 33:14,19,21 60:5 104:23 113:10,17 118:12 121:14 135:14 140:9 140:17 141:14 142:23 156:3,3 159:22 168:16 206:22,23 207:3 215:10 220:21 240:11 274:22 282:8 287:8 288:1 291:1 296:6 308:2 310:22 334:7 360:23
**trying** 25:18 26:8 39:25 41:20 59:18,19 59:21 60:3,9 65:11 74:21 79:4,5 92:3 100:1 113:8,14 113:20 119:15 120:8,22 139:10 140:7 140:24 146:14 150:15 164:24 168:4 175:15 179:17 200:15 200:18 201:4 213:11 216:8 224:21 228:1 228:22 235:6 242:12 255:2 256:4 261:23 270:6,10 279:14 281:19 282:24 283:2 284:23 287:10 305:11 306:12 306:13 310:10 313:20 342:9 355:1 357:14 360:16,18 363:21 374:2 375:5 378:10
**turn** 3:7 13:17 14:11 178:18 208:23 243:17 315:20 322:14 339:21 340:2 353:4 375:22
**turned** 44:8 51:10 57:6 59:3 109:22 186:13 190:20 203:11,14 249:8 265:14 302:9 311:25 335:20 338:6 339:10,13,20 376:9
**turning** 182:2
**turns** 15:13 58:9 239:14 322:23
**twice** 286:7
**two** 10:7,8 37:19 52:1 76:11 77:12 79:15,17,25 94:25 136:3,4 136:7 137:2 146:13 165:16 189:11 190:13 202:24 235:9 278:4 279:16 288:12 290:3 296:3 323:22 335:24 347:8 347:18,21,22

**[two - undertake]**

347:23 348:24 350:13 358:3 359:13 360:9 361:18 363:4 364:9 367:1,4 375:6,7 377:12 377:16,17,25 378:10 382:23
**tying** 138:21
**type** 7:5 109:17 193:17 205:5 261:14 338:25 350:8 353:21 365:13 366:5
**types** 158:15 215:11 241:25 261:14 293:3,6 294:12 302:1 348:24 355:10 355:16
**typical** 6:17 380:14,19
**typically** 69:4 272:6
**typo** 241:21

**u**

**uh** 72:20 296:16
**ultimate** 22:21 58:1 352:22 354:15
**ultimately** 142:19
**unable** 363:1
**unanswered** 368:11
**unattributed** 382:17
**unauthorized** 69:8 71:12
**unaware** 14:23
**unbake** 148:9
**uncertain** 224:7
**unclear** 6:24 34:20 87:13
**under** 12:8 64:12,19 84:13 84:14 112:14 119:12 188:7 196:17 249:8 268:25 279:3 310:12 349:8 365:13,22 374:10
**understand** 12:9 23:12 25:19 26:8,15 31:10,11,12 38:16 40:14 41:12,21 44:14 45:23 47:21 49:1 52:22 57:21 60:9 65:12 66:7 74:20,22 77:22 79:5 83:11 85:6,15 89:13 90:10,22 91:2 91:25 92:10 101:24 113:21 119:15,17 120:8 121:17 123:3 124:21 126:23 132:2 134:16 136:16 139:5,10 140:8 140:24 157:25 162:10,13 169:21 171:12 171:15 172:10 174:1 179:17 181:13 182:1 183:16 192:12 192:14 229:15 234:25 235:3 237:21 247:17 270:6 282:23 283:2 285:23 290:17,18 293:18 294:14 306:16 308:7 310:10 311:5 314:5,10 323:13 334:13 334:21 338:10 338:17 340:7 342:10 343:6 345:4 354:19 355:20 360:8 363:12 367:21 372:13 377:21 378:9 382:13
**understanding** 24:11,13,14 48:18,21 56:2 56:8,13,14,18 60:10 82:7 83:2 84:17 86:9 87:23 131:21,23 176:6 199:3 235:13 240:6,7 240:10 261:22 264:10 278:3 278:11 311:1 312:15 316:6 320:10 322:22 350:7
**understandings** 18:11 49:11
**understands** 229:24
**understood** 29:18 39:19 44:14 47:24 55:25 61:11 90:20 163:16 165:3,8 173:19 210:20 219:24 220:4 236:9 249:21 267:2 285:8,11 296:9 338:10 347:13 380:6
**undertake** 126:24 127:2 139:17 146:17

