**BOIES SCHILLER FLEXNER LLP**
David Boies (admitted pro hac vice)
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
dboies@bsfllp.com

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com

James Lee (admitted pro hac vice)
Rossana Baeza (admitted pro hac vice)
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Alison L. Anderson, CA Bar No. 275334
M. Logan Wright
725 S Figueroa St., 31st Floor
Los Angeles, CA 90017
Tel.: (213) 995-5720
alanderson@bsfllp.com
mwright@bsfllp.com

**SUSMAN GODFREY L.L.P.**
Bill Carmody (admitted pro hac vice)
Shawn J. Rabin (admitted pro hac vice)
Steven M. Shepard (admitted pro hac vice)
Alexander Frawley (admitted pro hac vice)
Ryan Sila (admitted pro hac vice)
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com
rsila@susmangodfrey.com

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: (310) 789-3100
abonn@susmangodfrey.com

**MORGAN & MORGAN**
John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)
Michael F. Ram, CA Bar No. 104805
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com
mram@forthepeople.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

ANIBAL RODRIGUEZ, SAL CATALDO, JULIAN SANTIAGO, and SUSAN LYNN HARVEY individually and on behalf of all other similarly situated,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

Case No.: 3:20-cv-04688-RS

**DECLARATION OF MICHAEL LASINSKI IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Judge: Hon. Richard Seeborg
Courtroom 3 – 17th Floor
Date: October 5, 2023
Time: 1:30 p.m.

## DECLARATION OF MICHAEL LASINSKI

I, Michael Lasinski, declare as follows.

1.      Counsel for the *Rodriguez* Plaintiffs retained me to provide expert analysis and, if requested, expert testimony. I have personal knowledge of the matters set forth herein and am competent to testify.

2.      I submit this declaration in connection with Plaintiffs' Motion for Class Certification.

3.      Attached is a true and correct copy of the Expert Report that I prepared in connection with this matter, dated February 20, 2023. The opinions I provided therein are true and correct to the best of my knowledge.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 17th day of July, 2023, at the Ankura offices located at 220 E. Huron, Suite 470, Ann Arbor, MI 48104.



/s/ _____

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Case No. 3:20-cv-04688-RS

---

ANIBAL RODRIGUEZ, SAL CATALDO, JULIAN SANTIAGO, AND SUSAN LYNN HARVEY,
INDIVIDUALLY AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED,

*Plaintiffs,*

v.

GOOGLE LLC,

*Defendant.*

---

EXPERT REPORT OF MICHAEL J. LASINSKI

February 20, 2023

CONFIDENTIAL – ATTORNEYS' EYES ONLY

TABLE OF CONTENTS

1. Executive Summary ................................................................................................................. 1

2. Qualifications / Background ..................................................................................................... 3

3. Statement of Limitations Regarding the Use of this Report ..................................................... 4

4. Assignment / Assumptions ...................................................................................................... 4

5. Information Considered ........................................................................................................... 5

6. Background ............................................................................................................................. 7

   6.1. Google ............................................................................................................................. 7

   6.2. AdMob ............................................................................................................................ 9

   6.3. Ad Manager .................................................................................................................. 11

   6.4. App Promo .................................................................................................................... 11

   6.5. Google Analytics for Firebase ...................................................................................... 12

   6.6. Web & App Activity (WAA) and Supplemental Web & App Activity (sWAA) ........... 15

   6.7. Google's Contemporaneous Analyses of the Financial Impact of Certain Settings and
       Privacy Controls .......................................................................................................... 19

   6.8. Potentially Available Measures of Monetary Relief ...................................................... 26

7. Unjust Enrichment ................................................................................................................ 27

   7.1. Analysis of Google's Unjust Enrichment Under Scenario One .................................... 28

   7.2. Analysis of Google's Unjust Enrichment Under Scenario Two .................................... 41

8. Actual Damages .................................................................................................................... 47

   8.1. Analysis of the Value of WAA/sWAA-Off Data Acquired by Google .......................... 48

   8.2. Analysis of Class Member Devices ............................................................................... 55

   8.3. Conclusion Regarding Actual Damages ........................................................................ 58

9. Apportioning Monetary Relief to the Classes and Class Members ......................................... 58

   9.1. Apportioning Monetary Relief Across Classes ............................................................. 59

   9.2. Apportioning Monetary Relief Among Class Members ................................................. 59

10. Signature ............................................................................................................................. 62

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## 1. EXECUTIVE SUMMARY

- As described in this report, and consistent with my prior work and experience, I have undertaken certain analyses to calculate class-wide unjust enrichment and actual damages for the two classes alleged in the Fourth Amended Complaint.

- As described in this report, and consistent with the work I have done in other cases, including class cases, it is my opinion that the discovery in this case can be used to quantify the monetary relief sought by Plaintiffs on a class-wide basis, for both Classes and for the full Class Period.

- As described in Section 7, it is my opinion that the most appropriate and reliable bases for quantifying's Google enrichment from the alleged wrongful conduct include financial data that Google produced in this matter and Google's contemporaneous financial impact analyses relating to certain settings and privacy controls.

- As described in Section 7, my analyses of Google's unjust enrichment are segmented by Google product area and liability scenario. This segmentation is intended to assist the trier of fact in determining Google's unjust enrichment under two liability scenarios identified by Counsel, namely that the alleged wrongful conduct caused Google to be unjustly enriched by an amount equal to either 1) the portion of Google's U.S. App Promo, AdMob, and Ad Manager app ads revenues and profits attributable to Google's collection, saving, and/or use of WAA/sWAA-Off Data for purposes of tracking advertising conversions ("Scenario One"), or 2) the portion of Google's U.S. App Promo, AdMob, and Ad Manager app ads revenues and profits attributable to Google's collection, saving, and/or use of WAA/sWAA-Off Data for purposes of serving and monetizing advertisements ("Scenario Two").[1] As detailed in the attached schedules and summarized in the figure below, I have determined that Google's unjust enrichment (as measured in revenue net of traffic acquisition costs) under Scenarios One and Two totals approximately $558.8 million and $664.3 million, respectively, during the period July 1, 2016 through December 31, 2022.[2] These Scenario One and Two amounts represent approximately 5.27% and 6.27%, respectively, of Google's U.S. revenues net of traffic acquisition costs from App Promo, AdMob, and Ad Manager for apps during that same period.[3]

---

[1]  As discussed below and used throughout this report, "WAA/sWAA-Off Data" is intended to collectively refer to all data that Google collects relating to user activity on non-Google mobile applications by way of the Firebase SDK and/or Google Mobile Ads SDK while a user is signed into Google and has WAA or sWAA turned off.

[2]  Schedule 1.1. As discussed in Section 7, traffic acquisition costs account for approximately ██% to ██% of Google's total booked revenues and are the largest expense on Google's App Promo and AdMob income statements.

[3]  Schedule 16.1.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 1**
**Unjust Enrichment Damages[4]**

|            | Scenario One  | Scenario Two  |
|------------|---------------|---------------|
| App Promo  | $332,020,541  | $332,020,541  |
| AdMob      | $169,231,550  | $247,998,478  |
| Ad Manager | $57,538,727   | $84,319,482   |
| Total      | $558,790,819  | $664,338,502  |

- As described in Section 8, it is my opinion that actual damages attributable to the alleged wrongful conduct can be determined as a function of the payments necessary to incentivize an individual to knowingly surrender the choice to keep activity on mobile apps private and allow an organization to track all app activity data. I have identified and considered various indicators of both the payments that Google and other organizations have paid to individuals to obtain their activity data and the fees that individuals have paid to various organizations in their attempts to increase online privacy and/or avoid tracking. In my opinion, the most probative indicator is derived from one aspect of the monthly compensation structure to participants in the Ipsos Screenwise Panel, a consumer research study conducted for Google by Ipsos. While compensation to Ipsos Screenwise Panel participants can vary based on numerous factors, it is my opinion that the baseline payment to participants of $3 per month for using a Screenwise meter app on a single mobile device represents a conservative indicator of the monthly payment necessary for an individual to knowingly surrender the choice to keep their app activity private and allow Google to track all app activity data, regardless of that individual's WAA and/or sWAA settings. While the Screenwise compensation structure applies this $3 payment per device per month, it is my opinion that actual damages through December 2022 can be conservatively measured by applying this $3 payment on a one-time basis to the number of Class Member Devices, where a single Class Member Device represents a mobile device (smartphone or tablet) used with WAA/sWAA off at least once during the Class Period through December 2022. Based on the available data and my calculations described in Section 8, the application of this $3 payment per device to my calculations of Class Member Devices yields total actual damages of approximately $486.0 million through December 31, 2022.[5]

- A relevant input to my analysis of actual damages was the data produced by Google regarding U.S. Google accounts for which sWAA was turned off at any time during the four-year period between July 27, 2016 and July 27, 2020. While Google has not produced similar data for the complete Class Period to date, even these truncated records indicate that, among approximately ███████ U.S. Google accounts that were ever active during this period, approximately ████ (*i.e.*, approximately ██ %) had sWAA turned off at some point. In my opinion, this demonstrates that a substantial number of users have (or at some point had) sWAA turned off.[6]

---

[4] Schedule 1.1.
[5] Schedule 10.1.
[6] Schedule 12.7. See also GOOG-RDGZ-00187010 at tab "sWAA"; Defendant Google LLC's Supplemental Objections and Responses to Plaintiffs' Interrogatories, Set Six (Nos. 12, 16, &17), Supplemental Response to Interrogatory No. 12, p. 6.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

- As described in Sections 7 and 8, while my current calculations of unjust enrichment and actual damages cover the period July 1, 2016 through December 31, 2022, I could readily update these calculations to cover subsequent periods through the date of trial. Relatedly, to the extent that the trier of fact determines that the calculation of unjust enrichment or actual damages should start on a date later than July 1, 2016, the calculations attached to this report can be readily modified to reflect that alternative period.

- As described in Sections 8 and 9, I conservatively estimate that there are approximately 90.9 million total class members through December 2022. Based on these estimates, my unjust enrichment calculations translate to an average of approximately $6.14 per class member for Scenario One or approximately $7.30 per class member for Scenario Two, while my actual damages conclusion translates to approximately $5.34 per class member.[7]

- As described in Section 9, my analyses can be readily used as common proof in part because they can be adjusted to calculate and assess unjust enrichment and actual damages for different periods of time and Classes (or subclass(es)) depending on any rulings by the Court and findings by a jury. All of these calculations can be readily apportioned across the two Classes and among Class members.

## 2. QUALIFICATIONS / BACKGROUND

1. I am Michael J. Lasinski, a Senior Managing Director at Ankura Consulting Group ("Ankura") and head of the Intellectual Property Group. Previously, I was the founding member of 284 Partners, LLC ("284 Partners"), a professional services firm focused on IP valuation, litigation consulting, IP acquisition and licensing strategy, and transactional services. Over the past twenty-eight years, I have assisted clients, including corporations, law firms, government entities, and investors, in understanding and evaluating the financial aspects of intellectual property.

2. My consulting practice has focused on the financial aspects of intellectual property since 1995. I have valued intellectual property and businesses in the context of licensing, sales, mergers, acquisitions, investments, tax matters, and litigation, as well as many other contexts. During my professional career, I have completed hundreds of valuations of intellectual property assets. I have spoken on the topic of intellectual property valuation, litigation, licensing, and tax matters throughout the U.S. and internationally.

3. I am President-Elect of the Licensing Executives Society International ("LESI"), the umbrella organization of national and regional associations for licensing executives, and I am a past President of the Licensing Executives Society United States and Canada ("LES"). LES is one of the country's largest intellectual property licensing trade organizations. I am a past Division Chair of the American Bar Association's IP Section. I am a former Chair of the Valuation and Taxation Committee of LES and a former Vice-Chair of the Intellectual Property Owners Association's Valuation and Taxation Committee. I have also been named one of the World's 300 Leading IP Strategists by Intellectual Asset Management.

4. I have been retained to provide expert testimony in other federal, state, tax, and arbitration proceedings. I have also been retained by both taxpayers and the IRS to determine intellectual property value and royalty rates in transfer pricing and other tax-related transactions. In addition, I

---

[7] Calculated as ($558,790,819 / 90,948,660); ($664,338,502 / 90,948,660); and ($486,046,273 / 90,948,660), respectively.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

was retained by a Federal Monitor to set royalty rates for a company that was subject to a deferred prosecution agreement from the U.S. Department of Justice. A list of cases in which I have provided expert testimony is provided in my curriculum vitae (attached as Appendix A of this report).

5.      I hold a Bachelor of Science in Electrical Engineering (Summa Cum Laude) and a Master of Business Administration (High Honors) from the University of Michigan. I am a Certified Public Accountant ("CPA") licensed in the state of Illinois. I am also Certified in Financial Forensics ("CFF") by the American Institute of Certified Public Accountants, and I am a Certified Licensing Professional ("CLP") initiated by the LES.

6.      Ankura is being compensated for my work in this matter at a rate of $795 per hour. Ankura is being compensated for the work of other Ankura consultants assisting me on this matter (as is my common practice, working at my direction and with my supervision) at hourly rates of less than $795. No part of my compensation, or that of Ankura, depends on the outcome of this litigation.

7.      I understand that I will be excluded from any Class recovery in this case.[8]

## 3.   STATEMENT OF LIMITATIONS REGARDING THE USE OF THIS REPORT

8.      This report was prepared in connection with *Rodriguez v. Google L.L.C.*, Case No. 3:20-cv-04688-RS, filed in the United States District Court for the Northern District of California. This report may not be used for any other purpose without the express written consent of Ankura. Moreover, this report contains proprietary information designated as "CONFIDENTIAL" and "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" under a Stipulated Protective Order entered in the United States District Court for the Northern District of California. Accordingly, no part of this report or its contents may be used outside of this litigation, or published or shared without adherence to the applicable legal standards governing such publications.

## 4.   ASSIGNMENT / ASSUMPTIONS

9.      I was retained with Ankura by counsel for the Plaintiffs in this action ("Counsel") to provide expert analysis and, if requested, expert testimony regarding the measures of monetary relief that may be appropriate if liability is found against Google LLC ("Google") for the alleged wrongful conduct described in Plaintiffs' Fourth Amended Complaint.[9]

10.     My assignment in this matter includes assessing the feasibility of identifying and quantifying various measures of monetary relief tied to Plaintiffs' claims, including that which I have described below as Google's unjust enrichment and Plaintiffs' actual damages during the period July 1, 2016 through December 31, 2022.

---

[8]    Fourth Amended Complaint, January 4, 2023, p. 66.

[9]    As detailed in the Fourth Amended Complaint, Plaintiffs contend that Google's wrongful conduct includes violations of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), invasion of privacy, and intrusion upon seclusion. As also detailed therein, "Plaintiffs" include Anibal Rodriguez, Sal Cataldo, Julian Santiago, and Susan Lynn Harvey. Fourth Amended Complaint, January 4, 2023, pp. 40-41, 62-69. I understand from Counsel that unjust enrichment, actual damages, nominal damages, and injunctive relief are available remedies for these remaining claims.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

11.    My investigations in this matter began with the necessary assumption that liability would be found against Google for the alleged wrongful conduct.  This assumption does not imply that such liability exists, nor does it imply that I have been engaged to provide opinions about liability issues.

12.    Based on the Fourth Amended Complaint and instructions from Counsel, I assume the following:

- ▪ The class period began on July 1, 2016 and is ongoing (the "Class Period").

- ▪ There are two classes defined in the complaint as follows:

    *Class 1 – All individuals who during the Class Period (a) turned off "Web & App Activity," or supplemental "Web & App Activity," and (b) whose mobile app activity was still transmitted to Google, from (c) a mobile device running the Android operating system (OS), because of the Firebase SDK and/or AdMob SDKs, on a non-Google branded mobile app.*

    *Class 2 – All individuals who during the Class Period (a) turned off "Web & App Activity," or "supplemental Web & App Activity," and (b) whose mobile app activity was still transmitted to Google, from (c) a mobile device running a non-Android operating system (OS), because of the Firebase SDK and/or AdMob SDKs, on a non-Google branded mobile app.*[10]

## 5.    INFORMATION CONSIDERED

13.    In connection with my work in this matter, I or Ankura personnel working at my direction reviewed and assessed the following types of information:

*Documents produced by Google*, including:

- ▪ Google internal analyses, memoranda, and presentations;
- ▪ Google internal correspondence;
- ▪ Google financial records.

*Publicly available information*, including:

- ▪ Company websites;
- ▪ Corporate financial filings; and
- ▪ Publicly available articles, press releases, and similar materials.

*Deposition testimony of Google personnel and corporate designees (with exhibits)*, including:

- ▪ Arne de Booij; Senior User Research Manager;[11]
- ▪ Greg Fair, former Senior Product Manager, Privacy;[12]
- ▪ Steve Ganem, Group Product Manager, Google Analytics;[13]
- ▪ Sam Heft-Luthy, former Product Manager;[14]

---

[10]  Fourth Amended Complaint, January 4, 2023, p. 65-66.
[11]  Deposition of Arne de Booij, February 7, 2023.
[12]  Deposition of Greg Fair, October 2, 2022.
[13]  Deposition of Steve Ganem, October 28, 2022.
[14]  Deposition of Sam Heft-Luthy, February 8. 2023 (rough transcript).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Belinda Langner, Product Manager, App Campaigns;[15]
- Francis Ma, Director of Product Management, Firebase;[16]
- Eric Miraglia, Senior Director of Product Management;[17]
- David Monsees, Product Manager, Footprints;[18]
- Rahul Oak, former Group Product Manager, App Ads Innovation;[19]
- Christopher Ruemmler, Software Engineer, Security, Trust, and Privacy;[20]
- Daniel Stone, former Group Product Manager;[21]
- Edward Weng, Product Manager, AdMob;[22] and
- Xinyu Ye, Software Engineer.[23]

*Written discovery*, including:

- Google's responses to written discovery served by Plaintiffs, including Google's responses to Plaintiffs' interrogatories and requests for admission.

14.   I also relied upon discussions with Jonathan Hochman, Plaintiffs' technical expert, and Mark Keegan, Plaintiffs' survey expert, and the results of a survey performed by Mr. Keegan (the "Keegan survey results").  My staff and I were also provided access to a document platform where we were able to independently search for and access any and all documents produced by Google in this case.

15.   My consideration of such information is consistent with my standard practice and also the practices of my peers who evaluate financial damages in commercial litigation.  The documents I have relied upon in developing my opinions are identified in this report, the attached schedules, and the attached Appendix B.  This report includes all information required under Federal Rules of Civil Procedure 26(a)(2)(B).  The balance of this report contains a summary of my current opinions and bases for those opinions.

16.   It is important to note that the opinions and conclusions contained in this report are based on the information that has been made available to me to date.  I understand that additional information relevant to the determination of damages may become available subsequent to the issuance of this report.  Accordingly, my opinions and conclusions contained herein are subject to change based on further developments in, or relevant to, this case, such as additional discovery, the testimony of other fact or expert witnesses, and/or rulings of the Court.  Additionally, I may prepare demonstrative exhibits to help me explain or illustrate concepts contained in this report at trial.

---

[15]   Deposition of Belinda Langner, December 15, 2022.
[16]   Deposition of Francis Ma, October 28, 2022.
[17]   Deposition of Eric Miraglia, October 25, 2022.
[18]   Deposition of David Monsees, September 15, 2022.
[19]   Deposition of Rahul Oak, November 18, 2022.
[20]   Deposition of Christopher Ruemmler, September 9, 2022.
[21]   Deposition of Daniel Stone, November 15, 2022 (rough transcript).
[22]   Deposition of Edward Weng, September 23, 2022.
[23]   Deposition of Xinyu Ye, February 9, 2023 (rough transcript).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

6. **BACKGROUND**

17.    For the purpose of understanding the current matter, I provide below certain background information regarding Google, AdMob, Ad Manager, App Promo, Google Analytics for Firebase, and Google's Web and App Activity and Supplemental Web and App Activity settings.

## 6.1.  Google

18.    Google is a wholly-owned subsidiary of Alphabet Inc. ("Alphabet") and the largest business within the Alphabet collection of businesses.[24]  From a financial reporting perspective, Google is comprised of two segments: Google Cloud and Google Services.[25]  The Google Cloud segment generates revenue from fees received for the Google Cloud Platform, which provides customers with scalable infrastructure, and from fees received for Google Workspace cloud-based collaboration tools for enterprises.[26]  The Google Services segment covers core products and platforms including those which Google categorizes as Ads, Android, Chrome, Gmail, Search, and YouTube.[27]

19.    The Google Services segment generates revenues primarily by delivering advertising that appears on Google Search ("Search Ads"), YouTube ("YouTube Ads"), and Google Network properties ("Display Ads").[28]  In its Form 10-K for the fiscal year ended December 31, 2022, Alphabet represented that more than 79% (*i.e.*, approximately $224.5 billion) of its total 2022 revenues (*i.e.*, approximately $282.8 billion) were generated from online advertising.[29]

20.    Google generates advertising revenues from its own platforms by selling advertisement placements within Google Search results pages, as well as within users' Gmail accounts, in the Google Play marketplace, and in Google Maps.[30]  Google also generates revenues through the placement of advertisements on YouTube results pages, from video advertisements users view prior to or during a selected YouTube video, and from embedded YouTube video links appearing on non-Google webpages and apps.[31]

---

[24]    Alphabet Form 10-K for the fiscal year ended December 31, 2022, p. 4.  See also, "G is for Google" per Alphabet at https://abc.xyz/ (accessed February 10, 2023).

[25]    Alphabet Form 10-K for the fiscal year ended December 31, 2022, p. 4.  Google also classifies certain of its pursuits as "Moonshots," which Google identifies as "high risk, high reward" projects.  See Alphabet Form 10-K for the fiscal year ended December 31, 2022, p. 5.  Notwithstanding how the term "Google services" has been used in this litigation, this report uses the term "Google Services" in the context of Google's financial disclosures.

[26]    Alphabet Form 10-K for the fiscal year ended December 31, 2022, pp. 6, 29.

[27]    Alphabet Form 10-K for the fiscal year ended December 31, 2022, p. 5.

[28]    Alphabet Form 10-K for the fiscal year ended December 31, 2022, pp. 6, 28.

[29]    Alphabet Form 10-K for the fiscal year ended December 31, 2022, pp. 9, 32.  I note that the share of total revenues generated from online advertising has ranged from approximately 80% to 88% over the 2016 through 2021 period.  See, for example, Alphabet Form 10-K for the fiscal year ended December 31, 2021, p. 33; Alphabet Form 10-K for the fiscal year ended December 31, 2019, p. 29; Alphabet Form 10-K for the fiscal year ended December 31, 2017, p. 28.

[30]    Alphabet Form 10-K for the fiscal year ended December 31, 2022, p. 28.

[31]    "Ads on embedded videos" per "YouTube Help" per https://support.google.com/youtube/answer/132596?hl= (accessed February 10, 2023) and "Bring your story to life with Video ads" per Google Ads at https://ads.google.com/home/campaigns/video-ads/ (accessed February 20, 2023).

21.    Google generates additional revenues through advertisers placing ads on non-Google webpages and mobile apps that comprise "Google Network properties."[32]  In its online resources for Google Ads, Google publicly describes the "Google Display Network" as a collection of over two million websites, videos, and apps that reach over 90% of Internet users across the globe.[33]  These network members display ads on their properties through the use of Google's sell-side advertising platforms including AdMob, Ad Manager, and AdSense.[34]  Some of these advertisements are App Promo ads, which are described in Section 6.4.

22.    Google explains in its SEC filings that it generates revenues by serving the "right ads at the right time"[35] and, in its online product support pages, Google explains that its targeting methods allow advertisers to "reach people based on who they are, their interests and habits, what they're actively researching, or how they've interacted with [the advertiser's] business."[36]  Google also explains that personalized advertising works by employing online user data to target users with more relevant advertising content and increase advertisers' return on investment.[37]  To offer targeted advertisements, Google collects, stores, and uses large amounts of users' data.[38]  Google uses "the information shared by sites and apps to deliver [Google's] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads."[39]  Google's methods of collecting, storing, and tracking user data across  devices provides Google with a detailed picture of each user's activity.[40]

23.    Google is also financially incentivized to track "conversions," which Google publicly describes as a tool that shows advertisers "what happens after a customer interacts with your ads – whether they purchased a product, signed up for your newsletter, called your business, or downloaded your app."[41]  Google notes that, "[w]hen a customer completes an action that you've defined as

---

[32]  "Compare Ad Manager, AdSense, and AdMob" per Google Ad Manager Help at https://support.google.com/admanager/answer/9234653?hl=en (accessed February 10, 2023).  See also Alphabet Form 10-K for the fiscal year ended December 31, 2022, pp. 6, 28.

[33]  "Reach a larger or new audience with Google Display Network targeting" per Google Ads Resources at https://ads.google.com/intl/en_id/home/resources/reach-larger-new-audiences/ (accessed February 10, 2023).

[34]  "Compare Ad Manager, AdSense, and AdMob" per Google Ad Manager Help at https://support.google.com/admanager/answer/9234653?hl=en (accessed February 10, 2023); "About App campaigns" per Google Ads Help at https://support.google.com/google-ads/answer/6247380?hl=en (accessed February 10, 2023).  I note that Google internally refers to its mobile app advertising campaign type as App Promo, but publicly uses the term App Campaigns to refer to the same.

[35]  Alphabet Form 10-K for the fiscal year ended December 31, 2022, p. 6.

[36]  "About audience targeting" per Google Ads Help at https://support.google.com/google-ads/answer/2497941?hl=en (accessed February 10, 2023).

[37]  "Personalized Advertising" per Advertising Polices Help at https://support.google.com/adspolicy/answer/143465?hl=en (accessed February 10, 2023).

[38]  "How Google uses information from sites or apps that use our services" per Google Privacy & Terms at https://policies.google.com/technologies/partner-sites?hl=en-US (accessed February 10, 2023).

[39]  "How Google uses information from sites or apps that use our services" per Google Privacy & Terms at https://policies.google.com/technologies/partner-sites?hl=en-US (accessed February 10, 2023).

[40]  "How Google uses information from sites or apps that use our services" per Google Privacy & Terms at https://policies.google.com/technologies/partner-sites?hl=en-US (accessed February 10, 2023).  See also "About the Cross Device reports" per Analytics Help at https://support.google.com/analytics/answer/3234673?hl=en (accessed February 10, 2023).

[41]  "About conversion tracking" per Google Ads Help at https://support.google.com/google-ads/answer/1722022?hl=en (accessed February 10, 2023); "Use pay for conversions in Display campaigns" per Google Ads Help at https://support.google.com/google-ads/answer/7528254?hl=en (accessed February 10, 2023).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

valuable, these customer actions are called conversions."[42]  Advertisers can choose to finance their campaigns based on conversions, paying Google "when customers convert on [the advertiser's] website or app."[43]  Advertisers can also choose to create ad campaigns that Google optimizes towards generating a selected conversion action.[44]

## 6.2. AdMob

24.    Google describes AdMob as "a mobile ad network and monetization platform for mobile developers who want to earn money from ads, gain actionable insights, and grow their app business."[45]  According to Google, "AdMob makes it easy for developers to earn money from their mobile apps with high-quality ads," as AdMob connects the advertisers who create and pay for advertisements with the mobile apps that can show those advertisements to relevant users.[46]  AdMob offers advertisements on mobile applications in various formats:

**Figure 2**
**AdMob Ad Formats[47]**



[42]  "About conversion tracking" per Google Ads Help at https://support.google.com/google-ads/answer/1722022?hl=en (accessed February 10, 2023).

[43]  "Use pay for conversions in Display campaigns" per Google Ads Help at https://support.google.com/google-ads/answer/7528254?hl=en (accessed February 10, 2023).

[44]  "About campaign-specific conversion goals," per Google Ads Help at https://support.google.com/google-ads/answer/9143218?hl=en (accessed February 19, 2023).

[45]  "Compare Ad Manager, AdSense, and AdMob" per Google Ad Manager Help at https://support.google.com/admanager/answer/9234653?hl=en (accessed February 10, 2023).

[46]  "What is AdMob" per Google AdMob at https://admob.google.com/home/resources/what-is-admob/ (accessed February 10, 2023).

[47]  "Ad units, ad formats, & ad types" per Google AdMob Help at https://support.google.com/admob/answer/6128738?hl=en (accessed February 10, 2023).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

25.    AdMob uses an ad auction to automatically select and serve high-performing advertisements to apps.[48]  I understand that the selected advertisements may be targeted using inferences made about users' interests based on websites they visit, apps they use, and other previously collected or historical data.[49]  These targeted ads consider user data including "previous search queries, activity, visits to sites or apps, demographic information, or location" and may include, for example, "demographic targeting, interest category targeting, remarketing" and various other targeting methods.[50]

26.    I understand that AdMob, including AdMob+, leverages the Google Mobile Ads Software Development Kit ("GMA SDK") in its provision of advertisements,[51] and Google represents that "[i]ntegrating the Google Mobile Ads SDK into an app is the first step toward displaying ads and earning revenue" with AdMob.[52]

27.    I also understand that, through an effort that Google internally called "AdMob+," Google included features from Google Analytics starting in the summer of 2019.[53]  According to documents that Google produced in this litigation, "AdMob+ is an initiative to ensure we are collecting analytics data for all AdMob publishers."[54]

28.    As of the date of this report, Google has produced its representation of global AdMob income statements for the period 2018 through 2021.[55]  As indicated therein, Google represents that its global AdMob gross revenues increased from approximately $3.9 billion in 2018 to approximately $9.0 billion in 2021.[56]

---

[48]    "How AdMob works" per Google AdMob Help at https://support.google.com/admob/answer/7356092?visit_id=638107965052971945-1412475492&hl=en&ref_topic=7579128&rd=1 (accessed February 20, 2023).

[49]    "AdMob & AdSense program policies" per Google AdMob Help at https://support.google.com/admob/answer/7676680 (accessed February 18, 2023).

[50]    "AdMob & AdSense program policies" per Google AdMob Help at https://support.google.com/admob/answer/7676680 (accessed February 18, 2023).

[51]    See, for example, Fourth Amended Complaint, January 4, 2023, pp. 17-18; "Mobile Ads SDK (Android)" per Google AdMob at https://developers.google.com/admob/android/quick-start (accessed February 10, 2023) and "Mobile Ads SDK (iOS)" per Google AdMob at https://developers.google.com/admob/ios/quick-start (accessed February 10, 2023).

[52]    See, for example, "Mobile Ads SDK (Android)" per Google AdMob at https://developers.google.com/admob/android/quick-start (accessed February 10, 2023) and "Mobile Ads SDK (iOS)" per Google AdMob at https://developers.google.com/admob/ios/quick-start (accessed February 10, 2023); See also Defendant Google LLC's Objections and Supplemental Responses to Plaintiffs' Interrogatories, Set Seven, Supplemental Response to Interrogatory No. 23, pp. 17-18.  The Interrogatory Response states that data is still collected by the GMA SDK when a user is logged into their Google Account and has WAA and/or sWAA turned off.

[53]    Fourth Amended Complaint, January 4, 2023, pp. 17-18.

[54]    GOOG-RDGZ-00058360-392 at 361.

[55]    GOOG-RDGZ-00187666; GOOG-RDGZ-00187665.

[56]    GOOG-RDGZ-00187666; GOOG-RDGZ-00187665.

