# EXHIBIT A

# WILLKIE FARR & GALLAGHER LLP

One Front Street
San Francisco, CA 94111
Tel: 415 858 7400
Fax: 415 858 7599

December 31, 2020

**SENT VIA E-MAIL**

Beko Reblitz-Richardson
BOIS SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA  94104
E-mail:  brichardson@bsfllp.com

Re:  *Anibal Rodriguez, et al., v. Google LLC*, Case No. 3:20-CV-04688
**Google's Responses and Objections to Plaintiffs' First and Second Sets of
Requests for Production of Documents**

Counsel:

I write in response to your letter of December 3, 2020, concerning Google's responses to
Plaintiffs' first and second sets of document requests.

**Request Nos. 1 and 2:**  The parties are unfortunately at an impasse on these requests. As we've
explained, these requests are overbroad and abusive. They are not reasonably limited to the
subject matter of this case and they seek documents purely because they were provided to
regulators or were requested by regulators in unrelated contexts or unrelated cases. Google is
willing to and has agreed to produce documents that relate to this case and its subject matter.
Any relevant documents should be captured by Plaintiffs' substantive requests.

**Request No. 3:** Like the first two requests, these requests seek documents by virtue of their
production elsewhere, without any further explanation or justification. Google will not simply re-
produce every document produced in the Arizona case, and every filing and exhibit, merely
because they were part of that case. That case deals with distinct and unrelated questions. Both
cases involve to some degree Google's Web & App Activity service ("WAA"), but the
similarities end there.

The allegations in the Arizona case concern what Google does when WAA is turned on; the
plaintiff there alleges that Google collects location history data without authorization when
WAA is turned on. The allegations in this case, by contrast, concern what Google does when
WAA is turned off. Plaintiffs here allege that by turning WAA off, they believed they were
disabling Google from receiving data about them in any context from anyone—a claim that is
both far-fetched and not grounded in reality. Regardless, that claim is unrelated to the claim in

Arizona, and a complete re-production of everything from that case here would only serve to burden Google unnecessarily by forcing it to disclose unrelated and sensitive documents to private plaintiffs here that were produced to a governmental entity in Arizona under a protective order. No authority supports such a wide-ranging fishing expedition.

Your letter relies on the allegations in paragraph 77 of the Amended Complaint concerning exhibits that were attached to the Arizona complaint. Those documents are irrelevant. The musings of Google employees about its products has no impact on any cause of action in this case, and when we asked during the meet and confer call if you could identify any element of any cause of action or defense in this case to which those musings could be relevant, you were unable to identify any such element.

**Request Nos. 4-10:** We did not discuss these requests during the call; you asked that we skip them, and we never returned to them. Google is making productions under these requests, and it does not appear Plaintiffs have any specific complaints about Google's written responses to them.

**Request No. 11:** This request seeks a list of every alleged class member, including all electronic and physical address information for each of them in Google's possession. Plaintiffs have never identified a reason why, at this stage, when the pleadings are not settled and discovery is in its infancy, Plaintiffs could have any legitimate need for this information. Collecting such information is highly burdensome, it will distract from the merits of this case (and in particular, the search for a production of core documents that will demonstrate to Plaintiffs the fundamental technological and factual misunderstandings that led them to file this lawsuit), and it will force Google to expose the private information of its users to third parties without justification. Especially given the concern Plaintiffs have for the privacy rights of Google's users, we find it surprising that Plaintiffs would insist on such an intrusive document production that can serve no purpose other than to place such information at unnecessary risk.

Your most recent letter claims that Plaintiffs have a legitimate need for this information because a list of potential class members and their home addresses will serve the purpose of "substantiating [Plaintiffs'] allegations." Dec. 3 Letter at 2. Your letter doesn't explain how such a list could substantiate (or negate) any of your claims, other than because Plaintiffs' self-referential class definition puts the cart before the horse. We can save for another day the problems with Plaintiffs' class definition; for now, we see no relevance to this request, nor any legitimate need why this information should be produced so early in a class action before even the complaint has been found viable.

The Ninth Circuit's decision in *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020), confirms Google's objections. There, a writ of mandamus directed a district court to reverse its decision to permit the discovery of a class list without a legitimate need or purpose. Until Plaintiffs are able to articulate one here, we see no reason why this request should be entertained at this stage.

