# EXHIBIT D

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4    ANIBAL RODRIGUEZ, JULIEANNA        )
      MUNIZ, ELIZA CAMBAY, SAL           ) Case No.:
 5    CATALDO, EMIR GOENAGA, JULIAN      ) 3:20-cv-04688
      SANTIAGO, HAROLD NYANJOM, KELLIE   )
 6    NYANJOM, and SUSAN LYNN HARVEY,    )
      individually and on behalf of all  )
 7    others similarly situated,         )
                                         )
 8                    Plaintiffs,        )
          vs.                            )
 9                                       )
      GOOGLE LLC,                        )
10                                       )
                      Defendant.         )
11    ----------------------------------)
12
13
14       ***HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY***
15                REMOTE PROCEEDINGS OF THE
16      VIDEOTAPED DEPOSITION OF CHRISTOPHER RUEMMLER
17                FRIDAY, SEPTEMBER 9, 2022
18
19
20
21
22
23    REPORTED BY NANCY J. MARTIN
24    CSR. NO. 9042, RMR, RPR
25    PAGES 1-235
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      BY MR. FRAWLEY:

2          Q.   Who is David Monsees?

3          A.   David Monsees works on WAA.

4          Q.   At this time, in July 2019, did you work with

5      Mr. Monsees on a regular basis?

6          A.   No.

7          Q.   Prior to this E-mail exchange in July 2019,

8      had you ever spoke- -- had you ever communicated with

9      Mr. Monsees before?

10         A.   I can't recall.  I don't know.

11         Q.   That was a bad question.  Prior -- at this

12     point in time, in July 2019, did you speak with

13     Mr. Monsees on a regular basis about work?

14         A.   In 2019?

15         Q.   Yes.

16         A.   Well, I mean "regular basis" is kind of

17     vague.  So I don't -- you know, he's not -- I work on

18     Gmail.  I work on Workspace.  So on a regular basis,

19     I'd have to say no because I wasn't probably -- you

20     know, I'm working on my own area; right?

21         Q.   And at any point since you've been at Google,

22     have you been -- let me restart this.

23              At any point since you've been at Google,

24     have you ever communicated with Mr. Monsees on a

25     regular basis about work?

                                            Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    testimony and the document.

2           THE WITNESS:   Yeah.   So I can only, you

3    know -- you know, it's back in 2019.   But like I said,

4    I work in Workspace.   Everything is GAIA tied.   So if

5    it's not GAIA tied, it's not there; right?   There's no

6    notion of something other than GAIA tied.   That's just

7    my background.

8    BY MR. FRAWLEY:

9        Q.   Sorry.   I don't believe that answered my

10   question.   So my question was -- and I'll read it

11   again.

12       A.   Uh-huh.

13       Q.   Why, in July 2019, did you think that if WAA

14   was off, that none of this data in Exhibit 7 would be

15   sent to Google?

16          MR. SANTACANA:   Objection.   Misstates prior

17   testimony and the document.   Vague.

18          THE WITNESS:   Yeah, because my background is

19   GAIA-tied data.   So I probably had the impression back

20   then that when WAA is on, it's associated with a

21   particular user in My Activity and when WAA is off,

22   well, there's no association anymore because you can't

23   GAIA tie it anymore to save it, so there's no data

24   being sent; right?   But I don't believe that's the way

25   it works.   Again, I don't work in WAA.

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MR. FRAWLEY:

 2        Q.  So -- sorry.  Right now you don't believe

 3    that's the way it works.  Fair?

 4        A.  Right now, after gaining more knowledge, I

 5    believe there's other mechanisms used to store the

 6    data at Google anonymously.

 7        Q.  What do you mean by "anonymously"?

 8        A.  Not tied to a GAIA ID.

 9        Q.  When you say storing the data at Google, what

10    do you mean by "at Google"?

11        A.  On Google infrastructure.

12        Q.  So which -- well, can you give me examples of

13    Google infrastructure?

14        A.  Spanner was one.

15        Q.  So fair to say that WAA off data is stored in

16    Spanner?

17        A.  I don't know exactly where it's stored.

18            MR. SANTACANA:  Yeah.  Lacks foundation.

19            THE WITNESS:  I don't work in the WAA group.

20    BY MR. FRAWLEY:

21        Q.  So you don't know where, within Google, WAA

22    off data is stored.  Is that fair?

23        A.  You know, I couldn't give you a solid answer

24    there because I don't work in the WAA team.

