# Exhibit 1



September 16, 2024

Eduardo Santacana, Esq.
Willkie Farr & Gallagher LLP
333 Bush Street, 34th Floor
San Francisco, CA 94104

Counsel,

I write concerning Plaintiffs' forthcoming supplemental damages report and certain related issues.

As you know, we plan to serve a supplemental report from Mr. Lasinski after the close of the class period. *See* Dkt. 363 (January 25, 2024 CMC Statement describing this plan and Google's ability to serve a responsive report). As reflected in the Court-approved class notice materials, the class period will end on the same day the class notice period begins. *See* Dkt. 370-3; Dkt. 413 (requiring the notice period to commence no later than September 23, 2024).

Given that the class period remains ongoing, we were surprised to receive the recent productions from Google (GOOG-RDGZ-02111187-91). Google produced four spreadsheets on August 12, 2024, and an additional spreadsheet on August 20, 2024. At a minimum, these spreadsheets will need to be updated once more after the class period concludes.

Please let us know when you are available to meet and confer regarding these spreadsheets, so the parties can resolve certain issues before Google updates these spreadsheets. To facilitate this meet and confer, we have prepared the attached Appendix, which contains questions about each of the spreadsheets.

We would also like to discuss next steps for Google's production of a sample of data collected by Google from users via the at-issue Google Firebase and GMA SDKs. As you know, Plaintiffs previously moved to compel Google to preserve all at-issue data stored within its logs. Dkt. 166. In denying that motion, Magistrate Judge Tse recommended a "sampling" approach to Google's production of data. Dkt. 185. But during the discovery period, Google objected to producing a sample of data, including on the ground that no class had been certified. For example, RFP 109 sought "activity data collected by Google during the Class Period for a sample of 5,000 individuals." Google objected, including on

Eduardo Santacana
September 16, 2024
Page 2

the ground that "this request is premature to the extent it seeks contact information for members of a *purported* class." (emphasis added).[1]

Now that the Court has certified a class (Dkt. 352) and "clarified" the scope of that class (Dkt. 384), the parties should revisit their discussions about Google's production of a data sample. This request is relevant to, among other issues, quantifying Plaintiffs' actual damages. While Mr. Lasinski in his initial report quantified actual damages by applying a one-time $3 payment for every class member device, he also made it clear that this calculation was conservative, including because Google had not yet provided information as requested by Plaintiffs.

To facilitate our discussion during the meet and confer, we are proposing one approach to providing a representative data sample. Our proposal is that Google randomly select a representative sample of Android and iOS device identifiers (e.g., ADID, IDFA) from Google's data sources within the previous 30 days. We propose a sample of 5,000 active sWAA-off devices from United States users through which Google has collected data using any means (e.g., sWAA/WAA bits = off, Show My History = off, or another similar field or bit, with U.S.-IP addresses). We ask that Google then produce all GA4F and GMA (AdMob and Ad Manager) data saved by Google associated with these 5,000 devices within the previous 90 days. The parties would agree to treat this sample as representative of what Google saves for GA4F and GMA, but we are open to another (not insubstantial) population size using device identifiers being treated as representative.

Our goal here is to ensure a fair and accurate presentation of the evidence. We look forward to discussing these issues with you and any ideas you have for next steps.

Plaintiffs reserve all rights, including their right to seek to preclude Google from relying on any newly produced information and to seek relief from the Court in connection with any disputes.

---

[1] Google raised the same objection in response to similar discovery requests. For example, RFP 19 sought "documents concerning Google's collection of data while users have Web & App Activity turned off." Google objected, including on the ground that "the Request is premature because a class has not been certified in this Action." Similarly, RFP 67 sought "documents sufficient to identify all data collected during the Class Period while users had Web & App Activity turned off, including data identifying the user, and the type of data collected, and the number of occasions when each data type was collected." Google again objected, including on the ground that "this Request is premature because a class has not been certified in this Action." RFP 69 requested "documents sufficient to identify, by month during the Class Period, the number of users for which Google collected data while users had Web & App Activity turned off." Google once again objected, including on the ground that "this Request is premature because a class has not been certified in this Action."

