# EXHIBIT A

# Redacted Version of

# Document Sought to be Sealed

# EXHIBIT 1

**BOIES SCHILLER FLEXNER LLP**
David Boies (admitted pro hac vice)
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
dboies@bsfllp.com

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
~~Erika Nyborg-Burch, CA Bar No. 342125~~
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com
~~enyborg-burch@bsfllp.com~~

James Lee (admitted pro hac vice)
Rossana Baeza (admitted pro hac vice)
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Alison L. Anderson, CA Bar No. 275334
725 S Figueroa St., 31st Floor
Los Angeles, CA 90017
Tel.: (213) 995-5720
alanderson@bsfllp.com

**SUSMAN GODFREY L.L.P.**
Bill Carmody (admitted pro hac vice)
Shawn J. Rabin (admitted pro hac vice)
Steven M. Shepard (admitted pro hac vice)
Alexander Frawley (admitted pro hac vice)
~~1301 Avenue of the Americas, 32nd~~One
Manhattan West, 50th Floor
New York, NY ~~10019~~10001
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: (310) 789-3100
abonn@susmangodfrey.com

**MORGAN & MORGAN**
John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com

Michael F. Ram, CA Bar No. 104805
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913
mram@forthepeople.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIBAL RODRIGUEZ, SAL CATALDO, JULIAN SANTIAGO, and SUSAN LYNN HARVEY individually and on behalf of all other similarly situated, <br><br> Plaintiffs, <br><br>    v. <br><br> GOOGLE LLC, <br><br> Defendant. | CASE NO.: 3:20-cv-04688-RS <br><br> **PLAINTIFFS' ~~SECOND~~THIRD AMENDED RULE 26 DISCLOSURES** |

Plaintiffs amend their initial disclosures per Federal Rule of Civil Procedure 26(a)(1).

## I.    NAMES AND ADDRESSES OF INDIVIDUALS LIKELY TO POSSESS DISCOVERABLE INFORMATION

The following individuals and/or entities may possess discoverable information that Plaintiffs may use to support their claims. Documents and information identifying additional witnesses are in the possession and control of Defendant Google LLC ("Google") and non-parties to this litigation. Plaintiffs reserve the right to supplement or amend these lists as discovery proceeds. **For purposes of trial, without limiting the set of individuals they will call (including individuals identified below), Plaintiffs expressly reserve the right to call as a trial witness any individual who was deposed in connection with this action, all Google document custodians and individuals associated with the documents produced by Google (including authors of those documents), plus if necessary one or more Google records custodians to authenticate and admit documents produced by Google in this litigation.**

### A.    Plaintiffs

Plaintiff Anibal Rodriguez has knowledge about his use of mobile apps and Google Search and his effort to turn off Google's "Web & App Activity" tracking. Plaintiff Rodriguez may only be contacted through counsel, but pursuant to the Stipulated Protective Order, ECF No. 70, provides his CONFIDENTIAL contact information as follows:



Plaintiff Julian Santiago has knowledge about his use of mobile apps and Google Search and his effort to turn off Google's "Web & App Activity" tracking. Plaintiff Santiago may only be contacted through counsel, but pursuant to the Stipulated Protective Order, ECF No. 70, provides his CONFIDENTIAL contact information as follows:



Plaintiff Susan Lynn Harvey has knowledge about her use of mobile apps and Google Search and her effort to turn off Google's "Web & App Activity" tracking. Plaintiff Harvey may only be contacted through counsel, but pursuant to the Stipulated Protective Order, ECF No. 70, provides her CONFIDENTIAL contact information as follows:



Plaintiff Sal Cataldo has knowledge about his use of mobile apps and Google Search and his effort to turn off Google's "Web & App Activity" tracking. Plaintiff Cataldo may only be contacted through counsel, but pursuant to the Stipulated Protective Order, ECF No. 70, provides his CONFIDENTIAL contact information as follows:



**B.    Current or Former Employees of Google and Non-Parties**

Current or former Google employees with knowledge of its privacy disclosures, Firebase SDK, use of data intercepted/collected by Google when users have turned off "Web & App Activity" tracking, financial information and revenues attributable to the use of any user data by Google, and any knowledge of the following categories of documents:

- Google's disclosures and policies relating to the data it collects directly and indirectly on consumers, particularly with regard to data collected on consumers who have turned off "Web & App Activity" tracking.

