# EXHIBIT 74

# DOCUMENT SOUGHT TO BE FILED UNDER SEAL

# MAO DECLARATION

# OPPOSITION TO SUMMARY JUDGMENT

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                     SAN FRANCISCO
 4                        --oOo--
 5    ANIBAL RODRIGUEZ, et al.,
      individually and on behalf of
 6    all other similarly situated,
 7                Plaintiffs,
 8    vs.                               Case No.
                                        3:20-CV-04688
 9    GOOGLE LLC, et al.,
10                Defendants.
      _____/
11
12
13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14
15
16    VIDEO-RECORDED DEPOSITION OF ANINDYA GHOSE, Ph.D.
17               SAN FRANCISCO, CALIFORNIA
18                 THURSDAY, JULY 13, 2023
19
20
21
22
23    Reported by:
24    Anrae Wimberley, CSR No. 7778
25    Job No.  5996136

                                                    Page 1
```

```
 1    used those terms?                                    01:35:47

 2         A.   I think what I meant is, if I had meant to

 3    include those concepts in any analysis, then I would

 4    have explicitly mentioned them, and I know

 5    Mr. Lasinski did not.  So that's what I'm trying to  01:36:01

 6    say.

 7         Q.   Okay.  So because he didn't use the terms

 8    "willingness to accept" and "willingness to pay,"

 9    that's your criticism of Mr. Lasinski?

10         MR. HUR:  Objection; misstates prior testimony. 01:36:13

11         THE WITNESS:  That's one of, you know, several

12    criticisms that he missed out on the whole customer

13    heterogeneity aspect of it.  He did not provide any

14    direct or empirical evidence that any of those

15    datasets were reliable benchmarks because he did not 01:36:28

16    analyze the difference or similarities between those

17    datasets and sWAA and sWAA off.  He also did not

18    discuss any potential differences in the purpose of

19    those datasets.

20         So, you know, I have several reasons to         01:36:45

21    criticize Mr. Lasinski.

22    BY MR. McGEE:

23         Q.   Okay.  But you don't have any direct or

24    empirical evidence that suggests his use of that

25    data was mistaken, do you?                           01:36:58
```

Page 147

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.  I mean, I have opined on the differences | 01:37:04 |
| 2 | between the datasets and sometimes even the | |
| 3 | purpose -- the differences and the purpose of the | |
| 4 | datasets, if that's what you're asking. | |
| 5 | Q.  And if you can turn to page 16 of your | 01:37:32 |
| 6 | report. | |
| 7 | And I'm looking at specifically | |
| 8 | paragraph 31. | |
| 9 | You state that "A substantial literature | |
| 10 | finds that WTA estimates tend to be higher than WTP | 01:37:50 |
| 11 | estimates." | |
| 12 | Do you see that? | |
| 13 | A.  Yes. | |
| 14 | Q.  And I think you cite just one source for | |
| 15 | that, and that's the Prince and Wallsten study? | 01:38:03 |
| 16 | A.  I mean, that is the cite -- that's the | |
| 17 | source that I've cited in that sentence, that's | |
| 18 | true. | |
| 19 | Q.  Okay.  So that would be the only | |
| 20 | literature that you have to rely on for making the | 01:38:22 |
| 21 | assertion that WTA estimates tend to be higher than | |
| 22 | WTP estimates? | |
| 23 | A.  I mean, there may be other papers that | |
| 24 | I've cited that mention that.  In that sentence, I | |
| 25 | only relied on it. | 01:38:40 |

```
 1              I know -- I think the main point here is         01:38:41

 2     that these -- there are these two concepts.  They

 3     are nuanced concepts.  And, you know, Mr. Lasinski

 4     doesn't mention them.

 5              Also, other academics have criticized the        01:38:56

 6     use of singular concepts, like Alexander through his

 7     work.

