**WILLKIE FARR & GALLAGHER LLP**
BENEDICT Y. HUR (SBN 224018)
  bhur@willkie.com
SIMONA AGNOLUCCI (SBN 246943)
  sagnolucci@willkie.com
EDUARDO E. SANTACANA (SBN 281668)
  esantacana@willkie.com
ARGEMIRA FLÓREZ (SBN 331153)
  aflorez@willkie.com
HARRIS MATEEN (SBN 335593)
  hmateen@willkie.com
NAIARA TOKER (SBN 346145)
  ntoker@willkie.com
ISABELLA MCKINLEY CORBO (SBN 346226)
  icorbo@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA 94104
Telephone: (415) 858-7400

Attorneys for Defendant
GOOGLE LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIBAL RODRIGUEZ, SAL CATALDO, JULIAN SANTIAGO, and SUSAN LYNN HARVEY, *al*. individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>    vs.<br><br>GOOGLE LLC,<br><br>                    Defendant. | Case No.  3:20-CV-04688 RS<br><br>**APPENDIX A TO GOOGLE LLC's REPLY IN SUPPORT OF MOTION TO STRIKE PLAINTIFFS' UNTIMELY DAMAGES OPINION**<br><br>*[FILED CONCURRENTLY WITH GOOGLE'S REPLY DECLARATION OF EDUARDO E. SANTACANA ]*<br><br>Date:     February 13, 2025<br>Time:    1:30 p.m.<br>Ctrm:    3 - 17th Floor<br>Judge:   Hon. Richard Seeborg<br><br>Action filed:   July 14, 2020<br>Trial Date:     August 18, 2025 |

**TABLE OF CONTENTS**

Excerpts from ECF 364-17 (Deposition Transcript of Michael Lasinski) ................... 1

Excerpts from ECF 364-15 (Rebuttal Report of Google's Expert Anindya Ghose, Ph.D.) .......................................................................................... 7

Excerpts from ECF 364-18 (Rebuttal Report of Google's Expert Christopher R. Knittel, Ph.D.) ................................................................................... 9

Excerpts from ECF 364-23 (Expert Report of Michael Lasinski) .............................. 11

Excerpts from ECF 361-1 (Plaintiffs' Motion for Class Certification) ....................... 14

Excerpts from ECF 361-2 (Plaintiffs' Trial Plan in Support of Motion for Class Certification) ....................................................................................... 15

Excerpts from ECF 361-4 (Plaintiffs' Opposition to Motion to Exclude Opinion of Michael Lasinski) .............................................................................. 16

**Excerpts from ECF 364-17 (Deposition Transcript of Michael Lasinski)**
*\* \* \**

*Page 55, line 11 – Page 62, line 5*

**Q.** (By Mr. Santacana) You have said that it's conservative many times already today, and you have called it a floor multiple times. So I'm just trying to understand. Was your task to calculate the floor, or was your task to calculate the actual damages to the actual class members?

**A.** My task was to calculate the actual damages to the actual class members. I believe I've done that in a conservative manner.

**Q.** What does that mean? Did you get it right or not?

**A.** I do—I do have it right, yes.

**Q.** Then why do you say it's conservative?

**A.** ==Because it's—because at the end of the day, it—there's a potential for it to be higher. But I believe—but I believe, based on the information that I have available to me, that—that it is the best estimate of what would be appropriate in this case.==

**Q.** All right. Is there a potential that it's a lot higher?

*MR. LEE: Objection. Form.*

**THE DEPONENT:** Not that I'm aware of, no.

**Q.** (By Mr. Santacana) You're not concerned that your actual damages opinion is grossly undercompensating the class?

**A.** I am not.

**Q.** Why not?

**A.** Because I think, based on the information available to me, that this is an appropriate conservative estimate.

**Q.** I know that's what you think. That's your conclusion. I want to know why that's your conclusion.

**A.** I—I think I just answered.

**Q.** No, you didn't.

**A.** Okay. Well, I think I did.

**Q.** Why do you think it's appropriate?

**A.** Based on the—

*MR. LEE: Asked and answered. Go ahead.*

**THE DEPONENT:** Based on the information that's available to me, I think that it—that --that it is— that it is appropriate.

1  **Q.** (By Mr. Santacana) The Ipsos study paid $3 a month?

