IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICHARD SEEBORG, CHIEF UNITED STATES DISTRICT JUDGE


Anibal Rodriguez, et al.,           )
individually and on behalf of       )
all others similarly situated,      )
                                    )
                 Plaintiff,         )
                                    )
            vs.                     )   3:20-cv-04688-RS
                                    )
Google LLC, et al.,                 )
                                    )
                 Defendant.         )
_____)


REPORTER'S TRANSCRIPT OF MOTIONS HEARING

THURSDAY, FEBRUARY 13, 2025

3:22 P.M.

SAN FRANCISCO, CALIFORNIA


_____

Teresa B. Johnson, CVR-M-CM, RVR, RVR-M
U.S. District Court Reporter
250 East North Street, Room 3401
Greenville, SC 29601

California CSR License# 14765
Appearing via videoconference

                    APPEARANCES OF COUNSEL:


For Plaintiff:

     Boies Sciller and Flexner
     BY:  David Boies, Esquire
     333 Main Street
     Armonk, NY  10504
     Appearing in person


For Defendant:

     Willkie Farr & Gallagher LLP
     BY:  Eduardo E. Santacana, Esquire
          Benedict Y. Hur, Esquire
          Argemira Florez, Esquire
          Harris Mateen, Esquire
     333 Bush Street
     San Francisco, CA  94104
     Appearing in person


ALSO PRESENT:

          Mark Mao, Esquire, Boies Schiller Flexner
          James Lee, Esquire, Boies Schiller Flexner
          John Yanchunis, Esquire, Morgan & Morgan
          Ryan Sila, Esquire, Susman Godfrey

<u>**P R O C E E D I N G S**</u>

1

2          (Court is called to order on Thursday, the

3          13th day of February 2025, at 3:22 p.m.)

4          THE COURTROOM DEPUTY:  Calling Case

5 20-CV-4688, Rodriguez versus Google.

6          Counsel, please come forward and state your

7 appearances.

8          MR. BOIES:  Good afternoon.  My name is David

9 Boies of Boies, Schiller and Flexner on behalf of the

10 plaintiffs.

11          THE COURT:  Good afternoon.

12          MR. HUR:  Good afternoon, Your Honor.  Ben

13 Hur, Eduardo Santacana, Argemia Florez, and Harris

14 Mateen from Willkie, Farr, and Gallagher for Defendant

15 Google.

16          THE COURT:  Good afternoon.

17          MR. MAO:  Good afternoon, Your Honor.  Just

18 special appearances:  Marc Mao and James Lee with Boies

19 Schiller Flexner; colleague John Yanchunis of Morgan and

20 Morgan; also Ryan Sila with Susman Godfrey.

21          THE COURT:  Good afternoon.

22          MR. MAO:  Good afternoon.

23          THE COURT:  We may need to -- to have

24 somebody, as I understand it, from IT or IT department

25 who may come and fiddle with the microphone; is that

1    right, Ms. Lew?

2            THE COURTROOM DEPUTY:  Yes.

3            THE COURT:  Yes.  So don't --

4            THE COURTROOM DEPUTY:  We could still talk,

5    but --

6            THE COURT:  Yeah.  Don't -- I mean, it may be

7    a little distracting, but just barely long, because

8    we've got to get through this.  So don't be surprised if

9    somebody is fiddling with the microphones up here.

10           Okay.  So this is Google's motion to strike

11   the supplemental damage opinion of Mr. Lasinski.  I've

12   read through what you've given me.  It's kind of a

13   glorified Rule 26 disclosure issue.  Don't see too many

14   of those; usually, those refer to the magistrate judges.

15   But this is a consequential issue, I understand.

16           So I don't have a tentative for you.  Probably

17   just want to get a sense from you about what's going on

18   here.  So why don't I go ahead and start with Moving

19   Party, whoever wants to speak?

20           MR. SANTACANA:  Thank you, Your Honor.

21   Eduardo Santacana for Google.

22           So I think I'll -- I'll just quickly summarize

23   our position, Your Honor, and see if you have questions

24   for me.

25           This is a Rule 26 issue.  We filed the motion

1    before there was a supplemental damages report.  It was

2    disclosed after the motion was filed.  I don't take any

3    issue with that, but just to be clear procedurally on

4    where we're at.

5            It's a -- it is a Rule 26 motion to strike.

6    And the plaintiff's position is that they're authorized

7    by Rule 26 to have amended their damages computations,

8    and then, ultimately, the calculation of actual damages

9    that Mr. Lasinski makes because of the duty to

10   supplement under Rule 26.

11           And the Ninth Circuit has looked at this at

12   least three times in reported decisions and once in

13   unreported decision in the last few years, and every

14   time has come to the same conclusion, which is that

15   that's not -- what -- what they've done there is not an

16   appropriate use of Rule 26, which is a duty, not a

17   right, to supplement your expert report --

18           THE COURT:  Although I assume those cases are

19   all -- are they-all saying that the judge's discretion

20   at the trial level on the issue is the one that they're

21   affirming?

22           MR. SANTACANA:  That's exactly right.  They're

23   affirming under abuse of discretion a district judge's

24   decision to exclude --

25           THE COURT:  Right.

1          MR. SANTACANA:  -- supplemental expert

2    opinions.

3          THE COURT:  So they're not necessarily

4    saying -- they're saying that it's a (inaudible) that

5    the district judge, the trial judge, is going to get to

6    make, is what they're sort of saying, if you have a

7    basis for the decision that you make.  Didn't want to

8    sort of jump ahead and --

9          MR. SANTACANA:  Sure.

10          THE COURT:  I believe in the rules.  The rules

11    are important.  We need to respect them.  At the same

12    time, just so that I kind of have an understanding of

13    what went on here, Mr. Lasinski, in his initial report,

14    said he had a conservative floor, which I know you will

15    take great issue with.  But what he said at the time

16    was -- he disclosed his methodology.  Methodology said

17    the -- his conservative floor was 486 million.  And

18    he -- he explained how he got there.

19          And you, in the deposition, pushed back on him

20    and said, you know, "Why are you using this three-dollar

21    figure on a one-time basis?  Isn't -- it would make more

22    sense, if we're applying your approach, to doing it on a

23    monthly basis?"

24          And he said, "Well, I don't have enough

25    information because Google hasn't turned over what I

1    would need to do that."  Okay.

2            For the moment, I'm not getting into the

3    battle of whether or not you should or shouldn't have

4    turned over that material.  He -- he's telling you

5    exactly what his method is.  He's saying, "This is my

6    floor, and here we are."

7            Your motion to strike, if I understand it

8    correctly, is to effectively say that, you know, they --

9    he can't go over four -- 486 million because that's the

10   figure he -- you're locked in.  That's your ceiling now.

