# EXHIBIT 2

ATTORNEYS' EYES ONLY - CONFIDENTIAL

1                  UNITED STATES DISTRICT COURT
2                 NORTHERN DISTRICT OF CALIFORNIA
3                        SAN FRANCISCO
4
5        _____
                                          )
6        ANIBAL RODRIGUEZ, et al.         )
         individually and on behalf of )
7        all others similarly situated,)
                                          )
8                  Plaintiffs,            )
                                          )
9        vs.                              ) No. 3:20-CV-04688 RS
                                          )
10       GOOGLE LLC, et al.,              )
                                          )
11                 Defendants.            )
                                          )
12       _____)
13
14          ATTORNEYS' EYES ONLY - CONFIDENTIAL
15    VIDEOTAPED REMOTE DEPOSITION OF BRUCE SCHNEIER, Ph.D.
16                 Cambridge, Massachusetts
17                  Monday, July 10, 2023
18                       Volume I
19
20
21    Reported by:
      CATHERINE A. RYAN, RMR, CRR, B.S.
22    CSR No. 8239
23    Job No. 5980592
24
25    PAGES 1 - 314

                                              Page 1

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
1    that you study user behavior related to many          11:28:13

2    different aspects of security and privacy.

3            Do you see that?

4        A    I do.

5        Q    When you say that you study user behavior,    11:28:21

6    how do you do that?

7        A    Mostly by reading other people's studies

8    and doing synthesis.  I do participate in some

9    studies, but that is not my primary area.

10       Q    You said that you read other people's         11:28:37

11   studies.

12           What types of studies do you read?

13       A    I think it's what said.  It's -- it's user

14   behavior and human factors related to aspects of

15   security and privacy.                                   11:28:56

16       Q    What methodology do those studies employ?

17           MR. CROSBY:  Object to the form of the

18   question.

19           THE WITNESS:  I don't know.

20   BY MS. AGNOLUCCI:                                       11:29:06

21       Q    You read and synthesize studies, but you

22   don't know what methodology they use?

23       A    I read and synthesize studies, but I don't

24   memorize what methodology they use.

25       Q    Can you think of any examples of              11:29:22
```

Page 42

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1    methodologies that have been used in studies that        11:29:23

 2    you've read and synthesized?

 3         A    User -- watching user behavior, testing

 4    users, maybe sending them emails and see if they

 5    click on phishing links; studies where we watch          11:29:37

 6    users interact with security systems and see what

 7    they do; studies on how they interpret security

 8    warning labels.

 9              Those are just three examples.

10         Q    Those are examples of studies conducted by      11:29:58

11    others that you have read?

12         A    Yes, although I am, right now, engaging in

13    a study on how people are responding to phishing

14    links written by AI, whether they respond better or

15    worse than phishing links written by humans.           11:30:13

16              You don't want to know the answer.

17         Q    And in this study, are you surveying a

18    representative sample of users?

19         A    We're serving -- we're serving [sic]

20    Harvard -- Harvard undergraduates; so no.              11:30:32

21         Q    How many people are involved in the study?

22         A    It's still --

23         Q    How many --

24         A    -- ongoing.

25         Q    -- subjects are being studied, rather?        11:30:42
```

Page 43

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1        A    It's still ongoing.                    11:30:44

 2             It's in the hundreds.

 3        Q    Have you engaged in any other quantitative

 4   research of user behavior yourself?

 5        A    No.                                     11:31:02

 6        Q    Have you engaged, yourself, in any

 7   qualitative research of user behavior?

 8        A    Not that I can remember.

 9        Q    Do you have any training in psychology?

10        A    Formal training, are you asking?        11:31:36

11        Q    Yes.

12        A    I do not.

13        Q    Do you have any training in user behavior?

14        A    No formal training, no.

15        Q    Do you have any training in user interface  11:31:54

16   design?

17        A    I have no formal training in that either.

18        Q    Do you have any training in user

19   experience design?

20        A    I do not.                               11:32:06

21        Q    Do you have any training in survey

22   science?

23        A    I do not.

24        Q    As part of your work, have you ever given

25   a talk at Google?                                 11:32:22
```

Page 44

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1        A    Yes.                                    11:32:25

 2             MS. AGNOLUCCI:  I'm going to try to see if

 3     we can get this to work in the Zoom platform.

 4             Argemira, can you please mark Tab 3a,

 5     which is a video clip excerpt of a talk you gave    11:32:40

 6     about your book, quote, "Click Here to Kill

 7     Everyone" [sic].

 8             THE VIDEOGRAPHER:  Also, Counsel, everyone

 9     should have Exhibit Share access now.  I'm not sure

10     if you saw my chat, but ...                        11:32:55

11             (Exhibit 5 was marked for identification

12             by the court reporter.)

13     BY MS. AGNOLUCCI:

14        Q    If you click on Exhibit 5, there's about a

15     20-minute -- 20-second clip that you can play.      11:33:13

16             Is the best way to do this for us to play

17     it in the screen share so everybody can see and hear

18     the same thing?

19        A    I certainly like that idea.

20             MS. AGNOLUCCI:  Okay.  Argemira, can you    11:33:33

21     do that, please?

22             MS. FLOREZ:  Yeah, one second.

23             MS. AGNOLUCCI:  I would start at roughly

24     minute 12:24, Argemira, 12:23.

25             MS. FLOREZ:  Sure.  The host disabled       11:33:53
```

Page 45

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1    participant screen sharing; so unless I have access      11:33:55

 2    to do that, I won't be able to share my screen.

 3            MS. AGNOLUCCI:  Okay.  Then let's --

 4            THE VIDEOGRAPHER:  It's -- it's --

 5            MS. AGNOLUCCI:  -- let Mr. Schneier review        11:34:05

 6    the video.

 7            THE WITNESS:  All right.  I'm going to go

 8    watch it right now.  Presumably you'll hear me

 9    watching it, I think.

10            THE VIDEOGRAPHER:  It's enabled now as            11:34:14

11    well.

12            THE WITNESS:  All right.  Let's do that in

13    the group.  That's easier, I think.

14            MS. FLOREZ:  Okay.  One second.

15            (Video played.)                                  11:34:24

16            MS. FLOREZ:  Is there any audio playing?

17            THE WITNESS:  No, there's no audio.

18            THE VIDEOGRAPHER:  So when you share it,

19    you have to enable audio.  It's a little box that

20    you check at the bottom.  When you pull it up, you       11:34:48

21    press Share, and when you select it --

22            MS. FLOREZ:  Let me look.

23            THE VIDEOGRAPHER:  You'll have to close

24    out of this.

25            MS. AGNOLUCCI:  Let's go off the record.          11:35:02
```

Page 46

```
1              THE WITNESS:  Yeah, those are also taught,      11:35:04
2    on Zoom learning, as horrible lessons.
3              THE VIDEOGRAPHER:  Off the record.  The
4    time is 11:35.
5              (Discussion Off the Record.)                   11:35:19
6              THE VIDEOGRAPHER:  We're back on the
7    record.  The time is 11:36.
8              MS. AGNOLUCCI:  We're going to play for
9    you a video clip excerpt, starting at minute 12:24,
10   from a talk you gave at Google about your book         11:36:57
11   "Click Here to Kill Everyone" [sic].
12             (Video played):
13                 Actually, so, you know, there's two
14                 reasons why our phones and computers are
15                 as secure as they are.  The first is that   11:37:10
16                 there are security engineers at Apple, at
17                 Microsoft, at Google that are designing
18                 them as secure as they are in the first
19                 place.  And those engineers can quickly
20                 write and push down patches when            11:37:22
21                 vulnerabilities are discovered.  That's a
22                 pretty good ecosystem.  We do that well.
23   BY MS. AGNOLUCCI:
24        Q    Mr. Schneier, you stated during the talk
25   we just watched that there are security engineers at    11:37:37
```

Page 47

ATTORNEYS' EYES ONLY - CONFIDENTIAL

1    Google designing phones and computers to be secure,        11:37:40

2    correct?

3        A    Yes.

4        Q    Sitting here today, is that something you

5    would continue to agree with?                               11:37:47

6        A    Yes.

7        Q    You also stated that one of the reasons

8    our phones and computers are as secure as they are

9    is that these security engineers can quickly write

10   and push down patches when there are                        11:38:01

11   vulnerabilities, correct?

12       A    Yes.

13       Q    Sitting here today, is that something you

14   continue to agree with?

15       A    Yes.                                                11:38:11

16       Q    Going back to your CV -- and we don't need

17   to look at it -- it includes a list of books and

18   academic publications that you authored.

19            Is that list complete?

20       A    I doubt it.  I'm always writing new                11:38:28

21   publications, and it's going to depend on the date.

22            The books -- well, I had a book come out

23   in February.  So it will depend which version you're

24   looking at.

25            And I think the papers is complete, but            11:38:42

Page 48

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
1    there might be a paper that came out after that was        11:38:44

2    written.

3         Q    Do we have the most version -- the most

4    recent version of your CV?

5         A    You probably do, but I don't update it          11:38:54

6    every minute.  So, I mean, I generally update it

7    twice a year.  So you do, but it's possible there's

8    one or two things missing.

9              MR. CROSBY:  I'll note that --

10   BY MS. AGNOLUCCI:                                           11:39:08

11        Q    You did not --

12             MR. CROSBY:  Sorry.  I'll note for the

13   record that, at least on the face of the document,

14   it says "Produced 6-29."

15             If you'd like, we can follow up off-line         11:39:17

16   to make sure that the version we produced 6-29 was,

17   in fact, current as of 6-29.

18             THE WITNESS:  It -- so if it's -- if it's

19   dated 6-29, it is current.  There have been no books

20   and no academic papers since then.                         11:39:32

21   BY MS. AGNOLUCCI:

22        Q    You did not write any publications

23   professing to be an expert in dark patterns,

24   correct?

25             MR. CROSBY:  Object to the form of the           11:39:45
```

Page 49

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1    question.                                          11:39:45

 2           THE WITNESS:  Are you asking me if I say

 3    in anything I've written I am an expert in dark

 4    patterns?

