1   **WILLKIE FARR & GALLAGHER LLP**
    BENEDICT Y. HUR (SBN: 224018)
2     bhur@willkie.com
    SIMONA AGNOLUCCI (SBN: 246943)
3     sagnolucci@willkie.com
    EDUARDO E. SANTACANA (SBN: 281668)
4     esantacana@willkie.com
    ARGEMIRA FLÓREZ  (SBN: 331153)
5     aflorez@willkie.com
    HARRIS MATEEN (SBN: 335593)
6     hmateen@willkie.com
    333 Bush Street, 34th Floor
7   San Francisco, CA 94104
    Telephone:  (415) 858-7400
8

9   Attorneys for Defendant
    GOOGLE LLC
10

11

12                    **UNITED STATES DISTRICT COURT**

13                  **NORTHERN DISTRICT OF CALIFORNIA**

14

15  | ANIBAL RODRIGUEZ, *et al.* individually and on behalf of all others similarly situated, | Case No.  3:20-CV-04688 RS |
    | --- | --- |

16                                          **GOOGLE LLC'S NOTICE OF MOTION**
                        Plaintiff,          **AND MOTION TO EXCLUDE**
17                                          **PLAINTIFFS' EXPERT OPINION OF**
         vs.                                **BRUCE SCHNEIER**
18
    GOOGLE LLC, *et al.*,                   [Filed concurrently with Santacana
19                                          Declaration and [Proposed] Order]
                        Defendant.
20                                          Date:        May 15, 2025
21                                          Time:        1:30 p.m.
                                            Ctrm:        3 - 17th Floor
22                                          Judge:       Hon. Richard Seeborg
23
                                            Action filed:  July 14, 2020
24                                          Trial Date:    August 18, 2025

25

26

27

28
    GOOGLE'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT OPINION OF BRUCE
    SCHNEIER
    Case No. 3:20-CV-04688 RS

1    **PLEASE TAKE NOTICE** that on May 15, 2025, at 1:30 p.m. the undersigned will appear

2    before the Honorable Richard Seeborg of the United States District Court for the Northern District

3    of California to move the Court, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell*

4    *Dow Pharms., Inc.*, 509 U.S. 579 (1993), to exclude the opinions of Plaintiffs' expert Bruce

5    Schneier ("Mr. Schneier") in his report submitted February 20, 2023 ("2023 Report"), except for

6    those opinions embodied in paragraphs 209–221, 296–310, and 268–278 of the 2023 Report; and to

7    exclude the opinions in Mr. Schneier's report submitted January 6, 2025 in their entirety.

8    This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points

9    and Authorities, and the Declaration of Eduardo E. Santacana filed concurrently herewith and the

10   exhibits attached thereto, along with all other materials in the record, argument of counsel, and such

11   other matters as the Court may consider.

12   <u>**ISSUE TO BE DECIDED**</u>

13   Whether Mr. Schneier's opinions should be excluded in whole or in part under Federal Rule

14   of Evidence 702 and the standards articulated in *Daubert*, 509 U.S. 579.

15

16

17   Dated: April 3, 2025                    Respectfully submitted,

18                                           WILLKIE FARR & GALLAGHER LLP

19                                           By:    */s/ Eduardo E. Santacana*

20                                                  Benedict Y. Hur
21                                                  Simona Agnolucci
                                                    Eduardo E. Santacana
22                                                  Argemira Flórez
                                                    Harris Mateen
23
24                                                  *Attorneys for Defendant*
                                                    *GOOGLE LLC*
25

26

27

28

GOOGLE'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT OPINION OF BRUCE
SCHNEIER
Case No. 3:20-CV-04688 RS

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  BACKGROUND .................................................................................................. 1

A.  Factual and Procedural Background ................................................................. 1

B.  Bruce Schneier's Affirmative Expert Reports ................................................. 2

i.   February 20, 2023 Report ............................................................................... 2

ii.  January 6, 2025 Report .................................................................................... 3

III. LEGAL STANDARD........................................................................................... 3

IV. ARGUMENT ........................................................................................................ 5

A.  Schneier's Opinions About Data and Privacy Are Irrelevant and Highly Prejudicial................ 6

i.   Mr. Schneier's inflammatory policy opinions are not relevant. ..................... 6

ii.  Mr. Schneier's inflammatory policy opinions are highly prejudicial. ............ 9

B.  Mr. Schneier's Opinions as to Google's Intent Should be Excluded. ..................... 10

i.   Mr. Schneier's "dark patterns" opinions depend on his impermissible lay opinion about Google's intent.............................................................. 11

ii.  Mr. Schneier impermissibly opines on Google's intent throughout his report.................... 14

C.  The Court Should Also Exclude All "Dark Patterns" Opinions Because They Are Based On Unsound Methodology.......................................................... 15

D.  Schneier Is Not Qualified to Opine on Consumer Expectations............................... 18

V.  CONCLUSION..................................................................................................... 20

GOOGLE'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT OPINION OF BRUCE
SCHNEIER
Case No. 3:20-CV-04688 RS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AngioScore, Inc. v. TriReme Med., Inc.*,
  87 F. Supp. 3d 986 (N.D. Cal. 2015), *rev'd and remanded sub nom. AngioScore,*
  *Inc. v. TriReme Med., LLC*, 666 F. App'x 884 (Fed. Cir. 2016) ..............................................11

*Berman v. Freedom Financial Network, LLC*,
  400 F. Supp. 3d 964 ...............................................................................................................18

*BJB Elec. LP v. Bridgelux, Inc.*,
  No. 22-CV-01886-RS, 2023 WL 4849764 (N.D. Cal. July 28, 2023) ......................................5

*Bowoto v. Chevron Corp.*,
  No. C 99-02506 SI, 2006 WL 2604592 (N.D. Cal. Aug. 23, 2006) .........................................7

*Brown v. Google, LLC*,
  No. 20-CV-3664-YGR, 2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ........................ *passim*

*City of Pomona v. SQM N. Am. Corp.*,
  750 F.3d 1036 (9th Cir. 2014) ..........................................................................................4, 16

*Conroy v. Ridge Tool Co.*,
  No. 4:20-CV-05882-YGR, 2022 WL 911138 (N.D. Cal. Feb. 3, 2022) ...........................5, 19

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) .......................................................................................5, 6, 15

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..................................................................................................... *passim*

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)...............................................................................................................16

*Karpilovsky v. All Web Leads, Inc.*,
  No. 17 C 1307, 2018 WL 3108884 (N.D. Ill. June 25, 2018)) ..............................................18

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)................................................................................................................4

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2017 WL 1391491 (N.D. Cal. Apr. 12, 2017)..................................11

*Montera v. Premier Nutrition Corp.*,
  No. 16-CV-06980-RS, 2022 WL 1225031 (N.D. Cal. Apr. 26, 2022), *aff'd in*
  *part,* 111 F.4th 1018 (9th Cir. 2024)....................................................................................20

ii

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
  No. 16-CV-01393-JST, 2018 WL 6511146 (N.D. Cal. Dec. 11, 2018) ................................14

