1

**BOIES SCHILLER FLEXNER LLP**

2

David Boies (admitted pro hac vice)
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200
dboies@bsfllp.com

3

4

5

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com

6

7

8

9

James Lee (admitted pro hac vice)
Rossana Baeza (admitted pro hac vice)
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

10

11

12

13

Alison L. Anderson, CA Bar No. 275334
M. Logan Wright, CA Bar No. 349004
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Tel.: (213) 995-5720
alanderson@bsfllp.com
mwright@bsfllp.com

14

15

16

17

**SUSMAN GODFREY L.L.P.**

Bill Carmody (admitted pro hac vice)
Shawn J. Rabin (admitted pro hac vice)
Steven M. Shepard (admitted pro hac vice)
Alexander Frawley (admitted pro hac vice)
Ryan Sila (admitted pro hac vice)
One Manhattan West, 50th Floor
New York, NY 10001
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com
rsila@susmangodfrey.com

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: (310) 789-3100
abonn@susmangodfrey.com

**MORGAN & MORGAN**

John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)
Michael F. Ram, CA Bar No. 104805
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com
mram@forthepeople.com

18

19

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

20

21

22

23

24

25

26

27

ANIBAL RODRIGUEZ, SAL CATALDO, JULIAN SANTIAGO, and SUSAN LYNN HARVEY, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

Case No.: 3:20-cv-04688-RS

**PLAINTIFFS' OPPOSITION TO GOOGLE'S MOTION TO EXCLUDE SUNDAR PICHAI FROM TESTIFYING AT TRIAL**

Judge: Hon. Mag. Alex G. Tse
Date: May 9, 2025
Time: 2:00 p.m.
Location: A – 15th Floor

1

## **TABLE OF CONTENTS**

2

3   I.      INTRODUCTION ...................................................................................... 1

4   II.     BACKGROUND .......................................................................................... 3

5           A.      PLAINTIFFS' ALLEGATIONS ........................................................ 3

6           B.      SUNDAR PICHAI'S INVOLVEMENT ............................................... 3

7           *1.* *Mr. Pichai Was Personally Involved with* ███████████ ........ *4*
8           *2.* *Mr. Pichai Was Personally Involved with* ███████████ .. *5*
            *3.* *Mr. Pichai Was Personally Involved with Google's Response to Public Controversy*
9               *about the WAA Setting, Which Included Testifying to Congress................... 6*
            *4.* *Mr. Pichai Was Personally Involved with* ███████ *and Google's Public*
10              *Messaging About It................................................................................ 8*
            *5.* *Google's Employees Could Not or Would Not Answer Questions About Mr. Pichai's*
11              *Involvement............................................................................................ 9*

12  III.    LEGAL STANDARD .............................................................................. 11

13          A.      THE TESTS FOR RELEVANCE AND UNFAIR PREJUDICE ......................... 11

14          B.      APPLICABILITY OF THE "APEX DOCTRINE" ................................. 11

15  IV.     ARGUMENT ......................................................................................... 12

16          A.      MR. PICHAI'S TESTIMONY IS RELEVANT AND THERE IS NO DANGER OF UNFAIR
17                  PREJUDICE ................................................................................. 13

18          B.      MR. PICHAI IS A PERCIPIENT WITNESS NOT PROTECTED BY ANY "APEX
                    DOCTRINE" ............................................................................... 16
19
            *1.* *Mr. Pichai possesses first-hand knowledge of relevant facts......................* 16
20          *2.* *Plaintiffs adequately exhausted less intrusive means.................................* 18
    V.      CONCLUSION .................................................................................... 20
21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apple Inc. v. Samsung Elecs. Co.*, 282 F.R.D. 259 (N.D. Cal. 2012). ...................................... 12

*Benson v. City of Lincoln* 2023 WL 5627091 (D. Neb. Aug. 31, 2023) ................................... 17

*Bicek v. C & S Wholesale Grocers, Inc.*, 2013 WL 5425345 (E.D. Cal. Sept. 27, 2013).......... 12

*Blankenship v. Hearst Corp.*, 519 F.2d 417 (9th Cir. 1975) ..................................................... 12

*City of Huntington v. AmerisourceBergen Drug Corp.*,

      2020 WL 3520314 (S.D. W.Va. June 29, 2020) ........................................................... 14

*Finisar Corp. v. Nistica, Inc.*, 2015 WL 3988132 (N.D. Cal. June 30, 2015). ......................... 12

*First Nat. Mortg. Co. v. Federal Realty Inv. Trust*,

      2007 WL 4170548 (N.D. Cal. Nov. 19, 2007)...................................................... 16, 19

*Groupion, LLC v. Groupon, Inc.*, 2012 WL 359699 (N.D. Cal. Feb. 2, 2012). ........................ 12

*Haggarty v. Wells Fargo Bank, N.A.*, 2012 WL 3939320 (N.D. Cal. Aug. 24, 2012).............. 18

*Hunt v. Cont'l Cas. Co.*, 2015 WL 1518067 (N.D. Cal. Apr. 3, 2015)…………………..…….16

*In re Apple iPhone Antitrust Litig.*, 2021 WL 485709 (N.D. Cal. Jan. 26, 2021)..................... 14

*In re Lincoln Nat'l COI Litig.*, 2019 WL 7581176 (E.D. Pa. Dec. 5, 2019)............................. 18

*In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab. Litig.*,

      2014 WL 3035791 (E.D. Pa. July 1, 2014) ..................................................... 18

*In re U.S. Dep't. of Educ.*, 25 F.4th 692, 700 n.1 (9th Cir. 2022)............................................. 12

*In re Uber Tech., Inc., Passenger Sexual Assault Litig.*,

      2025 WL 896412 (N.D. Cal. Mar. 24, 2025)................................. 11, 12, 14, 15, 16, 19

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,

      2024 WL 4023562 (N.D. Cal. Aug. 26, 2024) ........................................................... 11

*Opperman v. Path, Inc.*, 2015 WL 5852962 (N.D. Cal. Oct. 8, 2015)...................................... 16

