**WILLKIE FARR & GALLAGHER LLP**
BENEDICT Y. HUR (SBN: 224018)
  bhur@willkie.com
SIMONA AGNOLUCCI (SBN: 246943)
  sagnolucci@willkie.com
EDUARDO E. SANTACANA (SBN: 281668)
  esantacana@willkie.com
ARGEMIRA FLÓREZ (SBN: 331153)
  aflorez@willkie.com
HARRIS MATEEN (SBN: 335593)
  hmateen@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA 94104
Telephone: (415) 858-7400

Attorneys for Defendant
GOOGLE LLC

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIBAL RODRIGUEZ, *et al.* individually and on behalf of all others similarly situated,<br><br>                                        Plaintiff,<br><br>      vs.<br><br>GOOGLE LLC, *et al.*,<br><br>                                        Defendant. | Case No. 3:20-CV-04688 RS<br><br>**GOOGLE LLC'S RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF GOOGLE'S EXPERTS DONNA HOFFMAN, JOHN BLACK AND CHRISTOPHER KNITTEL [DKT 473]**<br><br>[Filed concurrently with Santacana Declaration and [Proposed] Order]<br><br>Date:         May 15, 2025<br>Time:        1:30 p.m.<br>Ctrm:       3 - 17th Floor<br>Judge:       Hon. Richard Seeborg<br><br>Action filed:   July 14, 2020<br>Trial Date:     August 18, 2025 |

## **TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................1

II.   LEGAL STANDARD ...........................................................................................2

III.  ARGUMENT .......................................................................................................3

    A.   Dr. Hoffman Provides Proper and Necessary Rebuttal Testimony Grounded in Academic Research, Her Specific Expertise, and Record Evidence .........................3

        1.   Mr. Schneier Should Not Opine on The Ultimate Issue of Google's Intent, Thus Rendering Any Rebuttal Opinion on Intent By Dr. Hoffman Unnecessary ...............................................................................................4

        2.   Dr. Hoffman's Rebuttal Regarding User Perception and Generalization is Well-Founded Expert Analysis, Not Improper Legal Instruction .................6

    B.   Dr. Hoffman's Analysis of User Experience and Disclosures Falls Squarely Within Her Marketing and UI Expertise ...............................................................................9

    C.   Dr. Black Offers Reliable Technical Rebuttal and Factual Clarification .................11

        1.   Dr. Black Accurately Identifies Google's Public Policy Definition of "Google Account"...........................................................................................11

        2.   Dr. Black Accurately Rebuts Plaintiffs' Unsupported "Interception" Allegations ...........................................................................................14

    D.   Dr. Knittel Provides Reliable and Relevant Economic Testimony on Unjust Enrichment Consistent With *Daubert* and Google's Proof Burdens .......................16

        1.   Dr. Knittel's Analysis Properly Focuses on Net Benefit and Google's Burden ...............................................................................................16

        2.   Dr. Knittel's Opinion on Alternative Monetization is Reliably Based on Economic Principles and Market Realities ...................................................20

IV.   CONCLUSION...................................................................................................22

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Addison v. La. Reg'l Landfill Co.*,
    2024 WL 3757551 (E.D. La. Aug. 12, 2024) ................................................13

4

5

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
    738 F.3d 960 (9th Cir. 2013) ................................................................3

6

7

*Apple, Inc. v. Samsung Elecs. Co.*,
    2012 WL 2571332 (N.D. Cal. June 30, 2012) ..............................................15

8

*Betances v. Fischer*,
    2021 WL 1534159 (S.D.N.Y. Feb. 23, 2021) ..............................................13

9

10

*Brown v. Google, LLC*,
    2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ..............................12, 17, 19

11

*California ex rel. Brown v. Safeway Inc.*,
    615 F.3d 1171 (9th Cir. 2020) ..............................................................19

12

13

*Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler*,
    130 F.4th 757 (9th Cir. 2025) ..............................................................12

14

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) .................................................................. *passim*

15

16

*Eason v. Anoka-Hennepin E. Metro Narcotics & Violent Crimes Task Force*,
    2002 WL 1739666 (D. Minn. July 22, 2002) ..............................................13

17

*In re Facebook Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ................................................................16

18

19

*Giovacchini v. Cincinnati Ins. Co.*,
    2024 WL 5077099 (N.D. Cal. Dec. 10, 2024) ..............................................15

20

*Hangarter v. Provident Life & Acc. Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) ................................................................14

21

22

*Huawei Techs., Co. v. Samsung Elecs. Co.*,
    340 F. Supp. 3d 934 (N.D. Cal. 2018) ......................................................15

23

24

*Hydrick v. Hunter*,
    500 F.3d 978 (9th Cir. 2007) ................................................................12

25

*ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*,
    2022 WL 16924139 (D. Or. Nov. 14, 2022) ................................................18

26

27

28

*Kumho Tire Co. v. Carmichael,*
  526 U.S. 137 (1999) ...................................................................................................2

*Meister v. Mensinger,*
  230 Cal. App. 4th 381 (2014) ...........................................................................16, 17

*Messenger v. Anderson,*
  225 U.S. 436 (1912) .................................................................................................13

*Messick v. Novartis Pharms. Corp.,*
  747 F.3d 1193 (9th Cir. 2014) ..................................................................................2

*Montera v. Premier Nutrition Corp.,*
  2022 WL 1225031 (N.D. Cal. Apr. 26, 2022), aff'd in part, 111 F.4th 1018 (9th Cir. 2024).......2

*Neo4j, Inc. v. PureThink, LLC,*
  2023 WL 7093805 (N.D. Cal. Oct. 25, 2023) .........................................................13

*Plumley v. Mockett,*
  836 F. Supp. 2d 1053 (C.D. Cal. 2010) ...................................................................15

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.,*
  752 F.3d 807 (9th Cir. 2014) ............................................................................2, 3, 7

*Ries v. Arizona Beverages USA LLC,*
  287 F.R.D. 523 (N.D.Cal., 2012) ............................................................................19

*S.E.C. v. Leslie,*
  2010 WL 2991038 (Jul. 26, 2010) ...........................................................................12

*Sheldon v. Metro-Goldwyn Pictures Corp.,*
  106 F.2d 45 (2d Cir. 1939) .......................................................................................21

*Smilovits v. First Solar, Inc.,*
  2019 WL 6875492 (D. Ariz. Dec. 17, 2019) ..............................................1, 6, 7, 11

*Snyder v. Bank of Am., N.A.,*
  2020 WL 6462400 (N.D. Cal. Nov. 3, 2020) ...........................................................15

*Southern Ry. Co. v. Clift,*
  260 U.S. 316 (1922) .................................................................................................12

*Sport Dimension, Inc. v. Coleman Co.,*
  820 F.3d 1316 (Fed. Cir. 2016) ................................................................................21

*Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.,*
  2024 WL 1975456 (N.D. Cal. Mar. 31, 2024) ...................................................7, 11

GOOGLE LLC'S RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE [DKT 473]
Case No. 3:20-CV-04688 RS

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.*,
  2018 WL 5013580 (N.D. Cal. Oct. 16, 2018).............................................................7, 8

