Exhibit A

WILMER CUTLER PICKERING
HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
CHRISTOPHER W. JOHNSTONE (SBN 242152)
Chris.Johnstone@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice application forthcoming*)
David.Gringer@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendants*
*Google LLC, Alphabet Inc.,*
*and XXVI Holdings Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA,
### SAN FRANCISCO DIVISION

| | |
|---|---|
| MARY KATHERINE ARCELL, et al., | Case No. 3:22-cv-02499-RFL |
| Plaintiffs, | **ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED** |
| v. | |
| GOOGLE LLC, et al., | Judge: Hon. Rita F. Lin |
| Defendants. | [N.D. Cal. Civil L.R. 3-12] |

Mere weeks after this Court significantly narrowed Plaintiffs' claims and, importantly, denied Plaintiffs leave to amend the complaint in the above-captioned action, one of Plaintiffs' lawyers withdrew from the case and promptly filed a new antitrust lawsuit in the Northern District of California against Defendants Google LLC, Alphabet Inc., and XXVI Holdings Inc. (collectively, "Google"). *See Attridge v. Google LLC, et al.*, No. 5:25-cv-02775-NW ("*Attridge*"). *Attridge*, which has been assigned to the Honorable Judge Wise, is strikingly similar to *Arcell*. The plaintiffs in both cases allege to be users of Google's general search services. The theory of exclusionary conduct in both cases is that Google entered exclusive deals with (the same) third parties to foreclose competition. The proposed relevant markets are the same: the U.S. general search services and general search text advertising markets. And of course, the defendants are also the same. The relatedness of the two cases is obvious. The only conceivable difference between the two cases is that the plaintiff in *Attridge* seeks damages on the fanciful theory—already rejected in *Arcell*—that Google would pay its users but for the default agreements. Given the overwhelming overlap between the two cases, Google respectfully moves the Court to issue an order relating *Attridge* to *Arcell*. Google has conferred with Plaintiff in the *Attridge* case, who opposes this motion.

## I.     Legal Standard

Under Civil Local Rule 3-12(a), actions are related "when: (1) The actions concern substantially the same parties, property, transaction, or event; and (2) It appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges." A party that knows or believes that an action may be related to another action that is or was pending in this District "must promptly file in the lowest numbered case an Administrative Motion to Consider Whether Cases Should be Related, pursuant to Civil L.R. 7-11." Civil L.R. 3-12(b).

## II.    *Attridge* and *Arcell* Concern Substantially The Same Parties, Transaction, or Event, And There Will Be An Unduly Burdensome Duplication of Labor And Expense Or Conflicting Results If They Are Conducted Before Different Judges

Plaintiff(s) in *Attridge* and *Arcell* are purported users of Google general search services. The defendant in both cases is Google. Both cases concern the same alleged events and

transactions: Google entered into the same "exclusionary" default agreements with certain third parties. *Compare Arcell* Third Am. Compl. ¶ 4, Exs. A-B *with Attridge* Am. Compl. ¶ 23, Exs. A-B. Both cases contend that through these agreements Google has unlawfully monopolized the general search services and general search text advertising markets, in violation of Section 2 of the Sherman Act. The cases overlap so completely that both complaints repeatedly use identical or nearly identical language and there are more than 40 identical or nearly identical paragraphs. For example, paragraph 222 of the *Arcell* Third Amended Complaint and paragraph 160 of the *Attridge* Amended Complaint both read in part:

> Google uses its general search services and general search text ads to compile End Users' searches on the web which information Google then sells to advertisers. When an End User uses Google, the End User provides personal information to Google in exchange for search results for no compensation to the End User which Google monetizes by selling the End User's information to advertisers and producing search advertising targeting the End User based on the End User's collected information. "By selling [End] Users' information, Google prevents End Users from monetizing their own data." *Brown et al. v. Google LLC*, No. 4:20- cv-3664-YGR (N.D. Cal. 2023).

Likewise, paragraph 233 of the *Arcell* Third Amended Complaint and paragraph 166 of the *Attridge* Amended Complaint are also nearly identical. Besides typographical errors in the *Attridge* version, both read in full:

> The End-user data that Google collects contains personal viewing information, which Google analyzes and associates with End-users' prior viewing histories, to create a "profile" for each End-user that enables Google to charge its advertiser-customers for targeted End-user data and enables Google to monetize End-users' data so that Google can profit from Google's ad-targeting services.

Additionally, both complaints rely heavily on the Honorable Judge Mehta's August 5, 2024 Memorandum Opinion in *United States v. Google*, No. 1:20-cv-03010 (D.D.C.), so much so that they include numerous nearly identical references. *Compare Arcell* Third Am. Compl. ¶¶ 55, 75, 117, 255 *with Attridge* Am. Compl. ¶¶ 36, 78, 108, 222.

The cases easily meet the standard for relation. *First*, *Attridge* and *Arcell* "concern substantially the same parties, property, transaction or event." Civil L.R. 3-12(a)(1). Both cases have Google users as plaintiffs, and the named plaintiffs in *Arcell* would be putative class

members in *Attridge*.   The defendants are also the same in both cases.[1]  And, as discussed, *Attridge* relies on "materially identical allegations of misconduct to those proffered by [Arcell] to support [her] theory of the case in this action."  *Zakinov v. Ripple Labs, Inc.*, No. 18-CV-06753-PJH, 2020 WL 2768966, at *2-*3 (N.D. Cal. May 28, 2020) (relating cases with similar theories of liability under the same federal and state securities laws that defendants engaged in a scheme, and made false and misleading statements, to raise money through sales of an unregistered security to retail investors).[2]

**Second**, given the substantial factual and legal overlap, it is "likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges."  Civil L.R. 3-12(a)(2).  This Court has already expended significant time (approximately three years) and effort assessing similar claims premised on a shared factual predicate.  Given the Court's familiarity with the overlapping issues in these cases, including, for instance, the dismissed theory of antitrust injury that Google's default agreements have stifled the development of search engines that compensate users for their search data, ECF No. 137 at 2, relating *Attridge* and *Arcell* would help conserve judicial resources.  *See Fin. Fusion, Inc. v. Ablaise Ltd.*, No. C-06-2451 PVT, 2006 WL 3734292, at *3-*4 (N.D. Cal. Dec. 18, 2006) (granting motion to relate where it would be "unduly burdensome duplication or labor and raise the danger of conflicting results").

Because of the significant overlap between *Arcell* and *Attridge*, and because the Court is already familiar with many of the legal and factual issues implicated in both cases, Google respectfully requests that the Court enter an order relating *Arcell* and *Attridge*.

---

[1] The Third Amended Complaint in *Arcell* was also filed against additional defendants, each of whom the Court subsequently dismissed.

[2] To be sure, the *Attridge* Amended Complaint propounds claims beyond those under Section 2 of the Sherman Act, including violations of Section 1 of the Sherman Act, *Attridge* Am. Compl. ¶¶ 262-270, violations of the California Unfair Competition Law, *id.* ¶¶ 271-273, and for unjust enrichment, *id.* ¶ 274.  But those claims, like the Section 2 Sherman Act claims, focus on the same allegedly anticompetitive conduct and effects.

**III.** ***Attridge*** **and** ***Rodriguez*** **Do Not Concern Substantially The Same Parties, Transaction, Property, or Event**

Plaintiff in *Attridge* not only opposes relation to *Arcell* but has also filed an administrative motion to consider whether *Attridge* is related to another case, *Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS (N.D. Cal.) ("*Rodriguez*"), currently pending before Chief Judge Seeborg.  Google will respond in full to Plaintiff's motion in *Rodriguez* in an opposition pursuant to Local Rule 3-12(e) but notes here that *Rodriguez* is wholly unrelated to *Attridge*. *Rodriguez* is not an antitrust case and deals with almost entirely different conduct.  Although the Fourth Amended Complaint in *Rodriguez* contains one allegation (out of 302 allegations) regarding a purported report that briefly mentions "restrictive contractual terms" requiring phone manufacturers using the Android operating system to pre-install Google's search tool, the thrust of the *Rodriguez* complaint relates to Google's "Web & App Activity" feature.  There are no other allegations in the *Rodriguez* complaint regarding Google's agreements with third parties related to general search services and general search text advertising.  Other than the fact that *Rodriguez* was also filed against Google LLC, *Rodriguez* does not "concern substantially the same parties, property, transaction or event" as *Attridge* or *Arcell*.  Civil L.R. 3-12(a)(1). The motion by the *Attridge* Plaintiff to relate *Attridge* to *Rodriguez* should be denied.


Dated: April 28, 2025        By: */s/ Sonal N. Mehta*
                             SONAL N. MEHTA (SBN 222086)
                             Sonal.Mehta@wilmerhale.com
                             CHRISTOPHER W. JOHNSTONE (SBN 242152)
                             Chris.Johnstone@wilmerhale.com
                             WILMER CUTLER PICKERING
                              HALE AND DORR LLP
                             2600 El Camino Real, Suite 400
                             Palo Alto, CA 94306
                             Telephone: (650) 858-6000

                             DAVID Z. GRINGER (*pro hac vice application forthcoming*)
                             David.Gringer@wilmerhale.com
                             WILMER CUTLER PICKERING
                              HALE AND DORR LLP
                             7 World Trade Center
                             250 Greenwich Street

New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendants Google LLC, Alphabet Inc.,
and XXVI Holdings Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of April, 2025, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

*/s/ Sonal N. Mehta*
Sonal N. Mehta

1   WILMER CUTLER PICKERING
    HALE AND DORR LLP
2   SONAL N. MEHTA (SBN 222086)
    Sonal.Mehta@wilmerhale.com
3   CHRISTOPHER W. JOHNSTONE (SBN 242152)
    Chris.Johnstone@wilmerhale.com
4   2600 El Camino Real, Suite 400
    Palo Alto, CA 94306
5   Telephone: (650) 858-6000

6

7   DAVID Z. GRINGER (*pro hac vice application forthcoming*)
    David.Gringer@wilmerhale.com
8   7 World Trade Center
    250 Greenwich Street
9   New York, NY 10007
    Telephone: (212) 230-8800
10

11  *Attorneys for Defendants*
    *Google LLC, Alphabet Inc.,*
12  *and XXVI Holdings Inc.*

13
                    **UNITED STATES DISTRICT COURT**
14                **NORTHERN DISTRICT OF CALIFORNIA,**
                        **SAN FRANCISCO DIVISION**
15

16

17  MARY KATHERINE ARCELL, *et al.*,          Case No. 3:22-cv-2499-RFL

18          Plaintiffs,                        **DECLARATION OF CHRISTOPHER W.**
                                               **JOHNSTONE IN SUPPORT OF**
19      v.                                     **ADMINISTRATIVE MOTION TO**
                                               **CONSIDER WHETHER CASES**
20  GOOGLE, INC., ALPHABET INC., and          **SHOULD BE RELATED**
    XXVI HOLDINGS INC.,
21                                             Judge: Hon. Rita F. Lin
            Defendants.
22                                             [N.D. Cal. Civil L.R. 3-12]

23

24

25

26

27

28

I, Christopher W. Johnstone, declare as follows:

1.     I am Special Counsel at Wilmer Cutler Pickering Hale and Dorr LLP.  I represent Defendants Google LLC, Alphabet Inc., and XXVI Holdings Inc. (collectively, "Google") in *Attridge v. Google*, No. 5:25-cv-02775-NW (N.D. Cal.) ("*Attridge*").

2.     On April 25, 2025, I spoke with Lingel Winters, counsel for Plaintiff in the *Attridge* action, No. 5:25-cv-02775-NW, via phone and he expressly agreed to a stipulation extending the deadline for Google to respond to the Amended Complaint to June 16, 2025 that I had emailed to him twice previously.  During that call, I informed Mr. Winters that we should have an independent discussion regarding the relation of cases on April 28, 2025.

3.     On April 28, 2025, I spoke with Mr. Winters via phone and asked whether the *Attridge* Plaintiff would stipulate to Google's instant motion.  Mr. Winters responded that the *Attridge* Plaintiff would not stipulate to Google's motion.  Mr. Winters stated that the *Attridge* Plaintiff's position was that the *Attridge* action was related to a different case pending in this District, *Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS.

4.     The Amended Complaint in *Attridge* is attached as Exhibit 1.

5.     The Fourth Amended Complaint in *Rodriguez* is attached as Exhibit 2.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of April 2025 in Palo Alto, California.

Dated: April 28, 2025                    By:     */s/ Christopher W. Johnstone*
                                                       Christopher W. Johnstone

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SIGNATURE ATTESTATION

I am the ECF User whose identification and password are being used to file the foregoing.  Pursuant to Civil Local Rule 5-1(i), I hereby attest that the other signatories have concurred in this filing.


Dated: April 28, 2025                    By:      */s/ Sonal N. Mehta*
                                                  Sonal N. Mehta

Exhibit 1

1  LAW OFFICES OF LINGEL H. WINTERS
   A Professional Corporation
2  Lingel H. Winters, Esq. (SBN 37759)
   2900 Shasta Rd.
3  Berkeley, California 94708
   Email: sawmill2@aol.com
4
   Attorneys for Plaintiff
5  And All Others Similarly Situated

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11 JAMES ATTRIDGE, in behalf of themselves    Case No:  4:25-cv-02775-DMR
   and all others similarly situated,
12                                            **FIRST AMENDED CLASS ACTION
                                              COMPLAINT FOR VIOLATIONS OF THE
                Plaintiff,                    SHERMAN ACT, THE CALIFORNIA
13                                            UNFAIR COMPETITION LAW AND FOR
        vs.                                   DISGORGEMENT OF UNJUSTLY EARNED
14                                            PROFITS-UNJUST ENRICHMENT**
   GOOGLE LLC; ALPHABET, INC.; XXVI
15 HOLDINGS INC.,                             **CLASS ACTION**

16              Defendants.                   **DEMAND FOR JURY TRIAL**

17

18

19 I.      **NATURE OF THIS ACTION**

20         1.      Plaintiff and the class of End Users of Google's general search services bring this

21 action for Google's monopolizing of and maintaining its monopoly in the general search services

22 and general search text advertising markets in the United States and for combining, conspiring and

23 agreeing with Apple, Inc. and the Android parties to maintain Google's monopoly and restrain trade

24 in those markets, sharing revenues and dividing markets with them in violation of Sections 1 and 2

25 of the Sherman Act through the use of distribution agreements with Apple, Inc. and the Android

26 parties that contain exclusionary default clauses, that impose a barrier to entry that prevents

27 Google's competition from gaining sufficient scale to compete in the markets, enabling Google to

28 extract, collect and sell End User's search data to advertisers for billions of dollars, with no

compensation to End users, preventing End users from monetizing their own data, while precluding competition and Google's competitors from providing End-users with search products that are more privacy protective and ad-free.

The plausibility of Plaintiff's allegations of Defendants' antitrust violations of monopolizing and maintaining a monopoly in violation of Section 2 of the Sherman Act is confirmed by Judge Mehta's 286-page Memorandum Opinion ("MO") in United States v. Google, 20-cv-3010, (D.D.C. Aug. 5, 2024) Dkt. No. 1033 page 4), issued after nine weeks of trial, in which the court held at page 4:

"(1) there are relevant product markets for general search services and general search text ads;

(2) Google has monopoly power in those markets;

(3) Google's distribution agreements are exclusive and have anticompetitive effects; and

(4) Google has not offered valid procompetitive justifications for those agreements. Importantly, the court also finds that Google exercised its monopoly power by charging supracompetitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits."

Plaintiff also claims violation of the UCL and Disgorgement of Unjustly Earned Profits.

## II.     JURISDICTION, VENUE, AND COMMERCE

2.     Plaintiff brings this action under sections 1 & 2 of the Sherman Act (15 U.S.C. §§ 1 & 2), section 4 of the Clayton Act (15 U.S.C. sec. 15(a)) to recover damages, treble damages, and to obtain injunctive, and equitable relief under section 16 of the Clayton Act (15 U.S.C. §26) against Defendants Google LLC, and its parent Alphabet, Inc., for violations of Sections 1 & 2 of the Sherman Act (15 U.S.C. §§ 1 & 2) arising from Google's unlawful maintenance of its monopoly and illegal conspiracy, combination, and agreements  with Apple and the Android OEMs and wireless carriers to monopolize and maintain Google's monopoly in the markets for general search services and general text advertising under which Google has entered into exclusive agreements with Apple, paying Apple billions of dollars to be the default search engine on Apple's devices, and exclusive agreements with the Android OEMs and wireless carriers (the Android parties") to protect Google's

1  monopoly, by paying the Android parties billions of dollars for Google to be the exclusive search

2  engine on their devices, restricting  distribution of rival search engines and excluding Google's

3  competition. Plaintiff' claims that Defendants violated the California Unfair Competition Law

4  ("UCL") and for Disgorgement of Unjustly Earned Profits-Unjust Enrichment are based on the

5  supplemental, ancillary jurisdiction of this Court. 28 U.S.C. §1387.

6      3.     This Court has subject matter jurisdiction over this action under Section 4 of the

7  Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

8      4.     The Court has personal jurisdiction over Google; venue is proper in this District

9  under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391 because Google

10  transacts business and is found within this District.

11                          **THE PLAINTIFF**

12      5.     Plaintiff James Attridge is a resident of Littleton, Colorado and is an End-user of

13  Google general search services and participates in the Google general search text ads market by

14  receiving such ads.

15      6.     Members of the End-user class are End-Users of Google general search services and

16  domiciled in various states, including the State of California.

17  **III.   PLAINTIFF'S CLASS ACTION ALLEGATIONS**

18      7.     Plaintiff bring this action under Federal Rule of Civil Procedure Rule 23, on behalf of

19  himself and a class defined as follows:

20
21      All End-Users, including consumers and business End Users in the United States,
        who used Google's general search services for their own end use since January 1,
22      2015 to and including the filing of this Complaint ("the Class Period"). Excluded
        from the class are Defendants, competitors of the Defendants, any co-conspirators of
23      Defendants, Defendants' predecessors, successors, parent, subsidiaries, affiliates,
        officers and directors, federal and state government entities and agencies, cities,
24      counties, and other municipalities, and any judge, justice or judicial officer presiding
        over this matter and members of their immediate family.

25      8.     The anticompetitive violations of Defendants alleged herein is common to Plaintiff

26  and the class, and has imposed, and threatens to impose, a common antitrust injury on Plaintiff and

27  the class members, including Google's extraction and collection of their data for no compensation

28  and Google's anticompetitive use of distribution default contracts to preclude competitors from

providing End-users with high quality search products that are more privacy protective and ad-free. The number of potential Plaintiff class members is so numerous that joinder is impracticable.  Online Google general search services stated on March 18, 2025:

> "Google Sites Receive 276 million Unique Monthly Visitors in the U.S. [United States]."

9.     Plaintiff, as representative of the Plaintiff class will fairly and adequately protect the interests of the class members and Plaintiff have engaged counsel experienced and competent in litigation of this type. The interests of Plaintiff are typical of with, and not antagonistic to, those of the class members.

10.     The anticompetitive conduct and effects of Defendants Google have been substantially uniform. Plaintiff's claims are typical of those of the End-user class. Except as to the amount of damages each member of the class has sustained, all other questions of law and fact are common to the class, including, but not limited to, Google's maintenance of its monopoly in the general search services and general search text ads markets and the conspiracy, combination and agreements between Google and Apple and the Android OEMs and wireless carriers to maintain Google's monopoly, through Google's exclusive distribution agreements and Google's acts of unfair competition and unjust enrichment herein alleged, and the effects of such violations.

11.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class. Among the questions of law and fact common to the class are the following:

a.     Whether the general search services and general search text ads markets are relevant product markets.

b.     Whether Google maintained a monopoly in the general search services market and /or the general search text ads markets in violation of Section 2 of the Sherman Act.

c.     Whether Google engaged in a combination, conspiracy and agreements with Apple and the Android OEMs and wireless carriers  to maintain Google's monopoly in violation of Section 2 of the Sherman Act.

d.     Whether Google engaged in a combination, conspiracy and agreements with Apple

and the Android parties to share revenue and divide markets in violation of Section 1 of the Sherman Act.

e.     All questions of law and fact relating to Defendants are common to all members of the class..

f.     Whether End-users suffer direct antitrust injury by having their valuable data extracted and collected by Google for no compensation and by Google's exclusion of competitors from providing End-users with higher-quality search products that are more privacy protective and ad-free.

g.     Whether google  violated the California Unfair Competition Law ("UCL").

h.     Whether Google engaged in Disgorgement of Unjustly Earned Profits-Unjust Enrichment

i.     Whether Class action treatment is a superior method for the fair and efficient adjudication of the controversy, as joinder is impracticable.

The separate prosecution by individual class members would create risks of inconsistency or varying adjudications respecting the validity, scope and enforceability of Defendants' combination and conspiracy to restrain trade and maintain its monopoly in the general search services and general search text ads markets and would establish incompatible standards. Since the damages suffered by class members are small in relation to the expense and burden of individual litigation, it is highly impractical for such class members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

12.     Plaintiff and other End-users of Google's search engine suffer antitrust injury  by the taking of their valuable search data for no compensation and by the preclusion of competition and competitors from providing End-users with innovation in search products that are more privacy protective and ad-free, while Google enables advertisers to use End-users' data  to target and bombard End-users with general search text ads.

## THE DEFENDANTS

13.     Google LLC ("Google") is a limited liability company organized and existing under the laws of the State of Delaware, and is headquartered in Mountain View, California. Google is

5

owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Google engages in, and its activities substantially affect, interstate trade and commerce. Google provides a range of products and services that are marketed, distributed, and offered to consumers.

14.     "Google is a subsidiary of Defendants XXVI Holdings Inc., which is a subsidiary of Defendants Alphabet Inc. a publicly traded company  incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California."

15.     Alphabet, Inc. is a publicly traded company with a net worth exceeding $1 trillion, and is incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California, and does business in the State of California and throughout the United States and is the parent company of Google whose CEO, Sundar Pichai is also the CEO of Google. As CEO of both Google and Alphabet, Pichai is the agent of both Google's general search services and Google's general text advertising. Google and Apple and the Android parties have entered into Google's distribution agreements that are exclusive and exclusionary and have anticompetitive effects, that provide for Google's search engine to be the out-of-the-box default general search engine ("GSE") on most of Apple's and the Android parties' devices. As used herein, Google includes Alphabet, Inc.

## IV. GOOGLE HAS WILLFULLY MONOPOLIZED AND MAINTAINED ITS MONOPOLIES IN THE GENERAL SEARCH SERVICES MARKET AND THE GENERAL SEARCH TEXT ADS MARKETS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

16.     Plaintiff realleges paragraphs 1 through 15 above.

17.     Google has willfully monopolized and maintained its monopolies in the general search services market and the general search text ads markets in violation of section 2 of the Sherman Act as held by Judge Mehta in his 286-page Memorandum Opinion ("MO") in *United States v. Google*, 20-cv-3010 (2020) (D.D.C. Aug. 5, 2024) Dkt. No. 1033 page 4),

18.     Google has used anticompetitive tactics to maintain and extend its monopolies in the markets for general search services and general search text advertising involving Google's general

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

search engine ("GSE") for many years.

19.     Google's general search engines are distributed to End users primarily on mobile devices (smartphones and tablets) and computers (desktops and laptops) which contain "search access points," including web browsers, (software applications for accessing information on the internet) that call on a general search engine to respond to an End user's query. Over the last ten years, internet searches on mobile devices have grown rapidly, eclipsing searches on computers and making mobile devices the most important avenue for search distribution in the United States. In FOF 59 in *United States v. Google*, Dkt. No. 1033, the court found that End-user's browsers interacted with Google's GSE through access points that were integrated into Google's general search services and general search text ads markets, stating:

> "The most efficient channel of GSE distribution is, by far, the placement as the preloaded out-of-the-box default GSE. That access point varies by device. On Apple products, it is  the integrated search bar in the Safari browser…On Android devices, it is the search widget…and the search toolbar in the Chrome browser…Google is the default GSE on all of these access points except on Edge where the default GSE is Bing." FOF 59.

20.     As Judge Mehta found: "The most efficient channel of GSE distribution is, by far, placement as the preloaded out-of-the-box default GSE." MO FOF 59. Even where End users can change the default, they rarely do. This leaves the preset default general search engine with de facto exclusivity, which is particularly true on mobile devices, where defaults are especially sticky, as found by Judge Mehta in United States v. Google, LLC, MO Finding of Fact ("FOF") Nos. 58-79, 66-70 [defaults are sticky].

21.     For years, Google has entered into exclusionary distribution agreements with Apple and the Android parties that contain default clauses that make Google's search engine exclusive that, lock up distribution channels and block rivals from providing compensation to users for their valuable search data.

22.     Google's maintenance of its monopoly includes exclusive distribution agreements among Google and Apple and Google and the Android parties which secure exclusionary  default status for Google's general search engine on their mobile devices, smartphones, tablets and desktop and laptop computers to the exclusion of Google's competitors such as DuckDuckGo and Neeva,

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR
COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

that enable Google to extract and collect End User's search data without compensation to End Users, foreclosed efficient channels of distribution and resulted in network effects that blocked their ability to gain the scale of user data that would enable them to develop search products that offer greater privacy protection or are less clogged with ads, and to sell advertising to advertisers who target End-users.

23.     Google has entered into exclusive distribution agreements with Apple, a potential competitor,  that include the Amendment To the Information Services Agreement, Exhibit A hereto, the Joint Cooperation Agreement, Exhibit B hereto, the Revenue Sharing Agreements ("RSA") and related agreements between Google and Apple, in which Google has paid Apple billions of dollars to secure exclusionary default status for Google's general search engines on Apple's devices, that have anticompetitive effects and exclude Google's competitors, to maintain Google's monopoly in general search services and general search text advertising, in violation of Section  2 of the Sherman Act.

24.     Google has also entered into exclusive distribution agreements with Android Original Equipment Manufacturers, Samsung and Motorola and wireless carriers Verizon, AT&T and T-Mobile (the "Android parties"), including the Google Mobile Revenue Share Agreement between Google LLC and Samsung Electronics Co., Ltd., attached hereto as Exhibit C for revenue share in which Google has paid Samsung significant dollars to secure exclusionary default status for Google's general search engines on their devices, that have anticompetitive effects and exclude Google's competitors, to maintain Google's monopoly in general search services and general search text advertising, in violation of Section 2 of the Sherman Act.

25.     In his MO in *United States v. Google* (2020), Judge Mehta stated in his Findings of Fact ("FOF") 379-384, that RSAs ["Revenue Share Agreements"] provide for revenue share and are exclusive agreements to the exclusion of competitors. The Google Mobile Revenue Share Agreement between Google LLC and Samsung Electronics Co., Ltd. attached hereto as Exhibit C, Attachment A of which provides that: "(a) Google will pay Company the following percentage of Qualified Net Ad Revenue with respect to the following Core Qualified Device categories and Service Access Points collectively, "Shared Net Core Ad Revenue") [% redacted]. Attachment C-1

1  provides "Search Access Points – Google provided widget and Google Search Application [to be]

2  Set pursuant to MADA." "Attachment C-2 provides: "Search Access Point - Chrome Browser – Set

3  as the default system browser intent and no disambiguation screen is ever presented to the end user

4  out-of-the-box, Chrome Browser icon is placed on the Application Dock, and Other requirements

5  pursuant to MADA."

6       26.    A key element of Google's monopolization and maintenance of its monopoly in the

7  general search services and general search text ads markets is Google' agreements to share revenue

8  from its advertisers with Apple and the Android parties. Google represented that it priced its sales of

9  end-user data to advertisers based on auction pricing as Judge Mehta found in his MO at FOF 238-

10  242. But Google fraudulently used "pricing knobs" to surreptitiously increase prices and the revenue

11  from advertisers that it shared with Apple and the Android parties and the profits thereon. Mehta

12  MO at FOF 243-267. As proof of its monopoly, "When Google made these pricing changes, Google

13  did not consider its rivals' text ad pricing." FOF 267. In 2024, Google's revenue from advertisers

14  was $350 billion and its profits were $100 billion.

15       27.    As Judge Mehta found in FOF 348 of  his MO in *United States v. Google* (2020),

16  "Google has entered into Mobile Application Distribution Agreements,  or MADAs with all Android

17  OEMs, including Motorola and Samsung, among others…The MADA is a device-by-device license

18  that allows OEMs to use Google's proprietary mobile applications developed for the Android

19  ecosystem…OEMs pay no fee for the GMS license, but Google requires OEMs to preload certain

20  applications in prominent placements."  In FOF 351 Judge Mehta found:  "Google views the MADA

21  as securing 'baseline distribution of [its] apps on Android'…Under the MADA, partner OEMs must

22  preload all 11 GMS applications onto a new device, including the Google Search Widget, Chrome,

23  YouTube, Gmail, Google Maps, Google Drive, among others…Six of these applications , including

24  the Google Search application and Chrome (which both default to Google), cannot be deleted by the

25  user…Without a MADA, an OEM cannot distribute any one of these GMS applications."

26       28.    Google and Apple and Google and the Android parties have entered into Google's

27  default distribution agreements that are exclusionary and have anticompetitive effects, that provide

28  for Google's search engine to be the out-of-the-box default general search engine ("GSE") on

Apple's and the Android parties' devices.

29.    Google's exclusionary agreements cover roughly 50 percent of all general search queries. "Another 20% of all general search queries in the United States flow through user-downloaded Chrome, which default to Google." MO FOF 62-65. Between its exclusionary contracts and owned-and-operated properties, Google effectively owns or controls search distribution channels accounting for roughly 70 percent of the general search queries in the United States. Largely as a result of Google's exclusionary agreements and anticompetitive conduct, Google in recent years has accounted for nearly 89.2 percent of all general-search-engine queries in the United States, and almost 94.9 percent of queries on mobile devices. *United States v. Google, LLC* (2020), MO Concl of Law at pp. 152-161.

30.    Google has thus foreclosed a substantial share of the general search services and general search text ads markets from competition that enables Google to extract and collect End User's search data without compensation to End Users, foreclosed efficient channels of distribution and resulted in network effects that blocked their ability to gain the scale of user data that would enable them to develop search products that offer greater privacy protection or are less clogged with ads, and enable advertisers to target and clog users with ads.

31.    Google monetizes this search monopoly in the market for general search text ads, which Google has also monopolized for many years. Google uses consumer search queries and End-user search data to sell advertising. In the United States, advertisers pay about $50 billion annually to place ads on Google's search engine results page ("SERP"). It is these search advertising monopoly revenues that Google "shares" with distributors in return for commitments to make Google's search engine exclusionary by default on their devices. These enormous payments create a strong disincentive for distributors to switch from Google. The payments also raise barriers to entry for rivals—particularly for small, innovative search companies that cannot afford to pay a multi-billion-dollar entry fee. Through these exclusionary payoffs, and the other anticompetitive conduct described below, Google has created continuous and self-reinforcing monopolies in the general search services and general text ads markets. ("The court thus concludes that Plaintiff have shown that Google's exclusive distribution agreements substantially contribute to maintaining its monopoly

10

1  in the general search text advertising market, violating Section 2 of the Sherman Act."). MO Concl.

2  of Law at pp. 258-265.

3       32.    Google's anticompetitive practices deny rivals scale to compete effectively. General

4  search services and general search text advertising require complex algorithms that are constantly

5  learning which organic results and ads best respond to user queries; the volume, variety, and velocity

6  of data accelerates the automated learning of search and search advertising algorithms. By using

7  distribution agreements to lock up scale for itself and deny it to others, Google unlawfully maintains

8  its monopolies. FOF 86-90.

9       33.    Google's grip over distribution also thwarts potential innovation. For example, one

10  company recently started a subscription-based general search engine that does not rely on

11  advertising profits derived from monetizing user information. Another, DuckDuckGo, differentiates

12  itself from Google through its privacy-protective policies. But Google's control of search access

13  points means that these new search models are denied the scale to become effective competitors with

14  access to End-users, advertisers, or data. MO Concl of Law pp. 226-234.

15       34.    Google's practices of shutting off effective distribution channels for rivals, such as

16  Google's requiring exclusive preset default status and making software undeletable are  exclusionary

17  and unlawful and violate Section 2 of the Sherman Act under long-established antitrust law. *United*

18  *States v. Microsoft*, 253 F.3d 34, 71 (D.C. Cir. 2001) ("Because Microsoft's exclusive contract with

19  Apple has a substantial effect in restricting distribution of rival browsers…reducing usage share of

20  rival browsers serves to protect Microsoft's monopoly, its deal with Apple must be regarded as

21  anticompetitive…Microsoft's exclusive deal with Apple is exclusionary, in violation of Section 2 of

22  the Sharman Act").

23       35.    The plausibility of Plaintiff' allegations of Defendants' antitrust violations of

24  monopolizing and maintaining a monopoly in violation of Section 2 of the Sherman Act is

25  confirmed by Judge Mehta's 286-page Memorandum Opinion ("MO") in United States v. Google,

26  20-cv-3010, (D.D.C. Aug. 5, 2024) Dkt. No.1033 page 4), issued after nine weeks of trial, in which

27  the court held at page 4:

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR
COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

"(1) there are relevant product markets for general search services and general search text ads; (2) Google has monopoly power in those markets; (3) Google's distribution agreements are exclusive and have anticompetitive effects; and (4) Google has not offered valid procompetitive justifications for those agreements. Importantly, the court also finds that Google exercised its monopoly power by charging supracompetitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits."

36.    Judge Mehta stated in his Conclusion to his Concl. Of Law in United States v. Google, LLC, MO Concl of Law at p. 276:

"For the foregoing reasons, the court concludes that Google has violated section 2 of the Sherman Act by maintaining its monopoly in two product markets in the United States—general search services and general text advertising –through its exclusive distribution agreements."

37.    At page 2 of his MO, Judge Mehta stated:

"But Google also has a major, largely unseen advantage over its rivals: default distribution. Most users access a general search engine through a browser (like Apple's Safari) or a search widget that comes preloaded on a mobile device. Those search access points are preset with a "default" search engine. The default is extremely valuable real estate. Because many users simply stick to searching with the default, Google receives billions of queries every day through those access points. Google derives extraordinary volumes of user data from such searches. It then uses that information to improve search quality. Google so values such data that, absent a user-initiated change, it stores 18 months-worth of a user's search history and activity.

The distribution agreements benefit Google in another important way. More users mean more advertisers, and more advertisers mean more revenues. As queries on Google have grown, so too has the amount it earns in advertising dollars. In 2014, Google booked nearly $47 billion in advertising revenue. By 2021, that number had increased more than three-fold to over $146 billion. Bing, by comparison, generated only a fraction of that amount—less than $12 billion in 2022.

For years, Google has secured default placements through distribution contracts. It has entered into such agreements with browser developers, mobile device manufacturers, and wireless carriers. These partners agree to install Google as the search engine that is delivered to the user right out of the box at key search access points.

Google pays huge sums to secure these preloaded defaults. Usually, the amount is calculated as a percentage of the advertising revenue that Google generates from queries run through the default search access points. This is known as "revenue share." In 2021, those payments totaled more than $26 billion. That is nearly four times more than all of Google's other search-specific costs combined. In exchange for revenue share, Google not only receives default placement at the key search access points, but its partners also agree not to preload any other general search engine on the device. Thus, most devices in the United States come preloaded exclusively with Google. These distribution deals have forced Google's rivals to find other ways to reach users."

38.  **End-users' Suffer Antitrust Injury And Have Standing To Sue**

39.  Google's monopoly in general search services and general search text ads enable Google to collect End-users' data for no compensation to End-users and sell and provide it to advertisers and others for billions of dollars. When End-users make queries on Google's general search services, End Users disclose their data while searching information on Google's search engine that Google extracts and collects and provides End-users' data to advertisers that enable them to bombard End-users with general search text advertisements targeted to End Users' expressed interests.

40.  End-users' data is collected by Google through Apple's Safari browser, Android And Chrome, as access points for Google's GSE, which operate as integral components of Google's GSE.

41.  In FOF 59 in *United States v. Google*, the court found that End-user's browsers interacted with Google's GSE through access points that were integrated into Google's general search services and general search text ads markets, stating:

> "The most efficient channel of GSE distribution is, by far, the placement as the preloaded out-of-the-box default GSE. That access point varies by device. On Apple products, it is the integrated search bar in the Safari browser…On Android devices, it is the search widget…and the search toolbar in the Chrome browser…Google is the default GSE on all of these access points except on Edge where the default GSE is Bing."

42.  In *United States v. Google* (2020), Judge Mehta's MO found that search access points on Safari and Mozilla browsers are incorporated in Google's GSE. ("The Apple ISA requires that Google be preloaded as the exclusive default search engine on all *Safari access points*…FOF 298… About 65% of queries on all Apple devices (mobile and desktop), and 61.8% on iOS devices (mobile) flow through the Safari default, *demonstrating that default placement is a primary channel [] for distribution of search*. FOF 296-297… Google is the default GSE on all *Firefox search access points*." (at pp. 204-205). As the primary channel for distribution of search through Safari [and Firefox] access points, the Safari [and Firefox] browsers and access points are an integral component of Google's general search engines in which search queries are entered and distributed through Google's code embedded on websites. (Emphasis supplied).

43.     In his ruling, Judge Mehta found that default search access points that provide search access to default browsers are integral to Google's GSE and incorporated in Google's general search services and general search text ads markets in which Google's exclusionary browser agreements substantially foreclose competition, are anticompetitive and violate Section 2 of the Sherman Act..

44.     In the "Ipsos Screenwise Panel, a consumer research study conducted by Google since 2012…The minimum recurring payment is $3 a month." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) at p. 20 lines 13-17 "…[A]s the court in *Brown* already noted, "The $3 rate is derived from looking at what Google *actually* pays Screenwise participants for agreeing to allow Google to collect their browsing data." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) p. 22 lines 18-20. Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

45.     Likewise, in *Brown v. Google, LLC*, 4:20-cv-3664-YGR; 2023 WL 5029899 (N.D. Cal Aug. 7, 2023), 685 F.Supp.3d 909 the court described the interaction of End-users' browsers with Google's GSE through Google code embedded on developers' websites creating an integrated search system:

> "**Data Collection**…When a user visits a website, the user's browser sends a "GET" request to the  website to retrieve it. (Id.) This GET request contains the following information: the Request URL, or the URL of the specific webpage the user is trying to access; the user's IP address; the Useragent, which identifies the user's device platform and browser; user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. (Id.) At the same time, *the user's browser reads Google's code, which is embedded on the website*. (Id.) *Google's code instructs the user's   browser to send a second and concurrent transmission directly to Google. (Id.) This second transmission tells Google exactly what a user's browser communicated to the website*. (Id.)

> Google's services are ubiquitous on the internet: over 70 percenta [sic] of websites use Google Analytics and Ad Manager. (4AC ¶¶ 67 and 78.) To use these services, ***Google requires website developers to embed Google's code onto their websites*** and agree to its Privacy Policy. (PAF 6.) *Google does not tell website developers that it tracks their visitors* even when they are in private browsing mode. (Id.)

> According to Plaintiff, Google then takes users' private browsing history and associates it with their preexisting user profiles. (PAF 47; Response to SUF 65.) Doing so allows Google to offer better, more targeted, advertisements to users.

(Response to SUF 63; 4AC ⁋84.) This is at the core of Google's business: the bulk of Google's hundreds of billions of dollars in revenue come from selling targeted advertisements to other companies. (4AC ⁋89.) By selling users' information, Google prevents users from monetizing their own data. (4AC ⁋138; PAF 27–28.) The value of this data can be quantified; for example, Google itself has piloted a program to pay users $3.00 per week to track them." (Docket No. 969, at pp. 2-3.)(Emphasis added).

46.     Thus, End-users' data is collected by Google in its general search services and general search text ads markets that incorporate the access points in Apple's Safari browser, and the Android and Chrome browsers for Google's GSE through which queries are entered and distributed through Google's code embedded on websites. Thus, when the End-user's browser reads Google's code embedded on the website, it operates as an extension of Google's general search engine in the general search services and general search text ad markets.

47.     End-users are also directly injured because Google's anticompetitive use of distribution agreements that contain default provisions that exclude competitors have precluded competitors from providing End-users with higher-quality search products that are more privacy protective and ad-free.

48.     Google uses its general search services to compile End Users' data, including searches on the web, which End User data Google sells and provides to advertisers and others. When an End User uses Google, the End User provides data, including personal information to Google in exchange for search results, for no compensation to the End User, which End-user data Google monetizes by selling or providing to advertisers and others, producing search advertising targeting End Users with masses of text advertising based on the End User's data collected by Google. "By selling [End] Users' information, Google prevents End Users from monetizing their own data." *Brown et al. v. Google LLC*, No. 4:20-cv-3664-YGR (N.D. Cal. 2023).

49.     In *Brown*, the Court under "Damages or Loss" at page 33 of its opinion further stated:

"Second, Google argues Plaintiff suffered no "damage or loss by reason of a [CDAFA] violation." Cal. Pen. Code § 502(e)(1). Plaintiff disagree and offer evidence showing that they have a stake in the value of their misappropriated data. *Facebook Tracking*, [In re *Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (citing *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3rd Cir. 2019) (cleaned up))]is instructive. In Facebook Tracking, the Ninth Circuit found that Plaintiff had sufficiently alleged their browsing histories carried financial value. Id. at 600. So too here. Plaintiff have evidence that there is a market for their data—Google itself has piloted a program where it pays users $3.00 a

day for their browsing history. (PAF 28.) Google responds that Facebook Tracking does not apply because it was a decision about standing, not liability. That is beside the point. The Ninth Circuit's decision stands for the proposition that Plaintiff can state an economic injury for their misappropriated data. Because Plaintiff proffer evidence that there is a market for their data—one Google itself has created—the Court cannot rule, as a matter of law, that Plaintiff suffered no damages . . ." (Docket No. 969, at p. 33

50.     Google uses its monopoly power to extract and collect End-users' data during their use of Google search. As described by the Court in *Brown v. Google LLC*, Plaintiff and the class of End-users herein, have suffered injury having their valuable search data extracted and collected by Google for no compensation and resold to advertisers and others for billions of dollars. Google induces End-users to use its search engine, which is protected by Google's monopoly and default distribution agreements, and when End-users use Google's search engine, Google extracts and collects the End-user's valuable search data for no compensation to the End-user. Google then monetizes the End-user's search data by selling it to advertisers and others for billions of dollars in revenue. Google's monetization of Plaintiff' data by selling it to advertisers establishes its value and, as held in *Brown v Google LLC*, Google's extraction of End-users' data for no compensation results in a direct injury to End-users. Plaintiff are injured because Google uses its monopoly power to extract and collect Plaintiff's and the class of End-users' personal data during their use of Google search.

51.     Plaintiff' injury is both particularized and concrete—particularized with respect to the End-user's specific data that is extracted for no compensation—and concrete with respect to the monetized value in billions that Google obtains by re-selling the End-users' data to advertisers and others. As further injury, Plaintiff and other End-users of Google's search engine are not only injured by the taking of their valuable search data for no compensation but Google has also harmed End-users by reducing the quality of the general search experience, by lessening choices, and by impeding privacy and innovation.

52.     End-users are also directly injured by Google's anticompetitive use of distribution agreements that contain default provisions that exclude competitors have and precluded competitors from providing End-users with higher-quality search products that are more privacy protective and ad-free and injured by being bombarded by advertisers' text ads enabled by Google.

16

53. Google's exclusive default distribution agreements stifle more privacy protected and ad-free innovation by competitors.

In *United States v. Google LLC* (2020), No. 20-CV-3010 (APM) Dkt. No. 1033, 2024 WL 3647498 (D.D.C. 2024) Aug. 5, 2024, the Google court found that Google's exclusive default distribution agreements with Apple and others prevented Google competitors such as Neeva and Duck Duck Go from providing End-users high quality search products that were more privacy protected and ad-free. In *United States, v. Google LLC* in its MO, the court (the "*Google* court") also concluded that Google's default agreements with Apple and others foreclosed efficient channels of distribution and resulted in network effects that made it difficult for competitors to gain the volume of users and user data that would allow the development of high-quality search products at \*79, \*109, \*111-14. The *Google* court stated in its MO at:

> FOF "76. Neeva exemplifies the importance of search distribution through a readily accessible channel. Neeva secured the capital and human resources needed to build a search engine. Tr. at 3671:4-3672:13 (Ramaswamy). Although it initially syndicated search results from Bing; it eventually crawled the web, built an index, and developed a ranking model, which relied heavily on artificial intelligence technology, to generate its own search results for about 60% of its queries. *Id*. at 3775:9—3776:21, 3739:14-16 (Ramaswamy). But Neeva was unable "to be even a default provider on things like the major browsers or operating system," which "was what made [its founders] conclude that it was hard to have Neeva consumer search as a viable business. *Id*.at 3701:1-7 (Ramaswamy). The reason "why Neeva failed …was simply because [it] could not get enough users to be in that state where they regularly used Neeva." *Id*. at 3712:10-12 (Ramaswamy); *id*. 3677:2-3, 3700:25-3701:7 (Ramaswamy) (testing that more users on Neeva would result in greater revenues through subscription fees); *id*. at 3724:18-21 (Ramaswamy) ("[I]f a well-funded and exceptionally talented team like Neeva could not even be a provider on most of the browsers, I don't see that as the market working.").

54. The court further found that Neeva, as a competitor to Google sought to create a subscription-based model for search that did not serve ads, but due to Google's exclusive default contracts, due to its inability to develop enough of a user base to have sufficient user data, it was driven out of the search market. Likewise, the court found that Duck Duck Go ("DDG"), another competitor of Google's, cannot compete effectively because of Google's exclusionary default search agreements and the lack of access to sufficient user data, at Google court at MO pp. 162-163.

The *Google* court found: "As a result, DDG and Neeva are the only two notable market entrants in the last 15 years. Each attempted to innovate—DDG on privacy and Neeva through a

subscription-based model—but found only limited success (DDG) or left the market altogether (Neeva)." *Google* court at MO pp. 162-163. FOF paras. 14, 25, 76.

55.    As the *Google* court found in FOF 74 of its MO:

"A GSE's placement as the default thus drives search volume through that access point. Tr. at 3689: 21-24 (Ramaswamy) (testifying that "the convenience of easy accessability and tapping into …engrained default behaviors are the deciding factors when it comes to whether a search engine gets lots of usage"); id. at 7674:6-7675:21 (Pichai) ("[B]ecause you're taking existing users, and by giving them more convenient access points, you're making them search more…Done correctly, and if you're putting a product out in front of users which users like and want to use, yes, defaults can make a difference.").  In 2017, over 60% of all queries entered on Google flowed through defaults. UPX83 at 967; see id. (60% of iOS queries were through the Safari [Apple] default, and 80% of Android queries were through defaults secured by the distribution deals…

"Google recognizes that securing the default placement is extremely valuable for monetizing search queries." FOF 75

56.    At page 237 of its MO Conclusions of Law, the *Google* court stated:

"The foreclosure of efficient channels of distribution has contributed significantly to the lack of new investment. Neeva is a case in point.  It could not gain a foothold in the market in part because it was relegated to a less efficient means of distribution, such as an alternative default GSE [general search engine] on any mobile device. FOF 76. Ultimately, Neeva's inability to retain and attract users—and thus acquire scale— was a primary reason for its withdrawal from the market. Id. The loss of nascent competitors is a clear anticompetitive effect.  See AREEDA para. 1802d5 (observing that exclusive  dealing arrangements that deny smaller firms access to retailers may 'impair their ability to expand, thus becoming more effective competitors with the dominant firm. Indeed, the smaller [firms] may decline and even be forced to exit the market.')."

57.    At MO p. 162 the *Google* court stated:

"The tales of DDG and Neeva illustrate *Rebel Oil*'s point. Both entered the market notwithstanding Google's dominance, but neither has "taken significant business from Google and they therefore have not posed any meaningful threat to its "market power." DDG though in operation since 2008, has barely reached a 2% market share. FOF 25; *Surescipts*, 665 Supp. 3d at 46-47 ("[T]he ability on one competitor to capture [a relatively minor percentage of the market does not undermine [the dominant firm's] durable monopoly power protected and perpetuated by barriers to entry."]. As for Neeva,it entered and exited within four years. FOF 14…The lack of access to efficient channels of distribution diminished Neeva's ability to grow its user base and significantly contributed to its demise."

58.    At MO page 200 the *Google* court stated:

"Google has no true competitor. Consider that Google's monopoly in general search has been remarkably durable. Its market share in 2009 was nearly 80%, and it has increased since then to nearly 90% by 2020. FOF 23. Bing during that same period, has never held a market share above 11%, and today holds less than 2.5% of the market. Id. Thus over the last decade, Google's grip on the market has only grown stronger...

"Moreover, there have been only two new market entrants of note in the last 15 years—DDG and Neeva. One of them is no longer in business(Neeva) , and the other has achieved a market share of 2.1% (as of 2020) after more than a decade in business. If there is genuine competition in the market for general search, it has not manifested in familiar ways, such as fluid market shares, lost business or new entrants."

59.   Thus, Neeva and Duck Duck Go, competitors of Google, who offered better privacy or ad-free alternatives to Google were unable to offer the same high quality of search to End-users, as Google, due to their lack of access to a large volume of user data and scale due to Google's anticompetitive use of exclusionary default agreements.

60.   As a result of Google's use of anticompetitive exclusionary default agreements with Apple and others that foreclosed DDG's and Neeva's access to the large volume of user data needed to offer the same high quality of search to End-users as Google, Plaintiff and End-users have been injured by being deprived of the better quality privacy and ad-free searches from Google's competitors, DDG and Neeva, which those companies offered.

61.   At MO page 222, the *Google* court stated:

"The court finds that as to the general search services market Plaintiff has proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume."

62.   At MO page 226-227, the *Google* court stated::

"Naturally then, GSE distributors prefer Google because of its search quality and because it would be economically irrational to sacrifice the high revenue share. They thus routinely renew the distribution deals with their exclusive terms. In this feedback loop, the revenue share payments" effectively make the ecosystem exceptionally resistan[t] to change" and basically freeze the ecosystem in place[.]" Tr at 3937:24-3798:21 (Ramaswamy); see id at 3513:1-3 (Nadella) ("[T]his vicious cycle that [Microsoft is]  trapped in can become even more vicious because the defaults get reinforced." That is the          antithesis of a competitive market."

At MO page 230 "Armed with its scale advantage, Google continues to use that data to  improve search quality...Scale also improves search ads monetization."

63.   At MO page 234 the *Google* court stated:

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

1    "No current rival or nascent competitor can hope to compete against Google in the
     wider marketplace without access to meaningful scale, especially on mobile. The
2    exclusive distribution agreements have substantially contributed to these
     anticompetitive market conditions."
3
     64.    At MO page 236, the *Google* court found:
4

5    "*The Exclusive Agreements Have Reduced Incentives To Invest and Innovate*. The
     distribution agreements have caused a third key anticompetitive effect: they have
6    reduced the incentive to invest and innovate in search.

7    65.    Scale is a significant barrier to entry. Scale affects a general search engine's ability to

8    deliver a quality search experience and since advertisers pay more to buy ads from a search provider

9    with a large audience of searched customers, targeted as potentially in the advertiser's product or

10   service, the Google, Apple, Android parties' conspiracy, combination and agreements effectively

11   eliminate Google's competitors' ability to build the scale necessary to compete in the general search

12   services and general search text ads markets. By April 2018, Google estimated that its share of the

13   general search services and general search text ad markets was 79 percent on computers and 93.5

14   percent on mobile devices. More recently, Google has accounted for almost 90 percent of all general

15   search engine inquiries in the United States, and almost 95 percent of inquiries on mobile devices.

16   66.    Google obtained dominant audience scale by being the exclusive general search

17   engine preset default on Apple's devices and the Android devices since, as Judge Mehta found  users

18   typically do not change their devices preset default search functions. FOF 65-75. Google's scale is

19   critical to generating the general search services and general search advertising revenues and profits

20   it shares with Apple since advertisers pay more to buy ads from a search provider with a large

21   audience of searched customers. In concert with Apple, Google can deliver the largest search

22   audiences, especially in mobile, from which Google's competitors are foreclosed by the Google-

23   Apple combination.

24   67.    Google's large and durable market shares with the significant barriers to entry in

25   general search services and general search text ads demonstrate the effectiveness of Google's

26   maintenance of its monopolies through its default distribution agreements with Apple and the

27   Android parties in those markets in the United States.

28   68.    **Relevant Markets**

                                        20

69. **General Search Services**. The general search services market is a relevant market that consists of general search engines that End Users can use to search the internet for answers to a wide range of queries. Google has an 89.2% share of and monopoly power in the general search services market that is fortified by barriers to entry, including (1) high capital costs, (2) Google's control of key distribution channels (3) brand recognition, and (4) scale, "The Court finds that these barriers exist and that, both individually and collectively, they are significant barriers to entry." As stated by Judge Mehta in his MO at pp. 156-157. See pp. 151-165.

70. **General Search Text Ads**. The general search text ads market is a relevant market that includes all text advertisements in connection with a general search query. Google had an 88% market share of the general search text ads market in 2020 and monopoly power in the general search text ads market, protected by high barriers to entry as stated by Judge Mehta's MO at p. 185.

71. There are currently only four meaningful general search providers in the general search services market: Google, Bing, Yahoo!, and DuckDuckGo. According to public data sources, Google today dominates the general search services and general search text ad markets with approximately 87% percent market shares, followed far behind in general search services by Bing with about seven percent (7%), Yahoo! with less than four percent (less than 4%), and DuckDuckGo with less than two percent (less than 2%). MO p. 200.

72. Judge Mehta's findings and holdings that "(1) there are relevant product markets for general search services and general search text ads; (2) Google has monopoly power in those markets; (3) Google's distribution agreements are exclusive and have anticompetitive effects; and (4) Google has not offered valid procompetitive justifications for those agreements. Importantly, the court also finds that Google exercised its monopoly power by charging supracompetitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits," are prima facie evidence herein.

73. Under Section 5(a) of the Clayton Act (15 U.S.C. sec. 16(a)) a final judgment or decree in a government action is prima facie evidence of the facts directly determined in the case. 15 U.S.C. sec. 16(a). *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 542-43, 74 S. Ct. 257, 260,98 L. Ed. 273 (1954) 15 U.S.C. sec. 16(a) provides:

"A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a Defendants has violated said laws shall be prima facie evidence against such Defendants in any action or proceeding brought by any other party against such Defendants under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto; Provided, that this section shall not apply to consent judgments or decrees entered before any testimony has been taken. Nothing contained in this section shall be construed to impose any limitation on the application of collateral estoppel...."

In *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568, 71 S. Ct. 408, 95 L.Ed.2d 534 (1951), the U.S. Supreme Court stated:

"By its terms, however, § 5 makes a prior final judgment or decree in favor of the United States available to a private suitor as prima facie evidence of 'all matters respecting which' the judgment 'would be an estoppel' between the defendants and the United States. We think that Congress intended to confer, subject only to a defendant's enjoyment of its day in court against a new party, as large an advantage as the estoppel doctrine would afford had the Government brought suit."

74. **Plausability And Plus Factors**

The plausibility of Plaintiff's allegations of Defendants' antitrust violations is confirmed by Judge Mehta's Opinion in *United States v. Google LLC*. In United States v. Google, 20-cv-3010, (D.D.C. Aug.5, 2024 Dkt. No.1033), Judge Mehta issued his Memorandum Opinion after nine weeks of trial in which the court held that:

(1)     there are relevant product markets for general search services and general search text ads;

(2)     Google has monopoly power in those markets;

(3)     Google's distribution agreements are exclusive and have anticompetitive effects; and

(4)     Google has not offered valid procompetitive justifications for those agreements.

Importantly, the court also finds that Google exercised its monopoly power by charging supracompetitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits."

Judge Mehta further stated in his Conclusion on MO page 276:

"For the forgoing reasons, the court concludes that Google has violated section 2 of the Sherman Act by maintaining its monopoly in two product markets in the United States—general search services and general text advertising–through its exclusive distribution agreements."

Plausability of the allegations herein is further enhanced by the jury verdict in *In Re Google Play Store Litigation*, MDL Case No. 21-md-02981-JD, Member Case No. 20-cv-05671-JD, Dkt. No. 866, in which the jury found in response to Question No. 3 that "…Google willfully acquired or maintained monopoly power by engaging in anticompetitive conduct…"

In his Opinion Judge Mehta cited *United States v. Microsoft*, 253 F.3d 34, 71-74 (D.C. Cir. 2001 en banc). In *Microsoft*, Microsoft found to have monopoly power, also employed exclusionary agreements with Apple to make Microsoft's Internet Explorer browser the default browser on MacOffice to the exclusion of competing browsers such as the Netscape Navigator browser. In *Microsoft*, the D.C. Circuit held:

> "Because Microsoft's exclusive agreement with Apple has a substantial effect in restricting distribution of rival browsers and because…reducing usage share of rival browsers serves to protect Microsoft's monopoly, it's deal with Apple must be regarded as anticompetitive…in violation of sec. 2 of the Sherman Act." (253. F.3d at 73-74).

Thus, the *Microsoft* case that held that Apple's exclusionary agreements with Microsoft to the exclusion of competitors was an antitrust violation is a plus factor that lends plausibility to Plaintiff's allegations that Apple's exclusionary agreements with Google that exclude competitors constitute plausible antitrust violations. Apple's additional plus factor is that it was found to have engaged in a per se price-fixing conspiracy with book publishers in violation of section 1 of the Sherman Act in *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015).

## ANTICOMPETITIVE CONDUCT

75.     Google has unlawfully conspired, combined and agreed with Apple, a potential competitor, in restraint of trade and to monopolize to share revenue with Apple and to divide the markets for general search services and general search advertising with Apple by paying Apple billions of dollars annually to provide Google with exclusive access as the default search engine provider on Apple's devices coupled with a right of first refusal in Google as to ads or paid listings on Apple's search technologies, Siri and Spotlight, per Section 2 of the Amendment To the Information Services Agreement. Google's exclusionary contracts cover almost 60 percent of U.S. search inquiries, and almost half the remaining searches are processed through properties operated

directly by Google. As a result, the large majority of searches are covered by Google's exclusionary

contracts and properties, depriving competitors of the ability to compete by denying its them access

to the scale necessary to compete with Google. By depriving competitors of scale and distribution,

Google and Apple and Google and the Android parties have deprived competitors of the ability to

compete and innovate and injured Plaintiff and the class by collecting their personal search data

without compensation while re-selling it to advertisers for billions of dollars who target and bombard

End-users with text ads in the general search text ads market. By depriving competitors of scale and

distribution, Google, Apple and the Android parties have precluded competitors from providing End-

users with innovation in higher-quality search products that are more privacy protective and ad-free.

76.     By foreclosing competition from competitors, Google and Apple harm competition

and harm End Users by collecting their search data without compensation while selling End Users'

search data to advertisers for billions of dollars annually.

## **ANTICOMPETITIVE EFFECTS**

77.     In its MO, the court in *United States v. Google* (2020) stated at page 216-222:

> "The key question then is this: Do Google's exclusive distribution contracts
> reasonably appear capable of significantly contributing to maintaining Google's
> monopoly power in the general search services market?  The answer is "yes."
> Google's distribution agreements are exclusionary contracts that violate Section 2
> because they ensure that half of all GSE users in the United States will receive
> Google as the preloaded default on all Apple and Android devices, as well as cause
> additional anticompetitive harm. The agreements "clearly have a significant effect in
> preserving [Google's] monopoly." *Microsoft* at 71.

78.     Moreover, Judge Mehta held that Microsoft's exclusive browser contracts that were

held to violate Section 2 of the Sherman Act in *United States v. Microsoft*, 253. F.3d 34, 67-71 (D.

C. Circuit 2001) was authority for finding that Google's browser agreements in the search markets

violated Section 2 of the Sherman Act, stating:

> "Google's browser agreements [with Apple and Mozilla] are exclusive insofar as they
> establish Google as the out-of-the-box default search engine," (at MO p. 204) and
> "Google's default placements on Firefox [access points] generate 80% of Mozilla's
> overall operating revenue, demonstrating that the vast majority of query volume on
> Firefox goes through defaults" FOF 335, in violation of Section 2 of the Sherman Act
> (at p. 205).

The agreements have three primary anticompetitive effects: (1) market foreclosure, (2)

preventing rivals from achieving scale, and (3) diminishing incentives of rivals to invest and innovate in general search…"

    1.      *The Exclusive Agreements Foreclose A Substantial Share of the Market*…

…Aggregating the foreclosure effects of the [Apple and Mozilla ] browser agreements is an appropriate way to understand the overall effect of Google's exclusive dealing in the relevant markets…" MO p. 216-217

"The court thus finds that as to the general search services market, Plaintiff have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume. MO p. 222.  The 50% figure meets the [significant] threshold.

    2.      "*The Exclusive Agreements Have Deprived Rivals of Scale*, MO p. 226.

Google's exclusive agreements have a second important anticompetitive effect: They deny rivals access to user queries, or scale, needed to effectively compete.  Scale is the essential raw material for building, improving and sustaining GSE [General Search Engines]. FOF paras. 86-106. For more than a decade, the challenged distribution agreements have given Google access to scale that its rivals cannot match FOF 87-89.  Google has used that scale to improve its search product and ad monetization. FOF90-94, 103-105. Meanwhile, without access to scale, other GSEs have remained at a persistent competitive disadvantage, and new entrants cannot hope to achieve a scale that would allow them to compete with Google. FOF 76, 87-89, 106." MO at p. 226.

    a.      "The Power of Defaults, MO p. 227

Numbers help explain the power of the search default setting. Half of all GSE queries in the United States are initiated through the default search access points covered by the distribution agreements…An additional 20% of all searches nationwide are derived from user-downloaded Chrome, a market reality that compounds the effect of the default search agreements. FOF 63. That means only 30% of all GSE queries in the United States come through a

search access point that is not preloaded with Google.  Additionally, default placements drive significant traffic to Google. Over 65% of searches on Apple devices go through the Safari default. FOF 296.  On Android, 80% of all queries flow through a search access point that defaults to Google." FOF 74.

"All of this makes defaults extremely valuable.  In 2021, Google spent $26.3 billion in traffic acquisition costs—the revenue share paid to its partners—which is four times more than the company's other search-related costs combined, including research and development." FOF para 289… MO pp. 227-228.

b.    "The Impact of Scale…, MO pp. 230-234

The sheer magnitude of Google's query volume, or scale, compared to rivals is startling: Users enter nine times more queries on Google than on all rivals combined. On mobile devices, that multiplier balloons to 19 times. FOF 87… This wealth of data gives Google greater insight into search behavior in part because it simply sees more queries than other GSEs See e.g. FOF 89…The more precisely targeted an ad, the greater likelihood that it will be clicked, which translates into higher revenues that Google uses to make larger revenue share payments. The market for GSEs is thus characterized by a type of network effect. Cf. *Microsoft* 253 F.3d at 49 (discussing network effects). (1) More user data allows a GSE to improve search quality, (2) better search quality attracts more users and improves monetization, (3) more users  and better monetization attract more advertisers, (4) more advertisers mean higher ad revenue, (5) more ad revenue enables a GSE to expend more resources on traffic acquisition  costs (i.e., revenue-share payments) and investments, which enable the continued acquisition of scale…There is a reason that Google still retains 18-months of a user's data.  It is still highly valuable to Google. Google's massive scale advantage thus is a key reason why Google is effectively the only genuine choice as a default GSE. MO pp.230-234.

26

"That barrier is reinforced by the size of Google's revenue share payments… The end result here is not dissimilar from the Microsoft court's conclusion as to the browser market. Just as the agreements in that case "help[ed] keep usage of Navigator below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly," Google's distribution agreements have constrained the query volumes of its rivals, thereby inoculating Google against any genuine competitive threat. *Microsoft* 252 F.3d at 71…No current rival or nascent competitor can hope to compete against Google in the wider marketplace without access to meaningful scale, especially on mobile. The exclusive distribution agreements have substantially contributed to these anticompetitive market conditions."

3. "*The Exclusive Agreements Have Reduced Incentives to Invest and Innovate*
The distribution agreements have caused a third key anticompetitive effect: They have reduced the incentive to invest and innovate in search…The foreclosure of efficient channels of distribution has contributed significantly to the lack of new investment." MO 236-237.

79. Google and Apple and the Android parties, OEM Samsung and the wireless carriers Verizon, AT &T and T-Mobil (the "Android parties") have monopolized and maintained Google's monopoly in a substantial share of general search services and general search ads text markets and injured Plaintiff and the class and harmed competition by:

a. By foreclosing competitors and competition from a substantial share of the general search services and general search text ad markets, by sharing Google's general search services and general search text ad revenues with Apple by paying Apple billions of dollars in return for Apple's agreement to grant Google's search engine exclusive out-of-the-box default status on Apple devices, Google and Apple have monopolized and maintained Google's monopoly in a substantial share of those markets and foreclosed competition and competitors from a substantial share of those markets resulting in Google collecting End Users' private search data without

27

compensation while reselling it to advertisers for billions of dollars annually and precluding competitors from providing End-users with high quality search products that are more privacy protected and ad-free while enabling advertisers to target and bombard End-users with text ads in the general search text ads market.

b. By foreclosing competitors and competition in the general search services and general search text ads markets, by sharing Google's general search services and general search advertising revenues with the Android parties, by paying the Android parties billions of dollars in return for their agreement to grant Google exclusive out-of-the-box default status on their devices, Google and the Android parties have engaged in and unlawfully monopolized and maintained Google's monopoly in a substantial share of those markets and foreclosed competition and competitors from a substantial share of those markets resulting in Google collecting End Users' private search data without compensation and reselling it to advertisers for billions of dollars annually while precluding competitors from providing End-users with high quality search products that are more privacy protected and ad-free while enabling advertisers to target and bombard End-users with text ads in the general search text ads market.

c. By foreclosing competitors and competition in the general search services and general search text ad markets, by sharing Google's general search services and general search text ad revenues with Apple by paying Apple billions of dollars in return for Apple's agreement to grant Google exclusive out-of-the-box default status on Apple devices, Google and Apple have monopolized and maintained Google's monopoly in a substantial share of those markets and substantially foreclosed competition and competitors from those markets resulting in Google collecting End Users' private search data without compensation while reselling it to advertisers for billions of dollars annually and precluding competitors from providing End-users with high quality search products that are more privacy protected and ad-free while enabling advertisers to target and bombard End-users with text ads in the general search text

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

ads market.

80.     In his Memorandum and Opinion, Judge Mehta held that Google's default distribution agreements with Apple and the Android parties raise substantial barriers to entry for Google's competitors in the general search services and general search text ad markets and has substantially foreclosed competition and competitors from competing with Google in those markets. The Google–Apple-Android agreements substantially foreclose Google's general search services and general search text ad competitors from a substantial share of the general search services and general search text ad markets.

81.     Google obtained dominant audience scale by being the exclusive general search engine preset default on Apple's devices and the Android devices since, as Judge Mehta found in his MO, users typically do not change their devices preset default search functions. FOF 65-75. Google's scale is critical to generating the general search services and general search advertising revenues and profits it shares with Apple since advertisers pay more to buy ads from a search provider with a large audience of searched customers. In concert with Apple, Google can deliver the largest search audiences, especially in mobile, from which Google's competitors are foreclosed by the Google-Apple combination.

82.     There are currently only four meaningful general search providers in the general search services market: Google, Bing, Yahoo!, and DuckDuckGo. According to public data sources, Google today dominates the general search services and general search text ad markets with approximately 87% percent market shares, followed far behind in general search services by Bing with about seven percent (7%), Yahoo! with less than four percent (less than 4%), and DuckDuckGo with less than two percent (less than 2%).  MO p. 200

83.     Scale is a significant barrier to entry. Scale affects a general search engine's ability to deliver a quality search experience and since advertisers pay more to buy ads from a search provider with a large audience of searched customers, targeted as potentially in the advertiser's product or service, the Google-Apple conspiracy, combination and agreements effectively eliminate Google's competitors' ability to build the scale necessary to compete in the general search services and general search text ads markets. By April 2018, Google estimated that its share of the general search

services and general search text ad markets was 79 percent on computers and 93.5 percent on mobile devices. More recently, Google has accounted for almost 90 percent of all general search engine inquiries in the United States, and almost 95 percent of inquiries on mobile devices.

84. Google's large and durable market shares with the significant barriers to entry in general search services and general search text ads demonstrate the effectiveness of Google's maintenance of its monopolies through its default distribution agreements with Apple and the Android parties in those markets in the United States.

85. Google has willfully acquired and maintained a monopoly in a substantial share of the general search services and the general search text advertising markets in violation of Section 2 Of the Sherman Act, through exclusionary distribution agreements that contain default provisions that exclude Google's competitors resulting in harm to competition and End-users by precluding competitors from providing End-users with higher-quality search products that are more privacy protective and ad-free and by enabling Google to extract and collect End-users' valuable data, for no compensation, transfer it to advertisers who use it to target and bombard End-users with general search text ads in the general search text ads market.

V. **GOOGLE AND APPLE AND GOOGLE AND THE ANDROID PARTIES HAVE ENTERED INTO CONSPIRACY, COMBINATIONS AND AGREEMENTS TO MAINTAIN GOOGLE'S MONOPOLY IN THE GENERAL SEARCH SERVICES AND THE GENERAL SEARCH TEXT ADVERTISING MARKETS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT**

86. Plaintiff realleges paragraphs 1 through 85 above.

87. Google and Apple have entered into conspiracy, combinations and default distribution agreements that are exclusionary and anticompetitive to maintain Google's monopoly in the general search services and general text advertising markets in violation of Section 2 of the Sherman Act, in which Google has paid Apple billions of dollars pursuant to the Amendment To the Information Services Agreement, Exhibit A hereto, the Joint Cooperation Agreement, Exhibit B hereto, the Revenue Sharing Agreements ("RSA") and related agreements between Google and Apple, in which Google has paid Apple billions of dollars to secure exclusionary default status for

30

1 Google's general search engines on Apple's devices and exclude competition.

2   88. Google entered into exclusive distribution agreements with Android Original

3 Equipment Manufacturers, Samsung and Motorola and wireless carriers Verizon, AT&T and T-

4 Mobile (the "Android parties") for revenue share. For example, the Google Mobile Revenue Share

5 Agreement between Google LLC and Samsung Electronics Co., Ltd. is attached hereto as Exhibit C,

6 Attachment A of which provides that "(a) Google will pay Company the following percentage of

7 Qualified Net Ad Revenue with respect to the following Core Qualified Device categories and

8 Service Access Points collectively, "Shared Net Core Ad Revenue") [redacted]. Attachment C-1

9 provides "Search Access Points – Google provided widget and Google Search Application [to be]

10 Set pursuant to MADA."  "Attachment C-2 provides: "Search Access Point - Chrome Browser – Set

11 as the default system browser intent and no disambiguation screen is ever presented to the end user

12 out-of-the-box, Chrome Browser icon is placed on the Application Dock, and Other requirements

13 pursuant to MADA." "Nearly all RSA-covered devices are presently enrolled at the highest-revenue

14 tier, thus locking in Google as [the] only preloaded GSE." MO Finding of Fact ("FOF") 379-384,

15 that RSAs provide for revenue share and are exclusive agreements to the exclusion of competitors.

16   89. Said exclusionary default distribution agreements constitute an unlawful combination

17 and conspiracy to maintain Google's monopoly in the general search services and general text

18 advertising markets in violation of Section 2 of the Sherman Act, that raises barriers to entry for

19 Google's competitors, so that at the time of a consumer's purchase of a new Apple device such as an

20 iPhone or iPad or Android device, all the significant access points default to Google as their general

21 search provider in Google's general search services and general search text ads markets, to the

22 exclusion of Google's competitors.

23   90. In May 15, 2014, Apple and Google entered into  the JCA, Exhibit B, that amended

24 their Information Services Agreement (ISA) beyond the termination date of July 31, 2015, which

25 provided  that Google's search engine would be the exclusionary preset out-of-the- box default

26 general search engine on Apple's devices so that at the time of a consumer's purchase of a new

27 Apple device such as an iPhone or iPad, all the significant access points default to Google as their

28 general search services and general search advertising provider. The JCA, Exhibit B states:

"Apple and Google wish to extend the ISA beyond the present termination date of July 31, 2015.
Search Rev. Share
1.      Rev share will become [Redacted] effective July 31, 2015.
2.      Subject to the options in point #3, Google shall remain the default search engine in all Geo's."

91.     Under the Information Services Agreement, Amendment To the Information Services Agreement, Exhibit A hereto, the Revenue Sharing Agreements ("RSA") and related agreements between Google and Apple Google has expressly agreed to pay and paid Apple billions of dollars in Net Ad Revenue that Google receives for Google ads run on Apple devices. The Amendment To the Information Services Agreement, Exhibit A hereto provides at Section 4 on page 5:

"Effective September 1, 2016, Google will pay Apple [% Redacted] of its Net Ad Revenue for the remainder of the term."

92.     Under these agreements, Google has paid Apple the following amounts in general advertising revenue sharing:

2017 - $3 Billion; 2018 - $9 Billion; 2019 - $12 Billion;

2020 - $12 Billion; 2021 - $15 Billion; 2022 - $20 Billion

93.     Since almost 50 percent of Google's search traffic originated on Apple devices, Google's own documents recognize that Apple's "Safari default is a significant revenue channel" and that losing its exclusive general default status with Apple could reduce Google's revenues by at least 50 percent; thus, Google views the prospect of losing default status on Apple devices as a "Code Red" scenario.

**Relevant Markets**

94.     ***General Search Services***.  The general search services market is a relevant market that consists of general search engines that End Users can use to search the internet for answers to a wide range of queries. Google has an 89.2% share of and monopoly power in the general search services market that is fortified by barriers to entry, including (1) high capital costs, (2) Google's control of key distribution channels (3) brand recognition, and (4) scale, "The Court finds that these barriers exist and that, both individually and collectively, they are significant barriers to entry." As stated by Judge Mehta in his MO at pp. 156-157. See pp. 151-165.

95. ***General Search Text Ads***.  The general search text ads market is a relevant market that includes all text advertisements in connection with a general search query. Google had an 88% market share of the general search text ads market in 2020 and monopoly power in the general search text ads market, protected by high barriers to entry as stated by Judge Mehta's MO at p. 185.

96. Google and Apple have foreclosed competition in a substantial share of the general search services and general search text ad markets through the Information Services Agreement, Amendment To the Information Services Agreement, Exhibit A hereto, the Revenue Sharing Agreements ("RSA") and related agreements between Google and Apple that cover almost 60 percent of all general search inquiries. Coupled with Google owned properties such as Chrome, gives Google roughly 90 percent of the general search services inquiries in the United States, and almost 95 percent of inquiries on mobile devices.

97. Google has 88% of the general search text ad market in the United States.

98. As early as May 15, 2014, Google's CEO and Apple's CEO entered into the Joint Cooperation Agreement, Exhibit B hereto, which provides: "1. Rev Share will become [Redacted] effective July 31, 2015; 2. Subject to the options in Point #3 below, Google shall remain the default search engine in all Geo's."  Subsequently Apple and Google held meetings to negotiate the Google-Apple the Information Services Agreement ("ISA"), the Amendment To the Information Services Agreement, Exhibit A hereto, the Revenue Sharing Agreements ("RSA") and related agreements. The Amendment To the Information Services Agreement provides in Section 5. CEO Check-Ins: "At the end of each contract year, or earlier if reasonably requested by a party, Chief Executive Officers from each party will meet to review and discuss in good faith the performance of the ISA agreement vis-à-vis the Agreement Purpose, and, upon request, to conform each party's compliance with terms of the ISA agreement."

99. By entering into and implementing the Information Services Agreement ("ISA"), the Amendment To the Information Services Agreement, Exhibit A hereto, the Revenue Sharing Agreements ("RSA") and related agreements, Google and Apple, with specific intent, have entered into a combination and conspiracy in the general search services and general search text ad markets by agreeing that Google's search engine will be the out-of-the-box default search engine on all

Apple devices to the exclusion of Google's competitors and by sharing Google's general search services and general search text ads revenues in the billions of dollars annually with Apple in return for Apple's agreement to employ Google's search engine as the default out-of-the-box search engine on Apple's devices to the exclusion of Google's competitors and competition  Said anticompetitive conduct constitutes unlawful exclusion of competitors and competition and unlawful sharing of revenues and division of the general search services and general search text ads markets between Google and Apple.

100.    A key element of Google's combinations, conspiracy and agreements with Apple and the Android parties to monopolize and maintain its monopoly in the general search services and general search text ads markets is Google' agreements to share revenue from its advertisers with Apple and the Android parties. Google represented that it priced its sales of end-user data to advertisers based on auction pricing as Judge Mehta found in his MO at FOF 238-242. But Google fraudulently used "pricing knobs" to surreptitiously increase prices and the revenue from advertisers that it shared with Apple and the Android parties and the profits thereon. Mehta MO at FOF 243-267. As proof of its monopoly, "When Google made these pricing changes, Google did not consider its rivals' text ad pricing." FOF 267. In 2024, Google's revenue from advertisers was $350 billion and its profits were $100 billion.

101.    In *United States v. Google*, 20-cv-3010, (D.D.C. Aug.5, 2024, Dkt. No. 1033),  at p. 4 Judge Mehta issued his Memorandum Opinion ("MO") after nine weeks of trial and held that:

(1)    "there are relevant product markets for general search services and general search text ads;

(2)     Google has monopoly power in those markets;

(3)    Google's distribution agreements are exclusive and have anticompetitive effects;

(4)    Google has not offered valid procompetitive justifications for those agreements.

(5)    Importantly, the court also finds that Google exercised its monopoly power by charging supracompetitive prices for general search text ads.  That conduct has allowed   Google to earn monopoly profits." In the Conclusion of his Memorandum Opinion in *United States v. Google*, 20-cv-3010, held: "For the forgoing reasons, the

34

court concludes that Google has violated section 2 of the Sherman Act by maintaining its monopoly in two product markets in the United States—general search services and general text advertising –through its exclusive distribution agreements."

102.    Google's large and durable market shares in combinations, conspiracy and agreements with Apple and the Android parties and the significant barriers to entry in general search services and general search text ads demonstrates the effectiveness of the Google-Apple combination and conspiracy and the Google-Android parties' combination and conspiracy to maintain Google's monopoly in those markets in the United States.

103.    In his Memorandum and Opinion, Judge Mehta held that Google's default distribution agreements with Apple and the Android parties raise substantial barriers to entry for Google's competitors in the general search services and general search text ad markets and has substantially foreclosed competition and competitors from competing with Google in those markets. The Google–Apple and Google-Android agreements substantially foreclose Google's general search services and general search text ad competitors from a substantial share of the general search services and general search text ad markets.  MO pp. 157-161.

104.    Google obtained dominant audience scale by being the exclusive general search engine preset default on Apple's devices and the Android devices since, as Judge Mehta found  users typically do not change their devices preset default search functions. FOF 65-75. Google's scale is critical to generating the general search services and general search advertising revenues and profits it shares with Apple since advertisers pay more to buy ads from a search provider with a large audience of searched customers. In concert with Apple, Google can deliver the largest search audiences, especially in mobile, from which Google's competitors are foreclosed by the Google-Apple combination.

105.    There are currently only four meaningful general search providers in the general search services market: Google, Bing, Yahoo!, and DuckDuckGo. According to public data sources, Google today dominates the general search services and general search text ad markets with approximately 87% percent market shares, followed far behind in general search services by Bing with about seven percent (7%), Yahoo! with less than four percent (less than 4%), and DuckDuckGo

1  with less than two percent (less than 2%)  MO p. 200, FOF 21-26.

2       106.    Scale is a significant barrier to entry. Scale affects a general search engine's ability to

3  deliver a quality search experience and since advertisers pay more to buy ads from a search provider

4  with a large audience of searched customers, targeted as potentially in the advertiser's product or

5  service, the Google-Apple conspiracy, combinations and agreements effectively eliminate Google's

6  competitors' ability to build the scale necessary to compete in the general search services and

7  general search text ads markets. By April 2018, Google estimated that its share of the general search

8  services and general search text ad markets was 79 percent on computers and 93.5 percent on mobile

9  devices. More recently, Google has accounted for almost 90 percent of all general search engine

10  inquiries in the United States, and almost 95 percent of inquiries on mobile devices.  MO p. 156.

11       107.    Google's large and durable market shares with the significant barriers to entry in

12  general search services and general search text ads demonstrate the effectiveness of Google's

13  maintenance of its monopolies through its default distribution agreements with Apple and the

14  Android parties in those markets in the United States.

15       108.    In its MO, the court in *United States v. Google* (2020), found as follows at page 242:

16

17      "Still, the ultimate question is whether the ISA reasonably appears capable of
significantly contributing to keeping Apple on the sidelines of search, thus allowing
Google to maintain its monopoly. *See Microsoft*, 253 F.3d at 79. The revenue share

18  payments unquestionably have that effect. The prospect of losing tens of billions in
guaranteed revenue from Google—which presently come at little to no cost to

19  Apple—disincentivizes Apple from launching its own search engine when it
otherwise has built the capacity to do so. The payments need not be Apple's sole

20  reason for staying out of search to constitute an anticompetitive effect. Plaintiff are
not required to prove that Google's "continued monopoly power is precisely

21  attributable to" the ISA. Id. 14."

22       109.    **End-users' Have Standing To Sue**

23       110.    General search services and general search text ads enable Google to target End Users

24  as potential customers based on keywords entered by End Users, when utilizing search to make

25  inquiries that express interest in the topic of the inquiries. General search text ads provide

26  advertising keyed to an End User's data that the End User discloses while searching information on

27  Google's search engine that Google collects and provides and sells and provides to advertisers and

28  others for billions of dollars that enable search advertisements to target End Users' expressed

36

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR
COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

1   interests.

2   111.   Google uses its general search services to compile End Users' data, including

3   searches on the web, which End User data Google sells and provides to advertisers and others. When

4   an End User uses Google, the End User provides data, including personal information to Google in

5   exchange for search results, for no compensation to the End User, which End-user data Google

6   monetizes by selling or providing to advertisers and others, producing search advertising targeting

7   End Users with masses of text advertising based on the End User's data collected by Google. "By

8   selling [End] Users' information, Google prevents End Users from monetizing their own data."

9   *Brown et al.v. Google LLC*, No. 4:20-cv-3664-YGR (N.D. Cal. 2023). In *Brown v. Google, LLC*,

10   4:20-cv-3664-YGR Dkt. 969 at pp. 2-3 (N.D. Cal. 2023), Judge Rogers, in denying Google's motion

11   for summary judgment against End-users, stated:

12
13      "Data Collection. . . . When a user visits a website, the user's browser sends a "GET"
        request to the website to retrieve it. (Id.) This GET request contains the following
14      information: the Request URL, or the URL of the specific webpage the user is trying
        to access; the user's IP address; the User agent, which identifies the user's device
15      platform and browser; user's geolocation, if available; the Referrer, which is the URL
        of the page on which the user clicked a link to access a new page; event data, which
16      describes how users interact with a website, for example, whether they saw an ad or
        played a video; and the actual search queries on the site. (Id.) At the same time, the
17      user's browser reads Google's code, which is embedded on the website. (Id.)
        Google's code instructs the user's browser to send a second and concurrent
18      transmission directly to Google. (Id.) This second transmission tells Google exactly
        what a user's browser communicated to the website. (Id.)…According to Plaintiff,
19      Google then takes users' private browsing history and associates it with their
        preexisting user profiles. (PAF 47; Response to SUF 65.) Doing so allows Google to
20      offer better, more targeted, advertisements to users. (Response to SUF 63; 4AC ¶84.)
        This is at the core of Google's business: the bulk of Google's hundreds of billions of
21      dollars in revenue come from selling targeted advertisements to other companies.
        (4AC ¶89.) By selling users' information, Google prevents users from monetizing
22      their own data. (4AC ¶138; PAF 27–28.) The value of this data can be quantified; for
        example, Google itself has piloted a program to pay users $3.00 per week to track
23      them." (Docket No. 969, at pp. 2-3.).

24      112.   Google looked to the Ipsos Screenwide Panel, a consumer research study conducted

25   by Google since 2012 to 'collect information about how users browse the internet.' *Id*. para.

26   135…The minimum recurring payment is $3 a month." Thus, damages at $3 per month can be

27   calculated by multiplying the number of class members by $3, and then multiplying that figure by

28   the number of months in the Class Period.

---

37

113.    In *Brown v. Google LLC*, Dkt. No. 969 at p. 33, the Court under "Damages or Loss" in its opinion further stated:

> "Second, Google argues Plaintiff suffered no "damage or loss by reason of a [CDAFA] violation." Cal. Pen. Code § 502(e)(1). Plaintiff disagree and offer evidence showing that they have a stake in the value of their misappropriated data. *Facebook Tracking*, [*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (citing *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3rd Cir. 2019) (cleaned up))]is instructive. In *Facebook Tracking*, the Ninth Circuit found that Plaintiff had sufficiently alleged their browsing histories carried financial value. Id. at 600. So too here. Plaintiff have evidence that there is a market for their data—Google itself has piloted a program where it pays users $3.00 a day for their browsing history. (PAF 28.) Google responds that *Facebook Tracking* does not apply because it was a decision about standing, not liability. That is beside the point. The Ninth Circuit's decision stands for the proposition that Plaintiff can state an economic injury for their misappropriated data. Because Plaintiff proffer evidence that there is a market for their data—one Google itself has created—the Court cannot rule, as a matter of law, that Plaintiff suffered no damages . . ." (Docket No. 969, at p. 33

114.    In the "Ipsos Screenwise Panel, a consumer research study conducted by Google since 2012…The minimum recurring payment is $3 a month." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) at p. 20 lines 13-17 "…[A]s the court in *Brown* already noted, "The $3 rate is derived from looking at what Google *actually* pays Screenwise participants for agreeing to allow Google to collect their browsing data." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) p. 22 lines 18-20. Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

115.    Plaintiff' injury is both particularized and concrete—particularized with respect to the End-user's specific data that is extracted for no compensation—and concrete with respect to the monetized value in billions that Google obtains by re-selling the End-users' data to advertisers and others. As further injury, Plaintiff and other End-users of Google's search engine are not only injured by the taking of their valuable search data for no compensation but   Google has also harmed End-users of general search services by reducing the quality of their general search experience, by lessening choices, and by impeding privacy and innovation in general search services.

116.    End-users are also directly injured because Google's anticompetitive use of distribution agreements that contain default provisions that exclude competitors have precluded

competitors from providing End-users with higher-quality search products that are more privacy protective and ad-free. Plaintiff are injured because Google extracts and collects Plaintiff's and the class of End-users' personal data to Google during their use of Google search, an injury that has been quantified by Google at $3.00 per month in Google's pilot program.

117.    Having had their data extracted  in the general search services market for no compensation, which data  Google resold  to advertisers and others for billions of dollars, End-Users are targeted and bombarded with general search text ads in the general search text ads market, and suffer direct injury by Google's anticompetitive use of default distribution agreements that have precluded  competitors from providing End-users with higher quality search products that are more privacy protective and ad-free results and such direct injury to End-users gives Plaintiff and the class of End-users standing to sue.

118.    Google and Apple specifically targeted End Users in their written agreements.  The written ISA contract, Exhibit A hereto, sets out the parties' agreement to share revenue, the parties specifically recited that the stated "Agreement Purpose" was to improve the "performance of the Services, the Spotlight Services and the Siri Services *for End Users* on Apple products." (Exhibit A, p. 7) (Emphasis Added.).

119.    Google's monopoly in general search services and general search text ads enable Google to collect End-users' data for no compensation and sell and provide it to advertisers and others for billions of dollars. When End-users make queries on Google's general search services and general search text ads, End-Users disclose their data while searching information on Google's search engine that Google collects and provides to advertisers that enable them to bombard End-users with general search text advertisements to targeted to End Users' expressed interests.

120.    In *United States v. Google LLC* (2020), No. 20-CV-3010 (APM), 2024 WL 3647498 (D.D.C. 2024) Aug. 5, 2024, the *Google* court found that Google's exclusive default agreements with Apple and others prevented Google competitors such as Neeva and Duck Duck Go from providing End-users high quality search products that were more privacy protected and ad-free. In *United States v. Google LLC* ( 2020), the court (the "*Google* court") also concluded that Google's default agreements with Apple and others foreclosed efficient channels of distribution and resulted

in network effects that made it difficult for competitors to gain the volume of users and user data that

would allow the development of high-quality search products. The Google court stated in its MO:

> FOF "76. Neeva exemplifies the importance of search distribution through a readily accessible channel. Neeva secured the capital and human resources needed to build a search engine. Tr. at 3671:4-3672:13 (Ramaswamy). Although it initially syndicated search results from Bing; it eventually crawled the web, built an index, and developed a ranking model, which relied heavily on artificial intelligence technology, to generate its own search results for about 60% of its queries. Id. at 3775:9—3776:21, 3739:14-16 (Ramaswamy). But Neeva was unable "to be even a default provider on things like the major browsers or operating system," which "was what made [its founders] conclude that it was hard to have Neeva consumer search as a viable business. Id.at 3701:1-7 (Ramaswamy). The reason "why Neeva failed …was simply because [it] could not get enough users to be in that state where they regularly used Neeva." Id. at 3712:10-12 (Ramaswamy); id. 3677:2-3, 3700:25-3701:7 (Ramaswamy) (testing that more users on Neeva would result in greater revenues through subscription fees); id. at 3724:18-21 (Ramaswamy) ("[I]f a well-funded and exceptionally talented team like Neeva could not even be a provider on       most of the browsers, I don't see that as the market working.").

121.    The court further found that Neeva, as a competitor to Google sought to create a

subscription-based model for search that did not serve ads, at , but due to Google's exclusive default

contracts, due to its inability to develop enough of a user base to have sufficient user data, it was

driven out of the search market. Likewise, the court found that Duck Duck Go ("DDG"), another

competitor of Google's, cannot compete effectively because of Google's exclusionary default search

agreements and the lack of access to  sufficient user data, at Google court at pp. 162-163.

The *Google* court found: "As a result, DDG and Neeva are the only two notable market

entrants in the last 15 years. Each attempted to innovate—DDG on privacy and Neeva through a

subscription-based model—but found only limited success (DDG) or left the market altogether

(Neeva)." *Google* court at MO pp. 162-163. FOF paras. 14, 25, 76.

122.    As the *Google* court found in its MO, FOF 74:

>  "A GSE's placement as the default thus drives search volume through that access point. Tr. at 3689: 21-24 (Ramaswamy) (testifying that "the convenience of easy accessability and tapping into …engrained default behaviors are the deciding factors when it comes to whether a search engine gets lots of usage"); id. at 7674:6-7675:21 (Pichai) ("[B]ecause you're taking existing users, and by giving them more convenient access points, you're making them search more…Done correctly, and if you're putting a product out in front of users which users like and want to use, yes, defaults can make a difference."). In 2017, over 60% of all queries entered on Google flowed through defaults. UPX83 at 967; see id. (60% of iOS queries were through the Safari [Apple] default, and 80% of Android queries were through defaults

40

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

secured by the distribution deals… "Google recognizes that securing the default placement is extremely valuable for monetizing search queries." FOF 75

123. At MO page 237 of its Conclusions of Law, the *Google* court stated:

"The foreclosure of efficient channels of distribution has contributed significantly to the lack of new investment. Neeva is a case in point. It could not gain a foothold in the market in part because it was relegated to a less efficient means of distribution, such as an alternative default GSE [general search engine] on any mobile device. FOF 76. Ultimately, Neeva's inability to retain and attract users—and thus acquire scale—was a primary reason for its withdrawal from the market. *Id.* The loss of nascent competitors is a clear anticompetitive effect. See AREEDA para. 1802d5 (observing that exclusive dealing arrangements that deny smaller firms access to retailers may 'impair their ability to expand, thus becoming more effective competitors with the dominant firm. Indeed, the smaller [firms] may decline and even be forced to exit the market.')."

124. At MO page 162 the *Google* court stated:

"The tales of DDG and Neeva illustrate *Rebel Oil's* point. Both entered the market notwithstanding Google's dominance, but neither has "taken significant business from Google and they therefore have not posed any meaningful threat to its "market power." DDG though in operation since 2008, has barely reached a 2% market share. FOF 25; *Surescipts*, 665 Supp. 3d at 46-47 ("[T]he ability on one competitor to capture [a relatively minor percentage of the market does not undermine [the dominant firm's] durable monopoly power protected and perpetuated by barriers to entry."]. As for Neeva, it entered and exited within four years. FOF 14…The lack of access to efficient channels of distribution diminished Neeva's ability to grow its user base and significantly contributed to its demise."

125. At MO page 200 the *Google* court stated:

"Google has no true competitor. Consider that Google's monopoly in general search has been remarkably durable. Its market share in 2009 was nearly 80%, and it has *increased* since then to nearly 90% by 2020. FOF 23. Bing during that same period, has never held a market share above 11%, and today holds less than 2.5% of the market. *Id*. Thus over the last decade, Google's grip on the market has only grown *stronger*…

"Moreover, there have been only two new market entrants of note in the last 15 years—DDG and Neeva. One of them is no longer in business (Neeva) , and the other has achieved a market share of 2.1% (as of 2020) after more than a decade in business. If there is genuine competition in the market for general search, it has not manifested in familiar ways, such as fluid market shares, lost business or new entrants."

126. Thus, Neeva and Duck Duck Go, competitors of Google, who offered better" privacy or ad-free alternatives to Google were unable to offer the same high quality of search to End-users, as Google, due to their lack of access to a large volume of user data due to Google's anticompetitive

---

41

use of exclusionary default agreements.

127.   As a result of Google's use of anticompetitive exclusionary default agreements with Apple and others that foreclosed DDG's and Neeva's access to the large volume of user data needed to offer the same high quality of search to End-users as Google, Plaintiff and End-users have been injured by being deprived of the better quality privacy and ad-free searches from Google's competitors, DDG and Neeva, which those companies offered.

128.   At MO page 222, the *Google* court stated:

"The court finds that as to the general search services market Plaintiff have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume."

129.   At MO pages 226-227, the *Google* court stated::

"Naturally then, GSE distributors prefer Google because of its search quality and because it would be economically irrational to sacrifice the high revenue share. They thus routinely renew the distribution deals with their exclusive terms. In this feedback loop, the revenue share payments" effectively make the ecosystem exceptionally resistan[t] to change" and basically freeze the ecosystem in place[.]" Tr at 3937:24-3798:21 (Ramaswamy); see id at 3513:1-3 (Nadella) ("[T]his vicious cycle that [Microsoft is] trapped in can become even more vicious because the defaults get reinforced." That is the antithesis of a competitive market."

At MO page 230 "Armed with its scale advantage, Google continues to use that data to improve search quality…Scale also improves search ads monetization."

130.   At MO page 234 the *Google* court stated:

"No current rival or nascent competitor can hope to compete against Google in the wider marketplace without access to meaningful scale, especially on mobile. The exclusive distribution agreements have substantially contributed to these anticompetitive market conditions."

131.   At MO page 236, the *Google* court found: "*The Exclusive Agreements Have Reduced Incentives To Invest and Innovate*. The distribution agreements have caused a third key anticompetitive effect: they have reduced the incentive to invest and innovate in search.

132.   Google and Apple and Google and the Android Parties have entered into a combination, conspiracy and exclusive default distribution agreements that are exclusionary and anticompetitive to maintain Google's monopoly in the general search services and the general search

1  text Ads markets in violation of Sections 2 of the Sherman Act.

**VI.   GOOGLE AND APPLE, AS A POTENTIAL COMPETITOR OF GOOGLE HAVE**
2
**CONSPIRED AND COMBINED TO RESTRAIN TRADE AND SHARE SEARCH**
3
**REVENUE AND DIVIDE THE SEARCH MARKETS**
4

5        133.    Plaintiff realleges paragraphs 1 through 132 above.

6        134.    Google and Apple as a potential competitor of Google in the general search services

7  market have conspired and combined to restrain trade, share revenue, and divide the search markets

8  pursuant to agreements for Google to pay Apple billions of dollars not to compete in violation of

9  Sections 1 of the Sherman Act.

10       135.    The sharing of revenue provided in the agreements between Google and its potential

11 competitor Apple is a restraint of trade and a per se violation of Section 1 of the Sherman Act.

12 *Citizens Publishing Co. v. United States*, 394 U.S. 131 (1969) (affirming summary judgment for

13 profit pooling). Moreover, by dividing the markets for general search services between them in

14 which Google maintains its monopoly in search and Apple surrenders its devices to Google's out-

15 of- the- box default search engine, excluding competitors, the agreements between Google and

16 Apple are likewise per se unlawful under Section 1 of the Sherman Act. *Palmer v. BRG of Georgia,*

17 *Inc.*, 498 U.S. 46 (1990) (reversing a grant of summary judgment for defendants and holding that

18 horizonal market allocation is a *per se* violation of the Sherman Act.).

19       136.    The court in *United States v. Google* (2020), recognized that Google's revenue share

20 payments to Apple "disincentivizes" Apple, a potential competitor, from competing in search "when

21 it otherwise has the capacity to do so, stating in its MO at p. 246,

22
23       "Still, the ultimate question is whether the ISA reasonably appears capable of
         significantly contributing to keeping Apple on the sidelines of search, thus allowing
         Google to maintain its monopoly. *See Microsoft*, 253 F.3d at 79. The revenue share
24       payments unquestionably have that effect. **The prospect of losing tens of billions in**
         **guaranteed revenue from Google—which presently come at little to no cost to**
25       **Apple—disincentivizes Apple from launching its own search engine when it**
         **otherwise has built the capacity to do so.** The payments need not be Apple's sole
26       reason for staying out of search to constitute an anticompetitive effect. Plaintiff are
         not required to prove that      Google's "continued monopoly power is precisely
27       attributable to"        the ISA. Id. 14." (Emphasis added)"

28       137.    As Judge Mehta stated in his MO at p. 238, Apple is a "fierce potential competitor" of

---
43

Google, who "remains on the sidelines due to the large revenue share payments it receives from Google."

138.    In acknowledgement of Apple as a potential competitor in general search services and general search advertising, Google obtained a right of first refusal of Apple's general search services and general search advertising technologies, including Apple's Siri and Spotlight search in their Amendment To the Information Services Agreement, Exhibit A hereto at paragraph 2 at page 4 which states:

> "Following the initial implementation of the Spotlight Services or Siri Services, if Apple includes ads or paid listings in Siri or Spotlight (or successor versions), Apple will offer Google the opportunity to supply such ads or paid listings under the financial terms set forth in Section 4 of this agreement and on equivalent implementation term.

139.    As a potential competitor, Apple has worked on developing "Apple Search," at least since 2013 when it acquired Topsy Labs' technology used to access information for Apple's iPhone voice assistant, Siri and the Apple's Mac' search feature, Spotlight. In 2018, Apple acquired Laserlike and its search technology based on artificial intelligence. Since 2018, Apple has acquired 21 artificial intelligence startup companies.

140.    In May 15, 2014, Apple and Google entered into the JCA, Exhibit B, that amended their Information Services Agreement (ISA) beyond the termination date of July 31, 2015, which provided that Google's search engine would be the exclusionary preset out of the box default general search engine on Apple's devices so that at the time of a consumer's purchase of a new Apple device such as an iPhone or iPad, all the significant access points default to Google as their general search services and general search advertising provider. The JCA, Exhibit B hereto states:

> "Apple and Google wish to extend the ISA beyond the present termination date of July 31, 2015.
>
> Search Rev. Share
>
> (1)    Rev share will become [Redacted]effective July 31, 2015.
>
> (2)    Subject to the options in point #3, Google shall remain the default search engine in all Geo's."

141.    Under the Information Services Agreement, Amendment To the Information Services

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

Agreement, Exhibit A hereto, the Revenue Sharing Agreements ("RSA") and related agreements between Google and Apple, Google has expressly agreed to pay and paid Apple billions of dollars in Net Ad Revenue that Google receives for Google ads run on Apple devices. The Amendment To the Information Services Agreement, Exhibit A hereto provides at Section 4 on page 5:

> "Effective September 1, 2016, Google will pay Apple [Redacted] of its Net Ad Revenue for the remainder of the term."

142.    A key element of Google's combination, conspiracy and agreements with Apple and the Android parties to restrain trade in the general search services and general search text ads markets is Google' agreements to share revenue from its advertisers with Apple and the Android parties. Google represented that it priced its sales of end-user data to advertisers based on auction pricing as Judge Mehta found in his MO at FOF 238-242. But Google fraudulently used "pricing knobs" to surreptitiously increase prices and the revenue from advertisers that it shared with Apple and the Android parties and the profits thereon. Mehta MO at FOF 243-267. As proof of its monopoly power, "When Google made these pricing changes, Google did not consider its rivals' text ad pricing." MO, FOF 267. In 2024, Google's revenue from advertisers was $350 billion and its profits were $100 billion.

143.    Under these agreements, Google has paid Apple the following amounts in general advertising revenue sharing:

 2017-$3 Billion; 2018 - $9 Billion; 2019 - $12 Billion;

 2020 - $12 Billion; 2021 - $15 Billion; 2022 - $20 Billion

144.    The sharing of revenue between Google and its potential competitor Apple is a *per se* violation of Section 1 of the Sherman Antitrust Act. *Citizens Publishing Co. v. United States*, 394 U.S. 131 (1969) (affirming summary judgment for profit pooling). Moreover, by dividing the markets for general search services between them in which Google maintains its monopoly in search and Apple surrenders its devices to Google's out-of-the-box default search engine, excluding competitors, the agreements between Google and Apple are likewise per se unlawful under Section 1 of the Sherman Act. *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990) (reversing a grant of summary judgment for defendants and holding that horizonal market allocation is a per se violation

1    of the Sherman Act.).

2    <u>**ANTICOMPETITIVE CONDUCT**</u>

3    145.    Google has unlawfully conspired, combined and agreed with Apple, a potential

4    competitor, in restraint of trade to share revenue with Apple and to divide the markets for general

5    search services and general search advertising with Apple in restraint of trade to disincentivize

6    Apple from competing with Google paying Apple billions of dollars annually to provide Google

7    with exclusive access as the default search engine provider on Apple's devices coupled with a right

8    of first refusal in Google as to ads or paid listings on Apple's search technologies, Siri and Spotlight,

9    per Section 2 of the Amendment To the Information Services Agreement. Google's exclusionary

10   contracts cover almost 60 percent of U.S. search inquiries, and almost half the remaining searches

11   are processed through properties operated directly by Google. As a result, the large majority of

12   searches are covered by Google's exclusionary contracts and properties, depriving competitors of the

13   ability to compete by denying its them access to the scale necessary to compete with Google. By

14   depriving competitors of scale and distribution, Google and Apple and the Android parties have

15   deprived competitors of the ability to compete and innovate and injured Plaintiff and the class by

16   collecting their personal search data without compensation while re-selling it to advertisers for

17   billions of dollars who bombard End-users with text ads in the general search text ads market.  By

18   depriving competitors of scale and distribution, Google, Apple and the Android parties have

19   precluded competitors from providing End-users with innovation in higher-quality search products

20   that are more privacy protective and ad-free.

21   146.    By foreclosing competition from competitors, Google and Apple harm competition

22   and harm End Users by collecting their search data without compensation while selling End Users'

23   search data to advertisers for billions of dollars annually.

24   <u>**ANTICOMPETITIVE EFFECTS**</u>

25   147.    In its MO, the court in *United States v. Google* (2020) stated at page 216-222:

26

27   "The key question then is this: Do Google's exclusive distribution contracts
     reasonably appear capable of significantly contributing to maintaining Google's
     monopoly power in the general search services market?  The answer is "yes."

28   Google's distribution agreements are exclusionary contracts that violate Section 2

---

46

because they ensure that half of all GSE users in the United States will receive Google as the preloaded default on all Apple and Android devices, as well as cause additional anticompetitive harm. The agreements "clearly have a significant effect in preserving [Google's] monopoly." Microsoft at 71.

The agreements have three primary anticompetitive effects: (1) market foreclosure, (2) preventing rivals from achieving scale, and (3) diminishing incentives of rivals to invest and innovate in general search…"

1.    *The Exclusive Agreements foreclose A Substantial Share of the Market* …

…Aggregating the foreclosure effects of the [Apple and Mozilla ] browser agreements is an appropriate way to understand the overall effect of Google's exclusive dealing in the relevant markets…" MO p. 216-217'

"The court thus finds that as to the general search services market, Plaintiff have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume. MO p. 222.  The 50% figure meets the [significant] threshold.

2.    *"The Exclusive Agreements Have Deprived Rivals of Scale*, MO p. 226.

Google's exclusive agreements have a second important anticompetitive effect: They deny rivals access to user queries, or scale, needed to effectively compete.  Scale is the essential raw material for building, improving and sustaining GSE [General Search Engines]. FOF paras. 86-106. For more than a decade, the challenged distribution agreements have given Google access to scale that its rivals cannot match FOF 87-89.  Google has used that scale to improve its search product and ad monetization. FOF90-94, 103-105. Meanwhile, without access to scale, other GSEs have remained at a persistent competitive disadvantage, and new entrants cannot hope to achieve a scale that would allow them to compete with Google. FOF 76, 87-89, 106." MO at p. 226.

a.    "The Power of Defaults, MO p. 227

Numbers help explain the power of the search default setting. Half of all GSE queries in the United States are initiated through the default search access points

47

covered by the distribution agreements…An additional 20% of all searches nationwide are derived from user-downloaded Chrome, a market reality that compounds the effect of the default search agreements. FOF 63. That means only 30% of all GSE queries in the United States come through a search access point that is not preloaded with Google.  Additionally, default placements drive significant traffic to Google. Over 65% of searches on Apple devices go through the Safari default. FOF 296.  On Android, 80% of all queries flow through a search access point that defaults to Google." FOF 74.

"All of this makes defaults extremely valuable.  In 2021, Google spent $26.3 billion in traffic acquisition costs—the revenue share paid to its partners—which is four times more than the company's other search-related costs combined, including research and development." FOF para 289… MO pp. 227-228.

b.      "The Impact of Scale…, MO pp. 230-234

The sheer magnitude of Google's query volume, or scale, compared to rivals is startling: Users enter nine times more queries on Google than on all rivals combined. On mobile devices, that multiplier balloons to 19 times. FOF 87… This wealth of data gives Google greater insight into search behavior in part because it simply sees more queries than other GSEs See e.g. FOF 89…The more precisely targeted an ad, the greater likelihood that it will be clicked, which translates into higher revenues that Google uses to make larger revenue share payments. The market for GSEs is thus characterized by a type of network effect. Cf. Microsoft 253 F.3d at 49 (discussing network effects). (1) More user data allows a GSE to improve search quality, (2) better search quality attracts more users and improves monetization, (3) more users  and better monetization attract more advertisers, (4) more advertisers mean higher ad revenue, (5) more ad revenue enables a GSE to expend more resources on traffic acquisition  costs (i.e., revenue-share payments) and investments, which enable the continued acquisition of scale…There is a reason that Google still retains 18-months of a user's data.  It is still highly valuable to Google. Google's

48

massive scale advantage thus is a key reason why Google is effectively the only genuine choice as a default GSE. MO pp. 230-234.

"That barrier is reinforced by the size of Google's revenue share payments… The end result here is not dissimilar from the Microsoft court's conclusion as to the browser market. Just as the agreements in that case "help[ed] keep usage of Navigator below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly," Google's distribution agreements have constrained the query volumes of its rivals, thereby inoculating Google against any genuine competitive threat. Microsoft 252 F.3d at 71…No current rival or nascent competitor can hope to compete against Google in the wider marketplace without access to meaningful scale, especially on mobile. The exclusive distribution agreements have substantially contributed to these anticompetitive market conditions." MO 230-234

3. *"The Exclusive Agreements Have Reduced Incentives to Invest and Innovate*

The distribution agreements have caused a third key anticompetitive effect: They have reduced the incentive to invest and innovate in search…The foreclosure of efficient channels of distribution has contributed significantly to the lack of new investment." MO 236-237.

148. Google and Apple have engaged in a conspiracy and combinations and agreements to restrain trade in the general search services and general search text ads markets and injured Plaintiff and the class and harmed competition resulting in damages to Plaintiff.

149. Google looked to the Ipsos Screenwide Panel, a consumer research study conducted by Google since 2012 to 'collect information about how users browse the internet.' *Id*. para. 135…The minimum recurring payment is $3 a month." Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

150. Google and Apple have engaged in a conspiracy and combination to restrain trade in the general search services and general search text ads markets and injured Plaintiff and the class and

harmed competition by:

  a.  By foreclosing competitors and competition in the general search services and general search text ad markets, by sharing Google's general search services and general search text ad revenues with Apple by paying Apple billions of dollars in return for Apple's agreement to grant Google's search engine exclusive out-of-the-box default status on Apple devices and dividing markets, Google and Apple have engaged in an unlawful conspiracy and combination to restrain trade and substantially foreclosed competition and competitors from those markets resulting in Google collecting End Users' private search data without compensation while reselling it to advertisers for billions of dollars annually and precluding competitors from providing End-users with higher quality search products that are more privacy protected and ad-free and bombarding End-users with text ads in the general search text ads market.

151. In the "Ipsos Screenwise Panel, a consumer research study conducted by Google since 2012…The minimum recurring payment is $3 a month." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) at p. 20 lines 13-17 "…[A]s the court in *Brown* already noted, "The $3 rate is derived from looking at what Google *actually* pays Screenwise participants for agreeing to allow Google to collect their browsing data." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) p. 22 lines 18-20. Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

## VII.   GOOGLE VIOLATED CALIFORNIA UNFAIR COMPETITION LAW BUS. & PROF. C. 17200

152. Plaintiff reallege paragraphs 1 through 151 above.

153. Google has violated California Unfair Competition Law ("UCL") Bus. & Prof. C. 17200 et seq.

154. Google's monopoly in general search services and general search text ads enable Google to collect End-users' data for no compensation and sell and provide it to advertisers and others for billions of dollars. When End-users make queries on Google's general search services and

general search text ads, End Users disclose their data while searching information on Google's

search engine that Google collects and provides to advertisers that enable them to bombard End-

users with general search text advertisements targeted to End Users' expressed interests based on

their data extracted and collected from them by Google.

155.    In *Brown v. Google, LLC*, 4:20-cv-3664-YGR; 2023 WL 5029899 (N.D. Cal  Aug. 7,

2023), the court stated:

> "**Data Collection**…When a user visits a website, the user's browser sends a "GET"
> request to the  website to retrieve it. (Id.) This GET request contains the following
> information: the Request URL, or the URL of the specific webpage the user is trying
> to access; the user's IP address; the Useragent, which identifies the user's device
> platform and browser; user's geolocation, if available; the Referer, which is the URL
> of the page on which the user clicked a link to access a new page; event data, which
> describes how users interact with a website, for example, whether they saw an ad or
> played a video; and the actual search queries on the site. (*Id.*) At the same time, *the
> user's browser reads Google's code, which is embedded on the website*. (Id.)
> Google's code instructs the user's browser to send a second and concurrent
> transmission directly to Google. (*Id.*) This    second transmission tells Google exactly
> what a user's browser communicated to the  website. (*Id.*)
>
> Google's services are ubiquitous on the internet: over 70 percenta of websites
> use Google Analytics and Ad Manager. (4AC ⁋⁋ 67 and 78.) To use these  services,
> <u>*Google requires website developers to embed Google's code onto their websites*</u> and
> agree to its Privacy Policy. (PAF 6.) *Google does not tell website developers that it
> tracks their visitors* even when they are in private browsing mode. (Id.) (Emphasis
> added).
>
> According to Plaintiff, *Google then takes users' private browsing history   and
> associates it with their preexisting user profiles. (PAF 47; Response to SUF 65.)
> Doing so allows Google to offer better, more targeted, advertisements to users*.
> (Response to SUF 63; 4AC ⁋ 84.) This is at the core of Google's business: the bulk of
> Google's hundreds of billions of dollars in revenue come from selling targeted
> advertisements to other companies. (4AC ⁋ 89.) By selling users' information,
> Google prevents users from monetizing their own data. (4AC ⁋ 138; PAF 27–28.) *The
> value of this data can be quantified; for example, Google itself has piloted a program
> to pay users $3.00 per week to track them. (PAF 28.).*" (Emphasis added).

156.    As recognized in *Brown v. Google LLC*, Google requires website developers to

embed Google's code onto their websites, so that Google's search engine can collect End-users' data

directly from End-users' browsers.  Google's communications code embedded on websites is thus an

extension of Google's search engine in the monopolized general search services and general search

text ads relevant markets. Google then takes End-users' private browsing history that Google

collected with Google's code embedded on websites and associates it with End-users' preexisting

1    user profiles that Google has compiled, which allows Google to offer higher quality, more targeted,

2    advertisements to End-users and to build scale that far surpasses Google's competitors.

3         157.     As stated in *Brown v. Google LLC*, Google has "piloted a program to pay users $3 per

4    week to track them." Plaintiff and End-users' data carried financial value and Google profited from

5    their valuable data by selling or transferring it to advertisers. Plaintiff and End-users retained a stake

6    in their data and in the profits garnered by Google from the disposition of Plaintiff and End-users'

7    data. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 599-600.

8         158.     In *Brown*, the Court under "**Damages or Loss**" further stated:

9

10       "Second, Google argues Plaintiff suffered no "damage or loss by reason of a
[CDAFA] violation." Cal. Pen. Code § 502(e)(1). Plaintiff disagree and offer
evidence showing that they have a stake in the value of their misappropriated data.

11       *Facebook Tracking*, [*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599
(9th Cir. 2020) (citing *In re Google Inc. Cookie Placement Consumer Privacy Litig.*,

12       934 F.3d 316, 325 (3rd Cir. 2019) (cleaned up))] is instructive. In *Facebook Tracking*,
the Ninth Circuit found that Plaintiff had sufficiently alleged their browsing histories

13       carried financial value. Id. at 600. So too here. *Plaintiff have evidence that there is a
market for their data—Google itself has piloted a program where it pays users $3.00*

14       *a day for their browsing history*. (PAF 28.) Google responds that Facebook Tracking
does not apply because it was a decision about standing, not liability. That is beside

15       the point. The Ninth Circuit's decision stands for the proposition that Plaintiff can
state an economic injury for their misappropriated data. Because Plaintiff proffer

16       evidence that there is a market for their data—one Google itself has created—the
Court cannot rule, as a matter of law, that Plaintiff suffered no damages . . ." (Docket

17       No. 969, at p. 33).

18         159.     As the court found in Brown v. Google: "Plaintiff have evidence that there is a market

19    for their data—Google itself has piloted a program where it pays users $3.00 a day for their

20    browsing history. (PAF 28.)" Thus, Google itself has paid for users' search data, establishing that

21    there is a market for user's search data and that user's search data has value.

22         160.     Google uses its general search services and general search text ads to compile End

23    Users' searches on the web which End User information Google sells to advertisers. When an End

24    User uses Google, the End User provides personal information to Google in exchange for search

25    results, for no compensation to the End User, which Google monetizes by selling the End User's

26    information to advertisers and producing search advertising targeting the End User based on the End

27    User's information collected by Google. "By selling [End] Users' information, Google prevents End

28    Users from monetizing their own data." *Brown et al.v. Google LLC*, No. 4:20-cv-3664-YGR (N.D.

1    Cal. 2023). As the court found in *Brown v. Google*: "*Plaintiff have evidence that there is a market

2    for their data—Google itself has piloted a program where it pays users $3.00 a day for their

3    browsing history*. (PAF 28.)" Thus, Google itself has paid for users' search data, establishing that

4    there is a market for user's search data and that user's search data has value.

5         161.    As described by the Court in *Brown*, Plaintiff and the class of End-users herein, have

6    suffered injury by having their valuable search data extracted by Google for no compensation and

7    resold to advertisers for billions of dollars.

8         162.    Google and Apple have engaged in a conspiracy and combination to restrain trade in

9    the general search services and general search text ads markets and injured Plaintiff and the class and

10   harmed competition resulting in damages to Plaintiff.

11        163.    Google looked to the Ipsos Screenwide Panel, a consumer research study conducted

12   by Google since 2012 to 'collect information about how users browse the internet.' *Id*. para.

13   135…The minimum recurring payment is $3 a month." Thus, damages at $3 per month can be

14   calculated by multiplying the number of class members by $3, and then multiplying that figure by

15   the number of months in the Class Period.

16        164.    Google induces End-users to use its search engine and when End-users use Google's

17   search engine, Google extracts the End-user's valuable search data for no compensation to the End-

18   user. Google then monetizes the End-user's search data by selling it to advertisers and others for

19   billions of dollars in revenue. Google's monetization of Plaintiff' data by selling it to advertisers

20   establishes its value and, as held in *Brown v Google LLC*, and Google's extraction of End-users' data

21   for no compensation results in a direct injury to End-users.

22        165.    In the "Ipsos Screenwise Panel, a consumer research study conducted by Google

23   since 2012…The minimum recurring payment is $3 a month." *Rodriguez v. Google LLC*, 20-cv-

24   04688, Dkt. No. 352 (Order granting class certification) at p. 20 lines 13-17 "…[A]s the court in

25   *Brown* already noted, "The $3 rate is derived from looking at what Google *actually* pays Screenwise

26   participants for agreeing to allow Google to collect their browsing data." *Rodriguez v. Google LLC*,

27   20-cv-04688, Dkt. No. 352 (Order granting class certification) p. 22 lines 18-20. Thus, damages at

28   $3 per month can be calculated by multiplying the number of class members by $3, and then

1   multiplying that figure by the number of months in the Class Period.

2        166.   The End-user data Google collects contains personal viewing information, which

3   Google  analyzes and associates with End-users' prior viewing histories, to  creates "profiles" for

4   each End-user that enable Google charge its customers for targeted End-user data and monetize End-

5   users' data  so that Google can profit from Google's ad-targeting services.

6        167.   Google is paid high prices for these targeted End-user data-based profiles for

7   advertisements by third-party advertisers because Google uses End-user data that Google collected

8   from End-users to select and display advertisements targeted at those specific profiles. End-users

9   retain a stake in the profits Google garnered from their data and it is unjust for Google to profit from

10  End-users' data without compensating them for it.

11       168.   Google also benefits by using the End-user data it collects to improve and refine

12  existing and new Google products, services, and algorithms.

13       169.   Google includes far more than volunteered personal information like name, birth date,

14  gender and email address since Google secretly plants numerous tracking mechanisms on End-users'

15  computers and web- browsers, which enable Google to track users' browsing histories and correlate

16  them with End-user browser IDs, preventing End-users' from blocking access to their data.

17       170.   Similarly, the value of End-user-correlated internet browsing history can be

18  quantified, because Google itself was willing to pay users for the exact type of communications that

19  Google illegally intercepted from Plaintiff and End-users during the Class Period. For example,

20  Google Inc. had a panel during the Class Period (and still has one today) called "Google Screenwise

21  Trends" which, according to the Google, is designed "to learn more about how everyday people use

22  the Internet."

23       171.   After three months, Google also agreed to pay panelists additional gift cards "for

24  staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated conclusively

25  that internet industry participants understood the enormous value in internet users' browsing habits.

26  Google now pays Screenwise panelists up to $3 per week to be tracked.

27       172.   In a study, web browsing histories were valued at $52.00 per year, web search

28  histories were valued at $57, GPS records were valued at $55, Emails and text messages were valued

54

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR
COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

at $59.

173.    Google has engaged in unlawful business practices in violation of California Bus. & Prof. C. 17200 et seq.  for which Plaintiff and the class of End-users seek restitution and injunctive relief.

174.    Google's combinations, conspiracy and agreements with Apple and the Android parties in violation of sections 1 & 2 of the Sherman Act, constitute unlawful business acts in violation of California Bus. & Prof. C. 17200 et seq. that have resulted in injury and loss of money and property to Plaintiff and the class of End Users by having their private search data in which they retained a stake in the profits, extracted and collected by Google, without compensation to Plaintiff and the End User class, and resold to advertisers for billions of dollars annually, which revenue Google shared with Apple and the Android parties. Google's unlawful conduct has resulted in harm to Plaintiff and the class of End-Users by having their valuable private search data extracted and collected by Google without compensation to End-users, by foreclosing  a substantial share of the general search services and general search text ads markets from competitors and precluding competitors from providing End-users with higher quality search products that are more privacy protective and ad-free, and by enabling advertisers to target and bombard End-users with text ads.

In *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011), the California Supreme Court held that "there are innumerable ways in which economic injury from unfair competition may be shown."  For example, a Plaintiff may "surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have" or "have a present or future property interest diminished." *Id*. at 323.

175.    The California Consumer Privacy Act ("CCPA") recognizes that the End-users' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers that opt-out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). Google violated the CCPA, which provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive,

1    or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

2         176.    End-users have a property right in the data that Google collects from them and End-

3    users retain a stake in the unjustly earned profits that Google garnered from selling or transmitting

4    End-users' data, including their personal browsing histories.  Because California law recognizes a

5    legal interest in unjustly earned profits from End-users' personal data, End-users have standing to

6    sue under the UCL.  *In re Facebook, Inc. Internet Tracking Litig.*, No. 17-17486 at pp. 14-17 ("In

7    other words, California law requires disgorgement of unjustly earned profits regardless of whether a

8    defendant's actions caused a Plaintiff to directly expend his or her own financial resources or

9    whether a defendant's actions directly caused the plaintiff's property to become less valuable.").

10        177.    By entering into and implementing the Information Services Agreement ("ISA"), the

11   Amendment To the Information Services Agreement, Exhibit A hereto, the Revenue Sharing

12   Agreements ("RSA") and related agreements. the Information Services Agreement ("ISA"), the

13   Amendment To the Information Services Agreement, Exhibit A hereto, the Revenue Sharing

14   Agreements ("RSA") and related agreements, and excluding competition and  by agreeing that

15   Google's search engine will be the out-of-the-box default search engine on all Apple devices to the

16   exclusion of Google's competitors and by sharing Google's general search services and general

17   search text ad revenues in the billions of dollars annually with Apple in return for Apple's agreement

18   to employ Google's search engine as the default out-of-the-box search engine  on Apple's devices to

19   the exclusion of competitors and competition, Google has been unjustly enriched.  *In re Facebook,*

20   *Inc. Internet Tracking Litig.*, 956 F.3d 589, 599-600 (citing *In re Google Inc. Cookie Placement*

21   *Consumer Privacy Litig.*, 934 F.3d 316, 325 (3rd Cir. 2019).

22        178.    A key element of Google's violation of the Unfair Competition Law ("UCL") is

23   Google' agreements to share revenue from its advertisers with Apple and the Android parties.

24   Google represented that it priced its sales of end-user data to advertisers based on auction pricing as

25   Judge Mehta found in his MO at FOF 238-242. But Google fraudulently used "pricing knobs" to

26   surreptitiously increase prices and the revenue from advertisers that it shared with Apple and the

27   Android parties and the profits thereon. Mehta MO at FOF 243-267. FOF 267. In 2024, Google's

28   revenue from advertisers was $350 billion and its profits were $100 billion.

179.    Google's business acts and practices are likely to deceive the general public, and therefore fraudulent under the UCL in that Google failed to disclose that "Google requires website developers to embed Google's code onto their websites, and does not tell website developers that it tracks their visitors even when they are in private mode." See *Brown v. Google*, LLC, Dkt. No. 969 at p.3. Nor does Google tell End-users that it tracks them.

180.    Through its false representations and unlawful data collection, Google is unjustly enriching itself at the cost of End-user's choice, when the End-user would otherwise have the ability to choose how they would monetize their own data.

181.    If not for Google's violations of the UCL End-users could have received monetary value for their valuable data from other internet firms and received higher quality search products that are more privacy protective and ad free from Google's competitors.

182.    Google's anticompetitive conduct in violation of Section 2 of the Sherman Act  and the CCPA and Google's misrepresentations have resulted in injury and loss of money and property to Plaintiff and the class of End-Users by having their private search data collected by Google, without compensation to Plaintiff and the End-User class, and resold to advertisers for billions of dollars annually, which revenue Google shared with Apple and the Android parties. In so doing, Defendants engaged in unlawful, unfair and fraudulent business acts and practices in violation of California Bus. & Prof. C. 17200 for which Plaintiff and the class seek restitution and injunctive relief.

## VIII.    END-USERS HAVE STANDING TO SUE GOOGLE FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT, IN WHICH END-USERS HAVE RETAINED A STAKE, THAT GOOGLE MADE BY EXTRACTING AND COLLECTING END-USERS' VALUABLE DATA, FOR NO COMPENSATION TO END-USERS, AND SELLING IT TO ADVERTISERS FOR BILLIONS OF DOLLARS

183.    Plaintiff realllege paragraphs 1 through 182 above.

184.    When End-users make queries on Google's general search engine ("GSE") , End Users disclose their data in the general search services market and  Google extracts and collects End-

users' data and sells it to advertisers and brokers, for billions of dollars that enable them to target and bombard End Users' with general search text advertisements in the general search text ads market focused on End-users' expressed interests.

185. End-users have a property right in the data that Google collected from them, in which they retained a stake in the unjustly earned profits that Google garners from selling or transmitting their data including their personal browsing histories, which confers standing to sue on End-users. *In re Facebook, Inc. Internet Tracking Litig.*, No. 17-17486 at pp. 14-17 ("In other words, California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a Plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable); *Greenley v. Kochava, Inc.*, No. 22-cv-01327-BAS-AHG, 2023 WL 4833466 at *4 (S.D. Cal. July 27, 2023) ("[T]o establish standing, Plaintiff must only establish a stake in the profits garnered from their personal data and that it is unjust for the Defendants to retain those profits.").

186. In *Brown v. Google, LLC*, 4:20-cv-3664-YGR, Dkt. No. 969 at p.3; 2023 WL 5029899 (N.D. Cal Aug. 7, 2023), 685 F.Supp.3d 909, the court stated:

> "**Data Collection**…When a user visits a website, the user's browser sends a "GET" request to the website to retrieve it. (Id.) This GET request contains the following information: the Request URL, or the URL of the specific webpage the user is trying to access; the user's IP address; the Useragent, which identifies the user's device platform and browser; user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. (Id.) At the same time, *the user's browser reads Google's code, which is embedded on the website*. (Id.) Google's code instructs the user's browser to send a second and concurrent transmission directly to Google. (Id.) This second transmission tells Google exactly what a user's browser communicated to the website. (Id.). (Emphasis supplied).
>
> Google's services are ubiquitous on the internet: over 70 percenta [sic] of websites use Google Analytics and Ad Manager. (4AC ¶¶ 67 and 78.) To use these services, *Google requires website developers to embed Google's code onto their websites* and agree to its Privacy Policy. (PAF 6.) *Google does not tell website developers that it tracks their visitors* even when they are in private browsing mode. (Id.) (Emphasis added).
>
> According to Plaintiff, *Google then takes users' private browsing history and associates it with their preexisting user profiles. (PAF 47; Response to SUF 65.) Doing so allows Google to offer better, more targeted, advertisements to users.* (Response to SUF 63; 4AC ¶ 84.) This is at the core of Google's business: the bulk of

58

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

Google's hundreds of billions of dollars in revenue come from selling targeted advertisements to other companies. (4AC ⁋ 89.) By selling users' information, Google prevents users from monetizing their own data. (4AC ⁋ 138; PAF 27–28.) *The value of this data can be quantified; for example, Google itself has piloted a program to pay users $3.00 per week to track them.* (PAF 28.)" (Emphasis added). *Brown v. Google, LLC*, 4:20-cv-3664-  YGR, Dkt. No. 969 at p.3

187.    As recognized in *Brown v. Google LLC*, Google requires website developers to embed Google's code onto their websites, so that Google's search engine can collect End-users' data directly from End-users' browsers.  Google's communications code embedded on websites is thus an extension of Google's search engine in the monopolized general search services and general search text ads relevant markets. Google then takes End-users' private browsing history that Google collected with Google's code embedded on websites and associates it with End-users' preexisting user profiles that Google has compiled, which allows Google to offer, more targeted advertisements to End-users and to build scale that far surpasses Google's competitors.

188.    As stated in *Brown v. Google LLC*, Google has "piloted a program to pay users $3 per week to track them." Plaintiff' and End-users' data carried financial value and Google profited from their valuable data by selling or transferring it to advertisers. Plaintiff and End-users retained a stake in their data and in the profits garnered by Google from the disposition of Plaintiff and End-users' data. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 599-600. In *Rodriguez v. Google LLC*, 20-cv-o4668 Dkt. No 352 at p. 13, Judge Seeborg stated:  "In [In re Facebook], the Court held that Plaintiff had adequately established standing because they alleged their data "carried financial value" and that the Defendants "profited from this valuable data."

189.    In *Brown*, the Court under "**Damages or Loss**" further stated:

"Second, Google argues Plaintiff suffered no "damage or loss by reason of a [CDAFA] violation." Cal. Pen. Code § 502(e)(1). Plaintiff disagree and offer evidence showing that they have a stake in the value of their misappropriated data. *Facebook Tracking*, [*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (citing *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3rd Cir. 2019) (cleaned up))]is instructive. In Facebook Tracking, the Ninth Circuit found that Plaintiff had sufficiently alleged their browsing histories carried financial value. Id. at 600. So too here. *Plaintiff have evidence that there is a market for their data—Google itself has piloted a program where it pays users $3.00 a day for their browsing history*. (PAF 28.) Google responds that Facebook Tracking does not apply because it was a decision about standing, not liability. That is beside the point. The Ninth Circuit's decision stands for the proposition that Plaintiff can state an economic injury for their misappropriated data. Because Plaintiff proffer

59

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

1    evidence that there is a market for their data—one Google itself has created—the

2    Court cannot rule, as a matter of law, that Plaintiff suffered no damages . . ." (Docket
     No. 969, at p. 33).

3    Google uses its general search services and general search text ads to compile End

4    Users' searches on the web which End User information Google sells to advertisers.
     When an End User uses Google, the End User provides personal information to

5    Google in exchange for search results, for no compensation to the End User, which
     Google monetizes by selling the End User's information to advertisers and producing

6    search advertising targeting the End User based on the End User's information
     collected by Google. "By selling [End] Users' information, Google prevents End

7    Users from monetizing their own data." *Brown et al. v. Google LLC*, No. 4:20-cv-
     3664-YGR (N.D. Cal. 2023).

8    190.    Google looked to the Ipsos Screenwide Panel, a consumer research study conducted

9    by Google since 2012 to 'collect information about how users browse the internet.' *Id*. para.

10   135…The minimum recurring payment is $3 a month." Thus, damages at $3 per month can be

11   calculated by multiplying the number of class members by $3, and then multiplying that figure by

12   the number of months in the Class Period.

13   Thus, Google itself has paid for users' search data, establishing that there is a market for

14   user's search data and that user's search data has value.

15   191.    In the "Ipsos Screenwise Panel, a consumer research study conducted by Google

16   since 2012…The minimum recurring payment is $3 a month." *Rodriguez v. Google LLC*, 20-cv-

17   04688, Dkt. No. 352 (Order granting class certification) at p. 20 lines 13-17 "…[A]s the court in

18   *Brown* already noted, "The $3 rate is derived from looking at what Google *actually* pays Screenwise

19   participants for agreeing to allow Google to collect their browsing data." *Rodriguez v. Google LLC*,

20   20-cv-04688, Dkt. No. 352 (Order granting class certification) p. 22 lines 18-20. Thus, damages at

21   $3 per month can be calculated by multiplying the number of class members by $3, and then

22   multiplying that figure by the number of months in the Class Period.

23   192.    Plaintiff' injury is both particularized and concrete—particularized with respect to the

24   End-user's specific data that is extracted for no compensation—and concrete with respect to the

25   monetized value in billions that Google obtains by re-selling the End-users' data to advertisers. As

26   further injury, Plaintiff and other End-users of Google's search engine are not only injured by the

27   taking of their valuable search data for no compensation. In addition, Google has also harmed

28   consumers of general search services by reducing the quality of the general search experience, by

60

1   lessening choices, and by impeding innovation.

2        193.    Plaintiff and End-users are also directly injured because they have been deprived of

3   alternative search engines that may be more responsive to Plaintiff' demands for privacy and ad-free

4   and because Plaintiff have been subjected to an inferior search experience. Plaintiff and the class are

5   injured because Plaintiff and the class relinquish their valuable personal information to Google

6   without compensation during their use of Google search, an injury that has been quantified by

7   Google at $3.00 per month.

8        194.    Google and Apple specifically targeted "End Users" in their written agreements. In

9   the written ISA contract, which sets out the parties' agreement not to compete and to share revenue,

10   the parties specifically recited that the stated "Agreement Purpose" was to improve the "performance

11   of the Services, the Spotlight Services and the Siri Services *for End Users* on Apple products."

12   (Exhibit A, p. 7) (Emphasis Added.) Having been expressly and unambiguously targeted as End-

13   Users by the Defendants within the context of a document which is anticompetitive on its face, the

14   Plaintiff meet the criteria for standing to bring this lawsuit.

15        Accordingly, when Google pays user's $3.00 a month for End-users' data, Google is paying

16   for data that is collected in the general search services and general text ads markets.

17        195.    Google LLC as one of the largest technology companies and its parent Alphabet Inc.

18   have over 276 million active users in the United States[1]  and Alphabet Inc. boasts a net worth

19   exceeding $1 trillion.[2]

20        196.    Google's enormous financial success results from its tracking and collection of the

21   personal and sensitive End-user data of Plaintiff and Class members and selling and brokering that

22   data to advertisers to optimize advertisement services in the general search text ads market.

23        197.    Google profits from the data it collects by charging its advertisers and others for

24

25

26   [1] See online Google.

27   [2] Many of Plaintiff' allegations herein are from Judge Rogers' Order Denying Summary Judgment in *Brown v. Google, LLC* , 4:20-cv-3664-YGR, Dkt. No. 969 and the Fourth Amended Complaint in

28   *Rodriguez v. Google  LLC*, 3: 20-cv-04688-RS, Dkt. No. 289.

1    advertisement-related services based on End-user data that targets advertisements to End-users, and

2    bombards Plaintiff and the class with text ads and by using the results to improve Google's own

3    algorithms and technology to achieve monopoly scale far beyond the scale its competitors can

4    achieve.

5         198.    A key element of Google's agreements with Apple and the Android parties in the

6    general search services and general search text ads markets is Google' agreements to share revenue

7    from its advertisers with Apple and the Android parties. Google represented that it priced its sales of

8    end-user data to advertisers based on auction pricing as Judge Mehta found in his MO at FOF 238-

9    242. But Google fraudulently used "pricing knobs" to surreptitiously increase prices and the revenue

10   from advertisers that it shared with Apple and the Android parties and the profits thereon. Mehta

11   MO at FOF 243-267. As proof of its monopoly, "When Google made these pricing changes, Google

12   did not consider its rivals' text ad pricing." FOF 267. In 2024, Google's revenue from advertisers

13   was $350 million and its profits were $100 million.

14        199.    The End-user data Google collects contains personal viewing information, which

15   Google  analyzes and associates with End-users' prior viewing histories, to  creates "profiles" for

16   each End-user that enable Google to charge its customers for targeted End-user data and monetize

17   End-users' data  so that Google can profit from Google's ad-targeting services.

18        200.    Google is paid high prices for these targeted End-user data-based profiles for

19   advertisements by third-party advertisers because Google uses End-user data that Google collected

20   from End-users to select and display advertisements targeted at those specific profiles.

21        201.    Google also benefits by using the End-user data it collects to improve and refine

22   existing and new Google products, services, and algorithms.

23        202.    Google's market power in general search services and general search text ads depends

24   on Google's ability to track what consumers are doing. The trackers that Google has across the

25   internet not only tell Google where consumers go after using Google, what websites are popular and

26   how often they are visited. By surveying End-users' behavior across the web, Google is able to

27   create a better and higher quality search product than its competitors.

28        203.    Google includes far more than volunteered personal information like name, birth date,

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR
COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

gender and email address since Google secretly plants numerous tracking mechanisms on End-users' computers and web- browsers, which enable Google to track users' browsing histories and correlate them with End-user browser IDs, preventing End-users' from blocking access to their data.

204.    Similarly, the value of End-user-correlated internet browsing history can be quantified, because Google itself was willing to pay users for the exact type of communications that Google illegally intercepted from Plaintiff and End-users during the Class Period. For example, Google Inc. had a panel during the Class Period (and still has one today) called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more about how everyday people use the Internet."

205.    Upon becoming a panelist, internet users would add a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com.

206.    After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated conclusively that internet industry participants understood the enormous value in internet users' browsing habits. Google now pays Screenwise panelists up to $3 per week to be tracked.

207.    In a study, web browsing histories were valued at $52.00 per year, web search histories were valued at $57, GPS records were valued at $55, Emails and text messages were valued at $59.

208.    End-users' data increased in value as a commodity, where Google itself began paying End-users specifically for their browsing data. As early as 2012 Google publicly admitted it utilized End-users' browsing data, paired with other sensitive and valuable personal information, to achieve what it called "nowcasting," or "contemporaneous forecasting," which Google's Chief Economist Hal Varian equated to the ability to predict what is happening as it occurs.

209.    Similarly, the value of user-correlated internet browsing history can be quantified, because Google itself was willing to pay users for the exact type of communications that Google illegally intercepted from Plaintiff and other members of the Class during the Class Period. For

example, Google Inc. had a panel during the Class Period (and still has one today) called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more about how everyday people use the Internet."

210. Thus, Google itself has recognized the value of End-user' data and has paid for End-users' search data.

**The End-users' Data Collected By Google Is Highly Valuable**

211. The data Google has collected from End-users is highly valuable to Google, to advertising companies, and to End-users. There was a growing consensus in the ecommerce industry that consumers' personal data was very valuable.[3] In 2004, Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[4]

212. In 2011, Christopher Soghoian, formerly of the Open Society Institute and current technologist at the ACLU, wrote in The Wall Street Journal:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search

---

[3] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD DIGITAL ECONOMY PAPERS No. 220 at 7 (Apr. 2, 2013), available at http://dx.doi.org/10.1787/5k486qtxldmq-en; Supporting Investment in Knowledge Capital, Growth and Innovation, OECD at 319 (Oct. 13, 2013), available at https://www.oecd.org/sti/inno/newsourcesofgrowthknowledge-basedcapital.htm; Pauline Glickman & Nicolas Glady, What's the Value of Your Data? TECHCRUNCH (Oct. 13, 2015), available at https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited Nov. 11, 2020) Paul Lewis & Paul Hilder, Former Cambridge Analytica Exec Says She Wants Lies to Stop, THE GUARDIAN (March 23, 2018), available at https://www.theguardian.com/uknews/2018/mar/23/former-cambridge-analytica-executive-brittany-kaiser-wants-to-stop-lies (last visited Nov. 11, 2020); SHOSHANNA ZUBOFF, THE AGE OF SURVEILLANCE CAPITALISM: THE FIGHT FOR A HUMAN FUTURE AT THE NEW FRONTIER OF POWER at 166 (2019).

[4] Paul M. Schwartz, Property, Privacy and Personal Data, 117 HARV. L. REV. 2055, 2056–57 (2004).

---

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[5]

A.    *End-users' Data Is Valuable to Class Members*

213.    It is possible to quantify the cash value, to Class members, of the data collected and saved by Google, including by way of Google tracking and advertising code.

214.    In a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[6] web browsing histories were valued at $52.00 per year, web search histories were valued at $57, emails and text messages were valued at $59.00, and GPS records were valued at $55.

B.    *End-users' Data Is Valuable to Google*

215.    In addition to quantifying the value of the collected data to End-users, it is also possible to quantify the value of this data to Google.

216.    For example, it is possible to calculate the profits Google has earned from using End-users' data to enhance its "user profiles"; to sell targeted advertisements; and to develop and refine other Google products.

217.    It is also possible to assess the value of the collected data to Google by reference to the money that Google has, on other occasions, paid to users for this kind of data. Google began paying users for their web browsing data in 2012.[7]

---

[5] Julia Angwin, How Much Should People Worry About the Loss of Online Privacy?, THE WALL STREET JOURNAL (Nov. 15, 2011), available at https://www.wsj.com/articles/SB10001424052970204190704577024262567105738 (last visited Nov. 11, 2020).

[6] Tim Morey, What's Your Personal Data Worth?, DESIGN MIND (Jan. 18, 2011), available at https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039syour -personal-data-worth.html (last visited Nov. 11, 2020).

[7] Jack Marshall, *Google Pays Users for Browsing Data*, DigiDay (Feb. 10, 2012), https://digiday.com/media/google-pays-users-for-browsing-data/
 K.N.C., *Questioning the searches*, The Economist (June 13, 2012), https://www.economist.com/schumpeter/2012/06/13/questioning-the-searchers

218. Google also pays internet users to participate in a panel that Google calls "Google Screenwise Trends."

219. Upon becoming panelists for Google Screenwise Trends, these users add a browser extension that shares with Google the sites they visit and how they use them. The panelists consent to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google then pays panelists additional gift cards "for staying with" the panel.

220. These gift cards, mostly valued at $5, demonstrated that Google assigned cash value to the data it obtained from internet users' communications with the websites they visited. Google now pays Screenwise panelists up to $3 per week.

221. There are other ways to assess the value of End-users' data, including in terms of Google's ability to maintain and extend its monopolies.

C. *End-users' Data Is Valuable to Other Internet Firms Who In A Competitive Market Would Compete By Compensating End-Users' For Their Search Data*

222. Unrestrained by Google's default contracts, Google or other firms would compete by compensating End-users for their search data. Since Judge Mehta found that Microsoft was willing to pay even 100% of its Bing revenue for a default GSE with improved privacy in search, it is plausible that Microsoft would have competed by paying End-users for their data to accomplish improved privacy in search. Once in a position to compete, Google's competitor Microsoft/Bing would offer to pay for End-user' data just as Microsoft/Bing offered to pay Apple for a default GSE with "improved private searching." In *United States v. Google*, FOF 322-323, Judge Mehta found with respect to Microsoft, a Google competitor:

> "Microsoft made clear that it was 'willing to provide Apple with the majority of profits in a search partnership along with greater levels of flexibility and control over the product experience including user experience and branding,' with one example being improved private searching 'consistent with the broader Apple value proposition around respecting user privacy.' Microsoft understood that it 'would have to pay and even subsidize the transfer' for the period of the transition and was willing to do so for the long term. Tr. at 3502:21-3503:8 (Nadella)…Microsoft proposed sharing 100% of its Bing revenue with Apple to secure the default or even selling Bing to Apple."

Since Judge Mehta found that Microsoft was willing to pay even 100% of its Bing revenue for a default GSE with improved privacy in search, it is likely Microsoft would have paid users for data to accomplish improved privacy in search as would DDG who attempted to obtain default status. At FOF 330, Judge Mehta also found that DDG, because of its brand emphasis on privacy, on multiple occasions has attempted to convince Apple to switch to DDG as the default GSE on Safari's 'private browsing mode'.

Second, a number of platforms have appeared on which consumers monetize their data. For example: a. Brave's web browser pays users to watch online targeted ads, while blocking out everything else.[8] b. Loginhood "lets individuals earn rewards for their data.[9] c. Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[10] d. Killi is a new data exchange platform that allows you to own and earn from your data.[11] e. Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[12] The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended their reach to computers

---

[8] Brandan Hesse, Get Paid to Watch Ads in the Brave Web Browser, LIFEHACKER (Apr. 26, 2019), available at https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser1834332279#:~:text=Brave%2C%20a0a%20chromiumbased%20web%20browser%20that%20boasts%20an,a%20more%20thoughtful%20way%20than %20we%E2%80%99re%20accustomed%20to (last visited Nov. 11, 2020) ("The model is entirely opt-in, meaning that ads will be disabled by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly")

[9] Privacy Drives Performance, LOGINHOOD, https://loginhood.io/ ; see also Chrome Browser Extension, LOGINHOOD, https://loginhood.io/product/chromeextension 2020) ("Start earning rewards for sharing data – and block others that have been spying on you. Win-win.").

[10] *Your data – Your Property*, DATA DIVIDEND PROJECT, https://www.datadividendproject.com ("Get your Data Dividend…We'll send you $$ as we negotiate with companies to compensate you for using your personal data.").

[11] *Killi Paycheck*, KILLI, https://killi.io/earn/

[12] FAQ, BIG TOKEN, https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

---

67

and mobile devices through Nielsen Computer and Mobile Panel. By installing the application on your computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits, and earn points worth up to $50 per month.[13]

223.    The California Consumer Privacy Act ("CCPA") recognizes that the End-users' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers that opt-out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). Google violated the CCPA, which provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4). Google's practices are unjust, unreasonable, coercive and usurious due to its monopolization of the general search services and general search text ads markets.

224.    End-users have a property right in the data that Google collects from them and End-users retain a stake in the unjustly earned profits that Google garnered from selling or transmitting End-users' data to others, including their personal browsing histories, which confers standing on Plaintiff and the class, and it is unjust for the Defendants to retain those profits. *In re Facebook, Inc. Internet Tracking Litig.*, No. 17-17486 at pp. 14-17 ("In other words, California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a Plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable); *Greenley v. Kochava, Inc.*, No. 22-cv-01327-BAS-AHG, 2023 WL 4833466 at *4 (S.D. Cal. July 27, 2023) ("[T]o establish standing, Plaintiff must only establish a stake in the profits garnered from their personal data and that it is unjust for the Defendants to retain those profits.")

225.    Because California law recognizes a legal interest in Google's unjustly earned profits

---

[13] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

from the sale of [End]-users personal data, End-users have standing to sue for disgorgement of Google's unjustly earned profits.

226.    End-users have a property right in the data that Google collects from them, a reasonable expectation of privacy and a stake in the unjustly earned profits that Google garnered from selling or transmitting their data including their personal browsing histories which confers Article III Standing. *In re Facebook, Inc. Internet Tracking Litig.*, No. 17-17486 at pp. 14-17 ("In other words, California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a Plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable.

227.    Through its false representations and unlawful data collection, Google is unjustly enriching itself at the cost of End-user's choice, when the End-user would otherwise have the ability to choose how they would monetize their own data.

228.     Through its false promises and unlawful data collection, Google is unjustly enriching itself.

229.    If not for Google's actions, End-users could have received monetary value for their data from other internet firms.

D.    *There Is Value to Class Members in Keeping Their Data Private*

230.    In addition to monetary value of selling their data, Class members also assign value to keeping their data private. It is possible to quantify this privacy value, which is destroyed when Google tracking and advertising code surreptitiously transmit End-users' data to Google.

231.    According to Google, more than 200 million End-users visit Google's "Privacy Checkup" website each year. Each day, nearly 20 million End-users check their Google privacy settings. because they care about keeping their data private and preventing its disclosure to anyone else, including to Google.

232.    Surveys of consumers indicate the importance that consumers assign to privacy. For example, in a recent study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have

someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was "very important" to control this.

233. Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies, such as Google or Facebook, control too much of our personal information and know too much about our browsing habits.

234. Through its false representations and unlawful data collection, Google is unjustly enriching itself at the cost of End-user choice, when the consumer would otherwise have the ability to choose how they would monetize their own data.

## IX.     TOLLING OF THE STATUTE OF LIMITATIONS

**The Statute Of Limitations Is Tolled Since The United States Proceeding To Punish Google's Violations Of Section 2 Of The Sherman Act Is Pending**

235. The United States instituted *United States v. Google LLC* (2020) Case 1:20-cv-03010- APM in the U.S. District Court For The District Of Columbia on October 20, 2020 and said suit remains pending as of the date of the filing of this action. The statute of limitations herein is tolled pursuant to Section 5(i) of the Clayton Act (15 U.S.C. sec. 16(i)) which provides:

> (i)      "Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain or punish violations of any of the antitrust laws…the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter…"

## X.     FRAUDULENT CONCEALMENT

236. Until shortly before the filing of this complaint, Plaintiff and members of the Plaintiff Class had no knowledge that Defendants were violating the antitrust laws as alleged herein. Plaintiff and the members of the class could not have discovered any other violations at any time prior to this date by the exercise of due diligence because of fraudulent and active concealment of the conspiracy by Defendants. With respect to Google' agreements to share revenue from its advertisers with Apple and the Android parties, Google represented that it priced its sales of end-user data to advertisers

70

1 based on auction pricing as Judge Mehta found in his MO at FOF 238-242. But Google fraudulently

2 concealed that it used "pricing knobs" to increase prices and the revenue from advertisers that it

3 shared with Apple and the Android parties and the profits thereon. Mehta MO at FOF 243-267. FOF

4 267. Google further concealed the extent of its tracking of End-users.

5     237.    The affirmative actions of Defendants hereinbefore alleged were wrongfully

6 concealed and carried out in a manner which precluded detection such as raising prices

7 "incrementally" to avoid detection as Judge Mehta found in MO, FOF 264. Plaintiff had no

8 knowledge of the antitrust violations herein alleged or any facts that might have led to their

9 discovery. Plaintiff could not have uncovered the violations alleged herein at an earlier date

10 inasmuch as the means for discovering their causes of action were not reasonably ascertainable due

11 to Defendants' fraudulent concealment of activities through various means and methods designed to

12 avoid detection. Defendants secretly conducted activities in furtherance of its maintenance of its

13 monopoly, its conspiracy to maintain its monopoly, its conspiracy to restrain trade and violate the

14 UCL by confining information concerning the conspiracy to key officials and engaged in

15 concealment giving rise to an estoppel to assert the statute of limitations.

16 **XI.**   **DAMAGES**

17     In his ruling, Judge Mehta found that default search access points that provide search access

18 to default browsers are integral to Google's GSE and incorporated in Google's general search

19 services and general search text ads markets in which Google's exclusionary agreements

20 substantially foreclose competition, are anticompetitive and violate Section 2 of the Sherman Act.

21 Google has thus foreclosed a substantial share of the general search services and general search text

22 ads markets from competition that precludes users from monetizing their own data, enabling Google

23 to extract and collect End User's valuable search data without compensation to End Users and

24 foreclosed efficient channels of distribution resulting in network effects that blocked competitors'

25 ability to gain the scale of user data that would enable them to develop search products that offer

26 greater privacy protection or are less clogged with ads, and enable advertisers to target users with

27 ads.

28     238.    During the period of time covered by the antitrust violations by Defendants, Google

1  collected End Users' private search data without compensation and resold it to advertisers for

2  billions of dollars annually.

3       239.    Google and Apple have engaged in a conspiracy, combination and agreements to

4  maintain Google's monopoly and to restrain trade in the general search services and general search

5  text ads markets and injured Plaintiff and the class and harmed competition resulting in damages to

6  Plaintiff.

7       Google looked to the Ipsos Screenwide Panel, a consumer research study conducted by

8  Google since 2012 to 'collect information about how users browse the internet.' Id. para. 135…The

9  minimum recurring payment is $3 a month." Thus, damages at $3 per month can be calculated by

10  multiplying the number of class members by $3, and then multiplying that figure by the number of

11  months in the Class Period.

12       240.    In the "Ipsos Screenwise Panel, a consumer research study conducted by Google

13  since 2012…The minimum recurring payment is $3 a month." *Rodriguez v. Google LLC*, 20-cv-

14  04688, Dkt. No. 352 (Order granting class certification) at p. 20 lines 13-17 "…[A]s the court in

15  *Brown* already noted, "The $3 rate is derived from looking at what Google *actually* pays Screenwise

16  participants for agreeing to allow Google to collect their browsing data." *Rodriguez v. Google LLC*,

17  20-cv-04688, Dkt. No. 352 (Order granting class certification) p. 22 lines 18-20. Thus, damages at

18  $3 per month can be calculated by multiplying the number of class members by $3, and then

19  multiplying that figure by the number of months in the Class Period.

20       241.    Plaintiff and the Class are entitled to damages, treble damages, injunctive relief,

21  disgorgement, and attorneys' fees and costs against defendants as set forth below.

22  **XII.**    **DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT,**

23       242.    End-users have a property right in the data that Google collected from them, in which

24  they retained a stake in the unjustly earned profits that Google garners from selling or transmitting

25  their data including their personal browsing histories, which confers standing to sue on End-users. *In*

26  *re Facebook, Inc. Internet Tracking Litig.*, No. 17-17486 at pp. 14-17 ("In other words, California

27  law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions

28  caused a Plaintiff to directly expend his or her own financial resources or whether a defendant's

actions directly caused the plaintiff's property to become less valuable); *Greenley v. Kochava, Inc.*, No. 22-cv-01327-BAS-AHG, 2023 WL 4833466 at *4 (S.D. Cal. July 27, 2023) ("[T]o establish standing, Plaintiff must only establish a stake in the profits garnered from their personal data and that it is unjust for the Defendants to retain those profits.").

**XIII.   VIOLATIONS ALLEGED**

**First Claim for Relief: Google Violated Section 2 Of The Sherman Antitrust Act (15 U.S.C. § 2) By Maintaining Its Monopoly in The Markets For General Search Services And General Search Text Ads**

243.    Plaintiff incorporate the allegations of paragraphs 1 through 242. above.

244.    Google has unlawfully maintained its monopoly in general search services and general search text ads markets in violation of Section 2 of the Sherman Antitrust Act by entering into exclusionary default agreements with Apple and the Android partiess that have foreclosed a substantial share of these markets from competitors that have resulted in Plaintiff and the class of End-Users having their private search data collected by Google without compensation, which Google resold to advertisers for billions of dollars annually, which revenue it shared with Apple and the Android parties, targeting End-users with text ads and precluded competitors from providing End-users with high quality search products that are more privacy protective and ad-free.

245.    *General Search Services*.  The general search services market is a relevant market that consists of general search engines that End Users can use to search the internet for answers to a wide range of queries. Google has an 89.2% share of and monopoly power in the general search services market that is fortified by barriers to entry, including (1) high capital costs, (2) Google's control of key distribution channels (3) brand recognition, and (4) scale, "The Court finds that these barriers exist and that, both individually and collectively, they are significant barriers to entry." As stated by Judge Mehta in his MO at p. 156-157. See pp. 151-165.

246.    *General Search Text Ads*.  The general search text ads market is a relevant market that includes all text advertisements in connection with a general search query. Google had an 88% market share of the general search text ads market in 2020 and monopoly power in the general search text ads market, protected by high barriers to entry as stated by Judge Mehta's MO at p. 185.

247.     Google and Apple's conspiracy and combination and agreements and Google and the Android parties' conspiracy, combination and agreements are anticompetitive and exclusionary in that they lock up the preset default positions for Google's search engines on Apple's and the Android's mobile devices, computers, and other devices and has foreclosed a substantial share of the general search services and general search text advertising markets to competitors and competition, depriving Google's competitors of the scale required to compete in the general search services and general search advertising markets, effecting a substantial barrier to entry for competitors resulting in injury to Plaintiff and the class of End Users.

248.     The Google-Apple and Google-Android parties' combinations, conspiracy and agreements effectively eliminate Google's competitors' ability to build the scale necessary to compete in the general search services and general search text ads markets and are thus a significant barrier to entry. Scale affects a general search engine's ability to deliver a quality search experience since advertisers pay more to buy ads from a search provider with a large audience of searched customers, targeted as potentially in the advertiser's product or service. By April 2018, Google estimated that its share of the general search services and general search text ad markets was 79 percent on computers and 93.5 percent on mobile devices. More recently, Google has accounted for almost 90 percent of all general search engine inquiries in the United States, and almost 95 percent of inquiries on mobile devices

249.     Google's and Apple's and the Android parties' anticompetitive acts have had substantial harmful effects on competition, and Plaintiff and the class of End Users. In its MO, the court found that "Aggregating the foreclosure effects of the [Apple] browser and Android agreements is an appropriate way to understand the overall effect of Google's exclusive dealing in the relevant markets…The Court thus finds that as to the general search services market, Plaintiff have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume." MO p. 222.

250.     With respect to the general search text ads market, Judge Mehta found that the challenged agreements foreclose 45% of the general services text ads market and that it was "significant." MO pp. 258-259.

251.     Google's default distribution agreements have foreclosed a substantial share of the general search services and general search text advertising markets from competitors and harmed competition and Plaintiff and the class of End-Users.

252.     The anticompetitive effects of Google's and Apple's anticompetitive agreements outweigh any procompetitive benefits in this market or can be achieved through less restrictive means.

**Second Claim for Relief: Conspiracy And Combinations to Monopolize The General    Search Services And General Search Text Ads Markets In Violation of Sherman Act § 2**

253.     Plaintiff incorporate the allegations of paragraphs 1 through 252 above.

254.     With specific intent, Google and Apple and Google and the Android parties have entered into combinations, conspiracy, and agreements to maintain Google's monopoly in the general search services and general search text ads markets in violation of Section 2 of the Sherman Act, (15 U.S.C. § 2) that have foreclosed a substantial share of those markets from competitors that have resulted harm to  Plaintiff and the class of End-Users by having their private search data extracted and collected by Google without compensation, which Google resold to advertisers for billions of dollars annually, which revenue it shared with Apple and the Android parties, and enabled the targeting and bombarding of End-users by advertisers with text ads and by precluding competitors from providing End-users with higher quality search products that are more privacy protective and ad-free.

255.     ***General Search Services***.  The general search services market is a relevant market that consists of general search engines that End Users can use to search the internet for answers to a wide range of queries. Google has an 89.2% share of and monopoly power in the general search services market that is fortified by barriers to entry, including (1) high capital costs, (2) Google's control of key distribution channels (3) brand recognition, and (4) scale, "The Court finds that these barriers exist and that, both individually and collectively, they are significant barriers to entry." As stated by Judge Mehta in his MO at p. 156-157. See pp. 151-165.

256.     ***General Search Text Ads***.  The general search text ads market is a relevant market that includes all text advertisements in connection with a general search query. Google had an 88%

market share of the general search text ads market in 2020 and monopoly power in the general search text ads market, protected by high barriers to entry as stated by Judge Mehta's MO at p. 185.

257.   Google and Apple's conspiracy and combination and agreements and Google and the Android parties' conspiracy, combination and agreements are anticompetitive and exclusionary in that they lock up the preset default positions for Google's search engines on Apple's  and the Android's mobile devices, computers, and other devices and has foreclosed a substantial share of the general search services and general search text advertising markets to competitors and competition, depriving Google's competitors of the scale required to compete in the general search services and general search advertising markets, effecting a substantial barrier to entry for competitors resulting in injury to Plaintiff and the class of End Users.

258.   The Google-Apple and Google-Android parties' combinations, conspiracy and agreements effectively eliminate Google's competitors' ability to build the scale necessary to compete in the general search services and general search text ads markets and are thus a significant barrier to entry. Scale affects a general search engine's ability to deliver a quality search experience since advertisers pay more to buy ads from a search provider with a large audience of searched customers, targeted as potentially in the advertiser's product or service.  By April 2018, Google estimated that its share of the general search services and general search text ad markets was 79 percent on computers and 93.5 percent on mobile devices. More recently, Google has accounted for almost 90 percent of all general search engine inquiries in the United States, and almost 95 percent of inquiries on mobile device

259.   Google's and Apple's and the Android parties' anticompetitive acts have had harmful effects on competition, and Plaintiff and the class of End Users. In its MO, the court found that "Aggregating the foreclosure effects of the [Apple] browser and Android agreements is an appropriate way to understand the overall effect of Google's exclusive dealing in the relevant markets…The Court thus finds that as to the general search services market, Plaintiff have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume." MO p. 222.

260.   With respect to the general search text ads market, Judge Mehta found that the

1    challenged agreements foreclose 45% of the general services text ads market and that it was

2    "significant." MO p. 258-259.

3          261.    The effects of Google's and Apple's anticompetitive agreements outweigh any

4    procompetitive benefits in the general search advertising market or that can be achieved through less

5    restrictive means. MO p. 4.

6          262.    **Third Claim for Violations of Section 1 of the Sherman Act.**

7          263.    Plaintiff incorporate the allegations of paragraphs 1 through 262 above.

8          264.    Google and Apple and the Android parties have entered into a conspiracy,

9    combination and agreements to restrain trade  in the general search services and general search text

10    ads markets in violation of Section 1 of the Sherman Act, (15 U.S.C. § 1) that have foreclosed a

11    substantial share of these markets from competitors that have resulted in Plaintiff and the class of

12    End-Users having their private search data collected by Google without compensation, which

13    Google resold to advertisers for billions of dollars annually, which revenue it shared with Apple and

14    the Android parties, targeting and bombarding End-users with text ads and precluding competitors

15    from providing End-users with higher quality search products that are more privacy protective and

16    ad-free.

17          265.    *General Search Services*.  The general search services market is a relevant market

18    that consists of general search engines that End Users can use to search the internet for answers to a

19    wide range of queries. Google has an 89.2% share of and monopoly power in the general search

20    services market that is fortified by barriers to entry, including (1) high capital costs, (2) Google's

21    control of key distribution channels (3) brand recognition, and (4) scale, "The Court finds that these

22    barriers exist and that, both individually and collectively, they are significant barriers to entry." As

23    stated by Judge Mehta in his MO at p. 156-157. See pp. 151-165.

24          266.    *General Search Text Ads*.  The general search text ads market is a relevant market

25    that includes all text advertisements in connection with a general search query. Google had an 88%

26    market share of the general search text ads market in 2020 and monopoly power in the general

27    search text ads market, protected by high barriers to entry as stated by Judge Mehta's MO at p. 185.

28          267.    Google and Apple's conspiracy and combination and agreements and Google the

Android parties' conspiracy, combination and agreements are anticompetitive and exclusionary in that they lock up the preset default positions for Google's search engines on Apple's and the Android's mobile devices, computers, and other devices and has foreclosed a substantial share of the general search services and general search text advertising markets to competitors and competition, depriving Google's competitors of the scale required to compete in the general search services and general search advertising markets, effecting a substantial barrier to entry for competitors resulting in injury to Plaintiff and the class of End Users.

268. Google's and Apple's and the Android parties' anticompetitive acts have had harmful effects on competition, and Plaintiff and the class of End Users. In its MO, the Google court found that "Aggregating the foreclosure effects of the [Apple] browser and Android agreements is an appropriate way to understand the overall effect of Google's exclusive dealing in the relevant markets…The Court thus finds that as to the general search services market, Plaintiff have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume." MO p. 222.

269. With respect to the general search text ads market, Judge Mehta found that the challenged agreements foreclose 45% of the general services text ads market and that it was "significant." MO p. 258-259.

270. The effects of Google's and Apple's anticompetitive agreements outweigh any procompetitive benefits in the general search advertising market or that can be achieved through less restrictive means.

**Fourth Claim for Relief: Violations of California Unfair Competition Law Bus. & Prof. C. 17200 et seq.**

271. Plaintiff incorporate the allegations of paragraphs 1 through 270 above.

272. Google's combination and conspiracy with Apple and the Android parties has resulted in injury and loss of money and property to Plaintiff and the class of End Users by having their private search data in which they retained a stake in the profits, collected by Google, without compensation to Plaintiff and the End User class, and resold to advertisers for billions of dollars annually, which revenue Google shared with Apple and the Android parties. Google's

anticompetitive conduct has foreclosed a substantial share of these markets from competitors and has resulted in Plaintiff and the class of End-Users having their private search data collected by Google without compensation, which Google resold to advertisers for billions of dollars annually, which revenue it shared with Apple and the Android parties. Google's anticompetitive conduct resulted in targeting End-users with text ads and precluded competitors from providing End-users with high quality search products that are more privacy protective and ad-free.

273.    In so doing, Google engaged in unlawful, unfair and fraudulent business acts and practices in violation of California Bus. & Prof. C. 17200 for which Plaintiff and the class of End-users seek restitution and injunctive relief.

**Fifth Claim for Relief: Disgorgement Of Unjustly Earned Profits - Unjust Enrichment**

274.    Plaintiff incorporate the allegations of paragraphs 1 through ___ above. Defendants anticompetitive conduct has resulted in injury and loss of money and property to Plaintiff and the class of End Users by having their private search data collected by Google, without compensation to Plaintiff and the End User class, and resold to advertisers for billions of dollars annually, which revenue Google shared with Apple and the Android parties.  Plaintiff and the class of End-users "retained a stake in the profits" garnered from Google's sale of their data because "as between the two [parties], it is unjust for [Google to retain it." *In re Facebook, Inc. Internet Tracking Litigation*, No. 17-17486 at pp. 15-16, 956 F.3d 589 (Ninth Cir. 2020).

<u>**REQUEST FOR RELIEF**</u>

275.    To remedy these illegal acts, Plaintiff request that the Court:

    a.    Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure Rule 23.

    b.    Appoint Plaintiff as class representatives to represent the End-user class.

    c.    Appoint the undersigned attorney as class counsel to represent the class.

    d.    Adjudge and decree that Google maintained its monopoly in and monopolized the general search services and general search text advertising markets in violation of Section 2 of the Sherman Act.

    e.    Adjudge and decree that the alleged conspiracy, combination and agreements

between Google and Apple and Google and the Android parties be adjudged
and decreed to be illegal combinations and conspiracy to monopolize the
general search services and general search advertising markets in violation of
Sherman Act sections 2.

f. Adjudge and decree that the alleged conspiracy, combination and agreements
between Google and Apple and the Android parties be adjudged and decreed
to be an illegal combination and conspiracy to restrain trade in the general
search services and general search advertising markets in violation of
Sherman Act sections 1.

g. Enter judgment in favor of Plaintiff and each member of the class for
damages, for threefold their damages and interest thereon;

h. Adjudge and decree that the alleged conspiracy, combination and agreements
between Google and Apple and the Android parties be adjudged and decreed
to be unlawful, unfair and fraudulent business acts and practices in violation
of the California Unfair Competition Law, California Bus. & Prof. C. 17200,
and that Plaintiff and the class are entitled to restitution and injunctive relief
thereunder.

i. Adjudge and decree that Defendants Google has been unjustly enriched by its
conduct of collecting End-users' private search data, without compensation to
Plaintiff and the End User class, and resold to advertisers for billions of
dollars annually, in which Plaintiff and the class of End-users retained a stake
in the profits, resulting in injury and loss of money and property to Plaintiff
and the class of End- Users and that it is unjust for Google to retain such
profits.

j. Order disgorgement of all of Defendant's profits that were derived, in whole
or in part, from Google's extraction, collection, saving, and subsequent use
and sale of End-user's data.

h. Order Defendants to disgorge revenues and profits wrongfully obtained;

        i.     Permanently enjoin Defendants from continuing to engage in the anticompetitive practices described herein, including employment of default distribution agreements and from engaging in any other practices with the same purpose and effect as the challenged practices, provide structural relief to cure any anticompetitive harm therefrom and restore competition, and permanently enjoin Defendant, and its officers, agents, servants, employees and attorneys, from intercepting, tracking, collecting, saving, or using End-user data;

        j.     Award Plaintiff and the Class members their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

        k.     Enter any additional relief the Court finds just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury of all issues so triable."

Dated: March 25, 2025      By: _____ */s/ Lingel H. Winters* _____

                                Lingel H. Winters, Esq. (State Bar No. 37759)
                                ***Attorneys for Plaintiff***

# EXHIBIT A

## AMENDMENT TO THE INFORMATION SERVICES AGREEMENT

This AMENDMENT TO THE INFORMATION SERVICES AGREEMENT (this "**Agreement**") is entered into effective as of September 30, 2016 ("**Execution Date**") by and among Apple Inc., Apple Distribution International ("**ADI**"), and Apple South Asia Pte. Ltd. ("**ASA**" and collectively with Apple Inc., ADI and their respective subsidiaries, "**Apple**"), on the one hand, and Google Inc., Google Ireland Limited ("**GIL**"), and Google Asia Pacific Pte. Ltd. ("**GAP**" and collectively with Google Inc., GIL and their respective subsidiaries, "**Google**"), on the other hand, amending that certain Information Services Agreement dated December 20, 2002 between Apple, Inc. and Google Inc. (as amended or otherwise modified prior to the Execution Date and as amended by this Agreement, the "**ISA Agreement**"). The provisions of this Agreement are effective as of the Execution Date, and the remaining provisions of the ISA Agreement remain unchanged and in full force and effect.

## 1.   Use and Implementation of Google Services in Apple Software

### *(a)      Safari (Web Browser Software)*

Apple will pre-set and use the Services as the Default search service for Search Queries in Apple's web browser software (e.g., Safari or successor versions) designed for use on (i) one or more of the following Apple operating systems: iOS, watchOS, tvOS, macOS or any other operating system software made generally available by Apple during the Term, or (ii) the Microsoft Windows operating system (such web browser software, the "**Web Browser Software**").  During the Term, Apple's use of the Services as Default in the Web Browser Software will remain substantially similar to its use (including, without limitation, vis-a-vis other providers of internet services) as of the Execution Date of this Agreement (such use, the "**Permissible Software Default Use**").

Subject to the Permissible Software Default Use, Apple shall not be limited in its ability to alter, modify and innovate its Web Browser Software, and Google shall not be limited in its ability to control branding, presentation, and use of the Services.

"**Default**" means the Services will automatically be used for responding to Search Queries initiated from the Web Browser Software, unless the End User selects a different third-party search service.

"**Search Query**" means any textual, voice, image or other input entered by an End User in the Web Browser Software or Siri or Spotlight (or successor versions) that requests information; provided however, that subject to the Permissible Software Default Use, Apple may determine an End User's input is not a Search Query so long as Apple's determination is based exclusively on its intent to provide a superior user experience.

1

*Confidential – Subject to Party NDA*

Ex. No.

JX0033

1:20-cv-03010-APM

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

GOOG-DOJ-02696793

"**Services**" means Google's search services made generally available at www.google.com and the applicable international equivalents thereof (or successor versions) that handle Search Queries initiated from the Web Browser Software in accordance with the ISA Agreement.

"**End User**" means a user of the Web Browser Software, Spotlight, or Siri.

*(b) Spotlight*

Redacted

*(c) Siri*

Redacted

2

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696794

## Redacted

Subject to the Permissible Software Default Use, Apple will not use Siri in response to Search Queries from the Web Browser Software, unless Apple's use is based exclusively on its intent to provide a superior user experience.

# Redacted

*(d)  Provision of Query Set*

# Redacted

*(e)  Reporting*

# Redacted

3

*Confidential – Subject to Party NDA*

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696795

Redacted

## 2. Advertising and Monetization

Following the initial implementation of the Spotlight Services or Siri Services, if Apple includes ads or paid listings in Siri or Spotlight (or successor versions), Apple will offer Google the opportunity to supply such ads or paid listings under the financial terms set forth in Section 4 of this Agreement and on equivalent implementation terms. Redacted

Redacted

4

*Confidential – Subject to Party NDA*

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

GOOG-DOJ-02696796

Redacted

**4. Ad Revenue Share**

Effective September 1, 2016 Google will pay Apple [Redacted] of its Net Ad Revenue for the remainder of the Term.

Redacted

5

*Confidential – Subject to Party NDA*

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

GOOG-DOJ-02696797

# Redacted

**5.** **CEO Check-Ins**

*Agreement Purpose*

Both parties agree they are entering into this Agreement for the following purposes (collectively, the "**Agreement Purpose**"): (1) to create tangible and intangible value for each party, (2) to increase the revenue performance of each party, and (3) to improve the search experience and performance of the Services, the Spotlight Services and the Siri Services for End Users on Apple products.

*Annual CEO Check-In*

At the end of each contract year, or earlier if reasonably requested by a party, Chief Executive Officers from each party will meet to review and discuss in good faith the performance of the ISA Agreement vis-a-vis the Agreement Purpose, and, upon request, to confirm each party's compliance with the terms of the ISA Agreement ("**Annual CEO Check-In**"). The parties mutually agree to address and resolve in good faith any issues identified during the Annual CEO Check-In that are interfering or have interfered with the Agreement Purpose. If a particular issue is under the reasonable control of Apple, then Apple will have primary responsibility for addressing and resolving such issue in good faith, with input from Google. If a particular issue is under the reasonable control of Google, then Google will have primary responsibility for addressing and resolving in good faith such issue, with input from Apple. The parties will have joint responsibility for addressing and resolving in good faith any other issues identified during the Annual CEO Check-Ins that are not under the reasonable control of one party.

# Redacted

**6.** **Limitation of Liability**

# Redacted

7

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

Redacted

**7.   Term & Termination**

Redacted

**8.   Branding, Presentation and Usage**

Redacted

8

*Confidential – Subject to Party NDA*

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696800

## 9. Regulatory and Government Actions

Apple and Google will cooperate to support and defend the ISA Agreement, work in good faith to modify it if necessary to resolve regulatory concerns, and not intentionally delay or prevent implementation of the ISA Agreement.

Redacted

## 10. Audit

Redacted

9

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696801

Redacted

**11. Assignment**

Redacted

**12. Parties and Affiliates**

Redacted

10

*Confidential – Subject to Party NDA*

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

GOOG-DOJ-02696802

Redacted

**13. Amendment**

Redacted

**14. Tax**

Redacted

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*[Remainder of page intentionally blank; Signature page follows]*

11

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696803

This Agreement may be executed in counterparts, including facsimile counterparts.

**Google Inc.**                                    **Apple Inc.**

By: Redacted                                       By: _____

Print Name: DANIEL ALEGRE                          Print Name: _____

Title: President                                   Title: _____

Date: Sept 30, 2016                                Date: _____

1600 Amphitheatre Parkway                          1 Infinite Loop, MS 301-4GC
Mountain View, CA 94043                            Cupertino, CA 95014
Tel: (650) 330-0100                                Tel: (408) 996-1010
Fax: (650) 618-1711                                Fax: (408) 966-0275


**Apple Distribution International**               **Apple South Asia Pte. Ltd.**

By: _____                       By: _____

Print Name: _____               Print Name: _____

Title: _____                    Title: _____

Date: _____                     Date: _____

Hollyhill Industrial Estate                        No. 7 Ang Mo Kio Street 64
Hollyhill, Cork, Ireland                           Singapore 569086
Tel: (353) 21 4284000                              Tel: (65) 6481 5511


**Google Ireland Limited**                         **Google Asia Pacific Pte. Ltd.**

By: _____                       By: _____

Print Name: _____               Print Name: _____

Title: _____                    Title: _____

Date: _____                     Date: _____

Gordon House, Barrow Street                        8 Marina View, Asia Square 1 #30-01
Dublin 4, Ireland                                  Singapore 018960



*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696804

This Agreement may be executed in counterparts, including facsimile counterparts.

**Google Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

1900 Amphitheatre Parkway
Mountain View, CA 94043
Tel: (650) 330-0100
Fax: (650) 618-1711

**Apple Inc.**

Redacted

By: _____

Print Name: Eddy Cue

Title: SVP Internet Software & Svcs.

Date: 9/29/16

1 Infinite Loop, MS 301-4GC
Cupertino, CA 95014
Tel: (408) 996-1010
Fax: (408) 966-0275

**Apple Distribution International**

By: _____

Print Name: _____

Title: _____

Date: _____

Hollyhill Industrial Estate
Hollyhill, Cork, Ireland
Tel: (353) 21 4284000

**Apple South Asia Pte. Ltd.**

By: _____

Print Name: _____

Title: _____

Date: _____

No. 7 Ang Mo Kio Street 64
Singapore 569086
Tel: (65) 6481 5511

**Google Ireland Limited**

By: _____

Print Name: _____

Title: _____

Date: _____

Gordon House, Barrow Street
Dublin 4, Ireland



**Google Asia Pacific Pte. Ltd.**

By: _____

Print Name: _____

Title: _____

Date: _____

8 Marina View, Asia Square 1 #30-01
Singapore 018960

12

*Confidential – Subject to Party NDA*

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

GOOG-DOJ-02696805

This Agreement may be executed in counterparts, including facsimile counterparts.

**Google Inc.**                                      **Apple, Inc.**

By: _____          By: _____

Print Name: _____          Print Name: _____

Title: _____          Title: _____

Date: _____           Date: _____

1900 Amphitheatre Parkway              1 Infinite Loop, MS 301-4GC
Mountain View, CA 94043                Cupertino, CA 95014
Tel: (650) 330-0100                    Tel: (408) 996-1010
Fax: (650) 618-1711                    Fax: (408) 966-0275


**Apple Distribution International**        **Apple South Asia Pte. Ltd.**

By: Redacted                           By: _____

Print Name: MICHAEL SULLIVAN           Print Name: _____

Title: DIRECTOR                        Title: _____

Date: 29ᵗʰ SEPT 2016                   Date: _____

Hollyhill Industrial Estate            No. 7 Ang Mo Kio Street 64
Hollyhill, Cork, Ireland               Singapore 569086
Tel: (353) 21 4284000                  Tel: (65) 6481 5511


**Google Ireland Limited**                  **Google Asia Pacific Pte. Ltd.**

By: _____          By: _____

Print Name: _____          Print Name: _____

Title: _____          Title: _____

Date: _____           Date: _____

Gordon House, Barrow Street            8 Marina View, Asia Square 1 #30-01
Dublin 4, Ireland                      Singapore 018960



12

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696806

This Agreement may be executed in counterparts, including facsimile counterparts.

**Google Inc.**                                    **Apple, Inc.**

By: _____                      By: _____

Print Name: _____                      Print Name: _____

Title: _____                      Title: _____

Date: _____                      Date: _____

1900 Amphitheatre Parkway                           1 Infinite Loop, MS 301-4GC
Mountain View, CA 94043                             Cupertino, CA 95014
Tel: (650) 330-0100                                 Tel: (408) 996-1010
Fax: (650) 618-1711                                 Fax: (408) 966-0275

**Apple Distribution International**                **Apple South Asia Pte. Ltd** Redacted

By: _____                       By: _____

Print Name: _____                       Print Name: Pert. HWEE  HWEE

Title: _____                       Title: Director

Date: _____                       Date: 9/29/16

Hollyhill Industrial Estate                         No. 7 Ang Mo Kio Street 64
Hollyhill, Cork, Ireland                            Singapore 569086
Tel: (353) 21 4284000                               Tel: (65) 6481 5511

**Google Ireland Limited**                          **Google Asia Pacific Pte. Ltd.**

By: _____                       By: _____

Print Name: _____                       Print Name: _____

Title: _____                       Title: _____

Date: _____                       Date: _____

Gordon House, Barrow Street                         8 Marina View, Asia Square 1 #30-01
Dublin 4, Ireland                                   Singapore 018960



12

*Confidential – Subject to Party NDA*

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

GOOG-DOJ-02696807

This Agreement may be executed in counterparts, including facsimile counterparts.

**Google Inc.**                                          **Apple Inc.**

By: _____          By: _____

Print Name: _____          Print Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

1600 Amphitheatre Parkway                1 Infinite Loop, MS 301-4GC
Mountain View, CA  94043                 Cupertino, CA  95014
Tel:  (650) 330-0100                     Tel:  (408) 996-1010
Fax:  (650) 618-1711                     Fax:  (408) 966-0275

**Apple Distribution International**           **Apple South Asia Pte. Ltd.**

By: _____          By: _____

Print Name: _____          Print Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

Hollyhill Industrial Estate              No. 7 Ang Mo Kio Street 64
Hollyhill, Cork, Ireland                 Singapore 569086
Tel:  (353) 21 4284000                   Tel:  (65) 6481 5511

Redacted

**Google Ireland Limited**                   **Google Asia Pacific Pte. Ltd.**

By: __ Redacted __          By: _____

Print Name: KOWAN HARRIS          Print Name: _____

Title: DIRECTOR          Title: _____

Date: 30/09/2016          Date: _____

Gordon House, Barrow Street              8 Marina View, Asia Square 1 #30-01
Dublin 4, Ireland                        Singapore 018960



12

*Confidential – Subject to Party NDA*

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

GOOG-DOJ-02696808

This Agreement may be executed in counterparts, including facsimile counterparts.

**Google Inc.**                                                    **Apple Inc.**

By: _____                          By: _____

Print Name: _____                          Print Name: _____

Title: _____                          Title: _____

Date: _____                          Date: _____

1600 Amphitheatre Parkway                             1 Infinite Loop, MS 301-4GC
Mountain View, CA 94043                               Cupertino, CA 95014
Tel: (650) 330-0100                                   Tel: (408) 996-1010
Fax: (650) 618-1711                                   Fax: (408) 966-0275

**Apple Distribution International**                   **Apple South Asia Pte. Ltd.**

By: _____                          By: _____

Print Name: _____                          Print Name: _____

Title: _____                          Title: _____

Date: _____                          Date: _____

Hollyhill Industrial Estate                           No. 7 Ang Mo Kio Street 64
Hollyhill, Cork, Ireland                              Singapore 569086
Tel: (353) 21 4284000                                 Tel: (65) 6481 5511

**Google Ireland Limited**                            **Google Asia Pacific Pte. Ltd.**

By: _____                          By: _____Redacted_____

Print Name: _____                          Print Name: ___MARCO BORLA____

Title: _____                          Title: _____DIRECTOR_____

Date: _____                          Date: ____SEP. 30, 2016_____

Gordon House, Barrow Street                           8 Marina View, Asia Square 1 #30-01
Dublin 4, Ireland                                     Singapore 018960

EFD

12

*Confidential – Subject to Party NDA*

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

GOOG-DOJ-02696809

# EXHIBIT B

EXECUTION COPY

## Joint Cooperation Agreement (JCA)

*This JCA between Apple and Google includes three parts: (i) a commercial agreement relating to search, that amends the Information Services Agreement (ISA) between the parties dated December 20, 2002, as amended, (ii) a litigation dismissal and executive escalation mechanism, and (iii) a collaboration framework regarding patent policy and reform.*

**Term & Termination**

Redacted

### (1) COMMERCIAL DEAL

Apple and Google wish to extend the ISA beyond the present termination date of July 31, 2015 to be co-terminus with this JCA.

**Search Rev Share**

1. Rev share will become Redacted effective July 31, 2015.
2. Subject to the options in point #3 below, Google shall remain the default search engine in all Geo's.
3. Apple will have the option to select a different default search engine in China and S. Korea on or after July 31, 2014, and in Russia on or after July 31, 2016.
4. Google will consider, in good faith, additional single country exclusions in countries where Google's usage share compared with other general search engines only declines to Redacted or less for Redacted consecutive years.

**Default Bookmark**

Redacted

Redacted

Ex. No.
JX0024
1:20-cv-03010-APM

1

**REDACTED FOR PUBLIC FILING**

GOOG-DOJ-02696822

EXECUTION COPY

# Redacted

**(2) LITIGATION NOTICE AND ESCALATION**

# Redacted

**2**

Redacted

REDACTED FOR PUBLIC FILING

GOOG-DOJ-02696823

EXECUTION COPY

Redacted

**(4) MISCELLANEOUS**

Redacted

3

Redacted

REDACTED FOR PUBLIC FILING

GOOG-DOJ-02696824

EXECUTION COPY

Redacted

**GOOGLE INC.**

By: Redacted
(signature)

Printed Name: LARRY PAGE

Title: CEO

Date: May 15, 2014

**APPLE INC.**

By: Redacted
(signature)

Printed Name: TIM COOK

Title: CEO

Date: MAY 15, 2014



4

Redacted

REDACTED FOR PUBLIC FILING

GOOG-DOJ-02696825

# EXHIBIT C

Google Confidential

## GOOGLE MOBILE
## REVENUE SHARE AGREEMENT

| Go gle | Google LLC<br>Google Asia Pacific Pte. Ltd.<br>Google Ireland Limited<br><br>*Address for Legal Notices:*<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043 | **Mobile Partnerships:** Jim Kolotouros, Christopher Li, Jinyoung Baik<br><br>**Google Legal:** Kate Lee, Richard Lee, Marie Mackey |
|---|---|---|

| COMPANY CONTACT DETAILS | | |
|---|---|---|
| | **Company Contact Information:** | **Company Legal Notices to:** |
| **Attention:** | Jay Kim, Seung Song | Steve Lee, Yuna Hong |
| **Title:** | Strategic Partnership Group (Mobile) | Legal Support & Compliance Group (Mobile) |
| **Address, City, State, Postal Code, Country:** | 129 Samsung-ro, Yeongtong-gu, Suwon-si, Gyeonggi-do, Korea 16677 | 129 Samsung-ro, Yeongtong-gu, Suwon-si, Gyeonggi-do, Korea 16677 |
| **Email:** | Redacted | Redacted |

**Effective Date:** July 1, 2020

## Confidential

Ex. No.
JX0071
1:20-cv-03010-APM

1

Redacted     REDACTED FOR PUBLIC FILING & ABRIDGED     GOOG-DOJ-21682392

Google Confidential

This Google Mobile Revenue Share Agreement, including all attachments (collectively referred to as this "**Agreement**"), effective as of the date noted above (the "**Effective Date**"), is made between:

**GOOGLE LLC**, organized in the state of Delaware, **GOOGLE ASIA PACIFIC PTE. LTD.**, organized in Singapore, and **GOOGLE IRELAND LIMITED**, organized in Ireland (in this Agreement, "**Google**" will mean Google LLC, Google Asia Pacific Pte. Ltd., and/or Google Ireland Limited, as the context requires), on the one hand; and

**SAMSUNG ELECTRONICS CO., LTD.**, a company existing under the laws of the Republic of Korea ("**Company**"), on the other hand.

# Not Reviewed for Confidentiality

# Confidential

2

Redacted      REDACTED FOR PUBLIC FILING & ABRIDGED      GOOG-DOJ-21682393

Google Confidential

1.5   "Alternative Search Service"  Redacted    **Confidential**

**Confidential**

**Confidential**

# Not Reviewed for Confidentiality

# Confidential

# Not Reviewed for Confidentiality

**Confidential**

## Not Reviewed for Confidentiality

1.16   "**Client ID(s)**" means the range of unique alphanumeric code(s) that Google provides to Company pursuant to this Agreement or the Prior Agreements that are used to identify Ad Revenue on Devices or Installed Base Devices, including Ad Revenue from particular access points on Devices or Installed Base Devices (e.g., Chrome Browser, Bixby, etc.).

# Not Reviewed for Confidentiality

Redacted

GOOG-DOJ-21682394

Google Confidential

# Confidential

# Not Reviewed for Confidentiality

# Confidential

### Not Reviewed for Confidentiality

# Confidential

1.48    **"Minus One Screen"** means the screen accessed by the End User by swiping their finger once from left to right on the Default Home Screen (excluding the lock screen and the notification tray).

# Confidential

# Not Reviewed for Confidentiality

### Confidential

# Not Reviewed for Confidentiality

# Confidential



Redacted    **REDACTED FOR PUBLIC FILING & ABRIDGED**    GOOG-DOJ-21682397

Google Confidential

1.58   "**Query**" means any End User query input through a Service Access Point.

# Confidential

# Not Reviewed for Confidentiality

 REDACTED FOR PUBLIC FILING & ABRIDGED  GOOG-DOJ-21682398

Google Confidential

## Confidential

## Not Reviewed for Confidentiality

10.   COMPANY AND GOOGLE OBLIGATIONS

10.1   **MADA, EMADA and TMADA.** During the Term, Company must have an effective MADA, EMADA and TMADA and be a licensee in good standing under the MADA, EMADA and TMADA; <u>provided</u>, <u>however</u>, that any termination of this Agreement for the reason of non-compliance with the foregoing shall made pursuant to <u>Section 14.2</u> or <u>Section 14.3</u>, and <u>further</u>, that in case of any non-compliance with respect to TMADA, such termination shall be effectuated for devices distributed in Turkey only.

## Not Reviewed for Confidentiality

REDACTED FOR PUBLIC FILING & ABRIDGED

Google Confidential

IN WITNESS WHEREOF, the parties have executed this Agreement by persons duly authorized as of the Effective Date.

| COMPANY: | GOOGLE LLC |
|---|---|
| Redacted | Redacted |
| | 2020.11.10 |
| By ___ Jay Kim | By ___ 10:11:39 -08'00' |
| Name ___ VP | Na ___ Leslie Rosenberg / Authorized Signatory |
| Title ___ | Title ___ |
| Date ___ Nov 9, 2020 | Date ___ |
| | |
| | GOOGLE ASIA PACIFIC PTE. LTD. |
| | |
| | By ___ Redacted ___ 2020.11.11 |
| | Nam ___ 10:17:04 |
| | Lavanya Swetharanyan / Director |
| | Title ___ Google Asia Pacific Pte. Ltd ___ +08'00' |
| | Date ___ |
| | |
| | GOOGLE IRELAND LIMITED |
| | |
| | By ___ |
| | Name ___ Redacted ___ 2020.11.10 |
| | Title ___ |
| | Luciano Moreto / For, Nick Leader (Director) ___ 10:25:44 Z |
| | Date ___ |

24



Redacted **REDACTED FOR PUBLIC FILING & ABRIDGED** GOOG-DOJ-21682415

Google Confidential

## ATTACHMENT A

### REVENUE SHARE

1.  Subject to the terms and conditions of this Agreement, Google will pay Company revenue share during the Term as follows:

(a)  Core Qualified Devices.  Google will pay Company the following percentage of Qualified Net Ad Revenue with respect to the following Core Qualified Device categories and Service Access Points (collectively, **"Shared Net Core Ad Revenue"**):

| % of Qualified Net Ad Revenue | Core Qualified Device Category | Service Access Points |
|---|---|---|
| **Confidential** | Core Qualified Devices sold or distributed in Territories other than Turkey | - Search Access Points under Attachment B-1; and<br><br>- Assistant Access Points |
| | Core Qualified Devices sold or distributed in Turkey | - Search Access Points in Attachment B-2; and<br><br>- Assistant Access Points |

# Confidential

(b)  Enhanced Qualified Devices.  In addition to the Shared Net Core Ad Revenue, for those Core Qualified Devices that are configured to meet the additional requirements for Enhanced Qualified Devices, Google will pay Company the following percentage of Qualified Net Ad Revenue with respect to the following Enhanced Qualified Device categories and Service Access Points (collectively "Shared Net Enhanced Ad Revenue"):

| % of Qualified Net Ad Revenue | Enhanced Qualified Device Category | Service Access Points |
|---|---|---|
| **Confidential** | Search Enhanced Qualified Devices | Search Access Points in Attachment C-1 |
| | Chrome Enhanced Qualified Devices<br># Confidential | Search Access Points in Attachment C-2 |
| | Search/Chrome Enhanced Qualified Devices **Confidential**<br># Confidential | Search Access Points in both Attachment C-1 and Attachment C-2 |

(c)  **Confidential**

25



Google Mobile Revenue Share Agreement

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-21682416

Google Confidential

## ATTACHMENT C-1

### SEARCH ACCESS POINTS FOR VALID QUERIES ON SEARCH ENHANCED QUALIFIED DEVICES

| **Confidential** | |
|---|---|
| Search Access Point | Minimum Usage and Placement Requirements |
| Google-provided widget | Set pursuant to MADA |
| Google Search Application | Set pursuant to MADA |
| (a) All search intents on the Enhanced Qualified Device, **Confidential** | For search intents: Set to Google Search Application |
| **Confidential** | **Confidential** |

31



REDACTED FOR PUBLIC FILING & ABRIDGED

Redacted

GOOG-DOJ-21682422

Google Confidential

## ATTACHMENT C-2

SEARCH ACCESS POINTS FOR VALID QUERIES AND CONFIGURATION REQUIREMENTS ON CHROME ENHANCED QUALIFIED DEVICES                    **Confidential**

Confidential

Subject to Section 9 (Permitted Activities), each of the below-listed Search Access Points must meet the Minimum Usage and Placement Requirements.

| Search Access Point | Minimum Usage and Placement Requirements |
|---|---|
| Chrome Browser | Set as the default system browser intent and no disambiguation screen is ever presented to the end user out-of-the-box; |
| | Chrome Browser icon is placed on the Application Dock; and |
| | Other requirements pursuant to MADA. |

33



Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-21682424

Exhibit 2

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899
mmao@bsfllp.com
brichardson@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Amanda K. Bonn, CA Bar No. 270891
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA. 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
abonn@susmangodfrey.com

John A. Yanchunis (admitted *pro hac vice*)
Michael F. Ram, CA Bar No. 104805
Ryan J. McGee (admitted *pro hac vice*)
Ra Amen (admitted *pro hac vice*)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com

William S. Carmody (admitted *pro hac vice*)
Shawn Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel.: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIBAL RODRIGUEZ, SAL CATALDO, JULIAN SANTIAGO, and SUSAN LYNN HARVEY, individually and on behalf of all other similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No.  3:20-cv-04688-RS <br><br> **FOURTH AMENDED COMPLAINT** <br><br> **CLASS ACTION FOR** <br> **(1) VIOLATIONS OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT ("CDAFA"), CAL. PENAL CODE §§ 502 *ET SEQ.*;** <br> **(2) INVASION OF PRIVACY;** <br> **(3) INTRUSION UPON SECLUSION** <br><br> **DEMAND FOR JURY TRIAL** |

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

THE PARTIES .......................................................................................................... 6

JURISDICTION AND VENUE ................................................................................ 6

FACTUAL ALLEGATIONS REGARDING GOOGLE ........................................ 7

I.     Google Has a Long History of Invading Consumers' Privacy and Misrepresenting the Scope of Google's Data Collections ..................... 7

II.    Google Uses Firebase SDK to Surreptitiously Collect Users' Communications with Third-Party Apps ........................................... 11

III.   Through Discovery and Google's Representations in this Case, Plaintiffs Begin to Understand that Google Uses Other Tracking and Advertising Code to Collect and Save App-Activity Data When WAA and/or sWAA Are Off ........................................................................ 17

IV.   Users Turned off the "Web & App Activity" and/or "Supplemental Web & App Activity" Feature to Prevent Google from Collecting and Saving Their Data, but Google Continued Without Disclosure or Consent to Intercept and Save Those Communications ........................ 20

    A.   Google's "Web & App Activity" Feature ................................. 20

    B.   Google's Privacy Policy and "Learn More" Disclosures Stated That the "Web & App Activity" and "Supplemental Web & App Activity" Features Stops Google from "Saving" Users' Data ................................................................................................. 23

        1.   Google's "Privacy Policy" and "Privacy and Security Principles" Stated That Users Could "Control" What Google Collects ........................................................ 23

        2.   Google's "Web & App Activity" and "Supplemental Web & App Activity" Features and Google's "Learn More" Disclosures with Respect to "Web & App Activity" Explained That Turning the Feature off Would Prevent Google from Saving Information Related to Third Party Apps ........................ 25

        3.   Google Knew That Its Disclosures Led Users to Believe That Turning "Web & App Activity" off Would Prevent Google from Collecting Communications with Apps ................................................................................... 28

        4.   Google's Passing Reference to "Your Google Account" Does Not Constitute Consent .................................... 30

    C.   Google Obscured Its Collection of These Communications Without Consent Through Its "Pro-Privacy" Campaigns and Other Public Statements ........................................................... 32

i

D.      Third-Party App Developers Did Not Consent to Google Collecting Users' Communications with Third-Party Apps When "Web & App Activity" Was Turned off ....................................... 38

V.      Google Profits from the Communications It Intercepts Using Google Tracking and Advertising Code ............................................................ 41

        A.      Google Creates and Maintains "Profiles" on Its Users Using the Data Collected from Google Tracking and Advertising Code ...................................................................................................... 41

        B.      Google Generates Targeted Advertising to Class Members Based on Data Transmitted to Google by Google Tracking and Advertising Code .................................................................................. 43

        C.      Google Refines and Develops Products Using the Data Transmitted to Google by the Google Tracking and Advertising Code ...................................................................................................... 44

                1.      Google Search ............................................................................. 44

                2.      On-Device Search Features ....................................................... 44

VI.     The Communications Intercepted by Google Using Google Tracking and Advertising Code Are Highly Valuable .......................................... 47

        A.      The Transmissions Are Valuable to Class Members ................................ 48

        B.      The Transmissions Are Valuable to Google ............................................. 49

        C.      The Data Would Be Valuable to Other Internet Firms ............................ 50

        D.      There Is Value to Class Members in Keeping Their Data Private ............................................................................................... 52

VII.    Google Acted Without Consent to Intercept and Collect User Data to Maintain and Extend Its Monopolies ................................................. 53

        A.      Google's Web Dominance ....................................................................... 53

        B.      Google's Mobile Problem ....................................................................... 54

        C.      Google's Mobile Focus with Android & Firebase ................................... 55

        D.      Google's Increasing Trove of Consumers' Mobile Data and Power ................................................................................................. 57

VIII.   Tolling of the Statutes of Limitations ................................................... 58

IX.     Google Collected the Data for the Purpose of Committing Further Tortious and Unlawful Acts .................................................................. 59

FACTUAL ALLEGATIONS REGARDING THE NAMED PLAINTIFFS ............................. 62

CLASS ACTION ALLEGATIONS ............................................................................... 65

ii

COUNTS........................................................................................................... 69

    COUNT ONE: VIOLATIONS OF THE COMPREHENSIVE COMPUTER
        DATA ACCESS AND FRAUD ACT ("CDAFA"), CAL. PENAL
        CODE § 502 *ET SEQ.* ........................................................................ 69

    COUNT TWO: INVASION OF PRIVACY ................................................. 71

    COUNT THREE: INTRUSION UPON SECLUSION ................................... 74

PRAYER FOR RELIEF ...................................................................................... 76

JURY TRIAL DEMAND ..................................................................................... 76

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

## FOURTH AMENDED CLASS ACTION COMPLAINT

Plaintiffs Anibal Rodriguez, Sal Cataldo, Julian Santiago, and Susan Lynn Harvey, individually and on behalf of all others similarly situated, file this Fourth Amended Class Action Complaint against defendant Google LLC ("Google" or "Defendant"), and in support state the following.

## INTRODUCTION

*"I want people to know that everything they're doing online is being watched, is being tracked, is being measured. Every single action you take is carefully monitored and recorded."*

-Jeff Seibert; Former Head of Consumer Product of Twitter[1]

1. This case is about Google's surreptitious interception, collection, saving, and use of consumers' highly personal browsing histories on their mobile devices, whenever consumers use certain software applications ("apps") that have incorporated Google code. Google did this without notice or consent, where Plaintiffs had turned off a Google feature called "Web & App Activity" ("WAA") or a sub-setting within WAA known as "supplemental Web & App Activity" ("sWAA"). Google had promised that by turning off this feature, users would stop Google from saving their web and app activity data, including their app-browsing histories. Google's promise was false.

2. Google has said, over and over again, that it values privacy and gives users control. The truth is just the opposite. Google continues to track users and collect their data even after users follow Google's instructions on how to stop that tracking and collection. What Google calls its privacy "controls" are ruses. These Google features are intended to lull users—along with regulators, legislators, and app developers—into a false sense of control and privacy. In reality, no matter what users do, Google never stops intercepting, collecting, tracking, and using users' app-browsing data. The Founder of Google's Privacy and Data Protection Office, Eric Miraglia, has testified in this case that he is "not aware of any setting" that users can employ to prevent

---

[1] *The Social Dilemma*, NETFLIX (Jan. 2020),
https://www.netflix.com/title/81254224?s=i&trkid=13747225.

Google from collecting data relating to their app activity. Miraglia Rough Tr. 83:13-23.

3. Google surreptitiously collected users' personal data from their mobile devices using software scripts embedded in Google's Firebase SDK development platform. Third-party software developers then used Firebase SDK to build their apps (as Google coerced them to do). Users downloaded and used those apps to communicate with third parties (e.g., The New York Times app allows users to communicate with The New York Times) through their mobile devices. Unknown to users, the Firebase SDK scripts still copied users' communications and transmitted them to Google's servers through the users' devices, to be saved and used by Google for Google's purposes. Google did all this even if users switched off Google's "Web & App Activity" feature, without providing any notice or obtaining any consent.

4. Discovery and representations by Google in this case have shown that Google's collection, saving, and use of users' app-activity data is even more extensive than Plaintiffs initially understood and alleged, and not limited to Firebase SDK scripts. Notwithstanding whether users have WAA or sWAA switched off (which is sometimes referred to as "disabled" or "paused"), Google also collects and saves users' app-activity data by way of other Google tracking and advertising code (in addition to Firebase SDK scripts) embedded in third-party apps. This additional Google tracking and advertising code includes without limitation the Google Analytics Services SDK, the Google Mobile Ads SDK (which supports AdMob and Ad Manager), Google's AdMob+ SDK, the Google Ads SDK (formerly known as AdWords SDK or AWCT SDK), and Google code associated with "Webview" technologies for apps.

5. While Google has sought to limit discovery to Google Analytics for Firebase, the discovery in this case establishes that Google's collection and saving of WAA-off data goes far beyond Firebase.

6. Google repeatedly told its users that if they "turn off" the "Web & App Activity" feature, then that would stop Google from "sav[ing]" the users' app data. That includes data both in connection with Google properties and third-party apps. Similarly, Google presented such settings to their business partners as device level controls, including by requiring the controls and accompanying representations written by Google as part of the Android operating systems ("Android

OS") licensed to Android device manufacturers, such as Samsung.

7.       Google's Privacy Policy also promised users control.  That Privacy Policy states, on the first page:

> When you use our services, you're trusting us with your information.  We understand this is a big responsibility and work hard to protect your information and ***put you in control***.
> . . . .
> Our ***services*** include: … ***products that are integrated into third-party apps*** and sites, like ads and embedded Google Maps.
> . . . .
> ***[A]cross our services, you*** *can adjust your privacy settings to control what we collect and how your information is used*.

That language is quite plain.  Any reasonable person would understand it to mean just what it says: the user "can adjust . . . privacy settings to control what [Google] collects and how [user] information is used" by Google "across [Google's] services," which services "include . . . products," like Google's Firebase SDK platform and other Google tracking and advertising code "that are integrated into third-party apps."

8.       In fact, Google still collects data from users who turn off the "Web & App Activity" feature.  Google collects this data through various backdoors made available through and in connection with Google's Firebase Software Development Kit, including not only Google Analytics for Firebase but also without limitation AdMob and Cloud Messaging for Firebase.  Google also collects data about users' interactions with non-Google apps by way of other Google tracking and advertising code (aside from the Firebase SDK scripts), including but not limited to the Google Mobile Ads SDK, AdMob+ SDK, and "Webview" technologies.  All of these products surreptitiously copy and provide Google with app activity data while WAA is turned off, including personal browsing data.

9.       Google accomplishes this surreptitious interception and collection using mobile devices to copy data from user communications with non-Google branded apps via and in connection with Google's Firebase SDK, including through background data collection processes such as Android's Google Mobile Service.  Through discovery in this case, Plaintiffs are only now beginning to understand the full scope of Google's unlawful data collection practices while WAA

is turned off, with internal Google documents showing that Google uses other tracking and advertising code (in addition to Firebase SDK) to collect (and save) app-activity data notwithstanding whether WAA is off.

10.     Google's employees recognize, internally and without disclosing this publicly, that WAA is "***not clear to users***" (GOOG-RDGZ-00021182), "***nebulous***" (GOOG-RDGZ-00014578), "***not well understood***" (GOOG-RDGZ-00020706), "***completely broken***" (GOOG-RDGZ-00130745 at -46) and "***confuses users***" (GOOG-RDGZ-00015004), where people "***don't know what WAA means***" (GOOG-RDGZ-00021184) and Google's promise of control is "***just not true***" (GOOG-RDGZ-00020680). Google employees accordingly describe WAA as a "***terrible control***" (GOOG-RDGZ-00130416) and a "***loser***" (GOOG-RDGZ-00144760), and lament how "***Web & App Activity is the worst name ever***" (GOOG-RDGZ-00089546).

11.     This is especially true in terms of turning WAA off, with Google employees admitting "***we don't accurately describe what happens when WAA is off***" (GOOG-RDGZ-00024690) and acknowledging that WAA "does not actually control what is stored by Google" which "is ***really bad***" because turning WAA off leaves users with a "***false sense of security*** that their data is not being stored at Google, when in fact it is" (GOOG-RDGZ-00024698). As aptly summarized by different Google employees:

> ***Isn't WAA off supposed to NOT log at all?*** At least that is what is implied from the WAA page. So, if WAA is off, how are we able to log at all?

GOOG-RDGZ-00130381.

> [T]o me, it feels like a ***fairly significant bug*** that ***a user can choose to turn off WAA but then we still collect and use the data*** (even locally).

GOOG-RDGZ-00044478.

> ***All participants*** [in a user study] expected turning off [the WAA] toggle to ***stop their activity from being saved***.

GOOG-RDGZ-0015992 (one user said that, based on the WAA disclosures, "whatever data was pumping out . . . would no longer be recorded"). The contrast between what Google represents publicly and what WAA actually does begs the question, shared by Google's own employees: "***What does [WAA] actually control***?" GOOG-RDGZ-00089546 at -46.

12.     Google has continued to engage in this illegal data collection even after Plaintiffs filed this lawsuit, with Google using the data it collects to create profiles and generate billions of dollars in revenues and other benefits.  Google could have disclosed its collection and use of this data, while Web & App Activity is turned off, but Google chose not to.  Instead, Google intentionally created an illusion of user control.

13.     Because of its pervasive and unlawful interceptions of this data, Google knows users' friends, hobbies, political leanings, culinary preferences, cinematic tastes, shopping activity, preferred vacation destinations, romantic involvements, and even the most intimate and potentially embarrassing aspects of the user's app usage (such as medical issues).

14.     Google's practices affect millions of Americans who care about protecting their privacy.  According to Google, more than 200 million people visit Google's "Privacy Checkup" website each year.  Each day, nearly 20 million people check their Google privacy settings.  People do this because they care about their privacy and believe that they can "control" what Google collects (because Google has told them so).  The truth is that Google's so-called "controls" are meaningless.  Nothing stops Google from collecting this data, data Google then monetizes for its own benefit.

15.     Google's practices unlawfully infringe upon consumers' privacy rights, give Google and its employees power to learn intimate details about individuals' lives, and make Google a potential target for "one-stop shopping" by any government, private, or criminal actor who wants to invade individuals' privacy.

16.     Google must be held accountable for the harm it has caused.  Google must be prevented from continuing to engage in its covert data collection from the mobile devices now in use by nearly every American citizen.  Both federal and state privacy laws recognize and protect individuals' reasonable expectations of privacy in confidential communications under these circumstances, and these laws prohibit Google's unauthorized interception and subsequent use of these communications.

17.     Plaintiffs are individuals who had WAA turned off but whose devices nonetheless transmitted data to Google as a result of Google tracking and advertising code embedded within non-

Google apps (including but not limited to Firebase SDK scripts).  Plaintiffs bring California state law claims on behalf of other similarly situated Google subscribers in the United States (the "Classes," defined herein in paragraph 257).  The Class Period begins on the date Google first received data, as a result of Google tracking and advertising code, from the device of a user who had turned off WAA and/or sWAA.  The Class Period continues through the present.

## THE PARTIES

18.     Plaintiff Anibal Rodriguez is an adult domiciled in Homestead, Florida.  He had active Google accounts during the Class Period.

19.     Plaintiff Sal Cataldo is an adult domiciled in Sayville, New York. He had active Google accounts during the Class Period.

20.     Plaintiff Julian Santiago is an adult domiciled in Miami, Florida.  He had an active Google account during the Class Period.

21.     Plaintiff Susan Lynn Harvey is an adult domiciled in Madera, California.  She had active Google accounts during the Class Period.

22.     Defendant Google LLC is a Delaware limited liability company with a principal place of business at what is officially known as The Googleplex, 1600 Amphitheatre Parkway, Mountain View, California 94043.  Google LLC regularly conducts business throughout California and in this judicial district.  Google LLC is one of the largest technology companies in the world and conducts product development, search, and advertising operations in this district.

## JURISDICTION AND VENUE

23.     This Court has personal jurisdiction over Defendant because Google's principal place of business is in California.   Additionally, Defendant is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' and Class members' claims occurred in this State, including Google servers in California receiving the intercepted communications and data at issue, and because of how employees of Google in California reuse the communications and data collected.

24.     This Court has subject matter jurisdiction over this entire action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the amount

in controversy exceeds $5,000,000, and at least one Class member is a citizen of a state other than California or Delaware.

25. Venue is proper in this District because a substantial portion of the events and actions giving rise to the claims in this matter took place in this judicial District. Furthermore, Google is headquartered in this District and subject to personal jurisdiction in this District.

26. Intradistrict Assignment. A substantial part of the events and conduct which give rise to the claims herein occurred in Santa Clara County.

## FACTUAL ALLEGATIONS REGARDING GOOGLE

### I. Google Has a Long History of Invading Consumers' Privacy and Misrepresenting the Scope of Google's Data Collections

27. For at least the last decade, Google has been persistently and pervasively violating consumers' privacy rights. The pattern is always the same. Google gets caught. Google gets punished. Google lulls consumers into a false sense of security again.

28. In 2010, the FTC charged that Google "used deceptive tactics and violated its own privacy promises to consumers when it launched its social network, Google Buzz." To resolve these claims, Google, in 2011, agreed to the FTC's entry of a binding Order (the "Consent Order"), which barred Google "from future privacy misrepresentations" and required Google "to implement a comprehensive privacy program."[2] The Consent Order also required Google to take steps relating to "covered information," defined as "information [Google] collects from or about an individual."[3] The FTC ordered as follows:

### I.

**IT IS ORDERED** that [Google], in or affecting commerce, shall not misrepresent in any manner, expressly or by implication:

A. the extent to which [Google] maintains and protects the privacy

---

[2] *FTC Charges Deceptive Privacy Practices in Googles Rollout of Its Buzz Social Network*, FED. TRADE COMM'N (Mar. 30, 2011), https://www.ftc.gov/news-events/press-releases/2011/03/ftc-charges-deceptive-privacy-practices-googles-rollout-its-buzz (last visited Nov. 11, 2020).
[3] The term "covered information" thus includes, but is not limited to, "(c) online contact information, such as a user identifier . . . (d) persistent identifier, such as IP address . . . (g) physical location; or any other information from or about an individual consumer that is combined with (a) through (g) above."

FOURTH AMENDED CLASS ACTION COMPLAINT   CASE NO. 3:20-cv-04688-RS

and confidentiality of any covered information, including, but not limited to, misrepresentations related to: (1) the purposes for which it collects and uses covered information, and (2) the extent to which consumers may exercise control over the collection, use, or disclosure of covered information…[4]

## II.

**IT IS FURTHER ORDERED** that [Google], prior to any new or additional sharing by respondent of the Google user's identified information with any third party, that: 1) is a change from stated sharing practices in effect at the time respondent collected such information, and 2) results from any change, addition, or enhancement to a product or service by respondent, in or affecting commerce, shall:

A. Separate and apart from any final "end user license agreement," "privacy policy," "terms of use" page, or similar document, clearly and prominently disclose: (1) that the Google user's information will be disclosed to one or more third parties, (2) the identity or specific categories of such third parties, and (3) the purpose(s) for respondent's sharing; and

B. Obtain express affirmative consent from the Google user to such sharing.

29.     Google quickly recidivated.  Just one year after entry of the Consent Order, the FTC found that Google had already violated it.  In an August 2012 press release, the FTC explained that Google had been promising users of Apple's Safari web browser that Google would not track their web browsing, and that Google had then broken those promises by "circumventing the Safari browser's default cookie-blocking setting":

Google Inc. has agreed to pay a record $22.5 million civil penalty to settle Federal Trade Commission charges that it misrepresented to users of Apple Inc.'s Safari Internet browser that it would not place tracking "cookies" or serve targeted ads to those users, violating an earlier privacy settlement between the company and the FTC.

The settlement is part of the FTC's ongoing efforts make sure companies live up to the privacy promises they make to consumers, and is the largest penalty the agency has ever obtained for a violation

---

[4] Agreement Containing Consent Order, *In re Google Inc.*, No. 1023136 (F.T.C.), https://www.ftc.gov/sites/default/files/documents/cases/2011/03/110330googlebuzzagreeorder.pdf (emphasis added).

FOURTH AMENDED CLASS ACTION COMPLAINT     CASE NO. 3:20-cv-04688-RS

of a Commission order. In addition to the civil penalty, the order also requires Google to disable all the tracking cookies it had said it would not place on consumers' computers.

"The record setting penalty in this matter sends a clear message to all companies under an FTC privacy order," said Jon Leibowitz, Chairman of the FTC. "No matter how big or small, all companies must abide by FTC orders against them and keep their privacy promises to consumers, or they will end up paying many times what it would have cost to comply in the first place."[5]

30. Since 2012, a number of federal, state, and international regulators have similarly accused Google of violating its data-collection and privacy promises, with Google failing to disclose and obtain consent for its conduct.

31. In January 2019, France's data privacy authority, known as the CNIL, fined Google $57 million for privacy violations. The violations related to: Google's lack of transparency regarding its data collection practices; Google's lack of valid consent from consumers; and the failure of Google's privacy settings to enable consumers to exercise real control over what Google collected.[6] In June 2020, France's highest court upheld this $57 million fine against Google, noting Google's failure to provide clear notice and obtain users' valid consent to process their personal data for ad personalization purposes on the Android mobile operating system. Google responded by stating that it had "'invested in industry-leading tools' to help its users 'understand and control how their data is used.'"[7]

32. In September 2019, Google and its YouTube subsidiary agreed to pay $170 million to settle allegations by the FTC and the New York Attorney General that YouTube illegally

---

[5] *Google Will Pay $22.5 Million to Settle FTC Charges It Misrepresented Privacy Assurances to Users of Apple's Safari Internet Browser*, FED. TRADE COMM'N (Aug. 9, 2012), https://www.ftc.gov/news-events/press-releases/2012/08/google-will-pay-225-million-settle-ftc-charges-it-misrepresented (last visited Nov. 11, 2020).

[6] Tony Romm, *France Fines Google $57 Million Under New EU Data-Privacy Law*, LOS ANGELES TIMES (Jan. 21, 2019), https://www.latimes.com/business/technology/la-fi-tn-google-france-data-privacy-20190121-story.html (last visited Nov. 11, 2020) (repost).

[7] The Associated Press, *Google Loses Appeal Against $56 Million Fine in France*, ABC NEWS (June 19, 2020), https://abcnews.go.com/Business/wireStory/google-loses-appeal-56-million-fine-france-71347227 (last visited Nov. 11, 2020).

1    collected personal information from children without their parents' consent.[8]

2          33.    Proceedings by the Arizona Attorney General and the Australian Competition and

3    Consumer Commission have also alleged that Google failed to obtain consent regarding its

4    collection of location data and regarding its practices of combining certain user data.

5          34.    In the Arizona Attorney General action, Google has produced documents

6    establishing "overwhelming" evidence that "Google has known that the user experience they

7    designed misleads and deceives users." Google's employees made numerous admissions in

8    internal communications, recognizing that Google's privacy disclosures are a "mess" with regards

9    to obtaining "consent" for its data-collection practices and other issues relevant in this lawsuit.

10   Some of these documents were made publicly available on August 21, 2020 (ironically, with heavy

11   privacy redactions by Google).

12         35.    Some of the documents produced by Google in the Arizona Attorney General action

13   refer to Google's "Web & App Activity" feature by name. These documents indicate that Google

14   has long known that Google's disclosures about this feature were (at a minimum) highly confusing

15   and insufficient to allow consumers to give informed consent. *See infra*, ¶¶ 98-99.

16         36.    In an Australia proceeding, the Australian Competition & Consumer Commission

17   ("ACCC") alleges that "Google misled Australian consumers to obtain their consent to expand the

18   scope of personal information that Google could collect and combine about consumers' internet

19   activity, for use by Google, including for targeted advertising." The ACCC alleges that Google

20   impermissibly combined the data it collected directly from consumers with data that it received

21   from "third-party sites and apps not owned by Google." The ACCC contends that Google "misled

22   Australian consumers about what it planned to do with large amounts of their personal information,

23   including internet activity on websites not connected to Google."[9]

24   _____

25   [8] *Google and YouTube Will Pay Record $170 Million for Alleged Violations of Children's Privacy Law*, FED. TRADE COMM'N (Sept. 4, 2019), https://www.ftc.gov/news-events/press-

26   releases/2019/09/google-youtube-will-pay-record-170-million-alleged-violations (last visited Nov. 11, 2020).

27   [9] *Correction: ACCC Alleges Google Misled Consumers About Expanded Use of Personal Data*, AUSTRALIAN COMPETITION & CONSUMER COMM'N (July 27, 2020),

28                                                    (Footnote Continued on Next Page.)

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

## II. Google Uses Firebase SDK to Surreptitiously Collect Users' Communications with Third-Party Apps

37.     Mobile "apps" (shorthand for "applications") are software programs that run on mobile devices (e.g., smart phones, tablets).

38.     Throughout the Class Period, the overwhelming majority of apps running on Class members' mobile devices have been third-party apps, meaning apps designed, developed, coded, and released by third-party developers.  Google did not own or directly control these third-party developers.

39.     Firebase SDK is a suite of software development tools that Google has owned and maintained throughout the Class Period.  Firebase SDK is intended for use by third-party software developers, including developers of third-party apps for mobile devices.  SDK stands for "software development kit."  Google calls Firebase SDK a "comprehensive app development platform." Google states that Firebase SDK allows developers to "build apps fast, without managing infrastructure," and that it is "one platform, with products that work better together."[10]

40.     On May 20, 2016, Jason Titus, Vice President of Google's Developer Products Group, stated that more than 450,000 software developers were using Firebase SDK.

41.     Throughout the Class Period, Google made significant efforts to coerce app developers to use Firebase SDK.  For example:

a.     Google requires third-party developers to use Firebase SDK in order to use the Google Analytics service to gain information about customers' use of the app;[11]

b.     Google requires third-party developers to use Firebase SDK in order to make

---

https://www.accc.gov.au/media-release/correction-accc-alleges-google-misled-consumers-about-expanded-use-of-personal-data#:~:text=The%20ACCC%20has%20launched%20Federal,Google%2C%20including%20for%20targeted%20advertising (last visited Nov. 11, 2020).

[10] *See* FIREBASE, https://firebase.google.com/ (last visited Nov. 11, 2020).

[11] For Android, see *Mobile App Reporting in Google Analytics - Android*, GOOGLE ANALYTICS, https://developers.google.com/analytics/devguides/collection/firebase/android (last visited Nov. 11, 2020) ("App reporting in Google Analytics is natively integrated with Firebase, Google's app developer platform . . . ."). For Apple iOS, see *Mobile App Reporting in Google Analytics - iOS*, GOOGLE ANALYTICS, https://developers.google.com/analytics/devguides/collection/firebase/ios (last visited Nov. 11, 2020) (also stating that "[a]pp reporting in Google Analytics is natively integrated with Firebase, Google's app developer platform . . . .").

the app pages searchable on Android devices;

        d.     Google through Firebase SDK provides support for Google's "Play Store"— a platform on which third-party app developers distribute their app to consumers and process payments in the app.

42.    As a result of Google's coercive practices, more than 1.5 million apps currently use Firebase SDK. That includes the vast majority of third-party apps that are currently in use on mobile devices that run Google's Android operating system. The third-party apps utilizing Firebase SDK include, for example, The New York Times, Duolingo, Alibaba, Lyft, Venmo, and The Economist.[12]

43.    The Firebase SDK scripts copy and transmit to Google's servers in California many different kinds of user communications between app users on the one hand and, on the other hand, the app and the persons and entities who maintain the app (typically, the app's owners and developers), by overriding device and account level controls.

44.    All of these communications qualify as "covered information" for purposes of the 2011 FTC Consent Order, and these communications contain personally identifiable information. These communications contain information relating to: (1) who the user is; (2) where the user is physically located; (3) what content the user has requested from the app (e.g., the app page URL); (4) what content the user has viewed on the app; and (5) much other information relating to the user's interaction with the app.

45.    Through the Firebase SDK scripts, Google intercepts these communications while the same are in transit and simultaneously sends surreptitious copies of them to Google even if the user is not engaged with any Google site or functionality; even if the user is not logged in to his or her Google account; and even if the user has "turned off" WAA and/or sWAA. From the apps, the Firebase SDK overrides the mobile device level controls, and causes the device to transmit the intercepted browsing data. Importantly, Google cannot receive this data without overriding device level settings, because the devices ultimately transmit and receive data, sitting between the user

---

[12] FIREBASE, https://firebase.google.com/ (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT   CASE NO. 3:20-cv-04688-RS

1    using the app, and the app server in the mobile cloud.

2       46.    The Firebase SDK scripts do *not* cause the apps to give any notice to the user that

3    the scripts are surreptitiously copying the communications and sending those copies to Google.

4       47.    These Firebase SDK scripts work on all mobile devices running all the major

5    operating systems—not just the Android system, but also Apple's iOS and many others.

6    Specifically on Android OS, Google surreptitiously collects the app-browsing data through the

7    Android GMS process, overriding device level controls.

8       48.    Here is one example of the kind of communications between users and third-party

9    apps that Google intercepts and copies using the Firebase SDK scripts, even when the user has

10   exercised their privacy controls by turning WAA and/or sWAA off:  When a user clicks on an app

11   icon on his or her mobile device, that opens the app and a line of communication between the user,

12   through his or her mobile device, and the app's application server.  If the user were to click on the

13   New York Times app, for example, that would open a line of communication with the New York

14   Times' application server to request content to be delivered to the user, such as the most current

15   news of the day.  For users who have elected to not allow Google to collect their app-browsing

16   activity by turning off WAA and/or sWAA, Google, by means of the Firebase SDK scripts,

17   surreptitiously intercepts the user's request as the request is in transit to the app's application

18   server, and simultaneously transmits a copy of the request to Google without disclosure to the user

19   or the user's consent.

20      49.    A second example is advertisements delivered by Google on third-party apps.

21   Google offers advertisement services such as Real Time Ad Bidding for which Google, through

22   the Firebase SDK scripts, intercepts and duplicates communications between users and third-party

23   apps while they are in transit and simultaneously transmits the communications to Google

24   controlled databases.  The duplicated communications delivered simultaneously to Google include

25   the user's personal information, from the communication between the user and the third-party

26   apps, such as the mobile app page being requested and the device from which the request is being

27   made.  This simultaneous interception and transmission to Google enables Google to target the

28   user with a targeted advertisement in real time.  This means that when a user communicates with

a third-party app to, for example, request app content related to flat screen televisions, through the process described above, Google will simultaneously intercept the user's communication and use it in real time to earn money by generating and serving the user an advertisement for flat screen televisions, in the third-party app. To accomplish ad delivery in real time, Google must intercept the communication between the user and the third-party app immediately, at the moment the request is sent by the user to the third-party app, so that Google can serve a targeted advisement on the user simultaneously with the requested app content.

50. Google's own documentation states that the Firebase SDK scripts allow Google to "[l]og the user's interactions with the app, including viewing content, creating new content, or sharing content."[13] The Firebase SDK scripts also allow Google to identify certain "actions" that consumers take within an app, such as "viewing a recipe." Thus, for example, Google's Firebase documentation states that Firebase can "log separate calls" each time a consumer "view[s] a recipe (start) and then clos[es] the recipe (end)." (This Google documentation, however, does *not* disclose that these scripts transmit this information and surreptitious copies of the data to Google even when the user switches the "Web & App Activity" feature off. And the documentation certainly does not disclose that Firebase SDK would be used to circumvent device and account level settings.)

51. Firebase SDK uses the term "event" to describe a wide range of user activity with an app. For example: when the user views a new screen on the app, that event is called "screen_view."[14] When the user opens a notification sent via the app from the Firebase Cloud Messaging system, that event is called "notification_open." And when the user selects content in the app, that event is called "select_content."

---

[13] *Log User Actions*, FIREBASE, https://firebase.google.com/docs/app-indexing/android/log-actions (last visited Nov. 11, 2020). Google has taken the position in its Interrogatory responses that Firebase App Indexing does not collect event data unless "Web & App Activity" is switched to "on." Plaintiffs are seeking additional discovery about how the "Web & App Activity" control impacts App Indexing.

[14] *See Automatically Collected Events*, FIREBASE HELP, https://support.google.com/firebase/answer/6317485?hl=en#:~:text=Automatically%20collected%20events%20%20%20%20Event%20name,currency%2C%20quan%20...%20%2023%20more%20rows%20 (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT   CASE NO. 3:20-cv-04688-RS

52.     The Firebase SDK scripts "automatically" copy and transmit (to Google) communications relating to at least 26 different kinds of events (including "screen_view" and "notification_open," described above), through the users' device.  The Firebase SDK scripts will "collect" these events "automatically," meaning, even if the developer does not "write any additional code to collect these events."

53.     In addition to the 26 different "automatically collected events," Firebase SDK permits app developers to code their apps to collect information about many more events (including "screen_view," described above).  Furthermore, Firebase SDK enables developers to create their own "custom events" to be tracked in their apps.[15]  Depending on how the app's code is written, Firebase SDK may also copy and transmit these and many additional events to Google's servers, through the users' device.  On Android OS, these intercepted messages are concurrently aggregated and facilitated by a background process called Google Mobile Service (GMS), which aggregates similarly intercepted messages across all the apps using Firebase SDK, so that user identity can be easily tracked across the apps, and so that browsing activity can be immediately associated and correlated for meaningful real-time context.

54.     Firebase SDK associates almost every kind of event with one or more specific pieces of information, called "parameters."  For example: when the user views a new screen (event: "screen_view"), the Firebase SDK scripts copy and transmit through the device at least seven different parameters to Google including "firebase_screen_id" and "engagement_time_msec."  When the user opens a notification (event: "notification_open"), then the Firebase SDK scripts copy and transmit at least seven parameters to Google including "message_name," "message_time," "message_id," "topic," and "label."  And when the user selects content in the app (event: "select_content"), then the Firebase SDK scripts copy and transmits through the device at least two parameters: "content_type" and "item_id."

55.     The Firebase SDK scripts "automatically" copy and transmit five basic

---

[15] *Google Analytics 4 Properties Tag and Instrumentation Guide*, GOOGLE ANALYTICS, https://developers.google.com/analytics/devguides/collection/ga4/tag-guide (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

"parameters" about all events.  These five automatically transmitted parameters are: "language"; "page_location"; "page_referrer"; "page_title"; and "screen_resolution."[16]  According to Google, these five parameters are "collected by default with every event."  This means that every time the user interacts with an app (in any sort of event), Firebase records that interaction by copying and transmitting to Google's servers through the device at least those five parameters.

56.     Focusing just on the three of the five "parameters" that Google "automatically" transmits:  the "page_title" parameter informs Google what the user is viewing; the "page_referrer" parameter informs Google whether the user arrived at that page from another place where Google has a tracker (and if so, the identity of that other place); and the "page_location" parameter informs Google of the URL address (e.g., internet address) of the content the user is viewing on his or her device.

57.     Google does not notify its users of these Firebase SDK scripts and how Google actually uses them, which cause the copying and duplication of browsing data to be sent to Google, for at least Google Analytics for Firebase, AdMob, and Cloud Messaging for Firebase.  These scripts are hidden from users and run without any notice to users of the interception and data collection even when they exercise their device level controls, which exceeds all contemplated and authorized use of the users' data.  All of these Firebase SDK products surreptitiously provide app browsing data to Google on mobile devices, overriding their device level controls, including through background processes such as Android GMS.

58.     Users have no way to remove these Firebase SDK scripts or to opt-out of this data collection.  Google intentionally designed these scripts in such a way as to render ineffective any barriers users may attempt to use to prevent access to their information, including by turning off the "Web & App Activity" feature.

---

[16] *Automatically Collected Events*, FIREBASE HELP, https://support.google.com/firebase/answer/6317485?hl=en#:~:text=Automatically%20collected%20events%20%20%20%20Event%20name,currency%2C%20quan%20...%20%20%23%20more%20rows%20 (last visited Nov. 11, 2020).

**III. Through Discovery and Google's Representations in this Case, Plaintiffs Begin to Understand that Google Uses Other Tracking and Advertising Code to Collect and Save App-Activity Data When WAA and/or sWAA Are Off**

59.     Plaintiffs have learned that Google's collection, saving, and use of app-activity data is not limited to Firebase SDK scripts.  Other Google tracking and advertising code likewise collects information about users' interactions with non-Google apps, notwithstanding whether the user switched off WAA or sWAA, where Google then saves and uses that "WAA-off" information.

60.     For example, one additional tracking and advertising code that Google uses to collect and save information about users' app-activity activity—regardless of whether WAA or sWAA is switched off—is Google's AdMob+ SDK.  Google AdMob is a Google service that app developers can use to generate revenue by way of in-app advertising.  Google integrated AdMob and Firebase during the Class Period.  An internal Google document produced in this case explains how "[t]his integration allows AdMob and Firebase to share their data across both platforms." GOOG-RDGZ-00028309 at -345.  Plaintiffs added allegations about AdMob (as well as Cloud Messaging) to their Second Amended Complaint, and Court ruled that "Plaintiffs' AdMob and Cloud Messaging averments . . . are well pled." Dkt. 127 at 7.

61.     Based on discovery, Plaintiffs know that Google developed and introduced "AdMob+" because it was not satisfied with the AdMob-Firebase integration.  Internal Google documents produced in discovery explain that because the "AdMob-Firebase integration only has 15% adoption," "AdMob cannot create first-class Analytics features."  GOOG-RDGZ-00058360 at -61.  "AdMob+ is an initiative to ensure that [Google is] collecting analytics data for all AdMob publishers," i.e., publishers that use AdMob but not Firebase SDK.  *Id*.

62.     "In Summer 2019, as part of the AdMob+ project, AdMob updated their SDKs . . . to include measurement SDKs" such that "AdMob itself is now able to collect automatic events and user properties."  GOOG-RDGZ-00031656 at -56.  "This automatic event data allows AdMob to report user metrics, like sessions per user, session duration, ad exposure per session, and daily active users (DAU).  Previously, these automatic events for analytics were only available if the app developer linked to Firebase and added the Firebase SDK for GA."  *Id*.

63.     In other words, Google created an upgraded version of Google's AdMob product

that allows Google to collect and save the same user app -activity data even with respect to apps that do *not* use the Firebase SDK. *See* GOOG-RDGZ-00059486 at -86 ("AdMob+ SDK collects the same set of automatic signals as the GA4F SDK"); *see also* Ed Weng Tr. 87:3-8 (testifying that with AdMob+, Google was "trying to collect similar types of data" as compared to Google Analytics for Firebase). The result is that Google is now collecting and saving users' app-activity data even without the Firebase SDK scripts. Like the Firebase SDK scripts, Google has designed its AdMob+ code in a way that enables Google to collect and save users' app-activity data even when the user had switched off WAA and/or sWAA.

64. Another example of Google tracking and advertising code that enables Google to collect and save users' app-activity data is the Google Mobile Ads SDK. Throughout the Class Period, Google required app developers seeking to use Google's AdMob service to install the Google Mobile Ads SDK. Weng Tr. 59:16-18. Google employee Ed Weng testified that the Google Mobile Ads SDK is "an interchangeable term with the AdMob SDK." Weng Tr. 59:9-12. App developers can and have installed this Google Mobile Ads SDK even without Firebase SDK and/or Google Analytics for Firebase. Weng Tr. 65:13-22. By way of the Google Mobile Ads SDK, Google collects and saves data entirely separate from the data that Google collects and saves by way of Google's Firebase SDK scripts.

65. As explained in one internal Google document produced through discovery: "App developers who sign up with our advertising service are provided code in the Google Mobile Ads software development kit, or SDK, to add to their apps that accomplishes a very similar function to the ad tags for web publishers. The data that is sent to Google is also similar, although rather than rely on an identifier set in a cookie, the SDK reads the advertising identifier set by the device OS, and sends to Google an encoded version of that ID." GOOG-RDGZ-00014026 at -28.

66. As explained by former Google employee Ed Weng, during his recent deposition in this case, Google by way of the Google Mobile Ads SDK collects information about ad impressions—when an app displays an ad to a user—and Google collects this app activity information notwithstanding whether the app publisher separately uses Firebase. Weng Tr. 60:6-11, 94:9-19. The same is true for ad clicks, meaning information about when a user clicks on a

1 particular ad. *Id.* 95:2-11.

2       67.    Google collects this app-activity information from the user and her device and uses

3 it to serve advertisements to the user notwithstanding whether the user has switched off WAA

4 and/or sWAA.  And Google saves this information in Google's own logs even after the

5 advertisement has been served.

6       68.    Yet another example of Google tracking and advertising code that enables Google

7 to collect users' app-activity data is Google code associated with its "Webview" technology.

8 Webview enables apps to display web content within the app without any need for the user to open

9 up a dedicated browser:



24 In that case, different Google tracking and advertising code is used to collect information about

25 users' interactions with those parts of the app.

26       69.    For example, instead of or in addition to relying on Firebase SDK scripts, an app

27 may use Google Analytics javascript tracking code, which is more typically used by websites.

28 GOOG-RDGZ-00049414 at -14.  An internal Google document labeled "[Google Analytics]

FOURTH AMENDED CLASS ACTION COMPLAINT   CASE NO. 3:20-cv-04688-RS

Tracking for Hybrid Apps" describes how this Google Analytics tracking code can be used to "measure user interactions in a WebView," including to "measure user interactions with HTML content as app data." GOOG-RDGZ-00093970 at -70. Separate from Firebase, Google through this tracking code receives information about URL requests. *Id.*

70.     Similarly, instead of or in addition to AdMob, Google collects and saves app-activity data by way of Google AdSense and Google Ad Manager javascript code, which is likewise more typically used by websites. AdSense and Ad Manager are Google services that enable Google to serve display advertisements within non-Google websites. By way of these Google advertising codes, Google also collects and saves app-activity information regarding users' interactions with non-Google apps, notwithstanding whether WAA and/or sWAA is switched off.

71.     The bottom line is that Google's collection and saving of WAA-off data extends beyond Firebase. Plaintiffs assert claims on behalf of people who turned WAA off, and it is now clear that Google uses various tracking and advertising codes to collect and save app-activity information concerning those users' interactions with non-Google apps. Just like with Firebase SDK, Google collects and saves this information regardless of whether the user has off WAA and/or sWAA, in violation of Google's uniform representations.

72.     Finally, not only does Google collect and save data from users' interactions with non-Google apps while WAA and/or sWAA are switched off, Google also uses fields and bits to track that activity—all while internally labeling that data as WAA-off data. "[M]ost of the logs" at Google have a "field" (or bit) which "determine[s] what the WAA state of a particular user was when the log entry was written." GOOG-RDGZ-00088573 at -74.

73.     As summarized by one Google employee, "Google stores and recalls tons of information about me with WAA disabled[.]" GOOG-RDGZ-00156520 at -21.

**IV.   Users Turned off the "Web & App Activity" and/or "Supplemental Web & App Activity" Feature to Prevent Google from Collecting and Saving Their Data, but Google Continued Without Disclosure or Consent to Intercept and Save Those Communications**

**A.     Google's "Web & App Activity" Feature**

74.     In or before 2015, Google launched the "Web & App Activity" feature.

75.     Throughout the Class Period, users have been able to access the "Web & App Activity" feature in at least two ways: through Google's website, and through the "Settings" menu of a mobile device running Android OS.  Google presented such settings to their business partners as device level controls, including by requiring the controls and accompanying representations written by Google as part of the Android OS, as licensed to Android device manufacturers, such as Samsung.

76.     To access the "Web & Activity" feature through Google's website, a user would direct his or her web browser to Google's My Activity website (and previously Google's My Account website), and would then log on with their Google account credentials.  The first screen of the My Activity website displays, among other options, the "Web & App Activity" feature.  By clicking on the words "Web & App Activity," the user is taken to a second screen, which displays the image of a switch beside the words "Web & App Activity."  The user can then toggle the switch "off" to turn off the "Web & App Activity" feature.[17]

77.     To access the "Web & Activity" feature through a mobile device running Google's Android operating system, the user would use the phone's "Settings" application.[18]  For example, on a Samsung phone running the Android system, the "Settings" application includes a section entitled "Privacy Controls."  (Shown in "Screen 1," below.)  Within that "Privacy Controls" menu, the user can select "Activity Controls" to "Choose the activities and info you allow Google to save," which would open a new screen.  (Shown in "Screen 2," below.)  In that second "Activity Controls" screen, the phone displays the image of a switch beside the words "Web & App Activity."  The user can then toggle the switch "off" to turn off the "Web & App Activity" feature.

---

[17] Google previously offered the option to "pause" Web & App Activity.  "Pausing" this feature likewise did not stop the Google interception, data collection, and use at issue in this lawsuit.

[18] The images for this paragraph were captured in July 2020, during the filing of the initial Complaint.  Since then, Google has changed the language of the device level settings on Android phones, including the Samsung phones referenced herein.  The reasons why Google removed such language, and its communications with manufacturers such as Samsung, will be subject to discovery.

FOURTH AMENDED CLASS ACTION COMPLAINT   CASE NO. 3:20-cv-04688-RS



SCREEN 1[19]                    SCREEN 2

78.     Beneath the "Web & App Activity" control switch, there is a separate box that the user may click to allow Google to "Include Chrome history and activity from sites, apps, and devices that use Google services." Users who access "Web & App Activity" through the Google website are likewise presented with this separate box. When the "Web & App Activity" switch is turned off, either through the Google website or Android "Settings" application, the box that states "Include Chrome history and activity from sites, apps, and devices that use Google services" is also automatically turned off and cannot be toggled to on. This separate box is known as "supplemental Web & App Activity" or sWAA. As succinctly summarized in an internal Google document produced in this case, "WAA must be on for sWAA to be on." GOOG-RDGZ-00061316 at -16. A user can elect to turn on WAA but turn off sWAA and/or keep sWAA off.

79.     The Google Privacy Policy also defines "Google services" to include Google apps

_____

[19] The highlighted language from this screen is part of the OS language written by Google.

1    and sites as well as Google products integrated into third-party apps and sites, such as Firebase

2    SDK products like Google Analytics for Firebase, AdMob, and Cloud Messaging, as well as other

3    Google tracking and advertising code.[20]  Ex. A (Google Privacy Policy) at 2.

4         80.    Google simultaneously tracks the user's setting of the WAA and sWAA features

5    (whether "on" or "off") across all Google's services and devices in real time.  Thus, if a user turns

6    off WAA and/or sWAA in the user's phone, then that change will also be reflected when the user

7    logs on to Google's "My Activity" website using the user's laptop.  Similarly, if a user then uses the

8    laptop to turn WAA or sWAA back "on," using the "My Activity" website, then that feature will

9    also be turned "on" in the user's Android phone "Settings" application.

10        81.    However, contrary to Google's disclosures (described below), turning off the WAA

11   and/or sWAA features actually does nothing to stop Google from receiving, collecting, and using

12   the data transmitted to Google by way of Google tracking and advertising code, including Firebase

13   scripts.

14    **B.    Google's Privacy Policy and "Learn More" Disclosures Stated That the**
          **"Web & App Activity" and "Supplemental Web & App Activity" Features**
15        **Stops Google from "Saving" Users' Data**

16        82.    Throughout the Class Period, Google stated that turning "off" the "Web & App

17   Activity" feature would prevent Google from collecting and saving users' data, including users'

18   communications made via apps.  Google's statements appeared in at least four places:  Google's

19   "Privacy Policy"; Google's "Privacy and Security Principles";  the "Web & App Activity" feature

20   itself; and Google's "Learn More" disclosures relating to the "Web & App Activity" feature.

21        **1.    Google's "Privacy Policy" and "Privacy and Security Principles"**
               **Stated That Users Could "Control" What Google Collects**
22

23        83.    Throughout the Class Period, Google's Privacy Policy has defined "Google

24   services" to include "Google apps [and] sites" as well as Google tracking and advertising code

25   that, like Firebase SDK, are "integrated into third-party apps."  The first page of Google's Privacy

26   Policy states:

27   _____

28   [20] *Google Privacy Policy*, GOOGLE PRIVACY & TERMS (July 1, 2020),
     https://policies.google.com/privacy/archive/20200701?hl=en-US (last visited Oct. 11, 2022).

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

> Our **services include: Google apps, sites** . . . [and] **Products that are integrated into third-party apps** and sites, like ads and embedded Google Maps

Ex. A at 1 (Privacy Policy).

84.    From at least May 25, 2018, to the present, Google's Privacy Policy has promised users that "**across our services**, **you** can adjust your privacy settings to **control what we collect and how your information is used**." *Id.* (emphasis added).[21]  Earlier versions of Google's Privacy Policy included similar representations.[22]

85.    Throughout the Class Period, Google's Privacy Policy has told users that they can "control data" by using Google's "My Activity" website.  (As described above, "My Activity" is the website that users can access in order to switch WAA and/or sWAA off.)  The Privacy Policy states: "My Activity allows **you to** review and **control data that's created when you use Google services** . . . ."  Ex. A at 9 (Privacy Policy) (emphasis added).

86.    Google also stated in its "Privacy and Security Principles," displayed on its "Safety Center" website,[23] that Google would: "[r]espect our users" and "their privacy"; "[b]e clear about what data we collect"; "make it easy to understand what data we collect"; and "[m]ake it easy for people to control their privacy."  Google further stated, in these Privacy and Security Principles: "Every Google Account is built with on/off data controls, so our users can choose the privacy

---

[21] *See* Privacy Policy, GOOGLE PRIVACY & TERMS, https://policies.google.com/privacy (last visited Nov. 11, 2020).  Google included this same statement—"you can adjust your privacy settings to control what we collect and how your information is used"—in versions of its Privacy Policy dated May 25, 2018, January 22, 2019, October 15, 2019, December 19, 2019, March 31, 2020, July 1, 2020, August 28, 2020, and September 30, 2020. *Id.*

[22] The Google Privacy Policies effective between August 19, 2015 and May 24, 2018 included a section titled "Transparency and choice."  That section states that Google's "goal is to be clear about what information we collect, so that you can make meaningful choices about how it is used" and directs users to "[r]eview and update your Google activity controls to decide what types of data, such as videos you've watched on YouTube or past searches, you would like saved with your account when you use Google services."  Also included in the "Transparency and choice" section is the statement that users can "[c]ontrol who you share information with through your Google Account."  *See* Aug. 19, 2015 Google Privacy Policy; Mar. 25, 2016 Google Privacy Policy; June 28, 2016 Google Privacy Policy; Aug. 29, 2016 Google Privacy Policy; Mar. 1, 2017 Google Privacy Policy; Apr. 17, 2017 Google Privacy Policy; Oct. 2, 2017 Google Privacy Policy; Dec. 18, 2017 Google Privacy Policy (this policy was effective until May 24, 2018).

[23] *Our Privacy and Security Principles*, GOOGLE SAFETY CENTER, https://safety.google/principles/ (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

1   settings that are right for them."  Google promised to "ensur[e] that privacy is always an individual

2   choice that belongs to the user."  These "principles" have been part of Google's successful efforts

3   to lull users, app developers, and others into a false sense of user control and privacy.

4       87.    Finally, Google's Privacy Policy has stated, throughout the Class Period, that "We

5   will not reduce your rights under this Privacy Policy without your explicit consent."

**2.    Google's "Web & App Activity" and "Supplemental Web & App Activity" Features and Google's "Learn More" Disclosures with Respect to "Web & App Activity" Explained That Turning the Feature off Would Prevent Google from Saving Information Related to Third Party Apps**

9       88.    As described above, Google's "My Activity" website is one of two ways users can

10  switch off "Web & App Activity."  By clicking on the words "Web & App Activity" on the "My

11  Activity" website, the user is taken to a second screen, which displays the image of a switch beside

12  the words "Web & App Activity." On that screen, Google states that "Web & App Activity"

13  provides "control" that includes "activity on Google sites and apps" and "activity from sites, apps,

14  and devices that use Google services."

15      89.    The "My Activity" website also contains a hyperlink with the words "Learn more,"

16  located below the on/off switch for "Web & App Activity."  When users click on this "Learn more"

17  hyperlink, their browser then displays a new webpage entitled "Find & Control your Web & App

18  Activity."[24]  On that page, during the Class Period, Google made the following disclosures:

**SEE & CONTROL YOUR WEB & APP ACTIVITY**

. . . .

You can turn Web & App Activity off or delete past activity at any time…

**I. What's saved as Web & App Activity…**

Info about your searches and other activity on Google sites, apps, and services

When Web & App Activity is on, Google saves information like:

---

[24] *Find & Control Your Web & App Activity*, GOOGLE SEARCH HELP, https://support.google.com/websearch/answer/54068?visit_id=6372555086257257422105376128&hl=en&rd=1 (last visited Nov. 11, 2020).

- Searches and other things you do on Google products and services, like Maps and Play
- Your location, language, IP address, referrer, and whether you use a browser or an app
- Ads you click, or things you buy on an advertiser's site
- Information on your device like recent apps or contact names you searches for

. . .

> Info about your browsing and other activity on sites, apps, and devices that use Google services

When Web & App Activity is on, you can include additional activity like:

- Sites and apps that partner with Google to show ads
- Sites and apps that use Google services, including data that apps share with Google
- Your Chrome browsing history
- Android usage & diagnostics, like battery level and system errors

***To let Google save this information:***

- ***Web & App Activity must be on***.

- The box next to "Include Chrome history and activity from sites, apps, and devices that use Google services" must be checked.

*Id.* (emphases added). This is a plain and direct statement to users that the switch for "Web & App Activity" "must be on" "[t]o let Google save this information," including "searches and other things you do on ***Google products***" as well as "[i]nfo about" the users' "activity on sites, ***apps***, and devices ***that use Google services***." *Id.* "Google services" includes, of course, Firebase SDK, Google Analytics for Firebase, Google AdMob+, Google Mobile Ads SDK, and Google code for Webview technologies, and hundreds of thousands of apps use these Google tracking and advertising codes. Google's own Privacy Policy defines the term "Google service" to include these Google tracking and advertising codes embedded in non-Google apps. Ex. A (Privacy Policy) at 1 ("Our ***services include:*** . . . ***products that are integrated into third-party apps*** . . . .").

90. Google's "Learn More" disclosures on the Android "settings" screens also stated that turning the Web & App Activity feature off would prevent Google from "sav[ing]" information related to Google Search and third-party apps. As described above, users with devices running Google's Android operating system have an additional means of switching the "Web & App Activity" feature off—namely, they can do this using the "Activity Controls" section of the

"Privacy" menu within these devices' "Settings" application. *Supra*, ¶ 77. This section also contains a "Learn more" hyperlink (see bottom of Screen 2, below) which, if selected, opens a web browser application on the device and displays to the user the same webpage, entitled "See & Control your Web & App Activity," within Google's "My Activity" website. *Supra*, ¶ 89 (describing and quoting this webpage). (Screen 3, below, shows a screenshot of part of this webpage as displayed on the device.)



SCREEN 1                SCREEN 2                SCREEN 3

91.     In Screen 1, the user is promised that the "Activity controls" will enable the user to "[c]hoose the activities and info you allow Google to save."

92.     Screen 2 makes clear that this "info" includes both "activity on Google sites and apps" as well as "activity from sites, apps, and devices that use Google services" and that "Web & App Activity" (including sWAA) is the relevant control.

93.     In Screen 3, after selecting "Learn more," the user is told that "To let Google save this information: Web & App Activity must be on."

94.     Thus, users who used their Android "Settings" application to learn more about the

"Web & App Activity" feature received the same misleading disclosures as did users who visited the "My Activity" website.

95.     Thus, Google publicly admits that its Activity Controls, including "Web & App Activity," are supposed to "allow you to switch the collection and use of data on or off."

96.     Based on Google's disclosures described and quoted above, Plaintiffs and Class members had the objectively reasonable belief that Google would stop collecting their communications and other interactions with apps on their phones—"across [Google's] services"—if the users turned the WAA and/or sWAA switch to "off."

97.     Plaintiffs and Class members could not possibly have consented to Google's collection of their communications and other interactions with apps on their mobile devices when they turned the "Web & App Activity" switch to off.

### 3.     Google Knew That Its Disclosures Led Users to Believe That Turning "Web & App Activity" off Would Prevent Google from Collecting Communications with Apps

98.     As a result of the Arizona Attorney General's investigation (*see supra*, ¶¶ 33-35), several heavily redacted internal Google documents have been made public.  These documents refer to Google's "Web & App Activity" feature and its on/off switch.  The documents indicate that Google's own employees understood that Google's disclosures to consumers, regarding this switch, misled consumers into believing, wrongly, that turning the switch "off" would prevent Google tracking and advertising code from transmitting users' communications to Google.

a.     On February 2, 2017, one Google employee (name redacted by Google for privacy reasons) referenced "work in progress" at Google "trying to rein in the overall mess that we have with regards to data collection, consent, and storage."  This was in response to another Google employee (name redacted by Google for privacy reasons), asking a question regarding whether "users with significant privacy concerns understand what data we are saving?"  Another Google employee (name redacted by Google for privacy reasons) stated that this area was "super messy" and users needed to "make sense out of this mess."  The "overall mess" with Google's data collection and consent described in these documents includes the Web & App Activity feature.

b.      On August 13, 2018, one Google employee (name redacted by Google for privacy reasons) referenced "Web/App Activity" and commented that the "current UI [user interface] feels like it is designed to make things possible, yet difficult enough that people won't figure it out." The Google employee also noted that selections were "defaulted to on, silently appearing in setting menus you may never see is <redacted>." These internal Google comments specifically addressed Web & App Activity, characterizing Web & App Activity as something "difficult enough" that users "won't figure it out."

c.      On August 14, 2018, one Google employee (name redacted by Google for privacy reasons) referenced Web & App Activity, stating "I did not know Web and App activity had anything to do with location. And seems like we are not good at explaining this to users." Another Google employee (name redacted by Google for privacy reasons) added: "Definitely confusing from a user point of view if we need googlers [to] explain it to us[.]" Google employees recognized Google was "not good" (perhaps intentionally so) at explaining the Web & App Activity feature.

d.      One heavily redacted 2017 Google presentation concerns a study that specifically focused, at least in part, on "Consent" and asked, "Do users comprehend what will happen if they turn on the Web & App activity setting . . . ." The presentation includes a lengthy, but mostly redacted, section of "Detailed findings." Those findings state that "Participants had difficulty [redacted]" and that the "effect of the activity of the Web & App Activity [redacted]."

99.      On information and belief, unredacted versions of those documents and other internal Google documents will further confirm that not even Google believes its users had consented to Google's interceptions between users and apps when "Web & App Activity" was switched off.

100.      Indeed, a Google presentation from April 2020 produced by Google in this case summarized an internal study of users' understanding of the WAA setting. The study yielded unequivocal results: "***All participants expected turning WAA toggle off to stop saving their activity***." GOOG-RDGZ-00151992 at -00.

101.      As summarized by a Google employee in an internal email, "WAA (or any of the

other controls) does not actually control what is stored by Google, but simply what the user has access to. ***This is really bad***. . . . I for one didn't realize ***Google actually stored all of my activity even if those controls were off*** and I work at Google!  Seems sort of silly to turn them off as I'm not any safer with them off than on."  GOOG-RDGZ-00024698 at -98.

102.    In that same email, a Google employee admitted: "Today, ***we don't accurately describe what happens when WAA is off***." *Id.* at -99. "[G]iven the way on/off works, one has to then assume that disabled (off) would be the exact opposite of what is described for what happens when the WAA bit is on." *Id.*  "***The WAA and other controls imply we don't log the data, but obviously we do***. ***We need to change the description*** to indicate even with the control off, Google retains this data and uses it for X purposes." *Id.* at -98.  "If we are storing data that the user does not have access to, we need to be clear about that fact." *Id.*

103.    Google in this case has taken the position that this email is not relevant to data collected by way of Google Analytics for Firebase, claiming that the employee's concerns, as expressed in the email, "were discussing completely unrelated products and circumstances . . . ." Dkt. 247 at 5 n.3.  Relatedly, Mr. Monsees, a product Manager for WAA, has testified that the concerns expressed in this email related to Google Search data.  Monsees Tr. 232:1-12.  Google's position in this case, and Mr. Monsees's testimony, support Plaintiffs' additional allegations, added in this Fourth Amended Complaint, that Google's storage and use of WAA-off data goes beyond the Google Analytics for Firebase service.  Google employees have internally expressed concern about Google falling far short of its promises to users regarding WAA, including in the context of Google Search.

104.    And as aptly summarized by yet another Google employee: "I think ***teams should not use user data at all if WAA is off***, regardless if there is user data that was collected when WAA was on***. It's a much cleaner story and what I would think most users expect***."  GOOG-RDGZ-00039094 at -94.

### 4.    Google's Passing Reference to "Your Google Account" Does Not Constitute Consent

105.    During the Class Period, Google made much of its commitment to privacy.  For

example, Google's CEO promised consumers, in a *New York Times* op-ed, that "[t]o make privacy real, we give you clear, meaningful choices around your data."[25]

106. Now faced with this lawsuit compelling it to honor these claims, Google has abandoned this commitment to clear and meaningful choices, instead contending that its Privacy Policy and promises were a ruse.

107. Google's first motion to dismiss contended—incorrectly and incredibly—that the "Learn more" disclosures described above somehow told users that Google would continue to intercept, copy, collect and save their communications with apps, even when the "Web & App Activity" feature was turned "off." Google's motion relied on the words "saved in your Google Account," taken from a single sentence in the "See & Control your Web & App Activity" page:

> If Web & App Activity is turned on, your searches and activity from other Google services are **saved in your Google Account**, so you may get more personalized experiences, like faster searches and more helpful app and content recommendations.

Google argued that the words "saved in your Google Account" conveyed to users that the "Web & App Activity" on/off switch was meaningless—that it would not do precisely what Google's Privacy Policy (and the rest of the "Learn More" hyperlinked page) says that the switch would do. Rather, these five words, according to Google, indicate that the "off" switch has all the effect of a light switch during a blackout: The switch merely toggles off what data Google will *display for the user* in the user's "account." To state this contention plainly reveals how outlandish it is. Over and over again Google's Privacy Policy and "Learn more" disclosures told users that the "Web & App Activity" feature switch would "control" what "Google saves"; "what we collect"; and "how your information is used"—across "Google services." The five words highlighted by Google do nothing to diminish Google's promises.

108. Google's reliance on these five words is particularly troubling because Google itself, in many other disclosures, told users that Google promised to "Be clear about what data we

---

[25] Sundair Pichai, *Google's Sundar Pichai: Privacy Should Not Be a Luxury Good*, THE NEW YORK TIMES (May 7, 2019), *available at* https://www.nytimes.com/2019/05/07/opinion/google-sundar-pichai-privacy.html (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT   CASE NO. 3:20-cv-04688-RS

collect and why.  To help people make informed decisions about how they use Google products, we make it easy to understand what data we collect, how it's used, and why. Being transparent means making this information readily available, understandable, and actionable."[26]  *See infra*, ¶¶ 111-29 (collecting such public statements by Google).  Google's made-for-litigation argument, relying on a passing reference to "activity" being "saved in your Google account," is not the kind of "easy to understand" and "transparent" disclosure Google elsewhere promised to its users.

109.   Google's argument is wrong for another reason, too:  This sentence refers only to what happens if "Web & App Activity *is turned on.*"  Nothing in this sentence limits Google's repeated promises, quoted above, about what would happen when users turned Web & App Activity *off*.  Plaintiffs and the Class members were never told about and were harmed by Google's continued interceptions and collections of data during the times when they turned the switch *off*.

110.   Critically, nowhere in any disclosures did Google ever state that it would continue to collect users' communications with apps when the WAA or sWAA features were turned off. The notion that users and apps consented to this practice is absurd—one cannot consent to what one does not know.

### C.   Google Obscured Its Collection of These Communications Without Consent Through Its "Pro-Privacy" Campaigns and Other Public Statements

111.   In addition to the Privacy Policy and "Learn More" disclosures, described above, Google masked its unauthorized data collection practices (including specifically Google's practice of receiving, collecting, and saving the Firebase SDK and other Google tracking and advertising code transmissions while users had switched off the WAA and/or sWAA features) through various "pro-privacy" campaigns and other public statements.

112.   On June 1, 2015, Google Product Manager of Account Controls and Settings, Guemmy Kim, published an article titled "Keeping your personal information private and safe—and putting you in control."[27] The article states that "Google builds simple, powerful privacy and

---

[26] *Our Privacy and Security Principles*, Google Safety Center, https://safety.google/principles/ (last visited Nov. 11, 2020).

[27] Guemmy Kim, *Keeping Your Personal Information Private and Safe—and Putting You in*

(Footnote Continued on Next Page.)

FOURTH AMENDED CLASS ACTION COMPLAINT   CASE NO. 3:20-cv-04688-RS

security tools that keep your information safe and put you in control of it," such as the "new hub"

called "My Account" (which at that time included the Web & App Activity feature that is at issue

in this lawsuit). This article told users that "My Account gives you quick access to the settings

and tools that help you safeguard your data, protect your privacy, and decide what information is

used to make Google services work better for you." The article stated that users can "[m]anage

the information" that Google "use[s]" from Google "products." As an example of how users can

control how Google uses their information, the article further represented that "you can turn on

and off settings such as Web and App Activity."

113. On June 1, 2016, Kim published another article titled "Celebrating My Account's

first birthday with improvements and new controls." This article described Google's My Account

hub (which at that time included the Web & App Activity feature at issue in this lawsuit) as "a hub

that gives you quick access to controls for safeguarding your data and protecting your privacy on

Google."[28] The article touted how Google's tools "make it easy for you to control your privacy"

and represented that when "you entrust your data to Google, you should expect powerful security

and privacy controls."

114. On September 8, 2017, Google Product Manager Greg Fair published an article

titled "Improving our privacy controls with a new Google Dashboard" in which he touted how

Google has "[p]owerful privacy controls that work for you" and emphasized that users had

"control" over their information and tools "for controlling your data across Google."[29] Mr. Fair

specifically referenced the My Activity hub (formerly named "My Account"), which at that time

included the Web & App Activity feature at issue in this lawsuit. Mr. Fair stated: "You–and only

you–can view and control the information in My Activity." After describing this privacy control,

---

*Control*, GOOGLE, THE KEYWORD (June 1, 2015), *available at* https://blog.google/topics/safety-security/privacy-security-tools-improvements/ (last visited Nov. 11, 2020).

[28] Guemmy Kim, *Celebrating My Account's First Birthday with Improvements and New Controls*, GOOGLE, THE KEYWORD (June 1, 2016), *available at* https://blog.google/technology/safety-security/celebrating-my-accounts-first-birthday/ (last visited Nov. 11, 2020).

[29] Greg Fair, *Improving Our Privacy Controls with a New Google Dashboard*, GOOGLE, THE KEYWORD (Sept. 8, 2017), https://www.blog.google/topics/safety-security/improving-our-privacy-controls-new-google-dashboard/ (last visited Nov. 11, 2020).

Mr. Fair boasted Google's efforts in "[b]uilding tools that help people understand the data stored with their Google Account and <u>control their privacy</u>."

115.    On June 21, 2018, Google Product Manager, Jan Hannemann, published an article titled "More transparency and control in your Google Account" in which he wrote: "For years, we've built and refined tools to help <u>you</u> easily understand, protect, and <u>control your information</u>. As needs around security and privacy evolve, we will continue to improve these important tools to help <u>you control</u> how Google works for you."[30]

116.    On May 7, 2019, Google CEO Pichai published an op-ed in the *New York Times*, titled "Privacy Should Not Be a Luxury Good," in which he stated that: "we [at Google] care just as much about the experience on low-cost phones in countries starting to come online as we do about the experience on high-end phones.  Our mission compels us to take the same approach to privacy.  For us, that means <u>privacy cannot be a luxury good offered only to people who can afford to buy premium products and services</u>."[31] Mr. Pichai further stated that it is "vital for companies to give people clear, individual choices around how their data is used" and that Google focuses on "features that <u>make privacy a reality</u> — for everyone."  He continued:  "To make privacy real, <u>we give you clear, meaningful choices around your data</u>."[32]

117.    On the same date, May 7, 2019, Google CEO Pichai gave the keynote address at Google's 2019 I/O developer conference.  He stated: "[a]nother way we build for everyone is by ensuring that our products are safe and private, and that people have clear, meaningful choices around their data.  We strongly believe that privacy and security are <u>for everyone, not just a few</u>."  The full text of his remarks was later published online.[33] Mr. Pichai further stated that Google's "products" are "built on a foundation of user trust and privacy."  He represented that Google

---

[30] Jan Hannemann, *More Transparency and Control in Your Google Account*, GOOGLE, THE KEYWORD (June 21, 2018), https://blog.google/technology/safety-security/more-transparency-and-control-your-google-account/ (last visited Nov. 11, 2020).
[31] Sundar Pichai, *Google's Sundar Pichai: Privacy Should Not Be a Luxury Good*, THE NEW YORK TIMES (May 7, 2020), *available at* https://www.nytimes.com/2019/05/07/opinion/google-sundar-pichai-privacy.html (last visited Nov. 11, 2020).
[32] *Id.*
[33] Pangambam S., *Sundar Pichai at Google I/O 2019 Keynote (Full Transcript)*, THE SINGJU POST (June 13, 2019), *available at* https://singjupost.com/sundar-pichai-at-google-i-o-2019-keynote-full-transcript/?singlepage=1.

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

1  "ensur[es] that our products are safe and private, and that people have clear, meaningful choices
2  around their data."[34]  Recognizing that "privacy and security are for everyone," he also stated:
3  "This is why powerful privacy features and controls have always been built into Google services."
4  Mr. Pichai specifically referenced the Web & App Activity control at issue in this lawsuit, touting
5  how Google was launching the auto-delete functionality as an example of how users can access
6  "privacy controls" to "easily change your privacy settings."

7  118.  In August 2019 Google launched a "pro-privacy" campaign called "Privacy
8  Sandbox."  In this campaign, Google promotes itself as a champion of privacy and choice that
9  scrupulously respects the privacy of its users and is transparent about the data it collects.[35]  The
10  blog post announcing this initiative declared to users that "Privacy is paramount to us, in
11  everything we do."

12  119.  Since the Privacy Sandbox campaign, Google has indicated that it will require rival
13  adtech companies using Google targeted advertising products to have their own consent directly
14  from the consumers, if the rival adtech companies are to track consumers directly.  In response to
15  questions from regulators—such as those in the United Kingdom—regarding whether Google was
16  engaged in anticompetitive conduct, Google responded by indicating that it was protecting
17  consumer privacy.

18  120.  On October 2, 2019, Google Director of Product Management, Privacy, and Data
19  Protection Office, Eric Miraglia, published an article titled "Keeping privacy and security simple,
20  for you" in which he represented that when it comes to "privacy and security," "managing your
21  data should be just as easy as making a restaurant reservation."[36] He emphasized how Google was
22  "rolling out more ways for you to protect your data . . . ."  He referenced Web & App Activity,
23  stating that Google was allowing users to "automatically delete your Location History and Web &

---

[34] *Id.*
[35] Justin Schuh, *Building a More Private Web*, Google, The Keyword (Aug. 22, 2019), *available at* https://www.blog.google/products/chrome/building-a-more-private-web/ (last visited Nov. 11, 2020).
[36] Eric Miraglia, *Keeping Privacy and Security Simple, For You*, GOOGLE, THE KEYWORD (Oct. 2, 2019), *available at* https://blog.google/technology/safety-security/keeping-privacy-and-security-simple-you/ (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT   CASE NO. 3:20-cv-04688-RS

App Activity, which <u>includes things you've searched for and browsed</u>."

121.    On December 19, 2019, Google Vice President of Product Privacy Rahul Roy-Chowdhury published an article titled "Putting you in control: our work in privacy this year" in which he represented that Google Account (which includes the Web & App Activity control at issue in this lawsuit) is a "tool[] for users to access, <u>manage and delete</u> their data" and that Google "let[s] you <u>control</u> how your information is used."[37]

122.    On January 22, 2020, Google CEO Pichai reiterated that privacy "cannot be a luxury good," and claimed that "privacy" is "at the heart of what we do."[38]

123.    On January 28, 2020, Google Vice President of Product Privacy Rahul Roy-Chowdhury published an article titled "Data Privacy Day: seven ways we protect your privacy" in which he identified the Web & App Activity feature and explained how Google's auto-delete functionality would allow users to "choose to have Google automatically and continuously delete <u>your activity</u> and location history after 3 or 18 months.  You can also <u>control</u> what data is saved to your account with <u>easy on/off controls</u> in your Google Account, and even delete <u>your data</u> by date, product and topic."[39]

124.    On May 7, 2020, Google Director of Product Management, Privacy and Data Protection Office, Eric Miraglia published an article titled "Privacy that works for everyone" in which he wrote that "you should be able to understand and manage your data–and make privacy choices that are right for you."[40]  He referenced the privacy features and controls at issue in this lawsuit, with Web & App Activity, and wrote:  "A few years ago, we introduced Google Account to provide a comprehensive view of the information you've shared and saved with Google, and

---

[37] Rahul Roy-Chowdhury, *Putting You in Control: Our Work in Privacy This Year*, GOOGLE, THE KEYWORD (Dec. 19, 2019), *available at* https://blog.google/technology/safety-security/putting-you-in-control-privacy-2019/ (last visited Nov. 11, 2020).
[38] James Warrington, *Privacy "Cannot Be a Luxury Good," Says Google Boss Under Pichai*, CITY A.M. (Jan. 22, 2020), *available at* https://www.cityam.com/privacy-cannot-be-a-luxury-good-says-google-boss-sundar-pichai/ (last visited Nov. 11, 2020).
[39] Rahul Roy-Chowdhury, *Data Privacy Day: Seven Ways We Protect Your Privacy*, GOOGLE, THE KEYWORD (Jan. 28, 2020), *available at* https://blog.google/technology/safety-security/data-privacy-day-seven-ways-we-protect-your-privacy/ (last visited Nov. 11, 2020).
[40] Eric Miraglia, *Privacy That Works for Everyone*, GOOGLE, THE KEYWORD (May 7, 2019), *available at* https://blog.google/technology/safety-security/privacy-everyone-io/ (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

one place to access your privacy and security settings. <u>Simple on/off controls let you decide which activity you want to save</u> to your account" and you "can also <u>choose which activities or categories of information you want to delete</u>." He also touted the "new control" for "Web & App Activity" with the auto-deletion of "your Location History and Web & App Activity data.

125.    On June 24, 2020, Google CEO Sundar Pichai published an article titled "Keeping your private information private" in which he represented that "[p]rivacy is at the heart of everything we do" and that Google focuses on "<u>putting you in control</u>" and "working to <u>give you control on your terms.</u>"[41] Mr. Pichai specifically referenced Web & App Activity as part of those efforts to treat "your information responsibly" and stated that Google changed its default settings for "new accounts" so that "<u>your activity data</u> will be automatically and continuously deleted after 18 months, rather than kept until you choose to delete it."

126.    On or about July 29, 2020, Google submitted written remarks to Congress for testimony by its current CEO Pichai (who helped develop Google's Chrome browser), which stated: "I've always believed that privacy is a universal right and should be available to everyone, and Google is committed to keeping your information safe, treating it responsibly, and <u>putting you in control of what you choose to share.</u>"[42]

127.    On September 15, 2020, Google's Global Partnership and Corporate Development President Donald Harrison stated during a Senate hearing that consent at times "appears confusing" but also represented that users "have control" and that Google wants "our users to be able to make a decision on how they control their data . . . ." He represented that "[u]sers own their data" and that users were "able to make a decision on how they control their data."

128.    The statements by Google and its key leaders, described above, were widely publicized to Google users by many different news outlets, which correctly interpreted these

---

[41] Sundar Pichai, *Keeping Your Private Information Private*, GOOGLE, THE KEYWORD (June 24, 2020), *available at* https://blog.google/technology/safety-security/keeping-private-information-private/ (last visited Nov. 11, 2020).
[42] *Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google: Hearing Before the Subcomm. on Antitrust, Commercial, and Administrative Law of the H. Comm. on the Judiciary*, July 29, 2020, https://docs.house.gov/meetings/JU/JU05/20200729/110883/HHRG-116-JU05-Wstate-PichaiS-20200729.pdf (written testimony of Sundar Pichai, Chief Executive Officer, Alphabet Inc.).

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

1  statements as claims, by Google, to be safeguarding users' privacy.[43]  Google intended these

2  statements to communicate that Google's data-collection practices were more transparent, and

3  more respectful of users' privacy, than were the practices of Google's competitors (e.g., Apple).

4      129.   Google and its key leaders made the statements described above in order to obscure

5  Google's intent to engage in widespread data collection without consent.  These statements were

6  intended to convey, and did convey, that Google did not intercept, collect, and save users' data

7  when the users had turned off the "Web & App Activity" feature.

8      **D.**    **Third-Party App Developers Did Not Consent to Google Collecting Users'**

9            **Communications with Third-Party Apps When "Web & App Activity" Was Turned off**

10      130.   Third-party app developers who used Google tracking and advertising code

11  including Firebase SDK likewise did not consent to Google's interception of users'

12  communications with apps when "Web & App Activity" was turned off.  Throughout the Class

13  Period, Google told these developers, in the service agreements, that Google: (1) would comply

14  with its own Privacy Policy; (2) would provide app users with control over their data; and (3)

15  would help the developers to comply with privacy laws and to protect consumers' rights over their

16  data, such as consumers' rights to "access; rectification; restricted processing; [and] portability."

17      131.   Google represented and continues to represent to app developers that Google will

18  adhere to its own Privacy Policy.  Specifically, Google states the following, on the Analytics Help

19  page intended for use by app developers who use Firebase SDK:

20

21

22

23

24

25

26

27  [43] Jon Porter, *Google's Sundar Pichai Snipes at Apple with Privacy Defense*, THE VERGE (May 8, 2019), *available at* https://www.theverge.com/2019/5/8/18536604/google-sundar-pichai-privacy-op-ed-nyt-regulation-apple-cook-advertising-targeting-user-data (last visited Nov. 11, 2020).

28

FOURTH AMENDED CLASS ACTION COMPLAINT   CASE NO. 3:20-cv-04688-RS



132.    When any app developer clicks on the "Google privacy policy & principles" above, they are taken to Google's Privacy Policy page—the same Privacy Policy page described above. *Supra*, ¶¶ 83-85.[44] In its Privacy Policy, Google falsely stated to its users that "***across our services***, **you** [the user] can adjust your privacy settings to ***control what we collect and how your information is used*.**"  As discussed above, Google's Privacy Policy also promises users that Google's "My Activity" website "allows you [the user] to review and control data that's created when you use Google services."

133.    Google also gave and gives assurances to app developers in its "Firebase Data Processing And Security Terms" that Google "will protect users' privacy."[45]  The purpose of these

---

[44] Google Privacy Policy, GOOGLE PRIVACY & TERMS, https://policies.google.com/privacy?hl=en.

[45] Firebase Data Processing and Security Terms, FIREBASE, https://firebase.google.com/terms/data-processing-terms#9.-data-subject-rights;-data-export (last visited Nov. 11, 2020) (stating, "[t]hese terms reflect the parties' agreement with respect to the terms governing processing and security of Customer Data under the [Firebase Terms of Service for Firebase Services"] Agreement.").  *See also* Terms of Service for Firebase Services, FIREBASE, https://firebase.google.com/terms (last visited Nov. 11, 2020) (stating, "I agree that my use of Firebase service is subject to the applicable terms below," including the "Firebase Data Processing and Security Terms").

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

Terms is to give app developers (and regulators, as further discussed below) the assurance that users can limit Google's data collection from Google's "Privacy Controls" as required by recent privacy laws.[46]  Such Terms state that "[i]f Non-European Data Protection Legislation applies to either party's processing of Customer Personal Data, the parties acknowledge and agree that the relevant party will comply with any obligations applicable to it under that legislation with respect to the processing of that Customer Personal Data."[47]

134.    The California Consumer Privacy Act ("CCPA"), CIPA, the CDAFA, and the FTC Act (as implemented through the FTC Consent Decree) each qualifies as "Non-European Data Protection Legislation."[48]  These laws forbid Google from using Google tracking and advertising code to collect consumers' communications with apps without their consent.  Therefore, Google's "Firebase Data Processing And Security Terms" indicated to developers (wrongly) that Google's "Web & App Activity" feature, when turned to "off," would prevent Google from collecting its users' communications with their apps.

135.    Accordingly, app developers implementing Google tracking and advertising code (like Firebase SDK) have not consented, do not consent, and cannot consent to Google's interception and collection of user data for Google's own purposes when users have turned off WAA and/or sWAA. In any event, consent to such brazen data-collection activities must be specific and express.  There is no disclosure or service agreement between Google and third-party app developers that grants Google permission to intercept communications between users and apps when the user has turned off the WAA and/or sWAA features.  And Google provided no notice to third-party app developers that it would intercept communications between users and apps when

---

[46] See also Google Ads Data Processing Terms, GOOGLE BUSINESSES AND DATA, https://privacy.google.com/businesses/processorterms/, Section 9, providing similar promises of honoring data subject rights and providing controls via "Data Subject Tool(s)" to control data collection (last visited Nov. 11, 2020).
[47] Firebase Data Processing and Security Terms, FIREBASE, https://firebase.google.com/terms/data-processing-terms#9.-data-subject-rights;-data-export (last visited Nov. 11, 2020), Section 5.1.3.
[48] The term is defined, in Google's terms, as "data protection or privacy legislation in force outside the European Economic Area, Switzerland, and the UK." Firebase Data Processing and Security Terms, FIREBASE, https://firebase.google.com/terms/data-processing-terms#9.-data-subject-rights;-data-export (last visited Nov. 11, 2020).

users shut off "Web & App Activity."

136.    Further, nowhere in any disclosures did Google ever indicate to its users that any separate agreement, between Google and an app developer, might override the user's decision to turn off WAA and/or sWAA.

## V.    Google Profits from the Communications It Intercepts Using Google Tracking and Advertising Code

137.    Google's continuous tracking of users is no accident.  Google is one of the largest technology companies in the world.  Google LLC and its parent Alphabet Inc. have over 1.5 billion active account users, and Alphabet Inc. boasts a net worth exceeding $1 trillion.

138.    Google's enormous financial success results from its unparalleled tracking and collection of personal and sensitive user information (including Plaintiffs' and Class members'), which data Google then uses to target its advertisements.

139.    Over the last five years, virtually all of Google's revenue was attributable to third-party advertising.  Google is continuously driven to find new and creative ways to leverage users' data in order to sustain Google's phenomenal growth in its sales of advertising services.

140.    Google profits from the data it collects and saves—including from users' interactions with third-party apps while users have switched off WAA and/or sWAA—in at least three ways.  First, Google associates the confidential communications and data with a user profile or profiles.  Second, Google later uses the user's profile (including the intercepted confidential communications at issue here) to direct targeted advertisements to consumers (including Plaintiffs and Class members) and track the impact of those advertisements on consumer behavior. *See, e.g.*, Miraglia Rough Tr. 95:19-96:21 (testifying that Google tracks conversions by way of "pseudonymous" identifiers, including in connection with both web and app activity). Google relatedly profits by leveraging data collected from non-Google apps by way of Google tracking and advertising code with data related to users' interactions with Google Search.  Third, Google uses the results to modify Google's own algorithms and technology, such as Google Search.

### A.    Google Creates and Maintains "Profiles" on Its Users Using the Data Collected from Google Tracking and Advertising Code

141.    Google builds and maintains "profiles" relating to each individual (including

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

Plaintiffs and Class members) and to each of their devices.  These "profiles" contain all the data Google can collect associated with each individual and each device.  In a *Wired* article regarding Google's privacy practices, Professor Schmidt stated that Google's "business model is to collect as much data about you as possible and cross-correlate it so they can try to link your online persona with your offline persona.  This tracking is just absolutely essential to their business.  'Surveillance capitalism' is a perfect phrase for it."[49]

142.    Google uses those user profiles for numerous purposes.  One important purpose is to guide Google's targeted advertisements.  The profiles allow Google to effectively target advertisements.  As a result of using the user profiles, Google's targeted advertisements are more effective and therefore Google can charge advertisers more for these services.

143.    Google includes in its user profiles data secretly transmitted to Google from consumer devices by Google tracking and advertising code during times that the user had switched off WAA and/or sWAA.  By including this data in its user profiles, Google increases the user profiles' value to Google and thereby allows Google to more effectively target advertisements to these users (among other uses of these profiles).

144.    Google combines the data, including data transmitted to Google by Google tracking and advertising code, with additional data generated by apps, running on the device, including apps that use Google's services.  This additional data includes: (1) device identifiers from the device's operating system; (2) geolocation information, including from cellular and wi-fi signals, and (3) Google's own persistent identifiers, such as its Google Analytics User-ID and Chrome X-Client Referrer Header, which identify specific individual users and the users' devices.

145.    The following diagram illustrates the process by which Google collects information from a mobile device while users have WAA and/or sWAA turned off:

---

[49] Lily Hay Newman, *The Privacy Battle to Save Google from Itself*, WIRED (Nov. 1, 2018), https://www.wired.com/story/google-privacy-data/ (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS



146.    The communications and data transmitted to Google from consumer devices, including by Google tracking and advertising code, is not "anonymized" in any meaningful sense of that word.  Instead, this data is combined by Google into a user profile with all the other detailed, user-specific data Google collects on individuals and their devices.  Google then uses these detailed profiles to help generate billions of dollars in advertising revenues without users' consent.

**B.    Google Generates Targeted Advertising to Class Members Based on Data Transmitted to Google by Google Tracking and Advertising Code**

147.    Google's targeted advertising services generate the vast majority of Google's hundreds of billions of dollars in annual revenue.[50]  The more accurately that Google can track and target consumers, the more advertisers are willing to pay.

148.    Google's "Ad Manager" service generates targeted advertisements to be displayed alongside third-party websites' content.  The "user profiles" described above are used by Ad Manager to select which ads to display to users.

149.    Google also sells in-app advertising services.  For example, some apps display an

---

[50] Eric Rosenberg, *How Google Makes Money (GOOG)*, INVESTOPEDIA (June 23, 2020), *available at* https://www.investopedia.com/articles/investing/020515/business-google.asp#:~:text=Google%20Ads%20and%20Search%20Advertising,results%20generated%20by%20Google's%20algorithm (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

advertisement on part of the screen. Google is paid to select and transmit targeted advertisements in this way, as well. In doing so, Google uses the "user profiles" described above.

150. Google is able to demand high prices for its targeted-advertising services because Google's user profiles (including data that Google obtained from Google tracking and advertising code) are so detailed.

151. If Google were to give consumers (including Plaintiffs and Class members) power to shut off the stream of data transmission (including from Google tracking and advertising code), then that would harm Google's ability to build detailed user profiles and to effectively target advertisements. That, in turn, would harm Google's biggest (by far) source of revenue. This explains why Google repeatedly promises privacy and control (in order to make users feel better) and then repeatedly breaks those promises (in order to make billions of dollars).

**C.      Google Refines and Develops Products Using the Data Transmitted to Google by the Google Tracking and Advertising Code**

152. Google also benefits by using the data it collects and saves to refine existing Google products, services, and algorithms—and to develop new products, services, and algorithms. This collection, usage, and monetization of user data contravenes the steps Plaintiffs and Class members have taken to try to control their information and to prevent it from being used by Google.

**1.      Google Search**

153. Currently, more than 90% of online searches carried out by U.S. consumers are done using Google's web-based search engine, called Google Search.

154. Google Search, and the algorithms that power it, make use of the data Google has obtained from the Google tracking and advertising code transmissions at issue here. Google Search would not be nearly as effective without the activity data at issue here.

**2.      On-Device Search Features**

155. Google also uses the tracking and advertising code transmissions to develop and refine Google's "On-Device Search" services. "On-Device Search" refers to a search of the content contained, linked, or referred to in the various apps of a mobile device. On most devices, this function appears as a text rectangle, with a magnifying glass on the left side, and the word

1   "Search" appearing where the user is meant to type in the query.

2   156.    A well-built On-Device Search feature will not only allow users to find their tools

3   and apps, but will also "deep link" the user to specific content and pages within the device's apps.

4   These "deep links" are similar to how web-based searches, like Google Search, can take a user

5   directly to specific pages within a website.  If a user then selects a search result that is "deep linked"

6   to content on an app, the phone will respond to that selection by opening the relevant app and

7   taking the user to the relevant content within the app.  This is in contrast to the more traditional

8   Google Search function, which would only search *web pages* rather than searching *within apps.*

9   157.    In 2015, an industry publication named *Search Engine Watch* described Google's

10  On-Device Search as follows: "Google can index the content contained within an app, either

11  through a sitemap file or through Google's Webmaster Tools.  If someone searches for content

12  contained within an app, and if the user has that app installed, the person then has the option to

13  view that content within the app, as opposed to outside the app on a mobile webpage.  For sites

14  that have the same content on their main website and app, the app results will appear as deep links

15  within the search listing.  If the user has the app installed and they tap on these deep links, the app

16  will launch and take them directly to the content."[51]

17  158.    In order to make its On-Device Search function more powerful, Google collects

18  and records the content of apps on users' phones.  This is called "indexing."  By "indexing" the

19  contents of apps, Google makes On-Device search quicker and more accurate.  In August 2015,

20  Google-sponsored publication *Search Engine Land* announced:

22          Historically, *app landing pages* on websites have been in the
            Google index—but *actual apps* and *internal app screens* have
23          not.…  Now that Google is indexing both app landing pages and
            deep screens in apps, Google's app rankings fall into two basic
24          categories, App Packs and App Deep Links.  App Packs are much
            more like the app search results that SEOs [search engine
25          optimizers] are used to, because they link to app download pages in
            Google Play or the App Store, depending on the device that you are

27  [51] Christopher Ratcliff, *What Is App Indexing and Why Is It Important?*, SEARCH ENGINE WATCH
28  (Nov. 19, 2015), *available at* https://www.searchenginewatch.com/2015/11/19/what-is-app-indexing-and-why-is-it-important/ (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

searching from."[52]

159.     In March 2015, the industry publication *Readwrite* reported on a rival search function, called AppWords, that was outperforming Google in the market for On-Device Search:

> Deep links for mobile apps were designed to mimic Web links by letting users click into different parts of an app and not just its home screen.  But they're also changing the way we discover new things. The deep-linking startup Deeplink has launched what appears to be the first intent based and keyword driven mobile search. Called AppWords (a play on Google AdWords), the new service basically prompts new links for app users to click on—ones that will take them from one app directly into another that's already on their phone.  "Query-based search has become a secondary surfacing tool in mobile," said cofounder Noah Klausman.  "AppWords uses context to predict what people want to search.  What we've built is what Google should have built a long time ago."[53]

160.     Google responded to this competition by acquiring Firebase in 2014, and then launching the Firebase SDK platform.  Google intentionally designed the Firebase SDK scripts to copy and transmit, to Google, users' communications with the apps and app developers while overriding device and account level controls.  Google did this because Google knew that it needed this data to develop and refine Google's On-Device Search services.  The Firebase SDK scripts, and other Google tracking and advertising code, give Google massive amounts of user data from apps—including apps that were developed for the devices of Google's rival, Apple.

161.     When app developers use Firebase SDK and other Google services that rely on embedded tracking and advertising code, Google receives a number of benefits that enhance and reinforce its market power in the market for On-Device Search.  As Google states in its own technical documentation for Firebase, Google's On-Device Search "uses information about the actions users take on public and personal content in an app to improve ranking for Search results and suggestions."

---

[52] Emily Grossman, *App Indexing & The New Frontier of SEO: Google Search + Deep Linking*, Search Engine Land (Aug. 12, 2015), *available at* https://searchengineland.com/app-indexing-new-frontier-seo-google-search-deep-linking-226517 (last visited Nov. 11, 2020).
[53] Lauren Orsini, *How Deep Linking Can Change the Way We Search on Mobile*, READWRITE.COM (Mar. 24, 2015), *available at* https://readwrite.com/2015/03/24/deep-linking-search-appwords/ (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT     CASE NO. 3:20-cv-04688-RS

## VI. The Communications Intercepted by Google Using Google Tracking and Advertising Code Are Highly Valuable

162. The information Google has collected and saved from users (including by using Firebase SDK and other tracking and advertising code) is highly valuable to Google, to other technology and advertising companies, and to users. This value is well understood in the e-commerce industry.[54] The world's most valuable resource is no longer oil, but is instead consumers' data.[55]

163. Even before the Class Period, there was a growing consensus that consumers' personal data was very valuable. In 2004, Professor Paul M. Schwartz noted in the *Harvard Law Review*:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[56]

164. Likewise, in 2011, Christopher Soghoian (a former fellow at the Open Society Institute and current principal technologist at the ACLU) wrote in *The Wall Street Journal*:

---

[54] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS No. 220 at 7 (Apr. 2, 2013), *available at* http://dx.doi.org/10.1787/5k486qtxldmq-en; *Supporting Investment in Knowledge Capital, Growth and Innovation*, OECD at 319 (Oct. 13, 2013), *available at* https://www.oecd.org/sti/inno/newsourcesofgrowthknowledge-basedcapital.htm; Pauline Glickman & Nicolas Glady, *What's the Value of Your Data?* TECHCRUNCH (Oct. 13, 2015), *available at* https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited Nov. 11, 2020) Paul Lewis & Paul Hilder, *Former Cambridge Analytica Exec Says She Wants Lies to Stop*, THE GUARDIAN (March 23, 2018), *available at* https://www.theguardian.com/uk-news/2018/mar/23/former-cambridge-analytica-executive-brittany-kaiser-wants-to-stop-lies (last visited Nov. 11, 2020); SHOSHANNA ZUBOFF, THE AGE OF SURVEILLANCE CAPITALISM: THE FIGHT FOR A HUMAN FUTURE AT THE NEW FRONTIER OF POWER at 166 (2019).
[55] *The World's Most Valuable Resource Is No Longer Oil, but Data*, THE ECONOMIST (May 6, 2017), *available at* https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited Nov. 11, 2020).
[56] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online.

Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[57]

A.      **The Transmissions Are Valuable to Class Members**

165.    It is possible to quantify the cash value, to Class members, of the communications and data collected and saved by Google (including by way of Google tracking and advertising code) while the WAA and/or sWAA features were turned off by Class members.

166.    For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[58] Contact information was valued by the study participants at approximately $4.20 per year. Demographic information was valued at approximately $3.00 per year. However, web browsing histories were valued at a much higher rate: $52.00 per year. The chart below summarizes the findings:

//

---

[57] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011), *available at* https://www.wsj.com/articles/SB10001424052970204190704577024262567105738 (last visited Nov. 11, 2020).

[58] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND (Jan. 18, 2011), *available at* https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039s-your-personal-data-worth.html (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS



Although none of the categories on this chart corresponds directly to the data obtained by Google from Class members using the Firebase SDK scripts or other Google tracking and advertising code, Morey's research demonstrates that it is possible, in theory, to quantify the value of this data to users.

### B.    The Transmissions Are Valuable to Google

167.    In addition to quantifying the value of the intercepted data *to users*, it is also possible to quantify the value of this data *to Google*.

168.    For example, it is possible to calculate the profits Google has earned from using this data to enhance its "user profiles"; to sell targeted advertisements; and to develop and refine other Google products.  *See supra*, ¶¶ 137-61.

169.    It is also possible to assess the value of the intercepted data to Google by reference to the money that Google has, on other occasions, paid to users for this kind of data.  Google began paying users for their web browsing data in 2012.[59]

170.    Google also pays internet users to participate in a panel that Google calls "Google Screenwise Trends."  The purpose of this panel is, according to Google, "to learn more about how

---

[59] Jack Marshall, *Google Pays Users for Browsing Data*, DIGIDAY (Feb. 10, 2012), *available at* https://digiday.com/media/google-pays-users-for-browsing-data/ (last visited Nov. 11, 2020); *see also* K.N.C., *Questioning the Searchers*, THE ECONOMIST (June 13, 2012), *available at* https://www.economist.com/schumpeter/2012/06/13/questioning-the-searchers (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT   CASE NO. 3:20-cv-04688-RS

everyday people use the Internet."

171.    Upon becoming panelists for Google Screenwise Trends, these users add a browser extension that shares with Google the sites they visit and how they use them.  The panelists consent to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com.  After three months, Google then pays panelists additional gift cards "for staying with" the panel.

172.    These gift cards, mostly valued at $5, demonstrated that Google assigned cash value to the data it obtained from internet users' communications with the websites they visited.  Google now pays Screenwise panelists up to $3 *per week*.

173.    There are other ways to assess the value of this data, including in terms of Google's ability to maintain and extend its monopolies, as discussed below.

### C.    The Data Would Be Valuable to Other Internet Firms

174.    The Firebase SDK and other Google tracking and advertising code transmissions at issue in this case would have value to other internet firms besides Google. It is possible to quantify this value.

175.    During the Class Period, a number of platforms have appeared on which consumers monetize their data.  For example:

a.    Brave's web browser pays users to watch online targeted ads, while blocking out everything else.[60]

b.    Loginhood "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their data sharing," via a "consent

---

[60] Brandan Hesse, *Get Paid to Watch Ads in the Brave Web Browser*, LIFEHACKER (Apr. 26, 2019), *available at* https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an,a%20more%20thoughtful%20way%20than%20we%E2%80%99re%20accustomed%20to (last visited Nov. 11, 2020) ("The model is entirely opt-in, meaning that ads will be disabled by default.  The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

1    manager" that blocks ads and tracking on browsers as a plugin.[61]

2            c.      Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to

3    help consumers, "[t]ake control of your personal data.  If companies are profiting from it, you

4    should get paid for it."[62]

5            d.      Killi is a new data exchange platform that allows users to own and earn

6    from their data.[63]

7            e.      BIGtoken "is a platform to own and earn from your data.  You can use the

8    BIGtoken application to manage your digital data and identity and earn rewards when your data is

9    purchased."[64]

10           f.      The Nielsen Company, famous for tracking the behavior of television

11   viewers' habits, has extended its reach to computers and mobile devices through Nielsen Computer

12   and Mobile Panel.  These applications track consumers' activities on computers, phones, tablets,

13   e-readers, and other mobile devices.  In exchange, Nielsen gives users points worth up to $50 per

14   month, plus the chance of winning more money in regular sweepstakes.[65]

---

[61] *Privacy Drives Performance*, LOGINHOOD, https://loginhood.io/ (last visited Nov. 11, 2020);
*see also Chrome Browser Extension*, LOGINHOOD, https://loginhood.io/product/chrome-extension (last visited Nov. 11, 2020) ("Start earning rewards for sharing data – and block others that have been spying on you.  Win-win.").

[62] *Your Data - Your Property*, DATA DIVIDEND PROJECT, https://www.datadividendproject.com/ (last visited Nov. 11, 2020) ("Get Your Data Dividend . . . . We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[63] *Killi Paycheck*, KILLI, https://killi.io/earn/ (last visited Nov. 11, 2020).

[64] *FAQ*, BIG TOKEN, https://bigtoken.com/faq#general_0 (last visited Nov. 11, 2020) ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms.  Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

[65] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash*, BEST WALLET HACKS (June 10, 2020), *available at* https://wallethacks.com/apps-for-selling-your-data/ (last visited Nov. 11, 2020).

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

1               g.     Facebook has an app, called "Study," that pays users for their data.

2 Facebook has another app, called "Pronunciations," that pays users for their voice recordings.[66]

3        176.     As established by the California Constitution and the CCPA, and recognized by the

4 recently-enacted California Privacy Rights and Enforcement Act, consumers have a property

5 interest in their personal data.  Not only does the CCPA prohibit covered businesses from

6 discriminating against consumers that opt-out of data collection, the CCPA also expressly provides

7 that: "[a] business may offer financial incentives, including payments to consumers as

8 compensation, for the collection of personal information, the sale of personal information, or the

9 deletion of personal information."  Cal. Civ. Code § 1798.125(b)(1).  The CCPA provides that,

10 "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or

11 usurious in nature."  Cal. Civ. Code § 1798.125(b)(4).

12        177.     Through its false promises and unlawful data collection, Google is unjustly

13 enriching itself.

14        178.     If not for Google's actions, consumers could have received monetary value for their

15 data from other internet firms.

16      **D.**     **There Is Value to Class Members in Keeping Their Data Private**

17        179.     In addition to monetary value of *selling* their data, Class members also assign value

18 to keeping their data *private.*  It is possible to quantify this privacy value, which is destroyed when

19 the Firebase SDK scripts and other Google tracking and advertising code surreptitiously transmit

20 users' data to Google while the users have turned off WAA and/or sWAA.

21        180.     According to Google, more than 200 million people visit Google's "Privacy

22 Checkup" website each year.  Each day, nearly 20 million people check their Google privacy

23 settings.  Users do these things because they care about keeping their data private and preventing

24 its disclosure to anyone else, including to Google.

25        181.     Users also switched off WAA and/or sWAA for the same reason—they cared about

26

27 [66] Jay Peters, *Facebook Will Now Pay You for Your Voice Recordings*, THE VERGE (Feb. 20, 2020), *available at* https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-
28 speech-recognition-viewpoints-proununciations-app (last visited Nov. 11, 2020).

their privacy and wished to prevent anyone, including Google, from accessing their data.

182.    Surveys of consumers indicate the importance that consumers assign to privacy. For example, in a recent study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was "very important" to control this.

183.    Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies, such as Google or Facebook, control too much of our personal information and know too much about our browsing habits."

## VII.    Google Acted Without Consent to Intercept and Collect User Data to Maintain and Extend Its Monopolies

184.    Google's audacious invasion of millions of users' privacy without consent was motivated in part by Google's ongoing efforts to unlawfully maintain and extend its monopoly power in search and other markets. These efforts included Google's 2014 acquisition of Firebase and Google's ongoing and unlawful interception, collection, and use of data when users have taken the affirmative step of turning off WAA and/or sWAA to prevent such interception, collection and use.

### A.    Google's Web Dominance

185.    Since its founding in 1998, Google has developed technology allowing Google to constantly track consumers across the internet, fueling and then ensuring Google's search dominance. Over 90% of the U.S. population uses Google to conduct web searches, giving Google an enormous and unprecedented set of consumer data.

186.    Google's dominance is tied to and based in part on Google's massive advertising business. Over 70% of online websites and publishers on the internet utilize Google's website visitor-tracking product, "Google Analytics," which allows Google to track consumers.

187. To implement Google Analytics, Google requires websites to embed Google's custom code into their existing webpage code. Google's embedded code causes the user's browser to send his or her personal information to Google and its servers in California, such as the user's IP address, the URL address (which identifies the particular page of the website that is being visited), and other information regarding the user's device and browser.

188. By embedding its tracking code through Google Analytics, Google has been able to intercept, track, collect, take, compile, and use a staggering amount of consumer data, far more than any company in the world. Because more than 70% of websites use Google Analytics, Google is able to track and collect personal consumer data online in real time and on non-Google properties—more pervasively than any other company online.

189. Google has been able to maintain and extend its dominance in products like Google Search because no other company is able to track consumers and aggregate their communications with websites and throughout the internet like Google.

**B.    Google's Mobile Problem**

190. Prior to 2007, with Apple's introduction of the iPhone, internet searching was primarily done on a computer, through a browser. With the 2007 launch of the iPhone, online activities began to move from computers to smartphones and the apps that run on them. This created an existential threat to Google's dominance.

191. Before Google acquired Firebase in October 2014, Google recognized that mobile applications on mobile devices allowed users to access information without using Google Search. Google thus knew that it needed data from users' app browsing activities to protect its search dominance and advertising revenues.

192. In February 2014, Google stated in its 10-K filings that one competitive threat to Google was "[m]obile applications on iPhone and Android devices, which allows users to access information directly from a publisher *without using our search engines*."

193. Google identified one of the key risk factors for the company as more people "using devices other than desktop computers to access the internet" and acknowledged that "search

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

queries are increasingly being undertaken via 'apps' tailored to particular devices or social media platforms, *which could affect our share of the search market over time*."

194.     Google stated in its next series of 10-K filings that this risk was a threat to Google's lucrative advertising business, noting that "search queries are increasingly being undertaken via 'apps' tailored to particular devices or social media platforms, *which could affect our search and advertising business over time*."

### C.     Google's Mobile Focus with Android & Firebase

195.     Google feared that consumers' switch from using computers to search, to instead using mobile devices to search, would endanger Google's dominance of the market for search functions.  In response to that danger, Google adopted a new strategy:  transport and embed Google's search ecosystem into every part of mobile devices over which Google had, or could gain, influence.  Google's purpose in doing this was to keep fueling Google's dominance and advertising revenues.

196.     One way Google sought to maintain and extend its dominance was with its acquisition of the Android operating system (OS); its subsequent development of Android; and its push to cause mobile device manufacturers to adopt Android on their devices. Google acquired Android in 2005 and released the first commercial version of the Android operating system, Android 1.0, in September 2008.

197.     As recently recounted in the comprehensive report issued by the U.S. House of Representative's Subcommittee on Antitrust, Commercial and Administrative Law, entitled *Investigation of Competition In Digital Markets*, "[f]or mobile devices, Google imposed a set of restrictive contractual terms effectively requiring manufacturers of devices that used its Android operating system to pre-install both Chrome and Google Search."[67]

198.     Just as Microsoft used its monopoly power on manufacturers to require the

---

[67] STAFF OF S. COMM. ON ANTITRUST, COMMERCIAL, AND ADMINISTRATIVE LAW, INVESTIGATION OF COMPETITION IN DIGITAL MARKETS, at 178, https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519.

FOURTH AMENDED CLASS ACTION COMPLAINT     CASE NO. 3:20-cv-04688-RS

installation of Windows Explorer instead of Netscape, Google used its monopoly power to require phone manufacturers and app developers to incorporate Google's various products that reinforce Google Search. The more dominance Google could obtain in search, the more information it could collect and aggregate. The more information it could collect and aggregate, the more dominance Google could have in advertising, its key profit center.

199. One other way that Google sought to maintain and extend its dominance was with its October 2014 acquisition of Firebase; its subsequent development of the Firebase SDK platform; and its push to cause third-party app developers to adopt Firebase SDK. Before Google acquired it, Firebase was a separate company with an application programing interface (API) enabling synchronization of application data across Apple's iOS, Android, and web devices. By acquiring Firebase, Google gained the tools it needed to acquire users' mobile app data and, in part and along with Android, to address the competitive threat posed by Apple.

200. Firebase was so important to Google that the company featured it during Google's annual conference in May 2016, with Google CEO Sundar Pichai stating: "Firebase is the most comprehensive developer offering we have done to date." Google presented more than thirty sessions on Firebase during that 2016 conference.

201. During that conference, on May 20, 2016, Jason Titus, Vice President of Google's Developer Products Group, announced the "next generation of Firebase" with a mobile analytics tool called "Firebase Analytics" that was "inspired by much of the work that we've done in the last 10 years with Google Analytics, but it's designed specifically for the unique needs of apps."[68]

202. Google's Android and Firebase efforts are also tied to Google's efforts with "on device search." Because mobile apps are not constantly active on the device and need to be launched separately, it is much more difficult for Google to crawl and index content maintained on mobile content. Because of personal content and information, apps also tend to be secured, self-contained, and separated from other apps. Unlike with data collection on the web, Google

---

[68] Pangambam S., *Google I/O 2016 Keynote (Full Transcript)*, THE SINGJU POST (May 20, 2016), *available at* https://singjupost.com/google-io-2016-keynote-full-transcript/?singlepage=1 (last visited Nov. 11, 2020).

1    cannot simply send its army of "web crawlers" to scan, scrape, and store content with mobile apps.

2        203.    Google's Firebase acquisition provided Google with what it previously lacked:  the

3    ability to collect personal user data *en masse* from mobile devices and apps—including devices

4    and apps developed by its rival Apple.  When app developers use Firebase SDK, Google receives

5    a number of benefits that enhance and reinforce Google's market power.  Firebase SDK enables

6    Google to crawl and index apps just as it does for traditional websites.  Developers often have no

7    choice but to use Firebase SDK because of Google's demands and market power, including with

8    search, analytics, advertisements, and the Android mobile operating system.

9        **D.    Google's Increasing Trove of Consumers' Mobile Data and Power**

10       204.    Since acquiring Firebase in 2014, Google has quietly collected what must be the

11   largest index of mobile app pages in the world, including most apps on Android OS.  Google has

12   also continued to use its monopoly power with respect to web-based searching to push rapid

13   adoption of Firebase SDK, so that it can eventually release a more complete search product that

14   includes every mobile app page in the world.  As a result, nearly every Android OS user (and most

15   iOS users) are likely to have fallen victim to Google's unlawful acts.

16       205.    Perhaps most concerning is that Google uses the data collected with Firebase SDK

17   and other embedded Google tracking and advertising code—including while users have WAA

18   and/or sWAA turned off—to target users with advertisements throughout Google's entire

19   advertising ecosystem—including in the very app where the communication was intercepted, and

20   other apps of other app developers.  All consumers' requests for content from the app thereby

21   become accessible, collectible, and usable by Google, even where users have not consented to

22   Google's collection and use of such information.

23       206.    By compiling not just consumer profiles, but surveying human behavior across the

24   vast majority of mobile app activity, Google tracks consumer activity more pervasively than any

25   other company and is thus able to create a more targeted search product as compared to its

26   competitors, by its ability to claim that Google knows how best to rank websites and online

27   properties.  Google Search would not be nearly as potent a tool without Google Analytics as a

28

complement and Google's ongoing data collection with its Firebase SDK and other Google tracking and advertising code.

207. Google's own internal documents reveal that Google knows what it is doing is wrong. But Google has made a bet: It has wagered that by the time regulators, lawmakers, or the public at large uncover that Google has compiled an almost unlimited amount of user data from apps (without proper consent), Google will have already won the game against any prospective competitor. Left unchecked, Google will achieve near complete monopoly power in search, data collection, and private user information the likes of which the world has never seen.

## VIII.  Tolling of the Statutes of Limitations

208. Each unauthorized transmission of data to Google by the Firebase SDK scripts or other Google tracking and advertising code is a separate "wrong" which triggers anew the relevant statutes of limitations.

209. Moreover, any applicable statutes of limitations have been tolled under (1) the fraudulent concealment doctrine, based on Google's knowing and active concealment and denial of the facts alleged herein, and (2) the delayed discovery doctrine, as Plaintiffs did not and could not reasonably have discovered Google's conduct alleged herein until shortly before the original complaint was filed.

210. Throughout the Class Period, Google repeatedly and falsely represented that its users (including Plaintiffs and Class members) could prevent Google from intercepting their communications by turning off WAA and/or sWAA. Google never disclosed that it would continue to track users and collect their data once this feature was turned off.

211. Google also further misled users by indicating that data associated with them would be viewable through their account, but Google did not make the user data at issue in this lawsuit (collected while WAA and/or sWAA is turned off) viewable in user accounts. Google's failure to do so during the Class period is part of Google's active deception and concealment.

212. Google has also made the statements quoted above, which (1) misrepresent material facts about Google's interception, storage, and use of users' data on apps and/or (2) omit to state material facts necessary to make the statements not misleading. *See supra*, ¶¶ 111-29. Google

thereby took affirmative steps to mislead Plaintiffs and others about the effect of switching the WAA and/or sWAA features off.

213.    Plaintiffs relied upon Google's false and misleading representations and omissions and believed that Google was not intercepting their private communications while the WAA and/or sWAA feature was turned off.

214.    Plaintiffs did not discover and could not reasonably have discovered that Google was instead intercepting, saving, and using their data in the ways set forth in this Complaint until shortly before the lawsuit was filed in consultation with counsel, and in some cases until after this lawsuit was filed and through discovery in this case.

215.    Plaintiffs exercised reasonable diligence to protect their data from interception. That is precisely why they turned off the "Web & App Activity" feature: to protect their data from interception by Google, and to prevent Google from saving their data.  Plaintiffs did not and could not reasonably have discovered their claims until consulting with counsel shortly before the filing of the original complaint through the exercise of reasonable diligence.

216.    Accordingly, Plaintiffs and Class members could not have reasonably discovered the truth about Google's practices until shortly before this litigation was commenced.

## IX.    Google Collected the Data for the Purpose of Committing Further Tortious and Unlawful Acts

217.    Google collected and saved the data at issue here (from users who turned off WAA and/or sWAA) for the purpose of committing additional tortious and unlawful acts.  Google's subsequent use of the data violated the California Consumer Privacy Act ("CCPA"); the CDAFA; and the FTC's 2011 Consent Order.  Google also used the data to tortiously invade consumers' privacy and intrude on their seclusion.

218.    ***Google collected and saved the data with the intent to violate the California Consumer Privacy Act.***  The data collected from users at issue in this lawsuit, while Web & App Activity is turned off, qualifies as "personal information" that is protected by the CCPA.  Cal. Civ. Code § 1798.140(o).  The CCPA provides:

> "A business that collects a consumer's personal information shall, <u>at or before the point of collection</u>, inform consumers as to the categories of

personal information to be collected and the purposes for which the categories of personal information shall be used.   <u>A business shall not . . . use personal information collected for additional purposes without providing the consumer with notice consistent with this section.</u>"

Cal. Civ. Code § 1798.100(b) (emphasis added).

219.    At the time Google collected and saved data from users when they turned off WAA and/or sWAA, Google intended to "use" that data "for additional purposes without providing the consumer with notice consistent with this section."   Whenever Google uses the confidential communications wrongfully collected or aggregates it with other information to gain additional insight and intelligence, Google has violated the express prohibitions of the CCPA.

220.    Moreover, Google carried out its intent:  As described elsewhere in this Complaint, Google made use of the data it collected from users who turned off WAA and/or sWAA for "additional purposes."  The users had never been "informed" of those "additional purposes." Google never gave its users "notice consistent with" the CCPA's requirements regarding these "additional purposes" for which Google used the data collected from users who have turned off WAA and/or sWAA.

221.    ***Google collected the data with the intent to violate the FTC's 2011 Consent Order.***  The FTC ordered Google to obtain "express affirmative consent" from each user, "prior to any new or additional sharing" of a user's information that is "a change from stated sharing practices in effect at the time [Google] collected such information."

222.    Google began the data collection and sharing at issue in this lawsuit after the 2011 Consent Order.  At the time Google collected data from users who turned off WAA and/or sWAA, Google intended to share that data with third parties, in a manner that was very different from the "stated sharing practices" Google had disclosed to users.  Google intended to do this without obtaining consent.

223.    Moreover, Google carried out its intent:  Google shared and/or sold the data, collected from users who turned off WAA and/or sWAA with third-parties including Google's advertising customers.  That sharing and/or selling of data contradicted Google's repeated assurances to users, described herein.  Google shared this data without obtaining consent.

224.   **Google collected the data with the intent to violate the CDAFA.**  The CDAFA provides that it is a public offense to "without permission . . . make[] use of any data from a computer . . . ."  Cal. Penal Code § 502.

225.   At the time that Google caused the Firebase SDK scripts and other tracking and advertising code to transmit users' data to Google's servers, Google intended to later "make use of" that data to enhance Google's profiles on the users; to sell advertising services; to select and send targeted advertising; and for other purposes.  Google then did "make use of" the data in these ways.  These subsequent acts by Google were separate and independent violations of the CDAFA.

226.   **Google collected the data with the intent to intrude upon users' seclusion and invade their constitutional privacy.**  The California Constitution and common law protect consumers from invasions of their privacy and intrusion upon seclusion – in addition to newer privacy laws such as the CCPA.

227.   Users of apps turned off WAA and/or sWAA for the purpose of preventing others, including Google, from finding out what the users were viewing and reading on mobile apps.  For example, users' app activities, while WAA and/or sWAA have been turned off, may reveal: a user's dating activity; a user's sexual interests and/or orientation; a user's political or religious views; a user's travel plans; a user's private plans for the future (e.g., purchasing of an engagement ring).  These are just a few of the many intentions, desires, plans, and activities that users intend to keep private when they turn off WAA and/or sWAA.

228.   Users had a reasonable expectation that Google would do as it promised, and that Google would stop collecting data from the Firebase SDK scripts and other tracking and advertising code once users switched off WAA and/or sWAA.

229.   By causing targeted advertisements to be sent to users and to users' devices, based on data Google collected and saved while users turned off WAA and/or sWAA, Google has caused that data to be revealed to others and has invaded the privacy and intruded upon the seclusion of the users whose data was collected and saved while they expected to have privacy.

230.   Google had the intent to send these targeted advertisements at the time that Google was collecting data from users who turned off "Web & App Activity."

## FACTUAL ALLEGATIONS REGARDING THE NAMED PLAINTIFFS

231.    Google does not disclose all of the apps that use Firebase SDK and other Google tracking and advertising code, and for which Google therefore collected or continues to collect users' data while they have WAA and/or sWAA turned off, or the time period during which Google collected or continues to collect such data for any given app.  Plaintiffs are therefore at this time unable to identify all apps that are relevant for purposes of this litigation.  Google's Firebase website identifies the following apps as supported by Firebase SDK:  The New York Times, NPR One, Halfbrick, Duolingo, Alibaba, Lyft, Venmo, The Economist, Trivago, Ctrip, Wattpad, and Gameloft.[69]  Other sources indicate that over 1.5 million apps use Google's Firebase SDK.  Discovery will reveal which of Plaintiffs' apps were or are supported by Firebase SDK and other Google tracking and advertising code, and for which Google intercepted and collection data without disclosure of consent while WAA or sWAA was turned off.

232.    Plaintiff Anibal Rodriguez is an adult domiciled in Florida and has active Google accounts and had active accounts during the Class Period.

233.    Mr. Rodriguez's WAA and sWAA settings have been turned off for at least part of the Class Period.

234.    Mr. Rodriguez has used Google Search while his WAA setting has been turned off.

235.    At various times during the Class Period, Mr. Rodriguez accessed numerous app pages on the Internet containing content he was interested in on his Android device while "Web & App Activity" was turned off.  Those app pages were accessed through apps including, among others, Alarm Clock for Me, Alibaba, AliExpress, Amazon Shopping, Android TV, Applebee's, Aptoide, Assistant, Barcode Scanner, Baseball Superstars 2020, Best Buy, Burger King, Call of Duty, Chili's, ClassDojo, Clawee, Craigslist, Current, Dairy Queen, Domino's, DoorDash, Dosh, Drive, DroidCam, Duolingo, eBay, ES File Explorer, Fair, Fire TV, Fulldive VR, GIPHY, Glassdoor, GoMLS miami, GoodRx, Google Pay, Google Play Games, Groupon, Grubhub,

---

[69] *See Firebase Helps Mobile and Web App Teams Succeed*, FIREBASE, https://firebase.google.com/.

1   Hangouts, Home, Ibotta, Indeed Job Search, Instagram, Instant Save, Jimmy John's, Kindle,
2   Layout, Letgo, LinkedIn, Little Caesars, Lyft, McDonald's, MX Player, myCigna, Netflix, Ninja's
3   Creed, OfferUp, Pandora, ParkMobile, PayPal, Pi Music Player, Pollo Tropical, Postmates, Prime
4   Video, Publix, Publix Instacart, RaceTrac, RAR, Realtor.com, Repost, Retro Bowl, Samsung
5   Members, Samsung Members v1, Samsung Notes, Samsung Pay, Samsung voice input, Sezzle,
6   Shazam, Shop, Shopping, Skillshare, Slack, Sleep Cycle, Slingshot Stunt Driver, Smart Switch,
7   Sonos S1, SOPlayer, SoundCloud, Square Point of Sale, Stack Colors, Stash, Steam, Stickman
8   Parkour Platform, Stream, Target, The Grand Mafia, Tiles Hop, Time Zone Updater, Trip.com,
9   Trivago, Truebill, Uber, Uber Eats, Udemy, USPS Mobile, VeSyncFit, Voice, Voice Recorder,
10  Walmart, WhatsApp, Wish, Word, WordPress, Xfinity, Xfinity Mobile, Xfinity My Account,
11  Yelp, Your Phone Companion, YouTube Music, YouTube VR, Zelle, Zillow, ZipRecruiter, Zoho
12  Mail, Zoom, Gmail, Google Calendar, Google Assistant, Google Fit, Google Pay, Google
13  Shopping, Google Meet, Google Home, Google Chrome, Google, Google Maps, and Google TV.
14  He sent and received communications through these apps on mobile devices which were
15  computing devices that were not shared devices.  His communications with the apps that used
16  Firebase SDK and other Google tracking and advertising code were intercepted and tracked by
17  Google without his knowledge or consent.

18      236.    Plaintiff Sal Cataldo is an adult domiciled in New York and has active Google
19  accounts had active Google accounts during the Class Period.

20      237.    Mr. Cataldo's WAA and sWAA settings have been turned off for at least part of
21  the Class Period.

22      238.    Mr. Cataldo has used Google Search while his WAA setting has been turned off.

23      239.    At various times during the Class Period, Mr. Catalo accessed numerous app pages
24  on the Internet containing content he was interested in on his Android devices while "Web & App
25  Activity" was turned off.  Those app pages were accessed through apps including, among others,
26  Accuweather, Acrobat Reader, Amazon Shopping, Among Us, Aqua Mail, Audible, CBS Sports
27  Fantasy, Chrome, Clock, Discord, Docs, Drive, ESPN, FuboTV, Gmail, IMDB, Instagram,
28  Jaybird, Kindle, Lawnchair, Maps, MyFitnessPal, Nest, Noom, NPR News, NPR One, The New

York Times, Outlook, PayPal, Photos, Play Music, Play Store, Pocket, Pocket Casts, Pokerrr 2, Premier League, Relay for Reddit, Samsung Internet, Samsung Notes, Sheets, Slack, Smokeball, Spotify, Talon, Tesla, Textra, The Athletic, The Economist, TheScore, Uber, Venmo, WalletHub, Waze, WhatsApp, Whole Foods, WHOOP, Wikipedia, Yahoo Fantasy, YouTube, Zero Calorie Counter, Zoom, Google Assistant, Google Chrome, Google Drive, Google Wallet, Google Files, Gmail, Google, Google One, Google TV, Google Lens, Google Maps, Google Meet, Google News, Google Photos, Google Play Store, and Google Calendar.   He sent and received communications through these apps on mobile devices which were computing devices that were not shared devices.  His communications with the apps that used Firebase SDK and other Google tracking and advertising code were intercepted and tracked by Google without his knowledge or consent.

240.   Plaintiff Julian Santiago is an adult domiciled in Florida and has an active Google account and had an active Google account during the Class Period.

241.   Mr. Santiago's WAA and sWAA settings have been turned off for at least part of the Class Period.

242.   Mr. Santiago has used Google Search while his WAA setting has been turned off.

243.   At various times during the Class Period, Mr. Santiago accessed numerous app pages on the Internet containing content he was interested in on his Apple device while "Web & App Activity" was turned off.  Those app pages were accessed through apps including, among others, Acorns, Amazon Shopping, Amazon Prime Video, Bleacher Report, Calm, Duolingo, E*Trade, ESPN Fantasy, Fundrise, Google Docs, Google Maps, Google Sheets, LinkedIn, MapMyRide, Marcus, Nextdoor, NFL, Nike Run Club, NPR One, Oak, Spotify, Starbucks, Stocks, Target, The Economist, Titan, Twitter, Venmo, Weather - The Weather Channel, Xfinity Stream, YouTube, and Google Maps. He sent and received communications through these apps on mobile devices which were computing devices that were not shared devices.  His communications with the apps that used Firebase SDK and other Google tracking and advertising code were intercepted and tracked by Google without his knowledge or consent.

244.   Plaintiff Susan Lynn Harvey is an adult domiciled in California and has active

Google accounts and had active Google accounts during the Class Period.

245. Ms. Harvey's WAA and sWAA settings have been turned off for at least part of the Class Period.

246. Ms. Harvey has used Google Search while her WAA setting has been turned off.

247. At various times during the Class Period, Ms. Harvey accessed numerous app pages on the Internet containing content she was interested in on her Android devices while "Web & App Activity" was turned off. Those app pages were accessed through apps including, among others, Avast Cleanup, Avast Antivirus – Scan & Remove Virus, Cleaner, Bixby Vision, California Lottery, Candy Crush, EECU, Facebook Messenger, File Viewer for Android, Galaxy Themes, Gangstar 4, Gold Fish, Google One, Jackpot Party, Jetpack, MixerBox, PicCollage, Samsung Gallery, Samsung Print Service Plugin, The New York Times, Voice Recorder, Wattpad, Gmail, Google Drive, Google Photos, Google Chrome, Google, Google Home, Google Play Store, YouTube, Google Maps, Google One, Google TV, Google Pay, and Google Meet. She sent and received communications through these apps on mobile devices which were computing devices that were not shared devices. Her communications with the apps that used Firebase SDK and other Google tracking and advertising code were intercepted and tracked by Google without her knowledge or consent.

248. None of the Plaintiffs consented to the interception, storage, and use of their confidential communications made while WAA and/or sWAA was turned off.

## CLASS ACTION ALLEGATIONS

249. This is a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Classes:

- Class 1 – All individuals who during the Class Period (a) turned off "Web & App Activity," or supplemental "Web & App Activity," and (b) whose mobile app activity was still transmitted to Google, from (c) a mobile device running the Android operating system (OS), because of the Firebase SDK and/or AdMob SDKs, on a non-Google branded mobile app.

- Class 2 – All individuals who during the Class Period (a) turned off "Web & App Activity," or "supplemental Web & App Activity," and (b) whose mobile app activity was still transmitted to Google, from (c) a mobile device running a *non*-Android operating system (OS), because of the Firebase SDK and/or AdMob SDKs, on a non-Google branded mobile app.

The Class Period begins on the date Google first received data, as a result of Firebase SDK and/or AdMob SDKs scripts, from the device of a user who had turned off (or paused) WAA and/or sWAA. The Class Period continues through the present.

250. Excluded from the Classes are: (1) the Court (including any Judge or Magistrate presiding over this action and any members of their families); (2) Defendant, its subsidiaries, parents, predecessors, successors and assigns, including any entity in which any of them have a controlling interest and its officers, directors, employees, affiliates, legal representatives; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel, Class counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

251. **Ascertainability**: Membership of the Classes is defined based on objective criteria and individual members will be identifiable from Google's records, including from Google's massive data storage, consumer accounts, and enterprise services. Based on information readily accessible to it, Google can identify members of the Classes who own an Android device or have a non-Android device with an associated Google account, who were victims of Google's impermissible interception, receipt, tracking, saving, or use of communications as alleged herein.

252. **Numerosity**: Each of the Classes likely consists of millions of individuals. Accordingly, members of the Classes are so numerous that joinder of all members is impracticable. Class members may be identified from Defendant's records, including from Google's consumer accounts and enterprise services.

253. **Predominant Common Questions**: Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. Common questions for the Classes include, but are not limited to, the

following:

a. Whether Google represented that Class members could control what communications of user information, app history and activity data were intercepted, received, collected, saved, or used by Google;

b. Whether Google gave the Class members a reasonable expectation of privacy that their communications of user information, app history and activity data were not being intercepted, received, collected, saved, or used by Google when the Class member had WAA and/or sWAA turned off;

c. Whether Google in fact intercepted, received, collected, saved, or used communications of user information, app history and activity data from Class members when the Class members had WAA and/or sWAA turned off;

d. Whether Google's practice of intercepting, receiving, collecting, saving, or using communications of user information, app history and activity data violated state and federal privacy laws;

e. Whether Google's practice of intercepting, receiving, collecting, saving, or using communications of user information, app history and activity data violated state and federal anti-wiretapping laws;

f. Whether Google's practice of intercepting, receiving, collecting, saving, or using communications of user information, app history and activity data violated any other state and federal tort laws;

g. Whether Plaintiffs and Class members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

h. Whether Plaintiffs and Class members have sustained damages as a result of Google's conduct and if so, what is the appropriate measure of damages or restitution.

254. **Typicality**: Plaintiffs' claims are typical of the claims of other Class members, as all members of the Classes were uniformly affected by Google's wrongful conduct in violation of federal and state law as complained of herein.

255.   **Adequacy of Representation**: Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel that is competent and experienced in class action litigation, including nationwide class actions and privacy violations.  Plaintiffs and their counsel have no interest that is in conflict with, or otherwise antagonistic to the interests of the other Class members.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so.

256.   **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of a single adjudication, economies of scale and comprehensive supervision by a single, able court.  Furthermore, as the damages individual Class members have suffered may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in management of this action as a class action.

257.   **California Law Applies to the Entirety of Both Classes**: California's substantive laws apply to every member of the Classes, regardless of where in the United States the Class member resides, or to which Class the Class member belongs.  Defendant's own Terms of Service explicitly state, "California law will govern all disputes arising out of or relating to these terms, service specific additional terms, or any related services, regardless of conflict of laws rules.  These disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts."

258.   By choosing California law for the resolution of disputes covered by its Terms of Service, Google concedes that it is appropriate for this Court to apply California law to the instant dispute to all Class members.  Further, California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class members under the Due Process Clause, *see* U.S. CONST. amend. XIV, § 1, and the Full Faith and Credit Clause, *see* U.S. CONST. art. IV, § 1, of the U.S. Constitution.  California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice

of California state law is not arbitrary or unfair. Defendant's decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible. The application of California laws to the Classes is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Classes and California has the greatest interest in applying its laws here.

259. Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## **COUNTS**

### **COUNT ONE: VIOLATIONS OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT ("CDAFA"), CAL. PENAL CODE § 502 *ET SEQ*.**

260. Plaintiffs hereby incorporate Paragraphs 1 through 259 as if fully stated herein.

261. Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Smart phone devices with the capability of using mobile apps are "computers" within the meaning of the statute.

262. Google violated Cal. Penal Code § 502(c)(2) by knowingly accessing and without permission taking, copying, saving, analyzing, and using Plaintiffs' and Class members' data.

263. In fact, Google's actions often exceeded Plaintiffs' and Class members' permission many times over, such as when Google (a) served an advertisement on a third-party app based on information collected when the user had turned WAA off; (b) tracked the WAA-off user's interactions with the advertisement; and/or (c) tracked the WAA-off user's behavior on another products (e.g., another third-party app) after being served advertisements.

264. Despite Google's false representations to the contrary, Google effectively charged Plaintiffs, Class members, and other consumers and Google was unjustly enriched, by acquiring

1   their sensitive and valuable personal information without permission and using it for Google's own
2   financial benefit, including to advance its advertising business.  Plaintiffs and Class members
3   retain a stake in the profits Google earned from their personal browsing histories and other data
4   because, under the circumstances, it is unjust for Google to retain those profits.

5       265.    Google accessed, copied, took, analyzed, and used data from Plaintiffs' and Class
6   members' computers in and from the State of California, where Google: (1) has its principal place
7   of business; and (2) used servers that provided communication links between Plaintiffs' and Class
8   members' computers and Google, which allowed Google to access and obtain Plaintiffs' and Class
9   members' data.  Accordingly, Google caused the access of Plaintiffs' and Class members'
10  computers from California and is therefore deemed to have accessed Plaintiffs' and Class
11  members' computers in California.

12      266.    As a direct and proximate result of Google's unlawful conduct within the meaning
13  of Cal. Penal Code § 502, Google has caused loss to Plaintiffs and Class members in an amount to
14  be proven at trial.

15      267.    Google has been unjustly enriched in an amount to be proven at trial. Google's ill-
16  gotten gains include, but are not limited to, profits earned from: serving advertisements to WAA-
17  off users, measuring advertisements' effect on WAA-off users' behavior, and developing and
18  refining Google products using data saved from WAA-off users.

19      268.    Plaintiffs, on behalf of themselves and Class members, seek compensatory damages
20  and/or disgorgement in an amount to be proven at trial, and declarative, injunctive, or other
21  equitable relief.

22      269.    Plaintiffs and Class members are entitled to punitive or exemplary damages
23  pursuant to Cal. Penal Code § 502(e)(4) because Google's violations were willful and, upon
24  information and belief, Google is guilty of oppression, fraud, or malice as defined in Cal. Civil
25  Code § 3294.

26      270.    Plaintiffs and the Class members are also entitled to recover their reasonable
27  attorneys' fees pursuant to Cal. Penal Code § 502(e).

28

## COUNT TWO: INVASION OF PRIVACY

271.    Plaintiffs hereby incorporate Paragraphs 1 through 259 as if fully stated herein.

272.    The right to privacy in California's Constitution creates a right of action against private entities such as Google.

273.    Plaintiffs' and Class members' expectation of privacy is deeply enshrined in California's Constitution.  Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property and pursuing and obtaining safety, happiness, *and privacy*."  The phrase "*and privacy*" was added by the "Privacy Initiative" adopted by California voters in 1972.

274.    The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11.  Critically, the argument in favor of Proposition 11 reveals that the legislative intent was to curb businesses' control over the unauthorized collection and use of consumers' personal information, stating:

> The right of privacy is the right to be left alone…It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us.  Fundamental to our privacy is the ability to control circulation of personal information.  This is essential to social relationships and personal freedom.[70]

275.    The principal purpose of this constitutional right was to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Google.

276.    To plead a California constitutional privacy claim, a plaintiff must show an invasion of (1) a legally protected privacy interest; (2) where the plaintiff had a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

277.    As described herein, Google has intruded upon the following legally protected

---

[70] BALLOT PAMP., PROPOSED STATS. & AMENDS. TO CAL. CONST. WITH ARGUMENTS TO VOTERS, GEN. ELECTION *26 (Nov. 7, 1972).

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

privacy interests:

     a.     The California Invasion of Privacy Act as alleged herein;

     b.     A Fourth Amendment right to privacy contained on personal computing devices, including app-browsing history, as explained by the United States Supreme Court in the unanimous decision of *Riley v. California*;

     c.     The California Constitution, which guarantees Californians the right to privacy; and

     d.     Google's Privacy Policy and policies referenced therein and other public promises it made not to track or intercept the Plaintiffs' and Class members' communications or access their computing devices while WAA and/or sWAA were turned off.

278.    Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances in that Plaintiffs and Class members could not reasonably expect Google would commit acts in violation of federal and state civil and criminal laws; and Google affirmatively promised users (including Plaintiffs and Class members) it would not track their communications or access their computing devices and mobile apps while they turned off WAA and/or sWAA.

279.    Google's actions constituted a serious invasion of privacy in that it:

     a.     Invaded a zone of privacy protected by the Fourth Amendment, namely the right to privacy in data contained on personal computing devices, including search and browsing histories;

     b.     Violated several federal criminal laws

     c.     Violated dozens of state criminal laws on wiretapping and invasion of privacy, including the California Invasion of Privacy Act;

     d.     Invaded the privacy rights of millions of Americans (including Plaintiffs and class members) without their consent;

     e.     Constituted the unauthorized taking of valuable information from millions of Americans through deceit; and

     f.     Further violated Plaintiffs' and Class members' reasonable expectation of

privacy via Google's saving, review, analysis, and subsequent uses of Plaintiffs' and Class members' private and other browsing activity that Plaintiffs and Class members considered sensitive and confidential; and

g.     Invaded Plaintiffs' and Class members' privacy many times over, such as when Google (a) served an advertisement on a third-party app based on information collected when the user had turned WAA off; (b) tracked the WAA-off user's interactions with the advertisement; and/or (c) tracked the WAA-off user's behavior on another products (e.g., another third-party app) after being served advertisements.

280.   Committing criminal acts against millions of Americans constitutes an egregious breach of social norms that is highly offensive.

281.   The surreptitious and unauthorized tracking, collection, saving, and/or use of the internet communications of millions of Americans, particularly where, as here, they have taken active (and recommended) measures to ensure their privacy, constitutes an egregious breach of social norms that is highly offensive.

282.   Google's intentional intrusion into Plaintiffs' and Class members' internet communications and their computing devices and mobile apps was highly offensive to a reasonable person in that Google violated federal and state criminal and civil laws designed to protect individual privacy and against theft.

283.   The taking, saving, and use of personally-identifiable information from millions of Americans through deceit is highly offensive behavior.

284.   Secret monitoring of mobile apps is highly offensive behavior.

285.   Such behavior is doubly offensive because the data collected is paired with other secretly collected data, such as data relating to interactions with other third-party apps.

286.   Following Google's unauthorized interception and storage of the sensitive and valuable personal information, the subsequent analysis and use of that private data (including in conjunction with other data collected without authorization, from third-party apps) to develop and refine profiles on Plaintiffs, Class members, and consumers violated their reasonable expectations

FOURTH AMENDED CLASS ACTION COMPLAINT   CASE NO. 3:20-cv-04688-RS

of privacy.

287.    Wiretapping and surreptitious recording of communications is highly offensive behavior.

288.    Google lacked a legitimate business interest in tracking users on their mobile apps without their consent.

289.    Plaintiffs and Class members have been damaged by Google's invasion of their privacy and are entitled to just compensation and injunctive relief.

290.    Google has been unjustly enriched in an amount to be proved at trial. Google's ill-gotten gains include, but are not limited to, profits earned from: serving advertisements to WAA-off users, measuring advertisements' effect on WAA-off users' behavior, and developing and refining Google products using data saved from WAA-off users.

## COUNT THREE: INTRUSION UPON SECLUSION

291.    Plaintiffs hereby incorporate Paragraphs 1 through 259 as if fully stated herein.

292.    Plaintiffs asserting claims for intrusion upon seclusion must plead (1) intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person.

293.    In carrying out its scheme to track and intercept Plaintiffs' and Class members' communications while they were using mobile apps with WAA and/or sWAA turned off, in violation of its own privacy promises, Google intentionally intruded upon the Plaintiffs' and Class members' solitude or seclusion in that it effectively placed itself in the middle of conversations to which it was not an authorized party. Google also intentionally intruded upon Plaintiffs' and Class members' solicitude or seclusion in that it saved, used, and profited from information that it promised not to save.

294.    Google's tracking and interception were not authorized by Plaintiffs and Class members, the mobile app servers with which they were communicating, or even Plaintiffs' and Class members' mobile apps.

295.    Google's intentional intrusion into Plaintiffs' and Class members' internet communications and their computing devices and mobile apps was highly offensive to a reasonable

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

person in that they violated federal and state criminal and civil laws designed to protect individual privacy and against theft.

296.    The taking of personally-identifiable information from millions of Americans through deceit is highly offensive behavior, particularly where, as here, Plaintiffs and Class members took active (and recommended) measures to ensure their privacy.

297.    Secret monitoring of internet activity is highly offensive behavior. The surreptitious and unauthorized tracking, collection, saving, and/or use of the internet communications of millions of Americans, particularly where, as here, they have taken active (and recommended) measures to ensure their privacy, constitutes an egregious breach of social norms that is highly offensive.

298.    Such behavior is doubly offensive because the data collected is paired with other secretly collected data, such as data relating to interactions with other third-party apps. Google pairs this data to construct profiles of users, to measure advertisements' effect on user behavior, and other purposes.

299.    Wiretapping and surreptitious recording of communications is highly offensive behavior.

300.    Public polling on internet tracking has consistently revealed that the overwhelming majority of Americans believe it is important or very important to be "in control of who can get information" about them; to not be tracked without their consent; and to be in "control[] of what information is collected about [them]." The desire to control one's information is only heightened while a person has their WAA and/or sWAA setting turned off.

301.    Plaintiffs and the Class members have been damaged by Google's invasion of their privacy and are entitled to reasonable compensation including but not limited to disgorgement of profits related to the unlawful internet tracking.

302.    Google has been unjustly enriched in an amount to be proved at trial. Google's ill-gotten gains include, but are not limited to, profits earned from: serving advertisements to WAA-off users, measuring advertisements' effect on WAA-off users' behavior, and developing and refining Google products using data saved from WAA-off users.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Certify this action is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Appoint Plaintiffs to represent the Classes;

C.      Appoint undersigned counsel to represent the Classes;

D.      Award compensatory damages, including statutory damages where available, to Plaintiffs and the Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

E.      Award nominal damages to Plaintiffs and the Class members against Defendant;

F.      Award punitive damages to Plaintiffs and the Class members against Defendant;

G.      Non-restitutionary disgorgement of all of Defendant's profits that were derived, in whole or in part, from Google's interception, collection, saving, and subsequent use of Plaintiffs' communications;

H.      Order Defendant to disgorge revenues and profits wrongfully obtained;

I.      Permanently restrain Defendant, and its officers, agents, servants, employees and attorneys, from intercepting, tracking, collecting, saving, or using communications after Class members turned off WAA or sWAA, or otherwise violating its policies with users;

J.      Award Plaintiffs and the Class members their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

K.      Grant Plaintiffs and the Class members such further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated: January 4, 2023 **SUSMAN GODFREY L.L.P.**

*/s/ Amanda Bonn*
Amanda Bonn

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA. 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
abonn@susmangodfrey.com

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
Erika Nyborg-Burch, CA Bar No. 342125
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899
mmao@bsfllp.com
brichardson@bsfllp.com
enyborg-burch@bsfll.com

Alison Anderson, CA Bar No. 275334
aanderson@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
Tel.: (213) 995-5720

Jesse Panuccio (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave, NW
Washington, DC 20005
Tel.: (202) 237-2727
Fax: (202) 237-6131
jpanuccio@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
Fax: (303) 539-1307
jlee@bsfllp.com

FOURTH AMENDED CLASS ACTION COMPLAINT     CASE NO. 3:20-cv-04688-RS

rbaeza@bsfllp.com

John A. Yanchunis (admitted *pro hac vice*)
Michael F. Ram CA Bar No. 104805
Ryan J. McGee (admitted *pro hac vice*)
Ra Amen (admitted *pro hac vice*)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
mram@forthepeople.com
rmcgee@forthepeople.com
ramen@forthepeople.com

William S. Carmody (admitted *pro hac vice*)
Shawn Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
Alexander P. Frawley (admitted *pro hac vice*)
Ryan K. Sila (admitted *pro had vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel.: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@ susmangodfrey.com
rsila@susmangodfrey.com

Ian B. Crosby (admitted *pro hac vice*)
Jenna G. Farleigh, CA Bar No. 288811
**SUSMAN GODFREY L.L.P.**
1201 Third Avenue Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880
Fax: (206) 516-3883
icrosby@susmangodfrey.com
jfarleigh@susmangodfrey.com

*Attorneys for Plaintiffs*

FOURTH AMENDED CLASS ACTION COMPLAINT    CASE NO. 3:20-cv-04688-RS

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April, 2025, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

*/s/ Sonal N. Mehta*
Sonal N. Mehta

WILMER CUTLER PICKERING
HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
CHRISTOPHER W. JOHNSTONE (SBN 242152)
Chris.Johnstone@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice application forthcoming*)
David.Gringer@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendants*
*Google LLC, Alphabet Inc.,*
*and XXVI Holdings Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA,
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| MARY KATHERINE ARCELL, et al., | Case No. 3:22-cv-02499-RFL |
| Plaintiffs, | **[PROPOSED] ORDER GRANTING ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED** |
| v. | |
| GOOGLE, INC., ALPHABET INC., and XXVI HOLDINGS INC., | Judge: Hon. Rita F. Lin |
| Defendants. | [N.D. Cal. Civil L.R. 3-12] |

**[PROPOSED] ORDER DEEMING CASES RELATED**

Pursuant to Civil Local Rule 3-12, Defendants Google LLC, Alphabet Inc., and XXVI Holdings Inc. filed an Administrative Motion to Consider Whether Cases Should Be Related, requesting that *Attridge v. Google LLC, Alphabet, Inc., and XXVI Holdings Inc.*, No. 5:25-cv-2775 (N.D. Cal.) ("*Attridge*") be designated as related to this action.

Good cause having been shown, IT IS HEREBY ORDERED that *Attridge* is related to this action.

DATED: _____ , 2025

_____

HONORABLE HON. RITA F. LIN

UNITED STATES DISTRICT JUDGE

Dated: April 28, 2025                    Submitted by:

By: */s/ Sonal N. Mehta*
SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
CHRISTOPHER W. JOHNSTONE (SBN 242152)
Chris.Johnstone@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice forthcoming*)
David.Gringer@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendants Google LLC, Alphabet Inc., and XXVI Holdings Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April, 2025, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

*/s/ Sonal N. Mehta*
Sonal N. Mehta