# EXHIBIT L

Pages 1 - 70

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,        )
                                 )
             Plaintiffs,         )
                                 )
   VS.                           )      NO. C 20-04688 RS
                                 )
GOOGLE LLC, et al.,              )
                                 )
             Defendants.         )
_____)

                         San Francisco, California
                         Thursday, May 15, 2025

                   TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:
                    BOIES SCHILLER FLEXNER LLP
                    100 Southeast Second Street, Suite 2800
                    Miami, Florida 33131
              BY:   JAMES W. LEE, ESQ.

                    BOIES SCHILLER FLEXNER LLP
                    44 Montgomery Street, 41st Floor
                    San Francisco, California 94104
              BY:   MARK C. MAO, ESQ.

                    MORGAN AND MORGAN, P.A.
                    201 North Franklin Street, Seventh Floor
                    Tampa, Florida 33602
              BY:   JOHN A. YANCHUNIS, ESQ.

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported by:    James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                Official Court Reporter

 1  **APPEARANCES**:   **(CONTINUED)**

 2  For Plaintiffs:
                             MORGAN & MORGAN
 3                           Complex Litigation Group
                             711 Van Ness Avenue, Suite 500
 4                           San Francisco, California 94102
                        BY:  **MICHAEL FRANCIS RAM, ESQ.**
 5
                             SUSMAN GODFREY LLP
 6                           One Manhattan West
                             395 Ninth Avenue, 50th Floor
 7                           New York, New York 10001
                        BY:  **ALEXANDER PATRICK FRAWLEY, ESQ.**
 8                           **RYAN SILA, ESQ.**

 9
    For Defendants:
10                           WILLKIE FARR & GALLAGHER LLP
                             333 Bush Street
11                           San Francisco, California 94104
                        BY:  **SIMONA ALESSANDRA AGNOLUCCI, ESQ.**
12                           **EDUARDO E. SANTACANA, ESQ.**
                             **ARGEMIRA FLOREZ, ESQ.**
13                           **HARRIS MATEEN, ESQ.**
                             **ISABELLA MCKINLEY CORBO, ESQ.**
14

15

16

17

18

19

20

21

22

23

24

25

<u>**Thursday - May 15, 2025**</u>                                    <u>**1:57 p.m.**</u>

**P R O C E E D I N G S**

---oOo---

1   **THE CLERK:**  Calling Case 20-CV-4688, Rodriguez versus
Google.

Counsel, please come forward and state your appearances.

**MR. LEE:**  Good afternoon, Your Honor.  James Lee, from
Boies Schiller, for the plaintiffs.

**THE COURT:**  Good afternoon.

**MR. LEE:**  I -- I also have with me Ryan Sila and
Alex Frawley, who will be handling some of the *Daubert*
arguments for us.  They are two associates at Susman Godfrey.

**THE COURT:**  Good afternoon.

**MR. YANCHUNIS:**  Good afternoon, Your Honor.  I do not
have a speaking role.  John Yanchunis, and I'm here with my law
partner, Michael Ram.

**THE COURT:**  Good afternoon.

**MR. MAO:**  Mark Mao, Your Honor.  My partner, James,
will be arguing today, but I just wanted to appear for the
record.

Thank you.

**THE COURT:**  Good afternoon.

**MS. AGNOLUCCI:**  Good afternoon, Your Honor.
Simona Agnolucci, with Willkie Farr & Gallagher, for Google.

**THE COURT:**  Good afternoon.

1          **MS. AGNOLUCCI:**  I'm here with Eduardo Santacana,

2    Harris Mateen, Argemira Florez, and Isabella Corbo.

3          **THE COURT:**  Good afternoon.

4    So this is a set of *Daubert* motions.  I suggest we start

5    with the motion with respect to Mr. Schneier, which is the

6    defense motion to exclude.

7          Just for your benefit, I have -- I've read through the

8    papers.  I know Judge Gonzalez Rogers had a similar go-around

9    on this in the *Brown* case.  I can tell you, I think she did a

10   persuasive job on that, for what it's worth.

11         So I don't know how you want to go through this, but I'll

12   let the defense start.  It's your motion with respect to

13   Mr. Schneier.

14         **MS. AGNOLUCCI:**  Thank you, Your Honor, and -- and we

15   do agree that -- that there's a lot to -- to be learned from

16   Judge Gonzalez Rogers's opinion, which is very helpful here.

17   Our motion identifies four major buckets of problems with

18   Mr. Schneier's testimony, and so I'll go through each one.

19         The first is Rule 403.  So, of course, an expert can give

20   opinions that are general and can give general opinions about a

21   topic like privacy.

22         And the cases that -- that the plaintiffs point to, like

23   the case about the clear technology, even Judge Gonzalez

24   Rogers's opinions, if we read it closely, the real-time bidding

25   case -- those all talk about general instructions about privacy

 1   and societal norms in the case that does permit that type of

 2   background information.

 3        The problem here is that Mr. Schneier is not doing that.

 4   What he is doing is laying out a terrible parade of horribles

 5   to the jury.  He's giving opinions about, for example, domestic

 6   violence victims who are stalked as a result of their privacy.

 7        **THE COURT:**  And I'll -- I'll sort of short-circuit

 8   this, to some extent.  I agree with Judge Gonzalez Rogers that,

 9   as a general matter, it's permissible to have some background

10   information.

11        And the -- the parade of horribles you identify are

12   really -- I think it's somewhat self-policing because, on

13   cross-examination -- if they really wanted to go into

14   suggesting that this conduct is akin to domestic violence

15   stalking, it's -- you're going to have an opportunity to really

16   go after that witness in cross and say, "Come on.  Does

17   that..."

18        I mean -- so I think it's a bit self-policing, and I don't

19   think that it's going to mislead the jury because it's plainly

20   just background and context, and they -- they will know enough

21   to know whether or not they think it's relevant background or

22   context or it's really pushing the envelope somewhat.

23        So I don't think it's as dangerous, I suppose, is one way

24   to say it, as you've indicated.

25        **MS. AGNOLUCCI:**  I disagree with that, Your Honor, and

1    this is exactly why we have Rule 403, because the examples that

2    Mr. Schneier parades in his -- in his report are classic

3    inflammatory, prejudicial testimony.

4        He's not getting up and saying, "We have norms about

5    privacy as a society.  People value privacy in our society."

6    He's talking about people being criminally prosecuted in the

7    wake of the *Dobbs* decision or being in financial ruin because

8    their social security number is hacked.  Those are inflammatory

9    and -- and very prejudicial examples that are going to be stuck

10   in the jury's head once they hear them.

11       And so while cross-examination is appropriate in some

12   cases, in this case, the danger of allowing him to go down that

13   road is that the jury then makes decisions based on

14   hypothetical and fear, and it's not necessary.  I mean, if we

15   kind of take a step back and -- and look at --

16       **THE COURT:**  Well, I suppose the point is -- and I'm

17   not the lawyer.  So I understand you've got to make the call.

18       If I was in your shoes, I'd almost want them to do that

19   because it's so obviously out there, and I think it would go to

20   his credibility if he tries to equate the activities in this

21   case with a domestic stalker violating the privacy of the

22   person they're stalking.

23       I mean, I just -- I -- it's an un- -- unusual prejudicial

24   point because I don't think, as in other cases, the jury would

25   be left with some suggestion that the case is really akin to

 1    that.  And I think, in this case, they would pretty obviously

 2    know -- I think it would be dangerous for this witness to do

 3    that.

 4        Now, your point is, "Well, that may be so, but I still" --

 5    "you shouldn't let him do it."

 6        Okay.  I understand the issue.

 7        Okay.  So --

 8            MS. AGNOLUCCI:  And, Your Honor, what's inflammatory

 9    to you or me may be different than what's inflammatory to a

10    juror, and we don't -- we don't know what people's lived

11    experiences are.

12        So I do think that being allowed to talk about *Roe v. Wade*

13    and *Dobbs* and stalking and hacking -- it's -- it's -- it's

14    potentially going to make people decide this case for the wrong

15    reasons.

16            THE COURT:  Okay.

17            MS. AGNOLUCCI:  None of that has anything to do

18    with our sWAA.

19            THE COURT:  I understand the argument.  I'll --

20    I'll -- I'll think it through, but I -- I don't need -- I think

21    I know what is going on here.

22            MS. AGNOLUCCI:  Thank you.

23            THE COURT:  Okay.  So the next bucket?

24            MS. AGNOLUCCI:  The next bucket is what I call the

25    ultimate issue of intent bucket, which, as Your Honor knows,

1  Judge Gonzalez Rogers also addressed in her opinion.  I think

2  we'd both agree -- and this is going to come up again with the

3  Hoffman *Daubert* --

4          **THE COURT:**  Yeah.

5          **MS. AGNOLUCCI:**  -- that no expert is going to be

6  allowed to opine on the ultimate issue of intent, but what

7  Schneier has done with -- with his report is try to shoehorn

8  that in in a couple of different ways.

9      One thing he does is -- says that he's opining on,

10  quote/unquote, incentives and not intent.  And if you look

11  at -- there's a list of examples at Pages 14 to 15 of our

12  motion.  Over and over again, he -- you can almost see the line

13  editing out of [sic] the word "intent" and the replacement of

14  the word "incentive."

15          **THE COURT:**  Well, I mean, this is the -- are we

16  getting into the dark patterns issue in -- in this context?

17          **MS. AGNOLUCCI:**  It's related, but it's slightly

18  different.

19          **THE COURT:**  Well, I think, you know -- I think we all

20  agree that the -- the expert cannot opine on -- on Google's

21  intent, and we all know that's true.  So then the question is

22  just the semantics things are being used here.

23      I do think an expert can say -- this expert -- that the

24  indicia of -- let's use the dark pattern example.  There are

25  certain indicia in a general sense, this expert thinks, that --

1    that is consistent with dark pattern activity.  That's very

2    different than saying, "I" -- "my opinion is Google is

3    intending to do X, Y, Z."

4        And I know it's a -- it's a somewhat, you know, tight

5    rope, but I think the expert can talk about indicia of -- of

6    dark pattern, for example, but can't say, "I" -- it's for the

7    jury, then, to decide whether or not Google's conduct was

8    intentionally of that type.

9            MS. AGNOLUCCI:  Let me address the two issues that I

10   see are in there, and -- and I -- if Your Honor will allow me,

11   I'd like to separate them out.

12       So the first issue is the one about intent that

13   Judge Gonzalez Rogers ruled on.  For example, Schneier cannot

14   say, "Google intended to do X, Y, and Z."  What he's done is

15   he's instead -- instead replaced that with the word

16   "incentives."

