# EXHIBIT M

Pages 1 - 72

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg

ANIBAL RODRIGUEZ, et al.,      )
                               )
            Plaintiffs,        )
                               )
    VS.                        )    **NO. 3:20-cv-04688 RS**
                               )
GOOGLE, LLC,                   )
                               )
            Defendant.         )
_____)

                        San Francisco, California
                        Thursday, July 25, 2024


### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

For Plaintiffs:
                    BOIES, SCHILLER & FLEXNER, LLP
                    333 Main Street
                    Armonk, NY 10504
              BY:   **DAVID BOIES**
                    **ALEX BOIES**
                    **ATTORNEYS AT LAW**

                    BOIES, SCHILLER, FLEXNER, LLP
                    44 Montgomery Street, 41st Floor
                    San Francisco, CA 94104
              BY:   **BEKO OSIRIS REBLITZ-RICHARDSON**
                    **MARK C. MAO**
                    **ATTORNEYS AT LAW**


              (Appearances continued on next page)



REPORTED BY:  Rhonda L. Aquilina, RMR, CRR, CRC
              CSR No. 9956, Official United States Reporter

**APPEARANCES cont'd.**

For Plaintiffs:

            BOIES, SCHILLER, FLEXNER
            100 SE 2nd Street, Ste. 2800
            Miami, FL 33131
    BY:  **JAMES W. LEE**
        **ATTORNEY AT LAW**

            BOIES, SCHILLER, FLEXNER, LLP
            2029 Century Park East, Ste. 1520
            Los Angeles, CA 90067
    BY:  **M. LOGAN WRIGHT**
        **ATTORNEY AT LAW**

            SUSMAN, GODFREY, LLP
            One Manhatan West
            395 9th Avenue, Ste. 50th Floor
            New York, NY 10001
    BY:  **ALEXANDER PATRICK FRAWLEY**
        **RYAN SILA**
        **ATTORNEYS AT LAW**

            MORGAN AND MORGAN, P.A.
            201 N. Franklin Street, 7th Floor
            Tampa, FL 33602
    BY:  **JOHN A. YANCHUNIS**
        **RYAN MCGEE**
        **ATTORNEYS AT LAW**

For Defendant:

            WILLKIE, FARR & GALLAGHER, LLP
            333 Bush Street
            San Francisco, CA 94104
    BY:  **EDUARDO E. SANTACANA**
        **BENEDICT Y. HUR**
        **ARGEMIRA FLOREZ**
        **SIMONA A. AGNOLUCCI**
        **ATTORNEYS AT LAW**

1    **Thursday - July 25, 2024**                                    **1:28 p.m.**

2                          **P R O C E E D I N G S**

3                              ---o0o---

4          **THE CLERK:**  Calling case 20-CV-4688, Rodriguez versus

5    Google.

6       Counsel, please state your appearances.

7          **MR. BOIES:**  Good afternoon, Your Honor.  David Boies

8    from Boies, Schiller & Flexner on behalf of plaintiffs.

9          **THE COURT:**  Good afternoon.

10      Go ahead.

11         **MR. MAO:**  Good afternoon.  Mark Mao, Boies, Schiller.

12         **MR. LEE:**  Good afternoon.  James Lee, Boies, Schiller.

13         **MR. YANCHUNIS:**  Good afternoon, Your Honor.  John

14   Yanchunis with Morgan and Morgan.

15         **MR. SILA:**  Good afternoon, Your Honor.  Ryan Sila from

16   Susman, Godfrey.

17         **MR. McGEE:**  Good afternoon, Your Honor.  Ryan McGee

18   from Morgan and Morgan.

19         **THE COURT:**  Good afternoon.

20         **MS. SANTACANA:**  Good afternoon, Your Honor.  Eduardo

21   Santacana of Willkie, Farr & Gallagher for Google.  And I have

22   counsel here who can introduce themselves.  We also have

23   in-house counsel from Google.

24         **MR. HUR:**  Good afternoon.  Ben Hur also from Willkie,

25   Farr.

PROCEEDINGS

1          **MS. AGNOLUCCI:**  Good afternoon.  Simona Agnolucci also

2     from Willkie, Farr.

3          **MS. FLOREZ:**  Good afternoon.  Argemira Florez, also

4     from Willkie, Farr.

5          **THE COURT:**  Good afternoon.  So we are here on

6     Defendant's Motion for Summary Judgment.

7          I will look to the moving party to start the discussion.

8     I don't -- I think you may have provided or some indication

9     you've provided some additional material in the form of

10    demonstrative, I guess we can call it, items.  Generally I

11    don't like those for motion arguments.  It's not that parties

12    intend this, but it is a bit of an end run around our page

13    limits.  In patent cases I've given up because they use it in

14    every single one, Power Points and other things.

15         I won't preclude you from using it, and you can make

16    reference to it, but certainly for consideration of the motion

17    I'm not going to be relying on any of the materials that you

18    use in that fashion, because at best they are demonstrative

19    materials.

20         Okay.  So if the moving party wants to begin.

21         **MS. SANTACANA:**  Thank you, Your Honor.

22         I'm actually not aware of any demonstratives on either

23    side in this matter.

24         **THE COURT:**  Oh, good.

25         **MS. SANTACANA:**  I don't know if the plaintiffs have

PROCEEDINGS

 1   any, but we do not.

 2        **THE COURT:**  I thought I was told that somebody had

 3   submitted some materials, but maybe I'm mistaken.

 4        Okay.  Go ahead.  So you're not patent lawyers, so that's

 5   great.

 6                        (Laughter)

 7        **MS. SANTACANA:**  Not today.

 8        Your Honor, there are three central reasons why this case

 9   should be dismissed.  First, Google said what it meant and it

10   did what it said.  Second, to the extent Google didn't get the

11   language exactly right, what it did do with the data in

12   question was harmless and not highly offensive.  Third,

13   Google's intent, backed up by major investments and

14   safeguarding pseudonymized user data, cannot give rise to

15   liability under the two remaining claims in the case.

16        I'll turn first to consent.

17        Google's internal view of the WAA button was exactly what

18   it told users it was, that the button should control whether

19   app activity data is saved to a user's Google account or

20   instead treated as non-personal information.

21        **THE COURT:**  Let me just stop you on this.  What

22   constitutes personal information and what would a user

23   understand that characterization to be?

24        You take the position that it's just crystal clear that if

25   you read through your privacy policy any user is going to

**PROCEEDINGS**

1  understand the distinctions that you're drawing.  But on what

2  do you base that?

3      I mean, this label "personal information" and that being

4  what, you think the user understands is the only thing that's

5  not being shared; is that really reflected in your privacy

6  policy materials?

7          **MS. SANTACANA:**  It is, Your Honor.  And I want to make

8  one preliminary point before answering your question, which is

9  that to the extent a user is unclear about what personal

10  information is and is not, it's not clear to me that that

11  should inure to Google's detriment here, and the reason for

12  that is because Google secured an underlying express consent

13  for the data collection in question, which is basic ad

14  recordkeeping collection and analytics customer servicing.

15      The question here is whether the plaintiffs clearly

16  withdrew their consent after giving it to Google by turning WAA

17  off.

18          **THE COURT:**  I mean, they made their -- the users, who

19  are the class members here, made it known in no uncertain terms

20  that they didn't want some of their information shared.  Now,

21  whether or not, as you say, they should have been clear on

22  what's being saved and not, we can all agree that --

23          **MS. SANTACANA:**  Yes.

24          **THE COURT:**  -- these class members took the

25  affirmative step of switching off the --

1        **MS. SANTACANA:**  Yes.

2        **THE COURT:**  -- the two switches, if you will.

3        **MS. SANTACANA:**  Yes.  And if you look at their

4   briefing, every single time they talk about scope of consent,

5   they say that the legal standard is consent is not an

6   all-or-nothing proposition, you have to look at the context, it

7   might be yes for this and no for that.  And so the same applies

8   when we're talking about withdrawal of consent.  They asked to

9   withdraw consent for something.  The question is how broad is

10  that scope.

11       So your specific question was, what is the definition of

12  "personal information?"  How do they know the difference

13  between personal and non-personal information?  It's actually

14  right in the privacy policy.  The first paragraph in the

15  privacy policy says if there's anything in here you don't

16  understand, click here, read the key terms definitions.

17       There's three key terms that are relevant to this motion.

18  the first is "Google Account," the second is "non-personally

19  identifiable information," and the third is "personal

20  information," which is where I'm going to start.

21       So, the WAA button says it controls what is, quote, saved

22  to your Google account.  The definition of personal information

23  says this is information which you provide to us which

24  personally identifies you, such as your name, email address,

25  your billing information or other data which can be reasonably

1  linked to such information by Google, such as information we

2  associate with your Google account.  Associate with your Google

3  account.

4      So here, again, Google is mirroring the language in the

5  WAA control, and it does it all throughout the privacy policy,

6  right?  In the main body of the privacy policy, what Google

7  says is this is what a cookie is, this is what similar

8  technologies to cookies are.  And we say information we collect

9  when you're signed in, in addition to information we obtain

10  from partners, quote, may be associated with your Google

11  account.  When information is associated with your Google

12  account, we treat it as personal information.

13      This is unlike page 4 of the privacy policy.

14      **THE COURT:**  What does "associated with your Google

15  account" mean?  I mean, I may have this wrong, and plaintiffs

16  can correct me, but I thought the plaintiffs were suggesting

17  that some of the information at issue here does link up with

18  certain devices.  I know you say it's all anonymized and nobody

19  can figure out exactly who is involved here, but it does link

20  up to -- there's some information that links up to particular

21  devices, doesn't it?  And those devices are then connected to

22  people, right?

23      So why is it that it -- you say it can't, as a matter of

24  law, because we're in summary judgment, and you're saying

25  there's just no dispute about it, that there is no way that the

**PROCEEDINGS**

1  information that's at issue here can be in any way associated,

2  and that was the word you just used, with individuals.

3      **MS. SANTACANA:**  Well, again, the question is not could

4  it be associated with your personal information or could it be

5  associated with your Google account.  This is not a case about

6  the theoretical conduct Google could have engaged in.

7      **THE COURT:**  Why not?  I mean, if you are collecting

8  information that could be used for that, why wouldn't that be

9  relevant in this case?  You're saying it has to have been used

10  in that fashion to link back up to individuals?

11      **MS. SANTACANA:**  Of course, Your Honor, because

12  otherwise it's a theoretical concern.  So Google --

13      **THE COURT:**  There may be value -- plaintiffs may view

14  that they have, class members, that there's value in that

15  information because it could be used in that fashion.

16      **MS. SANTACANA:**  That may be the case, but that doesn't

17  mean that Google has engaged in an intentional invasion of

18  privacy or a violation of the CDAFA.

19      So if we're looking at the legal claims in question,

20  Google actually has to engage in invasive conduct.  The fact

21  that it could happen one day if a bad actor circumvented

22  Google's protections --

23      **THE COURT:**  But I think you're looking at it from the

24  wrong perspective.  It's not what theoretically could happen or

25  not.  It's what information is being -- is being accessed.

