# EXHIBIT R

## REDACTED
## FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4    ANIBAL RODRIGUEZ, JULIEANNA          )
      MUNIZ, ELIZA CAMBAY, SAL             ) Case No.:
 5    CATALDO, EMIR GOENAGA, JULIAN        ) 3:20-cv-04688
      SANTIAGO, HAROLD NYANJOM, KELLIE     )
 6    NYANJOM, and SUSAN LYNN HARVEY,      )
      individually and on behalf of all    )
 7    others similarly situated,           )
                                           )
 8              Plaintiffs,                )
         vs.                               )
 9                                         )
      GOOGLE LLC,                          )
10                                         )
                Defendant.                 )
11    -------------------------------------)
12
13
14    ***HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY***
15
16            REMOTE PROCEEDINGS OF THE
17       VIDEOTAPED DEPOSITION OF ARNE DE BOOIJ
18              TUESDAY, FEBRUARY 7, 2023
19
20
21
22
23    REPORTED BY NANCY J. MARTIN
24    CSR. NO. 9504, RMR, RPR
25    PAGES 1-133
```

Page 1

1    see Insitum?  That's a vendor that we work with for
2    research.  So they probably wrote a large part of the
3    content, but I might have started the document and
4    they filled in the content.
5    BY MR. FRAWLEY:
6         Q.   So what do you mean that you work with a
7    vendor.  Can you tell me more about that?
8         A.   Yeah.  So Insitum, the name there, it's a
9    research vendor.
10        Q.   What's the name of this vendor?
11        A.   It's spelled Insitum.  It says it right there
12   on the document (indicating).
13        Q.   Oh, I see.  Is this the only vendor that you
14   work with, or are there other vendors?
15             MS. AGNOLUCCI:  Objection.  Vague.
16             THE WITNESS:  Work with in what sense?
17   BY MR. FRAWLEY:
18        Q.   For research.
19             MS. AGNOLUCCI:  Same objection.
20             THE WITNESS:  No.  They're not the only
21   vendor.
22   BY MR. FRAWLEY:
23        Q.   So for this study, the Pinecone Study 3 UDC,
24   why did you need to hire a vendor?
25        A.   Let's see.  I'm trying to remember.  We use

```
 1    vendors at Google to, you know, perform work for us so
 2    we don't have to do it, basically.  So in this
 3    instance, they did most of the research work for us.
 4    So they rented the facilities, recruited participants.
 5         Q.  What's a pinecone study?
 6         A.  Do you mean this particular study?
 7         Q.  Sure.  We'll start with this particular
 8    study.  Well, no, let me actually -- I don't think
 9    that's what I mean.
10             Is it fair to say a Pinecone study is a
11    category of study at Google?
12             MS. AGNOLUCCI:  Objection.  Vague.
13             THE WITNESS:  What do you mean by "a
14    category" of a study?
15    BY MR. FRAWLEY:
16         Q.  Like this wasn't the only pinecone study
17    ever; right?  It's a type of study.  Is that fair?
18         A.  It's true that there were more pinecone
19    studies, yes.
20         Q.  What's the purpose of a pinecone study?
21             MS. AGNOLUCCI:  Objection.  Vague.
22             THE WITNESS:  Yeah, it depends on what we
23    want to study.
24    BY MR. FRAWLEY:
25         Q.  What was the purpose of this pinecone study?
```

1        A.  Well, let's see.  I can scroll down.  There's
2    probably specifics.  Okay.  So looking at the page
3    ending in -697, that's Page 6 of the PDF.  So I'm
4    looking at that page, and there it says the topics
5    included were dashboards, consents, UDC consent and
6    UDC website.
7        Q.  And the title of the document says, "Pinecone
8    Study 3."  Does that mean there was a Pinecone Study 1
9    and 2 about these topics?
10       A.  No, not about these topics, I believe.
11       Q.  But there was a Pinecone Study 1 and a
12   Pinecone Study 2?
13       A.  Yes.
14       Q.  Do you recall what topics those studies were
15   about?
16       A.  I don't recall.
17       Q.  Were you involved in all of the pinecone
18   studies or just this one?
19       A.  When you say, "all of the pinecone studies,"
20   which ones are you referring to?
21       Q.  So are there more than the three that we've
22   already identified?
23       A.  Yes.
24       Q.  How many were there?
25       A.  I think 52.

Page 83

