1

**BOIES SCHILLER FLEXNER LLP**
David Boies (admitted pro hac vice)

2

333 Main Street
Armonk, NY 10504

3

Tel.: (914) 749-8200

4

dboies@bsfllp.com

5

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027

6

44 Montgomery St., 41st Floor
San Francisco, CA 94104

7

Tel.: (415) 293-6800
mmao@bsfllp.com

8

brichardson@bsfllp.com

9

James Lee (admitted pro hac vice)
Rossana Baeza (admitted pro hac vice)

10

100 SE 2nd St., 28th Floor
Miami, FL 33131

11

Tel.: (305) 539-8400

12

jlee@bsfllp.com
rbaeza@bsfllp.com

13

Alison L. Anderson, CA Bar No. 275334

14

M. Logan Wright, CA Bar No. 349004
2029 Century Park East, Suite 1520

15

Los Angeles, CA 90067
Tel.: (213) 995-5720

16

alanderson@bsfllp.com
mwright@bsfllp.com

17

**SUSMAN GODFREY L.L.P.**
Bill Carmody (admitted pro hac vice)
Shawn J. Rabin (admitted pro hac vice)
Steven M. Shepard (admitted pro hac vice)
Alexander Frawley (admitted pro hac vice)
Ryan Sila (admitted pro hac vice)
One Manhattan West, 50th Floor
New York, NY 10001
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com
rsila@susmangodfrey.com

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: (310) 789-3100
abonn@susmangodfrey.com

**MORGAN & MORGAN**
John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)
Michael F. Ram, CA Bar No. 104805
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com
mram@forthepeople.com

18

19

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

20

21

ANIBAL RODRIGUEZ, SAL CATALDO, JULIAN SANTIAGO, and SUSAN LYNN HARVEY, individually and on behalf of all others similarly situated,

22

23

24

Plaintiffs,

25

vs.

26

GOOGLE LLC,
Defendant.

27

28

Case No.: 3:20-cv-04688-RS

**PLAINTIFFS' OPPOSITION TO GOOGLE'S MIL NO. 5 RE: GOOGLE'S PRIVACY COMMITMENTS, PRACTICES, AND THE HISTORY AND DEVELOPMENT OF WEB & APP ACTIVITY**

The Honorable Richard Seeborg
Date: July 30, 2025
Time: 9:30 a.m.

1

## **<u>TABLE OF CONTENTS</u>**

2   I.      INTRODUCTION ................................................................................................. 1

3   II.     LEGAL STANDARD ......................................................................................... 2

4   III.    ARGUMENT ........................................................................................................ 3

5           A.    Google Employees' Admissions of Google's Broken
                  Protections for User Privacy ........................................................................ 3

6           B.    Sundar Pichai's Promises of control and Employees' Criticisms .............. 6

7           C.    Google's Internal Reaction to the Public Revelation of a Privacy
                  and Consent Failure Involving Web & App Activity ................................ 12

8           D.    History and Development of the Web & App Activity Privacy
                  Controls ...................................................................................................... 14

9   IV.     CONCLUSION ................................................................................................... 16

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

i

28

## I.    INTRODUCTION

Google's fifth motion in limine, concerning what it self-servingly calls evidence of "products outside the scope" of this case, should be denied. Google's four-page motion contains none of the necessary detail to warrant excluding the *33* at-issue exhibits before trial even begins. Google hardly engages with the exhibits themselves. Excluding citations, the Argument section of Google's brief contains fewer sentences (23) than the number of exhibits it targets. To the extent that Google's motion addresses the exhibits at all, it either states Google's own slanted perspective about them or gets them wrong entirely. That does not support exclusion.

A careful review of the exhibits targeted in this motion reveals that they are relevant to many issues that will be tried, such as Google's state of mind, users' expectations of privacy, and the offensiveness of Google's conduct. The exhibits can be sorted into four categories:

1. **Google Employees' Admissions of Google's Broken Protections for User Privacy**:[1] Google seeks to exclude notes from Google's internal interviews, in which the company's privacy employees and executives criticized the state of user privacy at Google. In these interviews, Google's employees admitted, among other things, that ████████████ ███████████████████████████████████████████████████████████████ Google's employees' statements are relevant to many of the issues in dispute, including Google's state of mind, its purported limitations on the use of (s)WAA-off app activity data, users' expectations with respect to privacy online, and the offensiveness of Google's conduct.

2. **Sundar Pichai's Promises of Control and Employees' Criticisms**:[2] Google seeks to exclude repeated public statements made by its CEO, Sundar Pichai, promising that users control the data that Google collects. This includes false sworn congressional testimony promising that Google offers its users a "toggle" that allows them to decide whether Google collects mobile data. As the record in this case proves, Google uses the Firebase and Google Mobile Ads SDKs to violate users' choice. Behind closed doors, Google employees criticized Mr. Pichai's statements. Mr. Pichai's public campaign contributed to users' reasonable expectation of privacy when they exercised the control they were offered. This evidence also speaks to Google's state of mind and the offensiveness of its conduct.

