# MATERIALS SOUGHT TO BE FILED UNDER SEAL

**BOIES SCHILLER FLEXNER LLP**
David Boies (admitted pro hac vice)
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200
dboies@bsfllp.com

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com

James Lee (admitted pro hac vice)
Rossana Baeza (admitted pro hac vice)
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Alison L. Anderson, CA Bar No. 275334
M. Logan Wright, CA Bar No. 349004
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Tel.: (213) 995-5720
alanderson@bsfllp.com
mwright@bsfllp.com

**SUSMAN GODFREY L.L.P.**
Bill Carmody (admitted pro hac vice)
Shawn J. Rabin (admitted pro hac vice)
Steven M. Shepard (admitted pro hac vice)
Alexander Frawley (admitted pro hac vice)
Ryan Sila (admitted pro hac vice)
One Manhattan West, 50th Floor
New York, NY 10001
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com
rsila@susmangodfrey.com

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: (310) 789-3100
abonn@susmangodfrey.com

**MORGAN & MORGAN**
John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)
Michael F. Ram, CA Bar No. 104805
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com
mram@forthepeople.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIBAL RODRIGUEZ, SAL CATALDO, JULIAN SANTIAGO, and SUSAN LYNN HARVEY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC,<br>Defendant. | Case No.: 3:20-cv-04688-RS<br><br>**PLAINTIFFS' OPPOSITION TO GOOGLE'S MIL NO. 4 RE: NON-U.S. CONSUMER STUDIES AND SURVEYS**<br><br>The Honorable Richard Seeborg<br>Courtroom 3 – 17th Floor<br>Date: July 30, 2025<br>Time: 9:30 a.m. |

## I.    INTRODUCTION

Google's motion focuses on four documents (PX-9, PX-14, PX-186, and PX-283) regarding Google's research into user sentiments regarding privacy and their expectations regarding the Web & App Activity ("(s)WAA") privacy controls. These documents include damning evidence and admissions. From one user study early in the class period, for example, Google concluded that "[t]he effect of the activation of the Web & App Activity [sic] is not well understood." Santacana Ex. O (PX-14) at -706. Later on, another researcher correctly predicted that users expect that turning off the (s)WAA privacy controls actually stop Google from collecting their data. Santacana Ex. N (PX-9). These studies also showed that respondents were uncomfortable with the data that Google collects, that promises of control build trust, and that Google's privacy controls and explanations were not designed to satisfy regulatory requirements.

Google's motion to exclude this evidence completely misses the mark; Google's motion is an improper effort to bury bad evidence, not exclude inadmissible evidence. While Google cites Rule 702, it does not apply: these documents are not expert witness testimony. They are *Google's* studies (and admissions), conducted in the ordinary course of its business and turned over to satisfy ordinary discovery requests. Rule 403 also does not authorize exclusion because Google cannot identify prejudice substantially greater than these exhibits' significant probative value. While some, not all, of the surveyed users were outside the United States, Google itself relied on these surveys to draw conclusions about its users in general, including in the United States. These exhibits were shared with Google employees in the United States—including David Monsees, product manager for the (s)WAA privacy controls—who were involved in Google's efforts to understand its users. In any event, Google's criticisms go to the weight of this evidence, not its admissibility. There is no basis under Rule 403 or otherwise to exclude four identified exhibits or any other evidence or argument concerning Google's research regarding its users around the world. To the contrary, Google's veiled attempt to bury bad evidence shows how relevant it is.

## II.    LEGAL STANDARD

"To exclude evidence on a motion in limine, the evidence must be inadmissible on all potential grounds." *Thunder Studios, Inc. v. Kazal*, 2018 WL 11346849, at *1 (C.D. Cal. Nov. 13,

1

2018) (citation omitted). "Unless a party can meet this 'high standard,' evidentiary rulings should be deferred until trial because 'a court is almost always better situated during the actual trial to assess the value and utility of the evidence." *L.D. v. EzyRoller, LLC*, 2024 WL 5416670, at *1 (C.D. Cal. Nov. 25, 2024) (citation omitted). Moreover, Rule 403 "is an extraordinary remedy to be used sparingly." *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995). Rule 403 authorizes exclusion when "the danger of prejudice [does] not merely outweigh the probative value of the evidence, but *substantially* outweigh[s] it." *Id.* (emphasis in original).

