# Exhibit 9

# Omnibus Mao Declaration

# MATERIALS SOUGHT TO BE FILED UNDER SEAL

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3
 4    ANIBAL RODRIGUEZ, JULIEANNA           )
      MUNIZ, ELIZA CAMBAY, SAL              ) Case No.:
 5    CATALDO, EMIR GOENAGA, JULIAN         ) 3:20-cv-04688
      SANTIAGO, HAROLD NYANJOM, KELLIE      )
 6    NYANJOM, and SUSAN LYNN HARVEY,       )
      individually and on behalf of all     )
 7    others similarly situated,            )
                                            )
 8                Plaintiffs,               )
            vs.                             )
 9                                          )
      GOOGLE LLC,                           )
10                                          )
                  Defendant.                )
11    --------------------------------------)
12
13
14      ***HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY***
15
16              REMOTE PROCEEDINGS OF THE
17         VIDEOTAPED DEPOSITION OF ARNE DE BOOIJ
18               TUESDAY, FEBRUARY 7, 2023
19
20
21
22
23    REPORTED BY NANCY J. MARTIN
24    CSR. NO. 9504, RMR, RPR
25    PAGES 1-133
```

Page 1

```
 1        A.  I don't recall specifically focusing on that
 2   in research.
 3        Q.  So setting aside the work that you
 4   specifically did, do you recall Google more generally
 5   doing research around how users perceive the word
 6   "control"?
 7            MS. AGNOLUCCI:  Objection.  Foundation.
 8   Vague.
 9            THE WITNESS:  I cannot point at a specific
10   study, no.
11   BY MR. FRAWLEY:
12        Q.  But setting aside whether you can point to a
13   specific study, do you recall generally Google doing
14   that kind of work?
15            MS. AGNOLUCCI:  Same objections.
16            THE WITNESS:  No, I don't recall.
17            MR. FRAWLEY:  Counsel, I'm at a good point
18   for a break, and then I think I would probably just
19   need one more module.
20            Would that work for counsel and Mr. de Booij?
21            MS. AGNOLUCCI:  Yes, that would work.
22            MR. FRAWLEY:  Okay.  Should we go off record?
23            MS. AGNOLUCCI:  Yes.
24            THE VIDEOGRAPHER:  Going off the record.  The
25   time is 11:32 a.m.
```

Page 79

```
 1              (A recess was taken from 11:32 a.m.
 2          to 11:48 a.m.)
 3              THE VIDEOGRAPHER:  We're back on the record.
 4   The time is 11:48 a.m.
 5              MR. FRAWLEY:  Okay, Mr. de Booij.  I just
 6   introduced Exhibit 201.
 7              Please let me know when you have that one in
 8   front of you.
 9              (Deposition Exhibit 201 was marked for
10              identification.)
11              THE WITNESS:  Okay.  It came in.  I'm
12   opening.  Yes, I see it.
13   BY MR. FRAWLEY:
14        Q.   Do you recognize this document?
15        A.   Yes.
16        Q.   Do you see your name on the first page?
17        A.   Let me scroll a little bit.
18        Q.   Yeah.  The letters are small.
19        A.   Yeah.  It's very small.  My eyes are getting
20   worse.  Yes, I see my E-mail address there.  Yes.
21        Q.   Are you the author of this document?  You can
22   feel free to take a look.
23              THE WITNESS:  Yeah.
24              (The witness reviewed Exhibit 201.)
25              THE WITNESS:  I'm probably the author.  You
```

1  see Insitum?  That's a vendor that we work with for
2  research.  So they probably wrote a large part of the
3  content, but I might have started the document and
4  they filled in the content.
5  BY MR. FRAWLEY:
6      Q.  So what do you mean that you work with a
7  vendor.  Can you tell me more about that?
8      A.  Yeah.  So Insitum, the name there, it's a
9  research vendor.
10     Q.  What's the name of this vendor?
11     A.  It's spelled Insitum.  It says it right there
12  on the document (indicating).
13     Q.  Oh, I see.  Is this the only vendor that you
14  work with, or are there other vendors?
15         MS. AGNOLUCCI:  Objection.  Vague.
16         THE WITNESS:  Work with in what sense?
17  BY MR. FRAWLEY:
18     Q.  For research.
19         MS. AGNOLUCCI:  Same objection.
20         THE WITNESS:  No.  They're not the only
21  vendor.
22  BY MR. FRAWLEY:
23     Q.  So for this study, the Pinecone Study 3 UDC,
24  why did you need to hire a vendor?
25     A.  Let's see.  I'm trying to remember.  We use

