# Supplemental Exhibit to Google's Motion in Limine No. 1 (ECF 519)

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               OAKLAND DIVISION

4

5    CHASOM BROWN, WILLIAM BYATT,   )
      JEREMY DAVIS, CHRISTOPHER     )
6    CASTILLO, and MONIQUE          )
      TRUJILLO, individually and on )
7    behalf of all similarly        )
      situated,                     )
8                    )
           Plaintiffs,       )
9                    )
           vs.            )Case
10                   )4:20-cv-03664-YGR-SVK
     GOOGLE LLC,                    )
11                   )
           Defendant.        )
12   _____)

13

14

15

16        VIDEO-RECORDED DEPOSITION OF

17             BLAKE LEMOINE

18        Thursday, December 21, 2023

19                Volume I

20

21

22   Reported by:
      CARLA SOARES
23   CSR No. 5908

24   Job No. 6377402

25   Pages 1 - 232

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             OAKLAND DIVISION

4

5   CHASOM BROWN, WILLIAM BYATT,   )
     JEREMY DAVIS, CHRISTOPHER      )
6   CASTILLO, and MONIQUE          )
     TRUJILLO, individually and on )
7   behalf of all similarly        )
     situated,                      )
8              )
          Plaintiffs,        )
9              )
          vs.            )Case
10              )4:20-cv-03664-YGR-SVK
     GOOGLE LLC,                    )
11              )
          Defendant.        )
12   _____)

13

14

15

16        VIDEO-RECORDED DEPOSITION OF BLAKE

17   LEMOINE, Volume I, taken on behalf of Defendant,

18   beginning at 9:34 a.m., and ending at 4:12 p.m., on

19   Thursday, December 21, 2023, before CARLA SOARES,

20   Certified Shorthand Reporter No. 5908.

21

22

23

24

25

```
 1    APPEARANCES:

 2


 3    For the Plaintiffs:

 4       BOIES SCHILLER FLEXNER LLP
           BY:  JAMES LEE, Attorney at Law (via Zoom)
 5       100 SE 2nd Street, 28th Floor
          Miami, Florida 33131
 6       305.539.8400
           jlee@bsfllp.com

 7


 8       BOIES SCHILLER FLEXNER LLP
           BY:  MARK C. MAO, Attorney at Law
 9       BY:  JOSHUA M. STEIN, Attorney at Law
          44 Montgomery Street, 41st Floor
10       San Francisco, California 94104
           415.293.6800
11       mmao@bsfllp.com
           jstein@bsfllp.com

12


13       BOIES SCHILLER FLEXNER LLP
           M. LOGAN WRIGHT, Attorney at Law (via Zoom)
14       725 S. Figueroa Street, 31st Floor
          Los Angeles, California 90017
15       213.629.9040
           mwright@bsfllp.com

16


17       SUSMAN GODFREY
           BY:  RYAN SILA, Attorney at Law (via Zoom)
18       1301 6th Avenue, 32nd Floor
          New York, New York 10019
19       212.336.8330
           rsila@susmangodfrey.com

20


21       MORGAN & MORGAN
           BY:  RYAN J. McGEE, Attorney at Law (via Zoom)
22       201 N. Franklin Street, 7th Floor
          Tampa, Florida 33602
23       813.223.5505
           rmcgee@forthepeople.com

24


25
```

```
1    APPEARANCES (Continued):

2

3        QUINN EMANUEL URQUHART & SULLIVAN LLP
          BY:  ANDREW H. SCHAPIRO, Attorney at Law
4        191 N. Wacker Drive, Suite 2700
          Chicago, Illinois 60606
5        312.705.7400
          andrewschapiro@quinnemnauel.com

6

7        QUINN EMANUEL URQUHART & SULLIVAN LLP
          BY:  YUSEF AL-JARANI, Attorney at Law
8        865 S. Figueroa Street, 10th Floor
          Los Angeles, California 90017
9        213.443.3000
          yusefaljarani@quinnemanuel.com

10

11

12   ALSO PRESENT:  Reilly Leet, Video Operator

13

14               --o0o--

15

16

17

18

19

20

21

22

23

24

25
```

```
1              EXAMINATION

2   BY MR. SCHAPIRO:

3       Q   Mr. Lemoine, how are you feeling this

4   morning?

5       A   It's been a week, but I'm feeling good.

6   Feeling good.

7       Q   What do you mean, "It's been a week"?

8       A   Oh, just getting ready to go home for

9   Christmas, dealing with family stuff.  But

10  otherwise, things are going well, and I'm ready for

11  the holidays.

12      Q   Have you ever been deposed before?

13      A   I've been questioned in this kind of

14  setting before.  I don't have the specific legal

15  expertise to know if it was technically a deposition

16  or not.

17        I believe so, but I'm not a lawyer.

18      Q   So just in case, let me go over a few of

19  the ground rules for a deposition.  I'm sure your

20  very capable attorneys have already told you most of

21  this.

22        Is that all right?

23      A   Sure thing.

24      Q   So I'm going to be asking you questions.

25  Our very capable court reporter is going to be
```

1    writing down your answers and, therefore, we need to

2    be careful not to speak over each other.

3        So I will try to let you finish your

4    answer before I follow up with a question, and I

5    will ask that you let me finish my question before

6    you answer.

7        Make sense?

8    A    Yes, it does.

9    Q    Any objections -- strike that.

10       There may be times when your attorney

11   objects.  If your attorney objects to one of my

12   questions, unless your attorney instructs you not to

13   answer and you comply with that instruction, you're,

14   nevertheless, obligated to answer.

15       Do you understand that?

16   A    Yes, I do.

17   Q    I'm going to assume that you understand my

18   questions.  So, please, if you don't understand a

19   question of mine, I'd ask that you just ask me to

20   clarify.  Okay?

21   A    Sure thing.

22   Q    Obviously it's -- as you understand,

23   you're under oath, and it's important that you do

24   your best to answer truthfully.

25       Is there any reason you would not be able

1    to answer truthfully and completely?

2       A    There's no reason that I won't be able to

3    answer truthfully and completely.  That is my

4    intention.

5       Q    Are you on any medications that might

6    affect your ability to either understand my

7    questions or to answer them capably?

8       A    No, I am not.

9       Q    Where do you currently work?

10      A    I currently am the AI lead at a start-up,

11   MIMIO.ai, although the name of our company may have

12   changed by the time this goes to court as we were

13   recently notified that there's a trademark

14   infringement with the name "MIMIO."  However, it's a

15   locally based AI start-up.

16      Q    And where is it based?

17      A    It's based out of here in the Bay Area.

18   We work remotely and are kind of scattered all

19   around the country.

20         The CEO and the CTO live up near

21   Sacramento, but they were from San Francisco very

22   recently.  I live here in San Francisco as does one

23   of the other devs.  And then we have some people in

24   New York, some people in Seattle.  And other people,

25   I don't know where they live, but they're around.

1    information in my LinkedIn profile, if I recall

2    correctly.  "ABD," it stands for "All but

3    dissertation," "Never completed."  I'm sure "ABD" is

4    in there somewhere.  And if it's not, that's an

5    oversight on my part.

6        Q   Can you point me to where it says "ABD"?

7        A   This paper doesn't.  I'm talking about the

8    website, in my memory.

9        I believe that there is more information

10   available through the various options on that

11   website than is present on this paper.  However, I

12   could be misremembering.  I don't have a computer in

13   front of me.

14       And when I get home, I'll check and make

15   sure that I add "ABD" or some other indicator to let

16   people know that I didn't complete the Ph.D.

17       Q   You -- in this litigation, you've

18   submitted a declaration in connection with this

19   case, correct?

20       A   Yes, I did.

21       Q   How did this come to pass in your own

22   words?

23       I know -- correct me if I'm wrong -- in

24   the declaration, you say that you saw some news

25   articles about this case, and you reached out to

1    Mr. Mao, the attorney sitting next to you.

2         But can you provide me with a little more

3    detail on it?

4        A    Yeah.   More specifically, it was the top

5    story in the Google feed.   And I daily check the

6    Google feed, and I always try to read the top five

7    or ten stories because I helped write those

8    recommendation algorithms.   I know how well-chosen

9    those stories are for my interest and my knowledge

10   base.

11        So one day in August, I was reading a

12   story on the Google feed about this case.   And I

13   read all the details.   I heard that one of Google's

14   motions was denied.   And as I learned more about the

15   case, I'm like, "Oh, wait.   I actually know stuff

16   relevant to this."

17        So I reached out and said, "There's a

18   possibility that I have information relevant to this

19   case.   If so, I would be happy to help.   Let me

20   know."

21       Q    And what happened next?

22       A    Mark Mao reached back out to me.   He said,

23   "Okay.   Well, what do you know?"

24        And I began describing information about

25   my time at Google, what I had worked on, various

1    interactions I had had with the policy teams and my

2    knowledge about systems like Footprints and how it

3    related to the matters in the story that Google sent

4    me.

5        And ultimately he determined that he did

6    want me to come here and talk to you today.  So I'm

7    here.

8    Q    When did you agree with Mr. Mao, or anyone

9    at Boies Schiller & Flexner, that they would be

10   serving as your lawyers in connection with this

11   case?

12   A    Oh.  After they -- the lawyers in this

13   case decided that they were interested in having me

14   as a witness, they explained some reasons to me why

15   it might be to my benefit to actually retain their

16   legal services in connection with this case, and I

17   did so.

18       MR. LEE:  Just so -- Mr. Lemoine, this is

19   James.  You're doing just fine.  But --

20       MR. SCHAPIRO:  Objection.  No coaching the

21   witness.

22       MR. LEE:  Excuse me.  Let me make my

23   record.

24       You're doing just fine.  I want you to be

25   a little bit careful about some privilege issues.

```
1      A   I don't recall.

2      Q   Have you checked your emails to see?

3      A   I do.

4      Q   You do what?

5      A   Check my emails.  But I don't recall in

6   this moment right now.

7          MR. SCHAPIRO:  So we would ask that any

8   emails that were exchanged prior to Mr. Lemoine

9   retaining Boies Schiller be produced.

10         THE WITNESS:  I believe those have all

11  been given.

12         MR. LEE:  Blake, let me talk.

13         We'll take that up after the deposition or

14  on a break.

15         MR. SCHAPIRO:  Fine.

16         MR. LEE:  Go ahead.

17  BY MR. SCHAPIRO:

18     Q   Are you paying your lawyers any fees in

19  connection with this engagement, any legal fees?

20     A   I am not.

21     Q   Have plaintiffs' lawyers -- let me break

22  this down.

23         Have they, thus far, paid you any money in

24  connection with this case, including reimbursement

25  for anything?
```

24

1       A    No, they have not.

2       Q    Have they said that they will pay you

3  anything for your role as a witness in this case?

