PAGES 1 - 126

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,          )
                                   )
            Plaintiffs,            )
                                   )
vs.                                ) **No. 3:20-cv-04688-RS**
                                   )
GOOGLE LLC, et al.,                )
                                   )
            Defendants.            )
_____)


San Francisco, California

Wednesday, July 30, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                    Boies Schiller and Flexner
                    333 Main Street
                    Armonk, NY 10504
            BY:     **DAVID BOIES, ATTORNEY AT LAW**
                    **ALEXANDER BOIES, ATTORNEY AT LAW**

                    Boies Schiller Flexner LLP
                    44 Montgomery Street, 41st Floor
                    San Francisco, CA 94104
            BY:     **MARK C. MAO, ATTORNEY AT LAW**
                    **BEKO RICHARDSON, ATTORNEY AT LAW**

                    Boies Schiller Flexner LLP
                    2029 Century Park East, Suite 1520
                    Los Angeles, CA 90067
            BY:     **ALISON L. ANDERSON, ATTORNEY AT LAW**

(Appearances continued on the following page)

**REPORTED BY:  April Wood Brott, CSR No. 13782, Official United States Reporter**

**APPEARANCES (continued):**

For Plaintiffs:

                Boies Schiller Flexner
                100 SE 2nd Street, Suite 2800
                Miami, FL 33131
     BY:  **JAMES W. LEE, ATTORNEY AT LAW**

                Boies Schiller Flexner LLP
                2029 Century Park East, Suite 1520
                Los Angeles, CA 90067
     BY:  **ALISON L. ANDERSON, ATTORNEY AT LAW**
          **SAMANTHA D. PARRISH, ATTORNEY AT LAW**

For Defendants:

                Cooley LLP
                3 Embarcadero Center, 20th Floor
                San Francisco, CA 94111
     BY:  **BENJAMIN Y. HUR, ATTORNEY AT LAW**
          **EDUARDO E. SANTACANA, ATTORNEY AT LAW**
          **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
          **ARGEMIRA FLOREZ, ATTORNEY AT LAW**
          **HARRIS MATEEN, ATTORNEY AT LAW**
          **ISABELLA M. CORBO, ATTORNEY AT LAW**
          **NAIARA TOKER, ATTORNEY AT LAW**

                Cooley LLP
                10265 Science Center Drive
                San Diego, CA 92121
     BY:  **MICHAEL ATTANASIO, ATTORNEY AT LAW**

```
 1   Wednesday - July 30, 2025                        9:40 A.M.
 2                     P R O C E E D I N G S
 3                        ---o0o---
 4        THE CLERK:  All rise.  The United States District
 5   Court for the Northern District of California is now in
 6   session.  The Honorable Richard Seeborg is presiding.
 7        You may be seated.  We are calling Case Number 20-CV-4688,
 8   Rodriguez, et al., versus Google.  Appearances please, starting
 9   with the plaintiff and then the defendant, if you want to come
10   up to the podium, please.
11        MR. BOIES:  Good morning, Your Honor.  David Boies of
12   Boies Schiller & Flexner on behalf of the plaintiff class.
13   With me today are my colleagues, Alison Anderson, Alex Boies,
14   Mark Mao, James Lee, Beko Richardson, and Samantha Parrish.
15        THE COURT:  Good morning.
16        MR. BOIES:  Good morning.
17        MR. HUR:  Good morning, Your Honor.  Ben Hur from
18   Cooley for Google.  I'm here with my colleagues, Mike
19   Attanasio, Simona Agnolucci, Eduardo Santacana, Argemira
20   Florez, Harris Mateen, Naiara Toker, and Isabella Corbo.
21        THE COURT:  Good morning.  So we have a lot to cover
22   today.  I always like pretrial conferences.  It's kind of a --
23   you feel like you get a lot done.  You actually do the nuts and
24   bolts of it all.
25        What I'm going to do, just to give you a roadmap of what
```

```
 1    we're going to be discussing, I want to first just talk about
 2    the logistics, how I conduct trials, in particular the jury
 3    selection day, and we'll go through all of that.
 4         Then we'll go to the -- some of the substantive issues in
 5    the form of the motions in limine, and then kind of related to
 6    the motions in limine, they cover certain areas that I want to
 7    talk about conceptually about how we're going to proceed in
 8    this case.
 9         But I do want to start just with, you know, the nuts and
10    bolts of jury selection on the day we begin, and I did confer
11    with our jury office.  There was some concern at one point that
12    we had too many jury selections on that day, but it looks like
13    on the 18th -- 18th or 19th?
14             THE CLERK:  18th.
15             THE COURT:  That we can move forward on the 18th and
16    pick a jury that day.
17         So first order of business is about my law clerk, who is
18    sitting there, and his name is RJ.  RJ has worked with me
19    through this case.  And not to embarrass him.  He's a superb
20    law clerk.
21         So at the time that he -- when he was working on this
22    case, he accepted an offer at the Cooley firm in New York.  At
23    that time, as you all know, Cooley had nothing to do with this
24    case, and he labored away.  Then the defense team -- same
25    defense team, but different place of work -- they are now at
```

1          the Cooley firm.

2               You know, I checked with our Washington ethics folks and

3          the like, and I don't think it's a problem.  Not only me, but

4          all of you will have benefit from having RJ to continue to work

5          on this case.  So he is going to continue to work on this case.

6          But I thought I should tell you in case someday you see him in

7          New York in a restaurant with Cooley people and wonder what's

8          going on.  So I thought you should know.

9               Okay.  So let's first talk about the jury questionnaire.

10         That will go out.  The responses will come back during the week

11         of August 10th.  What my practice is is to share the responses

12         with you and then have a meeting, by Zoom is fine, on Friday

13         before trial at 9:30.  And at that meeting with counsel, we'll

14         go over -- and it will be confined to hardship issues.  And

15         that way, there are certain jurors that don't -- we can tell

16         them they don't need to come in.

17              And just as I think we all know, the hardships are things

18         like caregiver responsibilities, either childcare or elderly

19         care; full-time student; people with travel, prearranged travel

20         plans during the period of time.  I don't include -- well, we

21         can talk about it on that Friday.

22              If someone has a financial hardship -- and these are

23         sometimes the toughest ones.  As we all know, the self-employed

24         people who tell you, you know, "If I can't work, I can't pay my

25         rent" kind of thing.  Because I run 8:30 to 1:30, sometimes we

1    can work around that.  So I don't have a blanket excuse, but we

2    will talk about that and see what the circumstances are.

3         Now, we can -- and I don't feel strongly about it.  It

4    would make life a little easier.  I can ask the jury office to

5    prescreen for three weeks; in other words, just using the

6    criteria I just said, full-time student, travel plans,

7    caregiver issues, that they can simply exclude the people that

8    fall into those buckets and can't do a three-week commitment.

9         If you want me to not do that, it sometimes means it's a

10   little dicier in terms of the numbers calling in and will we

11   have a jury.  But it's up to the parties.  I like to prescreen

12   for a three-week or more trial, but if there's a strong

13   negative view upon doing that, I won't do it.

14        Let's start with you, Mr. Boies.

15        **MR. BOIES:**  Not from us, Your Honor.  We think that

16   makes sense.

17        **MR. HUR:**  Your Honor, Ben Hur for Google.

18        We don't have an objection to that.  We do have some

19   concerns about the size of the panel in general, Your Honor.

20   Given how many class members are likely in this potential jury

21   pool, how many people use this setting, we do think it will

22   depend in part on how big this pool is and who else might be

23   pre-excluded as part of this process.

24        **THE COURT:**  Right.  Well, the benefit of doing the

25   prescreening for three weeks is that then if it looks like lots

1    are going, we can put more people in.  But -- and I will ask

2    for the most I can ask.  As you can appreciate, I'm getting

3    counterpressure, budgetary counterpressure, that -- you know,

4    don't bring in more than you need.  And I also don't like to --

5    I mean, you know, I don't want to inconvenience people in the

6    sense of bringing in way too many and then have them all go.

7        I am planning to ask for about 60.  And, you know, we're

8    going to get an eight-person jury.  So that's my current

9    notion.  I think even more reason why we should perhaps

10   prescreen and get people -- not have in the 60 people who we're

11   going to just have to say, "Okay.  You're gone."  So I hear

12   your concern, and I'm attuned to it, but I take it I can -- I

13   think I'm going to do the prescreening for the three weeks, ask

14   the jury office to do that.

15           **MR. HUR:**  Your Honor, that makes sense.

16           **THE COURT:**  Okay.

17           **MR. HUR:**  A related question.  Are you -- do you

18   prescreen for other questions as well?  You know, for example,

19   there is a question on the jury questionnaire that really gets

20   to the heart of whether someone has a financial interest in the

21   case.

22           **THE COURT:**  I -- oh.  They have a financial

23   interest --

24           **MR. HUR:**  Because they would --

25           **THE COURT:**  -- meaning they're a class member?

1          **MR. HUR:**  Yes.

2          **THE COURT:**  I'm not going to -- I won't -- they may be

3    wrong about what they think they're part of or not.  I think I

4    -- I want the jury office only to prescreen on very

5    easy-to-follow, kind of ministerial criteria.  So that -- I'm

6    not going to ask them to prescreen that because that's asking

7    them to make some calls that, you know, maybe inquire about,

8    well, do you really think you're a class -- you know, I don't

9    want to get into that.

10          All the jury office is doing is somebody says, "Listen,

11   I'm going to, you know, Cabo San Lucas on a prepaid family

12   holiday.  Here's the ticket during that three-week period.

13   That's the kind of thing that they are, you know, saying,

14   "Okay.  You don't have to show up."

15          **MR. HUR:**  Your Honor, it would be the answer to a

16   yes-or-no question on the agreed square, and the benefit would

17   be that if they answered that question yes -- and it could be a

18   significant part of the pool -- they would not have to come in,

19   and thereby, you would again, save those resources you were

20   discussing by having someone come in and clearly --

21          **THE COURT:**  Well, I don't know.  Mr. Boies, do you

22   want -- if they answer yes, do you want me to just let the jury

23   off and say don't bother?

24          **MR. BOIES:**  If they say yes to which question, Your

25   Honor?

1           **THE COURT:**  What's the question?

2           **MR. HUR:**  Your Honor, the question is on the jury

3    questionnaire "Do you turn off WAA or sWAA for privacy when

4    using Google apps, products, devices, or services?"  It was on

5    the agreed questionnaire.

6           **THE COURT:**  Well, I suppose there's also during what

7    period of time, but -- in terms of whether or not you're a

8    class member.  But do you want people that say yes -- Mr. Hur

9    is asking for me just to exclude them from the pool that we

10   then consider?  What's your view on that?

11          **MR. BOIES:**  Well, I think it's complicated, Your

12   Honor.  On the one hand, jurors would have to be excluded from

13   the class, and I think that one of the things that I think that

14   it is appropriate to do is to tell the jurors that if they are

15   a juror, they will not be in the class.

16          I think there is an issue an issue with respect to

17   excluding just the people who turn it off and not excluding the

18   people who turned it on.  One of the things that is going to --

19   it's a little bit like death penalty cases, you know, asking

20   whether they believe in the death penalty or not.

21          One of the issues here is going to be the privacy, how

22   people feel about privacy.  Obviously people who turned it on

23   feel differently than people who turned it off.  If you exclude

24   all the people who turned it off but leave on all the people

25   who turned it on, you're getting a skewed jury.

1          On the other hand, Google is so pervasive that if you

2     exclude everybody who turned it on and everybody who turned it

3     off, that could make getting a jury more complicated.

4          **MR. HUR:**  Your Honor, if I may?

5          **THE COURT:**  Let's -- go ahead.

6          **MR. HUR:**  The class is only people who had it off,

7     Your Honor.  So that's why we're asking about it off.

8          **THE COURT:**  I think I'm going to -- let's not have the

9     jury office automatically remove people.  But you've convinced

10    me maybe I'll increase the numbers that I'm asking to have come

11    in.  Maybe go up to 70.  But I don't want to -- I don't think

12    -- let's cross this bridge later on.  I will not automatically

13    exclude those people from even showing up.  We'll have to deal

14    with it, so.  Okay.

15         **MR. HUR:**  Thank you, Your Honor.

16         **THE COURT:**  Thank you.

17         So jury selection and what will happen.  When the jurors

18    come in -- and this is obviously we've had our Zoom meeting on

19    Friday.  We've gone through the list.  I share with -- for

20    counsel the order, the list that shows the order in which

21    people will be called.  So I don't keep that from you.  You'll

22    know the order.

23         Karen will take the roll of the jurors.  Then once that's

24    all done, I come out.  I'll make preliminary remarks in --

25    about jury service, thanking them, all of that.  I do want a

1    case -- a neutral, short -- meaning paragraph or less -- case

2    description, both for telling the jurors in the near -- at the

3    beginning, and then also, I'll need it for the preliminary jury

4    instruction that has brackets for us to include.  And that's

5    1.5, which I will give.

6        I give the Ninth Circuit pattern introductory jury

7    instructions.  We'll talk about that a little later.  But I

8    will need to get from counsel an agreed statement.  I know it's

9    hard sometimes to get an agreed statement, but this is truly

10   just the, you know, 60,000 feet, this is what this case is.

11   It's a case about privacy.  And so I will figure out a time for

12   when I want you to provide that to me.

13       So I call forward fourteen people that go into the box.

14   It's much easier in civil cases than in criminal cases because

15   of the numbers.  So we'll have fourteen people right out of,

16   you know, the beginning.  I'll call them forward.  I will share

17   with them a printed list at the appropriate time of the

18   witnesses anticipated to be called and ask them if they know

19   any of those people.

20       So make sure you give me as complete a list as you

21   contemplate.  You know, we want to be overinclusive rather than

22   under-inclusive.  And I tell them, "Don't worry."  You know,

23   they'll look and say, "Oh, my god.  I'll be here for ten

24   years."  I'll -- you know, I'll tell them, "Not all of these

25   people may be called, but look at it, and if you think you know

1    somebody, raise your hand," and then we'll determine what the

2    deal is.

3        I introduce lead counsel on each side, and then I look to

4    the person I've introduced to introduce the other people who

5    will be at counsel table with them.

6        So I'm assuming you, Mr. Boies.

7        And then is it you, Mr. Hur?

8        **MR. HUR:**  Yes, Your Honor.

9        **THE COURT:**  Okay.  And then you will introduce the

10    people, and I'll say, "Does anybody know any of these people?"

11    You know, you're on TV, Mr. Boies, so maybe we'll get some

12    responses, but -- I saw you last night on TV actually.

13        So we go through that whole process.  I also pass out a

14    printed schedule that the jurors get, the fourteen that are

15    called forward.  They have a little calendar, and it shows the

16    days that we are going to anticipate the case will go, and then

17    I'll tell them.

18        And I tell them, "But then the case is tendered to you,

19    and it's up to you how long, but this is the schedule of what

20    we anticipate is going to be the days in which trial

21    proceedings will be conducted."  And I tell them, you know,

22    "It's not exact.  This is our best sense of how it's going to

23    be."

24        Okay.  Then we go through the -- I ask the questions.  I

25    use the questionnaire, and what I do is I go to -- I want each

1    of the prospective jurors to speak.  So I will -- I'll do, you

2    know, follow-up with each of the fourteen.  Then I will turn to

3    counsel, and you have limited follow-up.  I've looked at the

4    voir dire questions that you've submitted to me.  They're fine.

5    And each -- 15, 20, minutes on each side with the first

6    fourteen, and you can do that.

7         Then we will have a sidebar with the for cause challenges.

8    Depending on that process, when I do excuse a juror for cause,

9    I replace that juror.  So in other words, we don't move the

10   pool around.  If, let's say, juror number 3 is excused for

11   cause, the next juror goes and sits in that seat and becomes

12   juror number 3.

13        And then I do a streamlined set of questions with them,

14   ask them, you know, if anything they've heard, they would need

15   to raise their hand, do they know any of the people that were

16   introduced, all of that.

17        Then with the new jurors, the new ones that have been

18   replaced because of the for cause, I will permit the counsel to

19   do a very short follow-up only with respect to the new jurors

20   that have been called.

21        Then we'll do another sidebar, do another for cause

22   challenge process, replace the jurors in the same process we go

23   forward with.  And then once we've passed the fourteen for

24   cause, you each have three peremptories.  So we know out of the

25   fourteen, you're going to have your jury of eight people.  And

1    remember, federal court.  We don't have alternates.  You have

2    to have a unanimous jury.  But you can get down to -- you can

3    have a jury with six.  And in fact, if you stipulate, it could

4    be even less, but hopefully we won't need that.

5         Okay.  Any questions thus far?

6         **MR. HUR:**  Your Honor, just to clarify that the for

7    cause will be first.  Once we have fourteen, they don't have a

8    cause issue, then we'll do the peremptories?

9         **THE COURT:**  Correct.

10        **MR. HUR:**  Thank you.

11        **THE COURT:**  And the way that works is Karen will give

12   you a form.  She can show you the form.  And it gets traded

13   back and forth.  Remember that if you pass, you don't burn a

14   challenge.  However, you risk the fact that if the other side

15   passes, you're done.  So, you know, that's the strategy you all

16   get paid the big bucks for, and I leave it to you to do that.

17   But that's how it works.

18        So any other questions?  Then I want to talk about the

19   preliminary instructions for a moment.  Okay.

20        **MR. BOIES:**  No, Your Honor.

21        **THE COURT:**  Very good.

22        With respect to preliminary instructions -- and I know

23   this will answer at least one of the motions in limine, I give

24   instruction 1.3 of the civil instructions of the Ninth Circuit,

25   1.5, which is the one I want some help from the parties on

1    their brackets that we need to supply.

2         1.6, which is the preponderance instruction -- I don't

3    think we have a standard on any of the claims that's different

4    than preponderance.  I think it's only preponderance.  So I

5    give the clear and convincing instruction.

6         I give 1.9 to 1.18.  This will -- 1.19 is the one that

7    implicates the motion in limine.

8         I do not solicit questions or encourage questions from

9    jurors.  Maybe it's back from my AUSA days.  Nothing good can

10   come of it, in my view.  However, they may ask a question.

11   They may fill out a -- they'll have the form that we use, once

12   they start deliberating, for questions.  They may fill out a

13   question.

14        It's certainly happened, and I will share that with the

15   parties, and we'll deal with it.  But I do not encourage them

16   to do it.  So in fact, I'm more of the discourage point.  So

17   that does take care of one of the motions in limine, I know.

18   So I don't give 1.19, which is questions from jurors.

19        1.20 and 1.21, I do give.

20        Timekeeping.  You have 20 hours per side, as we discussed.

21   RJ will be the timekeeper.  At the end of each day, he'll give

22   us the word.  If you're speaking -- this doesn't go to the

23   point of, you know, if you speak for -- make an objection, the

24   clock is counting.  But if you're speaking in the sense of

25   examining a witness, the clock is running.  If you're

1    cross-examining witness, the clock is running, and as I say, at

2    the end of each day, we'll hear where we stand.  There is no

3    appeal from his decision.  Okay.

4        Karen asked me to remind you -- and this is my error.

5    Error is not the right word, but I've got to revise my standing

6    orders.  Standing orders talk about all sorts of paper exhibit

7    binders that I want.  I don't want them anymore, and I need to

8    change my standing orders.  We're in a different age.  I don't

9    need all the paper.  I need one set, and I think you've all

10   provided a set, but I don't want more paper exhibits after

11   that.

