COOLEY LLP
MICHAEL A. ATTANASIO (151529)
(mattanasio@cooley.com)
BENEDICT Y. HUR (224018)
(bhur@cooley.com)
SIMONA AGNOLUCCI (246943)
(sagnolucci@cooley.com)
EDUARDO E. SANTACANA (281668)
(esantacana@cooley.com)
ARGEMIRA FLÓREZ (331153)
(aflorez@cooley.com)
NAIARA TOKER (346145)
(ntoker@cooley.com)
HARRIS MATEEN (335593)
(hmateen@cooley.com)
THILINI CHANDRASEKERA (333672)
(tchandrasekera@cooley.com)
ISABELLA MCKINLEY CORBO (346226)
(icorbo@cooley.com)
CHELSEA HU (357212)
(chu@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, CA  94111-4004
Telephone:      (415) 693-2000
Facsimile:      (415) 693-2222

Attorneys for Defendant
GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANIBAL RODRIGUEZ, et al. individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 3:20-CV-04688-RS<br><br>**GOOGLE LLC'S MOTION IN LIMINE NO. 16 TO EXCLUDE CERTAIN PROPOSED DEMONSTRATIVES**<br><br>Dept:      3, 17th Fl.<br>Judge:     Hon. Richard Seeborg<br><br>Date Action Filed: July 14, 2020<br>Trial Date: August 18, 2025 |

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOOGLE'S MIL TO EXCLUDE USE OF
CERTAIN HOCHMAN DEMONSTRATIVES
3:20-CV-04688-RS

1    Defendant Google LLC ("Google") hereby submits this motion *in limine* (the "Motion") to

2    preclude Plaintiffs from presenting certain proposed demonstratives and exhibits during their

3    examination of Dr. Jonathan Hochman, and specifically: demonstrative slides 7, 20, 28–29, 31–38,

4    and 51, and exhibits PX-001 and PX-013.  In addition, based on the inclusion of five other

5    demonstratives (slides 21–23 and 26–7), Google seeks an order from the Court cautioning Plaintiffs

6    against attempting to elicit impermissible testimony from Dr. Hochman that would purport to either

7    interpret Google's privacy policies or disclosures or make statements about what users think of

8    those policies or disclosures.

9    **I.    INTRODUCTION**

10    Plaintiffs designated Dr. Hochman, who has a Ph.D. in computer science, as their technical

11    expert, but their disclosures of demonstratives and exhibits in advance of calling him as a trial

12    witness indicate that Dr. Hochman will focus much of his presentation to the jury on undisclosed

13    opinions regarding consumer expectations and Google's intent.  These opinions are inadmissible

14    for multiple reasons:

15    - they are outside the scope of Dr. Hochman's expertise;

16    - he disclaimed having such opinions at deposition;

17    - they are not disclosed in his expert report;

18    - they constitute opinions on ultimate questions of law in this action; and

19    - several of the opinions rely on inadmissible hearsay for which no foundation is
20      available.

21    As the Court made clear in its Order Granting in Part and Denying in Part Parties' *Dauber* Motions

22    ("*Daubert* Order"), *see* Dkt. No. 511, at 5–6, 7–8, each of these reasons would independently

23    suffice to exclude Dr. Hochman's demonstratives and related testimony and exhibits.  The Court

24    should similarly preclude such testimony at trial from Mr. Hochman.[1]

25

---

26    [1] Google did not include Dr. Hochman in its *Daubert* motion because (1) Dr. Hochman repeatedly
disclaimed at his deposition that he would offer these opinions and (2) the structure and contents
27    of Dr. Hochman's report—consisting of 418 paragraphs of opinions over 171 pages—included only
passing reference (14 paragraphs over 4 pages) mentioning some of the evidence he now apparently
28    seeks to make the centerpiece of his direct examination.  *See* Florez Decl. at Ex. B ("Hochman
Rep."), at ¶¶ 381-394.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

GOOGLE'S MIL TO EXCLUDE USE OF
CERTAIN HOCHMAN DEMONSTRATIVES
3:20-CV-04688-RS

## II. BACKGROUND

On Monday, August 18, 2025, Plaintiffs disclosed to Google a list of 32 exhibits, a deposition transcript, and 71 demonstrative slides that they seek to use during the examination of their technical expert, Dr. Jonathan Hoffman.[2]  *See* Florez Decl. ¶ 2.  Following Google's review of these disclosures, Google files this Motion to exclude 6 exhibits and 13 slides, and to caution Plaintiffs against seeking testimony that the Court has held impermissible.

