# EXHIBIT C

CONFIDENTIAL

```
1              IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
3                   SAN FRANCISCO DIVISION
4                         ---o0o---
5    ANIBAL RODRIGUEZ, et al.       )
     individually and on behalf     )
6    of all other similarly         )
     situated,                      )
7                                   )
             Plaintiffs,            )Case No.
8                                   )3:20-CV-04688
     vs.                            )
9                                   )
     GOOGLE LLC, et al.,            )
10                                  )
             Defendant.             )
11   _____)
12
13                       CONFIDENTIAL
14                        ---o0o---
15              Videotaped Zoom Deposition of
16                     JULIAN SANTIAGO
17                 Monday, March 7, 2022
18                        ---o0o---
19
20
21
22
23   Katy E. Schmidt
24   RPR, RMR, CRR, CSR 13096
25   Veritext Job No.: 5106972
```

Page 1

```
 1                 Go ahead, you can answer it again.              01:19
 2   BY MS. ARAKAKI:                                                01:19
 3        Q.   You can answer.                                      01:19
 4        A.   If I've explicitly requested and opted out of        01:19
 5   The Economist collecting my data and what I've clicked         01:19
 6   on, then, yes, that is a huge invasion of my privacy.          01:19
 7        Q.   Would you stop using The Economist if you            01:19
 8   found that out?                                                01:19
 9        A.   If I had another source of that material that        01:19
10   I could access, I might consider it.                           01:20
11        Q.   But if you didn't have another source for the        01:20
12   same types of articles, would you continue to use              01:20
13   The Economist?                                                 01:20
14        A.   Well, I would have no choice if I still want        01:20
15   to have access to that material; right?                        01:20
16        Q.   Why do you believe you would have no choice?         01:20
17        A.   Well, you just said there's no other way to          01:20
18   access that information.  And if I find it -- in order         01:20
19   to continue living a certain way, I need to continue to        01:20
20   have access to certain information, then I would have no       01:20
21   choice in continuing to use it.                                01:20
22             MR. LEE:  Hey, Lori, I don't know how long           01:20
23   we've been on the record, but just FYI, Julian has not         01:20
24   had lunch yet, and I know in Pacific time, it's 1:00           01:20
25   something, 1:20.                                               01:20
```

Page 119

|   |   |   |
|---|---|---|
| 1 | A. Sure. Yeah. | 02:59 |
| 2 | Q. So if it's a couple times a week, let's say | 02:59 |
| 3 | two to three, would it be fair to say that you use the | 02:59 |
| 4 | Bleacher Report about eight to 12 times a month? | 02:59 |
| 5 | A. Sure. | 02:59 |
| 6 | Q. Why do you continue to use the Bleacher Report | 02:59 |
| 7 | over the last year after finding out that you -- what | 02:59 |
| 8 | you believe to be the fact that Google obtains and | 03:00 |
| 9 | saves your app interaction data, even though you have | 03:00 |
| 10 | web-and-app activity off? | 03:00 |
| 11 | A. I think Bleacher Report is a good app. And I | 03:00 |
| 12 | like their journalism and I like their articles and how | 03:00 |
| 13 | user friendly it is. And although unsettling that | 03:00 |
| 14 | whatever I'm accessing on Bleacher Report may still be | 03:00 |
| 15 | getting tracked and collected by Google, despite me | 03:00 |
| 16 | having turned web-and-app activity off, which Google | 03:00 |
| 17 | clearly states includes services like integrated | 03:00 |
| 18 | third-party apps, it's still a good app. And it is | 03:00 |
| 19 | highly unsettling but I've continued to use it because | 03:01 |
| 20 | they do a good job. | 03:01 |
| 21 | Q. So you say "highly unsettling" but it's not | 03:01 |
| 22 | highly -- or unsettling enough to cause you to stop | 03:01 |
| 23 | using the Bleacher Report; right? | 03:01 |
| 24 | A. Well, if there could be another | 03:01 |
| 25 | Bleacher Report app that isn't linked to Google, I would | 03:01 |

