# EXHIBIT A

Volume 2

Pages 175 - 340

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,           )
individually and on behalf of       )
all others similarly situated,      )
                                    )
            Plaintiffs,             )
                                    )
  VS.                               )   NO. 3:20-CV-04688 RS
                                    )
GOOGLE LLC,                         )
                                    )
            Defendant.              )
_____)

San Francisco, California
Tuesday, August 19, 2025

<u>**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:

                    BOIES SCHILLER FLEXNER LLP
                    333 Main Street
                    Armonk, New York 10504
              BY:   **DAVID BOIES, ATTORNEY AT LAW**

                    BOIES SCHILLER FLEXNER LLP
                    2029 Century Park East, Suite 1520n
                    Los Angeles, California 90067
              BY:   **ALISON L. ANDERSON, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1    Q.    Okay.  Let's look at one of them.  Take a look on your

2    screen, please, Plaintiffs' Exhibit 2.  This is entitled --

3    it's Google's -- it's an April 27, 2020, summary of a retention

4    controls comprehension study; fair?

5    A.    Correct.

6    Q.    And the first page identifies Nava -- and I'm going to do

7    some damage here -- I think it's Zokaei as the point of

8    contact?

9    A.    Correct.

10   Q.    But she is somebody who you worked with; correct?

11   A.    That's right.  She was a researcher on the Web & App

12   Activity Team.

13   Q.    Exactly.  Just like Mr. de Booij.  What she was --

14   A.    Exactly.

15   Q.    -- was a user experience researcher; fair?

16   A.    Fair.

17   Q.    Okay.  And you worked with her on retention control

18   projects like this one; correct?

19   A.    That's right.

20   Q.    And we know you worked with her here because your name is

21   on the cover; correct?

22   A.    Correct.

23          MR. CARMODY:  I move into evidence, Your Honor, PX2.

24          MR. SANTACANA:  No objection.

25          THE COURT:  Exhibit Number 2 will be admitted.

1           (Trial Exhibit PX2 received in evidence.)

2    **BY MR. CARMODY:**

3    **Q.**   So let's turn to page 6.

4           It says "Research Questions," and there's four of them,

5    and they've got little parts and stuff underneath.  But let's

6    just focus on the very top one.

7           And the context here, by the way, timewise, is this is

8    just what?  Nine months after your exchanges with Mr. Ruemmler;

9    correct?

10   **A.**   Yeah.

11   **Q.**   Okay.  So we're going back.  And the very first question

12   says -- and this is -- this is an internal Google research

13   study; correct?

14   **A.**   Correct.

15   **Q.**   [As read]:

16           "What do WAA users expect turning off WAA to

17       mean?"

18           That was the question, the very first thing we see?

19   **A.**   Yeah, one of the objectives of the study.

20   **Q.**   Okay.  And if we now turn to the next page -- or it's

21   actually page, I want to say, 7, it talks about the methods and

22   the procedure, how Google's going to go about doing it; right?

23   **A.**   Correct.

24   **Q.**   Okay.  And if we take a look here on the left side, it

25   says there's going to be nine participants, five female and

 1  four male.  They're going to each have 30-minute interviews.

 2       And then as to the procedure, we can turn to the right.

 3  Do you see that?

 4  **A.**   Yes.

 5  **Q.**   And underneath that, sir, we see five things:  "Background

 6  questions," "Reaction to the Activities Control page" -- PX84;

 7  correct?

 8  **A.**   Correct.

 9  **Q.**   "Expectation of WAA Off"; correct?

10  **A.**   Correct.

11  **Q.**   "Retention Flow walkthrough"; correct?

12  **A.**   Correct.

13  **Q.**   And the finale is "WAA off and No Data Scenario"; correct?

14  **A.**   Correct.

15  **Q.**   Now turn to page 8, and we're looking at the people

16  themselves.  And it looks like we have a fair cross-section of

17  people; correct?

18  **A.**   I think so.

19  **Q.**   I mean, some are knowledgeable, very knowledgeable about

20  tech issues.  Some are -- some people are somewhat

21  knowledgeable.  We have male and female.  We have folks from

22  different ages.  Fair?

23  **A.**   Fair.

24  **Q.**   And this research resulted in the 50-page presentation

25  that we're looking at now; correct?

1  **A.**    That's correct.

2  **Q.**    This research was approved by Google?

3  **A.**    It was conducted by Google.

4  **Q.**    I mean, you followed all the normal standards that Google

5  wants its researchers to follow to come out with a legitimate

6  bona fide study; correct?

7  **A.**    Oh, I see.  I understand.

8     There's a lot of different kinds of studies that we do.  I

9  would assume that Nava, who's very familiar with this, would be

10  following whatever best practices Google has.

11  **Q.**    In fairness, before this lawsuit, nobody ever suggested

12  that this study or its results were somehow inappropriate;

13  correct?

14  **A.**    Correct.

15  **Q.**    Okay.

16  **A.**    I've never heard that.

17  **Q.**    Let's take a look at the results.  Let's turn to page 20.

18  If you -- why don't we go top left in the big -- the big

19  lettering [as read]:

20         "All participants expected turning off the

21      toggle to stop their activity from being saved."

22      Do you see that?

23  **A.**    Yes, I do.

24  **Q.**    And the toggle they're referring to is the very toggle

25  behind me here in the courtroom.  I'm pointing to a foam board

1    of PX84; correct?

2    **A.**    Correct.

3    **Q.**    And the toggle is this turn on here and turn off here;

4    correct?

