# EXHIBIT B

**ROUGH DRAFT - UNCERTIFIED COPY - ATTORNEYS' USE ONLY**

---

Please be aware when using, saving onto a hard computer disk, or receiving a Livenote/Bridge/Realtime ASCII that:

1. Because of the nature of stenographic outlines, differences WILL exist between the Livenote/Bridge/Realtime ASCII copy and the certified transcript prepared by the reporter. Those differences will include the following, among others:

   a. Words may change;
   b. Page and line numbers may change;
   c. Punctuation may change; and/or
   d. Quotes may change.

2. The Livenote/Bridge/Realtime ASCII draft is an uncertified, rough-draft copy of the proceedings.

3. A Livenote/Bridge/Realtime ASCII or saving Livenote/Bridge/Realtime onto a computer hard drive will only be provided when a certified copy is purchased and that there will be a charge for the Livenote/Bridge/Realtime in addition to the charge for the certified copy.

---

**DISCLAIMER**

THIS REALTIME ROUGH DRAFT TRANSCRIPT IS BEING PROVIDED TO COUNSEL PURSUANT TO CODE OF CIVIL PROCEDURE, SECTION 2025(R)(2), WHICH PROVIDES AS FOLLOWS:

"WHEN PREPARED AS A ROUGH DRAFT TRANSCRIPT, THE TRANSCRIPT OF THE PROCEEDING MAY NOT BE CERTIFIED AND MAY NOT BE USED, CITED, OR TRANSCRIBED AS THE CERTIFIED TRANSCRIPT OF THE PROCEEDINGS. THE ROUGH DRAFT TRANSCRIPT MAY NOT BE CITED OR USED IN ANY WAY OR AT ANY TIME TO REBUT OR CONTRADICT THE CERTIFIED

1   TRANSCRIPT OF PROCEEDINGS AS PROVIDED BY THE COURT
2   REPORTING OFFICER."
3   IT IS AGREED BY ALL PARTIES RECEIVING A COPY OF THE
4   REALTIME ROUGH DRAFT TRANSCRIPT TO USE IT ONLY FOR THE PURPOSE
5   OF AUGMENTING YOUR NOTES AND NOT TO USE OR CITE IT IN ANY COURT
6   PROCEEDING OR TO DISTRIBUTE IT IN ANY FORM TO ANY PERSON OR
7   PARTY OUTSIDE OF THIS LITIGATION WITHOUT THE APPROVAL OF THE
8   CERTIFIED SHORTHAND REPORTER.
9   REALTIME ROUGH DRAFT TRANSCRIPT OF:
10  **RODRIGUEZ VS. GOOGLE LLC**
11  **08-25-2025**
12         Monday, August 25, 2025 08:05:47
13  (Proceedings were heard out of the presence of the jury.)
14         **THE COURT:** Good morning.
15         **ALL:** Good morning, Your Honor.
16         **THE COURT:** Okay. I received various communications
17  since we were together. Let me go through a couple of things.
18     Motion in Limine Number 18, that pertains to Plaintiffs'
19  Exhibit 6. Google has objected to that. I'm going to overrule
20  the objection. It will be admissible. Does that come in under
21  Mr. Heft-Luthy or somebody else?
22         **MS. BONN:** Mr. Heft-Luthy, Your Honor.
23         **THE COURT:** All right.
24     The fight about demonstratives, I want to see what the
25  proposed demonstratives are. I can't do this in the abstract.

1  **Q.**   Do you understand that when Google collects your app
2  activity data when WAA is off, that that impacts your device's
3  band width and drains the battery?
4  **A.**   Now I do, yes.
5  **Q.**   Do you think that's right for Google to do?
6  **A.**   No.  I mean, they're taking -- they're collecting your
7  data when you already told them not to and then they're using
8  your device resources to do so, and I think that's wrong.
9  **Q.**   You think the class should be compensated for that?
10 **A.**   Definitely, yes.
11 **Q.**   What other relief are you asking for on behalf of the
12 class?
13 **A.**   Well, Google obviously thinks that the data is valuable so
14 I think they should pay that.  I also think that -- that they
15 profited off it as well, so anything that they profited should
16 go back to the class.
17       And I -- I don't want them to do this again.  I would like
18 for them to learn their lesson in a sense, so I think punitive
19 damages would be right as well.
20 **Q.**   If you could tell Google anything, what would it be?
21 **A.**   Well, like, I honestly feel that, like -- that the tech
22 industry or just tech in general is a good thing for humanity.
23 It obviously makes things a lot better for humanity, but I
24 don't think being dishonest or misleading is a good thing.
25       So being that Google is the biggest tech company in the

