# EXHIBIT B

**Q.** Okay.

    **MR. SANTACANA:** Can we put up Google's Interrogatory Number 15, page -- Interrogatory Response, page 9, please, Brooklyn?

And, actually, you know what? I'm going to just move on. Thank you.

**BY MR. SANTACANA:**

**Q.** Dr. Hochman, you mentioned data breaches earlier today. You recall that?

**A.** Yes.

**Q.** And you say that in your mind, there is a privacy risk that data, like the toxic data that we saw that is sent to Google, could be hacked or leaked; right? That's a privacy risk?

**A.** Yes. There's always some risk. There's no system that's perfectly secure.

**Q.** You do not contend that a single bit or byte of the data that was sent to Google during the class period for these hundred-million users leaked out of Google? That's not something that you are claiming in this case; right?

**A.** That's not something I've said.

**Q.** You are not here to testify that there was a data breach of the data in question in this case; right?

**A.** Correct.

**Q.** Your testimony is that, hypothetically, there could be a

1  data breach; right?
2  **A.**   I'm pointing out that there is a risk to the user when
3  data is retained if the user did not agree to that data being
4  retained.  Because no system is completely risk free, and
5  everyone should be able to understand the risks, even if those
6  risks are small, and should be able to make their personal
7  choice.
8  **Q.**   You're not suggesting at all in this case, Dr. Hochman,
9  that Google has promised its 3 billion users absolute
10 perfection with respect to data security?  You're not
11 suggesting that, are you?
12 **A.**   No.  I'm not making any ridiculous suggestions, no.
13 **Q.**   It would be ridiculous to expect that?
14 **A.**   I think that everyone understands that perfect data
15 security is impossible.  Maybe I've used too strong a word.  I
16 shouldn't have said "ridiculous."
17     Perfect data security is impossible.  Everyone in the
18 field knows that.
19 **Q.**   You have also not seen any evidence in this case that any
20 user in this class had their identity stolen as a result of the
21 activity data in question; right?
22 **A.**   I have not asserted that.
23 **Q.**   You haven't seen any evidence in this case that any
24 criminal has in some way hacked or in other ways defrauded
25 somebody in connection with the data that was -- that is at

1  issue in this case?
2  **A.**  No.
3  **Q.**  Nor have you seen any evidence that anybody inside of
4  Google violated the policies we heard about yesterday and
5  reidentified a user who had sWAA off?  You have seen no
6  evidence of that; right?
7  **A.**  I'm not presenting any evidence of that.
8  **Q.**  Now, Dr. Hochman, you consider yourself an expert in the
9  fields of technology and security; right?
10 **A.**  Yes.
11 **Q.**  As part of your work as an expert in these fields, you
12 stay up-to-date on what's going on; right?
13 **A.**  I try to.
14 **Q.**  You follow developments in the law; right?
15 **A.**  Yes.  I follow -- I follow a lot of media, yes --
16 **Q.**  You follow --
17 **A.**  -- related to this field.
18 **Q.**  You follow developments in the privacy space; right?
19 **A.**  Yes.
20 **Q.**  Google is not the only entity in the world that uses the
21 term "pseudonymous data"; right?
22 **A.**  I think that other people would use that too.
23 **Q.**  You used it in your dissertation this year when you got
24 your Ph.D.; right?
25 **A.**  Yes.

1  **Q.**  It's also been used by the United States government, has
2  it not?
3  **A.**  Yes.
4  **Q.**  In the context of discussing how to protect user privacy,
5  the government has recommended using pseudonymous data, has it
6  not?
7  **A.**  Yes.  And, of course -- well, I'm going to summarize it
8  really quickly for you.  The devil is in the details.
9  **Q.**  Okay.  A variety of states in the United States have laws
10 that suggest the use of pseudonymous data to protect user
11 privacy, don't they?
12 **A.**  Yes.
13 **Q.**  The Department of Health and Human Services encourages
14 people who deal in medical records to use pseudonymous data to
15 protect their identities, doesn't it?
16 **A.**  Well, maybe you should just show me the record because I
17 don't remember that off the top of my head.
18 **Q.**  That's okay.  I think I got it.
19     You're not an economist; right?
20 **A.**  No.
21 **Q.**  Now, you agree with me that for Google to serve ads, it
22 must say something to the advertiser about the fact that the ad
23 was served; right?
24 **A.**  Yeah.  Google has to at least send the advertiser a bill.
25 **Q.**  In fact, it is an industry standard that Google must

