# TRIAL TRANSCRIPT AUGUST 25, 2025

Volume 5

Pages 788 - 1017

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

```
ANIBAL RODRIGUEZ, et al.,       )
individually and on behalf of   )
all others similarly situated,  )
                                )
          Plaintiffs,           )
                                )
  VS.                           )   NO. 3:20-CV-04688 RS
                                )
GOOGLE LLC,                     )
                                )
          Defendant.            )
_____)
```

San Francisco, California
Monday, August 25, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    BOIES SCHILLER FLEXNER LLP
                    333 Main Street
                    Armonk, New York 10504
            BY:  **DAVID BOIES, ATTORNEY AT LAW**
                 **ALEXANDER BOIES, ATTORNEY AT LAW**

                    BOIES SCHILLER FLEXNER LLP
                    2029 Century Park East, Suite 1520n
                    Los Angeles, California 90067
            BY:  **ALISON L. ANDERSON, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1    piece?

2    **A.**    Yes.

3    **Q.**    How about every single thing you've done on your apps with

4    these SDKs?  Is that a puzzle piece?

5    **A.**    It is.

6    **Q.**    What you read?

7    **A.**    Yes.

8    **Q.**    What pictures you looked at?

9    **A.**    Yep.

10   **Q.**    What you purchased?

11   **A.**    Yes.

12   **Q.**    Things you clicked on?

13   **A.**    Right.  Yes.

14   **Q.**    Now, when you put all these pieces together, even if a few

15   pieces are missing, is it obvious who the picture that the

16   puzzle forms is of?

17   **A.**    Yeah.  It's -- it's me.

18   **Q.**    Do you believe all of this information, these puzzle

19   pieces, are private?

20   **A.**    Yes, definitely.

21   **Q.**    Do you believe that information is personal?

22   **A.**    Very personal.

23   **Q.**    Let's talk about a few examples.  Did you ever use the

24   NightOwl Companion app while you had sWAA off?

25   **A.**    Yes.

RODRIGUEZ - DIRECT / LEE

1    Q.   What's that app for, Mr. Rodriguez?

2    A.   It's an app for sleep apnea.

3    Q.   Do you consider your sleep apnea a private and personal

4    matter?

5    A.   Definitely it is.

6    Q.   Did you ever use the MIPC camera app while sWAA was off?

7    A.   Yes.

8    Q.   And is that app for like home security?

9    A.   Yes.  It connects to my cameras in my home.

10   Q.   Do you consider what you do for home security a private

11   and personal matter?

12   A.   Oh, yeah, definitely.

13   Q.   Did you ever use the Career Karma app while sWAA was off?

14   A.   Yes.

15   Q.   And what's that for?

16   A.   That's an app that has -- it's a company that helps you

17   switch careers, and you get assigned a coach and they basically

18   help you with that.

19   Q.   Do you consider whether you're looking for a new job

20   something that's private and personal to you?

21   A.   Yes.

22   Q.   Do you consider the name of your coach, your Career Karma

23   coach, private and personal to you?

24   A.   Oh, yeah.

25   Q.   Do you want Google knowing all these things?

**RODRIGUEZ - DIRECT / LEE**

1   **Q.**   Is it an easy thing, Mr. Rodriguez, for you to have to buy

2   a new phone every couple of years?

3   **A.**   No, it's not.

4   **Q.**   Is that something you have to save up for as a family?

5   **A.**   Yeah.  I would say so, yes.

6   **Q.**   Do you have your phone in your pocket right now?

7   **A.**   I do.

8   **Q.**   Who owns the phone in your pocket?

9   **A.**   I do.

10  **Q.**   Who owns the apps on your phone?

11  **A.**   I do.

12  **Q.**   What about the data?  Who owns the data on your phone?

13  **A.**   I do.

14  **Q.**   Who owns all the activity on your phone?

15  **A.**   I do.

16  **Q.**   Do you like other people looking through your phone?

17  **A.**   No.  No.  I think, you know, anybody's first instinct,

18  when someone's trying to grab your phone from the table, is to

19  protect it and -- no.

20  **Q.**   Let me ask you a question.  Would you rather give a

21  stranger your name and email address or access to your phone?

22  **A.**   I would not give my phone.

23  **Q.**   The jury's heard testimony about the term

24  "Google Account."  Do you remember that?

25  **A.**   Yes.

1    activity with Google; and depending on your account

2    settings..."

3    So my account settings would be that I turn off WAA and

4    sWAA.  So the way I read it is that none of this should be

5    collected if it's off.

6    **Q.**  Do you agree with me that the word "and" means also or in

7    addition?

8    **A.**  Not in this case.

9    **Q.**  Not in this case.  Okay.

10    But you don't disagree with me that it says here that

11    "These services can share information about your activity

12    and" -- and to you it doesn't mean in addition, so we can set

13    aside our dispute about that, but -- "and depending on your

14    account settings" --

15    **A.**  Right.

16    **Q.**  -- "this data may be associated with your personal

17    information."

18    **A.**  Right.  And depending on your account settings, which is

19    the WAA and sWAA button.

