# TRIAL TRANSCRIPT
# AUGUST 20, 2025

```
                                        Volume 3

                                        Pages 341 - 562

            UNITED STATES DISTRICT COURT

          NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,       )
individually and on behalf of   )
all others similarly situated,  )
                                )
          Plaintiffs,           )
                                )
   VS.                          )   NO. 3:20-CV-04688 RS
                                )
GOOGLE LLC,                     )
                                )
          Defendant.            )
                                )
```

                                San Francisco, California
                                Wednesday, August 20, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
        BOIES SCHILLER FLEXNER LLP
        333 Main Street
        Armonk, New York 10504
  **BY: DAVID BOIES, ATTORNEY AT LAW**

        BOIES SCHILLER FLEXNER LLP
        2029 Century Park East, Suite 1520
        Los Angeles, California 90067
  **BY: ALISON L. ANDERSON, ATTORNEY AT LAW**

        BOIES SCHILLER FLEXNER LLP
        100 Southeast Second Street, Suite 2800
        Miami, Florida 33131
  **BY: JAMES W. LEE, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
 1   Wednesday - August 20, 2025                              8:07 a.m.
 2                         P R O C E E D I N G S
 3                              ---o0o---
 4        (Proceedings were heard out of the presence of the jury.)
 5            THE COURT:  Good morning.
 6            ALL:  Good morning, Your Honor.
 7            THE COURT:  Please be seated.
 8        I know last night there were some snafus in terms of
 9   filing things.  Don't worry about it.  These things happen.
10   Don't make any -- don't let anybody get into trouble for that.
11   I did get the apology.  I appreciate it.  So we can -- I got
12   what I needed, so don't fret about that aspect of it.
13        So the issue with respect to Ms. Harvey, I did review the
14   doctor's note, such as it is.  I don't think that is
15   sufficient.  It doesn't explain the situation.  It's a
16   check-the-box thing.
17        I considered what the defendants have requested, and
18   I think their alternative suggestion, which is that the use of
19   the deposition can occur in their case and then, if the
20   plaintiffs think that they need to counterdesignate under 106,
21   they can do so, that they won't use the deposition or
22   Ms. Harvey's testimony in their case-in-chief, it makes sense.
23   And so that's what I'm inclined to order.
24            MR. LEE:  I think that's right, Your Honor.
25   Thank you.
```

1  Q.  Let's look -- so just read the first sentence for us.
2  A.  Sure.
3      [As read]:
4          "Today (in Search, Maps, Assistant, et cetera)
5      WAA off is logged the same as being signed out."
6  Q.  Can you just explain to the jury what you mean by that?
7  A.  Yeah.  The -- what this would mean is when you use
8  products like Google Search, when you had WAA off, we would log
9  those logs generated -- right? -- what responses the products
10 gave, but always to a de-identified ID that happened to be the
11 exact same ID as when you're using Google signed out of your
12 Google Account.
13 Q.  Now, can you read the next sentence?  It's a little long,
14 but we'll break it down.
15 A.  Sure.
16     [As read]:
17         "What the WAA-off temp personal logs project
18     will do" --
19 Q.  Sorry.  I think that's the fourth label for the same
20 project?
21 A.  Yes.  Sorry.  A lot of the same words, though.
22     What this project will do is [as read]:
23         -- "change that behavior to be aligned with what
24     YouTube, Play, Apps, and many other teams have done
25     for years with GAIA temp logs.  Instead of creating a

1  Q.  Are the questions and the script, is any of that in this
2  presentation?
3  A.  No.  I believe this presentation is just the summary
4  coming out of all of that research.
5  Q.  So you were shown this page yesterday.  Do you recall,
6  just from your personal memory, receiving this result when it
7  came out?
8  A.  I do.
9  Q.  What was your reaction to seeing this slide when it first
10 came out?
11 A.  This seems great to me.  As a person in charge of
12 Web & App Activity, I read this to mean that users are
13 understanding the setting correctly, that these participants
14 understood that when they turned the Web & App Activity setting
15 off, that data would stop being saved into that Web & App
16 Activity bucket in their Google Account.  And this is, then, a
17 good foundation where the researcher would move on to then ask
18 about how the auto delete setting would behave.
19 Q.  Yesterday the plaintiffs' lawyer suggested to you that
20 this slide shows that users are confused.  Are you disagreeing
21 with that?
22 A.  I disagree with that, yeah.
23 Q.  So can you explain to us why it doesn't say on this slide,
24 after the word "saved," "to your" -- why doesn't it say "to
25 your Google Account"?

1    It says "Controls Revocation Text." Can you just explain
2 what that means?
3 **A.**    Yeah. "Revocation" is just a word we use sometimes
4 internally to mean turning off.
5 **Q.**    So when somebody turns off WAA or turns off sWAA, this is
6 the language that they would see when it pops up?
7 **A.**    That's right, for these timelines here.
8 **Q.**    Different over different time periods?
9 **A.**    That's correct.
10 **Q.**    All right. Let's look at the WAA-off pop-up, and just
