# TRIAL TRANSCRIPT
# AUGUST 21, 2025

```
                                        Volume 4

                                        Pages 563 - 787

            UNITED STATES DISTRICT COURT

            NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,       )
individually and on behalf of   )
all others similarly situated,  )
                                )
          Plaintiffs,           )
                                )
  VS.                           )  NO. 3:20-CV-04688 RS
                                )
GOOGLE LLC,                     )
                                )
          Defendant.            )
                                )

                              San Francisco, California
                              Thursday, August 21, 2025
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
        BOIES SCHILLER FLEXNER LLP
        333 Main Street
        Armonk, New York 10504
  **BY:  DAVID BOIES, ATTORNEY AT LAW**
        **ALEXANDER BOIES, ATTORNEY AT LAW**
        **M. LOGAN WRIGHT, ATTORNEY AT LAW**

        BOIES SCHILLER FLEXNER LLP
        2029 Century Park East, Suite 1520n
        Los Angeles, California 90067
  **BY:  ALISON L. ANDERSON, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1  or did not intend to do.  Am I right about that?
2  **A.**   I can talk about what Google did and didn't do; and as far
3  as intentions, I think people would have to make inferences
4  about that.
5  **Q.**   That's the jury's job, to decide what Google intended;
6  right?
7  **A.**   I think so.
8  **Q.**   You're also not offering any opinion about what Google's
9  consumers expected when they read these disclosures; right?
10 **A.**   Correct.
11 **Q.**   I think you talked a little bit about your personal
12 expectations, but you're not offering an opinion about what
13 regular people expect when they read it; right?
14 **A.**   Yeah.  I'm only offering an opinion about what my baseline
15 was for testing.
16 **Q.**   Now, you talked earlier about whether users have the
17 ability to delete data that is collected when sWAA is off.  Do
18 you remember that?
19 **A.**   I'm not sure.  Which are you referring to?
20 **Q.**   You testified earlier -- I know it's been a little while,
21 but you testified earlier that users are not given the
22 opportunity to delete sWAA-off data by Google.  Do you remember
23 that?
24 **A.**   Oh, right, yes, because it's not there in their activity
25 center.

1     The latitude and longitude data that is sent to Google
2  when sWAA is off from these SDKs is the city center of the city
3  the user's device is in; correct?
4  A.  I absolutely agree with you.  That's correct.
5  Q.  It is the center -- if they're in Sacramento, like Susan
6  Harvey was, that latitude and longitude tracks to the center of
7  Sacramento; right?
8  A.  Yes.
9  Q.  She could be on the very edge of Sacramento and the
10 latitude and longitude is the center of Sacramento?
11 A.  Yes.
12 Q.  So your testimony is that if she moves around cities a
13 lot, someone who is a nefarious actor might somehow form a --
14 find a pattern in that and figure out that it's Susan Harvey
15 who did that.  That's your testimony?  That's what you're
16 worried about?
17 A.  Well, essentially the facts of it are, if you have a
18 sequence of location data, and especially if you overlay it
19 with some of the other rich data that's in the record, it can
20 form a signature, an indicator of who that is.
21 Q.  Now, I want to make sure you're very clear because you
22 said it was very identifying, and I want to make sure the jury
23 understands.
24     You are not saying here today that Google uses the data
25 from these SDKs to figure out where devices are or to whom they

1  belong, when sWAA is off, based on the city center that is in
2  that data packet?  You haven't seen evidence that Google is
3  taking steps to do that; right?
4  **A.**  No.
5  **Q.**  Okay.  Now, in the course of your work analyzing all of
6  the data in this case, you actually found no evidence that
7  Google has ever joined together, in the same log, a user's
8  device ID and that user's GAIA ID?
9  **A.**  I'm just thinking if there may be an exception to that.  I
10 mean, the key thing is that I haven't seen all the logs that
11 Google keeps.
12 **Q.**  I don't think that is the key thing, Dr. Hochman.  The key
13 thing is that I asked you a very specific question and you
14 didn't answer it.  So I'm going to ask it again.
15     You have found no evidence that Google has ever joined
16 together, in the same log, a user's device ID and their GAIA
17 ID; correct?
18 **A.**  I don't think I've -- I don't recall whether I found that
19 or not, but I don't recall having found it.
20 **Q.**  And you also found no evidence that Google actually did
21 join sWAA-off data together with a GAIA ID, no evidence of
22 that?
23 **A.**  I understand that Google claims to have a policy against
24 doing that.
25 **Q.**  In fact, in your words, Google actually has the best

1  intentions of keeping that data apart.  You've said that under
2  oath; right?
