# TRIAL TRANSCRIPT
# AUGUST 25, 2025

```
                                             Volume 5

                                             Pages 788 - 1017

               UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,        )
individually and on behalf of    )
all others similarly situated,   )
                                 )
          Plaintiffs,            )
                                 )
   VS.                           )  NO. 3:20-CV-04688 RS
                                 )
GOOGLE LLC,                      )
                                 )
          Defendant.             )
_____)

                                  San Francisco, California
                                  Monday, August 25, 2025

          TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:
                      BOIES SCHILLER FLEXNER LLP
                      333 Main Street
                      Armonk, New York 10504
                 BY:  DAVID BOIES, ATTORNEY AT LAW
                      ALEXANDER BOIES, ATTORNEY AT LAW

                      BOIES SCHILLER FLEXNER LLP
                      2029 Century Park East, Suite 1520n
                      Los Angeles, California 90067
                 BY:  ALISON L. ANDERSON, ATTORNEY AT LAW




REPORTED BY:   Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
               CSR No. 7445, Official United States Reporter
```

1  piece?

2  **A.**   Yes.

3  **Q.**   How about every single thing you've done on your apps with

4  these SDKs?  Is that a puzzle piece?

5  **A.**   It is.

6  **Q.**   What you read?

7  **A.**   Yes.

8  **Q.**   What pictures you looked at?

9  **A.**   Yep.

10 **Q.**   What you purchased?

11 **A.**   Yes.

12 **Q.**   Things you clicked on?

13 **A.**   Right.  Yes.

14 **Q.**   Now, when you put all these pieces together, even if a few

15 pieces are missing, is it obvious who the picture that the

16 puzzle forms is of?

17 **A.**   Yeah.  It's -- it's me.

18 **Q.**   Do you believe all of this information, these puzzle

19 pieces, are private?

20 **A.**   Yes, definitely.

21 **Q.**   Do you believe that information is personal?

22 **A.**   Very personal.

23 **Q.**   Let's talk about a few examples.  Did you ever use the

24 NightOwl Companion app while you had sWAA off?

25 **A.**   Yes.

1   Q.   What's that app for, Mr. Rodriguez?
2   A.   It's an app for sleep apnea.
3   Q.   Do you consider your sleep apnea a private and personal
4   matter?
5   A.   Definitely it is.
6   Q.   Did you ever use the MIPC camera app while sWAA was off?
7   A.   Yes.
8   Q.   And is that app for like home security?
9   A.   Yes.  It connects to my cameras in my home.
10  Q.   Do you consider what you do for home security a private
11  and personal matter?
12  A.   Oh, yeah, definitely.
13  Q.   Did you ever use the Career Karma app while sWAA was off?
14  A.   Yes.
15  Q.   And what's that for?
16  A.   That's an app that has -- it's a company that helps you
17  switch careers, and you get assigned a coach and they basically
18  help you with that.
19  Q.   Do you consider whether you're looking for a new job
20  something that's private and personal to you?
21  A.   Yes.
22  Q.   Do you consider the name of your coach, your Career Karma
23  coach, private and personal to you?
24  A.   Oh, yeah.
25  Q.   Do you want Google knowing all these things?

1  still something that you're alleging in this case?

2  **A.** Can you repeat the question again? Because I'm not too
3  sure, not too clear.

4  **Q.** Do you know, as you sit here today, if you are still
5  alleging that Google builds cradle-to-grave personalized
6  advertising profiles?

7  **A.** No. I -- as far as cradle to grave, I don't know; but
8  what I do know is -- is what the alleging is, that it was taken
9  without my permission. That's basically what this case is
10 about. So as far as, like, detail or, like -- like, lawyer
11 talk and stuff like that, I'm not too sure, so...

12 **Q.** You heard Mr. Monsees testify in court last week that it
13 would be impossible to create personalized profiles from
14 de-identified data. Do you remember that?

15 **A.** I did hear him say that.

16 **Q.** Because the data is de-identified, he explained that you
17 can't know whose it is to create the profile; right?

