```
                                    Volume 1

                                  Pages 1 - 174

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

          Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,        )
individually and on behalf of    )
all others similarly situated,   )
                                 )
              Plaintiffs,         )
                                 )
     VS.                         )     NO. 3:20-CV-04688 RS
                                 )
GOOGLE LLC,                      )
                                 )
              Defendant.          )
_____)
```

                                      San Francisco, California
                                      Monday, August 18, 2025

                    **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

```
                         BOIES SCHILLER FLEXNER LLP
                         333 Main Street
                         Armonk, New York 10504
                  BY:  DAVID BOIES, ATTORNEY AT LAW
                       ALEXANDER BOIES, ATTORNEY AT LAW


                         BOIES SCHILLER FLEXNER LLP
                         2029 Century Park East, Suite 1520n
                         Los Angeles, California 90067
                  BY:  ALISON L. ANDERSON, ATTORNEY AT LAW
```

```
REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter
```

1    **APPEARANCES**:   (CONTINUED)

2    For Plaintiffs:

3                          BOIES SCHILLER FLEXNER LLP
                           100 Southeast 2nd Street, Suite 2800
                           Miami, Florida 33131
4                   BY:   **JAMES W. LEE, ATTORNEY AT LAW**

5

6                          BOIES SCHILLER FLEXNER LLP
                           44 Montgomery Street, 41st Floor
                           San Francisco, California 94104
7                   BY:   **MARK C. MAO, ATTORNEY AT LAW**

8

9                          SUSMAN GODFREY LLP
                           One Manhattan West, 50th Floor
                           New York, New York 10001
10                  BY:   **WILLIAM C. CARMODY, ATTORNEY AT LAW**

11

12                         SUSMAN GODFREY LLP
                           1900 Avenue of the Stars, Suite 1400
                           Los Angeles, California 90067
13                  BY:   **AMANDA BONN, ATTORNEY AT LAW**

14

15   For Defendant:

16                         COOLEY LLP
                           101 California Street, Fifth Floor
                           San Francisco, California 94111
17                  BY:   **BENEDICT Y. HUR, ATTORNEY AT LAW**
                          **EDUARDO E. SANTACANA, ATTORNEY AT LAW**
18                        **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
                          **ISABELLA M.M. CORBO, ATTORNEY AT LAW**

19

20                         COOLEY LLP
                           4401 Eastgate Mall
21                         San Diego, California 92121
                    BY:   **MICHAEL A. ATTANASIO, ATTORNEY AT LAW**

22

23

24   Also Present:        **Josh Dubin, Consultant**
                          **David Klein, Consultant**
25                        **Steve Ganem, Google**

1                              **I N D E X**

2

3     Monday, August 18, 2025 - Volume 1

4

5                                                    **PAGE    VOL.**

6     Jury Voir Dire                                    27      1

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Monday - August 18, 2025                              8:36 a.m.

 2                       P R O C E E D I N G S

 3                            ---o0o---

 4        (Proceedings were heard out of the presence of the

 5   prospective jurors.)

 6            THE COURTROOM DEPUTY:  We are calling Case Number

 7   20-CV-4688, Rodriguez vs. Google.

 8        Counsel for plaintiffs, come on up, state your

 9   appearances.

10            MR. DAVID BOIES:  Good morning.  David -- good

11   morning, Your Honor.  David Boies for the plaintiffs.

12            THE COURT:  Good morning.

13            MR. CARMODY:  Good morning, Your Honor.  Bill Carmody

14   here on behalf of the plaintiff class.

15            THE COURT:  Good morning.

16            MR. LEE:  Good morning, Your Honor.  James Lee on

17   behalf of the plaintiffs.

18            THE COURT:  Good morning.

19            MS. BONN:  Good morning, Your Honor.  Amanda Bonn for

20   the plaintiffs.

21            THE COURT:  Good morning.

22            MS. ANDERSON:  Good morning, Your Honor.  Alison

23   Anderson for the plaintiffs.

24            THE COURT:  Good morning.

25            MR. MAO:  Good morning, Your Honor.  Mark Mao for the
```

PROCEEDINGS

```
 1   plaintiffs.

 2           THE COURT:  Good morning.

 3           MR. ALEX BOIES:  Good morning, Your Honor.  Alex Boies

 4   for the plaintiffs.

 5           THE COURT:  Good morning.

 6       Okay.  Defense side?

 7           MR. HUR:  Good morning, Your Honor.  Ben Hur from

 8   Cooley for Google.  I'm here with my colleagues Simona

 9   Agnolucci, Eduardo Santacana, Mike Attanasio, and Isabella

10   Corbo.

11           THE COURT:  Good morning.

12       Okay.  I had naively hoped that I could get through the

13   first day without a flurry of motions, but that was, indeed,

14   naive.

15       So I got some motion last night/this morning.  So what's

16   this one about?  Who's the moving party on this?

17           MR. LEE:  Your Honor, I think there were three motions

18   that were filed late last night.  There's two on our side.

19       The first one is a motion to quash a subpoena that was

20   served on a class representative.  If you want to hear that

21   first, I'm prepared to handle that one.

22           THE COURT:  Let's go through them.

23           MR. LEE:  Sure.

24           THE COURT:  I don't want three motions a day, by the

25   way.
```

PROCEEDINGS

1          **MR. LEE:**  I know we're off to a bad start, Your Honor.

2          **THE COURT:**  Yes.

3          **MR. LEE:**  I'm actually -- I'm disappointed that this

4     one is actually before you.

5        If you want us to hold on the motion to quash for time

6     reasons, that's fine.

7          **THE COURT:**  Well, I mean, we're still getting the jury

8     all collected.

9          **MR. LEE:**  Okay.

10          **THE COURT:**  So tell me what it's about --

11          **MR. LEE:**  Sure.

12          **THE COURT:**  -- and I'll see if I...

13          **MR. LEE:**  So Susan Harvey is a class representative in

14    this case.  She's a disabled retiree.  She was deposed in the

15    case back in October 2022.

16        Immediately following her deposition, she suffered a

17    stroke that gave her paralysis on the left-side of her body.

18    Two days after that, so about a week after the deposition, she

19    had a second stroke while still in the hospital.  She

20    subsequently had a third stroke two months later.

21        She did not seek medical clearance to be here to testify

22    unbeknownst to counsel.  We didn't know about the strokes

23    either until she arrived.

24        I prepared her for her testimony beginning on August 15th,

25    just a few days ago, and it was clear that just even asking her

**PROCEEDINGS**

1  questions about the case gave her great distress.  She had

2  trouble breathing.  She hyperventilated.  She cried.

3         **THE COURT:**  She's still a named plaintiff?

4         **MR. LEE:**  She's still a named plaintiff.  We spent

5  two days with her.  Both days she could not complete even basic

6  preparation, and she agreed that she was not physically fit to

7  testify.

8         **THE COURT:**  Was her -- and her deposition was taken?

9         **MR. LEE:**  Her deposition was taken.

10  And so we offered -- I immediately informed counsel for

11  Google as soon as we made this decision, and their response was

12  a little strange.  The response was that if she were to be in a

13  hospital bed, they would cross-examine her there.

14  Same day, about an hour after that call, they sent a

15  process server to serve her with a subpoena at her home, which

16  obviously caused her a lot of -- a lot of distress.

17  So, you know, I know this is a hotly contested litigation;

18  but I just think that, given the circumstances, this is --

19  we're getting a little far past what's right.

20         **MS. AGNOLUCCI:**  Simona Agnolucci for Google.

21  And we are happy to take this up tomorrow after briefing,

22  since we only received counsel's brief last night.  But just to

23  lay the series of events down here, the facts are a little bit

24  differently than counsel here represented.

25  So Ms. Harvey was deposed in October of 2022, and

1  immediately following that deposition, it appears she had a

2  series of strokes.  At least that's what we're told by her and

3  by counsel.

4      Eight months after those strokes, in July of 2023, she

5  declared under penalty of perjury [as read]:

6          "I do not know of any facts that would limit my

7      ability to adequately represent the interest of other

8      members of the classes.  I will appear for trial for

9      this case."

10     This is after the strokes, after these events.  She

11 applied to be a class representative; she was willing to be

12 one.

13     In their joint pretrial statement in June, the plaintiffs

14 wrote that she would testify about her experience with the

15 relevant Google controls.

16     On Friday, Ms. Harvey arrived here in San Francisco at the

17 Ritz-Carlton, where she's staying with counsel.  Apparently,

18 that's where all of plaintiffs' counsel and the witnesses are

19 staying.  And she made a Facebook post that said that she was,

20 quote, "Feeling grateful to be at the Ritz-Carlton," and she

21 expressed excitement, "Well, it's finally time to testify at

22 trial."

23     This is not the post of a person who had any concerns that

24 she couldn't testify.  This is not the post of a person who was

25 afraid to tell her doctors that she couldn't testify.

1    Hours later, this post mysteriously disappeared from

2    Facebook, and we learned that counsel had met with her to

3    prepare her.  I don't doubt that she expressed anxiety.  Many

4    witnesses do.  And they decided they didn't want her coming to

5    trial, and they sent her home.

6         **THE COURT:**  Well, get me some doctor's report on this.

7    I'm not just going to accept one side or the other's

8    characterization of this poor person's health condition.  I'm

9    getting two very different stories about this lady.  So I need

10   an independent -- some doctor to tell me one way or the other

11   what her situation is, because you've got one version that is

12   diametrically different than what I just heard.  So what am I

13   supposed to do?

14        **MR. LEE:**  I --

15        **THE COURT:**  So get me somebody who is an independent

16   medical professional to tell me the lay of the land, and

17   I'll -- if the medical professional says she can't testify,

18   she's got cognitive problems and articulation problems, and the

19   like, you're going to end up using the deposition.  If they

20   said she's dining at the Ritz-Carlton, it's going to be a

21   different proposition.

22        So you've got work to do to tell me.  I'm not going to

23   call the question based on what I just heard between the two of

24   you.

25        **MR. LEE:**  Understood, Your Honor.  I get that.

**PROCEEDINGS**

 1       We did file a declaration with the papers.  It's -- we

 2   couldn't get in touch with her doctors over the weekend.  She

 3   signed a declaration herself attesting to everything I laid

 4   out.

 5            **THE COURT:**  Not good enough.

 6            **MR. LEE:**  We'll work on --

 7            **THE COURT:**  I want a doctor.

 8            **MR. LEE:**  We'll work on it.

 9            **THE COURT:**  Okay.

10            **MR. LEE:**  Thank you.

11            **MS. AGNOLUCCI:**  And, Your Honor, we would like to

12   brief it because I'll note that even if Your Honor were to

13   conclude that she is medically unavailable, there's an

14   interplay between Rule 32 about whether they can provide her as

15   a witness by deposition because of unavailability, which they

16   cannot, and we can explain that in our papers --

17            **THE COURT:**  All right.  Well --

18            **MS. AGNOLUCCI:**  -- and --

19            **THE COURT:**  Fine.  Well, we'll --

20            **MS. AGNOLUCCI:**  -- the rules around quashing the

21   subpoena.

22            **THE COURT:**  Fine, fine, fine, fine.  Go ahead and

23   brief the issue, and we'll deal with it.

24            **MR. LEE:**  Thanks, Your Honor.

25            **MS. AGNOLUCCI:**  Thank you, Your Honor.

1          **THE COURT:**  Okay.  What's the next one?

2          **MS. BONN:**  Amanda Bonn, B-o-n-n.  Thank you.

3       Your Honor, the next motion is a motion we filed based on

4    two slides the defense disclosed for their opening statement.

5    These slides, which we received yesterday morning at

6    10:00 a.m., initially included, essentially, screenshots from a

7    demonstrative video that they expect Mr. Monsees, the first

8    witness in the case, will introduce.

9          The screenshots from the demonstrative video include

10   disclosures and statements on Google websites after the class

11   period, from, in fact, July of 2025, regarding issues such as

12   Google Account, how data is saved when WAA is off.  These

13   disclosures were not produced during discovery.  They were not

14   referenced in response to our interrogatory asking them to

15   identify every disclosure on which they might rely.

16         After we raised the issue, they then replaced those two

17   slides with an excerpted slide from a single document in their

18   production which is a court filing that Google made in an

19   Australian litigation that was prepared by Google.

20         **THE COURT:**  Did they produce it to you?

21         **MS. BONN:**  The Australian litigation document, yes,

22   Your Honor.

23         **THE COURT:**  Okay.

24         **MS. BONN:**  And it was not referenced in their

25   interrogatory responses about the disclosures at issue in this

PROCEEDINGS

 1    U.S. case.

 2        Within the Australian court filing made by Google's

 3    Australian counsel, there is hearsay within hearsay.  There are

 4    statements by Google where they say, "This slide was available

 5    to users between X period."  There are screens in that document

 6    that they say are re-creations.

 7        And so we are moving to exclude this evidence under

 8    Rule 37.  It was not disclosed in their interrogatory

 9    responses, and as hearsay, and hearsay within hearsay, it's not

10    proper for opening statement.  And the details of what

11    Mr. Monsees may do tomorrow, I think we could take up after the

12    opening statement.

13        **THE COURT:**  Mr. Santacana?

14        **MR. SANTACANA:**  Good morning, Your Honor.  Eduardo

15    Santacana for Google.

16        The slides in question that we plan to use in the opening

17    are two screenshots of a document that was produced in

18    discovery.  It was listed on our exhibit list, and it was

19    prepared by a witness who will testify at trial tomorrow, who

20    will lay the foundation for why it is admissible.

21        **THE COURT:**  What is the -- why is it not hearsay?

22        **MR. SANTACANA:**  It's not hearsay, Your Honor, because

23    it was prepared by him and others at Google, at his direction,

24    from a Google source code database that generated historical

25    screenshots of what the screens looked like when users first

1    create a Google account.

2        And just to set the --

3        THE COURT:  Is it after the -- counsel said it's after

4    the class period.

5        MR. SANTACANA:  No, Your Honor.  The slides in

6    question in the opening are from the class period.

7        What counsel was referring to is a separate issue, which

8    is a demonstrative video that Mr. Monsees would like to use

9    while he's testifying in order to explain to the jury what it's

10   like to create a Google account.

11       For purposes of the opening, these are screenshots of

12   something that was created by a witness in the case, disclosed

13   during discovery, from a source code database that generates

14   these screenshots for a judicial proceeding.  They represent

15   U.S. -- U.S. consent flows.

16       And, again, it's just the first screen that somebody sees

17   when they create a Google account, and the purpose of it is to

18   do some scene setting for the jury so they understand what it's

19   like to create a Google account.

20       So, you know, I'm proffering here, Your Honor, that --

21       THE COURT:  You said it was during the class period

22   you would see this?

23       MR. SANTACANA:  These screens are during the class

24   period, and it was created during the class period.

25       MS. BONN:  May I respond, Your Honor?

PROCEEDINGS

1    We served, during discovery, an interrogatory that asked

2  Google to identify every public disclosure you made to users in

3  the class period on which you intend to rely in this case.

4    **THE COURT:**  Whether or not it was included in the

5  interrogatory response, it was produced to you; correct?

6    **MS. BONN:**  Correct.  But, Your Honor, the point I'd

7  like to make is, this document and the contents of the document

8  are about Google's practices in Australia.

9    The reason we served this interrogatory was to say, "Look,

10  you've produced hundreds of thousands of pages of things in

11  this case.  We have a right for you to tell us what are the

12  specific screens and the specific disclosures that you are

13  going to rely on as affecting U.S. users during the class

14  period."

15    They supplemented their answer to that interrogatory

16  response repeatedly.  Not only did they never cite the

17  Australian filing, they never cited any version of these

18  screens or the Google account setup at all.  They've never

19  cited it in their motion to dismiss, their summary judgment

20  briefing, class certification.

21    It's not like this case came about out of thin air.  It

22  has been heavily litigated, and this is an eleventh-hour trial

23  ambush with a page pulled from an Australian court filing that

24  they never put at issue in this case, despite our clear

25  interrogatory asking them to do so.

PROCEEDINGS

1              **THE COURT:**  Okay.  Mr. Santacana, the absence of any

2    reference in the interrogatory response?

3              **MR. SANTACANA:**  Your Honor, the screen was produced in

4    discovery.  The interrogatory response talks about the public

5    disclosures that we're relying on to say that we win the case.

6         This is a scene-setting slide.  This is not -- it's,

7    honestly, a bit of a mountain out of a molehill when you see

8    the slide, which I'd be happy to show you.  It just says, "Hi.

9    Welcome to Google.  Agree to our terms of service and click

10   next."  This is the screen that we got a 12-page MIL on at 1:00

11   in the morning.  And it is a U.S. screen.  It's not an

12   Australian screen.  We have a good faith basis it will come

13   into evidence from the witness who testifies tomorrow.

14             **THE COURT:**  You can use it.

15             **MR. SANTACANA:**  Thank you.

16             **THE COURT:**  The motion is denied.

17        Okay.  So when we bring the jury up, if you can, those of

18   you in the audience, be aware that there are going to be a lot

19   of people coming in.  Give them space.  It would be best,

20   actually, I think, if everybody who's not a juror would be on

21   one side of the room so we can focus on the jurors.

22        Anything else?

23             **MR. SANTACANA:**  Yes, Your Honor.  With apologies,

24   there was one other thing filed last night related to the

25   damages motion in limine that you issued an order on.

PROCEEDINGS

1          **THE COURT:**  I ruled a few moments ago.

2          **MR. SANTACANA:**  I know.  Yes, Your Honor.

3      What we filed last night relates to the opening slides,

4  which have two different things that we're objecting to.  One

5  is a slide that --

6          **THE COURT:**  Is this part of the motion that you filed?

7          **MR. SANTACANA:**  It is a brief we filed last night

8  after we got their opening.

9      I want to just clarify something about your order, and

10  then there's a separate issue.

11      The clarification is, in your order, you say that the

12  plaintiffs cannot directly contend that they have any evidence

13  to suggest the actual damages figure should be multiplied, as

14  you noted -- you say "as noted in the prior order," because the

15  initial report didn't disclose it.

16      The slide in question -- there's a couple of slides like

17  this in the opening -- say [as read]:

18          "Compensatory damages based on 56 months of SWA

19      off per device."

20      And does the calculation on the opening for the jury.

21          **THE COURT:**  We've been down this path so many times.

22  I have said they can argue this.

23          **MR. SANTACANA:**  Okay.  I'm just clarifying,

24  Your Honor.

25          **THE COURT:**  They can make these arguments.

PROCEEDINGS

1        And I think this is the third or fourth time you've been

2   trying to get me to change my view; and, you know, maybe I'm

3   wrong, but I've made my decision.  So I think it behooves you

4   to stop arguing the same point over and over again.

5        I think it's pretty clear.  The expert, Mr. Lasinski, is

6   confined to what he said.  But that doesn't confine lawyers

7   from saying, "Well, we can take what he did and we can

8   extrapolate."

9        And you can say, "That's pie in the sky.  They shouldn't

10  do that," blah-blah-blah-blah.

11       But I've gone down this path now many times.

12       **MR. SANTACANA:**  That fits with my understanding of

13  your order, Your Honor.  It was just the line saying they can't

14  contend they have evidence to suggest that it should be that.

15  That's all I wanted to clarify.

16       The second issue in the brief we filed last night is that

17  a different slide -- so when we were at the pretrial

18  conference, we had a discussion about supplemental expert

19  report issues, and you asked us to file any motions to strike

20  by August 5th.

21       The parties engaged in very deep discussions about trying

22  to get those motions to strike off the table.  Those

23  discussions fell apart two days ago.  And yesterday, in the

24  opening demonstrative, we saw a number that we thought we had

25  an agreement to get excluded.

1    I'm not casting blame on why the discussions fell apart.

2    The only point here is that in an opening slide, that number is

3    now on the slide.  It is an alternative calculation that was

4    first disclosed in a footnote of Mr. Lasinski's second

5    supplemental report, so his third expert report.  It was an

6    alternative way of calculating disgorgement.  It was a number

7    we had never seen before until that second supplemental report.

8    We think it should be stricken, and we filed a brief last night

9    explaining why.

10    Since we filed it so late, Your Honor, one option, if you

11    don't want to rule just like this on the fly, is to ask them to

12    not put that number on an opening slide, since we don't know

13    how you will rule.  But this is a damages opinion that was

14    disclosed in a footnote long after expert discovery.

15    **MS. BONN:**  May I respond, Your Honor?

16    **THE COURT:**  Go ahead.

17    **MS. BONN:**  After discovery closed, Google produced an

18    updated spreadsheet which, for the first time, included new

19    data about its traffic acquisition costs on one of the relevant

20    lines of business called App Promo for the year-ends '22 and

21    '23.

22    We then asked questions about it because we said, "The

23    numbers here look materially different from the earlier year

24    numbers you produced."

25    We spent several months negotiating with Google's counsel

1   for a stipulation about why their TAC numbers had changed in

2   April of 2025.  Mr. Lasinski then produced a supplemental

3   report in April of 2025 where he laid out, in schedules to his

4   report, the calculations.  And on page 3 of his supplement,

5   Footnote 9, he said [as read]:

6           "While Google represents the traffic acquisition

7       costs as a percentage of the corresponding revenue

8       did not materially change between 2021 and 2024,"

9       citing the April 18th, '25, stipulation by Google,

10      comma, "Google's App Promo revenue data for '22 and

11      '23 indicates that global TACs as a percentage of the

12      revenue were materially lower."

13       **THE COURT:**  Slow down.

14      **MS. BONN:**  Excuse me.

15   [As read]:

16   -- "were materially lower."

17      And so he attached, as what he calls an alternative

18   calculation, a schedule that shows what his calculation would

19   be if he used the numbers that Google produced after discovery,

20   as well as if he used Google's representation that there was no

21   material change, despite the fact that the spreadsheet Google

22   produced demonstrated a material change.

23      So they were on notice that these were two alternative

24   calculations based on new information after discovery.  They're

25   proper supplement.

1      And in the opening statement, my understanding is

2  Mr. Boies intends to argue that the evidence will show this

3  number.  He's not going to say, "Mr. Lasinski is going to do X,

4  Y, and Z" in the opening.  We have a good faith believe we're

5  going to be able to get evidence in that will show this

6  number --

7          **MR. SANTACANA:**  Your Honor --

8          **MS. BONN:**  -- through a number of data points.

9          **MR. SANTACANA:**  Your Honor, the short version of what

10  counsel just said is that we produced new numbers, as we had

11  agreed.  Mr. Lasinski didn't like them and doesn't believe

12  them, and so in a footnote -- he has his main unjust enrichment

13  opinion.  Then in a footnote he says:  But I don't like the

14  numbers Google gave me, so here's a new opinion.  The numbers

15  that were there before, let's extrapolate from those and

16  pretend that those continued on into the future, despite true

17  numbers we gave them that he just didn't like.

18          **THE COURT:**  Okay.  It sounds to me like you can cover

19  that on cross-examination.  You can use it.

20          **MS. BONN:**  Thank you, Your Honor.

21          **THE COURT:**  Okay.  So as soon as we hear -- Ms. Hom,

22  do we know when the jury is --

23      More?

24          **MR. HUR:**  Your Honor, the plaintiffs provided

25  66 slides yesterday.  We have tried to work out as many as we

PROCEEDINGS

 1    can.  We do have a few more disputes.  Your Honor, we'd like

 2    to, if possible, hand -- show you some of them.

 3          THE COURT:  What are you guys doing?  This is the day

 4    for jury selection, and you're -- everything -- you assured me

 5    at the pretrial conference, "Yes, we've got everything

 6    organized."  You know, you're filing things which I haven't

 7    even seen, and you're -- we need to pick this jury.

 8          MR. HUR:  Understood, Your Honor.

 9          THE COURT:  So what is this?

10          MR. HUR:  Your Honor, there are some of the

11    exhibits -- and, again, we worked out many of the disputes, but

12    some of them we still think are problematic.  These are not the

13    damages.

14          THE COURT:  Exhibits for what?  For opening

15    statements?

16          MR. HUR:  I'm sorry.  These are opening statement

17    demonstratives.

18          THE COURT:  That's going to happen this afternoon.

19          MR. HUR:  Yes, Your Honor.

20          THE COURT:  And you want rulings on these?  So how

21    many of them are there?

22          MR. HUR:  Your Honor, there are about five or six.

23          MR. DAVID BOIES:  Are these ones you've raised with us

24    before?

25          MR. HUR:  Yes, they are.

PROCEEDINGS

```
 1            MR. DAVID BOIES:  I thought -- I thought --

 2            THE COURT:  Give me the five or six, and I'll rule on

 3   them.

 4            MR. DAVID BOIES:  Okay.  We have four documents.

 5   Two --

 6            THE COURT:  Wait a minute.

 7       (Discussion off the record between the Courtroom Deputy

 8   and the Court.)

 9            THE COURT:  Okay.  Go ahead.

10            MR. DAVID BOIES:  We have four exhibits here that

11   they're showing me, two of which they say are argumentative.

12   I think they probably are a little argumentative, but I don't

13   need them for the opening.

14            THE COURT:  Okay.  That takes care of two.

15            MR. DAVID BOIES:  That takes care of two.

16       The third, they think I'm not going to get into evidence.

17            MR. HUR:  That's right.

18            MR. DAVID BOIES:  Can you tell me why?

19            MR. HUR:  Yes.  Because it's hearsay and it's not a

20   business record.

