Volume 2

Pages 175 - 340

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,           )
individually and on behalf of       )
all others similarly situated,      )
                                    )
            Plaintiffs,             )
                                    )
    VS.                             )    NO. 3:20-CV-04688 RS
                                    )
GOOGLE LLC,                         )
                                    )
            Defendant.              )
_____)

                        San Francisco, California
                        Tuesday, August 19, 2025

          <u>**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:
                    BOIES SCHILLER FLEXNER LLP
                    333 Main Street
                    Armonk, New York 10504
               BY:  **DAVID BOIES, ATTORNEY AT LAW**

                    BOIES SCHILLER FLEXNER LLP
                    2029 Century Park East, Suite 1520n
                    Los Angeles, California 90067
               BY:  **ALISON L. ANDERSON, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
1   APPEARANCES:  (CONTINUED)

2   For Plaintiffs:
                        BOIES SCHILLER FLEXNER LLP
3                       100 Southeast 2nd Street, Suite 2800
                        Miami, Florida 33131
4                   BY: JAMES W. LEE, ATTORNEY AT LAW

5                       BOIES SCHILLER FLEXNER LLP
                        44 Montgomery Street, 41st Floor
6                       San Francisco, California 94104
                    BY: MARK C. MAO, ATTORNEY AT LAW
7
                        SUSMAN GODFREY LLP
8                       One Manhattan West, 50th Floor
                        New York, New York 10001
9                   BY: WILLIAM C. CARMODY, ATTORNEY AT LAW
                        RYAN SILA, ATTORNEY AT LAW
10
                        SUSMAN GODFREY LLP
11                      1900 Avenue of the Stars, Suite 1400
                        Los Angeles, California 90067
12                  BY: AMANDA BONN, ATTORNEY AT LAW

13  For Defendant:
                        COOLEY LLP
14                      101 California Street, Fifth Floor
                        San Francisco, California 94111
15                  BY: BENEDICT Y. HUR, ATTORNEY AT LAW
                        EDUARDO E. SANTACANA, ATTORNEY AT LAW
16                      SIMONA A. AGNOLUCCI, ATTORNEY AT LAW
                        ISABELLA M.M. CORBO, ATTORNEY AT LAW
17
                        COOLEY LLP
18                      4401 Eastgate Mall
                        San Diego, California 92121
19                  BY: MICHAEL A. ATTANASIO, ATTORNEY AT LAW

20

21  Also Present:       Steve Ganem, Google
                        Anibal "Pete" Rodriguez
22                      Julian Santiago

