```
                                  Volume 3

                              Pages 341 - 562

                 UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,       )
individually and on behalf of   )
all others similarly situated,  )
                                )
          Plaintiffs,           )
                                )
  VS.                           )   NO. 3:20-CV-04688 RS
                                )
GOOGLE LLC,                     )
                                )
          Defendant.            )
_____)
```

San Francisco, California
Wednesday, August 20, 2025

**<u>TRANSCRIPT OF JURY TRIAL PROCEEDINGS</u>**

**<u>APPEARANCES</u>**:

For Plaintiffs:

```
                    BOIES SCHILLER FLEXNER LLP
                    333 Main Street
                    Armonk, New York 10504
               BY:  DAVID BOIES, ATTORNEY AT LAW

                    BOIES SCHILLER FLEXNER LLP
                    2029 Century Park East, Suite 1520
                    Los Angeles, California 90067
               BY:  ALISON L. ANDERSON, ATTORNEY AT LAW

                    BOIES SCHILLER FLEXNER LLP
                    100 Southeast Second Street, Suite 2800
                    Miami, Florida 33131
               BY:  JAMES W. LEE, ATTORNEY AT LAW
```

REPORTED BY: Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
             CSR No. 7445, Official United States Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiffs:
                          BOIES SCHILLER FLEXNER LLP
 3                        44 Montgomery Street, 41st Floor
                          San Francisco, California 94104
 4                 BY:    MARK C. MAO, ATTORNEY AT LAW

 5                        SUSMAN GODFREY LLP
                          One Manhattan West, 50th Floor
 6                        New York, New York 10001
                   BY:    WILLIAM C. CARMODY, ATTORNEY AT LAW
 7                        RYAN SILA, ATTORNEY AT LAW

 8                        SUSMAN GODFREY LLP
                          1900 Avenue of the Stars, Suite 1400
 9                        Los Angeles, California 90067
                   BY:    AMANDA BONN, ATTORNEY AT LAW
10
                          MORGAN & MORGAN COMPLEX LITIGATION GROUP
11                        201 North Franklin Street, Seventh Floor
                          Tampa, Florida 33602
12                 BY:    RYAN McGEE, ATTORNEY AT LAW

13

14   For Defendant:
                          COOLEY LLP
15                        Three Embarcadero Center, 20th Floor
                          San Francisco, California 94111-4004
16                 BY:    BENEDICT Y. HUR, ATTORNEY AT LAW
                          EDUARDO E. SANTACANA, ATTORNEY AT LAW
17                        SIMONA A. AGNOLUCCI, ATTORNEY AT LAW
                          THILINI L. CHANDRASEKERA
18                        ATTORNEY AT LAW

19                        COOLEY LLP
                          4401 Eastgate Mall
20                        San Diego, California 92121
                   BY:    MICHAEL A. ATTANASIO, ATTORNEY AT LAW
21

22

23   Also Present:         Steve Ganem, Google
                            Anibal "Pete" Rodriguez
24                          Julian Santiago

25
```

```
 1                        I N D E X

 2

 3   Wednesday, August 20, 2025 - Volume 3

 4

 5   PLAINTIFFS' WITNESSES                        PAGE   VOL.

 6   MONSEES, DAVID MICHAEL (RECALLED)
     (PREVIOUSLY SWORN)                            359    3
 7   Direct Examination resumed by Mr. Carmody     360    3
     Cross-Examination by Mr. Santacana            364    3
 8   Redirect Examination by Mr. Carmody           474    3

 9   SANTIAGO, JULIAN
     (SWORN)                                       475    3
10   Direct Examination by Mr. Lee                 476    3
     Cross-Examination by Mr. Attanasio            500    3
11   Redirect Examination by Mr. Lee               546    3

12                      E X H I B I T S

13   TRIAL EXHIBITS                        IDEN   EVID   VOL.

14     PX45                                        360    3

15     PX67                                        484    3

16     PX116                                       490    3

17     123                                         470    3

18     569                                         432    3

19     574                                         450    3

20     576                                         458    3

21     578                                         457    3

22     581                                         457    3

23     587                                         435    3

24     607                                         427    3

25     941.R2                                      453    3
```

```
 1   Wednesday - August 20, 2025                      8:07 a.m.

 2                   P R O C E E D I N G S

 3                        ---o0o---

 4        (Proceedings were heard out of the presence of the jury.)

 5              THE COURT:  Good morning.

 6              ALL:  Good morning, Your Honor.

 7              THE COURT:  Please be seated.

 8        I know last night there were some snafus in terms of

 9   filing things.  Don't worry about it.  These things happen.

10   Don't make any -- don't let anybody get into trouble for that.

11   I did get the apology.  I appreciate it.  So we can -- I got

12   what I needed, so don't fret about that aspect of it.

13        So the issue with respect to Ms. Harvey, I did review the

14   doctor's note, such as it is.  I don't think that is

15   sufficient.  It doesn't explain the situation.  It's a

16   check-the-box thing.

17        I considered what the defendants have requested, and

18   I think their alternative suggestion, which is that the use of

19   the deposition can occur in their case and then, if the

20   plaintiffs think that they need to counterdesignate under 106,

21   they can do so, that they won't use the deposition or

22   Ms. Harvey's testimony in their case-in-chief, it makes sense.

23   And so that's what I'm inclined to order.

24              MR. LEE:  I think that's right, Your Honor.

25   Thank you.
```

1          **MR. AGNOLUCCI:**  Thank you, Your Honor.  That's fine

2    with us.

3          I do want to make one comment, however.  Yesterday during

4    opening statements, Mr. Boies commented that Ms. Harvey was

5    unavailable for medical reasons, which was totally

6    inappropriate in light of the fact that Your Honor had asked

7    for evidence of a medical problem, that the issue was yet to be

8    briefed by the parties, that we hadn't seen a note and that you

9    hadn't seen a note.

10         You know, obviously, the cat's out of the bag at this

11   point, but we would like an order that they cease from making

12   similar commentary going forward.

13         **THE COURT:**  Okay.  Well, no more comments about any

14   medical problems for Harvey.

15         **MR. AGNOLUCCI:**  Thank you, Your Honor.

16         **THE COURT:**  Okay.  There was some issue with respect

17   to a deposition excerpt.

18         **MR. McGEE:**  Yes.  Good morning, Your Honor.

19   Ryan McGee for the plaintiffs.

20         **THE COURT:**  Good morning.

21         **MS. CHANDRASEKERA:**  Good morning, Your Honor.  Thilini

22   Chandrasekera for Google.

23         **THE COURT:**  Good morning.

24         This is new to me, so you'll have to bring me -- tell me

25   what -- who's disputing what, and what's the issue?

PROCEEDINGS

1          **MR. McGEE:**  Your Honor, I have copies of the two

2    exhibits that we'd be seeking to admit, as well as

3    Mr. Miraglia's full testimony.

4          We're not going to be, I don't believe this morning,

5    arguing over deposition experts -- excuse me -- deposition

6    excerpts or counters.  I think it's just the admissibility of

7    these two documents.

8          **THE COURT:**  Okay.  And they're both emails from

9    Ms. Mueller; right?

10          **MR. McGEE:**  That's correct.  One is an email from

11    Ms. Mueller, and then the other is an email from Giles Hogben.

12          **THE COURT:**  Okay.

13          **MR. McGEE:**  And I can address PX4 briefly, Your Honor.

14          I know you made a lot of rulings yesterday on admission by

15    a party opponent.  Mr. Miraglia, who is a recipient of this

16    email and is quoted in this email, head of the PDPO, he was, in

17    fact, the founder of Google's Privacy and Data Protection

18    Office, he's engaging here with Jens Mueller, who was -- excuse

19    me -- an engineer working on the Narnia II project.

20          There's also two Davids that may have been referred to

21    here.  The first is Mr. Monsees, who is presently testifying;

22    the second is Mr. Warren, who, indeed, wrote Google's privacy

23    policy.

24          So we think that PX4 comes in as a party admission.

25          **THE COURT:**  And then PX31, what is that?

PROCEEDINGS

1          **MR. McGEE:**  Forgive me, Your Honor.

2     That is an email between Mr. Kleidermacher, and he was the

3     head of Android Security and Privacy, and he was quoting

4     Mr. Miraglia's sentiments.

5          And Mr. Miraglia, during the testimony, confirmed that

6     those were indeed his sentiments.

7          **THE COURT:**  Yes, go ahead.

8          **MS. CHANDRASEKERA:**  Your Honor, first on PX4,

9     Mr. Miraglia is copied on these emails, but he's not quoted and

10    he's not engaging with this document.

11         The main issue is one of double hearsay that, even given

12    Your Honor's comments yesterday about party admissions -- it

13    takes place on page 2, beginning with "I'm confused by David's

14    comments."  There's a citation to an unattached Google

15    document.  The David is not identified.  And then the main

16    point of the deposition designations is to discuss that quoted

17    area.

18         We don't know who David is.  It's not necessarily even one

19    of the two Davids that counsel just requested.  And I can

20    provide deposition testimony that shows that there's

21    uncertainty as to who it is and that there might be more

22    Davids.

23         In addition, just the fact that we don't know whether or

24    not whoever this David was and whatever he was saying was in

25    the scope of his employment means that there's no foundation

1   here to say that it is a party admission that can be used by

2   Google.  Or used against Google, I should say.

3       And I can speak to PX31 as well or wait on this.

4           **THE COURT:**  You say the same argument for 31?

5           **MS. CHANDRASEKERA:**  It's slightly different.

6       The same issue applies, that Mr. Miraglia is not engaging

7   at all in PX31.  There is a discussion of "I agree with Eric's

8   sentiment," which is what they're saying is the quote of him,

9   but his deposition testimony says he actually does not agree

10  with that characterization of what he said.

11      So this is just a really classic hearsay issue.  We cannot

12  cross the person about what they were talking about.

13          **MR. McGEE:**  And, Your Honor, Mr. Miraglia, during his

14  deposition, confirmed that Mr. Kleidermacher was quoting him,

15  but it was at the time of the deposition that he took issue

16  with what was being quoted, and he had subsequently changed his

17  sentiment.

18          **THE COURT:**  Okay.  Well --

19          **MS. CHANDRASEKERA:**  We would not agree with that

20  characterization, Your Honor.

21          **THE COURT:**  Well, I'll take it back.

22      Have you highlighted the parts of this deposition --

23          **MR. McGEE:**  I can do that, Your Honor.  I --

24          **THE COURT:**  -- that are implicating these documents?

25          **MR. McGEE:**  And I apologize.  I interrupted you.

1      **THE COURT:**  Can you both look at that, and then I can

2  focus on that?

3      **MR. McGEE:**  Yes, Your Honor.

4      **MS. CHANDRASEKERA:**  Yes, Your Honor.

5      **THE COURT:**  On those -- generally, on those

6  objections -- and I've had a lot of them.  We'll hear a lot

7  more probably about admission of a party opponent, and then

8  sometimes I hear a hearsay objection.

9      Sometimes I understand the hearsay objection is

10  appropriate, but remember, hearsay is if it's being introduced

11  for the truth of the matter asserted.  So there are times when

12  these documents are being introduced and the party introducing

13  them is not saying that they're true.  They're saying it's

14  quite the contrary, like with respect to privacy policies and

15  the like, that they didn't mean it.  So that isn't even

16  hearsay.

17      So keep in mind, when the objection is -- that kind of

18  document, I don't think a hearsay objection is the -- you may

19  have an objection with respect to authentication or foundation

20  or something else.  But I understand that some of the documents

21  that are being admitted as admissions of party opponents are

22  being admitted for the truth of the matter asserted, some of

23  the emails and the like.  But remember that when you're making

24  these objections.

25      So the other issue -- and I'll take a look, once you give

 1    me this back, at this particular issue.

 2        But let's talk for a moment, because it's going to come up

 3    and it seems to be a big issue.  This whole business about this

 4    Australian stuff, who talks about that for each side?

 5        Okay.  Let me ask you, Mr. Santacana.  Did any of the

 6    putative class members ever see any of the Australian material,

 7    the privacy stuff from Australia that you want to utilize?

 8        **MR. SANTACANA:**  Yes, Your Honor.  The consent flows

 9    were used in the United States.  The proceeding was in

10    Australia, but the consent flows, as Mr. Monsees will testify,

11    are U.S. flows that were also shown in Australia.

12        **THE COURT:**  Okay.  Do you dispute that?

13        **MS. BONN:**  Well, we do, Your Honor, because we don't

14    know.  We received zero discovery on that.

15        There's an Australian court filing.  And that's precisely

16    the reason we served an interrogatory saying, "Tell us the

17    public disclosures at issue in the United States."

18        And if Google was going to take the position, "It's not

19    just an Australian court filing.  You're missing something

20    here.  The same things buried in this Australian document were

21    also shown to users in the U.S.," they had an obligation to

22    disclose that to us so that we could pursue it in discovery.

23        **THE COURT:**  Let me ask, Mr. Santacana, basically, why

24    are you using these Australian -- if, in fact, they're the same

25    things that the U.S. folks saw, why are we pulling this stuff

 1    from Australia?

 2          **MR. SANTACANA:**  Your Honor, it wasn't pulled from

 3    Australia.  It was pulled from Google's source code repository

 4    to show U.S. and global flows.

 5          **THE COURT:**  Well, why can't you use -- why do we have

 6    this passion play about Australia?  I mean, I don't understand

 7    it.  If it's U.S. stuff, let's just use the U.S. stuff.  Why

 8    are we even off on this --

 9          **MR. SANTACANA:**  Yes, Your Honor.  It was actually a

10    pretty major project to put together what a flow looked like in

11    2019, which is evident from G921.  It took a lot of man-hours

12    to do because they have to take the source code and rerun it.

13          I want to point out a couple of things because I don't --

14    I think that the Australia part of this is a complete sideshow.

15          The plaintiffs cite the Australian proceedings in their

16    operative complaint.  The plaintiffs' expert talks about the

17    Australia proceedings and how relevant those proceedings are to

18    this case.  Both experts talk about the Australian document in

19    question.

20          When Ms. Bonn says that they don't have discovery, what

21    she means is that they chose not to take discovery.  They

22    didn't ask anyone about it in deposition.  But there is

23    testimony and there are expert reports that address these exact

24    setup flows.

25          Our expert on the setup flows and on how disclosures work

1    relies on these flows in her report.  They deposed her about

2    her opinions, and what she says is:  These are flows that were

3    in the United States.  This is what this class looked like.

4         **THE COURT:**  So it's your -- your representation.  I'm

5    asking --

6         **MR. SANTACANA:**  Yes, Your Honor.

7         **THE COURT:**  -- for you to represent to me --

8         **MR. SANTACANA:**  That is my representation.

9         **THE COURT:**  -- that -- well, let me first ask it

10   before you say "yes."

11        -- that it's almost an incidental fact that some of this

12   also was apparently implicated in some Australian proceeding,

13   and that you're going to represent that it's the -- that these

14   putative class members, this would have been the -- you use --

15   you say consent flows, or however you characterize it, it's

16   what they would have seen at the operable time during the class

17   period in the United States.

18        **MR. SANTACANA:**  That will be the testimony,

19   Your Honor.

20        **THE COURT:**  Okay.

21        **MS. BONN:**  May I address an issue --

22        **THE COURT:**  Yes.

23        **MS. BONN:**  -- that was just raised?

24        In our complaint, we reference the fact that Google has

25   been sued by a number of authorities around the world for

1    misleading disclosures, including the Australian regulator.

2        We sought discovery, and we were barred by the magistrate

3    judge from seeking further discovery from Google about the

4    Australian and other litigation.

5        So the idea that we just mentioned this, we knew it was at

6    issue and chose not to seek discovery, is false.

7            THE COURT:  But what is the -- I mean, how are you

8    sandbagged?

9            MS. BONN:  Here's how --

10           THE COURT:  I don't understand.

11           MS. BONN:  Here's how we were sandbagged.  Two ways,

12   Your Honor.

13       Number one, they did not produce to us from their files

14   the documents in the U.S.  So all we had was this Australian

15   document.

16       We served an interrogatory to say:  Tell us what all the

17   public disclosures were about app activity, data collection in

18   the U.S. that could be at issue in this case.

19       And they disclosed a series of categories of disclosures:

20   privacy policies, policies about GA for Firebase, versions of

21   the button that you could find on that activity controls page.

22   And they never disclosed that:  We will be relying on account

23   creation flows in the U.S.

24       And you should know it's not just that these flows were in

25   an Australian document.  We are taking the position in this

 1   case, whether we've produced the documents or not, that those

 2   same screens shown in the Australian filing were also in place

 3   in the U.S. and we are relying on them.

 4        And to your point, Your Honor, if these were truly the

 5   flows that were at issue, why did they not just produce them in

 6   this case?  They produced privacy policies, emails, other

 7   internal documents, not these.

 8        That is why now they are going to this Australian court

 9   filing because it's the only thing in their production that

10   actually has these flows in it.  That's it.  That's all they

11   got because they didn't produce it in the U.S., and they didn't

12   disclose to us that those consent flows would be at issue.

13        And, further, we were barred from taking discovery about

14   the Australian proceeding in its entirety.

15        **THE COURT:**  If the magistrate judge barred you and I

16   didn't get any appeal on that, that's the end of that story.

17   You can't say, "Well, it's our" --

18        **MS. BONN:**  Sure.

19        **THE COURT:**  "Because we weren't allowed to do

20   discovery, therefore, you should now effectively undermine the

21   ruling of the magistrate judge."

22        **MS. BONN:**  No, I'm not.

23        **THE COURT:**  Because I won't do that.

24        **MS. BONN:**  I'm not, Your Honor.

25        But I think it's a sword/shield issue.  You can't say on

1    the one hand, "You can't take discovery of Australia, but we're

2    also not going to tell you what was in place in the U.S. and,

3    later, we'll blame you and say, 'Well, you should have known

4    from this Australia thing to pull the thread on that ball of

5    yarn.'"

6        That's the issue.

7            **THE COURT:**  Okay.

8        **MR. SANTACANA:**  Your Honor, I would like to clear

9    something up.

10           **THE COURT:**  Mr. Santacana?

11       **MR. SANTACANA:**  I want to be as clear as I can.  This

12   witness will testify that through the work of many people over

13   many hours, they pulled from Google's source code repository in

14   the United States, people in the United States pulled consent

15   flows that applied both in the U.S. and also happened to apply

16   in other places.

17       They created a document.  That document is a source of

18   truth on what it looked like in 2019, through great effort.

19   And then it was used in the future after they created it in

20   Australia in a judicial proceeding.

21       I don't know why the plaintiffs don't like the Australian

22   judicial system, but that's not the issue.  The issue is it was

23   created based on consent flows in the U.S.

24           **THE COURT:**  Well, the issue is what they had -- is the

25   sandbag issue.

PROCEEDINGS

1          **MR. SANTACANA:**  On the sandbagging issue, their

2    expert, Professor Schneier -- and I'd be happy to hand you --

3    I'll need a moment, but we'll print and highlight his expert

4    report -- that he discusses and analyzes and impugns these

5    consent flows as class period consent flows in at least nine

6    paragraphs of his report.  He goes through them one by one.

7          Then the plaintiffs deposed our rebuttal expert to

8    Professor Schneier; and when they deposed her, they asked her

9    [as read]:

10         **"QUESTION:**  So let's look at this.  Do you see these three

11         images of disclosures at the top?"

12         This is page 66 of Dr. Hoffman's deposition.

13         She said [as read]:

14         **"ANSWER:**  I do."

15         And she was asked [as read]:

16         **"QUESTION:**  Is it your understanding that these three

17         images capture the same disclosure but different versions?

18         **"ANSWER:**  It is my understanding that all three are WAA

19         disclosures."

20         This is not sandbagging.  They were perfectly aware this

21    document existed.  They used it as an exhibit in the deposition

22    of our expert, and they cited it in their own expert's report.

23         **THE COURT:**  Okay.  And this is going to arise with

24    this witness?

25         **MR. SANTACANA:**  During Mr. Monsees' direct testimony.

1          **THE COURT:**  All right.  Okay.

2          **MS. BONN:**  And, Your Honor, if it's helpful, now that

3     we've got a cite from them about where they think this was

4     addressed in expert reports, we'd like to take a look.  We

5     could also take it up at the morning break.

6          We also have, of course, our hearsay objections, which,

7     you know, we would just make contemporaneously during the

8     testimony, as Your Honor suggested yesterday.

9          **THE COURT:**  Okay.  I'll take the Miraglia materials

10    back and take a look at those, and hopefully, we can get

11    started pretty quickly.

12         And that issue is also implicated today; right?  Miraglia?

13         **MR. SANTACANA:**  Miraglia's deposition?

14         **THE COURT:**  Miraglia.

15         **MS. BONN:**  Miraglia?  Yes, Your Honor.  Just the two

16    exhibits, correct.  But we think most likely, after

17    Mr. Monsees, we'd put our plaintiffs on; and if -- we need it

18    at the end of the day, so there's more time for that, I think.

19         **MR. SANTACANA:**  I have a housekeeping issue,

20    Your Honor.

21         **THE COURT:**  Yes.

22         **MR. SANTACANA:**  So on Monday morning, you and I

23    discussed our objection to an opening slide that showed a

24    damages number we claim was a newly disclosed opinion.

25         On Monday evening, Your Honor issued a minute order

 1    ordering the plaintiffs to file an opposition to our Motion in

 2    Limine Number 15, which moves to strike that opinion before

 3    Mr. Lasinski testifies.

 4         That opposition brief wasn't filed.  The plaintiffs let us

 5    know that, in their view, you ruled on that motion in the

 6    morning, despite ordering an opposition brief in the afternoon.

 7    So we are not clear on whether Your Honor considers that motion

 8    resolved or not.

 9         **MS. BONN:**  And I apologize there's a misunderstanding.

10    On the record the Court's ruling was, "Sounds like that's an

11    issue for cross-examination."  We took that as he can talk

12    about it on direct; but if we were wrong, we can file our

13    written opposition today.

14         **THE COURT:**  Okay.  I'll go back and try to figure it

15    out.

16         **MS. BONN:**  Thank you, Your Honor.

17         **MR. SANTACANA:**  Thank you, Your Honor.

18         **THE COURT:**  All right.

19         **THE COURTROOM DEPUTY:**  Court stands in brief recess.

20                    (Recess taken at 8:24 a.m.)

21              (Proceedings resumed at 8:36 a.m.)

22       (Proceedings were heard out of the presence of the jury.)

23         **THE COURTROOM DEPUTY:**  All rise.  The United States

24    District Court for the Northern District of California is now

25    in session.  The Honorable Richard Seeborg is presiding.

