```
                              Volume 4

                           Pages 563 - 787

                 UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF CALIFORNIA

      Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,        )
individually and on behalf of    )
all others similarly situated,   )
                                 )
            Plaintiffs,           )
                                 )
   VS.                           )   NO. 3:20-CV-04688 RS
                                 )
GOOGLE LLC,                      )
                                 )
            Defendant.           )
_____)

                              San Francisco, California
                              Thursday, August 21, 2025
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

```
                    BOIES SCHILLER FLEXNER LLP
                    333 Main Street
                    Armonk, New York 10504
               BY:  DAVID BOIES, ATTORNEY AT LAW
                    ALEXANDER BOIES, ATTORNEY AT LAW
                    M. LOGAN WRIGHT, ATTORNEY AT LAW

                    BOIES SCHILLER FLEXNER LLP
                    2029 Century Park East, Suite 1520n
                    Los Angeles, California 90067
               BY:  ALISON L. ANDERSON, ATTORNEY AT LAW
```

```
REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter
```

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiffs:
                         BOIES SCHILLER FLEXNER LLP
 3                       100 Southeast Second Street, Suite 2800
                         Miami, Florida 33131
 4               BY:  JAMES W. LEE, ATTORNEY AT LAW

 5                       BOIES SCHILLER FLEXNER LLP
                         44 Montgomery Street, 41st Floor
 6                       San Francisco, California 94104
                 BY:  MARK C. MAO, ATTORNEY AT LAW
 7
                         SUSMAN GODFREY LLP
 8                       One Manhattan West, 50th Floor
                         New York, New York 10001
 9               BY:  WILLIAM C. CARMODY, ATTORNEY AT LAW
                     RYAN SILA, ATTORNEY AT LAW
10
                         SUSMAN GODFREY LLP
11                       1900 Avenue of the Stars, Suite 1400
                         Los Angeles, California 90067
12               BY:  AMANDA BONN, ATTORNEY AT LAW

13                       MORGAN & MORGAN COMPLEX LITIGATION GROUP
                         201 North Franklin Street, Seventh Floor
14                       Tampa, Florida 33602
                 BY:  RYAN McGEE, ATTORNEY AT LAW
15
     For Defendant:
16                       COOLEY LLP
                         Three Embarcadero Center, 20th Floor
17                       San Francisco, California 94111-4004
                 BY:  BENEDICT Y. HUR, ATTORNEY AT LAW
18                   EDUARDO E. SANTACANA, ATTORNEY AT LAW
                     SIMONA A. AGNOLUCCI, ATTORNEY AT LAW
19                   THILINI L. CHANDRASEKERA
                     ATTORNEY AT LAW
20                   CHELSEA HU, ATTORNEY AT LAW

21                       COOLEY LLP
                         4401 Eastgate Mall
22                       San Diego, California 92121
                 BY:  MICHAEL A. ATTANASIO, ATTORNEY AT LAW
23

24   Also Present:    Steve Ganem, Google
                     Anibal "Pete" Rodriguez
25                   Julian Santiago
```

```
 1                          I N D E X

 2

 3   Thursday, August 22, 2025 - Volume 4

 4
```

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **HOCHMAN, PH.D., JONATHAN** | | |
| (SWORN) | 579 | 4 |
| Direct Examination by Mr. Mao | 579 | 4 |
| Cross-Examination by Mr. Santacana | 659 | 4 |
| Redirect Examination by Mr. Mao | 739 | 4 |
| | | |
| **RODRIGUEZ, ANIBAL PETE** | | |
| (SWORN) | 750 | 4 |
| Direct Examination by Mr. Lee | 750 | 4 |

## E X H I B I T S

| TRIAL EXHIBITS | WITHDRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| PX45 | 567 | | | 4 |
| PX72 | | | 622 | 4 |
| PX104 | | | 765 | 4 |
| PX120A | | | 588 | 4 |
| PX442 | | | 648 | 4 |
| PX489 | | | 651 | 4 |
| PX491 | | | 653 | 4 |
| PX492 | | | 654 | 4 |
| PX493 | | | 656 | 4 |

PROCEEDINGS

| | |
|---|---|
| 1 | **Thursday - August 21, 2025**                                    **8:10 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | (Proceedings were heard out of the presence of the jury.) |
| 5 | **THE COURT:**  Good morning. |
| 6 | **ALL:**  Good morning, Your Honor. |
| 7 | **THE COURT:**  Okay.  There are various items to cover, |
| 8 | and I will go through them. |
| 9 | On the issue of the transcript of Mr. Pichai, reviewing it |
| 10 | and seeing what was submitted, I was under the mistaken |
| 11 | impression, fairly or unfairly -- maybe it was my mistake -- |
| 12 | that a deal had been reached, which was why I admitted it. |
| 13 | In the ordinary course, just like a deposition transcript, |
| 14 | the transcript doesn't go back.  That's like any testimony; if |
| 15 | they wanted to have a readback, they could -- or hearback, if |
| 16 | it's a video, they can do that, or ask for it at least, but it |
| 17 | does not go back.  And I was, frankly, surprised that, I guess |
| 18 | my misimpression that there had been an agreement. |
| 19 | So I will withdraw that as an exhibit.  I can either say |
| 20 | that to the jury -- I would think you would just as soon I not |
| 21 | say anything; but if you want an official withdrawal, I'll |
| 22 | consider that. |
| 23 | **MR. CARMODY:**  Yes, Your Honor.  I mean, I made that |
| 24 | representation to the Court yesterday afternoon.  In other |
| 25 | words, we talked with counsel; and the intent at the time, my |

 1  intent, was just to have an appellate record and not have it --

 2      **THE COURT:**  Oh, I understand.  I'm not saying --

 3      **MR. CARMODY:**  -- and not have it admitted as a

 4  substantive exhibit, and so the other side consented.

 5      And we will withdraw that now.  And what I wanted to do is

 6  then meet and confer with the other side and talk about if it's

 7  independently admissible, because we've certainly found law

 8  that it is.  But that's an issue for another day.  For today,

 9  we can happily withdraw this.

10      **THE COURT:**  Okay.  I doubt a transcript would be

11  independently admissible, even if it's an admission and all the

12  rest.  It's a matter of form.  The transcripts do not go back,

13  absent an agreement by the parties that they want it to go

14  back.

15      And I'm not suggesting either side did anything wrong.  It

16  was a misunderstanding between us.  I, for whatever reason,

17  thought this was a deal and you were proposing this deal and it

18  meant I was formally admitting the thing.  So...

19      **MR. HUR:**  Thank you, Your Honor.

20      **MR. CARMODY:**  Thank you.

21      **MR. HUR:**  We do not think that it needs to be

22  addressed with the jury.

23      **THE COURT:**  Okay.

24      **MR. CARMODY:**  Thank you, Your Honor.

25      (Trial Exhibit PX45 withdrawn.)

**PROCEEDINGS**

 1         **THE COURT:**  Okay.  Number two is, why don't I take the

 2    issue with respect to, I guess, our next class rep.  And

 3    there's some concern, this sort of catch-22 problem of standing

 4    and the legal issue, which, frankly, I wouldn't expect the

 5    class representatives necessarily to grasp.

 6         As I said, I've issued some opinions that I think it's

 7    unfair that the -- to say that you lose standing if you stop

 8    using a product that you're otherwise contesting about, but I

 9    know there's a lot of law that's going the other way as well.

10    It's a mess.

11         Mr. Santiago said for legal reasons.  As I read Google's

12    submission, they're saying -- they're not saying he went too

13    far, but he went close to the line.

14         I think your next plaintiff, you can get that close but no

15    further.

16         **MR. DAVID BOIES:**  Okay.  Your Honor, we don't even

17    have to get that close.  I think the issue here is the Court

18    has ruled that this is -- goes in because of offensiveness, not

19    to consent.  The Court said that.

20         And the Court did give a clarifying instruction yesterday

21    during the -- telling the jury that this goes in just to

22    show it doesn't --

23         **THE COURT:**  Did I?  What did you think I did?

24         **MR. DAVID BOIES:**  During -- during the talk about how

25    he used these apps going forward.

PROCEEDINGS

1          **THE COURT:**  Oh, oh, yes.  But that's a different

2      issue, in my mind.  What I was talking about there --

3          **MR. DAVID BOIES:**  Oh.

4          **THE COURT:**  -- was the motion in limine battle

5      about -- an important battle -- about whether or not the third

6      party's privacy policies and the interaction between putative

7      class members and third parties doesn't exculpate Google; that

8      the issue here is the Google privacy issues vis-à-vis the

9      putative class members.

10         So that ruling was in your favor.

11         **MR. DAVID BOIES:**  Yes.

12         **THE COURT:**  What I was saying when they objected is

13     the limiting principle there was, I was letting them -- you

14     talk about third-party apps with the class rep because it went

15     to the class rep's -- how valuable the class rep viewed

16     privacy.

17         **MR. DAVID BOIES:**  Yes.

18         **THE COURT:**  So that a class rep -- I thought the point

19     that was being made was, "Oh, you care a lot about privacy, but

20     you don't even bother looking at the privacy policies of the

21     third-party apps."

22         I thought that's where that was all going, and I said you

23     can do that.

24         But, Google, you can't suggest that if a third-party app

25     had a private -- that a putative class member uses a

**PROCEEDINGS**

 1   third-party app and there's some consent to use there, that

 2   that gets Google out from under.

 3          **MR. DAVID BOIES:**  I gotcha.  Okay.

 4          **THE COURT:**  Does that make sense to you?

 5          **MR. DAVID BOIES:**  Yes, it does completely, Your Honor.

 6      I thought one of the things they were doing was saying,

 7   "You continued to do this after you knew," and that that

 8   somehow vitiated the consent.

 9          **THE COURT:**  Well, and the problem, as I understand

10   what Google is presenting to us, is this -- it is, I guess, the

11   fact that some of the -- particularly the class

12   representatives, one of the reasons they, from your

13   perspective, are continuing to utilize their Google accounts,

14   and the like, is concern that if they stopped doing so --

15          **MR. DAVID BOIES:**  Yes.

16          **THE COURT:**  -- there would be an argument that they no

17   longer have standing in this case.

18          **MR. DAVID BOIES:**  Exactly.

19          **THE COURT:**  I would actually -- I don't view -- I

20   wouldn't find that they wouldn't have standing, but there's a

21   lot of law out there that now says, "If you stop, you're no

22   longer -- you're divested of standing."

23      But the problem is, that may be one of the reasons that

24   they're doing -- they're continuing to utilize it, but it gets

25   us into a complete quagmire with the jury about legal standing,

**PROCEEDINGS**

 1   and I mean, we don't want to go there.  I think that's --

 2           **MS. AGNOLUCCI:**  Yes.

 3           **THE COURT:**  -- the issue we're talking about.

 4           **MS. AGNOLUCCI:**  Your Honor, there's sort of three

 5   buckets of reasons that the plaintiffs have given for not --

 6   for continuing to use their apps.

 7       The first is, "I like them.  You know, my fantasy football

 8   league uses it, so it's too hard to stop."

 9           **THE COURT:**  Right.  "And I shouldn't be put in the

10   position because you're screwing up" -- this is them speaking.

11           **MS. AGNOLUCCI:**  Right.

12           **THE COURT:**  "I shouldn't have to change my practices

13   because of your stuff."

14           **MS. AGNOLUCCI:**  Fair.  No objection to that.

15       The second is, "Well, we needed to keep doing the same

16   thing because we have experts who are investigating the case

17   and they need to, presumably, see what's happening in order to

18   render an opinion."  That's Bucket 2.

19       Bucket 1, Bucket 2, that's what they said in their

20   depositions.

21       Yesterday we hear Bucket 3, which is, "Well, for legal

22   reasons, I'm legally obligated and I want to make Google change

23   its practices."

24       That's the bucket that we're alleging is inappropriate for

25   commentary.  They can still say, for example, that their

1    experts needed to investigate; but to, you know, inject

2    injunctive relief --

3         **THE COURT:**  Well --

4         **MS. AGNOLUCCI:**  -- into this is inappropriate because

5    that's not the function of the jury here.

6         **THE COURT:**  No.  But I think it is one of the reasons

7    why these class representatives are continuing to use it.

8         And I think what Mr. Santiago said was fine, and I think

9    he can do that.  What I don't think we want to do is then get

10   into an extended discussion about standing and all of that.

11        But he's under oath to testify what the reasons are that

12   they're -- and he's asked the question:  Why are you continuing

13   to use the Google services?  And one of the reasons is,

14   frankly, he's been told that he probably needs to do so to

15   preserve standing.

16        **MS. AGNOLUCCI:**  Well --

17        **THE COURT:**  That's just the fact.

18        **MS. AGNOLUCCI:**  That's what they're saying now.  It's

19   not what they said in their depositions.

20        **THE COURT:**  Well, that is one of the reasons, I

21   suspect.  And I think what Santiago said was fine.  I wouldn't

22   go -- I don't think he can go beyond that.

23        I will stop any discussion about "You understand legal

24   standing," "what you mean by 'legal.'"

25        Don't you probe it on cross or else you'd open the door.

 1  But I think they -- you said in your submission to me, "He went

 2  close to the line but didn't go over it," and I agree.

 3          **MR. DAVID BOIES:**  Okay.

 4          **MS. AGNOLUCCI:**  Well --

 5          **MR. DAVID BOIES:**  We will --

 6          **MS. AGNOLUCCI:**  -- that's fine, Your Honor, but it

 7  does open up a lot of questions about what exactly --

 8          **THE COURT:**  Only if you open it up.

 9          **MS. AGNOLUCCI:**  -- they were told.

10      Well, I can't because they're claiming privilege.

11          **THE COURT:**  Well, plus you don't want to go there.

12  You don't want to go into a standing discussion --

13          **MS. AGNOLUCCI:**  Well, I don't want to discuss the --

14          **THE COURT:**  -- with these witnesses.

15                  (Simultaneous cross-talk.)

16          (Reporter interrupts to clarify the record.)

17          **MS. AGNOLUCCI:**  I'm sorry.

18      I don't want to discuss the legal doctrine, but I do think

19  it's relevant, for example, "Did you -- in order to have

20  standing, did you have to keep using every single app, every

21  single app the same way?"

22          **THE COURT:**  No, I don't think that -- I think

23  that's -- no, I don't buy that.  So it goes no further than

24  Mr. Santiago went.

25      Okay.  Next, I know that Google says they want to talk

 1   about my order yesterday with respect to Mr. Marsiglia's

 2   transcript.  I do not want to hear further discussion.  I've

 3   spent a lot of time with this.  I understand your arguments.

 4   I've made my ruling.  That doesn't mean we're going to reargue

 5   everything.  No more discussion.  Live with it.

 6           MR. SANTACANA:  We haven't requested to discuss that,

 7   Your Honor.

 8           THE COURT:  Yes, you did.

 9           MR. SANTACANA:  To discuss Miraglia?

10           THE COURT:  Apparently, that's what I was told by my

11   courtroom deputy.

12           MR. SANTACANA:  I must have misspoken.  I listed

13   MIL 16 and 17.  16 is about Hochman's slides.

14           THE COURT:  Yeah.  And you said you've resolved that.

15           MR. SANTACANA:  We have resolved that.  That's the

16   good news.

17           THE COURT:  That's good.

18           MR. SANTACANA:  So there's no other issues.

19           THE COURT:  Well, I was told that you wanted to

20   rediscuss Marsiglia, but --

21           MR. McGEE:  Yes, Your Honor.

22           THE COURT:  -- if you don't, that's good.

23           MR. McGEE:  Yes, Your Honor.  After they filed MIL 16,

24   we were still in the process of meeting and conferring.  Cut

25   those slides.  Not an issue for today.

PROCEEDINGS

1          **THE COURT:** I now have lost track of what we're

2    talking about, but okay.

3          **MR. SANTACANA:** And I misspoke, Your Honor. I think

4    it was just one clarifying question, which was whether

5    Your Honor is excluding Exhibit Number 4 as part of your order.

6          **THE COURT:** Yes.

7          **MR. SANTACANA:** Okay. Thank you.

8          **THE COURT:** That's a fair clarification.

9          **MR. SANTACANA:** That was just a clarification,

10   Your Honor.

11         **THE COURT:** That's good.

12         **MR. SANTACANA:** No argument.

13         **THE COURT:** I like it.

14         **MR. McGEE:** Your Honor --

15         **THE COURT:** Yes.

16         **MR. McGEE:** -- I didn't think we had anything to

17   discuss, but there were designations that you kept where

18   Number 4 came in. It was just the discussion of Number 4.

19         **THE COURT:** The document does not come in. There may

20   be some confusion, and I was a bit confused because there's

21   some reference to "exhibit" in there, and I was wondering why

22   that was still there if the document went out. The document is

23   not coming in. Number 4 is not coming in.

24        Now, if that means there's some confusion in the

25   transcript designation where it says something about an exhibit

PROCEEDINGS

1  and you think that now is misleading, you guys can talk about

2  it and get rid it.  But I thought -- I went through it, and it

3  was a little bit confusing, but it flowed.

4          **MR. McGEE:**  And, Your Honor, I had understood, based

5  on the discussion yesterday, that Number 4 would come in not

6  for the truth of the matter asserted.

7          **THE COURT:**  4 is not coming in.  You're not going to

8  get Number 4 in.  End of story.

9          **MR. McGEE:**  Understood, Your Honor.

10          **THE COURT:**  All right.  The final thing on my list was

11  the unjust enrichment footnote in the Lasinski report.

12      Is Lasinski testifying today?

13          **MR. DAVID BOIES:**  No, Your Honor.

14          **MS. BONN:**  No, Your Honor.

15          **THE COURT:**  Okay.  I'm sort of tempted to deal with

16  this, then, once we get through with the day.  So why don't we

17  do that.

18          **MS. BONN:**  I think that's fine.

19          **MS. CHANDRASEKERA:**  Thank you, Your Honor.

20          **THE COURT:**  Okay.  Any other issues that are not

21  covered?

22          **MR. MAO:**  If I may just have a moment, Your Honor --

23          **THE COURT:**  Yes.

24          **MR. MAO:**  -- just with the other side?

25          **THE COURT:**  Yes.

1              (Discussion off the record.)

2              THE COURT:  Okay.

3              MR. MAO:  Your Honor, we just have a -- we're trying

4    to work out, essentially, admission of the plaintiffs' data.

5              THE COURT:  The admission of the plaintiffs' data?

6              MR. MAO:  Yeah.  I think we've worked it out, but

7    they're just checking the data just to make sure that they have

8    no objections to it.

9              THE COURT:  Is this coming up for the next witness?

10             MR. SANTACANA:  Right away, yeah, in the morning.

11             THE COURT:  Well, why don't you continue to --

12             MR. SANTACANA:  Yeah, we're looking at it.

13             THE COURT:  -- see, and then tell me when you've

14   either got some issue or it's resolved.  Then I'll come back,

15   and then we'll bring the jury in.

16             MR. SANTACANA:  Appreciate that, Your Honor.

17             THE COURTROOM DEPUTY:  Court stands in brief recess.

18                 (Recess taken at 8:25 a.m.)

19             (Proceedings resumed at 8:32 a.m.)

20      (Proceedings were heard out of the presence of the jury.)

21             THE COURTROOM DEPUTY:  Please remain as you are and

22   court will come to order.

23             THE COURT:  Okay.

24             MR. SANTACANA:  So, Your Honor, there's a list of

25   exhibits the plaintiffs want to admit through their expert that

1    contains raw analytics data.  We are reserving the right to

2    object, but don't currently object, and want to see how the

3    testimony comes in.

4         The concern that you have is simply that if the raw data

5    goes back to the jury with no context from testimony of an

6    expert, that they will effectively have source code in the room

7    and not know what it means and have no testimony to interpret

8    it.

9         So we'd like to see how he testifies.  The objection would

10   be a 403 objection if all they do is put it into the room and

11   he hasn't said anything about it, but if he lays a good

12   foundation and explains what they might be looking at, then we

13   probably won't object.

14        **MR. DAVID BOIES:**  That makes perfect sense to us,

15   Your Honor.

16        **THE COURT:**  Okay.  We'll see how it transpires.

17        All right.  Any other things before we bring the jury out?

18   They're all here.

19        **MR. SANTACANA:**  No.  Thank you, Your Honor.

20        **THE COURT:**  Okay.

21        (Proceedings were heard in the presence of the jury.)

22        **THE COURT:**  Our jury is present.

23        Good morning, members of the jury.  Thank you again for

24   being prompt.

25        Next witness.

1          **MR. MAO:**  Plaintiffs would like to call to the stand

2    Dr. Jonathan Hochman.

3          **THE COURT:**  Very well.

4          (Dr. Jonathan Hochman steps forward to be sworn.)

5          **THE COURT:**  Good morning.

6          **THE COURTROOM DEPUTY:**  After you have a seat, would

7    you please raise your right hand?

8                        <u>**JONATHAN HOCHMAN, Ph.D.**</u>,

9    called as a witness for the Plaintiffs, having been duly sworn,

10   testified as follows:

11         **THE WITNESS:**  I do.

12         **THE COURTROOM DEPUTY:**  Great.  Thank you.  Make sure

13   you don't slide off the stairs there.

14      Could you speak clearly into the microphone for our court

15   reporter.  Could you please state your full name for the record

16   and spell your last name.

17         **THE WITNESS:**  Jonathan Hochman, H-o-c-h-m-a-n.

18         **THE COURTROOM DEPUTY:**  Thank you.

19                       <u>**DIRECT EXAMINATION**</u>

20   BY MR. MAO:

21   **Q.**   And good morning.  I'm Mark Mao for the plaintiffs.

22      Could you please introduce yourself to the judge,

23   the Court, and also the jurors?

24   **A.**   Good morning.  My name is Jonathan Hochman.  I'm a

25   computer scientist from New London, Connecticut.

1  Q.   What degrees do you have, Dr. Hochman?

2  A.   I have a Bachelor of Science, two Master's of Science, and

3  two -- a Master of Science and a Master of Philosophy, and a

4  Doctorate in computer science.

5  Q.   What do you do for work, Dr. Hochman?

6  A.   I teach at Yale University, and I also have a consulting

7  business.

8  Q.   Can you tell us a little bit about your consulting

9  business?

10 A.   Yes.  We help businesses, large and small.  Initially, we

11 started doing a lot of Web development and Internet marketing.

12 More recently, we've had a lot of people come to us for help

13 with their computer problems, especially problems that result

14 in litigation.  So these days, I tend to focus on litigation

15 consulting within my consulting practice.

16 Q.   You -- did you have any previous businesses, find any

17 start-ups, anything like that?

18 A.   Yes.  I had a start-up called CodeGuard, which was in the

19 business of providing backups for website code and databases.

20 We were protecting a million different objects.

21       And I also have a current start-up called Universal Name

22 System, which is a system for more conveniently identifying

23 people and data on the Internet.

24 Q.   How many articles have you published, Doctor?

25 A.   I've published several articles.  It depends how you

 1    count, but I have a couple of academic papers and I have my

 2    dissertation.

 3    **Q.**    And how many -- how many depositions have you testified in

 4    in this area, Doctor?

 5    **A.**    I've testified over 60 times, including -- and also in 20

 6    trials.

 7    **Q.**    When you testify as an expert in these cases, are you

 8    always on the plaintiff side?

 9    **A.**    No.  It's roughly half-and-half.

10    **Q.**    And what kind of courses do you teach at Yale?

11    **A.**    This semester I'm teaching a seminar called "Digital

12    Identity Infrastructure," and I'm also a secondary instructor

13    for a class on advanced C++ programming.

14          **MR. MAO:**  Your Honor, I'd like to, under Federal

15    Rule 702, qualify Dr. Hochman as a technical expert in the

16    fields of software development, digital advertising, Internet

17    security, and digital technology.

18          **MR. SANTACANA:**  No objection, Your Honor.

19          **THE COURT:**  The witness will be so designated.

20      You may proceed, Mr. Mao.

21    **BY MR. MAO:**

22    **Q.**    Dr. Hochman, can you explain to me what your assignment

23    was for this case?

24    **A.**    Yes.  My assignment in this case was to find a baseline

25    and test whether the WAA and sWAA switches were doing what the

1    baseline suggested they would do.

2    **Q.**    And what kind of materials did you consider and evaluate

3    in order to render your opinion in this case?

4    **A.**    So I received technical documents from Google.    I also

5    received Google's answers to our technical questions.    And I

6    reviewed internal correspondence of Google employees, and I

7    reviewed public statements by Google.

8        And I also received data from Google.    This was data

9    related to the app activity of our plaintiffs, also data

10    related to some test devices that we set up and some test apps

11    that we created in order to get even more detailed information

12    about the behavior of their system.

13    **Q.**    Dr. Hochman, did you prepare any slides for your testimony

14    here today?

15    **A.**    Yes, I did.

16    **Q.**    Will these slides help you in explaining your professional

17    opinion in this case?

18    **A.**    I think so.

19        **MR. MAO:**    With the Court's permission, I'd like to

20    present and use these slides on the screen, Your Honor.

21        **THE COURT:**    Very well.

22    **BY MR. MAO:**

23    **Q.**    On a high level, Doctor, can you explain to us what your

24    opinions in this case are?

25    **A.**    Yes.    So there's four main opinions.

1        Opinion Number 1 is that Google created some software,

2    such as Firebase and Google Mobile Ads.  These are called

3    software development kits.  And the purpose of these is to

4    access people's devices and allow Google to take data from the

5    devices related to their app activity, especially when the

6    people are using non-Google apps.

7    **Q.**   What else, Doctor?

8    **A.**   The second opinion is that Google -- that I had a

9    baseline, and my baseline is that Google, based on their public

10   statements, their public web pages, statements of their people

11   from top to bottom, had suggested that the users would have

12   control over what data Google was taking from their devices,

13   whether that data was being copied, and how it was being used.

14   **Q.**   Anything else, Doctor?

15   **A.**   Yes.  The third opinion is that during the entire class

16   period, Google was taking this data from people's devices when

17   they were using non-Google apps, they were saving and using

18   that data, they were copying the data, and that this was

19   continuous throughout the time period.

20   **Q.**   Anything else, Doctor?

21   **A.**   Yes.  When the Web & App Activity, or sWAA, controls were

22   turned off, the data that Google took from people's devices was

23   used throughout Google's business in ways that helped Google to

24   make money, but also which impacted the users and caused

25   injuries to the users.

1          **MR. SANTACANA:**  Objection, Your Honor.  Outside the

2     scope of his report.

3          **MR. MAO:**  We obviously disagree, Your Honor.

4          **MR. SANTACANA:**  He has not disclosed an opinion about

5     injury to users.

6          **MR. MAO:**  I think that's premature, Your Honor,

7     because I think perhaps you should see what the slides actually

8     say because it's well within the ambit of his report; for

9     example, how it consumed data, how it consumed resources.

10          **THE COURT:**  Why don't --

11          **MR. MAO:**  Yes.

12          **THE COURT:**  I will overrule the objection without

13     prejudice.  You can renew it as we get a little further along.

14          **MR. SANTACANA:**  Thank you, Your Honor.

15     **BY MR. MAO:**

16     **Q.**   Let's go on to Opinion Number 1.

17          First, Doctor, what exactly is an SDK?  That gets thrown

18     around a lot here.  What is an SDK?

19     **A.**   Sure.  An SDK is a collection of computer code that helps

20     a developer, it makes it easier for a developer to create an

21     app because it provides some ready-made features that they can

22     use.

23     **Q.**   What role did the SDKs play in Google's collection of data

24     in this case?

25     **A.**   So the SDKs provided useful features to the app

1    developers, which they would want to use; but the SDKs also

2    came with Google Analytics for Firebase, which is a product

3    within the SDK that gathers data, it takes data from the users'

4    devices and gives that data to Google.

5    **Q.**    I understand there's two different kinds of SDKs here

6    Google released that's at issue in this case.  Can you explain

7    a little bit about these two different kinds of SDKs?

8    **A.**    Sure.  There's the Firebase SDK, which is -- provides a

9    bunch of different utilities and data collection.  And there's

10    also Google Mobile Ads, which is an SDK that allows a publisher

11    to put ads into their app.  And Google Mobile Ads interfaces

12    with a couple of Google's advertising services.  One is AdMob

13    and the other is Ad Manager.

14    **Q.**    And what about the Firebase SDK in this case?  Can you

15    tell me a little bit more about that?

16    **A.**    Sure.  Firebase provides a number of useful features for

17    developers.  Importantly, it provides Google Analytics for

18    Firebase, which will give some reports to app developers so

19    they can understand how the app is being used, and -- but it

20    also is collecting event-level data, granular data that Google

21    saves.

22    **Q.**    If we could move on to the next slide, what is a

23    third-party app, Doctor?

24    **A.**    A third-party app is an app that's not published by

25    Google.  So it could be -- well, there's Starbucks, Disney,

1  Bank of America, Reddit, *New York Times*.  There's a whole bunch

2  of third-party apps.  There's, in fact, 2.3 million different

3  apps out there.

4  **Q.**  And how prevalent are the two types of Google SDKs in this

5  case on the various apps in the various mobile phone stores?

6  **A.**  So these two SDKs are very prevalent.  Firebase is used in

7  97 percent of Android apps.  It's extremely prevalent in the

8  top thousand Android apps, 97 percent.  And it has presence in

9  54 percent of the top thousand iOS apps.  Those are the apps

10 for the Apple iPhone.

11 **Q.**  What about Android?

12 **A.**  In Android, it's 97 percent of the top thousand apps.

13 **Q.**  You said in your expert report in this case that all the

14 class members are exposed to Google Firebase and Mobile Ads

15 SDK.  What is the basis for that opinion?

16 **A.**  So the basis for the opinion is that all of these users

17 have a Google Account and they are using a smartphone.  And if

18 you look at probability of an app being -- of the Firebase SDK

19 being present in an app, even if you underestimate it, say it's

20 just in 50 percent of apps -- that's a low estimate -- if you

21 think about the average person, over the class period, which is

22 98 months, if you use just ten apps during that period, the

23 chance of running into this SDK is about -- is better than

24 99.9 percent.

25 **Q.**  If we move on to the next slide, what is your second

1    opinion that you're presenting here today, Dr. Hochman?

2    **A.**    The second opinion is that I established a baseline.   In

3    order to do my testing, I had to understand what I was testing

4    against.   So my baseline is that Google had created this

5    expectation that people could control whether Google was taking

6    their data and copying it and using it, and that when the

7    Web & App Activity switch was off or when the supplemental

8    Web & App Activity switch was off, when either switch was off,

9    Google wouldn't take their third-party app data and use it.

10    **Q.**    What type of materials did you consider to decide and

11    evaluate this technical baseline that you were testing for?

12    **A.**    So I looked at the Android screens that describe the

13    controls.   I looked at Google's privacy policy and related

14    pages.   I also considered statements by Google's employees from

15    top to bottom.   And those were some of the things that informed

16    what I should be testing against.

17         **MR. MAO:**   Your Honor, I'd like to move into exhibit

18    Exhibit -- it's PX120A.   And the reason why it's "A" as opposed

19    to 120 is because I think the 120 we had before was a little

20    bit hard to read.

21         Obviously, you're free to examine it.   The language, I

22    represent, is exactly the same.   Are there any issues with

23    this?

24         **MR. SANTACANA:**   Is that in here?

25         **MR. MAO:**   Yes.

1          MR. SANTACANA:  No objection.

2          THE COURT:  Go ahead.

3      So do you want 120 -- are you seeking to admit 120A and

4   leaving also 120 in there?  It's just a second version?

5          MR. MAO:  Yeah, I think that's easier, Your Honor,

6   because you might --

7          THE COURT:  Yes.

8      Mr. Santacana, he's moving to admit 120A.  We already have

9   120 in there.  Any objection?

10          MR. SANTACANA:  No objection.

11          THE COURT:  120A will be admitted.

12      (Trial Exhibit PX120A received in evidence.)

13          MR. MAO:  Thank you, Your Honor.  This way it creates

14   no confusion in case it was used in the last two days in court.

15   BY MR. MAO:

16   Q.   Looking at Exhibit 120A, Dr. Hochman, how did you use this

17   to consider -- for your technical opinion on the baseline?

18   A.   Okay.  So when someone has an Android phone, they can hit

19   the gear icon, the settings, and then they can hit a secondary

20   menu item like privacy and security, and that will show this

21   screen -- or privacy, they get to this screen which says

22   "Activity controls," third from the bottom.

23      And what it says there, front and center, when they first

24   encounter the control is that they can choose the activities

25   and info you allow Google to save.  So this -- this is a

1    control that affects whether Google is allowed to save your

2    data.

3    **Q.**    And --

4    **A.**    And then --

5    **Q.**    Go ahead.

6    **A.**    Sure.

