Volume 5

Pages 788 - 1017

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,          )
individually and on behalf of      )
all others similarly situated,     )
                                   )
            Plaintiffs,            )
                                   )
  VS.                              )    NO. 3:20-CV-04688 RS
                                   )
GOOGLE LLC,                        )
                                   )
            Defendant.             )
_____)

San Francisco, California
Monday, August 25, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    BOIES SCHILLER FLEXNER LLP
                    333 Main Street
                    Armonk, New York 10504
            BY:  **DAVID BOIES, ATTORNEY AT LAW**
                 **ALEXANDER BOIES, ATTORNEY AT LAW**

                    BOIES SCHILLER FLEXNER LLP
                    2029 Century Park East, Suite 1520n
                    Los Angeles, California 90067
            BY:  **ALISON L. ANDERSON, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1   **APPEARANCES**:   (CONTINUED)

2   For Plaintiffs:

3                           BOIES SCHILLER FLEXNER LLP
                            100 Southeast Second Street, Suite 2800
                            Miami, Florida 33131
4                   BY:  **JAMES W. LEE, ATTORNEY AT LAW**

5                           BOIES SCHILLER FLEXNER LLP
                            44 Montgomery Street, 41st Floor
6                           San Francisco, California 94104
                    BY:  **MARK C. MAO, ATTORNEY AT LAW**

7
                            SUSMAN GODFREY LLP
8                           One Manhattan West, 50th Floor
                            New York, New York 10001
9                   BY:  **WILLIAM C. CARMODY, ATTORNEY AT LAW**
                         **RYAN SILA, ATTORNEY AT LAW**

10
                            SUSMAN GODFREY LLP
11                          1900 Avenue of the Stars, Suite 1400
                            Los Angeles, California 90067
12                  BY:  **AMANDA BONN, ATTORNEY AT LAW**

13  For Defendant:
                            COOLEY LLP
14                          101 California Street, Fifth Floor
                            San Francisco, California 94111
15                  BY:  **BENEDICT Y. HUR, ATTORNEY AT LAW**
                         **EDUARDO E. SANTACANA, ATTORNEY AT LAW**
16                       **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
                         **THILINI L. CHANDRASEKERA**
17                       **ATTORNEY AT LAW**

18                          COOLEY LLP
                            4401 Eastgate Mall
19                          San Diego, California 92121
                    BY:  **MICHAEL A. ATTANASIO, ATTORNEY AT LAW**

20

21

22

23

24

25

1                                    **I N D E X**

2

3    Monday, August 25, 2025 - Volume 5

4

5    **PLAINTIFFS' WITNESSES**                                **PAGE**   **VOL.**

6    **RODRIGUEZ, ANIBAL PETE (RESUMED)**
     (PREVIOUSLY SWORN)                                        808      5
7    Direct Examination resumed by Mr. Lee                     808      5
     Cross-Examination by Ms. Agnolucci                        820      5
8    Redirect Examination by Mr. Lee                           858      5

9

10   **LASINSKI, MICHAEL JAY**
     (SWORN)                                                   869      5
11   Direct Examination by Ms. Bonn                            869      5
     Cross-Examination by Mr. Hur                              945      5
12   Redirect Examination by Ms. Bonn                          996      5
     Recross-Examination by Mr. Hur                            1004     5

13

14

15                               **E X H I B I T S**

16   **TRIAL EXHIBITS**                          **IDEN**  **EVID**  **VOL.**

17    PX477                                                906      5

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **<u>Monday - August 25, 2025</u>**                          **<u>8:05 a.m.</u>** |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---o0o--- |
| 4 | (Proceedings were heard out of the presence of the jury.) |
| 5 | **THE COURT:**  Good morning. |
| 6 | **ALL:**  Good morning, Your Honor. |
| 7 | **THE COURT:**  Okay.  I received various communications |
| 8 | since we were together.  Let me go through a couple of things. |
| 9 | Motion in Limine Number 18, that pertains to Plaintiffs' |
| 10 | Exhibit 6.  Google has objected to that.  I'm going to overrule |
| 11 | the objection.  It will be admissible.  Does that come in under |
| 12 | Mr. Heft-Luthy or somebody else? |
| 13 | **MS. BONN:**  Mr. Heft-Luthy, Your Honor. |
| 14 | **THE COURT:**  All right. |
| 15 | The fight about demonstratives, I want to see what the |
| 16 | proposed demonstratives are.  I can't do this in the abstract. |
| 17 | So get it to me and we will take a look. |
| 18 | Okay.  I know there are other things floating out there, |
| 19 | and I -- on the other ones, I need a little more time, so I |
| 20 | will get back to you on some of that. |
| 21 | I know we have -- you've gotten the time calculation every |
| 22 | day.  It's moving more slowly than I had hoped.  I really do |
| 23 | hope that we can get this evidence completed by the end of this |
| 24 | week.  I really want you to redouble your efforts to do that. |
| 25 | There's this -- even though it's in a complicated testimony |

**PROCEEDINGS**

 1   context, it's a pretty simple collection of questions.

 2        And I think we're -- I know we're going to have to have

 3   some -- the damages experts, some other experts and the like,

 4   but we're starting to hear kind of the same thing.  So I think

 5   it behooves everybody to speed up.

 6        I know I gave you each the set number of hours.  I'm not

 7   reneging on that, but I do really think you've got to start

 8   putting some speed on this.

 9        Okay.  What do you want to talk to me about?

10        **MS. ANDERSON:**  Your Honor, I just have a simple

11   question of:  Do you want me to hand you a copy of the

12   transcript and exhibits at issue for Mr. Kearns that we -- that

13   was filed in the joint filing, our positions, their positions,

14   because his depo may be played today?

15        **THE COURT:**  Mr. Kearn.

16        **MS. ANDERSON:**  Yeah, Mr. Kearns.

17        **THE COURT:**  I have to look at that one.

18        **MS. ANDERSON:**  I'll hand this -- I was just going to

19   hand this up for --

20        **THE COURT:**  Why don't you give it to RJ.

21        **MS. ANDERSON:**  Okay.  Great.  Thank you.

22        **MR. HUR:**  Your Honor, counsel just passed you the

23   demonstratives for Mr. Lasinski.  Those are going to come up

24   today.  We're happy to walk through those with you; or if you

25   would like to look at them on your own with the briefing,

**PROCEEDINGS**

1    that's, of course, fine too.

2           THE COURT:  When is -- so the first witness is our

3    class representative.  Then who's the next one?

4           MS. BONN:  Mr. Lasinski, Your Honor.

5           THE COURT:  He's the next one.

6           MS. BONN:  Correct.

7           THE COURT:  All right.  Well, can you -- can you tell

8    me, in particular, what -- which ones are in dispute here?  I'm

9    shocked, shocked that you didn't find my instructions clear.

10                         (Laughter.)

11          MS. CHANDRASEKERA:  Your Honor, we'd be happy to begin

12   with our objections.

13       We're looking at Slide 4.  And I apologize because these

14   have been renumbered recently, but the first set of three

15   slides that we object to are all titled "Summary of Opinions."

16   And as I mentioned, those are 4...

17       And maybe counsel can point us to the other two.

18          MS. BONN:  I think it's just it's 4 and a duplicate of

19   4 so --

20          MS. CHANDRASEKERA:  Right.

21          MS. BONN:  -- substantively it's just 4.

22          THE COURT:  What I was trying to impart was, that, as

23   I understand it, Mr. Lasinski had a basic conclusion.  Then we

24   have the *sturm und drang* of whether or not Google has produced

25   the appropriate cost information back and forth.  We have a

1   footnote.  The footnote says, "Well, perhaps it could be much

2   higher, up to X."

3      What I want the demonstrative to reflect is his initial

4   conclusion.  That's in his report.

5          MS. BONN:  It is, Your Honor.

6          THE COURT:  Okay.

7          MS. BONN:  Yes.

8          THE COURT:  Wait a minute.

9      And then if the demonstrative -- I was not precluding the

10  demonstrative to say, "And perhaps based on some other

11  assumptions, it could be as high as X."  The problem was

12  you're -- you took the footnote and used the demonstrative

13  conclusion in that -- the high thing.  I want -- his conclusion

14  is what's in his report.

15         MS. BONN:  Correct.

16         THE COURT:  Not -- and I know that, "Well, his report

17  was only the result of the poor information from Google."  I

18  understand all that, but that's his report.

19         MS. BONN:  Correct.

20         THE COURT:  And I was going to permit you, contrary to

21  the position of Google, to make it clear that you think

22  Lasinski can say, "I think, based on some -- depending upon how

23  some of these assumptions shake out in terms of this

24  information, it could be as high as X."  That's what I want it

25  to say.

1   **MS. BONN:**  Correct.  That's what we're doing,

2   Your Honor.  And this summary is based on the lower number.  So

3   the summary of his opinions on the left side, the 929 and 569

4   between the classes adds up to the 1-and-change billion-dollar,

5   not the 2-and-change number.

6       **THE COURT:**  What's wrong with this?

7       **MS. CHANDRASEKERA:**  Your Honor, for this calculation

8   that you're talking about, I'd actually point you to Slide 31.

9   We had a different issue with the slide I started with.

10      **THE COURT:**  Well, what's wrong with 4?  Let's go

11  through this systematically.

12      **MS. CHANDRASEKERA:**  Sure.

13      The issue with 4 is not the left-hand column; it's

14  actually the right-hand column, saying, "A single month of data

15  collection per device."  In Your Honor's order at Docket 614,

16  you said [as read]:

17          "Lasinski may not suggest that actual damages

18      could range up to any figure higher than that which

19      his conservative opinion supports."

20      **MS. BONN:**  He will not do so, Your Honor.  He will not

21  do so.  He is --

22      **THE COURT:**  This doesn't -- what about this Number 4

23  does what you just suggest?

24      **MS. CHANDRASEKERA:**  The fact that it says in red "A

25  single month of data collection per device."

1          **THE COURT:**  But that's what his report says, "a single

2     month."  That's what it says.

3          **MS. CHANDRASEKERA:**  Your Honor, we will cross on this,

4     but we do, for the record, respectfully disagree that that's

5     what his report says.

6          **THE COURT:**  Okay.

7          **MR. HUR:**  I'm sorry, Your Honor, just one

8     clarification.

9          He never says one month.  That, I think, is the -- the

10    fallacy here is that he never says it's for one month.

11         **THE COURT:**  Okay.

12         **MR. HUR:**  He says it's $3 --

13         **THE COURT:**  Are you saying they can't ask, "What's

14    that based on?"  It's based on one month.

15         **MR. HUR:**  It is not, Your Honor, in his report.  That

16    is not disclosed.  He does never -- he never says it's one

17    month.

18         **THE COURT:**  Overruled.  Overruled.

19    Thank you.  Go ahead.

20         **MS. CHANDRASEKERA:**  All right.  Your Honor, the next

21    slide -- I'll take out all of our objections, based on that

22    ruling, that were similar.

23         **THE COURT:**  Thank you.

24         **MS. CHANDRASEKERA:**  So now -- well, of course,

25    Your Honor.

**PROCEEDINGS**

 1        We now go to Slide -- what was Slide 24, which is titled

 2   "Lasinski U.S. App Promo Revenue."

 3        And, Counsel, are you able to point us to the new number?

 4        **MS. BONN:**  Yeah.

 5        Your Honor, I think if you go to Slides 20 and 21, it

 6   shows the issue.  Mr. Lasinski has slides where he says his

 7   opinion of Google's profits from the conduct at issue adds up

 8   to the 1.4 billion number.

 9        And we have a slide where we do what Your Honor indicated

10   in the order.  It says [as read]:

11            "Google's Profits from Conduct at Issue -

12        Alternative Using Assumptions Based on Updated

13        App Promo TAC."

14        And gives the number.  So it is -- he uses the exact

15   wording that Your Honor suggested in the order.  He will

16   testify consistently with the exact wording.  We have no

17   intention of flouting Your Honor's order whatsoever.

18        **MS. CHANDRASEKERA:**  That's not the slide we had an

19   issue with, which I believe counsel may have removed from the

20   deck.

21        **MS. BONN:**  Oh, is it this cost slide?

22        **MS. CHANDRASEKERA:**  It's the one that said, "Google's

23   interpretation of its produced App Promo revenue" no longer

24   appears to be in the deck, which -- so we would remove that

25   objection.

PROCEEDINGS

1          **MS. BONN:**  That's mistaken.

2          **MS. CHANDRASEKERA:**  The next one is currently Slide --

3          **MS. BONN:**  Your Honor, this is -- can I hand this up?

4      So this is the slide, and this is discussing the cost data

5  that Mr. Lasinski relied upon.  He indicated in his report that

6  initially he relied on Google's representation that the cost

7  data in the early years was U.S. cost data.

8      Google then had a 30(b)(6) witness testify under oath, and

9  she will testify in this trial, that it was global; and he is

10 going to respond to Dr. Knittel's critique that they are global

11 costs, not U.S.

12     This is squarely within the foundation for his original

13 opinion.  He's allowed to explain the assumptions underlying

14 his opinion and whether it appears now, on the basis of the

15 testimony and Dr. Knittel's opinion, that the cost data was

16 global versus U.S.

17         **MS. CHANDRASEKERA:**  Your Honor, our issue is with the

18 last two bars on this bar graph for the years 2022 and 2023,

19 and the issue is that this violates Your Honor's recent order

20 saying that anything Mr. Lasinski did related to his

21 alternative calculations should be disclosed as such and should

22 say that it is resting on his own assumptions about global

23 data.

24     So those two years talk about global traffic acquisition

25 costs and global revenue and do not include the disclaimers

PROCEEDINGS

 1   that Your Honor required on demonstratives.

 2       **MS. BONN:**  We're happy to offer that, but in this

 3   slide, he's not talking about his calculation, nor is he

 4   talking about his assumptions.  Those bars on the right side

 5   are the raw data out of Google's own P&Ls that they produced,

 6   which they stipulated are global.

 7       **THE COURT:**  The relevance of using those figures is

 8   what he -- what is based on some assumptions, isn't it?  I

 9   mean, in other words, we have his conclusions; and then because

10   of this disputed new information, or what -- however we want to

11   characterize it, then he has these 2022, 2023 numbers.

12       Couldn't you put something --

13       **MS. BONN:**  We could put alternative --

14                   (Simultaneous cross-talk.)

15        (Reporter interrupts to clarify the record.)

16       **THE COURT:**  Wait a minute.

17       **MS. BONN:**  I apologize.

18       **THE COURT:**  Couldn't you put, under the red and green

19   description, something that reflects that we are now in the

20   realm of the assumption area?  Because this is -- I don't know.

21   I don't want to write your demonstratives --

22       **MS. BONN:**  Yes.

23       **THE COURT:**  -- but I understand the point that Google

24   is making, to differentiate the 2022, 2023 from the 2021 and

25   earlier figures.

1     **MS. BONN:**  Okay.  I think I can do that, Your Honor.

2     **THE COURT:**  Okay.

3     **MS. BONN:**  I think what we can do is make a clear

4  differentiation.  Thank you.

5     **THE COURT:**  Okay.

6     **MS. CHANDRASEKERA:**  Your Honor, the same issue --

7     **MS. BONN:**  If I could have that back, Your Honor.  I

8  apologize.

9     **THE COURT:**  You can, yes.

10    **MS. BONN:**  Thank you.

11    **MS. CHANDRASEKERA:**  The same issue with Slide 21 and

12  its ilk.  I see it shows up again at 31, and there may be other

13  places.

14     These are the alternative calculation for unjust

15  enrichment.  The slide top -- the title says "Alternative," but

16  it does not explain the second part of the disclaimer

17  Your Honor required, which was that this was based on

18  Mr. Lasinski's own assumptions about data.

19    **THE COURT:**  Well, no.  No.  It's not his own

20  assumptions.  He -- you provided information and he's trying to

21  understand the information.  I don't think it has to be your

22  assumptions as opposed to other people's assumptions.  It's

23  just assumptions.  And you can -- I mean, most of these things

24  I think you can just deal with on cross-examination.  These are

25  demonstratives.  These are not going back to the jury and --

 1    anyway, go ahead.

 2             **MS. CHANDRASEKERA:**  Understood, Your Honor.

 3        Our last objection, and I would just ask counsel if it

 4    still exists in the slide deck, has to do with citations to

 5    Alphabet's 10-K.

 6             **MS. BONN:**  Yes, Your Honor.  If you can turn to --

 7    excuse me -- Slide 5, Mr. Lasinski -- and I -- he is relying on

 8    a description by Google of how it generates revenue.  He is not

 9    coming anywhere close to Your Honor's MIL, which we will not

10    touch, about talking about their overall revenue figures; but

11    he is relying on this to explain his understanding of Google's

12    business model and how it generates revenue, which was one of

13    the foundational pieces of evidence on which he based his

14    calculations.

15        My understanding is Google's issue is they say, "Well,

16    he's quoting from the 10-K."  We're not moving the 10-K in

17    evidence.  We're not saying a word about their overall revenue,

18    but I think he's entitled to rely on their own descriptions

19    about how they generate revenue.

20             **MS. CHANDRASEKERA:**  Your Honor, we have actually two

21    issues with the slide, both related to that bubble on the top

22    left.  First bubble does have to do with the 10-K.  That

23    "Serving the right ads at the right time" quote comes from

24    Alphabet's 10-K about Alphabet's revenue, which Your Honor has

25    said is not relevant to this case.

 1          The second bullet point apparently cites to the link at

 2   the bottom left shown at the page, which goes to an ad

 3   conversion tracking support page from Google which says nothing

 4   about revenue.  So the fact that this slide says, "According to

 5   Google, it generates revenue by," second bullet point,

 6   "tracking conversions is extremely" -- "is inaccurate and

 7   misleading."  That is not what that language --

 8          THE COURT:  Well, I think you can -- take out the

 9   quotes.  Just have the demonstrative have the boxes that

10   show -- you want to show Google's advertising business.  You

11   can do it.  You don't need the quotes from --

12          MS. BONN:  Sure.

13          THE COURT:  -- a 10-K --

14          MS. BONN:  That's fine.

15          THE COURT:  -- to make that point.  So take that out

16   and take out the reference to the -- the cite to the 10-K at

17   the bottom of it.  Okay?

18          MS. CHANDRASEKERA:  And, Your Honor, we also had

19   exhibit-related disputes, not just demonstrative disputes.  Did

20   you --

21          THE COURT:  I am aware of that.

22          MS. CHANDRASEKERA:  Did you want to hear those now?

23          THE COURT:  No.

24          MS. CHANDRASEKERA:  Okay.

25          THE COURT:  As we go through, I know there's some

**PROCEEDINGS**

 1    exhibit issues, and I will hear them as we go along, and some

 2    of them depend, quite frankly, on the foundation of what's

 3    going to be established or not established, and I want to hear

 4    it before I rule on the -- on the objections.

 5         **MS. BONN:**  And just as a preview because I think it

 6    may cut some of this out.

 7         There is a single exhibit, which is a summary exhibit,

 8    that we're going to attempt to lay foundation for.  The others

 9    we're not offering in evidence; we're simply showing as the 703

10    basis for his opinions, and so we're not planning to offer them

11    in evidence with Mr. Lasinski.  So I hope --

12         **THE COURT:**  Be careful on the showing part.  You can

13    ask him what he relied on.  He can rely on things that don't

14    come into evidence, but it isn't the -- you can't backdoor

15    it --

16         **MS. BONN:**  No, we're not going to.

17         **THE COURT:**  -- and say, "Okay.  Take a look at this

18    document."  That's not what --

19         **MS. BONN:**  No, we're not going to, Your Honor.

20    Thank you.

21         **MS. CHANDRASEKERA:**  Thank you, Your Honor.

22         **THE COURT:**  Okay.  We'll see if -- I don't know if

23    they're all here or not, but we'll be back.

24         **MR. DAVID BOIES:**  Your Honor?

25         **THE COURT:**  Yes.

PROCEEDINGS

 1          **MR. DAVID BOIES:**  I think we have one issue that I

 2    need to be sure that the Court is aware of.

 3          Early this morning Google filed a motion to in effect

 4    eliminate two of our witnesses.  One of them is -- very well

 5    may testify today.  That's Mr. Heft-Luthy.

 6          And the facts about Mr. Heft-Luthy, I think, are very

 7    simple.  The Court will recall that last Thursday, at the end

 8    of the day, the Court asked, "How are we coming and who are you

 9    going to bring," and I mentioned Mr. Heft-Luthy.

10          On Friday, we gave them a disclosure that listed

11    Mr. Heft-Luthy.  On, I think it was Sunday, we gave them an

12    updated list that listed the witnesses we'd previously given

13    them plus Mr. Ruemmler.  In that list, inadvertently

14    Mr. Heft-Luthy was omitted.

15          About a couple of hours later, they called back and said,

16    "Do you mean that you're not bringing Heft-Luthy?"  Or they

17    emailed back.

18          Five minutes after that email, we sent back an email that

19    said, "That was inadvertent.  We're calling Mr. Heft-Luthy."

20          Mr. Heft-Luthy is under a trial subpoena to be here.

21    They've never asked to have him released from that trial

22    subpoena, and we would hope he would show up today.  But in

23    light of that motion, I thought it was important to bring it to

24    the Court's attention.

25          **MR. ATTANASIO:**  Your Honor, Mr. Heft-Luthy will

1    appear.  He was disclosed pursuant to a protocol filed with

2    the Court to testify last Wednesday; to testify last Thursday;

3    and then, as counsel points out, initially to testify today.

4    We've had him ready each time.

5        It bears emphasis Mr. Heft-Luthy, unlike these other

6    people, does not work for Google.  He hasn't worked for Google

7    for six years.  We have tried to work with counsel to keep him

8    on the hook, as it were.  It's not easy.  He has a --

9            **THE COURT:**  I understand.

10           **MR. ATTANASIO:**  He has a demanding job at Airbnb,

11   where he works now.

12           **THE COURT:**  Okay.

13           **MR. ATTANASIO:**  He's been gracious.  He's been

14   accommodating.

15       When counsel released him yesterday -- and I accept the

16   representation it was inadvertent.  We're not going to hold

17   anybody to that.  We told him, "Okay.  Finally, you can get

18   back to work and work on Monday and catch up."

19           **THE COURT:**  Yeah, yeah.

20           **MR. ATTANASIO:**  To tell him now he has to be here

21   today is the problem.  I, frankly, don't think we'll get to him

22   today the way the trial is moving and given counsel's list for

23   today.  He will be here tomorrow morning, ready to testify.

24           **THE COURT:**  Can you just put him on tomorrow?

25           **MR. DAVID BOIES:**  Sure.

```
1         THE COURT:  Okay.  So that takes care of Heft-Luthy.
2         MR. DAVID BOIES:  Okay.
3         THE COURT:  Ruemmler, I mean, I want to go back and
4  look at this.  It will come as no surprise to you, I don't want
5  to get -- the one thing I don't -- definitely don't want to do
6  is get into the weeds about:  So at 3:00 p.m. on Saturday,
7  there was an email and then at 4:00 p.m. there was a response."
8  And not that I'm too grand for that, I just don't want to get
9  involved.
10                        (Laughter.)
11        THE COURT:  And so my -- I fall back on the -- and I
12  don't know how this will impact the motion.  I have to go back
13  and look at it.
14        But I have the 24-hour rule; 24 hours before, effectively,
15  or less, I guess, but the next day, concluding one day, I want
16  the other side not to be sandbagged and know who's going to be
17  coming to testify.
18        But the back-and-forth of, "Well, maybe we're not going to
19  call, we probably aren't going to call so-and-so.  Well, maybe
20  we're going to call so-and-so," I'm sorry, but you guys have to
21  work that out.
22        Otherwise, I just fall back, "Did you tell them at the end
23  of the court day who you're going to have the next day?
24        If they haven't been released or otherwise, I expect them
25  to be here because I don't want to get into the minutia of who
```

1    said what to whom in the middle of the night.

2        So I'll go back and look at it, but I'm hoping that with

3    that -- those comments, I just -- my question is going to be:

4    Did you give him the notice that I asked you to give him?  And

5    if the answer is "Yes," they better be here to testify.  If the

6    answer is, "We told them they can go and then we want them

7    back," that's a different proposition.

8        So 24 hours before.  If, like, on Friday, there was some

9    back-and-forth about, "Well, maybe we won't want them or maybe

10    we will," or whatever, I don't think anybody should take that

11    to the bank.

12        So, okay.  So we'll go see if they're there and,

13    hopefully, get started so that we can aspirationally look to

14    getting all the evidence in by the end of this week.

15            **MR. DAVID BOIES:**  Okay.

16                (Recess taken at 8:26 a.m.)

17                (Proceedings resumed at 8:35 a.m.)

18        (Proceedings were heard out of the presence of the jury.)

19            **THE COURTROOM DEPUTY:**  Please remain as you are.

20    Court is back in session.

21            **THE COURT:**  Okay.  Are we ready to bring the jury out?

22            **MR. HUR:**  Yes, Your Honor.

23            **THE COURT:**  Okay.

24        (Proceedings were heard in the presence of the jury.)

25            **THE COURT:**  The jury is present.

 1          Good morning, members of the jury.  Thank you for being

 2     prompt.  Very much appreciate it.  Hopefully, you had a very

 3     nice weekend and didn't think about this at all.

 4          So let's go ahead and have Mr. Rodriguez back on the

 5     stand.

 6          (Anibal Rodriguez steps forward to resume the stand.)

 7                    **ANIBAL PETE RODRIGUEZ**,

 8     called as a witness for the Plaintiffs, having been previously

 9     duly sworn, testified further as follows:

10          **THE COURT:**  And, Mr. Rodriguez, you understand you

11     remain under oath?

12          **THE WITNESS:**  Yes.

13          **THE COURT:**  All right.

14          **MR. LEE:**  May I proceed, Your Honor?

15          **THE COURT:**  Yes.

16                    **DIRECT EXAMINATION**   (resumed)

17     BY MR. LEE:

18     **Q.**   Good morning, Mr. Rodriguez.

19     **A.**   Good morning.

20     **Q.**   Good morning, everybody.

21          Mr. Rodriguez, we talked last Thursday about the Google

22     privacy policy and the WAA disclosures.  Do you remember going

23     over that?

24     **A.**   Yes.

25     **Q.**   If you could summarize what we discussed, what does Google

1    promise users in those disclosures with respect to privacy?

2    **A.**    Control over what data they collect and how they use it.

3    **Q.**    Can you put the mic a little closer?

4    **A.**    Sorry.

5    **Q.**    No worries.

6         So you've now heard that Google does, in fact, collect,

7    save, and use people's data even when WAA or sWAA is turned

8    off; correct?

9    **A.**    Right.

10   **Q.**    All right.  Let's get the first page of the privacy policy

11   back up.  It's PX62, which is in evidence.

12        Do you remember you read to the jury that last sentence,

13   "And across our services, you can adjust your privacy settings

14   to control what we collect and how your information is used"?

15   **A.**    Yes.

16   **Q.**    If Google collects and uses your data even when WAA is

17   turned off, how are you in control of what Google collects or

18   uses?

19   **A.**    I'm not.

20   **Q.**    Is this statement in the privacy policy, in your view,

21   true or false?

22   **A.**    I would say it's false.

23   **Q.**    All right.  Let's take a look at PX104.

24             **THE COURTROOM DEPUTY:**  Has that been admitted?

25             **MR. LEE:**  Yes, it's been admitted.

RODRIGUEZ - DIRECT / LEE

1   BY MR. LEE

2   **Q.**   You see at the top there, it says [as read]:

3          "Google can save information like websites and

4       apps you use and your activity on websites and in

5       apps that use Google services."

6       Do you see that?

7   **A.**   Yes.

8   **Q.**   And just below that, it says [as read]:

9          "To let Google save this information, Web & App

10      Activity must be on."

11      Do you see that?

12  **A.**   Yes.

13  **Q.**   If Google saves your app activity data even when WAA is

14  turned off, is this statement that "To let Google save this

15  information, Web & App Activity must be on," in your view, true

16  or false?

17  **A.**   False.

18  **Q.**   If Google offered you a privacy control but you can't

19  really stop Google from collecting your information, would you

20  still say that Google offered you a privacy control?

21  **A.**   No.

22  **Q.**   When I said the word "privacy control," I notice you kind

23  of shook your head.  Is there something that bothers you about

24  that word?

25  **A.**   So I just don't understand why they would use that term,

 1   if there's privacy and I have control, but there is no privacy

 2   and there is no control over that.

 3   **Q.**   The jury's heard a lot about data that Google considers

 4   personal information versus non-personal information.  Do you

 5   remember that?

 6   **A.**   Right.

 7   **Q.**   All right.  Let's talk about the types of data Google

 8   collects and uses when sWAA is off.

 9        Based on your involvement in this case, your work on this

10   case, what are the types of data that Google collects when WAA

11   or sWAA is turned off?

12   **A.**   So it's -- to me, the way I look at it is it's like pieces

13   of a puzzle, in a sense.  So one piece, they have my device ID.

14   Another piece would be the apps I downloaded, which ones I

15   opened.  Another one would be gender.  Another one would be

16   age.  There's a lot of other ones as well that kind of just,

17   when you put it all together, it becomes -- it is me.

18   **Q.**   Right.

19        Is IP address one of those puzzle pieces?

20   **A.**   Yes.

21   **Q.**   Your location, is that a puzzle piece?

22   **A.**   Yes.

23   **Q.**   Device type, is that a puzzle piece?

24   **A.**   Yeah.

25   **Q.**   How about what language you speak?  Is that a puzzle

RODRIGUEZ - DIRECT / LEE

1    piece?

2    **A.**    Yes.

3    **Q.**    How about every single thing you've done on your apps with

4    these SDKs?  Is that a puzzle piece?

5    **A.**    It is.

6    **Q.**    What you read?

7    **A.**    Yes.

8    **Q.**    What pictures you looked at?

9    **A.**    Yep.

10   **Q.**    What you purchased?

11   **A.**    Yes.

12   **Q.**    Things you clicked on?

13   **A.**    Right.  Yes.

14   **Q.**    Now, when you put all these pieces together, even if a few

15   pieces are missing, is it obvious who the picture that the

16   puzzle forms is of?

17   **A.**    Yeah.  It's -- it's me.

18   **Q.**    Do you believe all of this information, these puzzle

19   pieces, are private?

20   **A.**    Yes, definitely.

21   **Q.**    Do you believe that information is personal?

22   **A.**    Very personal.

23   **Q.**    Let's talk about a few examples.  Did you ever use the

24   NightOwl Companion app while you had sWAA off?

25   **A.**    Yes.

1   Q.   What's that app for, Mr. Rodriguez?

2   A.   It's an app for sleep apnea.

3   Q.   Do you consider your sleep apnea a private and personal

4   matter?

5   A.   Definitely it is.

6   Q.   Did you ever use the MIPC camera app while sWAA was off?

7   A.   Yes.

8   Q.   And is that app for like home security?

9   A.   Yes.  It connects to my cameras in my home.

10  Q.   Do you consider what you do for home security a private

11  and personal matter?

12  A.   Oh, yeah, definitely.

13  Q.   Did you ever use the Career Karma app while sWAA was off?

14  A.   Yes.

15  Q.   And what's that for?

16  A.   That's an app that has -- it's a company that helps you

17  switch careers, and you get assigned a coach and they basically

18  help you with that.

19  Q.   Do you consider whether you're looking for a new job

20  something that's private and personal to you?

21  A.   Yes.

22  Q.   Do you consider the name of your coach, your Career Karma

23  coach, private and personal to you?

24  A.   Oh, yeah.

25  Q.   Do you want Google knowing all these things?

1    **A.**    No.  They shouldn't.

2    **Q.**    Let me ask a different question.  Did you have an Android

3    Samsung Galaxy phone in 2021 to 2022?

4    **A.**    Yes.

5    **Q.**    Was sWAA off on that phone the entire time period?

6    **A.**    Yeah, it was.

7    **Q.**    Which email account did you sign in on for that phone?

8    **A.**    It's Peteysake08@gmail.com.

9    **Q.**    Did you ever sign out of that account on your phone?

10   **A.**    No.

11   **Q.**    Did you sign into another account on your phone?

12   **A.**    No.

13   **Q.**    Did you ever let your kids sign in on that phone?

14   **A.**    No.

15   **Q.**    Did you ever let your kids download apps on your phone?

16   **A.**    No.

17   **Q.**    Did you let anyone else use your phone?

18   **A.**    No.

19   **Q.**    How much did you pay for your current phone?

20   **A.**    I'm not sure.  They range anywhere from -- I mean, because

21   you pay monthly, so I would say me, $500, but I've paid 8-

22   to -- 800 to a thousand dollars on previous phones.

23   **Q.**    And what's your current monthly bill that you pay for your

24   service carrier?

25   **A.**    About $45 a month.

1    **Q.**   Is it an easy thing, Mr. Rodriguez, for you to have to buy

2    a new phone every couple of years?

3    **A.**   No, it's not.

4    **Q.**   Is that something you have to save up for as a family?

5    **A.**   Yeah.  I would say so, yes.

6    **Q.**   Do you have your phone in your pocket right now?

7    **A.**   I do.

8    **Q.**   Who owns the phone in your pocket?

9    **A.**   I do.

10   **Q.**   Who owns the apps on your phone?

11   **A.**   I do.

12   **Q.**   What about the data?  Who owns the data on your phone?

13   **A.**   I do.

14   **Q.**   Who owns all the activity on your phone?

15   **A.**   I do.

16   **Q.**   Do you like other people looking through your phone?

17   **A.**   No.  No.  I think, you know, anybody's first instinct,

18   when someone's trying to grab your phone from the table, is to

19   protect it and -- no.

20   **Q.**   Let me ask you a question.  Would you rather give a

21   stranger your name and email address or access to your phone?

22   **A.**   I would not give my phone.

23   **Q.**   The jury's heard testimony about the term

24   "Google Account."  Do you remember that?

