```
                                    Volume 6

                                 Pages 1018 - 1220

                     UNITED STATES DISTRICT COURT

                     NORTHERN DISTRICT OF CALIFORNIA

        Before The Honorable Richard Seeborg, Judge

        ANIBAL RODRIGUEZ, et al.,      )
        individually and on behalf of  )
        all others similarly situated, )
                                       )
                  Plaintiffs,          )
                                       )
          VS.                          )   NO. 3:20-CV-04688 RS
                                       )
        GOOGLE LLC,                    )
                                       )
                  Defendant.           )
        _____)

                                   San Francisco, California
                                   Tuesday, August 26, 2025

                     TRANSCRIPT OF JURY TRIAL PROCEEDINGS

        APPEARANCES:

        For Plaintiffs:

                        BOIES SCHILLER FLEXNER LLP
                        333 Main Street
                        Armonk, New York 10504
                   BY:  DAVID BOIES, ATTORNEY AT LAW
                        ALEXANDER BOIES, ATTORNEY AT LAW

                        BOIES SCHILLER FLEXNER LLP
                        2029 Century Park East, Suite 1520n
                        Los Angeles, California 90067
                   BY:  ALISON L. ANDERSON, ATTORNEY AT LAW

        REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                      CSR No. 7445, Official United States Reporter
```

1    **APPEARANCES**:   (CONTINUED)

2    For Plaintiffs:

3                                BOIES SCHILLER FLEXNER LLP
                                 100 Southeast Second Street, Suite 2800
                                 Miami, Florida 33131
4                          BY:   **JAMES W. LEE, ATTORNEY AT LAW**

5                                BOIES SCHILLER FLEXNER LLP
                                 44 Montgomery Street, 41st Floor
6                                San Francisco, California 94104
                           BY:   **MARK C. MAO, ATTORNEY AT LAW**

7

8                                SUSMAN GODFREY LLP
                                 One Manhattan West, 50th Floor
                                 New York, New York 10001
9                          BY:   **WILLIAM C. CARMODY, ATTORNEY AT LAW**
                                 **RYAN SILA, ATTORNEY AT LAW**

10

11                               SUSMAN GODFREY LLP
                                 1900 Avenue of the Stars, Suite 1400
                                 Los Angeles, California 90067
12                         BY:   **AMANDA BONN, ATTORNEY AT LAW**

13   For Defendant:

14                               COOLEY LLP
                                 Three Embarcadero Center, 20th Floor
                                 San Francisco, California 94111-4004
15                         BY:   **BENEDICT Y. HUR, ATTORNEY AT LAW**
                                 **EDUARDO E. SANTACANA, ATTORNEY AT LAW**
16                               **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
                                 **ISABELLA M.M. CORBO, ATTORNEY AT LAW**

17

18                               COOLEY LLP
                                 4401 Eastgate Mall
                                 San Diego, California 92121
19                         BY:   **MICHAEL A. ATTANASIO, ATTORNEY AT LAW**

20

21   Also Present:               **Steve Ganem, Google**
                                 **Julian Santiago**

22

23

24

25

1

<u>**I N D E X**</u>

2

3     Tuesday, August 26, 2025 - Volume 6

4                                                      <u>**PAGE**</u>  <u>**VOL.**</u>

5     Plaintiffs Rest                                  1124    6

6

7     <u>**PLAINTIFFS' WITNESSES**</u>                          <u>**PAGE**</u>  <u>**VOL.**</u>

8     <u>**HEFT-LUTHY, SAM**</u>
      (SWORN)                                          1036    6
9     Direct Examination by Mr. David Boies            1037    6
      Cross-Examination by Mr. Attanasio               1072    6
10    Redirect Examination by Mr. David Boies          1095    6

11

12    <u>**KEARNS, J.K.**</u>
      By Video Deposition                              1123    6

13

14    <u>**MIRAGLIA, ERIC**</u>
      By Video Deposition                              1124    6

15

16    <u>**DEFENDANT'S WITNESSES**</u>                          <u>**PAGE**</u>  <u>**VOL.**</u>

17    <u>**GANEM, STEVE**</u>
      (SWORN)                                          1125    6
18    Direct Examination by Mr. Santacana              1126    6
      Cross-Examination by Mr. David Boies             1190    6

19

20

21

22

23

24

25

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| PX6 | | 1039 | 6 |
| PX18 | | 1044 | 6 |
| PX40 | | 1050 | 6 |
| PX42 | | 1062 | 6 |
| PX163 | | 1197 | 6 |
| PX212 | | 1053 | 6 |
| PX213 | | 1065 | 6 |
| PX217 | | 1070 | 6 |
| G561 | | 1203 | 6 |
| G926 | | 1181 | 6 |
| G929 | | 1179 | 6 |
| G933, pages 32 to 42 | | 1148 | 6 |

| | |
|---|---|
| 1 | **Tuesday - August 26, 2025**                                      **8:11 a.m.** |

2                              **P R O C E E D I N G S**

3                                 ---o0o---

4        (Proceedings were heard out of the presence of the jury.)

5              **THE COURT:**  Good morning.

6              **ALL:**  Good morning, Your Honor.

7              **THE COURT:**  So I got some communications from you

8    folks last night.  Thank you for keeping submissions short.  I

9    appreciate that.

10       Let me address some of them.  First of all, with respect

11   to Hoffman, I appreciate the efforts or the comments by the

12   plaintiffs that they are trying to streamline things.  I, of

13   course, like that.

14       But I do think that Hoffman can testify in Google's case.

15   I think the areas of that testimony are to be limited to its --

16   as I read Google's response, it's that, "Well, we should be

17   entitled to rebut what the named plaintiffs" -- "even if the

18   expert hasn't testified, what the named plaintiffs have put in

19   play."  And that's all hardly something that everyone wasn't

20   aware of before.

21       But those in particular, as Google identified them, are

22   that the disclosures are confusing, that the button is fake,

23   and that the users really have no choice but to continue to

24   use.  That is the limit of the area that Hoffman can testify

25   to, but I think Hoffman can testify.

1    With respect to Kearns, let's start with the deposition.

2 The deposition can come in, page 87.  I think the

3 counterdesignation also can come in.  So there you are.

4    With respect to the exhibits, PX10, that one, I think, can

5 be admitted.

6    Exhibits PX13 and 5, Kearns is on a thread of -- I think

7 it's 11 people.  It's about search generally.  It's not sWAA

8 specific.  I think it could lead to some confusion.  I think

9 under Rule 403, those should not be admitted.

10    Okay.

11        **MS. ANDERSON:**  Your Honor, can I just clarify?

12        **THE COURT:**  Yes.

13        **MS. ANDERSON:**  So I think with that ruling, we'll

14 probably trim down the designations.  And we're actually --

15 I think we're fine just admitting the exhibit with no depo

16 playing unless there's -- if there's just the one.

17        **MR. CORBO:**  Isabella Corbo for Google.

18    We would ask that the deposition be played if the exhibit

19 is going to be admitted.  The deposition testimony specifically

20 mentions that Mr. Kearns' comments are in the context of

21 Google Search with respect to PX5.  So we need that context to

22 be played to the jury.

23        **THE COURT:**  Well, PX5 is not being admitted.

24        **MS. ANDERSON:**  Just PX10.

25        **THE COURT:**  Just 10.

1      **MR. CORBO:**  That's what I meant, PX10.

2      **THE COURT:**  So 10 is addressed in -- what is this?  On

3  page 87?

4      **MR. CORBO:**  No.  This is on page 77 of the deposition.

5  And Mr. Kearns was asked about this document, and he testified

6  that his statements there were strictly in the context of

7  Search.

8      **MS. ANDERSON:**  Your Honor, we can just take it back

9  and try to -- I just think we need to -- there's a lot of

10  discussion in that video about the two exhibits you're not

11  allowing in, so we can take it back and see if we can figure

12  something out before the next break.

13      **THE COURT:**  All right.  Okay.  I think when documents

14  just flow into evidence, some context is useful because

15  otherwise the jury doesn't know "Why am I looking at this?"

16  But I don't want -- because I'm not admitting certain of these

17  documents, I don't want discussion in a deposition about those

18  items and then they not come in.  So maybe you can figure out a

19  way forward on this.

20      **MS. ANDERSON:**  Okay.  Thank you, Your Honor.

21      **THE COURT:**  All right.  Anything else?

22      **MS. ANDERSON:**  Well...

23          (Co-counsel confer off the record.),

24      **MS. ANDERSON:**  And then we had Ganem on the list,

25  Your Honor.

PROCEEDINGS

1       **THE COURT:**  Had who?

2       **MS. ANDERSON:**  Ganem objections.  He is the live

3   witness that will be coming after Sam Heft-Luthy.

4       **THE COURT:**  Okay.  Well, you helpfully submit

5   objections to me, but what I'm generally doing is just dealing

6   with them when the witness is on the stand.

7       **MS. ANDERSON:**  Okay.  We do have just two that I want

8   to alert you to, and then we can decide then.

9       One is plaintiffs are proposing a limiting instruction.

10  Is that what is --

11      **MR. SANTACANA:**  Those are the exhibits.

12      **MS. ANDERSON:**  Oh, the exhibits.  Okay.

13      Plaintiffs are proposing a limiting instruction because

14  given the documents that were disclosed to us, there's a

15  significant amount that's related to Google's terms of service

16  with app developers as well as other policies and pages that

17  app developers see.

18      So we are asking for -- and we don't have to decide right

19  now, but wanted to give you a heads-up -- for a limiting

20  instruction, if this is going to be a significant amount of

21  testimony, so that the jury knows that this goes to the issue

22  of highly offensive, as you ordered in your MIL, and not to the

23  issue of consent and permission.

24      And I can hand up the proposed -- the proposed limiting

25  instruction as well as your MIL.  Excuse me.

PROCEEDINGS

1          THE COURT:  Okay.

2                (Document handed up to the Court.)

3          THE COURT:  Okay.

4          MS. ANDERSON:  And, again, we don't have to address it

5    at this moment, but we wanted to give you a heads-up just so

6    that --

7          THE COURT:  This is when Mr. Ganem is --

8          MS. ANDERSON:  Mr. Ganem.

9          THE COURT:  -- is testifying?

10         MS. ANDERSON:  Yes.

11         THE COURT:  Who's calling him?

12         MR. SANTACANA:  Google is calling him today,

13   Your Honor.

14         THE COURT:  Because you're going to be done?

15         MS. ANDERSON:  We are likely passing the case.  We've

16   got Sam Heft-Luthy and then two depos to play, which are short.

17         THE COURT:  Okay.  So we'll see this gentleman today?

18         MR. SANTACANA:  That's right, Your Honor.

19         THE COURT:  Okay.  And -- all right.  Let me --

20         MS. ANDERSON:  But not necessarily before the break.

21   So if, you know, we wanted to --

22         THE COURT:  Why don't you refresh my recollection on

23   what I said.

24         MS. ANDERSON:  And, Your Honor, I've been reminded to

25   make sure that we point out that in our case, we are also

1  calling Ruemmler, although our understanding is he will not be

2  here today.

3       THE COURT:  Well, I didn't know how that all shook out

4  but...

5     So I will tell the jury, when you conclude today, you are

6  resting and it's going to the defendants, but that there's one

7  witness, for scheduling purposes, that won't be called until

8  tomorrow and -- right?

9       MR. CARMODY:  Your Honor --

10      MS. ANDERSON:  There's still --

11      MR. CARMODY:  -- it's going to be, first --

12      THE COURT:  Great.  Now I've got everybody.

13      MR. SANTACANA:  I think it will be --

14      THE COURT:  What did I say?

15                    (Laughter.)

16      MR. ATTANASIO:  The good news is we have agreement,

17  Your Honor.

18      THE COURT:  That's lovely.

19      MR. ATTANASIO:  Go ahead.  Go ahead.

20      MR. CARMODY:  The agreement we struck, Your Honor, is

21  that Mr. Ruemmler is going to be examined by us adversely first

22  thing Thursday morning.

23      THE COURT:  Thursday morning.

24      MR. CARMODY:  Thursday.

25      THE COURT:  Okay.

1          **MR. CARMODY:**  So we will pass.  We will rest today,

2    subject to --

3          **THE COURT:**  Subject to.

4          **MR. CARMODY:**  -- calling Mr. Ruemmler first thing

5    Thursday morning.

6          **THE COURT:**  Well, and just so that we give all of --

7    everyone some leeway with your agreement, what I would say to

8    the jury is -- I'm not going to say, "They're resting but

9    Thursday morning there's going" -- I'm just going to say,

10   "They're resting.  There is one witness where there were some

11   scheduling issues, and they will reopen for one further witness

12   at some point."

13       They don't need to know --

14         **MR. CARMODY:**  Okay.

15         **THE COURT:**  -- if it's going to be Thursday morning --

16         **MR. CARMODY:**  That's fine.

17         **THE COURT:**  -- or whenever.

18         **MR. CARMODY:**  Thank you.

19         **THE COURT:**  Okay.

20         **MR. ATTANASIO:**  Thank you, Your Honor.

21         **MS. ANDERSON:**  And then, sorry.  There is just one

22   more issue that I'll flag for you now that will likely --

23         **THE COURT:**  I don't think we finished with --

24         **MS. ANDERSON:**  Ganem.

25         **THE COURT:**  -- Mr. Ganem.

PROCEEDINGS

1          **MS. ANDERSON:**  Yeah.  So there's one more issue on

2   Mr. Ganem, and that's that many of the documents --

3          **THE COURT:**  Well, which issue -- you've handed me my

4   order, which I always like to read.

5                      (Laughter.)

6          **THE COURT:**  And it -- and so -- and you've highlighted

7   stuff.  So what is this?

8          **MS. ANDERSON:**  So that's related to the proposed

9   limiting instruction that I sent up.

10         **THE COURT:**  That's the limiting instruction.  Okay.

11         **MS. ANDERSON:**  And this really depends on --

12  obviously, we're not putting on the witness, so we don't know

13  how much testimony he's giving about app developers, but -- so,

14  you know, it'll sort of depend on that.

15         And Mr. Boies is doing the witness, so he'll probably

16  stand up and address the issue when he thinks it's appropriate,

17  but just wanted to give you a heads-up.

18         **THE COURT:**  Okay.  And is this going to be an issue or

19  probably not an issue --

20         **MR. SANTACANA:**  No, Your Honor.

21         **THE COURT:**  -- from your perspective?

22         **MR. SANTACANA:**  I won't be violating the

23  motion in limine and neither will Mr. Ganem.  Your order --

24         **THE COURT:**  You won't be going into this area?

25         **MR. SANTACANA:**  We're going to follow your order,

1  which says that the terms of service of Google Analytics for

2  Firebase are relevant to certain issues in the case.

3      A limiting instruction in the middle of trial on legal

4  concepts the jury hasn't been charged on is both exceptionally

5  rare and, in this case, inappropriate.  The instruction they've

6  drafted, I think, is also quite slanted, and it's unnecessary

7  because I won't be violating the order and neither will

8  Mr. Ganem.

9      **THE COURT:**  Okay.  Well, we'll -- this one sounds

10  like -- thank you for telling me that this may come up, but

11  maybe it'll be a non-issue.  So I will keep this.

12      Okay.

13      **MS. ANDERSON:**  Thank you, Your Honor.

14      And then the second thing --

15      **THE COURT:**  And then the second thing.

16      **MS. ANDERSON:**  The second thing for Mr. Ganem, and

17  this just sort of runs through many of our objections to the

18  documents, is that many of them were not produced during

19  discovery; and Google's reason for why they should now be

20  allowed in as evidence, so not just shown but as evidence, is

21  that Mr. Hochman relied on them.

22      Our position is that an expert simply relying on a

23  document doesn't make it admissible as evidence.  And also,

24  Mr. Ganem is not noticed as an expert to rebut anything.  He's

25  a fact witness.

1     So Mr. Boies will stand up and object, but I just wanted

2  to give you that, that that runs through a lot of our

3  objections.

4     **THE COURT:**  I agree with your premise that just

5  because an expert relies on something, even in the rule itself,

6  the 703 says it doesn't mean it's admissible or inadmissible.

7  So plainly, it doesn't mean it automatically gets admitted.

8     Mr. Santacana?

9     **MR. SANTACANA:**  Your Honor, just to give you one

10  example so you understand what's going on here, Exhibit 699 in

11  your binder is the Google Analytics terms of service, which the

12  parties have fought about for five years and have referenced

13  in -- I don't know -- dozens of briefs.

14     The idea that the plaintiffs were not aware that the terms

15  of service exist because -- and, by the way, they do.  This was

16  produced in discovery with a Bates number -- I think is not

17  credible.

18     Another example is Exhibit 890.  They object to --

19     **MS. ANDERSON:**  Well, may I just respond to --

20     **THE COURT:**  Not until he finishes what he has to say.

21     **MS. ANDERSON:**  Oh, he's going to go through

22  multiple -- oh, sorry.

23     **MR. SANTACANA:**  Exhibit 890, Your Honor, is the

24  Google Analytics automatically collected events web page, which

25  Mr. Ganem will authenticate.  It's cited in the original

**PROCEEDINGS**

 1   complaint and the five complaints that are subsequent to that

 2   original complaint by the plaintiffs, and we have fought about

 3   it for five years also.

 4       So the idea that the plaintiffs are in some way prejudiced

 5   by us now putting it into evidence through the person who's in

 6   charge of this Help Center page, I think is not credible

 7   either.

 8       **THE COURT:**  This one wasn't produced, though.  It

 9   doesn't have a Bates number on it.

10       **MR. SANTACANA:**  No.  This is a Wayback Machine version

11   of it, of a particular date and time; but as I said, it's been

12   relied upon many, many times by the plaintiffs in briefing and

13   papers and it's a public Help Center page.

14       **THE COURT:**  Okay.

15       **MS. ANDERSON:**  I'll address these two, and of course

16   they're the best of the two.  But 699, Your Honor, if you look

17   at it, this was, well, produced because there's a Bates stamp.

18   It was in June of 2025, as we were receiving exhibits.  And you

19   can tell by the top that it says May 21st, 2025, which is when

20   this was downloaded, which is also outside of the class period.

21       So we have a relevance issue --

22       **THE COURT:**  Were you --

23       **MS. ANDERSON:**  -- there for 699.

24       But it was produced in June of 2025, and so well outside

25   of -- so just because it has a Bates stamp, I think we have a

PROCEEDINGS

 1    different view of that.

 2        And then 890...  I actually don't have 890.

 3        **THE COURT:**  Just so that I'm clear, the objection to

 4    these documents are the late production.  Those are the

 5    objections.  And this -- and your proposal is that -- maybe now

 6    I'm mixing up things.  Is your position that if these get

 7    admitted, you want this limiting instruction?

 8        **MS. ANDERSON:**  No, no, no.  The limiting --

 9        **THE COURT:**  I've now got different -- I should put

10    this aside.  Okay.

11        **MS. ANDERSON:**  But, yes, you are understanding the

12    connection in some ways because you're seeing that the

13    documents are related.

14        But, no, our objection is generally that these were not

15    produced.  They shouldn't go back to the jury because they were

16    not produced as evidence.  This is outside the class period.

17    It's something they printed in 2025.  And that's our general

18    objection through a lot of documents.

19        **THE COURT:**  Okay.

20        **MR. SANTACANA:**  If I could just clarify one thing,

21    Your Honor.

22        **THE COURT:**  Yes, go ahead.

23        **MR. SANTACANA:**  Exhibit 933 in your binder -- I was

24    trying to keep it simple, but with respect to the class period,

25    Exhibit 933 is a 1006 compilation of the terms of service in

**PROCEEDINGS**

 1   question all throughout the class period.

 2        We were just going to show the jury one of them because

 3   that's kind of what the parties have been doing in this case,

 4   is show them one privacy policy and let it stand in for the

 5   whole class period.

 6        But we do have the 1006 here with every term of service.

 7   We just -- you know, we have one that we were going to

 8   highlight.  We can obviously use any one from any point in the

 9   class period the plaintiffs would like.

10        **MS. ANDERSON:**  Well, in that case, Your Honor, as we

11   stated in our position, exhibits that they've already marked

12   that are these terms of service -- so G751, 545, 550, 548 and

13   699 -- we would have no objection to.  These are -- these are

14   policies that have been reprinted and produced, and also two of

15   them were never produced.  And so we -- while we have no

16   objection to the individual ones that were produced that I just

17   named, I think we have an ob- -- well, we do have an objection

18   to the compilation as some were not produced.  We also think it

19   shouldn't be a compilation; they should be separated.  And we

20   do not object to the ones that were produced that I just named.

21        **THE COURT:**  Unless I'm missing something, why don't

22   you just use one of the ones that was produced?  It sounded

23   like you --

24        **MR. SANTACANA:**  Well, that's what we were trying to

25   do, Your Honor, but they objected to it.

1              **MS. ANDERSON:**  No.  It's --

2              **MR. SANTACANA:**  Maybe we should talk and find one

3    they're okay with.

4              **MS. ANDERSON:**  -- the positions there.

5              **THE COURT:**  Why don't you talk.  Why don't you talk.

6        Okay.  I'm going to go check and see if we've got

7    everybody.

8              **MR. SANTACANA:**  Okay.  Thank you, Your Honor.

9              **MS. ANDERSON:**  Okay.  Thank you, Your Honor.

10                     (Recess taken at 8:26 a.m.)

11                  (Proceedings resumed at 8:35 a.m.)

12        (Proceedings were heard out of the presence of the jury.)

13             **THE COURTROOM DEPUTY:**  Please remain as you are.

14    Court will come to order.

15             **THE COURT:**  Are we ready?

16             **MR. DAVID BOIES:**  Yes, Your Honor.

17             **MR. HUR:**  Yes, Your Honor.

18             **THE COURT:**  Okay.  And who's going to be doing --

19    who's first up?

20             **MR. DAVID BOIES:**  Mr. Heft-Luthy.

21             **THE COURT:**  And you're doing the examination?

22             **MR. DAVID BOIES:**  I am, Your Honor.

23             **THE COURT:**  And who's the --

24                  (Mr. Attanasio raised his hand.)

25             **THE COURT:**  Okay.

1      (Proceedings were heard in the presence of the jury.)

2          **THE COURT:**  Good morning, members of the jury.

3   Welcome back.

4      So, Mr. Boies.

5          **MR. DAVID BOIES:**  Thank you, Your Honor.

6      We call as our next witness Mr. Heft-Luthy.

7   (Witness enters the courtroom and steps forward to be sworn.)

8          **THE COURT:**  If you can come forward to the stand to be

9   sworn.

10          **THE WITNESS:**  I'll sit in the box?

11          **THE COURT:**  Yes.  Thank you.

12          **THE COURTROOM DEPUTY:**  Before you have a seat, can I

13   just -- and be careful.

14          **THE WITNESS:**  Yes.

15          **THE COURTROOM DEPUTY:**  Could you please raise your

16   right hand?

17                          **<u>SAM HEFT-LUTHY</u>**,

18   called as a witness for the Plaintiffs, having been duly sworn,

19   testified as follows:

20          **THE WITNESS:**  Yes.

21          **THE COURTROOM DEPUTY:**  Great.  Thank you.  Make sure

22   you speak clearly into the microphone for our court reporter.

23      Could you please state your full name for the record and

24   spell your last name.

25          **THE WITNESS:**  My name is Sam Heft-Luthy.  Last name is

HEFT-LUTHY - DIRECT / DAVID BOIES

1    H-e-f-t, hyphen, L-u-t-h-y.

2              **THE COURTROOM DEPUTY:**  Thank you.

3                        <u>**DIRECT EXAMINATION**</u>

4    **BY MR. DAVID BOIES:**

5    **Q.**   Good morning, sir.  My name is David Boies.  We haven't

6    met; correct?

7    **A.**   That's correct, yes.

8    **Q.**   But you understand that I represent the plaintiffs in this

9    case?

10   **A.**   Yes.

11   **Q.**   You were employed by Google from 2016 to 2022; is that

12   right?

13   **A.**   That's correct.

14   **Q.**   And you were the product manager for Google's privacy

15   policy; correct?

16   **A.**   That's correct.

17   **Q.**   And in that capacity, you were part of a Central

18   Privacy team at Google responsible for coordinating various

19   cross-company privacy initiatives; correct?

20   **A.**   Yes.

21   **Q.**   Now, you also had responsibility as a product manager for

22   the revision of Google's privacy policy in May of 2018;

23   correct?

24   **A.**   Yes.

25   **Q.**   And is it fair to say that that privacy policy revision in

HEFT-LUTHY - DIRECT / DAVID BOIES

1   May 2018 was not something where Google was expanding Google's

2   rights or permissions; correct?

3   A.   That's correct.

4   Q.   Now, one of the projects that you were involved in was

5   something called PrivacyNative; correct?

6   A.   Yes.

7   Q.   And you have there, the larger volume is a volume of

8   exhibits that I'm going to be referring to.

9   A.   This larger binder is the one?

10  Q.   Exactly.

11  A.   Great.  Yes.

12  Q.   And if you would turn to the first tab there, this is a

13  document that has been previously marked as Plaintiffs'

14  Exhibit 6.  And this is a document that you're familiar with;

15  correct, sir?

16  A.   Yes.

17  Q.   And this was a document that was prepared by the

18  PrivacyNative team of which you were a member; correct?

19  A.   Yes.

20  Q.   And this records various notes that -- of interviews that

21  you and your team conducted; correct?

22  A.   That's correct.

23       MR. DAVID BOIES:  I would offer Plaintiffs' Exhibit 6,

24  Your Honor.

25       MR. ATTANASIO:  No objection other than the prior

1    issues we talked about with the Court when we objected.  No

2    objection.

3            THE COURT:  Okay.  Exhibit 6 will be admitted.

4        (Trial Exhibit PX6 received in evidence.)

5    BY MR. DAVID BOIES:

6    Q.   And after this document was prepared, was any action taken

7    based on this document?

8    A.   To my recollection, we prepared a few perspective

9    documents that we presented back to leadership as part of the

10   next phase of the project.

11   Q.   So you then -- based on the work that you did, you

12   presented some proposals to leadership; is that correct?

13   A.   I don't recall if there were specific proposals at the

14   level of this control should be different, but we presented a

15   summary of some of the perspectives that we heard.

16   Q.   Is it fair to say, without going through all of these

17   conversations, that a number of people expressed unhappiness,

18   discomfort with Google's privacy policies at that time?

19   A.   I would say people talked about the challenges that Google

20   was facing as part of the work, yes.

21   Q.   Well, in terms of challenges, it was more than challenges,

22   was it not, sir?  People were saying that there were problems

23   with Google's privacy policy; correct?

24   A.   I think they would have talked about some of the problems

25   that they had with Google's work.

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1    Q.    Not just Google's work.  Google's privacy policies;

2    correct?

3    A.    Google's privacy tools that it would offer to users, yes.

4    Q.    For example, people said that they couldn't figure out

5    what information Google was keeping on them; correct?

6    A.    I -- I don't know which specific you would be referring

7    to.  That there was a conversation where that came up, you're

8    asking?

9    Q.    Yes, that's what I'm asking.

10    A.    I believe there was something where somebody said

11    something to that effect, yes.

12    Q.    Okay.  So my point is simply that there were a number of

13    people here that were expressing concerns and what they saw as

14    problems with Google's privacy policy; fair?

15    A.    I would say -- I would say, yes.

16    Q.    Now, did the PrivacyNative team, that you were part of,

17    propose any changes to Google's privacy policies as a result of

18    this effort?

19    A.    Not to my recollection.

20    Q.    I'm sorry, sir?

21    A.    Not to my recollection.

22    Q.    Okay.  Now, this was initially intended to be something

23    that would focus on a five-year time horizon; correct, sir?

24    A.    Yes.

25    Q.    Did this continue after 2020?

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1  **A.**   I don't remember the timeline, but I believe after we

2  presented some of the follow-up work, it didn't -- it wasn't an

3  ongoing part of our work after that.

4  **Q.**   It stopped, in other words?

5  **A.**   Yes.

6  **Q.**   And what -- you mentioned that your proposals were

7  presented to leadership.  Who was that leadership?

8  **A.**   I don't recall who we would have presented it to as part

9  of the program.

10  **Q.**   You were part of the presentation; correct?

11  **A.**   Yes.

12  **Q.**   And you don't recall any of the people that you presented

13  to?

14  **A.**   No.

15  **Q.**   Let me ask you to look at Plaintiffs' Exhibit 18, which is

16  behind Tab 2.  And this is a PrivacyNature [sic] scratchpad;

17  correct?

18  **A.**   Yes.

19  **Q.**   And scratchpad is a term used within Google; correct?

20  **A.**   It would be a term referring to -- yes.  Yes, it would

21  have been.

22  **Q.**   And what does it mean?  What are scratchpads within

23  Google?

24  **A.**   To my recollection, this doc would be just an open space

25  where anybody working on the project could throw content in

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1  that didn't necessarily represent the opinions of all of the

2  authors but that could be used for drafting purposes.

3  **Q.**  Well, in this -- in this document -- and you were involved

4  in this document; correct, sir?

5  **A.**  I don't recall which of the content I would have written.