**[undertaken - used]**

**undertaken** 125:3,11 178:5
**unfavorable** 14:8
**unfortunately** 242:15
**unidentifiable** 258:20 259:15
**unified** 340:8
**uniform** 252:2 252:15 254:1
**uniformity** 252:6,18,20,23 253:10 254:8 254:16,20,23 255:3
**uniformly** 170:24
**unintentionally** 162:22
**unique** 60:14 161:13 178:20 180:19,21,24 181:2,3,5 183:25 230:20 274:25 384:4
**unit** 3:9 272:9
**united** 1:3 3:13 111:22 115:15
**universal** 115:9 294:2
**university** 37:21
**unknowns** 310:6
**unmask** 106:6
**unmasked** 102:2
**unnecessarily** 176:14
[redacted] 292:6,23 293:11
**unpack** 86:11
**unrealistic** 261:12
**uns** 112:25
**unsolvable** 225:8,9,12,16 225:18,20,23
**unusual** 305:16
**update** 150:9 150:22 152:18 155:11,22 156:5,12 157:5
**updated** 154:8
**updates** 155:12 155:13,14
**upgrade** 126:13
**uploaded** 362:10
**ups** 211:7
**upset** 308:11 309:14
**uptake** 155:13
**urchin** 63:24 64:1
**url** 230:8,11,17 230:18,19,19 230:21 231:18 231:19
**urls** 228:4,5,13 229:5,16,22 231:5
**usage** 63:6
**use** 17:23 37:11 37:15 39:16 40:16,21,23 43:9 46:3 54:3 62:19 64:5 70:21 71:9,11 73:14 84:25 90:6 96:18,21 103:3 114:2 116:3 118:22 121:11 123:25 124:23 126:10 126:11 127:15 136:18 142:6 151:16 152:9 168:25 171:8,9 171:19,24 180:10 184:3,8 186:17,19 190:15 206:17 212:25 218:19 219:22 220:21 221:24 230:12 230:19 246:13 250:11,17 252:1 253:8 261:3 280:22 284:12 285:24 289:11,13,20 289:22 290:10 291:2,4,10 292:1 303:9,15 304:12,15,23 314:1 321:22 324:18 325:23 329:15 333:8 334:2,7,10 335:2 339:19 340:25 341:1,3 341:4,5 342:1 342:7 346:14 352:9 353:1 354:21 355:2,6 355:17 364:3 366:19 368:17 370:10,11
**used** 37:13 38:24 39:22 41:18 43:6 45:17 47:17,24 50:25 51:6,9 60:14 61:22 62:18 63:4,10 64:3 69:6 71:17 73:13 75:2 77:4 86:8 88:5 96:23,25 102:22 115:10 115:11 117:15 117:16,16 121:22 136:21 145:20 146:8 154:4 161:5 162:18 174:2 174:12,16

**[used - using]**

190:18 197:14 197:15 201:23 202:2 203:15 219:25 220:1 220:15 221:19 221:21,22 222:11 253:5 255:9 259:1 262:20,20 284:1,10,13 285:12 295:11 295:13 296:8 301:15 303:18 324:24,24 326:4 327:13 328:15 336:17 348:8,18 352:7 376:8 385:12 386:20

**useful** 95:21 111:9 120:25 256:15 338:8

**user** 22:14 24:17,18 25:7 36:21 38:2,5 40:5 41:7 44:6 46:8,10 48:5 64:11 65:14,16 93:23,24 94:2 96:7 103:13 108:23 109:8 109:10 110:7 116:16 120:16 121:7 126:6 132:10,14 133:7,17 138:1 138:15,18,19 144:1,11,12,19 146:19,20 147:5 171:12 171:14,18,22 172:5 181:12 185:15,16,17 185:21 186:13 190:14 192:10 192:12,17 193:1 194:4,9 196:14 198:2 198:12 203:10 204:11 207:23 210:15 211:3,4 220:24 221:15 222:16 223:18 226:13,14,24 228:15 239:1 244:2,8 247:22 250:23 258:10 261:2,2,9,10,21 263:10 265:12 265:23,23 266:15,15,18 266:19,19 267:15 271:17 272:20,23 277:2,23 286:19,21,21 296:7 314:12 318:23 322:2 322:10,14,23 324:23 325:1 335:8 338:3 349:2 353:12 378:12,14,17 378:21 380:24 381:5,7