### 6.3. Ad Manager

29.   Google describes Ad Manager[57] as an "ad management platform for large publishers" that "provides granular controls and supports multiple ad exchanges and networks, including AdSense, Ad Exchange, third-party networks, and third-party exchanges."[58]  According to Google, Ad Manager provides publishers with a central place to monetize all of their advertising spaces, including websites, mobile apps, videos, and games.[59]

30.   Google explains that a web page or app using Ad Manager "needs to be able to request ads from Ad Manager to display them."[60]  With respect to mobile apps, Google represents that the Google Mobile Ads SDK "allows [publishers] to call ads from Ad Manager on [their] apps."[61]  Google also represents that in the context of Ad Manager and apps, the GMA SDK "collects information such as device information" which "helps app developers gain insights about their users and maximize ad revenue."[62]

31.   As of the date of this report, Google has not produced income statements for Ad Manager or the portion of Ad Manager that Google attributes to mobile apps.  As indicated on Schedule 5.3, however, the available information indicates that the annual gross revenues associated with the apps portion of Ad Manager are approximately one-third the size of annual gross revenues associated with AdMob.[63]

### 6.4. App Promo

32.   App Promo – Google's internal moniker for the advertising campaign type that Google publicly labels "App campaigns"[64] – is a type of Google Ads campaign focused on the promotion of third-party apps.[65]  App Promo allows app developers to promote their apps across Google's largest properties including Google Search, Google Play, YouTube, AdMob, and millions of apps and websites across the Google Display Network.[66]  App developers running an App Promo campaign

---

[57]  I understand that "DRX," "DFP," and "AdX" are names of former Google advertising offerings which have been combined within Ad Manager.  See GOOG-RDGZ-00083725-748 at 730 and "Introducing Google Ad Manager" per Google Ad Manager at https://blog.google/products/admanager/introducing-google-ad-manager/ (accessed February 10, 2023).

[58]  "Advertising with Google Ad Manager" per Google Ad Manager Help at https://support.google.com/admanager/answer/6022000?hl=en (accessed February 10, 2023).

[59]  "Advertising with Google Ad Manager" per Google Ad Manager Help at https://support.google.com/admanager/answer/6022000?hl=en (accessed February 10, 2023).

[60]  "Key Concepts" per Google Ad Manager Help at https://support.google.com/admanager/answer/6021064?hl=en&ref_topic=7505788 (accessed February 10, 2023).

[61]  "Key Concepts" per Google Ad Manager Help at https://support.google.com/admanager/answer/6021064?hl=en&ref_topic=7505788 (accessed February 10, 2023).

[62]  "Mobile Ads SDK" per Google Ad Manager at https://developers.google.com/ad-manager/mobile-ads-sdk (accessed February 10, 2023).

[63]  Schedule 5.3.

[64]  Deposition of Belinda Langner, December 15, 2022, pp. 276-277.

[65]  "About App campaigns" per Google Ads Help at https://support.google.com/google-ads/answer/6247380?hl=en (accessed February 10, 2023).

[66]  "About App campaigns" per Google Ads Help at https://support.google.com/google-ads/answer/6247380?hl=en (accessed February 10, 2023); GOOG-RDGZ-00182621-635 at 635.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

can choose from three campaign subtypes that focus on increasing app installs, re-engaging customers, or building excitement and awareness before an app's release.[67]

33.    As of the date of this report, Google has produced its representation of U.S. App Promo income statements for the period 2017 through 2021.[68]  As indicated therein, Google represents that its U.S. App Promo gross revenues increased from approximately $1.4 billion in 2017 to approximately $6.2 billion in 2021.[69]

**6.5.  Google Analytics for Firebase**

34.    Google Analytics for Firebase ("GA4F") is a set of tools offered by Google that allows app developers to measure, track, and analyze user behavior in mobile apps by providing "comprehensive in-app behavioral and marketing analytics."[70]  As indicated in the name and as discussed below, I understand that GA4F is a component of Firebase's suite of products, and that Firebase is Google's mobile application software development kit.[71]

35.    Google Analytics is an analytics platform that allows Google to collect data about users' activity on websites and mobile applications, aggregate and organize that data, and provide insight into consumer use of the application or website.[72]  With respect to mobile apps, I understand that Google Analytics for Firebase and its next generation Google Analytics 4 ("GA4")[73] are app measurement solutions that offer app analytics, event reporting, and data export to provide insight on app usage and user engagement.[74]

36.    Firebase is an app development platform that provides integrated tools to help developers build, grow, and monetize their apps, and the Firebase Software Development Kit ("SDK") enables

---

[67]  "About App campaigns" per Google Ads Help at https://support.google.com/google-ads/answer/6247380?hl=en (accessed February 10, 2023).

[68]  GOOG-RDGZ-00184247; GOOG-RDGZ-00185744.  While these App Promo income statements are not labeled as being specific to the U.S. (as compared to global), other information produced by Google in this matter supports my conclusion that these are U.S. income statements.  For example, in a November 2019 internal presentation entitled "Google Ads & Analytics: Internal Training for Firebase," Google represented global annualized App Promo revenues of approximately $10 billion as of July 2019, and that approximately 30% of these global revenues – approximately $3.0 billion – was attributable to the "Americas."  See GOOG-RDGZ-00067396-438 at 403.  The App Promo income statements that I assume are specific to the U.S. indicate 2019 revenues of approximately $2.8 billion.  See GOOG-RDGZ-00184247.

[69]  GOOG-RDGZ-00184247; GOOG-RDGZ-00185744.

[70]  "What is Google Analytics for Firebase?" per Firebase Help at https://support.google.com/firebase/answer/7388022?hl=en (accessed February 10, 2023).  See also "Google Analytics" per Firebase at https://firebase.google.com/docs/analytics (accessed February 10, 2023).

[71]  "Google Analytics" per Firebase at https://firebase.google.com/docs/analytics (accessed February 10, 2023).  See also "Firebase SDK" per Google Open Source at https://opensource.google/projects/firebasesdk (accessed February 10, 2023).

[72]  "How Google Analytics works" per Analytics Help at https://support.google.com/analytics/answer/12159447?hl=en (accessed February 10, 2023).

[73]  "[GA4] Introducing the next generation of Analytics, Google Analytics 4" per Analytics Help at https://support.google.com/analytics/answer/10089681?hl=en (accessed February 19, 2023).

[74]  See, for example, "Google Analytics" per Firebase at https://firebase.google.com/docs/analytics (accessed February 10, 2023); GOOG-RDGZ-00053252-277 at 256.

access to Firebase services.[75]  According to documents that Google produced in this litigation, Firebase is "strategically important to Google" and "critical to the robustness and long-term success of Google's businesses" because many of Google's key businesses are "dependent and aligned with the success of app developers":

> ***Firebase is strategically important to Google***, *because Google has many key businesses and platforms that are dependent and aligned with the success of app developers: Ads, Play, Android and GCP [Google Cloud Platform].  Google's ability to generate revenue [is] based on developers' ability to spend on Ads, generate IAP / subscriptions on Play, create engaging apps on Android and generate meaningful workload on GCP.  Thus **investing in helping developers succeed is strategically critical to the robustness and long term success of Google's businesses**.*[76]

37.    According to Google, Google Analytics is "at the heart" of Firebase,[77] and Google requires third-party developers to use the Firebase SDK in order to link their apps to Google Analytics data streams.[78]  According to documents produced by Google, the integration of Firebase, Google Analytics, and AdMob creates a unique offering in the advertising market.[79]  Google described the data implications of the combined product offering in a 2018 internal document entitled "AdMob + Firebase Integration":

> *AdMob will now have access to Google Analytics for Firebase contextual signals (e.g., session duration, in-app purchasing, etc.) and Google Analytics for Firebase will now have access to AdMob's click-level revenue data.  No other ads/analytics platform in the world has access to this type of data, and we think that this creates a differentiated offering as well as powerful use cases for our publishers.*[80]

38.    Google also notes that "the commercialization of Google Analytics for Firebase and its SDK to [app promo advertisers] affords [Google] strategic opportunities to drive incremental value to [Google's] Apps business."[81]  Google indicates the following benefits associated with increased integration and commercialization of GA4F by mobile application developers:

- *Developers receive value for measuring structured event data (e.g., first class reporting, insights, etc.)*

- *Optionally, this data then becomes usable across Google's products/services – allowing developers enhanced functionality and actionability (e.g., audience targeting and demographic reports)*

---

[75]  See, for example, "Firebase SDK" per Google Open Source at https://opensource.google/projects/firebasesdk (accessed February 10, 2023); "What is Google Analytics for Firebase?" per Firebase Help at https://support.google.com/firebase/answer/7388022?hl=en (accessed February 10, 2023); "Learn the fundamentals" per Firebase at https://firebase.google.com/docs (accessed February 10, 2023).

[76]  GOOG-RDGZ-00077957-961 at 957.  Emphasis added.

[77]  "Google Analytics" per Firebase at https://firebase.google.com/docs/analytics (accessed February 10, 2023).

[78]  Per discussions with Mr. Hochman, I understand that he is not aware of any indication from Google that third-party developers could link their apps to Google Analytics by any other means.  See also "Get Started with Google Analytics" per Firebase at https://firebase.google.com/docs/analytics/get-started?technology=android&platform=ios (accessed February 10, 2023); GOOG-RDGZ-00141077-337 at 189.

[79]  GOOG-RDGZ-00182863-877 at 863.

[80]  GOOG-RDGZ-00182863-877 at 863.

[81]  GOOG-RDGZ-00030019-023 at 019.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

- *As a result, developers are able to provide more engaging app experiences – increasing their end-users' satisfaction and building better businesses in the process*

- *Developers, in turn, come to see Google as a partner, returning to Google for additional solutions and for the opportunities it creates to reach new users*

- *And the cycle repeats; end-users are delighted by the app experience.*[82]

39.    Google has also represented that data from GA4F can be used to "understand campaign performance, unlocking optimizations to find more engaged and valuable customers for your app via [App Promo]."[83]  An October 2019 presentation entitled "App Campaigns with Google: App advertising, and our future plans" included the below graphic showing some ways in which Google leverages Google Analytics data (including GA4F data) for App Promo:

**Figure 3**
**Google Analytics and Personalized App Content**[84]



40.    Google Analytics can also be leveraged by customers of other Google advertising offerings, such as Ad Manager.[85]  Google's internal documents also reflect that Ad Manager can be integrated with Google Analytics for Firebase.[86]  Google represents that Ad Manager publishers can "make smarter decisions" by connecting their data with integrated tools including Google Analytics.[87]

---

[82]    GOOG-RDGZ-00030019-023 at 020.

[83]    "Google Analytics for Firebase" per Firebase at https://firebase.google.com/products/analytics (accessed February 10, 2023).

[84]    GOOG-RDGZ-00198470-643 at 515 and 529.

[85]    "Data & Insights" per Google Ad Manager at https://admanager.google.com/home/capabilities/data-insights/ (accessed February 10, 2023).

[86]    GOOG-RDGZ-00142970-977 at 970.

[87]    "Data & Insights" per Google Ad Manager at https://admanager.google.com/home/capabilities/data-insights/ (accessed February 10, 2023).

**6.6.  Web & App Activity (WAA) and Supplemental Web & App Activity (sWAA)**

41.     Web & App Activity ("WAA") is a Google setting (or "activity control") related to Google's collection and saving of a user's "activity on Google sites and apps, including associated information like location, to give users faster searches, better recommendations, and more personalized experiences in Maps, Search, and other Google services."[88]  As indicated in the image below from an online Google Help Center, the information controlled by WAA includes the user's searches, activity on Google products such as Maps and Google Play, the user's location, language, IP address, ads clicked, items purchased, and information about the user's device, even when the user is offline:

**Figure 4**
**What's Saved as Web & App Activity**[89]

42.     Supplemental Web & App Activity ("sWAA") refers to a WAA subsetting related to Google's collection and saving of a user's "Chrome history and activity from sites, apps, and devices that use Google services."[90]  I understand that when WAA is set to "off," the sWAA subsetting is turned "off" by default, but when WAA is set to "on," sWAA can be set to either "on" or "off." As indicated in the image below from the same online Google Help Center, the information controlled by sWAA includes data regarding the user's activity on sites and apps that partner with Google, data regarding activity on sites and apps that use Google services, and data regarding Android device usage and diagnostics including battery levels and system errors:

---

[88]   "Activity Controls" per Google Account at https://myactivity.google.com/activitycontrols (accessed February 10, 2023).

[89]   GOOG-RDGZ-00000921; "Find & control your Web & App Activity" at Google Account Help per https://support.google.com/accounts/answer/54068?hl=en&ref_topic=3382296 (accessed February 10, 2023).

[90]   "Activity Controls" per Google Account at https://myactivity.google.com/activitycontrols (accessed February 10, 2023).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 5**
**Supplemental Web & App Activity**[91]



> When Web & App Activity is on, you can include additional activity like:
>
> - Sites and apps that partner with Google to show ads
> - Sites and apps that use Google services, including data that apps share with Google
> - Your Chrome browsing history
> - Android usage & diagnostics, like battery level and system errors
>
> To let Google save this information:
>
> - Web & App Activity must be on.
> - The box next to "Include Chrome history and activity from sites, apps, and devices that use Google services" must be checked.
>
> Your Chrome history is saved only if you're signed in to your Google Account and have Chrome Sync turned on. Learn about Chrome Sync.

43. Google Product Manager David Monsees described the difference between WAA and sWAA as follows:

> *Broadly, WAA covers things you do with a Google product (e.g., search, maps, assistant, play store, etc.) and sWAA covers things you do on Google platforms where you may not know that data is being sent to Google (e.g., chrome, android, 3P apps, display ads, etc.)."*[92]

44. I understand that Google represents that it does not use data from GA4F to personalize ads when WAA or sWAA is set to "off," but Google continues to use that data for tracking conversions, regardless of WAA/sWAA settings.[93] From my discussions with Mr. Hochman, I understand that the data that Google collects and saves from users' app activity is nonetheless comprehensive, regardless of the user's WAA and sWAA settings.[94] More specifically, I understand that the app activity data collected from WAA/sWAA-Off users is effectively the same app activity data collected from WAA/sWAA-On users.[95]

45. I understand that, in July 2016, Google modified the default settings for newly created Google accounts such that WAA and sWAA were enabled (*i.e.*, WAA-On and sWAA-On) by default.[96] After this date, new Google account holders were automatically WAA/sWAA-On unless those account holders checked and proactively disabled one or both settings.[97] At about the same time in June 2016, Google initiated a "consent bump" program through which Google notified existing account holders upon sign-in to their Google account that they could elect to enable these settings and realize benefits such as "better Google products, fewer irrelevant ads."[98]

---

[91]  GOOG-RDGZ-00000921.

[92]  GOOG-RDGZ-00015211 – 219 at 217.

[93]  Discussions with Mr. Hochman. See also, for example, Deposition of Belinda Langner, December 15, 2022, pp. 89, 145, 185, and 217.

[94]  Discussions with Mr. Hochman.

[95]  Discussions with Mr. Hochman. See also, for example, Google Response to RFA No. 1.

[96]  See, for example, GOOG-RDGZ-00020690-691 at 690.

[97]  See, for example, GOOG-RDGZ-00023187-190 at 188.

[98]  See, for example, GOOG-RDGZ-00018661-675 at 668, 672.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

46.    As of the date of this report, Google has produced a document that represents the number of Google accounts that were "Created," "Active," and "Created or Active" with WAA and sWAA enabled in the U.S. for each month during the period May 2016 through October 2022.[99]  As detailed in Schedules 13.1 and 13.2 and summarized in the figure below, this data indicates that the percentage of Google's U.S. active accounts with sWAA-off (including accounts for which WAA is set to "off" and therefore sWAA is turned "off" by default) has decreased over time, but it continues to represent a material portion of active accounts.

**Figure 6**
**U.S. Active Google Accounts with sWAA Off:**
**July 1, 2016 – December 31, 2022[100]**

| Date | Monthly Active Accounts | Monthly Accounts with sWAA Enabled | Monthly Accounts with sWAA-Off | Average % of Monthly Accounts with sWAA-Off |
|---|---|---|---|---|
| Jul. - Dec. 2016 | | | | 69.13% |
| Jan. - Dec. 2017 | | | | 33.28% |
| Jan. - Dec. 2018 | | | | 21.20% |
| Jan. - Dec. 2019 | | | | 18.01% |
| Jan. - Dec. 2020 | | | | 14.09% |
| Jan. - Dec. 2021 | | | | 14.25% |
| Jan. - Dec. 2022 | | | | 13.87% |

47.    I am not aware of any representation from Google regarding its generation of the account data underlying the figure above or any limitations that Google may have applied in defining "WAA Enabled" and "SWAA Enabled" accounts (*e.g.*, if the settings were enabled throughout a given month, at any time during that month, etc.).  In the absence of this information, I searched for other evidence regarding the frequency of changes to WAA and sWAA settings or the extent to which Google personnel consider the WAA and sWAA settings to be temporary or permanent.  Based on my review of the available evidence and as indicated below, it appears that Google personnel generally characterize WAA settings as "a permanent opt-out/opt-in control" that is rarely changed.  For example:

▪    In an internal Google document updated in August 2018 and entitled "Consequences of not logging WAA-disabled users with Gaia ID in Search Sessions, News, and AdEvents Logs,"

---

[99]  GOOG-RDGZ-00204475, tab "Sheet1."  This document indicates that the data excludes "dashers" (*i.e.*, enterprise account holders), "Googlers" (*i.e.*, Google personnel), and "supervised" accounts.  I also understand that "Active Accounts" refers to accounts that were active in the 28-day period before the month start date of a given measurement period.  Deposition of Christopher Ruemmler, September 9, 2022, p. 181.  While the Google file produced as GOOG-RDGZ-00204475 is not designated as U.S. or global, other information produced by Google in this matter supports my conclusion that this file pertains to U.S. accounts.  For example, a separate Google file (GOOG-RDGZ-00187010 at tab "SWAA") represents that approximately ▮▮▮▮▮▮ U.S. accounts were "active at any time between July 27, 2016 and July 27, 2020," whereas the file produced as GOOG-RDGZ-00204475 represents that approximately ▮▮▮▮▮▮ accounts were "Created or Active" as of June 1, 2020.

[100]  Schedule 13.1.  While Google has produced similar account data for May and June 2016, I excluded those months from this summary for consistency with an assumed damages period beginning July 1, 2016.  In the absence of Google account data for November and December 2022, I hold constant the October 2022 account data for November and December 2022.  In my opinion, this assumption is conservative in light of the fact that the number of active accounts with sWAA off continued to increase on a month-over-month basis through October 2022.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Google personnel indicated that "███ of Google 28DA accounts didn't change their WAA status visibly in User Attributes in the last 28 days."[101]

- In a January 31, 2020 email from Uwe Bubeck to other Google employees, Mr. Bubeck noted that "*the fact that WAA is a pause control may be relevant from a theoretical/philosophical perspective, but most users probably use it as a permanent opt-out/opt-in control, instead of toggling.*"[102] Ms. Jia Liu responded that this was "*True for WAA.*"[103] Ms. Liu went on to indicate that "*For YTH [YouTube History] I heard some cases of more active usages of history pauses (i.e., a user toggles it back and forth) as well as history deletions, possibly related to the types of video watch sessions they have.*"[104] Later in the same email chain, Mr. Bob Cui noted that, by his analysis of 30 day "setting flip data," "*WAA flipping is only about 10% of YTW [YouTube Watch History] flipping, and even less with higher frequency range.*"[105]

48.    Google has also produced a separate file that includes the following data regarding U.S. Google accounts during the four-year period between July 27, 2016 and July 27, 2020:

**Figure 7**
**Data Regarding U.S. Google Accounts Active at Any Time Between**
**July 27, 2016 and July 27, 2020**[106]

| For US accounts active at any time between July 27th 2016 and July 27, 2020: | US Consumer + Enterprise: |
|---|---|
| # of accounts ever active during this time | ███ |
| # of accounts where sWAA was turned **OFF** at any time | ███ |
| # of accounts with sWAA **ON** at any time | ███ |
| # of accounts with sWAA **ON** the entire time | ███ |
| So, using the above: | |
| % accounts that ever turned sWAA off | ███ |
| % of accounts that had sWAA on at any time | ███ |
| % of accounts ever active during this time that had sWAA on the whole time | ███ |

49.    While Google has not produced similar data for the complete Class Period to date, even the above truncated records indicate that, among approximately ███ U.S. Google accounts that were ever active during this period, approximately ███ (*i.e.*, approximately ███%) had sWAA turned off at some point.[107]

---

[101] GOOG-RDGZ-00209874-876 at 875.

[102] GOOG-RDGZ-00042152.R-159.R at 153.R.

[103] GOOG-RDGZ-00042152.R-159.R at 153.R.

[104] GOOG-RDGZ-00042152.R-159.R at 153.R.

[105] GOOG-RDGZ-00042152.R-159.R at 152.R.  See also, for example, GOOG-RDGZ-00014982-986 at 984.

[106] GOOG-RDGZ-00187010 at tab "SWAA".  Emphasis added.

[107] GOOG-RDGZ-00187010 at tab "SWAA".  See also, Defendant Google LLC's Supplemental Objections and Responses to Plaintiffs' Interrogatories, Set Six (Nos. 12, 16, &17), Supplemental Response to Interrogatory No. 12, p. 6.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**6.7. Google's Contemporaneous Analyses of the Financial Impact of Certain Settings and Privacy Controls**

50.    Based on my review and analysis of the available record, I am aware of several indications that Google employees discussed or otherwise expressed interest in analyzing the financial impact to Google of users changing their WAA/sWAA settings.

51.    For example, as illustrated in the presentation slide below summarizing Google's separate analyses of the financial impact to Google of users changing their consent to GAIA Ads Personalization ("GAP"), an internal Google comment asks "Can we create a model for WAA off?  What is the % impact of turning WAA off?":

**Figure 8**
**Search: GAP Consent Impact Summary – WAA Off Questions[108]**



52.    Relatedly, in a late-March 2020 email to other Google personnel, Connie Choi, a Google Product Analyst within Ads Security,[109] reiterated an intent to "move forward with a WAA-off experiment with Search as soon as possible."[110]  When Google employee JK Kearns responded to clarify Ms. Choi's proposed experiment, Ms. Choi offered the example of quantifying the financial impact "if 25% fewer users opted-in to WAA" and her team's hypothesis of first- and second-order impacts:

---

[108] GOOG-RDGZ-00188655.  Emphasis in original.  I discuss the Google analysis underlying this presentation slide in Section 6.7.1.1 below.

[109] GOOG-RDGZ-00117988-992 at 991.

[110] GOOG-RDGZ-00117988-992 at 990.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 9**
**WAA-Off Experiment Email – March 25, 2020[111]**

On Wed, Mar 25, 2020 at 9:08 AM Connie Choi <ccchoi        wrote:
Hi JK -- That's right. The proposal is a WAA-off experiment where the control group is users who
have their WAA settings the same as they have them today; and the treatment group have WAA
turned off.

For context:
We are modeling out the **financial impact of changes to user privacy controls** as part of the Narnia
3 effort. For example: if 25% fewer users opted-in to WAA, what would the financial impact? Our
hypothesis is that there are both first-order impacts via Ads (e.g. reduced ability for personalized
targeting) but also second-order impacts (e.g. reduced relevance of search results, model degradation,
possible reduction in product use).

Here's an example of our financial impact summary for Gaia Ads Personalization (GAP): screenshot.
Ideally we'd like to do a similar exercise for WAA as well.

53.    David Monsees, a Product Manager within Footprints,[112] responded to Ms. Choi's message noting
       "Seems like this request is more about the \*use\* of WAA data vs. the collection of the data."[113]

**Figure 10**
**WAA-Off Experiment Email – March 25, 2020[114]**

On Wed, Mar 25, 2020 at 12:34 PM David Monsees <davidmonsees     wrote:
Seems like this request is more about the \*use\* of WAA data vs. the collection of the data. What
makes an experiment hard is that we don't want a user to see a bunch of proms to turn WAA on, of
have features that break when WAA is off, without the ability to fix it.

54.    On April 3, 2020, Mr. Monsees sent another email to Ms. Choi, Mr. Kearns and others
       "[c]onnecting folks to discuss how to run 'WAA impact' experiments in Search as part of [the]
       Narnia 3 assessments." Mr. Monsees indicated the goal of any such experiment would be to
       "understand the impact of WAA \*data\* on Search (organic and ads)":

**Figure 11**
**WAA-Off Experiment Email – April 3, 2020[115]**

On Fri, Apr 3, 2020 at 6:08 PM David Monsees <davidmonsees     wrote:
Connecting folks to discuss how to run "WAA impact" experiments in Search as part of Na   assessments.

**Goal**: Understand the impact of WAA \*data\* on Search (organic and ads)

**Ask**: Run an experiment in Suggest and SRP (results) for Signed-in WAA-on gaia, that acts as if the gaia has
no WAA data. Do this without impacting other products in Search (e.g., don't disable WAA data for Discover,
don't impact non-Search readers of WAA).

[111] GOOG-RDGZ-00117988-992 at 990.
[112] Deposition of David Monsees, September 15, 2022, pp. 23-24.
[113] GOOG-RDGZ-00117988-992 at 990.
[114] GOOG-RDGZ-00117988-992 at 990.
[115] GOOG-RDGZ-00147545-546 at 545.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

55.    On April 8, 2020 Mr. Vlad Adzic responded to a subset of the addressees on Mr. Monsees' April 3, 2020 email expressing support for a "data usage experiment" to measure the "short term financial impact of WAA off":

**Figure 12**
**WAA-Off Experiment Email – April 8, 2020[116]**

---

On Wed, Apr 8, 2020 at 8:38 AM Vlad Adzic <adzic ███████████ wrote:

If we care about measuring the short term financial impact of WAA off, then a "data usage" experiment as Monz described would be easiest. The upper bound for this would be the existing ads personalization numbers. In fact, perhaps they are quite similar. My understanding of search ads personalization is that the majority impact comes from using recent search history. We could try to understand what other data sources search ads uses for personalizing ads and conclude using the same numbers are good enough, or craft an experiment that disables AdMixer use of all WAA data sources.

An experiment for "pretending WAA is off" for users to look at broader search metrics (e.g. do queries go down from impersonal suggestions, discover usage, etc) would be much more difficult technically. The number of systems covered is larger, and it's not sufficient to just pretend the bit is off, as Chris explained; e.g. we should also not personalize discover based on yesterday's and last month's activity.

---

56.    Notwithstanding the above discussion of and interest in analyzing the financial impact to Google of users changing their WAA/sWAA settings, I am not aware of documentary evidence that such an experiment was performed by Google personnel.

57.    In light of the apparent absence of that evidence, I searched for and analyzed other indications of Google personnel assessing the financial impact to Google of changes in other settings and controls, including Google's analyses of the financial impact of changes to the GAP setting under Google's "Na███" program and the financial impact of the default blocking of third-party cookies within Google's "Incognito" Mode. I identify and describe these indicators below.

### 6.7.1.    Analyses of the Na███ Program

58.    In a June 3, 2020 internal presentation entitled "Privacy for personalized experiences workshop," Google described the Na███ Program as "an umbrella program designed to refactor Google's cross-product consent strategy around user consent for data collection, processing, and transparency."[117]  A separate internal presentation from early 2020 entitled "Consent Value Prop Research Overview: Narnia 3" indicated that Na███ was intended to provide "a graceful transition to a unified cross-product consent framework" that would be intuitive for Google's users, compatible with legislation such as the European Union's General Data Protection Regulation ("GDPR")[118] and the California Consumer Privacy Act ("CCPA"),[119] and conducive to Google's innovation of "AI-first products":

---

[116] GOOG-RDGZ-00117988-992 at 988.

[117] GOOG-RDGZ-00151720-971 at 907.

[118] See, for example, https://gdpr.eu/what-is-gdpr/ (accessed February 10, 2023).

[119] See, for example, https://oag.ca.gov/privacy/ccpa (accessed February 10, 2023).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 13**
**Google Internal Presentation – Consent Value Prop Research Overview: Na█████**[120]



59.    As part of the ████████ Program, Google personnel modeled the financial impact of changes to user consent rates on certain privacy controls.[121]  I am currently aware of two such financial impact analyses, both of which pertain to the GAP setting.  I understand from Mr. Hochman and my review of documents produced in this matter that GAP generally refers to a Google account-level setting that allows users to either grant or deny certain consent for personalized advertising.[122]  I describe these financial impact analyses below.

**6.7.1.1.    ████████████████████**

60.    In an internal file entitled "Na███ Revenue ████████████," Google analyzed the expected financial impact associated with different levels of GAP "consent" for years 2019-2023 and specific to the European Economic Area ("EEA") (the "████████████████").[123]  As detailed therein, Google's ████████████ evaluated the expected financial impact to Google assuming GAP consent percentages ranging from █% to █%, with █% consent meaning that no EEA user proactively turned GAP "on" from its default "off" setting.[124]  The ████ ████████ segmented the financial impact of varying consent levels across the five product categories of Search, YouTube, Display, Play Ads, and Gmail, with further segmentation between Web and App for the Display category.[125]  The analysis was also segmented to separately analyze the impact from "Signed-In" and "Signed-Out" users and presented impact conclusions in terms of both gross revenues and revenues net of traffic acquisition costs ("TACs").[126]

---

[120]  GOOG-RDGZ-00203024-038 at 025.
[121]  GOOG-RDGZ-00117988-992 at 990.
[122]  Discussions with Mr. Hochman.  See also, for example, GOOG-RDGZ-00090149-164 at 154.  I understand that when a user "consents" to GAP, that user has the GAP setting turned on and has therefore "consented" to ads personalization.
[123]  GOOG-RDGZ-00188768.
[124]  GOOG-RDGZ-00188768 at tab "Matrix."
[125]  See, for example, GOOG-RDGZ-00188768 at tab "Summary."
[126]  See, for example, GOOG-RDGZ-00188768 at tab "Summary."

61.    As previously discussed, the results of the ▮▮▮▮▮▮▮▮▮▮▮ specific to Google's Search product were included in a presentation slide entitled "Search: GAP Consent Impact summary."[127] As illustrated below, the ▮▮▮▮▮▮▮▮ indicated that the transition to a default "off" GAP setting in the EEA was expected to decrease Google's 2019 gross revenues by an amount between approximately ▮▮▮▮▮ and ▮▮▮▮▮, or Google's 2019 revenues net of TACs by an amount between approximately ▮▮▮▮▮ and ▮▮▮▮▮, depending on the level of EEA user consent to GAP:

**Figure 14**
**Search: GAP Consent Impact Summary**[128]



62.    Results from the ▮▮▮▮▮▮▮▮▮▮ were also included in a March 18, 2020 presentation entitled "Na▮▮▮ Impact on YouTube."[129] The presentation noted that the transition to a default "off" GAP setting in the EEA was expected to decrease Google's 2019 gross revenues by an amount between approximately ▮▮▮▮▮ and ▮▮▮▮▮, or Google's 2019 revenues net of TACs by an amount between approximately ▮▮▮▮▮ and ▮▮▮▮▮, depending on the level of EEA user consent to GAP:

---

[127] GOOG-RDGZ-00188655.

[128] GOOG-RDGZ-00188655.  See also GOOG-RDGZ-00188768 at tab "Matrix."

[129] GOOG-RDGZ-00208084-097 at 093-094.

**Figure 15**
**YouTube: GAP Consent Impact Summary**[130]



63.   As indicated in the figure above, the ▮▮▮▮▮▮▮▮ separately analyzed the impact of "Signed-In" and "Signed-Out" users for each of the Google product areas.  As discussed in Sections 7 and 8, this segmentation is relevant to my identification of signed-in users and my apportionments to isolate the revenues and profits attributable to those users.  To this end, the ▮▮▮▮ indicates that approximately ▮▮ % of App Display revenues net of traffic acquisition costs were attributable to signed-in users.[131]

64.   The ▮▮▮▮▮▮▮ also segments Display product revenues between "Web Display" and "App Display."[132]  As discussed in Section 7 below, this segmentation is relevant to the determination of Google's unjust enrichment in this matter, as Google's representations of App Promo, AdMob, and Ad Manager app ads revenues appear to require an adjustment for a potential overlap of revenues from advertisements for apps (*i.e.*, App Promo ads) served within apps (*i.e.*, on the AdMob and Ad Manager platforms).