**Request Nos. 12-13:** These requests are overbroad and unduly burdensome. There is no authority supporting the idea that Google must scour its records to identify every single

employee it has with any "knowledge of the alleged Google conduct" specified over eighty pages in Plaintiffs Amended Complaint, ranging from Google's history as a company, its development of privacy practices, its past litigations concerning privacy issues, several of its products, its third-party partners, and various engineering efforts. Though Plaintiffs are free to allege any fact they desire in a complaint, that does not render the entire universe of Google's knowledge relevant to the claims actually pleaded. These requests are not tailored to the claims and defenses in this case.

Google has provided information in its initial disclosures, and it has agreed to produce information sufficient to identify managerial employees with responsibility for WAA and GA for Firebase who are likely to have significant relevant knowledge related to the claims and defenses in the case. These are the individuals who are likely to become custodians in this case—the reason you've provided for propounding these requests. There is little likelihood that a C-suite officer or employee will be a custodian in this case, and likewise little likelihood that employees with limited responsibility or exposure to the alleged conduct will be custodians. Of course, this is a separate issue to be negotiated, but for the moment it is premature.

**Request No. 14:** This request is overbroad. It seeks presentations to and from the most senior Google employees and officers discussing a wide range of topics: Firebase (a software development kit that encompasses far more than the narrow aspect challenged by this case), My Account (which encompasses virtually the entirety of a user's account settings and options on Google's platform), and Web & App Activity. This last feature is especially inappropriate because Plaintiffs' allegations concern what happens when a user *turns WAA off*. Plaintiffs claim that by turning it off, they believed Google would act in a certain way, and they allege that Google contravened that expectation by providing Google Analytics for Firebase to third party app developers. In light of this, what happens when WAA is turned on is necessarily irrelevant to Plaintiffs' claims.

In spite of this, and contrary to your letter's statement, Google has offered to produce documents responsive to this request that relate directly to Google Analytics for Firebase. Your letter does not address this proposed compromise, nor does it make a counter-proposal.

**Request No. 15:** This request is overbroad, too. It seeks, in effect, all documents relating to the addition of WAA to the Google platform. On our call, you explained that you believe such documents are relevant because you want to be able to show that Google intended for the WAA control to enable users to control the information Google saves in their account. Plaintiffs don't need every document that relates to WAA to show that; it says it right on the WAA webpage that that is its purpose. There is no dispute in this case about what WAA is or what it does when it's on, and to the extent Plaintiffs are at all confused about what WAA does when it's on, that can be cleared up with a targeted document production (which would consist primarily of public documents explaining WAA's functionality).

To the extent your argument is that Google should search and produce this wide-ranging set of documents in a quest for employee statements about WAA, that is meritless, speculative, and irrelevant. What may have been in the mind of a Google employee does not bear on Plaintiffs' claims; Plaintiffs haven't alleged fraud, nor could they. It's important to remember that, as

Plaintiffs seem bent on litigating this case like a fraud case. What Google said internally about WAA when it was adding it to the platform does not relate to the Wiretap Act, CIPA, CDAFA, or UCL claims, which focus on the technical aspects of what Google did and didn't do, and whether users provided consent. As for the two tort claims—intrusion upon seclusion and invasions of privacy—they do not make relevant Google's reason for adding *WAA*; this case is about the addition of Google Analytics for Firebase, not WAA, to Google's platform. And those tort claims may not survive the motion to dismiss, anyway.

Finally, this case is about what happens when WAA is turned off—that is, it isn't about WAA at all, other than the reasonable expectations of a user when reading public disclosures about WAA.

**Request No. 16:** This request is grossly overbroad; it seeks:

> Documents concerning each change Google has made, is making, has considered, or is considering with respect to its privacy and data-collection disclosures and practices in connection with, separately, Firebase and Web & App Activity, and Google's reason(s) for each change.

The breathtaking scope of this request is completely out of proportion to any hoped-for relevant information it could generate. There is no reason to think any of the changes Google has made to WAA and Firebase have anything to do with Plaintiffs' claims at all. At a minimum, Plaintiffs should defer this RFP until they understand these features better, so they can tailor this request to information that matters. But, in response to other requests, Google will be producing historical disclosures concerning relevant aspects of GA for Firebase. Finally, the aspect of this request focused on "reasons" is compound and unduly burdensome to respond to.