25        Q.  You said you can't give me a solid answer.
```

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Q.   What does it mean to choose not to store data

2    in my account?

3      A.   My account is GAIA-tied data.   So whenever I

4    refer to my account, it's always GAIA-tied data;

5    right?

6      Q.   And how would someone choose for data to be

7    GAIA tied, as opposed to not GAIA tied?

8      A.   Well, if you're logged in --

9           MR. SANTACANA:   Sorry.   Objection.   Calls for

10   speculation.   Lacks foundation.   Vague and ambiguous.

11          THE WITNESS:   Can you repeat the question

12   again.

13   BY MR. FRAWLEY:

14     Q.   Yes.   I don't know if it's going to be the

15   exact, same question, but I'm going to try to ask the

16   same question.

17     A.   Okay.

18     Q.   How would someone choose to make the data

19   GAIA tied, as opposed to not GAIA tied?

20          MR. SANTACANA:   Same objections.

21          THE WITNESS:   Okay.   I'm not sure if they can

22   choose or not, but if you're logged in, then we know

23   your GAIA identify and we can GAIA tie data, but like

24   there may be cases where it's not GAIA tied either.

25   BY MR. FRAWLEY:

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Q.  And when you wrote --

2      A.  -- tied to --

3      Q.  Sorry.  I'm so sorry.  Are you finished with

4   the answer?  I don't want to interrupt.

5      A.  Yeah.

6      Q.  When you wrote "my account," is that just

7   like another way of saying My Activity?

8      A.  When I say "my account," that means like my

9   Google account or my -- you know, associated with my

10  GAIA ID.

11     Q.  And when someone is not logged into Google,

12  does Google have access to that data?

13          MR. SANTACANA:  Objection.  Vague and

14  ambiguous.  Calls for speculation.

15          THE WITNESS:  I don't know what you mean by

16  "that data."  I'm not quite sure of the question.  Can

17  you rephrase your question?

18  BY MR. FRAWLEY:

19     Q.  Sure.  Does Google ever receive logged-out

20  data?

21          MR. SANTACANA:  Objection.  Lacks foundation.

22  Vague and ambiguous.

23          THE WITNESS:  Again, I work on Workspace.  So

24  in Gmail, even Gmail I don't know for sure because

25  Gmail is huge in itself; right?  But the primary

Page 101

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        A.  Yeah.

2        Q.  Why was that really bad?

3        A.  I have to figure out what this is.  Okay.

4    I'm not sure what I mean by "or any of the other

5    controls."

6            I have to read after, "This is really bad."

7            (The witness reviewed the document.)

8            THE WITNESS:  This all appears to be, you

9    know, thinking that the data is GAIA tied, because as

10   you can see, after I said, "This is really bad," I

11   talk about storing data that the user does not have

12   access to.  And you can't store GAIA-tied data that

13   the user can't, you know, control basically -- right?

14   -- that they've given to you.

15   BY MR. FRAWLEY:

16       Q.  So I'm just trying to understand what you

17   meant by that.  Are you saying that your understanding

18   at this time was that WAA off data was still being

19   GAIA tied?

20       A.  That's my understanding -- or

21   misunderstanding maybe.  Yeah, because I would write

22   that only in the case of the GAIA-tied data because

23   it's very bad in general -- you know, it's bad to have

24   data that's GAIA tied that the user gave you and they

25   have no way of deleting it because it's tied to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    their -- you know, it's tied to them.

2        Q.  So when you wrote in the next sentence, "If

3    we are storing data that the user does not have access

4    to, we need to be clear about that fact," you were

5    only thinking about GAIA-tied data when you wrote

6    that?

7        A.  Again, it's three years ago, but that would

8    be a big concern, yeah, GAIA-tied data not being --

9    you know, that the user doesn't have access to, they

10   submitted; right?

11       Q.  So you thought that even after a user turned

12   WAA off, that Google was still tying the data to GAIA?

13   That was your concern?

14       A.  I believe back in that time, yes, that was

15   the concern based -- reading this E-mail right here,

16   because again, like I said, I work in Workspace.

17   Everything is GAIA tied.  So it felt like when WAA was

18   off, the data was still being GAIA tied.

19       Q.  What was your basis for thinking that the

20   data was still being GAIA tied?

21       A.  I'm not sure because I hadn't looked at any

22   logs or anything like that.  But reading what's

23   written here, again, it's three -- you know, 2019, it

24   looks like it was -- that was what I was coming to.

25   Based on that -- if we were storing data the user does

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    not have access to, that's really bad in my opinion;

2    right?  Coming from the Gmail standpoint, if we

3    receive messages in Gmail and it's tied to the user

4    and we never show it to the user, we never give the

5    user the ability to view it but we keep it, that's not

6    good.

7        Q.  Can you look at the last page of Exhibit 6.

8        A.  Yep.

9        Q.  And we were looking at this paragraph

10   earlier, but do you see the paragraph that begins,

11   "The temp GAIA log in"?

12       A.  The paragraph that begins what?

13       Q.  "The temp GAIA log in."

14       A.  Yes, I see that.  "The temp GAIA log in,"

15   yes.

16       Q.  In the middle of that paragraph, do you see

17   where you wrote, "We still would need to modify the

18   help article above to indicate that WAA off is

19   identical to being not logged into your account (data

20   logged, but not tied to your account)"?

21       A.  Okay.  I'm reading this.

22           (The witness reviewed the document.)

23           THE WITNESS:  Okay.  I see that sentence,

24   yeah.  There's a bunch of stuff around it, yeah.

25   BY MR. FRAWLEY:

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          Q.  Got it.  Okay.

2          A.  -- or what I was commenting on; right?  So I

3     can't -- it's very hard to make any, you know,

4     statement because I don't know what's linked to what.

5          Q.  Do you see where you wrote, "An 'on/off'

6     toggle, it means the off state is the opposite of the

7     on state"?

8               I'm in Exhibit 11.

9          A.  In the comment?

10          Q.  Yeah, in the comment.  Yeah.

11          A.  Right.  This still seems like GAIA-tied

12     stuff; right?

13          Q.  Where did you say something about GAIA-tied

14     stuff in this comment?

15          A.  Well, it says later, "If the on state is we

16     log your activity, the off state we don't log your

17     activity."

18               "The proposal is to temporarily log activity,

19     so something needs to change here."

20               So it seems like it's all about GAIA-tied

21     data still.

22          Q.  What specifically within comment 51 -- sorry.

23     Where specifically within comment 51 did you say this

24     is all about GAIA-tied data?

25          A.  I'm just telling you that's what the

                                        Page 134

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q.  And if a user were to click on that ad, they

2    might be brought to the Ford app?

3    A.  Yep.

4    Q.  And then I've never bought a car.  I imagine

5    people don't buy cars by clicking in an app, so maybe

6    this is a bad example.  But let's say that's how it

7    works, and let's say the user is in their Gmail.  They

8    see the ad for Ford.  They go to the Ford app, and

9    they say yep, good price, good car, click, buy,

10   deliver to me tomorrow.  Does that make sense?

11   A.  Yeah, what you're describing makes sense,

12   sure.

13   Q.  In that case, do you know whether or not

14   Google would track that conversion?

15   A.  I don't know how it's done.  I don't work on

16   the Ads team.  So somehow Google needs to get paid,

17   and somehow the money needs to come by -- you know,

18   from the person that got the, I guess, conversion;

19   right?  I don't know how that's done.

20   Q.  Now, you say you don't know how it's done,

21   but fair to say that it is done, that Google is

22   tracking conversions in that kind of example?

23   A.  Again, I don't work on the Ads team, so I

24   don't know how they make their revenue.  But just as a

25   layperson, like somehow if I'm Ford and Google is

Page 227

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    charging me money for ads, I want to make sure that

2    like people are visiting my site before I pay Google

3    money for ads; right?   You know, there's got to be

4    some sort of way to do this.

5         Q.   Were you at any point using WAA-off data to

6    measure anything for Gmail?

7         A.   WAA what?

8              MR. SANTACANA:   Objection.   Vague and

9    ambiguous.

10   BY MR. FRAWLEY:

11        Q.   Were you at any point using WAA-off data to

12   measure anything for Gmail?

13        A.   Not that I know of.   Gmail is GAIA-tied

14   access, logged-in access-type stuff.

15        Q.   Were you at any point using WAA-off data to

16   measure anything for Workspace?

17        A.   Not that I know of.

18        Q.   When we were discussing that example a moment

19   ago of going from the Gmail app to the Ford app and

20   buying a car, do you recall that discussion?

21        A.   Uh-huh.

22        Q.   Now, would Google's ability to track the

23   conversion hinge on whether or not the user had WAA on

24   or off?

25        A.   I don't know.   I don't work on the Ads team,

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    but I would suspect not.  But, like, I don't know.

2         Q.  Who would you recommend that I ask at Google

3    to get the correct answer to that question?

4         A.  Someone in the Ads team.

5         Q.  Anyone come to mind off the top of your head?

6         A.  No, not really.  Teams move -- you know, I

7    had one engineering contact at one point but no

8    longer.

9              MR. FRAWLEY:  Okay.  Mr. Ruemmler, I don't

10   have any further questions for you at this time.  But

11   if your counsel has any questions, then I might have

12   questions about that.

13             MR. SANTACANA:  I don't have any questions.

14             MR. FRAWLEY:  Okay.  We can go off the record

15   then.

16             THE VIDEOGRAPHER:  If there's nothing

17   further, we are off the record at 5:02 p.m. Pacific

18   daylight time.  This concludes today's testimony given

19   by Chris Ruemmler.  The total number of media units

20   used was seven and will be retained by Veritext Legal

21   Solutions.

22             MR. SANTACANA:  We're going to designate this

23   highly confidential.  We have a period of time to make

24   some more specific designations under the protective

25   order, but please make sure there's a "Highly

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              C E R T I F I C A T E

 2         I do hereby certify that the aforesaid testimony

 3    was taken before me, pursuant to notice, at the time

 4    and place indicated; that said deponent was by me duly

 5    sworn to tell the truth, the whole truth, and nothing

 6    but the truth; that the testimony of said deponent was

 7    correctly recorded in machine shorthand by me and

 8    thereafter transcribed under my supervision with

 9    computer-aided transcription; that the deposition is a

10    true and correct record of the testimony given by the

11    witness; and that I am neither of counsel nor kin to

12    any party in said action, nor interested in the

13    outcome thereof.

14

15

             Nancy J. Martin, RMR, CSR

16

17    Dated:  September 15, 2022

18

19

20

21    (The foregoing certification of this transcript does

22    not apply to any reproduction of the same by any

23    means, unless under the direct control and/or

24    supervision of the certifying shorthand reporter.)

25
```

Page 231