Eduardo Santacana
September 16, 2024
Page 3

Regards,

Mark C. Mao

Eduardo Santacana
September 16, 2024
Page 4

**Appendix**

GOOG-RDGZ-02111187

1. The "WAA" and "sWAA" worksheets state "US Consumer + Enterprise" at the top. Does "Consumer" include so-called "unicorn" accounts (for kids)?

2. The "WAA" and "sWAA" worksheets include separate calculations for July 27, 2016 through July 27, 2020 and July 28, 2020 through July 5, 2024. Why did Google present these calculations separately, for these two separate periods?

3. Your labels regarding the percentage of accounts that "ever" turned off WAA or sWAA in GOOG-RDGZ-02111187 during the later period (2020 through 2024) contradict other productions Google has already made. For example, the terms used in GOOG-RDGZ-02111187 suggest that the percentage of accounts that "ever" turned sWAA off during the four-year period 2020 through 2024 (21.9%) is somehow lower than every monthly indicator of the percentage of Active Accounts with sWAA off during the same four-year period as presented in GOOG-RDGZ-02111191. Is it correct that those are just accounts that turned WAA or sWAA off during that later time period and not "ever"? Or is GOOG-RDGZ-02111187 showing something else?

4. The spreadsheet represents that the WAA data was queried on July 12, 2024, with the MagicEye database, but there is no similar representation in the sWAA worksheet except the note that there was some measurement as of July 28, 2024. What additional information can you provide regarding the sWAA query?

GOOG-RDGZ-02111188

5. Those prior spreadsheets (GOOG-RDGZ-00187666 and GOOG-RDGZ-00187665) included additional details. Why did you include less information with this spreadsheet?

6. If requested, would Google agree to produce the "P&L 2024 V6" identified as the "Source" of the information contained in this spreadsheet?

7. The spreadsheet states "Privileged and Confidential" at the top. Is Google asserting privilege for this document?

8. We assume this spreadsheet reflects global data. Does Google have any process by which it calculates a portion attributable to the United States? Does Google maintain similar P&Ls that break these consolidated numbers down by country or region?

Eduardo Santacana
September 16, 2024
Page 5

9. Alphabet's 2022 Form 10-K represented that "Google Network revenues increased $1.1 billion from 2021 to 2022" and that was "primarily driven by strength in AdSense and AdMob" – but this spreadsheet suggests that Google's AdMob revenues declined from 2021 to 2022. Please explain.

10. Alphabet's 2022 Form 10-K represented that the "TAC rate on Google Network revenues" was "substantially consistent from 2021 to 2022" – but this spreadsheet suggests that AdMob's TAC rate increased from 67% in 2021 to 80% in 2022 (a 20% increase). Please explain.

GOOG-RDGZ-02111189

11. Who was involved with the preparation of this spreadsheet (which appears to be related to GOOG-RDGZ-00185743)?

12. That prior spreadsheet (GOOG-RDGZ-00185743) did not include the details in this spreadsheet. Please explain.

GOOG-RDGZ-02111190

13. Are these numbers global or US-only?

GOOG-RDGZ-02111191

14. This file presents revised data regarding the number and percentage of monthly "Created Accounts" (columns B through F) with WAA and sWAA enabled since May 2016, but Google elected to omit presentation of revised monthly data for "Active Accounts" (columns G through L) and accounts "Created or active since start of period" (columns M through Q) for the period May 2016 through April 2020. Please explain the omission of this data for these account categories.

15. If requested, would Google be willing to produce comprehensive information for the number and percentage of monthly "Created Accounts," "Active Accounts," and accounts "Created or active since start of period" with WAA and sWAA enabled, including "Dashers" and "Supervised Accounts, including unicorns," for the period May 2016 through July 2024?

16. A comparison of the data presented in GOOG-RDGZ-02111191 and GOOG-RDGZ-00204475 for the overlapping period May 2020 through October 2022 indicates that the magnitude of monthly "Active Accounts" is consistently higher in GOOG-RDGZ-02111191, while the magnitude of monthly "Active Accounts" with WAA- and sWAA-enabled is consistently lower in GOOG-RDGZ-02111191. Please explain how the number of monthly "Active Accounts" with WAA- and sWAA-enabled could be lower than that presented in GOOG-RDGZ-00204475,

Eduardo Santacana
September 16, 2024
Page 6

given that the total number of accounts has increased with the addition of "Dashers" and "Supervised Accounts, including unicorns."