- Google's logs relating to the data it collects directly and indirectly on consumers, particularly with regard to data collected on consumers who have turned off "Web & App Activity" tracking.

2

- Google's internal documents relating to consumers' control over how their data is collected, used, shared, and disposed.

- Google's internal documents relating to transparency about how consumers' data is collected, used, shared, and disposed.

- Google's written representations to and agreements with websites, web publishers, web applications, and mobile app publishers that use Google services, including but not limited to what data Google collects and how Google complies with laws and regulations regarding the collection of data.

- Google's technical documents relating to how its technologies and services work with consumer data that it collects directly and indirectly, particularly with regard to data collected while consumers have turned off "Web & App Activity" tracking.

- Google's documents concerning its acquisition of Firebase and technical documents relating to Firebase SDK.

- Google's technical documents relating to how to track individual consumers, their devices, and their locations.

- Google's responses and document productions to regulators, including without limitation the U.S. Federal Trade Commission (FTC) and Department of Justice (DoJ), the Arizona Attorney General, the California Attorney General, European data protection authorities, and the Australian Competition & Consumer Commission (ACCC), relating to Google's disclosures and data collection practices between at least 2011 and the present.

- Google's assurances, at any time, to not merge first- and third-party data and services.

- Google's compliance and audit documents relating to its efforts and/or failures to comply with the Google-FTC Consent Decree of 2011, relating to Google's Buzz Social Network.

- Google's external and internal documents relating to how Google attempted to comply and/or complied with the California Consumer Privacy Act (CCPA), Europe's General Data Privacy Regulation (GDPR), and similar legislation.

- Google's external and internal documents relating to how Google lobbied for or against bills and proposed laws in the United States similar to or based on the California Consumer Privacy Act (CCPA).

- Google's external and internal documents relating to any new privacy features Google has released or is releasing with regard to opting out of web and app activity tracking, and Google Analytics.

- Google's sales documents relating to its profits from Google Analytics (and legacy products that was eventually merged into Google Analytics) that may relate to how Google profited from the allegations at issue in the Complaint.

- Google's sales documents relating to its profits from Google Ad Manager (and legacy products that was eventually merged into Google Ad Manager) that may relate to how Google profited from the allegations at issue in the Complaint.

- Google's documents showing how Google improved its Google products and services (including but not limited to Search, Google Analytics, and Google Ad Manager) based on data Google obtained relating to the allegations at issue in the Complaint.

- All ways in which Google has benefited from the unlawful conduct alleged in this lawsuit, including without limitation advertising revenues.

Additionally, Plaintiffs have identified, through investigation and review of discovery, that the following current and former Google employees may have knowledge or information relevant to this case, including the following topics and topics addressed during their depositions:

David Monsees: Mr. Monsees is a Product Manager at Google, and Plaintiffs reasonably expect him to testify to his familiarity with the Web & App Activity controls, including WAA, sWAA, sWAAdl, and their functionality (including the datatypes controlled thereby); the disclosures that Google provides to consumers concerning Web & App Activity controls; how Google logs and tracks activity when these controls are enabled and disabled (including the associated identifiers); uniform user confusion related to Web & App Activity controls; and how Google uses this data (both when enabled and disabled).

Edward Weng: Mr. Weng was a Product Manager at Google, and Plaintiffs reasonably expect him to testify to his familiarity with the Web & App Activity controls, including WAA, sWAA, sWAAdl, and their functionality (including the datatypes controlled thereby); the disclosures that Google provides to consumers concerning Web & App Activity controls; how Google logs and tracks activity when these controls are enabled and disabled (including the

4

associated identifiers); uniform user confusion related to Web & App Activity controls; and how Google uses this data (both when enabled and disabled).

Chris Ruemmler: Mr. Ruemmler is a Senior Staff Software Engineer at Google, and Plaintiffs reasonably expect him to testify to his familiarity with the Web & App Activity controls, including WAA and sWAA, and their functionality (including the datatypes controlled thereby); the disclosures that Google provides to consumers concerning Web & App Activity controls; how Google logs and tracks activity when these controls are enabled and disabled (including the associated identifiers); uniform user confusion related to Web & App Activity controls; and how Google uses this data (both when enabled and disabled).