 8              Oh, and your question -- the other paper

 9     that mentions the difference between willingness to

10     accept and willingness to pay is the Winegar -- it's     01:39:11

11     in paragraph 32, the Winegar and Sunstein paper,

12     2019.

13        Q.   Paragraph 32 you said?

14        A.   Yes.

15        Q.   I'll come back to that.                           01:39:29

16        MR. McGEE:  I'll try to get this marked in the

17     right place for the court reporter here.

18              (Deposition Exhibit 0006 was marked.)

19     BY MR. McGEE:

20        Q.   I'm going to show you what's been marked         01:40:05

21     as Exhibit 0006.  I have a courtesy copy for your

22     counsel.

23        MR. McGEE:  And I'm going to mark this in

24     Exhibit Share.

25              So that should be in Exhibit Share for          01:41:04
```

Page 149

| | | |
|---|---|---|
| 1 | everybody. | 01:41:07 |
| 2 | BY MR. McGEE: | |
| 3 | Q. Dr. Ghose, have you had a chance to review | |
| 4 | what's been marked as Exhibit 0006? | |
| 5 | A. Yes. This is a paper that I've cited in | 01:41:27 |
| 6 | my report. | |
| 7 | Q. Is this that Prince and Wallsten paper | |
| 8 | that is cited in footnote 48 in support of what | |
| 9 | we've just been speaking about, the WTA and WTP | |
| 10 | relationship? | 01:41:43 |
| 11 | A. That's the right paper, yeah. | |
| 12 | Q. Okay. And if I can draw your attention to | |
| 13 | page 856. | |
| 14 | So there's page numbers at either -- yeah, | |
| 15 | they're -- it's the top right or the top left | 01:42:02 |
| 16 | depending. | |
| 17 | For this one, it's at the top left, so the | |
| 18 | paper clip is probably going to be in the way for | |
| 19 | you. | |
| 20 | A. Yes. | 01:42:22 |
| 21 | Q. Do you see that last paragraph there, that | |
| 22 | "Because of our unique focus"? | |
| 23 | A. I see that, yeah. | |
| 24 | Q. Okay. And you reviewed this entire piece | |
| 25 | of literature in considering the opinions in your | 01:42:35 |