2  **A.** In certain cases, yes.

3  **Q.** But your actual damages opinion pays $3 just once?

4  **A.** That is correct.

5  **Q.** Why?

6  **A.** Because based on the information that I have, I am able to determine that—I am able to determine the number of devices that had sWAA off at least a given point in time. I am not able to determine with certainty that it had sWAA off for—sWAA off and actually—and actually met with other requirements for the damages calculation, such as hitting third-party sites with Google trackers on them, after that initial calculation—after that addition sWAA-off calculation.

7  **Q.** If you had proof as to which class 11:27: members hit third-party sites with the Google trackers on them, as you say, and when and how many times, would that change your actual damages opinion?

8  **A.** Well, my understanding is that information has been deleted, so it's not available. So I don't –

9  **Q.** Let's assume that it's available. Would that change your opinion?

10  **A.** I—I don't know, because I don't have that –

*MR. LEE: Are you representing that you'll—you're going to make data available that you've previously represented was deleted?*

*MR. SANTACANA: James.*

*MR. LEE: I'm just trying to understand your question.*

**Q.** (By Mr. Santacana) My question is, assume the data's available. Would that change your actual damages opinion?

*MR. LEE: Are you making that representation or not?*

*MR. SANTACANA: I'm not answering your question, James. It's not my deposition.*

*MR. LEE: I'll take that as a no.*

**THE DEPONENT:** So I don't—I don't have that information, so I don't know if it would change it. I can't know unless I had that information.

**Q.** (By Mr. Santacana) Well, I asked you why you assigned $3 per device rather than $3 per month, and you said because you were missing data on whether a particular device actually went to third-party sites. And my question is, if you knew whether they had actually gone to third-parties sites and you knew how often and when, then would it

1  be $3 per month or some other calculation, or would it still just be $3 per device?
2
3  **A.** I don't know because I don't have that information. I would have to look at it, study it, and analyze it with all the other factors of the case. And since I don't have it, I can't answer that question.
4
5
6
7  **Q.** Then why do you say that that information is the reason why you have opined that actual damages is the $3 once not $3 per month or $3 per something else?
8
9
10
11  **A.** You—because you asked that question. Again, I don't know—I don't know the answer, and I won't know the answer until I get— unless I got the information.
12
13
14
15  **Q.** Is the Ipsos --
16  **A.** But that's—but that's—that's a potential reason why. But I can't answer it in any more detail than I have.
17
18
19  **Q.** Is the Ipsos study comparable to the transaction you're imagining in paragraph 130?
20
21  *MR. LEE: Objection to the use of—the continued use of "imagined."*
22
23  **Q.** (By Mr. Santacana) Hypothesizing. I don't mean to say it's make believe.
24
25
26  **A.** I believe that the Ipsos study provides the best data point --
27  **Q.** Is it comparable—
28

**A.**—for—

*MR. LEE: Hold on.*

**A.**—provides the best data point for a—for the actual damages calculation.

**Q.** (By Mr. Santacana) Is it comparable?

**A.** Yes, it is sufficiently comparable for what I'm using it for. Yes.

**Q.** Then why did you change the payment from $3 per month to $3 per device? Actually, let me strike that for a second. You're aware that Google has records of when devices—when users had WAA on and WAA off?

**A.** Yes.

**Q.** And for how long?

**A.** Yes.

**Q.** So you could, for example, calculate number of sWAA-off months for each user, right?

**A.** I did do that, yes.

**Q.** You did do that. So why didn't you pay them per sWAA-off month in your actual damages opinion?

**A.** I mean, ultimately, I thought it was more appropriate and—and conservative to do it—to do a one-time calculation based on the information that I had available to me.

3

APPENDIX A TO GOOGLE LLC'S REPLY ISO OF
MOTION TO STRIKE PLAINTIFFS' UNTIMELY DAMAGES OPINION
CASE NO. 3:20-CV-04688 RS

1  **Q.** Why was it more appropriate to do a one-time calculation?

2  *MR. LEE: Asked and answered.*

3  **THE DEPONENT:** Yeah.