11   How do you get there?

12           MR. SANTACANA:  So --

13           THE COURT:  I don't get it.

14           MR. SANTACANA:  I think there are two -- two

15   misnomers in your summary of our motion that come, I

16   think, from the way that the oppositional brief was

17   argued.  And I want to address that.

18           THE COURT:  You blame them.  That's right.

19           MR. SANTACANA:  So I want to address both of

20   those head on.  So the first is, you said that I

21   questioned Mr. Lasinski to say, "Wouldn't it make more

22   sense to do it this way?"  I'm not sure that's quite how

23   I characterize what happened in the record.

24           What I said was in the deposition -- I mean,

25   he was questioned for hours about lots of different

1    factors he could have taken into account, as you'll

2    recall.  Then we filed a *Daubert* that said, "Can you

3    take account any -- anything, basically, other than

4    three bucks per head?"  So this is one of the factors

5    that we questioned him on.

6           The reason was because he did use the months

7    figure as a third variable in his calculation -- $3,

8    number of devices, and number of months.  He did it in

9    the *Brown* case, and that had happened before the

10   deposition.  And so the obvious question was, "Why did

11   you change your methodology for this case?"  So not that

12   I thought it would make more sense, I just wanted to

13   understand his opinion.  And he explained it.

14          And it was not -- the explanation was not that

15   he was missing data.  And I -- I want to be really clear

16   about this.  Because the opposition raises two different

17   types of data that it argues are somehow relevant to

18   this, and neither one of them is relevant at all.  And

19   this is how we know that.

20          First of all -- actually, there's two reasons

21   we know that.  One is, in the *Brown* case, he disclosed

22   his intention to multiply by months in words, not in

23   numbers.  He could have done that in his report.  He

24   chose to do the opposite, which was to say, "I don't

25   want to multiply by months.  I want to do this one-time

1  fee."  So he disavowed the same approach he took in the

2  other case.

3         But the other way we know it is, because I

4  questioned him about it, in the report, he had already

5  calculated the number of months up through 2022.  That

6  number was already in there.  He uses it for a

7  completely different, unrelated opinion.  And so that

8  variable is out there.

9         And I say, "We have all these numbers in your

10  report.  Here's one that you already calculated and

11  said, so you could, for example, calculate the number of

12  sWAA off months for each user, right?"

13         He said, "I did do that, yes."  So he's -- in

14  his deposition, "I did that.  I have the number already.

15  I don't need any more data.  I have the number."

16         And I said, "You did do that.  So why didn't

17  you pay them for sWAA months in your actual damages

18  opinion?"

19         And his response was, "I mean, ultimately, I

20  thought it was more appropriate and conservative to do

21  a -- a one-time calculation with the same information I

22  had available."

23         THE COURT:  Yeah.  But doesn't he say he

24  didn't have sufficient information, i.e., from you?

25         MR. SANTACANA:  He -- he uses a disclaimer,

1    Your Honor, that we use in every expert report in every

2    case, which is:  "If more information comes out later, I

3    will reserve the right to supplement that."

4            He does also separately complain that we

5    hadn't provided him certain types of information that

6    don't bear on this question.  So the number of months

7    that users had sWAA turned off had been disclosed to

8    them.  And he calculated the number.  And it's in his --

9    in his expert report -- I can point you to the paragraph

10   in his expert report where he has the number sitting

11   right there.

12           Now, when the plaintiffs supplement their

13   initial disclosures a few months ago, in September, they

14   rigged the number from his original expert report.  And

15   they multiplied by $3 and by the number of devices.

16           So the opinion I want to exclude is an opinion

17   that takes numbers from one part of his report and

18   multiplies in another part.

19           THE COURT:  Well, but --

20           MR. SANTACANA:  So they weren't missing

21   anything.

22           THE COURT:  -- in your -- your motion, I

23   thought the -- the end result of what you want me to do

24   is to lock them in at 486 -- 486 million is -- that's --

25   that's the ceiling of what they can seek in this

1    lawsuit.

2              MR. SANTACANA:  Well, they had a second

3    different -- another damages matter with a larger number

4    than that.

5              THE COURT:  All right.

6              MR. SANTACANA:  But as for damages, what I'm

7    asking is that they'll stick to the computation they

8    disclosed during discovery.

9              THE COURT:  But he -- he said at the time --

10   he said -- he -- he said it was his floor, right?  You

11   know, I understand why you think he's out to lunch and

12   you're going to be able to go and, you know, hammer and

13   (inaudible) against this guy.  And I'm not saying he --

14   at this point that, you know, I buy his calculation.

15             But what's unusual about this motion to me is

16   that ordinarily when this kind of issue percolates up to

17   me, it's that, "Oh my God, the -- the -- the other side

18   has changed their entire -- they've -- they've done a

19   bait and switch on us.  They pulled their -- their

20   initial methodology.  And they've got a whole new thing.

21   And we're prejudiced because we built our case all the

22   way along premised on this idea that we understood what

23   they were seeking."

24             Here, their -- he hasn't changed anything.

25   He's changed the -- the -- you knew all the factors he

1    was going to use.  And now he's doing it per month with

2    a particular period of time.  How are you hurt by that?

3    You knew all that before.

4              MR. SANTACANA:  So that -- that -- now -- now

5    you're asking about harm.  But I want to be --

6              THE COURT:  Well, I do want to ask about it.

7              MR. SANTACANA:  Yeah.

8              THE COURT:  So even though you may think I'm

9    mixing things --

10             MR. SANTACANA:  No, no.

11             THE COURT:  Go with me.

12             MR. SANTACANA:  I'll go with you.

13             THE COURT:  So tell me why that's wrong.

14             MR. SANTACANA:  Yeah.  So what -- what I did,

15   Your Honor, and what we did repeatedly at his deposition

16   with two of our rebuttal expert reports, after *Daubert*,

17   we said it's inexplicable that he chose not to multiply

18   by months, given that he had done it in *Brown*, and that

19   is evidence that his methodology is malleable.  That was

20   one of the attacks that we made.  Your Honor opined on

21   it at class cert at summary judgment.

22             We also relied on Mr. Lasinski and the

23   plaintiffs closing themselves out of including months as

24   a variable in the calculation.  So it's an -- an

25   equation that had two -- two inputs -- $3 dollars --

```
1              THE COURT:  How is your --

2              MR. SANTACANA:  -- number of --

3              THE COURT:  How is -- all the work you've done

4    on the case after the disclosure of the report, how are

5    you now impacted in the -- in the sense that you --

6    you've been prejudiced in that you thought that this

7    case was very -- going off on a very different angle,

8    and you've structured your case, and you've done it all,

9    and now, "Oh my God.  We're so left in a terrible

10   position because all this time was spent thinking the

11   case was something that it isn't"?  That -- that's not

12   the case here.

13              I -- I -- you have a Rule 26 argument.  And

14   I'm not discounting it.  And I'm not even saying that

15   I'm not going to accept it.  But it is a -- it is --

16   what I'm asking you is it seems to me to be more a

17   technical violation of the rule than one that has

18   actually really, negatively impacted you very much.

19              We've got months before trial.  They've now

20   upped the ante quite significantly in terms of the

21   exposure.  I understand that.  But I -- I don't think

22   you're going to tell me, "Well, you know, for all these

23   months, we've been building a case.  And now they've,

24   you know -- people have -- we can't find people who can

25   respond."  I mean, it's -- it's just not one of those
```

1    cases.  It's a technical, at best, Rule 26 violation.