 5    BY MS. AGNOLUCCI:                                   11:39:52

 6        Q    Correct.

 7        A    I have -- no, I have never said those

 8    words.

 9        Q    Have you written any publications

10    exclusively about dark patterns?                    11:40:00

11           MR. CROSBY:  Object to the form.

12           THE WITNESS:  Exclusively, no.

13    BY MS. AGNOLUCCI:

14        Q    Do you believe that you're qualified to

15    determine what is and is not a dark pattern?        11:40:11

16        A    I do.

17        Q    Why?

18        A    Because it is an area I have studied, I

19    have written about, and I have taught.

20        Q    What do you mean when you say it's an area  11:40:29

21    you've studied?

22        A    I have read the literature on dark

23    patterns, and I have synthesized it in a way that

24    makes sense.

25        Q    Other than reading the literature on dark   11:40:44
```

Page 50

```
1    patterns, have you done anything else to study dark        11:40:47
2    patterns?
3              MR. CROSBY:  Object to the form of the
4    question.
5              THE WITNESS:  I believe I've listened to          11:40:55
6    talks by the researchers, but I would include that
7    in studying the literature.
8    BY MS. AGNOLUCCI:
9         Q    Other than studying the literature on dark
10   patterns and listening to talks by experts, have you      11:41:04
11   done anything else to study dark patterns?
12        A    I've taught it, and I consider that sort
13   of part of the process.
14        Q    Anything else you've done to study dark
15   patterns other than what we just talked about?           11:41:24
16        A    Not that I recall.
17             MR. CROSBY:  Sorry.  Object to the form of
18   the question.
19             MS. AGNOLUCCI:  We've been going for an
20   hour.  Would folks like to take a break?  Or we can       11:41:34
21   go for another 15 minutes.  Up to you.
22             MR. CROSBY:  It's up to the witness.
23   We've taken a couple of breaks for technical issues
24   while we're going, and I don't -- we'd love to avoid
25   going too late in the day, since we got a least -- a      11:41:49
```

Page 51

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1    and actual depositions.                            12:15:14

 2            I can't remember if there are anywhere I

 3    drafted a report but it was never submitted; but if

 4    I did, that would not be listed on -- in my CV, and

 5    I don't remember.                                  12:15:29

 6        Q    Do you consider all declarations to be

 7    reports?

 8        A    Yes.

 9        Q    Did you rely on any of your previous

10    declarations or reports in drafting your report in  12:15:44

11    this matter?

12        A    What do you mean by "rely on"?

13            I -- do you -- I looked -- I used the

14    general information from the Brown report in this

15    report in places where it was basically the same    12:16:01

16    thing.

17        Q    In other words, there may be portions of

18    the report in this matter that are identical or very

19    similar to your report in the Brown matter?

20        A    Yes.                                       12:16:18

21        Q    And there are overlapping opinions in the

22    two matters?

23        A    Yes.

24        Q    Have any of your reports or testimony been

25    stricken or excluded by a Court?                    12:16:37
```

Page 65

```
 1        A    I'm often not told that.  Actually, very    12:16:42
 2   often I'm not told that.  I will submit a report,
 3   and then I never hear from attorneys again, and I
 4   don't know what happens.  So I cannot answer that
 5   with any degree of accuracy.                         12:16:55
 6        Q    That you are aware of, have any of your
 7   reports or testimony been stricken or excluded, in
 8   whole or in part, by a Court?
 9        A    Not that I'm aware of, no.
10        Q    Are you aware that the Court struck parts   12:17:13
11   of your opinion in the Brown matter?
12        A    Yes.
13        Q    Are there any others that you may have
14   forgotten about?
15        A    It's a very hard question to answer         12:17:30
16   because, by definition, I will not know if there are
17   any others I've forgotten about.
18        Q    As you sit here right now, you can't think
19   of any others?
20        A    I cannot.                                   12:17:43
21             MS. AGNOLUCCI:  Let's take a look at the
22   order in the Brown case.
23             Argemira, can you please mark that as
24   Exhibit 7.
25             (Exhibit 7 was marked for identification    12:17:57
```

Page 66

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1                by the court reporter.)                    12:17:57

 2                THE WITNESS:  It has not come through yet.

 3      Wait.  Let me check.

 4                It has not come through yet.

 5                It has come through.  I have it.           12:18:44

 6      BY MS. AGNOLUCCI:

 7          Q    Okay.  Take a look at page 18.

 8          A    I am on page 18.  "These opinions, which

 9      rely on Schneier's," dot, dot, dot.

10          Q    And I mean page 18 of the pagination at      12:19:22

11      the bottom of the page.

12          A    This is -- that's where I am.

13          Q    Do you see where it says:  "While Schneier

14      is a security technologist, and can opine generally

15      about relevant privacy issues, he does not have       12:19:34

16      specialized expertise in opining about the purported

17      understandings and expectations of consumers

18      specifically.  Nor can he merely impute his own

19      opinions to those of a reasonable consumer."

20                Do you see that, Mr. Schneier?             12:19:49

21          A    I do.

22          Q    And then on the next page, the second

23      paragraph, do you see where it says (as read):

24      "Accordingly, Google's motion to exclude the

25      consumer expectations opinions is granted"?          12:20:00
```

Page 67

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1        A    Yes.                                    12:20:04

 2        Q    Are you purporting to opine in this case

 3   on how the Plaintiffs understood Google's

 4   disclosures regarding Web & App Activity?

 5        A    I don't know.  No.                      12:20:31

 6        Q    "No," you are not providing an opinion

 7   about the understandings and expectations of

 8   consumers regarding the Web & App Activity toggle?

 9             MR. CROSBY:  Object to the form of the

10   question.                                         12:20:52

11             THE WITNESS:  I don't think I am, no.

12   BY MS. AGNOLUCCI:

13        Q    Are you providing an opinion about the

14   reasonable consumer's understanding of the

15   functionality of Web & App Activity?              12:21:04

16        A    Definitely not.

17        Q    Are you providing any opinion about

18   consumer expectations relating to Web & App

19   Activity?

20        A    I am not.                               12:21:22

21        Q    Same questions for Supplemental Web & App

22   Activity.

23             Are you purporting to opine in this case

24   on how the Plaintiffs understood Google's

25   disclosures regarding Supplemental Web & App       12:21:35
```

Page 68

ATTORNEYS' EYES ONLY - CONFIDENTIAL

1    Activity?                                              12:21:35

2         A    I am not.

3         Q    Are you providing an opinion about the

4    understanding and expectations of consumers

5    regarding the Supplemental Web & App Activity          12:21:44

6    control?

7         A    I am not.

8         Q    Are you providing an opinion about the

9    reasonable consumer's understanding of the

10   functionality of Supplemental Web & App Activity?      12:21:55

11        A    I am not.

12        Q    Are you purporting to offer an opinion in

13   this case on whether any consumer suffered harm as a

14   result of Google's actions?

15        A    Are you asking about any particular           12:22:26

16   consumer?

17        Q    Any class member.

18        A    I talk about harms in general in my report

19   in many places, but nowhere do I associate a

20   particular harm with a particular consumer, no.        12:22:41

21        Q    Let's take a look now at paragraph -- I'm

22   sorry -- page 20 of the order granting the Daubert

23   motions in the Brown case, marked as Exhibit 7.

24        A    You said "page 20"?

25        Q    Yes.                                          12:23:13

                                                 Page 69

```
 1            Look at the part that says "Google's     12:23:15

 2    Intent, Services, or Receipt of Data."

 3            Do you see where it says:  "The Court has

 4    considered the parties' arguments" --

 5       A    Slow down.                                12:23:26

 6       Q    At the bottom of the page.

 7       A    Yes, I see it.  I'm sorry.  Yes, I see it.

 8       Q    -- "and agrees that some of Schneier's

 9    opinions impermissibly opine on Google's intent or

10    state of mind.  For example, he opines" -- and then   12:23:34

11    she goes on to quote from your report.  "Similarly,

12    Schneier opines that 'Google counts on most people

13    to access the Internet.'" And she goes on to quote

14    from your report.

15       A    Yes.                                      12:23:50

16       Q    "Schneier also impermissibly opines that

17    'Google is motivated to ensure that any privacy

18    controls are difficult to understand.'"

19            Do you see all of that?

20       A    I do.                                     12:24:00

21       Q    And are you aware of the fact that the

22    Court granted the motion to exclude your testimony

23    about the intent or state of mind or motivation of

24    Google?

25       A    I read that here, yes.                    12:24:13
```

Page 70

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
1        Q    Do you purport to opine in this case on       12:24:19

2    the intent or state of mind or motivation of Google?