*Palantir Techs. Inc. v. Abramowitz*,
  No. 19-CV-06879-BLF, 2022 WL 22913842 (N.D. Cal. Nov. 3, 2022)...........................6, 7

*Rovid v. Graco Children's Prods. Inc.*,
  No. 17-CV-01506-PJH, 2018 WL 5906075 (N.D. Cal. Nov. 9, 2018) ................................17

*Senne v. Kansas City Royals Baseball Corp.*,
  591 F. Supp. 3d 453 (N.D. Cal. 2022) ..............................................................................6

*Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*,
  927 F. Supp. 2d 1069 (D. Or. 2013) ................................................................................10

*Snyder v. Bank of Am., N.A.*,
  No. 15-CV-04228-KAW, 2020 WL 6462400 (N.D. Cal. Nov. 3, 2020) .........................10, 11

*Sonneveldt v. Mazda Motor of Am., Inc.*,
  No. 23-55325, 2024 WL 5242611 (9th Cir. Dec. 30, 2024)................................................4, 16

*Stiner v. Brookdale Senior Living, Inc.*,
  665 F. Supp. 3d 1150 (N.D. Cal. 2023), *opinion clarified*, No. 17-CV-03962-
  HSG, 2024 WL 3498492 (N.D. Cal. July 22, 2024)..........................................................4

*Tavilla v. Cephalon Inc.*,
  No. CV11-0270 PHX DGC, 2012 WL 1190828 (D. Ariz. Apr. 10, 2012) ............................17

*In re Twitter, Inc. Sec. Litig.*,
  No. 16-CV-05314-JST, 2020 WL 9073168 (N.D. Cal. Apr. 20, 2020) ................................13

*United States v. Tamman*,
  782 F.3d 543 (9th Cir. 2015) ..........................................................................................10

*Utne v. Home Depot U.S.A., Inc.*,
  No. 16-CV-01854-RS, 2022 WL 1443338 (N.D. Cal. May 6, 2022)......................................4

*Volk v. United States*,
  57 F. Supp. 2d 888 (N.D. Cal. 1999) ................................................................................9

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
  644 F. Supp. 3d 1075 (S.D. Fla. 2022) ..............................................................................17

**Statutes**

California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code §
  502 *et seq.* ....................................................................................................................1, 2

Federal Wiretap Act, California Invasion of Privacy Act.............................................................1

iii

**Other Authorities**

Federal Rule of Evidence 104(a) .................................................................................................3

Federal Rule of Evidence 402 ....................................................................................................6

Federal Rule of Evidence 403 ...............................................................................................5, 6, 9

Federal Rule of Evidence 702 ............................................................................................. *passim*

GOOGLE'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT OPINION OF BRUCE
SCHNEIER
Case No. 3:20-CV-04688 RS

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3

Both of the expert reports from Bruce Schneier put forth by Plaintiffs should be stricken

4

nearly in their entirety, as they fail to meet the standards for expert opinion under Federal Rule of

5

Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*").

6

Mr. Schneier purports to be an expert on so-called "dark patterns" and offers opinions on topics as

7

far-reaching as the abortion landscape in America, political violence, and J. Edgar Hoover.

8

His reports suffer from numerous fatal flaws. Most concerningly, Mr. Schneier offers

9

irrelevant, inflammatory, and highly prejudicial opinions on purported "data and privacy" topics,

10

none of which are properly the stuff of expert opinion. His opinions regarding Google's intent are

11

inadmissible because they usurp the jury's role. Indeed, another Court in this District excluded Mr.

12

Schneier's previous testimony on this same subject for this very reason. *Brown v. Google, LLC*, No.

13

20-CV-3664-YGR, 2022 WL 17961497, at *12-13 (N.D. Cal. Dec. 12, 2022). His "dark patterns"

14

opinions, which constitute a large portion of both reports, are not grounded in any testable

15

methodology and also are impermissibly based on Google's intent. And finally, he is unqualified to

16

opine on consumer expectations, as Judge Gonzalez-Rogers already ruled in *Brown*. Mr. Schneier's

17

reports are characterized by a stunning lack of rigor, and are based on little more than his own

18

subjective views. For these reasons, the Court should strike Mr. Schneier's 2023 Report (except for

19

paragraphs 209–221, 296–310, and 268–278), and strike Mr. Schneier's 2025 Report in its entirety.

20

## II.    BACKGROUND

21

### A.    Factual and Procedural Background

22

Plaintiffs filed their original complaint against Google LLC and Alphabet, Inc. in July 2020,

23

asserting violations of the Federal Wiretap Act, California Invasion of Privacy Act (CIPA), and

24

California Comprehensive Computer Data Access and Fraud Act (CDAFA), Cal. Penal Code § 502

25

*et seq.*, among other claims. Dkt. No. 1. Following multiple amendments and multiple rounds of

26

motion to dismiss briefing, the operative complaint is now the Fourth Amended Complaint ("4AC").

27

Dkt. No. 289. Plaintiffs have three legal claims remaining: (1) violation of the California

28

Comprehensive Computer Data Access and Fraud Act ("CDAFA"); (2) invasion of privacy; and (3) intrusion upon seclusion. *Id*.; *see also* Dkt. No. 209.

In its first Order on Google's Motion to Dismiss Plaintiffs' *First* Amended Complaint, this Court described Plaintiffs' core theory: That Google Analytics ("GA") for Firebase, a mobile app development tool provided to developers for free, "when functioning as advertised in a given app, contravenes [Google's] user-facing privacy representations." Dkt. No. 109, at 1. Essentially, Google makes available to users various tools for controlling the privacy-related aspects of their usage of Google's products. *Id*. at 2–4. One of these tools is an account setting called Web & App Activity, or "WAA,"[1] which presents users a toggle that "purports to give consumers control over a defined subset of Google's data-gathering efforts." *Id*. at 3. The toggle contains various disclosures, including the terms "Google services" and "Google Account," which, the Court found, could potentially mislead a reasonable user about how GA for Firebase actually works. *Id*. at 8–10. The Court issued its Order granting class certification on January 3, 2024, certifying two classes of plaintiffs comprising individuals who turned off (s)WAA and used Firebase—or Google Mobile Ads-enabled apps. Dkt. No. 352.

## B. Bruce Schneier's Affirmative Expert Reports

### i. February 20, 2023 Report

Plaintiffs submitted the affirmative expert report of Bruce Schneier on February 20, 2023 ("2023 Report"). Mr. Schneier's 2023 Report contains purported expert opinions on such disparate topics as Edward Snowden, J. Edgar Hoover's surveillance of Martin Luther King, Jr., and the evolution of the Internet. Santacana Decl., Ex. 1, at ¶¶ 38, 43, 48. In addition, Mr. Schneier opined about various other generalized "data and privacy topics" outside the context of this litigation, including international legal frameworks that are not at issue here, and his lay opinion that "privacy

---

[1] Following the Court's May 2021 Order Granting in Part Google's Motion to Dismiss, Plaintiffs amended their complaint to include descriptions of the supplemental Web & App Activity ("sWAA") button. *See* 4AC, Dkt. No. 289 . The (s)WAA button provides users with the option to allow Google to save "Chrome history and activity from sites, apps, and devices that use Google services" to the user's Google Account. *Id*. at 22. WAA must be on for sWAA to be on. *Id*. Thus, when a user disables the WAA toggle, the sWAA button is also disabled. *Id*. In this case, the parties refer to the two controls collectively as "WAA" or "(s)WAA".