*Pinn, Inc. v. Apple, Inc.* 2021 WL 4775969 (C.D. Cal. Sept. 10, 2021) ................................... 17

*Reddy v. Nuance Communications, Inc.*, 2015 WL 4648008 (N.D. Cal. Aug. 5, 2015)...... 14, 16

*Sprint/United Mgmt. Co. v. Mendelsohn*, 522 U.S. 379 (2008) ................................................ 11

ii

*Snubco Pressure Control Ltd. v. Lee*, 2023 WL 11950400 (E.D. Tex. Oct. 6, 2023)................ 17

*Wonderland Nurserygoods Co., Ltd. v. Baby Trend, Inc.*,

      2022 WL 1601402 (C.D. Cal Jan. 7, 2022).................................... 12

*Yphantides v. County of San Diego,* 2023 WL 7555301 (S.D. Cal. Nov. 14, 2023)................. 17

**Rules**

Fed. R. Evid. 401 ............................................................................................... 11

Fed. R. Evid. 402 ............................................................................................... 11

Fed. R. Evid. 403 ................................................................................ 11, 12, 15, 16

## I.    INTRODUCTION

Since filing this lawsuit in 2020, Plaintiffs have been asserting claims against Google that rest in part on conduct and statements by Mr. Pichai that were not tangential, but central to the facts and products at issue in this litigation.  In Plaintiffs' First Amended Complaint (filed on November 11, 2020; Dkt. 60), they included detailed allegations regarding conduct and statements by Mr. Pichai.  That included, for example, Mr. Pichai's public statement in 2019 (during the certified class period) that Google gives users "clean, meaningful choices about your data." Dkt. 60 ¶ 90.  That same year, Mr. Pichai discussed the WAA controls at issue in this lawsuit in a public Google conference, explaining how people can "easily change [their] privacy settings" and how Google was developing an "auto-delete functionality." Dkt. 60 ¶ 91.  In 2020, Mr. Pichai represented that privacy "is at the heart of what we do" and that Google was "putting [users] in control" and changing its default setting so that "your activity data will be automatically and continuously deleted after 18 months." Dkt. 60 ¶¶ 96, 99.  In making those representations, Mr. Pichai never disclosed that Google was saving people's activity data when people had WAA off, with Google saving that data with identifiers (including device identifiers) where users have no ability to review, delete, or otherwise control that data.

While this involvement alone is sufficient to compel Mr. Pichai to testify at trial, his involvement goes much deeper and earlier.  Since at least 2014, Mr. Pichai has been intimately involved with the facts and products at issue in this litigation. █████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████ Mr. Pichai's involvement continued through the filing of this lawsuit, with ███████████ ██████████████████████████████████████████████████████ █████████████████████████████ That Mr. Pichai devoted extensive time

1  and resources to prepare for and testify to Congress in 2018 and 2020 (each time misrepresenting

2  Google's privacy controls) is only one part of what he will be called at trial to testify about.

3        Google's Motion to Exclude Sundar Pichai ("Motion" or "Mot.") should be denied, and

4  Mr. Pichai should be called to testify at trial for at least three reasons.

5        *First*, Mr. Pichai is a percipient witness.  Mr. Pichai's testimony will not be limited to the

6  "general privacy practices" of a traditional "apex witness."  Rather, Mr. Pichai has specific,

7  personal knowledge about the facts and controversies at issue in this litigation.  Before he became

8  CEO, Mr. Pichai was directly involved ███████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████████

10 ███████████████████████████████████.

11       *Second*, Mr. Pichai's personal involvement with ████████████████████████

12 ████████████████████████████ is highly relevant.  Google chose to put Mr. Pichai

13 front and center to advocate about both WAA and Firebase.  This required Mr. Pichai to have a

14 deep and substantive understanding of how WAA and Firebase worked and why they were

15 important to Google's strategic goals to ████████████████████████████████████

16 ██████  Those witnesses who were deposed in this case confirmed ███████████████████

17 ████████████████████████████████████████████████████████████████████████

18 ████████████████████████████████████  Indeed, Mr. Pichai's relevant

19 testimony and documents were subject to witness depositions, and expert reports and depositions.

20       *Third*, the Court has certified this case for class treatment, where Google violated the

21 privacy of nearly 100 million Americans and billions of dollars are at stake.  Even if the "apex

22 doctrine" had any semblance of applicability in this case (it does not), courts are especially

23 hesitant to prevent examination of executive-level witnesses in litigation that concerns the rights

24 of aggregated groups.  In those circumstances, any burden that an executive-level witness might

25 endure to prepare for and testify is proportional when the damages total (and, indeed, exceed)

26 hundreds of millions of dollars.

27       Respectfully, the Court should deny Google's motion in full.

28

Plaintiffs' Opposition to Google's Motion to Exclude Sundar Pichai      3:20-cv-04688-RS

## II.    BACKGROUND

### A.    Plaintiffs' Allegations

This case concerns Google's Web & App Activity setting, a subsetting called supplemental Web & App Activity, and Google's collection of app activity data through its Firebase and Google Mobile Ads ("GMA") Software Development Kits ("SDKs") while those settings were turned off.  Dkt. 289 ("Compl.") ¶ 1.  In its Privacy Policy, Google proclaims that it "put[s] you in control" and that "you can adjust your privacy settings to control what we collect."  *Id.* ¶ 7.  Google tells people that they can "[c]hoose the activities and info you allow Google to save" by turning WAA off.  *Id.* ¶ 77.  Google represents that this includes "activity from . . . apps[] and devices that use Google services," which include the Firebase and GMA SDKs.  *Id.* ¶¶ 77, 79.  In an associated help page, Google explains that "[t]o let Google save this information," meaning "data that apps share with Google . . . Web & App Activity must be on."  *Id.* ¶ 89.  Behind closed doors, Google employees admit that people understand these disclosures as turning off WAA stops Google from saving their app activity data.  *Id.* ¶¶ 98–104.