*United States v. City of New York*,
  847 F. Supp. 2d 395 (E.D.N.Y. 2012) ........................................................................13

*United States v. Diaz*,
  876 F.3d 1194 (9th Cir. 2017) .......................................................................................7

*United States v. Sandoval-Mendoza*,
  472 F.3d 645 (9th Cir. 2006) .........................................................................................2

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981).......................................................................................................12

*Vizcarra v. Unilever United States, Inc.*,
  339 F.R.D. 530 (N.D. Cal. 2021)...................................................................................2

**Other Authorities**

Fed. R. Civ. P. 26 ..............................................................................................................11, 15

Fed. R. Evid. 702 ......................................................................................................2, 7, 11, 15

GOOGLE LLC'S RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE [DKT 473]
Case No. 3:20-CV-04688 RS

## I.    INTRODUCTION

This is not a "narrow" evidentiary motion. It is a broad attempt to dismantle core components of Google's defense by excluding critical, well-supported expert testimony from its marketing, technical, and economic experts. While Plaintiffs dress their arguments in the language of *Daubert*, their objections boil down to disagreements with Google's evidence and defense theories. But those disagreements are the purpose of litigation. They are to be resolved by the jury, not backdoored through a *Daubert* motion.

The motion fails and should be denied for at least three independent reasons.

*First*, Dr. Hoffman's testimony is essential expert rebuttal, not improper opinion. Plaintiffs wrongly attack Dr. Hoffman's opinions on user experience, disclosures, and intent as impermissible, ignoring that she directly rebuts Plaintiffs' expert using her specific expertise in marketing and online consumer behavior, relies on record evidence and established literature, and does not stray into technical areas she disclaimed or improper legal instruction. Excluding her testimony would compromise Google's ability to counter Plaintiffs' narrative on user perception and alleged "dark patterns" in interface design.

*Second*, Dr. Black provides necessary factual context and technically sound rebuttal. Plaintiffs' challenges to Dr. Black rest on a legally incorrect application of the law-of-the-case doctrine and a semantic game regarding the word "interception." His testimony accurately identifies Google's policy language and correctly points out the critical failure of Plaintiffs' own expert to substantiate their core technical theory of the case. Both are proper and necessary rebuttal.

*Third*, Dr. Knittel employs standard, required economic analysis for unjust enrichment. Plaintiffs mischaracterize Dr. Knittel's analysis of net benefit and deductions—a burden Google bears—as improper speculation. His use of alternative scenarios is standard practice in unjust enrichment, grounded in economic principles and record evidence, and crucial for the jury to avoid awarding a windfall based on Plaintiffs' incomplete gross revenue figures.

Plaintiffs misunderstand the *Daubert* standard. The Court's role is to act as a gatekeeper against genuinely unreliable methodologies or unqualified experts, not to arbitrate disagreements over admissible evidence or exclude opinions merely because they support the opposing party's

defense. Any perceived weaknesses in the challenged opinions are precisely what "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are designed to address. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). Indeed, with trial looming, the motion appears less like a targeted inquiry into reliability and more like Plaintiffs buying a *Daubert* scratcher, hoping one hits and weakens Google's defense. The Court should reject this attempt and deny the motion in its entirety.

## II.    LEGAL STANDARD

Under Federal Rule of Evidence 702, expert testimony is admissible if it meets three core requirements: (1) the expert is qualified; (2) the testimony is relevant; and (3) the testimony is reliable. *Vizcarra v. Unilever United States, Inc.*, 339 F.R.D. 530, 538 (N.D. Cal. 2021); Fed. R. Evid. 702. "The proponent of the testimony bears the burden of establishing its admissibility." *Montera v. Premier Nutrition Corp.*, 2022 WL 1225031, at *4 (N.D. Cal. Apr. 26, 2022), aff'd in part, 111 F.4th 1018 (9th Cir. 2024). This standard reflects a "liberal thrust" favoring admissibility. *Daubert*, 509 U.S. at 588.

The standard for relevance is low. *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014). Expert testimony is relevant under Rule 702 if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). This simply requires that testimony "logically advances a material aspect of the proposing party's case." *Messick*, 747 F.3d at 1196 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995)).

The reliability requirement ensures the expert's opinion has a "reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 592); *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014). The *Daubert* inquiry into reliability is "flexible," focusing on the expert's principles and methodology, not the correctness of their conclusions. *Daubert*, 509 U.S. at 595; *Pyramid Techs., Inc.*, 752 F.3d at 813. For testimony based on technical or other specialized knowledge derived from experience, the court's reliability assessment appropriately focuses on the expert's "personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006); *see Kumho Tire*, 526 U.S. at 150.

The trial court acts as a "gatekeeper" under *Daubert*, tasked with "screen[ing]" out "unreliable nonsense opinions." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013); *Pyramid Techs., Inc.*, 752 F.3d at 813. "The Court's task is not to decide whether the expert is right or wrong, just whether the testimony has substance such that it would be helpful to a jury." Dkt. 352 (Ord. at 5 (quoting *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969-70)). "The judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Pyramid Techs., Inc.*, 752 F.3d at 813 (internal quotation marks omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## III.    ARGUMENT

### A.    Dr. Hoffman Provides Proper and Necessary Rebuttal Testimony Grounded in Academic Research, Her Specific Expertise, and Record Evidence

Dr. Hoffman is a Full Professor of Marketing and holder of an endowed chair at The George Washington University School of Business who has spent the past three decades offering consulting services to technology companies and conducting research in the areas of the online consumer experience, consumer behavior in technology environments, and digital commerce strategy. *See* Expert Report of Donna L. Hoffman, Ph.D. (May 31, 2023) ("Hoffman Rep."), Dkt. 473-2 ¶ 1. In addition, and as Plaintiffs admit, she is a "marketing expert." Mot. at 2. Her expertise in online consumer experience includes consumer response to user interfaces ("UI"). Deposition Transcript of Donna L. Hoffman, Ph.D. (Jul. 11, 2023) ("Hoffman Dep. Tr."), Dkt. 473-6 at 107:1-6. She is qualified to opine on the online consumer experience and whether technology companies employ customer-centric strategies.

Plaintiffs seek to exclude certain of Dr. Hoffman's opinions, claiming they impermissibly address "motive, intent, and state of mind," but Dr. Hoffman's opinions on this subject are merely rebutting Plaintiffs' affirmative expert, Mr. Bruce Schneier's opinions, and since his should be excluded, hers would become unnecessary. Mot. at 1. As for Plaintiffs' argument that Dr. Hoffman would improperly instruct the jury on "the concept of a representative user and whether class

3

representatives' testimony can be 'generalized' across the class;" and involve "technical issues" outside her expertise, Mot. at 2-3, the record contradicts Plaintiffs' characterization of Dr. Hoffman's opinion.