17       So, for example, he says, "Google's incentives and actions

18   lead me to believe that it is more concerned with managing user

19   impressions than actually respecting privacy," or he says

20   Google, quote, "has strong incentives to overstate the

21   effectiveness of the promised privacy control mechanisms," or

22   he says, "Google has a strong incentive to overpromise and

23   underdeliver on privacy."

24       So he uses the word "incentive" over and over again.

25           THE COURT:  Well, would you think it would be wrong if

1    the expert -- or inappropriate if an expert said, "I think, in

2    a" -- "in an" -- "one indicia of this conduct is when a company

3    provides incentives"?

4        That's not saying Google intended to do anything.  It's

5    just saying that is indicative of activity that he thinks is

6    violative of privacy issues.

7            **MS. AGNOLUCCI:**  But I think what he's saying here is

8    that Google's incentive is to violate privacy.

9            **THE COURT:**  Well, what I'm asking you is:  Are you

10   saying an expert couldn't even say, "One of the" -- "one of the

11   indicia to me of" -- "of intruding upon privacy is when a

12   company offers certain incentives and" -- is that

13   inappropriate?

14           **MS. AGNOLUCCI:**  That is not at issue here.  I don't

15   understand him to be talking about Google incentivizing people

16   or --

17           **THE COURT:**  I guess what I'm -- what I'm trying to

18   understand is --

19           **MS. AGNOLUCCI:**  Your Honor --

20           **THE COURT:**  I don't have any -- my understanding is --

21   I don't have any problem with an expert saying, "In my

22   experience and my expertise, there are certain things that a

23   company does that raises a red flag to me about their privacy

24   practices," and I think that would be appropriate.

25       I -- and I -- we all agree that he can't say -- and I have

1    the specifics here, and I'll tell you in the order which thing

2    I think is in and which is out.  But, you know, the expert

3    can't say, "I think Google is intending to deceive and cheat

4    and violate everybody's privacy."  I agree he can't do that.

5        So it's really somewhere in between.

6        **MS. AGNOLUCCI:**  Yes, but I think, in the specific

7    examples that we've given Your Honor, he's literally taking out

8    the word "intent," because it was ruled inadmissible in the

9    Gonzalez Rogers opinion, and substituting in the word

10   "incentive."  And it is just masking the same opinion.

11       **THE COURT:**  But isn't that an important change?

12       **MS. AGNOLUCCI:**  No, because it's the same way of

13   saying -- it's a different way of saying the same thing in this

14   case and in the examples that we gave.

15       And I'm not saying that you could never use the word

16   "incentive" in an expert report.  Of course you could.  That

17   would be fine.  But what I'm saying is that the examples that

18   we gave, at Pages 14 to 15 of our motion, were clearly opinions

19   about intent that are simply masked as opinions about

20   incentives, and that's why they're inappropriate.

21       **THE COURT:**  Okay.  What's -- what's the third --

22       **MS. AGNOLUCCI:**  And -- and one more thing on that.

23   He's also not qualified to opine on intent.  He's not an

24   economist.  He's not a behavioral scientist.

25       So to the extent that he's talking about why companies are

incentivized to do one thing or another, that is outside the scope of his qualifications as a data security expert, which is what he is.

So I can move on, Your Honor, to the next category, which is dark patterns.  It's part and parcel of the same thing because it is another way of getting in an opinion about intent.  He himself acknowledges in his deposition that dark patterns require intent, so their way of saying, "This company has engaged in a course of conduct that was intended to deceive."

So, by definition, that too is an opinion about intent.

THE COURT:  Do you have a problem with his -- apparently, he's, you know, the -- the father of dark patterns or whatever.  Is -- you don't have a problem with him describing this -- this concept?

MS. AGNOLUCCI:  Yes, Your Honor.

Dark patterns is -- it's -- it's a nascent science.  We were involved in the Arizona case on which the plaintiffs rely extensively here, and he can certainly cite to Harry Brignull or Colin Gray or some of the other scholars on dark patterns.  Dark patterns is not, in and of itself, an impermissible thing to talk about.

Our quibble with his dark patterns opinion is that he doesn't just say, "These are what dark patterns are in general."  He then says, "And Google has engaged in dark

patterns" while admitting, at the same time, in his deposition

that dark patterns cannot be measured and that he doesn't know

of a test to determine whether something is a dark pattern.

So -- so that's the real problem here.  He has no

methodology for saying that Google's conduct or that Google's

disclosures here exemplify dark patterns.  He just looks at it

and says, "That's a dark pattern," and that's -- that's simply

not allowed under the rules.  Experts, of course, have to have

a methodology.

What he does is really no different than getting up and

saying to the jury, without doing any testing, "Well, the

defendant engaged in intentional deceit."  That is what we are

allowing him to do if we allow this opinion that has absolutely

no methodology to it, and it's the same intent opinion that

Judge Gonzalez Rogers excluded in *Brown*.

THE COURT:  But she didn't exclude it entirely.

MS. AGNOLUCCI:  She didn't exclude it entirely, but

she did exclude opinions about the ultimate intent of Google,

and that is what he is doing here when he is saying that Google

engaged in a dark pattern and --

THE COURT:  But she did allow test- -- testimony about

dark patterns.

MS. AGNOLUCCI:  She allowed some general testimony

about privacy, yes --

THE COURT:  Right.

1        **MS. AGNOLUCCI:** -- but she did not allow testimony

2   about intent, and that is what he is doing here.

3        **THE COURT:** But I think the devil is in the details.

4   We all agree -- we all agree that they can't -- an expert

5   cannot opine on the intent of the -- of the defendant.  We all

6   agree on that.

7        The only question is:  Is that what he's doing here, or is

8   that not what he's doing?  And -- and then we have to parse it

9   out, but -- yeah.

10       **MS. AGNOLUCCI:** And my point, Your Honor, is that if

11  you say, "Google has engaged in a dark pattern," that is

12  necessarily an opinion about intent, and that is different than

13  saying, "Dark patterns exist.  Here's what they are."  Those

14  are two totally different things.

15       And there may be, for example, a way of measuring if a

16  certain user interface is a dark pattern.  You could do a

17  survey.  You could see how consumers react to a certain

18  interface.  Does it cause them to take a certain action or not?

19  Do they like the blue button versus the green button?

20       There -- there -- there may be ways of testing consumer

21  behavior to determine if something is a dark pattern, but that

22  ultimate conclusion that this is a dark pattern is what we take

23  issue with in -- in our *Daubert* motion, and that's why his

24  opinion is inadmissible.

25       **THE COURT:** Well -- but you're -- you're saying his

 1    identifying something as a dark pattern is tantamount to

 2    saying -- because of the nature of dark pattern, it's saying

 3    he -- Google is intending to violate privacy rights.  I'm not

 4    sure I agree with you about that.

 5        I mean, if -- if -- if the expert is discussing what --

 6    reflects what conduct is consistent with a dark pattern

 7    identifier, I don't think that immediately jumps to saying

 8    the -- the entity deceived or the entity violated privacy.

 9    It's just saying these are some of the activities that the

10    expert thinks qualify for the label that we're talking about.

11        **MS. AGNOLUCCI:**  Except that his definition of a dark

12    pattern is that it is a user interface that is designed and

13    intended to deceive.  And so if he says X is a dark pattern,

14    he's also saying X was designed with the intent to deceive

15    consumers.

16        **THE COURT:**  Wouldn't it be, though, possible to say

17    it -- the effect of this -- of this procedure is that it does

18    end up deceiving somebody, but it doesn't say that they

19    intended to do it?  You could -- you could have -- you still

20    have to prove -- they have to prove intent.

21        So it isn't -- the fact that something happened or there

22    was -- somebody's privacy program includes a certain -- you

23    know, certain term or factor doesn't automatically equate with,

24    "They intended to deceive."  They still have to prove that.

25        In other words, a company could implement a procedure, and

1    it might have the effect of that, but that doesn't prove they

2    intended to do it.

3            **MS. AGNOLUCCI:**  I agree with you, Your Honor, but that

4    is not what Mr. Schneier is saying.

5            **THE COURT:**  Okay.  Well, I'll go back and look at

6    the --

7            **MS. AGNOLUCCI:**  That's -- that's the problem, and I'll

8    direct Your Honor to his deposition at Pages 80 to 89, where he

9    says "dark patterns" is a term for a variety of subversive

10   user-design tricks intended to manipulate users into doing

11   things they wouldn't normally choose to do.

12           **THE COURT:**  Okay.  Well, I'm actually -- I'm looking

13   more at what paragraphs of the report that you think are -- are

14   problematic rather than his deposition, and I have that, but --

15   okay.

16       I don't want to go through paragraph by paragraph.

17           **MS. AGNOLUCCI:**  Understood, Your Honor.  Understood.

18           **THE COURT:**  So what's the final --

19           **MS. AGNOLUCCI:**  The final one is his opinion on

20   consumer expectations.  Again, this was an area where

21   Judge Gonzalez Rogers struck down his opinion, and the

22   plaintiffs and -- and he have tried to get around the criticism

23   from Judge Gonzalez Rogers by saying, "Well, he's not opining

24   on consumer expectations.  What Mr. Schneier is doing is

25   talking about how experts in the field approach disclosures."

1       But if you look at his report -- and to Your Honor's

2  point, I can direct you to the specific paragraphs.  For

3  example, in Paragraph 236 of his report, he says consumers are,

4  quote, "expected to recognize" -- "are expected to recognize

5  certain things when they see a Google disclosure."

6       In Paragraph 89 of his report, where he had -- where he

7  talks about what consumers who have disabled WAA or sWAA will

8  expect, those are opinions about consumer expectations.  And as

9  Judge Gonzalez Rogers held, Mr. Schneier is not a survey

10 expert.  He's not a consumer expectations expert.  He's not a

11 user experience expert.

12      He didn't survey anyone.  He just concluded what people

13 expect.  That was not enough in *Brown*, Your Honor, and it's not

14 enough here.  And if it were, then Mr. Schneier's personal

15 interpretation of what these disclosures say would be enough,

16 and plaintiffs in any class action alleging deception could pay

17 an expert to get on the stand and say, "This is what consumers

18 expect, and here, they were deceived."

19      And, Your Honor, that simply is not science.

20          **THE COURT:**  Okay.  Let me look to the plaintiffs' side

21 on this, and then we'll go through the other motions.

22          **MR. LEE:**  Thank you, Your Honor.

23      So just real quick on 403, I think you have it just right.

24          **THE COURT:**  Well, are you going to go there?  Are

25 you --

1          **MR. LEE:**  We're not going to go there, Judge.  The

2    terrible parade of horribles to inflame the jury -- you're

3    absolutely right.  If we do that, that hurts the credibility of

4    our expert.

5          **THE COURT:**  Well, I guess their concern is it's in the

6    report.

7          **MR. LEE:**  It's in the report to establish what the

8    potential risks might be with WAA-off data being held

9    without -- without users' knowledge; right?  It could lead to

10   a -- a data leak; right?  It could lead to government

11   subpoenas.