**UNITED STATES COURT REPORTERS**

PROCEEDINGS

1      You're saying you are telling the user nothing that can be

2   associated with you is being collected, and now you're sort of

3   saying, well, theoretically, if it is used in a particular way

4   it could connect up to an individual user.

5          MS. SANTACANA:  No, Your Honor.  I'm actually -- I'm

6   not saying either of those things.

7          THE COURT:  Okay.

8          MS. SANTACANA:  So Google's WAA control doesn't say

9   what -- the way you just phrased it.  What it says is give us

10  permission to save data in your Google account.  The question

11  is did Google save it in your Google account or not.

12     Now, what Google -- and I think it's undisputed that

13  Google isn't saving it in your Google account.  That's why five

14  times in their brief they put an ellipsis in that phrase rather

15  than actually use it, because they don't want to focus the case

16  on that.

17     It is undisputed that Google doesn't save it in your

18  Google account and doesn't associate it with any reasonable

19  definition of personal information.  In fact, the California

20  legislature has in the CCPA already embodied this idea that you

21  can de-identify and pseudonymize data by attaching it to an

22  identifier that is randomly associated and that is not

23  connected to a person's identity.  That's the representation

24  that Google made.  That's the only representation that Google

25  should be responsible for here today, because that's the basis

PROCEEDINGS

1    of the case.

2        I think to some extent what Your Honor is asking is more

3    of a policy question.  But the specific disclosure in the

4    button says "saved data in your Google account."

5        Now, the second part of your question was, you were saying

6    our argument is, well, it could be, but it hasn't been.  That's

7    not our argument.  Our argument is that it cannot reasonably be

8    linked.  Why?  Because Google -- first of all, Google created

9    the system that exists, right?  This system is there because

10   Google created it.  It has a privacy policy that discloses that

11   it will collect certain information, and it has this button

12   that says what it will and won't do with that information,

13   right?  In this case app activity data.

14       That same system prohibits the connection from one to the

15   other.  And there's no allegation in the case that there's a

16   data breach or that Google sold it to a third party.  None of

17   that is in this case.  There's no evidence of that.

18       So what we're talking about is Google creates two buckets,

19   and it successfully kept the buckets apart.  In the words of

20   their expert, Google has attempted, with the best of

21   intentions, but who knows maybe one day they turn evil.  That's

22   what he says in his deposition:  "Maybe one day they turn

23   evil."

24       But right now, looking back for past damages, the two

25   buckets have remained separate.  The system worked.

**PROCEEDINGS**

1    And I want to be very clear about this.  If the plaintiffs

2    had identified any example of Google failing at keeping those

3    buckets apart, of Google connecting this data, quote,

4    associating it with personal information under any reasonable

5    definition, they would be jumping up and down screaming about

6    it in their brief; they would be jumping up and down

7    screaming -- I don't know if Mr. Boies jumps up and down and

8    screams, but somebody would be doing that.  I don't think

9    there's any evidence of that.  There's -- it's not in their

10   brief.  They never found any instance of that ever happening.

11       Instead, what they did was they theorized that there are

12   concerns within Google or within their expert's opinions that

13   it could be done by a bad actor, one day, if Google's systems

14   were to change.

15       This is a case about Google's class-wide conduct.  It is a

16   case about past damages, and so in the past Google didn't do

17   that.

18       **THE COURT:**  Okay.

19       **MS. SANTACANA:**  The other point I want to make about

20   consent, Your Honor, before I turn to harm, is that when we're

21   talking about the description of WAA, at the motion to dismiss

22   stage Your Honor held that the definition of Google account was

23   nebulous at best.

24       I want to be -- I want to read to you what Your Honor was

25   evaluating at the time, because I think it is lost in the

PROCEEDINGS

1  briefing.  The opposition to the motion to dismiss the first

2  amended complaint, parroting the allegations of the first

3  amended complaint, was arguing that Google was associating,

4  quote, that data with Google's preexisting profiles thereby

5  enriching those profiles with data Google was not supposed to

6  have, and that Google services target users based on this data.

7      Now, it was in that context -- and there's more in the

8  brief, but it was in that context, this idea of a shadow,

9  quote, not your Google account, that Your Honor said, well,

10  "save to your Google account" is nebulous if what you're saying

11  is there's some shadow account that you're keeping that just

12  doesn't have your name on it.  That's not the case anymore.

13  They were unable to find any evidence that Google ever

14  personalized advertising or built marketing profiles using this

15  data.

16      What they found, which we told them from the beginning in

17  an interrogatory response four years ago, was we do keep

18  records that we serve ads.  That's it.  We have a randomly

19  assigned string of characters.  It is not connectable to a

20  person's identity, and it indicates that that device, that

21  string of characters was served and added a particular time so

22  that we can charge advertisers for it.

23      And they come and they say, well, the fact that you're

24  keeping the receipt means that you're using the WAA-off data.

25  And since you're using the WAA-off data, if I were to disable

**PROCEEDINGS**

1  you from keeping the receipt, you couldn't charge, and so every

2  single penny of what you've charged needs to be disgorged.

3  That's where we are now.

4      And so when we're talking about the scope of withdrawn

5  consent, the question has to be could a reasonable user believe

6  that when they turn WAA off, they not only disabled Google from

7  saving personal information, but they disabled Google from

8  saving a non-personal list of service of ads that is basically

9  just a ledger of receipts.

10     And our argument is there's no reasonable user who

11  could -- there's no reasonable reading of the language to

12  support that.  There's no phrase in the privacy policy or in

13  the description of WAA to support that view.  And without a

14  textual hook, I think on the language by itself Your Honor can

15  grant summary judgment.

16     Turning to harm, Your Honor, these two claims require --

17         **THE COURT:**  Going back for a second to consent.

18         **MS. SANTACANA:**  Sure.

19         **THE COURT:**  And this is maybe just a variant on my

20  first question, but effectively what I understand the

21  plaintiffs to say is that the -- a reasonable consumer is left

22  with the notion that nothing associated with me -- if they

23  exercise the affirmative decision with respect to the buttons

24  and say I want out of this -- that nothing associated with me,

25  anonymized or otherwise, anything that you have retrieved about

1    me is not going to be shared, that that is their reasonable

2    understanding.

3         And you've gone through -- and I understand it -- a fairly

4    sophisticated analysis of what, you know, the material that

5    ultimately may flow to the advertisers or whatever really is so

6    generalized as to be almost not, in a sense, associated with

7    the individual.  But from the individual's perspective don't

8    you think that at least it is fair that the user thinks nothing

9    associated with me, be it anonymous or otherwise, is going to

10   be shared?  Isn't that a fair understanding of what you think

11   the reasonable consumer thinks when they are electing those

12   buttons?

13        Now, you could say yes to that and say we still win.  But

14   isn't that fair?

15             MS. SANTACANA:  No, Your Honor, it's not fair.

16             THE COURT:  Okay.  And you really then think that

17   they -- that the minutiae of your privacy policy is what the

18   reasonable consumer should understand all of the -- and if they

19   have a question, they can go ask and this, that, and the other

20   thing -- that's really your position then, that the idea that a

21   consumer walks away with the notion that they're just telling

22   you don't, don't share anything at all about me, that that is

23   just -- they're wrong, they, you know, it's on them to

24   understand it more.  I mean, what is it?

25             MS. SANTACANA:  So I have several responses, if I may,

**PROCEEDINGS**

1  Your Honor.

2      **THE COURT:**  Okay.  It was a rambling question, so

3  that's fair.

4      **MS. SANTACANA:**  So first I want to make sure that we

5  are taking the appropriate 30,000-foot view on this question,

6  okay?

7      Google is a big company.  It has lots of privacy buttons,

8  about 13 of them, I think.  Data comes in from various sources

9  just like the WAA button says, as well as some other buttons

10  that control other sources of data.  It has a billion users

11  worldwide, and it speaks to those users, or some subset of

12  them, effectively every day through a variety of products - all

13  of which are free and are self-serve, so anybody can come,

14  agree to the thing, and start using it.

15      So Google has to find a way to explain technology, which

16  we can all agree is sometimes not that easy to explain to a

17  reasonable user as best as it can.  And I don't think that a

18  half billion-dollar jury trial is called for every time Google

19  fails to use the perfect words to describe itself.

20      So when you're talking about the user who thinks "I told

21  you nothing associated with me, whether personal or anonymized

22  should be saved," my question is based on what?  Which language

23  are you relying on, Reasonable User, to believe this?

24      Because when I look at the language, that is not what it

25  says.  And it's not that it's not what it says in some

**PROCEEDINGS**

 1  legalese --

 2          **THE COURT:**  Let me stop you there.  That's where --

 3  and I understand you -- I know what your answer was going to

 4  be.  But we are at summary judgment, so what you think is a

 5  reasonable interpretation is a perfectly legitimate analysis on

 6  your part.

 7      But what you really have to convince me of is that no

 8  reasonable person could have a contrary view, because unless

 9  and until you do that -- and I understand you say, well, the

10  specter of every time -- I forget your language -- every time

11  we're at a point that we've reached here, that the alternative

12  for Google is a bazillion-dollar trial -- well, I'm not sure I

13  entirely buy that.  There are places along the path that

14  they -- it doesn't automatically mean you go from point A to a

15  bazillion-dollar judgment.

16      But going back to what I'm saying, you know, am I right

17  that I have to effectively say your view is not only

18  reasonable, but it is the only reasonable view?

19          **MS. SANTACANA:**  No, I don't think you have to say

20  that.

21          **THE COURT:**  Okay.  Why not, on summary judgment?

22          **MS. SANTACANA:**  Because the standard on -- what we're

23  talking about is the written word.  And so generally in this

24  area of the law, although a recent Ninth Circuit panel noted

25  repeatedly that actually it's very unclear what the standard is

**PROCEEDINGS**

 1  in California on privacy consent.  But mostly we look at

 2  contract principles to understand what the written language is

 3  supposed to mean.

 4       Here, I'm looking at the language -- and Your Honor has

 5  done this at summary judgment before -- you know, *Pacific*

 6  *Drayage*, California contract law.  It's black letter law.

 7  We're going to start with the plain language.  Does the plain

 8  language support reasonable -- is it reasonably susceptible to

 9  the plaintiff's view of it?  That's the question.  It's not

10  that I have the only reasonable view of it.  I might be able to

11  give you 15 reasonable views of the language, but if none of

12  them is reasonably susceptible to the plaintiff's view, then

13  the plaintiff's lose.  That's the standard.

14       **THE COURT:**  Okay.

15       **MS. SANTACANA:**  And so when I look at this language --

16  it's the paragraph at the top of the WAA button that they have

17  in their complaint -- this is what it says, and I'm just going

18  to read it because I'm going to make sure that we're focused on

19  the plain language:  "The data saved in your account helps give

20  you more personalized experiences across all Google services.

21  Choose which settings will save data in your Google account"

22  and then it says Web and App Activity, and then there's some

23  more words about all of the different types.