```
 1          Q.  Were there any other pinecone studies, aside
 2     from this one, that explored UDC?
 3              MS. AGNOLUCCI:  Objection.  Vague.
 4              THE WITNESS:  I would have to look at each
 5     study to determine like which ones focused on UDC.
 6     BY MR. FRAWLEY:
 7          Q.  Do you think there was at least one other one
 8     that focused on UDC besides this one?
 9              MS. AGNOLUCCI:  Calls for speculation.  Asked
10     and answered.
11              THE WITNESS:  I mean I would guess, and I
12     guess we're not allowed guessing.
13     BY MR. FRAWLEY:
14          Q.  So I just want to understand sort of how this
15     study came to be.  Why was Google studying UDC at this
16     time?
17          A.  I don't recall specifics.  I can take a look
18     at the document.
19          Q.  Yeah, please.  Go ahead.
20          A.  All right. So I'm on slide -- or Page 7 of
21     the PDF.  It says, "For the Activity controls, we
22     suspect that we can increase the clarity and
23     comprehension of the text.  Also, we are changing the
24     UI for web and we want to see if users comprehend what
25     the Activity controls are in this context."
```

```
 1              And then there are several research questions
 2     listed.  "Do users comprehend what will happen if they
 3     turn on the Web & App activity setting (in the context
 4     of an app)?
 5              "Does adding 'My Activity' in Activity
 6     controls help comprehension?
 7              "Do they understand what happens to their
 8     already stored data when they turn it off?"
 9              All right.  So that's one of the topics, and
10     that was the -- I mean it seems like that's the
11     purpose of this particular study.
12          Q.  Who at Google came up with these questions?
13              MS. AGNOLUCCI:  Objection.  Vague.
14     Foundation.
15              THE WITNESS:  Yeah.  I don't know who
16     specifically did this -- for this particular study
17     came up with those particular questions.  I just don't
18     remember.
19     BY MR. FRAWLEY:
20          Q.  Could it have been you?
21          A.  Let's see.  I have to scroll back up and
22     down.  I'm looking to see if my name is sort of
23     against that particular topic.  I mean you're asking
24     could it have been me; right?
25          Q.  Uh-huh.
```

Page 85

1       A.  And that's -- I don't know if it could have
2   been me.  It could be or it could not have been.  It's
3   either/or.  It's hard for me to answer conclusively.
4       Q.  Can you tell me about the specific work that
5   you did for this study?
6           MS. AGNOLUCCI:  Objection.  Vague.
7           THE WITNESS:  I don't remember the specifics.
8   This was in 2017, which is a very long time ago.
9   BY MR. FRAWLEY:
10      Q.  Can you just tell me more generally about the
11  work that you did on this study?  What was your role
12  in this study?
13      A.  So, more generally, I arranged the contract
14  with the vendor in this case, Insitum.  So I'm sure
15  that was in place.  Yeah, that's definitely a fact.
16          What else?  I ensured that the participants
17  were, you know, meeting the requirements as defined on
18  slides through Page 6.  So we're looking for 10
19  participants.  I don't know if it's mentioned, but I
20  can see from photos this is actually in Germany.  As I
21  mentioned before, we're doing it -- 99 percent of my
22  work focus is on research in Europe.  So this is
23  Germany.
24          So I arranged that the participants recruited
25  matched the requirements, followed the requirements.

1   What we can see here is that that's -- all of them are
2   interested in privacy issues.  So this reminds me that
3   this research -- actually, a lot of the research we
4   did involved participants more -- with more extreme --
5   I wouldn't say, "extreme" -- more interesting privacy
6   issues.
7          So the sample is sort of not even a -- it's
8   not a general population representative sample.  It's
9   more biased towards more privacy interests.  Also, you
10  can see it's 10 participants that we recruit for this
11  particular study.  Yeah.  Those are some examples of
12  what I did.
13       Q.  That's helpful.
14          Why did you want your sample to be biased
15  towards people who are more interested in privacy?
16       A.  It provides us with -- you know, I don't know
17  what the right word is, but with perceptions -- maybe
18  that's the right word -- from people that are
19  interested in this topic because we know -- in my
20  research with participants in Europe, we've seen a
21  variety of behaviors, and we wanted to get -- some
22  people don't read it at all and some people do.
23          So we wanted to focus on those people that
24  were interested and, you know, we would get more
25  useful information from that group.

Page 87