---

[1] Dkt. 478-32 (PX-6).

[2] Santacana Ex. D (PX-28); Dkt. 478-25 (PX-217); Santacana Ex. E (PX-132); Dkt. 478-35 (PX-249) Santacana Ex. C (PX-250); Dkt. 479-41 (PX-133); Dkt. 478-34 (PX-244); Santacana Ex. F (PX-134).

1

3. **Google's Internal Reaction to the Public Revelation of a Privacy Failure Involving Web & App Activity**:[3] In 2018, the Associated Press published an article revealing that Google uses the Web & App Activity privacy controls to collect users' location data, even when they choose to turn off the Location History setting. Google seeks to exclude evidence that its executives devoted significant time to Google's response, which is relevant for several reasons. It shows that executives recognized that the issue is serious—violating users' privacy choices is highly offensive to the public. It also shows that Google executives were knowledgeable about the Web & App Activity privacy controls, which goes to Google's state of mind regarding its false promises of control.

4. **The History and Development of the Web & App Activity Privacy Controls**:[4] Google seeks to exclude evidence regarding the creation of the Web & App Activity privacy controls as they exist today, as well as their development since. This evidence shows that senior executives at Google were involved at every step. That bears on the importance of this setting to Google and its users. And given the enhanced scrutiny applied when executives are involved, it also diminishes the likelihood that Google's privacy failures were inadvertent.

Google does not identify any particular danger in allowing this evidence to be presented to the jury. Its principal argument is that these exhibits "do[] not relate to the allegations at issue in this case," Mot. at 5, which is both untrue and not germane to the question of prejudice. There is no reason to believe that the jury is incapable of assigning this evidence the appropriate weight. Google's motion should be denied.

## II.    LEGAL STANDARD

"To exclude evidence on a motion in limine, the evidence must be inadmissible on all potential grounds." *Thunder Studios, Inc. v. Kazal*, 2018 WL 11346849, at *1 (C.D. Cal. Nov. 13, 2018) (citation omitted). "Unless a party can meet this 'high standard,' evidentiary rulings should be deferred until trial because 'a court is almost always better situated during the actual trial to assess the value and utility of the evidence." *L.D. v. EzyRoller, LLC*, 2024 WL 5416670, at *1 (C.D. Cal. Nov. 25, 2024) (citation omitted). Moreover, Rule 403 "is an extraordinary remedy to be used sparingly." *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995). Rule 403

---

[3] Dkt. 478-14 (PX-195); Dkt. 478-13 (PX-198); Dkt. 478-16 (PX-199); Dkt. 478-17 (PX-200); Dkt. 478-18 (PX-201); Dkt. 478-20 (PX-202); Dkt. 478-15 (PX-204); Santacana Ex. B (PX-207); Dkt. 478-21 (PX-208); Dkt. 478-22 (PX-210); Dkt. 478-19 (PX-215); Dkt. 479-37 (PX-221); Dkt. 479-36 (PX-233); Dkt. 478-33 (PX-236); Dkt. 478-30 (PX-263); Dkt. 478-28 (PX-273); Dkt. 478-27 (PX-277).

[4] Dkt. 478-1 (PX-152); Dkt. 478-2 (PX-153); Dkt. 478-3 (PX-154); Dkt. 479-35 (PX-226); Dkt. 478-26 (PX-243); Dkt. 478-34 (PX-244); Dkt. 478-28 (PX-273); Dkt. 478-27 (PX-277).

1    authorizes exclusion when "the danger of prejudice [does] not merely outweigh the probative value

2    of the evidence, but *substantially* outweigh[s] it." *Id.* (emphasis in original).

3    **III.    ARGUMENT**

4        The Court should deny Google's motion in full. For ease of comprehension, Plaintiffs

5    address the exhibits in four categories: (1) Google employees' admissions of Google's broken

6    protections for user privacy; (2) Sundar Pichai's promises of control (and employees' criticisms);

7    (3) Google's internal reaction to the public revelation of a privacy failure involving Web & App

8    Activity; and (4) the history and development of the Web & App Activity privacy controls. The

9    exhibits in each category are relevant to the issues at trial, and Google fails to identify specific and

10   material prejudice these documents may cause.

11       **A.    Google Employees' Admissions of Google's Broken Protections for User
              Privacy**

12       Without saying so, Google first seeks to exclude evidence of widespread concern amongst

13   privacy stakeholders at Google about the company's approach to consent and user privacy. In

14   moving to exclude **PX-6**, Google falsely represents that the document comprises "public

15   statements by Mr. Pichai about Google's general privacy practices." Mot. 4 (including PX-6 in

16   this category). It very clearly does not. *See* Dkt. 478-32 (PX-6). PX-6 is

17

18

19

20

21       The stated mission of the                          program was

22

23                                              Mao Ex. 19 (PX-309) at 1. As part of this initiative, Google

24   interviewed dozens of stakeholders within Google. PX-6 reflects notes from those interviews. Dkt.