## III.    ARGUMENT

The Court should deny Google's motion. Google cites four exhibits (PX-9, PX-14, PX-186, and PX-283), each of which is highly relevant to the issues in dispute. These issues include users' privacy expectations, Google's failure to obtain permission or consent, Google's culpable state of mind (e.g., how long Google knew that users were misled), and the offensiveness of Google's conduct. Although some documents concern studies outside the United States, that does not justify exclusion. They form part of Google's internal effort—conducted by U.S.-based employees, including the product manager in charge of the (s)WAA privacy controls—to study Google's users globally. Google relied on these studies to draw broad-based conclusions about its users and to inform its companywide privacy strategy. If these studies were excluded, the jury would be left with an incomplete picture of Google's knowledge about its users and their expectations regarding the (s)WAA privacy controls. At trial, Google may seek to elicit testimony to contextualize or even discredit the results of its own studies. But Google's arguments provide no basis to exclude this highly relevant evidence.

**Relevance.** The four exhibits at issue (PX-9, 14, 186, 283) grew out of an internal Google program codenamed "Narnia 3" (abbreviated N3), which had a "mission … to create a unified, cross-product, consent framework" that was "intuitive to [Google's] users." Santacana Ex. Q (PX-283) at -069. Although Google launched its Narnia program in part due to the General Data Protection Regulation (GDPR) in Europe, Google also contemplated companywide changes to make its business practices "compatible" with "expected legislation" in other jurisdictions. *Id.* Google employees involved with Narnia 3 recognized that some of Google's "current data

1   practices and settings were not designed for the level of prominent explanation/consent regulators

2   expect." *Id.* at -071. Google naturally focused on Google's (s)WAA privacy control, which was a

3   major cause of Google's deficient consent framework. *See* Mao Ex. 5 (Miraglia Tr.) at 201:23–

4   202:6 ('Narnia 3 refers to a continuation of programs we've been running to improve our privacy-

5   related products and improving Web & App Activity."); *see also* Mao Ex. 6 (PX-33) (U.S.-based

6   Google engineer writing: "The whole WAA story is also quite confusing. I thought this would be

7   resolved with Narnia 3, but that work looks to be deprecated.").

8           In connection with Narnia 3, Google conducted research on its users all over the world, in

9   a series of studies Google codenamed "Pinecone." Mao Ex. 7 (Fair Tr.) at 162:16–163:6 ("We

10  launched a pretty wide-reaching privacy research set of studies that are focused on privacy and

11  end users that we refer to as Pinecone."); Mao Ex. 8 (Heft-Luthy Tr.) at 99:7–11 ("Pinecone …

12  refer[red] to a user research program, a series of user research efforts."). Google enlisted some

13  professional agencies to help conduct these studies. *See* Mao Ex. 9 (de Booij Tr.) at 80:25–82:4 9.

14  Google used these studies to research topics that relate to core issues in this case—including users'

15  expectations regarding the (s)WAA privacy controls. *See, e.g.*, Mao Ex. 7 (Fair Tr.) at 162:21–

16  163:6 (identifying Pinecone as a project that "studied … expectations with WAA").

17          As reflected in the four exhibits identified in Google's motion, this evidence is highly

18  relevant:

19          **PX-14** is an April 2017 internal Google presentation containing striking results from one

20  of Google's Pinecone studies: "The effect of the Web & App Activity [sic] is not well understood."

21  Santacana Ex. O (PX-14) at -692, -706. This document was found in the files of David Monsees,

22  the U.S.-based product manager in charge of (s)WAA, and one of just four fact witnesses Google

23  intends to call for its defense at trial. Mao Ex. 10 (metadata for PX-14 identifying Monsees);

24  Dkt. 534-3 (Google's exhibit list, which includes Monsees). The researchers wrote, in English,

25  that Google should be "more explicit" regarding the "effects of activation/deactivation" of the

26  (s)WAA privacy controls. Santacana Ex. O (PX-14) at -706. This recommendation was not limited

27  to changes in Europe.