```
 1    vendors at Google to, you know, perform work for us so
 2    we don't have to do it, basically.  So in this
 3    instance, they did most of the research work for us.
 4    So they rented the facilities, recruited participants.
 5         Q.   What's a pinecone study?
 6         A.   Do you mean this particular study?
 7         Q.   Sure.  We'll start with this particular
 8    study.  Well, no, let me actually -- I don't think
 9    that's what I mean.
10              Is it fair to say a Pinecone study is a
11    category of study at Google?
12              MS. AGNOLUCCI:  Objection.  Vague.
13              THE WITNESS:  What do you mean by "a
14    category" of a study?
15    BY MR. FRAWLEY:
16         Q.   Like this wasn't the only pinecone study
17    ever; right?  It's a type of study.  Is that fair?
18         A.   It's true that there were more pinecone
19    studies, yes.
20         Q.   What's the purpose of a pinecone study?
21              MS. AGNOLUCCI:  Objection.  Vague.
22              THE WITNESS:  Yeah, it depends on what we
23    want to study.
24    BY MR. FRAWLEY:
25         Q.   What was the purpose of this pinecone study?
```

Page 82

1    A.  Well, let's see.  I can scroll down.  There's
2    probably specifics.  Okay.  So looking at the page
3    ending in -697, that's Page 6 of the PDF.  So I'm
4    looking at that page, and there it says the topics
5    included were dashboards, consents, UDC consent and
6    UDC website.
7    Q.  And the title of the document says, "Pinecone
8    Study 3."  Does that mean there was a Pinecone Study 1
9    and 2 about these topics?
10   A.  No, not about these topics, I believe.
11   Q.  But there was a Pinecone Study 1 and a
12   Pinecone Study 2?
13   A.  Yes.
14   Q.  Do you recall what topics those studies were
15   about?
16   A.  I don't recall.
17   Q.  Were you involved in all of the pinecone
18   studies or just this one?
19   A.  When you say, "all of the pinecone studies,"
20   which ones are you referring to?
21   Q.  So are there more than the three that we've
22   already identified?
23   A.  Yes.
24   Q.  How many were there?
25   A.  I think 52.

Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  research practice, it means an assumption or -- so
2  it's not theory or not a fact.  It's basically
3  something that we believe may or may not be the case,
4  and we describe that for the purposes of running the
5  research.
6      Q.  Okay.  Can you look at -- so if you look at
7  the bottom of this page, do you see where it says,
8  "Research Question, Goal, Hypothesis"?
9      A.  Yes.
10     Q.  And then if you just flip, it looks like --
11 well, would you agree with me that the next couple
12 pages just have lists of questions, goals, and
13 hypothesis -- hypotheses?  Does that look right to
14 you?
15     A.  Like there's three columns, and I would agree
16 that the first column, is "Research questions," the
17 second, "Goal," and the third, "Hypothesis."
18     Q.  Okay.  And can you look at the page ending in
19 -299.R?
20     A.  Yes.
21     Q.  And do you see, like a little bit under
22 halfway down the page in the "Hypothesis" column it
23 says, "Most respondents will believe that turning off
24 WAA will result in no data being collected from their
25 activity and no personalization in Google products and

Page 101

```
 1    services"?
 2         A.   Yes.
 3         Q.   So what was the basis for that hypothesis?
 4              MS. AGNOLUCCI:  Objection.  Vague.
 5              THE WITNESS:  The context of this study is --
 6    taking a step back.  As I mentioned, this was an
 7    account creation for European users.  So that's a
 8    first step; right?
 9              Second step was, as mentioned before, most
10    often it would be used for recruit participants with a
11    little bit more privacy interest and notice -- not
12    notice.  What's the right word?  Interest in -- more
13    interested in privacy; right?  So those are two limits
14    on a limiting fact for the context of this; right?
15              With that in mind, I don't know specifically
16    which particular research study was used to formulate
17    this particular hypotheses -- hypothesis.  As
18    mentioned, also to my recollection, I did not write
19    the entire document.  I might have written pieces of
20    it.
21              So, again, I may or may not have written this
22    particular sentence, but I don't remember what the
23    exact basis for the hypothesis was.  As I mentioned
24    before, this hypothesis is not a theory or a fact.
25    BY MR. FRAWLEY:
```

Page 102

```
 1         Q.  So just to clarify, for this study, was this
 2   another example of where you were seeking participants
 3   who were more privacy conscious?
 4         Let me look at the document and see if I find
 5   it anywhere.
 6         MR. FRAWLEY:  Sure.
 7         THE WITNESS:  I did not see it when I was
 8   scrolling down before.
 9         (The witness reviewed Exhibit 202.)
10         THE WITNESS:  It doesn't specify it for this
11   particular study.  So that was an assumption, but
12   there's no facts.  So I would say I don't know, for
13   this particular study, who did that or not.
14   BY MR. FRAWLEY:
15         Q.  And do you know what kind of research method
16   was used for this study?
17         A.  Again, I'm looking at the document.  It
18   doesn't specify it anywhere, at least not at the top.
19   I mean it doesn't specify it.  So I -- I would be
20   guessing.  So I don't know specifically.
21         Q.  I'm sorry.  I didn't mean to cut you off.
22   I'm sorry.
23         A.  I don't know specifically what method, for
24   this particular study, was used.
25         Q.  Do you think it might have been a survey?
```