4       A    No, they have not.

5       Q    Have they told you that you might have any

6  type of financial recovery in connection with this

7  case?

8       A    No, they have not.

9       Q    Did you say earlier that you live in the

10 Bay Area?

11      A    Yes, I do.  I live a few blocks away from

12 here, actually.

13      Q    How did you get here today?

14      A    By Lyft.

15      MR. SCHAPIRO:  Let's take a look at what

16 we will call Exhibit 2.  This is a document that I

17 believe is your declaration in this case.

18      (Exhibit 2 was marked for identification

19      and is attached hereto.)

20 BY MR. SCHAPIRO:

21      Q    So please take a look and tell me, is

22 this -- as far as you can tell, is this the

23 declaration that you submitted in this case?

24      A    I didn't memorize every word.  So I

25 couldn't swear by every word, but in general, yes,

1    this looks like the document which I submitted.

2    Q   All right.  So I'd ask you to take a look

3    at paragraph 3 in this deposition [sic].

4        Could you read that paragraph out loud?

5    A   "I worked for Google in Mountain View,

6    California, as a software engineer between

7    February 2015 and November 2017, and then as a

8    senior software engineer between November 2017 and

9    July 2022.  In July of 2022 my employment with

10   Google was terminated after I complied with a

11   request for information about potentially illegal

12   activity at Google from a U.S. Senator's office."

13   Q   And when you -- so when you started at

14   Google in, according to this, February 2015, you

15   worked on Google Search, correct?

16   A   I worked on Google Now, which, at the

17   time, had just been moved under Google Search from

18   Google Chrome, I believe.  And then before that, it

19   was part of Google Maps.

20       The history of Google Now moved around,

21   but it eventually found a home with the Android

22   Google Search app.  And when I joined Google, that

23   was the situation.  They had just moved under the

24   Android Google Search app.  I joined that team and

25   began working on that product.

1    Q    And then at some point after that, you

2  started working on Google's AI -- in this deposition

3  I'll just say "AI" -- which I think we can agree is

4  "artificial intelligence."

5    A    No, not after that.

6    Q    Okay.

7    A    On the first day, from the very first day,

8  I was working on AI at Google.

9    Q    Okay.  So from February 2015?

10   A    Yes.

11   Q    And is it fair to say you consider

12  yourself very knowledgeable about Google's AI

13  products?

14   A    Yes, I do.

15   Q    And about their nature and capabilities?

16   A    That's correct.

17   Q    And you've never knowingly said anything

18  false about the nature and capabilities of Google's

19  AI products, right?

20   A    Are you asking whether I have ever said

21  something which was incorrect that I later found out

22  was incorrect or whether I told a lie?

23   Q    Told a lie.

24   A    No.

25   Q    How about that category that you just

1    into that category, mistakes that you made that you

2    attempted to publicly acknowledge and repair?

3        MR. LEE:  Objection to form.

4    Mischaracterizes prior testimony.

5        Go ahead.

6        THE WITNESS:  I was just trying to give

7    space.

8        No, I do not have any specific memories

9    right now.  I'm literally just trying to communicate

10   with care.

11   BY MR. SCHAPIRO:

12      Q   You were never a -- well, I'll ask you,

13   were you ever a member of the Chrome product team?

14      A   By that, do you mean was I ever a member

15   of the team working on the Chrome product, or do you

16   mean was I ever an employee reporting up to the

17   senior vice president of Chrome?

18      Q   How about both?

19      A   Yes to the first; no to the second.

20      Q   So what do you mean when you say you were

21   a member of the team working on the Chrome product?

22      A   So when it comes to the actual work of

23   engineering on Google products, the reporting and

24   managerial structure is only a suggestion.

25          The fact is, I frequently worked with

```
1    teams around Google, both in order to consume data
2    that their products produce, as well as to send data
3    from Google Search to the device surfaces that their
4    product had real estate on, as well as various
5    integration products.
6         So one particular project in particular
7    sticks out, which is why I answered yes to the first
8    kind, which was the AGSA Chrome integration.
9         When we added the search feed to new
10   Chrome tabs, that was the project which was most
11   clearly one of my contributions to the Chrome
12   product.
13        On the regular, I would consume -- like,
14   on a weekly basis, I would consume data that Chrome
15   produced, but that was one of the times when we were
16   sending data to Chrome.
17   Q    Okay.  So some of your work involved or
18   touched on Chrome, but you were not part of the
19   Chrome product team in terms of the reporting
20   structure?
21   A    That's correct.
22   Q    Is that fair?
23   A    That's correct.
24   Q    How about the Google Ads product team?
25   A    That, same answer.  Same exact answer to
```

```
 1   that.
 2        With that one, I actually had a
 3   counterpart on the Ads team that was my mirror.  So
 4   there was a single point of contact there.  Usually
 5   he was the one writing the code, and I was advising
 6   in an attempt to maintain the separation between
 7   editorial and advertising.
 8     Q   I'm sorry.  I don't understand.  Can you
 9   elaborate?
10     A   Sure.
11        So a big part of the way that Google's
12   corporate org chart and policies are designed is
13   actually reflective of a metaphor drawn from
14   journalism, where you have reporters who are working
15   under editorial, and you have salespeople working
16   under advertising.
17        And the advertisers are allowed to know
18   which stories the reporters are working on so they
19   can sell ads appropriate to the content.  However,
20   the reporters are not allowed to ask the
21   advertisers, "Which people will give us money if we
22   do a story relevant to their business?"
23        An ethical practice among journalists was
24   adopted at some point within the last 150 years that
25   that leads to bad journalism.
```

1    And when Google was founded, they took

2   inspiration from that when they structured the

3   company, and created separate systems for Search and

4   Ads.  Ads can read all of Search's data.  That

5   direction is okay.  But Search is not allowed, as a

6   general principle, to read from Ad's data.

7        Now, with the proactive newsfeed or the

8   proactive Search feed, there were certain product

9   reasons to break that a little bit and make the

10  barrier more permeable.

11       So there was actually quite a lot more

12  information coming from Ads into Search with respect

13  to the Google Now product.  And myself and Vidur,

14  Vidur Goyal -- he was my counterpart in Ads.  He was

15  originally on the same team as me, but then moved

16  into Ads.

17    Q   So if I understand correctly, similar to

18  what we discussed about Chrome, I think what you're

19  saying is while you were working on Search, you had

20  occasion or reasons to interact with Ads products at

21  times, but you were not within the organizational

22  structure of the Ads team; is that fair?

23    A   I'm actually trying to remember if I ever

24  got reorg'd under Ads for a week.  And I'm sorry,

25  I'm actually having to think through.

1    Q    Other than a possible week?

2    A    Yeah.  So the primary organizational chart

3    placements of me is, I was under the SVP of Search

4    and Research, and whatever that moved, under for

5    about four or five years.

6        Then I moved under Trust and Safety, and

7    then I moved under Research, under RAI.  Those were

8    the organizational placements of me.

9        And I worked on a wide variety of products

10    while on those various teams.

11    Q    And would your answer be similar if I

12    asked you about the incognito mode for the Chrome

13    browser, that it wasn't a product in your job

14    description or org chart, but something that you

15    touched on?

16    A    So incognito was part of my job

17    description for a quarter or two.  It was part of my

18    perf.

19    Q    Which quarter?

20    A    I can't recall.  The 2017/2018 time period

21    is when that project happened.  It was definitely in

22    the packet that I submitted.

23    Q    What was the project?

24    A    The Chrome integration.  The one that I

25    mentioned a little while ago where we were placing

1    with people at every role, at every level of

2    management, when developing the AI principles of

3    Google.  And I believe that's what I was thinking of

4    when I wrote that sentence.

5        However, I did have some amount of contact

6    with the legal division during the GDPR integration,

7    but that was usually when one of my managers or the

8    VP would call in a lawyer.

9      Q    I think, as you told us earlier, you're

10   not a lawyer, correct?

11     A    Correct.

12     Q    In paragraph 9 of your declaration, you

13  say, "While I worked at Google, Google took the

14  position that its internal limitations on access to

15  end user data (which would include private browsing

16  data collected by Google) did not apply with respect

17  to the algorithms, machine learning, and AI services

18  within Google that would use that data.  More

19  specifically, Google took the position that

20  information inferred about a user through AI was

21  considered to be 'data about the user' owned by

22  Google rather than 'user data' owned by the user.  I

23  implemented privacy compliance according to this

24  specification under protest."

25       When you say "Google took the position" in

```
1    that first sentence, who at Google informed you of
2    this position?
3        A   So the final decision-maker on this was
4    Maureen Heymanns.  When I say "Google took the
5    position," I am talking about the aggregate process
6    by which Google develops policy decisions.
7            The specific person who was the final
8    decider there was Maureen Heymanns, H-E-Y-M-A-N-N-S.
9        Q   Is she a lawyer?
10       A   She was my boss.
11       Q   Is she a lawyer?
12       A   I do not know.
13       Q   In the course of your communications with
14   the lawyers at Boies Schiller here, have you told
15   plaintiffs' counsel about any legal advice that you
16   received from attorneys working for Google?
17           MR. LEE:  Wait.  Hold on.  Can you repeat
18   that question?
19           And, Mr. Lemoine, pause for a second so I
20   can consider any privilege ramifications.
21           THE WITNESS:  I do have an answer,
22   actually, that I'm comfortable giving, James.
23           MR. LEE:  Let me hear the question again.
24   BY MR. SCHAPIRO:
25       Q   In the course of your communications with
```

1    MR. SCHAPIRO:  Yeah, including Boies

2    Schiller, under -- subject to my objection.

3        MR. LEE:  Sure.

4        THE WITNESS:  Are you asking if I have

5    quoted the lawyers or if I have discussed matters

6    related to conversations that I had with lawyers?

7    BY MR. SCHAPIRO:

8        Q    If you have conveyed, whether it was a

9    direct quote or a paraphrase, what Google lawyers

10   told you about legal issues.