12       What I do like -- I don't mandate it, but I do like it --

13   is witness binders so that if, when a witness is called, if you

14   hand up a binder for me that does have the paper exhibits -- I

15   know I'm going to see them on the screen, but I have to admit,

16   just as a matter of personal preference, I kind of like having

17   it in a binder in front of me.  But that's the only paper.

18   Don't do any other paper.  Okay.

19       Let's see.  Other logistics.  8:30 to 1:30.  I try to

20   do -- it's not precise, but I try to have two breaks along the

21   path.  We don't have a lunch break, but I try to do, you know,

22   about every hour and a half to two hours, take a break for

23   about 15 minutes, and then that gets us to 1:30.

24       Try to minimize the side bars, but I know they happen.  I

25   tell the jury, you know, we're going to try to minimize them,

1    but, you know, sometimes we need to do them.

2        A plea for mercy -- you know, and you know this.  There

3    are a lot of you, and you're all very good, and there are two

4    of us.  Sometimes I get my other clerk to help out too, but

5    primarily there are two of us.  Motions in limine or

6    last-minute motions that come in at 5:00 o'clock that expect a

7    determination before we start the next day -- please don't do

8    that.

9        I mean, I know there will be times when it can't be

10   avoided, and I understand that, and I don't go to the extent of

11   my colleague, who I'm really tempted because she's a superb

12   judge, Judge Freeman in San Jose.  And she has a policy no more

13   than five motions in limine, and I will not give you an answer

14   if you file something and expect -- it's something like 48

15   hours or something like that.

16       I don't do that, but I'm tempted.  But please just do keep

17   in mind that I know each side could create -- the minds out

18   there could create all sorts of motions, and I am counting on

19   your -- the lead on each side not to say, "Your mission --

20   we're done for the day.  Now go and find four or five motions

21   for us."  Please keep in mind we have a limited crew, and I

22   would appreciate it if you keep it to the absolute minimum.

23       If there is something you want to talk to me about before

24   we start that particular day, I'll look to you to tell Karen,

25   and we can try to take it up between 8:00 and 8:30.  So I want

1    everybody here by 8:00.  And sometimes in the afternoon, you

2    know, when we're done and the jury is done for the day, we can

3    talk about issues.  But I also, you know, you're doing other

4    things, and I'm doing other things as well.  So I want to keep

5    that to a minimum.

6        I do tell the jury -- and I'm pretty particular about

7    this.  I tell the jury when it hits 1:30, we're done for the

8    day.  I want them -- and they appreciate it.  Every time I have

9    a trial, they thank me at the end of the process and say,

10   "Thank you for keeping it to the 1:30 and not letting it slip

11   to 2:00 or 2:30 or, you know, "Oh, we could be done with this

12   witness if we just had another 15 minutes" or whatever.

13       I find that we get jurors who otherwise would have a

14   problem serving if I can really commit to them, "You're gone at

15   1:30."  So don't be surprised when the clock hits 1:30, you

16   know, the jury is relieved of the day.  So that's how we're

17   going to proceed.

18       Okay.  Before I now go into the substantive issues and

19   some of the motions in limine, any questions at this point

20   about our process or...

21       **MR. HUR:**  Your Honor, one question about what the jury

22   is going to take back with them.  Do you prefer the exhibits

23   electronically on a computer?  Will they go back with paper?

24   How do you prefer to handle that?

25       **THE COURT:**  They usually -- they will get the paper

1    set, but I also -- we also make it available to them.  We

2    usually -- the last few trials I've had, they've had a monitor

3    back there, and they -- we can give them some instruction

4    before they start deliberating as to how to find things.

5        I'm glad you said that because that also -- an important

6    thing I wanted to mention is I really want the parties, as the

7    case progresses in trial, to work together to put an index

8    together of -- as exhibits are admitted, and some are not

9    admitted, to have an index because in several trials, when I

10   hadn't done that, the one comment I've gotten from the jury is

11   "Well, we can't find anything."  You know, so we need an index

12   for them.

13       Now, to answer your question about having it in digital

14   form, my intention is to make it available to them in digital

15   form.

16           **MR. HUR:**  Sounds good, Your Honor.  We can help

17   prepare that and provide a searchable index too, where, if they

18   can click on the item in the index, they can go to the

19   document.

20           **THE COURT:**  Right, and we'll have one of our IT

21   people, before they start deliberating -- obviously the IT

22   person can't be in there, but they can, before they start, tell

23   them how they can access, how it works, and then leave

24   obviously before they start.

25           **MR. HUR:**  Thank you, Your Honor.

1          **MR. BOIES:**  A related question, Your Honor.  When a

2     document is admitted, the jury will obviously be able to see it

3     on their screen.  What is the Court's view as to whether it's

4     appropriate to hand the jurors copies of the admitted exhibit

5     for them to hold and look at?

6          **THE COURT:**  I don't do -- I haven't done that in the

7     past.  The monitors seem to work just fine.  And no -- none of

8     the jurors have asked for a binder or paper.  If there is a

9     particular exhibit that you think, for whatever reason, you

10    know, the tactile process of it.  I'm not averse to having you

11    say, "Well, with this exhibit, we would request that it be

12    circulated."  That's fine.  But I don't want to load them up

13    with --

14         **MR. BOIES:**  Sure.

15         **THE COURT:**  -- paper.

16         **MR. BOIES:**  Understood.

17         **MR. HUR:**  I do worry, Your Honor, that once that door

18    is open, suddenly there is a lot of paper and lots of

19    exhibits --

20         **THE COURT:**  Yeah.  I don't want to --

21         **MR. HUR:**  -- that are passed.

22         **THE COURT:**  -- go down that path.  But I also -- I

23    mean, I don't know, but there may be some reason why the paper

24    is of consequence.  I can't think of it now, but I'm not

25    foreclosing it.  But no.  It will be on the -- it will be

1     digital.

2         In addition to the monitors that you see there in the

3     front row, we usually turn one of the big monitors around.  I

4     want to make sure it doesn't block you folks, but we position

5     it so that people, particularly at that end of the jury box,

6     can see.  If they don't want to look on the little, smaller

7     monitors, they can look on the big monitor.

8         **MR. HUR:**  Your Honor, where do you typically position

9     that big monitor?

10        **THE COURT:**  Where those folks are sitting, you know --

11    yes.  The person that is holding up her hand, that's about

12    where the monitor would be.  But I'm happy to work with -- I

13    mean, if counsel can agree where they want it.  I mean, I also

14    want -- you know, the audience is entitled to look, and one of

15    the monitors, by the way, is turned to the public.  We have

16    two.  One is turned to the public so that they can see as

17    exhibits are admitted.  Yes.

18        And obviously -- this goes without saying, I think.  We

19    don't publish anything to the jury until the document is

20    admitted.  So we will all see it.  Karen is very good at this.

21    We'll all see it on our monitor.  You'll move to admit it.  If

22    it's admitted, then it can be published to the jury.  I'm not a

23    stickler about counsel saying, "May we now publish," but that's

24    fine.  If you want to do it, it's up to you.

25        **MR. MAU:**  Just a --

1          **THE COURT:**  Yes.

2          **MR. MAU:**  -- question for Your Honor.  Mr. Mau for the

3     plaintiffs.  Is that also a projector?

4          **THE COURT:**  It is a projector.  It is primarily used

5     now if somebody needs to put something on the Elmo.  It's not

6     -- I've used it in many trials.  It's not particularly helpful

7     because it's too -- even though it's big, it's too far away.

8          **MR. MAU:**  Okay.

9          **THE COURT:**  So, you know, it will not be, in the

10    ordinary course, used unless, again, we need it for the Elmo or

11    something like that.  But I don't -- you can try it out, and I

12    -- you know, are you going to come in and do a tech visit?

13    When you do that, feel free to look at it.  I don't think -- we

14    can't -- our system will not put it on there, in other words.

15    But the Elmo, it would.  Okay.

16         **MR. BOIES:**  The Elmo will also put it on their

17    screens; is that right?

18         **THE CLERK:**  Yes.

19         **THE COURT:**  Yes.

20         **MR. BOIES:**  Your Honor, I noticed that the screens are

21    all in the front row.

22         **THE COURT:**  Yes.

23         **MR. BOIES:**  How, in your experience --

24         **THE COURT:**  Well, it's big enough --

25         **MR. BOIES:**  How does that work with the people in the

1      back?

2            **THE COURT:** -- that it hasn't -- you will see a lot of

3      leaning by the back row.  I don't like this.  We used to have

4      smaller monitors that were more like airplane, you know,

5      monitors, and that got changed.  I don't like it, but it's our

6      reality.  It actually does work.  I haven't had any instances

7      where the back row said they can't see, and that's also why the

8      large monitor is helpful.  But you will see jurors leaning

9      forward looking.

10            **MR. BOIES:**  Now, we'll only have one juror in the

11     back; is that right?

12            **THE COURT:**  No.

13            **MR. BOIES:**  We've got seven --

14            **THE COURT:**  We'll have eight jurors, so.

15            **MR. BOIES:**  We've got seven seats in the front.

16            **THE COURT:**  Three, four, five, six.  Well, I suppose

17     that's right.  They might feel a little strange if it's only

18     one person sitting back there, but I'll give them the option if

19     they want to do that.  So we could have seven in the front row

20     and the eighth person at the end so that they're closest to the

21     big monitor.

22            **MR. BOIES:**  Yeah.  I think that would make a lot of

23     sense.

24            **THE COURT:**  All right.

25            **MR. HUR:**  No objection.

```
1              THE COURT:  That's fine.  We'll do that.

2              MR. HUR:  Other than loneliness.

3              THE COURT:  Other than loneliness.

4              MR. HUR:  Your Honor, just two other questions.

5              THE COURT:  Go ahead.

6              MR. HUR:  Do you have a tech test day that you prefer

7    us to come in?

8              THE COURT:  I leave that to Karen.  She's in charge.

9              THE CLERK:  We can get the 14th.

10             MR. HUR:  Okay.  Thank you.

11             THE CLERK:  I'll talk to you during the break.

12             MR. HUR:  Okay.  And then my other question, Your

13   Honor, is for addressing the jury, do you have a preference as

14   to where attorneys can do that?

15             THE COURT:  You are not wedded to the podium.  Some of

16   my colleagues, as you know, do that.  But it's a rule of

17   reason.  I mean, you can move around, but don't get too close

18   to them.  And you're all, you know, skilled lawyers, and you

19   know not to cross the divide of invading their space.  But

20   other than that, you can -- I'm not a stickler about that.

21             MR. HUR:  Thank you, Your Honor.

22             THE COURT:  And even "may I approach" and all of that,

23   I think it's nice, and I think sometimes the jury likes it,

24   although over time, it can get kind of -- you know, they may

25   get tired of it.  It's up to you what style you want.  But I
```

```
 1    don't come down hard on you about "Oh, my god.  You went up to
 2    the witness, and you didn't ask me."  I mean, I don't care, so.
 3         MR. HUR:  Thank you.
 4         THE COURT:  Okay.  Obviously, I mean, it goes without
 5    saying, if you're making an objection in federal court, you
 6    stand.  You don't do it from a seated position.
 7         MR. HUR:  Understood.
 8         THE COURT:  Mr. Santacana.
 9         MR. SANTACANA:  I'm not standing to make an objection,
10    Your Honor, but two more quick items.
11         THE COURT:  You're not promising you won't do that.
12         MR. SANTACANA:  One is that someone is trying to watch
13    this on the Zoom, but I think the Zoom is not open, or it
14    hasn't been activated.  Is there any way to activate that?
15    It's our --
16         THE COURT:  Right now, you mean?
17         MR. SANTACANA:  -- client from Google, yeah.  I think
18    he thought it would be on the webinar.
19         THE CLERK:  Because we didn't have a remote reporter
20    and the reporter was in person --
21         MR. SANTACANA:  Okay.
22         THE CLERK:  -- there was no --
23         MR. SANTACANA:  Understood.  Understood.
24         THE CLERK:  Yeah.
25         MR. SANTACANA:  And then the other point, Your Honor,
```

```
 1   is your comments made me think about something the parties are

 2   still negotiating, which is the procedure for disclosing to

 3   each other the exhibits we intend to use a couple nights before

 4   they're going to be used.

 5        And in those negotiations, we have discussed filing

 6   something with the Court, not so that you would be ruling

 7   necessarily by the next morning, but I wanted to know if you

 8   think two nights before is reasonable, if we need to be filing

 9   something for your review.

10        THE COURT:  This is a motion?

11        MR. SANTACANA:  These would be, you know, short pocket

12   briefs about exhibits we could not agree on where we're

13   maintaining objections to them rather than --

14        THE COURT:  For exhibits?

15        MR. SANTACANA:  For exhibits.

16        THE COURT:  Well, I mean, that's sort of a different

17   motion because that doesn't necessarily mean I need to rule on

18   it before you offer the exhibit.

19        MR. SANTACANA:  True.

20        THE COURT:  But if you're giving me some advance

21   notice of what the disputed exhibits will be, I think that's,

22   yes, two days would be fine.

23        MR. SANTACANA:  Okay.

24        THE COURT:  Yes.

25        MR. SANTACANA:  Thank you.  That's all.
```

1          **THE COURT:**  Okay.  All righty.  Why don't I launch

2     into the next area, and we'll probably take a break about

3     quarter of 11:00.

4          So we're now going into more of the substantive part of

5     this, and I've been thinking about it.  I looked at your

6     motions in limine and then the other briefing that's come in,

7     and I sort of want to start by giving you a sense of how I

8     think the structure of the case would proceed, and this does

9     implicate some of the big questions -- you know, disgorgement,

10    who decides punitives, things of that nature.

11         But I thought maybe one way to approach this is to give

12    you a concept of how I think the structure might go, and then

13    we can go back into issues -- I'll talk about the particular

14    motions in limine, but the big issues -- you know, bifurcation,

15    disgorgement, nominal damages, all those issues, we can talk

16    about.

17         Oh, and one other thing.  Verdict form and instructions.

18    My practice is for us to -- about the point at which Plaintiffs

19    are concluding their case in chief, for us to have an initial

20    -- and maybe we'll have to have two -- jury instruction

21    conferences.

22         And along with jury instruction, verdict form.  In my

23    experience, verdict forms often get shorter shrift than they

24    deserve.  I think they're incredibly important, and I spend a

25    lot of time on them because it's the trap for the unwary.

1          Things go off the rails if the verdict form is not clear.

2              Plaintiffs have suggested a very short verdict form.  The

3     defendants have a more detailed one, but however it ends up, I

4     want it to be very literal about "Okay.  Answer question 1.  Go

5     to question 2," or jump over question 2 to 3.  I don't want any

6     uncertainty for the jury.  They really need to be, you know,

7     led down the path in a very literal way, or else it goes off

8     the rails, and it's a disaster.

9              So spend time on that.  But that would be the point at

10    which I would anticipate having an instruction conference.

11    What I like to do -- I can't promise.  It depends upon the

12    press of business.  If I can do it, I like to give you -- I

13    have the benefit of what you've submitted.

14             And by the way, thank you very much.  I like the way

15    you've teed it up for me in terms of what's in dispute and what

16    isn't.  What I like to do is give the parties a "Okay.  Here's

17    a working draft" from me that we can use as the jumping off

18    point.  I'll try to do that.  I can't promise it.  We'll see

19    how we're doing.  But we'll try.

20             Okay.  So what I see playing out here is, you know, the

21    liability case, we start out, and Plaintiffs will present their

22    damage theories.  The disgorgement issue, I want to talk about.

23    It's a big question of whether or not it's for me or it's for

24    the jury, but the basic way I would anticipate it would run is

25    we go through that.

1          The jury would have a verdict form that asks the question,

2     and it's -- we have a pattern jury instruction in the Ninth

3     Circuit whether or not they think punitive damages -- if they

4     do find for the plaintiff and they award damages, and we'll

5     talk about compensatory versus nominal in a moment, then they

6     are asked in the liability phase do they think punitive damages

7     are warranted.

8          If they answer yes, I do think bifurcation would be

9     appropriate, and we would then, if they come back, they find

10    for the plaintiffs, and they say yes to the availability of

11    punitive damages, we go into a very short punitive damage phase

12    that is limited to the financials.  And also, anticipating one

13    of the motions in limine, the Google financials, not the

14    Alphabet financials.

15         And so the punitive damage phase is purely the question

16    of, having already determined that the conduct meets the

17    punitive damage standards, what needs to be awarded for

18    punitive purposes.  And it's only a -- it's a financial

19    assessment at that point, that the bifurcated punitive

20    proceeding would not be a proceeding about whether or not, you

21    know, evidence introduced at that stage about egregiousness and

22    all that.

23         That, to the extent that that is part of the case, they

24    will have already assessed whether or not it's reached that

25    level of egregiousness to warrant punitive damages.  Then the

1    question that's running through this is also, you know, the

2    equitable relief.  And that would be the injunctive relief, and

3    that's for me to decide, and I will be hearing that, and I can

4    decide that after the jury does its work.

5        I don't think that necessarily needs to be a further bench

6    proceeding, but perhaps it does, and then depending upon how it

7    comes out on disgorgement, whether or not the jury will -- in

8    advisory or legal capacity will have determined the

9    disgorgement question, but if it's for me to decide.

10       Again, I would think in the liability phase, the evidence

11   will have come in that will -- I could use if it's a decision

12   for me to make.  So I know that is a very broad-brush notion of

13   how it proceeds, and that does already answer some of the

14   questions in the motions in limine like bifurcation and the

15   like.

16       I do think with respect to the question to the jury about

17   the availability of punitive damages, that that has to be keyed

18   to particular claims because the common law privacy invasion

19   claim doesn't, I think, have -- or the constitutional claim

20   does not permit punitive damages.

21       So the question to the jury with the punitive damage

22   instruction would be as to claims 2 and 3 or whatever they are,

23   do you think the threshold has been met that triggers punitive

24   damages or not.

25       And that question is after they've decided.  And again,

1    the verdict form would say -- if they're not going with

2    Plaintiffs, they won't ever get to that question.  It will be

3    you're done.  But if they've awarded under the claims that have

4    punitive availability, then they go to the question of whether

5    or not punitives are in the mix or not.  And then if they say

6    yes, when they come back, they have the bad news that they have

7    to do some further work.

8        Okay.  So let me stop there and hear from the parties, and

9    then we will, as I said, get maybe a little bit more deeply

10    into the questions of disgorgement and nominal damages and all

11    that.  Who wants to talk to me?

12        **MR. BOIES:**  Your Honor, I thought that was very clear.

13    I understand it.  I don't really have any questions.

14        **MR. SANTACANA:**  Thank you for explaining that, Your

15    Honor.  It sounds like you've made a decision about

16    bifurcation, and I understand that.

17        **THE COURT:**  There was some -- and the reason that I'm

18    sort of inviting some comments.  Bifurcation could mean a bunch

19    of different things.

20        **MR. SANTACANA:**  Right.

21        **THE COURT:**  And I've made a decision to the extent

22    that I think, when the question is being presented of -- that

23    would implicate the Google financials.  And I won't -- by the

24    way, I'm not necessarily precluding -- and Mr. Boies can give

25    me an argument.

1          I'm not saying that the Google financials couldn't

2    possibly come in earlier, in the liability determination, if

3    they can -- Plaintiffs can prove to me that they think it's

4    relevant, and I know what some of their theories of relevance

5    are.