## III. ARGUMENT

### A. Legal Standards.

A party who fails to provide information as required by Rule 26(a) or (e) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Further, Rule 702 of the Federal Rules of Evidence requires that a witness proffered as an expert by a party be qualified by "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  Scientific, technical, or other specialized testimony is admissible only if it (a) "will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "is based upon sufficient facts or data," (c) "is the product of reliable principles and methods," and (d) "the expert has reliably applied the principles and methods to the facts of the case."  *Id.*  Further, "[w]hile testimony on an ultimate issue is not 'per se improper, an expert witness cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law,'" (such as intent where, as here, intentional conduct is an element of a claim).  *Kawasaki Jukogyo Kabushiki Kaisha v. Rorze Corp.*, --- F. Supp. 3d ----, 2025 WL 1407350, at *8 (N.D. Cal. May 12, 2025) (quoting *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)).

---

[2] The parties also exchanged draft demonstratives on July 29, 2025.  *See* Florez Decl. ¶ 1.  Google does not suggest that it had been denied an opportunity to view the slides prior to August 18.

**B.     Discussion.**

    **1.     Dr. Hochman May Not Opine as to Consumer Expectations or Google's Intent**

Dr. Hochman is here to testify about the computer science issues in this case: the details of transmitted data, the way Google Analytics works; in short: the standard stuff of a technical expert. But to Google's surprise, Plaintiffs' demonstrative slides 7, 20, 28, 29, 31, 32, 33, 34, 35, 36, 37, 38, 51, attached hereto in the **Appendix** to this Motion, make clear that Plaintiffs seek to focus a very large chunk of their presentation to the jury via Dr. Hochman regarding (1) the expectations of consumers who view Google's disclosures, as well as (2) Google's state of mind, which is an element of the claims and thus an improper legal conclusion. The substantive slides discussed below mostly fall into the category of evidence relating to internal "concerns" from internal Google employees related to *user expectations* about WAA.

But Dr. Hochman may not testify about user expectations because he was not disclosed as a consumer expectations or consumer behavior expert; is not qualified to offer such opinions; and stated at his deposition that he would not offer such opinions. Nor, of course, can he testify about Google's intent, which he also recognized during his deposition. *See* Florez Decl., at Ex. A ("Hochman Dep. Tr."), at 17:6–14 ("Q. So are you offering any opinion in this case as to what consumers believed or expected? A. I don't think so. That doesn't sound like something I've opined about."); *id.* at 171:22–172:18 ("So, one, I'm not here I don't think to testify about user perceptions."); *id.* at 198:9–12 ("I don't know what the users are thinking. I haven't studied or surveyed that, okay? I really shouldn't even speculate about it."); 211:9-12 ("Q. [Y]ou were not intending to opine as to Google's intent in this case? A. No.")

<u>**Slides 28, 29, 32–38, and 51**</u> (along with the underlying exhibits included in the disclosure, PX-001 and PX-013[3]) are excerpts of communications between Google employees evaluating the potential for user confusion from Google's disclosures. *See* Appendix. These slides and exhibits are only relevant, in the context of Dr. Hochman's expert testimony about the computer science topics in this case, to the questions of whether Google's disclosures were misleading, and

---

[3] These slides also rely on PX-008 and PX-010, which have not been disclosed and are not admitted into evidence, and must be excluded on these grounds as well.

Cooley LLP
Attorneys at Law
San Francisco

3

**Google's MIL to Exclude Use of
Certain Hochman Demonstratives
3:20-CV-04688-RS**

if so whether it was Google's intent to mislead. Dr. Hochman may not testify as to Google's intent; further, Dr. Hochman has not previously disclosed an opinion on whether Google's disclosures were misleading. *See* Florez Decl. ¶ 6. Such an opinion would not be the proper subject of an expert opinion, and even if it were, Dr. Hochman, as a technical expert on Google's code, is not qualified to provide it. *See United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) (noting that expert opinions require underlying knowledge with a "valid connection to the pertinent inquiry").