Page 162

| | | |
|---|---|---|
| 1 | A. Because once you have information, and in this | 03:19 |
| 2 | case a team drafted, that's something that you keep | 03:19 |
| 3 | throughout the entire season. | 03:19 |
| 4 | So I kept using that app because I drafted a | 03:19 |
| 5 | team on that app, and I was playing with 12 different | 03:19 |
| 6 | individuals on that app where I couldn't just leave. | 03:20 |
| 7 | And there was money involved. | 03:20 |
| 8 | Q. Got it. | 03:20 |
| 9 | A. And there's people that are also relying on me | 03:20 |
| 10 | continuing to use that app to fulfill the season. | 03:20 |
| 11 | Q. And when you say there was money on the line, | 03:20 |
| 12 | do you mean money you paid to ESPN Fantasy or money in | 03:20 |
| 13 | the Fantasy Football League? | 03:20 |
| 14 | A. Money in the Fantasy Football League. | 03:20 |
| 15 | Q. When in the season did you draft or in the | 03:20 |
| 16 | year did you draft your team? | 03:20 |
| 17 | A. At the beginning of the season. | 03:20 |
| 18 | Q. And when was that, approximately? What month? | 03:20 |
| 19 | A. Probably August. Before the season started. | 03:20 |
| 20 | Q. This is August 2021? | 03:20 |
| 21 | A. Yes. | 03:20 |
| 22 | Q. Between the prior year, at least at the time | 03:20 |
| 23 | where you filed your Third Amended Complaint in November | 03:21 |
| 24 | 2020, where you had -- or understood these allegations | 03:21 |
| 25 | of yours that are in the Complaint, in August 2021 did | 03:21 |

Page 176

```
 1   you take any steps to come up with an alternative to         03:21
 2   ESPN Fantasy?                                                03:21
 3        A.   I suggested to my very stubborn friends who        03:21
 4   have been using this app for close to 10 years now that      03:21
 5   maybe we should use another app.  And like I said,           03:21
 6   they're very stubborn and majority rules, therefore we       03:21
 7   stuck with using the same app.                               03:21
 8        Q.   Surely you told those friends about what           03:21
 9   happened or what you believed Google to be doing; right?     03:21
10        A.   No.  Not surely.  I simply presented to them,     03:21
11   "Hey, why don't we use another app?"                         03:21
12        Q.   Did you give them a reason as to -- go ahead.      03:21
13             MR. LEE:  Yeah.  Go ahead.                         03:22
14             THE WITNESS:  I suggested we use another app.      03:22
15   I don't need to give my friends reasons.                     03:22
16   BY MS. ARAKAKI:                                              03:22
17        Q.   So you're telling me that you found what           03:22
18   Google was doing to be highly offensive, to be screwing      03:22
19   you, to be enough to be the case that you wanted to look     03:22
20   into a different app and get your whole set of friends       03:22
21   to move to a different Fantasy Football app but you          03:22
22   didn't tell them that?                                       03:22
23        A.   No.  I simply suggested it.                        03:22
24        Q.   Did you tell them that the suggestion to move      03:22
25   to a different Fantasy Football app was because you were     03:22
```

| | | |
|---|---|---|
| 1 | concerned Google was obtaining their app interaction | 03:22 |
| 2 | data? | 03:22 |
| 3 |    A.  No, I didn't get into detail about it.  I | 03:22 |
| 4 | simply suggested it in passing.  It didn't stick.  But | 03:22 |
| 5 | perhaps with the following season, like I said I've been | 03:22 |
| 6 | looking into different app alternatives, I will give | 03:22 |
| 7 | them a little more reason to. | 03:22 |
| 8 |    Q.  Did you mention Google at all in your | 03:23 |
| 9 | conversations -- | 03:23 |
| 10 |    A.  No. | 03:23 |
| 11 |    Q.  -- with your friends? | 03:23 |
| 12 |    A.  No. | 03:23 |
| 13 |       MR. LEE:  Lori, I'm sorry keep to bugging you, | 03:23 |
| 14 | but I really have to pee. | 03:23 |
| 15 |       MS. ARAKAKI:  Yeah.  We can take a break now. | 03:23 |
| 16 |       MR. LEE:  Okay.  Thank you. | 03:23 |
| 17 |       THE VIDEOGRAPHER:  Off the record.  The time | 03:23 |
| 18 | is 6:23 p.m. | 03:23 |
| 19 |       (Break taken in proceedings.) | 03:39 |
| 20 |       THE VIDEOGRAPHER:  Back on the record.  The | 03:40 |
| 21 | time is 6:40 p.m. | 03:40 |
| 22 | BY MS. ARAKAKI: | 03:40 |
| 23 |    Q.  Mr. Santiago, before the break, we were going | 03:40 |
| 24 | through a number of apps that are listed in the | 03:40 |
| 25 | Third Amended Complaint so I'm just going to keep going | 03:40 |