5    **A.**    Correct.

6    **Q.**    Okay.  And what these users say -- and let's even step

7    back a second.

8        In fairness, Chris Ruemmler's concerns were well-founded,

9    his fears where he said he asked you three questions about a

10    research study.  Remember that?

11    **A.**    Yes, I do.

12    **Q.**    And he feared people like him wouldn't understand what

13    WAA off means.

14        In fairness, Mr. Ruemmler was vindicated.  I mean, this is

15    what we see; correct?

16    **A.**    No.  This study is testing a very different concept.

17    Actually, it's cool that we have the foam core up here because

18    if you look, it's a little bit below the table there, but it's

19    the auto delete section.  We were creating a brand-new type of

20    control and that's what we were adding here.

21        What Mr. Ruemmler was discussing on the last email

22    chain --

23    **Q.**    Yeah.

24    **A.**    -- that we were looking at was about, remember that

25    proposal for changing the way WAA-off logging would work.

1          The research we're doing here wasn't, I think, related.

2    This project wasn't related at all, I think, to what

3    Mr. Ruemmler and I were discussing on that email chain --

4    **Q.**   But it doesn't say that --

5    **A.**   -- that we were just looking at.

6                    (Simultaneous cross-talk.)

7              (Reporter interrupts to clarify the record.)

8         **THE WITNESS:**  -- that we were just looking at.

9    **BY MR. CARMODY:**

10   **Q.**   Are you telling us that's what this -- you have an

11   independent recollection of all this?

12   **A.**   No.  What I'm saying is, just from reading that email that

13   we were just looking at, I think when Mr. Ruemmler mentioned

14   research, he's asking research clearly in the context of the

15   change --

16   **Q.**   Okay.

17   **A.**   -- to the way WAA-off logging works.

18        This research wasn't testing that.  This is a very

19   specific research study we did.

20   **Q.**   I can -- I'm kind of semi-comfortable with this now, these

21   50 pages.  But you're saying -- you're not questioning what's

22   presented here.  You're saying I wasn't fairly describing what

23   Mr. Ruemmler's concerns are; correct?

24   **A.**   That's correct.

25   **Q.**   Okay.  And the concerns we spent some time on going over

**MONSEES - DIRECT / CARMODY**

1  in PX3?

2  **A.**    Correct.  This research is very unrelated to I think in

3  PX3.  That was the exhibit we were discussing.

4  **Q.**    And PX3, in fairness, you tell us you didn't respond to

5  those concerns.  You set up a meeting, and you and a lawyer met

6  with Mr. Ruemmler.  And we've never seen another communi- --

7  another written communication about it; correct?

8  **A.**    Correct.

9  **Q.**    Okay.  But now let's take a look.  We all have our

10  recollection of exactly what Mr. Ruemmler said.  And we're

11  going to go back to it as well.

12      But what we see here is, like Mr. Ruemmler [as read]:

13          "All participants expecting" -- "expected

14      turning off the toggle" --

15      And that's referring to the WAA toggle?

16  **A.**    That's right.

17  **Q.**    [As read]:

18      -- "to stop their activity from being saved."

19      And being saved by Google; fair?

20  **A.**    Fair, being saved by Google in their Google Account, like

21  it says right up there at the top.

22  **Q.**    And if you take a look at the right side of the page, you

23  see that "Activity Controls"?

24  **A.**    Yeah.

25  **Q.**    We're looking -- I mean, it's like a mirror image.  If

1  we're looking what I have behind me in a courtroom and we're

2  looking at what people in the Google research study were tested

3  on, we see it's the same thing; right?

4  **A.**  It's a little bit different.  This was a test, like a

5  prototype, so kind of like a concept that we were testing that

6  I think changed a few more times before we finally launched

7  kind of what you see up on the big board.

8  **Q.**  But take a look --

9       **MR. CARMODY:**  Mr. Boles, can you blow up, please, the

10  top of that.

11  **BY MR. CARMODY:**

12  **Q.**  I mean, it says -- I'm looking at [as read]:

13       "Choose which settings will save data in your

14  Google Account."

15  And then right underneath that --

16       **MR. CARMODY:**  Let's blow it up.

17  Oh, is that the best we can do?

18  Oh, thank you.

19  **BY MR. CARMODY:**

20  **Q.**  So it says [as read]:

21       "The data saved in your account helps give you

22  more personalized experiences across all Google

23  services."

24  Do you see it right here, it was word for word?

25  **A.**  Yes, I do.

**MONSEES - DIRECT / CARMODY**

1  **Q.**  Okay.  And then we have -- well, in fact, let's move on

2  here to the next one because I can see my time is getting close

3  here.

4      So I'm going to run on to the next exhibit.  Take a look

5  at PX9.

6      Well, and before I do -- actually, before I do, are you

7  aware of a single research study that Google can bring into

8  this courtroom where it shows, oh, gosh all the users really

9  did understand when you turn off WAA, we're collecting your

10  information and we're actually making money on it?  Is there

11  ever such a study?

12  **A.**  I don't think we normally test broad study like that.

13  There's nothing I'm aware of.

14  **Q.**  Okay.  Okay.  Let's go to PX9, then.

15      We've spoken about Chris Ruemmler.  And it's fair to say

16  that other Google employees also commented on Google users'

17  comprehension of WAA and the WAA button; fair?

18  **A.**  That's fair.

19  **Q.**  Okay.  Okay.  And we're looking at this document now, PX9,

20  which is dated June 8th of 2020, just two months after the

21  study we just saw in PX2; correct?