1  industry, I think they should lead by example and do better in
2  what they're doing.
3  **Q.**   Thank you Mr. Rodriguez.
4  **A.**   Thank you.
5         **THE COURT:**  Ms. Agnolucci.
6         **MS. AGNOLUCCI:**  Thank you, Your Honor.
7                     **CROSS-EXAMINATION**
8  **BY MS. AGNOLUCCI:**
9  **Q.**   Good morning, Mr. Rodriguez.
10 **A.**   Good morning.
11 **Q.**   You are a class representative in this case; right?
12 **A.**   Right.
13 **Q.**   That's an important job?
14 **A.**   Definitely.
15 **Q.**   You are one of the faces of this lawsuit?
16 **A.**   Yes.
17 **Q.**   And you filed your lawsuit against Google in July of 2020;
18 is that right?
19 **A.**   Right.
20 **Q.**   And you learned about it from a friend named Arturo
21 Garcia?
22 **A.**   That's right.
23 **Q.**   At the time, Arturo was an IT specialist at the Miami
24 office of these lawyers at Boies Schiller?
25 **A.**   Right.

1  **Q.** And after amending your complaint in this case, you went
2  and turned WAA and sWAA off?
3  **A.** Right. For the same reasons as I turned off the other
4  ones.
5  **Q.** Your older son Nathan had a Samsung phone that you bought
6  for him; right, Mr. Rodriguez?
7  **A.** Right.
8  **Q.** That's an Android phone?
9  **A.** Right.
10 **Q.** A google phone?
11 **A.** Right.
12 **Q.** And you alleged in your complaint, of course, that Google
13 was collecting private information about you without your
14 consent?
15 **A.** Right.
16 **Q.** That information, to you, was as disturbing as a nude
17 photo; right?
18 **A.** Right.
19     And I'm sorry. We're talking about my kids here. I don't
20 know why we're talking about my kids.
21 **Q.** Well, I'll make it quick, Mr. Rodriguez. I just want to
22 understand one thing.
23 **A.** Sure.
24 **Q.** Okay? And I sympathize and I don't want to get into
25 anything about your kids that's, you know, difficult.

**REALTIME UNCERTIFIED ROUGH DRAFT - NOT TO BE QUOTED FROM**

1   I just want to understand.  You got them Google accounts
2   and you got them Android phones; right?
3   **A.**   Right.
4   **Q.**   And at the same time you were suing Google saying that all
5   of these terrible things were being done to you, your Google
6   accounts, and your Android phones; right?
7   **A.**   To me, right.
8   **Q.**   But you allowed your son to use his Android phone after
9   you filed this complaint the same way he had used it before;
10  right?
11  **A.**   What do you mean?  Like after I found out about this I let
12  him use the phone?
13  **Q.**   In the same way that he had always used it; right?
14  **A.**   Right.  He's very young.  They're not using any apps like
15  I am.  They really just used it for playing games and watching
16  videos and stuff like that.
17  **Q.**   Well, you remember testifying in your deposition that he
18  did use apps and that you didn't ask him to change his behavior
19  on any of those apps?  Do you remember that?
20  **A.**   I know it's video games.  I'm not sure what apps he was
21  using.
22  **Q.**   You're not sure what apps he was using?
23  **A.**   Right.  The apps that you're saying that I said in my
24  deposition, I'm not sure what was said there.
25  **Q.**   And do you remember being asked if you allowed your sons