1  comply with that requires Google to report to advertisers the
2  fact that it served an ad; right?
3  **A.** Yes.
4  **Q.** The Media Ratings Council requires Google to report when
5  it shows ads to users; right?
6  **A.** Yes.
7  **Q.** Otherwise Google could be accused of fraud, billing people
8  for ads that were never shown; right?
9  **A.** Correct.
10 **Q.** So it has to keep a receipt that it did it, does it not?
11 **A.** Yes.
12 **Q.** Now, Google is not required to count how many ads it shows
13 using personally identifiable information.  It can do it with
14 de-identified data; right?
15 **A.** I would assume so.
16 **Q.** Now, the requirements of keeping receipts of advertising,
17 you have said, come from the 1960s, when Congress became
18 concerned that there had been a lot of lying in advertising on
19 television, radio, and newspapers; right?
20 **A.** Yes, that's correct.
21 **Q.** And Congress's concern, in your words, moved from that
22 space to the online space; right?
23 **A.** Yes.
24 **Q.** And you have testified that Google Analytics is part of
25 the move that Congress had wanted.  It helps to make sure that

```
 1   online there is no fraud with respect to the serving of ads;
 2   right?
 3   A.   Okay.  So Google Analytics is not exactly an ad fraud
 4   solution.  There are others.  But Google itself is certified by
 5   the Media Rating Council as a -- and Google does do detection
 6   of ad fraud and they do proactive -- I mean, Google does work
 7   in this area.
 8   Q.   And you like that Google does that as somebody who runs a
 9   business and advertises, do you not?
10   A.   Very much.
11   Q.   You like that Google tries to maintain a clean ad network;
12   right?
13   A.   Yes.
14   Q.   You like that they try to protect you, as an advertiser of
15   your expert witness services to law firms, from ad fraud;
16   right?
17   A.   Sure.
18   Q.   And when Google is concerned that ad fraud might be going
19   on, it's your testimony in your deposition that they actually
20   proactively reach out and investigate it, which is another
21   thing that you like about it; right?
22   A.   Yes.
23   Q.   Google, in fact, has automatic systems that use
24   de-identified data to try and prevent ad fraud; right?
25   A.   Google has automated systems that do try to prevent ad
```

1  fraud, yes.
2  **Q.**  One way that Google accomplishes its ad fraud detection is
3  to use device ID, a pseudonymous identifier, to make sure, just
4  to give an example, that some bot is not using the same device
5  to hit ads a million times in order to make more money; right?
6  **A.**  That's true.
7  **Q.**  Now, as you sit here now, you cannot say whether Google
8  would have to completely stop its ad fraud detection if the
9  plaintiffs are right about what Web & App Activity should be
10 doing?
11 **A.**  Well, what I think is that either Google would have to
12 change the way they're handling data to comply with the
13 promises that they're -- or the impressions, let's say, that
14 they're giving to people about how the data will be handled.
15 The way the data is being handled needs to be brought into
16 alignment with the way it's being described.  That's really my
17 position.  It has to be brought into alignment, I think.
18 **Q.**  Okay.  But that's not what I -- what I asked you,
19 Dr. Hochman.
20     What I asked you is:  If the plaintiffs are right about
21 this case, you cannot say whether Google could continue the ad
22 fraud detection activity that it does with pseudonymous data;
23 right?
24 **A.**  Oh, well, like I was just saying, my position is that if
25 Google, hypothetically, was ordered to bring this into

1  alignment, there are ways they could do it.  And I don't know
2  that it would mean they couldn't do their ad fraud detention
3  anymore.  It just might mean that they have to update the
4  disclosures, or maybe they can do the ad fraud detection in a
5  different way.  That's a different question.  That's, you know,
6  not what I was tasked with investigating.
7  **Q.**  Suffice it to say, though, if the Web & App Activity
8  button worked the way these plaintiffs say it should work, if
9  it worked that way and it prevented the collection of all data
10 whatsoever, the ad fraud detection would be impossible, would
11 it not?
12 **A.**  Well, no.  I don't think ad fraud detection would be
13 impossible because Google would still be collecting data from
14 people with WAA and sWAA on.
15     And then as far as WAA and sWAA off, I don't know how
16 Google would have to deal with that.  That's -- that's
17 another -- that's a business problem you and your client may
18 have to address at some point.
19 **Q.**  Well, if it worked the way these plaintiffs say it should
20 work, wouldn't I just have to turn sWAA off, and then I could
21 defraud Google and advertisers freely?
22 **A.**  You know, that's a -- that's a problem that somebody will
23 have to think about how to reconcile the promises that Google
24 is making to users or the representations versus the way its
25 systems are behaving, and I'm not here to tell Google how to --