20    **Q.**  So despite the language in the privacy policy, you believe

21    that when WAA is turned off, Google shouldn't have any

22    information about you?

23    **A.**  Not from the apps that are on my phone.  If -- if you're

24    telling me that I have control over what Google collects and

25    how they use it -- can you hear me?  I'm sorry.  I thought you

RODRIGUEZ - CROSS / AGNOLUCCI

1   Q.   But what I'm asking you is whether you, as you sit here,

2   have any basis for alleging that besides, of course, what these

3   lawyers told you?

4   A.   That's what the evidence says.

5   Q.   Do you remember testifying in your deposition that you

6   don't feel safe knowing that Google has de-identified

7   information about you?

8   A.   I might have said that, yes.

9   Q.   And that you have to try to sleep at night knowing that

10  this information is being collected?

11  A.   Well, yeah.  It's -- and I think most people, if they feel

12  that they are, in a sense, being spied on to just get

13  information about them specifically, anybody would think that.

14  And I -- and I agree to that, yes.

15  Q.   You aren't alleging that you lost a single dollar; right,

16  Mr. Rodriguez?

17  A.   Well, I think -- yeah -- no, I'm not alleging -- I'm

18  alleging that you or Google, itself, took my data that you

19  found valuable, that you -- that you never mentioned that you

20  took, and you made money off it, which was mine.  And, in a

21  sense, that's almost like -- I mean, I don't know how to say it

22  in a better way.  It's almost like stealing.

23       And, of course, if you never said that, "Hey, we took your

24  data.  We made money off it, do you want a piece of the pie,"

25  then, yes, that's -- that's -- that's wrong.

1   **A.**   That's what it says here, yeah.

2   **Q.**   And it also says that you agreed to Target sharing your

3   data with an analytics company called Crazy Egg.  Do you see

4   that?

5   **A.**   Yes.

6   **Q.**   Do you know what Crazy Egg is?

7   **A.**   I don't.

8   **Q.**   You don't?

9   **A.**   I don't know what Crazy Egg is.

10  **Q.**   But you agree that the language you are looking at on the

11  screen was part of your deal with Google -- with Target?

12  **A.**   With -- with Target, right.

13  **Q.**   I keep calling Target Google.  I'm sorry.

14  **A.**   That's okay.

15  **Q.**   Part of your deal with Target was that Target was sharing

16  your data with third parties, including Google Analytics?

17  **A.**   Right.

18  **Q.**   And Crazy Egg?

19  **A.**   Right.

20  **Q.**   And Adobe Analytics?

21  **A.**   Right.

22  **Q.**   And you were okay with all of that?

23  **A.**   They're just getting my -- they're just getting my data

24  from Target alone.  That's -- I mean, they're not -- they --

25  they're not saying they're getting all my app information from

RODRIGUEZ - CROSS / AGNOLUCCI

1    my phone.

2         So -- and, again, going back, it's -- it's like you said,

3    my deal was with Target and Google.  So if Google is -- if I

4    made a deal with Google, saying, "Don't collect data from this

5    specific app or all apps on my phone," I think Google should

6    honor that.

7         Now, if we're talking about the other analytics companies

8    that are within this here, if they're sharing that with that

9    company, it's just that data from Target alone, not all my

10   apps.  So I wouldn't see a problem specifically for the Target

11   app.

12   **Q.**   You had no problem with the Target app sharing your data

13   with Google Analytics, Adobe Analytics, or Crazy Egg; right?

14   **A.**   If -- if -- understanding how -- how I see things and what

15   I learned, I don't think it was a big deal.

16   **Q.**   Not a big deal?

17   **A.**   Not with -- not sharing my Target information, my Target

18   activity, with the analytics company.  I don't think that's an

19   issue.  I think, again, it's more -- if we're talking about

20   what the problem here is, it's more Google gathering all the

21   data from all my apps to kind of paint a picture of who I am.

22   **Q.**   You testified on Thursday -- I got it right -- that you're

23   starting a new job this week; right, Mr. Rodriguez?

24   **A.**   Yes.

25   **Q.**   And you took professional development courses to help you

1   Google Accounts, and your Android phones; right?

2   **A.**    To me, right.

3   **Q.**    But you allowed your son to use his Android phone after

4   you filed this complaint the same way he had used it before;

5   right?

6   **A.**    What do you mean?  Like, after I found out about this, I

7   let him use the phone?

8   **Q.**    In the same way that he had always used it; right?

9   **A.**    Right.  He's very young.  They're not using any apps like

10  I am.  They really just used it for playing games and watching

11  videos and stuff like that.

12  **Q.**    Well, you remember testifying in your deposition that he

13  did use apps and that you didn't ask him to change his behavior

14  on any of those apps?  Do you remember that?

15  **A.**    I know it's video games.  I'm not sure what apps he was

16  using.

17  **Q.**    You're not sure what apps he was using?

18  **A.**    Right.  The apps that you're saying that I said in my

19  deposition, I'm not sure what was said there.

20  **Q.**    And do you remember being asked if you allowed your sons

21  to install new apps since filing your complaint?