11 read for the jury the beginning of that.
12 **A.**    Sure. It says here that [as read]:
13        "Pausing Web & App Activity may limit or disable
14    more personalized experiences across Google
15    services."
16 **Q.**    Now, the reference to "personalized experiences" there,
17 that's the same personalization we've been discussing?
18 **A.**    That's correct.
19 **Q.**    What about the language for when sWAA is turned off? Is
20 that language similar?
21 **A.**    Yes, it's very similar.
22 **Q.**    We can see that here.
23        Mr. Monsees, at any time from 2016 to now, has the
24 revocation text for WAA and sWAA ever mentioned that
25 de-identified data will not be collected?

1  **Q.** You just said it was misrepresented three minutes ago.
2  Who misrepresented it to you?
3  **A.** If -- my previous counsel.
4  **Q.** Your current counsel.
5  **A.** My -- yeah. Counsel who spoke previously, yes.
6  **Q.** So to set this up for the jury that Mr. Hur told an
7  untruth, told a whopper in this courtroom, your attorney
8  misrepresented something to you; is that fair?
9  **A.** I -- I have a lot of things mixed up in my head right now.
10 I'm not used to being in a position like this, and it's a lot
11 of lingo coming at me.
12 **Q.** Sir, if you don't understand anything I ask, you just say
13 so. I'll do better.
14 **A.** I appreciate that.
15 **Q.** But right now I'm still focused on the idea, as a lawyer,
16 by the way, who sits here and does his best, as do these folks,
17 that you would take that stand and look down over here and say
18 he said something that was not true. That's a big deal. Why
19 did you do that?
20 **A.** If what he was saying was that Google -- or that WAA was
21 turned off before the lawsuit, that is true.
22         **MR. ATTANASIO:** Your Honor, may I approach?
23         **THE COURT:** Yes.
24         **MR. ATTANASIO:** Thank you.
25 \\\

1  **A.**  Yes, I did.

2  **Q.**  I count 42 apps on this page. Will you take my count on
3  that?

4  **A.**  Yes, I'll take your word.

5  **Q.**  All right. You are aware, of course, that each of these
6  apps, all 42, had their own terms of service and privacy
7  policies; correct?

8  **A.**  Yes, they do.

9  **Q.**  As you sit here, you don't know all of the terms of
10 service and privacy policies for these 42 apps, of course; is
11 that fair?

12 **A.**  I don't know them by heart, but I'm sure the ones -- the
13 apps I frequently use, I've reviewed.

14 **Q.**  You would have reviewed the privacy policies and the terms
15 of service?

16 **A.**  In the -- in some --

17         **MR. LEE:** Objection, Your Honor. There's a
18 motion in limine on this.

19         **THE COURT:** Not really, no. Overruled.

20 **BY MR. ATTANASIO:**

21 **Q.**  Go ahead.

22 **A.**  Some of the big apps that I use that are large companies,
23 again, for example, Target, I may have reviewed, yes.

24 **Q.**  All right. Which other ones would you have reviewed the
25 terms of service and privacy policies, other than Target?

1  everywhere, competing with each other, offering to port over
2  your data from one fantasy app to another fantasy app.  You
3  know that, don't you?
4  A.    There's also 12 other people in the league that need to be
5  willing to change.  It's not just up to me.  And like I said,
6  let's say we do switch apps.  Let's say we go to another
7  fantasy app in this example.  How do we know the other fantasy
8  app doesn't have a Google SDK as well?  It's everything.  It's
9  everywhere.  What do you want us to do?  Not use our phones?
10 Q.    I don't see Bleacher Report on this list.  That's a
11 sports-related site, isn't it?
12 A.    Bleacher Report is a sports-related site.  They don't
13 offer fantasy football.
14 Q.    Hmm.  That's a sport-related app that you have; correct?
15 A.    I do.
16 Q.    That advertises alternatives to ESPN Fantasy; correct?
17 A.    I -- I imagine -- I don't know their advertisers, but they
18 do not have a fantasy option of their own.
19 Q.    All right.  Well, we're talking about -- let's be clear.
20 We're talking about fantasy football here.  That's what we're
21 talking about; right?
22 A.    Sure.
23 Q.    You used the ESPN Fantasy app before you saw the movie;
24 correct?
25 A.    Yes, I'd say so.

1  Go ahead --
2  **MR. ATTANASIO:** Thank you, Your Honor.
3  **THE COURT:** -- Mr. Attanasio.
4  BY MR. ATTANASIO:
5  **Q.** Mr. Santiago, you've told us about these strong feelings
6  you have about privacy. In fact, you recall that you believed
7  there were times when you appeared stressed out at work and
8  your co-workers commented on your apparent stress; is that --
9  is that fair?
10 **A.** I have been stressed out at work, yes.
11 **Q.** But you never told any of your co-workers about these
12 violations of your privacy by Google or warned them, did you?
13 **A.** After this lawsuit was filed and some of these documents
14 were, you know, publicly filed, I've shared with friends and
15 co-workers to be careful about, you know, their WAA data and
16 that it's still being collected.
17 **Q.** Well, as of March 2022, when you were deposed, do you
18 recall that you testified you had not told your co-workers
19 about Google invading your privacy; correct?
20 **A.** At that time, I have not -- I had not, no.
21 **Q.** Well, we established that the movie was in September 2020.
22 Your deposition was in March 2022. So despite your strong
23 feelings, you didn't warn, up to March 2022, any of your
24 co-workers or friends about what Google was supposedly doing;
25 correct?