3  **A.**    I think I said something, but we should probably look at
4  what exactly I said.
5  **Q.**    Do you doubt -- based on your review of the design of
6  Google's systems, the consent check on different servers, the
7  separation of pseudonymous data, do you doubt that Google's
8  design is there to separate GAIA ID from analytics data when
9  sWAA is off?
10 **A.**    My understanding is that Google is attempting to separate
11 the data.  At the same time, that's at the downstream point.
12 But at the same time, when the data is actually collected by
13 Google, all of the data, as it comes in, Google knows exactly
14 who that is at the time it's being taken and copied before even
15 the consent check is done.  And that, I think, is important to
16 keep in mind.
17         **MR. SANTACANA:**  Your Honor, I move to strike
18 everything in that response beginning with the phrase "At the
19 same time."
20         **THE COURT:**  Overruled.  These questions are --
21 overruled.
22 **BY MR. SANTACANA:**
23 **Q.**    Dr. Hochman, you were asked earlier if Google is able to
24 reidentify the user using sWAA-off data.  Do you recall that
25 question?

1  **A.**  Yes.

2  **Q.**  If Google is able to, and you said absolutely.  Do you
3  remember that?

4  **A.**  Yes.

5  **Q.**  You are not giving this jury the opinion that Google has
6  ever, in fact, reidentified the user; right?

7  **A.**  In terms of has Google done that?  I don't have -- I don't
8  say that Google has done that.  Google says that they don't,
9  and that's where I have to leave it.

10 **Q.**  You also said there is nothing technically preventing
11 Google from relinking all of this data together.  Do you
12 remember saying that?

13 **A.**  Yes.

14 **Q.**  Now, in order to relink all of this data together, which
15 you say is technically possible, would you agree with me that
16 to do that, Google would have to change the way its systems
17 work?  That is not how they work now.

18 **A.**  Okay.  So you're asking me to make a categorical statement
19 about how all Google systems work, which I haven't observed.
20 So I'm not going to contradict you, but I'm not going to
21 confirm your assertion either.

22 **Q.**  Well, you made a categorical statement when you said that
23 nothing is technically preventing Google from relinking all of
24 this data.  You remember saying that?

25 **A.**  Yes.  The data, by its nature, by being rich data, full of

1  identifiers and full of details about the person, lends itself
2  to reidentification, and preventing reidentification is a very
3  hard problem.  And as a result, my opinion is that nothing
4  stops Google from reidentifying it.
5  Q.  But Google hasn't done it.  You're just saying it's
6  technologically possible.
7  A.  Well, I mean, I also observe that Google has a policy
8  against doing it, and one has a policy because one is trying to
9  prevent something from happening that could happen.  If it was
10 impossible, then there would be no need for a policy.  They
11 would just -- it would never happen.
12         MR. SANTACANA:  I move to strike the answer as
13 nonresponsive, Your Honor.
14         THE COURT:  Overruled.
15 BY MR. SANTACANA:
16 Q.  Dr. Hochman, you are not offering the opinion in the case,
17 I want to be very clear, that Google has actually relinked
18 sWAA-off data; right?
19 A.  I'm not offering the opinion that Google has relinked
20 sWAA-off data with the GAIA data.
21         MR. SANTACANA:  I have no further questions,
22 Your Honor.

### REDIRECT EXAMINATION

24 BY MR. MAO:
25 Q.  Good afternoon, Dr. Hochman.  I will try to make this

1    sWAA in 2018; is that correct?

2    **A.**   Right.

3    **Q.**   Okay.  When you turned the WAA button off, did you think

4    that Google would continue to collect and save and use your

5    data based on everything you were doing on these apps?

6    **A.**   No.

7    **Q.**   Mr. Rodriguez, have you reviewed Google's privacy policy?

8    **A.**   Yes.

9    **Q.**   When was that?

10   **A.**   So back in 2018, I would say.

11   **Q.**   And why were you reading the privacy policy in 2018?

12   **A.**   So around that time frame I'd been hearing a lot about

13   Google saving a lot of information about people, so I looked --

14   I just went to look through the -- through my phone and just

15   found some more information.  And I was mainly worried about my

16   location, so I found the privacy settings, and I went ahead and

17   turned off WAA.

18   **Q.**   So you were -- I'm just trying to make sure I understand

19   you.

20   **A.**   Sure.

21   **Q.**   The reason you looked at the settings on your phone and

22   this privacy policy from 2018 is, your initial concern was

23   about location tracking?

24   **A.**   Right.

25   **Q.**   And in doing that research and looking at the privacy