18 **A.** That's what he says, but I don't -- I don't agree to that.

19 **Q.** And just now you were talking about puzzle pieces and how
20 Google has all of these different pieces of the puzzle. Do you
21 remember saying that?

22 **A.** Yes.

23 **Q.** Do you have -- you have no basis for alleging that Google
24 puts all of the puzzle pieces together, do you, Mr. Rodriguez?

25 **A.** Well, from what I heard and what we've seen, it's more

1  than just that.  I mean, with me specifically, it's pretty much
2  you know it's me.  My name's in there.  There -- I mean,
3  de-identified, it's how -- how is it de-identified if my name,
4  my email, my phone number is in there?  So in my case, it's --
5  it doesn't matter because it's all there.
6  Q.   So despite Mr. Monsees' testimony the other day that the
7  data was de-identified, that it didn't include names and email
8  addresses, it's your allegation that the puzzle pieces are all
9  there together?
10 A.   My name, my email address, my phone number is all there.
11 Q.   You testified on Friday that you had reviewed Google's
12 privacy policy; right, Mr. Rodriguez?
13 A.   On Friday?  Repeat the question.
14        THE COURT:  Thursday.
15 BY MS. AGNOLUCCI:
16 Q.   Yeah.  I know it's been a long weekend.
17        THE COURT:  Thursday.
18 BY MS. AGNOLUCCI:
19 Q.   We were all last here on Thursday.  I'm sorry.
20      You were here on the stand on Thursday; right?
21 A.   Right.
22 Q.   And you remember telling your lawyer that you had
23 carefully read Google's privacy policy?  Do you remember that?
24 A.   I did, yeah.
25 Q.   And he showed you parts of it on Thursday and then more

1  Q.  You've never tried to sell your personal information
2  before; right, Mr. Rodriguez?
3  A.  Prior to this, I had no idea that Google thought it was
4  valuable.  You know, that's where I learned a lot about this
5  issue.
6  Q.  You consider yourself a private person?
7  A.  Yes.
8  Q.  And it's important to you to know how companies are using
9  your data; right?
10 A.  Sure.
11 Q.  And you believe that the data generated by your activity
12 on apps is your data; right?
13 A.  Yes.
14 Q.  You have the right to control and access it; right?
15 A.  I have the right to control what is being used.
16 Q.  And you're concerned with companies sharing your data with
17 third parties; right?
18 A.  In this case here I'm concerned about the apps sharing
19 with Google specifically.
20 Q.  Only Google?
21 A.  At -- yes.
22 Q.  You testified in your deposition that you would stop using
23 an app if you learned it was sending data to an outside party.
24 Do you remember that?
25 A.  If I learned, yes.

1  **BY MS. AGNOLUCCI**
2  **Q.**   Mr. Rodriguez, please take a minute to read silently to
3  yourself the section in the middle of that page, starting with
4  the word "Other."
5  **A.**   Can you have somebody -- I'm sorry.  I don't know where
6  you want me to start.
7  **Q.**   The section that is blown up on the screen in front of
8  you.
9  **A.**   "Other Web" -- okay.  I got it.
10       (Witness examines document.)  Okay.  I see it.
11 **Q.**   Mr. Rodriguez, does the text in front of you help you
12 remember what you agreed to in Target's privacy policy?
13 **A.**   Yes.
14 **Q.**   And you understand that you agreed to the use of multiple
15 analytic services when you read and agreed to Target's privacy
16 policy?
17 **A.**   Right.
18 **Q.**   And those analytic services include Adobe Analytics;
19 right?
20 **A.**   Mm-hmm.
21 **Q.**   And those include Google Analytics?
22 **A.**   Right.
23 **Q.**   Yes?
24 **A.**   Right.
25 **Q.**   You agreed to that?

1  **A.**   That's what it says here, yeah.

2  **Q.**   And it also says that you agreed to Target sharing your

3  data with an analytics company called Crazy Egg.  Do you see

4  that?

5  **A.**   Yes.

6  **Q.**   Do you know what Crazy Egg is?

7  **A.**   I don't.

8  **Q.**   You don't?