21            MR. DAVID BOIES:  Isn't this something from this guy,

22   Sam Heft-Luthy?

23            MR. HUR:  It is a -- it is a comment from him

24   commenting on something on which he's not -- it's not going to

25   establish that it's a business record.  That is a comment,
```

1  I believe, in a document that we do not think is coming into

2  evidence.  And my partner Mr. Attanasio, I believe, is covering

3  that document.

4      **THE COURT:**  Of course, my view on a lot of this is

5  it's at the risk of the party using the demonstrative.  If it

6  doesn't come into evidence, the jury is told that the evidence

7  is what is admitted, and attorney argument is not evidence, and

8  the like.

9      So the self-policing on this is, to some extent, if they

10  overpromise and they say there's going to be evidence and there

11  isn't evidence, it's their problem.  So I can't -- I'm not

12  going to rule on every evidentiary issue in the case in the

13  context of the opening statements' demonstratives.

14      **MR. HUR:**  Your Honor, we understand that.  There

15  are -- there are many, many statements in here that we have

16  concerns will not come into evidence, but we have chosen this

17  particular one in part because of concerns about prejudice.

18      We understand Your Honor's general view on that and that

19  it is at the risk of the plaintiffs, but this particular

20  document, we were -- we had special concerns about.

21      **MR. DAVID BOIES:**  Let me ask you to look at the

22  document maybe, Your Honor.

23      I will say to the Court, I don't feel strongly about this;

24  and if the Court thinks that that's particularly prejudicial,

25  I'll wait and see whether we get it into evidence.

1      I actually thought --

2           **THE COURT:**  So this is -- this is a statement by

3  Mr. Heft-Luthy; is that right?

4           **MR. DAVID BOIES:**  That's my understanding.

5           **THE COURT:**  Heft-Luthy.

6           **MR. HUR:**  Your Honor, he did not write that statement.

7           **THE COURT:**  Okay.  Who is -- who's -- is this a quote

8  from somebody, or what is it?

9           **MR. DAVID BOIES:**  My understanding, it was a quote

10  from Heft-Luthy.  If they represent that's not a quote from

11  Mr. Heft-Luthy, I withdraw the exhibit --

12           **THE COURT:**  Okay.

13           **MR. DAVID BOIES:**  -- and we'll deal with it later.

14           **THE COURT:**  Is that correct?

15           **MR. ATTANASIO:**  Mike Attanasio for Google, Your Honor.

16      It is correct.  Mr. Heft-Luthy was responsible for

17  conducting a survey of other people.  Out-of-court statements

18  from those people are embedded in an email or --

19           **THE COURT:**  So he didn't say this?

20           **MR. ATTANASIO:**  That's my understanding, Your Honor,

21  yes.

22           **THE COURT:**  Okay.  Don't use it.

23           **MR. DAVID BOIES:**  I won't use it, and we'll examine

24  whether he really said it or not --

25           **THE COURT:**  All right.

**PROCEEDINGS**

1    **MR. DAVID BOIES:**  -- when we call him.

2        The last one is -- well, it was intended to be just a

3    summary of what we had to prove for privacy and intrusion upon

4    exclusion beyond what we have to prove for CDAFA, and it

5    references the "highly offensive to a reasonable person"

6    language.

7        Now, if they haven't -- if they have a different way they

8    would like me to express that, I'd be happy to take -- to try

9    to do that.  They haven't given me an alternative.  But if they

10   have a different way they -- this is just designed to say:

11   We've got CDAFA.  We've got these privacy claims.  In addition

12   to what we have to prove for CDAFA, we've got to prove highly

13   offensive.  So if they've got a different way they want me to

14   say it, we can talk about it.

15       **MR. HUR:**  Your Honor, with that representation, I

16   don't think we need to bother you with that.

17       The plaintiffs do have many statements of the law in their

18   opening which are disputed, but we will do our best to work

19   those out, Your Honor.

20       **THE COURT:**  Okay.  I'm told Prospective Juror Number 3

21   has not shown up.  So you have your list.  At least, unless

22   this prospective juror shows up in the next few moments,

23   Number 3 will not be in the initial 14.

24       **MR. ATTANASIO:**  Thank you, Your Honor.

25       May I inquire on a housekeeping matter about jury

1   selection?  I come in peace.

2       If Your Honor, in your questioning, detects hardship from

3   a juror, will Your Honor excuse -- and agrees with it, will

4   Your Honor dispense with that juror before --

5           **THE COURT:**  No.

6       **MR. ATTANASIO:**  -- the attorneys start voir dire?

7           **THE COURT:**  No.  I don't remove people as I go.  I

8   wait till I've done all the questioning.  I come to the side,

9   and we talk about for-cause challenges.  I don't just say,

10  "Okay.  You've convinced me.  Replace him."  I don't do that.

11      **MR. ATTANASIO:**  Right.  Okay.  Thank you, Your Honor.

12          **THE COURT:**  Okay.

13      **MR. ATTANASIO:**  And any issue if we move the podium

14  over here for this process?

15          **THE COURT:**  I don't care.

16      **MR. ATTANASIO:**  Thank you.

17          **THE COURT:**  Okay.  So, Ms. Hom, are they ready to

18  bring them up?

19      Okay.  So the jurors will be coming up, and I'll come back

20  out.

21                  (Recess taken at 9:04 a.m.)

22                  (Proceedings resumed at 9:21 a.m.)

23      (Proceedings were heard in the presence of the prospective

24  jurors.)

25  \\\

1              **JURY VOIR DIRE**

2          **THE COURT:**  Please be seated.

3      Good morning and welcome to the United States District

4  Court for the Northern District of California, San Francisco

5  Division.

6      I am Chief Judge Richard Seeborg, and I will be presiding

7  over the trial of the case for which we will be selecting a

8  jury today.

9      At the outset, let me thank you sincerely, each of you,

10 for responding to your jury summons.  You are fulfilling one of

11 the highest duties and responsibilities of American

12 citizenship.  The role of a juror is fundamental to our

13 country's judicial system.  That system entitles the parties to

14 an impartial jury to resolve the factual issues raised in a

15 case.

16     In order to obtain such a jury, we call persons throughout

17 the area which comprises this federal judicial district, the

18 Northern District of California.  These persons are selected at

19 random to assure that they represent a fair cross-section of

20 our community.  It was this random selection process that

21 brought you here today.

22     It is important that all who are called make every effort

23 to accept the responsibility to serve.  Only in this way will

24 the litigants in this court receive the trial which is so

25 fundamental to our judicial system.  Your willingness to serve

1   as jurors is not only appreciated by the Court but by the

2   parties in this particular case, and it is necessary in order

3   for our judicial system to continue to work.

4        Now, we do recognize that serving as a juror can be a real

5   imposition on those of you selected.  Please, though, keep in

6   mind that jury service is a unique opportunity to serve your

7   country and this community in a way that should be interesting,

8   rewarding, and educational.

9        No doubt all of you have busy lives with many important

10  commitments.  Please remember, though, that as Americans, we

11  make a compact with each other to serve on a jury when randomly

12  called so that if and when we are parties to a lawsuit, be it

13  criminal or civil, a jury of our peers will be available to

14  serve.

15       Put another way, if you are a party to a case, you would

16  not want a jury to sit in judgment on important facts on a

17  matter of importance to you where that jury consisted entirely

18  of those who do not lead productive or busy lives.

19       I will now ask my Courtroom Deputy, Karen Hom, to

20  administer the oath of jury service to all of you.

21       **THE COURTROOM DEPUTY:**  Could you please all rise and

22  raise your right hand.

23       **THE COURT:**  And that includes all those in the

24  audience who are potential jurors.

25  \\\

1    (The prospective jurors were duly sworn for voir dire

2    examination.)

3         **THE COURTROOM DEPUTY:**  Okay.  Thank you.  You may be

4    seated.

5         **THE COURT:**  Thank you.

6    Potential jurors, the case for which we are selecting a

7    jury today is a civil case, and it's entitled Rodriguez vs.

8    Google.  This is a class action in which three people, called

9    plaintiffs, are asserting claims against Google on behalf of

10   groups of other people which are called classes.

11   Plaintiffs claim that Google violated the law by

12   collecting, saving, and/or using information about their

13   activities on mobile apps without their permission.  These

14   claims concern Google's conduct between July 1st of 2016 and

15   September 23rd, 2024.

16   Plaintiffs assert three claims against Google.  First,

17   plaintiffs claim that Google's conduct violated the California

18   Comprehensive Computer Data Access and Fraud Act, which is

19   abbreviated CDAFA; second, plaintiffs claim that Google is

20   liable for invasion of privacy; and, third, plaintiffs claim

21   that Google is liable for intrusion upon seclusion.

22   Google denies plaintiffs' claims and also asserts certain

23   affirmative defenses that, if you find to be applicable, would

24   make Google not liable in whole or in part.  These affirmative

25   defenses include Google's assertions that plaintiffs consented

1    to Google's conduct at issue and that some portion of each of

2    plaintiffs' three claims are barred by the applicable statute

3    of limitations.

4        We will be providing each selected juror with a printed

5    schedule, but let me give you an overview now.  Today we will

6    select a jury, which I hope we can complete this morning.  We

7    will take a short lunch break, and then I will give you some

8    preliminary instructions to guide your work, and then counsel

9    for each side will have the opportunity to make an opening

10   state.  My expectation is that all of this can be completed by

11   mid-to-later afternoon today.

12       Thereafter, we will be operating on an 8:30 to

13   1:30 schedule each succeeding day.  We'll have two short breaks

14   along the path each day between 8:30 and 1:30, but we will not

15   be taking a lunch break.  We'll have some snacks of dubious

16   quality, but they'll be snacks to help you make it through.

17       And the reason we don't take a lunch break is, in my

18   experience, the jurors like a schedule that affords them the

19   opportunity to have afternoons free, and it also facilitates

20   the lawyers getting organized and make the presentation for the

21   next day run more smoothly.

22       So that's why we finish at 1:30 each day.  And I tell the

23   lawyers, and they know this, that I mean it.  When we hit 1:30,

24   we're done for the day.  Even if a witness would like to finish

25   and get off the stand, we're done at 1:30, and that's my

1    commitment to you.

2        Our hope and expectation is that the lawyers can complete

3    their presentation of evidence and closing arguments not later

4    than Friday, September 5th, which is three weeks from now, and

5    the case will then be in the jurors' hands for deliberation.

6        Along the way, there are two days in which the Court will

7    not be in session.  The first one is this Friday, August 22nd,

8    and the second one is Labor Day, Monday, September 1st.

9    Otherwise, we will be in session every day leading up to

10   submitting this case to the jury, hopefully, by September 5th,

11   if not earlier.

12       As I mentioned earlier, the case for which we are

13   selecting a jury today is a civil case.  A jury in this case

14   will consist of eight members, all of whom will participate in

15   jury deliberations.  In other words, in federal court, we don't

16   have in civil cases what you may have heard on television or

17   otherwise referred to as alternate jurors who are excused at

18   the end of the evidence submission in the case and then do not

19   participate in the deliberations.  In civil cases in federal

20   court, all eight jurors participate in the deliberations and

21   the rendering of a verdict.

22       Now, Ms. Hom has called forward 14 of you from the panel,

23   and I'm going to be directing my questions to the 14 of you,

24   which we will do in a few moments, going through the

25   questionnaires, and then the lawyers will have an opportunity

1    to follow up.

2        That does not mean that those of you who are in the

3    audience who are prospective jurors should tune this all out

4    because it is very likely some of you will be called forward to

5    occupy seats in the jury box.  So please do pay attention as

6    questions are being asked because you may well be asked to

7    review some of those questions as well.

8        Before we go further, allow me to introduce our court

9    personnel.  As you have already learned from comments already,

10   my courtroom deputy is Ms. Karen Hom.  She will be the

11   principal point of contact for the jury as well as running much

12   of the operations here in the courtroom.

13       Our court reporter seated to Ms. Hom's right is

14   Ms. Ana Dub.

15       My law clerk, R.J. Vogt, will be sitting next to the jury

16   box and assisting me with the legal issues which arise during

17   the trial.

18       So, focused first on the 14 of you that have been called

19   forward, please raise your hand if you know any of the people

20   that have just been introduced to you.

21                        (No response.)

22       **THE COURT:**  Now let me introduce the lawyers who will

23   be presenting this case.

24       The plaintiffs are represented by Mr. David Boies.

25       Mr. Boies, if you could introduce your colleagues who will

1  be sitting with you at counsel table.

2        **MR. DAVID BOIES:**  Thank you, Your Honor.

3     Sitting with me at counsel table is Bill Carmody --

4        **MR. CARMODY:**  Good morning.

5        **MR. DAVID BOIES:**  -- from Susman Godfrey; James Lee

6  from my firm, Boies Schiller Flexner; Amanda Burden -- Bonn --

7  excuse me --

8        **MS. BONN:**  Good morning.

9        **MR. DAVID BOIES:**  -- Amanda Bonn from Susman Godfrey,

10 Alison Anderson, and Josh Dubin.

11       **MR. DUBIN:**  Good morning.

12       **MR. DAVID BOIES:**  In addition, at counsel table during

13 the trial, you will see Mark Mao from my firm and Alex Boies

14 from my firm.

15    Thank you, Your Honor.

16       **THE COURT:**  Thank you.

17    Again focusing on the 14 of you who have been called

18 forward, do any of you know any of the individuals who have

19 just been introduced to you, or have heard of any of the

20 individuals that have just been introduced to you?

21                    (A hand is raised.)

22       **THE COURT:**  Yes, sir.  And your name is?

23       **PROSPECTIVE JUROR LEWIS:**  David Lewis.

24       **THE COURT:**  Okay.  You've heard of Mr. Boies?

25       **PROSPECTIVE JUROR LEWIS:**  Yeah.

```
 1              THE COURT:  All right.  Anything about what you've

 2    heard, do you think it would affect your ability to be a fair

 3    and impartial juror?  In other words, would you favor or not

 4    favor the plaintiffs because you've heard of Mr. Boies?

 5              PROSPECTIVE JUROR LEWIS:  No.

 6              THE COURT:  Okay.  Thank you.

 7         The defendant, Google, is represented by Mr. Benedict Hur.

 8         Mr. Hur, could you please introduce your colleagues who

 9    will be sitting with you at counsel table?

10              MR. HUR:  Thank you, Your Honor.

11         My name is Ben Hur.  I will be joined at counsel table by

12    my client Steve Ganem, who is director of product management

13    for Google Analytics, and my colleagues Simona Agnolucci --

14              MS. AGNOLUCCI:  Good morning.

15              MR. HUR:  -- Eduardo Santacana --

16              MR. SANTACANA:  Good morning.

17              MR. HUR:  -- Michael Attanasio --

18              MR. ATTANASIO:  Good morning.

19              MR. HUR:  -- and occasionally David Klein.

20              MR. KLEIN:  Good morning.

21              THE COURT:  Do any of you -- again focused on the 14

22    of you, do any of you know or have heard of any of the

23    individuals who've just been introduced to you?

24                        (No response.)

25              THE COURT:  Okay.  We have a list of witnesses who may
```

 1 be called to testify in the trial.  Don't assume all these

 2 witnesses are necessarily going to be called, but these are

 3 individuals who may be called in this trial.  And I'm going to

 4 ask Ms. Hom to circulate the list to the 14 of you who've come

 5 forward, and I'll ask you to just review the list when you

 6 receive it.

 7                     (Pause in proceedings.)

 8       **THE COURT:**  Has everybody had a chance to look through

 9 the list?

10    Okay.  Could you -- again, the 14 of you called forward,

11 could you raise your hand if you know or think you know any of

12 the individuals listed on this witness list?

13                     (No response.)

14       **THE COURT:**  Okay.  Now, as you know, we asked you to

15 complete a questionnaire, which is very helpful to us and

16 should greatly streamline our selection process.  I'm going to

17 follow up on some of your answers briefly, and for that

18 purpose, we're going to be passing the microphone along.

19    So I'll ask Ms. Hom to provide the -- ah, R.J., can you

20 hand it to our first prospective juror.  And that's Mr. Sharp.

21 Very good.

22    So, Mr. Sharp, you live in Windsor.

23       **PROSPECTIVE JUROR SHARP:**  Yes.  Yes.

24       **THE COURT:**  That's a long way away.

25       **PROSPECTIVE JUROR SHARP:**  Yes.

 1          **THE COURT:**  Okay.  I've mentioned to you our schedule,

 2    which would be 8:30 to 1:30 after today.  Is that doable for

 3    you?

 4          **PROSPECTIVE JUROR SHARP:**  It typically is, but I have

 5    a doctor appointment on Tuesday, the 2nd.  It's with my

 6    cardiologist.

 7          **THE COURT:**  What time of the day is that?

 8          **PROSPECTIVE JUROR SHARP:**  At 9 o'clock in the morning.

 9    It's taken me months to get.  I -- that's a real problem for

10    me.

11          **THE COURT:**  Okay.

12          **PROSPECTIVE JUROR SHARP:**  I had a stent put in a few

13    months ago, and this is the first appointment I've been able to

14    get with him.

15          **THE COURT:**  Okay.  And which date was that again?

16          **PROSPECTIVE JUROR SHARP:**  This is Tuesday,

17    September 2nd, at 9 o'clock.  Do you need the doctor's name or

18    anything like that?

19          **THE COURT:**  Right now, no, but thank you for telling

20    me.

21       So that's a shame that -- because you didn't -- you didn't

22    say there was a problem with the distance, and I was heartened

23    by that.

24          **PROSPECTIVE JUROR SHARP:**  When I filled out the form,

25    I didn't realize the time it was at.

1          THE COURT:  Okay.  So tell me what you -- you work

2    for?

3          PROSPECTIVE JUROR SHARP:  Friedman's Home Improvement.

4          THE COURT:  Okay.  And that is a home improvement

5    company?

6          PROSPECTIVE JUROR SHARP:  Yes.  And I'm an outside

7    sales rep for them.  I sell to building contractors.  I sell

8    building materials.

9          THE COURT:  Okay.  So do you do a lot of travel and --

10         PROSPECTIVE JUROR SHARP:  Yeah.

11         THE COURT:  Okay.  Now, you did serve on a jury

12   before.  Anything about that experience that would cause you

13   difficulty being a juror?

14         PROSPECTIVE JUROR SHARP:  No.

15         THE COURT:  Okay.  Is the -- just, is the appointment

16   that you've got, is that back in Windsor or down here?

17         PROSPECTIVE JUROR SHARP:  It's actually in Santa Rosa.

18         THE COURT:  In Santa Rosa.  Okay.

19      Okay.  Thanks.  If you could pass the microphone along.

20      Is that Mr. -- no.  For you.  Mr. Cheung?

21         PROSPECTIVE JUROR CHEUNG:  Yes.

22         THE COURT:  Okay.  And, Mr. Cheung, you live out in

23   Lafayette?

24         PROSPECTIVE JUROR CHEUNG:  Yes, I am.

25         THE COURT:  And you tell us that you are a sales

1  manager for Basler, Inc.  What does Basler do?

2          **PROSPECTIVE JUROR CHEUNG:**  We sell industrial cameras,

3  so --

4      **THE COURT:**  So very sophisticated cameras, it sounds

5  like.

6      **PROSPECTIVE JUROR CHEUNG:**  Yes.

7      **THE COURT:**  Okay.  And you've had as customers, you've

8  indicated, Google and Meta are your customers?

9      **PROSPECTIVE JUROR CHEUNG:**  That's correct.

10      **THE COURT:**  And you interact with some Google

11  employees?

12      **PROSPECTIVE JUROR CHEUNG:**  Yes.

13      **THE COURT:**  And your wife also works for a company

14  that has Google as a customer?

15      **PROSPECTIVE JUROR CHEUNG:**  That's correct.

16      **THE COURT:**  As you know already, this case involves --

17  it's a case where the defendant is Google.  Do you think having

18  that interaction with Google, would that impact your ability to

19  be a fair and impartial juror?

20      **PROSPECTIVE JUROR CHEUNG:**  It's hard to say.

21      **THE COURT:**  Okay.  Well, you'd receive instructions

22  from me that jurors are to be fair and impartial; that they are

23  to base their decision, their verdict on the evidence that's

24  submitted in the case and the instructions of law that I give

25  to the jury; and that you're going into this not favor or

 1    disfavor any party just because you may have heard of them or

 2    had experience with them.

 3        Do you think you could follow those instructions?

 4            **PROSPECTIVE JUROR CHEUNG:**  I think I can follow it.

 5            **THE COURT:**  Okay.  Thank you.  If you could pass the

 6    microphone.

 7        Is it Ms. Mathur?  Is that correct?

 8            **PROSPECTIVE JUROR MATHUR:**  Mathur.

 9            **THE COURT:**  Mathur?

10            **PROSPECTIVE JUROR MATHUR:**  Yeah.

11            **THE COURT:**  And where are you traveling from?

12            **PROSPECTIVE JUROR MATHUR:**  I live in the City, in

13    San Francisco.

14            **THE COURT:**  In the City.  Okay.

15        And what -- remind me what your work is.

16            **PROSPECTIVE JUROR MATHUR:**  I work at a company called

17    Fetch.  I've been both in the product management side and,

18    currently, working in a go-to-market function.

19            **THE COURT:**  The little that you now know about the

20    case -- and I realize it's very little -- anything about that

21    that would cause you to think you would have trouble being a

22    fair and impartial juror in this case?

23            **PROSPECTIVE JUROR MATHUR:**  I don't think so.  Fetch

24    also is in the ad space, I'm putting out there, but I don't

25    think I could -- I don't know.  I don't think I'd be biased.

1          THE COURT:  Okay.  The schedule that I went over,

2   8:30 to 1:30, those two days we're not in session, culminating

3   our best hope is by September 5th, is that doable for you?

4          PROSPECTIVE JUROR MATHUR:  Yes.

5          THE COURT:  Okay.  Thank you.  If you could pass the

6   microphone over.

7       And it's Ms. Neal?

8          PROSPECTIVE JUROR NEAL:  Yes.

9          THE COURT:  And, Ms. Neal, you're coming from Antioch?

10         PROSPECTIVE JUROR NEAL:  Correct.

11         THE COURT:  And that's a bit of a distance.

12         PROSPECTIVE JUROR NEAL:  Yes.

13         THE COURT:  The 8:30 to 1:30 schedule, does that help

14  at all?

15         PROSPECTIVE JUROR NEAL:  Not necessarily with work.

16         THE COURT:  Okay.  And let's see.  The work that you

17  do is a restaurant manager at the Walnut Creek Chick-fil-A?

18         PROSPECTIVE JUROR NEAL:  Correct.

19         THE COURT:  Okay.  What hours do you have out there?

20         PROSPECTIVE JUROR NEAL:  9:00 to 6:00 usually.

21         THE COURT:  Okay.  Do you know what their policy is

22  about jurors?

23         PROSPECTIVE JUROR NEAL:  We would not receive pay.

24         THE COURT:  Well, I'll remember that the next time

25  Chick-fil-A is a litigant in our court.

```
 1                            (Laughter.)

 2          THE COURT:  Well, that is -- that's unfortunate.  Is

 3   there a way you can -- is there some flexibility in adjusting

 4   your schedule, work schedule?

 5          PROSPECTIVE JUROR NEAL:  In terms of trying to get

 6   here and be here and there and then being back here the next

 7   morning, it would be very, very difficult.

 8          THE COURT:  Okay.  Now, you indicated that you have a

 9   cousin that works at Google.

10          PROSPECTIVE JUROR NEAL:  Formerly, yes.

11          THE COURT:  Formerly.  Okay.  Do you think that would

12   cause you any difficulty in being a fair and impartial juror

13   where Google is a party?

14          PROSPECTIVE JUROR NEAL:  No.

15          THE COURT:  Okay.

16      Okay.  Let me just -- bear with me as I write a couple of

17   notes.

18                       (Pause in proceedings.)

19          THE COURT:  Okay.  If you could pass the microphone on

20   down to -- is it Ms. Ye?

21          PROSPECTIVE JUROR YE:  Yes.

22          THE COURT:  Ms. Ye, welcome.

23      You work for Fur Pal Grooming?

24          PROSPECTIVE JUROR YE:  Yeah.

25          THE COURT:  Is that -- what does that do?
```

1          **PROSPECTIVE JUROR YE:**  Actually, it's a dog -- pets

2     grooming.

3          **THE COURT:**  It's a -- pardon me?

4          **PROSPECTIVE JUROR YE:**  A pets grooming.  Like dog and

5     cats grooming.

6          **THE COURT:**  Oh, dog and cats.

7          **PROSPECTIVE JUROR YE:**  Yeah.

8          **THE COURT:**  Okay.  And do you do veterinary work too,

9     or is it just grooming?

10         **PROSPECTIVE JUROR YE:**  No.  Self-employed.

11         **THE COURT:**  Self-employed?

12         **PROSPECTIVE JUROR YE:**  Yes.

13         **THE COURT:**  Okay.  The schedule that I talked about,

14    the 8:30 to 1:30, would you be able to make that work for you?

15         **PROSPECTIVE JUROR YE:**  A little bit difficult because

16    I don't work, I don't get paid.  That's all.

17         **THE COURT:**  Can you make some appointments in the

18    afternoon for this period of time?

19         **PROSPECTIVE JUROR YE:**  I mean, I can try, because,

20    like, most of the customers, they like to come in the morning.

21    Yeah, that's why.

22         **THE COURT:**  But you could tell them you're doing

23    important public service.

24         Okay.  I understand.

25         Anything about this case so far, the little that you know

 1   about it, do you think there's any reason why you'd have

 2   trouble being a fair and impartial juror in this case?

 3           **PROSPECTIVE JUROR YE:**  No.

 4       **THE COURT:**  Okay.  If you could pass the microphone

 5   down.

 6       Mr. Lewis?

 7           **PROSPECTIVE JUROR LEWIS:**  Yes.

 8       **THE COURT:**  And, Mr. Lewis, you are a doctor, and you

 9   work -- I used to use Palo Alto Medical Foundation.  It's a

10   wonderful operation.

11       Are you still a practicing doctor?

12           **PROSPECTIVE JUROR LEWIS:**  Oh, yeah.

13       **THE COURT:**  Yes.  The schedule that I've advised you

14   of, what impact would that have for you?

15           **PROSPECTIVE JUROR LEWIS:**  On me, I can do it, but the

16   problem is that we're short-staffed and I'm -- I'm not sure if

17   you read my form at all.  So I'm -- I was hired as a pediatric

18   anesthesiologist.  And so when I'm not working, kids are not

19   getting their operations and families who've made arrangements,

20   for example, to have operations over the next three weeks will

21   get canceled.  And so --

22           **THE COURT:**  I know you said it, but what type of

23   doctor are you again?

24           **PROSPECTIVE JUROR LEWIS:**  I'm a pediatric

25   anesthesiologist.

```
 1              THE COURT:  Pediatric anesthesiologist.  Okay.

 2              PROSPECTIVE JUROR LEWIS:  So I could do it.  It's just

 3    that there's, you know, the ripple effect of --

 4              THE COURT:  I understand.

 5              PROSPECTIVE JUROR LEWIS:  And so, for example,

 6    you know, for today, because you keep on calling and maybe,

 7    maybe not, well, on Thursday when it was yes, then families got

 8    called --

 9              THE COURT:  Right.

10              PROSPECTIVE JUROR LEWIS:  -- that we have to

11    reschedule.

12              THE COURT:  Right.

13        You did serve -- you've told us you did serve on a jury

14    before.

15              PROSPECTIVE JUROR LEWIS:  Correct.

16              THE COURT:  Anything about that experience that would

17    impact your ability to be a fair and impartial juror, do you

18    think?

19              PROSPECTIVE JUROR LEWIS:  No.

20              THE COURT:  You also advised us that one of your

21    goddaughters and your goddaughter's husband work for Google.

22              PROSPECTIVE JUROR LEWIS:  Correct.

23              THE COURT:  Would that, do you think, have any impact

24    on your ability to be a fair and impartial juror in a case

25    where Google is a party?
```

1    **PROSPECTIVE JUROR LEWIS:**  On the surface, no.

2    Underneath, probably.  I mean, it's a great situation for them,

3    their families.

4    **THE COURT:**  Well, you will receive the instruction, if

5    you are a juror, that you're to base your verdict on the

6    evidence that's submitted, the instructions of the law that I

7    give to you; that you're not to bring into the case biases,

8    sympathies, and the like.  Do you think you could follow that

9    instruction?

10    **PROSPECTIVE JUROR LEWIS:**  On the surface, yes; but,

11    you know, we all know there's lots of other things.  So

12    important fact is I've got -- you know, my closest goddaughter

13    works for Google, hard stop.

14    **THE COURT:**  Right.  Well, I suppose -- let me drill

15    down a little bit more.

16        The fact that -- I know you're very fond of your

17    goddaughter.  Does that -- do you then have a -- transfer the

18    fondness to Google such that you would favor Google because of

19    that?

20    **PROSPECTIVE JUROR LEWIS:**  Tough question.  I'm not

21    going to say no.

22    **THE COURT:**  Okay.  Okay.  If you could pass the

23    microphone.

24        And, Mr. Chang?

25    **PROSPECTIVE JUROR CHANG:**  Yes, sir.

1              THE COURT:  Okay.  Mr. Chang, you are a

2    San Franciscan.  And let's see.  You work for a Japanese

3    restaurant?

4              PROSPECTIVE JUROR CHANG:  Yes.

5              THE COURT:  You're the owner of the restaurant?

6              PROSPECTIVE JUROR CHANG:  Yes.  Two restaurant owner,

7    yeah.

8              THE COURT:  Okay.  Where are the restaurants?

9              PROSPECTIVE JUROR CHANG:  Japantown.

10             THE COURT:  Ah, okay.

11        You've heard the schedule.  I'm sure you're very busy as a

12    restaurant owner.  Could you make that schedule work?

13             PROSPECTIVE JUROR CHANG:  Two restaurants, only my

14    recipe I make every morning.  I open and --

15                 (Reporter interrupts to clarify the record.)

16             PROSPECTIVE JUROR CHANG:  Oh, yeah.  I cannot.  I'm

17    everyday working, open the business, and then I make only my

18    recipe.  I don't know my employee.  I cannot defer schedule.  I

19    cannot focus here --

20             THE COURT:  Okay.

21             PROSPECTIVE JUROR CHANG:  -- in court, yeah.

22             THE COURT:  So you're saying, in addition to being an

23    owner in the restaurants --

24             PROSPECTIVE JUROR CHANG:  Yes.

25             THE COURT:  -- you work in the restaurants?

1          **PROSPECTIVE JUROR CHANG:**  Yes, every day.

2          **THE COURT:**  Are there -- and you indicated you have

3    employees?

4          **PROSPECTIVE JUROR CHANG:**  Yes, we have employee.

5          **THE COURT:**  In both restaurants?

6          **PROSPECTIVE JUROR CHANG:**  Yes.

7          **THE COURT:**  So the concern you were expressing, if I

8    heard you right, was that you actually make some of the food.

9    Is that what it is?

10         **PROSPECTIVE JUROR CHANG:**  Yes.  I open business --

11   open the business, and then I make rice and sauce and

12   everything.  Only me, my recipe, yes.

13         **THE COURT:**  I see.  What hours are the restaurants

14   open?

15         **PROSPECTIVE JUROR CHANG:**  Just they serving and

16   then -- my employee?

17         **THE COURT:**  No.  What hours are the restaurants open?

18         **PROSPECTIVE JUROR CHANG:**  Oh.  11:00 to 9:00.  Both

19   the restaurant, 11:00 to 9:00.  But I come to 8:30, 8 o'clock,

20   come early.  Yeah, I make something, yeah, every morning.

21         **THE COURT:**  Every morning?

22         **PROSPECTIVE JUROR CHANG:**  Yes.

23         **THE COURT:**  Okay.

24       Okay.  R.J., can you grab the microphone and bring it back

25   down here?

 1      Mr. Fritzsche?

 2           **PROSPECTIVE JUROR FRITZSCHE:**  Fritzsche.

 3           **THE COURT:**  Fritzsche.  Fritzsche, okay.

 4      Mr. Fritzsche, you come all the way from Santa Rosa?

 5           **PROSPECTIVE JUROR FRITZSCHE:**  Yes.

 6           **THE COURT:**  That's a long, long way, I know.

 7      And you've alerted us that you have a problem on

 8  Wednesday, August 20th, which is Wednesday.

 9           **PROSPECTIVE JUROR FRITZSCHE:**  This Wednesday.  And

10  also -- I'm sorry, I didn't list the following Wednesday.  It's

11  the same issue.

12           **THE COURT:**  Every Wednesday?

13           **PROSPECTIVE JUROR FRITZSCHE:**  No, it's not every

14  Wednesday.  They're memorials, so they're these two particular

15  Wednesdays.

16           **THE COURT:**  I see.  What time of day are these?

17           **PROSPECTIVE JUROR FRITZSCHE:**  They're both at 11:00.

18           **THE COURT:**  Both at 11:00.

19           **PROSPECTIVE JUROR FRITZSCHE:**  Yeah.

20           **THE COURT:**  Well, is -- the jury will be advised I

21  need all the jurors here for all sessions of the court.  We

22  can't have a juror say, "Well, you know, I can't make it today

23  but I'll come tomorrow."  That doesn't work.  You've got to be

24  here for the entire time.

25      So your memorial service issues are a bit of a problem.