23

24

25
```

1              **I N D E X**

2

3    Tuesday, August 19, 2025 - Volume 2

4

5                                                    **PAGE**   **VOL.**

6    Preliminary Jury Instructions              195      2
     Opening Statement by Mr. David Boies       206      2
7    Opening Statement by Mr. Hur               232      2

8

9    **PLAINTIFFS' WITNESSES**                       **PAGE**   **VOL.**

10   **MONSEES, DAVID MICHAEL**
     (SWORN)                                     256      2
11   Direct Examination by Mr. Carmody           257      2

12

13                  **E X H I B I T S**

14   **TRIAL EXHIBITS**                   **IDEN**   **EVID**   **VOL.**

15     PX2                                      325      2

16     PX3                                      289      2

17     PX9                                      333      2

18     PX62                                     259      2

19     PX84                                     267      2

20     PX113                                    292      2

21     PX184                                    276      2

22     PX186                                    279      2

23     PX403                                    273      2

24     PX404                                    273      2

25     PX405                                    273      2

1    **Tuesday - August 19, 2025**                              **8:13 a.m.**

2                        **P R O C E E D I N G S**

3                           **---o0o---**

4         (Proceedings were heard out of the presence of the jury.)

5              THE COURT:  Okay.

6              ALL:  Good morning, Your Honor.

7              THE COURT:  Good morning.  So what are the fights of

8    the morning?

9              MR. HUR:  Your Honor, we have a few issues, the first

10   of which relates to testimony that Google's CEO, Sundar Pichai,

11   gave to Congress that the plaintiffs intend to show later

12   today.  And we exchanged designations.  We limited the

13   designations.

14        The current dispute is about some of Google's

15   counterdesignations.  Google wants to counterdesignate just two

16   introductory paragraphs that Mr. Pichai makes so that the jury

17   knows who he is and what he's talking about.

18        Google wants to add three lines because one of the

19   questions that plaintiffs proposed asking was not complete.

20        And then Google wants to add one and a half -- one

21   paragraph that describes the data that's at issue that was

22   being asked about.

23        So really, Your Honor, we're talking about four minutes,

24   three minutes of testimony that we're trying to

25   counterdesignate, and we think this is pretty unobjectionable.

PROCEEDINGS

1           **THE COURT:**  Okay.

2           **MS. BONN:**  May I be heard briefly, Your Honor?

3           **THE COURT:**  Yes.

4           **MS. BONN:**  Thank you.

5      And can I hand this up, Your Honor?  I have it flagged,

6   the two portions that are in issue.

7           **THE COURT:**  Okay.

8           **MS. BONN:**  Thank you.

9           **MR. HUR:**  Can I see what you flagged?

10          **MS. BONN:**  Of course.

11          **MR. HUR:**  Thank you.

12          **THE COURT:**  This is all what's going to be in opening

13   statement or what?

14          **MS. BONN:**  It's going to be used -- part of it we

15   wanted to use during the examination of Mr. Monsees later

16   today.

17          **THE COURT:**  He's being called today?

18          **MS. BONN:**  Yes.

19          **THE COURT:**  If we get there.

20          **MR. HUR:**  So are you not disputing the issue on

21   page 150?

22          **MS. BONN:**  No.  That's fine.  Just these two.

23          **MR. HUR:**  Okay.  Just those two?

24          **MS. BONN:**  Correct.

25          **MR. HUR:**  Okay.  Now we're down to two, Your Honor.

1       **THE COURT:**  That's great.

2       So where the green tabs are is --

3       **MS. BONN:**  Correct.  The blue.

4       And so, Your Honor, the two issues are, first of all,

5  Google wants to designate Mr. Pichai's entire opening statement

6  to Congress.  It's hearsay.  It's not optional completeness to

7  the question and answer that we've designated in yellow under

8  Rule 106, and so it's just improper hearsay.  It doesn't --

9       **THE COURT:**  But you're introducing some of his

10 statements.

11      **MS. BONN:**  Specific questions and answers, correct.

12      **THE COURT:**  Yes, but you're -- okay.

13      **MS. BONN:**  And then the other is that they simply

14 designated a question and answer of their own at page 90

15 that's, like, 50 pages away from the question and answer we've

16 designated.  Again, it's hearsay.  It doesn't come in as

17 optional completeness under Rule 106.  It's not a counter to

18 anything we have designated that was misleading or leaving a

19 misleading impression.  So it's just hearsay by Google.

20      **THE COURT:**  Well, my overall imp- -- you can't have it

21 both ways.  If you're going to be pushing Mr. Pichai's comments

22 to Congress, Google has an opportunity to fill out -- I mean,

23 this is all part of testimony he gave on the same day in front

24 of Congress; right?

25      **MS. BONN:**  Correct, Your Honor.

PROCEEDINGS

1          **THE COURT:**  So under the rule of completeness, I think

2     they're entitled to use that.

3          **MR. HUR:**  Thank you, Your Honor.

4          **THE COURT:**  Okay.  Next?

5          **MS. BONN:**  Thank you, Your Honor.

6      We have one other issue we wanted to raise in advance of

7     Mr. Monsees' testimony.  And yesterday, Your Honor, we

8     discussed two slides in the opening that the defense wanted to

9     show from the Australia document that we discussed.  There's

10    further evidence and evidentiary disputes about that that are

11    coming up in the context of Mr. Monsees.  If I can put it in

12    context and then hand Your Honor the specific issues.

13         **THE COURT:**  Okay.

14         **MS. BONN:**  So we understand that in Mr. Monsees'

15    examination, Google intends to do two things.  They intend to

16    try to lay a foundation for either the entire Australia court

17    filing or portions of it, and then have Mr. Monsees say, based

18    on his knowledge, "Well, I know that parts of this were in

19    effect in the U.S. during the class period."

20         Then, separately, they have a demonstrative video that

21    Google created in July of this year, after the class period, in

22    the context of creating a new Google Account.  And in that new

23    Google Account flow, after the class period in the U.S., there

24    are new screens that have never been disclosed as being part of

25    the U.S. consent disclosures relating to WAA.  And

1    specifically, there is a different version of a different

2    button that people were shown during the sign-up period that

3    has different language from the language on the WAA buttons

4    that have been disclosed and at issue in this case.

5        When we look at the Australia document that apparently

6    they intend to use to kind of create this bookend impression,

7    "Well, we had it here in Australia, we have it here now, and

8    I'm telling you this was what was in place during the class

9    period," the screen in the Australia document says, "This is a

10   re-creation"; and then there's a column of text next to it that

11   says, "During this period, some people may have been shown

12   this.  During another period, some people may have been shown

13   that."

14       And none of this was disclosed in their interrogatory

15   response, and so we are moving to exclude it under Rule 37(c)

16   because this issue has been heavily litigated.  It is a

17   different version of the button with different language.  And

18   if they intended at any point to say, "Look, it's not just an

19   Australian filing you can find in our production, but that

20   screen was in place in the United States during the class

21   period and we're relying on it," that was never done.  And so I

22   wanted to flag that issue.

23       THE COURT:  According to you, where would they be

24   obliged to do that?  In the answer to the interrogatory?

25       MS. BONN:  May I hand this up, Your Honor?  I've got

 1    the interrogatory and the response.

 2        The first document I'm handing you is the interrogatory,

 3    and I've flagged the definition of "public disclosure" that we

 4    made.  And then if you look at the response -- the

 5    interrogatory response, I've flagged the interrogatory itself

 6    and the responses, and it's nowhere in there.

 7            THE COURT:  Okay.  Well, I'll assume that's correct.

 8        Mr. Santacana?

 9        MR. SANTACANA:  Yeah, Your Honor.  So there's a lot of

10    assumptions I heard in that argument about what we intend to do

11    with Mr. Monsees that don't come from us.  I don't know where

12    they come from, but it's not how the testimony will go.  So I'd

13    like to explain what will actually happen.

14            THE COURT:  Yeah.

15        MR. SANTACANA:  Mr. Monsees will lay substantial

16    foundation for a document that he worked on and was in charge

17    of creating for a judicial proceeding that shows consent flows

18    that were drawn from a source code repository.  The re-creation

19    is that the repository recreates the screenshot.

20        We should be allowed to lay the foundation.  If Your Honor

21    has a problem with it after that, of course you can exclude it,

22    but he hasn't testified yet.  The foundation will be more than

23    sufficient.

24            THE COURT:  This is all this Australian --

25            MR. SANTACANA:  This is a document that was in the

1    judicial proceeding in Australia.

2         **THE COURT:** All right. And just to go back to basics,

3    this material was produced?

4         **MR. SANTACANA:** It was.

5         **THE COURT:** All right. But then their contention is

6    when they were inquiring, through interrogatory requests, you

7    didn't identify what you're now proposing to use. What's your

8    response to that?

9         **MR. SANTACANA:** Your Honor, this -- it's called the

10   ACCC, is the commission in Australia. The ACCC bundle, as we

11   call it, is something that the parties have gone back and forth

12   over for years. It was relied upon by our expert Donna

13   Hoffman. The plaintiffs are not surprised that it exists or

14   that it's been relied upon. It was disclosed in

15   demonstratives.

16       It may not be listed in the interrogatory response, and

17   part of the reason for that is because we're not saying that

18   this consent flow wins the case. This is a scene-setting flow

19   that explains what it's like to create a Google Account.

20       We have other exhibits, which will come in through

21   Mr. Monsees, that are the exhibits that have the language that

22   we will go through in loving detail when he's on the stand.

23       The purpose of the consent flow is really about explaining

24   what it's like physically.

25         **THE COURT:** And so the consent flow, what is that?

PROCEEDINGS

1          **MR. SANTACANA:**  I'm sorry.  Consent flow is Google

2    jargon for the experience of going from screen to screen as you

3    click through things.

4          **THE COURT:**  All right.

5          **MR. SANTACANA:**  So it's not about the -- it's about

6    explaining what it's like for people to go through it,

7    basically.

8          **THE COURT:**  Okay.

9          **MS. BONN:**  May I -- excuse me, Your Honor.  I didn't

10   mean to interrupt you.

11         But if I could please just show you both the screen that

12   we expect them to show in the video from post-class period and

13   the screen in this document, I think it would help provide some

14   context.

15         **THE COURT:**  Okay.

16         **MS. BONN:**  Thank you.  I've got the screen and the

17   document selected.

18         **THE COURT:**  I'm being overwhelmed with material.

19         **MS. BONN:**  Material.

20         **THE COURT:**  Okay?

21         **MS. BONN:**  Thank you.

22         **MR. SANTACANA:**  Well, for the record, Your Honor, I

23   haven't handed you anything.

24         **THE COURT:**  That's good.

25         **MR. SANTACANA:**  So I do want to explain one more thing

1  about what Ms. Bonn said, which is that the consent flow in

2  question is a U.S. flow.  Mr. Monsees will explain that on the

3  stand.

4      But the difference in language that Ms. Bonn is, I think,

5  complaining about is more -- has nothing to do with the

6  Australia document.  This is about a separate exhibit, which is

7  a video Mr. Monsees created.

8          THE COURT:  Right.

9          MR. SANTACANA:  So I'm happy to address the video when

10 you're ready.

11         THE COURT:  So what have you handed me?

12         MS. BONN:  It's both, Your Honor.  So the first

13 freestanding document I've handed you is one screenshot from

14 the video they propose to play, which they created in July of

15 this year, so postdating the class period.  And you can see

16 when they're saying when someone --

17         THE COURT:  The video is not being admitted into

18 evidence.

19         MS. BONN:  It's a demonstrative.

20         MR. SANTACANA:  No, Your Honor.  It's an illustrative

21 aid under Rule 107.

22         THE COURT:  All right.  Well, I have a very different

23 view about demonstratives.  They -- they're not going into

24 evidence, so the fact that you haven't seen them before, you've

25 seen them now, and they get exchanged later in the game

 1    ordinarily, so that's not a problem.

 2         **MS. BONN:**  Sure.  But, Your Honor, here's what I'd

 3    like to point out.  This version of the button is entirely

 4    different from the underlying documents they've produced in

 5    this case.

 6         And then if you look at the Australia document --

 7         **THE COURT:**  Well, can't you cover that on

 8    cross-examination?

 9         **MS. BONN:**  We will, Your Honor, but what I'm trying to

10    do is establish what's going on with the Australia document

11    which they intend to introduce in evidence.

12         So if you look in the binder, the second tab shows a

13    similar screen in the Australian document; and underneath it,

14    it says [as read]:

15              "This screen is a re-creation of the screen that

16         was shown to users during this period."

17         And then if you look at the sort of gray column on the

18    right-hand side, there appears to be just hearsay statements

19    from Mr. Monsees or Google's Australian counsel -- I don't know

20    who -- saying:  The text under this changed over time.  Between

21    these dates, some users were shown text as it appears here.

22    Between other dates, other people were shown other versions.

23         **THE COURT:**  Why do you need, Mr. Santacana, the side

24    panel of comments about this?

25         **MR. SANTACANA:**  Your Honor, they're not correct about

PROCEEDINGS

1    what these comments are.  These comments were written by Google

2    employees to explain what the consent flow screenshots are.

3            THE COURT:  Contemporaneously or --

4            MR. SANTACANA:  Yes, Your -- well, they were written

5    when the document was created by Google employees who were

6    charged with pulling the source code.  Mr. Monsees will lay all

7    of that foundation.

8        And, look, the comments are there because all they say is,

9    "From here to here, if you click on this, you go to page 7.  If

10   you click on that, you go to page 9."

11           MS. BONN:  And so our point, Your Honor, is all of

12   this on the side is hearsay.  It's made for litigation.  We

13   don't know whose statements they are.  But it all raises

14   questions about --

15           THE COURT:  Well, again, it's not -- it may be

16   hearsay, but it's not being introduced into evidence.

17           MS. BONN:  They are trying to introduce this into

18   evidence, Your Honor.

19           MR. SANTACANA:  The Australian consent flows are being

20   introduced into evidence.  The document that was created as a

21   business record from the source code repository is being

22   admitted into evidence.  The video that was created in 2025 is

23   not.

24           THE COURT:  So you want to admit into evidence this

25   document that has all of this column here that's --

1            MR. SANTACANA:  Yes, Your Honor.  So this document --

2            THE COURT:  Why is that all not just hearsay?  Why?

3            MR. SANTACANA:  Well, this is a business record,

4    Your Honor.  The --

5            THE COURT:  Well, by the way, as we go into this

6    trial, uttering "business record" doesn't get us over all sorts

7    of hurdles.

8            MR. SANTACANA:  And as I've --

9            THE COURT:  And both sides are going to be invoking

10    that with me, I presume, because in modern-day, we've been

11    spending a lot of time looking at it.  Simply because there's

12    an email or something else, just be prepared, if you get up and

13    say, "It's a business record," that doesn't wipe out all of

14    life's problems.

15            MR. SANTACANA:  I couldn't agree more.

16            THE COURT:  So, okay.

17            MR. SANTACANA:  I couldn't agree more, which is why I

18    said --

19            THE COURT:  So why isn't this -- why have you -- why

20    have you done more than just invoke business records in

21    response to this?

22            MR. SANTACANA:  Well, Your Honor, what I said earlier

23    is that Mr. Monsees will in depth establish the foundation for

24    the business record exception, although I didn't mention

25    "business record" earlier, to be fair.

1    I'll proffer now what he's going to say is this was

2    created on a team that he was leading.  When it was created,

3    what he did was lead that team to pull things from a source

4    code repository which records the language and screenshots and

5    code that creates the screenshots.  Contemporaneously, when the

6    code is changed at Google, it is the source of truth at Google;

7    it is the source code repository they rely on for accuracy.

8        And then what they did was describe, in the right-hand

9    column, what the code indicated about what would happen if you

10   click on certain buttons.

11       Now, all --

12       **THE COURT:**  Again, did this get -- was this produced,

13   or is this something new?

14       **MR. SANTACANA:**  This was produced.  It was relied upon

15   by the experts and fought about.

16       **THE COURT:**  Okay.

17       **MS. BONN:**  And just a final --

18       **THE COURT:**  Well, I think I'm going to -- I'm being

19   told that all will be clear when the foundation is elicited,

20   and I'll listen and I'll make the call when that happens --

21       **MS. BONN:**  Thank you, Your Honor.

22       **THE COURT:**  -- if it happens.

23       Okay.

24       **MR. SANTACANA:**  Your Honor?

25       **THE COURT:**  Yes.

1          **MR. SANTACANA:**  The plaintiffs, when they filed last

2   night their joint report, they had a number of objections to

3   other exhibits we disclosed that we intend to use with

4   Mr. Monsees today, and I don't know if those objections are

5   maintained but --

6          **THE COURT:**  Let's see.  Let's see how it plays out in

7   the -- I appreciate getting the advance notion.  It's very

8   helpful to get this joint report.

9      It does smack a bit, just to give you the benefit of my

10  reaction, of sending off to your very fine lawyers on each side

11  with the mission, "Find every objection that you can possibly

12  find."  But I do appreciate it.  It does give me some preview.

13  So we'll go from there.

14     But I think -- I have read through it, but I think I sort

15  of need to see the -- see it play itself out a bit before I can

16  make some of these calls.

17         **MR. SANTACANA:**  That makes sense.  Thank you,

18  Your Honor.

19         **MS. BONN:**  Thank you, Your Honor.

20         **MR. ATTANASIO:**  One last item very briefly,

21  Your Honor.

22         **THE COURT:**  Yes.

23         **MR. ATTANASIO:**  Beginning on Sunday evening, we have a

24  dispute over one exhibit.  I raise it now because it features

25  in the plaintiffs' opening.

PROCEEDINGS

1          THE COURT:  Is this the Mueller --

2          MR. ATTANASIO:  No, Your Honor.

3          THE COURT:  -- email?

4      No.

5          MR. ATTANASIO:  This would have been from our prior

6   report.  And, frankly, in the hurly-burly of yesterday morning,

7   we just didn't get to this one.  It relates to opening, which

8   is why I'm raising it now.

9          THE COURT:  Yeah.

10          MR. ATTANASIO:  It's a single exhibit.  It features in

11  Mr. Boies's slides.  And we have a dispute that sort of echos

12  Your Honor's comments about business records.

13      I can hand up the slide so Your Honor can see exactly what

14  we're talking about, or I can just explain it.

15          THE COURT:  Well, remember, in an opening statement,

16  I'm not necessarily of the view that everything mentioned in

17  the opening statement must be admitted into evidence or be

18  admissible.  And, again, counsel runs the risk that if it never

19  shows up in the evidence in trial, they've perhaps

20  overpromised.

21      But with that background, yes, let me see whatever it is

22  that you think is objectionable.

23          MR. ATTANASIO:  Yes.  I'll hand it to Your Honor's

24  clerk.

25          THE COURT:  Okay.

1          MR. ATTANASIO:  So, Your Honor, you will see

2    referenced in those blurbs that are on the slides PX6,

3    Plaintiffs' Exhibit 6.

4          THE COURT:  Right.

5          MR. ATTANASIO:  Plaintiffs' Exhibit 6 is a document

6    internal to Google that reflects a number of conversations

7    within Google, somewhat informal, in which Google personnel,

8    all of whom in terms of these slides are not witnesses --

9          THE COURT:  Why isn't this an admission?

10         MR. ATTANASIO:  Because the people talking

11   generally -- not about WAA and sWAA -- but generally about

12   privacy are not authorized speakers within Google for purposes

13   of being an admission at that time.

14      But I understand if the Court --

15         THE COURT:  This is the -- this is the Google

16   vice president of product management?

17         MR. ATTANASIO:  Speaking to another person, which then

18   goes into a third document.

19         THE COURT:  For your guidance in going forward, I do

20   view that as an admission.  So...

21         MR. ATTANASIO:  Understood, Your Honor.  Thank you.

22         THE COURT:  Okay.

23      Okay?  Anything else?

24         MR. DAVID BOIES:  Not from us, Your Honor.

25         THE COURT:  Okay.  As you know --

1          **MR. ATTANASIO:**  Not from us, Your Honor.

2          **THE COURT:**  -- we're -- a juror is running late.

3     When we start, when they all get here, I'm going to make a

4 little speech about how they really have to redouble the

5 efforts to get here on time.

6     If it becomes a chronic problem with a particular juror --

7 I think you know which one it is -- we may have to assess.  I

8 mean, one day is okay; but if we start to see this as a

9 pattern, we may have to talk about it because we can't lose

10 this amount of time every day.

11     So, okay.  Anything else?

12                    (No response.)

13          **THE COURT:**  All right.  Very good.  Thank you.

14          **MR. DAVID BOIES:**  Thank you.

15          **MR. HUR:**  Thank you, Your Honor.

16          **THE COURTROOM DEPUTY:**  Court stands in recess.

17               (Recess taken at 8:31 a.m.)

18          (Proceedings resumed at 9:19 a.m.)

19     (Proceedings were heard out of the presence of the jury.)

20          **THE COURT:**  Are we ready to bring the jury out?

21          **MR. DAVID BOIES:**  Yes, Your Honor.

22          **MR. HUR:**  Yes, Your Honor.

23          **THE COURT:**  Okay.

24     (Proceedings were heard in the presence of the jury.)

25          **THE COURT:**  Good morning, members of the jury.

PRELIMINARY JURY INSTRUCTIONS

1    Welcome back.

2        This is our first day.  It is important and I want to

3    really emphasize to you the need to get here on time.  We

4    really need to start at 8:30 so that we can move through this

5    process and complete it consistent with the schedule that I

6    advised you of.  So redouble your efforts to get here.  If we

7    end up starting this late every day, it would be a problem.

8    So, please, see what you can do.

9        Okay.  Now, as I mentioned to you yesterday, the day will

10   begin today with some preliminary instructions from me to

11   assist you in your work, and then we're going to have opening

12   statements from counsel.

13                   **PRELIMINARY JURY INSTRUCTIONS**

14       **THE COURT:**  Members of the jury, you are now the jury

15   in this case, and it is my duty to instruct you on the law.

16       It is your duty to find the facts from all the evidence in

17   the case.  To those facts you will apply the law as I give it

18   to you.  You must follow the law as I give it to you whether

19   you agree with it or not.  And you must not be influenced by

20   any personal likes or dislikes, opinions, prejudices, or

21   sympathy.  That means that you must decide the case solely on

22   the evidence before you.  You will recall that you took an oath

23   to do so.

24       At the end of the trial, I will give you final

25   instructions.  It is the final instructions that will govern

**PRELIMINARY JURY INSTRUCTIONS**

1    your duties.

2        Please do not read into these instructions or anything I

3    may say or do that I have an opinion regarding the evidence or

4    what your verdict should be.

5        To help you follow the evidence, and as I indicated during

6    jury selection yesterday, I will give you a brief summary of

7    the positions of the parties.

8        This is a class action in which three people called

9    plaintiffs are asserting claims against Google on behalf of

10   groups of other people which are called classes.

11       Plaintiffs claim that Google violated the law by

12   collecting, saving, and/or using information about their

13   activities on mobile apps without their permission or consent.

14   These claims concern Google's conduct between July 1st of 2016

15   and September 23rd, 2024.

16       Plaintiffs assert three claims against Google.

17       First, plaintiffs claim that Google's conduct violated the

18   California Comprehensive Computer Data Access and Fraud Act,

19   which is abbreviated as CDAFA.

20       Second, plaintiffs claim that Google is liable for

21   invasion of privacy.

22       And, third, plaintiffs claim that Google is liable for

23   intrusion upon seclusion.

24       Google denies plaintiffs' claims and also asserts certain

25   affirmative defenses that, if you find them to be applicable,

**PRELIMINARY JURY INSTRUCTIONS**

1    would make Google not liable in whole or in part.

2        These affirmative defenses include Google's assertions

3    that plaintiffs consented to Google's conduct at issue and that

4    some portion of each of plaintiffs' three claims are barred by

5    the applicable statutes of limitations.

6        Plaintiffs have the burden to prove the requirements of

7    their claims, and Google has the burden to prove the

8    requirements of its affirmative defenses.

9        When a party has the burden of proving any claim or

10   affirmative defense by a preponderance of the evidence, it

11   means you must be persuaded by the evidence that the claim or

12   the affirmative defense is more probably true than not true.

13       You should base your decision on all of the evidence,

14   regardless of which party presented it.

15       The evidence you are to consider in deciding what the

16   facts are consists of, one, the sworn testimony of any witness;

17   two, the exhibits that are admitted into evidence; three, any

18   facts to which the lawyers have agreed; and, four, any facts

19   that I may instruct you to accept as proved.

20       In reaching your verdict, you may only consider the

21   testimony and exhibits received into evidence.  Certain things

22   are not evidence, and you may not consider them in deciding

23   what the facts are.  And I will list them for you.

24       One, arguments and statements by lawyers are not evidence.

25   The lawyers are not witnesses.  What they may say in their

1    opening statements, closing arguments, and at other times is

2    intended to help you interpret the evidence, but it is not

3    evidence.  If the facts as you remember them differ from the

4    way the lawyers have stated them, your memory of them controls.

5          Two, questions and objections by lawyers are not evidence.

6    Attorneys have a duty to their clients to object when they

7    believe a question is improper under the rules of evidence.

8    You should not be influenced by the objection or by my ruling

9    on them.

10         Three, testimony that is excluded or stricken or that you

11   are instructed by me to disregard is not evidence and must not

12   be considered.  In addition, some evidence may be received only

13   for a limited purpose.  If I instruct you to consider certain

14   evidence only for a limited purpose, you must do so, and you

15   may not consider that evidence for any other purpose.

16         Four, anything you may see or hear when the Court is not

17   in session is not evidence.  You are to decide the case solely

18   on the evidence received at trial.

19         Some evidence, as I indicated, may be admitted only for a

20   limited purpose.

21         If I instruct you that an item of evidence has been

22   admitted only for a limited purpose, you must consider it only

23   for that limited purpose and not for any other purpose.

24         Evidence may be direct or circumstantial.  Direct evidence

25   is direct proof of a fact, such as testimony by a witness about

what that witness personally saw or heard or did.

Circumstantial evidence is proof of one or more facts from

which you could find another fact.  You should consider both

kinds of evidence.  The law makes no distinction between the

weight to be given to either direct or circumstantial evidence.

It is for you to decide how much weight to give to any

evidence.

There are rules of evidence that control what can be

received into evidence.  When a lawyer asks a question or

offers an exhibit into evidence and a lawyer on the other side

thinks that it is not permitted by the rules of evidence, that

lawyer may object.  If I overrule the objection, the question

may be answered, or the exhibit received.  If I sustain the

objection, the question cannot be answered, and the exhibit

cannot be received.  Whenever I sustain an objection to a

question, you must ignore the question and you must not guess

what the answer might have been.

Sometimes I may order that evidence be stricken from the

record and that you disregard or ignore the evidence.  That

means when you are deciding the case, you must not consider the

stricken evidence for any purpose.

In deciding the facts of this case, you may have to decide

which testimony to believe and which testimony not to believe.

You may believe everything a witness says, or part of it, or

none of it.

**PRELIMINARY JURY INSTRUCTIONS**

1    In considering the testimony of any witness, you may take

2    into account, one, the opportunity and ability of the witness

3    to see or hear or know the things testified to; two, the

4    witness's memory; three, the witness's manner while testifying;

5    four, the witness's interest in the outcome of the case, if

6    any; five, the witness's bias or prejudice, if any; six,

7    whether other evidence contradicted the witness's testimony;

8    seven, the reasonableness of the witness's testimony in light

9    of all the evidence; and, eight, any other factors that bear on

10   believability.

11   Sometimes a witness may say something that is not

12   consistent with something else he or she said.  Sometimes

13   different witnesses will give different versions of what

14   happened.  People often forget things or make mistakes in what

15   they remember.  Also, two people may see the same event but

16   remember it differently.  You may consider these differences,

17   but do not decide the testimony is untrue just because it

18   differs from other testimony.

19   However, if you decide that a witness has deliberately

20   testified untruthfully about something important, you may

21   choose not to believe anything that witness said.  On the other

22   hand, if you think the witness testified untruthfully about

23   some things but told the truth about others, you may accept the

24   part you think is true and ignore the rest.

25   The weight of the evidence as to a fact does not

**PRELIMINARY JURY INSTRUCTIONS**

1  necessarily depend on the number of witnesses who testify.

2  What is important is how believable the witnesses were and how

3  much weight you think the testimony deserves.

4      I will now say a few words about your conduct as jurors.

5      Please keep an open mind throughout the trial, and do not

6  decide what the verdict should be until you and your fellow

7  jurors have completed your deliberations at the end of the

8  case.

9      Second, because you must decide this case based solely on

10  the evidence received in the case and on my instructions as to

11  the law that applies, you must not be exposed to any other

12  information about the case or to the issues it involves during

13  the course of your jury duty.

14      Thus, until the end of the case, or unless I tell you

15  otherwise, do not communicate with anyone in any way and do not

16  let anyone else communicate with you in any way about the

17  merits of the case or anything to do with it.  This includes

18  discussing the case in person, in writing, by phone, tablet, or

19  computer, or any other electronic means, via email, text

20  messaging, or any Internet chat room, blog, website, or

21  application, including but not limited to Facebook, YouTube,

22  the platform "X," formerly known as Twitter, Instagram,

23  LinkedIn, Snapchat, TikTok, or any other forms of social media.

24      This applies to communicating with your fellow jurors

25  until I give you the case for deliberation, and it applies to

**PRELIMINARY JURY INSTRUCTIONS**

1  communicating with everyone else, including your family

2  members, your employer, the media or press, and the people

3  involved in the trial, although you may notify your family and

4  your employer that you've been seated as a juror in this case

5  and how long you expect the trial to last.

6  But if you are asked or approached in any way about your

7  jury service or anything about this case, you must respond that

8  you've been ordered not to discuss the matter and report the

9  contact to the Court.

10  Because you will receive all the evidence and legal

11  instruction you properly may consider to return a verdict, do

12  not read, watch, or listen to any news or media accounts or

13  commentary about the case or anything to do with it; do not do

14  any research, such as consulting dictionaries, searching the

15  Internet, or using other reference materials; and do not make

16  any investigation or in any other way try to learn about the

17  case on your own.  Do not visit or view any place discussed in

18  this case, and do not use the Internet or any other resource to

19  search for or view any place discussed during the trial.

20  Also, do not do any research about this case, the law, or

21  the people involved, including the parties, the witnesses, or

22  the lawyers, until you have been excused as jurors.  If you

23  happen to read or hear anything touching on this case in the

24  media, turn away and report it to me as soon as possible.

25  These rules are to protect each party's right to have this

PRELIMINARY JURY INSTRUCTIONS

case decided only on the evidence that has been presented here

in court.  Witnesses here in court take an oath to tell the

truth, and the accuracy of their testimony is tested through

the trial process.  If you do any research or investigation

outside the courtroom or gain information through improper

communications, then your verdict may be influenced by

inaccurate, incomplete, or misleading information that has not

been tested by the trial process.  Each of the parties is

entitled to a fair trial by an impartial jury, and if you

decide the case based on information not presented in court,

you will have denied the parties a fair trial.  Remember, you

have taken an oath to follow the rules, and it is very

important that you follow them.

A juror who violates these restrictions jeopardizes the

fairness of these proceedings, and a mistrial could result,

requiring the entire trial process to start over.  If any juror

is exposed to any outside information, please notify me

immediately by sending a note through Ms. Hom signed by any one

of you.

And as I indicated to you before, at the end of each day

and before our breaks, I'm going to give an abbreviated version

of this just to remind you, so bear with me.  It won't be as

long as what we just went through, but all of what I've just

said in summary form will be my instruction to you at the end

of each court day and at the -- between breaks, to not have any

**PRELIMINARY JURY INSTRUCTIONS**

1    connection to this case when you're not otherwise in the

2    courtroom.

3        If there is any news media account or commentary about the

4    case or anything to do with it, as I said, you must ignore it.

5    You must not read, watch, or listen to any news media account

6    or commentary about the case or anything to do with it.  The

7    case must be decided by you solely and exclusively on the

8    evidence that will be received in the case and on my

9    instructions as to the law that applies.  Again, notify me if

10   you're exposed to any outside information.

11       I urge you to pay close attention to the trial testimony

12   as it's given.  During your jury deliberations, when we get to

13   that phase, you will not have a transcript of the trial

14   testimony.