```
1          THE COURT:  Okay.  We have all the jurors here, so can
2    we bring them out?
3          MR. HUR:  Yes.
4          THE COURT:  We did make arrangements, which hopefully
5    will help us, that our juror, who's coming from two hours away,
6    we can get him a hotel room.  So he's going to be available, I
7    hope.
8       Okay.  Actually, while they're lining them up, I do -- to
9    make it clear, I do want a responsive brief on Google's
10   Number 15.  If you could get me that by the end of the day.
11         MS. BONN:  Yes, Your Honor.
12         THE COURT:  Thank you.
13      (Proceedings were heard in the presence of the jury.)
14         THE COURT:  Good morning, members of the jury.
15   Thank you very much for being prompt and ready to go.  We all
16   appreciate it.
17      We ended yesterday with Mr. Monsees on the stand, so if he
18   could return to the stand.
19      If you can come back to the stand.
20      And I'll just -- you don't need to swear him in again.
21         THE COURTROOM DEPUTY:  Thank you.
22                    DAVID MICHAEL MONSEES,
23   called as a witness for the Plaintiffs, having been previously
24   duly sworn, testified further as follows:
25         THE WITNESS:  Good morning.
```

1          **THE COURT:**  Good morning.

2      I just want to confirm with you, you understand,

3  Mr. Monsees, you remain under oath.

4          **THE WITNESS:**  Yes, I -- yes, I do.

5          **THE COURT:**  Thank you.

6      Mr. Carmody.

7          **MR. CARMODY:**  Thank you, Your Honor.

8      And before we begin, it's uncontested or counsel has

9  agreed, but we offer PX45, which was the testimony of

10  Mr. Pichai yesterday.

11          **THE COURT:**  Very well.  45 --

12          **MR. CARMODY:**  Thank you.

13          **THE COURT:**  -- if it hasn't been admitted yet, is now

14  admitted.

15          **MR. CARMODY:**  Thank you.

16      (Trial Exhibit PX45 received in evidence.)

17          <u>**DIRECT EXAMINATION (RESUMED)**</u>

18  **BY MR. CARMODY:**

19  **Q.**  Good morning, sir.

20      We only have a few minutes here.  I want to go back,

21  though, to how we ended yesterday.

22      We were talking about Plaintiffs' Exhibit 2, kind of --

23  what's entitled the "User" -- or the "Retention Controls

24  Comprehension Study."  Remember that?

25  **A.**   Yes, I do.

1  **Q.**  And there was -- I pointed to page 20, and it was one of

2  the findings.  And if we can turn to that, it's right in the

3  top in big letters.

4      And one of the findings of all the participants was they

5  expected turning off the WAA toggle to stop their activity from

6  being saved.  Do you remember we spoke about that?

7  **A.**  Yes, I do.

8  **Q.**  And you, in turn, talked to me and reminded us that -- you

9  said the study also tested the comprehension of Google's auto

10  delete feature; fair?

11  **A.**  Yes.

12  **Q.**  And to clarify, the auto delete feature is one that

13  applies when WAA is on; correct?  The WAA button is on?

14  **A.**  That's correct.  It --

15  **Q.**  Okay.

16  **A.**  It doesn't only apply when the WAA button is on.  It

17  applies to any data that was saved to the user's account

18  because of Web & App Activity.  So it's like what goes into

19  their WAA bucket, so to speak.

20  **Q.**  Now, I want to show you -- we're going to plow through

21  this -- a page that we didn't talk about yesterday and, in

22  fact, it's page 9.

23      And what this page 9 is -- and I could have and should

24  have showed you it yesterday and I don't know why I didn't, but

25  it talks about a finding summary because, the truth is, there

1   was more than one finding in this 50-page study; fair?

2   **A.**   Fair.

3   **Q.**   Okay.  So if we take a look at the very first one, that,

4   I believe, is identical to what we just showed you.  1(a), it

5   says when the WAA toggle is off [as read]:

6            "All participants expected turning WAA toggle

7            off to stop saving their activity."

8            Fair?

9   **A.**   Fair.

10  **Q.**   And then below that, we see I think what you were speaking

11  about, which is talking about what half the participants

12  thought about the auto delete feature; correct?

13  **A.**   That's correct.

14  **Q.**   Okay.  And so now I want to move on to something

15  different.

16           Remember I handed you yesterday Exhibits 403, 404, and

17  405, the ones that came from your custodial file?

18  **A.**   That's right.

19  **Q.**   Did you supervise the creation of those reports?

20  **A.**   Yes, I did.

21  **Q.**   Okay.  Now, in the last 60 seconds or so, setting aside

22  documents, we looked yesterday at privacy policies; we looked

23  at Google's help page.  Forget about that.  Let's just talk a

24  moment, you and me.

25           Do you think Google needs to get a user's consent before

**MONSEES - DIRECT / CARMODY**

1  Google collects their data?

2  **A.**   Yes, I do.   I think when we're collecting their data tied

3  to their identity -- right? -- it's that breadcrumb or history

4  of the things that you do, we want to make sure that users are

5  aware when we know that information associated with them.

6  **Q.**   We agree that a user's consent has to be meaningful; fair?

7  **A.**   Yes, I agree.

8  **Q.**   And you agree that for a user's consent to be meaningful,

9  Google should clearly disclose what data they're collecting;

10  fair?

11  **A.**   Yes.

12  **Q.**   And why Google's collecting that data; fair?

13  **A.**   I agree.

14  **Q.**   You haven't and can't point us to a single document where

15  Google ever told any class member, "When you turn your WAA

16  toggle off, we're going to collect your data and make money

17  from it"; correct?

18  **A.**   I mean, I think we looked at the privacy policy, which

19  I think explains a lot about the data we collect and how we use

20  it, including for advertising that powers many of our services.

21  **Q.**   Sir, my question is different.   My question is:   Can

22  you -- and you can bring it up with your counsel.   We're going

23  to be here for another week or so.

24      Can you show us a single document that we can all look at

25  where Google says clearly to its users, "You turn that WAA

 1  toggle off, we're going to collect and make money off your

 2  data"?  Can you bring us that document?

 3  **A.**    I mean, I -- personally, I think that's what the privacy

 4  policy explains, as we looked at it yesterday.

 5  **Q.**    Well, I hope -- will you go through it with your counsel,

 6  as I sit down now, and show us where in the privacy policy it

 7  says, "Users, when you turn that WAA toggle off, we're still

 8  going to collect your data and we're going to make money from

 9  it"?

10  **A.**    Yes.  I believe we are going to go through the privacy

11  policy today.

12           **MR. CARMODY:**  Good.  Thank you, sir.

13           **THE WITNESS:**  Thank you.

14           **THE COURT:**  Mr. Santacana?

15           **MR. SANTACANA:**  Thanks.

16      Your Honor, is it all right if we just place this board

17  over here so, you know, everybody can see it?

18           **THE COURT:**  Yes.

19           **MR. SANTACANA:**  Thank you.

20      Can you all hear me?

21                       **CROSS-EXAMINATION**

22  **BY MR. SANTACANA:**

23  **Q.**    Good morning, Mr. Monsees.

24  **A.**    Good morning.

25  **Q.**    You and I have met before?

1    **A.**    Yes, we have.

2    **Q.**    I'm Eduardo Santacana.  I represent Google in this case.

3    Can you please tell the jury a little bit about yourself.

4    **A.**    Sure.  I'm David Monsees.  I live here in San Francisco.

5    I've been here since 2008, I think; and I've been employed at

6    Google since 2009, almost 16 years now.

7    **Q.**    Would you mind explaining in a little bit more detail your

8    role at Google?

9    **A.**    Sure.  I'm a product manager in what is technically a part

10    of Google Search, and I oversee a system internally we call

11    Footprints.  And Footprints is a storage system that we use to

12    help feature teams, like the Google Suggest Team or the,

13    you know, Play Recommendation Team, store and use user data,

14    data tied to a user's Google Account.

15    **Q.**    Would you mind just moving that microphone a little bit

16    closer to you?

17    **A.**    Sure.

18    **Q.**    I'm having a little trouble hearing.

19    **A.**    Is this better?

20    **Q.**    That's much better.  Thank you.

21    **A.**    Okay.  Sorry.

22    **Q.**    So what does Google use this Footprints database for?

23    **A.**    Yeah.  So Footprints powers a lot of different features.

24    We store user data, like the Web & App Activity data that we've

25    been talking about yesterday, we store that data in Footprints.

 1   We provide a lot of different tools on top of it that lets a

 2   user see and delete it.  So we have the My Activity UI.

 3        And Footprints also manages a bunch of the different

 4   settings, like Web & App Activity, that determine when it's on

 5   or off, how that data can be stored, and how that data can be

 6   used.

 7   **Q.**   Web & App Activity, I think you said yesterday, is your

 8   responsibility?

 9   **A.**   That's correct.

10   **Q.**   And are you responsible for the way that it is described

11   to users?

12   **A.**   Yes.  The activity controls page we see here, I'm

13   responsible for this.  It's a part of our My Activity set of

14   user privacy tools.

15   **Q.**   And is it fair to say the buck stops with you with respect

16   to how this is described to users, or is that overstating it?

17   **A.**   That's correct.

18   **Q.**   How long has this Web & App Activity button been around?

19   **A.**   The Web & App Activity setting has been around since 2005,

20   a little over 20 years.

21   **Q.**   In the 20 years that this button has been around, have

22   you, from time to time, heard that some users are confused

23   about some aspects of Web & App Activity?

24   **A.**   Yes.  I mean, we've had, I think, over 38 billion Google

25   accounts created by this point, over 3 billion users across the

 1   world, all kinds of different backgrounds.  And some users have

 2   different expectations, different perceptions, and we regularly

 3   try to improve and make these settings clear for all users.

 4   **Q.**   How do you -- in your role as the person in charge of

 5   describing this activity control, how do you think about the

 6   challenge of being clear to 3 billion people?

 7   **A.**   I think the real challenge that we face is that we're all

 8   busy; right?  We hear from users in research.  They don't want

 9   to spend a lot of time reading screens.  And different users

10   have different expectations, depending on the products that

11   they use.

12       And so I think a lot of what we rely on is things like

13   user research, statistics and stuff from the website analytics,

14   from tools like this, so we can see how users behave.

15       We try to identify problems and resolve them, keeping

16   things kind of with an objective as being as simple as possible

17   for all those different users and then providing more detail

18   for the users looking for more.

19   **Q.**   You mentioned that you have, from time to time, heard that

20   some users are confused about parts of Web & App Activity.

21   What have you done to address confusion when you learn about

22   it?

23   **A.**   So we've made a bunch of changes to the text in the way we

24   describe.  We've done a lot of work on our Help Center

25   articles, the "Learn More" articles.

**MONSEES - CROSS / SANTACANA**

1    I remember we restructured, actually, the way this page

2    looks a little bit, adding things like icons that help users

3    better understand what products are part of Web & App Activity.

4        We launched an FAQ that we added so that users could even

5    submit questions, if they had, up at the top of the Web & App

6    Activity page.

7        So we've done a lot of these little changes to try to help

8    users.

9    **Q.**   Is it your opinion that the changes you've made have

10   resulted in a perfect disclosure that's perfectly clear to

11   every user?

12   **A.**   I think with 3 billion users, unfortunately, there's

13   probably no such thing as perfect, but we do our best.

14   **Q.**   Now, how long have you been in charge of WAA?

15   **A.**   I've been in charge of WAA since -- I think 2013 is when I

16   started leading the Footprints Team.

17   **Q.**   That's 12 years?

18   **A.**   Correct.

19   **Q.**   In the 12 years that you have been in charge of Web & App

20   Activity, has anyone ever raised a concern with you that

21   Web & App Activity should control Google's collection of

22   de-identified data?

23   **A.**   No.  Until this case, I had never heard that concern

24   raised in the past.

25   **Q.**   Has anyone raised a concern with you in those 12 years

1  that the Web & App Activity control should apply to

2  de-identified data that comes from Google Analytics?

3  **A.**   No.

4  **Q.**   When people have raised concerns with you at Google,

5  inside of Google, about how the Web & App Activity button

6  should work and whether it's confusing to users, what sorts of

7  concerns do they bring to you?

8  **A.**   Almost always the question about Web & App Activity is

9  about if data should or shouldn't be saved to the user's

10 Google Account.  The concern is -- like we saw from some of the

11 discussions with Chris yesterday, concerns are often about when

12 the setting is off, should data be saved against an account for

13 different purposes.

14 **Q.**   Now, we saw an email yesterday from Mr. Chris Ruemmler.

15 You know him?

16 **A.**   Yes, I do.

17 **Q.**   Have you -- is that the only email you've exchanged with

18 him?

19 **A.**   I've exchanged many emails about many different topics

20 with Chris.  Our two roles at the time would bump into each

21 other a lot.  We work in similar areas.

22 **Q.**   And you've discussed Web & App Activity with him on more

23 than one occasion.  Is that what you're saying?

24 **A.**   Yes, I have.

25 **Q.**   Over the time that you've worked with Mr. Ruemmler, what

 1   understanding have you come to about -- thank you.

 2       Let me put it this way:  What concerns did he raise to you

 3   about Web & App Activity, in your own words?

 4   **A.**    I think Chris really had two concerns.  Chris oversaw

 5   privacy for Google Workspace products.  It's like your Gmail

 6   data.  And Chris was very concerned about where Gmail data

 7   would go and how Gmail data would be used.

 8       For example, Chris was very concerned that when a user was

 9   using certain products, Gmail data might be saved in the

10   Web & App Activity data and then could be used by ads, which

11   would go against some of the Gmail Team's policies.

12       Chris was also concerned about what it would mean when

13   Web & App Activity was off and if data would still be saved to

14   a user's Google Account.

15       I think what's important to remember is that Gmail only

16   ever works with a Google Account.  There's no de-identified

17   version of Gmail.  You can't use email signed out.

18       So I think in Chris's world, he's very familiar with

19   everything being assumed against an account, and that's not

20   true for a lot of our products at Google, like Search or Maps.

21   **Q.**    Yesterday you were asked a number of questions about,

22   quote, "user data," that term "user data."  Is Gmail data user

23   data?

24   **A.**    Yes, it is.

25   **Q.**    Is de-identified data user data --

1    **A.**    It's --

2    **Q.**    -- within -- as people talk about it within Google?

3    **A.**    I think if it comes from users, we tend to think of it as

4    user data, though it's not personal information.

5    **Q.**    Okay.  So there's a user data and then there's

6    de-identified user data?  Is that how you talk about it at

7    Google?

8    **A.**    That's correct.

9    **Q.**    You were also shown a user study yesterday, and we'll take

10    a look at it in a moment, Mr. Monsees.  But have you ever seen

11    a user study that showed that users expected that this control,

12    Web & App Activity, could control the flow of de-identified

13    data?

14    **A.**    No, I have not.

15    **Q.**    The user study we saw yesterday doesn't qualify, in your

16    mind?

17    **A.**    No.  All of these studies are focused on data saved to a

18    user's account, and that's where we see the confusion sometimes

19    come up.

20    **Q.**    What about Google Analytics data?  Have you seen a user

21    study -- well, let me back up for a second.

22          You request user studies or they're just provided to you?

23    **A.**    Yeah.  I -- a product manager will request user studies,

24    particularly if we're launching a new feature, like the auto

25    delete feature we've been discussing here.  I'll request maybe

1    multiple studies to try to make sure it makes sense to as many

2    of our users as possible.

3    **Q.**    Are you in charge of how the user study is performed?

4    **A.**    No, I'm not.  Google has these Google experience

5    researchers.  They're the ones that are kind of the experts in

6    how to pick the right study.  They run the studies, and then

7    they provide reports back to us.

8    **Q.**    And what do you do with the reports when you get them?

9    **A.**    We'll often meet with the researcher and discuss how the

10    study went.  They'll give us their overview, and then we take

11    that feedback.

12    **Q.**    So is it fair to say that interpreting these user studies

13    is one of your job responsibilities?

14    **A.**    Yes, that's fair.

15    **Q.**    Okay.  So in the 12 years you've been in charge of WAA,

16    have you ever requested and then received a user study that

17    indicated to you that users were under the impression that

18    Web & App Activity controls the flow of Google Analytics data

19    when it's de-identified?

20    **A.**    No, I have not.

21    **Q.**    Now, you were asked by the plaintiffs' lawyer yesterday

22    whether Google shows its users their user data.  Does Google

23    show users their user data?

24    **A.**    Yes, it does.

25    **Q.**    How does it do that?

1   **A.**   Tools like the My Activity UI or if you click those manage

2   buttons, the view-all button that we can see up there -- the

3   view-all button, apologies -- that takes users to our UIs that

4   we show users all the things saved against their account.  They

5   can see.  They can delete.  They can even download or send the

6   data to another company.

7   **Q.**   Now, I believe that when you were asked about showing

8   users their user data, you also said something about there's

9   data that Google doesn't show to users and allow them to

10  delete.  Can you expand on that?

11  **A.**   Sure.  I believe yesterday we were talking about

12  de-identified data.  A great example of this would be, when you

13  visit the Google home page, your request from your Web browser

14  goes to a Google data center somewhere.  That data center

15  creates a server log that says where this request comes from,

16  what system did it go to.  It's used to make sure that our

17  systems run fast so the Google Web page shows up quickly.

18      But that log itself is never associated with the user's

19  Google Account.  It's vital to the running of our systems, but

20  it's de-identified and it's not personal user data.

21  **Q.**   So the server log that records that somebody has loaded

22  Google.com, maybe it records that somebody ran a search, you

23  don't -- you don't think this control should provide users the

24  ability to view and delete that log?

25  **A.**   No, because if users could delete it, people, you know,

1   performing abuse, systems that try to take down Google servers,

2   like, we wouldn't be able to stop that.  It would be very weird

3   to have these holes cut out of this essential data.

4   **Q.**   What if -- what if Google were not permitted even to

5   collect the -- you know, the transmission of information

6   requesting Google.com appear on a web browser?

7   **A.**   I think that would dramatically degrade the quality of

8   Google's services and how they work.  That information,

9   I think, is essential to make sure, you know, when you go to

10  Google.com, it loads fast, it loads at all.

11  **Q.**   It might not load at all?

12  **A.**   If you go to an overloaded data center, you'd get a 503.

13  It's an error code.

14  **Q.**   Now, as the head of Web & App Activity, what is your

15  personal position on the intent of what this control is

16  supposed to cover?

17  **A.**   The Web & App Activity setting has always been about the

18  data that we save in your Google Account, about the things you

19  do, so that we can use that data to provide you more

20  personalized experiences, basically to make Google services

21  work better for you.

22  **Q.**   Where -- and you should feel free to step down if you'd

23  like and point it out or you can point to it, but where in this

24  activity control people see on their phone or their browser,

25  where are you telling people that that's what this control is

1  intended to cover?

2  **A.**    Well, I think we can just see -- I don't know if everyone

3  can see it, but just on the top -- they're actually underlined,

4  I think -- the very description of what the activity controls

5  are for, so not just Web & App Activity, is to save this type

6  of data in your account to give you those more personalized

7  experiences.

8      Just to explain that just for a second, we can't

9  personalize your experience if we don't know who you are.  So

10  this only works when you're signed in and this data is saved.

11      And I think it's that account piece that ends up being so

12  critical because this is like your personal profile, your

13  history that goes with you so that the things you've done in

14  the past can improve the things you do in the future.

15  **Q.**    And so just for absolute clarity, when a user turns WAA or

16  sWAA off, does data collected from users go into their profile

17  at Google?

18  **A.**    When you turn those settings off, that data does not go

19  into your profile at Google.  It would not be saved against

20  your account.

21  **Q.**    Yesterday you were asked a number of questions about an

22  email that you received and responded to from Mr. Ruemmler.

23  I'd like to take a look at that because it sounded like there

24  was something you wanted to explain about it.

25      Can we look at Exhibit Number 3?  And let's just take a

1    look at the top here.

2        Now, before we get deeper into this email, Mr. Monsees,

3    can you just tell the jury a little bit more about

4    Mr. Ruemmler's role with respect to the work that you have done

5    with him?

6    A.   Yeah.  I believe I stated before that Mr. Ruemmler is an

7    engineer on the Privacy Team for Google Workspaces.  And Google

8    Workspaces, if you haven't heard the term, basically means your

9    Gmail, your Google Drive, your Google Docs, that kind of family

10   of services.

11       And as part of Chris's role over there -- or my

12   interactions, I should say, with Chris have often been about

13   reviewing and ensuring the policies that Google has internally

14   are being enforced with the safe handling and collection of

15   Google Workspace data.

16   Q.   Do you respect Mr. Ruemmler's opinion?

17   A.   Yes, I do.

18   Q.   And have you taken his opinion seriously when deciding

19   what to do with this control?

20   A.   Yes.

21   Q.   I noticed yesterday that you mentioned several times that

22   the discussion that you and Mr. Ruemmler were having in this

23   exhibit had to do with the concept of data saved to a

24   Google Account.

25       Are you -- as you worked at Google, in charge of WAA, are

1  you in the habit of clarifying, every time you say "data," that

2  you mean data saved to a Google Account?

3  **A.**    No.  Almost everyone that comes and talks to me, like when

4  Chris and I work, I know that they're talking about Google

5  Account data because that is primarily the role that I do.

6  **Q.**    Your role is about Google Account data?

7  **A.**    Exactly.

8  **Q.**    When you see -- when you have writings that you receive

9  and people talk about data, in your experience, do the people

10  who are writing to you always attach the words "in your

11  account" behind the word "data" whenever they say "data"?

12  **A.**    No.  I think that would be kind of silly to repeat that

13  all the time.

14  **Q.**    What sort of data does Mr. Ruemmler work with at Google?

15  **A.**    I mentioned that he works with Gmail data -- predominantly

16  that's what Chris and I would talk about -- and how that Gmail

17  data is used to enable various cool features.  Like, you could

18  ask Google Assistant, "Is my flight on time?"  And it would

19  know, "Oh, you have a flight confirmation from Southwest," and

20  it could answer that using your Gmail data.

21  **Q.**    You mentioned yesterday that this email thread had

22  something to do with, I think you said, a WAA-off logging

23  proposal.  Do you remember that?

24  **A.**    Yes, I do.

25  **Q.**    Can you just explain briefly for the jury what the WAA-off

1  logging proposal is?  I don't think you got a chance to explain

2  it.

3  **A.**   Sure.  So I believe it was around 2019, maybe even late

4  2018, we had had discussions to change the way WAA works when

5  it's turned off.

6      In the past, when you turned Web & App Activity off, it

7  basically stopped all personalization from happening, not just

8  on historic -- history, like your Web & App Activity data, but

9  even if you told Google your home address so you could say,

10 like, "Directions home" when you're in the car, that, because

11 it's personal, we would require Web & App Activity because we

12 want to ensure that the logs that are created -- you can't

13 really de-identify a log if it has your home address in it;

14 right? -- so we would just say, "We'll disable those."

15     And we had spent a lot of time trying to find a different

16 solution so we could enable those types of personal features,

17 particularly on things like the Assistant, which is meant to be

18 very personal, without also requiring you to save your

19 Web & App Activity.

20 **Q.**   So just so I understand your example, can you just spell

21 it out for us, who are not embedded in it?  What is it that was

22 not working for users when WAA was off that you were trying to

23 address?  Just give us one example.

24 **A.**   Sorry.  I think, basically, simply it's that when WAA was

25 off, non-history-based personal features just couldn't work for

 1   users, and that would greatly limit some of the products that

 2   we use.

 3   **Q.**   So if somebody said "Find me cafes in your home" on

 4   Google Search and WAA was off, would that have worked?

 5   **A.**   That would work.  But I'll give you an example of

 6   something that used to annoy my wife a lot --

 7   **Q.**   Okay.

 8   **A.**   -- is I have, you know, Google Assistants in my home and I

 9   have my lights controlled -- some of the lights controlled by

10   voice.

11       When WAA was off, you couldn't say, "Hey, Google, turn off

12   the lights," because that needed personal account information

13   to work and that was blocked when WAA was off.  That was very

14   frustrating.

15   **Q.**   Is that kind of -- it sounds like a pretty significant bug

16   from the experience of the user.  Why would Google have

17   disabled your ability to turn off the lights when WAA was off?

18   **A.**   Well, like in my example of using home address, we did it

19   to try to check -- protect user privacy.  We wanted to make

20   sure that personal data wouldn't be logged in the de-identified

21   logs when WAA is off.  So what we did is we engineered a

22   solution that could update that policy so that we could enable

23   these features.  You could turn off your lights.  You could get

24   directions home without requiring Web & App Activity to be on.

25   **Q.**   Okay.  And so this sort of first-draft proposal is the one

MONSEES - CROSS / SANTACANA

1    Mr. Ruemmler is expressing concerns about?

2    **A.**    Yes.  I believe we worked on this project for more than

3    two years, at least another year after this discussion with

4    Chris.

5    **Q.**    It took two years to fix this light problem?

6    **A.**    Yes.

7    **Q.**    Why did it take so long?

8    **A.**    There are a lot of systems at Google that are very

9    complicated, and we need to be very careful when we're making

10   changes to user privacy controls.  We don't want a system to

11   break and accidentally collect or mishandle user data.

12   **Q.**    Wouldn't an easy proposal -- wouldn't an easy solution

13   have been to just let the Google Assistant know where you live?

14   It's in your house.

15   **A.**    It would be, but the concern that we had is that if that

16   data, like your home address, went into our de-identified logs,

17   it might make those identifiable, which would go against our

18   policies.

19   **Q.**    So what is it about this technical proposal that

20   Mr. Ruemmler was telling you he didn't like?

21   **A.**    Yeah.  So in this first proposal, the first proposal was

22   very simple.  It was:  Well, what if instead of writing against

23   a de-identified log when a user has WAA off, we'll just still

24   write it to the user's Google Account, we'll just automatically

25   delete it.

1        The catch, though, as Mr. Ruemmler is very aware with

2   being so technically involved, is that it takes Google Systems

3   a little bit of time to delete.

4        And so the concerns that he's raising in a couple places

5   here is that it would mean that we would still have the data,

6   your Web & App Activity, against your Google Account even when

7   the setting is off just for a little bit of time.  But his

8   point was, I think, valid.  We would still have it, and he was

9   concerned about how we would explain that to users.

10  **Q.**   So just to be absolutely clear, this proposal would have

11  allowed Google to know where your Google Assistant is even when

12  WAA is off temporarily?

13  **A.**   That's correct.

14  **Q.**   And he didn't like that because?

15  **A.**   Because I think, as he explains in quite some detail in

16  this exhibit we were looking at, he was worried that it

17  would -- we would be misrepresenting to users.  Basically, we

18  wouldn't be explaining clearly what WAA actually does when it's

19  off.

20       And you see him, I recall, reference a couple of times the

21  GAIA temp.  That's what he's talking about, is writing to a

22  Google Account temporarily.

23  **Q.**   So let's look at the last paragraph of this first page.

24  I think you were shown some of the statements in this paragraph

25  yesterday, but not all of them.

1          Could you just take a look, Mr. Monsees, to the second

2    sentence and read it to the jury?

3    **A.**   Sure.  Chris is saying here [as read]:

4              "If I choose not to store data in my account,

5         then Google should not have access to the data either

6         as the data should not be in the account."

7    **Q.**   So he's saying to you in this email that Google should be

8    concerned about data that should not be in the account?

9    **A.**   What he's saying --

10             **MR. CARMODY:**  A little bit of hearsay is okay, but

11   he's getting into all these conversations he had.

12             **MR. SANTACANA:**  Your Honor, he was questioned for a

13   long time yesterday about what Mr. Ruemmler thinks.

14             **THE COURT:**  This document is in evidence.  You can

15   certainly ask about it.  Stay away from what did Mr. Ruemmler

16   mean or what is in his mind because, obviously, he can't

17   testify to that.

18             **MR. SANTACANA:**  I will.

19             **THE COURT:**  But you can proceed.

20             **MR. SANTACANA:**  Thank you, Your Honor.

21   **BY MR. SANTACANA:**

22   **Q.**   So, Mr. Monsees, just to rephrase my question, what did

23   you understand this sentence to mean when he says to you that

24   he's concerned about whether data should not be in the account?

25   **A.**   Given that the proposal that Chris was talking about would

1    have temporarily saved data in a user's account, I read this to

2    mean that that data shouldn't be saved in the user's account,

3    meaning he disagreed with the proposal.

4    **Q.**   Let's take a look at the end of this paragraph, which is

5    at the top of the next page.

6        Now, could you just read that last -- the only full

7    sentence there for me?

8    **A.**   Yeah.  He says [as read]:

9            "I'm probably better off having WAA on and

10           deleting the data immediately versus having WAA set

11           to off if Google moves it to GAIA temp logging."

12   **Q.**   Is GAIA temp logging a reference to the same proposal you

13   were discussing?

14   **A.**   That's exactly the proposal, yeah.

15   **Q.**   Can you explain briefly your understanding of why a user

16   would be better off having WAA on and deleting immediately

17   versus having WAA off if you had adopted this first-draft

18   proposal?

19   **A.**   Yeah.  I think what Chris is saying is that if WAA had

20   been on and you deleted immediately, at least you would see it

21   and it would run through a different system to remove it from

22   our system -- you know, from Google Systems.  So, basically,

23   we'd remove it from your account faster, is what he's saying,

24   than the temporary plan.

25   **Q.**   Let's look at your response to Mr. Ruemmler, which is on

1    page 3, just about a third of the way down, the paragraph that

2    starts "By some interpretations."

3        And if you could just read the only full sentence -- or

4    the second sentence here.

5    **A.**    Sure.  It says [as read]:

6            "With the move to temp personal logs" --

7        And just to clarify, that's the GAIA temp thing we've been

8    talking about.

9    **Q.**    So that's the third label for the same thing?

10   **A.**    Yeah.  Clearly, a confusing project.  Sorry.

11       [As read]:

12           -- "WAA off will retain less data than signed

13       out; however, signed out is and was never associated

14       with an identity, so the risk balance is different."

15   **Q.**    So just to be clear, Mr. Monsees, this email is from 2019.

16   That's before this lawsuit was filed?

17   **A.**    That's correct.

18   **Q.**    And in 2019, before this lawsuit was filed, you were

19   drawing a distinction between data associated with an identity

20   and data that's not associated with an identity?

21   **A.**    Yes.  I always have.

22   **Q.**    Okay.  Now, let's look at the last paragraph here in this

23   page, where it says -- starts with the word "Today."

24       So this is another paragraph you wrote?

25   **A.**    Yes.

1    **Q.**    Let's look -- so just read the first sentence for us.

2    **A.**    Sure.

3    [As read]:

4    "Today (in Search, Maps, Assistant, et cetera)

5    WAA off is logged the same as being signed out."

6    **Q.**    Can you just explain to the jury what you mean by that?

7    **A.**    Yeah.  The -- what this would mean is when you use

8    products like Google Search, when you had WAA off, we would log

9    those logs generated -- right? -- what responses the products

10   gave, but always to a de-identified ID that happened to be the

11   exact same ID as when you're using Google signed out of your

12   Google Account.

13   **Q.**    Now, can you read the next sentence?  It's a little long,

14   but we'll break it down.

15   **A.**    Sure.

16   [As read]:

17   "What the WAA-off temp personal logs project

18   will do" --

19   **Q.**    Sorry.  I think that's the fourth label for the same

20   project?

21   **A.**    Yes.  Sorry.  A lot of the same words, though.

22   What this project will do is [as read]:

23   -- "change that behavior to be aligned with what

24   YouTube, Play, Apps, and many other teams have done

25   for years with GAIA temp logs.  Instead of creating a

1          pseudonymous archival log, we will create a temporary

2          (30- to 60-day, Sawmill deletion window) limited

3          purpose log."

4    **Q.**    Okay.  Can you just explain what you meant when you said

5    "instead of creating a pseudonymous archival log"?

6    **A.**    Internally, Google will often use the term "pseudonymous"

7    or "pseudonym" to mean the same thing basically as

8    de-identified.  A pseudonym is just like a replacement name;

9    right?  So instead of saving to a Google Account, which is this

10   GAIA ID we've seen come up a couple of times, we would save to

11   another random string of numbers and letters that could never

12   be associated back to you.

13   **Q.**    And why did you say "instead of creating a pseudonymous

14   archival log"?

15   **A.**    Because that is what Search, Maps, and Assistant had been

16   doing to this point, the same pseudonymous or de-identified log

17   that we use signed out.  This proposal was to change it, write

18   it to the Google Account, but only temporarily.

19   **Q.**    In the end, in response to Mr. Ruemmler, did you make a

20   decision about whether to adopt this proposal?

21   **A.**    Yes, we did.  Thanks to discussions with Chris and others,

22   we actually dramatically changed the proposal; and what we

23   eventually launched in late 2020, maybe early 2021, was a new

24   different type of pseudonymous ID to maintain the same

25   de-identified behavior.

1   Q.   Let's look at the top of page 1, that email or that

2   paragraph that starts "Thanks, David" -- or, excuse me.  What I

3   mean, actually, is your email where you say, "Hi, Chris.  You

4   can read more..."  And then the paragraph [as read]:

5           "I would be happy to discuss further.  Feel free

6        to grab 30 minutes with Leslie Liu and myself."

7        Who is Leslie Liu?

8   A.   Leslie Liu was my lawyer at the time on this team.

9   Q.   Why did you invite her to this conversation?

10  A.   Because Leslie knows a lot about this space and Google's

11  internal policies, and so if we were going to have a discussion

12  about policies with Chris, I thought it would be helpful to

13  have her there.

14  Q.   At the end of this process and these discussions, your

15  decision was not to adopt this proposal.  Is that what you

16  said?

17  A.   That's correct.

18  Q.   Now, I think you said the ultimate thing you did do was

19  another type of pseudonymous log.

20  A.   That's right.

21  Q.   Which is another way of saying another type of

22  de-identified log?

23  A.   That's correct.

24  Q.   As far as you know, Mr. Monsees, was Mr. Ruemmler

25  satisfied with your solution of using a de-identified log to

1   fix the lights in your house?

2   **A.**   Yes, I believe so.

3   **Q.**   He's never complained to you that --

4           **MR. CARMODY:**  Your Honor, this is more of the hearsay.

5           **THE COURT:**  Well, why don't you ask -- you're going to

6   call that witness, so you can ask that witness.

7   **BY MR. SANTACANA:**

8   **Q.**   Has Mr. Ruemmler ever complained to you --

9           **MR. CARMODY:**  Objection.

10          **THE COURT:**  He can answer that question.

11      Yes, you can go ahead with that question.

12          **MR. SANTACANA:**  Thank you, Your Honor.

13  **BY MR. SANTACANA:**

14  **Q.**   Has Mr. Ruemmler ever complained to you that the use of

15  de-identified data in response to this project is inconsistent

16  with the activity controls description?

17  **A.**   No, he has not.

18  **Q.**   Now, let's take a look at the user study you talked about

19  yesterday.  That's Exhibit Number 2.

20      It sounded to me like you wanted to explain a little bit

21  more about what this study is about.  Could you just take a

22  moment briefly to do that for the jury now?

23  **A.**   Sure.  Actually, can we move to the next slide?  Is that