7         And on the third screen, I think, the -- well, the second

8    screen just shows the controls, which I think everyone's seen a

9    few times already, so I won't belabor that.

10        The third screen, at the bottom, the lower box says [as

11   read]:

12            "To let Google save this information" -- which

13        is the third-party app activity data -- "Web & App

14        Activity must be on" and "The box next to 'Include

15        Chrome history and activity from sites, apps, and

16        devices that use Google services' must be checked."

17        And in that case, that Google services is referring to

18   Google Analytics for Firebase or Firebase.  That's what it's

19   referring to.

20   **Q.**    Anything else it might be referring to?

21   **A.**    It could be referring to Google Mobile Ads also.  That's

22   another Google service.

23   **Q.**    Next slide, please.

24        And this is Exhibit Number PX62, which is already admitted

25   into evidence.

1  **A.**   So this is an excerpt from the Google privacy policy.  And

2  it says -- and I read this [as read]:

3           "We understand this is a big responsibility and

4      work hard to protect your information and put you in

5      control."

6  **Q.**   Next slide, please.

7  **A.**   And this is another excerpt.  It says [as read]:

8           "And across our services, you can adjust your

9      privacy settings to control what we collect and how

10     your information is used."

11  **Q.**   What is your understanding in terms of your technical

12  baseline?  What are you testing against here, reading these

13  disclosures?

14  **A.**   I'm testing against the idea that the switch is a control

15  that either allows a flow of your third-party Web & App

16  Activity to Google, it allows them to take that activity and

17  save it and use it; or if you shut one of those switches off,

18  if you shut either switch off, it should stop Google from

19  taking, copying, and saving your third-party Web & App Activity

20  data.

21          **MR. MAO:**  If you don't mind putting up Exhibit

22  Number 2.

23      This has already been admitted into evidence, Your Honor.

24          **MR. SANTACANA:**  Objection, Your Honor.  We were told

25  this witness would not testify about consumer expectations.

 1   He's not an expert in consumer expectations.  And this is a

 2   user study about consumer expectation.

 3         THE COURT:  I haven't heard the question yet, so I'm

 4   not sure what he's going to use it for.  So let's hear what the

 5   question is and then you can object, if necessary.

 6      What's the question?

 7         MR. MAO:  Sure.

 8   BY MR. MAO:

 9   Q.  Dr. Hochman, did you have a different understanding of how

10   these controls are supposed to work than other people?

11   A.  No.  My understanding --

12         MR. SANTACANA:  Objection, Your Honor.  I renew my

13   objection.

14         THE COURT:  Well --

15         MR. MAO:  Let me rephrase, Your Honor.

16         THE COURT:  Go ahead.

17   BY MR. MAO:

18   Q.  Okay.  Did you have a different understanding of how these

19   controls are supposed to work against other Google employees?

20         MR. SANTACANA:  Objection, Your Honor.

21         THE COURT:  Well, I'm going to sustain the objection.

22   I'm not sure I quite follow the question.

23      Go ahead.  Next question.  Sustained.

24   BY MR. MAO:

25   Q.  What is your understanding, from reviewing internal Google

1  documents, as to what the technical baseline is supposed to be

2  for these controls?

3  **A.**   My understanding, from reviewing the Google internal

4  technical documents, is that everyone thought these controls

5  would stop Google from taking and copying and using all of

6  people's third-party app data.

7        **MR. SANTACANA:**  Objection, Your Honor.  I move to

8  strike.

9        **THE COURT:**  Overruled.

10       Go ahead.

11 **BY MR. MAO:**

12 **Q.**   Okay.  Did you review internal surveys which Google had

13 conducted and was evaluated by the Google employees?

14 **A.**   Yes.

15 **Q.**   Have you seen Exhibit Number 2 that's been admitted into

16 evidence?

17 **A.**   Yes.

18 **Q.**   Did you use Exhibit Number 2 -- sorry.

19       Did you consider Exhibit Number 2 for the purposes of

20 rendering your technical opinion?

21 **A.**   Yes.

22       **MR. MAO:**  Can we put up the page the doctor wanted.

23 **BY MR. MAO:**

24 **Q.**   Is this one of the pages which you considered?

25 **A.**   Yes.

1    Q.    And can you explain to us how this helped you in terms of

2    rendering your technical opinion in terms of what you were

3    going to test against?

4    A.    I wanted to be sure that I had a good baseline to test

5    against, that I was testing the right thing.

6    Q.    And what was your conclusion from reading this?

7    A.    Well, I read what it said.  It said that -- I would assume

8    that whatever data was pumping out from, like me, using a

9    web browser, would no longer be recorded.  And it also says it

10   will stop giving Google permission to store my activity.

11   Q.    I'd like to put up Exhibit Number 9, which was also

12   admitted into evidence, before I ask the question.

13        Sorry.  Before I display this, did you consider any other

14   internal Google documents for the purposes of rendering your

15   technical opinion on how the technology was supposed to work?

16   A.    Yes.

17   Q.    Was Exhibit Number 9 one of them?

18   A.    Yes.

19   Q.    Okay.  Is this Exhibit Number 9 in which you had used for

20   the purpose of rendering your technical opinion?

21   A.    Yes.

22   Q.    Okay.  Can you walk us through this document in terms of

23   what you had concluded from it?

24             MR. SANTACANA:  Your Honor, I object.  This is not --

25             THE COURT:  You can ask him what he considered, but

1  the focus is the technical focus, not what --

2          MR. MAO:  Sure.

3          THE COURT:  -- consumers think or not.

4     He's not an expert on that.

5          MR. MAO:  I understand, Your Honor.

6          THE COURT:  Okay?  So, next question.

7          MR. MAO:  Sure.  Sure.

8  BY MR. MAO:

9  Q.   What is your understanding as to what the WAA and sWAA

10 buttons were supposed to do?

11 A.   My understanding of what these buttons are supposed to do

12 is that they should give consumers control, just plainly like

13 what they say.  You can control whether Google is taking,

14 saving, and using your data.

15 Q.   And you said that in the -- for the purposes of coming to

16 that conclusion, technical conclusion, you had also reviewed

17 internal Google documents; is that correct?

18 A.   Yes.

19 Q.   And were there Google engineers and employees internally

20 that had agreed with your understanding of the baseline?

21 A.   Yes.

22 Q.   Let's move on to the next slide.

23     Sorry.  It would be Opinion Number 2.  Oh, sorry.  Opinion

24 Number 3.

25     Doctor, what is your third opinion?

**A.**   So my third opinion is that throughout the class period,

Google was taking, copying, and using users' third-party app

activity data regardless of the position of the switches.

       **MR. MAO:**   Your Honor, I actually had a question, if we

can just go off the record for a moment, on use of

interrogatories.  I just want to know how they make it,

actually, to a jury.  I'm going to put up Interrogatory

Number 1.

       **THE COURT:**   I'm not sure I understand what you're

asking.

       **MR. MAO:**   Okay.  Well, let me try that, sure.

       **THE COURT:**   Just ask questions and then --

       **MR. MAO:**   Sure, sure.

       **THE COURT:**   -- we'll deal with it.

       **MR. MAO:**   If we can put up the slide on Exhibit -- on

Interrogatory Number 1.

       **THE COURTROOM DEPUTY:**   Should this be displayed to the

jury?

       **MR. MAO:**   Yes.  It's -- we've stipulated to this.

    For the record, this is Plaintiffs' Interrogatory

Number 1, I believe Supplemental Responses Number 4, page 9.

    Do you have any objections?

       **MR. SANTACANA:**   Sorry.  I don't think -- what are you

asking?

       **MR. DAVID BOIES:**   Is this Interrogatory Number --

1          **MR. WRIGHT:**  Interrogatory Number 1.

2      Sorry, Your Honor.

3              (Co-counsel confer off the record.)

4          **MR. MAO:**  Okay.  Sure.

5  **BY MR. MAO:**

6  **Q.**  Doctor, have you seen this interrogatory response before?

7  **A.**  Yes.

8  **Q.**  Did you consider it for the purposes of rendering your

9  technical opinion?

10  **A.**  Yes, I did.

11  **Q.**  Okay.  Can you tell me a little bit about what this is in

12  terms of the Google response?  What does it describe?

13  **A.**  Yeah.  This is a schematic that describes technically how

14  Google is taking data about third-party app activity from

15  users' phones.

16  **Q.**  Can we focus on the left-hand side here.

17      Can you explain to the jury what this Google response is

18  telling us in terms of how the data flowed and what data was

19  being collected?

20  **A.**  Sure.  The first box represents what's going on on the

21  user's phone.  So -- so through the Firebase SDK, the app

22  interaction data generated by the user interacting with the app

23  is going to be gathered, and it's gathered into a data bundle.

24      And Google -- that data bundle includes some things.  It

25  includes the event data.  Okay.  An event is like something

1  you've done on your phone.  All right?  It could be, you know,

2  starting an app or selecting a different app screen, clicking

3  to a different screen.  There are probably 25 different events.

4  We can look at those maybe in more detail.

5      The data bundle also includes some identifiers.  It says

6  here some acronyms.  Those are identifiers.  Those are unique

7  personal identifiers.  They identify that phone and the person

8  who's carrying it.

9      There's also some further IDs, some Google IDs, that may

10  be included.

11      And there are also user properties.  These are like

12  demographics, like age, gender, location, other things.  We

13  also could go into those in more depth too if you want to.

14  **Q.**  Yes.  Let's stay here for a moment.

15      Let me just understand.  What exactly is an event data?

16  What is event data?

17  **A.**  Event data is one event that's happening in the app on the

18  user's phone.  So it's one thing the user has done, one step.

19  **Q.**  Is event data aggregated data?

20  **A.**  No.

21  **Q.**  So Google -- is Google here collecting event data or

22  aggregated data?

23  **A.**  Google is collecting event data.

24  **Q.**  So in a typical, for example, action in which I'm, for

25  example, viewing a page on an app, how many event datas might

1    that collect?

2    **A.**    Well, it depends what you do on the page, but it could

3    generate multiple events.  And if you're using an app --

4    you know, you open an app and you do a variety of things in the

5    app -- you could generate dozens of events, maybe even

6    hundreds.

7    **Q.**    If I open an SDK-using app, does that generate an event?

8    **A.**    Yes.

9    **Q.**    If I'm looking at a specific page on an app, does that

10   generate an event?

11   **A.**    Yes.

12   **Q.**    If I then move to a different page, does that generate an

13   event?

14   **A.**    That's another event.

15   **Q.**    When I stop, go to another app, does that generate an

16   event?

17   **A.**    Yes.

18   **Q.**    When I come back, then, to that app to do something else,

19   does that generate an event?

20   **A.**    Yes.

21   **Q.**    And does that continue tracking me, collecting events, as

22   long as that SDK is on that app?

23   **A.**    Yes.  As long as one of Google's SDKs, either Firebase or

24   Google Mobile Ads, is in the app, those events are being

25   collected.

1   Q.   And all of those events are not aggregated data; isn't

2   that correct, Doctor?

3   A.   No.  They're collected, actually, as individual events,

4   and they're loaded into the data bundle as individual events.

5   Q.   Sir, I apologize.  I interrupted you.

6        Can you tell us why -- or what is happening here before it

7   goes to that next step called consent checks?  What is that?

8   A.   Okay.  So there's that sort of bold arrow.  That's showing

9   Google taking the data bundle from the user's phone.  That data

10  bundle goes across the Internet and it comes to the second box,

11  which is one of Google's servers.  That's where Google does a

12  variety of processing on that data packet.

13       So the first thing they do when the data packet arrives is

14  Google makes a copy of the packet.  It duplicates it.  So one

15  packet is received and then Google copies it, and now there are

16  two packets there.

17       After that's done, Google performs a consent check.

18  Q.   So let me make sure I understand this.

19       Google collects and copies the data before it checks for

20  consent; is that correct?

21  A.   That's right.

22  Q.   And that is what this graph is actually showing; is that

23  correct?

24  A.   Yes.  And it's doing this regardless of the position of

25  the WAA and sWAA switch.  The position of the switch doesn't

1   change the collecting or the copying.  That happens every time,

2   all the time.

3   **Q.**   So all of the systems designed to check for consent, the

4   data is duplicated before it even does that; is that correct?

5   **A.**   Correct.

6   **Q.**   Doctor, going back to the second step right here, is DSID

7   a personal identifier?

8   **A.**   Yes, it is.

9   **Q.**   Is DSID a pseudonym?

10  **A.**   Yes, it is.

11  **Q.**   How could the DSID both be a pseudonym and personal

12  information?

13  **A.**   Okay.  So I'll have to -- I'll have to explain a little

14  bit about that.

15      It's personal information because it's an identifier.

16  It's a unique identifier for each person.  Each person, each

17  device has one DSID.  And the device is personal.  Your phone

18  is in your pocket.  It's you.  It's very personal.

19      The DSID is also a pseudonym because it's not your proper

20  name.  It's just, like, a number.

21  **Q.**   I see that there's other IDs noted here on this data

22  bundle.  Are those other IDs also personal information?

23  **A.**   The IDFA is, because it's also a device identifier.  And

24  the other IDs also are.  Some of the other IDs are -- one of

25  them is an app instance ID.  It's a mouthful.  But the app

1    instance ID is like a serial number for your app.

2        Firebase generates a unique app instance ID for each copy

3    of the app.  All right?  So the same way, like, your

4    refrigerator has a serial number that's different from all the

5    other refrigerators, even though they all look the same, it's

6    like a serial number that identifies your copy of the app.

7    **Q.**   Can we show the next slide, which is Interrogatory

8    Response -- just page 11, that same interrogatory.

9        The interrogatory is a sworn statement by Google.  Is that

10   your understanding?

11   **A.**   Yes.

12   **Q.**   Did you consider this sworn statement response by Google

13   for the purposes of rendering your technical opinion?

14   **A.**   I did.  I read it very carefully.

15   **Q.**   And what is this response telling you?

16       **MR. SANTACANA:**  Objection, Your Honor.  We've objected

17   to the designation of this interrogatory response as

18   incomplete.  There's more to this.

19       **THE COURT:**  Well, why don't you put up the entire

20   response.

21   **BY MR. MAO:**

22   **Q.**   Go ahead.

23   **A.**   Sure.  A preliminary step before the consent check occurs

24   is data duplication.

25   **Q.**   Okay.

1  **A.**   And the data referred to there is that packet full of

2  event data and identifiers.

3  **Q.**   Can you explain the data duplication process here?

4  **A.**   Yes.  It's copying.  The data is copied.  A single copy of

5  the data packet received from a user's mobile device is made.

6  So one copy is made.  There's an original and now there's a

7  copy.

8  **Q.**   Do you have any understanding as to why Google decided to

9  make these copies before consent check is actually done?

10 **A.**   I mean, my inference is that it's -- it's done -- they're

11 creating a copy because that just helps them do what they're

12 trying to do.

13 **Q.**   Okay.  Dr. Hochman, are there other Google Firebase

14 products that actually checks for consent before the data is

15 actually sent?

16 **A.**   Could I just add to the prior answer?

17 **Q.**   Sure.  Please.

18 **A.**   So, actually, the next sentence is a little bit helpful.

19      [As read]:

20           "This is done to facilitate the eventual data

21      logging" -- okay? -- "that respects user consent

22      choices."

23 **Q.**   Okay.

24 **A.**   Yes.

25 **Q.**   So going back to my question, is there -- are there any

1    Google Firebase products that checks for consent before it logs

2    and transmits the data?

3    **A.**    Yes.

4    **Q.**    And what are those?

5    **A.**    There's a product within Firebase.  So Firebase is like a

6    collection of products.  It's a -- I said it was a collection

7    of different things that it could do.  So one of those things

8    is called the App Indexing service.

9    **Q.**    What exactly is the App Indexing service?

10   **A.**    It's a service that allows a developer to put tags in

11   their apps and then make those apps searchable from the search

12   box on the Android phone so that when you search on your

13   Android phone, you can get a result that's, like, within an

14   app.

15   **Q.**    And your understanding from Google's technical responses

16   in this case is that that process is set up for App Indexing,

17   but not for this app SDK -- sorry -- for this SDK?

18   **A.**    That's right.

19   **Q.**    Did you ever receive any responses as to why there's this

20   type of difference?

21   **A.**    No.  I've received no explanation as for why the

22   App Indexing service is checking for consent on the device and

23   the other S- -- the other services are not checking for consent

24   before the data is taken off the device.

25           **MR. MAO:**  So going back to the prior chart.  Yes.

1    BY MR. MAO:

2    Q.   So looking here at this data bundle, when you said that a

3    copy is made, are there other copies that are made in addition

4    to the data bundle?

5    A.   Yes.

6    Q.   Can you explain that, how that gets further copied?

7    A.   Sure.  Google, after they've processed the data and the

8    data ends up in some logs, the data is then copied from one log

9    often into another log and then into many other places

10   potentially.

11   Q.   Dr. Hochman, at any part of this process, is there any

12   type of data aggregation as opposed to just collecting of event

13   data?

14   A.   So far, no.  I -- there's no aggregation going on here.

15   Q.   And this event data collection, is that done for every

16   event that happens on every app for every device which has

17   these SDKs?

18   A.   Yes.

19        MR. MAO:  Your Honor, I think the issue now is going

20   to be that I'd like to put in plaintiffs' data.

21        Are there any objections to that from the slides on which

22   we do have?

23        THE COURT:  Well, I don't -- sort of a generalized "Do

24   you have any problem with this?" is not going to work.

25        MR. MAO:  Okay.

1          THE COURT:  If you have something specific to

2   propose --

3          MR. MAO:  Sure.

4          THE COURT:  -- propose it, and then I'll see if

5   they've got a problem.

6          MR. MAO:  Sure.

7   BY MR. MAO:

8   Q.   Dr. Hochman, did you examine all of the representative

9   plaintiffs' data which Google produced in response to discovery

10  requests in this case?

11  A.   Yes.

12  Q.   The ones that -- also, did you do any tests?

13  A.   Yes, we did tests.

14  Q.   How did you perform tests in order to get data back?

15  A.   Okay.  So we did several different kinds of tests.

16  Q.   Sure.

17  A.   One kind of test is that we had some of our own devices

18  and we went through a defined sequence of events:  launch

19  this app, close it, launch a different app, do something.

20  You know, it was a sequence of steps that we recorded.  And we

21  did it the same way each time because what we were looking for

22  is to see if there were differences in how these things were

23  recorded when WAA and sWAA were on versus off versus, you know,

24  different devices.  So we were looking for differences.

25  Q.   Dr. Hochman, what are you actually able to see by

HOCHMAN - DIRECT / MAO

1   examining plaintiffs' data?

2   **A.**   I'm able to see all the event data that Google has taken

3   from their devices and saved in Google's data repositories.

4   **Q.**   Would it be helpful for me to put up some of the slides in

5   order to show what kind of events are actually being collected

6   by Google?

7   **A.**   Yes.

8   **Q.**   Okay.  If you could put up the first slide.

9       What does this show, Doctor?

10  **A.**   This is an interaction between Pete Rodriguez --

11          **THE COURTROOM DEPUTY:**  To the gallery?

12          **THE WITNESS:**  -- and the Career -- he's using the

13  Career Karma app.

14          **THE COURT:**  Has this been admitted as an exhibit?

15          **MR. MAO:**  This is, Your Honor.  This is what we were

16  trying to discuss because this is part of the bulk data that we

17  were trying to admit.  This is exactly why I was trying to

18  resolve that beforehand.

19          **THE COURT:**  Okay.

20          **MR. MAO:**  Would you like to take a pause?  I can,

21  again, enumerate what these --

22          **THE COURT:**  Let me just...

23          **MR. SANTACANA:**  I don't object to the publication of

24  this slide, Your Honor.

25          **THE COURT:**  Very well.  Go ahead and publish it.

1          MR. MAO:  So just for the record, these are the

2    following exhibit -- plaintiffs' exhibits from which this data

3    is pulled from.  Did you want me to have that for the record,

4    Your Honor?

5          THE COURT:  Well, what I'm unclear on is:  Are these

6    documents that have been admitted previously or are you seeking

7    to admit them?

8          MR. MAO:  I'm seeking to admit them, Your Honor.

9          THE COURT:  You're seeking to admit them.  And what

10   numbers are we talking about?

11         MR. MAO:  Sure.  This is 442 --

12         THE COURT:  Yes.

13         MR. MAO:  -- 452, 453, 454, 455, 456, 459, 460, 461,

14   462, 463, 464, 483, 489, 485, 486, 489, and 491.

15         THE COURT:  Okay.  And this is the source code

16   material?

17         MR. MAO:  No, Your Honor.  This is plaintiffs' own

18   data received back from Google in addition to test data.

19         THE COURT:  Okay.  Any objection?

20         MR. SANTACANA:  Yes, Your Honor.  I object on

21   foundation and 403 grounds for the reasons we discussed this

22   morning.  The witness hasn't testified about these exhibits at

23   all at this time.

24         THE COURT:  Okay.  So are you going to ask some

25   foundational questions before we show this to the jury?

 1          MR. MAO:  Sure.

 2          THE COURT:  Although we've shown 453 to the jury and

 3   Mr. Santacana said he didn't have any objection to doing that.

 4       But before we show any further of these that you've just

 5   recited, please establish a foundation.

 6          MR. MAO:  Sure.

 7   BY MR. MAO:

 8   Q.   Dr. Hochman, I read a number of things into the exhibit.

 9       But you had examined all of plaintiffs' data and your own

10   testing data for the purposes of rendering your professional

11   opinion; is that correct?

12   A.   Yes, I did.  I and the team, we reviewed all this data

13   very carefully.

14   Q.   And you are the one that had requested this data and the

15   testing data in order for you to be able to assess your

16   technical opinion; isn't that correct?

17   A.   Yes.

18          MR. MAO:  Are there still objections, Your Honor?

19          THE COURT:  Was this created under your direction?

20          THE WITNESS:  This data was actually sort of in the

21   wild.  This was just what the plaintiffs were doing as they

22   went about their daily life using their apps.  This was not

23   staged.  This is just natural data.

24          THE COURT:  All right.

25          MR. MAO:  And to be clear, Your Honor, this is

 1  produced by Google and which they're objecting to.

 2          THE COURT:  I understand.  Well, they're not objecting

 3  yet.

 4      Go ahead.

 5          MR. SANTACANA:  Your Honor, as I said this morning, I

 6  don't think that sending this many exhibits of raw data to the

 7  jury without them having any idea what it is from this witness

 8  is appropriate.  I think the witness should explain what it is

 9  first, not just that he has seen it before.

10          THE COURT:  Well, okay.  Why don't you ask that

11  question and then we'll move on.

12          MR. MAO:  Sure.

13  BY MR. MAO:

14  Q.  Dr. Hochman, I realize this is a lot of data which Google

15  collected and produced, but you examined it, did you not?

16  A.  Yes.

17  Q.  And you used it to consider and to evaluate how much data

18  Google was actually collecting on us; isn't that correct?

19  A.  Yes.

20  Q.  And this screen which you see right there for PX453,

21  that's simply a display of what the data actually looks like;

22  isn't that correct?

23  A.  Yes.

24  Q.  And this is event-level data, isn't it, Dr. Hochman?

25  A.  Yes.  Yes, these are events.

1    **Q.**    Okay.  How detailed are those events?

2    **A.**    They're extremely detailed and extremely voluminous.

3    **Q.**    Can you show me, by looking at the slide, what type of

4    information, for example, it's collecting?

5    **A.**    This app was collecting Pete's first name.

6         **MR. MAO:**  Can we move on to the next screen.

7         Also 453, Your Honor?  Objections?

8         **THE COURT:**  Just -- you don't have to solicit

9    objections.

10        **MR. MAO:**  I understand, Your Honor.

11        **THE COURT:**  I'll take care of that.  I've got my job;

12   you've got yours.

13        **MR. MAO:**  I understand.  I'm just a little worked up.

14        **THE COURT:**  So just ask questions.

15        **MR. MAO:**  Sure.  I'm a little worked up.  I think this

16   is pretty simple.

17   **BY MR. MAO:**

18   **Q.**    Go ahead.  What is this?

19   **A.**    This is Mr. Rodriguez's last name.

20   **Q.**    Next slide, please.

21   **A.**    They got his email address also.

22   **Q.**    After that, next slide.

23   **A.**    And they've got his phone number.

24   **Q.**    Is this event data or aggregate data, Doctor?

25   **A.**    This is detailed event data.

**HOCHMAN - DIRECT / MAO**

1    Q.    Okay.  Move on to the next -- sorry -- the one after this.

2          And what is this, Doctor?

3    A.    This is another example of an event that's been taken by

4    Google.

5    Q.    Okay.  Can you tell me what exactly is happening in this

6    event?

7    A.    Yes.  I can tell you a few things.

8          Okay.  How about we start at the top, because there's a

9    lot here.

10   Q.    Sure.

11   A.    There's a timestamp at the top, and then there's the

12   device identifier.  In this case, it's an ADID.  Okay?

13   That's -- I think it's an ad ID.  Anyway, it's for Android.

14   That's an identifier that identifies a specific Android phone.

15   There's just one phone in the world with that number on it.

16   Okay?  So that's the identifier associated with this event, one

17   of the identifiers.

18         I can also see in here that it looks like a first open

19   event.  You can see in the second line there, right in the

20   middle of that, it says, "App first opened."

21         Then the advertiser use case is documented here.  So this

22   says that this event is being used for conversion tracking.

23   It's also being used for remarketing.

24   Q.    What is conversion tracking, Doctor?

25   A.    Okay.  So this will take a moment.

1    Conversion tracking is something that's very important to

2    Google ads.  It's what actually makes them quite unique from

3    other kinds of advertising.

4    Google provides advertisers with a connection between the

5    showing of an ad and the resulting event that the advertiser's

6    hoping to achieve.  So it could be someone shows an ad, someone

7    shows another ad, and then you go there and make a purchase.

8    That's a conversion when you make the purchase, maybe, for that

9    advertiser.

10    It could also be that you sign up for a newsletter or it

11    could be that you download their app and install it and launch

12    it.  Okay?

13    There are -- each advertiser can define different

14    conversion events, and there's some code or a method that the

15    advertiser can use -- a variety of methods they can use to

16    trigger Google to record that conversion and then be able to

17    tell you which of your ads led to that conversion.

18    And this is very important for advertisers to understand

19    what adver- -- what the value is of their advertising and to --

20    it's very important to Google because it helps them to sell

21    more advertising.

22    **Q.**   And this event data -- the last five screens that you had

23    shown as selected, was this with WAA -- with WAA or sWAA on or

24    WAA or sWAA off?

25    **A.**   This is sWAA-off data.

1   Q.   And this was naturally generated by one of the plaintiffs;
2   isn't that correct?
3   A.   Yes.
4   Q.   What else was peculiar about this specific event, Doctor?
5   A.   This event, I believe, showed up in the -- let's just take
6   a look at what log it's in.  Can we go back out?
7       So if I'm not mistaken, I think this one showed up in the
8   UUAD log.
9   Q.   Okay.  And what is a UUAD log, Doctor?
10  A.   It's the unified user app data.
11  Q.   Just so I understand, is that in the pseudonymous logs or
12  in the personal logs?
13  A.   Well, to my mind, it's personal because -- I think Google
14  might classify it as pseudonymous, but it's personal because
15  it's user app data.  It's for the user.
16  Q.   Assuming that this is in the pseudonymous side of Google's
17  logs, does the -- what does the label "unified user app data"
18  actually suggest to you?
19  A.   "Unified" means all of it together.  "User" means it's
20  data about users' app activity.
21  Q.   So looking at this particular event -- and this is just
22  one event; is that correct?
23  A.   Just one.
24  Q.   Okay.  Looking at this particular event, Doctor, was
25  Google able to reidentify the same user in a subsequent event?

1    **A.**   Yes.  User -- Google is able and is doing this for

2    conversion tracking so that they can see the user who sees an

3    ad is the same as the user who makes the purchase.  That's

4    critical for them to be able to connect those two together.

5    **Q.**   What is your understanding -- sorry.

6         Did you consider Dr. Black, Google's expert's report?

7    **A.**   Yes.

8    **Q.**   What is your understanding from Dr. Black as to what UUAD

9    was supposed to do when sWAA's off?

10   **A.**   Dr. Black, I think, said that the sWAA-off data would not

11   appear in UUAD.

12   **Q.**   On the UUAD side when sWAA is off?  Are you sure?

13   **A.**   I think that's what he said, yeah.

14   **Q.**   Okay.  So does this event surprise you when sWAA is off?

15   **A.**   Yes.

16   **Q.**   If you don't mind, let's go back to the flow chart for

17   Interrogatory Number 1.

18        So looking at this process, how much data did you receive

19   for our plaintiffs?

20   **A.**   We received 2 gigabytes of data for two plaintiffs over a

21   period of two months.

22   **Q.**   Okay.  If their sWAA is off, looking at this process, were

23   they still able to tell who the user was?

24   **A.**   Absolutely.

25   **Q.**   And how would they know that looking at this process,

1    Doctor?

2    **A.**    There are tons of identifiers in -- attached to each

3    event.

4    **Q.**    And looking at the next process, consent checks, how does

5    Google go about doing consent checks?

6    **A.**    Well, Google knows exactly who the user is in order to do

7    a consent check because they have to look up the position of

8    the user's switches and those are associated with the user's

9    Google ID.

10    **Q.**    So this type of consent checking happens whether WAA is on

11    or off?  Are you sure?

12    **A.**    Yes.

13    **Q.**    And you verified this; is that correct?

14    **A.**    Yes.  I verified it by Google's own technical answers and

15    by our own testing.

16    **Q.**    Right.  But my understanding also is that they didn't have

17    to first send a bundle and duplicate before they checked for

18    consent; is that correct?

19    **A.**    No, they didn't need to do that because the App Indexing

20    service demonstrates that they have the capability to check for

21    consent on the device and stop the taking of data if there's no

22    consent.

23    **Q.**    And what was the basis for your opinion and understanding

24    of how App Indexing worked?

25    **A.**    It was Google's -- it was actually, I think, Mr. Monsees

1  gave some deposition testimony that informed us about that.

2  **Q.**   Okay.  Going back to plaintiffs' data for a moment, how

3  much data was produced for the plaintiffs?

4  **A.**   I said it was 2 gigabytes.  And if we were to try to print

5  that out, we calculated it, give or take, about a million

6  pages.  That's a stack of paper 30 stories high.

7  **Q.**   That is part of the reason why there were so many exhibits

8  that you wanted me to admit; isn't that correct?

9  **A.**   Yeah, I guess so.

10 **Q.**   Okay.  But do you know whether or not that was all the

11 data that was collected?

12 **A.**   For those people?  No.  That was just the slice that

13 Google gave us.  But it looks like there's potentially much

14 more data that Google has, or at least many copies of it.

15         **MR. MAO:**  Can we put up Slide 14.

16     Oh, sorry.  If you don't mind just going back, just for

17 the purposes of the record -- I have a note here -- that UUAD

18 slide.  If you can go back to the UUAD slide.  It had a number

19 on that.  It was Exhibit Number 443 -- or 442.  I just want to

20 make sure we have that for the record.

21     Okay.  Sorry.  For plaintiffs' data.

22 **BY MR. MAO:**

23 **Q.**   What is your understanding, from Google's sworn responses

24 back to you, as to whether or not they have produced all of

25 plaintiffs' data?

1    **A.**    No.  They said they -- it was impractical for them to

2    produce all of plaintiffs' data.

3        **MR. MAO:**  Can we put up that interrogatory.

4    BY MR. MAO:

5    **Q.**    Okay.  Can you read into the record the Interrogatory

6    Number 14.

7    **A.**    Yes.

8        [As read]:

9            "Please identify every data source (including

10       logs) that includes or during the class period

11       included WAA-off data.  For each such data source,

12       please include a list of field names and

13       descriptions, the retention period, and how such data

14       sources are used."

15   **Q.**    And what was their response that you selected, Doctor?

16   **A.**    So it's -- Google's response was [as read]:

17           "... it is not practical or relevant to account

18       for every single potential data source (including

19       logs) that may contain such data because there are

20       various downstream users of the pseudonymous data

21       described in response to Plaintiff's Interrogatory

22       Number 1."

23       **MR. SANTACANA:**  Your Honor, I object.  We

24   counterdesignated the full paragraph.  If it's going to be read

25   into the record, it should all be read into the record.

1          THE COURT:  Let me see the rest of the --

2          MR. SANTACANA:  This is the full paragraph on the

3    screen here.

4          THE COURT:  Well, so you're -- the only part that

5    hasn't been read into the record is the last sentence?

6          MR. SANTACANA:  No.  He hasn't read above or below the

7    highlight.

8          THE COURT:  Well, you can ask him, then, on -- when

9    you cross-examine.