25   **A.**   Yes.

1  **Q.**   Now that you've heard Google's interpretation of that term

2  at this trial, do you think Google's interpretation is

3  reasonable?

4  **A.**   No, at all.  And the reason why is because the way I look

5  at is if -- if they say that I have control over what they

6  collect and how they use it and it's not being collected on my

7  Google Account but, yet, still being saved somewhere else, then

8  I don't have control and I don't have -- know what they collect

9  or how they use it.  So I don't agree with that, no, at all.

10 **Q.**   Should Google be saving your sWAA-off data somewhere

11 outside of your Google Account, in a place that you can't see?

12 **A.**   No.

13 **Q.**   In a place you don't know about?

14 **A.**   No.

15 **Q.**   Did you see anything in the Google disclosures, whether

16 disclosures we showed the jury or disclosures you've seen

17 otherwise, that clearly stated what was and what was not saved

18 in your Google Account?

19 **A.**   No, I didn't.

20 **Q.**   Did you see anything in any Google disclosures that

21 clearly stated that your data would still be saved somewhere

22 outside of your so-called Google Account?

23 **A.**   There is nothing.

24 **Q.**   Now that you know that Google was collecting saving and

25 using this data the entire time, how has that affected you?

 1   **A.**    So I would -- I'm pretty pissed about it, and I'm sorry

 2   saying that, but -- and the reason why is because they promised

 3   something that wasn't really real.  And, you know, I went on

 4   for a long time thinking everything was okay; and then I come

 5   to find out, it was all a lie, and I think that's pretty messed

 6   up.  And it's not just me.  It's other people, obviously, close

 7   to a hundred other -- a hundred million other people.  So I

 8   just think that's really messed up.

 9   **Q.**    After you joined the lawsuit because Google was collecting

10   your data even after WAA was turned off, did you stop using

11   your apps?

12   **A.**    I did not, no.

13   **Q.**    Explain to the jury why.

14   **A.**    One second.

15   **Q.**    Sure.  That's a good idea.

16   **A.**    So the reason I kept everything the same is so that way,

17   our team and our experts that were working on the case, the

18   only way for them to even know what was being collected and how

19   it was used, and things of that nature, was to keep everything

20   as is.  I -- you know, and if I leave everything -- if I was to

21   switch it back, there's no way that they can save that -- find

22   that information, and we wouldn't be here today.

23   **Q.**    By "keep everything as is," do you mean keeping sWAA off?

24   **A.**    Right.

25   **Q.**    And do you also mean continuing to use your apps?

1   **A.**   Right.  Sorry.

2   **Q.**   No worries.

3        Do you recall hearing from Dr. Hochman that Google

4   collected close to a million pages of sWAA-off data from just

5   your app usage after you joined the lawsuit?

6   **A.**   Right.

7   **Q.**   Would Dr. Hochman have been able to collect all that data

8   if you had stopped using your apps after joining the lawsuit?

9   **A.**   No.

10  **Q.**   Would Dr. Hochman have been able to confirm that Google's

11  so-called de-identified data included events that had your

12  name?

13  **A.**   No.

14  **Q.**   Your email address?

15  **A.**   No.

16  **Q.**   Your phone number?

17  **A.**   No.

18  **Q.**   The name of your Career Karma coach?

19  **A.**   No.

20  **Q.**   Do you understand that when Google collects your app

21  activity data when WAA is off, that that impacts your device's

22  bandwidth and drains the battery?

23  **A.**   Now I do, yes.

24  **Q.**   Do you think that's right for Google to do?

25  **A.**   No.  I mean, they're taking -- they're collecting your

1    data when you already told them not to, and then they're using

2    your device resources to do so, and I think that's wrong.

3    **Q.**    You think the class should be compensated for that?

4    **A.**    Definitely, yes.

5    **Q.**    What other relief are you asking for on behalf of the

6    class?

7    **A.**    Well, Google obviously thinks that the data is valuable,

8    so I think they should pay that.  I also think that -- that

9    they profited off it as well, so anything that they profited

10   should go back to the class.

11        And I -- I don't want them to do this again.  I would like

12   for them to learn their lesson in a sense, so I think punitive

13   damages would be right as well.

14   **Q.**    If you could tell Google anything, what would it be?

15   **A.**    Well, like, I honestly feel that, like -- that the tech

16   industry or just tech in general is a good thing for humanity.

17   It obviously makes things a lot better for humanity, but I

18   don't think being dishonest or misleading is a good thing.

19        So being that Google is the biggest tech company in the

20   industry, I think they should lead by example and do better in

21   what they're doing.

22             **MR. LEE:**  Thank you, Mr. Rodriguez.

23             **THE WITNESS:**  Thank you.

24             **THE COURT:**  Ms. Agnolucci?

25             **MS. AGNOLUCCI:**  Thank you, Your Honor.

1                        <u>CROSS-EXAMINATION</u>

2      **BY MS. AGNOLUCCI:**

3      **Q.**   Good morning, Mr. Rodriguez.

4      **A.**   Good morning.

5      **Q.**   You are a class representative in this case; right?

6      **A.**   Right.

7      **Q.**   That's an important job?

8      **A.**   Definitely.

9      **Q.**   You are one of the faces of this lawsuit?

10     **A.**   Yes.

11     **Q.**   And you filed your lawsuit against Google in July of 2020;

12     is that right?

13     **A.**   Right.

14     **Q.**   And you learned about it from a friend named Arturo

15     Garcia?

16     **A.**   That's right.

17     **Q.**   At the time, Arturo was an IT specialist at the Miami

18     office of these lawyers at Boies Schiller?

19     **A.**   Right.

20     **Q.**   And he told you there was a complaint against Google?

21     **A.**   Right.

22     **Q.**   He didn't tell you what that complaint was about, did he?

23     **A.**   So not specifically.  It's a -- just to kind of give you

24     an idea, we pretty much talk about our phones a lot, and we

25     compare, and stuff like that, and just going over who's better

1  and stuff like that.  He did bring up something like that the

2  firm was investigating some type of privacy issues with Google

3  and if I wanted to reach out, and I did.

4  **Q.**  So you knew it had something to do with Google, but at the

5  time that you spoke with Mr. Garcia, you didn't really know

6  what the complaint was about until you spoke with your

7  attorneys here at Boies Schiller; correct?

8  **A.**  Yeah.  He did tell me that it was some type of privacy

9  issues, which kind of made me concerned.

10  **Q.**  But you learned about the theory and the details of the

11  case about these -- from these lawyers for the first time?

12  **A.**  Right, right.  And I was pretty surprised on what was

13  going on.

14  **Q.**  And it's true that everything you learned about the

15  allegations in this case also came from these lawyers; right?

16  **A.**  I did learn a lot.

17  **Q.**  You didn't do any independent investigation other than

18  speaking to these lawyers; right?

19  **A.**  No.

20  **Q.**  You never did a Google search?

21  **A.**  No.

22  **Q.**  You never read any articles?

23  **THE COURT:**  You're getting the double negative, so be

24  careful about that.

25  **MS. AGNOLUCCI:**  Thank you, Your Honor.

1          **THE COURT:**  Yes.  Go ahead.

2    **BY MS. AGNOLUCCI:**

3    **Q.**    You did not do a Google search as part of your

4    investigation of this case?

5    **A.**    Prior to meeting with the lawyers?

6    **Q.**    And prior to your deposition two years later.

7    **A.**    Not prior -- before meeting -- before meeting my lawyers.

8    I'm not sure after.

9    **Q.**    And you remember testifying in your deposition, which was

10   two years after you filed your complaint, that you still hadn't

11   done any Google searches about the allegations in your

12   complaint?

13   **A.**    I'm not sure if I made any Google searches, but I did

14   learn a lot with my attorneys.

15   **Q.**    That was your testimony in your deposition, Mr. Rodriguez?

16   **A.**    I'm not sure.  I don't remember what I said.

17   **Q.**    Do you remember testifying in your deposition that you

18   hadn't read any news articles about the allegations in this

19   case or any other articles?

20   **A.**    Right.  Prior to meeting with my lawyers, I didn't know

21   what was going on.

22   **Q.**    You're suing Google over a button called supplemental

23   Web & App Activity?

24   **A.**    The sWAA button.

25   **Q.**    The sWAA button.

RODRIGUEZ - CROSS / AGNOLUCCI

1    **A.**    Right.

2    **Q.**    And you're now alleging that when sWAA is off, Google

3    illegally collected your data through Google Analytics for

4    Firebase?

5    **A.**    That is -- that -- yes.

6    **Q.**    Do you remember testifying in your deposition, about

7    two years after you had filed your complaint, that you had no

8    idea what sWAA even was?  Do you remember that?

9    **A.**    I don't remember that.

10          **MS. AGNOLUCCI:**   Brooklyn, can you please play the

11    video clip of transcript page 264, 11 to 17?

12                (Video was played but not reported.)

13    **BY MS. AGNOLUCCI:**

14    **Q.**    That was in October of 2022; right, Mr. Rodriguez?

15    **A.**    That's when the deposition was, yes.

16    **Q.**    So over two years after you filed your original lawsuit?

17    **A.**    Right.

18    **Q.**    Now that we're here five years later, you've formed some

19    understanding of what supplemental Web & App Activity is?

20    **A.**    Right.  I learned a lot about what it is.

21    **Q.**    And in your original complaint, you alleged that Google

22    created personalized marketing profiles about you when WAA was

23    off.  Do you remember that?

24    **A.**    Right.

25    **Q.**    Do you remember that in your complaint you called those

1    cradle-to-grave profiles?  Do you remember alleging that in

2    your original complaint?

3    **A.**    I'm -- I'm not too sure about that.

4            **MS. AGNOLUCCI:**  Brooklyn, can you please display to

5    the witness only Exhibit I-1, page 20, his original complaint?

6    Only to the witness, please.

7    **BY MS. AGNOLUCCI**

8    **Q.**    Do you see that on the screen, Mr. Rodriguez,

9    paragraph 60, last sentence?  Those were your allegations;

10   right?

11   **A.**    Sure.

12   **Q.**    So in June 2020, you alleged that Google had created

13   cradle-to-grave advertising profiles of you.  Do you remember

14   that now?

15   **A.**    Yes.

16   **Q.**    And then you later amended your complaint several times

17   over the years; right?

18   **A.**    Right.

19   **Q.**    Your allegations changed as you learned more about the

20   case?

21   **A.**    I did learn a lot.

22   **Q.**    And after learning about the case, you dropped that

23   allegation about the advertising profiles; right?

24   **A.**    I -- I don't know.

25   **Q.**    You have no idea, one way or the other, whether that's

1  still something that you're alleging in this case?

2  **A.**   Can you repeat the question again?  Because I'm not too

3  sure, not too clear.

4  **Q.**   Do you know, as you sit here today, if you are still

5  alleging that Google builds cradle-to-grave personalized

6  advertising profiles?

7  **A.**   No.  I -- as far as cradle to grave, I don't know; but

8  what I do know is -- is what the alleging is, that it was taken

9  without my permission.  That's basically what this case is

10  about.  So as far as, like, detail or, like -- like, lawyer

11  talk and stuff like that, I'm not too sure, so...

12  **Q.**   You heard Mr. Monsees testify in court last week that it

13  would be impossible to create personalized profiles from

14  de-identified data.  Do you remember that?

15  **A.**   I did hear him say that.

16  **Q.**   Because the data is de-identified, he explained that you

17  can't know whose it is to create the profile; right?

18  **A.**   That's what he says, but I don't -- I don't agree to that.

19  **Q.**   And just now you were talking about puzzle pieces and how

20  Google has all of these different pieces of the puzzle.  Do you

21  remember saying that?

22  **A.**   Yes.

23  **Q.**   Do you have -- you have no basis for alleging that Google

24  puts all of the puzzle pieces together, do you, Mr. Rodriguez?

25  **A.**   Well, from what I heard and what we've seen, it's more

1    than just that.  I mean, with me specifically, it's pretty much

2    you know it's me.  My name's in there.  There -- I mean,

3    de-identified, it's how -- how is it de-identified if my name,

4    my email, my phone number is in there?  So in my case, it's --

5    it doesn't matter because it's all there.

6    **Q.**   So despite Mr. Monsees' testimony the other day that the

7    data was de-identified, that it didn't include names and email

8    addresses, it's your allegation that the puzzle pieces are all

9    there together?

10   **A.**   My name, my email address, my phone number is all there.

11   **Q.**   You testified on Friday that you had reviewed Google's

12   privacy policy; right, Mr. Rodriguez?

13   **A.**   On Friday?  Repeat the question.

14       **THE COURT:**  Thursday.

15   **BY MS. AGNOLUCCI:**

16   **Q.**   Yeah.  I know it's been a long weekend.

17       **THE COURT:**  Thursday.

18   **BY MS. AGNOLUCCI:**

19   **Q.**   We were all last here on Thursday.  I'm sorry.

20       You were here on the stand on Thursday; right?

21   **A.**   Right.

22   **Q.**   And you remember telling your lawyer that you had

23   carefully read Google's privacy policy?  Do you remember that?

24   **A.**   I did, yeah.

25   **Q.**   And he showed you parts of it on Thursday and then more

1    parts of it today.  It was actually just the first page.  Do

2    you remember that?

3  **A.**    Right.

4           **MS. AGNOLUCCI:**  Can we please blow up PX62, the

5    privacy policy?  You can display it to the jury, Brooklyn, and

6    please bring up the section on "Your activity on other sites

7    and apps."

8           **THE WITNESS:**  What page would that be in the binder?

9  **BY MS. AGNOLUCCI:**

10  **Q.**    0022.

11         This is part of the policy that you reviewed; right,

12   Mr. Rodriguez?

13  **A.**    Yes.

14  **Q.**    And you see there where it says [as read]:

15             "Your activity on other sites and apps"?

16         Do you see that?

17  **A.**    I see that, yes.

18  **Q.**    And you say -- it says [as read]:

19             "Many websites and apps partner with Google to

20          improve their content and services.  For example, a

21          website might use our advertising services or

22          analytics tools like Google Analytics."

23         Do you see that?

24  **A.**    It does say that, yes.

25  **Q.**    And you see where it says [as read]:

**RODRIGUEZ - CROSS / AGNOLUCCI**

1           "These services may share information about your

2      activity with Google"?

3      Do you see that?

4  **A.**   I see that, and that would be with WAA and sWAA off.

5  **Q.**   Well, you're right.  Go on to read [as read]:

6           "... and depending on your account settings and

7      the products in use" --

8  **A.**   I'm sorry.  On.  I apologize.  I apologize.  It's on.

9  **Q.**   [As read]:

10          "... depending on your account settings and the

11     products in use, this data may be associated with

12     your personal information."

13     Do you see that?

14 **A.**   Right.  And I have to correct myself.  I apologize.

15 **Q.**   Oh, that's okay.

16 **A.**   So -- so this is what I understand when WAA and sWAA is

17 on.  When it's turned off, it shouldn't be collected.  And I'm

18 sorry.  I just have to correct myself there.

19 **Q.**   You agree with me that the word "and" means in addition;

20 right?  In general, Mr. Rodriguez.

21 **A.**   Well, and depending --

22 **Q.**   "And" means also?

23 **A.**   So I'm just going to read it over again.  Okay?  So it

24 says [as read]:

25          "These services may share information about your

RODRIGUEZ - CROSS / AGNOLUCCI

1          activity with Google; and depending on your account

2          settings..."

3          So my account settings would be that I turn off WAA and

4     sWAA.  So the way I read it is that none of this should be

5     collected if it's off.

6     **Q.**   Do you agree with me that the word "and" means also or in

7     addition?

8     **A.**   Not in this case.

9     **Q.**   Not in this case.  Okay.

10         But you don't disagree with me that it says here that

11    "These services can share information about your activity

12    and" -- and to you it doesn't mean in addition, so we can set

13    aside our dispute about that, but -- "and depending on your

14    account settings" --

15    **A.**   Right.

16    **Q.**   -- "this data may be associated with your personal

17    information."

18    **A.**   Right.  And depending on your account settings, which is

19    the WAA and sWAA button.

20    **Q.**   So despite the language in the privacy policy, you believe

21    that when WAA is turned off, Google shouldn't have any

22    information about you?

23    **A.**   Not from the apps that are on my phone.  If -- if you're

24    telling me that I have control over what Google collects and

25    how they use it -- can you hear me?  I'm sorry.  I thought you

RODRIGUEZ - CROSS / AGNOLUCCI

 1  were -- can you hear me?

 2  **Q.**   Yes, I can.

 3  **A.**   So the way I look at it is if Google is giving me that

 4  control, and it says it right in the beginning that, if I can

 5  control that, that I'm in control over what you collect and how

 6  you use it, I would -- I would say that that's everything that

 7  you have on me with my -- with the apps that I'm using.

 8  **Q.**   Literally anything and everything; right?

 9  **A.**   I don't know about everything.  I mean, as far as, like,

10  little details like something that had to do with, like, my

11  phone itself, like how it works and stuff like that; but I

12  didn't -- what I'm saying is that any data that's coming from

13  apps that I'm using should not be shared over because that's --

14  that's what Google promised me.

15  **Q.**   And you believe that Google promised you that it can't

16  know what city your anonymous device is in?

17  **A.**   Right.  If I -- if -- if the data is coming from the apps

18  on my phone and WAA and sWAA is off, then, no, right.

19  **Q.**   Google shouldn't know how many times the anonymous device

20  opened the Target app yesterday?

21  **A.**   It shouldn't.

22  **Q.**   Even if none of this information is tied to your name or

23  email?

24  **A.**   It doesn't matter to me if that's the case.  If -- the way

25  I look at it is if I didn't give permission to do that, then I

 1    don't think it matters what -- what you think.  If you're,

 2    like, saying if it's, "Oh, we'll collect this over here and we

 3    won't collect that," I mean, that's not really stated there.

 4    So I'm -- I'm thinking it's -- I'm assuming it's going to be

 5    everything, and I think it should be everything.

 6    Q.   And your allegation in this case is that when Google

 7    receives that de-identified data, it is an egregious breach of

 8    social norms; right?

 9    A.   I would say it's -- I would say it's disrespectful, in a

10    sense, where if -- like I said, if I'm saying not to do that

11    and you're saying that I had control over that, I think that

12    you should respect that.  I think Google should respect that,

13    definitely.

14    Q.   Mr. Rodriguez, I want to get you out of here quickly, so

15    let's try again, please.

16    A.   I'm trying my best.

17         **THE COURT:**  Let's not argue.  New question.

18    **BY MS. AGNOLUCCI:**

19    Q.   The question was:  Your allegation in this complaint is

20    that Google's collection of de-identified data is an egregious

21    breach of social norms; right?

22    A.   So I don't understand your question.  Can you re- -- can

23    you rephrase it in a sense?

24    Q.   The law that you're suing under --

25    A.   Mm-hmm.

1    Q.    -- the privacy law, requires that the conduct alleged be

2    an egregious breach of social norms.  Are you aware of that?

3    A.    Egregious?  Say it again.

4    Q.    Egregious breach of social norms.

5    A.    I apologize.

6    Q.    I know it's a mouthful, so maybe we can break it down.

7    Okay, Mr. Rodriguez?

8    A.    Yeah.

9    Q.    So let's start with "egregious."  Okay?  Think for

10   a minute about what you consider to be egregious behavior.

11   Would you agree with me that another word for "egregious" is

12   shocking?

13   A.    Yes.

14   Q.    Outrageous?

15   A.    Definitely.

16   Q.    And social norms, those are the rules that, as a society,

17   we get together and agree you can do this, you can't do that to

18   each other; right?

19   A.    That is right.

20   Q.    Treat all people like they're equal; right?

21   A.    I would say respect people.

22   Q.    Treat people with respect?

23   A.    Mm-hmm.

24   Q.    Okay.  These are the rules that we've agreed on as a

25   society.  And one of the things you said on Thursday was that

**RODRIGUEZ - CROSS / AGNOLUCCI**

1    Google's conduct in this case was like somebody peering in your

2    curtains and watching you eat; right?

3    **A.**    Right.  Yeah.

4    **Q.**    And you --

5    **A.**    I'm sorry, yeah.  And they -- that's the way I feel.

6    If -- if -- so the WAA and sWAA button is the curtain; right?

7    And so turning it off, I'm closing the curtain.  Unbeknownst to

8    me I'm still being looked at while my curtain is -- so

9    someone's peeking through my curtain.  That's just a way for me

10   to look at it and kind of explain what -- how I feel about it.

11   **Q.**    Do you remember testifying in your deposition that

12   Google's collection of de-identified data about you when WAA

13   was off was the equivalent of someone profiting off of a naked

14   photo of you?  Do you remember that?

15   **A.**    When did I say that?

16   **Q.**    In October 2022 when you --

17   **A.**    When I was deposed?

18   **Q.**    -- were deposed in this case.

19   **A.**    It's -- I mean, that's just another way of describing it.

20   **Q.**    You also called Google's behavior disturbing and scary.

21   Do you remember that?

22   **A.**    It is.  I -- I agree to that because I don't know what

23   Google is doing with my data.  It's -- that's what's scary

24   about it.

25   **Q.**    You have no idea what's happening to the de-identified

1    data that's collected about you?

2    **A.**    Again, my data wasn't de-identified.  So I can't really

3    agree to that, no.

4    **Q.**    You told Google during discovery that one of the apps

5    through which Google collected information about you that you

6    objected to was called Alarm Clock for Me.  Do you remember

7    that?

8    **A.**    When was this again?

9         **MS. AGNOLUCCI:**  Can you put up, Brooklyn, please, D1,

10   Plaintiffs' Demonstrative Exhibit GO664?

11   **BY MS. AGNOLUCCI**

12   **Q.**    Mr. Rodriguez, this is a demonstrative that your lawyers

13   created that include the apps that you're alleging Google

14   collected data from; correct?

15   **A.**    Right.

16   **Q.**    And you see the second one is Alarm Clock for Me?

17   **A.**    I see that.

18        **MS. AGNOLUCCI:**  You can take that down, Brooklyn.

19   Thank you.

20   **BY MS. AGNOLUCCI**

21   **Q.**    You used this app to set alarms, Mr. Rodriguez?

22   **A.**    I -- I think so.  I don't use it anymore in that way.  I

23   use the phone itself now, but I have.

24   **Q.**    You've changed the way that you use that app since the

25   complaint?

1    **A.**    That specific app.  I just recently changed phone, like,

2    two months ago.  So I -- it didn't switch over.  So my natural

3    way of using the alarm was my phone's alarm.

4    **Q.**    Mr. Rodriguez, you testified earlier on direct with your

5    lawyer that you didn't change any of your behavior because you

6    couldn't as a result of this case.  Do you remember saying

7    that?

8    **A.**    Right.

9    **Q.**    But it sounds like you changed your behavior with respect

10   to some apps?

11   **A.**    The last two months, since I changed my phone.

12   **Q.**    And Alarm Clock for Me was one of them?

13   **A.**    As far as usage?  It didn't -- it didn't transfer over to

14   my phone.

15   **Q.**    You agree that one piece of data that an alarm clock app

16   might collect is what time the device set its alarm; yes?

17   **A.**    Right.

18   **Q.**    And if your WAA is off and Google knows that one person in

19   the Miami, Florida, area turned an alarm off at 8:00 a.m. and

20   then that another person turned an alarm clock off at 8:01 and

21   then that another person turned an alarm clock off at 8:02, the

22   fact that you turned your alarm clock off, that's private and

23   something Google shouldn't know?

24   **A.**    Yes, but it's not just that one app that's the claim.  The

25   claim is that it's the alarm app, my Instagram app, all these

1  different apps that come together to say who I am.  And, again,

2  in this case, with me, it's -- you know it's me because my

3  information is in there.

4  **Q.**   So you're not offended by just the alarm clock app?

5  **A.**   So what I have a problem is any app.  Any app.

6  **Q.**   Including --

7  **A.**   Including my alarm clock.  So if I just said -- if I'm

8  saying not to collect any data, I just -- I expect all apps

9  to -- to not be collected.

10 **Q.**   And you believe, and testified in your deposition, that

11 Google's collection of de-identified data from the alarm clock

12 app is just as private as a naked picture of you?

13 **A.**   Right.  And -- and I still stand by that.  And the reason

14 why, it's not just that one app, the way I look at it.  And the

15 thing is that if you have all this information about me, you

16 can -- you can figure out it's me.

17     And in this case, like I said, we've all saw it.  My name,

18 my phone number, my email address was on there.  So it's not

19 hard to say that it is me.

20 **Q.**   You testified that you have no idea what, if anything,

21 Google does with the data it collects when sWAA is off; right?

22 **A.**   Right.

23 **Q.**   And, in fact, you have no basis for alleging that Google

24 puts together those puzzle pieces; right, Mr. Rodriguez?

25 **A.**   That's -- that's what's being saved.

1  **Q.**  But what I'm asking you is whether you, as you sit here,

2  have any basis for alleging that besides, of course, what these

3  lawyers told you?

4  **A.**  That's what the evidence says.

5  **Q.**  Do you remember testifying in your deposition that you

6  don't feel safe knowing that Google has de-identified

7  information about you?

8  **A.**  I might have said that, yes.

9  **Q.**  And that you have to try to sleep at night knowing that

10  this information is being collected?

11  **A.**  Well, yeah.  It's -- and I think most people, if they feel

12  that they are, in a sense, being spied on to just get

13  information about them specifically, anybody would think that.

14  And I -- and I agree to that, yes.

15  **Q.**  You aren't alleging that you lost a single dollar; right,

16  Mr. Rodriguez?

17  **A.**  Well, I think -- yeah -- no, I'm not alleging -- I'm

18  alleging that you or Google, itself, took my data that you

19  found valuable, that you -- that you never mentioned that you

20  took, and you made money off it, which was mine.  And, in a

21  sense, that's almost like -- I mean, I don't know how to say it

22  in a better way.  It's almost like stealing.

23      And, of course, if you never said that, "Hey, we took your

24  data.  We made money off it, do you want a piece of the pie,"

25  then, yes, that's -- that's -- that's wrong.

**RODRIGUEZ - CROSS / AGNOLUCCI**

```
 1   Q.   You've never tried to sell your personal information

 2   before; right, Mr. Rodriguez?

 3   A.   Prior to this, I had no idea that Google thought it was

 4   valuable.  You know, that's where I learned a lot about this

 5   issue.

 6   Q.   You consider yourself a private person?

 7   A.   Yes.

 8   Q.   And it's important to you to know how companies are using

 9   your data; right?

10   A.   Sure.

11   Q.   And you believe that the data generated by your activity

12   on apps is your data; right?

13   A.   Yes.

14   Q.   You have the right to control and access it; right?

15   A.   I have the right to control what is being used.

16   Q.   And you're concerned with companies sharing your data with

17   third parties; right?

18   A.   In this case here I'm concerned about the apps sharing

19   with Google specifically.

20   Q.   Only Google?

21   A.   At -- yes.

22   Q.   You testified in your deposition that you would stop using

23   an app if you learned it was sending data to an outside party.

24   Do you remember that?

25   A.   If I learned, yes.
```

**RODRIGUEZ - CROSS / AGNOLUCCI**

1  Q.  You use the Target app, don't you, Mr. Rodriguez?

2  A.  I do.

3  Q.  And you said in your deposition that you were fine with

4  Target knowing all the things that you were purchasing; right?

5  A.  Right, because they're using it for the app itself.

6  Q.  Do you remember saying, quote, "That's my deal with them,"

7  unquote?

8  A.  I probably said that, yes.

9  Q.  You made a deal with Target?

10  A.  I am working with Target with the specific app that I

11  downloaded, and I understand that they collect data for my

12  shopping experience.

13  Q.  And you reviewed and agreed to Target's privacy policy?

14  A.  Yes.

15  Q.  And as part of the deal with Target, you were okay with

16  them knowing all the things you purchased; right?

17  A.  Yes.

18  Q.  Why did you continue to use the Target app even though

19  Target told you that it was sharing your data with third

20  parties?

21  A.  Sharing with third parties, which would be Google.  I'm

22  not sure who else they -- they -- they shared it with.  But

23  that's the case here.  It's -- if -- we can go back to what I

24  said before, was that if I am telling Google not to collect it,

25  I expect Google not to collect it from Target.

1      I don't know who else Target -- I don't know who they

2  would be sending it to.  I would think it would be just Google

3  because Google's -- like you mentioned, that they used SDKs on

4  the app, so...

5          MS. AGNOLUCCI:  Brooklyn, please display to the

6  witness only Document I-2, page 8.

7  BY MS. AGNOLUCCI

8  Q.   Mr. Rodriguez, you testified earlier that you read and

9  agreed to Google -- to Target's privacy policy; right?

10 A.   Right.

11         MR. LEE:  I believe this is subject to an MIL.  May we

12 approach?

13         THE COURT:  All right.

14         MS. AGNOLUCCI:  I'm not seeking to admit this

15 document, Your Honor.  I'm just using it to help him refresh

16 his recollection.

17         MR. LEE:  That's not what the MIL is about.  It's not

18 about --

19         MS. AGNOLUCCI:  This doesn't go to the issue in the

20 MIL, Your Honor.  This is consistent with Your Honor's ruling

21 the other day that questions about people's expectation of

22 privacy in general are relevant here.

23         THE COURT:  I will allow you to proceed.

24         MS. AGNOLUCCI:  Thank you, Your Honor.

25 \\\

1    BY MS. AGNOLUCCI

2    **Q.**   Mr. Rodriguez, please take a minute to read silently to

3    yourself the section in the middle of that page, starting with

4    the word "Other."

5    **A.**   Can you have somebody -- I'm sorry.  I don't know where

6    you want me to start.

7    **Q.**   The section that is blown up on the screen in front of

8    you.

9    **A.**   "Other Web" -- okay.  I got it.

10          (Witness examines document.)  Okay.  I see it.

11   **Q.**   Mr. Rodriguez, does the text in front of you help you

12   remember what you agreed to in Target's privacy policy?

13   **A.**   Yes.

14   **Q.**   And you understand that you agreed to the use of multiple

15   analytic services when you read and agreed to Target's privacy

16   policy?

17   **A.**   Right.

18   **Q.**   And those analytic services include Adobe Analytics;

19   right?

20   **A.**   Mm-hmm.

21   **Q.**   And those include Google Analytics?

22   **A.**   Right.

23   **Q.**   Yes?

24   **A.**   Right.

25   **Q.**   You agreed to that?

1   **A.**   That's what it says here, yeah.

2   **Q.**   And it also says that you agreed to Target sharing your

3   data with an analytics company called Crazy Egg.  Do you see

4   that?

5   **A.**   Yes.

6   **Q.**   Do you know what Crazy Egg is?

7   **A.**   I don't.

8   **Q.**   You don't?

9   **A.**   I don't know what Crazy Egg is.

10  **Q.**   But you agree that the language you are looking at on the

11  screen was part of your deal with Google -- with Target?

12  **A.**   With -- with Target, right.

13  **Q.**   I keep calling Target Google.  I'm sorry.

14  **A.**   That's okay.

15  **Q.**   Part of your deal with Target was that Target was sharing

16  your data with third parties, including Google Analytics?

17  **A.**   Right.

18  **Q.**   And Crazy Egg?

19  **A.**   Right.

20  **Q.**   And Adobe Analytics?

21  **A.**   Right.

22  **Q.**   And you were okay with all of that?

23  **A.**   They're just getting my -- they're just getting my data

24  from Target alone.  That's -- I mean, they're not -- they --

25  they're not saying they're getting all my app information from

RODRIGUEZ - CROSS / AGNOLUCCI

1    my phone.

2         So -- and, again, going back, it's -- it's like you said,

3    my deal was with Target and Google.  So if Google is -- if I

4    made a deal with Google, saying, "Don't collect data from this

5    specific app or all apps on my phone," I think Google should

6    honor that.

7         Now, if we're talking about the other analytics companies

8    that are within this here, if they're sharing that with that

9    company, it's just that data from Target alone, not all my

10   apps.  So I wouldn't see a problem specifically for the Target

11   app.

12   **Q.**  You had no problem with the Target app sharing your data

13   with Google Analytics, Adobe Analytics, or Crazy Egg; right?

14   **A.**  If -- if -- understanding how -- how I see things and what

15   I learned, I don't think it was a big deal.

16   **Q.**  Not a big deal?

17   **A.**  Not with -- not sharing my Target information, my Target

18   activity, with the analytics company.  I don't think that's an

19   issue.  I think, again, it's more -- if we're talking about

20   what the problem here is, it's more Google gathering all the

21   data from all my apps to kind of paint a picture of who I am.

22   **Q.**  You testified on Thursday -- I got it right -- that you're

23   starting a new job this week; right, Mr. Rodriguez?

24   **A.**  Yes.

25   **Q.**  And you took professional development courses to help you

**RODRIGUEZ - CROSS / AGNOLUCCI**

1  with your job search?

2  **A.**  Yes.

3  **Q.**  Do you remember signing up for and taking professional

4  development courses from Google?

5  **A.**  Yes.

6  **Q.**  In fact, from November 2024 to February 2025, six months

7  ago, you took a course offered by Google called "Data Data

8  Everywhere."  Do you remember that?

9  **A.**  Right.

10  **Q.**  And after taking that course, you got a certificate in

11  Google data analytics?

12  **A.**  Right.

13  **Q.**  And you posted that on your LinkedIn so that employers

14  would know that you were qualified for potential jobs; right?

15  **A.**  Right.

16  **Q.**  And you also received a certificate on foundations of

17  cybersecurity offered through Google; right?

18  **A.**  Right.

19  **Q.**  That was in December of 2024?

20  **A.**  Mm-hmm.

21  **Q.**  You learned about security controls and safeguards

22  designed to keep data safe; right?

23  **A.**  Right.  It's -- it was very preliminary.  I didn't finish

24  the courses.  I finished a part of the course, that -- the full

25  course.  So I didn't really get to learn beyond that, so I

 1   don't know specifically.  And, honestly -- but, yeah, it was

 2   something that I was working on.