6  I would have been part of the set of people that would have

7  been throwing some stuff into this document.

8  **Q.**  Well, you say "throwing some stuff into the document."

9  You were one of the core team that was preparing this document;

10  correct, sir?

11  **A.**  That's correct.

12  **Q.**  Okay.

13       **MR. DAVID BOIES:**  I would offer Plaintiffs'

14  Exhibit 18, Your Honor.

15       **MR. ATTANASIO:**  Objection.  Lack of foundation.

16       **THE COURT:**  Actually, I don't think there has been a

17  sufficient foundation for this document, so see what you can

18  do.

19       **MR. DAVID BOIES:**  Thank you, Your Honor.

20  **BY MR. DAVID BOIES:**

21  **Q.**  This was a document, that you were part of the team that

22  prepared; correct?

23  **A.**  Define what you mean by "prepared."

24  **Q.**  It's prepared in terms that you're generally familiar

25  with?

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1  **A.**    Yeah.  I know it's --

2  **Q.**    Worked on.  How about worked on?

3  **A.**    The reason why it's hard for me to answer is just this

4  wouldn't have been a document we were revising or editing.  It

5  would have been just open text that people would be using and

6  then maybe porting over for formal consideration.

7  **Q.**    Well, first, just to be clear, there are some comments in

8  here by people; correct?

9  **A.**    Yes.

10  **Q.**    But in addition to comments by people, there are

11  conclusions in this document; correct, sir?

12  **A.**    There -- yeah, there's statements of people's position --

13  people writing stuff that could go to a different document,

14  yeah.

15  **Q.**    I want to distinguish between two things.  One, there are

16  people's comments in here attributed to particular people;

17  correct?

18  **A.**    Yes.

19  **Q.**    In addition to that, the document itself makes various

20  conclusions; correct, sir?

21  **A.**    I -- I don't know if I would agree with that.

22  **Q.**    Well, I mean, first of all, on the first page there is a

23  description of what the mission of PrivacyNative is; correct?

24  **A.**    Where it says, "This work stream aims to define"?

25  **Q.**    Yes.

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1   **A.**   Yes.

2   **Q.**   And that is described as the mission; correct?

3   **A.**   Yes.

4   **Q.**   And there is a description of what the core team is;

5   correct?

6   **A.**   That's correct.

7   **Q.**   And there is a description of what the related resources

8   are for PrivacyNative product; correct?

9   **A.**   That's correct.

10  **Q.**   And then if you go to the second page, there is a series

11  of statements that are not attributed to any particular person.

12  In fact, pages 1 and 2 and 3 all have points, numbered points;

13  correct, sir?

14  **A.**   That's correct.

15  **Q.**   And you were a part of the core team that worked on this

16  document; correct?

17  **A.**   Yes.

18          **MR. DAVID BOIES:**  Okay.  Your Honor, I would offer it.

19          **MR. ATTANASIO:**  Objection.  Lack of foundation.

20          **THE COURT:**  I will admit Exhibit 18.

21      (Trial Exhibit PX18 received in evidence.)

22          **MR. DAVID BOIES:**  Now, just briefly, if we could --

23  I think it is now on the jury's screens.

24      Okay.  If we go to the first page, and if we could

25  highlight the mission.

HEFT-LUTHY - DIRECT / DAVID BOIES

1  BY MR. DAVID BOIES:

2  Q.  It says [as read]:

3       "This work stream aims to define an overarching

4    vision and strategy for PDPO to inform the Google

5    privacy experience across products and services

6    according to a five-year time horizon."

7    Correct?

8  A.  That's correct.

9  Q.  And PDPO stands for Privacy and Data Protection Office;

10 correct?

11 A.  That's correct.

12 Q.  And you were a product manager in that office; correct?

13 A.  Yes.

14 Q.  Okay.  Now, if we go to page 2, and you see point Number 1

15 that says "Broad Permissions"?

16 A.  Yes.

17 Q.  And it says [as read]:

18       "It's difficult for people to fully meaningfully

19    give permission."

20    Do you see that?

21 A.  Yes.

22 Q.  And when you say "meaningfully give permission," you're

23 talking about give permission for Google to take or use their

24 data; correct?

25 A.  So this is where talking about this document is hard

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1  because I don't know if this would have been content that I

2  would have personally been part of writing or even approving.

3  So I don't know what I would have been referring to with this.

4  **Q.**  You don't know what you're referring to?

5  **A.**  Because I might -- I don't recall if this is something

6  that I would have actually drafted.

7  **Q.**  Well, let's see if we can refresh your recollection.

8      Let's go to the next paragraph, where it says [as read]:

9          "Not only are the implications of WAA extremely

10      broad and varied, but people use Google in such

11      diverse ways.  Much of the language intended to be

12      comprehensive feels vague and hard to parse for

13      non-engineers and lawyers."

14      Do you see that?

15  **A.**  Yes.

16  **Q.**  And when you were talking about the language that "feels

17  vague and hard to parse for non-engineers and lawyers," you

18  were talking about the language with respect to WAA; correct,

19  sir?

20  **A.**  I don't know.

21  **Q.**  You don't know?

22  **A.**  Because I don't know if I wrote this content.

23  **Q.**  Well, did you have an understanding of this document?  You

24  saw this document at the time; correct?

25  **A.**  I don't know.  This -- this -- this would have been a

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1  scratchpad that could have been ported over to a different

2  document, but I don't know -- this isn't content that I know if

3  I would have drafted or not.

4  **Q.**   This is a document that you saw in preparing for your

5  testimony; correct?

6  **A.**   Yes.

7  **Q.**   Okay.  And are you telling me that you didn't see it back

8  when you were at Google?

9  **A.**   I don't recall.

10  **Q.**   Okay.  Did you agree that much of the language, with

11  respect to WAA, intended to be comprehensive felt vague and

12  hard to parse for non-engineers or lawyers?  Did you agree with

13  that?

14  **A.**   I don't think so.

15  **Q.**   You don't think so.  Did you ever tell anybody you

16  disagreed with that back then?

17  **A.**   I don't -- not to my recollection, but I -- I don't know.

18  **Q.**   Did you ever tell anybody that you didn't agree with that

19  before you met with Google's lawyers?

20  **A.**   I don't know.

21  **Q.**   Okay.  By the way, Google's lawyers are representing you

22  now in connection with this testimony; correct?

23  **A.**   That's correct.

24  **Q.**   Okay.  And that was true back at the time of your

25  deposition as well?

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1  **A.**    Yes.

2  **Q.**    And you met with them a number of times to prepare for

3  this testimony; correct?

4  **A.**    Yes.

5  **Q.**    And they went over with you questions that might be asked;

6  correct?

7  **A.**    Yes.

8  **Q.**    And they went over with you answers that you might give;

9  correct?

10 **A.**    We talked about the sort of things that we would -- yeah.

11        **MR. ATTANASIO:**  Pardon me.  Objection.

12 Attorney-client privilege.

13        **THE COURT:**  Well, in preparation for a deposition, you

14 certainly can inquire what the witness was shown and what -- so

15 just so we have the parameters correct.

16        **MR. ATTANASIO:**  Yes, of course.

17        **THE COURT:**  Let me hear the next question, please.

18 **BY MR. DAVID BOIES:**

19 **Q.**    All right.  Did they give you documents to review?

20 **A.**    Yes.

21 **Q.**    Did they give you summaries of those documents to review?

22 **A.**    Not to my recollection.

23 **Q.**    Did they give you an outline of testimony?

24 **A.**    Not to my recollection.

25 **Q.**    Did they give you an outline of the questions they were

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1  going to ask you?

2  **A.**    No.

3  **Q.**    So it's your testimony that when they get up to ask you

4  questions, you're not -- you don't know in advance what those

5  questions are?  Is that what you're telling me?

6  **A.**    That's correct.

7  **Q.**    How many days did you meet with them in preparation for

8  this testimony?

9  **A.**    I -- I don't know.

10  **Q.**    About.

11  **A.**    A few.

12  **Q.**    How many?

13  **A.**    I -- I don't know the number.

14  **Q.**    Well, about.

15  **A.**    I don't know.

16  **Q.**    Over what period of time did you meet with them?

17  **A.**    The last two weeks or so.

18  **Q.**    Did you meet with them before the last two weeks?

19  **A.**    Maybe once or twice.

20  **Q.**    All right.  That's the best answer you can give us; right?

21  **A.**    Yes.

22  **Q.**    Let me ask you to look next at a document that is behind

23  Tab 4, which is Plaintiffs' Exhibit 40.

24       Now, this is another PrivacyNative document; correct, sir?

25  **A.**    Yes.

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1  Q.   And this is a document that you received in October of

2  2020; correct?

3  A.   I believe it's a summary of comments that would have been

4  made on another doc, yes.

5  Q.   Made and sent to you?

6  A.   I don't know this specific email, but this looks like

7  comments that would have been put on a Google doc somewhere.

8  Q.   This is addressed to you; correct, sir?  This document?

9  A.   Yes.

10  Q.   And you don't have any doubt that you got it at the time;

11  correct?

12  A.   No.

13  Q.   And you don't have any doubt that you read it at the time;

14  correct?

15  A.   No.

16       MR. DAVID BOIES:  I would offer Plaintiffs'

17  Exhibit 40, Your Honor.

18       MR. ATTANASIO:  Objection.  Foundation.

19       THE COURT:  I'll admit it.

20     (Trial Exhibit PX40 received in evidence.)

21  BY MR. DAVID BOIES:

22  Q.   Now, one of the members of your team was Kalle Buschmann;

23  correct?

24  A.   Yes.

25  Q.   And she was somebody that you had high regard for;

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1  correct?

2  **A.**  Yes.

3  **Q.**  Now, let me ask you to look at the second page of this

4  document.

5  **A.**  (Witness examines document.)

6  **Q.**  And do you see a statement by Kalle Buschmann --

7  **A.**  Yes.

8  **Q.**  -- at the top?

9  **A.**  Yes.

10  **Q.**  Do you see where it said that "Consent is too convoluted

11  to be comprehensible for people"?

12  **A.**  Yes.

13  **Q.**  Did you agree with that, sir?

14  **A.**  No.

15  **Q.**  Did you ever tell anybody you disagreed with that?

16  **A.**  No.  I don't -- I don't recall on this specific point

17  whether I would have said anything about it other than

18  conversation at the time as part of the drafting of a document.

19  **Q.**  But you don't have any reason to believe you ever

20  disagreed with this, at least before you met with Google's

21  lawyers; correct?

22  **A.**  I wouldn't agree with that necessarily.

23  **Q.**  What?

24  **A.**  I wouldn't agree with that.

25  **Q.**  Well, did you?  Did you disagree with it?

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1    **A.**    I don't know.

2    **Q.**    You just don't know one way or the other?

3    **A.**    That's correct.

4    **Q.**    Let me ask you to look at a document that has been marked

5    as Plaintiffs' Exhibit 212, which is behind Tab 9.

6         Do you have that?

7    **A.**    Yes.

8    **Q.**    And this is another document addressed to you; correct?

9    **A.**    These are more comments from a Google doc.

10    **Q.**    This is a document -- an email addressed to you; correct,

11    sir?

12    **A.**    Yes.

13    **Q.**    Okay.  And it's dated September 25th, 2018; correct?

14    **A.**    Yes.

15    **Q.**    And it is with respect to something called "Privacy

16    Advisor review."  Do you see that?

17    **A.**    Yes.

18    **Q.**    What was the Privacy Advisor review?

19    **A.**    Privacy Advisor was a Google Search summary of privacy

20    controls, so it would have been we were trying to add privacy

21    controls relevant to a specific product.  I don't know what

22    specifically the review would have been as part of that

23    process.

24    **Q.**    Were you -- were you involved in the Privacy Advisor

25    review?

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1   **A.**   I don't recall.

2   **Q.**   You don't recall one way or the other?

3   **A.**   No.  Just because I don't know what the specific meeting

4   that this would have been referring to is.

5   **Q.**   Now, you said that this had people's comments on it.  One

6   of the persons whose comments are on it is you; correct?

7   **A.**   Yes.

8   **Q.**   Okay.  The -- and the comments that you were making were

9   part of what you referred to as the Privacy Advisor review

10   process; correct?

11   **A.**   Yes.

12        **MR. DAVID BOIES:**  Your Honor, I would offer

13   Plaintiffs' Exhibit 212.

14        **MR. ATTANASIO:**  No objection.

15        **THE COURT:**  Exhibit 212 will be admitted.

16   (Trial Exhibit PX212 received in evidence.)

17   **BY MR. DAVID BOIES:**

18   **Q.**   And you understood, did you not, sir, that when you were

19   this product manager in the Privacy and Data Protection Office,

20   that Google collected a lot of data from its users; correct?

21   **A.**   Depending on settings but, yes.

22   **Q.**   Yeah.  Depending on what settings or controls they had?

23   **A.**   That's correct.

24   **Q.**   Okay.  And one of those settings or controls was sWAA;

25   correct?

HEFT-LUTHY - DIRECT / DAVID BOIES

1    **A.**   That's correct.

2    **Q.**   And what, as you understood it at the time, did sWAA

3    control?

4    **A.**   So my understanding for the purposes of the work I was

5    doing was that supplemental Web & App Activity was a

6    Google Account control controlling which data from third-party

7    apps or services would be brought into the Google Account and

8    made part of the user's experience in their Google Account.

9    **Q.**   Did you understand what data was saved from user's

10   activity on non-Google apps if the WAA or sWAA status was off?

11   **A.**   If the status was off?

12   **Q.**   Yes.

13   **A.**   I would have a very high-level understanding, at least

14   enough to be drafting things like the privacy policy.  I wasn't

15   involved in all the technical design or deep system part of

16   that.

17   **Q.**   Well, were you aware of whether Google saves data relating

18   to users' activity on non-Google apps regardless of their WAA

19   status?

20   **A.**   When you say saves their activity, what do you mean?

21   **Q.**   Let me -- let me show you your deposition.  The deposition

22   is the smaller volume that says your name and deposition.

23   **A.**   Yep.

24   **Q.**   Let's look at page 46 of that deposition.

25          **MR. ATTANASIO:**  Object to the use of the deposition

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1  based on the last answer.  I don't know if we're refreshing

2  recollection.  There's no foundation to go to the deposition.

3          THE COURT:  Well, he can use it if he thinks it's for

4  impeachment purposes.  It's for the jury to determine whether

5  or not it impeaches his testimony.

6      Go ahead.

7  BY MR. DAVID BOIES:

8  Q.  Now if you'd turn to -- let me just start, for context, on

9  page 45.  Do you see where on line 19 you were asked [as read]:

10          "QUESTION:  Were you aware that Google also saves data

11          relating to users' activity on non-Google apps regardless

12          of their WAA status?"

13      Do you see that?

14  A.  That's correct.

15  Q.  And you didn't have any understanding -- any difficulty

16  understanding what was meant by that at that time, did you,

17  sir?

18          MR. ATTANASIO:  Well, objection.  If we could read the

19  question and answer from the deposition.

20          THE COURT:  Yeah.  Well, he's, I think, just providing

21  some foundation about what a deposition is.

22      By the way, members of the jury, we've had some references

23  to deposition.  I should have probably given you this before.

24  Just for your information, a deposition is the sworn testimony

25  of a witness taken before trial.  The witness is placed under

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1   oath to tell the truth and lawyers for each party may ask

2   questions.  The questions and answers are recorded.  Insofar as

3   possible, you should consider deposition testimony presented to

4   you in court in lieu of live testimony in the same way as if

5   the witness had been present to testify.

6        Go ahead, Mr. Boies.

7   **BY MR. DAVID BOIES:**

8   **Q.**   You understood that what I'm -- or what the questioner was

9   asking because it wasn't me --

10  **A.**   I apologize.  I know we did a little bit of back and

11  forth.  Could you restate the question, please?

12  **Q.**   Sure.

13       You see where you were asked here [as read]:

14       **"QUESTION:**  Were you aware that Google also saves data

15       relating to users' activity on non-Google apps regardless

16       of their WAA status?"

17       And you understood what the questioner meant by that;

18  right?

19  **A.**   Yes.

20  **Q.**   And -- and you answered [as read]:

21       **"ANSWER:**  That's, similarly, not something that I have

22       recollection on in one direction or the other."

23       Correct?

24  **A.**   Yes.

25  **Q.**   Now, when did you come to the testimony, the knowledge

1    that you gave, the assertion that you made earlier about what

2    data was or was not saved at a high level, as you described it,

3    from WAA?  Where did you get that if you didn't know it when

4    your deposition was taken?

5    **A.**    So to my understanding, when we were doing a lot of the

6    work that I was working on, we would talk that data might be

7    part of third-party apps, but I don't know if we would call it

8    activity data or some of the specifics that would have been

9    used here.  But I knew that at a high level, because we were

10   working with Google Account controls, we would be talking about

11   supplemental Web & App Activity as a Google Account control.

12   **Q.**    My question, sir, is I understand that you said that, and

13   you said that before --

14   **A.**    Yes.

15   **Q.**    -- but you obviously didn't say that at your deposition.

16   And what I'm asking you is:  Who told you what you just

17   testified about?  Because you didn't -- you said you didn't

18   have any recollection in one direction or another at your

19   deposition.  So I'm asking you:  After your deposition, how did

20   you come to learn this?

21   **A.**    I took some time to familiarize myself with some of the

22   questions that were asked in the deposition, but I don't know

23   this specific question or if I -- I don't know if I would

24   disagree with what I said here, which is that I don't recall

25   things about activity data and how we would define that as part

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1    of what data is collected.

2    **Q.**    Now, at the time of your deposition, you'd already left

3    Google; correct?

4    **A.**    That's correct.

5    **Q.**    Okay.  So is it fair to say that anything that you learned

6    after the deposition, you would have learned in connection with

7    your preparation by Google's lawyers for this case?

8    **A.**    Not necessarily.

9    **Q.**    You went to work at TikTok; right?

10   **A.**    That's correct.

11   **Q.**    And are you telling me that at TikTok you investigated

12   what Google was saving relating to users' activity on

13   non-Google apps when WAA was off?  Is that what you're telling

14   me?

15   **A.**    I don't have a recollection of doing deep investigation,

16   but I would look at privacy settings from Google from time to

17   time.

18   **Q.**    Did you do that, sir?

19   **A.**    Yes.

20   **Q.**    You did?

21   **A.**    Yes.

22   **Q.**    And so what you're telling me is that you didn't do it

23   when you were at Google, at least enough to remember it at your

24   deposition, but you did do it after you were at TikTok?  Is

25   that what you're saying?

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1  **A.**    This -- I don't know when -- this deposition would have

2  been taken probably about a year after I had left; right?

3  **Q.**    Yes.

4  **A.**    So I think I had just not been thinking about it very much

5  just because I had left the company a while ago.

6  **Q.**    So you weren't thinking about it very much after you left

7  the company for a year, but you were thinking about it more

8  when you were gone, during the time that you were being

9  prepared for this case by Google's lawyers; is that your

10  testimony?

11  **A.**    I wouldn't say that that's a fair statement.

12  **Q.**    Okay, sir.

13      Now, if you stay with this deposition for a minute, if you

14  go back to page 44, line 21, there's a question [as read]:

15      **"QUESTION:**    Is it true that turning WAA off does not stop

16      Google from saving, in this case, search log data?"

17      Do you see that?

18  **A.**    Yes.

19  **Q.**    And your answer, which is at lines 7 through 10 of the

20  next page, says [as read]:

21      **"ANSWER:**    I wouldn't be able to say in specificity what

22      data is or isn't collected.  It's been a while since I

23      worked at Google, and I don't have a full knowledge of the

24      technological architecture."

25      Do you see that?

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1   **A.**   Yes.

2   **Q.**   And is it still the case that you would not be able to say

3   in specificity, one way or the other, whether data is or isn't

4   collected when WAA is turned off?

5   **A.**   I think that's a slight restatement of what you said, but

6   the statement here about search log data, I would still say I

7   don't -- I don't know.

8   **Q.**   You don't know?

9   **A.**   I don't know.

10  **Q.**   Okay.  Now, based on your work since you left Google, have

11  you come to understand that when WAA or sWAA is turned off,

12  Google still collects data from users' use of third-party apps?

13  **A.**   I would say that is something that I would have

14  understood.  It was part of our common understanding of the

15  work we were doing, yes.

16  **Q.**   That even when sWAA and WAA are turned off, Google still

17  collects data from users' use of third-party apps; correct?

18  **A.**   Yes, but in the context of how those third-party apps are

19  working and not connecting over to the Google Account for the

20  Google Account purposes.

21  **Q.**   Well, let's try to stay with my question.  Okay?

22       Are we in agreement that even when WAA and sWAA are turned

23  off, Google still collects data from users' use of third-party

24  apps?

25  **A.**   Yes.

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1  **Q.**   Okay.  And are we in agreement that there is no place that

2  a user can go to see what data has been collected with WAA and

3  sWAA off?

4  **A.**   I don't know.

5  **Q.**   You don't know one way or the other?

6  **A.**   No.

7  **Q.**   Do you agree that there is no way for a user to stop

8  Google from collecting the Google data that Google now collects

9  when sWAA and WAA are turned off?

10 **A.**   No.

11 **Q.**   You don't agree with that?

12 **A.**   No.

13 **Q.**   Okay.  How does a user stop Google from collecting the

14 data that Google is currently collecting?

15 **A.**   So to my understanding there would be settings that would

16 be relevant to the particular third-party apps or services for

17 which Google would be processing that data on behalf of that

18 third-party service.  So it would be with the third-party

19 service.

20 **Q.**   And who told you that?

21 **A.**   That was a high-level understanding that I would have at

22 least for my time at work -- while I was at Google.

23 **Q.**   Is there any document that you've seen -- they showed you

24 a lot of your documents, correct, in preparation?

25 **A.**   Yes.

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1   **Q.**   Did they ever show you a document that said that?

2   **A.**   I don't believe so.

3   **Q.**   Okay.  Now, let me ask you to look at a document that has

4   been marked as Plaintiffs' Exhibit 42.

5   **A.**   Back in the big binder?

6   **Q.**   Back in the big binder, Tab 5.

7        And this is a document that you wrote; correct, sir?

8   **A.**   Yes.

9   **Q.**   And this is to the Privacy Surfaces Team; correct?

10  **A.**   Yes.

11  **Q.**   And what was the Privacy Surfaces Team?

12  **A.**   The Privacy Surfaces Team was a team that was responsible

13  for creating Google Account privacy pages.  So these would be

14  summaries of your privacy information either in your

15  Google Account, things like the privacy checkup, or as part of

16  individual products.  The Privacy Advisor that I referred to

17  would have been a search-specific or a map-specific

18  destination.

19        **MR. DAVID BOIES:**  And I would offer Plaintiffs'

20  Exhibit 42, Your Honor.

21        **MR. ATTANASIO:**  No objection.

22        **THE COURT:**  42 will be admitted.

23     (Trial Exhibit PX42 received in evidence.)

24        **MR. DAVID BOIES:**  And if we could display this.

25  \\\

HEFT-LUTHY - DIRECT / DAVID BOIES

1    BY MR. DAVID BOIES:

2    Q.    On the first page, you talk about -- excuse me -- two

3    philosophies of success.  Do you see that?

4    A.    Yes.

5    Q.    And you say both of which are important; correct?

6    A.    That's correct.

7    Q.    And the first one is user trust and affect, which you

8    define as [as read]:

9            "Giving users a sense of the system as working

10          to their benefit.  Important but gameable without

11          actually improving any of the underlying conditions,

12          remains our higher-level goal."

13          Do you see that?

14   A.    That's correct.

15   Q.    Now, what do you mean by "gameable" there?

16   A.    I would use that term generally to describe the thing that

17   we would talk about a lot with privacy, where we knew we could

18   just throw a bunch of messages to the user, saying, "Privacy,

19   privacy, privacy," and then people would trust Google more.

20   But we knew that that wasn't enough, so we knew we could game

21   user affect without actually improving privacy controls, and we

22   wanted to make sure we weren't just doing that.

23   Q.    And when you write "giving users a sense of the system is

24   working to their benefit," "sense" is italicized; right?

25   A.    That's correct.

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1  **Q.**   Okay.  And in the next philosophy, which you describe is

2  "Concrete risk models being addressed."  Do you see that?

3  **A.**   Yes.

4  **Q.**   You talk about "our tangled consent approach."  Do you see

5  that?

6  **A.**   Yes.

7  **Q.**   And what was the tangled consent approach?

8  **A.**   I don't recall exactly what we would have been referring

9  to with that term specifically.

10  **Q.**   Okay.  Let me ask you to look at Tab 10, which is

11  Plaintiffs' Exhibit 213.

12      And this is another Privacy Advisor review communication;

13  correct?

14  **A.**   The -- the thing that we have on the screen I think is

15  different than what I have in Tab 10.  Just Tab 10 is what

16  we're looking at, just making sure I'm right.

17  **Q.**   Yes.  Yes.

18  **A.**   Starts with from David Warren?

19  **Q.**   Yes.  Plaintiffs' Exhibit 213.

20  **A.**   Could you repeat the question, then?  I apologize.

21  **Q.**   Sure.

22      This is another communication to you concerning the

23  Privacy Advisor review; correct?

24  **A.**   Yes.

25  **Q.**   And this includes comments that you made; correct?

HEFT-LUTHY - DIRECT / DAVID BOIES

1    **A.**   Yes.

2    **Q.**   That you personally made?

3    **A.**   Yes.

4          **MR. DAVID BOIES:**  I would offer Plaintiffs'

5    Exhibit 213, Your Honor.

6          **MR. ATTANASIO:**  No objection.

7          **THE COURT:**  213 will be admitted.

8      (Trial Exhibit PX213 received in evidence.)

9    **BY MR. DAVID BOIES:**

10   **Q.**   And there is a comment on the second page by Mr. Posner.

11   Do you see that?

12   **A.**   Yeah.  This would have been Rajni Posner.

13   **Q.**   And who was he?

14   **A.**   She was a marketing -- product marketing manager for

15   Google at the time.

16   **Q.**   And was she a part of the Privacy Advisor review?

17   **A.**   Again, I don't recall this specific review, what this

18   meeting would have been, but she would have been somebody that

19   we would have talked to about the project as we were developing

20   it.

21   **Q.**   Mm-hmm.  And she says, if we could highlight this

22   [as read]:

23        "I might suggest moving into passive tense here

24        so it doesn't feel as dramatic that Google is saving

25        it."

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1        Referring to data; correct?

2   **A.**    It's saying what data Google saves and uses, yes.

3   **Q.**    And -- and there's a comment by Mr. Warren, David Warren.

4   Who is David Warren?

5   **A.**    David Warren was a user experience writer at or working

6   with the PDPO.  I don't recall.

7   **Q.**    Now, when Mr. Warren says, "If we're pushing the control

8   story," what is he -- what's he talking about when he's talking

9   about "pushing the control story"?

10  **A.**    I don't know.

11  **Q.**    Well, isn't it the case, sir, that at this time Google was

12  trying to convince its users that they had control over the

13  data that Google collected and used?

14  **A.**    I would say that would be fair.

15  **Q.**    Okay.  And -- and when you saw this at the time, is it

16  fair to say you understood that that's what Mr. Warren was

17  referring to when he talked about "pushing the control story"?

18  **A.**    I don't know.

19  **Q.**    Let me ask you to -- well, before I do that, you're aware,

20  are you not, that the chief executive officer of Google

21  testified in front of Congress in December of 2018?

22  **A.**    Yes.

23  **Q.**    And you watched that at the time; right?

24  **A.**    Yes.

25  **Q.**    Now, when did you remember watching it at the time?

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1    **A.**   I -- to my recollection, I was asked about it in my

2    deposition; and in reviewing documents from my deposition, I

3    had a memory once I got to look at the actual testimony.

4    **Q.**   Because during your deposition, you said you didn't recall

5    watching it; correct?

6    **A.**   That's correct.

7    **Q.**   And -- and during your deposition, you were showed a clip

8    of it; correct?

9    **A.**   Yes.  I -- I -- I believe that or reading a transcript.  I

10   don't -- I don't remember which.

11   **Q.**   And when you were confronted with this, you said at your

12   deposition you didn't even know whether that was Mr. Pichai;

13   correct?

14   **A.**   I believe when we were reading the chat transcript out of

15   context, yes.

16   **Q.**   When you say "reading the chat out of context" --

17   **A.**   There was a chat discussing the testimony, yes.

18   **Q.**   So -- and at that time, it was your testimony under oath

19   that you didn't even know whether the Sundar referred to there

20   was Mr. Pichai; correct?

21   **A.**   Yes.

22   **Q.**   And that wasn't true, was it, sir?

23   **A.**   I don't think that's fair.

24   **Q.**   There's only one Sundar at Google that you know of;

25   correct?

**HEFT-LUTHY - DIRECT / DAVID BOIES**

1    **A.**    Yes.

2    **Q.**    And --

3    **A.**    Well, that is actually not true.  There were other Sundars

4    at the company but, yeah.

5    **Q.**    Do you remember at your deposition you didn't remember any

6    of the Sundars at Google?

7    **A.**    I don't recall.