**user's** 40:10,11 108:20 187:4 192:3,8 194:12 197:24 198:13 203:8 212:4 223:19 260:16 276:21 277:4

**users** 19:23 24:25 50:14 62:9 78:23,23 96:24 117:22 119:5 120:12 122:2 124:7 133:8 166:19 169:1 170:10 170:24 171:6 173:15 178:3,4 178:6 190:16 198:6,7,9 207:14 208:8 211:2,14 218:19 220:18 226:9,11,21 241:4 251:15 255:10 261:6,7 261:18,24 265:18,24 266:14 287:3 298:15 303:23 304:12,21 306:22,23 308:12,18 328:10 338:6 340:1 342:11 347:6 349:15 370:13

**uses** 42:15 43:22 44:17,19 47:25 48:2 49:21 52:2 68:18 73:2 77:3 84:22 96:17 118:23 120:5 121:20 203:8 204:4 221:12 235:8 249:6 262:5,23 264:16 277:1 304:6 324:19 367:12

**using** 37:4 40:20 41:23,25 42:1,4 45:4,24 46:13 58:6 63:14,22 65:25 66:1 93:9 97:4 120:1 123:11 136:14 141:23 142:12 145:6,9 146:3 151:22 152:19 171:13 171:13 173:20 175:2,11,13,14 179:8,9 181:9 191:23 211:2

212:3 219:18 219:20 220:7 233:21 235:2 235:10,13 241:19 245:15 247:14 248:23 259:5 262:16 290:8 300:8 301:17 302:14 303:12 304:17 309:5 324:2 325:24 328:9 339:5 340:5,6 340:15 341:22 341:23 343:2 347:25 355:13 363:20,25 370:13 386:3
**usually** 14:21 16:9,11 103:22 307:16

**v**

**v** 392:2
**vague** 172:2 197:17 224:23 255:25 263:14 349:25 350:10 353:11 378:18 381:2
**valid** 163:4,5 205:12,13 216:5
**valuable** 221:6 307:19
**value** 271:17 271:24,25 272:20,23 273:7,9,11,25 274:19,20 309:16
**values** 109:9 253:22
**variation** 262:3
**varies** 261:1
**variety** 203:3 221:18 352:10
**various** 7:24 24:14 68:5 106:17 160:3 213:19
**vary** 260:15 265:15,20,22 266:15 272:3 275:6
**vast** 222:13 331:4
**vendor** 116:17 118:21 205:22 236:1
**vendors** 111:11 124:23 206:10 207:24
**verified** 256:12 312:8
**verifier** 352:22 354:15
**verify** 260:11 291:14 329:17 334:8
**veritext** 3:21 392:1 393:7,9 393:11
**versa** 291:19
**version** 78:11 82:11 126:12
**versus** 3:12 22:2 140:21 198:18,18 344:24 349:18 361:15 378:11 382:19,22
**viable** 189:3
**vice** 291:19
**video** 3:10 318:15 320:22
**videographer** 2:21 3:1,19 47:10,13 66:17 66:20 67:13,18 128:4 129:4 172:25 173:3 176:19,22 189:22,25 233:1,4 251:18 251:21 280:24 281:2 306:4 317:21,24 329:1,4 344:9 344:12 362:4,7 371:9 373:19 385:4,15 387:1 388:3
**videotaped** 1:18
**view** 56:16,19 80:23 165:8 169:25 171:22 187:16,18 193:13,14 217:16 228:4,8 228:14,14 231:5 271:9 331:17
**viewed** 193:19
**views** 217:17 369:25
**vii** 12:7
**vin** 180:24
**violated** 28:16 271:12
**violating** 110:14
**violation** 28:21
**vis** 53:9,9
**visit** 303:24
**visited** 95:7
**visiting** 62:12
**visitors** 305:5 341:10,11,16 343:9
**volume** 62:21 329:19 346:4 355:24
**volumes** 239:12
**voluminous** 16:4 329:16 362:17 373:23
**vs** 372:15 393:4 395:1

**w**

**waa** 20:1 24:2 25:24 26:11,13 26:20 28:7 32:19 39:13,15 40:7 41:3 43:25 44:2,18 49:3,20 50:5 50:15,19 51:6 51:15 52:18 53:3,8 57:1,3,7 57:9 58:9,12 58:15,22 59:3 60:21 70:22 71:17 79:8,8 81:11,14 82:3 105:5 107:10 107:10,13,24 109:1,21,24 129:10 130:25 131:8 134:12 170:19 171:1 171:16,20 177:11,14,14 177:23 178:16 178:18,19 181:16,17,20 185:4 190:16 190:17 196:7,9 196:13 199:4 199:21 200:24 203:13 209:1 210:10 219:5 221:21 227:2 237:6,7,13,15 248:21 249:7 257:23,23 271:6 275:20 276:22 277:2 278:23 304:11 311:24 312:7 318:23 321:2 323:10 325:25 329:19 330:17 330:22,25 331:5 335:20 337:3,8,10 338:1,6 353:7 353:12 374:10 375:18,22