**6.7.1.2.   ▮▮▮▮▮▮▮▮▮**

65.   In a December 2019 model titled "Na▮▮ High-level Ads Impact Assessment, Dec 2019," Google analyzed the expected financial impact associated with different levels of GAP "consent" specific to the EEA (the "▮▮▮▮▮▮").[133]  The ▮▮▮▮▮▮▮▮ evaluated the expected financial impact to Google assuming GAP consent percentages ranging

---

[130] GOOG-RDGZ-00208084-097 at 094.  See also GOOG-RDGZ-00188768 at tab "Matrix."
[131] Schedule 15.1.  While this ▮▮▮▮▮▮▮ was specific to Europe, I am not aware of any reason and have not observed any evidence to indicate that this ratio would materially differ for the U.S.
[132] GOOG-RDGZ-00188768 at tabs "Summary" and "Matrix."
[133] GOOG-RDGZ-00205831.

from 0% to 100%, with 0% consent meaning that no EU user proactively turned GAP "on" from its default "off" setting.[134]

66.    The ███████████████ segmented the financial impact of varying consent levels across the three product categories of Search, YouTube, and Display, with further segmentation between Web and App for the YouTube and Display categories.[135]  The calculations within the ████ ██████████ were based on annualized revenues calculated from late 2019 revenue data.[136] The analysis was performed on the basis of both gross revenues and revenues net of traffic acquisition costs, and also considered the impact for Signed-In vs. Signed-Out users.[137]

67.    The results of the ████████████████████ specific to Google's YouTube product were included in a January 13, 2020 presentation entitled "YTAR: Evaluating Na███ █ Impact on YouTube."[138] As illustrated below, the presentation noted that the transition to a default "off" GAP setting in the EEA was expected to decrease Google's YouTube 2019 revenues net of TAC by an amount between approximately ████████ and ████████, depending on the level of EEA user consent to GAP:

**Figure 16**
**YTAR: Evaluating Na████ Impact on YouTube[139]**



6.7.2.    **Ads Impact and Response from "ChromeGuard" and "SameSite & Secure" Launches**

68.    In a May 2020 Google document entitled "Ads Impact and Response from 'ChromeGuard' and 'SameSite & Secure' Launches" (the "ChromeGuard study"), a cross section of Google personnel

---

[134] GOOG-RDGZ-00205831.

[135] See, for example, GOOG-RDGZ-00205831 at tab "Sensitivity Analysis (Net)."

[136] GOOG-RDGZ-00205831.  See, for example, tabs "Sensitivity Analysis (Net)" and "Search."  I note that the annualized revenues are calculated from source data covering inconsistent and limited time periods.  See, for example, GOOG-RDGZ-00205831 at tabs "YT-total" and "Search."

[137] GOOG-RDGZ-00205831 at tabs "Sensitivity Analysis (Gross)" and "Sensitivity Analysis (Net)."

[138] GOOG-RDGZ-00208058-083 at 062.  See also GOOG-RDGZ-00205831 at tab "Summary for deck."

[139] GOOG-RDGZ-00208058-083 at 062.  See also GOOG-RDGZ-00205831 at tab "Summary for deck."

CONFIDENTIAL – ATTORNEYS' EYES ONLY

summarized the results of internal analyses regarding the "anticipated impact to Search Ads, YouTube Ads, and Display Ads" from the then-pending release of "ChromeGuard," Google's internal moniker for the default blocking of third-party cookies within Google's Incognito Mode.[140]  Google's investigation of each product area included consideration of the Google revenue impacts with respect to "personalization," "remarketing," and "conversion tracking."[141] As detailed in the ChromeGuard study, Google personnel determined that the ChromeGuard implementation would cause an approximate ████████ reduction in Google's worldwide Search Ads, YouTube Ads, and Display Ads revenue during the remaining portion of 2020 and an approximate ████████ reduction in the same during full-year 2021.[142]

**Figure 17**
**Ads Impact and Response from "ChromeGuard" and "Samesite & Secure" Launches –**
**ChromeGuard Impact[143]**



| ChromeGuard Impact (M83) | | Prorated | Annualized |
|---|---|---|---|
| Search Ads | | | |
| | Post-Covid | ████ | ████ |
| | Pre-Covid | | |
| YouTube Ads | | Prorated | Annualized |
| | Post-Covid | ████ | ████ |
| | Pre-Covid | ████ | ████ |
| Display Ads | | Prorated | Annualized |
| | Post-Covid | ████ | ████ |
| | Pre-Covid | ████ | ████ |
| Total | | Prorated | Annualized |
| | Post-Covid | ████ | ████ |
| | Pre-Covid | ████ | ████ |

## 6.8.  Potentially Available Measures of Monetary Relief

69.    I understand from Counsel that the monetary relief available for the alleged wrongful conduct specified in Plaintiffs' Fourth Amended Complaint and not dismissed by the Court's prior orders includes Plaintiffs' actual damages (which would include restitution), and Google's unjust

---

[140]  GOOG-RDGZ-00188469-491 at 469.
[141]  GOOG-RDGZ-00188469-491 at 472-475.
[142]  GOOG-RDGZ-00188469-491 at 470.
[143]  GOOG-RDGZ-00188469-491 at 470.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

enrichment (also referred to as non-restitutionary disgorgement). I understand from Counsel that nominal damages and injunctive relief are also available for the alleged wrongful conduct.

70. I also understand that in seeking unjust enrichment, Plaintiffs may present evidence of the total or gross amount of the benefit from the alleged misconduct, or a reasonable approximation thereof, and then the defendant may present evidence of any further costs, expenses, and other deductions to show the actual or net benefit the defendant received.

## 7. UNJUST ENRICHMENT

71. In my opinion, the most appropriate and reliable bases for quantifying Google's unjust enrichment from the alleged wrongful conduct are Google's previously discussed App Promo and AdMob income statements, as well as Google's contemporaneous analyses of the financial impact to Google of certain settings that I understand are related to WAA/sWAA. More specifically, it is my opinion that these contemporaneous analyses represent the best available evidence for calculating unjust enrichment based on the actual assumptions, inputs, and methodologies that Google personnel used in the normal course of business to measure the financial impact of related changes in settings and privacy controls.

72. As discussed in Section 6.7, these contemporaneous analyses include the ███████████████ and ███████████████, which separately examined the financial impact to Google of changes in a related user setting (*i.e.*, GAP), as well as the ChromeGuard study, through which Google examined the financial impact of blocking third-party cookies by default in Chrome Incognito mode. I have therefore used relevant elements of Google's own analyses, together with appropriate adjustments and requisite apportionments, to quantify Google's unjust enrichment attributable to the alleged wrongful conduct for the two Classes and for the period July 1, 2016, through December 31, 2022.

73. Based on this data and as detailed in the sections below, my unjust enrichment analyses quantify the portion of Google's U.S. App Promo, AdMob, and Ad Manager app ads revenues and attendant profits attributable to the alleged wrongful conduct under two liability scenarios identified by Counsel. This segmentation is intended to assist the trier of fact in determining Google's unjust enrichment under the assumption that the alleged wrongful conduct caused Google to be unjustly enriched by an amount equal to either:

- The portion of Google's U.S. App Promo, AdMob, and Ad Manager app ads revenues and attendant profits attributable to Google's collection, saving, and/or use of WAA/sWAA-Off Data for purposes of tracking advertising conversions ("Scenario One");

    or

- The portion of Google's U.S. App Promo, AdMob, and Ad Manager app ads revenues and attendant profits attributable to Google's collection, saving, and/or use of WAA/sWAA-Off Data for purposes of serving and monetizing advertisements ("Scenario Two").

74. As previously discussed, and as used throughout this report, "WAA/sWAA-Off Data" is intended to collectively refer to all data that Google collects relating to user activity on non-Google mobile applications by way of the Firebase SDK and/or the GMA SDK while a user is signed into Google and has WAA or sWAA turned off.

75. Based on my understanding of the available record and my discussions with Mr. Hochman, I understand that these liability scenarios would have distinct impacts on Google's U.S. App Promo, AdMob, and Ad Manager businesses:

- Under Scenario One, I understand that Google could serve App Promo, AdMob, and Ad Manager advertisements to WAA/sWAA-Off users, and charge advertisers for that service, but Google could not collect, save, and/or use WAA/sWAA-Off Data for purposes of tracking any conversion events.[144] As such, Google's unjust enrichment under Scenario One would equate to the portion of Google's U.S. App Promo revenues and attendant profits from signed-in, WAA/sWAA-Off users attributable to conversion tracking with GA4F *plus* the portion of Google's U.S. AdMob and Ad Manager app ads revenues and attendant profits from signed-in, WAA/sWAA-Off users attributable to conversion tracking.

- Under Scenario Two, I understand that, in addition to not being able to use WAA/sWAA-Off Data for purposes of tracking conversions in App Promo, AdMob, and Ad Manager (as described in Scenario One), Google would also be precluded from collecting, saving, and using WAA/sWAA-Off Data for purposes of serving and monetizing advertisements in AdMob and Ad Manager, as Google would not collect or save AdMob or Ad Manager ad requests, impressions, and clicks from the corresponding user devices.[145] As such, Google's unjust enrichment under Scenario Two would equate to the revenues and attendant profits attributable to conversion tracking quantified under Scenario One *plus* an additional measure of AdMob and Ad Manager app ads revenues and attendant profits attributable to the serving and monetization of ads to WAA/sWAA-Off users.

76. The information contained in this report and corresponding schedules can therefore be used to quantify and determine Google's unjust enrichment pertaining to the above scenarios during the period July 1, 2016 through December 31, 2022.[146]

## 7.1. Analysis of Google's Unjust Enrichment Under Scenario One

77. As previously discussed, my unjust enrichment analyses quantify the portion of Google's U.S. App Promo, AdMob, and Ad Manager app ads revenues and attendant profits attributable to the alleged wrongful conduct under two liability scenarios identified by Counsel. The first of these scenarios (*i.e.*, Scenario One) is intended to assist the trier of fact in determining Google's unjust enrichment under the assumption that the alleged wrongful conduct caused Google to be unjustly enriched by an amount equal to the portion of Google's U.S. App Promo, AdMob, and Ad Manager app ads revenues and attendant profits attributable to its saving and use of WAA/sWAA-Off Data for purposes of tracking advertising conversions.

78. Based on my understanding of the available record and my discussions with Mr. Hochman, I understand that, under Scenario One, Google could serve App Promo, AdMob, and Ad Manager advertisements to WAA/sWAA-Off users, and charge advertisers for that service, but Google

---

[144] Discussions with Mr. Hochman. I understand conversion tracking correlates a user's interaction with an advertisement and that user's subsequent activity. See, for example, "About conversion tracking" per Google Ads Help at https://support.google.com/google-ads/answer/1722022?hl=en (accessed February 10, 2023).

[145] Discussions with Mr. Hochman.

[146] While my current calculations of Google's unjust enrichment cover the period July 1, 2016, through December 31, 2022, I could readily update these calculations to cover subsequent periods through the date of trial. Relatedly, to the extent that the trier of fact determines that the calculation of unjust enrichment should start on a date later than July 1, 2016, the calculations attached to this report can be readily modified to reflect that alternative period.

could not collect, save, and/or use WAA/sWAA-Off Data for purposes of tracking any conversion events.[147]  As such, Google's unjust enrichment under Scenario One would equate to the portion of Google's U.S. App Promo revenues and attendant profits from signed-in, WAA/sWAA-Off users attributable to conversion tracking with GA4F *plus* the portion of Google's U.S. AdMob and Ad Manager app ads revenues and attendant profits from signed-in, WAA/sWAA-Off users attributable to conversion tracking.

79.    As detailed in the attached schedules and summarized in the figure below, I have determined that Google's unjust enrichment (as measured in revenues net of traffic acquisition costs) under Scenario One totals approximately $558.8 million during the period July 1, 2016 through December 31, 2022:

**Figure 18**
**Summary of Google's Unjust Enrichment – Scenario One:**
**July 1, 2016 – December 31, 2022[148]**



| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| App Promo - Scenario 1 | | | | | | | | |
| AdMob - Scenario 1 | | | | | | | | |
| Ad Manager - Scenario 1 | | | | | | | | |
| Total | $22.90 | $39.68 | $36.78 | $43.90 | $67.40 | $157.93 | $190.20 | $558.79 |

80.    My analysis of this scenario is based on my review and consideration of the available record, and detailed in the subsequent sections of this report and corresponding schedules.

### 7.1.1.    Unjust Enrichment Scenario One: App Promo

81.    As discussed in Section 7.1, I understand from Mr. Hochman that, under Scenario One and with respect to App Promo, Google could serve App Promo advertisements to WAA/sWAA-Off users, and charge advertisers for that service, but Google could not collect, save, and/or use WAA/sWAA-Off Data to track any conversion events with GA4F.[149]

82.    Based on my review of the available record and my analyses detailed below, I have determined that it is possible to quantify Google's resulting unjust enrichment as the portion of Google's U.S. App Promo revenues and attendant profits from signed-in, WAA/sWAA-Off users attributable to conversion tracking with GA4F.

---

[147] Discussions with Mr. Hochman.
[148] Schedule 1.3.
[149] Discussions with Mr. Hochman.  See also, for example, Defendant Google LLC's Supplemental Objections and Responses to Plaintiffs' Interrogatories, Set Six (Nos. 12, 16, &17), Supplemental Response to Interrogatory No. 17, pp. 15-16.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

83.    The most appropriate starting point for this analysis is Google's U.S. App Promo income statements for the period 2017 through 2021.[150]  According to Ms. Belinda Langner, a Product Manager for App Promo and Google's corporate designee regarding Google's use of user data for purposes of tracking conversions,[151] these income statements set forth the annual revenues that Google attributes to App Promo from the various Google ad networks on which App Promo advertisements appear.[152]

84.    As indicated therein, these Google income statements begin with the total measure of App Promo revenues that Google classifies as "Booked Revenues."[153]  From these Booked Revenues, Google then deducts "traffic acquisition costs," or "TAC," to derive what Google classifies as "Net Revenues."[154]  I understand that these traffic acquisition costs include Google's payments to publishers for ads displayed on their apps and websites as well as Google's payments to browser providers and other distribution partners that use and make available Google's search services.[155]

85.    Google's contemporaneous analyses of the financial impact to Google of changes in user consent for GAP (i.e., ███████████ and ████████████) measure that financial impact in terms of both "Booked Revenues" (i.e., "gross revenues") and "Net Revenues" (i.e., revenues net of traffic acquisition costs).[156]  Therefore, while I understand that plaintiffs need only present evidence of the gross amount of benefit from the alleged misconduct, I have proactively and conservatively deducted these traffic acquisition costs – representing between approximately ███% and ███% of annual App Promo Booked Revenues and the largest expense on Google's App Promo income statements – in my analyses of Google's unjust enrichment in this matter.[157]

86.    Next, and in light of the fact that the produced Google App Promo income statements are limited to the period 2017 through 2021, I estimated Google's U.S. App Promo revenues net of traffic acquisition costs for the periods July 1, 2016 to December 31, 2016 and full-year 2022.[158]  As detailed on Schedule 7.2, I estimated the partial-year 2016 period as a function of the change in

---

[150]  GOOG-RDGZ-00184247 and GOOG-RDGZ-00185744.  As previously discussed, while these App Promo income statements are not labeled as being specific to the U.S. (as compared to global), other information produced by Google in this matter supports my conclusion that these are U.S. income statements.  For example, in a November 2019 internal presentation entitled "Google Ads & Analytics: Internal Training for Firebase," Google represented global annualized App Promo revenues of approximately ██████ as of July 2019, and that approximately ██% of these global revenues – approximately ████████ – was attributable to "the Americas."  See GOOG-RDGZ-00067396-438 at 403.  The App Promo income statements that I assume are specific to the U.S. indicate 2019 booked revenues of approximately ██████.  See GOOG-RDGZ-00184247.

[151]  Deposition of Belinda Langner, December 15, 2022, pp. 20, 23.

[152]  See, for example, Deposition of Belinda Langner, December 15, 2022, pp. 20, 23, 223-224.

[153]  GOOG-RDGZ-00184247 and GOOG-RDGZ-00185744.

[154]  GOOG-RDGZ-00184247 and GOOG-RDGZ-00185744.

[155]  See, for example, Deposition of Belinda Langner, December 15, 2022, p. 227; Alphabet Form 10-K for the fiscal year ended December 31, 2022, p. 26.

[156]  See, for example, GOOG-RDGZ-00188768; GOOG-RDGZ-00205831.  As of the filing of this report, I am not aware of any evidentiary basis for Google to contend that there are *additional* incremental operating costs that would be reasonably deducted from my determination of revenues net of traffic acquisition costs.  To the contrary, I understand from Mr. Hochman that it would be unreasonable to assume that any meaningful measure of incremental costs was associated with the alleged wrongful conduct, and that Google's infrastructure-heavy business would preclude any meaningful cost savings from the envisioned change to such a small portion of its operations.  To the extent that Google or its experts identify documents indicating that a further deduction of incremental costs may be appropriate and that these costs can be accurately calculated, I reserve the right to review that information and amend my analyses, if necessary.

[157]  Schedule 2.2.

[158]  Schedules 7.2, 2.2.

annualized App Promo revenues between annualized October 2016 and annualized October 2017 as represented in a November 2019 Google internal presentation entitled "Google Ads and Analytics, Internal Training for Firebase."[159] I then conservatively estimated 2022 U.S. App Promo revenues net of traffic acquisition costs by applying the growth in Alphabet's U.S. revenues from 2021 to 2022 to the 2021 U.S. App Promo revenues net of traffic acquisition costs.[160] The resulting annual U.S. App Promo revenues net of traffic acquisition costs are summarized in the figure below.

**Figure 19**
**Annual U.S. App Promo Revenues Net of Traffic Acquisition Costs: 2016 – 2022**[161]



87.  To the resulting base of U.S. App Promo revenues net of traffic acquisition costs for the period July 1, 2016 through December 31, 2022, I then applied apportionment factors necessary to isolate the portion of Google's U.S. App Promo profits from signed-in, WAA/sWAA-Off users attributable to conversion tracking.

88.  To isolate the portion of U.S. App Promo revenues net of traffic acquisition costs *from signed-in users*, I multiplied the U.S. App Promo revenues net of traffic acquisition costs by approximately ▮▮%.[162] This ▮▮% factor is equivalent to Google's own determination of the "Proportion of [App Display] Revenue from Signed-In" as represented in the previously discussed ▮▮▮▮▮▮.[163] Based on my discussions with Mr. Hochman, I understand that my selection of the signed-in metric specific to "App Display" from among other signed-in metrics for other Google products is appropriate because, while App Promo advertisements can be served across Search, YouTube, Web Display, and App Display products, App Promo conversions occur on third-party apps.[164] As detailed on Schedule 2.2 and summarized in the figure below, application

[159] Schedules 7.2 and 7.3; GOOG-RDGZ-00067396-438 at 403.
[160] Schedules 2.2 and 9.1.
[161] Schedule 2.2. While this figure shows revenues net of TAC for full-year 2016, my unjust enrichment calculations are adjusted to reflect the partial period between July 1, 2016 and December 31, 2016.
[162] Schedule 2.2.
[163] GOOG-RDGZ-00188768 at tab "Matrix." ▮▮% is calculated as approximately ▮▮▮▮▮ of revenues net of TACs from Signed-In App Display users divided by approximately ▮▮▮▮▮ of total App Display revenues. While the ▮▮▮▮▮▮▮ was specific to the EEA, I am not aware of an alternative indicator specific to the U.S. or any evidence that a U.S.-specific indicator would be materially different. See Schedule 15.1.
[164] Discussions with Mr. Hochman.

CONFIDENTIAL – ATTORNEYS' EYES ONLY
31

of this █ % factor yields approximately $6.3 billion of U.S. App Promo Revenues Net of TACs from Signed-In Users during the period July 1, 2016 through December 31, 2022:

**Figure 20**
**U.S. App Promo Revenues Net of TACs from Signed-In Users:**
**July 1, 2016 – December 31, 2022[165]**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| App Promo U S Revenue Net of TAC | █ | █ | █ | █ | █ | █ | █ | █ |
| Share of Revenue from Signed-In Users | █ | █ | █ | █ | █ | █ | █ | N/A |
| App Promo Signed In U S Revenue Net of TAC | █ | █ | █ | █ | █ | █ | █ | █ |

89.    After isolating the *App Promo Revenues Net of TACs from Signed-In Users*, I applied additional apportionment factors to isolate the portion of those revenues from WAA/sWAA-Off users. As detailed in Schedule 13.1, the annual apportionment factors for partial-year 2016 through 2022 were calculated based on Google's representation of the monthly number of total "active" and "sWAA-enabled" accounts.[166]

90.    As detailed on Schedule 2.2 and summarized in the figure below, application of these period-specific factors yields approximately ██████ of U.S. App Promo Revenues Net of TACs from Signed-In WAA/sWAA-Off Users during the period July 1, 2016 through December 31, 2022:

**Figure 21**
**U.S. App Promo Revenues Net of TACs from Signed-In WAA/sWAA-Off Users:**
**July 1, 2016 – December 31, 2022[167]**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| App Promo Signed-In U S Revenue Net of TAC | █ | █ | █ | █ | █ | █ | █ | █ |
| Adjusted Share of Monthly Accounts with sWAA-Off | █ | █ | █ | █ | █ | █ | █ | █ |
| App Promo Signed-In sWAA-Off U S Revenue Net of TAC | █ | █ | █ | █ | █ | █ | █ | █ |

91.    Lastly, to isolate the portion of the revenues described attributable to conversion tracking with GA4F, I applied period-specific apportionment factors equal to Google's representation of the

---

[165] Schedule 2.2.
[166] Schedule 13.1; GOOG-RDGZ-00204475. As detailed on Schedule 13.1, I determined the average share of sWAA-Off accounts (*i.e.*, the difference between "active" and "sWAA-enabled" accounts) for each annual period. The apportionment factor for 2022 reflects monthly data for the period January 2022 through October 2022, the last month for which this data was produced. Given the decline in monthly sWAA-Off rates during the July 2016 through December 2017 period, I also prepared an alternative set of calculations to quantify the impact to my unjust enrichment calculations of setting the sWAA-Off rates for partial-year 2016 and full-year 2017 equal to the lower average sWAA-Off rate for 2018 (*i.e.*, approximately █ % of active accounts in 2018, as compared to approximately █ % and █ % of active accounts in partial period 2016 and 2017, respectively). My unjust enrichment calculations assuming these adjusted sWAA-Off rates are detailed in Schedules 1.1B through 4.4B.
[167] Schedule 2.2.

share of "*App Campaign revenue attributable to conversion types bid against GA4F.*"[168]  As detailed on Schedule 2.1 and summarized in the figure below, application of these period-specific factors yields approximately $332.0 million of U.S. App Promo Revenues Net of TACs from Signed-In WAA/sWAA-Off Users Attributable to Conversion Tracking with GA4F during the period July 1, 2016 through December 31, 2022:

**Figure 22**
**U.S. App Promo Revenues Net of TACs from Signed-In WAA/sWAA-Off Users**
**Attributable to Conversion Tracking with GA4F:**
**July 1, 2016 – December 31, 2022**[169]

| *(in millions)* | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| App Promo Signed-In sWAA-Off U S Revenue Net of TAC | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| Share of Revenue Attributable to Conversion Types Bid Against GA4F | █. | █. | █. | █. | █. | █. | █. | █. |
| App Promo Signed-In sWAA-Off U S Revenue Net of TAC Attributable to Conversion Tracking from GA4F | █. | █. | █. | █. | █. | █. | █. | █. |

### 7.1.2.   Unjust Enrichment Scenario One: AdMob

92.     As discussed in Section 7.1, I understand from Mr. Hochman that, under Scenario One and with respect to AdMob, Google could serve AdMob advertisements to WAA/sWAA-Off users, and charge advertisers for that service, but Google could not collect, save and/or use WAA/sWAA-Off Data to track any conversion events.[170]

93.     Based on my review of the available record and my analyses detailed below, I have determined that it is possible to quantify Google's resulting unjust enrichment as the portion of Google's U.S. AdMob revenues and attendant profits from signed-in, WAA/sWAA-Off users attributable to conversion tracking.

94.     The most appropriate starting point for this analysis is Google's global AdMob income statements for the period 2018 through 2021.[171]  Consistent with my analysis of App Promo described in Section 7.1.1, I have proactively and conservatively deducted Google's representation of AdMob traffic acquisition costs – representing between approximately ██ % and ██ % of annual AdMob Booked Revenues and the largest expense on Google's AdMob income statements – in my analyses of Google's unjust enrichment in this matter.[172]

95.     In the absence of AdMob income statements specific to the U.S., I first determined and applied an apportionment factor to isolate the portion of global AdMob revenues net of traffic acquisition costs specific to the U.S.  While Alphabet publicly reports the percentage of its total annual revenues that it attributes to the United States (ranging from approximately 45.7% to 47.7% over

---

[168] Defendant Google LLC's Supplemental Objections and Responses to Plaintiffs' Interrogatories, Set Six (Nos. 12, 16, &17), Supplemental Response to Interrogatory No. 17, pp. 15-16.  The Interrogatory Response refers to "App Campaign Ad Revenue" which I understand to be synonymous with App Promo.
[169] Schedule 2.1.
[170] Discussions with Mr. Hochman.
[171] GOOG-RDGZ-00187666; GOOG-RDGZ-00187665.
[172] Schedule 6.5.

the 2016 through 2022 period),[173] I conservatively applied a lower factor tied to the U.S. portion of global App Promo revenue. More specifically, I considered a November 2019 internal presentation entitled "Google Ads & Analytics: Internal Training for Firebase," in which Google represented that approximately ██% of global App Promo revenues was attributable to the "Americas":[174]

**Figure 23**
**Americas Share of Total Global App Promo App Download Revenue[175]**



96. As the ██% revenue share applied to the "Americas," I calculated the U.S. portion of total revenues by dividing the separately reported and actual 2019 U.S. App Promo booked revenues (*i.e.*, approximately ████████) by the 2019 global App Promo booked revenues represented in the figure above (*i.e.*, approximately ████████).[176] As detailed on Schedule 6.5 and summarized in the figure below, I applied the resulting factor – approximately ██% – to annual global AdMob revenues net of traffic acquisition costs for the 2018 through 2021 period:

**Figure 24**
**U.S. AdMob Revenues Net of Traffic Acquisition Costs: 2018 – 2021[177]**

| (in millions) | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| AdMob Global Revenue Net of TAC | ██████ | ██████ | ██████ | ██████ |
| Share of Revenue Attributable to the U.S. | ████ | ████ | ████ | ████ |
| AdMob U.S. Revenue Net of TAC | ████ | ████ | ████ | ████ |

---

[173] Schedule 9.1.
[174] GOOG-RDGZ-00067396-438 at 396 and 403.
[175] GOOG-RDGZ-00067396-438 at 403. Emphasis added.
[176] Schedule 7.6.
[177] Schedule 6.5.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

97.    Next, and in light of the fact that Google has only produced AdMob income statements for the 2018 through 2021 period, I estimated Google's U.S. AdMob revenues net of traffic acquisition costs for the periods July 1, 2016 through December 31, 2017 and full-year 2022.[178]

98.    First, working backwards from 2018, I estimated U.S. AdMob revenues net of traffic acquisition costs for the July 1, 2016 through December 31, 2017 period based on the historical relationship between AdMob and App Promo revenues net of traffic acquisition costs.  More specifically, I determined that U.S. AdMob revenues were approximately 46.49% of U.S. App Promo revenues during 2018 and approximately 46.90% of U.S. App Promo revenues during 2019.[179]  I then applied the 46.49% factor for 2018 to the previously discussed U.S. App Promo Revenues Net of Traffic Acquisition Costs for the July 1, 2016 through December 31, 2017 period.[180]  I then conservatively estimated 2022 U.S. AdMob revenues net of traffic acquisition costs by applying the growth in Alphabet's U.S. revenues from 2021 to 2022 to the 2021 U.S. AdMob revenues net of traffic acquisition costs.[181]  The resulting annual U.S. AdMob revenues net of traffic acquisition costs are summarized in the figure below.



**Figure 25**
**U.S. AdMob Revenues Net of Traffic Acquisition Costs: 2016 – 2022[182]**



99.    Next, and based on my understanding that some advertisements for apps (*i.e.*, App Promo ads) can be served within apps (*i.e.*, on the AdMob and Ad Manager platform),[183] I adjusted my calculation of U.S. AdMob Revenues Net of Traffic Acquisition Costs to account for the potential overlap in revenues attributed to AdMob or Ad Manager on the one hand and App Promo on the other.  For example, I have seen indications of Google personnel referring to the potential overlap in revenues attributed to both AdMob and App Promo as "AdMob App Promo revenue."[184]  Based on my

---

[178]  Schedules 6.1, 6.2, and 6.3.
[179]  Schedule 6.4.
[180]  Schedules 6.2, 6.3.
[181]  Schedule 6.1.
[182]  Schedule 6.1.  While this figure shows revenues net of TAC for full-year 2016, my unjust enrichment calculations are adjusted to reflect the partial period between July 1, 2016 and December 31, 2016.
[183]  Discussions with Mr. Hochman.
[184]  See, for example, GOOG-RDGZ-00192788-845 at 793.

understanding of the available data, the quantification of this potential overlap required the following steps:

- I used data from the previously discussed ▮▮▮▮▮▮▮ to estimate the relative contribution of "Web Display" and "App Display" to Google's total Display revenues during the period 2019 through 2021;[185]

- I applied the resulting figures for App Display as percentage of Total Display to Google's separate representation of App Promo revenues from Display (as compared to App Promo revenues from Search or App Promo revenues from YouTube);[186]

- I divided the resulting App Promo revenues from App Display by the total App Promo revenues to derive App Promo revenue from App Display as a percentage of total App Promo revenues;[187]

- I applied the resulting factors to my previously discussed calculation of U.S. App Promo Revenues Net of Traffic Acquisition Costs to isolate approximately ▮▮▮▮▮ of those revenues that may have been generated via App Display (i.e., on the AdMob and Ad Manager platforms).[188]

- I understand that App Display revenues include both AdMob and Ad Manager app ads revenues. It is therefore necessary to allocate the total overlap between AdMob and Ad Manager.

- In my opinion, the most reasonable means of allocating the total overlap between AdMob and Ad Manager is in proportion to their respective revenues, which were summarized in a Google internal presentation entitled "Sellside apps network, as seen from data."[189] More specifically, this presentation indicated that AdMob accounted for approximately ▮% of total sellside global apps revenue during 2019, while Ad Manager accounted for approximately ▮%.[190]

- Lastly, I applied AdMob and Ad Manager's respective revenue shares to the previously calculated total overlap to yield a distinct measure of both "App Promo-AdMob Overlap" and "App Promo-Ad Manager Overlap."[191]

100. As detailed in Schedule 3.4 and summarized in the figure below, I then deducted the resulting ▮▮▮▮▮ of potential App Promo-AdMob overlap from my previously discussed quantification of U.S. AdMob Revenues Net of Traffic Acquisition Costs:

---

[185] Schedule 8.3; GOOG-RDGZ-00188768, tab "Matrix"; GOOG-RDGZ-00188768, tab "App Display Ads" and tab "Web Display Ads."
[186] Schedule 8.2; GOOG-RDGZ-00185743, tab "Pivot Table." Google only produced this disaggregation of App Promo revenues for the period Q3 2019 through Q4 2021.
[187] Schedule 8.1.
[188] Schedule 7.1.
[189] GOOG-RDGZ-00072319-365 at 328.
[190] GOOG-RDGZ-00072319-365 at 328. See also Schedule 5.3.
[191] Schedule 5.1.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 26**
**AdMob U.S. Revenues Net of TACs and Excluding App Promo-AdMob Overlap:**
**July 1, 2016 – December 31, 2022**[192]

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| AdMob U.S. Revenue Net of TAC | ███ | ██ | ██ | ██ | ██ | ██ | ██ | ███ |
| App Promo-AdMob Overlap - U.S. Revenue Net of TAC | ███. | ██. | ██. | ██. | ██. | ██. | ██. | ███. |
| AdMob U.S. Revenue Net of TAC (Excluding App Promo-AMob Overlap) | ███. | ██. | ██. | ██. | ██. | ██. | ██. | ███. |

101.    Having calculated the above AdMob U.S. Revenues Net of TACs and Excluding App Promo-AdMob Overlap, I then adjusted for signed-in and WAA/sWAA-Off users consistent with my previously discussed analysis of App Promo under Scenario One.  More specifically, and in order to isolate the portion these revenues *from signed-in users*, I applied the same ███% factor from Google's determination of the "Proportion of [App Display] Revenue from Signed-In."[193]  Next, and in order to isolate the portion of those revenues from WAA/sWAA-Off users, I applied the same period-specific factors for the average share of sWAA-Off accounts.  As detailed on Schedule 3.4 and summarized in the figure below, these adjustments yield approximately $325.5 million of U.S. AdMob Revenues Net of TACs and Excluding App Promo-AdMob Overlap from Signed-In WAA/sWAA-Off Users during the period July 1, 2016 through December 31, 2022:

**Figure 27**
**U.S. AdMob Revenues Net of TACs and Excluding App Promo-AdMob Overlap**
**from Signed-In WAA/sWAA-Off Users:**
**July 1, 2016 – December 31, 2022**[194]

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| AdMob U.S. Revenue Net of TAC (Excluding App Promo-AdMob Overlap) | ███ | ██ | ██ | ██ | ██ | ██ | ██ | ███ |
| Share of Revenue from Signed-In Users | ███. | ██. | ██. | ██. | ██. | ██. | ██. | ███. |
| AdMob Signed-In U.S. Revenue Net of TAC (Excluding App Promo-AdMob Overlap) | ███ | ██ | ██ | ██ | ██ | ██ | ██ | ███ |
| Share of Monthly Accounts with sWAA Off | ███. | ██. | ██. | ██. | ██. | ██. | ██. | ███. |
| AdMob Signed-In sWAA-Off U.S. Revenue Net of TAC (Excluding App Promo-AdMob Overlap) | ███. | ██. | ██. | ██. | ██. | ██. | ██. | ███. |

102.    I then applied an additional apportionment factor to isolate the portion of the above revenues attributable to conversion tracking.  For purposes of this adjustment, I looked to Google's assumptions as set forth in the previously discussed ChromeGuard study.  More specifically, in Google's assessment of the revenue impact specific to Display Ads and conversion tracking, Google's "revenue impact ratio" was calculated, in part, as a function of a ██% "conversion-based autobidding proportion."[195]

---

[192]  Schedule 3.4.
[193]  Schedule 3.4, 15.1; GOOG-RDGZ-00188768 at tab "Summary."
[194]  Schedule 3.4.
[195]  GOOG-RDGZ-00188469-491 at 475.