**Request No. 17:** This request seeks: "Documents discussing, analyzing, or evaluating any of the rights and claims asserted in this lawsuit." We have inquired of our client if any such documents exist that are not also privileged. Neither we nor our client are aware of any, though it is always possible that some of Google's 100,000 employees have discussed this case in a non-privileged setting; the value to this case of determining whether that has occurred would be completely outweighed by the burden involved in such a wild goose chase.

That said, if we become aware that any of the custodians or non-custodial sources in this case possess responsive documents, and those documents are not privileged, we will produce them. Google will not, however, independently search for such documents from any custodians or non-custodial sources that would not otherwise have been searched in response to another document request.

**Request No. 18:** We have not received your clients' Google Account IDs and/or e-mail addresses, so this request remains stalled.

**Request No. 19:** Your letter does not seek responsive documents; instead it asks whether Google is aware of any auto-deletion of relevant evidence.

We have investigated your question and have determined that Google is not engaging in the automatic destruction of relevant evidence. That said, Plaintiffs cannot claim that every scrap of data about every potential class member (encompassed by a class definition that has not been approved by any court and that has many flaws of its own) should be subject to ESI preservation, and that Google should in effect put those users' data at risk by not deleting it just in case Plaintiffs seek to discover it. Indeed, it escapes us why Plaintiffs would want the literal data Google has on every potential class member in a case that is about the rights of those users to keep their information private. This case is about Google's practices across users; the actual data that Google received—as alleged, information about which articles particular people read—cannot possibly bear on the viability of Plaintiffs' claims or Google's defenses.

This request is additionally complicated by Google's own privacy policies, which would bar it from simply handing over the private information of its users. Again, there is an important distinction between data explaining what and how Google receives from app developers through Firebase and the actual data Google received for particular people at a particular time.

We are open to discussing this issue further in the context of the ESI Order. We expect we can reach a common understanding here, but as you can understand, the maximal version of your letter's request implies that Google must freeze in place troves of data that otherwise would be deleted for the protection of the users themselves for no perceptible benefit.

**Request No. 20:** Here again, we asked during the call that you identify any element of any cause of action or defense to which it is relevant Google's profits from the acquisition of Firebase, its reasons for acquiring Firebase, or the documents that make up the acquisition itself. The only element you identified was damages for your UCL claim, but the UCL does not authorize damages—only restitution, and here Plaintiffs have not paid to Google anything, so restitution is unavailable. To be sure, regardless of anything else, the UCL does not authorize non-restitutionary disgorgement, such as a defendant's profits. You declined to identify any other element during our call, and your letter does not provide any clarification.

Your letter abandons the UCL as a justification for this request and relies instead on an inchoate request for disgorgement under the CDAFA and intrusion-upon-seclusion claims. The CDAFA claim is a statutory claim, and we see no reference in the statute to disgorgement. Please clarify. As for the tort claim, in California, privacy tort damages constitutes damages for mental suffering or anguish. *See Miller v. Nat'l Broad. Co.*, 187 Cal. App. 3d 1463, 1485 (Ct. App. 1986) ("substantial damages for mental anguish alone may be recovered"); Cal. Prac. Guide Privacy Law Ch. 2-B § 2:360. If you are aware of any contrary authority, please point it out to us; we couldn't find any case blessing the recovery of a defendant's profits for intrusion upon seclusion, nor would such a linkage make sense, as pointed out by California cases limiting damages in such cases to mental suffering damages.

Although Plaintiffs have thus far failed to identify any element of any claim or defense to which this type of financial information is relevant, even if Plaintiffs were to assert a claim for which disgorgement of profits is a potential remedy, that still does not render this request appropriate. It is grossly out of proportion to Plaintiffs' identified purpose of identifying the value of Google Analytics for Firebase to Google. Without writing Plaintiffs' requests for them, we suggest there is undoubtedly a more targeted way for Plaintiffs to obtain what they

seek—a single number to wave before a jury in an ask for damages—without forcing Google to scour the universe for any document related to the Firebase SDK writ large.

**Objections:** Your letter asks for a response to your November 18th letter's discussion of Google's objections, but it provides no further clarity, and we are unsure what you are asking. We did not discuss this issue during our call. Please clarify.

**Rolling Production:** As you know, we have begun rolling productions. Your letter misquotes Ms. Agnolucci. She said Google would begin producing documents keeping in mind the holidays and bureaucratic constraints. In general, we do not appreciate your inclusion of quotation marks around phrases that are not actually direct quotes.

Sincerely,

Eduardo E. Santacana