Greg Fair: Greg Fair was a Product Manager at Google, and Plaintiffs reasonably expect him to testify to his familiarity with the Web & App Activity controls, including WAA and sWAA, and their functionality (including the datatypes controlled thereby); the disclosures that Google provides to consumers concerning Web & App Activity controls and how Google has studied consumers' uniform confusion related to Web & App Activity controls; Google's efforts to study the financial impacts of Web & App Activity controls on Google's revenue and profits; and how Google logs and tracks Web & App Activity data, including by use of dashboards.

Eric Miraglia: Mr. Miraglia is a Senior Director of Product Management at Google, and Plaintiffs reasonably expect him to testify to his familiarity with the Web & App Activity controls, including WAA and sWAA, and their functionality (including the datatypes controlled thereby); the disclosures that Google provides to consumers concerning Web & App Activity controls; how Google deployed promises it did not intend to keep with its Narnia program to manufacture consent for its unauthorized collection practices of WAA-off data; how Google logs and tracks Web &

App Activity data, including by use of dashboards; and user confusion related to Web & App Activity controls.

Steve Ganem: Mr. Ganem is a Group Product Manager at Google, and Plaintiffs reasonably expect him to testify to his familiarity with the Web & App Activity controls, including WAA and sWAA and their functionality (including the datatypes controlled thereby); the disclosures that Google provides to consumers concerning Web & App Activity controls; how Google uses Web & App Activity data, including for ad targeting and personalization; the ways in which Google logs and tracks Web & App Activity data, including when those controls are enabled and disabled; how captured Web & App Activity data is stored and how long that data is retained; and how captured Web & App Activity data may be joined to specific devices and Google accounts and used to identify users.

Dan Stone: Mr. Stone is a former Group Product Manager at Google, and Plaintiffs reasonably expect him to testify concerning the technical functioning of Google Analytics for Firebase, the flow of app activity data Google collects using Google Analytics for Firebase, Google's use of data ~~it~~**Google** collects using Google Analytics for Firebase, the relationship between Google Analytics and Google's advertising products, and other topics addressed during his deposition.

Rahul Oak: Mr. Oak is a former Group Product Manager at Google, and Plaintiffs reasonably expect him to testify concerning the functioning of the Google Analytics for Firebase and Google Mobile Ads SDKs; how Google uses app activity data for purposes of advertising, conversion tracking, attribution, and development of Google's products and services; and other topics and documents addressed during his deposition.

Belinda Langner: Ms. Langner is a Director of Product Management for Google's App Ads business, and Plaintiffs reasonably expect her to testify concerning Google's use of app activity data for purposes of advertising, conversion tracking and attribution, and development of Google products and services, as well as the Rule 30(b)(6) topics for which she was designated as Google's corporate representative and other topics addressed during her deposition.

Sam Heft-Luthy: Mr. Heft-Luthy was a Product Manager in Google's Privacy & Data Protection Office. He was involved in creating a Google "Privacy Hub" to explain "what data Google collects from a given product, how it's used, and what mechanisms of controls users have over their data" including with WAA. GOOG-RDGZ-00014410. His work involved "research meta-analysis" and "a series of stakeholder interviews . . . with people working on privacy across Google." *Calhoun v. Google*, No. 20-cv-05146-YGR, ECF No. 871-3 (order with findings) ¶¶ 128, 140. Google asserts a consent defense, and internal Google documents relating to the "Pri***Na***e" project state that Google's consent approach was "out-of-step with user expectations and regulations" in a manner that "makes it difficult for people to understand how we use their data." *Id.* ¶ 141. Interview notes further acknowledge that Google had "gaps in how our system works and what we promise to people" such that "[u]sers don't know what is happening." *Id.* ¶ 142. Testimony by Mr. Heft-Luthy concerning these projects and admissions is clearly relevant to Plaintiffs' claims and Google's defenses.