```
1    case -- in your expert report; correct?                    01:42:38
2         A.   I mean, generally, when I'm citing
3    something, I read the full paper, that's true.
4         Q.   Okay.  And you see here that -- can you
5    read that sentence that starts with "Because of our"        01:42:56
6    unique"?
7         A.   Sure.
8              "Because of our unique focus on specific
9    platforms and types of data across countries, few
10   other results exist to compare against our own."            01:43:10
11        Q.   Okay.  And then do you see later in this
12   paragraph where they admit that the study -- that
13   this study specifically did not ask about smartphone
14   apps?
15             And you can read the entire paragraph, if         01:43:33
16   you need.
17        A.   I mean, they say [as read]:  While we do
18   not ask about smartphone apps explicitly, we explore
19   how much people are willing to accept to allow their
20   smartphones to share their location.                        01:43:50
21        Q.   Right.  But they don't ask about
22   applications; correct?
23        A.   Not explicitly at least.
24        Q.   Okay.  So their comparison between WTA and
25   WTP is about cell phone location data?                      01:44:06
```

1    A.   Amongst other things because, I think, to    01:44:12
2    be more precise, the earlier tables -- give us a
3    moment and I'll give you more information.
4         So the location data, sharing contacts,
5    sharing browsing history and sharing cash    01:44:27
6    withdrawals, sharing fingerprints, sharing voice
7    prints.  So if you go to your earlier tables, you
8    will see the other things they are sharing.
9    Q.   Sure.  And which earlier tables are you --
10   A.   Tables 2A, 2B, 2C.    01:44:45
11   Q.   And you see here that they value the WTA
12   at a $1.20; correct?
13   A.   I'll have to go to the page here.
14        On page 857, yes, I see they mention that
15   WTA as 1.2 for smartphones -- in the U.S. for    01:45:12
16   smartphones.
17   Q.   And that's for all of the data that you
18   just described the access to, contacts, browsing
19   history, fingerprints?
20   A.   I'm not sure exactly how they arrived at    01:45:27
21   it, but it could be that they've taken the average
22   across multiple categories because what they say in
23   the sentence, at least, they are saying it's the
24   next to accept in the U.S. for smartphones, and
25   assuming most of these attributes are available    01:45:45

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

| | | |
|---|---|---|
| 1 | through the smartphones, that might be the case, | 01:45:48 |
| 2 | they've taken the average. | |
| 3 |     Q.   Okay.  And would there be a problem with | |
| 4 | taking the average to calculate the WTA? | |
| 5 |     A.   No.  I was just trying to answer your | 01:46:00 |
| 6 | question. | |
| 7 |     I mean, some of these WTA numbers I'd | |
| 8 | expect to vary across some examples, which is pretty | |
| 9 | common in sort of this methodology. | |
| 10 |     If you just do WTA for location, it might | 01:46:10 |
| 11 | be different from fingerprinting or cash | |
| 12 | withdrawals, and I don't know if they have done that | |
| 13 | here, but that number seems to be the average across | |
| 14 | the categories. | |
| 15 |     Q.   Okay.  But, again, they calculated that | 01:46:25 |
| 16 | number by averaging across the categories and coming | |
| 17 | up with one WTA value of $1.20 for United States | |
| 18 | smartphones; right? | |
| 19 |     MR. HUR:   Objection; assumes facts. | |
| 20 |     THE WITNESS:   I don't know for sure.  I mean, | 01:46:39 |
| 21 | I'm just assuming that it's likely the methodology | |
| 22 | because they basically have some progression results | |
| 23 | here, so I assume they've taken the margin of X from | |
| 24 | the regressions and converted them into, you know, | |