4  *MR. LEE: Go ahead and answer it again if you want.*

5  **THE DEPONENT:** Again, even if I—even if I had sWAA-off months, that wouldn't necessarily tell me whether or not, technically—technically, if they hit a third-party site with Google track—with a Google tracker on it. And so in this case, to be, as I've said in the past, appropriate and conservative, I did it—I calculated a one-time payment per device.

\* \* \*

*Page 63, line 1 – Page 65, line 9*

**Q.** Okay. So is it fair to say, then, that your actual damages opinion is that each device should be compensated $3 once because it is extremely unlikely—excuse me—it is extremely likely that they were exposed to the allegedly wrongful conduct at least once?

**A.** Yes.

**Q.** What if they were exposed to the allegedly wrongful conduct a thousand times? How could their actual damages only be $3, but somebody who is exposed once also has damage of $3?

*MR. LEE: Asked and answered. Go ahead and answer it again.*

**THE DEPONENT:** I—again, I don't think that you could calculate with certainty which member, based on the data available to me, would hit it once or a thousand times. I think to incentivize someone to give up their information, whether it's once or a thousand times, you would have to pay them. And so...

**Q.** (By Mr. Santacana) A nonzero amount?

**A.** You—you would have to pay them. And in my opinion, a fair price—a fair value for that is $3.

**Q.** And is that fair value regardless of the amount of data in question?

**A.** Yeah, in this case, I think—I think that a uniform amount per device is appropriate. Yes.

**Q.** Why?

*MR. LEE: Asked and answered. Go ahead.*

**THE DEPONENT:** Well, for example, the—the Ipsos study, that's what they pay. They—they pay a user $3 per device per month, no matter how much usage. There—there certainly is difference—differences between Ipsos users, but they are not getting compensated differently per device.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Q. (By Mr. Santacana) They're not. That's true. How do you know that the $3 per month is not grossly over-incentivizing users in order to get a representative sample into the survey?

A. If—based on—based on a market transaction or a comparable of what—what needs to be paid to get someone to provide their information, that price—the $3—is set not only based—not only based on the Ipsos study, but there are other studies that are out there that—for example, that I talk about in my report that actually provide more value than three bucks—$3 per device. So it's not only the Ipsos study in which Google has actually paid users, but there are other studies that pay more per device than $3. So I think $3 is an appropriate and a conservative amount for actual damages.

\* \* \*

*Page 68, line 12 to Page 69, line 13*

Q. Why should the price paid to the unwilling participants be lower than the price paid to the Ipsos participants?

A. Well, at the end of the day, I'm using that as a comparable. It's—it ultimately is the same amount. It's the same amount per device.

Q. But, it's a lot less, right? Because Ipsos is per month, and this is one time. So my question is, why do you propose to pay this class less money than Google pays Ipsos participants?

A. I think—as I said before, I think that that's a conservative value –

Q. I know—

A. — to get them to sign up.

MR. LEE: Hold on.

THE DEPONENT: To get --

MR. LEE: Please let him finish.

THE DEPONENT: To get them to sign up.

Q. (By Mr. Santacana) I know the number is lower, which I think is what you mean by "conservative." My question is why should be lower or not equal or higher?

MR. LEE: Asked and answered.

THE DEPONENT: I don't -- I don't have another answer besides what I have said before.

\* \* \*

*Page 70, line 11 to Page 71, line 9*

Q. (By Mr. Santacana) You said earlier that a participant in Ipsos would get more money for data than a class member in this case. You are setting a conservative floor

5

APPENDIX A TO GOOGLE LLC'S REPLY ISO OF
MOTION TO STRIKE PLAINTIFFS' UNTIMELY DAMAGES OPINION
CASE NO. 3:20-CV-04688 RS

| | |
|---|---|
| 1 | of $3 one time, not $3 every month, right? |
| 2 | |
| 3 | A. That is how the calculation works. That is correct. |
| 4 | |
| 5 | Q. Okay. Can you name any factor that went into your calculation that weighed in favor of lowering the total amount of money the class members would receive as compared to the participants in the Ipsos study? |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | A. At the end of the day, I—the—the factor that I considered, we've talked about already, which is, in the Ipsos study, they're collecting data every single month based on the app tracker that is—the tracker that is put on their phone. In this case, as I've said, we know the number—we know the number of devices that would have WAA off. We don't know for sure if that information was tracked every month because we don't know if it hit a third-party app with a Google tracker on it. |

* * *

*Page 259, line 11 to page 260 line 6*

Q. Why isn't the $3-per-device price that you arrived at higher than what the Ipsos study pays participants? You say the Ipsos study is willing participants. This is unwilling—

A. Yes.

Q. —participants. So shouldn't these unwilling participants get paid more?

*MR. LEE: Asked and answered.*

**THE DEPONENT:** I think I answered that before. But I do believe that this is a conservative value for those—for the Ipsos studies.