2          MR. SANTACANA:  So the reason that there is

3    harm -- and I want to also remind you that under Rule

4    37, it's about harmlessness.  The sanction under Rule 37

5    is automatic unless they can show harmlessness, not a

6    lack of prejudice, which are different standards.  And

7    harm -- the harm here is the deposition we did of him

8    was a waste of our time and money.  They're asking us to

9    depose him again, which costs time and money and have to

10   reopen discovery.  The rebuttal reports of two of our

11   experts now need to be supplemented.  No doubt they will

12   want to depose them too.

13         The *Daubert* arguments that we made against

14   him, we will have to make again.  Now, we've had April 3

15   date for a *Daubert*.  If you let this in, we intend

16   *Daubert* it, but we have to do it all over again.

17         Your Honor ruled on a *Daubert* -- on an actual

18   damages model that doesn't exist anymore.  And -- and

19   when you were ruling on it, we were arguing that a flaw

20   in the model was that it was missing this.  So now we

21   are in a situation where you've ruled on a model that

22   doesn't exist.

23         In class certification, you were required to

24   evaluate the damages model under *Comcast v. Behrend*.

25   You certified a class under a model that no longer

1    exists anymore, that is -- where damages are calculated

2    differently.

3            THE COURT:  How does the model no longer

4    exist?  It's the same thing.

5            MR. SANTACANA:  It's really not.

6            THE COURT:  He's now multiplying by month,

7    something you contemplated might have been the case.  So

8    the figure has now gotten exponentially bigger.  Okay.

9    I understand that.

10           But I just don't see this -- this shift you --

11   you're saying has occurred here because it -- it doesn't

12   appear that that's the case.  I understand that you

13   think it's smoke and mirrors, and you're going to be

14   using every opportunity to attack it.  And that's your

15   right.

16           But this idea that if the best harm you can

17   come up with is, "We have to take another deposition,"

18   well, maybe I'll give you the cost of the deposition.

19   They may might have to pay for it.  But that's not

20   significant harm in the light -- in light of the nature

21   of this case.

22           MR. SANTACANA:  Well, there's a few things I

23   would say about, you know, decisions that I think hold

24   differently.  So the -- the three Ninth Circuit

25   decisions say that if you have to reopen discovery, that

1   is by definition "harm."  Because what you've done is

2   you've permitted a party to lie in wait or to change

3   their mind after the fact.

4           And those three Ninth Circuit cases are

5   *Hoffman*, *Ollier*, and *Wong*.  They're opining on what does

6   Rule 37 mean in the --

7           THE COURT:  But how is -- how did they change

8   it?  They said the -- Mr. Lasinski said, "This is how

9   I'm calculating this.  And my conservative floor,

10  subject to my getting more information, is $486

11  billion."

12          So now they -- now he's doing it on a

13  per-month basis, and the figure has gone into the

14  stratosphere.  But how is that -- how -- how --

15          MR. SANTACANA:  The analogy -- if -- if he

16  had -- if he had -- he was measuring lost profits and

17  his damages model had been, "I've measured the amount of

18  revenue that you made on your infringing widget," and

19  doesn't particularly count profit margin, and then the

20  discovery ends.  And then the -- after that, the expert

21  comes back after being Dahuberted -- there's a *Daubert*.

22  There's -- he's criticized for it -- comes back and

23  says, "Actually, let's take costs into account."

24          Or the expert says during expert discovery, "I

25  disavowed reliance on a particular cost line in the

1    profit-and-loss statement.  That one wouldn't be

2    appropriate to deduct."  And then before trial, and

3    after everything is done, he comes back, and he says,

4    "Actually, I think we should deduct it."

5          Those are actually examples that are very

6    similar to the cases that we cited.  Both -- in this

7    district -- Judge Illston, Judge Tigar, Judge Davila --

8    have all done this in very similar circumstances, and

9    that the Ninth Circuit was affirming in *Wong*, *Ollier* and

10   *Hoffman*.  And what they say is that Rule 26 requires you

11   to disclose not just the category of damage, but it's

12   computation.  You have to say the amount you're going to

13   ask the jury for.  So if you allow -- if you're

14   permitted to wait 600 days after discovery to start

15   disclosing new numbers using new variables and new

16   factors, which is what happens in the cases that we

17   cited, cases like *NetFuel versus Cisco* that Judge Davila

18   decided --

19          THE COURT:  What are the new variables and new

20   factors?

21          MR. SANTACANA:  In this case?

22          THE COURT:  Yeah.

23          MR. SANTACANA:  So in this case, as I said,

24   the equation was -- $3 was the amount the data was

25   worth.  And then the number of devices was the second

1    input.  Those are multiplied for a number.  And when --

2    when -- and the report said, and I expressly don't want

3    to multiply it by months, even though Google's

4    Screenwise program would multiply it by months.  And

5    then, in deposition, he said the same thing.

6         In response to the criticism at *Daubert* that

7    he didn't multiply it by months, the plaintiffs didn't

8    say, "Oh, he will later.  Don't worry."  They didn't say

9    he's always intended to.  They didn't say that's

10   actually a hidden third variable in his equation.  They

11   said, "It's a feature, not a bug.  It's a good thing

12   that he didn't multiply it by months, because it makes

13   it a conservative opinion."

14        So they are -- just like the expert who

15   disavows a cost line item on a profit margin, they're

16   disavowing something until 600 days after discovery is

17   over, and then coming back and saying, "Actually, I've

18   changed my mind.  I don't disavow anymore.  I embrace

19   it."  And that's very similar to some of the cases that

20   we cited.

21        Another one is *Mass Probiotics*, where the --

22   after discovery, there were line items in the financials

23   that they had said, "We're not going to rely on," and

24   then they came back, and they started to rely on them.

25   In every one of these cases that we cited, the Court did

 1   not say, "Just take a depo and let -- make them pay for

 2   it."  The Court said, "Scheduling orders mean something.