3        A    I don't believe so, no.

4        Q    Going back to your report, who drafted it?

5        A    I did.                                          12:24:41

6        Q    Did anyone assist you in drafting it?

7        A    What do you mean by "assist"?

8        Q    What does it mean to you to assist?

9        A    To -- to write it for me.

10       Q    Did anyone write it for you?                    12:25:02

11       A    No.

12       Q    Did anyone draft parts of it?

13       A    No.

14       Q    Did anyone edit it?

15       A    Yes.                                            12:25:14

16       Q    Other than lawyers.

17       A    My assistant helped with editing.

18            Wait.  I might take that back.

19            No, I'm sure she -- she finds commas.  She

20   finds periods.                                           12:25:36

21            Yes.  Let's say yes.

22       Q    In your report, you list a series of

23   opinions, both about Google and not about Google.

24            Does this report contain the full scope of

25   your opinions in this matter?                            12:26:24
```

Page 71

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1    BY MS. AGNOLUCCI:                                    12:35:32

 2         Q    Was the data tied to any individual user?

 3              MR. CROSBY:  Same objection.

 4              THE WITNESS:  Some of the data was, yes.

 5    Google believes some of the data was, yes.  Yes.    12:35:41

 6    BY MS. AGNOLUCCI:

 7         Q    Which data?

 8         A    That, I don't know.  Probably all of it.

 9              If you're going to tie one piece, you're

10    going to tie it all.                                12:35:55

11         Q    The basis of your belief that the data was

12    tied to an individual user is what?

13         A    It's based on the representations of

14    Google, Google documentation, and all the documents

15    that I read in association with this case.          12:36:14

16         Q    You did not do any research that involved

17    communicating with users of Web & App Activity to

18    develop your opinions in this case, correct?

19         A    I did not.

20         Q    You did not do any research that involved  12:36:44

21    communicating with users of Supplemental Web & App

22    Activity to develop your opinions in this case,

23    correct?

24         A    I did not, no.

25              Do you count reading the declarations of   12:36:55
```

Page 79

1    opinions are in that section starting at page 52?    12:38:47

2        A    Yes, but there are some Google-specific

3    things in the general section.  So it's not as clean

4    as we'd like it to be.

5        Q    You opine in your report that Google's    12:39:02

6    disclosures to users concerning WAA and sWAA and

7    Google's disclosures to app developers constitute

8    dark patterns, correct?

9        A    I do.

10        Q    Can you tell me what specific disclosures    12:39:21

11    you believe constitute dark patterns?

12        A    I believe they are all in my report.

13        Q    Other than the disclosures referenced

14    specifically in your report, are there any other

15    disclosures that you are opining constituted dark    12:39:39

16    patterns for purposes of this case?

17        A    No.

18        Q    Define "dark patterns."

19        A    So I did that in my report; so let me find

20    that, because I think it's a good definition, and I    12:39:55

21    don't want to make one up.

22        Q    There's one at paragraph 161, page 44.

23        A    Yeah, that's where I was headed.

24            Yes, that -- I will stand by that.

25        Q    Okay.  So let's read it so that we are    12:40:13

Page 81

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1    sure.                                        12:40:17

 2            "'Dark patterns' is an umbrella term for a

 3    variety of subversive user-design tricks intended to

 4    manipulate users into doing things they wouldn't

 5    normally choose to do."                      12:40:27

 6            Do you see that?

 7        A    I do.

 8        Q    Is that your definition of "dark

 9    patterns"?

10        A    That's the definition I use in this   12:40:37

11    report -- yes, that's a definition I use in this

12    report.

13        Q    That's the definition you use for purposes

14    of your analysis of this case?

15        A    Let me step back.                    12:40:49

16            That is one sentence, and that really

17    isn't a definition.  That's a -- that's an

18    introductory sentence.

19            I think the whole section really defines

20    the term, because there's a lot of -- of types that  12:41:02

21    I -- that I go into in subsequent paragraphs.  I

22    would not stand on the one sentence as the

23    definition, nothing else.

24        Q    Are you saying that the rest of your

25    report provides examples that illustrate the   12:41:19
```

Page 82

ATTORNEYS' EYES ONLY - CONFIDENTIAL

1   sentence we just read?                                12:41:24

2       A    I don't think I provide a lot of -- I

3   provide some examples.  Certainly the references

4   provide a lot of examples.  I believe I listed a few

5   examples in the section.  I'm seeing them now, but    12:41:39

6   there are many more in the references.

7       Q    I'm trying to understand if you were

8   asked, for purposes of your work in this case, to

9   say what is a dark pattern, what you would say.

10      A    I would point to the -- the paragraph in    12:41:58

11  the report.

12      Q    Which paragraph?

13      A    The one we were just talking about, which

14  is now blurry, 161.

15      Q    You believe that paragraph 161 contains    12:42:14

16  your definition of "dark patterns" for purposes of

17  your analysis in this case?

18      A    No.  I believe that all of the references

19  contain the definition and that 161 is a summary of

20  all the references.                                   12:42:33

21      Q    Are you able to articulate a definition of

22  "dark patterns"?

23      A    I think the definition in the report is --

24  is good.  So it's -- I mean, I would use this entire

25  section.  Certainly paragraph --                      12:42:53

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1        Q    Is it --                                  12:42:56

 2        A    -- 161 and -62, -63.  I think examples are

 3   necessary.

 4             I mean, if I'm teaching this, you don't

 5   just say one sentence and leave the room.  You spend   12:43:05

 6   an entire class.  And the process of seeing them and

 7   seeing the types and seeing examples is how we

 8   define them.

 9        Q    It sounds like you're not able to provide

10   a definition that's shorter than four paragraphs; is   12:43:22

11   that fair?

12             MR. CROSBY:  Object to the form of the

13   question.

14             THE WITNESS:  I am not able, right now, in

15   a deposition under oath, to provide a definition       12:43:32

16   that is under four paragraphs.  That feels like a

17   real piece of work and should be done properly.

18   BY MS. AGNOLUCCI:

19        Q    Is that definition anywhere in the report,

20   that you took several months to draft?                 12:43:45

21        A    I believe this section is the definition.

22        Q    And you are not able to point to a

23   definition shorter than this four-paragraph section

24   in your report?

25        A    I'm not -- I'm not sure where you got four   12:44:02
```

Page 84

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
1    paragraphs, because I didn't say four paragraphs.        12:44:04

2              No.

3         Q    Tell me where in your report the

4    definition of "dark patterns" is.

5              MR. CROSBY:  Object to the form of the          12:44:16

6    question.  Asked and answered.

7              THE WITNESS:  It's in section 6.3.

8    BY MS. AGNOLUCCI:

9         Q    All of the paragraphs in section 6.3 are

10   the definition of "dark patterns"?                       12:44:31

11        A    If you wish, I will go through and check

12   that.  This feels like a lot of work.  It is -- it

13   is ...

14             I feel like I answered this already.

15   Wait.  Stop.  I answered this already.                   12:44:39

16        Q    I think I misunderstood your answer, then,

17   because I thought you had said that it was in

18   paragraphs 161, 162, 163, and 164; but when I

19   referred to four paragraphs, you seemed to disagree

20   with that.                                               12:44:57

21             So maybe --

22        A    Yeah, because I don't --

23        Q    -- you can help me understand.

24        A    I think this section is my definition --

25   includes my definition of "dark patterns."  I think     12:45:04
```

Page 85

```
 1    you learn it from 160 -- paragraph 161 and the         12:45:06

 2    paragraphs following.  Certainly paragraphs 166,

 3    167, 168 inform the definition; 169, 170 inform the

 4    definition.  I think the examples of legislation,

 5    the FTC report -- that's 172, 173 -- inform the         12:45:28

 6    definition, as well as the examples in the

 7    paragraphs following.

 8              So, no, I don't think -- it's not four

 9    paragraphs.  I don't have a one-sentence definition

10    for you right now.  This is a complicated -- it's a     12:45:42

11    complicated topic, and it doesn't boil down as

12    simply as -- as that.

13              And when I teach it, it is this

14    complicated.

15         Q    Your best answer is that the eight-page       12:46:03

16    section, 6.3, of your report is the definition of

17    "dark patterns"?

18              MR. CROSBY:  Object to the form of the

19    question.

20              THE WITNESS:  I think the best answer is       12:46:12

21    what I said.

22    BY MS. AGNOLUCCI:

23         Q    Do you disagree with my characterization

24    of what you said?