1  is a basic human need." *See, e.g.*, *id.* ¶¶ 24–177. Mr. Schneier engaged in a discussion of Google's

2  market share; a series of hypotheticals about potential joinability risks of datasets maintained by

3  Google; and several data breaches involving primarily unrelated Google products. *See, e.g.*, *id.*

4  ¶¶ 178–248. He offered further opinions about Google's WAA and sWAA disclosures, and

5  concluded that Google employs "dark patterns" via its WAA and sWAA messaging. *See, e.g.*, *id.*

6  ¶¶ 249–400. Despite being a computer scientist, Mr. Schneier did not examine any of the data

7  actually at issue in this case, and does not put forward any opinion as to those sets of data and how

8  they compare to the disclosures made to consumers.

9      The relevant details of the 2023 Report are discussed at length in the following pages. Mr.

10  Schneier was deposed on July 10, 2023. *See* Santacana Decl., Ex. 2.

11                            **ii.  January 6, 2025 Report**

12      Although Google never agreed to it, Mr. Schneier served a "Supplemental Report" on

13  January 6, 2025 ("2025 Report"). *See generally* Santacana Decl. Ex. 3. In his 2025 Report, Mr.

14  Schneier stated that he was "not offer[ing] any new opinions," but rather explaining how his original

15  opinions "apply to conduct and events from the portion of the Class Period that post-dates [his]

16  [2023] Report (i.e. the period between February 20, 2022 and September 23, 2024)." *Id.* ¶ 3. The

17  2025 Report includes "Update[s]" to "Data and Privacy Topics," "Google-Specific Topics," and

18  "Google Tracking Web & App Activity Topics." *Id.* ¶¶ 4–35. Nevertheless, his new report contains

19  various new opinions ranging from claims about Google's usage of Google Analytics on a variety

20  of specific apps during the class period, ¶ 12, to Google's alleged practices regarding "sensitive

21  location data," ¶¶ 16–18, Google's practices regarding third-party cookies on its Chrome browser,

22  ¶¶ 19–20, Google's artificial intelligence systems, ¶¶ 24–26, and the comings and goings of

23  Google's executives, ¶ 27, among others. *Id.*

24  **III.  LEGAL STANDARD**

25      Recent amendments to Rule 702 clarify that although "many courts have held that the critical

26  questions of the sufficiency of an expert's basis, and the application of the expert's methodology,

27  are questions of weight and not admissibility," the Rules Committee believes "[t]hese rulings are an

28  incorrect application of Rules 702 and 104(a)." *Id.*, Fed. R. Evid. 702 Comm. Note to 2023 Am.

The Rules Committee emphasized "each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id*. Further, it is the judge's duty to perform the "essential" function of "gatekeeping," as "jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." *Id*.

Thus, the amendments make clear that the admissibility of expert testimony must be resolved under the preponderance of the evidence standard. Fed. R. Evid. 702 Comm. Note to 2023 Am. The burden is on the proponent of the testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1168 (N.D. Cal. 2023), *opinion clarified*, No. 17-CV-03962-HSG, 2024 WL 3498492 (N.D. Cal. July 22, 2024).

Expert testimony is admissible only if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the testimony reflects a reliable application of the relevant principles and methods to the facts of the case. *Utne v. Home Depot U.S.A., Inc.*, No. 16-CV-01854-RS, 2022 WL 1443338, at *2 (N.D. Cal. May 6, 2022) (citing Fed. R. Evid. 702). "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–149 (1999) (the tests under *Daubert* apply to all "expert matters described in Rule 702," meaning not only to "scientific knowledge," but also to "technical or other specialized knowledge."). Reliability requires "evidence in the record indicating the [expert's] methodology 'can be or has been tested.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014) (internal quotation and citation omitted). "Testability" requires an expert to sufficiently explain their methodology so that "'[s]omeone else using the same data and methods ... [is] able to replicate the result' found by the challenged expert." *Sonneveldt v. Mazda Motor of Am., Inc.*, No. 23-55325, 2024 WL 5242611, at *1 (9th Cir. Dec. 30, 2024) (alterations in original) (quoting *City of Pomona*, 750 F.3d at 1047). "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his

1   methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995). "[E]xpert

2   testimony is not admissible under Rule 702 if it is based on assumptions that are unsubstantiated by

3   the record." *BJB Elec. LP v. Bridgelux, Inc.*, No. 22-CV-01886-RS, 2023 WL 4849764, at *2 (N.D.

4   Cal. July 28, 2023). "Federal Rule of Evidence 702 permits expert opinion testimony by a witness

5   who is qualified and offers a relevant and reliable opinion." *Conroy v. Ridge Tool Co.*, No. 4:20-

6   CV-05882-YGR, 2022 WL 911138, at *6 (N.D. Cal. Feb. 3, 2022).

7   **IV.    ARGUMENT**

8         The bulk of Mr. Schneier's opinions from his 2023 Report and 2025 Report should be

9   excluded under *Daubert* and the Federal Rules of Evidence for four reasons. 509 U.S. 579; Fed. R.

10  Evid. 702; Fed. R. Evid. 403. Google does not move to exclude paragraphs 209–221, 296–310, and

11  268–278 of the 2023 Report at this time.

12        ***First***, Mr. Schneier's generalized lay opinions about data and privacy (and myriad other

13  inflammatory topics) are irrelevant, will only serve to confuse the jury because they are not

14  connected to the issues in this case, and are more prejudicial than probative.

15        ***Second***, all opinions purporting to know Google's intent should be excluded, which

16  necessarily includes all of Mr. Schneier's "dark patterns" opinions due to his testimony that "intent"

17  is a prerequisite for a dark pattern. Santacana Decl., Ex. 2, at 89:15–17. Judge Gonzalez Rogers

18  excluded all opinions from Schneier about Google's intent in *Brown v. Google, LLC*. 2022 WL

19  17961497, at *12.

20        ***Third***, Mr. Schneier's "dark patterns" opinions should be excluded because they are based

21  on unsound methodology and cannot be tested—an essential prong of *Daubert*. 509 U.S. 579 at 593

22  (discussing "testability" inquiry).

23        ***Finally***, Mr. Schneier is not qualified to opine on consumer expectations, and these opinions

24  should be excluded because of his lack of training and background. His consumer expectations

25  opinions were excluded by Judge Gonzalez Rogers in *Brown* for the same reasons. 2022 WL

26  17961497, at *11.