The truth is that Google collects, saves, and exploits people's app activity data even if they turn WAA off.  Google offers third-party app developers the opportunity to embed the Firebase and GMA SDKs into their apps.  *Id.* ¶ 3.  Millions of non-Google apps include those SDKs.  When people use those non-Google apps when WAA is off, those Google SDKs cause data to be sent from those people's devices to Google, with Google saving and using that WAA-off app activity data.  *Id.*  Google saves this WAA-off data with a unique identifier for the user's device and uses it to track them across mobile apps.  *Id.* ¶¶ 65, 140.

### B.    Sundar Pichai's Involvement

Sundar Pichai was extensively involved in the issues relevant to this case.  Mr. Pichai was not just the public voice of Google's misleading promises about users' control over their privacy.  Google's document productions and deposition testimony reveal that Mr. Pichai played an important role ████████████████████████████████████████

████████████████████████████████████████████████████████

1    ███████████████████████████████████  When a privacy scandal at

2   Google thrusted WAA into the national spotlight in 2018, it was Mr. Pichai who testified before

3   Congress about how Google purportedly allows users to decide what Google saves.  The record

4   in this case shows that Mr. Pichai had been ██████████████████████████████████

5   And in the months and years that followed his congressional testimony, Mr. Pichai personally

6   ██████████████████████████████████████████████████████████

7   ████████  and then delivered Google's promises about WAA to the public.  Mr. Pichai should be

8   made to tell the jury whether he knew that Google was breaking his promises—or whether he

9   was just as surprised as Plaintiffs.

       **1.    Mr. Pichai Was Personally Involved with** ████████████

11   ████████████████████

12      Mr. Pichai was involved with WAA from the start.  In 2014, before Mr. Pichai was

13   Google's CEO, Google ██████████████████████ Ex.[1] 1 (describing ████████

14   ████); Ex. 2 at -816 (describing ████████████████); Ex. 3 (meeting notes

15   about changes).  ██████████████████████████████████████████

16   ██████████████████████████████████████████████████████

17   ██████████████████████████████████████████████████████

18   ████████  Mr. Pichai was deeply involved in this process because, at the time, he led Google's

19   most prominent web-based brand: Google Chrome, its web browser.  Ex. 5 at 62:4–63:2; Ex. 6.

20      Throughout 2014, Mr. Pichai ████████████████████████████████

21   ██████████████████████████████████████████████████████

22   ██████████████████████████████████████████████████████.

23   For example, Mr. Pichai said the ██████████████████████  and so Google ████████

24   ██████████████"  Ex. 3.  Mr. Pichai's review was critical to approval of the "████

25   ██████████████████"  Ex. 2 at -816; Ex. 3 at -255 (████████████████████

26   ██████████████████).

_____

[1] Unless otherwise noted, all exhibits references are exhibits to the supporting Mao Declaration.

Plaintiffs' Opposition to Google's Motion to Exclude Sundar Pichai        3:20-cv-04688-RS

**2.      Mr. Pichai Was Personally Involved with** ███████████████

At nearly the same time as ██████████████████████, Mr. Pichai was personally involved in ████████████████████████████████████ ███████████ Mr. Pichai recognized ████████████████████████ ████████████ and Google acquired Firebase in 2014. Ex. 7 at 31:5–7.

In early 2015, Mr. Pichai formed Google's ██████████████████ ████████████████████████████████████████████████████████████ Ex. 8 at -952. Google's "████████" to the "██████████████████████████" and the company's ████████████████████████████ *Id.* at -947, -952; Ex. 9 at -980. According to Francis Ma, the Google product manager for Firebase and a Rule 30(b)(6) witness in this case, it was Mr. Pichai who personally "████████████████████████████ ████████████████. Ex. 10 at -898; Ex. 7 at 40:2–41:25.

Mr. Pichai was also the public face of Google's pivot towards the mobile space. In May 2015, Mr. Pichai was interviewed by The Verge, a popular tech news site.[2] By this time, Mr. Pichai had "extended his domain beyond Chrome" to "encompass" many domains, including "apps," "Android," "Ads," and, as of October 2014, all "day-to-day responsibilities of running the tech giant." *Id.* The Verge asked Mr. Pichai about his "specific priorities." *Id.* Mr. Pichai's answer was telling: "[W]e've been thinking hard about how we help organize users' information on mobile." *Id.*

Continuing after 2015, Mr. Pichai remained involved with ████████████████████ ██████████ Based on his leadership, Google "███████████████████████████████ ███████████████████████████" Ex. 9. ██████████████████████████ ████████████████████████████████████████████████████████████. Ex. 11 at -870. ██████████████████████████. *See* Ex. 12 at -729 (██████ ████████████████████████). And when Mr. Pichai gave his keynote speech during Google's public conference for developers in 2016, he touted Firebase as "the most

─────────────

[2] https://www.theverge.com/a/sundars-google/sundar-pichai-interview-google-io-2015

comprehensive offering we have done to date." Compl. ¶ 200; Dkt. 305 ("Answer") ¶ 200 (admitting he made that statement).

### 3. Mr. Pichai Was Personally Involved with Google's Response to Public Controversy about the WAA Setting, Which Included Testifying to Congress

On August 13, 2018, the Associated Press ("AP") broke a major story: even if users turn off Google's "Location History" setting, Google still saved users' location based on Google's WAA setting.[3] As the AP explained, Google continued tracking users' location when they turned WAA on, and whether or not they turned off "Location History." *Id.*

The story sent a shockwave through Google's leadership. According to a post-mortem Google drafted a few days later, the AP story was ███████████████████████████████████ ████████████████. Ex. 13 at -806–07. ███████████████████████████████████████ ██████████████████████" *Id.* at -807; Ex. 14 at -741. ███████████████████████████████ ████████████████████████" Ex. 15 at -917.