### 1. Mr. Schneier Should Not Opine on The Ultimate Issue of Google's Intent, Thus Rendering Any Rebuttal Opinion on Intent By Dr. Hoffman Unnecessary

No expert at this trial should opine on Google's motives, intent, or state of mind. That is why Google moved to exclude Plaintiffs' affirmative expert opinion on those subjects, proffered through their expert Bruce Schneier. *See* Google's Mot. to Exclude Pl's Expert Op. of Bruce Schneier, Dkt. 474 at 10-15. Mr. Schneier's report is replete with attempts to ascribe motives and intent to Google, to users, and to others, and those impermissible opinions fundamentally underlie his "dark patterns" opinions, which amount to a backdoor attempt to opine on the ultimate fact of intent, a necessary element of each of the remaining claims.

Dr. Hoffman's assignment in this case was to rebut Mr. Schneier's opinions. This included rebutting the impermissible ones, because it is impossible to know in advance whether they will survive a *Daubert* challenge. But the right outcome here is for the Court to forbid *both* experts from offering opinions about the motives, intent, or state of mind of anyone or any corporate entity at this trial.

Google notes, however, that the paragraphs identified by Plaintiffs as containing purportedly impermissible opinion about motive, intent, or state of mind also contain factual matter about which Dr. Hoffman is certainly permitted to testify, provided she stops short (as all experts should) of drawing an inference from that factual matter about Google's intent. Google respectfully submits that the Court should not follow Plaintiffs' proposed form of order, and instead simply prohibit Dr. Hoffman (and Mr. Schneier) from testifying at trial about Google's motives, intent, or state of mind, or that of anyone else, while preserving her ability to testify as to facts. Likewise, while the Court should strike Mr. Schneier's *opinions* about Google's intent and his *opinions* that Google's user interface does in fact constitute a "dark pattern" (*i.e.*, as defined by Mr. Schneier, an intentionally

1    deceitful design), Mr. Schneier also should be permitted to testify about the *facts* of Google's user

2    interface design while leaving for the jury the freedom to draw inferences from it themselves.

3        For example, Plaintiffs take issue with a snippet of Dr. Hoffman's report where she says,

4    "Google was not trying to deceive or manipulate its users." Mot. at 10; Hoffman Rep. ¶ 153 tbl. 8.

5    But in context, Dr. Hoffman was merely listing evidence to that effect in rebuttal to Mr. Schneier's

6    opinion that the user interface is a dark pattern, including the deposition testimony of Eric Miraglia,

7    a Senior Director of Product Management at Google, who during his deposition testified that he

8    played a role in the development and rollout of sWAA, and that "***The goal*** when we change these

9    settings is always to give users simple powerful controls that allow them to be in the state that they

10    want to be in to get the product experience that they want. ***So all of our changes are directed***

11    ***towards that end***." Declaration of Eduardo E. Santacana ISO Google's Response to Plaintiffs'

12    Motion to Exclude ("Santacana Decl."), Ex. A (Miraglia Dep. Tr.) at. 58:12-16. There is nothing

13    wrong with Dr. Hoffman (or Mr. Schneier) pointing the jury to that testimony.

14        Another example: Dr. Hoffman points to and discusses an internal email from Google

15    employees across multiple teams about "new improvements," including moving the Ad

16    Personalization settings in a way that "didn't remove or reduce user control in any way, but [] did

17    make our settings simpler and easier to use" and a revised setting structure for a setting that was

18    "originally built to help users save device contacts [and] installed app info" to their accounts because

19    the setting led to complicated interactions with other settings. Santacana Decl., Ex. B, GOOG-

20    RDGZ-00186830 at -31, 34, 35. Likewise, Dr. Hoffman points to a document related to the drafting

21    of disclosure text where the Google employees wrote that the "text is ***intended to*** . . . reassure users

22    that they have a real choice in how these changes affect their experience with Google." Santacana

23    Decl., Ex. C, GOOG-RDGZ-00149527 at -30 (emphasis added).

24        The evidence itself includes statements of the goals of product design changes. Any expert

25    can point to such evidence when explaining design changes. The Court should not prohibit Dr.

26    Hoffman from relaying such information to the jury, though, of course, neither she herself nor Mr.

27    Schneier should take the additional step of claiming that this evidence proves Google's or anyone

28    else's intent.

### 2. Dr. Hoffman's Rebuttal Regarding User Perception and Generalization is Well-Founded Expert Analysis, Not Improper Legal Instruction

Plaintiffs claim that two of Dr. Hoffman's opinions impermissibly intrude upon the Court's role to instruct the jury. Specifically, her statement that "there is no such thing as a 'representative' user with respect to privacy," Hoffman Rep. ¶ 43, and her opinion that Named Plaintiffs' interpretation of Google's (s)WAA disclosures "cannot be generalized across all of Google's users." *Id.* ¶122 tbl. 4. Plaintiffs argue that these opinions intrude upon the Court's role to instruct the jury because they would allegedly "instruct the jury about what they can and cannot do when assessing the evidence," and would confuse them as they read jury instructions with the "reasonable user" standard. Mot. at 12.

Plaintiffs mischaracterize the purpose for which Dr. Hoffman offers these opinions. They serve to rebut Mr. Schneier's opinions about how people behave online. Mr. Schneier opines that "lack of transparency makes it hard for people to make complex privacy decisions." Hoffman. Rep. ¶40; Expert Report of Bruce Schneier (February 20, 2023) ("Schneier Rep."), Dkt. 361-57 ¶¶ 143-146. Dr. Hoffman's rebuttal opinions address one of the many flaws in Mr. Schneier's opinions. Namely, that they "ignore[] that users are highly heterogeneous with varying needs and preferences" and that "both the context and individual preferences affect the level of a perceived privacy threat by users." Hoffman. Rep. ¶¶ 37, 41.

Dr. Hoffman's opinions do not attempt to instruct the jury on the law. Instead, they will help the jury understand consumers' interactions in the context of her own decades of research on how people behave online and relevant scholarship on the issue. *See* Hoffman Dep. Tr. at 126:14-16 ("I've been studying online consumer behavior, internet business models and e-commerce since the mid '90s"); *see also Smilovits v. First Solar, Inc.,* 2019 WL 6875492, at *6 (D. Ariz. Dec. 17, 2019) (finding that an accurate understanding of the industry was relevant where a jury had to decide how a reasonable investor would have responded to disclosures). Dr. Hoffman's opinions are based on what the "literature makes [] clear" and what "multiple studies have shown." *See* Hoffman Rep. ¶ 43 ("[t]he ***literature makes it clear*** that there is no such thing as a ***'representative' user*** . . . multiple studies have shown that the perception of privacy threats is highly individualized.") (emphasis

6

added). Her opinions will also assist the jury in determining how much weight to give Mr. Schneier's opinions about how people behave online.

For example, Dr. Hoffman's rebuttal testimony would be helpful to a jury in understanding consumer's online behavior and parsing through Mr. Schneier's opinions about who might be considered "privacy conscious individuals," Schneier Rep. ¶ 398 (concluding that a Google user study that consisted entirely of German citizens with a specific interest in privacy implied something about privacy-conscious individuals), and how to weigh a study he references about "reasonable user expectations," Schneier Rep. ¶ 127 (quoting a study about web browser privacy risks that concluded that transmission of certain data was "likely at odds with reasonable user expectations."). Plaintiffs may object at trial if they believe Dr. Hoffman's testimony crosses the line into inadmissible legal conclusions. *See Smilovits*, 2019 WL 6875492, at *6.