12         **THE COURT:**  Okay.  But you're not going to be talking

13   about *Roe v. Wade* and -- and stalking and all the rest?

14         **MR. LEE:**  No.  The most we get into it is an example.

15   The abortion thing is an example, which is health data apps can

16   provide information which -- which -- you can glean whether a

17   person has had an abortion.  And if that information gets

18   presented to a government or to an authority, that presents a

19   risk.

20         That's -- he's just going to touch on it to present what

21   the various risks may be and put all of this into context of

22   why it -- turning WAA off matters -- right? -- what the risks

23   are, because we already know.  They've telegraphed this for --

24   for years now.

25         What they're going to get up and say is, "What's the harm?

1    What's the harm with us having this data?"  Right?  "There are

2    no risks.  It's very secure.  It's just a receipt for ads, and

3    it's just code"; right?  And what Professor Schneier is going

4    to do is give context.  "Here's why there are risks."

5         So that's all he's going to do.  If he starts to get into,

6    you know, stalking or comparing Google to, you know, criminals

7    and things like that -- obviously, we're not going to do that.

8    And if we did, it would hurt us.

9         But what I suggest is this is not really appropriate for

10   *Daubert*.  I think we need to do this the old-fashioned way,

11   where Mr. -- we sort of know the ground rules.  And when

12   Professor Schneier is on the stand, we can -- if something is

13   out of bounds, I'm sure Google will object, and we can deal

14   with this contemporaneously.

15            **THE COURT:**  Okay.  The next issue?

16            **MR. LEE:**  The next is intent, Your Honor, and let's be

17   clear.  I think you -- I think you understand -- I think we're

18   all on the same page, that Professor Schneier is not going to

19   opine about Google's intent; right?  He said that point-blank

20   at his deposition.  They wanted him to say he is.  He -- over

21   and over again, he resisted --

22            **THE COURT:**  Well, his report does, though, have some

23   language that he uses that is certainly suggestive of -- that

24   he -- he thinks Google has done some things intentionally.

25            **MR. LEE:**  Yeah.

1    If I could clear that up, I think the way to look at it is

2    that what he will talk about is how Google was incentivized to

3    use -- to collect and use user data.  That isn't intent.  Those

4    are external factors.

5    The types of things he's going to talk about are:  What is

6    the value of this data?  How could Google profit from

7    misappropriating this data?  How is its business model created,

8    and how does that create incentives to not fully disclose its

9    collection?

10   He's not going to say, "Google intended to do this."  He's

11   going to present these incentives to the jury, and the jury can

12   draw inferences from them.

13   And to be clear -- Counsel kept mentioning the *Brown*

14   order, Judge Gonzalez Rogers's order, and let me be very clear.

15   She struck three paragraphs that affirmatively talked about

16   Google's intent.  We were very careful not to include that

17   here.  We had replaced those words with the word "incentives."

18   In fact, if you go back and look at the expert -- Dr. --

19   Professor Schneier's expert report in *Brown*, he has an entire

20   opinion about Google's incentives; right?  And she allowed that

21   in its entirety; right?  She understood the distinction between

22   "intent" and "incentives."

23   So we haven't gone and just changed a bunch of words from

24   "intent" to "incentives."  He's actually just adopting the very

25   similar opinion that he used in *Brown* that was allowed under --

1    despite their -- their -- their -- their motion in that case.

2        Now, as far as dark patterns, I know that we touched on

3    that with -- with respect to intent.  What Professor Schneier

4    is going to do is he's going to describe the concept of dark

5    patterns -- right? -- which is disclosures designed to

6    manipulate users into taking a certain action; right?  That's

7    what dark patterns is.

8        And he'll explain what the hallmarks of that is; right?

9    What are the techniques that are used?  And it -- it manifests

10   in these four ways, and he's going to then take Google's

11   disclosures and testify how certain things are consistent with

12   the hallmarks of dark patterns.

13       It's exactly what Your Honor said.  It's the indicia, as

14   you said.

15       **THE COURT:**  Well -- but you -- Counsel makes the point

16   that the very notion of a dark pattern is -- has sort of a

17   built-in-intent concept that, you know, a company would not be

18   engaging in -- in utilizing dark pattern -- patterns without

19   intending its -- the result that is identified is the point of

20   dark patterns.  It's not by accident that they do it.

21       So if it's not -- there isn't really suggesting that the

22   only -- only time it wouldn't be indicative of intent is when

23   it was by accident they did it, which is really not in this

24   case.  Nobody is suggesting they stumbled upon this.

25       So isn't she right that there's some intent aspect just by

1    identifying it as a dark pattern?

2         **MR. LEE:**  No.  I think the way I look at it, Judge,

3    is -- let's take an example in the criminal context; right?

4    Imagine if there's a -- a case about -- involving a murder, and

5    there's a crime scene reconstructionist expert that's put on

6    the stand, and he's not going to say the -- the defendant

7    committed the murder.

8         Murder, obviously, has an intent element to it.  But what

9    he could testify about is, based on his expertise, what he

10   observed in the crime scene and what -- whether what he noticed

11   at the crime scene have hallmarks that are consistent with an

12   intentional killing.

13        And for -- of course he would want to talk about that.

14   You can't say, "Well, he's saying" -- you know, "He's saying

15   it's consistent with murder, and murder has an intent element.

16   So, therefore, he can't testify at all" because it makes no

17   sense.

18        So that's why I think Judge Gonzalez Rogers understood

19   that and allowed -- disallowed specific testimony about intent

20   but said, "You know what?  If you can match up the indicia to

21   the definition and say these are consistent, then a jury can

22   make the inference about intent."

23        And -- and that's sufficient, and we do that all the time,

24   Judge.

25        **THE COURT:**  Okay.  Okay.

1    **MR. LEE:**  On the qualifications, I can address it, if

2    you'd like to hear about his qualifications.

3    **THE COURT:**  All right.  Go ahead.

4    **MR. LEE:**  Judge, he's obviously qualified to talk

5    about the -- the incentives that tech companies have when

6    they're doing this data collection.  He's spent his whole

7    entire life writing about it, teaching it.  He was a CTO at

8    major companies.

9    So he understands what data collection is, what the

10   implications are for its security storage/collection privacy.

11   He's lectured on it at -- at Harvard.  He's written 14 books.

12   We have him as specifically devoted just to this subject.

13   So the notion that he's not qualified to understand what a

14   tech company's incentives are in terms of data collection and

15   how it monetizes it -- it's -- it's really -- I don't really

16   think it's a real debate.

17   As for consumer expectations, Counsel is right that there

18   were consumer expectations opinions in *Brown* that Judge

19   Gonzalez Rogers precluded, no doubt about it.  So when we --

20   when we pre- -- when he prepared his expert report in this

21   case, he carefully removed anything that could be consumer

22   expectations.

23   I think what's happened here is there's a little bit of a

24   conflation of what is consumer expectations versus what are

25   just general principles about privacy.  So consumer

1    expectations is -- in this context, would be an opinion where

2    Dr. Schneier -- Professor Schneier said consumers read Google's

3    privacy policy, and all expected X, whatever that may be;

4    right?  That's consumer expectations.

5        He's not going to do that.  He doesn't do that in his

6    report, and he -- he disclaimed that he would do that at his

7    deposition, and we'll be certain that he doesn't do that.  Now,

8    what he does testify to are general principles based on his

9    experience and expertise with respect to online privacy.

10       So example:  People generally value their privacy in the

11   real world.  Another example:  People's real-world

12   understanding of privacy is different and maybe not suited to

13   their understanding of online privacy.  These are general

14   principles that he uses as a foundation to talk about privacy

15   and put -- put the concepts in -- into focus and into context;

16   right?

17       That is a far cry from him getting up there and saying, "I

18   know, because I'm an expert, that this disclosure means X to

19   everyone."  He's not going to do that; right?

20       And, you know, Counsel pointed to -- to Paragraph 236 of

21   his report, and I'll just note that that paragraph is -- is a

22   citation to a 2018 Associated Press investigation about Google

23   services.  It's not him saying, "Here's my opinion on consumer

24   expectations."

25       So I think you have to be a little bit circumspect when --

```
 1   when -- when considering this argument because there's just no

 2   there there; right?  We didn't -- we purposely did not have him

 3   prepare a report that included consumer expectations.  He

 4   disclaimed it, and he's not doing it anywhere.  He's not going

 5   to do it at trial.

 6            THE COURT:  Okay.

 7            MS. AGNOLUCCI:  May I respond, Your Honor?

 8            MR. LEE:  Thank you.

 9            MS. AGNOLUCCI:  I will try to be brief.

10        Okay.  On the first point, the Rule 403 example, Counsel

11   said, "Well, it's just one example," the criminal prosecution

12   of an individual if their abortion or, you know, other

13   reproductive health information is leaked.  That is a

14   terrifying example, and it is extremely inflammatory.

15        I can think of many more anodyne examples in a case that

16   involves receipt and recordkeeping and conversion tracking, but

17   I think the fact that plaintiffs have selected that as their

18   example -- and if you open Mr. Schneier's 2025 report and you

19   just read the first two pages, it is rife with examples like

20   that.

21        That is not an accident.  It is intended to inflame the

22   jury, and I'm sure we can come up with other examples that do

23   not have the same effect.  And so I don't agree that it makes

24   sense to wait and see and, "Oh, we can work this out at trial"

25   when the jury is going to be presented with a report and with
```

```
 1    testimony --
 2            THE COURT:  Well, they're not going to get the report.
 3            MS. AGNOLUCCI:  -- with testimony that is --
 4            THE COURT:  So that's why, to some extent, the "hash
 5    it out at trial" is not an absurd notion.  I can give you some
 6    guidance, but the jury is not going to read this report, and I
 7    think Counsel is perhaps aware now that they are going to --
 8    they have to be careful about the examples that they use.
 9        But I suppose I don't find the -- I mean, I think it's
10    perfectly appropriate for a witness to talk about the
11    importance of privacy, I mean, as a general concept.  And so I
12    don't see this parade of horribles you see with some of these
13    examples.  So -- but I understand your argument.
14        Okay.  Yes, go ahead.
15            MS. AGNOLUCCI:  The second thing that Counsel said was
16    that the testimony on dark patterns is going to be testimony to
17    the effect of, "Well, X, Y, and Z are consistent with the
18    hallmarks of a dark pattern."  And Your Honor was asking me
19    about Mr. Schneier's report.
20        Mr. Schneier -- and -- and the examples are listed on
21    Page 13 of our motion.  He has a number of opinions about dark
22    patterns that don't say words like "consistent with the
23    hallmarks of."  They say, "That exemplifies a dark pattern.
24    That is a dark pattern."  That's what we are taking issue with,
25    Your Honor, because that is a conclusion ultimately about
```

1   intent.