24       The user that you're positing who says, well, I thought

25  that button means nothing, it's as though all Internet

1   connection between my -- google android device, by the way,

2   this is an android device -- my Google android device and

3   Google is severed completely, is not realistic or reasonable.

4   No -- it's just not reasonably susceptible to app use.

5       So now we're at, okay, fine, so we agree with that.

6   Obviously, the android device has to communicate with Google

7   somehow about some thing.  Google is going to save some of

8   that.  And the question is fine then what's the scope?  Now

9   we're talking about scope.  And does it include marketing

10  profiles?  Yeah, maybe.  I don't think we would get summary

11  judgment on that.  But there are no marketing profiles that

12  Google is saving when WAA is off.

13      Does it include an anonymized list of which ads were

14  served which Google uses solely for the purpose of charging

15  advertisers?  I don't think a reasonable user -- I don't think

16  there is a reasonable reading of this language that would say

17  that.  But if there were, at a minimum we would need to click

18  on the "learn more" button and look at the privacy policy.

19      And the privacy -- you said minutia, I really -- I don't

20  agree with that.  The privacy policy over and over and over

21  again draws a conceptual distinction, as best as Google can

22  with a billion users talking to them every day, constantly

23  changing privacy policy, but over and over they're saying

24  there's such a thing as personal information, and there's such

25  a thing as non-personal information, and they do their best to

PROCEEDINGS

 1  say personal information, non-personal information are

 2  different.  You can control this one, you can't control that

 3  one.

 4      So the necessary implication is there's something I can't

 5  control, and does ads recordkeeping fall under this one or that

 6  one, is the question.  Is it reasonably susceptible to the view

 7  that it's the same as a marketing profile?  No.  I really -- it

 8  doesn't fit.  But if Your Honor doesn't agree with that, then

 9  we have to look at harm.

10      And on the question of harm, as I said, there isn't a

11  single piece of evidence in the case that Google ever

12  associated this ledger of ad receipts, or for that matter the

13  analytics data that's in this virtual safe deposit box for

14  analytics customers with a person's identity, when WAA was off.

15      And because there's no evidence of that, even if we assume

16  that the expectation of privacy that is given rise to by the

17  WAA button includes anonymized data, the question is, well, is

18  it highly offensive to keep a receipt for the ads you serve and

19  only use it for that?  Is it highly offensive or does it cause

20  actual damage or loss, which is an even higher bar in CDAFA.

21  It has to be actual damage loss.  Does it cause actual damage

22  or loss for Google to keep a record of what it does when it

23  services an advertising account?

24      Under both of the remaining claims in the case, there's no

25  CIPA claim, there's no UCL claim, these are --

PROCEEDINGS

1          THE COURT:  Yep.

2          MS. SANTACANA:  -- these claims require a showing of

3    real harm.

4          Where the plaintiffs have landed in their opposition brief

5    is to rely on things like battery depletion and emotional

6    distress.  They say the harm from the invasion of privacy

7    itself satisfies the harm requirement of invasion of privacy.

8    That's not true.  It's not true.

9          Now, the reason this doesn't come up in an invasion of

10   privacy tort case very often is because an individual plaintiff

11   can say you hurt my privacy and it caused emotional distress.

12   At class cert. they disclaimed any reliance on that.

13         So then they say in the opposition brief:  Well, what

14   about batteries?  My battery is being depleted.  Under *Comcast*

15   *versus Behrend*, the Supreme Court case on class action damages,

16   the damages model they present at class cert. has to be tied

17   directly to the way in which they say the conduct gives rise to

18   liability.  The liability theory must match the damages model.

19   There's no damages model on battery depletion, so they can't

20   proceed on that.  We' have to redo class cert., and honestly I

21   think they're precluded at this point.  It's been four and a

22   half years.

23         So then we have to talk about the damages models that they

24   do have and this question of disgorgement.

25         So, again, the theory of the case on disgorgement is if

**PROCEEDINGS**

1    the restaurant serves you pancakes and you pay for the

2    pancakes, and it keeps a receipt and I told them no, you can't

3    keep receipts, then the entirety of what's paid for the pancake

4    must be disgorged, because you couldn't possibly charge for the

5    food if you didn't have the ability to keep the receipt.

6    That's the argument.  The receipt is the WAA-off data.

7         Under *TransUnion*, which postdates the *Facebook Internet*

8    *Tracking* case, that is not sufficient to satisfy the statutory

9    standing requirement under a statute like CDAFA, and it's not

10   sufficient to the actual harm.  The fact that the receipt may

11   have business value to Google does not amount to a harm to the

12   user.

13        And what's interesting is there's no actual testimony in

14   the case from a user, like a plaintiff or one of the five who

15   withdrew, that says I'm hurt by the fact that you kept a

16   receipt for advertising.  Each plaintiff, what they testified

17   to, was:  I am hurt by the fact that you targeted advertising

18   to me.  Because they were under the false pretense that that

19   was actually happening.

20        So the first person to ever identify the ad recordkeeping

21   activity as a problem was a lawyer on the plaintiff's side.  No

22   employee of Google ever brought it up, no plaintiff ever

23   brought it up, nobody has ever brought it up, because it would

24   never occur to anybody that that could cause harm to a person

25   or be highly offensive or breach social norms.

**PROCEEDINGS**

1          The cases on offensiveness and harm, including Your

2    Honor's own cases, were evaluating, the ones we cite in the

3    papers, were evaluating data collection that was far more

4    detailed than this.  Your Honor decided the *Williams* case in

5    2018 and the *Katz-Lacabe* case last year; there's also the

6    *Williams versus DDR Media* case by Judge Illston, the *Low versus*

7    *LinkedIn* case by Judge Koh, the *Hammerling* case, which was

8    affirmed by a panel of the Ninth Circuit on March 5th, and the

9    *McCoy* case, which is related to the *Hammerling* case, which was

10   decided in 2021 by Judge van Keulen.  All of those cases

11   evaluated data collection that included information, just to

12   use *DDR Media* as an example, information like every keystroke

13   entered on a web site associated with an identifier that was

14   de-identified.

15         And even there each one of those judges, including Your

16   Honor, said this isn't highly offensive; this is routine,

17   commercial behavior or not even, because it's de-identified.

18         The California legislature has passed a law now, since

19   this case was filed, the amendment to the law that says

20   de-identifying is a legitimate way to protect data.

21   Pseudonymization is a legitimate way to safeguard user data,

22   which is what Google is doing.  So if we're looking for clues

23   as to what is or is not highly offensive, that's another one.

24         What is not in the papers is any case that comes anywhere

25   close to the facts of this one where it is found to be highly

**PROCEEDINGS**

```
 1   offensive.  And there's two cases in our reply brief I want to
 2   call your attention to if you're looking for binding authority.
 3   Eichenberger versus ESPN is a Ninth Circuit case from 2017.
 4   That case is actually a lot like this one.  In that case what
 5   was alleged was that a Roku, which is a smart TV appliance for
 6   televisions, a Roku was recording the serial number of the
 7   device and the names of the videos that the user was watching.
 8       Here, we're not even doing that.  We're recording the
 9   serial number, the device, and the randomly served ad, which
10   the user has no real private expectation in any way.  I mean,
11   even if we were to proclaim from the rooftops that a particular
12   person was served a particular ad, it's not clear to me that
13   there's anything private about that.
14       But in any case, Roku is the device, serial number, and
15   the names of the videos the user watched.  And the Ninth
16   Circuit said that's not highly offensive.  That's routine,
17   commercial behavior.
18       The second one is the Zynga case in 2014, which on these
19   facts is much more like this case than the Facebook Internet
20   Tracking case from 2020, which is the one Your Honor was
21   following at the motion to dismiss stage when the allegation
22   was that we were keeping browsing histories to personalized
23   advertising.
24       The last thing I'll say, Your Honor, is about intent.  And
25   this one is I think near and dear to my heart as somebody who
```

1    has worked on this case for so long.

2        Google -- the evidence in this record is that Google had

3    an internal understanding of what the button was supposed to do

4    and it followed it.  It set up all these systems to make it

5    happen.  We had 14 people from Google, former and current

6    employees testify, all said the same thing.

7        These systems were put in place to safeguard user data and

8    user privacy.  That was Google's subjective understanding of

9    what it was attempting to do.  The two claims that remain here

10   are not strict liability claims.  They require intent.  They

11   require the intent that is missing when you take into account

12   just two facts.

13       Google summarized its own understanding pretty well about

14   what it was trying to do.  It may not be perfect.  It may not

15   be enough for Your Honor to grant summary judgment on consent.

16   But they did summarize it in a way that is perfectly consistent

17   with what they were trying to do, and they did it at a massive

18   cost, leaving much money on the table that could have been

19   used, that could have been made if they had personalized

20   advertising with this data, which is precisely what the

21   plaintiffs alleged we were doing, falsely.

22       So if Your Honor is to say that a reasonable juror could

23   find intent, my question to the plaintiffs would be based on

24   which fact?

25       And for them, what they say is, well, there's employees

1  who understood that WAA was confusing in one way or another

2  way.  What I want to be really clear about, Your Honor, is not

3  one of them, not one of them ever thought about this.  They

4  weren't thinking about Google keeping a record of which ads it

5  serves or which conversions are made.  When they said that it

6  was confusing, one of them said it was confusing because it

7  was -- the dutch translation wasn't very good.  Another one

8  said it was confusing because it wasn't clear what it means

9  when the WAA button is on.

10     The fact that it is sometimes confusing to some people

11 about something else does not manifest intent on the part of

12 the company, which has spent millions to do exactly what it

13 thought it had said it was going to do.  It doesn't manifest

14 corporate intent that there is this other set of people,

15 individuals who are a little unclear about other aspects of the

16 button.

17     So with that, Your Honor, I'll yield.

18         **THE COURT:**  Well, just while you're on intent, and,

19 again -- well, this doesn't really call into question what

20 you've just said, but as a general matter I think you would

21 agree granting summary judgment on intent is disfavored, if you

22 will.

23         **MS. SANTACANA:**  Agreed.  Completely.

24         **THE COURT:**  You think this case on the intent issue is

25 so strong on your side that it's subject to summary judgment.

1          **MS. SANTACANA:**  I -- I don't -- it's incredibly strong

2     because, as I said, the company put its weight behind its

3     subjective intent, and its subjective intent is consistent with

4     the language on the button and in the privacy policy.  So there

5     isn't really a hook to say, oh, the company is trying to --

6          Like, for example, if the plaintiffs had demonstrated that

7     the company was secretly profiting off this data by using it to

8     target advertising, that would be a very different case.

9     That's more like the case Your Honor let through at the Rule 12

10    stage.

11         Google isn't doing anything with the WAA-off data.  It is

12    using it to keep a record of the ads that it served.  It's

13    servicing analytics customers' accounts for free.  It is not

14    using the data to enrich itself or understand better its own

15    users.

16         So where is the fact that's giving rise to even the

17    plausible thought that there is intent.  It is disfavored.