```
 1              MR. FRAWLEY:  All right.  I'm introducing a
 2     new exhibit.
 3              (Deposition Exhibit 202 was marked for
 4              identification.)
 5              MR. FRAWLEY:  All right.  I am marking
 6     Exhibit 202.
 7              Please let me know when you have that one in
 8     front of you.
 9              (Pause.)
10              THE WITNESS:  Yep.  It's opening.  Yep.
11     BY MR. FRAWLEY:
12         Q.  All right.  Do you see near the top of the
13     document that you are listed as the author?
14         A.  Yes.
15         Q.  And you can take a moment to review it, but
16     my question is just did you write this document?
17         A.  Let's see.  I definitely created the
18     document.  I don't think I wrote every word in the
19     document.
20         Q.  But you have some of the document.  Is that
21     fair?
22         A.  Yeah.  Yes.
23         Q.  Can you tell me what is meant by "N3" at the
24     very top?
25         A.  N3?  Yeah.  This stand for Narnia 3.
```

Page 98

1     Q.  And can you elaborate on what Narnia 3 is.
2     A.  It was a project name.  I mean I don't
3  remember the specifics.  It included, based on this
4  and memory, a change to the -- definitely to the
5  consent I think or engagement, and I think primarily
6  it was related to account creation in Europe.  Yep.
7     Q.  If you know, is there a Narnia 2?
8     A.  Yes, there is a Narnia 2.
9     Q.  What was the difference, if anything, between
10 Narnia 2 and Narnia 3, aside from the number?
11         MS. AGNOLUCCI:  Objection.  Foundation.
12         THE WITNESS:  I mean they are both projects
13 focused on different things, a lot of different
14 things.  But I don't sort of -- I can't sort of give a
15 complete answer to what exactly the difference was
16 between them.  There was a lot of different things
17 happening in both, probably.
18 BY MR. FRAWLEY:
19    Q.  Do you know why the name was given as
20 "Narnia"?
21         MS. AGNOLUCCI:  Objection.  Vague.
22         THE WITNESS:  I don't know exactly.  You mean
23 Narnia 3, why the name was Narnia 3?
24 BY MR. FRAWLEY:
25    Q.  The word "Narnia," was there some