25   478-32 (PX-6); Mao Ex. 20 (Heft-Luthy Tr.) at 121:5–17. The interviewees' responses—about

26   topics including but by no means limited to

27

28

1   ▮▮▮▮—are critically important. They bear on issues like Google's state of mind, the

2   reasonableness of users' expectation of privacy, the consistency of Google's conduct with social

3   norms, the offensiveness of Google's conduct, and more.

4        Take, for example, notes of the ▮▮▮▮ team's interview with **David Monsees**, who

5   Google describes as the product manager for the Web & App Activity ("(s)WAA") privacy

6   controls. In his interview, Mr. Monsees said that he "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" at

7   Google. Dkt. 478-32 (PX-6) at -883. Mr. Monsees also admitted that ▮▮▮▮▮▮▮▮▮

8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at -884. Asked whether ▮▮▮▮▮▮

9   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Monsees

10  said: ▮▮▮▮▮▮▮▮▮ *Id.* (emphasis added). His answer supports

11  the conclusion that Google does not offer users a choice over collection of their data, which is a

12  requirement to establish legal consent. And Google's apparent belief that users don't deserve a

13  choice-—despite repeated public statements to the contrary, *see infra*—heightens the offensiveness

14  of its conduct. Mr. Monsees also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮ *See id.* at -882, -885 ▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮

18       The ▮▮▮▮ team also interviewed **Bryan Horling**, David Monsees's boss, who

19  admitted that ▮▮▮▮▮▮▮▮▮▮▮▮▮." *Id.* at -898. That

20  admission illustrates the stakes of Google's data collection practices, as well as the offensiveness

21  of Google's decision to collect user data even when people turn off the Web & App Activity

22  privacy controls. Another stakeholder said that ▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮. *Id.* at -887. The fact that

24  users care deeply about Google's honesty, as well as their power to say no to data collection,

25  strongly supports a finding that Google's conduct is highly offensive and an egregious breach of

26  social norms for purposes of the privacy tort claims-—even setting aside the intimacy of app

27  activity data that Google collects.

28

1    In several interviews, senior privacy executives suggested that Google ████████

2    ███████████████████████████████████████████████████. **Stephan**

3    **Micklitz**, the director of engineering for Google's Privacy and Data Protection Office, said that

4    Google "████████████████████████████████████

5    ███████████████████████████████████ *Id.* at -896 (emphasis

6    added). **Rahul Roy-Chowdhury**, who was responsible for Google's long-term privacy strategy,

7    similarly said that Google was ██████████████████████████

8    in part because █████████████████████████████████ *Id.* at -

9    930. These admissions should rightfully cause the jury to doubt Google's assurances that it does

10   not use (s)WAA-off app activity data for certain purposes, like personalized advertising.

11   Many interviewees described Google's culture of what certainly appears to be disrespect

12   for user privacy. One product manager working on privacy issues at Google expressed his view

13   that "████████████████████████████." *Id.* at -877. Others expressed that ████

14   ███████████████████████████████████████████████████

15   ███████████████████████████████████████████████████

16   ████████████████████████████████. Othar Hansson, who led the product team for the

17   Privacy and Data Protection Office, said that ████████████████████████████

18   ███████████████████████████████████████████ *Id.* at -914, 917.

19   He continued: ████████████████████

20   ██████████████████████████████████ *Id.* He explained that ████████

21   ███████████████████████████████████████████████████

22   ███████████████████████████████████████████████████

23   ██   These statements reflect on Google's motives and intent. And Google's conduct is all the

24   more offensive because it is a symptom of known problems with company culture.

25   Google's only claim of prejudice is the inverse of its argument with respect to relevance—

26   that because these statements are purportedly irrelevant, they are prejudicial. *See* Mot. 5. But this

27   argument is deeply misguided. Although Google has sometimes described ██████████ as a

28   "*general* privacy project," Dkt. 266 at 5, Google's overall privacy practices by definition include

5

1   its conduct in this case. For example, when Google's executives admit ████████████

2   ████████████████████████████████████████████

3   ████████████████, that makes it more likely that Google's conduct in this case breaches

4   social norms. And when those executives admit that ███████████████████████████

5   █████, that undermines Google's assertion that it uses (s)WAA-off app activity data only for

6   benign "record-keeping" purposes. For that reason, this Court previously rejected Google's efforts

7   to block discovery into the ██████████ project. *See* Dkt. 299 (ordering Mr. Heft-Luthy's

8   deposition); *see also* Dkt. 266 at 5 (Google's objection to deposition of Mr. Heft-Luthy, on the

9   ground that he "worked on *general* privacy projects" such as "██████████"). Moreover,

10  discovery showed that the ██████████ project in fact focused on the Web & App Activity

11  privacy controls, because they are some of the main culprits of Google's failed approach to

12  privacy. *See, e.g.* Mao Ex. 21 (PX-18) at 2 ████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████). The notion that Google's own employees' opinions about

15  privacy, users' expectations, and the limitations of Google's privacy infrastructure can be excised

16  from this case is folly.