28

3

1    **PX-186** is a September 2017 internal Google presentation that "[l]ooked at the bigger

2    picture" illustrated by Google's global research. Santacana Ex. P (PX-186). Stepping back, Google

3    found that "it is often hard or impossible for people to formulate (accurate) expectations about how

4    their experience will be impacted by their consent." *Id.* at -363. According to Google's own

5    researchers, "[i]t is next to impossible for people to understand what they're consenting to, even if

6    they read all text" about Google's "User Data Controls," which include the (s)WAA privacy

7    controls. *Id.* at -377; Mao Ex. 11 (Monsees Tr.) at 159:9–161:2 ("[T]he UDC terminology and

8    activity controls are sort of synonymous … both Web & App Activity and Supplemental Web and

9    App Activity are a class of setting that we would consider part of UDC."). This was not idle talk.

10   Google specifically studied whether "users comprehend the … [c]onsequences of turning

11   [(s)WAA] off or on." *Id.* at -378. Google employees also worried that the lack of clarity would

12   cause people to pick "the least risky option—which is often the one where they don't consent." *Id.*

13   at -363. Google also found that when "confronted … with the details of the data Google collects,"

14   people found it "scary." *Id.* at -365. Google's solution was to tell users they had "control" over

15   their data; according to Google's research, that "put people at ease" and made them view Google

16   in a more positive light. *Id.* at -365, -367, -397. This document was also written in English, and it

17   was found in Mr. Monsees's files. Mao Ex. 12 (metadata for PX-186).

18       **PX-283** is a May 2020 internal Google presentation about Google's "[s]trategy" and

19   "approach" to the Narnia 3 project. Santacana Ex. Q (PX-283). In this document, Google

20   acknowledged that the "WAA setting" is a "key consent[]." *Id.* at -074. Google's employees also

21   admitted that its "settings are complex" and its disclosures are "not designed for the level of

22   prominent explanation/consent regulators expect." *Id.* at -071. As a result, Google contemplated a

23   new "consent framework" that might actually be "intuitive to our users"—and compatible with

24   both the GDPR and "other expected legislation." *Id.* at -069. This presentation addresses not only

25   Pinecone research, but also a ███████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████████████████

27   ███████████████████████████████████████████ Mao Decl. Ex.13 (metadata for PX-283).

28

4

**PX-9** is an internal Google document dated June 8, 2020—about a month before this lawsuit was filed—that planned for additional research into user comprehension of the (s)WAA activity controls. Santacana Ex. N (PX-9). Google contemplated that this study would help Google better understand "user expectations about the effect of their choice[s]" with certain settings and controls. *Id.* at -297.R. One question Google planned to investigate about users' comprehension of Google's "[d]ata collection and usage" was specifically about the (s)WAA privacy controls: "What do most respondents believe the effect of turning off WAA will have on (a) the amount of data collected and (b) the amount of personalisation they will experience?" Google's "[g]oal" was to "gauge users' perceptions of the WAA setting." *Id.* at -297.R, -299.R. Google's researchers predicted exactly what Plaintiffs allege: "***Most respondents will believe that turning off WAA will result in no data being collected from their activity***." *Id.* at -299.R (emphasis added). This document was also written in English and was produced from Mr. Monsees's files. Mao Ex. 14 (metadata for PX-9). Plaintiffs filed this lawsuit less than a month later, and either the study was not completed or Google did not produce the results.

This is damning evidence. That Google's research repeatedly showed that users do not understand the true impact of the (s)WAA privacy controls is strong evidence of nearly every element in dispute. Google commissioned these studies and provided their results and global recommendations, in English, to the product manager in charge of the (s)WAA privacy controls. Based on this and other evidence, the jury may conclude that Google's conduct was not only intentional but especially offensive, given what its own research showed about user expectations. The jury may also rely on this evidence to find that Plaintiffs' expectation of privacy was reasonable and that Google did not obtain their consent or permission. The jury may be offended by the fact that, by its own admission, Google did not design its privacy controls and explanations to meet regulators' expectations. The jury may also be offended by Google's research-backed, intentional decision to offer false promises of "control" in an effort to make Google appear trustworthy.

**Prejudice.** Google cannot possibly meet the high burden necessary to exclude these documents under Rule 403. Google's complaints regarding the survey population—in studies

Google itself commissioned—are not grounds for exclusion. There is nothing prejudicial about presenting evidence of Google's internal admissions based on user research relating to privacy, consent, and (s)WAA.