```
1           A.   It -- I'm just looking at the research
2      questions.
3               (Pause.)
4               THE WITNESS:  Let's see.  I mean it could
5      have been, but I'm not 100 percent sure it was.
6      BY MR. FRAWLEY:
7           Q.   So can you talk to me about, when you're
8      thinking about doing a study like this, how do you
9      decide whether it should be a survey or a usability
10     lab or some other method?
11              MS. AGNOLUCCI:  Objection.  Vague.
12              THE WITNESS:  I mean as mentioned before, it
13     really depends on, you know, the questions we want
14     answered.
15     BY MR. FRAWLEY:
16          Q.   So based on the questions for this study --
17     and I know you don't remember which method was
18     actually chosen.  But sitting here today, what's your
19     opinion on the best method for these questions?
20              MS. AGNOLUCCI:  Objection.  Vague.
21              THE WITNESS:  There's a lot of questions
22     here.  It looks like 30 or so.  I mean just quickly
23     counting or guessing.
24              I would have to go through each question, and
25     based on that, say that this is the appropriate
```

1  being collected from their activity and no
2  personalization in Google products and services,"
3  that's a hypothesis; right?  That's not the result;
4  correct?
5       A.  Yes.  It's in the third column.  We say
6  hypothesis.  So, yeah, that's the hypothesis.
7       Q.  Let's imagine that the hypothesis for this
8  study was proven true.  Would that have been a good
9  thing or bad thing?
10          MS. AGNOLUCCI:  Objection.  Vague.  Improper
11  hypothetical.  Calls for speculation.  Lacks
12  foundation.
13          THE WITNESS:  I mean it's hard for me to
14  imagine if that were good or bad because I don't want
15  to -- at that point in time, like who were the
16  respondents that we were looking for.  Like was it a
17  very small group of people?  Was it very, you know,
18  privacy sensitive or not or privacy interested.
19          So I can't really answer that question.  It
20  just depends on too many factors as mentioned.
21  BY MR. FRAWLEY:
22       Q.  So this study was -- you can look at the
23  first page, but this was in June 2020; correct?
24       A.  Let me scroll up.  Well, yeah.  It says the
25  document was updated on that date, yes.

Page 109

```
 1          Q.  Why was Google specifically interested in
 2   doing a study about WAA in that time period, June
 3   2020?
 4          MS. AGNOLUCCI:  Objection.  Foundation.
 5   Asked and answered.
 6          THE WITNESS:  I mean just going back to what
 7   I said before, the project was on account creation for
 8   European users; right?  So the study was not limited
 9   to WAA, just to make sure that's correct; right?  And
10   why is -- basically, we were working on this project;
11   therefore, we were running the research.
12   BY MR. FRAWLEY:
13          Q.  So then WAA is part of the account creation
14   process; is that right?
15          MS. AGNOLUCCI:  Objection.  Vague.
16   Foundation.
17          THE WITNESS:  It depends on -- I know, at
18   least in this case, this was focused on the European
19   account creation process; right?  As mentioned, this
20   is where most of my time at Google has been spent --
21   right? -- as in that particular flow.  I know WAA is a
22   part of that, yes.
23   BY MR. FRAWLEY:
24          Q.  You've said a few times today that the
25   studies we've been talking about was focused on, I
```

Page 110

```
 1    guess, European participants; right?
 2         A.   Yes.
 3         Q.   Were the results of these studies shared with
 4    Google employees in the United States?
 5         A.   Yes.
 6         Q.   Do you recall any specific Google employees
 7    in the United States who would have seen the results
 8    of these studies?
 9         A.   Well, if you talk about this particular
10    study -- right? -- I don't know specifically who sees
11    those results.  But looking at this document --
12    right? -- and the people that are mentioned in
13    comments on the right -- right? -- at least some of
14    these are in the U.S.  So I would say at least those
15    people, but I don't know who else we communicated the
16    results to.
17         Q.   Can you point out to me which employees in
18    the comments are based in the United States?
19         A.   Yes.  So that's Suniti.
20              And then in Comment 2 you see bbzhang and
21    Samat.  I mean the point of writing this -- this is a
22    long time ago -- they were based in the U.S.
23         Q.   Have you ever worked on any studies where the
24    participants were American?  And to be clear, I'm
25    talking about your work at Google.
```

Page 111

1        A.   Yeah.  I understood that.  Thanks for
2    clarifying.  Yes.
3        Q.   Did any of those studies have anything to do
4    with WAA?
5        A.   The ones I personally ran -- I'm trying to
6    remember -- I know they were not specific to WAA.  I
7    don't know specifically if WAA was part of it.
8        Q.   You don't remember?
9        A.   No.  I would have to look at the details.
10       Q.   What was the name of that study that you have
11   in mind?
12       A.   The name was ███████.
13       Q.   Can you spell that for the court reporter.
14   Sorry.
15       A.   Yeah.  ███████████.
16       Q.   Do you recall approximately when that study
17   was done?
18       A.   Probably 20- -- I want to say -- when did
19   Corona start?  2020; right?  So it must have been
20   2019.
21       Q.   And aside from the ████████ study do you
22   recall any others that might have included WAA?
23       A.   That might have included WAA in the U.S.?
24       Q.   Let's start with that.  In the U.S., yes.
25       A.   I have not run any of those studies, no.

                                                 Page 112