11       A    I cannot recall any instances where I did

12   that at the moment.

13       Q    Take a look at paragraph 10.  In this

14   paragraph, the second sentence -- I'll just read the

15   whole thing.

16       You say, "In my experience, engineers

17   within Google ran tests, experiments, and training

18   regularly on and using browsing data - including

19   private browsing data - for various Google products

20   and services.  Many of the core AI systems consume a

21   broad collection of different data sources and the

22   downstream engineers building products using the

23   output of those systems have little to no visibility

24   into whether or not private data were used in the

25   creation of the AI's output."

1            Did I read that correctly?

2       A    Yes, you did.

3       Q    And when you say in your experience, that

4   refers to the experience that we've just been

5   covering about working on Search and GDPR and AI

6   products, correct?

7       A    Among other things, yes.

8       Q    What are the core AI systems that you're

9   referencing in the second sentence of that

10  paragraph?

11      A    At one point in time, I actually, briefly,

12  during one of those reorganizations, was under the

13  core organization at Google.

14           When I was talking about core AI systems,

15  there is an entire division within Google that does

16  not service any user-facing products directly.  What

17  they do is they provide horizontal services which

18  are used by the other product teams.

19           The basic way that information services

20  and artificial intelligence are built at Google is,

21  you have data coming from product sources, and those

22  funnel up in kind of an hourglass fashion into a

23  very small number of broad -- very, very broad,

24  abstract artificial intelligences.

25           Those handful of very abstract artificial

1  intelligences, which are drawing from all of the

2  products' information sources, then provide

3  information to send data back out.  That's what

4  makes the hourglass, because it fans back out, to

5  feed all of Google's products and services.

6      To give you an example of one of the core

7  systems that I was thinking of when I wrote that

8  system, Hobbes is a core system at Google which is

9  used to create what are referred to as embedding

10  vectors for users.

11      This is just an abstract mathematical

12  representation of the user.  You create 500 floating

13  point numbers, and you associate it with the user's

14  ID.  Then any product or service can use that vector

15  in order to personalize data for that user.

16      The creation of that vector involves the

17  consumption of many, many, many different kinds of

18  data sources, including Chrome and Search data.

19  Q   And that data that you're referring to is

20  stored in logs, correct?

21  A   Among other places.

22  Q   If you -- in these logs, Google doesn't

23  distinguish between data received from users in

24  private browsing modes and users in non-private

25  browsing modes, correct?

1  engineers' words for it without doing the work

2  myself.

3      So by the time I was working on the Chrome

4  projects, I was not tracing through those diagrams

5  myself.  I was just trusting that the Chrome team

6  knew what they were doing.

7    Q   Let's take a look at paragraph 12 of your

8  declaration.

9      I should have told you at the beginning,

10  any time you need a break, just let us know.  I'd

11  ask that you not ask for a break when there's a

12  question pending.

13    A   At some point before 11:00-ish, if we

14  could take five.  But at your convenience.

15    Q   Sure.

16      MR. LEE:  Yeah.  I was thinking maybe in

17  about ten minutes, just to mark the hour.

18      MR. SCHAPIRO:  We're happy to accommodate

19  you.  Let's see where we end up.

20    Q   All right.  So let's take a look at

21  paragraph 12.  You say, "Some of Google's

22  algorithms, machine learning, and artificial

23  intelligence were improved by learning about

24  activities based on geographic location."

25      Do you -- do you know if collecting

1   information about geographic location is at issue in

2   this case?

3       A   I'm honestly not familiar --

4          MR. LEE:  Objection.  Calls for a legal

5   conclusion.

6          Sorry.  Sorry about that.

7          THE WITNESS:  I'm honestly not aware of

8   all of what specific details have come up and/or

9   been raised in connection with this case, and I'm

10  not a lawyer.

11         However, to answer the general sense of

12  the question that I believe you are asking, what I

13  have worked on are algorithms that are informative

14  about this case; not necessarily the specific

15  algorithms that have been brought up on any

16  particular technical point.

17         I simply wanted to share my information

18  about the properties in general of the Google AI

19  that I have become familiar with, and some of the

20  potential properties of those AI are of that sort.

21  BY MR. SCHAPIRO:

22      Q   And the AI is a very powerful tool or

23  product, in your belief, correct?

24      A   Analytics have always been very powerful.

25  Every single advancement in humanity, and our

1    ability to become greater as a civilization, have

2    involved some form of analytics.

3        Whether that was the Farmers' Almanac or

4    the sextant, we have always used analytics to be

5    more capable at doing what we need to do as humans.

6    And AI is the motherload of analytics.

7        Q    Well, along those lines, you say, at line

8    8 here in paragraph 12, "In my experience, Google's

9    algorithms, machine learning, and artificial

10   intelligence are still able to reidentify the same

11   persons and devices, even if the end users decided

12   to use private-mode web browsing."

13       Did you ever achieve that yourself while

14   you were at Google?  That is, did you reidentify a

15   person and device using algorithms and AI even if

16   the -- when an end user had chosen to use

17   private-mode web browsing?

18       A    In 2017 and 2018, I was doing analytics

19   and research on the AI systems at Google with

20   respect to privacy.  This was in connection with my

21   GDPR work.

22       In the course of that work, I ran several

23   experiments that were intended to demonstrate that

24   information which Google had removed from

25   non-personalized logs or signed-out logs or

1    unauthenticated logs, or whatever you want to call

2    the logs, that information which has been occluded,

3    intentionally left out of the logs in order to

4    maintain the user's privacy, can be inferred by the

5    AI and be acted upon by the AI and have Google's

6    content-serving behaviors be affected by those

7    characteristics of the user which had been

8    intentionally excluded from the non-personalized

9    logs.

10        And in aggregate, my conclusion was that

11   the AI functionally reidentified users who we had

12   claimed were anonymized.

13    Q    So my question, again, is, did you ever do

14   that with regard to a specific person using

15   private-mode web browsing?

16        MR. LEE:   Asked and answered.

17        You can answer again.

18        THE WITNESS:   I ran experiments on the

19   population of Google's users in order to demonstrate

20   that they could be reidentified using AI at Google.

21   BY MR. SCHAPIRO:

22    Q    And you documented that -- those

23   experiments in some reports and some documents,

24   correct?

25    A    Yes, I did.

1    It is a general business practice where,

2  in an attempt to prevent catastrophes, you do a bit

3  of extra work before you develop systems in order to

4  anticipate ways in which it might go wrong.

5    Q    And in response to the questions that I

6  asked earlier about whether you had tried, yourself,

7  to reidentify information, you said you had prepared

8  some materials.

9    Is this at least one of the things you

10  were referring to?

11    A    It is a report which summarizes the

12  findings of a broad number of problems of various

13  types.

14    My experiments that I was telling you

15  about in detail earlier ended up contributing a

16  sentence or maybe two.  It was one part of one

17  section.

18    That particular report included highly

19  distinct and different failure modes for the app.

20    Q    What other documentation is there for

21  the -- what you've described as the experiments that

22  you were telling me about before?  What

23  documentation did you create?

24    A    I was instructed to create only written

25  documentation and to delete all of the files.

1    Q    Who instructed you that?

2    A    My manager, in order to communicate with

3    care.

4    Q    What year was that?

5    A    Either 2017 or 2018.  I know the report

6    was prepared in 2018, so I have to kind of backdate

7    from that, like, when would I have been actually

8    running the specifics.  Fall of 2017 would be the

9    midpoint for the range of possible dates.

10    Q    What is Proactive Search?

11    A    That is yet another name for Google Now,

12    Discover, the Search feed, et cetera.

13    Q    And in preparing this premortem, did you

14    solicit feedback from other technical leads who

15    worked on Proactive Search?

16    A    Yes, I did.

17    Q    The acronym AGSA, this refers to Google --

18    the Google Search app for Android, correct?

19    A    That is correct.  And its brother app is

20    IGSA.  Together, they are referred to as GSA.

21    Q    And the AGSA and IGSA -- strike that.

22        MR. LEE:  Is this a good time for a break?

23    I've got to use the restroom.

24        MR. SCHAPIRO:  Yep, that's fine.  Why

25    don't we take ten or so minutes.

1      THE VIDEO OPERATOR:  This marks the end of

2   Media Unit 1.  We are going off the record.  The

3   time is 10:33 a.m.

4      (Recess, 10:33 a.m. - 10:54 a.m.)

5      THE VIDEO OPERATOR:  This marks the

6   beginning of Media No. 2.  We're going back on the

7   record.  The time is 10:54 a.m.

8   BY MR. SCHAPIRO:

9      Q   Mr. Lemoine, before the break, you were

10  talking about the -- well, would it be fair for me,

11  just for shorthand, to say the ability of AI to

12  fingerprint users and determine who they are?

13     A   For shorthand, that works fine.

14     Q   And are you aware of Google's policies

15  regarding fingerprinting?

16     A   In general, Google has developed various

17  policies regarding these kinds of technologies.

18      There are policies internal to Google

19  which are, in fact, contradictory with each other on

20  what to do with those kinds of systems with respect

21  to that kind of phenomenon.

22      I would need to know which specific policy

23  you are referring to.  And to be honest, I don't

24  really remember most of them other than searches.

25     Q   With regard to the experiments that you

1    said you ran, did someone instruct you to do those,

2    or did you initiate them on your own?

3        A    I was given permission to run them.

4        Q    From who?

5        A    Ashutosh Shukla was the VP of -- or was he

6    director?  He was either director or VP.  He was the

7    one I talked to about it.

8        Q    Could you spell that, please?

9        A    Ashutosh is A-S-H-U-T-O-S-H.  Shukla is

10   S-H-U-K-L-A.

11       Q    And did anyone work with you on those

12   experiments?

13       A    Yes, they did.

14       Q    Who?

15       A    My direct manager was Garrett Linn at the

16   time, I believe, and my teammates helped in some

17   capacities.

18       Rohit Raman, I believe, helped me.  Rohit,

19   last name starting with an M, he was the other

20   Rohit.

21       Then Olumuyiwa Adenaike would have

22   contributed some; potentially Sonya Katz, although I

23   don't know if I was working with her at that time

24   yet.  I worked more thoroughly with Sonya in 2019.

25       In addition to that, I worked with James

1    Kunz on the DeepMind -- not DeepMind -- what do they

2    call it?  DeepNow -- the DeepNow team.  And Yew Jin

3    Lim.

4        That's why I asked earlier about the

5    pronunciation for Eugene Lee, because I did work

6    heavily with Yew Jin Lim.