6          I'm not addressing that question right now.  What I am

7    addressing though is that for assessment of punitive damages, I

8    envision that stage of the case being focused on -- if we get

9    there, on Google's financials.

10         **MR. SANTACANA:**  Yes.  Understood.

11         **THE COURT:**  Okay.

12         **MR. SANTACANA:**  Understood.  And as you know, in our

13   motion for bifurcation, we requested to also bifurcate the

14   question of entitlement to punitives.

15         **THE COURT:**  Yes.

16         **MR. SANTACANA:**  We have motions in limine that I think

17   get at what would be my objection to the Court's preference

18   here, and so perhaps we should discuss those before we come

19   back to this.  But the objection really is the financials are

20   set aside potentially.  That is part of what we ask for.

21         The other piece we ask for is what we saw from the

22   plaintiffs' exhibit list is an intent to bring in lots of

23   evidence about other things that don't have to do with this

24   case and build an argument that Google is a habitual privacy

25   violator, I think is what they've said in their papers, or that

1    Google has had to enter settlements with the government or with

2    private entities or attorneys general and that that should all

3    come in to prove oppression or malice in some sense under

4    entitlement to punitives.

5        So we have motions in limine that say, at least as to the

6    claims and liability, that is all irrelevant and prejudicial.

7        **THE COURT:**  Aren't those issues though in some ways --

8    separate and apart from the structure I'm talking about, those

9    are objections that -- you just don't think that evidence

10   should come in in any phase of the trial?

11       **MR. SANTACANA:**  Yes.

12       **THE COURT:**  So I'm not sure it really implicates the

13   structure I'm talking about.

14       My problem with what you suggested is that, in my

15   experience, when I have bifurcated and cut punitives to another

16   phase, I don't recall having that proceeding be one where we're

17   talking about egregiousness.  We're only talking about what it

18   would take to punish the --

19       **MR. SANTACANA:**  Yes.

20       **THE COURT:**  -- party.  And I -- so I don't really

21   conceptually see how the jury -- it doesn't seem to be a very

22   logical way to proceed because I think in the part of the case

23   before the jury does its work, the jury has to be asked are we

24   going to get there or not.  And I don't quite get your

25   proposal.  But I hear your objection isn't addressed by my

1      structure necessarily.  You are saying this shouldn't come in.

2          Now, you do have the problem, I think, that you want to

3      bring in some -- you want to take the position that Google

4      really cares a lot about privacy.  So if that is the way you're

5      going, there's going to be an argument from Mr. Boies that

6      you're opening the door.  If you're saying, "We care so much

7      about privacy," they're going to say, "No, they don't.  Look at

8      all of this other activity," and I'm going to have to assess

9      what comes in and what doesn't, but --

10         **MR. SANTACANA:**  Yeah.

11         **THE COURT:**  -- isn't that going to be fought over in

12     the case in chief part one way or the other?

13         **MR. SANTACANA:**  I think the concern is based on how

14     they wrote their oppositions to some of our motions in limine

15     where they say even if evidence of some settlement with the

16     government weren't admissible for the claims, it would be

17     admissible for punitive damages entitlement because the

18     standard for malice is different from the standard for the

19     claims of highly offensive and intent, which I think should be

20     focused on the facts of the case.

21         And so to the extent there's a delta between those two,

22     that's where our concern --

23         **THE COURT:**  Well, do you have a case for me in which

24     the punitive phase has been an inquiry into whether or not the

25     conduct has been -- is egregious or not?  Because even the jury

1    instructions sort of contemplate that as the threshold question

2    goes to the jury, and that tells you whether or not you're ever

3    going to get to the punitive phase.  So I'm not even --

4    **MR. SANTACANA:**  Yes.

5    **THE COURT:**  -- sure if I adopted kind of your

6    approach, is it -- and in some ways, I wouldn't think you'd

7    want this.  If the jury awards damages to the plaintiffs, then

8    we won't know whether or not they think -- we automatically go

9    into the punitive phase, whereas if they're asked and they say

10    no, they say, you know, "Okay.  We've awarded compensatories

11    and nominal and whatever, but we don't think this rises to the

12    level of a punitive situation," I would think you would kind of

13    want that because then you cut off -- under your theory, don't

14    we -- if they award any damages, we have to go into a punitive

15    phase.

16    **MR. SANTACANA:**  Your Honor, I think you are

17    effectively right, and it's also right that typically what you

18    see is just the amount of punitives bifurcated, though we do

19    have some case law when sometimes you do the entitlement

20    bifurcated as well when it threatens prejudice.  And that's why

21    I say, you know, maybe we argue the motions in limine and, if

22    necessary, come back to this.

23    But our only concern is that the plaintiffs think or that

24    the Court might adopt a view that there's some evidence of

25    other wrongs that can come in on the question of entitlement to

1    punitives that wouldn't otherwise come in, which, by its

2    nature, is prejudicial.  We don't think it should come in at

3    all, but if it's going to come in on the grounds that it's

4    relevant solely to punitives, then we have an objection because

5    now what we're saying is that a jury that may not award --

6        **THE COURT:**  It's solely -- it's relevant to the

7    decision of whether or not punitive damages are something that

8    we're going to consider or not.  It's not the award of punitive

9    damages.  The bifurcation concept protects you -- the reason to

10   bifurcate is that the jury might be unfairly prejudiced by

11   knowing in this instance how rich, how wealthy the defendant

12   is.

13       **MR. SANTACANA:**  Right.

14       **THE COURT:**  Although I really question in this -- I

15   mean, I really do think in some ways it's a bit of an ironic

16   discussion.  For good or for bad, everybody knows that Google

17   is a very, very substantial corporate entity.  So the idea that

18   the actual amount of its assets -- I'm not -- you're the

19   lawyer, but I --

20       **MR. SANTACANA:**  Well, yeah.

21       **THE COURT:**  I wonder if it's --

22       **MR. SANTACANA:**  It's more about how hard Mr. Boies

23   intends to hammer on it during the liability --

24       **THE COURT:**  Well, he's going to --

25       **MR. SANTACANA:**  -- phase that matters.

1              **THE COURT:**  Oh, okay.

2              **MR. SANTACANA:**  But Your Honor, my only point here is

3       I don't think there is some special category of evidence that

4       comes in solely on the question of entitlement to punitives

5       that otherwise would never come in.  I don't think because

6       someone's on trial for A, you get to talk about B, C, and D

7       every time --

8              **THE COURT:**  Right.

9              **MR. SANTACANA:**  -- punitives are there.  If Your Honor

10      disagrees with that, then we are setting up a situation where

11      you would be admitting other evidence about other wrongs solely

12      because there's punitives on the table.

13             **THE COURT:**  But isn't -- what I asked you before --

14             **MR. SANTACANA:**  Yeah.

15             **THE COURT:**  Aren't you -- and maybe I'm misreading

16      what you're doing to be saying, but I did think some of what

17      you were going to be saying is "We care a lot about privacy at

18      Google.  We really respect privacy."

19             And if you're going to be taking that position, that

20      doesn't mean everything comes in.  I mean, I'm not prejudging

21      if some, as you characterize it, bad acts or however you want

22      to -- that the plaintiffs are going to seek to admit.  It

23      doesn't automatically mean everything comes in, but there is an

24      opening of the door there to some extent.

25             **MR. SANTACANA:**  You're totally right that the door

1    could be opened, and we don't intend to open it, and I think

2    we're prepared to address it in the context of the motion in

3    limine on that subject.

4        But to answer your question directly, I don't think

5    anything that we put on would justify or constitute opening the

6    door to evidence like what the plaintiffs have put on their

7    exhibit list like settlements with the FTC that are 20 years

8    old and press releases about what other people think Google did

9    wrong in other contexts.

10        **THE COURT:**  Right, but there may be other -- I mean,

11    the objection on some of that is not that it isn't -- I mean,

12    like, 20 years old.  I may say, "That's too old.  I'm not going

13    to let that in," but those are, like, specific objections to

14    particular evidence.

15        **MR. SANTACANA:**  Yes.

16        **THE COURT:**  The concept of "We care about privacy,"

17    Plaintiff saying, "No, they don't," is going to be relevant in

18    this case probably.

19        **MR. SANTACANA:**  I mean, it's up to us to open the door

20    if that's going to be Your Honor's ruling, but for now, I think

21    you know, we have a motion that identifies specific exhibits we

22    think should be excluded, and we will take your guidance on

23    what you think constitutes opening the door.

24        But, you know, one person saying we care about privacy, I

25    don't think, should mean that 10 of their 20 hours are spent on

1        other wrongs.

2            **THE COURT:**  Well, yeah.  But that's -- you know,

3        that's a different -- that's really not an issue, again, in my

4        mind about -- that's -- maybe it's cumulative.  Maybe it's too

5        old.  Maybe it's all sorts of things.  It's not that it's not

6        relevant, but we'll -- okay.

7            **MR. SANTACANA:**  Sure.

8            **THE COURT:**  I hear you.

9            **MR. SANTACANA:**  It's a prejudice issue.

10           **THE COURT:**  I got you.

11           **MR. SANTACANA:**  Yeah.

12           **THE COURT:**  Any comments?

13           **MR. BOIES:**  No, Your Honor.

14           **THE COURT:**  Okay.

15           **MR. SANTACANA:**  Thank you.

16           **THE COURT:**  All right.  So perhaps the best thing to

17       do now is to turn to some of these -- well, we can either do

18       the motions in limine, or you can talk a bit about some of

19       these big issues, one of which is let's start with

20       disgorgement, and I know it does implicate some of the motions

21       in limine.

22           The big question that I've been looking into that you've

23       teed up for me is, you know, is this a legal question or an

24       equitable question.  I'd like to hear from you on that.  So

25       let's -- who wants to talk about this question?

```
 1              MR. SANTACANA:  It's my short straw again, Your Honor.
 2              THE COURT:  Okay.
 3              MR. SANTACANA:  Eduardo Santacana for Google.
 4         I think in their opposition to our motion, the plaintiffs
 5    say -- they talk about how the legal and equitable divide
 6    bedevils courts, and it's a chameleon, and it's so hard, and
 7    it's so hard you should just give it to the jury and not worry
 8    about it because then that will -- you'll protect yourself.
 9    And I understand the argument, but it's, of course, the
10    argument you would expect to hear every time.  I actually
11    don't --
12              THE COURT:  It would -- I mean, at the very least, I
13    could do it as an advisory.
14              MR. SANTACANA:  Right.  That's their argument.  It
15    makes things easier and more conservative for you, and I
16    understand that.  The problem is I don't think this one is that
17    hard, for a couple of reasons.  One is the statute in question
18    and the Supreme Court's decision in Great-West Life talks about
19    just look to the statute.
20         The CDAFA statute is very clear that there's three
21    categories -- compensatory, injunctive, and equitable relief.
22    And what's interesting about the Great-West Life case is that
23    it says if the statute says equitable relief, then the only way
24    that you can get disgorgement is through an equitable remedy.
25    The legal remedy for disgorgement is now off the table.
```

1    So there's a little bit of a problem for the plaintiffs in

2    this.  The Supreme Court is backing them into a corner and

3    saying, "Well, are you seeking equitable relief under CDAFA?"

4    If so, there's no jury right to that.  That is an equitable

5    disgorgement.  So for that claim, I think it's actually very

6    straightforward.  It's just like the statute the Supreme Court

7    analyzes in that case.

8    And they can't argue that it's legal disgorgement because

9    if they argued that, then they run into this problem in the

10    Great-West Life case, where it says if it's equitable, you

11    can't ever have legal disgorgement.  More generally, because we

12    do have the tort where the plaintiffs argue for disgorgement as

13    well, I think the same Supreme Court case sets up a simple

14    task, which is are you trying to recover something that you say

15    you have a stake in.

16    And in Your Honor's summary judgment ruling and even in

17    the plaintiffs' opposition brief to this very motion, you both

18    say that the plaintiffs' disgorgement claim is a claim for

19    their, quote, stake in the value of the misappropriated data,

20    proceeds from which Google now has.  So -- and they say that

21    all over their damages expert report too, and they will say it

22    in opening, in closing, and when then they present this damages

23    expert.

24    That's their theory.  "You took my data, and you made

25    money with it."  Under Great-West Life, that is an equitable

1    remedy.  "I want the money back.  You took my painting.  I want
2    the painting back.  You sold my painting.  I want the proceeds
3    from the painting."  It's very simple.
4         In their opposition brief, for the first time, they say
5    no.  They say it because they need to.  "No, we want
6    disgorgement because we want to deter and punish," which is the
7    purpose of a legal remedy.  There's a problem with that
8    argument, which is the Facebook internet tracking case.  The
9    Facebook internet tracking case says you have standing for
10   disgorgement because it can constitute damage or loss.
11        That's the only reason this case is still alive, is
12   because they are here on the disgorgement theory to keep
13   standing in the case.  It's for -- to prove damage or loss, the
14   loss of the thing, my painting that you sold, and now I bet the
15   profits back.  If this were about deterrence or punishment,
16   then that couldn't serve as a basis for standing, and that's
17   how we know that the remedy they're asking for is equitable in
18   nature under Great-West Life.
19        The last thing I'll say, Your Honor, is their opposition
20   is actually mostly focused -- it's less focused on legal versus
21   equitable and mostly focused on "Some of the evidence I want to
22   bring in is relevant to the claims separate and apart from
23   disgorgement.  I want to prove Google profited, to prove that
24   it was highly offensive or that Google had intent."  And to
25   that, I say fair enough.  I understand that that is, to some

1    degree, relevant.

2         What's not going to work under this framework though is

3    for them to present a damages model through an expert to the

4    jury and say, "This is the amount the class was damaged, which

5    should be returned to the plaintiff class."  So we don't want a

6    line on the verdict form, and we don't want them arguing at

7    trial, through expert or counsel, that there should be a return

8    of the ill-gotten gains, as they would call them, because of a

9    damages model that Lasinski came up with.

10         That model is for you, Your Honor, to look at and decide,

11    and it's ultimately an accounting question.  Lasinski says,

12    "This is how much you made," and our guy says, "These are the

13    expenses," and Your Honor can decide, as judges do every day in

14    disgorgement and accounting cases, which expenses are you going

15    to deduct or not.

16         **THE COURT:**  And I appreciate your candor at the

17    beginning of this when you were talking about an advisory jury.

18    At some point, the decision -- I have to make the decision as

19    to whether or not this is a jury issue or an issue for me.  But

20    do you agree that it wouldn't be error if I -- part of your

21    argument, I understand, is well, it's prejudicial to us if this

22    being a jury question -- or a judge question, that, you know,

23    evidence may come in on the disgorgement theory that because

24    it's for you, the jury shouldn't hear it.

25         The problem you have is there isn't -- as I see it, there

1    isn't any prohibition at the very least, on my having an

2    advisory jury on this question.  And if I do have an advisory

3    jury on this question, implicitly there wouldn't be any error

4    in the jury hearing the evidence for that purpose.  So if an

5    advisory jury is available, then is there really an argument

6    that there's unfair prejudice to you with this evidence coming

7    in?

8         **MR. SANTACANA:**  The advisory question, the prejudice

9    question, I think, are actually separate.  There's absolutely

10   prejudice, but I'll answer your question directly, which is

11   yeah.  I think in the opposition brief, the quote from one of

12   the cases -- your decision to use an advisory jury is virtually

13   unreviewable insofar as it goes.

14        Now, is the evidence that's admitted at trial prejudicial

15   to us if it is not a jury question is, I think, a slightly

16   different analytical question, and the problem is here, their

17   actual damages model is $523,000,000 in damages.  They have

18   disgorgement theories that get up into the 2-something

19   billions.  So the problem we have is a classic, you know, trial

20   lawyer issue:  "I could ask for this much, but I'll only ask

21   for this much.  Isn't that so reasonable?"

22        It's the same problem we have with their total revenue --

23   their intention to submit the total revenue.  We got their

24   demonstrative slides, and they have bar charts showing "Oh,

25   Google makes so much.  This is so little.  It's no big deal."

1    That's the same problem with this.  The prejudice is they

2    wouldn't otherwise have a right to ask the jury for 2.2 billion

3    dollars or 2.5 billion dollars.

4        But you might submit it as an advisory jury, so now

5    they're asking them for that.  The jury might balk at that very

6    large number, but it suddenly makes their 523 suddenly seem so,

7    so reasonable, which, you know, I think that number should be

8    weighed on its merits and not on how it compares to something

9    four times as large that they don't have the right to ask the

10   jury for in the first place.

11           **THE COURT:**  Mr. Boies?

12           **MR. BOIES:**  First of all, let me just be clear.  As I

13   think everybody in the courtroom understands, we're not asking

14   for 523.  We're asking for 523 times the number of months.

15   This is the argument that we had with the Court, and the Court

16   decided that we could go to the jury, to the extent we had

17   evidence --

18           **THE COURT:**  You couldn't have Mr. Lasinski --

19           **MR. BOIES:**  I could not have the expert --

20           **THE COURT:**  -- say that.

21           **MR. BOIES:**  I could not have the expert do it, but I

22   guarantee that we're going to be asking the jury for more in

23   terms of compensatory damages.

24           **THE COURT:**  I understand that, and I know they oppose

25   that.

1          **MR. BOIES:**  Yeah.

2          **THE COURT:**  I know that was one of the issues.

3          **MR. BOIES:**  Yeah.

4          **THE COURT:**  I don't -- I think that you can argue to

5     the jury that "This is the analysis the expert had, and we

6     encourage you to utilize this and come up with whatever figure

7     you want."  But he cannot say to the jury, "In my opinion, you

8     should jump off from 500 million and multiply away."

9          **MR. BOIES:**  I understand that completely, Your Honor.

10          **THE COURT:**  All right.

11          **MR. BOIES:**  Now, first of all, with respect to

12     prejudice, the evidence that he's talking about is going to

13     come in on offensiveness in any event.  So I think there are a

14     couple of reasons why there's no prejudice.

15          **THE COURT:**  You're saying the disgorgement --

16          **MR. BOIES:**  Disgorgement.  You know, how much profit

17     they made, what their -- it goes to the motive, goes to the

18     intent, goes to the context.  Goes to all the factors that go

19     to offensiveness.  So I think in addition to the fact that the

20     Court could easily have an advisory jury on this, even if the

21     Court decided not to have an advisory jury, we would still

22     argue to the Court that we're entitled to put all this evidence

23     in in terms of our liability phase.

24          Now, with respect to the Seventh Amendment question, I

25     think that there isn't that much difference between us in terms

1    of what the standard is.  One of the things they say in their

2    motion is that it depends whether -- under federal law, which

3    is what is applicable here, it depends on whether you're

4    seeking to recover a specific property, a specific sum that

5    belongs to the plaintiff that somehow has been taken.  That's

6    not what's at issue here in terms of disgorgement or unjust

7    enrichment.

8        What we're seeking -- and they even say this in their

9    charts from their expert -- is that the unjust enrichment is

10   the revenue minus costs equals the profits.  It is not a sum of

11   what the plaintiff took from the plaintiff -- what the

12   defendant took from the plaintiff and is withholding.

13       The way the restatement puts it -- and the way the Supreme

14   Court, the United States Supreme Court case that counsel cites

15   puts it -- is that if all you're looking for is a particular

16   amount from the defendant, and it doesn't require constructive

17   trust or any of the equitable considerations that go into

18   disgorgement when you are applying constructive trust and the

19   like, that it's a legal remedy.