Besides, several of the statements described in these slides were made by persons who are not witnesses at trial, so that their statements lack foundation and constitute inadmissible hearsay. *See Smith v. Arizona*, 602 U.S. 779, 795 (2024) (discussing hearsay problems in deciding a Confrontation Clause challenge and noting that "[i]f an expert . . . conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts"). A party may not smuggle hearsay into a trial by hiding behind the unrelated rule that an expert may *rely* on hearsay to reach their opinions; while an expert may *rely* on hearsay, that does not entitle them to publish it to the jury, much less admit hearsay as evidence (as Plaintiffs seem likely to attempt by disclosing the underlying exhibits as exhibits they intend to use with Dr. Hochman). *See Jensen v. EXC, Inc.*, 82 F.4th 835, 850 (9th Cir. 2023) ("An opinion rendered by a person of unknown qualifications and contained in a report that, without any other explanation, relies uncritically on the hearsay statements of only selected witnesses and that does not expressly take account of, or address, any other relevant considerations, does not bear sufficient indicia of reliability and trustworthiness to be admitted as a competing expert "opinion" that a testifying expert may be required to address on cross-examination.").

**Slide 31** is not based on evidence at all, and is an egregious demonstrative that can only be used to mislead the jury or outright provide them with Plaintiffs' desired answer to the ultimate issue of Google's liability on the claims in this case:

Cooley LLP
Attorneys at Law
San Francisco

4

**Google's MIL to Exclude Use of
Certain Hochman Demonstratives
3:20-CV-04688-RS**

*See* Appendix. It is inconceivable that a technical expert here to testify about how Google's technology works and the data that Google produced should be permitted to pontificate on the subject of whether he personally believes Google intentionally misled users. And while Dr. Hochman's expert report did contain some "colorful" language that seemed to suggest an intent to provide forbidden opinions on Google's intent or consumer expectations, he outright disclaimed such opinions at his deposition:

> Q. You were not intending to opine as to Google's intent in this Case?
>
> A. No.
>
> Q. Okay. Because the phrase "pull the wool over its users' eyes" is pretty colorful. I'm just making sure that is not an opinion about Google's intent.
>
> A. I do like to be **colorful** sometimes because these reports could be dry, and I like them to be interesting to read. But it is a description of the effect. **It's not a description of Google's intent, okay? I'm sure that that's just – maybe it's overly colorful, but it's clear now**.

Hochman Dep. Tr. at 211:9-24.

Google does not dispute that Dr. Hochman can testify as to his opinions on what Google did technologically with WAA and sWAA data or anything else properly encompassed by his assignment in his engagement by Plaintiffs. *See* Florez Decl. at Ex. B ("Hochman Rep.") ¶ 9

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

GOOGLE'S MIL TO EXCLUDE USE OF
CERTAIN HOCHMAN DEMONSTRATIVES
3:20-CV-04688-RS

("Specifically, I am focusing on Google tracking and advertising code through which Google collects mobile app activity during users' interactions with non-Google branded mobile apps."). But the purported comparison in this slide between "What Google Said," with quotes about "control" or "must be on," and "What Google Did," with references to lack of mistake (*i.e.*, intent) is unsupportable with permissible expert testimony.

**Slide 20** quotes testimony given to Congress by Google's CEO, Sundar Pichai. *See* Hochman Slides at 4. This slide is also only relevant to the issue of whether Google's CEO gave misleading congressional testimony, which is not an issue for this expert, or relevant to the ultimate issue of Google's intent, and thus runs afoul of the "well-recognized rule" that "[n]o expert may testify as to Google's intent in this case; that is for a jury to decide." *Daubert* Order at 5 (citing B*rown v. Google, LLC*, 2022 WL 17961497, at *12 (N.D. Cal. Dec. 12, 2022); *Snyder v. Bank of Am., N.A.*, 2020 WL 6462400, at *2 (N.D. Cal. Nov. 3, 2020)).