Page 178

| | | | |
|---|---|---|---|
| 1 | through those.  We were just talking about ESPN Fantasy. | 03:40 |
| 2 | Let's talk about MapMyRide. | 03:40 |
| 3 | Do you still use that? | 03:40 |
| 4 | A. Occasionally, yes. | 03:40 |
| 5 | Q. Have you used it in the last year? | 03:40 |
| 6 | A. In the last year, yes. | 03:40 |
| 7 | Q. What do you use it for? | 03:40 |
| 8 | A. Mapping my cycling routes when I go on a bike | 03:40 |
| 9 | ride. | 03:40 |
| 10 | Q. Got it. | 03:40 |
| 11 | Is that similar to Nike Run Club, before for | 03:40 |
| 12 | cycling instead of running? | 03:40 |
| 13 | A. Yes.  That is correct. | 03:41 |
| 14 | Q. Is there a reason you didn't stop using | 03:41 |
| 15 | MapMyRide after learning about what you believe to be | 03:41 |
| 16 | Google's collection of data through MapMyRide? | 03:41 |
| 17 | A. Lori, real quick, I'll get to your question in | 03:41 |
| 18 | a sec.  Can you remind me of the page we were reviewing | 03:41 |
| 19 | with the apps? | 03:41 |
| 20 | Q. Sure.  It's paragraph 223, and it's page 59 -- | 03:41 |
| 21 | A. Thank you. | 03:41 |
| 22 | Q. -- at the bottom, but at the top it's 63. | 03:41 |
| 23 | A. Yep.  Thank you. | 03:41 |
| 24 | Q. Sure. | 03:41 |
| 25 | Would you like the question read to you? | 03:41 |

Page 179

| | | |
|---|---|---|
| 1 | A. Your question was did I continue using | 03:41 |
| 2 | MapMyRide? | 03:41 |
| 3 | Q. Yes. | 03:41 |
| 4 | A. Very simply because it's a great app for | 03:41 |
| 5 | tracking my bike rides. | 03:41 |
| 6 | Q. Do you think there's an alternative? | 03:42 |
| 7 | A. Sure. There may be other options, yeah. | 03:42 |
| 8 | Q. Have you looked into them? | 03:42 |
| 9 | A. I've tried other bike ride tracking apps, and | 03:42 |
| 10 | none of them do as good a job in my opinion as | 03:42 |
| 11 | MapMyRide does. | 03:42 |
| 12 | Q. In terms of the types of data you give to | 03:42 |
| 13 | applications, your locations, you know, what type of | 03:42 |
| 14 | language you're studying or an article you're reading, | 03:42 |
| 15 | is there some specific information you find to be more | 03:42 |
| 16 | private than another type of information? You know, for | 03:42 |
| 17 | example, like your social security number, do you find | 03:42 |
| 18 | that to be more private to you than the language you're | 03:42 |
| 19 | learning? | 03:42 |
| 20 | A. I find all my information to be private. And | 03:42 |
| 21 | I wouldn't want MapMyRide knowing what I'm searching on | 03:42 |
| 22 | Bleacher Report because I'm searching that on | 03:43 |
| 23 | Bleacher Report and not MapMyRide. | 03:43 |
| 24 | I wouldn't want Nike Run Club knowing what my | 03:43 |
| 25 | bike lanes are, just like wouldn't want MapMyRide | 03:43 |