22  **A.**  That's correct.

23  **Q.**  And now we have the author of this document is

24  Arne de Booij.  Do you see that?

25  **A.**  Yes, I do.

 1   **Q.**   We spoke about him earlier in the examination because he

 2   was the gentleman who was on the document talking about

 3   feelings of user control gives them trust in Google; right?

 4   **A.**   That's correct.

 5   **Q.**   Okay.  So Mr. de Booij, you know him.  You said he was an

 6   experience -- a user experience researcher, somebody that you

 7   worked with; fair?

 8   **A.**   That's fair.

 9              **MR. CARMODY:**  Okay.  I'm going to move in PX9.

10              **MR. SANTACANA:**  No objection, Your Honor.

11              **THE COURT:**  Exhibit 9 will be admitted.

12        (Trial Exhibit PX9 received in evidence.)

13   **BY MR. CARMODY:**

14   **Q.**   Now, the research project here was code-named

15   Express Echna?

16   **A.**   Echidna.

17   **Q.**   Echidna.  Okay.

18   **A.**   Some of the names are cute.  This was an account creation

19   flow in Europe.

20   **Q.**   Turn to page 4, please.

21        We can see here on the left side, if we want to look at

22   the format, it has -- because we're going to look at a column

23   coming up where we can't see the kind of the format so well.

24        So what we can see is the left column says "Research

25   Question."  Then it talks about what the goal is in the middle.

1   And then you see on the right "Hypothesis"; right?

2   **A.**   I do.

3   **Q.**   Okay.  So that was kind of -- that's the format.

4       So now let's take a look and turn to page 6 and kind of

5   look at what's written there right around the middle of the

6   page.  Okay?

7       So the question being posed is [as read]:

8           "What do most respondents believe the effect of

9           turning off the WAA button will have on the amount of

10          data collected..."

11      And there's a second one.  I want to stop here.

12      Well, we can even go on to it.  Just say [as read]:

13          "... and the amount of personalization they will

14          experience?"

15      Do you see that, sir?

16  **A.**   Yes, I do.

17  **Q.**   Okay.  Then if we go to the right, there's a hypothesis.

18  And, in fact, because there are two questions, we have two

19  hypotheses; right?  Correct?

20  **A.**   Correct.

21  **Q.**   Let's take them one at a time.

22      First hypothesis to the question in (a).  Reminder, the

23  question is [as read]:

24          "What do most respondents believe the effect of

25          turning off WAA will have on the amount of data

1    that's collected by Google?"

2    The hypothesis by Mr. de Booij is [as read]:

3        "Most respondents will believe that turning off

4    WAA will result in no data being collected from their

5    activity."

6    That was the hypothesis; correct?

7  **A.**  Correct.

8  **Q.**  And then he goes on to say, and in answering the question

9  in (b), the amount of personalization these users will

10  experience, he says [as read]:

11        "... and no personalization in Google products

12    and services."

13    Correct?

14  **A.**  That's correct.

15  **Q.**  So if we take them a step at a time, we can look and see

16  that he described up top what was actually happening in Google

17  at the time when he says "Most respondents will believe that

18  turning off data will result" -- or let me back up.  Maybe I

19  got it backwards here.

20    [As read]:

21        "Most respondents will believe that turning off

22    WAA will result in no data being collected from their

23    activity...."

24    That's what Mr. Ruemmler said in his email that we've

25  looked at, PX3; correct?  It was his last question.

**MONSEES - DIRECT / CARMODY**

1   **A.**   Correct.

2   **Q.**   Okay.  And then it says [as read]:

3        "... and no personalization in Google products

4   and services."

5   Correct?

6   **A.**   That's correct.

7   **Q.**   Now, a hypothesis is part of the scientific process.  It's

8   a prediction; right?

9   **A.**   That's correct.

10  **Q.**   They use -- Mr. de Booij's prediction was made one month

11  before this lawsuit.  Do you know that?

12  **A.**   No, I did not.

13  **Q.**   Okay.  I didn't until recently.

14       Okay.  And Mr. de Booij's hypothesis is certainly

15  consistent with the research study we went over, PX2; correct?

16  **A.**   Correct.

17  **Q.**   Where all participants believe that when they put their

18  WAA button on off, Google wasn't collecting any data at all;

19  fair?

20  **A.**   Well, I think --

21  **Q.**   That was "yes"?

22  **A.**   -- that was partially fair.

23       I think it's, they're not collecting any data at all in

24  their Web & App Activity in their account, given that that was

25  a Web & App Activity study and this is an account creation

1  study.

2  **Q.**  But it's interesting you say that because it doesn't --

3  what you just told us, you can't find in this 50-page study we

4  just looked at; right?

5  **A.**  Well, it's a study about the Web & App Activity setting

6  that we were looking at.  It's very specific about the data

7  that goes into that bucket when the setting is on and off.

8  **Q.**  And the user comprehension when the WAA toggle is off,

9  that Google is not collecting anybody's activity; fair?  That's

10  what the finding was?

11  **A.**  In their Google Account.  It's a Google Account setting

12  study.  So I think that context is important, I thought.

13  **Q.**  My question to you is:  Can you show us where in this

14  50-page -- do we need to go back to PX2?

15      Are you telling us somewhere in this 50-page document I

16  missed the point?  It's not whether Google collects your data;

17  it's just where we put it?

18  **A.**  I think the point on that exhibit, if we want to go back,

19  is that if you look at --

20  **Q.**  No.