1   to install new apps since filing your complaint?
2   **A.**   Yes.  So I do -- me and my wife, we both make sure that
3   when they're doing stuff on their phones or downloading stuff,
4   I am aware.  And I do periodically look at his phone just to
5   make sure that, you know, it's nothing crazy going on.  And,
6   again, he's young.  They're both young.  And me and my wife
7   both do the same thing.  So I think, you know, we do a good
8   job.
9        I don't -- I mean, and I apologize.  I know you mentioned
10  that you don't -- want to be sensitive here, but it's kind of
11  like I feel like you're saying that I'm a bad father of some
12  sort, and I don't agree with that.
13  **Q.**   Mr. Rodriguez, I have no idea what apps are on my
14  children's phones so I'm not casting any aspersions.
15       I'm just trying to understand and confirm the deposition
16  testimony that you allowed them to install apps, you didn't
17  tell them to change their behavior, and you weren't really
18  checking which apps were being installed.  And that's just my
19  last question.
20  **A.**   I did check what was being installed, and I believe I did
21  turn off WAA and sWAA on their phones.
22       But, again, I mean, these are their phones.  This is what
23  they do.  They play on their phones.  They play games.  They
24  watch videos.  And really I don't understand, how can I prevent
25  that?

**REALTIME UNCERTIFIED ROUGH DRAFT - NOT TO BE QUOTED FROM**

1    I mean, right now I would say at that time if there's any
2  data being collected, it's a five-year-old and a ten-year-old
3  at the time.  And, again, they're not using the phone the same
4  way as I would where you can kind of put the pieces of the
5  puzzle together and know who I am.  I think you would say it's
6  a five-year-old and a ten-year-old, and I don't think there's
7  much information that you can actually gather from that.  It's
8  just kids playing on a phone.  It's not using apps like an
9  adult uses an app.
10        **MS. AGNOLUCCI:**  No further questions, Mr. Rodriguez.
11 Thank you.
12        **THE COURT:**  Mr. Lee?

```
 1            THE COURTROOM DEPUTY:  It's coming up.
 2            MR. LEE:  Oh, thank you.
 3       Let's scroll down to the subsetting.
 4  BY MR. LEE
 5  Q.   So do you see the subsetting that we've been all calling
 6  sWAA during this trial?
 7  A.   Yes.
 8  Q.   At the time of your deposition, did you just understand
 9  this as the subsetting?
10  A.   Right.
11  Q.   Did Google's lawyer at your deposition ever refer to this
12  as the subsetting?
13  A.   No.
14  Q.   All right.  You were asked if you knew what the word,
15  I think it was, "egregious breach of social norms" was, and
16  I think we agreed that it meant something outrageous.
17  A.   Right.
18  Q.   Is creating a fake button to give users a false sense of
19  security that their information is not being taken when it is
20  outrageous in your opinion?
21  A.   Yes, of course it is.
22  Q.   You were asked questions about why you got your son an
23  Android phone.  Do you remember that?
24  A.   Right.
25  Q.   If you got your son an iPhone instead of an Android
```

1  phone, based on what we know in this case, would Google still
2  have taken the app activity data even with sWAA off?
3  **A.**  Yes.
4  **Q.**  Is there any smartphone that you could have purchased
5  where Google would not have taken app activity data even with
6  sWAA off?
7  **A.**  Right.  That's kind of where I was going to.  It's, like,
8  it doesn't matter what it is.  It's just kids playing on the
9  phone but, yeah.
10 **Q.**  You explained during your direct examination that for the
11 purposes of Dr. Hochman's testing about what Google collects,
12 you wanted to keep your -- everything the same, your device,
13 sWAA off and app usage.  Do you recall that?
14 **A.**  Right.
15 **Q.**  So you know you had to keep your Android; right?
16 **A.**  Right, right.  And that's kind of the -- when I was saying
17 I wanted everything uniform, I just wanted to make sure
18 everything was the same across the board on my phone.
19 **Q.**  Okay.  During cross-examinations -- excuse me.
20     I just want to make sure about something.  Was there
21 anything that Google's lawyers showed you on cross-examination
22 that told you Google would take, copy, save, or use any data
23 from your use of third-party apps if WAA or sWAA was off?
24 **A.**  No.
25 **Q.**  Was there anything Google's lawyer showed you, any