1  how to fix its systems.
2  **Q.**  Let me ask you something.  You testified earlier that
3  Google uses sWAA-off data to train AI.  You remember that?
4  **A.**  Well, I said that Google's sWAA-off data is going into
5  this pool of data, and it's going downstream and being used in
6  lots of places.  And I believe that in the Google responses to
7  our technical questions, I believe they identified AI
8  consumption of the data as one of the uses downstream.
9  **Q.**  Okay.  I want to make sure that your testimony is very
10 clear, Dr. Hochman.  Okay?
11     Do you have any evidence to suggest that Google Analytics
12 data at Google was provided to the AI Department at Google that
13 makes AI products like Gemini?
14 **A.**  Oh, I'm referring to other AI.  I'm referring to things
15 like the automated bidding in AdWords.  There's a lot of
16 machine learning in Google's systems.  I -- I'm not opining
17 about Gemini.
18 **Q.**  Okay.  So when you were -- when your counsel put AI on
19 that slide, what you meant was machine learning about how to
20 run an ad auction?
21 **A.**  That's an example of one thing.  It could mean other
22 things within Google Systems, but Google has deployed AI in a
23 bunch of different ways.
24 **Q.**  You're not suggesting that the AI that all of us have been
25 talking about non-stop for the last year and a half, you're not

1  suggesting that has anything to do with this data; right?
2  **A.**  I'm thinking about AI more generally.  I'm not making an
3  assertion about OpenAI or Perplexity or Gemini.  But I don't
4  know.  Maybe they would use the data for that.  Who knows?
5      You know, if you collect data, data is very valuable; and
6  if you have it, you might find a use for it in the future.
7  **Q.**  Well, this case is not about what Google might do in the
8  future, Dr. Hochman.  This is a case about whether Google is
9  liable for something that happened between 2016 and 2024.
10     So let me ask you this.  Let me ask it this way:  If my
11 client, Mr. Ganem, were to testify that Google Analytics data
12 has never been provided to the AI Department at Google, would
13 you have any basis in fact to dispute that?
14         **MR. MAO:**  Your Honor, it's argumentative and attorney
15 testimony.
16         **THE COURT:**  Overruled.
17         **THE WITNESS:**  You keep slipping back into
18 Google Analytics, but we're talking about Google Analytics for
19 Firebase, you know, the data that's being taken from the
20 Firebase SDK and from Google Mobile Ads SDK.  So regarding that
21 data, I'm not asserting that that data has been given to
22 Gemini.
23 **BY MR. SANTACANA:**
24 **Q.**  Now, you testified earlier about batteries.  Do you
25 remember that?

1  that correct?
2  **A.**   Yes.  I've even received files with ad fraud auditing
3  data, and I can receive those files and handle them on my
4  computer.  They're not huge.
5       In this case, the files were just enormous.  I mean, the
6  amount of data here -- even when we only got a small fraction
7  of it, the amount of data at issue here is much, much larger
8  than a simple audit log for preventing ad fraud.
9  **Q.**   Okay.  Last area of questions.
10      You agree with counsel, Google's counsel, that no data
11 security is perfect; is that correct?
12 **A.**   Yes.
13 **Q.**   You also agree that you know of no incident where sWAA-off
14 data collected by Google has been leaked.  Do you remember
15 that?
16 **A.**   Yes.
17 **Q.**   But does that mean that the user is not harmed by the
18 collection of sWAA-off data?
19           **MR. SANTACANA:**  Objection, Your Honor.  Outside the
20 scope.  User harm.
21           **THE COURT:**  Sustained.
22           **MR. MAO:**  I have no other questions.
23           **THE COURT:**  Very well.
24           **MR. SANTACANA:**  No questions, Your Honor.
25           **THE COURT:**  Anything further?