22  **A.**    Yes.  So I do -- me and my wife, we both make sure that

23  when they're doing stuff on their phones or downloading stuff,

24  I am aware.  And I do periodically look at his phone just to

25  make sure that, you know, it's nothing crazy going on.  And,

1  again, he's young.  They're both young.  And me and my wife

2  both do the same thing.  So I think, you know, we do a good

3  job.

4      I don't -- I mean, and I apologize.  I know you mentioned

5  that you don't -- want to be sensitive here, but it's kind of

6  like I feel like you're saying that I'm a bad father of some

7  sort, and I don't agree with that.

8  **Q.**  Mr. Rodriguez, I have no idea what apps are on my

9  children's phones, so I'm not casting any aspersions.

10     I'm just trying to understand and confirm the deposition

11 testimony that you allowed them to install apps, you didn't

12 tell them to change their behavior, and you weren't really

13 checking which apps were being installed.  And that's just my

14 last question.

15 **A.**  I did check what was being installed, and I believe I did

16 turn off WAA and sWAA on their phones.

17     But, again, I mean, these are their phones.  This is what

18 they do.  They play on their phones.  They play games.  They

19 watch videos.  And really I don't understand, how can I prevent

20 that?

21     I mean, right now I would say at that time, if there's any

22 data being collected, it's a five-year-old and a ten-year-old

23 at the time.  And, again, they're not using the phone the same

24 way as I would, where you can kind of put the pieces of the

25 puzzle together and know who I am.  I think you would say it's

```
 1   a five-year-old and a ten-year-old, and I don't think there's

 2   much information that you can actually gather from that.  It's

 3   just kids playing on a phone.  It's not using apps like an

 4   adult uses an app.

 5           MS. AGNOLUCCI:  No further questions, Mr. Rodriguez.

 6   Thank you.

 7           THE COURT:  Mr. Lee?

 8                       REDIRECT EXAMINATION

 9   BY MR. LEE:

10   Q.    Just one moment, Mr. Rodriguez.  Bear with me.

11   A.    Hurry up.  Just playing.

12                       (Pause in proceedings.)

13   BY MR. LEE:

14   Q.    Okay.  I'm just going to try and tick through these as

15   quickly as possible to get you out of here.

16   A.    Okay.

17   Q.    All right?

18         You were asked by Google's counsel whether you remembered

19   what -- whether you recognize what sWAA, or supplemental app

20   activity, was during your deposition.  Do you remember her

21   asking about that?

22   A.    Right.

23   Q.    And you understand that the lawyers talk about WAA and

24   sWAA at this trial, and sometimes Google calls it supplemental

25   app activity.  You remember that; right?
```

1  these concepts of unjust enrichment calculations on the one

2  hand versus compensatory damage on the other?

3  **A.**    Sure.  So, you know, maybe it's not a perfect analogy for

4  this case.  But if someone takes something of yours of value,

5  let's just say like a necklace or a piece of jewelry, they come

6  in and you say, "You can't take this," but they do take it and

7  they go ahead and sell it and they profit from that, that's the

8  profits that they made, and that's one way to determine

9  economic damages.

10      The other way is if they took it from you and you value

11  that and you think you should be paid for it, it's something

12  that you put a price on, that's another form of damages that

13  can be calculated in this matter.

14  **Q.**    Thank you.

15      Let's go to the next slide, and we're about to sort of

16  walk you through the information you considered and how you

17  reached the opinions that you did.

18      But can you just summarize for the jury your ultimate

19  opinions based on your analysis?

20  **A.**    Sure.  So remember I broke them down into two different --

21  two different categories, unjust enrichment and compensatory

22  damages.  This slide shows, on the left-hand side, what the

23  unjust enrichment is that I calculated, and I had to break it

24  up between two different classes.  I understand the first class

25  is actually folks that use Android phones, or Android devices,

1  I should say; and then the second class is folks that use

2  non-Android devices.  For the most part, that's Apple, that's

3  iOS, but it could be other non-Android devices.

4      And what I found was that there was at least $929 million

5  of unjust enrichment for Class 1 and $569 million of unjust

6  enrichment for Class 2, or the non-Android users.

7  **Q.**   And then what about on the right side?  Let's talk about

8  that second assignment, the compensatory damages.  What is this

9  based on?

10 **A.**   So this is based on Google's non-payment or the amount

11 that Google should have paid for the data that it took, and I

12 calculate for Class 1, which I just described, at least

13 $266 million for Class 1 and $256 million for Class 2.

14 **Q.**   And you used the words "at least."  Is your opinion shown

15 on the right-hand side a ceiling of what the damages are or a

16 floor?

17 **A.**   No, it's a floor.  It's a very conservative estimate,

18 you know, based on one-time payment.

19 **Q.**   Okay.  Do you understand that there are other forms of

20 harm that folks have testified about in this case, like

21 Dr. Hochman testifying about battery degradation and bandwidth

22 use, that you have not quantified in this case?

23 **A.**   Yes, that is accurate.

24 **Q.**   And can you explain why that is?

25 **A.**   Well, I understand that those types of harm can be nominal