9  **A.**   I don't know what Crazy Egg is.

10 **Q.**   But you agree that the language you are looking at on the

11 screen was part of your deal with Google -- with Target?

12 **A.**   With -- with Target, right.

13 **Q.**   I keep calling Target Google.  I'm sorry.

14 **A.**   That's okay.

15 **Q.**   Part of your deal with Target was that Target was sharing

16 your data with third parties, including Google Analytics?

17 **A.**   Right.

18 **Q.**   And Crazy Egg?

19 **A.**   Right.

20 **Q.**   And Adobe Analytics?

21 **A.**   Right.

22 **Q.**   And you were okay with all of that?

23 **A.**   They're just getting my -- they're just getting my data

24 from Target alone.  That's -- I mean, they're not -- they --

25 they're not saying they're getting all my app information from

1  my phone.
2      So -- and, again, going back, it's -- it's like you said,
3  my deal was with Target and Google.  So if Google is -- if I
4  made a deal with Google, saying, "Don't collect data from this
5  specific app or all apps on my phone," I think Google should
6  honor that.
7      Now, if we're talking about the other analytics companies
8  that are within this here, if they're sharing that with that
9  company, it's just that data from Target alone, not all my
10 apps.  So I wouldn't see a problem specifically for the Target
11 app.
12 Q.  You had no problem with the Target app sharing your data
13 with Google Analytics, Adobe Analytics, or Crazy Egg; right?
14 A.  If -- if -- understanding how -- how I see things and what
15 I learned, I don't think it was a big deal.
16 Q.  Not a big deal?
17 A.  Not with -- not sharing my Target information, my Target
18 activity, with the analytics company.  I don't think that's an
19 issue.  I think, again, it's more -- if we're talking about
20 what the problem here is, it's more Google gathering all the
21 data from all my apps to kind of paint a picture of who I am.
22 Q.  You testified on Thursday -- I got it right -- that you're
23 starting a new job this week; right, Mr. Rodriguez?
24 A.  Yes.
25 Q.  And you took professional development courses to help you

1  Google Accounts, and your Android phones; right?
2  **A.** To me, right.
3  **Q.** But you allowed your son to use his Android phone after
4  you filed this complaint the same way he had used it before;
5  right?
6  **A.** What do you mean? Like, after I found out about this, I
7  let him use the phone?
8  **Q.** In the same way that he had always used it; right?
9  **A.** Right. He's very young. They're not using any apps like
10 I am. They really just used it for playing games and watching
11 videos and stuff like that.
12 **Q.** Well, you remember testifying in your deposition that he
13 did use apps and that you didn't ask him to change his behavior
14 on any of those apps? Do you remember that?
15 **A.** I know it's video games. I'm not sure what apps he was
16 using.
17 **Q.** You're not sure what apps he was using?
18 **A.** Right. The apps that you're saying that I said in my
19 deposition, I'm not sure what was said there.
20 **Q.** And do you remember being asked if you allowed your sons
21 to install new apps since filing your complaint?
22 **A.** Yes. So I do -- me and my wife, we both make sure that
23 when they're doing stuff on their phones or downloading stuff,
24 I am aware. And I do periodically look at his phone just to
25 make sure that, you know, it's nothing crazy going on. And,

1  again, he's young.  They're both young.  And me and my wife
2  both do the same thing.  So I think, you know, we do a good
3  job.
4       I don't -- I mean, and I apologize.  I know you mentioned
5  that you don't -- want to be sensitive here, but it's kind of
6  like I feel like you're saying that I'm a bad father of some
7  sort, and I don't agree with that.
8  **Q.**  Mr. Rodriguez, I have no idea what apps are on my
9  children's phones, so I'm not casting any aspersions.
10      I'm just trying to understand and confirm the deposition
11 testimony that you allowed them to install apps, you didn't
12 tell them to change their behavior, and you weren't really
13 checking which apps were being installed.  And that's just my
14 last question.
15 **A.**  I did check what was being installed, and I believe I did
16 turn off WAA and sWAA on their phones.
17      But, again, I mean, these are their phones.  This is what
18 they do.  They play on their phones.  They play games.  They
19 watch videos.  And really I don't understand, how can I prevent
20 that?
21      I mean, right now I would say at that time, if there's any
22 data being collected, it's a five-year-old and a ten-year-old
23 at the time.  And, again, they're not using the phone the same
24 way as I would, where you can kind of put the pieces of the
25 puzzle together and know who I am.  I think you would say it's