```
 1   What is the second day that this is -- Wednesday, August 20th,

 2   is one of them, and then what's the other one?

 3          PROSPECTIVE JUROR FRITZSCHE:  The following Wednesday,

 4   the 27th.

 5          THE COURT:  The 27th.  Okay.

 6      And these are memorial services that you're -- you were --

 7   you would be attending?

 8          PROSPECTIVE JUROR FRITZSCHE:  I'm the music director.

 9   I'm the music for the memorials.

10          THE COURT:  Oh, I see.  Okay.  Oh, so this is in your

11   professional capacity?

12          PROSPECTIVE JUROR FRITZSCHE:  Yes.

13          THE COURT:  I see.  Okay.

14      Do you have any assistants as music director?

15          PROSPECTIVE JUROR FRITZSCHE:  I'm it.

16          THE COURT:  You're it.

17          PROSPECTIVE JUROR FRITZSCHE:  Yeah.

18          THE COURT:  Okay.  And this is at the Center for

19   Spiritual Living in Santa Rosa?

20          PROSPECTIVE JUROR FRITZSCHE:  Yes.

21          THE COURT:  Okay.  Are there -- putting those aside,

22   those two commitments, would the 8:30 to 1:30 schedule be,

23   except for that, workable for you?

24          PROSPECTIVE JUROR FRITZSCHE:  Yeah.

25          THE COURT:  You've heard very little about this case,
```

1  but of the little that you've heard, anything about it that

2  would cause you a concern about whether or not you could be a

3  fair and neutral juror in this case?

4      **PROSPECTIVE JUROR FRITZSCHE:**  No.  I think I could be

5  fair.  I'm not a big Google fan.  We have to use it for work,

6  and it's -- I find it difficult.  But I think I could, with

7  the -- I think I could follow the jury instructions.

8      **THE COURT:**  Okay.  You'd be instructed that -- coming

9  into this, you're instructed not to bring preconceptions and

10  likes and dislikes to the extent you can.  I mean, we're all

11  human.  But your mission as a juror is to base your verdict on

12  the evidence that's presented in this courtroom and the

13  instructions on the law that I give to you.

14      And the parties are entitled not to have jurors that come

15  in and say, "I haven't heard anything, but I favor this one

16  over the other side."  That's not what the jurors' obligations

17  are.

18      **PROSPECTIVE JUROR FRITZSCHE:**  I understand.

19      **THE COURT:**  So do you think you could follow that?

20      **PROSPECTIVE JUROR FRITZSCHE:**  I think I could, yeah.

21      **THE COURT:**  Okay.  This will probably be a foolish

22  question, but in terms of the scheduling of these memorial

23  services, can any adjustments be made, is the bottom line?

24      **PROSPECTIVE JUROR FRITZSCHE:**  These are families

25  coming from out of town and, yeah.

1          **THE COURT:**  I figured that was probably the answer.

2          **PROSPECTIVE JUROR FRITZSCHE:**  Yeah.

3          **THE COURT:**  All right.  If you could hand the

4    microphone over to -- is it Mr. Roller?

5          **PROSPECTIVE JUROR ROLLER:**  Yes.

6          **THE COURT:**  Mr. Roller, welcome.  You're coming to us

7    from El Cerrito.

8          **PROSPECTIVE JUROR ROLLER:**  Yes.

9          **THE COURT:**  You've alerted us to the fact that it

10   never rains but it pours.  Your wife has jury duty.

11         **PROSPECTIVE JUROR ROLLER:**  She was released, though.

12         **THE COURT:**  She was released.  Okay.

13      And then you've got some childcare responsibilities.

14      The 8:30 to 1:30, could that work for you?

15         **PROSPECTIVE JUROR ROLLER:**  The hours could work.  I'm

16   self-employed, so the three-week duration is more of a problem.

17   You know, no payment.

18         **THE COURT:**  You're a freelance copywriter --

19         **PROSPECTIVE JUROR ROLLER:**  Correct.

20         **THE COURT:**  -- you tell us.

21      I know it's not optimal, by any means.  It's a long, long

22   day, I understand.  But does -- the afternoons, do they help at

23   all in terms of an opportunity to do some of your work?

24         **PROSPECTIVE JUROR ROLLER:**  Minimally, yeah.  A little

25   bit.

 1          **THE COURT:**  Now, you have told us you work with an

 2    advertising agency as a freelancer where Google is one of their

 3    principal clients.

 4          **PROSPECTIVE JUROR ROLLER:**  Yeah, that's my main

 5    client.

 6          **THE COURT:**  Main client.  And you write ads for some

 7    of Google's technology and other products.

 8      Would that cause you any difficulty, you think, in being a

 9    fair and impartial juror in a case where Google is a party?

10          **PROSPECTIVE JUROR ROLLER:**  I mean, I'd like to say no,

11    but it's my main source of income, so possibly.

12          **THE COURT:**  Okay.  As I've sort of indicated before,

13    you will be instructed that you're to put aside, coming into

14    this courtroom, preconceived notions, favorable or not

15    favorable, about particular parties and really base evidence --

16    base your verdict on the evidence and the instructions on the

17    law that I provide.

18      Do you think you could do that?

19          **PROSPECTIVE JUROR ROLLER:**  I can do my best, yeah.

20          **THE COURT:**  Okay.  And knowing yourself, doing your

21    best, do you think you'd succeed?

22          **PROSPECTIVE JUROR ROLLER:**  I think so.

23          **THE COURT:**  Okay.  Thank you.

24      If you could pass the microphone to Ms. Badgett.

25      Ms. Badgett, and you're coming in from Napa.

1            **PROSPECTIVE JUROR BADGETT:**  Yeah.

2        **THE COURT:**  A long way away.

3      And you are a professor at the Napa Valley College,

4    teaching art history.

5            **PROSPECTIVE JUROR BADGETT:**  Yes.

6        **THE COURT:**  Very interesting stuff.  Any particular

7    period or specialty?

8            **PROSPECTIVE JUROR BADGETT:**  Well, at a community

9    college level, I'm a generalist --

10        **THE COURT:**  Okay.

11            **PROSPECTIVE JUROR BADGETT:**  -- by necessity.

12        **THE COURT:**  Fair enough.

13      What's your teaching schedule?

14            **PROSPECTIVE JUROR BADGETT:**  So the semester, which is

15    about to begin, is I will be teaching mornings, Monday through

16    Friday.

17        **THE COURT:**  Okay.

18            **PROSPECTIVE JUROR BADGETT:**  And by that, I mean

19    11 o'clock classes and for three days.  I also have a 7:30 a.m.

20    class at the local high school.

21        **THE COURT:**  Are there some substitute teachers

22    available to professors?

23            **PROSPECTIVE JUROR BADGETT:**  Regrettably not.  I mean,

24    in theory, yes, but I'm a one-person program and I currently

25    don't have a qualified substitute.

1          **THE COURT:**  Has there been enrollment so far?  Are

2     there -- how many -- give us a sense of how many students are

3     enrolled in the classes.

4          **PROSPECTIVE JUROR BADGETT:**  I teach -- a full load is

5     five classes, and I have 30 to 40 students in each class.

6          **THE COURT:**  Okay.  You've heard me sort of generally

7     describe the case, and you've indicated to us that you have

8     some strong views about some of the Google products that you

9     work with.

10         Putting that -- could you put that aside, do you think, as

11    a juror and be a fair and impartial juror in a case where

12    Google is a party?

13              **PROSPECTIVE JUROR BADGETT:**  I think so, yeah.

14         **THE COURT:**  You served on a jury, you've told us.  It

15    was a criminal jury.

16         Anything about that experience, do you think, that would

17    affect your ability to be a fair and impartial juror in this

18    civil case?

19              **PROSPECTIVE JUROR BADGETT:**  No.  Nothing, no.

20         **THE COURT:**  Okay.  Thank you.

21         If you could pass the microphone down to -- is it

22    Mr. Halverson?

23              **PROSPECTIVE JUROR HALVERSON:**  Yes, Your Honor.

24         **THE COURT:**  And, Mr. Halverson, you are coming in from

25    Danville.

1      You have told us you work for a security services company?

2          **PROSPECTIVE JUROR HALVERSON:**  Yes.  We provide

3   physical security guards.

4          **THE COURT:**  Okay.  And you're a manager of that

5   company?

6          **PROSPECTIVE JUROR HALVERSON:**  Yes, sir.

7          **THE COURT:**  Okay.  You've heard a little about this

8   case.  Any -- anything about it so far that you think would

9   cause you a problem being a fair and impartial juror?

10         **PROSPECTIVE JUROR HALVERSON:**  No, sir.

11         **THE COURT:**  Okay.  You've told us that you, in your

12  work, have some connection where Google is involved, although

13  not directly, it seems.  In a case where Google is a party, do

14  you think you could be a fair and impartial juror?

15         **PROSPECTIVE JUROR HALVERSON:**  Yes.

16         **THE COURT:**  The hours that I've advised you of, the

17  8:30 to 1:30, other than today where we're going into the

18  afternoon, is that doable for you?

19         **PROSPECTIVE JUROR HALVERSON:**  Yes.

20         **THE COURT:**  Okay.  Thank you.  If you could pass the

21  microphone --

22      Is it Ms. Macias Solorio?

23         **PROSPECTIVE JUROR MACIAS SOLORIO:**  Yeah.

24         **THE COURT:**  And you're coming also from Napa.

25         **PROSPECTIVE JUROR MACIAS SOLORIO:**  Yeah.

1          THE COURT:  A long way away.

2          PROSPECTIVE JUROR MACIAS SOLORIO:  Yeah,

3   transportation.

4          THE COURT:  Yeah.  You indicated you were -- were you

5   recently a full-time student, and now you've started working.

6          PROSPECTIVE JUROR MACIAS SOLORIO:  Yeah.  I've been

7   working at a retail job, the Target, a Target in my hometown.

8          THE COURT:  Okay.  And is that where you're working

9   now, Target?

10          PROSPECTIVE JUROR MACIAS SOLORIO:  Yeah, I'm still

11   working there.

12          THE COURT:  And which Target are you working in?

13          PROSPECTIVE JUROR MACIAS SOLORIO:  It's in -- it's

14   called the South Napa.  It's like a bigger Target.

15          THE COURT:  Okay.

16          PROSPECTIVE JUROR MACIAS SOLORIO:  Yeah.

17          THE COURT:  And what are your hours there?

18          PROSPECTIVE JUROR MACIAS SOLORIO:  It changes all the

19   time.  Like, right now I'm closing, but it's 2:00 to 10:00.

20   So, like, the transportation coming here is going to be a

21   little rough and then going back.

22          And then I didn't realize this was going to go on for a

23   long time.  I didn't have proof at the time, but the 27th to

24   the 31st I'm going to Washington with my friends.  So, like, I

25   don't know if I'm able to do this.

1          **THE COURT:**  Did you -- have you purchased the tickets?

2          **PROSPECTIVE JUROR MACIAS SOLORIO:**  Yeah, already.  I

3   just didn't have proof, but I could, like -- I have the file

4   ready and send it.

5          **THE COURT:**  Okay.  And are these non-refundable?

6          **PROSPECTIVE JUROR MACIAS SOLORIO:**  No, it's not.

7   Well, we've been planning it, and I didn't know this was going

8   to happen during that time because it was, like, in August, the

9   month.  So I was like, oh, maybe it's in the beginning of

10  August but...

11         **THE COURT:**  Okay.  Okay.

12      Okay.  If you could pass the microphone down.

13      And is that Ms. Barbour?

14         **PROSPECTIVE JUROR BARBOUR:**  Yes, Your Honor.

15         **THE COURT:**  All right.  And, Ms. Barbour, you are

16  coming to us from Sausalito.

17         **PROSPECTIVE JUROR BARBOUR:**  Yes.

18         **THE COURT:**  And let's see.  You work for the Sausalito

19  Police Department?

20         **PROSPECTIVE JUROR BARBOUR:**  Yes.

21         **THE COURT:**  Okay.  And you've been there for a good

22  long time.  What do you do for the police department?

23         **PROSPECTIVE JUROR BARBOUR:**  I was admin aide there,

24  but I retired, so...

25         **THE COURT:**  You retired?

 1    **PROSPECTIVE JUROR BARBOUR:**  Yeah.

 2         **THE COURT:**  Okay.  You have heard the schedule.

 3    What's the situation for you with respect to that schedule?

 4         **PROSPECTIVE JUROR BARBOUR:**  I think it will work.  I'm

 5    dog sitting, and the family worked around my schedule to do it,

 6    but I think half day would be good.

 7         **THE COURT:**  Good.

 8         The only problem with that is this day, because this one

 9    will go in the afternoon; but after that, 8:30 to 1:30.  So I

10    hope you could take care of your -- of your task here with

11    that.  You can take -- we have the dog groomer here, so maybe

12    you can kind of do a thing.

13                        (Laughter.)

14         **THE COURT:**  Okay.  Let's see.  You have served on a

15    jury before.  It was a criminal jury?

16    **PROSPECTIVE JUROR BARBOUR:**  Yes, sir.

17         **THE COURT:**  It's interesting you served on a criminal

18    jury and you were associated with the police department.

19         Anything about that experience that would cause you any

20    concerns about your ability to be a fair and impartial juror?

21         **PROSPECTIVE JUROR BARBOUR:**  No, sir.

22         **THE COURT:**  Okay.  And anything about the case so far

23    that you think would cause you any problems in terms of being

24    fair and impartial?

25         **PROSPECTIVE JUROR BARBOUR:**  No.

 1          THE COURT:  Okay.  If you could pass the microphone

 2   along.

 3      Is it Mr. Hall?

 4          PROSPECTIVE JUROR HALL:  Yes.

 5          THE COURT:  And, Mr. Hall, you're a San Franciscan.

 6   You work at UCSF?

 7          PROSPECTIVE JUROR HALL:  Yes.

 8          THE COURT:  They keep me healthy.  I love UCSF.

 9          PROSPECTIVE JUROR HALL:  That's good.

10          THE COURT:  And you are an administrative assistant?

11          PROSPECTIVE JUROR HALL:  Correct.

12          THE COURT:  In which part of the vast UCSF?

13          PROSPECTIVE JUROR HALL:  Pediatric nephrology.

14          THE COURT:  Ah.  So which of their facilities are you

15   located?

16          PROSPECTIVE JUROR HALL:  Mission Bay.

17          THE COURT:  Mission Bay, the fancy new one.  Yeah,

18   okay.

19          PROSPECTIVE JUROR HALL:  Correct.

20          THE COURT:  Great.

21      You have a brother that works with Google?

22          PROSPECTIVE JUROR HALL:  Previously worked with.

23          THE COURT:  Previously.  Is there anything about the

24   fact that you had your brother working for Google, does that

25   impact your -- would that impact your ability to be a fair and

1    impartial juror in this case?

2            **PROSPECTIVE JUROR HALL:**  No.

3            **THE COURT:**  Okay.  You don't either favor or disfavor

4    Google because of that connection?

5            **PROSPECTIVE JUROR HALL:**  No.  I use their products

6    every day, but that's pretty much it.

7            **THE COURT:**  Okay.  Let's see.

8        Okay.  So what we're going to do now, you can --

9        R.J., can you collect the microphone?

10       What we're going to do is I'm going to afford the parties

11   an opportunity to do some follow-up.  This will take -- we'll

12   be doing this in a couple of rounds, but they should get

13   shorter and shorter as we move along.  And we will take a break

14   in a little while, but I want to keep a head of steam so we can

15   keep moving here.

16       So what they'll do is they'll ask you some follow-up

17   questions.  Then I'll caucus with them at the side, we'll do

18   some adjusting, and we'll move on.

19       Actually, before I do that, let me ask you some final kind

20   of general questions.  And all I'm asking you to do here is,

21   for the 14 of you, just raise your hand if the answer to

22   your -- to the question would be yes.

23       And for all of you who are sitting out in the audience,

24   don't raise -- you don't have to raise your hand if you're a

25   prospective juror, but keep the question in mind because if you

1    are called forward, I will ask you whether or not there were

2    any questions that you would have raised your hand for.

3        Do any of you, again, the 14 of you that were called

4    forward, have any health issues which would, you think, get in

5    the way of your jury service?

6                          (No response.)

7        **THE COURT:**  Have any of you ever seen, heard, or read

8    anything about this case?  I know you know very little about it

9    thus far, but from the little that you've heard, have you ever

10   heard anything about the case, heard anyone express an opinion

11   about it?

12                         (No response.)

13       **THE COURT:**  As a juror in this case, it will be your

14   job, as I've indicated before, to be the judge of the facts.

15   Do any of you feel you can't perform that function for any

16   reason?

17                         (No response.)

18       **THE COURT:**  As a juror in this case, you will be

19   instructed, as I've now belabored a bit, to put aside biases,

20   prejudices, or sympathy and to judge the case solely and

21   objectively on the facts presented to you.  Do any of you feel

22   that you can't perform that function?

23                         (No response.)

24       **THE COURT:**  Okay.  I will now afford the parties an

25   opportunity to do some follow-up questioning.

 1        Mr. Boies, or one of your colleagues.

 2          **MR. DAVID BOIES:**  Thank you, Your Honor.

 3        Good morning.  As the Court told you, my name is David

 4     Boies, and I'm one of the lawyers for the plaintiffs.

 5        The Court indicated that this is a class action.  And,

 6     again, just by raising your hands, do any of you have any

 7     either positive or negative feelings about class actions?

 8                      (No response.)

 9          **MR. DAVID BOIES:**  Before this case started, how many

10     of you had ever heard of class actions?

11                      (Hands raised.)

12          **MR. DAVID BOIES:**  Okay.  So those of you who had heard

13     of class actions, any views, positive or negative, any of you

14     have?

15                      (No response.)

16          **MR. DAVID BOIES:**  Now, I know the judge is going to

17     instruct you that you've got to put aside any feelings that you

18     may have, and I know that you all will try.

19        But do any of you have any -- just right now, any of you

20     have positive significant -- I'm not talking about small

21     things, but do any of you have really significant, either

22     positive or negative, feelings about Google?

23                      (Hands raised.)

24          **MR. DAVID BOIES:**  Anybody else?

25                      (Hands raised.)

1    **MR. DAVID BOIES:**  Okay.  How many of those are

2    positive?  Who has positive feelings about Google?

3                        (Hands raised.)

4         **MR. DAVID BOIES:**  Let me start with Mr. --

5         **THE COURTROOM DEPUTY:**  Mr. Boies, could you speak into

6    the microphone for the court reporter?

7         **MR. DAVID BOIES:**  Microphone?  Is there a handheld

8    microphone, by any chance?

9         **THE COURTROOM DEPUTY:**  I can give you another one.

10        **MR. DAVID BOIES:**  Great.  Thank you very much.

11    Mr. Fritzsche.

12        **PROSPECTIVE JUROR ROLLER:**  No.  Mr. Roller.

13        **MR. DAVID BOIES:**  I'm sorry.  Roller.

14    Mr. Roller, you had strong positive feelings about Google.

15        **PROSPECTIVE JUROR ROLLER:**  Correct.

16        **MR. DAVID BOIES:**  And what does that come from?

17        **PROSPECTIVE JUROR ROLLER:**  My work with Google.

18        **MR. DAVID BOIES:**  Your work with Google?

19        **PROSPECTIVE JUROR ROLLER:**  I freelance, but my main

20    client is Google, making ads.

21        **MR. DAVID BOIES:**  Is it fair to -- and that's your

22    main client?

23        **PROSPECTIVE JUROR ROLLER:**  That's my main client, my

24    main source of income.

25        **MR. DAVID BOIES:**  Now, we're going to be asking the

1    jury, if the jury finds that the facts are what we say the

2    facts are -- because this is a class action and there are a

3    very large number of members of the class, we're going to be

4    asking the jury to award billions of dollars of damages against

5    Google.

6        Now, would you feel a little uncomfortable about awarding

7    billions of dollars of damages to your main client -- against

8    your main client?

9            PROSPECTIVE JUROR ROLLER:  Probably, yeah.

10       MR. DAVID BOIES:  Is it fair to say -- will you try to

11   be fair?  Is it fair to say that we'd be at a little bit of a

12   disadvantage?

13           PROSPECTIVE JUROR ROLLER:  It would be difficult to be

14   fair, given a billion-dollar settlement.

15       MR. DAVID BOIES:  Thank you for your honesty.  I

16   appreciate that.

17       While I'm on the subject of damages, would any of you have

18   trouble -- assuming that we prove our case, assuming we prove

19   our facts, would any of you have trouble awarding billions of

20   dollars of damages against --

21           (Reporter interrupts to clarify the record.)

22       MR. DAVID BOIES:  Billions of dollars of damages

23   against a company.

24           PROSPECTIVE JUROR ROLLER:  Maybe it's me.  Sorry.

25       MR. DAVID BOIES:  The question is:  Would any of you

 1    have trouble?  Can you hear me?

 2              THE COURT:  Yes.

 3              MR. DAVID BOIES:  Would any of you have -- I'm going

 4    to set this aside, if I can.

 5        Would any of you have trouble awarding billions of dollars

 6    of damages against Google, assuming that we prove that they're

 7    liable and that people have been harmed or that they've made a

 8    lot of money?  Anybody have a problem with that?

 9              PROSPECTIVE JUROR LEWIS:  I have a problem.

10              MR. DAVID BOIES:  Sure.

11              PROSPECTIVE JUROR LEWIS:  Does the jury have a role in

12    the damages?

13              MR. DAVID BOIES:  Yes.  The jury -- the jury will be

14    asked, first, to find liability; and then, second, if you find

15    liability, to determine the amount of damages.

16              PROSPECTIVE JUROR LEWIS:  How does that work?

17              MR. DAVID BOIES:  I'm sorry?

18              PROSPECTIVE JUROR LEWIS:  How does that work?

19              MR. DAVID BOIES:  Well, it's really up to the

20    collective judgment, your collective judgment.  We present

21    evidence.  They'll present evidence as to what the amount of

22    harm or profits is.  Two different ways of approaching damages.

23    We'll also be asking for punitive damages if the -- if the --

24    and the amount of that will be decided later.

25              THE COURT:  To answer your question, I will be giving

1    you instructions at the end of all the evidence which will,

2    hopefully, give you some guidance about how the jury does its

3    work, the law to be applied.  You judge the facts, who you

4    believe, who you don't believe, what facts you think are

5    persuasive, what aren't.  Then I provide instructions on the

6    law, some of which tell you -- talk about liability; some talk

7    about damages.  So you'll get guidance at the end before you

8    deliberate.

9         Go ahead, Mr. Boies.

10         **MR. DAVID BOIES:**  Ms. Mathur, you told us that your

11    best friend worked at Google.

12         **PROSPECTIVE JUROR MATHUR:**  Yes.

13         **MR. DAVID BOIES:**  And is she a really good friend.

14         **PROSPECTIVE JUROR MATHUR:**  Yes.

15         **MR. DAVID BOIES:**  Do you think that you'd have a

16    little reluctance awarding billions of dollars against her

17    company?

18         **PROSPECTIVE JUROR MATHUR:**  Potentially.

19         **MR. DAVID BOIES:**  I'm sorry?

20         **PROSPECTIVE JUROR MATHUR:**  Maybe.  I'm not -- I'm not

21    too sure.

22         **MR. DAVID BOIES:**  What position does she have at

23    Google?

24         **PROSPECTIVE JUROR MATHUR:**  She's on a go-to-market

25    team as well.

1          **MR. DAVID BOIES:**  How long has she worked there?

2          **PROSPECTIVE JUROR MATHUR:**  I think over -- over

3     ten years.

4          **MR. DAVID BOIES:**  How often do you talk to her?

5          **PROSPECTIVE JUROR MATHUR:**  Pretty much every week we

6     check in.

7          **MR. DAVID BOIES:**  Now, if this case was going on,

8     would you feel uncomfortable talking to her?

9          **PROSPECTIVE JUROR MATHUR:**  No.  I'd be able to follow

10    the instructions and not talk about this outside.

11         **MR. DAVID BOIES:**  So when it comes to deliberations,

12    is it fair to say that although you'd try to be fair, we'd

13    start off a little bit behind because of a natural reluctance

14    to not hurt your friend's company?

15         **PROSPECTIVE JUROR MATHUR:**  I think it's like the judge

16    has mentioned.  I'll try -- I think we're all instructed to see

17    how we can be unbiased.  I think that's what I'll have at the

18    back of my mind, not to be, but it's a little hard to say if --

19         **MR. DAVID BOIES:**  A little hard to say.

20         **PROSPECTIVE JUROR MATHUR:**  Yeah.

21         **MR. DAVID BOIES:**  I appreciate that.

22         **PROSPECTIVE JUROR MATHUR:**  I don't know.

23         **MR. DAVID BOIES:**  Mr. Lewis, you also had favorable

24    views of Google?

25         **PROSPECTIVE JUROR LEWIS:**  Correct.

1          **MR. DAVID BOIES:**  And what are those based on?

2          **PROSPECTIVE JUROR LEWIS:**  So my goddaughter works for

3    Google.  Her husband works for Google.

4          **MR. DAVID BOIES:**  And I'm sure you, like everybody

5    else, will try to follow the judge's instructions.  Do you

6    think we would, again, start off a little bit behind?

7          **PROSPECTIVE JUROR LEWIS:**  Right.  You do.

8          **MR. DAVID BOIES:**  I'm sorry?

9          **PROSPECTIVE JUROR LEWIS:**  You do.  I'm agreeing with

10   you.

11         **MR. DAVID BOIES:**  Independent of your goddaughter, do

12   you have other basis for your favoring views of Google?

13              (Reporter interrupts to clarify the record.)

14         **MR. DAVID BOIES:**  And her husband's employment, do you

15   have other bases for your views of -- positive views about

16   Google?

17         **PROSPECTIVE JUROR LEWIS:**  Well, I think tech in

18   general has benefited all of us.

19         **MR. DAVID BOIES:**  Mm-hmm.  Do you have any -- do you

20   have any views about plaintiffs generally in terms of civil

21   cases seeking damages?

22         **PROSPECTIVE JUROR LEWIS:**  No.

23         **MR. DAVID BOIES:**  No.

24      Excuse me just a minute.

25                   (Pause in proceedings.)

1    **MR. DAVID BOIES:**  Mr. Halverson, you also have very

2    positive views about Google; correct?

3        **PROSPECTIVE JUROR HALVERSON:**  Yes.

4        **MR. DAVID BOIES:**  And -- and what is your relationship

5    with Google?

6        **PROSPECTIVE JUROR HALVERSON:**  Besides being a pretty

7    avid technical person, I've worked in tech for the last

8    30 years.  Most, if not all, of the companies I've worked for

9    have used Google technologies.  They're one of the larger

10   companies.  Then Microsoft, Amazon.  You know, I'm very

11   involved with tech, so I'm favorable to tech companies.  But I

12   wouldn't say that it would diminish my ability to be, you know,

13   unbiased.

14       I would want to say, though, with the current security

15   company I work for, I know before I worked there -- I've been

16   there about three years -- there was a lawsuit of some kind

17   with an organization that -- I mean, it's not Google directly,

18   but one of the founders of Google, he has a family office, and

19   the family office employed our company as his security.  So we

20   had security guards, you know, guarding the family.  And they

21   sued the company.

22       **MR. DAVID BOIES:**  But that wouldn't affect you at all?

23       **PROSPECTIVE JUROR HALVERSON:**  I don't think that

24   affects me at all.

25       **MR. DAVID BOIES:**  Okay.  Do you have any friends at

1  Google, or do you follow anybody at Google on social media or

2  anything?

3  **PROSPECTIVE JUROR HALVERSON:**  I have a number of

4  acquaintances that work at Google, but I wouldn't say that any

5  of it has influenced me and biased.

6  **MR. DAVID BOIES:**  Okay.  Now, just one more.

7  Mr. Cheung.

8  **PROSPECTIVE JUROR CHEUNG:**  Hello.

9  **MR. DAVID BOIES:**  What is your favorable view of

10  Google based on?

11  **PROSPECTIVE JUROR CHEUNG:**  Well, I work with a lot of

12  their engineers on various projects; and through this

13  experience, I've had very pleasant experience working with

14  their employees.  And I think, you know, technically, they're

15  very capable.  So, therefore, I think very highly of them.

16  **MR. DAVID BOIES:**  And, again, would that cause you to

17  have some views?  You'd try to put them side, but is it fair to

18  say that we'd start out at least a little bit ahead -- or a

19  little bit behind, actually -- a little bit behind and they'd

20  start out a little bit ahead with you?  Is that fair?

21  **PROSPECTIVE JUROR CHEUNG:**  I probably would say that,

22  yeah.

23  **MR. DAVID BOIES:**  So we'd have to overcome something

24  with you.  Is that fair?

25  **PROSPECTIVE JUROR CHEUNG:**  Right.

1          MR. DAVID BOIES:  Now, Juror Number 3, I forgot your

2     name.  I apologize.

3          PROSPECTIVE JUROR MATHUR:  Yeah.  Mathur.

4          MR. DAVID BOIES:  No.

5          PROSPECTIVE JUROR MATHUR:  Wait.  3 or --

6          MR. DAVID BOIES:  You're the professor, and I

7     apologize.

8          PROSPECTIVE JUROR BADGETT:  That's okay.

9          MR. DAVID BOIES:  I have your names but --

10         PROSPECTIVE JUROR BADGETT:  Amanda Badgett.

11         MR. DAVID BOIES:  -- right now it's -- I apologize.

12     I think you said you had a negative view about Google or

13     you thought you might.

14         PROSPECTIVE JUROR BADGETT:  It's complicated.  And

15     it -- and I'm not coming at it from having a personal

16     connection to the company, but as an end user in my particular

17     discipline, in using -- relying sometimes on Google for certain

18     functionality.  And it's changed over the years, and it's been

19     less than satisfactory.

20         MR. DAVID BOIES:  Is there anything there that would

21     cause you to have either us or Google start off with a

22     disadvantage or advantage, or would you just be able to look at

23     the facts?

24         PROSPECTIVE JUROR BADGETT:  Well, I'm coming into this

25     with a little bit of concern about tech in general, but I can

1    follow directions, and I would focus on the facts in front of

2    me.

3         **MR. DAVID BOIES:**  Let me just ask for a show of hands.

4    People obviously have feelings about tech.  Some like it.  Some

5    don't like it.  Some are comfortable with it.  Some, like

6    myself, are not quite as comfortable as our children.

7         But is there anybody who has any feelings, positive or

8    negative, about tech that would cause them not to be able to be

9    fair?

10                        (No response.)

11        **MR. DAVID BOIES:**  Thank you very much.  I appreciate

12   your time.

13        **MR. ATTANASIO:**  May I proceed, Your Honor?

14        **THE COURT:**  Yes, you may.

15        **MR. ATTANASIO:**  Thank you.

16   Good morning, everybody.  My name is Mike Attanasio, and

17   along with my colleagues, I represent Google.

18        And the judge has gone over with you the process today,

19   and I'm sure you just picked up some of it a moment ago when

20   counsel was asking some questions, and I'm going to do the

21   same.

22        And, you know, I think of it sometimes like a 50-yard

23   dash, 50-yard race.  And the question sometimes is just:  Does

24   someone have a head start in the race or does someone start

25   behind in the race?  And that's sort of what we're after.  So

1  with that in mind and fairness in mind, I'm just going to ask

2  you a few questions.

3      If I could, let me begin with you, Professor Badgett.  And

4  you did express some strong feelings about Google in your

5  questionnaire, some of the products they have.  I think you

6  used the word, with respect to one product, that you loathe it,

7  and that struck me as pretty strong.

8      Do you have a generally negative view of Google, as you

9  sit here today, through your job?

10     **PROSPECTIVE JUROR BADGETT:**  Well, it's kind of

11 difficult to distinguish my job from just being a person in the

12 world because we are so reliant on tools provided by companies

13 like Google.  But the questionnaire might have caught me on a

14 particular day, but -- but, yeah, I mean, that's just the

15 reality of my doing my job.  But, again, I see the context here

16 and I could put that aside.

17     **MR. ATTANASIO:**  Okay.  And how about privacy in

18 general?  How do you feel about the way we interact with these

19 technology companies and these tools and our privacy?  What are

20 your feelings?

21     **PROSPECTIVE JUROR BADGETT:**  I have pretty profound

22 concerns about it, yeah.

23     **MR. ATTANASIO:**  Could you explain?

24     **PROSPECTIVE JUROR BADGETT:**  Well, I follow the news

25 and sort of current events and recent books that have come out

1  regarding data and data privacy and how it can impact

2  individuals, but also larger -- according to these articles and

3  books, how it can impact larger events.

4      **MR. ATTANASIO:**  And would those factors together, some

5  of your concerns about Google products, your concerns about

6  privacy, would that cause our side to start a little bit behind

7  in that -- in that race of this trial?  Would that -- would

8  that cause you to possibly favor the plaintiffs?

9      **PROSPECTIVE JUROR BADGETT:**  Yeah.  Possibly, yeah.

10      **MR. ATTANASIO:**  And, by the way, thank you for your

11  honesty.

12      I should have said this when I started.  There are zero

13  wrong answers in this process.  We just want to hear your

14  honest opinion so that we can get through this process and find

15  a fair jury for both sides.

16      Ms. Mathur, would you mind explaining a little bit more

17  about what you do?  I know Fetch.  Could you explain a little

18  bit more about what you do at Fetch?

19      **PROSPECTIVE JUROR MATHUR:**  Sure.  So I'm on their

20  go-to-market team, so I work very closely with their product

21  engineering teams as well as our sales teams.  Essentially,

22  Fetch users -- it's an app -- users use it to submit receipts

23  from anywhere that they've shopped.  We award them points and

24  then work with brands to, you know, put ads and offers on

25  our -- on our app.

1          **MR. ATTANASIO:**  Thank you.

2      And you have a generally positive view of Google, is that

3  fair, through your friend?

4          **PROSPECTIVE JUROR MATHUR:**  Through my friend, but also

5  just, you know, being around tech, being in tech.  I have a lot

6  of colleagues as well who are former Google employees, and so,

7  yeah, I think generally favorable of tech because that's --

8  that's my job as well.

9          **MR. ATTANASIO:**  Sure.  You're in tech, you live in

10  this community, and you have a generally favorable view of tech

11  companies, some more than others, some maybe less than others.