15       If you wish, you may take notes -- some of you are doing

16   so now -- to help you remember the evidence.  If you do take

17   notes, please keep them to yourselves until you go to the jury

18   room to decide the case.  Do not let note-taking distract you.

19   When you leave, your notes should be left in the jury room.  No

20   one will read your notes.

21       Whether or not you take notes, you should rely on your

22   memory of the evidence.  Notes are only to assist your memory.

23   You should not be overly influenced by your notes or those of

24   your fellow jurors.

25       Only the lawyers and I are allowed to ask questions of the

**PRELIMINARY JURY INSTRUCTIONS**

1  witnesses.  A juror is not permitted to ask questions of

2  witnesses.  If, however, you are unable to hear a witness or a

3  lawyer, please raise your hand and we'll make sure to correct

4  the situation.

5      From time to time during trial, it may become necessary

6  for me to talk to the attorneys out of the hearing of the

7  jury -- you saw us doing that during jury selection -- either

8  by having a conference at the sidebar when you're present in

9  the courtroom or by calling a recess and asking you to retire.

10  Please understand that while you are waiting, we are working.

11  The purpose of these conferences is not to keep relevant

12  information from you, but to decide how certain evidence is to

13  be treated under the rules of evidence and to avoid confusion

14  and error.

15      Of course, we will do what we can to keep the number and

16  length of these conferences to a minimum.  I may not always

17  grant an attorney's request for a conference.  Do not consider

18  my granting or denying a request for a conference as any

19  indication of my opinion of the case or of what your verdict

20  should be.

21      Trials proceed in the following way:  First, each side may

22  make an opening statement.  An opening statement is not

23  evidence.  It is simply an outline to help you understand what

24  that party expects the evidence will show.  A party is not

25  required to make an opening statement.

 1          The plaintiff will then present evidence, and counsel for

 2     the defendant may cross-examine.  Then the defendant may

 3     present evidence, and counsel for the plaintiff may

 4     cross-examine.

 5          After the evidence has been presented, I will instruct you

 6     on the law that applies to the case and the attorneys will make

 7     closing arguments.

 8          After that, you will go to the jury room to deliberate on

 9     your verdict.

10          Very well.  We will begin with opening statement, and

11     I believe it's Mr. Boies.

12          **MR. DAVID BOIES:**  Yes, Your Honor, and thank you.

13                         **OPENING STATEMENT**

14          **MR. DAVID BOIES:**  Good morning, members of the jury.

15          I want to, before I begin, take a moment and thank you for

16     your service.  My colleagues from Google and I are going to

17     disagree about a great many things over the next two weeks, but

18     I think one of the things that we are both completely in

19     agreement with is our appreciation for your willingness to

20     serve.  As Judge Seeborg said, our justice system could not

21     function without you.

22          We hope -- is this better?  Or could you hear me before?

23                         (Jurors nodding.)

24          **MR. DAVID BOIES:**  I move around a little bit, and so

25     if you can't hear me, please raise your hand.  But I move

1    around a little bit, so the microphone doesn't work for me --

2    the stationary mic doesn't work for me too well.

3        But I wanted to say that we know this can be a burden, but

4    we hope you also find it rewarding.

5        Every case is important.  This case, because of the

6    principles at stake and because of the money at stake, is

7    particularly important to everybody here.  Your verdict,

8    whatever it is, is going to have impact.

9        As Judge Seeborg said, this is a case about mobile apps,

10   the kind of apps that everybody has on their Android or Apple

11   smartphone or other device.  There are two kinds of apps.

12   There are Google Apps like Maps, and there are third-party apps

13   like Spotify, Reddit, GoodRX, Zillow.  This case is about

14   third-party apps.  You'll hear some references to Google Apps,

15   but the claims here are related to third-party apps.

16       It will not be disputed, I believe, that Google supplies

17   software to third-party app developers -- to most third-party

18   app developers -- not all, but most -- that enable Google to

19   collect data from people's use of those third-party apps.

20       What will be disputed here are two facts.  One, did

21   Google, in fact, take, copy, use data from our plaintiffs' use

22   of third-party apps?  Second, did our plaintiffs give

23   permission or consent for Google to take, collect, or use data

24   from their use of third-party apps?

25       I submit the evidence is going to show, first, Google did,

1    in fact, take, copy, use data from our plaintiffs' use of those

2    third-party apps.

3        Second, our clients never gave permission or consent; and,

4    in fact, Google told them that they would not -- affirmatively

5    told them that they would not collect this data unless they

6    checked a particular box, punched a particular button, moved a

7    particular toggle, and they never did.  In fact, they did the

8    opposite.  They moved a toggle that said -- that Google

9    provided that said, "Don't collect my data."

10        Now, I'm going to try to avoid jargon, but there is a

11    couple of phrases that I'm going to have to come back to a

12    number of times because they're throughout the documents and

13    throughout everybody's testimony.

14        And the first is Web & App Activity, or WAA, W-A-A.  This

15    refers to Google users' use of both Google Apps and third-party

16    apps.

17        And then there is supplemental Web & App Activity, or what

18    Google calls sWAA, s-W-A-A, that relates just to third-party

19    apps' usage.

20        WAA, or Web & App Activity, includes sWAA.  SWAA is, of

21    course, the third-party Web activity.  And you're going to hear

22    a lot about WAA and sWAA by the end of -- by the end of this

23    trial.

24        Now, people's use of apps can tell you a lot about them:

25    what they look at, what they search for, what they purchase.

1    It can tell where you live, what kind of food you like, do you

2    travel, where do you like to travel.  It can tell whether

3    you're married or single or dating.  It can tell whether you're

4    pregnant or trying to get pregnant.  It can tell what your

5    health issues are.  It can tell whether you're looking to buy a

6    house.  A great deal of data.

7        This data is very valuable.  Google describes it, quote,

8    "as data is the gold of the 21st Century."  It's very valuable

9    to Google.  It's very valuable to other people.

10        As I indicated before, one of the ways Google collects

11    data is through third-party apps that use what are called

12    Google software development kits, or SDKs.  Those SDKs have

13    embedded in them code that enables Google to collect data from

14    people's use of those third-party apps.  In other words, Google

15    furnishes these SDKs to app developers.  It helps the app

16    developers more efficiently and quicker develop their apps.

17        But one of the things Google gets out of that is, embedded

18    in those SDKs is code that allows Google to collect this data.

19    I don't think there's going to be any dispute about that.  The

20    dispute is whether Google actually does collect that data or

21    not.

22        Now, Google's data collection code is in millions of

23    third-party apps, and it's in the vast majority of the most

24    used apps.  These are examples of the many, many apps that

25    include Google's data collection code.

OPENING STATEMENT / DAVID BOIES

1        Now, some people are okay with Google collecting data from
2   their use of third-party apps, but there are others who did not
3   want Google checking their data, the so-called sWAA data.

4        Google, some years ago, decided that it could get and keep
5   more users if it promised users transparency and control over
6   whether Google collected data concerning their use of
7   third-party apps or didn't.  And this was important to Google's
8   business model.

9        Google makes most of its money selling advertising to
10  advertisers who want to display their ads to Google's users.
11  The more users Google has, the more advertising dollars it can
12  collect.  Most of its -- most of its adver- -- most of its
13  revenue comes from these advertising dollars.  So the more
14  users they have, the more money Google makes.  So it's very
15  important for Google to keep and increase its users.

16        And Google decided some years ago that it had a problem
17  with people perceiving that use of Google meant that they were
18  losing their privacy.  Not everybody, but enough to make Google
19  concerned about it.  And so Google decided that it could get
20  and keep more users if it promised those users that the users
21  could control what data Google collected and used.

22        And so Google introduced buttons or toggles that people
23  can turn on and turn off to determine whether Google collects
24  data from their use of third-party apps.  These toggles are
25  called the WAA and sWAA toggles.

 1          Now, many users left those toggles on because they were

 2    okay with Google collecting their data, or perhaps they didn't

 3    realize that Google was giving them a choice, but -- because

 4    one of the things that you'll hear is that when Google first

 5    introduced these toggles, in order to permit the collection,

 6    you had to turn it on.  After a period of time, Google decided

 7    too many people were turning it on, and so they then changed it

 8    so that they would collect your data unless you affirmatively

 9    turned it off.

10          So they made it a requirement.  If you were going to ask

11    Google not to collect your data, you had to take an affirmative

12    step.  You had to actually turn the toggle off.  That's what

13    our plaintiffs did, because while many users left the WAA and

14    sWAA toggles on, many other users turned them off.

15          And we're going to submit evidence that shows that when

16    they turned it off, it didn't turn off the collection of the

17    data.  It wasn't really a choice.  They were not really given

18    control.

19          Now, if you turned off the WAA -- two buttons, WAA and

20    sWAA -- if you turned off the WAA toggle, you turned off

21    Google's collection of any Web & App Activity, both Google Apps

22    and third-party apps.

23          You could, however, leave the WAA toggle on and turn the

24    sWAA toggle off.  What that meant was that Google could collect

25    data from your use of Google Apps, but not third-party apps.

OPENING STATEMENT / DAVID BOIES

1   And, remember, this is a case about third-party apps.

2       So Google tells its users, "If you want to turn off our

3   collection of data from your use of third-party apps, you've

4   got two ways of doing it.  You can turn off WAA or you can turn

5   off sWAA."

6       The plaintiffs and the plaintiffs' class are the

7   97,999,000, almost 98 million, users who turned sWAA off either

8   by turning WAA off, or who left WAA turned on and turned off

9   sWAA.  These 98 million people made an affirmative statement to

10  Google.  Not only were they not giving permission and consent,

11  but they were affirmatively saying to Google, "Do not take our

12  data."

13      Now, our plaintiffs represent about 28 percent -- it's at

14  least 28 percent.  It could be as much as a third, but it's at

15  least 28 percent of Google's users.  At least 28 percent of the

16  Google users turned either WAA or sWAA off, telling Google not

17  to collect their data from their use of third-party apps.

18      So Google told -- was told not to collect data.  Google

19  collected their data anyway for 98 months, from July 2016 to

20  September 2024.  During that period of time, Google profited by

21  billions of dollars but paid users nothing.

22      Now, as Judge Seeborg said, we have two class

23  representatives.  They represent this class.  I want to

24  introduce them to you.  One is Pete Rodriguez, and the other is

25  Julian Santiago, and you will hear both of them -- both of them

1   testify.  We had a third class representative that may or may

2   not testify because of medical reasons.

3       Now, the claims that are being made, as Judge Seeborg told

4   you, are three claims:  the so-called CDAFA claim, the

5   California Comprehensive Computer Data Access and Fraud Act --

6   legislators like to have long titles for some of their acts --

7   and the invasion of privacy and intrusion upon seclusion

8   claims.

9       For the CDAFA claim, we have to establish that Google

10  knowingly and without permission took, copied, or made use of

11  any of our plaintiffs' data.  Okay?  Two elements.  They've got

12  to take, copy, or make use of our plaintiffs' data, or -- and,

13  and, in addition, they've got to do so without permission.

14      The other claims, we have to establish both of those

15  elements; but, in addition, we have to establish that what they

16  did was highly offensive to a reasonable person.

17      And you will hear testimony about all of that as the case

18  progresses.  But the primary issues that we're going to be

19  talking about is:  Did Google actually take, copy, or use any

20  of our plaintiffs' data from their use of third-party apps?

21  And, second, was that with or without permission?

22      Now, you're going to see evidence like this at trial, and

23  you're going to have -- be able to get copies of it at least

24  during deliberations.  And some of this is hard to read.  But

25  these are three Android screens.

OPENING STATEMENT / DAVID BOIES

1     And the first screen goes to settings, and you can see

2   that there's a box there that talks about security and privacy.

3   If you click on that, it takes you to the next screen that has

4   a box about privacy.  If you click on that, it goes to a next

5   screen that says "Activity controls."

6     And I've tried to blow up that "Activity controls" so that

7   you can see it.  I'm not even sure, even with blowing it up,

8   you're going to be able to see it.  But it says [as read]:

9       "Choose" --

10   And I'm going to make sure I get the words exactly right.

11   [As read]:

12       "Choose the activities and information you allow

13   Google to save."

14       "Choose the information that you allow Google to

15   save."

16     And what you're going to see is Google repeatedly told

17   people that they could control and decide what information

18   Google saved.

19     Now, in December of 2018, the chief executive officer,

20   Mr. Sundar Pichai, of Google testified in front of Congress;

21   and before he did that, the evidence is going to show he was

22   briefed, as you would expect the CEO to be briefed, he was

23   briefed by his people about how Google's technology was

24   supposed to work.

25     They briefed him on what they were telling the public, and

 1    he went to Congress to explain that, relying on what he'd been

 2    told.  And he said [as read]:

 3              "... for any service we provide our users ... we

 4         give them transparency, choice, and control."

 5         Transparency so that you can see what we're collecting,

 6    and choice and control so you can decide what we're checking.

 7         And he also described how users can go to a particular

 8    setting called "My Account" and as he says, quote, "clearly see

 9    what information we have," closed quote.

10         And he says, quote, "We give clear toggles, by category,

11    where they can decide whether that information is collected,

12    stored."

13         So there are two things that Google is telling its users.

14    First, they can decide -- they can control and decide what

15    Google collects and stores; and, second, they can go someplace

16    and clearly see what information Google has.  The evidence, I

17    submit, is going to show that neither of those things were

18    actually true.

19         This is another statement that Mr. Pichai makes about how

20    you can go to your account settings.

21         [As read]:

22              "We clearly tell the categories and you can

23         click and see the information we have.  You can turn

24         it on or off...."

25         So, again, he is saying, based on what he was briefed, you

OPENING STATEMENT / DAVID BOIES

1    can choose, you can control, and you can see.

2        He says, quote [as read]:

3            "We are pretty explicit about data, which we

4        collect and we give protections for you to turn them

5        on or off."

6        [As read]:

7        **QUESTION:**  If a consumer tells you not to collect their

8        data, then you do not collect the data; is that correct?

9        **ANSWER:**  That's right."

10       Now, based on his briefing, this is what he told Congress.

11   This is what Google was telling everybody.

12       There is an exhibit, Plaintiffs' Exhibit 62, which is the

13   privacy policy.  On the very first page of that, it says

14   [as read]:

15           "You can use our services in a variety of ways

16       to manage your privacy."

17       And at the end it says [as read]:

18           "And across our services, you can adjust your

19       privacy settings to control what we collect and how

20       your information is used."

21       And there was a privacy control that was headed "Web & App

22   Activity" which, again, told users they could control what

23   information was saved, what information was collected.

24       There was a help page for Android and iPhone users.  The

25   heading "What's saved as Web & App Activity."  And it talks

1    about, at the beginning, what's saved when the WAA and sWAA

2    toggles are on.  And then it says [as read]:

3              "To let Google save this information, Web & App

4         Activity must be on."

5         The box next to "Include Chrome History," which is the

6    sWAA box, must be checked.

7         Now, that was in 2018.

8         In 2019, some people within Google began to discover that

9    Google was, in fact, contrary to their representations,

10   collecting data from the use of third-party apps even when the

11   user had said, "I don't want you to," even where the user had

12   turned off WAA or sWAA.

13        And this is from a Mr. Chris Ruemmler, who was a senior

14   software engineer at Google.  And he says [as read]:

15             "It would be good to do a study and know if what

16        is written is being properly interpreted by our

17        users.  I have a fear it most likely is not."

18        So in July of 2019, people within Google began to realize

19   that it's most likely that the consumers are being misled.  And

20   they did do a survey, and that survey was completed by

21   April 27th of 2020.  And what did it find?  It found all

22   participants expected turning off toggle to stop their activity

23   from being saved.

24        That's critical because, as I say, the evidence is going

25   to show that Google continued to collect and save data.  And I

1    don't think my colleague from Google is actually going to deny

2    that.  I think he may say, "Well, we didn't save all the data.

3    We didn't collect all the data.  We didn't use all the data in

4    the same way."

5         But I don't think -- and I ask you to listen carefully to

6    what he says.  I don't think he's going to be able to deny that

7    when WAA and sWAA were turned off, Google still took, copied,

8    and used the sWAA data.  If he does, we'll deal with that.

9         But please listen carefully to whether he actually denies

10   that or not, because Google knew in April of 2020 that all

11   participants expected turning off toggle to stop their activity

12   from being saved.

13        Now, Google planned a further survey.  This is a couple of

14   months later in June 2020.  And in designing that survey, they

15   had a survey hypothesis, what they thought the survey would

16   show.  They thought the survey would show, quote [as read]:

17            "Most respondents will believe that turning off

18        WAA will result in no data being collected from their

19        activity," no data being collected from their

20        activity, "and no personalization in Google's

21        products and services."

22        This is what Google internally believed in 2020 that their

23   users believed.  Obviously, no consent.  Obviously, no

24   permission.

25        [As read]:

1          "Most respondents will believe that turning off

2      WAA will result in no data being collected...."

3      Now, we don't know what happened after this.  The lawsuit

4  was brought a month later.  And we haven't seen the survey.

5  Google has never produced the survey.  They've never explained

6  why the survey wasn't done or, if the survey was done, what it

7  said.  We're going to be asking those witnesses from Google

8  that on the stand.

9      But what we know is, as of June of 2020, Google understood

10 that most of their users believed that turning off WAA would

11 result in no data being collected from their activity.  And as

12 I say, the evidence will be clear that that was not true.

13     Now, throughout the period of '19 -- from July 1990 -- '19

14 -- from July 2019 to June of 2020, there were a number of

15 statements made by people within Google, behind closed doors

16 when they didn't think anybody was looking, talking about how

17 they were misleading consumers.

18     For example, Plaintiffs' Exhibit 3.  This is from

19 Mr. Ruemmler [as read]:

20         "... it appears we have a real problem here with

21     accurately describing what happens when WAA is

22     disabled.  We should fix the current wording to

23     reflect reality...."

24     And this goes to Mr. Monsees, who you're going to hear

25 from later today.  And Mr. Monsees writes back [as read]:

 1          "Thanks for your thoughts.  I've discussed

 2     rewrites to explain the kind of if-it's-on versus

 3     if-it's-off points you bring up."

 4     Those rewrites never saw the light of day, or at least

 5 didn't until this year.  Throughout the class period, those

 6 rewrites never saw the light of day.

 7     Another email from Mr. -- Google responding to

 8 Mr. Monsees, who was talking about what was or was not in a

 9 so-called Google account, and Mr. Ruemmler says [as read]:

10          "I see how the wording here is very deceptive.

11          "'Your Google Account' means your data, not

12     Google's.  If I choose not to store data in my

13     account, then Google should not have access to the

14     data either as the data should not be in the account.

15     What you are stating is WAA (or any of the other

16     controls) does not actually control what is stored by

17     Google, but simply what the user has access to.  This

18     is really bad.  If we are storing data that the user

19     does not have access to, we need to be clear about

20     that fact.  In this case, the user has a false sense

21     of security that their data is not being stored at

22     Google, when, in fact, it is."

23     So Google understood back in 2019 that the user had this

24 false sense of security.  They believed their daughter -- their

25 data was not being collected, was not being stored at Google;

1    but, in fact, it was.

2         And this is interesting.  Mr. Ruemmler says [as read]:

3              "I for one didn't realize Google actually stored

4         all of my activity even if these controls were off

5         and I work at Google!"

6         Exclamation point.  His exclamation point.

7         If Google software engineers didn't know that Google was

8    actually storing their activity even when WAA and sWAA was off,

9    how could an ordinary user know that?

10        And, again, quote, from Plaintiffs' Exhibit 3 [as read]:

11             "The WAA and other controls imply we don't log

12        the data but obviously we do.  We need to change the

13        description to indicate even with the control off,

14        Google retains this data and uses it for X purposes."

15        They didn't do that at least until this year.

16        A month later Mr. Ruemmler writes [as read]:

17             "I don't see how this text can't need

18        modification.  An 'off/on' toggle means the off state

19        is the opposite of the on state.  If the on state is

20        we log your activity, the off state is we don't log

21        your activity."

22        He gets a reply that [as read]:

23             "David Monsees is working with Legal on making

24        the necessary edits."

25        Again, those edits never saw the light of day during the

1    class period up until September of last year.

2        Five months later, quote -- from PX1, Plaintiffs'

3    Exhibit 1, quote [as read]:

4            "Isn't WAA off supposed to NOT," capital N,

5        capital O, capital T -- "log at all?  At least that

6        is what is implied from the WAA page.  So if WAA is

7        off, how are we able to log at all?"

8        A year later J.K. Kearns, a Google product manager [as

9    read]:

10           "To me, it feels like a fairly significant bug

11       that a user can choose to turn off WAA but then we

12       still collect and use the data."

13       That's Plaintiffs' Exhibit 13.

14       From Mr. Roy-Chowdhury, who at the time was a Google

15   vice president of project management, quote [as read]:

16           "We have gaps in our" -- "how our system works

17       and what we promise to people.

18           "We are not taking our responsibility as a

19       steward of user data seriously."

20       Plaintiffs' Exhibit 6.

21       Micah Laaker, who at the time was a Google director of

22   user experience in the office of the chief executive officer,

23   quote [as read]:

24           "I don't have the faintest idea of what Google

25       has on me," closed quote.

1    [As read]:

2        "If I can't see it, I don't know what I should

3    be worried about," closed quote.

4    This is in August of 2020, Plaintiffs' Exhibit 6.

5    And, again, if the executives at Google, if the software

6    engineers at Google can't figure out by looking at the

7    disclosures what is being saved, what is being collected, what

8    is being used, how could an ordinary user?

9    Othar Hansson, Plaintiffs' Exhibit 6, quote [as read]:

10        "At Google we still seem to believe in that

11    fantasy that users agreed to this," closed quote.

12    Now, if you hear them say, "Despite all this, somehow

13    users should have figured out that we were still going to

14    collect and save your data," ask:  Why didn't Google simply

15    clearly say, "We collect and save your data even when WAA and

16    sWAA is off"?  Easy to say that.

17    If they were going to save it outside of their

18    Google Account, which the evidence is they did, not only -- not

19    only did they collect and save the data that they said they

20    wouldn't, but they put it in a place where users couldn't see

21    it.

22    Why didn't they say, "The WAA data is saved outside your

23    Google Account"?  Why didn't they say that "These controls

24    control not whether we collect but where we collect it"?  Why

25    didn't they say, "You're not going to be able to see what data

1   Google collects and saves when WAA/sWAA is off"?  These would

2   be simple things for them to say.  They knew back in 2019 and

3   2020, but they didn't do that.

4        Now, if you conclude that Google, in fact, took and copied

5   and saved sWAA-off data and that our users, our plaintiffs, did

6   not give them permission or consent, we're going to be asking

7   for four types of damages, because in addition to establishing

8   liability, we've got to establish that this caused some loss or

9   damage.  And we're going to be seeking four kinds of damages.

10       Compensatory damages, the value of the data Google

11   improperly collected.

12       Disgorgement, which is giving up the profit Google made.

13       Nominal damages for injuries where we can't prove the

14   actual amount of damages.  For example, the evidence will show

15   that the software that Google used to collect this data from

16   people's devices deteriorated the battery and other aspects of

17   the device.  That's a damage that's hard to calculate, so we'll

18   seek nominal damages for that.  The -- there's emotional

19   distress that can occur.  That, again, is hard to quantify.

20   We'll seek nominal damages for that.

21       And then the last category is punitive damages, which are

22   obviously designed to punish and deter future conduct.

23       Now, in terms of Google's profits and Google's taking of

24   data, the evidence is going to show that the value of the data

25   that Google took was at least $3 a month.  There will be

1  evidence it's much higher, but it was at least $3 a month.  And

2  the number of devices were 174 million.  And so just $3 per

3  month for one month times the number of devices is

4  $523 million.

5      And one of the things that you're going to see is that the

6  amount of money is so large here because the conduct went on so

7  long and because there were so many people affected by it.  You

8  have 174 million devices.  You have essentially 98 million

9  users.  There are more devices than users because some users

10  have more than one device.

11      Now, if there was only -- if people who turned off sWAA

12  only had it off for one month, that would mean the compensatory

13  damages are $523 million.  I don't think even Google is going

14  to say that they believe that people who turned it off only

15  left it off for one month.

16      One of the most important things that you're going to have

17  to decide is how many months, how many average months did

18  people leave the sWAA off, and there's going to be different

19  testimony about that.  I'm going to ask every one of their

20  witnesses how long -- because Google obviously has this

21  information better than anybody else, I'm going to ask each one

22  of their witnesses:  How long, on average, did people keep sWAA

23  off?

24      But before we get to that, you will hear some evidence

25  that the average number of months was 56.  98 months in the

 1    whole class period.  Obviously, not everybody kept sWAA off the

 2    entire period.  There will be a -- there'll be testimony that

 3    they kept it off an average of 56 months, which would result in

 4    $29 billion, $29 billion of damages.

 5         Now, that's a huge number, and one of the things that I

 6    asked during jury selection was whether, if the evidence

 7    established that the damages were many billions of dollars,

 8    would you be prepared to award that, and you all said you

 9    would.  And the reason that this is so large is because there's

10    so many people involved and there's so much time that went on.

11         For example, if you take the $29 billion number, that's

12    only a little bit less than $300 per person over the entire

13    eight-year period.  It's only a little -- it's about $168 per

14    device over the entire period.  This is -- this is a function

15    of how long the period is and how many people are involved.

16         This seems like a large number.  It's not so large in

17    connection with what Google's advertising revenue was just from

18    three products that you're going to see in a moment.  But it is

19    a large number.  I'm cognizant of that.  And I'm cognizant that

20    this is a number that, it's beyond my comprehension.  I don't

21    know whether it's beyond yours or not, but it's going to be

22    hard to get your head around that.  And that's one of the

23    reasons I asked during jury selection whether you were prepared

24    to do that if the evidence showed it.  And I think the evidence

25    will show it, and it will show it because of the number of

1    people involved and how long it went on.

2        If it was only off one month a year -- the class period

3    was eight years.  If it was only off one month a year, that

4    would be over $4 billion, and that's only $42 a person, only

5    $24 a device.  That's, again, because of the number of devices

6    involved, the number of people involved, and the length of

7    time.

8        Now, I told you a minute ago that there was over

9    $50 billion -- again, billion with a "B" -- that Google made in

10   revenue over the class period from just three products that

11   benefited from sWAA-off data.  How much their profits was is

12   something that is going to be complicated.  I'm going to try to

13   be candid with you about what I think is complicated and what

14   I think is simple.  This is compli- -- this is going to be

15   complicated.

16       We know it's more than $2.28 billion, but how much more,

17   we're going to have to be asking Google witnesses for.  The

18   data we've gotten -- I think you'll hear experts tell you the

19   data we've gotten from Google is not entirely consistent.  We

20   know it's more than $2.28 billion or that's what we believe the

21   evidence will show, but how much -- how much more is something

22   that, again, you're going to have to listen to the evidence and

23   make a judgment on.

24       Now, I told you before there were questions that Google

25   didn't want to answer, like:  Why didn't they just tell

1    people -- if they were going to collect data, why didn't they

2    simply tell people that they were going to do that?  Why didn't

3    they say, "We're not going to use it this way; we're going to

4    use it some other way"?  "We're not going to collect it in your

5    account.  We're going to collect it someplace else"?  If that

6    was what they were going to do, why didn't they just tell them?

7          In addition, these are four questions that I don't think

8    Google can answer.  I don't think Google has an answer to these

9    questions.

10          First, where did anyone ever tell Google users that Google

11   collected, saved, or used sWAA data when sWAA or WAA were

12   turned off?  Listen to what they tell you.  Listen to what my

13   colleague tells you today.  Listen to what their witnesses say.

14   Listen to whether they ever tell you anywhere that Google users

15   were told this.  And if they start showing you pieces of paper,

16   take the time to look at those pieces of paper and see whether

17   they even mention WAA or sWAA or whether they're talking about

18   something else.

19          Second, where could a user go to see what sWAA data Google

20   had collected and saved when WAA or sWAA were turned off?  You

21   saw where they repeatedly said, "You can go to your account,

22   the My Account setting, and see what we've collected on you."

23   And if WAA or sWAA were turned on, you could; but when sWAA was

24   turned off, you couldn't see what they were collecting.  So

25   it's a double untruth.  Not only did they collect it, but they

1    told users that they could see what was being collected and

2    they couldn't.

3         And I, again, ask you, listen to what my colleague from

4    Google says today.  Listen to what their witnesses say.  See if

5    they ever tell you where a user could go to see the sWAA data

6    that had been collected.

7         Third, how could a user control whether Google collected

8    and saved sWAA data when sWAA was off?  They said you could

9    control it, but how could that -- how could you?

10        And last, as I indicated before, if Google's own software

11   engineers and their own executives all the way up to the chief

12   executive officer didn't understand that Google collected and

13   saved sWAA data when WAA or sWAA were turned off, how could an

14   ordinary user be expected to know that?

15        And if you hear Google's witnesses or my colleague from

16   Google telling you, "Well, this is what was not in the

17   Google Account," or, "This is what we didn't use the sWAA-off

18   data for," I hope an alarm goes off in your head because I hope

19   what you are listening for is not what did Google not use the

20   data for, but what did Google use the data for; not what data

21   didn't they collect, but what data did they collect.

22        And I ask you to listen very carefully to see whether they

23   deny that when sWAA was off, Google collected no data, which is

24   what they thought, what the survey people thought.  That's what

25   Google believed.  That's what Google believed.  That's what the

1    survey people said.

2        Is there anything that they can tell you -- can they tell

3    you here that they didn't collect any sWAA-off data?  And can

4    they tell you where they showed Google users -- where they

5    showed Google users where that sWAA-off data was?

6        Thank you very much for your attention.  I'm not going to

7    get a chance to talk to you again until the end of the case,

8    but, again, thank you for your service.

9            **THE COURT:**  Is it Mr. Hur?

10           **MR. HUR:**  Your Honor, I think we need to do a

11   microphone switch.  It might take a couple of minutes.

12           **THE COURT:**  Okay.

13                   (Pause in proceedings.)

14           **THE COURT:**  Why don't we go ahead and take a short

15   break.  So we'll let counsel get set up.  Let's make it just no

16   more than a ten-minute break.  So we'll start at 20 of.

17       Remember my admonitions.  Don't discuss this amongst

18   yourselves or with anyone else.

19       I'll see you in another ten minutes.

20       (Proceedings were heard out of the presence of the jury.)

21           **MR. DAVID BOIES:**  Your Honor, can I just say, this has

22   appeared.  We were given -- we exchanged demonstratives.  I

23   don't know whether this is a new demonstrative or not.

24           **MR. HUR:**  Your Honor -- I'm sorry.

25       Go ahead, Mr. Boies.

PROCEEDINGS