24  possible?

25  **Q.**   Of course.

MONSEES - CROSS / SANTACANA

**A.**   If we could zoom in on that second paragraph there, this is just the overview of what this study was that I had requested.

This study was really about trying to understand how users thought of this new auto delete setting and how that behaved, whether the auto delete setting was on or off, when the Web & App Activity setting was on and off.  We did so many studies on this project.  This was a completely new concept, so we had to really take our time to make sure it made sense.

And we had seen issues in the past where, when Web & App Activity was off, users didn't expect auto delete to work; and that's what, like, really the next 50 pages in this long document is studying.

**Q.**   Let's go to page 6.

The question -- the first question, which you were shown yesterday, says [as read]:

"WAA:  What do users expect turning WAA off to mean?"

Now, you ordered up this study?

**A.**   That's correct.

**Q.**   So you wanted that question answered?

**A.**   That question, I think, is essential to do this research because before we can understand how users think that auto delete setting works, we have to first understand how they think WAA off works regarding the data in their account.

1    **Q.**   All right.  Let's go to page 20, which you looked at

2    yesterday.

3        And, actually, while we're doing that, can you just

4    explain to the jury, you know, there's lot of different types

5    of market research.  How is this research conducted?

6    **A.**   This research, I think in the beginning we saw -- so

7    I think this was a small study.  So that typically means, like,

8    maybe eight or nine people will come into a room with a

9    researcher and they'll say, "Hey, take a look at this

10   prototype."  I can't remember if this was on paper or on a

11   screen.  And they'll just ask questions and get responses.

12       There are different types of studies the Research Team

13   runs too.

14   **Q.**   Are those -- and how many participants was this one?

15   **A.**   I think this was nine.

16   **Q.**   In the United States?

17   **A.**   In, yes, I believe the United States.

18   **Q.**   So are those participants told anything orally or given

19   anything written down about what they're supposed to be doing?

20   **A.**   Just the questions asked by the researcher to guide them

21   through the prototype that we do.  The goal is really not to

22   bias the participant.  We want to see if they're confused about

23   something.  And we ask a lot of questions about what they

24   expect.  Like, when you click this button, what do you think

25   you'll see?  And they ask questions like that.

MONSEES - CROSS / SANTACANA

1  **Q.**   Are the questions and the script, is any of that in this

2  presentation?

3  **A.**   No.  I believe this presentation is just the summary

4  coming out of all of that research.

5  **Q.**   So you were shown this page yesterday.  Do you recall,

6  just from your personal memory, receiving this result when it

7  came out?

8  **A.**   I do.

9  **Q.**   What was your reaction to seeing this slide when it first

10  came out?

11  **A.**   This seems great to me.  As a person in charge of

12  Web & App Activity, I read this to mean that users are

13  understanding the setting correctly, that these participants

14  understood that when they turned the Web & App Activity setting

15  off, that data would stop being saved into that Web & App

16  Activity bucket in their Google Account.  And this is, then, a

17  good foundation where the researcher would move on to then ask

18  about how the auto delete setting would behave.

19  **Q.**   Yesterday the plaintiffs' lawyer suggested to you that

20  this slide shows that users are confused.  Are you disagreeing

21  with that?

22  **A.**   I disagree with that, yeah.

23  **Q.**   So can you explain to us why it doesn't say on this slide,

24  after the word "saved," "to your" -- why doesn't it say "to

25  your Google Account"?

1    **A.**    Because the researcher who prepared this who works on

2    Web & App Activity and the person she was preparing it for, for

3    me, who works on Web & App Activity, everything that we would

4    be discussing in this context is all about data saved in the

5    user's Google Account, and the focus here is how they can then

6    automatically delete that data.  This is not about

7    de-identified data at all.

8    **Q.**    This prototype you were testing, is that a picture of it

9    on the right?

10   **A.**    Yes, it is.

11   **Q.**    And in that prototype, did it say "in your Google Account"

12   anywhere?

13   **A.**    Yes, it does.  It's right up at the top [as read]:

14          "Choose which settings will save data in your

15      Google Account."

16   **Q.**    Okay.  Now, as far as you know -- why don't you take a

17   look at the full slide again.

18      As far as you know, were these participants asked about

19   de-identified data during the course of this study?

20   **A.**    No, they were not.

21   **Q.**    Are you in the habit, sir, of ordering studies to find out

22   what participants think about de-identified data?

23   **A.**    No, I am not.

24   **Q.**    Why not?

25   **A.**    Because it just doesn't impact what I work on.  Web & App

1    Activity is a setting about data in your Google Account, so

2    that's what we focus most of our research on.

3    **Q.**    Mr. Monsees, we have talked about, in this trial, the

4    concept of the Google Account a lot.  Could you just take a

5    moment and explain to us in your own words what a

6    Google Account is?

7    **A.**    Sure.  A Google Account is really an identity that users

8    can create for free, and they typically associate it with,

9    like, an email address, so dave@gmail.com.  And they provide

10   some additional profile information like their name.  And the

11   key is that everything they then do when they sign in with that

12   Google Account is then associated with that identity.

13   **Q.**    Does GAIA ID stand for something?

14   **A.**    Yes.  GAIA ID is a very old term.  It stands for,

15   I believe, Google Accounts and Identity Authorization ID.  So

16   close.

17   **Q.**    Internally, you don't use the full term?

18   **A.**    I honestly didn't look it up until we were preparing for

19   this.  It's only ever been called GAIA ID.

20   **Q.**    Okay.  Is there a minimum amount of information that

21   you're required to provide -- or, I should say, a user is

22   required to provide to create a Google Account?

23   **A.**    Yes.  As I mentioned, users typically have to provide or

24   generate an email address that they'll want associated with

25   their Google Account.  We need their first and last name,

1    though they could really type anything in there.  We have to

2    have date of birth so we can determine if an account is for a

3    child and different restricted policies might apply to a minor

4    then.

5         And I think that's about it.  There's maybe a few other

6    fields that are required.

7    **Q.**   Are people required to provide the true first and last

8    name?

9    **A.**   No.  You could make anything up in your Google Account.

10   **Q.**   What is the -- can you explain the relationship between

11   the email that somebody chooses when they create a

12   Google Account and the GAIA ID you've talked about?

13   **A.**   Sure.  The -- one of the attributes, I guess, for lack of

14   a better word, of a GAIA ID is the email address that they

15   create, but the two aren't the same.  A GAIA ID is just a

16   different random string of letters and numbers that is a unique

17   ID within Google Systems.

18   **Q.**   So if I manage to get my hands on your GAIA ID, could I

19   figure out your email address?

20   **A.**   You couldn't, but if you were a product or a team who

21   needs that and is authorized to get access, there are tools

22   Google has that can go from a GAIA ID to the profile, which

23   would then include the email address.

24   **Q.**   So anybody at Google who has a GAIA ID can look up who it

25   is?

1    **A.**    No, not anybody.  You have to have approved access to be

2    able to do that lookup.

3    **Q.**    Okay.  Where would I need to go if I wanted to set up a

4    new Google Account?

5    **A.**    Lots of places.  When you set up a new Android device,

6    like a Samsung phone or a Pixel phone, I believe there's a step

7    there where you can create a Google Account as part of the

8    process.

9         If you just go to any web browser, say, you know, visit

10    Google Search, in the top right you'll see a sign-in button.

11    When you go to sign in, there's an option that says "Create a

12    Google Account."

13        And most Google Apps I think also have a very similar

14    behavior.  If you open the Gmail app on your iPhone, there'll

15    be an option right there to sign in and, if you don't have an

16    account, to create a Google Account.

17    **Q.**    Sir, have you prepared anything to help the jury

18    understand what it's like to create a Google Account?

19    **A.**    Yes.  I signed out of my Google Account on my personal

20    Android phone and created a video just in July, stepping

21    through what it would look like to add a new account on my

22    phone.

23    **Q.**    What steps did you follow when you were creating that

24    video?

25    **A.**    I signed out of my normal personal Google Account, and

 1   then I went into the Google app on my phone and I went through

 2   that flow I described where I could see I was signed out on the

 3   top right, I tapped there, and I created an account from there.

 4   Q.   You did that in July of this year?

 5   A.   That's correct.

 6   Q.   How does the process that you recorded on this video

 7   differ from the process of creating a Google Account during the

 8   time period July 2016 to September 2024?

 9   A.   Some of the text and options may have changed in that

10   time, but it's pretty much the same thing.

11   Q.   Okay.  So the text that we might see on the screen isn't

12   necessarily exactly the same?

13   A.   That's correct.

14   Q.   But the steps are roughly similar?

15   A.   The general requirements for creating an account, that all

16   is basically the same.

17   Q.   Okay.  Let's pull up this video that you prepared, and I

18   just want to play the first minute or so of it, the first piece

19   of it.

20   A.   Sure.

21   Q.   And if you wouldn't mind explaining to the jury, as we go,

22   what it is you were doing and clicking on.

23   A.   Sure.

24        **THE COURTROOM DEPUTY:**  Can I go ahead and show it to

25   the jury?

 1              **THE COURT:**  You may.

 2              **MR. SANTACANA:**  Yes, please display it to jury.

 3                   (Video was played but not reported.)

 4              **THE WITNESS:**  Oh, we may have skipped a little part,

 5     if I recall, but --

 6     **BY MR. SANTACANA:**

 7     **Q.**   That's all right.  We can restart it.

 8     **A.**   Oh, yeah.  Can -- are we able to?

 9     **Q.**   Sure.

10              **MR. SANTACANA:**  Brooklyn, would you mind restarting

11     the video?  Thank you.

12                   (Video was played but not reported.)

13              **THE WITNESS:**  Ah.  So here I am in the Google app.  Up

14     on the top right, I'm going to tap my account picker, and I

15     tapped an add account --

16                   (Reporter interrupts to clarify the record.)

17              **THE WITNESS:**  Account picker.  And then I tapped the

18     little plus where it says "Add account."

19          So now it's -- there we go.  It says I'm going to create a

20     personal account.  I'm going to go ahead and put a first and

21     last name, obviously not actually my first and last name.

22          I mentioned I have to choose a date of birth, so I'm going

23     to go ahead and do that.

24          And gender is optional, so I'm just not going to fill it

25     out.

1          Instead of choosing one of the ones that Google's creating

2     for me, I'm going to go ahead and type in the email address I

3     want to do here.  It could really be anything.

4          Google's going to check.  And now that worked, so I just

5     have to enter in a password.

6          I'm going to review this option to add a phone number, and

7     I'm just going to go ahead and skip it for time.

8          And then now I get to the privacy and terms screen.

9          **MR. SANTACANA:**  Okay.  We can take that down.

10    Thank you, Brooklyn.

11    **BY MR. SANTACANA:**

12    **Q.**   So, Mr. Monsees, on that privacy and terms screen that we

13    last landed on, what is the user being asked to do at that

14    point?

15    **A.**   Google summarizes some of our different terms of service

16    and privacy policies on this page, and these users must review

17    that information before they agree to creating their

18    Google Account, which would be the step at the bottom of that

19    screen.

20    **Q.**   Are users required to actually read the privacy policy

21    today when they're creating a Google Account?

22    **A.**   No, they're not.  We provide links to it, but they don't

23    have to review it.

24    **Q.**   Were they required to read the privacy policy at any point

25    since 2016 in order to create the Google Account?

1    **A.**    No.

2    **Q.**    Were they required to agree to the privacy policy in order

3    to create the Google Account at -- all throughout the time

4    period 2016 to now?

5    **A.**    Yes, they were.

6    **Q.**    What about the Google terms of use that were -- that was

7    referred to there?  Were users required to agree to the terms

8    of use since 2016?

9    **A.**    Yes, they were.

10   **Q.**    But they didn't have to read those either if they didn't

11   want to?

12   **A.**    Correct.

13   **Q.**    All right.  Let's take a look at the next piece of this

14   video.

15                    (Video was played but not reported.)

16   **BY MR. SANTACANA:**

17   **Q.**    And just explain again what you're doing.

18   **A.**    So I've just scrolled down a little bit.  So this is just

19   past the top of the page where the links that we saw to the

20   privacy policy and the terms of use are.

21        Kind of going through this section here, there's a section

22   that mentions that I'm in control, that Web & App Activity is

23   turned on when you create your account; but you can always

24   select "More options," which we can see in the bottom left.

25        So I believe I'm going to go ahead now and click on "More

1  options."

2      This kind of explains that this is data saved in my

3  Google Account.  Here's Web & App Activity, kind of the

4  description of how that setting works and what the data is used

5  for, as well as how long the data is saved in my account.

6      And now what I'm going to do is I think I'm going to go

7  ahead and check on the -- see where it says "Learn more about

8  Web & App Activity" underneath that radio button?  I'm going to

9  click on that.

10     Ah, and this opens kind of a bigger window.  You can see

11  it's more words, and it's just more information about Web & App

12  Activity and the various kind of details about it.

13  **Q.**   Okay.  Let's take that down for a moment.

14     So I think a couple of questions about what just happened

15  there.

16     You clicked on "More options," and then it showed you some

17  Web & App Activity options.  Have there always been -- let me

18  phrase it this way:  Since 2016, have users always had the

19  opportunity to choose whether to have WAA on or off when they

20  were creating a Google Account?

21  **A.**   I believe for most of the period, but not all of it.

22  **Q.**   Okay.  So can you break that down?

23  **A.**   Yeah.  I think in 2018 we launched the option, that "More

24  options" feature we looked at.  Users were always informed that

25  Web & App Activity, that kind of data, was being saved to their

1    account; but in 2018, we added the option where they could

2    change it if they wanted, as well as some other settings.

3         Now, after creating an account, users have always, through

4    the period, been able to go and modify these settings at any

5    time.

6    **Q.**   From 2016 to 2018, was Web & App Activity default on or

7    default off?

8    **A.**   It was default on.

9    **Q.**   It was?

10   **A.**   Default on.

11   **Q.**   From 2016 to 2018?

12   **A.**   That's correct.

13   **Q.**   Now, what about the setting this case is about,

14   supplemental Web & App Activity?  Was sWAA default on or

15   default off from 2016 to 2018?

16   **A.**   It was default on since the end of 2016, I believe.

17   **Q.**   Okay.  And then what changed in 2018?

18   **A.**   In 2018, we updated our descriptions, tried to make them,

19   you know, clearer for users, and we added that "More options"

20   flow that we just clicked on that included the Web & App

21   Activity section that had the on-and-off toggles.

22        So the user was informed, kind of in that short summary at

23   the top, that the data was on; but if they wanted, they could

24   change it and you could turn the setting off before you

25   actually created the account.

1    Q.    So I want to ask you about this language at the top of the

2    activity controls page.  We'll come back to it in a minute.

3        But since 2016, has the activity controls page always

4    mentioned that it relates to data saved in your account?

5    A.    Yes.

6    Q.    Since 2016, if a user turned WAA off, would they have been

7    doing it on a page that had this phrase "saved in your

8    account"?

9    A.    Yes.

10   Q.    There's no page where somebody might have turned WAA off

11   and this language was not there for them?

12   A.    No.  WAA has always been in the context of your

13   Google Account on a page similar to this.

14   Q.    All right.  Now, after the "More options" piece, you said

15   you clicked on something called "Learn more"?

16   A.    That's right.

17   Q.    What is a "Learn more" link?

18   A.    We internally call this progressive disclosure, and the

19   idea of progressive disclosure is to try to, almost like

20   peeling back the layers of an onion, give users a short summary

21   of things that are clear about these general categories of

22   settings that we have.  And then for the users who want to know

23   more, they can click "Learn more," peel back another layer, and

24   you saw we had a lot more information on that screen.

25   Q.    On that screen, I noticed that there were some other

1    settings as well, not just Web & App Activity.  What are the

2    other -- are there other activity controls from the 2016 to

3    2024 time period?

4    **A.**    Yes.  Other activity controls include your YouTube history

5    setting, which controls if the videos you watch and the things

6    you search on YouTube are saved in your Google Account.

7        The location history setting, that's not an account

8    creation, but it is here on this activity controls page, if we

9    could scroll it.  That saves information about where you go.

10        And ad personalization, which doesn't control saving of

11    data, it's a control to choose what data ads can use to

12    personalize your experience.

13    **Q.**    So -- but you mentioned -- we've talked about Web & App

14    Activity.  You mentioned YouTube history, location history, and

15    ads personalization?

16    **A.**    That's correct.

17    **Q.**    Are YouTube history and location history, are those also,

18    quote/unquote, activity controls?

19    **A.**    Yes, they are.

20    **Q.**    Were those also described with respect to data saved in

21    your account, or are they described in some different way?

22    **A.**    No.  Always described as data saved in your account, just

23    like it says at the top of the page.

24    **Q.**    Why are there so many activity controls?

25    **A.**    Some people might say there aren't enough activity

**MONSEES - CROSS / SANTACANA**

1    controls.  I think the challenge that we have, as a company

2    with so many users, like I mentioned before -- you know,

3    3 billion users is a lot of people and a lot of opinions -- is

4    that we try to strike the right balance of the different main

5    categories of data.

6        And the categories that we just discussed, like your

7    Web & App Activity for, you know, most of your Google services,

8    YouTube history for the things on YouTube, locations that

9    happen, you know, kind of as your timeline map, and the way ads

10   are used, we've just kind of found to be the main categories

11   that users think of.  So that's where we've aligned as kind of

12   the right balance of settings.

13   **Q.**   On the screen here, this foam board that we have of

14   activity controls, it uses the term "Saved in your account

15   helps give you more personalized experiences."

16       Can you just explain, in your own words, what

17   "personalized experiences" mean?

18   **A.**   Sure.  I think, most simply, what personalized experiences

19   or personalization means is really using your history, data

20   saved in your account, to change your experience to make it,

21   hopefully, more relevant to you.

22   **Q.**   Can you give us a concrete example of what you mean by

23   that?

24   **A.**   Sure.  One of my favorite examples that you can try

25   yourself is that if you go to Google Search and you search for,

1    like, funny pet videos.  I have two dogs.  I have -- one of

2    them is a puppy.  My search history is full of things, like:

3    What's safe for a dog to eat?  What kind of, like, dog food to

4    feed a Whippet, things like that.

5        I'm probably going to see a lot more dog videos in my

6    search results.  But if you're interested in cats, if you're

7    searching for how to adopt a kitten or trying to find out about

8    cat allergies, you might see more cat videos than dog videos.

9        In that same search, you would get different results than

10   I would get.

11   **Q.**   Now, you said your search history has a bunch of

12   dog-related searches in it.  I take it you have WAA on?

13   **A.**   I do have WAA on.

14   **Q.**   If you had WAA off, would those search results be in

15   there?

16   **A.**   They would not, and Google would not know, then, to show

17   me more funny dog videos.

18   **Q.**   So if you had WAA off and I had WAA off and we both

19   searched for funny pet videos, would we get similar results?

20   **A.**   Yeah, we would.

21   **Q.**   Does personalization -- that's a nice and cute example of

22   personalization.  Does personalization also involve targeting

23   of ads?

24   **A.**   Yes.  Personalization is one type of ad targeting that

25   would use your history saved in your account to choose the

1    right ads to show you.

2    **Q.**    So if you and I both have WAA on, our search history is in

3    there, we might be seeing different ads as we move through the

4    Internet --

5    **A.**    Yes.

6    **Q.**    -- based on our search history?

7    **A.**    That's correct.

8    **Q.**    How is that different if WAA and sWAA are off?

9    **A.**    If WAA and sWAA are off, that data -- your history isn't

10   saved in your account, which means the data just isn't there

11   for ads to personalize on.  Ads can't personalize on data not

12   saved in your account when you're on Google.

13   **Q.**    So if you and I have WAA off and sWAA off and we visit the

14   same web page from the same computer at the same time, would we

15   see the same ads?

16   **A.**    We'd probably see similar ads, yes.

17   **Q.**    They wouldn't be personalized to you or to me?

18   **A.**    That's correct.

19   **Q.**    Why would Google give users the ability to prevent it from

20   serving personalized advertising?

21   **A.**    I mean, we always have.  We launched Web & App Activity

22   more than 20 years ago.  I think Google has always cared about

23   these types of controls and wanted to put users in control of

24   their experience.

25        Not everybody is the same.  A lot of people like

1  personalization, but not everybody wants everything to be

2  personalized all the time.  So we give these toggles to turn

3  things on and off.

4  **Q.**  Do people, in your experience, turn them on and off, or is

5  it like people have it on all the time or off all the time?

6  **A.**  People definitely turn them on and off.  I turn them on

7  and off myself.  I mean, I have a ten-year-old son who's not

8  allowed to have a phone but uses my phone a lot.  If you have

9  kids, everyone knows kids will take your phone.  And I might

10 turn Web & App Activity off when he's using my phone so that

11 his weird fourth grader stuff doesn't get saved into my

12 history, which would then change the recommendations of stories

13 that I see in my newsfeed, for example.

14     So it's an easy way to exclude a chunk of data from my

15 account when I want to.

16 **Q.**  What if, instead of wanting to prevent your ten-year-old

17 from affecting your personalization, you want to hide

18 information from Google so that you don't get targeted ads

19 about something that is private to you?  Would you turn WAA off

20 then?

21 **A.**  Yes, I could turn WAA off then.

22 **Q.**  Would that work?  Would that work if you wanted it to be

23 private?

24 **A.**  I mean, that would mean that ads could not be based on any

25 of my history because the history is not saved in my account.

1  **Q.**   Doesn't Google lose money by giving people the ability to

2  prevent it from personalizing advertising?

3  **A.**   Yes, I believe it does.

4  **Q.**   Can you just -- I want to make sure we've covered sort of

5  a little bit more about what Web & App Activity covers.

6      We've talked about Google Analytics in this trial.  What

7  other kinds of data go into Web & App Activity?

8  **A.**   Sure.  A lot of our kind of information products save data

9  as part of your Web & App Activity.  So if you use Google Maps,

10  the places you search for and that you click to view, those get

11  saved in Web & App Activity so we can personalize the places

12  that we put names on when Maps opens the next time.

13      If you are on an Android phone, like I am, and you use the

14  Google Play Store, the apps that you search for and the ones

15  that you click, Play will use those to recommend other related

16  apps.  Like, if you're into a particular type of game, you

17  might discover a new similar game.

18      Google Assistant saves conversations that you have when

19  Web & App Activity is on to personalize it.  So if you say,

20  "Call Dad," it's going to ask you, "Well, who's Dad?  Which

21  contact is Dad?"  Well, when WAA is on, Google Assistant can

22  learn and recommend that in the future, when you say "Call

23  Dad," you mean Mr. Monsees in this contact.

24  **Q.**   Now, would any of that be saved in a Google Account when

25  WAA is off?

1    **A.**    No.

2    **Q.**    So there's these checkboxes under WAA.  The first one is

3    the sWAA checkbox that this case is about.  Why are there these

4    subsettings under WAA?

5    **A.**    So Web & App Activity covers, I think we've mentioned, the

6    things you do on Google sites and apps, like Google Search,

7    Google Maps, Google Assistant, we just mentioned.  What sWAA

8    allows a user to do is to extend that to then also include

9    things they do on third parties, like the websites they visit

10   in Chrome or the types of information that service -- that

11   companies that use Google services, like Google Analytics for

12   Firebase, send to Google.

13   **Q.**    Do you have sWAA on?

14   **A.**    I do.

15   **Q.**    Why?

16   **A.**    Because I personally get a lot of value, particularly from

17   my Chrome history, in recommendations.

18   **Q.**    Does the data that sWAA adds to the WAA bucket, does that

19   include Google Analytics data?

20   **A.**    Yes, it can.

21   **Q.**    And what kind of Google Analytics data are we talking

22   about?

23   **A.**    It's the information that app and website developers who

24   use Google Analytics choose to send to their Google Analytics

25   service.  When sWAA is on, that data can then also be saved to

1    your Google Account.

2    **Q.**    What about when the user turns sWAA off?  Then does

3    Google Analytics data get saved to a user's account?

4    **A.**    No, it does not.

5    **Q.**    Does Google refuse entirely to accept Google Analytics

6    data in any form when a user turns sWAA off?

7    **A.**    No, it does not.

8    **Q.**    So Google Analytics data can still come to Google.  It's

9    just not saved in the Google Account?

10    **A.**    That's correct.  I mean, we couldn't provide app and site

11    developers the features of Google Analytics if we didn't

12    collect the analytics.  So it wouldn't make any sense to stop

13    that data from still being used for those essential purposes.

14    **Q.**    And you don't have a concern that that affects user

15    privacy?

16    **A.**    No.  I've never heard about this being a concern until I

17    heard about this case.

18    **Q.**    Well, you heard about this case when it was filed

19    five years ago; right?

20    **A.**    That's correct.

21    **Q.**    I think you said yesterday you've been working on this for

22    years?

23    **A.**    Yes.

24    **Q.**    What did you mean by that?

25    **A.**    I was made, I think, aware of this case fairly early, and

1    I've been asked questions to help produce information for this

2    case that we've looked at.

3    **Q.**    Did you -- in the five years since this case was filed,

4    did you consider that maybe the plaintiffs' lawyers' theory is

5    correct and that users are concerned, that this isn't just

6    about in your account, it's also about de-identified data?  Did

7    you ever consider that?

8    **A.**    I mean, I've looked at the Web & App Activity text so many

9    times since this case was filed; and, you know, though we've

10   made some minor text changes and we've launched some new

11   features around it, I think we've found that it is still

12   accurate.  It's still saying that this is about data saved in

13   your Google Account, and we didn't make any -- any, you know,

14   real changes against it.

15   **Q.**    You gave earlier the example for WAA-off data of a server

16   log when somebody searches something on Google -- or, excuse

17   me -- when somebody loads the Google page.  That's kind of a

18   technical example.

19        Can you give us a more accessible example of what WAA-off

20   data looks like?

21   **A.**    Sure.  How about instead of WAA off, we talk about YouTube

22   as a great example?

23        So I mentioned we saw that there's a YouTube history

24   setting when you create your account here on activity controls.

25   It does the same thing as WAA, saves data to your

1   Google Account.

2        And if a user turns YouTube history off, it won't save

3   that data to their account.  So your YouTube recommendations

4   can't be based on that.

5        But think about what that would mean if YouTube didn't

6   save any data at all.  Like, if everyone in this room turned

7   their YouTube history off and we all watched a MrBeast video --

8   right?  It's very popular on YouTube -- that would mean that

9   the watch counter couldn't increment.  We wouldn't be logging

10  the activity anywhere.

11       We couldn't pay MrBeast for the videos that we've watched.

12  As a content creator, his career is getting paid for the videos

13  he makes and the number of views that those get.

14       So there are these essential things just to make YouTube

15  and its creators work that need to happen even when YouTube

16  history is off.

17       Now, that data is not tied to a Google Account.  It's all

18  de-identified.  And we don't need a Google Account to provide,

19  you know, MrBeast's, you know, view counts and stuff, but it's

20  still necessary to process that data.

21  **Q.**   I want to make sure we understand your answer,

22  Mr. Monsees.

23       So just to be clear, the YouTube history account is

24  another activity control?

25  **A.**   That's correct.

 1  **Q.**  Excuse me.  Now I'm not being clear.

 2  **A.**  Sorry.

 3  **Q.**  The YouTube history button is another activity control?

 4  **A.**  That's right.  It's just below here if we scrolled up on

 5  this board.

 6  **Q.**  If we can scroll this board.

 7     Okay.  And so it's also limited to data in your

 8  Google Account?

 9  **A.**  That's correct.

10  **Q.**  And so when somebody has YouTube history on and they watch

11  videos, that affects the videos that are recommended to them?

12  **A.**  That's right.

13  **Q.**  And when they have YouTube history off?

14  **A.**  Then that data is not saved to their account, you can't

15  resume that video where you left it off, and you won't see

16  recommendations or personalization based on that data.

17  **Q.**  So if I have YouTube history off, which is an activity

18  control like WAA, and I watch a YouTube video, does Google save

19  nothing about the fact that I've watched the video?

20  **A.**  Google will save nothing about the fact that you watched

21  the video, but it will save the fact that someone watched the

22  video so we can increment those counters and make sure the

23  service works as it's designed.

24  **Q.**  I think you said yesterday that being able to save

25  de-identified data is essential to Google's ability to know

1    what to charge and know what to pay people.  Can you just

2    explain that answer in the context of what you just said?

3    **A.**    Yeah.  If Google can't save that de-identified watch, that

4    view of the MrBeast video that we were talking about, then we

5    wouldn't know that someone else watched his video; we wouldn't

6    know how much to pay him as the creator of that content.  And

7    so having that kind of essential information to run and operate

8    the service is essential.

9    **Q.**    Now, as the person who has been in charge -- I'm sorry.

10        Are you also in charge of the YouTube history control?

11   **A.**    The YouTube history control does show up on activity

12   controls, so I collaborate with the YouTube Team on making sure

13   that it works and it's clear to users here.

14   **Q.**    Okay.  So it's been your job for 12 years to clearly

15   describe not just Web & App Activity, but also YouTube history?

16   **A.**    That's correct.

17   **Q.**    Okay.  In the 12 years that you have been doing that job,

18   have you ever been concerned that by saving the fact that

19   somebody watched a YouTube video and so we put the watch

20   counter up by one, that you were misrepresenting what this

21   button does?

22   **A.**    No, I never have.  These settings have always been about

23   saving data in your account to personalize your experience, and

24   I've never seen any users confused about that fact.

25   **Q.**    Now, you don't deny, Mr. Monsees, that people have been

1  confused over time about aspects of Web & App Activity, do you?

2  **A.**    No, I don't deny that.

3  **Q.**    Can you describe just one example of the type of confusion

4  that you have encountered about Web & App Activity in the

5  12 years you've been in charge of it?

6  **A.**    Sure.  Most often I see users confused about how data is

7  being, you know, saved, how long it's being saved, what data is

8  being saved under Web & App Activity.  And we've, I think, done

9  a lot to try to, like, make that easier for users to understand

10  which products are part of your Web & App Activity.  I

11  mentioned we added the icons, for example, we added

12  illustrations, things to try to make it clearer, just as one

13  example.

14  **Q.**    What else have you done in the last 12 years?  I think you

15  talked about this a little bit.  Just give us one more example

16  of something that you have done in the last 12 years to respond

17  to user confusion about Web & App Activity.

18  **A.**    Well, we have updated the text.  I think, as we mentioned,

19  this text is kind of the same in its idea, but we've tried to

20  simplify it, clarify it.

21      We've made a bunch of other changes on our Help Center

22  articles where "Learn more" takes a user to, to try to give

23  more examples for a user to understand the settings.

24      We've added additional frequently asked questions

25  sections.  So we've really tried to give a lot of -- kind of in

1   that progressive disclosure spirit, more information to users

2   who may be confused.

3   **Q.**   Now, you understand, Mr. Monsees, just from your

4   questioning yesterday, that the plaintiffs' lawyers think that

5   when a user turns sWAA off, that means Google Analytics should

6   be disabled from sending any data to Google at all.  Do you

7   understand that?

8   **A.**   Yes, I do.

9   **Q.**   Did Google intend for this control to determine whether

10  data can be received by Google from Google Analytics in any

11  form?

12  **A.**   No.  That's never been our intent.

13  **Q.**   Can you understand, Mr. Monsees, how a user might be

14  confused by this description and maybe even come to the same

15  conclusion as the lawyer who was questioning you yesterday?

16  **A.**   I mean, I think with so many users with different

17  expectations, they could be; but we have done so much work to

18  try to make it clear to our users that this is within their

19  Google Account, this is a control for your experience when

20  you're signed in with your Google Account, that I really think

21  we've done our best to make that clear.

22  **Q.**   In the five years since this case was filed, have you

23  considered making changes to this to add the phrase "in your

24  Google Account" a few more times, make it -- maybe mention

25  de-identified data on this page, add more information?

1  A.    I mean, just given that this concern has never come up

2  until I heard about this case and I haven't heard questions

3  about it again outside of this case, and if we repeated

4  Google Account any more on this page, it would get a little

5  overwhelming, we just haven't decided to make those changes.  I

6  just don't think they're necessary.

7  Q.    What about just describing -- I mean, have you considered

8  describing, "We're going to save de-identified data even if you

9  have WAA off"?  Why not put that on the page?

10 A.    Well, we do provide links to users to the privacy policy,

11 and we do tell them about other information Google collects,

12 and why, is available on Policies@Google.com.  So we do

13 actually try to connect them with more information if that's

14 what they're looking for.

15 Q.    Okay.  I'll make sure to pull up -- pull up the privacy

16 policy.

17     Before we do, though, I want to look at what it says when

18 a user clicks "Learn more."  So, first, let's just pull up --

19 just so we have the actual exhibit up, let's pull up

20 Exhibit 84.

21     Mr. Monsees, I believe this was admitted yesterday.  When

22 was this activity controls page in effect at Google?

23 A.    I believe the exhibit we're looking at is from 2022.

24 Q.    And this case deals with a time period of 2016 to 2024.

25 Did the activity control page -- excuse me.

**MONSEES - CROSS / SANTACANA**

1          Did the activity controls page look like this that whole

2    time?

3    **A.**    Pretty much.  Some of the images and the styling has

4    changed through the years, but basically the same.

5    **Q.**    What about -- let's just start with the language at the

6    top, sort of, eighth of that page.  It says -- I want to ask

7    you about the phrase "in your account" there in the first

8    sentence.

9    **A.**    Yes.

10   **Q.**    Starting with that fourth word and, again, the phrase "in

11   your account" in the second sentence, those last four words.

12         Has that phrase been on the activity controls page the

13   entire period 2016 to 2024?

14   **A.**    I think the exact wording has changed a little bit, but