10         MR. SANTACANA:  Okay.  I will.

11   BY MR. MAO:

12   Q.   They didn't produce all of your data, did they?

13   A.   Oh, no.

14   Q.   Do you have an idea whether or not this is happening to

15   the entire class?

16   A.   Yes.  This is happening to the entire class because the

17   system, it's systemic.  It's processing these events the same

18   way for everybody.

19   Q.   Just based on the data that's been produced for the

20   plaintiffs, the limited data that you identified, how much data

21   are we actually talking about in terms of what they've

22   collected on the class, in your estimate?

23   A.   Just doing some thumbnail math, there's 98 million

24   plaintiffs, 98 months.  They have 174 million devices because

25   some people have more than one device.  If you multiply that

1   all out, we get 4.5 quadrillion pages.  That's a big stack of

2   paper.  If you start stacking it up, it'll go all the way to

3   the sun from the earth three times.

4   **Q.**   Does the event data also include location data?

5   **A.**   Yes.

6   **Q.**   So with things like location, your background, and also

7   the various IDs that Google has, is Google able to reidentify

8   the user?

9   **A.**   Absolutely.

10  **Q.**   I want to just go back to this concept of conversions

11  really fast before I go on to the next section.

12      Why is conversions important for Google's business?

13  **A.**   Conversions are how Google justifies value to the

14  advertiser.  It's what gives the advertiser the incentive to

15  spend more money.

16      Not only that, some of Google's advertising products are

17  actually charged per conversion.  So an advertiser can go out

18  and buy an app promo ad.  If they want to stimulate people to

19  download and use their app, they can place ads and they can pay

20  Google a bounty every time someone sees the ad and responds to

21  it and downloads and launches the app.

22  **Q.**   What is the difference between an app promo ad and Google

23  Mobile Ads?  It might help the jurors.

24  **A.**   Sure.  App promo ad is one kind of ad.  And also the

25  app promo ads tend to be priced -- because they're priced often

1    per conversion, they tend to be -- that price is much higher

2    than the price of just buying someone to view or click your ad,

3    because you're buying a result.

4    **Q.**    Is a price per conversion different than other types of

5    prices which Google might charge advertisers?

6    **A.**    Yes.    It could be -- you know, it could be a thousand

7    times more than the price of just merely showing someone an ad

8    because you're paying for a result.    If you're advertising,

9    sometimes you have to show your ad thousands and thousands of

10   times to get a result.    But with a conversion, you just pay

11   when someone -- when you've gotten the result.

12   **Q.**    And what type of ad events are more valuable to Google and

13   its advertisers?    Serving the ad or actually getting a result?

14   **A.**    The advertisers are focused -- having worked with many

15   advertisers over a couple decades, my experience is that the

16   advertisers are very focused on results.

17   **Q.**    In order for you to be able to track a conversion, do you

18   need more than one data point?

19   **A.**    You do.

20   **Q.**    What kind of data points do you need?

21   **A.**    Well, there's not only conversion; there's also

22   attribution.

23   **Q.**    Okay.

24   **A.**    I'll have to digress a little to explain that.

25        Google not only wants to tell advertisers that this ad led

1  to this sale; they want to be about able to show:  Look,

2  there's a whole sequence of ads.  View-through conversions is

3  what they call them.  But they want to be able to attribute

4  value to all the different interactions that person has before

5  they make a purchase, for example.  Okay?

6      The path to the purchase is often not a straight line.

7  It's like a pretzel.  Right?  The person does some searching

8  online.  They might do something on their phone.  They might

9  talk about it with someone else.  They might go do another

10  search.  It could be -- they could be wending around for a

11  while, especially for a big-ticket purchase.

12      And the advertiser wants to be able to influence them at

13  the various stages -- okay? -- at the point where they're

14  considering, where they're trying to make a decision, where

15  they're gathering more information.

16      So Google wants to be able to present information and data

17  about that whole consumer journey.  In order to do that, they

18  need to be able to connect the dots.  They need to be able to

19  connect this ad to this ad to this ad, finally to the purchase

20  over here.

21  **Q.**  Is there any dispute in this case that Google uses

22  sWAA-off data for conversions?

23  **A.**  No.

24      **MR. MAO:**  I want to just move on to -- if you don't

25  mind putting up Exhibit Number 72.

1      Your Honor, this has not yet been moved into the exhibit.

2  I've conferred with counsel on the other side, and they have no

3  objections.

4           **THE COURT:**  All right.  So is that correct?

5           **MR. SANTACANA:**  That is true.

6           **THE COURT:**  All right.  72 will be admitted.

7      (Trial Exhibit PX72 received in evidence.)

8  **BY MR. MAO:**

9  **Q.**   I only want to focus on one thing on this privacy policy.

10 I'm sure they've seen it a lot.  I just want to look at the

11 definition of "personal information."

12 **A.**   Yes.

13 **Q.**   Did you consider this statement for the purposes of your

14 professional opinion?

15 **A.**   Yes.

16 **Q.**   Okay.  So for the purposes of determining what is a

17 personal ID or personal identifier or personal information in

18 this case -- okay? -- do you agree with Google's definition of

19 "personal information" as the way they've interpreted it?

20 **A.**   Well --

21          **MR. SANTACANA:**  Objection, Your Honor.  This witness

22 explained any opinions on what does or does not constitute

23 personally identifiable information.

24          **MR. MAO:**  Your Honor, I just want to talk about IDs.

25          **THE COURT:**  Well, you're asking if he's agreeing with

 1    somebody's definition of --

 2              **MR. MAO:**  Sure.

 3              **THE COURT:**  So why don't you try something different.

 4              **MR. MAO:**  It's a poor question, I admit.

 5    **BY MR. MAO:**

 6    **Q.**    Okay.  Dr. Hochman, is my understanding correct that

 7    Google believes that only the GAIA ID is personally

 8    identifying?

 9    **A.**    Yes.  I think among their identifiers, I think that -- I'm

10    sorry.  Okay.

11    **Q.**    I understand.

12    **A.**    Can I just read this for a second?

13    **Q.**    Sure.  Go ahead.

14    **A.**    Let me just read it so everyone hears it.

15      [As read]:

16         "Personal information.  This is information that

17      you provide to us which personally identifies you,

18      such as your name, email address, or billing

19      information, or other data that can be reasonably

20      linked to such information by Google, such as

21      information we associate with your Google Account."

22      And I was jumping the gun a little bit there because I was

23    just thinking about identifiers, but there's all kinds of

24    information here that Google's definition would encompass.

25    **Q.**    Right.  So you understand that Google says that email

1    addresses are personal information?

2    **A.**    Yes.

3    **Q.**    Are email addresses also pseudonyms?

4    **A.**    Yes, they are.

5    **Q.**    When you look at an email address, can you tell actually

6    who that belongs to?

7    **A.**    You might be able to.

8    **Q.**    A device, a device ID, would you be able to tell who that

9    actually belongs to?

10    **A.**    I couldn't because they're really long and I wouldn't be

11    able to memorize one.

12    **Q.**    But let me ask you this:  What's more personal to you?

13    Your email address or your personal -- or your device ID?

14    **A.**    I think they're both personal because they relate -- they

15    point back to me, exactly to me.

16    **Q.**    Right.  So in terms of the IDs that Google use to measure

17    conversions, are those IDs personal information --

18        **MR. SANTACANA:**  Objection, Your Honor.

19    **BY MR. MAO:**

20    **Q.**    -- on a technical level, just looking at the technical

21    definition they provided here?

22        **MR. SANTACANA:**  Your Honor, I object.  He clearly

23    disclaimed any opinion in his deposition --

24        **THE COURT:**  He's not an expert on that issue, so don't

25    ask him.

1           MR. MAO:  Sure.

2       Do you mind putting up the -- let's put up Google's

3   expert's own list of unique IDs.

4       I presume no objection there; right?  Your slides.

5   BY MR. MAO:

6   Q.   Okay.  Let's go.  Unique IDs.  Who do you know

7   Dr. Jonathan -- Jon Black to be?

8   A.   He is the rebuttal expert that Google hired in this case.

9   Q.   Okay.  Dr. Black is saying on this slide here, personal

10  identifiers is on the left-hand side, pseudonymous identifiers

11  on the right-hand side.  Do you agree, Doctor?

12  A.   No.

13          MR. SANTACANA:  I object, Your Honor.  He disclaimed

14  any opinion on whether any data in this case --

15          THE COURT:  Sustained.  Sustained.  That's not what

16  he's disclosed to testify about.

17          MR. MAO:  But these are the IDs, Your Honor.

18          THE COURT:  Well, what are you asking the question?

19  You're just putting this up and saying, "These are the IDs."

20  What's the question to this witness?

21          MR. MAO:  Sure.

22  BY MR. MAO:

23  Q.   Are advertising IDs personal identifiers?

24          MR. SANTACANA:  I object, Your Honor.

25          THE COURT:  Sustained.  Sustained.  He's not

 1  testifying about what personal identifiers are.  You know that.

 2  Move to another area.

 3          MR. MAO:  May I ask if personal IDs -- if advertising

 4  IDs ties to a device?

 5          THE COURT:  You may ask that question.

 6  BY MR. MAO:

 7  Q.   Okay.  Do advertising IDs tie to a device?

 8  A.   Yes, they do.

 9  Q.   Do app instance IDs tie to a device?

10  A.   Yes, they do.

11  Q.   Do they tie any more to a device than the GAIA ID?

12  A.   No.  They all tie to a device.

13  Q.   And Google uses all of these IDs in order to identify

14  things for the purposes of conversions; isn't that correct?

15  A.   Yes.

16  Q.   Okay.  Let's move on to the next opinion.

17       Dr. Hochman, I understand that you measured a number of

18  impacts to the users; isn't that correct?

19  A.   Yes.

20          MR. MAO:  Can we put up the My Activity screen?  The

21  My Activity screen, please.  Sorry.  The next slide.

22  BY MR. MAO:

23  Q.   Okay.  What is the difference between what Google shows

24  users when sWAA is on versus when sWAA is off?

25          MR. MAO:  Can we stop running that?

1        Thanks.

2            THE WITNESS:  When sWAA is off, the My Activity screen

3   shows nothing.

4   BY MR. MAO:

5   Q.   What about when sWAA is on?

6   A.   When sWAA is on, it shows you sort of a portion or a

7   summary of some of your activity that Google has taken and

8   saved.

9   Q.   So do users have more transparency or less transparency in

10  terms of the type of data that's been collected on them with

11  sWAA on or with sWAA off?

12  A.   With sWAA off, they have no transparency.

13  Q.   With sWAA on, are they able to see all the data that's

14  been saved on them?

15  A.   They can see some of the data, but not all of the data.

16  Q.   Okay.  And why is it they are not able to see all of their

17  data?

18  A.   Well, Google only chooses to show a selection of the data,

19  but also, the data is enormously voluminous.

20  Q.   So you have previously indicated that the only data --

21  sorry -- that the data is duplicated when it's initially

22  collected.  Do you remember that?

23  A.   Yes.

24  Q.   What type of data is actually shown in My Activity?

25  A.   The data that's shown in My Activity is the WAA- and

1    sWAA-on data.

2    **Q.**   Are there other data that's saved by Google that's not

3    shown in My Activity?

4    **A.**   Yes.   There's other WAA- and sWAA-on data that's not

5    shown, but there's also WAA- and sWAA-off data that Google has

6    but doesn't show.

7    **Q.**   Where does the data that does not get shown on My Activity

8    get stored?

9    **A.**   Well, I've called it the shadow account.   Okay?   But

10   Google calls it -- has a variety of data storage and names for

11   those data stores.   One of those is Base View.   One of those is

12   UUAD.

13   **Q.**   In those type of data stores -- what exactly is a data

14   store, actually?

15   **A.**   It's just a collection of this activity data.   It's just a

16   huge collection of these individual events.

17   **Q.**   By the way, that data that's showing on there, what's

18   saved on Google computers, is that aggregated data or is that

19   event-level data?

20   **A.**   That is individual event-level data.

21   **Q.**   Okay.   So when we're talking about this thing that you've

22   termed the shadow account, what is actually in there?

23   **A.**   Everything.   Everything that they've taken and that they

24   copy in there until they choose to get rid of it.

25   **Q.**   Is that account broader or more narrow than what's

1    actually shown in My Activity?

2    **A.**    It's broader than what's shown in My Activity.

3    **Q.**    Why is it broader?

4    **A.**    There's stuff in there that's not shown in My Activity.

5    **Q.**    Such as?

6    **A.**    My Activity, it shows you sort of at a high level some of

7    your things, but it doesn't show you all of the fields that

8    Google has collected.  They're collecting very, very detailed

9    data.  And they don't show you every single action in the app.

10   They just show you some of the actions in an app.

11   **Q.**    Is there currently any way that you are aware of for users

12   to access their own sWAA-off activity?

13   **A.**    No.

14   **Q.**    Are you currently aware of any ways for users to be able

15   to access all of their sWAA-on activity?

16   **A.**    No.

17   **Q.**    So whether sWAA is on or whether sWAA is off, users are

18   not able to access all of their data?

19   **A.**    Correct.

20   **Q.**    Is that because of any particular architecture, the way

21   data is designed -- or, sorry -- the way the data stores are

22   designed?

23   **A.**    You know, Google could make it available.  They just

24   don't.

25   **Q.**    In terms of these data stores you speak of, whether sWAA

1    is on or off, is the data which Google has identified as

2    personal and pseudonymous, are they stored together or are they

3    stored separately?

4    **A.**    Sometimes -- there's some places where they're stored

5    separately, and there's some places where they're stored

6    together.

7    **Q.**    Okay.  When they are stored together, do you know the

8    places -- all the places in which they are stored?

9    **A.**    I know some of them, but Google has said that they have

10   other places this data goes that they can't even enumerate,

11   it's so many.

12   **Q.**    And you have asked for that in this litigation, for the

13   places -- for all the places in which that data is stored?

14            **MR. SANTACANA:**  Objection, Your Honor.  403.  It's a

15   discovery dispute.

16            **THE COURT:**  Sustained.

17   **BY MR. MAO:**

18   **Q.**    You're not aware of all the places in which all the data

19   is stored; isn't that correct?

20   **A.**    That's correct.

21   **Q.**    Whether for sWAA-on or sWAA-off users; isn't that correct?

22   **A.**    Correct.

23   **Q.**    And you're currently not aware of any way for any of those

24   users to be able to access all of their data; isn't that

25   correct?

1    **A.**    That's correct.

2    **Q.**    Are you aware of any way for all of those users to be able

3    to control all the data which Google has stored on them for

4    sWAA-off activity?

5    **A.**    No.

6    **Q.**    If I can move on to the "What Google Does When sWAA Is

7    Off" slide.

8         Did you design and write this slide, Doctor?

9    **A.**    I did.

10    **Q.**    Okay.  Can you explain to me what you are trying to show

11    here?

12    **A.**    This is a maybe more user-friendly schematic.

13         So there's the phone and there's an app, and Firebase is

14    in that app or Google Mobile Ads is in that app or maybe both

15    of them are in that app.

16         And those are some of the things that are being taken by

17    Google:  the user information, like age, gender, and

18    interest; the device information, like the operating system,

19    the version of the operating system; what type of device it is;

20    who the manufacturer is; there's app usage data -- that's that

21    event data -- there's a timestamp; and then there's also

22    location data.

23         And all that stuff is being taken by Google.  It goes to

24    Google's server, which then is copying and further processing

25    the data.  And that data ends up in a bunch of logs in Google's

**HOCHMAN - DIRECT / MAO**

1   data warehouse and it gets stored by Google, and it's used to

2   drive their ad revenue, to support their advertising system, to

3   do things like conversion tracking and attribution.  It's also

4   used for product development and improvement.  They analyze the

5   data and use it to help develop their products.

6       And Google uses the data to train AI because Google's

7   advertising system is -- heavily utilizes machine learning in

8   order to be able to do predictions about which ads a person is

9   going to respond to, in order to do personalization, in order

10  to advise advertisers how to bid as efficiently as possible.

11  So they have automated bidding that's driven by machine

12  learning.  So all this data feeds into that AI use.

13  **Q.**   In terms of this advertising revenue corner that you're

14  talking about, can Google link device ID and other sWAA-off

15  data to, for example, a user's email address?

16  **A.**   Could they tie it to a user's email address?

17  **Q.**   Yes.

18  **A.**   They could.

19  **Q.**   There is nothing technically preventing Google from

20  linking or joining any of these different IDs, is there, on a

21  technical level?

22  **A.**   No, there's no technical thing that stops Google from

23  doing it.

24  **Q.**   Have you seen any documents, disclosures, or

25  representations from Google to any of its users that it won't

HOCHMAN - DIRECT / MAO

```
 1   relink any of this?
 2             MR. SANTACANA:  Objection, Your Honor.
 3             THE COURT:  Overruled.
 4             THE WITNESS:  I haven't seen any such document.
 5   BY MR. MAO:
 6   Q.   And there's no technical barriers to all of this data
 7   being relinked, isn't it?
 8   A.   That's correct.
 9   Q.   Okay.  Looking at the ad revenue component here for a
10   moment, are there any technical barriers for the purposes of
11   that part of the business?
12   A.   One second.  I'm going to ask you to reask the question
13   because this is important --
14   Q.   Sure.
15   A.   -- and I want to be sure it's got all my attention.
16        Could -- just could you ask it again?
17   Q.   Go ahead.  Just...
18        For ad revenue, is there any technical barriers for Google
19   to not be able to collect sWAA-off data?
20   A.   Is there any technical barrier for Google to not be
21   able -- in other words -- I don't think so.
22   Q.   For all of Google's business, are they able to switch on
23   the technology which they use for App Indexing, for example,
24   where they actually check for consent before they collect the
25   data?
```

1   **A.**   Yeah.   They could apply that technology to the other SDKs

2   and have them work the same way.

3   **Q.**   Does Google incur any noticeable incremental costs from

4   the taking, copying, and using of WAA-off and sWAA-off data?

5         **MR. SANTACANA:**   Objection, Your Honor.   There's no

6   disclosed opinion on the costs.

7         **MR. MAO:**   I'm talking about technical costs.

8         **THE COURT:**   I'll allow it.   Overruled.

9         **THE WITNESS:**   Yes.   I've given the opinion that

10   Google's data processing operation is so massive that even

11   though this sWAA-off data is quite voluminous, it's still just

12   a little piece of their total data operations.   And, therefore,

13   they've got all these data centers and all the fiber, it's all

14   in place so -- and it's not -- it doesn't impose an additional

15   cost on them.   They've already got it.

16   **BY MR. MAO:**

17   **Q.**   In sworn statements, Google has admitted that it does join

18   different pseudonymous records for the purposes of ad

19   interactions and ad conversions; isn't that correct?

20   **A.**   Yes, they have.

21   **Q.**   Okay.   Can we put up the Supplemental Response to

22   Interrogatory Number 15?

23         Did you review and look at this interrogatory response for

24   the purposes of rendering your professional opinion?

25   **A.**   I did.

HOCHMAN - DIRECT / MAO

1    Q.   And does this statement tell us the pseudonymous records

2    already get joined for the purposes of ad revenue?

3    A.   Yes.

4         MR. SANTACANA:   Your Honor, I object on two grounds

5    and would like to be heard at sidebar.   We have a completeness

6    and a 403 objection.

7         What's being displayed --

8         THE COURT:   Well, completeness, when you get up and

9    you have your opportunity, you can point out other areas of

10   these responses.   So the completeness doesn't work.

11        What's the -- you have a 403 objection?

12        MR. SANTACANA:   Yes, Your Honor.   They're highlighting

13   a response that was supplemented with more information in order

14   to mislead the jury.

15        THE COURT:   Well, don't characterize what they're

16   doing.

17        But you're going to have an opportunity -- that's what

18   your time is for.

19        So, overruled.   Go ahead.

20        MR. SANTACANA:   I'll do it.   Thank you.

21        MR. MAO:   Move off that.   Back to the previous slide.

22   BY MR. MAO:

23   Q.   When you said that Google uses sWAA-off data for product

24   development, what do you mean by that?   Can you explain that a

25   little bit more?

1   **A.**   Yes.   The sWAA-off data goes into a big data lake with all

2   kinds of data.

3   **Q.**   Okay.   I guess we'll put up the slide on the lake.

4   **A.**   Yeah.   This is a good way to visualize this.

5   **Q.**   I know you like this slide.   Please.

6   **A.**   Okay.   I designed this slide.   I like it.

7       The on data -- sWAA-on data and the sWAA-off data, it all

8   ends up in the same place.   It may be processed a little bit

9   differently, but the data is there.

10      And all that data, that massive data is the thing that

11  gives Google tremendous abilities.   That data is helping them

12  to understand what's going on, to make their products better

13  and better, and to enable them to make more and more money.

14          **MR. MAO:**   Go back to the last slide.

15  **BY MR. MAO:**

16  **Q.**   Are one of those products AI?

17  **A.**   Yes.

18  **Q.**   And what do you mean by that?

19  **A.**   Google has, for many years, had machine learning as part

20  of its systems.   And the AI in, especially machine learning,

21  needs data to make predictions.   So it's almost like fuel for a

22  car.   Data is the fuel for AI.   You need to have as much data

23  as possible to build really good AI, and being able to make

24  accurate predictions helps.

25      So, for example, when you run a search on Google or you do

1  something, whatever it is you're doing on a Google product, the

2  better they are able to predict what you want, the more

3  effective they can make their product.

4          MR. MAO:  I want to go on to the last slide, if

5  possible.

6      Actually, before I go there, can we go back to the last

7  slide.

8  BY MR. MAO:

9  Q.  I had a question for you, Dr. Hochman.  These benefits --

10 ad revenue, Google product development, train AI -- is this for

11 the sake and the benefit of app developers or somebody else?

12 A.  This is for the benefit of Google.

13 Q.  Anybody else?

14 A.  Google is benefiting from this.  Google gets the ad

15 revenue, they get the value of their products, and they -- it's

16 their AI.

17         MR. MAO:  Next slide, please.

18     Oh, sorry.  The last slide, Google trackers.

19     I apologize.  If we could go back to Supplemental

20 Response, Interrogatory Number 15.

21 BY MR. MAO:

22 Q.  Okay.  Could you just read into the record the last two

23 lines there?

24 A.  Sure.

25     [As read]:

1           "DeviceID-keyed advertising interactions with an

2       advertiser, such as views and clicks of the

3       advertiser's ads, are joined to conversions recorded

4       in that advertiser's app" --

5   Q.  Can you break that down for me?  What does that mean?

6           MR. DAVID BOIES:  Finish the sentence.

7           THE WITNESS:  Oh, sorry.

8       [As read]:

9           -- "using Firebase (or other third-party

10      conversion tracking products or services)."

11      I'm sorry.  I got thrown off by the horizontal line.

12  BY MR. MAO:

13  Q.  Last slide.  What did you intend to show with this slide?

14  A.  I'm trying to show something that Google told us in their

15  answer to our technical questions, which is that the data

16  collection by Google, when they're taking data from the user's

17  phone, it uses up the phone's bandwidth.  Some people are on

18  metered plans.  It also uses energy because taking the data

19  requires the phone to make a radio transmission, and this

20  reduces the power in the battery.  So it means that the phone

21  will die sooner.

22      Now, it might seem like one ad interaction, well -- one

23  app interaction; well, maybe that's not so much.  But,

24  actually, if you think about how much data -- each app event is

25  like 14 pages of data.  And when there are dozens of them

 1    happening when you use an app, it becomes a considerable amount

 2    of power and bandwidth.

 3        And when the battery goes dead sooner, not only is your

 4    phone dead at the end of the day, your phone only has so many

 5    recharge cycles.  Okay?  Like, for example, an iPhone is

 6    rated as good for 500 recharge cycles.  After that, the battery

 7    is going to be -- fall below 80 percent capacity, and that's

 8    when people start to say, "This phone is getting kind of old

 9    and not working so good," and they might go out and buy a new

10    phone.

11        So -- so these Google software development kits that are

12    taking people's app activity data are imposing a real cost on

13    people.  They're imposing a cost in terms of bandwidth and in

14    terms of wearing out the phone and making the phone not as

15    good.

16            **MR. MAO:**  Thank you.

17        Before we end, Judge, I just want to make sure that the

18    bulk admissions actually gets into the record.

19            **THE COURT:**  Right.  Well, why don't we take a break.

20    I want to talk about that with you for a moment.

21            **MR. MAO:**  Sure.

22            **THE COURT:**  And this is a good time for our break

23    anyway.

24        Members of the jury, remember my admonitions not to

25    discuss this amongst yourselves.

 1          We'll resume at 10:15.

 2       (Proceedings were heard out of the presence of the jury.)

 3          THE COURT:  You can step down and we'll call you back.

 4       Okay.  We're out of the presence of the jury.

 5       So what is your request?

 6          MR. MAO:  So I'd like to admit that to bulk evidence,

 7    Your Honor.

 8       And let me just cover the procedural history on this a

 9    little bit, Your Honor.

10       This dispute first started with the 1006 demonstratives.

11    We simply wanted to be able to demonstrate how much data is

12    collected on each of the plaintiffs.  I think it's relevant.

13    Okay?

14          THE COURT:  Well, you've established that through his

15    testimony.

16          MR. MAO:  Yes.  But where we pulled it from, they've

17    objected to everything.  How am I --

18          THE COURT:  While this was all going on --

19          MR. MAO:  Yes.

20          THE COURT:  -- I was refreshing my memory about 703,

21    Rule 703.

22          MR. MAO:  Yes.

23          THE COURT:  And 703 says [as read]:

24          "An expert may base an opinion on facts or data

25       in the case that the expert has been aware of or

 1          personally observed.  If experts in the particular

 2          field would reasonably rely on those kind of facts or

 3          data in forming an opinion on the subject, they need

 4          not be admissible for the opinion to be admitted.

 5          But if the facts or data would otherwise be

 6          inadmissible, the proponent of the opinion may

 7          disclose them to the jury only if their probative

 8          value in helping the jury evaluate the opinion

 9          substantially outweighs their prejudicial effect."

10          Now, maybe this bulk of material might be otherwise

11     admissible.  It's produced by Google.  But I am concerned,

12     under 403, that just dumping an enormous amount of material

13     into the record -- you've made your points.  They're not going

14     to go look at the source code.  So what is the value to the

15     jury of having all this in there?

16          And there is always the danger that they may be looking at

17     it without a lot of guidance, and they will come to conclusions

18     that were not appropriate because -- and there's always that

19     danger.  If you just dump material into the record, even if

20     it's otherwise admissible, there is a 403 problem.

21          So why isn't this -- I'm not quite sure why you even want

22     it because you've made your points, and I don't think there's

23     much value in the jury having all this code.

24          So that's a question for you, Mr. Mao.

25          **MR. MAO:**  Okay.

1          **THE COURT:**  Or for Mr. Boies.  I don't know.

2          **MR. MAO:**  Just real quick, in terms of -- so we

3    understand what's being admitted, it's actually just on a zip

4    drive, Your Honor.  I'm not trying --

5          **MR. SANTACANA:**  I assume it's not 30 stories tall.

6          **MR. MAO:**  It's -- well, I mean, it depends on whether

7    we're talking literally -- you know, literally, or are we

8    talking about, like, how can we reduce that?

9          We reduced it just to a zip drive, Your Honor.  We just

10   want it for --

11         **THE COURT:**  Well, you're saying, "Oh, it's no problem

12   because it's such a small little item going back there."

13         **MR. DAVID BOIES:**  No, no, no.

14         **THE COURT:**  That's not the point.

15         **MR. DAVID BOIES:**  No, that's not the point.

16         **THE COURT:**  Even I understand that we're talking about

17   great voluminous material.  Why do they need it?

18         **MR. DAVID BOIES:**  Your Honor, let us take a look at

19   the exhibits and see if we can cut them back.

20         **THE COURT:**  Well, even cutting them back -- what I'd

21   ask you, Mr. Boies, is, perhaps look at it and then explain to

22   me why its probative value outweighs what I think is a

23   legitimate concern, that the jury is going to be hunting around

24   in voluminous material and perhaps making something out of it

25   that they shouldn't be.

1      And that is, I assume, more or less your 403 objection.

2          MR. SANTACANA:  I think you articulated it better than

3  I could, Your Honor.

4          THE COURT:  Well, you're being nice to me.

5                          (Laughter.)

6          THE COURT:  Thank you.

7          MR. SANTACANA:  That's not against the rules --

8          THE COURT:  I love that.

9          MR. SANTACANA:  -- is it?

10         THE COURT:  So be prepared to tell me why it advances

11 the ball because, frankly, I think the points you want to make,

12 you have made with the witness.  And I'm not sure even -- it's

13 not for me to say, but I don't quite even know why you want it.

14     But think about it and tell me.  I'm going to reserve

15 admission or not admission now.  You can renew it.  You've made

16 your request at the appropriate time.  But we don't need to

17 decide that right now unless you think it needs to be decided

18 for purposes of your cross-examination.

19         MR. SANTACANA:  I hate to say it, but Exhibit 442 is

20 one that he did explain to the jury a little bit about.  The

21 other exhibits on that list are actually completely different

22 type of log.  So it is possible that our objection would

23 involve, depending on Your Honor's position, that he should

24 also explain what those other pieces of data are if it's going

25 to go to the jury room, because those logs look completely

 1  different than what the jury saw during the testimony.

 2       THE COURT:  Well, how extensive would that

 3  explanation -- that examination be?  I mean --

 4       MR. SANTACANA:  Similar to what they did with

 5  Exhibit 442.

 6       THE COURT:  I have no problem with them showing this

 7  material and even publishing it to the jury as it's being

 8  presented because I think under 702, 703, they could do that.

 9       MR. SANTACANA:  We agree.

10       THE COURT:  So the only question is:  Does it go back

11  to the jury room or not?

12       MR. SANTACANA:  And we object to that.

13       THE COURT:  And you think you need to know that in

14  order to decide how much in depth you're going to be with this

15  witness?

16       MR. SANTACANA:  Exactly.  If there's a chance it's

17  going to the jury room, then exhibits other than 442, which are

18  formatted differently and look very different -- the

19  30-story-high exhibits.  442 is pretty short -- we would need

20  foundation on that.

21       THE COURT:  Well, why don't you, during the break, you

22  guys caucus about what exactly the plaintiffs want -- after

23  you've thought about this, what you really want to ask to have

24  admitted, and then you can assess, and then I'll see whether or

25  not there's a real issue left.

 1          **MR. DAVID BOIES:**  We'll do that, Your Honor.

 2          **THE COURT:**  Okay.

 3          **MR. DAVID BOIES:**  Thank you.

 4          **THE COURTROOM DEPUTY:**  Court stands in recess.

 5              (Recess taken at 10:02 a.m.)

 6            (Proceedings resumed at 10:25 a.m.)

 7       (Proceedings were heard out of the presence of the jury.)

 8          **THE COURTROOM DEPUTY:**  Please remain as you are.

 9   Court will come to order.

10          **THE COURT:**  Okay.

11          **MR. DAVID BOIES:**  I think we have resolved 90 percent

12   of it.

13          **THE COURT:**  Okay.

14          **MR. DAVID BOIES:**  There are four 106 summaries that we

15   are going to introduce.

16          **MR. SANTACANA:**  1006.

17          **MR. DAVID BOIES:**  Yes.

18          **MR. SANTACANA:**  Summary exhibits.

19          **MR. DAVID BOIES:**  Summary exhibits.

20       And then we're going to offer 442, which was one of the

21   documents that was shown to the jury.  All of that is without

22   objection.

23       Then there is 453 that was shown to the jury.  And the

24   issue with respect to 453 is that what was shown to the jury

25   was a certain number of pages of a document that has many,

1    many, many, many, many pages.  And I think there's not a

2    disagreement that we could have the pages shown, which are

3    exemplars, to the jury, but they object to having the entire

4    document in because of its volume.

5         Now, since this is something that's already been shown to

6    the jury and we don't need more examination on it, what I would

7    propose is that we try to work out some portion of that, we try

8    to strip down the exhibit to a certain number of pages that are

9    reasonable and have that be the exhibit, as opposed to the

10   whole thing, and try to work that out among ourselves.  If we

11   can't, we'll come back to the Court.

12        **MR. SANTACANA:**  That's a proposal I hadn't heard,

13   Your Honor.  And we're always happy to meet and confer with the

14   other side.  And if they don't want to put in more testimony on

15   that exhibit, of course that, I think, would be at their risk.

16        But we're happy to talk to them about stripping that

17   document down to something shorter than the 32 million lines it

18   currently stands at.

19        **THE COURT:**  Okay.  Well, continue to discuss that.  If

20   you can come to an agreement, that would be preferable.

21   Otherwise, when they come back in, what do you want to do?

22        Do you want to, Mr. Mao, move what's been agreed to, as I

23   understand it, what Mr. Boies --

24        **MR. SANTACANA:**  442.