 3   **Q.**   And you put certificates of completion --

 4   **A.**   Yeah.

 5   **Q.**   -- on your LinkedIn; right?

 6   **A.**   For the -- for the specific -- because they're in

 7   sections.  So you have a full course that has maybe six

 8   different modules.  Ability the module that I -- that I

 9   finished was, like, the first one.

10   **Q.**   And one of the modules that you finished had a section on

11   personally identifiable information and sensitive personally

12   identifiable information.  Do you remember that?

13   **A.**   Probably, yes.

14   **Q.**   And you are relying on the skills that you learned in

15   those courses to get a job; right?

16   **A.**   That was the idea, to finish -- but I didn't finish.  So

17   that was the idea, yes.

18   **Q.**   So the company that you're suing for allegedly mishandling

19   your data is the same company that you went to to learn about

20   data security, personally identifiable information.  Am I

21   getting that right, Mr. Rodriguez?

22   **A.**   Right.  So there's very limited amount of courses out

23   there.  It was simply just to learn.

24   **Q.**   And you're aware that before you took those courses, you

25   had to agree that Google could collect de-identified

RODRIGUEZ - CROSS / AGNOLUCCI

1   information about you that it would analyze at the aggregate

2   level.  Do you remember consenting to that?

3   **A.**  When I took the course?

4   **Q.**  Yes.

5   **A.**  Through Coursera?

6   **Q.**  Yes.

7   **A.**  That Google will?

8   **Q.**  Yes.

9   **A.**  I don't remember that.

10      **MS. AGNOLUCCI:**  Brooklyn, can you publish, just to the

11  witness, I-8?

12  **BY MS. AGNOLUCCI**

13  **Q.**  Can you read the paragraph, Mr. Rodriguez, that says, "By

14  completing this survey you understand," silently to yourself,

15  please.

16  **A.**  (Witness examines document.)  So this is the data that's

17  come -- that's collected for the specific course.

18  **Q.**  Correct.

19  **A.**  The data that I provide.

20  **Q.**  Correct.

21  **A.**  Okay.

22  **Q.**  So you agree with me that you agreed that Google could

23  collect de-identified and aggregated information about you that

24  it would analyze?

25  **A.**  For the Coursera course?  Yeah, that's what I see.

1  Q.   And you were okay with Google collecting your information

2  for the Coursera course?

3  A.   Yeah.  Yeah.  For this specific reason, yes.

4       MS. AGNOLUCCI:  We can take that down.  Thank you,

5  Brooklyn.

6  BY MS. AGNOLUCCI

7  Q.   Mr. Rodriguez, you have a few Google Accounts; right?

8  A.   Yes.

9  Q.   I believe you've created more than ten?

10 A.   I don't know the full number.  I know it's a list.

11 Q.   And on Thursday we went over and discussed a document

12 that's been admitted that shows your WAA and sWAA activity on

13 and off in those various Google Accounts.  Do you remember

14 that?

15 A.   Yes.

16 Q.   All right.

17      MS. AGNOLUCCI:  Brooklyn, if you could please display

18 Exhibit G0941.

19 BY MS. AGNOLUCCI

20 Q.   On the first page there, peteysake08@gmail.com, that,

21 Mr. Rodriguez, is your main account; right?

22 A.   Yes.

23 Q.   Okay.  And for that account, I want to direct your

24 attention to the last time that you paused your WAA.

25      Page 2, fifth row, do you see there where it says

1  July 16th, 2020?

2  **A.**   Yes.

3  **Q.**   That's when you turned WAA off for your main

4  Google Account; right?

5  **A.**   So I initially did it in 2018.  So I turned it off on

6  2018, November -- I think it says November 4th, 2018 --

7  **Q.**   I see that.

8  **A.**   -- I turned off WAA and sWAA.

9      I don't know.  And being totally honest, I don't know why

10  it's on on the 13th.  I -- I don't know why.  But sWAA's been

11  off, it looks like, from 2018, November 4th, all the way

12  through today.

13  **Q.**   Okay.  So staying with WAA, your WAA was on beginning in

14  November of 2018 and it was turned off in July of 2020;

15  correct?

16  **A.**   So when I realized it was on, yes, I turned it off.

17  **Q.**   And you realized it was on two days after you filed this

18  lawsuit; right?

19  **A.**   Yeah, because my -- my -- what I thought, it was already

20  off because that's what I intended to do in 2018.  Again, I'm

21  not sure why it got turned on a week later or two weeks later.

22  I'm not sure why.

23  **Q.**   But you're not disputing that your WAA was on for one and

24  a half years?

25  **A.**   The WAA was on but sWAA was definitely off.

1  Q.   And you are sure why it was off starting on July 16th;

2  right, Mr. Rodriguez?

3  A.   Why it was on or off?

4  Q.   So you're telling us, and I believe you, that you don't

5  remember why your WAA was on for a year and a half?

6  A.   Right.

7  Q.   But you remember why it was off starting on July 16th,

8  2020, because you turned it off; right?

9  A.   Right.  So I wanted to make sure.  When I looked in it, it

10  was on.  I don't know why, but it was on.  Then I turned it

11  off, right.

12  Q.   When you looked at it, two days after your lawyers filed

13  this complaint, you turned it off; right?

14  A.   Right.  That prompted me.  I did take a look to see

15  because I'm, like, "What's going on?"  And I saw it on, so I

16  turned it off.

17  Q.   After your lawyers told you to turn off WAA, you went and

18  turned it off?

19  A.   They didn't tell me to turn it off.  I looked -- after we

20  discussed this and I looked at my settings, and I noticed it

21  was on and I made sure to turn it off.

22  Q.   After discussing the case and the complaint with your

23  lawyers, two days after suing Google, you went and turned it

24  off; right?

25  A.   After discussing what the case was about, I took a look at

1    my settings and I turned it off.

2    **Q.**    And there's another five accounts on this document that

3    are yours.  I don't want to walk you through them one by one in

4    the interest of time.  We can, but, Mr. Rodriguez, do you

5    disagree with me that Thefightingbunny@gmail.com on page 1,

6    that that's also your Google Account?

7    **A.**    That is a Gmail account that I created.  It's a dummy

8    account.  I don't use it.

9    **Q.**    It's a dummy account, but you went and turned WAA and sWAA

10    off in November of 2020?

11    **A.**    Right.  I did that so, obviously, if -- because I have

12    these on my phone, and knowing what I found out through my

13    attorneys, I just wanted to make sure everything was all the

14    same because I didn't know -- what I didn't know is -- my

15    peteysake is my main one, and I didn't understand whether -- if

16    I have my main one off, I would assume that on my phone

17    everything would be turned off, and I noticed it wasn't.  So I

18    made sure I turned everything off after I found that out.

19    **Q.**    That was in November of 2020; right, Mr. Rodriguez?

20    **A.**    Right.  So when I -- when I found out that my WAA was on,

21    that day I made sure I went into all the accounts that I have

22    on my phone, all the Gmail accounts, and I just wanted to make

23    sure everything was uniform together.

24    **Q.**    And you did the same thing with mcmxcthrift@gmail --

25    **A.**    Right.

1  **Q.**    -- on page 2 of the document; right?

2  **A.**    Right.

3  **Q.**    And you did the same thing with Imnube08@gmail.com on

4  page 3 of the document; right?

5  **A.**    Right.

6  **Q.**    And you did the same thing with Hear305@gmail.com on

7  page 3 of the document?

8  **A.**    Yes.

9  **Q.**    And you did the same thing with beersinacan@gmail.com on

10  the top of page 4 of the document; right?

11  **A.**    Yeah.  These are all Gmail accounts that I've just -- kind

12  of like burner accounts really.

13  **Q.**    They're burner accounts but you bothered to go turn WAA

14  and sWAA off for all five of them in November of 2020; right?

15  **A.**    Right, because they're on my phone.  And I didn't --

16  again, I didn't know that they affected my phone, and just to

17  be on the safe side.  Because my thought was peteysake was my

18  main email account for my phone, which would probably -- what I

19  thought was that it would be the default settings for

20  everything.  So -- but to be on the safe side, when I learned

21  what I learned, I just wanted to make sure everything was

22  uniform all together.

23  **Q.**    Do you remember the first time you amended your complaint

24  in this case was six days before you went and turned WAA and

25  sWAA off for all of these accounts?

RODRIGUEZ - CROSS / AGNOLUCCI

1  A.    Yes.

2  Q.    So right after you filed an amended complaint, you went

3  and changed your settings on five different accounts; right?

4  A.    They're email accounts.  I'm not -- they're just emails

5  that I was using.  It was -- had nothing to do with my phone.

6  It was just email accounts.  But peteysake08 was the important

7  one.  And I wanted to make sure -- again, I wanted to make sure

8  everything was uniform together.  I didn't know if that was

9  affecting my phone; but just to be safe, I did that, yes.

10 Q.    These were important enough that you felt the need to

11 suddenly turn them off; right?

12 A.    After learning what was going on, yes, because initially,

13 I didn't think that none of the emails that I have there were

14 doing any of this because my primary email for my phone was

15 peteysake08.

16 Q.    You remember testifying here in court to this jury that

17 you were only using the peteysake email on your phone --

18 A.    Right.

19 Q.    -- yes?

20       That's not what you said in your deposition, is it,

21 Mr. Rodriguez?

22 A.    I'm -- I don't remember.

23 Q.    Do you remember testifying in your deposition that you

24 toggled between these accounts on your phone?

25 A.    My email accounts.  Right, to look through my emails, yes.

1    Not toggle -- so on your phone, you can toggle accounts to

2    switch which one you want as a primary; but there is a section

3    there, when you're looking through your emails, you can say,

4    "Okay, I want to look at this email, I want to look at this

5    email," to read the emails for the email itself, but the actual

6    profile on your phone, which is peteysake08, doesn't change.

7    **Q.**    So you toggled between these accounts on your phone;

8    correct?

9    **A.**    Yeah, to read the emails that I have in those accounts.

10   **Q.**    Mr. Rodriguez, you're not the only one in your family with

11   a Google Account.  You also opened Google Accounts for your two

12   sons; right?

13   **A.**    Yes.

14   **Q.**    Nathan and Luke?

15   **A.**    Yes.

16   **Q.**    Nathanrodriguez217@gmail.com on the document we're looking

17   at, on page 2, that's an email that you created for your son;

18   right?

19   **A.**    Right.  The emails that I created for both my children was

20   just an email to communicate with school, and they were just

21   email addresses.  They weren't really accounts associated with

22   anything on my phone.

23   **Q.**    And on page 3 of the document, there's two other Gmail

24   accounts for your other son, Luke?

25   **A.**    Right.

1    Q.    And you created Gmail accounts for them after you had sued

2    Google in this case; right?

3    A.    Right.  So school was starting and it was the height of

4    the pandemic.  There was no face-to-face communication, so the

5    only thing I could do is create an email address.  And this is

6    how I determined -- the Luke, having two of them, I don't

7    remember specifically.  I don't know if it's because my wife

8    created one and I created one and she submitted it.  And I left

9    it on my phone just in case one was being used over the other.

10        I don't know specifically but, yes, both of them was --

11   they were created for school.

12   Q.    And with all three of these accounts that you created for

13   your sons, you went and turned off WAA and sWAA in November of

14   2020; right?

15   A.    Right.  For the same reasons I turned off the other ones.

16   Q.    That was after you filed your original complaint in this

17   case; right?

18   A.    After finding out -- again, these are emails that were on

19   my phone.  They're not associated with -- with my phone.

20   They're just emails that I toggle through to read.

21   Q.    And after amending your complaint in this case, you went

22   and turned WAA and sWAA off?

23   A.    Right.  For the same reasons as I turned off the other

24   ones.

25   Q.    Your older son, Nathan, had a Samsung phone that you

 1   bought for him; right, Mr. Rodriguez?

 2   **A.**   Right.

 3   **Q.**   That's an Android phone?

 4   **A.**   Right.

 5   **Q.**   A Google phone?

 6   **A.**   Right.

 7   **Q.**   And you alleged in your complaint, of course, that Google

 8   was collecting private information about you without your

 9   consent?

10   **A.**   Right.

11   **Q.**   That information, to you, was as disturbing as a nude

12   photo; right?

13   **A.**   Right.

14        And I'm sorry.  We're talking about my kids here.  I don't

15   know why we're talking about my kids.

16   **Q.**   Well, I'll make it quick, Mr. Rodriguez.  I just want to

17   understand one thing.

18   **A.**   Sure.

19   **Q.**   Okay?  And I sympathize and I don't want to get into

20   anything about your kids that's, you know, difficult.

21        I just want to understand.  You got them Google Accounts,

22   and you got them Android phones; right?

23   **A.**   Right.

24   **Q.**   And at the same time, you were suing Google, saying that

25   all of these terrible things were being done to you, your

1    Google Accounts, and your Android phones; right?

2    **A.**    To me, right.

3    **Q.**    But you allowed your son to use his Android phone after

4    you filed this complaint the same way he had used it before;

5    right?

6    **A.**    What do you mean?  Like, after I found out about this, I

7    let him use the phone?

8    **Q.**    In the same way that he had always used it; right?

9    **A.**    Right.  He's very young.  They're not using any apps like

10    I am.  They really just used it for playing games and watching

11    videos and stuff like that.

12    **Q.**    Well, you remember testifying in your deposition that he

13    did use apps and that you didn't ask him to change his behavior

14    on any of those apps?  Do you remember that?

15    **A.**    I know it's video games.  I'm not sure what apps he was

16    using.

17    **Q.**    You're not sure what apps he was using?

18    **A.**    Right.  The apps that you're saying that I said in my

19    deposition, I'm not sure what was said there.

20    **Q.**    And do you remember being asked if you allowed your sons

21    to install new apps since filing your complaint?

22    **A.**    Yes.  So I do -- me and my wife, we both make sure that

23    when they're doing stuff on their phones or downloading stuff,

24    I am aware.  And I do periodically look at his phone just to

25    make sure that, you know, it's nothing crazy going on.  And,

1   again, he's young.  They're both young.  And me and my wife

2   both do the same thing.  So I think, you know, we do a good

3   job.

4       I don't -- I mean, and I apologize.  I know you mentioned

5   that you don't -- want to be sensitive here, but it's kind of

6   like I feel like you're saying that I'm a bad father of some

7   sort, and I don't agree with that.

8   **Q.**  Mr. Rodriguez, I have no idea what apps are on my

9   children's phones, so I'm not casting any aspersions.

10      I'm just trying to understand and confirm the deposition

11  testimony that you allowed them to install apps, you didn't

12  tell them to change their behavior, and you weren't really

13  checking which apps were being installed.  And that's just my

14  last question.

15  **A.**  I did check what was being installed, and I believe I did

16  turn off WAA and sWAA on their phones.

17      But, again, I mean, these are their phones.  This is what

18  they do.  They play on their phones.  They play games.  They

19  watch videos.  And really I don't understand, how can I prevent

20  that?

21      I mean, right now I would say at that time, if there's any

22  data being collected, it's a five-year-old and a ten-year-old

23  at the time.  And, again, they're not using the phone the same

24  way as I would, where you can kind of put the pieces of the

25  puzzle together and know who I am.  I think you would say it's

**RODRIGUEZ - REDIRECT / LEE**

```
 1    a five-year-old and a ten-year-old, and I don't think there's
 2    much information that you can actually gather from that.  It's
 3    just kids playing on a phone.  It's not using apps like an
 4    adult uses an app.
 5            MS. AGNOLUCCI:  No further questions, Mr. Rodriguez.
 6    Thank you.
 7            THE COURT:  Mr. Lee?
 8                    REDIRECT EXAMINATION
 9    BY MR. LEE:
10    Q.   Just one moment, Mr. Rodriguez.  Bear with me.
11    A.   Hurry up.  Just playing.
12                    (Pause in proceedings.)
13    BY MR. LEE:
14    Q.   Okay.  I'm just going to try and tick through these as
15    quickly as possible to get you out of here.
16    A.   Okay.
17    Q.   All right?
18         You were asked by Google's counsel whether you remembered
19    what -- whether you recognize what sWAA, or supplemental app
20    activity, was during your deposition.  Do you remember her
21    asking about that?
22    A.   Right.
23    Q.   And you understand that the lawyers talk about WAA and
24    sWAA at this trial, and sometimes Google calls it supplemental
25    app activity.  You remember that; right?
```

1    **A.**    Right.

2    **Q.**    Is that what's in the actual disclosures?  Does it say

3    "sWAA"?

4    **A.**    No.

5    **Q.**    Does it even say "supplemental"?

6    **A.**    No.

7    **Q.**    Let's take a look at PX84.  It's in evidence.

8            **MR. LEE:**  Can we get PX84?

9            **THE COURTROOM DEPUTY:**  It's coming up.

10           **MR. LEE:**  Oh, thank you.

11       Let's scroll down to the subsetting.

12   **BY MR. LEE**

13   **Q.**    So do you see the subsetting that we've been all calling

14   sWAA during this trial?

15   **A.**    Yes.

16   **Q.**    At the time of your deposition, did you just understand

17   this as the subsetting?

18   **A.**    Right.

19   **Q.**    Did Google's lawyer, at your deposition, ever refer to

20   this as the subsetting?

21   **A.**    No.

22   **Q.**    All right.  You were asked if you knew what the word,

23   I think it was, "egregious breach of social norms" was, and

24   I think we agreed that it meant something outrageous.

25   **A.**    Right.

RODRIGUEZ - REDIRECT / LEE

1  **Q.**   Is creating a fake button to give users a false sense of

2  security that their information is not being taken when it is

3  outrageous in your opinion?

4  **A.**   Yes, of course it is.

5  **Q.**   You were asked questions about why you got your son an

6  Android phone.  Do you remember that?

7  **A.**   Right.

8  **Q.**   If you got your son an iPhone instead of an Android

9  phone, based on what we know in this case, would Google still

10  have taken the app activity data, even with sWAA off?

11  **A.**   Yes.

12  **Q.**   Is there any smartphone that you could have purchased

13  where Google would not have taken app activity data even with

14  sWAA off?

15  **A.**   Right.  That's kind of where I was going to.  It's, like,

16  it doesn't matter what it is.  It's just kids playing on the

17  phone, but yeah.

18  **Q.**   You explained, during your direct examination, that for

19  the purposes of Dr. Hochman's testing about what Google

20  collects, you wanted to keep your -- everything the same, your

21  device, sWAA off and app usage.  Do you recall that?

22  **A.**   Right.

23  **Q.**   So you know you had to keep your Android; right?

24  **A.**   Right, right.  And that's kind of the -- when I was saying

25  I wanted everything uniform, I just wanted to make sure

1  everything was the same across the board on my phone.

2  **Q.**  Okay.  During cross-examinations -- excuse me.

3     I just want to make sure about something.  Was there

4  anything that Google's lawyers showed you on cross-examination

5  that told you Google would take, copy, save, or use any data

6  from your use of third-party apps if WAA or sWAA was off?

7  **A.**  No.

8  **Q.**  Was there anything Google's lawyer showed you, any

9  document or evidence, about Google Account which shows that

10 Google actually explained to anyone what was or was not saved

11 in that Google Account?

12 **A.**  No.

13 **Q.**  Was there anything she showed you that told you that your

14 data would still be saved somewhere outside of your so-called

15 Google Account?

16 **A.**  There was nothing.

17 **Q.**  Did she ever show you a definition of Google Account?

18 **A.**  No.

19 **Q.**  She did show you one paragraph of the privacy policy.  Do

20 you remember that?

21 **A.**  Right.

22 **Q.**  Okay.  Now, that section that she showed you suggested

23 that Google can collect certain information from users,

24 including app activity.  Do you remember that?

25 **A.**  Yeah.

1   **Q.**    Now, was that with WAA on or WAA off?

2   **A.**    That would be with WAA on.

3   **Q.**    Is the privacy policy essentially divided into two

4   separate parts?

5   **A.**    Yes.  So would you like me --

6   **Q.**    Yeah.  The first part of the privacy policy is what you

7   talked about on direct, where Google promises control of what

8   Google collects; right?

9   **A.**    Right.

10  **Q.**    And it also discusses privacy controls?

11  **A.**    Right.

12  **Q.**    And that's what directs you to the WAA and sWAA --

13  **A.**    Right.

14  **Q.**    -- privacy controls buttons?

15      Are those the sections that -- in the privacy policy that

16  we focused on during the direct examination?

17  **A.**    Right.

18  **Q.**    All right.  Let's talk about the second part of the

19  privacy policy.  Is that part focused on what information

20  Google can collect if users don't choose to use any privacy

21  controls like WAA or sWAA?

22  **A.**    Right.  It's if you don't choose to turn it off, those

23  settings -- I mean, those -- that privacy part would be valid.

24  **Q.**    During the cross-examination, which section did Google's

25  counsel show you, the part about how you control your data

1    through privacy controls or what Google collects when you don't

2    use privacy controls?

3    **A.**    What Google collects when -- the second part.    Sorry.

4    **Q.**    That's fine.

5         You were asked some questions about de-identified data

6    too; right?

7    **A.**    Right.

8    **Q.**    Do you think your device ID, unique identifiers,

9    IP address, location, age, and all your app browsing provide a

10   picture of who you are?

11   **A.**    Yeah.

12   **Q.**    If someone recorded you all day every day for the last

13   seven years without permission, but just scratched out your

14   name on the video file, would you be okay with that?

15   **A.**    No.    It's still me.

16   **Q.**    Now, you heard Google's lawyer suggest that all of your

17   data, the data that goes into the shadow account, is

18   de-identified because it doesn't have your name, your email

19   address, or your phone number.    Do you remember that?

20   **A.**    That's what they said.

21   **Q.**    I think she said Mr. Monsees said so.

22   **A.**    Right.

23   **Q.**    And you disagreed with that?

24   **A.**    Right.

25   **Q.**    Do you understand that Dr. Hochman looked at the so-called

 1   de-identified data that's specific to you?

 2   **A.**   Right.

 3   **Q.**   What are some of the things he found?

 4           **MS. AGNOLUCCI:**  Objection, Your Honor.  He's

 5   testifying.

 6           **THE COURT:**  Sustained.

 7   **BY MR. LEE:**

 8   **Q.**   Was your first name included in that dataset?

 9   **A.**   It was.

10   **Q.**   Last name?

11   **A.**   It was.

12   **Q.**   Email address?

13   **A.**   It was.

14   **Q.**   Phone number?

15   **A.**   It was.

16   **Q.**   The name of your career coach?

17   **A.**   It was.

18   **Q.**   Knowing this, do you trust that Google actually saves --

19   what it saves in its shadow account really has no link to your

20   name, email address, phone number, or other personal

21   information?

22   **A.**   Not at all.

23   **Q.**   You were asked a lot of questions about when you turned

24   WAA off and then it turned back on and you turned it back off

25   after the lawsuit.  Do you remember that?

RODRIGUEZ - REDIRECT / LEE

1    **A.**    Right.

2    **Q.**    Okay.  I just want to be clear about something.

3          There were two columns in that document; right?

4    **A.**    Yes.

5    **Q.**    There was a column for WAA?

6    **A.**    Right.

7    **Q.**    And a column for sWAA?

8    **A.**    Right.

9    **Q.**    Do you remember that?

10   **A.**    (Nods head.)

11   **Q.**    You understand that this case is about collecting data

12   from the use of third-party apps, which is controlled by the

13   sWAA button; right?

14   **A.**    Right.

15   **Q.**    And was sWAA off the entire time, beginning in 2018?

16   **A.**    Yes.

17   **Q.**    Years before this lawsuit?

18   **A.**    Yes.

19   **Q.**    Did it remain off the whole time?

20   **A.**    Yes.  For the seven years, I think it is.

21   **Q.**    We heard Google's attorney bring up terms of service or a

22   privacy policy from third-party apps.  Do you remember that?

23   **A.**    Yes.

24   **Q.**    Let me ask you this:  Before we talk about any specific

25   terms of service from an app, did you ever see a disclosure

**RODRIGUEZ - REDIRECT / LEE**

1 from any app that you've ever used that said it shares your

2 data with Google even when WAA is turned off?

3 **A.** No.

4 **Q.** Did counsel for Google show you any disclosure that said

5 that the app can share information with Google even with WAA

6 turned off?

7 **A.** No.

8 **Q.** Even in the document that was shown, the Target terms of

9 service, did that one ever -- did that terms of service for

10 Target tell you that Google would still collect data even if

11 WAA was off?

12 **A.** No.

13 **Q.** Now, I remember you said that -- something like it's not a

14 big deal if Adobe Analytics or I think it was called

15 Crazy Egg --

16 **A.** I think so.

17 **Q.** -- has data from that one app. Is that a different

18 concern than Google having information?

19 **A.** Right. That's what I was trying to explain.

20 **Q.** And did you have sWAA off when you used the Target app?

21 **A.** I did.

22 **Q.** So whatever Target says about what it may send to

23 Google Analytics, what was your -- what was your impression of

24 what would happen with WAA off?

25 **A.** With WAA off and sWAA or just WAA?

RODRIGUEZ - REDIRECT / LEE

 1    **Q.**    WAA and sWAA off, yes.

 2    **A.**    WAA and sWAA, that --

 3          **MS. AGNOLUCCI:**  Your Honor, we're now getting into

 4    the Court's ruling on the MIL.

 5          **MR. LEE:**  She opened the door, Judge.  We're talking

 6    about the terms of use.  She asked him about his understanding,

 7    and I'm allowed to draw that out in redirect.

 8          **THE COURT:**  You can proceed.  Overruled.

 9          **THE WITNESS:**  Can you ask the question again?  Sorry.

10    BY MR. LEE:

11    **Q.**    Sure.

12          Sticking to the Target ad -- I mean, the Target terms of

13    service, if WAA was turned off, would you expect Google to

14    collect any of your app activity from the Target site?

15    **A.**    No.

16    **Q.**    Was there anything in that Target policy that suggested

17    that Google would collect your data if sWAA was off?

18    **A.**    No.

19    **Q.**    You were shown a portion of a course agreement.  I think

20    it was a Google course or something?

21    **A.**    Right.

22    **Q.**    That talked about Google receiving information that you

23    furnished in connection with that course?

24    **A.**    Right.

25    **Q.**    Do you remember that?

1    **A.**    Mm-hmm.

2    **Q.**    Did this have anything to do with Google collecting any

3    data from your use of mobile apps?

4    **A.**    No.

5    **Q.**    And in that case, you consented?

6    **A.**    Right.

7    **Q.**    Did you consent, when you turned WAA off, to Google

8    collecting any of your app activity data?

9    **A.**    No.

10            **MR. LEE:**  No further questions.

11        Thank you very much, Mr. Rodriguez.

12            **THE WITNESS:**  Thank you.

13            **MR. LEE:**  Appreciate it.

14            **THE COURT:**  Anything further?

15            **MS. AGNOLUCCI:**  Nothing further, Your Honor.

16            **THE COURT:**  Very well.  You may step down.

17            **THE WITNESS:**  Thank you.

18                    (Witness excused.)

19            **MS. BONN:**  Your Honor, plaintiffs call Mr. Lasinski.

20            **THE COURT:**  Very well.

21      (Witness enters the courtroom and steps forward to be sworn.)

22            **MS. BONN:**  Your Honor, I understand we may need to

23        trade some binders.  It will take just a moment.

24            **THE COURT:**  Yes.

25            **MS. BONN:**  What time would be appropriate for a break?

LASINSKI - DIRECT / BONN

 1  Should we do it now?

 2          **THE COURT:**  Not quite yet.  Let's go to about 10:15.

 3          **MS. BONN:**  Thank you.

 4                    (Pause in proceedings.)

 5          **THE COURTROOM DEPUTY:**  Could you please raise your

 6  right hand?

 7                    **MICHAEL JAY LASINSKI**,

 8  called as a witness for the Plaintiffs, having been duly sworn,

 9  testified as follows:

10          **THE WITNESS:**  I do.

11          **THE COURTROOM DEPUTY:**  Thank you so much.  Make sure

12  you don't slide off the stair there.

13      Could you please state your full name for the record and

14  spell your last name?

15          **THE WITNESS:**  Sure.  It's Michael Jay Lasinski, and my

16  last name is spelled L-a-s-i-n-s-k-i.

17          **THE COURTROOM DEPUTY:**  Thank you.

18          **THE WITNESS:**  Thank you.

19                    **DIRECT EXAMINATION**

20  BY MS. BONN:

21  **Q.**   Good morning, Mr. Lasinski.

22  **A.**   Good morning.

23  **Q.**   Have you been retained by the plaintiffs as an expert

24  witness on damages in this case?

25  **A.**   Yes, I have.

1  Q.   And have you prepared some slides to help explain your

2  testimony about damages to the jury and to the Court?

3  A.   I have, yes.

4  Q.   Okay.

5       MS. BONN:   Could we please show Mr. Lasinski's first

6  slide regarding his professional background?

7       Next.   Thank you.

8       THE COURTROOM DEPUTY:   Are these being published to

9  the jury?

10      MS. BONN:   I think so.   There was no objection.

11      THE COURT:   Is someone objecting?

12      MS. BONN:   I don't think so.

13      THE COURT:   Go ahead.

14      MS. BONN:   Thank you.

15 BY MS. BONN

16 Q.   Could you please introduce yourself to the jury?  And why

17 don't we start at the bottom of the page, with your educational

18 background.

19 A.   Sure.   I have both a bachelor's in electrical engineering

20 as well as a master's in business administration, really with a

21 focus in finance and accounting.   Both are from the University

22 of Michigan.

23 Q.   After you received your training in engineering and then

24 your master's in business administration and financial

25 accounting, what did you do for work?

1   A.   Well, I started out working for Ford Motor Company in

2   their electronics division, and I actually wrote the software

3   for the first remote entry systems that went onto Ford cars.

4        And then after that, I went into public accounting.  I

5   went to a company called Coopers & Lybrand.  It's now part of

6   PricewaterhouseCoopers, one of the Big Four accounting firms.

7        And then after that, I moved into the career that I have

8   now, which was valuing and testifying in matters similar to

9   this, around intellectual property.

10  Q.   Do you have any certifications in the areas of accounting

11  or finance?

12  A.   Yes, I do.  I'm a certified public accountant in the state

13  of Illinois.  I also am certified in financial forensics.  And

14  then I'm a certified licensing professional, which is a

15  designation that is put forward by the -- well, it was started

16  by the Licensing Executive Society.

17  Q.   Let's just take a step back for a minute.

18       You said that after you worked for PwC, you moved into the

19  career that you have now.  Can you describe what it is you've

20  been doing for the last approximately 30 years?

21  A.   Yeah.  It's actually 32 years.  So I've been focused on

22  valuing intellectual property in all sorts of different

23  contexts, you know, licensing transactions when people buy and

24  sell patents and trademarks and that type of intellectual

25  property.  And then I've also been testifying in cases related

1   to intellectual property, and now more broadly breach of

2   contract cases and, you know, other commercial damages cases.

3   **Q.**   Outside of litigation, when you're just working on valuing

4   intellectual property, like patent portfolios, without

5   disclosing any confidential clients, can you describe to the

6   jury the kind of work you've done for Fortune 500 companies,

7   especially in the technology sector?

8   **A.**   Sure.  So one of the areas that I get hired in a lot is to

9   value intellectual property as it relates to mobile devices,

10  the way they, like, talk to the cell towers and stuff like

11  that.  That's called standard essential patents.  I've done

12  that for a number of both patent owners, so people that own the

13  patents and license to those companies, as well as the

14  companies that take licenses for those patents.  And I've done

15  that a lot in the automotive space as well.

16  **Q.**   You mentioned a certification that you've received from

17  the licensing professional society.  Can you describe what that

18  society is?

19  **A.**   Sure.  The Licensing Executive Society is a society that

20  focuses on training people about intellectual property.  So how

21  you get patents, where you need to file, that type of thing, as

22  well as transacting those types of intellectual properties and

23  then also, you know, matters regarding litigation and that type

24  of thing.

25      And it's a global organization.  We have regional

1    chapters.  The U.S. -- U.S. and Canada are combined.  That's

2    the biggest chapter.  And then, you know, we have chapters

3    throughout the world.  I think that there's 32 different

4    chapters, and I think we have about 6- or 7,000 members

5    worldwide.

6    **Q.**   Have you ever been elected to a leadership position in the

7    Licensing Executive Society?

8    **A.**   Yes, I have.  I was both the president of U.S.A. and

9    Canada, so the biggest chapter; and that was, I think, 2009,

10   going into 2010.  And then I was -- I'm the past-past president

11   of the Licensing Executive Society International.  So two

12   presidents ago.

13   **Q.**   Let's focus a little bit on your work as a litigation

14   consultant.

15       What are the types of matters where you've served as an

16   expert witness in cases like this one or other matters?

17   **A.**   Sure.  So I've served as an expert witness -- you know,

18   really, starting out, I started on patent infringement cases,

19   trademark infringement cases, and I did that for a number of

20   years.  I did both plaintiff and defendant side.

21       And then I started getting into some different types of

22   cases, a class action case, also some big breach of contract

23   cases.  And sometimes those go to trial; sometimes they don't.

24   Sometimes they go to arbitration instead.  And so I've

25   testified in a lot of those types of cases.

LASINSKI - DIRECT / BONN

1  Q.   And in recent years have you also been an expert in a

2  number of data privacy cases like this one?

3  A.   Yes, I have.

4  Q.   Okay.  When you work as an expert witness in the context

5  of a litigation, what's the approximate division between your

6  work on behalf of plaintiffs versus defendants?

7  A.   Well, it varies year to year, but it's -- I think over my

8  career it's been 50-50 plaintiffs, 50-50 defendants.

9  Q.   Okay.  And have you worked with my law firm, Susman &

10 Godfrey, on prior litigations other than this one?

11 A.   Yes, I have.

12 Q.   Can you just describe, over the course of the last

13 20 years or so, approximately how many times have you worked on

14 other matters with my law firm?