8    **Q.**    Well, let's go to your deposition.  And actually let me

9    play --

10    **MR. DAVID BOIES:**  Your Honor, can I play an excerpt

11    from his deposition?

12    **THE COURT:**  Well, what is the question that you're

13    then going to use this for for impeachment purposes?  You can't

14    just put this witness up here and play something.

15    **MR. DAVID BOIES:**  No, I understand.  But the point is

16    that at his deposition, he was testifying that he -- even when

17    confronted with exhibit proof, he was --

18    **THE COURT:**  Well, show me where in the deposition

19    you're referring to --

20    **MR. DAVID BOIES:**  Sure.  If you look at --

21    **THE COURT:**  -- so then I'll understand what question

22    you're asking.

23    **MR. DAVID BOIES:**  Let me -- page 102 of the

24    deposition.  Well, start -- let me start back at 99 for

25    context, Your Honor.

 1          96, lines 15 to 16, the question and answer.  Then

 2    starting at page 97, at the top, and continuing to the bottom

 3    of 98.

 4          THE COURT:  Okay.  I'm still unclear on what you're

 5    asking.  You've asked about if he, at the time of the

 6    deposition, knew who Mr. Pichai was?  We've talked about that.

 7    What is it that you're now -- perhaps what would help me is

 8    if -- can you ask a question of the witness?

 9          MR. DAVID BOIES:  Sure.

10          THE COURT:  And then we'll see what we're doing.

11          MR. DAVID BOIES:  Sure.

12       And just so the witness has the document he referred to,

13    I think I have that here, actually.

14       Yes, here it is.

15    BY MR. DAVID BOIES:

16    Q.   Go to Tab 11, Plaintiffs' Exhibit 217.

17       This is a document from you to a number of people;

18    correct?

19    A.   Yes.

20    Q.   And this is the chat summary that you had talked about

21    before; correct?

22    A.   Yes.

23          MR. DAVID BOIES:  I would offer Plaintiffs'

24    Exhibit 217.

25          MR. ATTANASIO:  No objection.

HEFT-LUTHY - DIRECT / DAVID BOIES

1          **THE COURT:**  217 will be admitted.

2          (Trial Exhibit PX217 received in evidence.)

3    **BY MR. DAVID BOIES:**

4    **Q.**  And at the very top, this is a comment by you; correct?

5    **A.**  Yes.

6    **Q.**  And it says [as read]:

7                "Anybody watching the Sundar testimony?"

8          Do you see that?

9    **A.**  Yes.

10   **Q.**  And -- and at your deposition, you said that you didn't

11   know whether that was referring to Sundar Pichai; correct?

12   **A.**  Yes.

13   **Q.**  And you also said you didn't know any other Sundars;

14   correct?

15   **A.**  Yes.

16   **Q.**  And you said you didn't recall whether any other person

17   named Sundar that you're aware of gave testimony, whether you

18   watched it or not; correct?

19   **A.**  I -- I don't recall that answer; but if it's in the

20   record, I don't dispute it.

21   **Q.**  If you look at page 98, line 4.

22   **A.**  Apologies.  Back in the deposition or here?

23   **Q.**  In the deposition.

24   **A.**  Page 98, line 4?

25   **Q.**  Yes.

1  A.    Great.

2  Q.    Do you see where it says [as read]:

3        "QUESTION:  Do you remember whether any other person named

4        Sundar that you're aware of gave testimony, whether you

5        watched it or not?"

6        And you say [as read]:

7        "ANSWER:  I don't recall."

8  A.    Sorry.  Apologies.  98, line 4.

9        (Witness examines document.)  Yes.

10 Q.    And then you sent a link in connection with this chat,

11 correct, that's represented by Plaintiffs' Exhibit 217?

12 A.    That's correct.

13 Q.    And that link said [as read]:

14        "Google's CEO, Sundar Pichai, testifies data

15        privacy."

16        Do you see that?

17 A.    Yes.

18 Q.    And you were shown that at your deposition; correct, sir?

19 A.    Yes.

20 Q.    And you were asked whether that refreshed your

21 recollection that you were talking about Mr. Pichai.  Do you

22 recall that?

23 A.    Yes.

24 Q.    And you said it didn't; correct?

25 A.    That's correct.

1                     (Pause in proceedings.)

2              **MR. DAVID BOIES:**  Your Honor, I have no more

3    questions.

4              **THE COURT:**  Very well.

5         Mr. Attanasio?

6              **MR. ATTANASIO:**  May I proceed, Your Honor?

7              **THE COURT:**  You may.

8                     <u>**CROSS-EXAMINATION**</u>

9    **BY MR. ATTANASIO:**

10   **Q.**   Good morning, Mr. Heft-Luthy.  How are you?

11   **A.**   I'm doing all right.

12   **Q.**   Okay.  Let's back up a little bit and get to know you.

13        Where do you live?

14   **A.**   I live here in San Francisco.

15   **Q.**   And where do you work now?

16   **A.**   I'm currently a platform manager on the Privacy Team at

17   Airbnb.

18   **Q.**   How long have you worked at Airbnb?

19   **A.**   A little over four months.

20   **Q.**   And before Airbnb, where did you work?

21   **A.**   I was at TikTok for two years.

22   **Q.**   Did you join Google out of college?

23   **A.**   I did.

24   **Q.**   What year was that?

25   **A.**   2016.

**HEFT-LUTHY - CROSS / ATTANASIO**

1  **Q.**   How old were you?

2  **A.**   I was 22, I believe.

3  **Q.**   And you left Google in 2022; is that right?

4  **A.**   That's correct.

5  **Q.**   Some of the emails you've been shown today, and Google

6  docs you've been shown today, Mr. Pichai's testimony, are from

7  2018, 2019; is that correct?

8  **A.**   That's correct.

9  **Q.**   Six to seven years ago?

10  **A.**   Yes.

11  **Q.**   Do you remember everything that happened six to

12  seven years ago, sir?

13  **A.**   No.

14  **Q.**   When you left Google, did you leave of your own choosing?

15  **A.**   Yes.

16  **Q.**   Did you leave on good terms?

17  **A.**   I would say so.

18  **Q.**   By the way, until your deposition, had you ever testified

19  before in a deposition?

20  **A.**   I had done one other deposition right before I left

21  Google.

22  **Q.**   In some other case?

23  **A.**   A different case, yes.

24  **Q.**   When you left Google in 2022, did you take a break from

25  tech and pursue some other projects?

HEFT-LUTHY - CROSS / ATTANASIO

1   **A.**   Yes.

2   **Q.**   What did you do?

3   **A.**   I was studying Mandarin Chinese at the City College of

4   San Francisco and working on some local ballot measure

5   campaigns in SF.

6   **Q.**   Just very briefly, what was one of the ballot measures you

7   worked on?

8   **A.**   One of the ballot measures was what ended up being

9   Proposition M in 2022, which was taxing landlords who leave

10  apartments empty, larger-scale landlords, raising money for

11  affordable housing.

12  **Q.**   You live in San Francisco in the Mission; is that right?

13  **A.**   That's correct.

14  **Q.**   So with respect to Google, sir, that was three jobs ago?

15  **A.**   Yeah.  I was a part-time organizer for that ballot measure

16  campaign.  So, yes, three years -- three jobs ago.

17  **Q.**   Are you being paid an hourly fee or a consulting fee, or

18  anything like that, with respect to your testimony?

19  **A.**   No.

20  **Q.**   I'd like to dive in just a little deeper about your job at

21  Google.  All right?

22  **A.**   Sure.

23  **Q.**   What was your job title?

24  **A.**   I was a product manager, and I was a member of a product

25  team within -- excuse me -- the Privacy and Data Protection

**HEFT-LUTHY - CROSS / ATTANASIO**

1    Office.

2    **Q.**    I believe you had asked us if you could have some water

3    while you were up there.

4    **A.**    Yeah.    I think I'm going to take you up on that one.

5    Thank you.

6    **Q.**    Go ahead.

7                          (Pause in proceedings.)

8    **BY MR. ATTANASIO:**

9    **Q.**    You said you were a product manager in the Privacy and

10   Data Protection Office; is that right?

11   **A.**    That's correct.

12   **Q.**    Is that sometimes referred to in these documents as the

13   PDPO?

14   **A.**    Yes.

15   **Q.**    What is the job of a product manager in the PDPO?

16   **A.**    So I was one of a few product managers.    There was a

17   couple smaller product teams, of which I was part of one, that

18   were responsible for various privacy initiatives.    Some of them

19   would have been backend data governance, making sure that we

20   meet all the different data-handling requirements that we have

21   or that we've set for our users.

22        I was working as part of a team called the User Facing

23   Privacy Team for most of my time that was either launching new

24   controls or building surfaces that would summarize existing

25   controls for users.

1    Q.    Okay.  Now, when I hear you say -- when I hear you say

2    "surfaces," I always think you mean privacy services.  But

3    you're saying "surfaces" like the surface of a table; yes?

4    A.    Yeah.  It's a -- it's a, to use the metaphor, a place in

5    Google Account or in the product that has a couple different

6    privacy controls on it so you can see the controls either that

7    are part of your Google Account or relevant to that particular

8    product.

9    Q.    Now, just so we're clear about your role, you understand,

10    from a distance, this case is about the sWAA settings at

11    Google; correct?

12    A.    That's correct.

13    Q.    In your job, were you responsible for the functionality

14    and performance of privacy switches like WAA and sWAA?

15    A.    No.

16    Q.    Did you own or have direct responsibility for

17    Google Analytics?

18    A.    No.

19    Q.    Did you own or have any specific responsibility for

20    Google Analytics for Firebase?

21    A.    No.

22    Q.    Did you have responsibility and oversight or involvement

23    in how Google receives specific data from third-party apps?

24    A.    No.

25    Q.    Now, you've looked at a few snippets this morning from

1    some documents.  I'd like to talk to you more broadly for a

2    moment about communications at Google.

3         On an average day at Google six or seven years ago, how

4    many communications, emails, DMs, Google docs, chat messages,

5    did you receive or have with your colleagues?

6    **A.**    Dozens to hundreds.  It would depend on the day.

7    **Q.**    Since then, have you received similar incoming flow of

8    communications?

9    **A.**    Yes.  At every job you get a lot of -- you get a lot of

10   messages.

11   **Q.**    Do you remember what you said in one email, one direct

12   message, one chat, one Google doc from that collection of

13   communications that we all deal with?

14   **A.**    No.

15   **Q.**    Is the culture at Google one where you and your colleagues

16   were encouraged to share ideas with each other?

17   **A.**    Yes.

18   **Q.**    Are you familiar with the phrase "brainstorming"?

19   **A.**    Yes.

20   **Q.**    How would that relate to your work at Google and some of

21   what we've actually seen today?

22   **A.**    Yeah.  I mean, I think the scratchpad might be a good

23   example of that, where you're throwing something out.  It might

24   be the thing that everybody agrees on.  And you're trying to

25   phrase it.  It might be you putting out a new idea and then

1    seeing how people are going to respond to it to try to build

2    agreement that the thing that you want to do is actually what

3    you want to build.

4    **Q.**    And let's look at that.

5            **MR. ATTANASIO:**  Exhibit 18, please, Brooklyn.

6            **THE COURTROOM DEPUTY:**  Is that --

7            **MR. ATTANASIO:**  It's admitted.

8            **THE WITNESS:**  Do you know which tab in the binder it

9    is?

10   **BY MR. ATTANASIO:**

11   **Q.**    Actually, I don't, but we're just going to be brief on the

12   screen.

13   **A.**    You can put it on the screen.

14   **Q.**    Yes.

15   **A.**    That's fine.

16   **Q.**    Tab 2, Mr. Heft-Luthy.

17           Thank you, Counsel.

18           And up here it says "scratchpad" and then we have some

19   dialogue, and even on the right we have comments coming in on

20   the margins.  Do you see that?

21   **A.**    Yes.

22   **Q.**    So go ahead.  In your own words, what's going on here?

23   **A.**    We have another -- to my recollection, with PrivacyNative

24   we would have had another doc that would have been the actual

25   for presentation doc.  This would have been basically just an

1  open document that you can -- anybody from the team could go in

2  and throw a version in.  We might comment on it and people

3  could say, "Oh, this makes sense," and then one of us would

4  port it over to the main; or we might say, "Hey, I'm going to

5  bring this content over here."

6  **Q.**    And if you look at the mission statement -- you can look

7  at it to yourself, we don't need to linger on it -- is there

8  anything in this document you were just shown this morning that

9  has to do with what happens when sWAA is turned off?

10  **A.**    Not to my recollection.

11  **Q.**    Let's look at another document, if we could, and that

12  would be -- to continue on this theme, and that would be

13  Exhibit 213.

14      You were shown several of these.

15          **MR. ATTANASIO:**  Just hold it there, Brooklyn, please.

16  This is in evidence.

17  **BY MR. ATTANASIO:**

18  **Q.**    As was established, this was an email to you from someone

19  named David Warren.  Do you see that at the top?

20  **A.**    Yes.

21  **Q.**    Okay.  But what's going on here?  This is not like a

22  normal email.  What -- there are documents on the left.

23  There's comments from different people.  Explain this protocol

24  because there's a few of these you were shown this morning.

25  **A.**    So this protocol, this format that we're looking at would

1  be the way that Google Docs will send comments that people will

2  write on a document that go to your notification.

3      So you might get an email saying, "This -- these four

4  people commented on this document part," and it'll try to

5  reproduce some of the content on the side so you know what it's

6  in reference to.  And some of that I think got ported over and,

7  I guess, some of it didn't.

8  **Q.**  Do we have the documents here?

9  **A.**  I don't believe so.

10 **Q.**  So we don't even know what's being commented on because we

11 don't have the document that's actually on the left; right?

12 **A.**  That's correct.

13 **Q.**  And if we look at the bottom of 213, you were asked about

14 a comment you wrote.  It says "Sam Heft-Luthy" about two-thirds

15 of the way down?

16 **A.**  Yes.

17 **Q.**  And you say [as read]:

18      "This is pretty hard to parse."

19 Do you see that?

20 **A.**  Yes.

21 **Q.**  Do you know, as you set here now, what that is even about?

22 **A.**  No.

23 **Q.**  Do you know if it has anything to do -- just from looking

24 at this, have anything at all to do with what happens when sWAA

25 is turned off?

**HEFT-LUTHY - CROSS / ATTANASIO**

1    **A.**    No.

2    **Q.**    Or Google Analytics?

3    **A.**    No.

4    **Q.**    Or Firebase?

5    **A.**    No.

6    **Q.**    Is it -- as far as we're sitting here right now, would

7    this be something you'd call in context or out of context?

8    **A.**    I would say out of context.

9         **MR. ATTANASIO:**    You can take that down, Brooklyn.

10   Thank you.

11   **BY MR. ATTANASIO:**

12   **Q.**    All right.  Let's talk about Exhibit 6.  We're going to

13   spend a little more time on this.

14        Do you remember Exhibit 6 is the survey?

15   **A.**    Yes.

16   **Q.**    Privacy notes conversations, which is in evidence?

17   **A.**    PrivacyNative, yes.

18   **Q.**    Thank you.

19        And just to set the stage, you testified this morning that

20   this reflects some interviews you and your colleagues conducted

21   of various Google employees; is that right?

22   **A.**    That's correct.

23   **Q.**    And in relation to identifying user perceptions of Google,

24   what was the goal here?

25   **A.**    We were having very high-level conversations with people

1    who were working in privacy in various ways, asking them really

2    to dive on core challenges for privacy.  Right?  We had a good

3    sense of what we were doing well.  We wanted to talk to people

4    about where we want to evolve privacy experience in the -- in

5    the next five years.

6    **Q.**    Were you doing that from inside -- from the perspective

7    of, "Hey, what do we talk about inside the four walls of

8    Google?"  Or in terms of what the user experience and the user

9    perceptions were?

10   **A.**    I apologize.  I don't quite understand the distinction.

11   **Q.**    Were you focused in this work on user perceptions?

12   **A.**    Yes.

13   **Q.**    Okay.  Why was that important?

14   **A.**    You know, I think, like I talked about before with the

15   thing around user experience and the sense of the system, we

16   knew that we wanted people to use Google services with a sense

17   of trust and a sense of understanding, and we knew that that

18   would also involve trying to look at where we could do a better

19   job of either explaining the system or, you know, launching new

20   settings or things that could improve user experience.

21   **Q.**    You mentioned these interviews were done at a very high

22   level.  The whole project was at a very high level.  Did I hear

23   that right?

24   **A.**    That's correct.

25   **Q.**    Did this project of interviews and a survey specifically

1  intend to analyze the WAA or sWAA settings?

2  **A.**   No.

3  **Q.**   If I wanted to understand how WAA and sWAA work and what

4  happens when it's on or off, would Exhibit 6 be the place to

5  go?

6  **A.**   No.

7  **Q.**   All right.  Let's see if we can find some clues in the

8  document to guide us.

9       **MR. ATTANASIO:**  If we could go to page 6.1 and

10  highlight the language in the bottom third of the page, please.

11      One back, the title page, 6.1.

12      Yeah.  Can you highlight, please, where it says "About

13  this document," or enlarge it?

14       **THE COURTROOM DEPUTY:**  It's coming up.

15       **MR. ATTANASIO:**  Oh, thank you.

16  **BY MR. ATTANASIO:**

17  **Q.**   All right.  So, Mr. Heft-Luthy, this says [as read]:

18       "This document is a growing collection of notes

19       from conversations the PrivacyNative team has with

20       stakeholders across Google."

21      Is that what you've just described?

22  **A.**   Yes.

23  **Q.**   And if we turn, then, to page 68, you see another sentence

24  has been added here.

25       [As read]:

1           "Some of those conversations happened more

2      structured; others happened more ad hoc or via

3      email/chat."

4      Do you see that?

5   A.  Yes.

6   Q.  Were some of the discussions fairly informal?

7   A.  Yes.

8   Q.  If we turn to page 6.8, please.

9      And just to -- if we look at the first question that was

10  asked in this interview, I just want to give you some color to

11  what you've already told us.

12     Is this the kind of question you were asking repeatedly?

13  A.  Yes.

14  Q.  And if we look at page 6.17, please, page 17 of this

15  exhibit, and we turn to the third question on the page.

16     Do you see it says [as read]:

17          "What are the main privacy challenges Google

18     faces today?"

19  A.  Yes.

20  Q.  Page 6.22.

21     Third question on that page, and it says [as read]:

22          "What are the main challenges Google faces in

23     privacy?"

24  A.  Yes.

25  Q.  Fair to say, from your review of this document, we could

HEFT-LUTHY - CROSS / ATTANASIO

1  find this all over the pages?

2  **A.**  Yes.

3  **Q.**  Okay.  We won't.  All right?

4      But what's the point?  What were you out to accomplish

5  here in terms of looking ahead as opposed to assessing systems

6  inside Google at the time?

7  **A.**  Yeah.  We wanted to really just understand where people

8  who were thinking about privacy full-time wanted our privacy

9  controls and our information to go and get feedback that we

10  could use to, at a high level, inform some of the work of the

11  Privacy and Data Protection Office.

12  **Q.**  All right.  And if we could look at page 23 of Exhibit 6,

13  please, and the second question on the page.  Do you see that?

14      [As read]:

15          "What are the strengths now Google has in the

16      next five years?"

17      Again, you were looking ahead to this five-year plan?

18  **A.**  That's correct.

19  **Q.**  And page 6.25, please, last question on the page.  It says

20  [as read]:

21          "Looking into the next five years, what are the

22      main opportunities for Google in respect to privacy?"

23      Do you see that?

24  **A.**  Yes.

25  **Q.**  Was that your time span horizon?

HEFT-LUTHY - CROSS / ATTANASIO

1    **A.**    To my recollection, yeah.

2    **Q.**    Why was that important to you?

3    **A.**    We -- when you're working in privacy, you're spending a

4    lot of time thinking about the next piece of regulation or what

5    people -- what are people talking about right now.  And we

6    wanted to also carve the space to really think about where did

7    we think privacy was going, where do we think the industry is

8    evolving.

9    **Q.**    Okay.  Last one on this sequence.  If we could look at

10   page 67, please, of Exhibit 6.  And if we turn to the fifth

11   bullet, do you see here someone named Kalle is talking to the

12   interviewee, to the person being interviewed?

13   **A.**    Yes.

14   **Q.**    And who was Kalle again?

15   **A.**    Kalle was --

16   **Q.**    Kalle?

17   **A.**    -- was a user experience designer who was part of the team

18   working on the project.

19   **Q.**    And could you just read slowly what Kalle wrote here in

20   Exhibit 6, in this interview?

21   **A.**    [As read]:

22        "We would like to have your insight to inform

23        the vision as we start crafting it.  You mentioned

24        internal tools, so we want to think about how that

25        would affect the user journey in a positive way.  We

**HEFT-LUTHY - CROSS / ATTANASIO**

1    would love to have a longer conversation about this."

2    **Q.**    Is that consistent with what the mission was of this

3    project?

4    **A.**    Yes.

5    **Q.**    And if you turn just below, there's some bullet points

6    about that longer conversation and some topics for it.

7        If we could have those, please.  And if we could have the

8    individual items that are just below this.

9        And are these the kinds of issues -- we don't have to read

10   them all, but are these the kinds of issues that the company,

11   at least insofar as you were working on this project, wanted to

12   focus on in the years ahead?

13   **A.**    Yes.

14   **Q.**    Is that what this document is about?

15   **A.**    Yes.

16   **Q.**    Things like children's privacy; yes?

17   **A.**    Yes.

18   **Q.**    That's what's written here?

19   **A.**    Yes.

20   **Q.**    Biometrics?

21   **A.**    Yes.

22   **Q.**    All right.  Government surveillance?

23   **A.**    Yes.

24   **Q.**    All right.  We can take that down.

25       And if we look at -- I'd like to look, then, in some of

1    the responses that you -- that you received.  If we could look

2    quickly at page 45 of Exhibit 6.

3        First question on this page, do you see that, "What is

4    Google's business model?"

5    **A.**    Yes.

6    **Q.**    And if we go to the fifth bullet point under that

7    question, this interview subject wrote, or said [as read]:

8            "Our consumer business model is and will always

9        remain that we make great products and get people to

10       use them and make money with them appropriately."

11       Did you record that from this interview?

12   **A.**    I or somebody in the team would have taken those notes.

13   **Q.**    All right.  You can take that down, please.

14       If we could turn to page 2, please.  And in the upper

15   third of the page where it says "Feedback from Nathaniel," I

16   wanted to ask you one question, Mr. Heft-Luthy, about this.

17       "Feedback from Nathaniel," it says [as read]:

18           "He is dealing with these topics on a daily

19       basis.  They are always working with the Privacy

20       Council to make sure they do the right thing."

21       First of all, Nathaniel was somebody within Google?

22   **A.**    I -- the format of the username would imply.  I just don't

23   remember who that was specifically.

24   **Q.**    All right.  That's fine.

25       What I wanted to ask you is:  What is the Privacy Council

1   where they're always working together to make sure they do the

2   right thing?  What was the Privacy Council?

3   **A.**    The Privacy Council, to my recollection, was a set of

4   senior Google stakeholders who would have been responsible for

5   getting presentations about privacy work and trying to guide

6   privacy work at a high level.  So you'd go to them with a

7   presentation.  Sometimes for stuff I worked on, you'd get

8   feedback; and sometimes, they would be able to say, "Hey, this

9   is really good.  We'll talk to our team and make sure that it

10  can happen quickly."

11  **Q.**    All right.  Then let's turn to page 19, please.

12       And in the middle of the page, there's an interview with

13  somebody named Cassidy M.  Do you see that?

14  **A.**    Yes.

15  **Q.**    Five years ago almost -- remarkably almost to the day --

16  to the day.  Excuse me.  That's a coincidence.

17       Do you remember who Cassidy M was?

18  **A.**    I don't.

19  **Q.**    All right.  If we look at the second black bullet, please.

20  There's white bullets and black ones.  Can we look at the

21  second white one -- black one?

22       Cassidy -- your team recorded two broader comments by

23  Cassidy.  Could you read the first one, please, slowly?

24  **A.**    [As read]:

25            "We know that in user minds, privacy and safety

**HEFT-LUTHY - CROSS / ATTANASIO**

1      are the same thing."

2   **Q.**   Then if we could turn to the fourth and final subbullet.

3      And could you read what Cassidy said about privacy and

4   safety?

5   **A.**   [As read]:

6         "The notion of safe and safety is the foundation

7      of the strategy we put into place now."

8   **Q.**   And the next black bullet, please?

9   **A.**   (Witness examines document.)

10  **Q.**   Right there.  Do you see "We already have"?  Could you

11  read that, please, Mr. Heft-Luthy?

12  **A.**   [As read]:

13         "We already have an ambition that got traction:

14      Safe."

15  **Q.**   Was that recorded in your survey?

16  **A.**   Yes.

17  **Q.**   Will you turn to page 20?

18      And this has a gazillion bullets.  Hopefully, we can zero

19  in here.  If we could go to the ninth bullet from the bottom of

20  the first big set.

21      And this interview subject says [as read]:

22         "There's really great stuff happening."

23      Do you see that?

24  **A.**   Yes.

25  **Q.**   If we could look at the next bullet, please, in this

1    interview.

2         And could you read that slowly, please?

3    **A.**    [As read]:

4              "70 percent of users think the value exchange on

5         an individual level is a fair one."

6    **Q.**    Now let's go to the final four bullets in this section

7    from this person who was interviewed.

8         Can you read those off for us slowly, please, of what this

9    person told you and your colleague?

10   **A.**    [As read]:

11             "We are the knight in shining armor we should be

12        building for the 70 percent.  We will never convince

13        the 30 percent.  We need to find a way to talk about

14        where we want to go that actually clicks with

15        people."

16   **Q.**    And I want to zero in on that last one.

17        That last bullet, "We need to find a way to communicate

18   that clicks with people," was that one of your passions at

19   Google?

20   **A.**    Yes.

21   **Q.**    And what do you mean by that?  Explain what's going on

22   there.

23   **A.**    You're a PM working in privacy.  You're in this space that

24   is really important to a lot of people, where people are

25   dealing with a million different challenges, whether it's

1    interpersonal privacy, whether it's their relationship with

2    companies like Google, and you want to be able to build stuff

3    that speaks to those challenges and helps them both be safe and

4    feel confident in that safety.

5    **Q.**    Okay.  Last one we're going to look at here we'll find at

6    page 44, please.  And if we could go to the third bullet.

7          This -- could you read what this interview subject told

8    you, Mr. Heft-Luthy?

9    **A.**    [As read]:

10          "We are piloting an oil tanker here, but the

11          problem is not that the cargo is full of toxics."

12   **Q.**    And the next bullet?

13   **A.**    [As read]:

14          "It sounds like a bad strength to have, but if

15          we would have to fix this, we had a very different

16          situation."

17   **Q.**    So using the analogy here -- and, by the way, this was a

18   person named Yooki, Y-o-o-k-i.  Do you know who that is?

19   **A.**    I believe that would refer to Yooki Park.

20   **Q.**    Okay.  Someone who worked at Google?

21   **A.**    Yes.

22   **Q.**    In this general group of privacy stakeholders?

23   **A.**    Yes.

24   **Q.**    And according to Yooki anyway, then, there were no toxins

25   in the oil tanker of information that Google has?

1    **A.**    I -- I suppose, yes.

2    **Q.**    All right.  Let's just -- we can take that down, please.

3         You were shown a few snippets from that on direct.  I

4    wanted to give more context.

5    **A.**    Yeah.

6    **Q.**    But let me cut to the chase.  Were the interviews we find

7    in Exhibit 6 in both directions -- some sound good; some don't

8    sound good -- were they about WAA or sWAA specifically?

9    **A.**    No.

10   **Q.**    Were they focused on Google Analytics or Firebase?

11   **A.**    No.

12   **Q.**    Was it the purpose of the exercise to investigate the

13   functionality of those settings?

14   **A.**    No.

15   **Q.**    Was the purpose of the interviews to determine if Google

16   was invading its users' privacy by how it handled the sWAA

17   switch?

18   **A.**    No.

19   **Q.**    By the way, did you believe -- from your perch in the

20   privacy office, did you ever believe, at the time you were at

21   Google, that Google was deceiving its users when it comes to

22   privacy and the sWAA button?

23   **A.**    No.

24        **MR. DAVID BOIES:**  Objection.  Foundation, Your Honor.

25        **THE COURT:**  Overruled.

1  **BY MR. ATTANASIO:**

2  **Q.**  Based on what you knew, as somebody who was there, did you

3  believe the sWAA button was, quote, "fake"?

4  **A.**  No.

5  **Q.**  With respect to Mr. Pichai's testimony before Congress,

6  there was quite a bit about what you remembered and didn't

7  remember.

8     When you were first asked about his testimony at Congress

9  in your deposition, were you shown the video or a transcript of

10  the testimony first?

11  **A.**  No.

12  **Q.**  Were you shown instead a chat message that's been put

13  before the jury between you and four colleagues at Google,

14  talking about a whole bunch of people?

15  **A.**  Yes.