**wait** 264:1 340:16

**waived** 393:23 393:23

**waiving** 393:20

**walk** 198:7

**want** 14:14 16:25 17:3 18:16 19:9 25:2,10 28:9 35:6 38:16 39:6,9,9,10 41:20 42:9 43:14 47:4 65:4,5,9 68:6 71:18 74:22 76:1 84:15,15 84:16 85:2,6 86:22,24 89:13 94:20 97:18 100:2 103:14 103:19 104:14 104:16 107:1 110:7,20,25 114:18,19 116:7 121:1,3 126:12 129:12 130:18,20,22 137:4,15 138:15,25 142:21 149:4,5 151:8,17 152:23 154:18 155:10,23 157:18 162:2 172:10 173:25 176:25 177:4 178:4 180:15 184:21 189:9 190:10 191:22 200:2 204:14 205:16 206:19 210:17 214:1 215:2 218:25 249:19 253:1 259:20,24 266:8 277:3 282:3 283:18 286:22 289:22 291:14 295:22 306:10 307:19 308:7 313:25 314:23 323:5 325:8 326:2 327:2 328:10 335:10 336:20 339:2 340:15 341:5,6 344:17 345:23 351:14 352:17 356:9 356:10 360:1 361:25 362:17 366:3,17 367:23 371:21 377:11,15,22 378:8 385:21 387:6

**wanted** 67:4 68:17 98:11 115:20 130:9 167:24 206:13 231:23 249:13 346:25 356:24

**wants** 90:6 113:16 163:22

**washington** 101:11 233:8 233:13

**waste** 33:14

**watch** 200:3

**watching** 172:22 301:9

**water** 120:23

**way** 9:24 14:15 18:22 20:10 21:10 22:1,12 23:14 25:6 33:24 35:16 36:9 40:25 44:2,8 47:25

**[way - witness]**

48:2 49:4,24 50:6 59:1,24 59:25 61:7,18 62:10 64:25 65:14 69:17 73:12 75:13 76:3 77:13 82:8 91:21 93:8 94:8 101:3,12 112:10,12 114:21,25 115:16 118:7 120:22 133:3 138:3 143:7 145:19 150:22 158:12 165:10 170:19 171:8 177:6 179:18 180:1 184:21 184:24 185:3 193:3 195:12 197:4,11 198:16 200:2 200:10 201:3,9 205:3 207:18 208:17 209:25 213:24 227:24 230:7 231:1,25 235:16 244:10 246:8,16 248:17 250:2 256:15,16,18 260:10 261:5 262:10,20 263:9 266:16 267:24,25 268:7 272:5,14 279:6 282:8 290:18 291:24 292:13,21 293:14 300:4 301:24 307:10 307:13,17 308:9 309:24 321:18 322:12 322:15 334:25 342:12 353:14 354:4 360:23 361:3 366:15 375:4 376:24 387:22 391:12

**ways** 63:7 134:5 139:21 195:8,24,25 207:4 221:6,7 223:24 336:15 347:11 351:17 352:10

**we've** 101:15 139:14,20 218:16

**wears** 305:24

**web** 18:13 22:13 42:19,25 43:10,23 44:20 46:7 49:9 63:17 201:7 217:12,15,17 229:21,23 230:3,4,20,22 231:20 292:18 305:12 309:13 318:17 337:25 340:13 341:17 343:21 372:9

**webbed** 134:11

**website** 62:12 62:19,22 64:6 95:8 96:8,14 96:17 98:10,16 109:12 116:17 117:18 119:22 120:2,11 121:2 121:9 214:10 214:11 227:5 300:21 301:6 301:14 303:10 303:24 306:23 339:6 340:5 341:10,11,14 341:14 344:2 351:1 372:11