**Figure 28**
**ChromeGuard Study – "Conversion-Based Autobidding Proportion"[196]**



103.    As detailed in Schedule 3.3 and summarized in the figure below, applying this ■% factor yields approximately $169.2 million of U.S. AdMob Revenues Net of TACs and Excluding App Promo-AdMob Overlap from Signed-In WAA/sWAA-Off Users Attributable to Conversion Tracking during the period July 1, 2016 through December 31, 2022:

**Figure 29**
**U.S. AdMob Revenues Net of TACs and Excluding App Promo-AdMob Overlap from Signed-In WAA/sWAA-Off Users Attributable to Conversion Tracking:**
**July 1, 2016 – December 31, 2022[197]**



---

[196] GOOG-RDGZ-00188469-491 at 475.  Emphasis added.
[197] Schedule 3.3.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 7.1.3.    Unjust Enrichment Scenario One: Ad Manager

104.  As discussed in Section 7.1, I understand from Mr. Hochman that, under Scenario One and with respect to Ad Manager, Google could serve Ad Manager advertisements to WAA/sWAA-Off users, and charge advertisers for that service, but Google could not collect, save, and/or use WAA/sWAA-Off Data for purposes of tracking any conversion events.[198]

105.  Based on my review of the available record and my analyses detailed below, I have determined that it is possible to quantify Google's resulting unjust enrichment as the portion of Google's U.S. Ad Manager app ads revenues and attendant profits from signed-in, WAA/sWAA-Off users attributable to conversion tracking.

106.  As of the date of this report, Google has not produced income statements specific to Ad Manager. In the absence of any such produced data, I estimated Ad Manager app ads revenues as a function of the relationship between AdMob and Ad Manager app ads revenues as indicated in the previously discussed "Sellside apps network, as seen from data" presentation.  As indicated therein, in 2019, Ad Manager gross revenues were approximately ▮▮% of AdMob gross revenues.[199]

107.  As detailed on Schedule 5.2 and summarized in the figure below, I estimated Ad Manager app ads revenues by applying this ▮▮% factor to my determination of AdMob U.S. Revenue Net of TAC as previously discussed in Section 7.1.2.  This calculation yields approximately ▮▮▮▮▮lion U.S. Ad Manager App Ads Revenues Net of TAC during the period July 1, 2016 through December 31, 2022:

**Figure 30**
**U.S. Ad Manager App Ads Revenues Net of Traffic Acquisition Costs:**
**July 1, 2016 – December 31, 2022[200]**



108.  Next, and based on my understanding that some advertisements for apps (*i.e.*, App Promo ads) can be served within apps (*i.e.*, on the Ad Manager platform),[201] I adjusted my calculation of U.S. Ad Manager App Ads Revenues Net of Traffic Acquisition Costs to account for the potential overlap in revenues attributed to both App Promo and Ad Manager, as previously discussed in Section 7.1.2.  More specifically, and as detailed in Schedule 4.4 and summarized in the figure below, I deducted the previously determined ▮▮▮▮▮▮ of potential App Promo-Ad Manager overlap from my quantification of U.S. Ad Manager App Ads Revenues Net of Traffic Acquisition Costs:

---

[198]  Discussions with Mr. Hochman.
[199]  GOOG-RDGZ-00072319-365 at 319, 328.  See also Schedule 5.3.
[200]  Schedule 5.2.
[201]  Discussions with Mr. Hochman.

**Figure 31**
**U.S. Ad Manager App Ads Revenues Net of TAC and Excluding**
**App Promo-Ad Manager Overlap:**
**July 1, 2016 – December 31, 2022**[202]



| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Ad Manager U.S Revenue Net of TAC | ▮ | | | | | | | |
| App Promo-Ad Manager Overlap - U.S Revenue Net of TAC | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Ad Manager U.S Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

109.    Having calculated the above Ad Manager U.S. Revenues Net of TACs and Excluding App Promo-Ad Manager Overlap, I then adjusted for signed-in and WAA/sWAA-Off users consistent with my previously discussed analysis of App Promo & AdMob under Scenario One.  More specifically, and in order to isolate the portion these revenues *from signed-in users*, I applied the same ▮% factor from Google's determination of the "Proportion of [App Display] Revenue from Signed-In."[203]  Next, and in order to isolate the portion of those revenues from WAA/sWAA-Off users, I applied the same period-specific factors for the average share of sWAA-Off accounts.  As detailed on Schedule 4.4 and summarized in the figure below, these adjustments yield approximately ▮ of U.S. Ad Manager App Ads Revenues Net of TAC and Excluding App Promo-Ad Manager Overlap from Signed-In WAA/sWAA-Off Users during the period July 1, 2016 through December 31, 2022:

**Figure 32**
**U.S. Ad Manager App Ads Revenues Net of TAC and Excluding**
**App Promo-Ad Manager Overlap from Signed-In WAA/sWAA-Off Users:**
**July 1, 2016 – December 31, 2022**[204]

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Ad Manager U.S Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Share of Revenue from Signed-In Users | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Ad Manager Signed-In U.S Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Adjusted Share of Monthly Accounts with sWAA Off | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Ad Manager Signed-In sWAA-Off U.S Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

110.    I then applied an additional apportionment factor to isolate the portion of the resulting revenues attributable to conversion tracking.  For purposes of this adjustment, I applied the ▮% "conversion-based autobidding proportion" apportionment factor previously discussed in Section 7.1.2.

---

[202] Schedule 4.4.
[203] Schedule 4.4; GOOG-RDGZ-00188768 at tab "Summary."
[204] Schedule 4.4.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

111.  As detailed in Schedule 4.3 and summarized in the figure below, applying this ██% factor yields approximately $███████ of U.S. Ad Manager App Ads Revenues Net of TAC and Excluding App Promo-Ad Manager Overlap from Signed-In WAA/sWAA-Off Users Attributable to Conversion Tracking during the period July 1, 2016 through December 31, 2022:

**Figure 33**
**U.S. Ad Manager App Ads Revenues Net of TAC and Excluding**
**App Promo-Ad Manager Overlap from Signed-In WAA/sWAA-Off Users**
**Attributable to Conversion Tracking:**
**July 1, 2016 – December 31, 2022[205]**



### 7.1.4.  Unjust Enrichment Scenario One: Conclusion

112.  As detailed in Schedule 1.3 and summarized in the figure below, I have determined that Google's unjust enrichment under Scenario One totals approximately $558.8 million during the period July 1, 2016 through December 31, 2022:

**Figure 34**
**Summary of Google's Unjust Enrichment – Scenario One:**
**July 1, 2016 – December 31, 2022[206]**

| *(in millions)* | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| App Promo - Scenario 1 | $4.64 | $8.04 | $7.45 | $13.49 | $39.49 | $115.72 | $143.19 | $332.02 |
| AdMob - Scenario 1 | $13.62 | $23.61 | $21.88 | $22.70 | $20.83 | $31.51 | $35.08 | $169.23 |
| Ad Manager - Scenario 1 | $4.63 | $8.03 | $7.44 | $7.72 | $7.08 | $10.71 | $11.93 | $57.54 |
| Total | $22.90 | $39.68 | $36.78 | $43.90 | $67.40 | $157.93 | $190.20 | $558.79 |

### 7.2.  Analysis of Google's Unjust Enrichment Under Scenario Two

113.  As previously discussed, my unjust enrichment analyses quantify the portion of Google's U.S. App Promo, AdMob, and Ad Manager app ads revenues and attendant profits attributable to the alleged wrongful conduct under two liability scenarios identified by Counsel.  Under Scenario Two, I understand that, in addition to not being able to use WAA/sWAA-Off Data for purposes of tracking conversions in App Promo, AdMob, and Ad Manager (as described in Scenario One), Google would also be precluded from collecting, saving, and/or using WAA/sWAA-Off Data for

---

[205]  Schedule 4.3.
[206]  Schedule 1.3.

purposes of serving and monetizing advertisements in AdMob and Ad Manager, as Google would not collect or save AdMob or Ad Manager ad requests, impressions, and clicks from the corresponding user devices.[207]  As such, Google's unjust enrichment under Scenario Two would equate to the revenues and attendant profits attributable to conversion tracking quantified under Scenario One *plus* an additional measure of AdMob and Ad Manager app ads revenues and attendant profits attributable to the serving and monetization of ads to WAA/sWAA-Off users.

114.  As detailed in the attached schedules and summarized in the figure below, I have determined that Google's unjust enrichment under Scenario Two totals approximately $664.3 million during the period July 1, 2016 through December 31, 2022:

**Figure 35**
**Summary of Google's Unjust Enrichment – Scenario Two:**
**July 1, 2016 – December 31, 2022**[208]

| (in millions) | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| App Promo - Scenario 2 | $4.64 | $8.04 | $7.45 | $13.49 | $39.49 | $115.72 | $143.19 | $332.02 |
| AdMob - Scenario 2 | $19.96 | $34.60 | $32.07 | $33.26 | $30.52 | $46.17 | $51.41 | $248.00 |
| Ad Manager - Scenario 2 | $6.79 | $11.77 | $10.90 | $11.31 | $10.38 | $15.70 | $17.48 | $84.32 |
| Total | $31.39 | $54.41 | $50.43 | $58.06 | $80.39 | $177.58 | $212.08 | $664.34 |

115.  My analysis of this scenario is based on my review and consideration of the available record and detailed in the subsequent sections of this report and corresponding schedules.

### 7.2.1.  Unjust Enrichment Scenario Two: App Promo

116.  I understand that the impact to Google's App Promo business insofar as it relates to conversion tracking would be unchanged between Scenario One and Scenario Two.[209]  As such, and as discussed in Section 7.1.1, my analyses indicate Google's unjust enrichment attributable to that alleged wrongful conduct is approximately $332.0 million during the period July 1, 2016 through December 31, 2022.[210]

### 7.2.2.  Unjust Enrichment Scenario Two: AdMob

117.  As discussed in Section 7.2, I understand that under Scenario Two, in addition to not being able to use WAA/sWAA-Off Data for purposes of tracking conversions in AdMob (as described in Scenario One), Google would also be precluded from collecting, saving and/or using WAA/sWAA-Off Data for purposes of serving and monetizing advertisements in AdMob, as Google would not collect or save AdMob ad requests, impressions, and clicks from the corresponding user devices.[211]  Google's unjust enrichment under Scenario Two and specific to

---

[207]  Discussions with Mr. Hochman.
[208]  Schedule 1.4.
[209]  Discussions with Mr. Hochman.
[210]  Schedule 2.1.
[211]  Discussions with Mr. Hochman.

AdMob would therefore equate to the revenues and attendant profits attributable to conversion tracking quantified under Scenario One *plus* an additional measure of AdMob revenues and attendant profits attributable to the serving of ads to WAA/sWAA-Off users.

118.    From a quantitative perspective, the determination of this additional measure of AdMob revenues and profits attributable to the serving of ads to WAA/sWAA-Off users requires 1) the isolation of U.S. AdMob revenues net of traffic acquisition costs and excluding App Promo-AdMob Overlap from signed-in WAA/sWAA-Off users that is <u>not</u> attributable to conversion tracking and 2) a further adjustment to reflect the financial impact of what I understand to be the diminished ad relevance when WAA/sWAA is off.

119.    As discussed in Section 7.1.2, I previously determined both the U.S. AdMob Revenues Net of TAC and Excluding App Promo-AdMob Overlap from Signed-In WAA/sWAA-Off Users during the period July 1, 2016 through December 31, 2022 (*i.e.*, approximately ▓▓▓▓▓) and the portion of this amount attributable to conversion tracking (*i.e.*, approximately ▓▓▓▓). As detailed in Schedule 3.2 and summarized in the figure below, subtracting the latter from the former results in approximately $▓▓▓▓ of AdMob revenues that are <u>not</u> attributable to conversion tracking.

**Figure 36**
**AdMob Signed-In sWAA-Off U.S. Revenue Net of TAC and Excluding App Promo-AdMob Overlap Not Attributable to Conversion Tracking:**
**July 1, 2016 – December 31, 2022[212]**



120.    I then adjusted the revenues represented in the figure above to reflect the financial impact of what I understand to be diminished ad relevance when WAA/sWAA is off. More specifically, and based on my review of Google's contemporaneous analyses of the financial impact of changes in its ability to personalize ads and my discussions with Mr. Hochman regarding the same, I understand that Google generates less revenue from serving non-personalized ads than it does for serving personalized ads, all else held equal.[213] For example, the previously discussed ChromeGuard study document indicates that the "revenue impact due to loss of personalization" is ▓%.[214] Similarly, and as summarized in the figure below, the previously discussed ▓▓▓▓▓▓▓ indicates that the loss of consent for GAP causes Google to generate ▓% of the "App Display" revenue it would earn with such consent.

---

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 37**
**Revenue Impact with GAP Off per** [215]



121. I therefore conservatively applied a ▮▮▮% apportionment factor to reflect the financial impact of diminished ad relevance when WAA/sWAA is off. Applying this ▮▮▮% factor results in approximately $78.8 million of U.S. AdMob Revenues Net of TAC and Excluding App Promo-AdMob Overlap from Signed-In WAA/sWAA-Off Users Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with WAA/sWAA-Off during the period July 1, 2016 through December 31, 2022:

**Figure 38**
**U.S. AdMob Revenues Net of TAC and Excluding App Promo-AdMob Overlap from Signed-In WAA/sWAA-Off Users Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with WAA/sWAA-Off:**
**July 1, 2016 – December 31, 2022**[216]



122. Having calculated this additional measure of AdMob revenues and profits attributable to the serving of ads to WAA/sWAA-Off users, the final step of determining Google's unjust enrichment under Scenario Two specific to AdMob is to add this amount to the profits attributable to conversion tracking quantified under Scenario One. As detailed in Schedule 3.1 and summarized in the figure below, this calculation yields approximately $248.0 million of total unjust enrichment

---

[215] Schedule 14.1; GOOG-RDGZ-00188768 at tab "Matrix."

[216] Schedule 3.2. I understand from Mr. Hochman that Google may serve personalized ads to WAA/sWAA-Off users, relying on information collected when their WAA/sWAA setting was on. My adjustment is therefore conservative.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

under Scenario Two specific to AdMob during the period July 1, 2016 through December 31, 2022:

**Figure 39**
**Unjust Enrichment Scenario Two – AdMob:**
**July 1, 2016 – December 31, 2022[217]**



| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| AdMob Signed-In sWAA-Off US Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Attributable to Conversion Tracking | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| AdMob Signed-In sWAA-Off US Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with sWAA Off | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| AdMob Total Unjust Enrichment - Scenario 2 | $19.96 | $34.60 | $32.07 | $33.26 | $30.52 | $46.17 | $51.41 | $248.00 |

### 7.2.3.  Unjust Enrichment Scenario Two: Ad Manager

123.  As discussed in Section 7.2, I understand that under Scenario Two, in addition to not being able to use WAA/sWAA-Off Data for purposes of tracking conversions in Ad Manager (as described in Scenario One), Google would also be precluded from collecting, saving, and/or using WAA/sWAA-Off Data for purposes of serving and monetizing advertisements in Ad Manager, as Google would not collect or save Ad Manager ad requests, impressions, and clicks from the corresponding user devices.[218]

124.  Google's unjust enrichment under Scenario Two and specific to Ad Manager would therefore equate to the revenues and attendant profits attributable to conversion tracking quantified under Scenario One *plus* an additional measure of Ad Manager app ads revenues and attendant profits attributable to the serving of ads to WAA/sWAA-Off users.

125.  From a quantitative perspective, the determination of this additional measure of Ad Manager app ads revenues and profits attributable to the serving of ads to WAA/sWAA-Off users requires 1) the isolation of U.S. Ad Manager app ads revenues net of traffic acquisition costs and excluding App Promo-Ad Manager Overlap from signed-in WAA/sWAA-Off users that is not attributable to conversion tracking and 2) a further adjustment to reflect the financial impact of what I understand to be the diminished ad relevance when WAA/sWAA is off.

126.  As discussed in Section 7.1.3, I previously determined both the U.S. Ad Manager App Ads Revenues Net of TAC and Excluding App Promo-Ad Manager Overlap from Signed-In WAA/sWAA-Off Users during the period July 1, 2016 through December 31, 2022 (*i.e.*, approximately ▉▉▉▉) and the portion of this amount attributable to conversion tracking (*i.e.*, approximately ▉▉▉▉). As detailed in Schedule 4.2 and summarized in the figure below, subtracting the latter from the former results in approximately ▉▉▉▉ of Ad Manager app ads revenue that is not attributable to conversion tracking.

---

[217]  Schedule 3.1.
[218]  Discussions with Mr. Hochman.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 40**
**Ad Manager App Ads Signed-In sWAA-Off U.S. Revenue Net of TAC and Excluding App Promo-Ad Manager Overlap Not Attributable to Conversion Tracking: July 1, 2016 – December 31, 2022**[219]



127.     I then adjusted the resulting revenues to reflect the financial impact of diminished ad relevance when WAA/sWAA is off by applying the ▮▮▮▮% apportionment factor discussed in Section 7.2.2. Applying this ▮▮▮▮% factor results in approximately ▮▮▮▮▮▮ of U.S. Ad Manager App Ads Revenues Net of TAC and Excluding App Promo-Ad Manager Overlap from Signed-In WAA/sWAA-Off Users Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with WAA/sWAA-Off during the period July 1, 2016 through December 31, 2022:

**Figure 41**
**U.S. Ad Manager App Ads Revenues Net of TAC and Excluding App Promo-Ad Manager Overlap from Signed-In WAA/sWAA-Off Users Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with WAA/sWAA-Off: July 1, 2016 – December 31, 2022**[220]



128.     Having calculated this additional measure of Ad Manager revenues and profits attributable to the serving of ads to WAA/sWAA-Off users, the final step of determining Google's unjust enrichment under Scenario Two specific to Ad Manager is to add this amount to the profits attributable to conversion tracking quantified under Scenario One. As detailed in Schedule 4.2 and summarized in the figure below, this calculation yields approximately $84.3 million of total unjust enrichment under Scenario Two specific to Ad Manager during the period July 1, 2016 through December 31, 2022:

---

[219] Schedule 4.2.
[220] Schedule 4.2.

**Figure 42**
**Unjust Enrichment Scenario Two – Ad Manager:**
**July 1, 2016 – December 31, 2022[221]**



| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Ad Manager Signed-In sWAA-Off U S Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Attributable to Conversion Tracking | | | | | | | | |
| Ad Manager Signed-In sWAA-Off U S Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with sWAA Off | | | | | | | | |
| Ad Manager Total Unjust Enrichment - Scenario Two | $6 79 | $11 77 | $10 90 | $11 31 | $10 38 | $15 70 | $17 48 | $84 32 |

### 7.2.4. Unjust Enrichment Scenario Two: Conclusion

129.  As detailed in Schedule 1.4 and summarized in the figure below, I have determined that Google's unjust enrichment under Scenario Two totals approximately $664.3 million during the period July 1, 2016 through December 31, 2022:

**Figure 43**
**Summary of Google's Unjust Enrichment – Scenario Two:**
**July 1, 2016 – December 31, 2022[222]**

| (in millions) | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| App Promo - Scenario 2 | $4.64 | $8.04 | $7.45 | $13.49 | $39.49 | $115.72 | $143.19 | $332.02 |
| AdMob - Scenario 2 | $19.96 | $34.60 | $32.07 | $33.26 | $30.52 | $46.17 | $51.41 | $248.00 |
| Ad Manager - Scenario 2 | $6.79 | $11.77 | $10.90 | $11.31 | $10.38 | $15.70 | $17.48 | $84.32 |
| Total | $31.39 | $54.41 | $50.43 | $58.06 | $80.39 | $177.58 | $212.08 | $664.34 |

## 8. ACTUAL DAMAGES

130.  As previously discussed, my assignment in this matter also included an assessment of the feasibility of identifying and quantifying measures of actual damages attributable to Google's alleged wrongful conduct during the period July 1, 2016 through December 31, 2022. In my opinion, and as described below, such actual damages can be determined as a function of the payments necessary to incentivize an individual to knowingly surrender the choice to keep activity on mobile apps private and allow an organization to track app activity data. I have therefore identified and considered various indicators of both the payments that Google and other organizations have paid to individuals to track their online activity and the fees that individuals

---

[221] Schedule 4.1.
[222] Schedule 1.4.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

have paid to various organizations in their attempts to increase online privacy and/or avoid tracking.

131.    As discussed below, it is my opinion that the most probative indicator of the harm to WAA/sWAA-Off users from Google's collection, saving, and/or use WAA/sWAA-Off Data, and the value of that WAA/sWAA-Off Data, is derived from one aspect of the monthly compensation structure to participants in the Ipsos Screenwise Panel, a consumer research study conducted for Google by Ipsos. More specifically, it is my opinion that the baseline payment to Screenwise Panel participants of $3 per month for using a Screenwise meter app on a single mobile device represents a conservative indicator of the monthly payment necessary for an individual to knowingly surrender the choice to keep their app activity private and allow Google to track all app activity data, regardless of that individual's WAA or sWAA settings. While the Screenwise compensation structure applies this $3 payment per device per month, it is my opinion that actual damages through December 2022 can be conservatively measured by applying this $3 payment on a one-time basis to the number of Class Member Devices, where a single Class Member Device represents a mobile device (smartphone or tablet) used with WAA/sWAA off at least once during the Class Period through December 2022. I describe my analysis of Class Member Devices in Section 8.2 below.

## 8.1.    Analysis of the Value of WAA/sWAA-Off Data Acquired by Google

132.    As previously discussed, I searched for and analyzed various indicators of both the payments that Google and other organizations have paid to individuals in order to transparently track their online activity, and the fees that individuals have paid to various organizations in their attempts to increase privacy and/or avoid tracking. I therefore identified and considered evidence of the following:

- Google's payments for user data;
- Users' willingness to pay to prevent data collection; and
- Research organizations' willingness to pay for data collection.

133.    My analysis of these indicators is discussed below.

### 8.1.1.    Google's Payments for User Data

134.    I have identified and considered the following indicator of Google's payments for user data.

**Ipsos Screenwise Panel**

135.    Since 2012, Google has utilized consumer research studies conducted by Ipsos, a global market research company,[223] to collect information on how users browse the internet.[224] Through these

---

[223] "Ipsos Screenwise Panel Cookie Policy" per Ipsos at https://screenwisepanel.com/cookie-policy (accessed February 10, 2023).

[224] "About the Ipsos Screenwise Panel" per Ipsos at https://screenwisepanel.com/home (accessed February 10, 2023). See also "Google Screenwise pays opt-in users for expanded web tracking" at https://www.theverge.com/2012/2/8/2785751/google-screenwise-panel-web-monitoring-knowledge-networks (accessed February 10, 2023) and "Google paying users to track 100% of their Web usage via little black box" per Ars Technica at https://arstechnica.com/gadgets/2012/02/google-paying-users-to-track-100-of-their-web-usage-via-little-black-box/ (accessed February 10, 2023).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

studies, which are marketed as the Ipsos Screenwise Panel ("Screenwise Panel"), members of selected U.S. households are paid to voluntarily link their devices, operate a special router, and recruit other members of the household to participate in a comprehensive online data collection process.[225]

136.    According to the Ipsos Screenwise Panel privacy and cookie policies, Google uses the collected information to "better understand how consumers use technology and digital media."[226] According to the related "Google Panel Privacy Policy," which describes "*how Google LLC will collect, store, use, and share information obtained from the hardware, software, and other Panel metering technology (collectively 'Meters') used in connection with the Panel*," the information collected via the "Meters" includes a vast array of data that can be combined with "*other data collected by Google when you're using Google products and services as a Google user*":[227]

**Figure 44**
**Google Panel Privacy Policy Summary**[228]



137.    The Google Panel Privacy Policy states that "*[t]hese Meters help Google learn about your interaction with technology and digital media on various devices.  This includes your desktop and*

---

[225] "About the Ipsos Screenwise Panel" per Ipsos at https://screenwisepanel.com/home (accessed February 10, 2023). See also GOOG-RDGZ-00187578-622 at 580 and GOOG-RDGZ-00187623-624.

[226] "Ipsos Screenwise Panel Cookie Policy" per Ipsos at https://screenwisepanel.com/cookie-policy (accessed February 10, 2023) and "Ipsos Screenwise Panel Privacy Policy" per Ipsos at https://screenwisepanel.com/ipsos-Sow-privacy-policy (accessed February 10, 2023).

[227] "Google Panel Privacy Policy" per Ipsos at https://screenwisepanel.com/google-panel-privacy-policy (accessed February 10, 2023).

[228] "Google Panel Privacy Policy" per Ipsos at https://screenwisepanel.com/google-panel-privacy-policy (accessed February 10, 2023).  Emphasis added.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

*laptop computers, wireless routers, mobile phones, tablets, wearable devices, automotive items connected to the Internet, and other devices you may use to consume and interact with digital content throughout the day."*[229]  The policy also states that digital media and digital content are broadly defined to include *"your interactions with Internet browsers and websites, mobile and tablet applications and software, the devices you use to access digital media and digital content, TV content, and any other electronic delivery systems of digital content."*[230]

138.    The Google Panel Privacy Policy explains that *"[w]hen a Meter is placed on a device, it potentially will collect and record all interactions with that device.  For example, when a Meter is placed on your mobile phone, it potentially will record everything you see on your screen and everything you tap, type, swipe, or otherwise input."*[231]  The policy goes on to further define the scope of the information collected, which includes, among other items, *"every web page you've visited and all of your interactions with those web pages,"* *"your use of applications and widgets (collectively 'apps'), software, and operating systems,"* *"the content you see on your screen or device at any given time,"* and *"[i]nformation you provide or otherwise input when visiting websites, using apps or using a TV user interface [including] search terms and personal information you provide to a website, TV user interface, or app, including your name, email address, home/work address, telephone number, Social Security number, or credit card number."*[232]

139.    Based on my review of the Google Panel Privacy Policy and its detailed itemization of the information collected, it is readily apparent that participants in the Screenwise Panel voluntarily and knowingly allow Google to track all online activity on the device and, in doing so, relinquish any sense of online data privacy – actual or perceived – related to that online activity for as long as they participate in the study.  Further, while the policy states that past participants can formally request the deletion of information collected during the study, and that *"Google will make reasonable efforts to comply with such requests,"* the policy also states that Google *"may aggregate, anonymize, or otherwise de-identify any personal information instead of deleting it"* and *"[w]hen your participation in the Panel ends, Google may continue to store, use, and share the information previously obtained."*[233]

140.    Participants in the Screenwise Panel receive various payments and rewards for their activity.  According to the limited amount of compensation information available on the Screenwise Panel website, the financial consideration to panel participants can include "rewards" valued at $120 for qualifying for the study and installing a special router, as well as monthly payments of up to $16 per household member:

---

[229]  "Google Panel Privacy Policy" per Ipsos at https://screenwisepanel.com/google-panel-privacy-policy (accessed February 10, 2023).

[230]  "Google Panel Privacy Policy" per Ipsos at https://screenwisepanel.com/google-panel-privacy-policy (accessed February 10, 2023).

[231]  "Google Panel Privacy Policy" per Ipsos at https://screenwisepanel.com/google-panel-privacy-policy (accessed February 10, 2023).

[232]  "Google Panel Privacy Policy" per Ipsos at https://screenwisepanel.com/google-panel-privacy-policy (accessed February 10, 2023).

[233]  "Google Panel Privacy Policy" per Ipsos at https://screenwisepanel.com/google-panel-privacy-policy (accessed February 10, 2023).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 45**
**Ipsos Screenwise Panel – Summary of Rewards and Payments per Screenwisepanel.com[234]**



141. Additional information regarding this compensation structure is found in the text of a "Screenwise Panel Recruitment Survey" produced in this matter:

**Figure 46**
**Ipsos Screenwise Panel – Summary of Rewards and Payments per Recruitment Survey[235]**

> If you complete this survey and qualify for the Ipsos Screenwise Panel, you will receive a $20 reward. You will also receive up to $100 after installing the router and up to $16 in monthly rewards for your participation.
>
> How you can earn monthly rewards:
> •  Router: $5 for having all Wi-Fi devices connected to the Screenwise Router
> •  Browser: $3 for using browsers with the Screenwise Meter browser extension
> •  Mobile phone: $3 for using phones with the Screenwise Meter app installed
> •  Tablet: $3 for using tablets with the Screenwise Meter app installed
> •  $2 bonus reward for using 3 of the 4 of the devices above
>
> Participating with all of your household devices gives us a better understanding of how people use the internet and mobile apps—and it's the best way to earn the most rewards available.

142. While monthly payments and other rewards to a single Screenwise Panel participant can reach or exceed $16 per month, the minimum recurring payment to Screenwise Panel participants for their use of a Screenwise browser extension or a Screenwise Meter app on a single device (including both mobile phones and tablets) is $3 per month.

---

[234] "About the Ipsos Screenwise Panel" per Ipsos at https://screenwisepanel.com/home (accessed February 10, 2023).
[235] GOOG-RDGZ-00187578-622 at 580.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 8.1.2. Consumers' Willingness to Pay to Prevent Data Collection or Block Advertisements

143.   I have also identified and considered the following indicator of consumers' willingness to pay in their attempts to increase online privacy and/or prevent their data from being saved.