Arne de Booij: Mr. de Booij is a Google User Experience Research Manager tasked with designing and overseeing studies of user preferences and views, including WAA. Through a limited 3.5 hours deposition of Mr. de Booij, Plaintiffs seek to develop testimony regarding these studies of users' understanding of WAA disclosures. Plaintiffs deposed Mr. de Booij's former manager Greg Fair, but Mr. Fair could not provide the more detailed testimony that Plaintiffs

anticipate from Mr. de Booij. Fair Rough Tr. 144:14-149:25 (declining to provide testimony). Plaintiffs also deposed the Founder of Google's Privacy and Data Protection Office, Eric Miraglia, who described Mr. de Booij as "the researcher who founded the Pinecone program" which oversaw one study that sought to determine why "users don't understand what WAA means." Miraglia Rough Tr. 174:7-175:21. Mr. Miraglia also explained that "I'm sure there have been many studies over the years that touched on" "what users would expect to happen when WAA is off," but he could not recall "specific studies." *Id.* 196:12-19. This case focuses on Google's WAA controls, and Plaintiffs should hear from the employee responsible for studying users' perceptions of WAA.

Xinyu Ye: Plaintiffs seek the testimony of Ye, a Software Engineer in Google's Privacy Working Group, to shed light on what data Google collects when WAA is off, where Google saves that WAA-off data, and how Google uses that WAA-off data. Ye has documents showing what percent of data is used by various Google products such as AdMob, GOOG-RDGZ-00180644, as well as documents demonstrating how Google uses Google Analytics and AdWords to convert data using "client ID." GOOG-RDGZ-00179824. Ye also has documents on how Google stores and uses data collected from users who switched off WAA as well as documents regarding "joinability risks" with respect to "link[ing] app events collected by GA4F to GAIA ID even if end users turn off WAA." GOOG-RDGZ-00033244; GOOG-RDGZ-00181801 ("ID joinability has been one of the biggest challenges in Google Analytics since introduction of Gaia IDs in GA");GOOG-RDGZ-00184488 ("Firebase: IID which can map to GAIA to join to app instance id").

JK Kearns: Mr. Kearns is a Group Product Manager who vocalized discomfort with the fact that Google continued to collect and save data even when the WAA/sWAA button had been toggled to "off." *See, e.g.*, GOOG-RDGZ-00043966 (Mr. Kearns wrote: "To me, it feels like a

fairly significant bug that a user can choose to turn off WAA but then *we still collect and use the data* (even locally)") (emphasis added); GOOG-RDGZ-00090741 (Mr. Kearns noting that the disclosures "feel[] *misleading* as it's currently written") (emphasis added); GOOG-RDGZ-00039094 (Mr. Kearns stating that "teams *should not use user data at all if WAA is off*") (emphasis added). These admissions go to the heart of this case.

**Sundar Pichai: Mr. Pichai is currently the Chief Executive Officer of Alphabet Inc. and its subsidiary Google LLC. As reflected in Plaintiffs' Fourth Amended Complaint (Dkt. 289), Mr. Pichai has made various statements that support Plaintiffs' claims and undermine Google's defenses. Further, as highlighted in Plaintiffs' motion for class certification and also in opposition to Google's motion for summary judgment, Mr. Pichai gave false testimony to Congress regarding Google's data collection practices at issue in this case. Mr. Pichai testified that Google's data collection is "a choice users make," that "we make it clear," and that users "can clearly see what information we have—we actually show it back to them. We give clear toggles, by category, where they can decide whether that information is collected [or] stored." *See, e.g.*, Schneier Rep. ¶¶ 253-55.[1] In 2019, Mr. Pichai also published an op-ed in the New York Times titled "Privacy Should Not Be a Luxury Good," in which Mr. Pichai represented that "you get to decide how your information is used" by Google and that "we give you clear, meaningful choices around your data." Mr. Pichai has repeated these and similar false statements in other public comments.[2] Testimony from Mr. Pichai—regarding,**

---

[1] **Mr. Pichai also provided written testimony in advance. Written Testimony of Sundar Pichai, Before the House Judiciary Committee Hearing on "Transparency & Accountability: Examining Google and its Collection, Use, and Filtering Practices (December 11, 2018)**, *available at*: **https://judiciary.house.gov/sites/evo-subsites/republicans- judiciary.house.gov/files/legacy_files/wp-content/uploads/2018/11/Pichai-Testimony.pdf; *see also* C-SPAN, Google CEO Sundar Pichai testifies on Data Collection,** *available at*: **https://www.youtube.com/watch?v=WfbTbPEEJxI (last accessed August 9, 2024).**

[2] *See, e.g.*, **Written Testimony of Sundar Pichai, Before the House Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law Hearing on "Online Platforms and Market Power, Part 6:**

**for example, his statements to Congress and the public, Google's data collection practices, and his knowledge of those practices—is relevant to Plaintiffs' claims and Google's defenses, including without limitation the issues of permission and consent, reasonable expectation of privacy, offensiveness of Google's intrusion, fraudulent concealment, and punitive damages.**

Non-parties who make use of data intercepted/collected by Google, including when users have turned off "Web & App Activity" tracking.