| 25 | some dollar value. | 01:46:57 |

1   BY MR. McGEE:                                                01:46:58

2       Q.   Okay.  And then if you go to the next

3   paragraph, there's some WTP and WTA figures here.

4            Do you see those?

5       A.   Yes.  I see the -- their WTA figure seems            01:47:11

6   to be 1.06, but they also have numbers from the

7   authors of the paper of Savage and Waldman, who are

8   the ones -- they focus on apps.

9       Q.   And those Savage and Waldman figures were

10  a WTP of $4.05 and a WTA of $5.11?                            01:47:33

11      A.   Yes, that is correct.

12      Q.   And then there's also a WTP of $2.12 to

13  eliminate advertising in apps and then a WTA of

14  $1.06 to eliminate advertising in apps in the U.S.

15  on smartphones?                                               01:48:08

16      A.   Yeah, the two numbers are from two

17  different papers, just to be precise, but yes, those

18  numbers are mentioned.

19      Q.   Okay.  And so did you see anything else in

20  this literature to suggest any other values for WTA           01:48:18

21  or WTP?

22      MR. HUR:  Objection; vague.

23      THE WITNESS:  You mean -- when you say in the

24  literature, you mean outside the scope of these

25  papers?                                                       01:48:31

Page 154

| | | |
|---|---|---|
| 1 | BY MR. McGEE: | 01:48:32 |
| 2 | Q.   No, this paper that you've cited in your | |
| 3 | report. | |
| 4 | A.   Oh.  I mean, I don't recall if there are | |
| 5 | other numbers, but I'm happy to take a look. | 01:48:39 |
| 6 | Q.   If you need to, sure. | |
| 7 | A.   I think the conclusion section they have | |
| 8 | 1.2.  And this section has, you know, different | |
| 9 | papers with the different numbers. | |
| 10 | I mean, there are some numbers mentioned | 01:49:19 |
| 11 | on page 854.  There's some numbers mentioned on | |
| 12 | page 852.  And, of course, in table 1C, 1D, 1A and | |
| 13 | 1B, there's a whole, you know, range of numbers from | |
| 14 | a range of countries. | |
| 15 | Q.   And what about for the United States, | 01:50:05 |
| 16 | what's the range of those numbers for WTA? | |
| 17 | A.   So if I look at table 1A, seems like it | |
| 18 | goes from $0 to $4.25.  That's the amount they are | |
| 19 | willing to receive in monthly payments from the | |
| 20 | bank. | 01:50:32 |
| 21 | And there may be other U.S. numbers that | |
| 22 | I'll have to dig into and find out. | |
| 23 | Q.   So that was in table 1A? | |
| 24 | A.   1A, 1B and 1C and 1D, they all have the | |
| 25 | same range for the United States. | 01:50:51 |

1   Q.   And that range, again, is anywhere from $1                01:50:56
2   to maybe 6 or $7?
3   A.   No.  The tables I mentioned, their ranges
4   are from $0 -- so some people are actually not
5   getting any money -- to $4.25.  I think the upper             01:51:10
6   bound is that's what they are saying.
7   Q.   Okay.  And that zero to $4.25, it doesn't
8   really differ much from Mr. Lasinski's calculations
9   in this case, does it?
10   MR. HUR:  Objection; vague.                                  01:51:28
11   THE WITNESS:  I mean, it doesn't make it right.
12   If you're asking me if the number 3 falls between 0
13   and 4.25, that is mathematically true, but it
14   doesn't make his analysis right.
15   BY MR. McGEE:                                                01:51:39
16   Q.   Well, it's one of the pieces of his
17   analysis, but you didn't analyze the other part.
18   You only analyzed actual damages in this case;
19   correct?
20   A.   Yes.  I'm just talking about his dollar-3              01:51:46
21   number, that's all.
22   Q.   Yeah, the single dollar-3 payment?
23   A.   The one-time payment, yes.
24   Q.   Yeah.  And it falls right within that
25   range -- really, the upper bound of that range              01:51:56