Q. (By Mr. Santacana) What does "conservative" mean in that sentence?

A. It means that it could be—it could, in fact, be higher. But I think that this is an appropriate price to incentivize based on what I said—based on what I said before, to incentivize those users to part with their data.

* * *

**Excerpts from ECF 364-15  (Rebuttal Report of Google's Expert Anindya Ghose, Ph.D.)**

\* \* \*

*Page 6, paragraph 116* (emphasis in original)

Summary of Mr. Lasinski's "Actual Damages" opinion and bases

Mr. Lasinski provided a measure of "actual damages attributable to Google's alleged wrongful conduct" in Section 8 of his report.6 Mr. Lasinski opines that the "most probative indicator of the harm to WAA/sWAA-Off users" is "the baseline payment to Screenwise Panel participants of $3 per month for using a Screenwise meter app on a single mobile device" and that this is a "conservative indicator of the monthly payment necessary for an individual to knowingly surrender the choice to keep their app activity private and allow Google to track all app activity data." Mr. Lasinski further opines that "actual damages [] can be conservatively measured by applying this $3 payment on a ***one-time*** basis to the number of Class Member Devices [] used with WAA/sWAA off at least once during the Class Period through December 2022.

*Page 7, paragraph 18*

Mr. Lasinski's "actual damages" method ascribes the same dollar value of WAA/sWAA-Off Data to all users in the purported class. That is, his measure of $3 from Ipsos Screenwise applies uniformly to all purported class members, regardless of each individual class member's valuation for data and concerns about privacy (or lack of concerns about privacy), which Mr. Lasinski has not assessed or measured. In fact, based on the academic literature, a single "one-size-fits-all" dollar figure that does not account for heterogenous user preferences or heterogeneous valuations for data privacy is fundamentally flawed, unscientific, and hence unreliable. Individual inquiry is therefore required to determine purported class members' preferences and valuations of their privacy.

*Page 10, paragraph 22*

Although Mr. Lasinski's damages method applies a uniform dollar value of data privacy to all class members, he has not demonstrated that class members' privacy preferences and valuations of data privacy are homogenous. In particular, the literature suggests that there exists not only heterogeneity in privacy preferences and valuations for data privacy across users within the three

categories of users (privacy pragmatists, privacy fundamentalists, and privacy unconcerned) but that there also exists "within user" heterogeneity amongst users based on context, time, or cost-benefit tradeoffs. Privacy research nomenclature traditionally identifies consumers as (i) "privacy fundamentalists" who "reject[] consumer-benefit or societal-protection claims for data uses and sought legal-regulatory privacy measures;" (ii) "privacy unconcerned," who are "generally ready to supply their personal information to business and government and reject[] too much privacy fuss;" or (iii) "privacy pragmatists," who "examine[] the benefits to them or society of the data collection and use, want[] to know the privacy risks and how organizations propose[] to control those, and then decide[ whether to trust the organization or seek legal oversight.

*Page 26, paragraph 49*

In summary, notwithstanding the difficulty in determining users' valuations of personal data and privacy, the information that Mr. Lasinski relies upon in an attempt to establish "actual damages" is unreliable for that purpose. Just because Google pays Ipsos Screenwise Meter panel participants $3 does not inform us whether purported class members' WTA is $3, less than $3, or even $0, for Google's collection of WAA/sWAA-Off Data. If some purported class members' willingness-to-accept is in fact $0, and they were to receive $3 in "actual damages" award, then they would receive a windfall gain of $3, i.e., they receive $3 but were actually damaged $0. Mr. Lasinski has not provided any evidence for his assumption that any, much less that all purported class members' willingness-to-accept is $3. In fact, his measure of $3 does not account for the heterogenous user preferences or heterogeneous valuations for data privacy I have discussed above. As a result, Mr. Lasinski's "actual damages" estimate is fundamentally flawed, unscientific and hence unreliable."