 3   Rule 37 is very harsh.  It's an automatic sanction for a

 4   reason because you -- you have to disclose your

 5   computation before discovery closes, so that everybody

 6   knows what they're preparing, so that everybody has a

 7   chance to attack it, and so that when you attack it, the

 8   experts" -- so in *Benefit Cosmetics*, you held the

 9   expert, while he's sitting in a chair at deposition,

10   cannot start offering surrebuttal opinion because it's

11   not fair.  They have to offer their opinion, and then

12   they have to lock themselves into it.

13           And this isn't a case where the -- the record

14   is silent about this particular issue with the opinion.

15   This is a case where they've repeatedly disavowed any

16   intention to rely on the number of months as an input

17   into the calculation, and now they're relying on it.

18   And of course, the reason is obvious, right?  It does

19   enhance the exposure, but it is also a -- not just a

20   quantitative difference; it's a qualitative difference

21   in how the equation is set up.  It's an input they said

22   they wouldn't use.

23           THE COURT:  Okay.  Let me hear from the

24   plaintiffs.

25           MR. BOIES:  May it please the Court?

```
1              THE COURT:  Yes.
2              MR. BOIES:  Let me begin by just clarifying
3   what the record actually shows.  Counsel told you that
4   Mr. Lasinski did not give us an explanation that he
5   didn't have the data.  That is just not accurate,
6   Your Honor.
7              The deposition is before the Court.  But on
8   page 57 of the deposition, and this is after the
9   calculation of $3 per month is one that has been
10  decided.  After Mr. Lasinski had said that a
11  conservative measure is $3 per device per month.  And
12  that was based on the so-called Ipsos study that Google
13  did.
14             Now, counsel, same counsel that's arguing, in
15  the brief:
16                  "Question:  The Ipso study paid $3 a
17             month?
18                  "Answer:  In certain cases, yes.
19                  "But your actual damages opinion pays $3
20             just once.
21                  "Answer:  That's -- that is correct.
22                  "Question:  Why?
23                  "Answer:  Because based on the information
24             that I have, I am able to determine the number
25             of devices that had sWAA off at at least a
```

                    given point in time.  I am not able to

                    determine the certainty that it has sWAA off

                    and actually met with other requirements for

                    the damages calculation, such as hidden

                    third-party sites with Google trackers on them

                    after the initial calculation."

            Now, just to be certain that there's no

    misunderstanding about what he was saying, he was saying

    he didn't have at that point, the data to be able to

    determine how many months to multiply it by.  Counsel,

    and this is at page 59, and this is counsel's question

    summarizing what has just happened.

            "Question:  Now I asked you why you assigned

    $3 per device rather than $3 per month.  And you said

    because you were missing data on whether a particular

    device actually went to third-party sites."

            That's at lines 5 and 9.

            And then on page 61, again, a question:

            THE COURTROOM DEPUTY:  I know.  I can't -- I'm

    sorry, Judge.  The court reporter is trying to talk, but

    I can't hear her.  So I don't think she can --

            THE COURT:  She's indicating she can't hear,

    unfortunately.

            THE COURTROOM DEPUTY:  Yeah.

            Can you hear me?

```
 1              THE COURT:  As you all know, we have a court
 2    reporter shortage, so we're virtual.  And this is the
 3    first time I've had any issue with it.
 4              THE COURTROOM DEPUTY:  Yeah.  So you can't --
 5    can we stop one minute?
 6              THE COURT:  Well, perhaps, if Mr. Boies move
 7    to that -- is that lecture working better?
 8              THE COURTROOM DEPUTY:  Let's see.  Is the
 9    other lectern -- okay.  Let's try that.
10              MR. BOIES:  Can you -- can you hear me now?
11              As they say in the commercials.
12              THE COURTROOM DEPUTY:  Oh, step back a little
13    bit, she said.
14              THE COURT:  Step back a bit.
15              Okay.  Try again.  Try the:  "Can you" --
16              MR. BOIES:  Can you hear me now?
17              THE COURT:  She can.
18              THE COURTROOM DEPUTY:  She can, yeah.  Okay.
19              MR. BOIES:  To sort of summarize --
20              THE COURT:  I -- I'm -- I'm with you.  I have
21    the transcript -- parts of the transcript, so I'm with
22    you.  Go ahead.
23              MR. BOIES:  So I -- I'll now go to the page
24    61, line 17.  This is the third time this question had
25    been asked.
```

1     "Question:  Why was it more appropriate to

2          do a one-time calculation?

3          "Answer:  Again, even if I had SWAA off

4          months, that wouldn't necessarily tell me --

5          or not technically, if they hid a third-party

6          site with Google tracking.  And so in this

7          case, as I've said in the past, appropriate

8          and conservative, I calculated a one-time

9          payment per device."

10    And then, it goes on.  Page 63, lines 14 to

11    17, says the same thing.

12    THE COURT:  So my question to you is:  What --

13    what changed for him between the time of the

14    supplemental -- or between the time of his initial

15    report and then his decision to adopt to the per-month

16    approach and come up with the figure that he came up

17    with.  What -- what's new?  Why -- why did he do it?

18    MR. BOIES:  I -- I think two things,

19    Your Honor.  And -- and to answer fully, I need to go

20    back a little bit into -- into time.

21    At the very beginning of this case, we asked

22    for documents and data that would show the actual number

23    of months that class members used devices with WAA

24    turned off and hit third-party sites.  And we asked

25    that -- who will preserve all that data.  Judge Tse

1    denied our request on the grounds it was too voluminous

2    and said that what we should do is we should have a

3    statistical sampling.

4            We then asked Google to provide a statistical

5    sampling.  And they said -- this was before class

6    certification -- and they said it is premature to do

7    that until we have class certification.  There's a

8    dispute as to whether they agreed to do it or not after

9    class was certified, but there's no dispute that they

10   objected to doing it at that time, providing the sample

11   data.  And they said it was premature to do it until

12   class had been certified.  Of course, class wasn't

13   certified until after discovery closed and after class

14   was certified and the motion to clarify was decided.

15   Again, asked them for the sample data.

16           And then we had the Case Management Conference

17   on October 10th.  Preceding that, we had a case

18   management statement.  And in that statement, we said we

19   want the sample data.  And they said, you don't need the

20   sample data because the jury can infer from all the data

21   that you already have, how many months are at issue.

22           And what we did in the so-called new opinion,

23   which is not a new opinion at all.  There's no opinion

24   that's there.  All the expert at saying is, "I'm going

25   to provide illustrative calculations so that the jury

1    knows the arithmetic that occurs if they find a certain

2    number of months."  And Google was saying explicitly in

3    the case management statement that they put in, they

4    were saying -- let me see if I can find it.

5           They say -- and this is on page 13 of the case

6    management statement at line 21.  Importantly,

7    plaintiffs admit that there are satisfactory

8    alternatives to this data, that is, the sampling data

9    that we're asking for, that could achieve the same

10   purpose, i.e., plaintiffs can ask the jury to draw

11   certain inferences using the information Google did

12   produce.  That's in quotes.  Plaintiffs cannot argue

13   prejudice.  They have not argued, and cannot argue, that

14   they cannot make their intended arguments before the

15   jury at trial without the data that they belated the

16   request.