25              MR. CROSBY:  Object to the form --            12:46:22
```

Page 86

ATTORNEYS' EYES ONLY - CONFIDENTIAL

1              THE WITNESS:  Say it again.                    12:46:23

2              MR. CROSBY:  -- of the question.

3    BY MS. AGNOLUCCI:

4        Q    Your best answer is that the eight-page

5    section, 6.3, of your report is the definition of        12:46:28

6    "dark patterns"?

7              MR. CROSBY:  Object to the form of the

8    question.  Misstates testimony.

9              THE WITNESS:  No, I said that it includes.

10             MS. AGNOLUCCI:  Let's -- let's hold back        12:46:41

11   on the speaking objections.

12       Q    It includes the definition of "dark

13   patterns."

14             But you are not able to narrow that

15   eight-page section down any further, correct?            12:46:51

16       A    I believe I have been narrowing it, but

17   not enough for you.

18       Q    I didn't hear any narrowing in the answer

19   that you just gave me --

20       A    Okay.                                           12:47:05

21       Q    -- where you went through every paragraph

22   in the eight pages of the report.

23             If I missed something in your answer, let

24   me know, but I read it as all eight pages are the

25   definition of "dark patterns."                           12:47:13

                                                     Page 87

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1              MR. CROSBY:  Objection.  Badgering.        12:47:17

 2      There's no question.

 3              THE WITNESS:  That's fair.  There is no

 4      question.

 5      BY MS. AGNOLUCCI:                                  12:47:24

 6          Q    The question was, quote:  But you are not

 7      able to narrow that eight-page section down any

 8      further, correct?

 9          A    The definition is what I put in my report.

10          Q    The sentence you originally read in        12:47:45

11      paragraph 161 reads:  "'Dark patterns' is an

12      umbrella term for a variety of subversive

13      user-design tricks intended to manipulate users into

14      doing things they wouldn't normally choose to do."

15              Do you see that?                            12:48:00

16          A    I do.

17          Q    Now, I understand that you think it's

18      important to illustrate the definition with the

19      other examples given in this section of your report.

20              But do you believe that one sentence to be   12:48:17

21      a true part of the definition of "dark patterns"?

22              MR. CROSBY:  Object --

23              THE WITNESS:  I --

24              MR. CROSBY:  -- to the form of the

25      question.                                           12:48:22
```

Page 88

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1              THE WITNESS:  I do.                    12:48:23

 2    BY MS. AGNOLUCCI:

 3         Q    Do you believe that one sentence to be

 4    true with respect to your analysis of what Google

 5    does that constitutes a dark pattern?            12:48:32

 6         A    I do.

 7         Q    In other words, dark patterns require an

 8    intent to manipulate users, correct?

 9              MR. CROSBY:  Object to the form of the

10    question.                                        12:48:55

11              THE WITNESS:  I like my words better.

12    BY MS. AGNOLUCCI:

13         Q    "Intended to manipulate users"?

14         A    Yes.

15         Q    Dark patterns are intended to manipulate  12:49:14

16    users, correct?

17         A    Yes.

18         Q    When I first asked you to define "dark

19    patterns," you read the first sentence of paragraph

20    161 and said, "That is the definition I use in my   12:49:27

21    report."

22              Have you used other definitions of "dark

23    patterns" in other places?

24              MR. CROSBY:  Object to the form of the

25    question.                                         12:49:39
```

Page 89

ATTORNEYS' EYES ONLY - CONFIDENTIAL

1              THE WITNESS:  I don't remember.                12:49:41

2       BY MS. AGNOLUCCI:

3              Q     Would you agree that there is no one

4       definition of a "dark pattern"?

5              A     I agree that there's a consensus of       12:49:56

6       opinion on what dark patterns are.  There's broad

7       agreement on what constitutes a dark pattern.  There

8       are overlapping taxonomies of dark patterns, and

9       there are edge cases.

10             Q     What is the consensus of opinion on what  12:50:19

11      dark patterns are?

12             A     Oh, wow.  That is something I would have

13      to research.

14             Q     You haven't researched that?

15             A     I haven't memorized that.                 12:50:31

16             Q     Can you say anything about what the

17      consensus of opinion on what dark patterns are is?

18             A     I tried to put that in my report.

19             Q     Is that in section 6.3, those eight pages

20      we were just looking at?                               12:50:49

21             A     Yes.

22             Q     Do you believe that all of those eight

23      pages reflect the consensus of opinion on what dark

24      patterns are?

25             A     That, I don't know.  I'm listing          12:51:01

                                                        Page 90

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1    opinion -- I'm listing definitions and taxonomies of    12:51:04

 2    different researchers, of different government

 3    agencies, of different governments.  So I think it

 4    represents the -- the cluster of opinions of what

 5    dark patterns are.                                       12:51:18

 6        Q    You said there's a consensus of opinion.

 7             What's the difference between a consensus

 8    and a cluster?

 9             MR. CROSBY:  Object to the form of the

10    question.                                                12:51:30

11             THE WITNESS:  I don't know.  I think I'm

12    using one to mean the things we all agree on and the

13    other cluster to mean the different ways we're

14    describing it.

15             If you look at the taxonomies, they --          12:51:46

16    they overlap.  They contain the same stuff, but

17    they're defined a bit differently.

18    BY MS. AGNOLUCCI:

19        Q    Okay.  So where are the things we all

20    agree on in your report?                                 12:51:58

21        A    I think that first sentence of paragraph

22    161 and other things as well.

23             I would have to do more work to -- to map

24    the different researchers' and government bodies'

25    way of defining them on top of each other.              12:52:34
```

Page 91

1      Q    You believe the first sentence of          12:52:38

2    paragraph 161 includes the consensus opinion of what

3    dark patterns are?

4           MR. CROSBY:  Object to the form of the

5    question.                                          12:52:48

6           THE WITNESS:  No.  The other way around.

7    I believe the consensus opinion includes the

8    sentence.

9    BY MS. AGNOLUCCI:

10     Q    You say, "There's broad agreement on what   12:53:02

11   constitutes a dark pattern."

12          Is there broad agreement that the first

13   sentence of 161 is what constitutes a dark pattern?

14     A    I would say yes.

15     Q    You refer in your report to several         12:53:29

16   definitions of "dark patterns," correct?

17     A    Yes.

18     Q    You agree that there are multiple

19   definitions of "dark patterns"?

20     A    Yes.                                         12:53:44

21     Q    Do you believe that whether something is

22   or is not a dark pattern is context specific?

23     A    What do you mean by that?

24     Q    Do you believe that whether something is

25   or is not a dark pattern depends on context?        12:54:11

                                              Page 92

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1            MR. CROSBY:  Object to --                12:54:19

 2            THE WITNESS:  I'll try again too.

 3            What do you mean by "context"?

 4   BY MS. AGNOLUCCI:

 5       Q    What does "context" mean to you?         12:54:25

 6            MR. CROSBY:  Object to the form of the

 7   question.

 8            THE WITNESS:  The world it's embedded in.

 9   That's a really general definition.  So I want to

10   know what you mean by "context."                  12:54:34

11   BY MS. AGNOLUCCI:

12       Q    Do you believe that whether something is

13   or is not a dark pattern can depend on the user

14   interacting with that experience?

15       A    It's actually a hard question to answer  12:55:06

16   because "can depend" means there exists one user on

17   the planet for whom or one exception.  So I hesitate

18   to make the generality.

19            But, in general -- there might be

20   exceptions -- no.                                 12:55:23

21       Q    In other words, in general, something is

22   or is not a dark pattern regardless of who's

23   interacting with it?

24            MR. CROSBY:  Object to the form of the

25   question.                                         12:55:37
```

Page 93

```
1              THE WITNESS:  In general -- in general --      12:55:38

2       and there might be exceptions -- no.

3              MS. AGNOLUCCI:  Can you queue up Tab 7,

4       Argemira?

5              And let's take a look at Exhibit 9.            12:55:59

6              (Exhibit 9 was marked for identification

7              by the court reporter.)

8              THE WITNESS:  All right.  It arrived.

9       BY MS. AGNOLUCCI:

10         Q    Did you write a book called "A Hacker's         12:56:34

11      Mind"?

12         A    I did.

13         Q    Does Exhibit 9 appear to be an excerpt

14      from your book?

15         A    It appears to be.  I have a copy of the         12:56:48

16      book in eyesight, if we need to confirm it.

17         Q    Do you see the language highlighted on the

18      right?

19         A    I do.

20         Q    "'Dark patterns' is a term given to            12:57:00

21      subversive user-design tricks that co-opt common

22      designs to nudge users towards certain ends."

23         A    I do.

24         Q    In this definition, you say that a user

25      design might be a dark pattern if it nudges a user     12:57:14
```

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1              And I was asking:  Anything else?        13:06:17

 2        A    I want to say the methodology of

 3     generalization, because I'm not sure what you're

 4     asking.

 5        Q    Let's take a look at Exhibit 10, which is   13:06:29

 6     already loaded up in your Exhibit Share.

 7        A    Thank you for the preloading.

 8              (Exhibit 10 was marked for

 9              identification by the court reporter.)

10     BY MS. AGNOLUCCI:                                   13:06:38

11        Q    It's a New York Times article by Kashmir

12     Hill.

13              You're welcome.  We're trying to make this

14     efficient for everybody.

15        A    I appreciate your hard work.               13:06:46

16              Exhibit 10 --

17        Q    Scroll to page --

18        A    -- tab 8?

19        Q    Scroll to page 3.

20        A    Okay.                                       13:07:07

21        Q    This is an article by Kashmir Hill about

22     trying to live without the tech giants.

23              Do you see on page 3, where she says

24     they're all -- "There are alternatives for products

25     and services offered by the tech giants"?          13:07:18
```

Page 102

```
1          A    Yes.                                    13:07:21

2          Q    Do you agree with that statement?

3          A    Yes.

4          Q    Going back to your report on page 4,

5     paragraph three --                                13:07:33

6          A    Yes.

7          Q    -- you write that:  "Google fails to

8     adequately disclose or provide notice of its data

9     collection practices or to provide users with

10    effective privacy controls."                      13:07:53

11              Do you see that?

12         A    Yes.

13         Q    Is that opinion about the WAA and sWAA

14    controls?

15         A    Yes.                                     13:08:12

16         Q    Is it about any other controls?

17         A    It might be true about other controls, but

18    it is written here about the controls at issue in

19    this case.

20         Q    In other words, for purposes of this case,  13:08:23

21    you are offering an opinion about the WAA and sWAA

22    controls?

23         A    Yes.

24              And there's an extra indent in the

25    paragraph.  God knows why.                         13:08:36
```