27

28

1

2

**A. Schneier's Opinions About Data and Privacy Are Irrelevant and Highly Prejudicial.**

3

4

5

6

7

8

9

10

11

12

A quick review of Mr. Schneier's 2023 and 2025 Reports reveals their "data and privacy" sections for what they are: a dump of grievances against Google for its past actions unrelated to this case, and an even larger dump of lay opinions about what legislatures and courts should do about privacy in society, none of which is the stuff of expert opinion, and all of which is highly prejudicial. None of these opinions will "assist the trier of fact to understand the evidence or to determine a fact in issue," and they all should therefore be excluded. *Palantir Techs. Inc. v. Abramowitz*, No. 19-CV-06879-BLF, 2022 WL 22913842, at *1 (N.D. Cal. Nov. 3, 2022) (quoting *Daubert*, 509 U.S. 579 at 591). These assertions are also needlessly inflammatory, introducing controversial subjects entirely unrelated to the facts of this case in what appears to be a deliberate effort to emotionally manipulate the jury. They should be excluded under *Daubert* and Federal Rule of Evidence 403.

13

**i.   Mr. Schneier's inflammatory policy opinions are not relevant.**

14

15

16

17

18

19

20

21

22

23

The *Daubert* test requires that an expert's testimony be "relevant to the task at hand" and "logically advance[] a material aspect of the proposing party's case." *Daubert*, 43 F.3d 1311 at 1315. Mr. Schneier's generalized opinions about data and privacy in both his original and supplemental reports are neither relevant nor in service of advancing a material aspect of Plaintiffs' case. Because these opinions simply do not "fit" the issues here, they should be excluded. *Id.* (citing *Daubert*, 509 U.S. 579 at 591); *see also Senne v. Kansas City Royals Baseball Corp.*, 591 F. Supp. 3d 453, 479 (N.D. Cal. 2022) (the "fit" requirement "is more stringent than the relevancy requirement of Rule 402 of the Federal Rules of Evidence, 'reflecting the special dangers inherent in'" expert testimony. (quoting *Jones v. United States*, 933 F. Supp. 894, 900 (N.D. Cal. 1996), *aff'd,* 127 F.3d 1154 (9th Cir. 1997)).

24

25

26

27

28

Evidence is relevant if it is "sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute." *Palantir Techs. Inc.*, 2022 WL 22913842, at *1 (quoting *Daubert*, 509 U.S. 579 at 591). Mr. Schneier's generalized opinions about data and privacy "do[] not relate to any issue in the case," are thus "not relevant and, ergo, non-helpful." *Id*. In *Palantir*, this District excluded the opinions of an expert who proffered testimony "about whether Palantir

6

1    develops or maintains the data underlying its alleged trade secrets," finding it irrelevant. *Id.*, at \*5.

2    The court determined that focusing on Palantir's role in developing or maintaining individual data

3    sources would distract from the key issue—whether the combinations of this data were protected

4    trade secrets—and would potentially confuse the jury. *Id.* The same analysis applies here. Mr.

5    Schneier does not advance any material issue, but instead strings together disparate topics without

6    ever connecting them to the disclosures at issue. These opinions are, "at best, marginally relevant

7    [to the issues in *Rodriguez*] and [are] more likely to confuse the jury than to help it." *Id.*; *see also*

8    *Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2006 WL 2604592, at \*4 (N.D. Cal. Aug. 23, 2006)

9    (excluding testimony of "marginal relevance" that would not be "particularly helpful to the jury").

10       ***2023 report.*** Schneier's Opinions 1 through 6, collected as "Data and Privacy Topics," are

11    replete with irrelevant information.

12    - Opinion 1 contains various privacy-related statements, the majority of which are completely divorced from this litigation. *See, e.g.,* Santacana Decl., Ex. 1, at ¶ 41 (discussing Amazon's workplace surveillance efforts); *id.* ¶ 42 (discussing U.S. trade practices related to encryption systems in 1993); *id.* ¶ 43 (referencing Edward Snowden's "revelations … regarding the extent of NSA surveillance of the communications of US and foreign residents"); *id.* ¶ 44 (discussing data breaches on Facebook).

17    - Opinion 2, broadly entitled "Data Privacy," attempts to take the jury on a journey from the Internet's inception in "the late 1960s," its early "netizens," and the rise of blogging to the widespread adoption of social media applications. *See, e.g.*, *Id.* ¶¶ 45–52 (Opinion 2.1: "Privacy Has Become a Significant Issue with the Rise of the Internet"). While certainly interesting material for Mr. Schneier's course at the Harvard Kennedy School, this is simply not relevant to any of the claims or defenses in this case.

22    - Opinion 3 goes on to describe topics as varied as the volume of data produced by computers, word processors, the Internet, mobile devices, and cameras. ¶¶ 70–77. Mr. Schneier discusses "user data", ¶¶ 84–88, and opines that "Information from App Activity Is Highly Personal," ¶¶ 89–95, that this information is "unique," ¶¶ 96–99, and "sensitive," ¶¶ 103–110, and that online advertising "[h]as [r]isks," ¶¶ 100–102. *Id.* ¶¶ 70–110.

26
27    - Opinion 4, "The Value of User Data," discusses topics as varied as corporate revenue, ¶ 111, and the history of credit bureaus, ¶ 120, while failing to explain why any of this is

28

connected to *Rodriguez* (it is not). *Id.* ¶¶ 111–127.

- Opinion 5, "Limitations on Collecting User Data," explains Mr. Schneier's interpretations of various privacy laws and frameworks, from to GDPR, to the "OECD Privacy Framework," and the ACM Code of Ethics and Professional Conduct," none of which are at issue here. *Id.* ¶¶ 128–141.

- Opinion 6 contains musings about the data "[p]eople reveal [] about themselves all the time" as "social animals." *Id.* ¶¶ 142–147. Mr. Schneier also spends a number of pages in Opinion 6 discussing instances in which "large sets of anonymous data" have been "de-anonymized," ostensibly to invoke a jury inference that this could also happen to any pseudonymous data sets in Google's control. *Id.* ¶¶ 148–159. But these paragraphs are primarily about non-Google data sets. *See id.* ¶ 150 (voter registration database); ¶ 151 (AOL search data); ¶ 152 (Netflix movie rankings); ¶ 153 (credit card metadata); ¶ 156 (location, credit card, and school data).

Mr. Schneier's Opinions 8.2 and 8.3 are likewise irrelevant. He opines that "Google Has a History of Data Breaches" and that "Google Has a History of Privacy and Consent Failures," referencing everything from Chinese and Russian hacks, ¶¶ 233–234, to Google Street View cars and third-party cookies, ¶¶ 231–232, to Nest security devices, ¶ 239, and a contract between Google and a health care company in Tennessee, ¶¶ 242–243. *Id.* ¶¶ 222–248.