Mr. Pichai was at the center of Google's response. Google's executives ██████████ ██████████████████████████████████████████████████████████████████" Ex. 16 at -087. Mr. Pichai ███████████████████████████████████████████████████████████ ████████████████████. Ex. 17; Ex. 18 (Dave Monsees, Google's Rule 30(b)(6) witness on WAA, recounting that he "████████████████████████████████████████████████████████████ ████████████████████████████"); *see also* Exs. 17–19. Those who briefed Mr. Pichai acknowledged that "███████████████████████████████████████" Ex. 20. Mr. Pichai organized meetings to discuss ways to "improve clarity around WAA and [location history] settings." Ex. 21 at -594. Any "███████████████████" to Google's description of WAA required Mr. Pichai's sign-off. *Id.*

The story "████████████████████████████████████████████████████████ ████████████" until it culminated in a hearing before the House Judiciary Committee. Ex. 22 at -252. Google decided that Mr. Pichai was best prepared to answer Congress's questions and

---

[3] https://apnews.com/article/828aefab64d4411bac257a07c1af0ecb

Plaintiffs' Opposition to Google's Motion to Exclude Sundar Pichai        3:20-cv-04688-RS

persuade Congress that, notwithstanding the recent debacle, Google offers users genuine transparency and control over their data.  Representative Bob Goodlatte, then-Chair of the House Judiciary Committee, pressed Mr. Pichai on whether people understand the "volume of detailed information" that Google collects from their phones.  Ex. 23 at 24:2–10; *id.* at 22:19–25:2.  Mr. Pichai's testimony—delivered under oath—was strident:

> In fact, in the last 28 days, 160 million users went to—went to their My Account settings ***where they can clearly see what information we have***. We actually give, you know, show it back to them, and ***we give clear toggles, by category, where they can decide whether that information is collected, stored***.

*Id.* at 24:19–25.  Representative John Rutherford asked Mr. Pichai whether there are "areas where information is being collected" even with "the particular sites turned off," that Google might still "collect[] through some of these other passive systems that you've … contracted with."  *Id.* at 167:15–20.  Mr. Pichai doubled down:

> We are pretty explicit about data which we collect, and ***we give protections for you to turn them on or off***.

*Id.* at 167:21–168:2.  Representative Goodlatte returned to the topic:

> Q. So if you get an app that gathers information on a specific thing, ***that's not also coming to Google***, as well as, to the—the developer of the app?
>
> A. In a general sense, ***no***.

Mr. Pichai's testimony was false.  After Plaintiffs sued, Google admitted that it uses Firebase to collect and save information about what users do on non-Google apps even when they turn off WAA.  *See, e.g.*, Ex. 24 at 5.  ███████████████████ ████████████████████████████████████████ ████████████████.  Ex. 25 at 96:21–97:6.  Perhaps that is why ███████████ ████████████████████████████████████████ ████████████████"  Ex. 26 at -672.

### 4. Mr. Pichai Was Personally Involved with ████████ and Google's Public Messaging About It

After Mr. Pichai testified to Congress, Mr. Pichai personally ████████
████████████████████████████████████████████████ For example, he ████████
████████████████████████████████████████████████
*See, e.g.*, Ex. 27 at -701 (███████████████████████████████████████"); *see also* Ex. 20; Ex. 21. Mr. Pichai later "████████████████████████████████
████████████████████████████████. Ex. 28; Ex. 29 at -122; Ex. 30. Mr. Pichai also directed teams to ████████████████████████████████████████████
Ex. 31; Ex. 32; *see also* Ex. 33 at -883 ("████████████████████████████████
████████████████").

Mr. Pichai also ████████████████████████████████████████████
████████████████████████████████████████████ In early 2019, Google employees were considering whether and how to ████████████████████
████████████████████████████████████████████. *See* Ex. 34 (████████████████████████████████████████████). Mr. Pichai, however, suggested that Google ████████████████████████████████████ Ex. 35. Internally, Google described this "████████" with a term that might have been written by George Orwell: "████████████" *Id.* That is the solution Google ultimately adopted. *See* Ex. 36; Ex. 37. Similarly, Mr. Pichai approved ████████████████████████
████████████████████████████████ Ex. 27 at -701–02. It does not ████████████████████████████████████████████████████████████
████████████████████████ *Id.* at -702. Mr. Pichai therefore blessed ████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

All the while, Mr. Pichai orchestrated a public relations campaign to give the illusion that WAA and other controls provide users with real transparency and control over what Google

saves.  Advisors working under his supervision drafted talking points for Mr. Pichai emphasizing how Google "█████████████████████████████████████████" Ex. 38 at -764.  Mr. Pichai wrote an op-ed in the New York Times claiming that Google "give[s] you clear, meaningful choices around your data" and that "you get to decide how your information is used." Ex. 39 at -600.  In his keynote speech during a conference with developers in 2019, Mr. Pichai touted WAA's features and added that Google's products are "built on a foundation of trust and user privacy."  Dkt. 289 ¶ 117.  In 2020, Mr. Pichai authored an article claiming that "[p]rivacy is at the heart of everything we do" and that Google "put[s] you in control . . . on your terms," using WAA as an example of how Google treats "your information responsibly."  Ex. 40.  In July 2020, less than a month after Plaintiffs filed this lawsuit, Mr. Pichai returned to Congress.  In his written remarks, Mr. Pichai played the same old tune: "Google is committed to . . . putting you in control of what you choose to share."  Ex. 41 at 2.

### 5. Google's Employees Could Not or Would Not Answer Questions About Mr. Pichai's Involvement

Although the written discovery shows that Mr. Pichai played a pivotal role in establishing the strategic direction of the WAA setting and Google's mobile strategy, Google's witnesses claimed they were unable to describe the nature of his involvement.

For example, Plaintiffs took the deposition of David Monsees, the product manager responsible for the WAA setting and a Rule 30(b)(6) witness in this case.  Plaintiffs asked Mr. Monsees about ██████████████████████████████████████████ ██████████████████████████████.  Ex. 5 at 61:2–63:2.  Mr. Monsees said that ███████████ ████████████████████████████████████████████████████████████████████, but he couldn't "recall the exact details" of their discussion.  *Id.* at 63:4–16; *see also id.* at 66:10–25.