Dr. Hoffman's rebuttal testimony is admissible under Rule 702 because it is both relevant and reliable. It is relevant because it has a valid connection to the pertinent inquiry–*i.e.*, rebuttal of Mr. Schneier's opinion that users' intuition begins to fail in an online setting and that "lack of transparency makes it hard for people to make complex privacy decisions." Hoffman. Rep. ¶ 40; Schneier Rep. ¶¶ 143-146. And it is reliable because it is grounded in academic literature and her expertise. This is more than an "unreliable nonsense opinion[]" that courts screen for as part of the *Daubert* inquiry. *Pyramid Techs., Inc.*, 752 F.3d at 813. Plaintiffs cannot seek to exclude it just because they disagree with it. *See Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*, 2024 WL 1975456, at *9 (N.D. Cal. Mar. 31, 2024) ("The Court will not exclude this relevant and reliable expert testimony merely because [defendant] disagrees with it.").

"While the Ninth Circuit has held that an expert may not offer a legal conclusion, *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017), the court has also held that 'if the terms used by an expert witness do not have a specialized meaning in law' and 'do not represent an attempt to instruct the jury on the law,' or 'how to apply the law to the facts of the case, the testimony is not an impermissible legal conclusion.'" *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 2018 WL 5013580, at *3 (N.D. Cal. Oct. 16, 2018) (Seeborg, J.); *Smilovits*, 2019 WL 6875492, at *5 (same).

Dr. Hoffman does not equate her opinion that there is no "representative user" with respect to privacy to an assessment of what a "reasonable person" should mean with respect to privacy. Dr. Hoffman does not attempt to instruct the jury on the law by defining "representative user" or "reasonable person" or equating them with any specialized meaning in the law, and thus her opinion is not incompatible with any jury instruction about the "reasonable user." *See United Energy Trading, LLC*, 2018 WL 5013580, at \*3 (denying a motion to exclude testimony of an expert who did not use any specialized legal terms to describe defendants' compliance).

That said, if the Court would prefer, Dr. Hoffman can use different language to avoid confusion, without changing or withholding her opinion. For example, the Court could order that Dr. Hoffman refrain from using the phrase "representative user" in the context of her opinion and instead use phrases akin to "users have varying views about privacy." But it is clearly important that the jury be able to hear well-founded academic information about what consumer research shows about consumer attitudes toward privacy online, as it works to determine what a reasonable person in this case would have expected.

Finally, Plaintiffs' argument that Dr. Hoffman's opinion that Named Plaintiffs' testimony "cannot be generalized" to the class and would intrude upon and conflict with the jury instructions for this case overstates what Dr. Hoffman actually said, and is also premature. Mot. at 13. First, Dr. Hoffman's opinion attacked the logic of generalizing users' impressions about Google's disclosures across "all of Google's users," meaning imputing Mr. Schneier's opinions to Google users who have not opted into Plaintiffs' class or who never fell within the class definition to begin with. Her opinion does not disrupt Plaintiffs' goal of ensuring that jurors adopt the Court's ruling that "Named plaintiffs' individual claims are also typical of those of the ***proposed class members***." Dkt. 352 at 6 (emphasis added). Second, Plaintiffs have not explained why jury instructions would not sufficiently cure any potential confusion. Plaintiffs have not initiated any outreach to confer over what the jury instructions in this case should be and where there might be potential disagreement. Such conferrals are consistent with this Court's pretrial procedure. *See* Guidelines for Final Pretrial Conference in Civil Jury Cases Before Chief District Judge Richard Seeborg 4(c).

**B.    Dr. Hoffman's Analysis of User Experience and Disclosures Falls Squarely Within Her Marketing and UI Expertise**

Plaintiffs contend that Dr. Hoffman "strays beyond her marketing expertise" and attempts to opine on the "technical accuracy" of Google's disclosures by "offer[ing] technical opinions" about the data Google collects and how it does so in eight paragraphs within her opening and supplemental reports. Mot. at 14. But Dr. Hoffman does not purport to offer a technical opinion and limited her opinions to "rebutting Mr. Schneier's report, which concerns his claims that Google's interface display dark patterns" based on her "expertise in how to design and how consumers react with interfaces," in addition to her expertise in marketing. *See* Hoffman Dep. Tr. at 34:4-9; 107:4-6.

Plaintiffs attack Dr. Hoffman's inability to describe things "technically" and her decision not to comment on "the technical specifications of Google's disclosures or how different aspects of Google work "under the hood" even after she explained "[t]hat was not the focus of my rebuttal." Hoffman Dep. Tr. at 35:5-9. Furthermore, none of Plaintiffs' examples demonstrate an attempt by Dr. Hoffman to opine on Google's technical processes. Nor are her opinions "based on assertions she makes about how Google's technology works and the technical details regarding where and how Google saves data." Mot. at 14. Instead, her opinions consistently reflect analyses rooted in her expertise.

For example, Plaintiffs claim that Dr. Hoffman asserts that Google's (s)WAA (i.e., a Google Account setting) disclosures are technically "accurate[]" because these disclosures "explain what WAA does," which is to "save certain activity in a user's [Google] account." Mot. at 14; Hoffman Rep. ¶ 173. However, in paragraph 173, Dr. Hoffman rebuts Mr. Schneier's opinions related to the WAA toggle and WAA help page by stating that they are "examples of user-friendly UI design" because of how they present information about the purpose of the control "accurately and in an understandable manner." *Id.* Dr. Hoffman does not need any technical expertise to state the fact that WAA is a Google Account setting, or need a technical background to opine on what those in her field would consider user-friendly design. She has the pertinent experience in consumer behavior and perception. As she testified at her deposition, "I am familiar with the literature on progressive

9

disclosure. That literature [] dates back to the '80s. I've been studying online consumer behavior and user perceptions since the mid '90s so I have my expertise in how to design and how consumers react with interfaces. But in addition, I'm aware that the WAA settings control what is saved to one's account, and I am aware that there are many other settings, many, and so I . . . have rendered an opinion that providing information on all those other settings would overwhelm users." Hoffman Dep. Tr. at 106:24-107:12.

Plaintiffs also claim that Dr. Hoffman strays from her expertise where she opines that Google's disclosures are "clear," notwithstanding the fact that her opinions are based on her expertise in consumer response to UI. *See* Hoffman Rep. ¶¶ 108, 72, 34, 35. To form these opinions, she analyzed how Google's disclosures were organized within users' Google Account settings to opine on whether Google's practices were consistent with principles of good UI design. *See* Hoffman Dep. Tr. at 101:9-20. And based on her analysis, Dr. Hoffman found that Google's disclosures followed hallmarks of good UI design, such as progressive disclosure, and concluded that they presented Google's message about the (s)WAA controls in a clear manner without overwhelming users. *See, e.g.,* Hoffman Rep., ¶¶ 47, 108, 126. Dr. Hoffman's opinions are not about the more technical concept of any data transmission that could occur as a result of WAA being on but on how the disclosures on the page when the WAA setting is turned on relate to the types of information users expect to receive in that specific context (*i.e.*, the user's Google Account Settings) and how they may process such information given the disclosure interface. *See, e.g.,* ¶ 72 (opining that Google "makes it clear that when WAA is switched off, 'new activity won't be saved to your account,'" and that Google employs good UI design such as pop-ups with details on what users can expect and hyperlinks to other terms that reflect progressive disclosures).