2       So I would urge Your Honor to look at the examples --

3           THE COURT:  Oh.  So you would agree that if he said,

4   "This has the indicia of dark pattern," you wouldn't have a

5   problem with it?

6           MS. AGNOLUCCI:  I'm -- I'm not saying that.  I have a

7   problem with it, no matter what, but I certainly have a problem

8   with the characterization that this is okay because it's just

9   saying, "This is consistent with the hallmark" because that's

10  not what he's actually saying in his report and not what I

11  would expect him to say in his testimony.

12          THE COURT:  I guess I'm having some trouble following

13  how -- you know, you're, on the one hand, saying, "Oh, no, no.

14  We're not saying he can't go to discuss dark patterns," but

15  then you're also saying any reference to dark patterns is so

16  dangerous because it intrudes on intent.  I'm not sure what

17  you're telling me.

18      I mean, are you taking the position that he can't utter

19  the word or what?

20          MS. AGNOLUCCI:  I'm taking the position that the

21  testimony that I see playing itself out, based on what is said

22  in the report, goes beyond uttering the word.

23      I do not have a problem with him uttering the word, if

24  that's really what he's doing, but what he's doing in this

25  report is not just uttering the word and not just saying X, Y,

```
 1   and Z are consistent with indicia.  He's saying, "This
 2   exemplifies a dark pattern."
 3              THE COURT:  Well --
 4        MS. AGNOLUCCI:  "This case is a dark pattern."
 5              THE COURT:  -- I don't see the distinction.
 6        If -- if they -- if he's presented with Google's terms and
 7   conditions and he says, "Well, this one is indicative to me of
 8   dark pattern activity," are you saying he can't say that or he
 9   can say that?
10        MS. AGNOLUCCI:  I'm saying he cannot say that.
11        THE COURT:  Well -- but then he can't say anything.
12   What is he -- he can't -- what I'm hearing you saying is he
13   sits up there, and he says "dark patterns," end of story.
14        MS. AGNOLUCCI:  No.
15        THE COURT:  I mean, he's got to -- he's -- he's --
16   it's pointless if he's not equating it with some of the
17   activities in the case.
18        MS. AGNOLUCCI:  I understand Your Honor's point, and
19   the reason that -- that we're having this debate is because
20   our -- our brief and our motion takes the position that he
21   shouldn't be allowed to talk about dark patterns.  I am sensing
22   your --
23        THE COURT:  Well, then, now you're -- now you're --
24   now you're coming clean with me and saying --
25        MS. AGNOLUCCI:  I'm -- I'm -- I'm just --
```

1          THE COURT:  -- you want to exclude it all --

2          MS. AGNOLUCCI:  I'm just --

3          THE COURT:  -- and not -- so a lot of our discussion

4   about indicia and all of this, I guess -- did you really mean

5   it, or are you -- are you saying, "No, he should" -- "he should

6   just be precluded from talking about dark patterns"?

7          MS. AGNOLUCCI:  I'm trying to be responsive to

8   Your Honor's concerns.  Our motion was a motion to strike all

9   but certain -- very specific paragraphs of Mr. Schneier's

10  report from 2023 and all of the 2025 report.  That is the

11  relief we're asking the Court for.

12         THE COURT:  Okay.

13         MS. AGNOLUCCI:  I see that Your Honor is, you know, in

14  disagreement with some of that, and so I'm trying to explain

15  why the -- the position that the plaintiffs are now saying what

16  they think he's going to take is -- is dangerous and equally

17  dangerous because it's not actually what he's going to get up

18  there and say.

19         And so would -- would we be able to live in a world where

20  you want ourselves -- well, Mr. Schneier can get up, and he can

21  give the jury background information.  "There's a view of the

22  science.  It's called dark patterns.  This is how they're

23  defined.  This is what isn't dark pattern."  That is different

24  than saying, "Google engaged in dark patterns."

25         We would rather have him say none of that, but if

```
 1   Your Honor is going to allow something, then the part that's

 2   the most offensive is the ultimate conclusion because that is a

 3   conclusion about intent.

 4            THE COURT:  Okay.  Let's go on to the motions that

 5   pertain to -- Hoffman and Knittel and Black, I think, are the

 6   three.

 7        And so that's motions that plaintiffs are making, and I

 8   know Hoffman kind of dovetails, to some extent, because it's --

 9   Hoffman, as I understand, is a responsive expert to -- to --

10   what --

11            MR. LEE:  Professor Schneier.

12            THE COURT:  Yeah.

13            MR. LEE:  That's correct, Your Honor.

14            MS. AGNOLUCCI:  Yes.

15        And, Your Honor, I'm going to talk about Dr. Hoffman, and

16   then my colleague, Mr. Santacana, is going to address Knittel

17   and Black.

18            THE COURT:  Okay.

19            MS. AGNOLUCCI:  So we're kind of --

20            MR. LEE:  And, Your Honor -- I'm sorry, Your Honor.

21   My colleague, Mr. Frawley, is going to handle Dr. Hoffman, and

22   Mr. Sila is going to handle Knittel and Black.

23            THE COURT:  Okay.  So we're going to Mr. Hoffman.  Is

24   it Mr. or Ms. Hoffman?

25            MR. FRAWLEY:  It's -- it's "Dr."
```

```
 1              MS. AGNOLUCCI:  "Dr."  Female doctor.

 2              THE COURT:  Well, I --

 3              MR. FRAWLEY:  She's a female --

 4              MS. AGNOLUCCI:  Female doctor.

 5              THE COURT:  Thank you.

 6         Okay.  All right.  So let's talk about Hoffman.  The

 7    problem is this.  I mean, what -- how should we analyze this?

 8    Because it's -- it -- to some extent, some of the problems that

 9    plaintiffs identify with respect to Hoffman really seem to

10    depend upon how I come out on -- on the -- I keep forgetting

11    the name -- Schneier.

12         All right.  Go ahead.

13              MR. FRAWLEY:  Sure.

14         Thank you, Your Honor.  Alexander Frawley, from

15    Susman Godfrey, for the plaintiffs.

16         So we raised three issues as to Dr. Hoffman.  The first

17    one was intent.  I don't think we have to belabor that point

18    because we spoke a lot about it just now, but we identified ten

19    paragraphs from her report where we think she crossed the line.

20         And Google didn't take any issue with any of the ten

21    paragraphs that we identified.  What they instead said was,

22    "Well, there's some things in those paragraphs that are fair

23    game, and you shouldn't strike the entirety of those

24    paragraphs," and we agree with that.

25         So we identified the ten paragraphs where we think there's
```

 1  something wrong with intent, and we think that can be sort of

 2  the end of this issue.

 3      The second issue that we talk about, Your Honor, is just,

 4  really, two sentences in the entirety of her two reports that

 5  we're taking issue with.  So these two sentences that we think

 6  are going to conflict with the jury instructions for this

 7  case -- and the first sentence is, "There's no such thing as a

 8  representative user with respect to privacy."

 9      And for a moment -- to go to Your Honor's question that

10  began this argument, I think -- from the argument just now,

11  Your Honor, it seems like Mr. Schneier will, at a minimum, be

12  allowed to testify about background principles on privacy.  So

13  I think this dispute will still be relevant and --

14          **THE COURT:**  I thought that there was some offer, if

15  you will, that they wouldn't use "representative."

16          **MR. FRAWLEY:**  That -- oh.

17          **MS. AGNOLUCCI:**  Yes, Your Honor.

18      I actually think this issue is largely resolved by the

19  reply brief.  As I read Pages 4 and 5, I think the plaintiffs

20  are only taking issue with two sentences.  One is, "There's no

21  such thing as a representative user," and the other is about

22  whether the named plaintiffs' testimony can be generalized.

23      And although we can quibble about the law, and we don't

24  agree that she can't give that testimony, we're happy to excise

25  those two sentences and continue to allow her to testify, for

1  example, about the heterogeneity of privacy preferences.  So I

2  think we're in agreement, and --

3          **THE COURT:**  Okay.

4          **MR. FRAWLEY:**  And --

5          **MS. AGNOLUCCI:**  -- believe it or not, we can take some

6  of this off your hands.

7          **THE COURT:**  All right.  Okay.

8          **MR. FRAWLEY:**  So real quick, Your Honor.

9      We are in agreement.  I might have misspoke.  It's

10  actually three sentences.  It's just because the second issue

11  about named plaintiffs' testimony being generalized -- she says

12  that twice.  So it's two statements but three sentences, but

13  we're in agreement.

14          **THE COURT:**  Okay.

15          **MS. AGNOLUCCI:**  Agreed.

16          **MR. FRAWLEY:**  Yeah.

17          **THE COURT:**  Okay.  So that one -- and then there are

18  the intent issues, which we don't have to belabor, but I have

19  your identification which -- or the contested statements, and

20  I'll go through them.

21      So does that take care of Hoffman?

22          **MR. FRAWLEY:**  No, Your Honor.  There's one more

23  issue --

24          **THE COURT:**  Okay.

25          **MR. FRAWLEY:**  -- and I think this one still remains

disputed, based on the briefing, and this is -- we're seeking

to exclude opinions that she has about the data that Google

collects and how toggling WAA on or off impacts that data

collection.

For example, she asserts that the disclosures are accurate

because they, quote, "explain what WAA does."  And as another

example, she analyzes congressional testimony from Google's

CEO, Sundar Pichai, about these data collection practices.  And

she opines that his testimony to Congress was, in fact,

accurate.

And Dr. Hoffman isn't qualified to offer these opinions.

**THE COURT:**  Well -- but she's not really offering the

opinion that his technical -- she's not corroborating the CEO's

technical expertise, is -- is she?

**MR. FRAWLEY:**  That's how we read her expert reports,

Your Honor, and I can point you to, for example, Paragraph 47

of her supplemental report, Footnote 123.

And what she's doing here is she's addressing what

Mr. Schneier said about Mr. Pichai's congressional testimony in

his report, and she's responding to Mr. Schneier's opinions.

And she says, "However, Mr. Schneier failed to acknowledge in

the Schneier report that the statement by Mr. Pichai was

accurate."

And Mr. Schneier is, of course, saying that these

statements were inaccurate, and he's doing so, from his

1    technical background, to explain why the statements were

2    technically inaccurate.

3        So -- so we do read her opinion as saying that -- she's

4    almost backing up Mr. Pichai to say, "No.  He was" -- "he was

5    providing accurate testimony," and the testimony -- I think it

6    would be helpful to read the testimony from Mr. Pichai that

7    we're talking about --

8            THE COURT:  Uh-huh.

9            MR. FRAWLEY:  -- is when he said to Congress, "We give

10   users clear toggles where they can decide whether the

11   information is collected.  So whether the information was

12   collected, does it control that, or doesn't it?"