18         Last week, Your Honor, Judge Chhabria held at the motion

19    to dismiss stage that the plaintiffs had failed to allege, in

20    an analytics case, had failed to allege enough facts to meet

21    the intent standard, because Google publicly says we are not

22    going to use data for health-related advertising.  This is in

23    the *Doe versus Google* case, which we can submit to Your Honor

24    if you're interested.  And the plaintiffs had no basis to argue

25    that that was a lie.

**PROCEEDINGS**

 1        Here, it's the same thing.  Where is the basis to say

 2   Google had secretly had a different intent that was sufficient

 3   to give rise to an intentional tort for invasion of privacy,

 4   which is typically reserved for some pretty serious conduct, or

 5   a violation of a state anti-hacking statute.

 6        I agree with the plaintiffs that the intent to do what you

 7   set out to do can sometimes be enough.  But when -- but here,

 8   the intent has to be read in the context of the disclosures

 9   that Google made.  So Google says I'm going to do this, and it

10   does that.  And the plaintiffs say, well, I didn't totally

11   understand what you meant.  Nobody else has ever taken the same

12   interpretation as the plaintiffs.  Does that really give rise

13   to liability?

14        **THE COURT:**  Okay.  I'll give you an opportunity to

15   respond, because you're the moving party, but I'll look to the

16   plaintiff, Mr. Boies.

17        **MS. SANTACANA:**  Thank you, Your Honor.

18        **MR. BOIES:**  Thank you, Your Honor.  And may it please

19   the court, my name is David Boies.

20        Let me begin with the issue of intent, Your Honor,

21   because --

22        **THE COURT:**  Aha!  Some materials.

23        **MR. BOIES:**  These are things I'm going to be referring

24   to, but they're, for the most part at least, not demonstrative,

25   so they're the actual evidence.  For example --

1          **THE COURT:**  Okay.  All right.

2          **MR. BOIES:**  -- I'm going to point you to the

3   beginning.

4      If we could go to chart number 2, because I want --

5          **THE COURT:**  Well, I won't quibble with you, but it --

6   we have things like statements that look like Power Points and

7   things.

8          **MR. BOIES:**  There are some Power Points.

9          **THE COURT:**  It's fine.  I gave my spiel.  You know my

10  general view of this for motion argument, but I'm not

11  precluding you from using it.  So go ahead.

12         **MR. BOIES:**  Thank you, Your Honor.  And I'm not

13  relying -- I'm not offering anything here except the actual

14  evidence.

15         **THE COURT:**  Okay.

16         **MR. BOIES:**  But the actual evidence is really critical

17  here, because you've heard a lot about what they think their

18  evidence is going to show.  But, respectfully, since this is a

19  summary judgment motion and they're the moving party, what's

20  really relevant is the evidence we're relying on.

21      The question is not whether they have evidence from which

22  they can make arguments.  The question is whether we have

23  evidence that creates a triable issue of fact.  And so you've

24  got to look at what the actual words are, because we don't

25  think the actual words are what they were saying the words are.

PROCEEDINGS

1    I mean, for example, they said:  All we ever promised to

2    do is not save personal information.  That's not what their

3    documents say, and I'm going to take you through it.

4         THE COURT:  Well, I assume your position is even if

5    that was --

6         MR. BOIES:  Even if that was the case, we think they

7    save personal information because, as they have said

8    themselves, if it can be reasonably -- could be, could be, not

9    it were, but could be reasonably linked, that's personal

10    information.  That's what the California statute says.  That's

11    what their definition says.  And there's no doubt here that

12    they can do it.  Their expert admits it.  Our expert says so,

13    and their internal documents say that they do it.

14    So they may say that they have these safeguards to prevent

15    people from -- bad actors from doing it.  But there's no

16    dispute in the record -- there's certainly far more than

17    necessary to create a triable issue of fact -- that they could

18    reasonably link this --

19         THE COURT:  So what do you say to Mr. Salcedo's (sic)

20    point that until they do it, no harm, no foul?

21         MR. BOIES:  Because, Your Honor, what they've done is

22    they've collected this very personalized information.  And if

23    you look at our expert report, Mr. Schneier, paragraph, I think

24    it's 89 --

25    Let me see number 73, because I think I've got it.  I

**PROCEEDINGS**

1   think I quoted it.  It's page 73 of what I've given you, I

2   think.

3        Can we put that up?  No?  Maybe.  Can we put up number 73?

4             **THE COURT:**  Well, I'm on your -- the Schneier report,

5   73.

6             **MR. BOIES:**  Yes.

7             **THE COURT:**  It's paragraph 89.

8             **MR. BOIES:**  Exactly.

9             **THE COURT:**  Okay.

10            **MR. BOIES:**  And if you look at that, you see the kind

11   of information that is being collected.  Now, they may say they

12   don't use that information.  They may say -- although I think

13   the evidence is that they use at least some of that

14   information.  But this is the kind of information that is being

15   collected, and that is exactly the kind of information that we

16   think is highly offensive to people, particularly when they're

17   told that information is not going to be collected.

18        Now, in addition, unlike the cases that they cite --

19            **THE COURT:**  But, actually, and this is jumping around

20   with you a bit --

21            **MR. BOIES:**  Yeah, sure.

22            **THE COURT:**  You know, the nature of the information, I

23   understand what you're saying, could be objectionable to a

24   particular class member in terms of the nature of the

25   information.  But if it is ultimately anonymized, then why

PROCEEDINGS

1    should they care?

2            **MR. BOIES:**  Well, I think there are two reasons.

3    First, they don't really claim it's anonymized.  They say

4    pseudonymized.

5            **THE COURT:**  That was a new word to me, but, okay.

6            **MR. BOIES:**  It's a new word to me, too, Your Honor.

7        I'm actually told they didn't invent it, that it existed

8    before, but they've certainly adapted it to a new use.

9        And the reason they don't say anonymized and they say

10   pseudo-anonymized is because this is tied to the device

11   identifier, and the device identifier can be tied to a person.

12   Even if the device identifier could not be tied to a person,

13   that device identifier is still a very personal identification.

14       For most people today their smart phone that they carry

15   around is the closest thing they have to their diary.  It

16   contains all of their private information.  It is what they use

17   to make purchases, to have their -- to have their personalized

18   information tied to their personal device is itself I think

19   something that people are -- would be concerned about.

20       But in addition to that, there's more, because they can

21   and do sometimes link the personalized device identification to

22   the name.  So what they've done is they've taken this

23   information, and it could be linked to the person.  That itself

24   is going to be concerning to people.

25       I mean, suppose that somebody puts a camera in a changing

**PROCEEDINGS**

1  room at a retail store, and they don't tell anybody so they

2  don't know what's happening.  They collect all this

3  information.  And suppose they blur the faces.  Does anybody

4  think that people wouldn't find that offensive, particularly if

5  they say they're not doing it?

6      The thing that distinguishes their cases -- well, several

7  things that distinguish their cases, but one of the things that

8  distinguish their cases, is that here, Google told people they

9  weren't going to do it.  And they didn't just say we're not

10  going to collect your personal information.  What they say is,

11  for example, in our Exhibit 36, in the summary judgment

12  submissions, screen 1.  "Activity Controls.  Choose the

13  activities and information you allow Google to save."  It

14  doesn't say choose the personal information.  It says choose

15  the information.

16      And they keep talking about Google account.  There's no

17  reference to Google account on this first screen.

18      There is a reference to Google account on the second

19  screen, screen 2.  But, again, no reference to personal

20  information.  It says in order to -- you've got to check a box

21  in order to "include Chrome history and activity from sites,

22  apps and devices that use Google services."  They're talking

23  about all the app activity.  All of the app activity is saved,

24  collected, and what they're telling people is that we're not

25  going to do it if you check this box or unless you check this

1   box.  If you've got this turned off, we're not going to collect

2   the information.

3        And the reference to Google account here is just -- is

4   choose which settings will save data in your Google account.

5   Google account is not defined there.  And if you go to the

6   definition -- what they call the definition, it's not really a

7   definition, it's just describing some of the stuff that's in

8   the Google account.

9        And then if you go to screen 3, okay, it says:

10  "Information about your browsing other activity on sites, apps,

11  and devices that use Google services," and then it says:  "To

12  let Google save this information," this information about the

13  app activity.  "To let Google save this information, Web and

14  App Activity must be on."  It doesn't say anything about we're

15  only going to save -- we're only going to not save personal

16  information.  It's talking about app activity.  "To let Google

17  save this information, Web and App Activity must be on."

18       Now, let me go to the next page which is a help page, WAA

19  help page, screen 3.  This is docket 315-17, at 2.  It says at

20  the beginning "Find and control your Web and App Activity."

21  And it says "Web and App Activity saves your searches and

22  activity from other Google services in your Google account."

23  Nowhere does it say or suggest that they're going to save it

24  anyplace else.  The suggestion that, well, we said we are not

25  going to save it in your Google account, but that doesn't mean

1    we're not going to save it someplace else.

2        This is a statement to people that the only place they're

3    serving it is the Google account.  So this idea that, well, we

4    reserve the right, even though we didn't say it, we reserve the

5    right implicitly that we could save this information, this app

6    activity stuff someplace else unless it was personal data.

7    There's no support for that in the actual documentation that's

8    here.

9        And then it says -- it lists all the -- "When activity is

10   on, you can include additional activity like," and it lists a

11   whole bunch of stuff.  And then it says "Information about your

12   browsing and other activity on sites, apps and devices that use

13   Google services to let Google save this information, Web and

14   App Activity must be on."

15       That's what they're saying, and that's what they're saying

16   in the specific stuff.

17       Now, in the -- they talk about their general privacy

18   policy.  That general privacy policy, when you print it out,

19   goes on for 27 pages.  Now, there's stuff in there that they

20   can quote, but there's also stuff in there that they ignore.  I

21   mean, for example, and I've got an extra up here, and this is

22   from pages 2 and 3 of Exhibit 8.  Exhibit 8 is the entire

23   policy.  It begins by:  "When you use our services, you're

24   trusting us with your information.  We understand this is a big

25   responsibility and work hard to protect your information and

PROCEEDINGS

1   put you in control."

2        And then it goes on to say later on:  "And across our

3   services, you can adjust your privacy settings to control what

4   we collect and how your information is used."

5        And then again it later on it goes on to say:  "The

6   information Google collects, and how that information is used,

7   depends on how you use our services and how you manage your

8   privacy controls."

9        There isn't anything here that says yes, but this only has

10  to do with your personal information.  Other stuff we always

11  collect, and you can't do anything about it.

12       They could have very easily put in here:  By the way,

13  except for personal information, whether your web activity is

14  on or off, we're going to collect all that information and log

15  it in.  They could have said that.

16       And interestingly, in their brief they quote -- they

17  haven't got this quote about their ad personalization, and they

18  point out that people can opt out of ad personalization.  And

19  then they say, and this is on page 13 of their opening brief,

20  they quote something that's in their privacy provisions:

21  Quote, even if you opt out of ad personalization, you may still

22  see ads based on such factors as your general location derived

23  from your IP address, your browser type, your terms of search.