```
 1    significance to that choice?
 2              MS. AGNOLUCCI:  Same objection.
 3              THE WITNESS:  I don't remember if there was
 4    significance to that.
 5    BY MR. FRAWLEY:
 6         Q.   Okay.  And can you tell me what is meant by
 7    "Express ▓▓▓▓▓▓"?
 8         A.   Yes.  It's a code name for one of the options
 9    or design directions that was part of the Narnia 3
10    project.
11         Q.   What was the specific object or direction
12    that ▓▓▓▓▓ was code name for?
13         A.   Are you talking about this point in time,
14    when this document was written?
15         Q.   Sure.  We can start there.
16         A.   Yeah.  I think it was the code name for a
17    design direction that included something called
18    "Express."  Express path, probably, is the right word.
19    Above it, it says manual path.  So "express" means
20    express path.
21         Q.   Do you see where in the -- still on the first
22    page it says, "Hypothesis & Research Questions"?
23         A.   Yes.
24         Q.   What is meant by "Hypothesis"?
25         A.   Hypothesis in research -- it's common in
```

Page 100

1    research practice, it means an assumption or -- so
2    it's not theory or not a fact.  It's basically
3    something that we believe may or may not be the case,
4    and we describe that for the purposes of running the
5    research.
6         Q.  Okay.  Can you look at -- so if you look at
7    the bottom of this page, do you see where it says,
8    "Research Question, Goal, Hypothesis"?
9         A.  Yes.
10        Q.  And then if you just flip, it looks like --
11   well, would you agree with me that the next couple
12   pages just have lists of questions, goals, and
13   hypothesis -- hypotheses?  Does that look right to
14   you?
15        A.  Like there's three columns, and I would agree
16   that the first column, is "Research questions," the
17   second, "Goal," and the third, "Hypothesis."
18        Q.  Okay.  And can you look at the page ending in
19   -299.R?
20        A.  Yes.
21        Q.  And do you see, like a little bit under
22   halfway down the page in the "Hypothesis" column it
23   says, "Most respondents will believe that turning off
24   WAA will result in no data being collected from their
25   activity and no personalization in Google products and

Page 101

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    services"?
2         A.   Yes.
3         Q.   So what was the basis for that hypothesis?
4              MS. AGNOLUCCI:  Objection.  Vague.
5              THE WITNESS:  The context of this study is --
6    taking a step back.  As I mentioned, this was an
7    account creation for European users.  So that's a
8    first step; right?
9              Second step was, as mentioned before, most
10   often it would be used for recruit participants with a
11   little bit more privacy interest and notice -- not
12   notice.  What's the right word?  Interest in -- more
13   interested in privacy; right?  So those are two limits
14   on a limiting fact for the context of this; right?
15             With that in mind, I don't know specifically
16   which particular research study was used to formulate
17   this particular hypotheses -- hypothesis.  As
18   mentioned, also to my recollection, I did not write
19   the entire document.  I might have written pieces of
20   it.
21             So, again, I may or may not have written this
22   particular sentence, but I don't remember what the
23   exact basis for the hypothesis was.  As I mentioned
24   before, this hypothesis is not a theory or a fact.
25   BY MR. FRAWLEY:
```

Page 102

```
 1        Q.  So just to clarify, for this study, was this
 2   another example of where you were seeking participants
 3   who were more privacy conscious?
 4        Let me look at the document and see if I find
 5   it anywhere.
 6        MR. FRAWLEY:  Sure.
 7        THE WITNESS:  I did not see it when I was
 8   scrolling down before.
 9        (The witness reviewed Exhibit 202.)
10        THE WITNESS:  It doesn't specify it for this
11   particular study.  So that was an assumption, but
12   there's no facts.  So I would say I don't know, for
13   this particular study, who did that or not.
14   BY MR. FRAWLEY:
15        Q.  And do you know what kind of research method
16   was used for this study?
17        A.  Again, I'm looking at the document.  It
18   doesn't specify it anywhere, at least not at the top.
19   I mean it doesn't specify it.  So I -- I would be
20   guessing.  So I don't know specifically.
21        Q.  I'm sorry.  I didn't mean to cut you off.
22   I'm sorry.
23        A.  I don't know specifically what method, for
24   this particular study, was used.
25        Q.  Do you think it might have been a survey?
```

Page 103

1          A.   It -- I'm just looking at the research
2    questions.
3               (Pause.)
4               THE WITNESS:  Let's see.  I mean it could
5    have been, but I'm not 100 percent sure it was.
6    BY MR. FRAWLEY:
7          Q.   So can you talk to me about, when you're
8    thinking about doing a study like this, how do you
9    decide whether it should be a survey or a usability
10   lab or some other method?
11              MS. AGNOLUCCI:  Objection.  Vague.
12              THE WITNESS:  I mean as mentioned before, it
13   really depends on, you know, the questions we want
14   answered.
15   BY MR. FRAWLEY:
16         Q.   So based on the questions for this study --
17   and I know you don't remember which method was
18   actually chosen.  But sitting here today, what's your
19   opinion on the best method for these questions?
20              MS. AGNOLUCCI:  Objection.  Vague.
21              THE WITNESS:  There's a lot of questions
22   here.  It looks like 30 or so.  I mean just quickly
23   counting or guessing.
24              I would have to go through each question, and
25   based on that, say that this is the appropriate

CERTIFICATE

I do hereby certify that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

*[signature]*

Nancy J. Martin, RMR, CSR

Dated: February 8, 2023

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)

Page 127