17        **B.    Sundar Pichai's Promises of control and Employees' Criticisms**

18        Next, Google seeks to exclude evidence of various public statements made by its Chief

19  Executive Officer, Sundar Pichai, and Google employees' reactions to them. Mr. Pichai's

20  relentless campaign to instill in the public a sense of control over what Google collects, especially

21  by using "toggles" like the (s)WAA toggle at issue in this case, is highly relevant to the

22  reasonableness of class members' expectation of privacy and lack of consent or permission. That

23  the evidence shows Google's conduct in this case proved these promises false-–and that Google

24  employees knew it—supports a finding that Google's conduct was highly offensive. There is no

25  merit to Google's claim of prejudice, which depends entirely on Google's false and unsupported

26  assertion that Mr. Pichai's public statements do not relate to app activity data.

27        **PX-28** is a transcript of Mr. Pichai's testimony before Congress on December 11, 2018,

28  which contributed to the public perception that Google allows its users to choose what data—

6

1   including app activity data—they allow Google to save. At the top of the hearing, the Chair of the

2   House Judiciary Committee pressed Mr. Pichai about the "volume of detailed information" that

3   Google was "collect[ing]" from "smartphones," Mr. Pichai assured everyone that this data

4   collection is within Google users' control. Santacana Ex. D (PX-28) at 22:22–23:18. He testified:

5           *[Y]ou have a choice of what information is collected*, and we make
            it transparent. … [I]n the last 28 days, 160 million users went to —
6           went to their My Account settings where *they can clearly see what
            information we have*. We actually give, you know, show it back to
7           them, and *we give clear toggles, by category, where they can decide
            whether that information is collected, stored*.
8

9   *Id.* at 23:24, 24:17–25:2 (emphasis added). Mr. Pichai's testimony was crystal-clear: For each

10  category of information, there is a toggle that allows Google's users to decide whether that

11  information is collected. The "category" of data at issue in this case is app activity data. The only

12  "toggles" that purport to control whether Google collects app activity data are the (s)WAA privacy

13  controls. Mr. Pichai later doubled down, testifying that his promise applies to app activity data. *Id.*

14  at 174:4–8 ("Q. So if you get an app that gathers information on a specific thing, that's not also

15  coming to Google as well as, to the — the developer of the app? A. In a general sense, no."). As

16  the record in this case proves, Google uses the Firebase and Google Mobile Ads Software

17  Development Kits to violate these repeated promises.

18          **PX-217** is a group chat between several Google product managers—including David

19  Monsees, Google's product manager in charge of the (s)WAA privacy controls, Sam Heft-Luthy,

20  a product manager in Google's Privacy and Data Protection Office, and others —

21  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Dkt. 478-25 (PX-217). ▬▬▬▬▬▬▬▬▬▬▬▬

22  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *Id.* In his deposition, Mr.

23  Heft-Luthy ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

24  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

25  ▬▬▬▬▬▬▬▬. *See* Dkt. 478-37 (Heft-Luthy Tr.) at 97:17–99:9, 100:21–104:24. The jury should

26  be free to draw the obvious inference that Mr. Heft-Luthy's opinions would be damaging to

27  Google's defense.

28

                                              7

1    Mr. Pichai's congressional testimony—and Google privacy employees' criticisms of it—

2    are relevant to most of the questions the jury will be asked to decide. By telling members of

3    Congress and the public, in sworn testimony, that people can decide what Google collects,

4    Mr. Pichai added to the objective reasonableness of class members' expectation of privacy—that

5    when the Web & App Activity privacy controls are turned off, Google will not collect their data.

6    If Mr. Pichai himself believed that to be true, then how could *class members'* expectation of

7    privacy be anything but reasonable? How could it be said that class members consented? And if

8    Mr. Pichai *didn't* believe that users could stop Google from collecting data about their activity on

9    mobile devices, then that would make Google's conduct highly offensive as required for the tort

10   claims. That would mean that the ruse of the Web & App Activity control reached all the way to

11   the top of the company, and that Google was so committed to it that its CEO would have knowingly

12   given false testimony under oath. Even if Mr. Pichai's testimony were merely inaccurate, as

13   opposed to dishonest, that, too, would be offensive: it would mean that Google employees

14   concealed from its CEO the enormous limitations of its purported "transparency and control"

15   offerings. And █████████████████████████████████████████████████████ are

16   relevant to Google's state of mind and the offensiveness of its conduct. This evidence reflects ███

17   █████████████████████████████████████████████████████████████████████████

18   █████████████████████████████████████████████████████████████████████████

19   ███████████████████████████████████████████ to the offensiveness of Google's conduct.