Google's arguments regarding surveys designed and presented by testifying experts have no application here. Even if they did, it is well established that arguments regarding the "[t]echnical unreliability" of an expert survey "go[] to [its] weight … not its admissibility." *Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156 (9th Cir. 1982). That includes arguments regarding the survey population. *See, e.g.*, *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 & n.8 (9th Cir. 1997) (affirming admission of expert survey even though it "was only conducted in Southern California").[1] "Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value." *Id.* at 1143.

And those are the heightened standards applicable to *expert* surveys, which are not at issue here. This motion concerns documentation regarding surveys conducted in the ordinary course of Google's business. Such documents "need not meet the evidentiary standards of expert testimony" in Rule 702. *Int'l Marine, L.L.C. v. Delta Towing, L.L.C.*, 2011 WL 890680, at *3 (E.D. La. Mar. 11, 2011); *see also Chase Fed. Sav. & Loan Ass'n v. Chase Manhattan Fin. Servs., Inc.*, 681 F. Supp. 771, 780 (S.D. Fla. 1987) (allowing ordinary-course survey into evidence even though "it might well [have been] excludable" had it "been conducted for the purpose of litigation," for example because of a "failure to show that the survey universe was properly defined").

---

[1] *See also, e.g.*, *In re Pepperdine Univ. Tuition & Fees COVID-19 Refund Litig.*, 2023 WL 6373845, at *7 (C.D. Cal. Sept. 26, 2023) (C.D. Cal. Sept. 26, 203) (denying motion to exclude expert survey that did not "survey[] actual Pepperdine students" because "[c]oncerns about how representative a survey population is do not preclude the survey's admission"); *Cadena v. Am. Honda Motor Co.*, 2024 WL 4005097, at *6 (C.D. Cal. July 2, 2024) (denying motion to exclude expert survey despite an allegedly "improper survey population" because that "purported flaw[] go[es] only to the weight of the evidence and not its admissibility"); *Gunaratna v. Dennis Gross Cosmetology LLC*, 2023 WL 2628620, at *19 (C.D. Cal. Mar. 15, 2023) (denying motion to exclude expert survey because the "alleged flaws in [the] survey design (i.e., improper survey population [and other issues]) … go only to the weight of the evidence and not the admissibility"); *Express, LLC v. Forever 21, Inc.*, 2010 WL 3489308, at *8 n.10 (C.D. Cal. Sept. 2, 2010) ("Courts … have generally been reluctant to exclude survey evidence on the basis of purported methodological errors, especially alleged errors in the selection of sample demographics.").

It makes sense to hold testimony of retained experts to a higher standard. Such witnesses speak with the authority of an "expert," and if they are unscrupulous, there is a risk of influence from the litigation. These concerns do not apply to ordinary-course documents, and so the special reliability and fit requirements of Rule 702 do not apply either. *See Nestle Co. v. Chester's Mkt., Inc.*, 571 F. Supp. 763, 776 (D. Conn. 1983) ("[T]he same standard should not apply when admitting survey evidence developed before litigation as is applied to surveys developed for the purposes of litigation. The former are inherently more trustworthy, especially when the results are against the developer's interest, as is the case here."), *vacated on other grounds*, 609 F. Supp. 588 (D. Conn. 1985). Google exclusively cites cases applying the *Daubert* framework, which is irrelevant here.[2]

The surveys and related documents at issue in this motion amply exceed comparatively lenient standards under Rule 403. Google's two criticisms of its own surveys overlook important facts about those studies. And to the extent Google's criticisms are valid, jurors can assign these documents lesser weight. *See Southland Sod Farms*, 108 F.3d at 1143 ("[A] jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value."). There is no basis under Rule 403 to exclude this evidence from trial.

*First*, Google's objection that these documents relate only to other geographies does not hold water. A significant part of the Pinecone research took place in the United States. *See, e.g.*, Santacana Ex. Q (PX-283) at -086 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉; Mao Ex. 15 (reporting the results of "Pinecone ▉▉▉▉," which was "[i]mmersion research in the United States"). Although some of the research took place in other countries, Google itself relied on those results for its global privacy strategy—including in the United States. *BoDeans Cone Co., L.L.C. v. Norse Dairy Sys., L.L.C.*, 678 F. Supp. 2d 883, 904 (N.D. Iowa 2009) ("[I]t is difficult