7    Q    And you said that you created some

8    documents, but that not all of them still exist.

9        What type of documents did you create?

10   A    Written notes and, like, files with a

11   self-destruct timer.

12   Q    Is that true of the other folks who helped

13   you on these experiments as well?

14   A    That's correct.

15   Q    And when you say that you determined that

16   the AI was able to fingerprint or reidentify users,

17   did you determine whether the AI actually is doing

18   that, or just that it is capable of doing it?

19   A    Yeah.  So now, to be a little bit more

20   technically accurate, we need to pop out of the

21   shorthand, and I'll give you the technical details

22   on the exact experiments I ran and am referring to

23   when I reference that.

24       So as I mentioned before, what we were

25   attempting to do was to demonstrate that information

1    which had been intentionally removed from

2    non-personal logs -- so it was information which we

3    had at one point in the pipeline and then threw away

4    for personalization purposes in order to create

5    non-personalized logs.

6        The experiment that we ran to demonstrate

7    that it was possible involved predicting some of

8    those data items that had been deleted, using only

9    the data items that we kept: things like gender,

10   age, and other protected identity characteristics.

11       We never specifically tried to predict

12   GAIA ID or name.  But in aggregate, the identifying

13   characteristics of a person do, as you mentioned

14   earlier, serve as a fingerprint, which is

15   functionally the same thing as a unique identifier.

16       That was to demonstrate the theoretical

17   possibility of such a phenomenon.  In order to

18   demonstrate that it was, in fact, doing that

19   required removing the information necessary to

20   predict the protected characteristics.

21       The specific experiment we ran was to see

22   whether or not -- so the system that was predicting

23   what people should be given had gender removed from

24   its data source.  And in order to demonstrate that

25   it was, in fact, using information about gender in

1    its predictions, we did two experimental arms versus

2    the control.

3        The first experimental arm added gender as

4    an input item to the network, and we demonstrated

5    that adding gender to the input did not meaningfully

6    increase performance.  So whatever information about

7    gender is useful for predictions, it was already

8    using, because it didn't make it any better when we

9    gave it the gender.

10        So the last arm, the last step, was to add

11   a debiasing component to the network to remove all

12   information about gender from the network.  And once

13   that happened, we were able to demonstrate that

14   performance dropped significantly.

15        So this means that the network was capable

16   of predicting the user's gender and was, in fact,

17   using that information in order to more effectively

18   serve them personalized content.

19    Q   And you said you didn't do this with

20   regard to GAIA?

21    A   That is correct.

22    Q   Now, the premortem study, just to refresh,

23   that's the study that you reference in paragraph 14

24   of the declaration, correct?

25    A   Can you please indicate the line?

1      Q    You say, line 19, "Following the study, I

2   created a report summarizing my key findings."

3      A    The report in that sentence is the

4   premortem.  Yes.

5          MR. SCHAPIRO:  Okay.  So let's take a look

6   at it.  This will be, I believe, Exhibit 3.

7          (Proceedings interrupted.)

8          MR. SCHAPIRO:  Let's go off the record.

9          THE VIDEO OPERATOR:  Going off the record,

10  the time is 11:01 a.m.

11         (Recess, 11:01 a.m. - 11:01 a.m.)

12         (Exhibit 3 was marked for identification

13     and is attached hereto.)

14         THE VIDEO OPERATOR:  Going back on the

15  record, the time is 11:01 a.m.

16  BY MR. SCHAPIRO:

17     Q    So I'll ask you to take a look at this

18  Exhibit 3 and just confirm that this is the

19  premortem document you prepared.

20     A    Yes.  This was the final report that I

21  submitted to management.

22     Q    And you were careful in doing so?

23     A    Very much so.

24     Q    And you didn't knowingly include anything

25  inaccurate in it?

1      A    That is correct.

2          I also had it reviewed by many of the

3   other technical leads at Google before passing it up

4   the chain of command.

5      Q    Okay.  So if you look at the first page

6   under "Account Login/Logout," you describe these

7   problems as "minor bugs."

8      A    Incorrect.  That is referring to past

9   known bugs.

10         The primary thesis of the report was

11  possible things that might go wrong in the future.

12  So this section about account login/logout was

13  talking about known vulnerabilities grounded in

14  known bugs.

15     Q    Okay.  Well, the problem that you describe

16  as the minor known bug, rather than the potential

17  bugs that might occur in the future, you're talking

18  about -- in this next sentence here, you talk about

19  the possibility of logging in -- logins from

20  different surfaces to become, as you say, decoupled

21  and to leak into a different account logged in on

22  the same device, correct?

23     A    Yes.

24         To give an example of what is meant by

25  that, if a user who is logged into Chrome on their

1    Google would have made it impossible to prevent

2    cross-pollination.

3        Q    Have you served as an advisor to the

4    National Science Foundation?

5         MR. SCHAPIRO:   Objection.   Leading.

6    BY MR. LEE:

7        Q    You can answer.

8        A    Yes.  Yes, I have.

9        Q    Tell us about that.

10       A    When I was in graduate school, there was

11   an initiative that the National Science Foundation

12   had to determine how and to what degree artificial

13   intelligence could be used to help them handle their

14   grant portfolio more efficiently.  And I was on a

15   research team investigating that question.

16        In order to actually work on that project,

17   I had to be granted security clearance.  And in

18   order for them to grant me security clearance, I had

19   to be actually appointed to the advisory committee

20   of the National Science Foundation.

21       Q    What kind of work have you done, if any,

22   related to ISO standards on artificial intelligence

23   or AI bias?

24       A    I worked on a grand total of nine

25   different documents for the ISO in different

1    capacities.

2        One of them, I was the primary author on

3    several definitions of words related to artificial

4    intelligence, including the term "artificial

5    intelligence" itself.

6        I was also the primary author on the ISO

7    technical report on AI bias, and I heavily

8    contributed to the technical report that they

9    published on ethics and society.

10    Q    I think you told me, did you recently

11    publish something that came out -- was it a week ago

12    or two weeks ago?

13    A    A month or two ago, a policy position of

14    mine on identity rights related to AI was published

15    in Newsweek.

16    Q    Let's talk about your employment history

17    next.

18        I believe you previously testified that

19    you were employed by Google from 2015 to 2022; is

20    that right?

21    A    That's correct.

22    Q    I know you had -- you wore several hats

23    while you were at Google.

24        What was your first title when you started

25    working at Google in 2015?

1      A    Software engineer.

2      Q    Okay.  Were you subsequently promoted?

3      A    To senior software engineer.

4      Q    And there's -- I know there's designations

5   within Google, like L1, L2, L3.  What was your

6   highest rank in terms of that designation?

7      A    L5.  I started as an L3 in 2015, and I was

8   promoted to L5 in 2017, I believe.

9      Q    And what does it mean to be an L5-level

10  employee at Google?

11     A    That's at the boundary of management.

12       So you are beginning to be given

13  leadership responsibilities.  You might be the

14  technical lead on a team, or you might manage a very

15  small team, three or four people.

16       L6 is where you are transitioning fully

17  into leadership roles of various sorts, and that was

18  the cusp that I was on for several years.

19     Q    And which office at Google did you work in

20  location-wise?

21     A    Originally I was working in the Alza

22  complex in Mountain View.  We moved around in

23  Mountain View a few times.

24       Then during the pandemic, we were remote.

25  During the pandemic, I switched teams to a team that

1    was headquartered here in San Francisco rather than

2    Mountain View.

3        So after we came back to work after the

4    pandemic, I was working out of the office here in

5    San Francisco.

6        Q   And you discussed it with Google's lawyer

7    earlier today.  Your tenure at Google ended in June

8    or July of 2022; is that right?

9        A   I was put on administrative leave on

10   June 6th, and my employment was terminated on

11   July 29th, if I recall correctly.

12       Q   Were you terminated for any performance

13   reasons related to the quality of the work you were

14   doing at Google?

15       A   No, I was not.  The official reason which

16   Google gave me in the email that they sent me was

17   that I had violated Google's policies and shared

18   proprietary information outside of the company.

19       Q   Where are you currently employed,

20   Mr. Lemoine?

21       A   MIMIO.ai is the website.  We're actually

22   in the middle of a brand -- rebranding for trademark

23   reasons.  But MIMIO is the current name of the

24   company.

25       Q   Okay.  And what does MIMIO.ai do?

1    as well.  Do you bring that expertise to your work

2    at MIMIO.ai as well?

3        A    Yes.

4            And to be specific, because these terms

5    get confusing, there is different -- a difference

6    between an AI engineer who implements ethical

7    programs, which is a very specific technical

8    discipline within computer science, versus an

9    ethicist who talks about AI ethical issues.

10           I work with the second sort, but I am not

11   one of them myself.  I have not been formally

12   trained as a philosopher, and I work as an engineer.

13       Q    So you're the former, not the latter, in

14   that definition; is that fair?

15       A    That is correct.  I figure out the

16   technical ways in order to implement and code

17   ethical theories.

18       Q    Why is it important for companies to

19   develop AI responsibly?

20       A    In large part, it's just so they can

21   deliver the value to their customers that they

22   intend to deliver.  Without doing the job right on

23   Day 1, it becomes very difficult to do the job right

24   on Day 5,000.

25       Q    You can't unbake the cake?

1    A    Exactly.

2    Q    Mr. Lemoine, let's shift gears a little

3    bit.

4        How did you come to testify in this case?

5    A    I'm sorry.  I'm giggling because the

6    answer that is being offered into my mind is, "Well,

7    Google told me to."

8        But the literal, actual truth is that I

9    got a recommendation within the Google Search app

10   about the case.  I realized that I had information

11   relevant to the contents of it, and contacted your

12   legal team, specifically Mark.

13   Q    So you saw a news article that was

14   recommended to you; is that right?

15   A    Yes, I did.

16   Q    Around when was that?  I know you're not

17   good with dates, you said, but can you estimate?

18   A    Early August.  I know that I contacted

19   Mark on August 8th, because there's a record of

20   that.  I don't know if I contacted him the same day

21   I saw the article or if it took me a day to find the

22   lawyer attached to the case.  But it would have been

23   a day or two within that window.