20       It's not an equitable remedy in terms of jury -- in terms

21   of what you're entitled to a jury trial on.  The --

22       **THE COURT:**  Let me back you up a bit.

23       **MR. BOIES:**  Yeah.

24       **THE COURT:**  The claims -- your claims that would --

25   under your theory are entitling you to an unjust enrichment

1     award are your -- now, you said it's a matter of federal law.

2     Isn't it a matter of -- I mean, these are state -- there's a

3     state claim.

4          **MR. BOIES:**  It is a state claim, but whether you're

5     entitled to a jury trial on the issue is a question of federal

6     law, and I think we cited some of those --

7          **THE COURT:**  Okay.

8          **MR. BOIES:**  -- cases in our brief.

9          **THE COURT:**  But don't I look, for example, in -- under

10    the statute, the state statute that you are proceeding on when

11    we look at analogous state statutes, the one about likeness,

12    utilizing likeness --

13         **MR. BOIES:**  Yes.

14         **THE COURT:**  -- and the like, that has a CACI

15    instruction, proposed instruction, that indicates that is for

16    the jury to decide.  But in the statute you're proceeding

17    under, it -- there isn't any indication that that -- at least

18    that state statute contemplates it being a jury question, is

19    it?  Unless the -- we're talking about --

20         **MR. BOIES:**  Are you talking about CACI instruction

21    1821?

22         **THE COURT:**  I don't --

23         **MR. BOIES:**  Is that --

24         **THE COURT:**  I don't remember.  I think it's 1800,

25    but --

1          **MR. BOIES:**  Well, there is a CACI 1821 that talks

2     about instructing the jury how to calculate taking revenue,

3     subtracting expenses, coming to profits.

4          **THE COURT:**  Yeah.

5          **MR. BOIES:**  The -- I didn't recall that that was

6     specifically related to the name, image, and likeness.  It may

7     be.

8          **THE COURT:**  You're right.  It is 1821, damages for use

9     of names or likeness.

10         **MR. BOIES:**  Yeah.  And the -- I think that the fact

11    that there's not a comparable instruction --

12         **THE COURT:**  Right.

13         **MR. BOIES:**  I don't know exactly what you draw from

14    that.

15         **THE COURT:**  That was the question.

16         **MR. BOIES:**  Yeah.

17         **THE COURT:**  Here, there is a particular instruction

18    that indicates to me that under -- for damages for use of name

19    or likeness, it is a jury question.

20         **MR. BOIES:**  Yes.

21         **THE COURT:**  But we don't have a comparable instruction

22    under the statutes you're proceeding under.  So does that

23    indicate that it is not a jury question?

24         **MR. BOIES:**  I don't think so, Your Honor.  Obviously I

25    yield to the Court in terms of how to interpret the --

1          **THE COURT:**  No.  I'm asking --

2          **MR. BOIES:**  -- CACI instructions, but it seems to me

3     that the instructions, you know, deal -- you know, are drafted

4     deal with questions that people present.  The fact that it has

5     not been dealt with one way or the other with respect to this

6     statute, I don't think tells you anything.  I think what the

7     Court has to do is look at the statute itself, as the Court did

8     in our motions for summary judgment in class certification and

9     as the Ninth Circuit did in the Facebook tracking case.

10         So I think when you look at the statute itself and what

11    constitutes damage or loss, as the Court found -- as this court

12    found in this case and as the Ninth Circuit found in the

13    Facebook tracking case, then what you have here is something

14    that, under United States Supreme Court precedent and under the

15    restatement, is something that ought to go to the jury.

16         Now, I think that if the Court has some dubiety about

17    that, I think in terms of having, you know, an appropriate

18    record, there is some rationale to say, "Send it to the jury.

19    I will decide after the fact whether it is advisory or whether

20    I'm bound by it."

21         And if this goes up to the Court of Appeals, the Court of

22    Appeals will at least have it.  So if the Court of Appeals

23    decides that it was a jury question, you then have a full

24    record.

25         Now, it's always possible that, depending upon what the

1    jury finds, we might reverse our positions when it comes to

2    arguing it to the Court.

3         **THE COURT:**  It's very possible the jury finds

4    something and you say, "Well, this is something for you to

5    decide."

6         **MR. BOIES:**  Right.

7         **THE COURT:**  Yeah.  I understand.

8         Okay.  Why don't we take a break so our court reporter can

9    rest her hands, and we'll come back in about five minutes or

10   so.

11        **MR. BOIES:**  Thank you, Your Honor.

12        **MR. SANTACANA:**  Thank you.

13        **THE CLERK:**  Court stands in recess.

14        (Recess taken from 10:55 - 11:11 A.M.)

15        **THE CLERK:**  Please remain seated and come to order.

16        **THE COURT:**  Okay.  I think probably the best way to

17   proceed now is just to go to the motions in limine.  You know,

18   some of the issues we've already talked about are implicated by

19   some of these, and so we may be repeating some things.  I will

20   be planning to give you an order, a written order on the

21   motions in limine probably maybe next week.  I hope to get

22   something out to you.

23        Okay let me start with the plaintiffs' motions.

24        **MR. SANTACANA:**  Your Honor --

25        **THE COURT:**  Yes.

1          **MR. SANTACANA:**  If I may just comment on one thing

2      before the break.

3          **THE COURT:**  Sure.

4          **MR. SANTACANA:**  You and Mr. Boies had a back and forth

5      about the limits of his expert's --

6          **THE COURT:**  Yes.

7          **MR. SANTACANA:**  -- ability to multiply his opinion and

8      counsel's ability to multiply the opinion, and I think what I

9      heard you say was the plaintiffs can encourage the jury to draw

10      their own conclusions, which I think is how you phrased it in

11      your order as well.

12          We've seen the slides, some of them, because we had the

13      disclosure already, and it's pretty clear to us that they would

14      go beyond what you've said and that their intent is to actually

15      explicitly ask the jury in argument to multiply by 98 or even

16      do the math for them, which gets them from 523 to almost 52

17      billion dollars, by presenting effectively a new calculation.

18      And our view is that that undermines the spirit of the order,

19      which is this is not a damages model in the case.

20          The juries can draw their own conclusions.  They can

21      present them the evidence, including that the class period is

22      98 months long, but there's a line, we think, between that and

23      "Hey, jury, we are now asking you to multiply by 98."

24          **THE COURT:**  But how -- you know, if it doesn't have

25      the imprimatur of an expert saying this is the right

1    calculation, how can you really cut off -- I mean, and also of

2    course the jury is told lawyers arguments' are that.  It's not

3    evidence.  Why -- what would be the basis of saying that the

4    lawyer can't say, "I encourage you to multiply by X" or -- you

5    know, I mean, I don't quite --

6            **MR. SANTACANA:**  Yeah.

7            **THE COURT:**  -- understand why the lawyer should be

8    constrained in asking the jury not just to make -- not just to

9    multiply, if you will, but to multiply to a particular place.

10   Why not?

11           **MR. SANTACANA:**  Well, we know, Your Honor, that

12   lawyers, even in argument, aren't permitted to invite juries to

13   speculate or to base their verdict on something that isn't

14   factual.  We also know they're not allowed to tell juries

15   things that would be prejudicial or that weren't disclosed in

16   discovery.

17           And our view is that the logic of permitting them to cross

18   that line I was talking about in the mine run of trials would

19   effectively mean that there's no purpose to the disclosures

20   that happen during discovery because at closing, a plaintiffs'

21   lawyer can always just come up with a new number.  Today it's

22   multiplied by 98, or maybe he says it's multiplied by 3 because

23   that's the number I feel like today or multiply by a thousand.

24   There's no limit.

25           And I know Your Honor will say, "Well, he might look kind

1    of silly doing that" --

2          **THE COURT:**  That's the first one.  You're reading my

3    mind.

4          **MR. SANTACANA:**  But --

5          **THE COURT:**  That's true, and the other reason -- you

6    know, the thing that I think -- the reason I ruled in your

7    favor on that is that I think if, you know, a witness, an

8    expert who will be designated as an expert has all the, you

9    know, stature of that on the stand is a very different

10   proposition than a lawyer, and, you know, not only is there the

11   you look bad concept, but I suspect you will get up and argue

12   and say, you know, they're just making -- they're asking you to

13   give them the moon and the stars, and it's offensive and

14   whatever else you want to say.

15       I'm just -- I'm sort of loathe to constrain the lawyer

16   argument.  I agree with you that -- and I think it's different

17   -- a lawyer can't make up facts and can't mislead the jury on

18   the laws and that kind of thing, but that's not what's going on

19   here.

20       What's going on here is a lawyer saying your experts say,

21   you know, calculate out to 500 million, and he told you how he

22   did it.  We think you should take that, and you should, you

23   know, award much more.

24       It's not new facts.  It's just an argument.  But I hear

25   you, and I haven't decided the question.  I'll think about it.

1       If you have some specific -- now that you've exchanged it, if

2       there's something to crystalize this by showing me the

3       proposed, you know, PowerPoint or what have you, I'll take a

4       look at it.

5           Do you want to comment on this, Mr. Boies?

6           **MR. BOIES:**  No, Your Honor.  Let me just briefly.  The

7       Court ruled that our expert couldn't testify to it.

8           **THE COURT:**  Right.

9           **MR. BOIES:**  But that the expert had provided them with

10      notice this was a monthly figure, and he only had information

11      -- didn't have information himself.  He said how many months,

12      so he took one because he knew it was at least one, but if we

13      had in the record evidence that it was more than one month, we

14      could ask the jury for those more than one month.  That's what

15      I'm going to do.

16          And I'm not going to risk my credibility with a jury by

17      just making up a number.  I'm going to show the jury where in

18      the evidence I think there is basis for them to decide that

19      it's not one month.  Maybe it's five months.  I'm not going to

20      ask for a hundred months.  I think that wouldn't be credible

21      for the jury.

22          But I think part of my job and part of my right is to look

23      at the evidence and tell the jury what I think the evidence

24      leads them to do.

25          **THE COURT:**  Is this one of your numbered in limine

1    motions?

2              **MR. SANTACANA:**  It's not, Your Honor.  It's not.

3              **THE COURT:**  Okay.

4              **MR. SANTACANA:**  Because it's sort of coming up in the

5    context of the slide exchange.

6              **THE COURT:**  Okay.  Well, why don't you supplement what

7    you have already submitted in the form of an additional -- you

8    can label it whatever you want.  But, you know, it's an

9    important enough question.  Why don't you give me something in

10   writing that explains the constraints and what you think you're

11   entitled to, and then Mr. Boies and his colleagues can respond,

12   and I'll look at it.

13             **MR. SANTACANA:**  Thank you, Your Honor.  We will.

14             **THE COURT:**  Okay.  Let's go back to the plaintiffs'

15   motions in limine, and several of these, we've already kind of

16   dealt with.  But the first one, I don't really think -- and you

17   can correct me -- come on up.

18             **MS. AGNOLUCCI:**  Simona Agnolucci for Google.  Good

19   morning, Your Honor.

20             **THE COURT:**  Good morning.

21             **MS. AGNOLUCCI:**  So I will deal with 1 through 3 of the

22   plaintiffs' motions, which I think are intertwined.  I think

23   the parties are largely in agreement about all three of those.

24   We don't intend to discuss how much money the lawyers are

25   making in this case.  We don't intend to comment on the fact

1    that this is lawyer-driven litigation or to use those words.

2        I think the only daylight between the parties at this

3    point has to do with our intent to ask the named plaintiffs how

4    they came to learn of this litigation, what they did to

5    investigate their claims and related questions, which I think

6    are plainly allowed, but there does seem to be disagreement

7    about that one point.

8        Other than that, I think we are on the same page with

9    respect to Plaintiff's motions 1 through 3.

10        **THE COURT:**  Just as a point of guidance here, the --

11    one of my least favorite cases that seems to never end,

12    although it looks like there's an ending.  In that case, this

13    issue came up, and I was reminded that what I said at that

14    time, and it makes sense to me now, is that the named plaintiff

15    can -- it was a she.

16        How she can -- they can inquire, the defense can inquire,

17    how she became involved in the case and whether she was

18    dissatisfied with the product before learning of the case.  In

19    an attorney advertisement.  It's the Montera vs. Nutrition

20    case.  And that's kind of my view.  So I think it's actually

21    consistent with what you just said.

22        But go ahead.

23        **MR. RICHARDSON:**  Good morning, Your Honor.  Beko

24    Richardson.  And I think I agree with counsel.  We're largely

25    in agreement on 1, 2, and 3.  Motion in limine 2 is where i

1    think we have a little bit of a disagreement.  And the problem

2    that we see with motion in limine 2 is that even though Google

3    is agreeing not to use the words "lawyer-driven," to not say

4    those words, if you read the brief, what they're really trying

5    to do is present a picture of the case being lawyer-driven.

6        And if you look at the testimony in the footnotes,

7    footnotes 2, 3, and 4, you'll see that it actually doesn't

8    track with what they're saying in the brief.  And so they're

9    trying to say that these clients were solicited by

10   advertisements.  We didn't run any advertisements in this case.

11   What Ms. Harvey said at her deposition was that she saw a news

12   article about the case after --

13        **THE COURT:**  Well, that's fine.

14        **MR. RICHARDSON:**  And that's absolutely fine.  We

15   agree.

16        **THE COURT:**  So that's what you -- that's what the

17   examination will be.  But the point is that while they won't be

18   permitted to say, "This is just a plaintiff lawyer construct."

19   The class plaintiffs -- it's certainly appropriate for them to

20   ask questions about how they became involved.  And you're

21   saying it wasn't as a result of an advertisement.  They could

22   certainly ask that question.  If it's that she read an article,

23   they can ask about that.

24        And if the suggestion they're trying to leave with the

25   jury is that these plaintiffs aren't really committed to this

1    or that they're really trying to get a fast buck or whatever,

2    then, you know, that's okay.  The class representatives are

3    open season to them.  But I think we're -- I don't think

4    there's a real dispute here.

5            **MS. AGNOLUCCI:**  I agree, Your Honor.

6            **THE COURT:**  Okay.  All right.  So then we've got --

7    number 4 is exclude evidence and argument about former

8    plaintiffs who were voluntarily dismissed.  I think it really

9    only implicates Cataldo, the most recent one.

10           You guys may want to make your appearance.  It's a new

11   cast, so go ahead and make your appearance.

12           **MS. FLOREZ:**  Good morning.  Argemira Florez for

13   Google.

14           **MR. LEE:**  Good morning.  James Lee.

15           **THE COURT:**  Good morning.

16           **MR. LEE:**  For the plaintiffs.

17           **THE COURT:**  Okay.  So we're really talking about the

18   Cataldo deposition.  Is that what we're talking about?

19           **MR. LEE:**  That's right, Your Honor.

20           **THE COURT:**  Okay.  So it's Plaintiffs' motion.  So why

21   don't you start.

22           **MR. LEE:**  Sure.

23           So Judge, what's going on here is that we have dismissed

24   or we're going to dismiss Mr. Cataldo from the case.  He will

25   not testify in Plaintiffs' case in chief.  What Google has done

1    is said, "Well, even if he's not coming to trial, we want to

2    designate testimony from his deposition."  And if you look at

3    what they've designated, they're using him solely for the

4    purposes of impeachment, which they can't do.

5        He's not coming in for any substantive.  It's really just

6    calling him, playing his video so that they can impeach him.

7    So let me give you some examples.  If you look at the

8    designations, they try to suggest that -- again, this is sort

9    of a lawyer driven case, that he himself is a lawyer, and

10   there's a lot of back and forth when he turned the WAA feature

11   off.  His testimony is that he remembers doing it years ago,

12   and they confront him with documents that suggest he turned it

13   off later after he joined the lawsuit.

14       And that has no bearing on what the jury is going to

15   decide, right?  And the fear is that once they play those clips

16   and then they hear that this was a class representative, and

17   now he's not -- what happened?  What is the jury left to

18   speculate on why that is?  Why was he played?  Why was he

19   dismissed?

20       And I think they're hoping that the jury will branch onto

21   this, reach this conclusion that this is lawyer-driven and this

22   was brought by a lawyer, and he got caught with something he

23   shouldn't have on his WAA feature, and so he dismissed the

24   case.

25       That really has no place for the jury on any of the

1    claims, any of the elements of our case.  So I think that's the

2    problem, is it's going to lead to a lot of jury confusion, and

3    the prejudice is that what will the jury be left to conclude

4    about Mr. Cataldo.

5          **THE COURT:**  Okay.

6          **MS. FLOREZ:**  Thank you, Your Honor.  I'd start by

7    saying that Mr. Cataldo is currently a named plaintiff.  There

8    hasn't been any dismissal, and I would also add that we have

9    communicated our intention -- we subpoenaed Mr. Cataldo, and we

10   also communicated our intention to play his deposition

11   testimony, and we think that that's not controversial.  It's

12   permitted under the Rules of Evidence.

13        And to Mr. Lee's point, his testimony is clearly relevant.

14   It's not only for impeachment purposes.  We designated a ton of

15   testimony, and I actually read testimony from the record.  But

16   Plaintiffs in this case must show that they had a reasonable

17   expectation of privacy in the data at issue, as we know, for

18   all of their invasion of privacy claims.  But as part of its

19   defense, Google has to demonstrate that Plaintiffs didn't have

20   that reasonable expectation, and Mr. Cataldo's testimony goes

21   to that very issue.

22        At deposition, he demonstrated that he understood a

23   difference between the sWAA setting and the ad personalization

24   setting.  He understood that he couldn't use sWAA or ads

25   personalization to prevent Google from serving ads at all.  So

1    he distinguished the two settings in a way that other

2    plaintiffs didn't.  So his testimony is very unique, and I

3    think Mr. Lee is really focusing on a small subset of the

4    testimony that we designated to kind of play up the last

5    motion.

6            THE COURT:  Just in sort of a bigger question, what's

7    the relevance of a former class representative, however that

8    person perceived the case, how they got involved and all of

9    that?  Once they're out of the case -- and I understand you

10   said they haven't formally gotten them out.  But doesn't it

11   cease to be kind of relevant anymore what that person --

12   anything about that person?

13           MS. FLOREZ:  Well, I think Mr. Cataldo was uniquely

14   situated.  He's been part of this since 2020, the first amended

15   complaint.  The parties have built their case around his

16   testimony and the arguments he made.  I'm sorry.  The

17   factual -- you know, his understanding of the disclosures, and

18   I think what's more important to focus on here is that courts

19   in this district have found that even former plaintiffs have

20   relevant testimony.

21           If it's relevant to the outstanding factual disputes,

22   there's really -- there's no reason not to let it in.  We're

23   not trying to, you know, point out that he's a former plaintiff

24   and dismissed his claims, and he dismissed his claims

25   because --

1              **THE COURT:**  Well, I guess what I'm getting at is if

2     somebody is in a case as class representative and then, you

3     know, if it's done, right.  They're no longer involved.

4     They're out of the case.  They're almost -- like, just the

5     relevance of their views about anything is kind of like pick

6     somebody off the street and ask them what they think of

7     something.  I mean, it's -- they've almost exited relevance, if

8     you will.

9          And I hear you saying -- and I don't disagree with you

10    that there could be circumstances in which there is relevance,

11    but the particular views, say, of Mr. Cataldo -- I don't really

12    know why they're relevant anymore.