**Slide 7** is a table-of-contents slide that states Dr. Hochman's third opinion as: "Throughout the class period, Google copied, collected, and saved data when Web & App Activity was turned off, underline despite concerns raised by Google employees." *See* Appendix. This slide is copied at slides 8, 16, 30, and 49. *See* Appendix. As described above, the substantive slides about the "concerns" consist of quotes about internal Google employees discussing *user expectations* about WAA, which is impermissible expert testimony about intent or user expectations already barred by this Court.

## 2. Dr. Hochman May Not Interpret Google's Disclosures

Several of Plaintiffs' demonstrative slides also suggest that they will seek opinion testimony from Dr. Hochman about his interpretation about Google's disclosures, or about what users think of the disclosures. For example, slides 21-23 and 26-27 show excerpts of Google's privacy policies, and include suggestive highlighting, underlining, and outline boxes. Google does not seek to bar Dr. Hochman from discussing Google's disclosures, but, given Dr. Hochman's deposition testimony that he cannot and will not "speculate" about what users think, Google requests that the Court issue a cautionary order that such testimony would be impermissible. Dr. Hochman should be careful to stick to his assignment: explaining Google's technology, not telling the jury how to rule in this case.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

GOOGLE'S MIL TO EXCLUDE USE OF
CERTAIN HOCHMAN DEMONSTRATIVES
3:20-CV-04688-RS

1

## IV.    CONCLUSION

2        For the foregoing reasons, Google respectfully requests that the Court preclude Plaintiffs

3  from presenting Dr. Hochman's demonstrative slides 7, 20, 28, 29, 31, 32, 33, 34, 35, 36, 37, 38,

4  51 and exhibits PX-001 and PX-013, including any related testimony regarding consumer

5  expectations, Google's intent, or any other legal conclusion.

6

7

Dated: August 20, 2025                    Respectfully submitted,

8                                          COOLEY LLP

9

10

                                          By: */s/ Eduardo E. Santacana*
11                                              Michael A. Attanasio
                                                Benedict Y. Hur
12                                              Simona Agnolucci
                                                Eduardo E. Santacana
13                                              Argemira Flórez
                                                Harris Mateen
14                                              Isabella McKinley Corbo
                                                Naiara Toker
15                                              Thilini Chandrasekera
                                                Chelsea Hu
16
                                          *Attorneys for Defendant*
17                                        *Google LLC*

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

GOOGLE'S MIL TO EXCLUDE USE OF
CERTAIN HOCHMAN DEMONSTRATIVES
3:20-CV-04688-RS

# APPENDIX A

# Rodriguez v. Google

## Dr. Jonathan Hochman

# Opinions

**1** Google wrote computer code called SDKs to access people's devices and to allow Google to copy, collect, and save their data when those people use non-Google apps.

**2** Google said people had control and could stop Google from copying, collecting, and saving their data, and that Google would only save app activity data when Web & App Activity was on.

**3** Throughout the class period, Google copied, collected, and saved data when Web & App Activity was turned off, despite concerns raised by Google employees.

**4** Google used people's data, collected when Web & App Activity was turned off, in many ways that benefited Google and harmed users.

7

# Opinions

**1** Google wrote computer code called SDKs to access people's devices and to allow Google to copy, collect, and save their data when those people use non-Google apps.

**2** Google said people had control and could stop Google from copying, collecting, and saving their data, and that Google would only save app activity data when Web & App Activity was on.

**3** Throughout the class period, Google copied, collected, and saved data when Web & App Activity was turned off, despite concerns raised by Google employees.

**4** Google used people's data, collected when Web & App Activity was turned off, in many ways that benefited Google and harmed users.

# Opinions

**1** Google wrote computer code called SDKs to access people's devices and to allow Google to copy, collect, and save their data when those people use non-Google apps.

**2** Google said people had control and could stop Google from copying, collecting, and saving their data, and that Google would only save app activity data when Web & App Activity was on.

**3** Throughout the class period, Google copied, collected, and saved data when Web & App Activity was turned off, despite concerns raised by Google employees.

**4** Google used people's data, collected when Web & App Activity was turned off, in many ways that benefited Google and harmed users.