Page 180

| | | |
|---|---|---|
| 1 | A. Yes, I would have. | 06:43 |
| 2 | Q. Now, I understand that you turned the WAA | 06:43 |
| 3 | button off again in September 2020 -- did I say that | 06:43 |
| 4 | right? -- 2020. | 06:44 |
| 5 | Do you recall giving that testimony? | 06:44 |
| 6 | A. Yes, I do. | 06:44 |
| 7 | Q. Now, when you turned the WAA button off again | 06:44 |
| 8 | in September of 2020, did you know about this lawsuit? | 06:44 |
| 9 | A. No. | 06:44 |
| 10 | MS. ARAKAKI: Objection. Misstates the | 06:44 |
| 11 | record. | 06:44 |
| 12 | BY MR. LEE: | 06:44 |
| 13 | Q. Did you -- when you turned the WAA button off | 06:44 |
| 14 | again in September 2020, did you know who I was? | 06:44 |
| 15 | A. No. | 06:44 |
| 16 | Q. Did you know any of the lawyers working on | 06:44 |
| 17 | this case when you turned the WAA button off again in | 06:44 |
| 18 | September 2020? | 06:44 |
| 19 | A. No. | 06:44 |
| 20 | Q. You were asked questions about why you haven't | 06:44 |
| 21 | changed your app-browsing behavior after you filed the | 06:44 |
| 22 | lawsuit. | 06:44 |
| 23 | Do you remember those questions? | 06:44 |
| 24 | A. Yeah, I do. | 06:44 |
| 25 | Q. And why didn't you change your behavior after | 06:44 |

Page 274

| | | |
|---|---|---|
| 1 | the lawsuit was filed? | 06:44 |
| 2 | A. Well, one of the reasons is because I'm part | 06:44 |
| 3 | of this ongoing lawsuit. And in order for us to figure | 06:45 |
| 4 | out what apps Google is using to track and what is being | 06:45 |
| 5 | tracked, I need to remain consistent with that behavior. | 06:45 |
| 6 | Q. And have you endeavored to be consistent with | 06:45 |
| 7 | your behavior for that reason? | 06:45 |
| 8 | A. I have. | 06:45 |
| 9 | Q. Now, you were also asked about which apps you | 06:45 |
| 10 | allege in the Third Amended Complaint that Google | 06:45 |
| 11 | collects data from. | 06:45 |
| 12 | Do you remember those questions? | 06:45 |
| 13 | A. Yes, I do. | 06:45 |
| 14 | Q. Do you have the Complaint in front of you? | 06:45 |
| 15 | A. Yes. | 06:45 |
| 16 | Q. Can you turn to -- I don't have the page | 06:45 |
| 17 | number, but can you turn to paragraph 223, which | 06:45 |
| 18 | Google's counsel asked extensive questions about? | 06:45 |
| 19 | A. Yep. | 06:45 |
| 20 | Q. Could you just read paragraph 223 very quickly | 06:45 |
| 21 | to yourself? | 06:45 |
| 22 | A. Sure. | 06:45 |
| 23 | Okay. | 06:46 |
| 24 | Q. Now, focusing particularly on the last | 06:46 |
| 25 | sentence of paragraph 223, did you allege in the | 06:46 |

Page 275

| | | |
|---|---|---|
| 1 | sound like something I said. | 07:07 |
| 2 | Q. My understanding of what you said is that you | 07:07 |
| 3 | continue to use third-party apps even after learning | 07:07 |
| 4 | that Google allegedly obtained that interaction data | 07:07 |
| 5 | because you wanted to find out or investigate for this | 07:08 |
| 6 | lawsuit how Google is getting your app interaction data; | 07:08 |
| 7 | right? | 07:08 |
| 8 | MR. LEE: Mischaracterizes to the extent | 07:08 |
| 9 | that's an exclusive statement. He said much more. It's | 07:08 |
| 10 | in the record. | 07:08 |
| 11 | BY MS. ARAKAKI: | 07:08 |
| 12 | Q. You may answer. | 07:08 |
| 13 | A. I said much more than that. | 07:08 |
| 14 | Q. Mr. Santiago, I'm just trying to figure out | 07:08 |
| 15 | what you're trying to find out from Google in the -- | 07:08 |
| 16 | A. I'm trying to -- sorry to interrupt. Go on. | 07:08 |
| 17 | Q. Because you said that you are continuing to | 07:08 |
| 18 | use these apps. | 07:08 |
| 19 | I'm trying to figure out why you're continuing | 07:08 |
| 20 | to use the apps. | 07:08 |
| 21 | Can you explain that to me in your words? | 07:08 |
| 22 | A. I've explained that on multiple occasions and | 07:08 |
| 23 | the various number of reasons why -- what I'm trying to | 07:08 |
| 24 | figure out is why Google is continuing to track and | 07:08 |
| 25 | store the information of consumers who have chosen and | 07:09 |