21  **A.**  -- what the study was for, we were requesting a study

22  about an auto delete feature we were launching as part of your

23  Web & App Activity.  So I think it's kind of obvious probably

24  to the folks working on it that we're talking about Web & App

25  Activity, Google Account data, not other non-account data.

1  **Q.**  You understand that retention controls were a separate

2  part of this 50-page study?  It had nothing to do with the

3  findings we just looked at?

4  **A.**  No.  The retention study that we were looking at is a

5  study specifically about the creation of these retention

6  controls.  It was one of many studies that we did.

7  **Q.**  Let me just --

8  **A.**  Can we bring the exhibit back up if we're talking about

9  it?

10          **THE COURT:**  One at a time.

11          **MR. CARMODY:**  Sorry.

12          **THE COURT:**  One at a time.

13          **MR. CARMODY:**  Sorry.  That's my fault.

14          **THE COURT:**  Question?

15          **THE WITNESS:**  So I was just --

16  **BY MR. CARMODY:**

17  **Q.**  Do you want to finish, sir?

18          **THE COURT:**  Wait, wait, wait.

19      Let's have a question.

20  **BY MR. CARMODY:**

21  **Q.**  Does Google stand by its research finding in PX2 that all

22  participants expected turning off the toggle, the WAA toggle,

23  to stop their activity from being saved?  Can I hold --

24  **A.**  Yes.

25  **Q.**  Can we hold --

PROCEEDINGS

1          **THE COURT:**  Okay.  So we'll see you tomorrow.

2          **MR. HUR:**  Thank you, Your Honor.

3          **THE COURT:**  Thank you.

4          **THE COURTROOM DEPUTY:**  Court stands in recess.

5              (Proceedings adjourned at 1:29 p.m.)

6                       ---o0o---

7

8              **CERTIFICATE OF REPORTER**

9          I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   DATE:  Wednesday, August 20, 2025

13

14

15

16                    *Ana Dub*

17   _____

18          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

19          CSR No. 7445, Official United States Reporter

20

21

22

23

24

25

**Volume 3**

**Pages 341 - 562**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

```
ANIBAL RODRIGUEZ, et al.,        )
individually and on behalf of    )
all others similarly situated,   )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )   NO. 3:20-CV-04688 RS
                                 )
GOOGLE LLC,                      )
                                 )
          Defendant.             )
_____  )
```

San Francisco, California
Wednesday, August 20, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                BOIES SCHILLER FLEXNER LLP
                333 Main Street
                Armonk, New York 10504
       **BY:** **DAVID BOIES, ATTORNEY AT LAW**

                BOIES SCHILLER FLEXNER LLP
                2029 Century Park East, Suite 1520
                Los Angeles, California 90067
       **BY:** **ALISON L. ANDERSON, ATTORNEY AT LAW**

                BOIES SCHILLER FLEXNER LLP
                100 Southeast Second Street, Suite 2800
                Miami, Florida 33131
       **BY:** **JAMES W. LEE, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
               CSR No. 7445, Official United States Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiffs:
                          BOIES SCHILLER FLEXNER LLP
 3                        44 Montgomery Street, 41st Floor
                          San Francisco, California 94104
 4                   BY:  MARK C. MAO, ATTORNEY AT LAW

 5                        SUSMAN GODFREY LLP
                          One Manhattan West, 50th Floor
 6                        New York, New York 10001
                     BY:  WILLIAM C. CARMODY, ATTORNEY AT LAW
 7                        RYAN SILA, ATTORNEY AT LAW

 8                        SUSMAN GODFREY LLP
                          1900 Avenue of the Stars, Suite 1400
 9                        Los Angeles, California 90067
                     BY:  AMANDA BONN, ATTORNEY AT LAW
10
                          MORGAN & MORGAN COMPLEX LITIGATION GROUP
11                        201 North Franklin Street, Seventh Floor
                          Tampa, Florida 33602
12                   BY:  RYAN McGEE, ATTORNEY AT LAW

13

14   For Defendant:
                          COOLEY LLP
15                        Three Embarcadero Center, 20th Floor
                          San Francisco, California 94111-4004
16                   BY:  BENEDICT Y. HUR, ATTORNEY AT LAW
                          EDUARDO E. SANTACANA, ATTORNEY AT LAW
17                        SIMONA A. AGNOLUCCI, ATTORNEY AT LAW
                          THILINI L. CHANDRASEKERA
18                        ATTORNEY AT LAW

19                        COOLEY LLP
                          4401 Eastgate Mall
20                        San Diego, California 92121
                     BY:  MICHAEL A. ATTANASIO, ATTORNEY AT LAW
21

22

23   Also Present:       Steve Ganem, Google
                          Anibal "Pete" Rodriguez
24                        Julian Santiago