1  a five-year-old and a ten-year-old, and I don't think there's
2  much information that you can actually gather from that. It's
3  just kids playing on a phone. It's not using apps like an
4  adult uses an app.
5       MS. AGNOLUCCI: No further questions, Mr. Rodriguez.
6  Thank you.
7       THE COURT: Mr. Lee?
8                    **REDIRECT EXAMINATION**
9  BY MR. LEE:
10 Q.  Just one moment, Mr. Rodriguez. Bear with me.
11 A.  Hurry up. Just playing.
12              (Pause in proceedings.)
13 BY MR. LEE:
14 Q.  Okay. I'm just going to try and tick through these as
15 quickly as possible to get you out of here.
16 A.  Okay.
17 Q.  All right?
18    You were asked by Google's counsel whether you remembered
19 what -- whether you recognize what sWAA, or supplemental app
20 activity, was during your deposition. Do you remember her
21 asking about that?
22 A.  Right.
23 Q.  And you understand that the lawyers talk about WAA and
24 sWAA at this trial, and sometimes Google calls it supplemental
25 app activity. You remember that; right?

1    **MS. BONN:** Your Honor, plaintiffs offer PX477 as a
2 1006 summary.
3    **MR. HUR:** Your Honor, we object to the second page of
4 this. We are okay with the first page.
5    **MS. BONN:** That's fine, Your Honor. Thank you.
6    **THE COURT:** All right. The first page is now
7 Exhibit 477, and it will be admitted.
8    (Trial Exhibit PX477 received in evidence.)
9    **MS. BONN:** May we publish to the jury, please?
10    **THE COURT:** You may.
11    **MS. BONN:** Thank you.
12 BY **MS. BONN:**
13 **Q.** Okay. And can you just explain to the jury, now that they
14 can see it, what this summary is showing?
15 **A.** Yes. This is the total number of sWAA-off account months
16 during the period, and this breaks it down by year, and then
17 sums up to be, you know, more than 10 billion accounts.
18 **Q.** Okay. Let's go back to the slide that we were just on.
19    And we were talking about this deduction you made, "Share
20 of monthly accounts with WAA off."
21    **MS. BONN:** And can we just highlight that row,
22 Mr. Boles. There we go. Starting with the 69.13, if there's a
23 way to highlight it. If not, that's okay.
24 BY **MS. BONN:**
25 **Q.** It looks like there's a big drop-off in the number of

1  sWAA-off accounts between 2016 and 2017.
2      Did you have an understanding, for purposes of your
3  analysis, of what that was based on?
4  A.  Yes.
5  Q.  And what was that?
6  A.  Well, I under- -- I understood that there was -- well,
7  originally sWAA was off by default and then it was turned on.
8      And so I understood that there was a consent bump, so
9  something that was called consent bump, where they were trying
10 to get people to turn their sWAA on instead of off.  And so in
11 those earlier periods, there may be more people with sWAA off
12 and then fewer in the later periods.
13 Q.  Okay.  Let's go ahead to the next slide, please.
14     All right.  So now we've talked about taking U.S. revenue,
15 making a deduction for traffic acquisition costs, funneling it
16 down to signed-in and sWAA-off data.
17     Once you had taken all those steps, what was the final
18 step of your analysis in calculating the App Promo profits?
19 A.  Sure.
20     For this particular calculation, I was looking at the
21 share of revenue that Google attributes to conversion-type bid
22 against GA4F.  We heard about what, you know, that data is
23 earlier in the case, and that's what I was focused on here.
24 Q.  And did you rely on information Google provided for these
25 percentage figures that you provide for this deduction, ranging