12  Is that fair?

13          **PROSPECTIVE JUROR MATHUR:**  Yes, that's fair.

14          **MR. ATTANASIO:**  All right.  Now, I'm going to ask this

15  question of you, and I'll preview, I'll probably ask it of a

16  handful of you.

17      Judge Seeborg is going to instruct you on the law, and one

18  of the key parts of that instruction is going to be you can

19  only base a verdict on the evidence that you hear in this case.

20  And only Judge Seeborg will instruct you on the law, not the

21  lawyers, and it'll be your duty to follow what he tells you.

22          Would you be able, Ms. Mathur, to look at the evidence, to

23  follow His Honor's instructions and reach a fair verdict?

24          **PROSPECTIVE JUROR MATHUR:**  Yes.  I think I'll be able

25  to put everything else aside that I know of tech and sort of

 1   see what's being presented here.  I know I follow instruction

 2   well, so I think I'll be able to do that.

 3           **MR. ATTANASIO:**  You're an independent thinker?

 4           **PROSPECTIVE JUROR MATHUR:**  Yes.

 5           **MR. ATTANASIO:**  You think for yourself?

 6           **PROSPECTIVE JUROR MATHUR:**  Yes.

 7           **MR. ATTANASIO:**  You follow the rules?  Yes?

 8           **PROSPECTIVE JUROR MATHUR:**  Yes.

 9           **MR. ATTANASIO:**  Okay.  Thank you.

10       If we wouldn't mind handing the mic to Mr. Roller.

11       Good morning, sir.

12           **PROSPECTIVE JUROR ROLLER:**  Good morning.

13           **MR. ATTANASIO:**  Same question for you.  Judge Seeborg

14   will instruct you, you can only base a verdict on the evidence

15   you hear in this courtroom and you have to follow that law

16   according to his instructions.  That's the oath you just took.

17   That's the duty.  Will you be able to do that?

18           **PROSPECTIVE JUROR ROLLER:**  I think so.

19           **MR. ATTANASIO:**  All right.  And Google is a client of

20   yours?

21           **PROSPECTIVE JUROR ROLLER:**  Correct.

22           **MR. ATTANASIO:**  Do you have other clients besides

23   Google?

24           **PROSPECTIVE JUROR ROLLER:**  A few, but Google is more

25   than half of my, you know, yearly clients.

1          MR. ATTANASIO:  But you're confident -- also, you're

2     an independent thinker; is that right?

3          PROSPECTIVE JUROR ROLLER:  I think so.

4          MR. ATTANASIO:  You're confident you'd be able to

5     follow the evidence and follow Judge Seeborg's instructions in

6     this case?

7          PROSPECTIVE JUROR ROLLER:  I think so.

8          MR. ATTANASIO:  Thank you.

9     Let's go to Dr. Lewis.

10    Good morning, Doctor.

11         PROSPECTIVE JUROR LEWIS:  Hi.

12         MR. ATTANASIO:  In terms of your job, I appreciate the

13    importance of those medical appointments.  I have an

14    anesthesiologist who's actually a very close friend, and he

15    often has coverage or another anesthesiologist and they swap

16    duties sometimes, shifts sometimes.  Is that something you'd be

17    able to cover in your organization if you were here?

18         PROSPECTIVE JUROR LEWIS:  It's tough and variable and,

19    because I'm sub-subspecialty, much less than just flexing like

20    in a regular operating room.

21         MR. ATTANASIO:  Okay.  So it would be challenging?

22         PROSPECTIVE JUROR LEWIS:  So I -- so I can make it

23    here.  I can show up every day --

24         MR. ATTANASIO:  Okay.

25         PROSPECTIVE JUROR LEWIS:  -- indefinitely.

 1          **MR. ATTANASIO:**  You can be here?

 2          **PROSPECTIVE JUROR LEWIS:**  Yeah.  It's just the impact

 3    on family and kids and colleagues who won't work because I'm

 4    not there.

 5          **MR. ATTANASIO:**  Okay.  Thank you for that.

 6       Now, you also expressed some views about -- positive views

 7    about Google earlier this morning.  We don't need to go over

 8    those again, but that same question.  Will you be able to

 9    follow the law as instructed to you by one person only, and

10    that's Judge Seeborg, and follow the instruction that says you

11    can only base a verdict on the evidence, not anything out

12    there, only on the evidence you hear in this courtroom?  Will

13    you be able to follow that instruction and reach a fair verdict

14    for either side?

15          **PROSPECTIVE JUROR LEWIS:**  Yes.

16          **MR. ATTANASIO:**  Okay.  Thank you.

17       If we could hand the mic, please, to Mr. Halverson.

18       Good morning, sir.

19          **PROSPECTIVE JUROR HALVERSON:**  Good morning.

20          **MR. ATTANASIO:**  I heard you say that you work --

21    you've worked with Google in different capacities or with

22    Google products; is that right?

23          **PROSPECTIVE JUROR HALVERSON:**  Yes.

24          **MR. ATTANASIO:**  And you have a generally favorable

25    view of Google?

1           **PROSPECTIVE JUROR HALVERSON:**  Yes.

2           **MR. ATTANASIO:**  You work with a lot of tech companies,

3    though; is that correct?

4           **PROSPECTIVE JUROR HALVERSON:**  Correct.

5           **MR. ATTANASIO:**  Not just Google?

6           **PROSPECTIVE JUROR HALVERSON:**  Correct.

7           **MR. ATTANASIO:**  You have favorable views of some of

8    them as well?

9           **PROSPECTIVE JUROR HALVERSON:**  Yes.

10          **MR. ATTANASIO:**  All right.  Now, if you're a juror in

11   this case, as I said, you'll be instructed by the judge that

12   you can base your verdict only on the evidence.  Will you be

13   able to follow that instruction?

14          **PROSPECTIVE JUROR HALVERSON:**  Yes, sir.

15          **MR. ATTANASIO:**  You'll be able to follow the law?

16          **PROSPECTIVE JUROR HALVERSON:**  Yes.

17          **MR. ATTANASIO:**  Render a fair verdict for plaintiff if

18   that's what the evidence shows?

19          **PROSPECTIVE JUROR HALVERSON:**  Yes.

20          **MR. ATTANASIO:**  Thank you, sir.

21      If we could go to Mr. Cheung.

22          **PROSPECTIVE JUROR CHEUNG:**  Hello.

23          **MR. ATTANASIO:**  Sir, you've worked with some Google

24   engineers; is that correct?

25          **PROSPECTIVE JUROR CHEUNG:**  That's correct.

1           MR. ATTANASIO:  You have a generally favorable view of

2     their technical capacity?

3           PROSPECTIVE JUROR CHEUNG:  Yes, I do.

4           MR. ATTANASIO:  They're good engineers?

5           PROSPECTIVE JUROR CHEUNG:  Yes.  Yes.

6           MR. ATTANASIO:  Thank you.

7        And you do that at Basler?

8           PROSPECTIVE JUROR CHEUNG:  Yes.

9           MR. ATTANASIO:  And that's a company, I heard you say

10    it makes sophisticated camera technology.  Is that for security

11    type of --

12          PROSPECTIVE JUROR CHEUNG:  No.

13          MR. ATTANASIO:  -- things?

14          PROSPECTIVE JUROR CHEUNG:  For robotic, automation,

15    inspection, medical device, semiconductor, et cetera.

16          MR. ATTANASIO:  All right.  Now, with your positive

17    view of Google in mind, would you be able to follow

18    Judge Seeborg's instructions?

19          PROSPECTIVE JUROR CHEUNG:  Yes, I can.

20          MR. ATTANASIO:  Follow the law and base a verdict only

21    on the evidence?

22          PROSPECTIVE JUROR CHEUNG:  Yes, I can.

23          MR. ATTANASIO:  And if that evidence showed that

24    Google's in the right, you could reach a verdict for Google; if

25    it showed that plaintiff's in the right, you could reach a

1    verdict for plaintiff.  Is that right?

2             **PROSPECTIVE JUROR CHEUNG:**  Yes, I can.

3             **MR. ATTANASIO:**  Thank you, sir.

4        Let me ask a general question.  Does anybody on the

5    panel -- has anybody on the panel ever deliberately avoided

6    using a company's product or service because of the company's

7    reputation for privacy and personal data in terms of handling

8    privacy and personal data?  Anybody ever said, "I won't work

9    with that company because I'm worried about their privacy

10   policies or how they handle my data"?

11                      (Hands raised.)

12            **MR. ATTANASIO:**  Yes, sir.  Mr. Sharp -- excuse me.

13            **PROSPECTIVE JUROR FRITZSCHE:**  Fritzsche.

14            **MR. ATTANASIO:**  Mr. Fritzsche.  1's up there, yes.

15            **PROSPECTIVE JUROR FRITZSCHE:**  I'm not a tech person,

16   but I did switch stuff -- please don't laugh at me -- Firefox

17   because, I -- yeah, I am -- I'm disturbed when somebody comes

18   and talks to me while I'm on my iPad and, next thing I know, an

19   ad's popping up for what they were just talking about.  It kind

20   of freaks me out but...

21            **MR. ATTANASIO:**  Okay.

22            **PROSPECTIVE JUROR FRITZSCHE:**  Again, I think I could

23   put that stuff aside for the situation.

24            **MR. ATTANASIO:**  And do you hold that against Google in

25   particular, that sense that maybe I'm getting advertisements?

1          **PROSPECTIVE JUROR FRITZSCHE:**  Yeah, Google's -- yeah,

2     I try to avoid it when I can.

3          **MR. ATTANASIO:**  And would that -- do you think that

4     since this is a case about privacy and about data and about

5     Google, it sort of checks all the boxes you just went with?

6          You know, one feature of this process is sometimes it's

7     great.  You can be a juror, but maybe you're just a juror who's

8     better suited for a different case.  It doesn't mean anything's

9     wrong.  It doesn't mean anybody's done anything wrong here or

10    there.  It just means maybe this isn't the case for you.  It

11    would be better to be on a different case on another day

12    because of those feelings you have.  Do you think that would be

13    accurate here?

14         **PROSPECTIVE JUROR FRITZSCHE:**  Maybe.  I would try to

15    do my -- my duty if I'm selected and -- but, yeah, maybe.

16         **MR. ATTANASIO:**  You think Google would start a little

17    behind, in your mind?

18         **PROSPECTIVE JUROR FRITZSCHE:**  Perhaps.

19         **MR. ATTANASIO:**  I also noticed in your questionnaire

20    you'd mentioned that -- there's a question about "Do you have

21    religious views that may impact your serving as a juror?"  And

22    you wrote [as read]:

23            "I believe I may."

24       Is that right?

25         **PROSPECTIVE JUROR FRITZSCHE:**  Yeah.

1          MR. ATTANASIO:  Can you explain that?

2          PROSPECTIVE JUROR FRITZSCHE:  It's hard to say what's

3    going to bump up against my religious views before knowing what

4    it is.  But, yeah, those views have an effect on how I see the

5    world and -- but without you saying, "How about this?  What do

6    you" -- you know, so that's why I put "I may."

7          MR. ATTANASIO:  I understand.

8          PROSPECTIVE JUROR FRITZSCHE:  I think anybody would be

9    in that particular situation.

10         MR. ATTANASIO:  Right.  As you sit here now, you just

11   can't know?

12         PROSPECTIVE JUROR FRITZSCHE:  Without specifics, yeah.

13         MR. ATTANASIO:  Okay.  I appreciate that.

14      Let me ask, if I could, let's hand the mic to Ms. Neal.

15      Good morning, Ms. Neal.

16         PROSPECTIVE JUROR NEAL:  Good morning.

17         MR. ATTANASIO:  In terms of your work at Chick-fil-A

18   and that schedule you mentioned, which sounds like it would be

19   a real challenge, if you were here, would that be distracting

20   to you?  Would it be hard to sort of stick with the proceedings

21   here because you're worried about all the other things you have

22   to deal with?

23         PROSPECTIVE JUROR NEAL:  Yes.  I am the training

24   director, and I'm in charge of making sure that everybody is

25   properly being trained and everything's running smoothly.  So

1  that would be very distracting, honestly.

2          MR. ATTANASIO:  Okay.  Really hard?

3          PROSPECTIVE JUROR NEAL:  Yeah.

4          MR. ATTANASIO:  All right.  I appreciate that.

5  Thank you for being honest.

6      Let's, if we could, if we could just hand it to Ms. Ye,

7  please.

8      Good morning.

9          PROSPECTIVE JUROR YE:  Good morning.

10          MR. ATTANASIO:  Regarding the Fur Pal work --

11          PROSPECTIVE JUROR YE:  Uh-huh.

12          MR. ATTANASIO:  -- are you an employee there or do you

13  own the company?

14          PROSPECTIVE JUROR YE:  Actually, self-employed.

15          MR. ATTANASIO:  Self-employed?

16          PROSPECTIVE JUROR YE:  Yes.

17          MR. ATTANASIO:  Meaning it's your business?

18          PROSPECTIVE JUROR YE:  Yes.

19          MR. ATTANASIO:  Do you use Google products at all for

20  your work?

21          PROSPECTIVE JUROR YE:  No, not really.

22                  (Cellular telephone ringing.)

23          THE COURT:  That's the last time that will happen;

24  right?

25          MR. ATTANASIO:  Ms. Ye, I didn't quite catch the

 1  answer.  Did you say you don't really use Google in the

 2  business?

 3          **PROSPECTIVE JUROR YE:**  Not really.

 4          **MR. ATTANASIO:**  Okay.  Thank you.

 5      If you could just hand the microphone, actually, down to

 6  Ms. Macias Solorio.  Thank you.

 7      I noticed that you work for Andrea Clark, you wrote down.

 8  Is that a person or a business?

 9          **PROSPECTIVE JUROR MACIAS SOLORIO:**  Oh, that's a

10  business.  That's, like, my manager.

11          **MR. ATTANASIO:**  Okay.  That's -- oh.

12          **PROSPECTIVE JUROR MACIAS SOLORIO:**  I work at Target,

13  yeah.

14          **MR. ATTANASIO:**  I see.  And is that -- I saw you got

15  an art degree.

16          **PROSPECTIVE JUROR MACIAS SOLORIO:**  Yeah, I'm an

17  artist.  I paint.

18          **MR. ATTANASIO:**  All right.  Is that a -- and is Andrea

19  Clark, your manager, is that an art business that you work for?

20          **PROSPECTIVE JUROR MACIAS SOLORIO:**  No.  I just work

21  retail.  I do service and engagement, like guest service,

22  returns.

23          **MR. ATTANASIO:**  Okay.

24          **PROSPECTIVE JUROR MACIAS SOLORIO:**  Yeah.

25          **MR. ATTANASIO:**  And do you use Google a lot?

1          **PROSPECTIVE JUROR MACIAS SOLORIO:**  I do.  Like, when

2    an item, like, the price is not there, I search it up on Google

3    and stuff.

4          **MR. ATTANASIO:**  Okay.  How do you feel about Google?

5          **PROSPECTIVE JUROR MACIAS SOLORIO:**  I mean, I use it,

6    but, like, it's still scary, you know.

7          **MR. ATTANASIO:**  What do you mean?

8          **PROSPECTIVE JUROR MACIAS SOLORIO:**  Like, the privacy

9    thing; how, you know, when you search something up or you're

10   thinking about something, then you get an ad for it.

11         **MR. ATTANASIO:**  Okay.  Would that bother you in terms

12   of being a juror in this case?  Do you think you have a little

13   bit of a negative feeling about Google that would make our side

14   start behind?

15         **PROSPECTIVE JUROR MACIAS SOLORIO:**  I don't know yet,

16   you know.

17         **MR. ATTANASIO:**  You're not sure you could be fair?

18         **PROSPECTIVE JUROR MACIAS SOLORIO:**  Yeah.  I'm not

19   sure, yeah.

20         **MR. ATTANASIO:**  Okay.  Do you think that you'd be

21   better in a different case maybe that didn't involve Google

22   because of those feelings?

23         **PROSPECTIVE JUROR MACIAS SOLORIO:**  Maybe, but --

24   you know.

25         **MR. ATTANASIO:**  Well, we need to know if you think --

 1   and remember what I said.  No wrong answers.

 2          **PROSPECTIVE JUROR MACIAS SOLORIO:**  Uh-huh.

 3          **MR. ATTANASIO:**  We just need to know if you think

 4   personally, in your heart, in your mind, that you can be fair.

 5      So what I'm hearing is you just don't know.  You're not --

 6          **PROSPECTIVE JUROR MACIAS SOLORIO:**  Yeah, I don't know.

 7          **MR. ATTANASIO:**  You don't know if you can be fair?

 8          **PROSPECTIVE JUROR MACIAS SOLORIO:**  Yeah.

 9          **MR. ATTANASIO:**  And you might have a -- you might have

10   a feeling about Google that would make it start behind; is that

11   correct?

12          **PROSPECTIVE JUROR MACIAS SOLORIO:**  A little bit, yeah.

13          **MR. ATTANASIO:**  All right.  Thank you for that.

14      And I'm going to ask this.  You have to just indulge me.

15   I have to ask this.

16      You studded studio arts at Napa Valley College, I saw;

17   right?

18          **PROSPECTIVE JUROR MACIAS SOLORIO:**  Yeah.

19          **MR. ATTANASIO:**  Did you take Professor Badgett's

20   class?

21          **PROSPECTIVE JUROR MACIAS SOLORIO:**  Yeah.  I did an art

22   history class.

23          **MR. ATTANASIO:**  Oh, you did?

24                          (Laughter.)

25          **PROSPECTIVE JUROR MACIAS SOLORIO:**  It was Asian art

1  and modern art with you.  It was online, yeah, during, like,

2  2021, 2022, yeah.  It's nice meeting you.

3          MR. ATTANASIO:  All right.  Excellent.  Good grade?

4          PROSPECTIVE JUROR MACIAS SOLORIO:  Yeah.

5                          (Laughter.)

6          PROSPECTIVE JUROR MACIAS SOLORIO:  I really liked her

7  class.  I learned a lot.

8          MR. ATTANASIO:  All right.  If you could hand the

9  phone, Ms. Macias Solorio, to Ms. Barbour, please.

10      Ms. Barbour, you had expressed a concern on the

11  questionnaire about technology companies being intrusive, I

12  think.  Is that fair?

13          PROSPECTIVE JUROR BARBOUR:  Yes.

14          MR. ATTANASIO:  Could you explain what you meant by

15  that?

16          PROSPECTIVE JUROR BARBOUR:  I just think, from my own

17  personal experience with my identification being given up to

18  fraud and having to lock down all of my things, that I don't

19  think any of us have real privacy.  And so from what I learned

20  from where I work, we can find out anything about anybody if we

21  really try.  So that's where I come from, yeah.

22          MR. ATTANASIO:  And when you say where you work, you

23  mean the police department --

24          PROSPECTIVE JUROR BARBOUR:  Yes.

25          MR. ATTANASIO:  -- in Sausalito?

1          **PROSPECTIVE JUROR BARBOUR:**  Yes.

2          **MR. ATTANASIO:**  All right.  And do you attach that

3    general feeling about privacy and how we can find out things to

4    Google in particular, or is that a general feeling about

5    technology?

6          **PROSPECTIVE JUROR BARBOUR:**  No.  It's just a general

7    feeling, and I just think we need to be aware that if someone

8    really wants to find out about us, they can.

9          **MR. ATTANASIO:**  Okay.  And you were -- it sounds like

10   you were the victim at one point of some kind of hack.

11         **PROSPECTIVE JUROR BARBOUR:**  Yes.

12         **MR. ATTANASIO:**  And that's very distressing, very

13   upsetting?

14         **PROSPECTIVE JUROR BARBOUR:**  Yes.

15         **MR. ATTANASIO:**  Do you think you could be fair in this

16   case?

17         **PROSPECTIVE JUROR BARBOUR:**  Yes.

18         **MR. ATTANASIO:**  Okay.  If you could hand the phone to

19   your -- "the phone" -- the microphone to Mr. Hall.

20      Good morning, Mr. Hall.

21         **PROSPECTIVE JUROR HALL:**  Good morning.

22         **MR. ATTANASIO:**  You mentioned your brother had worked

23   at Google.

24         **PROSPECTIVE JUROR HALL:**  Yes.

25         **MR. ATTANASIO:**  Do you know how long ago he left?

 1              **PROSPECTIVE JUROR HALL:**  It was -- he worked there in

 2      the mid- -- or, yeah, the mid-2010s.

 3              **MR. ATTANASIO:**  What did he do, in general?

 4              **PROSPECTIVE JUROR HALL:**  IT.

 5              **MR. ATTANASIO:**  Was he happy there, as far as you

 6      recall?

 7              **PROSPECTIVE JUROR HALL:**  I believe so.

 8              **MR. ATTANASIO:**  You also -- and do you use Google?

 9      I think you mentioned you use Google products.  Do you use

10      particular Google stuff?

11              **PROSPECTIVE JUROR HALL:**  Yes.  I used it to get here.

12              **MR. ATTANASIO:**  Okay.  Meaning Google Directions?

13              **PROSPECTIVE JUROR HALL:**  Yes.

14              **MR. ATTANASIO:**  Yes.  You like that?

15              **PROSPECTIVE JUROR HALL:**  Yes.

16              **MR. ATTANASIO:**  Okay.  Google Searches?

17              **PROSPECTIVE JUROR HALL:**  Yes.

18              **MR. ATTANASIO:**  Okay.  Generally happy with your

19      Google experiences?

20              **PROSPECTIVE JUROR HALL:**  Yes.

21              **MR. ATTANASIO:**  All right.  You mentioned some -- not

22      unlike some of the other jurors here, you mentioned some

23      skepticism, some worry about our privacy and big technology

24      companies.  Is that a fair statement for you?

25              **PROSPECTIVE JUROR HALL:**  Correct, yes.

1          MR. ATTANASIO:  Explain in your own words what you

2    mean by that.

3          PROSPECTIVE JUROR HALL:  Just with, like, the recent

4    lawsuits and things with other companies, it raises concern at

5    certain points in time.

6          MR. ATTANASIO:  And do you think that that feeling

7    makes us start a little bit behind in terms of this case and

8    Google?

9          PROSPECTIVE JUROR HALL:  Potentially.

10          MR. ATTANASIO:  Okay.  Sort of like another answer

11    we've heard, is it at this point you just -- you're not sure --

12    you can't tell me for sure you can be fair all the way to

13    Google because of those concerns?

14          PROSPECTIVE JUROR HALL:  I think I could, but I don't

15    know enough to make a decision.

16          MR. ATTANASIO:  Okay.  As I sit -- as we sit here now,

17    is Google a little bit behind, in your mind, just because of

18    your concerns and its reputation as a big tech company?

19          PROSPECTIVE JUROR HALL:  No.  I would say I could be

20    fair about it.

21          MR. ATTANASIO:  Okay.  Thank you for that.

22          PROSPECTIVE JUROR HALL:  Thank you.

23          MR. ATTANASIO:  You can hand the microphone right

24    behind you, please.

25        Mr. Chang?

1          **PROSPECTIVE JUROR CHANG:**  Yes.

2          **MR. ATTANASIO:**  How is the food at the restaurants?

3     A-plus?

4          **PROSPECTIVE JUROR CHANG:**  Yes, number one.

5          **MR. ATTANASIO:**  All right.  And I heard you say that

6     the burden on you -- I think I understood the burden on you is

7     that you have the recipes, they're your recipes and no one else

8     is getting them, so you go in every morning with your recipes

9     and you do the work?

10         **PROSPECTIVE JUROR CHANG:**  Yes.

11         **MR. ATTANASIO:**  Are you going to hand those over

12    someday to somebody?

13         **PROSPECTIVE JUROR CHANG:**  Only my wife, but I did -- I

14    didn't teach everything.  Just only just my recipes, I keep it.

15         **MR. ATTANASIO:**  Okay.  In terms of a restaurant, a lot

16    of a times restaurants engage with Google and people get

17    recommendations or they search for a Japanese restaurant

18    through Google.  Do you use Google products in your business?

19         **PROSPECTIVE JUROR CHANG:**  No.

20         **MR. ATTANASIO:**  Okay.  Do you have any strong feelings

21    one way or the other about Google?

22         **PROSPECTIVE JUROR CHANG:**  No.

23         **MR. ATTANASIO:**  Thank you, sir.

24      Let me see.  I think that is all I have right now.  I want

25    to thank you all.

 1          Actually, let me ask one more question.  I apologize.

 2          Mr. Sharp, you had expressed some -- first of all, I

 3     noticed and I heard you're a sales representative.

 4               **PROSPECTIVE JUROR SHARP:**  Correct.

 5               **MR. ATTANASIO:**  And so you operate on commission?

 6               **PROSPECTIVE JUROR SHARP:**  Yes.

 7               **MR. ATTANASIO:**  In part?

 8               **PROSPECTIVE JUROR SHARP:**  In part.

 9               **MR. ATTANASIO:**  And would the trial be a major

10     financial hardship?

11               **PROSPECTIVE JUROR SHARP:**  Yeah, it would obviously

12     affect me that way.  And it is -- just in the building

13     industry, this is the busiest time of the year; and I do rely

14     on my commission as well, you know, for my income.  It's a

15     major part of my income.

16               **MR. ATTANASIO:**  And would that be a financial

17     hardship?

18               **PROSPECTIVE JUROR SHARP:**  Absolutely.  The commission

19     part of it is, you either make it or you don't.

20               **MR. ATTANASIO:**  Right.

21               **PROSPECTIVE JUROR SHARP:**  And so it can make a

22     tremendous difference.

23               **MR. ATTANASIO:**  And this would also put you in a

24     position to miss your bonus; is that right?

25               **PROSPECTIVE JUROR SHARP:**  Correct.  That's what I'm

1    referring to.

2            MR. ATTANASIO:  Okay.  You live 65 miles away?

3            PROSPECTIVE JUROR SHARP:  Yes.

4            MR. ATTANASIO:  So would that also be a hardship for

5    you?

6            PROSPECTIVE JUROR SHARP:  Yeah.  I'm renting car right

7    now too because I don't have a car to get down here.

8            MR. ATTANASIO:  So you're having to -- so you're

9    spending money --

10           PROSPECTIVE JUROR SHARP:  Yes.

11           MR. ATTANASIO:  -- by renting a car?

12           PROSPECTIVE JUROR SHARP:  Yes, sir.

13           MR. ATTANASIO:  And you're losing money over here at

14   work?

15           PROSPECTIVE JUROR SHARP:  (Nods head.)

16           MR. ATTANASIO:  All right.  Would that -- would the

17   pressure of that situation be something that would be

18   distracting during the trial?

19           PROSPECTIVE JUROR SHARP:  Yeah, it's distracting.  It

20   can happen.  It can work.  It's distracting.  It's difficult.

21           MR. ATTANASIO:  Okay.  You had expressed -- we don't

22   need to go over them all, but you had expressed also some

23   fairly strong feelings about Google and privacy and data.

24           PROSPECTIVE JUROR SHARP:  Yeah.  Not specific to

25   Google, but yes.

1           MR. ATTANASIO:  Big technology in general?

2           PROSPECTIVE JUROR SHARP:  Yeah.  But I also use their

3     products too, so...

4           MR. ATTANASIO:  And how do you feel about the products

5     and Google, as you sit here today?

6           PROSPECTIVE JUROR SHARP:  I don't have a bias one way

7     or the other.  I use their products.  They work for me.  So

8     I guess I'm a satisfied customer.

9           MR. ATTANASIO:  Which products do you use?

10          PROSPECTIVE JUROR SHARP:  Just general searches, just

11    Maps and such that the others have referred to.

12          MR. ATTANASIO:  Okay.  In the questionnaire, you did

13    talk about how companies seem to know what we're doing and know

14    when we're moving around, and you expressed some discomfort

15    about that.

16          PROSPECTIVE JUROR SHARP:  Absolutely, but much the

17    same as the others.

18          MR. ATTANASIO:  Okay.  Is that, you know,

19    understanding that Google does what it does, it's a search

20    engine, it interacts with us in certain ways?

21          PROSPECTIVE JUROR SHARP:  Well, that's the irony.  I

22    mean, I can be frustrated; but also, it helps me in my work as

23    well too.  So there's two things going on there.

24          MR. ATTANASIO:  Kind of a trade-off?

25          PROSPECTIVE JUROR SHARP:  Of course there is, yes.

 1              **MR. ATTANASIO:**  Right.  So a trade-off between the

 2     benefits and conveniences and the other things we've been

 3     talking about?

 4              **PROSPECTIVE JUROR SHARP:**  Absolutely, yes.

 5              **MR. ATTANASIO:**  Okay.  Would you have a concern about

 6     sitting as a juror in a case involving Google and involving,

 7     frankly, privacy and data?

 8              **PROSPECTIVE JUROR SHARP:**  No.

 9              **MR. ATTANASIO:**  Okay.  Thank you, Mr. Sharp.

10        I appreciate everybody's time and patience and your honest

11     answers.  Thank you very much.

12              **THE COURT:**  Let me just ask one or two follow-up

13     questions, and then I'm going to meet with the counsel.

14        Mr. Fritzsche, just about these memorial services, I

15     wanted to understand a little bit more.  If you were selected

16     for the jury, what would -- what would happen with respect to

17     those two 11 o'clock services?

18              **PROSPECTIVE JUROR FRITZSCHE:**  Well --

19              **THE COURT:**  Would they be able to go forward or not?

20     I don't --

21              **PROSPECTIVE JUROR FRITZSCHE:**  They probably -- I mean,

22     I don't know.  I would -- they might.  I mean, there's music

23     that's been selected with the families that's particular to

24     each situation.  There's not another person to perform it.  I

25     don't know if they would -- I don't know what they would do.

1          THE COURT:  But when you say "perform it," are you --

2    is it sort of a deejay function, or are you --

3          PROSPECTIVE JUROR FRITZSCHE:  No.

4          THE COURT:  No.

5          PROSPECTIVE JUROR FRITZSCHE:  No.  I'm --

6          THE COURT:  Playing.

7          PROSPECTIVE JUROR FRITZSCHE:  -- playing and singing.

8          THE COURT:  I see.

9          PROSPECTIVE JUROR FRITZSCHE:  I'm performing live the

10   music that's selected with the families beforehand.

11         THE COURT:  I see.  Thank you.

12      Mr. Sharp, also just on your cardiology appointment --

13         PROSPECTIVE JUROR SHARP:  Yes.

14         THE COURT:  -- and I don't want to pry into your

15   medical situation, but is that a routine annual?

16         PROSPECTIVE JUROR SHARP:  No.

17         THE COURT:  This is for something specific?

18         PROSPECTIVE JUROR SHARP:  Yeah.  Yeah, based on my

19   surgery a few months ago.

20         THE COURT:  Okay.  Let me just ask one question to all

21   of you again.

22      There's been a lot of questions, and they're appropriate

23   questions, from both counsel about "Do we start behind?"  You

24   heard this quite a bit, and I asked questions that were kind of

25   similar to that.  So let me just ask this general question, and

1   you raise your hand if the answer is yes.

2       You've heard a lot from me about how the expectation for a

3   juror is to come in, base their verdict entirely on the

4   evidence and the instructions on the law.  For those of you who

5   said, well, starting out behind or starting out ahead, or what

6   have you, does anyone think they could not follow my

7   instruction that you are to base your decision entirely on the

8   evidence that you hear in this courtroom and the instruction on

9   the law that I provide to you?  Do any of you think you

10  couldn't do that?

11                      (No response.)

12          **THE COURT:**  Okay.  Thank you.

13      So I'm going to talk to the counsel on the side.

14      This is kind of a good point for us to take a break.

15  You've heard very little about the case, both those of you in

16  the box and the prospective jurors, so there isn't, even if you

17  wanted to, much to talk about, but don't talk about the case.

18  Don't speculate on what it's about at this stage.  Just put

19  that to one side.

20      Let's take a break.  And I'd like to ask you, for those of

21  you in the box, jury box, come back to your exact same seat.

22  It's very important because otherwise we'll -- it'll not be

23  good.

24      And for those of you in the audience, just come back and

25  come into the audience pews.  And let's resume at ten after.

SIDEBAR

1      If I could see the counsel on the side.

2      Could I see counsel over to the side here?

3      (The following proceedings were heard at the sidebar:)

4          **THE COURT:**  Okay.  Gather around.

5          **MR. HUR:**  Yes.

6          **THE COURT:**  Okay.  Let me start with plaintiffs.

7      Any for-cause?

8          **MR. CARMODY:**  The first number I think of is

9  Mr. Roller, whose most important client, the biggest client, is

10 Google.

11         **THE COURT:**  I thought he was effectively rehabbed.  So

12 I don't think it's a for-cause challenge.  He said he could be

13 fair.

14         **MR. ATTANASIO:**  What was the last one?

15         **THE COURT:**  Roller.

16         **MR. ATTANASIO:**  Yeah, I agree, Your Honor.

17         **MR. CARMODY:**  I understand.  I just want to put on the

18 record --

19         **THE COURT:**  Go right ahead.

20         **MR. CARMODY:**  -- over 50 percent of his income was

21 Google; it is his biggest client.

22     And he said a few things earlier that he could possibly --

23 it was 9:57 a.m. -- he could possibly.  He wasn't sure if he

24 could be fair and impartial.  He said then, "I could do my

25 best."  Then he said -- he went on from there that he thought

1   he could.  And everyone, in light of the Court's leading

2   question, said no -- nobody raised their hand and said they

3   couldn't.

4        But I honestly think, if we're getting to -- with all the

5   folks we have here, if we're going to really be even to

6   everyone, this is his main source of income, and that, to me,

7   just seems real unfair.

8            **THE COURT:**  Okay.

9            **MR. ATTANASIO:**  He has other clients.  He said he

10  could do it.  He also responded both to my questions and

11  Your Honor's questions.  I think he was rehabilitated.  It is

12  true that Google's his client, but he never once said, "I'll

13  throw the game because Google's my client."  He disavowed that

14  throughout.

15           **THE COURT:**  Yeah.  I'm going to deny the for-cause

16  challenge.

17       Okay.  Next one?

18           **MR. CARMODY:**  It's the same issue with David Lewis,

19  Number 6, Your Honor.  I mean, not the same.  He had two big

20  issues, the one issue in connection with his goddaughter; and

21  his pausing on questions that he possibly, under your

22  questioning and Mr. Boies, he wasn't sure.  And he said,

23  you know, plaintiffs are going to start off behind; Google

24  would start off ahead.

25       But then the bigger question, you know, on the damages,

**SIDEBAR**

1    you know, believing that high verdicts -- he had a strong

2    feeling here, and just when we're talking about billions of

3    dollars.

4        And, you know, you talk about -- he said he could be here

5    on schedule and it would be a problem for his clients, his

6    patients.

7        But when you talk about the big problem he has with big

8    numbers, the connection he has with the goddaughter there, and

9    then the practice he has, we respectfully request the Court

10   consider that.

11           **THE COURT:**  Okay.

12           **MR. ATTANASIO:**  Same answer.  I thought Dr. Lewis was

13   very clear that he could be fair in the case, despite what he

14   expressed about Google in the first instance and his schedule

15   in the second instance.  He said, when I asked him if he could

16   get some coverage, there'd have to be some appointments missed.

17   But he seemed very willing to serve, notwithstanding his role

18   as a doctor.

19           **THE COURT:**  Right.

20           **MR. ATTANASIO:**  I hate to tell him he can't serve when

21   he's --

22           **THE COURT:**  Well, I'm not sure he really -- I'm not

23   sure he's saying, "Please leave me on," but okay.  I don't

24   think that's a for-cause challenge either.

25        Okay.  Next one?

SIDEBAR