```
1          MR. DAVID BOIES:  I just -- so when something like
2    this appears, I just wonder what it is and whether it's
3    something new.
4          THE COURT:  Mr. Hur?
5          MR. HUR:  Your Honor, it's just a board of one of the
6    screens that we have shared with them.  We also sent a
7    screenshot of the board.
8          MR. DAVID BOIES:  So this is just another way of
9    displaying it?
10         MR. HUR:  Yes, exactly.
11         MR. DAVID BOIES:  Okay.
12         MR. SANTACANA:  We disclosed it.
13         MR. DAVID BOIES:  Okay.  Thank you.
14         THE COURT:  Are you going to be writing on this or --
15         MR. HUR:  Your Honor, I'm going to put a board on it.
16         THE COURT:  That's fine.  That's fine.
17         MR. HUR:  Yeah.
18         THE COURT:  Okay.
19         MR. HUR:  Thank you.
20         THE COURT:  See you in ten minutes.
21              (Recess taken at 10:28 a.m.)
22              (Proceedings resumed at 10:41 a.m.)
23         (Proceedings were heard out of the presence of the jury.)
24         THE COURTROOM DEPUTY:  Please remain seated and come
25    to order.
```

 1          **THE COURT:**  Okay.  Are we ready to bring the jury out?

 2          **MR. DAVID BOIES:**  Yes, Your Honor.

 3          **MR. HUR:**  Yes, Your Honor.

 4          **THE COURT:**  All right.

 5      (Proceedings were heard in the presence of the jury.)

 6          **THE COURT:**  The jury is present.

 7      Mr. Hur, your opening statement.

 8          **MR. HUR:**  Thank you, Your Honor.

 9                        **OPENING STATEMENT**

10          **MR. HUR:**  Good morning.  Once again, my name is

11  Ben Hur, and I represent Google in this case.

12      There's one thing that I agree with with plaintiffs'

13  counsel, and that is I want to thank you for your service as

14  jurors.

15      As the judge explained to you, your role is fundamental to

16  our democracy because at the heart of our judicial system is

17  the idea that all of us are equal under the law.  And here in

18  this courtroom, over the next few weeks, you are the people

19  empowered to uphold that ideal; and in order to do that, you

20  really need to keep an open mind.  The judge said it.  You

21  heard it from plaintiffs' counsel as well.  And make sure you

22  hear both sides of the story before you make a decision.

23      And the reason that's important is because there's a lot

24  of information you haven't heard about this case so far.  For

25  example, you did not hear plaintiffs' counsel utter the words

 1    "Google Analytics for Firebase."  That is the product that

 2    collects data, that Google uses to collect data from

 3    third-party apps.  Google Analytics for Firebase is the product

 4    that is at issue in this case, and you didn't hear the

 5    plaintiffs' counsel mention it even once.

 6        You didn't hear him explain that it is a product that app

 7    developers use to help them understand what their users are

 8    doing on the app so that they can make their apps better.  You

 9    didn't hear that app developers download this product so that

10    they can analyze the data that their users are providing.

11        You also didn't hear that when an app developer signs up

12    for Google Analytics for Firebase, they have an agreement with

13    Google Analytics for Firebase, and that agreement says that

14    they must disclose to every one of their users that the app is

15    using Google Analytics for Firebase and that Google Analytics

16    for Firebase is collecting data.

17        Brooklyn, can you please put up Slide 5.

18        You saw this in the plaintiffs' presentation.  Every

19    single one of these apps and every single one that downloads

20    Google Analytics for Firebase agrees that it will tell their

21    own users that their app uses Google Analytics for Firebase to

22    collect and process data.  Google Analytics is a business tool

23    used by apps to help them analyze their data.

24        You can take that down.  Thank you.

25        Now, you also didn't hear plaintiffs talk about many of

1    the disclosures in this case that Google makes to its own

2    users.  You didn't see any disclosures about Google Analytics.

3    You didn't see any disclosures about Web & App Activity or

4    supplemental Web & App Activity.  You heard the plaintiffs'

5    counsel talk about it, but he didn't even show you what Google

6    says about it.  I mean, he did show you this.

7        If you can put up Slide 7, please.

8        7, please.  Oh, I'm sorry.  25.

9        He did show you this one.  And what I want to point you

10    to -- he pointed you to that box on the far right, "Activity

11    controls," but he didn't actually show you what the activity

12    controls screen says.

13        Here's what it says.  At the very top, it talks about --

14    it says "Google Account" and it says "Activity controls."  This

15    is the screen where Google discloses the Web & App Activity

16    setting and the supplemental Web & App Activity setting.  Okay.

17    This is sWAA.

18        And the plaintiffs' counsel made it sound like Google

19    doesn't tell you very much about what it saves and how it saves

20    it.  Look at the very top of this screen.

21        [As read]:

22            "The data saved in your account helps give you

23            more personalized experiences across all Google

24            services.  Choose which settings will save data in

25            your Google Account."

1    [As read]:

2        "Safer with Google."

3    The next line [as read]:

4        "You control what data gets saved to your

5    account."

6    Now, it's true that in the middle of this screen, Google

7    doesn't also say here "Web & App Activity saves data to your

8    Google Account."  It's true.  But Google does say it three

9    times on the same screen at the very top.

10    And it's true that for the subsetting sWAA -- this is

11    sWAA.  I'm sorry.  My handwriting is terrible.  Can you see

12    that?  That says sWAA.

13    The subsetting sWAA, it's true it doesn't say "in your

14    Google Account" at the end; but, again, Google tells users on

15    the very same screen three times that what sWAA controls is

16    whether data is saved to your Google Account.

17    This is the toggle the plaintiffs' lawyers are talking

18    about, and they didn't even bother to show it to you.

19    Now, you may be wondering, why does it matter whether data

20    is saved to a user's Google Account or not?  And I'm going to

21    help explain that to you.

22    As I mentioned, the data in this case, the data that's at

23    issue, the data relating to activity on third-party mobile

24    apps, is by a product called Google Analytics for Firebase.

25    Now, throughout this trial you may hear the phrase

 1   "Google Analytics for Firebase."  You may hear

 2   "Google Analytics."  You may hear "Firebase."  But they're all

 3   referring to the same product:  Google Analytics for Firebase.

 4        In addition, there's an integration to Google Analytics

 5   for Firebase called Google AdMob and that's an integration that

 6   helps apps measure app performance.

 7        Google Analytics is a business product.  It is directed

 8   towards apps.

 9        The Google Account, as we just talked about, is a

10   consumer-facing product that is directed towards individuals.

11   So you may be familiar with the Google Account because, if you

12   sign up for Gmail, you'd get a Google Account.  If you get an

13   Android phone and set it up, you set up a Google Account.  This

14   is a consumer-facing product, not a business-facing product.

15        You didn't hear this mentioned at all.  This case is about

16   non-personal data, data that isn't tied to any user's identity.

17   It is de-identified data.  What is non-personal data?  It's

18   data that contains no name, email address, home address, or

19   billing information.  It's not tied to personal identity, and

20   it is not used for personal advertising.

21        What about personal data?  Personal data is data that's

22   tied to a person's name, their email address, their home

23   address, or their billing information.

24        Now, why is this important?  Because Google Analytics for

25   Firebase, again, the product at issue in this case, collects

1    non-personal data, data that isn't tied to a person's identity,

2    whereas the Google Account is for activity that is tied to a

3    person's name, email address, and the like.

4        And one of the questions that the plaintiffs' counsel

5    asked you to consider is:  What does this sWAA setting actually

6    do?  This is the setting.  What does it actually do?

7        When sWAA is on, non-personal data on the left can be

8    combined with personal data on the right.  The Google Analytics

9    for Firebase data can be combined with personal data.  But when

10   sWAA is off, the non-personal data on the left cannot be

11   combined with the personal data on the right.

12       So what sWAA does is ensure that the non-personal data

13   collected by Google Analytics cannot be combined with personal

14   data in a user's Google Account.  That is what the toggle is

15   meant to do, and that's what Google disclosed to its users.

16       Now, over the course of the next 20, 25 minutes or so, I'm

17   going to cover three things.  I'm going to first cover how

18   Google Analytics makes apps better; and then I'm going to cover

19   how Google Analytics adheres to the sWAA setting, how

20   Google Analytics is consistent and operates in the way that it

21   tells users; and, finally, I'm going to tell you about how

22   Google Analytics is itself disclosed to its users.

23       So let's learn a little bit more about Google Analytics.

24   The people who are going to tell you about Google Analytics are

25   two primary witnesses.  First, Steve Ganem, who's the director

1   of product management for Google Analytics.  And you met him

2   yesterday.  He's sitting right here at counsel table.  And he's

3   going to talk to you about how Google Analytics functions, what

4   it's for, how it helps app developers improve their apps, and

5   the security features that Google Analytics has created so that

6   non-personal data can never be combined with personal data when

7   sWAA is off.

8       Belinda Langer, she's the director of product management

9   for mobile app ads, and she will talk about how when sWAA is

10  on, and depending on other settings, Google Analytics data can

11  be used to personalize ads, and that Google makes more money

12  when sWAA is on and ads are personalized but Google doesn't do

13  that when sWAA is off.  She'll also tell you that

14  Google Analytics can help apps measure ad performance.

15      So what exactly is Google Analytics?  Now, Google

16  Analytics is not going to build you an app.  So imagine a

17  restaurant owner wants an app.  They might hire an app

18  developer to build it.  They might build it themselves.  But

19  once the app is created, the app will download an analytics

20  product.  Google Analytics is just one of many that app

21  developers can use.

22      And the reason why an app developer will download an

23  analytics tool is because they want to know what their users

24  are doing on the app.  So, for example, if you have a burger

25  app, what pages are loading too slowly?  How many people used

1  the app last week?  What are people clicking on the most?  In

2  which month did we sell the most burgers?  This is the kind of

3  information that Google Analytics helps apps learn about their

4  users so that they can improve their apps and make sure they're

5  functioning optimally.

6      Now, you heard very little about exactly what data we're

7  talking about here or what it looks like.  This is the kind of

8  information that Google Analytics actually provides to apps.

9  It's aggregated data that isn't tied to any particular user.

10     So, for example, you can see the total number of users

11  that this sample app had over the last 30 days, 117,000; over

12  the last seven days, the app had 25,000 users; over the last

13  day, 4,000 users.

14     Google Analytics can even provide more up-to-date

15  information about the number of users who have used the app in,

16  say, the last 30 minutes.  Why is that valuable?  For example,

17  if suddenly there are very few people using your app, you might

18  think there might be a problem with the app and you can address

19  it so that your users aren't out -- don't have the app

20  unavailable for too long.

21     This is the kind of aggregate information that

22  Google Analytics collects and provides to app developers.

23     Google Analytics -- again, this is the contract that

24  Google Analytics has with every app developer, and Google

25  prohibits apps from disclosing personal information.

1    So the contract with the apps says [as read]:

2         "You will not and will not assist or permit any

3    third party to pass information to Google that Google

4    could use or recognize as personally identifiable

5    information."

6    Apps are prohibited from sending Google personal

7    information.  Why?  Google doesn't need personal information

8    for this product and tells apps that it does not want that

9    data.

10    Now, if an app violates Google's policy and, for example,

11    sends an email address in a field that's for the type of

12    burger, then that is a violation.  Google still can't use that

13    data because the product is designed to, in that example, count

14    the number of burgers, not use email addresses, but that is in

15    violation of Google's policies.

16    And if Google becomes aware that there are serious

17    violations of this, it will take action and kick apps off of

18    the Google Analytics for Firebase platform.

19    Now, I told you when I first started speaking that Google

20    requires all apps to disclose Google Analytics, and here's

21    where Google says it [as read]:

22         "You must disclose the use of Google Analytics

23    and how it collects and processes data.  This can be

24    done by displaying a prominent link to the site 'How

25    Google uses data when you see our partners' sites or

1        apps.'"

2        So just imagine, every single app that uses

3    Google Analytics is required to tell its users about this.  If

4    a user downloads 50 apps, each of those 50 apps is required to

5    tell the user about Google Analytics.  You heard plaintiffs'

6    counsel say that this was all a surprise.  All the apps are

7    required to disclose it.

8        How does Google Analytics adhere to the sWAA setting?

9    And, again, you didn't really see how the technology works.

10   You didn't see much about the sWAA setting.  So this is

11   intended to help you understand how the technology actually

12   works, and you'll hear from the witnesses to verify that this

13   is how it works and this is what happens.

14       How is Google Analytics data used when sWAA is on?  Data

15   is saved in a user's Google Account.  When this setting, when

16   this is checked, data is saved to a user's Google Account.  Why

17   is that important?  Because when data is saved to a user's

18   account, it can be used to personalize content, and we'll talk

19   a little bit more about what that means.

20       But when sWAA is on, the data can be used to personalize

21   content.  When sWAA is off, that non-personal data that we

22   talked about cannot be used to personalize any experiences to

23   the user.

24       And when sWAA is on, data is tied to a person's identity.

25   When sWAA is off, it is not tied to a person's identity.  This

 1   is what the sWAA toggle controls.  Let's look at an example.

 2        Let's say that you have a user named Jim.  And Jim wants

 3   to use the burger restaurant app that we've been talking about.

 4   Goes on the app, he wants to make a reservation.  He types in

 5   his name -- you can see his name at the top -- his email

 6   address, and his phone number.  And then there's some

 7   information at the bottom that isn't tied to his identity.

 8   It's a property ID for the burger restaurant; it's a user ID

 9   that's associated with the app; and then there is a

10   reservation, the behavior that the app engages in.

11        Google Analytics gets the information that is not tied to

12   the user, it's not tied to the user's identity.

13   Google Analytics doesn't get the name, the email address, or

14   the phone number.

15        Now, what Google does is it developed an extensive consent

16   check process so that it could determine whether or not this

17   de-identified ID is a Google Account holder who has sWAA on.

18        And if sWAA is on, then the data that Jim provided to the

19   restaurant app that he made a reservation can be saved in the

20   user's Google Account.  And why would Jim want to do that?  For

21   example, if a user does that, Google Maps might recommend

22   directions to the restaurant.  At the time of the restaurant,

23   Google Maps might suggest, "Hey, you should leave.  It's going

24   to take you 20 minutes to get there."

25        Those are the kinds of experiences that having sWAA on can

1    provide to Jim based upon information that is saved to his

2    Google Account.

3         What happens when sWAA is off?  When sWAA is off, it's a

4    similar process.  Jim makes the reservation.  The data that

5    isn't tied to Jim is provided to Google Analytics for Firebase.

6    But after the consent check process, Google determines that

7    sWAA is off, so no data is associated with Jim's

8    Google Account.  The information is not saved in his account

9    and cannot be used to personalize his experiences.

10        Look, I'll be candid with you.  Google makes more money

11   when users have sWAA on because personalized experiences mean

12   people are on Google more and, as I'll show you in a moment, it

13   can lead to targeted ads for which Google -- for which Google

14   profits more; that is true.

15        But this case, every class member in this case had sWAA

16   off.  That's why all the data in this case is not personally

17   identifiable.  It is non-personal data.

18        Now, I want to take this opportunity to explain to you

19   what plaintiffs' theory is because I don't think it was very

20   clear from what you heard earlier.

21        Plaintiffs' theory is that when sWAA is off, Google can't

22   even get this information, information that isn't tied to a

23   particular person's identity.

24        Now, what would that mean for the burger app?  If

25   Google Analytics for Firebase could not get information about

1    every reservation that was made on its app by its users, then

2    it couldn't rely on Google Analytics to process all of its

3    information and give it the kind of aggregated statistics that

4    would be valuable.

5        Remember this?  We saw this slide.  Plaintiffs' theory is

6    that if 10,000 of these users had sWAA off, Google Analytics

7    wouldn't even know that those users were using the app.  So

8    instead of reporting 25,000 users, Google Analytics would

9    report to this app 15,000 users, which would be inaccurate.

10       How long do you think this app would use Google Analytics?

11   And the theory is that Google designed this sWAA setting in a

12   way that would essentially render Google Analytics completely

13   worthless.

14       Now, you can quibble with the words that Google provides

15   to users, and I'll show you the disclosures and show you what

16   Google says, but the idea that Google intended for sWAA to work

17   in a way that would render Google Analytics inoperable is not

18   credible.  That's what the evidence will show.

19       I mentioned ads to you.  There are no personalized ads

20   when sWAA is off.  When sWAA is on and depending on other

21   account settings, a user can make a reservation and they can

22   get a targeted ad.  So, for example, if you've made a

23   reservation at the restaurant, you may get an ad for a discount

24   coupon when you go.

25       When sWAA is off, that cannot happen.  The information

 1    that Jim put into the app to make the reservation cannot be

 2    used to target an ad to Jim.

 3        Now, as you know, there are ads -- ads are all over the

 4    place on the Internet, but the reservation that Jim made is not

 5    stored in Jim's Google Account and cannot be used to target an

 6    ad to him.

 7        So what does the sWAA button do?  How is Google Analytics'

 8    data used?  When sWAA is on, the data is saved in the user's

 9    Google Account.  When sWAA is off, it is not.  When sWAA is on,

10    the data is used to personalize experiences and ads.  When sWAA

11    is off, it is not.  And when sWAA is on, the data is tied to a

12    user's identity; and when sWAA is off, it is not.  That is what

13    this setting does.  That is what it was designed to do.

14        Let's talk about disclosures that Google Analytics makes,

15    and I want to start by talking about a couple of witnesses that

16    you heard the plaintiffs' counsel talk about, David Monsees and

17    Chris Ruemmler.

18        And David Monsees is the senior product manager for the

19    Footprints Team, and he will tell you about how WAA and sWAA

20    work.  He will explain to you how Google made its disclosures.

21    He will explain to you how the product was designed to operate,

22    and he's also going to tell you about concerns that people at

23    Google had about WAA and sWAA and what Google did to address

24    those.

25        You'll also hear from Chris Ruemmler, who's the senior

1  software engineer for Data Governance and Risk, and he too will

2  tell you about his communications with Mr. Monsees and what his

3  concerns were about WAA and sWAA.

4       And, Brooklyn, can you please put up 43.

5       This is an email that the plaintiffs' counsel put up.

6  What Mr. Ruemmler will explain is that this was about a

7  proposal that Google made that Mr. Ruemmler objected to; and

8  based on Mr. Ruemmler's objection, Google decided not to go

9  forward with the proposal.  Okay?  This has nothing to do with

10  what is at issue in this case.

11       You can take that down.  Thank you.

12       And both Mr. Ruemmler and Mr. Monsees will tell you that

13  all of those emails that you saw in the plaintiffs'

14  presentation, none of them had to do with Google Analytics for

15  Firebase or the data that is collected by Google Analytics for

16  Firebase.  And maybe that's why you didn't hear about that

17  product, because those emails are not about the data and the

18  product that is at issue in this case.

19       Let's talk about the Google Account, and I'm going to show

20  you some of the disclosures that Google makes to its users

21  about Google Analytics and about what data can be saved in the

22  user's Google Account.

23       Now, as I mentioned, the Google Account is a consumer

24  product directed to individual users, and Google allows people

25  to save activity in their Google Account, and there are many

 1    types of activity that I will walk through with you.  This is

 2    going to take a few moments because there are several

 3    disclosures that Google makes to its users about what can be

 4    saved in a Google Account and how that data is used.

 5         So the activity you keep helps Google make services more

 6    useful for you, like helping you rediscover the things you

 7    searched for, read, and watched.  You can see and delete your

 8    activity using the controls on this page.

 9         When you create a Google Account, like most things on the

10    Internet today, you agree to the privacy and terms.  So to

11    create a Google Account, you'll need to agree to the terms of

12    service; and, in addition, when you create a Google Account,

13    you agree to the privacy policy.  Not a surprise.

14         Later in the privacy and terms, Google talks about the

15    data you're in control of.  Depending on your account settings,

16    some of this data may be associated with your Google Account,

17    and we treat this data as personal information.

18         What Google is telling users they're in control of is data

19    that's tied to their personal information because that is their

20    data.  Now, you heard or you saw a couple of slides about

21    Google's CEO talking about the data that users are in control

22    of.  This is what he's talking about.  Users are in control of

23    personal information.

24         And just think about how this would work under the

25    plaintiffs' theory.  If Google could not collect any

1    information, if a user had WAA off, for example, that would

2    mean that a person who did a Google search wouldn't get any

3    results if they had WAA off.  Or if they wanted to watch a

4    YouTube video, they wouldn't be able to log in and see it.

5        Of course Google is going to return search results even

6    when WAA is off, but it's not going to be tied to a person's

7    identity or associated with their personal information.  That

8    is what Google is talking about in the Google Account and their

9    activity.

10        You saw some parts of the privacy policy, but there are

11    some key parts that you didn't see.

12        The activity controls.  Now, the activity controls in the

13    privacy policy tells users that they can decide what type of

14    activity you'd like saved in your account.  For example, you

15    can turn on location history if you want traffic predictions

16    for your daily commute, or you can save your YouTube watch

17    history to get better video suggestions.

18        So what is this activity and how does Google define what

19    the activity involved is?

20        Your activity -- again, this is in the privacy policy --

21    and here is where Google is describing the types of activity

22    that users can save in their Google Account.  What does Google

23    say right at the top?

24        [As read]:

25            "We collect information about your activity in

1          our services, which we use to do things like

2          recommend a YouTube video you might like.  The

3          activity information we collect may include..."

4     There's a long list, but what matters for purposes of this

5     case is the bullet that I've highlighted there at the bottom

6     [as read]:

7          "Activity on third-party sites and apps that use

8          our services."

9          "Activity on third party sites and apps that use

10         our services."

11    I think the parties agree on this, that this is the

12    activity that matters in this case.

13    What does Google say about the activity on third-party

14    sites and apps that use our services?  Here is what Google

15    tells you.  And you saw part of this, but, again, you didn't

16    see the whole thing.

17    [As read]:

18         "Your activity on other sites and apps.  Many

19         websites and apps partner with Google to improve

20         their content and services.  For example, a website

21         might use our advertising services (like AdSense) or

22         analytics tools (like Google Analytics).  These

23         services may share information about your activity

24         with Google" -- "These services may share information

25         about your activity with Google and, in addition,

1          depending on your account settings and the products

2          in use, (for instance, when a partner uses

3          Google Analytics in conjunction with our advertising

4          services), this data may be associated with your

5          personal information."

6      So what is Google telling users here, telling users about

7  Google Analytics?  It's telling users that these services can

8  share information about your activity with Google.  And, in

9  addition, it's telling users that, depending on your account

10 settings, like WAA and sWAA, information that is shared can be

11 associated with your personal information.

12     And that brings us back to here.  Users get to control

13 what data is saved in their Google Account.  It's right at the

14 top.  Google says "Data saved in your account."  You can choose

15 which settings will be saved in your Google Account.  For the

16 third time, you control what data gets saved to your

17 Google Account.

18     And, yes, Google doesn't say it again here, but that's

19 because it says it three times above.

20     And, again, here is the subsetting that matters, sWAA.

21     Now, you may be a little confused about WAA and sWAA, so I

22 do want to clarify one thing.  This case is all about whether

23 users had sWAA off.

24     And sWAA can be off in two different ways.  One, it can be

25 off in and of itself when WAA is on; but if WAA is off, sWAA is

 1    automatically off.  So we're talking about WAA because if it's

 2    off, it controls sWAA.  But really the question is:  Did users

 3    have sWAA off?  And if they did, no personal information was

 4    tied to that user.

 5        Again, Google Analytics, non-personal data.

      Google Account has personal data.  And when sWAA is off, none

 7    of the data from Google Analytics can be saved to the user's

 8    Google Account to personalize ads or content to them or be tied

 9    to their personal identity.

10        You haven't really seen the data that's at issue in this

11    case, so I wanted to show you a sample.

12        Here's the type of data that Google Analytics can provide.

13    And there are reams of data that, of course, are available.

14    There are a lot of apps.  But here is an example of the type of

15    data that Google receives.  And you are going to be asked to

16    decide whether or not receipt and use of this data by

17    Google Analytics to help apps make them better is an egregious

18    breach of social norms -- you didn't hear that phrase, but that

19    is required by one of the claims -- or highly offensive

20    conduct.  This is the kind of data we're talking about.

21        Now, you heard a little bit about the plaintiffs in this

22    case, and later this week you're going to hear from

23    Mr. Santiago and Mr. Rodriguez.  There are a few facts you

24    didn't hear about them.

25        You didn't hear that none of the plaintiffs came up with

 1    this -- the idea for this case on their own.  Each of them are

 2    connected to one of the plaintiffs' law firms or heard about

 3    the case from an article.

 4        You didn't hear that each of them turned their sWAA

 5    setting off shortly before or after meeting their lawyers so

 6    that they could become class representatives.

 7        And you didn't hear that even after they learned about

 8    what the case was about, and even though they're going to

 9    testify that sWAA caused them serious harm when it was off,

10    none of them changed their behavior.  None of them tried to use

11    different apps.  None of them tried to use their apps

12    differently.  None of them used their devices differently.

13    None of them switched devices.

14        They're going to come up here and claim they were

15    seriously harmed but did nothing at all to change their

16    behavior or how they used apps when sWAA was off.

17        Maybe that won't come as a surprise to you because the

18    evidence will show there was no data leak in this case.  There

19    was no data breach.  There was no information that was provided

20    to a third party who used it nefariously.  There is simply

21    going to be no evidence of harm at all.

22        Yet, the plaintiffs' counsel came up here and basically

23    told you that he's going to ask for billions and billions of

24    dollars.  He didn't tell you how any user was hurt.  And let me

25    tell you, if they thought users were hurt, I'm sure that would

1  be -- have been the first thing you had heard.  But they put up

2  billions and billions of dollars and don't even tell you how

3  users were harmed.

4      The other thing he didn't tell you is that their paid

5  expert, getting paid about 800 bucks an hour, analyzed this and

6  he rendered an opinion that the compensatory damages in this

7  case are 523 million.  Okay.  Look, that is an outrageous

8  number in and of itself, and I will talk to you a little bit

9  about why; but their own paid expert wouldn't go near the

10  numbers that the plaintiffs' counsel just put on the screen for

11  you.  There will be no evidence justifying those numbers.

12      Now, you heard from the judge, what lawyers argue to you,

13  what lawyers tell you in opening, what they argue in closing is

14  not evidence.  So I want you to look carefully, I want you to

15  look carefully for the witness who will tell you that there

16  were billions and billions of dollars in compensatory damages

17  in this case because you will not hear it.

18      Now, I just want to talk for a moment about the

19  $523 million number that plaintiffs' expert is going to talk

20  about.  That is based on a panel survey that some folks may be

21  familiar with.

22      But a panel survey is essentially a survey where Google

23  got a subset of people to test what it was like to get all of

24  their data.  So not this kind of sWAA-off data that isn't tied

25  to any individual and is only about apps, but essentially

1    everything that a user does on their phone or on their device.

2    And Google paid users $3 a month for that, for a limited number

3    of people.

4        What the plaintiffs' theory is, is that Google would have

5    paid 174 -- for 174 million devices to do that.  Now, anybody

6    familiar with panel studies knows, just because you might pay

7    somebody some money to do a study doesn't mean you would pay

8    174 million, that amount, because that is not the purpose of a

9    study.

10       Ladies and gentlemen, the evidence in this case will show

11   that there's nothing justifying these numbers; and as you get

12   ready to hear the testimony and the evidence, I do ask you to

13   consider a few questions as well.

14       I ask you to look for evidence that there was actually an

15   invasion of privacy here.  I ask you to look for evidence that

16   the plaintiffs were harmed.  I ask you to consider whether

17   there's overreaching here.

18       And even if you think that Google's disclosures could have

19   been written differently, I ask you to consider the evidence of

20   Google's intent.  Did Google actually intend for sWAA to work

21   in a way that would render Google Analytics useless?  Is that

22   what Google really intended when it created the sWAA button?

23       And, finally, when you listen to the witnesses, when you

24   see emails, ask yourselves:  Are any of these people

25   complaining about how Google Analytics for Firebase is using

1    data, or are these emails about WAA generally?

2        We're about to embark on a somewhat lengthy journey here,

3    and I do want to thank you for your time because I know it's a

4    big commitment.  And I think if you consider these questions,

5    listen carefully to the evidence, and use your common sense to

6    apply that evidence to the law, that you will come to the right

7    decision.

8        Thank you very much.

9        **THE COURT:**  Members of the jury, we are going to take

10    a second break.  This is earlier than we ordinarily would, but

11    we're going to do that so that, as you can see, we need to set

12    up the next phase, which will be the calling of witnesses.

13        So let's take a break and, again, try to make it a little

14    short.  Why don't we look to resume at 20 of.

15        Remember my admonitions.  Don't discuss this amongst

16    yourselves or with anyone else, and we'll see you at 20 of.

17                    (Recess taken at 11:25 a.m.)

18                (Proceedings resumed at 11:42 a.m.)

19        (Proceedings were heard out of the presence of the jury.)

20        **THE COURT:**  Can we bring the jury out?

21        **MR. CARMODY:**  We're ready.

22        **THE COURT:**  Okay.

23        (Proceedings were heard in the presence of the jury.)

24        **THE COURT:**  The jury is present.

25        The plaintiffs can call their first witness.

PROCEEDINGS

1          **MR. CARMODY:**  Thank you, Your Honor.  We're going to

2    call David Monsees.

3     (Witness enters the courtroom and steps forward to be sworn.)

4          **THE COURT:**  If you could please come forward to the

5    stand to be sworn.

6          **MR. SANTACANA:**  Your Honor, we don't have a copy of

7    the binders.

8          **MR. CARMODY:**  As I use the exhibits, Your Honor, we'll

9    hand them out to counsel, I promise.

10          **THE COURT:**  In the future, can you give them a binder

11    at the beginning of an examination of the witness?

12          **MR. CARMODY:**  Okay.

13          **THE COURT:**  Don't do it one at a time.

14          **MR. CARMODY:**  Okay.

15          **MR. SANTACANA:**  Thank you, Your Honor.

16          **THE COURTROOM DEPUTY:**  Mr. Monsees, could you please

17    raise your right hand.

18                        **DAVID MICHAEL MONSEES,**

19    called as a witness for the Plaintiffs, having been duly sworn,

20    testified as follows:

21          **THE WITNESS:**  I do.

22          **THE COURTROOM DEPUTY:**  Great.  Thank you.

23     Go ahead and have a seat.  Make sure you don't roll off

24    the stairs there.

25          **THE WITNESS:**  Oh, okay.  Thank you.