15   those -- the idea of your Google Account has always been on the

16   page.

17   **Q.**    All right.  And you're responsible for this language?

18   **A.**    That's correct.

19   **Q.**    And you have been, I guess, the entire class period?

20   **A.**    Yes, that's correct.

21   **Q.**    Okay.  So can you read to the jury, please, exactly how

22   you chose to describe activity controls to users?

23   **A.**    Sure.  It says here [as read]:

24              "The data saved in your account helps give you

25         more personalized experiences across all Google

1          services.  Choose which settings will save data in

2          your Google Account."

3    **Q.**   Is the reference to personalized experiences the same as

4    you mentioned before?

5    **A.**   That's the same personalization we've been talking about,

6    yes.

7    **Q.**   And the reference to "in your Google Account," I assume is

8    the same as you've been discussing.

9    **A.**   That is the same.

10   **Q.**   What about what it says below that?

11   **A.**   So we have some additional information for users looking

12   for it.  It's called Safer with Google.  It says here [as

13   read]:

14          "You control what data gets saved to your

15          account."

16          And if you click "Learn more," it would take you to this

17   site with not just privacy, but also security options you can

18   learn about.

19   **Q.**   Now, in your email to Mr. Ruemmler from before the case

20   was filed, when you mentioned associating data with a person's

21   identity, were you referring to the distinction that's drawn

22   here related to "in your account"?

23   **A.**   Yes.

24   **Q.**   Now, let's look at the next piece of this page, starting

25   with the logo there down to the turn-on button.

1    **A.**    (Witness examines document.)   Sure.

2    **Q.**    So we've looked at this.   Why doesn't it say "in your

3    Google Account" right here under the words "Web & App

4    Activity"?

5    **A.**    Well, I think a user sees these settings, these cards

6    directly beneath the descriptions that we had just read.

7    They're also in their Google Account, literally that page; and

8    depending on the UI, you also see your profile photo up on the

9    top right.

10   **Q.**    This is a computer monitor.   These are TVs.

11       On a mobile phone, how much distance did you design this

12   to be between these three references to "in your

13   Google Account" and the description of WAA?

14   **A.**    It's all basically the same text.   The formatting is just

15   a little bit, you know, narrower for a mobile phone.   They're

16   still very close.

17   **Q.**    So how far away would you say?

18   **A.**    Oh, they would show up on the same screen.   I think you'd

19   see your account profile when you see WAA.

20   **Q.**    You would see it all at once?

21   **A.**    Yes.

22   **Q.**    Kind of like this?

23   **A.**    Yes.   Yes.   This is on a mobile phone, yes.

24   **Q.**    So -- well, we created -- I want to be clear.   We created

25   this for the purposes of the trial, but you have experience

1  with the screen.

2      When you pull it on a real mobile phone, do you see all of

3  that kind of at once?

4  **A.**   Yes.  I look at this screen all the time.

5  **Q.**   All right.  Now let's look at the next section of this

6  page.

7      Just to confirm, Mr. Monsees, can you point out where sWAA

8  is?

9  **A.**   Sure.  SWAA is that first checkbox beneath where it says

10  "subsettings."  So these are subsettings of Web & App Activity.

11  And it says [as read]:

12          "Include Chrome history and activity from sites,

13      apps, and devices that use Google services."

14  **Q.**   Why didn't you mention "in your Google Account" on this

15  sentence?

16  **A.**   Well, I think as a subsetting, it's clear to users that

17  this is part of their Web & App Activity, which we already

18  discussed is clear, I think, that it's part of their

19  Google Account.

20  **Q.**   Okay.  So right under Web & App Activity, it says "Learn

21  more."  What happens when you click on it?

22  **A.**   So when you -- oh, sorry.  You mean this "Learn more"

23  here?

24  **Q.**   I don't, actually.  Let's go back to the middle of the

25  page.

1          The Web & App Activity language, it says "Learn more" at

2     the end there.

3     A.    Yeah.

4     Q.    What happens when you click on that if somebody's

5     interested?

6     A.    That's a learn more about Web & App Activity that would

7     open an additional help article that we have that explains in

8     quite a lot more detail both what Web & App Activity is and how

9     to use it if you have questions around how to turn it on and

10    off.

11    Q.    So -- and I want to be clear about something.  Users are

12    not required to click on "Learn more" in order to turn

13    Web & App Activity on and off?

14    A.    That's correct.

15    Q.    So it's possible that there are people from 2016 to '24

16    who clicked on "Learn more"?

17    A.    Oh, definitely.

18    Q.    It's possible there are people from 2016 to 2024 who have

19    WAA off but never clicked "Learn more"?

20    A.    Yes.

21    Q.    Okay.  Let's take a look at where that takes you.  Let's

22    look at Exhibit 113, which was admitted yesterday.

23          Is this where the "Learn more" button goes?

24    A.    Yes, this is.

25    Q.    I think yesterday we skipped to the middle of the page,

MONSEES - CROSS / SANTACANA

 1    but what I want to do is look at the very top.

 2        Just read for the jury how you begin to describe the

 3    Web & App Activity button on the "Learn more" page.

 4    **A.**    Sure.  It says [as read]:

 5            "If Web & App Activity is turned on, your

 6            searches and activity from other Google services are

 7            saved in your Google Account, so you may get more

 8            personalized experiences, like faster searches and

 9            more helpful app and content recommendations."

10    **Q.**    Has a phrase like that, saved in your -- that it controls

11    "saved in your Google Account," has that been on this

12    "Learn more" page the entire time since 2016?

13    **A.**    Yes.

14            **MR. SANTACANA:**  All right.  We can put that away.

15        Just a few more questions, Your Honor.  Maybe a break.  I

16    don't know what you were thinking in terms of timing.

17            **THE COURT:**  I was going to go till about 10:15, but --

18            **MR. SANTACANA:**  Great.  I can keep going.

19            **THE COURT:**  Okay.  Is that -- in terms of the jury, I

20    was shooting for 10:15.  Is that fine for everybody for a

21    break?

22        Okay.  Go ahead.

23    **BY MR. SANTACANA:**

24    **Q.**    Okay.  So, Mr. Monsees, what happens when you click

25    "Turn on"?  Does the user see anything else?

MONSEES - CROSS / SANTACANA

1  **A.**    Yes, they do.  When you click "Turn on," there's a pop-up

2  that explains additional information about Web & App Activity

3  that a user can see before they actually agree to turning the

4  setting on.

5  **Q.**    What about when they -- if they just go straight to sWAA

6  and they turn sWAA on, do they see something?

7  **A.**    Yes.  They'll see a pop-up telling them they can't turn

8  sWAA on unless WAA is on.  Since sWAA's a subsetting, WAA has

9  to be on before sWAA can be turned on.

10 **Q.**    What about when a user turns WAA or sWAA off?  Are they

11 shown anything when they turn it off?

12 **A.**    Yes.  There's also a pop-up for turning off that gives

13 them additional information they might need to know when they

14 move forward.

15 **Q.**    Okay.  I'd like to show you what's been marked for

16 identification as Exhibit 607.

17 **A.**    I don't have that.

18        **MR. SANTACANA:**  Can we get the binder?

19 **BY MR. SANTACANA:**

20 **Q.**    While we're doing that, Mr. Monsees, have you, in the

21 course of your work, been called upon to document what this

22 language looked like over time?

23 **A.**    Yes, I have.  I regularly pull histories of language for

24 our settings.

25 **Q.**    What's that?

 1    A.    Yes.   I regularly pull histories of language for our

 2    settings like this.

 3    Q.    Why do you pull histories of language?

 4    A.    Well, as the product manager responsible for these

 5    settings, I often get questions; or I'll look at, over time,

 6    how we've, you know, improved and changed the descriptions, the

 7    text.

 8            MR. SANTACANA:   Okay.   Your Honor, may I approach,

 9    please?

10            THE COURT:   Yes.

11    BY MR. SANTACANA:

12    Q.    I apologize, Mr. Monsees.   I thought you already had this.

13    A.    No problem.

14    Q.    This is your other binder.

15    A.    Okay.   Thank you.

16    Q.    Okay.   And you have two volumes there.

17            THE COURT:   We keep the binder people in business in

18    these trials.

19                        (Laughter.)

20            THE WITNESS:   Wow, yeah.   I feel bad for the trees.

21            THE COURT:   Thank you.

22    BY MR. SANTACANA:

23    Q.    Okay.   So now I'd like to show you what's been marked for

24    identification as Exhibit 607.

25        Do you recognize Exhibit 607?

 1   **A.**   Yes, I do.

 2   **Q.**   What is it?

 3   **A.**   This is a document that I prepared basically showing the

 4   historical descriptions of the Web & App Activity and

 5   supplemental Web & App Activity settings.

 6   **Q.**   Why did you prepare this set of historical descriptions?

 7   **A.**   As I mentioned, I prepared things like this regularly as

 8   part of my job overseeing these settings.

 9   **Q.**   What procedure did you follow to prepare these historical

10   descriptions?

11   **A.**   So to make sure that the dates were accurate here, I

12   worked with an engineer on the Footprints Team to actually go

13   through the source code that we have for this page so we could

14   see exactly what was in the code at the time of these dates.

15   **Q.**   Is the source code that you're consulting to prepare this,

16   does that record changes of source code as the changes are

17   made?

18   **A.**   Yes, it does.

19   **Q.**   And the language that is on this document that you

20   prepared is the language represented in that source code?

21   **A.**   That's correct.

22          **MR. SANTACANA:**  Your Honor, I offer into evidence

23   Exhibit 607, the authenticity of which has been stipulated.

24          **MR. CARMODY:**  No objection.

25          **THE COURT:**  607 will be admitted.

1          (Trial Exhibit 607 received in evidence.)

2     **BY MR. SANTACANA:**

3     **Q.**   Could you please explain to the jury how you organized

4     this document?

5     **A.**   Sure.  So what we did is we basically structure this so we

6     have the description of the Web & App Activity setting.  If we

7     look at the board, it's what's displayed right underneath that

8     illustration.

9          And then the description of the supplemental Web & App

10    Activity setting, that's the text next to the checkbox.

11         And then if we move forward a little bit, there is a

12    section about WAA, and then later sWAA, consent text.

13    **Q.**   What page are you looking at?

14    **A.**   Sorry.  I'm looking on page 2, the heading on 2.  Ah, yes,

15    right there.

16         This is the text that would show up when you click

17    "Turn on."  This is what's in the pop-up I described just

18    a minute ago.

19         Then we have the same thing in here for sWAA on the top of

20    page 4.  That's what would be in the sWAA pop-up.

21         And then if we go to page 6, this is the text that would

22    show up in the pop-up if WAA was already on and you were

23    turning it off.  This would be the turn-off pop-up text.  And

24    then the same thing for the sWAA turning-off pop-up text.

25    **Q.**   Okay.  Let's focus on that page 6 for a moment.

1          It says "Controls Revocation Text."  Can you just explain

2     what that means?

3     **A.**    Yeah.  "Revocation" is just a word we use sometimes

4     internally to mean turning off.

5     **Q.**    So when somebody turns off WAA or turns off sWAA, this is

6     the language that they would see when it pops up?

7     **A.**    That's right, for these timelines here.

8     **Q.**    Different over different time periods?

9     **A.**    That's correct.

10    **Q.**    All right.  Let's look at the WAA-off pop-up, and just

11    read for the jury the beginning of that.

12    **A.**    Sure.  It says here that [as read]:

13              "Pausing Web & App Activity may limit or disable

14         more personalized experiences across Google

15         services."

16    **Q.**    Now, the reference to "personalized experiences" there,

17    that's the same personalization we've been discussing?

18    **A.**    That's correct.

19    **Q.**    What about the language for when sWAA is turned off?  Is

20    that language similar?

21    **A.**    Yes, it's very similar.

22    **Q.**    We can see that here.

23         Mr. Monsees, at any time from 2016 to now, has the

24    revocation text for WAA and sWAA ever mentioned that

25    de-identified data will not be collected?

**MONSEES - CROSS / SANTACANA**

1    **A.**    No, it has not.

2    **Q.**    Have you ever intended to promise users that if they

3    turned WAA and sWAA off, that disables not just

4    personalization, not just data saved in an account, it also

5    disables the collection of de-identified data?

6    **A.**    No.  That was never a goal.

7    **Q.**    Is there any promise on the activity controls page that

8    you intended to make on behalf of Google to give users the

9    ability to disable entirely the flow of data to Google,

10    de-identified or not?

11    **A.**    No.  I wouldn't do that.  It wouldn't make sense to

12    operate those products.

13    **Q.**    Now, you've talked a lot about personalization; and

14    I believe you said that when WAA and sWAA are off,

15    personalization is disabled.

16        How do we know, how can the jury know that that is

17    actually enforced internally at Google?

18    **A.**    So internally within Google Systems, any Web & App

19    Activity data saved in your account, any sWAA data also saved

20    in your account would be saved against that GAIA ID that we

21    talked about before.  That's that unique ID that represents

22    someone's Google Account.

23        The data, when these settings are off, cannot be saved

24    against those IDs.  It would violate policies.  And so that

25    data would, therefore, have to be de-identified and, thus,

1  would be impossible to use for personalization because we

2  wouldn't know what person to use it for, what Google Account to

3  use it for.

4  **Q.**  Well, a policy is just a policy.  We -- some of us, at

5  least, break rules all the time.  What is to stop a user --

6  excuse me -- an employee at Google from writing code that will

7  personalize and use people's personal information even when WAA

8  is off?

9  **A.**  Well, beyond the fact that that would violate internal

10  policies, which would and could get you fired for violating

11  internal policies, we also have technical systems in place.

12  For example, Footprints, the platform that I'm the product

13  manager for, we have code that basically makes sure that when

14  WAA is off, even if a system tries to write that data to your

15  Google Account, it's locked; it cannot be written.

16      So we have not only the policies and procedures that teams

17  follow, but we also have technical practices in place to try to

18  make these systems work, no matter what.

19  **Q.**  To the best of your knowledge, are you aware of people

20  violating the policy and engaging in personalization at Google

21  or personally identifying users when they have WAA or sWAA off?

22  **A.**  No.  That would violate so many policies.

23  **Q.**  Not in the 16 years you've been at Google?

24  **A.**  Not in the 16 years I've been at Google.

25  **Q.**  I'd like to show you what's been marked as

1    identification -- for identification as Exhibit 569.

2         What is Exhibit 569?

3    **A.**   This is an internal Google policy about the requirements

4    when doing personalization on user data and what systems teams

5    are expected to use to do personalization features.

6    **Q.**   Are you -- it says authors -- one of the authors, it says

7    "Monsees@."  Is that you?

8    **A.**   Correct.

9    **Q.**   You helped author this policy?

10   **A.**   Yes, I did.

11   **Q.**   Where within Google would you go to get this policy?

12   **A.**   This is on our policies page.

13   **Q.**   So you're personally familiar with this document?

14   **A.**   Very familiar.

15   **Q.**   And you've gone to your policies page to pull it?

16   **A.**   Yes, I have.

17   **Q.**   There's comments in the margins.  Do you know why those

18   are there?

19   **A.**   This was the draft when we were writing it.  It was then

20   later added into the site's page, which is actually in code.

21          **MR. SANTACANA:**  Okay.  Your Honor, I offer into

22   evidence Exhibit 569.

23          **MR. CARMODY:**  No objection.

24          **THE COURT:**  559 will be admitted.

25          **MR. SANTACANA:**  569, Your Honor.

1          **THE COURT:**  569 will be admitted.

2          (Trial Exhibit 569 received in evidence.)

3   **BY MR. SANTACANA:**

4   **Q.**   Can you just point out to the jury, let's start with the

5   title.  What does the title mean?

6   **A.**   This title is about our policies around what data may be

7   used for personalization.

8   **Q.**   And can you explain the summary to the jury, please?

9   **A.**   Yeah.  What the summary is saying here is that all

10  activity-based personalization -- so this is when we're using

11  history saved in a user's Google Account -- must be done using

12  Footprints -- that's the infrastructure I'm the product manager

13  for -- or other approved primary sources location history we

14  had mentioned briefly earlier.

15  **Q.**   How does that protect your role as preventing

16  personalization when WAA is off?

17  **A.**   Well, I mentioned that the Footprints infrastructure has

18  certain technical capabilities in it where we make sure the

19  data is only saved when WAA is on.

20          It also, I think, if I recall -- we'll see later down in

21  this document, we -- Footprints is designed to enforce things

22  like user deletions in order of seconds.  So if you delete

23  something, it disappears from personalization.

24          So it's really a system built to safely serve user data in

25  a way that complies with our internal policies.

1  **Q.**   Does Google make exceptions to this and allow people to

2  engage in personalization or personally identifying users

3  outside of this technical structure?

4  **A.**   There are sometimes situations where teams have an

5  approved and valid reason to do personalization on something

6  that -- on data that's not in Footprints.  And so we have an

7  exceptions process where if a team can't follow this policy,

8  they'd say, "Hey, I can't follow this policy," and then we

9  would walk through it with them and make sure they're still

10 adhering to all of the internal Google policies.

11 **Q.**   All right.  I'd like to show you now what's been marked

12 for identification as Exhibit 587.

13      Can you just tell us what this document is?

14 **A.**   Oh, yes.  This is the internal Google user data access

15 policy, or UDAP, as we refer to it.

16 **Q.**   What is the user data access policy?

17 **A.**   This is one of Google's internal security and privacy

18 policies.  We can see it here on the policies site that every

19 Googler has access to and --

20 **Q.**   Where would you go to pull this up inside of Google?

21 **A.**   There are a few different ways to get to this policy

22 repository, this site that we're looking at.  We have an

23 internal search engine.  So if you just type in "user data

24 policy," this would be the first result.

25 **Q.**   What are the rules -- do you consult this policy as part

**MONSEES - CROSS / SANTACANA**

1  of your job?

2  **A.**  Yes.  This is, I think, one of the more important policies

3  that I deal with.

4  **Q.**  Do you consult it regularly or just episodically?

5  **A.**  I would say pretty regularly.

6  **Q.**  Why?

7  **A.**  Well, because, as I think we've mentioned, a lot of what

8  my job focuses on is user data, data saved in the user's

9  account, personal information, and this policy lays out a lot

10  of rules around when data can be saved and how data can be

11  read.

12  **Q.**  And can you just explain to the jury, summarize, I would

13  say, sort of the gist of this policy?  What is it trying to

14  say?

15  **A.**  So the gist is, basically, that little top section peeking

16  out about obtaining access to user data --

17  **Q.**  Okay.

18  **A.**  -- gives you a pretty good sense of what this policy is

19  about.

20      Sorry.

21  **Q.**  No.  I was going to say, let's highlight it then.

22  **A.**  Oh, yeah.  If we can, that would be great.

23  **Q.**  Sure.  "Obtaining access to user data" and those top

24  couple bullets?

25  **A.**  Yeah.  So this is basically saying here that --

1           THE COURT:  You haven't moved to admit this yet, so

2     the jury isn't seeing --

3           MR. SANTACANA:  Oh, I'm sorry, Your Honor.  I skipped

4     right over that.  Thank you, Your Honor.

5        I move to admit Exhibit 587 into evidence.

6           MR. CARMODY:  No objection.

7           THE COURT:  All right.  Exhibit 587 will be admitted.

8        (Trial Exhibit 587 received in evidence.)

9           THE COURT:  I'll also just use this document to take

10    the opportunity to mention to the jury, you're going to be

11    seeing -- you've already seen -- a lot of documents coming --

12    flowing in; and you'll see, on these documents, at the bottom

13    of them, there are -- on the right side, there are numbers and,

14    on the left side, sometimes it'll say "Confidential."  That's

15    simply for purposes of tracking these documents in this case.

16    Those numbers and that other designation, they were not on the

17    original documents.

18        And you're going to see this on virtually every document

19    that gets admitted into evidence, but they weren't part of the

20    original document.  They're only for tracking purposes.  So you

21    should just ignore those designations at the bottom of these

22    documents.

23        Okay.  We probably should go ahead and take our break at

24    this point.

25        Members of the jury, please remember, do not discuss this

1    amongst yourselves or with anyone else during the break.

2        R.J., can you move that back against the wall?

3            **MR. SANTACANA:**  We can do it, Your Honor.

4            **THE COURT:**  Well, he's handy.

5        (Proceedings were heard out of the presence of the jury.)

6            **THE COURT:**  I didn't say how long, but let's try to

7    resume at 10:30.

8                    (Recess taken at 10:14 a.m.)

9                (Proceedings resumed at 10:33 a.m.)

10       (Proceedings were heard out of the presence of the jury.)

11           **THE COURT:**  Are we ready to bring them out?

12           **MR. SANTACANA:**  Yes, Your Honor.

13           **THE COURT:**  Okay.

14       (Proceedings were heard in the presence of the jury.)

15           **THE COURT:**  The jury is present.

16       Mr. Santacana, you can proceed.

17           **MR. SANTACANA:**  We seem to be missing a witness,

18   Your Honor.

19           **THE COURT:**  Oh, I guess you can't proceed.

20           **MR. SANTACANA:**  There he is.

21           **THE COURT:**  You can ask me questions.

22                        (Laughter.)

23           **MR. SANTACANA:**  I thought maybe you'd run away.

24           **THE WITNESS:**  Not yet.

25           **THE COURT:**  Do you want the demonstrative back?

1          **MR. SANTACANA:**  Yeah, that would be great, but --

2     Thank you, R.J.  Appreciate it.

3                    (Pause in proceedings.)

4          **MR. SANTACANA:**  Thank you very much.

5     **BY MR. SANTACANA:**

6     **Q.**   Mr. Monsees, we were talking about Exhibit 587.  Let's

7     pull that back up, the user data access policy, which I had not

8     displayed to the jury while we were talking about it, so I

9     wanted to make sure it was clear to them.

10         So "User Data Access Policy" here at the top, where do you

11    go to pull this policy?

12    **A.**   I had mentioned that this is on Google's internal security

13    and privacy page, which you can -- any Google employee can

14    access through a couple of different ways.

15    **Q.**   And I believe you were directing us to the section that

16    begins "Obtaining Access to User Data."

17    **A.**   That's correct.

18    **Q.**   But which portion of this did you want to direct us to?

19    **A.**   So I personally, and I think Googlers that use user data,

20    care about all of this.  But what I think -- there's a couple

21    points here that, I think, make a really good kind of point

22    about what we've been talking about.

23         And the first bullet here, that "User Data access is only

24    granted for authorized, valid Google business purposes," kind

25    of ties into the second bullet as well about how it must be

1    authorized.  It's the same word.

2         This basically means that for any product team to read

3    user data, that they have to go through a request process.

4    There are policies that then are checked, and then we certify

5    those sometimes by different explicit rules that check those

6    things, like our Privacy Working Group that we have.

7         So that gives a sense of how, say, Web & App Activity data

8    would be read.

9         And then I think we look at the third -- yes, the third

10   bullet, "Authorization to access personally identifiable user

11   data may require user consent."  That sounds a little bit

12   confusing, but basically, what that is saying is that,

13   depending on the type of data, there might be other controls

14   required in place to be able to read data.

15        And this -- also, you'll notice that a lot of these

16   bullets point users to other policies where they can learn

17   more.  Sorry.  By "users," I mean Google employees.

18        And so I think those were kind of the main points that I

19   wanted to -- that I thought kind of summarized, like, what

20   Footprints does and the types of policies that we both enforce

21   through working with teams, but also technically enforce as

22   well.

23   Q.   So I'll ask you what I asked you about the other policy.

24        In your time at Google, are you aware of anybody who

25   violated this policy and used user data that -- when WAA was

**MONSEES - CROSS / SANTACANA**

1   off?

2   **A.**   No, I'm not.

3   **Q.**   Okay.  We can take that down.

4          I'd like to show you what's been marked for identification

5   as Exhibit 574.

6   **A.**   Oh, yes.

7   **Q.**   Mr. Monsees, what is Exhibit 574?

8   **A.**   This looks like a piece of a document that I helped

9   prepare for a judicial proceeding in Australia.

10  **Q.**   It is a piece of a document?  The real document -- or the

11  whole document was longer than this?

12  **A.**   I think, yeah, quite a bit longer than what I see in my

13  binder.

14  **Q.**   What -- did you prepare this document?

15  **A.**   Yes, I did.

16  **Q.**   Why did you prepare this document?

17  **A.**   I mentioned that this was for a judicial proceeding in

18  Australia.  So I was requested to work with some other teams to

19  assemble these different screenshots and explain kind of what's

20  happening on each of these screenshots.

21          **MR. CARMODY:**  Your Honor, may we approach?

22          **MR. SANTACANA:**  Your Honor, I'd prefer to lay some

23  more foundation first.

24          **THE COURT:**  Go ahead.

25          **MR. SANTACANA:**  Thank you.

**BY MR. SANTACANA:**

**Q.**   Mr. Monsees, you said "screenshots."  What are the
screenshots of?

**A.**   These are screenshots of the account creation flow,
I believe, on an Android device.

**Q.**   When you say "flow," what do you mean?

**A.**   Sorry.  By "flow," if you recall the video that we walked
through earlier today, that was nice and moving.  The
screenshots are basically taking, like, one snapshot of each of
those steps.  The flow is basically going through the whole
thing.

**Q.**   What procedure did you follow to create this document?

**A.**   Similar to other documents that I have created, I went
through to make sure that these were technically accurate in
our systems.  At Google, we have systems where we save these,
like, screenshots of these flows.

    And then I worked closely with the team that actually put
the binder together to provide those annotations that we can
see, what looks like comments on the right-hand side that
explains what's happening on the screenshot.

**Q.**   Was it challenging to assemble this?

**A.**   Yes.  It took some time.

**Q.**   You mentioned this was in a judicial proceeding in
Australia.  Are these consent flows, these screenshots, are
they just what was shown to Australians?

**MONSEES - CROSS / SANTACANA**

 1  **A.**   No.  They should be consistent with what anyone in the

 2  United States would have seen, though you might see Australia

 3  or ".AU" on something instead of ".com."

 4  **Q.**   Okay.  So apart from pages where it might say "Australia"

 5  instead of "U.S.," is there any difference in these screenshots

 6  between what was used in Australia and what was used in the

 7  United States?

 8  **A.**   No.  They would be the same.

 9  **Q.**   There's comments in the marginalia, what are those?

10  **A.**   These comments are effectively explaining what the -- kind

11  of the different links or parts of the screenshot a user could

12  click on.  So we can see, like, this top one says that if a

13  user tapped -- oh, sorry.

14  **Q.**   Please don't read it.

15  **A.**   My apologies.

16  **Q.**   No worries.

17       Go ahead, though.  You can finish your answer.

18  **A.**   No.  Basically, what they're doing is they're describing

19  what would have happened if you tapped this link, and sometimes

20  their reference is to say, "Turn to page 15 to see what

21  page" -- "to see what screenshot you would have seen if you had

22  clicked on this."

23  **Q.**   This was also written by you and your team?

24  **A.**   That's correct.

25  **Q.**   And what was the basis of what you were writing down?

1   Was it just the memory of you and your team?

2   **A.**   No.  We went through and verified all this.  We spent

3   quite a bit of time on this.

4   **Q.**   What is the time period these screenshots apply to?

5   **A.**   I believe this was done for a few different types of

6   devices, maybe from 2017 to 2019.

7   **Q.**   And for this particular Exhibit 574, if you could just

8   take a look at it, is it a subset of that time period or that

9   whole time period?

10  **A.**   This looks like, just from the heading, is a subset.  It's

11  April of 2018 through October of 2019.

12          **MR. SANTACANA:**  Your Honor, I offer this exhibit into

13  evidence.

14          **MR. CARMODY:**  Ready to approach?

15          **THE COURT:**  All right.  And can we keep it to maybe

16  three people per side?  We don't need everybody at every

17  sidebar.

18          **MR. CARMODY:**  I think we can do it just with me.

19      (The following proceedings were heard at the sidebar:)

20          **MR. CARMODY:**  I want to lodge the objection out of the

21  presence of the jury so as not to have a speaking objection in

22  front of them.

23      The first objection on this document, 57- -- Google 574,

24  is hearsay for a number of reasons.  First of all, it's not a

25  business record because it wasn't put together at the time of

1  or near the event.  This is a court filing that we can see was

2  filed in 2020, yet refers to things that happened in 2018, 2019

3  that were years earlier.

4      Secondly, by definition, under Ninth Circuit law, the

5  *Clark* case and others we can cite to the Court, a court filing

6  is not kept in the ordinary course of business.  It's not a

7  business record.  It's a litigation record.

8      **THE COURT:**  Well, but a court filing -- that begs the

9  question.  It may have been a court filing.  That doesn't mean

10  that's the only thing it is.  It may have been a document --

11  simply because it is filed in court doesn't mean it's

12  automatically no longer a business record.  The filing could

13  have been a business record.

14      **MR. CARMODY:**  Well, filing in the ordinary course of

15  business, and this document, what the law says --

16      **THE COURT:**  It's the underlying document that's

17  important, not the fact that it was filed in a court somewhere.

18      **MR. CARMODY:**  And what this is based on, the next

19  thing I'd like to say, Your Honor, is everything in here has

20  been recreated.  If you look at Screen 60, this is what they're

21  showing.  This is what they want to show us is this screen is a

22  recreation of a screen, and it goes on and on.

23      They're not showing this right now to the jury, but what

24  this is, this is all based on internal Google source code.

25  That source code has never been produced.  We can't question

1  anyone on the accuracy of the source code.

2      So if we all step back and think about what's happened

3  here is, instead of this guy saying, "I've got a great memory.

4  I remember this disclosure here was somehow used in the U.S.,"

5  he's not saying that.

6      He's saying, "We have source code in Google that I've

7  seen, no one else has seen.  It's not been produced in this

8  case.  But that source code has enabled us to go back way after

9  the fact and show what we disclosed to people when, in

10  Australia.  And I can remember we did it there, we did it in

11  America."

12      That is so many layers of hearsay that the underlying

13  source code, while that could be a business record if we went

14  through that and they produced it in this courtroom and in this

15  case, that's one thing, but he is extrapolating from that.

16      We do not need this document at all on a pure 403 basis.

17  Any probative value of this document outside of his pure memory

18  is substantially outweighed by the dangers of unfair prejudice

19  and confusion to the jury.

20      **MR. SANTACANA:**  Your Honor, it's -- I don't understand

21  what the objection is to this document.  This is a class

22  action, the basis of which is that everyone in the class saw

23  disclosures from Google.

24      They identified in their interrogatory response, where

25  they were asked to state all facts that form the basis of their

 1    allegations, that Google collected data without their

 2    permission, that the plaintiffs' allegations were supported by

 3    the ACCC action against Google for failing to obtain consent

 4    from consumers.

 5         The fact it was filed in Australia is neither here nor

 6    there.  It was also filed in the Arizona litigation.  It's a

 7    document that was created that has been filed multiple times

 8    when it has been useful to file.

 9         **THE COURT:**  Let me get to the item itself and not the

10    filing in various courts.

11         This was not -- this was not kept in the ordinary course

12    of business.  This was created for the litigation; correct?

13         **MR. SANTACANA:**  It was generated from, as Mr. Monsees

14    testified -- and we can ask him more.  But they took the source

15    code and make it spit out --

16         **THE COURT:**  I understand.

17         **MR. SANTACANA:**  -- what it showed at the time.

18         **THE COURT:**  But not this part?

19         **MR. SANTACANA:**  No.  And I'd be happy to redact that

20    part, but it is a guide to what happens when you click --

21         **THE COURT:**  I understand.  But this -- your argument

22    for the core material.  Then we have the objection whether or

23    not the source code was produced or what have you.

24         But what does seem to me to be the case is this was all

25    created -- this was not a business record kept in the ordinary

 1  course of business.

 2          **MR. SANTACANA:**  I'm happy to redact it, Your Honor.

 3          **THE COURT:**  All right.  So you're going to have to do

 4  that at the very least.

 5      If he redacts the side panels, why not -- otherwise it's

 6  just out of the -- as I understand it, the source code of

 7  Google.

 8      And, okay.  It wasn't produced.  The source code --

 9          **MR. CARMODY:**  No.  I'm not going to the production

10  part.  I'm way past that.

11          **THE COURT:**  That's good.

12          **MR. CARMODY:**  I really am.  The document is an

13  out-of-court statement used to prove the truth of the matter

14  asserted.

15          **THE COURT:**  But this part is a business record kept in

16  the ordinary course of business.

17          **MR. CARMODY:**  No.

18          **THE COURT:**  Not this part, but this part.

19          **MR. CARMODY:**  This part here was created from source

20  code.

21          **THE COURT:**  Which is kept in the ordinary course of

22  business.

23          **MR. CARMODY:**  But he has -- we've never seen --

24          **THE COURT:**  I understand.  That's a different

25  argument.

SIDEBAR

1          MR. CARMODY:  Okay.

2          THE COURT:  But this is -- on the business record

3     point, this is being spit out by the system that is in place in

4     the company in the ordinary course of business.

5          MR. CARMODY:  In fairness, Your Honor, instead of on

6     the pure 403 issue, because it sounds like we can go back and

7     forth on hearsay as well --

8          THE COURT:  You haven't convinced me on the 403 issue.

9          MR. CARMODY:  I mean, any -- okay.

10     Do you want to say something, David?

11          MR. DAVID BOIES:  What I want to say, Your Honor, is

12     this is a summary of the source code.

13          THE COURT:  Yes, that's fair.

14          MR. DAVID BOIES:  Every time you do a summary in court

15     of something, the other side has got to have the underlying

16     documents --

17          THE COURT:  That's also true.

18          MR. DAVID BOIES:  -- so they can check it.

19          THE COURT:  The 1006.

20          MR. DAVID BOIES:  1006.  That stuff was never

21     produced.

22          THE COURT:  Well, I'm sure there was litigation about

23     the source code.  I have litigation about source code in all

24     these cases.

25          MR. SANTACANA:  They never requested source code in

 1   this case, Your Honor.

 2           **THE COURT:**  Did you ever request the source code?

 3           **MR. CARMODY:**  I honestly don't know.

 4           **MR. DAVID BOIES:**  No.  But, Your Honor, I respectfully

 5   suggest, it's not whether we requested the source code.  It's a

 6   1006 summary.  They've got to produce the source code.

 7           **THE COURT:**  It has to be available.  You have to ask

 8   for it.

 9           **MR. SANTACANA:**  That's right.

10           **THE COURT:**  1006 says it must be available.

11           **MR. DAVID BOIES:**  It must be available.  It was never

12   available.  Nobody ever gave it to us.  In other words --

13           **MR. HUR:**  Your Honor --

14           **MR. DAVID BOIES:**  But, Your Honor --

15           **THE COURT:**  Let's have one at a time.

16           **MR. DAVID BOIES:**  Here, no -- in their interrogatory

17   answers, if they had said, "We're going to rely on this," we

18   would have appealed to you for the source code and everything

19   else.

20       The source code, unless it was going to be the basis of a

21   1006 summary, wasn't critical to the case.  Okay?  What's

22   critical to the case -- it becomes critical to the case when

23   they try to put in a 1006 summary.  If they told us that they

24   were going to rely on this in the interrogatories, we would

25   have had a very different situation.

SIDEBAR