25        **THE COURT:**  -- just recited?

1    So you can just, at the beginning, before Mr. Santacana

2    starts, you could just make the motion to admit that so the

3    record is clear, and I will admit it.

4         MR. MAO:  Okay.

5         MR. DAVID BOIES:  Okay.

6         MR. SANTACANA:  And their 1006 exhibits, they're going

7    to lay some foundation and try and get them in.  So they have a

8    couple more exhibits they want to do on direct.

9         MR. DAVID BOIES:  Right.

10        THE COURT:  Oh, so he's going to come back up and

11   you're still on direct with --

12        MR. DAVID BOIES:  Yes.

13        THE COURT:  -- Mr. --

14        MR. DAVID BOIES:  And that's if you want us to lay the

15   foundation for the 106, we will.

16        THE COURT:  Okay.

17   Okay.  So, Doctor, you can come back, take the stand.

18   Are we ready?  Are you ready?

19        MR. MAO:  I am, sir.

20        THE COURT:  Okay.

21   (Proceedings were heard in the presence of the jury.)

22        THE COURT:  The jury is present.

23   Mr. Mao, you may proceed.

24        MR. MAO:  Yes, Your Honor.

25   Before we begin to wrap this up for the direct, I just

1  want to admit into the record Exhibit Number 442, which was

2  discussed with the -- with the witness.

3          **THE COURT:**  442.

4          **MR. SANTACANA:**  No objection, Your Honor.

5          **THE COURT:**  442 will be admitted.

6      (Trial Exhibit PX442 received in evidence.)

7          **MR. MAO:**  And then, Your Honor, what I'm going to do

8  is I'm just going to finish up this last slide, I'm going to

9  deal with all the record stuff, and then I'm just going to have

10  three concluding questions and that's it.

11          **THE COURT:**  Okay.

12          **MR. MAO:**  Okay?

13      Sorry, the last slide, please.  Let's just finish this up.

14  **BY MR. MAO:**

15  **Q.**  Okay.  Sorry.  There was a break.

16      I just want to make sure, going back to this last slide --

17  okay? -- the sWAA-off data is collected directly from the

18  user's devices; is that correct?

19  **A.**  Correct.

20  **Q.**  And that type of collection harms the devices how?

21  **A.**  It's consuming the bandwidth, and it also is using up

22  battery power.

23  **Q.**  Because of the extra sWAA-off data that's being collected

24  in the --

25  **A.**  Right.

1   **Q.**   -- actual state; is that correct?

2   **A.**   The bandwidth usage and the battery power usage is

3   proportional to how much data is being transmitted.

4   **Q.**   Okay.  So on the volume of data that's being transmitted,

5   let's talk about the plaintiffs' data just for a moment.  That

6   way I can get some of the stuff admitted.  Okay?

7       Did you prepare any summaries on the volume of data that

8   was collected?

9   **A.**   Yes, I did.

10  **Q.**   Okay.  So for the record, we are trying to admit some of

11  these summaries on the volume of the two plaintiffs' data, and

12  those are Exhibits -- Demonstrative Exhibits 489, 491, 492, and

13  493 -- okay? -- on the volume for the two plaintiffs and, also,

14  the apps from which they were collected from, the number of

15  events.  Okay?

16      Can you please explain to the judge and jury how you were

17  involved in the preparation of those summaries?

18  **A.**   Sure.  So we received the data in a bulk form, and we

19  filtered out all the sWAA-on data that might have been

20  provided.  So we were looking at just sWAA-off data.

21      We then sorted it and categorized it and made a summary

22  that showed how many events were collected from each app and

23  how many events were collected -- different events by different

24  categories.

25      So let me take a look at this one.  Yeah, this is

 1  indicating the apps.  The apps' names are kind of funny because

 2  it's like a website address, but you see the "com" comes first.

 3  So the app names, for whatever reason, they were, like,

 4  backwards to Web addresses.  But these are all apps.

 5      And this, by the way -- I'm just going to point this out

 6  because I see it.  The total shouldn't be 10,000 here.  That's

 7  a typo.

 8          THE COURT:  Pardon?

 9          A JUROR:  Shouldn't we be seeing the screen?

10          THE COURT:  It hasn't yet been admitted, or has it

11  been?

12          MR. MAO:  It hasn't.  We're getting it --

13          THE COURT:  Yeah.

14          MR. MAO:  -- to be admitted.

15          THE COURT:  See, what's happening is the counsel is

16  asking the questions that provide the basis for the counsel to

17  then ask for it to be admitted.  We'll hear from the other

18  side, and then a decision will be made.  And if I say "yes,"

19  then you get to see it.

20      Go ahead, Mr. Mao.

21          THE WITNESS:  Why don't you just show me each one

22  quickly so I can see them all.

23  BY MR. MAO:

24  Q.  Sure.  Just to be clear, just how long of a period was

25  this?

1    **A.**    This was over a two-month time period.

2    **Q.**    Okay.  So, go ahead.  Can you finish your description?

3    **A.**    Sure.  This report is for Plaintiff Harvey, non-Google app

4    activity with sWAA off.  Okay.  And this is -- actually, it's

5    very clearly stated:  October 15th, 2021, to December 20th,

6    2021.  So it's two months and five days.  Okay?

7         And this is also broken down by the app -- which app, the

8    number of records per app.

9    **Q.**    And, again, is this event data or is this aggregate data?

10   **A.**    This is event data.

11   **Q.**    Okay.

12   **A.**    It's a count of the event data.

13        **MR. MAO:**  Your Honor, I'd like to move in the exhibit,

14   Exhibit PX489.

15        **MR. SANTACANA:**  No objection.

16        **THE COURT:**  489 will be admitted, and it may be

17   published to the jury.

18        (Trial Exhibit PX489 received in evidence.)

19        **MR. MAO:**  If we can put up 491.

20        Sorry.  Can we show 489?

21        **THE COURT:**  Right.

22        **MR. MAO:**  Can we go back to 489 just so they can see

23   it -- so the jurors can see it?

24   **BY MR. MAO:**

25   **Q.**    Just so I understand, Dr. Hochman, your understanding is

1    that this is a natural collection?  This wasn't a test; right?

2    This is their past data; is that correct?

3    **A.**   Yeah, this is a natural -- well, I would call it a natural

4    test.  This is their natural activity that we then collected

5    and analyzed.

6    **Q.**   And, again, by the number of records, you mean the number

7    of event records?

8    **A.**   Correct.

9    **Q.**   Okay.  If we can go now on to 491.

10    Doctor, can you explain 491 so I can introduce it into

11    evidence?

12    **A.**   Yes.  This is another summary.  For whatever reason, when

13    Google produced the data to us, it came in two files, so we --

14    we tallied them separately.

15    **Q.**   So did you prepare 491 as well?

16    **A.**   Yes.

17    **Q.**   Okay.  And can you explain what exactly you did?

18    **A.**   Yeah.  It's the same thing I did with the other one.  We

19    filtered out any non- -- any sWAA-on activity.  So we were

20    looking at sWAA-off activity only, sorted it by app, and then

21    took a count.

22            **MR. MAO:**  Okay.  I'd like to offer into exhibit

23    Number 491, Your Honor.

24            **MR. SANTACANA:**  No objection.

25            **THE COURT:**  491 will be admitted.

1          (Trial Exhibit PX491 received in evidence.)

2     **BY MR. MAO:**

3     **Q.**   Okay.  Can you explain to me, is this aggregated data or

4     is this event-level data?

5     **A.**   All right.  This is event-level data.  It's a count of the

6     event-level data.

7     **Q.**   And from what period to what period was this?

8     **A.**   This is October 15th, 2021, to December 20th, 2021.

9     **Q.**   Was this natural or was this test data?

10    **A.**   It's the same as before.  It's the natural activity.

11    **Q.**   Okay.  And was this with WAA on or WAA off?

12    **A.**   This is with -- the sWAA is off, which means either WAA is

13    off or sWAA is off.

14    **Q.**   Okay.  I'd like to introduce 492.  Before we show it to

15    the jury, just talk about the preparation.

16         Okay.  So 492, were you involved in the preparation of

17    this?

18    **A.**   Yes.

19    **Q.**   How did you go about preparing this?

20    **A.**   The same as with the other ones.  Filter out any

21    irrelevant activity.  This is -- and this is the sWAA-off data

22    for Plaintiff Rodriguez between October 15th, 2021, and

23    December 20th, 2021.

24    **Q.**   Again, is this aggregate or event-level data?

25    **A.**   This is event-level data.  It's a count of the number of

 1   events per app.

 2          MR. MAO:  I'd like to move -- sorry.  Can I see what

 3   exhibit we're on?

 4          THE COURT:  492.

 5          MR. MAO:  Okay.  I'd like to move into exhibit

 6   Number 492.

 7          MR. SANTACANA:  No objection.

 8          THE COURT:  492 will be admitted.

 9       (Trial Exhibit PX492 received in evidence.)

10   BY MR. MAO:

11   Q.   Okay.  Can you explain to me what we have here for 492?

12   A.   Yeah.  This is the second list for Plaintiff Rodriguez.

13       As I said before, because the data was produced to us in

14   two files, we just compiled two separate lists.

15   Q.   And, again, this is event-level data for each of these

16   different apps; is that correct?

17   A.   Yes, this is event-level data.  It's a count of the number

18   of events that we have.

19   Q.   So looking at Exhibit 492, which I think is shown to the

20   jury now, can you give me a sense of how large is the volume

21   generated by the records referenced in this exhibit?

22   A.   In this exhibit -- well, let's scroll down to the bottom,

23   and let me look at the total and see if it's accurate.

24       Yeah, it looks like there's 49,000 events that were in

25   that record.

HOCHMAN - DIRECT / MAO

1  Q.  And just exactly -- what exactly is that kind of volume

2  we're talking about?

3  A.  49,000 events?

4  Q.  Yes.

5  A.  Well, there's, like, 14 pages per event.  So if you want

6  to multiply that out --

7  Q.  I see.

8  A.  -- well, it's a lot of pages.

9  Q.  Okay.

10       MR. MAO:  All right.  And then lastly, Your Honor, I

11 just want to proffer 493 and discuss that real fast to lay a

12 foundation.  493 should be the last 1006.

13 BY MR. MAO:

14 Q.  Doctor, were you involved in the preparation of

15 Exhibit 493?

16 A.  Yes.

17             (Co-counsel confer off the record.)

18 BY MR. MAO:

19 Q.  Were you involved in the preparation of 493?

20 A.  Yes.

21 Q.  Can you tell us what exactly you were trying to do here?

22 A.  Well, again, this is a count, by app ID, of the number of

23 events that were in the file.

24 Q.  Again, with sWAA off; is that correct?

25 A.  Yes, this is sWAA-off data.

1          **MR. MAO:**  Your Honor, I'd like to move into evidence

2     Exhibit Number 493.

3          **MR. SANTACANA:**  No objection.

4          **THE COURT:**  493 will be admitted.

5       (Trial Exhibit PX493 received in evidence.)

6          **MR. MAO:**  Okay.  If we could display that to the jury.

7     **BY MR. MAO:**

8     **Q.**   Is this aggregate-level data or event-level data?

9     **A.**   This is event-level data.

10         **MR. MAO:**  Okay.  Can we just scroll down to the bottom

11    so that we get a sense of the volume.

12         **THE WITNESS:**  Can you scroll back up to the top?

13    **BY MR. MAO:**

14    **Q.**   Sure.

15    **A.**   Hold there.

16       Okay.  Yeah, I think it's about 9,000 records.

17    **Q.**   Okay.  So looking at this, this is the type of volume of

18    data that's being collected at an event level that's causing

19    things like depletion of battery life; is that correct?

20    **A.**   Yes.

21    **Q.**   And this is being collected directly from the devices;

22    isn't that correct?

23    **A.**   Yes.

24       Can you give me one more second?  I just want to look at

25    this --

1    **Q.**    Sure.

2    **A.**    -- the numbers a little more.

3        (Witness examines document.)  Yeah.  Okay.  Thank you.

4        **MR. MAO:**  We have one more record, Your Honor, that

5    we'll just deal with later, if you don't mind.

6    **BY MR. MAO:**

7    **Q.**    I'm just going to -- can you please explain the difference

8    between aggregate and event-level data?

9    **A.**    Yes.  Aggregate data would be, like, a total.  So Google

10    might report to an app developer and say, "Your total number of

11    daily active users for a certain day was 50,000 users."  That's

12    an aggregate statistic.  It's not saying who those 50,000 users

13    are.  It's just giving them a total, like this is the size of

14    the population of people who used your app or who -- you know,

15    who downloaded and installed the app today.  It would be some

16    sort of business metric in aggregate, total statistic.

17    **Q.**    For the purposes of the technology that we're talking

18    about here, why does that difference between aggregate versus

19    event-level data matter?

20    **A.**    Well, what matters is that the data that's taken from the

21    phone is event-level data; and Google's taking that data,

22    they're copying it, and they're using it.

23        The aggregate data is what's reported out to the app

24    developer.  They don't get the event-level data.  That's

25    Google's data.  They keep that.  Actually, it's the user's data

HOCHMAN - DIRECT / MAO

1    that Google's got possession of.

2    **Q.**    Did the WAA and sWAA technology operate as it was

3    described -- as it was described, question mark?

4    **A.**    No, according to my test, it did not operate as described.

5    **Q.**    Why, in your opinion, did it not operate the way it was

6    described?

7    **A.**    Well, the fundamental issue is that the data would be

8    taken and copied before the consent check was done.  So there's

9    no possibility of that consent check affecting whether the data

10   would be taken and copied because Google didn't even look until

11   after they'd already taken and copied the data.

12   **Q.**    Is the data taken and copied, is it de-identified?

13   **A.**    No.  The data is personally identified.  It's

14   absolutely -- Google, upon receiving the data, knows who that

15   user is.

16   **Q.**    And can that data, the sWAA-off data, can that be

17   reconnected?

18   **A.**    Yes.

19           **MR. MAO:**  That's all I have for direct, Your Honor.

20           **THE COURT:**  Mr. Santacana?

21           **MR. SANTACANA:**  Your Honor, I'm handing up

22   Dr. Hochman's deposition transcript and expert report for your

23   reference during the examination.

24       You got your binders?  Mr. Mao, are you ready?

25           **MR. MAO:**  Yes, please.

**CROSS-EXAMINATION**

**BY MR. SANTACANA:**

**Q.**   Okay.  Good morning, Dr. Hochman.

**A.**   Good morning.

**Q.**   It's nice to see you again.  You and I have met before;
right?

**A.**   Yes.

**Q.**   We met at your deposition?

**A.**   Yes.

**Q.**   We spent a day together, and you testified that day under
oath?

**A.**   Yes.

**Q.**   And that day you did your best to tell the truth under
oath; right?

**A.**   Yes.

**Q.**   And we haven't met since then until right now?

**A.**   I think that's correct.

**Q.**   Great.

     Now, you agree, Dr. Hochman, that your role here as an
expert is the role of someone who is attempting to be neutral.
Is that fair to say?

**A.**   Yes.

**Q.**   Your job here is to explain the facts as accurately as you
can; right?

**A.**   Yes.

1   Q.   And that's true even if the facts lead to a conclusion

2   that is less favorable to the plaintiffs than to Google.  Is

3   that fair to say?

4   A.   My job is to say the facts as I see them.

5   Q.   Even if that leads to conclusions that are less favorable

6   to your clients; right?

7   A.   I'm not necessarily sure that I know what's more or less

8   favorable, but I just say the facts as I understand them.

9   Q.   So your testimony is that you do not have a sense, sitting

10  here right now, of which conclusions you've drawn are more or

11  less favorable to your clients?

12  A.   There's a lot of issues in play here that are not my area.

13  There are all kinds of legal questions and things that I don't

14  fully understand.

15  Q.   Now, you testified under oath that you had not reached any

16  conclusions in your work in this case that you thought were

17  less favorable to the plaintiffs.  Didn't you say that?

18  A.   I may have said something like that.  I think you should

19  read exactly the question and the context of it just for

20  clarity.

21  Q.   We'll get to your deposition transcript, Dr. Hochman.

22       Now, will you agree with me, as you did at your

23  deposition, that if you were to discover that you had made a

24  mistake in your expert opinions, that it would be your

25  obligation to disclose that here to the jury?  Do you agree

1   with me?

2   **A.**   Well, what I would agree with is that if I make a mistake,

3   I want to correct it.  Yes, I would want to correct --

4   **Q.**   I --

5   **A.**   -- a mistake.

6   **Q.**   I am so sorry.  Go ahead.

7   **A.**   No, that's all right.  I was -- if I have made a mistake,

8   I always would like to correct it.

9   **Q.**   You wouldn't hide a mistake that you had made in your

10  expert opinions from the jury, would you?

11  **A.**   If I have made a mistake, I would want to correct it,

12  I think, yes.

13  **Q.**   Yes?  You wouldn't hide it?

14  **A.**   I'm not sure exactly what you mean by "hide it," but I

15  would want to correct -- if I had made a mistake, I would want

16  to correct it.

17  **Q.**   Now, you are a very experienced expert witness; isn't that

18  right?

19  **A.**   I have worked on, as I said, probably hundreds of cases;

20  and I've testified 60 times at deposition, over 60 times, and

21  at over 20 trials.

22  **Q.**   You have a Ph.D. in computer science?

23  **A.**   I do.

24  **Q.**   You are not a tenured professor at any college or

25  university; right?

**HOCHMAN - CROSS / SANTACANA**

1   **A.**   No.

2   **Q.**   Your primary professional activity is running a business

3   called Hochman Consultants?

4   **A.**   That depends on when.

5   **Q.**   Right now, your primary source of income is your work at

6   Hochman Consultants, your consultancy.  Isn't that fair to say?

7   **A.**   Well, it's -- things have changed a little bit within the

8   last year, so that's not exactly right as of today; but --

9   I guess you can just ask a follow-up if you want to.

10   **Q.**   How about at the time of your deposition and the time that

11   you were retained to work on this case?  At those two points in

12   time, your primary professional activity and source of revenue

13   was running your consultancy, Hochman Consultants; right?

14   **A.**   At the time in those years, that's where I was making most

15   of my income from, although it does vary from year to year.

16   **Q.**   So is it fair to say that at the time you were retained to

17   work on this case, your primary professional activity was

18   providing expert testimony for lawyers?  That was your main

19   business; right?

20   **A.**   Well, I would put it differently.  I help people with

21   computer problems.  They come to me, they ask for help, and I

22   provide my time.  Okay?  I don't sell testimony.  I sell time.

23   **Q.**   So you're not saying that these lawyers hired you because

24   they couldn't figure out how to work their laptops; right?

25   That's not what you mean by "computer problems"?

1   **A.**   Well, it started with that kind of problem in college.

2   That was the basic problem I would get.  People would knock on

3   my door and say, "Can you help me?"  And I'd find -- save their

4   paper in the middle of the night.

5        And over time, it's escalated to more and more severe

6   problems until, well, we come here today with what I think is a

7   very severe problem.

8   **Q.**   Dr. Hochman, when you were hired by the lawyers sitting at

9   this table, were you hired to help them with a computer problem

10  with their personal computers or were you hired to provide time

11  to this case?

12  **A.**   I was hired to provide time, analysis, and opinions in

13  this case.

14  **Q.**   And you have been hired hundreds of times to provide

15  expert opinions by lawyers, have you not?

16  **A.**   Yes.

17  **Q.**   Since July of 2020, you've testified a number of times;

18  right?

19  **A.**   Yes.

20  **Q.**   Including in this case?

21  **A.**   Yes.

22  **Q.**   Now, the plaintiffs' lawyers are paying you to be here

23  today for your time; right?

24  **A.**   Yes, I am being paid for my time.

25  **Q.**   By the plaintiffs' lawyers?

1    **A.**    I'm paid -- they cut the check.

2    **Q.**    And the time that you've spent sitting in the gallery

3    since the trial began?

4    **A.**    Yes.

5    **Q.**    And your rate is what?

6    **A.**    I believe it's $800 an hour.

7    **Q.**    Since this case began and you were first hired by these

8    lawyers, is it fair to say that they have paid you and your

9    team over a quarter million dollars?

10    **A.**    Yes.

11    **Q.**    More than a quarter million dollars?

12    **A.**    Well, I have a metric.  I know that we've logged, just

13    myself and Julie Burns and Sam, who's here today, we've logged,

14    I think, about a thousand hours -- okay? -- between us.

15        And then there are other people on the team who also have

16    assisted and participated, and they are billing separately.

17    **Q.**    So is it more than a quarter million dollars?

18    **A.**    Well, I'd have to look at the breakdown between my time

19    and other people's time because we bill at different rates, but

20    it's -- it's definitely a good amount of money over a period

21    of, like -- well, I guess it's about four years, 2022 onward.

22    **Q.**    And this is not the only case that the plaintiffs' lawyers

23    sitting at this table have hired you for, is it?

24    **A.**    There was a parallel case called *Brown v. Google*.

25    **Q.**    So they hired you for a different case also against

HOCHMAN - CROSS / SANTACANA

1   Google; right?

2   **A.**   These cases, I think, came in at about the same time.

3   **Q.**   So they hired you for two different cases, to testify

4   against Google in two different cases?

5   **A.**   They had two cases, and I was hired to work on both of

6   them.

7   **Q.**   And they've paid you in that other case, separate from the

8   numbers we just discussed?

9   **A.**   Yes.

10  **Q.**   Do you know how much you made in that case?

11  **A.**   About probably a similar amount of money, order of

12  magnitude.

13  **Q.**   Now, it's not just the law firm of Mr. Mao that hired you

14  and has paid you for the last four years.  It's also a second

15  law firm that has hired you in the past, Susman Godfrey; right?

16  **A.**   Yes.

17  **Q.**   That law firm is also at this table?

18  **A.**   Yes.

19  **Q.**   Now, you actually consider these plaintiffs to be your

20  client, don't you?

21  **A.**   So I think -- I just want to be precise.  I send my bill

22  to the law firm.  That's what I've been directed to do.  And

23  the client is, I guess -- maybe that's a legal question, but

24  the client is either the law firm or the plaintiff.

25  **Q.**   Your client is either the law firm or the plaintiff?

1   A.   Well, that's a legal question.  But the law firm is the

2   one who's issuing checks to me, and the plaintiff is the one

3   who's the party in the case.

4   Q.   A moment ago you just said, "My client is either the law

5   firm or the plaintiff."  You said that; right?

6   A.   Well, I think you might be asking a -- like a legal

7   definitional question.  But let's just say that the law firm is

8   paying my invoices and I'm aware of who the plaintiff is.

9   Q.   Dr. Hochman, if there's a problem with my question, your

10  lawyer, your client will object, and he hasn't objected.  So I

11  would like a straight answer to my question, which I did ask

12  you at your deposition.

13       You consider your client in this case to be the

14  plaintiffs; right?

15  A.   I don't recall how I answered that question at the

16  deposition.  I'll just say that.  I don't recall how I answered

17  it.  And I -- I'm working on behalf of the plaintiffs, and the

18  law firm is the one who's paying my invoices, and I send my

19  invoices to the law firm.

20  Q.   Okay.  You work on their behalf.  That's good enough.

21       Now, in addition to being paid by these lawyers, you have

22  also received other forms of compensation, have you not?

23  A.   I'm not sure what you're referring to; but if you could be

24  more specific, I'll try to answer.

25  Q.   In your opinion, have you received any other forms of

1  compensation from these lawyers other than the hourly rate of

2  $800 an hour that they've been paying you?

3  **A.**   Well, the way the money is distributed, I send them a bill

4  for my time and for Julie's time, and Julie and I then get paid

5  a cut of that money, and Hochman Consultants retains a portion

6  of the money to pay for expenses and overhead.  And then when

7  all is said and done, if there's extra money, the partners

8  divide it.  We have three partners at the moment.  There's

9  myself and Julie and Rob.

10  **Q.**   Okay.  So I understand that you've been paid a substantial

11  sum of money for time.  My question was:  You've also received

12  another form of compensation, have you not?

13  **A.**   I'm not sure what you're referring to; but if you have an

14  idea, give me a hint and I'll confirm it if it's true.

15  **Q.**   Well, these lawyers flew you here, did they not?

16  **A.**   Yes.  The contract -- or the agreement is that it's always

17  the case that when I go to work for someone, if I have

18  work-related travel expenses, I get reimbursed for those.  I

19  don't -- I don't think that's compensation.  That's just

20  reimbursement of work-related expenses.

21  **Q.**   They've put you up in a hotel for weeks, haven't they?

22  **A.**   I've been here for eight days, although, honestly, I'd

23  rather still be at home, but I came here and I'm doing my duty.

24  **Q.**   And you have been strategizing and meeting with these

25  lawyers and the plaintiffs themselves for days at that hotel,

**HOCHMAN - CROSS / SANTACANA**

1  have you not?

2  **A.**   Yes, I've been there.  And the case is very important, and

3  there's a lot of -- a lot of materials, and I want to come here

4  and be prepared and to be able to answer your questions

5  efficiently.

6  **Q.**   Was that a "yes"?

7  **A.**   Yes.  I did say "yes."

8  **Q.**   You said a lot more, though.

9  **A.**   I answered you.  I mean, I'm being conversational.  I'm

10  trying to be friendly and give you a friendly answer.

11  **Q.**   You slept at the hotel the last eight days.  You're going

12  to sleep at the hotel for a couple more weeks?

13  **A.**   I am about to leave the hotel tonight because my

14  grandmother died and I'm going to her funeral tomorrow.

15  **Q.**   You're not coming back?  We won't see you next week?

16  **A.**   I don't know.

17  **Q.**   Okay.  Well, I'm sorry to hear about your grandmother.

18  **A.**   That's all right.  Thank you.

19  **Q.**   Was it a nice hotel?

20  **A.**   It's a nice hotel, yes.  It's the Ritz-Carlton.  It's a

21  very nice hotel.

22  **Q.**   And are they going to reimburse you for your stay at the

23  Ritz-Carlton?

24  **A.**   I think that they've actually got some sort of corporate

25  rate, a good discounted rate, for a block of rooms.  So they're

1 paying for the rooms for the people who are working on the

2 project.

3 **Q.**    Okay.  So it's a budget Ritz-Carlton, is what you're

4 saying?

5 **A.**    No, it's not a budget Ritz-Carlton.  It seems to be very,

6 very nice.  I don't usually stay at the Ritz-Carlton.  But in

7 this case, that's where they were able to get the block of

8 rooms; and I understand that there's, you know, a discount or

9 group rate.  That's sort of normal.

10 **Q.**    Did you talk to these lawyers about their special

11 discounted rate at the Ritz-Carlton?

12 **A.**    No.  I think it may have just come up in passing

13 somewhere, but my understanding is that when you go -- I mean,

14 I've -- in my distant past, I did some travel planning.  If you

15 take a group of people --

16 **Q.**    Dr. Hochman, I'm sorry.

17         **THE COURT:**  I think we've exhausted the Ritz-Carlton

18 part.

19         **MR. SANTACANA:**  I am moving on.

20         **THE COURT:**  Let's move on.

21         **MR. SANTACANA:**  I am moving on, Your Honor.

22 **BY MR. SANTACANA:**

23 **Q.**    So, Dr. Hochman, your opinions have been excluded by

24 judges in the past in other cases, have they not?

25 **A.**    Yes.

HOCHMAN - CROSS / SANTACANA

1    Q.    They have been excluded in the past as unreliable, have

2    they not?

3    A.    Yes.

4    Q.    For example, in a case called *Affiliati Network,*

5    *Incorporated vs. Wanamaker*, you submitted an expert opinion in

6    the case; right?

7    A.    Yes.  Let me think, because this was -- I think this was

8    eight years ago, but yes.

9    Q.    And the federal judge in that case excluded the entirety

10   of your opinion as unreliable, did they not?

11   A.    Yes.

12   Q.    In fact, that judge characterized your opinions in that

13   case as, quote, "complete speculation"?  Didn't the judge say

14   that?

15   A.    Yes.

16   Q.    Other courts have also excluded your opinions, in whole or

17   in part, as unreliable, have they not?

18   A.    I am not aware of another one excluded in whole for that

19   reason.  I think there might have been one excluded because of

20   a timeliness issue, an attempt to supplement after a deadline,

21   which the Court decided wasn't allowed.  There may be some that

22   were excluded in parts.  Perhaps you could name the cases and

23   I'll confirm them.

24   Q.    That's all right.  I'll move on.  I think I've made my

25   point.

1      All right.  Let's switch gears, Dr. Hochman.

2      You understand that the phrase "Google Account" is fairly

3  important in this case, do you not?

4  **A.**  Is the term "Google Account" fairly important in this

5  case?  I understand that the term has been used, and I

6  understand that it's hotly contested.

7  **Q.**  A hotly contested term; right?

8  **A.**  I think you guys have been talking about the

9  Google Account.  I think I saw it in the opening statement.

10  **Q.**  But your lawyers, they haven't been talking about the

11  phrase "Google Account."  Is that what you're trying to say?

12  **A.**  No, I'm not trying to say that.

13  **Q.**  Well, you didn't mention it during your testimony today,

14  did you?

15  **A.**  I think it came up on the screen at least.

16  **Q.**  You didn't mention it during your testimony, did you?

17  **A.**  I don't think that's quite right.

18  **Q.**  Okay.  Well, you understand that that phrase is found on

19  the activity controls page with the Web & App Activity button,

20  do you not?

21  **A.**  Oh, yes.  I remember it.

22  **Q.**  It is also found on the WAA help page when a user clicks

23  "Learn more," is it not?

24  **A.**  It may be.

25  **Q.**  You don't know?

1    **A.**    Well, you know, if we're going to talk about the document,

2    why don't we -- why don't we look at it together.  I think that

3    would be helpful.

4    **Q.**    Well, Dr. Hochman, I'm sorry, but you testified for an

5    hour that you believe that Google's description of WAA is

6    inconsistent with what it does.

7         Do you recall, sitting here, now that I'm questioning you,

8    whether the "Learn more" page uses the phrase "Google Account"?

9    **A.**    I think it does, but, again, that's just from memory.  I

10   mean, the page -- it would be best for us to look at the page

11   if we want to talk about it.

12   **Q.**    You understand that the plaintiffs in this case contend

13   that all of the data that Google receives when sWAA is off

14   should be covered by the Web & App Activity button?  You

15   understand that's their theory; right?

16   **A.**    Okay.  I'll take your word for it.

17   **Q.**    Well, you were here for opening statement; right?

18   **A.**    Yes.

19   **Q.**    So you heard it.  You heard Mr. Boies's opening statement?

20   **A.**    Yes.  He said what he said.

21   **Q.**    Did I mischaracterize his theory of the case?

22   **A.**    I don't know that it's my place to say whether you're

23   mischaracterizing him or not.

24   **Q.**    Do you have any understanding of his theory of the case?

25   **A.**    The theory of the case is -- it seems to be that's a legal

1    argument.  I'm here for the facts.

2    Q.   You understand that Google's contention is the Web & App

3    Activity control is a control for what is saved in the user's

4    Google Account?  You understand that's Google's contention?

5    A.   Yes, I've heard that argument made.

6    Q.   For purposes of your expert opinions in this case, you

7    created your own definition of the term "Google Account," did

8    you not?

9    A.   Well, we should read exactly what I wrote in my expert

10   report because I think what I said was to the effect, "This is

11   what this means to me."  When you say a "Google Account," what

12   it means to me is all the data -- it contains all the data

13   related to me.

14   Q.   Okay.  So just to be clear for everybody, you created a

15   definition just for this case, for your expert report, of the

16   phrase "Google Account"?  Yes or no?

17   A.   I don't know that I would put it that way.  I would

18   probably say it a little differently.

19   Q.   So you did not define the term "Google Account" in your

20   expert report?  Is that your testimony?

21   A.   Well, I think it's -- I would flip it around.  What I

22   would say -- do you want to know what I would say, or do you

23   want to just ask questions?  I don't want to start talking

24   without --

25   Q.   I'm listening to your answer, Dr. Hochman.  I'm just also

 1  pulling up the footnote where you define it, but you can

 2  continue your answer.

 3  A.    No.  I think the best thing would be for us to just read

 4  what I said.  That would be the best.

 5          THE COURT:  Just answer his question.  He's entitled

 6  to ask the question and you answer his question.  If you can't,

 7  you tell him you can't.  Answer his question.

 8          THE WITNESS:  Yeah.  I mean -- now, I'm sorry.  Can

 9  you reask the question?

10  BY MR. SANTACANA:

11  Q.    Do you deny that you defined the phrase "Google Account"

12  in a footnote of your expert report for this case?  Do you deny

13  that?

14  A.    Oh, no, I'm not denying that.

15  Q.    The definition that you gave in your expert report was,

16  quote [as read]:

17          "The data that Google collects and saves

18      regarding a user, including data that Google

19      characterizes as pseudonymous."