15 A.   I think it's about five --

16 Q.   And have --

17 A.   -- five times.

18 Q.   -- all of those matters been with me or the lawyers on

19 this case?

20 A.   No.  They've been with other lawyers.  I mean, one of the

21 matters was with you, Ms. Bonn, but then there are other

22 lawyers that I've worked with in the past as well, both

23 plaintiff and defendant side.

24 Q.   And if you had to look over the course of the last

25 20 years, was Susman Godfrey the sole source of your litigation

1    consulting business?

2    **A.**    No.  It's not even close, no.

3    **Q.**    Okay.  Approximately how many hours have you and your team

4    worked on this case in particular?

5    **A.**    In this case in particular, we've worked for over

6    4,000 hours on this case.

7    **Q.**    And I know you've sort of changed firms while the case has

8    been pending.

9    **A.**    Sure.

10    **Q.**    Can you just explain where you work and where your team

11    works?

12    **A.**    So right before the pandemic, I sold my firm to a company

13    called Ankura Consulting, and my team and I went to

14    Ankura Consulting.  I worked there for approximately

15    four years.

16        After that, I worked at another firm for a year.  And then

17    I just recently got back into litigation consulting, IP

18    valuation, and that type of stuff, but my team for this project

19    remains at Ankura.  So I'm at a company called HKA, which is

20    basically a parallel firm to Ankura, similar firm to Ankura,

21    but my team is at Ankura.  And I do have one person at HKA

22    that's been helping me with this too.

23    **Q.**    And are you compensated for your time in this matter?

24    **A.**    Well, my firm is compensated for my time, yes.

25    **Q.**    And do you charge your standard hourly rate?

1  **A.**    Yes, I do.

2  **Q.**    Over the years, approximately how many times have you

3  testified in a case that's actually proceeded to trial?

4  **A.**    Well, I think -- I think if you include not just trial but

5  arbitrations, I think it's closing in on 20 times.

6  **Q.**    And have those been on matters of valuation and damages?

7  **A.**    Yes, they have been.

8  **Q.**    And in addition to the times you've testified in trial,

9  approximately how many times have you been an expert witness

10  and testified in a deposition?

11  **A.**    I think I'm closing in on -- you know, it's definitely

12  more than 50 times, but it could be as many as 60 or 70.

13  **Q.**    Over the course of the 30-plus years you've been doing

14  this work and testifying in dozens of trials, have you ever had

15  an opinion of yours excluded by a court in whole?

16  **A.**    Yes, I have.

17  **Q.**    And can you just explain what happened?

18  **A.**    Sure.  That was in a patent infringement matter.  It

19  related to my interpretation of a cost savings technology in a

20  hypothetical negotiation.  Really nothing to do with what we're

21  talking about today.

22  **Q.**    Are hypothetical negotiation constructs the kind of issue

23  that are applicable in this data privacy case?

24  **A.**    No.  That's a patent specific.

25  **Q.**    Okay.

1      **MS. BONN:**  Your Honor, the plaintiff offers and

2  tenders Mr. Lasinski as an expert in the areas of valuation of

3  intangible assets and intellectual property and the computation

4  of damages.

5      **MR. HUR:**  No objection, Your Honor.

6      **THE COURT:**  Mr. Lasinski will be so designated.

7      **MS. BONN:**  Thank you.

8  **BY MS. BONN**

9  **Q.**   Let's go to the next slide you prepared.  And can you just

10  explain to the jury:  What were the questions that you were

11  asked to answer and assigned with investigating in your role as

12  an expert in this case?

13  **A.**   Sure.  I was asked to look at two different types of harm,

14  if you will.  The first is what we call unjust enrichment, or

15  Google's profits from the conduct at issue.  And that caused me

16  to look at, you know, what was the revenue that Google

17  generated, extra revenue that Google generated; what costs

18  would they have incurred in generating that revenue; and how --

19  what would be appropriate to measure those to determine what

20  unjust enrichment is.

21      And then I was asked for a separate calculation, which is

22  compensatory damages or actual damages, and that really is,

23  you know, how much the class members should have been paid for

24  the data that was taken from them.

25  **Q.**   And is there an analogy that you can use just to describe

1  these concepts of unjust enrichment calculations on the one

2  hand versus compensatory damage on the other?

3  **A.**    Sure.  So, you know, maybe it's not a perfect analogy for

4  this case.  But if someone takes something of yours of value,

5  let's just say like a necklace or a piece of jewelry, they come

6  in and you say, "You can't take this," but they do take it and

7  they go ahead and sell it and they profit from that, that's the

8  profits that they made, and that's one way to determine

9  economic damages.

10       The other way is if they took it from you and you value

11  that and you think you should be paid for it, it's something

12  that you put a price on, that's another form of damages that

13  can be calculated in this matter.

14  **Q.**    Thank you.

15       Let's go to the next slide, and we're about to sort of

16  walk you through the information you considered and how you

17  reached the opinions that you did.

18       But can you just summarize for the jury your ultimate

19  opinions based on your analysis?

20  **A.**    Sure.  So remember I broke them down into two different --

21  two different categories, unjust enrichment and compensatory

22  damages.  This slide shows, on the left-hand side, what the

23  unjust enrichment is that I calculated, and I had to break it

24  up between two different classes.  I understand the first class

25  is actually folks that use Android phones, or Android devices,

1    I should say; and then the second class is folks that use

2    non-Android devices.  For the most part, that's Apple, that's

3    iOS, but it could be other non-Android devices.

4        And what I found was that there was at least $929 million

5    of unjust enrichment for Class 1 and $569 million of unjust

6    enrichment for Class 2, or the non-Android users.

7    **Q.**   And then what about on the right side?  Let's talk about

8    that second assignment, the compensatory damages.  What is this

9    based on?

10   **A.**   So this is based on Google's non-payment or the amount

11   that Google should have paid for the data that it took, and I

12   calculate for Class 1, which I just described, at least

13   $266 million for Class 1 and $256 million for Class 2.

14   **Q.**   And you used the words "at least."  Is your opinion shown

15   on the right-hand side a ceiling of what the damages are or a

16   floor?

17   **A.**   No, it's a floor.  It's a very conservative estimate,

18   you know, based on one-time payment.

19   **Q.**   Okay.  Do you understand that there are other forms of

20   harm that folks have testified about in this case, like

21   Dr. Hochman testifying about battery degradation and bandwidth

22   use, that you have not quantified in this case?

23   **A.**   Yes, that is accurate.

24   **Q.**   And can you explain why that is?

25   **A.**   Well, I understand that those types of harm can be nominal

1    damages; and so at the end of the day, that's a different type

2    of harm.  I've only been asked to calculate these two types of

3    harm, and so I haven't calculated, you know, specific battery

4    degradation.

5    **Q.**    And, likewise, there were some questions earlier about

6    whether some of the plaintiffs were disturbed or had some

7    distress about their data being taken.  Similarly, what is your

8    understanding about nominal damages as it applies to that

9    category versus a computation?

10         **MR. HUR:**  Objection, Your Honor.  Foundation.

11   Undisclosed opinion.

12         **MS. BONN:**  Maybe I can just rephrase.

13   **BY MS. BONN**

14   **Q.**    Sir, have you calculated or are you offering an opinion

15   attempting to compute the value to the class of any emotional

16   distress?

17   **A.**    No, I'm not.  I'm calculating on fair price.

18   **Q.**    Okay.  Thank you.

19         Let's go to the next slide, please.

20         Taking a step back, before you began your work and your

21   analysis in this case, was it important for you to understand

22   how Google generates revenue from the data that's at issue in

23   this case?

24   **A.**    Yes, it was.

25   **Q.**    And can you explain to the jury what you wanted to

1  demonstrate with this slide in terms of your understanding?

2  **A.**   Sure.

3       So one of the ways that Google generates revenues is

4  through serving ads, and Google gets paid for serving those ads

5  by the advertisers.  Google tracks information about those ads

6  and the publishers of those ads and uses that information to

7  create algorithms to make that most efficient.

8       And so this is basically showing that sort of virtuous

9  cycle of, you know, advertisers pay Google, Google serves the

10  ads, and then they track what's happening with the ads.  And so

11  then that goes back into the cycle so, you know, the system, if

12  you will, can be most efficient.

13  **Q.**   And we heard a little bit from Dr. Hochman earlier in this

14  case about conversion tracking, how Google links what happened

15  after an ad was shown and what action a user took.  Is that

16  something that you considered in forming your opinions in this

17  case?

18  **A.**   Yes.  Yes, it is.  In fact, we'll see that Google

19  attributes revenue to conversion measurement.

20  **Q.**   Okay.  Let's go to the next slide.

21       And focusing in on conversions, can you explain what you

22  considered in this case with respect to Web-to-app conversions

23  and what that means?

24  **A.**   Sure.  So I'm going to talk about three different

25  products.  One is a product called App Promo, one is a product

1  called AdMob, and the other product is called Ad Manager.  And

2  if you look at sort of the top bar here, Web-to-app

3  conversions, I understand that the information that was

4  provided to me from a revenue standpoint, I have information

5  when an ad was served on a Web -- the Web.  And if you go to an

6  app for an app advertisement, someone advertising an app, then

7  I have that information for Web-to-app conversions.

8  Q.   What about if there's an ad not for an app, just, let's

9  say, an ad on the *New York Times* website for a Nike shoe and it

10 takes someone to a shoe app on their phone that has a Google

11 tracker.  Is that type of revenue from a Web-to-app conversion

12 outside of App Promo something that you calculated in your

13 unjust enrichment scenario?

14 A.   No, it's not.

15 Q.   Okay.  And were you provided with that?

16 A.   No, I was not.

17 Q.   Okay.  Let's talk about app-to-app conversions.  Can you

18 explain how that factored into your opinion in this case?

19 A.   Sure.  App-to-app conversions, like I said, I'm going to

20 talk about AdMob and Ad Manager; and if you saw an ad on an app

21 and then you were taken to another app to convert, that would

22 be in the data that I've included in my report.

23 Q.   Okay.  Let's go to the next slide.

24     And, finally, can we talk about app-to-Web conversions?

25 Like someone is shown an ad by Google in a third-party app and

1  then they're taken to a website to convert.  How did that

2  factor into your opinions?

3  **A.**   I included that in the data that was provided.  Well, it

4  was included in the data that was provided to me and I analyzed

5  that.

6       And I should just -- I should just be clear.  Everything

7  that I'm working towards is getting to third-party apps.

8  **Q.**   Thank you.

9       Let's look at the next slide.

10      And with that understanding in mind, can you explain to

11  the jury what kinds of information you and your team considered

12  as you were spending, as you said, 4,000 hours preparing in

13  this case?

14  **A.**   Sure.

15      So I'll start on the left-hand side in the bottom, "Public

16  Filings."  Google is a public company.  They are required to

17  file financial information.  I reviewed their public filings.

18      Expert reports.  We heard Dr. Hochman testify earlier.

19  We're going to hear other experts from the other side testify

20  that have opinions about my opinions.  I read those reports.  I

21  was actually able -- for our side of the case, for the

22  plaintiffs' side of the case, I was able to actually to talk to

23  the experts if I had questions about their reports.

24      Google emails, you know, we've seen a lot of testimony

25  about Google emails, and they can provide context in cases,

LASINSKI - DIRECT / BONN

1  like when there's an attachment, like what the attachment means

2  and that type of stuff.

3      Google performs some analyses that I looked at and relied

4  upon in my analysis.

5      There's presentations.  We'll see a presentation that

6  they -- that they had created for one of the -- that includes

7  data on one of the areas that I'm looking at, and I looked at

8  those as well.

9  **Q.**   Okay.  Let's look at the next demonstrative slide you

10  created.

11      And you mentioned you looked at and considered Google's

12  internal analyses.  What are the kinds of internal Google

13  analyses that were relevant as you were trying to calculate the

14  unjust enrichment in this case?

15  **A.**   Sure.

16      This is just a summary of them, but if you look, for

17  example, on the left-hand side with the circle, that's an

18  analysis they did for GAP consent or ads personalization

19  consent, and they were calculating, in this case, what the

20  revenue impact -- and I believe it was in Europe -- what the

21  revenue impact in Europe would be if people were not consenting

22  to ads personalization.

23      If you look on the right-hand side, it's similar.  There's

24  an analysis that they did.  It was called ChromeGuard.  And it

25  related to their analysis if they were to get less revenue from

1    people that were searching in what's called incognito mode or

2    like a private browsing mode.  So I looked at that.

3        Sort of in the middle here, I had mentioned that I'm going

4    to talk about App Promo.  This is -- this is a graph in one of

5    their presentations that talks about App Promo's growth over

6    time.  The bars are on a global basis here.

7        And then in the bottom left-hand corner, we're talking

8    about sWAA off, you know, where the button is pushed, so sWAA

9    is off.  That's data that Google provided to me on the number

10   of accounts that were sWAA off.

11   **Q.**  You mentioned relying on a couple of Google's internal

12   analyses, the GAP analysis they did and something called

13   ChromeGuard about incognito.

14       How, if at all, did that provide a blueprint for you in

15   analyzing Google's unjust enrichment or unjust profits here?

16   **A.**  Well, for the GAP analysis -- analyses, one of the -- one

17   of the factors that they considered was signed in, and I

18   considered that factor in my analysis also.  I understand that

19   you need to be signed in to have your sWAA button off, so

20   that's one of the things that I used.

21       If you look at, sort of on the right, the ChromeGuard

22   analyses, one of the things that they're calculating there is

23   the revenue impact to conversion tracking there, and so I used

24   that type of analysis in my calculations.

25   **Q.**  Okay.  Let's go to the next slide, and we're going to

1   start walking through your calculations of profits on each of

2   the three products that you mentioned.

3       Before we do --

4           THE COURT:  Actually, this is probably a good time for

5   the break.

6           MS. BONN:  Perfect.

7           THE COURT:  Members of the jury, remember my

8   admonitions.  Do not discuss this amongst yourself or with

9   anyone else, and we'll try to get started about 10:30.

10      (Proceedings were heard out of the presence of the jury.)

11          THE COURT:  We're out of the presence of the jury.

12      We seem to be missing Exhibits 138, 140, and 142,

13  plaintiffs' exhibits.  Can you get us copies of those?

14          MR. DAVID BOIES:  Absolutely.

15          MS. BONN:  Yes.

16          THE COURT:  Okay.  Thank you.

17                  (Recess taken at 10:17 a.m.)

18              (Proceedings resumed at 10:32 a.m.)

19      (Proceedings were heard out of the presence of the jury.)

20          THE COURT:  Okay.  Can we bring the jury out?

21          MS. BONN:  Yes.

22          THE COURT:  Okay.

23      (Proceedings were heard in the presence of the jury.)

24          THE COURT:  The jury is present.

25      Members of the jury, we were talking about the temperature

1  a moment ago.  Is the temperature okay?  Is it too cold?  Too

2  warm?  How many people think it's okay?

3                    (No audible response.)

4          THE COURT:  How many people think it's too warm?

5                    (No audible response.)

6          THE COURT:  How many people think it's too cold?

7                    (Hands are raised.)

8          THE COURT:  All right.  We'll see what we can do about

9  maybe tweaking it a little.  As we go through the day, it sort

10 of naturally gets warmer and then it'll overcompensate, but

11 we'll do the best we can.

12     Okay.  You may proceed.

13         MS. BONN:  Thank you, Your Honor.

14 BY MS. BONN

15 Q.  And someone reminded me at the break that I never actually

16 introduced myself.  Just for everyone, my name is Amanda Bonn.

17     Why don't we take a look at the slide that we were just

18 about to start with before the break.

19 A.  Okay.

20 Q.  And to bring us back, we're talking about the profits that

21 Google made.

22     Did you look at all of the profits that Google may have

23 made from the sWAA-off data they collected from the class?

24 A.  No, I did not.

25 Q.  Can you give some examples of the kinds of revenues or

LASINSKI - DIRECT / BONN

1  profits that you conservatively did not consider?

2  **A.**   Sure.

3      Well, my understanding is that the sWAA-off information

4  gets used in a lot of different areas.  We heard Mr. Hochman

5  talk about AI, machine learning.

6          **MR. HUR:**  Objection, Your Honor.  Foundation.

7          **THE COURT:**  Well, sustained.  I think you can...

8  **BY MS. BONN:**

9  **Q.**   Did you quantify any unjust profits that Google may have

10 earned from using sWAA-off data in things like their machine

11 learning?

12 **A.**   No, I didn't.

13 **Q.**   Were your calculations of Google's profits limited to the

14 three lines of revenue that we see on this slide?

15 **A.**   Yes.

16 **Q.**   Let's start with the first, App Promo.  And you mentioned

17 this a little bit earlier, but just to set the stage, what is

18 App Promo, and what is that revenue line that you looked at?

19 **A.**   App Promo is advertising apps.  So it's, you know, someone

20 wants you to download an app, they advertise for that, and so

21 that's advertising apps.

22 **Q.**   Okay.  Why don't we start by -- we're going to walk

23 through each of these three lines, and we're going to start

24 with App Promo.

25      Why don't we turn to the next slide.

1    **A.**    Sure.

2    **Q.**    And can you just explain to the jury and the Court the

3    process that you used to calculate Google's profits from the

4    conduct at issue, sWAA-off data collection, with respect to

5    App Promo?

6    **A.**    Sure.

7         This is sort of a roadmap about what we're going to talk

8    about as we go through calculating this for App Promo.

9         Start with U.S. revenue, because this is a case in the

10   U.S.; deduct costs that are appropriate to come down to unjust

11   enrichment, because we're calculating not just revenue but

12   profits; and then making sure that we are consistent with the

13   data at issue here.

14        And so I make cuts for signed in, for sWAA off, and then

15   the share of profit that Google attributes to certain

16   conversion types and, in this case, GA4F.

17   **Q.**    Okay.  Let's turn to the next slide.

18        And is this a demonstrative that you've created to show

19   the jury and the Court some examples of the detailed

20   calculations that you performed --

21   **A.**    Yes.

22   **Q.**    -- in this analysis?

23   **A.**    This basically follows the roadmap that I just showed up

24   there, but I think we're going to get into more detail in the

25   coming slides.

1  **Q.**   And the jury's heard this for other experts but for you,

2  did you prepare detailed expert reports in this case that

3  included backup spreadsheets and schedules with your

4  calculations?

5  **A.**   Yes, I did.

6  **Q.**   And is that some of what's being shown here?

7  **A.**   Exact -- yes, exactly.

8  **Q.**   Okay.  Let's go to the next slide.

9       And we're going to talk about how you could isolate the

10  U.S. App Promo revenue rather than just looking at global

11  everywhere.

12       So can we zoom in a little bit more on the schedule?

13       And could you just explain, how did you determine Google's

14  U.S. App Promo revenue?

15  **A.**   Well, we were given a number of different types of

16  information.  First we were given profit and loss statements

17  that had Ad Manager -- I'm sorry -- App Promo in them.  We were

18  given what I understand to be financial pulls from their

19  financial database -- databases that give us the revenues.  And

20  so I used a combination of the P&Ls, or profit and loss

21  statements, and these financial pulls from their -- from their

22  databases.

23       **MS. BONN:**  And, Mr. Boles, can we just scroll to the

24  right a lit bit so that we can see the latter years?

25       Let's go a little bit more to the right.

LASINSKI - DIRECT / BONN

1  BY MS. BONN

2  Q.   Okay.  And based on the data that you reviewed from the

3  P&Ls and the data pulls from the financial accounting systems,

4  what was the total U.S. App Promo revenue that you calculated

5  over the class period?

6  A.   Well, you can see that.  That's the top line.  It's 31 --

7  well, basically, $32 billion.

8  Q.   Okay.  Do you understand that Google has their own damages

9  expert, Dr. Knittel, who's raised a dispute about whether some

10 of these years on your schedule actually reflect global

11 App Promo revenue as opposed to U.S.?

12 A.   Yes, I do.  My understanding is that relates to the years

13 2017, 2018, and 2019.  Well, and 2016 as well, the half of year

14 2016.

15       MS. BONN:  Can we scroll over so that we can see 2016

16 through 2019?

17 BY MS. BONN

18 Q.   Okay.  And so can you explain to the jury, given that this

19 dispute was raised over 2016 to 2019, were you able to confirm

20 your opinion that the revenues you've listed for those years

21 are, in fact, App Promo U.S. revenue as opposed to global?

22 A.   Yes, I can.

23 Q.   Okay.  Let's take a look, for example, at 2019.

24       Using the 2019 figure, can you explain how you were able

25 to confirm that that figure from Google's P&Ls was, in fact,

1    reflecting U.S. App Promo revenue?

2    **A.**    Sure.

3        So if you look at the figure in 2019, it's $2.781 billion,

4    but we earlier looked at a presentation that was put together

5    by Google which highlighted its global revenues for App Promo.

6    And if you look at the fraction of this, you know,

7    2.781 billion to the overall global revenues, that global

8    revenues is broken down between Asia-Pacific, Europe, and

9    America.

10        My number here, 2.781 billion, which I received from

11    Google, is consistent with the fraction in the Americas, which

12    was about 30 percent of 10 billion, which would be $3 billion

13    and I'm at $2.781 billion.  So I'm within that fraction.

14    **Q.**    Let's go back just to show the Slide Number 9, the

15    demonstrative, I believe, you're talking about, and let's zoom

16    in to the -- that big middle box that says "Apps Buy Side."

17        Okay.  And is this the document from Google that you were

18    able to use to confirm that the 2.781 billion revenue number

19    for App Promo 2019 was U.S.?

20    **A.**    Yes, it is.

21    **Q.**    And now that we've got it up, could you explain how you

22    did that?

23    **A.**    Sure.

24        What this is, is apps buy side reached a $10 billion run

25    rate, which this is App Promo.  And so what you see here is in

1    July of 2019, the business was about a $10 billion business.

2        And then if you consider what I was looking at for U.S.,

3    it was 2.781 billion.  And so that's within the range of what

4    would be in the Americas, and you would expect the U.S. to be

5    the highest percentage of the Americas.  So that gave me

6    comfort that it's a U.S. number.

7    **Q.**   And looking at the -- I know it's a little bit hard to

8    read -- at the very bottom, Mr. Boles -- where it says,

9    "Firebase Global App Promo ARR," sir, is that what you relied

10   on to conclude that this slide in particular was about global

11   App Promo revenue?

12   **A.**   Yes, it is.

13   **Q.**   Okay.

14       **MS. BONN:**  Let's go back to Slide 13, and let's just

15   zoom in, once again, on the numbers so we can see the 2.781.

16   **BY MS. BONN:**

17   **Q.**   So once you confirmed that the 2019 revenue number in the

18   P&L Google provided was, in fact, U.S., what did that tell you

19   about the years that surrounded it, from 2017 to 2020?

20   **A.**   Well, so they were all on the same P&L; and so if one

21   number -- for revenue, if one number is U.S., the other numbers

22   would be U.S.

23       In addition to what I just talked about for 2019, I was

24   able to tie out 2020's revenue as well to a separate document

25   that's not disputed.  And so looking at that and looking at

1    sort of the growth curve that you see here for these revenues,

2    I believe that they're all U.S. revenues.

3    **Q.**    Okay.  Let's talk about the costs.

4        Once you determined Google's U.S. App Promo revenue, did

5    you then make a deduction for certain costs in order to

6    calculate the profits?

7    **A.**    Yes, I did.  And the first deduction that I made was for

8    traffic acquisition costs.

9    **Q.**    Can you explain this concept of traffic acquisition costs

10   and why you thought it was appropriate to make a deduction?

11   **A.**    Sure.

12       I view those costs as incremental costs, so costs that

13   would -- are -- you know, they need to incur to actually

14   generate the revenue.

15       And traffic acquisition costs are, actually -- one way to

16   think of it in sort of a layperson's terms is buying space on

17   the apps so you have the ability to actually display the ad.

18   And my understanding is that Google incurs those costs so they

19   can display the ads on apps.

20   **Q.**    Did you deduct other costs, like fixed operating costs for

21   real estate or employees, in reaching your calculation in this

22   case?

23   **A.**    No.  I did not, and I do not think that there would be any

24   other incremental costs.

25   **Q.**    What is your basis for saying that other fixed costs like

1  real estate or employees would not be appropriate to deduct as

2  incremental costs?

3  **A.**    Well, I've seen no evidence in the record that those would

4  be anything other than fixed.  And then I spoke with

5  Dr. Hochman, who understands Google's business from a technical

6  perspective, and confirmed that understanding with him.

7  **Q.**    Have you seen any evidence in the record that Google has

8  employees with job lines or responsibilities limited to

9  sWAA-off data, like sWAA-off data engineers that would go away

10  if this slice of data were not collected?

11  **A.**    No, I have not.

12  **Q.**    Okay.  Let's go ahead and talk about the next step in your

13  analysis, deducting traffic acquisition costs.

14      What was the basis -- and let's zoom in a little bit so we

15  can see these numbers.

16      And can you just explain the range of traffic acquisition

17  costs that you deducted between 2017 and the end of the class

18  period?

19  **A.**    Sure.

20      So these numbers, for the most part, came from the same

21  P&Ls that we were talking about before because they had booked

22  revenues and then they had traffic acquisition costs on them.

23      And so what I did was I took those numbers from that data

24  and deducted it.  And the range is anywhere between -- I think

25  it's a low of 64 percent on the one hand to a high of

 1    70 percent on the other hand.

 2        In some of the outer years of the calculation, we didn't

 3    get information on traffic acquisition costs so what I've shown

 4    here is that I held that constant.  I forget the specific

 5    years, but it's on -- it's on the slide if you scroll over.

 6            MS. BONN:  Can you scroll over to the right,

 7    Mr. Boles?  Thank you.

 8            THE WITNESS:  So, yeah, after 2021 -- 2021, I held

 9    that ratio of revenues to traffic acquisition costs constant.

10    BY MS. BONN:

11    Q.    And was the basis for holding the traffic acquisition

12    costs constant for those years a stipulation that Google made?

13    A.    Yes, it was.

14    Q.    Okay.

15            MS. BONN:  May we please show to the witness

16    Docket 489, the joint stipulation on Google's supplemental

17    financial productions?

18            THE COURTROOM DEPUTY:  Has this been admitted?

19            MS. BONN:  No.  We're just showing the witness.

20        Let's go to the stipulation, please, 481, Docket

21    Number 481.

22            THE WITNESS:  Yes, this is it.

23            MS. BONN:  And can we turn just so the witness can,

24    please, see the last page?  And can we actually scroll up to

25    Number 15 so that the witness can see it?

LASINSKI - DIRECT / BONN

1    BY MS. BONN

2    Q.   And, sir, is a stipulation a set of facts that Google has

3    agreed are true?

4    A.   Yes.

5    Q.   And have you relied on Google's agreement that these facts

6    are true in forming your opinion?

7    A.   Yes, I have.

8    Q.   Did you rely on Stipulation Number 15 in forming your

9    opinion?

10   A.   I did, yes.

11        MS. BONN:   Your Honor, I'd ask permission to publish

12   Number 15 to the jury so they can understand what he relied

13   upon.

14        MR. HUR:   Your Honor, no objection.

15        THE COURT:   You may.

16        MS. BONN:   Thank you.

17        THE WITNESS:   Okay.   What this says is for the purpose

18   of this litigation, Google states that traffic acquisition

19   costs, as a percentage of corresponding App Promo revenues, did

20   not materially change after 2021 and through the end of the

21   class period, which is September 23, 2024.

22   BY MS. BONN:

23   Q.   Let's go -- oh, go ahead.

24   A.   That's what I relied upon.

25        MS. BONN:   Let's go back to the last slide.

LASINSKI - DIRECT / BONN

1    Thank you.

2    **BY MS. BONN:**

3    **Q.**    And so was that the basis for your decision to hold the

4    traffic acquisition costs ratio of 67.91 constant from 2021

5    through the end of the class period?

6    **A.**    Yes, it was.

7    **Q.**    Okay.  Let's talk about -- and let's zoom out a little

8    bit.

9        You talked about how you were able to confirm that the

10    revenue you relied on from Google's profit and loss statements

11    was U.S. revenue.  What about the costs that they reported,

12    these traffic acquisition costs?  Were you able to confirm

13    whether they were U.S. or global?

14    **A.**    Well, I have a question in my mind as to whether they were

15    U.S. or global given additional information that we received,

16    and I think that there's a reasonable chance that they're

17    global.

18        And the issue with that is if they're global costs against

19    U.S. revenues, then the profit would be much lower versus if

20    it's U.S. versus U.S. costs.

21        **MS. BONN:**    Let's go ahead and show the next slide with

22    the cost curve.

23    **BY MS. BONN:**

24    **Q.**    Okay.  And let's just take a minute and explain to the

25    jury, what was it you saw in the evidence that caused you to

LASINSKI - DIRECT / BONN

1  have a concern that Google provided profit and loss statements

2  for this analysis that had U.S. revenue but global traffic

3  acquisition costs?

4       **MR. HUR:**  Objection, Your Honor.  Foundation and

5  undisclosed opinion.

6       **THE COURT:**  Are you asserting the same objection that

7  we discussed earlier with respect to this demonstrative or just

8  generally you're questioning his capacity to testify on this

9  issue?  I'm not sure what you're objecting to.

10       **MR. HUR:**  Your Honor, it's not an opinion that he

11  disclosed in his report.  He can say what the revenue was, but

12  this opinion as to -- his speculation as to how this was

13  derived is not.

14       **THE COURT:**  Well, I think you can cover that on

15  cross-examination.  Overruled.

16       **THE WITNESS:**  Okay.  So this is going to take a minute

17  because there's a lot of information in this chart, but if you

18  start on the left with the dark green bar --

19  **BY MS. BONN:**

20  **Q.**  Sorry.  On the right or the left?

21  **A.**  I'm sorry.  On the right.

22      If you start on the right with the two dark green bars,

23  you see we were produced information that showed global

24  App Promo revenues.  And in each of those years, it was about

25  $18 billion.

1      The red bars there, those two years included data points

2  which included traffic acquisition costs.  So I understand

3  those to be global traffic acquisition costs because they were

4  in the same spreadsheet as the U.S. global App Promo revenues.

5  **Q.**   Let's pause for a minute just to make sure we understand.

6      For the two years, '22 and '23, that we see on the

7  right-hand side, I just want to make sure I understand.  You

8  received a profit and loss, or a data pull, that showed global

9  App Promo revenues as well as global costs; is that correct?

10  **A.**   I -- so I -- yeah, I don't think it was a profit and loss.

11  I think it was a data pull from their system.

12  **Q.**   And from those latter two years, where the data pull

13  showed global App Promo revenue and global costs, what was the

14  approximate ratio between the costs and the revenue?

15  **A.**   It was between 23 and 25 percent.  For the -- traffic

16  acquisition costs were about 23 to 25 percent.  You can kind of

17  see that in this chart here.

18  **Q.**   And what was it about that that raised questions for you

19  about whether the P&Ls you were given for the earlier years,

20  2017 through 2021, reported global traffic acquisition costs

21  taken against U.S. revenue?

22  **A.**   Well, if you look -- if you look sort of to the left, the

23  left of the dotted line, then, you know, the light red bars

24  there -- well, first, the light green bars are U.S. revenues.

25  The light red bars are the traffic acquisition costs that I

1    understood to be U.S.

2        But if you look at sort of the curve and you see how

3    much -- you know, like 2021 to 2022, there's not a lot of

4    difference between the traffic acquisition costs, and in one

5    case it's global; in the other case, my understanding was that

6    it was U.S.  And then you look back in earlier years, it sort

7    of has what you would expect for a normal growth curve.

8        I -- so that gave me pause to say maybe we have global

9    costs but U.S. revenues for the earlier years, and that's when

10   I came up with an understanding and felt like, you know, there

11   might be a mismatch between the revenues and the costs.

12   **Q.**  Let's go to the next slide, 16, to see if we can

13   understand this.

14       Looking at the first schedule and your original opinion,

15   your opinion in this case on profits, if that 64 to 67 percent

16   traffic acquisition cost ratio was because you were deducting

17   global costs against U.S. revenue, what would that have done in

18   terms of the impact on your calculation of how much profit

19   Google made?

20   **A.**  Sure.  If I just look at the years for which we had data

21   and then hold the last year constant, so '22 and '23 and then

22   hold '24 constant with '23, it has a material impact.  On the

23   one hand, I would calculate $10 billion of revenue after

24   traffic -- profits after traffic acquisition costs; on the

25   other hand, I would calculate about $17 billion of profit after

1    traffic acquisition costs.

2    **Q.**    Nevertheless, was your opinion, your final opinion in this

3    case, based on taking the 67 percent or so that Google reported

4    initially, even though it might be global, and holding it

5    constant through the end?

6    **A.**    Yes, it was.

7    **Q.**    Did you perform an alternative calculation based on

8    alternative assumptions of the ratio of traffic acquisition

9    costs to App Promo revenue during 2022 to 2024?

10    **A.**    I did, yes.

11    **Q.**    And what -- is that what we're looking at on the bottom

12    schedule here?

13    **A.**    That is exactly what we're looking at, yes.

14    **Q.**    And can you explain why you created this alternative and

15    the basis for your assumption?

16    **A.**    Sure.

17         I mean, if this data point is more accurate than the data

18    point that I was using, then this would be a more accurate

19    calculation of what the actual profits were and then,

20    therefore, what the unjust enrichment was.

21    **Q.**    And even in this alternative, is it conservative in that

22    you did not say, "Well, if the ratio is 25 percent, in fact,

23    I'll pull that back to the earlier years"?

24    **A.**    Yes.  I mean, if I had held that ratio constant, similar

25    to what I did in the top schedule for the later years, if I had

1    pulled that back into the earlier years, it would have been a

2    higher profit calculation.

3    **Q.**    Okay.  Let's go to the next slide.

4        Once you had isolated the U.S. App Promo revenue and

5    deducted traffic acquisition costs, what was the next step in

6    your analysis?