16  **Q.**  When you were shown the chat talking about a whole bunch

17  of people, including Mr. Pichai, was that what you were trying

18  to work through in terms of what you were being asked?

19  **A.**  Yes.

20  **Q.**  Were you later shown the video or a transcript of the

21  video?

22  **A.**  I honestly don't recall.  I believe the transcript

23  shows -- showing me something, but I don't remember what it was

24  showing.

25  **Q.**  When you were shown that, did you have any problem saying,

 1    "Yes, there's our CEO, Mr. Pichai"?

 2    **A.**    No.

 3            **MR. ATTANASIO:**  Okay.  That's all I have.  Thank you,

 4    Your Honor.

 5            **THE COURT:**  Mr. Boies.

 6                      (Pause in proceedings.)

 7            **THE WITNESS:**  And apologies.  I'm a Type I diabetic.

 8    I'm going to check my blood sugar very quickly on my phone.

 9            **MR. DAVID BOIES:**  When you're ready, let me know.

10            **THE WITNESS:**  Thank you for your patience.

11            **THE COURT:**  If you'd like to take a break, we're happy

12    to take a break.

13            **THE WITNESS:**  I'm okay.

14            **THE COURT:**  Okay.

15            **THE WITNESS:**  Thank you.

16                    <u>**REDIRECT EXAMINATION**</u>

17    BY MR. DAVID BOIES:

18    **Q.**    I think you just testified that you were shown a video of

19    Mr. Pichai's testimony at your deposition; correct?

20    **A.**    Yes.

21    **Q.**    And did I hear you say that after you saw that, you

22    immediately identified that as Mr. Pichai?  Did I hear you say

23    that?

24    **A.**    I don't recall what order the stuff happened in the

25    deposition.

1   **Q.**   Well, at the deposition, did you identify it as

2   Mr. Pichai?

3   **A.**   I -- I don't recall.  Yeah, I don't recall what I said in

4   the deposition.

5   **Q.**   Okay.  I thought I heard you say to Mr. -- Google's

6   counsel that at the deposition, once you were shown it, you

7   identified it as Mr. Pichai.  You didn't say that at your

8   deposition, did you, sir?

9   **A.**   I -- I just don't recall what the deposition -- what the

10  order of operations and what I said in the specific deposition

11  would have been.

12  **Q.**   Okay.  Now, you were asked a number of questions about

13  what I think Google's counsel would describe as snippets from

14  PX6.  Do you recall that?

15  **A.**   Yes.

16  **Q.**   And he asked you a question about page 22.  Would you turn

17  to page 22?

18      And he asked you about "What are the main challenges

19  Google faces in privacy?"  Do you see that?

20  **A.**   Yes.

21  **Q.**   And right above that, there's another question that he did

22  not ask you about.  Do you see that?  "What are the main

23  privacy challenges that users face?"

24  **A.**   Yes.

25  **Q.**   And the answer is "Knowing what they should worry about."

**HEFT-LUTHY - REDIRECT / DAVID BOIES**

1  Do you see that?

2  **A.**  Yes.

3  **Q.**  Now, he also asked you some questions on page 25.

4  And he didn't ask you about -- the question I'm going to

5  ask you about is "What are ways data can be used against

6  people?"  And you see the answer there?

7  **A.**  Yes.

8  **Q.**  And you understood that users were concerned about

9  somebody hacking Google or getting -- somehow getting data that

10  Google has?  You understood that; right?

11  **A.**  Yes.

12  **Q.**  And, indeed, if you turn to page 38, that was identified

13  as one of the main privacy challenges; correct?  A lot of

14  people are concerned that their account is going to be hacked?

15  **A.**  That this would have been somebody's representation, yes.

16  **Q.**  Yes.

17  Now, let me just ask you maybe a couple of questions.  I'm

18  not going to go through this, don't worry.  The jury's going to

19  have this.  They're going to see the whole thing.

20  **A.**  Okay.

21  **Q.**  But just a couple more questions to put in context what

22  counsel was asking you.

23  If you look at page 49, and this is a -- an interview of

24  somebody with an email address Othar.  Do you see that?

25  **A.**  Yes.

1  **Q.**   And you know who that is, don't you?

2  **A.**   I would read -- yeah.  Othar would be Othar Hansson from

3  the PDPO.

4  **Q.**   From the what?

5  **A.**   From the PDPO.

6  **Q.**   Yes.  And he says, if you go to page 49, the second bullet

7  from the top, quote [as read]:

8          "At Google we still seem to believe in that

9       fantasy that users agreed to this."

10      Do you see that?

11 **A.**   Yes.

12 **Q.**   And maybe just one more.  If you go to page 31, at the

13 bottom [as read]:

14         "What are the main privacy challenge that users

15      face today?"

16      Do you see that?

17 **A.**   Yes.

18 **Q.**   And it says [as read]:

19         "Everyone is concerned about their data being

20      collected.  They don't know about it and they don't

21      know how to control it."

22      Do you see that?

23 **A.**   Yes.

24 **Q.**   Now, with respect to Plaintiffs' Exhibit 18, counsel asked

25 you whether or not there was another presentation document, if

1   this was just part of the process and then there was a

2   presentation document.  Do you recall that?

3   **A.**   Yes.

4   **Q.**   Have you ever seen that presentation document?

5   **A.**   I don't believe since I would have been at Google, but I

6   don't -- I don't think so.

7   **Q.**   You don't even know whether there was a presentation

8   document, do you?

9   **A.**   There -- there would have been another one.  I just don't

10  know if I've seen it since I left Google.

11  **Q.**   When you say "there would have been" --

12  **A.**   Yes.

13  **Q.**   -- there was supposed to be; is that fair?  When you left

14  Google, you thought there was going to be one; but you don't

15  know whether there ever was one, do you?

16  **A.**   I don't know what you mean by "supposed to be."  There

17  would have been -- this would have been a scratchpad, and there

18  would have been another document that we would have used this

19  as a writing pad to bring stuff over to.

20  **Q.**   And did they ever show you that other document during your

21  preparation?

22  **A.**   I don't believe so.

23  **Q.**   I haven't seen it either.

24       You've never seen it, have you?

25  **A.**   Again, not since I left Google, to my recollection.

**HEFT-LUTHY - REDIRECT / DAVID BOIES**

1  Q.   Well, you couldn't have seen it before you left Google

2  because it hadn't been prepared yet, you told me just a minute

3  ago; right?

4  A.   No.  What I'm saying is that this scratchpad was not the

5  document itself, that there was another document that we were

6  working on that would have been presented as part of the

7  program.  This is not that document.

8  Q.   That document -- this other document, this document that

9  you say was going to happen, you never saw that document;

10  right?

11  A.   Maybe I'm misunderstanding the question.

12  Q.   Did you ever see that document?

13  A.   While I was at Google?

14  Q.   The presentation document?

15  A.   Yes.  Yes.

16  Q.   Oh, you did?

17  A.   Yes.

18  Q.   Now, do you have any understanding why that document would

19  not have been here in court?

20       **MR. ATTANASIO:**  Objection.  Foundation.

21  Argumentative.

22       **THE COURT:**  Sustained.  Sustained.

23  BY MR. DAVID BOIES:

24  Q.   Let's -- it's your testimony now that you saw this

25  presentation document; is that correct?  And you made the

 1  presentation?

 2  **A.**    I just want to make sure I'm understanding the question

 3  correctly.  There was another document that I would have been

 4  responsible for helping draft.

 5  **Q.**    You keep saying "I would have been."

 6  **A.**    Or that I was.  Apologies.

 7        -- that I was responsible for drafting, and that document,

 8  which I prepared and presented, you're asking if I saw that

 9  document.  And the answer to that is, yes, because I was

10  drafting it.

11  **Q.**    And do you know what happened to that document?

12  **A.**    I do not.

13        **MR. DAVID BOIES:**  No more questions, Your Honor.

14        **THE COURT:**  Anything further?

15        **MR. ATTANASIO:**  No further questions, Your Honor.

16        **THE COURT:**  All right.  You may step down.

17        **THE WITNESS:**  Thank you.

18                    (Witness excused.)

19        **THE COURT:**  Members of the jury, why don't we go ahead

20  and take a break between witnesses.  Remember my admonitions.

21  Do not discuss this matter amongst yourselves or with anyone

22  else, and we'll be back here at -- shoot for 20 after.

23                 (Recess taken at 10:05 a.m.)

24              (Proceedings resumed at 10:21 a.m.)

25      (Proceedings were heard out of the presence of the jury.)

1          THE COURT:  Is everybody ready?

2          MR. DAVID BOIES:  We have -- we're now prepared to

3    rest; but before doing that, we've got some document issues to

4    admit.

5          THE COURT:  Okay.  I thought there was also some

6    deposition that was going to be played.

7          MR. DAVID BOIES:  There's also some depositions, but

8    the jury is going to come in and I didn't -- I thought I'd

9    raise the document issues before the jury came in.

10          MR. SANTACANA:  There's one objection that we have

11    from what I understand to be their plan here to put documents

12    in at the end, Your Honor.

13          THE COURT:  Okay.

14          MR. MAO:  Good morning, Your Honor.

15          THE COURT:  Good morning.

16          MR. MAO:  It's the plaintiffs' data from Dr. Hochman's

17    deposition.

18          THE COURT:  Dr. Hochman's deposition.

19          MR. MAO:  Right.  Recall there was 18.  You asked me

20    to reduce.  I did that.  I made a proposal.  My understanding

21    is that opposing counsel is against it.

22          On the record Dr. Hochman said he personally supervised

23    all 18.  We collected all 18.  It was too voluminous, and it

24    was being offered for two -- well, three, one, he first

25    examined it and what it was, talked about some of that.

1        Secondly, the quantity, we ultimately agreed to put that

2   in through a 1006, which that did get admitted.  If you want to

3   go and look at the record on that, Your Honor, that was on that

4   day.  It was around pages 607 to 608, and you'll see all 18

5   were enumerated and the witness indicated that he had

6   personally supervised all of that, analyzed that, and that's

7   what we were debating.

8        We admitted 442 into the record.  So what you asked us to

9   do was look at 453 to see what could be admitted in.

10       There were a total of two that were talked on the record

11  specifically, which was 442 and 453.  You admitted 442.  You

12  asked us to meet and confer on 453.

13       And what I proposed was that we could substantially reduce

14  the 453 from thousands of records.  There were about 70 we were

15  looking at.  We then reduced it to the 20-some.  We compiled

16  all of that, plus an additional six pages from 454, into this

17  one folder.  I reduced it from ten boxes in which the witness

18  was talking about.  That's all I'm looking to basically get in.

19       **THE COURT:**  Okay.  So, first of all, what you want to

20  admit, let me have it.

21       **MR. MAO:**  Sure.  This is your copy, Your Honor.  May I

22  approach?

23       **THE COURT:**  You can just give it to Karen and she can

24  give it to me.

25            (Document handed up to the Court.)

1    **THE COURT:** All right. So focus me on what exactly --

2    **MR. SANTACANA:** Sure.

3    **THE COURT:** -- where I am here.

4    **MR. MAO:** So PX442, which was already in the record, I

5    would just suggest we put it as 442A because it's all in one

6    binder and people don't have to look through that. 442A is

7    simply what was admitted, which is 442, which is the UUAD data

8    of the plaintiffs' data.

9    **MR. SANTACANA:** We have no objection to 442,

10   Your Honor.

11   **THE COURT:** But I thought -- I thought you said it's

12   already admitted.

13   **MR. SANTACANA:** It's been admitted.

14   **THE COURT:** So why do I need to do anything with it

15   now? It's admitted.

16   **MR. MAO:** Because all of the -- I'm trying to make it

17   easier for people to rummage through this. This is, you know,

18   three, reduced from ten, boxes of data, Your Honor. I'm

19   just -- I put it in a binder.

20   **MR. DAVID BOIES:** I don't know why you've got 442 in

21   there. You have a 442A.

22   **THE COURT:** What is 442? 442 is -- my understanding,

23   everybody tells me, has been admitted. So now is there

24   something --

25   **MR. MAO:** We can take that out.

1        **THE COURT:**  I'm not tracking this.  If there's a

2   document that's already been admitted, I would prefer not to

3   talk about it.  I want --

4        **MR. MAO:**  That's fine.

5        **THE COURT:**  -- to focus on what is in dispute.  So

6   tell me what's in dispute.  And I understand you distilled

7   down.  I appreciate that.  That's fine.  But let's -- tell me

8   what I need to look at right now.

9        **MR. MAO:**  So from 453 --

10       **THE COURT:**  Yes.

11       **MR. MAO:**  -- my understanding is that opposing counsel

12  only wants one event pulled from all of that.  We disagree.

13       **THE COURT:**  Okay.  And you want -- I'm now on 453.

14  And you want 453, Tabs 1 through 26; correct?  Is that correct?

15       **MR. MAO:**  Yes.

16       **THE COURT:**  Okay.  That's good to know.

17     Now, go ahead, Mr. Santacana.

18       **MR. SANTACANA:**  Your Honor, at the front of

19  Exhibit 453 is a document that is not evidence.  It's a

20  spreadsheet that was created by counsel indicating their view

21  of whether random events they have selected here contain

22  usernames, emails or phones, conversion events, demographic

23  information, and latitude/longitude.  It's not in evidence and

24  Dr. Hochman did not discuss it.  We object to that front page.

25  That's the first of two objections I have to 453.

1    **THE COURT:**  Okay.  Okay, that's one objection.

2    **MR. SANTACANA:**  The second objection, Your Honor, is

3    that they cherrypicked 26 of these events from the, you know,

4    32 million-line document in the events that they chose.  What

5    they're trying to do is disproportionately represent to the

6    jury that events contain name or email address inside of them.

7    Your Honor certified the case on a different theory of the

8    case.  Less than a half of a percent of these events contain

9    such information, and this is a class action.  And so if they

10   intend to prove their case based on a half of a percent of the

11   data, then we have a certification problem.

12   And so my proposal, at which we were not able to reach

13   agreement on, is that we put back events that are actually what

14   we can all agree are more fairly representative of what's in

15   the record.

16   Alternatively, Your Honor, Dr. Black could testify about

17   what they seek to put into evidence, and we could revisit the

18   question then.

19   **MR. MAO:**  Your Honor --

20   **THE COURT:**  Yes.

21   **MR. MAO:**  -- all of this data is sWAA-off data.  There

22   is no individualization issue.  Google collects -- as you

23   understand, Your Honor, this is just a sliver of the data in

24   which they collect.  I had to make it reviewable and convenient

25   for Your Honor pursuant to your instructions.

 1      All of this is sWAA-off data.  There is nothing disparate

 2  or different or uncommon about all of that.

 3      I asked counsel how he would suggest that we compile this.

 4  He says, "Well, make a proposal."  This was my proposal.  They

 5  didn't make any counterproposals on that data.

 6          **THE COURT:**  Well, he just kind of did, but I don't

 7  know what the jury's going to do with this, but...

 8          **MR. DAVID BOIES:**  Your Honor, can I make just a

 9  suggestion?

10          **THE COURT:**  Sure.

11          **MR. DAVID BOIES:**  I understand counsel's view that we

12  picked these examples.  This is huge so we've --

13          **THE COURT:**  I understand.

14          **MR. DAVID BOIES:**  -- so we've got to give examples.

15  We've presented some examples.

16      They can pick as many examples as they want, and we'll add

17  it in; and we'll have examples that we picked and examples that

18  they picked.

19          **THE COURT:**  I thought Mr. Santacana kind of just

20  suggested that by saying let's have more representative

21  examples.

22          **MR. DAVID BOIES:**  Right.  But --

23          **MR. SANTACANA:**  Yes, Your Honor.

24          **MR. DAVID BOIES:**  But what he wants to do is take out

25  our examples.

1    **THE COURT:**  Well, you want to take theirs out and put

2    yours in, huh?

3    **MR. SANTACANA:**  No, not exactly, Your Honor.  My

4    problem, if you look at their summary here, is that four of the

5    26 they claim contain a username, email, or phone, if this

6    were, for example, a class action about cars with a defective

7    radio and the drop in value of the car, which is kind of

8    comparable to their class -- certified class theory, and they

9    only wanted to talk to the jury about the one car out of a

10   hundred million that had a fire because of the radio, that

11   would be a certification problem.  This is akin to that.

12    Dr. Hochman testified, their expert, that username -- that

13   name, email, or phone number in the data was an incidental

14   finding.  And what they want to do is provide the incidental

15   finding to the jury in a disproportionate manner and then

16   argue, presumably in closing, that they should assume that that

17   is representative of what happened in the class period, which

18   it's not.  Dr. Hochman, their own expert, admitted that on the

19   stand.  So we'd like the samples to be representative.

20    **THE COURT:**  So to rectify or to guard against that

21   possible misconception, why is -- why not -- at the risk of too

22   much material in the record, why not adopt Mr. Boies'

23   suggestion, which is you can supplement this with what you

24   think is appropriate?

25    **MR. SANTACANA:**  I think that is a good suggestion.

PROCEEDINGS

```
 1   I think they will say they want -- I think the proportion is

 2   the question, but it's something we can discuss and work out

 3   for Dr. Black.

 4           THE COURT:  50-50, something like that.

 5           MR. SANTACANA:  Sure.  We can add 26 to this.

 6           MR. DAVID BOIES:  Yeah.

 7           THE COURT:  Okay.  Let's do that.

 8           MR. DAVID BOIES:  Okay.

 9           MR. SANTACANA:  Sounds good.  Thank you, Your Honor.

10           MR. MAO:  And then there's --

11           MR. SANTACANA:  On 454 --

12           MR. MAO:  Which is a six-page --

13           THE COURT:  Uh-huh.

14           MR. MAO:  -- in its native format.

15           THE COURT:  Let me get to that.

16           MR. MAO:  It was produced to us as an Excel

17   spreadsheet.

18           THE COURT:  By the way, we still have the issue of the

19   front page.

20           MR. SANTACANA:  Yes, Your Honor.  We object to their

21   summary.

22           THE COURT:  And it does appear to me that that's -- I

23   mean, it might be helpful in terms of navigating through the

24   material, but it is not -- it's not -- it doesn't have

25   independent evidentiary value.  So I'm going to exclude it.
```

1    Okay.  454.

2        MR. SANTACANA:  My objection, Your Honor, to 454, and

3    you recall when we discussed this while Dr. Hochman was on the

4    stand, the risk that they would want to admit an exhibit he did

5    not discuss or show to the jury after he was no longer on the

6    stand, and that is what -- that risk has now been realized.

7    Dr. Hochman did not show any portion of 454 to the jury.  It

8    will be inscrutable to the jurors without his testimony.

9        THE COURT:  What is 454?

10       MR. MAO:  454 is just a different kind of log, and he

11   absolutely did testify.  You can see it on the record,

12   Your Honor, on the pages in which I am happy to read from that

13   if you want.

14       THE COURT:  Why don't you go ahead.

15       MR. MAO:  Sure.  This is on page 608 of the

16   transcript, starting on line 7, by me.

17   [As read]:

18   "QUESTION:  Dr. Hochman, I read a number of things into

19       the exhibit, but you have examined all of plaintiffs' data

20       and your own testing data for the purposes of rendering

21       your professional opinion; is that correct?

22   "ANSWER:  Yes, I did.  I and the team reviewed all this

23       data very carefully," period.

24   I mean, there's --

25       MR. SANTACANA:  Your Honor --

1          **MR. MAO:**  -- there's others if you want, but I tried

2     to make that as curt as possible.

3          **THE COURT:**  And he had this in front of him when he

4     was testifying --

5          **MR. MAO:**  This is the one --

6          **THE COURT:**  -- about that history?

7          **MR. MAO:**  This is the one we were talking about the

8     zip drive we tried to provide, and that was a medium that was

9     unacceptable as a way of making it to the back.

10         **MR. SANTACANA:**  Your Honor, all this data, when we're

11    talking about what he says is a 30-story building, is not the

12    same as testifying about 454.  No aspect of it was ever

13    displayed to the jury, and he did not explain how they should

14    interpret what is on it, unlike 442, which we did not object

15    to, and 453, which we will provide samples of and not object

16    to.

17         **THE COURT:**  Okay.  454 will not be admitted.

18        Okay.  Let's get to the jury.

19        So what's next?

20         **MR. DAVID BOIES:**  We have Plaintiffs' Exhibit 28.

21         **THE COURT:**  And that is a --

22         **MR. DAVID BOIES:**  That is a transcript of Mr. Pichai's

23    testimony before Congress, which we are offering as an

24    admission.  Now, we don't need the entire transcript.

25         **THE COURT:**  Didn't I already rule on this?

PROCEEDINGS

1           **MR. HUR:**  You did, Your Honor.

2           **MR. DAVID BOIES:**  I don't think so.  What you ruled on

3    was, there was a video played, and I think you ruled that that

4    was available to be reheard if they wanted it, but it wasn't

5    coming in to evidence to go back to them.

6           **THE COURT:**  Correct.

7           **MR. HUR:**  That that would be treated as if it were

8    deposition testimony or the like.

9           **THE COURT:**  Right.

10          **MR. DAVID BOIES:**  But this is clearly a party

11   admission.

12          **THE COURT:**  So you want to -- I see.  All right.

13   Okay.

14       So all right.  Now, I'm with the program.  Go ahead.

15          **MR. DAVID BOIES:**  And so we want to offer 28.  It's

16   the entire transcript.  We actually only have about six or

17   eight pages that have the key stuff that we're going to ever

18   use with the jury.

19          **THE COURT:**  Is it the stuff you played in opening

20   statement?

21          **MR. DAVID BOIES:**  What?

22          **THE COURT:**  Did you play some of it in opening

23   statement?

24          **MR. DAVID BOIES:**  Yes, exactly.  Exactly.

25          **THE COURT:**  Okay.

1      **MR. HUR:**  Your Honor, you did address this issue.  We

2  had a long discussion about this, about the transcript going

3  back to the jury.

4      **THE COURT:**  Right.  But it's not going back to the

5  jury.  It's being read in, like an admission in a deposition.

6  It's different.

7      **MR. HUR:**  It was played --

8      **THE COURT:**  I said the transcript -- I said I -- this

9  goes back to the miscommunication.  What I was addressing

10 before was whether or not I should withdraw the transcript,

11 which I had inadvertently thought had been -- by agreement, was

12 admitted into evidence.  We withdrew that.  I didn't say you

13 couldn't, like any other deposition admission, read it into the

14 record because that's what they --

15     **MR. HUR:**  They plan to read into the record now,

16 Your Honor?  Is that their -- I'm sorry.

17     **THE COURT:**  Yes.

18     **MR. DAVID BOIES:**  Yes.  We're going to offer it and

19 then read it into the record.

20     **MR. HUR:**  Your Honor, the video was played for the

21 jury.

22     **THE COURT:**  But it was played in the opening

23 statement.

24     **MR. HUR:**  No.  It was played, Your Honor, with the

25 witness, with Mr. Monsees.  They played the video with the

 1   witness.

 2          **THE COURT:**  I'm trying to remember.

 3          **MR. HUR:**  That would be emphasizing one piece of

 4   testimony versus the other.

 5          **THE COURT:**  You already played the -- played it?

 6          **MR. DAVID BOIES:**  It was an excerpt.

 7          **THE COURT:**  If what he wants is an admission, it's now

 8   in.  You're not going to play it again then.

 9          **MR. DAVID BOIES:**  No.  No.  What I want to do is I

10   want to admit either the whole transcript or the portions of

11   the transcript.  Now, this is a transcript of his testimony in

12   front of Congress.

13          **THE COURT:**  Oh, I understand that.

14          **MR. DAVID BOIES:**  Okay.  This is not a deposition.

15          **THE COURT:**  What I want to remember is, or you help me

16   remember, is did this -- when you had Mr. -- when Monsees was

17   on the stand, was this already -- you're not going to get the

18   transcript in as an exhibit.

19          **MR. DAVID BOIES:**  Five minutes of the transcript -- of

20   the testimony was played.

21          **THE COURT:**  Is this a different section of the

22   testimony that you want to play now?

23          **MR. CARMODY:**  No.  It's the same.

24          **THE COURT:**  Well, if it's the same, I don't want you

25   to just do it again.

PROCEEDINGS

1      **MR. DAVID BOIES:** Okay.  All right.  Here is the

2   problem that I have, Your Honor.  Okay?  I think that these

3   statements by him, although they are in a transcript of

4   testimony, are no less admissions than if they were in a

5   document.

6      And if all I have in the record is a transcript that was

7   played to the jury but never taken down by the -- because it

8   wasn't taken down -- the words that were being said were not

9   down taken in the record.  Okay?

10      **THE COURT:** Right.  It's no different than a

11   deposition.

12      **MR. DAVID BOIES:** I agree, it's no different than; but

13   what I'm saying is, this is not just a deposition.  I mean,

14   it's not a deposition at all.  But what it is, is a party

15   admission that I am entitled to confront other witnesses with,

16   and --

17      **THE COURT:** Is there going to be a witness?

18      **MR. DAVID BOIES:** Well, we're going to have Mr. Ganem,

19   we're going to have a whole series of witnesses, and I'm going

20   to want to confront them, just as Mr. Monsees was confronted

21   with it.  But unless I -- if I play the -- the only way to

22   confront it in the current way is for me to play that clip

23   again, over and over again.  I don't have any written words in

24   the record that reflect this admission, and what I'm trying to

25   do is get something written.

1    **THE COURT:**  I don't understand that because you have a

2  transcript.  If you want to ask a witness -- just like a

3  deposition transcript.  It's -- the transcript is not coming

4  into evidence, but you can ask the witness, if it's

5  appropriate, to say --

6    **MR. DAVID BOIES:**  Do you agree with that?

7    **THE COURT:**  Treat it just like a deposition

8  transcript.

9    **MR. DAVID BOIES:**  But can I display it to the jury, in

10  other words, as I'm doing it?

11    **THE COURT:**  I'd have to see what the runup is to it.

12    **MR. DAVID BOIES:**  No, no, right.

13    **THE COURT:**  Let's just view it as a deposition

14  transcript, and then just deal with it that way.

15    **MR. DAVID BOIES:**  Okay.

16    **MR. HUR:**  Thank you, Your Honor.

17    **THE COURT:**  I mean, isn't --

18    **MR. DAVID BOIES:**  Now --

19    **THE COURT:**  Do you have a problem with that?

20    **MR. HUR:**  Your Honor, I think it is fine to treat it

21  as a deposition transcript.  I understand Your Honor has

22  already ruled it's not coming into evidence.  I think we should

23  just handle this when it -- as it arises.

24    **THE COURT:**  I also -- just to anticipate so we don't

25  have some outrage on the other side, I'm not saying that if

**PROCEEDINGS**

1    there's a witness here and he -- and someone says something

2    that Mr. Boies or his colleagues think can -- you can use this

3    to impeach them.  He can potentially use it to impeach them.

4         **MR. HUR:**  Your Honor, depending on the situation --

5         **THE COURT:**  Depending on the questions.

6         **MR. HUR:**  Yes, I believe that's possible.

7         **THE COURT:**  Okay.  Well, let's deal with it that way.

8         **MR. DAVID BOIES:**  The other thing is:  How would

9    the Court like to proceed so that we have this in for the

10   appellate record?  In other words --

11        **THE COURT:**  Well, they get -- again, it is no

12   different than a deposition transcript.  The appellate record

13   includes the video clip.  If it's a video deposition, there's a

14   video clip.  It goes to the appellate court.

15        **MR. DAVID BOIES:**  But in terms of having it for the

16   appellate court -- I understand it's not going back to the

17   jury.

18        **THE COURT:**  Yes.

19        **MR. DAVID BOIES:**  Does the Court --

20        **THE COURT:**  My understanding is that the court

21   reporter, and she can confirm this for me, if, say, it's a

22   video deposition and it's played to the jury, she doesn't

23   transcribe it and the video clip goes into the record.  And if

24   the appellate court wants to look at it, they can look at it.

25        Now, maybe I'm mistaken on how -- that's how I've always

**PROCEEDINGS**

 1    thought it worked.  Is that contrary to how you think it works?

 2         **MR. DAVID BOIES:**  No.  I think that's the way we've

 3    done it here.  I've done it both ways, but the way we did it

 4    here was she did not take it down; the video clip goes in.

 5         **THE COURT:**  Correct.

 6         **MR. DAVID BOIES:**  And just in terms of ease of

 7    citation to the appellate court, I think it would be -- and

 8    usually -- and the way I've usually done deposition

 9    transcripts, you know, if they're read --

10         **THE COURT:**  Well, you can mark it.  You can mark it

11    just like a demonstrative.  You could mark it as an exhibit for

12    identification.

13         **MR. DAVID BOIES:**  I'll mark it.

14         **THE COURT:**  And it can then -- if you somehow wanted

15    to make sure that it's in there in addition to the video link,

16    as long as it's clear that it was not admitted into evidence,

17    if you want to preserve it in a different way, i.e. Exhibit X

18    for identification, you can do that.

19         If there was a dispute about a demonstrative, for example,

20    you could say -- you usually mark it and say it's for

21    identification.  I haven't been paying attention if you guys

22    are doing that, but it can then be preserved in the appellate

23    record.