**website's** 96:24

**websites** 184:2 301:19 303:13

**week** 10:7,8

**weird** 305:10 305:15

**welcome** 113:18 321:12 327:10

**went** 92:7 140:9 165:24

**whereof** 391:14

**whipping** 237:24

**whispering** 3:6

**white** 111:6 204:14,15

**widely** 162:17

**wild** 101:15 105:15 159:17 159:20

**willing** 274:23 297:15 366:22

**willkie** 1:20 2:13,19 3:16

**willkie.com** 2:16,17 393:2

**window** 351:10 380:15,19

**wires** 38:8,23 39:1

**wish** 240:14

**wishes** 251:15 268:6 271:12

**withdraw** 11:19

**withheld** 331:3

**witness** 3:25 4:3 13:11 33:12 36:16 80:8 81:5 108:14 117:6 123:16 170:8 189:19 210:23 237:2 249:2,11 259:10 269:4

281:14 283:16 287:23 317:19 344:15 363:20 372:3,24 389:2 391:6,9,14 392:3 393:13 393:16 394:2,5 395:24
**witnesses** 301:7
**wool** 211:1,14
**word** 6:20 25:2 37:7 77:18 85:1 93:21 145:20 165:1 169:2 189:8 222:21,22 223:6,7 233:25 252:2 253:5 254:5 320:3,4 320:6 363:20 363:25 370:4 382:13
**worded** 314:25
**wording** 255:14
**words** 41:6 59:17 74:3 84:23 86:7 96:8 161:22 173:11 177:19 194:13 204:10 204:11 213:3 214:11 258:15 259:2,5,6,7 305:8 346:11 347:16 354:23 363:19
**work** 7:5 8:4 19:17 20:9,23 21:11 22:4 23:14 36:8 49:3,6 56:11 56:15 58:3 59:24,25 60:4 62:4 116:21 127:14 133:12 134:23 148:21 151:25 177:15 181:17,20 184:21,24 190:10 198:15 207:18,25 208:18 209:10 209:17,18 215:10 223:17 269:18 274:4 298:9 307:14 310:2 320:5,7 321:12 323:5 371:8
**workable** 118:8
**worked** 10:23 357:6
**workers** 97:6
**working** 23:13 26:1,1 38:22 61:7 95:24 111:14 116:9 116:15,16 303:22 308:15 340:12
**workload** 197:10
**works** 10:14 20:25 21:10,22 22:2,2,8,8,11 56:1,9,19,21 60:1 101:4 116:8 164:8 184:21 219:14 341:5,7
**world** 101:4 102:17 103:5 185:20 187:21 331:11 351:4,6 372:5
**worried** 274:8
**worry** 199:11 199:16
**worth** 266:23 268:7 271:7 273:13,15,19 326:17 383:12
**wrap** 123:22 187:16
**write** 181:23
**written** 8:16 11:7 40:15 90:7 130:17 249:5 259:8 344:25 345:1
**wrong** 15:24 21:2 55:3 59:21 67:9,11 78:7 84:17 135:6 165:6 170:21 263:19 289:2,3 290:14 298:13 321:23 340:18
**wrote** 6:15 8:7 8:21 90:21 130:21,22

**x**

**x** 1:7,15 318:13 389:1,5 394:9
**x6** 67:23,24 389:7
**xinyu** 238:15

**y**

**yale** 37:21 111:17
**yanchunis** 2:9
**ye** 238:15
**yeah** 29:7 34:12 39:11 45:13 71:19 73:24 94:8 105:18 106:25 108:8 113:20 124:25 131:4 133:18 135:7 135:25 143:12 144:9 149:9,17 150:23 151:7,8 153:10 156:24 158:11 160:12 161:10 162:8 164:9 172:11

**[yeah - à]**

173:24 174:11 176:18 185:13 189:17 190:5,8 191:2,20 192:17 193:12 195:19 196:4 197:12 202:6 204:7 217:5 218:13 223:15 227:9 229:12 229:25 232:1 244:7 269:17 270:3 272:16 278:20 289:4 290:25 296:18 302:6 312:6 314:15 315:24 316:19,20 329:9 330:12 330:17 345:20 360:20 362:2 366:14 369:17 370:4,4,15 376:12 387:9 387:10
**year** 319:20
**years** 11:1 26:2 56:5 58:8 60:20 78:12 82:10 97:11 112:16 291:19 295:14 301:13 384:1
**yesterday** 76:7 302:10
**york** 1:22,22,24 3:17,17 117:19 119:23 121:22 121:23,23,25 233:14 391:4 392:1

**z**

**zero** 137:14
**zoom** 2:9,10,16 2:19,20 172:21

**à**

**à** 53:9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.