### AT&T's GigaPower Campaign & Internet Preferences Program

144.   In 2013, AT&T launched its "GigaPower" all-fiber network in parts of Austin, Texas.[236]  The cost was $70 per month if customers agreed to participate in AT&T's "Internet Preferences" program, which would use customers' personal data to serve targeted advertisements, but an extra $29 per month (for a total of $99) for customers who did not opt into the targeted advertisement program.[237]  AT&T explained that it uses "various methods to collect web browsing information" and that through Internet Preferences, user information such as search terms and website visits could be used for targeted advertising:[238]

> [The $70 price] is available with your agreement to participate in AT&T Internet Preferences.  AT&T may use your Web browsing information, like the search terms you enter and the Web pages you visit, to provide you relevant offers and ads tailored to your interests.[239]

145.   AT&T also explained that the price differential was due to AT&T's ability to generate advertising revenue:

> We can offer a lower price to customers participating in AT&T Internet Preferences because advertisers will pay us for the opportunity to deliver relevant advertising and offers tailored to our customer's interests.[240]

146.   AT&T expanded its GigaPower and Internet Preferences program to Kansas City, MO and parts of Kansas in February 2015.[241]  However, in September 2016, AT&T announced that it would "sunset" the Internet Preferences program beginning in October 2016 and charge all customers the best available rate for their area and speed tier.[242]  AT&T characterized the end of the program as

---

[236] "AT&T offers gigabit Internet discount in exchange for your Web history" per Ars Technica at https://arstechnica.com/information-technology/2013/12/att-Offers-gigabit-internet-discount-in-exchange-for-your-web-history/ (accessed February 10, 2023).

[237] "AT&T offers gigabit Internet discount in exchange for your Web history" per Ars Technica at https://arstechnica.com/information-technology/2013/12/att-Offers-gigabit-internet-discount-in-exchange-for-your-web-history/ (accessed February 10, 2023).

[238] "AT&T offers gigabit Internet discount in exchange for your Web history" per Ars Technica at https://arstechnica.com/information-technology/2013/12/att-Offers-gigabit-internet-discount-in-exchange-for-your-web-history/ (accessed February 10, 2023).

[239] "AT&T offers gigabit Internet discount in exchange for your Web history" per Ars Technica at https://arstechnica.com/information-technology/2013/12/att-Offers-gigabit-internet-discount-in-exchange-for-your-web-history/ (accessed February 10, 2023).

[240] "AT&T Offers Data Privacy – for a Price" per Wall Street Journal at https://www.wsj.com/articles/BL-DGB-40475 (accessed February 10, 2023).

[241] "AT&T Offers Data Privacy – for a Price" per Wall Street Journal at https://www.wsj.com/articles/BL-DGB-40475 (accessed February 10, 2023) and "AT&T charges $29 more for gigabit fiber that doesn't watch your Web browsing" per Ars Technica at https://arstechnica.com/information-technology/2015/02/att-charges-29-more-for-gigabit-fiber-that-doesnt-watch-your-web-browsing/ (accessed February 10, 2023).

[242] "AT&T to end targeted ads program, give all users lowest available price" per Ars Technica at https://arstechnica.com/information-technology/2016/09/att-to-end-targeted-ads-program-give-all-users-lowest-available-price/ (accessed February 10, 2023).

an attempt to simplify its offering for customers and confirmed that data collection and targeted ads would be shut off as a result of the change.[243]

### 8.1.3.  Research Organizations' Willingness to Pay for Data Collection

147.  I have also identified and considered the following indicators of research organizations' willingness to pay users to allow for additional data collection.

**Nielsen Computer and Mobile Panel**

148.  Nielsen, the world's leading provider of media and marketing information, tracks and collects information related to device usage to develop an understanding of consumer behavior, including what consumers view and listen to, as well as how they browse the internet.[244]  Participants in the Nielsen Computer and Mobile Panel register demographic and device information, download a Nielsen app or computer software on devices, and ultimately earn money for their participation.[245]  The data collected from participants in the panel includes the following:

**Figure 47**
**What does the Nielsen Computer & Mobile App / Software Collect?**[246]



---

[243] "AT&T to end targeted ads program, give all users lowest available price" per Ars Technica at https://arstechnica.com/information-technology/2016/09/att-to-end-targeted-ads-program-give-all-users-lowest-available-price/ (accessed February 10, 2023).  AT&T's GigaPower campaign was also referenced by the Federal Communications Commission ("FCC") in a December 2016 Final Rule decision issued to Congress regarding telecommunications customer privacy.  The FCC highlighted AT&T's GigaPower program, noting that until recently, customers had to opt into AT&T Internet Preferences in order to receive GigaPower services at a lower cost.  The FCC also noted that "consumers have difficulty placing a monetary value on privacy."  See "Protecting the Privacy of Customers of Broadband and Other Telecommunications Services," Federal Communications Commission, December 2, 2016, p. 87317.

[244] "Nielsen Computer & Mobile Panel" per Nielsen at https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing (accessed February 10, 2023); "Frequently Asked Questions" per Nielsen at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (accessed February 10, 2023).

[245] "Nielsen Computer & Mobile Panel" per Nielsen at https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing (accessed February 10, 2023) and "What Rewards Can I Earn?" per Nielsen at https://computermobilepanel nielsen.com/ui/US/en/faqen.html (accessed February 10, 2023).

[246] "What does the Nielsen Computer & Mobile App/software collect?" per Nielsen at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (accessed February 10, 2023).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

149. By downloading the Nielsen app, users can earn up to $50 per year, depending on the number of mobile devices for which the user installs and uses the app.[247] Nielsen describes the Computer and Mobile Panel's purpose as "*help[ing] understand how consumers use the Internet by studying the websites people like you visit*" and represents that it uses the collected information to perform research and prepare analyses regarding internet usage patterns and demographics.[248]

**SavvyConnect**

150. SavvyConnect launched an application that tracks user data in 2009 and has since been performing "behavioral market research" on users' browsing activities.[249] Users of SavvyConnect earn rewards by downloading an app on their smartphone, tablet, and/or computer and participating in their typical web browsing activities.[250] SavvyConnect collects data as users browse the internet and utilizes the data it collects to identify trends in search, shopping, and entertainment.[251] By installing and activating SavvyConnect on a device and allowing their typical web browsing activities to be tracked, users earn $5 per device per month for up to three devices, (up to $15 per month for installing and activating SavvyConnect on their computer, mobile phone, and tablet).[252]

### 8.1.4.  Conclusion Regarding the Value of WAA/sWAA-Off Data Acquired by Google

151. Based on the above, it is my opinion that the most probative indicator of the harm to WAA/sWAA-Off users from Google's collection, saving, and/or use WAA/sWAA-Off Data, and the value of that WAA/sWAA Off Data, is derived from the monthly compensation structure for participants in the Ipsos Screenwise Panel. More specifically, it is my opinion that the baseline payment to Screenwise Panel participants of $3 per month for using a Screenwise meter app on a single mobile device (including both smartphones and tablets) represents a conservative indicator of the monthly payment necessary for an individual to knowingly surrender the choice to keep app activity private and allow Google to track app activity data, regardless of that individual's WAA or sWAA settings. While the Screenwise compensation structure applies this $3 payment per device per month, it is my opinion that actual damages through December 2022 can be conservatively measured by applying this $3 payment on a one-time basis to the number of Class Member Devices, where a single Class Member Device represents a mobile device (smartphone or tablet) used with WAA/sWAA off at least once during the Class Period through December 2022. I describe my analysis of Class Member Devices in Section 8.2 below.

---

[247] "What rewards can I earn?" per Nielsen at https://computermobilepanel nielsen.com/ui/US/en/faqen html (accessed February 10, 2023).

[248] "What does Nielsen use my information for?" per Nielsen at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (accessed February 10, 2023) and "What is the Nielsen Computer & Mobile Panel?" per Nielsen at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (accessed February 10, 2023).

[249] "How it Works" per Survey Savvy at https://www.surveysavvy.com/how_it_works (accessed February 10, 2023).

[250] "What is SavvyConnect?" per Survey Savvy at https://www.surveysavvy.com/savvyconnect (accessed February 10, 2023).

[251] "What is SavvyConnect?" per Survey Savvy at https://www.surveysavvy.com/savvyconnect (accessed February 10, 2023).

[252] "SavvyConnect Monthly Participation Requirements" per Survey Savvy at https://www.surveysavvy.com/savvyconnect/requirements (accessed February 10, 2023) and "What is SavvyConnect?" per Survey Savvy at https://www.surveysavvy.com/savvyconnect (accessed February 10, 2023).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## 8.2.  Analysis of Class Member Devices

152.    As previously discussed, I undertook an independent analysis of the base of mobile devices (smartphones and tablets) to which the $3 payment per device per month can be applied in the determination of total actual damages.  I therefore sought to conservatively determine the number of Class Member Devices, where a single Class Member Device represents a mobile device (smartphone or tablet) used with WAA/sWAA off at least once during the Class Period through December 2022.

153.    My analysis of Class Member Devices required the quantification of class members during the Class Period through December 2022 and the average number of mobile devices used by those class members.

154.    As described below, I first estimated the number of class members (individual users) during the Class Period through December 2022 based on Google data regarding the number of U.S. accounts that were "ever active" during the four-year period between July 27, 2016 and July 27, 2020 and the portion of those accounts for which sWAA was turned off at any time during the same period,[253] as well as survey evidence and publicly available data regarding:

  ▪  the U.S. population by age group;
  ▪  the share of U.S. minors and adults that use the internet;
  ▪  the share of U.S. minors and adults that use smartphones; and,
  ▪  the share of smartphone users that have at least one Gmail account.

155.    Noting that internet and mobile device usage can vary across ages, I began with Census Bureau data regarding the 2021 U.S. population by age group.  This data allows for the quantification of minors under ten years of age, minors aged ten to 17, and adults aged 18 and over.[254]  I conservatively excluded minors under age ten.  I then applied apportionment factors to each of the two remaining groups to isolate individuals that use the internet.  For purposes of this adjustment, I applied a 95.0% factor from the National Center for Education Statistics to the group aged ten to 17 and a 93.0% factor from Pew Research to the group of adults.[255]  I then applied further apportionment factors to isolate individuals with smartphones.  For purposes of this adjustment, I applied a 73.0% factor derived from the "2021 Common Sense Census: Media Use by Teens and Tweens" and a 96.0% factor from the Keegan survey results regarding the share of respondents (all of whom are adults) who use smartphones.[256]  To both of these groups, I then applied additional apportionment factors to isolate individuals with Gmail accounts (*i.e.*, approximately 84.0%, per the Keegan survey results) and the share of accounts that ever turned sWAA off (*i.e.*, approximately ███%, per Google's data regarding the number of U.S. accounts that were "ever active" during the four-year period between July 27, 2016 and July 27, 2020 and the portion of

---

[253]  Schedule 12.7.  See also GOOG-RDGZ-00187010 at tab "SWAA". See also, Defendant Google LLC's Supplemental Objections and Responses to Plaintiffs' Interrogatories, Set Six (Nos. 12, 16, &17), Supplemental Response to Interrogatory No. 12, p. 6.

[254]  Schedules 10.2 and 10.3.  See also Annual Estimates of the Resident Population for Selected Age Groups by Sex for the United States: April 1, 2020 to July 1, 2021, Census Bureau (accessed February 17, 2023).

[255]  Schedules 10.2 and 10.3.  See also "Children's Internet Access At Home," National Center for Education Statistics, 2019, per https://nces.ed.gov/programs/coe/indicator/cch/home-internet-access (accessed February 17, 2023); "Internet Use Over Time," Pew Research, 2021, per https://www.pewresearch.org/internet/fact-sheet/internet-broadband/ (accessed February 17, 2023).

[256]  Schedules 10.2 and 10.3.  See also "The Common Sense Census: Media Use by Teens and Tweens, 2021" per https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf (accessed February 17, 2023); Schedules 10.4 and 12.5.

those accounts for which sWAA was turned off at any time during the same period).[257]  My calculations in this regard are detailed in Schedules 10.2 and 10.3 and summarized in the figure below.

**Figure 48**
**Estimated Class Members Through December 31, 2022[258]**

|  | Ages 10-17 | Adults (18+) | Total |
|---|---|---|---|
| United States Population | 34,447,547 | 258,327,312 | 292,774,859 |
| Share of U.S. Age Group that Use the Internet | 95.00% | 93.00% | N/A |
| U.S. Internet Users | 32,725,170 | 240,244,400 | 272,969,570 |
| Share of Internet Users with Smartphones | 73.00% | 95.96% | N/A |
| U.S. Internet Users with Smartphones | 23,889,374 | 230,532,884 | 254,422,258 |
| Share of Smartphone Users with Gmail Accounts | 84.05% | 84.05% | N/A |
| U.S. Smartphone Users with Gmail Accounts | 20,079,534 | 193,767,861 | 213,847,395 |
| Share of U.S. Google Accounts where sWAA was Turned Off at Any Time | ██% | ██% | N/A |
| Estimated Class Members | 8,539,766 | 82,408,894 | 90,948,660 |

156.    I also considered potential apportionments to 1) isolate some smaller subset of WAA/sWAA-Off mobile devices that interact with one or more mobile application that contains the Firebase and/or GMA SDKs and 2) account for users that may quickly toggle between WAA/sWAA settings. Based on my understanding of the available data, however, I determined that neither of these additional apportionments was appropriate.

157.    For example, with respect to a potential apportionment to isolate the subset of WAA/sWAA-Off mobile devices that interact with one or more mobile application that uses the Firebase and/or GMA SDKs, I understand that any such adjustment would at most be de minimis and most likely zero.  For example, I understand from Mr. Hochman that an individual who has WAA/sWAA off and uses ten (10) mobile apps would have a 99.9% chance of going to an app where Google collects their WAA/sWAA Data via the Firebase and/or GMA SDKs.[259]  I evaluated this probability in light of the following considerations:

- A 2017 report by App Annie Intelligence entitled "Spotlight on Consumer App Usage" found that an average mobile phone user in the United States is using approximately 10 mobile applications per day;[260]

---

[257] Schedules 10.2 and 10.3.  See also Schedules 12.4 and 12.7.
[258] Schedules 10.2 and 10.3.
[259] Discussions with Mr. Hochman.
[260] "Spotlight on Consumer App Usage" per App Annie at
    http://files.appannie.com.s3.amazonaws.com/reports/1705_Report_Consumer_App_Usage_EN.pdf (accessed February 10, 2023).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

- The same 2017 report by App Annie Intelligence entitled "Spotlight on Consumer App Usage" indicated that the number of mobile applications used by mobile device users per month was greater than 30 in the United States;[261] and

- According to a July 2020 Google presentation entitled "Increase user engagement with Firebase & Google Analytics," Firebase was used in connection with ██% of the top 1,000 mobile applications on Android and ██% of the top 1,000 mobile applications on iOS.[262]

158. Further, and with respect to a potential apportionment to account for users that may quickly toggle between WAA/sWAA settings, I understand that Google personnel generally characterize WAA and sWAA settings as "a permanent opt-out/opt-in control" that is rarely changed. Indeed, and as previously discussed in Section 6.6, I searched for evidence regarding the frequency of changes to WAA and sWAA settings or the extent to which Google personnel consider those settings to be temporary or permanent. Based on my review of the available evidence and as indicated below, it appears to be the latter:

- In an internal Google analysis updated in August 2018 and entitled "Consequences of not logging WAA-disabled users with Gaia ID in Search Sessions, News, and AdEvents Logs," Google personnel indicated that "██% of Google 28DA accounts didn't change their WAA status visibly in User Attribute in the last 28 days."[263]

- In a January 31, 2020 email from Uwe Bubeck to other Google employees, Mr. Bubeck noted that "*the fact that WAA is a pause control may be relevant from a theoretical/philosophical perspective, but most users probably use it as a permanent opt-out/opt-in control, instead of toggling.*"[264] Ms. Jia Liu responded that this was "*True for WAA.*"[265] Ms. Liu went on to indicate that "*For YTH [YouTube History] I heard some cases of more active usages of history pauses (i.e., a user toggles it back and forth) as well as history deletions, possibly related to the types of video watch sessions they have.*"[266] Later in the same email chain, Mr. Bob Cui noted that, by his analysis of 30 day "setting flip data," "*WAA flipping is only about 10% of YTW [YouTube Watch History] flipping, and even less with higher frequency range.*"[267]

159. The next step in determining the number of Class Member Devices is the adjustment from class members to the corresponding number of mobile devices. In order to derive the corresponding number of mobile devices and reflect the fact that users can have more than one mobile device, I multiplied the estimated number of class members by age group by the average number of mobile devices per person. For purposes of this adjustment, I conservatively assumed one (1) mobile device per class member aged ten to 17 and 1.86 mobile devices per adult class member as indicated in the Keegan survey results and as calculated on Schedule 12.2. As detailed on Schedule 10.1 and summarized in the figure below, the application of these device counts to the estimated number of class members yields approximately ███████ Class Member Devices through December 2022:

---

[261] "Spotlight on Consumer App Usage" per App Annie at http://files.appannie.com.s3.amazonaws.com/reports/1705_Report_Consumer_App_Usage_EN.pdf (accessed February 10, 2023).
[262] GOOG-RDGZ-00060716-804 at 729.
[263] GOOG-RDGZ-00209874-876 at 875.
[264] GOOG-RDGZ-00042152.R-159.R at 153.R.
[265] GOOG-RDGZ-00042152.R-159.R at 153.R.
[266] GOOG-RDGZ-00042152.R-159.R at 153.R.
[267] GOOG-RDGZ-00042152.R-159.R at 152.R.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 49**
**Class Member Devices through December 2022[268]**

|  | Ages 10-17 | Adults (18+) | Total |
|---|---|---|---|
| Estimated Class Members | 8,539,766 | 82,408,894 | 90,948,660 |
| Average Number of Mobile Devices per Person | 1.00 | 1.86 | N/A |
| Class Member Devices | 8,539,766 | 153,475,659 | 162,015,424 |

### 8.3.  Conclusion Regarding Actual Damages

160.   In my opinion, the most probative indicator of the harm to WAA/sWAA-Off users from Google's collection, saving, and/or use WAA/sWAA-Off Data, and the value of that WAA/sWAA Off Data, is derived from the monthly compensation structure for participants in the Ipsos Screenwise Panel. More specifically, it is my opinion that the baseline payment to Screenwise Panel participants of $3 per month for using a Screenwise meter app on a single mobile device represents a conservative indicator of the monthly payment necessary for an individual to knowingly surrender the choice to keep their app activity private and allow Google to track all app activity data, regardless of that individual's WAA or sWAA settings.

161.   While the Screenwise compensation structure applies this $3 payment per device per month, it is my opinion that actual damages through December 2022 can be conservatively measured by applying this $3 payment on a one-time basis to the number of Class Member Devices, where a single Class Member Device represents a mobile device (smartphone or tablet) used with WAA/sWAA off at least once during the Class Period through December 2022.  My calculations in this regard are detailed in the Schedule 10.1 and summarized in the figure below:

**Figure 50**
**Actual Damages: July 2016 to December 2022[269]**

|  | Total |
|---|---|
| Class Member Devices | 162,015,424 |
| Selected Payment per Class Member Device | $3.00 |
| Actual Damages | $486,046,273 |

### 9.  APPORTIONING MONETARY RELIEF TO THE CLASSES AND CLASS MEMBERS

162.   All of the calculations discussed in this report and detailed in the corresponding schedules can be readily apportioned across the two Classes and among Class members.  If required and relevant, allocations for Class members in California could also be performed based on publicly available data such as the population of California as a percentage of the total U.S. population.

---

[268]  Schedule 10.1.
[269]  Schedule 10.1.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

163.   My analyses of the monetary relief that can be awarded in this case can be readily used as common proof in part because they can be adjusted to calculate and assess unjust enrichment, actual damages, and nominal damages for different periods of time and subclass(es), depending on rulings from the Court and findings by a jury.

## 9.1.   Apportioning Monetary Relief Across Classes

164.   I have determined that my analyses of Google's unjust enrichment attributable to the alleged wrongful conduct and actual damages could be allocated across Classes as a function of the available data regarding the U.S. market share of Android (*i.e.*, Class 1) and Non-Android (*i.e.*, Class 2) operating systems in mobile devices and the share of Class 1 and Class 2 members that are typically "signed-in" to their Google accounts.  More specifically, the available data regarding the overall share of "App Display Revenue from Signed-In" as represented in Google's ▮▮▮ ▮▮▮▮▮▮▮ (*i.e.*, ▮▮ %),[270] the share of Android mobile device users that are typically signed-in (*e.g.*, nearly all, or 100%),[271] and data regarding the market share of Android and Non-Android operating systems on mobile devices (*e.g.*, 51% and 49%, respectively, as indicated in the Keegan survey results)[272] can be combined to calculate class-specific apportionment factors.  I provide a framework to calculate these class-specific apportionment factors on Schedule 1.5, and I provide example calculations showing my application of these apportionment factors to my analyses of Google's unjust enrichment on Schedules 1.3 and 1.4.

165.   Alternatively, my analyses of Google's unjust enrichment attributable to the alleged wrongful conduct and actual damages could also be allocated across Classes as a function of the available data regarding the U.S. market share of Android (*i.e.*, Class 1) and Non-Android (*i.e.*, Class 2) operating systems in mobile devices, without further adjustment for differences (or lack thereof) in "signed-in" rates across the Classes.  Among other indications of market share, this apportionment could be performed using data from the Keegan survey results regarding the share of respondents that have Android and Non-Android operating systems on their primary device (*i.e.*, 51% and 49%, respectively).

## 9.2.   Apportioning Monetary Relief Among Class Members

166.   I have determined that my analyses of Google's unjust enrichment attributable to the alleged wrongful conduct and actual damages could also be readily allocated among Class members based on number of Class members or the number of sWAA-Off User Months, as discussed below.

### 9.2.1.   The Number of Class Members

167.   As previously discussed in Section 8.2, I estimated the number of class members (individual users) during the Class Period through December 2022 based on Google data regarding the number of U.S. accounts that were "ever active" during the four-year period between July 27, 2016 and July

---

[270]   Schedule 15.1.

[271]   The calculations set forth on Schedule 1.5 can be modified to reflect alternative Android sign-in rates if such information becomes available.  The 100% sign-in rate used in this calculation is for demonstration purposes, but is consistent with my understanding that various Android features are unavailable if the user is not signed-in to his or her device.  See, for example, "Can you use an Android device without a Google account" per https://www.howtogeek.com/854837/can-you-use-an-android-phone-without-a-google-account/.

[272]   Keegan Survey Results, Q8; Schedule 12.6.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

27, 2020 and the portion of those accounts for which sWAA was turned off at any time during the same period,[273] as well as survey evidence and publicly available data regarding:

- the U.S. population by age group;
- the share of U.S. minors and adults that use the internet;
- the share of U.S. minors and adults that use smartphones; and,
- the share of smartphone users that have at least one Gmail account.

168.   My calculations in this regard are detailed in Schedules 10.2 and 10.3 and summarized in the figure below.

**Figure 51**
**Estimated Class Members Through December 31, 2022[274]**

|  | Ages 10-17 | Adults (18+) | Total |
|---|---|---|---|
| United States Population | 34,447,547 | 258,327,312 | 292,774,859 |
| Share of U.S. Age Group that Use the Internet | 95.00% | 93.00% | N/A |
| U.S. Internet Users | 32,725,170 | 240,244,400 | 272,969,570 |
| Share of Internet Users with Smartphones | 73.00% | 95.96% | N/A |
| U.S. Internet Users with Smartphones | 23,889,374 | 230,532,884 | 254,422,258 |
| Share of Smartphone Users with Gmail Accounts | 84.05% | 84.05% | N/A |
| U.S. Smartphone Users with Gmail Accounts | 20,079,534 | 193,767,861 | 213,847,395 |
| Share of U.S. Google Accounts where sWAA was Turned Off at Any Time | ███% | ███% | N/A |
| Estimated Class Members | 8,539,766 | 82,408,894 | 90,948,660 |

169.   Notably, this total number of estimated class members could be allocated across Classes based on the available data regarding the U.S. market share of Android (*i.e.*, Class 1) and Non-Android (*i.e.*, Class 2) operating systems in mobile devices. Among other indications of market share, this apportionment could be performed using data from the Keegan survey results regarding the share of respondents that have Android and Non-Android operating system on their primary device (*i.e.*, 51% and 49%, respectively).

**9.2.2.   The Number of sWAA-Off User Months**

170.   I also estimated the number of sWAA-Off User Months during the period July 2016 through December 2022, where a single sWAA-Off User Month represents a month in which an individual used a smartphone or tablet with sWAA off in the U.S. My analysis in this regard was based on the previously discussed Google document that represents the number of Google accounts that were "Created," "Active," and "Created or Active" with WAA and sWAA enabled in the U.S. for each month during the period May 2016 through October 2022 as well as data from the Keegan survey results regarding the number of Gmail accounts used by survey respondents with at least

---

[273]  Schedule 12.7. See also GOOG-RDGZ-00187010 at tab "SWAA".
[274]  Schedules 10.2 and 10.3.

one Gmail account and the rate of smartphone use.[275]  As discussed below and detailed in the attached schedules, I used this information to determine the number of sWAA-Off User Months during the period July 2016 through December 2022.

171.   As an initial step of this analysis, and in the absence of Google account data for November and December 2022, I hold constant the October 2022 account data for November and December 2022.  In my opinion, this assumption is conservative in light of the fact that the number of active accounts with sWAA off continued to increase on a month-over-month basis through October 2022.[276]  To the resulting base of active sWAA-Off accounts by month during the period July 2016 through December 2022, I then performed two adjustments in order to derive the corresponding measure of sWAA-Off User Months.  The first adjustment converted the represented sWAA-Off accounts into individual sWAA-Off users, and the second isolated the portion of those users that use a mobile device.

172.   First, and in order to derive the number of users and reflect the fact that users can have more than one Google account, I divided the base of active sWAA-Off accounts by the average number of Gmail accounts per Gmail account holder.  In the absence of information from Google regarding the average number of Google accounts per Google account holder, I used the average number of Gmail email accounts used by survey respondents with at least one Gmail account as indicated by the Keegan survey results.  As calculated on Schedule 12.1, this survey data indicates that survey respondents with at least one Gmail account have, on an average, approximately 1.77 Gmail accounts.[277]  As detailed on Schedule 11.1 and summarized in the figure below, this adjustment yields approximately ▮▮▮▮▮ sWAA-Off User Months Before Adjustment for Mobile Device Use during the period July 2016 through December 2022:

**Figure 52**
**sWAA-Off User Months Before Adjustment for Mobile Device Use:**
**July 2016 through December 2022[278]**

| (in millions) | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Number of Monthly sWAA Off Accounts | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Average Number of Gmail Accounts per Gmail Account Holder | 1.77 | 1.77 | 1.77 | 1.77 | 1.77 | 1.77 | 1.77 | 1.77 |
| sWAA-Off User Months Before Adjustment for Mobile Device Use | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

173.   Next, and in order to reflect the fact that some sWAA-Off users may not use mobile devices, I multiplied the sWAA-Off User Months Before Adjustment for Mobile Device Use by the rate of smartphone use as indicated by the Keegan survey results (*i.e.*, approximately 96% of respondents).[279]  As detailed on Schedule 11.1 and summarized in the figure below, this adjustment yields approximately 3.0 billion sWAA-Off User Months during the period July 2016 through December 2022:

---

[275]  GOOG-RDGZ-00204475, tab "Sheet1."  This document indicates that the data excludes ▮▮▮▮ (*i.e.*, enterprise account holders), "Googlers" (*i.e.*, Google personnel), and "supervised" accounts.  I also understand that "Active Accounts" refers to accounts that were active in the 28-day period before the month start date of a given measurement period.  Deposition of Christopher Ruemmler, September 9, 2022, p. 181.

[276]  Schedule 13.2; GOOG-RDGZ-00204475, tab "Sheet1."

[277]  Keegan Survey Results, Q12; Schedule 12.1.

[278]  Schedule 11.1.

[279]  Keegan Survey Results, Q7; Schedule 12.5.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 53**
**sWAA-Off User Months:**
**July 2016 through December 2022**[280]

| (in millions) | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| sWAA-Off User Months Before Adjustment for Mobile Device Use | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Share of Internet Users with Smartphones | 95 96% | 95 96% | 95 96% | 95 96% | 95 96% | 95 96% | 95 96% | 95 96% |
| sWAA-Off User Months | 512 76 | 608 71 | 426 69 | 386 88 | 340 27 | 371 65 | 376 84 | 3,023 80 |

174.    The dollar value resulting from the division of my analyses of Google's unjust enrichment attributable to the alleged wrongful conduct or actual damages by the above sWAA-Off User Months could then be distributed to Class members in the claims administration process as a function of the number of sWAA-Off User Months deemed attributable to each Class member.

**10.  SIGNATURE**

Respectfully,

_Michael J. Lasinski_
_____

Michael J. Lasinski

_February 20, 2023_
_____

Date

---

[280]  Schedule 11.1.

# Appendix A



# MICHAEL J. LASINSKI
# CURRICULUM VITAE

February 2023

Michael J. Lasinski is a senior managing director at Ankura Consulting Group where he heads the intellectual property (IP) group. Previously, he was a founding member of 284 Partners, LLC, a professional services firm focused on IP valuation, litigation consulting, IP strategy, and transactional services. Over the past twenty years, Mr. Lasinski has consulted on hundreds of engagements pertaining to IP-centric transactions, IP valuations, and IP damages analyses.

Mr. Lasinski is a recognized expert on financial aspects of intellectual property. He is *President-Elect of the Licensing Executives Society International* (LESI), an association of over thirty national and regional member societies, and he is a *Past-President of the Licensing Executives Society USA & Canada* (LES). Mr. Lasinski was also named one of the *World's 300 Leading IP Strategists* by Intellectual Asset Management. He is a past *Division Chair for the Intellectual Property Section of the American Bar Association.* He is a former *Chair of the Valuation and Taxation Committee for LES* and a former *Vice Chair of the Intellectual Property Owners' Valuation and Taxation Committee*. Mr. Lasinski is a Certified Public Accountant and an active member of the American Institute of Certified Public Accountants (AICPA) and the Illinois CPA Society. He is Certified in Financial Forensics by the AICPA and is a Certified Licensing Professional as initiated by the LES.

Mr. Lasinski has been retained and has testified as an expert in federal, ITC, state, tax and arbitration proceedings. Mr. Lasinski was retained by Boeing as the sole agent for licensing its technology into the automotive sector. He was instrumental in advising creditors and other interested parties on IP and financial issues related to the sale of Nortel's patent portfolio for more than $4.5 billion. Mr. Lasinski's consulting experience includes a broad cross-section of industries, including the advertising, automotive, chemicals, computer hardware & software, consumer products, e-commerce, food & beverage, Internet, healthcare, life sciences, medical devices & related products, semiconductors, telecommunications, and wireless communications.

Mr. Lasinski has helped clients strategically manage their IP by creating global corporate organizations designed to maximize the current and future value of their intellectual property. His experience includes acquisitions, divestitures, mergers, joint ventures and bankruptcy. He has been a financial advisor to creditor committees, private equity companies, venture capitalists and Fortune 500 companies on numerous occasions. Mr. Lasinski was selected to be one of the developers/reviewers of the American Society of Appraisers Advanced Valuation Courses. He has lectured on intellectual property valuation for university business schools, law schools, the USPTO and other regulatory agencies.

Prior to focusing on IP, Mr. Lasinski was an automotive engineer and OEM program manager. Mr. Lasinski developed software for remote keyless entry and anti-theft systems. He was also responsible for airbag diagnostics, in-vehicle phone systems and other products.