Plaintiffs have also identified Dr. Blake Lemoine, a former Google employee (but who Google did not identify as a potential document custodian) who ~~may have~~has knowledge ~~or~~and information relevant to this case about Google's collection and use of (s)WAA off data, including without limitation for various AI-based algorithms, and also regarding Google's internal processes in connection with documenting, monitoring, and overseeing and addressing problems. Dr. Lemoine has retained the undersigned counsel and may only be contacted through undersigned counsel.

## II. DESCRIPTION OF ALL RELEVANT DOCUMENTS IN PLAINTIFFS' POSSESSION

Plaintiffs possess relevant documents from their Google Takeout data, which is in the possession, custody, and control of Google (and accessible to Plaintiffs via https://takeout.google.com/settings/takeout) relating to their use of mobile apps, advertisements displayed to them, and documents relating to their request for damages. Plaintiffs also possess emails from Google related to "Privacy Checkup" and/or consent bumps under Google's Narnia program that encouraged people who turned WAA and/or sWAA off to turn those functions back

---

Examining the Dominance of Amazon, Apple, Facebook, and Google" (July 29, 2020), *available at*: https://www.congress.gov/116/meeting/house/110883/witnesses/HHRG-116-JU05-Wstate-PichaiS-20200729.pdf; *see also* C-SPAN, CEOs Mark Zuckerberg, Tim Cook, Jeff Bezos & Sundar Pichai testify before House Judiciary Cmte, *available at*: https://www.youtube.com/watch?v=1s1uWo1_bzg (last accessed August 9, 2024)

on. In addition, Plaintiffs may use certain publicly available documents, such as Google's representations and press releases, marketing materials, and industry reports.

Plaintiffs may also rely on documents produced in this litigation. Plaintiffs have previously identified a number of these documents, including in correspondence with Google's counsel, discovery requests and disputes, motions filed with the Court, Plaintiffs' complaints, and the parties' expert reports. These documents fall into a number of categories, including:

- Google's Terms of Service, Privacy Policy, and other public disclosures relating to Firebase, Ad Manager, AdMob, and Google Ads, the Web & App Activity setting, and the supplemental Web & App Activity setting;

- Documents concerning the functionality of the Firebase SDK, Google Mobile Ads SDK, AdMob, Ad Manager, and Google Ads;

- Documents concerning the types of data collected through the Firebase SDK and Google Mobile Ads SDK;

- Documents concerning the flow of data collected through the Firebase SDK and the Google Mobile Ads SDK;

- Documents concerning the use of data collected through the Firebase SDK and the Google Mobile Ads SDK;

- Documents concerning Google's knowledge that it lacked permission to collect, save, and/or use app activity data from (s)WAA-off users; and

- Other documents identified during Plaintiffs' ongoing investigation pertaining to this matter.

Plaintiffs are continuing their investigation and reserve the right to supplement and/or amend this response to identify additional documents, electronically stored information, and tangible things they may use in support of their claims. As one example, Google is in possession of documents reflecting Dr. Lemoine's relevant knowledge and communications at Google, and Plaintiffs will be requesting those documents.

## III.    DAMAGES

Plaintiffs seek **all available damages and other forms of monetary relief, including** compensatory damages, punitive and exemplary damages, restitution, and disgorgement, ~~pre-judgment~~**pre- judgment** interest, post-judgment interest, reasonable attorneys' fees, expert witness fees and other costs, and any other further relief as the Court deems just and proper, including equitable, declarative, and injunctive relief as permitted by law. ~~Plaintiffs seek~~**That includes without limitation the** non- restitutionary disgorgement and actual damages~~, as~~ described in Michael J. Lasinski's expert report dated and served on February 20, 2023**, which Mr. Lasinski calculated through the end of 2022. The class period has not yet ended, in part due to Google's delay in providing information for purposes of starting class notice. After the class period ends, Plaintiffs anticipate serving a supplemental report from Mr. Lasinski with additional calculations covering the full time period for the certified classes**. Plaintiffs also seek nominal **damages (which may be cumulative with other damages, provided they compensate for distinct injuries such as depletion of device resources)** and punitive damages.