```
 1   between 0 and $4.25?                                      01:51:59

 2        A.   And like I said, mathematically it does,

 3   but it doesn't make it right.

 4        Q.   Okay.  Well, what would make it right?

 5   What more would he have done, in your opinion, to         01:52:08

 6   further justify the number $3 that fall within this

 7   range that's in this one piece of literature that

 8   you cite for WTA and WTP figures?

 9        A.   So like I said, I think it's not just the

10   fact that he missed out describing WTA or WTP, but        01:52:26

11   more fundamentally, he's completely missed out

12   discussing heterogeneity in customer preferences for

13   privacy, the existence of the privacy paradox, you

14   know, differences in reasons why people have

15   different preferences and how they change over time.      01:52:47

16   He just completely ignored the whole notion of

17   heterogeneity in privacy.

18        Q.   Do you know if Google did any studies of

19   heterogeneity in privacy when it developed the

20   Screenwise Panel?                                         01:53:01

21        A.   I don't know about that, but like I said

22   before, in footnote 42, 43, 44, 45, I cited Google

23   user's study in privacy where, as I've said in my

24   report, for example, within a 6-month period -- so

25   they sample 1 percent of their consumer base, which       01:53:19
```

Page 157

| | | |
|---|---|---|
| 1 | was 36 million people, and within the 6-month | 01:53:24 |
| 2 | period, up to 78 percent of people displayed no | |
| 3 | privacy behavior, and over a longer duration, beyond | |
| 4 | 6 months, up to 44 percent of people displayed no | |
| 5 | privacy behavior. | 01:53:45 |
| 6 |     So to answer your question, I know they | |
| 7 | have done studies in Google.  I'm not aware of any | |
| 8 | study they have done for Ipsos. | |
| 9 |   Q.  Do you know if they disclosed to the users | |
| 10 | that they would be conducting that study on that | 01:53:57 |
| 11 | sample? | |
| 12 |   MR. HUR:  Objection; vague. | |
| 13 |   THE WITNESS:  I don't know the answer to that. | |
| 14 | BY MR. McGEE: | |
| 15 |   Q.  But, again, for Screenwise, when Google | 01:54:10 |
| 16 | offered $3 to a user to come into the Screenwise | |
| 17 | program, you're not aware of any study or any factor | |
| 18 | that Google considered with regard to the | |
| 19 | heterogeneity of the privacy preferences of those | |
| 20 | individuals?  Google was essentially blind to the | 01:54:28 |
| 21 | privacy preferences for anyone who signed up? | |
| 22 |   MR. HUR:  Objection; lacks foundation. | |
| 23 |   THE WITNESS:  I'm not aware of one way or the | |
| 24 | other.  They may have done it.  I don't know. | |
| 25 |   MR. McGEE:  Okay.  I think we've been going for | 01:54:44 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | about an hour, so makes sense for a break. | 01:54:45 |
| 2 | THE VIDEOGRAPHER:  This marks the end of Media | |
| 3 | No. 4.  Off the record.  The time is 1:54. | |
| 4 | (Recess taken.) | |
| 5 | THE VIDEOGRAPHER:  This marks the beginning of | 02:15:58 |
| 6 | Media No. 5 in the deposition of Dr. Anindya Ghose. | |
| 7 | We're back on the record.  The time is 2:16. | |
| 8 | BY MR. McGEE: | |
| 9 | Q.   Okay.  And if I can draw your attention to | |
| 10 | paragraph 21 -- or, excuse me, page 21. | 02:16:12 |
| 11 | MR. McGEE:  I'm going to introduce what's been | |
| 12 | marked as Exhibit 0007, which is apparently | |
| 13 | uploading on Exhibit Share.  I've got a courtesy | |
| 14 | copy for your counsel. | |
| 15 | And this is going to be a deposition | 02:16:35 |
| 16 | transcript of one of the plaintiffs in this case, | |
| 17 | Sal Cataldo. | |
| 18 | (Deposition Exhibit 0007 was marked.) | |
| 19 | BY MR. McGEE: | |
| 20 | Q.   Have you seen this before, Dr. Ghose? | 02:16:42 |
| 21 | A.   Yeah.  I mean, I've cited it in | |
| 22 | footnote 67. | |
| 23 | Q.   Right. | |
| 24 | And this is a physical copy, you may have | |
| 25 | seen a digital copy, but you're generally familiar | 02:16:52 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

| | | |
|---|---|---|
| 1 | MR. HUR: -- foundation. | 02:25:24 |
| 2 | THE WITNESS: I'm not sure I follow.  Are you | |
| 3 | asking if the plaintiffs who join a class action | |
| 4 | should change their behavior or -- | |
| 5 | BY MR. McGEE: | 02:25:34 |
| 6 | Q.   No.  So Mr. Cataldo, who you believe | |
| 7 | wouldn't change his behavior in this case based on | |
| 8 | your review of that portion of the testimony, do you | |
| 9 | think that his joining this case to advocate against | |
| 10 | Google's practices is a change in behavior after he | 02:25:48 |
| 11 | learned about all of the ways that Google was | |
| 12 | collecting his data when he thought that it wasn't? | |
| 13 | MR. HUR:  Objection; lacks foundation, assumes | |
| 14 | facts. | |
| 15 | THE WITNESS:  I mean, I don't have an opinion | 02:26:01 |
| 16 | on that. | |
| 17 | The only point I was trying to make is | |
| 18 | that, you know, did he change his behavior on the | |
| 19 | phone, for example, and he said he's not going to | |
| 20 | stop using any of the apps. | 02:26:11 |
| 21 | BY MR. McGEE: | |
| 22 | Q.   But I think he does say that he's going to | |
| 23 | be more careful about how he may or may not use his | |
| 24 | phone; right? | |
| 25 | A.   Phone, yes -- I'm sorry.  Go ahead. | 02:26:21 |

Page 166