## Excerpts from ECF 364-18  (Rebuttal Report of Google's Expert Christopher R. Knittel, Ph.D.)

\* \* \*

*Page 73, paragraph 115*

Mr. Lasinski claims that "actual damages can be determined as a function of the payments necessary to incentivize an individual to knowingly surrender the choice to keep activity on mobile apps private and allow an organization to track app activity data." He further opines that "the baseline payment to Screenwise Panel participants of $3 per month for using a Screenwise meter app on a single mobile device represents a conservative indicator of the monthly payment necessary for an individual to knowingly surrender the choice to keep their app activity private and allow Google to track all app activity data, regardless of that individual's WAA or sWAA settings." He claims that this $3 payment, applied "on a one-time basis to the number of Class Member Devices," is the "most probative indicator" of class-wide "actual" damages.

*Pages 80-81, paragraph 130-133*

D. Mr. Lasinski Presents No Economic Basis for His "Actual" Damages Estimate of $3 Per Class Member Device

Even assuming Mr. Lasinski's methodology could measure "actual" damages, and ignoring his inclusion of unharmed putative class members, Mr. Lasinski fails to provide an economic basis for why his $3 per class member device measures on a class-wide basis the quantum of harm that putative class members may have suffered as a result of the alleged wrongful conduct.

Mr. Lasinski fails to provide any adequate foundation or economic analysis to support his claim that each putative class member suffered $3 of "actual" damages per device. As a result, his methodology to quantify class-wide damages is unreliable.

Mr. Lasinski argues that "the baseline payment to Screenwise Panel participants of $3 per month for using a Screenwise meter app on a single mobile device [including both smartphones and tablets] represents a conservative indicator of the monthly payment necessary for an individual to knowingly surrender the choice to keep app activity private and allow Google to track app activity data, regardless of that individual's WAA or sWAA settings." He adds that "[w]hile the Screenwise compensation structure applies this $3 payment per

device per month, it is my opinion that actual damages through December 2022 can be conservatively measured by applying this $3 payment on a one-time basis to the number of Class Member Devices."

**Excerpts from ECF 364-23 (Expert Report of Michael Lasinski)**
\* \* \*

*Executive Summary, Page 2*

As described in Section 8, it is my opinion that actual damages attributable to the alleged wrongful conduct can be determined as a function of the payments necessary to incentivize an individual to knowingly surrender the choice to keep activity on mobile apps private and allow an organization to track all app activity data. I have identified and considered various indicators of both the payments that Google and other organizations have paid to individuals to obtain their activity data and the fees that individuals have paid to various organizations in their attempts to increase online privacy and/or avoid tracking. In my opinion, the most probative indicator is derived from one aspect of the monthly compensation structure to participants in the Ipsos Screenwise Panel, a consumer research study conducted for Google by Ipsos. While compensation to Ipsos Screenwise Panel participants can vary based on numerous factors, it is my opinion that the baseline payment to participants of $3 per month for using a Screenwise meter app on a single mobile device represents a conservative indicator of the monthly payment necessary for an individual to knowingly surrender the choice to keep their app activity private and allow Google to track all app activity data, regardless of that individual's WAA and/or sWAA settings. ==While the Screenwise compensation structure applies this $3 payment per device per month, it is my opinion that actual damages through December 2022 can be conservatively measured by applying this $3 payment on a one-time basis to the number of Class Member Devices, where a single Class Member Device represents a mobile device (smartphone or tablet) used with WAA/sWAA off at least once during the Class Period through December 2022.== Based on the available data and my calculations described in Section 8, the application of this $3 payment per device to my calculations of Class Member Devices yields total actual damages of approximately $486.0 million through December 31, 2022

\* \* \*

*Page 48, Paragraph 131*

As discussed below, it is my opinion that the most probative indicator of the harm to WAA/sWAA-Off users from Google's collection, saving, and/or use WAA/sWAA-Off Data, and the value of that WAA/sWAA-Off Data, is derived from one aspect of the monthly compensation structure to participants in the Ipsos Screenwise Panel, a consumer research study conducted for Google by Ipsos. More specifically, it is my opinion that the baseline payment to

Screenwise Panel participants of $3 per month for using a Screenwise meter app on a single mobile device represents a conservative indicator of the monthly payment necessary for an individual to knowingly surrender the choice to keep their app activity private and allow Google to track all app activity data, regardless of that individual's WAA or sWAA settings. ==While the Screenwise compensation structure applies this $3 payment per device per month, it is my opinion that actual damages through December 2022 can be conservatively measured by applying this $3 payment on a one-time basis to the number of Class Member Devices, where a single Class Member Device represents a mobile device (smartphone or tablet) used with WAA/sWAA off at least once during the Class Period through December 2022.== I describe my analysis of Class Member Devices in Section 8.2 below.