17          Now, they knew exactly what our intended

18   arguments for trial were at this point.  Because this is

19   after our third amended disclosure.  So they know

20   exactly what we are going to be asking the jury to find,

21   which is to take the number of months that the jury

22   finds that this data was actually used multiplied by the

23   number of devices multiplied by $3.

24          THE COURT:  Well, under that theory, and I

25   just want to understand your position, do you think the

1   initial report by Mr. Lasinski would permit you to make

2   the -- the demand for the calculation that you now make?

3   In other words, are you saying because he said how he

4   did it, and he said this is a conservative floor and the

5   rest, that therefore, he didn't even need a supplemental

6   report?  Is that what you're arguing?

7           MR. BOIES:  Absolutely, Your Honor.  And not

8   only is that our argument, that is what Google agreed to

9   up until their child brief in this -- in this motion.

10          THE COURT:  But the -- the -- from their

11  perspective, therefore, the 486 million doesn't really

12  give them much of a sense of what you're going to be

13  claiming.  Because Mr. Lasinski disclaims that he's

14  going to use a per month multipli- -- dollars per month.

15  He's going to do it on a one-time basis, and they're

16  left with, all right, that's how he's calculated it with

17  the usual caveats and maybe new information and the

18  like.  Then we don't have any new information.  And then

19  he's -- he's come up with a 50 billion, or whatever the

20  figure is.  So they really weren't on notice that that's

21  what you were going to do.

22          MR. BOIES:  I -- I -- I think, Your Honor,

23  they were certainly on notice of the following things --

24  and he didn't disclaim.  He didn't disavow.  What he

25  said -- and I read it four times --

```
 1              THE COURT:  Yeah.  No.  I have it in front of
 2    me.
 3              MR. BOIES:  What he said was, "I don't have
 4    the information.  I don't have the data for me to make
 5    that -- for me to render an opinion as to how many
 6    months."
 7              And as Your Honor will see at -- at trial,
 8    Mr. Lasinski is a very conservative expert.  And you
 9    know, his view was, "I can't tell you exactly because I
10    don't have the data."  Our argument was, we're going to
11    ask a jury to make that inference from the evidence that
12    we can present to the jury, and that you can then take
13    the model -- Mr. Lasinski's model of $3 per device per
14    month, and -- and then -- and the jury can then conclude
15    what the right damages amount is.
16              Now, it is true that in Mr. Lasinski's expert
17    report, he did not calculate each of the numbers that
18    could come up.  It did provide a model, and that model
19    hasn't changed.  The -- he's said repeatedly in his --
20    in his expert report and in his deposition that the
21    right number is $3 per device per month.  He says, I can
22    tell you the $3.  I can tell you the number of devices.
23    But I can't tell you the number of months because I
24    don't have that information.
25              Now, what we were asking for in October --
```

1    actually, we asked for it in September, and then the

2    hearing was in October -- was to provide the sampling

3    data that would permit him to actually take that

4    sampling data and come up with a number.  They said, You

5    don't need the sampling data because you can just ask

6    the jury to infer the number of months."

7            Now, in their initial briefing in this is very

8    motion, Your Honor, in their initial briefing, they

9    say -- and this is on page 11, at lines 17 to 20.  They

10   say:

11           "Plaintiff's new opinion -- that's what

12           they're referring to when they talk about the

13           additional expert disclosure -- is not

14           necessary to support their actual damages

15           opinions.  Plaintiff's own disclosures admit

16           that there are alternatives for the jury.

17           Plaintiff's own disclosures admit that there

18           are alternatives for the jury to reach the

19           actual damages figure without the addition of

20           the new opinion proposed in their third

21           amended Rule 26 disclosures."

22           And they then cite, Exhibit 1, at pages 14 to

23   15 of their brief.  Exhibit 1 at pages 14 and 15 of

24   their brief, which they are citing and which they are

25   saying we can take to the jury as our damage model is

1    word for word what we're asking to do -- it is word for

2    word what is in our third amended disclosure.

3            The only question is whether -- now, in their

4    reply brief, they say, "No.  We want to take this back.

5    And you can't even ask a jury to make inferences."  But

6    assuming that they don't get to take this back, the only

7    issue here is whether the expert gets to make

8    illustrative calculations based on what the jury is

9    going to find the right number of months are.  The

10   expert has provided the formula -- from the very

11   beginning, the same formula, $3 times device times

12   months.

13           All we're going to do is ask the jury to fill

14   in that -- months.  And all we would like to do is have

15   our expert provide arithmetic calculations.  Now, we

16   could probably do it with somebody else on the stand,

17   even one of the plaintiffs, with a calculator or

18   something.  But all we were asking to do with the expert

19   is have the expert make that illustrative calculation.

20           And they got out of reducing the sample data

21   back in October because they said we could take this to

22   the jury.  If -- if they're now going to argue we can't

23   take it to the jury, we're going to ask the court to

24   give us that sample data, so we can actually have the --

25   the expert make the calculations on the sample data.

1          But up until their reply brief, there was

2    agreement that we could ask the jury to make these

3    findings based on the model.  We have information in the

4    record from which we can ask the jury to do that.  And

5    any question with whether we could have the expert do

6    illustrative arithmetic calculations.

7          THE COURT:  I understand.  Thank you.

8          MR. BOIES:  Thank you.

9          Oh, just one more --

10         THE COURT:  Sure.  Go ahead.

11         MR. BOIES:  Mr. Lee reminds me of something

12   that I knew I was going to forget, and that is -- and

13   it's a minor point -- but in his expert report, he says

14   this was up through 2022.  And now if -- we certainly

15   would have some number -- number of months after 2022.

16   So, I mean --

17         THE COURT:  I understand.

18         MR. BOIES:  They knew it was not going to be

19   just one time.

20         THE COURT:  Because they didn't have the

21   certified -- the -- the --

22         MR. BOIES:  Yeah.

23         THE COURT:  -- the class cert period?

24         MR. BOIES:  Yeah.

25         THE COURT:  Yeah.

1          MR. BOIES:  Thank you.

2          MR. SANTACANA:  Thank you, Your Honor.  I want

3    to start where Mr. Boies started, which is the testimony

4    that Mr. Lasinski gave because he stopped reading right

5    where our argument begins.  So sure, of course, Mr.

6    Lasinski, like almost every expert I've ever deposed,

7    claims that some of the flaws in his opinion come from

8    the fact that the defendant hasn't produced something

9    he'd love to see.  This is par for the course in an

10   expert deposition.