Page 103

ATTORNEYS' EYES ONLY - CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q    About halfway through the paragraph, you | 13:08:44 |
| 2 | say (as read):  "The Google privacy controls | |
| 3 | addressed in this lawsuit, WAA and sWAA, are merely | |
| 4 | an illusion." | |
| 5 | Do you see that? | 13:08:51 |
| 6 | A    I do. | |
| 7 | Q    Is that opinion limited to WAA and sWAA | |
| 8 | for purposes of this case? | |
| 9 | A    For purposes of this case, yes. | |
| 10 | Google might have many other -- | 13:09:06 |
| 11 | Q    Why -- | |
| 12 | A    -- reasons. | |
| 13 | Q    What is the illusion created by WAA? | |
| 14 | A    So I believe this is something I wrote | |
| 15 | about extensively; so let me find it. | 13:09:23 |
| 16 | So I write about this in section 10.1, | |
| 17 | where I talk about how Google presents WAA and sWAA | |
| 18 | as ways for users to control their privacy and that | |
| 19 | contain a switch to -- to turn the controls off, and | |
| 20 | then I write about how Google continues to collect | 13:10:08 |
| 21 | data on users even when they switch the tracking | |
| 22 | toggle to off. | |
| 23 | Q    And then in the same paragraph on page 4, | |
| 24 | paragraph three, you say that Google uses dark | |
| 25 | patterns, subversive user interface designs that | 13:10:35 |

Page 104

```
 1   manipulate users into making decisions that serve       13:10:39

 2   Google's purposes rather than their own, to provide

 3   users and app developers with a false sense of

 4   security.

 5           Do you see that?                                 13:10:50

 6       A    Yes, I found it.

 7       Q    What methodology did you use to come to

 8   that conclusion?

 9       A    I looked at the Google controls with

10   respect to the definitions of "dark patterns" that     13:11:14

11   are discussed in section whatever it is -- section

12   6.3 and as outlined in the various sections of --

13   various subsections of section 11, came to the

14   conclusion.  It's the methodologies analysis.

15       Q    It's the methodology of analysis?             13:11:55

16       A    Eh, maybe that's not right.

17            I don't know.  I'd love to see a list of

18   methodologies, if we're going to talk about

19   methodologies, so I can see -- it's not a way I

20   normally think of things.                               13:12:11

21       Q    You understand that in order to be

22   qualified as an expert in this case, you have to

23   apply some methodology or scientific process,

24   correct?

25            MR. CROSBY:  Object to the form of the         13:12:27
```

Page 105

ATTORNEYS' EYES ONLY - CONFIDENTIAL

1    question.                                          13:12:29

2              THE WITNESS:  I've -- I've never heard

3    that explicitly.

4    BY MS. AGNOLUCCI:

5        Q    Did you apply any methodology to reach the   13:12:42

6    conclusions that you reached in this case?

7              MR. CROSBY:  Object to the form of the

8    question.

9              THE WITNESS:  Again, I do not know a list

10   of methodologies of which to pick one.              13:12:51

11             I -- if you look at section 11, I analyzed

12   Google's screens and their disclosures and their

13   user interfaces, in light of what I know about dark

14   patterns, as referenced in that other section, and

15   came to the conclusions I did.                      13:13:18

16   BY MS. AGNOLUCCI:

17       Q    Did you apply any other methodology, other

18   than what you just told me about, to reach the

19   conclusions you reached in this case?

20             MR. CROSBY:  Object to the form of the     13:13:31

21   question.

22             THE WITNESS:  So other people have looked

23   at various things Google has done in light of dark

24   patterns.  I know I referenced them somewhere in

25   here.  I certainly read those, and those probably    13:13:52

                                             Page 106

1     did inform my analysis, yes.                          13:13:57

2     BY MS. AGNOLUCCI:

3          Q     Anything else?

4          A     Not that I can think of right now.

5          Q     Earlier, we discussed -- and I believe you   13:14:30

6     agreed with -- the proposition that there are

7     many -- strike that.

8                Earlier, we discussed -- and I believe you

9     agreed with -- the proposition that there are

10    different definitions of "dark patterns" out there,  13:14:46

11    correct?

12         A    Yes.

13         Q     And in paragraph 161 of your report, you

14    read a definition by Harry Brignull, who you say

15    coined the term, correct?                             13:15:00

16         A     Yes.

17         Q     Now, taking a look at paragraph 166 of

18    your report, you cite a definition by Professor

19    Colin Gray, who defines "dark patterns" as:

20    "Instances where designers use their knowledge of     13:15:16

21    human behavior, (e.g., psychology) and the desires

22    of end users to implement deceptive functionality

23    that is not in the user's best interests."

24                Do you see that?

25         A    I do.                                        13:15:30

                                                    Page 107

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
1          Q    Is that different than Mr. Brignull's          13:15:35

2     definition?

3          A    Where do you see Brignull's definition?

4          Q    161.

5          A    I don't think I see Brignull's definition      13:16:03

6     here.  I mean, I don't see a quote by Brignull.

7               My guess is they're substance --

8     substantively the same, but there might be

9     differences around the edges.

10              But I didn't quote Brignull, looking at        13:16:21

11    these pages.

12         Q    I believe paragraph 161 contains multiple

13    quotations by Brignull and cites to Brignull.

14         A    It does, but that first sentence is a

15    sentence I wrote.  It's not in quotes.  So I          13:16:36

16    hesitate to ascribe it exactly to -- to Brignull,

17    because if it was his -- his words, I would have

18    quoted it.  So we would have to pull the records.

19         Q    Going back to page 46 and to the bolded

20    list we were looking at under Colin Gray's           13:16:54

21    definition, you see a list of behaviors that

22    purportedly constitute dark patterns, correct?

23         A    I do.

24         Q    Those behaviors include nagging,

25    obstruction, sneaking, interface interference, and   13:17:16
```

Page 108

1    forced action, correct?                               13:17:19

2         A    Yes.

3         Q    Do you agree that those are all categories

4    of dark patterns?

5         A    Yes.                                          13:17:27

6         Q    Which one of these categories do you

7    contend the WAA and sWAA settings fit into?

8         A    So I believe I said all of that in the

9    relevant sections.

10             Do you want me to find them all and read     13:17:50

11    them to you?

12        Q    Let's take a look at the relevant

13    sections.  Yes.

14        A    I'm on page 88.

15        Q    Okay.                                         13:18:14

16        A    So -- I'm sorry.  Do you want me to find

17    and read the sentences where I name dark patterns?

18        Q    I'm asking you which of the categories

19    from page 46 WAA and sWAA fit into.  So I want you

20    to answer me.  And if you need to look at what you     13:18:37

21    wrote to come to that answer, that's fine.

22        A    Okay.  So give me a second.

23             All right.  So in paragraph 314, I say

24    that Googles's WAA Help Page exemplifies those dark

25    patterns, which are the ones I reference in            13:19:06

                                                        Page 109

ATTORNEYS' EYES ONLY - CONFIDENTIAL

1   paragraph 311, which is sneaking.                    13:19:08

2           Section 11.2, they -- the WAA -- the WAA

3   and sWAA toggles themselves, I include under

4   sneaking.

5           Section 11.3, Google statements about       13:19:47

6   privacy and user control exemplify, in Gray's

7   taxonomy, interface interference.

8           Section 11 --

9       Q    Is that --

10      A    I'm sorry?                                   13:20:10

11      Q    -- with respect to users or developers for

12   interface interference?

13      A    In section 11.3, it is about -- section

14   11-point --

15      Q    I didn't hear your answer.                   13:20:29

16      A    Really?  That's -- in section --

17           MS. AGNOLUCCI:  Nor did the court

18   reporter.

19           THE REPORTER:  Please repeat.

20           THE WITNESS:  That's not good.  All right.   13:20:38

21   That's on me.

22           Section 11.3, I'm referring to users.

23           In section 11.4, I'm talking about

24   Google's WAA controls for location privacy, and I

25   write of that being an example of hidden            13:20:53

                                                    Page 110

ATTORNEYS' EYES ONLY - CONFIDENTIAL

1    information, which is a subsection of interface          13:20:58

2    interference.  So it's interface interference in

3    that previous paragraph.

4          Section 11.5, I talk about Google's WAA

5    and sWAA consent bump and put that in the category      13:21:11

6    of nagging.

7          Section 11.6 -- and I think there's a way

8    you thought about for developers, is where I look at

9    Google's disclosure to app developers.  And there, I

10   also contend that it is an example of sneaking.          13:21:32

11         And that's it.

12   Q    Okay.  So you --

13   A    And then --

14   Q    -- told me about nagging.

15   A    I'm sorry.  You go.                                  13:21:46

16   Q    Sorry.  Were you going to say something

17   else?

18   A    Yeah, I'm just saying that in section

19   11.7, I -- I just talk about Google employees saying

20   much of the same things.                                 13:21:58

21         All right.  I'm sorry.  Go.

22   Q    So you contend that the WAA and sWAA

23   toggles/disclosures can constitute examples of

24   nagging, sneaking, and interface interference?

25         MR. CROSBY:  Object to the form of the             13:22:20

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1   question.                                           13:22:21

 2            THE WITNESS:  Yes.

 3   BY MS. AGNOLUCCI:

 4       Q    If you look at paragraph 167, it refers to

 5   the 2017 book "White Hat" [sic].                    13:22:36

 6            That book has 12 different dark pattern

 7   examples:  Bait and switch, disguised ads, forced

 8   continuity, forced disclosure, friend spam,

 9   misdirection, road block, roach motel, door slam,

10   trick questions, click bait, and hidden costs.      13:22:51

11            Do you see that?

12       A    I do.

13       Q    You say:   "These can be mapped to Gray's

14   taxonomy."

15            What does that mean?                        13:23:03

16       A    That means -- well, so --

17            Okay.  First thing:  The book is called

18   "White Hat UX."  Let's get the book title correct in

19   the deposition.

20            That if you look at Gray's taxonomy, he     13:23:13

21   has five major categories and then many

22   subcategories.  So if you look at the -- the diagram

23   that is in the page -- paragraph 166, you'll see

24   includes, so all those including.

25            And you can -- and I didn't do it here,     13:23:30
```

Page 112

ATTORNEYS' EYES ONLY - CONFIDENTIAL

1    but I did it just -- I did it enough to know that        13:23:33

2    it's true.  I didn't write it out -- that you can

3    map these 12 different patterns into these five

4    buckets, given Gray's subcategories.