**2025 report.** Here, Mr. Schneier opines on wholly irrelevant topics such as the state of abortion rights in America, the rise in political violence following the 2024 U.S. presidential election, and government surveillance. Santacana Decl. Ex. 3, at ¶¶ 6–7. He attempts to draw connections between such subject matter and the case at hand, but the fact is that this litigation simply has nothing to do with reproductive rights, domestic unrest, or law enforcement investigations. He comments that Google is a frequent subpoena recipient, without alleging that any data at issue in this case has ever been the focus of a subpoena to Google. *Id.* ¶ 14. He mentions Google's practices regarding certain "sensitive location data," but never makes a connection between this location data and this litigation. *Id.* ¶¶ 16–18. He references a few data breaches at Google "between 2013 and 2018," none of which are claimed to have anything to do with the relevant conduct here. *Id.* ¶¶ 21–22. Schneier also offers several opinions regarding artificial intelligence programs, despite the fact that artificial intelligence is not at issue in this case. *Id.* ¶¶ 24–26. And in paragraph 26 of the 2025 Report, Mr. Schneier writes that "AI models have leaked private training data during the course of their operation," despite the fact that the cited example concerns

Microsoft's model and has nothing to do with Google. *Id*. ¶ 26. All of these opinions should be excluded.

### ii.    Mr. Schneier's inflammatory policy opinions are highly prejudicial.

In addition to being wholly irrelevant, Mr. Schneier's data and privacy opinions contain statements that are extremely prejudicial and inflammatory. Federal Rule of Evidence 403 bars evidence that is more prejudicial, confusing, or misleading than it is probative. Fed. R. Evid. 403. Rule 403 also guides the court in their role as gatekeepers under Rule 702 and *Daubert*. 509 U.S. 57 at 595 (a judge assessing expert testimony "under Rule 702 should also be mindful of other applicable rules[,]" including Rule 403). Indeed, "[e]xpert evidence can be both powerful and quite misleading," and "[b]ecause of this risk, the judge in weighing possible prejudice against probative force under Rule 403 … exercises more control over experts than over lay witnesses." *Id*.

"[A] major principle underlying the *Daubert* gatekeeping function is that the trier of fact should not be unduly prejudiced by testimony that is based on foreign concepts." *Volk v. United States*, 57 F. Supp. 2d 888, 896 (N.D. Cal. 1999). Mr. Schneier's 2023 Report contains numerous opinions that would "unduly prejudice[]" the trier of fact, so disconnected they are from any relevant matter while simultaneously intended to elicit pearl-clutching from the jury. *Id*.; *see also* Santacana Decl., Ex. 1, at ¶ 31 ("[s]urveillance … makes people feel like prey, just as it makes the surveillors behave like predators."); *id*. ¶ 36 (quoting both "seventeenth-century French statesman Cardinal Richelieu" and the "head of Joseph Stalin's secret police"); *id*. ¶ 38 ("Before Internet-enabled surveillance became common, J. Edgar Hoover spied on Martin Luther King, Jr., and the FBI's COINTELPRO program spied on nonviolent protesters during the Vietnam War. Ubiquitous digital surveillance makes this unseemly sort of work much easier; consider the revelation in 2015 that for years, AT&T collaborated with the NSA to indiscriminately collect US citizens' communications."); *id*. ¶ 40 ("Extensive digital surveillance invites surveillance-based discrimination."); *id*. ¶ 41 (In a discussion of Amazon's business practices, noting that "Widespread adoption of digital surveillance by employers can also contribute to unjust workplace conditions."); *id*. ¶ 51 ("Today's technology enables mass surveillance, and mass surveillance is dangerous."); *id*. ¶ 66 ("US citizens have been harmed by the vulnerability of information collected online and stored

by numerous companies. Major data leaks abound."); *id*. ¶ 67 (referencing the Ashley Madison data breach); *id*. ¶ 83 ("Data is not only the exhaust of the information age, it has become the pollution problem of the information age; and protecting privacy is the environmental challenge."); *id*. ¶ 100 ("The rise in online advertising … has enabled an increase in the ability of hostile nations to influence American citizens.").

Mr. Schneier's 2025 Report regurgitates much of the same. He discusses everything from the criminalization of abortion in certain states following the overturning of *Roe v. Wade*, ¶ 6, to Google's practices related to location data from sensitive places including abortion clinics, ¶¶ 15–18. Santacana Decl., Ex. 3. He inexplicably cites and references a study regarding political violence in America, including the conclusions that "certain Americans believed that violence may be necessary or appropriate to achieve political goals" and that "US citizens have recently been arrested for threats of violence," ¶ 7. *Id*. And he references artificial intelligence, which, again, has nothing to do with this litigation, in an apparent attempt to play on a jury's fears about this new technology. *Id*. ¶¶ 24–26.

**B. Mr. Schneier's Opinions as to Google's Intent Should be Excluded.**

In addition to striking Mr. Schneier's irrelevant and inflammatory opinions as described above, the Court should exclude Mr. Schneier's many lay opinions about Google's intent and motivations. Expert opinions regarding a party's "intent, motive, or state of mind" are impermissible and are routinely excluded, as allowing this type of testimony would usurp the role of the jury. *Snyder v. Bank of Am., N.A.*, No. 15-CV-04228-KAW, 2020 WL 6462400, at *2 (N.D. Cal. Nov. 3, 2020) (granting motion to exclude under *Daubert*); *see also Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) (excluding "as impermissible expert testimony as to intent, motive, or state of mind," as "[c]ourts routinely do," and collecting cases). It is well settled that experts may not testify as to legal conclusions, which for each claim here, includes a conclusion about Google's intent. *United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015) (affirming exclusion of expert testimony).

Mr. Schneier impermissibly opines on Google's intent in two ways. ***First***, his entire "dark patterns" analysis rests on drawing conclusions about Google's intent, and thus should be stricken

wholesale. **Second**, both of Mr. Schneier's reports provide impermissible opinions on Google's overall intent regarding a variety of topics. Indeed, Mr. Schneier's opinions about Google's intent were previously excluded by Judge Gonzalez-Rogers in *Brown v. Google*, in similar circumstances. There, Schneier offered opinions about Google's motivations and objectives, and purported to know what Google "counts on" in the course of its business, leading the court to exclude those opinions as impermissible. 2022 WL 17961497, at *12. That is the same course the Court should take here.

> ### i. Mr. Schneier's "dark patterns" opinions depend on his impermissible lay opinion about Google's intent.

Every opinion put forth by Mr. Schneier about Google employing a "dark pattern" goes to Google's intent, and should be excluded. Mr. Schneier offers a number of such opinions, claiming that certain Google products and disclosures "exemplif[y]" what he calls "dark patterns." *See, e.g.*, Santacana Decl., Ex. 1, at ¶ 314 (in the context of "Google's WAA Help Page"). Mr. Schneier cannot put forth a concise and comprehensive definition of "dark patterns" (which is an independent reason that these opinions are doomed, as discussed *infra* at 15–18), but suffice it to say that Mr. Schneier means "dark patterns" to comprise intentionally deceitful user interface design in light of consumer expectations. *Id*. ¶¶ 3, 161.