Francis Ma, the product manager for Firebase and another Rule 30(b)(6) witness, gave similar testimony.  He testified that Mr. Pichai "███████████████████████████████████ ███████████████████████████████.  Ex. 7 at 40:2–41:16.  Mr. Ma also referenced

1   "█████████████████████████████████████████" but explained that he could

2   not testify to Mr. Pichai's ███████████████████████" *Id.* at 41:19–25.

3       Eric Miraglia, the former director of Google's Privacy and Data Protection Office, also

4   admitted that Mr. Pichai ████████████████████████████ Ex. 25 at 73:20–

5   23.  But he could not recall ███████████████████████████████████████

6   ████████████ *Id.* at 68:16–74:25.

7       Greg Fair, another product manager with responsibilities for WAA, testified that he

8   sometimes submitted presentations and proposals to Mr. Pichai, including ████████ Ex. 42

9   at 210:18–213:4.  Like the others, however, Mr. Fair's memory of Mr. Pichai's input was sparse.

10  *See id.* at 213:5–215:12.

11      The deposition of Sam Heft-Luthy, a former product manager in Google's Privacy and

12  Data Protection Office, showcased the lengths to which Google employees will go to ████████

13  ███████ Mr. Heft-Luthy was presented with ████████████████████████████████

14  ██████████████████████████████ Ex. 26.  Mr. Heft-

15  Luthy's testimony speaks for itself:



Plaintiffs' Opposition to Google's Motion to Exclude Sundar Pichai      3:20-cv-04688-RS

Ex. 43 at 97:17–99:9.  Mr. Heft-Luthy then claimed he ███████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████████████████  *Id.* at 100:21–104:24.

### III.    LEGAL STANDARD

#### A.    The Tests for Relevance and Unfair Prejudice

The Federal Rules of Evidence employ one of the most lenient tests in law to determine whether evidence is relevant: whether "it has *any* tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added).  Upon meeting this incredibly low threshold, that relevant evidence "is admissible" unless an exception is met.  Fed. R. Evid. 402.  As relevant to Google's Motion, Rule 403 prohibits the introduction of otherwise relevant evidence when its probative value is *substantially* outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403.  This requires a "fact-intensive, context-specific inquiry."  *Sprint/United Mgmt. Co. v. Mendelsohn*, 522 U.S. 379, 388 (2008).  "The fact that there may be overlap between [testimony] does not, in and of itself, justify exclusion on the basis of 'needlessly present[ed] cumulative evidence'" because "[s]teps can be taken at trial to ensure testimony presented to the jury is not needlessly cumulative."  *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2024 WL 4023562, at *15 (N.D. Cal. Aug. 26, 2024) (Seeborg, C.J.).

#### B.    Applicability of the "Apex Doctrine"

The Ninth Circuit has never recognized the "apex doctrine."  *In re Uber Tech., Inc., Passenger Sexual Assault Litig.*, 2025 WL 896412, at *1 (N.D. Cal. Mar. 24, 2025).  The Ninth Circuit has explicitly distinguished similar analysis and its origins from the "apex doctrine."  *See*

1    *In re U.S. Dep't. of Educ.*, 25 F.4th 692, 700 n.1 (9th Cir. 2022) (where the rules and analysis

2    rested on a constitutional foundation, making that analysis "distinct from the 'apex doctrine'").

3    This "lack of clear appellate authority . . . cautions against treating past practice in non-binding

4    decisions as establishing inflexible rules of law." *In re Uber Tech., Inc.*, 2025 WL 896412, at

5    *1.

6        To the extent California district courts have applied the judicially created "apex doctrine,"

7    the party invoking those protection bears the heavy burden of proving its applicability. *Finisar

8    Corp. v. Nistica, Inc.*, 2015 WL 3988132, at *2 (N.D. Cal. June 30, 2015).  Courts are guided by

9    two factors: (1) whether the witness has unique first-hand, non-repetitive knowledge of the facts

10   at issue in the case; and (2) whether the party seeking that testimony has exhausted other less

11   intrusive discovery methods. *Wonderland Nurserygoods Co., Ltd. v. Baby Trend, Inc.*, 2022 WL

12   1601402, at *2 (C.D. Cal Jan. 7, 2022) (citing *Apple Inc. v. Samsung Elecs. Co.*, 282 F.R.D. 259,

13   263 (N.D. Cal. 2012)).

14       Although some courts have required the party seeking the testimony to make some

15   preliminary showing of the first factor, that showing is assessed under the low "plausibility"

16   standard. *Id.* (citing *Finisar Corp.*, 2015 WL 3988132, at *3; *Bicek v. C & S Wholesale Grocers,

17   Inc.*, 2013 WL 5425345, at *5 (E.D. Cal. Sept. 27, 2013) (declining protective order where

18   noticing party made a "plausible showing that [the executive] may have first-hand knowledge of

19   relevant matters as a percipient witness")).  Upon that showing, "the party resisting the apex

20   [testimony] has a heavy burden to show why" the witness should not be called to testify. *Id.*

21   (citing *Apple Inc.*, 282 F.R.D. at 263; *Blankenship v. Hearst Corp.*, 519 F.2d 417, 429 (9th Cir.

22   1975); *Groupion, LLC v. Groupon, Inc.*, 2012 WL 359699, at *4 (N.D. Cal. Feb. 2, 2012)).

23   **IV.    ARGUMENT**

24       Google advances two arguments: *first*, that Rule 403 should bar Plaintiffs from calling

25   Mr. Pichai as a witness at trial, and *second*, the "apex doctrine" should prevent his testimony at

26   trial because (according to Google) he lacks unique, first-hand knowledge.  Neither of these

27   arguments are supported by the factual record, which demonstrates that Mr. Pichai is a percipient

28

witness who began his detailed involvement with WAA and Firebase before he became CEO and continued that role for years, including after this lawsuit was filed. Google's Motion should be denied.