Plaintiffs also argue that Dr. Hoffman does not have the technical expertise necessary to opine that portions of Google CEO's congressional testimony are accurate. That is wrong. Dr. Hoffman's opinion was not about whether Mr. Pichai's statements were "technically" accurate. Mot. at 3, 14. Dr. Hoffman opined that Mr. Schneier failed to acknowledge that Mr. Pichai's comments about user choice are accurate because "Users have access to privacy control tools" and that Mr. Schneier's characterization of privacy as an all or nothing approach is contradicted by the fact that

10

Google provides users with access to various controls where they can adjust their settings to control how and what data Google collects about them." Hoffman Rep. ¶ 139 tbl. 6. There is nothing technical about these opinions, or about Mr. Pichai's statements for that matter. Dr. Hoffman's opinions do not address technical issues about user privacy controls, she merely states that they exist and opines on how consumers engage with these controls in light of how they are designed, including but not limited to how, when, and where Google discloses information about them. Given her decades of experience in online consumer behavior and consumer response to UIs, this is appropriate. *See Surgical Instrument Serv. Co., Inc.*, 2024 WL 1975456, at *2 ("Experts may offer testimony based on their knowledge and experience . . . 'The Rules Advisory Committee has explicitly recognized that 'the application of extensive experience' is a 'method' that can reliably support expert testimony.'"); *Smilovits*, 2019 WL 6875492, at *5 (finding expert employed a reliable methodology where she relied on her industry experience to form her opinion).

## C.    Dr. Black Offers Reliable Technical Rebuttal and Factual Clarification

Plaintiffs seek to exclude testimony from Google's technical expert, Dr. John Black, based on distorted readings of his opinions and inapplicable legal doctrines. Their challenges regarding his identification of Google's definition of "Google Account" and his rebuttal concerning data "interception" both fail. Dr. Black's testimony provides accurate factual information, necessary technical context, and proper rebuttal under FRCP 26 and FRE 702.

### 1.    Dr. Black Accurately Identifies Google's Public Policy Definition of "Google Account"

Plaintiffs claim Dr. Black engages in "false[] opining" by quoting Google's publicly available definition of "Google Account." They argue that this direct quote violates the law-of-the-case doctrine based on a preliminary observation in the Court's motion to dismiss Order ("MTD Order") issued several complaints ago. Mot. at 4, 17 (citing Dkt. 109 (MTD Order) at 4). This argument misrepresents Dr. Black's testimony, the Court's prior order, and the law-of-the-case doctrine itself.

---

GOOGLE LLC'S RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE [DKT 473]
Case No. 3:20-CV-04688 RS

1  First, in the challenged paragraph, Dr. Black directly quotes the definition from Google's

2  public Privacy & Terms "key terms" section, a section of the webpage that contains a list of

3  definitions of various words and phrases as they are used in the Privacy Policy:

4  > *Google Account*

5  > "You may access some of our services by signing up for a Google Account
   and providing us with some personal information (typically your name,

6  > email address, and a password). This account information is used to
   authenticate you when you access Google services . . ."

7

8  > Rebuttal Expert Report of John R. Black, Ph.D. (May 31, 2023) ("Black
   Rep."), Dkt. 473-4 ¶112 (quoting Google, *Privacy & Terms*,

9  > https://policies.google.com/privacy/key-terms?hl=en-US#toc-terms-
   account)

10

11  Identifying and quoting existing public text is not "opining," let alone "falsely." Rather, Dr.

12  Black provides this factual context to rebut Plaintiffs' expert's reliance on a self-created definition.

13  *See* Black Rep. ¶ 111. Whether Plaintiffs believe the quoted definition is sufficiently prominent or

14  clear is a matter for cross-examination and goes to the *weight* the jury may assign it, not the

15  admissibility of testimony accurately quoting the policy's language. *See S.E.C. v. Leslie*, 2010 WL

16  2991038, at *8 (Jul. 26, 2010), *see also* Dkt. 352 (finding challenges to expert's reliance on specific

17  data proxy did not warrant exclusion); *Brown v. Google, LLC*, 2022 WL 17961497, at *5 (N.D. Cal.

18  Dec. 12, 2022) ("[A]ny arguments that [an expert] based his opinions on an improper assumption

19  go to the weight, not the admissibility of the testimony.").

20  Plaintiffs' invocation of "law-of-the-case doctrine" is misplaced. The doctrine applies only

21  when an issue has been "decided explicitly or by necessary implication" on the merits. *Hydrick v.*

22  *Hunter*, 500 F.3d 978, 986 (9th Cir. 2007) (citation omitted), *vacated on other grounds*, 556 U.S.

23  1256 (2009). A ruling on a motion to dismiss, made under a plaintiff-favoring standard accepting

24  allegations as true and often on an incomplete record, is preliminary and "not binding at trial on the

25  merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see Cedar Park Assembly of God of*

26  *Kirkland, Wash. v. Kreidler*, 130 F.4th 757, 763 (9th Cir. 2025) (distinguishing MTD standard from

27  later stages requiring evidence). Such preliminary rulings merely reflect the court's discretion, not

28  a compulsion binding future proceedings. *See Southern Ry. Co. v. Clift*, 260 U.S. 316, 319 (1922)

(distinguishing law of the case, which "directs discretion," from res judicata, which "supersedes it and compels judgment"); *Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (Holmes, J.) (law of the case expresses courts' general practice, not a limit on power).

Here, the MTD Order Plaintiffs exhume simply found the materials *then* before it insufficient for dismissal *at that stage*; it did not definitively find that no definition exists *anywhere* nor preclude testimony on policy language like the "key terms" Dr. Black cites. Indeed, in denying summary judgment, the Court subsequently found that the meaning of the Google disclosures, including the meaning of the definition of "Google Account," is an open factual question for the jury. Dkt. 445 (MSJ Order) at 7-9, 12. Dr. Black's testimony quoting the policy language is necessary to assist the jury in resolving this very dispute.

The cases cited by Plaintiffs are distinguishable because they involved issues *actually decided* on the merits after extensive proceedings or explicit adoption by the court, none of which applies here. *See, e.g.*, *Addison v. La. Reg'l Landfill Co.*, 2024 WL 3757551, at *1-2, *5-7 (E.D. La. Aug. 12, 2024) (exclusion based on specific findings after bench trial); *United States v. City of New York*, 847 F. Supp. 2d 395, 412–13 (E.D.N.Y. 2012) (rejecting relitigation of methodology already explicitly adopted); *Eason v. Anoka-Hennepin E. Metro Narcotics & Violent Crimes Task Force*, 2002 WL 1739666, at *3 (D. Minn. July 22, 2002) (barring only legal conclusions contradicting law of the case, allowing factual testimony); *Neo4j, Inc. v. PureThink, LLC*, 2023 WL 7093805, at *6 (N.D. Cal. Oct. 25, 2023) (attempt to contradict ruling after appeal); *Betances v. Fischer*, 2021 WL 1534159, at *4 (S.D.N.Y. Feb. 23, 2021) (attempt to contradict affirmed summary judgment).