13           THE COURT:  Not really a technological opinion.

14           MR. FRAWLEY:  I think it is a -- it's a technical

15   statement, Your Honor, and one that we think is technically

16   inaccurate because our allegation -- and we think we've --

17   our -- our -- when WAA is turned on or off doesn't actually

18   affect whether Google is collecting app activity data.

19       So for him to say the toggle controls the collection,

20   whether Google collects it, we think that's a technical

21   statement that's inaccurate, and yet here she is opining that

22   it is, in fact, accurate.

23           THE COURT:  Okay.  Let me ask for a response on that.

24           MS. AGNOLUCCI:  Sure.

25       And just very quickly on intent, I think we're in

1    agreement here.  Nobody thinks anyone should be talking about

2    intent.  And -- and so on this issue of the technical accuracy

3    of the disclosures, I think we're also largely in agreement.

4        Dr. Hoffman is not a technical expert.  She's not there to

5    talk about how things work, how the products function, what

6    they do.  She is there to talk about whether the disclosures

7    are clear.  She's there to talk about their design.  She's

8    there to talk about whether they present the information in a

9    certain matter, consistent with principles of user interface

10   design.

11       So that is what she's being presented as.  She is not

12   going to give opinions about whether WAA collects information

13   in a certain way.

14       On the issue of Mr. Pichai's testimony, I don't think

15   either expert should be opining on whether Mr. Pichai was

16   technically correct when he was addressing Congress and making

17   generalized statements.  Certainly, she is not trying to talk

18   about the functionality of the products.

19           **THE COURT:**  Okay.

20           **MR. FRAWLEY:**  Thank you, Your Honor.

21       I -- I think I agree with much of what Counsel said, but

22   that's not what Dr. Hoffman wrote in her report.  So, for

23   example, she wrote that the disclosures -- they explain what

24   WAA does accurately.  That's Paragraph 173 of her report.

25       She wrote that they, quote, "clear-" -- the disclosures,

1    quote, "clearly describe the purposes" -- "the purpose and the

2    benefits of WAA."  That's Paragraph 35 of her supplemental

3    report.  She does also, in places in her report, say the

4    disclosures are user-friendly, and I think that's what Counsel

5    is focusing on.

6         We're not seeking to exclude those opinions that she

7    asserts where she says the disclosures are user-friendly.

8    We're not, at this point, taking issue with her qualification

9    for those kinds of opinions, but -- but she does cross the line

10   sometimes.

11        And it's not a large number of paragraphs, and we identify

12   them.  In fact, there's only eight of them throughout her two

13   reports where she crosses the line, not just to say these are

14   user-friendly but to say "user-accurate."  These clearly

15   describe the purpose of WAA.

16        And based on what Counsel just said and, in fact, what

17   Dr. Hoffman admitted at her deposition, she isn't qualified

18   to -- to cross that line into technical accuracy.  So that's

19   our issue.

20        And I just want to make one clarification point about

21   Mr. Pichai, which is we do think it's inaccurate.  You know, in

22   fact, no toggle controls Google's collection of app activity

23   data, and it's improper for Dr. Hoffman to assert that that's

24   accurate, especially when she lacks the qualifications.

25             **THE COURT:**  Okay.

1          **MS. AGNOLUCCI:**  And -- and, Your Honor, I think we are

2      largely in agreement.  This is really a matter of semantics.

3          I mean, I think for -- the example that Counsel gave about

4      whether a disclosure, quote/unquote, clearly describes WAA -- I

5      think what Dr. Hoffman is opining on is the clarity from a user

6      interface design perspective.  Are you using as few words as

7      possible, is it bogged down in legalese, or is this a hallmark

8      of good design?

9          She's not meaning to say, "And then I looked at the source

10     code, and this is what WAA did."  So I think we're in

11     agreement, but she can talk about the design, and she -- and

12     the clarity, and she cannot talk about the functionality.

13         **THE COURT:**  Okay.  Okay.  Mr. Black?

14         **MS. AGNOLUCCI:**  Thank you.

15         **MR. FRAWLEY:**  Thank you, Your Honor.

16         **MR. SANTACANA:**  Good afternoon, Your Honor.

17     Eduardo Santacana for Google.

18         **THE COURT:**  Good afternoon.

19         **MR. SILA:**  Good afternoon, Your Honor.  Ryan Sila for

20     plaintiffs.

21         **THE COURT:**  All right.  So this is plaintiffs' motion.

22     So you can start.

23         **MR. SILA:**  That's right.

24         Dr. Black, as Your Honor is aware, is Google's technical

25     expert, and we've moved to exclude two narrow portions of his

1    reports on fairly straightforward grounds.

2         The first issue is, in one paragraph of Dr. Black's

3    report, he opines that Google's, quote, "current privacy policy

4    defines 'Google Account,'" and then he goes on to talk about

5    how he thinks that term is defined.

6         As we've explained in our papers, this is inadmissible

7    because it directly contradicts the language of a prior court

8    order in which Your Honor stated that, quote, "Neither the WAA

9    materials nor the Privacy and Terms hub defines 'Google

10   Account.'"  And that's from the order on the first motion to

11   dismiss.

12             THE COURT:  I -- just as a general matter --

13             MR. SILA:  Yeah.

14             THE COURT:  -- when I made rulings on motions to

15   dismiss and motions for summary judgment, to argue that that's

16   law of the case that binds me is a misunderstanding.

17        Those are preliminary motions that we go through leading

18   the case either to end or to go to trial, but they do not, in

19   any way, cabin me in in terms of, "Oh, you now can't assess the

20   situation and" -- "and rule on it.  It's" -- "you're bound by

21   your own words."  I'm not.

22        So that's fine to point out that, in a particular order, I

23   characterized something in a particular way.  But then to

24   suggest that, well, I can -- I can't assess this because I'm

25   bound by this is not correct.

1          **MR. SILA:**  I understand, Your Honor.

2          **THE COURT:**  Okay.

3          **MR. SILA:**  We certainly didn't mean to characterize

4    what you meant by the language.  It was more just we saw it --

5    we saw an opinion that --

6          **THE COURT:**  Okay.

7          **MR. SILA:**  -- appeared to conflict.

8          **THE COURT:**  All right.

9          **MR. SILA:**  So should I -- I don't think I'm going to

10   persuade you on this one.  Am I right?

11         **THE COURT:**  Yeah.

12         **MR. SILA:**  All right.  So -- so moving on to --

13         **THE COURT:**  You're not going to persuade me using --

14   saying, "You can't go" -- you know, "This is what you said, and

15   that means you've got to do this" and --

16         **MR. SILA:**  Okay.

17         **THE COURT:**  Go ahead.

18         **MR. SILA:**  Sure.  I understand.

19      So, you know, if law of the case doesn't apply, that's the

20   basis for -- for this particular, you know, part of the motion.

21   So I don't think that's --

22         **THE COURT:**  Yeah.

23      You don't have to go there.

24         **MR. SILA:**  All right.  So moving on, then, to the

25   second part of our -- you know, the second opinion of

1    Dr. Black's that we're seeking to exclude, it's Dr. Black's

2    opinion that -- that Google doesn't intercept app activity

3    data, which, in our view, really comes out of left field.

4        Dr. Black is a rebuttal expert, and his job is to explain

5    what our technical expert, Jonathan Hochman, got right and got

6    wrong.

7        And the law is very clear -- Google doesn't disagree --

8    that expert opinions that attempt to put forward new theories

9    outside the scope of the affirmative expert report are improper

10   rebuttal.  There's really no denying that that's what is going

11   on here.  That's what Dr. Black's opinion is.

12       Our expert, Mr. Hochman, did opine about the way that

13   Google collects data and explained the mechanism behind that.

14   Dr. Black is -- is -- you know, it's perfectly permissible for

15   him to testify about that, to explain what Mr. Hochman got

16   right, what he got wrong.

17       But what Dr. Black can't do is introduce this whole new

18   concept of interception, which is only going to confuse the

19   jury.  It's not an element of any of the claims that have to

20   be -- that are going to be tried in this case.  And to

21   introduce the concept will suggest that there's a burden for us

22   to prove interception, which is actually a legal concept

23   anyway.

24       Now, Google has a couple of arguments in response, neither

25   of which we think have merit.  The first is that the question

1    of interception relates to Google's data collection, and -- and

2    Mr. Hochman did opine on Google's data collection.  I think

3    that stretches the meaning of, quote, "subject matter," which

4    is the language from Rule 26, too far.

5         We cited the *Vu v. McNeill* case in our reply brief, which

6    explains that a broad reading like that, a reading that, quote,

7    "encompasses any possible topic that relates to the subject

8    matter at issue would blur the distinction between affirmative

9    and rebuttal experts."  And -- and I think that's what's going

10   on.

11        And Google's second argument is that there are still

12   allegations in our complaint about -- about interception, kind

13   of leftover from earlier stages, and I'm happy to address that.

14   But the bottom line is that it's sort of irrelevant to this

15   question about what a rebuttal expert is permitted to testify

16   about.

17        They're bound not by the complaint and what the

18   case-in-chief is going to look like but by the expert to whom

19   they're responding, and that's here Mr. Hochman, who does not

20   talk about interception.

21             **THE COURT:**  Okay.  Mr. Santacana?

22             **MR. SANTACANA:**  Your Honor, this might be a situation

23   where the parties are agreeing so aggressively that they're

24   disagreeing.

25        The -- their opposition to the summary judgment motion

 1    talks about interception.  Their rhetoric in the cases always

 2    talked about interception.  It's a word that has different

 3    meanings in different contexts, but the experts are talking

 4    about the method of transmission and the method of capture,

 5    let's say, of data or collection of data.

 6        Yes, it's true that their expert -- their technical expert

 7    didn't use the word "interception" in his report, but it's in

 8    their complaint 60 times.  We invited them, in our opposition,

 9    to disavow any intention to use the word at trial before the

10    jury.  And they didn't accept that invitation in their reply

11    brief, even as they repeatedly argue that their claims don't

12    depend on proving anything related to interception.

13        Now, if they can accept our invitation, then I don't think

14    we have a disagreement.  But if they're going to use the word

15    "interception" before the jury, then I think it is perfectly

16    permissible for our technical expert to talk about the method

17    of transmission and the method of collection, which they may or

18    may not -- I'm not sure -- intend to characterize as an

19    interception, which is a loaded word.  That's really, I think,

20    the only disagreement we are really having.

21        And I think the only other thing I would say about it is

22    they're not moving on this for no reason.  They did not prepare

23    this motion out of the blue.  This didn't come out of left

24    field.  This case was brought as an interception case.

25        Their wiretaps claims don't persist, but at motion for

 1  summary judgment, when those wiretap claims no longer existed,

 2  they still used the word in their rhetoric surrounding why the

 3  motion should be denied on their statutory claim for -- under

 4  the anti-hacking statute.