24       They could have done that with app activity.  They could

25  have just as easily said even if you turn off WAA, we may still

**PROCEEDINGS**

 1   collect the following information.  They could easily have said

 2   that.  They didn't say that.  In fact, what they said is that

 3   for us to collect this information, to let Google save this

 4   information, Web and App Activity must be on.

 5        Now, on the question of intent, you notice counsel didn't

 6   go through any documents, internal Google documents talking

 7   about intent.  I want to go through some of those.  Let me

 8   start at my number 12.

 9        This is an internal Google email, 2019, December, from a

10   Google executive.  "Isn't WAA-off supposed to not log at all?

11   At least that is what is implied from the WAA page."  This

12   isn't counsel's argument.  This isn't counsel making it up.

13   This is contemporaneous Google.

14        Let's go to the next page, November of 2019, a different

15   Google software engineer and copying a whole lot of other

16   people:  "I think teams should not use user data at all if WAA

17   is off.  It's what I would think most users expect."  This is

18   not counsel trying to put a gloss on what they say.  This is

19   Google's internal statement.

20        Now, not only that, they did a study --

21        **THE COURT:**  Let me first stop you on the two that

22   you've mentioned.

23        **MR. BOIES:**  Yeah.  Yes.

24        **THE COURT:**  What was the context in which these

25   statements occur?  Are there responses to the statement, and

**PROCEEDINGS**

1    who are these people in the hierarchy?

2            **MR. BOIES:**  Sure.  These are software engineers.

3            **THE COURT:**  Okay.

4            **MR. BOIES:**  And these are people who, in varying --

5    I'm going to go through a number of these people, but a number

6    of these people are people who are related to the software

7    engineering, they're related to trying to make the statements

8    correct, and they're trying to figure out what they can use.

9    These are people who see this information and they're

10   questioning whether they can really use this information.

11           And Google says, well, these people didn't know what they

12   were talking about; they were outliers.  They can argue that to

13   the jury.  But certainly at the summary judgment stage, the

14   fact that we have these internal documents, at a minimum, you

15   know, creates a triable issue of fact.  And there are a whole

16   lot of them.

17           And if we go to the next page, there's Exhibit 3 in our

18   summary judgment submission.  This is a report.  They did a

19   study.  They said:  "In this study we want to get an

20   understanding of users' mental model of the control hierarchy

21   and see if users have a correct understanding of the

22   relationship between the different controls on the page."

23           So they're doing internal research.  This is in April of

24   2020.

25           And research question number 1.  "WAA:  What do users

1  expect turning WAA-off to mean?"

2      Answer, next page:

3      "All participants expected turning WAA toggle off to stop

4  saving their activity."

5      Now, they're going to say, well, there weren't very many

6  people in the survey.  Google picked the number of people that

7  were in the survey.  This is what Google was internally relying

8  on.

9      Now, after that, after that they decided to do a more

10 detailed study, and this is Exhibit 41, and this is going to be

11 research how they -- about how the design of a page impacted

12 reading behavior.  And they developed a hypothesis they were

13 going to test.  The hypothesis was based on the prior study,

14 okay?  The hypothesis -- and this is June of 2020.  The

15 hypothesis was:  "Most respondents will believe that turning

16 off WAA will result in no data being collected from their

17 activity."

18     That's what they hypothesized their user -- that's what

19 their intent was.  That's what they internally believed.

20     Now, we never got the answer to this --

21     **THE COURT:**  Well, now, stopping on that, it then goes

22 on, there's a sentence that says "being collected from their

23 activity and no personalization from Google products and

24 services."

25     **MR. BOIES:**  Both.  Both.

PROCEEDINGS

```
 1          THE COURT:  Well, that's my question.

 2       MR. BOIES:  It's not --

 3          THE COURT:  You are distinguishing between the two.

 4       MR. BOIES:  Yes.

 5          THE COURT:  Okay.

 6       MR. BOIES:  As Google did.

 7     And Your Honor makes a very good point.  They didn't say

 8  most respondents believe there will be no personalization in

 9  Google products.  They said:  "Most respondents believe no data

10  being collected from their activity, and no personalization."

11  So they believed that neither of those things are happening.

12  And, again, they've got some arguments on this, but those are

13  for the jury.

14     Now, I want to go on next to page 33 in the evidence I

15  want to go through.

16     This is another -- this is Mao Exhibit 2 in our summary

17  judgment submission.  This is another software engineer --

18     Oh, before I do that, though, before I do that, I just

19  want to remind the court in our -- in our papers, Mao

20  Exhibit 4, and I think 47, we have quotes from Google's CEO

21  testifying at a House Judiciary Committee hearing in

22  December 2018, and I think I've got -- yeah, yeah, here it is.

23  Yeah, number 18.  They put it up.

24     I'm not going to go all the way through it, but at the end

25  it says:  "We are pretty explicit about data which we collect
```

**PROCEEDINGS**

1   and we give protections for you to turn them on or off."

2       There's nothing here about saying we give you control of

3   your personal information, but everything else we're going to

4   take.  That's not what they were saying.

5       But now let me go to page 33.  This is another internal

6   email, July 25, 2019.  This is from another Google software

7   engineer:  "The WAA and other controls imply we don't log the

8   data, but obviously we do."

9       He goes on to say:  "I see how the wording here is very

10  deceptive."

11      He goes on to say:  "The user has a false sense of

12  security that their data is not being stored at Google, when in

13  fact it is."

14      That's not something counsel is making up.  That's what

15  Google is saying contemporaneously internally.

16      The same person:  "We don't accurately describe what

17  happens when WAA is turned off."

18      Again at Exhibit 2, same person:  "We need to change the

19  description."

20      If you go to chart 37, this is Mao Exhibit 59, at 46, a

21  different Google employee:  "WAA - completely broken, no way

22  for the user to determine what this actually controls."

23      Mao Exhibit 64 on my chart 38, another Google employee,

24  July 14, 2020:  "To me, it feels like a fairly significant bug

25  that a user can choose to turn off WAA but then we still

PROCEEDINGS

1    collect and use the data."

2        Now, throughout this there's no suggestion here, well,

3    they're only talking about personalized data.  There's no

4    suggestion here that the data is just collected and then set it

5    aside and never used in any way.  This is what they're saying

6    internally, Your Honor.

7        And, again, we can argue back and forth about the

8    significance of some of these people, but at a summary judgment

9    stage I respectfully suggest this has got to create at minimum

10   a triable issue of fact, and I think in front of a jury they're

11   going to have a hard time explaining some of these things.

12       **THE COURT:**  Okay.  Let's -- can you move for me to the

13   harm issue?

14       **MR. BOIES:**  Sure.

15       First, this here is -- there is a market for the

16   plaintiffs' data, and that also distinguishes this case from

17   the cases they're citing.

18       **THE COURT:**  And elaborate for me "the market."

19       **MR. BOIES:**  Sure.

20       **THE COURT:**  You've done it in the papers, and I think

21   I have a sense of where you're going with it.  But humor me,

22   give me sort of a summary of what this "the market" is here.

23       **MR. BOIES:**  Sure.  For example, Google itself -- and

24   the Court in a similar case, *Brown against Google*, had the same

25   issue and relied on the fact that Google had itself created, in

UNITED STATES COURT REPORTERS

PROCEEDINGS

 1    effect, a market.

 2        And if you go to my chart, 42, which is an excerpt from

 3    the damages expert's report, and there was a survey that Google

 4    did and it paid users $3 a month to track their activity on

 5    their mobile phones and tablets.  And the Court in *Brown* held,

 6    and we think pretty obvious, that when you're paying somebody

 7    for the data, you're putting a value on that.  And this is data

 8    that with the WAA off, they took.  It didn't belong to them.

 9    Belonged to the user.  They took it.  They told the user they

10    weren't going to do it.

11        And the harm here is not just the harm of having your

12    personal data taken.  We think that's enough.  And one of the

13    things I think is significant is, and probably the farthest a

14    court has gone that requires standing, is *TransUnion*.  And in

15    *TransUnion*, both the one thing that -- maybe it's not the only

16    thing, but certainly one thing, and there weren't very many,

17    that both the majority opinion and the dissent agreed on was

18    that you could go after intrusion of exclusion and privacy.

19    They said those were traditional kinds of harms that you could

20    go after.  So that if you had an intrusion, you didn't have to

21    prove a monetary damage or something like that.

22        And as the court indicated earlier in prior opinions in

23    the class certification motion to dismiss, one of the things we

24    seek is nominal damages.  And so nominal damages, when you have

25    as many class members as we have, can be a very substantial

1   amount of money.

2       So there are all sorts of harms here that are cognizable.

3       And in addition to the price of a data, in effect, the

4   value of the data that they improperly took, there's also a

5   disgorgement and unjust enrichment.  And you have a -- and the

6   court will remember they had a *Daubert* challenge to that

7   calculation, which the court rejected.

8       Now, they'll be able to argue that we're asking for too

9   much.  That's fair jury argument, and maybe the jury comes in

10  somewhere in between.  But in terms of allowing us to get to

11  the jury, I mean, the court has already addressed the *Daubert*

12  challenges, as to whether this is an appropriate thing to

13  present, and it certainly is a quantification of the unjust

14  enrichment that they have gotten.

15      So you've got your cause of action, you've got your

16  liability, and you've got these means of measuring damages.

17      **THE COURT:**  Well, to drill down a bit more on these

18  different avenues that you've identified for me in terms of how

19  we can -- how I can be comfortable to let the case go forward

20  with this damage, these damages being requested.  First you say

21  there's a market for this, and that's reflected, as you've just

22  pointed out to me, in Google's own payment to effectively get

23  this material or a similar material.  But that's -- isn't that

24  a bit of a one-off?

25      I mean, if Google itself wants to run some analyses on its

**PROCEEDINGS**

 1  operations, is that really -- you say they pay Google users $3

 2  a month.  Does that really establish a market, if you will,

 3  for -- that I could look to that says, well, okay, they've

 4  quantified the value of this information.  They've done kind of

 5  a one-off study for their own internal operating.  It's not

 6  like anybody in the outside world is -- outside of Google is

 7  paying this.

 8      **MR. BOIES:**  Well, actually, I think the evidence will

 9  be that other people like Neilsen and -- I mean, I think our

10  expert goes through --

11      **THE COURT:**  True.  Okay.  All right.  Fair enough.

12      Then with respect to the emotional -- this is an issue

13  that, as you know, we just wrestle with over and over again

14  when we're talking about a class case.  Can emotional distress

15  be effectively a damage theory on a class-wide basis?

16      I understand emotional distress is available for invasion

17  of privacy.  No one can argue with you on that.  And I know

18  we're not talking about class certification at the moment.

19  We've done that.  But is it a viable -- if that were the only

20  basis you could point to for a damage recovery, emotional

21  distress, can that be done on a class basis?

22      **MR. BOIES:**  Your Honor, I think if that was all we

23  had, I don't think we could get more than nominal damages on a

24  class-wide basis.

25      **THE COURT:**  Okay.

PROCEEDINGS

1        **MR. BOIES:**  I think in terms of quantification, I

2   think the emotional distress, other than nominal damages, which

3   I think we would be entitled to get, I don't think we could do

4   that on a class-wide basis.