20   The remaining exhibits in this category are relevant for similar reasons.

21   **PX-132** is a New York Times op-ed written by Sundar Pichai, titled "Privacy Should Not

22   Be a Luxury Good." Santacana Ex. E (PX-132). In that article, Mr. Pichai repeated the themes

23   from his congressional testimony. *Id.* at 3 ("[W]e give you clear, meaningful choices around your

24   data. … [Y]ou get to decide how your information is used."). Mr. Pichai also wrote about his own

25   views of the "social norms" around privacy, which the jury will consider with respect to the privacy

26   tort claims. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601–02 (9th Cir. 2020)

27   ("We first consider whether a defendant gained access to data by electronic or other covert means,

28   in violation of the law or social norms."). Mr. Pichai admitted that "[p]eople today are rightly

8

concerned about how their information is used and shared," that privacy is "one of the most important topics of our time," and that it is "vital for companies to give people clear, individual choices around how their data is used." Santacana Ex. E (PX-132) at 1–2. These statements help the jury to understand what the relevant social norms are. And Google's conduct in this case is especially offensive because it is inconsistent with the ideas that its own CEO, in the pages of the New York Times, argued are good, just, integral to the company he leads.

PX-249 and 250 are internal emails amongst Google employees discussing Mr. Pichai's New York Times article. Santacana Ex. C (PX-250); Dkt. 478-35 (PX-249). In these emails, employees recognized that ████████████████████████████████ ██████████████████████████████████████████. *See* Santacana Ex. C (PX-250) at -579 ("█████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████."). Their comments reflected internal disagreement with Mr. Pichai's public representations about the clarity and meaningfulness of the choices Google offers to its users, including the Web & App Activity privacy controls.

PX-133 is another article written by Sundar Pichai, this one titled "Keeping your information private." Dkt. 479-41 (PX-133). In this article, Mr. Pichai once again represented that "[p]rivacy is at the heart of everything we [Google] do" and that one of Google's "three important principles" it "putting you in control." *Id.* at 1–2. That promise—-and its repetition—give rise to an objectively reasonable expectation of privacy when users exercise the privacy controls that Google offers, such as the Web & App Activity privacy controls. This particular article also describes how even with Web & App Activity on, your activity data will be automatically and continuously deleted after 18 months" because "products should keep your information for only as long as it's useful and helpful to you." *Id.* at 2. That is relevant for two reasons. First, because these retention controls affect what is saved in the user's account, it reinforces the false expectation that if information is not saved in the user's account, it is not saved anywhere. And second, it falsely suggests that Google does not save app activity data from users who *never* found that data useful, *i.e.*, those who turned off the Web & App Activity privacy controls.

1    **PX-244** is a set of talking points that were drafted for Mr. Pichai for use during a public

2    conference. Dkt. 478-34 (PX-244). These talking points provide that ████████████████

3    ████████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████ *Id.* at -765. This

5    document further supports some of the most important distinctions in this case: between "on" and

6    "off," and between "in your account" and "deleted" or never collected in the first place. *Id.* It

7    reinforces that the Web & App Activity settings are about *all* of the data Google keeps about a

8    user, not just the data it decides to categorize as within the user's account.

9    **PX-134** is written testimony that Mr. Pichai provided in the House Judiciary Committee's

10   July 29, 2020 hearing on online platforms and market power. Santacana Ex. F (PX-134). Mr. Pichai

11   wrote that he "always believed that privacy is a universal right and should be available to

12   everyone," which may matter when the jury is deciding whether Google violated class members'

13   rights, knowingly or otherwise. *Id.* at 4. Mr. Pichai repeated his mantra that "Google is committed

14   to … putting you in control of what you choose to share." *Id.* And he also hinted at some of the

15   incentives for Google to abandon that commitment with respect to the mobile app ecosystem:

16              [W]e know Google's continued success is not guaranteed. Google
             operates in highly competitive and dynamic global markets, I which
17           prices are free or falling. … For example, people have more ways to
             search for information than ever before — and increasingly this is
18           happening outside of only a search engine. Often the answer is just
             a click or an app away.
19

20   *Id.* at 3. This evidence contextualizes Google's conduct and sheds light on its motives: Google's

21   business was threatened by users' ongoing migration to a mobile ecosystem that did not depend

22   on Google's crown jewel, Google Search. Google's motives are relevant to its state of mind and

23   the offensiveness of its conduct.