---

[2] *Citizens Fin. Grp. v. Citizens Nat'l Bank*, 383 F.3d 110, 118–19 (3d Cir. 2004) (expert survey); *Solofill, LLC v. Rivera*, 2018 WL 3357497, at *4 (C.D. Cal. May 16, 2018) (same); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 2010 WL 5186393, at *4 (D. Utah Dec. 15, 2010) (same); *Citizens Fin. Grp. v. Citizens Nat'l Bank*, 2003 WL 24010950, at *5 (W.D. Pa. Apr. 23, 2003) (same); *Icon Enters. Int'l, Inc. v. Am. Prods. Co.*, 2004 WL 5644805, at *28 (C.D. Cal. Oct. 7, 2004) (same); *Lamphere Enters., Inc. v. Jiffy Lube Int'l Inc.*, 138 F. App'x 20, 23 (9th Cir. 2005) (same); *Elliot v. Google Inc.*, 45 F. Supp. 3d 1156, 1167 (D. Ariz. 2014) (same).

for the court to take seriously 'trustworthiness' challenges to a survey made by the very party that commissioned and use the survey in the first instance, albeit not for purposes of the present litigation."). For example, Google reported the results back to its employees in the United States. *See* Mao Ex. 9 (de Booij Tr.) at 110:24–111:22 (testifying that "the results of these studies [were] shared with Google employees in the United States" and identifying U.S. employees who commented on one example). And when Google synthesized what it learned from the Pinecone studies, it drew on results from across countries. *See, e.g.*, Mao Ex. 16 (PX-326) at -980–81; *see id.* at 031 (summarizing combined results from respondents in the United States, United Kingdom, France, Denmark, and Japan). In fact, some of the conclusions in the United States study were borrowed from a study codenamed "Pinecone ███████" which occurred in France. *See* Mao Ex. 17 at -311 ("Actually, ██████ takes some of the findings from ██████ as well."); Mao Ex. 16 (PX-326) at -031 (showing that Pinecone ██████ included French participants). It is no surprise that Google would rely on foreign survey results to inform its operations in the United States: Google's own research showed that American sentiment was generally consistent with sentiment in other countries. *See, e.g.*, Mao Ex. 15 at -577–78, 583–84, 586; Mao Ex. 18 (PX-2) at -000 ("All participants expected turning WAA toggle off to stop saving their activity.").

The notion that studies of Google users who happen to live in other countries would have zero probative value with respect to users in the United States strains credulity. *See Thunder Studios*, 2018 WL 11346849, at \*2 ("The evidence relating to Defendants' actions in, or relating to, Australia, is relevant. … While these actions are not close in geographic relation, it is difficult to ignore the connection between [the common course of conduct]."). The Court already rejected this argument in ordering the deposition of Mr. de Booij over Google's objection that he was a "European" user experience researcher. *See* Dkt. 299 (order granting Mr. de Booij's deposition); Dkt. 266 at 5 (objecting to his deposition in part on that basis).

*Second*, Google's contention that these studies relate to a limited set of privacy-conscious users is both factually questionable and irrelevant. Google relies on its disclosure expert, Dr. Hoffman, to establish this fact. Mot. 4. Dr. Hoffman, in turn, relies on the deposition testimony of Mr. de Booij. *See* Dkt. 473-2 (Hoffman Rep.) at 91–92, tbl. 13. But immediately after Mr. de Booij

8

suggested that his hypothesis concerned *privacy-conscious* users' expectations of (s)WAA, he clarified that this "was an assumption," based on "no facts." Mao Ex. 9 (de Booij Tr.) at 102:3– 103:13. Regardless, Google's contention is not a valid criticism. This case concerns privacy-conscious users: every class member chose to turn off the (s)WAA privacy control.

Google's remaining arguments are meritless. The Court's *Daubert* Order does not prohibit Prof. Schneier from testifying about these documents. *See* Dkt. 511 at 5–7. Prof. Schneier relies on this evidence to support his opinion that "Google employees repeatedly identified problems with Google's disclosures regarding WAA/sWAA, but Google ignored them," which the Court did not exclude. *See* Dkt. 474-4 (Schneier Rep.) at § 11.7, ¶ 398; Dkt. 511 at 5–7. Although Prof. Schneier may not be a consumer expectations expert, Dkt. 511 at 5–7, he may nonetheless rely on survey results to support his other opinions. One "does not need to be a survey expert" to "rel[y] on surveys produced by … Defendant." *Boston Sci. Corp. v. Cook Med. LLC*, 2023 WL 1476573, at *12 (S.D. Ind. Feb. 2, 2023). The Order's reference to Paragraph 398, which cites some of the evidence at issue in this motion, appears to be a scrivener's error: the opinion the Court excluded begins with Paragraph 399. *See* Dkt. 511 at 6 (excluding the opinion that "Google Uses Dark Patterns to Manipulate User Behavior to Its Own Benefit, *see* Schneier Rep. ¶ 398–99"); Dkt. 474-4 (Schneier Rep.) at Dkt. 474-4 (Schneier Rep.) at § 11.8 ("Google Uses Dark Patterns to Manipulate User Behavior to Its Own Benefit," spanning ¶¶ 399–400).