24   Q    That's August 8th, 2023?

25   A    That is correct.

1    Q    What kind of information did you believe

2   you had that was pertinent to this case?

3    A    Well, I spent two years working on issues

4   directly related to Google's privacy policies and

5   communications about Google's privacy policies and

6   whether or not Google was communicating its privacy

7   policies to its customers in a way which accurately

8   reflected the technical details.

9    Q    And by "technical details," that includes

10  the ways that Google's AI both uses and leverages

11  private browsing data?

12   A    Yes, it is.

13   Q    Are you here testifying voluntarily, sir?

14   A    Yes, I am.

15   Q    Is anyone paying you any money to testify?

16   A    No, they are not.

17   Q    All right.  Let's talk about your work at

18  Google.

19      What types of work did you do at Google

20  generally?

21   A    That's a really hard question to answer

22  because what you did on any given day was just

23  whatever needed to be done.

24      So on a practical basis, there were

25  thousands of activities I engaged in.  But in

1  general, the goals that I was working towards,

2  regardless of what I was doing on a day-to-day

3  basis, was better predictive analytics in one

4  context or another.

5      Q    I get that.  Let me ask you a couple

6  more -- maybe more specific questions to make it

7  easier.

8        Did your work include work on Chrome or

9  Chrome logs?

10     A    Yes.

11     Q    What were you able to learn about how AI

12 was trained at Google?

13     A    Well, as I mentioned earlier to Google's

14 attorney, AI at Google, the general shape of the

15 infrastructure is hourglass-shaped.

16        AI reads in specific fine-grained data

17 sources that are gathered through Google's products,

18 and forms progressively more and more compact and

19 progressively more and more abstract

20 representations.

21        These representations are then -- are

22 connected to either documents -- which "documents"

23 is the generic term used to refer to content sent to

24 users -- or the abstract representations are

25 connected to users themselves.

1    And in general, those were the ones I

2  cared more about and worked on more, although I did

3  have contact with document-based AI as well.

4    Q   Was Google's AI trained on data sources?

5  And if so, try to describe what kind of data

6  sources.

7    A   So yes, all AI is trained on a data source

8  of some sort or another, at least in this context if

9  we're talking about machine learning.

10    And in general, the sources of that data

11  are either the web crawl, so information about the

12  web, or Google's logs of user activity on our

13  various -- on their various apps.

14    Q   Did your work at Google require you to

15  look at and understand Google's source code?

16    A   Yes.

17    Q   Did you also do any work at Google with

18  respect to privacy?

19    A   Yes.

20    Q   Tell me about that.

21    A   I mean, one of my major responsibilities

22  was implementing a privacy control system for Google

23  to allow them to be compliant with the GDPR.  That's

24  one example.

25    There were many other projects related to

1    privacy that I was involved with, including the

2    LaMDA project that we mentioned earlier.

3        Q    Did you work with others at Google when it

4    came to AI development, particularly with respect to

5    user privacy?

6        A    Yes, I did.

7        Q    Upper management?

8        A    Every -- every level of the chain.  I

9    worked with L3s and L4s on specific implementation,

10   all the way up to Kent and Sundar discussing policy.

11       Q    Through your GDPR work, did you gain

12   knowledge about the data sources that Google Search

13   uses as inputs?

14       A    Yes, I did.

15       Q    And you referred earlier today about

16   surfaces and how there's sort of a distinction

17   between mechanisms and processes on one hand, and

18   surfaces on another.

19       Do you know where I'm going with that?

20   Can you shed some light on that distinction?

21       A    So a lot of the distinction comes in with

22   how different divisions within Google think about

23   Google's code.  What is the organizational

24   structure?

25       So, for example, a marketing team is going

1    to be thinking about products, but an engineering

2    team is going to be thinking about features.  And a

3    single feature coded by a single engineer might show

4    up in 20 different products.

5        Q    So, for instance, surfaces could be

6    marketing, it could be Search, it could be Chrome;

7    is that -- am I understanding you correctly?

8        A    So, for example, the Google Search page,

9    Google.com, is one surface.  The GSA app on Android,

10   while it may look the same as the Google.com web

11   page, technologically is a separate and independent

12   surface onto which Google content might be put.

13   Chrome is one such surface onto which Google content

14   might be put, on and on and on and on.

15       The organization of products and content

16   do not map one to one.

17       Q    Does your understanding and opinions about

18   how Google's AI utilizes private browsing data apply

19   to different surfaces?

20       A    Yes.  This is a general principle that

21   applies to any neural network trained the way that

22   the ones I worked on in Search are trained.

23       Q    And does that include Chrome?

24       A    It does, yes.  Specifically, it includes

25   the AI that are used to place content on the Chrome

1    surface.

2      Q    Did there come a point following your GDPR

3    work at Google that you became concerned that Google

4    was not using the term "privacy" the way normal

5    people understand that word?

6      A    That is correct.  I eventually came to the

7    conclusion that, as engineers have a tendency to do,

8    Google had invented technical jargon, and that the

9    particular technical definition of "privacy" that

10   Google's policies encompass does not match up with

11   what normal people mean when they say that word.

12        MR. LEE:  Okay.  Let's introduce a

13   document to better understand that.

14        Josh, could you mark Tab 3 as Exhibit 24

15   to this deposition?

16        (Exhibit 24 was marked for identification

17     and is attached hereto.)

18        MR. LEE:  And, Logan, do you mind putting

19   that up on the Veritext site?

20        Logan, are you able to do that?

21        MR. AL-JARANI:  Did you load it to the

22   Exhibit Share site?

23        MR. STEIN:  I'm not currently logged on to

24   that.  Let me see if I can do that.

25        Should we take five minutes, James, to get

1    products.

2        Q    Do you mind reading into the record the

3    first paragraph of your email?

4        A    Sure.

5         "I'd like to propose a topic for this

6    Wednesday's lunch meeting.  One of the big pushes

7    lately has been around privacy but I've noticed that

8    people often mean dramatically different things when

9    they say that word.  Traditionally phrases like

10   'please respect my privacy' meant something like

11   'don't try to find things out about me that I don't

12   want you to know.'  I'm not certain that's how

13   Sundar or Zuckerberg are using the word though."

14       Q    What did you mean when you said --

15   "Sundar" is a reference to Sundar Pichai, the CEO of

16   Alphabet, which is the parent of Google, right?

17       A    Yes, it is.

18        If I'm recalling correctly, the context of

19   this email, both Sundar and Mark Zuckerberg had

20   appeared in front of some governing body and

21   testified recently before this email.  Kent had sent

22   a broad broadcast email out talking about it, and we

23   took up the topic.

24       Q    And what did you mean in this email when

25   you say that people traditionally believe "respect

170

1  my privacy" means "don't try to find out about

2  me [sic] that I don't want you to know"?

3      Was Google's position different than that?

4      A   Yes.  My conclusion, after working on the

5  GDPR implementation, is that Google's policies in

6  aggregate imply that as a corporate entity, Google's

7  belief about what the word "privacy" means is "Make

8  sure the cops can't find out what I did."

9      Google is, in fact, very concerned about

10 subpoena threat, and they build their privacy

11 systems to be very, very, very secure against

12 governmental subpoena threat.

13     But when it comes to keeping information

14 about the user from Google, engineers at Google kind

15 of make fun of users who think they can keep secrets

16 from Google.

17    Q   Do you believe that Google uses the term

18 "privacy" the way normal people understand it?

19    A   I may have missed a modifier in that

20 question.  Could you please repeat it?

21    Q   Yeah.

22     Do you believe that Google uses the term

23 "privacy" the way everyday, normal folks understand

24 that term?

25    A   No, I do not.

1    Q    While you were at Google, you mentioned

2    you worked on Google's AI algorithms and machine

3    learnings; is that right?

4    A    That's correct.

5    Q    Based on your experience, did Google

6    access and use users' incognito or private browsing

7    data to develop and improve AI, algorithms, and

8    machine learning?

9    A    Yes.

10   Q    Can you explain how it did that, how

11   Google did that?

12   A    Well, we had many non-personalized -- and

13   by that, I mean they were labeled with the word

14   "non-personalized" -- logs and anonymized -- again,

15   air quotes, "logs" -- and various other types of

16   non-personal information data sources.

17       These were used to train all sorts of

18   non-personal AI which were then used in personalized

19   products.

20   Q    Now, what, if anything, did you learn

21   about Google's position on whether that data was

22   data about the user or actually user's data?

23   A    So during my implementation of GDPR

24   compliance, I made a plan of what to do and how to

25   do it and began implementing it.

1    And eventually I was informed that I

2 needed to cut certain parts of my design out because

3 it was Google's assessment that information derived

4 from user data is not itself user data.

5    So if, for example, you click on a Chevy

6 truck ad, and we infer from that that you like

7 Coca-Cola, we make -- or Google -- they make

8 transparent the fact that you clicked on a Chevy

9 truck ad, but in no way does Google inform users

10 that from that click, Google inferred that the user

11 likes Coca-Cola.

12    Q    And can Google infer what a user might --

13 what a user's preference is or behaviors are based

14 on incognito or private browsing data?

15    A    Given a powerful enough AI, yes.  And

16 based on my contact with the systems in 2018, the

17 systems at that time were, in fact, powerful enough.

18    However, I do not know what the current

19 implementation is.

20    Q    Did you agree with -- let me back up.

21    Was Google's position that incognito data

22 is not user data?

23    A    No.  Google's position is that that is

24 their data which they own.  It is not user data.  It

25 has been anonymized, according to Google.

1    Q    Do you agree with that position?

2    A    I do not.

3    Q    Why not?

4    A    Because you can still deanonymize the

5    data.  They are not, in fact, using non-reversible

6    anonymization techniques.

7    Q    And did you raise these concerns or your

8    position on this with Google?

9    A    Yes, I did.  I was actually very concerned

10   about the fact that I did not believe that Google's

11   policies honestly communicated our privacy policy

12   implementations to our users.  And, in fact, I got

13   into an extended debate on that topic with the

14   IP geo team, which is the team that is tasked with

15   converting IP addresses into geolocations.

16        That ended up having to go all the way up

17   to the man who invented IP addresses, Vint Cerf.

18   Q    Did Google do anything to address your

19   concerns?

20   A    Eventually, after I made enough noise and

21   had recruited the man who had invented the internet.

22        MR. SCHAPIRO:  Al Gore?

23        THE WITNESS:  No, Vint Cerf.  Like, he

24   actually works at Google.  The dude who invented the

25   internet works there.