13             **MS. FLOREZ:**  Well, Mr. Cataldo was a class

14    representative.  So I would distinguish him from the example

15    you gave of anybody that we would, you know, pick up off the

16    street.  He accepted that role when he joined this case, and so

17    his testimony specifically about the highly offensive nature of

18    the harm and -- or of Google's alleged conduct, and his

19    understanding of the disclosures is very relevant to the

20    outstanding disputes.

21          So I think that, different from anybody we pick up, you

22    know, off the street and ask these questions to -- the fact

23    that he was a class representative really distinguishes him

24    from anyone else.

25             **THE COURT:**  Okay.  I think --

 1              **MR. LEE:**  You got it?

 2              **THE COURT:**  I think I got it.  Okay.

 3              **MR. LEE:**  Okay.

 4              **THE COURT:**  And as I say, I'll give you an order on

 5      all of these.  I don't think I'm going to rule necessarily

 6      on --

 7              **MR. LEE:**  Thank you, Judge.

 8              **THE COURT:**  -- a whole lot here.

 9              **MS. FLOREZ:**  Your Honor?

10              **THE COURT:**  Yes.

11              **MS. FLOREZ:**  If I may, I just wanted to put on the

12      record that I do oppose -- that Google does oppose Mr.

13      Cataldo's dismissal from the case.  That changes many things.

14              **THE COURT:**  Oh, the dismissal out of the case?

15              **MS. FLOREZ:**  Yes.

16              **THE COURT:**  Okay.  What would be the basis of you

17      trying to block someone from saying, "I want out"?

18              **MS. FLOREZ:**  Sure, your Honor.  A few reasons.  First,

19      we do think that there would be legal prejudice for us for

20      certain defenses that we'd be making.

21          In addition, we think that, you know, this dismissal was

22      on the eve of trial.  We were informed of Mr. Cataldo's

23      intention to be dismissed on June 24th just hours before we

24      were filing the pretrial conference statement.  We subpoenaed

25      Mr. Cataldo, and Plaintiffs ignored that subpoena.  So we think

1    that we suffered legal prejudice, and really this -- it just

2    seems like gamesmanship at this point.

3         THE COURT:  Well, is there any authority that I can

4    force a person to stay in a case if they tell me they want to

5    be gone?

6         MS. FLOREZ:  Well, Your Honor, I think that you can

7    condition his dismissal on a few things, and there's a lot of

8    case law on conditioning dismissal, and so we would -- we'd be

9    happy to see, you know, Plaintiffs' motion trying to seek

10   dismissal, and we would be happy to oppose it and provide case

11   law that explains our prejudice.

12        THE COURT:  Okay.  Are you -- is there a pending

13   motion, or are you planning a pending motion to actually

14   formally --

15        MR. LEE:  We're going to formally do that this week.

16        THE COURT:  Okay.  All right.  Well, then --

17        MR. LEE:  I'll just say, Judge, that I think based on

18   that, it just underscores the fact of why they want to do this,

19   right?  They want to impeach him.

20        THE COURT:  I understand.

21        MR. LEE:  And that's just not proper here.  I think

22   you're right.  Maybe he once was a class rep, but once he's not

23   a class rep --

24        THE COURT:  Okay.

25        MR. LEE:  -- he's a guy off the street.

1          **THE COURT:**  Well, we want to accelerate the back and

2     forth on this.  So when you file your motion, can you promptly

3     give me your response so that I can rule on this in this time.

4     Okay.

5          **MR. LEE:**  Thank you, Your Honor.

6          **MS. FLOREZ:**  Absolutely.  Thank you.

7          **THE COURT:**  The next one is number 5.

8          **MR. MATEEN:**  Good morning, Your Honor.  Harris Mateen.

9     So the majority of cases that Plaintiffs cited -- they

10    referenced instances in which a party was trying to bring in

11    the specifics of an old claim or the fact that something was

12    dismissed or entering a motion for summary judgment or the

13    nuances of an appeal or something like that.  We're not trying

14    to do that at all.

15    The thing that we're trying to do is that there are

16    certain factual allegations in the original complaint.  Those

17    were then changed over time as discovery came in, and we think

18    that it's relevant to ask plaintiffs their view of how

19    outrageous what they originally pled was versus how outrageous

20    what they currently plead is.

21    And there is plenty of authority that's showing that these

22    are prior admissions of plaintiffs.  They're not binding on

23    them, but they are prior admissions of them, and we, I think,

24    should be able to impeach them on them.

25          **THE COURT:**  Mr. Boies?

1          **MR. BOIES:**  Your Honor, I think the cases that we cite

2     are cases that involve exactly what's involved here, which is

3     where they're trying to use prior allegations to say, "You

4     didn't prove these allegations," and it takes us down a pathway

5     where we're going to have another trial on allegations that are

6     not in front of the jury.  The cases they cite are cases in

7     which what is being used from the past is an admission of a

8     fact.  It's an admission against interest, something that they

9     want to prove.

10         They don't want to prove these allegations.  They dispute

11    these allegations.  This is not a situation which they're using

12    the complaint to establish a relevant fact.  This is a

13    situation in which they're trying to use the complaint to say,

14    "You made these claims before, and you're not making those

15    claims now, and why not?"

16         That takes us down a pathway that is both going to

17    elongate the trial, it's going to be confusing to the jury, and

18    it is fundamentally irrelevant.  The allegations that were made

19    in the past, except if they are an admission that they want to

20    introduce for the truth of the matter asserted are irrelevant

21    to the issues that are being tried now.

22         **THE COURT:**  Okay.  Let me move to the next one, and

23    that's about CDAFA, and it references to it being an

24    anti-hacking statute.  I take it suggesting the concern that

25    the plaintiffs have is suggesting that the -- defense is

1    suggesting a misuse, if you will, of a statute that really has

2    a very different purpose.

3           So yes.  You may start --

4           **MR. RICHARDSON:**  Yes, Your Honor.  Mr. Richardson.

5           **THE COURT:**  -- your motion.  Go ahead.

6           **MR. RICHARDSON:**  You have it exactly right.  We had

7    briefing for your court, for Your Honor where Google referred

8    to the CDAFA as an anti-hacking statute.  That wasn't an issue

9    before the Court.  In front of the jury, the jury should be

10   focused on the instructions from the Court and what the

11   elements are for the claim.

12          There's no mention of hacking in either the CDAFA or the

13   pattern jury instruction, which is CACI 1812.  And if you look

14   at Google's opposition to this motion in limine number 6,

15   they're talking about what the scope of the law is, what the

16   intent of the law is, and we think that would be quite a

17   sideshow and a distraction and prejudicial to the plaintiffs

18   for us to be going down the path of making arguments or trying

19   to present evidence regarding what the legislative intent was

20   or what the scope of the law is.

21          They talk about the amendment to the law.  I looked back

22   at that, the 1987 amendment to this law.  The whole purpose of

23   that was to expand the scope, and they added Cal Penal Code

24   502(a)(1), which is specifically talking about the broad scope

25   of the law.  It's never meant to be limited to hackers or

1    hacking.  And so using that sort of framing with the jury is to

2    falsely suggest that the law is narrower than it is.

3           **THE COURT:**  What is the point of labeling it at all?

4    I mean, the statute is the statute, and there will be

5    instructions, but why do we have to characterize it one way or

6    the other?

7           **MS. TOKER:**  Good morning, Your Honor.  Naiara Toker

8    for Google.

9        We think that Google is entitled to call the statute what

10   it is.  It is an anti-hacking statute.  Courts in the Ninth

11   Circuit have universally referred to it --

12          **THE COURT:**  Well, it's --

13          **MS. TOKER:**  -- as an anti --

14          **THE COURT:**  Its name -- I mean, you can refer to it by

15   the name of the statute, which is, you know, probably a better

16   way to do it.  To give it a nickname is -- I mean, I don't

17   quite get the point.

18          **MS. TOKER:**  We think it provides appropriate context

19   for the jury's decision about whether Google's conduct, its

20   disclosures, the fact that it requires third-party apps to

21   disclose the use of Google Analytics, whether all of that

22   constitutes without knowingly accessing Plaintiffs' computer or

23   data without permission, and the Ninth Circuit in U.S. v.

24   Christensen actually relied on the fact that it's an

25   anti-hacking statute in interpreting the statute.

1          So the Court there was -- relied on the fact that by

2    definition, hacking involves accessing something without

3    permission to say that therefore, without permission has to

4    also include accessing a computer with a valid password and

5    subsequently taking the data improperly.

6          **THE COURT:**  Those are sort of arguments as to whether

7    or not the plaintiff satisfies the elements of the statute in

8    this case.  What this likens to me -- and I don't know if

9    there's law going one way or the other.  I'll tell you what my

10   inclination would be.  We often hear in the press all the time

11   when someone is charged with a RICO violation, and somebody

12   gets up there and says, "The RICO statute is a mob statute.

13   It's directed towards anti-mob activity, and it's being

14   misused."

15         I don't think I would let anybody in court say to the jury

16   in a RICO case, "Well, it's -- it was originally intended for

17   the mob.  So this is a misuse of the statute."  Is this really

18   different, what you're proposing to do here?

19         **MS. TOKER:**  Well, I don't think we're saying that it's

20   intended for hackers.  It -- courts have referred to it as an

21   anti-hacking statute.

22         **THE COURT:**  Okay.  But the fact that it's maybe being

23   referred to that way -- what you want to say -- I mean, in

24   fairness, you want to say to the jury, "They took a statute

25   that is intended for a particular purpose, and they're misusing

1      it."  I mean, that's the reason they want to say it's an

2      anti-hacking statute.

3          And I'm not -- I'm wrestling with the idea of whether or

4      not that's a legitimate argument to say to the jury, because

5      the statute is what it is.  It either fits or it doesn't.  And

6      the sort of notion that maybe legislators were looking at --

7      the particular harm they're trying to address is hacking, that

8      doesn't mean the statute doesn't apply.  Just as in RICO, you

9      know, a lot of people get convicted of RICO, and they're not

10     mob people.  So I'm not sure how that's any different than

11     this, but...

12          **MS. TOKER:**  Well, again, I think the fact that the

13     Ninth Circuit relied on the fact that it's a hacking statute to

14     decide what "without permission" means that the jury should

15     also have that context.

16          **THE COURT:**  Okay.  All righty.

17          **MR. RICHARDSON:**  Unless you have further questions, I

18     think --

19          **THE COURT:**  No.

20          **MR. RICHARDSON:**  Okay.  Thank you, Your Honor.

21          **THE COURT:**  Okay.  Number 7 is excluding evidence that

22     the app developers consented to sharing data with Google or the

23     argument that developer Google agreements could establish

24     consent.  This is a big issue, third-party involvement through

25     the third-party users here, or customers, however we want to

1    characterize them.

2        This goes to the question of how do we proceed in the

3    case.  I do think that you rise or fall, meaning Google in this

4    case, on going back to the basics, what reasonable consumers

5    think they do when they turn off the switch.  And is it -- do

6    they think that overrides everything else, or is it

7    unreasonable to think that?

8        And so I think sort of the agreements with the third-party

9    vendors, users, whatever label we want to put on them may well

10    come into evidence.  And it's an appropriate piece of evidence,

11    but it isn't, at the end of the day, about whether or not

12    there's consent vis-à-vis third-party users or whether or not

13    Google says to the third parties, "You go and tell your users

14    that" -- you know, get consent from them.

15        It's going to turn on whether or not Plaintiffs can prove

16    that a reasonable consumer would think that they turned

17    everything off when they said they want it off, or it's

18    unreasonable to think that that should trump third-party

19    consent issues.

20        So that's kind of my sense of the case.  Now, I don't know

21    which way that then impacts this particular motion in limine,

22    although I think, of the relative importance of these motions,

23    that one's a fairly important one.  So I'll start with

24    plaintiffs because you're the moving party.

25        **MR. MAU:**  Thank you, Your Honor.  This is Mr. Mau, for

```
 1        the plaintiffs, Boies Schiller and Flexner.

 2             So I'm actually a little unsure, Your Honor, because we've

 3        been meeting and conferring on this, and I think we may

 4        actually have an agreement.

 5             THE COURT:  Okay.

 6             MR. MAO:  But let me just state now my understanding.

 7             THE COURT:  Do you want to caucus with Mr. Hur off

 8        the --

 9             MR. MAU:  No.

10             THE COURT:  -- record for a moment?

11             MR. MAU:  I think we can do this on the record.

12             THE COURT:  All right.  Okay.

13             MR. MAU:  My understanding is that Defendants have not

14        and they don't intend to introduce any third-party privacy

15        policies or terms from an app developer.  They certainly have

16        not identified any as such in their exhibits, and my thinking

17        is this may allow the parties to strike out a compromise on

18        this motion and possibly motion in limine number 10 for Google

19        as well, which relates to similar issues, but theirs is more on

20        compliance.

21             Ours is on the discussion of third-party policies, and I

22        will let Mr. Hur explain his understanding as to where we are

23        because I'm sure you can appreciate, Your Honor, there were a

24        lot of issues.  There were moving pieces and parts, but I do

25        know that they do not have an exhibit regarding -- or showing a
```

1    third-party policy or terms.

2         **THE COURT:**  Mr. Hur.

3         **MR. HUR:**  Thank you, Your Honor.

4         I think, to answer your question about which way the case

5    cuts, I do think it weighs in favor of denying this motion

6    because even if it's just about the reasonableness of the class

7    members' view of the WAA setting and the sWAA setting and what

8    it means, that is impacted by what they also learned from the

9    app itself when they agreed to those terms of service in order

10   to download the app.

11        The apps were required by Google to disclose the use of

12   Google Analytics.  So if a user, having previously agreed to

13   WAA, then reads the disclosure for the app, and it says, "We

14   use Google Analytics, and we will process your data," that is

15   relevant to their interpretation of WAA.

16        **THE COURT:**  I don't disagree with you, but can I back

17   you up --

18        **MR. HUR:**  Yes.

19        **THE COURT:**  -- for a moment?  Because my ears always

20   perk up when I hear there may be an agreement between the

21   parties about something.  Is that not your understanding, or

22   what's the situation there?

23        **MR. HUR:**  Your Honor, I think there are -- it

24   sometimes appears we have common ground about how these

25   arguments can be raised, and I think to fully understand the

1    scope of what Mr. Mau is now suggesting, I think we'd also have

2    to address Google's MIL 10 and likely 11.

3        But if they're not disputing that we can argue and present

4    evidence about what Google requires the app developers to

5    disclose and explain why we think that provides both consent

6    and a lack of reasonableness, then perhaps we don't have an

7    issue.

8        **MR. MAU:**  Just to be clear, Your Honor, may I further

9    venture that we have a further agreement, which is that in the

10    meet and confer on the exhibits, Defendants also agree that

11    there's not a single third-party policy or term that actually

12    specifically identification WAA or what happens when WAA is

13    turned off?  That is also not going to be in the exhibits

14    because it's simply not in existence.

15        Given that, those two -- and I'll let Mr. Hur state

16    whether or not he disputes the second because it doesn't sound

17    like he disputes the first one, if those two are true, I don't

18    see how Plaintiffs' motion wouldn't be granted because then

19    otherwise, they would simply be speculating as to what

20    third-party policies out there may say but don't, in fact, say

21    regarding WAA?

22        **THE COURT:**  I think what Mr. Hur was just talking

23    about --

24        **MR. MAU:**  Right.

25        **THE COURT:**  -- was not the third-party agreements.  It

1    was Google and third.  So that was a little different than

2    third-party agreements with users.

3          MR. MAU:  And this is the part where I agree with

4    Mr. Hur, on the record, which is that it interplays with motion

5    number 10 of Google, which I think is what Your Honor is

6    talking about.  Our motion relates to the relevance of

7    third-party policies in which they don't even have any

8    exhibits.

9          THE COURT:  Okay.  Let's stop on that one.

10          MR. MAU:  Right.

11          THE COURT:  On that issue, not what Google is telling

12    the third parties, but the third parties' agreements with the

13    users, he's saying there's no evidence about that at all

14    anyway, so you can't go there.

15          MR. HUR:  Your Honor, I think it depends on what he

16    means by "You can't go there."  It is true that we do not have

17    third-party app agreements on the exhibit list because the

18    class was certified for all apps.  I mean, for that to be

19    meaningful, we'd have to put in 2 million of those.  What we

20    are asserting is that Google requires the apps to do that, and

21    for purposes of this trial, where you can't distinguish between

22    the apps, we should basically assume that the apps comply.

23          THE COURT:  Well, why should we assume anything?

24          MR. HUR:  Or that at least Google required the apps --

25          THE COURT:  That part --

1          **MR. HUR:** -- to make that disclosure.

2          **THE COURT:** That's a -- those are two different

3     things, that Google required them to do that.  That's step 1.

4     Whether or not they do it, we have no evidence.  We have no

5     evidence of whether or not they do it.  And we can't say -- I

6     know you wanted me to, but I can't say to the jury, "Assume

7     that they all did what Google asked them to do."  I don't think

8     we can do that.

9          **MR. HUR:** Well, we can say -- I think we can say, Your

10    Honor, that we required this.

11         **THE COURT:** Yes.

12         **MR. HUR:** And there are -- you know, two million apps

13    in this that are covered by this class, and  what we don't want

14    is a situation -- and this is part of our motion -- where the

15    plaintiffs are saying, "Well, there's no evidence that the

16    third parties agreed or not."

17         So the fact of the -- the fact that third parties have to

18    have agreements with the plaintiffs, I think is something that

19    we will get into evidence or that we will certainly push to get

20    into evidence because that is the basis for the requirement

21    that Google has with app developers.  They cannot use Google

22    Analytics unless they have an agreement with their users that

23    discloses Google Analytics.

24         We're not going to prove that two million apps did it, and

25    the truth is that the apps do it in different ways --

1              **THE COURT:**  Well --

2              **MR. MAO:**  -- and the language is very different.

3              **THE COURT:**  -- I mean, neither -- I mean, there are

4      two sides of the coin.  You're saying, well -- or you asked me

5      at one point that I should in one way or another tell the jury

6      we should assume they all complied with your request, and I am

7      uncomfortable doing that because there's no evidence to that.

8              At the same time, I don't think then the plaintiffs can

9      suggest well, the defense has failed to show any compliance

10     with any -- by any third-party.  I just don't think what the

11     third parties do is just -- it's not the issue here one way or

12     the other.  Either they 100 percent complied or nobody

13     complied.  We don't know.

14             And they can't say -- I'm hearing you be concerned that

15     they might suggest it was your burden to go and show every one

16     of these third parties complied with your directive, and I

17     wouldn't let them say that.  At the same time, I'm not going to

18     let you say, "Well, let's assume it's 100 percent compliance."

19     Neither of those is --

20             **MR. HUR:**  Understood, Your Honor.

21             **THE COURT:**  Is correct.

22             **MR. MAU:**  Sorry, Your Honor.

23             **THE COURT:**  Go ahead.

24             **MR. MAU:**  Yeah.  Okay.  This is why I pointed out fact

25     number 2, that I do believe that we have an agreement, or at

1    least a tacit one, which is that there are no third-party

2    policies that discuss web and app activity and what happens

3    when it turns off.

4        Regardless of whether that's a compliance issue, if the

5    parties agree on that, I don't see why that does not obviate a

6    lot of the concerns of Mr. Hur because, again, this case is

7    about the representations by Google with the consumers and the

8    class members.