16

# Google CEO Sundar Pichai



**Sundar Pichai**

Google CEO

In sworn testimony before Congress:

"[Y]ou have a choice of what information is collected"

"We give ==clear toggles==, by category, where they can decide **==whether==** that information is collected ...."

"We are pretty ==explicit about data which we collect== and give you protections for you to ==turn them on or off==."

PX 28 at 23–24, 167

20

# WAA Off Means Google Is "Supposed to NOT Log At All"



**Chris Ruemmler**
Senior Staff
Software Engineer



**David Monsees**
Product Manager
for (s)WAA

**Chris Ruemmler**

Isn't WAA off supposed to NOT log at all? At least that is what is implied from the WAA page: https://support.google.com/websearch/answer/54068?co=GENIE.Platform%3DDesktop&hl=en

So, if WAA is off, how are we able to log at all?



# WAA Off Means "Stop Saving Their Activity"



## David Monsees
Product Manager for (s)WAA

### Retention Controls Comprehension
go/default-retention-findings2

April 27, 2020
UXR: nzokaei (POC)
UXD: dgearity
UXW: jwoll
PM: davidmonsees, cahwu

### Research Questions

1. **WAA:** What do users expect turning WAA off to mean
   a. How do they expect that to affect other functionalities?

### Findings Summary

**Controls Comprehension:**

1. **WAA Toggle Off:**
   a. All participants expected turning WAA toggle off to stop saving their activity

### Research Questions

1. **WAA:** What do users expect turning WAA off to mean
   a. How do they expect that to affect other functionalities?
2. **WAA Off and Retention:** What are users' expectations around retention when turning off WAA?
   a. Do they understand what happens to existing data?
3. **Retention flow:** What are users' pain point when setting/changing retention?
   a. Do they think they have enough information to make a choice.
   b. Do users understand how changing auto delete will impact their data?
4. **WAA Off and no data:** Does the page clearly communicate to users when they don't have data?
   a. Do users expect Auto-delete and Manage Activity to be disabled or enabled when there's no data?

PX 2 at -992, 997, 000

29

# Opinions

**1** Google wrote computer code called SDKs to access people's devices and to allow Google to copy, collect, and save their data when those people use non-Google apps.

**2** Google said people had control and could stop Google from copying, collecting, and saving their data, and that Google would only save app activity data when Web & App Activity was on.

**3** Throughout the class period, Google copied, collected, and saved data when Web & App Activity was turned off, despite concerns raised by Google employees.

**4** Google used people's data, collected when Web & App Activity was turned off, in many ways that benefited Google and harmed users.

30

# What Google Said vs. What Google Did

## What Google Said

→ You're "in control."

→ "Privacy Controls"

→ You can use toggles to decide "whether" Google collects your data.

→ For Google to save your app activity data with non-Google apps, WAA and sWAA "must be on."

## What Google Did

→ Google copied and saved app activity data when people had WAA and sWAA <u>turned off</u>.

→ Google did this using the Google SDKs to access people's devices and data.

→ This was no mistake.  Google did this despite the concerns expressed by Google's own employees.

→ This was also unnecessary.  Google could have stopped saving this data.

31

# Google Collected & Saved (s)WAA-Off Data



**JK Kearns**
Product Manager

On Tue, Jul 14, 2020 at 4:21 PM JK Kearns <jkearns@google.com> wrote:
I think if we hear that, then that motivates a need for thinking about more options
we need to offer users.  To me, it feels like a fairly significant bug that a user can
choose to turn off WAA but then we still collect and use the data (even
locally). For users that want pSuggest, but don't want data collected, I think

# Google Collected & Saved (s)WAA-Off Data



**Chris Ruemmler**
Senior Staff
Software Engineer



**David Monsees**
Product Manager
for (s)WAA



| Message | |
|---|---|
| **From:** | Chris Ruemmler [ruemmler@google.com] |
| **Sent:** | 7/25/2019 7:16:06 PM |
| **To:** | David Monsees [davidmonsees@google.com] |
| **CC:** | Leslie Liu [laliu@google.com]; Nick Linkow [nicklinkow@google.com] |
| **Subject:** | Re: Wording changes for WAA bit |