|   |   |   |
|---|---|---|
| 1 | have opted out of Google keeping their information and | 07:09 |
| 2 | collecting their information in the first place. | 07:09 |
| 3 | What I'm trying to figure out is why Google -- | 07:09 |
| 4 | if they are telling all of their consumers that the | 07:09 |
| 5 | consumer is in control of what happens with that | 07:09 |
| 6 | information, why is Google continuing to collect that | 07:09 |
| 7 | information despite consumers -- people's requests for | 07:09 |
| 8 | them not to by turning web-and-app activity off? | 07:09 |
| 9 | Q.  What gave you the reason to believe that you | 07:09 |
| 10 | could figure all of that out by remaining consistent | 07:09 |
| 11 | with your usage of the third-party app? | 07:09 |
| 12 | MR. LEE:  Calls for an expert opinion. | 07:09 |
| 13 | BY MS. ARAKAKI: | 07:10 |
| 14 | Q.  You can answer, if you have an idea. | 07:10 |
| 15 | A.  Well, that's what we're investigating. | 07:10 |
| 16 | Q.  You told me that the reason you were remaining | 07:10 |
| 17 | consistent is to investigate what Google is doing wrong, | 07:10 |
| 18 | and now you just told me you're not sure you're trying | 07:10 |
| 19 | to investigate.  And I'm just trying to figure out how | 07:10 |
| 20 | you got the idea that you needed to remain consistent in | 07:10 |
| 21 | order to figure out what Google is doing wrong. | 07:10 |
| 22 | Is that something that you came up with | 07:10 |
| 23 | yourself or have you ever discussed that idea with | 07:10 |
| 24 | counsel before? | 07:10 |
| 25 | MR. LEE:  So -- well, I guess there's two | 07:10 |

| | | |
|---|---|---|
| 1 | things wrong with your question.  One, you just | 07:10 |
| 2 | mischaracterized testimony, and two, you're directly | 07:10 |
| 3 | asking for privileged information. | 07:10 |
| 4 |       Is that what you're doing? | 07:10 |
| 5 |       Why don't you rephrase it. | 07:10 |
| 6 |       MR. SANTACANA:  Just make your objections, | 07:10 |
| 7 | James.  It's late. | 07:10 |
| 8 |       MR. LEE:  Sure. | 07:10 |
| 9 |       I direct you not to answer that question. | 07:10 |
| 10 | BY MS. ARAKAKI: | 07:11 |
| 11 |   Q.   Are you -- | 07:11 |
| 12 |       MR. LEE:  Also, Eduardo -- Eduardo, with all | 07:11 |
| 13 | due respect, stop talking. | 07:11 |
| 14 |       Okay? | 07:11 |
| 15 |       It's one attorney per side.  I have lawyers on | 07:11 |
| 16 | my side.  They've all been respectful.  They've never | 07:11 |
| 17 | spoken on the record.  You've done it now twice.  So be | 07:11 |
| 18 | quiet. | 07:11 |
| 19 |       MR. SANTACANA:  James, I'm entitled to speak | 07:11 |
| 20 | on the record.  I don't know what you're talking about. | 07:11 |
| 21 |       I'm here.  I'm in attendance. | 07:11 |
| 22 |       MR. LEE:  I'm talking about just normal trial | 07:11 |
| 23 | practice, so... | 07:11 |
| 24 |       MR. SANTACANA:  All right.  Well, we can | 07:11 |
| 25 | review the rule later.  Can we just get through this? | 07:11 |