25
```

1    And we looked at this before.  Do you remember when it

2   laid out the activity, and it says, "To let Google save this

3   information, Web & App Activity must be on"?

4   **A.**   Yes.

5   **Q.**   All right.  If Google saves your app activity data even

6   when WAA is turned off, then is the statement that "To let

7   Google save this information, Web & App Activity must be on,"

8   in your view, is that true or false?

9   **A.**   It's false.

10  **Q.**   Now that you know that Google was collecting, saving, and

11  using your app activity data this entire time, describe how

12  that's affected you.

13  **A.**   Well, Google has a ton of information on us that they

14  never had our permission to have.  We have no idea what they're

15  doing with it, what they will do with it.  It's concerning.

16  **Q.**   And do you feel that Google taking your information is

17  highly offensive?

18  **A.**   Yeah.  Yes.

19  **Q.**   Explain why.

20  **A.**   Misleading people is highly offensive.  Taking people's

21  information without their permission, that's highly offensive.

22  Making a fake button that deceives people is highly offensive

23  as well.

24  **Q.**   Now, after you joined the lawsuit because Google was

25  collecting your browsing activity even with WAA off, did you

**SANTIAGO - DIRECT / LEE**

1    stop using your apps?

2    **A.**    No, I did not.

3    **Q.**    Why not?

4    **A.**    Well, a few reasons.  Firstly, Google should have to

5    change.  Google should make a privacy button that actually

6    works and honor its promises to its users.

7        And, secondly, as a class representative, it is my

8    responsibility to this class to maintain my same behaviors so

9    that our experts can do their work, and they've done a

10    phenomenal job at that, to be able to confirm what Google was,

11    indeed, collecting; and, finally, for legal reasons, to get

12    Google to change its practices.

13    **Q.**    Did knowing that Google collected and saved your app

14    activity after the lawsuit, did it change how you used certain

15    apps?

16    **A.**    I would say so, yeah.

17    **Q.**    Tell me more about that.

18    **A.**    Well, I was certainly more cautious with certain apps and

19    probably veered away from some altogether, maybe some of the

20    social media apps.  So it definitely affected the number of

21    apps that I was using.

22    **Q.**    Do you have an understanding, Mr. Santiago, one way or

23    another, that Google compromises the bandwidth or data on your

24    phone, as well as the battery life on the device, by taking

25    this sWAA data even when you have WAA off?

1    my best, because I don't.

2        But fantasy football involves having a team that you own.

3    You can draft players from different teams around the NFL to

4    create your own team.  There's a point-scoring system based on

5    the players you have on your team, and you compete with other

6    team owners who do the same thing, usually a group of friends.

7    Is that fair?

8    **A.**    Yeah, that sounds right.

9    **Q.**    Often there's a cash prize at the end.  Everybody

10   contributes money, and there can be a cash prize at the end

11   that can be real money; true?

12   **A.**    There can be, yes.

13   **Q.**    How long have you played fantasy football?

14   **A.**    I'd say, I guess, about ten -- ten-ish years.

15   **Q.**    Okay.  The sports network ESPN has an app for fantasy

16   football; yes?

17   **A.**    They do, yes.

18   **Q.**    It's on this screen here under "ESPN Fantasy."  Do you see

19   that?

20   **A.**    Yes.

21   **Q.**    Did you check the terms of service and privacy policy for

22   the ESPN Fantasy app?

23   **A.**    Yes, I do, and I remember bringing up to my league mates

24   about switching after I found out that ESPN Fantasy had Google

25   SDKs.

PROCEEDINGS

1          And, you know, it's difficult -- it's a huge ask to ask

2   people to not use all of their apps on their phone and

3   basically not use their phones unless -- there shouldn't be

4   tracking on it.  And unfortunately, I was overruled in my

5   fantasy league and we continue using that app.

6   **Q.**   Do you use it today?

7   **A.**   I believe there will be a league with that app, yes.

8   **Q.**   Well, the league starts in two weeks.

9   **A.**   Yes.

10  **Q.**   You've already done your draft.  I know you've probably

11  done your draft by now.

12  **A.**   I have not, no.

13  **Q.**   Okay.

14  **A.**   It's coming up.

15  **Q.**   But the point is, your league with you and your friends,

16  you're going to continue to use the app that we have

17  highlighted here, ESPN Fantasy; yes?

18  **A.**   Yes.  It's difficult to be able to go somewhere else.  If

19  we switch to another app, how do we know if the other app has a

20  Google SDK as well?  We can't look that up anywhere.

21  **Q.**   Sir --

22  **A.**   We don't know where -- if the other apps have SDKs.

23  **Q.**   Sir, you are aware there are countless websites competing

24  every day for fantasy participants, for gambling participants

25  around the NFL.  They're everywhere.  They are literally

1  everywhere, competing with each other, offering to port over

2  your data from one fantasy app to another fantasy app.  You

3  know that, don't you?

4  **A.**    There's also 12 other people in the league that need to be

5  willing to change.  It's not just up to me.  And like I said,

6  let's say we do switch apps.  Let's say we go to another

7  fantasy app in this example.  How do we know the other fantasy

8  app doesn't have a Google SDK as well?  It's everything.  It's

9  everywhere.  What do you want us to do?  Not use our phones?

10  **Q.**    I don't see Bleacher Report on this list.  That's a

11  sports-related site, isn't it?

12  **A.**    Bleacher Report is a sports-related site.  They don't

13  offer fantasy football.

14  **Q.**    Hmm.  That's a sport-related app that you have; correct?

15  **A.**    I do.

16  **Q.**    That advertises alternatives to ESPN Fantasy; correct?

17  **A.**    I -- I imagine -- I don't know their advertisers, but they

18  do not have a fantasy option of their own.

19  **Q.**    All right.  Well, we're talking about -- let's be clear.

20  We're talking about fantasy football here.  That's what we're

21  talking about; right?

22  **A.**    Sure.

23  **Q.**    You used the ESPN Fantasy app before you saw the movie;

24  correct?

25  **A.**    Yes, I'd say so.

PROCEEDINGS

1   **Q.**   Before you turned sWAA and WAA off; correct?

2   **A.**   Yes.

3   **Q.**   Before you joined this lawsuit; correct?

4   **A.**   Correct.

5   **Q.**   And you used ESPN Fantasy app after you saw the movie,

6   after you turned off WAA and sWAA, and after you joined this

7   case and you use it to this day; correct?

8   **A.**   That's correct.  And it is my responsibility to this

9   class, as previously mentioned, to continue those behaviors,

10  to -- so we can figure out what Google is collecting, where

11  that information is being stored, and so we can get Google to

12  delete that information.  There are reasons for me continuing

13  to use that.  If I stop using these apps, you're going to say

14  that I'm no longer in harm.

15         **MR. ATTANASIO:**  Your Honor, objection.

16  Non-responsive.  Move to strike everything after "That's

17  correct."

18         **THE COURT:**  Overruled.

19  **BY MR. ATTANASIO:**

20  **Q.**   Mr. Santiago, after you joined the case in November 2020,

21  you also continued to use the app that was then called Twitter;

22  correct?

23  **A.**   I'd say on and off.

24  **Q.**   You continued to use it on and off; is that fair?

25  **A.**   Yes.

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Thursday, August 21, 2025

7

8

9

10   _____

11            Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

12          CSR No. 7445, Official United States Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

Volume 4

Pages 563 - 787

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,           )
individually and on behalf of       )
all others similarly situated,      )
                                    )
            Plaintiffs,             )
                                    )
  VS.                               )   NO. 3:20-CV-04688 RS
                                    )
GOOGLE LLC,                         )
                                    )
            Defendant.              )
_____)

San Francisco, California
Thursday, August 21, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    BOIES SCHILLER FLEXNER LLP
                    333 Main Street
                    Armonk, New York 10504
            BY:  **DAVID BOIES, ATTORNEY AT LAW**
                 **ALEXANDER BOIES, ATTORNEY AT LAW**
                 **M. LOGAN WRIGHT, ATTORNEY AT LAW**

                    BOIES SCHILLER FLEXNER LLP
                    2029 Century Park East, Suite 1520n
                    Los Angeles, California 90067
            BY:  **ALISON L. ANDERSON, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiffs:
                         BOIES SCHILLER FLEXNER LLP
 3                       100 Southeast Second Street, Suite 2800
                         Miami, Florida 33131
 4              BY:  JAMES W. LEE, ATTORNEY AT LAW

 5                       BOIES SCHILLER FLEXNER LLP
                         44 Montgomery Street, 41st Floor
 6                       San Francisco, California 94104
                BY:  MARK C. MAO, ATTORNEY AT LAW
 7
                         SUSMAN GODFREY LLP
 8                       One Manhattan West, 50th Floor
                         New York, New York 10001
 9              BY:  WILLIAM C. CARMODY, ATTORNEY AT LAW
                     RYAN SILA, ATTORNEY AT LAW
10
                         SUSMAN GODFREY LLP
11                       1900 Avenue of the Stars, Suite 1400
                         Los Angeles, California 90067
12              BY:  AMANDA BONN, ATTORNEY AT LAW

13                       MORGAN & MORGAN COMPLEX LITIGATION GROUP
                         201 North Franklin Street, Seventh Floor
14                       Tampa, Florida 33602
                BY:  RYAN McGEE, ATTORNEY AT LAW
15
     For Defendant:
16                       COOLEY LLP
                         Three Embarcadero Center, 20th Floor
17                       San Francisco, California 94111-4004
                BY:  BENEDICT Y. HUR, ATTORNEY AT LAW
18                   EDUARDO E. SANTACANA, ATTORNEY AT LAW
                     SIMONA A. AGNOLUCCI, ATTORNEY AT LAW
19                   THILINI L. CHANDRASEKERA
                     ATTORNEY AT LAW
20                   CHELSEA HU, ATTORNEY AT LAW

21                       COOLEY LLP
                         4401 Eastgate Mall
22                       San Diego, California 92121
                BY:  MICHAEL A. ATTANASIO, ATTORNEY AT LAW
23

24   Also Present:      Steve Ganem, Google
                        Anibal "Pete" Rodriguez
25                      Julian Santiago
```