```
 1         MR. CARMODY:  That's all we have right now.

 2         THE COURT:  Okay.

 3         MR. ATTANASIO:  Yes, Your Honor.  If I could just tick

 4    off some hardship challenges first, unless Your Honor doesn't

 5    want to hear --

 6         THE COURT:  Well, that's fine.  No, I'm going to -- I

 7    have some hardship issues, but I wanted to hear who else you

 8    have on your list.

 9         MR. ATTANASIO:  Okay.  Then I'll skip the hardship for

10    now.

11         For cause, Your Honor, Ms. Neal, who works at Chick-fil-A,

12    she has a hardship issue too.  I'll be quiet if Your Honor is

13    going to let her go on hardship.  She's the manager at

14    Chick-fil-A.

15         THE COURT:  No, I know who she is.  That's a close

16    call, but I understand.  We'll get back to that in a moment.

17         Go to the next one.

18         MR. ATTANASIO:  On cause for the same person,

19    Ms. Neal, she was one who ultimately said in response to my

20    questions that she just didn't know if she could be fair.

21         THE COURT:  Well, yeah.  But I mean, all of these

22    folks are in the same boat.  And I really am comfortable that

23    the collection, that they now understand what they have to do.

24    And I think both -- each of you can point to the same tipping

25    one way or the other.
```

1    And I think to be somewhat consistent, I'm comfortable

2    that they all got over the hurdle, thanks to each of you doing

3    it; that they could be fair and impartial.  So I'm not -- I'm

4    not thinking about that.

5         **MR. ATTANASIO:**  Understood.  Then just so I can

6    complete my record.

7         **THE COURT:**  Go ahead.  Yes, yes.

8         **MR. ATTANASIO:**  Then we would ask the same for

9    Ms. Badgett, our professor from Napa State.  She expressed

10   strong anti-Google views throughout.  I don't believe, other

11   than Your Honor's --

12        **THE COURT:**  She'd be a good juror but, yeah.

13        **MR. ATTANASIO:**  Other than Your Honor's general

14   question which, you know, is helpful, but most people just are

15   going to say yes.

16        **THE COURT:**  Oh.

17        **MR. ATTANASIO:**  She was not rehabilitated other than

18   that.

19        And then the same with Juror Number 12, Ms. Macias

20   Solorio.  She's the young woman with the vacation.  But also,

21   she was, like Ms. Neal, saying, "I don't know if I can be

22   fair."

23        **THE COURT:**  Okay.  Well, let's start with

24   Macias Solorio.  Had she put the -- her vacation down, she

25   would have not -- she would have actually been excluded from

**SIDEBAR**

 1    the pool.  So while she wasn't entirely clear on how refundable

 2    or not the tickets were, I mean --

 3              **MR. DAVID BOIES:**  She said they were refundable.

 4              **THE COURT:**  Did she?

 5              **MR. ATTANASIO:**  I don't think she understood.

 6              **THE COURT:**  I don't think she understood my question.

 7              **MR. DAVID BOIES:**  She might not have understood the

 8    question.

 9              **THE COURT:**  But I think she's -- I'm going to let her

10    go.

11         Mr. Sharp and the cardiology appointment, knowing how hard

12    it is sometimes, and my last question was important to me.  If

13    it had been a routine annual exam, you move it around, even

14    though it's hard.  If he has some issue and he's fought to get

15    this, I'm not going to block it.  So I think he should go.

16              **MR. DAVID BOIES:**  Can I just make a suggestion about

17    that?

18              **THE COURT:**  Yes.

19              **MR. DAVID BOIES:**  I don't know what your practice is,

20    but I know occasionally the Court will call and say, "This

21    person is for juror duty.  Can he come in the afternoon?"  In

22    other words, I know how hard doctors are to get appointments

23    with, and I agree completely with Your Honor that if it's -- he

24    shouldn't have to miss the appointment to come to the jury

25    but --

SIDEBAR

1          **THE COURT:**  It's an interesting idea, but we don't

2     have time.  We just don't have time to do that.

3          So Mr. Sharp, I think I'm going to let him go.

4          The restaurant owner, I think in addition to his hardship

5     in terms of running a restaurant, I think he was having some

6     difficulty --

7          **MR. ATTANASIO:**  I agree.

8          **THE COURT:**  -- kind of understanding us, so I'm going

9     to let him go.

10          Ms. Macias Solorio, I'm going to let her go.

11          Ms. Badgett, you had her for --

12          **MR. ATTANASIO:**  I had her for cause.

13          **THE COURT:**  You had her for cause.  I'm more focused

14     on her classes.

15          **MR. ATTANASIO:**  Right.

16          **THE COURT:**  She -- we do let all full-time students

17     go, and it sounds like if she isn't there, the classes all get

18     canceled.

19          **MR. ATTANASIO:**  Right.

20          **THE COURT:**  So I'm a little concerned about that.

21          **MR. ATTANASIO:**  What I would add to that, when we

22     talked on Friday, the one open issue that Your Honor had was

23     maybe it's a night class maybe.  And it turns out she clarified

24     it's a morning class every day.

25          **MR. DAVID BOIES:**  In response to that, Your Honor,

**SIDEBAR**

```
 1    I think there is some hardship there.  On the other hand, this
 2    is only going to go for eight or nine days, trial days.  We're
 3    not going to go Friday.  And I think that she's a kind of
 4    institutional person.  It's not a personal hardship.  It's a
 5    question of, I think -- and we've got the same issue, frankly,
 6    with respect to Dr. Lewis.  I think the discomfort may even be
 7    greater for a patient rescheduling and he is a pediatric
 8    anesthesiologist.  So I think that -- I think the hardship on
 9    the patients -- there's no hardship on the professor.  The
10    hardship is on the --
11            THE COURT:  Students.
12            MR. DAVID BOIES:  -- students.
13        And if you're going to be concerned about the --
14            THE COURT:  Okay.  I'll leave her on.
15        Mr. Fritzsche, I think we should let him go.  I mean, I
16    don't know.  It's a close call, but I would feel somewhat
17    troubled by throwing a wrench into two memorial services.
18            MR. ATTANASIO:  I agree, Your Honor.
19            MR. DAVID BOIES:  I understand.  But what he's doing
20    is he's playing the piano.
21            THE COURT:  I know, but someday we'll need that.
22            MR. DAVID BOIES:  I know, but somebody else can play
23    the piano, Your Honor.
24            THE COURT:  Oh, I don't know.
25            MR. ATTANASIO:  It's an organ probably.
```

1   **MR. DAVID BOIES:**  It's not an organ.

2   **THE COURT:**  Okay.  I'm going to let him go.

3   Okay.  And then let's see.  Was there any other -- was

4   there any hardship challenges besides that?

5   **MR. ATTANASIO:**  Ms. Neal, the Chick-fil-A manager.

6   **THE COURT:**  Yeah, Ms. Neal.  What's your position on

7   Ms. Neal?

8   **MR. DAVID BOIES:**  I don't see any basis for letting

9   her go.

10   **THE COURT:**  Well, I'm a little concerned about her not

11   having -- not being able to make ends meet for three weeks.

12   **MR. DAVID BOIES:**  But, you know, it's --

13   **THE COURT:**  She could theoretically do some work in

14   the afternoon.  I don't think we're totally impoverishing her.

15   **MR. DAVID BOIES:**  Right.

16   **THE COURT:**  Okay.  I'll leave her on.

17   Yes, go ahead.

18   **MR. ATTANASIO:**  She told us her hours are from 9:00 to

19   6:00, I believe.  She's a manager at Chick-fil-A.  She can be

20   here, but she lives, I think --

21   **THE COURT:**  She lives a long way away in Antioch.

22   **MR. ATTANASIO:**  She lives a far distance away.  She

23   would have to get all the way back.

24   I don't have the questionnaire in front of me.  I believe

25   she's a single parent.  I believe she has other

**SIDEBAR**

 1   responsibilities.

 2           **THE COURT:**  She didn't say anything to us about that.

 3           **MR. ATTANASIO:**  Fair enough.  I just think that's an

 4   awful big ask to a young woman --

 5           **THE COURT:**  It is.

 6           **MR. ATTANASIO:**  -- who's working at Chick-fil-A.

 7           **MR. DAVID BOIES:**  Your Honor, as I listen to this, I

 8   don't object to releasing her.

 9           **THE COURT:**  All right.

10           **MR. DAVID BOIES:**  I think she's --

11           **THE COURT:**  Okay.  We'll let her go.

12       Okay.  So just to review:  Mr. Chang, Ms. Neal, Mr. Sharp,

13   Mr. Fritzsche, and Ms. Badgett and Ms. Macias Solorio, and

14   we're going to replace those six seats.

15           **MR. CARMODY:**  One thing.  I don't want to backtrack,

16   Your Honor, but on not the cause, on the hardship issue with

17   Mr. Roller.

18           **THE COURT:**  Mr. Roller.

19           **MR. CARMODY:**  We talked about him, Number 9, Eric

20   Roller.

21           **THE COURT:**  Mm-hmm.

22           **MR. CARMODY:**  He works by the hour.  If he doesn't

23   work, he doesn't get paid.  And, obviously, he's not going to

24   get paid here.  If we're considering hardships for everyone

25   else.  He said it was a hardship during the original

1    questioning.

2         **THE COURT:**  He's the copyrighter.

3         **MR. CARMODY:**  Yes, exactly.

4         **THE COURT:**  He can work in the afternoon.  I don't

5    think that -- it's not an optimal situation, but he's not in

6    the same position that someone like Ms. Neal is in.  He's a

7    freelancer and he does his own work.  It'll be a tough three

8    works for him, but he can do it.  So, okay.

9         **MR. ATTANASIO:**  Thank you, Your Honor.

10        **THE COURT:**  Okay.  Thank you.

11       They're not all back, so...

12                    (Recess taken at 11:09 a.m.)

13                 (Proceedings resumed at 11:10 a.m.)

14       (Proceedings were heard in the presence of the prospective

15    jurors.)

16        **THE COURTROOM DEPUTY:**  Please remain as you are and

17    court will come to order.

18        **THE COURT:**  All right.  I'm going to ask Ms. Hom to

19    tell us the jurors that will be, at this point, released, and

20    then we're going to call forward jurors to replace those we're

21    substituting.

22       By the way, as we do this process, as one of the counsel

23    indicated, sometimes you are called as a juror and, for

24    whatever reason, the decision is made that you're not going to

25    sit on that jury but then perhaps you'll sit on a different

 1    jury.

 2        But by being excused, it in no way is a judgment on your

 3    ability to serve as a juror or anything about you coming today

 4    to respond to your summons.  It is, as I indicated before,

 5    something we're very grateful for, and you have -- you should

 6    all be proud that you answered that summons and responded.

 7        So, Ms. Hom, if you can go ahead.

 8        (Discussion off the record between the Courtroom Deputy

 9    and the Court.)

10        **THE COURTROOM DEPUTY:**  So the first person excused is

11    Number 1, Mr. Sharp.  And just leave your anticipated schedule

12    and witness list on the chair.  Thank you.

13        The next one is Juanita Neal.  Thank you.

14        The next one is Mr. Chang.  Mr. Chang, can you leave those

15    papers on your chair, the schedule with the -- and the witness

16    list?  Thank you.

17        Juror Number 8, Mr. Fritzsche, Christopher Fritzsche.

18    Thank you.

19        Number 10, Ms. Badgett.

20        **MR. DAVID BOIES:**  May I approach?

21        **THE COURT:**  Yes.

22    Hold on, Ms. Badgett.

23        (Sidebar conference heard but not reported.)

24        **THE COURT:**  Ms. Badgett is not excused.

25    Sorry, Ms. Badgett.

1              THE COURTROOM DEPUTY:  So Number 12, Ms. Macias

2     Solorio.

3              THE COURT:  And now we will call forward the new

4     jurors to occupy the vacated seats.

5              THE COURTROOM DEPUTY:  So, Yashas Rajendra, could you

6     please take Seat Number 1.

7          Yashas Rajendra, R-a-j-e-n-d-a-r.

8          And then Billy Crawford, could I have you take Seat

9     Number 4?

10         Kelly Pelehach.

11                         (Pause in proceedings.)

12             THE COURTROOM DEPUTY:  The next person is Brenda

13    Castillo-Valverde.

14             PROSPECTIVE JUROR CASTILLO-VALVERDE:  Where do I sit?

15             THE COURTROOM DEPUTY:  Seat Number 8, please.

16         And then Kenny, T-u-y-e-n, Tuyen.  And if I can have you

17    take Seat Number 12.

18         I think that is it, I think.

19             THE COURT:  Very good.

20         Welcome to our new jurors.  Let me begin with just a

21    couple of summary questions.  This is just for the new jurors

22    who've been called forward into the box.

23         We asked various questions that were prompting if you had

24    a "yes" answer, please raise your hand.  I know it's hard to

25    remember all of that, but for the new jurors sitting here, was

 1   there anything that you heard that caused you to think "I would

 2   tell the judge the answer is yes"?

 3                        (No response.)

 4        **THE COURT:**  Okay.  There should be a list of witnesses

 5   on the seat.  If each of you could look at the list of

 6   witnesses and tell me if any of you think you know or have

 7   heard of any of those people.

 8                        (No response.)

 9        **THE COURT:**  Okay.  Various people were introduced to

10   you, the court staff, counsel for each side.  Do any of you

11   know or think you know any of the people that were introduced?

12                        (No response.)

13        **THE COURT:**  Let me go to the questionnaires.

14        Mr. Rajendra, did I pronounce that right?

15        **PROSPECTIVE JUROR RAJENDRA:**  Yeah.

16        **THE COURT:**  Okay.  And, Mr. Rajendra, you are a

17   scientist; is that right?

18        **PROSPECTIVE JUROR RAJENDRA:**  Yes.

19        **THE COURT:**  At Denali Therapeutics?

20        **PROSPECTIVE JUROR RAJENDRA:**  Correct.

21        **THE COURT:**  And what does Denali Therapeutics do?

22        **PROSPECTIVE JUROR RAJENDRA:**  We work on large molecule

23   biologics affecting neurodegenerative diseases.

24        **THE COURT:**  Okay.  And is that a job you do in the

25   laboratory or virtually?  How do you operate?

 1          **PROSPECTIVE JUROR RAJENDRA:**  I personally am not in

 2   laboratory anymore, but my team is.

 3          **THE COURT:**  Okay.  And where do you -- where do you

 4   supervise the team?

 5          **PROSPECTIVE JUROR RAJENDRA:**  I'm an on-site employee,

 6   yes.

 7          **THE COURT:**  Okay.  And that is located in San Mateo?

 8          **PROSPECTIVE JUROR RAJENDRA:**  South San Francisco.

 9          **THE COURT:**  South San Francisco.

10     You've heard quite a few questions about whether or not

11   jurors could be fair to each side and the fact that Google's a

12   defendant, the fact that privacy is an issue in this case.  Any

13   of those things cause you to think you would have trouble being

14   a neutral, fair, and impartial juror?

15          **PROSPECTIVE JUROR RAJENDRA:**  No.

16          **THE COURT:**  The 8:30 to 1:30 schedule after today,

17   would that be workable for you?

18          **PROSPECTIVE JUROR RAJENDRA:**  I should be able to

19   accommodate, yes.

20          **THE COURT:**  Okay.  Anything you heard in our

21   discussions that caused you to think, "Boy, I would want to --

22   I'd want to let the Court know my answer to that"?  Anything

23   come to mind?

24          **PROSPECTIVE JUROR RAJENDRA:**  Nothing specific, no.

25          **THE COURT:**  Okay.  Thank you.