```
 1              THE COURTROOM DEPUTY:  So make sure you speak clearly
 2    into the microphone for our court reporter.
 3         Could you please state your full name for the record and
 4    spell your last name.
 5              THE WITNESS:  Yes.  It's David Michael Monsees.  Last
 6    name is spelled M-o-n-s-e-e-s.
 7              THE COURTROOM DEPUTY:  Thank you.
 8                          DIRECT EXAMINATION
 9    BY MR. CARMODY:
10    Q.   All ready?  Good morning, sir.
11         Let's begin with who you are.  You're a current Google
12    employee; fair?
13    A.   That's correct.
14    Q.   And your job is senior product manager?
15    A.   That's correct.
16    Q.   And you have supervisory authority over Web & App
17    Activity; fair?
18    A.   Yes.
19    Q.   And Web & App Activity, as we've heard, is abbreviated or
20    pronounced sometimes WAA; correct?
21    A.   That's right.
22    Q.   And let's just be clear for what we're talking about here.
23         Web & App Activity, or WAA, is a setting that Google
24    provides to its users; correct?
25    A.   That's right.  It's a Google Account setting along with a
```

1  few other account-level settings we have.

2  **Q.**   And Web & App Activity, kind of hence its name, is about

3  activity in websites and apps; correct?

4  **A.**   That's right.  The base Web & App Activity setting is

5  specifically about websites and apps that Google provides, so

6  Google search or Google Maps, things like that.

7  **Q.**   Yes.

8       And you understand -- well, part of your job, of course,

9  is working on web pages that provide WAA disclosures to

10  users -- Google users; correct?

11  **A.**   That's right.

12  **Q.**   And you understand those statements are at issue in our

13  case?

14  **A.**   Yes, I do.

15  **Q.**   And people come to you within Google from time to time to

16  inquire about WAA; correct?

17  **A.**   That's right.

18  **Q.**   And you prepared today with Google lawyers to give your

19  best testimony; correct?

20  **A.**   Yes, I did.

21  **Q.**   You've had a fair amount of time to prepare with them;

22  right?

23  **A.**   Yes, I have.

24  **Q.**   Okay.

25  **A.**   I've been working on this for quite a few years now.

1    Q.   And even though this is -- I mean, this is the first time

2    we've ever met; correct?

3    A.   That's correct.

4    Q.   And just for context for everyone, you haven't prepared

5    with the plaintiffs for your testimony today; right?

6    A.   No.  I have never worked with the plaintiffs.

7    Q.   Okay.  You're familiar with Google's privacy policy;

8    correct?

9    A.   Yes, I am.

10        MR. CARMODY:  All right.  Let's put up PX62, please,

11   and I move to admit PX62.

12        THE COURT:  And we're showing that just to?

13        MR. CARMODY:  To the witness, I thought.

14        THE COURT:  The witness, right.

15        MR. CARMODY:  But I'm moving it in, Your Honor.

16        MR. SANTACANA:  Your Honor, we don't have a copy of

17   the exhibit.

18        MR. CARMODY:  I thought we --

19        MR. SANTACANA:  Oh, I'm just getting it now.

20        THE COURTROOM DEPUTY:  What's the exhibit number

21   again?

22        MR. CARMODY:  I'm sorry.  PX62.

23        MR. SANTACANA:  No objection, Your Honor.

24        THE COURT:  Exhibit 62 is admitted.

25        (Trial Exhibit PX62 received in evidence.)

MONSEES - DIRECT / CARMODY

BY MR. CARMODY:

Q.   Sir, if we take a look at PX62, this is one version of Google's privacy policy; correct?

A.   That's correct.

Q.   And we can see it became effective on May 25th of 2018; correct?

A.   That's -- yes, that's what it says here.

Q.   And this is what Google, during the class period, had published on its websites for everyday users to read; correct?

A.   That's correct.

Q.   And you would agree with me it's important for Google that its privacy policy be accurate and complete; fair?

A.   That's fair.

Q.   Because Google knows its users are going to rely on what Google posts in its privacy policy; fair?

A.   Yeah, that's fair.

Q.   Okay.  Now, let's start around the middle of the page, if we can.  Google writes [as read]:

        "We build a range of services that help millions
     of people daily to explore and interact with the
     world in new ways.  Our services include..."

     And one of those services, the third one listed, sir, says [as read]:

        "Products that are integrated into third-party
     apps and sites, like ads and embedded Google Maps."

1       Do you see that?

2   **A.**    Yes, I do.

3   **Q.**    Let's talk about what that means for a moment.

4       When someone is thinking of kind of a Google product, they

5   may think of Google Search or YouTube; fair?

6   **A.**    Yes.

7   **Q.**    And those are products that are Google's own products

8   which they're providing directly to users; fair?

9   **A.**    That's right.

10  **Q.**    And a third bullet here that we just took a look at,

11  though, is a bullet that's describing third-party apps and

12  sites where Google's software's embedded there; correct?

13  **A.**    That's right.  Google provides many different solutions to

14  businesses, website app developers, in addition to the products

15  that we provide to our end users.

16  **Q.**    And the term "third-party apps" refers to other companies

17  and their own apps; correct?

18  **A.**    Right.  Like the Yelp app.  If you live in San Francisco,

19  you use the Yelp app a lot, things like that.

20  **Q.**    Reddit, Uber, any number of things; fair?

21  **A.**    That's correct.

22  **Q.**    Okay.  And Google products may be integrated into or

23  included in some of those third-party apps; correct?

24  **A.**    That's right.

25  **Q.**    Like ad services, software that Google serves on

 1  third-party apps that's embedded in those third-party apps;

 2  fair?

 3  **A.**   Right.  If the third party or the developer integrates our

 4  solution like an ad unit, then, yes, we would serve that on the

 5  third-party site.

 6  **Q.**   And a Google user may not even know those display ads are

 7  being sent from -- to Google; correct?

 8  **A.**   I believe Google Ads always identify with an "About this

 9  Ad" control, but I think in general, yeah, it's -- you know,

10  the user is thinking that they're using the third-party site;

11  and, you know, the third party is just using the solutions that

12  we provide to them.

13  **Q.**   So we could agree, then, a user may be on an Uber app and

14  not realizing that the information is also being provided to

15  Google; fair?

16  **A.**   I believe most third-party app developers do or are

17  required to disclose the different providers they use, but

18  I think it's fair.

19  **Q.**   We can agree; correct?

20  **A.**   I would agree.

21  **Q.**   Okay.  Now let's talk about Google Analytics.

22       Another example of Google's services in third-party apps

23  are Google Analytics; correct?

24  **A.**   That's correct.

25  **Q.**   And that's a fancy word, but a simple way to explain

MONSEES - DIRECT / CARMODY

1    "analytics" is it's collecting info, information about what

2    users are doing on these third-party apps; correct?

3    **A.**    It's really -- analytics are all about measurement, how do

4    you help an app developer understand how their app is being

5    used.

6    **Q.**    Was the answer to my question "yes"?

7    **A.**    Yes.

8    **Q.**    Okay.

9    **A.**    I think that's fair.

10   **Q.**    And Google Analytics software also sends Google data

11   directly from what users are doing on third-party apps;

12   correct?

13   **A.**    It really depends on how the third-party app has decided

14   to integrate Google Analytics.  Google Analytics has, I think,

15   a lot of different features that we make available to site and

16   app developers.  So I think what gets sent into

17   Google Analytics really depends on how, you know, Reddit or

18   Yelp, in the examples we're using, have chosen to put that

19   software into their development.

20   **Q.**    My question is maybe a teeny bit different, and maybe I

21   wasn't clear.

22        It's fair to say when Google Analytics are embedded in

23   third-party apps like Reddit or Uber, when I'm on that site

24   doing some business with Uber, that information is being

25   directly sent to Google; correct?

1          **MR. SANTACANA:** Objection.  Foundation.

2          **THE COURT:**  Overruled.

3    **BY MR. CARMODY:**

4    **Q.**    Correct?

5    **A.**    Yeah.  I see what you're saying.

6    **Q.**    Okay.

7    **A.**    I think my previous statement was right.  It really

8    depends on what the third-party developer is choosing to send,

9    but, yes, that data would go from the Uber app to

10   Google Analytics.

11   **Q.**    Well, let's continue with the privacy policy and go down a

12   little bit below.  And right there it says [as read]:

13              "And across" -- "And across our services,

14         you" --

15         And that's referring to the Google user; correct?

16   **A.**    That's correct.

17   **Q.**    [As read]:

18              -- "you can adjust your privacy settings to

19         control what we collect and how your information is

20         used."

21         Correct?

22   **A.**    Yes, that's correct.

23   **Q.**    I mean, Google is telling its users two different things.

24   It starts with a headline "You control what we collect";

25   correct?  That's what Google's saying.

1        [As read]:

2            "Across our services, you can adjust your

3        privacy settings to control what we collect...."

4        Correct?

5    **A.**    I see that here.

6    **Q.**    And how Google uses the user's information; correct?

7    **A.**    That's correct in the context of the variety of services

8    I think --

9    **Q.**    Yeah.

10    **A.**    -- that we discussed at the bullets above.

11    **Q.**    And we can see Google's language is "Across our services,"

12    and we know Google has what?  170 services covered here?

13    **A.**    Oh, I don't know.  Probably something like that.

14    **Q.**    Okay.  And certainly, those privacy settings -- or, excuse

15    me -- across our -- oh, first of all, "Across our services" is

16    referring to all the Google services; correct?

17    **A.**    Yeah, I think it's referring -- since the privacy policy

18    covers all of those, it would be about a variety of services.

19    **Q.**    Including services that Google is providing to third-party

20    apps?  Or let me back up.  I didn't say that the right way.

21        Including Google's services on third-party apps; correct?

22    **A.**    Yes.  I think there would be different controls, and then

23    we would provide likely very differently for third-party

24    services than we do for consumer services, like you mentioned

25    before.

MONSEES - DIRECT / CARMODY

1  **Q.**   We're going to get to that.

2  **A.**   Okay.

3  **Q.**   And, in fact, Google's privacy policy here points its

4  users to privacy settings like WAA; correct?

5  **A.**   Yes.  I believe there are links that explain WAA and other

6  related activity --

7  **Q.**   So for --

8  **A.**   -- controls.

9                         (Simultaneous cross-talk.)

10           (Reporter interrupts to clarify the record.)

11           **MR. CARMODY:**  I'm sorry.

12  **BY MR. CARMODY:**

13  **Q.**   For example, if we turn to page 8 in the policy, we can

14  see a heading called "Activity Controls."  Do you see that

15  right under "Privacy controls"?

16  **A.**   I do.

17           And sorry.  Could I ask a quick question?

18  **Q.**   Yes, sir.

19  **A.**   Do I also have a printout of this?

20  **Q.**   You have it right there, sir.

21  **A.**   Oh, it is in here?

22  **Q.**   Yes, sir.  I'm sorry.

23           And if you look -- so 62 -- we're on PX62.

24  **A.**   (Witness examines document.)  Great.  Thank you.

25  **Q.**   You got it.

1    So do you see right here, we're all looking at the big

2    screen as well, and it has "Privacy controls" and "Activity

3    Controls."  And you agree one of those activity controls is

4    WAA; correct?

5    **A.**   That's correct.

6    **Q.**   Okay.  And then if we go and click on "Go to Activity

7    Controls," let's see what happens.

8        Do you want to click it?

9        We're going to go to what we have labeled here PX84;

10   correct?

11   **A.**   Yes, I see that here.

12          **MR. CARMODY:**  I move to admit PX84.

13          **MR. SANTACANA:**  No objection.

14          **THE COURT:**  84 will be admitted.

15       (Trial Exhibit PX84 received in evidence.)

16   **BY MR. CARMODY:**

17   **Q.**   And now that we can put that on the big screen, this is

18   something we've seen earlier today.

19       And it's important, you would agree, for Google to be

20   accurate and complete on all the information contained in this

21   activity controls page; correct?

22   **A.**   I just want to note real quick, I think I'm missing this

23   exhibit.  My section is blank.  But I'm very familiar with --

24   **Q.**   It should be PX84.  Is it not there, sir?

25   **A.**   Yeah, there just isn't a page there, but I'm very familiar

1    with the activity controls page.

2    **Q.**   Okay.  Good.

3    **A.**   I'm sorry.  Could you repeat your question?

4    **Q.**   Sure.  I apologize for that.

5              **MR. SANTACANA:**  Your Honor, may I give him my copy?

6              **THE COURT:**  Sure.

7    **BY MR. CARMODY:**

8    **Q.**   And you agree it's fair for Google users to rely on this

9    activity controls page we've marked as PX84; correct?

10   **A.**   That's correct.

11   **Q.**   And if we move it on up a little bit -- I think that's the

12   word -- we can see the settings that we've heard about today.

13        And the first setting here on the page is what we've been

14   talking about, which is WAA.  And there's a button on the right

15   that says "Turn on," and there's one where you can turn it off;

16   correct?

17   **A.**   Almost.  This is the Web & App Activity setting.  The

18   button on the right would turn it on, and it would open a

19   pop-up to see the text.  The left-hand side is just indicating

20   to the user that the setting is currently off.

21   **Q.**   Yes.  But, for example -- exactly.

22        So -- and I think what we learned today -- well, let me --

23   let me get back to where I am first.

24        But what we can see at least, this is a toggle we've heard

25   about or a button where a user starts off on "on," they can

1  click the button on the left to turn it off; correct?

2  **A.**    Yeah.  Whether it's on or off, this is how a user --

3  **Q.**    This is it?

4  **A.**    -- can change it in both directions.

5  **Q.**    Okay.  And below that, we can see subsettings; correct?

6  **A.**    That's correct.

7  **Q.**    And the first subsetting talks about -- this is what we

8  learned to be the sWAA button; correct?

9  **A.**    That's correct.

10  **Q.**    And that stands for supplemental Web & App Activity;

11  correct?

12  **A.**    That's right.

13  **Q.**    And this is what a user can click on or not click on to

14  have sWAA on or off for their visits to third-party apps;

15  correct?

16  **A.**    That's right.  If their Web & App Activity is on, they

17  could choose to check and turn on sWAA, and it would show a

18  pop-up that would give them that additional information of

19  extending their Web & App Activity.

20  **Q.**    So we're going to talk about how to turn these settings on

21  and off for a minute, but right now I just want to focus on the

22  differences between WAA and sWAA.

23      So broadly, WAA has to do and covers what people do with a

24  Google product, and we talked about that earlier, like

25  Google Search and Google Maps; correct?

**MONSEES - DIRECT / CARMODY**

1  **A.**    That's right.  It says here that it's --

2  **Q.**    And, sir --

3  **A.**    -- the things you do on Google sites and apps.

4  **Q.**    -- just to move it a little faster because we're going to

5  have some fair time together, I would ask you if you can -- if

6  my question is a "yes," if you need to explain it, sure; but if

7  you don't need to and because you're going to have some time

8  with your own counsel, my question to you, though, just to kind

9  of get through some of this background stuff, is that this sWAA

10  setting -- subsetting covers the third-party apps; correct?

11  **A.**    That's right.  Specifically devices, sites, and apps that

12  use Google services, yeah.

13  **Q.**    So now let's talk about how users can adjust the settings.

14      When a regular consumer creates an account, the WAA

15  setting is automatically on; correct?

16  **A.**    The WAA setting is preselected, and a user can --

17  **Q.**    Is that a "yes" --

18  **A.**    -- change it --

19  **Q.**    -- sir?

20  **A.**    Sorry.  I'm just trying to clarify that a user can change

21  it during account creation.  We preselect the "on" option.

22  They can change it to "off."  And that all happens while a

23  consumer is creating their account.

24  **Q.**    But as a default, it's on.  Are you telling me there's a

25  step between this?

1   **A.**   No.  By the default, it is selected to the on --

2   **Q.**   That's what I thought.

3   **A.**   -- and the user can change.

4   **Q.**   Okay.

5   **A.**   Yeah.  Correct.

6   **Q.**   So we agree everything starts off with WAA on; correct?

7   **A.**   Unless the user changes it, that's correct.

8   **Q.**   Okay.  And one of the ways to turn sWAA off is just to

9   turn WAA off; correct?  It's like a master switch?

10  **A.**   That's right.  Since sWAA extends WAA, WAA has to be on

11  for sWAA to be on.

12  **Q.**   And yet another way that we've learned, and I just want to

13  clarify it with you, that even if WAA is on, if the subsetting

14  below button is on off, then sWAA is on off; fair?

15  **A.**   Yes.  If that checkbox here is unchecked, that would mean

16  that sWAA is off.

17  **Q.**   Now, you know some of Google's users, of course, turn sWAA

18  off; correct?

19  **A.**   That's right.

20  **Q.**   And Google tracks which users turn off sWAA; correct?

21  **A.**   Yes, we do.

22  **Q.**   And you can look up a user's sWAA setting in an internal

23  Google system called Footprints; correct?

24  **A.**   That's right.

25  **Q.**   And you're the lead manager for Footprints?

MONSEES - DIRECT / CARMODY

1   **A.**   Yes.  I'm the product manager.

2   **Q.**   And what I'm going to do is have you take a look at 403,

3   404, and 405 in your binder or on the screen to you.

4          **MR. CARMODY:**  And I'm going to move in, Your Honor,

5   403, Plaintiffs' 404, and Plaintiffs' 405.

6          **MR. SANTACANA:**  I'm sorry, Your Honor.  I just need a

7   moment.  I don't have them.

8          **THE COURT:**  Okay.

9          **MR. SANTACANA:**  Your Honor, I think he should lay some

10  foundation.  He's displaying it before it's been admitted.

11         **THE COURT:**  Well, it shouldn't be.

12         **MR. CARMODY:**  It shouldn't be.

13         **THE COURT:**  It's not his fault.  I don't think it's

14  being displayed to the jury.

15      Can you see anything on the screen?  No.

16         **MR. SANTACANA:**  Okay.  Great.

17      I think he should lay some foundation, Your Honor.

18         **THE COURT:**  All right.  Why don't you just provide us

19  with some foundation.

20  **BY MR. CARMODY:**

21  **Q.**   Sir, you've been designated by Google as the witness who

22  can testify about these very documents; fair?

23  **A.**   Sorry.  About these documents?

24  **Q.**   Yes.  You have been designated by Google to testify on

25  these reports; correct?

 1   **A.**   Yes, meaning reports that are to do with, you know, WAA

 2   and sWAA setting states.

 3   **Q.**   You understand these reports that we're looking at, I've

 4   asked you to look at, come from your own custodial files?

 5   That's what the metadata shows; correct?

 6   **A.**   That's correct.

 7   **Q.**   Okay.  So you're familiar with these documents; right?

 8   **A.**   Yes, I am.

 9           **MR. CARMODY:**   Okay.  I'm going to move into evidence

10   PX403, 404, and 405.

11           **MR. SANTACANA:**   No objection.

12           **THE COURT:**   403, 404, and 405 will be admitted.

13       (Trial Exhibits PX403, PX404, and PX405 received in

14   evidence.)

15   **BY MR. CARMODY:**

16   **Q.**   And now, these reports show the number of United States

17   Google Accounts with WAA and sWAA on each month; correct?

18   **A.**   That's correct.

19   **Q.**   And so let's start with Number 405 that's now in evidence,

20   and we're going to turn to a spreadsheet.

21           **MR. CARMODY:**   And in this kind of green area in the

22   middle, Mr. Boles, if you can kind of turn to that.  And I want

23   to say it's the second-to-last-column here, if we can kind of

24   focus in on that.

25       And, first, can we go, please, to the top of the page so

 1   we're all together in terms of what we're looking at.

 2   **BY MR. CARMODY:**

 3   **Q.**   If we look at the column, see on the top left, sir,

 4   Mr. Monsees, it says "Column 17"?

 5   **A.**   Yeah, I see that.

 6   **Q.**   And that's a date column.  When we go down below, we're

 7   going to see a bunch of dates; correct?

 8   **A.**   I believe when it was --

 9   **Q.**   I hope we do.

10   **A.**   -- scrolled below, we did.

11        Sorry.  My font is super tiny on the exhibits.  I'm trying

12   to go by the screens.

13   **Q.**   Me too.

14        And so we have that.

15   **A.**   Yes.

16   **Q.**   And then what we can see in the column right after that,

17   it has -- it says "Number of Active," and it's talking about

18   the number of active users; correct?

19   **A.**   Correct.  And just to clarify, "active" just means that

20   this account is still being used.

21   **Q.**   Exactly.

22        And then if we go to the far right, we can see it says

23   "Percentage of sWAA of the Active."  That is the percentage of

24   active users with their sWAA buttons on; correct?

25   **A.**   That's correct.

1  Q.   Okay.  So if we just go down, then, to where I wanted to

2  begin, which is the second-to-last kind of -- there you go --

3  we're looking at the date, and what it says is September 1st of

4  2024; correct?

5  A.   That's correct.

6  Q.   And in terms of active users, we can see almost

7  521 million people across America; correct?

8  A.   Just know that users -- these are active accounts, not

9  people.

10 Q.   Okay.  Active accounts.  Fair.

11      And then if we see the percentage of sWAA of that active,

12 it says 73.1 percent; correct?

13 A.   That's correct.

14 Q.   So then by a little arithmetic, we can figure out that

15 27 percent of those users had their sWAA buttons off; correct?

16 A.   That's right.

17 Q.   And so we can see here that we have more than 100 million

18 people in this month, and this month is September, who had the

19 sWAA buttons off; correct?

20 A.   That's right.

21 Q.   Okay.  Now that I'm done with kind of background, let's --

22 let's get into what we're going to talk about today.

23      First of all, Google's number one asset is the trust of

24 its users; fair?

25 A.   I think so, yes.

 1  Q.   Okay.  Let's take a look -- take a look at Exhibit 184.

 2       This is a Google presentation bearing your name on the

 3  cover; correct?

 4  A.   Yes, it is.

 5            MR. CARMODY:  I move in 184, Your Honor.

 6            MR. SANTACANA:  Objection, Your Honor.  It's hearsay.

 7            THE COURT:  Overruled.  184 will be admitted.

 8       (Trial Exhibit PX184 received in evidence.)

 9            MR. SANTACANA:  May I be heard, Your Honor?

10            THE COURT:  No.

11  BY MR. CARMODY:

12  Q.   Let's take a look, sir, if you would, let's turn to

13  page 4.

14       And what we see up top is "User Trust is Google's Number 1

15  asset"; correct?

16  A.   That's right.

17  Q.   What Google writes internally here is [as read]:

18            "We saw a sharp decline in user trust in the

19       second half of 2017, especially in the

20       United States."

21       Fair?

22  A.   That's what I see, correct.

23  Q.   And underneath that it says [as read]:

24            "It was fueled by an ongoing negative press

25       narrative about big tech, data, privacy, and

MONSEES - DIRECT / CARMODY

 1          advertising."

 2          Do you see that?

 3     **A.**   Yes, I do.

 4     **Q.**   And we can see what Google's doing is it's posting a

 5     *Washington Post* article that's saying [as read]:

 6               "Hands off my dial.  15 default privacy settings

 7          you should change right now."

 8          And we see the *60 Minutes* piece.

 9          Is it fair to say, sir, that Google research revealed that

10     when users feel like they have control, they trust Google more?

11     **A.**   I definitely recall research that shows that as we give

12     users additional controls, they feel more confident in the

13     choices that they can make, which I think does correlate to

14     trust --

15     **Q.**   Okay.

16     **A.**   -- but I don't think it's a direct line.

17     **Q.**   Take a look, if you will, sir, at PX186.  This is a two

18     thousand -- excuse me -- a September 2017 presentation called

19     "Pines."  Do you see that?

20     **A.**   Yes, I do.

21     **Q.**   The author is Arne de Booij.  And he was a Google

22     employee; correct?

23     **A.**   That's right.  He was in our research department.

24     **Q.**   Somebody you worked with at Google?

25     **A.**   I do work with him at times.

1  **Q.**  Okay.  And in Google's terminology, Mr. de Booij is a

2  Google user experience researcher?

3  **A.**  That's what I recall.

4        **MR. CARMODY:**  Okay.  I'm going to move in, Your Honor,

5  Exhibit PX186.

6        **MR. SANTACANA:**  Objection, Your Honor.  Hearsay.

7        **THE COURT:**  This is not a document that this witness

8  prepared.  What's the response?

9  **BY MR. CARMODY:**

10  **Q.**  Sir, will you take a look at the last page.  This

11  document, the metadata shows it comes from your custodial

12  files, number one; correct?

13  **A.**  I think that's what I read here.

14  **Q.**  Okay.

15  **A.**  I'm not very familiar with this format.

16  **Q.**  Number two, this is a document you're familiar with.

17  That's why it's in your custodial files; fair?

18  **A.**  I mean, as part of my job, I end up having access to many

19  documents.  Not all of them I have read or reviewed.

20  **Q.**  My question was a tad different.  I said, this is a

21  document, a type of document, you're familiar with, correct, a

22  study like this?

23  **A.**  I'm definitely familiar with types of user research

24  documents like this.

25  **Q.**  Okay.  And the person sending you this is another Google

1  employee, Mr. de Booij, that you worked with; correct?

2  **A.**   Yes.

3  **Q.**   Okay.

4  **A.**   But I would assume that Arne sent this to many

5  individuals.

6           **MR. CARMODY:**  I move in, Your Honor --

7           **THE COURT:**  And the hearsay issue, what's your

8  response?

9           **MR. CARMODY:**  It's an admission by --

10          **THE COURT:**  That was all foundation.  What's the

11  hearsay?

12          **MR. CARMODY:**  It's an admission.  It's a Google

13  document with Google users, Google people, talking to each

14  other.

15          **THE COURT:**  I hear you.

16          **MR. SANTACANA:**  Your Honor, he hasn't laid the

17  foundation.  The witness is not the author of the document.  He

18  hasn't laid the foundation of what his familiarity is with

19  this.

20          **THE COURT:**  Yes, he did.  Overruled.

21          **MR. CARMODY:**  Okay.

22          **THE COURT:**  It will be admitted.

23          **MR. CARMODY:**  Thank you, Your Honor.

24      (Trial Exhibit PX186 received in evidence.)

25  \\\

1  BY MR. CARMODY:

2  Q.   So let's take a look, sir, and let's turn to page 30 --

3  or, excuse me -- yeah, 30.

4       What we're looking at up top, and this is going to be

5  tricky for me, but I think it's Escurel.  That's a code name

6  for the Google study here, the Google project?

7  A.   That's correct.

8  Q.   Okay.  And if we stay with the left column here and maybe

9  make it a little -- there you go -- it says [as read]:

10           "Google providing choice during account creating

11           is very much appreciated by people.  When people

12           discover that they could make a choice, this feeling

13           of control elicited positive feelings like

14           empowerment."

15       I read that fairly; correct?

16  A.   Yes.

17  Q.   And Google goes on to say [as read]:

18           "In the past, we have also found that the

19           feeling of control is crucial to build trust."

20       Correct?

21  A.   That's correct.

22  Q.   So we see this finding is consistent with Google's prior

23  research; correct?

24  A.   That's correct.

25  Q.   Now let's take a look -- let's go back to Google's privacy

1    policy for a second, and it's right on the top.  It's PX62.

2    Those big words on the very first page, "What Google tells its

3    users."

4         And let's put this in context.  We said earlier that the

5    effective date of this privacy policy is May 25th of 2018;

6    fair?

7    **A.**   Correct.

8    **Q.**   And what we saw moments ago is that Escurel project, the

9    study we just saw, that was nine months earlier; correct?

10   **A.**   Correct.  I'll take your word for it.  I don't recall.

11   **Q.**   Okay.  And so the very first thing that we see here is

12   [as read]:

13            "When you use our services" --

14        "You" is the user; correct?

15   **A.**   That's correct.

16   **Q.**   "Our" is Google; correct?

17   **A.**   Correct.

18   **Q.**   [as read]:

19            -- "you're trusting us with your information."

20        So Google is telling its users, "You're trusting us with

21   your information"; fair?

22   **A.**   That's fair.

23   **Q.**   And we go right to the next sentence, and Google says

24   [as read]:

25            "We understand this is a big responsibility" --

MONSEES - DIRECT / CARMODY

1      Fair?

2   **A.**   That's fair.

3   **Q.**   [As read]:

4           -- "and work hard to protect your information

5      and put you in control."

6      Correct?

7   **A.**   That's right.

8   **Q.**   And that gives us a little context for what we saw earlier

9   when you go down to the bottom of this first page, please, and

10  the last line on the last paragraph where Google says to its

11  users [as read]:

12          "And across our services, you can address

13     your" -- excuse me -- "adjust your privacy settings

14     to control what we collect and how your information

15     is used."

16     That's what Google says; correct?

17  **A.**   That's right.

18  **Q.**   And you would agree with me that Google user -- Google

19  needs to get its users to consent to collect data from its

20  users; fair?

21  **A.**   I think it depends on the type of data.  The Escurel study

22  that we were looking at before, for example, was about the

23  account creation flow.  So those are consents mentioned there

24  about the process of creating a Google Account, not necessarily

25  the other bullets that we discussed here prior.

1    Q.    Yeah.    What I'm saying here, and I thought we talked about

2    it earlier, you talked about there's about 170 services.    And

3    two of those are at issue in our case, WAA and sWAA; correct?

4    A.    Yes.

5    Q.    Okay.    And across those services, Google needs to get the

6    user's consent before Google can collect their data.    That's

7    what Google is saying right here; fair?

8    A.    Sorry.    It says here that [as read]:

9            "... you can adjust your privacy settings to

10        control what we collect...."

11    We don't say -- this sentence doesn't say "consent."    Was

12    there somewhere else you were referencing?

13    Q.    No.    I mean, let me ask you.

14    Are you suggesting to us that Google doesn't need consent

15    to collect its users' information?

16    A.    I think that what this is saying is that Google is

17    informing users of the types of data that we collect and the

18    types of services that we provide.

19    Q.    I'm switching to a new question.    I want to see if we're

20    on the same wavelength.

21    Are you -- do you agree with me that Google needs to get

22    its users' consent before Google can collect their information?

23    A.    Oh, I see what you're saying.    You're thinking of things

24    like does the user have to agree, like when you agree to the

25    privacy policy --

**MONSEES - DIRECT / CARMODY**

1    Q.    Yeah.

2    A.    -- create your account, that is a consent?

3          Okay.  Sorry.  I may have just been confused --

4    Q.    That's okay.

5    A.    -- with the terminology.

6    Q.    But you agree with me --

7                        (Simultaneous cross-talk.)

8              (Reporter interrupts to clarify the record.)

9              **THE COURT:**  One at a time.

10             **THE WITNESS:**  I had said:  Sorry.  I may have been

11   confused with your terminology.

12         And, yes, I would agree that Google users need to agree --

13   **BY MR. CARMODY:**

14   Q.    Okay.

15   A.    -- to our policies for our services.

16   Q.    User consent is needed; correct?

17   A.    Yes, user agreement.

18   Q.    And we can also agree that "consent" is synonymous with

19   "permission"; correct?

20   A.    Yeah, I think we could agree with that.

21   Q.    Now, you know Mr. Sundar Pichai because he's the CEO of

22   your company; fair?

23   A.    That's correct.

24   Q.    Okay.  And he's been the CEO for about a decade; correct?

25   A.    I think that's right.

1   Q.   And you've worked with him personally; correct?

2   A.   It's been a while, but I've had a few meetings with

3   Mr. Pichai.

4   Q.   In fact, you worked with Mr. Pichai during the launch of

5   sWAA back in around 2014 or so; fair?

6   A.   I think so, yes.

7   Q.   Okay.  And you knew Mr. Pichai testified before Congress

8   in late 2018; fair?

9   A.   Yes, I did.

10  Q.   And you agree it's a big deal, you know, for someone like

11  Mr. Pichai, a person who runs Google, to testify before

12  Congress; fair?

13  A.   Yes.

14  Q.   And he was testifying about privacy, one of the things at

15  issue in our case.  You understand that; right?

16  A.   Yeah, I believe privacy was part of what Mr. Pichai was

17  talking about.

18  Q.   And Mr. Pichai is not the kind of guy to show up and

19  testify before Congress being unprepared; fair?

20  A.   I wouldn't think so.

21  Q.   Okay.  And, in fact, this -- the presentation we saw,

22  PX184, about the users' -- Google understanding about trust

23  issues with users, that was from June of 2018; correct?

24  A.   Yes, I see that.

25  Q.   About six or so months before Mr. Pichai's testimony

**MONSEES - DIRECT / CARMODY**

1  before Congress; correct?

2  **A.**   That's right.

3  **Q.**   Now, let's set a little context.

4      Just a few months before Mr. Pichai testifies, you briefed