```
 1          THE COURT:  Well, okay.  You're going to have to
 2   redact this, and I don't know how you're going to do it up
 3   there because I'm not going to let you show the jury this.
 4          MR. SANTACANA:  She can block out the right side
 5   during testimony.  But we're actually not going to spend much
 6   time looking at it during this witness.
 7          THE COURT:  All right.  Well, I will admit it, but
 8   you've got to take out the items on the side panels.  And,
 9   otherwise, I think it comes in as a 1006 summary.
10      Frankly, I don't agree that they have to -- if they're
11   proposing a summary, they have to -- they have to say, "And
12   please look at the underlying material."  You have to do
13   something proactively.
14      But we've had enough time.
15          MR. SANTACANA:  Thank you, Your Honor.
16          MR. CARMODY:  Your Honor, if they're going to do it,
17   the jury might as well see everything because it shows it's a
18   re-creation.
19          THE COURT:  That's your choice.
20          MR. CARMODY:  If they're going to show it now, if
21   that's your decision.  We lodged our objection on the record.
22   We have requested the source code.
23          THE COURT:  I'm not going to get into --
24          MR. CARMODY:  I would rather, if they're going to do
25   this, put it all in.
```

```
 1              THE COURT:  All right.  If you want it all in, it goes
 2    in.
 3              MR. CARMODY:  Don't you want the jury to see all this
 4    stuff?  Or no?
 5         Okay.  Never mind.
 6              THE COURT:  Okay.  Take it out.
 7              MR. SANTACANA:  Take it out.
 8         (The following proceedings were heard in open court:)
 9              THE COURT:  Thank you for your patience, members of
10    the jury.  We're working away, getting things resolved.
11         All right.  Mr. Santacana, you may proceed.
12              MR. SANTACANA:  Okay.  So, Brooklyn, if you wouldn't
13    mind, we are going to cut out the margins of this document so
14    that we can't see those; we just see the screenshot.  Okay?
15              THE COURT:  So Exhibit 574 is admitted as modified, as
16    we discussed.
17         (Trial Exhibit 574 received in evidence.)
18    BY MR. SANTACANA:
19    Q.   Mr. Monsees, is this the excerpt of the document you
20    described creating?
21    A.   Yes.  This is the part excluding the margins on the right
22    side.
23    Q.   Okay.  Now, could you just flip for me, Mr. Monsees -- and
24    we'll do it on the screen as well -- to page 13.
25    A.   Okay.  I'm there.
```

1    **Q.**    Sorry?

2    **A.**    I'm there.

3    **Q.**    Now, earlier, we saw -- earlier, we saw you on a video

4    creating an account and being asked to select whether WAA

5    should be on or off.  Is this a screenshot of that same process

6    but from this time period?

7    **A.**    That's correct.

8    **Q.**    And let's take a look at page 17.

9        Is this a screen -- well, you tell the jury.  I won't lead

10   you.  Why don't you tell the jury what this screenshot is.

11   **A.**    This is a screenshot of what was that "Learn more" pop-up

12   that we saw, just like in the video that I created that we saw

13   earlier today.

14   **Q.**    Okay.  We can take down.

15       Now, Mr. Monsees, as part of your job, do you also, from

16   time to time, need to determine whether particular users have

17   WAA or sWAA turned on or off?

18   **A.**    Yes, I do.

19   **Q.**    And did you at any time have reason to find out what the

20   plaintiffs in this case, what their WAA and sWAA settings were

21   over time?

22   **A.**    Yes, I did.

23   **Q.**    How do you know -- or do you know what they were?

24   **A.**    So, yes.  I know, as product manager for Footprints, both

25   WAA and sWAA are settings that are stored and managed by

1    Footprints, and so that means that our system has the full

2    history of that setting, whether it was on or off, the exact

3    timestamps for each Google Account.

4    **Q.**    Did you go ahead and pull from that system the plaintiffs'

5    WAA and sWAA settings over time?

6    **A.**    Yes.

7    **Q.**    And did you generate a document showing that?

8    **A.**    Yes.

9    **Q.**    I'd like to show you what's been marked for identification

10   as Exhibit 941.4.

11       **MR. SANTACANA:**  Your Honor may not have the .R version

12   of this.  I'll just hand that up.

13   **BY MR. SANTACANA:**

14   **Q.**    I believe you do, but here's another copy for you.

15       Oh, well, and, actually, I guess we're on .R2 now, which I

16   don't have a printed copy of.

17       Mr. Monsees, what is Exhibit G941.R2?

18   **A.**    This is a summary of when various accounts, that are owned

19   by the plaintiffs, when those accounts were created and when

20   they had WAA and sWAA either on or off.  So, basically, each

21   time when those settings changed.

22       **MR. SANTACANA:**  Your Honor, I move Exhibit G941.R2

23   into evidence.

24       **MR. CARMODY:**  No objection.

25       **THE COURT:**  All right.  941.R2 -- is that correct? --

1    will be admitted.

2         (Trial Exhibit 941.R2 received in evidence.)

3    **BY MR. SANTACANA:**

4    **Q.**   Mr. Monsees, could you please explain to the jury how this

5    document is organized?

6    **A.**   Sure.  This is a table.  If we start on the left, the

7    first column is the name of the plaintiff.

8         Many people have many different email addresses.  These

9    are the different Google email addresses, which, remember, we

10   have tools to turn into a Google Account ID.  That's what's in

11   the second column there.

12        The third column is the date when that Google Account was

13   created.  The timestamp that we see next to it is the timestamp

14   of the change of settings.

15        And then we see the states of the WAA and sWAA settings in

16   those last two columns.  And so if you kind of go from the top

17   to the bottom within an account, you can track how the states

18   of these settings changed over time on specifically the dates

19   that are in that timestamped column.

20   **Q.**   Okay.  So just to use one example, Mr. Monsees, I'd like

21   to focus on the email address peteysakeo8@gmail.com.  Do you

22   see that?

23   **A.**   Yes, I do.

24   **Q.**   All right.  So just to use an example, the first row

25   there, the second column of timestamps represents what?

1    A.    That's the time that the setting was changed.  So we can

2    see that the account was created, which would mean that when

3    the WAA setting was turned on, it was turned on at the same --

4    same day that the account was created.

5    Q.    Okay.  Let's use one more example, and then we'll move on

6    from this.

7         Let's look at page 4, I think it is.  Yes, the Julian

8    Santiago entries.  So let's look at juliansant8@gmail.com, just

9    to use an example.

10        That last row there, could you just explain what it

11   represents?

12   A.    Sure.  That last row is showing that on -- what is

13   that? -- September 15th of 2020, this account paused, turned

14   off their sWAA setting.  And we can see that in that bottom

15   right cell.

16   Q.    And before that, was that setting on?

17   A.    Yes.  We can see that setting was on back to 20 --

18   December 21st of 2016, which is three rows above that.

19   Q.    So how long had that setting been on before plaintiff

20   Santiago turned it off?

21   A.    Almost four years.

22   Q.    And just, you said you've been working on this case for

23   five years.  Do you recall when this case was filed?

24   A.    I do not.  2020.

25   Q.    Do you know if it was before or after Mr. Santiago paused

1    his WAA setting?

2    **A.**    I think it was before.

3    **Q.**    All right.  So we can take that down.

4          Have you heard of Screenwise, Mr. Monsees?

5    **A.**    Yes, I have.

6    **Q.**    What is it?

7    **A.**    Screenwise is a program in Google.  If you've ever heard

8    of Nielsen ratings for TV shows, it's kind of like Google's

9    version of that.

10         And for Screenwise, Google will pay users who sign up for

11   it to allow Google to monitor all of their Web traffic.  It's

12   basically used so that Google can get a sense of how a sample

13   of American users are -- what they're doing on the Internet,

14   both with Google products and non-Google products.

15   **Q.**    I'd like to show you some documents that relate to this.

16   Let's take a look at the document marked for identification as

17   Exhibit 578.

18         Do you recognize this document?

19   **A.**    Oh, yes, I do.

20   **Q.**    What is it?

21   **A.**    This is the privacy policy for users of Google Panels,

22   which, I think, is the external name for Screenwise.

23   **Q.**    Okay.  And you're familiar with the Screenwise privacy

24   policy?

25   **A.**    Yes, I am.

1          MR. SANTACANA:  I move Exhibit 578 into evidence,

2    Your Honor.

3          MR. CARMODY:  We object, Your Honor.  Foundation.  May

4    I take the witness on voir dire?

5          THE COURT:  Well, no.  You've made your foundation

6    objection.

7        You should provide a little more foundation about this

8    particular Panel privacy policy, and then I'll rule on it.

9          MR. SANTACANA:  Of course, Your Honor.

10          MR. CARMODY:  What it is, Your Honor, it's firsthand

11    knowledge, it's personal knowledge.

12          THE COURT:  Yes, I get that.

13        Go ahead.

14    BY MR. SANTACANA:

15    Q.    Mr. Monsees, you have -- you've worked in relation to

16    Screenwise over time in your job?

17    A.    I have worked with the Screenwise Team for probably more

18    than six years.

19    Q.    And you're familiar with how, in general, the Screenwise

20    system works?

21    A.    Yes, I am.  They work with Footprints, which I'm the

22    product manager for, to manage some of their data and some of

23    the UIs that they give to their panelists.

24    Q.    In fairness, would you say you're an expert on Screenwise?

25    A.    I wouldn't say I'm an expert.

MONSEES - CROSS / SANTACANA

1    Q.    And you have personal experience with this privacy policy?

2    A.    I do.  I believe many years ago we discussed this with the

3    Screenwise Team when they first began working with Footprints.

4    Q.    Is this the privacy policy that was in effect in October

5    of 2017 for Screenwise?

6    A.    Yes, it is.

7            MR. SANTACANA:  Your Honor, I move it into evidence.

8            MR. CARMODY:  No objection.

9            THE COURT:  All right.  578 will be admitted.

10    (Trial Exhibit 578 received in evidence.)

11            MR. SANTACANA:  Okay.  Let's take that down.

12    BY MR. SANTACANA:

13    Q.    I'd like to show you what's been marked for identification

14    as Exhibit 581.

15        Mr. Monsees, what is this document?

16    A.    This is just an updated version of the Screenwise privacy

17    policy that we were just discussing.

18    Q.    When was this in effect?

19    A.    This is from June of 2021.

20            MR. SANTACANA:  Your Honor, I move 581 into evidence.

21            MR. CARMODY:  No objection.

22            THE COURT:  581 will be admitted.

23    (Trial Exhibit 581 received in evidence.)

24    BY MR. SANTACANA:

25    Q.    Now I'd like to show you what's been marked for

1    identification as Exhibit 576.

2         And what is this document?

3    **A.**   This is another version of the Screenwise -- sorry.   This

4    is the terms and conditions for Screenwise/Google Panels from

5    March of 2018.

6              **MR. SANTACANA:**   I move Exhibit 576 into evidence.

7              **MR. CARMODY:**   No objection, Your Honor.

8              **THE COURT:**   576 will be admitted.

9         (Trial Exhibit 576 received in evidence.)

10   **BY MR. SANTACANA:**

11   **Q.**   I'd like to show you what's been marked for identification

12   as Exhibit 937.   Last one.   I know it's a little dry.

13        Mr. Monsees, could you tell us what this document is?

14   **A.**   Yes.   This is a summary, a table, capturing the different

15   disclosures for the Screenwise Panel program.

16   **Q.**   Can you just explain a little bit more what you mean by a

17   summary of different disclosures?

18   **A.**   So this is taking kind of key terms from the Screenwise

19   Panel that I think their panelists see, and it's providing the

20   disclosures, the exact excerpts from the privacy policy about

21   these topics.

22             **MR. SANTACANA:**   Your Honor, I move Exhibit 937 into

23   evidence as a summary.

24             **MR. CARMODY:**   It's an improper 1006.

25             **THE COURT:**   And it's an improper summary because?

1          **MR. CARMODY:**  Can we approach, Your Honor?

2          **THE COURT:**  Well, I'd like to see if we can speed it

3     up a little bit.  Can you just tell me what the basis of the

4     objection is?

5          **MR. CARMODY:**  Yeah.  It's misleading.  It doesn't

6     include a lot of stuff.

7          **THE COURT:**  Okay.  Did you put this together,

8     Mr. Monsees?

9          **THE WITNESS:**  No, I did not.

10         **THE COURT:**  All right.  I'll sustain the objection at

11    this point.

12    **BY MR. SANTACANA:**

13    **Q.**   Okay.  Mr. Monsees, during our time here today, we have

14    gone through a number of Google's disclosures, and I'd like to

15    go back to the very first one that we discussed, which is the

16    privacy policy, if that's all right.

17    **A.**   Sure.

18    **Q.**   You recall the last thing that the plaintiff lawyer told

19    you is that he would like you to point out to the jury where

20    Google explains to users that it will collect their

21    de-identified data.  Do you recall that?

22    **A.**   I do.

23    **Q.**   All right.  Let's take a look at Exhibit 62.

24         And just to remind the jury, are users required to read

25    the privacy policy in order to create a Google Account?

MONSEES - CROSS / SANTACANA

1   **A.**   No, they are not.

2   **Q.**   Are they required to agree to it in order to create a

3   Google Account?

4   **A.**   Yes, they must.

5   **Q.**   Are they given an opportunity to read the privacy policy?

6   **A.**   Yes, they are.

7   **Q.**   Your job includes describing things to users.  Based on

8   what you know from your work at Google, do users sometimes read

9   the privacy policy?

10  **A.**   Yes, they do.

11  **Q.**   Is it very rare?  How would you describe it?

12  **A.**   We provide links to the privacy policy.  I think within

13  every Google product we provide links from activity controls,

14  like we mentioned.  I'm not sure exactly how many users read

15  it, but it's not a bad privacy policy.

16  **Q.**   All right.  Now, do you -- I think you said the answer is

17  a privacy policy.  Are you saying the privacy policy explains

18  to users that data will be collected?

19  **A.**   Yes.

20  **Q.**   Where?

21  **A.**   In a couple of places, but I think if we just --

22  **Q.**   Let's start with one.

23  **A.**   Well, I think if we just start at the top -- right? --

24  that text right there below the heading, it says [as read]:

25          "This Privacy Policy is meant to help you

1    understand what information we collect" -- "we"

2    meaning Google -- "why we collect it, and how you can

3    update, manage, export, and delete your information."

4    So I think we're pretty clear about that's what we're

5    talking about, not only for consumers like myself that use

6    Google services, but also businesses that use Google services.

7    It's all explained here in the privacy policy.

8    **Q.**  Does the privacy policy explain, somewhere near the top,

9    what sort of activity data -- because we're talking about

10   Web & App Activity -- what sort of activity data will be

11   collected?

12   **A.**  Yes.  If we scroll down a bit, there's a section where we

13   describe very specifically the types of activity.

14   **Q.**  Okay.  And I believe this is -- this was shown to you

15   yesterday.

16   **A.**  That's correct.

17   **Q.**  All right.  So go ahead and read that.

18           **A JUROR:**  Your Honor, we have -- we don't have this

19   visible on these screens.

20           **THE COURT:**  Oh, it was admitted because it's

21   Exhibit -- this is 62; right?

22           **MR. SANTACANA:**  Yes, previously admitted.

23           **THE COURT:**  It was admitted yesterday, I think.

24                   (Discussion held off the record.)

25           **MR. SANTACANA:**  Here, I can turn this around for you.

 1    That's probably a little far, but we'll blow it up as much as

 2    we can.

 3              **THE COURTROOM DEPUTY:**  They can probably look at that

 4    monitor over there.  So four of those monitors are out.

 5              **THE COURT:**  I'd like to say this never happens, but

 6    that wouldn't be the truth.

 7         We'll have our IT people come up and work on it, but one

 8    possibility is if the jurors that are off on the end want to

 9    move in, maybe you could sit together for a little while until

10    we can fix the other monitors.  It's up to you.  If you think

11    that's good enough, that's fine as well.

12              **MR. SANTACANA:**  Okay.

13              **THE COURT:**  Okay.  Go ahead.

14              **MR. SANTACANA:**  Okay.  All ready?  Great.

15    **BY MR. SANTACANA:**

16    **Q.**  All right.  So we were looking at the "Your activity"

17    section.  Could you just please read to the jury where Google

18    discloses that it will collect activity data?

19    **A.**  Sure.  So right at the top, it says [as read]:

20              "We collect information about your activity in

21         our services, which we use to do things like

22         recommend a YouTube video you might like.  The

23         activity information we collect may include..."

24         And then it gives many of the examples that we've

25    discussed today, like your search history or your watch

1    history.

2        Further down it also says "Activity on third-party sites

3    and apps that use our services," which I believe we looked at

4    yesterday.

5    **Q.**    And then does that include activity data from

6    Google Analytics?

7    **A.**    Yes, it does.

8    **Q.**    Okay.  Is this the only thing the privacy policy explains

9    about activity data collection from Google Analytics?

10   **A.**    No.  I think if we scroll down, there is another section,

11   a heading specifically about third-party sites and apps.

12   **Q.**    Before we scroll down, why doesn't Google insert, right

13   here near the top, "This is going to include Google Analytics

14   data even when WAA is off, even if it's de-identified"?  Why

15   doesn't it say that?

16   **A.**    Well, I believe the section here is just really explaining

17   to users generally the types of activity that gets collected

18   when you're using a great variety of Google products, all those

19   different bullets above.  So it's really just trying to explain

20   the overview for users at this point.

21   **Q.**    So what if they want to understand better what you mean by

22   this "Your activity" section?

23   **A.**    Well, the great thing is, as we scroll down this policy,

24   there are detailed sections that will talk about the types of

25   activity and tools you can use that are saved in your

1   Google Account, like the activity controls page that we've been

2   talking about.  And then I mentioned, I think, there's another

3   section specific to third-party sites and apps that use

4   services.

5       So there's kind of detail areas as well as eventually,

6   I think, a glossary of key terms.

7   **Q.**   Let's start with the detail area you just referred to

8   called "Your activity on other sites and apps."

9       22, please.

10      Okay.  Is this the more detail on "Your activity on other

11  sites and apps" section you were referring to?

12  **A.**   Yes.  This is the one I was thinking of.

13  **Q.**   All right.  If you wouldn't mind, we'll go through this

14  briefly, but we need to break it down.  It's a lot of words.

15      So let's start with the first sentence.  What does it say?

16  **A.**   Sure.

17      [As read]:

18          "This activity might come from your use of

19      Google services, like from syncing your account with

20      Chrome or your visits to sites and apps that partner

21      with Google."

22  **Q.**   Go ahead and keep going.  That seems pretty clear to me.

23  **A.**   [As read]:

24          "Many websites and apps partner with Google to

25      improve their content and services.  For example, a

1        website might use our advertising services (like

2        AdSense)" -- those are the Google served ads you see

3        on other websites -- "or analytics tools (like

4        Google Analytics)" -- we're talking about here -- "or

5        it might embed other content (such as videos from

6        YouTube)."

7    **Q.**   Has Google disclosed that it collects activity data from

8    other sites and apps, like analytics tools, from 2016 to 2024

9    in its privacy policy?

10   **A.**   Yes, it has.

11   **Q.**   To be fair, it's possible that people like the plaintiffs

12   didn't read this paragraph.  You'd agree; right?

13   **A.**   Yes.

14   **Q.**   But they are all given the opportunity and required to

15   agree to it?

16   **A.**   Yes, they are, to create an account.

17   **Q.**   Let's keep reading.

18   **A.**   It then goes on to say [as read]:

19        "These services may share information about your

20        activity with Google and, depending on your account

21        settings and the products in use (for example, when a

22        partner uses Google Analytics in conjunction with our

23        advertising services), this data may be associated

24        with your personal information."

25   **Q.**   All right.  So let's -- I want to focus on the part of

1    this that came before the word "and" in that last sentence

2    [as read]:

3            "These services may share information about your

4        activity with Google," then it says, "and, depending

5        on your account settings, this data may be associated

6        with your personal information."

7        Did I read that right?

8    A.    That's correct.

9    Q.    What account settings -- that looks like a link.  Is that

10   a link?

11   A.    That is a link.  I believe that link takes you to another

12   part of the privacy policy that then explains things like

13   activity controls.

14   Q.    So right here in the privacy policy, Google says there's a

15   thing called Google Analytics that sends data and, depending on

16   your account settings, which includes WAA, this may be

17   associated with your personal information?

18   A.    May be.  That's correct.

19   Q.    So why does it say "may be"?

20   A.    Because this sentence is saying these settings may share

21   information about your activity to Google and, when -- let's

22   just pick on this one specifically -- when sWAA is on, these

23   may be associated with your personal information, meaning your

24   Google Account.

25   Q.    So just to be perfectly clear, is there a part of this

1  privacy policy that contradicts what this says and instead

2  says:  That account setting doesn't just control whether it's

3  associated with personal information; it actually controls

4  de-identified information also?

5  **A.**    No, not that I'm aware of.

6  **Q.**    Has there ever been a statement like that in Google's

7  privacy policy since 2016?

8  **A.**    Not that I can think of.

9  **Q.**    As far as you know, has there ever been a statement like

10  that from Google anywhere since it was founded?

11  **A.**    No.  I don't believe we've ever made statements about

12  controls for that de-identified data.

13  **Q.**    Now, the last two words in this paragraph say "personal

14  information."  Is that a term that people use inside of Google?

15  **A.**    Yes.

16  **Q.**    Does it have a specialized meaning?

17  **A.**    Yes.  I had mentioned before that I think there is a

18  glossary of key terms that's included in the privacy policy

19  that explains this.

20  **Q.**    Okay.  So that specialized meaning is actually provided to

21  users in the privacy policy?

22  **A.**    Yes, it is.

23  **Q.**    Let's go to page 26.

24       Where is -- why don't you read that definition of

25  "personal information."

1  **A.**   Sure.  So we're looking at a list of key terms that often,

2  in the privacy policy, you can tap and, like, a little bubble

3  pops up and defines them.  And here, for personal information,

4  it says [as read]:

5        "This is information that you provide to us

6     which personally identifies you, such as your name,

7     email address, or billing information, or other data

8     that can be reasonably linked to such information by

9     Google, such as information we associate with your

10    Google Account."

11 **Q.**   Can you just explain, in your own words, your

12 understanding of what you were trying to say in this privacy

13 policy when you defined this term "personal information"?

14 **A.**   This is basically saying that this is information that is

15 going to be tied with one of those GAIA IDs that we talked

16 about, which links to your Google Account profile, like your

17 email address and your name.

18 **Q.**   Does Google -- you know this case is about the difference

19 between on and off.  Does Google define non-personal

20 information in the privacy policy in case somebody, after

21 reading all this, is still confused?

22 **A.**   Yes, it does.  I believe it's right above, in the same key

23 term section.

24 **Q.**   Okay.  It's defined right before it.  Let's take a look.

25    Go ahead and read that.

1    **A.**    So this is non-personally identifiable information.

2    [As read]:

3        "This is information that is recorded about a

4    user so that it no longer reflects or references an

5    individually identifiable user."

6    This is basically the de-identified information or the

7    pseudonymous information that we've been talking about today.

8    **Q.**    Does Google provide any controls that you are aware of in

9    this activity controls page that give users the ability and

10    power to prevent Google from collecting non-personally

11    identifiable information?

12    **A.**    No.

13    **Q.**    Let's go back up to where we were before in the privacy

14    policy, this section called "Your activity on other sites and

15    apps."

16    So we saw that reference to account settings controlling

17    what may be associated with your personal information.  Right

18    below that it says [as read]:

19        "Learn more about how Google uses data when you

20    use our partners' sites or apps."

21    So what happens if you click that link?

22    **A.**    I believe that jumps you down to that other section of --

23    oh, sorry.

24    That actually jumps you to a different section, I think,

25    of the policy site, where we have a detailed article just about

1  our third-party technologies.

2  **Q.**  So if somebody is still confused, they can click that and

3  learn more?

4  **A.**  Correct.

5  **Q.**  I'd like to show you what's been marked for identification

6  as Exhibit 123.

7     What is this exhibit?

8  **A.**  This is that technologies article that I mentioned that

9  explains, for users looking for more info, how Google uses

10  information from sites or apps that use our services.

11        **MR. SANTACANA:**  Your Honor, I move Exhibit 123 into

12  evidence.

13        **MR. CARMODY:**  No objection.

14        **THE COURT:**  123 will be admitted.

15     (Trial Exhibit 123 received in evidence.)

16  **BY MR. SANTACANA:**

17  **Q.**  So, Mr. Monsees, this is what Google shows users if they

18  want to learn more about Google activity data on other sites

19  and apps?

20  **A.**  That's correct.

21  **Q.**  Could you just read the top of it for us, orient us?

22  **A.**  Sure.  It says here [as read]:

23        "Many websites and apps use Google services to

24     improve their content and keep it free.  When they

25     integrate our services, these sites and apps share

1          information with Google."

2    **Q.**    Okay.  So here, again, Google is saying sites and apps do

3    send Google data?

4    **A.**    Correct.

5    **Q.**    Let's look at the next paragraph.

6    **A.**    So we give an example here.  We say [as read]:

7              "For example, when you visit a website that uses

8          advertising services, like AdSense, including

9          analytics tools, like Google Analytics, or embeds

10         video content from YouTube, your web browser

11         automatically sends certain information to Google."

12   **Q.**    Can you read the next sentence?

13   **A.**    Sure.

14         [As read]:

15             "This includes the URL of the page you're

16         visiting and your IP address."

17   **Q.**    How about the last sentence for me, please?

18   **A.**    [As read]:

19             "Apps that use Google advertising services also

20         share information with Google, such as the name of

21         the app and a unique identifier for advertising."

22   **Q.**    What does that last term, "unique identifier for

23   advertising," mean?

24   **A.**    This is another type of de-identified or pseudonymous ID.

25   I think it depends on the type of ad service being provided.

1   Sometimes it is an ID provided by your mobile device, like

2   your iPhone.  Sometimes it's an ID based on a cookie but also

3   de-identified, not tied to your account.

4   **Q.**   Are people at Google permitted to figure out who -- whose

5   device is generating the unique identifier you just discussed?

6   **A.**   No.  I think that would violate multiple policies.

7   **Q.**   Would it violate any of the policies we saw earlier today?

8   **A.**   Yes.  I think that UDAP policy -- or sorry -- the user

9   data access policy that we looked at, it would violate that.

10  It could lead up to getting fired if you did.

11  **Q.**   Okay.  Let's look at the next paragraph.

12      What if a user is wondering what you're going to use this

13  data for and what you're not going to use it for when you

14  collect it?  What does Google say to users about that?

15  **A.**   So we describe that right here.  It says [as read]:

16          "Google uses the information shared by sites and

17      apps to deliver our services, maintain and improve

18      them, develop new services, measure the effectiveness

19      of advertising, protect against fraud and abuse, and

20      personalize content and ads you see on Google and on

21      our partners' sites and apps."

22  **Q.**   What is an example of measuring the effectiveness of

23  advertising that's being disclosed to users here?

24  **A.**   I think the best example is when Google shows a display ad

25  through AdSense, say on a newspaper's website that you're

1    looking at, we need to measure when those ads are clicked.  So

2    that allows Google to know which advertisers to charge, which

3    publishers to pay, and it tells our systems that an ad might be

4    good or bad.  If an ad never gets clicked, it's not going to

5    show up as often when Google serves it because it doesn't seem

6    to be a good ad.

7    **Q.**   Is that log of a transaction, like a click on an ad, is

8    that saved in a user's Google Account?

9    **A.**   No.  That information has to be processed independently,

10   and I believe we have obligations to store that data for

11   financial reporting.

12   **Q.**   Okay.  Now, I want to look at the second page, third

13   bullet in that list of bullets there.

14        The next bullet, please.

15        Can you read that for us?

16   **A.**   Sure.  It says [as read]:

17             "Many websites and apps use Google Analytics to

18        understand how visitors engage with our sites and/or

19        apps.  If you don't want analytics to be used in your

20        browser, you can install the Google Analytics browser

21        add-on."

22        And then there's a "Learn more" link here to the

23   Google Analytics page.

24   **Q.**   So at least with respect to web browsers, Google has a

25   product people can use to prevent analytics from being

1    collected?

2    **A.**    Yes.  There's an extension that you can install.

3    **Q.**    Does this page or any other privacy policy say that WAA is

4    the way to prevent analytics data from being collected?

5    **A.**    No, it does not.

6    **Q.**    It's a different product entirely?

7    **A.**    Yes.  The browser extension, doesn't matter if you're

8    signed in, signed out, WAA on, it's a totally separate thing.

9    **Q.**    Okay.  We can put that away.

10       Mr. Monsees, I have no further questions.

11   **A.**    Thank you.

12           **THE COURT:**  Mr. Carmody?

13                   <u>**REDIRECT EXAMINATION**</u>

14   **BY MR. CARMODY:**

15   **Q.**    Sir, are the documents that you just went over with

16   counsel this morning the best documents that Google has to

17   support its claim that users somehow should have known Google

18   was collecting and profiting from their sWAA data even when

19   their sWAA controls were turned off?

20   **A.**    Yes.  I think from my personal opinion, these would be the

21   documents that I would think of.

22           **MR. CARMODY:**  Thank you, sir.

23           **THE COURT:**  Anything further?

24           **MR. SANTACANA:**  No questions, Your Honor.

25           **THE COURT:**  You may step down.

 1          THE WITNESS:  Thank you.

 2      Do I leave the binders or --

 3          THE COURT:  Yeah, we'll take care of the binders.

 4          THE WITNESS:  Okay.  Thank you.

 5                      (Witness excused.)

 6          THE COURT:  Whoever's binders these all are, please

 7  retrieve them and we'll -- before the next witness.

 8      All right.  The next plaintiffs' witness.

 9          MR. LEE:  The next witness is Julian Santiago.

10          THE COURT:  All right.  Please come to the stand to be

11  sworn.

12          (Julian Santiago steps forward to be sworn.)

13                    __JULIAN SANTIAGO__,

14  called as a witness for the Plaintiffs, having been duly sworn,

15  testified as follows:

16          THE WITNESS:  I do.

17          THE COURTROOM DEPUTY:  Thank you.  Make sure you don't

18  roll off the stairs there in that chair.

19          THE WITNESS:  I'll try not to.

20          THE COURTROOM DEPUTY:  Could you make sure you speak

21  clearly into the microphone for the court reporter?

22          THE WITNESS:  Yes.

23          THE COURTROOM DEPUTY:  Could you please state your

24  full name for the record and spell your last name.

25          THE WITNESS:  Julian Santiago, S-a-n-t-i-a-g-o.

SANTIAGO - DIRECT / LEE