20      That's the definition you gave, is it not?

21  A.    That's what I said in that footnote.

22  Q.    The definition that you created for this lawsuit is not

23  the same as the definition that Google itself uses, is it?

24  A.    I have to take issue with your statement.  I don't agree

25  with you.

1   **Q.**   You don't agree with that?

2   **A.**   No.

3   **Q.**   Well, let's take a look at what you said in your

4   deposition at page 39, lines 11 through 18.

5                   (Video was played but not reported.)

6   **BY MR. SANTACANA:**

7   **Q.**   What Google thinks "Google Account" means may be different

8   than what you think it means.  You didn't misspeak, did you?

9   **A.**   No.  I agree with that.

10  **Q.**   Not only that, but the phrase "Google Account," as it

11  appears on the Web & App Activity control, you admit that that

12  is Google's use of the phrase, not your definition of the

13  phrase.  You admit that, do you not?

14  **A.**   So if I can, just to be very clear, what I'm taking issue

15  with in your prior question is your use of the word

16  "definition."  Okay?

17      Google's using the phrase and they're saying some things

18  about Google Account, but they never actually anywhere provide

19  a clear definition of what that means and what that includes.

20  **Q.**   Dr. Hochman, my question was quite different.  So please

21  listen.

22      The phrase "Google Account," as it appears on the

23  Web & App Activity control, Google's use of that phrase is

24  different than yours, is it not?

25  **A.**   Yes, Google's use of that phrase is different than mine.

1  **Q.**  And you are aware that the way that Google means

2  Google Account in its privacy policy is different than the

3  definition that you came up with for this lawsuit.  You're

4  aware of that?

5  **A.**  I think that Google's describing -- says some things about

6  it, but I don't consider it to be an actual definition.  It is

7  not clear.  It is vague what that includes.  At least it's

8  vague to me.

9  **Q.**  Dr. Hochman, my question was not whether it's vague to

10 you.  My question was whether you are aware that the way Google

11 uses the phrase "Google Account" in its privacy policy is

12 different than the definition you came up with when you came up

13 with your expert opinions in this case.  You're aware of that,

14 are you not?

15 **A.**  Okay.  I just want to -- I want to parse this very

16 carefully.

17      I'm not saying that what Google said is a definition.

18 Okay?  But I understand that Google is taking a different view

19 of what "Google Account" means and that this is actually just a

20 word game, that this is really some weird word game that Google

21 seems to be doing about this word that they've --

22 "Google Account" that's nowhere clearly defined:  This is

23 what's in it and this is what's not in it.  This is the data of

24 yours that's in the account, and here's the data of yours that

25 we're storing somewhere on the side, something I call the

 1  shadow account.  That's not explained anywhere.

 2  **Q.**   Let me ask you about that phrase "shadow account."

 3     Is that an accepted term in the art of computer science,

 4  "shadow account"?

 5  **A.**   Those are just descriptive words from -- you know, I'm

 6  just trying to be descriptive in a way that people would

 7  understand, because an account, in computer science, typically

 8  means all the data related to a user.

 9     I think we had a long discussion about this, how the word

10  "account" can kind of have two meanings, like a golf club.  Do

11  you remember that?

12  **Q.**   Let me just ask you this:  The term "shadow account" is a

13  term you came up with for this case?

14  **A.**   I don't know that I haven't used it before.  I mean, it

15  was just some words that came quite naturally.

16  **Q.**   When you were reading the documents and emails from

17  employees at Google in preparation for this case, you

18  understood that internally those people were using the term

19  "Google Account" differently than the definition that you came

20  up with; correct?

21  **A.**   Well, I think that you're making a categorical statement

22  about some unknown emails.  Maybe we should look at the emails

23  and let's -- let's be specific.  Let's look at which emails

24  you're referring to because it's hard for me to answer a

25  question about these emails sight unseen.

1   Q.   Dr. Hochman, I'm just quoting your deposition testimony to

2   you.  I'll say it again.

3        When you were reading documents and emails from employees

4   at Google in preparing for this case, you understood that the

5   way they used the term "Google Account" was different than the

6   definition you came up with for this case.  You understood that

7   when you were reading those documents; right?

8   A.   I guess whatever I said in the deposition, I stand by it.

9   I'm not trying to change my testimony.  But at the same time, I

10  don't want to -- I mean, as I'm sitting here now testifying

11  two years later, I don't want to make statements about

12  documents that -- I would like to look at them, at least to

13  refresh my memory.  I'd like to see the documents you're

14  referring to.

15  Q.   Dr. Hochman, you saw evidence in this case that

16  internally, before this lawsuit was ever filed, Google

17  employees used the term "Google Account" interchangeably with

18  "GAIA ID-tied information"; right?

19  A.   I mean, I think I might have seen something that was like

20  that, and I just would like to -- I think it would be best for

21  all concerned to just put the document up and let's look at

22  them.

23  Q.   Dr. Hochman, when your counsel and client gets up here, he

24  can show you whatever he wants to show you.  Okay?  I'm just

25  asking you about your sworn testimony in this case.  Okay?

1        Now, I read to you how you described the term

2   "Google Account."  Did you consult with these lawyers when you

3   were drafting that definition?

4   **A.**   That is actually a definition, I think, that I suggested,

5   that I -- my opinions are my own.

6   **Q.**   So nobody here ordered you to redefine "Google Account" in

7   a footnote of your expert report?

8   **A.**   I think that I've been explaining, as this case developed,

9   there was a time when we would talk about the case and I would

10  give advice and we would talk about things and we would explain

11  to each other.  They would tell me about the case.  I would

12  tell them my impressions.  And then I wrote the report, at

13  least a first draft.

14       And we worked on the draft, and there were, of course,

15  revisions over time.  And I'm -- I don't know exactly -- I

16  don't remember the genesis of that footnote.  Okay?  Let's just

17  say that I don't remember the exact circumstances of why I put

18  that in there or how I put that in there.  But what I do

19  remember is that footnote accurately represents my opinions.

20  **Q.**   You don't remember the genesis of the definition in the

21  footnote?  That's your testimony?

22  **A.**   You're asking me if a lawyer suggested it to me.

23  **Q.**   Dr. Hochman, it would be a lot easier if you could just

24  listen to my questions carefully and then answer them directly.

25  Okay?

1      Your lawyer will get up and he will ask you to explain.

2   But each of us is on a clock.  We don't have unlimited time.

3   So please just answer my question.

4      You do not recall the genesis of the footnote defining

5   "Google Account" in your expert report?

6   **A.**    Yeah, I don't remember when I put it there.

7   **Q.**    So it is possible that that definition was suggested to

8   you by a lawyer at this table; right?

9   **A.**    I think I wrote it there, but maybe somebody there said,

10  "Hey, Jonathan, do you remember when you said this?  It would

11  be a good thing to put it here because you said it before or

12  you thought it before and now this would be helpful to explain

13  things."

14  **Q.**    Now, before you started working on this case, before you

15  started getting paid for your time on this case, you had a

16  general understanding of what "Google Account" means; right?

17  **A.**    Yes, I think I had an understanding of what it means.

18  **Q.**    And your understanding of what "Google Account" means

19  before you were paid to work on this case was, quote, "I can

20  log into Google and my account has some collection about me."

21  That was your general understanding before you knew anything

22  about this case?

23  **A.**    That sounds right.

24  **Q.**    Now, when you first joined the case, you didn't know

25  anything about it; right?

 1   **A.**   That's right.

 2   **Q.**   And one of the first things you did was read the

 3   description of Web & App Activity?

 4   **A.**   Okay.

 5   **Q.**   And when you read that description, you formed no opinion

 6   whatsoever about whether Web & App Activity should apply to

 7   pseudonymous data.  You had no opinion about it after that very

 8   first time you read it; right?

 9   **A.**   That's probably fair.

10   **Q.**   And at the time that you first read the Web & App Activity

11   description, you knew what pseudonymous data was, did you not?

12   **A.**   I would say this:  I understood it then; and as a result

13   of my -- my studies and my work at school, I've come to have a

14   greater understanding of it over time because that's one of the

15   topics that I've been researching, actually.

16   **Q.**   And you are not, Dr. Hochman, giving the opinion in this

17   case that your custom definition of "Google Account" is the

18   most natural definition of the phrase "Google Account"?  That

19   is not an opinion that you are providing in this case.  Am I

20   right about that?

21   **A.**   I don't think I've said that.  I don't know, I mean, if I

22   did say it, but it seems like a strange thing for a technical

23   expert to say.

24   **Q.**   I agree.  You're not going to offer that opinion; right?

25   **A.**   I don't think I've testified to that effect.  I think I

1   might have said that that's what naturally comes to me, but I

2   can't -- I can't speak for what other -- what's in someone

3   else's mind.

4   **Q.**   What naturally came to you after you were hired by these

5   lawyers as a computer scientist with 20 years of experience

6   testifying and working on Internet marketing?  That's what came

7   most naturally to you?

8   **A.**   Well, the way I would put it is I have experience with

9   online platforms, long experience with online and digital

10  platforms.  And usually, when someone says "an account," that's

11  where you put the data related to the user.  The account -- the

12  data of that user, the data connected to that user goes in that

13  user's account.

14      That's sort of the default explanation of what that

15  account is, subject, of course, to my long discussion with you

16  about golf clubs, the way the golf club could be the thing you

17  use to hit the ball or it could be the place where you go after

18  work to get a beer.

19  **Q.**   Dr. Hochman, speaking of your experience with Internet

20  marketing, you had used Google Analytics extensively before

21  this -- joining this case; right?

22  **A.**   Yes.

23  **Q.**   You had used it for about ten years before joining this

24  case, as a person who owns a business?

25  **A.**   I -- I had used it, in fact, since Google acquired Urchin

1    because I had been using Urchin even before Google acquired

2    that product.

3    **Q.**   Google Analytics was, at the time that you joined this

4    case, employed on Hochman Consultants' website, was it not?

5    **A.**   Yes.

6    **Q.**   You understood, at the time, what it was like to use

7    Google Analytics from the same perspective as a website or app

8    developer; right?

9    **A.**   Yes.

10   **Q.**   After your experience with Google Analytics, you read the

11   description of WAA; right?

12   **A.**   Yes.

13   **Q.**   And when you read that description, you had -- you formed

14   no opinion at all about whether or not Google Analytics data

15   that is pseudonymous should be controlled by WAA or not; right?

16   **A.**   I think I may have said that before, and what I would say

17   about it is that this is actually -- it seems that it takes

18   people a while to come to understand what's going on here.  It

19   actually takes time to gain understanding and to review all the

20   information.

21   **Q.**   Time you were paid for?

22   **A.**   Well, I'm paid for my time working for my clients, yes.

23   **Q.**   You gained your understanding on the clock, at $800 an

24   hour?

25   **A.**   Well, not exactly because some of my understanding is from

1    reviewing the documents in the case; some of my understanding

2    is just from experience and also from education, from studying.

3    I've been working on a digital identity product -- project

4    since 2018.  So some of my time is -- a lot of my time,

5    actually, is relatively uncompensated.

6    Q.   Before you joined this case, you had been working on a

7    project, the goal of which was to help data online be protected

8    and kept private; right?

9    A.   That's sort of a high-level general way of saying it,

10   sure.

11   Q.   And yet, when you joined the case in 2020 and you first

12   read the description of WAA, you formed no opinion about

13   whether or not pseudonymous Google Analytics data should be

14   controlled by WAA; right?

15   A.   I -- when I first looked at it, I think that what I was

16   doing was I was open-minded.  I was looking at that, and I

17   didn't just jump to some snap opinion.  I wanted to see all the

18   evidence and give it thorough consideration.

19   Q.   So you had no opinion when you first read it?  Is the

20   answer to my question "yes"?

21   A.   Well, in this case, I'm engaged in an exercise where what

22   my job is, is to be thoughtful and to be -- not to jump to

23   conclusions.

24   Q.   Would you --

25   A.   So I understand what you are asking, and I just want to

1    make clear that I'm engaged in an exercise here of trying to

2    get to the facts.  I'm trying to be thoughtful and I'm trying

3    to consider all the information, and I'm trying not to jump to

4    some immediate opinion without considering everything.

5    **Q.**    Dr. Hochman, when you first started this case and you read

6    the Web & App Activity description and you had used

7    Google Analytics before, you did not form the opinion that

8    Google should dump all of the pseudonymous Google Analytics

9    data that it had?  That was not an opinion that you formed

10   right at the beginning, before you had started working on the

11   case and meeting with the lawyers?  Just when you read the

12   description, that was not an opinion that you formed; right?

13   **A.**    Well, of course, because I hadn't seen the data.  So I

14   didn't even know what -- you're saying the pseudonymous data,

15   but I hadn't seen that data.  I didn't know what it was.

16   **Q.**    You testified that you'd never even -- it had never

17   occurred to you, never occurred to you that Google would have

18   pseudonymous data that's controlled by WAA.  You hadn't thought

19   about it before you joined the case?

20   **A.**    Well, I think you asked that in the context of had I used

21   the WAA and sWAA controls, was I aware of them.  Yes, I was

22   aware of them.

23       And then you asked if I had thought about how those

24   controls intersected with Google Analytics, and I said I hadn't

25   really thought about that because I just looked at this as,

1   well, here's some switches and they should do what they say,

2   and there's Google Analytics, which provides me with aggregated

3   data.  I didn't see an immediate contradiction.

4   Q.   You did not see an immediate contradiction when you joined

5   the case.  That's exactly what you said in your deposition;

6   right?

7   A.   Well, it's great that I remembered it, yes.

8   Q.   Now, this case focuses on data that's collected by

9   analytics SDK, which is the Firebase SDK and the Google Mobile

10   Ads SDK.  Fair to say?

11   A.   Yeah.  I'll just be super precise so that no one gets

12   confused.  It's collected by Google Analytics for Firebase,

13   which is the product within that Firebase SDK, and also in

14   Google Mobile Ads SDK, yes.

15   Q.   The SDKs in apps that we are talking about, they are

16   installed by the app developer, not Google; right?

17   A.   Correct.

18   Q.   Google doesn't go to Reddit and say, "I'm putting this SDK

19   in your app"?

20   A.   All right.  There's a little wrinkle.  I just want to be

21   clear.  There was a time when Google pushed out an update of

22   the SDK, one of these SDKs, and actually inserted

23   Google Analytics for Firebase into the SDK.  So just to be

24   clear, I think I've documented that in my report.

25   Q.   Are you giving the opinion that Google forced developers

HOCHMAN - CROSS / SANTACANA

1   to use any of these SDKs?

2   **A.**   No.

3   **Q.**   Okay.  Now, Google Analytics has features that are on

4   automatically and it has features that are customized by the

5   app developer; right?

6   **A.**   That's right.

7   **Q.**   Developers can choose which types of information to send

8   to Google, can they not?

9   **A.**   That's correct.

10  **Q.**   There are events that are automatically collected; right?

11  **A.**   Yes, that's right.  They're called the default events.

12  **Q.**   The default events.  Earlier we saw one called first open.

13  That's a default event; right?

14  **A.**   Yes.

15  **Q.**   But developers can create custom events to add on more

16  information; right?

17  **A.**   That's correct.

18  **Q.**   And they do that because there might be something in the

19  app that they want to track and understand how it's working

20  that's not offered by Google as a default?

21  **A.**   Yes, that's right.  There are custom events.

22  **Q.**   Developers can also choose which user parameters go along

23  with these custom events; right?

24  **A.**   Yes.

25  **Q.**   Google has no role in choosing those.  There's some

1  default ones, but developers can send a lot more; right?

2  **A.**   Yes.  The developers can choose what data they send to

3  Google, and Google can choose whether to accept that data and

4  save it or not.

5  **Q.**   Now, you are not aware of any evidence in this case that

6  Google does anything to try and understand what a developer's

7  custom event actually means?  You're not aware of any such

8  evidence; right?

9  **A.**   That's right.  I'm not aware of Google attempting in any

10 way to implement safeguards against developers uploading

11 information that's against policy.

12 **Q.**   You -- let's talk about the logs that you discussed with

13 Mr. Mao.

14     When sWAA is turned off, you concede that Google logs the

15 app activity data in question into a non-GAIA log.  You concede

16 that; right?

17 **A.**   I've said that.  I don't -- yes, I've said that.

18 **Q.**   And you concede that Google Analytics actually doesn't

19 even log IP address; right?

20 **A.**   Wait a second.  Google Analytics is the product that

21 displays the data to the Web developer.  Do you mean

22 Google Analytics for Firebase?  If so --

23 **Q.**   I do mean that.

24 **A.**   Okay.  I believe the IP address is sent along in the data

25 packet.  I believe we've seen it in the packet.  After the data

 1    is taken by Google and they receive it and copy it and process

 2    it, sometimes that IP address might go to certain places and

 3    not to other places.  So in a roundabout way, I'm somewhat

 4    agreeing with you.

 5    Q.   Well, at your deposition, you fully agreed with me that

 6    Google does not log IP address with Google Analytics for

 7    Firebase.

 8    A.   I think that we should just take a look at what I said to

 9    be very careful, because if I'd said something wrong, I would

10    correct it.

11         But what I would say is that you can't get the

12    IP addresses from Google Analytics.  If you're a developer and

13    you're using Google Analytics, you can't see -- they don't show

14    you the IP addresses.

15    Q.   I asked you, and you were under oath, Google Analytics

16    does not store IP addresses in logs?

17    A.   Yes, Google Analytics data doesn't have the IP address.

18    It's not available.  As a Google Analytics user, I can't see

19    the IP addresses.

20    Q.   Now, you -- well, excuse me.  No.

21         The question was:  Google does not store, Google does not

22    store the IP address that is sent via Google Analytics in any

23    Google logs.  It throws it away.  You don't deny that, do you?

24    A.   Well, I think we might have been -- there might have been

25    a confusion there because I was thinking of Google Analytics.

1    I wasn't thinking of the Google Analytics for Firebase, which

2    is taking the data from the user's phone.  I think we've seen

3    that the IP address is in the data packets.

4    **Q.**   So your testimony is that you misunderstood my question?

5    **A.**   I don't know for sure.  We could go look at that

6    transcript carefully and try to -- try to sort it out.

7         But I will say this:  My understanding is that

8    Google Analytics isn't giving information about IP addresses

9    out.  That is not part of Google Analytics.  That's not what

10   that does.

11   **Q.**   Okay.  Well, we'll hear from Mr. Ganem, who's the expert

12   on Google Analytics, about what it does and doesn't store, so

13   I'm going to move on.

14           **MR. MAO:**  Your Honor, can I just -- I've been trying

15   to be polite, but can you allow the witness to just finish his

16   answer before you go on?

17   **BY MR. SANTACANA:**

18   **Q.**   Dr. Hochman, was your answer complete?

19   **A.**   I think I've said enough on the topic.  Let's move on.

20   **Q.**   You mentioned demographic information, like age and

21   gender, during your testimony earlier, did you not?

22   **A.**   Yes.

23   **Q.**   True or false, Dr. Hochman, you do not know if that

24   demographic information came from Google or if it was sent by

25   the app developers?  That's not something you studied for this

1    case; right?

2    **A.**    Oh, the fact is that the information -- my assertion is

3    that that information is included, if available, in that data

4    bundle.  So Google is taking that information from the phone.

5    When they get it, they copy it, and then they process it and

6    use it.

7    **Q.**    Okay.  Let's talk about the consent check process you were

8    discussing earlier with your counsel.

9        To check whether a user on Android has sWAA on or off,

10   Google performs a consent check; right?

11   **A.**    Yes.

12   **Q.**    The way that Google does that is that it sends something

13   called DSID to a server that is separate from the server that

14   has the analytics data to figure out what the user's settings

15   are; right?

16   **A.**    Let me just say it to be more precise.

17   **Q.**    Sure.

18   **A.**    After Google takes the data off the phone and receives it

19   at their server, that first server uses a second server to

20   decrypt the DSID and get back the consent signal.  So that

21   piece of it, I agree with you on.

22   **Q.**    And the DSID that is used to check the settings is

23   encrypted, is it not?

24   **A.**    Yes.

25   **Q.**    It is not the GAIA ID of the user; right?

1   **A.**   It is, I think, the encrypted GAIA ID.

2   **Q.**   It's an encrypted GAIA ID that you can't figure out

3   without having the encryption key; right?

4   **A.**   Indeed.  Google has both the data and the key.  That's

5   right.

6   **Q.**   And I think we all know Google in this courtroom.  You're

7   not suggesting here that Google's encryption methods are in any

8   way below average; right?

9   **A.**   Oh, no, I'm not criticizing Google's encryption methods.

10      I think the problem with this is, of course, that the data

11  and the key are being held by the same entity; and the user's

12  already indicated, if sWAA is off, that they don't want that

13  entity to have this data.  So that's where I see an issue.

14  **Q.**   The encryption key is also temporary.  Google trashes it?

15  **A.**   Yes, I'm aware that Google uses key rotation.

16  **Q.**   The purpose of using key rotation is to make the data even

17  safer and less likely that somebody could decrypt the DSID;

18  right?

19  **A.**   I understand that key rotation is a good practice, and I

20  understand Google is following that.

21  **Q.**   And, in fact, Google's design of separating the consent

22  check into two servers, one with analytics data and one with

23  the DSID, that is a design pattern that you recognize from

24  computer science, do you not?

25  **A.**   Yes, very much so.

1    Q.    It's called isolation; right?

2    A.    Yes.

3    Q.    Its purpose is to make it more difficult for an attacker

4    to be able to put together the information about the person's

5    identity with the other information?

6    A.    Right.  But let's -- I saw you objecting to some of the

7    documents when things were said incompletely.  I do want to

8    complete your statement.

9          Isolation --

10   Q.    My statement was complete, in my opinion.

11   A.    Okay.  That's all right.  I'll tell you what.  I have more

12   to say about isolation because you missed an important premise

13   of isolation; but if you don't want to ask, then, you know --

14   Q.    I'm sure Mr. Mao can ask you about that if he'd like to

15   use his time on it.

16   A.    Okay.

17   Q.    You do not dispute that the isolation design in question

18   separates data that is stored with a GAIA ID from data that is

19   stored with some other identifier?  You don't dispute that?

20   A.    No, I'm not disputing that.

21   Q.    Now, you said that Google is taking this DSID because --

22   I think what you said was because Google has to know who the

23   user is in order to check consent; right?

24   A.    Yes.  When they're setting up their consent check in this

25   manner, to take the data and copy it first and then check for

1    consent, I think I've highlighted that there's another design

2    pattern available, which is to check consent first before

3    taking the data.

4    **Q.**    Okay.  So you would like to see Google use a different

5    design pattern, but you don't deny that the purpose of this

6    pattern is to check whether the user has sWAA on or off?  You

7    don't deny that?

8    **A.**    No.  I agree with you that Google is checking the position

9    of the switches --

10   **Q.**    You're not --

11   **A.**    -- after they've taken the data and copied it, yes.

12   **Q.**    You are not suggesting to this jury that in order to honor

13   the user's WAA setting, Google should not check their consent

14   settings at all?  That's not something you're suggesting to

15   them, is it?

16   **A.**    I don't think I've said that.

17   **Q.**    That would be absurd, would it not?

18   **A.**    That's up to you, but I haven't suggested it.

19   **Q.**    Now, you have been using Google Analytics, as we've

20   discussed; and when you have looked at Google Analytics from

21   the perspective of a user, you have said that Google doesn't

22   show you any individual user information; right?

23   **A.**    Yes, that's right.

24   **Q.**    And you agree, in fact, that Google endeavors not to show

25   its Google Analytics customers like you data about specific

HOCHMAN - CROSS / SANTACANA

1  users; right?

2  **A.**    Yes, that's right.

3  **Q.**    You've had clients, in your time working on computer

4  problems, who have asked you, "Can you tell me exactly who's

5  visiting my website," when they hire you as a consultant;

6  right?

7  **A.**    That's been a frequent request, yes.

8  **Q.**    And what did you say to them?

9  **A.**    We can't do that.

10  **Q.**    Why not?

11  **A.**    Because that -- Google Analytics doesn't work that way.

12  They don't provide data about individual users.

13  **Q.**    They wouldn't permit it; right?

14  **A.**    That's right.

15  **Q.**    And, in fact, at some point Google even took away your

16  ability to see the keywords that people were using to reach

17  your website; right?

18  **A.**    Yes.    That -- wow, that made a lot of search engine

19  optimization people angry.    They're still angry about that.

20  **Q.**    And you were told that Google did that because they were

21  trying to protect user privacy?

22  **A.**    I think that that was the reason that Google cited, but

23  I think there are people in the industry who maybe think there

24  are other reasons.    But this is very far afield.    We're not

25  going into it.

1    Q.    Well, in your deposition, you didn't say, "This is very

2    far afield."  You just simply admitted -- in fact, I think you

3    explained to me in a long monologue that this was very

4    frustrating, but Google did it to protect user privacy.  That's

5    what you said, did you not?

6    A.    Yes.

7    Q.    Okay.  Now, you do not believe that your use of

8    Google Analytics has materially increased anyone's risk.  You

9    have said that; right?

10   A.    Yes, I said that.

11   Q.    You had tracking pixels on your own website at the time

12   this case was filed?

13   A.    Yes.

14   Q.    They were on your website when we last met at your

15   deposition?

16   A.    Yes.

17   Q.    And I asked you at your deposition:  How can you square

18   the plaintiffs' position in this case with the fact that you

19   yourself were using Google Analytics on your website?  You

20   remember I asked you that?

21   A.    Yes.

22   Q.    And you said that you didn't believe that using

23   Google Analytics on your website would materially increase

24   anyone's risk.  You said that?

25   A.    Yes.

HOCHMAN - CROSS / SANTACANA

1  Q.   Now, after I suggested to you at your deposition that it

2  might be a problem that you're criticizing Google Analytics on

3  the one hand and using it on the other, you removed

4  Google Analytics from your website, did you not?

5  A.   Sometime later, I decided that I didn't want to share my

6  website visitor data with Google because I was getting the idea

7  that Google could use that data against me, and I decided not

8  to use that.

9       And, in fact, I've actually decided not to use a whole

10  bunch of Google products.  I've -- just for my own reasons,

11  I've stopped using Gmail.  I've stopped using Chrome.  I'm

12  using Proton Mail.  I'm using the Vivaldi browser.  I'm using

13  DuckDuckGo.  And I'm doing all right.

14  Q.   You were deposed in the summer of 2023; right,

15  Dr. Hochman?

16  A.   Yes.

17  Q.   You were hired for this case a couple of years earlier;

18  right?

19  A.   Yeah.  There was -- I guess it might have been in 2022

20  that I was hired.

21  Q.   So for a year, you maintained Google Analytics on your

22  website; right?

23  A.   Yes.

24  Q.   Then I deposed you?

25  A.   Yes.

HOCHMAN - CROSS / SANTACANA

1  Q.   And I suggested to you that it didn't look very good that

2  you were using Google Analytics while criticizing it; right?

3  A.   You said that, sure.

4  Q.   I said that.  And sometime after that, you went and you

5  took it off your website?  True or false?

6  A.   That's true.

7  Q.   When this case is over and the jury has done their work

8  and these lawyers aren't paying you anymore, are you going to

9  put Google Analytics back on your website?

10 A.   Absolutely not.

11 Q.   Dr. Hochman, you agree with me that Google Analytics is

12 not showing app developers personally identifiable information;

13 right?  You've said that?

14 A.   I've used it and I haven't seen that, so yes.

15 Q.   Now, you are not -- just to be perfectly clear for this

16 jury, you are not offering an expert opinion about what is or

17 is not personally identifiable information; right?

18 A.   Oh, yeah.  I heard you use that term before in an

19 objection.  I wanted to clarify it.  Thanks for the

20 opportunity.

21 Q.   Dr. Hochman, I'm sorry, but the time to clarify is with

22 your counsel.  I asked you a very simple question.

23 A.   Okay.

24 Q.   You are not offering an opinion in this case about what is

25 or is not personally identifiable information?

1    **A.**   I'm not offering any legal opinions here because that's a

2    legal term.

3    **Q.**   That's the jury's job to decide, not yours?

4    **A.**   I don't know about that.  That's over my pay grade.

5    **Q.**   Now, you testified earlier today that you found email

6    addresses in some of the data that you reviewed for purposes of

7    this case; right?

8    **A.**   That's right.

9    **Q.**   I think you put up a slide.

10        Let's take a look at Dr. Hochman's Slide Number 43.

11            **THE COURTROOM DEPUTY:**   Should this be published?

12            **MR. SANTACANA:**   Yes.  It's been published already to

13    the jury.  That should be fine.

14   **BY MR. SANTACANA:**

15   **Q.**   You recall your testimony when this slide was on the

16    screen; right?

17   **A.**   Yes.

18   **Q.**   Now, did you find a lot of email addresses -- actually,

19    just so we're consistent here, let's look at Slide -- no.

20    I think I'm looking at 43, but maybe they gave you a different

21    one.

22        That's fine.  I saw one with an email.  This one has a

23    name.

24        I think you said the volume of data was enormous; right?

25   **A.**   Yes.

1  Q.  Or maybe you said "huge."  I don't know what word you

2  used.

3      How does the volume of records that you found from this

4  natural test that had an email address in it, how does that

5  compare to the total volume of records in the data?

6  A.  Oh, so it's great.  I think Dr. Black actually helped me

7  by compiling a statistic, but I think there was something

8  like -- I don't know -- 19,000 records -- 19,000 records.

9  There might have been just a small number that had email

10 addresses.  I think it might have been, like, maybe a few

11 hundred records that had something -- let's just call it toxic

12 data -- that had some of this toxic data in it.

13 Q.  Would you agree with me that it was a tiny proportion of

14 data that had an email in it?

15 A.  Well, the only problem with it being a tiny proportion is

16 that once it comes out in one record, then it links, and you

17 can apply that email address to all the other records in the

18 corpus that share an identifier with the one record that's been

19 exposed.

20 Q.  Is it your testimony, Dr. Hochman, that Google takes

21 something like this and uses it to link records to other

22 records that are not containing information like this?

23 A.  Oh, the way that that would get linked is if some -- if

24 there were a data breach and a few of the records have email

25 addresses in them, then it's possible for the adversary to line

1  up the records and identify which ones relate to the same user.

2  And then if they see one email address associated with the

3  user -- let's say the user's got a million events stored.  If

4  one of those events leaks the email address, that blows the

5  privacy on the other -- all the other ones.

6  **Q.**  I'm going to ask my question again.

7      You are not offering any evidence here that Google

8  attempts to reidentify users when toxic data makes its way to

9  Google?

10  **A.**  I haven't said that.

11  **Q.**  Now, you understand that it is against Google's rules with

12  Google Analytics for a developer to send an email address to

13  Google; right?

14  **A.**  Oh, yes.  I understand that Google has rules, and with all

15  rules, there's some non-compliance.  And this is -- I

16  understood that this is -- we're observing non-compliance in

17  the wild, that there are a few apps that were doing this.

18  I think one of them we observed was Career Karma, and the other

19  one was the *Washington Post*.

20  **Q.**  You are not opining in this case that Google is somehow

21  taking advantage of the non-compliance of app developers who

22  are sending information like this?  You're not opining that;

23  right?

24  **A.**  No, I'm not saying Google's taking advantage of it.  I'm

25  just saying that this non-compliance introduces a risk into the

HOCHMAN - CROSS / SANTACANA

1  system.

2  **Q.**  You have seen no evidence that Google does anything with

3  toxic data that happens to make its way to Google in violation

4  of its terms; right?

5  **A.**  I haven't said that.  I haven't said -- I haven't asserted

6  that, no.

7  **Q.**  You have seen no such evidence?

8  **A.**  Let's just repeat -- could you repeat what you said

9  before, just because I forgot what you were saying?

10  **Q.**  Sure.

11      You've seen no evidence that Google does anything to use

12  PII, like an email address, that makes its way to

13  Google Analytics in violation of its terms?

14  **A.**  I haven't seen anything to suggest that Google's using

15  that PII.

16  **Q.**  You haven't seen anything to suggest Google is

17  interpreting this either; right?

18  **A.**  I actually wish that Google would.  I wish Google would

19  recognize that this is an email address and reject it.

20  **Q.**  Can you answer my question?

21  **A.**  Yeah, I haven't seen Google applying a safeguard here.

22  **Q.**  You haven't seen any evidence that Google attempts to

23  interpret this and figure out that it's an email address and

24  whose it is; right?

25  **A.**  Yeah, I haven't seen them doing that.

HOCHMAN - CROSS / SANTACANA

1  Q.   You also have done nothing to study how frequently this

2  happens; right?

3  A.   Right.  I haven't done a statistical survey.  This is just

4  something -- this was like an incidental finding.  We just

5  accidentally found this happening.  I think there were two

6  sites I remember, Career Karma and *Washington Post*.