7    **A.**    So the next step in my analysis was to calculate the

8    amount of revenue -- well, profits at this point -- the amount

9    of profits at this point that was related to signed-in users

10    because, again, I understand for the sWAA button, to have

11    access to the sWAA button, you need to be signed in.  So I'm

12    only looking at signed-in users here.

13    **Q.**    And why was it that you used this factor, 82.18 percent,

14    to reduce down to signed-in traffic?

15    **A.**    Remember, we talked about the GAP study, the ads

16    personalization study?  That study also looked at a signed-in

17    percentage, and I used the information from that study to

18    calculate this signed-in percentage.

19    **Q.**    And have you seen any evidence in the record to suggest

20    the share of revenue from signed-in users differs in Europe,

21    where that study was analyzing revenue, versus the U.S.?

22    **A.**    No, I have not.

23    **Q.**    Do you understand that Dr. Knittel, the defense expert,

24    has suggested that a different ratio should be applied?

25    **A.**    Yes.  I think he suggested 70 percent, but I think that my

1  number is more appropriate.  It was used in the GAP study, and

2  I understand his calculation -- or I guess it's pulled right

3  from a presentation to be more about accounts and/or traffic,

4  and I'm focused on calculating revenues and profits here.

5  **Q.**   Okay.  Let's go to the next slide.

6       Once you had decreased the profits for only the signed-in

7  revenue, what was the next step in your analysis?

8  **A.**   The next step -- I mean, we're talking about sWAA off

9  here.  So the next step was to get down to the number of users

10  that were sWAA off, so signed in, sWAA off.  Then this is the

11  profit that's related to signed in and sWAA off.

12  **Q.**   And did you base the deduction that you made here for the

13  share of monthly accounts with sWAA off on a series of

14  spreadsheets that Google produced from its Footprints database?

15  **A.**   Yes, I did.

16  **Q.**   And are those the ones we heard Mr. Monsees testify that

17  he supervised the creation of earlier in this case?

18  **A.**   That is my understanding, yes.

19  **Q.**   Is that PX403, 404, and 405?

20  **A.**   Yes, I believe that it is.

21       **MS. BONN:**  May we please show the witness PX405, which

22  is in evidence.

23  **BY MS. BONN:**

24  **Q.**   And this is one of those spreadsheets; is that correct,

25  sir?

1    A.    (Witness examines document.)  Yes.  I believe it is, yes.

2    Q.    And can you just explain to the jury what the spreadsheet

3    that Google produced showed and how it factored into your

4    calculation?

5    A.    Sure.

6          I mean, what they're showing here is -- what I'm able to

7    see here is the number of sWAA on or sWAA actives, and I'm

8    looking for the folks that don't have sWAA active.  So I'm

9    calculating what the sWAA-off accounts are based on this

10   information.

11   Q.    Okay.  And did you create -- did you perform that

12   calculation to determine the number of accounts here that show

13   sWAA off in a schedule in your report?

14   A.    Yes, I did.

15   Q.    And did you supervise the creation of a summary exhibit

16   based on this Google data in a more readable format for the

17   jury?

18   A.    Yes, I did.

19          MS. BONN:  Can we please show the witness PX477?

20   BY MS. BONN:

21   Q.    Is this the summary, we call it a 1006 summary, that you

22   supervised the creation of that summarizes the number of

23   sWAA-off accounts by month according to the three spreadsheets

24   Google produced at PX403, 404, and 405?

25   A.    Yes, it is.

1          MS. BONN:  Your Honor, plaintiffs offer PX477 as a

2    1006 summary.

3          MR. HUR:  Your Honor, we object to the second page of

4    this.  We are okay with the first page.

5          MS. BONN:  That's fine, Your Honor.  Thank you.

6          THE COURT:  All right.  The first page is now

7    Exhibit 477, and it will be admitted.

8          (Trial Exhibit PX477 received in evidence.)

9          MS. BONN:  May we publish to the jury, please?

10         THE COURT:  You may.

11         MS. BONN:  Thank you.

12   BY MS. BONN:

13   Q.   Okay.  And can you just explain to the jury, now that they

14   can see it, what this summary is showing?

15   A.   Yes.  This is the total number of sWAA-off account months

16   during the period, and this breaks it down by year, and then

17   sums up to be, you know, more than 10 billion accounts.

18   Q.   Okay.  Let's go back to the slide that we were just on.

19         And we were talking about this deduction you made, "Share

20   of monthly accounts with WAA off."

21         MS. BONN:  And can we just highlight that row,

22   Mr. Boles.  There we go.  Starting with the 69.13, if there's a

23   way to highlight it.  If not, that's okay.

24   BY MS. BONN:

25   Q.   It looks like there's a big drop-off in the number of

1    sWAA-off accounts between 2016 and 2017.

2        Did you have an understanding, for purposes of your

3    analysis, of what that was based on?

4    **A.**    Yes.

5    **Q.**    And what was that?

6    **A.**    Well, I under- -- I understood that there was -- well,

7    originally sWAA was off by default and then it was turned on.

8        And so I understood that there was a consent bump, so

9    something that was called consent bump, where they were trying

10   to get people to turn their sWAA on instead of off.  And so in

11   those earlier periods, there may be more people with sWAA off

12   and then fewer in the later periods.

13   **Q.**    Okay.  Let's go ahead to the next slide, please.

14       All right.  So now we've talked about taking U.S. revenue,

15   making a deduction for traffic acquisition costs, funneling it

16   down to signed-in and sWAA-off data.

17       Once you had taken all those steps, what was the final

18   step of your analysis in calculating the App Promo profits?

19   **A.**    Sure.

20       For this particular calculation, I was looking at the

21   share of revenue that Google attributes to conversion-type bid

22   against GA4F.  We heard about what, you know, that data is

23   earlier in the case, and that's what I was focused on here.

24   **Q.**    And did you rely on information Google provided for these

25   percentage figures that you provide for this deduction, ranging

 1   from 6 percent in 2016 all the way up to 70.5 percent in 2023?

 2   **A.**   Yes, I did.

 3   **Q.**   Okay.  For the early years, did you rely on a Google sworn

 4   answer to an interrogatory in forming your opinion?

 5   **A.**   Yes, I did.

 6   **Q.**   Okay.

 7          **MS. BONN:**  May we please show the witness only

 8   Interrogatory Number 17.

 9   **BY MS. BONN:**

10   **Q.**   Sir, is this the interrogatory that Google answered and

11   whose answer formed the basis of your opinion as to the

12   percentage of conversions bid against GA for Firebase?

13   **A.**   Yes, it is.

14          **MS. BONN:**  Permission to publish to the jury and the

15   portion he relied on, Your Honor.

16          **MR. HUR:**  No objection, Your Honor.

17          **THE COURT:**  You may.

18          **MS. BONN:**  Thank you.

19   **BY MS. BONN:**

20   **Q.**   Sir, can you just explain to the jury -- and

21   "interrogatory" is a word we've heard thrown around, but can

22   you just explain what that means in terms of your analysis?

23   What is an interrogatory?

24          **THE COURT:**  Well --

25          **MR. HUR:**  Objection.

 1          MS. BONN:  I apologize.

 2          THE COURT:  -- this is not the witness to talk about

 3     what an interrogatory is.

 4          MS. BONN:  Okay.

 5          THE COURT:  Just, members of the jury, interrogatory

 6     questions are asked by one side to the other.  There's an

 7     answer.  The answer is certified as true and the parties

 8     exchange that.  And this, apparently, is one of those

 9     interrogatories that was asked and then responded to -- asked

10     by the plaintiffs and responded to by Google.

11          MS. BONN:  And can we just -- thank you, Your Honor.

12     I appreciate that.

13          Can we just zoom in to the very top question under the

14     interrogatory so we can see what this is about?  Thank you.

15     BY MS. BONN:

16     Q.  And can you just -- we're about to look at the answer, but

17     can you read this introduction to the question and explain to

18     the jury what the purpose of this was in terms of --

19     A.  Sure.

20     Q.  -- your analysis?

21     A.  Sure.

22          [As read]:

23              "Please describe all facts concerning the

24          revenue and profits that Google generates or receives

25          related to the collection, storage, or use of WAA-off

1    data, including for each year of the class period."

2  **Q.**   And then are there a number of specific questions that you

3  helped in coming up with to make sure that you had what you

4  needed for your opinion?

5  **A.**   Yes, there were.

6         **MS. BONN:**   Okay.  Let's show the witness the portion

7  of the answer that he relied upon, please.

8  **BY MS. BONN:**

9  **Q.**   And is this a portion of Google's answer to the

10  interrogatory about conversion types bid against GA for

11  Firebase?

12  **A.**   Yes, it is.

13  **Q.**   And I'm going to ask you to read this portion of the

14  answer, from lines 3 to 8, into the record, and then we'll

15  explain how it factored into your opinion.

16  **A.**   Okay.

17      [As read]:

18          "Google traps" -- "tracks app campaign and add

19      spend that is bid against different types of

20      conversion" -- "conversions.  As of last month,

21      approximately 55 percent of app campaign ad revenue

22      was attributable to conversion types bid against GA4F

23      as opposed to other sources of conversions.  Before

24      project UNO, which launched approximately 1H 2019" --

25      first half of 2019 that means -- "this percentage was

1    significantly lower, approximately 6 percent or less.

2    By October 31, 2019, this percentage was

3    10.6 percent.  By October 21, 2020, it was

4    29.4 percent.  By October 1, 2021, it was

5    49.4 percent.  And by October 1, 2022, it was 54.9

6    percent."

7    **Q.**  How did you rely on that sworn answer by Google in this

8    step in your analysis that we were just talking about regarding

9    App Promo profits?

10   **A.**  Well, I used this in the calculation just the way I showed

11   it just a second ago.

12   **Q.**  Let's go back to the slide at 19, please.

13      And can we see those numbers reflected in your schedule as

14   the ratios you applied for conversion types bid against GA for

15   Firebase from 2016 through 2021?

16   **A.**  Yes.

17   **Q.**  Okay.  What did you rely on as your basis for the ratios

18   you applied for the latter years, 2022 and 2023?

19   **A.**  I understand that there was a stipulation as to those

20   numbers.

21      **MS. BONN:**  Let's please show the witness the

22   stipulation again, Docket 481.

23   **BY MS. BONN:**

24   **Q.**  Is this the stipulation you relied upon as you did

25   earlier?

**LASINSKI - DIRECT / BONN**

1  **A.**   Yes, it is.

2         **MS. BONN:**  Let's please show the witness Stipulations

3  Number 16 and 17.

4  **BY MS. BONN:**

5  **Q.**   Are these the specific stipulations you relied upon in

6  forming this opinion?

7  **A.**   Yes, it is.

8         **MS. BONN:**  May I publish to the jury, Your Honor?

9         **THE COURT:**  Mr. Hur?

10        **MR. HUR:**  No objection, Your Honor.

11        **THE COURT:**  You may.

12        **MS. BONN:**  Thank you.

13  **BY MS. BONN:**

14  **Q.**   Okay.  Could you explain to the jury what these two

15  stipulations are and how you used them in your opinion on

16  conversion types bid against GA for Firebase?

17  **A.**   Sure.

18        Very similar to what we just looked at, these are for the

19  last two years of my analysis, 2023 and 2024, and I used these

20  for those years in the same way I used what we just talked

21  about for conversion -- conversions attributable to bids

22  against GA4F.

23  **Q.**   And just for the record, can you explain, what did Google

24  stipulate was the ratio in 2023?

25  **A.**   In 2023 it was 66 percent, and in 2024 it was

**LASINSKI - DIRECT / BONN**

 1    70.5 percent.

 2    **Q.**    Okay.  Let's go back to the last slide, Number 19.

 3         Are those the percentages that you used in your

 4    calculation of profits for the years 2023 and 2024?

 5    **A.**    Yes.  You can see that right here.

 6    **Q.**    Okay.  Let's go to the -- actually, looking at the very

 7    bottom of the schedule, now that we've walked through all of

 8    the steps that you took, what was your opinion about Google's

 9    profits from App Promo from the conduct at issue in this case?

10    **A.**    You can see it in the bottom right-hand corner.  It was

11    $1 billion -- you know, $1,010,000,000.

12    **Q.**    Okay.  Let's go to the next slide, please.

13         And, sir, did you also perform an alternate calculation

14    for App Promo revenue based on the issue we talked about

15    earlier with global versus U.S. traffic acquisition costs and

16    applying a lower cost percentage for the latter years?

17    **A.**    Yes, I did.

18    **Q.**    And can we turn to the next slide?

19         Can you tell the jury what the alternate calculation of

20    Google's profits would have been for App Promo using the

21    25 percent ratio of traffic acquisition costs for the latter

22    years?

23    **A.**    Yes, it was $1.984 billion.

24    **Q.**    Okay.  Let's go to the next slide, please.

25         Now that we've talked about App Promo, let's take a look

1    at the next product line that you analyzed, AdMob.

2         And can you just explain to the jury, what is AdMob in

3    terms of your opinions?

4    **A.**    Yeah.  So this is ads or revenue that's generated from ads

5    within apps.

6    **Q.**    Okay.  And let's turn to the next slide, please.

7         Did you follow a similar methodology in calculating the

8    profits from the AdMob revenue as you did for App Promo?

9    **A.**    Yeah, it's basically the same methodology.  There were

10   three differences that I had to -- that I had to have for

11   AdMob, and I can get into those.

12   **Q.**    Let's go to the next slide.

13        Is this showing the schedules or the spreadsheets that

14   walk through your opinion in this case?

15   **A.**    Yes, it is.

16        **MS. BONN:**  And let's zoom in to the middle box, and

17   let's just start with the top line, AdMob U.S. revenue.

18   **BY MS. BONN:**

19   **Q.**    You mentioned there were three differences in your

20   opinion.  What's the first difference in how you approached the

21   AdMob calculation as compared to App Promo?

22   **A.**    So I'm getting to the same point, AdMob versus App Promo,

23   so I'm getting to U.S. revenues.  But in this case, for AdMob

24   we were provided with global revenues, and so I had to make a

25   reduction to get to U.S. revenues.

1  **Q.**   What was the basis that you used to come up with a

2  reduction factor to bring the global AdMob revenues down to

3  just the U.S. component?

4  **A.**   So remember we talked about the global ratio of App Promo

5  to -- U.S. App Promo to global App Promo was about 27 percent?

6  It was less than 30 percent?  I used that same ratio that I

7  used for App Promo for AdMob here.

8  **Q.**   And do you think that was a conservative assumption?

9  **A.**   I do because I also looked at information from the 10-K

10  for Google, and I saw that, you know, on their general business

11  basis, they were generating upwards of 45 to 47 percent

12  U.S. versus other types of revenue.

13  **Q.**   And so then when you were looking at this global AdMob

14  revenue, did you say, "Well, I'll say 45 to 46 percent is

15  U.S.," or did you use that lower ratio of 20-something percent

16  that you found for App Promo?

17  **A.**   I used the lower ratio.

18  **Q.**   And would that have tended to make your calculation of

19  profits from the U.S. lower and more conservative?

20  **A.**   Yes, it would have.

21  **Q.**   Okay.  Let's talk about the next difference in the steps

22  you took on AdMob as compared to App Promo.

23      What was the next difference in your analysis?

24  **A.**   Well, the next difference that's highlighted in this red

25  box here, or I should say red oval, what happened in AdMob and

1  in Ad Manager, which we'll talk about in a minute, is I

2  understood that some of the app ads that we talked about from

3  App Promo could have been served via AdMob.  You know, so, in

4  other words, there could be an overlap between the revenue of

5  App Promo and AdMob.  And so what I did here was I deducted

6  what that overlap could be.

7  **Q.**  And were you doing that to make sure, in an abundance of

8  caution, that there was no double counting of revenue in your

9  calculation?

10 **A.**  Yes.  I saw in one document that there might be an overlap

11 between the two; and so because of that, I took that out.

12 **Q.**  Okay.  And you mentioned that there was a third difference

13 in your calculation of AdMob revenue or profits as compared to

14 what you had done for App Promo.  What was the third

15 difference?

16 **A.**  So, again, it's not a difference in methodology, but what

17 it is is a difference in the calculation or the number that I

18 use for conversions.

19     Here, I used conversions from a different document, from

20 the ChromeGuard document that we saw earlier.  So instead of

21 using the 6 percent that goes to 70 percent, I used 52 percent

22 across the board.

23 **Q.**  We'll take a look at that in just a minute.  But, first,

24 can I understand, why would you use, just conceptually, a

25 different conversion percentage for AdMob than what you had

1  used earlier for GA for Firebase?

2  **A.**    Sure.

3       So what I understood and what I understand is that there's

4  different SDKs, so software development kits.  On the one hand,

5  you've got Google Analytics for Firebase, for App Promo; but

6  then for AdMob and Ad Manager, one might use -- I think it's

7  called Google Mobile Ads, GMA, SDK and those may have

8  differences.

9         **MS. BONN:**  And let's go back to Slide 9, and let's

10  zoom in to the kind of right side of the page, where we see

11  conversion tracking.

12  **BY MS. BONN:**

13  **Q.**    Is that the portion of the ChromeGuard Google internal

14  analysis that you relied upon for the 52 percent conversion

15  tracking percentage you applied here?

16  **A.**    Yes, it is.  And you can see it's talking about

17  calculating conversion tracking; and in the bottom right, it

18  shows the 52 percent for conversions -- conversion-based auto

19  bidding.

20         **MS. BONN:**  Can you also highlight, Mr. Boles, where it

21  says, "Therefore, overall approximate revenue impact ratio to

22  display ads can be estimated as..."?

23  **BY MS. BONN:**

24  **Q.**    Can you explain what display ads are and why you thought

25  it was appropriate to take the conversion ratio for display ads

**LASINSKI - DIRECT / BONN**

1  and apply that to AdMob?

2  **A.**   Sure.

3       In this context, we're talking about display ads on the

4  Web; but in the AdMob context, there are also display ads as

5  well, so I used that.

6  **Q.**   Okay.  Let's go to the last slide we were on, and let's

7  zoom in toward the bottom box so we can see where you used that

8  52 percent ratio.

9       Let's say, instead of the 52 percent, you had used the

10  same conversion ratios for GA for Firebase.  Would that have

11  made a material difference in the amount of unjust enrichment

12  you calculated?

13  **A.**   No, it wouldn't.  I made that calculation and it's less

14  than $61 million.

15  **Q.**   Off of a total of what?

16  **A.**   1.5 billion.

17  **Q.**   And why is it -- if this is 52 percent across the board

18  and on GA for Firebase the ratio was 6 to 70 percent, why is it

19  that the numbers shake out to be pretty close at the end of the

20  day?

21  **A.**   Well, because in the early years, when you have the lower

22  percentage, there's less revenue.  And so in the later years,

23  when there's a higher percentage for the -- like we saw

24  70 percent for the conversions against GA4F, it just counts

25  more revenues at that period of time.  So it shakes out that

**LASINSKI - DIRECT / BONN**

1  way.

2  **Q.**  Let's go to the next slide, please, Slide 25.

3      Other than the three differences we talked about, did you

4  follow the same series of steps in calculating the AdMob

5  profits that Google earned from signed-in sWAA-off data as you

6  had taken for App Promo that we discussed earlier?

7  **A.**  Yes, I did.

8  **Q.**  And what was your final calculation of Google's unjustly

9  earned profits from the conduct at issue in this case from

10  AdMob?

11  **A.**  Sure.  It's $364 million.

12  **Q.**  Okay.  Finally, let's turn to the next slide and talk

13  about Ad Manager.

14      What is Ad Manager?

15  **A.**  So Ad Manager, I think of it as similar to AdMob, although

16  it's sort of like for large publishers.  So people that have a

17  lot of different properties, they can manage those properties

18  in a different service or different business line versus AdMob.

19  **Q.**  Okay.  Let's go to the next slide.

20      How did your calculation of Google's profits from

21  Ad Manager compare to the methodologies we discussed earlier?

22  **A.**  So the methodology was exactly the same.  The only

23  difference was the starting point for U.S. Ad Manager revenue,

24  we did not get U.S. Ad Manager P&Ls or revenues, so I used a

25  ratio of Ad Manager revenues to AdMob revenues.

LASINSKI - DIRECT / BONN

1   **Q.**   Let's go ahead to Slide Number 29.  That's two slides

2   ahead.

3        Is this the document that you relied upon in order to

4   determine the ratio of U.S. AdMob revenues to U.S. Ad Manager

5   revenues?

6   **A.**   Yes, it is.

7   **Q.**   And can you explain what it was about this document that

8   you relied upon and how it factored into your calculation?

9   **A.**   Sure.

10       What we were able to see here was, you know, in 2019, what

11  is AdMob's revenues, and they were about $5 billion from a

12  gross perspective.  ADX, which is sort of the bottom here, that

13  was Ad Manager's revenues and they were $1.7 billion.  So that

14  ratio is about 34 percent.

15  **Q.**   And just to be clear, is this document we're looking at

16  one that you created, or was it from Google's internal files

17  and produced in this case?

18  **A.**   It was produced in this case.  I did not create this.

19  **Q.**   Okay.  Let's go back to Slide 28, and let's just zoom in a

20  little bit on your schedules.

21       When we see Ad Manager U.S. revenue net of TACs here, did

22  you base that on this 34 percent scaling factor compared to

23  AdMob?

24  **A.**   Yes, I did, and that basically flows through the whole

25  rest of the schedules.

LASINSKI - DIRECT / BONN

1   **Q.**   And did -- to your knowledge, did Google's expert,

2   Dr. Knittel, criticize your use of this 34 percent scaling

3   factor?

4   **A.**   No, he did not.

5   **Q.**   Okay.  Let's just scroll to the right a little bit.

6       And what did you calculate -- actually, let's scroll up.

7   Let me scroll up to the top box.

8       Okay.  Thank you.

9       What did you calculate was the U.S. Ad Manager revenue net

10  of traffic acquisition costs?

11  **A.**   The U.S. Ad Manager revenue net of traffic acquisition

12  costs is the top here -- wait.  Well, it's one below.  So it's

13  $1.1 billion.

14  **Q.**   Thank you.

15      Other than the 34 percent scaling factor to reach the U.S.

16  revenues, did you have any differences in how you calculated

17  the Ad Manager profits by deducting traffic acquisition costs

18  for signed-in users for sWAA-off data and for conversion types

19  at 52 percent, or was that the same as AdMob?

20  **A.**   It was the same.

21  **Q.**   Okay.

22          **MS. BONN:**  Let's turn to the next slide.  One after

23  that, please.  Thank you.

24  **BY MS. BONN:**

25  **Q.**   What was your final calculation of Google's profits earned

1    from Ad Manager from the conduct at issue in this case?

2    **A.**    So it was 120 -- well, $123.9 million.

3    **Q.**    Okay.  And now that we've talked about the three areas of

4    business that you analyzed -- App Promo, AdMob, Ad Manager --

5    what was your calculation of the total profits that Google

6    earned from the conduct at issue from those three lines of

7    business?

8    **A.**    It was $1.498 billion.

9    **Q.**    And from these three lines of business, if someone said,

10   "I just want to know what was the revenue, the overall revenue,

11   from those three lines combined that was the starting point,"

12   approximately what was that?

13   **A.**    For U.S. revenue it was approximately $51 billion.

14   **Q.**    And if you take that $51 billion revenue and say, "I just

15   want to know how much of that revenue was from the signed-in

16   users sWAA off and bid against the relevant conversion types,"

17   what would that revenue number be?

18   **A.**    That would be about $4.6 billion.

19   **Q.**    And did you perform an alternate calculation of Google's

20   total profits from the conduct at issue using the alternate

21   assumption about traffic acquisition costs for App Promo that

22   we discussed earlier?

23   **A.**    Yes, I did.

24   **Q.**    Let's show the next slide.

25        What was your opinion about the alternate calculation of

1  Google's profits if you had used the lower traffic acquisition

2  cost ratio for App Promo in the years 2023 and 2024?

3  **A.**   Well, then in that case it would be $2.366 billion for all

4  three products.

5  **Q.**   Okay.  Just to put in context where we are and then where

6  we're going next, you've calculated the total profits that

7  Google earned from the conduct at issue.  Did you, then, try to

8  figure out how do you allocate that amount between Class 1 and

9  Class 2 Android users versus other or iPhone users?

10  **A.**   Yes, I did.

11  **Q.**   Okay.  Let's go to the next slide, please.

12       What was the basis -- first of all, what was your opinion

13  about how any profits should be divided between the two

14  classes?

15  **A.**   Well, so what I did here was I relied on a survey from

16  Mr. Keegan, and I think we're going to talk more about that

17  later, but what he did was identify the number of folks that

18  have Android devices versus other devices, and it's primarily

19  iOS devices.

20       And then I used that information in a calculation to

21  figure out basically what the ratio was for signed-in share and

22  then calculated what the overall market share -- weighted

23  market share, of, you know, one device versus the other device,

24  both signed in, would be.  And what I see here is it's a

25  38 percent for Class 2, which is the non-Android devices, and

1   62 percent for Class 1, which is the Android devices.

2   **Q.**   If we can see at the top that basically, in the

3   marketplace there's a 50-50 split or so between Android and

4   iOS, why is it that you don't just assign a 50-50 split between

5   Android and Class 2 here?

6   **A.**   Well, because I understand if you have an Android device,

7   being signed in is very important because it will allow you to

8   get to the App Store, allow you to use certain features on your

9   phone where you don't necessarily have to be signed in if you

10  have an Apple phone, for example.  And so just to weight them

11  evenly I think would be inappropriate given what we're getting

12  to here because every user has to be signed in.

13  **Q.**   Okay.  And so did you assume that the signed-in rate for

14  Android devices was higher, closer to a hundred percent, and

15  the signed-in rate for iPhone devices was lower?

16  **A.**   Exactly.

17  **Q.**   And is that the basis for your opinion that of the

18  profits, about 62 percent should be allocated to the Android

19  class and 38 percent to the other or iPhone class?

20  **A.**   Yes, exactly.

21  **Q.**   Okay.  Thank you.

22       Let's go to the next slide, Slide 37.  Oh, excuse me.

23  Yes, Slide 34.

24       And once you have that allocation percentage in mind, can

25  you explain to the jury what you're showing here on the

1  right-hand side in terms of the specific profit numbers that

2  you would assign to each class?

3  **A.**    Right.  So as you can see on the right-hand side, in the

4  red box, the number, the 1.498 billion, is what I calculated in

5  total.  And then if you take from the previous slide the ratio

6  that we showed, which is 32 to 68 percent, and multiply those

7  two together, that's how you break up between Class 1 and

8  Class 2.  So that's what I did here.

9  **Q.**    And what is the amount of Google's unjust profits that you

10  calculated would be allocated to Class 1?

11  **A.**    So for Class 1, it's $929 million.  For Class 2, it's

12  $569.3 million.

13  **Q.**    Okay.  And we're seeing something on the left here with a

14  different time period.  Do you understand that in this case

15  Google is asserting a partial statute of limitations defense?

16  **A.**    I do, yes.

17  **Q.**    And did you attempt to calculate how much lower the

18  profits would be if Google prevails and one year of the class

19  period were not at issue anymore?

20  **A.**    Yes, I did.  And I would use those spreadsheets to cut off

21  the early year effectively, and that's what this shows here.

22  **Q.**    And what would the difference be in the total amount of

23  unjust profits if Google's statute of limitations defense

24  prevails and one year of the class period is not at issue?

25  **A.**    It's less than 4 percent difference.

1   **Q.**   Okay.  Let's go to the next slide.  Thank you.

2        And was the -- excuse me.  Why don't we go back.

3   Thank you.

4        We saw here that the numbers you were just discussing were

5   for Claim 1.  You understand that's the CDAFA claim?

6   **A.**   I do, yes.

7   **Q.**   Okay.  Let's go to the next slide.

8        And do you understand that there are also two other

9   claims, Claims 2 and 3, that are privacy-related claims?

10  **A.**   Yes, I do.

11  **Q.**   And I see that you've done a calculation, and at the top

12  it says "Excluding Dashers and Unicorns."  Do you see that?

13  **A.**   Yes.

14  **Q.**   Okay.  Are "dashers" and "unicorns" two terms that Google

15  uses?

16  **A.**   Yes, it is.

17  **Q.**   And can you explain what they mean and why you would

18  exclude them from this calculation only on Claims 2 and 3?

19  **A.**   Sure.

20       So dashers are folks that have enterprise account holders.

21  So they have their Google Account through an enterprise, like a

22  company or a university.  Unicorns I understand to be children

23  that are younger than 13 years old.

24  **Q.**   And "unicorn" is a term that Google uses to refer to those

25  children's accounts?

LASINSKI - DIRECT / BONN

1   **A.**   Yes.

2   **Q.**   Okay.  And then did you understand, in performing your

3   calculation, that while dashers and unicorns were part of the

4   class for Class 1, that was not the case for Claims 2 and 3?

5   **A.**   Yes, I did, that they needed to be removed and that's what

6   I show here.

7   **Q.**   And how did you go about determining how much the profits

8   would be reduced if dashers and unicorns were removed?

9   **A.**   There was a file that was produced by Google which showed

10  the number of active accounts with dashers and unicorns in and

11  dashers and unicorns out, and I used that file to compare what

12  the numbers were and came up with this reduction, which is

13  approximately 10 or 11 percent.

14  **Q.**   And were the spreadsheets that you just talked about that

15  showed the difference in the number of accounts from those

16  PX403, 404, and 405 that Mr. Monsees testified about earlier?

17  **A.**   Yes, they were.

18  **Q.**   Okay.  Let's go to the final slide on your unjust

19  enrichment or profits opinion.  And we're about to move on to

20  the second step, but I just want to make sure we understand

21  where we are.

22      Going back to your earlier analogy that you take something

23  like a necklace and you sell it, what is your opinion about

24  Google's profits that you calculated in this case and why it's

25  the appropriate measure of unjust enrichment or unjust profits

1    here?

2    **A.**    So going back to the analogy of the stolen necklace or

3    piece of jewelry, if someone comes in and takes your jewelry

4    and then goes and sells it and profits from it, then that's

5    what I'm calculating here.   In this case, we're calculating the

6    profits from the data that was taken from the class and that's,

7    you know, similar to selling a piece of jewelry and profiting

8    from it that way.

9    **Q.**    Okay.   Let's take a look at the next slide and talk about

10   the second type of opinion that you offered, which is on

11   something called compensatory damage.

12        Using that same analysis, can you explain the difference

13   between what it means to calculate compensatory damage versus

14   the profits that you just discussed?

15   **A.**    So the profits, on the one hand, are the damages that we

16   just talked about that Google made from using the data; on the

17   other hand, the compensatory damages are what Google should

18   have paid from taking the data.   And I've broken that up

19   between Class 1 and Class 2.

20   **Q.**    Okay.   And can you summarize before we -- we're about to

21   walk through how you did that, but can you just summarize what

22   your opinion is on the conservative floor, or minimum amount of

23   compensatory damages for Class 1 and Class 2?

24   **A.**    Yes, it is.   So for Class 1 it's $266 million and for

25   Class 2 it's $256 million.

LASINSKI - DIRECT / BONN

1   Q.   And I think you mentioned this earlier, but are you saying

2   that's as high as it could be or that's the minimum floor?

3   A.   That's the minimum floor.  I think that's the minimum

4   anyone could logically think was appropriate.

5   Q.   Okay.  Let's turn to the next slide.

6        And we're about to walk through each step, but can you

7   explain to the jury, what steps did you follow in order to

8   reach the opinion you just summarized?

9   A.   Sure.

10       The very first thing I had to determine, since we're

11  talking about a class here, is how many class members there

12  were and then determine what the best way to compensate the

13  class members would be.

14  Q.   Okay.  Let's go to the next slide.

15       Can you describe at a high level, and then we'll look at

16  the data points you considered, how did you estimate the number

17  of class members in this case that were affected by Google's

18  collection of sWAA-off data?

19  A.   Sure.  I started with the United States population, and

20  then I determined the number of Internet users, got information

21  on the number of those Internet users that had smartphones,

22  because we're talking about apps or, you know, I should say

23  mobile devices.  I looked at Google -- the number of those

24  people that had Google Accounts and then, in addition to having

25  a Google Account, they had to have sWAA off, and that helped me

1   determine the number of total class members.

2   **Q.**   Let's go to the next slide.

3       And is this slide showing the schedules or spreadsheets

4   from your report where you actually made those calculations?

5   **A.**   Yes, it is.

6   **Q.**   Let's zoom in to the upper left-hand box, and we can see

7   that you use some numbers for the total U.S. population.  What

8   was the factual basis for your opinion about the total U.S.

9   population?

10  **A.**   Well, the starting point was the U.S. census for the total

11  U.S. population.

12  **Q.**   Okay.  And then we see that you made a 93 percent

13  deduction for the share of adults who use the Internet.  What

14  was the basis that you used to calculate the share of American

15  adults who use the Internet?

16  **A.**   That was a Pew research study, so a research institute

17  that's out of Washington, D.C.

18  **Q.**   And is that a reputable firm that conducts studies and

19  that experts in your field typically rely on?

20  **A.**   Yes.  Pew is a very reputable firm.

21  **Q.**   Okay.  We see that you made further deductions for the

22  share of Internet users with smartphones, with and without

23  Gmail accounts, and devices.  What were the bases for those

24  calculations?

25  **A.**   For those -- for those calculations, Internet users with

1    smartphones and smartphones with and without Gmail accounts, I

2    relied on the study that we talked about earlier from

3    Mr. Keegan.

4    **Q.**    Okay.  Let's go to the next slide.

5         And can you just explain who Mr. Keegan is and what the

6    survey was that you relied upon in forming your opinions in

7    this case?

8    **A.**    Sure.

9         Mr. Keegan is a survey expert.  I understand that he's

10   been conducting surveys for the past 25 years.  He's a partner

11   or founding partner in two different survey research firms and

12   has lectured on designing surveys for litigation.  You can see

13   his educational background here, but you can see his experience

14   and I relied on his report.