24         So I don't have a problem with you including the

25    transcript if it's clear it's been marked for identification

 1    but not admitted into evidence.

 2         **MR. DAVID BOIES:**  Yeah.  I understand it's not going

 3    back to the jury.

 4         **THE COURT:**  Correct.

 5         **MR. DAVID BOIES:**  But what I'm saying is, when you say

 6    not in evidence, I respectfully think it is in evidence.  It's

 7    been read.  It's been heard.  It's part of what they can

 8    consider.

 9         **THE COURT:**  Right.  But the transcript is not an

10    admitted exhibit.  For the appellate court, we need to make

11    sure that the record reflects that that was not an exhibit that

12    was, as a transcript, admitted and sent back into the jury room

13    because it was not.  So the transcript itself is not an exhibit

14    that's been admitted.

15        Now, if that -- that's why I thought the way you could

16    handle it, if you were not comfortable with the video link

17    being adequate, you could say, "In addition, I want the

18    transcript of the video marked for identification."  And then

19    if they don't want to see the video, they can look at the

20    transcript.  I don't really care.

21         **MR. DAVID BOIES:**  I think it's clear.  I mean, I think

22    it's clear Exhibit 28 for identification --

23         **THE COURT:**  Okay.

24         **MR. DAVID BOIES:**  -- that we've marked is the

25    transcript, and that's what was read from.

1    **THE COURT:**  Right.

2    **MR. DAVID BOIES:**  And so it's available to the

3    appellate court, and the jury has heard it.  I think that's

4    sufficient.

5    **THE COURT:**  Okay.

6    **MR. HUR:**  Your Honor, just to make it clear, though,

7    the transcript was not read.  The video was played for the

8    witness.  We are happy to meet and confer about making sure the

9    appellate record sufficiently identifies the words that were

10   said, whether that's marking it for identification or --

11   **THE COURT:**  It's a mechanical problem.

12   **MR. HUR:**  Exactly, Your Honor.

13   **THE COURT:**  And try to work it out, because both

14   sides, it's not -- it's a neutral principle.  Just how you want

15   to preserve something that was in video format that was not

16   transcribed by the court reporter it's almost like if -- there

17   aren't subtitles on the video?  I mean, it's almost like a --

18   when you play a video deposition, usually it has the language

19   on the bottom.

20   **MR. DAVID BOIES:**  The language below.

21   **THE COURT:**  This is just another version of that.  But

22   if you want to -- why don't you meet and confer?  This is a

23   mechanical issue.

24   **MR. HUR:**  Yes, Your Honor.

25   **MR. DAVID BOIES:**  We'll figure that out, Your Honor.

PROCEEDINGS

1    **THE COURT:** Okay. Where does that leave us in terms
2    of what you want to do next? Because I'm not -- where we ended
3    this was I said, because it's already been played in the
4    Monsees' deposition or testimony, that we're not going to just
5    play it again, although in closing statement.
6        Anyway, go ahead. So what's next?
7        **MR. DAVID BOIES:** One more exhibit that is not
8    objected to, Plaintiffs' Exhibit 82. It's a screenshot.
9        **THE COURT:** Okay. And you're just going to read that
10   in or something?
11       **MR. DAVID BOIES:** I'm just -- I'm offering it now and
12   we'll read it in.
13       **MR. HUR:** Your Honor, we stipulate to having it
14   admitted into evidence.
15       **THE COURT:** Okay. And you're going to -- I'm just --
16   mechanically how you're going to do it, you don't have a
17   witness on the stand.
18       **MR. DAVID BOIES:** No. I could either publish it just
19   to the jury or I could wait and use it with one of their
20   witness.
21       **MR. SANTACANA:** That would probably be easier,
22   frankly.
23       **MR. DAVID BOIES:** I'll do that. I'll do that.
24       **MR. HUR:** All right. Thank you.
25       **THE COURT:** All right. So anything left for you?

PROCEEDINGS

1          **MR. DAVID BOIES:**  Just our depositions now.

2          **THE COURT:**  The deposition.

3          **MR. DAVID BOIES:**  Yeah.

4          **THE COURT:**  And which -- whose deposition, again, are

5     we playing?

6          **MR. DAVID BOIES:**  This is, first, Mr. Kearns and then

7     Mr. Miraglia.

8          **THE COURT:**  And you're all set up to do this?

9          **MR. DAVID BOIES:**  We're all set up to do that.

10         **THE COURT:**  Okay.  Let's bring the jury out.

11         **MR. HUR:**  Thank you, Your Honor.

12     (Proceedings were heard in the presence of the jury.)

13         **THE COURT:**  The jury is present.

14     Thank you, members of the jury, for your patience.  That

15     was an example, frankly, of, I think, while it was probably

16     frustrating to be waiting, we actually had a productive

17     discussion, and I think it will help in terms of presenting the

18     case to you.  So thank you very much for your patience.

19     Mr. Boies.

20         **MR. DAVID BOIES:**  Your Honor, we have two brief

21     selections from depositions to play.

22         **THE COURT:**  Very well.

23     And do you want to call the -- just so we're clear, who?

24         **MR. DAVID BOIES:**  The first one is Mr. Kearns, and I

25     will give you his first name in a moment.

1          **THE COURT:**  I think you need to come back to the

2    microphone here.

3          **MR. DAVID BOIES:**  J.K. Kearns.

4          **THE COURT:**  J.K. Kearns, very well.

5        And, again, remember, members of the jury, what we're

6    going to do at this point is you're going to have a

7    deposition -- part of a deposition played for you.  As I

8    advised you earlier, a deposition is just like if the witness

9    was sitting on the stand.  The witness is under oath, being

10   questioned by counsel.  So you're to treat it as if that

11   witness was sitting here testifying to you.

12       Go ahead, Mr. Boies.

13       (Video deposition of J.K. Kearns was played but not

14   reported.)

15         **MR. DAVID BOIES:**  The Deposition Exhibit 375 is what

16   has been marked as the Trial Exhibit PX10.  So they're saying

17   375 because that was the way it was referred to at the

18   deposition.

19         **THE COURT:**  Right.  The deposition exhibit number was

20   for purposes of the deposition.  375 is the same as what's

21   marked as Exhibit 10, and Exhibit 10 has been admitted.

22       (Video deposition of J.K. Kearns was played but not

23   reported.)

24         **MR. DAVID BOIES:**  Your Honor, we now will call, by

25   deposition, Mr. Eric Munger.

 1          **THE COURT:**  Eric.  And say it again, please.

 2          **MR. DAVID BOIES:**  I'm having trouble pronouncing it.

 3          **THE COURT:**  I do too.

 4          **MR. DAVID BOIES:**  Miraglia.  It's Miraglia.

 5          **THE COURT:**  Miraglia?  All right.  Mr. Eric Miraglia.

 6    We're going to now see deposition excerpts from that one.

 7       Go ahead.

 8       (Video deposition of Eric Miraglia was played but not

 9    reported.)

10          **MR. DAVID BOIES:**  And, again, Your Honor, this is the

11    deposition reference to the PX that is on the screen, 345.

12          **THE COURT:**  Right.  So it's -- in our case here, it's

13    Exhibit 345 that has been admitted; correct?

14          **MR. DAVID BOIES:**  Yes, Your Honor.

15          **THE COURT:**  All right.  So the exhibit they're

16    referring to now, even though it has a different deposition

17    exhibit number, is Exhibit 345, which you see on the screen.

18       Go ahead.

19       (Video deposition of Eric Miraglia was played but not

20    reported.)

21          **MR. DAVID BOIES:**  Your Honor, that completes the

22    plaintiffs' case-in-chief, subject to Mr. Ruemmler, who we will

23    hear from later.  And so we pass the case to the defendant.

24          **THE COURT:**  Very well.

25       Members of the jury, the plaintiff has now rested, with

1    the caveat that because of witness scheduling, they have one

2    additional witness that they wish to call in their case, and

3    we're going to be scheduling that.

4        So with the exception of that -- in other words, their

5    case will be briefly reopened when this scheduling issue can be

6    resolved, and the witness will take the stand.  With the

7    exception of that, the plaintiffs have concluded their

8    case-in-chief.

9        So now it goes to the defense to present.  So who would

10   like to call the first witness for the defense?

11       **MR. SANTACANA:**  Thank you, Your Honor.

12   Google calls Steve Ganem.

13       **THE COURT:**  Very well.

14                          **<u>STEVE GANEM</u>,**

15   called as a witness for the Defendant, having been duly sworn,

16   testified as follows:

17       **THE WITNESS:**  I do.

18       **MR. SANTACANA:**  Your Honor, you should have your

19   binder from this morning.

20       **THE COURT:**  Yes, I do have it.

21       And have we cleared off any other binders that are up

22   there?

23       **MR. SANTACANA:**  Yes.

24       **THE COURT:**  Okay.

25       **THE COURTROOM DEPUTY:**  Mr. Ganem, could you please

 1   state your full name for the record and spell your last name?

 2   And make sure you speak clearly into the microphone for our

 3   court reporter.

 4           **THE WITNESS:**  Steve Ganem, G-a-n-e-m.

 5           **THE COURTROOM DEPUTY:**  Thank you.

 6                          <u>**DIRECT EXAMINATION**</u>

 7   **BY MR. SANTACANA:**

 8   **Q.**   Good morning, Mr. Ganem.

 9   **A.**   Good morning.

10   **Q.**   You and I, of course, have met.  We've been sitting at

11   this table together for the past week or so; but just to

12   reintroduce myself, my name is Eduardo Santacana and I

13   represent Google.

14       Would you mind, please, introducing yourself to the jury?

15   **A.**   I'm Steve Ganem.  I'm a product manager at Google, and I'm

16   based out of the Irvine office in Southern California.  Good

17   morning.

18   **Q.**   How long, Mr. Ganem, have you been working at Google?

19   **A.**   Since June of 2015.  So I just passed my ten-year

20   anniversary.

21   **Q.**   Could you please tell the jury a little bit about your

22   education?

23   **A.**   Sure.  So I got a Bachelor of Science degree from the

24   University of California at Irvine.

25   **Q.**   Do you have any graduate degrees, sir?

1    **A.**    I do not.

2    **Q.**    Before joining Google, where did you work?

3    **A.**    Before joining Google, I spent 19 years in the video games

4    industry as a software engineer at Activision, Electronic Arts;

5    and then I founded my own independent video game company, which

6    I owned and operated for 11 years.

7    **Q.**    Did you produce any video games as part of your own video

8    game studio that the jurors might know?

9    **A.**    We developed lots of games, 30 throughout my career; but

10   the most popular, well-recognized ones were the Tony Hawk's Pro

11   Skater series of video games.

12   **Q.**    After 20 years of building video games and running your

13   own studio, why did you decide to go work at Google?

14   **A.**    My wife and I had just had a child and, you know, running

15   a start-up is extremely difficult, time committing.  So I was

16   recruited by Google, and I thought it would be a great

17   opportunity for a better work-life balance that would allow me

18   the opportunity to spend more time with my family.  And it was

19   Google, so I felt like it was an amazing opportunity to work on

20   world-changing stuff with the smartest people in the world.

21   **Q.**    What is your current role at Google?

22   **A.**    I'm the director of product management on

23   Google Analytics.

24   **Q.**    How long have you been the director of Google Analytics?

25   **A.**    Since 2022.

GANEM - DIRECT / SANTACANA

1  Q.  What does it mean, in the hierarchy of Google, to be a

2  director?

3  A.  To be a director of a product is essentially like being

4  the CEO of that product, to be fully responsible and to have a

5  team under you to be fully responsible for how -- the features

6  that you're developing, how you communicate those externally,

7  the policies associated with it, how you take it to market.

8  Q.  Fair to say then, sir, that you are the CEO of

9  Google Analytics at Google?

10 A.  I think it's fair to say that it's sort of commonly

11 described as that sort of role.

12 Q.  Are you the person most responsible at Google for

13 Google Analytics?

14 A.  Yes, I am.

15 Q.  And, sir, have you been here in this trial in a different

16 capacity as well?

17 A.  I was deposed in this trial in 2022.

18 Q.  And have you been here representing Google since the trial

19 began?

20 A.  Yes, I have.

21 Q.  Can you say a little bit more about your responsibilities

22 as director of Google Analytics?

23 A.  So as the director of Google Analytics, every proposal for

24 how the product will change or work is run through reviews in

25 front of me and my team.

**GANEM - DIRECT / SANTACANA**

1    Every piece of Help Center documentation where we describe

2    how the product works and all of our policies are reviewed by

3    me and my team.

4    And we work with our engineering counterparts and UX

5    counterparts and others to make sure we build the best product

6    we can.

7    **Q.**   Mr. Ganem, we saw yesterday during the trial a reference

8    to the virtuous cycle of Google Analytics.  Is that a phrase

9    you're familiar with?

10   **A.**   It is.

11   **Q.**   What does -- what is the virtuous cycle of

12   Google Analytics?

13   **A.**   The basic idea is the belief that data-driven insights can

14   help businesses make better decisions; and in the context of

15   Google Analytics for Firebase, that means app developers can

16   use the insights they get from analytics to understand better

17   what content resonates with their users to help them build

18   better apps for more users.  And when their apps are better,

19   their businesses will grow, and we believe that that will --

20   they'll hopefully have desire to spend more on advertising with

21   Google.

22   **Q.**   Does Google Analytics for Firebase make money for Google?

23   **A.**   Not directly.  You could say indirectly, based on what

24   we -- what I just described, that when businesses grow with

25   analytics and when they see insights in analytics that

1  highlight the value that Google is driving to their business,

2  that they may choose to spend more money with Google.  So

3  indirectly Google may benefit from usage of analytics.

4  **Q.**   Now, Mr. Ganem, we have a lot to cover today, but I want

5  to jump right to the heart of this case so that the jury has

6  the benefit of hearing your thoughts.

7       You've been sitting here throughout the trial.  We've

8  discussed that.  Did you hear Dr. Hochman's testimony regarding

9  a 30-story building of data?

10 **A.**   I did.

11 **Q.**   Did you have any understanding as to what he was trying to

12 convey with his 30-story building analogy.

13 **A.**   My understanding is that he was trying to convey that

14 there was device profiles that had mountains of sWAA-off data

15 associated with them in Google Analytics.

16 **Q.**   Does Google Analytics maintain profiles of user data

17 organized by device or by user?

18 **A.**   No.  That's not how Google Analytics stores its data.

19 **Q.**   Is it stored in the form of the equivalent of a 30-story

20 building of data assigned to a particular user or a particular

21 device?

22 **A.**   No.  That's not how I would describe it.

23 **Q.**   How is the data stored?

24 **A.**   Google Analytics stores data compartmentalized in accounts

25 that are created by our customers.  So each business that signs

1    up for analytics effectively has its own storage unit or

2    account where their data that belongs to their business

3    resides.

4    **Q.**    Using Dr. Hochman's analogy of the 30-story building, can

5    you explain how the data is organized?

6    **A.**    If you were to describe Google Analytics data as being in

7    a building, it would be more like where -- a building where

8    there's many apartments, one apartment per business that uses

9    Google Analytics, where the data for that business is stored

10   only in their apartment and kept separated from the other

11   businesses that use Google Analytics.

12   **Q.**    Does the data in each apartment from each different app,

13   can the data intermingle?

14   **A.**    Not in Google Analytics, no.

15   **Q.**    Is there anything that restricts Google from intermingling

16   the data from the different apartments assigned to the

17   different apps?

18   **A.**    There's lots of technical barriers that we put in place to

19   make sure that that does not happen.  For example, encryption

20   and access to the data is locked down.  There are policies, but

21   there's also technical access restrictions put in place to make

22   sure that the -- only the people who are working on providing

23   the service to our customers have access to that data and, of

24   course, the customers themselves have access to their data.

25   **Q.**    Now, you heard Dr. Hochman refer to something he calls a

1   shadow account.  Does your product maintain shadow accounts of

2   analytics data organized by user or device or any other

3   identifier assigned to users?

4   **A.**   No, it doesn't.

5   **Q.**   Have you prepared anything to help the jury understand

6   your analogy?

7   **A.**   Yes.  We put together a series of diagrams that helps

8   describe this better, in a way that's more faithfully

9   represented with how the product actually works.

10  **Q.**   What prompted you to prepare this diagram?

11  **A.**   Honestly, sitting in court and hearing others who aren't

12  as familiar with the product describe how it works and how it

13  stores data, I felt compelled to set the record straight on how

14  it actually works.

15       **MR. SANTACANA:**  Okay.  Let's go ahead and look at

16  Mr. Ganem's first slide, Brooklyn.

17  **Q.**   Is this --

18       **THE COURTROOM DEPUTY:**  To the jury?

19       **MR. SANTACANA:**  Yes, please.  I don't believe there's

20  an objection.

21  **BY MR. SANTACANA:**

22  **Q.**   Mr. Ganem, is this the diagram you were just referring to?

23  **A.**   I'm waiting for it to show up somewhere.

24       Yes, this is right.

25  **Q.**   So now that the diagram is on the screen, can you please

1    just walk the jury through what you created?

2    **A.**    So this is a diagram depicting, in this building analogy,

3    a building with individual apartments corresponding to

4    businesses who create Google Analytics account.

5        So you'll see the Nike logo, the McDonald's logo, ESPN,

6    and others, each one corresponding to an app that uses

7    Google Analytics for Firebase.

8    **Q.**    Mr. Ganem, there's locks on these apartment doors and

9    there's numbers in the apartments.  Can you explain what those

10   two things are meant to convey?

11   **A.**    So two things.  The locks represent access controls.  So

12   this is meant to indicate that Googlers, besides the ones

13   providing the analytics service, do not actually have access to

14   these accounts.  The owners of the accounts, the app developers

15   do.

16       And the second thing is the numbers in the -- in each box

17   are meant to indicate that the user identifiers, pseudonymous

18   user identifiers, which are associated with each of these

19   accounts.

20   **Q.**    And I notice that some of the numbers are in blue.  What

21   is the significance of your having highlighted some of these

22   numbers in blue?

23   **A.**    This is meant to signify that although some pseudonymous

24   identifiers, like device ID, might be common among the

25   different apps, for example, if a user on a single device uses

1   both Nike and McDonald's, that by virtue of us using different

2   encryption keys and encrypting this data, the numbers that we

3   actually store in each of these accounts, these apartments, are

4   actually different from one another.

5   **Q.**   So if I -- and I won't pull my phone out, but if I pulled

6   my phone out and I used the Nike app and I used the Uber app

7   and I used the Reddit app, are you saying that the numbers that

8   are recorded associated with my phone for those three apps

9   would be the same or different?

10   **A.**   Those would be different for your pseudonymous user

11   identifiers.

12   **Q.**   Is Google Analytics able to translate those three blue

13   numbers to figure out that each one of them came from the same

14   phone?

15   **A.**   Only for providing the service to the app developer.

16   **Q.**   So, Mr. Ganem, did you hear Mr. -- Mr. Rodriguez's

17   testimony yesterday concerning puzzle pieces?

18   **A.**   Yes, I did.

19   **Q.**   Do you have an understanding of the point Mr. Rodriguez

20   was trying to make when he was talking about puzzle pieces?

21   **A.**   I think I do.

22   **Q.**   What is your understanding of his analogy?

23   **A.**   Combining the two analogies, my understanding is that each

24   of these apartments represents what he believes to be a piece

25   of the puzzle that describes him.

1    Q.    What do you think of his analogy?

2    A.    I don't think that's unfair to say that each of these

3    apartments individually characterizes some description of his

4    behavior.

5    Q.    Does Google put -- under any circumstance, does Google put

6    the puzzle pieces together?

7    A.    I would say that it does for sWAA-on users.  That's

8    effectively the expectation we set, and the value of sWAA on is

9    putting it together so that your content is personalized based

10   on these signals.

11   Q.    Continuing with the puzzle analogy, Mr. Ganem, what

12   happens when sWAA is off?

13   A.    When sWAA is off, these puzzle pieces remain in the

14   apartments, locked and not -- they're not combined by Google to

15   form a complete picture.

16   Q.    Let's look at the next slide, please.

17         You made this slide as well?

18   A.    That's right.

19   Q.    Can you please explain to the jury what you're trying to

20   convey on this sWAA-on slide?

21   A.    So similar to before, there are still these apartments

22   that are locked where the data is only available to each

23   analytics customer.  But in this case, the data is being shared

24   with Google for those users who have sWAA enabled, and the

25   analytics data from the apps they use are -- is saved to their

1  Google Account.

2  **Q.**   And you testified just a moment ago that the three blue

3  numbers are actually different when it comes from the same

4  phone.  Is there some process by which Google is able to put

5  pieces of data, when sWAA is on, into Jim Doe's Google Account

6  despite those numbers being different?

7  **A.**   When sWAA is on and the user gives us the permission to

8  associate or save their app activity from third-party apps to

9  their Google Account, and once we confirm that we have that

10  consent, we are able to both decrypt the device IDs and export

11  this information or the associated information to their

12  Google Account.

13      The device IDs, by the way, don't get saved to the

14  Google Account, but the app activity does.  Let me clarify.

15  **Q.**   Why is that?

16  **A.**   We want to make sure that we don't -- we actually, by

17  policy, do not associate your Google Account with your device

18  IDs so that we don't break this promise to users with sWAA off

19  that we would know their identity.  We're trying to keep the

20  identity of the sWAA-off users completely off the table for

21  Googlers.

22  **Q.**   Let's go back to Slide Number 1.

23      So since this case is about sWAA off, I want to stick with

24  this slide for a moment, Mr. Ganem.

25      Is Google able to profit from the data in these apartments

1    using personalized advertising when sWAA is off?

2    **A.**    No.  Google doesn't build personalized advertising

3    profiles based on sWAA-off data.

4    **Q.**    So just to summarize it for the jury, sir, could you just

5    spell out for us the difference between, in the puzzle analogy,

6    sWAA on and sWAA off?

7    **A.**    In the puzzle analogy, when sWAA is on, these puzzle

8    pieces can be saved to your Google Account and in such a way

9    that they're identified with you or associated with your

10   Google Account, providing Google with a more complete picture

11   of your Web & App Activity so that it can do personalization.

12        In the sWAA-off example, this data remains completely

13   de- -- non-personal information or de-identified and is used to

14   provide app developers with insights on how users are using

15   their apps so that they can build and improve their apps.

16   **Q.**    Mr. Ganem, have you heard some of the people at this table

17   describe WAA as a fake button?

18   **A.**    I have.

19   **Q.**    Do you have any response to that?

20   **A.**    I think it's demonstrably false that it's fake.  The way

21   that we apply it in Google Analytics, it has clear differences,

22   as you can see in the diagram.

23   **Q.**    Now, you've also, I think, heard yesterday Mr. Rodriguez

24   accuse Google of collecting his name and his email and his

25   phone number through Google Analytics.  Do you recall that

1  testimony?

2  **A.**    I do.

3  **Q.**    I just want to make clear right at the start, Mr. Ganem,

4  as the head of Google Analytics, do you intend to collect

5  people's names, phone numbers, or email addresses with

6  Google Analytics?

7  **A.**    Absolutely not.

8  **Q.**    Is there any part of the design of Google Analytics that

9  is intended to collect names, phone numbers, email addresses,

10  or any personally identifiable information?

11  **A.**    No.  To the contrary.  We design it so that it can't

12  collect that or it shouldn't collect that.

13  **Q.**    Now, in addition to the design that it shouldn't collect

14  that, is there anything else that you do to address the risk

15  that a developer might send Google personally identifiable

16  information via Google Analytics?

17  **A.**    Yes.  We have, I would say, three categories of things

18  that we do.  The first is the way we design the product

19  intentionally contains the data for each account.  So if you

20  have one customer who's violating our policies by sending the

21  PII we tell them not to send us, that data is contained within

22  one of these accounts.

23      Secondly, it's never used.  It's there and if it's

24  valuable to that analytics customer, so be it, but Google never

25  looks for it or intends to use that to reidentify the user.  So

1    that's sort of this first bucket of things we do, is contain

2    it.

3        The second bucket of things we do is enforce the policy.

4    When we learn about customers who have violated our policy by

5    sending this personally identifiable information to us, we kick

6    off an investigation.  We have a team that works with our

7    lawyers to investigate if they are, in fact, doing it.  And

8    then we have a process for dealing with it; that -- it could be

9    that we terminate their account if they don't fix the problem.

10   Q.   Okay.  Let me stop you there because that's a long answer.

11       Just with the last thing that you said, how often do you

12   engage in this enforcement of personally identifiable

13   information in Google Analytics data?

14   A.   It's -- it has happened regularly, I would say; and over

15   the course of my time on Google Analytics, we've enforced it

16   over 5,000 times.

17   Q.   5,000 times in how long?

18   A.   Maybe the last seven, eight years, as far as I'm aware.

19   Q.   Okay.  So you talked about containment.  You talked about

20   your investigations and I stopped you.

21       Was there something else that you do to address the risk

22   of PII, or personally identifiable information, in

23   Google Analytics?

24   A.   The third bucket is prevention.  So we have -- we are

25   investing and continuing to invest more in preventing this data

1    from getting into our systems in the first place.

2        So on the website, for example, we've added a feature to

3    detect whether a customer is, whether, you know, inadvertently

4    or intentionally, sending us email addresses, and we prevent

5    that data from coming in.  And we are starting on the designs

6    to do the same for apps.

7    Q.   Just to be clear, Mr. Ganem, has Google ever done anything

8    to use PII that sneaks its way into Google Analytics against

9    your policies?

10   A.   No.

11   Q.   How are you so sure of that?

12   A.   Again, as the lead for Google Analytics and having been on

13   the team for ten years, I have reviewed every proposal, every

14   request that comes through, and I would never approve of

15   something like that.

16       Secondly, as I mentioned, we have access controls in place

17   so that other teams who would -- you know, even if they had an

18   idea to do so, they would prevent it from doing so.

19   Q.   So if the Nike app there in the upper left apartment, if

20   Nike decided that they wanted to start sending names and email

21   addresses in their analytics data, first of all, just to be

22   clear, are they permitted to do that?

23   A.   No.  That's a clear violation of our policy.

24   Q.   Okay.  Let's say they decide to do it anyway.  There's no

25   system in place that automatically stops that from happening;

1  fair?

2  **A.**    Not for Google Analytics for Firebase.

3  **Q.**    So let's say they do it.  What happens to the data once it

4  arrives in the apartment?

5  **A.**    So it's logged in that apartment.  It stays there for a

6  certain period of time; but after that period of time elapses,

7  which I believe is 56 days for our logs, then this raw PII data

8  is deleted.

9  **Q.**    It's there for how long?

10  **A.**    56 days in our logs.

11  **Q.**    And then after that?

12  **A.**    After that, in -- once that data gets processed and moved

13  down the pipeline, it's stored in the account, in this

14  apartment, and the app -- you know, the app developer can

15  choose how long to retain that raw data, but the default is

16  60 days.

17  **Q.**    Do you have a sense, Mr. Ganem, of how common of a problem

18  it is that app developers send PII against your policies?

19  **A.**    We -- I don't know what proportion does.  I don't believe

20  it's super common, but obviously it does happen.

21  **Q.**    Do you catch every instance of it?

22  **A.**    No, we don't.

23  **Q.**    Is this a problem -- this data sneaking in, I think

24  Dr. Hochman called it toxic data, is this problem something

25  that you worry about in your job?

GANEM - DIRECT / SANTACANA

1    **A.**    I'm -- it bothers me.  I would say that I'm confident that

2    our systems won't use it and won't make use of it.  So that's a

3    baseline comfort level.  But it bothers me that customers are

4    sending it in because it gives the false impression that

5    Google Analytics wants this data or uses it.

6    **Q.**    Can you understand, Mr. Ganem, how some users might be

7    concerned about this problem of PII sneaking its way into your

8    product?

9    **A.**    Yes.

10    **Q.**    Do you -- is there anything that you would tell, if you

11    could, the members of the class about this problem?

12    **A.**    I would say this is a violation of our policy.  It

13    shouldn't be happening, and we are taking steps to make sure it

14    doesn't happen.

15    **Q.**    And just to put a fine point on it, Mr. Ganem, do you or

16    have you ever intended for app developers to send you this kind

17    of information?

18    **A.**    No.

19    **Q.**    Okay.  I'd like to take a step back now, and I want to use

20    an example.  If you could, please, let's use the Reddit example

21    that's come up a few times in the trial.

22        Why would Reddit want to use Google Analytics for Firebase

23    in its app?

24    **A.**    Reddit might want to use Google Analytics for Firebase in

25    its app to understand trends in user behavior.

GANEM - DIRECT / SANTACANA

1    Q.    How does Google Analytics help them do that?

2    A.    There's all sorts of valuable reporting and insights with

3    metrics like how many -- how many users are logging into Reddit

4    each day, week, or month.  Do they post?  Do they read?  How

5    many posts or reads?  Where do they come from?  How do they

6    discover Reddit in the first place when they signed up?  Things

7    like that.

8    Q.    Sorry to interrupt.

9          How good is your product at helping them understand how

10   their product is being used?

11   A.    I'd like to think it's world class, and I think the

12   adoption shows that.