**ankura**

| | |
|---|---|
| **PROFESSIONAL EXPERIENCE** | Senior Managing Director, Ankura Consulting Group, Dec. 2019 – Present |
| | Managing Director & CEO, 284 Partners, 2010 – Dec. 2019 |
| | Managing Director, Capstone, 2009 – 2010 |
| | Managing Director, Ocean Tomo, 2006 – 2009 |
| | Executive Director, Center for Applied Innovation, 2005 – 2006 |
| | Vice President, Charles River Associates, 2004 – 2005 |
| | Managing Director, InteCap (now Charles River Associates), 1999 – 2004 |
| | Associate, IPC Group (now Charles River Associates), 1995 – 1999 |
| | Staff Accountant, Coopers & Lybrand (now PriceWaterhouseCoopers), 1994 – 1995 |
| | Program Manager, Ford Motor Company, 1989 – 1993 |
| **EDUCATION / LICENSES / PROFESSIONAL ASSOCIATIONS** | M.B.A., Finance and Accounting, The University of Michigan, with High Distinction |
| | B.S.E.E., Electrical Engineering, The University of Michigan, Summa Cum Laude |
| | Licensed CPA (State of Illinois) |
| | American Institute of Certified Public Accountants |
| | Illinois CPA Society |
| | Certified in Financial Forensics (CFF) |
| | Licensing Executives Society International, President-Elect |
| | Licensing Executives Society USA & Canada, Past President (former Valuation and Taxation Committee Chair) |
| | Certified Licensing Professional (CLP) |
| | Intellectual Property Owners Organization, Founder and Former Vice Chair, Valuation and Taxation Committee |

ankura

| | |
|---|---|
| **EDUCATION / LICENSES / PROFESSIONAL ASSOCIATIONS** | American Bar Association, Former-Chair of the Intellectual Property Section Division, Former-Chair of the Economics of the Profession Committee |

| | |
|---|---|
| **UNIVERSITY INSTRUCTION & IP VALUATION COURSE INSTRUCTION** | Franklin Pierce Law Center |
| | John Marshall Law School |
| | University of Notre Dame, Mendoza College of Business |
| | University of Michigan, Ross School of Business |
| | US Joint Committee on Taxation, Ad-hoc group for IP valuation |
| | US Chamber & USPTO to Chinese State Intellectual Property Office |

Multiple courses for:

- Licensing Executives Society
- American Bar Association
- Intellectual Property Owners Organization
- Industrial Research Institute
- Many other IP Symposiums

| | |
|---|---|
| **PUBLICATIONS** | **Article:** "Assessing the reasonableness of 5G headline royalty rates," IAM (Law Business Research), September 8, 2021, with Philip W. Kline and Alejandra Loaiza-Delgado |
| | **Book Chapter:** The New Role of Intellectual Property in Commercial Transactions, Cumulative Supplement, 1997, with Andrew W. Carter. "Financial Accounting and Reporting Considerations, Supplementary Material" |
| | **Article:** "IP Survey Finds 'Gap' in Information," les Nouvelles, Volume XXXIII No. 3, September 1998, with Daniel M. McGavock. |
| | **Book Chapter:** Intellectual Property in the Global Marketplace, Volume 1, Valuation, Protection, Exploitation, and Electronic Commerce, 2nd Edition, Melvin Simensky, Lanning Bryer and Neil J. Wilkof, September 1999, with Andrew W. Carter. Chapter 8: "Financial Accounting and Reporting Considerations" |



| | |
|---|---|
| **PUBLICATIONS** | **Book Chapter:** <u>Intellectual Property Assets in Mergers and Acquisitions</u>, Lanning Bryer & Melvin Simensky, December 2001.  Chapter 4: "Valuation of Intellectual Property Assets in Mergers and Acquisitions" |

**Article:** "Investing in IP," <u>European CEO</u>, November-December 2007.

**Article:** "Patent Attorney Malpractice: What's the Value of Nonexistent Patent Rights?" <u>Landslide</u> (a publication of the American Bar Association Section of Intellectual Property Law), January/February 2010, with Richard Conroy. Franklin Pierce Law Center

**Article:** "A look at licensing in the year ahead"  <u>IAM Licensing 250 2010: The World's Leading Patent & Technology Licensing Lawyers</u> (a publication of Intellectual Asset Magazine – The IP Media Group), December 2010

**Article:** "Introduction: A brief perspective on IP valuation" <u>IP Value 2011 – An International Guide for the Boardroom</u> (a publication of Intellectual Asset Magazine – The IP Media Group), January 2011

**Article:** *"25％ルール」を否定したUniloc判決の影響〜会計・訴訟対応の視点から〜"* (Article about *Uniloc* published in Japanese) <u>Nikkei IP Awareness</u>, January 20, 2011, with Kevin Arst

**Article:** "Licensing in 2011 and Beyond: Observations on Intellectual Property Quality, Value and Sale" <u>WIPR, World Intellectual Property Review – Digest 2010</u>, February 2011

---

| | |
|---|---|
| **EXPERT TESTIMONY** | ***Chasom Brown, William Byatt, Jeremy Davis, Christopher Castillo, and Monique Trujillo, Individually and on Behalf of All Other Similarly Situated v. Google LLC***<br>Case No.: 4:20-cv-03664-YGR-SVK<br>Industry: Internet Data Privacy<br>Venue: United States District Court for the Northern District of California |

***Moskowitz Family LLC v. Globus Medical, Inc.***
Case No.: 2:20-cv-03271-MSG
Industry: Medical Devices
Venue: United States District Court for the Eastern District of Pennsylvania

| EXPERT TESTIMONY | *Mediatek, Inc. and MediaTek USA Inc. v. NXP Semiconductors N.V. et al.* |
|---|---|

**EXPERT TESTIMONY**

*Mediatek, Inc. and MediaTek USA Inc. v. NXP Semiconductors N.V. et al.*
Investigation No.: 337-TA-1272
Industry: Semiconductors
Venue: United States International Trade Commission

*Confidential Arbitration on behalf of HTC Corporation*
ICC Case No.: 24176/MK
Industry: Telecommunications
Venue: International Chamber of Commerce, International Court of Arbitration

*GE Transportation Parts, LLC v. Central Railway Manufacturing, LLC*
Case No.: 1:19-cv-04826-AJN
Industry: Locomotive
Venue: Southern District of New York

*In the Matter of Certain UMTS and LTE Cellular Communication Modules and Products Containing the Same (Quectel and Telit)*
Investigation No. 337-TA-1240
Industry: Communication Modules
Venue: United States International Trade Commission

*Syngenta Crop Protection, LLC v. Atticus, LLC*
Case No. 5:19-cv-00509-D
Industry: Agrichemical, Fungicides
Venue: United States District Court, Eastern District of North Carolina

*Commonwealth of Kentucky v. Stars Interactive Holdings (ION) LTD, et al.*
Civil Action No. 10-CI-00505
Industry: Internet Gaming
Venue: Commonwealth of Kentucky, Franklin Circuit Court, Divisions II

*Monarch Networking Solutions LLC v. Cisco Systems, Inc.*
Case No. 2:20-cv-00015
Industry: Network Routing
Venue: United States District Court, Eastern District of Texas

*Certain Smart Thermostats, Smart HVAC Systems, and Components Thereof*
Inv. No. 337-TA-1185
Industry: HVAC
Venue: United States International Trade Commission

**ankura**

| **EXPERT TESTIMONY** | ***Confidential Arbitration on behalf of Syngenta Crop Protection AG***<br>AAA Case Nos. 01-19-0002-4192 and 01-19-0002-4208<br>Industry: Herbicides<br>Venue: American Arbitration Association |

***Eaton Steel Bar Company, Inc. v. Plex Systems, Inc.***
Case No. 2019-173411-CB
Industry: Business Software
Venue: State of Michigan, Oakland County Circuit Court

***Bell Northern Research, LLC v. ZTE Corporation et al.***
Case No. 3:18-CV-01786
Industry: Consumer Electronics
Venue: United States District Court, Southern District of California

***Confidential Arbitration on behalf of Syngenta Crop Protection AG***
CPR File No. G-19-24-G
Industry: Insecticides
Venue: CPR Institute for Dispute Resolution

***Fundamental Innovation Systems International LLC v. ZTE Corporation et al.***
Case No. 3:17-cv-01827
Industry: Consumer Electronics
Venue: United States District Court, Northern District of Texas

***Looksmart Group, Inc. v. Microsoft Corporation***
Case No. 3:17-cv-4709
Industry: Search Engines
Venue: United States District Court, Northern District of California

***Louisiana-Pacific Corporation v. James Hardie Building Products, Inc. v. The Kruse Brothers, Inc.***
Case No. 3:18-cv-00447
Industry: Manufactured Siding
Venue: United States District Court, Middle District of Tennessee

***In Re: Qualcomm Antitrust Litigation (Merits)***
Case No. 5:17-cv-0773
Industry: Telecommunications
Venue: United States District Court, Northern District of California



| | |
|---|---|
| **EXPERT TESTIMONY** | ***Novartis Vaccines and Diagnostics, Inc., et al. v. Regeneron Pharmaceuticals, Inc.***<br>Case No. 18-cv-2434-DLC<br>Industry: Pharmaceuticals<br>Venue: United States District Court, Southern District of New York<br><br>***Intellectual Ventures II LLC v. Bitco General Insurance Corp. et al. and Great West Casualty Co.***<br>Case Nos. 6:18-cv-00298 and 6:18-cv-00299<br>Industry: Insurance<br>Venue: United States District Court, Eastern District of Texas<br><br>***Confidential Appeals Pre-Conference on behalf of the United States Internal Revenue Service***<br>Valuation Issue Related to Transfer Pricing Dispute<br>Venue: Internal Revenue Service Office of Appeals<br><br>***In the Matter of: Memory Modules and Components Thereof – SK hynix, Inc.***<br>Investigation No. 337-TA-1089<br>Industry: Semiconductor<br>Venue: United States International Trade Commission<br><br>***Federal Trade Commission v. Qualcomm Incorporated***<br>Case No. 5:17-cv-00220<br>Industry: Telecommunications<br>Venue: United States District Court, Northern District of California<br><br>***In Re: Qualcomm Antitrust Litigation (Class Certification)***<br>Case No. 5:17-cv-0773<br>Industry: Telecommunications<br>Venue: United States District Court, Northern District of California<br><br>***Huawei Technologies Co., Ltd., et al. v. Samsung Electronics Co., Ltd., et al.***<br>Case No. 3:16-cv-02787<br>Industry: Telecommunications<br>Venue: United States District Court, Northern District of California<br><br>***Daniel Grellner v. Rodney D. Raabe et al.***<br>Case No. 2:15-cv-00189<br>Industry: Medical Implants<br>Venue: United States District Court, Eastern District of Washington |

**ankura**

| | |
|---|---|
| **EXPERT TESTIMONY** | ***The Coca-Cola Company & Subsidiaries v. Commissioner of Internal Revenue*** |
| | Tax Court Docket No. 31183-15 |
| | Industry:  Food & Beverage |
| | Venue: United States Tax Court |
| | |
| | ***Evolved Wireless, LLC v. ZTE Corporation et al.*** |
| | Case No. 1:15-cv-00546-SLR-SRF |
| | Industry: Telecommunications |
| | Venue: United States District Court, District Court of Delaware |
| | |
| | ***Implicit, LLC v. Trend Micro, Inc. et al.*** |
| | Case No. 6:616-cv-00080-JRG |
| | Industry: Network Security |
| | Venue: United States District Court, Eastern District of Texas |
| | |
| | ***In the Matter of: Certain Memory Modules and Components Thereof, and Products Containing the Same – SK hynix, Inc.*** |
| | Investigation No.: 337-TA-1023 |
| | Industry: Semiconductor |
| | Venue: United States International Trade Commission |
| | |
| | ***Unwired Planet International Ltd., et al. v. Huawei Technologies Co. Ltd., et al.*** |
| | Claim No. HP-2014-000005 |
| | Industry: Telecommunications |
| | Venue: High Court of Justice of England and Wales, Chancery Division, Patents Court |
| | |
| | ***Green Mountain Glass, LLC and Culchrome, LLC v. Saint-Gobain Containers, Inc. d/b/a Verallia North America*** |
| | Case No. 1:14-cv-00392 |
| | Industry: Glass Recycling |
| | Venue: United States District Court, District Court of Delaware |
| | |
| | ***Quest Licensing Corporation v. Bloomberg LP, et al.*** |
| | Case No. 1:14-cv-00561 |
| | Industry: Financial Data Services |
| | Venue: United States District Court, District Court of Delaware |
| | |
| | ***Jezign Licensing, LLC v. Skechers U.S.A., Inc.*** |
| | Case No. 8:16-cv-01193 |
| | Industry: Fashion and Retail |
| | Venue: United States District Court, District of Maryland |

**ankura**

| | |
|---|---|
| **EXPERT TESTIMONY** | ***Avago Technologies U.S. Inc. et al. v. IPtronics Inc., et al.*** <br> Case No. 5:10-cv-02863 <br> Industry: Fiber Optic Data Communications <br> Venue: United States District Court, Northern District of California |

***Avago Technologies U.S. Inc. et al. v. IPtronics Inc., et al.***
Case No. 5:10-cv-02863
Industry: Fiber Optic Data Communications
Venue: United States District Court, Northern District of California

***Confidential Arbitration on behalf of Huawei Technologies Co. Ltd.***
ICDR Case Number: 01-14-0002-2610
Industry: Telecommunications
Venue: International Centre for Dispute Resolution

***Eaton Corporation and Subsidiaries v. Commissioner of Internal Revenue***
Tax Court Docket No. 5576-12
Industry:  Industrial and Residential Electrical Apparatus
Venue: United States Tax Court

***Confidential Arbitration on behalf of Nokia Corporation***
Case Number: 19602/AGF
Industry: Telecommunications
Venue: International Chamber of Commerce, International Court of Arbitration

***CardioNet, Inc. v. The ScottCare Corp., et al.***
Case No. 2:12-cv-02516
Industry: Medical Devices
Venue: United States District Court, Eastern District of Pennsylvania

***Mobile Telecommunications Technologies, LLC v. United Parcel Service, Inc.***
Case No. 1:12-cv-03222-AT
Industry: Telecommunications / Shipping
Venue: United States District Court, Northern District of Georgia

***Numatics, Inc. v. Balluff, Inc. and H.H. Barnum Company***
Case No. 2:13-cv-11049-DML-MKM
Industry: Industrial Automation Equipment
Venue: United States District Court, Eastern District of Michigan

***Amazon.com, Inc. & Subsidiaries v. Commissioner of Internal Revenue***
Tax Court Docket No. 31197-12
Industry: E-Commerce
Venue: United States Tax Court

**ankura**

| EXPERT | ***In the Matter of: Certain Wireless Devices with 3G and/or 4G Capabilities and*** |
|---|---|
| TESTIMONY | ***Components Thereof – Client ZTE Corporation*** |

Investigation No. 337-TA-868
Industry: Consumer Electronics
Venue: United States International Trade Commission

***NeoMedia, Inc. v. Scanbuy, Inc.***
Case No. 13 117 01730 12
Industry: Consumer Electronics
Venue: American Arbitration Association, New York

***In the Matter of: Certain Wireless Devices with 3G Capabilities and***
***Components Thereof – Client ZTE Corporation***
Investigation No. 337-TA-800
Industry: Consumer Electronics
Venue: United States International Trade Commission

***Multimedia Patent Trust v. Canon, Inc., Canon U.S.A., et al.***
Case No. 10-cv-02618
Industry: Consumer Electronics
Venue: United States District Court, Southern District of California

***Realtime Data d/b/a/ IXO v. MetroPCS Texas, LLC, et al.***
Case No. 1:12-cv-10204
Industry: Telecommunications
Venue: United States District Court, Eastern District of Texas

***Zecotek Imaging Systems Pte. Ltd. and Beijing Opt-Electronics Technology Co.,***
***v. Saint-Gobain Ceramics & Plastics, Inc. et al.***
Case No. 5:12-cv-01533
Industry: Medical Device Manufacturing
Venue: United States District Court, Northern District of Ohio

***Warrior Sports, Inc. v. Dickinson Wright, PLLC, et al.***
Case No. 09-cv-12102
Industry: Sports Equipment
Venue: United States District Court, Eastern District of Michigan

***In Re: Eastman Kodak Company et al.***
Case No. 1:12-cv-10204
Industry: Digital Imaging
Venue: United States Bankruptcy Court, Southern District of New York

**ankura**

| | |
|---|---|
| **EXPERT TESTIMONY** | ***Procter & Gamble Company v. United States of America***<br>Case No. 1:08-cv-00608<br>Industry: Pharmaceutical & Consumer Products<br>Venue: United States District Court, Southern District of Ohio |
| | ***Pittsburgh Standard Spine Co. v. Lanx, Inc.***<br>Case No. 1:09-cv-01062<br>Industry: Medical Devices<br>Venue: United States District Court, District of Colorado |
| | ***MacroGenics, Inc. v. Centocor, Inc. and Ortho-McNeil Pharmaceutical, Inc.***<br>CPR File No. G-09-08<br>Industry: Pharmaceutical<br>Venue: American Arbitration Association, New York |
| | ***MiraVista Diagnostics et al. v. Indiana University R&D et al.***<br>Case No. 49D04-0603-PL-009827<br>Industry: Medical Devices<br>Venue: Indiana State Court |
| | ***Vaxiion Therapeutics, Inc. v. Foley & Lardner, LLP et al.***<br>Case No. 3:07-cv-00280<br>Industry: Pharmaceutical & Medical products<br>Venue: United States District Court, Southern District of California |
| | ***Schütz Container Systems, Inc. v. Mauser Corp. and National Container Group, LLC***<br>Case No. 1:09-cv-03609<br>Industry: Shipping Containers<br>Venue: United States District Court, Northern District of Georgia |
| | ***In re: Composite Technologies Corporation, et al. (Client Partners for Growth II, LP)***<br>Case No. 8:11-bk-15058<br>Industry: General Manufacturing<br>Venue: United States Bankruptcy Court, Central District of California |
| | ***Joseph Chernesky v. Ronald Epstein et al.***<br>Case No. 491041<br>Industry: Patent Monetization<br>Venue: Superior Court of California, County of San Mateo |

11

ankura

| | |
|---|---|
| **EXPERT TESTIMONY** | ***Service Employees International Union, CTW/CLC et al. v. SEIU United Healthcare Workers-West, et al.***<br>Case No. 3:09-cv-0404<br>Industry: Labor Union<br>Venue: United States District Court, Northern District of California |
| | ***Frank T. Shum v. Intel Corporation et al.***<br>Case No. 4:02-cv-03262<br>Industry: Telecommunications Equipment<br>Venue: United States District Court, Northern District of California |
| | ***DigaComm, LLC v. Vehicle Safety and Compliance, LLC et al.***<br>Case No. 08-338<br>Industry: Telecommunications Equipment<br>Venue: American Arbitration Association, Delaware |
| | ***Landmark Screens, LLC v. Pennie & Edmonds, et al.***<br>Case No. 74 194 Y 01059 60 DEAR<br>Industry: General Electronics<br>Venue: American Arbitration Association |
| | ***Simpliance, Inc., et al. v. WM. Bruce Davis, Esq.***<br>Case No. A0503866<br>Industry: Software<br>Venue: Hamilton County, Ohio Municipal Court |
| | ***Procter & Gamble Company, and Subsidiaries et al. v. United States of America***<br>Case No. 1:05-cv-00355<br>Industry: Consumer Products<br>Venue: United States District Court, Southern District of Ohio |
| | ***Tenneco Automotive Operating Company, Inc. v. Visteon Corporation***<br>Case No. 1:03-cv-01030<br>Industry: Automotive Components<br>Venue: United States District Court, District of Delaware |

---

| | | |
|---|---|---|
| **PATENTS AND APPLICATIONS** | ▪ 7,885,897 | Intellectual Property Trading Exchange and a Method for Trading Intellectual Property Rights |
| | ▪ 7,987,142 | Intellectual Property Trading Exchange |



| **PATENTS AND APPLICATIONS** | ▪ 8,180,711 | Intellectual Property Trading Exchange |
| --- | --- | --- |
| | ▪ 8,355,932 | System and Method for Managing Intellectual Property Based Risks |
| | ▪ 8,554,687 | Intellectual Property Trading Exchange and a Method for Trading Intellectual Property Rights |
| | ▪ Application 20090070150 | Methods and Systems for Managing the Risks of Patent Coverage |
| | ▪ Application 20110295757 | Intellectual Property Trading Exchange |
| | ▪ WO 2006113551 | An Intellectual Property Trading Exchange and a Method for Trading Intellectual Property Rights |
| | ▪ WO 2012074668 | Intellectual Property Trading Exchange |
| | ▪ WO 2011126616 | Intellectual Property Trading Exchange |

| **CONTACT** | Michael J. Lasinski |
| --- | --- |
| | Senior Managing Director |
| | Ankura Consulting Group, LLC |
| | 215 E. Washington, Suite 201 |
| | Ann Arbor, MI 48104 |
| | |
| | (734) 369-8723 Direct |
| | (312) 485-8500 Cell |
| | michael.lasinski@ankura.com |

# Appendix B

*Rodriguez et al v. Google LLC et al.*
**DOCUMENT INDEX**

| **Beginning Bates Stamp:** | **Ending Bates Stamp:** |
|---|---|
| GOOG-RDGZ-00000921 | GOOG-RDGZ-00000921 |
| GOOG-RDGZ-00014982 | GOOG-RDGZ-00014986 |
| GOOG-RDGZ-00015211 | GOOG-RDGZ-00015219 |
| GOOG-RDGZ-00018661 | GOOG-RDGZ-00018675 |
| GOOG-RDGZ-00020690 | GOOG-RDGZ-00020691 |
| GOOG-RDGZ-00023187 | GOOG-RDGZ-00023190 |
| GOOG-RDGZ-00030019 | GOOG-RDGZ-00030023 |
| GOOG-RDGZ-00042152 R | GOOG-RDGZ-00042159 R |
| GOOG-RDGZ-00053252 | GOOG-RDGZ-00053277 |
| GOOG-RDGZ-00060716 | GOOG-RDGZ-00060804 |
| GOOG-RDGZ-00067396 | GOOG-RDGZ-00067438 |
| GOOG-RDGZ-00072319 | GOOG-RDGZ-00072365 |
| GOOG-RDGZ-00077957 | GOOG-RDGZ-00077961 |
| GOOG-RDGZ-00083725 | GOOG-RDGZ-00083748 |
| GOOG-RDGZ-00090149 | GOOG-RDGZ-00090164 |
| GOOG-RDGZ-00117988 | GOOG-RDGZ-00117992 |
| GOOG-RDGZ-00141077 | GOOG-RDGZ-00141337 |
| GOOG-RDGZ-00142970 | GOOG-RDGZ-00142977 |
| GOOG-RDGZ-00147545 | GOOG-RDGZ-00147546 |
| GOOG-RDGZ-00151720 | GOOG-RDGZ-00151971 |
| GOOG-RDGZ-00166035 | GOOG-RDGZ-00166358 |
| GOOG-RDGZ-00182621 | GOOG-RDGZ-00182635 |
| GOOG-RDGZ-00182863 | GOOG-RDGZ-00182877 |
| GOOG-RDGZ-00184247 | GOOG-RDGZ-00184247 |
| GOOG-RDGZ-00185734 | GOOG-RDGZ-00185734 |
| GOOG-RDGZ-00185743 | GOOG-RDGZ-00185743 |
| GOOG-RDGZ-00185744 | GOOG-RDGZ-00185744 |
| GOOG-RDGZ-00187010 | GOOG-RDGZ-00187010 |
| GOOG-RDGZ-00187578 | GOOG-RDGZ-00187622 |
| GOOG-RDGZ-00187623 | GOOG-RDGZ-00187624 |
| GOOG-RDGZ-00187665 | GOOG-RDGZ-00187665 |
| GOOG-RDGZ-00187666 | GOOG-RDGZ-00187666 |
| GOOG-RDGZ-00188469 | GOOG-RDGZ-00188491 |
| GOOG-RDGZ-00188655 | GOOG-RDGZ-00188655 |
| GOOG-RDGZ-00188768 | GOOG-RDGZ-00188768 |
| GOOG-RDGZ-00192788 | GOOG-RDGZ-00192845 |
| GOOG-RDGZ-00198470 | GOOG-RDGZ-00198643 |
| GOOG-RDGZ-00203024 | GOOG-RDGZ-00203038 |
| GOOG-RDGZ-00204475 | GOOG-RDGZ-00204475 |
| GOOG-RDGZ-00205831 | GOOG-RDGZ-00205831 |
| GOOG-RDGZ-00208058 | GOOG-RDGZ-00208083 |
| GOOG-RDGZ-00208084 | GOOG-RDGZ-00208097 |
| GOOG-RDGZ-00209874 | GOOG-RDGZ-00209876 |

**Depositions with Exhibits:**

Deposition of Arne De Booij, February 7, 2023
Deposition of Greg Fair, October 3, 2022
Deposition of Steve Ganem, October 28, 2022
Deposition of Sam Heft-Luthy, February 8, 2023 (Rough)
Deposition of Belinda Langner, December 15, 2022
Deposition of Francis Ma, October 28, 2022

*Rodriguez et al v. Google LLC et al.*
**DOCUMENT INDEX**

Deposition of Eric Miraglia, October 25, 2022
Deposition of David Monsees, September 15, 2022
Deposition of Rahul Oak, November 18, 2022
Deposition of Christopher Ruemmler, September 9, 2022
Deposition of Daniel Stone, November 15, 2022 (Rough)
Deposition of Edward Weng, September 23, 2022
Deposition of Xinyu Ye, February 9, 2023 (Rough)

**Expert Analyses:**

Keegan Survey Results

**Pleadings:**

Fourth Amended Complaint, January 4, 2023
Defendant Google LLC's Supplemental Objections and Responses to Plaintiffs' Interrogatories, Set Six (Nos  12, 16, &17), Supplemental Response to Interrogatory No  17
Defendant Google LLC's Supplemental Objections & Responses to Plaintiffs' Interrogatories, Set Seven (Nos  18-24), Supplemental Response to Interrogatory No  23
Google Response to RFA No  1

**Public Sources:**

Alphabet Form 10-K for the fiscal year ended December 31, 2016
Alphabet Form 10-K for the fiscal year ended December 31, 2017
Alphabet Form 10-K for the fiscal year ended December 31, 2018
Alphabet Form 10-K for the fiscal year ended December 31, 2019
Alphabet Form 10-K for the fiscal year ended December 31, 2021
Alphabet Form 10-K for the fiscal year ended December 31, 2022
https://abc xyz/
https://admanager google com/home/capabilities/data-insights/
https://admob google com/home/resources/what-is-admob/
https://ads google com/home/campaigns/video-ads/
https://ads google com/intl/en_id/home/resources/reach-larger-new-audiences/
https://blog google/products/admanager/introducing-google-ad-manager/
https://developers google com/ad-manager/mobile-ads-sdk
https://developers google com/admob/android/quick-start
https://developers google com/admob/ios/quick-start
https://firebase google com/docs
https://firebase google com/docs/analytics
https://firebase google com/docs/analytics/get-started?technology=android&platform=ios
https://firebase google com/products/analytics
https://myactivity google com/activitycontrols
https://opensource google/projects/firebasesdk
https://policies google com/technologies/partner-sites?hl=en-US
https://support google com/accounts/answer/54068?hl=en&ref_topic=3382296
https://support google com/admanager/answer/6021064?hl=en&ref_topic=7505788
https://support google com/admanager/answer/6022000?hl=en
https://support google com/admanager/answer/9234653?hl=en
https://support google com/admob/answer/6128738?hl=en
https://support google com/admob/answer/7356092?visit_id=638107965052971945-1412475492&hl=en&ref_topic=7579128&rd=1
https://support google com/admob/answer/7676680
https://support google com/adspolicy/answer/143465?hl=en
https://support google com/analytics/answer/10089681?hl=en
https://support google com/analytics/answer/12159447?hl=en
https://support google com/analytics/answer/3234673?hl=en
https://support google com/firebase/answer/7388022?hl=en

*Rodriguez et al v. Google LLC et al.*
**DOCUMENT INDEX**

https://support google com/google-ads/answer/1722022?hl=en
https://support google com/google-ads/answer/2497941?hl=en
https://support google com/google-ads/answer/6247380?hl=en
https://support google com/google-ads/answer/7528254?hl=en
https://support google com/youtube/answer/132596?hl=en
https://www commonsensemedia org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0 pdf
http://files appannie com s3 amazonaws com/reports/1705_Report_Consumer_App_Usage_EN pdf
https://nces ed gov/programs/coe/indicator/cch/home-internet-access
https://www pewresearch org/internet/fact-sheet/internet-broadband/
https://screenwisepanel com/cookie-policy
https://screenwisepanel com/google-panel-privacy-policy
https://screenwisepanel com/home
https://screenwisepanel com/ipsos-Sow-privacy-policy
https://computermobilepanel nielsen com/ui/US/en/faqen html
https://computermobilepanel nielsen com/ui/US/en/sdp/landing
https://www surveysavvy com/how_it_works
https://www surveysavvy com/savvyconnect
https://www surveysavvy com/savvyconnect/requirements
https://arstechnica com/gadgets/2012/02/google-paying-users-to-track-100-of-their-web-usage-via-little-black-box/
https://arstechnica com/information-technology/2013/12/att-Offers-gigabit-internet-discount-in-exchange-for-your-web-history/
https://arstechnica com/information-technology/2015/02/att-charges-29-more-for-gigabit-fiber-that-doesnt-watch-your-web-browsing/
https://arstechnica com/information-technology/2016/09/att-to-end-targeted-ads-program-give-all-users-lowest-available-price/
https://www theverge com/2012/2/8/2785751/google-screenwise-panel-web-monitoring-knowledge-networks
https://www wsj com/articles/BL-DGB-40475
https://www howtogeek com/854837/can-you-use-an-android-phone-without-a-google-account/
https://gdpr eu/what-is-gdpr/
https://oag ca gov/privacy/ccpa
Annual Estimates of the Resident Population for Selected Age Groups by Sex for the United States: April 1, 2020 to July 1, 2021, Census Bureau
"Protecting the Privacy of Customers of Broadband and Other Telecommunications Services," Federal Communications Commission, December 2, 2016

# Schedules

*Rodriguez et al v. Google LLC et al.*
**SUMMARY - UNJUST ENRICHMENT BY PRODUCT**
Schedule 1 1
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

|  | Scenario One | Scenario Two |
|---|---|---|
| App Promo | $332,020,541 | $332,020,541 |
| AdMob | $169,231,550 | $247,998,478 |
| Ad Manager | $57,538,727 | $84,319,482 |
| Total | $558,790,819 | $664,338,502 |

**Note:**
Schedule 1 2

*Rodriguez et al v. Google LLC et al.*
**SUMMARY - UNJUST ENRICHMENT SCENARIOS ONE AND TWO BY PRODUCT AND CLASS**
Schedule 1 2
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Scenario One [1] | Scenario Two [2] |
|---|---|---|
| *App Promo* | | |
| Class 1 | $205,868,026 | $205,868,026 |
| Class 2 | $126,152,515 | $126,152,515 |
| Total | $332,020,541 | $332,020,541 |
| | | |
| *AdMob* | | |
| Class 1 | $104,931,355 | $153,770,477 |
| Class 2 | $64,300,195 | $94,228,000 |
| Total | $169,231,550 | $247,998,478 |
| | | |
| *Ad Manager* | | |
| Class 1 | $35,676,661 | $52,281,962 |
| Class 2 | $21,862,066 | $32,037,520 |
| Total | $57,538,727 | $84,319,482 |
| | | |
| Total | $558,790,819 | $664,338,502 |