**For actual damages, Plaintiffs will seek to have the jury award the monetary value of the data that Google obtained from the class in violation of law. That value may be computed using the following formula: (i) a reasonable dollar value for the right to collect data during one "device month"; multiplied by (ii) the total number of "device months" in which Google was able to collect (s)WAA-off app activity data from class members. The term "device-month" refers to one month in which Google was able to collect (s)WAA-off app activity data from one mobile device used by one class member. *See* Lasinski Rep. ¶ 170 (similarly defining (s)WAA-off User Months). This formula is consistent with the formula Google used to pay participants in the Ipsos Screenwise program. Lasinski Rep. ¶¶ 135–42.**

In determining the first component of this actual-damages formula (the reasonable value for one device month) the jury may rely upon the amount ($3.00 per device month) that Google paid to participants in the Ipsos Screenwise study. *See* Lasinski Rep. ¶¶ 160–61. The jury may adjust this $3.00-per-device-month amount upward or downward based on evidence presented at trial.

In determining the second component of this actual-damages formula (the total number of device months) the jury may consider the fact that Google deleted certain data regarding the number of device months in which Google collected (s)WAA-off app activity data from the class members. *See* Lasinski Dep. at 57:14-58:7; Dkt. 331 at 19–20. Google's deletion makes it appropriate to rely on reasonable estimates and assumptions.

*Minimum number of device months.* In determining the second component of this actual- damages formula, the jury may determine that there are at least as many device months as there are class member devices. *See* Lasinski Rep. ¶ 161. Based on this extremely conservative estimate, there are at least 162,015,424 "device months" through the end of 2022. *Id.* If the jury determines that $3.00 per device month is reasonable, then actual damages under the above formula would be at least $486,046,273 through 2022. *Id.*

*Maximum number of device months.* In determining the second component of the actual- damages formula, the jury may also determine the total number of device months by multiplying (x) the number of "user months" (*see* Lasinski Rep. ¶¶ 170–73 & fig. 53, sch. 11.1) by (y) the average number of devices per person (*id.* ¶ 159 & fig. 49, sch. 12.2). The total number of user- months is 3,023,800,204. See Lasinski Rep. sch. 11.1. Apportioning these user months across U.S. adults and minors aged ten to seventeen (*see* Lasinski Report sch. 10.2 & 10.3) and multiplying the results by the corresponding average number of devices

(1.86 per adult and 1.00 per minor, Lasinski Rep. sch. 10.1 & 12.2) yields 5,324,617,315 device months through 2022. This is the maximum number of device months. If the jury determines that $3.00 per device month is reasonable, then actual damages under the above formula would be $15,973,851,945 through 2022.

*Number of device months during which Google collected app activity data.* In determining the second component of the actual-damages formula, the jury may also decide to award damages only for those device months in which Google actually did collect app activity data. To determine *that* number, the jury may multiply (a) the maximum number of device months (described in the last paragraph) by (b) a reasonable estimate of the percentage of device months in which Google collected class members' app activity data based on class members using their devices to interact with non-Google apps running Firebase SDK or Google Mobile Ads SDK.

To determine (b), the jury may rely on a random sampling of Google's app activity data logs showing the frequency with which Google collected app activity data from a random selection of users' devices. Plaintiffs previously requested such a sampling but Google refused to produce it prior to the certification of the class. Now that the class has been certified, Plaintiffs have renewed their demand for this sampling by separate letter to Google. Once the results of this sampling have been produced, Plaintiffs will further update this paragraph of this disclosure to describe in further detail how the jury may apply these results to estimate the number of device months during which Google collected app activity data.

The jury may alternatively determine (b) by relying on other data showing the frequency with which class members used non-Google apps running the Firebase and/or Google Mobile Ads SDK. On average, class members used approximately 40 apps per month.

Hochman Rep. ¶ 1. At least 80% of class members' apps used either the Firebase or Google Mobile Ads SDK (or both). *Id.* ¶¶ 2, 355. Therefore, the probability that any given class member, in any given month, used a device to interact with a non-Google app running Firebase SDK or Google Mobile Ads SDK is equal to one minus 0.2 to the power of forty. *Id.* ¶ 356 (describing this formula). That is over 99.99%. Based on this probability, the jury can reasonably conclude that Google collected data in every one of the device months.