*\*  \*  \**

*Page 54, Paragraph 151*

Conclusion Regarding the Value of WAA/sWAA-Off Data Acquired by Google

Based on the above, it is my opinion that the most probative indicator of the harm to WAA/sWAA-Off users from Google's collection, saving, and/or use WAA/sWAA-Off Data, and the value of that WAA/sWAA Off Data, is derived from the monthly compensation structure for participants in the Ipsos Screenwise Panel. More specifically, it is my opinion that the baseline payment to Screenwise Panel participants of $3 per month for using a Screenwise meter app on a single mobile device (including both smartphones and tablets) represents a conservative indicator of the monthly payment necessary for an individual to knowingly surrender the choice to keep app activity private and allow Google to track app activity data, regardless of that individual's WAA or sWAA settings. ==While the Screenwise compensation structure applies this $3 payment per device per month, it is my opinion that actual damages through December 2022 can be conservatively measured by applying this $3 payment on a one-time basis to the number of Class Member Devices, where a single Class Member Device represents a mobile device (smartphone or tablet) used with WAA/sWAA off at least once during the Class Period through December 2022.== I describe my analysis of Class Member Devices in Section 8.2 below.

\* \* \*

*Page 58, Paragraphs 160-161*

Conclusion Regarding Actual Damages

In my opinion, the most probative indicator of the harm to WAA/sWAA-Off users from Google's collection, saving, and/or use WAA/sWAA-Off Data, and the value of that WAA/sWAA Off Data, is derived from the monthly compensation structure for participants in the Ipsos Screenwise Panel. More specifically, it is my opinion that the baseline payment to Screenwise Panel participants of $3 per month for using a Screenwise meter app on a single mobile device represents a conservative indicator of the monthly payment necessary for an individual to knowingly surrender the choice to keep their app activity private and allow Google to track all app activity data, regardless of that individual's WAA or sWAA settings. While the Screenwise compensation structure applies this $3 payment per device per month, it is my opinion that actual damages through December 2022 can be conservatively measured by applying this $3 payment on a one-time basis to the number of Class Member Devices, where a single Class Member Device represents a mobile device (smartphone or tablet) used with WAA/sWAA off at least once during the Class Period through December 2022. My calculations in this regard are detailed in the Schedule 10.1 and summarized in the figure below:

**Figure 50**
**Actual Damages: July 2016 to December 2022[269]**

|  | Total |
|---|---|
| Class Member Devices | 162,015,424 |
| Selected Payment per Class Member Device | $3.00 |
| Actual Damages | $486,046,273 |

Schedule 10.1 (*Actual Damages Through December 2022*)

|  | Ages 10-17 (1) | Adults 18+ (2) | Total |
|---|---|---|---|
| Estimated Class Members | 8,539,766 | 82,408,894 | 90,948,660 |
| Average Number of Mobile Devices per Person (3) | 1.00 | 1.86 | N/A |
| Class Member Devices | 8,539,766 | 153,475,659 | 162,015,424 |
| Selected Payment per Class Member Device (4) | $3.00 | $3.00 | N/A |
| Actual Damages | $25,619,298 | $460,426,976 | $486,046,273 |