11         And so I pressed him on it to find out what

12   difference it would make if he had this supposed data he

13   said he did not have.  And that is when I said to him --

14   and I read this at the beginning, but I want to note

15   it's on page 61 right after where Mr. Boies was reading

16   from.  That's where I asked him:

17              "Well, hold on a minute.  You are aware

18         that Google has the records of when users had

19         WAA on and off?

20         "Yes.

21         "And for how long?

22         "Yes.

23         "So you could, for example, calculate the

24         number of sWAA off months for each user.

25         "And he says:  I did do that."

1          The number was in his report, Your Honor.  The

2     number they now use for this new report was in there

3     already.  And so I said:  "You did do that.  So why

4     didn't you pay them per month?"

5          And he says -- he doesn't say, "I didn't pay

6     them for months because there's some other piece of

7     information that I am missing."  He says -- when he's

8     cornered and when he's shown that he has the data

9     already, "I thought it was more appropriate and

10    conservative to do a one-time calculation."

11         And I said, "Why was it more appropriate to do

12    a one-time calculation?"

13         And this is where he says, "Even if I had sWAA

14    off months, even if I had it, that wouldn't necessarily

15    tell me whether or not they had a third-party site."

16         Now --

17         THE COURT:  Can you address what Mr. Boies

18    pointed me to in terms of the -- his argument on the

19    case management submissions and the suggestion that,

20    according to him, you made that, you know, they can

21    operate by influence and come up with the calculation

22    that they've come up with.

23         MR. BOIES:  No, you're not.  This is -- I

24    mean, there are -- every time we come before you, there

25    is a sort of litany of, "Well, the other side said this

1  and that, and Google said this and that, and that's why

2  I didn't live up to my obligations in discovery."  We've

3  been here before .

4           The case management statement, the statement

5  that he read to you, if you go back and look at it in

6  context, was a statement about their desire to argue

7  about how offensive the data collection is.  And they

8  were saying, "We want sample data."  And we said, "You

9  have sample data."

10          And I really want to stress this.  They keep

11  saying we got away with something by not producing

12  sample data.  Judge Tse said, "You could sample data, or

13  you could provide the named plaintiff's data."  We

14  provided the named plaintiffs data.  We also provided

15  sample data from their experts.  They created fake

16  accounts.  They used apps that had Google Analytics, and

17  we produced all of that, and we did it all during

18  discovery.  So we had sample data from which they could

19  make all of these arguments and inferences the whole

20  time, and they never moved to compel some third bucket

21  of sample data.  So it's not in the case.  They didn't

22  have to compel it.

23          But when we said in a case management

24  statement was the jury can infer how offensive the data

25  is by looking at the evidence that's in the record.

1    That's what we were saying.  We were never saying --

2    and -- and I think it's kind of -- it's -- it's not

3    believable to suggest that what Google said in a case

4    management statement was it would be fine with us if the

5    jury, without any opinion in the record and any record

6    evidence, inferred that the damages was 60 times as high

7    as the number of the plaintiffs had put forward.

8              Likewise, our Notice of Motion says the

9    plaintiffs shouldn't be permitted to press a damages

10   calculation that they never disclosed, which is just a

11   baseline rule under Rule 26.  That's what our motion

12   says.  So to say that there's a paragraph in our motion

13   that somehow says, unless the -- I mean, you can say it

14   to the jury in closing for the very first time with no

15   prior disclosure.  Obviously, we're not agreeing to

16   that.  And to the extent there's any reading of what we

17   wrote to that effect, obviously, it's not what we

18   intended.

19             THE COURT:  I -- I still don't get, though,

20   fundamentally, how you can say that the initial Lasinski

21   report capped them at 486 billion.

22             MR. SANTACANA:  Well, actually, it didn't.

23             THE COURT:  I don't see how you come up with

24   that.

25             MR. SANTACANA:  Well, I want to be clear.  It

```
 1   didn't actually cap them.  It had a fixed variable of $3
 2   and a variable -- dynamic variable of number of devices.
 3   And in fact, after discovery, we produced the figures of
 4   number of devices for '23 and '24.  And his number's
 5   gone up to 523 million.  So it's not capped.  It's a
 6   calculation.  And it has one dynamic variable in it.
 7   And that variable changes over time.  And we have --
 8   we're not moving to strike that.
 9           His supplemental report has three sections --
10           THE COURT:  The only variable that has
11   changed, even with their calculation, is per month.
12           MR. SANTACANA:  There -- there -- it's the
13   addition of a new variable, which is per month.
14           THE COURT:  It's not a new variable.  The
15   variable is $3 and they're now applying it on a
16   per-month basis.
17           MR. SANTACANA:  Right.  So the number of
18   months would be a third variable in this equation.
19           THE COURT:  It's sort of a semantic
20   discussion, but yeah, okay.
21           MR. SANTACANA:  Well, it's a new -- I don't --
22   it's a new method of --
23           THE COURT:  It's not a new method.  It's not a
24   new method.  It --
25           MR. SANTACANA:  Your Honor --
```

```
 1            THE COURT:  Wait a minute.

 2            At best, it is -- they led you to believe that

 3   they felt a one-time $3 multiplier was the appropriate

 4   way to go.  And according to you, you were hoodwinked

 5   into thinking that they would never then take the

 6   position that they're going to do it -- do it on a

 7   monthly basis.  But it's not some new

 8   come-from-left-field variable.  You have discussions

 9   about should it be done per month or not?

10            And -- and I'm not saying your --

11            MR. SANTACANA:  They can disavow that.

12            THE COURT:  -- argument is wrong.  I'm just

13   saying that to -- to -- to use this $3 per month concept

14   as something that is this wild thing that you had no

15   idea that this could happen -- I understand that from

16   your perspective, the frustration of saying you thought

17   he was locked in, that he wasn't going to do that.  I

18   understand your reading of that.  But to -- to say this

19   is a methodology or a variable that you've never seen

20   before is taking it too far.

21            MR. SANTACANA:  I'm not saying that we've

22   never seen it before.  I'm saying that we -- that he

23   closed himself off from using it in recalculation.

24            THE COURT:  I understand.  I understand.

25            MR. SANTACANA:  Right?  If I had said why
```

1    don't you multiply it by the number of red cars in San

2    Francisco, and he said, no, that wouldn't be

3    appropriate, and then later, he added that variable to

4    be the same --

5         THE COURT:  But then we're -- then we're

6    parsing the words of this -- you know, these fine

7    lawyers and skilled expert on whether or not he left the

8    door open or he didn't leave the door open.  And --

9         MR. SANTACANA:  I'd like to --

10         THE COURT:  Each side then reads the back and

11    the floor a little bit differently.  But nobody is -- is

12    shocked that we have a -- a -- a $3 per month issue

13    before us, I don't think.