5         Q    In paragraph 168, you refer to the EU Data        13:23:55

6    Protection Board's taxonomy, and you state that that

7    one has six patterns: overloading, skipping,

8    stirring, hindering, fickle, and left in the dark,

9    correct?

10        A    Yes.                                             13:24:09

11             MS. AGNOLUCCI:  Let's take a look at

12   Exhibit 11, which is already in your folder.

13             (Exhibit 11 was marked for

14             identification by the court reporter.)

15   BY MS. AGNOLUCCI:                                          13:24:27

16        Q    It's a document entitled "EU Data

17   Protection Board" [sic].

18             Is that the document that contains the

19   taxonomy you are referencing in your report?

20        A    I'm sorry.  This is Tab 8?  No.                  13:24:40

21        Q    Exhibit 11.

22        A    Exhibit 11.  Okay.  Just --

23        Q    Tab 9 --

24        A    It just arrived.

25        Q    -- your --                                       13:24:46

Page 113

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1        A    It just arrived.                        13:24:46

 2             I have to refresh.  I keep forgetting

 3    that.

 4             And you're asking me if that is the

 5    reference I used.                                 13:24:55

 6             All EU documents look alike.  So let's

 7    check.

 8             Yes, that looks correct.  It's the right

 9    date.

10        Q    Take a look at the --                    13:25:19

11        A    It's the right version number.  Yes.

12        Q    Take a look at the "Executive Summary."

13    It says:  "These Guidelines offer practical

14    recommendations to designers and users of social

15    media platforms on how to assess and avoid so-called  13:25:33

16    'dark patterns' in social media interfaces that

17    infringe on GDPR requirements."

18             Do you see that?

19        A    I do not, but I just got here.  So it's

20    on -- it's on the first page?                      13:25:47

21             All right.  So I see the first paragraph

22    that I see the --

23        Q    First paragraph under "Executive Summary."

24        A    Under "Executive Summary."  Hang on.

25             Oh, yeah, it's the first sentence.  Yes, I  13:26:02
```

Page 114

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
1     see it.  Yes.  I do.                          13:26:04

2          Q    Do you contend that Google's WAA and sWAA

3     disclosures constitute a social media platform?

4          A    No.

5          Q    Do they constitute social media        13:26:32

6     interfaces?

7          A    They can.

8          Q    How?

9          A    Well, if they're used by social media

10    sites, then they are part of the interface.    13:26:45

11         Q    Any other way?

12         A    Not that I can think of right now.

13              MR. CROSBY:  So I think we let you know

14    that we have a hard stop for a lunch break at 10:30

15    Pacific, 1:30 Eastern.                         13:27:13

16              MS. AGNOLUCCI:  Let's go off the record.

17              THE VIDEOGRAPHER:  This marks the end of

18    Media No. 2.  Off the record.  The time is 1:27.

19              (Lunch Recess.)

20              THE VIDEOGRAPHER:  This marks the     14:36:19

21    beginning of Media No. 3 in the deposition of Bruce

22    Schneier.  We are back on the record.  The time is

23    2:36 Eastern time.

24    BY MS. AGNOLUCCI:

25         Q    Before the break, we were talking about  14:36:36
```

Page 115

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1   various definitions of "dark patterns" by Gray, the        14:36:40

 2   FTC, and the EU.

 3            Do you remember that, Mr. Schneier?

 4       A    I do.

 5       Q    Do you contend that all of the behaviors           14:36:51

 6   described by Gray, the FTC, and the EU are dark

 7   patterns?

 8       A    Yes.

 9       Q    Would you agree that taking their

10   definitions of "sneaking," that those definitions          14:37:09

11   are not identical?

12       A    I give those definitions in paragraphs

13   311, 312, and 313, and they are not identical.

14       Q    The first is Colin Gray's definition.  He

15   describes "sneaking" as often occurring in order to        14:37:53

16   make the user perform an action they may object to

17   if they had knowledge of it, correct?

18       A    Yes.

19       Q    And then the second is the FTC's

20   definition, which considers practices having to do         14:38:09

21   with consumer shopping experiences, correct?

22       A    I write that it includes that; so I think

23   that's a better verb than "considers."

24       Q    How would you characterize the EU's -- the

25   FTC's definition of "sneaking"?                            14:38:27
```

Page 116

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
1          A    It includes tricking a shopper into buying      14:38:29

2     unwanted items by using a pre-checked box and hiding

3     material information or significant product

4     limitations from people.

5          Q    Does it include anything else?                  14:38:43

6          A    Almost certainly.  Those are not full

7     sentences I'm quoting.

8          Q    Do you know what else the FTC's category

9     includes?

10         A    If you're asking me if I memorized their        14:38:57

11    definition, I did not.

12         Q    Do you know whether the FTC's definition

13    includes practices that don't have to do with

14    consumer shopping?

15         A    I don't.                                        14:39:11

16         Q    The third definition of "sneaking" is the

17    EU's category of left in the dark, which refers

18    specifically to hiding information or data

19    protection control tools and, which we just

20    discussed, applies in the context of social media     14:39:31

21    platforms, correct?

22         A    We discussed social media platforms, but I

23    don't remember discussing the EU in particular, that

24    their definition relies on social media platforms.

25    So remind me of that.                                     14:39:47
```

Page 117

```
1           Q    We looked at the exhibit from the EU that      14:39:53

2      included the EU's definition.  It's Exhibit 11.

3           A    Right.  It's on my screen.

4           Q    And in the appendix -- in the executive

5      summary, it says (as read):  "These Guidelines offer   14:40:05

6      practical recommendations for designers and users of

7      social media platforms to assess 'dark patterns' in

8      social media interfaces."

9           A    Yes.

10          Q    Do you remember that?                          14:40:20

11          A    I see it right now.

12          Q    So my question to you was simply that the

13     third definition of "sneaking" is the EU's category

14     of left in the dark, which refers to hiding

15     information or data protection control tools and      14:40:36

16     which applies in the context of social media

17     platforms, correct?

18          A    I think it applies in other contexts as

19     well, but it does apply in that context, yes.

20          Q    Where does the EU say that it applies in      14:40:49

21     other contexts?

22          A    I would have to research that.

23          Q    You can't point to anything the EU said

24     that contradicted --

25          A    I --                                           14:41:02
```

Page 118

ATTORNEYS' EYES ONLY - CONFIDENTIAL

1        Q    -- the executive summary, which says how        14:41:03

2    to avoid dark patterns in social media interfaces?

3        A    At this moment, I don't have access to any

4    other EU documents or writings on dark patterns.  I

5    have not memorized them.  No, I cannot.  That is        14:41:16

6    something that can be researched.

7        Q    Based on your knowledge and the materials

8    we've just looked at, would you agree that the

9    contexts for sneaking are different as between

10   Mr. Gray, which talks generally about performing an     14:41:34

11   action, the FTC, which provides as an example

12   consumer shopping, and the EU, which talks about

13   social media platforms?

14       A    I -- I don't have an opinion on the

15   context.                                                14:41:52

16          Certainly the examples are different,

17   which is why I included all of them.

18       Q    Which definition of "sneaking" are you

19   applying in your analysis in this case?

20       A    I think they all apply in this case.          14:42:05

21       Q    You think the FTC's definition of

22   "sneaking," which talks about consumer practices and

23   shopping experiences, applies in this case?

24       A    The F- -- the FTC's definition, which

25   includes an example of consumer practices in what      14:42:27

Page 119

1    you said, applies in this case, yes.                14:42:31

2        Q    You mentioned that you weren't sure

3    whether the FTC had any nonconsumer shopping

4    examples.

5            If, upon reviewing the FTC documentation    14:42:42

6    you cite, you discover that there are no examples

7    outside of the consumer-shopping context, does that

8    change your opinion that the FTC's definition of

9    "sneaking" applies in this case?

10       A    I don't know.  I would have to actually do  14:42:58

11   that work.  I don't want to hypothesize to that

12   degree.

13       Q    But you haven't done that work?

14       A    I haven't -- I haven't -- at this point, I

15   do not memorize an answer to your question, no.      14:43:10

16       Q    And you can't recall having done that

17   analysis for purposes of this report in this case?