Historically, courts have routinely made clear that experts may not opine on intent, nor may they opine as to the ultimate facts of the case. *See Snyder*, 2020 WL 6462400, at *2 (excluding expert opinion about a party's "intent, motive, or state of mind"); *AngioScore, Inc. v. TriReme Med., Inc.,* 87 F. Supp. 3d 986, 1016 (N.D. Cal. 2015), *rev'd and remanded sub nom. AngioScore, Inc. v. TriReme Med., LLC*, 666 F. App'x 884 (Fed. Cir. 2016) (expert "may not testify on the ultimate issue of fact in this case, specifically, whether [defendant] did or did not breach his duties"; reversed on unrelated grounds). So, for example, in a consumer fraud case, an expert cannot take the stand and tell the jury that in her expert opinion the defendant intended to deceive the public, nor could the expert opine that the public was deceived. There are two reasons for this: first, as explained, experts cannot opine as to ultimate facts, but second, experts cannot tell a jury what would deceive a reasonable consumer because *that* conclusion is in the exclusive province of the jury. *In re Lithium*

*Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 WL 1391491, at *5 (N.D. Cal. Apr. 12, 2017) (expert opinions "on an ultimate issue of fact … may invade the province of the jury.") (quotations omitted). (Indeed, Judge Gonzalez-Rogers barred Mr. Schneier from testifying about consumer expectations in *Brown* because he was not qualified to do so. 2022 WL 17961497, at *11. He is, of course, no better qualified to do so in this case. *See infra*, at 18–20.)

Enter the "science" of "dark patterns," a term already abandoned by its creator in favor of the term "deceptive patterns." *See* Deceptive Patterns, https://www.deceptive.design/ (last visited Apr. 3, 2025) (reflecting the shift to "deceptive patterns"). Knowing that he cannot opine on intent or consumer expectations, Mr. Schneier instead puts forward the questionable opinion that he can spot a "dark pattern" when he sees it according to various factors. *See infra*, at 16. Of course, no court would permit an expert to opine that a particular practice is "intentional" or "deceptive" in a case where the ultimate questions of intent and deception are dispositive to each claim. That Mr. Schneier cloaks his impermissible opinions in the term "dark pattern" does nothing to save them.

Lest there be any doubt as to Mr. Schneier's own intentions, he made it abundantly clear in his deposition that "intent" is a necessary condition of dark patterns:

> **Q:** The sentence you originally read in paragraph 161 reads: "'Dark patterns' is an umbrella term for a variety of subversive user-design tricks intended to manipulate users into doing things they wouldn't normally choose to do.
>
>                 *        *        *
>
> **Q:** Do you believe that one sentence to be true with respect to your analysis of what Google does that constitutes a dark pattern?
> **A:** I do.
> **Q:** In other words, dark patterns require an intent to manipulate users, correct?
> **A**: I like my words better.
> **Q:** "Intended to manipulate users"?
> **A:** Yes.
> **Q:** Dark patterns are intended to manipulate users, correct?
> **A:** Yes.

Santacana Decl., Ex. 2, at 88:10–89:17; *see also* Santacana Decl. Ex. 1, at ¶ 161. Mr. Schneier further testified that he believes this "intent" element to be consistent with his "analysis of what Google does that constitutes a dark pattern." Santacana Decl., Ex. 2, at 89:3–6.

Because, by his own admission, Mr. Schneier's opinions regarding "dark patterns" are fundamentally based on the concept of "intent," any opinion he offers regarding Google's alleged use of dark patterns is improper. This is the precise type of testimony that courts have routinely excluded as impermissible—including when offered by Mr. Schneier himself—as it inherently involves an assessment of Google's state of mind or motivation. *See Brown*, 2022 WL 17961497, at *12 (excluding Mr. Schneier's opinions about Google's intent and motivations); *see also In re Twitter, Inc. Sec. Litig.*, No. 16-CV-05314-JST, 2020 WL 9073168, at *6 (N.D. Cal. Apr. 20, 2020) (excluding "impermissible [expert] testimony as to intent, motive, and state of mind").

Mr. Schneier offers a number of opinions concerning dark patterns, in both his 2023 and 2025 Reports. Mr. Schneier's 2023 Report Opinion 11—"Google's Use of Dark Patterns"—concerns multiple alleged instances in which various Google products, disclosures, and prompts "exemplif[y]" dark patterns, including Google's WAA Help Page (Opinion 11.1); disclosures accompanying the WAA and sWAA toggles, including the "Activity Controls" page (Opinion 11.2); Google's statements about privacy and user control (Opinion 11.3); Google's WAA controls for location privacy (Opinion 11.4); the WAA/sWAA "consent bump" prompt (Opinion 11.5); and Google's disclosures to app developers (Opinion 11.6). Santacana Decl. Ex. 1, at ¶¶ 311–400. Opinion 11 concludes that "Google Uses Dark Patterns to Manipulate User Behavior to Its Own Benefit," which impermissibly opines as to Google's intent both because it concerns dark patterns and because it presumes to know Google's motivations. *Id*. ¶¶ 399–400. Furthermore, a sub-part of Opinion 9 states that "Google Uses Dark Patterns." *Id*. ¶¶ 279–295. Mr. Schneier also suggests that Google "uses dark patterns" in his introduction. *Id*. ¶ 3. And in Mr. Schneier's 2025 Supplemental Report, Opinion 4 is entirely about instances in which Google exhibits "various dark patterns." Santacana Decl. Ex. 3, at ¶¶ 29–34. All of these opinions rely on Mr. Schneier's conclusions and opinions regarding Google's intent or state of mind, and the Court should reject them in line with the court's ruling in *Brown*, 2022 WL 17961497, at *13.

ii.    **Mr. Schneier impermissibly opines on Google's intent throughout his report.**

Mr. Schneier also opines on Google's presumed incentives, desires, and motivations more generally, in both of his Reports. These opinions are inadmissible, because an expert "may not opine" about why individuals or organizations "took or did not take a particular action or made or did not make a particular decision." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, No. 16-CV-01393-JST, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11, 2018) (granting *Daubert* motion to exclude opinion about intent, motive, and state of mind).

Mr. Schneier sprinkles intent opinions throughout his 2023 Report. Mr. Schneier claims that Google has "overwhelming incentives to maximize collection of data about users and it has unmatched power to do so." Santacana Decl., Ex. 1 at ¶ 2. He baselessly asserts that "Although Google portrays itself as a champion of user privacy, Google's incentives and actions lead me to believe that it is more concerned with managing user impressions than actually respecting user privacy." *Id*. ¶ 3. In Opinion 2, he claims that "Given that Google benefits by increasing the scope of its collection and storage of user data, it has strong incentives to overstate the effectiveness of the promised privacy control mechanisms of its numerous services." *Id*. ¶ 61. Mr. Schneier opines that "Google's business model demands the maximization of data collection, and creates a strong incentive to overpromise and underdeliver on privacy." *Id*. ¶ 178. He claims that "Google has strong business incentives to promote itself as a trustworthy guardian of privacy in order to sustain the user base that attracts advertisers to its platforms. This allegedly includes incentives for Google to continue offering and marketing its privacy "controls" and "settings," notwithstanding any misconceptions or misunderstanding by users." *Id*. ¶ 262. He proffers opinions regarding "Google's Surveillance-Dependent Business Model," which discusses topics including "Google's desire." *Id*. ¶¶ 178–208.[2] His Opinions 9.1 ("Google Promises Users Control over the Company's Collection of Their Data"), *id*. ¶¶ 249–258, and 9.2 ("Giving Users Privacy Control Is Important for Google's

---

[2] This section, Opinion 7, of Mr. Schneier's 2023 Report also includes two sub-sections that discuss Google and Android's market share, neither of which are relevant to this litigation and both of which should be excluded for this separate reason, as well. *Daubert*, 509 U.S. at 589 ("the trial just must ensure that any and all scientific testimony or evidence admitted is [] relevant").