**A.    Mr. Pichai's Testimony is Relevant and There is No Danger of Unfair Prejudice**

Google wrongly characterizes Mr. Pichai's involvement in this case as limited to its "general privacy practices" to then wrongly assert that "none of them address the specific issues in this case." Mot. at 6. That could not be further from the truth. The documents show that Mr. Pichai's involvement goes well beyond "general privacy practices" and was directly involved with those "specific issues in this case" through his ██████████████████████████ ██████████████████████████████████████████

Mr. Pichai's ██████████████████████████████████████ ████████████ Ex. 1; Ex. 8 at 947–953. Mr. Pichai ████████████████████████ ██████████████████████████████████████████. Ex. 11 at -870; Ex. 3; FAC ¶ 200; Answer ¶ 200. When Google was exposed in 2018 for its misrepresentations about location history and WAA was implicated, Mr. Pichai directly ██████████████████████████ ████████████████████ Ex. 16 at -087; Ex. 17; Ex. 20. These facts alone more than meet the relevance test, but Mr. Pichai's involvement with the decisions and conduct at issue in this litigation goes much further.

As CEO, Mr. Pichai ████████████████████████████████████ ██████████████████████████████████████, including his 2018 congressional testimony. *Supra* § II.B. Afterwards, it was Mr. Pichai who decided that Google should "████████████████████████████████████████ Ex. 34, and personally oversaw and approved ██████████████████████████ ████████████████████████████████████████████████ ████ Ex. 27. Mr. Pichai's involvement ██████████████████, further buttressing the relevance of his testimony as a percipient witness in this matter.

13

Mr. Pichai then engaged in a misleading public campaign to glorify users' "███████ ████████. Ex. 38 at -764. He was intimately involved with ██████ ████████████████████████████████████████████" Ex. 44. This included a media blitz with outlets like the New York Times to reassure people of the (false) notion that they were in control of what Google does and does not collect, as well as the May 2019 Google development conference where Mr. Pichai repeated that false messaging while touting WAA and its retention controls. *Supra* § II.B.4. Mr. Pichai's direct involvement with WAA and Firebase continued through the filing of this lawsuit in 2020, when Mr. Pichai returned to Congress to falsely reiterate that Google puts users in control of what they share with Google. *Supra* § II.B.4.

Mr. Pichai's undeniable personal involvement and oversight of WAA and Firebase bears no resemblance to the facts in any of the cases cited by Google. In *Reddy v. Nuance Communications, Inc.*, the plaintiff advanced a theory that a CEO's *inaction* ratified the company's illegal conduct. 2015 WL 4648008, at *4 (N.D. Cal. Aug. 5, 2015). Here, because this case "concerns important aspects of [Google's] business model that are plainly the result of high-level executive decisions, we should expect" that Mr. Pichai's "testimony will be relevant and proportional" instead of "abusive or harassing." *In re Apple iPhone Antitrust Litig.*, 2021 WL 485709, at *4 (N.D. Cal. Jan. 26, 2021). This is even more expected in "aggregated litigation," *In re Uber Tech. Inc.*, 2025 WL 896412, at *2, like this certified class action where the interests of nearly 100 million Americans will be tried to a jury in August of this year. *See also City of Huntington v. AmerisourceBergen Drug Corp.*, 2020 WL 3520314, at *3 (S.D. W.Va. June 29, 2020) (where the "astronomical amount in controversy," i.e., "hundreds of millions of dollars," weighs against "application of a rigid apex deposition rule better suited to an individual personal injury, employment, or contract dispute in which the 'apex' official had no personal knowledge"). Surely if Mr. Pichai can prepare to testify for hours before Congress under oath, repeatedly over the years, and to personally direct and participate in media blitzes regarding Google's privacy controls, he can and should be ready to testify at trial about products he

1    personally managed. *See id.* (declining to apply "apex doctrine" where executive provided

2    "written and verbal answers to Congress . . . demonstrat[ing] core competence, personal

3    involvement, and direct knowledge of the factual issues" to be tried).

4        Google's arguments about the cumulative and harassing nature of Mr. Pichai's testimony

5    are nothing but vague and conclusory aspersions.  The Rule 403 analysis is a "fact-intensive,

6    context-specific inquiry," which is notably absent from Google's Motion.  *Mendelsohn*, 522 U.S.

7    at 388.  Like in *In re Uber Tech. Inc.*, Google's motion must fail because Google has not

8    presented "evidence that [Mr. Pichai's testimony is] sought for harassing purposes" after

9    Plaintiffs "have gathered sufficient discovery through other means to demonstrate that [Mr.

10   Pichai] ha[s] relevant and superior knowledge."  2025 WL 896412, at *3.

11       Even still, Google's radical request to exclude Mr. Pichai from trial in the face of his

12   clearly relevant, first-hand knowledge ignores the reality that, to the extent Google believes

13   Plaintiffs' lawyers—all exceptionally experienced, professional, and respected trial attorneys—

14   would harass Mr. Pichai or seek purely cumulative testimony, the Court may fashion limits and

15   instructions as a less restrictive means to wholesale exclusion.  After all, as Chief Judge Seeborg

16   recently held: "[s]teps can be taken at trial to ensure testimony presented to the jury is not

17   needlessly cumulative."  *In re Xyrem*, 2024 WL 4023562, at *15.  These potential "steps" can be

18   discussed amongst the parties and with the Court, which would allow Plaintiffs to elicit Mr.

19   Pichai's testimony at trial while assuaging Google's concerns that any *unfair* prejudice would

20   result.[4]  Google's refusal "to negotiate and then litigat[e] such disputes . . . drives up costs for

21   litigants and risks expending court resources, which in turn leads to delay and expenses that

22   outstrip the costs associated with having [Mr. Pichai] testify for a very limited amount of time."

23   *In re Uber Tech. Inc.*, 2025 WL 896412, at *4.

24       Mr. Pichai's testimony is clearly relevant and Google has not met its burden of

25

26   [4] *See also Google Inc. v. American Blind & Wallpaper Factory, Inc.*, 2006 WL 2578277, at *3
     (N.D. Cal. Sep. 6, 2006) (Seeborg, C.J.) (rejecting application of "apex doctrine" because
27   plaintiff learned from other witnesses "that [the executive] may have relevant first-hand
     information" but limiting scope and duration of examination).