Plaintiffs' reliance on Dr. Hoffman's deposition testimony is similarly misplaced. *See* Mot. at 17. Dr. Hoffman, Google's marketing expert, testified she could not point to a specific page defining "Google Account." *Id.* (citing Hoffman Dep. Tr. at 272:19-25). The ability of another expert to recall the specific location of a definition within a policy during a deposition does not negate the documented existence of the definition within Google's published policies. This goes, at most, to the weight the jury might assign the definition, not the admissibility of Dr. Black's testimony identifying the actual policy language.

Finally, Plaintiffs' attempt to bar any mention of Google's definition is particularly untenable given that they themselves previously quoted this same definition and argued its interpretation was a jury question when opposing summary judgment, stating explicitly, "[i]nterpreting these disclosures is an issue for the jury." Dkt. 398 (Pls.' Opp. Summ. J.) at 6. They cannot now seek to hide this definition from the jury. Moreover, Plaintiffs' own expert, Mr. Hochman, acknowledged this definition's existence in his deposition, merely disputing its clarity, calling it "kind of squishy." Hochman Dep. Tr. 69:14-71:15). Dr. Black's testimony identifying the definition directly rebuts Mr. Hochman's position and properly sets up the quintessential "battle of the experts" over the definition's clarity and meaning for the jury to resolve. *See Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004).

### 2. Dr. Black Accurately Rebuts Plaintiffs' Unsupported "Interception" Allegations

Plaintiffs next argue that references to "interception" in one section of Dr. Black's expert report is improper rebuttal and irrelevant. Mot. at 4, 6-7, 18-19. They claim it's improper because their expert, Mr. Hochman, never used the word "interception" and irrelevant because statutory wiretap claims were dismissed.

But Dr. Black's testimony directly addresses the technical allegations underpinning Plaintiffs' surviving claims, rebuts Mr. Hochman's significant omissions concerning Plaintiffs' *own theory* of the case, is properly based on the operative complaint, and provides relevant technical clarification essential for the jury.

Plaintiffs' argument that "interception" is irrelevant ignores their own operative complaint and arguments. While statutory wiretap claims were dismissed, Plaintiffs *chose* to center the narrative of their surviving tort claims in the Fourth Amended Complaint ("4AC") around the factual allegation that Google "surreptitiously intercept[s]" user data. This term appears over sixty times in the 4AC. Critically, Plaintiffs explicitly tied their surviving CDAFA claim (Count 1) to this theory when opposing summary judgment, arguing Google lacked permission because it "intercepted and used the data itself." Dkt. 398, at 25. They similarly grounded their surviving common law tort claims (Counts 2 & 3) in allegations involving this same "interception" narrative,

1  describing the intrusion and invasion of privacy in terms of Google's alleged scheme to "track and

2  intercept" communications without authorization. *See, e.g.*, Dkt. 289 (4AC) at ¶¶ 277, 286, 293.

3  Plaintiffs now claim this central factual allegation, explicitly used to support their surviving claims,

4  is irrelevant simply because statutory claims were dismissed.

5      Given Plaintiffs' focus on "interception," Dr. Black, as a rebuttal expert, properly identifies

6  a critical gap in Plaintiffs' technical proof. Black Rep. ¶¶ 50-54. Rule 26 permits rebuttal on the

7  "same subject matter." Fed. R. Civ. P. 26(a)(2)(D)(ii). The subject matter here is the technical

8  mechanism of data collection, which Plaintiffs themselves framed as "interception," even if their

9  technical expert, Mr. Hochman, did not mention that word. Dr. Black directly addresses this subject

10  by explaining the actual technical process and highlighting Mr. Hochman's failure to provide *any*

11  evidence supporting Plaintiffs' core allegation. That is proper rebuttal.[1]

12      Furthermore, this testimony is highly relevant under Rule 702(a). Plaintiffs have made the

13  *manner* of collection central to their argument that Google's conduct was offensive, unauthorized,

14  and intrusive. If Plaintiffs intend to argue that Google nefariously "intercepted" data, Dr. Black's

15  testimony explaining the actual technical process and critiquing Mr. Hochman's failure to support

16  this theory is essential context to "help the trier of fact" understand the technical realities and

17  evaluate Plaintiffs' narrative. This contrasts with clearly irrelevant testimony excluded in other

18  cases. *See Snyder v. Bank of Am., N.A.*,2020 WL 6462400, at *2 (N.D. Cal. Nov. 3, 2020) (excluding

19  testimony irrelevant to remaining claims); *Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 2571332, at

20  *4 (N.D. Cal. June 30, 2012) (excluding testimony on dismissed claims).

21      Perhaps Plaintiffs' motion signals a retreat from their long-held "interception" theory. If

22  Plaintiffs are now willing to formally stipulate that the mechanism of data collection described as

23  "interception" in the 4AC (and rebutted by Dr. Black) is irrelevant to their surviving claims, agree

24

25  ─────────────────

[1] Plaintiffs' cited cases involving improper rebuttal are easily distinguished because they
26  concerned experts opining on truly different subject matters. *See, e.g.*, *Plumley v. Mockett*, 836 F.
Supp. 2d 1053, 1066 (C.D. Cal. 2010) (excluding rebuttal on damages when expert addressed
27  validity); *Giovacchini v. Cincinnati Ins. Co.*, 2024 WL 5077099, at *1 (N.D. Cal. Dec. 10, 2024)
(excluding rebuttal on repair costs when expert addressed coverage); *Huawei Techs., Co. v.
28  Samsung Elecs. Co.*, 340 F. Supp. 3d 934, 996 (N.D. Cal. 2018) (excluding rebuttal on Chinese
legal system when expert addressed patent issues).

to strike all such allegations and related prayers for relief, and agree not to argue it or mention it at trial, then Google will withdraw Dr. Black's opinions in paragraphs 50-54. Absent that, however, Plaintiffs' motion to preclude Dr. Black from addressing a central tenet of their case should be denied.

### D.    Dr. Knittel Provides Reliable and Relevant Economic Testimony on Unjust Enrichment Consistent With *Daubert* and Google's Proof Burdens

Plaintiffs seek to exclude portions of Dr. Christopher R. Knittel's testimony regarding unjust enrichment. Specifically, Plaintiffs challenge Dr. Knittel's opinions that Google's alleged unjust enrichment should be reduced because (1) users might have reacted minimally to more complete disclosure of Google's (s)WAA-off data practices, leading to similar revenue outcomes, and (2) Google could have generated some revenue from sWAA-off users through alternative methods not requiring the challenged GA4F data use. Mot. at 4-5, 19-22. Plaintiffs label these opinions irrelevant (due to an "improper but-for world") and speculative. Plaintiffs are mistaken. Dr. Knittel's testimony is central to calculating Google's *net* alleged unjust enrichment and fulfills Google's legal burden to present evidence rebutting Plaintiffs' inflated gross figures. His opinions are grounded in sound economic principles and relevant record evidence, meeting the *Daubert* standard and aligning with this Court's prior rulings.