 5          **THE COURT:**  Okay.

 6          **MR. SILA:**  If I may just respond briefly, Your Honor.

 7          **THE COURT:**  You may.

 8          **MR. SILA:**  I think we're mostly in agreement with the

 9  exception that the way that we characterize the claims and

10  briefs in our complaint is not really important to the way that

11  a rebuttal expert addresses our technical expert.

12      I think that if our technical expert gets on the stand and

13  says, "Here's the way that Google collects data, and I think

14  that's interception" -- I think we'd agree that Dr. Black can

15  address Mr. Hochman's testimony.  But if Google wanted to

16  address, you know, our attorneys', you know, allegations in the

17  complaint or in briefs, they should have brought an affirmative

18  expert report on this.

19      This is -- this is outside the scope of rebuttal, and

20  that's really the issue that we're having here.

21          **THE COURT:**  Okay.  Okay.  Let's talk about

22  Mr. Knittel.

23          **MR. SILA:**  All right.  So as Your Honor is aware,

24  Dr. Knittel is Google's damages expert, and he rebuts our

25  damages expert, Michael Lasinski.

 1      I think it helps just to start with a little bit of

 2   context.  I know you're very familiar with Mr. Lasinski's

 3   opinions after, you know, various proceedings with him over the

 4   years, but I want to call back to the class certification order

 5   and *Daubert* motion on his opinion because I think it -- it

 6   provides an important context.

 7      So there, the Court evaluated Mr. Lasinski's opinions on

 8   unjust enrichment, among other things, so how much money Google

 9   made by taking class members' data and then using it for

10   advertising purposes.  And there were three holdings that I

11   think are important here today.

12      The first was that Lasinski's opinions are reliable, and

13   the second was that the Court rejected Google's argument that

14   Mr. Lasinski was required, before reaching an opinion about

15   unjust enrichment, to consider everything else -- or anything

16   else that Google might have been able to do instead in order to

17   make that money.

18      And, third, Your Honor held that Google and its experts --

19   they can quant- -- they can offer -- you know, they can try to

20   prove deductions, so the amount of unjust enrichment, but it's

21   their burden.  It's their burden to prove and justify and

22   quantify what those deductions should be, and that's where

23   Dr. Knittel is supposed to come in.

24      In this motion, we've moved to exclude two related

25   opinions from Dr. Knittel which purport to be about deductions

1    to unjust enrichment but are kind of just hand-wavy and

2    speculative.  And these two opinions are about profits that

3    Google allegedly might have been able to make had it done this

4    thing or that thing instead of the un- -- unlawful conduct.

5    Maybe it could have kept all the money, maybe some.  It's very

6    unclear.

7        So setting aside the question of whether or not this form

8    of reasoning is even a proper kind of deduction from unjust

9    enrichment in a case like this, these opinions share a common

10    problem -- and I do want to talk about them individually, but

11    they share a common problem that I'll address first, which is

12    Dr. Knittel doesn't actually quantify anything.

13        He just gestures at a couple of things that maybe Google

14    could do in some hypothetical but-for world to clutch onto as

15    much money as it possibly could, money they've actually made

16    illegally.

17        And that's not good enough for expert testimony in the

18    same way that -- had Mr. Lasinski's opinion been, "Well, I know

19    Google must have made some money with this" -- "with this data,

20    but I don't know how much.  You, the jury -- I don't know --

21    pick a number or" -- "or, you know, make Google disgorge

22    literally every dollar it's ever made on anything anywhere."

23        This is Google's burden to kind of create and justify a

24    deduction, and Dr. Knittel just hasn't done that.  He -- his

25    opinion has no substance, it's speculative, and it invites the

1    jury to do the same thing.  So if I may, I'll proceed on to the

2    specific opinions themselves.

3        The first opinion -- Dr. Knittel asks the jury to consider

4    what might happen if Google had adequately disclosed that it

5    collects WAA-off data.  It's inadmissible for two reasons.  The

6    first is kind of a threshold reason, which is that this is not

7    the correct but-for world.

8        Under black-letter law, the but-for world has to remain

9    the same except for the defendant's wrongful conduct, and the

10   wrongful conduct in this case is that Google disregarded the

11   fact that the class members denied permission to collect their

12   data.

13       So logically, a but-for world is one in which Google

14   respects these -- the fact that these class members were asked

15   for permission.  They said, "No" by turning off sWAA.  And

16   then, you know, Google wouldn't take it anyway, as they did in

17   the real world.

18       But Dr. Knittel, on the other hand, imagines a sort of odd

19   but-for world where, instead of honoring class members' choice,

20   Google just takes away the choice.  It tells them, you know,

21   "No matter what you do, if you use your phone, if you use apps,

22   we're going to collect your data."

23       And then he further imagines that the class members in

24   this case, people who chose to deny permission, would be fine

25   with that.  We don't agree, and we don't think that's

1    permission.

2         But even if -- even if one were to perceive of that as

3    permission, that still doesn't work for the but-for world

4    because a thief can't get itself off the hook by claiming that

5    the victim might have given away the stolen goods if the thief

6    had been persuasive enough or leaned on them enough, you know,

7    and said, "You can't use your phone unless you let me walk away

8    with this."

9         So the correct but-for world is one in which the defendant

10   changes their conduct, not where the plaintiffs change their

11   mind about this.  And, again -- so I -- we think that we should

12   be focusing on, you know, what did -- what did Google do here,

13   which was collect data without permission.

14        So moving on to the second point, which is that

15   Dr. Knittel just speculates about what this deduction might be,

16   and he asks the jury to do the same.  So, again, you know, the

17   Court held, at the class certification stage, that Google bears

18   the burden of quantifying these deductions.

19        But Knittel doesn't do that.  He doesn't quantify how much

20   user behavior might change.  He doesn't quantify how much

21   Google -- Google might have profited.  He goes on to describe

22   how one might go about doing that analysis, but he blames

23   Mr. Lasinski for not doing it, but it's not Lasinski's burden.

24   It's -- it's Google's burden.  It's Dr. Knittel's burden.

25        And so instead of telling the jury, "Here's how much you

1    should deduct," he just says, "Well, there might be some

2    deduction appropriate."  So that's speculative, and it just

3    doesn't help the jury at all, in our view.  It introduces lots

4    of confusion into the case.

5        I'll pause here, if Your Honor has any questions, or I can

6    move on to the second -- the second issue.

7            THE COURT:  No.  Why don't you pause there, and I'll

8    ask Mr. Santacana.

9            MR. SILA:  Okay.

10            THE COURT:  What is the methodology that, assuming --

11    jumping to that second point, not that the -- is the but-for

12    world correctly constructed, but jumping, then, forward to --

13    okay.  Let's assume that he can opine on that but-for world.

14    He doesn't give any guidance on how a jury would then go about

15    making the deduction.

16        What's the methodology?

17            MR. SANTACANA:  So he does give actually substantial

18    guidance, and it is in the record.

19        But I wanted to just correct one -- one thing about what

20    you just said, which is it's not a deduction.  We are still in

21    the causation part of the analysis, and the question is how

22    much of the profits were caused by the wrongful conduct.

23        They cite the Restatement (Third) of Restitution,

24    Section 51.  I think just reading that section through is all

25    the Court needs to understand how many courts and juries have

1    struggled with the question of causation.

2         So deduction is about costs.  It's about --

3         **THE COURT:**  Well, I guess I'm not following you.

4         He -- it's -- he's -- he's opining on -- on what he views

5    as a but-for world; correct?

6         **MR. SANTACANA:**  No.  Actually, the way I would

7    characterize it is that he's opining that Lasinski's but-for

8    world has holes in it.  His job is to poke holes in the

9    affirmative case of causation put forward by this damages

10   expert.  He didn't take the extra step of saying, "Now I'm

11   going to construct it for you" or --

12        **THE COURT:**  If your argument -- and perhaps you're not

13   making this argument.  Is your argument that what the jury

14   should do is the jury should, even if the jury finds that

15   there's been certain elements established in terms of violation

16   of -- under the claims -- that they then should say, "However,

17   any" -- you know, "No harm, no foul here" because the -- you

18   know, "We wouldn't have been harmed in the end because, you

19   know, the" -- "certain of these customers would have said, 'Oh,

20   I'm fine with that,' and, therefore, you have to make an

21   adjustment"?

22        He's not saying that?

23        **MR. SANTACANA:**  That -- no, and that won't be our

24   argument, Your Honor, at trial.  Our argument to the jury will

25   be that the burden of proving disgorge- -- or the unlawfully

1    gained profits that should be disgorged -- that that burden was

2    not discharged by the plaintiffs, and, therefore, disgorgement

3    cannot be awarded.

4        So Knittel does not put forward an alternative

5    disgorgement figure on this basis.  All he's doing here is

6    saying they have failed to discharge their burden, and he

7    provides many factual bases to explain why the jury should

8    agree that the but-for world that Lasinski has constructed is

9    unrealistic and fails to account for fundamental pieces like --

10            **THE COURT:**  Why is it unrealistic?

11            **MR. SANTACANA:**  So I think the perfect analysis -- let

12    me take a step back and think about what this case is about.

13    The case is about inadequate disclosure.  This case is not

14    about data collection in a vacuum because data collection is

15    not unlawful.  There are many ways that data is collected.

16            **THE COURT:**  Data collection, they contend, without

17    consent --

18            **MR. SANTACANA:**  Without consent.

19            **THE COURT:**  -- is unlawful.

20            **MR. SANTACANA:**  And so the question is:  If the

21    disclosure had been complete, how would that have affected the

22    revenues that Google made?

23            **THE COURT:**  Why should we get there?  If they -- if

24    they are able to establish that -- that Google collected it

25    without consent --

1      MR. SANTACANA:  Uh-huh.

2      THE COURT:  -- why should we speculate about, "Well,

3   maybe they would have gotten consent.  We should" -- "we should

4   theorize about the world in which, well, they would then" -- "a

5   lot of these people didn't care, and so, you know, there's no

6   problem here"?

7      I don't --

8      MR. SANTACANA:  Yeah.

9      THE COURT:  -- understand what -- I thought I

10  understood what this witness was doing, but now I don't

11  understand what this witness is doing.

12      MR. SANTACANA:  Well, let me -- I apologize for -- for

13  making it worse, but let me try and -- and -- and explain it

14  differently.

15      In a case about an inadequate disclosure on a juice

16  bottle, the issue is that the analysis, which is sometimes

17  called a conjoint analysis, that many experts run is they say,

18  "Okay.  If the bottle had said, 'Unnatural means we don't use

19  this particular ingredient' and been specific about it, then

20  how many bottles would you have sold?"