5        **THE COURT:**  Okay.  So you're using that as the

6   predicate for the nominal damage recovery that you see?

7        **MR. BOIES:**  I think that would be a predicate.  That

8   would be one predicate.

9        **THE COURT:**  Okay.  And then in addition to that there

10  was a third avenue that you, I think, were identifying as a

11  damage approach.

12        **MR. BOIES:**  And that was on the harm to the devices.

13        **THE COURT:**  All right.  Harm to devices.  And that's

14  the battery degradation and the like, and I did have a case on

15  that issue, yeah.

16        **MR. BOIES:**  Right.  And now, and don't put this one

17  up.  They want to -- this is quotes from something that they

18  want to have sealed.

19        But if you turn to page 49 in what you have --

20        **THE COURT:**  Okay.

21        **MR. BOIES:**  -- at the top you have our expert, and

22  that's not sealed.  But at the bottom you have a quotation from

23  Google's internal documents that --

24        **THE COURT:**  Well, I'll just say I don't -- looking at

25  this now just for guidance for the parties, I don't see any

PROCEEDINGS

1    basis to seal this, but that's a different question.

2         **MR. BOIES:**  Yeah, I didn't see any basis either.

3         **THE COURT:**  I know you're doing what you have to do,

4    but, go ahead.

5         **MR. BOIES:**  But, I mean, this demonstrates, we think,

6    that Google recognizes that to the extent that it is doing --

7    collecting this data while WAA is off, that it has an effect.

8         Now, again, this is not something that we quantify.  This

9    is something that is a basis for nominal damages, basis for

10   liability, but we can't quantify it on a class-wide basis.

11        You know, so we think there are those kind of -- we think

12   there are those kind of harms.

13        And if I could maybe just spend a moment on the

14   offensiveness --

15        **THE COURT:**  Yes.

16        **MR. BOIES:**  -- aspect of it.

17        **THE COURT:**  I'll candidly tell you, I think that's --

18   that's a tough one for your side, because what I see is not

19   obvious to me where one could couper up a highly offensive

20   characterization.

21        **MR. BOIES:**  Well, and I think that the offensiveness

22   comes from a number of standpoints.  I mean, first, I showed

23   you the Schneier report where it goes -- has the kind of

24   information that is being, you know, and I just -- think about

25   it in any other context.  If somebody was taking pictures of

**PROCEEDINGS**

1  you, you know, tracking you around physically for this kind of

2  information, it would clearly be highly offensive.  And the

3  question is whether you can do -- and it's no less highly

4  offensive because it's done electronically.

5       Now, the question is whether they have permission to do

6  that, whether there's consent to do that.  But if there's not

7  consent, if there's not permission, this is clearly, I suggest,

8  and certainly is a triable issue that this is highly offensive.

9       The second thing about it is that they ignored what they

10  were being told internally by their own software engineers

11  about what normal reactions were going to be, what normal

12  expectations were going to be.  And it's not just a handful of

13  engineers.  You'll see from this there are a lot of them.  And

14  in addition to that they did studies.  These were not random

15  emails.  They did studies that came up with the same

16  conclusions.

17       So you had not only the collection of stuff that they told

18  people they weren't going to collect, but the character of what

19  they were collecting was very personal.  And they knew what

20  they were doing, you know, at least there is a jury argument

21  that they knew and were on notice to what they were doing.

22       They made very large profits from this.  I think that goes

23  into the offensiveness --

24            **THE COURT:**  How --

25            **MR. BOIES:**  -- calculation.

PROCEEDINGS

1    **THE COURT:**  How do they really -- I understand you

2    have your disgorgement theory.  How do they make large profits

3    from this.  This being, I assume, the information you're saying

4    that they are, in an anonymized way or otherwise, collecting.

5    How does that then connect up to the large profits that they

6    were making?  I know you have expert information on this that

7    theorizes it, but what --

8    **MR. BOIES:**  Well, there's expert information, but also

9    there's what we -- what we know that they do.  I mean, for

10   example, it's not just our experts.  Their own -- their own

11   documents, and to some extent their own interrogatory

12   answers --

13   Let me see if I can -- I think I've got something in here

14   that actually addresses, you know, that issue.

15   If I can go to page 21.  This is from Google's responses

16   to interrogatories in this case.  This is Google's Fourth

17   Supplemental Responses and Objections to Plaintiffs'

18   Interrogatories, Set One, at 16.

19       "Google uses user data collected via GA for Firebase

20       across teams for product development, improvement, and

21       diagnostics."

22   So it's not just putting it on the shelf.  Google's

23   response to Interrogatory 14, at the end it goes through all

24   the logs.  It says:

25       "Google has provided exacting details of its main

UNITED STATES COURT REPORTERS

PROCEEDINGS

1    logs associated with the transmission of

2    app-interaction/measurement data to Google via Google

3    Analytics for Firebase when a user has turned WAA off."

4    So we're talking about when they've turned WAA off.  It

5    then says:

6        "Google states, however, that it is not practical or

7        relevant to account for every single potential data source

8        (including logs) that may contain such data because there

9        are various downstream users of the pseudonymous data."

10   Okay.  Various downstream uses, so many that they can't

11   even count them.  They can't even tell us in an interrogatory.

12   The Hochman report, our expert report, at paragraph 273 is

13   the one I've got here, where it says:

14       "Google's collection of WAA/sWAA-off data also

15       enables Google to serve targeted advertisements."

16   We took a deposition of a former Google software engineer,

17   Blake Lemoine, and he testified about how they used WAA-off

18   data for their AI.

19   The Hochman report, paragraphs 102 and 305, also have

20   additional detail.

21   But interrogatory number 15, if I can go to my chart 28,

22   we said interrogatory 15:

23       "Please describe how Google currently uses and

24       previously during the class period has used WAA-off data."

25   So -- and you'll see the response is here, and they say at

**PROCEEDINGS**

1  the end, and I've highlighted it on the screen, but they say at

2  the end that the use "includes pseudonymous conversion tracking

3  and ad targeting for anonymized ad profiles."  So they're using

4  it for ad targeting.

5       Now, they then gave a supplemental response to number 15,

6  which is at docket 364-22, at 9 to 10, in which they gave

7  additional examples of how they use this -- they use this

8  information.

9            THE COURT:  But then the -- is the premise that

10 because they used the information, somehow then all the profits

11 they make are ascribable to this?

12           MR. BOIES:  No.  No.

13           THE COURT:  Okay.  Well, and that's where your experts

14 do their calculation.

15           MR. BOIES:  Exactly.  No, no, we're not claiming all

16 their profit.  I mean, the $644 million, I think that may be a

17 daily profit for them.  I don't know how much they make, but

18 they make so many hundreds of billions of dollars that --

19           THE COURT:  So you're not asking for all of it.

20           MR. BOIES:  We're not even asking for 10 percent of

21 their profits.

22           THE COURT:  Okay.

23           MR. BOIES:  But what you can see is that there is

24 enormous value, you know, in what is done.  There are a lot of

25 different uses.

**PROCEEDINGS**

1        They can argue to the jury, well, this wasn't all that

2    valuable.  Yes, we collected it, but we could have done it some

3    other way, and the plaintiffs are asking for too much money.

4    Those are all jury arguments.  Those aren't -- and to the

5    extent perhaps maybe a *Daubert* argument, but it's not a summary

6    judgment argument.  These are all pieces of evidence from which

7    we can properly argue to the jury that they have taken

8    something for which there was a market, for which there was

9    great value to Google and value to the user as well.

10        **THE COURT:**  Okay.  Can I now turn to Mr. Santacana to

11   respond?

12        And I referred to you as Mr. Salcedo.  I apologize to

13   Mr. Santacana.

14        **MS. SANTACANA:**  Thank you, Your Honor.

15        I'd like to start where Mr. Boies ended on harm.

16        Your Honor, the data that we're talking about here, and

17   there hasn't been a serious disagreement about this, is not a

18   diary.  It isn't a videotape of somebody even with their face

19   blurred.  The data here is a list of receipts that Google never

20   uses but for the purpose of keeping records.  That's the data

21   we're talking about.

22        And when --

23        **THE COURT:**  Does keeping records potentially have some

24   value?  Because you're then sharing this recordkeeping to

25   assist, as I understand it, advertisers in what they're doing,

PROCEEDINGS

1    or at least to --

2             MS. SANTACANA:  Yeah, report --

3             THE COURT:  It can be described as, hey, you're doing

4    a good job --

5             MS. SANTACANA:  Right.

6             THE COURT:  -- look at this.

7             MS. SANTACANA:  Exactly.

8             THE COURT:  It's to boost them up a bit.

9             MS. SANTACANA:  Report the effectiveness of the

10   campaign.

11            THE COURT:  There you go.

12            MS. SANTACANA:  Yeah.  Absolutely.

13            THE COURT:  Okay.  So you sort of say, well, that's,

14   you know, no big deal.  It's kind of just recordkeeping.  But

15   to share it with them sort of implies to me that you think

16   there's some value to it.

17            MS. SANTACANA:  Your Honor, I mean, I think you're

18   using some value to it, I guess, in the colloquial sense.

19            THE COURT:  True.

20            MS. SANTACANA:  The question on this motion is not

21   whether there's value to Google, but whether there's harm to

22   the class that is provable on a class-wide basis.

23            THE COURT:  Well, although we would get to the value

24   issues when we're trying to quantify the harm.

25            MS. SANTACANA:  If there is any harm to begin with,

 1    sure.  But I'm saying there's no harm to begin with, right?

 2    The activity of keeping an anonymized receipt that an ad was

 3    served is not harmful to anyone.  And if it were, there would

 4    be evidence of it that someone other than these plaintiffs'

 5    counsel cared about it.

 6         Not even their clients cared about it when they testified.

 7    What their clients cared about was personalized advertising.

 8    That's what they testified about:  I don't want you to know

 9    everything I'm doing, and send me better ads when I turn WAA

10    off.  One of them said I do want you to do that, but not when I

11    turn WAA off, and then the rest said I never want you to do

12    that.

13         We're not doing that.  We said we wouldn't.  We're not

14    doing that.

15         When we're talking about a market for data, I'm aware of

16    four -- sort of four leading cases on the question of whether

17    you can get past, on the tort claim and on the CDAFA claim, the

18    filter of Rule 12 or Rule 56 with a market for data.  Two of

19    them are yours, *Katz-Lacabe* and *Williams versus Facebook*, one

20    of them is Judge Chhabria's in *McClung versus AddShopper*, I

21    think it's called, and then the *Hazel* case by Judge Breyer.

22    They all come out the same way.  The only case that comes out

23    the other way is *Brown*.

24         And in *Brown*, which is the one plaintiffs hammer on, they

25    are the plaintiffs' counsel in that case, what Judge Gonzalez

**PROCEEDINGS**

1    Rogers was evaluating was an allegation that browsing histories

2    were being collected and incognito mode.  This case is not

3    about browsing histories.  The allegation in *Brown* is that they

4    were then being used to target advertising.  This case is not

5    about browsing histories being used to target advertising.