24   Google's principal claim of prejudice is once again that this evidence is irrelevant. *See*

25   Mot. 5. It is not, for reasons explained above. Google's attempts to explain away Mr. Pichai's

26   public statements make little sense. For example, Google argues that Mr. Pichai's statements were

27   "about Google's general privacy practices," Mot. 4, which the Court credited in holding that the

28   Judge Tse did not commit clear error by excusing Mr. Pichai from an obligation to appear live at

1  trial. But it is another thing altogether to exclude evidence based on that conclusion. Google's
2  overall privacy practices by definition include the practices at issue in this case, which are
3  inconsistent with Mr. Pichai's testimony. Google's secondary argument—that there is no
4  "connection between these statements and the functioning of GA for Firebase"—is also a non
5  sequitur. Mot. 4. Mr. Pichai's testimony is relevant because, sworn to tell the truth, he testified to
6  the public and its representatives that Google's users can choose which categories of data Google
7  collects and stores. Mr. Pichai promised that Google's users can decide what Google collects; of
8  course he would not also testify about the tools Google uses to break that promise. Last, Google
9  argues that some of Mr. Pichai's testimony referred to "preloaded apps on an Android phone." *Id.*
10  Google overlooks that non-Google apps can be preloaded, and in fact the Chair explicitly
11  referenced one—"Amazon." Santacana Ex. D (PX-28) at 173:1–7. These apps may include the
12  Firebase and Google Mobile Ads SDKs. And it is hard to believe that users would perceive the
13  (s)WAA privacy controls to offer different functionality based on whether an app is preloaded.

14      Google's attorney argument about what Mr. Pichai meant to say is neither authoritative nor
15  relevant to this motion. It is not authoritative because only Mr. Pichai knows what was in his mind,
16  and Google fought to exclude him from trial. Having won that dispute, Google lacks the evidence
17  to establish Mr. Pichai's intent or clarify his testimony. And Google's attorney argument is
18  irrelevant to this motion because *what* Mr. Pichai said matters, not just *why* he said it. Those
19  watching Mr. Pichai's testimony heard his words; they did not hear him explain his reasons.

20      Google also argues that Mr. Pichai's congressional testimony "poses an obvious and
21  heightened risk of prejudice," but it does not explain why. Mot. 6. The only case Google cites for
22  that proposition involved *negative* congressional testimony given by a Tylenol executive,
23  concerning a wholly distinct product failure. *See In re Tylenol (Acetaminophen Mktg., Sales Procs.*
24  *& Prods. Liab. Litig.*, 181 F. Supp. 3d 278, 299 (E.D. Pa. 2016) (excluding congressional
25  testimony about manufacturing defect in case regarding unrelated *design* defect, except to the
26  extent that defendants "open the door" by arguing that they "compl[ied] with FDA regulations").
27  Whatever prejudice was risked in that case is not possible here, because Mr. Pichai gave *positive*
28  testimony concerning Google's purported *companywide* privacy protections. His testimony could

11

1   harm Google's defense only if it is inconsistent with Google's conduct in this case. That would

2   not be unfair prejudice.

3          The jury should be permitted to review Mr. Pichai's public statements and weigh the

4   importance of Mr. Pichai's testimony for themselves. That is the purpose of the jury, not a motion

5   *in limine. SEC v. Sabrdaran*, 2016 WL 7826653, at *2 (N.D. Cal. Oct. 20, 2016) (denying

6   defendant's motion *in limine* because it "[went] to weighing the evidence, which is the province

7   of the jury"). There is no reason to doubt jurors' ability to give appropriate weight to this evidence.

8          **C.    Google's Internal Reaction to the Public Revelation of a Privacy and Consent
               Failure Involving Web & App Activity**

9          Google also seeks to exclude evidence of Google's response to another privacy scandal

10  involving the Web & App Activity settings. In August 2018, the Associated Press reported that

11  when users turned off the Location History setting, Google relies on the Web & App Activity

12  privacy controls to collect location information anyway. *See* Ryan Nakashima, *AP Exclusive:*

13  *Google Tracks Your Movements, Like It or Not* (Aug. 13, 2018), *available at*

14  https://shorturl.at/BSkqL; Dkt. 478-13 (**PX-198**) (explaining the timeline of Google's response to

15  the article) Google's reaction to this story is relevant to Google's state of mind, the reasonable

16  expectation of privacy, consent and permission, and offensiveness. Google's records illustrate that

17  Google's most senior executives knew the Web & App Activity privacy control is misleading.

18         Although Google now argues that this issue was not about Web & App Activity, both the

19  AP article itself and Google's reaction prove the opposite. *See id.* (explaining that the "Web &

20  App Activity" setting causes the unexpected behavior). In **PX-200**, for example, Google

21  employees ███████████████████████████████████████████████

22  ███████ Dkt. 478-17 (PX-200). ███████████████████████████

23  ████████████████████████████████████████████.[5] Google is

24  _____

[5] *See* Dkt. 478-14 (**PX-195**) at -741 (███████████████████████████

25  ██████████████████████████████████████████████████████

26  ███████████████████████ Dkt. 478-16 (**PX-199**) at -088 ██████

27  ██████████████████████████████████████████████████████

28  █████████████████████████████████████████████ Dkt.

1    able to argue that the Web & App Activity privacy controls are irrelevant to that story only because

2    ████████████████████████████████████████████████████████████████████. *See*

3    Mao Ex. 22 (PX-196) ███████████████████████████████████████████████████████████

4    █████████████████████████████████████████████████████████████████████████████████

5    ███████████████████████ And good thing, too: As the record in this case proves, further

6    investigations may have revealed that the location issue reported in the AP article was only the tip

7    of the iceberg with the Web & App Activity privacy controls.