Google's argument that Plaintiffs cannot establish the studies' methodology is false. Two of the exhibits themselves identify the studies' methodology. *See* Santacana Ex. P (PX-186), at - 356–359 (providing information about "[p]articipants," "[r]esearch topics," and "[s]tudy setup"); Santacana Ex. O (PX-14) at -697 (identifying study's "Goals & Method," including "[t]opics," "[p]articipants," and "[p]rocedure"). It would not make sense to expect the other two exhibits to reflect a "methodology" because they concern Google's internal strategy, not survey results. *See* Santacana Ex. N (PX-9) at -299.R (Google's user researcher expected that most would "believe that turning off WAA will result in no data being collected from their activity"); Santacana Ex. Q (PX-283) at -069, -071 (describing "[t]he mission of the Narnia 3 program" and Google's

9

awareness that its "current data practices were not designed for the level of prominent explanation/consent regulators expect").

Google fails to satisfy its burden under Rule 403. Google's research into users' expectations of the (s)WAA privacy controls is exceptionally powerful evidence. The mere fact that some of this research occurred outside of the United States does not render it prejudicial—and certainly not substantially more prejudicial than probative. Google itself relied on this research to understand its users worldwide, including in the United States. Google's made-for-litigation criticisms of its own research are not grounds for exclusion. Courts in the Ninth Circuit recognize that the jury can understand methodological criticisms of surveys and weigh their results accordingly. Google's motion should be denied.

## IV.    CONCLUSION

For these reasons, the Court should deny Google's fourth motion *in limine*, which seeks to exclude PX-9, PX-14, PX-186, and PX-283. The Court should not countenance Google's attempt to bury bad evidence, which shows just how long Google knew its users were misled.

Dated: July 10, 2025                                Respectfully submitted,


                                                    By: */s/ Mark C. Mao*

                                                    Mark C. Mao (CA Bar No. 236165)
                                                    mmao@bsfllp.com
                                                    Beko Reblitz-Richardson (CA Bar No. 238027)
                                                    brichardson@bsfllp.com
                                                    BOIES SCHILLER FLEXNER LLP
                                                    44 Montgomery Street, 41st Floor
                                                    San Francisco, CA 94104
                                                    Telephone: (415) 293 6858
                                                    Facsimile (415) 999 9695

                                                    David Boies (admitted *pro hac vice*)
                                                    dboies@bsfllp.com
                                                    BOIES SCHILLER FLEXNER LLP
                                                    333 Main Street
                                                    Armonk, NY 10504
                                                    Telephone: (914) 749-8200

James Lee (admitted *pro hac vice*)
jlee@bsfllp.com
Rossana Baeza (admitted *pro hac vice*)
rbaeza@bsfllp.com
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street, Suite 2800
Miami, FL 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Alison L. Anderson, CA Bar No. 275334
alanderson@bsfllp.com
M. Logan Wright, CA Bar No. 349004
mwright@bsfllp.com
BOIES SCHILLER FLEXNER LLP
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: (813) 482-4814

Bill Carmody (*pro hac vice*)
bcarmody@susmangodfrey.com
Shawn J. Rabin (*pro hac vice*)
srabin@susmangodfrey.com
Steven Shepard (*pro hac vice*)
sshepard@susmangodfrey.com
Alexander P. Frawley
afrawley@susmangodfrey.com
Ryan Sila
rsila@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330

Amanda Bonn (CA Bar No. 270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
Michael F. Ram (CA Bar No. 238027)
mram@forthepeople.com
MORGAN & MORGAN, P.A.

11

201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

*Attorneys for Plaintiffs*