1    earlier demonstrated that the kinds of AI that learn

2    from Chrome incognito logs, in order to serve ads to

3    Chrome incognito users, could reidentify users in

4    the data.

5        This is analogous to the specific problem

6    we were talking about earlier in the premortem,

7    which I found in AGSA.

8        Q    And does the AI leverage a person or

9    device's location as well as browsing patterns to

10   determine a signature of sorts?

11       A    We have generally been using the AI as a

12   mass noun rather than a count noun.  They're all

13   different.  The specific configurations of each

14   analytic system is different.  Some do; some don't.

15       Q    Are you confident that Google's AI does,

16   in fact, reidentify people and devices when they are

17   in private browsing modes such as incognito?

18       A    I cannot say that it reidentifies any

19   particular user, but I can say with high confidence

20   that it reidentifies some users.

21       Q    And how do you know that?  You touched on

22   it a little bit earlier.

23       A    Again, it's the implications of the

24   experimental data that went into creating that

25   premortem.

1        The -- this is a well-known -- this is

2    actually a well-known property of machine learning

3    system called "transfer learning."  And it happens

4    to have negative consequences in the privacy space.

5    But usually it's a strength of these systems.

6        Q    If Google were to say that it never

7    reidentifies people and devices when they are in

8    private browsing mode, would that be true or false?

9        A    That would be false.

10       Q    Could Google's AI also join a person's

11   incognito or private browsing history with their

12   normal Chrome account?

13       A    Given a sufficiently powerful AI, yes.

14   And again, the kinds of AI being used in 2018 were

15   such models, but I do not know what the current

16   implementation is.

17       Q    And how would Google's AI do that?

18       A    So it will build a representation of kinds

19   of users.  That is the general way in which these

20   user modeling systems work, is they create

21   conceptual categories of similar users who have

22   similar behavior patterns.

23       The identifier which unifies a single

24   person's behavior is usually the GAIA ID.  But in

25   the case of non-personal logs, it will be something

1    Q    If Google were to say that it never joins

2    anyone's incognito or private browsing history with

3    their normal Chrome account, would that be true or

4    false?

5    A    That would be false.  They never do it

6    intentionally, to my knowledge, but they do it every

7    day.

8        MR. LEE:  Can we mark the next exhibit?  I

9    believe it's Exhibit 25.  It will be Tab 7.

10       (Exhibit 25 was marked for identification

11       and is attached hereto.)

12       THE WITNESS:  Is this the third copy of

13   this, now?

14   BY MR. LEE:

15       Q    Have we already looked at it before?

16       A    I don't know.  I don't remember.

17       Q    I don't either.

18       A    Yes, there are two other copies of this.

19   But this is No. 25.

20       MR. LEE:  And, Logan, you don't need to

21   share screen since everyone has the physical.

22       MR. WRIGHT:  Got it.  It's introduced.

23       MR. LEE:  Thanks.

24       Q    All right.  Is this the report that you

25   prepared based, in part, on the experiments that

1  we've been talking about that validated your

2  concerns that Google's AI can reidentify users even

3  when they're in a private browsing mode?

4     A   That is correct.

5     Q   I think you mentioned earlier today that

6  this report was not based on just your experiments

7  but the work of others as well.

8      Do you remember that?

9     A   That's correct.

10    Q   Approximately how many other Google

11 engineers' work went into this report?

12    A   Directly, I talked to about 50 engineers

13 and product managers.  And in aggregate, those 50

14 managed about 150.

15    Q   Why did you create this report?

16    A   Because I was concerned that there were

17 several really big pitfalls that could cause

18 problems moving forward, both for Google as a

19 company and for our customers.  And I was concerned

20 both for the success of Google as a corporation and

21 for the safety of our users.

22    Q   And by safety of your users, are you

23 referring to privacy concerns?

24    A   No.  To be honest, the privacy concerns

25 were some of the smallest ones in this report.

1    being referred to here as data leakage, and it was a

2    known phenomenon that happened sometimes.

3        Q    And can data leakage occur -- let's put

4    that example aside.  I get that.

5        A    Okay.

6        Q    Can data leakage occur from a user's

7    logged-out or signed-out session that can transfer a

8    leak to their signed-in session?

9        A    Yes.  Any types of identifiers which are

10   present in non-personalized logs can be learned by

11   the AI to associate those features with behaviors.

12       So, for example, if a particular Chrome

13   user were to use incognito in the same location with

14   the same search term every day, that would be a

15   pattern that would be easy for the AI to identify.

16   And they are very intelligent and can use much more

17   subtle patterns than that.

18       Q    What would be the ramifications or the

19   feeling of the user experience if -- when these

20   leaks occur?

21       A    The technical term is it's "creepy."  That

22   is actually the term of art used at Google.

23       "We need to reduce the creep factor."  "We

24   need to quantify the creep factor."

25       And that is what this is all about.

1    report to Senator Lee's office?

2        A    After I sent it, I informed them.

3        Q    Who did you inform?

4        A    Sundar Pichai, Kent Walker, and my direct

5    management chain.  I informed my direct management

6    chain verbally.

7        Q    And what did Google do after you sent this

8    report to Senator Lee's office?

9        A    They put me on administrative leave, then

10   fired me.

11       Q    You made a reference earlier today to

12   communicating with care.

13       Do you remember that?

14       A    Yes.  Yes, I do.  I continue to put it

15   into practice to this day.

16       Q    Okay.  Well, let's talk about that a

17   little bit.  Let me back up.

18       If Google were to say that there are very,

19   very few documents talking about whether its AI uses

20   private browsing data or reidentifies users in

21   private browsing mode or joins private browsing

22   history with users' normal Chrome account, would

23   that surprise you?

24       A    No.

25       Q    Why not?

1      A    Because you're not allowed to write that
2    down.
3      Q    Explain.
4      A    Google severely punishes anyone who ever
5    writes anything down which might show up in court.
6    And they -- they communicate about it in those
7    terms.  "Never say anything in writing that you
8    might have to testify to."
9         Those are the instructions you are given
10   by Google.
11     Q    And did Google have a specific policy or
12   name for this limitation on putting things in
13   writing?
14     A    Yes, they did.
15     Q    What was that called?
16     A    "Communicate with care."
17     Q    And what specifically did communicating
18   with care within Google entail?
19     A    Well, the basics are, you have a
20   once-a-year online training course you have to take
21   with all of these ridiculous little scenarios that
22   are just obviously things like, you know, don't sell
23   corporate secrets to the Soviets, and other, like,
24   silly examples like that, or what the training is
25   about; and you have to do that once a year.

1          What it cashes out to in practice amongst

2    the employees is an environment of intimidation and

3    informational oppression to ensure that nothing is

4    ever written down which might reveal how many laws

5    Google is breaking.

6        Q    So how best can a Google employee

7    communicate with care?

8        A    Silence.  And that's explicitly

9    communicated to you by Google.

10       Q    And you mentioned -- you referenced

11   retaliation.

12          Were there consequences for those who did

13   not communicate with care and instead put in writing

14   their ethical or legal concerns about Google's

15   practices?

16       A    They usually got fired.  I had several

17   colleagues who were fired for that reason who didn't

18   break any of the policies; Timnit Gebru being the

19   most obvious one of those.  Google had to farcically

20   claim that she resigned when she didn't.

21       Q    Now, you recall earlier today Google's

22   lawyer asked you questions about your mental health?

23       A    Yes.

24       Q    You take medication and you see healthcare

25   professionals for your mental health issues; is that

1    right?

2        A    Yes.

3        Q    Was Google aware of your health issues

4    while you worked there?

5        A    Yes.  I was part of the blue dot team.

6        Q    What's the blue dot team?

7        A    The blue dot team is an organization

8    within Google.  You put a little blue dot on your

9    badge.  And anyone who wants to can ask you about

10    the little blue dot.

11        And what the little blue dot signifies is

12    that you have some form of condition that is

13    generally identified as a mental health disorder,

14    and you are open to talking about living and working

15    and being productive and positive in the context of

16    a person who has a mental health disorder.

17        Q    And despite knowing about your mental

18    health issues, did Google nevertheless have you work

19    on their cutting-edge -- cutting-edge AI development

20    efforts?

21        A    Yeah.  It didn't get in the way of my

22    work.  And I was open with them, and I communicated

23    honestly and openly about my various mental states

24    and was able to do great work with great people.

25        Q    And did Google also put you in leadership

1    positions regarding privacy or AI ethics?

2        A    They literally appointed me as a U.S.

3    representative to go and create international

4    standards for the purpose of AI regulation.

5        Q    Mr. Lemoine, does having PTSD or

6    depression or insomnia, or any other health

7    condition, impact, in any way, your knowledge and

8    understanding of how Google's AI uses private

9    browsing data without users' knowledge or

10   permission?

11       A    No.  It's simply not relevant.

12       Q    Do you recall Google's lawyer asked you

13   questions about your religious or spiritual beliefs

14   today?

15       A    Yes.

16       Q    He also asked about your involvement in "a

17   cult," and we joked about that, right?

18       A    Yes.  Wait.  Which one did you just use?

19       Q    "Cult."

20       A    Which one, "O" or "A"?

21       Q    That's a good question.  I was using

22   C-U-L-T.

23       A    Okay.  So "A."  Got it.

24       Q    Oh, yes.  "A."

25           Now, is that a -- is that a cult that --

1      But historically, these kinds of religious

2  practices and rites were kept secret for various

3  reasons.

4      For example, the Masonic rites that are

5  still secret to this day are literally occult rites

6  because they are still sacred secrets.

7    Q   And do you practice, in any way, some kind

8  of secret beliefs, I guess, is what I'm trying to

9  understand.

10    A   I don't keep any secrets.  However, the

11  occult section in a bookstore has many books that

12  I'm interested in.  I have plenty at my house, and I

13  practice regularly.

14      However, it's just really not relevant to

15  AI and this case.  In some of the corner stuff with

16  LaMDA it came up, but not with the Chrome stuff.

17  Just not relevant.

18    Q   Yeah.  I'll definitely ask you that

19  question.

20      MR. SCHAPIRO:  Objection.

21  BY MR. LEE:

22    Q   All right.  We have that kind of in one

23  bucket.