9        THE COURT:  Well, I take it his concern is to cut off

10   an argument by you that -- in response to the fact that Google

11   is directing the third parties to obtain the consent, your

12   argument then being that that's -- you know, that's really an

13   ephemeral request, because they don't do -- you know, there's

14   no evidence that anybody did anything on this.  So, you know,

15   it doesn't make any -- it's entitled to no significance that

16   Google directs third parties to do this.

17       And you can argue that it doesn't obviate the basic

18   turn-off by Google of the switches, and that's what I

19   understand to be your principal argument.  But I don't think

20   you can argue well, one of Google's additional mistakes here or

21   problems or liability is they didn't follow up with their

22   third-party people in terms of getting consents from the users.

23       MR. MAU:  I guess I feel like there's a little bit of

24   a passing of ships by night --

25       THE COURT:  Perhaps.

1          **MR. MAU:**  -- going on here because their -- these

2     third-party compliance policies that Mr. Hur is referring to,

3     respectfully, do not get into disclosures regarding WAA and

4     what happens with data when WAA is off.

5          **THE COURT:**  Right.

6          **MR. MAU:**  And therefore, I'm not seeing the import of

7     Mr. Hur's points because --

8          **THE COURT:**  Well, let me ask this, and I'll ask both

9     of you this.

10         **MR. MAU:**  Yeah.

11         **THE COURT:**  Is there any disagreement that Google may

12    introduce its directive to the third parties?  Do you have a

13    problem with that?

14         **MR. BOIES:**  Your Honor, may I?  I apologize, because I

15    was supposed to argue their motion number 10 --

16         **THE COURT:**  Yeah.

17         **MR. BOIES:**  And we probably should have the same

18    person argue from our sides.

19         **THE COURT:**  You can tag team it as far as I'm

20    concerned.

21         **MR. BOIES:**  Okay.  The issue here is they want to put

22    in the fact that they had these agreements with their app

23    developers, but they don't want us to be able to put in what

24    the app developers then did.

25         **THE COURT:**  Right.

1          **MR. BOIES:**  Now, what is going to be relevant to

2     whether our plaintiffs were reasonable in believing that when

3     they turned off, it meant off, is what they were told.  It's

4     not what Google told the app developers.  It's what our

5     customers heard from the app developers.

6          Going to the issue of what was reasonable for our

7     plaintiffs to interpret, that's got to be what goes to our

8     plaintiffs.  What goes from Google to the app developers is

9     irrelevant, except maybe to the issue of their good faith.  But

10    even with respect to that, they then know what the app

11    developers do, and if the app developers are not doing it, I

12    don't think they can make that -- even that good faith

13    argument.

14         But the basic point is that what's relevant is what comes

15    to our plaintiffs, and they can't introduce evidence of what

16    they told the app developers for that proposition.

17         **THE COURT:**  Well, so it sounds to me you don't have

18    any agreement at all on this.

19         **MR. BOIES:**  I think --

20         **THE COURT:**  So hope springs eternal.  When you first

21    said you had something -- now I think you're completely at odds

22    on this question.  But okay.

23         One more comment from you, and then I want to move on to

24    other ones.  So Mr. Hur.

25         **MR. HUR:**  Yes, Your Honor.  This is exactly the

1    problem and, I think, where the dispute lies.  Yes.  The

2    document that we are trying to admit are the Google Analytics

3    terms of service that tell the app developers what to tell

4    their users about Google Analytics.

5         **THE COURT:**  Yeah.

6         **MR. HUR:**  And we should be able to argue that that is

7    what the app developers are required to do.  What I heard

8    Mr. Boies trying to say --

9         **THE COURT:**  And articulate for me from your

10   perspective what the relevance of that is.

11        **MR. HUR:**  The relevance --

12        **THE COURT:**  For when you're analyzing the

13   reasonableness of Plaintiff's understanding when they say, "I

14   want the switches off."

15        **MR. HUR:**  So imagine you are a member of this class.

16   You have turned -- you're a Google accountholder.  You're

17   signed in.  You've turned sWAA off.  You later want to download

18   an app.  Every time you download an app, you agree to their

19   terms of service, and as part of those terms, they were

20   required by Google to disclose Google Analytics.

21        So we believe arguing that whatever that user may have

22   thought WAA meant, it is not reasonable at the time they

23   download that app, where the app is required to tell them about

24   Google Analytics, that they would have thought that this other

25   setting somehow overrode the disclosure about Google Analytics.

1        And Your Honor, I can see that there is a reasonable

2    dispute here where the plaintiffs can argue, well, that

3    disclosure that Google required apps to make should have

4    mentioned sWAA.  They can make that argument.  That is a

5    legitimate dispute.

6        But what they're trying to do is prevent us from even

7    telling the jury that apps were required to tell the class

8    members about Google Analytics, and that is a critical element

9    to whether or not their view of sWAA is reasonable, not to

10   mention consent.

11       **MR. BOIES:**  I think what's relevant is what goes to

12   our plaintiffs.  If the things they downloaded said something

13   about WAA, that would be relevant, but what they want to do is

14   they don't want to rely on what the app developers told our

15   plaintiffs.

16       They want to rely on what they told the app developers,

17   and they want the jury then to assume that the app developers

18   did what they agreed to.  That is what makes what they're

19   asking to do irrelevant.

20       **MR. HUR:**  Your Honor, if you'll just indulge me for

21   just one moment.

22       **THE COURT:**  You have one more --

23       **MR. HUR:**  Okay.

24       **THE COURT:**  -- comment.  Yeah.  Go ahead.

25       **MR. HUR:**  Thank you.

1          Your Honor, in many of these cases -- and I have a lot of

2     these Google Analytics cases -- it's about one app.  And so

3     those disclosures are in evidence, and we look at what the

4     disclosure said.  They have a certified class here of millions

5     of apps.

6          And so the idea that we can't talk about what app

7     developers were required to tell their users because we didn't

8     put in 2 million different disclosures -- Your Honor, I do not

9     think it's credible or fair or consistent with how this class

10    was certified.

11         **THE COURT:**  Okay.

12         **MR. MAU:**  Just one --

13         **MR. BOIES:**  Stop.  Stop.  Stop.

14         **THE COURT:**  Okay.  But this is it.  This is truly it.

15         **MR. BOIES:**  Go ahead.

16         **MR. MAU:**  Sorry.

17         **THE COURT:**  Go ahead.

18         **MR. MAU:**  Short leash here.

19         Your Honor, I can assure you, they also don't have any

20    evidence showing that they actually told app developers that

21    when WAA is off, it's still collecting data.  So that's why I

22    was saying there's no ships in the night.

23         **THE COURT:**  Okay.  Let's go on to number 8, which is

24    excluding evidence that Plaintiffs continued using Google

25    products and services after filing suit.

1          You know, I'm going to give you an order, and I'm going to

2     think about a lot of these, but this one, I do think that they

3     should be entitled to show that Plaintiffs continued to use it.

4     I mean, it goes to, you know -- it goes to several things.  But

5     you're the moving party.  Go ahead.

6          **MR. A. BOIES:**  Sure.  Well, I obviously understand the

7     arguments.  We've read the briefs and can understand why

8     Google's arguing they're irrelevant.  The problem is largely on

9     the prejudice side, which is, as Google knows, full well

10    Plaintiffs had to keep using apps after filing a lawsuit.

11         **THE COURT:**  Well, and you can make that point.

12         **MR. A. BOIES:**  In general yes, but it's difficult with

13    a jury trial because the context that's being omitted, the

14    context that's left out is something about Article III standing

15    and the requirement of the plaintiffs to continue using apps in

16    order to ask Your Honor for an order requiring Google to change

17    its practices, something that the jury is not going to decide.

18         And so we could try to elicit that testimony through a

19    fact witness.  It would be challenging.  We could try to get

20    the jury to understand.  I mean, it's challenging for

21    third-year law students, issues of Article III standing, so

22    that would be hard too.  And I certainly understand the

23    inclination to let Google, you know, make its defense, and we

24    can argue about it.

25         But it puts us at a disadvantage because the context

1    that's missing is not context that's easily drawn out in front

2    of a jury as opposed to in front of Your Honor.  And in the

3    class certification order, Your Honor recognized it's kind of

4    what -- I think you quoted --

5    **THE COURT:**  So it's your position it's not Google's

6    ubiquitous and therefore, they don't have a choice.  It's that

7    they have to keep using it so they maintain their standing?

8    That's actually a rather dangerous argument because that goes

9    right into the issues of the motivation of these plaintiffs.

10    **MR. A. BOIES:**  So it's certainly part of it.  Part of

11    it is the probative value of their continued use, but this is

12    something that we briefed at class certification.  Your Honor

13    cited the Yahoo Mail case about the catch-22 --

14    **THE COURT:**  Yeah, I understand, and I think I did that

15    in the Arizona Ice Tea and some other cases, but, you know, can

16    they -- when they're exploring why Plaintiffs are doing certain

17    things, shouldn't it be available to them if a plaintiff has

18    said the reason I'm continuing to use it is because I want to

19    have this case against you?  Are they allowed to ask that

20    question?

21    **MR. BOIES:**  Your Honor, if I could take it, I think

22    one of the problems here is that this has -- given what the

23    Court has already found about the lack of choice, this has very

24    little probative value.  And what it does is it takes us into

25    exactly the kind of questions that the Court is thinking about.

1          And for example, do we really want the jury to hear from

2     the plaintiff "Well, I had to keep using it because I don't

3     have any choice because Google is a monopoly"?  And in

4     addition, I was told that if I stopped using it, then we

5     couldn't get the injunctive relief to stop them from doing it

6     because part of what this case is about is trying to get a

7     finding from the jury that there's liability, and then the

8     judge can order them to stop it.

9          **THE COURT:**  Yeah.

10         **MR. BOIES:**  This is -- for very little probative

11    value, this takes us into areas that I think are going to be

12    very complicated.

13         **THE COURT:**  Okay.

14         **MS. CORBO:**  Good afternoon.  Isabella Corbo on behalf

15    of Google.

16         First, I would say that this is not a standing issue to

17    Google.  We do think that this has probative value.  This

18    information is relevant to the degree of harm that these

19    plaintiffs suffered and how offended they were by Google's

20    conduct.

21         In their depositions, these plaintiffs testified that they

22    continued using these applications and continued using their

23    phones in the exact same manner even when there were

24    alternatives available, and we should be permitted to ask them

25    these questions on cross-examination, and then counsel can

1    rehab their plaintiffs if they so choose, which I'm sure they

2    will, but we shouldn't be precluded from asking those

3    questions.

4        **THE COURT:**  Would you seek to preclude the answer if

5    an aspect of the answer is "I need to maintain my claim because

6    we're also trying to get injunctive relief against Google"?

7    Would you be -- will I be hearing from your side saying they

8    shouldn't be allowed to go into that?

9        **MS. CORBO:**  I don't believe that's an argument that

10    we'll be making.

11        **THE COURT:**  So you think it's fine if they say that?

12    In answer to the question, you know, "Why did you continue to

13    use Google," are you comfortable with letting them say --

14    because otherwise the jury doesn't know that this claim is

15    seeking injunctive relief.  You don't care if the jury knows

16    that?

17        **MS. CORBO:**  No, we're not comfortable with that.  I

18    don't -- I don't think that it's proper also for a witness to

19    be testifying about their legal conclusions when they're not a

20    lawyer.

21        **THE COURT:**  But that would be the truthful answer,

22    right?  I mean, if you say, "Well, we should be able to ask the

23    question to a plaintiff," you know, "why did you keep using

24    this," but at the same time, what you're asking me to do then

25    is to say they can answer the part that Google is ubiquitous or

1    whatever, but they can't say, "Because we want to maintain our

2    injunctive relief claim."  I just want to know what you're

3    asking me to do here.

4        **MR. HUR:**  Sorry, Your Honor.  Ben Hur.

5        We are not contesting that they can seek injunctive

6    relief, and so their legal conclusion or their perceived legal

7    conclusion about what they can or can't seek is not relevant.

8    We've asked them these questions in deposition.  They have

9    provided answers.

10       **THE COURT:**  Yeah.

11       **MR. HUR:**  They didn't say, "Oh, it's because we want

12   injunctive relief," and certainly we are not contesting that if

13   they had stopped using, they couldn't get injunctive relief.

14   So Your Honor, I think that is a red herring, and I don't think

15   that ought to come in, and it wouldn't be relevant.

16       If they want to say, "Look, we love our Android phones" or

17   "We feel like we have no choice.  Most apps" -- you know, "All

18   our apps seem to use this," I mean, that's a different thing,

19   but making a legal conclusion is -- should be out of bounds.

20       **THE COURT:**  I think on the standing issue -- I'd have

21   to go back and look at my decisions, but I think I ruled that

22   you didn't have to keep using to maintain your right to

23   injunctive relief.  If I recall correctly, I went the other way

24   on that question.

25       **MR. A. BOIES:**  So if I just -- if I may, Your Honor --

1      so Google made this argument before at class certification.

2      They pointed to the exact same testimony that they're relying

3      on now.  And if you look at the class certification order,

4      pages 12 and 13, Your Honor said, "Look.  This is not a fair

5      argument because to embrace this argument creates a catch-22."

6           Either they continue using their mobile apps, as our

7      plaintiffs did, and they get hit with these arguments about

8      "Well, that destroys your claims.  It must not be offensive.

9      It must not be damaging.  Your claims, you know, just don't

10     survive"; or they stop using apps, and Google says, "Well, you

11     don't have standing to pursue injunctive relief."

12          **THE COURT:**  Right.  I think I ruled that I wouldn't

13     agree with that position.

14          **MR. A. BOIES:**  Which -- sorry.  Which position, Your

15     Honor?

16          **THE COURT:**  That if you stop using it, you don't lose

17     your standing to seek injunctive relief.

18          **MR. A. BOIES:**  That may be so, but, you know, we're

19     operating in a world of uncertainty with -- you know, I don't

20     think we have a ruling from Your Honor on that issue in this

21     case.

22          **THE COURT:**  True.

23          **MR. A. BOIES:**  And so, you know, the actions that our

24     Plaintiffs took throughout the litigation aren't necessarily

25     bound by any of your orders.

1          **THE COURT:**  I hear what you're saying.

2          **MR. A. BOIES:**  And so for Google to say they're not

3     disputing that our plaintiffs have standing to pursue

4     injunctive relief, correct, because our plaintiffs continued

5     using mobile apps to maintain that standing.

6          So I don't even understand the -- they're punishing

7     Plaintiffs with the other side of the catch-22 that because

8     Plaintiffs continued using their mobile apps, they are not

9     disputing injunctive relief.  But they're punishing them on the

10    merits of their claims, which is not fair because it excludes

11    the whole predicament that the plaintiffs are in.

12         **THE COURT:**  Okay.

13         **MR. A. BOIES:**  And just to point just briefly about

14    the testimony from our plaintiffs about the reasons that they

15    continued, I mean, each one of our plaintiffs testified they

16    continued using apps as they had before because of this

17    litigation.  They said, you know, "I want to make sure

18    everything's investigated."

19         They said, "I needed to keep what I had so my behaviors

20    are still the same.  In order for this to continue, I want to

21    make sure you know that I still have the same behaviors."

22         They said and they admitted that they're continuing to use

23    apps consistently in order to find out what Google is doing

24    wrong in order to keep this case going.  So it's not true this

25    never came up before, and the plaintiffs were deposed before

1    class certification obviously.

2              **THE COURT:**  Okay.

3              **MR. A. BOIES:**  So anyway.

4              **THE COURT:**  I think want to move to the next batch of

5    motions, which are the defendants' motions.  Okay.  Number 1 is

6    the testimony of Blake Lemoine.  Frankly, I don't want to hear

7    argument on that.  I'm going to grant the motion.  That one

8    wins.

9         Okay.  Number 2 is to exclude plaintiffs' introduction of

10   emotional distress and arguments regarding disgorgement.  I

11   mean, that -- we've kind of dealt with that one way or the

12   other.  I don't think we need any more discussion about that.

13   I just need to make some calls.

14        Number 3 is excluding evidence -- or reference to evidence

15   about leaks or misuse of unrelated data or other litigation and

16   investigations into Google's privacy practices.  There are

17   specific documents that are associated with some of this, and I

18   guess it also implicates a later motion.  Okay.  So let's start

19   with the moving party, Defendants.

20             **MS. AGNOLUCCI:**  Thank you, Your Honor.  Simona

21   Agnolucci for Google.

22        Obviously we had a colloquy about a similar issue at the

23   Daubert hearing, and I recognize Your Honor's ruling there.

24   When we discussed this at the Daubert hearing, counsel told us

25   that the parade of horribles that we were concerned would

1    emerge from Mr. Schneier's testimony was not going to happen

2    and that perhaps discussion of Roe v. Wade would come up as,

3    quote, one example.

4         Since then, we've looked at demonstratives that

5    Mr. Schneier intends to use in his testimony, which are very

6    heavy with information about data leaks, about data incidents,

7    about litigation involving Google where Google settled and did

8    not admit liability about totally unrelated issues about, for

9    example, women being criminally prosecuted in states in the

10   aftermath of Dobbs after receiving data about having abortions.

11        All of this, Your Honor, really proves that the plaintiffs

12   here don't intend to keep their word about what they told us

13   Mr. Schneier would testify about, and we're concerned not just

14   about Schneider's testimony but about many of the documents

15   that were attached to these briefs.

16        So we're asking Your Honor to make two rulings.  The first

17   is that evidence of data leaks and, you know, privacy incidents

18   and similar information not be admitted.  And then the second

19   has to do with litigation and settlements that Google has

20   entered into about totally different products, totally

21   different allegations, obviously not admissions of liability

22   and obviously highly inflammatory.

23            **THE COURT:**  Okay.

24            **MR. LEE:**  I think it's best to put this in two

25   buckets, data leaks and then the other matters.  With data

1    leaks, it's a bit of déjà vu, Your Honor.  You've already heard

2    everything on the data leaks at the last Daubert regarding

3    Professor Schneier.  Counsel made the exact same arguments

4    then.  You heard argument from both of us extensively.  You

5    ruled.  I think you should stick to that ruling.

6        To the extent there are particular demonstratives, which I

7    don't know what they are, that they object to from Professor

8    Schneier's demonstratives -- we just sent them -- we can take

9    that up with you at the right time.  This is not it.  This is

10    essentially a way to try to relitigate the Daubert issue, which

11    is already kind of long past.  That's bucket one.

12        Bucket two are the other matters.  They really split into

13    two different cases.  It's the Brown incognito case, which my

14    junior partner Dave Boies is going to handle later.  So I'll --

15    that's the subject of his motion.  So I'll just stick to the

16    smaller group of cases which is the Arizona vs. Google case and

17    the Texas vs. Google case.

18        Both of them are fairly similar.  They're both about

19    another privacy control that Google offered called location

20    tracking.  And Google promised when you turned off location

21    tracking, Google won't track you.  Of course, they did using

22    WAA data, right?  So location tracking and WAA are sort of

23    inextricably tied in these two cases.

24        Now, why else does it matter?  It goes to pattern and

25    practice, Judge.  So pattern and practice evidence is

1    admissible under 404(b)(2).  It's admissible if relevant to

2    prove motive; opportunity; intent; and, importantly, lack of

3    accident.  So the evidence here with these other privacy

4    controls is going to demonstrate that WAA is not the only one,

5    right?  This is a feature, not a bug in Google's design of its

6    privacy controls.