Google needs to be really clear about what user content we are logging and what we don't store/keep/log. The WAA and other controls imply we don't log the data, but obviously we do. We need to change the description to indicate even with the control off, Google retains this data and uses it for X purposes.

what the user has access to. This is really bad. If we are storing data that the user does not have access to, we need to be clear about that fact. In this case, the user has a false sense of security that their data is not being stored at Google, when in fact it is. Have we performed any studies to see what customers think is happening

33

# Google Did This Despite Employee Concerns



**JK Kearns**
Product Manager



On Tue, Nov 13, 2018, 10:50 PM JK Kearns <jkearns@google.com> wrote:
I think teams should not use user data at all if WAA is off, regardless if there is user data that was collected when WAA was on. It's a much cleaner story and what I would think most users expect.

# Google Did This Despite Employee Concerns



**Chris Ruemmler**
Senior Staff
Software Engineer



**David Monsees**
Product Manager
for (s)WAA



On Wed, Jul 24, 2019 at 4:25 PM Chris Ruemmler <ruemmler@google.com> wrote:

is described for what happens when the WAA bit is on. Today, we don't accurately describe what happens when WAA is off. For instance, we state the following for the "on" state:

PX 3 at -710

# Google Did This Despite Employee Concerns



**Chris Ruemmler**
Senior Staff
Software Engineer



**David Monsees**
Product Manager
for (s)WAA



On Thu, Jul 25, 2019 at 9:08 AM Chris Ruemmler <ruemmler@google.com> wrote:

Google needs to be really clear about what user content we are logging and what we don't store/keep/log. The WAA and other controls imply we don't log the data, but obviously we do. We need to change the description to indicate even with the control off, Google retains this data and uses it for X purposes.

PX 3 at -710

# Google Did This Despite Employee Concerns



**Chris Ruemmler**
Senior Staff
Software Engineer



On Wed, Aug 5, 2020 at 10:27 PM Chris Ruemmler <ruemmler@google.com> wrote:

WAA - ==completely broken, no way for the user to determine what this actually controls.==  Both admin and user controlled, but ==neither will understand what it actually does.==

PX 8 at -746

37

# Google Did This Despite Employee Concerns



**Chris Ruemmler**
Senior Staff
Software Engineer



**David Monsees**
Product Manager
for (s)WAA



On Thu, Jul 25, 2019 at 9:08 AM Chris Ruemmler <ruemmler@google.com> wrote:

The activity controls wording isn't any better.  I see how the wording here is very deceptive.

PX 3 at -709

38

# Opinions

**1** Google wrote computer code called SDKs to access people's devices and to allow Google to copy, collect, and save their data when those people use non-Google apps.

**2** Google said people had control and could stop Google from copying, collecting, and saving their data, and that Google would only save app activity data when Web & App Activity was on.

**3** Throughout the class period, Google copied, collected, and saved data when Web & App Activity was turned off, despite concerns raised by Google employees.

**4** Google used people's data, collected when Web & App Activity was turned off, in many ways that benefited Google and harmed users.

# "False Sense of Security"



**Chris Ruemmler**
Senior Staff
Software Engineer





**David Monsees**
Product Manager
for (s)WAA

| Message | |
|---|---|
| **From:** | Chris Ruemmler [ruemmler@google.com] |
| **Sent:** | 7/25/2019 7:16:06 PM |
| **To:** | David Monsees [davidmonsees@google.com] |
| **CC:** | Leslie Liu [laliu@google.com]; Nick Linkow [nicklinkow@google.com] |
| **Subject:** | Re: Wording changes for WAA bit |

"your Google Account" means your data, not Google's. If I choose not to store data in my account, then Google should not have access to the data either as the data should not be in the account. What you are stating is WAA (or any of the other controls) does not actually control what is stored by Google, but simply what the user has access to. This is really bad. If we are storing data that the user does not have access to, we need to be clear about that fact. In this case, the user has a false sense of security that their data is not being stored at Google, when in fact it is. Have we performed any studies to see what customers think is happening with their data when they disable these controls? It would be good to do a study and know if what is written