Page 294

|   |   |   |
|---|---|---|
| 1 | MR. LEE: Yeah. We'll raise it with the | 07:11 |
| 2 | Court. Don't worry about it. | 07:11 |
| 3 | MR. SANTACANA: I look forward to it. | 07:11 |
| 4 | We'll also raise your redirect with the Court | 07:11 |
| 5 | at the same time. | 07:11 |
| 6 | MR. LEE: Okay. | 07:11 |
| 7 | Is there a question pending? A new question? | 07:11 |
| 8 | MS. ARAKAKI: There's no question pending at | 07:12 |
| 9 | the moment. I'm just taking a moment. | 07:12 |
| 10 | BY MS. ARAKAKI: | 07:12 |
| 11 | Q. Mr. Santiago, I'm just trying to clarify this | 07:12 |
| 12 | one piece of questioning and then -- I understand it's | 07:12 |
| 13 | getting late, and we can all try to get out of here. | 07:12 |
| 14 | So to help get us on the same page, I will | 07:12 |
| 15 | read what you answered that we all understand what I'm | 07:12 |
| 16 | trying to figure out. | 07:12 |
| 17 | So Mr. Lee asked you why didn't you change | 07:12 |
| 18 | your behavior after the lawsuit was filed, and you | 07:12 |
| 19 | answered: | 07:12 |
| 20 | "Well, one of the reasons is because | 07:12 |
| 21 | I'm part of this ongoing lawsuit. And in | 07:12 |
| 22 | order for us to figure out what apps | 07:13 |
| 23 | Google is using to track and what is being | 07:13 |
| 24 | tracked, I need to remain consistent with | 07:13 |
| 25 | that behavior." | 07:13 |

Page 295

```
 1            Do you recall testifying to that?              07:13
 2       A.   Yes.                                           07:13
 3       Q.   What gave you the idea that you need to remain 07:13
 4  consistent with that behavior in order to figure out     07:13
 5  what apps Google is using to track you?                  07:13
 6       A.   I think it's just common sense.                07:13
 7       Q.   I'm sorry.  I just don't -- I don't            07:13
 8  understand.  So if you can explain to me what you        07:13
 9  believe to be common sense about that, that would be     07:13
10  helpful.                                                 07:13
11       A.   Okay.  So if I have an app and I stop using    07:13
12  it, how am I supposed to later find out that Google      07:13
13  isn't tracking it if I'm not using it?  It's common      07:13
14  sense.                                                   07:13
15       Q.   Do you think you could just ask Google that?   07:13
16       A.   Yeah, let me get in contact with a billion     07:13
17  dollar firm and just ask them a question about what      07:13
18  they're tracking on my information.                      07:13
19       Q.   I'm just asking through discovery responses.   07:13
20            Is that something you could ask Google about?  07:14
21            MR. LEE:  Calls for a -- I guess a legal       07:14
22  opinion.                                                 07:14
23            Go ahead.                                      07:14
24            MS. ARAKAKI:  You can answer, if you           07:14
25  understand.                                              07:14
```

Page 296

```
 1                      REPORTER'S CERTIFICATE
 2                            ---o0o---
 3    STATE OF CALIFORNIA    )
                             ) ss.
 4    COUNTY OF YOLO         )
 5          I, KATY E. SCHMIDT, a Certified Shorthand
 6    Reporter in and for the State of California, duly
 7    commissioned and a disinterested person, certify:
 8          That the foregoing deposition was taken before me
 9    at the time and place herein set forth;
10          That JULIAN SANTIAGO, the deponent herein, was
11    put on oath by me;
12          That the testimony of the witness and all
13    objections made at the time of the examination were
14    recorded stenographically by me to the best of my
15    ability and thereafter transcribed into typewriting;
16          That the foregoing deposition is a record of the
17    testimony of the examination.
18          IN WITNESS WHEREOF, I subscribe my name on this
19    21st day of March, 2022.
20
21          [signature]

22          Katy E. Schmidt, RPR, RMR, CRR, CSR 13096
            Certified Shorthand Reporter
23          in and for the County of Sacramento,
            State of California
24
25    Ref. No. 5106972 KES
```

Page 301

Veritext Legal Solutions
866 299-5127