1  Q.   Well, in your deposition, you didn't say, "This is very

2  far afield."  You just simply admitted -- in fact, I think you

3  explained to me in a long monologue that this was very

4  frustrating, but Google did it to protect user privacy.  That's

5  what you said, did you not?

6  A.   Yes.

7  Q.   Okay.  Now, you do not believe that your use of

8  Google Analytics has materially increased anyone's risk.  You

9  have said that; right?

10 A.   Yes, I said that.

11 Q.   You had tracking pixels on your own website at the time

12 this case was filed?

13 A.   Yes.

14 Q.   They were on your website when we last met at your

15 deposition?

16 A.   Yes.

17 Q.   And I asked you at your deposition:  How can you square

18 the plaintiffs' position in this case with the fact that you

19 yourself were using Google Analytics on your website?  You

20 remember I asked you that?

21 A.   Yes.

22 Q.   And you said that you didn't believe that using

23 Google Analytics on your website would materially increase

24 anyone's risk.  You said that?

25 A.   Yes.

HOCHMAN - CROSS / SANTACANA

1   Q.   Now, after I suggested to you at your deposition that it

2   might be a problem that you're criticizing Google Analytics on

3   the one hand and using it on the other, you removed

4   Google Analytics from your website, did you not?

5   A.   Sometime later, I decided that I didn't want to share my

6   website visitor data with Google because I was getting the idea

7   that Google could use that data against me, and I decided not

8   to use that.