```
 1        If you could pass the microphone to -- is it Mr. Crawford?

 2        PROSPECTIVE JUROR CRAWFORD:  Thank you.

 3        THE COURT:  Mr. Crawford, welcome.

 4        PROSPECTIVE JUROR CRAWFORD:  Thank you.

 5        THE COURT:  You work for Contra Costa as -- in social

 6   work?

 7        PROSPECTIVE JUROR CRAWFORD:  Yes, sir.

 8        THE COURT:  Okay.  And what -- tell me a little about

 9   your -- a day in the life, your professional life.  What does

10   it entail?

11        PROSPECTIVE JUROR CRAWFORD:  So I'm an APS social

12   worker.  I do intakes.  I also go out in the field and

13   investigate adult elder abuse.  So we do --

14        THE COURT:  Did you say elder abuse?

15        PROSPECTIVE JUROR CRAWFORD:  Yes.

16        THE COURT:  Elder abuse, okay.

17        PROSPECTIVE JUROR CRAWFORD:  So physical, financial,

18   psychological, all those types of things, but we get a lot of

19   financial abuse these days.

20        THE COURT:  And you've been with Contra Costa now for?

21        PROSPECTIVE JUROR CRAWFORD:  Five years.

22        THE COURT:  Five years.  Okay.  What did you do before

23   that?

24        PROSPECTIVE JUROR CRAWFORD:  I was a child welfare

25   social worker.
```

1   **THE COURT:**  Now, you did serve, you tell us, on a jury

2   in Solano Superior Court.

3   **PROSPECTIVE JUROR CRAWFORD:**  Yes, sir.

4   **THE COURT:**  Anything about having served as a juror

5   that you think would affect your ability to be a fair and

6   impartial juror?

7   **PROSPECTIVE JUROR CRAWFORD:**  No.

8   **THE COURT:**  You heard a great deal about privacy, who

9   are participants in this case.  Do you think you could be a

10   fair and impartial juror here?

11   **PROSPECTIVE JUROR CRAWFORD:**  Yes, sir.

12   **THE COURT:**  Okay.  Very good.  If you could pass

13   the -- oh, and I should say, how about the 8:30 to

14   1:30 schedule, roughly three weeks, hopefully maybe a little

15   less?  Can you do that?

16   **PROSPECTIVE JUROR CRAWFORD:**  Yep, works for me.

17   **THE COURT:**  And you're coming in from Concord, which

18   is a bit of a distance, but certainly a lot of people commute

19   in and out of the City, so...

20   **PROSPECTIVE JUROR CRAWFORD:**  Right.

21   **THE COURT:**  Good.  Okay.  Thank you.

22   If you could pass the microphone down to Ms. Pelehach.

23   Ms. Pelehach, you work for Tesla?

24   **PROSPECTIVE JUROR PELEHACH:**  I do.

25   **THE COURT:**  And your work is a supply chain.

1          **PROSPECTIVE JUROR PELEHACH:**  Yes.  I work in

2    procurement and contracts.

3          **THE COURT:**  Procurement.  Are you in the Fremont --

4    where is --

5          **PROSPECTIVE JUROR PELEHACH:**  Palo Alto.

6          **THE COURT:**  Palo Alto.

7       Okay.  Do you know any of the people that were introduced?

8          **PROSPECTIVE JUROR PELEHACH:**  I do not.

9          **THE COURT:**  And you actually live in the City?

10         **PROSPECTIVE JUROR PELEHACH:**  I do.

11         **THE COURT:**  Okay.  You have a youngster?

12         **PROSPECTIVE JUROR PELEHACH:**  I have three.

13         **THE COURT:**  Three.  Okay.  But most immediately for

14   purposes of being here, you've got a nine-month old, you tell

15   us.

16         **PROSPECTIVE JUROR PELEHACH:**  I do.

17         **THE COURT:**  We will take breaks.  On the 8:30 to 1:30,

18   as I indicated, we usually take at least two about 15-minute

19   breaks.  Try to keep them -- we try to keep them under control

20   because the breaks can spread and then we, you know, lose time.

21   But could you -- could that work for you?

22         **PROSPECTIVE JUROR PELEHACH:**  If there are -- if

23   there's a known break that I could go to the mother's room,

24   that would be helpful.  15 minutes is pretty short, but it

25   could be workable, yeah.

 1          **THE COURT:**  I appreciate your willingness to do that.

 2      Now, you have a spouse that is -- am I reading this

 3 right? -- works for Google?

 4          **PROSPECTIVE JUROR PELEHACH:**  Correct.

 5          **THE COURT:**  Okay.  How long has your spouse worked for

 6 Google?

 7          **PROSPECTIVE JUROR PELEHACH:**  He's been there -- he

 8 just passed eight years.

 9          **THE COURT:**  Eight years.  I suspect you have a view

10 about Google as a result.

11          **PROSPECTIVE JUROR PELEHACH:**  I do, yes.

12          **THE COURT:**  Could you be a fair and impartial juror in

13 a case involving Google?

14          **PROSPECTIVE JUROR PELEHACH:**  I could.

15          **THE COURT:**  You wouldn't favor them just because your

16 spouse is employed?

17          **PROSPECTIVE JUROR PELEHACH:**  No.

18          **THE COURT:**  Or disfavor them --

19          **PROSPECTIVE JUROR PELEHACH:**  No.

20          **THE COURT:**  -- because your spouse is employed?

21      And just so it's -- so I'm clear on it, what does your

22 spouse do?

23          **PROSPECTIVE JUROR PELEHACH:**  Right now he works on

24 Android strategy.

25          **THE COURT:**  Okay.

 1          **PROSPECTIVE JUROR PELEHACH:**  He's previously worked on

 2    hardware strategy and operations.

 3          **THE COURT:**  And where is his place of work?

 4          **PROSPECTIVE JUROR PELEHACH:**  In the Embarcadero.

 5          **THE COURT:**  Okay.  He works -- he physically is there?

 6    He's not a virtual worker?

 7          **PROSPECTIVE JUROR PELEHACH:**  Correct.

 8          **THE COURT:**  Okay.

 9          **PROSPECTIVE JUROR PELEHACH:**  Hybrid.

10          **THE COURT:**  Hybrid.  Okay.

11        Anything that comes to mind from our discussions with your

12    fellow potential jurors?  Anything that you thought, "I need to

13    tell the Court that"?

14          **PROSPECTIVE JUROR PELEHACH:**  No.

15          **THE COURT:**  Okay.  Good.

16          **PROSPECTIVE JUROR PELEHACH:**  Sorry.  One scheduling

17    question on the 8:30 block.

18          **THE COURT:**  Yes.

19          **PROSPECTIVE JUROR PELEHACH:**  Okay.  My husband will be

20    traveling out of the country on Monday, the 25th, so I'm

21    responsible for two drop-offs in separate locations in the

22    City.  I think I can be to the parking garage by 8:35.  So if

23    there's a chance that it could start at 8:45 where I'm coming

24    in hot, I could make it work.

25          **THE COURT:**  And this is one day?

1    **PROSPECTIVE JUROR PELEHACH:**  One day.

2        **THE COURT:**  And which day was that again?

3    **PROSPECTIVE JUROR PELEHACH:**  Monday, 8/25, he'll be

4    traveling.

5        **THE COURT:**  Okay.  Well, I appreciate your precise

6    calculation that you can maybe be here at 8:35.  I think

7    that -- that aspect of it wouldn't be a problem.

8    **PROSPECTIVE JUROR PELEHACH:**  Okay.

9        **THE COURT:**  We could move it a little bit.

10       Thank you.  If you could, then, pass the microphone down

11   to Ms. Castillo-Valverde.

12       Welcome.  You indicated to us on your questionnaire that

13   you work for Kaiser Permanente.

14   **PROSPECTIVE JUROR CASTILLO-VALVERDE:**  Yes.

15       **THE COURT:**  And you're a systems manager healthcare.

16   **PROSPECTIVE JUROR CASTILLO-VALVERDE:**  Yes.

17       **THE COURT:**  And you're a remote worker?

18   **PROSPECTIVE JUROR CASTILLO-VALVERDE:**  Yes.

19       **THE COURT:**  Okay.  Is that a hundred percent of the

20   time, or do you sometimes go into the Kaiser facilities?

21   **PROSPECTIVE JUROR CASTILLO-VALVERDE:**  It's a hundred

22   percent remote.

23       **THE COURT:**  Okay.  You also advised us that you've got

24   primary care responsibilities for a 15-year-old and you are

25   driving -- picking up your 15-year-old Monday through Friday.

1    The 8:30 to 1:30 schedule, how would that work for you?

2            PROSPECTIVE JUROR CASTILLO-VALVERDE:  I don't have a

3    problem in the morning.  I did find transportation for him in

4    the morning.  In the afternoon, I have to pick him up.  But he

5    goes to school in Concord, so I think I can make it by 3:30 if

6    we leave here at 1:30.

7            THE COURT:  I hope so.

8            PROSPECTIVE JUROR CASTILLO-VALVERDE:  I hope so.

9    Otherwise, he's taking Uber.

10           THE COURT:  Good.  Okay.  That's very helpful.

11       Anything that you heard in our discussions about the

12   parties here, about the issues, anything that caused you any

13   concern about your ability to be a fair and impartial juror?

14           PROSPECTIVE JUROR CASTILLO-VALVERDE:  No.

15           THE COURT:  And if you could pass the microphone to --

16   is it Mr. Tuyen?  Tuyen?

17       Am I pronouncing your name right, Mr. Tuyen?

18           PROSPECTIVE JUROR TUYEN:  Tuyen, yes.

19           THE COURT:  Okay.  And you are a scientist?

20           PROSPECTIVE JUROR TUYEN:  Yes.

21           THE COURT:  And you work for Oxford Nanopore

22   Technologies; is that right?

23           PROSPECTIVE JUROR TUYEN:  Oxford Nanopore

24   Technologies.

25           THE COURT:  Okay.  And what do they do?

 1          **PROSPECTIVE JUROR TUYEN:**  Our company sells DNA

 2    sequencing instruments.

 3          **THE COURT:**  And your particular work as a scientist,

 4    what does that entail?

 5          **PROSPECTIVE JUROR TUYEN:**  Oh.  I'm someone that works

 6    in the lab.  I'll take customer samples and I'll put them on

 7    the sequencer.

 8          **THE COURT:**  I see.  I see.  To do the DNA testing?

 9          **PROSPECTIVE JUROR TUYEN:**  Yes, for whatever

10    application that they're interested in, whatever they want to

11    investigate.

12          **THE COURT:**  I see.

13      The schedule that I went over, how does that impact you?

14          **PROSPECTIVE JUROR TUYEN:**  It doesn't impact me.  The

15    schedule works great.

16          **THE COURT:**  Okay.  Any -- any reasons that you can

17    think of that would make it difficult for you to be a fair and

18    impartial juror in this case?

19          **PROSPECTIVE JUROR TUYEN:**  No.

20          **THE COURT:**  All right.  Let's have some follow-up

21    from -- brief follow-up from counsel.

22          **MR. DAVID BOIES:**  I'll be very brief, Your Honor.

23      Good morning.

24      Ms. Pelehach, obviously, I want to talk a little bit about

25    you because of your feelings about Google.  Can you be a little

 1    more explicit about what you feel about Google?

 2         **PROSPECTIVE JUROR PELEHACH:**  I have generally positive

 3    feelings about Google.

 4         **MR. DAVID BOIES:**  Why is that?

 5         **PROSPECTIVE JUROR PELEHACH:**  It's been good for our

 6    family.  Very supportive during all three of my pregnancies,

 7    good healthcare for my kids.  So, yeah, generally good.

 8         **MR. DAVID BOIES:**  Now, your husband works at Google?

 9         **PROSPECTIVE JUROR PELEHACH:**  Correct.

10         **MR. DAVID BOIES:**  And as you heard from before,

11    you know, we're seeking billions of dollars from Google.

12       Now, I know you say that you will follow the judge's

13    instructions as everybody will, but is it fair to say that

14    there's going to be some influence on you that your husband is

15    working at Google?

16         **PROSPECTIVE JUROR PELEHACH:**  There may be some

17    influence, and that's a very large dollar value you're seeking,

18    but they're also a very large company.  So I do think I can

19    follow instructions and be fair.  But, yes, Google has been a

20    part of our life for a long time, and my whole family has a

21    very positive relationship with it.

22         **MR. DAVID BOIES:**  And are you at all concerned, even a

23    little bit concerned about if this jury comes back and awards

24    the plaintiffs several billions of dollars, what the effect is

25    going to be on your husband when he goes to work and they know

1    that his wife helped award billions of dollars?

2          **PROSPECTIVE JUROR PELEHACH:**  Well, I wouldn't talk

3    about it, so they wouldn't know I was on the jury.

4                        (Laughter.)

5          **PROSPECTIVE JUROR PELEHACH:**  But, I mean, maybe there

6    would be, you know, financial implications on the stock, but I

7    don't think his day-to-day would be impacted.  And we have,

8    you know, financial holdings within Google, as many people do,

9    but we are diversified.

10          **MR. DAVID BOIES:**  You hold Google stock?

11          **PROSPECTIVE JUROR PELEHACH:**  We do.

12          **MR. DAVID BOIES:**  Can I ask how much?

13          **PROSPECTIVE JUROR PELEHACH:**  I don't know.

14          **MR. DAVID BOIES:**  What?

15          **PROSPECTIVE JUROR PELEHACH:**  I don't know.

16          **MR. DAVID BOIES:**  You don't know.  But is it a

17    significant amount of stock?

18          **PROSPECTIVE JUROR PELEHACH:**  A significant amount,

19    yes.

20          **MR. DAVID BOIES:**  Thank you very much.

21          **PROSPECTIVE JUROR PELEHACH:**  Yep.

22          **MR. DAVID BOIES:**  I don't have any other questions,

23    Your Honor.

24          **THE COURT:**  All right.  Any follow-up from

25    Mr. Attanasio?

1           **MR. ATTANASIO:**  And I'm permitted to ask all five of

2    the new jurors at once?

3           **THE COURT:**  Yes.

4           **MR. ATTANASIO:**  Thank you, Your Honor.

5       This is a question just for our new guests:  Mr. Rajendra,

6    Mr. Crawford, Ms. Pelehach, Ms. Castillo-Valverde, and

7    Mr. Tuyen.

8       Have any of you ever deliberately avoided using a

9    company's product or service because of its reputation for

10   handling data or privacy issues?

11                        (No response.)

12          **MR. ATTANASIO:**  Okay.  Thank you all.

13      Mr. Crawford, sir, I see -- I saw on your questionnaire

14   you are a class member, I believe, in an EEOC complaint.  Is

15   that right?  What's your role in that case?  Are you a named

16   plaintiff?  Are you part of a class, or do you -- what's your

17   role?

18          **PROSPECTIVE JUROR CRAWFORD:**  So I'm a member of it.

19   It's been going on since 2008 and we're still in court.

20          **MR. ATTANASIO:**  And just in general terms, what's the

21   case about, if you don't mind?

22          **PROSPECTIVE JUROR CRAWFORD:**  Discrimination.

23          **MR. ATTANASIO:**  On the job?

24          **PROSPECTIVE JUROR CRAWFORD:**  Yes.

25          **MR. ATTANASIO:**  At Contra Costa County or somewhere

 1    else?

 2            PROSPECTIVE JUROR CRAWFORD:  No.  This is U.S. Postal.

 3            MR. ATTANASIO:  U.S. Postal?

 4            PROSPECTIVE JUROR CRAWFORD:  Mm-hmm.

 5            MR. ATTANASIO:  Anything about that experience you

 6    think influence how you would approach this case?

 7            PROSPECTIVE JUROR CRAWFORD:  Not at all.

 8            MR. ATTANASIO:  You feel like you've been treated

 9    fairly so far in that other piece of litigation, although

10    there's not a decision yet?

11            PROSPECTIVE JUROR CRAWFORD:  Not a decision, so I've

12    moved on from that.

13            MR. ATTANASIO:  You've moved on?

14            PROSPECTIVE JUROR CRAWFORD:  Mm-hmm.

15            MR. ATTANASIO:  All right.  Thank you.

16        Ms. Pelehach, if I could, is the Google stock you

17    mentioned something that's awarded to your husband as part of

18    his job?

19            PROSPECTIVE JUROR PELEHACH:  Correct.

20            MR. ATTANASIO:  Is that in his name in terms of stock

21    options, for instance?

22            PROSPECTIVE JUROR PELEHACH:  It's in his name, yes,

23    but we have joint finances.

24            MR. ATTANASIO:  Excuse me?

25            PROSPECTIVE JUROR PELEHACH:  We have joint finances.

1      **MR. ATTANASIO:**  Understood.  Okay.  Thank you for that

2   clarification.

3      If we could come to Ms. Castillo Valverde, please.

4      You had -- you had expressed some fairly strong feelings

5   about the importance of privacy in your questionnaire.

6      **PROSPECTIVE JUROR CASTILLO-VALVERDE:**  Correct.

7      **MR. ATTANASIO:**  Could you explain how you think about

8   it?

9      **PROSPECTIVE JUROR CASTILLO-VALVERDE:**  Just from my

10   experiences with my personal data being compromised.

11      Also, just when I use the Google search engine, sometimes

12   I've noticed that I get advertisement in my personal email.  I

13   do use it at work as well, but our emails are very secured so I

14   don't see anything coming through.

15      But it's actually kind of funny.  My girlfriends and I

16   have this joke that when we want our boyfriends or spouses to

17   buy something, we just say it into Google and we start getting

18   advertisements in our emails or their emails.  So I do have

19   some concerns about privacy in data.

20      **MR. ATTANASIO:**  Does it work?  Do you get the

21   presents?

22      **PROSPECTIVE JUROR CASTILLO-VALVERDE:**  Pretty much,

23   yeah.

24                     (Laughter.)

25      **MR. ATTANASIO:**  All right.  And you -- your work, of

1    course, involves very significant rules --

2              PROSPECTIVE JUROR CASTILLO-VALVERDE:  Yes.

3        MR. ATTANASIO:  -- and laws on privacy under HIPAA; is

4    that right?

5              PROSPECTIVE JUROR CASTILLO-VALVERDE:  Yes.

6          THE COURT:  Because you work at Kaiser?

7              PROSPECTIVE JUROR CASTILLO-VALVERDE:  Yes.  I have

8    access to national member records and data, so, yeah.

9        MR. ATTANASIO:  So you -- as a person through your

10   professional experience, you have sort of a high alert for

11   privacy issues?

12             PROSPECTIVE JUROR CASTILLO-VALVERDE:  Oh, absolutely.

13       MR. ATTANASIO:  All right.  Do you hold any of that --

14   does any of that impact how you feel about Google, positive or

15   negative?

16             PROSPECTIVE JUROR CASTILLO-VALVERDE:  No.  I have a

17   friend that works for Google, and he has very high moral

18   ethical standards.  And it doesn't really affect me either way,

19   not positive or negative.

20         MR. ATTANASIO:  Okay.  And the friend with high oral

21   and -- moral and ethical standards, he's worked there a few

22   years?

23             PROSPECTIVE JUROR CASTILLO-VALVERDE:  I think he's

24   worked there for about 20 years.

25         MR. ATTANASIO:  20 years?

 1          **PROSPECTIVE JUROR CASTILLO-VALVERDE:**  Yeah.

 2          **MR. ATTANASIO:**  Okay.  Thank you.  I appreciate it.

 3      If you could go right behind you, please, to...

 4      Could you explain a little more your specialty at Denali,

 5  Mr. Rajendra?  Do you focus on a particular -- I heard you say

 6  large molecule.  Are you focused on a particular disease, like

 7  Alzheimer's or cancer, or something like that, in your work?

 8          **PROSPECTIVE JUROR RAJENDRA:**  Sure.  I can provide some

 9  background.

10      So Denali Therapeutics works on diseases that involve

11  getting proteins across the blood-brain barrier and diseases

12  that are affected by, you know, symptoms that affect the brain.

13      I am part of a function called chemistry manufacturing

14  controls.  My team is responsible for generating cell lines and

15  upstream processes that are ultimately used for generating the

16  product that goes into clinical trials and, hopefully, to the

17  market.

18          **MR. ATTANASIO:**  Okay.  In your questionnaire, you

19  expressed some concern, in particular, about the way consents

20  are obtained by technology companies.  Is that right?

21          **PROSPECTIVE JUROR RAJENDRA:**  That's correct.

22          **MR. ATTANASIO:**  And could you explain in your own

23  words what you think about that?

24          **PROSPECTIVE JUROR RAJENDRA:**  Yeah.  I mean, this is

25  not specific to Google but in general.  Right?  We all sign off

1  on agreements as we sign up for apps and things like that, but

2  as a -- as a general public, I don't think any of us really

3  understand what we're signing off on.  So that's a general

4  concern.

5        MR. ATTANASIO:  You mean the general human experience

6  of seeing pages and pages of consent forms that we scroll

7  through and then hit "I agree"?  Is that what you're talking

8  about?

9        PROSPECTIVE JUROR RAJENDRA:  Yep.

10       MR. ATTANASIO:  All right.  And let me ask you this:

11  Do you think that those agreements are binding if people sign

12  up and then use the services for years and years and get the

13  benefits from the technology and the conveniences that those

14  companies provide us?

15       PROSPECTIVE JUROR RAJENDRA:  I think it's the lack of

16  clarity as an everyday consumer in terms of, yes, you're

17  getting benefits from using technologies, but what you're

18  signing up for is not clear -- right? -- as an average

19  consumer.

20       MR. ATTANASIO:  Okay.  And if this case involves some

21  analysis of consents and agreements, would that cause you to be

22  skeptical of Google's position?

23       PROSPECTIVE JUROR RAJENDRA:  I don't think so.  I

24  would like to believe I will base my decisions on facts.

25       MR. ATTANASIO:  Okay.  You don't think Google would

 1   start behind when we start talking about consents and approvals

 2   because of your concern?

 3        **PROSPECTIVE JUROR RAJENDRA:**  I don't think so.

 4   I think it's a more regulation question and concern that I

 5   have.  Right?

 6        **MR. ATTANASIO:**  Did you say "regulation"?

 7        **PROSPECTIVE JUROR RAJENDRA:**  Yes.

 8        **MR. ATTANASIO:**  By the Government, you mean?

 9        **PROSPECTIVE JUROR RAJENDRA:**  Yeah.

10        **MR. ATTANASIO:**  Okay.  Thank you very much.  I

11   appreciate it.

12        If we could go to Mr. Tuyen.

13        In your questionnaire, Mr. Tuyen, you expressed some, I'd

14   call it, wariness about your private information when it comes

15   to -- when it comes to Google; is that right?

16        **PROSPECTIVE JUROR TUYEN:**  Yes.

17        **MR. ATTANASIO:**  All right.  What do you mean by that?

18        **PROSPECTIVE JUROR TUYEN:**  What I wrote in the

19   questionnaire, one time I found that while browsing through my

20   stored privacy data from Google, I came across some audio

21   recordings of me that I don't remember taking.  When I listened

22   to it, it was just some -- some -- I think I was just talking

23   to myself at the time, nothing -- it was nonsensical.  But ever

24   since then, I've been kind of wary about Google, like,

25   recording myself when I'm not aware.

1          MR. ATTANASIO:  Okay.  Well, I've -- you said it was

2     nonsensical, almost like background noise.  Is that what it

3     sounded like?

4          PROSPECTIVE JUROR TUYEN:  I think I was just mumbling

5     to myself.

6          MR. ATTANASIO:  I've recorded myself mumbling to

7     myself before.  Do you think it was that kind of thing?

8          PROSPECTIVE JUROR TUYEN:  Maybe.  I really don't

9     recall.

10         MR. ATTANASIO:  All right.  Does that experience or

11    anything else in your thinking about Google give you a negative

12    perception of Google?

13         PROSPECTIVE JUROR TUYEN:  No.  Not specifically

14    towards Google, no.

15         MR. ATTANASIO:  Okay.  Do you use Google products?

16         PROSPECTIVE JUROR TUYEN:  Yes.  I'm a big user of

17    Google products.

18         MR. ATTANASIO:  A big user?

19         PROSPECTIVE JUROR TUYEN:  Yeah.  I grew up using

20    Google Mail and such.  So since then, I've just integrated

21    myself in the ecosystem.  I didn't want to change providers.

22         MR. ATTANASIO:  You use Gmail?

23         PROSPECTIVE JUROR TUYEN:  Gmail, Google Maps,

24    Calendar, Drive, Google Search, yes.

25         MR. ATTANASIO:  Do you think you could be fair to both

1   sides in this case, plaintiffs and Google?

2        **PROSPECTIVE JUROR TUYEN:**  Absolutely.

3        **MR. ATTANASIO:**  Thank you, Mr. Tuyen.  I appreciate

4   it.

5        That's all I have, Your Honor.  Thank you.

6        **THE COURT:**  Very well.  Let me see the counsel to the

7   side.

8        (The following proceedings were heard at the sidebar:)

9        **THE COURT:**  I'm going to let Ms. Pelehach go.  It's a

10  conflict.  We let somebody go before.  And she owns stock.

11       **MR. CARMODY:**  Jason Harts.

12       **THE COURT:**  End of story for me.

13       The other ones, any problems?

14       **MR. CARMODY:**  No.

15       **MR. ATTANASIO:**  No, Your Honor.

16       **THE COURT:**  Okay.  We'll replace Ms. Pelehach and do

17  the -- almost there.

18       (The following proceedings were heard in open court:)

19       **THE COURT:**  We're getting closer here.

20       Ms. Pelehach, we will excuse you.

21       And I will ask Ms. Hom to call a juror to replace

22  Ms. Pelehach.

23       **THE COURTROOM DEPUTY:**  So the next person would be

24  Casey Parker.

25       **THE COURT:**  Mr. Parker, welcome.

1      You tell us you're from a place called Cazadero, and I

2   have to admit, I'm not sure I know exactly where that is.

3           **PROSPECTIVE JUROR PARKER:**  It's about two hours north.

4           **THE COURT:**  Two hours north.

5      Okay.  What is your sense of your ability to get here on

6   a -- for a 8:30 to 1:30 schedule?

7           **PROSPECTIVE JUROR PARKER:**  Yeah.  I mean, it's early,

8   but, yeah, doable.

9           **THE COURT:**  Doable?  Okay.  I appreciate your

10  willingness to do that.

11     So you are looking for work at this point?

12          **PROSPECTIVE JUROR PARKER:**  Yes.

13          **THE COURT:**  What area -- what kind of work are you

14  looking for?

15          **PROSPECTIVE JUROR PARKER:**  I'm not sure.  Just stuff

16  that's around me basically.

17          **THE COURT:**  Okay.  And then for occupation, you tell

18  us you're a poker player.  Do you do that as a -- on a regular

19  basis or recreationally or what?

20          **PROSPECTIVE JUROR PARKER:**  Yeah, I used to.

21          **THE COURT:**  But you don't do that now?

22          **PROSPECTIVE JUROR PARKER:**  No, not really.

23          **THE COURT:**  Okay.  Now, there was some discussion, as

24  you know, about witnesses.  There's a witness list.  If you

25  could take a look at it.  Do you recognize any of the names on

 1    there, or do you think you recognize them?

 2         **PROSPECTIVE JUROR PARKER:**  I don't recognize any.

 3         **THE COURT:**  The various people that were introduced,

 4    counsel for each side and the court personnel, do you know or

 5    think you know any of those people?

 6         **PROSPECTIVE JUROR PARKER:**  No.

 7         **THE COURT:**  Okay.  Any -- was there anything that was

 8    discussed that you thought to yourself "I would need to raise

 9    my hand and tell the Court something"?

10         **PROSPECTIVE JUROR PARKER:**  No, nothing came to mind.

11         **THE COURT:**  Do you think you could be a fair and

12    reasonable juror in this case?  You've heard a lot of

13    discussion about who the parties are and the nature of this

14    case.  Do you think you could be fair and impartial?

15         **PROSPECTIVE JUROR PARKER:**  Yes.

16         **THE COURT:**  Any reason why you think you'd have a

17    problem sitting on this jury?

18         **PROSPECTIVE JUROR PARKER:**  No.  I can't think of

19    anything.

20         **THE COURT:**  Okay.  Mr. Boies?

21         **MR. DAVID BOIES:**  Thank you, Your Honor.

22         Just to follow up, a two-hour drive, I don't know how

23    early you get up in the morning generally, but is that going to

24    be practical for you?

25         **PROSPECTIVE JUROR PARKER:**  I mean, I'd rather not do

1    it, but I can do it, yeah.

2            **MR. DAVID BOIES:**  Okay.  Thank you.

3            **MR. ATTANASIO:**  Good morning, Mr. Parker.

4            **PROSPECTIVE JUROR PARKER:**  Good morning.

5            **MR. ATTANASIO:**  Mike Attanasio.  I represent Google.

6        What's your favorite poker game?

7            **PROSPECTIVE JUROR PARKER:**  Ace Ace Jack Ten.

8            **MR. ATTANASIO:**  Okay.  Thank you.

9        Do you use Google products?

10           **PROSPECTIVE JUROR PARKER:**  Yes.

11           **MR. ATTANASIO:**  Google Search.

12           **PROSPECTIVE JUROR PARKER:**  Yeah.  Search, email, Maps.

13           **MR. ATTANASIO:**  Keep the mic up.

14           **PROSPECTIVE JUROR PARKER:**  Oh, sorry.  Search, email,

15    and Maps, yeah.

16           **MR. ATTANASIO:**  Do you have feelings about Google one

17    way or the other?

18           **PROSPECTIVE JUROR PARKER:**  I think it's helpful, yeah.

19           **MR. ATTANASIO:**  You like their products?

20           **PROSPECTIVE JUROR PARKER:**  Yeah.

21           **MR. ATTANASIO:**  Thank you very much, sir.

22           **PROSPECTIVE JUROR PARKER:**  Thank you.

23           **THE COURT:**  Dr. Lewis, R.J. told me you had some

24    question.

25           **PROSPECTIVE JUROR LEWIS:**  So I tried to flesh this out

1  earlier -- I'm sorry.

2     I tried to flesh this out earlier when I was asking you

3  about, you know, decisions and damages.  And so the first

4  series of questions seems binary, yes-no.

5     Then when you get to damages, I have -- I'm trying to be

6  kind here -- significant thoughts about that as a physician

7  who's been sued falsely.  And it wasn't successful.  But I've

8  got strong feelings about damages, and so I could see myself

9  deciding for Mr. Boies and his team and just saying, "I'm going

10  to award you nothing because I don't think you deserve

11  anything."

12          **THE COURT:**  Okay.

13          **PROSPECTIVE JUROR LEWIS:**  And that's just a

14  deep-rooted feeling.

15          **THE COURT:**  Okay.  So then I'll redouble the

16  question -- questions in a different way.

17     You will get some instructions, as I indicated, from me

18  about how a jury is to go about -- if a jury has found

19  liability, then moving to damages, how they should address that

20  question.

21     And I want to make sure I understand what your comment is.

22  If you're -- is what you're saying that you wouldn't be

23  amenable to engaging in that process because you have strong

24  feelings about whether or not damages should be awarded?  Or --

25  let me start with that.  Is that what you're talking about?

 1              **PROSPECTIVE JUROR LEWIS:**  That's the -- that's the

 2    root of it.  So I think that --

 3              **THE COURT:**  Pardon me?

 4              **PROSPECTIVE JUROR LEWIS:**  That's the root of my

 5    feelings.

 6              **THE COURT:**  All right.

 7              **PROSPECTIVE JUROR LEWIS:**  Yeah.  It's your decision to

 8    make, but I'm just going to say up-front, I've got very strong

 9    feelings about that.

10              **THE COURT:**  Okay.  Well, let me afford the counsel an

11    opportunity to follow up on that particular issue if you want

12    to.

13              **MR. DAVID BOIES:**  Your Honor, I think he's been very

14    candid.  I don't have any further questions.

15              **MR. ATTANASIO:**  May I inquire?

16              **THE COURT:**  Yeah, go ahead.  Briefly.

17              **MR. ATTANASIO:**  Understood.

18         So, Dr. Lewis, the damages aspect of the case is ahead of

19    us.  You'll hear from witnesses.  You'll see documents.  You'll

20    hear from expert witnesses; economists, for instance.  You'll

21    have a whole collection of information, along with your fellow

22    jurors, to evaluate and be analytical about.  That will be your

23    job.

24         And whatever feeling you might have from your case as a

25    doctor where you were sued, you leave that outside and then you

1    follow Judge Seeborg's instructions.

2        When you have the evidence -- instead of thinking about it

3    now in some cloud, when you have the evidence in front of you

4    and you have Judge Seeborg instructing you, would you be able

5    to analyze that and reach a fair verdict with your fellow

6    jurors?

7        PROSPECTIVE JUROR LEWIS:  So analyzing really fuzzy,

8    made-up numbers that are steered to both parties' favor, I'm

9    going to tell you, I'll get analytical, but it's going to be

10   analytical in one way.

11       MR. ATTANASIO:  Do you think with Judge Seeborg's

12   instructions that you could render a fair verdict, despite your

13   own experience on damages?

14       PROSPECTIVE JUROR LEWIS:  So I can see potential

15   conflict between myself and people who have not been in my

16   position.

17       MR. ATTANASIO:  Well, many people sit as jurors who've

18   been sued or sued, and that's a different case.  This case is

19   this case.  And you'll only be able to deal with the evidence,

20   including on damages from experts and non-experts, documents,

21   spreadsheets, all kinds of information.  Would you be able to

22   evaluate that and reach a fair verdict?

23       PROSPECTIVE JUROR LEWIS:  So, that would be fair to

24   me, but I can see a potential roadblock between myself and

25   others.

1        **MR. ATTANASIO:**  Well, you're entitled to your opinion.

2   That's why you're a juror and that's why these other people are

3   jurors.

4        **PROSPECTIVE JUROR LEWIS:**  Right.

5        **MR. ATTANASIO:**  You would deliberate, you would do

6   your best, but the point is, you would leave any biases or

7   experiences outside except for what you hear in this courtroom.

8   That's really what we're asking.  Could you do that?

9        **PROSPECTIVE JUROR LEWIS:**  Sure.

10       **MR. ATTANASIO:**  Thank you, sir.  I appreciate it.

11       **THE COURT:**  I'm going to excuse Dr. Lewis.

12       And I'm going to ask Ms. Hom to call someone to replace

13   him.

14       **THE COURTROOM DEPUTY:**  The next person is Fatemeh

15   Shayesteh.

16       **MR. ATTANASIO:**  Your Honor, may we approach briefly?

17       **THE COURT:**  Yes.

18       (Sidebar conference heard but not reported.)

19       **THE COURT:**  Very well.  Ms. -- and let me make sure I

20   get the name correct -- Shayesteh?

21       **PROSPECTIVE JUROR SHAYESTEH:**  Yes.

22       **THE COURT:**  Is that close?  Good.  Thank you.

23   Welcome.

24       So you tell us you are a researcher for a company called

25   Esri?

1          **PROSPECTIVE JUROR SHAYESTEH:**  Yes.

2          **THE COURT:**  And what does Esri do?

3          **PROSPECTIVE JUROR SHAYESTEH:**  It creates mapping

4    software.

5          **THE COURT:**  Mapping software?

6          **PROSPECTIVE JUROR SHAYESTEH:**  Yes.

7          **THE COURT:**  I see.

8      And you have -- have you served on a jury before?

9          **PROSPECTIVE JUROR SHAYESTEH:**  No.  It's my first time

10   here.

11         **THE COURT:**  The list of witnesses that is on the

12   chair, I hope, do you recognize any of those individuals?

13         **PROSPECTIVE JUROR SHAYESTEH:**  No, I don't.

14         **THE COURT:**  And you heard us introduce the court staff

15   and counsel for each of the parties.  Do you know or think you

16   know any of those people?

17         **PROSPECTIVE JUROR SHAYESTEH:**  I don't.

18         **THE COURT:**  Okay.  You heard a lot of discussion about

19   the parties in this case and about some of the issues that are

20   going to be presented.  Did any of the -- any of what you heard

21   cause you to think you would have any difficulty being a fair

22   and impartial juror in this case?

23         **PROSPECTIVE JUROR SHAYESTEH:**  No.

24         **THE COURT:**  Now, the schedule here, as you know, is

25   8:30 to 1:30 after today.  Do you think you can accommodate

1   that schedule?

2           **PROSPECTIVE JUROR SHAYESTEH:** Yes, I can.

3           **THE COURT:** Okay. Anything that you heard in the

4   earlier discussion that you thought to yourself, "You know, I

5   need to tell the judge -- if I get called up into the box, I

6   need to tell him this"? Anything like that come to mind?

7           **PROSPECTIVE JUROR SHAYESTEH:** No.

8           **THE COURT:** Okay.

9       All right. Mr. Boies, any questions?

10          **MR. DAVID BOIES:** I don't have any additional

11  questions, Your Honor.

12          **THE COURT:** Okay. Mr. Attanasio?

13          **MR. ATTANASIO:** May I?

14          **THE COURT:** Go ahead.

15          **MR. ATTANASIO:** Thank you.

16      Good morning, Ms. Shayesteh.

17      Your work at Esri -- that's E-s-r-i -- is that right?

18          **PROSPECTIVE JUROR SHAYESTEH:** Yes.

19          **MR. ATTANASIO:** You work as a researcher there?

20          **PROSPECTIVE JUROR SHAYESTEH:** Yes.

21          **MR. ATTANASIO:** And what do you research? What's your

22  day-to-day work entail?

23          **PROSPECTIVE JUROR SHAYESTEH:** Customer experience

24  research, and so I'm talking with customers and trying to

25  understand their perspectives and pain points specifically in

 1  using our products.

 2      MR. ATTANASIO:  So what customers are enjoying, what

 3  they may want to see improved, that sort of thing?

 4      PROSPECTIVE JUROR SHAYESTEH:  Yes.

 5      MR. ATTANASIO:  All right.  In your questionnaire, you

 6  mentioned that your dissertation for your doctorate focused on

 7  social media data.  Is that right?

 8      PROSPECTIVE JUROR SHAYESTEH:  Yes.

 9      MR. ATTANASIO:  Could you just elaborate on that a

10  little bit?

11      PROSPECTIVE JUROR SHAYESTEH:  Actually, my

12  dissertation didn't focus on data privacy per se, but it was

13  about how different people use social media.  And specifically,

14  I was working on women in Iran, on how they use social media

15  for social movements and women's movements.

16      MR. ATTANASIO:  Okay.  So how women in Iran, under a

17  repressive regime --

18      PROSPECTIVE JUROR SHAYESTEH:  Yes.

19      MR. ATTANASIO:  -- how they communicate and how they

20  connect?

21      PROSPECTIVE JUROR SHAYESTEH:  Yes.

22      MR. ATTANASIO:  Okay.  In your questionnaire, you

23  mentioned that even between large companies, the policies may

24  not be the same for consumer privacy.  Could you share with me

25  what you had in mind with that answer?

1      **PROSPECTIVE JUROR SHAYESTEH:**  So I know, like, there

2   could be some differences between different companies in how

3   they decide to -- how to pursue different kinds of data and

4   use -- or use them for different purposes, like marketing and

5   all of that.  So depending on their, I guess, ideology and

6   different kinds of thinking processes, it could affect how they

7   take care of data and customers' data.

8      So in the past, we have heard that some social media

9   companies abuse some users' data and not so much from other

10  companies, so...

11     **MR. ATTANASIO:**  Okay.  Do you have a feeling about

12  Google in that hierarchy in terms of where Google would fit in

13  your mind?

14     **PROSPECTIVE JUROR SHAYESTEH:**  Not really.  But at

15  least, I mean, I know that some social media companies, I've

16  heard their names and -- in news.  I know that they have been

17  involved in some different cases.

18     **MR. ATTANASIO:**  So when you say "social media

19  companies," are you more focused on companies like Meta or

20  Instagram --

21     **PROSPECTIVE JUROR SHAYESTEH:**  Yes.

22     **MR. ATTANASIO:**  -- things like that?

23     **PROSPECTIVE JUROR SHAYESTEH:**  Yes.

24     **MR. ATTANASIO:**  Okay.  Do you feel fair about Google?

25  You could give us a fair trial and give plaintiffs a fair

1  trial?

2          **PROSPECTIVE JUROR SHAYESTEH:**  I'd try.

3          **MR. ATTANASIO:**  That's all we can ask.  Thank you.

4      That's all.

5          **THE COURT:**  Thank you.

6      Other than the challenges that you've already recorded,

7  pass for cause?

8          **MR. DAVID BOIES:**  No, Your Honor.

9          **THE COURT:**  Do you pass for cause?

10         **MR. DAVID BOIES:**  Yes, yes.

11         **THE COURT:**  Yes?

12         **MR. ATTANASIO:**  Yes, Your Honor.

13         **THE COURT:**  All right.  Members of the prospective

14  jury, now that we have completed our questioning of prospective

15  jurors, the law permits each side to excuse some jurors from

16  this case.  When prospective jurors are excused in this

17  process, it's not because of any personal dislike or distrust,

18  but in order to get a final jury panel that is impartial and

19  that has the kind of balance that the parties feels appropriate

20  in this case.

21      If you happen to be one of those who's excused, please do

22  not consider it any reflection upon you or the quality of your

23  service as a juror.  For example, a person may be challenged

24  and excused because one side or the other believes from the

25  juror's occupation, his or her point of view, that it's duly

1  represented amongst those occupying the jury box, so we'll

2  excuse that juror.

3      The procedure whereby the members of the jury are chosen

4  is part of our system of justice, and it has evolved with the

5  purpose of fairness to both sides.

6      You have done your full duty by your presence and your

7  readiness to serve if called.

8      Now, while the attorneys are considering this process,

9  please, for those of you, 14 of you, stay where you are but

10 feel free to stand, to stretch.

11     And, by the way, those of you who ultimately get chosen

12 for the jury, I tell the jurors they are -- they're the bosses.

13 They can get up and stretch and move around any time they want

14 and we all know that may happen.  So I want you to be

15 comfortable.

16     So -- but if you could sort of stay in the jury box while

17 they're doing their work.  Then what's going to happen is

18 Ms. Hom will ask you all to go back into the audience, and she

19 will call forward the eight people who will comprise our jury.

20     And we should hopefully get this all done by about 12:30

21 and then we'll take a lunch break, and then the trial will

22 begin, I'll give you some instructions, and we'll hear opening

23 arguments.

24     So with that, I'm going to leave the bench, and I'm going

25 to let the lawyers do their work; and once they've completed

 1    that, we can seat the jury and move to the next phase.  Okay.

 2                    (Recess taken at 11:58 a.m.)

 3                 (Proceedings resumed at 12:22 p.m.)

 4        (Proceedings were heard in the presence of the prospective

 5    jurors.)

 6           THE COURTROOM DEPUTY:  Remain as you are, and court

 7    will come to order.

 8           THE COURT:  Very well.  I'm going to ask Ms. Hom to

 9    call up the members of the jury.

10           THE COURTROOM DEPUTY:  So Juror Number 1 is Wendy Ye.

11    Could you have a seat in Chair Number 1, please.

12        Juror Number 2 is Eric Roller.

13        Juror Number 3 is Armani Hall.

14        Juror Number 4 is Yashas Rajendra.  I'm sorry if I

15    mispronounced your name.

16        Number 5 is Billy Crawford.

17        Number 6 is Kenny Tuyen.

18           THE COURT:  You can sit in any seats that you -- there

19    are only going to be eight of you, so you can sit wherever you

20    like in the jury box.

21           THE COURTROOM DEPUTY:  Number 7 is going to be Casey

22    Parker.

23        And the last one will be Fatemeh Shayesteh, which is

24    Number 8.

25        That's it.

 1          **THE COURT:**  Okay.  I have one final question for each

 2    of you who have been chosen as members of the jury, and it's

 3    just a "yes" or "no."

 4       First of all, Ms. Ye, any reason why you could not serve

 5    on this jury?

 6          **PROSPECTIVE JUROR YE:**  I need money to -- money to pay

 7    for my rent.

 8          **THE COURT:**  You have been chosen as a juror in this

 9    case, and you're obliged to come to the trial.  Are you

10    prepared to do that?

11          **PROSPECTIVE JUROR YE:**  I guess.

12          **THE COURT:**  Well, more than guess.  I need to know.

13          **PROSPECTIVE JUROR YE:**  Well, can I say no?

14          **THE COURT:**  Well, let me tell you why I'm asking this

15    question.

16          **PROSPECTIVE JUROR YE:**  Yeah.

17          **THE COURT:**  I've presided over a lot of jury trials,

18    and once in a while, after we go through all of the questions

19    and it's asked one way or the other of prospective jurors, "Is

20    there any reason why you can't do this," once in a while you'll

21    end up having a juror get impaneled on the jury and the juror

22    then says, "Oh, I can't be here next Thursday.  I can't do

23    this."  And it creates a real serious problem.

24       So the reason I'm asking these questions -- we've gone

25    through the process of considering the issues, and I'm very

 1   attuned to the fact, for example, Ms. Ye, that, you know, there

 2   is a financial hardship to this, and I don't minimize it at

 3   all.  But jury service is an obligation of the citizens, and so

 4   this question is more you understand you need to show up every

 5   day for trial.

 6           **PROSPECTIVE JUROR YE:**  I do.

 7           **THE COURT:**  That's what the question is.

 8           **PROSPECTIVE JUROR YE:**  Yes.

 9           **THE COURT:**  You do.  And I appreciate it very much,

10   and I understand the sacrifice that you're making and I

11   appreciate it.

12       Mr. Roller, any reason why you could not serve on this

13   jury?

14           **PROSPECTIVE JUROR ROLLER:**  My biggest project of the

15   year kicks off this week.  It's for Google.  So if I'm here for

16   three weeks, they may award that project to someone else, in

17   which case I'd lose out on several months of income

18   potentially.

19           **THE COURT:**  Well, are you --

20           **PROSPECTIVE JUROR ROLLER:**  But in the same way --

21           **THE COURT:**  Are you going to be here for the trial on

22   each day that you're required to be here?

23           **PROSPECTIVE JUROR ROLLER:**  Yes.

24           **THE COURT:**  Thank you.

25       Mr. Hall?

SIDEBAR