5  him on privacy controls; fair?

6  **A.**   I honestly don't recall.

7  **Q.**   Well, do you recall preparing a presentation, a slide

8  deck, in fact, that included how users -- how Google's users

9  consent to WAA?

10  **A.**   I've prepared, I think, a lot of different slide decks

11  like that.  I don't recall one specifically for Sundar,

12  however.

13  **Q.**   Does what I'm saying sound fair?

14  **A.**   I have definitely prepared many presentations like that in

15  my career.

16  **Q.**   Okay.  And is it fair to say that just a few months before

17  Mr. Pichai testifies before Congress, you prepared a

18  presentation for a meeting with Mr. Pichai which involved

19  changes to improve clarity around WAA?

20  **A.**   I don't recall preparing a slide for -- for Sundar, for

21  Mr. Pichai, about that.

22  **Q.**   We can go -- is it something you disagree with, or you

23  teach me?  I mean, if you agree that it could have happened, we

24  can move on.  If you say, "No, that didn't happen," we're going

25  to have to stop a moment.

1   **A.**   I definitely have prepared a lot of slide presentations,

2   and I could see how one may have been then presented to Sundar

3   as part of preparation, but I don't recall being part of that

4   process.

5   **Q.**   Okay.  You know his testimony before Congress was

6   televised; right?

7   **A.**   Yes.

8   **Q.**   I mean, people at work were talking about it; correct?

9   **A.**   Yeah.

10   **Q.**   You watched it; correct?

11   **A.**   I did.  I think I watched most of it.

12   **Q.**   Okay.  Do you remember what Mr. Pichai said?

13   **A.**   I -- I vaguely remember him talking about the different

14   types of services that Google provides, the different kind of

15   opportunities those services create for our users and for the

16   different businesses that use those services.

17       I recall the team that I worked with at that time being

18   very proud that he talked about some of the privacy controls

19   that we service.  I don't think he mentioned some of my

20   settings directly, but he definitely, I think, showed that

21   Google cares and invests a lot in the space, which made my team

22   very excited.

23   **Q.**   Let's play -- we have about five minutes --

24   **A.**   Okay.

25   **Q.**   -- to play of Mr. Pichai's testimony.

1    Can we do so now?  Would you watch it?

2    **A.**    Sure.

3    **MR. CARMODY:**  Good.

4    Ma'am, we'll get you a transcript so it's on the record.

5    **THE COURT:**  Fine.

6    (Video was played but not reported.)

7    **BY MR. CARMODY:**

8    **Q.**    I think we're finished there, sir.

9    **A.**    Okay.

10   **Q.**    You agree that Mr. Pichai's testimony was consistent with

11   Google's privacy policy?

12   **A.**    Yes, I do.

13   **Q.**    And you heard Mr. Pichai discuss clear toggles that allows

14   Google's users to decide whether their information is collected

15   or stored; correct?

16   **A.**    That's right.  I believe he was talking about activity

17   controls.

18   **Q.**    Yeah.  WAA; correct?

19   **A.**    WAA is one of them, that's correct.

20   **Q.**    Okay.  And it's important, obviously, for Google's CEO,

21   Mr. Pichai, to be accurate and complete when he's testifying

22   before Congress; fair?

23   **A.**    That's fair.

24   **Q.**    Okay.  And it's -- you agree that it would be fair for the

25   American people to rely on what Mr. Pichai is telling Congress

**MONSEES - DIRECT / CARMODY**

1  about; correct?

2  **A.**  Yes.

3  **Q.**  And what Google's doing with user privacy settings; fair?

4  **A.**  That's fair.

5  **Q.**  Okay.  Now, we know Mr. Pichai testified before Congress

6  in December of '18.

7      I want you to take a look at PX3 on your screen, please.

8  This is a grouping, an email string between yourself and Chris

9  Ruemmler, another Google employee.  And this is in July of

10  2019; correct?

11  **A.**  Yes.  I see that here.

12  **Q.**  This is about eight months or so after Mr. Pichai's

13  testimony before Congress; fair?

14  **A.**  That is fair.

15  **Q.**  And Mr. Ruemmler was then the tech lead on Google's

16  Security Trust and Privacy Team; fair?

17  **A.**  Yes, I believe specifically for the Google Workspaces

18  Team, like Gmail.

19  **Q.**  And you guys were discussing Google's disclosures to its

20  users about WAA; correct?

21  **A.**  That -- that's right.

22          **MR. CARMODY:**  Okay.  I move in PX3.

23          **MR. SANTACANA:**  No objection, Your Honor.

24          **THE COURT:**  Exhibit 3 will be admitted.

25      (Trial Exhibit PX3 received in evidence.)

 1  **BY MR. CARMODY:**

 2  **Q.**   Now, this wasn't the first time you and Mr. Ruemmler had

 3  emailed about his questions about WAA; correct?

 4  **A.**   That's right.  He and I had discussed it a few times.

 5  **Q.**   All right.  Now, I want to apologize in advance because

 6  this email is a little confusing to go through because I've

 7  been looking at it for days now, and it contains emails and

 8  responses between you and Mr. Ruemmler that are kind of mixed

 9  together.  You'll say something, he'll respond, and you guys go

10  back and forth; fair?

11  **A.**   Yes.

12  **Q.**   Good.  We're going to sort it through together.

13      Because from your testimony in deposition and his, we've

14  been able to discern what Chris Ruemmler said to you and when,

15  and how you responded and talked to him and when.  Okay?

16  **A.**   Okay.

17  **Q.**   And what we're going to do, as I go through this with you,

18  is to show his questions or his emails to you in yellow, and

19  then we'll see your response in another color.  I think they

20  may have picked like an orange or a red or something.  Okay?

21  **A.**   Okay.

22  **Q.**   And if I get anything wrong, your counsel will get a

23  chance to come up and set the record straight.  Okay?

24  **A.**   Okay.

25  **Q.**   Now, this is a long email, so we're not going to go

1   through all of it, but we're going to go through parts of it.

2   Okay?

3       The first thing, if we turn to the second page here --

4   it's a three-pager -- and we're going to start with the very

5   first email in sequence.  And this is from Mr. Ruemmler to you,

6   and we see the date July 24th of 2019.  And he writes to you

7   [as read]:

8           "David, Bryan Horling said that you are the one

9           responsible for determining how to change the wording

10          at..."

11      And then he gives us a link here.  Do you see that?

12  **A.**   Yes, I do.

13  **Q.**   Okay.  That link is a page entitled "See & control your

14  Web & App Activity"; correct?

15  **A.**   Yes, I believe that's correct.

16  **Q.**   And the parties in this case have referred to that as the

17  WAA help page.  Is that okay if I call it the WAA help page

18  with you?

19  **A.**   That's perfect.

20  **Q.**   Or the help page?

21  **A.**   Yeah, the WAA help page is good.

22  **Q.**   Okay.  Great.

23      And let's put that up for you to look at, sir, and then we

24  can show it to everyone if it comes right in.

25      This is a version of the WAA help page back on May 7th,

1   2019, shortly before Mr. Ruemmler's email.  You have no basis

2   to disagree; correct?

3   **A.**   Right.  No reason to disagree.

4   　　　　**MR. CARMODY:**  Okay.  I move in 113 -- Plaintiffs' 113.

5   　　　　**MR. SANTACANA:**  No objection.

6   　　　　**THE COURT:**  113 will be admitted.

7   　　　(Trial Exhibit PX113 received in evidence.)

8   **BY MR. CARMODY:**

9   **Q.**   And Google gives this page, this help -- the WAA help page

10  so that its users could understand what WAA does and doesn't

11  do; correct?

12  **A.**   That's right.

13  **Q.**   And, again, it's important for Google to be accurate and

14  complete with everything it says in this help page; fair?

15  **A.**   Yes.  We always want to be as accurate as we can.

16  **Q.**   And you -- because you understand and think it's fair for

17  users to rely on Google's help page; correct?

18  **A.**   That's right.

19  **Q.**   Okay.  So now let's go through this together.

20  　　　Let me see.  A page has gone missing.  Would you hold

21  tight?

22  　　　　　　　　　(Pause in proceedings.)

23  　　　　**MR. CARMODY:**  Thank you for the help here.

24  **BY MR. CARMODY:**

25  **Q.**   So let's -- before we get to Mr. Ruemmler's email to you,

1  since he puts up this hyperlink or the web page, I first wanted

2  to just go over the web page.  Then we're going to get to his

3  email where he discusses it with you.  Okay?

4  **A.**   Sure.  Makes sense.

5  **Q.**   Thank you.

6       So let's go to the top of this -- this web page here --

7  the help page.  I'm sorry.  And it's Exhibit 113, and it says

8  [as read]:

9            "When WAA & App Activity is on, Google saves

10       information like..."

11      And the first little thing we can see underneath says

12  [as read]:

13            "Searches and other things you do on Google

14       products, like Maps."

15      Correct?

16  **A.**   Yes, I see that.

17  **Q.**   And then if we go down below that, we can see where it

18  says [as read]:

19            "Google can save information like..."

20      Do you see that?

21  **A.**   Yes, I do.

22  **Q.**   And that's referring to sWAA; correct?

23  **A.**   That's right.

24  **Q.**   And what we see here is a second bullet that says

25  [as read]:

1            "Your activity on sites and apps that use Google

2       services."

3       Correct?

4  A.   That's right.

5  Q.   The third-party sites we talked about earlier that have --

6  that -- where users can get ads, and Google has its analytics

7  embedded in those third-party apps; fair?

8  A.   Right, where the app has chosen to embed those.

9  Q.   Yes.

10      And then we see below that it says [as read]:

11           "To let Google save this information" --

12      See the words "this information"?

13 A.   Yes, I do.

14 Q.   That's referring to everything above that we're looking

15 at; fair?

16 A.   That's fair.

17 Q.   Okay.  And then, of course, we can see right underneath

18 that it says [as read]:

19           "To let Google save this information:  Web & App

20      Activity must be on."

21      And then it goes to the sWAA box, and it says [as read]:

22           "The box next to 'Include Chrome history and

23      activity from sites, apps, and devices that use

24      Google services' must be checked."

25      So it's explaining that to the user; correct?

1    **A.**    That's correct.

2    **Q.**    So -- oh, here it is.

3         Why don't we now turn to -- back to Chris Ruemmler's email

4    to you.

5         Now that we've seen this link that he posts and the

6    wording in the link, what he says is [as read]:

7              "Bryan Horling said that you are the one

8         responsible for determining how to change the wording

9         at" -- and he has the link, the help page -- "to

10        properly reflect how Google handles the user's

11        'Web & App Activity' when the WAA bit is disabled and

12        enabled."

13        Let's stop there.

14        "Disabled" means when the WAA button is off; correct?

15   **A.**    Correct.

16   **Q.**    "Enabled" means when the WAA button is on; fair?

17   **A.**    That's correct.

18   **Q.**    Okay.  Mr. Ruemmler goes on to say [as read]:

19             "The above text actually doesn't describe what

20        happens when the bit is disabled."

21        When WAA is off; correct?

22   **A.**    I see that's what Mr. Ruemmler says here.

23   **Q.**    And for context and fairness for all of us, what he's

24   saying is, I've looked at this help page, which we just saw,

25   Plaintiffs' 113, and he says:  The above text doesn't describe

1    what happens when the WAA button is off.  Correct?

2    **A.**    That's correct.

3    **Q.**    And then he goes on to say [as read]:

4              "However, given the way WAA" -- excuse me --

5         "given the way on/off works, one" --

6         The "one" is referring to a Google user; fair?

7    **A.**    I think so.

8    **Q.**    Okay.

9         [as read]:

10             -- "one has to then assume that disabled (or

11        off) would be the exact opposite of what is described

12        for what happens when the WAA button is on."

13        Fair?

14   **A.**    That's fair.

15   **Q.**    Okay.  Then Mr. Ruemmler goes on to say [as read]:

16             "Today" --

17        "Today" meaning July 9th -- July -- excuse me -- 24th of

18   2019; correct?

19   **A.**    That's correct.

20   **Q.**    We -- in the class period, right?  Smack in the middle of

21   the class period.  We're about three years into the class

22   period; right?

23   **A.**    That's right.

24   **Q.**    Okay.

25        [As read]:

1              "Today, we don't accurately describe what

2       happens when WAA is off."

3       And then he says [as read]:

4              "For instance, we state the following for the

5       'on' state...."

6       And he's referring to when the WAA button is on; correct?

7  **A.**    That's correct.

8  **Q.**    And he's talking about that because he cited the link to

9  the Google help page where it talks about:  When WAA is on,

10 here's what happens; right?

11 **A.**    That's right.

12 **Q.**    And what he's saying is:  When WAA is on, we say all this;

13 and what he's doing is he's cutting and pasting right here

14 about five or so things down to the word "note."  That comes

15 from what we just saw, the help page; correct?

16 **A.**    That's right.  That looks like that was copied from the

17 help page.

18 **Q.**    Exactly.

19      And then he says below that, Mr. Ruemmler, that is

20 [as read]:

21             "So, when Web & App Activity is OFF" -- when the

22      WAA button is off -- "I'd expect the opposite to

23      happen.  The opposite of the above is:  When

24      Web & App Activity is off, Google does not save

25      information like..."

1          And you go down, please, Mr. Boles.

2          And what he's doing is he's copying the same stuff again.

3     And so in context, what we see Mr. Ruemmler saying is that the

4     opposite would be that Google is not saving this information

5     that we're looking at here if the WAA button is on off.  That's

6     what he thought; correct?

7     **A.**    Yes, that's what he's proposing.

8     **Q.**    Okay.  Okay.

9          Then what I want to do is turn to the top of the next page

10    where I believe this continues, and he says [as read]:

11              "But that is not what is done either today" --

12          and then he goes on after the word "or" -- "or what

13          is being proposed going forward."

14         Because you all were talking about another project called

15    this GAIA logging project; correct?

16    **A.**    That's right.

17    **Q.**    Okay.

18    **A.**    I believe this, what I think Mr. Ruemmler here is calling

19    the "GAIA temp logs" --

20    **Q.**    Okay.

21    **A.**    -- that project was actively being developed when he would

22    have sent this email.

23    **Q.**    So let's stop here a moment and dissect this together,

24    though.

25         He says but that is not what is being done today, and he's

1   talking about the help page in Exhibit Plaintiffs' 113 that we

2   looked at where he says, "We're not disclosing what we're

3   collecting when WAA is on off"; correct?

4   **A.**   I mean, I think just to clarify, he's speaking about the

5   Help Center page that we were looking at --

6   **Q.**   Exactly.

7   **A.**   -- which is about Web & App Activity specifically and the

8   data in your Google Account, and so he's kind of writing the

9   opposite here.

10  **Q.**   So the answer to my question was "yes"?

11  **A.**   Yes, but just specifically --

12  **Q.**   Okay.

13  **A.**   -- in the scope of the setting that we're talking about

14  here.

15  **Q.**   Then Mr. Ruemmler continues, and he says [as read]:

16          "The line 'Ads you click, or things you buy on

17      an advertiser's site' we probably don't want to lose

18      ever as that is how we charge for Ads."

19      And then we see a little smiley face; right?

20  **A.**   Yes.

21  **Q.**   "We charge for Ads" is how Google charges for ads;

22  correct?

23  **A.**   Yes.  The "we" meaning Google.

24  **Q.**   And Mr. Ruemmler goes on to say [as read]:

25          "If everybody turned off WAA, then we would not

1          know who clicked on Ads which would be bad."

2          So then he says [as read]:

3              "So, obviously, the opposite of on is not really

4          the way it should work."

5          Correct?

6     **A.**   Yes.  That's what he's saying here --

7     **Q.**   That's the words.

8     **A.**   -- yeah.

9     **Q.**   Well, let's stop here, though, and dissect this for

10    a minute.

11         I mean, the truth is, users' WAA-off data has value;

12    correct?

13    **A.**   Yes.  It's essential to providing the ad services

14    Mr. Ruemmler describes here.

15    **Q.**   Google was making money from it during the entire class

16    period; correct?

17    **A.**   Well, I mean, without this data that we save about ads

18    interactions, not only would Google not know what to charge, we

19    wouldn't know what to pay website and app developers that run

20    our ads.  It's essential to the operation of ads business

21    whether WAA is on or off, and that's why we save the data, as

22    Mr. Ruemmler is mentioning, not against their Web & App

23    Activity, not against their Google Account.  We save it as

24    de-identified information.

25    **Q.**   Was the answer to my question "yes"?

1    **A.**    Yes.  But, I'm sorry.  Trying to give you the context

2    because --

3    **Q.**    Let me ask it again in a simple way.

4    **A.**    -- I think it's important.

5                        (Simultaneous cross-talk.)

6            (Reporter interrupts to clarify the record.)

7            **THE WITNESS:**  Because I think it's important.

8    **BY MR. CARMODY:**

9    **Q.**    My question is simple.  Throughout the class period, which

10   is about eight years and two months --

11   **A.**    Okay.

12   **Q.**    -- Google made money from the class members WAA-off data;

13   fair?

14   **A.**    That -- that's fair.

15   **Q.**    Okay.

16   **A.**    We made money through the normal course of providing our

17   services.

18   **Q.**    Now, let's take a look here and see on the bottom of this

19   very -- right around there, yes.  So -- thank you.

20       So Mr. Ruemmler continues, and he says [as read]:

21           "So, it appears we have a real problem here with

22       accurately describing what happens when WAA is

23       disabled."

24       When WAA is off; correct?

25   **A.**    Yes, I see that.

1    **Q.**   He says [as read]:

2            "We" -- as in Google -- "should fix the current

3    wording" --

4    That's the wording as of July 24th, 2019; correct?

5    **A.**   That's correct.

6    **Q.**   [As read]:

7            "We should fix the current wording to reflect

8    reality...."

9    And then he goes on to talk about this temporary GAIA

10   project, something different; correct?

11   **A.**   Yes.  However, I think he's talking about the -- the

12   temporary GAIA logging solution that we're talking about here

13   specifically is the problem that we need to correct.

14   **Q.**   Yeah.  There's -- let's talk about the problem you think

15   we need to correct --

16   **A.**   Okay.

17   **Q.**   -- because what's happening is if we take a look --

18       **MR. CARMODY:**  And, in fact, if there's any way,

19   Mr. Boles, to put the whole page so we can all together kind of

20   dissect this document in the context of what Mr. Ruemmler is

21   saying.

22   **BY MR. CARMODY:**

23   **Q.**   When he says "So" --

24   There you go.  Thank you.

25   [As read]:

1          "So, it appears we have a real problem here with

2     accurately describing what happens when WAA is

3     disabled."  Or off.  "We should fix the current

4     wording to reflect reality...."

5     And then there's the conjunction "and."  Let's stop there

6 for a second because that's another thought.

7     What he says is -- well, you can even take a look at it.

8     [As read]:

9          "... and if" -- "and if we make the change to

10     the temporary GAIA logging project...."

11     And then he goes on.  So he's talking about two different

12 things in the context of this same sentence; fair?

13 **A.**   I think so, but I believe --

14 **Q.**   Okay.

15 **A.**   -- Mr. Ruemmler's reply -- do you see how it's, like, kind

16 of indented a little bit? -- I think is in reply to what

17 I believe is my sentence above it.

18 **Q.**   Let's take it a step at a time now.

19 **A.**   Okay.

20 **Q.**   Because he's saying [as read]:

21          "We should fix the current wording to reflect

22     reality...."

23     The current wording, we both agree on, is July 24th of

24 2019; correct?

25 **A.**   Correct.

1    Q.    And if we go right up top of page, in that first line up

2    there, it says [as read]:

3              "But this is not what is being" -- excuse me.

4        "This is" -- "This is not what is done either

5        today...."

6        And that word "today," again, is referring to the current

7    wording in July 24th of 2019; fair?

8    A.    That's fair.

9    Q.    Okay.  So you respond the next morning to him; correct?

10   A.    (Witness examines document.)  Yes.  Yes, it looks like it.

11   Q.    Let's take a look at what you said to him the next

12   morning.

13       It starts with right there you say [as read]:

14             "Hi, Chris.  Thanks for the thoughts!"

15       And you said [as read]:

16             "Nick Linkow and I have discussed rewrites of

17       all the UDC Help Center articles (including WAA and

18       sWAA)...."

19       Do you see that?

20   A.    Yes, I do.

21   Q.    And the UDC Help Center articles, one of them we just saw.

22   It's Plaintiffs' Exhibit 113; correct?

23   A.    That's right.

24   Q.    The help page.

25       And you say [as read]:

1              "... to create a more consistent structure to

2         explain the kind of 'if it's on' versus 'if it's off'

3         points you bring up.  Right now, my focus is on the

4         actual consent language...."

5         And you go on to cite a little link there; correct?

6    **A.**   That's correct.

7    **Q.**   And you say [as read]:

8         "... but we'll want those changes to flow down into

9         the Help Center."

10        Correct?

11   **A.**   That's correct.

12   **Q.**   We're going to come right back to this in a moment, so

13   don't -- don't think I'm not, but I want to jump right now to

14   the end, last thing you say to Mr. Ruemmler.

15   **A.**   Okay.

16   **Q.**   Right here -- there it is.

17        The top line of that paragraph, please.

18        You say [as read]:

19             "Today WAA off is logged the same way as being

20        signed out."

21        Correct?

22   **A.**   That's right.

23   **Q.**   And when you said it, that was an accurate statement of

24   fact at the time; correct?

25   **A.**   That's correct.

MONSEES - DIRECT / CARMODY

1  Q.  And "logged" means saved; correct?

2  A.  That's right.

3  Q.  Okay.  So let's step back a second and see if we can make

4  sure we're all on the same wavelength.

5      We agree that when Google users visit third-party apps

6  that use Google Ads and Analytics, that data is sent right to

7  Google; correct?  The user's data.

8  A.  That's correct, if -- depending on what the third party

9  has decided to send in their Google Analytics.

10 Q.  And we agree that after Google receives the user's data,

11 Google checks the user's consent status, that is, WAA on or WAA

12 off; fair?

13 A.  Yes, or sWAA on or sWAA off or whatever is --

14 Q.  Exactly.

15     And where Google saves that data you say depends on what

16 the user's WAA setting is; correct?

17 A.  That's right.  We don't save that data to their

18 Google Account if WAA is off.  It wouldn't make any sense.

19 Q.  You're getting ahead of me.

20 A.  Oh, sorry.

21 Q.  Okay.  You say when WAA is on, Google is saving the user's

22 data into his or her Google Account -- what you called the

23 Google Account; right?

24 A.  That's right.

25 Q.  Okay.  And you're telling us, though, when the user has

MONSEES - DIRECT / CARMODY

1  the WAA button off, Google's saving it somewhere else, not in

2  the Google Account; right?

3  **A.**   That's right.  We do not want to save that data to your

4  Google Account.

5  **Q.**   The data that's being sent to Google is the same

6  regardless of what the user setting is; fair?

7  **A.**   It may be, yes.

8  **Q.**   Okay.  And Google saves the user's data whether they have

9  the WAA button on or they chose to go WAA off; correct?

10 **A.**   I believe it depends, but I think the key is we do not

11 save it to their Google Account if the WAA button is off.  If

12 the WAA button is off, we would have to save it against, say, a

13 de-identified ID space, like what Mr. Ruemmler's describing

14 here.

15 **Q.**   Do you remember my question?

16 **A.**   Yes.

17 **Q.**   What was the answer?  Yes?

18 **A.**   Yes, but I'm saying it depends on the type of data.  We

19 might write it differently.  We might not write it at all.  So

20 it depends on the data.

21 **Q.**   Can we be clear?  Whether the WAA button is on or off,

22 whether a class member decides to put that toggle off --

23 **A.**   Yeah.

24 **Q.**   -- Google is still collecting the user's WAA-off

25 information; fair?

1    **A.**    I think it depends on the type of data, but, yes, some

2    data we'll still collect and, obviously, not save to their

3    Google Account.

4    **Q.**    Now, let's go now to see what Mr. Ruemmler says in

5    response to what you just told him.  Okay?

6        He responds about a half hour later, at 9:08 in the

7    morning, and what he says -- and it's going back to page 1,

8    Mr. Boles -- and what he says and you can see what he's -- this

9    is why this is tough to follow sometimes because he's saying

10   "David."  We know he's speaking to you, and we can see what you

11   wrote right above that.

12       And then he writes [as read]:

13           "The activity controls wording isn't any

14       better."

15       Do you see that?

16   **A.**    Yes, I do.

17   **Q.**    Okay.  And before we continue, what he's doing is he

18   attaches a link to you.  Well, let me back up.  That's not

19   right.

20       You sent him the link of the account settings which we

21   know is Plaintiffs' Exhibit 84.  That's what you sent him right

22   up in your response to him; fair?

23   **A.**    That's right.

24           **MR. CARMODY:**  Okay.  In fact, what you said in

25   opening --

 1          Can we -- can I get help here?  Let's grab that thing and

 2     put it up a second.

 3     **BY MR. CARMODY:**

 4     **Q.**   Okay.  So what we see here, sir, is Mr. Ruemmler's

 5     responding to you and the link you posted.  And to be sure

 6     about it, the link you --

 7                **MR. CARMODY:**  Is PX84 in?  Okay.  That's what I

 8     thought.

 9     **BY MR. CARMODY:**

10     **Q.**   Okay.  So what he post -- what you post is what we call

11     Plaintiffs' Exhibit 84.  Okay?

12     **A.**   Okay.

13     **Q.**   And we can see he talks about that; right?  That's what

14     we're going to see upcoming; right?

15     **A.**   That's right.

16     **Q.**   Okay.  Now, with that context, let's see what Mr. Ruemmler

17     says.  Mr. Ruemmler says [as read]:

18              "The activity controls wording isn't any

19          better."

20          He's talking about the activity controls wording in PX84;

21     correct?

22     **A.**   Yes.

23     **Q.**   Okay.  Then he goes on to say -- well, he attach- -- he

24     goes on to say [as read]:

25              "I see how the wording here is very deceptive."

1          Do you see that?

2    **A.**    Yes, I do.

3    **Q.**    And then what he cites -- and I wish we had it.  Oh, here

4    we have it.

5          The wording he focuses on is the wording we see right up

6    here, which was talked about this morning.

7          Were you in opening statement?

8    **A.**    No, I was not.

9    **Q.**    Okay.  There was discussion about a disclosure that the

10   data saved in your account helps give you, the Google user,

11   more personalized experiences across all Google services and

12   choose which settings you will save in your Google Account.  Do

13   you see that?

14   **A.**    Yes, I do.

15   **Q.**    Mr. Ruemmler takes that exact language, and what he says

16   is [as read]:

17             "I see how the wording here is very deceptive."

18         He goes on to say [as read]:

19             "The problem is it ... 'your Google Account'

20         means your data, not Google's."

21         Those were his words back in July 25th of 2019; correct?

22   **A.**    Yes.

23   **Q.**    And he goes on to say in that next sentence [as read]:

24             "If I choose not to store data in my account,

25         then Google should not have access to the data either

MONSEES - DIRECT / CARMODY

1        as the data should not be in the account."

2        Those were his words; correct?

3   A.   Correct.

4   Q.   And so Mr. Ruemmler is saying, way back when "'your

5   Google Account' means your data," and he is referring "your"

6   being the user data; correct?

7   A.   That's right.

8   Q.   The data of all the Google users; fair?

9   A.   Correct.  Like my search history is my search history.

10  Q.   Mr. Ruemmler goes on to say [as read]:

11           "What you" --

12       And the word "you" is referring to you, sir, Mr. Monsees?

13  A.   I believe so.

14  Q.   Okay.

15       [As read]:

16           "What you are stating is WAA (or any of the

17       other controls) does not necessarily control what is

18       stored by Google, but simply what the user has access

19       to."

20       Do you see that?

21  A.   Yes, I do.

22  Q.   And let's talk about what the user has access to.

23       We can agree that when Google takes WAA off data from a

24  user, the user can't go anywhere online anywhere in life to go

25  see what Google has, can they?

1   **A.**   Correct.  If the data is de-identified, we wouldn't know

2   who to show it to because there's no ID associated with it.  We

3   wouldn't know it's your data or my data.

4   **Q.**   So the answer is a "yes" on that one; correct?

5   **A.**   Yes.

6   **Q.**   Okay.  And there's no way for that user -- Google has the

7   data, just to be sure about it.  So user has -- collects the

8   user's WAA-off data.  As Mr. Ruemmler said, it's stored by

9   Google; correct?

10   **A.**   That's correct.

11   **Q.**   What he said was accurate then and accurate now; correct?

12   **A.**   I think it might be a little bit more complicated.

13   **Q.**   Let me -- can we just focus?  Because you're going to have

14   a chance with your counsel to say basically anything you want.

15        But my question is simply this:  When WAA was off, as

16   Mr. Ruemmler says, Google is still storing the user's WAA-off

17   information; fair?

18   **A.**   Google would still store some WAA-off information.  I

19   mentioned before not everything's the same.

20   **Q.**   And Google does it today, as we sit here today; right?

21   **A.**   And Google does that today, but --

22   **Q.**   Okay.

23   **A.**   -- as I mentioned, that WAA-off data is never going to be

24   saved against your account, which I believe is what

25   Mr. Ruemmler and I are talking about in this email.

1  **Q.**   We're going to get into that too.

2  **A.**   Okay.

3  **Q.**   But what Mr. Ruemmler talks about is transparency; right?

4  Mr. Ruemmler says [as read]:

5         "What you are stating is that the WAA does not

6     actually control what is stored by Google, but simply

7     what the user has access to.  That is really bad."

8     You would agree with me, I think, two things.  First, if

9  Google -- well, it's not "if."  It's Google is storing user's

10  WAA-off data, and the user can't go -- know what it is.  They

11  can't look at it.  They can't get online, like with this thing,

12  and hit My Activity and stuff and go try to look at it; right?

13  The user can't do that?

14  **A.**   Yes.  As I mentioned, though, because it's not associated

15  with the user, we wouldn't know what to show you.

16  **Q.**   So the user couldn't delete it either?

17  **A.**   That's correct, because there's no connection to a user.

18  **Q.**   The only --

19                    (Cell phone interruption.)

20         **MR. CARMODY:**  I thought it was my chorus.

21         **THE WITNESS:**  It wasn't me.

22  **BY MR. CARMODY:**

23  **Q.**   So let's continue with what Mr. Ruemmler says.  He says

24  [as read]:

25         "If we are storing data that the user does not

MONSEES - DIRECT / CARMODY

1          have access to, we need to be clear about that fact."

2          That's what he says; right?

3     A.   Yes, and I agree with him.

4     Q.   And in context, he's saying PX84 isn't clear; correct?

5     That's what he wants to change the wording in; correct?

6     A.   No, I don't think that's what he's saying here, is he?

7     Q.   Well, maybe I'm harkening back.

8          It says [as read]:

9               "I see how the wording here is very deceptive."

10         And we're going to continue on where he wants to change

11    that wording.

12         You've seen this email in preparation; right?  You're

13    familiar with it?

14    A.   I have, yeah.

15    Q.   Okay.  So you know what's coming.  It says "we need to be

16    clear."

17         [As read]:

18              "If we're storing data that the user does not

19         have access to, we need to be clear about that fact."

20         Correct?

21    A.   Yeah.  I agreed with him.

22    Q.   Okay.

23         [As read]:

24              "In this case, the user has a false sense of

25         security that their data is not being stored at

1        Google when, in fact, it is."

2        Those were his words.

3        And then Mr. Ruemmler asks you a question.  He says [as

4    read]:

5            "Have we performed any studies to see what

6        customers think is happening with their data when

7        they turn off these controls?"

8        Do you see that?

9    **A.**    Yes, I do.

10   **Q.**    And these controls -- "controls" has an "S" -- he's

11   talking about WAA and sWAA; correct?

12   **A.**    Yes, as well as, I think, other controls --

13   **Q.**    Okay.

14   **A.**    -- on the activity controls page.

15   **Q.**    Okay.  And then he said [as read]:

16           "It would be good to do a study and know if what

17       is written is properly being interpreted by our

18       users."

19       Do you see that?

20   **A.**    Yes, I do.

21   **Q.**    And he concludes with [as read]:

22           "I have a fear it most likely is not."

23       Then Mr. Ruemmler goes on to say [as read]:

24           "I for one didn't realize that Google actually

25       stored all of my activity even if those controls were