```
 1            THE COURTROOM DEPUTY:  Thank you.

 2            THE WITNESS:  Can you hear me there good?

 3            THE COURT:  Yes.

 4            THE WITNESS:  Thank you.

 5            THE COURT:  You may proceed.

 6                       DIRECT EXAMINATION

 7   BY MR. LEE:

 8   Q.   Mr. Santiago, I guess it's almost afternoon.

 9        Would you please introduce yourself to the jury?

10   A.   My name is Julian Santiago.

11   Q.   And, Mr. Santiago, what do you do for a living?

12   A.   I'm an operations manager at a produce company in Miami,

13   Florida.  I oversee the import and distribution of fruits and

14   vegetables to some of the major retailers here in the

15   United States.

16   Q.   Organic vegetables?

17   A.   Some, yeah.

18   Q.   How long have you been doing that?

19   A.   I've been doing that about four years.

20   Q.   Did you attend college?

21   A.   Yes.

22   Q.   Where did you go to school?

23   A.   I went to Florida State University.

24   Q.   What did you study there?

25   A.   I studied business.
```

SANTIAGO - DIRECT / LEE

1    **Q.**   And do you have family, kids?

2    **A.**   I do have a family.  I'm married.  No kids yet.

3    **Q.**   And do you understand that you're serving as a class

4    representative in this case?

5    **A.**   Yes.

6    **Q.**   And what do you understand that to mean?

7    **A.**   I understand that this is a class action and there are

8    millions of people whose rights are at issue with this case,

9    and I understand that all those people cannot be here right

10   now.  So, therefore, I'm here to represent them, and I will do

11   that to the best of my ability.

12   **Q.**   And as a class representative, have you been involved in

13   this case for several years now?

14   **A.**   Yes.

15   **Q.**   Did you let Google take your deposition in this case?

16   **A.**   Yes.

17   **Q.**   And have you tried to keep up-to-date on the case?

18   **A.**   I've done my best.

19   **Q.**   Did you take a lot of calls from your lawyers, including

20   myself?

21   **A.**   Yes.  You guys call a lot.

22   **Q.**   Sorry about that.

23        How long have you participated in this lawsuit?

24   **A.**   It's five years now.

25   **Q.**   And have you been paid any money to be a class

1    representative?

2    **A.**    No.

3    **Q.**    Why did you decide to join this lawsuit and become a class

4    representative?

5    **A.**    Well, I think this matter is important, not just for me

6    but for our society as a whole.  I think -- I take my privacy

7    very seriously, and we need to demand that big tech companies,

8    like Google, be honest with their users; and if Google promised

9    us something, that they would not collect our data with WAA

10    turned off and they still collected that, I don't think that's

11    right.

12    **Q.**    Do you have a Gmail account, Mr. Santiago?

13    **A.**    Yes.

14    **Q.**    Do you recall how long you've had that account?

15    **A.**    I opened that in 2016, so almost ten years.

16    **Q.**    And what kind of cell phones have you had, smartphones,

17    since 2016?

18    **A.**    I've had Apple iPhones.

19    **Q.**    And were there apps on your Apple iPhones?  I know

20    that's a dumb question, but --

21    **A.**    Yes --

22    **Q.**    -- I've got to ask.

23    **A.**    -- of course.

24    **Q.**    Okay.  Once you became a class representative in this

25    case, do you remember Google providing a list of non-Google

1    apps, third-party apps, that have a software development kit

2    which enables Google to take your data from those apps?

3    **A.**    Yes, I do remember.

4    **Q.**    And do you remember identifying from that list which on

5    that -- which of the apps on that list that you had on your

6    phone during the class period?

7    **A.**    Yes.

8    **Q.**    All right.  Let's take a look at a demonstrative slide.

9                        (Pause in proceedings.)

10            **MR. LEE:**  I've got it now.

11   **BY MR. LEE:**

12   **Q.**    Mr. Santiago, what is this slide?

13   **A.**    Well, these are my third-party apps that had -- that I had

14   on my phone that Google told us had their Google SDKs on it.

15   As it turns out, it was a majority of the apps on my phone, and

16   basically we found out that Google was collecting my data

17   across all of these apps even when I had WAA turned off.

18   **Q.**    All right.  Let's look at some of the apps identified

19   here.  I'll just list a few.  Cash App, Discord, eBay,

20   Facebook, Map My Ride, Twitter, Venmo.

21        Is it now your understanding that Google was taking your

22   data from each of these apps even when you had WAA off?

23   **A.**    It is now, yes.

24   **Q.**    Before you joined the lawsuit, did you know that Google

25   was taking your data from these apps even with WAA off?

1    **A.**    No.

2    **Q.**    Are you aware of any place where Google publicly tells

3    people which apps have Google SDKs that take this data?

4    **A.**    No.

5    **Q.**    How did you learn that Google was taking your data through

6    these apps?

7    **A.**    Well, it wasn't until after we filed this lawsuit that

8    Google -- we asked Google to provide that information.  I told

9    Google what apps I use, and Google told us which of those apps

10    had the Google SDKs.

11        And then at that point, our expert was able to do his work

12    and confirm that Google was, indeed, collecting data across all

13    these apps even with WAA turned off.

14    **Q.**    Collecting your data?

15    **A.**    Yes, from the apps.

16    **Q.**    Now, do you want someone knowing everything you're

17    browsing on your apps at all times?

18    **A.**    No, absolutely not.

19    **Q.**    Why not?

20    **A.**    Well, it's invasive.  You know, you don't -- I don't want

21    Google knowing what I'm doing across every app, what I'm

22    shopping for, what I'm reading online.  It's a lot, it's

23    everything, and it's uncomfortable.

24    **Q.**    Do you know what Google is doing with that information?

25    **A.**    No.  We have no idea.

**SANTIAGO - DIRECT / LEE**

1   Q.   Do you know what Google will do with that information?

2   A.   No.

3   Q.   Mr. Santiago, is your iPhone password protected?

4   A.   Yes.

5   Q.   All right.  These apps that were on your phone that we

6   talked about, do you use them regularly?

7   A.   Yeah.  I use a handful of them every day and a few of them

8   a couple times a week.  It varies.

9   Q.   Which ones would you say that you use regularly?

10  A.   Well, I use the Calm app, Duolingo, Map My Ride, some of

11  the sports ones, Target, a few of them -- you know, Weather

12  Channel.  Being in South Florida, we have hurricanes, so that's

13  a common one.

14  Q.   And your regular use of these apps, does that go all the

15  way back to 2016?

16  A.   Yes.

17  Q.   Since 2016 to now, have you owned multiple smartphones and

18  tablets?

19  A.   Yeah, I'd say so.

20  Q.   Okay.  And in that time period, did you ever own a

21  smartphone or tablet that you purchased, used for just one

22  month, and then never used again for one reason or another?

23  A.   No.  That wouldn't make much sense.  I -- you know, these

24  devices are expensive.  You try to get the most use out of them

25  you can.

**SANTIAGO - DIRECT / LEE**

1  Q.   Did you use all your smartphones or tablets that you've

2  owned since 2016 at least -- at least on a monthly basis?

3  A.   Yeah.  I'd use them on a daily basis.

4  Q.   And do you understand that the relevant time period in

5  this case is the 98 months between July 2016 and

6  September 2024?

7  A.   Yes, I understand that.

8  Q.   Okay.  And during that 98-month period, which -- what is

9  your best estimate, in terms of the number of months, that you

10 use one or more of these apps that are listed here?

11 A.   I'd say I used them every one of those months.

12 Q.   Let's talk about how you manage your privacy settings to

13 control Google's collection of your app activity.  Okay?

14 A.   Okay.

15 Q.   Have you heard of the privacy control called Web & App

16 Activity or WAA?

17 A.   Yes.

18 Q.   We've talked a lot about it here.

19 A.   I've seen it quite a bit here.

20 Q.   Okay.  Who called the WAA button a privacy control?

21 A.   That's what Google called it.

22 Q.   And did you ever turn the WAA button off?

23 A.   Yes.

24 Q.   When did you first remember turning the WAA button off?

25 A.   I remember in September of 2020, which we also saw

1  earlier.

2  **Q.**  Okay.  And we'll get more to it in a bit, but I just want

3  to be very clear up-front.  Did you turn the WAA button off

4  before or after you joined this lawsuit?

5  **A.**  After.

6  **Q.**  No.  Did you turn the WAA button off before or after you

7  joined this lawsuit?

8  **A.**  Beforehand.

9  **Q.**  Thank you.  You scared me.

10     Now, when you turned the WAA button off, did you expect

11  Google would continue to collect and save your app browsing

12  activity?

13  **A.**  No.

14  **Q.**  All right.  Before you turned the WAA button off, did you

15  review Google's privacy policy?

16  **A.**  Yes.

17  **Q.**  Is there a particular reason you reviewed Google's privacy

18  policy?

19  **A.**  Well, Google's a very large company.  I wanted to have an

20  understanding of what Google would be collecting and what my

21  rights were in terms of privacy.

22  **Q.**  Now, I'm showing you what's been premarked as Plaintiffs'

23  Exhibit PX67.

24     Mr. Santiago, do you recognize this document?

25  **A.**  Yes.

1   Q.   What is it?

2   A.   This is Google's privacy policy from July 1st, 2020.

3   Q.   And did you read this privacy policy prior to joining the

4   lawsuit?

5   A.   Yes.

6   Q.   Can you read the effective date towards the top of this

7   document?

8   A.   July 1st, 2020.

9           MR. LEE:   Your Honor, may I move per PX67 into

10  evidence?

11          MR. ATTANASIO:   No objection.

12          THE COURT:   67 will be admitted.

13      (Trial Exhibit PX67 received in evidence.)

14  BY MR. LEE:

15  Q.   All right.   So let's get oriented because the jury is just

16  seeing this now.

17      What's been blown up here, where does this actually show

18  up on the privacy policy?

19  A.   This is from right up at the top -- tippy top of the

20  privacy policy.

21  Q.   Would you like a binder, by the way, in case --

22  A.   Sure.

23  Q.   -- the monitor doesn't work?

24  A.   Sure.

25  Q.   Okay.   Hold on one second.

1          MR. LEE:  May I approach, Your Honor?

2          THE COURT:  Sure.

3          THE WITNESS:  Thank you.

4    BY MR. LEE:

5    Q.   No problem.

6         Do you got water?

7    A.   Yes.  Thanks.

8    Q.   Let's start with basics.  What do you understand the word

9    "privacy policy" to mean?

10   A.   Well, pretty self-explanatory.  Google's policy on

11   privacy, what Google would promise to do in terms of our

12   privacy.

13   Q.   Do you see at the top of the privacy policy on the first

14   page there's a -- the first few sentences are in big bold

15   letters?

16   A.   Yes.

17   Q.   Could you read the big bold letters to the jury, please?

18   A.   Sure.

19        [As read]:

20             "When you use our services, you're trusting us

21        with your information.  We understand this is a big

22        responsibility and work hard to protect your

23        information and put you in control."

24   Q.   All right.  And let's go down two paragraphs on the same

25   page of the privacy policy, and do you see the last sentence

1    that begins with "Across our services"?

2    **A.**    Yes.

3    **Q.**    Could you read that to the jury?

4    **A.**    [As read]:

5         "And across our services, you can adjust your

6    privacy settings to control what we collect and how

7    your information is used."

8    **Q.**    What is your understanding of what Google means when it

9    says, "you can control what we collect"?

10    **A.**    Well, they're putting us in control of what they will be

11    collecting.

12    **Q.**    And what's your understanding of what Google means here

13    when it says, "You can control how your information is used"?

14    **A.**    Again, the user is in control of what information is used

15    and how that information is used.

16    **Q.**    Okay.  And I think we covered it, but let's be sure.

17         As you understand this first page that we read in Google's

18    privacy policy, who's in control of what information Google is

19    allowed to collect and what Google is allowed to use?

20    **A.**    I am.

21    **Q.**    Do you recall whether Google's privacy policy, explaining

22    that you have privacy controls that allow you to control what

23    information Google can take, copy, or use?

24    **A.**    Sorry.  Can you repeat it?

25    **Q.**    Sure.

1          Do you recall whether Google's privacy policy offered

2    something called privacy controls that allowed you to control

3    the information that Google could take, copy, or use?

4    **A.**   Yes, I do.

5    **Q.**   All right.  Let's take a look on the very next page of the

6    privacy policy.

7          Do you see in that last sentence that begins with "The

8    information Google collects"?

9    **A.**   Yes.

10   **Q.**   Could you read that to the jury, please.

11   **A.**   [As read]:

12             "The information Google collects and how that

13         information is used depends on how you use our

14         services and how you manage your privacy controls."

15   **Q.**   And so they're saying here that you can manage the

16   information that Google collects through something called

17   privacy controls.  Do you see that?

18   **A.**   Yes.

19   **Q.**   Is there a section in the privacy policy that actually

20   lays out privacy -- the privacy controls?

21   **A.**   Yes.

22   **Q.**   All right.  Let's look at that.  That's on page 8.

23         And is this the section in the privacy policy that

24   specifically talks about privacy controls?

25   **A.**   Yes, privacy controls.

SANTIAGO - DIRECT / LEE

1   Q.   All right.  There's a little blue link there that says,

2   "Go to activity controls."  Do you see that?

3   A.   Yes, I do.

4   Q.   Did you click that back when you read the privacy policy?

5   A.   Yes.

6   Q.   And what happens if you click that blue link?

7   A.   The "Go to activity controls" link takes you to the WAA

8   page that we've been talking about.

9   Q.   All right.  Let's take a look at PX84, which is already in

10  evidence.

11       Are you familiar with this document?

12  A.   Yes.

13  Q.   Did you review what Google specifically says about WAA and

14  the subsetting sWAA in this document?

15  A.   Yes, I did.

16  Q.   And what's -- what was your understanding before this

17  lawsuit about what these buttons do when they're turned on?

18  Let's start with WAA.

19  A.   Sure.  So if it's on, pretty simple, what it says right

20  there.  Google will save your activity on Google sites and

21  apps; and if sWAA is also on, that will include Chrome history

22  and activity from sites and apps at devices -- and devices that

23  use Google services.  So if that is on, Google will collect

24  this; and if it is off, Google shouldn't collect this.

25  Q.   How about sWAA?

1    A.    Yes.   SWAA -- sWAA as well.

2    Q.    Okay.   Did you -- do you see where it says "Learn more"

3    right at the top of the Web & App Activity section right there?

4    A.    Web & App -- yes, "Learn more."

5    Q.    And do you remember clicking that?

6    A.    I do.

7    Q.    All right.

8          MR. LEE:   Before we move to another document,

9    Your Honor, I think I forgot to move in PX67.

10         MR. ATTANASIO:   No objection.

11         THE COURT:   67 will be admitted.   It was already

12   admitted.

13         MR. LEE:   That's what I thought.

14         THE COURT:   It's been admitted twice.

15         MR. LEE:   Okay.   Thank you.

16   BY MR. LEE:

17   Q.    Let's take a look at what happens when you click the

18   "Learn more" button.   Okay?

19   A.    Okay.

20   Q.    So I'm going to show you what's been premarked as PX116.

21   A.    Okay.

22   Q.    And do you see, sort of towards the bottom of the first

23   page, there's a section that says, "What's saved as Web & App

24   Activity"?

25   A.    Yes, I do.

1    **Q.**    Okay.  Do you recall reading this document?

2    **A.**    I do.  I remember it.

3    **Q.**    Did you do that before joining the lawsuit?

4    **A.**    Before.

5           **MR. LEE:**  May I move PX116 into evidence, Your Honor?

6           **MR. ATTANASIO:**  No objection.

7           **THE COURT:**  116 will be admitted.

8       (Trial Exhibit PX116 received in evidence.)

9    **BY MR. LEE:**

10   **Q.**    All right.  Now let's take a look, I think it starts a

11   little on the next page, where -- beginning with "Info about

12   your browsing" --

13   **A.**    Mm-hmm.

14   **Q.**    -- and then some of those bullets below.

15   **A.**    Okay.

16   **Q.**    Based on this disclosure, what activity does Google say

17   that it saves when WAA is on?

18   **A.**    If WAA is on, based on this, Google will be saving info

19   about your browsing and other activity on sites, apps, and

20   devices that use Google services, along with activity from

21   sites and apps that partner with Google to show ads, and

22   activity from sites and apps that use Google services,

23   including data that apps share with Google.

24   **Q.**    Now, do you see below that where Google states [as read]:

25           "To let Google save this information, Web & App

**SANTIAGO - DIRECT / LEE**

1          Activity must be on"?

2    **A.**    Yes.

3    **Q.**    Do you see that?

4    **A.**    I see that.

5    **Q.**    Mr. Santiago, what is the opposite of on?

6    **A.**    Off.

7    **Q.**    So based on this disclosure, what understanding did you

8    have regarding what app activity Google is not allowed to save

9    when WAA is turned off?

10   **A.**    Well, if WAA is turned off, Google should not be saving

11   activity from sites and apps that partner with Google to show

12   ads, and Google should not be saving activity from sites and

13   apps that use Google services, including data that apps share

14   with Google.

15   **Q.**    Now, after you read the privacy policy and specifically

16   the privacy control that we're looking at here, WAA, what did

17   you do next?

18   **A.**    After reading this, I turned WAA off.

19   **Q.**    When you turned WAA off, did that subsetting that we

20   looked at, sWAA, also turn off?

21   **A.**    Yes.

22   **Q.**    All right.  Where did you turn WAA off from?

23   **A.**    From the activity controls page.

24   **Q.**    All right.  And do you recall when that was?

25   **A.**    That was mid-September of 2020.

1  **Q.**   Why do you remember turning it off in mid-September of

2  2020?

3  **A.**   Well, a few reasons.  I had just gotten a new laptop when

4  I started a new job, and like a lot of us do when we get a new

5  device, you know, I was setting up my personal preferences, and

6  that included some of the privacy stuff.

7       And a big one was that I had just recently seen the

8  documentary that had just come out on Netflix, *The Social*

9  *Dilemma*; and this documentary talked about how big tech

10  companies, like Google, were collecting endless amounts of

11  information on us and profiting greatly from that information,

12  and that was a big eye-opener for me.  After seeing that

13  documentary, I began to take my privacy much, much more

14  seriously.

15  **Q.**   And how much time after seeing *The Social Dilemma* in early

16  September 2020 did you review Google's privacy policy and WAA

17  disclosures and turn WAA off?

18  **A.**   Pretty much immediately after.

19  **Q.**   And when did you learn about this lawsuit?

20  **A.**   In late September of 2020.

21  **Q.**   Did you learn about this lawsuit -- I'll strike that.

22       How did you learn about this lawsuit?

23  **A.**   Well, I was out to dinner with my girlfriend at the time,

24  my now wife, and her family and celebrating a birthday; and as

25  we often do at dinners and gatherings, we talk about shows,

 1  movies we liked, and I brought up this documentary I had just

 2  seen, *The Social Dilemma*, and how crazy it was, big eye-opener,

 3  like I mentioned, and was telling them about it.

 4      And my girlfriend's aunt at the time was working as a

 5  secretary at a law firm, Boies Schiller Flexner, and she

 6  mentioned that her firm was working on a case against Google

 7  and some of this privacy stuff.  I was intrigued right away and

 8  asked her for contact information to reach out to the firm.

 9  **Q.**   And who reached out first?  Did you reach out or did the

10  lawyers representing the plaintiffs reach out to you?

11  **A.**   I did.  I reached out.

12  **Q.**   And when did you join the lawsuit?

13  **A.**   In late September 2020.

14  **Q.**   Did you watch the opening statement from Google's lawyer

15  in this case?

16  **A.**   Yes, I did.

17  **Q.**   And did you hear him say the plaintiffs turned off WAA for

18  the first time after joining the lawsuit?

19  **A.**   Yes.

20  **Q.**   Was that a true statement or an untrue statement?

21  **A.**   That was untrue.

22  **Q.**   I'd like to talk a little bit more about how you expected

23  WAA to work after you turned it off and continued to use apps

24  like, you know, Twitter, Spotify, and the things on that list.

25  Okay?

**SANTIAGO - DIRECT / LEE**

1  **A.**   Okay.

2  **Q.**   Now, when you turned off WAA, did you expect that Google

3  was going to collect and save your app activity when you used

4  those apps?

5  **A.**   No, certainly not.  When I turned off WAA, I expected

6  Google would not be saving or collecting any activity from my

7  apps.

8  **Q.**   What about the apps themselves that you were using?  Could

9  you still collect -- did you understand that they could still

10  collect information even when WAA was off?

11  **A.**   Sure.  It may be possible for the apps to collect certain

12  information from within the app if I had given the app

13  permission; but as far as Google's concerned, WAA turned off

14  means that they would not be collecting any information from

15  the apps.

16  **Q.**   Did you ever see a disclosure from any app that said apps

17  share your data with Google even when WAA is off?

18  **A.**   No.

19  **Q.**   Did you ever see a disclosure from any app, any app on

20  your list, that said Google can save your data from the app

21  even when WAA is turned off?

22  **A.**   No.

23  **Q.**   At the time you turned WAA off, did you trust that Google

24  would honor the promises it made in its privacy policy and in

25  the WAA disclosures that we saw?

**SANTIAGO - DIRECT / LEE**

1  **A.**   At the time, yes.

2  **Q.**   And before joining this lawsuit, did you read or see

3  anything that would call into question the promises that Google

4  made about WAA?

5  **A.**   Specifically about WAA, no.

6  **Q.**   Now, the jury's heard that Google does collect, save, and

7  use people's app browsing data even when WAA is off.  Do you

8  recall hearing that?

9  **A.**   Yes.

10  **Q.**   All right.  Let's get the first page of the privacy policy

11  back up, PX67.  And let's highlight what we read before.

12      [As read]:

13          "Across our services, you can adjust your

14      privacy settings to control what we collect and how

15      your information is used."

16      Do you see that?

17  **A.**   Yes.

18  **Q.**   Now, if Google collects and uses your app activity data

19  even when WAA is turned off, how are you in control of what

20  Google collects?

21  **A.**   I'm not.

22  **Q.**   So is this statement in the privacy policy, is it true or

23  is it false?

24  **A.**   It's false.

25  **Q.**   Let's go back to PX116.

**SANTIAGO - DIRECT / LEE**

1    And we looked at this before.  Do you remember when it

2    laid out the activity, and it says, "To let Google save this

3    information, Web & App Activity must be on"?

4    **A.**    Yes.

5    **Q.**    All right.  If Google saves your app activity data even

6    when WAA is turned off, then is the statement that "To let

7    Google save this information, Web & App Activity must be on,"

8    in your view, is that true or false?

9    **A.**    It's false.

10   **Q.**    Now that you know that Google was collecting, saving, and

11   using your app activity data this entire time, describe how

12   that's affected you.

13   **A.**    Well, Google has a ton of information on us that they

14   never had our permission to have.  We have no idea what they're

15   doing with it, what they will do with it.  It's concerning.

16   **Q.**    And do you feel that Google taking your information is

17   highly offensive?

18   **A.**    Yeah.  Yes.

19   **Q.**    Explain why.

20   **A.**    Misleading people is highly offensive.  Taking people's

21   information without their permission, that's highly offensive.

22   Making a fake button that deceives people is highly offensive

23   as well.

24   **Q.**    Now, after you joined the lawsuit because Google was

25   collecting your browsing activity even with WAA off, did you

1    stop using your apps?

2    **A.**    No, I did not.

3    **Q.**    Why not?

4    **A.**    Well, a few reasons.  Firstly, Google should have to

5    change.  Google should make a privacy button that actually

6    works and honor its promises to its users.

7         And, secondly, as a class representative, it is my

8    responsibility to this class to maintain my same behaviors so

9    that our experts can do their work, and they've done a

10   phenomenal job at that, to be able to confirm what Google was,

11   indeed, collecting; and, finally, for legal reasons, to get

12   Google to change its practices.

13   **Q.**    Did knowing that Google collected and saved your app

14   activity after the lawsuit, did it change how you used certain

15   apps?

16   **A.**    I would say so, yeah.

17   **Q.**    Tell me more about that.

18   **A.**    Well, I was certainly more cautious with certain apps and

19   probably veered away from some altogether, maybe some of the

20   social media apps.  So it definitely affected the number of

21   apps that I was using.

22   **Q.**    Do you have an understanding, Mr. Santiago, one way or

23   another, that Google compromises the bandwidth or data on your

24   phone, as well as the battery life on the device, by taking

25   this sWAA data even when you have WAA off?

1    **A.**    Yes, I'd imagine so.

2              **MR. ATTANASIO:**  Objection.  Foundation.

3              **THE COURT:**  Overruled.

4    BY MR. LEE:

5    **Q.**    What was your answer?  I'm sorry.

6    **A.**    I would imagine so.

7    **Q.**    Do you think Google should be doing that?

8    **A.**    No.  Certainly not.  Google shouldn't be doing anything

9    with our data.  When we turned WAA off, we told them that they

10   did not have permission to do anything with that data.  So if

11   they're also invading our phones and taking that data, there's

12   definitely additional bandwidth or energy usage going to that,

13   I'm sure, to send those -- that information back to Google.  So

14   not only are they taking that data from us, they're also using

15   our resources to do so.

16   **Q.**    Do you think the class should be reimbursed for the loss

17   of their bandwidth and battery life?

18   **A.**    Yes, I would think so.

19   **Q.**    Can you describe how Google's conduct has impacted you

20   emotionally?

21   **A.**    It's been challenging knowing that we've been deceived and

22   there's nothing you could do to stop it after Google made you

23   feel that you had their trust -- or they had our trust and they

24   continued to collect our data even when they told us we were in

25   control.

1   **Q.**   Do you think people should have a choice about controlling

2   their information online?

3   **A.**   Yes, absolutely.  I believe everyone has the right to

4   decide what happens with their personal information.

5   **Q.**   What would you like Google to know, if anything, through

6   this lawsuit?

7   **A.**   You can't mislead people.  You can't take people's

8   information without their permission.  You can't make a fake

9   button that deceives people and get away with it.  What you did

10  is wrong and you know it.

11  **Q.**   Mr. Santiago, what relief are you asking for on behalf of

12  the class?

13  **A.**   Google took a lot of data from millions of people that

14  obviously has value, and Google profited from that data.  Those

15  profits belong to the people who own and created that data.

16  Those profits should go back to the class.  And Google should

17  also be punished so they don't do stuff like this again.  So

18  we're asking punitive damages.

19  **Q.**   Thank you, Mr. Santiago.

20  **A.**   Thank you.

21          **THE COURT:**  Mr. Attanasio?

22          **MR. ATTANASIO:**  Yes, Your Honor.

23          **THE COURT:**  Just for your information, in about

24  five minutes we're going to take a break because our IT people

25  are here to see what they can do.

1          **MR. ATTANASIO:**  Thank you, Your Honor.

2                    **CROSS-EXAMINATION**

3    **BY MR. ATTANASIO:**

4    **Q.**   Mr. Santiago, good morning for four more minutes.

5          You and I, other than a nod in the hallway, have never met

6    before; correct?

7    **A.**   Yes.  That is correct.

8    **Q.**   My name is Mike Attanasio.  I'm an attorney for Google.

9    **A.**   Nice to meet you.

10          (Reporter interrupts to clarify the record.)

11   **BY MR. ATTANASIO:**

12   **Q.**   My name is Mike Attanasio.  I'm an attorney for Google.

13          Mr. Santiago, let's start, if we could, with the timeline.

14          I think you said this.  I just want to walk through it.

15   You created your first personal Google Account in 2016; is that

16   correct?

17   **A.**   That is correct.

18   **Q.**   You turned off WAA for your Google Accounts in

19   September 2020; is that right?

20   **A.**   I turned off WAA in my Gmail in September of 2020, yes.

21   **Q.**   You remember that, in part, I believe, because at around

22   that time, you got a new laptop; is that fair?

23   **A.**   That's correct, along with seeing this documentary that,

24   you know, was quite impactful.

25   **Q.**   Do you remember talking about your new laptop, in

1    September 2020, causing you to go look at your settings and

2    then turn off WAA?

3    **A.**    I got this new laptop and was setting up personal

4    preferences towards settings across the laptop, and that

5    included some of the privacy stuff, yes.

6    **Q.**    Okay.  And if we could look quickly -- I think I can do

7    this in the time we have, if we could look quickly at the

8    document, the Exhibit 941.R2, already in evidence, so we may

9    publish it.  I think this will help us just tie down the

10   timeline and then it's forward ahead.  Okay?

11   **A.**    Great.

12            **MR. ATTANASIO:**  Can we switch?

13            **THE COURTROOM DEPUTY:**  I did.

14            **MR. ATTANASIO:**  Thank you.

15            **THE COURTROOM DEPUTY:**  Hold on.  Let me...

16   **BY MR. ATTANASIO:**

17   **Q.**    Do you recall, sir, that Mr. Monsees testified about this

18   document a few minutes ago?  Mr. Santiago, you remember that?

19   **A.**    Yes, I do.

20   **Q.**    All right.  And if we turn to page 4, please, middle of

21   the page, you see your name there?

22   **A.**    Yes.

23   **Q.**    Do you see the first email listed next to it?

24   **A.**    Yes.

25   **Q.**    Was that an email that you used for work?

SANTIAGO - CROSS / ATTANASIO

1   **A.**   That is -- that is a work email, yes, that I -- that I

2   opened up on the date of 9/22.

3   **Q.**   September 22, 2020; yes?

4   **A.**   Correct.

5   **Q.**   Do you see that at the time you opened it up, just when

6   you started, you had WAA and sWAA on because that was the

7   default, I believe; fair?

8   **A.**   Default, yep.

9   **Q.**   Later that same day, if we go to the third row down, you

10  turned it off.  It says "paused," but you and I can agree

11  "paused" means off; is that fair?

12  **A.**   Yes.

13  **Q.**   All right.  If we look at the next email, that is your

14  personal email; correct?

15  **A.**   Yes.

16  **Q.**   Still your personal email today?

17  **A.**   It is.

18  **Q.**   And if we look at the first row, we see that, as you've

19  testified, you started your first Google Account in 2016; is

20  that correct?

21  **A.**   That's what it says there, yeah.

22  **Q.**   And if we look at the fourth row down from here, we see

23  that in September 2020, you paused or turned off WAA and sWAA

24  for that personal Gmail account; is that correct?

25  **A.**   Yes.

1  **Q.**  All right.

2          **MR. ATTANASIO:**  Your Honor, now would be a fine time

3  to take the break.

4          **THE COURT:**  Members of the jury, remember my

5  admonitions not to discuss this amongst yourselves or with

6  anyone else.

7          And we'll resume, I hope, in 15 minutes.  We'll have the

8  IT people working away in the meantime.

9                    (Recess taken at 11:59 a.m.)

10                   (Proceedings resumed at 12:20 p.m.)

11         (Proceedings were heard out of the presence of the jury.)

12         **THE COURT:**  Are we ready to bring them out?

13         **MR. ATTANASIO:**  Yes, Your Honor.

14         **THE COURT:**  Okay.

15         (Proceedings were heard in the presence of the jury.)

16         **THE COURT:**  The jury is present.

17         Members of the jury, we think it's fixed, but they've been

18  going off.  They have a mind of their own.  So if it goes off

19  again, just tell us.  We think we may be able to, even without

20  the IT people, bring it back to life, but tell us if it does

21  conk out.

22         And we also -- as I mentioned to the lawyers, I know

23  it's -- for some reason it's getting warm in here.  We're

24  trying to see if we can adjust it, but I think it's because

25  it's a warm day and the court system is not state-of-the-art,

**PROCEEDINGS**

 1    so it takes a little while to adjust.  But, hopefully, we'll be

 2    able to do that.

 3        Okay.  Mr. Attanasio, you may proceed.

 4            **MR. ATTANASIO:**  Thank you, Your Honor.

 5    **BY MR. ATTANASIO:**

 6    **Q.**  Mr. Santiago, when we took our break, we had established

 7    that you turned off your WAA and sWAA settings on your Google

 8    accounts in September 2020; correct?

 9    **A.**  Yes.

10    **Q.**  Let's go forward from there, if we could.

11        You did that because privacy is important to you; yes?

12    **A.**  Privacy is, yes.

13    **Q.**  Because privacy is important to you, you did not want

14    Google collecting any of your data; correct?

15    **A.**  That's correct.

16    **Q.**  So you turned those buttons off; yes?

17    **A.**  Yes.

18    **Q.**  There was an exception; correct?

19    **A.**  An exception?

20    **Q.**  Yes.

21    **A.**  Which was?

22    **Q.**  You left on -- do you remember what you left on?

23    **A.**  I turned WAA off.

24    **Q.**  Yes.  Do you remember specifically that you left on WAA

25    and sWAA intentionally for YouTube?

1   **A.**   That's correct.  I spoke about that at my deposition.

2   **Q.**   Yes, you did.

3   **A.**   I left YouTube available for some of the things that

4   Mr. Monsees spoke about, that I may have searches on my YouTube

5   available to me.

6   **Q.**   No.  Mr. Monsees talked about how, when sWAA is off,

7   Google needs to be able to continue to count views and

8   viewership so that they know what's going on with those videos

9   even though the user has turned it off.  That's what he

10   testified about, sir.

11        You left it on; correct?

12   **A.**   I left YouTube on, yes --

13   **Q.**   Who owns YouTube?

14   **A.**   -- but WAA was turned off.

15   **Q.**   Who owns YouTube?

16   **A.**   Google does.

17   **Q.**   Pardon me?

18   **A.**   Google.

19   **Q.**   Are you aware -- did you look at the YouTube privacy

20   policy?

21   **A.**   I looked at what was on the Google privacy policy, where

22   YouTube is one of the options.

23   **Q.**   Yes.  Did you look at the YouTube privacy policy?

24   **A.**   I reviewed it, but not as thoroughly as Google's because

25   Google is owned -- or YouTube is owned by Google.

1    **Q.**   Right.  Exactly.

2        So -- and your passionate interest about privacy caused

3    you to turn off the Google WAA and sWAA; correct?

4    **A.**   Google WAA and sWAA turned off, yes.

5    **Q.**   But over here, owned by Google is YouTube, which you

6    intentionally left on, knowing that it would track your

7    activity; correct?

8    **A.**   That's correct.  I was allowing YouTube to continue to be

9    tracked.  Everything else on Google services and my apps, which

10   this case is about our -- the third-party apps, that would not

11   be tracked.

12   **Q.**   Exactly.  Are you aware that the YouTube privacy policy

13   states, "We adhere to Google's privacy principles"?  Did you

14   read that at the time?

15   **A.**   I don't recall that specifically.

16   **Q.**   Are you aware that the YouTube privacy controls map to the

17   Google-wide controls, including WAA, but are separate?  In

18   other words, if you leave them on, you've left them on?  Are

19   you aware of that?

20   **A.**   Can you repeat that, please?

21   **Q.**   Yes.  Are you aware that there's a WAA link on YouTube as

22   well?

23   **A.**   The -- the WAA that we're talking about is from Google's

24   privacy policy.  There's WAA and there's sWAA, and one of the

25   options is for YouTube, and I gave Google permission to keep

1    track of my YouTube searches.  They should not be collecting

2    anything else from any third-party apps.

3    **Q.**    Do you know that the third-party apps who are partners of

4    Google also interact with YouTube for the same reasons, to

5    create personal experiences?  Do you know that?

6    **A.**    That's great.  They have the data from YouTube available,

7    but third-party apps do not because of WAA turned off.

8    **Q.**    WAA turned off on Google, WAA turned on at YouTube owned

9    by Google; is that a fair summary and we'll move forward?  Yes?

10   **A.**    Yes.

11   **Q.**    All right.  Let's talk about how you learned about this

12   case.

13        You heard about this case in the fall of 2020; correct?

14   **A.**    In September of 2020, yes, late September.

15   **Q.**    Same month you turned off WAA and sWAA for Google, not

16   YouTube; correct?

17   **A.**    I turned it off on Google.  It was a time where this

18   documentary had just come out, and it was a popular topic of

19   conversation amongst many circles, social circles, friends,

20   family.  We were talking about how, you know, this

21   *Social Dilemma* documentary was a concern.  So it was a topic of

22   conversation.

23   **Q.**    I didn't -- if I -- if I asked you about the film or

24   movie, I apologize.

25        I just simply intended to ask you, and I think I did, you

**PROCEEDINGS**

1    heard about this case in September 2020; correct?

2    **A.**    Yes, after seeing the film.

3    **Q.**    Okay.  You heard about it at a dinner, correct, the case?

4    **A.**    It was -- yes.

5    **Q.**    The case wasn't in the movie, was it?

6    **A.**    No.

7    **Q.**    All right.  You heard about it at a dinner in

8    September 2020 from a person named Tracy Lopez; correct?

9    **A.**    Yes.  She mentioned it.

10    **Q.**    Pardon me?

11    **A.**    Yes.  She mentioned it.

12    **Q.**    Tracy Lopez was the aunt of your then girlfriend; correct?

13    **A.**    Yes.  She still is.

14    **Q.**    Tracy Lopez is the aunt of your spouse; correct?

15    **A.**    Yes.

16    **Q.**    Ms. Lopez at the time just happened to work at this law

17    firm, Boies Schiller; correct?