7       And then in our test app, we actually tried to do it

8  ourselves to see if maybe it wasn't repeatable, but it was

9  repeatable.  We were also able to do the same -- cause the

10 system to do the same behavior.

11 Q.   So just to be totally clear with this jury, Google, by

12 default, in Google Analytics, does not collect email addresses;

13 right?

14 A.   I'll just -- I want to be clear.  It's in Google Analytics

15 for Firebase, which is part of the Firebase SDK, and Google

16 Mobile Ads SDK.  Those products are not, by default, taking the

17 email address in this form.

18 Q.   Google's SDKs at issue in this case were not designed to

19 collect email addresses; correct?

20 A.   They're not the default -- they're not part of the default

21 data that is collected.

22 Q.   Nor does the default design result in the collection of

23 names; right?

24 A.   The default design is not to send the user's name, no.

25 Q.   Nor does the default design result in the collection of

HOCHMAN - CROSS / SANTACANA

1  phone numbers; right?

2  **A.**   Correct.

3  **Q.**   Addresses; right?

4  **A.**   Correct.

5  **Q.**   Billing information?

6  **A.**   Well, as far as addresses are concerned, just the default

7  does collect location information, which can be very

8  identifying.  But it's not collecting the user's mailing

9  address; it's not collecting billing information, no.

10  **Q.**   Okay.  I want to make sure I got your testimony very clear

11  because we're going to come back to this.

12      Your testimony is that the location information that comes

13  with Google Analytics data is very identifying?  That's your

14  testimony under oath?

15  **A.**   Yes.  If you have a sequence of location information, even

16  if it's been approximated, that sequence forms an indication

17  of -- that can be specific to a user.

18  **Q.**   Okay.  I'm glad that you made that clear.

19      You mentioned that Google Analytics for Firebase somehow

20  also involves information about the interests of users.  Do you

21  recall that?

22  **A.**   Yes.

23  **Q.**   You have no idea how the interest information in the data

24  that you reviewed was generated; right?

25  **A.**   Well, I wouldn't put it that way.

1    Q.   Well, you didn't disclose any such idea in your expert

2    report, did you?

3    A.   Just to be clear, that data, that interest information,

4    somehow the app gets it.  I'm not concerning myself with how

5    the app got that information.  But if the information is there

6    in the app, Google Analytics for Firebase will extract it from

7    the app and put it into that data bundle, and Google then takes

8    that data bundle on its server and it starts, you know, copying

9    it and processing it and doing everything that we've discussed.

10        So the thing that's happening is Google is taking that

11   data from the phone.  Now, how it got in there, I'm not saying

12   how it got there.

13   Q.   You do not know?

14   A.   Well, I think that it's sort of not -- that's not my

15   opinion of how it got there.  It's just that the data, if it's

16   in the app, Google Analytics for Firebase will collect that

17   interest data by default and send it along.

18   Q.   Okay.  Now, I think you mentioned that Dr. Black, who

19   responded to your expert report, did some math about this

20   incidental amount of email addresses and names that comes

21   through Google Analytics.

22   A.   Yes.

23   Q.   And just to put numbers on it, the incidental amount, he

24   found that for one of the plaintiffs, 16,009 out of the 16,163

25   entries in the data had no such toxic data in them; right?

1  **A.**  So let's just do the math here.

2  **Q.**  It's 0.95 percent.

3  **A.**  No, but it's like 154 leaks occurred.

4  **Q.**  Out of 16,163 entries?  You don't -- I just -- my

5  question --

6  **A.**  No, I'm not disputing the math, but I'm pointing out --

7  **Q.**  You don't dispute the math?

8  **A.**  I'm pointing out that that's 154 leaks that should not

9  have happened.

10  **Q.**  Well, you have pointed out, actually, that the data in

11  question is not representative of the data that would have

12  applied to the class from 2016 to 2024; right?

13  **A.**  I don't agree with that.

14  **Q.**  You didn't say that in your deposition, that the data

15  sample was not representative?

16  **A.**  Oh, the data sample that we got from Google -- now I see

17  what you're getting at.

18       Google provided us with a data sample for our plaintiffs.

19  Okay?  That's all that we could get from them.  I couldn't get

20  from them, like, a survey of, you know, 30,000 random people.

21  It might have been nice, but that wasn't -- we weren't able to

22  do that.

23  **Q.**  So it's possible that the error rate or the non-compliance

24  rate is even lower if you were to have representative data

25  about what happened in the class period?

1  **A.**  As much as it could be lower, it also could be higher, and

2  I will agree with you.

3  **Q.**  Okay.  Let's talk about personalized advertising.

4  Now, in your report and in your deposition, there's a back

5  and forth about this term.  So, first, I just want to make sure

6  we're all on the same page about what these terms mean.

7  You distinguish between two types of what you call

8  targeting.  There's personalized ad targeting and then

9  there's -- let's just call it other targeting.  You with me so

10  far?

11  **A.**  Yeah.  I think I would just describe it -- let's make it

12  really easy on everyone.

13  **Q.**  Sure.

14  **A.**  There's personalization of ads and there's targeting of

15  ads.  Let's just call those two different things.

16  **Q.**  Personalization and targeting, we'll call them two

17  different things.  That's fine.  We can do that.

18  **A.**  Okay.

19  **Q.**  Now, when we're talking about personalization of ads,

20  that's like using a profile about a user that Google has that

21  is something that Google can only do with data that was

22  collected when sWAA was on; right?

23  **A.**  My understanding is that Google is using the sWAA-on data

24  to personalize ads.  I think that I may have made the point

25  that there's also a possibility of personalizing ads.  Like, if

1   a user is just totally logged out, if there's an account,

2   Google doesn't know who that person is; but during that

3   session, they can join up the action during that session.  So

4   there may be some personalization there; but if that person

5   goes away and comes back, they're not connected up again maybe.

6   **Q.**    And just to be clear, because I don't want there to be any

7   confusion, this case is about people who are logged in with

8   sWAA off.  This is not a case about people who are logged out;

9   right?

10  **A.**    Right.

11  **Q.**    Okay.  So let's stick to the people who are logged in with

12  sWAA off.  Google knows they have sWAA off, and it does not use

13  the data while sWAA is off to personalize advertising to them;

14  right?

15  **A.**    Okay.  So now that gets to be a little bit of a thorny

16  issue because there's actually two switches.  I think you

17  probably will cover this, so let me just say it now.

18          There's a switch called sWAA that controls whether or not

19  the data is being collected, at least in my view of the world.

20  And there's another switch called Google Ads Personalization,

21  GAP, maybe another control, like Triple O, Opt Out of Ad

22  Personalization.  There's a couple of other controls that you

23  can use to shut off ad personalization.

24          So my understanding of the interaction between these

25  different controls is that the one set of controls is -- at

1   least I understand it is suggesting that you can control the

2   collection of your app activity data from third-party apps, and

3   the other controls allow you to decide whether or not Google is

4   personalizing your ads.

5       So there may be some edge cases where someone, you know,

6   turns the collection on for a while and there's some

7   information there and then they turn the collection off.  And

8   if collection is off but personalization is on, I haven't seen

9   anything to say that personalization wouldn't happen there.

10  Okay?

11      If you assume that someone's always had sWAA off, then

12  there would be no data and there would be no personalization.

13  So in that scenario, I would agree with you.

14  **Q.**   And, Dr. Hochman, I do appreciate that a lot of this is

15  complicated, and it's good for you to explain the complexity.

16  I also want to make sure the jury understands the facts of the

17  case, so I'm going to ask the question a little differently,

18  and I think we'll be able to agree.

19      Google does not use sWAA-off data to personalize

20  advertising; fair?

21  **A.**   That's my understanding.

22  **Q.**   You don't dispute that at all.  You heard Mr. Monsees say

23  that.  You don't dispute that?

24  **A.**   I don't think I'm disputing that.

25  **Q.**   So to take an example, if Google Analytics sends to

HOCHMAN - CROSS / SANTACANA

1    Google Analytics for Firebase -- my apologies -- sends to

2    Google an in-app purchase event -- okay? -- and it says a

3    purchase was made by a particular device -- you with me so far?

4    **A.**   Yes.

5    **Q.**   -- if the user's device -- excuse me -- if the user whose

6    device sent the in-app purchase event had sWAA off, the fact

7    that they made that purchase will not influence the ads that

8    they see in the future; correct?

9    **A.**   That's my understanding.

10   **Q.**   So now let's talk about what you say is called targeting

11   as opposed to personalization.

12       Targeting, fair to say, is a type of selecting an ad that

13   does not depend on what the user has done in the past when they

14   are logged in and they have sWAA off; correct?

15   **A.**   Correct.

16   **Q.**   What you call targeting includes, for example, a user who

17   is looking at an app about sports and so they receive an ad

18   about sneakers, not because in the past they have been

19   interested in sneakers, but because right now in the moment,

20   that sports app, one could infer, might benefit from sneaker

21   ads; fair?

22   **A.**   Yes.  That's a good example of contextual targeting.

23   **Q.**   Contextual targeting is where I was going next.  That's

24   what Google calls it; right?

25   **A.**   Yes.

1    Q.    Okay.

2            **MR. SANTACANA:**  Can we put up Google's Interrogatory

3    Number 15, page -- Interrogatory Response, page 9, please,

4    Brooklyn?

5            And, actually, you know what?  I'm going to just move on.

6    Thank you.

7    **BY MR. SANTACANA:**

8    Q.    Dr. Hochman, you mentioned data breaches earlier today.

9    You recall that?

10   A.    Yes.

11   Q.    And you say that in your mind, there is a privacy risk

12   that data, like the toxic data that we saw that is sent to

13   Google, could be hacked or leaked; right?  That's a privacy

14   risk?

15   A.    Yes.  There's always some risk.  There's no system that's

16   perfectly secure.

17   Q.    You do not contend that a single bit or byte of the data

18   that was sent to Google during the class period for these

19   hundred-million users leaked out of Google?  That's not

20   something that you are claiming in this case; right?

21   A.    That's not something I've said.

22   Q.    You are not here to testify that there was a data breach

23   of the data in question in this case; right?

24   A.    Correct.

25   Q.    Your testimony is that, hypothetically, there could be a

1  data breach; right?

2  **A.**   I'm pointing out that there is a risk to the user when

3  data is retained if the user did not agree to that data being

4  retained.  Because no system is completely risk free, and

5  everyone should be able to understand the risks, even if those

6  risks are small, and should be able to make their personal

7  choice.

8  **Q.**   You're not suggesting at all in this case, Dr. Hochman,

9  that Google has promised its 3 billion users absolute

10  perfection with respect to data security?  You're not

11  suggesting that, are you?

12  **A.**   No.  I'm not making any ridiculous suggestions, no.

13  **Q.**   It would be ridiculous to expect that?

14  **A.**   I think that everyone understands that perfect data

15  security is impossible.  Maybe I've used too strong a word.  I

16  shouldn't have said "ridiculous."

17      Perfect data security is impossible.  Everyone in the

18  field knows that.

19  **Q.**   You have also not seen any evidence in this case that any

20  user in this class had their identity stolen as a result of the

21  activity data in question; right?

22  **A.**   I have not asserted that.

23  **Q.**   You haven't seen any evidence in this case that any

24  criminal has in some way hacked or in other ways defrauded

25  somebody in connection with the data that was -- that is at

1    issue in this case?

2    **A.**    No.

3    **Q.**    Nor have you seen any evidence that anybody inside of

4    Google violated the policies we heard about yesterday and

5    reidentified a user who had sWAA off?  You have seen no

6    evidence of that; right?

7    **A.**    I'm not presenting any evidence of that.

8    **Q.**    Now, Dr. Hochman, you consider yourself an expert in the

9    fields of technology and security; right?

10   **A.**    Yes.

11   **Q.**    As part of your work as an expert in these fields, you

12   stay up-to-date on what's going on; right?

13   **A.**    I try to.

14   **Q.**    You follow developments in the law; right?

15   **A.**    Yes.  I follow -- I follow a lot of media, yes --

16   **Q.**    You follow --

17   **A.**    -- related to this field.

18   **Q.**    You follow developments in the privacy space; right?

19   **A.**    Yes.

20   **Q.**    Google is not the only entity in the world that uses the

21   term "pseudonymous data"; right?

22   **A.**    I think that other people would use that too.

23   **Q.**    You used it in your dissertation this year when you got

24   your Ph.D.; right?

25   **A.**    Yes.

1   Q.   It's also been used by the United States government, has

2   it not?

3   A.   Yes.

4   Q.   In the context of discussing how to protect user privacy,

5   the government has recommended using pseudonymous data, has it

6   not?

7   A.   Yes.  And, of course -- well, I'm going to summarize it

8   really quickly for you.  The devil is in the details.

9   Q.   Okay.  A variety of states in the United States have laws

10  that suggest the use of pseudonymous data to protect user

11  privacy, don't they?

12  A.   Yes.

13  Q.   The Department of Health and Human Services encourages

14  people who deal in medical records to use pseudonymous data to

15  protect their identities, doesn't it?

16  A.   Well, maybe you should just show me the record because I

17  don't remember that off the top of my head.

18  Q.   That's okay.  I think I got it.

19       You're not an economist; right?

20  A.   No.

21  Q.   Now, you agree with me that for Google to serve ads, it

22  must say something to the advertiser about the fact that the ad

23  was served; right?

24  A.   Yeah.  Google has to at least send the advertiser a bill.

25  Q.   In fact, it is an industry standard that Google must

1    comply with that requires Google to report to advertisers the

2    fact that it served an ad; right?

3    **A.**   Yes.

4    **Q.**   The Media Ratings Council requires Google to report when

5    it shows ads to users; right?

6    **A.**   Yes.

7    **Q.**   Otherwise Google could be accused of fraud, billing people

8    for ads that were never shown; right?

9    **A.**   Correct.

10   **Q.**   So it has to keep a receipt that it did it, does it not?

11   **A.**   Yes.

12   **Q.**   Now, Google is not required to count how many ads it shows

13   using personally identifiable information.  It can do it with

14   de-identified data; right?

15   **A.**   I would assume so.

16   **Q.**   Now, the requirements of keeping receipts of advertising,

17   you have said, come from the 1960s, when Congress became

18   concerned that there had been a lot of lying in advertising on

19   television, radio, and newspapers; right?

20   **A.**   Yes, that's correct.

21   **Q.**   And Congress's concern, in your words, moved from that

22   space to the online space; right?

23   **A.**   Yes.

24   **Q.**   And you have testified that Google Analytics is part of

25   the move that Congress had wanted.  It helps to make sure that

HOCHMAN - CROSS / SANTACANA

 1   online there is no fraud with respect to the serving of ads;

 2   right?

 3   **A.**   Okay.  So Google Analytics is not exactly an ad fraud

 4   solution.  There are others.  But Google itself is certified by

 5   the Media Rating Council as a -- and Google does do detection

 6   of ad fraud and they do proactive -- I mean, Google does work

 7   in this area.

 8   **Q.**   And you like that Google does that as somebody who runs a

 9   business and advertises, do you not?

10   **A.**   Very much.

11   **Q.**   You like that Google tries to maintain a clean ad network;

12   right?

13   **A.**   Yes.

14   **Q.**   You like that they try to protect you, as an advertiser of

15   your expert witness services to law firms, from ad fraud;

16   right?

17   **A.**   Sure.

18   **Q.**   And when Google is concerned that ad fraud might be going

19   on, it's your testimony in your deposition that they actually

20   proactively reach out and investigate it, which is another

21   thing that you like about it; right?

22   **A.**   Yes.

23   **Q.**   Google, in fact, has automatic systems that use

24   de-identified data to try and prevent ad fraud; right?

25   **A.**   Google has automated systems that do try to prevent ad

1  fraud, yes.

2  **Q.**   One way that Google accomplishes its ad fraud detection is

3  to use device ID, a pseudonymous identifier, to make sure, just

4  to give an example, that some bot is not using the same device

5  to hit ads a million times in order to make more money; right?

6  **A.**   That's true.

7  **Q.**   Now, as you sit here now, you cannot say whether Google

8  would have to completely stop its ad fraud detection if the

9  plaintiffs are right about what Web & App Activity should be

10  doing?

11  **A.**   Well, what I think is that either Google would have to

12  change the way they're handling data to comply with the

13  promises that they're -- or the impressions, let's say, that

14  they're giving to people about how the data will be handled.

15  The way the data is being handled needs to be brought into

16  alignment with the way it's being described.  That's really my

17  position.  It has to be brought into alignment, I think.

18  **Q.**   Okay.  But that's not what I -- what I asked you,

19  Dr. Hochman.

20      What I asked you is:  If the plaintiffs are right about

21  this case, you cannot say whether Google could continue the ad

22  fraud detection activity that it does with pseudonymous data;

23  right?

24  **A.**   Oh, well, like I was just saying, my position is that if

25  Google, hypothetically, was ordered to bring this into

1    alignment, there are ways they could do it.  And I don't know

2    that it would mean they couldn't do their ad fraud detention

3    anymore.  It just might mean that they have to update the

4    disclosures, or maybe they can do the ad fraud detection in a

5    different way.  That's a different question.  That's, you know,

6    not what I was tasked with investigating.

7    **Q.**   Suffice it to say, though, if the Web & App Activity

8    button worked the way these plaintiffs say it should work, if

9    it worked that way and it prevented the collection of all data

10   whatsoever, the ad fraud detection would be impossible, would

11   it not?

12   **A.**   Well, no.  I don't think ad fraud detection would be

13   impossible because Google would still be collecting data from

14   people with WAA and sWAA on.

15        And then as far as WAA and sWAA off, I don't know how

16   Google would have to deal with that.  That's -- that's

17   another -- that's a business problem you and your client may

18   have to address at some point.

19   **Q.**   Well, if it worked the way these plaintiffs say it should

20   work, wouldn't I just have to turn sWAA off, and then I could

21   defraud Google and advertisers freely?

22   **A.**   You know, that's a -- that's a problem that somebody will

23   have to think about how to reconcile the promises that Google

24   is making to users or the representations versus the way its

25   systems are behaving, and I'm not here to tell Google how to --

1  how to fix its systems.

2  **Q.**  Let me ask you something.  You testified earlier that

3  Google uses sWAA-off data to train AI.  You remember that?

4  **A.**  Well, I said that Google's sWAA-off data is going into

5  this pool of data, and it's going downstream and being used in

6  lots of places.  And I believe that in the Google responses to

7  our technical questions, I believe they identified AI

8  consumption of the data as one of the uses downstream.

9  **Q.**  Okay.  I want to make sure that your testimony is very

10  clear, Dr. Hochman.  Okay?

11  Do you have any evidence to suggest that Google Analytics

12  data at Google was provided to the AI Department at Google that

13  makes AI products like Gemini?

14  **A.**  Oh, I'm referring to other AI.  I'm referring to things

15  like the automated bidding in AdWords.  There's a lot of

16  machine learning in Google's systems.  I -- I'm not opining

17  about Gemini.

18  **Q.**  Okay.  So when you were -- when your counsel put AI on

19  that slide, what you meant was machine learning about how to

20  run an ad auction?

21  **A.**  That's an example of one thing.  It could mean other

22  things within Google Systems, but Google has deployed AI in a

23  bunch of different ways.

24  **Q.**  You're not suggesting that the AI that all of us have been

25  talking about non-stop for the last year and a half, you're not

1    suggesting that has anything to do with this data; right?

2    **A.**    I'm thinking about AI more generally.  I'm not making an

3    assertion about OpenAI or Perplexity or Gemini.  But I don't

4    know.  Maybe they would use the data for that.  Who knows?

5         You know, if you collect data, data is very valuable; and

6    if you have it, you might find a use for it in the future.

7    **Q.**    Well, this case is not about what Google might do in the

8    future, Dr. Hochman.  This is a case about whether Google is

9    liable for something that happened between 2016 and 2024.

10        So let me ask you this.  Let me ask it this way:  If my

11   client, Mr. Ganem, were to testify that Google Analytics data

12   has never been provided to the AI Department at Google, would

13   you have any basis in fact to dispute that?

14        **MR. MAO:**  Your Honor, it's argumentative and attorney

15   testimony.

16        **THE COURT:**  Overruled.

17        **THE WITNESS:**  You keep slipping back into

18   Google Analytics, but we're talking about Google Analytics for

19   Firebase, you know, the data that's being taken from the

20   Firebase SDK and from Google Mobile Ads SDK.  So regarding that

21   data, I'm not asserting that that data has been given to

22   Gemini.

23   **BY MR. SANTACANA:**

24   **Q.**    Now, you testified earlier about batteries.  Do you

25   remember that?

**HOCHMAN - CROSS / SANTACANA**

1    **A.**    Yes.

2    **Q.**    You're not a hardware expert; right?

3    **A.**    I have some experience in mobile hardware development and

4    sales earlier in my career, and I am familiar enough to know

5    how batteries work in mobile phones.

6    **Q.**    You are not here testifying as a hardware expert.  Am I

7    correct about that?

8    **A.**    I mean, to the extent that hardware is relevant, I

9    understand computer hardware.

10    **Q.**    Dr. Hochman, this is your expert report?

11    **A.**    Yes.

12    **Q.**    Anywhere in this report did you disclose any study that

13    you did with respect to how Google Analytics for Firebase

14    affects batteries?

15    **A.**    I haven't said anything about a study in my report.

16    **Q.**    I don't -- I don't understand your answer.

17        My question is:  In this report, is there anything about a

18    study that you conducted, a scientific study, any type of

19    study, an observational study, just using your phone for a

20    little bit and seeing how it goes, where you were quantifying

21    the effect of Google Analytics for Firebase on batteries?

22    **A.**    I haven't put that in my report.  I think the issue came

23    up in my deposition, and I think it's also been addressed in

24    Google's responses to our technical questions.

25        **THE COURT:**  It's about time for our break.  How much

 1    longer?

 2              **MR. SANTACANA:**  This is a good time.

 3              **THE COURT:**  Okay.  Members of the jury, remember my

 4    admonitions to not discuss this amongst yourselves or with

 5    anyone else.

 6         And we'll take a break and be back here at 25 after.

 7                    (Recess taken at 12:07 p.m.)

 8              (Proceedings resumed at 12:27 p.m.)

 9       (Proceedings were heard out of the presence of the jury.)

10              **THE COURTROOM DEPUTY:**  Please remain as you are.

11    Court will come to order.

12              **THE COURT:**  Doctor, you can come back to the stand.

13         Okay.  Ready to bring them out?

14              **MR. SANTACANA:**  Yes, Your Honor.

15              **THE COURT:**  Okay.

16         (Proceedings were heard in the presence of the jury.)

17              **THE COURT:**  The jury is present.

18         Mr. Santacana.

19    **BY MR. SANTACANA:**

20    **Q.**   Dr. Hochman, we left off talking about batteries.  Do you

21    remember that?

22    **A.**   Yes.

23    **Q.**   I want to make sure your testimony is completely clear.

24    You testified, when your counsel was questioning you, about the

25    degradation of batteries in phones as a result of the

1  transmission of data from those phones.  Do you remember that?

2  **A.**   Yes.

3  **Q.**   In your report, you documented the things you did to

4  prepare your opinions for this case; right?

5  **A.**   Yes.

6  **Q.**   And in that report, you did not document anything that you

7  did to measure the degree, if any, of battery degradation

8  caused by Google Analytics for Firebase.  Am I correct about

9  that?

10  **A.**   Correct.

11  **Q.**   Since you wrote this report, you have not disclosed to us

12  any work that you have done to try and measure the degree of

13  battery degradation, if any, caused by Google Analytics for

14  Firebase.  Am I right about that?  You haven't disclosed any

15  such measurement work; right?

16  **A.**   I haven't disclosed that.

17  **Q.**   The installation of Google Analytics for Firebase in an

18  app is up to the app developer to install; right?

19  **A.**   Yes.

20  **Q.**   The installation of Google Mobile Ads SDK is up to the app

21  developer to install; right?

22  **A.**   Yes.

23  **Q.**   The app developer decides whether and how much data to

24  cause their app to transmit out of a phone; fair?

25  **A.**   The app developer, that's an interesting question.  I

 1  have -- I don't know which app developer you're talking about.

 2  It's a categorical statement.  So I would just say that the app

 3  developer designs their app and it works.  You know, they

 4  design it.

 5  **Q.**    The app developer designs the app, not Google; right?

 6  **A.**    Google designs the SDK.

 7  **Q.**    Google designs the SDK.  It's up to the app developer to

 8  put it in the app; right?

 9  **A.**    Yep, and then Google gets the data from the SDK.

10  **Q.**    And if the app developer were to choose not to install the

11  Google Analytics SDK, then the battery degradation you were

12  speculating about earlier wouldn't happen; right?

13  **A.**    Yes.

14  **Q.**    There's nothing that Google is doing to cause the battery

15  degradation.  It is the app developer who has control over

16  whether Google Analytics for Firebase is installed.  True or

17  false?

18  **A.**    Well, you've sort of said a few things together.  And what

19  I would point out is, if someone switches sWAA off, there --

20  according to my baseline, that is the data will not be taken

21  from their phone.  If it worked according to the baseline, then

22  their battery would work better.  The user would have a control

23  over whether that data is taken from their phone or not if it

24  worked according to the baseline.

25        So, in fact, the user would have some control if the

1    switch worked according to the baseline because they could say,

2    "Stop this data transmission."

3    Q.    Dr. Hochman, I did not ask you about sWAA or the user and

4    how much control they have.  What I asked you was whether

5    Google has control over whether Google Analytics for Firebase

6    is installed in any particular app.

7    A.    The app developer chooses to install that SDK.

8    Q.    It is outside of Google's control whether those data

9    transmissions occur or don't occur?  It's up to the developer

10   to install the SDK; right?

11   A.    I disagree.

12   Q.    Okay.  Well, you can talk to your counsel about why then.

13         Do you have any basis in evidence to suggest to this jury

14   that the degree of battery degradation that you were

15   speculating about earlier that you have done nothing to measure

16   is anything greater than negligible?

17   A.    I have evidence that it's greater than negligible.

18   Q.    You have evidence.  Did you disclose that evidence to us

19   in this case?

20   A.    Yes.  It's listed in my documents considered.

21   Q.    So do you have -- do you have it here in the courtroom?

22   A.    Yeah.  I think somewhere we've got -- it's the Google's

23   answers to our technical questions.  Google themselves raised

24   the issue of bandwidth and battery life.  When talking about

25   the use of a hit bundle, Google said they use the hit bundle to

 1   reduce the impact on the user's device.  So the fact that

 2   Google is speaking about it and thinking about it indicates

 3   that this is significant.

 4   **Q.**   So I think you're answering a different question than I

 5   asked, but that's helpful.

 6        You understand that Google has actually designed these

 7   SDKs to minimize the impact on battery life; right?

 8   **A.**   At least on the Android device, I think Google can do

 9   that.  I don't think that it works that way on iOS.

10   **Q.**   Apple doesn't let them do that in the same way; right?

11   **A.**   Whatever it is, it's not available on iOS.

12   **Q.**   So Google attempts to minimize the impact on battery life.

13   And my question is:  Do you have any evidence that the impact

14   on battery life is anything greater than negligible?  Do you

15   have evidence?

16   **A.**   Well, the fact that Google worries about it is an

17   indication that the battery life impact -- I mean, if Google is

18   doing something to mitigate it on Android, okay.  Google can't

19   do anything to mitigate it on iOS.  So let's just leave that

20   there because that's -- that's the situation.

21   **Q.**   I don't think I will leave it there, Dr. Hochman.  I

22   really do need you to answer this question.  Okay?  Because you

23   spent some time speculating about batteries and bandwidth and

24   how harmful it is, which isn't in your report.  So I need you

25   to answer the question.

**HOCHMAN - CROSS / SANTACANA**

1    Have you done anything to measure whether the impact on

2    battery life is anything greater than negligible?

3    **A.**   I haven't done any analysis beyond what I've already told

4    you about.

5    **Q.**   Thank you.

6         Now, Google is not the only company that offers analytics

7    SDKs for third-party apps; right?

8    **A.**   Correct.

9    **Q.**   There is a robust market of analytics SDKs available for

10   app developers to use; right?

11   **A.**   Well, there's a market, yes.

12   **Q.**   Facebook has an analytics SDK; right?

13   **A.**   Yes.

14   **Q.**   Used in a lot of apps, is it not?

15   **A.**   Yes, Facebook has an SDK.

16   **Q.**   Adobe has an analytics SDK that's used in a lot of apps;

17   right?

18   **A.**   Yes.

19   **Q.**   LinkedIn has an SDK that's used?

20   **A.**   I believe so.

21   **Q.**   AppsFlyer is a company that offers an analytics SDK;

22   right?

23   **A.**   Yes.

24   **Q.**   Now, you have done no work to compare Google's SDK to

25   those of the competitors; right?

1    **A.**    I haven't done a competitive analysis.

2    **Q.**    But you don't deny that many apps use multiple analytics

3    SDKs in the same app; right?

4    **A.**    Apps sometimes do use multiple SDKs.

5    **Q.**    Frequently they use multiple SDKs.  Wouldn't you agree

6    with that?

7    **A.**    I haven't determined the frequency, so I just --

8    **Q.**    You don't know?

9    **A.**    I haven't expressed an opinion on that.

10   **Q.**    Now, when an app uses multiple SDKs for analytics in their

11   app, that means that event-level data can be sent to Google but

12   also to the other entities whose SDKs have been installed in

13   the app; isn't that true?

14   **A.**    Potentially that could happen.

15   **Q.**    That could include multiple parties receiving the device

16   ID of that device; right?

17   **A.**    Yes.

18   **Q.**    Okay.  Let's use the first open event as an example.  If a

19   user first opens an app after they have installed it and that

20   first open event triggers on Google Analytics, the same event

21   might also trigger on the Facebook SDK if it's installed;

22   right?

23   **A.**    Conceivably, yes.

24   **Q.**    Does Facebook have a WAA-off button that separates the

25   data from a user's Facebook ID?

1  **A.**   I haven't investigated the Facebook controls.  But, again,

2  this case is about Google.  It's not about other people.

3  **Q.**   Sure, but I'd like to understand if these other analytics

4  providers -- this case is also about the expectation of

5  privacy, and I'd like you to tell the jury if these other

6  analytics providers are affording their -- the users that they

7  have, like Facebook and its users, the opportunity to separate

8  the analytics data from the user's Facebook ID.  Do you know,

9  one way or another, whether Facebook has such a button?

10 **A.**   I'm not aware of Facebook having a WAA or sWAA control of

11 their own.

12 **Q.**   Now, I want to clarify some of the other limits of your

13 opinion just so we are all on the same page.

14     You're not offering an opinion in this case about whether

15 or not Google committed any invasion of privacy; right?

16 **A.**   I'm offering an opinion about the fact of what happened,

17 and that sounds like a legal conclusion, which is for somebody

18 else to make.

19 **Q.**   You're not offering such an opinion?

20 **A.**   I'm just saying what happened and the circumstances around

21 it that I can speak to as facts.

22 **Q.**   You're not offering an opinion about whether Google has

23 violated any law; right?

24 **A.**   That's a legal opinion, no.

25 **Q.**   You're also not offering any opinion about what Google did

1   or did not intend to do.  Am I right about that?

2   **A.**   I can talk about what Google did and didn't do; and as far

3   as intentions, I think people would have to make inferences

4   about that.

5   **Q.**   That's the jury's job, to decide what Google intended;

6   right?

7   **A.**   I think so.

8   **Q.**   You're also not offering any opinion about what Google's

9   consumers expected when they read these disclosures; right?

10  **A.**   Correct.

11  **Q.**   I think you talked a little bit about your personal

12  expectations, but you're not offering an opinion about what

13  regular people expect when they read it; right?

14  **A.**   Yeah.  I'm only offering an opinion about what my baseline

15  was for testing.

16  **Q.**   Now, you talked earlier about whether users have the

17  ability to delete data that is collected when sWAA is off.  Do

18  you remember that?

19  **A.**   I'm not sure.  Which are you referring to?

20  **Q.**   You testified earlier -- I know it's been a little while,

21  but you testified earlier that users are not given the

22  opportunity to delete sWAA-off data by Google.  Do you remember

23  that?

24  **A.**   Oh, right, yes, because it's not there in their activity

25  center.

HOCHMAN - CROSS / SANTACANA

1   **Q.**   Do you use YouTube at all?

2   **A.**   Do I use YouTube?  Not very much.

3   **Q.**   You've been on it before?

4   **A.**   Yes.

5   **Q.**   You know there's a watch counter at the bottom of it;

6   right?

7   **A.**   At the bottom of the video?

8   **Q.**   Yeah.  It shows number of views?

9   **A.**   Sure.

10  **Q.**   You've seen that before?