15   **Q.**    And was there anything that gave you confidence in relying

16   on his survey in this case in particular?

17   **A.**    Yes.  So, typically, you know, in these cases, you have

18   experts on the one side, and you'll have an expert on the other

19   side that will dig into someone's calculations if they don't

20   think it's right and push back on it.  And I've seen no

21   evidence of something like that in this case.

22   **Q.**    Is the survey that you relied on the type of data that

23   experts in your field reasonably rely upon to form conclusions

24   in estimating damages and computing the size of the class?

25   **A.**    Yes, it is.

LASINSKI - DIRECT / BONN

1    **Q.**    Okay.  Let's go to the next slide, please.

2        What did you rely on from Mr. Keegan's survey in terms of

3    the share of smartphone users who also have one or more Gmail

4    accounts?

5    **A.**    Sure.  You know, he did a survey of approximately --

6    I think it is a little bit more than a thousand people; and he

7    was able to determine that about 84.1 percent of those

8    people -- I have it as 84.5 percent of those people have one or

9    more Gmail accounts.

10   **Q.**    And let's go to the next slide.

11       How many Gmail accounts on average did each person have

12   according to Mr. Keegan's survey?

13   **A.**    It's about 1.77 Gmail accounts per person.

14   **Q.**    Let's go to the next slide, please.

15       Did you also rely on Mr. Keegan's survey in order to

16   determine the average number of mobile devices per adult?

17   **A.**    Yes, I did.

18   **Q.**    And what was the portion of Mr. Keegan's survey that you

19   relied upon in calculating the average number of mobile devices

20   per adult?

21   **A.**    Yes.  So this was a survey where he looked at a thousand

22   respondents -- this piece of the survey, he looked at a

23   thousand respondents and looked at the number of mobile devices

24   that they had; and in this case, he was able to calculate, and

25   I used data to calculate, a 1.866 devices per person ratio.

1   Q.   Okay.  Let's go to the next slide.

2        And looking at this slide, can you just explain how this

3   1.86 devices per adult factored into your analysis of how many

4   class members and how many class member devices there were?

5   A.   Sure.

6        So we'll see in a moment that one of the things that I'm

7   doing is -- to calculate appropriate compensation is

8   determining the number of class member devices.  And so what I

9   did here is for the adult population, I assumed that they had

10  1.86 devices per class member, and the reason that I did that

11  is because of the survey that we just saw.

12       But for -- but no one was surveyed who's in a 10- to

13  17-year-old range.  And so for that portion of the class, I

14  assumed one device per member, and I did that because to have

15  made it through the rest of the definitions that I had set up,

16  you'd have to have at least one device.  So a child must have

17  at least one device.

18  Q.   In order to be part of the class?

19  A.   Correct.

20  Q.   Okay.  Let's go back to Slide 40 and your schedules.

21       And we looked at the upper left-hand box, the population

22  of adults.  Is the upper right-hand box the similar opinions

23  but as applied to the number of children?

24  A.   It is, yes.

25  Q.   Okay.  And what was your opinion about the approximate

1  number of children that are a part of the class?

2  **A.**   Well, if you scroll a little bit more to the right, it

3  shows, you know, there's about 9 million; when you add those

4  two numbers together, a little bit more than 9 million

5  children.  And if you look at that, that's about, you know,

6  10 percent of the class.

7  **Q.**   Okay.  And we talked about two numbers.  You talked about

8  each class member who's an adult has about 1.86 devices on

9  average and about 1.77 Google Accounts or Gmail accounts on

10  average.

11      What's the approximate relationship between the number of

12  devices and the number of email or Google Accounts that a class

13  member adult would have?

14  **A.**   Sure.  If you use, you know, just the ratio of 1.86 to

15  1.77, it's about 1-point -- it's 105.  It's like 105 percent.

16  **Q.**   Let's go ahead to the next slide.

17      Having gone through the calculations we just discussed

18  using the census, Pew research, and Mr. Keegan's study, along

19  with Google's data about the number of sWAA-off accounts, what

20  was your overall conclusion about the number of class members

21  in this case?

22  **A.**   There were 97-point -- well, basically, 98 million class

23  members, and class members would have 174.5 million devices.

24  **Q.**   And I think you said this earlier, but out of that total

25  number of class members, 98 million, how many are children?

LASINSKI - DIRECT / BONN

1  **A.**    It's about 10 percent.

2  **Q.**    Okay.  And then what was the class period in the case that

3  this class members and class member devices could have been

4  found in?

5  **A.**    98 months.

6  **Q.**    Okay.  Let's go ahead to the next slide.

7        Once you had calculated the number of class members and

8  the number of class member devices, what was your next step in

9  terms of coming up with a conservative baseline estimate of

10  compensatory damages?

11  **A.**    So what I was looking for here and what I found was

12  information that relates to Google's payments made for user

13  data.  I found information on fees that users or customers were

14  willing to pay to prevent their data collection, and then there

15  were some other companies who had collected and collect user

16  data, and I considered all of those in forming my opinion.

17  **Q.**    Did you focus primarily on the Google data point, Google's

18  payments for data?

19  **A.**    Yes, I did.

20  **Q.**    We're going to talk about that in a minute, but before we

21  zoom in on the data point about Google, can you explain the

22  other data points that you considered as you were reaching your

23  opinion about the payment that would be required for data?

24  **A.**    Sure.

25        So one data point was AT&T performed like a pilot, if you

1    will, in some cities where if you were to buy Internet from

2    them, they would charge you $70, on the one hand, if you

3    allowed them to collect their -- your data and serve personal

4    ads; but if you didn't allow that, then it was $99.  So a

5    difference of $29 per month for those -- for that situation.

6    Q.    What other data points did you look at?

7    A.    There were two others.  Nielsen is a company that collects

8    lots of information on people, and I believe that you're

9    able -- for user data, you could earn as much as $50 a year for

10   them collecting your user data.  And then there was another

11   data point called IP SavvyConnect and in that case, I think you

12   could earn as much as $15 a month for them collecting that

13   data.

14   Q.    We'll come right back to that.  I want to go back to

15   something we talked about a moment ago and that I realized I

16   didn't ask a very clear question about.

17         When you were discussing the ratio of devices to Google

18   Accounts being approximately 105, does that mean for every 100

19   Google Accounts in the class there are 105 devices?

20   A.    Yes.

21   Q.    All right.  Coming back to the payments for data, have you

22   described all of the data points you looked at other than

23   Google's own payments?

24   A.    Yes, I have.

25   Q.    Okay.  Let's talk about the Google data point that you

1  relied on, and let's go ahead and look at the next slide.

2      Can you explain what Google's Screenwise Panel is and why

3  you considered it important in this case?

4  **A.**    Sure.

5      Well, Screenwise -- Screenwise Panel, I understand, is

6  being run by a company called Ipsos.  Or Ipsos is a market

7  research firm that helps them gather this information, and what

8  this does is a consumer research study, which is commissioned

9  by Google, it's a voluntary study where they use meters on

10  people's devices to track all the information from their

11  devices.

12  **Q.**    Okay.  Let's look at the next slide.

13      What are the different payments that a participant in

14  Google's Screenwise Panel could receive?

15  **A.**    First -- yeah, so the first payment that one receives is

16  if they complete the survey and qualify for the study, they

17  would receive $20.

18      Another thing that they receive if they install a router,

19  and to be fair, you would only have one router per household,

20  so like sort of the lead participant could get $100.  Not

21  everyone in a household would get $100 for installing this

22  router but the lead participant would.

23      In addition, I understand that that router is valued at

24  about $150.  So you'd get not only $100 for installing the

25  router but you'd get a nice router that was $150.

1          And then, depending on if you connect your devices to the

2     router, you could earn monthly benefits of $5 a month.  If you

3     connected your browser to the router, then you could get $3 a

4     month.  And then here I've highlighted in green for tablets

5     and/or mobile devices, you would get $3 a month for a tablet or

6     a mobile device.  And then there's a bonus, if you connect all

7     of those devices above, of an extra $2.  So someone could earn,

8     on a monthly basis, $16.

9     **Q.**   Can you just explain to the jury, why is it that for some

10    of these payments, you've crossed them out in red; but for the

11    $3 for using a tablet or $3 for a mobile device with the

12    Screenwise app, you've put a green box around that?

13    **A.**   Sure.  Because here we're talking about mobile devices.

14    That's what the case is about.  We're talking about tablets.

15    We're talking about smartphones.  And so I'm only focused on

16    that, although I consider all the other payments that were made

17    because there's a lot of data being taken but I'm focused on

18    that.

19    **Q.**   Okay.  Do you understand that in this case, Google and its

20    experts have criticized your use of the $3, saying, "Hey, wait

21    a minute.  The Screenwise app takes a lot more data than just

22    app activity.  There's biometric.  There's personal

23    information.  There's what's shown on your screen"?  Are you

24    aware of that criticism?

25    **A.**   Yes, I am.

1    Q.   And what is your response to that criticism?

2    A.   Well, my response is, as you can see, there's a lot more

3    payment that is made to people that are participating in the

4    survey than just the $3.

5         Another point is I think it's very important that these

6    participants in this survey, they want to help Google.  They're

7    a willing participant, so they've signed up for this survey to

8    have their data.

9    Q.   Why does that matter?

10   A.   Well, it matters --

11        MR. HUR:  Objection, Your Honor.  Foundation.

12   Undisclosed opinion.

13        THE COURT:  Overruled.

14        THE WITNESS:  So -- but, on the other hand, if you

15   have your sWAA off, you're an unwilling participant.  And it's

16   well understood that somebody that, you know, is willing to

17   sell something and wants to sell something will sell it for a

18   lower cost than somebody who doesn't want to sell it.

19   BY MS. BONN:

20   Q.   Now let's set aside the other payments for the router and

21   whatnot.

22        Even just the $3 for the data on the device, do you

23   understand, in fairness, there are differences between some of

24   the data the Screenwise app on a phone collects versus the app

25   activity sWAA-off data we're talking about here?

1    **A.**    Yes, I do.  I mean, there are differences.

2    **Q.**    Why do you, nevertheless, believe that this $3 per mobile

3    device is the best indicator of what would be required to pay

4    for taking someone's sWAA-off data without permission?

5    **A.**    Well, look, these -- these $3 payments are for taking data

6    off of a mobile device, exactly what we're talking about here.

7         First, I do understand that there's more data being taken

8    off the devices in Screenwise; but, again, they're willing to

9    have that data taken.  They want to participate in the survey

10    versus someone who doesn't think that their data is being taken

11    or, importantly, doesn't want it to be taken.

12    **Q.**    Let's go to the next slide.  Let's go one more.

13         How did this Screenwise payment and your opinion on the

14    number of adult class members factor into your opinion about a

15    conservative baseline for compensatory damages?

16    **A.**    So what I -- the numbers that we've been looking at till

17    now are the $266 million and the $256 million, and what I did

18    was I took a $3 payment per class member device -- so each

19    adult was 1.86 devices, each child has one device -- and I

20    applied it one time or, you know, sort of assuming one month of

21    payment to them.

22    **Q.**    And is that why you say that this is a conservative

23    baseline in terms of the potential compensatory damage in this

24    case?

25    **A.**    Yes.  It's a one-time payment versus a monthly payment.

1  Q.  Let's go to the last slide.

2      One question I have is, when we're looking at this, we see

3  on the one hand, well, Google profited over 1.4 billion from

4  this data, and yet here you're saying there's a different

5  compensatory damage number for the data that's a baseline but

6  it could be higher.

7      Can you just explain to the jury, going back to your

8  analogy, how those two measures could be different when someone

9  takes something that doesn't belong to them and then profits

10 off of it?

11 A.  Sure.

12     You know, on the one hand, going -- you know, if someone

13 steals your jewelry, sells it for $500, that's how much they

14 made for it, but that's not necessarily what it's worth to you.

15 You may say, "Hey, I don't -- I'm not going to sell it to you

16 for $500.  I need more than that."  And, in this case, that

17 could be potentially possible, or you could say that they made

18 less -- they need less than that.  But it's what you think the

19 data is worth to you and what you would accept in that

20 situation.

21 Q.  Okay.  Let's take the slides down for a minute.

22     And I just want to give you a chance to respond to some of

23 the disagreements that Google's expert, Dr. Knittel, has raised

24 about some of your opinions.

25     Do you understand that one of the disagreements is the

1  idea that you should have deducted fixed overhead costs from

2  your calculation of Google's profits?

3  **A.**    Sure.  To be fair, I think he thinks that they're

4  incremental costs.  I just want to be clear about that.

5  I think that they're fixed costs.

6       And I disagree with him based on all the reasons that we

7  talked about, that those are not incremental costs.  Those are

8  fixed costs.  They would not change if this revenue that I

9  calculated here was to be -- was to go away.

10  **Q.**    And do you also understand that Dr. Knittel has raised

11  various criticisms, saying, "Well, you should be, in

12  calculating profits, thinking of a but-for or an alternate

13  world where maybe this data could have been taken in some other

14  way or used by some third party"?  Are you aware of that

15  criticism?

16  **A.**    I am aware of that criticism.

17  **Q.**    What's your response to this criticism about changing

18  elements of a but-for world when you're calculating profits?

19       **MR. HUR:**  Objection, Your Honor.  Undisclosed opinion.

20  Foundation.

21       **THE COURT:**  Overruled.

22       **THE WITNESS:**  Well, look, I'm calculating what

23  actually happened in the real world, what Google actually

24  profited -- how Google actually profited.

25       What they might do in some but-for world if they didn't

 1  take the information that they took, that's a separate

 2  question.  And so I'm looking at what the actual profits were.

 3  **BY MS. BONN:**

 4  **Q.**  And can you give an example, in the context of your

 5  analogy, why is it that you would be able, in the case of

 6  someone who takes a necklace, to calculate the profits they

 7  made without changing other elements of what you'd call the

 8  but-for world?

 9  **A.**  Yeah, I mean, if you think of it this way:  If they took

10  the necklace, they sold it for $500, that's how much they

11  actually made.  But, on the other hand, if you had to say,

12  "Hey, wait a second, what could they have done instead of

13  getting the necklace and hocking it for $500," they might have

14  asked you for it or they might have done something different.

15  They might have had someone else steal it and sell it for

16  something different.  It just doesn't make any sense.

17  **Q.**  Okay.  Are you aware that Dr. Knittel has also raised a

18  criticism that in the latter part of the class period, Apple

19  iPhones implemented a change in a new version of iOS that

20  prevented a single device identifier called IDFA from being

21  sent to Google in certain cases?

22  **A.**  Yes, I understand that.

23  **Q.**  And are you aware of his opinion that that means all those

24  members of the class should be excluded and they're uninjured?

25  **A.**  Yes, I am.

LASINSKI - DIRECT / BONN

1    **Q.**   And what's your response to that?

2           **MR. HUR:**  Objection, Your Honor.  Foundation.

3    Undisclosed opinion.

4           **THE COURT:**  Overruled.

5           **THE WITNESS:**  So my understanding is that Google does

6    get the data from the iOS.

7    **BY MS. BONN:**

8    **Q.**   SWAA-off data?

9    **A.**   The sWAA-off data from the Google iOS devices and they are

10   able to store it, and so I don't think that it's appropriate

11   that they would be barred from being part of the class.

12   **Q.**   And is that your opinion even if one identifier, the IDFA,

13   was no longer collected?

14   **A.**   That is, yes.

15   **Q.**   Let's go back to the last slide.

16         What is your final opinion in terms of what you are

17   sharing with the jury on Google's unjust profits for Class 1

18   and Class 2 compared to compensatory damage baseline for

19   Class 1 and Class 2?

20   **A.**   So for compensatory damages baseline, $266 million for

21   Class 1, $256 million for Class 2.  Unjust enrichment would be

22   $929 million for Class 1 and $569 million for Class 2.

23         **MS. BONN:**  Thank you, Mr. Lasinski.

24         Nothing further at the time, Your Honor.

25         **THE COURT:**  Members of the jury, we'll take our second

1  break at this point.  Remember my admonitions not to discuss

2  this amongst yourselves or with anyone else, and we'll be back

3  here at certainly no later than 12:15.

4            (Recess taken at 11:53 a.m.)

5            (Proceedings resumed at 12:14 p.m.)

6        (Proceedings were heard out of the presence of the jury.)

7        **THE COURTROOM DEPUTY:**  Please remain as you are and

8  court will come to order.

9        **THE COURT:**  Everybody in their place?  Ready to bring

10  them in?

11        **MR. HUR:**  Yes, Your Honor.

12        (Proceedings were heard in the presence of the jury.)

13        **THE COURT:**  The jury is present.

14  Mr. Hur, cross-examination.

15        **MR. HUR:**  Thank you, Your Honor.

16  Good afternoon, members of the jury.

17                    **CROSS-EXAMINATION**

18  BY MR. HUR:

19  Q.   Good afternoon, Mr. Lasinski.  We haven't met before?

20  A.   That is accurate, yeah.

21  Q.   My name is Ben Hur, and I'm counsel for Google in this

22  case.

23        In addition to being hired by the Susman Godfrey firm five

24  times, you've also been hired by the Boies Schiller firm;

25  right?

**LASINSKI - CROSS / HUR**

1    **A.**    In one other case, yes.

2    **Q.**    And the Boies Schiller firm is one of the firms

3    representing the plaintiffs here?

4    **A.**    Yes.

5    **Q.**    So both firms have paid you before for providing

6    consulting services; right?

7    **A.**    Yes, they have.

8    **Q.**    Both of you -- both of them have paid you for providing

9    litigation support services; right?

10    **A.**    Yes, that's correct.

11    **Q.**    And they're paying you $800 an hour?  Is that your rate?

12    **A.**    Well, they're not paying me.  They're paying my firm $800

13    an hour; but, yes, that's my rate.

14    **Q.**    And I believe you just testified this morning that you and

15    your team have spent 4,000 hours on this case; is that right?

16    **A.**    Yes, that is correct.

17    **Q.**    So your firm's been paid over a million dollars; is that

18    right?

19    **A.**    I would expect so, yeah.  It's been a lot of work.

20    **Q.**    Over $2 million?

21    **A.**    I don't think it would be over $2 million.

22    **Q.**    Somewhere between a million and $2 million?

23    **A.**    I would think that it's over a million.

24    **Q.**    Okay.  And that's just for this case; right?

25    **A.**    That is correct.

1   Q.   Not for the other cases in which you have worked with

2   these plaintiffs' lawyers; right?

3   A.   For the lawyers here, is that what you're talking about?

4   Q.   Yes.

5   A.   Yes.

6   Q.   The between 1 and 2 million doesn't count the other work

7   you've done for these plaintiffs' lawyers; right?

8   A.   That is accurate, sure.

9   Q.   You don't have an economics degree?

10  A.   I don't have a Ph.D. in economics; that's correct.

11  Q.   You don't have a master's in economics?

12  A.   No, I do not.

13  Q.   You're not a professor?

14  A.   I am not a professor.

15  Q.   You make basically all of your money providing consulting

16  services; right?

17  A.   Yeah.  I think that that's -- that's accurate, yeah.

18  Q.   And you've been in consulting for over 30 years; right?

19  A.   Yes, I have.

20  Q.   Worked on hundreds of consulting projects?

21  A.   Yes, that's accurate.

22  Q.   And a significant part of your income is derived from

23  witness and litigation support; right?

24  A.   Yes, it is.

25  Q.   It's fair to say that providing paid expert services for

 1  lawyers has been your bread and butter for 30 years; right?

 2  **A.**   No, that's not accurate.

 3  **Q.**   You're not a consumer privacy expert; right?

 4  **A.**   I am not a consumer privacy expert with the exception of

 5  understanding the finances that I talked about here.

 6  **Q.**   Okay.  And you understand that this case is about consumer

 7  privacy controls; right?

 8  **A.**   Yes, it is in part.

 9  **Q.**   You testified this morning that your expertise is really

10  in valuing intellectual property; right?

11  **A.**   Yes, it is in valuing intellectual property, and I view

12  data as intellectual property.

13  **Q.**   And, in fact, the only privacy-related case in which

14  you've been hired to evaluate damages is the other case that

15  Boies Schiller hired you for; right?

16  **A.**   No, that's not accurate.

17  **Q.**   At least at the time of your deposition, that had been the

18  only other case in which you had been hired to value Internet

19  data; isn't that right?

20  **A.**   For litigation, that is accurate, yes.  At the time of my

21  deposition, that would be accurate.

22  **Q.**   You don't hold yourself out to be an expert in the field

23  of market dynamics of advertising and mobile apps; right?

24  **A.**   I do not, no.

25  **Q.**   Now, you've been criticized in other cases for calling

1  your assumptions conservative when your analysis was, in fact,

2  based on a flawed premise; right?

3  **A.**    I don't remember being criticized for being called

4  conservative.

5  **Q.**    Do you remember having your opinions excluded in a case

6  called *Looksmart vs. Microsoft*?

7  **A.**    Yes, I do.   That's the case that we talked about earlier.

8  **Q.**    Mm-hmm.   And in that case, the court found that your

9  opinion flunked the standard for allocating incremental

10  profits?

11  **A.**    That's exactly what I just talked about, yeah --

12  **Q.**    Okay.   And --

13  **A.**    -- on direct.

14  **Q.**    -- the judge also criticized you for calling assumptions

15  conservative when your analysis was based on a flawed premise;

16  right?

17  **A.**    That's what that judge said; that's correct.

18  **Q.**    And that judge excluded every single opinion you offered

19  in that case; right?

20  **A.**    He did, yes.

21  **Q.**    Now, you provide an opinion you call actual damages;

22  right?

23  **A.**    I do.   I call them compensatory, just so there's not a

24  mix-up here; but when I spoke earlier, I was calling those

25  compensatory damages.   It's also actual damages.

1  Q.  Compensatory damages are supposed to measure the

2  difference between someone's actual economic position and their

3  economic position if the conduct at issue had never occurred;

4  right?

5  A.  That is -- that is accurate, yes.

6  Q.  Now, you understand that this case is about what Google

7  does with WAA and sWAA-off data; right?

8  A.  Yes, exactly right.

9  Q.  Okay if we just call it sWAA-off data since we understand

10  that when WAA is off, sWAA is also off?

11  A.  Sure.

12  Q.  Now, your understanding of the data Google collects is

13  from --

14  A.  Could I just make sure that we're clear here?

15      My analysis is based on sWAA-off data.  I think you said

16  WAA and sWAA-off data, but it's just based on the sWAA-off

17  data.

18  Q.  Okay.  So you're comfortable if we talk about sWAA-off

19  data?

20  A.  Yeah.  I just wanted to make sure it wasn't unclear.

21  Q.  Your understanding of the data that Google collects comes

22  from Dr. Hochman; right?

23  A.  Yes, in part.

24  Q.  SWAA-off data is not used for personalization; right?

25  A.  That is my understanding; that is correct.

1   Q.   SWAA-off data is not used to personalize ads; right?

2   A.   Well, yeah.  I -- I thought I just answered that question.

3   It's not -- when you said personalization, I thought you were

4   asking about personalized ads.  And so I'm answering in the

5   affirmative for both because I think they're the same thing.

6   Q.   Okay.  You assume that personalizing ads is the same as

7   all personalization; is that right?

8   A.   For the purpose of the last question that you just asked,

9   yes.

10  Q.   So for purposes of your opinion, did you assume that

11  sWAA-off data is not used for personalization?

12  A.   I assumed that it's not used for personalized advertising.

13  Q.   Okay.  SWAA-off data is also not tied to a user's

14  Google Account; right?

15  A.   I am not an expert, I'm not the technical expert there, so

16  I don't have an opinion on that.

17  Q.   You didn't assume, for purposes of your opinion, that

18  sWAA-off data is not tied to a user's Google Account?

19  A.   Could you rephrase that because you said "not assume" and

20  "not," and I just want to make sure that we're not double

21  negativing here.

22  Q.   For purposes of your opinion in this case, you assumed

23  that sWAA-off data is not tied to a user's Google Account?

24  A.   I think that that's accurate, yes.

25  Q.   And you understood that Google does not sell sWAA-off

 1  data; right?

 2  **A.**    I did not calculate harm for Google selling sWAA-off data.

 3  **Q.**    You haven't heard anything in this case suggesting that

 4  Google sells sWAA-off data; right?

 5  **A.**    No.  My understanding is that they provide it to their

 6  customers, but I don't see them selling it separately, if

 7  that's what you're asking.

 8  **Q.**    Your understanding -- your opinion is based on Google

 9  providing sWAA-off data to its customers?

10  **A.**    In part, yes.

11  **Q.**    And that's the basis of your opinion?

12  **A.**    That's one of the bases of my opinion.

13  **Q.**    So if Google is not providing sWAA-off data to its

14  customers, then your opinion is not reliable, is it?

15  **A.**    No, that's not accurate.

16  **Q.**    It doesn't matter whether or not Google is providing

17  sWAA-off data to its customers?

18  **A.**    No, it does not.  Because what I'm talking about here is

19  that sWAA-off actually goes into the conversion tracking and

20  the conversion bid algorithms here, and I understand that those

21  algorithms are supplied to Google's customers.  So I'm not

22  saying that they supply and give people sWAA-off data.  I'm

23  saying that it goes into the algorithms that they use in their

24  business.

25  **Q.**    Your testimony is that Google provides its algorithms to

1    its customers?

2    **A.**    That they provide the analytics data that they get from

3    GA4F in helping their customers manage their businesses, yes.

4    **Q.**    Okay.  So your opinion is that rather than receiving and

5    analyzing the data, Google actually gives third parties the

6    analytics data?

7    **A.**    No --

8    **Q.**    That's your opinion?

9    **A.**    -- I did not say that.

10           **THE COURT:**  Let's question-answer.  Don't talk over

11   each other.

12          Okay.  Go ahead, Mr. Hur.

13   **BY MR. HUR:**

14   **Q.**    Your opinion is that Google actually gives the data to

15   third parties, not that it's receiving the data and analyzing

16   it for third parties?

17   **A.**    No, that's not my opinion.

18   **Q.**    Okay.  So you understand that Google is not giving this

19   data to anybody; right?

20   **A.**    Not -- yes, they're not taking the data, packaging it up,

21   and giving it to someone.

22   **Q.**    SWAA-off data isn't tied to a user's phone number; right?

23   **A.**    Well, I don't know that to be true.  We saw evidence

24   earlier here where sWAA-off data came in and had someone's

25   phone number attached to it, so...

1  Q.   Did you base your opinions on the notion that sWAA-off

2  data is tied to phone numbers?

3  A.   No, I did not.

4  Q.   If SWAA-off data was tied to phone numbers, then your

5  opinion would be wrong, wouldn't it?

6  A.   No.

7  Q.   Is sWAA-off data tied to a person's billing address?

8  A.   I didn't assume that it was tied to someone's billing

9  address in my analysis.  Whether or not it is from a technical

10 standpoint, I'm not the technical expert, so I can't answer

11 that.

12 Q.   Okay.  So you can't answer technical questions because

13 you're not a technical expert; right?

14 A.   Correct.

15 Q.   But you assumed for your analysis that sWAA-off data is

16 not tied to a person's phone number; right?

17 A.   I -- I didn't assume that it was tied to the phone number,

18 so that's correct.

19 Q.   And you didn't assume that sWAA-off data is tied to a

20 person's billing address; right?

21 A.   No, I did not assume that.

22 Q.   And you didn't assume that sWAA-off data is tied to a

23 user's Google Account; right?

24 A.   That's correct.

25 Q.   Now, you tried to compare sWAA-off data to the Screenwise

1    Panel; right?

2    **A.**    I did compare the sWAA-off data to the Screenwise Panel;

3    that's accurate.

4    **Q.**    And you've testified that the Screenwise Panel is the most

5    probative indicator of the harm caused by Google's collection

6    and use of sWAA-off data; right?

7    **A.**    Yeah.    I think it's a probative indicator --

8    **Q.**    It's the most --

9    **A.**    -- correct.

10    **Q.**    -- probative indicator in your mind; right?

11    **A.**    Of the information that's available in the record, that is

12    accurate.

13    **Q.**    And you looked for information to find a probative

14    indicator; right?

15    **A.**    Correct.

16    **Q.**    Now, you rely on the Screenwise Panel to assess the value

17    of sWAA-off data acquired by Google; right?

18    **A.**    Yes, in part.

19    **Q.**    All of the information Google collected by the Screen --

20    strike that.

21        All of the information collected by the Screenwise Panel

22    can be combined with a person's name; right?

23    **A.**    That's my understanding, yeah.

24    **Q.**    All of the information can be combined with a person's

25    email address; right?

**LASINSKI - CROSS / HUR**

1    **A.**    That is my understanding, yes.

2    **Q.**    All of the information can be combined with a person's

3    phone number; right?

4    **A.**    That's consistent with my understanding.

5    **Q.**    All the information can be combined with a person's

6    Google Account; right?

7    **A.**    That's -- yeah, that is my understanding.

8    **Q.**    And, in fact, users have to put a meter on their device to

9    participate in the Screenwise Panel; right?

10    **A.**    Well, sir, you're saying a meter -- put a meter on their

11    device.  I think it actually is something that they can

12    download onto their device.  So it's not -- I don't think it's

13    attached to their device.

14    **Q.**    Understood.  It's something they download onto their

15    device; right?

16    **A.**    Right.  They put a meter.  I think it's called a

17    Screenwise meter.

18    **Q.**    And the meter can collect everything the user taps on

19    their phone; right?

20    **A.**    Yeah, that's exactly right.

21    **Q.**    It can collect everything the user types on their phone;

22    right?

23    **A.**    That's my understanding, yes.

24    **Q.**    It can collect everything the user swipes on their phone;

25    right?

LASINSKI - CROSS / HUR

1    **A.**    Correct.

2    **Q.**    It collects all content shown on each device; right?

3    **A.**    I'm not sure that it's all content, but it is certainly a

4    significant amount of content on each device.

5    **Q.**    It records every video you watch; right?

6    **A.**    Yes.  I mean, I just want to be accurate, for the record.

7    The Screenwise users have the ability to pause that.  So maybe

8    if they're watching a video, when it's paused, that would not

9    be recorded, but generally I think that it would record that.

10   **Q.**    If the meter is on, it's going to record the content of

11   every video a person watches; right?

12   **A.**    If the meter isn't paused, yes, that's correct.

13   **Q.**    In the meter is on, it collects every email a user writes?

14   **A.**    Are you asking me to confirm that?

15   **Q.**    Yes.

16   **A.**    Yeah, that's my understanding.

17   **Q.**    If the meter is on, it collects every email a user

18   receives; right?

19   **A.**    Yes, that's accurate.

20   **Q.**    If the meter is on, it collects every text that a user

21   writes; right?

22   **A.**    Correct.

23   **Q.**    If it's on, the meter collects all texts that the user

24   receives; right?

25   **A.**    That is correct.

1    **Q.**    It collects all the information a person provides to every

2    single website; right?

3    **A.**    Yes, that's what I understand it to do.

4    **Q.**    It collects Social Security numbers; right?

5    **A.**    That is correct.

6    **Q.**    It collects financial information; right?

7    **A.**    It does.

8    **Q.**    It collects credit card information, doesn't it?

9    **A.**    Sir, I'm just -- maybe you could slow down just a little

10    bit.  I'm saying, "Yes," and you're already on to the next

11    question.  But, yes, it does.

12    **Q.**    The Screenwise program was able to collect biometric

13    information; right?

14    **A.**    That's consistent with my understanding.

15    **Q.**    In addition to the data collected by the actual meters,

16    panel participants agree to provide additional information;

17    right?

18    **A.**    Yes.  They -- like, for example, I talked about this, they

19    fill out a survey.

20    **Q.**    They provide their phone number; right?

21    **A.**    Yes.  Yes, they do.

22    **Q.**    They tell Screenwise their marital status?

23    **A.**    That's part of the survey, is my understanding, yeah.

24    **Q.**    They provide their personal income?

25    **A.**    Yes, that's accurate.

1    **Q.**    They provide their household income?

2    **A.**    Yes.

3    **Q.**    And as you testified earlier, the Screenwise Panel is the

4    best indicator, in your view, of the harm in this case; right?

5    **A.**    Yes, that's right.

6    **Q.**    You're not an expert in conducting panel studies; right?

7    **A.**    That's accurate.  I am not an expert, but I use panel

8    studies in my job to provide economic information to people.

9    **Q.**    You don't design panel studies; right?

10    **A.**    That is accurate.  No, I do not.

11    **Q.**    You didn't compare the data obtained by the Screenwise

12    meter to the sWAA-off data in your report; right?

13    **A.**    I did not in my report, no.

14    **Q.**    You didn't do anything to attempt to determine the value

15    of any subset of the data collected by the Screenwise Panel;

16    right?

17    **A.**    No, I did not break it down in any way.

18    **Q.**    You didn't attempt to evaluate the value of text messages;

19    right?

20    **A.**    That is accurate.

21    **Q.**    You didn't attempt to evaluate the value of obtaining

22    emails; right?

23    **A.**    No.  I did not think that that was necessary for my

24    assignment, so I didn't do it.

25    **Q.**    You didn't attempt to evaluate the value of obtaining all

1    information inputted into websites; right?

2    **A.**   That is correct.

3    **Q.**   You didn't attempt to evaluate the value of collecting

4    every video a user watches?

5    **A.**   I did not -- I think what you're asking me, and just so

6    we're all on the same page here, is I didn't attempt to value

7    anything separately --

8    **Q.**   You didn't attempt --

9    **A.**   -- in that way, and I'm agreeing with you on that.

10   **Q.**   Okay.  You didn't evaluate the value of data collected by

11   the Screenwise meter being tied to a person's identity; right?

12   **A.**   I didn't look at that separately, no, of course not.

13   **Q.**   You didn't evaluate -- now, the Screenwise Panel allows

14   Google to use the participants' data for personalized

15   advertising; right?