13   Q.    We've heard reference to the concept of a Google Analytics

14   event.  What is a Google Analytics event?

15   A.    An event, roughly speaking, describes a user interaction

16   in an app.

17   Q.    What's an example of an event?

18   A.    So in the context of Reddit, a session start event would

19   indicate -- would be logged by the app when the app is opened

20   by the user.

21   Q.    Is Google Analytics necessary for the Reddit app to

22   function?

23   A.    No.

24   Q.    Is it an optional feature effectively?

25   A.    Yeah, it's optional.

1  **Q.**  Do you charge for it?

2  **A.**  It's a free product available to all app developers.

3  **Q.**  Does anybody pay extra if they want more features?

4  **A.**  There are -- there is a premium version of the

5  Google Analytics product that a lot of customers use if they

6  want paid support or higher limits, but the basic GA for

7  Firebase product is free.

8  **Q.**  For the paid version, is the data organized any

9  differently than this?

10  **A.**  No.

11  **Q.**  Is Google Analytics the only tool like it on the market?

12  **A.**  No.  I feel like I learn about a new analytics product

13  every week.

14  **Q.**  What are examples of other analytics SDKs that an app like

15  Reddit could choose from?

16  **A.**  Well, there's Meta's SDK that is in many, many apps.

17  **Q.**  Meta as in Facebook?

18  **A.**  Yes.

19  **Q.**  Okay.  What else?

20  **A.**  Adobe is a really -- is a very popular one and a

21  competitor, as well as Mixpanel; AppsFlyers, extremely popular

22  among app advertisers; Amplitude.  I could go on and on.

23  **Q.**  We heard yesterday, in the context of the Target app,

24  about an analytics product called Crazy Egg.  Are you familiar

25  with Crazy Egg?

1    **A.**    I heard about it for the first time yesterday.

2    **Q.**    Not a big competitor?

3    **A.**    Not as far as I know.

4    **Q.**    What -- when you're competing with Facebook and Adobe and

5    AppsFlyer to try and make sure that people use your product,

6    what are the differentiators that you emphasize with them?

7    **A.**    Well, one is that we believe that Google as a -- Google is

8    trusted as a brand that has -- offers security.  There's not

9    data breaches associated with Google.  We are known to be very

10   technically strong and trustworthy.  Businesses already trust

11   Google often with their email accounts and cloud.  So trust is

12   a big factor.

13       Another one is, by being part of this Firebase platform,

14   they know that it can help them build better apps.

15       And then last, I would say, is data privacy first.

16   Google Analytics offers a host of data privacy features for our

17   customers to implement their privacy policies.

18   **Q.**    Do apps just choose among all of these competitors and

19   install one analytics SDK?

20   **A.**    No, not typically.  What we've seen, and we've run

21   research on this recently to confirm it, is that on average,

22   customers use at least four analytics solutions simultaneously.

23   **Q.**    The average app uses, sorry, at least four analytics SDKs?

24   **A.**    Yes.

25   **Q.**    Why would an app like Reddit use four analytics SDKs?

1  **A.**   One reason is that these different solutions, different

2  products offer -- they have their strengths and weaknesses.

3  Another is each has its own methodology for how to measure

4  things, and so businesses often triangulate the results among

5  them.

6  **Q.**   Why does Google offer Google Analytics for free?

7  **A.**   I mentioned earlier that we believe that when app

8  developers -- there's this virtual cycle -- virtuous cycle

9  where app developers use the insights from analytics and build

10  their businesses better.

11      The other reason is that we believe that when they have --

12  when they measure their apps with Google Analytics, they will

13  see that Google Search and Google Ads are driving the most

14  valuable users to their apps, and that -- we hope that will

15  lead to them spending more on Google.

16  **Q.**   Mr. Ganem, does Google intend to do anything with respect

17  to Google Analytics to inform the public that Google Analytics

18  is in any particular app, like Reddit or Nike?

19  **A.**   We require that our app developers disclose their use of

20  Google Analytics to their end users.

21  **Q.**   Where is that requirement located?

22  **A.**   In our terms of service.

23  **Q.**   Are app developers required to agree to the terms of

24  service in order to use Google Analytics?

25  **A.**   Yes, they are.

1   Q.   Okay.  I'd like to show you what's been marked as

2   Exhibit 933, just to the witness, please.  And what I'd like to

3   show you is page 32 of Exhibit 933.

4        Do you have your binder, Mr. Ganem?

5   A.   No.

6   Q.   Here.  I will --

7        **MR. SANTACANA:**  Could we get a binder for Mr. Ganem?

8   I think there might be one in the box right there.  Thank you.

9        And that's 933, Brooklyn.  Thank you.

10       So page 32 -- may I approach, Your Honor?

11       **THE COURT:**  You may.

12  **BY MR. SANTACANA:**

13  Q.   Page 32 of 933.  There's a lot of numbers in a trial.  Let

14  me know when you're there.

15  A.   Page 33, you said?

16  Q.   Yes.  32 and 33.

17  A.   Okay.

18  Q.   All right.  Do you recognize what you see on pages 32 and

19  33?

20  A.   This looks like the Google Analytics terms of service as

21  of April 17th, 2019.

22  Q.   Okay.  Are these the terms of service that

23  Google Analytics requires app developers to agree to before

24  they use Google Analytics?

25  A.   Yes.

1              **MR. SANTACANA:**  Your Honor, I move into evidence

2    pages 32 to 42 of Exhibit 933, and we will be cutting out the

3    rest.

4              **MR. DAVID BOIES:**  With that modification, no

5    objection, Your Honor.

6              **THE COURT:**  Very well.  So the Exhibit --

7              **MR. SANTACANA:**  And we'll replace it for you,

8    Your Honor, after the day is over.

9              **THE COURT:**  The new Exhibit 933 are the pages you just

10   mentioned?

11             **MR. SANTACANA:**  That's right, 32 to 42.

12             **THE COURT:**  All right.  Those -- that exhibit, as

13   you've described it, will be admitted.

14        (Trial Exhibit G933, pages 32 to 42, received in

15   evidence.)

16             **MR. SANTACANA:**  Thank you, Your Honor.

17   BY MR. SANTACANA:

18   Q.   Mr. Ganem, let's go ahead and display that to the jury.

19        If you could, please, sir, point out to the jury where in

20   the contract with the app developers you require that they

21   disclose Google Analytics to their users.

22   A.   That would be under Section 7 --

23   Q.   Okay.

24   A.   -- Privacy.

25   Q.   Let's take a look at Section 7, which is page 36 at the

1  bottom and page 37 at the top.

2      Can you please explain to the jury where in this section

3  of the contract you require that app developers disclose

4  Google Analytics to their own users?

5  **A.**    Yes.  So there's a sentence that starts "You must," and it

6  reads [as read]:

7          "You must post a Privacy Policy and that Privacy

8          Policy must provide notice of your use of cookies,

9          identifiers for mobile device (e.g. Android

10         Advertising Identifier or Advertising Identifier for

11         iOS) or similar technology that are used to collect

12         data.  You must disclose the use of the service, and

13         how it collects and processes data.  This can be done

14         by displaying a prominent link to the site 'How

15         Google uses data when you use your partners' sites or

16         apps,'" -- located at this URL -- "or any other URL

17         Google may provide from time to time."

18 **Q.**    Would you mind reading the next sentence as well,

19 Mr. Ganem?

20 **A.**    [As read]:

21         "You will use commercially reasonable efforts to

22         ensure that a user is provided with clear and

23         comprehensive information about and consents to the

24         storing and accessing of cookies or other information

25         on the user's device where such activity occurs in

1          connection with the service and where providing such

2          information and obtaining such consent is required by

3          law."

4    **Q.**    Has this requirement been in the contract between Google

5    and app developers for Google Analytics since 2016?

6    **A.**    Yes.

7    **Q.**    And you've been the head of Google Analytics for, I guess,

8    three years now approximately?

9    **A.**    Yes.

10   **Q.**    In those three years, what has been your intent in

11   including this in the terms of service?  Why is it there?

12   **A.**    The intent is really clear.  We want to make sure that

13   Google users who use these apps, or users in general,

14   understand that these apps use our service, and when they

15   have -- and that these identifiers are collected as a part of

16   it, and to link to our Privacy Policy, to understand how Google

17   treats that data.

18   **Q.**    At any time, Mr. Ganem --

19          **MR. DAVID BOIES:**  May we approach, Your Honor?

20          **THE COURT:**  Very well.

21       (The following proceedings were heard at the sidebar:)

22          **MR. DAVID BOIES:**  The witness just testified that the

23   reason for putting paragraph 7 -- or Section 7 into the

24   agreement with app developers was to ensure that the users

25   understood what was being collected.  That is exactly what

 1    the Court has said they are not permitted to do.  This is not

 2    about consent.

 3         **THE COURT:**  Well, it's going to be clear in the jury

 4    instructions that consent vis-à-vis the third-party apps is not

 5    a defense.  So to the extent that you think that suggestion has

 6    been made, it will be clear that that's not the defense in this

 7    case, and that's what we discussed at great length.

 8         What is your reason for going into this?  Because you

 9    agree that I've said quite clearly --

10         **MR. SANTACANA:**  Yes.

11         **THE COURT:**  -- that's out.

12         **MR. SANTACANA:**  Yes, Your Honor.  And you also said

13    that it goes to whether Google's conduct was highly offensive.

14         **THE COURT:**  Right, right.

15         **MR. SANTACANA:**  And it goes to Google's intent.

16         Each question I asked him was:  What was Google's intent

17    in including this in the contract?  Google's intent here is an

18    element in each of the three claims, and they have to prove

19    that Google intended to take things without permission.

20         Mr. Ganem is testifying that at least from his perspective

21    as head of the product, he did not intend that.

22         **THE COURT:**  Okay.  As long as he keeps it on what

23    Google's intent is in terms of its -- that's fine.  And I

24    haven't heard him yet suggest that somehow, if there's consent

25    vis-à-vis the third-party apps, that that somehow takes them

 1    off the hook.  As long as you stay away from that and hew to,

 2    as you said, whether or not your conduct is egregious and

 3    ignoring people's privacy concerns and the like, you can

 4    continue.

 5         **MR. DAVID BOIES:**  Your Honor, would the Court consider

 6    an instruction to make clear to the jury, that closing

 7    statements are a ways away, and the jury can get confused as to

 8    what this is going to.  In other words, the jury hasn't heard

 9    all of this, and what they think this is about is consent.

10         **THE COURT:**  Well, you gave me a proposed limiting

11    instruction.  I'd have to go back and look at it.  I was not

12    comfortable with that limiting instruction.  But I'm not

13    adverse to possibly giving one if you could encapsulate what I

14    just -- the parameters that I think are appropriate here.

15         So -- well, you want it now, obviously.

16         What's your view on it?

17         **MR. SANTACANA:**  We do object, Your Honor.  The jury

18    doesn't know what the legal elements are yet.  They haven't

19    been charged.  If you start talking about highly offensive,

20    intent, consent, whose consent, that, actually, I think was

21    confusing.

22         **THE COURT:**  Well, not that necessarily, but phrased in

23    a different way, what it's not going in for.  Not trying to

24    say:  You can consider it for this.  You can consider it for

25    that.  Alternatively, just say:  You can't consider this for

SIDEBAR

1    purposes of determining whether or not -- you'd have to figure

2    out how to phrase it.  Focus on what is not permitted rather

3    than:  You can consider it for this.  You can consider it for

4    that.

5        I understand why you don't want that all now, but how

6    about something that says this cannot be considered for

7    purposes of consent?

8        **MR. SANTACANA:**  I worry, Your Honor, that that

9    prejudices Google more because it suggests that we have somehow

10   misled the jury as to the relevance of the information.  To

11   just say "Everything you just heard doesn't go to consent" is

12   going to leave them wondering what it goes to.

13       **THE COURT:**  Well, okay.  I think -- I understand your

14   point, but I think in the final instructions, it can be made

15   quite clear.  And you then also will have an opportunity in

16   closing argument.  There's a lot of opportunity to discuss

17   this.  And I think to weigh in now with a limiting instruction

18   would just cause confusion.

19       So I will overrule that objection.  But stay close --

20       **MR. SANTACANA:**  I will.

21       **THE COURT:**  How close to what we've talked about.

22       **MR. DAVID BOIES:**  The only thing I would ask is, as

23   you listen to the testimony, if you believe that there is going

24   to be some confusion, disclose the consent, I would just asking

25   you to consider it, saying what it doesn't go to.

1          **THE COURT:**  If I think he's gone too far, then I might

2     weigh in with a limiting instruction.

3          So he can count on you, Mr. Boies, to object because

4     you'll keep it on the straight and narrow.

5          **MR. DAVID BOIES:**  Okay.  Thank you, Your Honor.

6          **MR. SANTACANA:**  Thank you, Your Honor.

7          (The following proceedings were heard in open court.)

8          **THE COURT:**  Members of the jury, thanks for your

9     patience.  We've kept these to a minimum, but every once in a

10    while, we have to do them.

11    **BY MR. SANTACANA:**

12    **Q.**   Sorry about that, Mr. Ganem.

13         So we were talking about the contract between Google and

14    the app developers who install Google Analytics.

15         I want to ask you about the first sentence here now.  We

16    talked earlier about personally identifiable information that

17    sneaks its way into Google Analytics.  Can you please read the

18    first -- the first sentence of this Privacy section?

19    **A.**   It says [as read]:

20             "You will not, and will not assist or permit any

21         third party to, pass information to Google that

22         Google could use or recognize as personally

23         identifiable information."

24    **Q.**   Why do you include this sentence in your terms of service?

25    **A.**   Again, we really don't want customers to do that.  It

1    gives the false impression that Google would --

2    Google Analytics wants or uses this data or Google could use it

3    or wants to use it to identify their users.

4    **Q.**    Do app developers sometimes violate this sentence?

5    **A.**    Yes.

6    **Q.**    What do you do about it?

7    **A.**    So we have a process in place when we become aware of it.

8    We kick off this process to first investigate to confirm

9    whether or not they're doing it; second, to notify the customer

10   that they're in violation of our contract.  Typically, we give

11   them some amount of time to fix the problem; and at the end of

12   that period that we give them, we either let them off the hook

13   or terminate their account.

14   **Q.**    Mr. Ganem, have you ever intended to mislead end users

15   with respect to whether or not Google Analytics is present in

16   any particular app?

17   **A.**    No.

18   **Q.**    Until this lawsuit was filed, had it ever occurred to you,

19   sir, that the WAA control should determine whether your product

20   is able to operate as it does?

21   **A.**    Never.

22   **Q.**    Why not?

23   **A.**    Because that would be -- if you want a working analytics

24   product that gives businesses an understanding of their users,

25   that would leave huge gaping holes in their data that make the

**GANEM - DIRECT / SANTACANA**

1    product useless to them.

2    **Q.**    Okay.  I'd like to show you a different exhibit now.

3    Let's look at -- or I'll show you what's been marked for

4    identification as Exhibit 896.

5         What is Exhibit 896?

6    **A.**    This is the upload data use policy.

7    **Q.**    What is the upload -- what is the Google Analytics upload

8    data use policy?

9    **A.**    Can you give me a moment to familiarize myself with it?

10   **Q.**    Yes.  Go ahead.

11   **A.**    (Witness examines document.)  Okay.  This is the policy

12   that makes clear what Google Analytics does, the service we're

13   providing to you, for the data that you send to the service.

14   **Q.**    When you say "that you," you're referring to app

15   developers?

16   **A.**    That's correct.

17   **Q.**    Not people like me?

18   **A.**    Unless you're an app developer.

19   **Q.**    I would love to be one, but I'm a lawyer, so I don't have

20   any apps up my sleeve.

21        So what does the upload data use policy require of app

22   developers?

23   **A.**    Well, among other things, it says that they must have the

24   rights --

25             **MR. DAVID BOIES:**  Objection, Your Honor.  It's not in

1    evidence.

2              **THE COURT:**  All right.  Have you -- are you moving

3    this into evidence?

4              **MR. SANTACANA:**  I will, Your Honor, I'm asking him --

5    **BY MR. SANTACANA:**

6    **Q.**   Let me ask you generally, Mr. Ganem, during the period

7    2016 to 2024, what was the Google Analytics upload data use

8    policy?

9    **A.**   That the customer must have the rights to actually upload

10   the data to Google Analytics, and that they will not send us

11   any personally identifiable information.

12   **Q.**   Okay.

13             **MR. SANTACANA:**  And, actually, Brooklyn, we can take

14   that down.

15   **BY MR. SANTACANA:**

16   **Q.**   I'll just ask you, sir.  Where has Google provided that

17   policy to app developers?  Has it only been in the contract we

18   just saw?

19   **A.**   No.  This is also just in the Help Center for

20   Google Analytics.

21   **Q.**   What is the Help Center for Google Analytics?

22   **A.**   Help Center is where we -- where the documentation for how

23   the product works lives.

24   **Q.**   Can every app developer access it?

25   **A.**   Yes, even those that haven't yet used the product, if they

1   want to understand how it works.

2   **Q.**   Since 2016 has the upload data use policy been available

3   for app developers on the Help Center?

4   **A.**   Yes.

5   **Q.**   Okay.  Now, taking, again, the example of *The New York*

6   *Times* or Reddit, what does Google do with the data that is

7   being sent from the app?

8   **A.**   So Google processes that data in order to generate the

9   analytics reports for the app developer.

10   **Q.**   And did you prepare something to help the jury understand

11   what that looks like?

12   **A.**   Yes.  I worked with the team to create a video to walk

13   them through what the product looks like sort of to demystify

14   it.

15   **Q.**   I'd like to show you what's been marked for identification

16   as Exhibit 888.

17        Is this what you prepared?

18   **A.**   Yes.

19   **Q.**   How did you go about preparing this?

20   **A.**   Well, I first logged in to the Firebase demo account and

21   recorded myself as we scrolled through the reports.

22        **MR. SANTACANA:**  I'd like to publish this demonstrative

23   to the jury, Your Honor.

24        **THE COURT:**  You may use it as a demonstrative.

25        **MR. DAVID BOIES:**  No objection to using it as a

1    demonstrative.

2            **THE COURT:**  Very well.

3        Go ahead.

4    **BY MR. SANTACANA:**

5    **Q.**   Okay.  So what are we seeing on the screen here,

6    Mr. Ganem?

7    **A.**   This is the analytics dashboard in Firebase for the

8    Firebase demo project.

9    **Q.**   What does it show?

10   **A.**   This shows the analytics data for an app called Floodit,

11   which I helped to develop.  This demo project is available to

12   external users who might be prospective customers of Firebase.

13   **Q.**   So app developers would be the ones to see this screen?

14   **A.**   Yes.

15           **MR. SANTACANA:**  Let's go ahead and press play.

16   **BY MR. SANTACANA:**

17   **Q.**   For the first 20 seconds or so, if you wouldn't mind

18   narrating what you did.

19               (Video was played but not reported.)

20   **A.**   So at the top of the dashboard are metrics like daily

21   active, monthly active users, which might be -- actually, can

22   we go back up to the top and freeze it?  Let's freeze here for

23   a second.

24       This dashboard shows the most common metrics for app

25   developers that every app developer would want to know.  How

**GANEM - DIRECT / SANTACANA**

 1  many users use my app today, in the last week, in the last

 2  30 days?  And by users, what it uses is the account of app

 3  instance IDs where that is a randomly generated number for the

 4  installation of that app.

 5       Okay.  We can continue.

 6            (Video was played but not reported.)

 7  **A.**  More metrics here that are showing how many users are on

 8  which version of the app, how much time users are spending once

 9  they're in the app, the retention of users over time in your

10  app.

11       And if we could freeze here, this shows some of the events

12  that we talked about.  So, for example, on the far bottom

13  right, we show a report of event count by event name.  You can

14  see session start is there, third from the bottom.  I had

15  mentioned that this event is automatically collected by the SDK

16  when the user opens the app.

17       And so what you see here is that the session start event

18  was logged 230,000 times over the last 28 days in this app.

19       Another insight you get here, you see two events labeled

20  "Level Start Quick Play," "Level End Quick Play."  These were

21  implemented or coded by the app developer manually because this

22  was a need that they had.

23       There's a -- you can quick play.  It's a button.  And

24  between starting and ending, you can see that there's half the

25  people that started quick play didn't finish.  That typically

GANEM - DIRECT / SANTACANA

 1   means that lots of users are quitting before they're finishing

 2   the level.  So in this case, using analytics, they could try to

 3   investigate and find out what level are users getting stuck on

 4   or something like that.

 5   **Q.**   In order to help Floodit understand that insight that you

 6   just made, is Google leveraging or exploiting personally

 7   identifiable information?

 8   **A.**   No.  That's not necessary.

 9   **Q.**   What about their Google Account identity?  Is it using

10   that to figure all of this out?

11   **A.**   No.

12   **Q.**   When sWAA is on, does it use that to figure all of this

13   out?

14   **A.**   No.

15   **Q.**   Do the reports like this that are provided to the app

16   developers, do those contain personally identifiable

17   information for the app developer to review?

18   **A.**   No.

19   **Q.**   Where does Google log all of the data that underlies this

20   report?

21   **A.**   So there's -- we have log sources when the data initially

22   gets to our servers where they're first written.

23   **Q.**   Does the user's sWAA state affect how the data is logged?

24   **A.**   Yes, it does.

25   **Q.**   How does it affect it?

1   **A.**   Well, if the sWAA isn't consented to, then the data is

2   only logged in what we call pseudonymous logs, de-identified

3   logs.  And if sWAA is consented, then the data is separately

4   logged in identified logs.

5   **Q.**   How long does it take Google Analytics to do the math that

6   generates these reports?

7   **A.**   It can take hours to do it across all of our customers.

8   **Q.**   How long does that pseudonymous log you just discussed

9   remain in existence?

10  **A.**   The data that's written to the pseudonymous logs expires

11  after 56 days.

12  **Q.**   Why 56 days?

13  **A.**   We retain that data in case there are bugs and the data

14  needs to be reprocessed, which, unfortunately, happens more

15  often than we would like.

16  **Q.**   How often?

17  **A.**   We've had to reprocess millions of accounts' data over the

18  last couple of years.

19  **Q.**   What if the bug is discovered after 56 days?

20  **A.**   Then, unfortunately, that data is unrecoverable.

21  **Q.**   Okay.  I'd like to talk a little bit more about what that

22  data looks like.

23      How exactly does your product differentiate between

24  different users of the Reddit app?

25  **A.**   Well, when the Reddit app user first installs the app and

 1    launches it, the SDK generates an ID, which we call app

 2    instance ID.  It's a randomly generated number, and it's -- it

 3    identifies that instance of the app as being different from

 4    another installation of the app.

 5    **Q.**   Does the user have the same app instance ID across all the

 6    apps on their phone?

 7    **A.**   No.  It's unique to that installation of that app on that

 8    device.

 9    **Q.**   So the way that you're actually differentiating between

10    users is by app, not by device?

11    **A.**   That's right.

12    **Q.**   Does the app instance ID include any information like name

13    or email address?

14    **A.**   No.  It's just a random number.

15    **Q.**   You mentioned session start earlier.  Is session start

16    something that the programmer has to create, or is that part of

17    the design of Google Analytics?

18    **A.**   The SDK is designed to automatically collect certain

19    events --

20    **Q.**   Um --

21    **A.**   One of them being session start.

22    **Q.**   Sorry.

23        Let's look at what's been marked for identification as

24    Exhibit 890.

25        Do you recognize this document?

1   **A.**   Yes.

2   **Q.**   What is it?

3   **A.**   It is a Help Center article, again describing how the

4   product works, that describes and enumerates the events which

5   the SDK can collect automatically.

6         **MR. SANTACANA:**  Your Honor, I move Exhibit 890 into

7   evidence.

8         **MR. DAVID BOIES:**  Your Honor, I object.  This was not,

9   I believe, produced in discovery, and I think it was generated

10  on July 9th of this year, outside of the class period.

11        **MR. SANTACANA:**  Can I ask one more foundation

12  question, Your Honor?

13        **THE COURT:**  You may.

14  **BY MR. SANTACANA:**

15  **Q.**   Mr. Ganem, are you familiar -- well, maybe a couple more.

16        Are you familiar with the Wayback Machine?

17  **A.**   Yes.

18  **Q.**   Can you please take a look at this document and tell me

19  the date from the Wayback Machine that this is from?

20  **A.**   Looks like -- is it July -- no, January -- sorry,

21  May 12th, 2023.

22  **Q.**   May 12th, 2023.  Is this a true and correct copy,

23  Mr. Ganem, of this Help Center page as it was on Google's

24  website on May 12th, 2023?

25        **MR. DAVID BOIES:**  Objection, Your Honor.  Foundation.

1          **THE WITNESS:**  I believe so.

2          **THE COURT:**  It's overruled.  He can answer that

3    question.

4          **MR. SANTACANA:**  Okay.  And now I move it into

5    evidence, Your Honor.

6          **MR. DAVID BOIES:**  It still wasn't produced to us.

7    Even if this is a copy of something from the past, what was in

8    the past wasn't produced to us, and this wasn't produced to us

9    either.

10          **MR. SANTACANA:**  Your Honor, this web page was cited

11    multiple times in the plaintiffs' five complaints they filed in

12    this case, starting with the very first one.  The idea that

13    they didn't know this page existed when they were relying on it

14    to file this lawsuit --

15          **THE COURT:**  Can you respond to that one, Mr. Boies?

16          **MR. DAVID BOIES:**  I don't know what he's talking about

17    in terms of what ones we relied on.  I don't think it was this

18    one, but I honestly can't say to the Court.  What I do know is

19    that this one wasn't produced to us.

20          **THE COURT:**  Okay.  I'm not going to admit the

21    document.  If it was not produced, it's not appropriate to be

22    admitted.

23          **MR. SANTACANA:**  Okay.  We can take that down,

24    Brooklyn.

25      Thank you, Your Honor.

1    BY MR. SANTACANA:

2    Q.   So, Mr. Ganem, what is an automatically collected event?

3    A.   This is an event that is automatically collected by the

4    Google Analytics for Firebase SDK that the developer doesn't

5    have to manually collect.

6    Q.   Can you provide some examples of what are the

7    automatically collected events?

8    A.   The principle is that if we think that all app developers

9    would benefit from it, we want to prevent -- or not require

10   them to do extra work.  So the types of events would be first

11   open, which is an event that's logged the first time a user

12   opens an app; session start, which we discussed earlier, the

13   first time -- every time the user opens an app.

14   Q.   Are there other types of events?

15   A.   Yes.  There's also custom events.

16   Q.   What's a custom event?

17   A.   These would be those events which the app developer wants

18   to collect which aren't covered by our automatically collected

19   events but which may be important to them.

20   Q.   Can you give a concrete example of why a developer would

21   want a custom event?

22   A.   Sure.

23        An example would be with Reddit, they may be interested in

24   logging an event when a user reads a thread or posts to a

25   thread.  And since our SDK can't log this automatically and

1    it's valuable to their business, then they would have to write

2    some code to collect it.

3    **Q.**    Does Google do anything to try and understand the meaning

4    of the custom events that app developers create?

5    **A.**    No.

6    **Q.**    Does Google understand the meaning of those events?

7    **A.**    No.

8    **Q.**    Now, what does your product do to respect the user's

9    choice of turning sWAA off?

10    **A.**    Two things.  One, if sWAA is off, we don't collect

11    Google's identifier GAIA; and second is we don't save that

12    user's activity to their Google Account.

13    **Q.**    How do you know whether a particular packet of data from a

14    particular app on a particular phone corresponds to a user with

15    a Google Account with sWAA off?

16    **A.**    We -- the SDK collects a token called the DSID, which is

17    encrypted, which allows us to call a server to check whether

18    that user has sWAA enabled.

19    **Q.**    Why is Google Analytics designed to collect the DSID

20    token?

21    **A.**    To facilitate that check of the sWAA consent.

22    **Q.**    If sWAA were a fake button, would you need to check it?

23    **A.**    No.

24    **Q.**    Can you explain to the jury a little bit about how the

25    consent setting of the user is actually checked?

**GANEM - DIRECT / SANTACANA**

1  **A.**   Yes.  So when an event is uploaded from the device to the

2  Google Analytics server, then what our server does is it makes

3  a call to another service and passes this token.  That server

4  knows how to map that token to a user's account and check its

5  sWAA settings.  And if the user has consented to sWAA, it

6  returns that result back to Google Analytics so that it knows

7  what it can or cannot do with that user's data.

8  **Q.**   Is the analytics data that comes from the phone ever

9  combined with the user's identity when you're in the process of

10  checking their consent setting?

11  **A.**   No.  We immediately separate them, and we perform that

12  check of the user's sWAA consent separated from their

13  signed-out data.

14  **Q.**   Why do you separate them?

15  **A.**   We, at the first possible moment, want to make sure that

16  there's no association between the user's signed-in data and

17  this token which could -- Google could use to look up their

18  GAIA account.

19  **Q.**   If sWAA were a fake button, would you bother to separate

20  them in this manner?

21  **A.**   No.

22  **Q.**   Is this an engineering problem that you had to solve to

23  figure out how to check consents?