**Notes:**
(1) Schedule 1 3
(2) Schedule 1 4

*Rodriguez et al v. Google LLC et al.*
**EXAMPLE APPORTIONMENT OF UNJUST ENRICHMENT TO CLASSES - SCENARIO ONE**
Schedule 1 3
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| **Scenario One Total - Both Classes** | | | | | | | | |
| App Promo (1) | $4,639,297 | $8,041,039 | $7,452,251 | $13,491,271 | $39,490,311 | $115,716,620 | $143,189,752 | $332,020,541 |
| AdMob (2) | $13,623,775 | $23,613,341 | $21,884,305 | $22,695,692 | $20,828,745 | $31,505,683 | $35,080,010 | $169,231,550 |
| Ad Manager (3) | $4,632,084 | $8,028,536 | $7,440,664 | $7,716,535 | $7,081,773 | $10,711,932 | $11,927,203 | $57,538,727 |
| Total Scenario One - Both Classes | $22,895,156 | $39,682,917 | $36,777,219 | $43,903,497 | $67,400,829 | $157,934,235 | $190,196,965 | $558,790,819 |
| | | | | | | | | |
| Class 1 Apportionment Factor (4) | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% |
| Class 2 Apportionment Factor (4) | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% |
| | | | | | | | | |
| **Scenario One - Class 1** | | | | | | | | |
| App Promo | $2,876,578 | $4,985,815 | $4,620,739 | $8,365,209 | $24,485,812 | $71,749,633 | $88,784,241 | $205,868,026 |
| AdMob | $8,447,368 | $14,641,359 | $13,569,277 | $14,072,374 | $12,914,781 | $19,534,975 | $21,751,222 | $104,931,355 |
| Ad Manager | $2,872,105 | $4,978,062 | $4,613,554 | $4,784,607 | $4,391,026 | $6,641,891 | $7,395,415 | $35,676,661 |
| Total Scenario One - Class 1 | $14,196,051 | $24,605,236 | $22,803,570 | $27,222,190 | $41,791,618 | $97,926,499 | $117,930,878 | $346,476,042 |
| | | | | | | | | |
| **Scenario One - Class 2** | | | | | | | | |
| App Promo | $1,762,719 | $3,055,225 | $2,831,512 | $5,126,062 | $15,004,500 | $43,966,986 | $54,405,511 | $126,152,515 |
| AdMob | $5,176,407 | $8,971,982 | $8,315,028 | $8,623,318 | $7,913,964 | $11,970,709 | $13,328,788 | $64,300,195 |
| Ad Manager | $1,759,978 | $3,050,474 | $2,827,109 | $2,931,928 | $2,690,748 | $4,070,041 | $4,531,788 | $21,862,066 |
| Total Scenario One - Class 2 | $8,699,105 | $15,077,681 | $13,973,650 | $16,681,307 | $25,609,211 | $60,007,736 | $72,266,087 | $212,314,777 |

**Notes:**
(1) Schedule 2 1
(2) Schedule 3 3
(3) Schedule 4 3
(4) Schedule 1 5

*Rodriguez et al v. Google LLC et al.*
**EXAMPLE APPORTIONMENT OF UNJUST ENRICHMENT TO CLASSES - SCENARIO TWO**
Schedule 1 4
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| **Scenario Two Total - Both Classes** | | | | | | | | |
| App Promo (1) | $4,639,297 | $8,041,039 | $7,452,251 | $13,491,271 | $39,490,311 | $115,716,620 | $143,189,752 | $332,020,541 |
| AdMob (2) | $19,964,809 | $34,603,906 | $32,070,109 | $33,259,147 | $30,523,251 | $46,169,650 | $51,407,607 | $247,998,478 |
| Ad Manager (3) | $6,788,035 | $11,765,328 | $10,903,837 | $11,308,110 | $10,377,905 | $15,697,681 | $17,478,586 | $84,319,482 |
| Total Scenario Two - Both Classes | $31,392,141 | $54,410,273 | $50,426,197 | $58,058,527 | $80,391,467 | $177,583,951 | $212,075,945 | $664,338,502 |
| | | | | | | | | |
| Class 1 Apportionment Factor (4) | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% |
| Class 2 Apportionment Factor (4) | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% |
| | | | | | | | | |
| **Scenario Two - Class 1** | | | | | | | | |
| App Promo | $2,876,578 | $4,985,815 | $4,620,739 | $8,365,209 | $24,485,812 | $71,749,633 | $88,784,241 | $205,868,026 |
| AdMob | $12,379,101 | $21,456,015 | $19,884,944 | $20,622,203 | $18,925,821 | $28,627,309 | $31,875,084 | $153,770,477 |
| Ad Manager | $4,208,894 | $7,295,045 | $6,760,881 | $7,011,549 | $6,434,779 | $9,733,285 | $10,837,528 | $52,281,962 |
| Total Scenario Two - Class 1 | $19,464,573 | $33,736,875 | $31,266,564 | $35,998,961 | $49,846,412 | $110,110,228 | $131,496,853 | $411,920,466 |
| | | | | | | | | |
| **Scenario Two - Class 2** | | | | | | | | |
| App Promo | $1,762,719 | $3,055,225 | $2,831,512 | $5,126,062 | $15,004,500 | $43,966,986 | $54,405,511 | $126,152,515 |
| AdMob | $7,585,708 | $13,147,891 | $12,185,164 | $12,636,944 | $11,597,430 | $17,542,341 | $19,532,523 | $94,228,000 |
| Ad Manager | $2,579,141 | $4,470,283 | $4,142,956 | $4,296,561 | $3,943,126 | $5,964,396 | $6,641,058 | $32,037,520 |
| Total Scenario Two - Class 2 | $11,927,568 | $20,673,398 | $19,159,633 | $22,059,567 | $30,545,055 | $67,473,723 | $80,579,092 | $252,418,035 |

**Notes:**
(1) Schedule 2 1
(2) Schedule 3 1
(3) Schedule 4 1
(4) Schedule 1 5

*Rodriguez et al v. Google LLC et al.*
**EXAMPLE CLASS-SPECIFIC APPORTIONMENT FACTORS**
Schedule 1 5
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| Example Inputs | | |
|---|---|---|
| Share of Revenue from Signed-In Users | ▮▮▮ | (1) |
| Class 1 Market Share | 50 95% | (2) |
| Class 2 Market Share | 49 05% | (2) |
| Class 1 Signed-In Share | 100 00% | (3) |

| | Market Share | Signed-In Share | Market Share-Weighted Signed-In Share | Class-Specific Apportionment Factors |
|---|---|---|---|---|
| Class 1 - Android | 50 95% (2) | 100 00% (3) | 50 95% (5) | 62 00% (6) |
| Class 2 - Other | 49 05% (2) | 63 66% (4) | 31 22% (5) | 38 00% (7) |
| Total | 100 00% | 82 18% (1) | 82 18% | 100 00% |

**Notes:**
(1) Schedule 15 1
(2) Schedule 12 6
(3) 100% sign-in rate is for demonstration purposes, but is consistent with understanding that various Android features are unavailable if the user is not signed-in to his or her device   See Report Section 9 1
(4) Calculated as the Class 2 Signed-In Share that, given the assumed Class 1 Signed-In Share, yields a total Signed-In Share of ▮▮▮
(5) Calculated as "Market Share" x "Signed-In Share "
(6) Calculated as ▮▮▮▮
(7) Calculated as ▮▮▮▮

*Rodriguez et al v. Google LLC et al.*
**APP PROMO TOTAL UNJUST ENRICHMENT**
Schedule 2 1
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| App Promo Signed-In sWAA Off U S  Revenue Net of Traffic Acquisiton Costs (1) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Share of Revenue Attributable to Conversion Types Bid Against GA4F (2) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| App Promo Total Unjust Enrichment | $4,639,297 | $8,041,039 | $7,452,251 | $13,491,271 | $39,490,311 | $115,716,620 | $143,189,752 | $332,020,541 |

**Notes:**
(1) Schedule 2 2
(2) Defendant Google LLC's Supplemental Objections and Responses to Plaintiffs' Interrogatories, Set Six (Nos  12, 16, &17), Supplemental Response to ROG 17, pp  15-16  Source represents that these revenue shares correspond to specific dates, as compared to annual averages

*Rodriguez et al v. Google LLC et al.*
**APP PROMO SIGNED-IN SWAA OFF U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS**
Schedule 2 2
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| App Promo U S  Booked Revenue (1) | | | | | | | | |
| App Promo U S  Traffic Acquisition Costs (1) | | | | | | | | |
| *TAC Share of Booked Revenue* | | | | | | | | |
| App Promo U S  Revenue Net of Traffic Acquisition Costs (2) | | | | | | | | |
| *YoY Growth Rate (3)* | | | | | | | | |
| Share of Revenue from Signed-In Users (4) | | | | | | | | |
| App Promo Signed-In U S  Revenue Net of Traffic Acquisition Costs | | | | | | | | |
| Share of Monthly Accounts with sWAA Off (5) | | | | | | | | |
| App Promo Signed-In sWAA Off U S  Revenue Net of Traffic Acquisiton Costs | | | | | | | | |

**Notes:**
(1) 2017-2020 per GOOG-RDGZ-00184247   2021 per GOOG-RDGZ-00185744
(2) July 2016 through December 2016 per Schedule 7 2   2022 calculated by applying assumed year over year growth rate to 2021 value
(3) 2017 - 2021 year over year growth rates calculated using App Promo U S  Revenue Net of TAC   2021 - 2022 growth rate set equal to the growth in U S  Total Alphabet revenue from 2021 to 2022 per Schedule 9 1
(4) Schedule 15 1
(5) Schedule 13 1

*Rodriguez et al v. Google LLC et al.*
**ADMOB TOTAL UNJUST ENRICHMENT - SCENARIO TWO**
Schedule 3 1
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| AdMob Signed-In sWAA Off U S Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Attributable to Conversion Tracking (1) | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ |
| AdMob Signed-In sWAA Off U S Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with sWAA Off (2) | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ |
| AdMob Total Unjust Enrichment - Scenario Two | $19,964,809 | $34,603,906 | $32,070,109 | $33,259,147 | $30,523,251 | $46,169,650 | $51,407,607 | $247,998,478 |

**Notes:**
(1) Schedule 3 3
(2) Schedule 3 2

*Rodriguez et al v. Google LLC et al.*

**ADMOB SIGNED-IN SWAA OFF U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS (EXCLUDING APP PROMO-ADMOB OVERLAP) NOT ATTRIBUTABLE TO CONVERSION TRACKING AND ADJUSTED FOR DIMINISHED AD RELEVANCE WITH SWAA OFF**

Schedule 3.2

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**



| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| AdMob Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-AdMob Overlap) (1) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| AdMob Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Attributable to Conversion Tracking (2) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| AdMob Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Not Attributable to Conversion Tracking | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| Apportionment for Diminished Ad Relevance with sWAA Off (3) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| AdMob Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with sWAA Off | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |

**Notes:**

(1) Schedule 3.4.

(2) Schedule 3.3.

(3) Schedule 14.1.  See also Report Section 7.2.2.

*Rodriguez et al v. Google LLC et al.*

**ADMOB SIGNED-IN SWAA OFF U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS (EXCLUDING APP PROMO-ADMOB OVERAP) ATTRIBUTABLE TO CONVERSION TRACKING - SCENARIO ONE**

Schedule 3 3

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| AdMob Signed-In sWAA Off U S Revenue Net of TAC (Excluding App Promo-AdMob Overlap) (1) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| Share of Revenues Attributable to Conversion Tracking (2) | ██ | ██ | ██ | ██ | ██ | ██ | ██ | █ |
| AdMob Signed-In sWAA Off U S Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Attributable to Conversion Tracking | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |

**Notes:**

(1) Schedule 3 4

(2) GOOG-RDGZ-00188469-491 at 475   Represented on source document as "Conversion Based Autobidding Proportion "

*Rodriguez et al v. Google LLC et al.*
**ADMOB SIGNED-IN SWAA OFF U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS (EXCLUDING APP PROMO-ADMOB OVERLAP)**
Schedule 3 4
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| AdMob U S Revenue Net of Traffic Acquisition Costs (1) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| App Promo-AdMob Overlap - U S Revenue Net of TAC (2) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| AdMob U S Revenue Net of TAC (Excluding App Promo-AdMob Overlap) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| Share of Revenue from Signed-In Users (3) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| AdMob Signed-In U S Revenue Net of TAC (Excluding App Promo-AdMob Overlap) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| Share of Monthly Accounts with sWAA Off (4) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| AdMob Signed-In sWAA Off U S Revenue Net of TAC (Excluding App Promo-AdMob Overlap) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |

**Notes:**
(1) Schedule 6 1
(2) Schedule 5 1
(3) Schedule 15 1
(4) Schedule 13 1

*Rodriguez et al v. Google LLC et al.*
**AD MANAGER TOTAL UNJUST ENRICHMENT - SCENARIO TWO**
Schedule 4 1
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Ad Manager Signed-In sWAA Off U S  Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Attributable to Conversion Tracking (1) | ■■■ | ■■■ | ■■■ | ■■■ | ■■■ | ■■■ | ■■■ | ■■■ |
| Ad Manager Signed-In sWAA Off U S  Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with sWAA Off (2) | ■■■ | ■■■ | ■■■ | ■■■ | ■■■ | ■■■ | ■■■ | ■■■ |
| Ad Manager Total Unjust Enrichment - Scenario Two | $6,788,035 | $11,765,328 | $10,903,837 | $11,308,110 | $10,377,905 | $15,697,681 | $17,478,586 | $84,319,482 |

**Notes:**
(1) Schedule 4 3
(2) Schedule 4 2

*Rodriguez et al v. Google LLC et al.*
**AD MANAGER SIGNED-IN SWAA OFF U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS (EXCLUDING APP PROMO-AD MANAGER OVERLAP) NOT ATTRIBUTABLE TO CONVERSION TRACKING AND ADJUSTED FOR DIMINISHED AD RELEVANCE WITH SWAA OFF**
Schedule 4.2
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Ad Manager Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) (1) | ██████ | █████ | █████ | █████ | █████ | █████ | █████ | █████ |
| Ad Manager Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Attributable to Conversion Tracking (2) | █████. | ____. | █████. | █████. | █████. | █████. | ____. | █████. |
| Ad Manager Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Not Attributable to Conversion Tracking | █████ | █████ | █████ | █████ | █████ | █████ | █████ | █████ |
| Apportionment for Diminished Ad Relevance with sWAA Off (3) | ___█. | ___█. | ___█. | ___█. | ___█. | ___█. | ___█. | ___█. |
| Ad Manager Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with sWAA Off | █████. | █████. | █████. | █████. | █████. | █████. | █████. | █████. |

**Notes:**
(1) Schedule 4.4.
(2) Schedule 4.3.
(3) Schedule 14.1.  See also Report Section 7.2.3.

*Rodriguez et al v. Google LLC et al.*

**AD MANAGER SIGNED-IN SWAA OFF U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS (EXCLUDING APP PROMO-AD MANAGER OVERLAP) ATTRIBUTABLE TO CONVERSION TRACKING - SCENARIO ONE**

Schedule 4 3

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Ad Manager Signed-In sWAA Off U S Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) (1) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| Share of Revenues Attributable to Conversion Tracking (2) | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| Ad Manager Signed-In sWAA Off U S Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Attributable to Conversion Tracking | ███ | ██ | ███ | ███ | ███ | ███ | ███ | ███ |

**Notes:**
(1) Schedule 4 4
(2) GOOG-RDGZ-00188469-491 at 475   Represented on source document as "Conversion Based Autobidding Proportion "

*Rodriguez et al v. Google LLC et al.*
**AD MANAGER SIGNED-IN SWAA OFF U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS (EXCLUDING APP PROMO-AD MANAGER OVERLAP)**
Schedule 4 4
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Ad Manager U S  Revenue Net of Traffic Acquisition Costs (1) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| App Promo-Ad Manager Overlap - U S  Revenue Net of TAC (2) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Ad Manager U S  Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Share of Revenue from Signed-In Users (3) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Ad Manager Signed-In U S  Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Share of Monthly Accounts with sWAA Off (4) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Ad Manager Signed-In sWAA Off U S  Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

**Notes:**
(1) Schedule 5 2
(2) Schedule 5 1
(3) Schedule 15 1
(4) Schedule 13 1

*Rodriguez et al v. Google LLC et al.*
**APP PROMO-ADMOB OVERLAP & APP PROMO-AD MANAGER OVERLAP - U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS**
Schedule 5 1
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| App Promo U S Display App Revenue Net of TAC (App Promo-Display App Overlap) (1) | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ |
| AdMob App Share of Total Sellside App Revenue (2) | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| App Promo-AdMob Overlap - U S Revenue Net of TAC | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ |
| | | | | | | | | |
| App Promo U S Display App Revenue Net of TAC (App Promo-Display App Overlap) (1) | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ |
| Ad Manager App Share of Total Sellside App Revenue (2) | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| App Promo-Ad Manager Overlap - U S Revenue Net of TAC | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ |

**Notes:**
(1) Schedule 7 1
(2) Schedule 5 3

*Rodriguez et al v. Google LLC et al.*
**AD MANAGER U.S. REVENUE NET OF TRAFFIC ACQUISTION COSTS - JULY 2016 - DECEMBER 2022**
Schedule 5 2
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| AdMob U S Revenue Net of Traffic Acquisition Costs (1) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| Ad Manager App Revenue as a Percentage of AdMob App Revenue (2) | ██ | ██ | ██ | ██ | ██ | ██ | ██ | █ |
| Ad Manager U S Revenue Net of Traffic Acquisition Costs | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |

**Notes:**
(1) Schedule 6 1
(2) Schedule 5 3

*Rodriguez et al v. Google LLC et al.*
**AD MANAGER APP REVENUE AS A PERCENTAGE OF ADMOB APP REVENUE**
Schedule 5 3
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

|  | 2019 | |
|---|---|---|
|  | Amount | Percentage |
| AdMob App Gross Revenue | ▮▮ | ▮ |
| Ad Manager App Gross Revenue | ▮▮ | ▮ |
| Total Sellside App Gross Revenue | ▮ | ▮ |
|  |  |  |
| Ad Manager App Revenue as a Percentage of AdMob App Revenue | | ▮ |

**Note:**

(1) 2019 "Actual" per GOOG-RDGZ-00072319 at 328   Source only presents rounded values   I understand that "AdX" refers to Ad Exchange,
     a former Google offering that was combined with Ad Manager   See, for example, GOOG-RDGZ-00083725-748 at 730

*Rodriguez et al v. Google LLC et al.*
**ADMOB U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS**
Schedule 6 1
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 (1) | 2017 (2) | 2018 (3) | 2019 (3) | 2020 (3) | 2021 (3) | 2022 (4) | Total |
|---|---|---|---|---|---|---|---|---|
| AdMob U S  Revenue Net of Traffic Acquisition Costs | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| *YoY Growth Rate* (5) | ██ | ██ | ██ | ██ | ██ | ██ | ██ | |

**Notes:**
(1) Revenues per Schedule 6 2
(2) Revenues per Schedule 6 3
(3) Revenues per Schedule 6 5
(4) Revenues calculated by applying assumed year over year growth rate to 2021 value
(5) 2017 - 2021 year over year growth rates calculated using AdMob U S  Revenue Net of TAC   2021 - 2022 growth rate set equal to the growth in U S  Total Alphabet Revenue from 2021 to 2022 per Schedule 9 1

*Rodriguez et al v. Google LLC et al.*
**ESTIMATED ADMOB U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS - JULY 2016 TO DECEMBER 2016**
Schedule 6 2
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 |
|---|---|
| Estimated App Promo U S  Revenue Net of Traffic Acquisition Costs - 2016 (1) | ■■■■ |
| AdMob as a Percentage of App Promo Revenue Net of Traffic Acquisition Costs - 2018 (2) | ■■ |
| AdMob U S  Revenue Net of Traffic Acquisition Costs - 2016 | ■■■■ |
| 2016 Partial Period Adjustment (July to December) | 0 5000 |
| AdMob U S  Revenue Net of Traffic Acquisition Costs - July 2016 to December 2016 | ■■■■ |

**Notes:**
(1) Schedule 7 2
(2) Schedule 6 4

*Rodriguez et al v. Google LLC et al.*
**ESTIMATED ADMOB U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS - 2017**
Schedule 6 3
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

|                                                                                   | 2017       |
|-----------------------------------------------------------------------------------|------------|
| App Promo U S  Revenue Net of Traffic Acquisition Costs (1)                        | ████████   |
| AdMob as a Percentage of App Promo Revenue Net of Traffic Acquisition Costs - 2018 (2) | ██████ |
| AdMob U S  Revenue Net of Traffic Acquisition Costs                               | ████████   |

**Notes:**
(1) GOOG-RDGZ-00184247
(2) Schedule 6 4

*Rodriguez et al v. Google LLC et al.*
**ADMOB AS A PERCENTAGE OF APP PROMO REVENUE NET OF TRAFFIC ACQUISITION COSTS**
Schedule 6 4
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | **2018** | **2019** | **2020** | **2021** |
|---|---|---|---|---|
| App Promo U S  Revenue Net of Traffic Acquisition Costs (1) | ███ | ███ | ███ | ███ |
| AdMob U S  Revenue Net of Traffic Acquisition Costs (2) | ███ | ███ | ███ | ███ |
| AdMob as a Percentage of App Promo Revenue Net of Traffic Acquisition Costs | ██ | ██ | ██ | ██ |

**Notes:**
(1) 2018-2020 per GOOG-RDGZ-00184247   2021 per GOOG-RDGZ-00185744
(2) Schedule 6 5

*Rodriguez et al v. Google LLC et al.*
**ADMOB U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS**
Schedule 6 5
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| AdMob Global Booked Revenue (1) | ███ | ███ | ███ | ███ |
| AdMob Global Traffic Acquisition Costs (1) | ███ | ███ | ███ | ███ |
| *TAC Share of Booked Revenue* | | | | |
| AdMob Global Revenue Net of Traffic Acquisition Costs (1) | ███ | ███ | ███ | ███ |
| Estimated U S  Share of Global Revenue (2) | ███ | ███ | ███ | ███ |
| AdMob U S  Revenue Net of Traffic Acquisition Costs | ███ | ███ | ███ | ███ |

**Notes:**
(1) 2018-2020 per GOOG-RDGZ-00187666  2021 per GOOG-RDGZ-00187665  Sources present only rounded-values
(2) Schedule 7 6   Estimated U S  share of global App Promo revenue used as proxy for estimated U S  share of global AdMob revenue

*Rodriguez et al v. Google LLC et al.*
**APP PROMO APP DISPLAY U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS (APP PROMO-APP DISPLAY OVERLAP)**
Schedule 7 1
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| App Promo U S Revenue Net of TAC (1) | | | | | | | | |
| *YoY Growth Rate* (2) | | | | | | | | |
| App Display % of Total App Promo U S Booked Revenue (3) | | | | | | | | |
| App Promo App Display U S Revenue Net of TAC (App Promo-App Display Overlap) | | | | | | | | |

**Notes:**
(1) 2016 per Schedule 7 2  2017-2020 per GOOG-RDGZ-00184247   2021 per GOOG-RDGZ-00185744   2022 calculated by applying assumed 2021 to 2022 year over year growth rate to 2021 value
(2) 2017 - 2021 year over year growth rates calculated using App Promo U S Revenue Net of TAC   2021 - 2022 growth rate held equal to the growth in U S Total Alphabet Revenue from 2021 to 2022 per Schedule 9 1
(3) Schedule 8 1  2019 share held constant for years 2016 - 2018   2021 share held constant for 2022

*Rodriguez et al v. Google LLC et al.*
**APP PROMO U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS - JULY 2016 TO DECEMBER 2016**
Schedule 7 2
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 |
|---|---|
| App Promo U S  Revenue Net of TAC - Full Year 2017 (1) | ███████ |
| Selected Growth Rate (2016 to 2017) (2) | ████ |
| App Promo U S  Revenue Net of TAC - 2016 | ███████ |
| 2016 Partial Period Adjustment (July to December) | 0 5 |
| App Promo U S  Revenue Net of TAC - July 2016 to December 2016 | ████████ |

**Notes:**
(1) 2017 per GOOG-RDGZ-00184247
(2) Schedule 7 3   Conservatively selected highest indicated growth rate between same quarters (i e , █% YoY growth, October 2016 to October 2017)

*Rodriguez et al v. Google LLC et al.*
**APP PROMO U.S. BOOKED REVENUE GROWTH RATE 2016 V. 2017**
Schedule 7 3
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | 2016 | | | | 2017 | | | |
|---|---|---|---|---|---|---|---|---|
| | Jan. | Apr. | Jul. | Oct. | Jan. | Apr. | Jul. | Oct. |
| Annualized Americas App Promo Revenue in Centimeters (1) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Annualized Americas App Promo Revenue per Centimeter (2) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Annualized Americas App Promo Revenue in Dollars | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| U S  Share of App Promo Americas Revenue (3) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Annualized App Promo U S  Booked Revenue | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| *Indicated Growth Rate Between Same Quarters (2016 v. 2017)* | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

**Notes:**
(1) Schedule 7 4
(2) GOOG-RDGZ-00067396-438 at 403   Source represents that annualized global App Promo revenue for 2019 was ■   Physical measurement of hard copy of source indicates a scale of approximately ■ per centimeter
　　Calculated as ■
(3) Schedule 7 5

*Rodriguez et al v. Google LLC et al.*
**AMERICAS PERCENTAGE OF ANNUALIZED GLOBAL APP PROMO REVENUE**
Schedule 7 4
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| *(Length in Centimeters)* | 2016 | | | | 2017 | | | | 2018 | | | | 2019 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan. | Apr. | Jul. | Oct. | Jan. | Apr. | Jul. | Oct. | Jan. | Apr. | Jul. | Oct. | Jan. | Apr. | Jul. |
| Annualized Americas App Promo Revenue (cm) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ∎ | ■ | ■ | ■ | ■ | ■ | ■ |
| Annualized Global App Promo Revenue (cm) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Americas Percentage of Annualized Global App Promo Revenue | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

**Note:**
GOOG-RDGZ-00067396-438 at 403   Length in centimeters as measured on hard copy of source

*Rodriguez et al v. Google LLC et al.*
**U.S. SHARE OF APP PROMO AMERICAS REVENUE: 2019**
Schedule 7 5
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | **2019** |
|---|---|
| Estimated U S  Share of Global App Promo Revenue (1) | ▮ |
| Represented Americas Share of Global App Promo Revenue (2) | ▮ |
| U S  Share of App Promo Americas Revenue | ▮ |

<u>**Notes:**</u>
(1) Schedule 7 6
(2) GOOG-RDGZ-00067396-438 at 403

*Rodriguez et al v. Google LLC et al.*
**ESTIMATED U.S. SHARE OF GLOBAL APP PROMO REVENUE: 2019**
Schedule 7 6
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | 2019 |
|---|---|
| App Promo U S  Booked Revenue (1) | ███████ |
| App Promo Global Annualized Booked Revenue (2) | ███████ |
| | |
| Estimated U S  Share of Global App Promo Revenue | ████ |

**Notes:**
(1) GOOG-RDGZ-00184247
(2) GOOG-RDGZ-00067396-438 at 403   See also Report Section 7 1 2

*Rodriguez et al v. Google LLC et al.*
**APP DISPLAY PERCENT OF APP PROMO U.S. TOTAL BOOKED REVENUE**
Schedule 8.1
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| App Promo U.S Booked Revenue | 2019 | | | 2020 | | | | | 2021 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q3 | Q4 | Total | Q1 | Q2 | Q3 | Q4 | Total | Q1 | Q2 | Q3 | Q4 | Total |
| Web Display (1) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| App Display (1) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| Search (2) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| YouTube (2) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| Total | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| App Display % of Total U.S. Booked Revenue | | ███ | | | | | | ███ | | | | | ███ |

**Notes:**
(1) Schedule 8.2.
(2) GOOG-RDGZ-00185743 at tab "Data."

*Rodriguez et al v. Google LLC et al.*
**APP DISPLAY AND WEB DISPLAY PORTIONS OF APP PROMO U.S. BOOKED REVENUE**
Schedule 8.2
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| App Promo U.S. Booked Revenue | 2019 | | | 2020 | | | | | 2021 | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Q3 | Q4 | Total | Q1 | Q2 | Q3 | Q4 | Total | Q1 | Q2 | Q3 | Q4 | Total |
| U.S. App Promo Display Booked Revenue (1) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| App Portion of Display per ▇▇▇ (2) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| App Display App Promo U.S. Booked Revenue | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Web Display App Promo U.S. Booked Revenue | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

**Notes:**
(1) GOOG-RDGZ-00185743 at tab "Data."
(2) Schedule 8.3.

*Rodriguez et al v. Google LLC et al.*

**APP AND WEB PORTION OF DISPLAY TOTAL REVENUE PER █████████████: 2019 - 2021**

Schedule 8 3

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**



|  | **2019** | **2020** | **2021** |
|---|---|---|---|
| *EEA Gross Revenues per* █████████ |  |  |  |
| App Display (1) | ██████ | ██████ | ██████ |
| Web Display (2) | ██████ | ██████ | ██████ |
| Display Total | ██████ | ██████ | ██████ |
| App Portion of Display Total | ████ | ████ | ████ |
| Web Portion of Display Total | ████ | ████ | ████ |

**Notes:**

(1) 2019 at GOOG-RDGZ-00188768 at tab "Matrix "  2020 and 2021 at GOOG-RDGZ-00188768 at tab "App Display Ads "  2020 and 2021 revenues are forecast by Google

(2) 2019 at GOOG-RDGZ-00188768 at tab "Matrix "  2020 and 2021 at GOOG-RDGZ-00188768 at tab "Web Display Ads "  2020 and 2021 revenues are forecast by Google

*Rodriguez et al v. Google LLC et al.*
**U.S. SHARE OF TOTAL ALPHABET REVENUE**
Schedule 9 1
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | 2015 (1) | 2016 (2) | 2017 (3) | 2018 (3) | 2019 (4) | 2020 (4) | 2021 (4) | 2022 (5) |
|---|---|---|---|---|---|---|---|---|
| Total Alphabet Revenue | $74,989,000,000 | $90,272,000,000 | $110,855,000,000 | $136,819,000,000 | $161,857,000,000 | $182,527,000,000 | $257,637,000,000 | $282,836,000,000 |
| U S Alphabet Revenue | $34,810,000,000 | $42,781,000,000 | $52,449,000,000 | $63,269,000,000 | $74,843,000,000 | $85,014,000,000 | $117,854,000,000 | $134,814,000,000 |
| U S Share of Total Alphabet Revenue | 46 42% | 47 39% | 47 31% | 46 24% | 46 24% | 46 58% | 45 74% | 47 67% |
| *YoY U.S. Alphabet Revenue Growth* | *N/A* | *22.90%* | *22.60%* | *20.63%* | *18.29%* | *13.59%* | *38.63%* | *14.39%* |

**Notes:**
(1) Total and U S Alphabet revenue per Alphabet Form 10-K for the fiscal year ended December 31, 2016, p 81
(2) Total and U S Alphabet revenue per Alphabet Form 10-K for the fiscal year ended December 31, 2018, p 56
(3) Total and U S Alphabet revenue per Alphabet Form 10-K for the fiscal year ended December 31, 2019, p 61
(4) Total and U S Alphabet revenue per Alphabet Form 10-K for the fiscal year ended December 31, 2021, p 61
(5) Total and U S Alphabet revenue per Alphabet Form 10-K for the fiscal year ended December 31, 2022, p 59

*Rodriguez et al v. Google LLC et al.*
**ACTUAL DAMAGES THROUGH DECEMBER 2022**
Schedule 10 1
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Ages 10-17 (1) | Adults 18+ (2) | Total |
|---|---|---|---|
| Estimated Class Members | 8,539,766 | 82,408,894 | 90,948,660 |
| Average Number of Mobile Devices per Person (3) | 1 00 | 1 86 | N/A |
| Class Member Devices | 8,539,766 | 153,475,659 | 162,015,424 |
| Selected Payment per Class Member Device (4) | $3 00 | $3 00 | N/A |
| Actual Damages | $25,619,298 | $460,426,976 | $486,046,273 |

**Notes:**
(1) Schedule 10 3
(2) Schedule 10 2
(3) Report Section 8 2   See also Schedule 12 2
(4) Report Section 8 1 4

*Rodriguez et al v. Google LLC et al.*
**ESTIMATED CLASS MEMBERS THROUGH DECEMBER 2022 - AGES 18+**
Schedule 10 2
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

|  | **Adults** |
|---|---|
| United States Population - Adults (1) | 258,327,312 |
| Share of U S  Adults Who Use the Internet (2) | 93 00% |
| U S  Internet Users - Adults | 240,244,400 |
| Share of Internet Users with Smartphones - Adults (3) | 95 96% |
| U S  Internet Users with Smartphones - Adults | 230,532,884 |
| Share of Smartphone Users with Gmail Accounts (4) | 84 05% |
| U S  Smartphone Users with Gmail Accounts - Adults | 193,767,861 |
| Percent of U S  Google Accounts where sWAA was Turned Off at Any Time (5) | ■■■■ |
| Estimated Class Members - Adults | 82,408,894 |

**Notes:**
(1) Annual Estimates of the Resident Population for Selected Age Groups by Sex for the United States: April 1, 2020 to July 1, 2021, Census Bureau
(2) Pew Research, "Internet Use Over Time" available at https://www pewresearch org/internet/fact-sheet/internet-broadband/
(3) Schedule 12 5
(4) Schedule 12 4
(5) Schedule 12 7