*Alternative calculation by user months.* Google's damages expert, Christopher Knittel, opined that damages should be determined on a per-person basis, rather than on a per-device basis. *See* Knittel Rep. ¶¶ 156–61. Plaintiffs reserve the right to offer an alternative damages model based on a per-person rather than per-device basis. To calculate this amount, the jury may multiply (i) a reasonable dollar value for the right to collect data during one "user month"; by (ii) the total number of "user months" in which Google was able to collect (s)WAA-off app activity data from class members.

In determining the first component of this alternative actual-damages formula, the jury may conservatively rely on the per-device amount ($3.00) that Google paid to participants in the Ipsos Screenwise study. *See* Lasinski Rep. ¶¶ 160–61. The jury may adjust this amount upward or downward based on evidence presented at trial.

In determining the second component of this alternative actual-damages formula, the jury may rely on (a) the minimum number of user months, equal to one month per class member (90,948,660 through 2022, *see* Lasinski Rep. ¶ 168 & n.51, yielding $272,845,980 in damages); (b) the maximum number of user months (3,023,800,000 through 2022, *see* Lasinski Rep. ¶ 173 & n.53, yielding $9,071,400,000 in damages); or (c) the number of user-months in which Google collected app activity data. In determining (c), the jury may decide

**that, as a result of the frequency of app usage and prevalence of the Google Firebase and Google Mobile Ads SDKs, Google collected app activity data in every possible user-month. *See supra*. Alternatively, the jury may calculate (c) by multiplying the maximum number of user months by a reasonable estimate of the percentage of user months in which Google collected class members' app activity data based on class members using their devices to interact with non-Google apps running Firebase SDK or Google Mobile Ads SDK, as determined from data sampling (as discussed *supra*).**

**As noted above, Plaintiffs intend to serve a supplemental report from Mr. Lasinski updating his calculations through the end of the class period. Based on additional data recently produced by Google, those updated calculations may also include additional adjustments, including for example to account for class members who never had any Gmail account.**

## IV.    INSURANCE AGREEMENT

Not applicable to Plaintiffs.

Dated: ~~October 4, 2023~~September 16, 2024

Respectfully submitted,

By: */s/ Mark C. Mao*

Mark C. Mao (CA Bar No. 236165)
mmao@bsfllp.com
Beko Reblitz-Richardson (CA Bar No. 238027)
brichardson@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293 6858
Facsimile (415) 999 9695

David Boies (admitted *pro hac vice*)
dboies@bsfllp.com
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200

James Lee (admitted *pro hac vice*)
jlee@bsfllp.com
Rossana Baeza (admitted *pro hac vice*)
rbaeza@bsfllp.com
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street, Suite 2800
Miami, FL 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Alison L. Anderson, CA Bar No. 275334
725 S Figueroa St., 31st Floor
Los Angeles, CA 90017
Tel.: (213) 995-5720
alanderson@bsfllp.com

Bill Carmody (*pro hac vice*)
bcarmody@susmangodfrey.com
Shawn J. Rabin (*pro hac vice*)
srabin@susmangodfrey.com
Steven Shepard (*pro hac vice*)
sshepard@susmangodfrey.com
Alexander P. Frawley
afrawley@susmangodfrey.com

17

SUSMAN GODFREY L.L.P.
~~1301 Avenue of the Americas, 32nd Floor~~
**One Manhattan West, 50th Floor**
New York, NY ~~10019~~**10001**
Telephone: (212) 336-8330

Amanda Bonn (CA Bar No. 270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
Michael F. Ram (CA Bar No. 238027)
mram@forthepeople.com
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

*Attorneys for Plaintiffs*

| Summary report: Litera Compare for Word 11.7.0.54 Document comparison done on 9/17/2024 5:26:05 PM | |
|---|---|
| **Style name:** Custom | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 2023-10-04 Plaintiffs' Second Amended Rule 26 Disclosures.docx | |
| **Modified filename:** 2024-09-16 Rodriguez – Third Amended R26 Disclosures.docx | |
| **Changes:** | |
| **Add** | 38 |
| **Delete** | 15 |
| Move From | 0 |
| Move To | 0 |
| **Table Insert** | 0 |
| **Table Delete** | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 53 |