\* \* \*

**Excerpts from ECF 361-1 (Plaintiffs' Motion for Class Certification)**

\* \* \*

*Page 21 (Emphasis in Original)*

c. Actual Damages

Actual damages (including restitution) can also be calculated classwide using common evidence. Mr. Lasinski quantified the value of class members' data that Google unlawfully collected, relying on an internal Google project known as the "Ipsos Screenwise Panel." Through this program, Google pays people to let Google track their activity on a device, including mobile devices. Lasinski Report ¶¶ 135, 139. Google's payments to users can exceed $16 per month. *Id.* ¶ 142. But Mr. Lasinski selected the program's minimum payment for a single device ($3 per month) as a conservative indicator of the payment necessary for an individual to allow Google to track their app activity. *Id.* ¶ 151. Although Google pays participants $3 *per month*, Mr. Lasinski calculated actual damages in a more conservative way, applying this $3 payment on a *one-time* basis, for each mobile device used with (s)WAA off during the Class Period. Id. As another Court held, this figure approximates both restitution and the value associated with the peace of mind from knowing that Google is not watching. *Brown*, 2022 WL 17961497, at *5. Mr. Lasinski also used internal Google data to quantify the number of class members devices, totaling 162,015,424 across the two classes and for the full Class Period. *Id.* ¶¶ 152–59. Multiplying that input by $3 per device, Mr. Lasinski calculated that Google would have had to pay at least $486 million to persuade class members to give up their data and their peace of mind. *Id.* ¶ 161.

**Excerpts from ECF 361-2 (Plaintiffs' Trial Plan in Support of Motion for Class Certification)**

\* \* \*

*Page 21 (Emphasis in Original)*

**Michael Lasinski**: Plaintiffs' damages expert Michael Lasinski is a Certified Public Accountant with twenty-nine years of experience evaluating the financial aspects of intellectual property for government entities, corporations, and law firms. Mr. Lasinski has two damages models. In one model, he quantified the aggregate amount by which Google was unjustly enriched from its collection and use of (s)WAA-off app activity, focusing on how Google used the data to serve and monetize advertisements and to track advertising conversions. Lasinski Rep. § 7. Using Google's own methodologies from its internal studies of the revenue impact of other privacy settings that affect these same revenue-generating activities, Mr. Lasinski concluded that Google made approximately $664 million from its use of (s)WAA-off app activity to serve ads and track conversions. *Id.* ¶ 129. In his other damages model, Mr. Lasinski quantified the aggregate value of the class members' data that Google unlawfully collected, relying on a Google project where Google paid users $3 per month to track their activity on a device. Id. ¶¶ 135, 139, 151. Conservatively using that $3 input on a *one-time* basis, rather than a per-month basis, Mr. Lasinski calculated that Google would have had to pay at least $486 million to class members for their data. *Id.* ¶ 161. Mr. Lasinski has also explained how any aggregate damages award can be readily apportioned. *Id.* § 9.

**Excerpts from ECF 361-4  (Plaintiffs' Opposition to Motion to Exclude Opinion of Michael Lasinski)**

\* \* \*

*Page 5 (Background)*

Considering these market transactions, Mr. Lasinski selected Google's Screenwise program (and Google's own payments to participants) as the most reliable evidence of both the payment necessary for a user to willingly relinquish their app data privacy from Google, and Google's willingness to pay for mobile activity data. *Id.* ¶ 151. Mr. Lasinski then arrived at his $3- per-device estimate by adjusting Google's Screenwise payments to fit the data at issue in this case. First, Mr. Lasinski excluded enrollment payments, which require the participant to provide additional information and an agreement to abide by certain rules set forth by Screenwise, and are not compensation for activity data. *Id.* ¶¶ 140 fig.45, 151. Second, Mr. Lasinski excluded monthly payments for other types of data, namely activity on a web browser (for which Google pays $3 per month) and data sent via a special Screenwise WiFi router (for which Google pays $5 per month). *Id.* ¶¶ 141, 151. ==Mr. Lasinski then isolated two Screenwise payments for data similar to the app activity data at issue in this case: Google pays $3 per month for a mobile phone and $3 per tablet, regardless of the user's activity level or beliefs about privacy. Id. For reasons described below, Mr. Lasinski applied a conservative, single $3-per-device payment, rather than a monthly payment. *Id.* ¶ 151.== He calculates that classwide actual damages equal $486 million. *Id.* ¶ 161 fig.50.