14         MR. SANTACANA:  Well, the -- the question --

15    "shock" is the right word.  The question is, What is

16    the -- was Google surprised, and to what degree, to see

17    this calculation?  And I want to read to you from the

18    end of their opposition --

19         THE COURT:  Is surprise the concept, or is it

20    whether or not you were --

21         MR. SANTACANA:  Your Honor, we were deeply

22    surprised.  And actually, the plaintiffs --

23         THE COURT:  Well, I -- I am willing to say you

24    were the most surprised you've ever been.  Is that -- is

25    that the -- is surprise the metric I'm to apply here?

1           MR. SANTACANA:  It's one of the four --

2           THE COURT:  Okay.

3           MR. SANTACANA:  -- factors under Rule 37.

4           So when they opposed the *Daubert*, and we said

5   it's really inexplicable that he doesn't multiply by

6   month, which shows that he's not reliable, this is what

7   they said -- they're joking in their brief in their

8   opposition to the *Daubert*.  They say, "What Google is

9   really saying with a straight face is that

10  Mr. Lasinski's damages opinion should be stricken

11  because the actual damages he prescribes are not high

12  enough.  If Google honestly believes a $3 payment is

13  inadequate -- this is them writing it -- that problem is

14  easily solved.  Plaintiffs welcome a stipulation that

15  Mr. Lasinski's estimated payment should apply on a

16  per-month basis."

17          They knew at *Daubert* that we did not think

18  that was in the case, that it was off the table, that it

19  was not part of Lasinski's opinion.  They knew that.

20  They were joking about it.  They were sticking it in our

21  face.  So to come back after mediation fails and say for

22  the first time, "You still haven't stipulated to it, but

23  I'm going to do it anyway," for Your Honor to bless that

24  is to say that they can always add or multiply their

25  damages figures as long as there's some number in the

 1   record to hang their hat on.

 2          And I think the only other thing I want to

 3   read to you, Your Honor, and I'm not trying to read you

 4   a bunch of passages.  But the *Wong* case says, and this

 5   is repeated in every case --

 6          THE COURT:  Which case is this?

 7          MR. SANTACANA:  *Wong* is a Ninth Circuit case.

 8          THE COURT:  Okay.

 9          MR. SANTACANA:  They're affirming an exclusion

10   under Rule 37 and they are elaborating on the standard

11   of substantial justification or harmlessness.  And under

12   harmlessness, the disclosing -- the late disclosing

13   party said it's not harmful because it can be cured;

14   there's enough time before trial.  And the Ninth Circuit

15   says, "Disruption to the schedule of the court and other

16   parties in that manner is not harmless.  It's not

17   harmless as a matter of law.  Courts set such schedules

18   to permit the court and the parties to deal with cases

19   in a thorough and orderly moment.  And they must be

20   allowed to enforce them."

21          And there's a number of --

22          THE COURT:  As I sort of alluded to you

23   before, I -- I'm glad you've presented these authorities

24   for me so I can review them, and they're persuasive and

25   helpful in the appropriate circumstance.  But the

1    takeaway to me is not that the Ninth Circuit has said,

2    "This is what you must do."  The Ninth Circuit is being

3    asked whether or not with the particular facts before

4    the District Judge, did District Judge abused his or her

5    discretion?  That's what the Ninth Circuit is being

6    asked.

7                MR. SANTACANA:  Yeah.  And then --

8                THE COURT:  So it can only be -- go so far.

9    It doesn't support the proposition that had the district

10   judges gone the other way in some of these cases, that

11   necessarily would have resulted in a reversal by the

12   Ninth Circuit.

13               MR. SANTACANA:  I fully understand -- I fully

14   understand your point.  The only point I'm trying to

15   make is that the ability to cure and -- by reopening

16   discovery has repeatedly been held by the Ninth Circuit

17   to not be evidence of harmlessness.

18               THE COURT:  In the particular case the Ninth

19   Circuit was reviewing.

20               MR. SANTACANA:  Correct.

21               THE COURT:  I don't know if it's a --

22               MR. SANTACANA:  If you want a comparable

23   district case --

24               THE COURT:  No.  But are you saying to me that

25   the Ninth Circuit is saying, "If you open -- if you have

1   to reopen discovery, we're telling you, District Courts,

2   that is harmful and you should -- you should rule in a

3   particular way on the question like we have before us."

4   I don't think that's --

5           MR. SANTACANA:  No.  I don't think that's --

6           THE COURT:  -- is saying.

7           MR. SANTACANA:  -- true.  I don't think that's

8   true.  I just think they're elaborating on what

9   harmlessness means in Rule 37.

10          THE COURT:  Okay.  Fair enough.  Fair enough.

11          MR. SANTACANA:  So I'll give you an example of

12  a district court case, which is affirmed in an

13  unreported Ninth Circuit decision.  It's the *Luke versus*

14  *Family Care -- Care* case.  It's very similar to this

15  case.

16          "The expert says the symptoms of a particular

17  disease would not show up on a liver function test for

18  two to four weeks.  Then later, it turns out, at summary

19  judgment, that that's kind of a problem for this expert.

20  So after summary judgment, the expert says actually the

21  symptoms would show up in 10 days."

22          So he goes from two to four weeks to 10 days,

23  right?  It's actually not even adding a variable.  He's

24  just -- and all the evidence was there in the record.

25  And even still, the district judge -- this is a Western

1    District of Washington case -- and the Ninth Circuit

2    say, you -- you can't -- even if it looks like a small

3    change --

4            THE COURT:  Well, that doesn't seem to be a

5    small change to me.  That seems to me quite a

6    substantial change.

7            MR. SANTACANA:  Well, it's depending on your

8    perspective.  29 and a half billion dollars, Your Honor.

9    I mean, they brought, I think, 13 lawyers here for a

10    reason.

11            THE COURT:  No, no.  But -- but if they're

12    saying -- what?  You're saying this case, it's a big --

13    big difference.  You're right.  It definitely is.  What

14    I'm saying is -- I'll have to go look at that case.  But

15    if the expert's opinion on -- what? -- a diagnosis that

16    it's going to show up in a certain period of time, and

17    no, it -- it -- I'm changing my view.  It shows up --

18            MR. SANTACANA:  Right.

19            THE COURT:  That's a bit different than this

20    case, where the expert says, "I'm only going to apply

21    the $3 on one month," and then he says, "I'm going to

22    apply it on more to" -- and therefore, the damage amount

23    gets changed.  I don't think those are analogous.  But

24    I'll go and look at your --

25            MR. SANTACANA:  Yeah.  I mean --

1          THE COURT:  If you're suggesting that stands

2     for the proposition that the expert is making a very

3     small change, I'd have to look at that, because that

4     doesn't sound like a small change to me.