18       A    For purposes of this report, I believe the

19   FTC's definition applies.

20       Q    And you can't recall having done the        14:43:27

21   analysis I just asked you about for the purposes of

22   your report in this case?

23       A    Go back.

24            What is -- what is the analysis you

25   claim -- what is the analysis you think I did or      14:43:37

Page 120

ATTORNEYS' EYES ONLY - CONFIDENTIAL

1    didn't do?                                            14:43:41

2        Q    The definition that the FTC uses of

3    "sneaking," that you cite in your report, only

4    contains examples related to consumer shopping

5    online.                                               14:43:56

6              I asked you whether you are aware of the

7    FTC applying that definition outside of the

8    consumer-shopping context, and you said you didn't

9    know.

10             What I'm asking you is:  If, when you go    14:44:09

11   look at the materials you cited from the FTC, you

12   discover that, in fact, there are no examples

13   outside of the context of consumer online shopping,

14   would you still contend that the FTC's definition

15   applies to your analysis in this case?              14:44:29

16       A    I don't know.  It depends on what I would

17   have read.

18       Q    But I'm talking about an absence of

19   information.

20             So you would have -- you wouldn't have     14:44:43

21   seen anything?

22       A    But that's not true.  I wouldn't have seen

23   hundreds of blank pages.  I would have seen hundreds

24   of blank pages with words in them, and those words

25   would inform my opinion.                             14:44:53

                                              Page 121

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1        Q    Okay.  So your opinion is that it is        14:44:56

 2   possible that the FTC's definition of "dark

 3   patterns" would apply to your analysis in this case

 4   even if the FTC never discussed examples outside the

 5   context of consumer shopping?                        14:45:13

 6        A    Ever in that document discussed examples

 7   outside.  Yes.

 8        Q    Let's look back at "A Hacker's Mind."

 9             So in your report, on page 6, paragraph

10   14, you state that your book, "A Hacker's Mind,"      14:45:42

11   discusses dark patterns.

12             And on -- let's look at Tab 10 -- look at

13   Exhibit 12, Tab 10.

14        A    Not here yet.  All right.  I have to go

15   back and refresh.  We now know that.                  14:46:08

16             (Exhibit 12 was marked for

17             identification by the court reporter.)

18             THE WITNESS:  Scroll down.  Exhibit 12,

19   Tab 10.

20             Yes, I read it.                             14:46:31

21   BY MS. AGNOLUCCI:

22        Q    Is -- is Exhibit 12 another excerpt of

23   your book, "A Hacker's Mind"?

24        A    It looks like it.  I have the book there,

25   if you want to confirm it.                            14:46:40
```

ATTORNEYS' EYES ONLY - CONFIDENTIAL

1       Q    In the highlighted section, you see where        14:46:43

2    it says (as read):  "In 2019, Senators Warner and

3    Fischer introduced legislation banning dark

4    patterns.  It didn't pass.  But if a future version

5    does, the sponsors had better get their definition        14:46:54

6    right, because that definition itself will be

7    subject to all sorts of hacks, as programmers and

8    apps that use dark patterns to hack us try to get

9    around the rules."

10          Did you write that?                                14:47:08

11      A    I did.

12      Q    You write that the sponsors better get

13   their definition right.

14          What did you mean by that?

15      A    That, in this case, they need a legal           14:47:16

16   definition, very precise, because what is in and out

17   matters a lot in terms of a regulation; and that, in

18   the future, when someone reads what the law is, they

19   will look for loopholes.  They will look for ways to

20   do the same thing while technically following the        14:47:38

21   letters of the regulation.

22          It's a very precise statement about law

23   and loopholes, which I call "hacking," which is a

24   theme of the book.

25      Q    What's the definition -- what's the --           14:47:56

                                                  Page 123

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1    strike that.                                      14:47:59

 2            What's the difference between your

 3    eight-page definition of "dark patterns" and a legal

 4    definition?

 5        A    Legal definition is proscriptive.  It will    14:48:10

 6    list things that you can't do or maybe things you

 7    can do, but primarily it's things you can't do, and

 8    that definition will be used by prosecutors in

 9    courts to determine if someone who is being charged

10    with -- with breaking the rule did or did not.        14:48:37

11            So there's a precision that's necessary in

12    rule writing that's just very different than any

13    other type of writing.  And, again, that is really a

14    theme of the book.

15        Q    Why is that precision important?            14:48:58

16        A    Because people will read the rule as

17    written and then do their best to get around it,

18    because that's what people do.

19        Q    Do you think your eight-page definition of

20    "dark patterns" is sufficiently precise?            14:49:14

21            THE WITNESS:  Ian, we're not hearing you.

22    You're on mute.

23            MR. CROSBY:  Sorry.

24            Object to the form of the question.

25            THE WITNESS:  It's probably true for the     14:49:28
```

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1    entire time.                                       14:49:29

 2          No, I don't think my -- what I wrote in my

 3    document is suitable for a -- a law.

 4    BY MS. AGNOLUCCI:

 5          Q    But you think it's suitable to determine  14:49:48

 6    whether or not a company's actions constitute a dark

 7    pattern in the context of a lawsuit?

 8          A    Yeah, I don't think I'm drawing

 9    conclusions about that -- I mean legal conclusions.

10    I am stating what I think is true based on my         14:50:00

11    expertise, but I feel like what I wrote is going to

12    be given to a Court that will make the -- that

13    decision.

14          And I was definitely not writing a rule

15    that will be followed going forward.                 14:50:18

16          Q    How do you expect a Court to make that

17    decision without the type of precise and specific

18    definition you advocate for in your book?

19          A    Courts do that all the time.  I don't

20    think that that's a hindrance.                       14:50:38

21          I know if we were having a case about a

22    chair, we would not have a precise legal definition

23    of a chair.  There would be chairs in the case.

24    There might be things that are stools and benches

25    that some people think are chairs and not, and the   14:50:54
```

```
1    Court would figure it out.                          14:50:57

2         To me, this is what courts do, so I don't

3    see this as a hindrance in general; that without a

4    precise legal definition, the Court throws up its

5    hands and says, "We can't do anything."  They figure  14:51:10

6    out stuff all the time.  And sometimes definitions

7    come out of case law.

8         It doesn't feel like a problem in the same

9    way that a proscriptive regulation would be.

10   Q    Is there a legal definition of "dark           14:51:33

11   patterns" today?

12   A    I don't know.

13        So the question I think you're asking is

14   that EU document have the force of law?  I don't

15   know.                                                14:51:47

16        Does the FTC document have the force of

17   law?  I don't know.

18        There have been cases and -- and fines

19   that involved dark patterns.  So there is case law.

20   Some of it might have settled.  I don't know.        14:52:01

21        So I know this stuff has made its way into

22   courts and legal documents, but to answer your

23   question, I don't know.

24   Q    What was wrong with the definition that

25   Senators Warner and Fischer introduced in 2019?      14:52:27
```

Page 126

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
1         A    I don't know in particular.  I don't have        14:52:33

2    anything wrong.

3              In the book, I make -- I'm ending -- I

4    think I'm ending the chapter on that.  I'm just

5    ending it to remind the reader that any set of rules     14:52:43

6    will be hacked and that defining your sets of rules

7    is important.

8              So what I'm saying in that book is really

9    a general statement.  I'm not talking about the

10   particular piece of legislation.                        14:52:59

11        Q    Do you have, in your mind, a ideal

12   proscriptive legal definition of "dark patterns"?

13        A    I have never been asked to produce one,

14   no.

15        Q    Can you think of one now?                     14:53:19

16        A    The lesson in my book is never do that

17   stuff off the top of your head live.  Always

18   consider it.  So no.

19        Q    And you've never considered it?

20        A    Not enough to -- to have a definition that    14:53:35

21   I think would be suitable.

22             It would be a fun problem to work on.

23        Q    Can whether something is a dark pattern be

24   empirically tested?

25        A    I don't know what you mean by that.           14:54:07
```

Page 127

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
1              It is not something you measure, like        14:54:08

2      height or weight.

3              So what do you mean by "empirically

4      tested"?  You mean -- do you mean compared to a

5      standard?  Does that count?                          14:54:15

6          Q    I'm asking you whether there could be a

7      test to determine whether something is a dark

8      pattern.

9          A    Whether there could possibly be a test?

10     Yes.                                                 14:54:31

11         Q    Like what?

12             MR. CROSBY:  Object to the form.

13             THE WITNESS:  I don't know.

14     BY MS. AGNOLUCCI:

15         Q    Can you think of, as you sit here, any      14:54:43

16     appropriate test to determine whether something is a

17     dark pattern?

18         A    That is something I would like -- that is

19     something I would research before I answered.

20         Q    Let's talk about Google's alleged use of    14:55:12

21     dark patterns.

22             Turning to page 80 of your report, section

23     9.4, you include a section titled "Google Uses Dark

24     Patterns," correct?

25         A    Yes.                                        14:55:31
```

Page 128

```
1        Q    And in the first paragraph of this        14:55:37

2    section, you state (as read):  "As previously

3    defined in 6.3, dark patterns are user interface

4    designs that serve to manipulate users into making

5    choices that are contrary to their own interests."    14:55:49

6             Do you see --

7        A    Yes.

8        Q    -- that?

9        A    Yes.

10       Q    How did you choose which definition of        14:55:57

11   "dark patterns" to apply here?

12       A    I don't remember.

13       Q    You also state here, quote:  It is helpful

14   to consider the broader range of Google controls.