14

Brand, and Getting/Keeping Users"), *id.* ¶¶ 259–267, strike *directly* at Google's "intent or state of mind." *Brown*, 2022 WL 17961497 at *12. In these sections, Mr. Schneier opines on Google's "incentives" in building its brand, and claims that "Google's privacy efforts are primarily directed at building user trust in Google rather than delivering real protection." Santacana Decl., Ex. 1 at ¶¶ 262–263. He purports to know what Google employees do or do not "understand." *Id.* ¶¶ 265–267. And he concludes his 2023 Report by asserting that Google is "more concerned with managing users' impressions than with respecting their privacy intentions." *Id.* ¶ 400.

Mr. Schneier's 2025 Report includes similar language. As an initial matter, he states point blank that in his prior report, he "explained that there is a fundamental conflict between Google's desire for data and its users' desire for privacy." Santacana Decl., Ex. 3, at ¶ 9. And he discusses Google's "promises," ¶¶ 15–19, as well as Google's "commitment" to a certain business model, ¶ 20. *Id.*

All of these statements purport to know the meaning and motivation behind certain of Google's statements and actions, which go directly to the question of Google's intent. They are impermissible and should be excluded.

### C.  The Court Should Also Exclude All "Dark Patterns" Opinions Because They Are Based On Unsound Methodology.

Mr. Schneier's "dark patterns" opinions are impermissible for a second, independent reason: they are based on unreliable methodology. Mr. Schneier is unquestionably a decorated commentator on technology issues, but having an opinion, even a strongly held one, even when held by a very accomplished person, is not the same as having an **admissible *expert*** opinion.

*Daubert* asks whether the method employed by an expert has been or can be tested. *Daubert*, 509 U.S. 579 at 593; *see also Daubert*, 43 F.3d 1311 at 1318 ("the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology."). This "testability" inquiry first asks "whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability." Fed. R. Evid. 702 Comm. Note to 2000 Am. The district court may also apply a "testability" factor to determine whether "[s]omeone else using the same data and methods ... [is]

able to replicate the result" found by the challenged expert. *City of Pomona*, 750 F.3d 1036 at 1047. "Regardless of one's qualifications, an expert must still base his opinions on sufficient facts and data and a reliable methodology. *Sonneveldt*, 2024 WL 5242611, at *2 (excluding expert testimony that "was neither reliable nor based on an adequate foundation"). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*, at *2 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Yet this is precisely what Plaintiffs ask this Court to do.

Mr. Schneier offers a number of opinions concerning Google's alleged use of "dark patterns." *See* Santacana Decl., Ex. 1, at ¶¶ 311–400 (Opinion 11; "Google employs "dark patterns""); *id*. ¶ 3; *id*. ¶¶ 160–177 (Opinion 6.3, "The Industry Uses Dark Patterns to Nudge Users in Particular Directions"); *id*. ¶¶ 279–295 (Opinion 9.4, "Google Uses Dark Patterns"); *see also* Santacana Decl., Ex. 3, at ¶¶ 29–34 (Google employs "various dark patterns."). Yet Mr. Schneier admitted in his deposition that "dark patterns" cannot actually be measured:

> **Q:** Can whether something is a dark pattern be empirically tested?
>
> **A:** I don't know what you mean by that. It is not something you measure, like height or weight.

Santacana Decl., Ex. 2, at 127:23–128:2. Mr. Schneier couldn't even say whether there could "*possibly* be a test" to determine if something is a "dark pattern." *Id*. 128:6–19. Indeed, Mr. Schneier was not even aware that he is required to apply some methodology or scientific process in order to be qualified as an expert in this case. *Id*. 105:21–106:3. The Supreme Court has made clear that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.*, 522 U.S. 136 at 146. If the fact that the proponent of this testimony admits that "dark patterns" are "not something you measure" isn't enough, then the fact that he is unable to even determine if there could "possibly" be a way to measure dark patterns should be the nail in the coffin.

Even as a professor, Mr. Schneier is unable to offer a more concrete definition of dark patterns to his students, instead teaching them "to recognize [dark patterns] when they see them." Santacana Decl., Ex. 2, at 136:18–137:5. Exactly the same level of "analysis" is being applied

16

through his reports, with the same fuzziness and lack of rigor. This type of "I know it when I see it" expert testimony is completely outside the bounds contemplated by Rule 702, and should be excluded. *See, e.g.*, *Tavilla v. Cephalon Inc.*, No. CV11-0270 PHX DGC, 2012 WL 1190828, at *6 (D. Ariz. Apr. 10, 2012) (excluding "I know it when I see it" where an expert "failed to support her opinion with treatment records, clinical notes, diagnostic tests, dates of treatment, details of treatment, or any other record of traditional medical care" and where her "methodology is just as sparse"). "[R]eproducibility is the sine qua non of science." *Rovid v. Graco Children's Prods. Inc.*, No. 17-CV-01506-PJH, 2018 WL 5906075, at *5 (N.D. Cal. Nov. 9, 2018) (citing *United States v. Hebshie*, 754 F. Supp. 2d 89, 125 (D. Mass. 2010)); *see also In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1130 (S.D. Fla. 2022) ("Reproducibility is one of the hallmarks of reliable scientific testing and is pertinent to an analysis under Daubert."). But an expert opinion based on a methodology that amounts to nothing more than "I know it when I see it" is, by definition, not reproducible, and should not be allowed.

The "testability" inquiry also asks about "the existence and maintenance of standards and controls; and [] whether the technique or theory has been generally accepted in the scientific community." Fed. R. Evid. 702 Comm. Note to 2000 Am. Dark patterns analysis is not—and cannot be, since it cannot be reliably measured—subject to any standards and controls. There is no consensus in the academic community on what constitutes a "dark pattern" or indeed how to recognize one. *See* Santacana Decl., Ex. 2, at 107:8–12 ("there are different definitions of 'dark patterns'").