28

1  demonstrating that it should otherwise be excluded under Rule 403.

2  **B.    Mr. Pichai is a Percipient Witness Not Protected by any "Apex Doctrine"**

3  **1.    Mr. Pichai possesses first-hand knowledge of relevant facts.**

4  Mr. Pichai is a C-suite executive, but he is not divorced from the facts and conduct at

5  issue in this litigation.  Mr. Pichai was intimately involved with ███████████████

6  ████████████████████████████████.  *Supra* §§ II.B.1, 2.  The "apex doctrine" test does not

7  start and stop with whether the witness is a senior level employee.  Instead, it requires the senior

8  level employee not to have personal knowledge of the facts at issue.  *See Opperman v. Path, Inc.*,

9  2015 WL 5852962, at *1 (N.D. Cal. Oct. 8, 2015) (while an executive "is a busy person with

10  substantial responsibilities . . . that fact does not control where, as here, there is a substantial basis

11  to believe that he may have relevant information to which Plaintiff is entitled under the Federal

12  Rules." (quoting *Hunt v. Cont'l Cas. Co.*, 2015 WL 1518067, at *3 (N.D. Cal. Apr. 3, 2015))).

13  Contrary to Google's suggestion that Mr. Pichai lacks any knowledge about "the facts or products

14  involved in Plaintiffs' case" (Mot. at 8), he was intimately involved in ███████████████

15  ████████████████████████████████.  *Supra* §§ II.B.1, 2.

16  Although courts "generally do refuse to allow the immediate [testimony] of high-level

17  'apex deponent' executives," that refusal is "*before* the testimony of lower level employees with

18  more intimate knowledge of the case has been secured."  *First Nat. Mortg. Co. v. Federal Realty

19  Inv. Trust*, 2007 WL 4170548, *2 (N.D. Cal. Nov. 19, 2007) (Seeborg, C.J.) (emphasis in

20  original).  Where a party "has shown that its depositions of lower-level employees suggest that

21  [the executive] may have at least *some* relevant personal knowledge" that party may elicit

22  testimony from that executive.  *Id.* (emphasis in original).  "[A]n overemphasis on *unique*

23  knowledge is inconsistent with otherwise common approaches to discovery and trial advocacy,

24  where corroborating evidence and testing credibility through the testimony of more than one

25  witness is often appropriate."  *In re Uber Tech. Inc.*, 2025 WL 896412 at *2.

26  None of Google's cases are on point.  In *Reddy*, the court applied the "apex doctrine"

27  because that executive had "been dismissed as a defendant and does not appear to know anything

28

about the case." 2015 WL 4648008, at *4. In *Yphantides v. County of San Diego*, the "apex doctrine" shielded former high-ranking official because he "was not involved in the decision to terminate Plaintiff nor consulted in that decision." 2023 WL 7555301, at *4 (S.D. Cal. Nov. 14, 2023). Also, because the high-ranking official there had recently resigned from his position, the court held that jurors might hold a negative opinion of him, increasing the likelihood of unfair prejudice. *Id.*

The facts in *Pinn, Inc. v. Apple, Inc.*, are a far cry from those here. In *Pinn*, the only evidence connecting the senior executive to the litigation was a "brief response to a 'cold call' e-mail from [plaintiff's] CEO." 2021 WL 4775969, at *2 (C.D. Cal. Sept. 10, 2021). That document was not shown to any witnesses and the plaintiff's explanation of its relevance made no sense because the senior executive was responsible for "mergers, acquisitions, and strategic investing efforts, and was not involved with the design, engineering, marketing, or sales of the accused products." *Id.* The court squarely summarized the evidence: nothing in the record "suggests that [the senior executive] has any further knowledge as to Apple's conduct with regard to Pinn, let alone any 'unique first-hand, non-repetitive knowledge.'" *Id.* at *3.

*Benson v. City of Lincoln* is equally inapplicable. There, the plaintiff in a discrimination case sought to call the mayor as a witness. 2023 WL 5627091, at *6 (D. Neb. Aug. 31, 2023). After the court reviewed the plaintiff's "assemblage of information" about myriad plans, policies, and the investigation of plaintiff, it was glaringly obvious that the mayor was not "directly involved in the investigation of [plaintiff's] complaints" or "involved at all in the decision to terminate [plaintiff]." *Id.* The court also concluded that the mayor's testimony was sought "primarily—if not entirely—because she is the highest level executive of the City" and not because she had any relevant knowledge of the facts and issues in that specific litigation. *Id.*

Other district courts have declined to extend the "apex doctrine" where the witness had first-hand knowledge of the facts at issue. *See*, *e.g.*, *Snubco Pressure Control Ltd. v. Lee*, 2023 WL 11950400, at *2 (E.D. Tex. Oct. 6, 2023) (finding no undue burden under "apex doctrine" even though chairman of investment firm's testimony "may be minimal, and his testimony may

at times be duplicative" because chairman had not "established that the burdens of traveling and testifying at some point over th[e] span of [three] days is an undue burden"); *City of Huntington*, 2020 WL 3520314, at *3 (rejecting application of "apex doctrine" where executive's "written and verbal answers to Congress . . . demonstrate core competence, personal involvement, and direct knowledge of the factual issues" to be tried); *In re Lincoln Nat'l COI Litig.*, 2019 WL 7581176, at *3 (E.D. Pa. Dec. 5, 2019) (declining to apply "apex doctrine" where plaintiffs made a "bare" "*prima facie*" showing of the executive's involvement with matters related to the litigation); *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab. Litig.*, 2014 WL 3035791, at *2 (E.D. Pa. July 1, 2014) (declining to apply "apex doctrine" where executive was "actively involved in decision making regarding the marketing and product development of [the] products while working both as a marketing manager and later as President" of the company).