#### 1.    Dr. Knittel's Analysis Properly Focuses on Net Benefit and Google's Burden

Plaintiffs' argument that Dr. Knittel relies on an "improper but-for world" fundamentally misunderstands the nature of unjust enrichment claims and ignores this Court's prior rulings. Indeed, Plaintiffs' argument on this subject turns their entire case on its head just to avoid an uncomfortable truth about their damages theories: that disclosure of an allegedly undisclosed fact does not, in 100% of cases, result in a consumer changing their behavior.

Unjust enrichment is a restitutionary remedy focused on disgorging the defendant's *net benefit* derived *specifically from the wrongful aspect* of its conduct. *See In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 601, 607 (9th Cir. 2020) (noting restitution measures the defendant's unjust gain); *Meister v. Mensinger*, 230 Cal. App. 4th 381, 399 (2014) (defendant bears burden on

16

deductions to establish net benefit). The alleged wrongful conduct is therefore at the center of this analysis; it is the axis on which unjust enrichment damages hinge.

The Court is now well aware that Plaintiffs' alleged wrong here is that Google represented that the sWAA button would do something that, in Plaintiffs' view, was false. The wrong here is **not** the collection or use of analytics data *per se*, but the failure to provide adequate disclosure and to obtain consent for it. Rebuttal Expert Report of Christopher R. Knittel, Ph.D. (May 31, 2023) ("Knittel Rep."), Dkt. 364-18 ¶¶ 11-16. The appropriate counterfactual for unjust enrichment, then, is not a world where Google does not collect the at-issue data, but a world where Google adequately discloses that it will do so. That is, Google would explain more clearly how the sWAA button is meant to work—what it does control, and what it does not control. Thus, the but-for world to analyze for unjust enrichment is not one where Google earns *zero* revenue from sWAA-off users, but rather one where experts measure what would happen with users' behavior if Google provided adequate disclosure.

Dr. Knittel is a rebuttal expert, and in that role, he points out in his report that Plaintiffs' damages expert utterly fails to consider the appropriate but-for world. Lasinski instead assumes that in the but-for world, the corrective measure is not a clearer explanation of what sWAA does and does not control, but the much more dramatic and unrealistic hypothetical where Google changes its analytics products to match Plaintiffs' preferred reading of the sWAA button. The Court did not exclude Lasinski's unrealistic but-for world analysis when Google moved to exclude it as divorced from reality, on the ground that Google and Dr. Knittel could instead attack the weight of that expert opinion. Dkt. 352 at 4-5. Now, Plaintiffs seek to preclude Dr. Knittel from doing just that. *See* Knittel Rep. ¶¶ 70-78.

Crucially, this analysis is essential for Google to meet its recognized burden on deductions. As this Court held when denying Google's motion to exclude Plaintiffs' expert Mr. Lasinski: while Mr. Lasinski was not required to consider such scenarios for Plaintiffs' *prima facie* case, "Google bears the burden of quantifying recouped profits." Dkt. 352 at 14. Judge Gonzalez Rogers similarly reaffirmed in *Brown v. Google*, that under *Meister*, the defendant bears the burden for deductions from gross unjust enrichment. 2022 WL 17961497, at *6. Dr. Knittel's analysis directly addresses

17

the burden this Court placed on Google. Excluding his testimony for performing this necessary analysis would contradict these rulings and hinder Google's ability to present its defense.

Plaintiffs rely heavily on *ICTSI Oregon*, but that case is fully distinguishable. Mot. at 4, 19-20; *see also* Knittel Rep. ¶ 70. *ICTSI* involved *compensatory damages* under the Labor Management Relations Act, where the court sought to measure the plaintiff's losses caused by the defendant's illegal labor practices. *ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*, 2022 WL 16924139, at *4, *10 (D. Or. Nov. 14, 2022). To assess those compensatory damages—aimed at restoring the plaintiff to its original position—the *ICTSI* court analyzed a hypothetical "but-for world" which "holds all other factors except one—the alleged conduct—the same in order to measure what [profits] would have been but for the alleged conduct." *Id.* at *8 (alteration in original) (internal quotation marks omitted). This approach, requiring the removal of the *entire* harmful act, was necessary there to determine the damages needed to restore the plaintiff to the position it would have occupied absent the defendant's unlawful conduct. *See id.* at *8–9. But here, the alleged harmful act was inadequate disclosure, not the data collection itself. Plaintiffs draw the wrong analogy, then, to their preferred case.

Plaintiffs' further claim that Dr. Knittel's rebuttal on this subject is "speculative." Mot. at 19-20. That is wrong for two reasons. First, Dr. Knittel can opine that Lasinski failed to measure the correct but-for world and explain from economic principles why that is; there is nothing speculative about pointing out the flaws in Lasinski's analysis. Plaintiffs, and Lasinski, bore the burden of pressing an initial measurement of damages in the but-for world. Because Lasinski failed to measure the correct but-for world, Dr. Knittel opines that no reliable measure of unjust enrichment has been offered at all. The jury could, based on this, reasonably conclude that it cannot award unjust enrichment damages because Plaintiffs failed to meet their initial burden to put forth an appropriate measure.

Second, Dr. Knittel points out various ways in which Lasinski *could have* measured the but-for world accurately, but he does not take the additional step of doing Plaintiffs' work for them. That is also appropriate given Dr. Knittel's role as a rebuttal expert. Plaintiffs are welcome to point out in cross-examination that Dr. Knittel did not take those extra steps; that is not a *Daubert* issue.

To do this part of his analysis, Dr. Knittel, an endowed professor of economics at MIT, relies on standard economic principles (like difference-in-differences analysis), grounded in record evidence and observable market data. *See* Knittel Rep. ¶¶ 70-78. For instance, Dr. Knittel evaluates data indicating that real-world sWAA opt-*in* rates are high, which suggests that users perceive value in the services tied to this setting. *Id.* ¶ 73 & Lasinski Rep., Fig. 21. And he also relies on the testimony of *the named Plaintiffs themselves*—representatives of the proposed class—which reveals that learning of the alleged misconduct did not cause them to change their behavior regarding app usage or their relationship with Google services. *Id.* ¶¶ 59-68, 73 & n.161. This is powerful, non-speculative evidence from class representatives about how users in this specific context actually react when they learn the true facts they allege were not adequately disclosed. This is not unlike a class learning that a juice was not, in fact, all natural, and measuring whether that would affect sales of that juice. *See Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 532 (N.D.Cal., 2012) (Seeborg, J.). It should be beyond question that sales of the juice would not drop to zero, and the reason for that is that some members of the class would buy the juice, anyway. *Id.* ("The proper measure of the restitution to which plaintiffs may be entitled must be based in evidence establishing the difference between the value of an AriZona Iced Tea billed as all-natural and the value of a comparable beverage not marketed or sold at a premium due to such claims."). So, too, here, just as some named plaintiffs in fact did.