21      So here, a similar analysis would have been if Google had

22  been clearer about what the button does do and what the button

23  doesn't do, would Google's revenue from advertising go down

24  because users would not use Google products or apps that use

25  this Google service as much?

1    So it's not about would we have gotten their consent or

2    not.  It's about how would their behavior on the Internet

3    change in a way -- and not to create their analysis for them

4    but in a way that would reduce Google's revenue.

5    And that can be measured.  It's done all the time.

6    Conjoint analysis is one way to do it.  That's done in the

7    juice cases and similar sort of all-natural-type POM

8    Wonderful-type cases.  Another way to do it is to observe user

9    behavior when you shift different variables.

10    Okay.  Well, what if WAA was described this way as opposed

11    to this way?  Would you use apps as often?  Would you try not

12    to use apps that use Google Analytics?

13    **THE COURT:**  I guess my experience in these -- and I've

14    had a lot of these cases about --

15    **MR. SANTACANA:**  I know.

16    **THE COURT:**  You brought it up.

17    -- about, you know, ingredients and things.

18    **MR. SANTACANA:**  Right.

19    **THE COURT:**  The issue, then, is did they deceive a

20    consumer or not.  Then you find liability.

21    And then there is an issue about, well, does the -- does

22    the juice have any value absent the -- you know, the deception?

23    Would they have bought it, you know, for half the price so they

24    get hydration or something?  That's the analysis in that -- in

25    those cases.

 1          So I don't see how that, then, overlays with this case.

 2          MR. SANTACANA:  Because when that analysis -- when you

 3     unpack it from the perspective of -- of disgorgement from a

 4     legal perspective, what you're really doing is trying to

 5     determine whether the inadequate disclosure was the cause of

 6     the revenue or if it was some other cause.

 7          And so what you're measuring is not, "What's the value of

 8     the juice?" so much as, "How would it change?  What behavior in

 9     the market would occur?  Would juice sales go up, or would they

10     go down, and by how much?"

11          And so here, I would say how -- would fuller disclosure --

12     disclosure of the -- what WAA, the button, does and doesn't do

13     affects people's behavior online?  Because, of course, the more

14     people are on apps that use Google Analytics, according to

15     Lasinski, the more money Google makes.

16          So if there really --

17          THE COURT:  Well, I guess now I go -- I want to circle

18     back to your initial point, which is this is all going to

19     causation and not -- and under that analysis, you're telling

20     me, "Well, we don't have a burden to" -- "to" -- "it is not our

21     function to describe what the possible method is to make" --

22     "make adjustments."

23          MR. SANTACANA:  Right.

24          THE COURT:  But I don't understand how this is going

25     to causation.

1          **MR. SANTACANA:**  It goes to causation because the

2     question is whether the description of law is the cause of

3     Google, down the road, making money on advertising.  If I don't

4     describe it as clearly, do people get exposed to more ads that

5     I make more money on?  That is Lasinski's ultimate conclusion,

6     but he just doesn't measure it well.

7          And so we brought this *Daubert*, and we -- and we said to

8     Your Honor -- we argued he's measuring the wrong but-for world,

9     and your only ruling was, "He's not required to measure it your

10    way.  He's not required to conceive it your way.  You can

11    attack him all you want and say that's unrealistic."

12         And so here's Knittel, and he's saying, "Well, hold on a

13    second.  There are people who use apps that have Analytics

14    products from six different Analytics providers, and you're

15    telling us that if they knew that the Google Analytics one was

16    going to send stuff to Google, then they would stop using the

17    app, or they would use the app less, which would drop Google's

18    ad revenue because they don't use it as much."  That's

19    Lasinski's theory, essentially.

20         And Knittel is saying, as a matter of economics, "You

21    could measure that, and you failed to."  You do actually find

22    out by how much it would drop, the fact that they use the app

23    when Meta's on there or LinkedIn is on there and Google is not.

24    He shows that there's very high opt-in rates for the WAA

25    button.  People opt in all the time, and that doesn't seem to

1    affect their behavior.

2        Lasinski could have compared, for example, do people who

3    are opted into WAA -- are they exposed to more ads that are

4    more valuable than people who opt out?  That would be another

5    thing that could have been measured that Lasinski failed to

6    consider.

7        What he does is he says a hundred percent -- a hundred

8    percent of the revenue that these people are generating is

9    caused by the now-description of WAA.  And that's like saying a

10   hundred percent of the juice bottle's revenue is caused by the

11   description of "all-natural"; or a hundred percent of the film

12   that has one infringing component in it is caused by -- or the

13   revenue of that film is caused by the one infringing component;

14   or a hundred percent of the laptop's revenue is caused by the

15   patent-infringing RAM chip in the laptop.

16       And we know, from all those other contexts, that that's

17   not --

18           **THE COURT:**  But if you establish, say, using the juice

19   analogy, that there's been a deception, and the jury agrees

20   with it, that there's been a misrepresentation of the -- the

21   item, it's not -- then doesn't the burden shift to, if they

22   found that -- you're saying, "Well, they can't assume that

23   that's a hundred percent of the reason."

24       But they -- isn't it, then, your burden to show why it

25   isn't a hundred percent?  So --

1          **MR. SANTACANA:**  Two responses.

2      The second response, which is the direct response to your

3  question, is we do show it.  Knittel's -- and I just listed

4  three of them.  There's seven different arguments that he makes

5  in seven different paragraphs from an economic -- economist's

6  perspective of why it would be lower.

7      So he does -- he doesn't just say --

8          **THE COURT:**  He doesn't quantify it.  He doesn't --

9          **MR. SANTACANA:**  He doesn't quantify it.

10         **THE COURT:**  He doesn't tell the jury --

11         **MR. SANTACANA:**  No.

12         **THE COURT:**  -- how to do it.

13         **MR. SANTACANA:**  And we won't ask the jury for a

14  different number on this basis.  That's not what we're going to

15  do.  So -- so there's a perfect match there.

16      But the first response to your question and, I think, the

17  more important one, in my view, is that if you -- if you think

18  about the -- the burden question and the causation issue,

19  the -- the discussion that we're having right now is all the

20  evidence we need, that a classic battle of the experts over

21  whether or not the revenue was 100 percent caused by the

22  description of WAA is a perfectly admissible and permissible

23  thing to have at a trial.

24      The jury could agree with us, and they could agree with

25  Lasinski, but to exclude Knittel's rebuttal to Lasinski's view

1  of why the revenue was -- was garnered in the first place, what

2  the causes of that revenue were, would be unfair.  It would be

3  prejudicial to Google.

4      He takes a position, he looks at the facts, and he says,

5  "If you had a duty" -- "if you had disclosed the" -- "if you

6  hadn't disclosed this the way that you did, you would have made

7  zero dollars instead of all of the dollars."

8      And Lasinski's saying, "I can poke holes in that.  There's

9  some problems with your analysis."  That's a classic battle of

10  the experts, and I don't think he has to put up a specific

11  number.

12      **THE COURT:**  I guess I'm still hung up on your point

13  about this is -- this is going to causation.  I just -- I

14  frankly don't understand it.

15      If -- if, as the case proceeds, the plaintiff, should they

16  be able to prove the -- and let's, for simplicity, use the --

17  the con- -- you know, the consumer item, a bottle of juice or

18  whatever.

19      If they prove a deceptive label and -- and then -- and

20  that it -- it has had -- and it has had a damage element --

21  they're saying someone was damaged, not to the quantification

22  of that, they've established liability.  We're beyond

23  causation.  Then we're into what's the damage.

24      **MR. SANTACANA:**  I understand.  I'm sorry.  I think I

25  understand what you're saying.

1      So the causation question is not -- is not causation of an

2  injury.  The disgorgement analysis, under the restatement and

3  under the law, requires a separate causation analysis.

4        **THE COURT:**  All right.  But then we're already into

5  the -- a different phase if you go up the case.

6        **MR. SANTACANA:**  Yes.  Absolutely.  Yeah.

7        **THE COURT:**  So we -- then -- then when we're in that

8  phase, isn't the -- isn't their point that the burden has now

9  shifted?

10       **MR. SANTACANA:**  No.  The -- their burden is, in the

11  first instance, to put up a number --

12       **THE COURT:**  To show them?

13       **MR. SANTACANA:**  -- of -- of -- of wrongfully garnered

14  revenue.  So I'll give you an example, and I think he proposed

15  the same example.

16      If Lasinski got up there and he said the reason -- and he

17  said all of Google's revenue last year was garnered as a

18  consequence of the misdescription of WAA, Knittel would get up,

19  and he'd say -- he'd say, "You're measuring the wrong thing" --

20  right? -- "because some of that revenue did not come from this

21  misdescription of WAA."  They're not -- there's a mismatch of

22  causation.  This is just another more granular example of that.

23      So, obviously, with the juice company, nobody says, "All

24  of your juice's revenue comes from this one bottle, but when

25  we're at the level of the single bottle, it's still" --

1    "there's still further questions to ask about causation."

2         So disgorgement causation, which, in the restatement, is

3    called -- actually, they talk about it as causation, and then

4    they use some other words.  And they sometimes call it

5    "restitution" in that same section, and they talk about why

6    there's so much confusing terminology and people use different

7    words.

8         But -- but the point is it is their burden, in the first

9    instance, to say what is the revenue that Google made thanks to

10   its unlawful conduct.  And that "thanks to" is where Knittel

11   takes issue, and he says, "Google would make money on ads, even

12   if it described WAA more clearly, and you didn't attempt to

13   find out how much money it would have made."

14        You could have, just like the juice guy can figure out how

15   many juice bottles you'd sell.  They can do surveys.  You do

16   analysis or even just a qualitative, and they didn't attempt a

17   qualitative.  He just said it's a hundred percent, and

18   Your Honor said he's allowed to.

19        We -- we tried to exclude the 100 percent as so

20   unrealistic, it's not fair, and you said he's allowed to go

21   ahead and attack it.  So here we are.  We're attacking it.

22             MR. SILA:  If I may just respond, Your Honor --

23             THE COURT:  Go ahead.

24             MR. SILA:  -- he talked a lot about the juice case and

25   false advertising.  Google would very much like it if this were

1    a false advertising case.  It is not.  It is a case about

2    collection of data without permission, and so that's the

3    framework in which we're operating.

4         It's not so much that the -- the damage has to be

5    attributable to a false advertisement.  It's the data has to --

6    the -- the dollars have to be attributable to the data that

7    Google cook [sic] -- took in violation of law.  That's what

8    Mr. Lasinski calculated.

9         And that's what -- Dr. Knittel has an obligation, to prove

10   any deductions, to say, "Well, we might have gotten data, you

11   know, in compliance with law, or maybe we could have gotten the

12   money without this data."  It's Dr. Knittel's burden to prove

13   up what that number is, and -- I mean, Google admits he doesn't

14   do that.