6        It is undisputed -- their own expert says we don't

7    personalize advertising with sWAA-off data.  In the second

8    paragraph of their class certification motion they actually

9    accuse us of being deceptive by not personalizing advertising

10   with WAA-off data.  They say because if we did, then it would

11   tip off the plaintiffs that we are using it for something, that

12   we have saved it, but now, at summary judgment, they're telling

13   you that we are, with no evidentiary basis.

14       So on the market for data, what they've done is convert

15   what is really another disgorgement theory into a theory of

16   actual damage.  And the way it goes is, well, Google is paying

17   or Neilsen is paying or somebody is paying people for their

18   browsing histories.  Again, this case is not about browsing

19   histories.  We're not using browsing histories for anything

20   that are sWAA-off.

21       But in any case, they can sign up right now for Google

22   Screenwise program and they can get their $3 per month right

23   now.  The value of their data has not diminished one iota.

24   Google has not stood in their way of selling their data.  And

25   since Google isn't using browsing histories, like the ones that

PROCEEDINGS

1  are collected in the Screenwise program for any purpose, such

2  as to profit, Google is not also causing any harm to them by

3  getting away with stealing something that they could have paid

4  for.

5       So it is a complete misnomer to point to that program and

6  say --

7       THE COURT:  Well, I'm having trouble with your

8  argument to the extent you're saying, well, they haven't been

9  harmed because they can go out and get the $3 a month today.

10 But that's not really the question, is it?  It's the $3 a month

11 is being pointed to by the plaintiffs to me to show that

12 there's some value to this.  The harm could -- maybe they don't

13 want to sell it, but the $3 a month is just -- is putting some

14 value parameter to show that it's not worthless --

15      MS. SANTACANA:  Yes.

16      THE COURT:  -- information.  But is it enough to say,

17 well, they're not harmed, because if they really want the money

18 they can go out and get it.  That's really kind of beside the

19 point.

20      MS. SANTACANA:  No, it's not.  And this point puts the

21 lie to their damages model, because what they're saying is if

22 it has value in the abstract, then I must have been harmed.

23      But the claims require harm.  They're not -- the claim

24 says actual damage or loss.  Okay.  What was the damage?  What

25 was the loss?  Did they lose --

1          **THE COURT:**  Let's posit a person who says:  I

2     absolutely don't want my information to be shared with anybody.

3     And then the question is -- and a lawsuit is brought, and you

4     say, well, no harm, no foul, this is valueless information.

5     And so then they come back and say, no, look, there is a value

6     to this, but the individual that we represent, it doesn't --

7     there's harm to them because information that is of value is

8     being used and they don't want it to be used.

9          **MS. SANTACANA:**  Yes.  Control over their private

10    information.

11         **THE COURT:**  So, and you're saying, well, but they

12    can't be harmed because they can sell the information.  They

13    haven't, you know, their information is just as valuable today

14    as it was when we did what we were alleged to have done.  But

15    that's ships that are passing in the night.  That's not going

16    to the question of, you know, is there a value in this,

17    whatever the person wants to do with the information.

18         **MS. SANTACANA:**  So the -- I don't think it's ships

19    passing in the night.  I think the issue -- this is exactly my

20    point, is that what you just articulated is a desire to control

21    private information, which is the traditionally, you know, the

22    restatement talks about this.  This is what invasion of privacy

23    torts are all about.  And the harm is the emotional distress

24    that is caused by preventing me from being able to control it.

25    And then you say how do I measure that harm?  And it would be

PROCEEDINGS

1    unusual to say, well, if you had sold it, it would have been

2    worth X, Y and Z.

3        Now, you might say I want disgorgement as a form of relief

4    or you might --

5        **THE COURT:**  Or one could also interpret that as being

6    an answer to your claim that no harm, no foul because this is

7    worthless.  And they're saying it's not worthless, in fact,

8    there's a market out there.

9        So, and that's answering that question.  It's not going to

10   the issue of -- unless they want to sell it they can't be

11   harmed.

12       **MS. SANTACANA:**  Yeah, and I think maybe I'm not --

13       **THE COURT:**  I understand.  I think I know what you're

14   trying to tell me, so we can move on to the next point.

15       So go ahead.

16       **MS. SANTACANA:**  Okay.  Well, to jump off of that

17   point, I heard nominal damages come up I think four times when

18   counsel was speaking.  That's four more times than it came up

19   in the briefing, so this is a little bit

20   fly-by-the-seat-of-the-pants.

21       But here's the problem with the reference to nominal

22   damages.  The Supreme Court for the longest time, going back to

23   *Amchem versus Windsor*, Justice Ginsburg's opinion, says,

24   effectively, personal injury is a pretty dangerous place for

25   class actions, for a lot of reasons.

```
 1        What you just heard counsel say is even if you don't
 2   believe me on the market for data, even if you don't believe me
 3   on the battery depletion, even if you don't believe me on
 4   disgorgement, I should still be able to go to trial and
 5   collect, presumably, they will say, a penny for each class
 6   member, or some amount of nominal damage, which I don't think
 7   is the law anyway.  It could be just one dollar for the entire
 8   class.
 9        But in Amchem, what the Court says is, well, hold on a
10   second.  If your claim is that some people in this class
11   suffered emotional distress, now you aren't representing them
12   adequately, because that means that you are asking only for
13   nominal damages for someone who suffered actual harm.  This is
14   why we don't do this in class actions unless in the most
15   clearest of cases.
16        So the nominal damages piece is not a loophole to get
17   around what is clear case law from the Supreme Court, Comcast
18   versus Behrend, Amchem versus Windsor, Fibreboard versus Ortiz
19   that says when you're doing damages in a class you have to be
20   careful, the model has to match the liability theory.  And if
21   you're dealing with personal injury, then you have to be
22   careful about individualized issues.
23        That is why, Your Honor, at the class cert. stage in their
24   brief they disclaimed any reliance on this.  Mr. Boies was
25   talking about emotional distress and saying he can collect
```

PROCEEDINGS

1    nominal damages, but in their brief they disclaim this.  And I

2    can give you the page cite if you'd like it, but I'm sure you

3    remember the hearing.  They said:  I don't have to do that type

4    of damage.  What I want is disgorgement.  Well, then *TransUnion*

5    is decided and *McClung* is decided and now disgorgement doesn't

6    look so good, so now they're talking about nominal damages

7    again.

8            THE COURT:  You want to address for me the anecdotal,

9    in the sense --

10           MS. SANTACANA:  Yes, I do.

11           THE COURT:  -- information from some of your people --

12           MS. SANTACANA:  Yes, I do want to address it.

13           THE COURT:  -- that Mr. Boies drew my attention to.

14           MS. SANTACANA:  Yeah.  Your Honor, these emails are

15   trotted out in every one of these cases.  This is a

16   150,000-person company.  I think, as you pointed out, context

17   is probably the best way to weed out ones that matter from ones

18   that don't, ones that are relevant from ones that don't.  Half

19   of the ones he showed you he also showed Judge Gonzalez Rogers

20   in *Brown*, which has nothing to do with this case.

21           So the other half are seriously flawed, and I am happy to

22   go -- I could go through each one right now if that's what you

23   want.

24           THE COURT:  Well --

25           MS. SANTACANA:  But at a more general level --

PROCEEDINGS

1          THE COURT:  Yeah.

2          MS. SANTACANA:  -- to be hopefully more helpful to

3    Your Honor, the problem with that evidence is that not one of

4    them addresses the specific conduct that is being sued upon

5    here.  And by their logic, they could sue Google over and over

6    again as to WAA in each one of every aspect they can come up

7    with if anybody ever found WAA confusing as to some other

8    aspect.

9          So I find that's one problem with it, because WAA is

10   actually a very capacious button.  You've seen the description:

11   Chrome history is in there, sites are in there, app data is in

12   there - there's all kinds of stuff in there.  So, you know,

13   that could become a cottage industry in and of itself if these

14   12 emails are sufficient to get past summary judgment.

15         THE COURT:  Well, you know, it really, to some extent,

16   goes back to my initial question to you, which is from a very,

17   very simplistic level, what I understand the plaintiffs to be

18   saying is certain of their class members are operating on the

19   understanding that even -- and this puts aside your issues with

20   respect to the language of the privacy policies and the like,

21   but that they think they have exited any use of anything

22   anonymized or otherwise about them.  And some of those emails,

23   whether or not they, you know, are applicable in all sorts of

24   other cases, they go to that question.

25         MS. SANTACANA:  Yeah.

1    **THE COURT:**  They go to the issue of saying the

2    consumer out there thinks they've checked out, and they

3    haven't.  Pretty simplistic thing.  But just because those

4    emails may have applicability in other lawsuits doesn't mean

5    they get disregarded in this one.

6    **MS. SANTACANA:**  The point is well taken, and I think

7    the best way to address that is to address an example.

8    So four of the examples you were shown or four of the

9    slides you were shown were all authored by an employee named

10   Chris Rumler, who comes up in every one of these cases.  The

11   plaintiffs all over the country love Chris Rumler and his

12   colorful emails.

13   And what Chris Rumler was talking about in these emails,

14   he was really upset about it over the course of months, he

15   wrote email after email after email, and this is what he

16   testifies to.  It's in the record, we put in it there.  He

17   works on Gmail.  There's only one kind of data in Gmail - data

18   tied to your identity.  That's how Gmail works.  This is like a

19   foreign concept to him, that there's such a thing as anonymized

20   data, because it doesn't -- it didn't enter his mind.  And so

21   he's asked about it by these lawyers, and he explains that:  I

22   read a technical proposal from a different product team I know

23   nothing about.  I misunderstood it to mean that Google was

24   going to identify data in a log with the person's GAIA ID,

25   which is basically their email address, their Gmail address,

 1   even when WAA was off, and I was really upset about that.

 2   Which is exactly what Google wants its employees to do, is be

 3   on the lookout for this sort of thing.  And once it was

 4   explained to him, and once he understood the proposal, he

 5   changed his mind.  He has disavowed the plaintiffs' view.

 6         **THE COURT:**  Now I'll ask you the question you know is

 7   coming on summary judgment --

 8         **MS. SANTACANA:**  Sure.

 9         **THE COURT:**  -- which is that's all well and good, but

10   why should that be the only interpretation that is adopted such

11   that --

12         **MS. SANTACANA:**  Right.

13         **THE COURT:**  -- the obvious alternative interpretation

14   of those, some of those statements is disregarded?  I mean,

15   isn't that something for the jury to hear what you just said

16   about explaining the Rumler comments.  And you'd be perfectly

17   free to have this individual on the stand and to explain it

18   exactly as you just have explained it.  But on summary judgment

19   isn't it a tall order to say that I have to adopt that

20   interpretation?  Because the counter --

21         **MS. SANTACANA:**  I don't think you do.