8         Google's internal focus on the Web & App Activity privacy controls in the aftermath of

9    the AP story is important for three reasons.

10        First, Google employees' attention to one respect in which the Web & App Activity privacy

11   controls were "██████████████████████████ *see* Dkt. 478-14 (**PX-195**) at -741, should

12   have caused a broader effort to identify and cure any other respects in which those controls were

13   misleading. The fact that Google nonetheless failed to address other known problems with the Web

14   & App Activity privacy controls is relevant to Google's intent and the offensiveness of its conduct.

15        Second, the severity of Google's internal reaction to the AP story also demonstrates that a

16   public revelation of a violation of user consent is an extremely serious event, which is relevant to

17   the offensiveness element. ███████████████████████████████████████████████████

18   ████████████████████████████. Dkt. 478-14 (**PX-195**) at -741. The

19   organizers of that meeting ██████████████████████████████ no small thing for a

20   company as successful as Google. Dkt. 478-15 (**PX-204**); *see also* (**PX-210**) (███████

21   █████████████████████████████████████████████████████████████████████████████████

22   Google's response was directed by the company's most senior executives. That includes Mr.

23   ────────────────────

24   478-17 (**PX-200**) ██████████████████████████."); Dkt. 478-18 (**PX-201**)

25   ███████████████ Dkt. 478-20 (**PX-202**) at -151 ████████████████████████████████

26   ████████████████████████████████████████████████████); Santacana

27   Ex. B (**PX-207**) at -928 (████████████████████████████████████████████████████

28   ██████████████████████ Dkt. 478-19 (**PX-215**) at -080 ████████.

1    Pichai, who ███████████████████████████████████████████████████████████

2    █████████████████████.[6] Their personal and sustained attention suggests that disregarding

3    users' privacy choices is so offensive that the public reaction could threaten even Google.

4        Third, this evidence bears on Mr. Pichai's state of mind when he repeated in his sworn

5    congressional testimony, his New York Times op-ed, and his article on Google's website that users

6    can control whether Google collects their data. The documents reflect that ████████████

7    ████████████████████████████████████████████████████████████████████████████

8    ██████████████████████████ And yet Mr. Pichai still made sweeping promises that do

9    not account for the severe limitations of the Web & App Activity privacy controls. There are two

10   reasonable inferences: either Mr. Pichai did so willingly, or Mr. Pichai was misled like the class

11   members. Those inferences are relevant to the users' reasonable expectation of privacy or the

12   offensiveness of Google's conduct.

13       Google does not come remotely close to carrying its burden to prove prejudice that

14   substantially outweighs the probative value of this evidence. Google's sole argument is that these

15   documents relate only to Google's "Location History" setting. As we have explained, that is false.

16       **D.    History and Development of the Web & App Activity Privacy Controls**

17       Finally, Google seeks to exclude a number of documents that reflect parts of the history

18   and development of the Web & App Activity privacy controls, which of course are the settings at

19   issue in this case. These documents show, among other things, that Google's representations about

---

20   [6] Dkt. 478-16 (**PX-199**) at -087 ("████████████████████████."), Dkt. 478-17 (**PX-200**) ██████

21   ██████ Dkt. 478-18 (**PX-201**) (PAREN), Dkt. 478-20 (**PX-202**)

22   (███████████████████████████"), Santacana Ex. B (**PX-207**) (██

23   ██████████████████"), Dkt. 479-37 (**PX-221**) at -629

24   ███████████████, Dkt. 479-36 (**PX-233**) at -516 (██

25   █), Dkt. 478-33 (**PX-236**) at -489 (██████████

26   ███████), Dkt. 478-30 (**PX-263**) at -803

27   ███), Dkt. 478-28 (**PX-273**) at -122

28   ██████████████████████████████ Dkt. 478-27 (**PX-277**)

     at -531 ("██████████████████████████████

14

1   those privacy controls were overseen by the company's highest executives, including Mr. Pichai.

2   Executive involvement often inspires especially careful scrutiny, diminishing the likelihood that

3   Google's misrepresentations about the Web & App Activity privacy controls were a mistake. This

4   evidence is therefore relevant to Google's state of mind, the offensiveness of its conduct, the

5   reasonableness of users' expectations of privacy, and permission and consent.

6          Some of the exhibits that Google seeks to exclude show that Google's most senior

7   executives were personally involved with the Web & App Activity privacy controls from the start.

8   **PX-152**, for example, shows that ████████████████████████████████████

9   ███████████████████████████████████████████████████████████████

10  ███████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████. Dkt. 478-1 (PX-

12  152).[7] **PX-153** reflects that ████████████████████████████████

13  ███████████████████████████████████████████████ Dkt. 478-2 (PX-

14  153) at -816. **PX-154** contains ████████████████████████████████

15  ██████████████████████ Dkt. 478-3 (PX-154). At this meeting,

16  ███████████████████████████████████████████████████. *Id.* at -

17  255 █████████████████████████████████████████████████). This

18  evidence provides important context for the Web & App Activity privacy controls. It also shows

19  that they are important enough to merit the personal attention of Google's executives, and it

20  suggests that Google's representations about those settings were carefully considered, not

21  inadvertent.