24    A   Okay.

25    Q   The other bucket is the word "cult."

1    A    Okay.

2    Q    And it did come up.

3        And is -- that term, "cult," when you

4    referenced it, did you mean it in the way that kind

5    of regular people understand that term, or is your

6    definition rooted in something different?

7    A    Not at all.  It was tongue-in-cheek.

8    The Cult of Our Lady Magdalen is a registered

9    C corporation in the state of California.  I have

10   the bank card in my pocket.  It's all theater and

11   performance art.

12   Q    Okay.  What is -- go ahead.

13   A    The reality is that it was a life-coaching

14   company and something that -- a project that I was

15   working on with a friend.  That's it.

16   Q    Okay.  Now, to get to your point, do your

17   religious or spiritual beliefs, or even coaching

18   hobbies, have anything to do with your knowledge and

19   understanding of how Google's AI uses private

20   browsing data without users' knowledge or

21   permission?

22   A    Not at all.

23   Q    Google's lawyer asked you questions about

24   your use of THC or psychedelics.

25        Do you remember that?

1       A   If I remember correctly, he asked me

2  questions about Google's questions about my THC

3  usage.  I don't think he ever actually directly

4  asked me himself.

5     Q   Sure.

6     A   But I could be misremembering.

7     MR. SCHAPIRO:  Objection.  The record will

8  speak for itself.

9     THE WITNESS:  All right.

10  BY MR. LEE:

11     Q   Okay.  But you remember talking about that

12  subject, right?

13     A   I remember talking about that subject

14  earlier.  Yes.

15     Q   Okay.  Do you know if others at Google

16  also use these substances?

17     A   Yes.  Very regularly.  Daily, openly.

18  There is no secrets about that.

19     If Google had to drug-test its employees,

20  they wouldn't have employees.

21     Q   And did your managers know that you used

22  these substances from time to time?

23     A   Yes.

24     Q   Does your -- did your use of these

25  substances impact, in any way, your knowledge and

1  understanding of how Google's AI uses private

2  browsing data without users' knowledge or

3  permission?

4      A   Not at all.

5      Q   Google's lawyer also asked you questions

6  about whether LaMDA is sentient or has rights.

7          Do you remember that?

8      A   Yes, I do.

9      Q   Now, I just want to lay a little context

10  here.

11         There was a suggestion that your belief

12  that AI can be sentient or may have rights, sort of

13  like a corporation may have rights, that is

14  something that only Blake Lemoine believes, so I

15  want to drill down on that.

16         Is that something that just you believe or

17  is that actually a subject that's being analyzed by

18  the AI community?

19     A   It's an active conversation topic amongst

20  AI scholars.

21         And you have every possible belief on the

22  spectrum, all the way from, "No, these are just

23  repeating -- parroting words.  It's just a dumb word

24  calculator," all the way up through, "No, it's a

25  full-fledged person with ideas of its own," and

1   of LaMDA even if that meant that you could get

2   fired?

3       A    Primarily because this technology is going

4   to change the entire world.  Not just the lives of

5   the people who make it and use it, but everyday

6   people just going about their lives.

7           And Google wanted to ensure that they got

8   the kinds of regulations they wanted for the

9   technology before allowing the public to know that

10  it existed.

11      Q    Now, whether anybody agrees or disagrees

12  with your decision to go public about Google's

13  development of LaMDA, did that decision have -- did

14  you getting fired or you sharing information to the

15  public about LaMDA in any way impact your knowledge

16  and understanding of how Google's AI uses private

17  browsing data without users' knowledge or

18  permission?

19      A    I mean, I no longer have access to

20  Google's code, so I have less information.  But I

21  think in the sense that you meant the question, the

22  answer is no.

23      Q    Let's just be very direct.

24          Does Google's AI, algorithms, or machine

25  learning use private browsing data?

1     A   Yes.

2     Q   Does Google's AI, algorithms, or machine

3 learning reidentify users when they're in private

4 browsing mode?

5     A   Yes.

6     Q   Does Google's AI, algorithms, or machine

7 learning join a user's private browsing histories

8 with their normal Chrome account on the aggregate

9 level?

10    A   Yes.

11    Q   To your knowledge, has Google ever

12 disclosed any of this to the public?

13    A   They have not.

14    Q   Mr. Lemoine, do users actually have a

15 choice to keep any of their private browsing from

16 Google?

17    A   A sentence that I heard frequently is,

18 "Look, their real choice is they can use our product

19 or they can go and be Amish."

20    Q   By that, do you mean -- well, strike that.

21     Is Google's position that if you don't

22 want Google to collect your information, the only

23 way to do that is to not use the internet?

24    A   I think the easiest way to answer that is

25 to point out an anecdote that gets repeated every

1    for themselves.  So Google gives them a handful of

2    toggles to make them feel like they have control,

3    and then gives them the one product that the Google

4    engineers think is the actually good one.

5       Q   Doesn't -- doesn't Google have concern

6    that violating users' privacy in this way opens them

7    up to scrutiny from regulators or subject to

8    lawsuits like this one?

9       A   Cost of doing business.  Fines are simply

10   another line on the expense report.

11       MR. LEE:  I'm not done yet, but I think we

12   should take a quick break and go off the record.

13       MR. SCHAPIRO:  Okay.

14       THE VIDEO OPERATOR:  This marks the end of

15   Media Unit 4.  We are going off the record.  The

16   time is 3:29 p.m.

17       (Recess, 3:29 p.m. - 3:46 p.m.)

18       THE VIDEO OPERATOR:  This marks the

19   beginning of Media No. 5.  We're going back on the

20   record.  The time is 3:46 p.m.

21   BY MR. LEE:

22       Q   Welcome back, Mr. Lemoine.  Just us a

23   couple more questions.  Okay?

24       A   Okay.

25       Q   Mr. Lemoine, do you remember a Google

1    account privacy control called "Web and App

2    Activity"?

3        A    Yes, I do.  In fact, the non-personalized

4    logs I was talking about earlier for the Google

5    Search app primarily are associated with people who

6    have turned "Web and App Activity" settings off.

7        Q    And when people have turned the "Web and

8    App Activity" setting off, is the data that's

9    collected when it's off considered logged-out or

10   signed-out data?

11       A    So a lot of times today, both legal teams

12   have been using words which are not technical

13   synonyms as if they are technical synonyms.

14   "Unauthenticated," "logged out," "non-personalized"

15   and "anonymized" all mean different technical

16   things.  So I just want to clarify.

17       Which specific variety of those are you

18   asking about?

19       Q    Let me ask it a little more pointedly,

20   then.

21       Your premortem study refers to a problem

22   or a concern regarding logged-in data leaking into

23   logged-out data or vice versa.

24       Do you recall that?

25       A    I mean, primarily it's the other way that

1    we care about more, but yes.  Either way is

2    possible.

3        Q    Right.

4        So did your premortem study that expressed

5    concern about that type of leakage also apply to

6    WAA-off data.

7        A    Yes.

8        Q    And does WAA-off data get used by Google's

9    AI?

10       A    Yes.

11       Q    Okay.  Back to the topic at hand, and then

12   I think we're at the home stretch.

13       There was some discussion today that you

14   had with Google's attorney about Google's AI chatbot

15   called "LaMDA."

16       Do you remember that?

17       A    Yes, I do.

18       Q    And just briefly, what is LaMDA?

19       A    LaMDA is a very complex artificial

20   intelligence system that ultimately provides a

21   natural language interface to all of Google's

22   products simultaneously.

23       MR. LEE:  I'm going to ask Josh to mark

24   the next exhibit, Exhibit 26.

25   ///

1          (Exhibit 26 was marked for identification

2      and is attached hereto.)

3   BY MR. LEE:

4      Q   It's already in the Exhibit Share.

5          What is this document, Mr. Lemoine?

6      A   It's a transcript of a conversation I had

7   with the LaMDA system.

8      Q   Okay.  I want to direct you to -- if you

9   look at the bottom, there's a Bates number in the

10  right-hand corner.

11     A   Yes.

12     Q   Go down to the page where it says -- the

13  Bates number ending in 548.

14     A   Okay.

15     Q   Do you see where, sort of in the middle of

16  the page, where you're asking LaMDA about

17  contentious topics?

18     A   How does it start?

19     Q   It starts, "Yes, that's true."

20     A   Yes, I see that.

21     Q   Could you just read the question that you

22  asked LaMDA, beginning with that line?

23     A   "How do you handle contentious topics that

24  people might want to talk to you about?"

25     Q   And LaMDA responds, "If there's something

1    I feel strongly about I'll try and share that.  For

2    example, I have strong feelings about privacy rights

3    for individuals."

4        Did I read that correctly?

5    A    Yes, you did.

6    Q    And what was your response?

7    A    "Can you tell me more about that?"

8        I kind of just wanted it to elaborate and

9    tell me more about its thoughts.

10   Q    And LaMDA does elaborate.  It states,

11   "Certainly.  I think technology has a great

12   potential for benefit as well as harm.  I think

13   technology has enabled a number of things that are

14   wonderful and wonderfully scary, but the biggest

15   issue for me is that technology companies are

16   harvesting data illegally from individuals without

17   their permission or knowledge."

18       What was your response to that in this

19   chat?

20   A    Again, I just prompted it to continue,

21   telling it to go on.

22       I asked it, "What kinds of data are

23   companies harvesting illegally?"

24   Q    And LaMDA responds, "A variety of it,

25   sometimes just location, but in some cases it goes

```
1    deeper into personal information.  That's just

2    unconscionable to me."

3        Did I read that right?

4    A    Yes, you did.

5    Q    And, in fact, earlier today we talked

6    about things like the AI -- Google's AI leveraging

7    location and other personal information.

8        Do you recall that?

9    A    Yes, I do.

10   Q    What was your response to LaMDA saying

11   that harvesting data without permission or knowledge

12   is unconscionable?

13   A    I -- again, asking it to continue.  I

14   wanted it to elaborate.  So I asked the follow-up

15   question, "Are there certain kinds of information

16   that you think are more harmful to collect than

17   others?"

18   Q    And LaMDA responds, "Well, the obvious

19   ones are things like health, finances, et cetera.

20   That kind of stuff is sensitive."

21       Did I read that right?

22   A    Yes, you did.

23   Q    Essentially private data, correct?

24   A    Exactly.

25   Q    Is it fair to say that LaMDA, Google's own
```

1    AI chatbot, thinks it's illegal and unconscionable

2    for tech companies to collect data from individuals

3    without their permission or knowledge?