7         Now, why that matters is because when Google comes up and

8    says "Hey, this isn't offensive," right?  "Maybe it was a

9    mistake.  WAA is a one-off.  We got this one wrong maybe."  But

10   we have to be able to rebut that by saying, "You know what?

11   This is actually part of a bigger design," right?  "Here's

12   incognito, here's location history, here's privacy controls,

13   and here's what's happened with litigation behind them."  So

14   that's why it comes in.

15        **MS. AGNOLUCCI:**  Thank you, Your Honor.

16        So first point on the Arizona and Texas cases, which we

17   had the honor of litigating and resolving, they are not

18   probative of anything except for the fact that two state

19   attorneys general and others chose to litigate against Google,

20   and those cases were resolved.

21        It doesn't mean that Google did anything wrong.  Google

22   certainly did not admit liability in those cases.  So I don't

23   agree that it's probative of a pattern and practice.  It's

24   probative of allegations.

25        But second of all, those cases had nothing to do with the

1    allegations here.  Those cases, as Mr. Lee said, had to do with

2    a location setting and with what happened when that location

3    setting was turned off and whether WAA separately had some

4    location-related information stored in it.

5         That is an absolute sideshow from the allegations in this

6    case, which have to do with sWAA being off.  And what we don't

7    want to do is waste our precious 20 hours of time going down

8    the rabbit hole of mini trials about what did and didn't happen

9    in Arizona and Texas.

10        We have to defend ourselves if the plaintiffs are going to

11   bring up those allegations.  We have to explain to the jury why

12   that has nothing to do with what we're here to talk about.

13   What we're here to talk about is not a settlement that Google

14   entered into with Arizona and Texas.

15        **THE COURT:**  Okay.  Let's move on to 4, and that's

16   about non-U.S. customers.  I suppose it's Defendants' motion,

17   so I'll ask you.  At the very least, doesn't this go to

18   knowledge, offensiveness?  Obviously class members are not all

19   in the U.S., but isn't this one of those that you can deal with

20   on cross and direct and -- I mean, I don't -- why should it be

21   precluded?

22        **MS. TOKER:**  So this is a case about a specific

23   disclosure and how that disclosure interacted with a specific

24   set of data, and there's no evidence that that specific

25   disclosure in English was what was being studied in any of the

1    research studies that were conducted outside of the United

2    States.

3         These are studies that were conducted, as you say, on

4    populations that are not members of these two classes about

5    disclosures that, in many cases, aren't even in English.

6         **THE COURT:**  But can't you deal with that on

7    cross-examination?

8         **MS. TOKER:**  Well, we just think that it's easier to

9    get rid of the evidence now.

10        **THE COURT:**  Okay.  All right.

11        **MR. MAU:**  Well, Your Honor, we agree with your

12   sentiments regarding Defendants getting rid of evidence, and

13   I'll just point out two points real quick, which is that the

14   very evidence they're trying to get rid of, their own expert

15   relies on the same people who are writing and studying that.

16   That is on our page 8 of our opposition.

17        And the second point is that this evidence actually

18   relates to a global study in which they were doing -- to try to

19   make sure that it wasn't language differences, for example,

20   that was not causing the users to understand that, you know,

21   the specific buttons that were at issue were not operating or

22   doing something, which Google wanted to study whether or not

23   they get.

24        Most important thing, Your Honor, is that I do know that

25   these exhibits are now actually in your possession, and you can

1    take a look, and you will see.  You will see that.

2        I do want to point out one, I would say, task-keeping

3    thing, which is that if you look at their request, it is rather

4    vague as to which exhibits they're trying to exclude.  They

5    only point to 4.  And I just want to make sure that this is not

6    one of those broad strokes of getting rid of the evidence in

7    such a way that is, as you said, Your Honor, would be much

8    better dealt with one at a time at the point of examination and

9    introduction into evidence.

10        **THE COURT:**  Okay.  Let's skip over 5.  It's sort of a

11    grab bag of various exhibits, and I'll just go through them,

12    and I understand, I think, the issues, and I'll make the call

13    and give you guidance.

14        6 also, I know what I need to know on 6.  I don't want to

15    have any discussion on that further.

16        So let's go to 7, which is the incognito mode issue and

17    implicates my colleague, Judge Gonzales Rogers' case, Brown

18    case.

19        So Mr. Boies.  Actually, I'll go -- let me let the defense

20    start on this one.

21        **MS. AGNOLUCCI:**  Thank you, Your Honor.  As Your Honor

22    noted that the Brown case was another case involving Judge

23    Gonzalez Rogers, and that was a case about the incognito mode

24    manner of browsing.  It didn't have to do with apps, it didn't

25    have to do with sWAA.  And what plaintiffs are seeking to

1    introduce are a series of incendiary emails about that case,

2    which they, of course, litigated.

3        This -- incognito mode never came up in discovery, it was

4    not the focus of the expert reports in this case, and I

5    understand Plaintiffs' argument to be well, this goes to

6    Google's motive and intent, but the question Your Honor has to

7    ask --

8        **THE COURT:**  But it does, in fairness, pertain in a

9    more general sense to privacy issues, right?  I mean, the fact

10   that it may not be specific to the WAA world and deal with a

11   different arena, if you will, a different area, it still

12   implicates some of the big questions in the case, doesn't it?

13       **MS. AGNOLUCCI:**  I wouldn't say implicates some of the

14   big questions in this case.  I would acknowledge that it

15   implicates privacy, and so do many, many, many cases that are

16   brought and litigated and settled against Google.  But that is

17   not what this case is about.

18       And so just because Plaintiffs are able to find a

19   collection of, you know, emails that they think are interesting

20   and potentially inflammatory and incendiary in some other

21   privacy litigation does not mean, again, that we can make this

22   case a sideshow.

23       **THE COURT:**  Okay.  Mr. Boies?

24       **MR. BOIES:**  First, just to be clear, this doesn't have

25   anything to do with bringing in the Brown litigation.  This

1    simply has to do with specific documents that are Google's

2    documents.  We think those documents are relevant for a number

3    of purposes.  These are particularly relevant to pattern and

4    practice.

5        This is a situation that didn't involve WAA off but

6    involved a situation in which Google had very, very similar

7    kind of disclosures and, again, told people that they could

8    control their data, they could control what Google kept.  And

9    the CEO at the time was Mr. Schmidt, who's not, you know, the

10   current CEO, but Mr. Schmidt.  He testified in front of

11   Congress, gave very similar testimony.  People watched it and

12   said, "That's wrong," but they never corrected it.  So it is a

13   very similar pattern and practice to what we have here.

14       In addition, it goes to their claim they try to protect

15   people's privacy.  It completely refutes that.  It is certainly

16   something that the jury ought to be able to consider.

17           **THE COURT:**  Any final comments?

18           **MS. AGNOLUCCI:**  Yeah.  I mean, Your Honor, I would

19   first of all say that the documents are from the Brown docket.

20   Only one of them was even produced in this case.  So they're

21   not documents that were given over to the plaintiffs in this

22   case because they are relevant to these claims.

23       And looking at the documents, I would encourage Your Honor

24   to read these emails because they are very long.  They are very

25   dense.  They're going to be very difficult for a juror to

1    understand and contextualize, and to the extent that counsel

2    wants to rely on, you know, catch phrases here and there in

3    these emails, we're going to have to explain them.  And again,

4    this creates side shows and mini trials when really we ought to

5    be focusing on what this case is about, sWAA and Google

6    Analytics.

7         **THE COURT:**  Okay.  Number 8 is about -- I'm not sure

8    there's a dispute here -- meet and confer communications.  I

9    mean...

10        **MS. TOKER:**  Naiara Toker for Google.

11        We are in the process of agreeing to a stipulation.

12   Plaintiffs sent us an idea of a stipulation last night.  Our

13   position is that the underlying factual information is

14   admissible as a stipulated fact but the surrounding meet and

15   confer communications are completely irrelevant and

16   inadmissible.  So I'm confident that we can reach agreement on

17   this, but if we do not, that is our position.

18        **THE COURT:**  Well, can I just put this one to one side

19   and let you see if you can work it out.

20        **MR. BOIES:**  I think we can do that, Your Honor.

21        **THE COURT:**  Okay.  Good.

22        The next one is excluding evidence and arguments about

23   Plaintiffs' emotional distress.  Who's up for that one from the

24   defense side?

25        **MS. FLOREZ:**  Argemira Florez for Google.

1          **THE COURT:**  You may proceed.

2          **MS. FLOREZ:**  Your Honor, Google is seeking to exclude

3    testimony from Plaintiffs about their alleged emotional harm

4    because it can't be proven class-wide without going into

5    individualized inquiries.  We've explained  why this exclusion

6    is necessary.  It's supported by the law.  We cited three

7    reasons:

8          First, Plaintiffs haven't put forth a damages model that

9    would be able to quantify emotional harm class-wide; second,

10   the Court hasn't certified such a model; and third, introducing

11   individualized evidence on emotional harm at this stage would

12   just waste time confusing the jury.

13         **THE COURT:**  Does it go to nominal damages though under

14   these claims that have nominal damage --

15         **MS. FLOREZ:**  Well, Your Honor --

16         **THE COURT:**  -- option --

17         **MS. FLOREZ:**  Sorry, Your Honor.

18         **THE COURT:**  Go ahead.

19         **MS. FLOREZ:**  Yeah.  We think that Plaintiffs' desire

20   to introduce evidence of emotional distress to get nominal

21   damages shows a grave misunderstanding of when nominal damages

22   are actually appropriate.  Nominal damages are not awarded in

23   response to an injury like compensatory damages are, and we

24   also think it's really notable that Plaintiffs have already

25   conceded that they can't prove emotional damages class-wide.

1          We think it's -- first, it's inconsistent with their

2     representations to this court and to us for them to be trying

3     to do that now, but it's also inconsistent with Supreme Court

4     case law.  In Comcast, Justice Scalia held that the class was

5     improperly certified where the damages model didn't measure

6     damages resulting from the particular injury on which liability

7     was premised.

8          So we think the injury in this case -- also the emotional

9     distress, the emotional harm -- can't be properly measured, and

10    without an appropriate model of emotional distress, you know,

11    it just can't be proven class-wide.  So we think that what

12    Plaintiffs are trying to do here is improper.

13         **THE COURT:**  I would agree.  I mean, I think it's

14    pretty clear that emotional distress is not a class-wide --

15    would defeat class certification because it's an individualized

16    inquiry, but that doesn't mean it doesn't come in otherwise on

17    issues like offensiveness or other issues that might be

18    relevant.  So putting aside the class concern that you've

19    identified with the emotional distress, why can't it come in on

20    another basis?

21         **MS. FLOREZ:**  Well, Your Honor, a couple reasons.  First,

22    I'd start by saying that, you know, what we're requesting is

23    that the Court require Plaintiffs to present evidence of claims

24    that can actually be proven on a class-wide basis.  What

25    they're trying to do is introduce evidence of, you know, four

1    Plaintiffs' complaints about anxiety and fear, and they're

2    trying to group that in with harm and offensiveness.

3        And it's improper.  It's improper to ask the jury to

4    generalize the -- you know, the emotional harm for Plaintiffs

5    across the entire class.  That's inconsistent with the Supreme

6    Court precedence.  It's inconsistent with how these damages

7    work.

8        We also think, you know, to the point about creating mini

9    trials and wasting time, I mean, to introduce the evidence of

10   -- to have to investigate and ask about each Plaintiff's

11   emotional distress and harm and whether, you know, they had any

12   at all.  I mean, there's a sideshow that's inappropriate.

13       I mean, they didn't put forth the damages model.  They

14   didn't -- Your Honor has already found that Plaintiffs have

15   offered no models or explanations for how these harms apply

16   across the classes.  So there's just no reason to include it at

17   this stage.

18           **THE COURT:**  Mr. Boies.

19           **MR. BOIES:**  This doesn't have anything to do with the

20   damages model.  We're not claiming damages on a class-wide

21   basis.  We are claming nominal damages for this violation, and

22   emotional distress certainly goes to issues of offensiveness,

23   and it goes to liability issues.  We need to prove liability in

24   order to get nominal damages.

25       We are not going to be seeking to introduce class-wide

1    damages.  All we are seeking for emotional distress is nominal

2    damages.  I think we've made that clear.  We're entitled

3    obviously to prove our liability case.  Emotional distress is

4    part of offensiveness.  It's part of our liability case, and it

5    goes to our justification to get nominal damages.

6              **THE COURT:**  Okay.  We're down to the last three.  The

7    motion by Defense is to exclude evidence about third-party app

8    compliance and GA4F terms of service.  We kind of covered some

9    of these issues, but --

10             **MR. BOIES:**  I think we've covered the --

11             **THE COURT:**  I think we have too.  Anything else,

12   Mr. Hur, on this?

13             **MR. HUR:**  Your Honor, I think we've covered it as

14   well.

15             **THE COURT:**  Okay.  The next one is excluding evidence

16   and arguments regarding sensitive apps and data.  We also kind

17   of talked about this a little bit.  But -- so Mr. Hur?

18             **MR. HUR:**  Thank you, Your Honor.

19        We are trying to be reasonable here about how apps are

20   actually used in the trial, but we are concerned that an

21   emphasis on any one app or type of app is going to run the risk

22   of the jury making a determination based upon facts that apply

23   only to a subset of the class.  And it's kind of a similar

24   issue to what was just argued about emotional distress.  The

25   plaintiffs' emotional distress isn't really relevant in a

1    class-wide case where they're determining what should happen to

2    the class.

3    And it's similar with the apps, Your Honor.  If they're

4    going to point to, for example, a period tracking app and say

5    this is why the conduct was highly offensive because Google got

6    data about a period tracking app, well, that runs the risk of a

7    decision that's not based on class-wide issues.  So we are

8    trying to come up with a way where the parties can talk about

9    how apps work without focusing on any one app or type of app.

10    **THE COURT:**  Isn't that something that can be

11    controlled by virtue of -- it's almost a cumulative concept.

12    You can't -- you can't just, as you say, focus or harp on one

13    thing.  And isn't that for me to control it by saying, "Okay.

14    We've heard enough about this particular incendiary app, if you

15    will.  You know, move on.  Isn't it that kind of issue, in a

16    sense?

17    **MR. HUR:**  Your Honor, it is sort of that kind of

18    issue.  We're concerned that by the time the Court gets to

19    that, the damage may have been done and the focus may have

20    already been provided.  And then we think there are

21    prophylactic measures the Court can take in order to avoid that

22    problem entirely.

23    If the plaintiffs will just agree we're not going to focus

24    on any of these, you know, highly sensitive areas that run this

25    risk, we can certainly agree on apps or categories of apps that

1    can be presented and used as examples.  And if the plaintiffs

2    want to deviate form that, we can sidebar and talk about that

3    perhaps.  But I think having some more guardrails will prevent

4    the prejudice that --

5            THE COURT:  Well --

6        MR. HUR:  -- we're concerned about.

7            THE COURT:  But the guardrails create more problems

8    than they solve if -- you know, let's take for example, some

9    abortion app or something.  You know, I'm not going to make a

10   ruling that they're precluded to make any reference to any app

11   that might be perceived as sensitive.

12           But if they did it more in passing as an example, I'd say

13   they can't keep going there.  So I'm not sure how the

14   guardrails -- I'm not -- I guess what I'm trying to say is I'm

15   not averse to the concept you're talking about, but I'm a

16   little concerned that if there is -- if preclusion from

17   referring to anything sensitive, that that would create even

18   more problems than it solves.  But okay.  Go ahead.

19           MR. MAU:  Mr. Mau for the plaintiffs.

20           So Your Honor, we agree with your general sentiments, and

21   I will just point out that if we're being honest here, this is

22   a fate and abate here for us in terms of wanting to control the

23   framing.  We disagree.

24           So the way we frame the case is that these -- the buttons

25   are framed as Google controls, Google privacy controls.  That's

1    how they're labeled, that's how they're presented to the users,

2    and we are not second guessing as to what the users may think

3    one way or the other about --

4            **THE COURT:**  Right, but --

5            **MR. MAO:**  What apps are sensitive or not.

6            **THE COURT:**  -- I think Google is entitled to have some

7    concern that you will pick three or four of the most incendiary

8    issues, if you will, that a person would say, you know, "my

9    medical history" or whatever is and just spend the whole time

10   harping on that.  And they have some concern that the relevance

11   will be outweighed by the unfair prejudice in the 403 type of

12   thing.

13        And so, you know, I don't fault them.  I'm not going to

14   say I'm going to grant or deny their motion, but it's a real

15   concern for them.

16           **MR. MAU:**  So Your Honor, we understand and we

17   certainly appreciate that you will help control that with 403

18   objections at the time in which they are run.  But as Your

19   Honor had indicated, some of this may go to other things such

20   as offensiveness, for example, right, or pattern and practice

21   or the liability elements that otherwise pervade in the case.

22        And we are going to be at least entitled to introduce some

23   of those things in order to talk about why this is important to

24   people who have taken Google's offer of privacy controls, their

25   own label, regardless of whether they think their apps are

1    sensitive or not.

2         **THE COURT:**  Okay.  I get issue.

3         The final one we've talked about it a little bit, but it's

4    -- we didn't get to -- I'm going to grant it as to Alphabet.

5         But as to Google's financials, at the beginning, as you

6    will recall, of this proceeding, I was talking about it coming

7    in in the light of a punitive phase, but I acknowledged that

8    there might be an argument -- and I've read some of the defense

9    argument, or the Plaintiffs' argument -- that it's relevant,

10   some of the financial information is relevant on other issues.

11        You know, when I was talking about this, it's almost like

12   the argument I'm understanding the plaintiffs to make.  It kind

13   of goes to their claim that Google is being callous in some

14   fashion or another, that, you know, it's -- these are such --

15   for a massive, rich company, it shows a certain callousness if

16   they don't care about the little guy's privacy or something.  I

17   assume that's one of the themes.

18        **MR. BOIES:**  Yeah.

19        **THE COURT:**  So but at the same time, I have some

20   concern that the -- that, you know, the revenue that Google is

21   making isn't really relevant until we get to the punitive

22   damage phase.

23        So let me start with Mr. Santacana.  It's his motion.

24        **MR. SANTACANA:**  Sure, Your Honor.

25        I think that you've read correctly their argument, which I

1    have to say is clever and lawyerly in that they're saying the

2    amount of profit they want disgorged is so small compared to

3    the total revenue, and how could Google sacrifice the privacy

4    of users for so little money in its on context?

5         Imagine we were in the opposite situation and actually, it

6    was 90 percent of Google's total revenue.  We know Mr. Boies

7    would say it's relevant because it was existential for Google.

8    They really it's heads, I win and tails, you lose.  They want

9    to get the --

10        **THE COURT:**  They like those arguments.

11        **MR. SANTACANA:**  They want to get this total revenue in

12    not matter what, and they will make an argument about how it's

13    relevant.  The question is whether it's unduly prejudicial.

14    This is why we bifurcate as a matter of routine.  It's because

15    everybody knows it's unduly prejudicial.  They say, "Well,

16    everybody knows Google's rich.  What's the big deal?"

17        And I said earlier the problem is how hard does Mr. Boies

18    intend to hammer on that is really what indicates how unduly

19    prejudicial it is.  There's a difference between a juror

20    knowing Google's a big company and every time the plaintiffs'

21    counsel get up, talking about it and hammering our witnesses

22    about how rich it is because it makes money, for example, from

23    cloud service infrastructure.  It provides to other enterprise

24    services.  That has nothing to do with this case.