9        And, in fact, I've actually decided not to use a whole

10  bunch of Google products.  I've -- just for my own reasons,

11  I've stopped using Gmail.  I've stopped using Chrome.  I'm

12  using Proton Mail.  I'm using the Vivaldi browser.  I'm using

13  DuckDuckGo.  And I'm doing all right.

14  Q.   You were deposed in the summer of 2023; right,

15  Dr. Hochman?

16  A.   Yes.

17  Q.   You were hired for this case a couple of years earlier;

18  right?

19  A.   Yeah.  There was -- I guess it might have been in 2022

20  that I was hired.

21  Q.   So for a year, you maintained Google Analytics on your

22  website; right?

23  A.   Yes.

24  Q.   Then I deposed you?

25  A.   Yes.

1   Q.   And I suggested to you that it didn't look very good that

2   you were using Google Analytics while criticizing it; right?

3   A.   You said that, sure.

4   Q.   I said that.  And sometime after that, you went and you

5   took it off your website?  True or false?

6   A.   That's true.

7   Q.   When this case is over and the jury has done their work

8   and these lawyers aren't paying you anymore, are you going to

9   put Google Analytics back on your website?

10  A.   Absolutely not.

11  Q.   Dr. Hochman, you agree with me that Google Analytics is

12  not showing app developers personally identifiable information;

13  right?  You've said that?

14  A.   I've used it and I haven't seen that, so yes.

15  Q.   Now, you are not -- just to be perfectly clear for this

16  jury, you are not offering an expert opinion about what is or

17  is not personally identifiable information; right?

18  A.   Oh, yeah.  I heard you use that term before in an

19  objection.  I wanted to clarify it.  Thanks for the

20  opportunity.

21  Q.   Dr. Hochman, I'm sorry, but the time to clarify is with

22  your counsel.  I asked you a very simple question.

23  A.   Okay.

24  Q.   You are not offering an opinion in this case about what is

25  or is not personally identifiable information?

**RODRIGUEZ - DIRECT / LEE**

1    policy and the privacy controls that were offered, is that how

2    you came across WAA?

3    **A.**    Yes.

4    **Q.**    Did you -- when you saw the WAA disclosures and the

5    privacy button that is either both WAA and sWAA, did you turn

6    it off after reading the privacy policy?

7    **A.**    Yes.

8    **Q.**    Let's put up on the screen what's been previously admitted

9    as PX62.

10        Do you recognize this document, Mr. Rodriguez?

11   **A.**    Yes.

12   **Q.**    Did you read this privacy policy prior to the lawsuit?

13   **A.**    Yes.

14   **Q.**    And can you read the effective date on there?

15   **A.**    It says effective May 25th, 2018.

16   **Q.**    And could you please read out loud to the jury the first

17   paragraph that's in bold letters?

18   **A.**    [as read]:

19            "When you use our services, you're trusting us

20        with your information.  We understand that this is a

21        big responsibility and work hard to protect your

22        information and put you in control."

23   **Q.**    All right.  Let's go down two paragraphs on the same page.

24        And, by the way, is this -- what page are we on right now?

25   Do you know?

1   **A.**   The policy -- the privacy policy.

2   **Q.**   Yeah.  Is it the first page?

3   **A.**   Yes.

4   **Q.**   All right.  Let's go down, yeah, two paragraphs.

5       And do you see the sentence at the end of that paragraph,

6   beginning with "Across our services"?

7   **A.**   Yes.

8   **Q.**   Could you read that to the jury?

9   **A.**   [as read]:

10          "And across our services you can adjust your

11      privacy setting" -- "settings to control what we

12      collect and how your information is used."

13  **Q.**   What is your understanding of what Google means when it

14  says you can control what we collect?

15  **A.**   It means I can control what they can collect as far as my

16  information.

17  **Q.**   And what's your understanding of what Google means here

18  when it says you can control how your information is used?

19  **A.**   Exactly that, that I can control how it can be used.

20  **Q.**   According to the first page of the privacy policy, who's

21  in control of what information Google is allowed to collect and

22  use?

23  **A.**   Me.

24  **Q.**   All right.  Let's go -- let's continue on down the privacy

25  policy on page 8.

RODRIGUEZ - DIRECT / LEE

1      Do you see there's a section in the privacy policy that

2   presents you the privacy controls?

3   **A.**   Yes.

4   **Q.**   And did you see this privacy control section when you

5   reviewed this document back in 2018?

6   **A.**   Yes.

7   **Q.**   Now, from here, can you explain to the jury how you get to

8   the WAA button?

9   **A.**   There is a link there that says, "Go to activity

10  controls."

11  **Q.**   Okay.  Let's take a look at PX84, also already in

12  evidence.

13      And is this what is displayed when you click that link?

14  **A.**   Yes.  Similar, yes.

15  **Q.**   Okay.  Now, what was your understanding of what these

16  buttons do?

17      So let's start with the Web & App Activity, and we can

18  snip out -- we can also include the subsettings.

19      What was your -- so do you see at the top there's

20  Web & App Activity?

21  **A.**   Right.

22  **Q.**   And then below, there's the subsettings?

23  **A.**   Yes.

24  **Q.**   Okay.  What was your understanding of what these buttons

25  do when they're on?  Let's start with WAA.

1    **A.**    So if it's on, it does save your activity on Google sites

2    and apps, including associated info, like location.

3    **Q.**    All right.  And how about sWAA?  We've been calling it

4    sWAA, but here it's labeled as the subsettings.  Do you see

5    that?

6    **A.**    Right.

7    **Q.**    What happens if a user turns sWAA on?