```
 1              PROSPECTIVE JUROR HALL:  Yes.

 2          THE COURT:  Any reason?  Yes, very good.

 3      Mr. Rajendra?

 4          PROSPECTIVE JUROR RAJENDRA:  Yes.

 5          THE COURT:  Yes?

 6      Mr. Crawford?

 7          PROSPECTIVE JUROR CRAWFORD:  Yes.

 8          THE COURT:  Mr. Parker?

 9          PROSPECTIVE JUROR PARKER:  Yes.

10          THE COURT:  Mr. -- Ms. Shayesteh?  I did better the

11  first time.

12          PROSPECTIVE JUROR SHAYESTEH:  Fatemeh is fine.  And,

13  yes.

14          THE COURT:  All right.  And Mr. Tuyen?

15          PROSPECTIVE JUROR TUYEN:  Yes, I can serve.

16          THE COURT:  All right.

17          MR. DAVID BOIES:  Your Honor, may we approach?

18          THE COURT:  Yes.

19      (The following proceedings were heard at the sidebar:)

20          MR. DAVID BOIES:  Your Honor, listening to those first

21  two responses, I really think we ought to excuse those two.

22          THE COURT:  Well, I wish you guys -- I wasn't even --

23  I'm depending on you folks to kind of --

24          MR. CARMODY:  We raised it with Number 2, but not with

25  Number --
```

SIDEBAR

1    **MR. DAVID BOIES:**  And, Your Honor, sometimes, as you

2    know, they go through this and then now they're in.

3         **THE COURT:**  That's why I asked the last question.

4         **MR. DAVID BOIES:**  I think it's the right question.

5    And those two jurors are going to -- they're going to have a

6    problem.  And as you know, Ms. Castillo, who was a good juror

7    for us, I looked at her and the Chick-fil-A woman --

8         **THE COURT:**  Yeah, yeah.  Well, I don't think that was

9    Castillo.

10        **MR. DAVID BOIES:**  Whoever it was.  Neal.

11        **THE COURT:**  Correct.  Okay.

12        **MR. ATTANASIO:**  I think we went through a whole

13   process, particularly as to Number 2, to determine if he could

14   do his work around the times.  We don't know.  It's very

15   speculative he's going to lose the contract.  If anything, it

16   makes him less biased towards Google, I suppose.

17        But they both have said they can serve.  I'm less

18   concerned about -- Number 1 is self-employed.  I think she has

19   her dog grooming business.  She clearly is -- and she owns the

20   business.  So I think they both should stay on, frankly, after

21   that dialogue.

22        But Number 2, in particular, I asked him, counsel asked

23   him about the work, Your Honor asked him about the work, and he

24   said he could do it.  I took much less reticence from what he

25   just said to Your Honor just now than from Number 1.  He's made

 1   it clear he can serve.

 2          **THE COURT:**  Well, I think -- yes, go ahead.

 3          **MR. CARMODY:**  We just, respectfully, renew our

 4   hardship request for Number 2 that I had made earlier.

 5          **THE COURT:**  They're both gone.  Either they're --

 6          **MR. CARMODY:**  Yeah, I think so.  I think they both

 7   have to because I don't want to get down to this and them not

 8   showing up.

 9          **THE COURT:**  Well, we can have a verdict with six

10   but --

11          **MR. CARMODY:**  But we could lose --

12          **THE COURT:**  All right.  I'm going to let them go.

13          **MR. DAVID BOIES:**  Thank you.

14      (The following proceedings were heard in open court:)

15          **THE COURT:**  Okay.  Ms. Ye and Mr. Roller, we're going

16   to excuse you.

17      So, Ms. Hom, if you can call two more jurors into the box.

18          **MR. ATTANASIO:**  May we approach just briefly?  I

19   apologize, Your Honor.

20      (The following proceedings were heard at the sidebar:)

21          **MR. ATTANASIO:**  I apologize for the interruption.

22      I've not had it happen before where the Court has sat the

23   jury after both parties have used all of their peremptories.

24   Will we have another --

25          **THE COURT:**  I'll give you each one additional

```
 1    peremptory.

 2            MR. ATTANASIO:  Thank you, Your Honor.

 3        (The following proceedings were heard in open court:)

 4            THE COURTROOM DEPUTY:  So, Juror Maria Yermash.

 5    Ms. Yermash, could you have a seat in Chair Number 8?

 6        Kurk Radford.  Mr. Radford, could you take a seat in

 7    Number 9?  Juror Number 9.  Thank you.

 8        Marc Zaminsky.  Mr. Zaminsky, I'll have you take Number 1,

 9    Seat Number 1, right up here.

10        And then Christopher Willis.  Mr. Willis, can I have you

11    take Seat Number 2?

12            THE COURT:  Yes.

13        Ms. Yermash.

14            PROSPECTIVE JUROR YERMASH:  Yes.

15            THE COURT:  Welcome.

16        You indicated that you have some concerns about driving

17    into the City.

18            PROSPECTIVE JUROR YERMASH:  Yeah.  I don't like

19    driving into the City, that's true.

20            THE COURT:  Yes.  We can, though, make sure that you

21    can park very nearby; and, in fact, we can also explore making

22    some arrangements if you need some alternate transportation,

23    like Uber or Lyft.  We can see what we can do for you.  But can

24    that work for you?