```
 1          off and I work at Google!"
 2          And then he has an exclamation point; correct?
 3   A.    Yes, I see that.
 4   Q.    And you know Mr. Ruemmler.  He's a Berkeley software
 5   engineer; correct?  With a master's; correct?
 6   A.    I didn't know that.
 7   Q.    Okay.  But no basis to disagree; right?
 8   A.    No.  I take your word for it.
 9   Q.    Okay.  And so here's Mr. Ruemmler, who didn't realize
10   that.  And do you think -- would it be fair to say if
11   Mr. Ruemmler didn't understand the effect of the WAA-off button
12   where Google is still collecting his information, that an
13   average user may not either?
14   A.    I think -- like I mentioned before, I think it's kind of
15   complicated because we're in a discussion between Chris and I
16   about a proposed change that would have changed the way logging
17   would have worked for WAA-off.  And I -- again, I mentioned
18   I think I agree with him in his reaction.  Chris and I chatted
19   about this, and we made changes based on our discussion.
20   Q.    Are you telling us you remember -- you have an independent
21   recollection now of speaking to him?
22   A.    I think Chris and I had a few conversations through email
23   and stuff about this Web & App Activity off setting, this GAIA
24   temp project that we think -- saw come up here elsewhere in the
25   exhibit.
```

MONSEES - DIRECT / CARMODY

1   Q.   When Mr. Ruemmler -- okay.

2        So is -- was the answer to my question "yes"?  That is, if

3   Mr. Ruemmler, this Berkeley master's degree computer software

4   engineer, had a problem understanding what happens when WAA is

5   off, that an average Google user may too?  You agree with that?

6   A.   I think we do --

7   Q.   Okay.

8   A.   -- again, in the context of what he and I are discussing

9   here.

10  Q.   So then let's turn to the last emails here.  Or wait a

11  second.  I think I've gone over -- let's go to the next page.

12  I've missed some of the best stuff.

13       Go to the -- stop right here, right where it says "Google

14  needs."

15       It says [as read]:

16           "Google needs to be really clear about what user

17       content we are logging and what we don't

18       store/keep/or log."

19       He says [as read]:

20           "The WAA and other controls imply we don't log

21       the data, but we obviously do."

22       And the data he's referring to here is a class member's

23  WAA-off data; correct?

24  A.   Correct.

25  Q.   Okay.  He goes on to say [as read]:

1          "We need to change the description to indicate

2      even with the control off...."

3      And he's talking about with WAA toggle on off; right?

4  **A.**   That's right.

5  **Q.**   [As read]:

6          "... Google retains this data and uses it for

7      X purposes."

8      Do you see that?

9  **A.**   I do.

10  **Q.**   Google has not told its users "We're logging your data and

11  we're using it to make money off it"; correct?

12  **A.**   I mean, I think if -- we skipped a paragraph.  If we look

13  just right above, it's pretty clear that Mr. Ruemmler's concern

14  here is about data saved to your account without you having

15  transparency and control over it when WAA is off.  And we

16  agreed.  We changed this proposal based on feedback from folks

17  like Chris.

18  **Q.**   I'm not talking -- sir, do you remember my question, first

19  of all, or no?

20  **A.**   Yes.  I'm saying I would have a concern, but I think we

21  skipped an important paragraph above it.

22  **Q.**   I'm not talking about a proposal that was once discussed

23  and then maybe have been tabled.  What I'm talking about is

24  where he says [as read]:

25          "We need to change the description to

1          indicate...."

2          He's talking about the current disclosures as of July 25th

3     of 2019; correct?

4     **A.**    I think -- unfortunately, I have to disagree with you.

5     I think from literally the sentence above it, Mr. Ruemmler is

6     talking about the change.  Because what he's describing above

7     about "any legal investigation against me because it has the

8     data available (for up to 60 days)," he's exactly describing

9     what could have been this project that, as you've mentioned, we

10    tabled.

11         So I think his sentence here is saying:  We would

12    obviously have to change the descriptions.  I agree with Chris

13    if we did the proposal that he's talking about just on the

14    sentence above it.

15    **Q.**    He doesn't say, "We would need," the word you just used.

16    He said, "We need."

17         [As read]:

18              "We need to change the description to indicate

19         even with the control off, Google retains this data

20         and uses it for X purposes."

21         So let me stop there.

22         First of all, did I read that correctly?

23    **A.**    Yes, you did.

24    **Q.**    We know as of that date, as of July 25th of 2019, he spoke

25    the truth.  Right then and there -- forget about future

**MONSEES - DIRECT / CARMODY**

1  proposals.  Right then and there, we do know Google was

2  collecting user's WAA-off data; fair?

3  **A.**    Correct.

4  **Q.**    And Google wasn't then disclosing that to the users, that

5  "I'm using your WAA-off data" and for what purpose; fair?

6  **A.**    Fair.

7  **Q.**    Okay.  Now, let's take a look and now look at your

8  response back to him.

9       And even to this day, sir, do you know where all this

10  WAA-off data is?

11  **A.**    Where all the WAA-off data is?

12  **Q.**    Yeah.

13  **A.**    I'm aware of different systems that store de-identified

14  data; but normally, folks like Chris come to talk to me about

15  identified, the stuff against your Google Account.

16  **Q.**    My question is a simple one.  As you sit here today, do

17  you know where all this WAA-off data is?

18  **A.**    I probably know where a lot of different systems would be,

19  but it doesn't relate to what I work on.  So I'm trying to

20  answer your question very honestly.

21  **Q.**    Do you know --

22  **A.**    I know where a lot of it probably is and the systems

23  within Google that I would go to look at, but because I focus

24  primary on the data saved to your account, not de-identified

25  data, I know a lot more about the account-type data.

1   Q.   What we have, sir, here is your response, returning back

2   to page 1, and we're seeing July 25th of 2019, and we say -- we

3   see you write [as read]:

4          "Hi, Chris.  You can read more about how deletes

5      are processed, which includes how temporary personal

6      logs are processed, and other purposes in the

7      retention article I mentioned."

8   And you give a link; correct?

9   A.   That's correct.

10  Q.   And then you go on to say [as read]:

11         "I would be happy to discuss further."

12  Please feel free to grab 30 minutes with yourself and

13  Leslie Liu.  Correct?

14  A.   Correct.

15  Q.   And here's the important part.  Leslie Liu was a Google

16  lawyer; right?

17  A.   Yes, she was.

18  Q.   So we have you -- I mean, Chris Ruemmler in his email, we

19  can agree, is raising some thorny issues to you; right?

20  A.   Right.

21  Q.   His recommendation of how to change the WAA disclosures,

22  that Google's giving users a false sense of security,

23  questioning you about whether Google has performed studies.

24  You don't answer any of those questions in your response; fair?

25  A.   Correct.

**MONSEES - DIRECT / CARMODY**

1  Q.  Okay.  What you do say is:  Let's get together.  Let's

2  have a Google lawyer present.

3      And is it fair to say, sir, that you then understood if a

4  Google lawyer sat with yourself and Mr. Ruemmler, what you all

5  said may be legally privileged?  Did you understand that?

6  A.  I mean, I think I understood that at the time.

7  Q.  Okay.  That if there was discussion between you all at

8  that point about all the stuff that we've seen here discussed

9  in PX3, that it might not appear ever, not in a lawsuit like

10  this, not ever -- right? -- because it'd be privileged?

11  A.  I'm not very familiar with what -- how things are

12  privileged or not.  But I think we can tell from this email

13  this was a pretty messy, confusing conversation to do over

14  email.  Probably best to talk about it in a meeting, and Leslie

15  knew a lot about this space.

16  Q.  And you see his response right above?

17  A.  I do.

18  Q.  He says [as read]:

19          "Thanks, David.  I'm well aware of that

20      retention documentation.  I set up a meeting to

21      discuss my concerns."

22      That's what he says; correct?

23  A.  Correct.

24  Q.  And did you and Chris Ruemmler and Leslie Liu meet to

25  discuss Mr. Ruemmler's concerns about the WAA disclosures?

1   **A.**   I've gone back through my calendar, and I saw that there

2   was a meeting with the three of us.  I don't recall anything

3   specifically about it.  But as I mentioned before, from

4   discussions with Chris, we did change the project that I'm

5   pretty certain I mentioned I think he's talking about here.

6   **Q.**   One thing we know is changed is there's no more emails

7   like this between you and Mr. Ruemmler.  I mean, we can see

8   right here in PX Number 3, I've counted at least three

9   back-and-forth exchanges, and you -- correct?  First of all,

10  correct?

11  **A.**   Correct, yeah.

12  **Q.**   We know you all talked before this.  You said that earlier

13  on the stand; correct?

14  **A.**   Correct.

15  **Q.**   But I can't find anywhere after where there's anymore free

16  flow of information and discussion with you and Mr. Ruemmler

17  about the disclosures of Google being very deceptive.  Are you

18  aware of any more writings?

19  **A.**   I can't think of any.  This was so long ago.  I don't

20  know.

21  **Q.**   Okay.  So let's turn, sir, let's turn to something else.

22      Do you remember Mr. Ruemmler asked about user studies?

23  **A.**   I do.

24  **Q.**   Okay.  In fact, Google did a number of user studies; fair?

25  **A.**   Yes.

**MONSEES - DIRECT / CARMODY**

1   **Q.**   Okay.  Let's look at one of them.  Take a look on your

2   screen, please, Plaintiffs' Exhibit 2.  This is entitled --

3   it's Google's -- it's an April 27, 2020, summary of a retention

4   controls comprehension study; fair?

5   **A.**   Correct.

6   **Q.**   And the first page identifies Nava -- and I'm going to do

7   some damage here -- I think it's Zokaei as the point of

8   contact?

9   **A.**   Correct.

10  **Q.**   But she is somebody who you worked with; correct?

11  **A.**   That's right.  She was a researcher on the Web & App

12  Activity Team.

13  **Q.**   Exactly.  Just like Mr. de Booij.  What she was --

14  **A.**   Exactly.

15  **Q.**   -- was a user experience researcher; fair?

16  **A.**   Fair.

17  **Q.**   Okay.  And you worked with her on retention control

18  projects like this one; correct?

19  **A.**   That's right.

20  **Q.**   And we know you worked with her here because your name is

21  on the cover; correct?

22  **A.**   Correct.

23        **MR. CARMODY:**  I move into evidence, Your Honor, PX2.

24        **MR. SANTACANA:**  No objection.

25        **THE COURT:**  Exhibit Number 2 will be admitted.

1          (Trial Exhibit PX2 received in evidence.)

2  **BY MR. CARMODY:**

3  **Q.**   So let's turn to page 6.

4          It says "Research Questions," and there's four of them,

5  and they've got little parts and stuff underneath.  But let's

6  just focus on the very top one.

7          And the context here, by the way, timewise, is this is

8  just what?  Nine months after your exchanges with Mr. Ruemmler;

9  correct?

10 **A.**   Yeah.

11 **Q.**   Okay.  So we're going back.  And the very first question

12 says -- and this is -- this is an internal Google research

13 study; correct?

14 **A.**   Correct.

15 **Q.**   [As read]:

16          "What do WAA users expect turning off WAA to

17      mean?"

18          That was the question, the very first thing we see?

19 **A.**   Yeah, one of the objectives of the study.

20 **Q.**   Okay.  And if we now turn to the next page -- or it's

21 actually page, I want to say, 7, it talks about the methods and

22 the procedure, how Google's going to go about doing it; right?

23 **A.**   Correct.

24 **Q.**   Okay.  And if we take a look here on the left side, it

25 says there's going to be nine participants, five female and