18    **A.**    Yes.  She was a secretary at the law firm.

19    **Q.**    So you turned off WAA and sWAA in September 2020, and you

20    happened to have a conversation with an assistant at a law

21    firm, Tracy Lopez, also in September 2020.  Do I have that

22    right?

23    **A.**    Yes.  Later that month, yes.

24    **Q.**    And somewhere in there you saw this movie that you -- that

25    you want to tell us about; correct?

PROCEEDINGS

1          **MR. LEE:** Objection.  Mischaracterizes testimony.

2          **THE COURT:** Overruled.

3   **BY MR. ATTANASIO:**

4   **Q.** Yes?

5   **A.** I saw the film first.  To be clear with the timeline, I

6   turned off WAA after seeing the film because of my concerns and

7   wanting to take privacy more seriously.  And through -- it was

8   a topic of conversation during that time amongst several

9   dinners and friend groups and communications, and one of them

10  happened to be this Tracy Lopez, yes.

11  **Q.** So the answer to my question is "yes"?

12  **A.** Can you repeat it, please?

13  **Q.** Ms. Lopez told you about the case that brings us here

14  today in front of this jury; correct?

15  **A.** She mentioned the case, yes, at the dinner party.

16  **Q.** Ms. Lopez gave you information that allowed you to call

17  the law firm Boies Schiller, one of the multiple law firms

18  represented here today; correct?

19  **A.** She knew of the case's general existence and gave me

20  contact information to -- so I could reach out and get in

21  contact with the right people regarding the case, yes.

22  **Q.** You did that; correct?

23  **A.** Yes, I did.

24  **Q.** You called Boies Schiller; correct?

25  **A.** Yes.

1  Q.   You called Boies Schiller and the person you spoke to is

2  the attorney who just questioned you, Mr. Lee; correct?

3  A.   I spoke with a secretary first, and then she put me in

4  contact with Mr. Lee.

5  Q.   Okay.

6  A.   I had never heard of or met Mr. Lee or any of the other

7  attorneys before that moment.

8  Q.   And as you've just shared with us, turning off WAA and

9  sWAA, talking to Tracy Lopez, talking to Mr. Lee, those things

10  happened in September 2020; correct?

11  A.   Yes.  I turned off WAA and sWAA in mid-September, and then

12  later on met Mr. Lee in late September of 2020.

13  Q.   Okay.  And I heard you say to this jury that when my law

14  partner, Mr. Hur, in opening statement, said that the

15  plaintiffs turned sWAA off after learning about the case -- do

16  you recall being asked that question by Mr. Lee?

17  A.   Can you --

18  Q.   Yes.

19  A.   -- reword that, please, or --

20  Q.   Sure.

21  A.   -- say that wording again?

22  Q.   Yes.

23       Do you recall Mr. Lee describing to you the opening

24  statement of Mr. Hur?

25  A.   Yes.

1  **Q.**   And stating to you that Mr. Hur said, in his opening

2  statement to the jury, that the jury would hear that the

3  plaintiffs in this case turned WAA and sWAA off after joining

4  the lawsuit.  Do you recall that?

5  **A.**   We turned WAA off before we heard -- I heard about the

6  lawsuit.

7  **Q.**   Understood.  I understand that's your testimony.

8       You were asked, just a few minutes ago, about Mr. Hur's

9  supposed statement in opening statement that you turned it off

10  after joining the lawsuit.  Do you recall that?

11  **A.**   That's what he said, but I don't -- that's not true.

12  **Q.**   Exactly.  You testified to this jury under oath that when

13  Mr. Hur said that, it was untrue; correct?

14  **A.**   Yes.

15  **Q.**   Okay.  I happen to have the transcript here.  This is

16  August 19th, 2025, page 252.  Mr. Hur stated in his opening

17  statement [as read]:

18       "You did not hear that each of the plaintiffs

19       turned their sWAA setting off shortly before or after

20       meeting their lawyers so that they could become class

21       representatives."

22       So what he said was that you and the other class reps

23  turned sWAA off before or after meeting their lawyers; is that

24  untrue?

25  **A.**   Before.

1  Q.   Correct.  So what Mr. Hur said is true; yes?

2  A.   Look, I'm just a normal guy.  I'm not a lawyer.  I'm

3  having trouble following along with all the wording.

4  Q.   Sir, you didn't have any trouble following along when you

5  were asked about whether a lawyer in this case for Google made

6  a statement to this jury that was true or untrue.  You didn't

7  have any problem saying that this Mr. Hur, my law partner, said

8  something in this courtroom that was untrue.  You just

9  testified to that 25 minutes ago; right?

10 A.   What he said was misrepresented to me if it was not what

11 he -- exactly what he said.

12 Q.   Who misrepresented it to you?

13 A.   I turned off WAA before hearing about the lawsuit.  That's

14 all I was trying to confirm.

15 Q.   Have you noticed I haven't quarreled with you one bit

16 about that; yes?

17 A.   That's correct.  I don't remember exactly what Mr. Hur

18 said yesterday about before or after.  I thought it was about

19 before.  But thank you for reading it now, and we could agree

20 now.

21 Q.   We can agree now after you said that that man lied to the

22 jury?

23 A.   I didn't say that.  I agreed with something else said.

24 Q.   Who misrepresented that to you?

25 A.   I don't know if it was misrepresented or misheard.

1   **Q.**   You just said it was misrepresented three minutes ago.

2   Who misrepresented it to you?

3   **A.**   If -- my previous counsel.

4   **Q.**   Your current counsel.

5   **A.**   My -- yeah.  Counsel who spoke previously, yes.

6   **Q.**   So to set this up for the jury that Mr. Hur told an

7   untruth, told a whopper in this courtroom, your attorney

8   misrepresented something to you; is that fair?

9   **A.**   I -- I have a lot of things mixed up in my head right now.

10   I'm not used to being in a position like this, and it's a lot

11   of lingo coming at me.

12   **Q.**   Sir, if you don't understand anything I ask, you just say

13   so.  I'll do better.

14   **A.**   I appreciate that.

15   **Q.**   But right now I'm still focused on the idea, as a lawyer,

16   by the way, who sits here and does his best, as do these folks,

17   that you would take that stand and look down over here and say

18   he said something that was not true.  That's a big deal.  Why

19   did you do that?

20   **A.**   If what he was saying was that Google -- or that WAA was

21   turned off before the lawsuit, that is true.

22         **MR. ATTANASIO:**  Your Honor, may I approach?

23         **THE COURT:**  Yes.

24         **MR. ATTANASIO:**  Thank you.

25   \\\

PROCEEDINGS

1    BY MR. ATTANASIO:

2    **Q.**   I want to make sure we're completely fair.

3    **A.**   Thank you.

4    **Q.**   That's the official transcript right there.  I've

5    highlighted it.

6               **MR. LEE:**  Is there a copy?

7               **MR. ATTANASIO:**  I've already called the page out.

8    It's 252.  It's a daily transcript.

9               **THE WITNESS:**  Yes, it says, "shortly before or after

10   meeting their lawyers."

11   BY MR. ATTANASIO:

12   **Q.**   Meaning it's 100 percent true; correct?

13   **A.**   Some tricky terminology.  If you're saying it's saying two

14   different things, I suppose.  Before or after are two different

15   moments in time.

16   **Q.**   Well, we're going to learn that your other colleague

17   turned it off after.  I accept that you turned it off before.

18       So it's a hundred percent true statement; correct?

19   **A.**   In those terms, then, yes.

20   **Q.**   Now, you are not the only class representative in this

21   case; correct?

22   **A.**   Yes, correct.

23   **Q.**   As of a week ago, there were four class representatives;

24   is that true?

25   **A.**   I believe there was three.

**PROCEEDINGS**

1    **Q.**    Okay.  You're aware of the class representative named

2    Mr. Anibal Rodriguez; correct?

3    **A.**    I am.

4    **Q.**    And Mr. Rodriguez is here with us at the end of the table;

5    yes?

6    **A.**    That's him.

7    **Q.**    And you said there were three.  There's also a class

8    representative named Susan Harvey; is that right?

9    **A.**    There was, yes.

10   **Q.**    There was?

11   **A.**    I don't see her here.

12   **Q.**    Have you ever met Ms. Harvey?

13   **A.**    I met her in passing earlier this -- this week before she

14   left.

15   **Q.**    Left San Francisco?

16   **A.**    I believe so.  I don't know the details of where she left

17   to.

18   **Q.**    Where did you meet her?  Where were you?

19   **A.**    At our hotel.

20   **Q.**    What hotel is that?

21   **A.**    The --

22        **MR. LEE:**  Objection, Your Honor.

23        **THE COURT:**  What is the relevance of the hotel they're

24   staying at?

25        **MR. ATTANASIO:**  Just the circumstance of their

PROCEEDINGS

 1    meeting, Your Honor.

 2              **THE COURT:**  Move on.

 3              **MR. ATTANASIO:**  Yes, sir.

 4    **BY MR. ATTANASIO:**

 5    **Q.**   So you saw her a few days ago; is that fair?

 6    **A.**   Met her briefly, shook her hand, and that was it.

 7    **Q.**   Okay.  By the way, as a class representative, you know

 8    that you are in line for what's called an incentive payment

 9    should the case be successful; correct?

10    **A.**   I'm unaware of that.  I'm here to do what I can for this

11    class.

12    **Q.**   You never heard anything about that?

13    **A.**   No.

14    **Q.**   Let's talk about your continued use of apps and how that's

15    affected you, Mr. Santiago.

16        You've said that the idea of Google receiving your app

17    data is extremely psychologically distressing; is that correct?

18    **A.**   It's difficult, yes.

19    **Q.**   You think about it every day; correct?

20    **A.**   I -- it's something I have to deal with on a daily basis.

21    **Q.**   And because Google gets this depersonalized data in the

22    aggregate, you've even tried exercise and meditation to reduce

23    your anxiety about Google; is that correct?

24    **A.**   I exercise and meditate, yes.

25    **Q.**   Because of this circumstance that brings us here; correct?

**PROCEEDINGS**

1  **A.**   It's one of them, sure.

2  **Q.**   All right.  You haven't sought out any doctors for your

3  psychological distress in this case, have you?

4  **A.**   No.

5  **Q.**   You've not sought out a therapist because of what you

6  believe Google's done, have you?

7  **A.**   I've spoken with therapists, and I try to take a holistic

8  approach to my health.

9  **Q.**   You recall being asked in your deposition whether you've

10  seen a therapist about Google's conduct?

11  **A.**   I recall being asked that, yes, and that was several years

12  ago.

13  **Q.**   It was 2022, sir.

14  **A.**   Yeah.

15  **Q.**   Correct?

16  **A.**   Yeah.  Three years ago.

17  **Q.**   Okay.  Is it your testimony now that you have seen a

18  therapist because of the allegations in this case?

19  **A.**   I have seen a therapist about several things, including

20  privacy, yes.

21  **Q.**   My question is slightly different.

22      Is it your testimony to this jury that you've seen a

23  therapist because of the allegations you've made in this case?

24  **A.**   The things that I've discussed with my therapist would be

25  between us.

1    **Q.**    I'm not asking you about any of them, sir.

2         Okay.  And you have not been -- as of the time of your

3    deposition, you've not been diagnosed with any psychological

4    disorder as a result of what you say Google does with your

5    data; correct?

6    **A.**    No.

7    **Q.**    As the time of your deposition, you've not been prescribed

8    any medications because of what you say Google does about your

9    data; correct?  Is that right?

10   **A.**    Again, I try to take a holistic approach to my health.

11        **MR. ATTANASIO:**  Okay.  Let's look at Demonstrative

12   Slide Number 3 that the plaintiffs put up a few minutes ago, if

13   we could, Brooklyn.

14   **BY MR. ATTANASIO:**

15   **Q.**    I'd like to talk to you about the apps you use,

16   Mr. Santiago.

17        This is a list of apps you use that have the Google

18   analytics tool.  Am I understanding this correctly?

19   **A.**    Yes.  The Google SDKs, correct.

20   **Q.**    You have other apps beyond these; yes?

21   **A.**    I -- there's other apps on my phone, but this is

22   definitely a large majority of them.

23   **Q.**    Okay.  That's fine.

24        You downloaded -- you personally downloaded and installed

25   all of these apps; is that true?

PROCEEDINGS

1    **A.**    Yes, I did.

2    **Q.**    I count 42 apps on this page.  Will you take my count on

3    that?

4    **A.**    Yes, I'll take your word.

5    **Q.**    All right.  You are aware, of course, that each of these

6    apps, all 42, had their own terms of service and privacy

7    policies; correct?

8    **A.**    Yes, they do.

9    **Q.**    As you sit here, you don't know all of the terms of

10   service and privacy policies for these 42 apps, of course; is

11   that fair?

12   **A.**    I don't know them by heart, but I'm sure the ones -- the

13   apps I frequently use, I've reviewed.

14   **Q.**    You would have reviewed the privacy policies and the terms

15   of service?

16   **A.**    In the -- in some --

17           **MR. LEE:**  Objection, Your Honor.  There's a

18   motion in limine on this.

19           **THE COURT:**  Not really, no.  Overruled.

20   **BY MR. ATTANASIO:**

21   **Q.**    Go ahead.

22   **A.**    Some of the big apps that I use that are large companies,

23   again, for example, Target, I may have reviewed, yes.

24   **Q.**    All right.  Which other ones would you have reviewed the

25   terms of service and privacy policies, other than Target?

**PROCEEDINGS**

1    **A.**    Probably E*Trade.

2    **Q.**    Okay.

3    **A.**    Marcus because it's, you know, financial focused, a

4    financial app.  Ticketmaster, big companies.

5    **Q.**    And did you find out if any of these apps that are

6    displayed on this slide, including the ones you just mentioned,

7    use Google Analytics?

8    **A.**    Sorry.  I didn't follow along all the way.  Can you repeat

9    that, please?

10    **Q.**    Sure.

11    Did you ever determine whether any of the apps on Slide 3

12    here, including the ones you just mentioned, use

13    Google Analytics?

14    **A.**    It wasn't until after we filed this that I learned that,

15    that I learned that Google SDKs were on all these apps.

16    **Q.**    Understood.

17    So before you learned it in this litigation, did you ever

18    go look on the terms of service or the privacy policies to see

19    what these third-party apps do with a partner like Google?

20    **A.**    I don't recall specifically, no.

21    **Q.**    What about Target?  Do you know if Target discloses what

22    it does?

23    **THE COURT:**  This is not going to the question of

24    whether or not these apps have privacy policies or not.  This

25    is going to the issue of this witness's concern for privacy,

PROCEEDINGS

1    and that is why it is appropriate testimony.

2        But there's no suggestion that these -- whatever policies

3    these third parties may have has relevance independently in

4    this case.

5        So you can proceed.

6            **MR. ATTANASIO:**  Thank you, Your Honor.

7    **BY MR. ATTANASIO:**

8    **Q.**   Do you remember the question?

9    **A.**   No.

10   **Q.**   What about Target?  Did you determine whether Target

11   interacts with Google?

12   **A.**   Target may interact with Google, but I have my own

13   agreement with Google.  I told Google that they would not be

14   able to collect my data when they put me in control; and if

15   Target wants to send something back to Google, my own agreement

16   with Google says that they should not be collecting that.

17   **Q.**   Sir, not my question.

18       My question is:  Did you determine, when you reviewed the

19   terms of service and the privacy policy for Target, whether

20   Target interacts with Google in any way?

21   **A.**   I don't recall that exactly.

22   **Q.**   You have played fantasy football for several years; is

23   that correct?

24   **A.**   Yes, I have.

25   **Q.**   Let's just make sure we're all on the same page.  I'll do

1    my best, because I don't.

2         But fantasy football involves having a team that you own.

3    You can draft players from different teams around the NFL to

4    create your own team.  There's a point-scoring system based on

5    the players you have on your team, and you compete with other

6    team owners who do the same thing, usually a group of friends.

7    Is that fair?

8    **A.**    Yeah, that sounds right.

9    **Q.**    Often there's a cash prize at the end.  Everybody

10   contributes money, and there can be a cash prize at the end

11   that can be real money; true?

12   **A.**    There can be, yes.

13   **Q.**    How long have you played fantasy football?

14   **A.**    I'd say, I guess, about ten -- ten-ish years.

15   **Q.**    Okay.  The sports network ESPN has an app for fantasy

16   football; yes?

17   **A.**    They do, yes.

18   **Q.**    It's on this screen here under "ESPN Fantasy."  Do you see

19   that?

20   **A.**    Yes.

21   **Q.**    Did you check the terms of service and privacy policy for

22   the ESPN Fantasy app?

23   **A.**    Yes, I do, and I remember bringing up to my league mates

24   about switching after I found out that ESPN Fantasy had Google

25   SDKs.

**PROCEEDINGS**

1    And, you know, it's difficult -- it's a huge ask to ask

2  people to not use all of their apps on their phone and

3  basically not use their phones unless -- there shouldn't be

4  tracking on it.  And unfortunately, I was overruled in my

5  fantasy league and we continue using that app.

6  **Q.**  Do you use it today?

7  **A.**  I believe there will be a league with that app, yes.

8  **Q.**  Well, the league starts in two weeks.

9  **A.**  Yes.

10 **Q.**  You've already done your draft.  I know you've probably

11 done your draft by now.

12 **A.**  I have not, no.

13 **Q.**  Okay.

14 **A.**  It's coming up.

15 **Q.**  But the point is, your league with you and your friends,

16 you're going to continue to use the app that we have

17 highlighted here, ESPN Fantasy; yes?

18 **A.**  Yes.  It's difficult to be able to go somewhere else.  If

19 we switch to another app, how do we know if the other app has a

20 Google SDK as well?  We can't look that up anywhere.

21 **Q.**  Sir --

22 **A.**  We don't know where -- if the other apps have SDKs.

23 **Q.**  Sir, you are aware there are countless websites competing

24 every day for fantasy participants, for gambling participants

25 around the NFL.  They're everywhere.  They are literally

1    everywhere, competing with each other, offering to port over

2    your data from one fantasy app to another fantasy app.  You

3    know that, don't you?

4    **A.**    There's also 12 other people in the league that need to be

5    willing to change.  It's not just up to me.  And like I said,

6    let's say we do switch apps.  Let's say we go to another

7    fantasy app in this example.  How do we know the other fantasy

8    app doesn't have a Google SDK as well?  It's everything.  It's

9    everywhere.  What do you want us to do?  Not use our phones?

10   **Q.**    I don't see Bleacher Report on this list.  That's a

11   sports-related site, isn't it?

12   **A.**    Bleacher Report is a sports-related site.  They don't

13   offer fantasy football.

14   **Q.**    Hmm.  That's a sport-related app that you have; correct?

15   **A.**    I do.

16   **Q.**    That advertises alternatives to ESPN Fantasy; correct?

17   **A.**    I -- I imagine -- I don't know their advertisers, but they

18   do not have a fantasy option of their own.

19   **Q.**    All right.  Well, we're talking about -- let's be clear.

20   We're talking about fantasy football here.  That's what we're

21   talking about; right?

22   **A.**    Sure.

23   **Q.**    You used the ESPN Fantasy app before you saw the movie;

24   correct?

25   **A.**    Yes, I'd say so.

**PROCEEDINGS**

1    **Q.**   Before you turned sWAA and WAA off; correct?

2    **A.**   Yes.

3    **Q.**   Before you joined this lawsuit; correct?

4    **A.**   Correct.

5    **Q.**   And you used ESPN Fantasy app after you saw the movie,

6    after you turned off WAA and sWAA, and after you joined this

7    case and you use it to this day; correct?

8    **A.**   That's correct.  And it is my responsibility to this

9    class, as previously mentioned, to continue those behaviors,

10   to -- so we can figure out what Google is collecting, where

11   that information is being stored, and so we can get Google to

12   delete that information.  There are reasons for me continuing

13   to use that.  If I stop using these apps, you're going to say

14   that I'm no longer in harm.

15           **MR. ATTANASIO:**  Your Honor, objection.

16   Non-responsive.  Move to strike everything after "That's

17   correct."

18           **THE COURT:**  Overruled.

19   **BY MR. ATTANASIO:**

20   **Q.**   Mr. Santiago, after you joined the case in November 2020,

21   you also continued to use the app that was then called Twitter;

22   correct?

23   **A.**   I'd say on and off.

24   **Q.**   You continued to use it on and off; is that fair?

25   **A.**   Yes.

PROCEEDINGS

1   **Q.**   After you turned off WAA and sWAA; true?

2   **A.**   Yes, I continued to use it.  And, again, I needed to

3   continue to use it so that we could figure these things out.

4   If I would have stopped using it, our expert does not find out

5   where this information is going and what information is being

6   collected.

7           **THE COURT:**  Just answer his questions.  Okay?

8           **THE WITNESS:**  Yes, sir.

9           **THE COURT:**  Don't elaborate.  Your counsel can get up

10  and ask you to elaborate, if they so choose, but stick to the

11  question.

12          **THE WITNESS:**  Understood.

13          **THE COURT:**  Go ahead.  Next question.

14          **MR. ATTANASIO:**  Thank you.

15  BY MR. ATTANASIO:

16  **Q.**   You continued to interact with X, which used to be

17  Twitter, today; correct?

18  **A.**   Like I said, on and off, yes.

19  **Q.**   You use an app called MapMyRide, M-a-p-M-y-R-i-d-e;

20  correct?

21  **A.**   Yes, for keeping track of bike rides.

22  **Q.**   It's an app that tracks your bike rides, tracks your

23  exercise activity; yes?

24  **A.**   Yes, within that app.

25  **Q.**   It's a third-party app that has Google Analytics; correct?

 1  **A.**    Yes.  It's on this list.

 2  **Q.**    You used it before you joined the lawsuit; correct?

 3  **A.**    Yes.

 4  **Q.**    Despite your anxiety about Google's alleged invasion of

 5  privacy, you continue to use it; correct?

 6  **A.**    Again, I'm not sure what you're asking us to do here.  If

 7  we switch to another app, they could also have Google Analytics

 8  on it.  You're asking us to not use any apps and essentially

 9  not use any phones.  That's a very big ask in this modern world

10  where we rely on technology to get by in our daily lives.

11  You're not just asking me that.  You're asking 100 million

12  people.

13          **THE COURT:**  Again, again, let -- you will -- your

14  counsel will get up --

15          **THE WITNESS:**  Okay.

16          **THE COURT:**  -- and ask you to explain further if they

17  think that's appropriate, but don't launch into an answer

18  beyond the question.  Just answer the question.

19          **THE WITNESS:**  Understood, Your Honor.  Thank you.

20  **BY MR. ATTANASIO:**

21  **Q.**    The question was simply:  After you joined the lawsuit,

22  and despite your anxiety about Google's alleged invasion of

23  privacy, you continued to use this tracker for your bike rides;

24  correct?

25  **A.**    Yes, information that should have stayed in the app.

**PROCEEDINGS**

1    **Q.**   Last one here.

2          You use the Target app?

3    **A.**   Yes.

4    **Q.**   For shopping?

5    **A.**   That's correct.

6    **Q.**   You continued to use the Target app after you joined the

7    lawsuit and despite your anxiety about Google's alleged

8    invasion of privacy; correct?

9    **A.**   Yes, I continue to shop at Target.

10   **Q.**   Using the app that you know links up to its partner,

11   Google; correct?

12   **A.**   We now know that, yes.

13          **MR. ATTANASIO:**  We can take that down, Brooklyn.

14          **THE COURT:**  Actually, as that's being taken down, it

15   occurs to me I should have mentioned to you, members of the

16   jury, you keep hearing us, from time to time, talk about

17   demonstratives, and this last item was a demonstrative.

18          What that is, is it's something that the counsel are using

19   to help develop the testimony and explain to you, but it is not

20   independent evidence.  So that's a good example.  That's a

21   document that will not be evidence in this case, but it is

22   being shown to you to help and assist in the testimony.

23          So when you hear "demonstrative," don't think that is a

24   piece of evidence in the case.  It's just there to assist in

25   explaining what the testimony is all about.

PROCEEDINGS

1    Go ahead --

2         **MR. ATTANASIO:**  Thank you, Your Honor.

3         **THE COURT:**  -- Mr. Attanasio.

4    BY MR. ATTANASIO:

5    **Q.**  Mr. Santiago, you've told us about these strong feelings

6    you have about privacy.  In fact, you recall that you believed

7    there were times when you appeared stressed out at work and

8    your co-workers commented on your apparent stress; is that --

9    is that fair?

10   **A.**  I have been stressed out at work, yes.

11   **Q.**  But you never told any of your co-workers about these

12   violations of your privacy by Google or warned them, did you?

13   **A.**  After this lawsuit was filed and some of these documents

14   were, you know, publicly filed, I've shared with friends and

15   co-workers to be careful about, you know, their WAA data and

16   that it's still being collected.

17   **Q.**  Well, as of March 2022, when you were deposed, do you

18   recall that you testified you had not told your co-workers

19   about Google invading your privacy; correct?

20   **A.**  At that time, I have not -- I had not, no.

21   **Q.**  Well, we established that the movie was in September 2020.

22   Your deposition was in March 2022.  So despite your strong

23   feelings, you didn't warn, up to March 2022, any of your

24   co-workers or friends about what Google was supposedly doing;

25   correct?

PROCEEDINGS

1  **A.**    Well, yes, I had conversations with people about privacy

2  in general; but as far as WAA specifically, we were in the

3  middle of this lawsuit.  So I discuss -- I had conversations

4  and warnings about being careful with privacy in general.

5  **Q.**    But not Google; correct?

6  **A.**    Like I said, it was an ongoing investigation and lawsuit.

7  **Q.**    Well, the lawsuit was publicly filed in this very court at

8  that time; correct?

9  **A.**    2022, you mean?

10  **Q.**    Yes, sir.

11  **A.**    Yes.

12  **Q.**    The lawsuit had your name in it.  It had where you live in

13  Florida, your city; correct?

14  **A.**    Yes.

15  **Q.**    And the lawsuit even had a page, much like what we just

16  looked at, that listed all of your apps, didn't it?

17  **A.**    Yeah.  Yes.

18  **Q.**    So all of that was out there in the public.  Despite the

19  privacy concerns, all your apps, your name, your city, were all

20  in the lawsuit in this case; correct?

21  **A.**    Yes.

22  **Q.**    But you didn't tell any of your friends or co-workers, at

23  least up to March 2022, about Google's alleged invasion of

24  privacy; correct?

25  **A.**    At that point, no.  And, you know, like I said, I'm a

1  regular guy.  I'm not a lawyer.  I wanted to be careful about

2  discussing privileged information or anything of the sort.

3  **Q.**  Let's talk about these exhibits you were shown about some

4  of Google's policies.

5     The first one was Exhibit 117.  Do you have it up there?

6  **A.**  No, I do not.

7  **Q.**  It should be in your binder.

8  **A.**  I have 116.

9  **Q.**  All right.  Maybe 117 was added by your lawyers later.

10    No, this is still the first binder that they gave us --

11  that the plaintiffs gave us.  That's okay.

12    I always keep a spare copy, Mr. Santiago.

13        **MR. ATTANASIO:**  May I approach, Your Honor?

14        **THE COURT:**  Yes, you may.

15        **THE WITNESS:**  Thank you.

16  **BY MR. ATTANASIO:**

17  **Q.**  It will also be on the screen.  This is already admitted.

18        **THE COURTROOM DEPUTY:**  117?

19        **MR. ATTANASIO:**  117.

20        **MR. LEE:**  I believe 116 was admitted.

21        **THE COURTROOM DEPUTY:**  116 was.

22        **MR. ATTANASIO:**  All right.  Thank you.  Thank you.

23  Then the binder will be fine.

24        **THE COURTROOM DEPUTY:**  Putting up 116.

25        **THE WITNESS:**  Did you want that back?

PROCEEDINGS

1    BY MR. ATTANASIO:

2    Q.    No.  You can keep it.

3         And this is what you discussed, Exhibit 116, earlier in

4    your examination; is that correct?

5    A.    Yes.

6    Q.    And I want to walk through some of the parts you didn't

7    cover because you went right sort of down to the bottom part of

8    the page.

9         If we look at the top part of the page that starts this

10   off, sort of the title of it, it says, "See and control your

11   Web & App Activity."  Do you see that?

12   A.    Yes, I do.

13   Q.    And the first sentence says [as read]:

14             "If Web & App Activity is turned on, your

15        searches and activity from other Google services are

16        saved in your Google Account."

17        Underlined "Google Account," please, Brooklyn.

18        And then it goes on from there about the personalized

19   experiences; correct?  Yes?

20   A.    Yes, I see that.

21   Q.    All right.

22   A.    "Google Account" is a bit deceptive, I think.

23   Q.    Pardon me?

24   A.    The terminology of "Google Account" is quite deceptive.

25   Q.    Okay.  You have talked to me about your Google Account.

**PROCEEDINGS**

1    You got your Google Account in 2016; correct?

2    **A.**   No.  We talked about my Gmail.

3    **Q.**   Okay.  You have a Google Account; correct?

4    **A.**   I have a Gmail account.

5    **Q.**   Let's go back to Exhibit 116.

6         It goes on in the third paragraph, it says [as read]:

7              "If you got your Google Account through work or

8         school, you might need to contact your administrator,

9         et cetera."

10        Right?

11   **A.**   That's what it says there, yes; but, again,

12   "Google Account" a bit deceptive.

13   **Q.**   You feel it's deceptive; yes?

14   **A.**   I wouldn't say it's just me.

15   **Q.**   I'm asking you about what this says, sir.  If you could

16   just focus on my question, we'll be done before the end of the

17   day, I promise.  You with me?

18   **A.**   I'm with you, yeah.

19   **Q.**   All right.  I'm not asking you about whether it's, in your

20   judgment, in your opinion, deceptive or not.  I'm asking you if

21   that's what it says.  Do you see that?

22   **A.**   That's what it says there, and I have to say it comes

23   off -- it's deceptive, and it's not just me that thinks that.

24        **THE COURT:**  Mr. Santiago, just answer the question.

25   I've told you this many times now.

1          **THE WITNESS:**  Yes, Your Honor.

2          **THE COURT:**  Your counsel can get up and ask you to

3    elaborate afterwards, but don't editorialize beyond the

4    question.  Okay?

5          **THE WITNESS:**  Understood.

6          **THE COURT:**  Very good.

7       Go ahead, Mr. Attanasio.

8          **MR. ATTANASIO:**  Thank you.

9    **BY MR. ATTANASIO:**

10   **Q.**   If we go down to the next segment of this disclosure and

11   see more of the sort of title summary of it, do you see it

12   says, "Turn Web and app activity on or off"?  Do you see that,

13   Mr. Santiago?

14   **A.**   I see that.

15   **Q.**   Number one [as read]:

16         "On your Android phone or tablet, open your

17         device's settings app, go to Google, go to manage

18         your Google Account."

19       Would you underline, please, "your Google Account,"

20   Brooklyn?

21       So looking at the words on this page, sir, you understand

22   this is talking about the user's Google Account; correct?

23   **A.**   I don't have an Android phone.  I have an Apple iPhone.

24   **Q.**   Is that a "yes," this is talking -- I didn't ask you what

25   kind of phone you have.  Is this talking about a user's

1   Google Account?

2   **A.**    It's talking about a user's Google Account on their

3   Android phone or tablet.

4   **Q.**    Let's talk about the privacy policy then, Mr. Santiago.

5         You read Google's privacy policy even before you joined

6   this lawsuit; is that true?

7   **A.**    Yes, I did.

8   **Q.**    You've actually reviewed Google's privacy policy on

9   multiple occasions, going back to when you had a Gmail account;

10  correct?

11  **A.**    Back to when I first opened it, yes.

12  **Q.**    That's back to 2016; yes?

13  **A.**    Yes.

14  **Q.**    You even read the updates; is that correct?

15  **A.**    I try to review them if I have a moment, when it comes

16  across, if I'm notified of it.

17  **Q.**    You read them; correct?

18  **A.**    I try to review them, yes.

19  **Q.**    So in the world we live in where many people might scroll

20  through quickly and then hit "I agree," you're not one of

21  those?  You read the policy, at least for Google; correct?

22  **A.**    I try to be more thorough, yes, especially for a big

23  company like Google.

24  **Q.**    You even have gone out -- other than getting an update

25  from Google, you've taken your own time to go out and search

**PROCEEDINGS**

1   and look for the Google privacy policy so you could read it

2   again; correct?

3   **A.**   Yes, after seeing the documentary, I did.

4   **Q.**   And for Google, at least, you don't just skim the policy.

5   You review it, I think these were your words, in depth; is that

6   correct?

7   **A.**   Yes, I read it.

8   **Q.**   So you looked at the July 2020 policy with counsel today,

9   which is Exhibit 67, already in evidence.

10          If we could look at that again, please.

11          Do you have it?

12  **A.**   Yes, I do.   Thanks.

13  **Q.**   At the top left, you see it says "Google Privacy Policy"?

14  **A.**   Yes.

15  **Q.**   A third of the way down, it's the effective date, which

16  you mentioned, July 1st, 2020; is that right?

17  **A.**   Yes.

18  **Q.**   And if we go to the bottom of page 2, do you see it says

19  at the bottom in big letters [as read]:

20              "Information we collect as you use our

21       services."

22          Do you see that, sir?

23  **A.**   Yes, I see it says that.

24  **Q.**   And that's -- you understood what that meant; right?   It

25  meant information that Google collects when a user engages with

**PROCEEDINGS**

1    Google; correct?

2    **A.**    Sure.  If WAA was turned on, it would -- that's the

3    information it would collect.

4    **Q.**    Okay.  Let's look at page 3.  And do you see in the middle

5    of the page -- and Mr. Monsees covered this -- but you see it

6    says, "Your activity"?

7    **A.**    Yes.

8    **Q.**    You would understand the "your" in that sentence to be the

9    user; correct?

10   **A.**    Yes.

11   **Q.**    Including you; yes?

12   **A.**    Including me, yes.

13   **Q.**    If we go to the second-to-the-last bullet point, you see

14   that one of the things -- actually, let's go back up to the

15   last sentence of the first paragraph.  Thank you.

16       It starts with "The activity information we collect may

17   include," then it goes from there; correct?

18   **A.**    Yes.

19   **Q.**    And the second-to-the-last bullet point, Google states

20   that it may collect information about the user from activity on

21   third-party sites and apps that use our services.  Is that what

22   it says?

23   **A.**    Yes, that's what it says.  And, again, I would understand

24   that to mean that if WAA was on, that would be the case.

25   **Q.**    I'm only asking you if that's what it says.  Is that what

**PROCEEDINGS**

1    it says?

2    **A.**    Yes.

3    **Q.**    Would you have reviewed that at the time you were doing

4    these in-depth reviews of Google's privacy policies?

5    **A.**    I read that, yes.

6    **Q.**    Down below that, at the bottom of the page, let's see what

7    it references here.  Well, it says at the very bottom

8    [as read]:

9              "You can visit your Google Account to find and

10        manage activity information that's saved in your

11        account."

12        Is that what the privacy policy that you reviewed states,

13    sir?

14    **A.**    Yes.  Google's allowing us to be in control of managing

15    our activity and what is saved.

16    **Q.**    You read that at the time?

17    **A.**    Yes.

18    **Q.**    You knew that at the time, the "time" meaning before you

19    joined this lawsuit, and after you joined this lawsuit;

20    correct?

21    **A.**    That's correct.

22    **Q.**    All right.  Let's go to page 12, if we could.

23        Yes, thank you.

24        At the bottom of the page, last paragraph, now, let's look

25    here, Mr. Santiago.  This says very directly [as read]:

**PROCEEDINGS**

 1              "We" -- meaning Google -- "may share

 2       non-personally identifiable information publicly and

 3       with our partners, like publishers, advertisers,

 4       developers, or rights holders."

 5       Have I read that correctly?

 6   **A.**    That's what it says, yes.

 7   **Q.**    And from this case, even from opening statement, from

 8   Mr. Monsees, you know what "non-personally identifiable

 9   information" means; correct?

10   **A.**    That's still my information.

11   **Q.**    That's not my question.

12       You understand that "non-personally identifiable

13   information" means exactly what it says, information that

14   cannot be used to identify a single person; correct?

15   **A.**    I understand it's still my gender, my app activity, my

16   IP address, my unique device identifiers.  It's still my

17   information.

18   **Q.**    Are you done with your answer?

19   **A.**    Yes.

20   **Q.**    Please just focus on my question.  I will ask it again.

21       You understood, at the time you reviewed this policy in

22   depth, that "non-personally identifiable information" means

23   information that cannot be used to identify a particular

24   person; correct?

25   **A.**    I think that's still my information.

**PROCEEDINGS**

1  **Q.**  That's not my question of whether it's your information or

2  not.

3       It is non-personally identifiable information, meaning it

4  cannot be used to identify an individual person; correct?

5  **A.**  I think it still can be.  It's everything about me besides

6  my name.

7  **Q.**  Everything -- okay.  Let's make sure we have this under

8  oath.

9       Your position is that non-personally identifiable

10  information is everything about you except your name, Julian

11  Santiago; correct?

12  **A.**  It's my unique device identifiers.  It's my IP address.

13  It's my location.  It's all of my apps, what I've downloaded,

14  what I've looked at, what I've bought, what I've clicked on,

15  what I've looked at.  The list goes on.

16  **Q.**  Sir, is it your testimony that non-personally identifiable

17  information, as you just said a minute ago, is everything about

18  you except your name, Julian Santiago?  That's just what you

19  told the jury.  Is that true?

20  **A.**  From what I understand, it's everything besides my name

21  and my email address.  It's pretty much everything else on my

22  phone.

23  **Q.**  I'm glad we -- I'm glad we established that.  I believe

24  we'll leave your testimony right there.

25       It then goes on.  It states [as read]:

**PROCEEDINGS**