11  **A.**   Yes.

12  **Q.**   You know that Google is counting the number of views;

13  right?

14  **A.**   Sure.

15  **Q.**   And you know that in order to do -- just as a computer

16  scientist, you know in order to do that accurately, Google has

17  to make sure no one is committing fraud on YouTube and viewing

18  a bunch of times; right?  So they are making sure that a

19  particular device actually viewed the video; fair?

20  **A.**   Again, that's -- that's not something I've investigated

21  here, so I'll believe you if you want to say that's what

22  they're doing.  I'm not going to dispute you.

23  **Q.**   Well, can you imagine, in your mind, as a computer

24  scientist who works in Internet marketing, that Google wouldn't

25  attempt to make sure that the view counter at the bottom of the

1    YouTube video is accurate?

2    **A.**    I will happily take it on your word that they're doing

3    that.

4    **Q.**    Is it your position that when sWAA is off, a user should

5    have the ability to delete the data that Google is using to

6    count the number of views on a YouTube video?

7    **A.**    Well, that's an interesting question because the data of

8    the count seems like an aggregate statistic, where Google might

9    just receive a signal that says plus one, someone watched the

10   video.

11   **Q.**    No, we just agreed that doesn't work, Mr. Hochman.    Plus

12   one doesn't work because you've got to make sure people are not

13   defrauding YouTube; right?

14   **A.**    Well, this is the thing, if Google had to save that data

15   to keep its systems working, then why doesn't it -- I haven't

16   seen them say that plainly anywhere on the privacy pages.    I

17   don't see anything there.    I haven't seen anything which said,

18   "Hey, for security we need to keep certain data.    Just be alert

19   that we're always keeping this data."    I haven't seen that.

20          **MR. SANTACANA:**    Your Honor, I move to strike the

21   entire answer as nonresponsive.

22          **THE COURT:**    Overruled.

23   **BY MR. SANTACANA:**

24   **Q.**    Dr. Hochman, I didn't ask you that question.    What I asked

25   you is:    You would agree with me that Google cannot simply plus

1    one the YouTube video counter because that would open it up to

2    fraud, would it not?

3    **A.**    Again, this is a -- this is a different problem.  It's a

4    different matter.

5    **Q.**    You are a very smart man.  I'm sure you can think through

6    this one.

7    **A.**    I'm not going to shoot from the hip and redesign Google's

8    ad and video auditing systems while I sit here on the stand.  I

9    can't do that.

10    **Q.**    Do you recall earlier today when you said that the

11    location data that Google Analytics sends is very identifying?

12    Do you remember you said that?

13    **A.**    Yes, it could be.

14    **Q.**    And I asked you to confirm that that was your under-oath

15    testimony; right?

16    **A.**    Yes, and I explained it in further detail.

17    **Q.**    I also asked you, at the very beginning of this

18    examination, if you discovered a mistake in your opinions, you

19    would correct it; right?

20    **A.**    Yes.

21    **Q.**    Okay.  You personally observed location data in the form

22    of latitude and longitude in the data that you reviewed; right?

23    **A.**    Yes.

24    **Q.**    And you summarized the records that had latitude and

25    longitude in them, and in that summary, you put in -- you put

1  in how many records were associated with each latitude and

2  longitude; right?

3  **A.**  Let's take a look at the document because I -- wow, there

4  were a lot of documents in this case.

5  **Q.**  Well, let me ask you this:  Is it your testimony today

6  that the latitude and longitude that you observed in, for

7  example, Plaintiff Susan Harvey's pseudonymous log data that

8  was provided by Google to you, that that latitude and longitude

9  was very identifying?  Is that your testimony?

10 **A.**  Ah.  So I just want to be clear.  I'm aware that the

11 latitude and longitude that Google eventually puts in the logs

12 may be city level; in other words, it may not be precise.  I'm

13 aware of that.

14     The point I'm making is a little different point than the

15 one you're, I think, trying to fix, which is that when you look

16 at someone's history, when there is many, many readings --

17 **Q.**  Uh-huh.

18 **A.**  -- you can say the person was in this city, then they were

19 in this city, and now they're in that city, and people have

20 patterns.  Over time, this pattern is identifying.  You develop

21 a unique signature of your travels.  That's the point I'm

22 making.  It's a subtle point and it's a different point than

23 one, I think, you're trying to get at.

24 **Q.**  Well, I want to make sure it's clear for the jury because

25 I don't think it was clear when you were testifying earlier.

1      The latitude and longitude data that is sent to Google

2  when sWAA is off from these SDKs is the city center of the city

3  the user's device is in; correct?

4  **A.**   I absolutely agree with you.   That's correct.

5  **Q.**   It is the center -- if they're in Sacramento, like Susan

6  Harvey was, that latitude and longitude tracks to the center of

7  Sacramento; right?

8  **A.**   Yes.

9  **Q.**   She could be on the very edge of Sacramento and the

10  latitude and longitude is the center of Sacramento?

11  **A.**   Yes.

12  **Q.**   So your testimony is that if she moves around cities a

13  lot, someone who is a nefarious actor might somehow form a --

14  find a pattern in that and figure out that it's Susan Harvey

15  who did that.   That's your testimony?   That's what you're

16  worried about?

17  **A.**   Well, essentially the facts of it are, if you have a

18  sequence of location data, and especially if you overlay it

19  with some of the other rich data that's in the record, it can

20  form a signature, an indicator of who that is.

21  **Q.**   Now, I want to make sure you're very clear because you

22  said it was very identifying, and I want to make sure the jury

23  understands.

24      You are not saying here today that Google uses the data

25  from these SDKs to figure out where devices are or to whom they

1  belong, when sWAA is off, based on the city center that is in

2  that data packet?  You haven't seen evidence that Google is

3  taking steps to do that; right?

4  **A.**    No.

5  **Q.**    Okay.  Now, in the course of your work analyzing all of

6  the data in this case, you actually found no evidence that

7  Google has ever joined together, in the same log, a user's

8  device ID and that user's GAIA ID?

9  **A.**    I'm just thinking if there may be an exception to that.  I

10  mean, the key thing is that I haven't seen all the logs that

11  Google keeps.

12  **Q.**    I don't think that is the key thing, Dr. Hochman.  The key

13  thing is that I asked you a very specific question and you

14  didn't answer it.  So I'm going to ask it again.

15      You have found no evidence that Google has ever joined

16  together, in the same log, a user's device ID and their GAIA

17  ID; correct?

18  **A.**    I don't think I've -- I don't recall whether I found that

19  or not, but I don't recall having found it.

20  **Q.**    And you also found no evidence that Google actually did

21  join sWAA-off data together with a GAIA ID, no evidence of

22  that?

23  **A.**    I understand that Google claims to have a policy against

24  doing that.

25  **Q.**    In fact, in your words, Google actually has the best

1  intentions of keeping that data apart.  You've said that under

2  oath; right?

3  **A.**    I think I said something, but we should probably look at

4  what exactly I said.

5  **Q.**    Do you doubt -- based on your review of the design of

6  Google's systems, the consent check on different servers, the

7  separation of pseudonymous data, do you doubt that Google's

8  design is there to separate GAIA ID from analytics data when

9  sWAA is off?

10  **A.**    My understanding is that Google is attempting to separate

11  the data.  At the same time, that's at the downstream point.

12  But at the same time, when the data is actually collected by

13  Google, all of the data, as it comes in, Google knows exactly

14  who that is at the time it's being taken and copied before even

15  the consent check is done.  And that, I think, is important to

16  keep in mind.

17        **MR. SANTACANA:**  Your Honor, I move to strike

18  everything in that response beginning with the phrase "At the

19  same time."

20        **THE COURT:**  Overruled.  These questions are --

21  overruled.

22  **BY MR. SANTACANA:**

23  **Q.**    Dr. Hochman, you were asked earlier if Google is able to

24  reidentify the user using sWAA-off data.  Do you recall that

25  question?

1    **A.**    Yes.

2    **Q.**    If Google is able to, and you said absolutely.  Do you

3    remember that?

4    **A.**    Yes.

5    **Q.**    You are not giving this jury the opinion that Google has

6    ever, in fact, reidentified the user; right?

7    **A.**    In terms of has Google done that?  I don't have -- I don't

8    say that Google has done that.  Google says that they don't,

9    and that's where I have to leave it.

10   **Q.**    You also said there is nothing technically preventing

11   Google from relinking all of this data together.  Do you

12   remember saying that?

13   **A.**    Yes.

14   **Q.**    Now, in order to relink all of this data together, which

15   you say is technically possible, would you agree with me that

16   to do that, Google would have to change the way its systems

17   work?  That is not how they work now.

18   **A.**    Okay.  So you're asking me to make a categorical statement

19   about how all Google systems work, which I haven't observed.

20   So I'm not going to contradict you, but I'm not going to

21   confirm your assertion either.

22   **Q.**    Well, you made a categorical statement when you said that

23   nothing is technically preventing Google from relinking all of

24   this data.  You remember saying that?

25   **A.**    Yes.  The data, by its nature, by being rich data, full of

HOCHMAN - REDIRECT / MAO

1  identifiers and full of details about the person, lends itself

2  to reidentification, and preventing reidentification is a very

3  hard problem.  And as a result, my opinion is that nothing

4  stops Google from reidentifying it.

5  **Q.**  But Google hasn't done it.  You're just saying it's

6  technologically possible.

7  **A.**  Well, I mean, I also observe that Google has a policy

8  against doing it, and one has a policy because one is trying to

9  prevent something from happening that could happen.  If it was

10 impossible, then there would be no need for a policy.  They

11 would just -- it would never happen.

12      **MR. SANTACANA:**  I move to strike the answer as

13 nonresponsive, Your Honor.

14      **THE COURT:**  Overruled.

15 **BY MR. SANTACANA:**

16 **Q.**  Dr. Hochman, you are not offering the opinion in the case,

17 I want to be very clear, that Google has actually relinked

18 sWAA-off data; right?

19 **A.**  I'm not offering the opinion that Google has relinked

20 sWAA-off data with the GAIA data.

21      **MR. SANTACANA:**  I have no further questions,

22 Your Honor.

23                **REDIRECT EXAMINATION**

24 **BY MR. MAO:**

25 **Q.**  Good afternoon, Dr. Hochman.  I will try to make this

 1    quick.

 2         You were just asked a number of questions about battery

 3    depletion.

 4         Can I put up the battery depletion interrogatory just so

 5    we can put that into the record?

 6         Can you -- have you seen this interrogatory response

 7    before?

 8    **A.**    I have.

 9    **Q.**    Did you consider this interrogatory response for the

10    purposes of rendering your opinion in this case?

11    **A.**    Yes.

12    **Q.**    And where in this interrogatory response does it tell you

13    that battery depletion is an issue for Google when it's

14    collecting sWAA-off data, notwithstanding sWAA button being

15    off?

16    **A.**    Sure.  Let's look at the second paragraph [as read]:

17              "For Android apps with Google Play services

18         enabled, GA for Firebase data is collected from all

19         apps into a central file called App Measurement DB,

20         which is periodically uploaded to Google's servers.

21         Google does this because it saves battery for users

22         whose devices would otherwise be initiating more

23         uploads every day.  On iOS devices this is not

24         possible, so each GA for Firebase-enabled app

25         periodically transmits the data to Google's servers

1          individually."

2    **Q.**    How does this response, on Google's response to

3    Interrogatory Number 1, a sworn statement, how does this show

4    battery depletion?

5    **A.**    It shows that battery depletion is something that they

6    have to think about because it's material.   It's meaningful or

7    they wouldn't have had to talk about it here when they

8    explained how their system works.

9    **Q.**    Moving on from this, if we could go to Exhibit 72, slide.

10          **THE COURTROOM DEPUTY:**  Did you say Exhibit 172?

11          **MR. MAO:**  Sorry.  PX72, yes.

12          **THE COURTROOM DEPUTY:**  That's been admitted; right?

13          **MR. MAO:**  That's been moved into evidence, yes.

14   BY MR. MAO:

15   **Q.**    You were asked a number of questions about Google Account

16   and also personal information.   Okay?

17          I believe that when we were talking about personal

18   information, we were trying to figure out whether or not the

19   type of data specified under this definition of "personal

20   information" was something which you actually saw in Google

21   systems.   Do you recall that?

22   **A.**    Yes.

23   **Q.**    Okay.   Looking at the type of data with the type of IDs in

24   the system, is there anything within the pseudonymous IDs, the

25   Google pseudonymous IDs, that does not fulfill the definition

1   of "personal information" on a technical level?

2   **A.**   No.

3   **Q.**   And why is that, Dr. Hochman?

4   **A.**   Because all of that information, Google could link it back

5   to the user if they decided to do so.

6   **Q.**   Under this definition, is there anything from this

7   definition that requires Google to say that the only thing that

8   personally identifies you is the GAIA ID?

9   **A.**   No.

10  **Q.**   The other IDs we talked about -- Google's device ID, the

11  app instance ID, and other IDs which you enumerated -- can

12  those things be things in which Google decides to personally

13  identify you?

14  **A.**   Yes.

15  **Q.**   And, in fact, Google does that for the purposes of ad

16  measurements; isn't that correct?

17  **A.**   Yes.  When they collect data in certain logs for ad

18  activity, they do link these up in order to count conversions

19  and to do ad attribution.  I talked about that earlier.

20  **Q.**   And you haven't actually seen all of the logs which Google

21  has on the plaintiffs; isn't that correct?

22  **A.**   Correct.  There's more that's unseen.

23  **Q.**   Right.  And defense counsel accused you of undersampling,

24  but the fact is that you didn't get that which you asked for;

25  isn't that correct?

 1              MR. SANTACANA:  Objection, Your Honor.

 2              MR. MAO:  He opened the door, Your Honor.

 3              THE COURT:  I'm going to sustain that objection.

 4      Go ahead.

 5  BY MR. MAO:

 6  Q.   Okay.  Did you get all the logs which you requested?

 7  A.   No.

 8              MR. SANTACANA:  Objection, Your Honor.

 9              THE COURT:  Yeah, don't.

10              MR. MAO:  Okay.

11              THE COURT:  What was discovered in the discovery

12  process is not for this witness.

13      Go ahead.

14  BY MR. MAO:

15  Q.   Were there other logs that you -- that would have been

16  relevant to your investigation?

17  A.   Yes.

18  Q.   Were you able to get your hands on those?

19              MR. SANTACANA:  Objection, Your Honor.

20              THE COURT:  Don't ask those questions.  The last

21  question was appropriate, not this one.

22              MR. MAO:  Okay.  Yes, Your Honor.

23  BY MR. MAO:

24  Q.   Moving on here, defense counsel talked about the opening

25  statements.

1          You were here for Google's opening statement as well,

2    weren't you?

3    **A.**    Yes.

4    **Q.**    Google had promised that this data was aggregated.  Is it

5    aggregated?

6    **A.**    No.

7    **Q.**    Google had promised that this data was for developers

8    only.  Is this data for developers only?

9    **A.**    No.

10   **Q.**    Google had promised that this would make GA not work.

11         Have you seen any evidence that GA -- Google Analytics

12   would stop working as a result of actually making the sWAA

13   button work the way it's supposed to?

14   **A.**    No.

15   **Q.**    Defense counsel talked about how Google's trying to

16   protect people from attackers.

17         In terms of what -- who is actually -- who are the users

18   actually trying to use the technical safeguards provided to

19   them to protect themselves from?  Is it a third-party attacker

20   or is it Google?

21   **A.**    The users --

22              **MR. SANTACANA:**  Objection, Your Honor.  Now, he's

23   asking about consumer expectations.

24              **MR. MAO:**  Your hypothetical.  You said "attackers."

25              **THE COURT:**  He can answer it from a technical

1    perspective.

2        Go ahead.

3        **THE WITNESS:**  Sure.  From a technical perspective, the

4    sWAA control and the WAA control, if they're shut off and if it

5    worked according to baseline, that would stop the flow of

6    detailed personal app activity data from third-party apps to

7    Google.  So the switch in the off position is an indication

8    that the user has rejected giving their agreement for Google to

9    have that data in the first place.

10   **BY MR. MAO:**

11   **Q.**   And that was your understanding on the baseline; isn't

12   that correct?

13   **A.**   Yes.

14   **Q.**   You were also asked about how Google Analytics only

15   provides aggregated data reporting.  Do you remember that?

16   **A.**   Yes.

17   **Q.**   But that's not what Google's actually collecting; isn't

18   that correct?

19   **A.**   Correct.

20   **Q.**   It's -- insofar as Google provides its app developers

21   aggregated data, Google would have then provided less technical

22   information than it says it's actually collecting for app

23   developers; isn't that correct?

24   **A.**   That's right.  The data collected -- taken by Google is

25   greater than the data that's shared with app developers.

HOCHMAN - REDIRECT / MAO

1  Q.    And you don't know all the uses in which Google actually

2  uses sWAA-off data; is that correct?

3  A.    That's correct.  In their response to our technical

4  questions, they said they couldn't even document or count all

5  the different places and ways that they might be using the

6  data.

7  Q.    Google's counsel had asked you about your use of

8  Google Analytics.  Do you recall that?

9  A.    Yes.

10  Q.    Do you have a lot of choices on the market in terms of

11  alternatives to Google?

12  A.    Google is pretty dominant in the market in terms of

13  analytics and online advertising.  It's really hard to get by

14  because they have such a large share and because of the way

15  they've designed their products to work together.

16  Q.    I'm almost done.

17      We were talking -- or at least counsel was talking with

18  you about things such as third-party policies.  Do you recall

19  that?

20  A.    Yes.

21  Q.    Have you seen anything in the Google documents which you

22  reviewed that would prevent Google from changing how they use

23  the data which they collect from app developers?

24  A.    No.

25  Q.    Can they change that at any time?

HOCHMAN - REDIRECT / MAO

1    **A.**    Yes.

2    **Q.**    Can they use a different identifier than GAIA IDs at any

3    time in which they want from a technical level?

4    **A.**    On a technical level, Google could do whatever it wants.

5    **Q.**    And Google can, on a technical level, use all the unique

6    Firebase SDK IDs however they want; isn't that correct?

7    **A.**    Correct.

8    **Q.**    Same thing with the Google Mobile Ads IDs; isn't that

9    correct?

10   **A.**    Yes.

11   **Q.**    And all of those IDs are uniquely identifying, are they

12   not?

13   **A.**    Yes.  They all point to one person.

14   **Q.**    Let me ask you one of my few last questions, which is that

15   you heard counsel talking about how taking this event-level

16   data might be necessary for receipts, maybe necessary for ad

17   fraud.  Do you remember that?

18   **A.**    Yes.

19   **Q.**    You have done exhaustive review of data actually produced

20   on the plaintiffs; is that correct?

21   **A.**    Yes.

22   **Q.**    Did they need all of that data in order to do receipts, in

23   order to do ad fraud?

24   **A.**    Oh, no.  They only needed a tiny portion of it.

25            **MR. MAO:**  Give me a moment, Your Honor.

1                    (Pause in proceedings.)

2   BY MR. MAO:

3   **Q.**    How many times has your opinion been accepted by the

4   courts?

5   **A.**    20 times that I've been -- testified in court or in

6   arbitration.  Now 21.

7   **Q.**    Do you want to give an example of how some of these cases

8   relate to the type of subjects in which you testified here?

9   **A.**    I mean, I can give you a general rundown.

10  **Q.**    Sure.  Do you mind just giving me a quick general rundown?

11  **A.**    Yeah.  Actually, a number of them -- well, at least one of

12  them related to ad fraud.  Some of them were related to

13  trademarks.  Some of them are related to First Amendment-type

14  cases, defamation.

15       But a lot of different kinds of legal disputes end up

16  getting into things like, you know, how these digital platforms

17  work and the statistics and data that you can get from them.

18  **Q.**    So you would know whether or not a certain amount of

19  information is necessary to prevent ad fraud; isn't that

20  correct?

21  **A.**    Yes.

22  **Q.**    And you didn't see that in this case in terms of the total

23  volume of event data and the total volume of events -- sorry --

24  of various types of app activity data, which was collected in

25  this case, as being necessary for preventing ad fraud; isn't

1   that correct?

2   **A.**   Yes.  I've even received files with ad fraud auditing

3   data, and I can receive those files and handle them on my

4   computer.  They're not huge.

5        In this case, the files were just enormous.  I mean, the

6   amount of data here -- even when we only got a small fraction

7   of it, the amount of data at issue here is much, much larger

8   than a simple audit log for preventing ad fraud.

9   **Q.**   Okay.  Last area of questions.

10       You agree with counsel, Google's counsel, that no data

11  security is perfect; is that correct?

12  **A.**   Yes.

13  **Q.**   You also agree that you know of no incident where sWAA-off

14  data collected by Google has been leaked.  Do you remember

15  that?

16  **A.**   Yes.

17  **Q.**   But does that mean that the user is not harmed by the

18  collection of sWAA-off data?

19           **MR. SANTACANA:**  Objection, Your Honor.  Outside the

20  scope.  User harm.

21           **THE COURT:**  Sustained.

22           **MR. MAO:**  I have no other questions.

23           **THE COURT:**  Very well.

24           **MR. SANTACANA:**  No questions, Your Honor.

25           **THE COURT:**  Anything further?

RODRIGUEZ - DIRECT / LEE

 1          You may step down.

 2               **THE WITNESS:**  Thank you.

 3                         (Witness excused.)

 4               **THE COURT:**  Okay.  Next witness.

 5               **MR. LEE:**  Yes, Your Honor.  Your Honor, plaintiffs

 6     call Anibal Pete Rodriguez.

 7          (Anibal Pete Rodriguez steps forward to be sworn.)

 8                    <u>**ANIBAL PETE RODRIGUEZ**</u>,

 9     called as a witness for the Plaintiffs, having been duly sworn,

10     testified as follows:

11               **THE WITNESS:**  I do.

12               **THE COURTROOM DEPUTY:**  Make sure you speak clearly

13     into the microphone for our court reporter.

14          Could you please state your full name for the record and

15     spell your last name?

16               **THE WITNESS:**  Sure.  My name is Anibal Pete Rodriguez.

17     That's R-o-d-r-i-g-u-e-z.

18               **THE COURTROOM DEPUTY:**  Thank you.

19                    <u>**DIRECT EXAMINATION**</u>

20     BY MR. LEE:

21     **Q.**   Good afternoon, Mr. Rodriguez.  How are you?

22     **A.**   Good afternoon.  Doing well.

23     **Q.**   Could you please introduce yourself to the jury?

24     **A.**   Sure.  My name is Anibal Pete Rodriguez.

25     **Q.**   And, Mr. Rodriguez, what do you do for a living?

**RODRIGUEZ - DIRECT / LEE**

1    **A.**    I am in sales.

2    **Q.**    And where do you live?

3    **A.**    I live in Connecticut.

4    **Q.**    Do you have family, kids?

5    **A.**    I do have a family back at home.

6    **Q.**    Any kids?

7    **A.**    Two kids, yes.

8    **Q.**    Are you aware -- are you away from your family that's back

9    in Connecticut while you're here at trial with us?

10    **A.**    Yes.

11    **Q.**    And I know you'd like to be here throughout the whole

12    case, but could you explain to the jury why you need to get

13    back home to Connecticut next week?

14    **A.**    Sure.  I have a new job that I have to start, and also my

15    wife's home alone, working and juggling the kids.  I just want

16    to be there and make sure that I'm there supporting her.

17    **Q.**    Are you serving as a class representative in this lawsuit,

18    Mr. Rodriguez?

19    **A.**    Yes.

20    **Q.**    And as a class representative, have you kept up-to-date on

21    the case over the years?

22    **A.**    Yes.

23    **Q.**    Did Google take your deposition in this case?

24    **A.**    Yes.

25    **Q.**    And did you have lots of calls with your lawyers,

**RODRIGUEZ - DIRECT / LEE**

1    including with me?

2    **A.**    Yes.

3    **Q.**    Okay.  How long have you been a class representative for

4    this case?

5    **A.**    Five years now.

6    **Q.**    Have you ever been paid any money to be a class

7    representative?

8    **A.**    No.

9    **Q.**    Why did you -- why did you decide to file this lawsuit and

10   become a class representative?

11   **A.**    Well, Google -- Google gave me a choice to -- to have them

12   stop collecting my information and it wasn't true; and when I

13   learned that, I was pretty upset and I wanted to come find out

14   what I could do to help them stop doing that -- well, help stop

15   doing that.

16   **Q.**    So did you initially believe that Google was offering you

17   a choice to stop it from saving your app activity data through

18   a privacy control called WAA or sWAA?

19   **A.**    Yes.

20   **Q.**    Did that choice turn out to be a real choice?

21   **A.**    No.  No.

22   **Q.**    Before we go further, I want to clear something up that

23   came up yesterday.

24   **A.**    Sure.

25   **Q.**    You were here for the opening statement; right?

**RODRIGUEZ - DIRECT / LEE**

1   **A.**   Yes.

2   **Q.**   You were also here yesterday for the other class

3   representative, Julian Santiago's testimony?

4   **A.**   Yes.

5   **Q.**   And you saw the cross-examination of Mr. Santiago; right?

6   **A.**   Yes.

7   **Q.**   All right.  Let's take a look at what Mr. Hur, Google's

8   lawyer, said in opening statement about an issue that came up

9   in Mr. Santiago's examination.  This was shown yesterday.

10      This is Mr. Hur who stated [as read]:

11          "You didn't hear that each of them, the class

12          representatives, turned their sWAA setting off

13          shortly before or after meeting their lawyers so that

14          they could become class representatives."

15      Do you see that?

16  **A.**   I see that here, yes.

17  **Q.**   And do you recall yesterday Mr. Santiago testifying that

18  he had turned off WAA before he ever met with any lawyer or

19  became a class representative?

20  **A.**   Yes.

21  **Q.**   And, in fact, Google's lawyer, Mr. Attanasio, during

22  cross-examination, said the following to Mr. Santiago.

23      If we can pull up 514, line 6 -- line 16.  I'm sorry.  You

24  have it.

25      And he stated [as read]:

1              "Well, we're going to learn that your other

2        colleague turned it off after.  I accept that you

3        turned it off before."

4        That's what he told Mr. Santiago yesterday; right?

5   A.   Right.

6   Q.   So I guess Mr. Attanasio thought that you were the one

7   that Mr. Hur was referring to in his opening statement.  So

8   let's be very clear.  What year did you turn off WAA or sWAA?

9   A.   2018.

10  Q.   And when did you first learn about this lawsuit against

11  Google?

12  A.   2020.

13  Q.   Did this lawsuit even exist before 2020?

14  A.   No.

15  Q.   Had you met any of the lawyers on your team or any expert

16  before 2020?

17  A.   No.

18  Q.   All right.  Let's go back to Mr. Hur's opening statement.

19  It's at 252.  What he said was [as read]:

20             "You didn't hear that each of them turned their

21        sWAA setting off" --

22        MS. AGNOLUCCI:  Your Honor, this transcript is being

23  displayed to the jury.  We object.

24        THE COURT:  Well, why don't you just ask the question,

25  although the door has certainly been opened on all of this, but

1    don't show the transcript.

2          **MR. LEE:**  Sure.  We can do it without the transcript.

3    No problem, Judge.

4    **BY MR. LEE:**

5    **Q.**   So Mr. Hur stated that [as read]:

6          "You didn't hear that each of them turned their

7          sWAA setting off shortly before or after meeting

8          their lawyers so that they could become class

9          representatives."

10         Right?

11   **A.**   Right.

12   **Q.**   Now, did either you or Mr. Santiago turn off sWAA after

13   learning of this lawsuit?

14   **A.**   No.

15   **Q.**   Did either you or Mr. Santiago turn off sWAA to become

16   class representatives?

17   **A.**   No.

18   **Q.**   Was Mr. Hur's statement in opening statement -- in his

19   opening statement accurate?

20   **A.**   I don't think so.

21   **Q.**   Mr. Rodriguez, let's shift gears.  Let's start from the

22   basics.

23         Do you have a Gmail account?

24   **A.**   I do.

25   **Q.**   When did you first open a Gmail account?

**RODRIGUEZ - DIRECT / LEE**

1  **A.**    I would say when I first got a smartphone, roughly around

2  2009.

3  **Q.**    And have you had several Gmail accounts over the years?

4  **A.**    Yes.

5  **Q.**    Why did you have different Gmail accounts?

6  **A.**    So I created Gmail accounts for, like, dummy accounts.

7  Basically, a lot of them were dummy accounts.  I created Gmail

8  accounts for things like eBay store or something like that, a

9  YouTube channel.

10      And I also have emails for each of my kids so that way I

11  can communicate with their teachers, and I can diff- -- it's a

12  hard word to say -- differentiate between both of them and just

13  kind of make sure I have it all collected and I know who -- who

14  the email is for.

15  **Q.**    Now, what kind of phones have you had since 2016?

16  **A.**    I've had mainly Samsung phones.  So I've had a Samsung S8,

17  a Samsung S21, and right now I have a Motorola.

18  **Q.**    The Samsung and Motorola devices, are those all running

19  Android?

20  **A.**    They are.

21  **Q.**    And are you aware that Android phones are developed by

22  Google?

23  **A.**    I am aware.

24  **Q.**    Now, as part of this lawsuit, did Google provide a list of

25  non-Google apps or third-party apps that use software

1   development kits, these SDKs we've been hearing about?

2   **A.**   Yes.

3   **Q.**   And those SDKs are what enables Google to take data from

4   your apps when you're using them?

5   **A.**   Right.

6   **Q.**   Is that your understanding?

7   **A.**   Right.

8   **Q.**   And do you remember looking at Google's list that it

9   provided and identifying which of those apps that you used?

10  **A.**   Yes.

11  **Q.**   All right.  Let's take a look at that.  It's a

12  demonstrative slide.

13        Ready?

14  **A.**   Yes.  I'm sorry.  I see it.

15  **Q.**   No, no.  We're just waiting for it to come up.

16        Could you explain to the jury what this slide is?

17  **A.**   So this is a list of apps that are on my phone that have

18  the Google SDK that collect data apparently with WAA off as

19  well.

20  **Q.**   Now, is it your understanding that Google was taking your

21  data from each of these apps even with WAA off?  Is it now your

22  understanding?

23  **A.**   Yeah.

24  **Q.**   Before the lawsuit, did you know that Google was taking

25  your data when you used all of these apps even with WAA off?

1    **A.**    No.

2    **Q.**    How did you learn that Google was taking your data from

3    these apps even when you had WAA off?

4    **A.**    Through our team, our experts, Mr. Hochman.  He

5    investigated a little bit further, found out that these --

6    these apps were still taking data and providing it to Google.

7    **Q.**    And it was your data from these apps.  That's what he

8    confirmed; correct?

9    **A.**    Yes.

10   **Q.**    Now, based on just looking at these apps here, what are

11   some things that Google would know about you that you didn't

12   want it to know?

13   **A.**    There's quite a few here, but like things like what I ate,

14   for instance, like McDonald's; Zillow, if I'm looking for a

15   house; Instagram, what photos I'm looking at, what articles I'm

16   reading, things of that nature.

17   **Q.**    Do you want Google to know everything that you're doing on

18   these apps?

19   **A.**    No.

20   **Q.**    Why not?

21   **A.**    It's -- I just think it's really, like, creepy and weird

22   that, like, if you think everything's okay, everything -- you

23   know, it's like someone's looking over your shoulder at all

24   times and -- and collecting -- or just kind of just watching

25   you and just getting to know who you are.

**RODRIGUEZ - DIRECT / LEE**

1    And just, like, it's just weird, especially if it's

2    some -- if you didn't give permission for that to happen, and I

3    don't know.  It's just weird.

4    **Q.**  All right.  Is your phone password protected?

5    **A.**  It is.

6    **Q.**  All right.  These apps that were on your phone that we

7    talked about, do you use them regularly?

8    **A.**  I do, yes.

9    **Q.**  And does that frequency of use go back to 2016?

10   **A.**  Mm-hmm, yeah.

11   **Q.**  You understand that the relevant time period in this case

12   is the 98 months between July 2016 and September 2024?

13   **A.**  Yes.

14   **Q.**  Okay.  During that 98-month period, what's your best

15   estimate in terms of the number of months that you used one or

16   more of these third-party apps here where Google would have

17   taken your data?

18   **A.**  Every -- every one of those months.

19   **Q.**  Did Google provide you with something called privacy

20   controls?

21   **A.**  Yes.

22   **Q.**  Was Web & App Activity a privacy control offered to you by

23   Google?

24   **A.**  It was, yes.

25   **Q.**  All right.  Now, you told us that you turned off WAA or

1  sWAA in 2018; is that correct?

2  **A.**  Right.

3  **Q.**  Okay.  When you turned the WAA button off, did you think

4  that Google would continue to collect and save and use your

5  data based on everything you were doing on these apps?