16   **A.**   Could you just repeat?  I just want to make sure I have

17   it.

18   **Q.**   The Screenwise Panel terms allow use of participants' data

19   for personalized advertising; right?

20   **A.**   Oh, yeah, that's my understanding.

21   **Q.**   And in this case, sWAA-off data is not used for

22   personalized advertising; right?

23   **A.**   That's my -- yes, sWAA-off data is not used for

24   personalized advertising.

25   **Q.**   Your report does not acknowledge a single difference

1    between the data collected by the Screenwise Panel and the

2    sWAA-off data in this case; right?

3    A.    I -- in my report I say that the Screenwise data collected

4    is very, very significant.  So, yeah.  And I understand exactly

5    what the sWAA-off data is here, so I acknowledge that there are

6    differences.

7    Q.    Substantial differences; right?

8    A.    Yeah, substantial differences.

9    Q.    You didn't do any independent survey to test how much

10   users would have to be paid to give up their sWAA-off activity

11   data; right?

12   A.    I did not, no.  I think, on the one hand, you've got a

13   willing participant; and on the other hand, you've got an

14   unwilling participant like I talked about on direct, and

15   I think that that's a fair assumption to use in my analysis.

16   Q.    Let's talk about your testimony about willing versus

17   unwilling participants.

18        Do you remember being asked about this by my colleague

19   Mr. Santacana at your deposition?

20   A.    Yes, I do.

21   Q.    Do you remember that he asked you shouldn't unwilling

22   participants get paid more?

23   A.    Yes.

24   Q.    Do you remember that question?

25   A.    Yes.

1  **Q.**    Do you remember answering that question?

2  **A.**    I do.

3  **Q.**    And do you remember testifying that it could, in fact, be

4  higher but that you think "$3 is an appropriate price to

5  incentivize based on what I said -- based on what I said before

6  to incentivize those users to part with their data"; right?

7  **A.**    Yes.  That's exactly what I said.

8  **Q.**    So even if -- even in this case, where you say the

9  participants are unwilling, you believe that a one-time payment

10  of $3 per device is the appropriate amount; right?

11  **A.**    I believe that that's a conservative baseline that can be

12  used to determine what compensatory damages are, yes.

13  **Q.**    You believe $3 is the appropriate amount; right?

14  **A.**    $3, yes, on a -- yes.

15  **Q.**    And, in fact, there's no potential, no potential for

16  actual damages to be a lot higher than a one-time $3 payment

17  per class member device; right?

18  **A.**    No, that's not accurate.

19  **Q.**    Do you remember testifying at your deposition about this?

20  **A.**    Yes, I do.

21  **Q.**    Do you remember being asked if there was a potential that

22  the $3 payment should be a lot higher?

23  **A.**    That's exactly right.  I do not think that the $3 payment

24  should be a lot higher.  I think that you can look at the

25  number of months.  I said a one-time $3 payment, but I think

1  you can look at the number of months.  That's a different

2  question, but I do not think that the $3 should be a lot

3  higher.

4  **Q.**   Now, you -- your opinion is not that users in this case

5  should receive $3 per month; right?  That's not the opinion you

6  offer in this case?

7  **A.**   No, I don't -- I don't have that opinion.  I have the

8  opinion that a one-time payment, one monthly payment, if you

9  will, is a conservative baseline for determining damages for

10  compensatory damages.

11  **Q.**   Your opinion is that $3, one $3 payment should cover the

12  entire class period per device; right?

13  **A.**   I think that if the evidence shows that it's one time

14  if -- and I talk about this in my report -- one time -- a

15  one-time payment for a monthly amount, then, yeah, that's

16  correct -- that's correct.

17  **Q.**   Isn't it your opinion, Mr. Lasinski, that actual damages

18  through the end of the class period can be conservatively

19  measured by applying this $3 payment on a one-time basis to the

20  number of class member devices; right?

21  **A.**   I said that, yeah.  That's accurate.  I think you skipped

22  a word, though, because I said a $3 monthly payment.

23  **Q.**   You know what?  Let's pull it up.

24      Let me show you your report, your 2023 report,

25  paragraph 151.  I think you should have it in your binder from

1  the plaintiffs.

2  **A.**  I don't have it.  It wasn't in -- it wasn't in my binder.

3  **Q.**  Okay.  Let me get you a copy of it.

4      **MR. HUR:**  May I approach, Your Honor?

5      **THE COURT:**  You may.

6      **THE WITNESS:**  Thank you.

7  **BY MR. HUR:**

8  **Q.**  Mr. Lasinski, please turn to page 54.

9  **A.**  Yep.

10  **Q.**  And if you look towards the bottom of that paragraph, do

11  you see where it says, "While the Screenwise compensation

12  structure..."?

13  **A.**  Yes.

14  **Q.**  Can you read that sentence to the jury?

15  **A.**  Sure.

16      **MS. BONN:**  I'll object as to the rule of completeness

17  to this paragraph, and I'd ask that the paragraph be displayed

18  under Rule 106.

19      **MR. HUR:**  Your Honor, she can ask that on cross.  It's

20  a very long paragraph.

21      **THE COURT:**  Fair enough.  Go ahead.

22      **THE WITNESS:**  Which am I supposed to do now?  Read the

23  sentence that starts with "While"?

24  **BY MR. HUR:**

25  **Q.**  Yes, please.

1    **A.**    Okay.

2        [As read]:

3            "While the Screenwise compensation structure

4        applies this $3 payment per device per month, it is

5        my opinion that actual damages through December 2022

6        can be conservatively measured by applying this $3

7        payment on a one-time basis to the number of class

8        member devices where a single class member device

9        represents a mobile device, smartphone or tablet,

10       used within the WAA/sWAA off at least once during the

11       class period through December 2022.  I describe my

12       analysis in class" -- "of class member devices in

13       Section 8.2 below."

14   **Q.**   So you considered applying the $3 payment on a monthly

15   basis; right?

16   **A.**   That's right.

17   **Q.**   But you say, "It is my opinion that the actual damages can

18   be conservatively measured by applying this $3 payment on a

19   one-time basis..."; right?

20   **A.**   Right.  And then -- and then the rest of the sentence is

21   what I write, assuming that it is hitting an SDK one time.

22   **Q.**   Now, you were asked at your deposition about why you

23   didn't choose $4 instead of $3.  Do you remember that?

24   **A.**   Yes, I do.

25   **Q.**   And you say that, "Ultimately, there's a market

LASINSKI - CROSS / HUR

 1    transaction here that shows $3 per class member device is the

 2    right amount"; right?

 3    **A.**    Yes, that's right.

 4    **Q.**    $3 on a one-time basis; right?

 5    **A.**    Well, the market transaction is $3 on a monthly basis.

 6    **Q.**    You didn't say $3 on a monthly basis, did you?

 7    **A.**    Where?

 8    **Q.**    In your deposition.

 9    **A.**    There's a market transaction at $3?  We were talking about

10    monthly amounts at that time in my deposition.

11    **Q.**    Well, you were asked, "Why didn't you say $4 for a

12    one-time payment?"  Do you remember that?

13    **A.**    I do remember that, yes.

14    **Q.**    And do you recall testifying that, "Based on the totality

15    of the information available to me, I think that $3 is an

16    appropriate amount, a one-time payment of $3 is an appropriate

17    amount"; right?

18    **A.**    That's exactly what I testified to, and I think that

19    that's consistent with my report on a conservative basis.

20    **Q.**    That's your opinion today; right?

21    **A.**    That is, yes.

22    **Q.**    Now, you apply this $3 per class member device; right?

23    **A.**    That is correct, yes.

24    **Q.**    You don't do it per user; right?

25    **A.**    No, I do not; that's correct.

LASINSKI - CROSS / HUR

1  **Q.**   Now, a person with one device, say an Apple iPhone,

2  could spend six hours a day on that device; right?

3  **A.**   Are you asking me to --

4  **Q.**   It's hypothetical.

5  **A.**   Oh, yeah, sure, they could.

6  **Q.**   And a user with two devices, say an iPhone and an

7  iPad, could spend four hours on those devices combined; right?

8  **A.**   I think I'm following you.  That's -- that could happen.

9  **Q.**   But you assert that the $3 on a one-time basis should be

10  applied to each device; right?

11  **A.**   Yes.

12  **Q.**   No matter whether the person with multiple devices

13  actually spends more time using apps than the person with one

14  device; right?

15  **A.**   Yeah, that's exactly right.

16  **Q.**   You didn't do any analysis to suggest that people with

17  multiple devices spend multiples of more time using apps;

18  right?

19  **A.**   No.  I mean, the market transaction that we have here is a

20  per-device transaction, so that's what I used.

21  **Q.**   You didn't do any experiments to support the position that

22  someone with an iPhone and an iPad spends twice as much

23  time on apps than a person with just an iPhone?

24  **A.**   No, that's accurate.  You're -- well, no.  I'm agreeing

25  with you.  I just want to make sure that the record is clear.

**LASINSKI - CROSS / HUR**

1   Q.   Thank you.

2        If you had used class members as a multiple -- multiplier

3   instead of class member devices, then the total actual damages

4   you would have suggested is about 294 million; right?

5   A.   Are you asking me to multiply $3 by 97 million or

6   98 million?

7   Q.   Yes.

8   A.   Is that what you're asking?

9        If I were to just multiply $3 by 98 million, then that --

10  I'm assuming that that's right.  I didn't calculate that, but I

11  will agree with you.  I don't think it's the right metric, but

12  I will agree with you.

13  Q.   So if you had calculated based upon the number of users

14  rather than the number of devices, it's approximately

15  294 million; right?

16  A.   Again, if you're asking me if I multiply $3 by 200 -- I'm

17  sorry -- by 98 million, I'll take your word for it that it's

18  294 million.  That seems about right.

19  Q.   Sounds about right.

20       And the number of class members, as you told your counsel,

21  is about 98 million people; right?

22  A.   It is, yeah, that's right.

23  Q.   Your -- you didn't identify in your report how many people

24  participate in the Screenwise Panel; right?

25  A.   I did not, no.

1    Q.    The number of people who participated in it don't

2    necessarily -- isn't necessarily important for your analysis;

3    is that fair to assume?

4    A.    I'm not sure that that's fair to assume.  I understood

5    that Screenwise was going on for a long time, so I understand

6    it's a big program at Google --

7    Q.    You don't know --

8    A.    -- or at Ipsos.

9    Q.    -- how many people participate --

10   A.    Or at Ipsos.  I'm sorry.

11   Q.    Are you done with your answer?

12   A.    I am, yes.

13   Q.    You don't know how many people participated in the

14   Screenwise Panel; right?

15   A.    Well, the data that I reviewed in the record showed

16   budgets for anywhere between 25,000 and 125,000 people, and so

17   I have that information, that it's a significant number of

18   people.

19   Q.    That's a little less than 98 million people, fair to say?

20   A.    It's -- sure, sir, it is less than 98 million people.

21   Q.    It's a lot less than 175 million devices; right?

22   A.    Yeah.  If you're asking me if 25,000 to 125 is less,

23   significantly less, it is.

24   Q.    You also offer an opinion you call unjust enrichment; is

25   that right?

1    **A.**    I do, yes.

2    **Q.**    And in unjust enrichment, you're trying to determine what

3    the profits ought to be; right?

4    **A.**    Well, what I'm determining is the profits that shouldn't

5    have been.

6    **Q.**    You were trying to evaluate the profits that Google made

7    from the alleged conduct; right?

8    **A.**    That is accurate, yes.

9    **Q.**    Now, you first start by trying to allocate profits between

10   Class 1 and Class 2; isn't that right?

11   **A.**    That's correct.  Yes.

12   **Q.**    Can we --

13   **A.**    Wait.  I don't first start by that.  I end with Class 1

14   and Class 2.

15   **Q.**    Okay.  Well, that is part of your analysis, is trying to

16   allocate profits between Class 1 and Class 2; right?

17   **A.**    That is accurate, yes.

18           **MR. HUR:**  Can we pull up the plaintiffs' Slide 33?

19   **BY MR. HUR:**

20   **Q.**    Do you remember being shown this slide in the exam that

21   your counsel did with you?

22   **A.**    Yes, sir.

23   **Q.**    And do you see that under market share it says "Class 1

24   Android, 50.95 percent"?

25   **A.**    Yes, sir.

1  Q.   And do you see under Class 2 it says "Class 2 Other,

2  49.05 percent"?  Do you see that --

3  A.   Yes, sir.

4  Q.   -- Mr. Lasinski?

5  A.   Yes, sir.

6  Q.   "Class 1, Android" refers to Android devices; right?

7  A.   Yes, sir.

8  Q.   "Class 2, Other" is almost entirely Apple devices; right?

9  A.   I would think so, yes, sir.

10  Q.   And these are the numbers that were derived from the

11  survey that somebody named Mr. Keegan did; right?

12  A.   Correct.

13  Q.   You relied on that survey?

14  A.   Yes.

15  Q.   You relied on these market numbers?

16  A.   Yes.

17  Q.   If these numbers are wrong, then your allocation between

18  Class 1 and Class 2 would also be wrong; right?

19  A.   Well, if the starting point is inaccurate, then it would

20  be inaccurate, yes.

21       MR. HUR:  Okay.  We can take that down.

22  BY MR. HUR:

23  Q.   Now, in your unjust enrichment opinion, you were trying to

24  measure the value of something called conversion measurement;

25  right?

LASINSKI - CROSS / HUR

1   **A.**   Yes.

2   **Q.**   Conversion measurement is different from sending

3   personalized ads; right?

4   **A.**   Yes, it is.

5   **Q.**   Because you understand that in this case Google is not

6   using sWAA-off data to send personalized ads?

7   **A.**   Correct.

8   **Q.**   And you assumed, for purposes of your opinion, that the

9   data at issue here is de-identified; right?

10  **A.**   Yes, sir.

11  **Q.**   And you attempt to analyze what profits Google would have

12  lost if it had not received any data about sWAA-off users from

13  Google Analytics for Firebase; right?

14  **A.**   Yes, sir.

15  **Q.**   And you do this by trying to isolate revenue from the

16  conduct and subtracting costs; right?

17  **A.**   Yes, sir.

18  **Q.**   And, in fact, you showed the jury Slide 13.  Do you

19  remember showing the jury this slide?

20  **A.**   Yes, sir.

21  **Q.**   And this is a slide you prepared?

22  **A.**   Yes, sir.

23  **Q.**   And you said this came from profit and loss statements

24  about App Promo.  Do you remember testifying to that?

25  **A.**   Yes, sir.

 1   **Q.**   And you relied on the profit and loss statements for

 2   App Promo in putting this slide together; right?

 3   **A.**   Yes.

 4          **MR. HUR:**   Can we pull up Exhibit 588?  It's just for

 5   the witness.

 6   **BY MR. HUR:**

 7   **Q.**   Mr. Lasinski, is this the profit and loss statement that

 8   you relied upon in your report?

 9   **A.**   I believe that it is.  There were two profit and loss

10   statements that looked very similar, but -- so I'm not sure if

11   this is the one that looked similar to it or the one that I

12   actually relied upon in my analysis.

13          **MR. HUR:**   Can we show the first page of this exhibit

14   with the cover page with the Bates number?

15          I'll take a hard copy, if we have that.

16          Thank you, Brooklyn.

17   **BY MR. HUR:**

18   **Q.**   Mr. Lasinski, do you see that Bates number, the document

19   number on the bottom of that first page?

20   **A.**   Yes, I do.

21   **Q.**   Can you please turn to page 30 of your expert report?

22   **A.**   Yes, sir.

23          (Witness examines document.)  Okay.

24   **Q.**   Can you look at Footnote 150?

25   **A.**   Yes, sir.

1  **Q.**  Do you see that you cite this document in support of your

2  opinion?

3  **A.**  Yes.

4  **Q.**  Okay.  Let's go back to the exhibit.

5      So, now, Mr. Lasinski, do you agree that this is the

6  App Promo P&L that you relied upon in your report?

7  **A.**  Yes, sir.

8          **MR. HUR:**  Your Honor, we move to admit Exhibit 588.

9          **MS. BONN:**  Objection to a lack of foundation and

10  hearsay, especially given the reliability questions we have

11  about this document.

12          **THE COURT:**  Well, didn't your witness rely on it?

13          **MS. BONN:**  He relied on it, but that's a different

14  question from it being admitted for the truth of the matter

15  asserted in evidence by Google.

16          **THE COURT:**  Well, I think you can show it to the jury.

17  It's an item that was utilized by the witness in preparing

18  this, but I don't think it's independently admissible.

19          **MR. HUR:**  That's fine, Your Honor.

20      Let's display it to the jury.

21  **BY MR. HUR:**

22  **Q.**  Now, Mr. Lasinski, you state that these are U.S. revenues;

23  right?

24  **A.**  I believe that they are U.S. revenues.

25  **Q.**  And you see the traffic acquisition costs in line 28;

1  right?

2  **A.**    Yes, I do.

3  **Q.**    And you opine those are U.S. traffic acquisition costs;

4  right?

5  **A.**    Well, I understand that those are U.S. traffic acquisition

6  costs, or at least they were purported to be U.S. traffic

7  acquisition costs.  I talked about this in my direct.  I have

8  some doubts.

9  **Q.**    Your analysis relies on these traffic acquisition costs

10  being U.S.; right?

11  **A.**    It does, yes.

12  **Q.**    And you conclude in line 30 that the net revenue is, for

13  example, in 2017 $490,000,000; right?

14  **A.**    I believe that these are the numbers that are in my

15  schedules, so I would agree with this, but these are actually

16  Google-produced documents.  But if we looked at my schedules,

17  I think it would mirror this.

18  **Q.**    I think you're right, Mr. Lasinski, so I won't hold you to

19  the numbers.

20      But what you did was you relied on the net revenue, which

21  is the booked revenue minus the traffic acquisition costs;

22  right?

23  **A.**    Yes.  For these years, that's correct.

24  **Q.**    And you didn't include all of the other costs that are on

25  the P&L; right?

1    **A.**    I did not deduct those; that is accurate.

2    **Q.**    You didn't deduct any of the costs from line 35 all the

3    way down to line 118; right?

4    **A.**    No, because I believe that those would be fixed costs, not

5    incremental costs.

6    **Q.**    You didn't do any independent analysis to evaluate whether

7    any of these were fixed costs or incremental costs; right?

8    **A.**    No.  I spoke with Mr. Hochman about it and, you know, as

9    we discussed, I also worked in a parallel case where there was

10    testimony about whether or not these costs should -- would be

11    fixed or variable.

12    **Q.**    In this case, you haven't heard any testimony about

13    whether these costs should be fixed or variable; right?

14    **A.**    I have heard that.

15    **Q.**    You re- --

16    **A.**    I have heard testimony that they should be fixed, that

17    they would not be variable.

18    **Q.**    You heard that from Mr. Hochman?

19    **A.**    Correct.

20    **Q.**    Mr. Hochman -- Mr. Hochman is the entire basis for your

21    understanding of whether these costs are fixed or variable; is

22    that your testimony?

23    **A.**    No.  My testimony is I reviewed the evidence in the

24    record, first of all; second of all, I spoke with Mr. Hochman;

25    and then, third, you know, there's an admission in a prior case

 1   that I think is relevant here that would determine whether or

 2   not they were fixed or variable.

 3           MR. HUR:  Objection.  Move to strike, Your Honor.  The

 4   last part about the other case.

 5           MS. BONN:  He's on cross and he asked the question.

 6           THE COURT:  You asked the question.  Overruled.

 7   BY MR. HUR:

 8   Q.   Now, you can see under "Total Operating Expenses" that a

 9   lot of these expenses are for people; right?

10   A.   Yes.  Yes.  Engineers, engineering people.

11   Q.   And when a company makes less money, oftentimes that means

12   it ends up with fewer people; right?

13   A.   That is accurate, but we're talking about Google here,

14   not, you know, just any company.

15   Q.   You didn't do any analysis as to whether the conduct at

16   issue here would result in any changes in the number of

17   employees that would be needed to support the revenue; right?

18   A.   We asked for that information.  None was provided.  I

19   spoke with Mr. Hochman, so I do not believe that there would be

20   any difference -- differences here.

21   Q.   You asked for the information?

22   A.   The information --

23   Q.   Who did you ask?

24   A.   The information was asked for by our lawyers.

25           MR. HUR:  Your Honor, move to strike as nonresponsive.

1      **THE COURT:**  Well, I am going to grant that motion.

2      You shouldn't speculate on what was asked for and what was

3      received.

4      **THE WITNESS:**  Okay.

5      **BY MR. HUR:**

6      **Q.**   If you look at line 120, Mr. Lasinski, you see a line that

7      says "Operating Profit"?

8      **A.**   Yes, sir.

9      **Q.**   You didn't utilize the operating profit when determining

10     the profits Google made from the alleged conduct; right?

11     **A.**   No.  I believe that that would be inappropriate.

12     **Q.**   And you also looked at P&Ls for App Promo for 2021; right?

13     **A.**   P&Ls for App Promo for 2021, yes, that is accurate.

14     **Q.**   And you similarly did not use the operating profit line

15     when determining the profit that Google made from the alleged

16     conduct; right?

17     **A.**   Yeah, that is accurate.

18     **Q.**   Same with AdMob, you didn't rely on the operating profit

19     line when determining the profit that Google made from the

20     alleged use of this data; right?

21     **A.**   That is accurate.  I'm determining the incremental profit,

22     not the operating profit.

23     **Q.**   Now, same with Ad Manager?

24     **A.**   Sir, just to be clear, for Ad Manager, we did not receive

25     P&Ls.  I talked about that on my direct.

1  **Q.**   So you didn't determine, one way or the other, whether you

2  were relying upon operating profit when calculating AdMob

3  profit; is that right?

4  **A.**   I would not have been relying on operating profit.

5  **Q.**   I'm sorry.  I think I misspoke.  I said AdMob and I meant

6  Ad Manager, and I think you were answering about Ad Manager, so

7  let's try it again.

8  **A.**   Okay.

9  **Q.**   Mr. Lasinski, you weren't relying upon operating profit

10  when determining the profit that Google made from the alleged

11  conduct relating to Ad Manager; right?

12  **A.**   That is accurate.  I was not.

13           **MR. HUR:**  Now, can we put up Figure 14 from

14  Mr. Lasinski's report?

15  **BY MR. HUR:**

16  **Q.**   Now, you assumed, for purposes of your report and your

17  analysis, that 82 percent of Google's profits from the alleged

18  conduct were attributable to signed-in users; right?

19  **A.**   That is correct.

20  **Q.**   And this 82.2 percent comes from this figure; right?

21  **A.**   I think it comes from somewhere else in the -- in the

22  document.  There's a -- there's another schedule in the

23  document that shows revenue from signed-in and signed-out, and

24  I used that.

25  **Q.**   This isn't the impact tracker model that you testified

1    about this morning?

2    **A.**    This is -- oh, to be clear, this is the impact tracker

3    model that I testified about this morning.  You were asking me

4    if this page related to that, and I don't believe that this

5    page relates to what I used.

6    **Q.**    Okay.  Fair enough.

7          This is the impact tracker model, though, that you relied

8    upon to derive that 82 percent number; right?

9    **A.**    Yes, that's correct.

10   **Q.**    And this is the image of it that you showed the jury this

11   morning, right, in your slide?

12   **A.**    Yes, sir.

13   **Q.**    And it's clear from the top of this document that this

14   impact tracker model relates to GAP consent; right?

15   **A.**    Yes, sir.

16   **Q.**    And GAP consent is Google Ads personalization consent;

17   right?

18   **A.**    Yes, sir.

19   **Q.**    And if you look in the middle of the slide, can you read

20   what it says in big red letters?

21   **A.**    Yes.

22         [As read]:

23             "Can we create a model for WAA off?  What is the

24         percent impact of turning WAA off?"

25   **Q.**    This document, the very one you relies, asks the question

 1   what about -- what happens if WAA is off; right?

 2   A.   Yes, sir.

 3   Q.   And isn't it fair to assume that if the very document is

 4   asking the question what about WAA, that you can't rely on this

 5   document to answer that question?

 6   A.   No, sir.

 7   Q.   So you rely on a consent impact summary about a different

 8   setting to reach your conclusion that 82 percent of profits

 9   were attributable to signed-in users; is that right?

10   A.   Yes, sir.  I think that -- I think that the information

11   that underlies this is accurate, and that's why I used it.

12   Q.   Okay.  Even though it's not about WAA; right?

13   A.   Yes, sir.  Yeah.

14   Q.   And even though the document asks the question "What would

15   be the impact of WAA?"

16   A.   Exactly.  That's right.

17   Q.   Now, the impact tracker model forecasted the financial

18   impact foregoing personalized advertising in Europe; right?

19   A.   Yes, sir.

20   Q.   It's not about the U.S., is it?

21   A.   I agree with that, yes.  It's not about the U.S.; that's

22   right.

23   Q.   And you didn't actually -- right.

24        Now, you say you're not aware of any reason that a U.S.

25   number would be different; right?

1  **A.**   Correct.

2  **Q.**   But you didn't actually compare any -- you didn't actually

3  analyze potential differences between the U.S. and Europe;

4  right?

5  **A.**   I searched for additional information and there was none,

6  so I didn't analyze that, correct.

7  **Q.**   The impact tracker model is a forecast, isn't it?

8  **A.**   Yes.  It's looking at what might happen, but it's looking

9  at what might happen based on actual data in certain parts of

10  the tracker model.

11  **Q.**   The impact tracker model is a forecast; right,

12  Mr. Lasinski?

13  **A.**   Forecast which uses actual data, that is correct.

14  **Q.**   It's not telling users what actually -- it's not telling

15  Google what actually happened; right?

16  **A.**   Correct.

17  **Q.**   And the impact tracker model is your only source for the

18  assumption that 82 percent of Google's relevant alleged revenue

19  comes from signed-in users; right?

20  **A.**   That is my source.  Yes, that's correct.

21  **Q.**   Now, do you remember testifying about data attributable to

22  certain Google Analytics for Firebase conversion types --

23  **A.**   Yes, sir.

24  **Q.**   -- this morning?

25       And I believe you relied upon Google's Interrogatory

1    Number 17.  Do you remember that?

2    **A.**    Yes, sir.

3    **Q.**    And you carefully reviewed this document; right?

4    **A.**    Yes, sir.

5    **Q.**    You reviewed not just the parts that you liked but perhaps

6    parts that you may not have liked; right?

7    **A.**    I reviewed the entire document, sir.

8    **Q.**    You reviewed it carefully; right?

9    **A.**    Yes, sir.

10   **Q.**    And you relied on page 16 of Google's interrogatory

11   response.

12            **MR. HUR:**  If we can publish it to Mr. Lasinski.

13            **THE WITNESS:**  Yes, sir.

14            **MR. HUR:**  Can we blow up lines 3 through 8?

15       Can we show it to the jury as well?

16   **BY MR. HUR:**

17   **Q.**   Mr. Lasinski, this is the paragraph you relied upon when

18   your counsel was asking you about the revenue Google earned

19   from certain conversion types; right?

20   **A.**    Yes.  Attributes to certain conversion types, that's

21   exactly right.

22   **Q.**    Did you read the prior sentence when you rendered that

23   opinion?

24   **A.**    Yes, sir.  Well, I read it when I wrote my report.  I

25   don't know that I read it just a minute ago.

1    Q.    You didn't see it this morning; right?

2    A.    No.

3            MR. HUR:  Can we show the prior sentence?

4    BY MR. HUR:

5    Q.    Mr. Lasinski, you would agree with me that in the prior

6    sentence, Google defines what it means by attribution; right?

7    A.    Yes, sir.

8    Q.    And what Google says is [as read]:

9            "In a process called attribution, Google serves

10           as an accountant for the app developer/advertiser,

11           determining if the ad interaction and the conversion

12           recorded by GA4F or by a third-party SDK was made by

13           the same device or user so the developer/advertiser

14           can measure the effectiveness of the ad campaign."

15           Did I read that right --

16   A.    Yes, sir.

17   Q.    -- Mr. Lasinski?

18   A.    Yes, sir.

19   Q.    Google tells users -- or strike that.

20           Google said in this response that Google serves as an

21   accountant for the app developer and advertiser; right?

22   A.    Yes, sir.

23   Q.    And it's merely determining if the ad interaction and the

24   conversion recorded by Google Analytics for Firebase was made

25   by a device or not; right?

1    **A.**    Yes, sir.

2    **Q.**    And that's what conversion measurement is, isn't it?

3    **A.**    Yes, sir.

4    **Q.**    So when Google says that 55 percent of -- actually, let's

5    go to the next paragraph.

6        So when Google says approximately 55 percent of app

7    campaign revenue was attributable to conversion types bid

8    against GA4F, that just means that 55 percent of the ad revenue

9    was measured using Google Analytics for Firebase; right?

10   **A.**    Yes, sir.  And the data that we're talking about here,

11   that's right.

12   **Q.**    Now, let's look at the beginning of that -- this answer.

13   If we can go to page 14, lines 9 through -- lines 10 through 11

14   [as read]:

15            "Google Analytics for Firebase app measurement

16       data does not directly generate revenue for Google.

17       The product itself operates at a significant loss."

18       Do you see that?

19   **A.**    Yes, sir.

20   **Q.**    You read that when --

21   **A.**    Yes.

22   **Q.**    -- forming your opinion?

23   **A.**    Yes, sir, I did.

24   **Q.**    You read that just as carefully as you read the paragraphs

25   I just showed you?

1  **A.**   Yes, exactly.

2          **MR. HUR:**  We can take that down.

3  **BY MR. HUR:**

4  **Q.**   Mr. Lasinski, you agree it's important to correct any

5  errors in your analysis; right?

6  **A.**   Yes, sir.

7  **Q.**   And if you knew about errors, you would correct them;

8  right?

9  **A.**   Yes, sir.

10 **Q.**   And just this afternoon, right before I got up, you

11 offered a critique about your failure to analyze the impact of

12 a change in Apple's software.  Do you remember that?

13 **A.**   I'm sorry.  I don't -- I don't --

14         **MS. BONN:**  Objection.  Vague.

15 **BY MR. HUR:**

16 **Q.**   Do you remember being asked about a --

17         **THE COURT:**  Wait, wait, wait.  We've got now three

18 people talking.

19         **MR. HUR:**  I'm sorry, Your Honor.

20         **THE COURT:**  Okay.  Question.

21 **BY MR. HUR:**

22 **Q.**   Do you remember being asked about a software release that

23 Apple made that revealed a new feature called App Tracking

24 Transparency?

25 **A.**   Yes, sir.

LASINSKI - CROSS / HUR

1   **Q.**   And at the time of your deposition, you didn't know

2   whether Apple's software update changed Google's ability to

3   determine whether an iPhone user had sWAA on or off; right?

4   **A.**   That is correct, sir.

5   **Q.**   And you didn't -- now, you offered a supplemental report

6   earlier this year; right?

7   **A.**   Yes, sir.

8   **Q.**   You didn't mention any new opinion about App Tracking

9   Transparency, did you?

10  **A.**   No, sir.  I do not think that one's necessary.

11  **Q.**   And it is your opinion that Google can still measure

12  conversion measurements per device even when an iPhone user

13  has App Tracking Transparency enabled; isn't that what you

14  testified to this afternoon?

15  **A.**   My understanding is that they still get the sWAA-off data

16  whether -- when sWAA is off, and so Google gets that

17  information.  That's what I testified to.

18  **Q.**   Do you know, one way or the other, whether when an Apple

19  iPhone user has App Tracking Transparency off, whether Google

20  can measure conversions from that device?

21  **A.**   My understanding is that they can, that they use an

22  algorithm that can do that.  That's my understanding.

23  **Q.**   Your understanding is that Google can directly measure the

24  conversion event if an Apple iPhone user has App Tracking

25  Transparency enabled; is that your testimony?

1    **A.**    I'm not a technical expert.  You're getting into technical

2    details.  That's not my testimony.  I said that they still

3    collect the information, and that my understanding is that they

4    can make a conversion measurement off of that information.

5    **Q.**    You were willing to testify about technical issues when

6    your counsel was asking the questions, weren't you?

7    **A.**    I don't believe that I was, sir.

8    **Q.**    Mr. Lasinski, do you know, one way or the other, whether

9    when App Tracking Transparency is enabled, Google can actually

10   measure a conversion event from that iPhone?

11   **A.**    You're using the word "actually."  I -- again, I'm not the

12   technical expert, so I think you're outside the scope of my

13   opinions here.

14   **Q.**    Okay.  So you don't -- you're not offering an opinion one

15   way or the other on that; is that fair?

16   **A.**    Not on -- not on technical issues, no, sir.

17   **Q.**    You relied on something called the ChromeGuard study to

18   identify the proportion of AdMob revenue attributed to

19   conversion measurement; is that right?

20   **A.**    Yes, sir.

21   **Q.**    And you rely upon it to also identify the proportion of

22   Ad Manager revenue attributed to conversion measurement; right?

23   **A.**    Yes, sir.

24   **Q.**    Now, ChromeGuard, I think you said, was a study related to

25   the impact of changing certain settings in Chrome's incognito

1    mode; right?

2    **A.**    Well, I think it's actually going into incognito mode, so

3    it's changing settings in Chrome that you go into incognito

4    mode.

5    **Q.**    ChromeGuard is related to advertising on web browsers;

6    right?

7    **A.**    Yes, sir.

8    **Q.**    ChromeGuard is not about app activity data; right?

9    **A.**    Yes.  Well, I think that that's right.

10   **Q.**    Your report does not assert that ChromeGuard analyzed app

11   activity data; right?

12   **A.**    No, it does not.

13   **Q.**    Now, ChromeGuard was evaluating what would happen if all

14   conversion tracking on websites was disabled for Google and

15   third parties; right?

16   **A.**    Yes, sir.

17   **Q.**    And the plaintiffs here do not allege that third parties

18   should be disabled from tracking app conversions; right?