24  **A.**   Yes.

25  **Q.**   Is it a challenging problem?

1  **A.**    It is.

2  **Q.**    In what way?

3  **A.**    To design these systems to uphold, not just, you know,

4  theoretically, but in practice, the principles that we have

5  requires a lot of effort and a lot of review to make sure that

6  those are upheld.

7  **Q.**    Now, how is it different if you check that consent from

8  that separate server and it turns out the user has sWAA on?

9  What's different?

10  **A.**    If sWAA is on, then two things are different.  One, the

11  Google identifier, account identifier, GAIA, is collected; and,

12  secondly, that data is copied to their Google Account.

13  **Q.**    How long does this consent check process take?

14  **A.**    Sometimes it's immediate, but typically less than

15  five minutes.

16  **Q.**    While the consent check is underway, is the data stored?

17  **A.**    No, it's not.  This is all done in memory, in the air

18  practically.  It's not logged or stored at that point.

19  **Q.**    At what point in this process does Google actually save

20  the data for the first time?

21  **A.**    Only after hearing back from the other server whether the

22  user has consented to sWAA.

23  **Q.**    Now, you have heard some questions during the trial about

24  why Google doesn't check the consent setting of users on the

25  device rather than, I think as you said, in the air.  Why don't

1    you check it on the device?

2    **A.**    I believe that's -- our design is superior.

3    **Q.**    Why?

4    **A.**    A couple of things.  We've seen from our other projects

5    that communicating the other way, from the server to the

6    device, the status results in 6 percent loss of data.  So that

7    would net out to be 6 percent of data missing for our

8    customers.

9        And the second is, you typically want to do these checks

10   as close to what we would call the source of truth as possible,

11   which is on a Google server, to make sure it's as accurate and

12   up-to-date as possible.

13   **Q.**    Okay.  Actually, one more question about that.

14       You also work on Firebase with the other products in

15   Firebase?

16   **A.**    Yes.

17   **Q.**    You heard a reference to app indexing, checking consents

18   on the device?

19   **A.**    Yes.

20   **Q.**    How long has it been since that design was in place?

21   **A.**    I believe app indexing launched in 2016 and was deprecated

22   shortly thereafter, maybe a year later.

23   **Q.**    So it's been eight years since you've been checking

24   consents on device?

25   **A.**    I believe so.

GANEM - DIRECT / SANTACANA

1   Q.   Now, in addition to measuring how their apps perform using

2   Google Analytics, do app developers also use Google Analytics

3   to measure how their ads perform?

4   A.   Yes, they do.

5   Q.   What does Google Analytics do to help app developers

6   understand how their ads perform?

7   A.   If they're running ad campaigns, they want to know how

8   much success they're having with those ad campaigns, so

9   Analytics offers advertising measurement as sort of a report

10  card on their advertising.

11  Q.   When Google is -- when your product is generating this

12  information about how ads are performing, is it using

13  personally identifiable information to do that?

14  A.   No, not -- especially not when sWAA is off, of course.

15  But, no, it doesn't need to.

16  Q.   Does it use it when sWAA is on?

17  A.   It can.

18  Q.   Let's use a hypothetical, please, so that the jury can

19  understand an example of what -- well, let me start here.

20       What is a conversion?  Can you just explain that?

21  A.   A conversion refers to something important that a business

22  wants their users to do.  So in a Reddit app, it might be when

23  they sign up for an account.  In a DoorDash app, it might be

24  when they create an order.  *New York Times*, it might be when a

25  user subscribes to the paper.

GANEM - DIRECT / SANTACANA

1  Q.   So a conversion is something the app wants a user to do.

2  How does that relate to advertising?

3  A.   Typically the goal of advertising is to drive more of that

4  thing to happen.

5  Q.   How do you know if a conversion has occurred?

6  A.   In the app, whether it's one of these automatically logged

7  events or an event that the app developer has put in place

8  manually, one of those would be triggered corresponding to this

9  user action, and that would be your conversion event.

10  Q.   What proportion -- or what -- you know, what pieces of the

11  data that we've been discussing, the analytics data, which

12  pieces are used to measure conversions?

13  A.   The device ID.  That is the most prominent ID that's used

14  for this.

15  Q.   You've heard people characterize how much data your

16  product collects on user activity, goes into these apartments

17  that you told us about.  How much of that data is used to

18  measure ad performance?

19  A.   For App Promo, the vast majority of it is one event, first

20  open.

21  Q.   Um --

22  A.   That's because, if I may --

23  Q.   Sure.  Go ahead.

24  A.   -- the goal of so many apps is really to drive installs of

25  their app, and the first open event is evident that the user

**GANEM - DIRECT / SANTACANA**

1    installed it.

2    **Q.**    And you don't deny, Mr. Ganem, that Google Analytics can

3    measure conversions even when sWAA is off?

4    **A.**    I don't deny that.

5    **Q.**    Does it use, when sWAA is off, a user's Google Account or

6    their account information to measure that a conversion has

7    occurred?

8    **A.**    No.

9    **Q.**    Does Google know who in the world is the person who

10    clicked on the ad?

11    **A.**    No, not for sWAA-off users.

12    **Q.**    What about for sWAA on?

13    **A.**    It may.

14    **Q.**    When sWAA is on, is there -- are there any other

15    additional benefits to the analytics data that your product

16    collects to Google?

17    **A.**    When sWAA is on, are there benefits to Google?

18    **Q.**    Mm-hmm.

19    **A.**    The products that these users use are more personalized,

20    the content is more useful, all the promises and value

21    proposition of sWAA.

22    **Q.**    So does Google make money off of sWAA on analytics data?

23    **A.**    Probably.

24    **Q.**    How?

25    **A.**    These products are better and stickier, and maybe,

1    indirectly from that, customers spend more money on them.

2    **Q.**    Does analytics data, when sWAA is on, get used for

3    personalizing advertising?

4    **A.**    It can.

5    **Q.**    And does that make a profit for Google?

6    **A.**    It can.

7    **Q.**    Does Google do that when sWAA is off?

8    **A.**    No.

9    **Q.**    Is there a role in -- that Google Analytics plays in

10    keeping track of advertising?

11    **A.**    Can you explain what you mean by "keeping track of"?

12    **Q.**    Sure.  Logging for billing purposes, for example.

13    **A.**    Not logging for billing purposes, no.

14    **Q.**    What about preventing the misuse of apps or analytics or

15    bots, things like that?  Is there any role that your product's

16    data plays in that?

17    **A.**    Yes.  Analytics data can help Google recognize bots and

18    fraud and spam.

19    **Q.**    How?

20    **A.**    Excuse me.  By recognizing patterns in the data that

21    correspond to the activities of bots and click spammers, which

22    is a fraudulent activity in advertising, and omitting those

23    from the advertisers.  We don't want them to -- advertisers to

24    be charged for this activity.

25    **Q.**    Now, yesterday we heard testimony from Mr. Lasinski about

1    Google's profits from measuring conversions.  Do you remember

2    that?

3    A.    Yes.

4    Q.    Does Google profit from measuring conversions?

5    A.    App Promo advertising campaigns, Google generates revenue

6    when the ad is served to the user.

7    Q.    So if an ad results in a conversion, does Google make more

8    or less money?

9    A.    It doesn't make more or less money.  It's based on whether

10   the ad was served.

11   Q.    It makes no difference --

12   A.    Right.

13   Q.    -- to what Google makes?

14   A.    Not directly.  Now, it may be that by virtue of showing

15   this report card of how many conversions that their advertising

16   campaigns led to, they may have more confidence that it's

17   working for them and spend more.

18   Q.    You mentioned there are analytics competitors in the

19   market.  Do those analytics competitors also measure

20   conversions?

21   A.    Yes, many of them do.

22   Q.    How do they measure conversions?

23   A.    Similarly to how Google Analytics does, through this

24   device identifier.

25   Q.    Does Google -- is Google Analytics the leader in measuring

1    conversions?

2    **A.**    No.

3    **Q.**    Who is the leader?

4    **A.**    AppsFlyer is by far the leader among app advertisers.

5    **Q.**    Do you have an understanding as to why AppsFlyer is doing

6    a better job competing for advertisers than Google Analytics

7    with respect to measuring conversions?

8    **A.**    Yes.    It's pretty simple.    Google Analytics basically only

9    measures Google ad campaigns.    And AppsFlyer and other

10   competitors in the space measure across Google, Meta, TikTok,

11   and others, and most advertisers who advertise with Google also

12   advertise on these other channels.

13   **Q.**    Mr. Ganem, have you ever intended to cede control of

14   whether or not your product can measure conversions to the WAA

15   button?

16   **A.**    No.

17   **Q.**    If this jury were to find that you should have, that the

18   WAA button should prevent you from being able to measure

19   conversions, what would happen to Google Analytics?

20   **A.**    It would cripple the product and make it impossible for

21   businesses to faithfully measure what's going on in their app

22   and how to make their apps better for users.

23   **Q.**    Now, what if you couldn't measure conversions but you

24   could still have analytics data?    What would that mean for the

25   product?

1    **A.**    It would be useful to app developers for improving their

2    apps, but not for growing their businesses necessarily since

3    they don't get an understanding of what are their sources of

4    their most valuable users and which ad campaigns they're

5    running are working for them.

6    **Q.**    Could they use a different product to measure ad

7    performance instead of yours?

8    **A.**    Yes.    They would probably use AppsFlyer or one of the

9    other ads measurement tools.

10   **Q.**    In your mind, would that impact whether or not they choose

11   to advertise with Google?

12   **A.**    It could, but it really depends on their results.

13           **THE COURT:**    Would this be a good time for the break?

14        **MR. SANTACANA:**    Sure, Your Honor.

15           **THE COURT:**    Okay.    Members of the jury, let's take our

16   second break.    Remember my admonitions to not discuss this

17   amongst yourselves or with anyone else, and we'll see you back

18   in 15 minutes.

19                    (Recess taken at 12:18 p.m.)

20                (Proceedings resumed at 12:37 p.m.)

21       (Proceedings were heard out of the presence of the jury.)

22           **THE COURT:**    Okay.    Are we ready to bring the jury out?

23        **MR. SANTACANA:**    We are, Your Honor.

24        **MR. DAVID BOIES:**    Yes, Your Honor.

25       (Proceedings were heard in the presence of the jury.)

1          **THE COURT:**  The jury is present.

2      Mr. Santacana.

3          **MR. SANTACANA:**  Just one more exhibit for the Court.

4                    (Pause in proceedings.)

5  **BY MR. SANTACANA:**

6  **Q.**  Welcome back, Mr. Ganem.

7      I want to ask you about the separation of data that you've

8  been discussing.

9      In what ways does Google maintain separation between PII

10 and pseudonymous data?

11 **A.**  There's a number of different ways.  So, first, when sWAA

12 is consented to, data signed out, pseudonymous data, is stored

13 in a separate log from the signed-in identified data.

14     Additionally, we use a technique called scrubbing to make

15 sure there's no common identifiers across the two logs that

16 might make it possible to join across them.

17     Third, we use encryption so that the data in each log

18 source, the identifiers, are encrypted; and using access

19 controls, no Googler, no human at Google -- excuse me -- can

20 have access to those keys to decrypt the data.

21     And there's more things beyond this, but these are some

22 examples.

23 **Q.**  Would you mind moving your microphone kind of up higher a

24 little bit or a little closer?  I'm having a little trouble

25 hearing you.

1    **A.**    Is that better?

2    **Q.**    Much better.

3    **A.**    All right.

4    **Q.**    Thank you.

5         So I'd like to show you what's been marked for

6    identification as Exhibit 929.  It should be in your binder

7    right there.

8         Do you recognize Exhibit 929?

9    **A.**    Yes.

10   **Q.**    What is it?

11   **A.**    These are scrubbing policies for logs data.

12   **Q.**    Where do you go to get this policy?  Inside of Google, I

13   mean.

14   **A.**    Google has internal websites available for our development

15   team, and that's where you would go to find this.

16        **MR. SANTACANA:**  I move to admit Exhibit 929 into

17   evidence.

18        **MR. DAVID BOIES:**  No objection, Your Honor.

19        **THE COURT:**  929 will be admitted.

20        (Trial Exhibit G929 received in evidence.)

21   **BY MR. SANTACANA:**

22   **Q.**    Mr. Ganem, could you please explain to the jury what

23   they're looking at here with Exhibit 929?

24   **A.**    This is a policy for Google engineers to follow in how

25   they use a technique called scrubbing to prevent the

1    identification of data in our logs.

2    **Q.**    Why does Google use a technique called scrubbing?

3    **A.**    Because this is a technique that we -- that we put in

4    place to prevent the data from being identifiable.  This is

5    like our standard way of de-identifying data.

6    **Q.**    Why does Google de-identify data?

7    **A.**    Because we don't want it to be associated with a user's

8    Google Account unless they've given us permission to.

9    **Q.**    If sWAA were a fake button, would this policy be in effect

10    at Google?

11    **A.**    No.

12    **Q.**    What is IP address redaction?

13    **A.**    This is a process of stripping off some of the data from

14    an IP address; and in this place, in the context of

15    Google Analytics, that would be stripping off the -- a quarter

16    of the numbers of the IP address, basically.

17    **Q.**    What is the purpose of redacting IP address?

18    **A.**    To make it not user identifiable by Google.

19    **Q.**    If sWAA were a fake button, would you be redacting

20    IP addresses?

21    **A.**    No.

22    **Q.**    If sWAA didn't exist, could you make use of an IP address

23    that has not been redacted in your product?

24    **A.**    Possibly.

25    **Q.**    Could you make a beneficial use of the full IP address?

1    **A.**   Possibly.

2    **Q.**   Could Google make more money if it didn't redact

3    IP addresses when sWAA is off?

4    **A.**   It's possible.

5    **Q.**   Nevertheless, when sWAA is off, you do scrub and redact;

6    right?

7    **A.**   Yes.

8    **Q.**   Let's show you what's been marked for identification as

9    Exhibit 926.

10        What is Exhibit 926?

11   **A.**   This is Google's device fingerprinting and immutable

12   identifiers policy, our fingerprinting policy.

13   **Q.**   Where at Google would you go to find this policy?

14   **A.**   Again, this would be on our internal sites.

15   **Q.**   Does this policy have relevance to your product?

16   **A.**   Yes, it does.

17        **MR. SANTACANA:**  I move 926 into evidence.

18        **MR. DAVID BOIES:**  No objection, Your Honor.

19        **THE COURT:**  926 will be admitted.

20        (Trial Exhibit G926 received in evidence.)

21   BY MR. SANTACANA:

22   **Q.**   What is the relevance of this policy to your product,

23   Mr. Ganem?

24   **A.**   Well, fingerprinting is a process whereby you could, in

25   theory, identify the identity of a user using a combination of

1  different information about them.

2  **Q.**   If sWAA were a fake button, would you have this policy?

3  **A.**   No.

4  **Q.**   What does the policy require engineers on your product to

5  do?

6  **A.**   Go through a number of steps to make sure that there is

7  not any use of fingerprinting in our products.

8  **Q.**   Has this policy been in place since 2016?

9  **A.**   Yes.

10  **Q.**   What about the scrubbing policy we looked at a moment ago?

11  Has that been in place since 2016?

12  **A.**   Yes.

13  **Q.**   Have you ever known anyone at Google, on your team, on

14  your product, to violate either one of these policies?

15  **A.**   No.

16  **Q.**   How are you so sure that it hasn't been violated?

17  **A.**   Well, again, as a lead product manager and now director of

18  product management on Google Analytics, I review every change

19  that we make to the product.  Every launch gets reviewed.

20  Nothing launches without us reviewing it.  And we would review

21  any change we're making that's a violation of these policies

22  and say, "Don't launch it."

23  **Q.**   Mr. Ganem, you have heard in this trial the allegation

24  that Google's disclosures to end users are misleading.  You've

25  heard that; right?

GANEM - DIRECT / SANTACANA

1    **A.**    I have.

2    **Q.**    And we've seen a number of times the front page of

3    Google's privacy policy.  Do you remember that?

4    **A.**    Yes.

5    **Q.**    What is your response to the claim that Google's privacy

6    policy is intending to mislead users about what your product

7    does when sWAA is off?

8    **A.**    My response is it's -- it's honestly hard to not take it

9    personally with the amount of time and energy I put into making

10   sure to explain clearly how our product works both to the

11   businesses that collect data and to the end users whose data is

12   potentially, you know, in question here.

13   **Q.**    I'd like to put up what's been admitted already as

14   Exhibit 62.

15         Mr. Ganem, we have seen this exhibit many times already in

16   the trial, so I don't want to belabor it, but I do want to ask

17   you:  Do you see here at the top, where it says that "Google

18   works hard to protect your information and put you in control"?

19   **A.**    Yes.

20   **Q.**    And then at the last full paragraph of the page in the

21   last sentence, do you see where it says [as read]:

22             "Across our services, you can adjust your

23         privacy settings to control what we collect and how

24         your information is used"?

25         From your perspective as the head of Google Analytics,

1  does Google allow users to control what you collect and how

2  your analytics information is used?

3  A.   Yes.

4  Q.   How so?

5  A.   We just walked through all these flows which showed that

6  differences in outcome when a user has sWAA on and sWAA off and

7  discussed a number of engineering investments with high

8  complexity to make sure that we honor that.

9  Q.   Now, you have heard the claim in this courtroom that

10  Google doesn't tell users that you're going to be collecting

11  analytics data.  You've heard that; right?

12  A.   Yes.

13  Q.   Can you point to us where in this privacy policy Google

14  discloses to its users that you're going to collect analytics

15  data?

16  A.   There's a number of places in the privacy policy that

17  mention it.

18  Q.   Can we start with one?

19  A.   Sure.  So I believe it's on --

20  Q.   Do you have a copy of it?

21  A.   What is the --

22  Q.   62.  I don't think you do.

23       MR. SANTACANA:  Mine is highlighted, Your Honor, but

24  if you wouldn't perhaps mind giving him yours, which is not

25  highlighted, or I can give him my own.

1          **THE COURT:**  There you go.

2          **MR. SANTACANA:**  I apologize for taking your exhibit.

3      Oh, we do have one more.  Never mind.  Thank you.

4  **BY MR. SANTACANA:**

5  **Q.**   Sorry.  It wasn't in there.

6  **A.**   No problem.

7  **Q.**   So, Mr. Ganem, you were going to show us where, in this

8  privacy policy we've seen so many times, Google is disclosing

9  that Google Analytics collects data.

10  **A.**   If you turn to, I believe it's page 6, you'll see a

11  section called "Measure Performance."

12  **Q.**   Okay.  Why don't you start just with the first sentence.

13  **A.**   [As read]:

14          "We use data for analytics and measurement to

15      understand how our services are used."

16  **Q.**   Does anything in this paragraph promise users control over

17  whether or not Google will measure performance?

18  **A.**   No.

19  **Q.**   Can you actually go back to the page right before that,

20  page 5?

21  **A.**   Yes.

22  **Q.**   What else does Google say here about the data it collects?

23  **A.**   This page talks about how Google uses the data it collects

24  to build better services.

25  **Q.**   What are some of those uses?  Just give us one.

GANEM - DIRECT / SANTACANA

1   **A.**   Maintain and improve our service.  So I think the examples

2   I mentioned earlier in, you know, understanding what is bought

3   traffic and what is malicious traffic, being able to prevent

4   that from being harmful to websites or waste advertisers' money

5   is one way that we use data to maintain and improve services.

6   **Q.**   What about this section at the top, "Provide Our

7   Services"?  Could you read that top section?

8   **A.**   Sure.

9        [As read]:

10           "We use your information to deliver our

11       services, like processing the terms you search for in

12       order to return results or helping you share content

13       by suggesting recipients from your contacts."

14  **Q.**   Does Google promise users control over whether or not

15  Google can deliver its services?

16  **A.**   No.

17  **Q.**   What about the last section on here?  Let's do that whole

18  section.  What's this section about?

19  **A.**   [As read]:

20           "Provide personalized services, including

21       content and ads.  We" --

22       Sorry.  Go ahead.

23  **Q.**   No.  Please go ahead.

24  **A.**   [As read]:

25           "We use the information we collect to customize

1          our services for you, including providing

2          recommendations, personalized content, and customized

3          search results.  For example, security checkup

4          provides security tips adapted to how you use Google

5          products; and Google Play uses information, like apps

6          you've already installed and videos you've watched on

7          YouTube, to suggest new apps you might like."

8   **Q.**    In this section, Mr. Ganem, does Google provide users the

9   ability to control whether or not personalization occurs?

10  **A.**    Yes.  It's the next practice.

11  **Q.**    Go ahead and read that first sentence.

12  **A.**    [As read]:

13          "Depending on your settings, we may also show

14         you personalized ads based on your interests.  For

15         example, if you search for mountain bikes, you may

16         see an ad for sports equipment when you're browsing a

17         site that shows ads served by Google.  You can

18         control what information we use to show ads by

19         visiting your ad settings."

20  **Q.**    Let's look at the next page, page 6.  There's a section

21  called "Protect Google, Our Users, and the Public."  Could you

22  just read that one for us?

23  **A.**    Sure.

24         [As read]:

25          "We use information to help improve the safety

1          and reliability of our services.  This includes

2          detecting, preventing, and responding to fraud,

3          abuse, security risks, and technical issues that

4          could harm Google, our users, or the public."

5    **Q.**   Is there anything in this section that promises users

6    control to prevent Google from using information to improve

7    safety and reliability?

8    **A.**   No.

9    **Q.**   Okay.  Just a couple more.

10         Next page, paragraph that starts with "We may combine."

11   Let's look at the whole paragraph.

12         All right.  Can you just read for us the last sentence

13   there?

14   **A.**   [As read]:

15             "Depending on your account settings, your

16         activity on other sites and apps may be associated

17         with your personal information in order to improve

18         Google's services and the ads delivered by Google."

19   **Q.**   Where does that blue underline go?

20   **A.**   It goes to a section later about other websites and apps.

21   **Q.**   Okay.  Before we get to that, let's look at the next page,

22   under "Privacy Controls."  What is this section of the privacy

23   policy for?

24   **A.**   This enumerates and describes the controls available to

25   end users to control their data privacy.

1  Q.   Do any of these controls tell the end user that they have

2  the ability to prevent Google from measuring performance,

3  protecting Google users in the public, providing services, or

4  maintaining and improving services?

5  A.   No.

6  Q.   Do any of these controls promise users they can control

7  whether Google personalizes their experience?

8  A.   Yes.

9  Q.   All right.  Last one.  If you could just flip for me.

10      You said there's an underline that leads to elsewhere in

11  the privacy policy.  Let's go there now.  That's page 22.

12      So somebody clicks on that "your activity" -- so still --

13  yeah, exactly.

14      You said if somebody clicks on that "your activity"

15  phrase, they are led here; is that right?

16  A.   That's right.

17  Q.   Okay.  And here Google says at the end -- well, why don't

18  you tell the jury what Google says at the end.  What's the

19  point of this?

20  A.   The last sentence says [as read]:

21          "These services may share information about your

22      activity with Google; and depending on your account

23      settings and the products in use (for instance, when

24      a partner uses Google Analytics in conjunction with

25      our advertising services), this data may be

1        associated with your personal information."

2   **Q.**   Okay.  Let's go back to the first page, to the sentence

3   we've seen so many times, Mr. Ganem, the last sentence of the

4   last full paragraph.

5        Now, you have heard the plaintiffs say that Google

6   promises users control over what we collect and how your

7   information is used.

8        Now that we've walked through the privacy policy, can you

9   please explain to the jury whether you agree with them or not?

10  **A.**   I don't agree.  We do offer controls over how the user's

11  data is used and collected as it relates to specific use cases.

12              **MR. SANTACANA:**  Thank you.  No further questions.

13              **THE COURT:**  Mr. Boies.

14              **MR. DAVID BOIES:**  Thank you, Your Honor.

15                      **CROSS-EXAMINATION**

16  **BY MR. DAVID BOIES:**

17  **Q.**   Good morning.  We haven't actually formally met, although

18  we sat across from each other.

19        You understand I'm David Boies and I represent the

20  plaintiffs?

21  **A.**   Yes.  Good afternoon.

22  **Q.**   Let me start with Plaintiffs' Exhibit 62 that you were

23  just talking about, and let me start on the page that you ended

24  with, which is the first page, and this language "And across

25  our services you can adjust your privacy settings to control

GANEM - CROSS / DAVID BOIES

 1   what we collect."

 2        Perhaps we can highlight that.

 3        Now, you would agree with me, would you not, sir, that

 4   there is no way that a user can control what Google collects

 5   when sWAA is off?  There's no way they can prevent Google from

 6   collecting that data; correct?

 7   **A.**   The way you phrased it the first time is more in line with

 8   reality.  There is a way for users to control what Google

 9   collects from their --

10   **Q.**   How does a user prevent Google from collecting the

11   sWAA-off data that Google now collects?  What do they do?

12   **A.**   A user can control whether Google collects the sWAA-on

13   data.

14   **Q.**   No, not sWAA on.  SWAA off.

15   **A.**   So the user can control what data is collected from

16   third-party apps and sites that use Google Analytics.  That's

17   the control we offer them.

18   **Q.**   You say users can control using the privacy settings.

19   Those are Google privacy settings; right?

20   **A.**   That's right.

21   **Q.**   Okay.  Now, is there a privacy setting that a Google user

22   can use to stop Google from collecting the sWAA-off data that

23   Google currently collects?  That's a yes-or-no question, sir.

24   **A.**   With Google Analytics specifically, no.

25   **Q.**   When you say "Google Analytics specifically," I'm talking

GANEM - CROSS / DAVID BOIES

1  about Google.  You understand that?

2  **A.**    Right.  I'm just representing Google Analytics, so I want

3  to make sure that's -- that part's clear.

4  **Q.**    Well, when you were talking about Google Analytics today,

5  were you talking just about Google Analytics, or were you

6  talking about Google in its entirety?

7  **A.**    I was talking about how the privacy settings relate to the

8  use of Google Analytics.

9  **Q.**    Just Google Analytics?

10 **A.**    In particular.

11 **Q.**    What?

12 **A.**    In particular.

13 **Q.**    But were you only talking about how the privacy settings

14 affected Google Analytics?

15 **A.**    I was talking how they apply to Google Analytics and

16 products that -- to which Google Analytics sends data, like

17 Google Ads.

18 **Q.**    Okay.  But only Google Analytics, is what I'm saying.

19 **A.**    Okay.

20 **Q.**    Okay.  Now, you said you were the person most responsible

21 for Google Analytics.

22     Are you also the person most responsible for the WAA and

23 sWAA controls?

24 **A.**    No, not at Google.  I'm most responsible for how those

25 settings apply to data collected in Google Analytics.

1  **Q.**   Who is the person most responsible for the WAA and sWAA

2  controls at Google?

3  **A.**   I believe that would be Dave Monsees, who testified

4  earlier.

5  **Q.**   Now, you agree with me that even with sWAA off, Google

6  today collects a considerable amount of data with respect to

7  users' use of third-party apps; correct?

8  **A.**   I would.

9  **Q.**   And you would also agree with me that that data that they

10  collect has a lot of value to Google.  Indeed, I think you said

11  if you didn't have it, it would create a huge hole; correct?

12  **A.**   It offers huge value to app developers; and if we didn't

13  have that data, Google Analytics would be -- wouldn't be very

14  valuable to them.

15  **Q.**   And Google Analytics is very valuable to Google; correct,

16  sir?

17  **A.**   I'd like to believe so.

18  **Q.**   Because Google Analytics does a lot of stuff.  It helps

19  get people to use your SDKs; correct?

20  **A.**   Customers use our SDK to use Google Analytics.

21  **Q.**   Yes.  And the SDKs have a lot of value to Google; correct?

22  **A.**   Potentially.

23  **Q.**   I mean, for example, they're an automatic source of

24  structured app data; correct?

25  **A.**   They do collect structured app data.

1  **Q.**   And that's valuable to Google; correct?

2  **A.**   Potentially.

3  **Q.**   Well, not just potentially.  It's actually valuable;

4  correct?

5  **A.**   When sWAA is off, the value is really for the app

6  developer to understand their users.

7  **Q.**   Well, you use -- Google uses sWAA-off data; correct?  Not

8  the app developer.  Google uses sWAA-off data; correct?

9  **A.**   For advertising measurement?  Yes.

10  **Q.**   Yes.  And that advertising measurement is important to

11  Google's profitability; correct, sir?

12  **A.**   Advertising measurement in general is; but as I testified

13  earlier, the vast majority of our app advertisers actually use

14  other services besides Google Analytics for advertising

15  measurement.

16  **Q.**   Sir, you're not saying that the use that Google makes of

17  sWAA-off data isn't valuable to Google, are you?

18  **A.**   Could you repeat that?  I couldn't tell if you said sWAA

19  on or off.

20  **Q.**   Let me rephrase it because I had a double negative.

21      You would agree with me that the sWAA-off data that Google

22  uses, not the app developer, that Google uses has a lot of

23  value to Google; correct, sir?

24  **A.**   In theory.

25  **Q.**   I'm sorry?