*Rodriguez et al v. Google LLC et al.*
**ESTIMATED CLASS MEMBERS THROUGH DECEMBER 2022 - AGES 10-17**
Schedule 10 3
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

|  | Ages 10-17 |
|---|---|
| United States Population - Ages 10 - 17 (1) | 34,447,547 |
| Share of U S  Population Under 18 Who Use the Internet (2) | 95 00% |
| U S  Internet Users - Ages 10 - 17 | 32,725,170 |
| Average Share of Internet Users (Ages 10 - 17) with Smartphones (3) | 73 00% |
| U S  Internet Users with Smartphones - Ages 10 - 17 | 23,889,374 |
| Share of Smartphone Users with Gmail Accounts (4) | 84 05% |
| U S  Smartphone Users with Gmail Accounts - Ages 10 - 17 | 20,079,534 |
| Percent of U S  Google Accounts where sWAA was Turned Off at Any Time (5) | ██████ |
| Estimated Class Members - Ages 10 - 17 | 8,539,766 |

**Notes:**
(1) Annual Estimates of the Resident Population for Selected Age Groups by Sex for the United States: April 1, 2020 to July 1, 2021, Census Bureau
(2) Children's Internet Access At Home per National Center for Education Statistics available at https://nces ed gov/programs/coe/indicator/cch/home-internet-access
(3) Schedule 10 4
(4) Schedule 12 4
(5) Schedule 12 7

*Rodriguez et al v. Google LLC et al.*
**SHARE OF INTERNET USERS AGES 10-17 WITH SMARTPHONES**
Schedule 10 4
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| Internet User Age | 2021 |
|---|---|
| 10 | 42% |
| 11 | 37% |
| 12 | 71% |
| 13 | 70% |
| 14 | 91% |
| 15 | 86% |
| 16 | 90% |
| 17 | 97% |
| Average Share of Internet Users (Ages 10-17) with Smartphones | 73% |

**Note:**
"The Common Sense Census: Media Use by Teens and Tweens, 2021" available at https://www.commonsensemedia org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0 pdf

*Rodriguez et al v. Google LLC et al.*
**SWAA OFF USER MONTHS - JULY 1, 2016 THROUGH DECEMBER 31, 2022**
Schedule 11 1
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Number of Monthly sWAA Off Accounts (1) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| Average Number of Gmail Accounts per Gmail Account Holder (2) | 1 77 | 1 77 | 1 77 | 1 77 | 1 77 | 1 77 | 1 77 | 1 77 |
| sWAA Off User Months Before Adjustment for Mobile Device Use | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| Share of Internet Users with Smartphones (3) | 95 96% | 95 96% | 95 96% | 95 96% | 95 96% | 95 96% | 95 96% | 95 96% |
| sWAA Off User Months | 512,761,472 | 608,710,131 | 426,689,310 | 386,876,298 | 340,267,579 | 371,652,291 | 376,843,123 | 3,023,800,204 |

**Notes:**
(1) Schedule 13 1
(2) Schedule 12 1
(3) Schedule 12 5

*Rodriguez et al v. Google LLC et al.*

**AVERAGE NUMBER OF GMAIL ACCOUNTS PER GMAIL ACCOUNT HOLDER PER KEEGAN SURVEY RESULTS**

Schedule 12 1

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| Number of Gmail Accounts | Number of Respondents | Total Gmail Accounts | Average Number of Gmail Accounts per Gmail Account Holder |
|---|---|---|---|
| 1 | 433 | 433 | N/A |
| 2 | 251 | 502 | N/A |
| 3 | 91 | 273 | N/A |
| 4 | 28 | 112 | N/A |
| 5 or more | 32 | 160 | N/A |
| | | | |
| Total | 835 | 1,480 | 1 77 |

**Note:**

Keegan Survey Results, Question No  12  Responses indicating "5 or more" accounts have been counted as 5 accounts

*Rodriguez et al v. Google LLC et al.*
**AVERAGE NUMBER OF MOBILE DEVICES PER PERSON PER KEEGAN SURVEY RESULTS**
Schedule 12 2
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | iOS (1) | Android (1) | Non-User or Don't Know (2) | Total |
|---|---|---|---|---|
| Mobile Phones | 576 | 665 | 0 | 1,241 |
| Tablets | 355 | 339 | 0 | 694 |
| Total Devices | 931 | 1,004 | 0 | 1,935 |
| Number of Respondents | 997 | 997 | 42 | 1,039 |
| Average Number of Mobile Devices per Person | 0 93 | 1 01 | N/A | 1 86 |

**Notes:**
(1) Schedule 12 3
(2) Keegan Survey Results, Question No  7

*Rodriguez et al v. Google LLC et al.*
**AVERAGE NUMBER OF MOBILE DEVICES PER SMARTPHONE USER PER KEEGAN SURVEY RESULTS**
Schedule 12 3
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | iPhone | | |
|---|---|---|---|
| **Number of Devices** | **Number of Respondents** | **Total iPhone** | **Average Number of Devices per Person** |
| 0 | 486 | 0 | N/A |
| 1 | 459 | 459 | N/A |
| 2 | 39 | 78 | N/A |
| 3 or more | 13 | 39 | N/A |
| Total - iPhone | 997 | 576 | 0 578 |

| | iPad | | |
|---|---|---|---|
| **Number of Devices** | **Number of Respondents** | **Total iPad** | **Average Number of Devices per Person** |
| 0 | 685 | 0 | N/A |
| 1 | 276 | 276 | N/A |
| 2 | 29 | 58 | N/A |
| 3 or more | 7 | 21 | N/A |
| Total - iPad | 997 | 355 | 0 356 |

| | Android Phone | | |
|---|---|---|---|
| **Number of Devices** | **Number of Respondents** | **Total Android Phone** | **Average Number of Devices per Person** |
| 0 | 431 | 0 | N/A |
| 1 | 488 | 488 | N/A |
| 2 | 57 | 114 | N/A |
| 3 or more | 21 | 63 | N/A |
| Total - Android Phone | 997 | 665 | 0 667 |

| | Android Tablet | | |
|---|---|---|---|
| **Number of Devices** | **Number of Respondents** | **Total Android Tablet** | **Average Number of Devices per Person** |
| 0 | 699 | 0 | N/A |
| 1 | 264 | 264 | N/A |
| 2 | 27 | 54 | N/A |
| 3 or more | 7 | 21 | N/A |
| Total - Android Tablet | 997 | 339 | 0 340 |
| Total - All Devices | 997 | 1,935 | 1 941 |

**Note:**
Keegan Survey Results, Question Nos  14, 15, 16, and 17  Responses indicating "3 or more" devices have been counted as 3 devices

*Rodriguez et al v. Google LLC et al.*

**PERCENT OF SMARTPHONE USERS WHO HAVE ONE OR MORE GMAIL ACCOUNTS PER KEEGAN SURVEY RESULTS**

Schedule 12 4

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| Keegan Survey Results Question No. 11 | Number of Respondents | Percent of Respondents |
|---|---|---|
| I do have one or more Gmail accounts | 838 | 84 05% |
| I do not have one or more Gmail accounts | 143 | 14 34% |
| Don't know | 16 | 1 60% |
| Total | 997 | 100 00% |

**Note:**

Keegan Survey Results, Question No  11

*Rodriguez et al v. Google LLC et al.*

**PERCENT OF INTERNET USERS WHO HAVE A SMARTPHONE FOR PERSONAL USE PER KEEGAN SURVEY RESULTS**

Schedule 12 5

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| **Keegan Survey Results Question No. 7** | **Number of Respondents** | **Percent of Respondents** |
|---|---|---|
| I do currently have a smartphone for my own personal use | 997 | 95 96% |
| I do not currently have a smartphone for my own personal use | 34 | 3 27% |
| Don't know | 8 | 0 77% |
| Total | 1039 | 100 00% |

**Note:**

Keegan Survey Results, Question No  7

*Rodriguez et al v. Google LLC et al.*
**OPERATING SYSTEM MARKET SHARE PER KEEGAN SURVEY RESULTS**
Schedule 12 6
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| Keegan Survey Results Question No. 8 | Number of Respondents | Percent of Respondents |
|---|---|---|
| iOS (Apple iPhone) | 480 | 48 14% |
| Android (Samsung, Google Pixel, etc ) | 508 | 50 95% |
| Other (Windows, Blackberry, etc ) | 1 | 0 10% |
| Don't know | 8 | 0 80% |
| Total | 997 | 100 00% |

**Note:**
Keegan Survey Results, Question No  8

*Rodriguez et al v. Google LLC et al.*

**PERCENT OF U.S. GOOGLE ACCOUNTS WHERE SWAA WAS TURNED OFF AT ANY TIME: JULY 27, 2016 - JULY 27, 2020**

Schedule 12 7

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | July 27, 2016 - July 27, 2020 |
|---|---|
| Number of U S  Google Accounts where sWAA was turned Off at Any Time | ███████ |
| Number of U S  Google Accounts Ever Active During this Time | ███████ |
| Percent of U S  Google Accounts where sWAA was Turned Off at Any Time | ████ |

<u>**Source:**</u>
GOOG-RDGZ-00187010 at tab "SWAA" See also, Defendant Google LLC's Supplemental Objections and Responses to Plaintiffs' Interrogatories,
Set Six (Nos  12, 16, &17), Supplemental Response to Interrogatory No  12, p  6

*Rodriguez et al v. Google LLC et al.*
**PERCENTAGE AND NUMBER OF MONTHLY ACCOUNTS WITH SWAA OFF**
Schedule 13 1
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Active Accounts - Summary | | | |
|---|---|---|---|---|
| **Date** | **Monthly Active Accounts** | **Monthly Accounts with sWAA Enabled** | **Monthly Accounts with sWAA Off** | **% of Monthly Accounts with sWAA Off** |
| Jul - Dec 2016 | | | | |
| Jan - Dec 2017 | | | | |
| Jan - Dec 2018 | | | | |
| Jan - Dec 2019 | | | | |
| Jan - Dec 2020 | | | | |
| Jan - Dec 2021 | | | | |
| Jan - Dec 2022 | | | | |

**Note:**
Schedule 13 2 (two page schedule)

*Rodriguez et al v. Google LLC et al.*
**SUMMARY OF GOOGLE U.S. ACTIVE ACCOUNT DATA**
Schedule 13 2 (two page schedule)
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | | | U.S. Active Accounts (1) | | | | |
|---|---|---|---|---|---|---|---|
| Date (2) | Number of Active Accounts (2) | Number of Accounts with WAA Enabled (2) | Number of Accounts with sWAA Enabled (2) | Number of Accounts with WAA Off | Number of Accounts with sWAA Off | % of Accounts with WAA Off | % of Accounts with sWAA Off |

*Rodriguez et al v. Google LLC et al.*
**SUMMARY OF GOOGLE U.S. ACTIVE ACCOUNT DATA**
Schedule 13 2 (two page schedule)
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**



| | | | | U.S. Active Accounts (1) | | | |
|---|---|---|---|---|---|---|---|
| Date (2) | Number of Active Accounts (2) | Number of Accounts with WAA Enabled (2) | Number of Accounts with sWAA Enabled (2) | Number of Accounts with WAA Off | Number of Accounts with sWAA Off | % of Accounts with WAA Off | % of Accounts with sWAA Off |

**Notes:**
(1) October 2022 held constant for November and December 2022  Data assumed to be U S -specific   See Report Section 6 6
(2) GOOG-RDGZ-00204475, tab "Sheet1 "  Source represents that active accounts were active in the 28-day period before the first of the month and that data excludes Dashers, Googlers,
   supervised accounts, or deleted accounts

*Rodriguez et al v. Google LLC et al.*

**GAP OFF REVENUE IMPACT SHARE WITH 0% CONSENT PER** ███████████

Schedule 14 1

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| Product | 2019 | | | |
| | Revenue Net of TAC (in millions) | Revenue Impact with 0% Consent | Revenue Retained with 0% Consent | GAP-Off Revenue Impact Share |
| --- | --- | --- | --- | --- |
| Search | █ | █ | █ | █ |
| YouTube | | | | |
| Web Display | | | | |
| **App Display** | | | | |
| Play | | | | |
| Gmail | | | | |
| | | | | |
| Total | █ | █ | █ | █ |

**Source:**

GOOG-RDGZ-00188768 at tab "Matrix "

*Rodriguez et al v. Google LLC et al.*

**SHARE OF APP DISPLAY REVENUE NET OF TRAFFIC ACQUISITION COSTS PER** ██████████████

Schedule 15.1

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| App Display | 2019<br>Revenue Net of TAC |
|---|---|
| Signed-In | |
| Signed-Out | ███████ |
| | |
| Total | ███████ |
| | |
| Share of Revenue Net of TAC from Signed-In Users | ██████ |

**Source:**

GOOG-RDGZ-00188768 at tab "Matrix."

*Rodriguez et al v. Google LLC et al.*
**SUMMARY - UNJUST ENRICHMENT AS PERCENT OF U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS**
Schedule 16 1
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Scenario One | Scenario Two |
|---|---|---|
| Unjust Enrichment | | |
| App Promo (1) | | |
| AdMob (1) | | |
| Ad Manager (1) | | |
| | | |
| Total Unjust Enrichment | $558,790,819 | $664,338,502 |
| | | |
| U S  Revenue Net of Traffic Acquisition Costs | | |
| App Promo (2) | | |
| AdMob (3) | | |
| Ad Manager (4) | | |
| | | |
| Total Revenue Net of Traffic Acquisition Costs | | |
| | | |
| Unjust Enrichment as a Percent of U S  Revenue Net of TAC | | |

**Notes:**
(1) Schedule 1 1
(2) Schedule 2 2
(3) Schedule 3 4  U S  Revenue Net of TAC excluding overlap with App Promo
(4) Schedule 4 4  U S  Revenue Net of TAC excluding overlap with App Promo

*Rodriguez et al v. Google LLC et al.*
**SUMMARY - UNJUST ENRICHMENT BY PRODUCT - ADJUSTED SWAA OFF RATE**
Schedule 1 1B
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

|  | Scenario One | Scenario Two |
|---|---|---|
| App Promo | $325,884,296 | $325,884,296 |
| AdMob | $151,211,834 | $221,591,687 |
| Ad Manager | $51,412,024 | $75,341,173 |
| Total | $528,508,154 | $622,817,156 |

**Note:**
Schedule 1 2B

*Rodriguez et al v. Google LLC et al.*
**SUMMARY - UNJUST ENRICHMENT SCENARIOS ONE AND TWO BY PRODUCT AND CLASS - ADJUSTED SWAA OFF RATE**
Schedule 1 2B
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Scenario One [1] | Scenario Two [2] |
|---|---|---|
| *App Promo* | | |
| Class 1 | $202,063,272 | $202,063,272 |
| Class 2 | $123,821,024 | $123,821,024 |
| Total | $325,884,296 | $325,884,296 |
| | | |
| *AdMob* | | |
| Class 1 | $93,758,301 | $137,397,051 |
| Class 2 | $57,453,533 | $84,194,636 |
| Total | $151,211,834 | $221,591,687 |
| | | |
| *Ad Manager* | | |
| Class 1 | $31,877,822 | $46,714,997 |
| Class 2 | $19,534,201 | $28,626,176 |
| Total | $51,412,024 | $75,341,173 |
| | | |
| Total | $528,508,154 | $622,817,156 |

**Notes:**
(1) Schedule 1 3B
(2) Schedule 1 4B

*Rodriguez et al v. Google LLC et al.*

**EXAMPLE APPORTIONMENT OF UNJUST ENRICHMENT TO CLASSES - SCENARIO ONE - ADJUSTED SWAA OFF RATE**

Schedule 1 3B

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Scenario One Total - Both Classes | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
| App Promo (1) | $1,422,629 | $5,121,463 | $7,452,251 | $13,491,271 | $39,490,311 | $115,716,620 | $143,189,752 | $325,884,296 |
| AdMob (2) | $4,177,696 | $15,039,704 | $21,884,305 | $22,695,692 | $20,828,745 | $31,505,683 | $35,080,010 | $151,211,834 |
| Ad Manager (3) | $1,420,417 | $5,113,499 | $7,440,664 | $7,716,535 | $7,081,773 | $10,711,932 | $11,927,203 | $51,412,024 |
| Total Scenario One - Both Classes | $7,020,741 | $25,274,667 | $36,777,219 | $43,903,497 | $67,400,829 | $157,934,235 | $190,196,965 | $528,508,154 |
| | | | | | | | | |
| Class 1 Apportionment Factor (4) | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% |
| Class 2 Apportionment Factor (4) | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% |

| | Scenario One - Class 1 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| App Promo | $882,095 | $3,175,543 | $4,620,739 | $8,365,209 | $24,485,812 | $71,749,633 | $88,784,241 | $202,063,272 |
| AdMob | $2,590,364 | $9,325,309 | $13,569,277 | $14,072,374 | $12,914,781 | $19,534,975 | $21,751,222 | $93,758,301 |
| Ad Manager | $880,724 | $3,170,605 | $4,613,554 | $4,784,607 | $4,391,026 | $6,641,891 | $7,395,415 | $31,877,822 |
| Total Scenario One - Class 1 | $4,353,183 | $15,671,457 | $22,803,570 | $27,222,190 | $41,791,618 | $97,926,499 | $117,930,878 | $327,699,395 |

| | Scenario One - Class 2 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| App Promo | $540,533 | $1,945,920 | $2,831,512 | $5,126,062 | $15,004,500 | $43,966,986 | $54,405,511 | $123,821,024 |
| AdMob | $1,587,332 | $5,714,395 | $8,315,028 | $8,623,318 | $7,913,964 | $11,970,709 | $13,328,788 | $57,453,533 |
| Ad Manager | $539,693 | $1,942,894 | $2,827,109 | $2,931,928 | $2,690,748 | $4,070,041 | $4,531,788 | $19,534,201 |
| Total Scenario One - Class 2 | $2,667,558 | $9,603,209 | $13,973,650 | $16,681,307 | $25,609,211 | $60,007,736 | $72,266,087 | $200,808,759 |

**Notes:**
(1) Schedule 2 1B
(2) Schedule 3 3B
(3) Schedule 4 3B
(4) Schedule 1 5

*Rodriguez et al v. Google LLC et al.*
**EXAMPLE APPORTIONMENT OF UNJUST ENRICHMENT TO CLASSES - SCENARIO TWO - ADJUSTED SWAA OFF RATE**
Schedule 1 4B
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | **Scenario Two Total - Both Classes** | | | | |
| App Promo (1) | $1,422,629 | $5,121,463 | $7,452,251 | $13,491,271 | $39,490,311 | $115,716,620 | $143,189,752 | $325,884,296 |
| AdMob (2) | $6,122,157 | $22,039,766 | $32,070,109 | $33,259,147 | $30,523,251 | $46,169,650 | $51,407,607 | $221,591,687 |
| Ad Manager (3) | $2,081,533 | $7,493,520 | $10,903,837 | $11,308,110 | $10,377,905 | $15,697,681 | $17,478,586 | $75,341,173 |
| Total Scenario Two - Both Classes | $9,626,319 | $34,654,750 | $50,426,197 | $58,058,527 | $80,391,467 | $177,583,951 | $212,075,945 | $622,817,156 |
| | | | | | | | | |
| Class 1 Apportionment Factor (4) | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% | 62 00% |
| Class 2 Apportionment Factor (4) | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% | 38 00% |
| | | | | | | | | |
| | | | | **Scenario Two - Class 1** | | | | |
| App Promo | $882,095 | $3,175,543 | $4,620,739 | $8,365,209 | $24,485,812 | $71,749,633 | $88,784,241 | $202,063,272 |
| AdMob | $3,796,019 | $13,665,670 | $19,884,944 | $20,622,203 | $18,925,821 | $28,627,309 | $31,875,084 | $137,397,051 |
| Ad Manager | $1,290,647 | $4,646,328 | $6,760,881 | $7,011,549 | $6,434,779 | $9,733,285 | $10,837,528 | $46,714,997 |
| Total Scenario Two - Class 1 | $5,968,761 | $21,487,541 | $31,266,564 | $35,998,961 | $49,846,412 | $110,110,228 | $131,496,853 | $386,175,320 |
| | | | | | | | | |
| | | | | **Scenario Two - Class 2** | | | | |
| App Promo | $540,533 | $1,945,920 | $2,831,512 | $5,126,062 | $15,004,500 | $43,966,986 | $54,405,511 | $123,821,024 |
| AdMob | $2,326,138 | $8,374,096 | $12,185,164 | $12,636,944 | $11,597,430 | $17,542,341 | $19,532,523 | $84,194,636 |
| Ad Manager | $790,887 | $2,847,193 | $4,142,956 | $4,296,561 | $3,943,126 | $5,964,396 | $6,641,058 | $28,626,176 |
| Total Scenario Two - Class 2 | $3,657,558 | $13,167,209 | $19,159,633 | $22,059,567 | $30,545,055 | $67,473,723 | $80,579,092 | $236,641,836 |

**Notes:**
(1) Schedule 2 1B
(2) Schedule 3 1B
(3) Schedule 4 1B
(4) Schedule 1 5

*Rodriguez et al v. Google LLC et al.*
**APP PROMO TOTAL UNJUST ENRICHMENT - ADJUSTED SWAA OFF RATE**
Schedule 2 1B
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| App Promo Signed-In sWAA Off U S  Revenue Net of Traffic Acquisiton Costs (1) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ██ ██ |
| Share of Revenue Attributable to Conversion Types Bid Against GA4F (2) | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ |
| App Promo Total Unjust Enrichment | $1,422,629 | $5,121,463 | $7,452,251 | $13,491,271 | $39,490,311 | $115,716,620 | $143,189,752 | $325,884,296 |

**Notes:**
(1) Schedule 2 2B
(2) Defendant Google LLC's Supplemental Objections and Responses to Plaintiffs' Interrogatories, Set Six (Nos  12, 16, &17), Supplemental Response to ROG 17, pp  15-16

*Rodriguez et al v. Google LLC et al.*

**APP PROMO SIGNED-IN SWAA OFF U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS - ADJUSTED SWAA OFF RATE**

Schedule 2 2B

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| App Promo U S  Booked Revenue (1) | | | | | | | | |
| App Promo U S  Traffic Acquisition Costs (1) | | | | | | | | |
| App Promo U S  Revenue Net of Traffic Acquisition Costs (2) | | | | | | | | |
| *YoY Growth Rate* (3) | | | | | | | | |
| Share of Revenue from Signed-In Users (4) | | | | | | | | |
| App Promo Signed-In U S  Revenue Net of Traffic Acquisition Costs | | | | | | | | |
| Adjusted Share of Monthly Accounts with sWAA Off (5) | | | | | | | | |
| App Promo Signed-In sWAA Off U S  Revenue Net of Traffic Acquisiton Costs | | | | | | | | |

**Notes:**

(1) 2018-2020 per GOOG-RDGZ-00184247   2021 per GOOG-RDGZ-00185744

(2) July 2016 through December 2016 per Schedule 7 2   2022 calculated by applying assumed year over year growth rate to 2021 value

(3) 2017 - 2021 year over year growth rates calculated using App Promo U S  Revenue Net of TAC   2021 - 2022 growth rate set equal to the growth in U S  Total Alphabet revenue from 2021 to 2022 per Schedule 9 1

(4) Schedule 15 1

(5) Schedule 13 1B

*Rodriguez et al v. Google LLC et al.*
**ADMOB TOTAL UNJUST ENRICHMENT - SCENARIO 2 - ADJUSTED SWAA OFF RATE**
Schedule 3 1B
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| AdMob Signed-In sWAA Off U S Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Attributable to Conversion Tracking (1) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| AdMob Signed-In sWAA Off U S Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with sWAA Off (2) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| AdMob Total Unjust Enrichment - Scenario 2 | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |

**Notes:**
(1) Schedule 3 3B
(2) Schedule 3 2B

*Rodriguez et al v. Google LLC et al.*

**ADMOB SIGNED-IN SWAA OFF U.S. REVENUE NET OF TAC (EXCLUDING APP PROMO-ADMOB OVERLAP) NOT ATTRIBUTABLE TO CONVERSION TRACKING AND ADJUSTED FOR DIMINISHED AD RELEVANCE WITH SWAA OFF - ADJUSTED SWAA OFF RATE**

Schedule 3.2B

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**



| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| AdMob Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-AdMob Overlap) (1) | | | | | | | | |
| AdMob Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Attributable to Conversion Tracking (2) | | | | | | | | |
| AdMob Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Not Attributable to Conversion Tracking | | | | | | | | |
| Apportionment for Diminished Ad Relevance with sWAA Off (3) | | | | | | | | |
| AdMob Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with sWAA Off | | | | | | | | |

**Notes:**
(1) Schedule 3.4B.
(2) Schedule 3.3B.
(3) Schedule 14.1.  See also Report Section 7.2.2.

*Rodriguez et al v. Google LLC et al.*
**ADMOB SIGNED-IN SWAA OFF U.S. REVENUE NET OF TAC (EXCLUDING APP PROMO-ADMOB OVERAP) ATTRIBUTABLE TO CONVERSION TRACKING - SCENARIO ONE - ADJUSTED SWAA OFF RATE**
Schedule 3 3B
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| AdMob Signed-In sWAA Off U S  Revenue Net of TAC (Excluding App Promo-AdMob Overlap) (1) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| Share of Revenues Attributable to Conversion Tracking (2) | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| AdMob Signed-In sWAA Off U S  Revenue Net of TAC (Excluding App Promo-AdMob Overlap) Attributable to Conversion Tracking | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |

**Notes:**
(1) Schedule 3 4B
(2) GOOG-RDGZ-00188469-491 at 475   Represented on source document as "Conversion Based Autobidding Proportion "

*Rodriguez et al v. Google LLC et al.*
**ADMOB SIGNED-IN SWAA OFF U.S. REVENUE NET OF TAC (EXCLUDING APP PROMO-ADMOB OVERLAP) - ADJUSTED SWAA OFF RATE**
Schedule 3 4B
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| AdMob U S  Revenue Net of Traffic Acquisition Costs (1) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| App Promo-AdMob Overlap - U S  Revenue Net of TAC (2) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| AdMob U S  Revenue Net of TAC (Excluding App Promo-AdMob Overlap) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Share of Revenue from Signed-In Users (3) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| AdMob Signed-In U S  Revenue Net of TAC (Excluding App Promo-AdMob Overlap) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Adjusted Share of Monthly Accounts with sWAA Off (4) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| AdMob Signed-In sWAA Off U S  Revenue Net of TAC (Excluding App Promo-AdMob Overlap) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

Notes:
(1) Schedule 6 1
(2) Schedule 5 1
(3) Schedule 15 1
(4) Schedule 13 1B

*Rodriguez et al v. Google LLC et al.*
**AD MANAGER TOTAL UNJUST ENRICHMENT - SCENARIO 2 - ADJUSTED SWAA OFF RATE**
Schedule 4 1B
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**



| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Ad Manager Signed-In sWAA Off U S  Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Attributable to Conversion Tracking (1) | | | | | | | | |
| Ad Manager Signed-In sWAA Off U S  Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with sWAA Off (2) | | | | | | | | |
| Ad Manager Total Unjust Enrichment - Scenario Two | | | | | | | | |

**Notes:**
(1) Schedule 4 3B
(2) Schedule 4 2B

*Rodriguez et al v. Google LLC et al.*
**AD MANAGER SIGNED-IN SWAA OFF U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS (EXCLUDING APP PROMO-AD MANAGER OVERLAP) NOT ATTRIBUTABLE TO CONVERSION TRACKING AND ADJUSTED FOR DIMINISHED AD RELEVANCE WITH SWAA OFF - ADJUSTED SWAA OFF RATE**
Schedule 4.2B
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Ad Manager Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) (1) | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| Ad Manager Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Attributable to Conversion Tracking (2) | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| Ad Manager Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Not Attributable to Conversion Tracking | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| Apportionment for Diminished Ad Relevance with sWAA Off (3) | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| Ad Manager Signed-In sWAA Off U.S. Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Not Attributable to Conversion Tracking and Adjusted for Diminished Ad Relevance with sWAA Off | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |

**Notes:**
(1) Schedule 4.4B.
(2) Schedule 4.3B.
(3) Schedule 14.1.  See also Report Section 7.2.3.

*Rodriguez et al v. Google LLC et al.*
**AD MANAGER SIGNED-IN SWAA OFF U.S. REVENUE NET OF TAC (EXCLUDING APP PROMO-AD MANAGER OVERLAP) ATTRIBUTABLE TO CONVERSION TRACKING - SCENARIO ONE - ADJUSTED SWAA OFF RATE**
Schedule 4 3B
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Ad Manager Signed-In sWAA Off U S  Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) (1) | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| Share of Revenues Attributable to Conversion Tracking (2) | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| Ad Manager Signed-In sWAA Off U S  Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) Attributable to Conversion Tracking | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |

**Notes:**
(1) Schedule 4 4B
(2) GOOG-RDGZ-00188469-491 at 475   Represented on source document as "Conversion Based Autobidding Proportion "

*Rodriguez et al v. Google LLC et al.*
**AD MANAGER SIGNED-IN SWAA OFF U.S. REVENUE NET OF TRAFFIC ACQUISITION COSTS (EXCLUDING APP PROMO-AD MANAGER OVERLAP) - ADJUSTED SWAA OFF RATE**
Schedule 4 4B
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Ad Manager U S  Revenue Net of Traffic Acquisition Costs (1) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| App Promo-Ad Manager Overlap - U S  Revenue Net of TAC (2) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| Ad Manager U S  Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| Share of Revenue from Signed-In Users (3) | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| Ad Manager Signed-In U S  Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| Adjusted Share of Monthly Accounts with sWAA Off (4) | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| Ad Manager Signed-In sWAA Off U S  Revenue Net of TAC (Excluding App Promo-Ad Manager Overlap) | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |

**Notes:**
(1) Schedule 5 2
(2) Schedule 5 1
(3) Schedule 15 1
(4) Schedule 13 1B

*Rodriguez et al v. Google LLC et al.*
**SWAA OFF USER MONTHS - JULY 1, 2016 THROUGH DECEMBER 31, 2022 - ADJUSTED SWAA OFF RATE**
Schedule 11 1B
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Jul. - Dec. 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Number of Monthly sWAA Off Accounts (1) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Average Number of Gmail Accounts per Gmail Account Holder (2) | 1 77 | 1 77 | 1 77 | 1 77 | 1 77 | 1 77 | 1 77 | 1 77 |
| sWAA Off User Months Before Adjustment for Mobile Device Use | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Share of Internet Users with Smartphones (3) | 95 96% | 95 96% | 95 96% | 95 96% | 95 96% | 95 96% | 95 96% | 95 96% |
| sWAA Off User Months | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

**Notes:**
(1) Schedule 13 1B
(2) Schedule 12 1
(3) Schedule 12 5

*Rodriguez et al v. Google LLC et al.*
**ADJUSTED PERCENTAGE AND NUMBER OF MONTHLY ACCOUNTS WITH SWAA OFF**
Schedule 13 1B
**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | Active Accounts - Summary (1) | | | | | |
|---|---|---|---|---|---|---|
| Date | Monthly Active Accounts | Monthly Accounts with sWAA Enabled | Monthly Accounts with sWAA Off | % of Monthly Accounts with sWAA Off | Adjusted % of Monthly Accounts with sWAA Off (2) | Adjusted Monthly Accounts with sWAA Off (3) |
| Jul - Dec 2016 | ■ | ■ | ■ | ■ | ■ | ■ |
| Jan - Dec 2017 | | | | | | |
| Jan - Dec 2018 | | | | | | |
| Jan - Dec 2019 | | | | | | |
| Jan - Dec 2020 | | | | | | |
| Jan - Dec 2021 | | | | | | |
| Jan - Dec 2022 | | | | | | |

**Notes:**
(1) Schedule 13 2 (two page schedule)
(2) Partial year-2016 and 2017 held equal to 2018
(3) Partial year-2016 and 2017 calculated by multiplying number of Monthly Active Accounts by the Adjusted % of Accounts with sWAA Off