\* \* \*

*Page 16*

B. Mr. Lasinski's actual damages model is relevant and reliable.

Mr. Lasinski's quantification of actual damages and restitution is well-supported. Lasinski Rep. ¶ 69. As explained (see Section II.C), Mr. Lasinski used an industry-recognized, market based approach, relying on market-tested evidence to reach a fair value for the at-issue (s)WAA off app activity data. Mr. Lasinski canvassed the market for real-world transactions suggesting Google's willingness to pay for app activity data, and users' willingness to relinquish the privacy of their app activity from Google. Lasinski Rep. ¶ 132. Mr. Lasinski identified four comparable transactions, involving AT&T, Nielsen, a company called SavvyConnect—and Google. Id. ¶¶ 132-51. Through its Screenwise

program, Google actually pays users to monitor their activity. *Id.* ¶¶ 135-42. ==Two particular payments stand out: Google pays users $3 per month to track their activity on a mobile phone and an additional $3 per month to track their activity on a tablet. *Id.* ¶ 141. Notably, with both devices the primary tracking activity is done over apps. Accordingly, in Mr. Lasinski's judgment, this is the most reliable evidence of Google's willingness to pay for data and users' willingness to relinquish their privacy from Google. *Id.* ¶ 151. Mr. Lasinski arrives at a classwide damages estimate by multiplying $3 by the number of class-member devices. *Id.* ¶¶ 160- 61. The basis of Mr. Lasinski's opinion is no "mystery." Mot. 20.== That is how much Google itself is actually willing to pay, and users are willing to accept. Google's criticisms are theater.

*\* \* \**

*Pages 19-20 (emphasis in original)*

Google next criticizes Mr. Lasinski for suggesting a one-time payment, even though Screenwise payments were monthly. Google says this suggestion is "inexplicable," but once again, Mr. Lasinski's testimony provides the answer Google claims is missing: ***Google deleted the data necessary to conclusively determine whether it collected (s)WAA-off data from a particular device in a given month***. Lasinski Tr. 57:14-58:7. Early in the litigation, Plaintiffs asked Google to preserve (s)WAA-off activity data, which would have done the job. But Google refused, arguing that "***the actual data Google received … cannot possibly bear on the viability of Plaintiffs' claims or Google's defenses***." Mao Ex. 13 at 5. When the parties briefed the dispute, Google's position carried the day. *See* Dkt. 185. Now that the trap has been laid, Google weaponizes the absence of data it insisted was irrelevant and could be deleted without prejudicing Plaintiffs. Google's gamesmanship should not be countenanced. *See Eastman Kodak Co. v. S. Photo Mats. Co.*, 273 U.S. 359, 379 (1927) ("[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."); *cf. Raffin v. Medicredit, Inc.*, 2017 WL 131745, at *6 n.5 (C.D. Cal. Jan. 3, 2017) (rejecting argument against class certification that was affected by the "defendant's own destruction of records").

As Mr. Lasinski explained during his deposition, at least a single $3 payment is justified because the Firebase and GMA SDKs are so prevalent that it is effectively certain Google collected app activity data from each (s)WAA-off mobile device during one period or another. Lasinski Tr. 62:6-14; *see also* Hochman Rep. ¶¶ 2, 59, 355-56. But without the data that Google deleted (over

17

1  Plaintiffs' objection), Mr. Lasinski was not equally certain about the *precise*
2  *number* of months during which Google collected (s)WAA-off app activity data
3  from a mobile device. Lasinski Tr. 61:17-62:2. *See Pet Food Exp. Ltd. v. Royal Canin USA, Inc.*, 2011 WL 6140874, at *5 (N.D. Cal. Dec. 8, 2011)
4  ("'mathematical precision' is not required in calculating the extent of damages.").
5  So Mr. Lasinski did what trustworthy experts do: He erred on the side of caution, calculating these damages with only a one-time payment. Lasinski Tr.
6  62:3-5. Google's suggestion that Mr. Lasinski should have gotten more "creativ[e]" and that conservatism is "no rationale" at all reflects on Google, not
7  Mr. Lasinski. Mot. 18. What Google is really saying, with a straight face, is that Mr. Lasinski's actual damage opinions should be stricken because the actual
8  damages he prescribes are not high enough. If Google honestly believes a $3 payment is inadequate, that problem is easily solved: Plaintiffs welcome a
9  stipulation that Mr. Lasinski's estimated payment should apply on a per-month basis over the class period, based on class members' (s)WAA settings. Either
10  way, Google should not be permitted to benefit even more from its deletion of data than it already has.