5          MR. SANTACANA:  No.  What -- what I meant by

6     small change was that he changed the number of 14 days

7     to 10 days, which sounds small, but is significant in

8     the context of that case, just like it is here.  So for

9     example, if we had known that Mr. Lasinski --

10          THE COURT:  He's not changing the $3 per

11     month.  He's just -- he didn't apply it -- he applied it

12     on a one-time basis, and now he's applying it on a

13     per-month basis.  He's not changing anything.  He's just

14     multiplying it out on a per-month basis.

15          In your case, he said this -- the -- the --

16     the condition would manifest in a different period of

17     time.  That's -- that's a pretty different change, don't

18     you think?

19          MR. SANTACANA:  I see them as similar.

20          Another case is Judge Illston's *Bastidas* case,

21     where it was a -- it was a damaged opinion, if that is

22     more analogous.

23          THE COURT:  Well, I think a damages opinion is

24     a better group of opinions for us to look at than --

25          MR. SANTACANA:  Sure.

1          THE COURT:  -- than an opinion where --

2          MR. SANTACANA:  Well --

3          THE COURT:  -- for example, a medical

4    diagnosis is altered in some fashion.

5          MR. SANTACANA:  I -- I see what you're saying.

6    Well, so *Bastidas* is a damages case.  And in that case,

7    all of the numbers had been disclosed in the -- in the

8    report, but the expert had disclaimed a particular way

9    of combining them, and then later, does combine them.

10   And Judge Illston said, "You can't do that."

11         And in *Mass Probiotics*, the same thing.  There

12   was a specific calculation of actual damages, just like

13   here of $350,000.  And then later the calculation

14   became, after discovery, 12 million based on -- it was

15   on the last day of discovery, I believe, so still plenty

16   of time to cure before trial -- but -- but decided to

17   calculate it differently.

18         And so here, you said a number of times it

19   hasn't changed.  Maybe a way we can say it is he decided

20   to calculate it differently than what he disavowed

21   before and what his lawyers -- or what plaintiff's

22   lawyers had disavowed before.

23         And the reason I know that -- and that you

24   should know that the surprise is significant to Google

25   from a litigation tactics perspective, is because we

1    pointed this out in the *Daubert*.  And all the plaintiffs

2    had to do if this intention that they say was always

3    there had been there, would have been to write in their

4    opposition brief, "What do you mean?  It's one month

5    today, but it might be three months later.  It might be

6    300 months."

7              THE COURT:  Well, I'll tell you --

8              MR. SANTACANA:  Well, what they end up saying

9    is 3 billion months.

10             THE COURT:  I'll tell you, and I suspect

11   you're agree with me when I say this.  I think your

12   strongest argument is that we didn't get any new

13   information and it changed.  That's your strongest

14   argument to me.

15             And I'm still unclear why their -- why the --

16   the decision to go per month -- I know that the class

17   cert occurred.  There's a class cert period.  That's

18   part of the answer I heard from Mr. Boyce.  But I --

19             MR. SANTACANA:  Well, they say in their brief

20   why, actually.  In their opposition brief, they adopt a

21   specific view of what happened.  And they say that the

22   reason that they decided they needed to disclose this

23   was because of something that happened out of mediation.

24   They don't say because they got data they didn't have

25   before or a ruling that they do not expect or have

1    before.  They say that it was because -- they -- I think

2    the way they phrased it was they learned for the first

3    time that we might have a different view.

4              THE COURT:  Yeah.  And we don't -- obviously,

5    I can't get into --

6              MR. SANTACANA:  Of course.  But my point is,

7    like, they must have -- of course, they knew our view.

8    We filed several motions about it.  So it's not a

9    credible explanation for why you would suddenly disclose

10   it.

11             THE COURT:  Okay.  Any final comment?

12             MR. BOIES:  I'll be very brief, Your Honor.

13             THE COURT:  And yeah, you need this

14   apparently.

15             MR. BOIES:  First, answer the Court's

16   question.  There was no change in the model.  It was

17   always $3 per device per month.  He always said that was

18   the right way to do it.  He said repeatedly, I don't

19   have the data to fill that in.

20             And when we got to last October, we asked for

21   the sampling data.  And -- and they said in response,

22   "You don't need the sampling data to make your damages

23   calculation to the jury because you've got enough

24   already."  And once we had that, we were, "Okay.  We can

25   now go to the jury with our arguments."

1          And when they say, that this -- page 11 of --

2    of their first brief -- this is their brief.  Page 11.

3    The -- I don't know if the Court has that up there.

4          THE COURT:  Go ahead.

5          MR. BOIES:  Line 17 through 20.  And counsel

6    suggested to the Court that when they said we could go

7    to the jury, that didn't have anything to do with

8    damages.  Just look at what they said, Your Honor.

9          "Plaintiff's new opinion is not necessarily to

10   support their actual damages opinion.  Plaintiff's own

11   disclosures admit there are alternatives for the jury to

12   reach the actual damages figure without the addition of

13   the new opinion proposed in the third amended Rule 26

14   disclosures."  And they cite Exhibit 1 at 14 to 15.  If

15   you look at that -- if you look at those pages, 14 to

16   15.  That's exactly what they're now in their reply

17   brief in the argument, trying to strike and trying to

18   prevent us from going to the jury on.

19         All we're asking here is what we've always

20   wanted to do was take this model and apply it to the

21   number of months when we have an ability to calculate

22   those months.  And we said, instead of the -- in his

23   deposition, we've said repeatedly when we get those

24   number of months, we can do it.  We asked for the

25   sampling data.  They said, "You don't need a sampling

1    data.  You've already got enough to go to the jury."  We

2    said, okay.

3            THE COURT:  All right.  I suspect whatever I

4    do, then it will prompt some flurry of following.  So

5    we'll deal with it when it comes.  I don't want to -- in

6    other words, I don't want to -- I don't want to talk

7    through the scenarios of, "Well, if we -- if I go with

8    the defense -- defendants, then how does that impact

9    trial date.  Or if I go with the plaintiffs, or what

10   have you" -- we'll -- we'll leave that for another day.

11   Because I need to make the first decision of -- on this

12   particular motion.  But it may then require some

13   scheduling conferences and the like.  So we'll deal with

14   that later on.

15           Okay.  Thank you.  You know, Judge Tse knows a

16   lot about this case, and consenting to Judge Tse for all

17   purposes would be a -- really a thing that you should

18   all think about.  So okay.  Thank you very much.  Very

19   helpful.

20           (Proceeding concludes at 4:25 p.m.)

21

22

23

24

25

1
\*\*\*\*\*\*\*\*

2
**C E R T I F I C A T E**

3
   I certify that the foregoing is a correct

4
transcript from the record of proceedings in the

5
above-entitled matter.

6

7

8
_____          02/14/2025

9
Teresa B. Johnson, CVR-M-CM, RVR, RVR-M          Date

10
California CSR License# 14765

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25