15            Are you referring to Google products and        14:56:17

16   services beyond WAA and sWAA here?

17       A    I am.

18       Q    What are you referring to?

19       A    I'm referring to the controls in the

20   following subsequent paragraphs, from 280 to the end        14:56:31

21   of the section.

22       Q    Did you -- were you asked to provide an

23   opinion on those other controls in this case?

24       A    I was not.

25       Q    And you told me earlier that paragraph        14:56:46
```

Page 129

ATTORNEYS' EYES ONLY - CONFIDENTIAL

 1   three of your report, which refers to WAA and sWAA,      14:56:51

 2   encapsulates all of the controls you are opining on

 3   in this matter, correct?

 4       A    That is correct.

 5       Q    So you did not look at the disclosures or      14:57:06

 6   products at issue in paragraphs 280, 282, 283 to

 7   -84, 289, 290, and 291?

 8       A    That is correct.  I just summarize other

 9   people's examinations.

10       Q    And those products and disclosures are not     14:57:30

11   part of your materials considered?

12       A    I read the documents that I referenced.  I

13   did not go further than that.

14       Q    In other words, you read the study by the

15   Norwegian Consumer Council, you read the authorities    14:57:48

16   cited in section 9.4, but nothing more?

17       A    Yes.

18       Q    Would you agree that none of the summaries

19   or observations or investigations in these two pages

20   of section 9.4 pertain to the WAA and sWAA settings?    14:58:19

21       A    At first glance, no, but they might, and

22   I'm not aware -- I'm not aware of that in this

23   reading.

24       Q    And, actually, I'm going to re-ask my

25   question because it's not limited to two pages;         14:59:00

Page 130

1    rather, your statements about Google's general use          14:59:03

2    of dark patterns go from page 80 to 85 of your

3    report.

4              Would you agree that the discussion at

5    pages 80 to 85 of your report does not pertain to          14:59:15

6    the sWAA and WAA settings at issue in this case?

7              MR. CROSBY:  Object to the form of the

8    question.

9              THE WITNESS:  The paragraphs are not about

10   the WAA and sWAA settings.  They are about the             14:59:28

11   company.

12   BY MS. AGNOLUCCI:

13        Q    In paragraph 250, you talk about "GDPR

14   popups."

15             You didn't consider the actual popups           14:59:49

16   discussed, did you?

17             MR. CROSBY:  Object to the form of the

18   question.

19             THE WITNESS:  Where do you see the popups?

20   I'm in paragraph 250.                                     15:00:00

21             MS. AGNOLUCCI:  I'm sorry.  I think I -- I

22   meant 280.

23             THE WITNESS:  Okay.  I see -- I see the

24   word "popup."

25             No, the -- the -- I don't -- I'm sorry.  I     15:00:31

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1    don't know what Google's GDPR popup says.  So I         15:00:36

 2    don't know if they mention WAA or sWAA.

 3    BY MS. AGNOLUCCI:

 4         Q    You didn't look at the GDPR popup or

 5    include it in your materials considered, correct?       15:00:47

 6         A    I did not.

 7         Q    And paragraph 284 discusses a Norwegian

 8    Consumer Council study that appears to relate to

 9    Chrome.

10              Is whether Chrome is a dark pattern part      15:01:12

11    of your opinion in this case?

12              MR. CROSBY:  Object to the form of the

13    question.

14              THE WITNESS:  It's part of my report, and

15    this section is included to demonstrate that           15:01:23

16    Google's use of dark patterns in this case is not

17    anomalous.  I do not know if that means it is part

18    of my opinion or not.

19    BY MS. AGNOLUCCI:

20         Q    Did you look at the links that the privacy    15:01:39

21    dashboard testers navigated through in the Norwegian

22    Consumer Council matter?

23         A    I did not.

24         Q    For paragraph 281, you talk about ad

25    personalization settings.                              15:02:03
```

Page 132

```
1              Did you look at the ad personalization        15:02:06

2    settings that were at issue in the Norwegian

3    investigation?

4        A    I did not.

5        Q    In other words, the examples we've been        15:02:16

6    discussing in section 9.4 are examples about others'

7    conclusions and opinions about certain Google

8    settings and disclosures, correct?

9        A    Yes.  I'm summarizing other organizations'

10   conclusions about Google and dark patterns.           15:02:38

11       Q    The Norwegian Consumer Council performed a

12   series of tests to reach its conclusions, correct?

13       A    I believe that is correct.

14            I think I say that somewhere, don't I?

15       Q    Yes.                                           15:03:06

16       A    Can you tell me where, so I can see it?

17            Yeah, okay.  I see it in paragraph 281.

18   Testers have to navigate.

19            So, in part, yes, Norwegian Consumer

20   Council did tests.                                     15:03:17

21       Q    You did not conduct any such user tests

22   for your analysis of WAA and sWAA, correct?

23       A    I did not.

24       Q    In fact, you didn't conduct any empirical

25   testing to determine how users received the sWAA and   15:03:36
```

Page 133

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
1    WAA settings, correct?                              15:03:39

2         A    That is correct.  I did not opine on any

3    users in particular.

4         Q    Or in general?

5         A    Or in general.                            15:03:50

6         Q    Paragraphs 173 to -74 of your report talk

7    about an FTC report on dark patterns, which

8    described deceptive design elements in e-commerce

9    interfaces.

10              Do you see that?                          15:04:16

11        A    Yes.

12        Q    And in paragraph 174, you list a number of

13   examples about consumer harms caused by a

14   rent-to-own payment plan company and online lending

15   corporation, a credit monitoring company, and a tax   15:04:33

16   filing service lying to people about prices or terms

17   of a paid deal, correct?

18        A    Yes.

19        Q    None of these examples are about WAA and

20   sWAA settings, correct?                             15:04:50

21        A    Yes, that's correct.

22        Q    And they're not about Google Analytics for

23   Firebase?

24        A    That's what I was checking.  I don't think

25   so.                                                 15:05:07
```

Page 134

1      Q    And they're not about any alleged harm to        15:05:09

2   users of WAA, sWAA, or Google Analytics?

3      A    So that -- so I wondered about your

4   phrasing, because, almost certainly, many of the

5   users who were harmed by these are using some site    15:05:25

6   that uses WAA or sWAA.  So they are users of WAA and

7   sWAA because, as we determined a couple of hours

8   ago, you can't avoid using it.  So those humans were

9   using WAA and sWAA, but not in conjunction with

10  these actions, or maybe in conjunction with these    15:05:47

11  actions, not in conjunction with the -- with what

12  the FTC was complaining about.

13     Q    I want to direct you to paragraphs 161 to

14  166, where we're talking about Brignull's definition

15  and categories of "dark patterns."                    15:06:13

16     A    Mm-hmm.

17     Q    Brignull refers to human behavior in his

18  definition of "dark patterns."

19          Do you agree with that?

20     A    Can you tell me where?                         15:06:37

21     Q    I can search for it.  I just saw it.

22          At the top of page 46.  So --

23     A    I wasn't even there.  I see it.  Yes.

24     Q    -- "Colin Gray has extended the" --

25          Okay.  So part of his definition is          15:07:12

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

ATTORNEYS' EYES ONLY - CONFIDENTIAL

```
 1    "instances where designers use their knowledge of      15:07:14

 2    human behavior."

 3           Do you see that?

 4      A    Well, that's Colin Gray's quote, but I do

 5    see it.                                                 15:07:23

 6      Q    And it's part of your definition, you

 7    said, of "dark patterns," correct?

 8           MR. CROSBY:  Object to the form of the

 9    question.

10           THE WITNESS:  Yeah, it's part of the            15:07:29

11    section where I discuss what dark patterns are.

12    BY MS. AGNOLUCCI:

13      Q    What human behaviors are referred to here?

14      A    I think it's a collection of human

15    behaviors: checking a box, clicking on a thing,        15:07:47

16    buying a thing, moving a slider, doing something

17    with -- with an interface.

18      Q    Okay.  You also said that you've taught in

19    the area of dark patterns.

20           When you're teaching, how do you teach          15:08:11

21    your students to recognize a dark pattern?

22      A    It's similar to what I did in this report.

23    I put up different taxonomies, and then I put up

24    examples.

25      Q    And then they are to use their judgment to      15:08:33
```

Page 136

```
 1   determine whether an example fits into a taxonomy?        15:08:36
 2       A    Yeah, I'm not teaching people to go out
 3   and be, you know, dark pattern police officers, but,
 4   yes, I mean, I'm trying to teach them to recognize
 5   them when they see them.                                  15:08:53
 6       Q    They'll know it when they see it, I take
 7   it?
 8            MR. CROSBY:  Object to the form of the
 9   question.
10            THE WITNESS:  You know, I'm okay with --         15:09:01
11   with a fuzzy definition in a class, right.  There
12   are -- I mean, I'm teaching in cybersecurity.
13   It's -- so many things are fuzzy.  There are things
14   that are obviously dark patterns; there are things
15   that are obviously not.  There are edge cases that        15:09:14
16   are -- that are worth discussing.
17            I mean, these people are going into a
18   variety of policy roles in their career, and I want
19   them to be familiar with the term and the tactics
20   and the current policy discussions around it.             15:09:33
21   That's really the point of my class.
22   BY MS. AGNOLUCCI:
23       Q    Let's go back to paragraph 279, where you
24   include your definition of "dark patterns."
25            Do you believe that WAA and sWAA are user        15:09:54
```

Page 137