Illustrating this lack of consensus, Mr. Schneier applies three distinct "taxonomies" of dark patterns, which themselves contain conflicting and inapplicable definitions. *See, e.g.*, Santacana Decl., Ex. 1, at ¶ 311 (applying "Colin Gray's taxonomy"); *id*. ¶ 342 (applying "the EU's taxonomy"); *id*. ¶ 371 (applying "[t]he FTC'a defin[itions]"). For example, Mr. Schneier stated in his deposition that the FTC's definition of "sneaking," which only has to do with consumer shopping as stated on the face of the definition, applies here despite consumer shopping not being at issue in this litigation. Santacana Decl., Ex. 2, at 119:18–120:15; *see also* Santacana Decl., Ex. 1 at ¶ 312 (applying the FTC's framing). The European Union's taxonomy is not relevant either. It is

specifically intended to provide recommendations to "designers and users of social media platforms … to avoid dark patterns in social media interfaces," but no "social media platforms" are at issue in this matter, which Mr. Schneier well knows. *See* Santacana Decl., Ex. 2, at 114:12–115:4. Finally, the categories within these taxonomies aren't even uniform. *See id.* 112:2–22 ("Gray's taxonomy [] has five major categories and then many subcategories"); Santacana Decl., Ex. 1, at ¶ 168 ("EU Data Protection Board['s]" taxonomy "delineates six broad patterns," none of which are the same as those in Gray's categories). Mr. Schneier does not conduct any studies or put forth any "taxonomies" of his own. For the reasons stated above, Mr. Schneier cannot possibly apply any sort of rigorous, testable methodology that would meet the requirements of *Daubert* and Rule 702—and this is especially true when the taxonomies that he *does* rely on to form his opinions contain conflicting definitions and definitions that are not even relevant to the case at hand.

Finally, adding insult to injury, Mr. Schneier does not even have any academic background in the area of dark patterns. *See* Santacana Decl., Ex. 2, at 49:22–50:12 (Mr. Schneier has never written any publications exclusively about dark patterns, nor professed in any published work to be an expert on the topic). Nor does Mr. Schneier have any training in "the design of user interface and registration pages, [nor] user-experience design," and is therefore not even qualified to opine on "whether certain website designs may confuse or manipulate users." *Cf. Berman v. Freedom Financial Network, LLC*, 400 F. Supp. 3d 964, 971–72 (allowing such expert testimony only where the expert had "formal training" in user interface design); *see also Karpilovsky v. All Web Leads, Inc.*, No. 17 C 1307, 2018 WL 3108884, at *1 (N.D. Ill. June 25, 2018) (allowing expert to testify on the "subjects of web design and typical user behavior" only where the basis for these opinions was expert's "considerable experience in the website design industry," in which he had been working since at least 1999); *see also* Santacana Decl., Ex. 2, at 44:15–20 (Schneier has no training in "user interface design" nor "user experience design").

### D.  Schneier Is Not Qualified to Opine on Consumer Expectations

Despite admitting that he has no training or background in psychology, user behavior, user interface design, or user experience design, Mr. Schneier propounds a number of conclusions about what users expect and think. Santacana Decl., Ex. 2, at 44:3–20. The Federal Rules of Evidence

require that an expert be "qualified … by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *see also Conroy*, 2022 WL 911138, at *6 ("Federal Rule of Evidence 702 permits expert opinion testimony by a witness who is qualified and offers a relevant and reliable opinion."). Yet during his deposition, Mr. Schneier could not identify an instance where he engaged in any qualitative or quantitative research of user behavior. Santacana Decl., Ex. 2, at 44:3–8. Nor did he do "any research that involved communicating with users of [WAA or sWAA] to develop [his] opinions in this case." *Id*. 79:16–24. These opinions should be stricken.

Like his opinions about Google's intent, Mr. Schneier's opinions about consumer expectations were previously excluded by this District in *Brown*, this time on the basis that such opinions "fall outside the scope of Schneier's expertise and are not reliable." 2022 WL 17961497, at *11. Judge Gonzalez-Rogers acknowledged that Mr. Schneier "does not have specialized expertise in opining about the purported understandings and expectations of consumers specifically. Nor can he merely impute his own opinions to those of a reasonable consumer." *Id*. But this is precisely what Schneier attempts to do again in his *Rodriguez* Reports, despite his admission that he still lacks any relevant expertise or training. Santacana Decl., Ex. 2, at 44:3–20.

Confusingly, Schneier testified that he was not opining on the "understandings and expectations of consumers" regarding both WAA and sWAA despite the fact that he does so repeatedly throughout his 2023 Report. Santacana Decl., Ex. 2, at 68:2–69:11. For example, in paragraph 89 of his 2023 Report, Mr. Schneier opines that "users who have turned their WAA or sWAA controls off have specifically signaled an expectation that their app activity data and the associated content not to be [sic] collected and saved by Google". Santacana Decl., Ex. 1, at ¶ 89. This statement blatantly offers a belief about consumer expectations, despite any of Schneier's attempts at disclaimer. He further asserts that "users without a technical education cannot be expected to recognize that the "Turn Off Location History" option only affects a subset of applications, and that their location history continues to be collected and used by other applications if the WAA setting is turned on." *Id*. ¶ 236. But Mr. Schneier is not the right person to proclaim what certain users can or cannot be "expected to recognize." *Id*.

1    Mr. Schneier also offers a number of other judgments regarding consumer expectations. In

2 Opinion 2, he claims that "[n]ow more than ever, people rightfully seek to use the Internet without

3 being tracked, and that "[p]ublic concern about privacy has [] escalated." *Id*. ¶¶ 68–69. He opines

4 that "users seek refuge in the promise and expectation of 'privacy control.'" *Id*. ¶ 83. He asserts that

5 "People's Privacy Intuition Is Not Suited for the Internet." *Id*. ¶¶ 142–147. All of these statements

6 imply that consumers have some unspecified baseline expectation of privacy that is somehow

7 misaligned with how the internet actually works. Mr. Schneier claims that certain "dark patterns"

8 in the form of colorful buttons can, "[w]ay too often," "cause the user to download something other

9 than what they were expecting." *Id*. ¶ 163. And he declares that "it is less likely that the general

10 population would think that it is any more acceptable to be continuously, automatically tracked by

11 unseen technologies than it would be to be tracked by flesh-and-blood parties." *Id*. ¶ 247.

12    Just as he attempted to do in *Brown*, Mr. Schneier opines repeatedly here about "the purported

13 understandings and expectations of consumers specifically," all of which the Court should exclude.

14 2022 WL 17961497, at *11; *see also Montera v. Premier Nutrition Corp.*, No. 16-CV-06980-RS,

15 2022 WL 1225031, at *6 (N.D. Cal. Apr. 26, 2022), *aff'd in part,* 111 F.4th 1018 (9th Cir. 2024)

16 (excluding expert testimony about how a company's "intended [] message was interpreted by

17 consumers").

18 **V.    CONCLUSION**

19    For the foregoing reasons, this Court should grant Google's Motion to Exclude the 2023 and

20 2025 Reports of Plaintiffs' Expert Bruce Schneier.

21

22

23

24

25

26

27

28

GOOGLE'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT OPINION OF BRUCE SCHNEIER
Case No. 3:20-CV-04688 RS

Dated: April 3, 2025

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP

By:     _/s/ Eduardo E. Santacana_

Benedict Y. Hur
Simona Agnolucci
Eduardo E. Santacana
Argemira Flórez
Harris Mateen

*Attorneys for Defendant*
*GOOGLE LLC*

GOOGLE'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT OPINION OF BRUCE SCHNEIER
Case No. 3:20-CV-04688 RS