### 2. Plaintiffs adequately exhausted less intrusive means.

Google's superficial blustering that the custodial productions and depositions of the "many" current and former Google employees is somehow sufficient (Mot. at 9) is belied by the factual record. Google witnesses could not either testify under oath "with specificity" that their references to Sundar were to Sundar Pichai, or provide much (if any) detail about their unwritten and generally non-memorialized meetings with Mr. Pichai. *Supra* § II.B.5; *see, e.g.*, *Haggarty v. Wells Fargo Bank, N.A.*, 2012 WL 3939320, at *2 (N.D. Cal. Aug. 24, 2012) (allowing examination where "three lower-level employees" were deposed by they "did not definitively answer Plaintiffs' questions"). What those Google employees did confirm, however, is that ███

████████████████████████████████████████████████████

██████████████████████████. *Supra* §§ II.B.1, 2.

That Plaintiffs did not seek Mr. Pichai's custodial files and deposition actually makes the point that they do not intend to harass Mr. Pichai. Instead, Plaintiffs sought discoverable materials through less intrusive means and, with the benefit of what they were able to gather, Plaintiffs seek to have Mr. Pichai do what he has already done at least twice: testify in public about WAA and answer questions about the illusion of control that Google wants users to think

they have over their data when WAA is off.  Mr. Pichai willingly engaged with Congress twice, wrote multiple op-eds, and engaged in a media blitz to defend WAA and Firebase that he controlled since their inceptions at Google.  Yet now, with trial imminent, Google seeks to usher Mr. Pichai back behind closed doors and avoid that examination in the only forum where the examiners have had the benefit of discovery.  It wasn't harassing or disruptive to Mr. Pichai in 2018 or 2020, and it won't be in August 2025.  As Chief Judge Seeborg has opined:

> It may be true that courts are sometimes willing to protect high-level corporate officers from depositions when the officer has no *first hand* knowledge of the facts of the case or where the officer's testimony would be *repetitive*. . . . The mere fact, however, that other witnesses may be able to testify as to what occurred at a particular time or place does not mean that a high-level corporate officer's testimony would be repetitive.

*First Nat. Mortg. Co.*, 2007 WL 4170548, at *2 (internal marks omitted).

In the recent decision of *In re Uber Tech. Inc.*, Magistrate Judge Cisneros analyzed a similar factual record where Uber sought to shield some executive-level employees from testifying.  2025 WL 896412, at *3.  Admittedly the plaintiffs did not seek the testimony of Uber's CEO, but the court's analysis is nevertheless applicable.  The plaintiffs in that case sought to depose those executive-level witnesses because of their specific knowledge of the facts and issues in that litigation.  *Id.* at *3.  After examining the record, Magistrate Judge Cisneros found that Uber presented "no evidence that the depositions are sought for harassing purposes, and Plaintiffs have gathered sufficient discovery through other means to demonstrate that the proposed deponents have relevant and superior knowledge."  *Id.* at *3.  Further, Magistrate Judge Cisneros' order was "calculated to balance the protections" against harassment and cumulative presentation of evidence, such that the procedural rules require "the just, speedy, and inexpensive determination of every action and proceeding."  *Id.* at *3.

Plaintiffs pursued discovery of other witnesses.  The custodial files for those witnesses were produced, they were deposed, and those witnesses confirmed (at least when they were willing to acknowledge that "Sundar" referred to "Sundar Pichai") that Mr. Pichai has relevant information to which those witnesses are not privy, such as the discussions that Mr. Pichai had

with other executive-level Google employees who participated in reviews of WAA and Firebase and Google's false messaging concerning both.  Google made Mr. Pichai the face of its privacy messaging, he drove Google's mobile strategy, and he should face the jury in this case.

## V.    CONCLUSION

Plaintiffs respectfully request that the Court deny Google's motion, rejecting Google's attempt to shield Mr. Pichai from being examined at trial.

Dated: April 17, 2025                 By */s/ Mark C. Mao*
                                       Mark C. Mao (CA Bar No. 236165)
                                       mmao@bsfllp.com

                                       Beko Reblitz-Richardson (CA Bar No. 238027)
                                       brichardson@bsfllp.com
                                       BOIES SCHILLER FLEXNER LLP
                                       44 Montgomery Street, 41st Floor
                                       San Francisco, CA 94104
                                       Telephone: (415) 293 6858
                                       Facsimile (415) 999 9695

                                       David Boies (*pro hac vice*)
                                       dboies@bsfllp.com
                                       BOIES SCHILLER FLEXNER LLP
                                       333 Main Street
                                       Armonk, NY 10504
                                       Telephone: (914) 749-8200

                                       James W. Lee (*pro hac vice*)
                                       jlee@bsfllp.com
                                       Rossana Baeza (*pro hac vice*)
                                       rbaeza@bsfllp.com
                                       BOIES SCHILLER FLEXNER LLP
                                       100 SE 2nd Street, Suite 2800
                                       Miami, FL 33130
                                       Telephone: (305) 539-8400
                                       Facsimile: (305) 539-1304

                                       Alison Anderson (CA Bar No. 275334)
                                       aanderson@bsfllp.com
                                       M. Logan Wright, CA Bar No. 349004
                                       mwright@bsfllp.com
                                       BOIES SCHILLER FLEXNER LLP
                                       2029 Century Park East, Suite 1520
                                       Los Angeles, CA 90067
                                       Telephone: (213) 995-5720
                                       Facsimile: (213) 629-9022

Plaintiffs' Opposition to Google's Motion to Exclude Sundar Pichai                 3:20-cv-04688-RS

Amanda Bonn (CA Bar No. 270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

Bill Christopher Carmody (*pro hac vice*)
bcarmody@susmangodfrey.com
Shawn J. Rabin (*pro hac vice*)
srabin@susmangodfrey.com
Steven Shepard (*pro hac vice*)
sshepard@susmangodfrey.com
Alexander P. Frawley (*pro hac vice*)
afrawley@susmangodfrey.com
Ryan Sila (*pro hac vice*)
rsila@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY  10001
Telephone: (212) 336-8330

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

Michael F. Ram, CA Bar No. 104805
mram@forthepeople.com
MORGAN & MORGAN
711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Telephone: (415) 358-6913

*Attorneys for Plaintiffs*