This evidentiary foundation distinguishes Dr. Knittel's work from the "data-free conjecture" excluded in *California ex rel. Brown v. Safeway Inc.*, 615 F.3d 1171, 1181 n.4 (9th Cir. 2020). His use of economic reasoning applied to record facts indeed meets the same standard of reliability this Court approved when admitting Mr. Lasinski's damages model, which itself relied on extrapolations from the Screenwise program. *See* Dkt. 352, at 22. There, the Court found it sufficiently reliable because it was based on "what Google actually pays" and represented an "objective standard," despite challenges regarding its fit and assumptions. *Id.* at 22. In *Brown v. Google*, Judge Gonzalez Rodgers similarly found the $3 proxy "logical and reliable," holding that challenges went to "weight, not admissibility." 2022 WL 17961497, at *5.

Plaintiffs cannot demand Dr. Knittel's exclusion for employing standard economic analysis (using evidence Plaintiffs' own expert ignored) to address the very factors this Court deemed permissible for *their* expert to omit from his *prima facie* analysis. Plaintiffs' disagreement with Dr. Knittel's *conclusion* is for cross-examination, not exclusion. Dkt. 352 at 5 (quoting *Daubert*, 509 U.S. at 596 (1993)).

### 2.     Dr. Knittel's Opinion on Alternative Monetization is Reliably Based on Economic Principles and Market Realities

Plaintiffs attack as "speculative" Dr. Knittel's opinion that Google likely could have generated *some* advertising revenue from sWAA-off users through alternative means, even without using the challenged GA4F data. Mot. at 21-22. They grossly mischaracterize this opinion, which is perfectly appropriate rebuttal for determining *net* enrichment, and which directly addresses Google's burden to prove deductions.

In the too-cute-by-half telling of Plaintiffs' scenario two, since it is necessary to exchange data with a device to serve an ad to it, and since Plaintiffs read the sWAA button as foreclosing the exchange of data of any kind when sWAA is off, the button would, in their view, disable the serving of ads entirely—even the serving of a purely randomly selected ad.

Based on this scenario two, Mr. Lasinski offers a dubious all-or-nothing opinion that Google's relevant advertising revenue would *vanish entirely* without the specific sWAA-off conversion measurement data at issue. Expert Report of Michael Lasinski ("Lasinski Rep.") (Feb. 20, 2023), Dkt. 364-23 ¶¶75, 113. The opinion is, to put it simply, facially absurd. Dr. Knittel merely points out these serious infirmities in the assumptions Lasinski makes, based on sound economic reasoning and market analysis (that, frankly, any average person could also surmise): that a company would not simply shutter an entire arm of its business in response to being limited from using a particular kind of data, rather than make changes to its business to continue to be able to operate it. Indeed, nothing in Plaintiffs' case suggests that the serving of ads itself is illegal, and of course it is not.

Dr. Knittel applies the standard economic principle that firms have strong incentives to adapt and find alternative methods to monetize valuable assets when faced with restrictions. Knittel Rep.

¶ 79. His resulting opinion—that *some* level of alternative monetization was likely, thus necessitating a deduction from Mr. Lasinski's gross revenue figure—is supported by several concrete market realities he identifies in his report:

- The persistent, fundamental market need for advertising conversion/attribution measurement (Knittel Rep. ¶ 80).

- The likelihood advertisers would have sought or expanded use of *existing* third-party measurement alternatives (Knittel Rep. ¶ 80).

- The documented market prevalence of *non-Google* measurement tools already used by significant advertiser segments (Knittel Rep. ¶ 82 & fns 176-177).

- The existence and adoption of specific *privacy-protective advertising technologies* developed precisely to enable attribution without relying on the same type of user/device identifiers (*e.g.*, Apple's SKAdNetwork, Google's own conversion modeling technology) (Knittel Rep. ¶¶ 81, 85 & fn 170-172, 179-183).

Dr. Knittel does not offer a measurement of what that amount should be because he is a rebuttal expert, and it was not Google's burden to measure Plaintiffs' scenario two; indeed, Google's position is that damages under scenario two are zero, given Mr. Lasinski's failure to measure a meaningful number showing what would happen if Google had to serve ads by alternative means.

This type of economic analysis—projecting likely market responses based on established incentives, existing conditions, and available technological pathways—is standard and reliable. It stands in contrast to the baseless opinions excluded in cases like *Sport Dimension, Inc. v. Coleman Co.*, where an expert with no relevant experience offered designs based purely on "imagination." 820 F.3d 1316, 1323 (Fed. Cir. 2016). Dr. Knittel's opinion provides a crucial rebuttal to Mr. Lasinski's all-or-nothing assumption and is vital for the jury to assess the *net* benefit, consistent with Google's burden under *Meister. See also Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 48 (2d Cir. 1939).

Plaintiffs improperly seize on a single word—"imagine"—from deposition testimony, stripping it of context and ignoring the robust economic reasoning and concrete market evidence underlying Dr. Knittel's analysis. Mot. at 22 (citing Knittel Dep. Tr., Dkt. 331-4, 185:25-186:4). In deposition, Dr. Knittel properly acknowledged the limits of *economic* expertise to blueprint specific *engineering* solutions, but his *economic* opinion—that alternative monetization was likely

given market incentives and available technological avenues—is grounded in the established market facts cited above. Demanding an economist provide a detailed technical schematic misunderstands economic analysis and contravenes *Daubert*. And pointedly, Google's *technical* expert provides opinion on various ways that Google *already* uses synthetic data, sampling, and other methods to continue to serve ads and measure conversions without actual user data. Black Rep. ¶¶ 198-203 (describing non-Google conversion measurement solutions); ¶ 208 (discussing impacts of Apple's SKAdNetwork); ¶ 209 (explaining that Google can measure conversions through modeling). The jury can hear that testimony, too, and draw inferences from it.

Dr. Knittel's role here is primarily to critique Mr. Lasinski's flawed assumption and show, based on reliable economic reasoning and market facts, that the true net enrichment, if any, is likely lower because *some* deduction for alternatives is warranted. Disagreements over the *likelihood or extent* of alternative monetization are precisely the kinds of issues for the jury to weigh after cross-examination, consistent with this Court's prior rulings and *Daubert*. Dkt. 352 at 5 (quoting *Daubert*, 509 U.S. at 596).

## IV.    CONCLUSION

For the foregoing reasons, Google respectfully requests that Plaintiffs' Motion to Exclude Certain Opinions and Testimony of Google's Experts [Dkt 473] be denied in its entirety.


Dated: April 24, 2025                                   Respectfully submitted,

                                                        WILLKIE FARR & GALLAGHER LLP


                                                        By:    */s/ Eduardo E. Santacana*
                                                               Benedict Y. Hur
                                                               Simona Agnolucci
                                                               Eduardo E. Santacana
                                                               Argemira Flórez
                                                               Harris Mateen

                                                               *Attorneys for Defendant*
                                                               *GOOGLE LLC*