15        So what Google is going to say is -- and does say -- is,

16   "At trial, we're not going to ask Dr. Knittel for a different

17   number," but that's just code for them.  They're going to ask

18   the jury to -- to throw out Mr. Lasinski's entire opinion on

19   the basis that Mr. Lasinski allegedly didn't consider these

20   but-for worlds.

21        When Google talks about but-for worlds, this is a subtle

22   way to shift the burden on deductions back away from Google to

23   Mr. Lasinski.  And on that point, I do think it's helpful to

24   revisit the class certification order where -- which addressed

25   precisely these two kind of but-for worlds.

1    This is from Page 21 of the class certification order, and

2  Your Honor rejected the argument that -- you know, Google, you

3  know, raised this point that Lasinski allegedly did not

4  consider user reactions for adequate disclosure or change in

5  behavior by Google ad- -- or advertisers if Google didn't keep

6  this data.

7    Your Honor said that Lasinski is not required to examine

8  whether Google could have profited otherwise.  He's not

9  required to do so because what he did offer is sufficient in

10  and of itself.  And then Your Honor said next, quote,

11  "Furthermore, Google bears the burden of quantifying recouped

12  profits."  That's directly relating to these specific but-for

13  worlds that we're challenging here today.

14    Google bears the burden to quantify it, and Google has not

15  done so.  Dr. Knittel hasn't done so.  Instead, he's just

16  asking the jury to throw out the entire award, which is

17  essentially a 100 percent deduction, which just doesn't track.

18    And I do want to just point out -- because we're not

19  taking issue with the fact that Dr. Knittel can try to prove

20  deductions.  Mr. Santacana alluded to -- to some other

21  deductions that we're not -- we're not challenging.  He talks

22  about costs, for example.  That's fine.

23    If he had undertaken, you know, the analysis that he

24  thinks is necessary to quantify how much Google would have made

25  in this alternative scenario, where Google makes an adequate

1   disclosure, we would still have some problems with that

2   opinion -- I've addressed them.  It's the wrong but-for

3   world -- but this wouldn't be one of them.

4       It's -- it's not consistent with law for Dr. Knittel to

5   suggest that Mr. Lasinski bore the burden of carrying -- of --

6   of quantifying what this but-for world would look like.  And --

7   and if he's permitted to do so, he's going to confuse the jury,

8   and they might throw out his -- his opinion on a legally

9   improper basis.

10          THE COURT:  Okay.

11          MR. SANTACANA:  Your Honor -- I would like to say a

12   couple things, Your Honor.

13          THE COURT:  Briefly, yes.

14          MR. SANTACANA:  So on the question of Google bearing

15   the burden, I want to be really clear that the opinion that has

16   been attacked is not an opinion about profits that Google would

17   recoup.  This is an opinion that is saying Lasinski has

18   measured the wrong thing.  It's not different than saying if he

19   had just measured all of Google's revenue -- where he would

20   say, "Not all of it was caused by this."

21       It is -- it's interesting.  Every time we come here, one

22   of us wants to talk about this case as a false advertising case

23   and the other as a privacy case, and it tends to switch back

24   and forth.  The reality is that it is both, but the wrongful

25   conduct here is not the collection in a vacuum.  The wrongful

1   conduct that we have to measure is the failure to gain

2   authorization.   That's the element in both existing claims.

3        And the question is:  By failing to gain authorization,

4   how much more money did Google make?  That would be the

5   disgorgement question, and Knittel is just saying Lasinski's

6   answer to that question is not a good one.  Here are seven

7   reasons why -- in Paragraphs 70 through 78, why his answer is

8   not very good.

9        And, yeah, if he doesn't carry his burden, then he loses,

10  and the plaintiffs lose.  That's how it works.  It's his burden

11  to demonstrate that there were profits made -- or revenues

12  made, I should say -- revenues made as a consequence and as a

13  failure to gain authorization, and then it's our burden to say

14  what the costs were so that we can reach a profit number.

15       And Knittel has other opinions about all the costs and

16  deductions, and he puts up specific numbers about that, and

17  those are not being challenged.  So this is eight paragraphs

18  that are just saying, "Your analysis is bunk."

19           THE COURT:  I understand.  Okay.

20           MR. SILA:  If I may just briefly respond to one point,

21  and then I'll move on to the second.  I know we've belabored

22  this point.

23           THE COURT:  Yeah.

24       What's the other -- okay.  Go ahead.

25           MR. SILA:  So -- so the point that -- that

1  Mr. Santacana raised is that this is essentially the same

2  criticism as if Lasinski had just said Google should have to

3  disgorge every single dollar that it made across the entire

4  company.  It's not.

5      Mr. Lasinski looked at what revenues Google made using the

6  data that it collected unlawfully.  He's not looking at, for

7  example, Google's revenues from Waymo and other, you know,

8  unrelated things from the data.

9      And that's really the -- the important distinction here,

10 is Mr. Lasinski identified the gross benefit that -- at least

11 the gross benefit.  He actually did deduce some costs, but he

12 at least identified the gross benefit, and now it's Google's

13 turn to -- to, you know, quantify deductions.

14     **THE COURT:**  Okay.  What's the other point?  We are --

15 I don't want to -- we can't go much beyond two hours without

16 taking a break, and I would prefer not to have a break and

17 resume.

18     So what is -- what's left?

19     **MR. SILA:**  So this next point is -- is -- is -- raises

20 some of the same issues, but there's a second kind of but-for

21 world that Dr. Knittel raises.

22     And he imagines, "Well, maybe Google could have invented a

23 way to serve ads without collecting sWAA-off data" -- because

24 recall that Google makes money, in part, by collecting the data

25 in the form of an ad request, which includes information about

1    the user and what app they're using.  And Google uses that

2    information to serve the ad, which makes them money.

3        And so Dr. Knittel says, "Well, maybe in this but-for

4    world, Google could have invented some new way to do this

5    without sWAA-off data."  There is absolutely nothing in the

6    record that suggests that this is possible.  In five years of

7    litigation, Google hasn't put together -- put forth a single

8    witness about how this could work.

9        I asked -- I happened to take Dr. Knittel's deposition.  I

10   asked him about this opinion, and he said he didn't even know

11   how it would be possible.  His quote was he, quote, "could not

12   think of a way, but Google is full of very smart people, and I

13   would imagine that they would think, or could potentially

14   think, of a way to monetize that space in some way."

15       So this actually goes a step further than the issue we

16   were just discussing because I think we can agree that, in

17   theory, it's possible for Google to edit its disclosures.

18   Dr. Knittel hasn't identified any technological evidence that

19   the but-for world he's identifying is a real one, as -- as

20   opposed to one that's in his imagination.

21       Google's identified a couple of -- couple of other kinds

22   of things Google claims it does without sWAA-off data.  We

23   disagree, but they're an entirely different set of activities,

24   and they pose different challenges.  I'm happy to explain why,

25   but I'm mindful of the time.  So I don't want to go into it if

1    Your Honor doesn't have questions.

2        But suffice to say that there's nothing in Google's expert

3    report, from its damages expert, from its technical expert,

4    from its other experts in this case that talk about delivery of

5    ads without sWAA-off data.  It just -- it just doesn't come up.

6        And so for Dr. Knittel to get on the stand and tell the

7    jury, who probably thinks Google engineers are smart, like

8    Dr. Knittel -- to say, "Look, I think Google engineers are

9    smart, and I bet they could imagine a way to do this if they

10   could figure out this puzzle."

11       "I don't know how" -- "I don't know how effective it would

12   be.  I don't know how expensive it would be or how many people

13   would adopt it.  I don't know how many" -- "how much in profits

14   Google might have been able to make had it done this imaginary

15   other thing."

16       Maybe that would be persuasive to the jury, but it's based

17   on nothing, no foundation at all.  It's not the proper subject

18   of an expert opinion.  And that's in addition to issues about

19   quantification and things like that, but we think that's a

20   pretty open-and-shut baseless expert opinion.

21       **MR. SANTACANA:**  Dr. Knittel is not going to get on the

22   stand and say that.  The problem is that the paragraph that

23   they've identified that they want to strike doesn't say that,

24   either.  He did say that in response to a question where he was

25   invited to imagine things, but what he's actually saying is

1    this.

2        Lasinski has a separate opinion that says this is closer

3    to -- you know, you would give up all of the revenues of the

4    whole company.  He has a separate opinion that says, "Well,

5    thanks to the description of WAA, Google would just shutter its

6    advertising business for anybody that turns WAA off."  So when

7    you go onto a web page and there's supposed to be ads there, if

8    you have WAA off and Google knows it, I guess, in their view,

9    it would just be a blank space.

10       And Knittel makes the brief -- it's in one paragraph, the

11   brief but, I think, obvious point, and also a point from the

12   perspective of an economist, that that is not realistic, that

13   they're not going to shutter an entire business and stop

14   serving ads just because there's a failure to disclose exactly

15   what a particular button does or doesn't do.

16       That's as far as he's going to go.  He doesn't present a

17   specific alternative.  He -- he -- his report does not say,

18   "There's smart people at Google, and I imagine they'll do it

19   this way or that."

20       He's just saying, as a matter of economics, Lasinski's

21   second backup scenario, with an inflated number that says

22   Google would just stop serving ads completely, is, as a matter

23   of economics, also unrealistic.

24       You had a -- you had a discussion earlier about incentives

25   with the other counsel.  That is really all he's doing -- is

1    saying.  You know, it's a little bit of, "Life finds a way."

2    Companies don't just stop making money because a court said

3    that WAA had to be described this way versus that way.

4            THE COURT:  Okay.

5            MR. SILA:  If I may just respond just very briefly.

6            THE COURT:  You have one minute.

7            MR. SILA:  Yep.

8        There -- he can have his opinion about what is

9    economically, you know, incentivized for Google, but Google

10   wouldn't be able to serve the ads as a technical matter.

11   There's no physical capability -- at least Knittel hasn't

12   described one -- to be able to do this.

13       And for him to suggest, without any basis, that life finds

14   a way is, you know, not the stuff of expert opinion.

15           THE COURT:  Okay.  All right.  I'll take it under

16   submission and get you an order.

17       I was looking at the calendar and thinking about this

18   case.  For your planning purposes, as you're getting ready for

19   the trial of this action in August, as you know, I give the

20   parties a certain number of hours to try the case, and they use

21   the hours any way they see fit.

22       I'm probably going to give each side 20 hours in this

23   case.  So work with that.

24       Okay.  Thank you.

25           ALL:  Thank you, Your Honor.

1            **THE CLERK:**  Thank you, James.

2                (Proceedings adjourned at 3:24 p.m.)

1

2

3                          **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5       from the record of proceedings in the above-entitled matter.

6

7       DATE:   Monday, May 26, 2025

8

9

10

11       _____

12            James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                          U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25