22         **THE COURT:**  -- the alternative interpretation is what

23   I said before, that it is indicative of or supportive of the

24   argument, from a macro level, that the plaintiffs are making

25   that their class members think they're out from under, and even

**PROCEEDINGS**

```
1   within Google there are people who are saying that's what they
2   think, and that's not what's happening.
3         MS. SANTACANA:  Right.
4         THE COURT:  I mean, it's pretty simplistic, I
5   understand, and you have all sorts of reasons why context
6   matters, and it's not what you think it is, and all that, and
7   I'm not surprised.  But, you know, I am at summary judgment
8   so...
9         MS. SANTACANA:  I understand, and credibility is
10  generally a trial issue, and I'm not asking Your Honor to adopt
11  a particular interpretation of the statements.  I'm just
12  putting them in context of the record evidence.  That's all I'm
13  doing, because you requested it.
14        But on the legal question of consent, which I think is
15  what we're talking about right now, I do not think that Chris
16  Rumler's statements undermine the plain language of the
17  disclosure and the privacy policy, and I -- because they can be
18  read consistent with what we're saying it means.  And what
19  they're saying it means cannot be reconciled with the plain
20  language.
21        Again, it doesn't say you are out from under, nothing --
22  this android device will just shut down and not send anything
23  to Google ever about anything.  We won't save anything.
24        I'll just give you a ridiculous example, right.  If a user
25  turns WAA off on their android device and then downloads an app
```

**PROCEEDINGS**

1  in the Google Play Store, under plaintiffs' theory of what is a

2  reasonable reading of WAA, Google would not be permitted to

3  keep a log that that device downloaded that app.

4      If that same device then pays for something using Google

5  Wallet on a web site, according to them Google would be

6  disabled from keeping a record that this user used Google

7  Wallet to pay for this item on the Internet.

8      If that same user then logged into Google and sent an

9  email through Gmail, under their theory we would then have to

10 delete that.

11     **THE COURT:**  Of course under all of those examples

12 Google is retaining the information, not sharing it with

13 anybody else.

14     **MS. SANTACANA:**  Nor is -- well, it's not sharing -- I

15 guess I don't understand your question.

16     **THE COURT:**  Well, in this particular scenario the, as

17 I understand it, the anonymized data is ultimately going to

18 advertisers in the form of saying, look, your ads are working.

19 This is good -- the information is being utilized by Google

20 outside of Google.

21     **MS. SANTACANA:**  There's no evidence that Google is

22 sharing individual level --

23     **THE COURT:**  Oh, I understand that.  I understand that

24 it's, if you will, being packaged, but the information is

25 being -- is being characterized by Google to third parties in

**PROCEEDINGS**

1    the form of saying, look, your ads are working.

2        **MS. SANTACANA:**  Sure.

3        **THE COURT:**  And some of the information that goes into

4    that communication is this anonymized data.

5        **MS. SANTACANA:**  Well, I guess I'm not sure what

6    connection that has to the description of WAA, which is not --

7    is not talking about whether we will or won't share aggregated

8    information with advertisers -- that's sort of orthogonal, I

9    think, to the --

10        **THE COURT:**  So you're saying that under their reading

11    there's a violation -- you would be violating the policy even

12    if there is operational information that's -- that at a certain

13    period of time is within Google.  I understand what you're

14    saying, right.

15        **MS. SANTACANA:**  Yeah, I mean, the guy who sold the

16    sneakers to the user --

17        **THE COURT:**  Got you.  Yeah, I understand.

18        **MS. SANTACANA:**  So just a couple more points on this,

19    Your Honor.

20        First, I just want to be clear, Google doesn't share the

21    device identifiers with advertisers.  So whether it's a consent

22    question or a --

23        **THE COURT:**  You get into the *could* issue, which we've

24    already hashed out.

25        **MS. SANTACANA:**  Okay.  Well, if you feel like we've

PROCEEDINGS

1    hashed it out -- I felt like I heard something relatively new,

2    in that, the argument you asked counsel if it could be but it

3    never is and it never has been, is that still actionable?

4            **THE COURT:**  Mm-hmm.

5            **MS. SANTACANA:**  On that, just on that question I think

6    there's significant case law that says no, it's not actionable.

7        And whether you want to analyze that under harm or

8    expectation of privacy or even just under the consent rubric,

9    depending on the case it comes out in different places, but the

10   *Hammerling* case, which is affirmed by the Ninth Circuit, is one

11   of them that analyzes it on consent.

12       And there's a couple of others in our papers.

13           **THE COURT:**  Mm-hmm.

14           **MS. SANTACANA:**  So I just think that would be

15   stretching the law to a place it hasn't gone to before, and

16   there isn't a case that's been cited on that basis.

17       The *Brown* case doesn't go that far either.  The *Brown* case

18   says this is a browsing history that's -- that is identifiable

19   because it's an entire browsing history.  Where, as here, what

20   we're talking about is the record of ad service.

21           **THE COURT:**  *Hammerling* was a non-published --

22           **MS. SANTACANA:**  The panel decision is unpublished,

23   yes.  And the lower court decision makes the same ruling.

24   That's why I say it was affirmed, but --

25           **THE COURT:**  I understand.

PROCEEDINGS

1          **MS. SANTACANA:**  -- not published.

2      Okay.  So the last point I wanted to make, Your Honor, is

3  about the privacy policy.

4      The plaintiffs rely on the privacy policy to make their

5  claims, while at the same time arguing that we shouldn't assume

6  users read it.  But the plaintiffs who testified each testified

7  and submitted declarations, which we have in our papers, that

8  say "I read and relied on the privacy policy."

9      So I understand it's a legal fiction that, you know,

10  people read all the terms of use and all these things.  But in

11  this case the testimony from the plaintiffs is:  I read it and

12  relied on it, that's why I'm here.

13      So yes, I could pick out phrases that are ambiguous if

14  read in isolation, but I think at a minimum the court should

15  analyze the WAA disclosures and the privacy policy together

16  holistically.  And when done that way, one thing is very clear.

17  Mr. Boies said Google could easily say there's such a thing as

18  not your personal information.  We say that.  We say it in the

19  privacy policy over and over and over again and provide a

20  definition that distinguishes personal information which is

21  associated with a Google account from non-personal information

22  which we say cannot reasonably be linked to your identity.

23      So we do say that in the privacy policy, and I do think

24  that has to be -- and it may be 27 pages long -- we say it at

25  least every couple pages, and that has to be part of the

PROCEEDINGS

1   analysis.

2       And if, if this motion comes down to, well, there's a fact

3   question about whether it can reason -- it could reasonably be

4   linked to your identity by somebody somehow someday, as I said,

5   I don't think the law supports that on the consent side.  It

6   definitely doesn't support it on the harm side, Your Honor.

7   Because even if it could reasonably be linked, a browsing

8   history that falls in the woods can't hurt anybody.

9       And it may be that one day somebody can point to actual

10  harm, but as of today, looking back, class wide, Google kept

11  its word.

12      Thank you, Your Honor.

13          THE COURT:  Thank you.

14      MS. SANTACANA:  Yeah.  Actually, I'm sorry, can I

15  address one more thing?

16          THE COURT:  Yeah, go ahead.

17      MS. SANTACANA:  So Mr. Boies showed you an

18  interrogatory response.  I don't know how much weight Your

19  Honor would put on that, but I want to make sure it's clear to

20  Your Honor that that interrogatory response that he showed you,

21  which says that there's such a thing as anonymized ad profiles,

22  it is explained in the supplemental response and also in

23  deposition testimony that that was an edge case where somebody

24  is sharing their device in a signed-out state, and the owner of

25  the device has WAA off, but the device doesn't know that when

**PROCEEDINGS**

1  they're sharing it with somebody else.

2      So it's really not a class-wide issue.  They're edge cases

3  where if somebody -- if people are sharing tablets, it's

4  unclear which account is going to control the way the data is

5  treated, and that's all that was meant by that.

6      So I'm not sure the court should put any weight on that.

7          **THE COURT:**  Okay.  Thank you very much.  Very helpful

8  argument.

9      I'll take the matter under submission and get you an

10 order.

11         **MS. SANTACANA:**  Two housekeeping things, Your Honor.

12         **THE COURT:**  Yes.

13         **MS. SANTACANA:**  So first, because of the class notice

14 schedule, we wanted to make sure Your Honor is aware that a

15 summary judgment order probably should not issue, I think best

16 practice is not to issue before the opt-out period closes.  The

17 parties are agreed on that.

18     By our calculations we're looking at sometime in January,

19 maybe late December, if we're lucky, is when the opt-out period

20 will close, and right now trial is scheduled for early

21 February.

22     So we've lightly talked about what we should do but wanted

23 to sort of put it on your radar that we may need to move the

24 trial a little bit, and we're not sure what your schedule looks

25 like.

PROCEEDINGS

1      **THE COURT:**  Right.  Well, I've got a criminal trial in

2  February, so you'll be moving, if February was the real date,

3  in any event.

4      But does it matter whether or not I'm granting or denying?

5  I mean, if I'm denying summary judgment, the timing is --

6      **MS. SANTACANA:**  Would matter less?  But I don't think

7  Your Honor should indicate his intentions before the opt-out

8  period closes.

9      **THE COURT:**  Which is January?

10      **MS. SANTACANA:**  It creates incentives around whether

11  to opt out.

12      **THE COURT:**  All right.  And that's January, when is

13  it?

14      **MS. SANTACANA:**  Most likely January 6th, you know,

15  maybe a week sooner or something.

16      **MR. BOIES:**  I think he's right.  If it should be

17  December or -- we have some issues that we'll continue talking

18  about.

19      The data they've given us is not really very useful in

20  terms of making the -- getting the stuff out, so it's taking

21  longer than it should have.

22      **THE COURT:**  Okay.  Well, you know, when counsel asks

23  me please don't rule for a while, I don't mind that.  That's

24  fine.

25                      (Laughter)

UNITED STATES COURT REPORTERS

PROCEEDINGS

1          **THE COURT:**  But it does -- you know, this issue does

2    not -- it's a bit academic, because I, frankly, wasn't even

3    focused on the February trial date in this case.  But that's

4    not -- that's not a realistic date for my schedule, so we're

5    going to have to reassess that in any event.

6          But I'm happy to -- I'm happy to hold off a pending -- the

7    parties will -- can the parties agree that they can give me the

8    trigger of, okay, you know, we've passed the date -- and I

9    understand the reason why, because, you know, binding class

10   members and the like.  But I'll leave it to you to tell me so

11   it doesn't just fall through the cracks and I'm doing other

12   things.

13          **MR. BOIES:**  We can do that.

14          **MS. SANTACANA:**  Sure.  Absolutely, Your Honor.

15          **THE COURT:**  Okay.  Very good.  Thank you.

16          **ALL COUNSEL:**  Thank you, Your Honor.

17          (Proceedings adjourned at 3:17 p.m.)

18

19

20

21

22

23

24

25

**UNITED STATES COURT REPORTERS**

1                   CERTIFICATE OF REPORTER

2           I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4

5    Dated:  July 26, 2024

6

7

8

9

10

11    _____

12          Rhonda L. Aquilina, CSR #9956, RMR, CRR, CRC
                 U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES COURT REPORTERS**