22         Google also seeks to exclude evidence that after the AP story, it attempted to mollify the

23  public with superficial changes to the Web & App Activity privacy controls, leaving intact their

24  core problem—████████████████████████████████████ For example, Google claimed

25  to create "retention controls" for Web & App Activity data, which purport to cause the deletion of

26  user data. *See, e.g.,* Dkt. 478-34 (**PX-244**); Dkt. 478-28 (**PX-273**); Dkt. 478-27 (**PX-277**). But ███

27  ───────────────────

28  [7] The filename of this document, which is included in metadata that Google produced but did not
    file, is "████████████████████████████."

15

1 ███████████████████████████████████████████████████

2 ██████████████████████████████████████ Dkt. 478-26 (**PX-243**) at -702

3 (███████████████████████").[8] Google's decision to implement—and

4 congratulate itself on—these "improvements," knowing full well that they do not address the

5 unseen collection of (s)WAA-off data, reflects on Google's intent and the offensiveness of its

6 conduct with respect to the data at issue in this case.

7       There is no merit to Google's argument that this evidence is only about what happens when

8 the Web & App Activity privacy controls are *on*, not when it is *off*. Dkt. 523 at 5. For one thing,

9 Google's assertion is false, as explained above. And for another, the Court previously rejected this

10 distinction, ordering the very discovery Google seeks to exclude over this exact objection. Dkt. 85

11 at 2 ("The Court doesn't find this distinction particularly persuasive and agrees with plaintiffs that

12 'documents describing what happens when WAA is turned on may bear on what happens (or does

13 not happen) when WAA is turned off.'"). Google's renewed objection should be rejected for the

14 same reasons.

15 **IV.**     **CONCLUSION**

16       For these reasons, the Court should deny Google's fifth motion in limine.

17

18

19

Dated: July 10, 2025               Respectfully submitted,

20

21                            By: */s/ Mark C. Mao*

22                            Mark C. Mao (CA Bar No. 236165)

23                            mmao@bsfllp.com
                               Beko Reblitz-Richardson (CA Bar No. 238027)

24

25 [8] *See also, e.g.*, Dkt. 479-35 (**PX-226**) at -483 (discussing retention controls); Dkt. 478-31 (**PX-269**) at -840 (email regarding "████████████████"); *id.* at -845 (national press

26 writing that "Google is a step ahead of other internet giants ... which don't provide ways to easily delete large batches of dated posts"). Google also made other similarly ineffective "improvements"

27 to the Web & App Activity privacy controls. *See* Dkt. 478-30 (**PX-263**) ██████████████

28 ████████).

brichardson@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293 6858
Facsimile (415) 999 9695

David Boies (admitted *pro hac vice*)
dboies@bsfllp.com
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200

James Lee (admitted *pro hac vice*)
jlee@bsfllp.com
Rossana Baeza (admitted *pro hac vice*)
rbaeza@bsfllp.com
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street, Suite 2800
Miami, FL 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Alison L. Anderson, CA Bar No. 275334
alanderson@bsfllp.com
M. Logan Wright, CA Bar No. 349004
mwright@bsfllp.com
BOIES SCHILLER FLEXNER LLP
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: (813) 482-4814

Bill Carmody (*pro hac vice*)
bcarmody@susmangodfrey.com
Shawn J. Rabin (*pro hac vice*)
srabin@susmangodfrey.com
Steven Shepard (*pro hac vice*)
sshepard@susmangodfrey.com
Alexander P. Frawley
afrawley@susmangodfrey.com
Ryan Sila
rsila@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330

Amanda Bonn (CA Bar No. 270891)

17

1   abonn@susmangodfrey.com
    SUSMAN GODFREY L.L.P.
2   1900 Avenue of the Stars, Suite 1400
    Los Angeles, CA 90067
3   Telephone: (310) 789-3100

4   John A. Yanchunis (*pro hac vice*)
    jyanchunis@forthepeople.com
5   Ryan J. McGee (*pro hac vice*)
    rmcgee@forthepeople.com
6   Michael F. Ram (CA Bar No. 238027)
    mram@forthepeople.com
7   MORGAN & MORGAN, P.A.
8   201 N Franklin Street, 7th Floor
    Tampa, FL 33602
9   Telephone: (813) 223-5505
    Facsimile: (813) 222-4736
10

11   *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO GOOGLE'S MIL NO. 5 RE: GOOGLE'S PRIVACY COMMITMENTS,
PRACTICES, AND THE HISTORY AND DEVELOPMENT OF WEB & APP ACTIVITY
CASE NO. 3:20-CV-04688-RS