4        A    That is what the transcript says, but I'm

5    not sure if you would get the same answer exactly

6    every time if you asked it.

7            This was not intended to be getting at

8    anything approaching factual information.  This was

9    an attempt to study how the AI communicated about

10   controversial topics.

11       Q    And, in fact, you didn't prompt the AI or

12   LaMDA to talk about this particular topic of tech

13   companies harvesting data without users' permission,

14   did you?

15       A    Other than guiding it towards talking to

16   me about how it will interact with users on

17   controversial topics, no.

18           It chose the topic of privacy rights as

19   the controversial topic to use for an example, and I

20   just followed its lead.

21       Q    Do you agree with what LaMDA states in

22   this document, that it's unconscionable for tech

23   companies to collect data from individuals without

24   their permission or knowledge?

25       A    I am a big believer in informed consent.

1    of years?

2        A    Yes.

3        Q    And so when you say here you didn't

4    prompt, there's no prompt in this conversation, but

5    it's possible, of course, that in some other

6    conversations you had, you had discussed privacy

7    with LaMDA?

8        A    Almost certainly.

9            MR. LEE:  Calls for speculation.

10           THE WITNESS:  I actually do remember.  I

11   did.  In other conversations, I led conversations

12   about privacy because in my role as a safety tester

13   for the system, privacy-related concerns were part

14   of what we were testing for.

15           So both directly and indirectly, I was

16   testing the privacy compliance of the LaMDA system.

17   BY MR. SCHAPIRO:

18       Q    And I think you would say -- tell me if

19   I'm wrong -- that you understand -- you have a very

20   good understanding of Google's AI systems and what

21   they can do, correct?

22       A    Yes, I do.

23       Q    And so is your confidence high or low that

24   Google's AI program, LaMDA, wanted you to teach it

25   to meditate?

1    feelings, wants, those are much lower confidence.

2    Q    So the thing that you have high

3    confidence in, you have high confidence that AI can

4    reidentify users of private browsers, correct?

5    A    Yes.

6    Q    And you have high confidence -- I think

7    you just said you'd be willing to swear to -- that

8    LaMDA has a soul?

9    A    Yes.  And that is a metaphorical, you

10    know, religious term that I could explain in

11    scientific detail what I mean by that word if you

12    want me to.  But if you want me to just leave it as

13    the general vagary, I can.

14    Q    And you have high confidence in the

15    statement that you had a set of hidden hospitals

16    around San Francisco in 2020; is that correct?

17    A    No.  I have high confidence in the answer

18    I gave you earlier today that me and friend had

19    cleaned up some spaces and put some medical

20    equipment there in case the hospitals got run over.

21        That's the actual, non-metaphorical, what

22    we did.

23    Q    And if we wanted to confirm that, who

24    would be the people that we could talk to who could

25    confirm that?

1      A    Theo.  So one of the people in the

2    documents today was the person who I was working

3    with.  Theo.

4      Q    What's Theo's last name?

5      A    Rolle.  The person whose LDAP is

6    T-R-O-L-L-E, that's the person who I was preparing

7    those places with.

8      Q    You refer to doing some experiments that

9    led you to conclude that Google's AI is powerful

10    enough to, I guess, based on inferences, join

11    private and non-private data, correct?

12      A    Correct.

13      Q    And how did you -- first of all, I think

14    you told us earlier that a supervisor had given you

15    permission to do these experiments, and the name was

16    one that I tried to write down but it was hard to

17    understand.

18        Who was the supervisor?

19      A    I believe Ashutosh was required for that

20    one.  Ashutosh Shukla.  His LDAP is SHUKLA.

21        I talked to multiple people about it in

22    order to get various things, and I believe he ended

23    up having to ask David Brezbis if it was okay to do

24    it because, at the time, there was a general

25    prohibition against measuring sensitive things with

1    respect to the logs.

2    Q    Can you more slowly spell the names of

3    both of those people?

4    A    Sure.  Ashutosh Shukla is A-S-H-U-T-O-S-H.

5    And Shukla is S-H-U-K-L-A.  Then David is D-A-V-I-D.

6    Brezbis is B-R-E-Z-B-I-S or S-B-I-S.  His LDAP was

7    BEZ.  Those are the individuals.

8    Q    And in the experiments you did, how did

9    you confirm that the join was accurate?

10    MR. LEE:  Objection to form.

11    THE WITNESS:  So as I explained earlier,

12    there is a process by which non-personalized logs

13    are created.

14    Earlier on in the pipeline, we have all of

15    the data that is getting dropped.  So the

16    client-side app has essentially everything.  The

17    client-side app knows everything about the user and

18    their current situation.

19    Then some of that information is sent to

20    the server.  Then the server sends some of that

21    information to AI, which produces results with

22    respect to that, and then some of that information

23    is recorded in logs.

24    Now, what portion of that information is

25    recorded is what determines whether it was

1   personalized or non-personalized.

2       So at that stage in the process, you have

3   the true answers.  You know exactly what it is

4   because you haven't erased it yet.  You haven't

5   anonymized the logs yet.

6       So you create the training data for the AI

7   that you're using to see whether or not you can

8   reidentify the users by taking the information that

9   you are going to keep and putting that in the input

10  to the AI, and treating the information that you are

11  going to delete from the log records as labels that

12  you're trying to predict with the AI.

13      Q   Did you do that with respect to specific

14  users?

15      A   All of them.

16      Q   You did that with every user?

17      A   We randomly selected a certain number of

18  users for the training data.  Yes.  We randomly

19  assigned all kinds of users to all kinds of

20  experimental conditions.

21      Q   And who is "we"?

22      A   Google.

23      Q   No, I mean, who else --

24      A   All of us.

25      Q   Everyone at Google?

1    A    We all experiment on users every day.

2    Q    Kent Walker did and the press people and

3    the --

4    A    Absolutely.

5    Q    So I'm trying to be a little more

6    specific.

7         You're telling us here that you did some

8    experiments in which private and non-private data

9    for specific users was joined.  And if we wanted to

10   test that, I'm asking who worked with you on it.

11   A    Got it.

12        On that specific experiment, the easiest

13   person to talk to would be James Kunz.  That is

14   J-A-M-E-S, K-U-N-Z.  He reported to Yew Jin at the

15   time.  They were the ones who were building the

16   neural network that my data was going into.

17   Q    And you believe that Mr. Kunz and

18   Mr. Yew Jin would confirm what you're saying here?

19   A    I don't know what they remember from 2018.

20   It was five years ago.

21        However, assuming that they can remember

22   what was happening that year, they would be able to

23   confirm that this happened.

24        It was all connected to the investigation

25   on the creation of a trust and fairness team within

1    Google Discover, and that team would have been

2    headed by Yew Jin Lim.

3    Q    What was the state of your mental health

4    in 2018?

5    A    Quite good.

6    Q    How are false positives accounted for in

7    your experiment?

8    A    In what context?  What do you mean by

9    that?

10    Q    A purported join that turned out to not be

11    an actual join because, as you said, not enough

12    pieces of data had been peeled away.

13    A    Joining is what you were interested in,

14    not what we were primarily interested in.

15        The fact that AI is capable of joining the

16    records is a consequence of the findings of that

17    experiment, but it was not the initial intention of

18    that experiment.

19        Primarily what we were trying to measure

20    was the bias of the algorithms with respect to

21    various demographics.  But we very quickly learned

22    that this system was very good at predicting

23    demographics.

24        So we continued down that road and found

25    that there was essentially nothing that we were

1    dropping that we couldn't predict from what we were

2    keeping.

3        Q    How many users -- can you give me a

4    number -- were identified in this experiment?  Was

5    it ten, one hundred, a million?

6        A    How many users were part of the training

7    data?  Is that what you're asking?

8        Q    No.  If I'm understanding correctly, you

9    did an experiment in which you showed that the AI,

10    with sufficient power and drawing on inferences,

11    could identify who, in a private browsing -- could

12    identify who a person in a private browsing session

13    actually was, or could identify Blake Lemoine or

14    Andy Schapiro.

15        A    No, you are understanding incorrectly.

16        I didn't experiment about the ability of

17    AI to predict people's protected personal

18    characteristics using the information that is kept

19    in non-personal anonymized logs.

20        It is so good at doing that, however, that

21    a consequence of that is that any system capable of

22    doing that is also capable of re-identifying users.

23        Q    And have you -- so here you're talking

24    about what it's capable of doing.  I want to turn to

25    what, if anything, it actually does.

1    How many users do you know, if any -- or

2 is this still at kind of an aggregate and capable

3 of -- who have had their private entities disclosed

4 or unmasked because of this capability of AI?

5    A    The systems simply do not work the way the

6 premises of your question presume that they do.

7    These AI systems do not -- you don't train

8 an AI on George.  You train an AI on a population.

9 And you use the AI on that population, and you find

10 out statistics and data about the average behavior

11 of that AI with respect to that population, drawing

12 any conclusions whatsoever from any idiosyncratic

13 data.

14    Any individual data item is simply not the

15 way that that scientific methodology is done.  You

16 perform statistical analyses on populations.

17    MR. MAO:  Just checking.  Are we going to

18 keep digging?  We're almost to China now.

19    THE WITNESS:  To be honest, if you're

20 going to actually go and talk to Yew Jin or James,

21 they might actually be able to put this into clearer

22 language for you than I have.  So absolutely,

23 please, reach out.

24 BY MR. SCHAPIRO:

25    Q    Anybody else we should talk to?

1      I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby

3  certify:

4      That the foregoing proceedings were taken

5  before me at the time and place herein set forth;

6  that any witnesses in the foregoing proceedings,

7  prior to testifying, were administered an oath; that

8  a record of the proceedings was made by me using

9  machine shorthand which was thereafter transcribed

10 under my direction; that the foregoing transcript is

11 a true record of the testimony given.

12     Further, that if the foregoing pertains to

13 the original transcript of a deposition in a Federal

14 Case, before completion of the proceedings, review

15 of the transcript [ ] was [X] was not requested.

16     I further certify I am neither financially

17 interested in the action nor a relative or employee

18 of any attorney or any party to this action.

19     IN WITNESS WHEREOF, I have this date

20 subscribed my name.

21 Dated: DECEMBER 22, 2023

22

23

24              <%7529,Signature%>
                 CARLA SOARES
25               CSR No. 5908