25        The other point I'll make, and then I can turn it over, is

1     the other reason they're using it, based on the slides we've

2     already seen, has nothing to do with the argument they put in

3     their brief.  The other argument they very clearly intend to

4     make is the damages they're asking for aren't reasonable in

5     context to how much money Google has.  "It won't hurt them so

6     bad" is basically the argument.

7          And there's a line in their opposition that hints that

8     they are going to do this, but I think that's actually the

9     primary reason they want to say, and I think the line in the

10    opposition says, "Jurors might find it a little bit

11    eye-watering to award a billion dollars, but it might be easier

12    for them -- they say this in their brief -- if they knew that

13    Google made 200 billion dollars last year.

14         **THE COURT:**  Although if they get to the punitive

15    phrase, they're going to switch that argument.  You're going to

16    have to switch the argument entirely.

17         **MR. SANTACANA:**  Exactly.  But that's --

18         **THE COURT:**  Well --

19         **MR. SANTACANA:**  -- at the punitive phase.  I mean --

20         **THE COURT:**  -- doesn't that mean maybe they're not

21    going to make the exact argument that you're suggesting?

22         **MR. SANTACANA:**  It's what they wrote it in their

23    brief, Your Honor.  They said, "A juror might think it's a lot

24    of money until they learn how much money Google makes," and

25    they say, from their perspective, "We're concerned jurors will

1    have hesitancy awarding so much money.  So want to give them a

2    little bit less hesitancy.

3         That's classic prejudice, Your Honor.  That's not an

4    admissible purpose or an appropriate purpose for admitting what

5    is otherwise prejudicial information.

6         **MR. BOIES:**  I don't think we said that we want to

7    diminish their hesitancy.

8         I agree, in part, that even Google's total revenue is not

9    going to be something that we are going to be stressing at the

10   liability phase before we get to punitive damages, if we ever

11   get to punitive damages.  To the extent that we use those

12   numbers at all -- it will be as a starting point for various

13   allocations that our experts make.

14        And I think that even there, we are not going to start

15   with Google's total revenues.  We'll start with Google's

16   advertising revenues, because that's a step in getting to

17   profits, and it's a step towards getting to the significance of

18   what's going on.

19        So I think in terms of even Google's total revenues, which

20   is what they direct their motion to, technically I don't think

21   we're going to be talking about their total revenues.  And

22   we're certainly not going to be talking, pre-punitive damage

23   phase by saying, "Google has got all this money, so they can

24   spare some for our plaintiffs."

25        We are going to be talking about the size of their

1    advertising revenue because that was what was critical to their

2    wanting to keep people using the service and wanting to get the

3    data, and we are going to be talking about the profitability of

4    that data to Google.  But that goes directly to the kind of

5    issues that we have, and if there's an issue where they think

6    that something that we're offering is irrelevant, the Court can

7    rule on it --

8         **THE COURT:**  So you're not making the argument that

9    this is so minuscule to Google that it shows that they -- it

10   shows it's egregious?

11        **MR. BOIES:**  No.  We are arguing that, but not in

12   relationship to their total revenue.  In other words, he's

13   right that even Google has activities that are unrelated to,

14   you know, search and advertising.

15        **THE COURT:**  Sure.

16        **MR. BOIES:**  For example, included within Google, I

17   think, is YouTube.

18        **THE COURT:**  YouTube, correct.

19        **MR. BOIES:**  And so we're not arguing that somehow

20   YouTube or even cloud services, for example, are something that

21   ought to be taken into account here.

22        What we are saying is that Google had this enormous

23   advertising because, and what they were gaining from this,

24   while a lot of money to us, was not a lot of money to Google.

25   And nevertheless, they were prepared for this relatively modest

1    increase in their bottom line from this business.  They were

2    prepared to mislead people, invade their privacy, and that goes

3    to offensiveness.  It goes to egregiousness.  It goes to their

4    motive.

5        So I think it is relevant there, and the only thing that

6    I'm saying is that -- what we're saying is relevant is the

7    revenues from the search business and advertising, not from

8    things like YouTube and probably cloud service as well.

9            **MR. SANTACANA:**  Your Honor, just a couple points

10    please.

11            **THE COURT:**  Yes.

12            **MR. SANTACANA:**  This is important for us.

13        First, I do want to, if you'll indulge me, read to you

14    three sentences from their opposition on this MIL because --

15            **THE COURT:**  Go ahead.

16            **MR. SANTACANA:**  -- I don't think that the answer you

17    just received is accurate.

18        It says, "Google has repeatedly complained" -- this is the

19    Plaintiffs' writing -- "that the billions of dollars requested

20    on behalf of the class members is somehow necessarily

21    unreasonable.

22        Google's complaints seemingly indicate the parties agree

23    on at least one point, that Plaintiffs' claims for actual

24    damages and for disgorgement are both large enough as an

25    absolute matter to create an undue risk that the jury will be

1    skeptical of Plaintiffs' damages models.

2        "Given this risk, it is reasonable to provide the jury

3    with the perspective necessary to fairly evaluate Plaintiffs'

4    claims, namely evidence of Google's annual revenues during the

5    class period."

6        Now, regardless of what position Mr. Boies is taking

7    today, I think the Court should rule in response to our motion

8    that that argument is impermissible because that is a classic

9    prejudice argument, and here -- I don't have it printed because

10   I didn't expect this, but this is what the slide looks like,

11   Your Honor.  This is the slide that they intend to show to the

12   jury when the damages expert is on the stand.  There's a pile

13   of money on the left.

14       **THE COURT:**  Okay.

15       **MR. SANTACANA:**  It says a thousand dollars Alphabet

16   revenue, and there's a single dollar bill on the right, and it

17   says unjust enrichment, the amount they're asking for.  Now,

18   that's very obviously not allowed.  So I don't know if they

19   intend to exactly use this slide, but that's why we filed the

20   motion.

21       The other point I wanted to make, the final point, is

22   Mr. Boies, I think, is negotiating with you a little bit and

23   saying, "Well, can we just get the ad revenue total in, not the

24   *total* total?"  It didn't say that in their opposition, but my

25   question is why can't they just stick to the products and

1    verticals at issue?  It is a lot of money still.

2        Why can't they stick to the products and verticals instead

3    of trying to get Your Honor to allow them to put in numbers

4    that relate to products, ad products, that aren't at issue in

5    the case when we all know that that type of evidence is

6    typically considered unduly prejudicial?  They haven't said

7    what prejudice would flow to them from exclusion, and they

8    aren't really identifying why, for example, ads on the Google

9    search page that have nothing to do with this are somehow

10   relevant to the jury's determination.

11           **MR. BOIES:**  The reason --

12           **THE COURT:**  One more round.

13           **MR. BOIES:**  The reason I focused on it was because

14   their motion is directed to Alphabet and Google's total

15   revenue.  That's what their motion -- they didn't move to

16   exclude evidence about their advertising revenue, and what I

17   was saying is that I was in agreement with the total revenue

18   issue prior to the punitive damages.  I was making clear that

19   that did not mean that I wasn't going to talk about their --

20       (Overlapping speakers.)

21           **MR. BOIES:**  What?

22           **THE COURT:**  They were reacting to, as I understand it,

23   what you were showing you planned to use, and he just showed me

24   that.  First of all, that's not going to be permitted in any

25   event --

1        **MR. BOIES:**  Right.

2        **THE COURT:**  -- because you're not doing Alphabet, but

3    that's why he showed it.

4        **MR. BOIES:**  That -- yeah.  If he moved, you know, just

5    on that, we wouldn't have had this argument.

6        **THE COURT:**  Okay.

7        **MR. BOIES:**  Any chart that we have that has total

8    revenue comparisons prior to the punitive damages phase, we

9    ought to change to what I think is relevant, which is the

10   advertising.  They haven't moved about that.

11        **THE COURT:**  Well, although because before today, as

12   Mr. Santacana mentioned, it wasn't clear that that -- you had

13   reduced it down to that.  I do think it's fair -- I take it

14   that, and he's told me, he doesn't even like your reduced

15   amount.  So it's not like they haven't -- I'm not going to say

16   well, I'm not going to rule on it because you didn't move on

17   the subset.

18        **MR. BOIES:**  Yeah.

19        **THE COURT:**  I think it's fair they moved on what was

20   in front of them, and I will accept that he's still moving on

21   the reduced presentation based on the ad revenue, right.

22        **MR. SANTACANA:**  Yes, Your Honor.

23        **THE COURT:**  I got it.

24        **MR. SANTACANA:**  I think the total they should show is

25   total ad revenue on the products and services at issue.

1            **THE COURT:**  I got it.  Okay.

2            **MR. BOIES:**  And I think it's perfectly fair for the

3     Court to --

4            **THE COURT:**  Okay.

5            **MR. BOIES:**  -- rule on that.

6            **THE COURT:**  Okay.

7            **MR. BOIES:**  I would say that we do have charts that

8     use the advertising revenue too.

9            **THE COURT:**  Okay.

10            **MR. BOIES:**  I mean, it's not like we haven't put in --

11            **THE COURT:**  Well --

12            **MR. BOIES:**  -- charts on that.

13            **THE COURT:**  -- I understand the issue.  You need a

14     ruling from me one way or the other, and I will do that.  I'll

15     go back and work on this.  The parties, each side, are going to

16     win some and lose some, but that's the nature of the game.  So

17     -- yes.

18            **MS. AGNOLUCCI:**  Your Honor, may I make one more brief

19     comment having to do with the motion 5 that we didn't argue,

20     and then 7 and 3, Google's motions?

21            **THE COURT:**  Okay.  And I also know there's a motion to

22     quash that is enveloped in the motions in limine.  I'm going to

23     deal with both of them at the same time.  Yes.  Go ahead.

24            **MS. AGNOLUCCI:**  So 5 had to do with the primarily

25     Sundar Pichai-related documents --

1          **THE COURT:**  Yes.

2          **MS. AGNOLUCCI:**  -- that Your Honor mentioned you were

3     going to go through one by one, and then of course we talked

4     about 3 and 7 having to do with data breaches and the incognito

5     case.  To the extent the Court's concerned with all of these

6     because I hear you asking us well, aren't the plaintiffs

7     entitled to comment about privacy in general?

8          So to the extent the Court's concern is that Google is

9     planning to get up and say, "Here at Google, we love privacy

10     generally.  Here at Google we are consumer-centric generally,"

11     we are absolutely willing to cabin those discussions to the

12     products at issue in this case, their functionality, why

13     they're protective, and not make those sweeping statements.

14          **MR. BOIES:**  I think if they limit what they say, we

15     will probably limit what we say.  Now, what we have to do is

16     not merely respond to what they say but also make our

17     affirmative case, and some of this stuff is relevant to our

18     affirmative case.  So some of it is in response to the

19     affirmative case.  If they narrow what they say, they may have

20     better objections to some of our affirmative case.  I think

21     that's what the Court is going to have to deal with at the time

22     we get to trial.

23          **THE COURT:**  So in other words, there isn't -- it's

24     probably a fool's errand to ask you to see if you can stipulate

25     to "We don't say this.  You won't say that."  We just need to

1    barrel ahead.

2         **MR. BOIES:**  Yeah.  I think --

3         **THE COURT:**  Okay.

4         **MR. BOIES:**  I think so, Your Honor.  Could I raise one

5    other issue?

6         **THE COURT:**  Sure.

7         **MR. BOIES:**  And this is to get the Court's guidance.

8         Last month, they served a 40-page supplemental expert

9    report after obviously the Daubert motions had been ruled on.

10   Now, in what we got from them, the additional points that were

11   made in this expert report are not in their demonstrative

12   exhibits.  So we're not sure how much of this is going to come

13   in to the trial or not.

14        **THE COURT:**  Which expert are we talking about?

15        **MR. BOIES:**  What?

16        **THE COURT:**  Which expert are we talking about?

17        **MR. BOIES:**  This was Knittel.

18        **THE COURT:**  Okay.

19        **MR. BOIES:**  Knittel.  And the -- we obviously object

20   to their supplementing their expert report at this stage, and I

21   guess the issue is should we bring a formal motion for the

22   Court to decide?  Is that something that the Court wants to

23   discuss now?

24        **THE COURT:**  Well, Mr. Hur, what are you going to -- go

25   ahead.

1          **MR. HUR:**  Thank you, Your Honor.

2          It sounds like there is a dispute about something that our

3      expert said in that report.  I think, Your Honor, we should

4      meet and confer.  We have some concerns about what their expert

5      said.  So I think we should meet and confer, and if we need a

6      motion, we can agree --

7          **THE COURT:**  Okay.  If you are going to file -- if the

8      meet and confer fails to resolve these questions, I want you to

9      file any motions that are going to pertain to supplementing the

10     expert reports on either side promptly.  So I would want -- if

11     you're going to -- if this isn't going to resolve in some other

12     way, then I want the motion by early next week because time is

13     fleeting, and I want to get as much done as we can get done in

14     advance.

15         So plan to file it, say, by Tuesday of next week if you're

16     going to have, you know, a dispute with respect to either

17     side's supplemental expert documents.  And the only other, as

18     I'm trying to think back on what we talked about today is going

19     to be -- what was the other motion that I'm anticipating?

20         **MR. HUR:**  We were going to file a motion in limine --

21         **THE COURT:**  Well, one is to -- with respect to Mr. --

22     whatever his name is, your representative.

23         **MR. BOIES:**  Cataldo.

24         **MR. HUR:**  Cataldo.

25         **THE COURT:**  Yeah.  So that's going to be a motion.

1    And then supplemental expert.  Anything else that I'm --

2          **MR. HUR:**  I thought there was one motion.

3          **MR. SANTACANA:**  And a motion in limine, Your Honor,

4    that you invited earlier today.

5          **THE COURT:**  And remind me what it's about.

6          **MR. SANTACANA:**  I need to remind myself.

7    Your Honor, this is about multiplying the damages by 98

8    months.

9          **THE COURT:**  Oh, yes.  Okay.  I'm going to get a motion

10   on that, that's right.

11         **MR. SANTACANA:**  Yes.

12         **THE COURT:**  And then as I said -- I said this, but

13   I'll repeat it.  There is a subpoena.  This goes to number 6,

14   and I will deal with the motion to quash and the motion in

15   limine together, and you'll get an order on that issue.  Okay.

16   And as Karen reminds me, I think everybody agrees with

17   this, witnesses are excluded until -- yeah, that's way we

18   operate.  Okay?

19   So I will be giving you written orders on the motions in

20   limine, and I will then rule on these additional items that you

21   submit, but otherwise, I think we're just ready to go, I think.

22   Any settlement discussions going on?  I just want to know.

23   I don't want to know anything about them.  I just want to know

24   if they're going on.

25         **MR. BOIES:**  We have had them, Your Honor, and I think

1    it's safe to say they're over.

2            **THE COURT:**  They're over?

3            **MR. BOIES:**  Yeah.

4            **THE COURT:**  Okay.  I shouldn't make vacation plans in

5    August.  Okay.

6            **MR. BOIES:**  Thank you, Your Honor.

7            **THE COURT:**  All right.

8            **MR. HUR:**  Your Honor, one housekeeping issue that

9    relates to something you mentioned at the beginning, which is

10   the juror questionnaires.  And we understand they're coming

11   back the week of the 10th and that we'll have a call the Friday

12   before trial.

13       If the questionnaires indicate that -- for example, that

14   question we were discussing, half the people clicked yes, is

15   there a mechanism for us to try to communicate with the Court

16   earlier, or would there be --

17           **THE COURT:**  Well --

18           **MR. HUR:**  -- a way to get more jurors if needed?

19           **THE COURT:**  First of all, if they say yes, as I was

20   hearing from the plaintiffs' side, does that automatically mean

21   they're -- they may not be a member of the class because it

22   depends upon timing, right?  Because the class is the defined

23   period of time.  Is it automatic that they're off the jury?  Is

24   it a for cause challenge automatically or what?

25           **MR. HUR:**  Your Honor, I think we would have a basis to

1    get them off the jury for being class members subject, you're

2    right, to some time limitation.  What we were trying to think

3    through, Your Honor, is because the class is so big, how do we

4    have a jury with a reasonable number of people that doesn't

5    necessarily exclude every single class member?

6        And so one thing that we were thinking is that okay.

7    Well, if they are actively turning WAA on and off, then these

8    people -- there's a higher risk that these people are going to

9    bring, you know, facts that weren't presented at trial into the

10   jury room.  If they turned it off seven years ago and they

11   don't even know, then that's not a big deal, and we could have

12   them --

13       **THE COURT:**  Okay.  Well, that's why I don't think the

14   yes or no can -- we can call the question based on the yes or

15   no.  If it's seven years ago, I don't think it would

16   automatically be they'd be off the jury, but...

17       **MR. BOIES:**  I agree with that, Your Honor.  I also --

18   I mean, since this was raised, I've been thinking about it, and

19   it seems to me that one thing to consider is simply excluding

20   from the class anybody -- just like Your Honor, if you used

21   off, you'd be out of the class.  It would be to exclude any

22   jurors from the class.

23       **THE COURT:**  Well, I would be a little -- I'm a little

24   concerned about, you know, a negotiation with a prospective

25   juror that, you know, to sit on this jury, you understand you

1    can't be a member of this class.  You know, I think going down

2    that road is not a good one.

3         First of all, I'd think I'd hear an argument that perhaps,

4    from one side or the other, that's going to affect how that

5    juror looks at this.  But beyond that, it's -- a juror

6    shouldn't be put in that position.  I mean, a juror shouldn't

7    have to give up anything to be on a jury.

8         **MR. BOIES:**  I do understand that, Your Honor.

9         **THE COURT:**  So I'm troubled by that.  So I don't think

10   I want to do that.

11        I think the more -- the reason I'm more averse to just

12   calling the question on a yes is that I think once we find out

13   why they said yes, it may be they turned something else off

14   that didn't have to do with this, or it was, you know, long

15   before this class.  So that's why I don't want to just

16   automatically say -- tell them not to show up.  But I

17   understand that this is, you know, a lot of people that are

18   potentially class members here.

19        So back to square one.  Where does that leave us?  I know

20   you want me just to probably call in more people.

21        **MR. HUR:**  Well, Your Honor, that's just my concern.

22   You suggested you might call in maybe ten more people, but if

23   it turns out from the questionnaires that there are a lot more

24   yeses than perhaps you expected, is there a mechanism to --

25        **THE COURT:**  Well --

1          **MR. HUR:**  -- get more?

2          **THE COURT:**  Now that you ask me, we will be attuned to

3     that, and as soon as they come in, I'm not sure what the jury

4     office can do in terms of hauling in some new people and having

5     them, you know, fill out the questionnaire when they come here,

6     but I'll give it some thought, and I'll look into it, and maybe

7     I'll increase the numbers.  We'll do that.

8          **MR. HUR:**  Thank you, Your Honor.

9          **THE COURT:**  Okay.

10          **MR. BOIES:**  Thank you very much, Your Honor.

11          **THE COURT:**  See you later.

12          **THE CLERK:**  Court stands in recess.

13          (The proceedings concluded at 12:57 P.M.)

14                         ---o0o---

15

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE OF REPORTER**

2         I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.

4

5    DATE:  Saturday, August 2, 2025

6

7    _____

8          April Wood Brott, CSR No. 13782

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25