8    **A.**    SWAA leaves -- okay -- include Chrome history and activity

9    from sites, apps, and devices that use Google services.

10    **Q.**    So Google can save all those things if sWAA is on?

11    **A.**    Right.

12    **Q.**    And if you turn WAA off, by the way, what would happen

13    with sWAA?

14    **A.**    It automatically gets turned off.

15    **Q.**    So they both turn off?

16    **A.**    Right.

17    **Q.**    Do you see here at the top of Web & App Activity it says

18    "Learn more"?

19    **A.**    Yes.

20    **Q.**    Do you remember clicking that back in 2018?

21    **A.**    Yes.

22    **Q.**    All right.  Let's take a look at what's been premarked as

23    Exhibit 104.

24              **THE COURTROOM DEPUTY:**  Has that been admitted?

25              **MR. LEE:**  Not yet.  I'm going to do it right now.

RODRIGUEZ - DIRECT / LEE

1   BY MR. LEE:

2   Q.   Mr. Rodriguez, did you review this disclosure in 2018?

3   A.   Yes.

4           MR. LEE:  Your Honor, may I admit PX104 into evidence?

5           MS. AGNOLUCCI:  No objection, Your Honor.

6           THE COURT:  104 will be admitted.

7        (Trial Exhibit PX104 received in evidence.)

8           MR. LEE:  All right.  It's up.

9   BY MR. LEE:

10  Q.   Do you see here where the disclosure states what's saved

11  as Web & App Activity?

12  A.   Yeah, I see that.

13  Q.   I know it has a weird formatting thing, but just bear with

14  me.  Okay?

15  A.   Sure.

16  Q.   Based on Google's disclosure, what activity does Google

17  say that it saves when WAA is on?

18  A.   It says websites and apps you use -- that I use.

19  Q.   Mm-hmm.

20  A.   Your activity on websites and in apps that use Google

21  services.

22  Q.   Okay.  Do you see below there, Google also states, "To let

23  Google save this information, Web & App Activity must be on"?

24  A.   Yes.

25  Q.   All right.  What's the opposite of on?

1  **A.**   Off.

2  **Q.**   And based on these statements by Google, what's your --

3  what understanding did you have regarding the data Google is

4  not allowed to save when WAA is turned off?

5  **A.**   That none of this information would be saved.

6  **Q.**   And based on all the disclosures that we looked at, does

7  the WAA button and sWAA button control where Google saves your

8  app data or whether Google saves your app data?

9  **A.**   Whether.

10  **Q.**   Whether?

11  **A.**   Right.

12  **Q.**   After you read the privacy policy and these disclosures

13  about WAA, what did you do next?

14  **A.**   I went on my phone and found the -- the activity controls

15  and turned off WAA from there.

16  **Q.**   You did that from your Android phone?

17  **A.**   My phone, yeah.

18  **Q.**   All right.  Let's take a look at PX120A, which is now in

19  evidence.

20       Are you familiar with these screens from the Android

21  phone?

22  **A.**   Yes.

23  **Q.**   And before you joined this lawsuit, did you check your

24  Android phone to make sure that these were the same screens as

25  what we have depicted here?

1  **A.**   Yes.

2  **Q.**   Now, at the top of screen one, do you see where -- it's at

3  the very top -- do you see where Google calls this entire

4  screen privacy?

5  **A.**   Yes, I see it there.

6  **Q.**   And then below, in the red box, do you see that there's

7  something called activity controls?

8  **A.**   Yes.

9  **Q.**   And what does it say?  What's the description of activity

10  controls?

11  **A.**   It says [as read]:

12        "Choose the activities and info you allow Google

13      to save."

14  **Q.**   Now, by clicking "activity controls," does that take you

15  to the screen in the middle, the second screen?

16  **A.**   Yes.

17  **Q.**   And do you see the WAA and sWAA button presented there?

18  **A.**   I do.

19  **Q.**   And there's a smaller box below Web & App Activity that

20  has a "Learn more" link.  Do you see that?

21  **A.**   Yes.

22  **Q.**   All right.  And does clicking that take us to Screen 3?

23  **A.**   Yes, it does.

24  **Q.**   Now, based on Screen 3 -- let's blow that up a little,

25  Screen 3 -- what activity does Google say it saves when WAA is

1    on, starting at the top there?

2    **A.**    Sure.  Info about your browsing and other activities on

3    sites, apps, and devices that use Google services.

4    **Q.**    And what about the two bullets there?

5    **A.**    Yeah.  Sites and apps that partner with Google to show ads

6    and sites and apps that use Google -- service -- services,

7    including data apps that share with Google.

8    **Q.**    And do you see in the box below, it says, "To let Google

9    save this information, Web & App Activity must be on"?

10    **A.**    Yes.

11    **Q.**    So what should happen when you turn Web & App Activity

12    off?

13    **A.**    Like before, everything that it says it would save, it

14    should not save.

15    **Q.**    All right.  You mentioned that you have a specific memory

16    of reading the Google privacy policy and disclosures about

17    WAA --

18    **A.**    Right.

19    **Q.**    -- and turning off WAA in 2018?

20    **A.**    Right.

21    **Q.**    Okay.  So let's just set the stage for that.  Let's take a

22    look at DX 941.R2, which is already in evidence.

23        This document was shown during Mr. Monsees' examination,

24    as well as Mr. Santiago's examination.  Do you remember that?

25    **A.**    Yes.

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3          I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6   DATE:  Friday, August 22, 2025

7

8

9

10

11   _____

12         Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13      CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25