25            PROSPECTIVE JUROR YERMASH:  Well, what I didn't
```

1    indicate in that questionnaire, actually, that -- it didn't

2    enter my mind at that time, but I do have a very close relative

3    who works in Google, actually, in legal department.  So I don't

4    know how that's going to work out.

5        **THE COURT:**  Well, would the fact -- you will be

6    instructed to apply the law that I give you to the facts you

7    find.  You'd have to base your decision entirely on the

8    evidence in this case.  Could you do that?

9        **PROSPECTIVE JUROR YERMASH:**  Well, I can try.  It's

10   going to be hard.  I mean, they are a very close-knit family,

11   and she's a very -- I mean, she's not blood relative, but we

12   are, like, more friends, like, relative friends.  So we get

13   together pretty often and we discuss all kind of things.  So, I

14   mean, I can try, but I'm just letting you know that's -- I'm in

15   this situation.

16       **THE COURT:**  So you work as a patient service

17   representative?

18       **PROSPECTIVE JUROR YERMASH:**  Yeah.  I don't work as of

19   now.  Like, right now, I don't.  I'm looking for a new

20   position.  But, yeah, for, like, three or four years, I worked

21   as a patient service representative.

22       **THE COURT:**  Okay.  You're not doing that now?

23       **PROSPECTIVE JUROR YERMASH:**  No.  My contract ended.

24       **THE COURT:**  I see.  I see.

25       You -- there was a list of witnesses.  Do you know any of

1  the witnesses?

2      **PROSPECTIVE JUROR YERMASH:**  No.

3      **THE COURT:**  I introduced counsel and court personnel.

4  Do you know any of the people that were introduced?

5      **PROSPECTIVE JUROR YERMASH:**  No.

6      **THE COURT:**  You've told us about knowing the person

7  who works at Google.  Anything else that was discussed that you

8  think would cause you any problems being a fair and impartial

9  juror in this case.

10      **PROSPECTIVE JUROR YERMASH:**  I mean, I think it can,

11  like, make a difference in my decision.  I mean, can keep me

12  from being impartial because I'm very close with that person.

13  Again, I can try follow the rules and instructions but --

14      **THE COURT:**  Well, all I can ask is that you try.

15    Do you think -- knowing yourself, do you think you would

16  be able to do that?

17      **PROSPECTIVE JUROR YERMASH:**  I can try.

18      **THE COURT:**  The case, you know, will be based on the

19  facts that come in.  And you know who the parties are, so the

20  issue will not involve your friend.  It's about these facts.

21  So do you think you can consider those and follow the law?

22      **PROSPECTIVE JUROR YERMASH:**  Yeah, I guess.  I don't

23  know.  I can try.

24      **THE COURT:**  Okay.

25    Mr. Radford?  Mr. Radford --

 1          **PROSPECTIVE JUROR RADFORD:**  Yes.

 2          **THE COURT:**  -- you're coming in from Santa Rosa.

 3      That's a long way.  Do you think you can accommodate us?

 4          **PROSPECTIVE JUROR RADFORD:**  I probably can.  It's a

 5      long trip for me.  I'm 68 years old, and I have a cat- --

 6      starting to get a cataract in my left eye, so I don't like

 7      driving in the dark.

 8          **THE COURT:**  Oh, it won't -- well --

 9          **PROSPECTIVE JUROR RADFORD:**  And so I have to take the

10      bus.  And the bus, even from there to here, is two hours and

11      25 minutes.  So that's a long day for me, for a person who has

12      a mechanical aortic valve and an aortic aneurysm right now.

13          **THE COURT:**  I think we can look into -- and perhaps

14      Ms. Hom can help me on this, but I think we can sometimes

15      arrange for Lyft or Uber transport.

16          **THE COURTROOM DEPUTY:**  Yes.  We can talk to the jury

17      person.

18          **THE COURT:**  Right.  We can get transport for you.

19          **PROSPECTIVE JUROR RADFORD:**  Okay.  Another issue I

20      have is I have a stress -- you know, I'm having trouble with my

21      left arm going numb on me, and so I have a stress test planned

22      for September the 9th, and I really can't miss that.

23          **THE COURT:**  September 9th is okay.  We'll be done by

24      then.

25      Okay.  You work as a microwave engineer for Keysight

1    Technologies?

2          PROSPECTIVE JUROR RADFORD:  I'm retired now, but

3    that's where I used to work, yes.

4          THE COURT:  And --

5          PROSPECTIVE JUROR RADFORD:  I was a presales support

6    engineer.

7          THE COURT:  Anything about what you heard that would

8    cause you any concern about being a fair and impartial juror?

9          PROSPECTIVE JUROR RADFORD:  No.  I used to use Google

10   on my job every day.  It had a better search engine than our

11   internal search engine.  But I also -- I don't like big

12   companies collecting data and then, you know, a hacker gets in

13   and hacks it, and then my credit cards get charged by somebody

14   else.  And, you know, that's happened a bunch of times to me

15   already, and I'm kind of sick of that.

16         THE COURT:  Well, even that being your attitude, do

17   you think you could follow my instructions and the law and

18   consider the facts and base your decision on the evidence that

19   you hear in this courtroom?

20         PROSPECTIVE JUROR RADFORD:  I probably could do that,

21   yeah.

22         THE COURT:  Okay.  Thank you.

23      Mr. Zaminsky?

24      Yes, Mr. Zaminsky, you're from South San Francisco and

25   retired.

 1              **PROSPECTIVE JUROR ZAMINSKY:**  Yes.

 2          **THE COURT:**  You worked at -- with the San Francisco

 3  Marin Food Bank?

 4              **PROSPECTIVE JUROR ZAMINSKY:**  Yes.

 5          **THE COURT:**  Very good organization.

 6      The Court's schedule, 8:30 to 1:30, is that something that

 7  you could accommodate?

 8              **PROSPECTIVE JUROR ZAMINSKY:**  No.

 9          **THE COURT:**  How come?

10          **PROSPECTIVE JUROR ZAMINSKY:**  My wife is handicapped,

11  and I have to take care of her.  I cook breakfast.  I make bed.

12  I take care of the house, and I take care of her as well.

13          **THE COURT:**  Okay.

14          **PROSPECTIVE JUROR ZAMINSKY:**  Plus I also served on

15  March 19th already.

16          **THE COURT:**  Well, that was probably in state court.

17          **PROSPECTIVE JUROR ZAMINSKY:**  It was court.

18          **THE COURT:**  Yeah.  Well, unfortunately, service in one

19  court doesn't excuse you from service in -- if it's in the

20  state court.  This is the federal court.  It doesn't give you

21  that excuse.

22          **PROSPECTIVE JUROR ZAMINSKY:**  Okay.

23          **THE COURT:**  Let me just ask Mr. Willis.

24      Mr. Willis, the 8:30 to 1:30 schedule, could you

25  accommodate that?

 1          **PROSPECTIVE JUROR WILLIS:**  No, I can't.

 2      **THE COURT:**  And why is that?

 3          **PROSPECTIVE JUROR WILLIS:**  I work full-time at

 4  Philz Coffee at the coffee plant in Oakland.  Even today I had

 5  to use my vacation pay to come here.

 6      **THE COURT:**  They don't provide any --

 7      **PROSPECTIVE JUROR WILLIS:**  No.

 8      **THE COURT:**  Which company is it?

 9      **PROSPECTIVE JUROR WILLIS:**  Philz Coffee.

10      **THE COURT:**  Oh, Philz, yeah.  Okay.  Well, I'm going

11  to stop fraternizing Philz.  Okay.

12                          (Laughter.)

13      **THE COURT:**  All right.

14      Okay.  Well, why don't we, Ms. Hom, have some new jurors

15  for where -- Mr. Zaminsky and Mr. Willis.

16      **THE COURTROOM DEPUTY:**  So the next person on the list

17  is Stephanie Gonzales.  Ms. Gonzales, could you come up here

18  and have Seat Number 10?

19          **PROSPECTIVE JUROR GONZALES:**  Which number?

20      **THE COURT:**  Yeah, you can go.

21      (Prospective Jurors Zaminsky and Willis exit.)

22      **THE COURTROOM DEPUTY:**  Take Seat Number 1.

23      And the next person would be Michael Wyatt.

24          **THE COURT:**  Ms. Gonzales, you are working for the City

25  and County of San Francisco?

 1          **PROSPECTIVE JUROR GONZALES:**  Yes, I do.

 2          **THE COURT:**  And in the mental health field?

 3          **PROSPECTIVE JUROR GONZALES:**  Yes.

 4          **THE COURT:**  And how long have you been doing that?

 5          **PROSPECTIVE JUROR GONZALES:**  I've been doing that for

 6  over -- I've been doing it for, like, 20 years because I do

 7  domestic violence work on the side.  But for the mental part,

 8  I've been doing it for about five years.  I come from jail

 9  psych.

10          **THE COURT:**  Okay.  As I indicated before, you had some

11  concerns about just being able to sit for a long time.  The

12  policy I have is you are -- jurors are free to stand and

13  stretch and move around whenever they feel like it, and we also

14  take breaks.  But you would be able to do that so you don't

15  have to sit in one place.  Would that help out?

16          **PROSPECTIVE JUROR GONZALES:**  I mean, the only issue

17  and problem that I have is because I need to have my phone on

18  for work because I do do domestic violence work on the side.

19  So domestic -- and I'm not trying to be rude and disrespectful

20  to the Court, but domestic violence doesn't run 8:00 to 5:00.

21  Domestic violence runs 24 hours a day.

22          And the medication that I'm on is because I got half of my

23  toenail cut off on Friday because I fell at my graduation.  So

24  one pill makes me sleepy, and the other one makes me go to -- I

25  have to go to the bathroom.  So I don't want to be, like,

1   thinking I don't want to hear or listen and then I have to go

2   to the bathroom constantly; or they see me doing this, I don't

3   want them to think I'm on drugs.  So those are the only issues

4   and problems I have.

5           **THE COURT:**  Well, those are significant ones.

6       Did you -- do you see the list of witnesses?  Do you know

7   who they are?

8           **PROSPECTIVE JUROR GONZALES:**  Oh, thank you.

9       Is that yours?

10          **PROSPECTIVE JUROR WYATT:**  It's just on the floor here.

11  This is it.

12          **PROSPECTIVE JUROR GONZALES:**  Thank you.

13          **THE COURT:**  Do you recognize any of those people?

14          **PROSPECTIVE JUROR GONZALES:**  I mostly work with the

15  homeless community, so none of these names look familiar.

16          **THE COURT:**  Okay.  And the people that were

17  introduced, did you know any of those people?

18          **PROSPECTIVE JUROR GONZALES:**  No, I don't.

19          **THE COURT:**  Any reason why you could not -- other than

20  the concerns that you've already advised us of, any reason you

21  couldn't be a fair and impartial juror?

22          **PROSPECTIVE JUROR GONZALES:**  No.  I'm a -- I'm a very

23  fair person.  It's just that I have bad anxiety, as it is,

24  because I'm a former -- I'm a domestic violence survivor

25  myself.  So just sitting for long, knowing that someone needs

 1  my help, and that clock is right there, and I can't get to my

 2  phone is going to legally bother me.

 3          **THE COURT:**  Fair enough.

 4      If you could pass the microphone to Mr. Wyatt.

 5      Mr. Wyatt, you are an investment banker at Morgan Stanley?

 6          **PROSPECTIVE JUROR WYATT:**  That's right.

 7          **THE COURT:**  And you work out of what office of Morgan

 8  Stanley?

 9          **PROSPECTIVE JUROR WYATT:**  The office is in Menlo Park.

10          **THE COURT:**  You're responsible for M&A work and

11  technology companies?

12          **PROSPECTIVE JUROR WYATT:**  That's right.

13          **THE COURT:**  And you've advised us Google is considered

14  a client -- a large client of Morgan Stanley's.

15          **PROSPECTIVE JUROR WYATT:**  That's right.

16          **THE COURT:**  Do you think that would cause you any

17  problems being a fair and impartial juror?

18          **PROSPECTIVE JUROR WYATT:**  As discussed by others, the

19  damages part would be uncomfortable for me.  You've asked the

20  question could I follow instructions.  Yes, I can, but the

21  sentiment around that would be, it would be difficult.

22      Do you have the supplemental note that I got in addition

23  to the questionnaire?  I submitted it by email.

24          **THE COURT:**  I don't believe so.

25          **PROSPECTIVE JUROR WYATT:**  My brother-in-law runs the

 1   family office for one of the co-founders of Google.  So I just

 2   want to say that.  That's part of the --

 3        **THE COURT:**  Thank you for telling us.

 4        **PROSPECTIVE JUROR WYATT:**  Yes, sir.

 5        **THE COURT:**  Okay.

 6        **PROSPECTIVE JUROR WYATT:**  I know Mr. Boies.  I don't

 7   think we've been involved in specific litigation, but know him

 8   by reputation.

 9        **THE COURT:**  Okay.  Anything about having that

10   knowledge would that affect your ability to be a fair and

11   impartial juror?

12        **PROSPECTIVE JUROR WYATT:**  Like I said, I can follow

13   instructions.  I understand class actions well.  I think the

14   real issue for me is just my various affiliations with Google

15   that would make it, to be honest, quite uncomfortable to, as

16   Mr. Boies has said, find a large finding against Google.

17        **THE COURT:**  Okay.  We're getting closer, folks, and we

18   will take a lunch break fairly soon, but let me see the lawyers

19   at the sidebar.

20        (The following proceedings were heard at the sidebar:)

21        **THE COURT:**  This was all going too smoothly so now

22   it's not.

23        Okay.  I'm not -- obviously, I'm not letting you do any

24   follow-ups.  I want to move this along.

25        But go ahead, Mr. Boies.

1          MR. DAVID BOIES:  I think the Morgan Stanley person

2    needs to go.

3          THE COURT:  I agree.

4          MR. ATTANASIO:  I understand the Court's ruling.

5          THE COURT:  How about the other three?

6          MR. ATTANASIO:  I think Ms. Gonzales should go on

7    hardship.

8          THE COURT:  I'm concerned about --

9          MR. ATTANASIO:  Ability to pay attention and

10   participate.

11         THE COURT:  I'm concerned about her, she being able to

12   not -- I think she's going to have to stop the proceedings too

13   many times potentially.

14         MR. DAVID BOIES:  This is the most recent one?

15         THE COURT:  Yes, the lady who has to go to the

16   bathroom all the time.

17         MR. CARMODY:  We're okay with that.

18         THE COURT:  So I'm going to replace the next -- those

19   two.  How about the other two?

20         MR. CARMODY:  They seem fine.

21         MR. DAVID BOIES:  I don't see any --

22         MR. CARMODY:  There's no issue.

23         MR. DAVID BOIES:  I don't see anything for those two.

24         MR. ATTANASIO:  I say this openly.  I sort of like

25   Mr. Radford as a juror.  His story sounded pretty dramatic in

 1  terms of getting here, back and forth.  I'm not against -- I

 2  like Mr. Radford.

 3         **THE COURT:**  We actually can send an Uber for him.

 4         **MR. ATTANASIO:**  Okay.  Thanks, Your Honor.

 5         **THE COURT:**  Okay.

 6     (The following proceedings were heard in open court:)

 7         **THE COURT:**  Okay.  We're going to release you,

 8  Mr. Wyatt, and also Ms. Gonzales.

 9      And we will have two more jurors.

10         **THE COURTROOM DEPUTY:**  Michael Bowman and Sophia

11  Kline.

12      Mr. Bowman, could you have a seat in Number 1?

13         **PROSPECTIVE JUROR BOWMAN:**  Sure.

14         **THE COURTROOM DEPUTY:**  Thank you.

15         **THE COURT:**  Welcome.

16      First of all, Ms. Kline, you are coming in from Berkeley;

17  is that right?

18         **PROSPECTIVE JUROR KLINE:**  Correct.

19         **THE COURT:**  And you were an executive assistant at

20  something called Fervo Energy?

21         **PROSPECTIVE JUROR KLINE:**  Yes.

22         **THE COURT:**  And what does Fervo Energy do?

23         **PROSPECTIVE JUROR KLINE:**  It's a geothermal energy

24  company.

25         **THE COURT:**  And you indicate that your company does

 1    have a relationship with Google and that you had a former

 2    roommate who worked for Google.  And then there's some other --

 3    well, those are the principal connections.

 4        Do you think you could be a fair and impartial juror where

 5    one of the parties is Google?

 6        **PROSPECTIVE JUROR KLINE:**  I mean, I think it would be

 7    a little complicated with my company's relationship with

 8    Google, but I would try my best.

 9        **THE COURT:**  Why don't you tell me a little bit more

10    about -- you said it could be complicated.  If you -- let me

11    ask you this question, as I've asked other potential jurors.

12        You'll be instructed to decide this case based on just the

13    evidence that's presented in the case, and then you will be

14    instructed to follow the law as I give it to you as to how to

15    apply facts to the law.  Will you be able to do that?

16        **PROSPECTIVE JUROR KLINE:**  I think so.

17        **THE COURT:**  The list of witnesses, do you recognize

18    any of those people?

19        **PROSPECTIVE JUROR KLINE:**  No.

20        **THE COURT:**  Okay.  And how about the people that were

21    introduced, the counsel and court personnel?  Did you recognize

22    any of them?

23        **PROSPECTIVE JUROR KLINE:**  No.

24        **THE COURT:**  Okay.  Any reasons that you can think of

25    that would preclude you from being a fair and impartial juror?

 1          **PROSPECTIVE JUROR KLINE:**  I don't think so.

 2          **THE COURT:**  And if you are selected, could you serve?

 3          **PROSPECTIVE JUROR KLINE:**  It would be hard on my work

 4   schedule, but yes.

 5          **THE COURT:**  Okay.  Thank you.

 6       If you could pass the microphone to Mr. Bowman.

 7       Mr. Bowman, you are coming in from Richmond?

 8          **PROSPECTIVE JUROR BOWMAN:**  Yes.

 9          **THE COURT:**  And you're retired at this point?

10          **PROSPECTIVE JUROR BOWMAN:**  Mostly retired, yes.

11          **THE COURT:**  You were VP of sales at Anastasia Beverly

12   Hills.  Was that a real estate firm?

13          **PROSPECTIVE JUROR BOWMAN:**  No.  Cosmetics.

14          **THE COURT:**  Cosmetics.  Ah, okay.

15       And you worked there for about a year?

16          **PROSPECTIVE JUROR BOWMAN:**  Yes.

17          **THE COURT:**  And what did you do before that?

18          **PROSPECTIVE JUROR BOWMAN:**  I was VP of sales at

19   Benefit Cosmetics.

20          **THE COURT:**  Ah, Benefit Cosmetics.

21       You have sat on many juries.

22          **PROSPECTIVE JUROR BOWMAN:**  Yes.

23          **THE COURT:**  Anything about those experiences that

24   would cause you a problem being a juror in this civil case?

25          **PROSPECTIVE JUROR BOWMAN:**  No.

1           **THE COURT:**  You heard a lot of questions about whether

2    or not you could be fair and impartial in this case.  Anything

3    that would cause you any concern about your ability to do that?

4           **PROSPECTIVE JUROR BOWMAN:**  No.

5           **THE COURT:**  Okay.  You -- could you decide this case

6    based just on the evidence that was submitted and on the

7    instructions of the law?

8           **PROSPECTIVE JUROR BOWMAN:**  Yes.  Yes, mm-hmm.

9           **THE COURT:**  Okay.  Anything that we discussed that you

10   thought "I need to tell the Court this"?

11          **PROSPECTIVE JUROR BOWMAN:**  No.

12          **THE COURT:**  Okay.  If chosen, can you serve on this

13   jury?

14          **PROSPECTIVE JUROR BOWMAN:**  Yes.

15          **THE COURT:**  All right.  What I'm going to do now is

16   each counsel has one more opportunity for peremptory.

17       So I'm going to ask you to do that now.

18       So, Ms. Hom, if you could.

19          (Sidebar conference heard but not reported.)

20          **THE COURT:**  Well, the good news for all of those who

21   are here is that we're going to complete this process,

22   hopefully, shortly.  And then we're going to have instructions

23   from me and opening statements, for those who are chosen in the

24   jury, tomorrow.  So we won't be going into the later afternoon

25   today.

1    So we're getting close to the end.  I know you're probably

2    all hungry, but we should be concluded with the selection

3    process pretty quickly, and then we'll be done for the day.

4                    (Pause in proceedings.)

5          **THE COURT:**  All right.  Ms. Yermash and Ms. Kline, you

6    are released.

7          All right.  So, very good.

8          So those of you who have been selected for the jury --

9    there should be eight of you, and there are.  Those of you in

10   the jury box, if you could please stand to be sworn as jurors.

11         **THE COURTROOM DEPUTY:**  Could you please raise your

12   right hand.

13             (The jurors were duly sworn to try this case.)

14         **THE COURTROOM DEPUTY:**  You may be seated.

15         **THE COURT:**  Very well.  The rest of you who have

16   dutifully come and responded to your jury summons, you are

17   released.  So have a very nice afternoon.

18             (Remaining prospective jurors excused.)

19         **THE COURT:**  All right.  Members of the jury, what's

20   going to happen now is we will be concluding for the day.

21   Ms. Hom is going to give you some orientation on getting you

22   situated and just some instruction on the comings and the

23   goings.

24         We will start tomorrow morning with instructions,

25   preliminary instructions, from me.  Then we'll have opening

1  statements from the parties, and then we will begin the calling

2  of witnesses and the admission of evidence.  So it's all going

3  to begin tomorrow.

4      Please do your very best to be here promptly so we can

5  start at 8:30 and move along.

6      You don't know much about this case other than the very

7  general questions we've discussed, but it is very important for

8  me to emphasize to you -- and you're going to get very tired

9  hearing this but you're going to have to bear with me on

10  this -- please do not do anything to try to understand this

11  case or learn about this case other than what you hear in the

12  courtroom.

13      So what that means is do not do any research.  Do not

14  access the Internet.  Don't -- do not talk with anybody about

15  this case at this stage or, frankly, until you get this case

16  for deliberation.

17      When you're not in this room, put the case aside.  If

18  somebody tries to talk to you about the case, you are to say,

19  "I can't talk to you about that."  And if that does happen, you

20  should advise the Court that someone has attempted to try to

21  talk to you about it.

22      But I will give you a longer instruction tomorrow about

23  don't go to any Internet sites, don't -- it goes on and on and

24  on, now that we have all these different social media and the

25  like.  But for present purposes, just do not do anything to

1   learn anything about this case until you're back into the

2   courtroom and you're hearing the evidence as it's being

3   presented.

4         So with that, I will -- oh, one other thing.  The lawyers

5   may pass you in the hall; and if they do, other than saying

6   "hello," they won't talk to you.  And that is not their being

7   rude.  They are doing their duty.  They are not to have any

8   contact with you other than what you hear in the courtroom.  So

9   don't hold it against them.  They're just doing what I've told

10  them that they have to do.

11        So with that, I will let you go back with Ms. Hom and get

12  organized, and we'll see you tomorrow at 8:30.

13        (Proceedings were heard out of the presence of the jury.)

14        **THE COURT:**  Okay.  We're out of the presence of the

15  jury.

16        We'll get started at 8:30 and go from there.

17        Have you exchanged the witness lists?  They know who

18  you're calling?

19        **MR. DAVID BOIES:**  Yes, Your Honor.

20        **THE COURT:**  Okay.  That's good.

21        You've got all this extra time to fine-tune your opening

22  statements, so I'm looking forward to really superb

23  presentations tomorrow.

24        **MR. DAVID BOIES:**  We should have done it today.

25        **THE COURT:**  Okay.  Anything else that we need to deal

**PROCEEDINGS**

 1    with now?

 2            **MR. DAVID BOIES:**  Nothing from us, Your Honor.

 3            **MR. HUR:**  Your Honor, do you want us here tomorrow

 4    at 8 o'clock?

 5            **THE COURT:**  I think going forward, you should plan --

 6    I mean, your entire team on either side doesn't need to be

 7    here; but if you expect to bring anything up with me, I will

 8    want you here at 8:00.

 9            **MR. HUR:**  Thank you, Your Honor.

10            **THE COURT:**  And there's no shame if you have nothing

11    to bring up.

12                        (Laughter.)

13            **THE COURT:**  8 o'clock can simply be a time for coffee

14    and introspection.

15            **MR. HUR:**  That sounds lovely, Your Honor.

16            **THE COURT:**  Very good.

17            **MR. DAVID BOIES:**  And we -- oh, excuse me.

18            **MR. HUR:**  And, Your Honor, we can raise this tomorrow

19    at 8:00, but we had one issue with a preliminary instruction

20    that we think there's one line that might be an error.

21            **THE COURT:**  Well, please tell me now.  I'm glad you

22    brought it up because I don't want to have to change things in

23    the morning.

24        So what is the issue?

25            **MR. HUR:**  Your Honor, it is Instruction Number 3, and

**PROCEEDINGS**

 1    we raised this with opposing counsel, but there is a line about

 2    a quarter way down that says [as read]:

 3         "You may assume that the evidence at this trial

 4         applies to all class members."

 5    Your Honor, this is from the state model, not the

 6    Ninth Circuit model; and, Your Honor, we can have a debate

 7    about it, if needed, down the road, but we think that should be

 8    stricken because --

 9         **THE COURT:**  Which -- my -- I have a different

10    numbering system.  Is this the instruction that begins "To help

11    you follow the evidence"?

12         **MR. DAVID BOIES:**  No.  This begins "This case is a

13    class action."  It's what I have as Jury Instruction Number 3.

14    What number do you have?

15         **MR. HUR:**  Yes, I have Number 3 as well.

16         **THE COURT:**  I'm not sure I'm giving that instruction.

17         **MR. HUR:**  That would be fine, Your Honor.  Then we

18    could deal with it in the closing instructions.

19         **THE COURT:**  I thought I ran through with you what --

20    the instructions that I was going to give, and they're almost

21    all the pattern instructions.

22    The only one that's sort of customized is the one that you

23    gave me.  It was Instruction Number 2, and there was a dispute

24    about "without their permission or consent," and I'm going to

25    include that.  But I'm -- maybe it's in this instruction that

**PROCEEDINGS**

 1  you're --

 2          **MR. HUR:**  Your Honor, it's the definition of a

 3  class action, I believe.

 4          **MR. DAVID BOIES:**  Yes.

 5          **THE COURT:**  Oh, I see.  This is my Instruction

 6  Number 2 [as read]:

 7              "This is a class action in which three people

 8       called plaintiffs are asserting claims against Google

 9       on behalf of groups of other people which are called

10       classes.  Plaintiffs claim that Google violated,"

11       da-da-da-da-da.

12       I don't see anything about -- in here about applies to

13  everybody.

14          **MR. DAVID BOIES:**  The instruction -- this was, as I

15  thought, originally agreed.  Can I hand out the instructions

16  that we have in our book?

17          **THE COURT:**  Well, why don't I hand you the

18  instruction --

19          **MR. DAVID BOIES:**  That'd be great.

20          **THE COURT:**  -- that I am going to give.

21       And now that Ms. Hom is not here...

22          **MR. DAVID BOIES:**  This one, what you gave us,

23  Your Honor, is 1 and 2, but it's not the class action one.

24          **THE COURT:**  Well, I think I was, therefore, not

25  planning to give a class action preliminary instruction.

PROCEEDINGS

1          **MR. DAVID BOIES:**  Okay.

2          **THE COURT:**  Now, there's an instruction on the back of

3      that, but I wasn't going to give that one on the back of the --

4          **MR. DAVID BOIES:**  All right.  Your Honor, I think --

5      I think the portion that they were objecting to is not in what

6      you're planning to give.

7          **THE COURT:**  Okay.

8          **MR. HUR:**  That's right, Your Honor.

9          **MR. DAVID BOIES:**  And we have -- they have edited the

10     one chart that they objected to, and I've accepted their edits.

11         **THE COURT:**  Very good.

12         **MR. HUR:**  Thank you, Your Honor.

13         **THE COURT:**  No other -- if there are things, I'd

14     rather do it now than tomorrow, but any other issues?

15         **MR. HUR:**  No, Your Honor.

16         **MR. DAVID BOIES:**  I don't think there are, Your Honor.

17         **MR. HUR:**  We'll try not to come up with too many

18     overnight.

19                         (Laughter)

20         **THE COURT:**  Work on your opening statements.

21         **MR. DAVID BOIES:**  Thank you, Your Honor.

22         **THE COURT:**  All right.  Very good.

23              (Proceedings adjourned at 1:14 p.m.)

24                      ---o0o---

25

1

2                    **<u>CERTIFICATE OF REPORTER</u>**

3          I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6   DATE:  Tuesday, August 19, 2025

7

8

9

10

11   _____

12          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13       CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25