```
 1   four male.  They're going to each have 30-minute interviews.
 2        And then as to the procedure, we can turn to the right.
 3   Do you see that?
 4   A.   Yes.
 5   Q.   And underneath that, sir, we see five things:  "Background
 6   questions," "Reaction to the Activities Control page" -- PX84;
 7   correct?
 8   A.   Correct.
 9   Q.   "Expectation of WAA Off"; correct?
10   A.   Correct.
11   Q.   "Retention Flow walkthrough"; correct?
12   A.   Correct.
13   Q.   And the finale is "WAA off and No Data Scenario"; correct?
14   A.   Correct.
15   Q.   Now turn to page 8, and we're looking at the people
16   themselves.  And it looks like we have a fair cross-section of
17   people; correct?
18   A.   I think so.
19   Q.   I mean, some are knowledgeable, very knowledgeable about
20   tech issues.  Some are -- some people are somewhat
21   knowledgeable.  We have male and female.  We have folks from
22   different ages.  Fair?
23   A.   Fair.
24   Q.   And this research resulted in the 50-page presentation
25   that we're looking at now; correct?
```

1   **A.**   That's correct.

2   **Q.**   This research was approved by Google?

3   **A.**   It was conducted by Google.

4   **Q.**   I mean, you followed all the normal standards that Google

5   wants its researchers to follow to come out with a legitimate

6   bona fide study; correct?

7   **A.**   Oh, I see.  I understand.

8        There's a lot of different kinds of studies that we do.  I

9   would assume that Nava, who's very familiar with this, would be

10   following whatever best practices Google has.

11   **Q.**   In fairness, before this lawsuit, nobody ever suggested

12   that this study or its results were somehow inappropriate;

13   correct?

14   **A.**   Correct.

15   **Q.**   Okay.

16   **A.**   I've never heard that.

17   **Q.**   Let's take a look at the results.  Let's turn to page 20.

18   If you -- why don't we go top left in the big -- the big

19   lettering [as read]:

20        "All participants expected turning off the

21        toggle to stop their activity from being saved."

22        Do you see that?

23   **A.**   Yes, I do.

24   **Q.**   And the toggle they're referring to is the very toggle

25   behind me here in the courtroom.  I'm pointing to a foam board

**MONSEES - DIRECT / CARMODY**

1  of PX84; correct?

2  **A.**   Correct.

3  **Q.**   And the toggle is this turn on here and turn off here;

4  correct?

5  **A.**   Correct.

6  **Q.**   Okay.  And what these users say -- and let's even step

7  back a second.

8      In fairness, Chris Ruemmler's concerns were well-founded,

9  his fears where he said he asked you three questions about a

10  research study.  Remember that?

11  **A.**   Yes, I do.

12  **Q.**   And he feared people like him wouldn't understand what

13  WAA off means.

14      In fairness, Mr. Ruemmler was vindicated.  I mean, this is

15  what we see; correct?

16  **A.**   No.  This study is testing a very different concept.

17  Actually, it's cool that we have the foam core up here because

18  if you look, it's a little bit below the table there, but it's

19  the auto delete section.  We were creating a brand-new type of

20  control and that's what we were adding here.

21      What Mr. Ruemmler was discussing on the last email

22  chain --

23  **Q.**   Yeah.

24  **A.**   -- that we were looking at was about, remember that

25  proposal for changing the way WAA-off logging would work.

1          The research we're doing here wasn't, I think, related.

2     This project wasn't related at all, I think, to what

3     Mr. Ruemmler and I were discussing on that email chain --

4     **Q.**   But it doesn't say that --

5     **A.**   -- that we were just looking at.

6                    (Simultaneous cross-talk.)

7           (Reporter interrupts to clarify the record.)

8          **THE WITNESS:**   -- that we were just looking at.

9     **BY MR. CARMODY:**

10    **Q.**   Are you telling us that's what this -- you have an

11    independent recollection of all this?

12    **A.**   No.  What I'm saying is, just from reading that email that

13    we were just looking at, I think when Mr. Ruemmler mentioned

14    research, he's asking research clearly in the context of the

15    change --

16    **Q.**   Okay.

17    **A.**   -- to the way WAA-off logging works.

18         This research wasn't testing that.  This is a very

19    specific research study we did.

20    **Q.**   I can -- I'm kind of semi-comfortable with this now, these

21    50 pages.  But you're saying -- you're not questioning what's

22    presented here.  You're saying I wasn't fairly describing what

23    Mr. Ruemmler's concerns are; correct?

24    **A.**   That's correct.

25    **Q.**   Okay.  And the concerns we spent some time on going over

**MONSEES - DIRECT / CARMODY**

1  in PX3?

2  **A.**   Correct.  This research is very unrelated to I think in

3  PX3.  That was the exhibit we were discussing.

4  **Q.**   And PX3, in fairness, you tell us you didn't respond to

5  those concerns.  You set up a meeting, and you and a lawyer met

6  with Mr. Ruemmler.  And we've never seen another communi- --

7  another written communication about it; correct?

8  **A.**   Correct.

9  **Q.**   Okay.  But now let's take a look.  We all have our

10 recollection of exactly what Mr. Ruemmler said.  And we're

11 going to go back to it as well.

12      But what we see here is, like Mr. Ruemmler [as read]:

13          "All participants expecting" -- "expected

14      turning off the toggle" --

15      And that's referring to the WAA toggle?

16 **A.**   That's right.

17 **Q.**   [As read]:

18      -- "to stop their activity from being saved."

19      And being saved by Google; fair?

20 **A.**   Fair, being saved by Google in their Google Account, like

21 it says right up there at the top.

22 **Q.**   And if you take a look at the right side of the page, you

23 see that "Activity Controls"?

24 **A.**   Yeah.

25 **Q.**   We're looking -- I mean, it's like a mirror image.  If

MONSEES - DIRECT / CARMODY

1  we're looking what I have behind me in a courtroom and we're

2  looking at what people in the Google research study were tested

3  on, we see it's the same thing; right?

4  **A.**   It's a little bit different.  This was a test, like a

5  prototype, so kind of like a concept that we were testing that

6  I think changed a few more times before we finally launched

7  kind of what you see up on the big board.

8  **Q.**   But take a look --

9        **MR. CARMODY:**  Mr. Boles, can you blow up, please, the

10  top of that.

11  **BY MR. CARMODY:**

12  **Q.**   I mean, it says -- I'm looking at [as read]:

13        "Choose which settings will save data in your

14  Google Account."

15  And then right underneath that --

16        **MR. CARMODY:**  Let's blow it up.

17  Oh, is that the best we can do?

18  Oh, thank you.

19  **BY MR. CARMODY:**

20  **Q.**   So it says [as read]:

21        "The data saved in your account helps give you

22  more personalized experiences across all Google

23  services."

24  Do you see it right here, it was word for word?

25  **A.**   Yes, I do.

**MONSEES - DIRECT / CARMODY**

1  Q.   Okay.  And then we have -- well, in fact, let's move on

2  here to the next one because I can see my time is getting close

3  here.

4       So I'm going to run on to the next exhibit.  Take a look

5  at PX9.

6       Well, and before I do -- actually, before I do, are you

7  aware of a single research study that Google can bring into

8  this courtroom where it shows, oh, gosh all the users really

9  did understand when you turn off WAA, we're collecting your

10 information and we're actually making money on it?  Is there

11 ever such a study?

12 A.   I don't think we normally test broad study like that.

13 There's nothing I'm aware of.

14 Q.   Okay.  Okay.  Let's go to PX9, then.

15      We've spoken about Chris Ruemmler.  And it's fair to say

16 that other Google employees also commented on Google users'

17 comprehension of WAA and the WAA button; fair?

18 A.   That's fair.

19 Q.   Okay.  Okay.  And we're looking at this document now, PX9,

20 which is dated June 8th of 2020, just two months after the

21 study we just saw in PX2; correct?

22 A.   That's correct.

23 Q.   And now we have the author of this document is

24 Arne de Booij.  Do you see that?

25 A.   Yes, I do.

 1   **Q.**   We spoke about him earlier in the examination because he

 2   was the gentleman who was on the document talking about

 3   feelings of user control gives them trust in Google; right?

 4   **A.**   That's correct.

 5   **Q.**   Okay.  So Mr. de Booij, you know him.  You said he was an

 6   experience -- a user experience researcher, somebody that you

 7   worked with; fair?

 8   **A.**   That's fair.

 9           **MR. CARMODY:**  Okay.  I'm going to move in PX9.

10           **MR. SANTACANA:**  No objection, Your Honor.

11           **THE COURT:**  Exhibit 9 will be admitted.

12       (Trial Exhibit PX9 received in evidence.)

13   **BY MR. CARMODY:**

14   **Q.**   Now, the research project here was code-named

15   Express Echna?

16   **A.**   Echidna.

17   **Q.**   Echidna.  Okay.

18   **A.**   Some of the names are cute.  This was an account creation

19   flow in Europe.

20   **Q.**   Turn to page 4, please.

21       We can see here on the left side, if we want to look at

22   the format, it has -- because we're going to look at a column

23   coming up where we can't see the kind of the format so well.

24       So what we can see is the left column says "Research

25   Question."  Then it talks about what the goal is in the middle.

1    And then you see on the right "Hypothesis"; right?

2    **A.**    I do.

3    **Q.**    Okay.  So that was kind of -- that's the format.

4    So now let's take a look and turn to page 6 and kind of

5    look at what's written there right around the middle of the

6    page.  Okay?

7    So the question being posed is [as read]:

8    "What do most respondents believe the effect of

9    turning off the WAA button will have on the amount of

10    data collected..."

11    And there's a second one.  I want to stop here.

12    Well, we can even go on to it.  Just say [as read]:

13    "... and the amount of personalization they will

14    experience?"

15    Do you see that, sir?

16    **A.**    Yes, I do.

17    **Q.**    Okay.  Then if we go to the right, there's a hypothesis.

18    And, in fact, because there are two questions, we have two

19    hypotheses; right?  Correct?

20    **A.**    Correct.

21    **Q.**    Let's take them one at a time.

22    First hypothesis to the question in (a).  Reminder, the

23    question is [as read]:

24    "What do most respondents believe the effect of

25    turning off WAA will have on the amount of data

1      that's collected by Google?"

2      The hypothesis by Mr. de Booij is [as read]:

3         "Most respondents will believe that turning off

4      WAA will result in no data being collected from their

5      activity."

6      That was the hypothesis; correct?

7  **A.**  Correct.

8  **Q.**  And then he goes on to say, and in answering the question

9  in (b), the amount of personalization these users will

10  experience, he says [as read]:

11         "... and no personalization in Google products

12      and services."

13      Correct?

14  **A.**  That's correct.

15  **Q.**  So if we take them a step at a time, we can look and see

16  that he described up top what was actually happening in Google

17  at the time when he says "Most respondents will believe that

18  turning off data will result" -- or let me back up.  Maybe I

19  got it backwards here.

20     [As read]:

21         "Most respondents will believe that turning off

22      WAA will result in no data being collected from their

23      activity...."

24      That's what Mr. Ruemmler said in his email that we've

25  looked at, PX3; correct?  It was his last question.

1    **A.**    Correct.

2    **Q.**    Okay.  And then it says [as read]:

3            "... and no personalization in Google products

4        and services."

5        Correct?

6    **A.**    That's correct.

7    **Q.**    Now, a hypothesis is part of the scientific process.  It's

8        a prediction; right?

9    **A.**    That's correct.

10    **Q.**    They use -- Mr. de Booij's prediction was made one month

11        before this lawsuit.  Do you know that?

12    **A.**    No, I did not.

13    **Q.**    Okay.  I didn't until recently.

14        Okay.  And Mr. de Booij's hypothesis is certainly

15        consistent with the research study we went over, PX2; correct?

16    **A.**    Correct.

17    **Q.**    Where all participants believe that when they put their

18        WAA button on off, Google wasn't collecting any data at all;

19        fair?

20    **A.**    Well, I think --

21    **Q.**    That was "yes"?

22    **A.**    -- that was partially fair.

23        I think it's, they're not collecting any data at all in

24        their Web & App Activity in their account, given that that was

25        a Web & App Activity study and this is an account creation

1  study.

2  **Q.**   But it's interesting you say that because it doesn't --

3  what you just told us, you can't find in this 50-page study we

4  just looked at; right?

5  **A.**   Well, it's a study about the Web & App Activity setting

6  that we were looking at.  It's very specific about the data

7  that goes into that bucket when the setting is on and off.

8  **Q.**   And the user comprehension when the WAA toggle is off,

9  that Google is not collecting anybody's activity; fair?  That's

10  what the finding was?

11  **A.**   In their Google Account.  It's a Google Account setting

12  study.  So I think that context is important, I thought.

13  **Q.**   My question to you is:  Can you show us where in this

14  50-page -- do we need to go back to PX2?

15      Are you telling us somewhere in this 50-page document I

16  missed the point?  It's not whether Google collects your data;

17  it's just where we put it?

18  **A.**   I think the point on that exhibit, if we want to go back,

19  is that if you look at --

20  **Q.**   No.

21  **A.**   -- what the study was for, we were requesting a study

22  about an auto delete feature we were launching as part of your

23  Web & App Activity.  So I think it's kind of obvious probably

24  to the folks working on it that we're talking about Web & App

25  Activity, Google Account data, not other non-account data.

1    **Q.**   You understand that retention controls were a separate

2    part of this 50-page study?  It had nothing to do with the

3    findings we just looked at?

4    **A.**   No.  The retention study that we were looking at is a

5    study specifically about the creation of these retention

6    controls.  It was one of many studies that we did.

7    **Q.**   Let me just --

8    **A.**   Can we bring the exhibit back up if we're talking about

9    it?

10            **THE COURT:**  One at a time.

11            **MR. CARMODY:**  Sorry.

12            **THE COURT:**  One at a time.

13            **MR. CARMODY:**  Sorry.  That's my fault.

14            **THE COURT:**  Question?

15            **THE WITNESS:**  So I was just --

16   **BY MR. CARMODY:**

17   **Q.**   Do you want to finish, sir?

18            **THE COURT:**  Wait, wait, wait.

19        Let's have a question.

20   **BY MR. CARMODY:**

21   **Q.**   Does Google stand by its research finding in PX2 that all

22   participants expected turning off the toggle, the WAA toggle,

23   to stop their activity from being saved?  Can I hold --

24   **A.**   Yes.

25   **Q.**   Can we hold --

1        (Simultaneous cross-talk.)

2          (Reporter interrupts to clarify the record.)

3          **MR. CARMODY:**  Your Honor, it's about 1:29.  I'm

4    thinking maybe --

5          **THE COURT:**  Okay.

6          **MR. CARMODY:**  And I'll try to --

7          **THE COURT:**  We'll do two minutes early.

8      Members of the jury, remember my admonitions.  Do not

9    discuss this amongst yourselves or with anyone else.  Do no

10   research.  Put this case away.  Do other things.

11     And please be here promptly at 8:30 so we can get going.

12     Thank you and have a nice evening.

13    (Proceedings were heard out of the presence of the jury.)

14         **THE COURT:**  Okay.  We're out of the presence of the

15   jury.

16     Unfortunately, I have a 2:30 criminal calendar.  So you

17   don't have to take everything out of the courtroom, but please

18   clear out the counsel table so that counsel for the 2:30

19   proceeding can come in.

20     You may step down, and -- but you need to be back here

21   tomorrow at 8:30.

22     R.J. will announce the hours total.

23         **THE LAW CLERK:**  The hours remaining:  Plaintiffs have

24   17 hours, 29 minutes, and 18 seconds.  Defendant has 19 hours,

25   18 minutes, and 21 seconds.

PROCEEDINGS

1              **THE COURT:**  Okay.  So we'll see you tomorrow.

2              **MR. HUR:**  Thank you, Your Honor.

3              **THE COURT:**  Thank you.

4              **THE COURTROOM DEPUTY:**  Court stands in recess.

5                  (Proceedings adjourned at 1:29 p.m.)

6                          ---o0o---

7

8                  <u>**CERTIFICATE OF REPORTER**</u>

9          I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   DATE:  Wednesday, August 20, 2025

13

14

15

16

17   _____

18          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

19      CSR No. 7445, Official United States Reporter

20

21

22

23

24

25