```
 1              "For example, we share information publicly to

 2         show trends about the general use of our services.

 3         We also allow specific partners to collect

 4         information from your browser or device for

 5         advertising and measurement purposes using their own

 6         cookies or similar technologies."

 7         Now, Mr. Santiago, maybe you disagree -- if you do, just

 8    say so -- but that sounds an awfully -- awful lot like what

 9    Mr. Monsees described Google does with de-identified

10    non-personal information.  Do you agree?

11    A.   I'm not a software engineer.  It's a lot of different

12    terminology and things that I don't fully understand.  I can't

13    answer that for sure.  I'm not certain.

14    Q.   Well, you said you read these in depth.  You were really

15    into them.  You'd go look for them.  You'd read the updates.

16    You'd read it several times.  Correct?

17    A.   What was your question originally?

18    Q.   Do you agree that what is being described in the last

19    sentence of this disclosure is exactly what Mr. Monsees

20    describes Google does with non-personally identifiable

21    information?

22    A.   I recall Mr. Monsees mentioning that some of our

23    information goes towards ads but that he doesn't know where all

24    of it goes --

25    Q.   Do you recall --
```

**PROCEEDINGS**

1  **A.**    -- what other places it goes.

2  **Q.**  Do you recall him testifying that the apps use it for

3  measurement purposes to track performance?  Do you recall that?

4      **MR. LEE:**  Objection.  He's just parroting from a

5  different witness that we already heard today, commenting on

6  somebody else's testimony and asking the witness to comment on

7  it.

8      **MR. ATTANASIO:**  I'm asking if the witness agrees just

9  to cut to the bottom line.  I can rephrase if Your Honor would

10 like.

11     **THE COURT:**  If you have a proposition you want to know

12 if the witness agrees to our not, you don't have to say as some

13 other witness said.  You can just ask about the proposition.

14 So why don't you do that.

15     **MR. ATTANASIO:**  Understood.  Thank you, Your Honor.

16 **BY MR. ATTANASIO:**

17 **Q.**  Mr. Santiago, do you understand that Google Analytics uses

18 non-personally identifiable information and shares it with its

19 partners for advertising and measurement purposes using those

20 partners' or apps' cookies or similar technologies?  Do you

21 understand that?

22 **A.**  I don't understand how it works, but that still sounds

23 like my information is being used and -- for certain things

24 that we don't know where it's going.

25 **Q.**  Well, last question about this paragraph.

1       Did you understand or did you not, from your in-depth

2 review of this policy, that Google told you it could share your

3 de-identified information with app developers?

4 **A.**   Again, it's still my information. I would -- I would

5 think that if Google tells me that I'm in control and that they

6 won't collect my information, that that would include all of my

7 information. It should be everything.

8 **Q.**   Sir, my question was different.

9       My question is simply: Do you agree, from your in-depth

10 review of this disclosure, that Google told you it could share

11 non-personally identifiable information with third-party apps?

12 Yes or no, please.

13 **A.**   From my understanding, if WAA is turned off, that

14 shouldn't be the case.

15 **Q.**   Sir -- we can take that down, Brooklyn.

16       Your complaint in this case, just generally speaking, is

17 that you feel Google has invaded your privacy; is that correct?

18 **A.**   Google told us we had the option and put us in control and

19 gained our trust, and I -- we asked Google to not collect our

20 data and they did.

21 **Q.**   So the answer to my question is "yes"?

22 **A.**   Yes.

23 **Q.**   That conduct that you complain of is Google getting

24 depersonalized interaction data from other apps through

25 Firebase; correct? That's what we're here for.

1    **A.**    Yes.

2    **Q.**    You aren't saying that those apps provided your emails to

3    Google, are you?

4    **A.**    No.  I'm saying --

5    **Q.**    You're not saying -- "no" is fine.

6          You are not saying that those third-party apps gave Google

7    recordings of your phone calls, are you?

8    **A.**    No.

9    **Q.**    You're not saying that those third-party apps told Google

10   who your contacts are; correct?  Correct?

11   **A.**    I don't believe so, no.

12   **Q.**    You're not saying that those third-party apps told Google

13   your home address; correct?

14   **A.**    No.

15   **Q.**    You're not saying those third-party apps told Google your

16   email address; true?

17   **A.**    Like I mentioned, it's a bunch of other information.

18   **Q.**    So the answer is, yes, that's true?

19   **A.**    I'm not saying they had my email, no.

20   **Q.**    These apps aren't giving Google any photographs or videos

21   that you have; correct?

22   **A.**    It's hard to know for sure.

23   **Q.**    Do you believe -- as you sit here today, do you believe in

24   some idea that Google is giving -- excuse me -- that

25   third-party apps are giving Google videos and pictures of you?

**PROCEEDINGS**

1    **A.**    No.    The other information that we had previously

2    mentioned.

3    **Q.**    You know that doesn't happen; right?    Google is not giving

4    any personal information -- strike that.

5         You know that these third-party apps are not giving Google

6    any personally sensitive information about you; correct?

7    **A.**    I believe that some of this information that Google calls

8    non-personal is still my information.    It's still information

9    about me.

10   **Q.**    You understand that the apps did not give Google the

11   names, for instance, of the websites you visit; true?

12   **A.**    Okay.

13   **Q.**    Yes?

14   **A.**    The websites?

15   **Q.**    Yes.

16   **A.**    Okay.

17   **Q.**    You agree the apps did not give Google your web browsing

18   activity; true?

19   **A.**    Again, I'm not a software engineer.    This is hard for a

20   normal person to answer.

21   **Q.**    Well, you looked over here and you looked at this table

22   and you said Google's doing the wrong thing and Google should

23   stop.    You made quite a -- quite a statement there.    So I would

24   think you would know.

25        Do the apps that partner with Google give Google your

1  browsing history?  Yes or no.

2  **A.**    No.

3  **Q.**    Those apps don't give Google access to your text messages,

4  do they?

5  **A.**    No, but there's other information.

6  **Q.**    We're not here in this case about a data leak or a data

7  breach; correct?  You understand this case has nothing to do

8  with that; yes?

9  **A.**    Google's had data leaks.

10  **Q.**    But that's not what this case is about?

11  **A.**    Correct.

12  **Q.**    Mr. Santiago, that's all I have.  Thank you.

13  **A.**    Thank you.

14          **THE COURT:**  Mr. Lee.

15          **MR. LEE:**  Yes, Your Honor.

16              <u>**REDIRECT EXAMINATION**</u>

17  **BY MR. LEE:**

18  **Q.**    How you doing, Mr. Santiago?  Are you holding up?

19  **A.**    Well, I'm not used to being in a place like this, and it's

20  quite nerve-racking.

21  **Q.**    Well, I can tell you, you hurt my feelings, because you

22  said that I misrepresented something that Mr. Hur said in

23  opening.

24  **A.**    So sorry.

25  **Q.**    Let's just clear that up.  Okay?

SANTACRUZ - REDIRECT / LEE

1    **A.**    Yes.

2    **Q.**    You -- counsel for Google read to you what was said in

3    opening; right?

4    **A.**    Yes.  I have it here.

5    **Q.**    And I think you pointed out -- or did you point out that

6    Mr. Hur said really both things?  He said there are class

7    representatives that turned it off before or after joining the

8    lawsuit; right?

9    **A.**    Yes.

10   **Q.**    So if Mr. Hur was saying that you turned it off before

11   joining the lawsuit, that would be true; fair?

12   **A.**    That would be included, yes.

13   **Q.**    Right.  But if he was saying that you turned it off after,

14   would that be true or untrue?

15   **A.**    That would be untrue.

16   **Q.**    All right.  You were asked about apps that you continued

17   to use after joining the lawsuit.  Do you remember?

18   **A.**    Yes.

19   **Q.**    There was ESPN Fantasy, there was Twitter --

20   **A.**    Yes.

21   **Q.**    -- Target?

22       Were there any others?  I don't remember.

23   **A.**    There was a few.  MapMyRide.

24   **Q.**    A few more.

25       Can you --

1  **A.**    Duolingo.

2  **Q.**    Just to reorient us all, can you explain to the jury why

3  you had to continue to use those apps after you joined the

4  lawsuit as a class representative in this case?

5  **A.**    Sure.  Well, a few reasons, the first one being that

6  Google should have to honor its promises to its users and make

7  a privacy button that actually works.  It shouldn't be on us to

8  just stop using apps and stop using our smartphones in this

9  digital world that we rely on it to get by every day.  It's a

10  vital part of our modern society.

11        And, secondly, as I mentioned, as a class representative,

12  it was my responsibility to a hundred million people to

13  continue to use my apps so that our experts can figure out what

14  Google was collecting, where it was going, what they're doing

15  with that.

16        And, finally, for legal reasons, to try to get Google to

17  change its practices.

18  **Q.**    All right.  You mentioned, at the end of the

19  cross-examination, that you said apps don't give browsing

20  history to Google.  Do you remember that?

21  **A.**    Yes.

22  **Q.**    I just want to know if you remember that.

23  **A.**    I remember his question, yes.

24  **Q.**    Right.  And I just want to be very, very clear because he

25  asked it one way and then he asked it a different way.

1      Was he talking about web browsing or app browsing?

2   **A.**   I was confused by it myself, so I wasn't sure.

3   **Q.**   Okay.  So let me just ask you straight up.

4      Do apps -- does Google collect app browsing data from apps

5   even when WAA is off?

6   **A.**   Yes.  That's why we're here; right?

7   **Q.**   That's what the case is about; right?

8   **A.**   Yes.

9   **Q.**   It's not about web browsing, is it?

10  **A.**   No.  It's about the apps.

11  **Q.**   All right.  There was some discussion about the term

12  "Google Account."  Do you remember that?

13  **A.**   I do.

14  **Q.**   And you noted that that term sounded, I think you said,

15  quite deceptive?

16  **A.**   Yes.

17  **Q.**   Can you explain to the jury why that is?

18  **A.**   Well, if Google is taking our data and putting it

19  somewhere else that's not our Google Account, they need to tell

20  us that.  They need to be clear about that.

21     Our Google Account should be everything about us, not some

22  stuff that Google is putting somewhere else.  Where is that

23  going?  We don't know.

24     And when Google tells us that they're putting us in

25  control but then putting our information somewhere else where

**SANTACRUZ - REDIRECT / LEE**

1    we can't even see it, it doesn't sound like we're in control of

2    whether our data is being collected or what it's being used

3    for.  It's an illusion of us -- of us being in control.

4    It's -- you're giving the user a false sense of security.

5    **Q.**   Why don't we take a look at the privacy policy again.

6    It's PX67.

7    **A.**   Okay.

8    **Q.**   And I promise you we're not going to redo everything.   I

9    just want to check something.   Okay?

10   **A.**   Okay.

11   **Q.**   All right.  Let's look at the big bold letters again.

12   **A.**   Okay.

13   **Q.**   You remember reading that to the jury; right?

14   **A.**   Yes.

15   **Q.**   Where does it say there that you're only in control of

16   what goes into your Google Account?

17   **A.**   It doesn't.  It says that Google's putting you in control

18   of all of your information.

19   **Q.**   All right.  Let's go down two paragraphs.

20       And do you remember you read to the jury this other

21   promise from Google?

22       [As read]:

23           "And across our services, you can adjust your

24       privacy settings to control what we collect and how

25       your information is used."

1      Do you see that?

2  **A.**   Yes.

3  **Q.**   Okay.  Where does it say that you're only in control of

4  what Google can collect and use in your Google Account?

5  **A.**   It doesn't.  It seems like it's all of our information,

6  everything.

7  **Q.**   All right.  Let's go to the next page.

8      We read that last sentence [as read]:

9          "The information Google collects and how that

10         information is used depends on how you use our

11         services and how you manage our privacy controls."

12     Do you see that?

13 **A.**   Yes, I do.

14 **Q.**   Where in that sentence does it say managing your privacy

15 controls only controls what's collected in your Google Account

16 but Google can save it somewhere else?

17 **A.**   It doesn't say that.

18 **Q.**   All right.  Let's look at PX116.

19     Let's blow up the part that says "To let Google save."

20 I think that's on the next page.  There we go.

21     Do you remember this?

22 **A.**   Yes.

23 **Q.**   Where here does it say that to let Google save, it must

24 be -- it's talking about your Google Account?  Does it say that

25 anywhere there?

SANTACRUZ - REDIRECT / LEE

1   **A.**   It does not say that.

2   **Q.**   Okay.  Was there anything -- you can put that down -- that

3   counsel for Google showed you that indicated that Google would

4   take, copy, or use any data from the use of third-party apps if

5   WAA or sWAA was off?  Did he show you anything like that?

6   **A.**   No.

7   **Q.**   Was there anything that counsel for Google showed you

8   about Google accounts and what was or was not saved in those

9   accounts that indicated that data was saved someplace other

10  than this so-called Google Account?

11  **A.**   No.

12  **Q.**   He didn't show you any of that?

13  **A.**   No.

14  **Q.**   All right.

15          **MR. LEE:**  Let's get 67 back up, and let's go to

16  page 16, Mr. Boles.  And I'd like to blow up just the bottom

17  half, starting with the categories.

18       Yes.  Thank you.

19  **BY MR. LEE:**

20  **Q.**   It might be easier to see it on the screen.  I don't know

21  if your screen's working.

22  **A.**   Yes.

23  **Q.**   Okay.  Let's try to do this together.

24  **A.**   Okay.

25  **Q.**   So at the top, do you see where it says it's titled

1  "Categories of personal information we collect"?

2  **A.**   Yes.

3  **Q.**   The reason I want to focus on this is because counsel for

4  Google talked a little -- a lot about personal information and

5  non-personal information.  Do you remember that?

6  **A.**   I do.

7  **Q.**   Okay.  So let's look at the part of the privacy policy

8  that talks about what Google considers personal information.

9  Okay?

10  **A.**   Okay.

11  **Q.**   Let's start at the top.  Do you see where it says

12  "Identifiers"?

13  **A.**   Yes.

14  **Q.**   Okay.  So they include some things that they consider

15  identifiers that are personal information.  Do you see that?

16  **A.**   Yes.

17  **Q.**   One of those things that they consider personal is -- do

18  you see where it says "unique identifiers"?

19  **A.**   Yes.

20  **Q.**   Does Google consider that, according to this page,

21  personal information?

22  **A.**   According to this page, yes.

23  **Q.**   And do you see just below, in the same section, they also

24  refer to "application or device you're using"?

25  **A.**   Yes, I see that.

1  **Q.**   So the app and device you're using -- apps and device

2  you're using, does Google consider that personal information?

3  **A.**   Yes.

4  **Q.**   All right.  Let's go a little further down, where it says

5  "Internet, network, and other activity information."

6     Do you see in the second sentence it refers to information

7  about the interaction of your apps, browsers, and devices with

8  our services?

9  **A.**   Yes, I see that.

10  **Q.**   That's what this case is about; right?

11  **A.**   It is.

12  **Q.**   Does Google consider that your personal information?

13  **A.**   According to this, yes.

14  **Q.**   The next sentence, beginning with "and activity on

15  third-party sites and apps that use our services."  Do you see

16  that?

17  **A.**   Yes.

18  **Q.**   And does Google also consider that your personal

19  information?

20  **A.**   Yes.

21  **Q.**   Based on your involvement in this case and the work you've

22  done on this case, does your sWAA-off data include identifiers,

23  your apps, your device, and your app activity on third-party

24  sites that use Google services?

25  **A.**   Yes, it does.

1  **Q.**   By the way, let's just be clear.  Do you agree or disagree

2  that your sWAA-off data is not personal to you?

3  **A.**   It is personal to me.  It's my information still.

4  **Q.**   Based on your involvement in this case, can you explain to

5  the jury what you know is included in the sWAA-off data, or

6  I guess what Google's counsel called de-identified data?

7       But let's just stick with sWAA off for purposes of my

8  question.  I don't want to get confused.

9       Based on your involvement in this case, explain to the

10  jury what is included in the sWAA-off data that Google collects

11  without permission.

12  **A.**   Well, they're collecting information about my gender, my

13  location, my apps that I've downloaded, everything I've done on

14  those apps, what I've bought, what I've looked at, things I've

15  clicked, time spent on them, unique ID identifiers -- or I'm

16  sorry -- unique device identifiers, IP address, which is my

17  device.  It's -- I would rather give someone my name and my

18  email and my phone number than give them my phone with no

19  passcode because that's everything else.  That's all of it.

20  **Q.**   And do you consider that private to you?

21  **A.**   Yes, to all of us.

22  **Q.**   Is it personal to you and the class?

23  **A.**   Yes.

24       **THE COURT:**  We're now at the witching hour.

25       **MR. LEE:**  I have the last question, Judge.

1          **THE COURT:**  The last question, okay.

2          **MR. LEE:**  Famous last words.

3          **THE COURT:**  All right.  Well, I'm holding you to it.

4                              (Laughter.)

5    BY MR. LEE:

6    **Q.**    All right.  Counsel for Google asked you if there's a --

7    remember he talked about how you let Target have your

8    information when you were on that app?

9    **A.**    Yes.

10   **Q.**    And then suggested, "Well, you let Target do it.  Why

11   shouldn't Google get to do it too?"

12         Can you explain to the jury in your mind, in your view,

13   what is the difference between a single app, like Target,

14   having your app activity information when you're just on that

15   app versus what Google is doing in terms of what it collects?

16   **A.**    Well, I would have given Target permission to have the

17   information from within that app.  Google did not have

18   permission to -- or have consent to get data from what I'm

19   doing on Target.

20         Google's the largest collector of data in the world.  We

21   all know this.  They have more information on us than any

22   single app can ever have.  They have everything, all these

23   things we've talked about.  So I'm okay with one app, Target,

24   having my information about what I'm shopping for; but Google

25   has everything across all of our apps, across all of our

**PROCEEDINGS**

 1  devices, and that's -- that's a lot more than I'm comfortable

 2  with.

 3  **Q.**    Thank you, Mr. Santiago.  I'm going to -- I'm going to

 4  step away now so I don't get in trouble from the judge.

 5  Thank you.

 6  **A.**    Thank you.

 7        **MR. ATTANASIO:**  No redirect, Your Honor.

 8        **THE COURT:**  Very well.

 9     You may step down.

10        **THE WITNESS:**  Thank you.

11              (Witness excused.)

12        **THE COURT:**  Members of the jury, we've completed the

13  day.  Remember my admonitions.  Do not discuss this amongst

14  yourselves, with anyone else, no research, nothing about the

15  case.  It's a beautiful day.  Don't think about this case.

16  Just enjoy the day.

17     And then be here at 8:30 so we can get started.  Enjoy the

18  afternoon.

19     (Proceedings were heard out of the presence of the jury.)

20        **THE COURTROOM DEPUTY:**  Court stands in recess.

21        **THE COURT:**  Okay.  We're out of the presence of the

22  jury.

23     R.J., the time pronouncements.

24        **THE LAW CLERK:**  Plaintiffs have 16 hours, 41 minutes,

25  and 18 seconds.  Defendant has 16 hours, 9 minutes, and 32

 1    seconds.

 2              **THE COURT:**  Okay.

 3              **MR. HUR:**  Your Honor?

 4              **THE COURT:**  Yes.

 5              **MR. HUR:**  One question about the time.  When the

 6    parties are at sidebar, how is that time allocated?

 7              **THE COURT:**  It's not running.

 8              **MR. HUR:**  It's not counted?

 9              **THE COURT:**  No.

10              **MR. HUR:**  Okay.

11        Your Honor, one other housekeeping item, which is that

12    yesterday we saw some of the congressional testimony from

13    Google's CEO.  We understood that we were providing the court

14    reporter with a transcript so that it could be in the record.

15    We did not understand the exhibit was being -- the transcript

16    was being admitted as an exhibit.  It was unclear to me exactly

17    what happened when it was handed up, so I just want to be

18    clear.

19              **MR. CARMODY:**  I can tell you, because I offered it in

20    all courts, including this one, whenever there's a video

21    played, whether it's a deposition or Mr. Sundar Pichai, there's

22    no record.  We have to have a record for the Appellate Court to

23    see, you know, what was said.  So it's just a record.  It's not

24    going back to the jury, but it's going to be here for the

25    Ninth Circuit.

PROCEEDINGS

```
 1          THE COURT:  That's correct.  The court reporter does

 2     not transcribe when it's being played.  So, however, you could

 3     put the link.  It could be -- the official record could be the

 4     video link, I think.

 5        But the bottom line is, it was offered, it was admitted,

 6     so we're done.  I mean, it's there.

 7          MR. DAVID BOIES:  The exhibit is admitted in evidence.

 8          THE COURT:  Yes, it's been admitted.

 9          MR. HUR:  Oh.  I understood that Mr. Carmody was just

10     saying it's not going back to the jury, but it's here for the

11     record for the Appellate Court, which is the way I understood

12     it, Your Honor.

13          THE COURT:  Well --

14          MR. DAVID BOIES:  It may or may not go back to the

15     jury if they -- I assume it does go back to the jury if it's in

16     evidence.  I mean, if it's in evidence.  It was admitted in

17     evidence.

18          THE COURT:  The bottom line is, we -- it is now in

19     evidence.  I admitted it, the transcript.  I don't think at the

20     time I had an objection.  It was admitted.  It's now in

21     evidence.  I'm not going to change -- that's -- it will go back

22     because it's in evidence.

23          MR. HUR:  Your Honor, when was it -- when was the

24     transcript admitted?

25          THE COURT:  I believe somebody offered it, and I --
```

1        **MR. CARMODY:**  I did earlier.

2        **THE COURT:**  Do you remember the number?  I don't

3    remember the number, but --

4        **MR. CARMODY:**  I thought it was 45.

5        **THE COURT:**  -- my recollection was there was no

6    discussion about it, and I don't even think there was an

7    objection.

8        **MR. DAVID BOIES:**  And, in any event, Your Honor, of

9    everything that's an admission, this is the CEO.  So whether

10   there was an objection or not, the evidence was going to come

11   in.

12       **MR. HUR:**  Your Honor --

13       **THE COURT:**  The difference would be if they wanted to

14   see it, they would then play it if they -- so I don't quite see

15   why you're hung up on this.  I mean, it is -- so --

16       **MR. HUR:**  Yes, Your Honor, if it was a deposition, for

17   example, the transcript wouldn't go back.  They -- sure, they

18   could ask for it to be replayed and that would be one thing,

19   but I understood that the transcript there was just for the

20   record, not actually being admitted as an exhibit.

21       **THE COURT:**  Well, we could have had -- and perhaps you

22   can go back and look.  We could have had a discussion about

23   that, but my recollection is we didn't.  It was offered as an

24   exhibit.  I don't recall any objection, and so it was admitted,

25   and I'm not going to now unscramble it.  It was admitted in

**PROCEEDINGS**

 1   front of the jury, that transcript, as evidence so --

 2        **MR. SANTACANA:**  There's a reason for that, Your Honor,

 3   which is --

 4        **THE COURT:**  Pardon?

 5        **MR. SANTACANA:**  There's a reason why there was no

 6   objection, which is that we made an email agreement last night

 7   that it would be provided to the court reporter, not admitted

 8   into evidence, and so we did not -- based on that email, we

 9   didn't object because we were confused what they were trying to

10   do.

11        **THE COURT:**  Well, I'm oblivious to all of that

12   discussion, so I don't know what I'm supposed to do with it.

13   What I hear -- my recollection was there was an offer of the

14   transcript with an exhibit number, and all I know is I didn't

15   get an objection and I think I admitted it.

16      So I can't read your minds.  I don't know about some deal;

17   but, you know, if I'm wrong about my recollection that we

18   actually did admit it without objection, we can discuss it

19   again.  If my recollection is correct, it was offered, I didn't

20   hear anything, I admitted it, I ain't gonna unscramble.

21        **MR. HUR:**  Your Honor, what -- I'm sorry.

22        **MR. DAVID BOIES:**  We'll go back and look at the

23   transcript.

24        **THE COURT:**  One at a time.  Yes?

25        **MR. HUR:**  Your Honor, what happened this morning is

1    that Mr. Monsees was on the stand.  Mr. Carmody was about to

2    reexamine him.  We had agreed on the language that was

3    consistent with the transcript, and we had agreed it would be

4    given to the court reporter so that it could be part of the

5    record, but not an exhibit.  I, candidly, did not hear him even

6    say that it was he was offering to admit it into evidence.  It

7    was not when the testimony of Mr. Pichai was being played or

8    thereafter.  It was this morning.

9         **THE COURT:**  Okay.  Well, why don't you go back and

10   look at the transcript and tell me what -- remind me what

11   happened this morning.  Okay?

12        **MR. HUR:**  Thank you, Your Honor.

13        **THE COURT:**  And if I didn't admit it into evidence,

14   then we'll discuss how best it should be memorialized.  If I

15   did admit it into evidence and there was no objection, then the

16   train has left the station.  But let's deal with it tomorrow.

17   Okay?

18        **MR. HUR:**  Thank you, Your Honor.

19        **THE COURT:**  Thank you.

20             (Proceedings adjourned at 1:38 p.m.)

21                     ---o0o---

22

23

24

25

1

2                    **<u>CERTIFICATE OF REPORTER</u>**

3           I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6   DATE:  Thursday, August 21, 2025

7

8

9

10  _____

11          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

12          CSR No. 7445, Official United States Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25