6  **A.**  No.

7  **Q.**  Mr. Rodriguez, have you reviewed Google's privacy policy?

8  **A.**  Yes.

9  **Q.**  When was that?

10  **A.**  So back in 2018, I would say.

11  **Q.**  And why were you reading the privacy policy in 2018?

12  **A.**  So around that time frame I'd been hearing a lot about

13  Google saving a lot of information about people, so I looked --

14  I just went to look through the -- through my phone and just

15  found some more information.  And I was mainly worried about my

16  location, so I found the privacy settings, and I went ahead and

17  turned off WAA.

18  **Q.**  So you were -- I'm just trying to make sure I understand

19  you.

20  **A.**  Sure.

21  **Q.**  The reason you looked at the settings on your phone and

22  this privacy policy from 2018 is, your initial concern was

23  about location tracking?

24  **A.**  Right.

25  **Q.**  And in doing that research and looking at the privacy

**RODRIGUEZ - DIRECT / LEE**

1  policy and the privacy controls that were offered, is that how

2  you came across WAA?

3  **A.**   Yes.

4  **Q.**   Did you -- when you saw the WAA disclosures and the

5  privacy button that is either both WAA and sWAA, did you turn

6  it off after reading the privacy policy?

7  **A.**   Yes.

8  **Q.**   Let's put up on the screen what's been previously admitted

9  as PX62.

10      Do you recognize this document, Mr. Rodriguez?

11  **A.**   Yes.

12  **Q.**   Did you read this privacy policy prior to the lawsuit?

13  **A.**   Yes.

14  **Q.**   And can you read the effective date on there?

15  **A.**   It says effective May 25th, 2018.

16  **Q.**   And could you please read out loud to the jury the first

17  paragraph that's in bold letters?

18  **A.**   [as read]:

19          "When you use our services, you're trusting us

20      with your information.  We understand that this is a

21      big responsibility and work hard to protect your

22      information and put you in control."

23  **Q.**   All right.  Let's go down two paragraphs on the same page.

24      And, by the way, is this -- what page are we on right now?

25  Do you know?

1    **A.**   The policy -- the privacy policy.

2    **Q.**   Yeah.  Is it the first page?

3    **A.**   Yes.

4    **Q.**   All right.  Let's go down, yeah, two paragraphs.

5          And do you see the sentence at the end of that paragraph,

6    beginning with "Across our services"?

7    **A.**   Yes.

8    **Q.**   Could you read that to the jury?

9    **A.**   [as read]:

10            "And across our services you can adjust your

11         privacy setting" -- "settings to control what we

12         collect and how your information is used."

13   **Q.**   What is your understanding of what Google means when it

14   says you can control what we collect?

15   **A.**   It means I can control what they can collect as far as my

16   information.

17   **Q.**   And what's your understanding of what Google means here

18   when it says you can control how your information is used?

19   **A.**   Exactly that, that I can control how it can be used.

20   **Q.**   According to the first page of the privacy policy, who's

21   in control of what information Google is allowed to collect and

22   use?

23   **A.**   Me.

24   **Q.**   All right.  Let's go -- let's continue on down the privacy

25   policy on page 8.

RODRIGUEZ - DIRECT / LEE

1    Do you see there's a section in the privacy policy that

2  presents you the privacy controls?

3  **A.**   Yes.

4  **Q.**   And did you see this privacy control section when you

5  reviewed this document back in 2018?

6  **A.**   Yes.

7  **Q.**   Now, from here, can you explain to the jury how you get to

8  the WAA button?

9  **A.**   There is a link there that says, "Go to activity

10  controls."

11  **Q.**   Okay.  Let's take a look at PX84, also already in

12  evidence.

13    And is this what is displayed when you click that link?

14  **A.**   Yes.  Similar, yes.

15  **Q.**   Okay.  Now, what was your understanding of what these

16  buttons do?

17    So let's start with the Web & App Activity, and we can

18  snip out -- we can also include the subsettings.

19    What was your -- so do you see at the top there's

20  Web & App Activity?

21  **A.**   Right.

22  **Q.**   And then below, there's the subsettings?

23  **A.**   Yes.

24  **Q.**   Okay.  What was your understanding of what these buttons

25  do when they're on?  Let's start with WAA.

RODRIGUEZ - DIRECT / LEE

1    **A.**   So if it's on, it does save your activity on Google sites

2    and apps, including associated info, like location.

3    **Q.**   All right.  And how about sWAA?  We've been calling it

4    sWAA, but here it's labeled as the subsettings.  Do you see

5    that?

6    **A.**   Right.

7    **Q.**   What happens if a user turns sWAA on?

8    **A.**   SWAA leaves -- okay -- include Chrome history and activity

9    from sites, apps, and devices that use Google services.

10   **Q.**   So Google can save all those things if sWAA is on?

11   **A.**   Right.

12   **Q.**   And if you turn WAA off, by the way, what would happen

13   with sWAA?

14   **A.**   It automatically gets turned off.

15   **Q.**   So they both turn off?

16   **A.**   Right.

17   **Q.**   Do you see here at the top of Web & App Activity it says

18   "Learn more"?

19   **A.**   Yes.

20   **Q.**   Do you remember clicking that back in 2018?

21   **A.**   Yes.

22   **Q.**   All right.  Let's take a look at what's been premarked as

23   Exhibit 104.

24          **THE COURTROOM DEPUTY:**  Has that been admitted?

25          **MR. LEE:**  Not yet.  I'm going to do it right now.

**RODRIGUEZ - DIRECT / LEE**

```
 1   BY MR. LEE:

 2   Q.   Mr. Rodriguez, did you review this disclosure in 2018?

 3   A.   Yes.

 4           MR. LEE:   Your Honor, may I admit PX104 into evidence?

 5           MS. AGNOLUCCI:   No objection, Your Honor.

 6           THE COURT:   104 will be admitted.

 7       (Trial Exhibit PX104 received in evidence.)

 8           MR. LEE:   All right.   It's up.

 9   BY MR. LEE:

10   Q.   Do you see here where the disclosure states what's saved

11   as Web & App Activity?

12   A.   Yeah, I see that.

13   Q.   I know it has a weird formatting thing, but just bear with

14   me.   Okay?

15   A.   Sure.

16   Q.   Based on Google's disclosure, what activity does Google

17   say that it saves when WAA is on?

18   A.   It says websites and apps you use -- that I use.

19   Q.   Mm-hmm.

20   A.   Your activity on websites and in apps that use Google

21   services.

22   Q.   Okay.   Do you see below there, Google also states, "To let

23   Google save this information, Web & App Activity must be on"?

24   A.   Yes.

25   Q.   All right.   What's the opposite of on?
```

**RODRIGUEZ - DIRECT / LEE**

1  **A.**    Off.

2  **Q.**    And based on these statements by Google, what's your --

3  what understanding did you have regarding the data Google is

4  not allowed to save when WAA is turned off?

5  **A.**    That none of this information would be saved.

6  **Q.**    And based on all the disclosures that we looked at, does

7  the WAA button and sWAA button control where Google saves your

8  app data or whether Google saves your app data?

9  **A.**    Whether.

10  **Q.**    Whether?

11  **A.**    Right.

12  **Q.**    After you read the privacy policy and these disclosures

13  about WAA, what did you do next?

14  **A.**    I went on my phone and found the -- the activity controls

15  and turned off WAA from there.

16  **Q.**    You did that from your Android phone?

17  **A.**    My phone, yeah.

18  **Q.**    All right.  Let's take a look at PX120A, which is now in

19  evidence.

20      Are you familiar with these screens from the Android

21  phone?

22  **A.**    Yes.

23  **Q.**    And before you joined this lawsuit, did you check your

24  Android phone to make sure that these were the same screens as

25  what we have depicted here?

**RODRIGUEZ - DIRECT / LEE**

1   A.   Yes.

2   Q.   Now, at the top of screen one, do you see where -- it's at

3   the very top -- do you see where Google calls this entire

4   screen privacy?

5   A.   Yes, I see it there.

6   Q.   And then below, in the red box, do you see that there's

7   something called activity controls?

8   A.   Yes.

9   Q.   And what does it say?  What's the description of activity

10  controls?

11  A.   It says [as read]:

12          "Choose the activities and info you allow Google

13      to save."

14  Q.   Now, by clicking "activity controls," does that take you

15  to the screen in the middle, the second screen?

16  A.   Yes.

17  Q.   And do you see the WAA and sWAA button presented there?

18  A.   I do.

19  Q.   And there's a smaller box below Web & App Activity that

20  has a "Learn more" link.  Do you see that?

21  A.   Yes.

22  Q.   All right.  And does clicking that take us to Screen 3?

23  A.   Yes, it does.

24  Q.   Now, based on Screen 3 -- let's blow that up a little,

25  Screen 3 -- what activity does Google say it saves when WAA is

1  on, starting at the top there?

2  **A.**    Sure.  Info about your browsing and other activities on

3  sites, apps, and devices that use Google services.

4  **Q.**    And what about the two bullets there?

5  **A.**    Yeah.  Sites and apps that partner with Google to show ads

6  and sites and apps that use Google -- service -- services,

7  including data apps that share with Google.

8  **Q.**    And do you see in the box below, it says, "To let Google

9  save this information, Web & App Activity must be on"?

10  **A.**    Yes.

11  **Q.**    So what should happen when you turn Web & App Activity

12  off?

13  **A.**    Like before, everything that it says it would save, it

14  should not save.

15  **Q.**    All right.  You mentioned that you have a specific memory

16  of reading the Google privacy policy and disclosures about

17  WAA --

18  **A.**    Right.

19  **Q.**    -- and turning off WAA in 2018?

20  **A.**    Right.

21  **Q.**    Okay.  So let's just set the stage for that.  Let's take a

22  look at DX 941.R2, which is already in evidence.

23      This document was shown during Mr. Monsees' examination,

24  as well as Mr. Santiago's examination.  Do you remember that?

25  **A.**    Yes.

1    Q.    Both times that this document was shown, did they ever go

2    to the second page of this document?

3    A.    I don't recall, no.

4    Q.    Okay.  Let's focus on the peteysake08@gmail account.  Do

5    you see that?

6    A.    Yes.

7    Q.    And is that the Gmail address associated with your Android

8    phone?

9    A.    It is.  It's on my phone.

10    Q.    And has that been the case for how long?

11    A.    A very long --

12    Q.    That would be since 2016?

13    A.    Yeah.  A very long time.

14    Q.    All right.  Let's flip to the second page.

15          And so at the top there, you can see that the account

16    email section is blank because it's still peteysake from the

17    first page.

18    A.    Right.

19    Q.    Do you see that?

20    A.    Mm-hmm.  Yes.

21    Q.    And you see the timestamp for WAA shows that you turned

22    WAA off November 4th, 2018.  Do you see that?

23    A.    I do, yes.

24    Q.    And sWAA is also off?

25    A.    Yes.

1   Q.   And then you see that in 2018, it turns back on?

2   A.   Yeah.  I'm not too sure why.  I don't know why that would

3   happen.  It's happened before, but I can't explain why.  But

4   sWAA is still off.

5   Q.   And did you see -- did you turn the WAA button back on

6   when you noticed that it was turned on?

7   A.   I'm sorry.  Say it again.

8   Q.   Did you turn -- I'm sorry.

9        Did you turn the WAA button off again when you noticed

10  that it was back on?

11  A.   Yes.

12  Q.   Okay.  Now let's focus on the sWAA column, since the case

13  is about third-party apps.

14       Has sWAA been continuously off since November 4, 2018?

15  A.   Yes.  It looks like, yes.

16  Q.   And does it remain off to this day?

17  A.   Yes.

18  Q.   Now, if you take that -- and keep the document, but let's

19  minimize the blowup part, the pop-up.  Thank you.

20       You see that there was a couple of other Gmail addresses

21  on this page, and I think there was one on the prior page too.

22  A.   Right.

23  Q.   Are these the accounts that you were referencing earlier

24  today?

25  A.   Yes.

1  **Q.**   Okay.  Now, when you turned off WAA or turned off sWAA,

2  did you expect that Google was going to collect and save your

3  data when you used those apps?

4  **A.**   No.

5  **Q.**   And before joining the lawsuit, had you ever read anything

6  that would call into question the promises Google made about

7  WAA or sWAA?

8  **A.**   No.

9  **Q.**   Putting aside what data Google collects, did you

10  understand that the apps themselves could access your activity

11  when you were on those apps?

12  **A.**   Yes.  I am aware of that, yeah, and I get it.  You know,

13  those specific apps will save certain things like, you know,

14  like an alarm clock's, you know, saving your -- the time that

15  you put an alarm on, stuff like that.  I mean, I understand

16  that.

17  **Q.**   And if you're okay with an app, a specific app, having

18  your data, why do you mind if Google has it?

19  **A.**   The thing is, is that Google will collect all the data

20  from all the apps and have more than just, for instance, the

21  alarm clock.  They'll have where you've been, where you ate,

22  what you ate, what you watched on your phone, whether you're

23  looking for a job.  All these things, you know, I think is

24  private.  I mean, no one wants to look -- no one wants anybody

25  looking into your home while you're eating when your curtain is

1    closed.

2          **MR. LEE:**  You could take the thing down.

3          **THE COURT:**  We've now reached the moment of truth.

4          **MR. LEE:**  That's fine, Your Honor.

5          **THE COURT:**  Okay.  So, members of the jury, you're

6    going to have a long weekend, as I mentioned to you before.

7    Even more reason to redouble your efforts to make sure you

8    don't discuss this case with anyone, you don't do any research,

9    you do nothing associated with the case.  Put it out of your

10   mind.  Enjoy what, hopefully, will be a nice weekend.

11         And then at 8:30 on Monday, you'll be back, engaged, and

12   we'll get going.  But have a very nice weekend and do other

13   things.  Thanks.

14         (Proceedings were heard out of the presence of the jury.)

15         **THE COURT:**  You may step down.

16   We're out of the presence of the jury.

17   R.J., do you want to give us the time pronouncement?

18         **THE LAW CLERK:**  Plaintiffs have 14 hours, 30 minutes,

19   and 40 seconds.  Defendant has 14 hours, 26 minutes, and

20   2 seconds.

21         **THE COURT:**  Okay.

22         Okay.  The one issue that we deferred from the morning was

23   with respect to Mr. Lasinski and the disgorgement

24   extrapolation, global cost ratio issue, the footnote in his

25   supplemental report.

1    So who is going to talk to me about that?

2         **MS. BONN:**  I can, Your Honor.

3    And I apologize.  I've got someone bringing in the report.

4    But what's happened here is that essentially during

5    discovery, as we talked about before opening statement, Google

6    produced certain income statements that they represented

7    included U.S. figures for their App Promo line of business.  It

8    didn't include the latter years.

9         In August of 2024, they produced an updated spreadsheet

10   which they represented were global figures through that time

11   period, through '21 through '23.  And we had a lot of questions

12   about the spreadsheet because, since they had given us numbers

13   they represented were U.S. earlier and now global numbers, we

14   were noticing some key differences, including that in the

15   earlier statements they gave us, it looked like traffic

16   acquisition costs as a proportion of App Promo revenue were in

17   the 65 percent plus range.  But in the new spreadsheets, which

18   they gave us after discovery closed, at least on a global

19   basis, the ratio of traffic acquisition costs to revenue was

20   more like in the 25 percent range.

21        So we spent some time negotiating with Google to work out

22   a stipulation by which they would give us further information

23   that would allow us to use the spreadsheet and their

24   representations to calculate the App Promo net revenue for

25   those latter years.

**PROCEEDINGS**

1      The stipulation was reached in April of 2025.  I believe

2  April 18th, it was filed on the docket.  And shortly

3  thereafter, I think within a week of the stipulation,

4  Mr. Lasinski supplemented his report.  He used the same

5  methodology to calculate net revenue.

6      The only difference was that Google represented in their

7  stipulation that there was effectively an accounting change to

8  their system; that, therefore, these latter years were on a

9  global basis.

10      And they also represented that for purposes of this

11  litigation, their traffic acquisition cost, as a proportion of

12  the revenue from App Promo, did not materially change.

13      And so in Mr. Lasinski's supplemental report, he

14  calculated the numbers for those latter years using two

15  methods, and both were disclosed in his report and in the

16  schedules attached.

17      The first method is he said, "Well, if I rely on what

18  you're telling me in the stipulation, which is the ratio has

19  not changed, then I'm going to take the 65 percent --

20  67 percent ratio from the earlier years for traffic acquisition

21  costs, and I will hold that constant for the latter years, and

22  that will help me estimate the net revenue for the latter years

23  using the spreadsheet but relying on your representation that

24  there really was no change in the ratio of traffic acquisition

25  costs for the U.S."

PROCEEDINGS

1          On the other hand, he said, "Looking at the spreadsheet,

2     it could suggest there was a change because, on a global basis

3     at least, the traffic acquisition costs appear to be materially

4     lower, 25 percent range as opposed to 67 percent range."

5          So in his footnote he said, "If I were instead to rely on

6     the numbers that you have reported to me in the spreadsheet in

7     order to then isolate to the U.S., it would result in a

8     larger" --

9               THE COURT:  Independent of the number --

10              MS. BONN:  Yeah.

11              THE COURT:  Independent of the notification, if you

12    will, that this is -- this was a global number.  Do you have

13    any reason -- anything else to believe that that is the

14    appropriate figure to use to come up with the ratio?

15              MS. BONN:  I do, Your Honor.

16              THE COURT:  What is it?

17              MS. BONN:  Here's what it is.  Google, when they

18    produced their initial App Promo data, they initially

19    represented they were U.S. figures.  They have since

20    backtracked and said, "Actually, wait a minute.  Even the

21    initial figures we presented were global."

22          We have been able to, I think, demonstrate, and

23    Mr. Lasinski will be able to demonstrate, that the figures they

24    gave us in the App Promo spreadsheet for the earlier years had

25    U.S. revenue figures.  However, they are repre- -- and we have

1    not been able to confirm the same is true of costs, and they

2    are representing that the costs were global.

3        So I think there's a possibility that what happened here

4    is Google produced to us a spreadsheet where they shoved global

5    costs, global traffic acquisition costs, into a U.S. revenue

6    number, which is what accounted for Mr. Lasinski relying on it

7    and showing a 67 percent traffic acquisition cost as a

8    proportion of revenue.

9        And then I think that when Google produced the latter

10   updated spreadsheet on a global basis and it showed that, in

11   fact, traffic acquisition costs in this line of business were

12   more like 25 percent, that could explain the delta.

13       And at the time of his report, what Mr. Lasinski was left

14   with was a contradiction between two different things Google

15   was saying; on the one hand, there's no change; and, on the

16   other hand, these data points that suggest there was.

17       And so what he did in his report, in fairness, was to

18   say --

19           THE COURT:  That last piece I'm still unclear on.

20           MS. BONN:  Yes.

21           THE COURT:  He says there was no change and you're

22   saying, "Well, these figures suggest there was."  Is there

23   anything, beyond the fact that it's different figures, that

24   leads you to believe that is the appropriate calculation?

25           MS. BONN:  Yes, Your Honor.  What I'm trying to say as

1  well is, now what we believe is happening is even in the

2  earlier spreadsheets they produced to us during discovery --

3           THE COURT:  And what's your basis for that?

4           MS. BONN:  -- that the cost in those, and when you

5  look at the cost that they represented at the time was U.S. and

6  then the later cost for global during the later years they

7  produced, the cost curve does not look like there's a delta

8  essentially.  The cost curve continues.

9       And Google has now had one of their witnesses, Ms. Belinda

10  Langer, testify under oath that she believes the earlier

11  spreadsheet was global, not U.S.

12      We have confirmed for ourselves that the revenue figures,

13  at least in that spreadsheet, tie out to other documents Google

14  has produced showing the revenue in the earlier spreadsheets is

15  U.S. revenue, but we cannot do the same for the costs.

16      So we have a good faith basis to believe that what is

17  really going on here is that Google, in the earlier years, when

18  they gave us the initial spreadsheet, mixed and matched and

19  gave us U.S. revenue and global costs; and then in the later

20  spreadsheet, they just gave us global against global.

21      And so we think that what caused -- potentially what

22  caused the difference in these two numbers is that if

23  Mr. Lasinski was given, in the first instance, global traffic

24  acquisition costs but U.S. revenue, it would make the global

25  traffic acquisition costs look like a much higher proportion.

**PROCEEDINGS**

1          So in order for him to explain clearly what happened and

2    to present both numbers, I think, in fairness, that is

3    something that he disclosed.  He has a reason to think that the

4    second number may be the reliable number, and that's why he

5    included an alternative calculation not only in a footnote but

6    in a series of schedules that were attached to the report that

7    walked through the calculation and that showed the result of

8    the calculation.  So I think also saying that it was confined

9    to a footnote is inaccurate.

10          **THE COURT:**  Okay.

11          **MS. CHANDRASEKERA:**  Your Honor, just to take a step

12    back -- and, first, Thilini Chandrasekera for Google.

13          To take a step back, we're talking about Mr. Lasinski's

14    profit calculations because this is his unjust enrichment

15    analysis.  So we don't dispute that in both his initial report

16    from 2023 and his supplemental report from 2025, that he tried

17    to do a revenue-minus-cost-equals-profit analysis.

18          The issue here is about what costs he used.  And

19    Your Honor picked on the exact assumption that we are

20    questioning here that we did not get to cross him about at his

21    deposition, and that is the costs that Mr. Lasinski uses are

22    called traffic acquisition costs, TACs.  Those are the costs --

23    it's essentially rent that Google pays app developers to take

24    up space for their -- to put other ads on those apps.

25          The issues that Mr. Lasinski is now using global numbers,

1    which are the fees that are charged to Google to show ads,

2    there isn't just one Internet.  Global numbers -- there's no

3    reason to believe that global numbers would be accurate or the

4    right ratio to use for U.S.  Things cost different things in

5    different places.

6            **THE COURT:**  Isn't this confusion, to some extent, the

7    result of Google's disclosures?

8            **MS. CHANDRASKERA:**  No, Your Honor.  It's -- that

9    stipulation that counsel just spoke about, it's actually quite

10    clear what Google is trying to explain.

11        This did all stem -- because Mr. Lasinski's initial report

12    came partway through the class period; and at the same time,

13    there's a confluence factor where Google changed its accounting

14    structure so that it stopped providing these traffic

15    acquisition costs by country.  So, instead, Google had to

16    provide global TACs, traffic acquisition costs.

17        To explain that, the parties heavily negotiated a

18    stipulation in which Google took great pains to explain what

19    exactly it was -- what exactly it was providing.  Sorry.  And

20    we explained that the new data we had provided was global but

21    that, based on our internal metrics, that the ratio of U.S.

22    traffic acquisition costs from 2017 to '21, which was what was

23    available to Mr. Lasinski for his initial report, had not

24    materially changed by the time he wrote his second supplemental

25    report.

1    And so between those two things, the explanation that our

2    internal metrics showed that U.S. costs, what app developers

3    can charge Google in the U.S. to place ads, had not really

4    changed and that global numbers, unsurprisingly, are far lower

5    because, you know, the U.S. has a strong dollar.  Frankly,

6    things are more costly here, and we explained that.  I'm

7    looking at Docket 481.  Sorry.  481, that's the stipulation.

8    We explain in paragraph 14 that Google's new accounting

9    structure didn't track, report, or otherwise maintain

10   country-specific records.

11   Paragraph 15 explains that our TACs, as a percentage of

12   the correct App Promo revenues, did not materially change

13   through the end of the class period.

14   And, additionally, because of the -- there is a confusion

15   here about the initial numbers; and we had expressed an

16   agreement -- or a willingness to enter an agreement in which

17   our expert, our rebuttal damages expert, would not criticize

18   Mr. Lasinski on the use of potentially global figures in his

19   initial report, which Dr. Knittel had included in his original

20   rebuttal report.  We are willing to drop that for the sake of

21   this confusion.

22   **MS. BONN:**  I think what's going on here, Your Honor,

23   is I think Dr. Knittel no longer has confidence that, in fact,

24   the original numbers that were given were both global, which is

25   what Google represented.  We have confidence that while their

 1  revenue numbers were U.S. numbers, the cost numbers were
 2  global.
 3      And because of that mismatch, it caused both Mr. Lasinski,
 4  in relying on Google's representation at the time that they
 5  were both U.S., to say, "Okay.  Well, looks like traffic
 6  acquisition costs are as high as 67 percent."
 7      Google's stipulation, which they offered to explain this
 8  second spreadsheet, says the following [as read]:
 9          "For purposes of this litigation, Google states
10      that as it relates to Google's revenues from
11      app promo ads, the ratio of serve-to-build revenue
12      during 2023 was not materially different from the
13      ratio for 2022."
14      That doesn't answer the question we have, which is:  What
15  was the ratio?  Was the ratio 67 percent or was it lower and
16  more in line with these latter figures they produced?  Because
17  what really happened in the early years is they gave us U.S.
18  revenue and global costs.
19      And they say quite carefully in paragraph 14 of their
20  stipulation [as read]:
21          "Google's 2022 to 2024 accounting structure does
22      not track, report, or otherwise maintain
23      country-specific records of Google's traffic
24      acquisition costs for App Promo."
25      They never say what was the case for the earlier years.

1    And so I think what's happening here is that Mr. Lasinski

2    relied on what Google gave him -- and, by the way, it was given

3    to him after his deposition.  He was deposed in 2023.  Google

4    produced this updated App Promo spreadsheet in August of '24.

5    And he said, "Look, there's an inherent inconsistency

6    between these two things.  You've given me these spreadsheets

7    that if I take them at face value and what you tell me they

8    are, seemingly show a huge change or dropoff in these traffic

9    acquisition costs; and then I've got your representation, which

10   you say is for purposes of litigation, that nothing has

11   changed."

12   And then when he looks and he digs into the original

13   spreadsheet, we can tie out the revenue figures in there to

14   other documents in Google's production.  So we have great

15   confidence that the earlier spreadsheet had U.S. revenues.

16   But Google, to this day, Dr. Knittel, to this day, have

17   represented it was global costs.  So this is the issue.  It's a

18   problem of Google's own making.  It's a problem with their

19   production.

20   I think their real problem is now Dr. Knittel no longer

21   wants to stand behind some of the things that he accepted to be

22   true for his analysis, and they're trying to unwind all of this

23   by preventing Mr. Lasinski from offering an opinion that was an

24   appropriate supplement based on new information that Google

25   produced.

1            **THE COURT:**  I'm not sure why you think you're

2     constrained in terms of your cross-examination of their

3     witness.  You're not.  You can --

4            **MS. BONN:**  Of course.

5            **THE COURT:**  You can test whether or not he's backing

6     away from it.

7            **MS. BONN:**  Well, I think what she just raised as well,

8     he won't do this if Mr. Lasinski won't do that.  And my point

9     is:  I think Mr. Lasinski fairly disclosed the opinions.  He

10    should be able to offer both and explain which --

11           **THE COURT:**  The other opinion -- my problem is that

12    the footnote that Lasinski has included that has, in the

13    alternative, upper-end possibility seems to be untethered to

14    any basis.

15        It -- I can -- I'm willing to accept everything you say

16    about the initial confusion was not of your making and all that

17    you've described.

18        The one piece I'm not quite seeing is how you then say:

19    So then we can leap up to this higher figure for which we don't

20    appear to have any support because we don't believe the other

21    numbers.  And that's what I'm not following based on --

22           **MS. BONN:**  Let me explain further.

23           **THE COURT:**  Actually, she's doing very well,

24    Mr. Boies.  You don't need to.

25           **MS. BONN:**  Yeah.  Yeah, if I can explain.

**PROCEEDINGS**

 1    So in the earlier years -- okay.  Let's assume for a

 2    moment that what we currently think is correct, that what

 3    Google did was give us global traffic acquisition costs in U.S.

 4    figures.

 5    That would suggest that the U.S. traffic acquisition

 6    costs, the raw numbers should actually be much lower than the

 7    global costs they gave us.  And if that were the case, then in

 8    the earlier years, in fact, traffic acquisition costs would not

 9    be as high as 67 percent.  They would be much lower.

10    You could take that global number and back it out to U.S.,

11    and it would actually demonstrate a lower percentage, and that

12    lower percentage is actually in line with the latter

13    spreadsheet they produced that showed global.

14    So it's not merely that they gave us a spreadsheet that

15    shows global and we have nothing to link it up.  Based on this

16    mismatch, we can take the earlier number, say:  Okay.  What

17    fraction of that -- if I assume -- I know it's U.S. revenue.

18    Now if I take Google's current word that this was global costs

19    and I now isolate it to U.S., what does that suggest the ratio

20    actually should have been the whole time?  And it's much closer

21    to the 20-something percent range, in line with the latter data

22    point.

23    So we're not merely going to have Mr. Lasinski say, "I'm

24    assuming that the global applied to the U.S."  In fact, he's

25    been able to tie this out very carefully and explain in great

1    detail why this explanation for what happened would actually

2    demonstrate that the TACs were lower even in the earlier years.

3         And his schedule didn't even go that far.  His schedule

4    said, "You know what?  I'm just still going to take as a given

5    what you told me, but I think that I can trust, at least in

6    this alternative, that it's a possibility that this was the

7    number for the latter years."

8         So I want to just clear up, he's not merely going to offer

9    an untethered assumption; it's actually from having carefully

10   tied out each of these numbers and explaining why that

11   rationale actually makes perfect sense when you look at the

12   numbers in both spreadsheets.

13        And it's really the only explanation we've seen that makes

14   sense.  Google hasn't given us any explanation for why do they

15   keep going back and forth.  They represented initially the

16   spreadsheet were both U.S. figures.  Then they said, "No.

17   Wait.  We messed that up.  They were both global."  Now, all of

18   a sudden, Dr. Knittel doesn't want to talk about it anymore,

19   and they're bending about over backward to say he won't offer

20   the opinion.

21        So I think that's what's really going on here, Your Honor.

22             MS. CHANDRASKERA:  May I respond, Your Honor?

23             THE COURT:  Yes, you can go ahead.

24             MS. CHANDRASKERA:  We've heard a lot of attorney

25   argument just now, but if you look at what is actually in

1    Mr. Lasinski's two reports, these -- this analysis and these

2    opinions are not -- are not disclosed.

3         In his initial report, Mr. Lasinski says, about the

4    calculation, that the App Promo income statements he used are

5    not labeled as being specific -- were not labeled as being U.S.

6    specific, but he assumed they were.

7         Now in his most recent report, again another footnote, he

8    says, "These new" -- he doesn't want to believe our

9    stipulation, and so he says, "This other spreadsheet I found

10   that we produced indicates that global TACs, as a percentage of

11   revenues, were materially lower, so I'll try those as well."

12        He doesn't even put a number in this footnote, and he

13   includes them in these alternative schedules at the back of his

14   supplemental report.

15        Nowhere -- that is the extent, in his report, of what he

16   says about this.

17        **THE COURT:**  Nothing precludes you, should I allow

18   that, from making all the points you just made when you examine

19   that witness.  So to some extent, that can be addressed.  If

20   you think he has no basis for it, you can test that

21   proposition.

22        But, okay, I think I get it.

23        I'll go ahead -- I'm not going to rule from the bench.  I

24   want to go back and think about it.  And when I give you a

25   ruling, and I'll give it to you, hopefully, before we start on

**PROCEEDINGS**

 1  Monday, I'm just going to give you the ruling.  We're at the

 2  point now where long orders that discuss these points I don't

 3  think is helpful.  So I'm just -- I've heard it all and I'm

 4  going to tell you who wins and who loses.

 5          **MS. BONN:**  Thank you, Your Honor.

 6          **THE COURT:**  Okay.

 7          **MS. CHANDRASKERA:**  Thank you, Your Honor.

 8          **THE COURT:**  Okay.  So Monday morning, 8:30, we've got

 9  Mr. Rodriguez.  And then who's next?

10          **MR. DAVID BOIES:**  We have Keegan, Mr. Keegan, who will

11  be quite short.

12      We have -- we have Mr. Keegan who will be quite short.  We

13  have Mr. Heft-Luthy, who will be significantly longer.  We also

14  have that very short deposition that the Court is aware of that

15  we'll play whenever there's a --

16          **THE COURT:**  Marsiglia or --

17          **MR. HUR:**  Miraglia.

18          **THE COURT:**  Miraglia.  Okay.  I can't -- sorry.  Okay.

19          **MR. DAVID BOIES:**  Thank you.

20          **THE COURT:**  Good.  Thank you.

21      All right.  See you all on Monday morning.

22          **ALL:**  Thank you, Your Honor.

23          **THE COURTROOM DEPUTY:**  Court stands in recess.

24              (Proceedings adjourned at 1:53 p.m.)

25                      ---o0o---

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3            I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Friday, August 22, 2025

7

8

9

10

11    _____

12            Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13         CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25