19   **A.**    Can you just repeat your prior question?  I was thinking

20   about that.  I think I might have misspoke.

21   **Q.**    ChromeGuard was evaluating what would happen if all

22   conversion tracking on websites was disabled for Google and

23   third parties; right?  You said at your deposition.

24   **A.**    Just to be -- yeah.  Just to be clear, it's for incognito

25   mode.  That's in incognito mode.  I'm not saying across the

1  board, like every single website, you know, any Chrome browser

2  would be; but, yes, for incognito mode.

3  **Q.**   Right.  So this ChromeGuard study was trying to evaluate

4  what would happen if all third-party cookies were blocked;

5  right?

6  **A.**   Yes, sir.

7  **Q.**   And that's both for Google and for third parties; right?

8  **A.**   Yes, sir.

9  **Q.**   And in this case, plaintiffs don't even allege that third

10  parties should be prevented from measuring conversions; right?

11  **A.**   Yes, sir, that's correct.

12  **Q.**   And, in fact, you didn't analyze whether third parties in

13  this case could actually conduct the conversion measurement if

14  Google could not; right?

15  **A.**   That -- my understanding is that they cannot, but I didn't

16  analyze that, no.

17  **Q.**   That understanding comes from Dr. Hochman?

18  **A.**   Yes, sir.

19  **Q.**   You didn't do anything independent to try to verify that

20  assertion; right?

21  **A.**   No, sir.  That's a technical area that I would not be able

22  to independently verify.

23  **Q.**   You don't even discuss third-party conversion measurement

24  providers in your report; right?

25  **A.**   No, I do not, sir.

1   Q.   You didn't consider in your analysis if app advertisers

2   might actually prefer to have third parties measure the success

3   of Google Ads rather than Google itself doing that measurement;

4   right?

5   A.   Well, if you look at the Google information, I don't think

6   that people would prefer, you know, app advertisers would

7   prefer third parties.  Google has a whole host of information,

8   but I didn't analyze third parties versus Google for what

9   you're asking me about.

10  Q.   You don't offer the opinion that app advertisers would

11  actually prefer Google to measure its own ads instead of

12  independent third parties; right?  That's not an opinion you

13  are offering in this case?

14  A.   I'm not offering that opinion; that's correct.

15  Q.   Now, Mr. Lasinski, I want you to imagine a world in which

16  Google required app developers to tell all of their users that

17  even with sWAA off, Google Analytics would still collect and

18  analyze data from that device.  Are you with me so far?

19  A.   Yeah, I think so.

20  Q.   And you didn't do any analysis that in that situation

21  where Google required app developers to not just tell app

22  developers that their user -- to tell app developers to tell

23  their users to disclose Google analytics.  I want you to

24  imagine a world where they also mention sWAA off.  Okay?

25  A.   I think I can follow you.

1   **Q.**   You think you're following me?

2   **A.**   I think so.

3   **Q.**   You didn't analyze whether in that situation, people would

4   just refuse to download apps; right?

5   **A.**   I don't believe so.  This hypothetical is outside the

6   scope of my report.  But I'm not a hundred percent sure I'm

7   following you, so I'm going to say "I don't believe so" as

8   opposed to "yes" or "no."

9   **Q.**   Okay.  Let's just make sure the setup is clear so we're on

10  the same page.  Is that fair?

11  **A.**   Sure.

12  **Q.**   So I want you to imagine that Google tells every app

13  developer that -- not just that it uses Google Analytics and to

14  tell its users that the app uses Google Analytics, but to also

15  mention to all of their users that Google will use that

16  analytics data even if the user has sWAA off.  Okay?  So I want

17  you to imagine that every app developer mentions sWAA in their

18  disclosure to every user.

19       Do you understand what I'm saying?

20  **A.**   I think so.

21  **Q.**   Did you analyze whether, for example, a person would

22  refuse to download the Uber app because the disclosure said

23  that?

24  **A.**   You're talking about this hypothetical world that you just

25  posed to me and you're asking me if I analyzed that?  No, I did

1   not analyze that.

2   **Q.**   You didn't analyze whether people would just refuse to

3   download apps if that disclosure had just mentioned sWAA?

4   **A.**   I'm very uncomfortable answering these questions because

5   I'm not a hundred percent sure I'm following what you're asking

6   me; but to the extent that I'm understanding it, I don't think

7   that I -- no, I did not do that.  I did not do any survey of

8   people about this topic.

9   **Q.**   You didn't do any survey asking whether people would

10  actually change whether or not they downloaded apps based upon

11  whether a disclosure had a few more words; right?

12  **A.**   I did not do a survey of people; that's correct.

13  **Q.**   Now, you're not an expert in conversion measurement;

14  right?

15  **A.**   No, I am not an expert in conversion measurement, with the

16  exception of being able to apply it in the economic setting I

17  did here.

18  **Q.**   And everything you know about conversion measurement, I

19  think we established, comes from Dr. Hochman; right?

20  **A.**   As well as the record, sir.

21  **Q.**   Can we pull up your Slide 5?

22      You made this slide?

23  **A.**   Yes, sir.

24  **Q.**   Mr. Lasinski, this is your understanding of how Google's

25  advertising business works?

1    A.    This is just a general understanding, yes, sir.

2    Q.    So in your understanding, Google serves the ad, right, at

3    the top in the green box?

4    A.    Yes, sir.

5    Q.    Then Google tracks the conversion?

6    A.    They do.  If something converts, they do track it, yes.

7    Q.    And then Google gets paid; right?

8    A.    Correct.

9    Q.    That's your understanding of how this business works;

10    right?

11    A.    I think it's a general understanding of how it works, yes.

12    Q.    If you're wrong about this, then you would agree your

13    analysis could be significantly flawed; right?

14    A.    No, sir.

15    Q.    No?  You can be wrong about this and it doesn't matter to

16    your report -- to your analysis of whether and how much Google

17    profited from conversion measurement?

18    A.    Yeah.  I mean, I may not be explaining Google's business

19    exactly perfectly, but I think I have a good enough

20    understanding for the products that I'm talking about that it

21    would not affect my analysis.

22    Q.    And this reflects your baseline understanding; right?

23    A.    Yes.

24    Q.    And you're confident this is correct; right?

25    A.    Yes, sir.

1   Q.   And if it's wrong, your analysis may no longer be

2   reliable; right?

3   A.   I don't believe that, sir.

4   Q.   You don't believe that it could be totally wrong and it

5   wouldn't affect your analysis; is that fair?

6   A.   I don't think it is totally wrong, so I don't think it

7   would affect my analysis.

8   Q.   Can you answer my question?  If it were wrong, could it

9   affect your analysis?

10  A.   I do not think so.

11  Q.   Okay.  Mr. Lasinski, you're not giving an opinion about

12  whether Google is liable in this case; right?

13  A.   No, sir, I am not.

14  Q.   You have no opinion on whether Google violated the law

15  here?

16  A.   That is correct, sir.

17  Q.   It's the jury's role to determine whether Google is

18  liable; right?

19  A.   My understanding of my role, just to be clear, is if

20  liability is found, then my numbers come into play.

21  Q.   And if liability is not found, then your opinions are not

22  necessary; right?

23  A.   I mean, I'm not a legal expert, but that's my

24  understanding.

25  Q.   Thank you.

LASINSKI - REDIRECT / BONN

1          **MR. HUR:**  No further questions, Your Honor.

2                     <u>**REDIRECT EXAMINATION**</u>

3    **BY MS. BONN:**

4    **Q.**   Just a few follow-ups, Mr. Lasinski.

5          You were just asked about a hypothetical world where all

6    these app developers out there are required by Google to tell

7    their users Google still collects this data even when sWAA is

8    off.  Do you remember that hypothetical?

9    **A.**   Yeah, I do.

10   **Q.**   Are you aware of any evidence whatsoever that even a

11   single third-party app in the real world was required by Google

12   to tell their users Google is still going to collect data even

13   if the sWAA button is off?

14   **A.**   No, I'm not.

15   **Q.**   Okay.  You were shown a portion of Google's response to

16   Interrogatory Number 17.

17          **MS. BONN:**  If we could please pull that up again.  And

18   could we zoom in at the paragraph under "Supplemental

19   Response"?  Thank you.

20   **BY MS. BONN:**

21   **Q.**   And do you remember Google's counsel read the statement

22   aloud that said [as read]:

23             "Google Analytics for Firebase app measurement

24        data does not directly generate revenue for Google.

25        The product itself operates at a significant loss"?

1          Do you see that?

2    **A.**    Yes, I do.

3    **Q.**    Can you read the sentence that follows immediately after

4    that, which was not read aloud by Google's counsel?

5    **A.**    Sure.

6          [As read]:

7              "However, GA4F helps Google's revenue-generating

8          functions because it leads to a virtuous cycle, in

9          the parlance of the GA4F Team, that helps developers

10         make their apps perform better, which in turn leads

11         to increased user engagement, which in turn leads to

12         app developers investing more in their apps and into

13         advertising their apps."

14   **Q.**    And is your opinion in this case that Google was able to

15   generate advertising revenue using data it collected from GA

16   for Firebase and tracking conversions against that data that

17   was collected from GA for Firebase?

18   **A.**    Yes, it is.

19   **Q.**    Your opinion in this case is not that GA for Firebase, as

20   a standalone business, generated some profit separate from

21   advertising revenue; is that correct?

22   **A.**    Right.  That's correct.

23   **Q.**    And you were asked some questions about conversion

24   tracking, whether Google makes money off of conversion

25   tracking.

1          Is your opinion based in part on what you heard from

2    Mr. Hochman, that many advertisers pay Google on the basis of

3    conversions?

4    **A.**    Yes, it is.

5    **Q.**    Okay.  You were also asked some questions about a term

6    that counsel used called "conversion measurement."  Do you

7    recall that?

8    **A.**    Yes.

9    **Q.**    And do you understand that Google uses different

10   terminology for attributing conversions when it's deterministic

11   or measured versus probabilistic or determined on the basis of

12   probabilities using their algorithm?

13   **A.**    Yes.

14   **Q.**    And was your opinion on conversion based on Google's

15   attribution of revenue to conversion, whether by measurement or

16   modeling?

17   **A.**    Yes, it was.

18   **Q.**    Okay.  You talked about the ads impact document.

19          **MS. BONN:**  And can we go to the slide that we showed

20   earlier?  Excuse me.  Thank you.

21          Can we zoom in on the box on the right-hand side of the

22   page?

23   **BY MS. BONN:**

24   **Q.**    And is that showing a portion of the ChromeGuard ads

25   impact incognito analysis that you relied on?

1  **A.**   Yes, it is.

2  **Q.**   When Google itself is conducting analyses internally and

3  saying, "We might give up a portion of the data we're

4  collecting and we want to know what kind of impact is that

5  going to have on our revenue or our profits," does Google

6  itself internally acknowledge that some of their revenue and

7  profits are generated by conversion-based auto bidding?

8  **A.**   Yes.  This is exactly what this document did for incognito

9  mode -- well, what was going to be incognito mode.

10  **Q.**   And when you were reviewing this ads impact document, and

11  based on your experience with this document in this case and

12  the parallel case, I mean, was there someone in Google saying,

13  "What are you talking about?  You're saying we're going to lose

14  a bunch of revenue from conversion.  We don't make money from

15  conversion"?  Are you aware of that ever happening?

16  **A.**   No, I'm not.

17  **Q.**   Okay.  You were shown a paragraph of your report about

18  Screenwise and whether it was $3 a month or $3 in total.

19  **A.**   Yes.

20          **MS. BONN:**  Can we pull up the 2023 report, at

21  paragraph 51?

22  **BY MS. BONN:**

23  **Q.**   And is this the paragraph where counsel asked you to read

24  a sentence into the record?

25  **A.**   Did you say 51?

1    Q.    151.

2    A.    151.  I was going to say, I don't think --

3    Q.    Thank you, sir.

4    A.    (Witness examines document.)  Yes, it is.

5    Q.    Okay.  And could you take a look at the sentence toward

6    the middle of the paragraph, starting with "More specifically"?

7    A.    Yes.

8    Q.    And could you read that into the record?

9    A.    Yes.

10    [As read]:

11    "More specifically, it is my opinion that the

12    baseline payment for Screenwise Panel participants of

13    $3 per month for using a Screenwise meter app on a

14    single mobile device (including both smartphones and

15    tablets) represents a conservative indicator of the

16    monthly payment necessary for an individual to

17    knowingly surrender the choice to keep app activity

18    private and allow Google to track app activity,

19    regardless of that individual's WAA or sWAA

20    settings."

21    Q.    And is that the portion of the paragraph where you made

22    clear that $3 was based on a single monthly payment?

23    A.    Yes.

24    Q.    Okay.

25    A.    And I can tell you, I'm never going to write a sentence

1    that long again in one of my reports.

2    **Q.**   Okay.  You were asked some questions in the examination a

3    moment ago about whether in some hypothetical world where

4    Google couldn't collect this data, someone else would just

5    collect it anyway, and how did that factor into your opinions.

6        Can we just bring this back to the analogy that you

7    offered on your direct examination of someone taking a

8    necklace?  And can you explain how this idea of "Well, if I

9    didn't take a necklace, someone else would have," I mean, is

10   that something that you think is pertinent to your calculation

11   of profits that Google earned or compensatory damage in this

12   case?

13   **A.**   No.  I mean, getting back to my example, if you think

14   about it, if someone stole your necklace and sold it for $500,

15   that's the amount of unjust enrichment.  That's the amount that

16   they made.

17       But if they were to say, "Hey, somebody else could steal

18   that information or take that information," it's not relevant

19   what they would make from it.

20   **Q.**   Okay.  I have some questions about the P&L that Google

21   showed you during your examination.

22       And is that the P&L where you could determine the revenue

23   for App Promo was U.S. but you now have concerns that they gave

24   you global traffic acquisition costs?

25   **A.**   Yes, it was.

1    Q.    Now, were these numbers in that P&L furnished by Google

2    for this case?

3    A.    I think that they were, yes.

4    Q.    Did Google represent that these were accurate numbers?

5    A.    Yes, they did.

6    Q.    Did you rely on these numbers because of Google's

7    representation about their accuracy?

8    A.    Yes.

9    Q.    After your report, have you received data that made you

10   believe that the TAC numbers Google reported in those P&Ls were

11   too high because they were global and yet reported against U.S.

12   revenue?

13   A.    Yes.  After my initial report, I received that

14   information.

15   Q.    And what was the information that now leads you to believe

16   that the TAC numbers Google furnished to you were global and,

17   yet, put in the same P&L as U.S. revenue?

18   A.    They were -- that was the U.S. -- I'm sorry -- the global

19   App Promo revenues versus the global TACs; and so if you look

20   at the comparison of them, that's why I think that.

21   Q.    And given that that P&L, you now believe there are

22   indicators that the TAC costs reported were global, does that

23   also cause you to have questions about whether the other costs,

24   what you called fixed costs listed on that P&L, may have been

25   global as well?

1    **A.**    Yeah, I think that's a reasonable inference.

2    **Q.**    If the numbers that you used for TACs to deduct from

3    revenue were too high because of a problem or a mistake in what

4    Google furnished, how would that have affected your

5    calculations?

6    **A.**    My numbers would be lower in my calculations because the

7    costs would be too high.

8    **Q.**    And how does that affect the profits, sir?  What is the

9    difference in the profits that the error, potential error, in

10   the furnishing of this traffic acquisition costs would have led

11   to?

12   **A.**    The profits should be higher.  The profits should be

13   higher because the costs I was using were too high.

14        **MS. BONN:**  And can we show just to put the -- make

15   sure the witness is seeing the number, the slide that has the

16   alternate calculation?

17        **MR. HUR:**  Your Honor, I object.  This is beyond the

18   scope of cross-examination.

19        **THE COURT:**  Well, you've gone over all this, so I

20   don't think you need it.

21        **MS. BONN:**  Okay.  That's fine.  Thank you, Your Honor.

22   I think nothing further.

23        **THE COURT:**  All right.  Anything further?

24        **MR. HUR:**  Your Honor, very limited.

25        **THE COURT:**  Very, yes.

PROCEEDINGS

1        **<u>RECROSS-EXAMINATION</u>**

2   **BY MR. HUR:**

3   Q.   Mr. Lasinski, you're trying to evaluate the profits Google

4   earned from conversion measurement; right?

5   A.   Conversion measurement, yes.

6   Q.   You're not trying to evaluate the profits Google earned

7   from selling ads; right?

8   A.   I think -- I think that the ads that they actually use the

9   conversion measurement for are the profits that are at issue

10  here.

11  Q.   Right.  But you're trying to distill the amount of profit

12  Google made from the conversion measurement portion; right?

13  A.   I believe that that's accurate, yes.

14  Q.   And that's because the sWAA-off data was used for a

15  conversion measurement; right?

16  A.   It is, yes.

17  Q.   Now, you keep going back to this example of a necklace.

18  Do you remember that?

19  A.   Yes.

20  Q.   And it's true that a rational person would not pay more

21  for the necklace than they could profit by selling it; right?

22  A.   Oh, yeah, I think that that's right.

23          **MR. HUR:**  Thank you.  No further questions.

24          **THE COURT:**  All right.  You may step down.

25                          (Witness excused.)

1    **THE COURT:**  So, members of the jury, we've reached the

2    end of the day.  Remember my admonitions.  Do not discuss this

3    amongst yourselves or with anyone else.  Don't do any research.

4    Don't think about this case.  Set it aside.  If you hear

5    anything about it, ignore it.  And we'll see you back here to

6    get started at 8:30 tomorrow morning.

7        (Proceedings were heard out of the presence of the jury.)

8        **THE COURT:**  We're out of the presence of the jury.

9        I'm assuming that we're going to be doing more than one or

10   two witnesses a day, if this witness list is still accurate.

11       Okay.  R.J., you want to give them the official word?

12       **THE LAW CLERK:**  Plaintiffs have 12 hours, 15 minutes,

13   and 40 seconds.  Defendant has 12 hours, 34 minutes, and

14   14 seconds.  And for what it's worth, today, Plaintiffs, you

15   used 2 hours and 15 minutes and, Defendant, you used an hour

16   and 51 and 48 seconds.

17       **THE COURT:**  Okay.

18       **MR. DAVID BOIES:**  We have -- Your Honor, we spoke

19   among ourselves with respect to Mr. Ruemmler.

20       **THE COURT:**  Ruemmler.

21       **MR. DAVID BOIES:**  Ruemmler.  And we've not been able

22   to reach agreement.  They are still taking the position that

23   they're not going to bring him.  So we're going to have to

24   resolve that.

25       If I could hand up just a two-page response to the brief

1    they filed.

2         **THE COURT:**  Well, you can certainly do that.

3         **MR. DAVID BOIES:**  If that would be helpful.

4         **THE COURT:**  But I'll hear Mr. Attanasio.

5         **MR. ATTANASIO:**  Thank you, Your Honor.

6    I would suggest the way we think about this is a little

7    more straightforward than it may appear.

8         Sometime tomorrow plaintiffs are not going to have a

9    witness in the hallway ready to go.  They're going to need to

10   rest.  One of the witnesses who will not be in the hallway is

11   Mr. Ruemmler; and so with that understanding, then we say:

12   Well, why is that?

13        And normally, when plaintiffs or defense don't have a

14   witness ready to go, the Court has the discretion to say,

15   "You've rested."

16        **THE COURT:**  That's not the question in my mind.  The

17   question in my mind is the 24-hour understanding that I have.

18   I want -- I want each side to tell the other side, 24 hours

19   before the witness is hitting the stand, who the witnesses are.

20        Did they tell you or not?  That's the only question I care

21   about.  If the answer is that they did, Ruemmler should be

22   here.  If they didn't, Ruemmler doesn't have to be here.  I

23   don't care about what went on before that, the back-and-forth,

24   the maybe he's coming, maybe he's not.  That's the question for

25   me.  So whether or not they run out of witnesses, that's also

 1    not my question.

 2        Did they give you the -- my rule on the notice?  That's

 3    all I care about.  What's the answer to that question?

 4            **MR. ATTANASIO:**  The answer is no.

 5            **THE COURT:**  Okay.

 6            **MR. ATTANASIO:**  The answer is on Friday they told

 7    us --

 8            **THE COURT:**  I don't care about Friday, Mr. Attanasio.

 9    I want to know about 24 hours before tomorrow, which is

10    Tuesday.  When they were -- or today, when they were getting

11    ready for today's testimony and they -- did they list Ruemmler

12    and say, "We want him"?

13            **MR. ATTANASIO:**  I want to be -- I don't want to be off

14    base with the Court, so I want to answer this directly.

15        Last night, after history that I will say is relevant,

16    Your Honor, they put Ruemmler back on their list; that is true.

17            **THE COURT:**  History is not relevant to me because --

18    and I'll tell you, quite candidly, I don't want to get into the

19    sandbox with you guys leading up to all -- because it makes it

20    quite straightforward for me.  That's my rule.

21        You can fight between yourselves.  I don't care.  I want

22    to know if you're abiding by my rule; and if you are, that

23    gentleman is going to be here.  If you're not, he doesn't have

24    to be here.  That's the only relevant question.

25            **MR. ATTANASIO:**  The reason I started where I did is

1  because he is not here.  He is in New York.

2      **THE COURT:**  There are airplanes that go all the time.

3  Get him on an airplane.

4      **MR. ATTANASIO:**  If that's the Court's order, we will

5  get him on an airplane.

6      **THE COURT:**  That is my order.  Okay.

7      **MR. DAVID BOIES:**  Thank you, Your Honor.

8      **MR. ATTANASIO:**  Your Honor, we -- Your Honor, I

9  appreciate the Court's 24-hour rule.  We negotiated, in the

10  interest of efficiency and helping the Court and the jury, a

11  three-day rule, which we filed with the Court on the court

12  filing system.

13      **THE COURT:**  So?

14      **MR. ATTANASIO:**  Well, are we not entitled to rely on

15  that?  It's a rhetorical --

16      **THE COURT:**  Did I sign that as my order?

17      **MR. DAVID BOIES:**  No, Your Honor, you did not.

18      **THE COURT:**  I am not going to police the arrangements

19  you have with the other side.  My orders are the ones, to me,

20  that are important.  You follow those.

21      If you want to make an independent agreement, I'm just not

22  going to get into policing your agreements vis-à-vis each

23  other.  If it's a stipulation that I've signed, that may be a

24  different proposition.  But it's a fool's errand for me to get

25  involved in all of those things.

PROCEEDINGS

1    Now, at the same time, I don't know why you can't work

2  this out.  If you needed to call him out of order or something,

3  if he can't be here tomorrow, I don't have a problem with

4  saying, "Okay, he'll go on Wednesday," and you call him out of

5  order or what -- something like that.  That's all right.

6    But otherwise, I am surprised you're actually asking me if

7  you got the notice that was consistent with my order.

8    **MR. ATTANASIO:**  Your Honor, we are entitled to rely on

9  the following:  Plaintiffs' counsel tells us not anything about

10  Mr. Ruemmler, that they're resting twice without Mr. Ruemmler,

11  "We are resting our case without Mr. Ruemmler."  If I can't

12  rely on that, from experienced counsel --

13    **MR. DAVID BOIES:**  Your Honor.

14    **MR. ATTANASIO:**  -- then --

15    **THE COURT:**  When did they say they were resting?

16  Did --

17    **MR. ATTANASIO:**  I can read it to you.

18    **THE COURT:**  You see, this -- I'll do this, I'll engage

19  in this, but this is precisely why I don't want to do this.

20    This is going to be -- there's going to be language in

21  there that says, "We reserve our right to call the witness

22  back.  We think at this point in time that it is -- we're not

23  going to call him."  I'm not going to start parsing your words

24  about this stuff.  You're adults.  You're big boys and girls.

25  Work it out.

1    **MR. DAVID BOIES:**  And, Your Honor -- and, Your Honor,

2    if I could --

3        **THE COURT:**  Wait, wait, wait.

4      Go ahead.

5        **MR. ATTANASIO:**  That is exactly what we've been trying

6    to do; and when counsel tells us, "We indicated in our

7    disclosures yesterday we would be passing the case to you guys

8    on Tuesday, so we don't have any further disclosures," and the

9    state of the record at that moment is that Mr. Ruemmler is off

10   the list, I want to be very clear, "We indicated in our

11   disclosure yesterday we would be passing the case to you guys,

12   to the defense, on Tuesday, tomorrow morning."

13       **THE COURT:**  Where is the "Ruemmler" name involved in

14   this?

15       **MR. ATTANASIO:**  Ruemmler -- so we don't have any

16   further disclosures.  The disclosures at that moment did not

17   include Ruemmler.  The witness list, we had the disclosures, no

18   Ruemmler.  "We're resting."

19       **THE COURT:**  Okay.  Go ahead, Mr. Boies.

20       **MR. DAVID BOIES:**  Your Honor, this is -- was a text

21   message with one of our associates relating to disclosure of

22   documents.  It did not have to -- and what they were doing was

23   simply repeating what they had been told formerly in an email,

24   that many things can happen in trial and we reserve our right

25   to make changes.  We told them.

1    And this is a situation in which Mr. Ruemmler was on their

2  witness list.  They told the jury they were going to call him.

3    Our view was up until Sunday night -- we were going back

4  and forth, but our basic view is:  Let them call him in their

5  direct case.

6    It became clear to us Sunday they were not going to call

7  him in their direct case, so we said, "He's still under

8  subpoena.  We never released him."  They never asked us to

9  release him from the subpoena ever.  They knew what was going

10  on.

11    And I apologize that this got to the Court.

12    **MR. ATTANASIO:**  As do I, but we've been whipsawed by

13  these witness issues, four of them now, and it's a little

14  frustrating, to be honest.  We don't want to engage the Court

15  on --

16    **THE COURT:**  At the same time, taking your conclusion

17  to its limit is, then parties won't -- if a party says to the

18  other, "I don't think we're going to need him," you're going to

19  then have a situation where there won't even be interchange

20  because of, well, then you're relying on that and sending the

21  witness forth if they give you an assessment at a particular

22  time that they don't think they're going to need that witness.

23    **MR. ATTANASIO:**  Your Honor --

24    **THE COURT:**  It behooved you that point, Mr. Attanasio,

25  to say, "We want to let Mr. Ruemmler go home to wherever he's

**PROCEEDINGS**

 1   from.  And is that -- are you -- yes or no?  Can we do that?"

 2   At that point it was your job to do that, not to take some

 3   comment that somebody on their team said, "We don't think we're

 4   going to need him," when -- in the back-and-forth and then you

 5   put him on a plane and send him out of here.  That is not -- I

 6   don't think that is appropriate.

 7           **MR. ATTANASIO:**  I cited one exchange.  The record that

 8   Your Honor has is replete with them.  And there's not a problem

 9   with the exchanges.

10       I'll give you an example of why this is not a problem.

11   Mr. Heft-Luthy, they made a mistake.  They didn't include him.

12   I'm not squawking about that.  He'll be here tomorrow morning

13   first thing.  They didn't include him on their disclosure list.

14       It would behoove -- if I were going to make that argument,

15   "Oh, you're caught with your pants down" -- I wouldn't do that

16   to counsel.  This record is much different.  And I know

17   Your Honor doesn't want to get into the weeds, but if you look

18   at our motion on this, I started where I started for a very

19   good reason.

20           Mr. Ruemmler as of tomorrow morning -- we'll get him on a

21   plane if that's the order; but as of tomorrow morning, they

22   will be out of witnesses.  Mr. Ruemmler won't be out there.

23   He'll be on a plane.

24           **THE COURT:**  Well, do you have an objection, if he

25   needs time to get here, to call him out of order?

PROCEEDINGS

1       **MR. ATTANASIO:**  Of course not, Your Honor.  I think

2  plaintiffs have created -- you know, what is frustrating is

3  that the defense is being prejudiced by this.  We should have

4  had -- the reason for the three-day rule is so counsel has an

5  opportunity, in this complex case -- Your Honor's aware of

6  Mr. Ruemmler's role here through opening --

7       **THE COURT:**  Well, what is Ruemmler's --

8       **MR. ATTANASIO:**  -- to prepare --

9       **THE COURT:**  -- personal situation?

10    What is the problem here?

11       **MR. ATTANASIO:**  Well --

12       **THE COURT:**  He's gone to New York.  Okay.  Is there

13  some reason he can't come back?

14       **MR. ATTANASIO:**  Your Honor, as far as I know, he can

15  come back.  He's on a trip with his daughter.  We'll pull him

16  back.

17    But I hesitate to add this, but we had a right to prepare

18  him this weekend if he's testifying tomorrow.  He's an

19  important witness.  He was all over opening statement.  We sent

20  him home.  We haven't prepared him in the last 72 hours.  We

21  haven't --

22       **THE COURT:**  Well, have you listened to me that you can

23  call him out of order, you don't have to call him tomorrow or

24  they won't be allowed to call him tomorrow?  They can rest, and

25  then they can re- -- if you take that position, then I'm going

**PROCEEDINGS**

 1  to have you get started, and then they can call him on

 2  Wednesday, out of order.

 3          **MR. ATTANASIO:**  In the middle of our case?

 4          **THE COURT:**  Well, yes.  And I'm sorry, I don't find

 5  that to be much of a prejudice to you in light of the fact that

 6  I think this whole situation is regrettable for all concerned.

 7  I mean --

 8          **MR. ATTANASIO:**  Understood.

 9          **THE COURT:**  -- bring him in.  I want Ruemmler back

10  here.

11          **MR. ATTANASIO:**  We're bringing him in.

12          **THE COURT:**  And then you can work out at what moment

13  in time he hits the stand.  I'm not insisting he be on the

14  stand tomorrow, but he's coming back.

15          **MR. ATTANASIO:**  Understood.

16          **THE COURT:**  Okay.

17          **MR. HUR:**  Your Honor, we've got an unrelated and

18  non-controversial, I think --

19          **THE COURT:**  Oh, that's good.

20          **MR. HUR:**  -- housekeeping issue.

21          **THE COURT:**  Go ahead, Mr. Hur.  All the

22  non-controversial stuff you can lay on me.

23          **MR. HUR:**  Your Honor, we heard you suggest to the

24  parties that we should try to be done with evidence this week.

25  I just wanted to get your sense as to when you would want any

1    updated jury instructions and the like --

2              **THE COURT:**  Right.

3              **MR. HUR:**  -- so that we can make sure that process is

4    efficient.

5              **THE COURT:**  I think that ball is in my court.  What

6    I'm going to try to do is to get you, and I don't have a

7    specific -- my hope was to get something to you certainly by

8    midweek, and then we would have an opportunity, before this

9    week was out, to have a conference.

10         To be candid with you, my grand scheme is complicated a

11   bit, because as you may look when you see my calendar, tomorrow

12   I have a TRO requesting that I enjoin the Administration on

13   some issues of consequence, and so that has stalled things a

14   bit.

15         By the way, you're going to have to -- it's going to be a

16   Zoom hearing, but I'm going to do it in court, so there may be

17   people here.  And so tomorrow, once we're done, you got to move

18   this stuff off.  That's at 3 o'clock.

19         I'm still hoping that sort of by midweek, I can get you a

20   proposed draft of the verdict -- of the jury instructions and

21   verdict form so we have something you can use as the

22   foundation.  That's my plan.  So I'm hoping I can do that.

23             **MR. HUR:**  Thank you, Your Honor.

24         I think there was one error in what was filed, and so we

25   would like to correct that.  I think one of the versions was

**PROCEEDINGS**

 1  not Google's most updated when it was filed, so we'd like to

 2  get that to you.

 3          **THE COURT:**  Sure.

 4          **MR. HUR:**  And if the parties have any additional

 5  instructions or anything else, can we file those?

 6          **THE COURT:**  Sure.

 7          **MR. HUR:**  It sounds like we should do it promptly.

 8          **THE COURT:**  I mean, I know this is an iterative

 9  process between you and me, and you can continue to file

10  updates about jury instructions and verdict form as we move

11  along.

12          **MR. HUR:**  Thank you, Your Honor.

13          **THE COURT:**  And is it possible to get those updates by

14  Wednesday?

15          **MR. HUR:**  Yes, Your Honor.

16          **MS. ANDERSON:**  And, Your Honor, just for the record,

17  since I'm working on jury instructions, that we have been

18  filing those jointly, so we'll work with them to file whatever

19  the new one is jointly.

20          **THE COURT:**  That's great.  I appreciate that, and that

21  is helpful to me.

22          **MS. ANDERSON:**  Thank you.

23          **MR. HUR:**  Thank you, Your Honor.

24          **MR. MAO:**  Just a quick administrative issue,

25  Your Honor, was the exhibits of Dr. Hochman, the plaintiffs'

1    data.

2              THE COURT:  What about them?

3              MR. MAO:  Right.  So if you recall, we didn't admit

4    them because they were too voluminous, and you wanted me to

5    reduce them.

6         So what I did was -- there were four.  There's 442, 452,

7    453, 454.  So what I proposed -- you admitted 442, and then we

8    stopped on 453.

9         So what I proposed to defendants was, I reduced the ten

10   boxes to just this folder.  I took out 452.  It's 442, 453, and

11   454.  It's really just a compilation of the other two boxes.

12             MR. SANTACANA:  Your Honor, this was handed to me when

13   the trial day started.  I haven't looked at it, but I will.

14             THE COURT:  Okay.  We'll take that up again after

15   you've had an opportunity to look at it.

16             MR. SANTACANA:  Thank you, Your Honor.

17             MR. MAO:  Thank you, Your Honor.

18             THE COURT:  Any other things?

19             MR. DAVID BOIES:  No, Your Honor.

20             THE COURT:  Thank you.  See you tomorrow.

21             THE COURTROOM DEPUTY:  Court stands in recess.

22                  (Proceedings adjourned at 1:46 p.m.)

23                       ---o0o---

24

25

1

2                       **<u>CERTIFICATE OF REPORTER</u>**

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Tuesday, August 26, 2025

7

8

9

10

11    _____

12          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13          CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25