GANEM - CROSS / DAVID BOIES

1    **A.**    In theory.

2    **Q.**    Well, but not in theory but in practice; correct?  We're

3    not just talking about theory here.

4    **A.**    We believe -- I mentioned a couple of ways that

5    Google Analytics -- may I explain?

6    **Q.**    No.  What I'm just trying to get at, and your counsel --

7    **A.**    My answer is potentially.

8            **THE COURT:**  Wait, wait, wait.

9            **THE WITNESS:**  Sorry.

10            **THE COURT:**  One at a time.

11    **BY MR. DAVID BOIES:**

12    **Q.**    Your counsel is going to have another chance to examine

13    you.

14        I'm just trying to establish a simple point that I think

15    you agree with, which is that the sWAA-off data that Google

16    collects has a lot of value to Google; fair?

17    **A.**    Potentially.

18    **Q.**    Well, when you say "potentially," Google uses that

19    sWAA-off data; correct?

20    **A.**    Yes.

21    **Q.**    Okay.  And it uses it now, not just in theory but in

22    practice?

23    **A.**    Yes.

24    **Q.**    Now, it also uses that data to inform machine learning

25    models; correct?

 1    **A.**    Yes.

 2    **Q.**    And those machine learning models are also very valuable

 3    to Google; correct?

 4    **A.**    It depends which ones you mean, to be honest.  Can you be

 5    more specific?

 6    **Q.**    Well, let me show you a document that we've marked as

 7    Plaintiffs' Exhibit 163, and that will be in your binder and it

 8    will be behind Tab 8.

 9            **THE COURTROOM DEPUTY:**  Is this already in evidence?

10            **MR. DAVID BOIES:**  This is a -- no, this is not.

11    **BY MR. DAVID BOIES:**

12    **Q.**    This is an exhibit that you've seen before; correct, sir?

13    **A.**    May I take a moment to look at it?

14    **Q.**    Certainly.

15    **A.**    (Witness examines document.)  It does look vaguely

16    familiar.  It's from, looks like, 2016, so some of the details

17    may be fuzzy.

18    **Q.**    And if you look at the last page, you see it was produced

19    to us by Google from your files.  Do you see that?

20    **A.**    I'll take your word for it.

21    **Q.**    And this was a part of Firebase Analytics; is that

22    correct?

23    **A.**    Yes.

24    **Q.**    And this is part of what you're responsible for; correct?

25    **A.**    Yes.

 1              **MR. DAVID BOIES:**  I would offer Plaintiffs'

 2    Exhibit 163.

 3              **MR. SANTACANA:**  Objection, Your Honor.  It lacks

 4    foundation because of the time period and the lack of author.

 5              **THE COURT:**  163 will be admitted.

 6         (Trial Exhibit PX163 received in evidence.)

 7    **BY MR. DAVID BOIES:**

 8    **Q.**   Now, if you turn to page 30 of the document.

 9    **A.**   (Witness examines document.)  I'm there.

10    **Q.**   You see at the top it says, "What is the value of Google

11    ads of scaled Firebase Analytics penetration?"  Do you see

12    that?

13    **A.**   I do.

14    **Q.**   And it says [as read]:

15              "In-app data to inform UAC machine learning

16         models."

17         Do you see that?

18    **A.**   Yes.

19    **Q.**   And what is UAC?

20    **A.**   That is universal app campaigns.

21    **Q.**   And -- and the data that you get for this UAC machine

22    learning models is important to Google; correct, sir?

23    **A.**   Yes.  For advertisers who link Google Analytics to

24    Firebase and -- sorry -- Google Analytics to ads and use

25    analytics conversions, it's important.

**GANEM - CROSS / DAVID BOIES**

1  **Q.**  And you also use SDKs to capture data to enhance Google's

2  products; correct?

3  **A.**  It's, again, potential.  It depends on if the developer

4  allows us to use it that way.

5  **Q.**  And developers do allow that; correct, sir?

6  **A.**  Yes.

7  **Q.**  Okay.  Now, let me go back to the Exhibit 62, the privacy

8  policy.

9      And on the first page, we've gone over this a lot of

10  times, but the sentence, "Across our services, you can adjust

11  your privacy settings to control what we collect."

12      And you expected users to rely on that; correct, sir?

13  **A.**  Yes.

14  **Q.**  Now, counsel for Google directed your attention to a

15  number of pages here, and I'd like to go through them as well.

16      For example, he directed your attention to page 5 where,

17  under "Develop New Services," it says [as read]:

18          "We use the information we collect in existing

19      services to help us develop new ones."

20      Do you see that?

21  **A.**  Yes.

22  **Q.**  And that's limited to the information that Google

23  collects; correct?

24  **A.**  Yes.

25  **Q.**  And the next page, page 6, there was a sentence that says

 1   that [as read]:

 2           "When you visit sites that use Google

 3       Analytics" -- this is under "Measure Performance" --

 4       "Google and Google Analytics customers may link

 5       information about your activity from that site."

 6       Do you see that?

 7   A.  Yes.

 8   Q.  It says "may"; correct?

 9   A.  Yes.

10   Q.  And it doesn't say it will.  It says "may."

11       And is there any place in here or, in fact, in this entire

12   policy where Google says, "We do this even if you have sWAA

13   off"?

14   A.  No, it doesn't say that in that section.

15   Q.  It would have been really easy to say that; correct?

16   A.  If we --

17   Q.  You could have said may link -- may --

18           THE COURT:  Wait.  Don't argue with each other.  One

19   at a time.

20       Go ahead.

21   BY MR. DAVID BOIES:

22   Q.  You could have said right here, "may, even with sWAA off";

23   correct?

24   A.  We could have.

25   Q.  And it also -- he directed your attention to page 22.  Do

1  you recall that?

2  **A.**  Yes.

3  **Q.**  And it says -- remember the sentence under "Your

4  Activity," the last sentence that says [as read]:

5        "These services may share information about your

6        activity with Google..."?

7  **A.**  Yes.

8  **Q.**  It doesn't say anything here about what will happen with

9  sWAA off, does it?

10  **A.**  I think the second half of that sentence is a connection

11  to sWAA-off.  The part that starts [as read]:

12        "And depending on your account settings and the

13        products in use, this data may be associated with

14        your personal information."

15  **Q.**  Do you see any reference to sWAA-off here?

16  **A.**  Not specifically.

17  **Q.**  And it would have been very easy to just say, "If sWAA is

18  off, we still are going to collect and save this information";

19  right?

20  **A.**  I suppose that's one way to explain it.

21  **Q.**  Now, you testified that until this lawsuit was filed, it

22  never occurred to you that anyone had a problem with this.

23  Remember that?

24  **A.**  Sort of.  I think I said until this lawsuit was filed, it

25  never occurred to me that a user would expect that when sWAA

 1  was off, their Google Analytics data wouldn't be collected at

 2  all.

 3  **Q.**    Did that occur to you after this lawsuit was filed?

 4  **A.**    Well, from being in this courtroom, it was pretty obvious,

 5  yeah.

 6  **Q.**    Yeah.  And, indeed, even before you were in this

 7  courtroom.  During the course of the litigation over the last

 8  five years, you knew that; correct?

 9  **A.**    Yes.

10  **Q.**    So did it ever occur to you that maybe what you ought to

11  do is just, after the word "may," just add "even when sWAA is

12  off"?  "Even when sWAA is off," five words, to make it

13  absolutely clear what was happening, did that ever occur to

14  you?

15  **A.**    No.

16  **Q.**    Okay.

17  **A.**    May I add?

18  **Q.**    What?

19  **A.**    May I add something?

20          **THE COURT:**  Your lawyer will have an opportunity to

21  get up and do redirect.

22  **BY MR. DAVID BOIES:**

23  **Q.**    The -- now, your counsel also directed your attention to

24  Section 7 of an agreement with app developers.  Do you recall

25  that?

**GANEM - CROSS / DAVID BOIES**

 1   **A.**   I do.

 2   **Q.**   And let me see if I can pull that up.  I think that was --

 3   yeah, there it is.

 4          **THE COURT:**  We're still on Exhibit 62?

 5          **MR. DAVID BOIES:**  No, Your Honor.  We've now shifted

 6   to Google Exhibit --

 7          **MS. ANDERSON:**  933, page 37.

 8          **MR. DAVID BOIES:**  -- 933 --

 9          **THE COURT:**  Thank you.

10          **MR. DAVID BOIES:**  -- page 37.

11   **BY MR. DAVID BOIES:**

12   **Q.**   And this talks about how Google is saying to the app

13   developer that they should post a privacy policy, and that

14   privacy policy must provide certain information.  Do you recall

15   that?

16   **A.**   Yes.

17   **Q.**   Now, immediately after that sentence, it continues

18   [as read]:

19          "You must disclose the use of the service and

20          how it collects and processes data."

21          And then it says [as read]:

22          "This can be done by displaying a prominent link

23          to the site:  'how Google uses data when you use our

24          partners' sites or apps.'"

25          Do you see that?

GANEM - CROSS / DAVID BOIES

1   **A.**   I do.

2   **Q.**   So what Google is saying is that you can comply with this

3   if you simply give the user a link; correct?

4   **A.**   In your privacy policy, yes.

5   **Q.**   Yes.  And if you look at the last tab in what I've given

6   you, you'll see Google Exhibit 561, which I don't think has

7   been admitted, but I will offer.

8           **THE COURT:**  Any objection?

9           **MR. SANTACANA:**  I'm sorry.  I didn't hear him offer

10  it.  No objection.

11          **THE COURT:**  I think he's asking to admit 561.

12          **MR. SANTACANA:**  No objection.

13          **THE COURT:**  561 will be admitted.

14      (Trial Exhibit G561 received in evidence.)

15  **BY MR. DAVID BOIES:**

16  **Q.**   Now, this talks about how Google uses information from

17  sites or apps that use our services; right?

18  **A.**   Yes.

19  **Q.**   And this is what you told the app developers they could

20  post or link to to satisfy what you were asking them to do;

21  correct?

22  **A.**   I believe so.  I haven't clicked on that link recently,

23  but this looks like the page I remember.

24  **Q.**   You don't have any doubt --

25          **THE COURT:**  Can you keep your voice up a little bit?

1          THE WITNESS:  Sorry.

2    BY MR. DAVID BOIES:

3    Q.   You don't have any doubt that that's what this is;

4    correct?

5    A.   No.

6    Q.   Okay.  Do you see, at the bottom of the page in big bold

7    letters, [as read]:

8              "How you can control the information collected

9         by Google on these sites and apps"?

10   A.   Yes.

11   Q.   And if you -- if you look at the bottom of the page, it

12   says "My Activity" right at the very bottom of the page

13   [as read]:

14             "My Activity allows you" -- speaking of the

15        user, "to review and control data that's created when

16        you use Google services, including the information we

17        collect from the sites and apps you have visited."

18        Do you see that?

19   A.   Yes.

20   Q.   And you expected users to rely on that, did you not, sir?

21   A.   Yes.

22   Q.   Now, we agree that Google collects data from the users'

23   use of third-party apps even when sWAA is turned off; correct?

24   A.   Yes.

25   Q.   But you say that it is de-identified; correct?

1    **A.**    I do.

2    **Q.**    And one of the things that you talked with your counsel

3    about was Google Exhibit 929, the scrubbing policies?

4    **A.**    Yes.

5    **Q.**    Do you recall that?

6    **A.**    Yes.

7    **Q.**    I'd like to direct your attention to a note that's right

8    at the top of the page.  Can you read that note to the jury,

9    please?

10   **A.**    [As read]:

11            "Despite the name 'Dynamic Anonymization,' this

12        framework performs deidentification rather than true

13        anonymization.  It's important to remember that

14        sawmill data is sensitive and potentially

15        reidentifiable even after the scrubbing described

16        here."

17   **Q.**    And by "reidentifiable," you mean you've de-identified

18   somebody and now you reidentified them; correct?

19   **A.**    Yes.

20   **Q.**    The -- you also talked to your counsel about Google

21   Exhibit 926.  Do you recall that?

22   **A.**    Yes.

23   **Q.**    And under "Purposes of the Policy," right at the very top,

24   do you see where it says, "This policy does not," in italics?

25   Do you see that?

1   **A.**   I do.

2   **Q.**   Could you read that to the jury?

3   **A.**   It says [as read]:

4           "This policy does not apply to identification of

5       users across devices based on characteristics such as

6       location, router IP address, or Web history (also

7       known as cross-device linking, behavioral pattern

8       linking, or probabilistic heuristic device

9       association)."

10  **Q.**   And those are all ways by which you use modeling or some

11  kind of algorithm to try to connect people and data; correct?

12  **A.**   Possibly.

13  **Q.**   Now, when Google first receives this sWAA-off data from

14  the app, whatever it is, it has all of the personal identifiers

15  in it; correct?

16  **A.**   Yes.

17  **Q.**   And Google makes a copy of that; correct?  The first thing

18  that happens is it goes into the memory of your server;

19  correct?

20  **A.**   Yes.

21  **Q.**   Okay.  And you then perform -- after that happens, after

22  this copy is made, you perform the consent check; correct?

23  **A.**   I think you skipped the copy step.  You said it arrives at

24  the server but before it's written to any disk, a duplicate is

25  made.

**GANEM - CROSS / DAVID BOIES**

1  **Q.** Before it is written, a duplicate is made?

2  **A.** Before it's logged or saved anywhere in disk.

3  **Q.** Well, when you save, it's saved in memory.

4  **A.** It's in memory.

5  **Q.** Right.  I mean, when it first comes in, the data comes in

6  as electrons and it's put in -- a copy of that is put into your

7  memory; right?

8  **A.** Yes, short-term memory.

9  **Q.** Right.  Now, once it's in there, another copy is made; is

10 that correct?

11 **A.** Yes, for this consent check.

12 **Q.** And that second copy is what is de-identified, and the

13 first copy is going to be destroyed; correct?

14 **A.** I don't know about destroyed.  It separates the --

15 **Q.** It's separated?

16 **A.** Yeah.

17 **Q.** Okay.  So the sWAA-off data comes in, and then it's copied

18 into memory.  A second copy is made, and those two copies are

19 separated; correct?

20 **A.** Yes.

21 **Q.** Now, you then perform the consent check; correct?

22 **A.** That's right.

23 **Q.** And you said that you could perform the consent check on

24 the device and never bring in the identified information;

25 correct?

GANEM - CROSS / DAVID BOIES

1  **A.**   Yes, though I noted that I believe that's an inferior

2  design.

3  **Q.**   But you thought that was inferior?

4  **A.**   Yes.

5  **Q.**   It wouldn't be as good for Google; correct?

6  **A.**   It wouldn't be as good for Google or the app developer

7  that's using our service.

8  **Q.**   But what you're concerned about is what's good for Google;

9  correct?

10 **A.**   What's good for the app developer is what's good for

11 Google because of the virtuous cycle.

12 **Q.**   You want it to be good for the app developer because

13 that's going to help Google make more money; correct?

14 **A.**   I want to make the best product for our customers.

15 **Q.**   But that's not just an eleemosynary impulse.  You're just

16 not a charitable institution.  You're doing it because you want

17 to make money from it; correct?

18 **A.**   It's a business, so certainly we want to succeed.

19 **Q.**   Right.

20 **A.**   Yeah.

21 **Q.**   I'm not suggesting there's anything wrong with trying to

22 make money.  I'm just saying that that's what -- that's why you

23 are using this data, to make money for Google; right?

24 **A.**   Ultimately, we believe that Google will benefit when app

25 developers benefit.

**GANEM - CROSS / DAVID BOIES**

1    **Q.**    Now, you said that there are a lot of policies in force at

2    Google to prevent people from reidentifying the data.  Do you

3    recall that?

4    **A.**    Yes.

5    **Q.**    But Google can always change those policies; correct?

6    There's nothing -- no contract you've entered into, no court

7    injunction that you're bound by.  You can always change those

8    policies; correct?

9    **A.**    I suppose.

10   **Q.**    And do you understand that some users might be

11   uncomfortable with your having their data even though you say

12   you've got policies that are not going to reidentify it?  Do

13   you understand that?

14   **A.**    I suppose.

15   **Q.**    Okay.  Now, when you were talking with your counsel, you

16   were talking about conversion.  And conversion is when an event

17   happens that the -- that somebody is going to pay for; is that

18   fair?

19   **A.**    Not quite.  I would say that a conversion is what happens

20   when the end user does something important to the business.

21   **Q.**    When the end user does something that's important?

22   **A.**    To the app developer's business.

23   **Q.**    Is it also when a person does something that's important

24   to an advertiser?

25   **A.**    Yes.

GANEM - CROSS / DAVID BOIES

1  Q.  And when somebody does something that's important to an

2  advertiser, that makes Google more money; correct?

3  A.  Not necessarily.  Google makes the money on serving the

4  ad.  I would say that the fact that conversions happen gives

5  more value to that campaign.

6  Q.  Well, when you say, "Google makes more money from serving

7  the ad," does it also make money?  Does the money increase if

8  there's a conversion?

9  A.  Maybe indirectly.

10  Q.  You say "maybe indirectly."

11       One of the reasons that you measure conversions is because

12  if there are conversions, that will increase your advertising

13  revenue; correct, sir?

14  A.  Indirectly so, but that is the indirect connection, yes.

15  Q.  When you say it's an indirect connection, a conversion

16  event is something that is defined by the advertiser; correct?

17  A.  It is.

18  Q.  The advertiser says, "If this conversion event happens" --

19  and it could be somebody buying a product, it could be somebody

20  signing up for something, it could be somebody signing up for

21  an app; correct?

22  A.  Yes.

23  Q.  But the advertiser says, "If there is a conversion event,

24  we're going to pay more money"; correct?

25  A.  Not quite.

**GANEM - CROSS / DAVID BOIES**

1  **Q.**   Well, are you -- is it your testimony that conversions are

2  not a metric that Google and the advertiser uses to determine

3  how much money the advertiser pays?

4  **A.**   No.

5  **Q.**   Is that your testimony?

6  **A.**   My testimony is that conversion --

7  **Q.**   I'm asking:  Is that your testimony?

8  **A.**   Not quite.

9  **Q.**   Okay.  So are there -- as you use the term "conversions"

10 within Google, applying to advertising, are there instances

11 where advertisers pay more money because an ad has resulted in

12 a conversion?

13 **A.**   Yes.

14 **Q.**   Okay.  That's what I was trying to get at.

15      And so one of the benefits to Google of proving a

16 conversion, or establishing a conversion, is that it will get

17 more advertising dollars; correct?

18 **A.**   Yes.

19 **Q.**   Okay.  And in order to get a conversion, you need to link

20 up two events.  You need to link up the ad and you need to link

21 it up to the conversion event; correct?

22 **A.**   Yes.

23 **Q.**   And you've got to establish that the same device that saw

24 the ad or clicked on the ad was the same device that went to

25 the conversion event; correct?

1  **A.**   That's one way to do it.

2  **Q.**   Now, when you say, "That's one way to do it," sometimes

3  you're able to connect those two events by observing them;

4  correct?

5  **A.**   Yes.

6  **Q.**   Sometimes, for some reasons, you're not able to do that

7  and then you model it; correct?

8  **A.**   Yes.

9  **Q.**   And when you model it, what you're trying to do is, for a

10 conversion event that you can't tie directly to a device ID,

11 you use other things that you know about that device or the

12 person using that device to infer that that is the same person;

13 correct?

14 **A.**   I don't agree with the same-person aspect of it.

15 **Q.**   Same device?

16 **A.**   Yes, something like that.  I'm not super familiar with the

17 conversion modeling and ads piece.

18 **Q.**   But you agree that what you're doing in conversions is

19 you're trying to tie the phone, say, that bought the product

20 with the phone that saw the ad; correct?

21 **A.**   "Connect" isn't the word I would use --

22 **Q.**   Connect.

23 **A.**   -- but measure how many conversions were related to the ad

24 campaign.

25 **Q.**   And you use sWAA-off data for conversion tracking;

1  correct?

2  **A.**  Yes.

3  **Q.**  Okay.  And that is -- and that, again, is valuable to

4  Google because it allows you to get more advertising dollars;

5  fair?

6  **A.**  It can.

7  **Q.**  Now, you understand that when somebody turns off WAA, it

8  automatically turns off sWAA?

9  **A.**  I do.

10  **Q.**  And you understand that a number of people leave WAA on

11  but turn sWAA off; correct?

12  **A.**  I presume.  I don't know the numbers, but I know that's a

13  possibility.

14  **Q.**  And would you agree that people who turn off WAA or sWAA

15  are people that are particularly concerned with their privacy?

16  **A.**  I mean, I don't know all their intentions, but that's a

17  possibility.

18  **Q.**  Well, but that's something that Google believes; correct?

19  That's why you have these.

20  **A.**  We offer the control because we believe there are people

21  out there who want more control over what's collected and how

22  it's used.

23  **Q.**  Yes.  And you agree that there's no way, under the present

24  system, that a Google user with sWAA off can see what data

25  Google has collected about their use of third-party mobile

1   apps; correct?

2   **A.**   This de-identified data?  No.  There's -- I agree.

3   **Q.**   And you also agree there's no way for a Google user to

4   delete the sWAA-off data that Google has collected and saved;

5   correct?

6   **A.**   The sWAA-off data that's collected into Google Analytics?

7   No, there's no way for them to delete that data that's

8   de-identified.

9   **Q.**   Now, let me just follow up with that answer.  You said

10  there was no way to delete what was in Google Analytics.

11       The sWAA-off data is saved in a number of logs; correct?

12  **A.**   It -- it's saved in the logs and then processed and stored

13  in Google Analytics.

14  **Q.**   That's what I'm asking.

15       The -- there are a number of logs in Google Analytics that

16  contain either sWAA-off data or the results of sWAA-off data;

17  correct?

18  **A.**   I wouldn't -- I don't know about logs, but there are

19  tables of data to support Google Analytics where sWAA-off data

20  may be.

21  **Q.**   Well, are there also logs?

22  **A.**   Yes.

23  **Q.**   Okay.  Now, are there logs outside of Google Analytics

24  that also contain sWAA-off data?

25  **A.**   SWAA-off data from Google Analytics?

**PROCEEDINGS**

1    **Q.**    Let me start with that.

2    **A.**    For conversion measurement.

3    **Q.**    Okay.

4    **A.**    I'm not sure if they're logs; but for the purposes of

5    conversion measurement, this data that Google Analytics sends

6    to ads is presumably stored over there for that purpose.

7    **Q.**    Now, in addition to the sWAA-off data that comes from

8    Google Analytics, are there other places in Google, outside of

9    Google Analytics, that have this sWAA-off data?

10   **A.**    I'm not an expert on those other areas of Google.

11   **Q.**    Did you try to find that out before testifying here?

12   **A.**    I don't recall.

13          **THE COURT:**    I think we've reached the 1:30 point.

14       Members of the jury, we've come the end of the day.

15   Remember my admonitions.  Do not discuss this with anyone or

16   amongst yourselves.  Do no research, nothing associated with

17   the case.  Put it aside.  Enjoy the rest of the day, and we'll

18   see you tomorrow at 8:30.

19     (Proceedings were heard out of the presence of the jury.)

20          **THE COURT:**    Okay.  We're out of the presence of the

21   jury.

22       What's the roster for tomorrow?

23          **MR. DAVID BOIES:**    For once, I don't have to answer,

24   Your Honor.

25                          (Laughter)

**PROCEEDINGS**

1          **MR. HUR:**  Your Honor, after Mr. Ganem, we have Belinda

2   Langner and Donna Hoffman.

3          **THE COURT:**  Okay.  Langner.  And do you think that

4   will take the rest of the day?

5          **MR. HUR:**  I expect that, Your Honor.

6          **THE COURT:**  Okay.

7          **MR. DAVID BOIES:**  Who did you have after Langner?

8          **MR. HUR:**  Thank you, Your Honor.

9          **THE COURT:**  Okay.

10          **MR. DAVID BOIES:**  Did we have somebody after Langner?

11          **MS. AGNOLUCCI:**  Donna Hoffman.

12          **MR. DAVID BOIES:**  Oh, Donna Hoffman.

13          **MR. HUR:**  Yes.

14          **THE COURT:**  Okay.

15      Okay.  Mr. Vogt, will you give us the official time count?

16          **MS. ANDERSON:**  On that note, Your Honor, can I -- for

17   housekeeping, the parties, we had agreed we were going split

18   the time of the depos based on who designated what side.  So we

19   probably have to get --

20          **THE COURT:**  No, no.

21          **MS. ANDERSON:**  No?

22          **THE COURT:**  As I said at the beginning, RJ's

23   calculations are not appealable.  They're not reviewable.

24   Private agreements are not part of this.

25          **MR. DAVID BOIES:**  That had only to do with whose

 1    designations they were.  In other words --

 2            MS. ANDERSON:  If they designated a bunch.

 3            MR. DAVID BOIES:  In other words, these depositions

 4    had both our designations and their designations.

 5            THE COURT:  I know, but this is an inexact science,

 6    and we are going to do the best we can.  First of all, I'm

 7    hoping it's not even going to be an issue in terms of time, but

 8    let's hear it and then we'll discuss it.

 9            THE LAW CLERK:  Plaintiffs have 10 hours, 24 minutes,

10    and 28 seconds remaining.  Defendant has 10 hours, 45 minutes,

11    and 53 seconds remaining.

12            THE COURT:  Okay.  We're going to go with that.

13            MS. ANDERSON:  Thank you, Your Honor.

14            MR. DAVID BOIES:  And I'm assuming that witnesses

15    don't talk while they're on cross.

16            THE COURT:  While they're on cross, I assume that's

17    the operating principle.

18            MR. DAVID BOIES:  Yeah.

19            MR. SANTACANA:  Yes, Your Honor.

20            THE COURT:  Okay.  The discussion we had this morning

21    prompts me to say why don't we -- why don't the parties work

22    together in terms of the demonstratives and the items that have

23    been shown to the jury that are not evidence -- we've talked

24    about the transcripts and things like that.

25        So that we have a complete record, those items ought to be

**PROCEEDINGS**

1  marked for identification, and I think the best way to do it is

2  if they're, for example, a video deposition, the transcript

3  would be, if the video deposition has come in, you can then use

4  some designation that indicates it's tied to that.  You can use

5  As and Bs and the like, but you should work together to have a

6  list so, at the end of this, we can docket that so that there

7  is a complete record of what was shown to the jury.

8      So work on that together; right?

9          MR. SANTACANA:  We will.

10          THE COURT:  So I can get a list at the end.

11          MR. DAVID BOIES:  Your Honor, one question.

12          THE COURT:  Yes.

13          MR. DAVID BOIES:  Exhibit 31, Plaintiffs' Exhibit 31,

14  which was one of the deposition exhibits --

15          THE COURT:  Yeah.

16          MR. DAVID BOIES:  -- I didn't offer that during the

17  deposition.  I think the Court ruled earlier that it had been

18  admitted.  I just wanted to check on that and see if we are in

19  agreement on that.

20          THE COURT:  This is a document that was used in --

21          MR. DAVID BOIES:  In the deposition.

22          THE COURT:  -- the deposition.

23          MR. DAVID BOIES:  And I think it was one of the ones

24  that the Court indicated that it was admitting, but I just

25  wanted to check on it.

PROCEEDINGS

```
 1          THE COURT:  Ms. Hom said it was admitted, and she's

 2   got --

 3          THE COURTROOM DEPUTY:  No.  It was during the

 4   deposition of Miraglia, but it hadn't been admitted.

 5          MR. DAVID BOIES:  Okay.  Then I would offer that.

 6          MR. SANTACANA:  I honestly don't know, Your Honor.

 7   I'll take a look.

 8          THE COURT:  All right.  Take a look at it and tell me.

 9   If it's not an issue, I'll just admit 31.

10          MS. ANDERSON:  Your Honor, I would add you've already

11   ruled on it.  I mean, if you remember reviewing Miraglia's depo

12   designations, the exhibits.

13          THE COURT:  I do remember that, but I don't recall if

14   the actual document, there was a request to have that admitted

15   or not.  Go back and look.  I don't want to -- if this is not

16   an issue, I don't want to spend any time on it until I know

17   it's an issue.

18          MR. SANTACANA:  If you ruled on it, it'll be a short

19   look.

20          THE COURT:  Okay.  Very good.

21          MR. DAVID BOIES:  Thank you.

22          THE COURT:  Anything else?

23          MR. DAVID BOIES:  Not from us, Your Honor.

24          THE COURT:  All right.  Remember I'm going to have a

25   proceeding, a Zoom proceeding, but I'm going to be in the
```

**PROCEEDINGS**

1    courtroom.  So clear out, if you will.

2         **MR. HUR:**  Thank you, Your Honor.

3         **THE COURT:**  Thank you.

4         **THE COURTROOM DEPUTY:**  Court stands in recess.

5              (Proceedings adjourned at 1:36 p.m.)

6                   ---o0o---

7

8              **CERTIFICATE OF REPORTER**

9         I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   DATE:  Wednesday, August 27, 2025

13

14

15

16                    *Ana Dub*

17   _____

18        Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

19      CSR No. 7445, Official United States Reporter

20

21

22

23

24

25