**Volume 7**

**Pages 1221 - 1416**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

| | |
|---|---|
| ANIBAL RODRIGUEZ, et al., individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| VS. | ) **NO. 3:20-CV-04688 RS** ) |
| GOOGLE LLC, | ) ) |
| Defendant. | ) ) |
| _____ | ) |

San Francisco, California
Wednesday, August 27, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        BOIES SCHILLER FLEXNER LLP
        333 Main Street
        Armonk, New York 10504
   BY: **DAVID BOIES, ATTORNEY AT LAW**
       **ALEXANDER BOIES, ATTORNEY AT LAW**
       **M. LOGAN WRIGHT, ATTORNEY AT LAW**

        BOIES SCHILLER FLEXNER LLP
        2029 Century Park East, Suite 1520n
        Los Angeles, California 90067
   BY: **ALISON L. ANDERSON, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
        CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiffs:

          BOIES SCHILLER FLEXNER LLP
          100 Southeast Second Street, Suite 2800
          Miami, Florida 33131
BY:   **JAMES W. LEE, ATTORNEY AT LAW**

          BOIES SCHILLER FLEXNER LLP
          44 Montgomery Street, 41st Floor
          San Francisco, California 94104
BY:   **MARK C. MAO, ATTORNEY AT LAW**

          SUSMAN GODFREY LLP
          One Manhattan West, 50th Floor
          New York, New York 10001
BY:   **WILLIAM C. CARMODY, ATTORNEY AT LAW**
      **RYAN SILA, ATTORNEY AT LAW**
      **ALEXANDER P. FRAWLEY, ATTORNEY AT LAW**

          SUSMAN GODFREY LLP
          1900 Avenue of the Stars, Suite 1400
          Los Angeles, California 90067
BY:   **AMANDA BONN, ATTORNEY AT LAW**

          MORGAN & MORGAN COMPLEX LITIGATION GROUP
          201 North Franklin Street, Seventh Floor
          Tampa, Florida 33602
BY:   **RYAN McGEE, ATTORNEY AT LAW**

For Defendant:

          COOLEY LLP
          Three Embarcadero Center, 20th Floor
          San Francisco, California 94111-4004
BY:   **BENEDICT Y. HUR, ATTORNEY AT LAW**
      **EDUARDO E. SANTACANA, ATTORNEY AT LAW**
      **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
      **THILINI L. CHANDRASEKERA**
      **ATTORNEY AT LAW**
      **CHELSEA HU, ATTORNEY AT LAW**

          COOLEY LLP
          4401 Eastgate Mall
          San Diego, California 92121
BY:   **MICHAEL A. ATTANASIO, ATTORNEY AT LAW**

Also Present:       **Steve Ganem, Google**
          **Julian Santiago**

**I N D E X**

Wednesday, August 27, 2025 - Volume 7

**DEFENDANT'S WITNESSES**                                    **PAGE**   **VOL.**

**GANEM, STEVE (RESUMED)**
(PREVIOUSLY SWORN)                                           1230      7
Cross-Examination resumed by Mr. David Boies                1230      7
Redirect Examination by Mr. Santacana                       1244      7
Recross-Examination by Mr. David Boies                      1276      7
Further Redirect Examination by Mr. Santacana               1279      7


**LANGNER, BELINDA**
(SWORN)                                                      1280      7
Direct Examination by Mr. Hur                               1281      7
Voir Dire Examination by Mr. David Boies                    1316      7
Direct Examination resumed by Mr. Hur                       1318      7
Cross-Examination by Mr. David Boies                        1327      7


**HOFFMAN, DONNA**
(SWORN)                                                      1355      7
Direct Examination by Ms. Agnolucci                         1355      7
Cross-Examination by Ms. Bonn                               1396      7
Redirect Examination by Ms. Agnolucci                       1412      7

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| PX11 | | 1236 | 7 |
| PX31 | | 1227 | 7 |
| G0100 | 1286 | | 7 |
| G0101 | 1291 | | 7 |
| G102 | 1357 | | 7 |
| PX232 | | 1233 | 7 |
| PX419 | | 1319 | 7 |
| 574 | | 1228 | 7 |
| G590 | | 1353 | 7 |
| G591 | | 1322 | 7 |
| G693 | | 1303 | 7 |

**Wednesday - August 27, 2025**                              **8:22 a.m.**

# P R O C E E D I N G S

---o0o---

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  Good morning, everyone.

**ALL:**  Good morning, Your Honor.

**THE COURT:**  A few small matters.  I did get what you submitted in terms of what's in store.  I appreciate it.  It's always helpful.

Let me first mention the situation with respect to instructions.  My hope and intention is that by tomorrow afternoon, what you'll receive is a draft set of instructions and a verdict form, which we've been working on, utilizing what each side submitted to us.

I would like to then schedule, for Friday afternoon, a conference to go over the instructions and the verdict form.  We'll end at 1:30.  So let's get something to eat so we all don't pass out.  Maybe 2:30 or even 3:00 for a conference.

What you're going to get is, as you will expect, something that neither side will be happy with.  Each side won some, lost some, and we created some things probably neither side wanted.  So I understand that both sides are going to probably have some objections.

What I would ask, when you're planning for Friday afternoon, is you -- each side submitted very helpful briefing

and materials to me.  I actually very much appreciated how you did it.  It made my life a lot easier in terms of having -- where the rubber met the road in terms of the disputes.  It was very helpful.

But I think you've preserved your objections if the instructions aren't consistent with what you've submitted, but I appreciate the fact that you may want to, either in written form or otherwise, make clear which ones you object to.  Of course you can do that.

In the conference, though, if you can, please don't just reargue everything that you've already submitted in written form.  I have -- we've been diligent in considering it.  So you may want to just bookmark it, but we don't have to go through a full-fledged argument.  If there's a real problem, if you think, "Oh, my God, there's an enormous error looming there," of course I want to know that.

Okay.  So that's that.

I was advised that with respect to the Harvey deposition, that's gotten worked out, or not?

**MR. SANTACANA:**  Your Honor, we won't be playing that deposition today, and we do have a deal.  So I don't think you need to pay any further attention to the counters and objections.

**THE COURT:**  Okay.  The other issue, which pertains to -- is it Ms. Langner?  Ms.?

MR. SANTACANA:  Yes, Your Honor, Ms. Langner.

THE COURT:  Ms. Langner.  There's some foundation objections.  I'll just see how the foundation gets presented.

I will say, I think I'm inclined to -- I think they're going to be able to do it.  I don't think it's necessary for every witness to have been the one that pulled the underlying financial documents that are being sought if they otherwise have a basis to say these are what are kept in the ordinary course of business and et cetera, et cetera.  So I'll just hear how the foundation goes.

Were there any other issues?

MR. SANTACANA:  There's two exhibits to put on the record, Your Honor.

Yesterday the plaintiffs asked about Exhibit 31.  We stipulate.  You did overrule the objection, so it was a short look, and it should be admitted.

THE COURT:  Okay.  Do we need to do that in front of the jury?

MR. DAVID BOIES:  No.

MR. SANTACANA:  I don't think so, Your Honor.

THE COURT:  All right.  Exhibit 31 will be admitted.

(Trial Exhibit PX31 received in evidence.)

MR. SANTACANA:  The second exhibit in question is 574.R2, which is a revised version of 574, which is already admitted.  There were two pages missing, and we're tacking them

onto the back.  We're printing new copies of them for you, and we'll submit, of course, the digital copies as well.

THE COURT:  And so do I need to readmit this or just -- what are you doing?

MR. SANTACANA:  I think, Your Honor, I would move to admit 574.R2, which we will submit to the Court as soon as we can.

MR. DAVID BOIES:  I think that's fine, or they could just substitute it for the exhibit.  Either way.

MR. SANTACANA:  Substitution would be fine with us as well.

THE COURT:  I don't have a view on this.  So whatever you want me to do, I'll do.

MR. SANTACANA:  We'll substitute 574, Your Honor. It's fewer letters.

THE COURT:  Very well.  I will grant, to the extent I need to, the substitution.

MR. SANTACANA:  Thank you, Your Honor.

(Trial Exhibit 574 received in evidence.)

THE COURT:  Okay.  Any other issues?

MR. DAVID BOIES:  Not from us, Your Honor.

MR. HUR:  Your Honor, a couple of housekeeping things.

With respect to the jury instructions, you had mentioned that if we had any -- you know, a few additional or any modifications, we should file them today.  We will do so.

In addition, we are planning to file a motion for judgment as a matter of law after Mr. Ruemmler testifies, and we can file that tomorrow.

THE COURT:  A Rule 50 motion?

MR. HUR:  Yes, Your Honor.

THE COURT:  Okay.

MS. ANDERSON:  And, Your Honor, again, I'll just confirm we're going to do that jointly; right?  And that'll be disclosed to us beforehand, like the other jury instructions?

MR. HUR:  Yes.  We will meet and confer.

MS. ANDERSON:  Okay.  Thank you.

THE COURT:  Okay.  Nobody else has any -- anything to say?

All right.  Mr. Boies, you looked like you had something on your mind.

MR. DAVID BOIES:  No, Your Honor.

THE COURT:  All right.  Good.

Mr. Ganem, you can --

MR. DAVID BOIES:  I did, but not -- it had to do with the witness.

THE COURT:  Okay.  Fair enough.  It's not for me.  It's for the witness.  Okay.

MR. DAVID BOIES:  Right.

(Pause in proceedings.)

(Proceedings were heard in the presence of the jury.)

THE COURT: Good morning, members of the jury. You're getting very good at hitting the time, getting almost exactly 8:30. Let's hope we can continue that. Welcome back.

Where we left it was Mr. Ganem is on the stand.

And, Mr. Ganem, you understand you remain under oath?

THE WITNESS: I do, Your Honor.

THE COURT: Very well.

Mr. Boies.

MR. DAVID BOIES: Thank you, Your Honor.

STEVE GANEM,

called as a witness for the Defendant, having been previously duly sworn, testified further as follows:

CROSS-EXAMINATION   (resumed)

BY MR. DAVID BOIES:

Q.   Good morning, sir.

A.   Good morning.

Q.   Did you communicate with anyone over the evening break about this case or about your testimony?

A.   No, I didn't.

Q.   Now, you were here during the opening statements; correct?

A.   Yes.

Q.   And you recall that I told the jury that one of the key things that they were going to have to decide was how many average months people kept WAA off. Do you recall that?

A.   I recall that.

Q.   As the corporate representative of Google and the CEO of Google Analytics, what is your testimony as to what's the average number of months people keep sWAA off?

A.   I don't --

MR. SANTACANA:  Objection.  Lacks foundation.

THE COURT:  Well, can you ask some questions about the degree which he would know this?

BY MR. DAVID BOIES:

Q.   You're the corporate representative of Google; correct?

A.   Yes.

Q.   And you're here to present Google's position; fair?

A.   That's fair.

Q.   Okay.  And you're the CEO, you described, of Google Analytics?

A.   Yes, that's fair.

Q.   I now ask you, what's the average number of months people keep sWAA off?

MR. SANTACANA:  Same objection, Your Honor.

THE COURT:  Overruled.

You can answer it.

THE WITNESS:  I don't recall, or I'm not sure.

BY MR. DAVID BOIES:

Q.   About how many?

A.   I honestly don't know.

Q.   Just approximately?

**A.**    I don't know.

**Q.**    Did you look that up at all?

**A.**    I don't recall.

**Q.**    Did you try to find that out?

**A.**    I don't recall.

**Q.**    You don't recall whether you tried to find it out?

**A.**    No.

**Q.**    You did hear me say that I was going to ask every one of the Google witnesses that question; right?

**MR. SANTACANA:**  Objection, Your Honor.  Argumentative.  And he said he doesn't know.

**THE COURT:**  You can answer that.

But then move on to another area.

**THE WITNESS:**  I don't recall you saying that specifically.

**BY MR. DAVID BOIES:**

**Q.**    Okay, sir.  Now, you would agree that most of Google's revenues come from advertising; correct?

**A.**    Yes.

**Q.**    And the vast majority of that revenue globally runs through an app; correct?

**A.**    I'm -- I don't know that to be the case.

**Q.**    Let me ask you to look at Exhibit 232, which is at Tab 9.

And you're familiar with this document, are you not, sir?

**A.**    May I take a look at it briefly?

**Q.**   Certainly.  And if you look at the last page, you'll see it was produced to us by Google from your files.

**A.**   (Witness examines document.)  I'm vaguely familiar with this document.

**Q.**   And this was a document that was produced by Google Analytics; correct, sir?

**A.**   It's related to Google Analytics.  I'm not sure the person who actually produced it was on Google Analytics.

           **MR. DAVID BOIES:**  Your Honor, I would offer Plaintiffs' Exhibit 232.

           **MR. SANTACANA:**  No objection.

           **THE COURT:**  232 will be admitted.

      (Trial Exhibit PX232 received in evidence.)

**BY MR. DAVID BOIES:**

**Q.**   And if you look at page 4 of this exhibit -- let me just show the jury the first page.

      This is a document headed "Google Analytics for Firebase ST" -- "SDK Deep Dive."  Do you see that?  Do you see that, sir?

**A.**   Yes.

**Q.**   This is dated February of 2019; correct?

**A.**   Yes, it is.

**Q.**   And if you turn to page 4, it says [as read]:

           "Benefits of the SDK:  Why are we doing this?"

      Do you see that?

**GANEM - CROSS / DAVID BOIES**

**A.**    Yes.

**Q.**    And it says "For Google:"  The first item is "Data Integrity," and it says [as read]:

"80 percent of revenue runs through a third-party app, a large dependency/risk."

Do you see that?

**A.**    It says A-A-P, not "app."

**Q.**    AAP, third-party AAP.  Do you see that?

**A.**    Yes.

**Q.**    And then down below, it says [as read]:

"Last year Google generated $6.5 billion in app promo revenue and about 80 percent of that revenue globally runs through an AAP putting us at risk."

Do you see that?

**A.**    Yes.

**Q.**    Now, you agree that Google should not collect data without users' consent; correct?  You agree to that?

**A.**    I agree that we need consent to store it against their account, their Google Account.

**Q.**    Well, you say the Google Account.  There's been some discussion in here as to what "Google Account" means, and there's been some discussion that you've heard about how data is saved.  Some data is saved in the Google Account, and some data is saved someplace else.  You've heard that; right?

**A.**    Yes.

**Q.**    And that's your understanding; correct?

**A.**    Yes.

**Q.**    Now, do you agree that Google needs user consent to store data, regardless of whether it is in their so-called Google Account or not?

**A.**    Their personal data, perhaps; but to operate our services, no.

**Q.**    So it's your -- it's your understanding that Google does not need users' consent to collect what you call their non-identified information; is that right?

**A.**    For certain use cases, as called out in the privacy policy, yes.

**Q.**    Well, if it's spelled out in the policy -- policy clearly, then you would argue that maybe you've got consent; correct?

**A.**    For -- yes.

**Q.**    Okay.  Now, I'm talking about whether you need consent.

The jury will determine whether you got consent or not through the policy.  You understand that?

**A.**    Okay.

**Q.**    Now, what I'm asking is:  Is it your position that Google needs to have clear user consent to collect any data from their activity?  Yes or no?

**A.**    Yes.

**Q.**    Okay.  And in order for users to give consent, would you

agree they have to have notice as to what you're proposing to collect?

A.    Yes.

Q.    Okay.   Let me ask you to look at a document that is behind Tab 1.

Now, this is a document that you received in the ordinary course of business; correct, sir?

A.    Yes.

MR. DAVID BOIES:   I would offer this document, Your Honor, PX11.

MR. SANTACANA:   No objection.

THE COURT:   Exhibit 11 will be admitted.

(Trial Exhibit PX11 received in evidence.)

BY MR. DAVID BOIES:

Q.    And this is an email exchange between you and other people at Google; correct, sir?

A.    Yes, it is.

Q.    And if you look up at the top, the paragraph that begins "Some of the examples of this joinability risks," do you see that?

A.    Yes.

Q.    Who is asserting that?

A.    This is an email from Xinyu Ye.

Q.    And who is Xinyu Ye?

A.    A member of the Privacy Working Group that we work with at

**GANEM - CROSS / DAVID BOIES**

Google Analytics.

**Q.** The Privacy Working Group at Google; correct?

**A.** Yes.

**Q.** Okay. And is that a man or a woman?

**A.** This is a man.

**Q.** Okay. And he says here that some examples of the joinability risk are creating the ability to link app events collected by GA4F -- and that's Google Analytics for Firebase; correct?

**A.** That's correct.

**Q.** -- to GAIA ID -- and that's the GAIA ID; correct, sir?

**A.** That's correct.

**Q.** -- even if end users turn off WAA and developers/customers disable data sharing.

Do you see that?

**A.** Yes.

**Q.** And you would agree that that is a joinability risk; correct?

**A.** That's a theoretical joinability risk with this version of the proposal.

**Q.** And it also says that it breaks user expectations because My Activity controls and transparency. Do you see that?

**A.** Yes, I do.

**Q.** And you understood, when this was being sent to you, that what was being referred to here was the perception that

My Activity controls and transparency meant users could control what data was collected and they would know what data is collected; correct?

A.   That -- yes, that's right --

Q.   Okay.

A.   -- in connection with their Google Account.

Q.   Yes.  Well, this doesn't say "Google Account."  It says "My Activity controls"; correct?

A.   My Activity is a Google Account control.

Q.   So what you're saying is that My Activity controls the Google Account?

A.   It's a user control in their Google Account.

Q.   And does that -- My Activity controls, does that control, as you understand it, everything Google is going to collect?

A.   It controls the data in a user's Google Account.

Q.   That's not what I'm asking.

You understand that there's been this distinction between what is called the Google Account and some other accounts. Some people call them shadow accounts.  I don't.  It's not a particular term that I embrace.

But there's different testimony about people collecting data in different places.  You understand that?

A.   Yes.

Q.   Now, does My Activity controls, as you understand it, does that control what Google collects in the so-called

Google Account only, or does it collect any data Google is going to collect and store anywhere?

A.   It doesn't control everything.

Q.   It does not?

A.   It controls the -- the data associated with that user, the identifiable data.

Q.   So as you understand it, the My Activity controls only controls identifiable information in the Google Account; is that right?

A.   Yes.

Q.   Okay.  Before I go further on PX11, let me just clear one thing up.

You said that -- in your direct testimony, that there was a lot of other SDKs.  Do you remember that?

A.   I believe so.

Q.   Now, Google SDK is in 90 percent of the top 1,000 apps for Android; correct?

A.   I remember that stat at some point, yes.

Q.   And it's well over 50 percent of the top 1,000 apps for iOS or Apple; correct?

A.   I recall that statistic as well.

Q.   Now let me go back to PX11.

It also says another risk is a subpoena [as read]:

       "Having to retrieve Android AdId data, app_instance_id data given a GAIA ID for users

turning off WAA."

Do you see that?

A.   Yes.

Q.   And what's being referred to here is the danger that Google will get a subpoena and then it will have to reidentify the de-identified information and respond to that subpoena; correct?

A.   Not quite.

Q.   Okay.  What part of that is not accurate?

A.   Well, the assertion here by Mr. Xinyu Ye is that this is -- this IID may actually be identifiable and that, therefore, it may -- his assertion is that it should require end user consent to store it.

Q.   But it doesn't.  But you don't have end user consent to store the sWAA-off data; correct?  That's what you said just a few minutes ago.  You didn't need that consent.  You didn't get it; right?

A.   Yes.  His assertion is that sWAA should govern the storage of this identifier.

Q.   But it doesn't govern it; correct?

A.   In this version of the proposal, it was not going to; but in the actual design that launched, it does.

Q.   Well, didn't you just tell me a minute ago that the sWAA off did not control whether you collected this data that was -- that you -- after you got it, was de-identified?  Correct?

That's what you told me.

**A.**    The sWAA control governs the storage of identified data, and the assertion was that this Firebase IID is identified data and that sWAA should control it.

**Q.**    That's what he's proposing here?

**A.**    Yes.

**Q.**    But didn't you just tell me that sWAA -- turning sWAA off didn't stop you from collecting information that was initially identified and then de-identifying that information?  Didn't you tell me that?

**A.**    I don't recall putting it that way.

**Q.**    Okay.  Let me just ask you.  And while I'm asking you, maybe somebody at my table will find the transcript from yesterday, but let me just ask you.

When sWAA-off data comes in, the first thing that happens is a copy of that is made in memory; correct?

**A.**    Yes.

**Q.**    And that copy that's made in memory that first comes in has all of the personal identification information; correct?

**A.**    Yes.

**Q.**    Okay.  And then what you do is you make another copy and you de-identify that personal information; correct?

**A.**    Yes.

**Q.**    Okay.  Now, that, both the first copy that comes in and the second copy that comes in, is something that you told me

before you didn't need user consent for; correct?

A.   The pseudonymous data does not require sWAA consent because it's not saved against their Google Account.

Q.   And the reason that you don't need consent is because you say it's not saved in the Google Account; correct?

A.   Yes.  That's the purpose of the sWAA control.

Q.   And you say you can just go and save it someplace else; correct?

A.   Yes.

Q.   Okay.  And you don't need user consent for that, you say?

A.   The consent is the one they granted when they created their Google Account and acknowledged the privacy policy.

Q.   But that assumes that the privacy policy gives that consent; right?

A.   Yes.

Q.   Okay.  Now, you know that you can reidentify, or join, in the language here, that de-identified information back to a person.  Google can do that; right?  You say there are policies against it, but Google can do it; right?

A.   Google would have to change the way its systems are designed in order to do it.

Q.   But Google can do that; right?

A.   In theory, if it made those changes.

Q.   Yes.  And making those changes is within Google's power; correct?

**A.**   Technically.

**Q.**   Okay.  And if you get a subpoena asking for that, you're going to have to comply with that subpoena; correct?

          **MR. SANTACANA:**  Objection.  Calls for a legal conclusion.

          **THE COURT:**  Sustained.

**BY MR. DAVID BOIES:**

**Q.**   Your understanding is that -- as the CEO of this Google Analytics and as the corporate representative of Google, your understanding is that if you got that kind of subpoena, you'd have to comply with it, and that's one of the joinability risks that's referred to here; right?

          **MR. SANTACANA:**  Objection, Your Honor.  I have a 403 objection.  I'd like to --

          **THE COURT:**  This witness is not going to be able to answer the degree to which a subpoena requires certain conduct by this.  So, sustained.

**BY MR. DAVID BOIES:**

**Q.**   Do you understand that users, if they knew that you had this de-identified information that could be reidentified, that they would be concerned that you might do that in response to a subpoena?  Do you understand that that would be a legitimate concern on their part?

**A.**   On whose part?  Could you repeat that?

**Q.**   Users' part, yeah.

**A.**   I could imagine so.

**Q.**   I mean, for example, if you were a woman in a state that prohibits abortions, you wouldn't want your information subject to a possible subpoena; correct?

        **MR. SANTACANA:**  Objection, Your Honor.

        **THE COURT:**  Overruled.

    You can answer that question.

        **THE WITNESS:**  I can imagine so.

        **MR. DAVID BOIES:**  No more questions, Your Honor.

        **MR. SANTACANA:**  Phone in the pocket.

<u>**REDIRECT EXAMINATION**</u>

BY MR. SANTACANA:

**Q.**   Good morning, Mr. Ganem.  How are you doing this morning?

**A.**   Good morning.  Doing okay.

**Q.**   Almost there.

    I want to start where Mr. Boies left off, sir, which is on this subject of users being concerned about subpoenas.

    Have you, as the head of Google Analytics, ever been asked to change the way Google's code works in response to a subpoena?

**A.**   No.

**Q.**   Have you ever changed the way the system that separates the data works in order to rejoin the data at the behest of a government?

**A.**   No.

Q.   I'd like to go to Tab 1 in your binder, which is Plaintiffs' Exhibit 11.

Are you there?

A.   Yes.

Q.   Sorry.  Tab 1.  So not -- Tab 1 is Exhibit 11.

A.   Okay.

Q.   Okay.  So we were just looking at this, and Mr. Boies asked you about whether or not Google gets consent for this identifier.

Does Google get consent for the use of this identifier?

A.   Yes, it does.

Q.   How does it do that?

A.   The same way that it gets -- that we discussed in the -- earlier yesterday.  It collects this data.  It checks for the sWAA consent.  If sWAA consent is granted, it's stored.  If not, it's not.

Q.   Was this comment -- well, first, let's back up for a moment.

Is this an email or something else?

A.   It's a document comment that was followed up through email.

Q.   Okay.  Did Mr. Boies show you the document underlying this comment?

A.   No, he didn't.

Q.   So can you explain to the jury what the document

underlying this comment was?

A.   The document related to this comment was a design that was proposed for this feature that this individual on our Privacy Working Group, Xinyu Ye, was reviewing.

Q.   Did Mr. Xinyu Ye provide you this comment at your direction?

A.   Yes, he did.

Q.   What was the direction that you provided to him?

A.   I asked him to express any concerns that he might have with our design with our team.

Q.   And what was your understanding of the concern Mr. Ye was expressing here?

A.   My understanding is that he highlighted the potential --

        MR. DAVID BOIES:  Objection as to what Mr. Ye meant.

        MR. SANTACANA:  I've asked him for his understanding after Mr. Ye responded to his direction.

        THE COURT:  All right.  So you're not speculating on what someone else thought.  The question is what you thought.

        THE WITNESS:  My understanding is that he highlighted what he believed was a theoretical joinability risk with our design.

BY MR. SANTACANA:

Q.   That's a new term for this trial.  What is a joinability risk?

A.   It's the risk that Google could, if it made changes to its

designs, be able to join signed-in identified data with this signed-out identifier as we had proposed it.

Q.   There's been a lot of talk in this trial about the difference between what Google could do and what Google does do.

Why did you ask him to tell you what he's concerned about with respect to what Google could do?

A.   We wanted to make sure that it wasn't even practically -- it wasn't a real practical concern and that we could be buttoned up even on theoretical concerns to make our designs so strong against that that they were not actual concerns.

Q.   Did this proposal propose to actually join together pseudonymous and identifiable data?

A.   No.

Q.   So when you say "joinability risk," can you just give a concrete example of the risk that you are thinking about?

A.   This would be if some person or system within Google had access to some signed-out information and an identifier that would allow them to join with their signed-in information.

Q.   So would that person if they -- if that risk were realized, would that person be following Google's policies?

A.   No.

Q.   Nevertheless, you wanted to ensure that -- well, I'll just ask you the question.

Why ask about the risk if the risk is that somebody might

break your policies?

**A.**   I asked about the risk to make sure that we honor end users' expectations.  I wanted to make sure that our product upholds the privacy policy.

**Q.**   After Mr. Ye examined this proposal and determined that it created joinability risk, what did you do?

**A.**   I had the team update the design to check the user's consent before actually storing it.

**Q.**   If sWAA were a fake control, would you have changed the design to a design that checks for sWAA?

**A.**   No.

**Q.**   I'd like to direct your attention to the bottom of this document.

Who is Mr. Dan Stone?

**A.**   Dan Stone was the lead of privacy for Google Analytics at the time.

**Q.**   What does that mean?  There's somebody who's a lead for privacy in your department?

**A.**   That's right.

**Q.**   What is --

**A.**   This individual would be responsible for applying Google's privacy policies and the settings to our product.

**Q.**   Do you work with the lead for privacy in your day-to-day job as head of Google Analytics?

**A.**   Yes.

**Q.**   Why?

**A.**   Because we want -- we need to make sure that our product upholds those standards and users' expectations.

**Q.**   Does that work that you do with the lead for privacy have anything to do with sWAA?

**A.**   Yes.

**Q.**   In what way?

**A.**   Well, sWAA is an end user control with expectations that we set, and we need to make sure that they're honored accordingly in our products.

**Q.**   And I just want to reconfirm for the jury, Mr. Ganem, because you're so smart and so articulate.  You and I have not spoken since you were here yesterday; right?

**A.**   That's correct.

**Q.**   Okay.  So you are just answering on the fly right now?

**A.**   Yes.

        **MR. DAVID BOIES:**  Objection, Your Honor.  He's answering on the fly.

        **THE COURT:**  Go to the next question.

**BY MR. SANTACANA:**

**Q.**   So Mr. Dan Stone responds to the comment?  I take it that's how this works.  The bottom one is a response to the top one?

**A.**   Yes.

**Q.**   Okay.  Can you just read what he says?

**A.**   He says [as read]:

"Thanks so much, Xinyu.  Can we update this to clarify that this is really expanding the ability, not creating it?  Also, can you please explain the user expectations?  This data would not show up in My Activity and is not actually joined to GAIA, so not sure how this would break their expectations."

**Q.**   Okay.  Now, had you ever discussed this lawsuit with Mr. Dan Stone by September of 2020?

**A.**   No.

**Q.**   And at this point, he is writing the words [as read]:

". . . is not actually joined to GAIA, so not sure how this would break their expectations."

Right?

**A.**   Yes.

**Q.**   Was it your understanding, before the lawsuit was filed, that the way that sWAA and My Activity are meant to work is that they are meant to control whether data is joined to GAIA?

**A.**   Yes.

**Q.**   You were asked, while you were looking at this document with Mr. Boies, if the data that comes to Google Analytics, I think he said, is initially identified and then de-identified.  Is that really how it works?

**A.**   Well, technically, in the data that's uploaded, there's a token along with the activity data.  That token, by itself, is

not GAIA.  So you can argue whether or not that's a personal identifier.  But the purpose of that token is to look up consent.  That's the only way to do it.

Q.   So if I took that DSID -- by the way, internally, does DSID have any other names?

A.   I think it stands for something like the Doritos cookie.

Q.   Doritos.  Okay.

So if I gave you the packet of data that is uploaded from the device to Google Analytics right in that first millisecond and it has the Doritos token inside of it and I handed it to you, would you be able to figure out whose data it is?

A.   I would not be able to.

Q.   What would you have to do to figure out whose data it is?

A.   I'd have to make a call to this other server that's able to decrypt that Doritos ID, use that to look up the account information, and then check the according sWAA bit.

Q.   "SWAA bit" as in whether sWAA is on or off?

A.   Yes, the sWAA consent status.

Q.   And when the Doritos token is sent to the other server, does the server decrypt it if the person's setting is off?  Does it send back the GAIA to you?

A.   If the user has not consented, the GAIA is not sent back to Google Analytics.

Q.   Now, you also mentioned, while Mr. Boies was talking to you, I believe you said that the data -- that Google makes a

copy of the data in memory.  Can you explain what you mean by "in memory"?

A.   What I mean is in short-term memory in the computer as opposed to as a file on the disk or in a log.

Q.   And why is that a significant distinction to you, the difference between in memory or saved to disk?

A.   Well, the user expectation with sWAA is that it governs the saving of their Web & App Activity specifically to their Google Account, and that's not what's happening when you copy this data in short-term memory for the purposes of looking up the consent.

Q.   Do you -- just to be clear, do you consider making a copy in short-term memory a form of saving?

A.   No.

Q.   And just explain why not.

A.   It's just when you -- for those who do computer science, in order to make these API calls, the data needs to be in memory.  It's just, in the course of looking up the consent status, it's something you would have to do.

Q.   While it's in -- how long is it in short-term memory for?

A.   No more than a few minutes.

Q.   And while it's in short-term memory, while the server is checking for consent, let's say the power goes out.  What would happen to the data?

A.   It would disappear.

**Q.**   So -- and I just want to clarify one thing.  I got a note here to make sure to clarify, Mr. Ganem.

When you said that the Doritos cookie goes to the server and that it can send a GAIA back if sWAA is on, can you just remind us what you mean when you say "GAIA"?

**A.**   GAIA is the identifier associated with a Google Account.

**Q.**   So do you consider that GAIA identifier to be a personal identifier?

**A.**   Yes.

**Q.**   Okay.  You were asked --

         **MR. SANTACANA:**  We can take that down.  Thank you, Brooklyn.

**BY MR. SANTACANA:**

**Q.**   You were asked yesterday about the deletion of data.  Do you remember that?

**A.**   You'll have to refresh my memory.

**Q.**   Well, I believe the question was something along the lines of:  Does Google allow end users to delete the de-identified data that came from their devices?

Do you remember that?

**A.**   Yes.

**Q.**   And can you just remind us your answer?

**A.**   Google does not.  The My Activity control that we offer only allows them to delete the data associated with their Google Account.

Q.   Now, I just want to think about this for a moment, Mr. Ganem.  What would it take if you wanted to give end users the ability to delete de-identified data that came from their devices?

A.   Well, the first thing you'd have to do is reidentify them so that when they submit this request, you would know -- you would then know what data is associated with them.

Q.   Does Google have, right now, as far as you know, the technology built to reidentify users whose data is de-identified?

A.   No, it doesn't.  In fact, we -- our designs are such that that's technically impossible.

Q.   Is that part of, for example, why those servers are separated?

A.   That's right.

Q.   Are there other technical barriers to reidentifying de-identified data at Google?

A.   Yes.

Q.   Can you give us some examples?

A.   So, for example, Google Analytics does not log or store the full IP address.  It removes about a quarter of the information before any of that information is stored.

     Another would be that as timestamps come in, we modify these, adding random numbers to jitter them so that they can't possibly be personally identifiable.

We also have scrubbing policies in place to remove identifiers that might be in the data.

We also have these encryption keys, which are under lock and key, and no human at Google can have access to them.

There's a variety of things that are all used together to prevent this.

Q.   So if you wanted to -- let's say the jury found that end users should be permitted to delete de-identified data that came from their devices.  You with me so far?

A.   Yes.

Q.   In order to do that, what would that -- how would that interact with Google's current privacy -- internal privacy protections and policies?

A.   There would currently be no technical way to do it.

Q.   I'd like to -- you just mentioned scrubbing policies, so I'd like to look at Google's Exhibit 929.

This is the scrubbing policy that you and I talked about yesterday.  You remember?

A.   Yes.

Q.   And you talked about it with Mr. Boies as well and, in particular, this blue note near the top.  Do you remember that?

A.   Yes.

Q.   So the blue note, this warning, says that [as read]:

        "It's important to remember that Sawmill data is sensitive and potentially reidentifiable even after

the scrubbing described here."

What is sawmill data?

A.   These are our logs.

Q.   What is your understanding of why this warning is here on this scrubbing policy?

A.   This warning is here to highlight that there's a theoretical reidentifiable possibility even if you implement only this IP scrubbing.

Q.   So what do you take from this warning, as the person in charge of Google Analytics?

A.   That you shouldn't solely rely on this one approach if you want to make the data not identifiable.

Q.   Do you solely rely on this one approach to prevent reidentification of data?

A.   No.  As I just mentioned, there's several things that we do in our design to make the data not reidentifiable.

Q.   Do you rely on this approach at all to help prevent reidentification?

A.   Yes.  This is one of the techniques that we use.

Q.   All right.  I want to look at Tab 8 in your binder from Mr. Boies, which is Plaintiffs' Exhibit 163.

Now, Mr. Ganem, yesterday Mr. Boies showed you one page from this exhibit, and that was page 30.  So why don't you flip to that page.

Just for context, sir, how many pages are in this slide

show?

**A.**   Looks like 39.

**Q.**   Okay.  So 39 pages.  I believe he showed you one bullet point out of the 39 pages, and that's the top bullet point there on this slide.  Do you see that?

**A.**   Yes.

**Q.**   The bullet says [as read]:

"In-app data to inform UAC machine learning models."

Do you remember testifying about that?

**A.**   Yes.

**Q.**   Can you remind us what "UAC" means?

**A.**   Universal app campaigns.

**Q.**   What is that?

**A.**   If you have an app and you want more users to discover it, you can run a universal app campaign.  It's an advertising campaign through Google Ads for users to discover and install your app.

**Q.**   Now, you recall yesterday you were explaining to the jury your analogy of the apartment building, where each app has its own apartment?

**A.**   Yes.

**Q.**   These machine learning models, do they mix together data from the different apartments?

**A.**   No.

Q.   Could they mix together data from the different apartments?

A.   That, I don't know.  I'm not an expert on those models.

Q.   But as far as you know, these machine learning models are not mixing data from different apartments?

A.   As far as I know.

Q.   So can you just explain, at a high level, what these machine learning models are being trained on?

A.   The conversions -- which, again, if you're Reddit, let's say it's someone signing up for an account.  That conversion, if you link analytics to ads, flows into your ads account to inform your ad campaign that a user signed up.

Q.   So is it -- it's using Reddit's own data?

A.   That's right.

Q.   From analytics?

A.   Yes.

Q.   Which stays inside of Reddit's own apartment?

A.   Yes.

Q.   And what if the data is sWAA-off data?  Does it do anything to reidentify where it came from?

A.   No.

Q.   Okay.  Now, he showed you this slide.  I just want to orient the jury to this document, which they will have in the jury room.

     Let's go to the first -- let's go to page 6 for a moment.

Can you just explain sort of the general purpose of this slideshow?

A.   This is to communicate the -- how Google Analytics for Firebase and Google Ads can work together.

Q.   And so what is the mission of Google Analytics for Firebase and Google Ads working together?

A.   Our mission is to help developers build better apps and a more successful business.

Q.   Now, you didn't write this slide -- well, first of all, did you author this slide?

A.   No.

Q.   Was this slide authored since this case was filed or before?

A.   Before.

Q.   I want to show you Slides 34 and 35.  These slides are titled "Competitive Insights."  The first one says "Strengths" and the second one says "Weaknesses."  Are you with me?

A.   Yes.

Q.   What is the --

        MR. SANTACANA:  And I do want to show, Brooklyn, if you wouldn't mind, the full slides of both strengths and weaknesses.

BY MR. SANTACANA:

Q.   So for strengths, could you just read to the jury that top set of bullets for Firebase's key strengths?

**A.**   It's free and unlimited.  It offers behavioral and attribution analytics.  It's easy to get started and to extend. And customers own their data.

**Q.**   I want to ask you why -- why is that last bullet point a strength?

**A.**   This differentiates Google Analytics from some of its competitors.  So, for example, Facebook Analytics, at the time, they owned the data from their analytics product that their developers used.

**Q.**   And Google does not own the data that the app developers send to Google?

**A.**   No, it doesn't.

**Q.**   How do you know that?

**A.**   That's in our terms of service.

**Q.**   Let's look at the weaknesses slide.

So these are competitive weaknesses of analytics in the market?

**A.**   Yes.

**Q.**   So I want to ask you about the second bullet point on Analytics for Firebase weaknesses.  Can you just read that to the jury?

**A.**   [As read]:

"Facebook's identity graph is more readily usable than ours."

**Q.**   Can you just explain what that means?

**A.** This means that Facebook Analytics did offer more rich insights to their app developers because they shared their identity graph with the data that's collected.

**Q.** What is an identity graph?

**A.** This is everything that Facebook would know about a user. This would be their -- you know, if they knew phone number, email address, any other personal information, that they would use this in conjunction with the Facebook Analytics data.

**Q.** From the period 2016 to 2024, were you at a competitive disadvantage to Facebook for this reason?

**A.** Yes.

**Q.** During that time, did you consider ignoring the sWAA control and competing with Facebook by identifying everyone's data?

**A.** No.

**Q.** Why not?

**A.** Because that would not be consistent with users' expectations on how the sWAA control works.

**Q.** Well, you could just dump the sWAA control and then compete better with Facebook, couldn't you?

**A.** In theory.

**Q.** Did you consider doing that?

**A.** No.

**Q.** Have you ever heard anybody propose that, to compete better with Facebook, Google should just start reidentifying

all of the data?

A.   No.

Q.   Does this remain a competitive disadvantage to this day?

A.   Yes.

Q.   I'd like to ask you about, at the bottom, the bullet point that says [as read]:

        "Aggregated-only reports and audiences with

     client-side persistence."

     Why is -- can you just explain that bullet point?

A.   "Aggregated-only reports and audiences" refers to the reports that we walked through yesterday in the video.  These were, like, the number of daily active users, the number of events that are logged, that sort of thing.

     "Client-side persistence," I'm going to be honest and say I'm not sure what that refers to here.

Q.   Why are aggregated-only reports and audiences a competitive weakness for analytics?

A.    Well, other tools which are more rich in sharing, like Facebook, offering these, you know, identity graph insights at the user level might be more appealing to businesses, but that's just not something that Google Analytics was going to offer.

Q.   So Facebook is providing -- your understanding is that Facebook was providing analytics customers user-level reporting?

**A.**   Yes, that was my understanding.  But more so that Facebook Analytics was mixing their identified data with the analytics users' data to enrich Facebook profiles.

**Q.**   I see.

Now, does that competitive weakness, did that persist throughout the 2016 to 2024 time period?

**A.**   Yes.

**Q.**   Did you consider doing it the Facebook way?

**A.**   No.

**Q.**   Why not?

**A.**   That's -- that would be incongruous with the users' expectations on how our products work, out of step with our privacy policies.

**Q.**   Mr. Ganem, I want to ask you, personally, would you want to be the head of Google Analytics if you were ordered by Google to do it the Facebook way?

**A.**   I would quit.

**Q.**   I want to look at Tab 9 in your binder.  You were shown this document just a moment ago by Mr. Boies.  This is Exhibit 232, and you were shown Slide Number 4.  So if we could just flip to that slide.

I just want to make sure we're all on the same page because you and Mr. Boies had a back-and-forth about whether that says app or not in that first subbullet.

Can you just -- let's take a step back and explain what's

going on with this slide.

**A.**    This slide is describing the -- basically, the market share of Google Analytics for Firebase relative to competitors.

**Q.**    So can you explain what the data integrity bullet is?

**A.**    This is trying to describe these -- what the source of the data is for Google Ads, and it's highlighting that -- in this case, that 80 percent of that -- of their revenue has data flowing through third-party products.  AAP stands for app attribution products, like AppsFlyer, Adjust, and others.

**Q.**    So AAP does not mean apps like the ones I have on my phone?

**A.**    No.

**Q.**    What's an example of an AAP?

**A.**    AppsFlyer is the most popular one.

**Q.**    That's another analytics company?

**A.**    Yes.

**Q.**    So what is this bullet saying about 80 percent of Google's revenue?

      Well, let me ask you this way:  Is it saying what Mr. Boies said, that 80 percent of the revenue is from apps?

**A.**    No.

**Q.**    What is it saying?

**A.**    It's saying that 80 percent of revenue, in this case App Promo revenue, is reliant on third-party products for, you know, revenue -- or for measurement.

Q.   And what do you mean by relying on third-party products?

A.   So we mentioned yesterday that advertise -- or Google Analytics offers sort of a report card or a receipt on the advertising that happens.  This is saying that 80 percent of our advertising revenue relies on third-party products to get those reports or those receipts.

Q.   I want to look at Slide 29 of this presentation.

     By the way, how long is this presentation?

A.   (Witness examines document.)  About 58 pages.

Q.   Okay.  So let's look at Slide 29.  There's some FAQs on here.  Can you just take a moment and read the first sentence.

A.   [As read]:

          "Why doesn't Google just begin using all the
      non-Google attributed data that we are currently
      sending via our MMP integration?"

Q.   I don't want to get into technical weeds.  Can you explain, just at a high level, what this question means to you?

A.   This is a question about why doesn't Google use more data from these third-party AAPs, like AppsFlyer, than we currently do.

Q.   Okay.  And can you read the last sentence.

A.   [As read]:

          "If it's a user privacy" -- "If it's
      user-privacy related, what is our plan to obtain user
      consent?"

**Q.** Now, this was written before this lawsuit was filed; is that right?

**A.** Yes.

**Q.** Let's look at the speaker notes below the slide.

Does "PM" have a specialized meaning to you at Google?

**A.** Product manager.

**Q.** What's a product manager?

**A.** A person who's responsible for how a product works.

**Q.** Okay. And what -- can you just read the response here to the slide. Let's start with the first sentence.

**A.** [As read]:

"PM: From a legal point of view and a privacy point of view, we can't use unattributed data that we get from the third parties for universal app campaigns/AdWords. So, yes, we do receive the data but non we cannot use it, hence why we are asking for the Firebase SDK so we can get cleaner data from a privacy standpoint."

**Q.** Do you have an understanding as to why the Firebase SDK would provide cleaner data from a privacy standpoint?

**A.** The design that we've been stepping through the last two days is an example of how careful we've designed it in order to be able to honor and uphold the privacy policy. These third-party products won't have similar designs or considerations.

Q.   So your data would be cleaner, from a privacy standpoint, than analytics data from a third party?

A.   Yes.

Q.   What's an example of one of those third parties?

A.   AppsFlyer.

Q.   And did you say AppsFlyer -- where do they stand in the market with respect to conversion measurement?

A.   Clear number one.

Q.   So let's look at -- well, let me -- just a quick question.

     To your knowledge, does Facebook have a button like WAA that allows people to opt out of the collection of identified analytics data?

A.   Not to my knowledge.

Q.   What about Adobe?

A.   Not to my knowledge.

Q.   What about Crazy Egg?

A.   I hadn't heard about Crazy Egg till yesterday, so I don't know.

Q.   Are you aware of any major analytics SDK that you compete with that provides users the ability to opt out of the identification of their analytics data?

A.   No.

Q.   Have you considered competing better with those competitors by not providing the opt out that Google provides?

A.   No.

**Q.** Have you heard anybody propose doing that?

**A.** No.

**Q.** Have you heard anyone propose abolishing sWAA so that Google could make more money and have a better analytics product?

**A.** No.

**Q.** Speaking of money, Mr. Ganem, you were asked yesterday about the value to Google -- I think Mr. Boies began by talking to you about the value to Google of analytics data. Do you remember that?

**A.** Yes.

**Q.** And I think at some point he asked you about the value of conversion measurement, and you guys had a bit of a back-and-forth.

Can you just explain, in your own words, how conversion measurement helps Google be a stronger business?

**A.** Yes. So conversion measurement is a report card to advertisers about how well their advertising is working relative to their goals. And so Google Analytics does offer such a report card, but it's focused exclusively on Google Ads.

And these AAPs, like AppsFlyer, they offer a report card across Google, Meta, TikTok, and others; and most of our advertisers simultaneously advertise across all these platforms. So that report card is actually more useful for them than ours.

Q.   Why does providing a report card help Google make more money?

A.   I think the simple principle is that investors, in this case advertisers, they only want to invest in something they can measure.  So measurement is important.

Q.   This case involves ads that are run in App Promo, AdMob, Ad Manager.  You're familiar generally with those three types of advertising products?

A.   More familiar, perhaps, with Ads than AdMob, but generally.

Q.   To your knowledge, does Google charge -- in those products, does it charge more if an ad results in a conversion?

A.   My understanding is that for App Promo, Google is billing customers based on those ads being served to end users.  And the click might also be an additional cost, but the eventual conversion is not what they're being billed on.

Q.   So if the report card shows that an ad campaign was really successful, does Google make more money on that ad campaign that just ran than if it shows that it was unsuccessful?

A.   No.

Q.   I want to talk now about the disclosures that you were shown yesterday, and I want to start with Tab 19 in your binder, which is Plaintiffs' Exhibit 561.

     Do you remember this document?

A.   Yes.

**GANEM - REDIRECT / SANTACANA**

**Q.**   So you were asked a number of questions about this document.  I just want to allow you a moment to refamiliarize yourself with what it says, and then I'll ask you a couple of questions.

**A.**   (Witness examines document.)  Okay.

**Q.**   All right.  So does this page inform users that Google will receive information that is sent to Google by Google Analytics?

**A.**   Yes.

**Q.**   Can you point out to the jury where it informs users of that?

**A.**   Let's see.  Starting at the bottom of the first page and continuing onto the next page, so underneath the heading "How you can control the information collected by Google on these sites and apps," the second bullet says [As read]:

"If you are signed in to your Google Account, and depending on your Account activity, My Activity allows you to review and control data that's created when you use Google services, including the information we collect from the sites and apps you have visited.  You can browse by date and by topic, and delete part or all of your activity."

**Q.**   And the next bullet?

**A.**   [As read]:

"Many websites and apps use Google Analytics to

understand how visitors engage with their sites or apps. If you don't want Analytics to be used in your browser, you can install the Google Analytics browser add-on. Learn more about Google Analytics and privacy."

Q.   Let's flip back to the first page. I want to look at right at the top, that second paragraph. Do you see that?

A.   (Witness examines document.) Yes.

Q.   Maybe just read the first sentence of that paragraph.

A.   [As read]:

"For example, when you visit a website that uses advertising services like AdSense, including analytics tools like Google Analytics, or embeds video content from YouTube, your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and your IP address. We may also set cookies on your browser or read cookies that are already there. Apps that use Google advertising services also share information with Google, such as the name of the app and a unique identifier for advertising."

Q.   You were asked yesterday whether Google explains to users that this is not something that they can completely shut off. I want to look at the next paragraph that starts with "Google uses." If you could just read that first sentence for us.

**GANEM - REDIRECT / SANTACANA**

**A.**   [As read]:

"Google uses the information shared by sites and apps to deliver our services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize contents and ads you see on Google and on our partners' sites and apps.  See our Privacy Policy to learn more about how we process data for each of these purposes and our Advertising page for more about Google Ads, how your information is used in the context of advertising, and how long Google stores this information."

**Q.**   All right.  Now I want to blow up the next section, called "Ad personalization."  I think this is the first time the plaintiffs have shown this document in this trial was with you.

Let's look at the first sentence of the second paragraph.

**A.**   [As read]:

"If ad personalization is off, Google will not collect or use your information to create an ad profile or personalize the ads Google shows to you."

**Q.**   Now, let's -- just -- yeah.  Let's look at the last sentence of that paragraph.

**A.**   [As read]:

"Your information can still be used for the other purposes mentioned above, such as to measure

the effectiveness of advertising and protect against fraud and abuse."

Q.  To your knowledge, does Google anywhere, in any of its pages that are shown to users, promise users the ability to stop Google from measuring the effectiveness of advertising?

A.  No.

Q.  To your knowledge, does Google provide any control or tell users that they may have control over Google's ability to protect against fraud and abuse?

A.  No.

Q.  Can Google measure the effectiveness of advertising or protect against fraud and abuse without collecting at least some data?

A.  I don't think so.

Q.  I want to look now --

                    (Audio interruption.)

        MR. SANTACANA:  That was pretty accurate, actually.

BY MR. SANTACANA:

Q.  Okay.  So let's look at Exhibit 62.  I want to go back, sir, to where you were yesterday with Mr. Boies when we ended. He was asking you about the privacy policy, and I want to flip back to page 22.  He asked you about this paragraph.

He said, "Does Google tell users that sWAA is related to the collection of this data?  Does Google right here mention sWAA in any form?"

**A.**   That's referenced in the account settings link.

**Q.**   Okay.  So in this sentence where it says, "These services may share information about your activity with Google and, depending on your account settings, this data may be associated with your personal information," your testimony is that the phrase "account settings" refers to sWAA?

**A.**   Yes.

**Q.**   How do you know that?

**A.**   Well, when you go into -- when you click on this link and you look at those settings, you'll find that sWAA governs the association of your browsing and websites and apps from third parties, the saving of that information with your Google Account.  So that's the connection.

**Q.**   So --

**THE COURT:**  Can I see counsel to the side for a moment?

**MR. SANTACANA:**  Sure.

(Sidebar conference heard but not reported.)

**BY MR. SANTACANA:**

**Q.**   So, Mr. Ganem, where did you say this hyperlink account settings leads to?

**A.**   To another article that describes the controls that are available for users, the privacy controls.

**Q.**   And is sWAA the only control that impacts this?

**A.**   No.  There are others.

Q.   So Mr. Boies asked you yesterday, "Why don't you just add three words right here, even with sWAA off?"

Do you remember that?

A.   Yes.

Q.   Does this mention sWAA?

A.   No.

Q.   Does it have a link so you can turn sWAA off?

A.   Yes.

Q.   Does the link also involve other settings?

A.   Yes.

Q.   If you wanted to take this account settings link and stuff everything behind it into this paragraph, would you stop at saying "even with sWAA off"?

A.   No.

Q.   Would you need to say "even with YouTube history off"?

A.   Possibly.

Q.   Would you need to say "even with location history off"?

A.   Possibly.

Q.   What about all other controls that Google provides?  Would you stuff those in here?

A.   Yes.

Q.   But instead, there's just a hyperlink that takes you right to the control?

A.   Yes.

MR. SANTACANA:  I have no further questions.

THE COURT:  Microphone exchange?

MR. DAVID BOIES:  Well, I'll be short enough, so I'll try to use this one, Your Honor.

Could we put up Plaintiffs' Exhibit 11 on the screen.

**RECROSS-EXAMINATION**

BY MR. DAVID BOIES:

Q.   Counsel asked you about this, and he said that this related to another document, and he said I didn't show you that document.  Do you recall that?

A.   Yes.

Q.   Now, he didn't show you that document either; right?

A.   No.

Q.   Have you ever seen that document?

A.   Yes.

Q.   Have you seen the document in preparation for this case?

A.   I think in preparation for deposition.

Q.   So your counsel has it available to them?

A.   I don't know.

Q.   Well --

A.   I presume so.

Q.   -- they showed it to you in connection with the deposition, you said?

A.   I presume so, yes.

Q.   Because they prepared you for your deposition?

A.   Yes.

**Q.** And that was one of the documents they showed you?

**A.** I don't recall. It was years ago. Maybe.

**Q.** I thought you just said that you have seen it in connection with your deposition.

**A.** I read through a lot of those documents on my own, but whether or not it was used in preparation, I don't know.

**Q.** Do you know if that document was even produced to us in this case?

**A.** I --

**MR. SANTACANA:** Objection, Your Honor. Lacks foundation, and counsel knows it was produced.

**THE COURT:** Sustained. I don't think this witness can go into that.

**BY MR. DAVID BOIES:**

**Q.** Now, you testified to your counsel that in order to give people the ability to delete their information, you'd have to reidentify them. Do you recall that?

**A.** Yes.

**Q.** Now, one of the things that you save in the so-called de-identified information is the device ID; correct?

**A.** Yes.

**Q.** And you could communicate with that device; correct?

**A.** Yes.

**Q.** Okay. So you could -- if you wanted to, you could send to the device what information you'd collected and give that

device a chance to delete it; correct?  Technically, you could do that?

A.   Perhaps.  That's not the way the systems are designed, and I think you're talking about data on a server.

Q.   Well, first of all, when the information comes to you, the sWAA-off data comes to you, it comes directly from a device to Google; correct?

A.   That's correct.

Q.   That is, it doesn't pass through the app.  It comes directly from the device to Google; correct?

A.   It is from the app on the device to Google.

Q.   But it's being sent from the device --

A.   That's correct.

Q.   -- correct?

From the person's phone; correct?

A.   Yes.

Q.   And so you could -- because you save that phone's device ID, you could send back to that phone at any time what you'd collected and give them a chance to delete it; correct?

A.   Sending the data from the server to the device to delete it on the device?  Yes.

Q.   Yes.  Okay.

          MR. DAVID BOIES:  That's all I have, Your Honor.

          THE COURT:  Very well.

Anything further?

## FURTHER REDIRECT EXAMINATION

BY MR. SANTACANA:

Q.   Going -- I apologize.  I don't have that document in my binder, but do you recall that document?

A.   The -- I recall the design for IID because I was intimately involved with it.

Q.   Can you just say what it is?

A.   This was a design to allow app developers to send push notification to their users based on their analytics data.

Q.   What is -- what is a design document?  Is it going to describe more information?

A.   This is how engineers intend to design the system in order to offer that feature.

Q.   Okay.  So do you need to see that document to understand PX11?

A.   No.

Q.   You have a personal memory of this project?

A.   Yes.

Q.   Just to remind the jury, what decision did you make with respect to this project?

A.   We decided that we would honor the user's consent before storing this data.

        MR. SANTACANA:  No questions.

        THE COURT:  Okay.

        MR. DAVID BOIES:  Nothing further, Your Honor.

THE COURT:  Pardon?

MR. DAVID BOIES:  Nothing further.

THE COURT:  Very well.

You may step down.

THE WITNESS:  Thank you.

(Witness excused.)

MR. HUR:  Your Honor, Google calls Belinda Langner.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURT:  Come forward, please, to the stand to be sworn.

THE WITNESS:  Do I come up here?

THE COURT:  Yes.

BELINDA LANGNER,

called as a witness for the Defendant, having been duly sworn, testified as follows:

THE WITNESS:  I swear.

THE COURTROOM DEPUTY:  Thank you.  Go ahead and have a seat.

THE WITNESS:  Thank you.

THE COURTROOM DEPUTY:  You're welcome.  Make sure you don't slide off the stairs.

THE WITNESS:  Yeah.

THE COURTROOM DEPUTY:  Could you make sure you speak clearly into the microphone for our court reporter?

THE WITNESS:  Yeah.

THE COURTROOM DEPUTY:  Could you please state your full name for the record and spell your last name?

THE WITNESS:  My name is Belinda Langner.  My last name is spelled L-a-n-g-n-e-r.

THE COURTROOM DEPUTY:  Thank you.

MR. HUR:  Your Honor, may I approach?

THE COURT:  You may.

Do you have a binder for me?

MR. HUR:  Oh, I'm sorry, Your Honor.  Yes --

THE COURT:  That's all right.

MR. HUR:  -- we do.

THE COURT:  Thank you.

### DIRECT EXAMINATION

BY MR. HUR:

Q.   Good morning, Ms. Langner.

A.   Good morning.

Q.   Could you please introduce yourself to the jury?

A.   Sure.

Hi, everyone.  My name is Belinda Langner.  I live down in Mountain View, and I work at Google, and I've been at Google for the last 14 years.

Q.   Ms. Langner, what is your current title at Google?

THE COURT:  Can I stop you for a moment?

This binder has a first item in it.  Is this -- do you want this in here?  Let me show you the...

Can you hand that back to him?

(Document handed down.)

MR. HUR:  No, Your Honor.  I'm sorry.  Thank you, Your Honor.

THE COURT:  You're welcome.

MR. DAVID BOIES:  It would have been good for me to have.

THE COURT:  I was waiting for you to move to admit it.

(Laughter.)

(Pause in proceedings.)

THE WITNESS:  And do we need to adjust mine too?

MR. HUR:  Your Honor, may I approach?

THE COURT:  Yes.

(Pause in proceedings.)

THE COURT:  There were just some attorney notes that inadvertently were included.  That's what this is all about.

BY MR. HUR:

Q.   Okay.  Ms. Langner, please tell the jury your current title at Google.

A.   I am the director of product management for App Campaigns.

Q.   And, Ms. Langner, if you could try, during your testimony, to be clear when you are saying the word "app" versus "ad" --

A.   Acknowledged.

Q.   -- because our court reporter is trying to take everything down, and those two words can sound very similar.

So what are -- what is your role as the director of product management for App Campaigns?

A.   My role is to drive the overall product direction and drive the revenue for App Campaigns.

Q.   Are you essentially the CEO of App Campaigns at Google?

A.   That's a way to look at it, yes.

Q.   What are App Campaigns?

A.   App Campaigns are a way for mobile app developers to find users to help install and engage with their app, with their mobile app.

Q.   How long have you been working on App Campaigns at Google?

A.   I've been working on App Campaigns since the beginning.  I helped launch App Campaigns, and I'm one of the first product managers on App Campaigns.

Q.   When did App Campaigns at Google launch?

A.   Our first initial version launched in 2015.

Q.   Ms. Langner, over the course of the last couple of days, the jury has heard some about the ad ecosystem and how conversion measurement and ad sales work, but can you please -- I'd like to tell them a little bit more about what the ad ecosystem is like.

Who are the main players in the ad ecosystem?

A.   Yeah, sure.  The main three key players would be the advertiser, the publisher, and the user.

Q.   Let's start with the advertiser.  Can you give us an

example of an advertiser and what the advertiser's role is in this ecosystem?

A.    Sure.  The advertiser is someone, a company that wants to promote their service in some way; and so for a -- in the mobile app context, that would basically be getting someone to install and engage with their app.

Q.    What's an example of an advertiser?

A.    An example could be Nike, for example.  They might want you to install the Nike app onto your phone.

Q.    What is the publisher?  What is the publisher's role?

A.    The publisher is a company or a mobile app that wants to basically provide space within their app to show advertisements.  So they basically want a billboard to put ads in.

Q.    Can you give us an example of a publisher?

A.    So, for example, you could have the ESPN app that may want to show you ads while you're, you know, looking up sports scores.

Q.    So, Ms. Langner, if a person is scrolling through the ESPN app, for example, when they -- when they see an ad, is that the billboard you're talking about?

A.    Yeah.  So if a user is scrolling through the ESPN app and they happen to see the Nike ad, in this example, ESPN would be the publisher and Nike would be the advertiser.

Q.    The third player you mentioned is the user?

**A.**    Correct.

**Q.**    What is the user's role in this?

**A.**    The user's role is, basically, anyone, like you and me, who might be using the ESPN app in this example.

**Q.**    So the user is the person scrolling on the ESPN app who may see and click on an ad; is that fair?

**A.**    Correct.

**Q.**    Where does Google fit into this ecosystem?

**A.**    Google helps the advertiser by basically trying to find them users to download and install the app.  Google helps publishers by finding advertisers to fill the space that they provided within their app.

**Q.**    The jury has heard a little bit about a product called AdMob.  Can you tell them what AdMob is?

**A.**    Sure.  AdMob would be the service that we -- that Google has to enable publishers like ESPN to fill the billboard that they would have created with ads and help them earn revenue.

          **MR. HUR:**  So can we show the AdMob disclosure or demonstrative?

**BY MR. HUR:**

**Q.**    Ms. Langner --

**A.**    Sorry.

**Q.**    Oh, is it not --

**A.**    It's not on my -- oh, here it is.  Thank you.

**Q.**    Ms. Langner, what is depicted here?

**A.**   Yeah.  So what you can see here on the screen is the sort of overall process of the -- you know, the ESPN app wanting to fill a space with their ad.  So on the right-hand side, you can see that the Nike ad is on the ESPN app.

**Q.**   So remind the jury again, who is the advertiser in this example?

**A.**   In this example, Nike would be the advertiser because they are showing the user an ad.

**Q.**   Who is the --

        **THE COURT:**  Are we going to start giving these numbers for identification?

        **MR. HUR:**  Yes, Your Honor, we should do that.  We would like to mark this demonstrative for identification as G0100.

        **THE COURT:**  Okay.  G0100 for identification.

    (Trial Exhibit G0100 marked for identification.)

        **THE COURT:**  Go ahead.

**BY MR. HUR:**

**Q.**   Ms. Langner, who is the publisher in this example?

**A.**   The publisher in this example is ESPN.  So you can see this is the app that you would be using if you were the user.

**Q.**   So the ESPN app is displaying the Nike ad; is that right?

**A.**   Correct.

**Q.**   Now, this is a little confusing because we're talking about ads and advertisers and apps and publishers.  Can an app

be both an advertiser and an app?

A.    Yes.

Q.    Can a publisher be both a publisher and an app?

A.    Yes.

Q.    What is the user's role in this example?

A.    The user's role is just trying to get information; and if they like the ad and they want to engage more with Nike, they can click on that ad.

Q.    What is Google's role?

A.    Google's role is providing the ads to show within the provided space that ESPN has provided.

Q.    How does Google make money from this process?

A.    Google makes money when the user interacts with the ad in some way; for example, clicking on the ad.

Q.    So when the user clicks on the ad, how does payment work?

A.    Google charges the advertiser a certain amount of money, and Google then shares some of that -- of the money that they got from the advertiser with the publisher for providing space on the app to show the ad.

Q.    So Google gets paid when the user clicks on the ad; is that right?

A.    Yes.

Q.    And why does Google share some of the money with the publisher, in this case ESPN?

A.    In this case, ESPN provided the billboard for Google to

show the ad, and so we want to give them credit for the space on their app.

Q.   Yesterday one of the plaintiffs' experts showed the following demonstrative.

         MR. HUR:  Can you put up Mr. Lasinski's Demonstrative Number 5.

BY MR. HUR:

Q.   And Mr. Lasinski told the jury that this is how he understood Google's advertising business to work.

     Is this how Google's app advertising business works?

A.   I would probably make a few changes to this flow.

Q.   What would you change?

A.   I would -- I think this is missing the critical component of the user.  So the user certainly needs to click on an ad first.

     I would also say that, you know, Google -- the tracking of conversions and measurement is sort of orthogonal to serving an ad.  So I would probably pull out that blue box there, "Google tracks conversions," and I would probably sort of put it as a horizontal almost, and I would replace that box with the user interacts with the ad in some way.

     And I don't know that there necessarily has to be a flow back after advertisers pay Google to serve the ad.  I think that just is sort of a one-way flow.

Q.   Ms. Langner, what does "orthogonal" mean?

A.   "Orthogonal," in the context in which I'm using it, means separate from the serving process.

Q.   So if you were to revise this slide, what would you do with that blue box where it says "Google tracks conversions"?

A.   I would just pull it to a side, and probably when the user -- after the advertisers pay Google, if the user then decides to do an event that is important, like a download, then that's when an important event would happen, and that's when a conversion measurement could happen.

Q.   Okay.  So the blue box would go to the side.  And then I think you said you would add a click.  Where would the click go?

A.   Yeah.  After Google serves the ad to the user, the user can choose to interact with that ad, so I would put that as the next box.

Q.   So where "Google tracks conversions," you would pick "User interacts with the ad," something like that?

A.   Something like that, yes.

Q.   Okay.  Then if the user interacts with the ad in that blue box, is the yellow box on the left correct?

A.   Yeah.  If the user interacts with the ad, then the advertisers would pay Google for that interaction.

Q.   Now, you say the blue box should be to the side.

     Let's go back to the demonstrative about ESPN and Nike we were just looking at.

Is the far box on the right where you would put conversion measurement?

A.   Yes.

Q.   And why would you put it there?

A.   Because it's separate from the -- it's basically to allow advertisers to understand what's happening within the app, so it's sort of separate from -- from the rest of the process.

Q.   We'll come back to that.

Now, Ms. Langner, we've heard a lot about this term "conversion measurement" or "conversion tracking."  It's been used a lot over the last couple of days.

What is conversion measurement or conversion tracking?

A.   Sure.  Conversion measurement is a way for advertisers to confirm that the ads that were shown drove an event that they cared about to their business and that's important to their business.

Q.   Okay.  And why is it important for advertisers to be able to measure conversions?

A.   It's important because advertisers want to understand that the ads that are being shown are actually leading to impactful business results.  You can sort of view it as a report card on how the ads are performing.

MR. HUR:  Can we pull up the demonstrative showing conversion measurement.

We'd like to mark this for identification as G0101.

THE COURT:  Very well.

(Trial Exhibit G0101 marked for identification.)

BY MR. HUR:

Q.   Ms. Langner, can you describe for the jury what is happening in this demonstrative?

A.   Sure.

What you see here is that it looks like someone has seen an ad for a burger company of some sort.  They then decide to click on that ad because they love burgers.  The advertiser pays Google because that user clicked and interacted with the ad.  And then the user then chooses to download that app perhaps to order a burger for lunch.

Q.   Ms. Langner, when does Google get paid for the ad?

A.   Google gets paid when and after that user clicks on the ad.

Q.   And when does the conversion occur?

A.   The conversion occurs after the payment, after the click.

Q.   So which step of these three does Google get paid in?

A.   Step 2 in this demonstrative.

Q.   And when does the conversion happen?

A.   The conversion happens after the click.

Q.   Which step?

A.   Step 3.

Q.   Does Google get paid anything else, anything in addition, when a user downloads the app in Step 3?

A.    No.

Q.    Ms. Langner, can you explain for the jury how conversions work on a technical level?

A.    Sure.

At a technical level, what is happening with conversion measurement is that there is an identifier that helps tie Event 1, which is the ad click, to Event 3, which is the download.

Q.    And, Ms. Langner, I'm not sure if you mentioned this to the jury, but can you tell them what your academic background is?

A.    Sure.  I have a degree in computer science from Carnegie-Mellon.

Q.    Okay.  So we're talking about technically how conversion measurement occurs.  How does Google, or any conversion measurement company, know that the device that clicked burger ad in Step 1 is the same device that later downloaded the app?

A.    Yeah.  There -- there's a device identifier that can be used for advertising on the Apple phones.  It's called an IDFA. On Android phones, it's called AdId.

Q.    Okay.  So you said on Apple phones, or iPhones, the device identifier is called IDFA.  What does that stand for?

A.    Identifier for advertising.

Q.    And on Android devices, it's called AdId; is that right?

A.    Correct, advertiser ID.

**Q.** Advertiser ID.

For both AdId and IDFA, what do these identifiers look like?

**A.** These are random strings and a random generated string of numbers and letters.

**Q.** Are they tied to anyone's name?

**A.** No.

**Q.** Are they tied to anyone's email address?

**A.** No.

**Q.** Are they tied to anyone's phone number?

**A.** No.

**Q.** Are they tied to anyone's home address?

**A.** No.

**Q.** Are they tied to anyone's billing address?

**A.** No.

**Q.** Are these numbers resettable by the user?

**A.** Yes.  The users can reset them at the device level.

**Q.** What does it mean for an identifier to be resettable?

**A.** It means that the random numbers and letters that were generated the first time for the ID, you basically get a new one.

**Q.** Ms. Langner, back to the demonstrative.

How might Google -- let's say that that burger app is on an Android device and Google can see the AdId.  How does Google determine that the device that clicked that ad in Step 1 is the

same device that later downloaded the app in Step 3?

A.    The AdId in Step 1 would need to match the AdId in Step 3.

Q.    Can the download of the app occur days or even weeks after the ad is clicked?

A.    Yes.

Q.    And Google doesn't get paid anything extra for that download; right?

A.    No.

Q.    Tell us about these companies that are on the far right under "Conversion Measurement."  Who are these entities?

A.    Yeah.  So you can see some conversion tools that advertisers can use to understand what is happening within their app.  The first two, one's called AppsFlyer; one's called Kochava.  They're very common app measurement tools that are used.  And then there's also Google Analytics, which is provided by Google as a free tool for advertisers to use.

Q.    So as you understand it, Google Analytics both can help apps understand what's happening on their apps -- right?

A.    Correct.

Q.    -- and it can also help apps measure the effectiveness of their advertising --

A.    Correct.

Q.    -- is that correct?

    What do the app advertisers, so the Nike in your example, what do they see when any of these three conversion measurement

companies tell them about conversion measurement?

**A.**   Yeah.   I can speak best to, obviously, the Google tools. So in Google, the advertiser would see an aggregated report of how many of the conversions that they care about happened. Right?   So they would see how many downloads happened in an aggregate number.

**Q.**   Do the app advertisers, so the Nike in this example, do they see individually identifiable information about a conversion?

**A.**   No.

**Q.**   Can -- can Google measure conversions on iPhones?

**A.**   Yes, pending the user settings.

**Q.**   Okay.   And I think you said that the iPhone identifier is called IDFA; is that right?

**A.**   Correct.

**Q.**   And are there certain instances when Google cannot see the IDFA?

**A.**   Yes.   In the Apple -- or in the iPhones, there is something called ATT prompt or App Tracking Transparency prompt.   This is a prompt that is shown to you the first time you open the app if the developer wants to be able to access IDFA.   And as a user, you have a choice to say that you would like the app to track you, or you could also tell the app that you do not want them to track you.

**Q.**   Now, what happens if the user selects "Ask app not to

track"?

**A.**   In the case where the user might select "Ask app not to track," Google and the developer would not be able to access the IDFA.

**Q.**   So let's go back to our example here.  If that setting is set to ask not to track, can Google determine whether the ad that's clicked in Step 1 leads to a download in Step 3 on that device?

**A.**   No, not on that device.

**Q.**   Does Google also offer the ability for users to opt out of sharing their AdId?

**A.**   Yes.  There is a setting on Android devices called "Opt out of ad personalization."

**Q.**   And if this O -- do you call it OOAP -- OOOAP?

**A.**   OOOAP, yeah.  Lots of Os.

**Q.**   Okay.

        **MR. HUR:**  Sorry.  Can we put that back up, please.

**BY MR. HUR:**

**Q.**   So if OOOAP is set to enabled, can Google determine, on an Android phone, whether or not the ad that's clicked in Step 1 is the same -- is the same device that downloaded the app in Step 3?

**A.**   No.

**Q.**   Ms. Langner, are you familiar with a term called "conversion modeling"?

**A.**   Yes.

**Q.**   What is conversion modeling?

**A.**   Conversion modeling is a method using statistics to basically make an educated guess on what might happen if we are not able to conversion -- do conversion measurement.

**Q.**   Why does Google need to make an educated guess when conversion modeling?

**A.**   There are times and instances where Google would not be able to determine at the device level -- right? -- if an ad click led to a download of an app, so we would make an educated guess to help advertisers understand how effective their ads are holistically.

**Q.**   And can Google use past conversion data to help inform the model for conversions?

**A.**   Correct.

**Q.**   Do you believe that conversion modeling is -- respects user privacy?

**A.**   Yes.

**Q.**   Why is that?

**A.**   There is -- we're basically using prior information that we understand to make an educated guess.  We're not linking back to a user in any specific way.

        **MR. HUR:**  Can we go back to G0100.

**BY MR. HUR:**

**Q.**   Ms. Langner, we were talking about this slide earlier in

your testimony.

Now, let's imagine that Nike bids 5 cents for that ad spot on ESPN and Google places that ad.  If a user's on ESPN and clicks on that Nike ad, how much does Google get paid?

A.    Google gets paid 5 cents.

Q.    And will the publisher get some portion of that?

A.    The publisher would also -- get a portion of that 5 cents, correct.

Q.    Does Google make a commission if later that same user downloads the Nike app?

A.    No.

Q.    If app developers don't pay for it, how does Google benefit from conversion measurement?

A.    Google benefits from conversion measurement by demonstrating that the ads are effective.  When advertisers see that their ads are effective, they will want to buy more ads with Google.

        MR. HUR:  Okay.  Can we go back to G0101.

BY MR. HUR:

Q.    Now, Ms. Langner, do you have a sense as to what percentage of app advertisers use AppsFlyer and Kochava?

A.    About 80 percent use a third party of some sort.  So AppsFlyer and Kochava would be what we call a third-party measurement tool for conversion measurement.

Q.    And do most app advertisers use multiple conversion

measurement tools?

A.    Yeah, they can.

Q.    Ms. Langner, would Google prefer that advertisers use Google Analytics' conversion measurement tool?

A.    Certainly we provide it so that advertisers can use it.

Q.    What are some benefits that Google sees from having advertisers use its own conversion measurement tool versus a third party?

A.    By having advertisers use Google Analytics, we can trust that the data and the user permissions are all collected properly.  We also, then, can use some of that data for ads personalization.

Q.    Now, for ads personalization, does the sWAA setting have to be on?

A.    For the data to be stored, the sWAA setting has to be on. There are also additional controls that users have to control their overall privacy.

Q.    So is it true that with sWAA off, Google ads cannot use this analytics data for ads personalization?

A.    When sWAA is off, Google does not store any of the data that is collected for ads personalization.

Q.    Now, you mentioned these third-party apps, and I know that you said Google prefers to -- that advertisers use Google Analytics.  Do third-party advertisers use these third-party conversion measurement tools?

**A.**    Yes.

**Q.**    Do they -- might they prefer to use AppsFlyer or Kochava instead or in addition to Google Analytics?

**A.**    Yeah.  What we see is that many people choose to use a third party in addition to Google Analytics, and that's really so that they can compare how their ads on Google are performing to other networks, such as on Facebook or on TikTok.

**Q.**    So can you explain that a little further?  Why would an advertiser like Nike need AppsFlyer or Kochava to understand ad performance on Facebook, for example?

**A.**    Yeah.  So Nike would use a third party.  If you use the report card example, Nike may want to have a third party validate the grading, if you will, of the ad performance.  So it's just a way to basically have an independent party verify how the ads are performing.

**Q.**    Okay.  So Google serves ads on the Google Ads network; right?

**A.**    Correct.

**Q.**    And Google Analytics only measures ads on the Google Ads network; right?

**A.**    Correct.

**Q.**    So in your report card example, it sounds like you're saying if Google Analytics provides the measurement, it's like Google grading its own ads performance.  Is that fair?

**A.**    Yes.  We obviously believe we're very trustworthy, but

it's very natural to want to have a third party take a look and see what they say.

Q.   So Nike might want AppsFlyer, for example, to check whether Google Analytics is accurately reporting how well the ad is performing; is that fair?

A.   Yeah.  It's a way to do that and also compare against other ad networks.

Q.   So I want to ask you about that too.

So because Google Analytics is only measuring ad performance on the Google ad network, what does AppsFlyer do for Nike, for example, on the Facebook ad network?

A.   A very similar process to what we described that happens on Google also happens on Facebook and other ad networks.

Q.   And, again, Ms. Langner, what percentage of app advertisers use AppsFlyer and Kochava?

A.   All the various -- there's more than AppsFlyer and Kochava.  About 80 percent of advertisers are using some sort of third party.

Q.   Are AppsFlyer and Kochava the biggest third party?

A.   They are by far the biggest.

Q.   Okay.  The jury has seen this term "AAP."

A.   Correct.

Q.   What is AAP?

A.   AAP stands for app attribution partners.  So they are the trusted partners that Google has decided to partner with to

enable third-party conversion tools to integrate with App Campaigns.

(Reporter interrupts to clarify the record.)

MR. HUR:  There's that confusion again, "app" versus "ad."

BY MR. HUR:

Q.   Okay.  Ms. Langner, does Google tell advertisers that they can use third-party app provide -- strike that.  Let me start again.

Does Google tell advertisers that they can track conversions using third-party measurement providers?

A.   We do.

MR. HUR:  I'd like to show the witness what's been marked as G693.

THE COURTROOM DEPUTY:  693?

MR. HUR:  693.

THE COURTROOM DEPUTY:  Has that been admitted?

MR. HUR:  It has not been admitted, so please just show the witness.

BY MR. HUR:

Q.   Ms. Langner, are you familiar with this document?

A.   Yes.

Q.   Where does it come from?

A.   This is a document in the Google Help Center.

Q.   As CEO of App Campaigns, is this content that you would be

familiar with and have approved?

**A.**   Yes.

         **MR. HUR:**  Your Honor, we'd like to admit Exhibit 693.

         **MR. DAVID BOIES:**  Objection, Your Honor.

         **THE COURT:**  And the objection is?

         **MR. DAVID BOIES:**  Foundation and hearsay.

         **THE COURT:**  Well, what's your response to that?

         **MR. HUR:**  Your Honor, she's laid the foundation.  This is a publicly available document reflecting how the analytics product, the App Campaign works.

         **THE COURT:**  And the hearsay objection?

         **MR. HUR:**  Your Honor, this is for non-hearsay purposes, just to see -- show what third-party advertisers are shown.  It's not for the truth.

         **THE COURT:**  Well, it also would be a business record, I assume.

         **MR. HUR:**  It could also be a business record, yeah.

         **THE COURT:**  I'll admit 693.

     (Trial Exhibit G693 received in evidence.)

         **THE COURT:**  Is this -- yes?

         **A JUROR:**  Can I request a break?

         **THE COURT:**  Yes.  In fact, you read my mind.  I was about to say that.

     Members of the jury, we're going to take our morning break.  Remember my admonitions not to discuss this amongst

yourselves or with anyone else.  We'll come back at 10:30.

(Recess taken at 10:28 a.m.)

(Proceedings resumed at 10:35 a.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:**  Do you have any issues to take up before we bring in the jury?

**THE COURT:**  No.

(Laughter.)

**THE COURT:**  Bring them out.

**MS. AGNOLUCCI:**  Your Honor, may I raise an issue at sidebar before we bring the jury in?

**THE COURT:**  Well, let's just not bring the jury in.

**MS. AGNOLUCCI:**  Or, yes.

**THE COURT:**  Tell him to hold off.

(Pause in proceedings.)

**THE COURT:**  All right.  Go ahead.

**MS. AGNOLUCCI:**  One of our witnesses, Professor Donna Hoffman, is severely immunocompromised.  She's wearing a mask, and she needs to wear her mask to testify.  She has a life-threatening condition.

I just wanted to check in because I understand that -- I haven't talked to any members of the plaintiffs' team but that there's maybe some kind of illness that could be COVID.  So could we clear that up because --

**THE COURT:**  Someone has COVID?

MS. ANDERSON:  Your Honor, I'll just --

MS. AGNOLUCCI:  I understand that Alison --

MS. ANDERSON:  Mr. Santacana and I had just talked a little bit beforehand.  He asked if there's any chance that anyone on our team had any illnesses, and I said there is, but we're not aware that it's COVID in particular.  But --

THE COURT:  Okay.  Well, I hope people are -- if they think they've got something, they're testing, I'd like to know.

But, so the witness will be here.  Those folks are there.  Are you asking for us to do something?

MS. AGNOLUCCI:  I literally heard about this ten seconds ago.  I wanted to understand whether someone had taken a test, whether the issue is that people are sick and haven't tested.

I think it might make sense for people who are feeling sick to wear a mask while she's testifying, but I'm relying on the good faith of counsel here because we have someone with a life-threatening condition.

THE COURT:  I understand.  If there's somebody -- if it's somebody on your team who's not feeling very well, perhaps they can just -- are they necessary to be here for that witness?

MR. CARMODY:  Well, I think maybe folks are talking about me, Your Honor.  I think I just last night -- I'm dehydrated.  I was very much dehydrated.  And it's not COVID.

You know, I think after some rest, my body feels better, but I don't believe it's COVID or anything of the sort.

THE COURT: Okay. Well, okay. I mean, is it -- perhaps, Mr. Carmody, do you need to be here for that witness?

MR. CARMODY: I mean, I can certainly sit in the back, Your Honor.

THE COURT: Yeah, why don't you sit in the back.

MS. AGNOLUCCI: Thank you. We appreciate that.

MR. DAVID BOIES: And, Your Honor, I have a little bit of a cold, as I think may be a little apparent. I don't think it's anything more than that. But I'd be happy to wear a mask if that would assist.

MS. AGNOLUCCI: I would appreciate it --

MR. DAVID BOIES: Sure.

MS. AGNOLUCCI: -- if you think there's any chance because --

MR. DAVID BOIES: I'm pretty sure it's not COVID.

MS. AGNOLUCCI: My apologies. I'm stepping back from the microphone for a reason.

I would appreciate it if you would wear a mask if you think it could be. Thank you.

THE COURT: Yeah. And I assume you'll -- if it gets worse --

MR. DAVID BOIES: I don't have one.

THE COURT: If it gets worse, you'll -- we have lots

of masks.

If it gets worse, you'll test and all of that.  You seem to be hale and hearty, Mr. Boies.  And we all have -- at times you get colds.

So do you want to say -- do you want to explain -- when the witness gets called, do you want to ask a question, or it's up to you?

MS. AGNOLUCCI:  Yes, Your Honor, I do plan to ask her to explain to the jury --

THE COURT:  Why she's wearing a mask?

MS. AGNOLUCCI:  -- why she has to testify masked.

THE COURT:  Would you like a mask?  I can give you one.

MR. DAVID BOIES:  I'd be happy to wear one.

THE COURT:  Okay.  And are you the examiner?  You will be the person?

MR. DAVID BOIES:  No, I'm not.

MS. BONN:  No.  I will be, Your Honor.

THE COURT:  All right.  Well, then you can wear a mask.  That's even better then.

Okay.  But you're feeling fine?

MS. BONN:  I'm feeling great.

THE COURT:  Excellent.  Wonderful.

(Laughter.)

THE COURT:  Okay.

MR. DAVID BOIES:  Now, before we bring the jury in, since we've stopped for a second --

THE COURT:  Yes.

MR. DAVID BOIES:  -- can I ask the Court to consider an instruction about the use of this exhibit?

THE COURT:  Which exhibit?

MR. DAVID BOIES:  The exhibit that he says he's introducing not for the truth of the matter asserted, but only to show what app developers were told.

THE COURT:  Well, if you're introducing it -- I inquired as to whether or not you could -- it might qualify as a business record, but he didn't go through the when it was created and how it was kept and all that.

But if you're only offering it for how it's -- how people react to it or not for the truth of the matter asserted, I can give that hearsay limiting instruction.  Oftentimes, my impression, it's lost on the jury, but I can do it if you would like.

MR. DAVID BOIES:  I would like that.

THE COURT:  You're offering -- you're not offering it for the truth of the matter asserted?

MR. HUR:  Your Honor, I wasn't offering it for the truth, so that's fine.

THE COURT:  All right.  So I'll give the limiting instruction, and we'll see if there's any sort of sense of

recognition on the part of the jury, but I'll try.  I'll do my best.

MR. DAVID BOIES:  I appreciate it, Judge.

THE COURT:  All right.  Can we bring them out now?  Yes?  Okay.

MR. HUR:  Yes.

THE COURT:  Oh, and when we bring them back, I'll get R.J. to get a mask.

(Proceedings were heard in the presence of the jury.)

THE COURT:  The jury is present.

Sorry, again, for the slight delay, but we had some issues to resolve.

As you begin, Mr. Hur, on the exhibit that was -- that we're on right now -- which is Exhibit Number 693; is that correct?

MR. HUR:  Correct, Your Honor.

THE COURT:  Yes.

693 has been admitted for the limited purpose that it is not being offered for what's called the truth of the matter asserted; in other words, that it's not being offered that these -- the language here is true.

What it's being offered for is for you to understand how others react to the document, how they understand it.  But Mr. Hur is not offering it to you to say, "We want to use this to prove that the language in here is true and accurate."  He's

offering it for this other purpose.

Okay.  Go ahead, Mr. Hur.

MR. HUR:  Thank you, Your Honor.

BY MR. HUR:

Q.   You see on the screen here, Ms. Langner, the document titled "Track app conversions with third-party app analytics"?

A.   Yes, I do.

Q.   Does Google tell advertisers that they can use third parties to track their conversion measurement or track their conversions?

A.   It does.  That's the reason for this Help Center document.

Q.   Okay.  And why does Google tell advertisers -- is it up on your screen still?

A.   It is not up on my screen.

Q.   Why does Google tell advertisers that they can use third parties to measure conversions on the Google Ads network?

A.   We understand that advertisers may want to use a third-party analytics tool, and we want to inform them how they can integrate that tool to be used with Google App Campaigns.

Q.   And before we took the break, you were mentioning that Kochava and AppsFlyer and other third-party measurement providers have about 80 percent of the conversion tracking market; is that right?

A.   80 percent of advertisers are using them in some way, yes.

Q.   Okay.  So what would happen if Google -- what would happen

if advertisers could not use Google Analytics for Firebase to measure conversions?

A.   They would use one of the third-party tools to measure conversions, which they are doing today.

Q.   Do you think Google would lose money if advertisers couldn't use Google Analytics to measure conversions?

A.   No.

Q.   Why not?

A.   They would simply use the third party to measure the conversions and to see how effective their ads are performing on Google.

Q.   Ms. Langner, you've used this phrase "attributable" before.  Do you understand what "attributable" means in the context of app conversions?

A.   Yes.

Q.   What does it mean?

A.   It means that the analytics tool has confirmed that the ad click has ultimately led to a conversion event that the advertiser cares about.

Q.   And, again, does that later download, the conversion, does Google get paid for that download?

A.   No.

Q.   Do you recall the percentage of ad revenue attributable to Google Analytics for Firebase over time?

A.   It's been changing.

Q.   Okay.  I want to show you a document to see if that can refresh your recollection as to the specific numbers.

Only for the witness, please.

Ms. Langner, I want to put up Interrogatory Number 17 and the response to that.

MR. HUR:  If you could pull up page 16, lines 3 through 8.  And this is just for the -- okay.  Just for the witness.

BY MR. HUR:

Q.   Ms. Langner, does this refresh your recollection as to what the percentage of App Campaign ad revenue that was attributable to conversion measurement for Google Analytics for Firebase in 2022?

A.   Yes.

Q.   And what is that percentage?

A.   In October 2022, it looks like it was about 55 percent.

Q.   Now, plaintiffs' damages expert yesterday told the jury that if Google says 55 percent of ad revenue is attributable to Google Analytics for Firebase, that means that 55 percent of all the ad revenue is because of Google Analytics for Firebase ability to measure conversions.  Do you agree with that?

A.   No, I don't.

Q.   Why not?

A.   What this means, when we say "revenue attributed to," means that 55 percent of the revenue --

**MR. DAVID BOIES:**  Objection, Your Honor.  This is an interrogatory answer given by Google's lawyers to us.  She is now interpreting what it means.

**THE COURT:**  Well, the question was whether or not this refreshed her recollection.

**MR. DAVID BOIES:**  Then she said, "Yes," but then the most recent question is what does this mean -- what it means.

**THE COURT:**  All right.  Can you rephrase this, Mr. Hur?

**MR. HUR:**  Sure.

BY MR. HUR:

Q.   Ms. Langner, this refreshed your recollection as to whether -- what the percentage of App Campaign ad revenue was attributable to conversion measurement --

A.   Yes.

Q.   -- by Google Analytics?

A.   Yes.

Q.   Ms. Langner, what does it mean -- you can take that down.

Ms. Langner, what does it mean for 55 percent of ad revenue to be attributed to Google Analytics for Firebase conversion measurement?

A.   It means that Google Analytics confirmed that 55 percent of the revenue from ad clicks ultimately led to a conversion event.

Q.   This language is a little confusing, Ms. Langner.  Can you

give us an example to try to clarify that?

A.   Sure.  Let's imagine that an advertiser spent a hundred dollars on ads and $55 ultimately led to clicks -- right? -- that they paid Google for.

Google would confirm that those $55 of ad clicks did ultimately lead to the event that the advertiser was trying to measure; so, for example, an app download.

Q.   Okay.  So that means Google Analytics for Firebase confirmed that $55 worth of ad clicks that were already paid later led to conversions; is that right?

A.   Correct.

Q.   And did Google get paid anything extra for confirming that?

A.   No.

Q.   Could a third party, like AppsFlyer, also confirm the same $55 of ad clicks led to conversions?

A.   Yes.

Q.   Now, if Google isn't getting paid for conversion measurement, what is the real value add to Google Ads for Google Analytics for Firebase data?

A.   Google Analytics for Firebase helps provide data to perform ads personalization.

Q.   The jury's heard a lot about ads personalization in this case.  And just to make it clear, Ms. Langner, with -- if a user has sWAA off, can Google Ads use that analytics data for

ads personalization?

**A.**   When the user has sWAA off, that data that comes from GA4 is not stored, and Google will not use that information for ads personalization.

**Q.**   Why not?

**A.**   It's never stored against the identifier, and so we want to respect the user's wishes and we don't use that data.

**Q.**   So when sWAA is on and Google can use the data for ads personalization, if other settings are also on, why is that so valuable to Google?

**A.**   Yeah.  Google wants to be able to show users the most relevant ads.  So, for example, you know, if the user had clicked on the Nike ad, we know that they might be interested in sports attire; and so for future ads, maybe we'll show a Lululemon ad, for example.

**Q.**   Ms. Langner, I want to show you a document that's been marked for identification as PX419.  It has not been admitted yet.

     If you could scroll to the next page.

     Ms. Langner, do you recognize this document?

**A.**   Yes.

**Q.**   What is it?

**A.**   This is the P&L for the DVA App Promo product.

**Q.**   How are you familiar with the numbers that are reflected in this document?

**A.**   It is my job to drive and to grow these numbers.

**Q.**   Ms. Langner, since your deposition, have you confirmed where these -- this document came from?

**A.**   Yes.

**Q.**   Where does it come from?

**A.**   From the finance backend tables that we have.

**Q.**   Do you regularly rely on data pulls from the finance backend in the course of your duties as the CEO of App Campaigns?

**A.**   Correct.  We review our overall numbers very regularly.

**Q.**   Does this reflect the global P&L for App Promo for the periods 2017 to 2020?

**A.**   Yes, for DVA App Promo.

         **MR. HUR:**  Your Honor, we move to admit Exhibit 419 into evidence.

         **MR. DAVID BOIES:**  May I inquire on voir dire, Your Honor, briefly?

         **THE COURT:**  Well, on this one, okay.  Go ahead.

                    **VOIR DIRE EXAMINATION**

**BY MR. DAVID BOIES:**

**Q.**   Was this document maintained in the ordinary course of business, or was this prepared for this litigation?  This document, this particular document.

**A.**   To the best of my understanding, we certainly produced this for -- for this case, but we do obviously regularly

produce P&Ls as part of our business.

Q.   But this is not one of the regularly produced P&Ls; correct?

A.   For -- for what purpose?

Q.   What I'm saying is:  This was produced to give us information in this lawsuit; correct?

A.   This document, in this form, was produced to give you information.

Q.   And this was, somebody other than you took information from some database or document and prepared this; correct?

A.   Yes.  But this is reported regularly to show the overall revenue for DVA App Promo and to show the operating expenses and the machine costs for the business.

Q.   But my point is, you regularly keep this information -- you regularly keep information, but somebody else took that information and prepared this for the lawsuit; correct?

A.   I mean, we run a business, sir, so this is information that we need to understand to run a business.

         THE COURT:  He's asking whether or not -- does this exist in this form in the records of Google, or was it generated for purposes of this litigation?

         THE WITNESS:  I believe this data exists in this form for running a business.

         THE COURT:  Okay.

         MR. DAVID BOIES:  I just want to be clear, Your Honor.

BY MR. DAVID BOIES:

Q.   This piece of paper right here, this was prepared for this litigation.  It's from document -- it's from evidence or data that you say is kept in the regular course of business, but this piece of paper was put together by somebody for purposes of this litigation; correct?

A.   This piece of paper and, obviously, a lot of pieces of paper that have been generated are -- have been created for this case, correct.

Q.   And this is one of them?

A.   Sure, this is one of them.

Q.   Okay.

A.   I mean, I'm not a lawyer, so --

        THE COURT:  Just, there's no question.

     Yes, do you want to respond to the objection?

        MR. HUR:  Yes.  Ms. Langner -- may I ask her one follow-up?

        THE COURT:  Yes.  Go ahead.

                    DIRECT EXAMINATION   (resumed)

BY MR. HUR:

Q.   Ms. Langner, is this P&L the same as the P&L used in the regular course of business at Google?

A.   Yes.

        MR. HUR:  Your Honor, we move to admit 419.

        MR. DAVID BOIES:  Your Honor, this -- there may be

P&Ls like this in the regular course of business.  They didn't bring those.  If they bring those, I don't have any objection to them.  What they're doing is they're using one that was prepared for this litigation and by somebody who's not on the stand and who I can't cross-examine.

THE COURT:  Well, I think the substance of this document is material that's derived from their business records, and so I hear your objection.  Overruled.

It will be admitted.  419 is admitted.

(Trial Exhibit PX419 received in evidence.)

MR. HUR:  Thank you, Your Honor.

BY MR. HUR:

Q.   Ms. Langner, can you tell the jury what is reflected in Exhibit 419?

A.   Yes.  This is the revenue that is generated on the ad network for App Promo, or another word we use for App Campaigns.

Q.   Ms. Langner, can you please pull the microphone just a little bit closer to you.

A.   Yeah.  Sorry.

Q.   Thank you.  I just want to make sure the jury can hear.

So, Ms. Langner, what is reflected in Row 27?

A.   Row 27 shows the booked revenue or the amount of money that was collected from the ad clicks and ad interactions on third-party apps promoting websites -- or promoting

App Campaign ads.

Q.    Okay.  Ms. Langner, what is shown in line 28?

A.    Line 28 is something called TAC.  That is traffic acquisition cost.  That is effectively the money that we pay to publishers for giving the space on their app.  So in the ESPN/Nike example we used earlier, this would be the money that we gave to ESPN.

Q.    Ms. Langner, what is reflected in Row 30?

A.    Row 30 is the net revenue, so the amount of money that Google collected.

Q.    And if you look towards the bottom of the screen, Ms. Langner, what is reflected in Row 120?

A.    120 shows the operating profit.  So this is the amount of money that Google collects after we pay out publishers and after we calculate and take away the machine costs to run our business, along with all the different operating expenses, such as the salaries of all the engineers that helped develop the product.

Q.    Ms. Langner, as the CEO of App Campaigns, which row on this screen in Exhibit 419 would you rely upon to determine the profit of the App Campaigns business?

A.    Sorry.  Can you repeat that?

Q.    As the CEO of App Campaigns, which line on this spreadsheet would you rely upon to determine the profit for the App Campaigns business?

**A.**   The operating profit, so line 120.

**Q.**   Ms. Langner, if Google were to lose a lot of revenue from App Promo campaigns, what would likely happen to the operating expenses?

**A.**   I think over time, if Google was to continue losing money on the product, like any business, we would want to reduce the costs, and so you would expect us to try to lower those operating expenses.

**Q.**   How might Google do that?

**A.**   We may do that by, unfortunately, laying off some of the folks that are working on the product or trying to lower our machine costs.

**Q.**   If Google isn't -- what do you mean by lower machine costs?

**A.**   That would be trying to use the machines more effectively in some way.

**Q.**   To use less energy or what is it?

**A.**   Yeah.  To use less energy or less resources or cores.

**Q.**   What is a core?

**A.**   Core is sort of the core -- is the way that we think about how -- the aspect that processes all the code.

          **MR. HUR:**  We can take that down.

**BY MR. HUR:**

**Q.**   Ms. Langner, I want to show you a document that's been marked for identification as Exhibit 591.

**A.**    (Witness examines document.)

**Q.**    Ms. Langner, what is this document?

**A.**    This is a P&L for the Display Buying Door for App Promo for 2021.

**Q.**    And similar to the last document, is this the document that contains numbers that you would use as the CEO of App Campaigns?

**A.**    To understand how the ads are performing on the ad network, yes.

**Q.**    Was this information derived in the same way as Exhibit 419 -- as the information in Exhibit 419?

**A.**    Yes.

        **MR. HUR:**  Your Honor, we move to admit Exhibit 591.

        **MR. DAVID BOIES:**  Same objection.

        **THE COURT:**  Very well.  It also could come in as a 1006 summary.

        **MR. HUR:**  It could as well, Your Honor.

        **THE COURT:**  591 is admitted.

    (Trial Exhibit G591 received in evidence.)

**BY MR. HUR:**

**Q.**    Ms. Langner, similar to the document we just saw in Exhibit 419, can you please tell the jury what is reflected in Row 27 of this document?

**A.**    Row 27 shows the operating profit -- sorry -- Row 27 shows the booked revenue.  So this is the amount of money that Google

received from the ad interactions, the clicks, for example.

Q.   And, again, what is reflected in Row 28?

A.   Row 28, again, is the traffic acquisition costs, so the money given to publishers to -- for the space on their app.

Q.   And then what is reflected in Row 30?

A.   Row 30 would be the amount that Google takes in after paying out publishers.

Q.   Finally, Ms. Langner, what is reflected in Row 118?

A.   118 now would be the operating profit, so the amount of money that is made after we pay out publishers and after we consider all the costs to run the business.

Q.   And, Ms. Langner, as the CEO of App Campaigns, which line do you rely upon to determine the profitability of the App Campaign business?

A.   The operating profit line, which would be 118.

Q.   Ms. Langner, yesterday the jury was shown a demonstrative from the plaintiffs' damages expert, Mr. Lasinski, and I want to show it to you.

     MR. HUR:   Could you put up Slide 15 from the Lasinski presentation?

BY MR. HUR:

Q.   Ms. Langner, you'll notice that this slide reflects a very big jump in revenue in 2022 and 2023.  Does that make sense to you?

A.   No, this does not make sense to me.

**Q.**   Why not?

**A.**   That really big jump.  In my course of running the business, we have never seen that kind of growth levels.

**Q.**   Do you have a theory as to why the numbers reflected in those two tall bar graphs in dark green, what those reflect?

**A.**   That would be the global App Promo revenue, or the global revenue that is made from Google App Campaigns across all of the surfaces that Google App Campaigns shows ads, including AdMob, like we've talked about; but this would also include the ad revenue that comes from Google.com or what is commonly referred to as Google Search.  It also shows the ad revenue from YouTube and also the ad revenue from ads shown on Google Play.

**Q.**   Ms. Langner, do you remember, off the top of your head, the amounts of money that are captured by those categories that are not based upon just DVA App Promo revenue?

**A.**   The total amount for App Promo in 2022 would have been around the 18 billion range.

**Q.**   Okay.  And do you remember, off the top of your head, the breakdown?

**A.**   AdMob is about 30 percent, I want to say, give or take, but there's a wide confidence range there.

**Q.**   Okay.  Let me show you a document that's been previously marked as PX421.

        **MR. HUR:**  Can we flip to the next page.  It's just for

the witness.  And can we go to the follow-up summary tab.

BY MR. HUR:

Q.   Ms. Langner, does this refresh your recollection as to what this spreadsheet is about?

A.   Yes.

Q.   And what is it about?

A.   It is pulling, from our finance backend tables, the global revenue for App Promo or, as I said earlier, our name for App Campaigns across Search, display, which includes AdMob and Play and YouTube.

MR. HUR:  Can we pull up the next tab, "Follow-up Output"?

BY MR. HUR:

Q.   Ms. Langner, does this refresh your recollection about the actual numbers that appear to have been reflected in those two dark green bar graphs?

A.   Yes.

Q.   And what does -- what does this show?

A.   This shows the revenue broken out by DVA App Promo, which, as I said, was display, which includes Play and AdMob.  It also shows Search, Google.com, and it shows YouTube App Promo revenues.

Q.   So why are, for example, YouTube and Search App Promo revenues not included in DVA App Promo revenue?

A.   DVA App Promo, and specifically the AdMob portion of

DVA App Promo, is the revenue that we generate from apps not owned by Google, so what we would call third-party apps.

MR. HUR: Can we put up Lasinski 15 again.

BY MR. HUR:

Q. Ms. Langner, are there any other errors that you notice on this slide, other than the two dark green bars on the right?

A. So other than the two dark green bars, I'll also point out that, to the best of my recollection, if these numbers are pulled from the P&L that we shared earlier, those P&L numbers are global numbers.

So you'll see in that table it's marked as "U.S. Revenue." Our P&Ls are produced at the global level and not at a country level, so those revenue numbers, that green -- that light green box should also be marked as global revenue.

MR. HUR: Thank you. You can take that down.

BY MR. HUR:

Q. Ms. Langner, I just want to have you summarize a couple of key points for the jury.

A. Sure.

Q. If a user has sWAA off, does Google use -- does Google Ads use their app activity data to personalize ads?

A. No.

Q. If a user turns sWAA off, can Google still use their IDFA or AdId to measure conversions?

A. Yes, but with de-identified data, so data that is not

associated with the user in any way.

Q.   And I think you testified earlier that the IDFA and the AdId are not tied to any personal identity; is that right?

A.   Correct.

Q.   Ms. Langner, if Google were prohibited from allowing advertisers to use Google Analytics for Firebase data to measure conversions, how would Google track conversions?

A.   Google would continue to partner with the third-party measurement tools to enable advertisers to track conversions so that they can understand how the ads are performing.

MR. HUR:   Thank you, Ms. Langner.

I have no further questions.

THE COURT:   Mr. Boies.

MR. DAVID BOIES:   Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. DAVID BOIES:

Q.   Good morning.

A.   Good morning.

Q.   We haven't met, but you know I'm David Boies and I represent the plaintiffs.

A.   It's nice to meet you, Dave -- Mr. Boies.

Q.   Nice to meet you.

You testified that the numbers in these P&Ls were global numbers; correct?

A.   Sorry.  Can you say that again?  I was distracted with the

binders.

Q.    Sure.

You testified that the numbers in these P&Ls that you provided were global numbers, not U.S. numbers?

A.    Correct.  The P&Ls are produced at a global level.

Q.    Now, let me take the P&L for 2021.

Who told you that these numbers were global numbers?

A.    The finance team.

Q.    The finance team told you they were global numbers?

A.    And also, to the best, I have an understanding of how much revenue is being made across the product.

Q.    And there were two distinctions that you made.  One was App Promo revenue between U.S. and global, and the other was App Promo that came from third-party apps as opposed to other sources --

A.    Correct.

Q.    -- correct?

A.    Correct.

Q.    Now, we had a document that we used with the last witness.  See if I can find that.

It was Exhibit 232, which is now in evidence.

MR. DAVID BOIES:  Can we put back up 232, and page 4 in particular.

BY MR. DAVID BOIES:

Q.    This was a document that we showed before and was admitted

with the last witness, and there's a reference here to

[as read]:

          "Last year Google" -- last year would have been

     2018 -- "generated 6.5 billion in app promo

     revenue...."

     Do you see that?

A.   Sorry.  What year did you say?

Q.   Do you see the highlighted?

A.   Yes.

Q.   Last year?

     And just for context, if we go to the very first page of

the document, this is February of 2019.  Do you see that?

A.   Yes.

Q.   And so this would have been 2018; is that correct?

A.   That is correct.

Q.   And it says Google generated 6.5 billion in App Promo

revenue?

A.   Correct.

Q.   And is it your understanding that that was for all

App Promo, whether it was third-party apps or some other

source?

A.   I would need to go back to double-check.  We are talking

many years back.  But that seems within range.

Q.   That seems what?

A.   Within the range.

**Q.** Within the range for?

**A.** App Promo global revenue on App Campaigns across all the various properties that Google would have served ads.

**Q.** And when you say all the different properties, you mean Search and YouTube and third-party apps; is that right?

**A.** Correct.

**Q.** Okay. Now, about what percentage of this was for third-party apps?

**A.** I believe, like I was saying earlier, about a third, or 30 percent or so.

**Q.** So about a third of the App Promo revenue.

Now, with respect to the ads that are served on App Promo campaigns, on the Web, or on YouTube, some of those are converted in an app; correct?

**A.** Correct.

**Q.** And what percentage of those are converted in an app?

**A.** Can you define what you mean by "in an app"? And, also, are we referring to App Campaigns?

**Q.** I'm talking about third-party apps, and what I'm asking you is: What you've told us is about revenue that is served on an app and converted in an app; correct?

**A.** Correct, ultimately leading to installs, first opens, and in-app purchases and other purchases in apps.

**Q.** Now, what I'm asking you about is, there are ads that are served on YouTube or Search that are then converted by somebody

using a third-party app; correct?

**A.**   That would lead to, like, an install driven by App Campaigns?  Is that what you're asking?

**Q.**   I'm simply asking, sometimes apps convert for an advertisement that was not served in the third-party app but was served in YouTube or Search; correct?

**A.**   Yeah, correct.

**Q.**   Okay.

**A.**   So App Campaigns can serve ads on the various different properties.  So we can show an app install ad on Google.com or on YouTube, for example, and that would be outside of what I would consider the AdMob network.

**Q.**   The point I'm trying to make is simple, I think.

**A.**   Okay.

**Q.**   When you're serving ads, you will serve those ads in an ad campaign on various of what you call properties --

**A.**   Correct.

**Q.**   -- of apps, third-party apps, Search, YouTube; correct?

**A.**   Correct.

**Q.**   Now, those ads are sometimes converted in what you call a property other than the property that served the ad; correct?

**A.**   What I mean -- when I say "conversion event," I mean the event that the advertiser is tracking.  And they track important events within their app.  So it's always the advertiser's app that I'm talking about in the context of

App Campaigns when we talk about conversion events.

Q.   I'm sorry.  I didn't understand that.

     My question was:  Sometimes an ad is served on what you call a property?

A.   Mm-hmm, correct.

Q.   And converted in another of what you call a property, a different property; correct?

A.   So can you define what you think a conversion is?

Q.   Well, what we had defined before is that an advertiser will sometimes define an event --

A.   Correct.

Q.   -- that they want to achieve.

A.   Mm-hmm.

Q.   It could be the downloading of something.  It could be the purchase of something.  It could even be coming back to the site.  But it's an event that the advertiser wants to achieve.

A.   Correct.

Q.   And that's called a conversion event?

A.   Correct.

Q.   Now, what I'm saying is that sometimes the conversion event for an ad is on a different property than the property that it was served on; correct?

A.   I think, by definition, the conversion -- so maybe I can back up a little bit.

Q.   I think this is a yes-or-no question, and I've got limited

time.  So if you could respond to that, it would be helpful.

**A.**   Well, I'm trying to -- I feel like we're talking about different things, Mr. Boies, and so I really want to make sure that we're talking about the same thing here.

When the ad -- Google App Campaigns shows an ad.  We show it on a property.  So, for example, Nike, we can show the Nike ad on Google.com.  We can show the Nike add on AdMob.  Right?

The conversion would happen within the Nike app.  So when you download, then, the Nike app, you could make a purchase and buy some snazzy new shoes, and that conversion happens within the app.

It has -- it is separate from where we served the ad, by definition, because the advertiser would be a different app than the publisher app.

**MR. DAVID BOIES:**  Your Honor, could I ask for an instruction to try to keep to my question?

**THE COURT:**  Yes, although this back-and-forth seems to be your ships that are passing in the night.

**MR. DAVID BOIES:**  Exactly.

**THE COURT:**  There needs to be some -- I don't -- please try to answer the question; but if you don't understand the question, you may say, "I don't understand."

**BY MR. DAVID BOIES:**

**Q.**   And I'll rephrase.  If you don't understand the question, I'll rephrase it.

Now my question is:  You have said that there are what you call properties in Google, YouTube, Search, third-party apps, and sometimes you will serve ads all across those properties; correct?

A.    Correct.

Q.    And those ads will sometimes be converted; correct?

A.    The ad will lead to a conversion event.

Q.    Yes.  And sometimes that conversion event will be on a property different from the property that served the ad; right?

A.    By definition.

Q.    Well, sometimes the converted -- the conversion could be -- you could have an ad on an app and it could be converted in that app; correct?

A.    App Campaigns is trying to get users to a -- to the app that the advertiser wants.  So by definition, the advertiser would not be the same app as the publisher app.  So the event would not happen within the publisher app.

Q.    But the advertiser --

THE COURT:  Wait, wait.  Wait a minute.

Okay.  Ask a question.

If you don't -- if you think these questions don't make any sense, you can just say, "They don't make any sense," and then the job of the lawyer is to try to --

THE WITNESS:  Okay.

THE COURT:  -- understand, and then we go from there.

Go ahead.

THE WITNESS:  I apologize.  I'm trying to be helpful.

THE COURT:  No, no, no.  That's fine.

Go ahead.

BY MR. DAVID BOIES:

Q.  There was an example given to the jury before of an ad for Nike --

A.  Sure.

Q.  -- that was published on ESPN.

A.  Correct.

Q.  And that ad, which was published on a third-party app, could also be converted in a third-party app; correct?

A.  I don't believe I understand this question.

Q.  Okay.  Nike has apps; correct?

A.  Yes.

Q.  Okay.  And a Nike app would be a third-party app; correct?

A.  Correct.

Q.  ESPN is a third-party app; correct?

A.  Correct.

Q.  And so they could click on an ad on ESPN, a third-party app?

A.  Correct.

Q.  And they could then convert it in the Nike ad, a third-party app; correct?

A.  You mean "they" being the user?

**Q.** The user could.

**A.** Yes.

**Q.** Okay. And that would be a conversion event for the Nike ad on ESPN in the Nike third-party app; correct?

**A.** It is a conversion for Nike that happened from an ad that was shown on the ESPN app.

**Q.** And both of those are third-party apps?

**A.** Correct.

**Q.** And so you have an ad shown on a third-party app and a conversion in a third-party app; correct?

**A.** Correct.

**Q.** So you have both the showing of the ad and the conversion in the same app -- in the same, what you call, property; correct?

**A.** I -- when I say "property" in this case, I mean the publisher property. On the advertiser side, we would not call that a property.

**Q.** I thought you told me that Google Search and third-party apps were each properties; correct?

**A.** They are properties where we can show ads.

**Q.** Yes. And sometimes those ads will be converted in an app; correct?

**A.** By definition of App Campaigns, the conversion happens within an app.

**Q.** So the answer to my question is "yes"?

A.    Yes, by definition.

Q.    Okay.  Now, sometimes the app will be served in a -- the advertisement will be served in a third-party app and converted in a third-party app; correct?

A.    Yes.

Q.    Okay.  Now, when you say one-third of the App Promo revenue comes from third-party apps --

A.    When I say one-third of App Promo revenue, because App Promo revenue comes specifically from user ad interactions, I mean that one-third of the revenue from App Campaigns comes from an ad interaction within a third-party app.

Q.    When you say "ad interaction," do you mean a conversion event or do you mean the publishing of the ad or both?

A.    When I say "ad interaction," I mean an ad click, so the user clicked on the ad, or an ad view, so the user saw the ad.

Q.    And do you also mean if the conversion event occurs in the app?

A.    The conversion event has nothing to do with how Google is paid.  Google charges advertisers on the click.

        MR. DAVID BOIES:  Your Honor, I'm not asking that question.

        THE COURT:  Yeah.  Just, your counsel, Mr. Hur, can get up and clarify if he thinks it's not clear.

        THE WITNESS:  Okay.

        THE COURT:  But just try to answer Mr. Boies's

questions.

**BY MR. DAVID BOIES:**

Q.   Now, when you say about a third of the App Promo revenue is related to third-party apps, is that only when the app is shown -- or the advertisement is shown in-app?

A.   Only when the ad click or the ad view is happening within a third-party app.

Q.   So if somebody sees an advertisement on YouTube --

A.   Correct.

Q.   -- and then converts it in a third-party app, that is not included in the one-third of the total App Promo revenue; correct?

A.   Correct.

Q.   Okay.  Now, if an ad is shown on YouTube and then converted in a third-party app, is that something that you will consider a conversion event when reporting to advertisers?

A.   It shows the ad effectiveness from an ad shown on YouTube, so that is a conversion event that we would report to advertisers.

Q.   The answer to my question is "yes"?

A.   Yes.

Q.   Okay.  And the same thing would be true for an ad that was served on Search; correct?  Converted in a third-party app, served on Search --

A.   Yes.

Q.  -- same thing would be true?

A.  We would mark the conversion, yes.

Q.  Now, I thought I heard you say -- and I want to be sure. Did you say that sWAA-off data was not used to track conversion events?

A.  SWAA-off data is used in the de-identified -- with de-identified data to measure conversions.

Q.  And did I understand you to say that if that didn't happen, Google would not lose any money?

A.  Google -- advertisers would choose to use a different measurement provider.

Q.  My question was:  If you didn't have sWAA-off data to track conversion events, are you saying that would not cost Google any more money?

A.  This is a hypothetical situation, but I generally think that Google would have mechanisms to enable advertisers to measure the effectiveness of their ads, and we would also likely use some sort of conversion modeling to fill in the gaps.

Q.  So it's your testimony that Google doesn't really need the sWAA-off data; is that correct?

A.  Not for conversion measurement purposes.

Q.  Well, do they need it for some other purpose?

A.  As I mentioned earlier, Google Analytics does enable better ads personalization.

**LANGNER - CROSS / DAVID BOIES**

**Q.**   I'm talking about sWAA-off data, not sWAA-on data. SWAA-off data.  Do you understand that?

**A.**   Correct.

**Q.**   Okay.  Now, does Google use sWAA-off data for any purpose?

**A.**   We use sWAA-off data for measurement with de-identified data.

**Q.**   When you say "measurement," are you talking about conversion measurement?

**A.**   Correct, conversion measurement.

**Q.**   Okay.  So you're using sWAA-off data for conversion measurement.  Is that your testimony?

**A.**   We use de-identified data for conversion measurement, yes.

**Q.**   And that's sWAA-off, what you call de-identified data; correct?

**A.**   Correct.

**Q.**   Okay.  Now, is it fair to say that there's some value to Google of using this sWAA-off data?

**A.**   It's valuable to show -- for Google to show how our ads are performing.

**Q.**   Okay.  And do you have an estimate of how much value is created for Google by having this sWAA-off data?

**A.**   I've never measured that, Mr. Boies.

**Q.**   Have you tried to?

**A.**   To the best of my knowledge, we have not tried to measure the value of sWAA-off data.

**Q.** Do you have any estimate at all, as you sit here now?

**A.** No, not right now.

**Q.** Could it be a billion dollars?  Could it be $10 billion?

**A.** I mean, you're throwing out some big numbers, Mr. Boies. I don't know right now.

**Q.** Okay.  Now, you talked about conversion modeling.  Do you recall that?

**A.** Correct.

**Q.** And that's where you don't have something that directly ties a device that showed the ad to a device that did the conversion event; correct?

**A.** Correct.

**Q.** And what you do is you use a variety of modeling techniques to try to tie those two devices together, even though you don't have a specific identification; correct?

**A.** Correct.

**Q.** And you said that AdId and IDFA were not tied to any particular person; correct?

**A.** Correct.

**Q.** But they are tied to particular devices; correct?

**A.** Correct.

**Q.** And Google knows what particular device belongs to what particular person; correct?

**A.** We do not try to identify a user's GAIA account with a device ID.

**Q.**   I didn't ask whether you tried to do that.

But Google knows what devices particular people are using; correct?  They know that from the account and from the sign-in and from all of the information that you have; right?

**A.**   We don't log that -- the information together, so I would not be able to say if a device ID was owned by a specific user unless I had access to their device.

**Q.**   But if you have the device ID, if you have the AdId or the IDFA, Google knows what device everybody who is a Google user is using; correct?

**A.**   If you only gave me a device identifier, our systems have no -- there's no way for me to go through our systems, to the best of my knowledge, to find your Google Account information. We have policies that keep that in place.  We also have code that prevents people from trying to merge a GAIA account or a Google Account with the AdId or the IDFA.

**Q.**   My question is not what policies or procedures or designs you've set up.

Google knows -- for its users, they know a name, they know an email address, and they know what email address is using what particular device.  You know that; right?  Google know -- I didn't mean you personally, but Google knows that; correct?

**A.**   I can't agree to that statement, Mr. Boies.

**Q.**   You don't know that?  Is that your testimony?

**A.**   I am saying that I cannot agree that Google knows that

information.

Q.   When you fill out an account, you provide your email address; correct?

A.   Correct.

Q.   And you provide what device you're using.  Google knows what device you're using because you are using that device to sign up for the account; right?

A.   Yes, but I would only know on that device.  So you would have to physically hand me your device for me to see that that GAIA account is on a specific device identifier.

Q.   Well, you didn't -- wouldn't have to hand the device if the data that came in had the device identifier on it; right?

A.   We specifically keep that information separate.

Q.   I'm not asking you whether you keep it separate.  Okay?  And I would just -- I've got a limited amount of time.

     You may keep it separate, but you do keep it; correct?  Google does keep it?

A.   I -- I'm not sure I understand the premise of your question, Mr. Boies.  Can you try to help me understand?

Q.   I'll leave it with that.  I think perhaps we've made the point.

     Let me -- let me turn back to these financial documents.

     And the document that you have that you say is global -- let me ask you to look at a document that was given to us by your counsel --

A.    Okay.

Q.    -- that describes one of these documents.

And if you'd turn to Tab 1.

A.    Sorry.  Is it okay if I put this here so I have a little bit of space?

THE COURT:  Yes, sure.

MR. DAVID BOIES:  And this has to do with Google Exhibit 591.

MR. HUR:  Objection, Your Honor.  Foundation.

THE COURT:  Well, he hasn't moved its admission yet.  Have you?

MR. HUR:  I'm sorry.  I thought he asked a question.

THE COURT:  Well, he's asking some --

MR. DAVID BOIES:  I will.

THE COURT:  -- foundational questions, and then presumably he'll either move it or not --

MR. DAVID BOIES:  Yes.

THE COURT:  -- but that's when your moment will come.

Go ahead.

BY MR. DAVID BOIES:

Q.    Now, first of all, have you seen this document before?

A.    No, sir.

Q.    You were prepared for this testimony; correct?

A.    Correct.

Q.    And how many hours were you prepared for this testimony?

**A.**    I would have to look at my calendar to add it up, sir.

**Q.**    20, 30, 40 hours, something like that?

**A.**    Maybe.

**Q.**    The -- and did they show you any documents in preparation?

**A.**    Yes.

**Q.**    Did they show you this document?

**A.**    No.

            **MR. DAVID BOIES:**  Your Honor, there's no authenticity objection to this document, and I would offer it as an admission.

            **MR. HUR:**  Your Honor, objection.  Foundation.  This is a -- these are communications between outside counsel.

            **THE COURT:**  Sustained.

            **MR. DAVID BOIES:**  Your Honor, could we approach?

            **THE COURT:**  Okay.

      (The following proceedings were heard at the sidebar:)

            **MR. DAVID BOIES:**  This is definitely from counsel, Your Honor, and I understand generally the Court's view of it, but this is a statement by counsel that these are U.S. figures, not global figures.  She's testified they're global figures.  This is a document that -- I believe from counsel.  They are acting as an agent.  They're clearly authorized to provide this information, and this is clearly within the scope of what they're doing.

      The mere fact that they happen to be counsel I don't think

affects anything that they've already mentioned.

(Pause in proceedings.)

THE COURT:  Okay.  Go ahead.

MR. HUR:  Well, it's my words --

(Official Reporter clarification.)

MR. DAVID BOIES:  If I could just say one thing.  If this were an interrogatory answer, we would clearly be able to --

THE COURT:  But it's not.  That's part of the problem.

MR. DAVID BOIES:  But what I'm saying is, when you have something in writing from an agent of a party acting within the scope of their authority, it is an admission.

THE COURT:  If it was an interrogatory, it would be verified.  It would be -- it would be in a very different form.  This is a back-and-forth between counsel.  I've never heard anyone ever tell me that this kind of thing is tantamount to an admission by a party.

MR. MAO:  Your Honor, just procedurally, this happened after discovery closed.

THE COURT:  Well, first of all, I want to hear from one lawyer from each side.  Okay?

MR. MAO:  Okay.

THE COURT:  So, go ahead.

MR. SANTACANA:  So, Your Honor, if you're even tempted to admit it, I will make further other objections, but for

now --

THE COURT:  Well, I want to hear your objections.

MR. SANTACANA:  Yeah.  So, first, my objection is that this is obviously not discovery.  It's not an admission.  It's not verified by a witness.  The parties have the right to move to compel information if they needed more information.

Your Honor has heard a motion and decided a motion on the subject of the U.S. and global issue and then a second motion on this subject.

Now, in order for this document to come in, I mean, I don't know what their plan is, but they'd have to call me to the stand to explain why I said these are U.S.A.-only figures, whether I was mistaken, and whether I subsequently corrected that mistaken impression, and what other things they did to figure it out.

Of course, Your Honor, the other objections I would have are it's prejudicial to start introducing my name into the record.  Redaction would be required.  There's insufficient context because there are other email threads on this subject.

THE COURT:  Okay.  Quick response.

MR. DAVID BOIES:  I'm happy to redact anything except the fact that these are U.S. numbers.

THE COURT:  Okay.  We've had a lot of language, words in this U.S. versus global.  You may be able to do some examination, but you're not going to do it with this document

being admitted.

So I sustain the objection.

MR. SANTACANA:  Thank you, Your Honor.

(The following proceedings were heard in open court:)

BY MR. DAVID BOIES:

Q.   Let me approach it this way:  Let me ask you to look at Google Exhibit 590.  That's in the book that they gave you.

A.   Okay.

THE COURTROOM DEPUTY:  Did you say 590?

MR. DAVID BOIES:  590.  Google Exhibit 590, yes.

THE WITNESS:  Okay.

BY MR. DAVID BOIES:

Q.   And can you explain what this document is?

A.   This shows the overall App Promo quarterly revenue based off of different product areas -- DVA, Search, and YouTube -- broken out for the years 2019 to 2021.

Q.   And what is DVA?

A.   DVA stands for Display, Video, and Apps.  It's an organizational name for the group that I'm part of at Google.

Q.   And so would this be the App Promo revenue from third-party apps?

MR. HUR:  Objection, Your Honor.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  I would need to double-check.  DVA can often refer to ad network, but it can also oftentimes include

Play.  And I would need to double-check the source of this data.  I don't see the script, and I don't have access to my dashboards, so it's hard for me to confirm for a fact.

**BY MR. DAVID BOIES:**

Q.   You had this document prepared; correct?

A.   I don't -- I would like to see the script to make sure that I'm answering truthfully, sir.

Q.   I don't know what you mean by "script."  What do you mean by "script"?

A.   Oh, sorry.  A script is basically something that we use to grab data.  So there's a lot of data, as you can imagine, so sometimes we will write a script or some code to grab data because otherwise it's very hard for a human to grab that much data.

Q.   Didn't you testify about this at your deposition?

A.   My deposition was a couple of years ago, sir, so I don't remember everything.

Q.   Well, is it your testimony to the jury that you don't remember testifying about this at your deposition?  Is that your testimony?

A.   I mean, it's been many years.  I don't know -- sometimes I don't remember what happened last year.

Q.   If you don't remember, I'm not suggesting you necessarily should.

A.   I would need a refresher, sir.

Q.   I'm just asking a simple question.  I'm not suggesting you should remember.

Simple question.  Do you remember testifying about this at your deposition?

A.   I would like a refresher.

THE COURT:  It's just yes or no.  Do you remember, or you don't remember?

THE WITNESS:  Maybe.  I mean, I'm --

THE COURT:  Do you remember or not?

THE WITNESS:  I looked at a lot of documents, sir, and so I don't remember this specific --

THE COURT:  Just answer the question.

THE WITNESS:  Okay.

THE COURT:  Do you remember or do you not remember?  It's a simple question.  Answer that one.

THE WITNESS:  Sorry.

THE COURT:  Answer it.

THE WITNESS:  I don't remember this specific one.

MR. DAVID BOIES:  Okay.

THE COURT:  Okay.  Next question.

BY MR. DAVID BOIES:

Q.   Was this a document that you discussed with counsel in preparation for this deposition -- this testimony?

A.   Likely.

Q.   Likely.  So -- well, do you remember discussing this

document with counsel, truthfully?

A.    I mean, I saw a lot of documents.  I know we looked at a lot of revenue numbers.  So I remember discussing documents, yes.

Q.    But do you remember discussing this document?

A.    I reviewed a lot of documents.  I don't remember this specific document.

Q.    This is a document that was put in your binder by your counsel and given to you today; right?

A.    Correct.

Q.    Okay.  And is it your testimony to the jury that you don't remember asking to have this prepared from finance, just like the other documents?

A.    I have not reviewed it recently, so I don't remember in preparation for this -- for right now.

        THE COURT:  It'll be a lot simpler, it will go faster if you just say, "I remember.  I don't remember."  Then he asks another question.  Don't go into a long discussion about "I saw lots of documents.  I did this and the other thing."  Just answer the question.

        THE WITNESS:  I'm sorry.  I'm just trying to clarify.

        THE COURT:  Fine, fine.  Just answer the question.

    Go ahead, Mr. Boies.

BY MR. DAVID BOIES:

Q.    Let me -- let me ask you to look at --

MR. DAVID BOIES: Excuse me. May I have just a moment, Your Honor?

THE COURT: Yes.

(Co-counsel confer off the record.)

BY MR. DAVID BOIES:

Q. Let me ask you -- try to put up on your screen page 229 of your deposition. And this is Deposition Exhibit 182, and I just want to confirm that this is the same exhibit as 590.

(Co-counsel confer off the record.)

BY MR. DAVID BOIES:

Q. We're talking about Deposition Exhibit 182, and this is the same document as Google Exhibit 590. And you can check by just comparing the Bates numbers. And if you look on -- you can look as much as you want for context.

But this is a document where you say [as read]:

"The finance team" -- this is at page 230, line 19 -- "The finance team pulled these numbers and they used the finance tables for these numbers."

Do you see that?

A. I see that, sir.

Q. And if you go down to the next question [as read]:

"QUESTION: Is this, again, for App Promos?

"ANSWER: This is for App Promos, and my understanding is that this is restricted to U.S., while the other P&L was a global P&L."

Do you see that?

**A.**   Yes.   Thank you for refreshing my memory.

**Q.**   Okay.   And was that accurate testimony?   Was that accurate testimony that you gave?

**A.**   Yes.   So by refreshing my memory, then these would be U.S. App Promo numbers.

        **MR. DAVID BOIES:**   I now offer Google Exhibit 590.

        **MR. HUR:**   No objection, Your Honor.

        **THE COURT:**   590 will be admitted.

    (Trial Exhibit G590 received in evidence.)

        **MR. DAVID BOIES:**   May I have just another moment, Your Honor?

        **THE COURT:**   Yes.

            (Co-counsel confer off the record.)

        **THE COURT:**   We can hear you, so if you're going to have a consult, come over here away from where the jury is. Okay?

        **MR. DAVID BOIES:**   Absolutely.   Absolutely, Your Honor.

**BY MR. DAVID BOIES:**

**Q.**   Let me go back to -- and I hope -- I hope this goes faster, but let me go back to what I was talking about before in terms of where ads are served on something other than a third-party app but converted in a third-party app.

    When that happens, the traffic acquisition costs are different; correct?

**A.**   Correct.

**Q.**   How much different, roughly?

**A.**   I mean, it varies property to property.  So obviously, on the O&O apps, we don't need to -- O&O being owned and operated by Google -- we don't need to pay as much traffic acquisition costs as we would for an app that's not owned by Google.

**Q.**   And that would be true both for Search and for YouTube; correct?

**A.**   Yeah.

**Q.**   And we saw some traffic acquisition costs that were in the range of 68 percent on some of these documents.  What --

**A.**   That sounds about what we would pay to publishers, correct.

**Q.**   And the publishers would be the third-party app?

**A.**   Correct.

**Q.**   And what would that be for YouTube and Search, approximately?

**A.**   I don't know this off the top of my head, sir.

**Q.**   Less than half?

**A.**   Definitely less than half.

        **MR. DAVID BOIES:**  Okay.  Thank you.

     No more questions, Your Honor.

        **THE COURT:**  Mr. Hur, or is it -- yeah, Mr. Hur.

        **MR. HUR:**  Your Honor, I don't have any other questions.

THE COURT:  Very well.

You may step down.

THE WITNESS:  Okay.  Thank you.

(Witness excused.)

MS. AGNOLUCCI:  Your Honor, the defense calls Dr. Donna Hoffman.

THE COURT:  Very well.

**DONNA HOFFMAN**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Have a seat and make sure you don't slide off.

Could you make sure you speak clearly into the microphone for our court reporter.  If you could state your full name and spell your last name.

THE WITNESS:  My full name is Donna Hoffman, and my last name is spelled H-o-double F, like "frank," m-a-n.

THE COURTROOM DEPUTY:  Thank you.

THE WITNESS:  You're welcome.

Good morning.

**DIRECT EXAMINATION**

BY MS. AGNOLUCCI:

Q.   Good morning.  My name is Simona Agnolucci.  We've met before.  I represent Google in this case.

Please introduce yourself to the jury.

**A.**   My name is Donna Hoffman.  I'm a full professor of marketing at George Washington University, the co-director of the Center for the Connected Consumer at George Washington University, and I'm a holder of the Louis Rosenfeld Distinguished Scholar Endowed Chair also at GW.

**Q.**   Do you prefer Doctor or Professor Hoffman?

**A.**   I like professor.

**Q.**   Professor Hoffman, before you begin, can you please briefly explain to the jury why you're wearing a mask?

**A.**   Sure.  I lack an antibody that protects me against airborne pathogens that enter through my mucous membranes or my GI tract.  So since COVID, I've -- my immunologist has recommended I wear a mask indoors, and I have followed that advice.

**Q.**   If you need to take a break or anything else so that you can drink water, will you let me know?

**A.**   Sure.  Thanks.  Thank you.

**Q.**   Why are you here testifying today, Professor Hoffman?

**A.**   I have been asked to apply my expertise to rebut the plaintiffs' allegations that Google's privacy disclosures are not sufficient to users and, also, that they do not use good UI design.

**Q.**   Did you prepare any demonstratives, such as slides, to help you with your testimony?

**A.**   I did.

**Q.**   What did you prepare?

**A.**   I prepared a number of slides to -- to show the jury to help my testimony.

        **MS. AGNOLUCCI:**  Your Honor, request to publish the demonstrative slides that Dr. Hoffman prepared, and I think we're marking them now as -- are we at G103?  G103.

        **THE COURT:**  All right.  G103 for identification.

        **THE COURTROOM DEPUTY:**  I have it as 102 for the next.

        **THE COURT:**  102 for identification.

     (Trial Exhibit G102 marked for identification.)

        **MS. AGNOLUCCI:**  Thank you.

     Brooklyn, can you please display Slide 1 and now Slide 2?

**BY MS. AGNOLUCCI:**

**Q.**   Professor Hoffman, tell the jury about your current position.

**A.**   So as I already said, I am a full professor at George Washington University, and I run a research center that studies online consumer behavior.

**Q.**   What does it mean to be a full professor?

**A.**   It means I've achieved the highest possible rank in the academic profession, so I'm a tenured professor, and I have the rank of full, which is as high as it goes.

**Q.**   What's an endowed chair?

**A.**   An endowed chair is when a donor gives money to the

university, the university takes the money and then gives someone like me the title.

Q.   And you mentioned that you're a full professor of marketing.  Do you have a particular educational focus?

A.   Yes.  So I do research -- so my -- I do research in online consumer behavior, Internet marketing strategy, digital strategy, online advertising, and online privacy.

Q.   And what's your educational background?

A.   I have a Ph.D. in quantitative psychology from the University of North Carolina at Chapel Hill, with a formal minor in marketing, and I have an undergraduate degree in psychology from University of California.

Q.   Is there a particular field of psychology that you focus on in your work?

A.   Yes.  So I am trained to -- you can think of it as a behavioral statistician.  So I am trained to be able to quantitatively assess consumers' behavior.

Q.   Let's go to Slide 3.

     Can you talk a little bit about your research and publications?

A.   Sure.

     So in the course of my career, I've published around 90 papers and book chapters and monographs and notes and things like that.  About 66 are in peer-reviewed academic journals. Many of those are in the top journals in my profession.

My work is multidisciplinary, meaning I publish across disciplines.  So I don't just publish in the marketing journals.  I publish in related disciplines like management science or information science and things of that nature.

I also have co-founded and co-directed the first online lab in the country to study online consumer behavior and grew our online panel to about 80,000 members.

Q.  Is that the reference on the slide to eLab?

A.  Yes.  It was called eLab at the time.

Q.  What's online consumer behavior?

A.  So generally, online consumer behavior concerns the study of what emerges from consumers' interactions in online environments.  That's sort of a general description.

MS. AGNOLUCCI:  Brooklyn, can you please advance to Slide 4.

BY MS. AGNOLUCCI:

Q.  Professor Hoffman, can you give us some examples of the research that you've published that is relevant to this case?

A.  Sure.  So I've been working in the online consumer behavior space for about 30 years.  I got interested in it about the time the Internet became a commercial medium.  So I publish papers, theoretical, conceptual, computational, and empirical and experimental, and some qualitative papers, looking at what happens as people navigate through online environments.

And so this slide just shows a few of the papers that I've written over time. One -- the paper on the left turned out to be a seminal paper, and so subsequent papers have built on that research and built on the other people who have cited that research.

And more recently, my work is now concerned with what happens as people interact with smart things and artificial intelligence and what emerges from that.

Q. Have you received awards for your research?

A. I have. I've been very fortunate to be recognized by my peers and the industry, my industry in general. I've received long-term impact awards for my work. I've received best paper awards. I have been named a fellow of one of our major societies. I was recently named one of the top business and management scientists in the United States and the world by Research.com on the basis of my productivity.

Q. What does your day-to-day work entail, Professor Hoffman?

A. So it depends on the day, but generally, I'm teaching if it's a teaching semester. I am doing research. I'm writing the research up for publication. I'm submitting it for publication, revising it as it comes back.

I also serve on a number of editorial boards in my field for the top journals, so I am either on the board or I'm an associate editor. Sometimes I serve as a special guest editor. So I do quite a bit of reviewing, which is -- counts as service

in my field.

And time permitting and on the side, I consult with companies, and I do a little expert witness work.

Q.   So you're not a professional expert, Professor Hoffman?

A.   No.

Q.   You mentioned the field of online consumer experience.  Is there a body of literature on this field?

A.   There's a very large body of literature on online consumer experience.

Q.   Can you give me an example of papers that you yourself have published on this topic?

A.   So this slide has two, the two on the top.  And I think the one on the bottom would also be considered because it's people -- some of the interactions people have with artificial intelligence, for example, LLMs, large language models, or ChatGPT, that occurs online.  But most of my work for the past 30 years has concerned people's interactions and navigations in online environments.

Q.   Professor Hoffman, have you been retained by Google in this case?

A.   Yes, I have.

Q.   How much are you paid by the hour?

A.   I'm paid $1200 an hour.

Q.   Has that been your rate throughout this case?

A.   I think my rate started maybe at about 950, and this case

has gone for a while, and I do raise my rates every year.

Q.    Do you know how much you've billed to Google in total for your work on this case?

A.    So far, not counting this month because it's not over yet, I think I've billed around $85,000.

Q.    Professor Hoffman, you and I have worked together before?

A.    Yes, we have.

Q.    How many times?

A.    Two or three.

Q.    And you've testified for Google before?

A.    Yes, I have.

Q.    How many times?

A.    I have been retained by Google on six matters.

Q.    In your 30 years of work with respect to your litigation expert testimony experience, have you only worked for defendants?

A.    No.  About a third of my work for an expert witness has concerned the plaintiff, and about two-thirds has concerned the defendant.

Q.    Does your compensation here depend on whether Google wins this case?

A.    No.

Q.    Do you believe that you're qualified to serve as an expert witness in this case?

A.    Absolutely.

MS. AGNOLUCCI:  Your Honor, based on Dr. Hoffman's -- Professor Hoffman's education, training, and experience, I offer Professor Hoffman as an expert in online consumer behavior, in technology environments, including the consumer response to user interface design.

MS. BONN:  No objection, Your Honor, subject to the limitations the Court imposed on the scope of the testimony.

THE COURT:  Well, as to the certification, I will -- the witness will be so certified as Ms. Agnolucci just set forth.

Is this a good place for our second break?

MS. AGNOLUCCI:  It's a perfect place, Your Honor. Thank you.

THE COURT:  Okay.  Members of the jury, remember my admonitions.  Do not discuss this amongst yourselves or with anyone else, and we'll come back in 15 minutes.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  We're out of the presence of the jury.

Just remember, this testimony is going to be confined as I indicated before; correct?

MS. AGNOLUCCI:  Yes, Your Honor.  We intend to comply with the motion in limine, with our proposal, and with Your Honor's ruling.

THE COURT:  Very good.

MS. AGNOLUCCI:  Thank you.

(Recess taken at 12:03 p.m.)

(Proceedings resumed at 12:21 p.m.)

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  Ready?

MR. SANTACANA:  One quick housekeeping thing, Your Honor.

THE COURT:  Okay.

MR. SANTACANA:  There is a chance, small chance but a chance, that we finish with this direct and cross and everything shortly before 1:30; and I think the parties are in agreement that, because Mr. Ruemmler is starting first thing in the morning, that we could let everybody go at that time, if that's all right with Your Honor.

THE COURT:  Yeah, that's fine.

Do you have a sense of where we are in the process?

MR. SANTACANA:  We're very sure we will rest on Friday.

THE COURT:  On Friday.

And do you know if you're going to have anything further?

MR. DAVID BOIES:  We will have, I believe, two rebuttal witnesses, but short.

THE COURT:  Do you think we can get it all done by Friday?

MR. SANTACANA:  It's news to us, Your Honor.  Those witnesses haven't been disclosed before, so we'd have to talk

to them about it.

THE COURT:  They're rebuttal witnesses.

Be consulting about time.  I know everybody wants to keep their cards and all that, but I do want to kind of know.  I mean, if we have to go into Tuesday and then have closings on Wednesday, that's okay.  I would prefer closings to be on Tuesday, but keep me posted.

MR. DAVID BOIES:  We will, Your Honor.

THE COURT:  Okay.

MR. SANTACANA:  Thank you, Your Honor.

THE COURT:  Ending early today is fine.

MR. SANTACANA:  Thank you.

(Proceedings were heard in the presence of the jury.)

THE COURT:  The jury is present.  You may continue.

MS. AGNOLUCCI:  Thank you, Your Honor.

BY MS. AGNOLUCCI:

Q.   Professor Hoffman, we talked about your qualifications and your experience.  What was your assignment in this case?

A.   My assignment in this case was to rebut opinions regarding Google's privacy disclosure and the UI design of Google based on my expertise.

Q.   What methodology did you use?

A.   I consulted the academic literature, including my own research.  I consulted the legal documents that were provided to me in this case; for example, the complaint.  I consulted

the evidence that was provided to me by the parties; for example, the notices and disclosures.  And I've sat in on much of the testimony, and the days I couldn't be here, I read the daily transcripts.

MS. AGNOLUCCI:  Brooklyn, can you please display Slide 5.

BY MS. AGNOLUCCI:

Q.   Professor Hoffman, can you tell the jury what your two key conclusions are?

A.   Yes.  So I have come to two conclusions.  One is that different users have different privacy preferences, and the other is that Google uses or applies a principle of good UI design, which is known as progressive disclosure, which reflects the application of good design principles.

MS. AGNOLUCCI:  You can take that down, Brooklyn.

BY MS. AGNOLUCCI:

Q.   Can we start with the first opinion, that different people have different privacy preferences?  Please explain to the jury what you mean by that.

A.   So there is a very robust and rigorous body of research that has shown very clearly that different people have different preferences for privacy.  They also have different perceptions of privacy, and these -- this variety in people is not -- is so well-known that even the same person could have different preferences for their privacy on different occasions.

And that's sort of the basic idea.

Q.   Can you give the jury some examples of these different preferences in the context of what we've seen in this case?

A.   Sure.

So it was very interesting that in this case, that I heard three different examples.

One of the examples was, when Mr. Monsees was testifying, he talked about how he often gives -- or sometimes gives his child his phone.  And he indicated that he did not want -- whatever his child's navigational behavior activity was on the phone, he did not want that to influence his own personalized recommendations from using those apps and services.  So when his son had the phone, he would turn off, I think, the WAA and sWAA settings, if I'm not mistaken.  So that's an example of different privacy preferences under different contexts.

Another example I heard, which I also found very interesting, was one of the named plaintiffs, Mr. Santiago, he indicated that despite his concerns over his privacy, he was not willing to give up his use of the ESPN Fantasy Football app -- I think that's what it's called -- and he wanted to, I believe he testified, but he wasn't able to convince his friends not to give it up.  And so he decided that there was a benefit from interacting with his friends, and that outweighed any privacy concerns he might have, so he continued to use the app.

Q.   Can you think of any other examples from the testimony?

A.   There -- another example, which I heard in court, which I also found interesting, was when Dr. Hochman was testifying. He indicated -- he expressed his concerns over his privacy preferences using Google products and services.  And he did stop using Google products and services because it bothered him, what he felt was happening to his privacy, so he actually stopped them.  And then he said, you know, he was doing all right, even though he had stopped that.

     So I think those are three pretty good examples from what's happening here in this case that illustrate that different people can have different privacy preferences and even the same person could have different preferences, depending on the context or the situation.

Q.   Is there an academic concept that explains or describes these differences?

A.   There is.  In the academic literature, this is referred to as the privacy trade-off.

Q.   So how does an online business balance the need to cater to these different privacy preferences?

A.   So let's use an -- let's use Google as the example, which is the company in this case.

     Google, as we know, has hundreds of millions of users, and these users have different privacy preferences, and those preferences can vary, depending on the situation and also

individual characteristics of the users.

And Google doesn't have any way to know, when somebody comes to a user interface, who is this person, in terms of what are their privacy preferences, what's going on in their mind about their perceptions of privacy, what should we show them based on those preferences.

Google, like any other, you know, successful online company, can't know that. And so the answer comes from human-computer interaction and user interface design, which says: Since we can't really know what any particular user is going to want to see, we can use a princi- -- we can apply a principle called progressive disclosure, and we can present the most important information first, and then we can provide navigational opportunities for different people to choose the paths they want to take to get the information they want when they want to get it.

Q. Professor Hoffman, this brings us into your second opinion about progressive disclosure.

And before I get there, can you talk about the way that different users with different privacy preferences might interact with a disclosure or with text in an online environment?

A. Sure. So the literature has its own names for this in terms of the different kind -- sort of, we can kind of summarize the groups of people and how they might behave

online, and -- but Google has actually given very interesting labels to this. And Google calls people skippers, skimmers, and readers. And there's fancier names in the literature, but I actually think Google's are pretty good.

And so the idea is that there will be some people that will come to, say, a notice or a disclosure, or something like that, and they don't really care about their privacy preferences. You know, it's not a big deal to them, or in that particular situation, it's not a concern, and so they're just going to skip through. They're going to skip, and then they're just going to consent or choose the options that make the most sense to them without kind of digging further.

Then you have the skimmers, and the idea behind the skimmers is: You know, I would like to know something about what's happening, and so I'm going to skim what I think is interesting to me. I'm going to follow some links. I'm not going to follow other links. And then I'll get to where I need to go, to go ahead and consent or change my settings or what have you.

The third category is what are called readers or what Google calls readers, and the readers' preferences are different because they would like to know: You know, what am I agreeing to, exactly what's happening? They're more likely to read the privacy policy or the terms of service. They're going to click more of the links to try to understand: You know,

what's happening here?  What am I consenting to?  What's -- for example, what's happening with my data?

Q.   What challenge does this diversity among the skippers, the skimmers, and the readers create for a company like Google?

A.   Well, it's -- obviously, it's not just Google, but it's for all companies that have hundreds of millions or many millions of users, it's an enormous challenge because, you can imagine, there's no way to design an interface that could at the -- you know, a single interface that would satisfy all these different people, all their difference preferences over all their different contexts.

And so one of the principles from user interface design is this idea of progressive disclosure.  And so the idea behind it is we would present the most important and primary information first at a high level, and then we provide navigational aids, so links, different color fonts, pop-ups, you know, things of that nature, which, you know, most people are familiar with and know how to navigate through.  And then those links provide the opportunities for the user to customize or control for themself how they're going to go through the particular, you know, user interface experience.

And so that's how Google and many other companies handle that challenge.

Q.   You talked about navigating, you know, all the information that you want or may need to tell a user at once, on one

screen, being very challenging.  Is there a term for the reaction to seeing all that information at once that a user has?

A.   Yes.  And the reason progressive disclosure was actually, you know, conceived of and invented, and the concept has been around since the '80s, is that the concern is if you present too much information at one time to a person, they're going to suffer what is called cognitive overload.  And basically, that means they're going to have -- they're going to have difficulties comprehending, it's going to be very hard to process the information, and they might not be able to understand everything that's happening because it's just too much in front of them at one point in time.

And the goal behind progressive disclosure is to emphasize functionality and ease of use without sacrificing the ability for the user to get all the information they need, but to do it in such a way that it minimizes the cognitive overload.

Q.   In your expert opinion, how is progressive disclosure viewed in the field of UI design?

A.   It's considered a -- critical.  I mean, it's essential. If you have complicated information that you want to present in an online interface, progressive disclosure is certainly one of the principles that you would apply.

Q.   As part of your work in this case, Professor Hoffman, did you review Google's disclosures and interact with its user

interfaces?

A.   Yes, I did.

Q.   Can you give some examples of what you did to familiarize yourself with the disclosures and user interfaces?

A.   Sure.

So I -- you know, I observed the testimony, which went through some of those disclosures.  I myself received a number of those disclosures and I analyzed them.  I had the opportunity to view a video on those disclosures.  And then, of course, I myself, I am a -- I have a Google Account and I'm a Google user, and so I myself personally went through those disclosures, not just on my own account but then more generally to understand all the different navigational paths and links.

So I studied static screenshots and then followed all the different options and navigational paths, and then I did some live navigation myself.

Q.   Did you come across examples of Google using progressive disclosure?

A.   Google uses progressive disclosure in most of its disclosures and notices, so hundreds of examples.

Q.   Did you look at any in particular that would be helpful to discuss with the jury in this case?

A.   So we can talk about the activity controls, and I think there's some pretty good examples of progressive disclosure in the activity controls.

MS. AGNOLUCCI:  Your Honor, permission to display to the jury Demonstrative Board 1, also admitted into evidence as PX84.

THE COURT:  You may.

MS. AGNOLUCCI:  Thank you.

I'm going to put the board up here.  We've seen this before.

BY MS. AGNOLUCCI:

Q.   Can you see it, Professor Hoffman?

A.   Sort of.

Q.   Okay.  Well, if you need to come down and point --

A.   Okay.

Q.   -- you have free rein to do so.

A.   Oh, that's great.

Q.   Yeah.  You can move around.

All right.  So what are we looking at here?

A.   So may I come down?

Q.   Please, yes, come on down.

A.   Do you mind pushing --

Q.   And I'm going to point the microphone toward you.

THE COURTROOM DEPUTY:  I have a handheld mic.  Would that be better?

THE WITNESS:  Yeah, that would be great.

(Pause in proceedings.)

\\\

BY MS. AGNOLUCCI:

Q.   Here you go, Professor.

Okay.  So what are we looking at here?

A.   So can you all see it?

So in this example, so this is the landing page for the activity controls, and this is a really great example of progressive disclosure because the first thing that it does is it gives you the context.

So, for example, you see at the top "Google Account," so you know that you are dealing with settings related to your Google Account.

The next thing you see right at the top in the header is "Activity controls."  So the user now knows:  Okay, I'm dealing with my Google Account and this has to do with My Activity controls.

And then right at the very top, it says very clearly high-level important general information.

[As read]:

      "The data saved in your account helps give you
   more personalized experiences across all Google
   services.  Choose which settings will save data in
   your Google Account."

So now that the user has the idea:  Okay, I see what's happening here.  This is about my account.  These are about My Activity controls, and these particular settings are going

to toggle whether the data is saved in my account or not.

MS. BONN: Objection to foundation as to the basis for saying what users understood in the absence of any user experience study that she has conducted.

THE COURT: I think you can deal with that on cross-examination.

Go ahead.

BY MS. AGNOLUCCI:

Q.   Professor Hoffman, in your professional opinion, does the activity controls screen that we're looking at on the board here constitute an example of progressive disclosure?

A.   Yes, it does.  And the reason that it does is not just because it provides this general high-level information first; but as you can see clearly, there are several things happening.

Where it says "Safer with Google" and it says, "You control what data gets saved to your account," there's a hyperlink there.  You can see it's the blue font and it's bolded, and it says "Learn more."

And so the idea here is -- behind progressive disclosure is, you know, there's a lot of data -- there's a lot of text when you click that "Learn more."  It would be complicated to put it on that first screen.

And so in a secondary screen, it's made available to users.  Remember, keep in mind those skippers, skimmers, and readers.  Some of them will want to learn more.  Some of them

will not.  So it provides control and choice to the user.

Similarly, if we scroll down, we could see under "Web & App Activity" -- and so now we see the activity controls have a label "Web & App Activity."  And then we are -- we learn that we can control what's saved to our Google Account, depending on our behavior on different sites and apps.  And we have another opportunity through the hyperlink at the -- which is bolded, in blue, which says "Learn more," and so on.

And I think there's another "Learn more" a little farther down.  There's a toggle to turn something on.  There's, you know, other things you can see and delete and so on.

So this is a nice, I think, example, in my opinion, of progressive disclosure.

Q.   Let's go to the toggle that you just mentioned.

So do you see, under "Web & App Activity," there's a toggle that says "Turn on"?

A.   Yes, I see that.

Q.   And did you hear testimony in this case about what happens when a user clicks "Turn off" if it's already on and they are choosing to turn that toggle off?

A.   Yes, I heard that testimony.

Q.   What did you hear, so the jury understands the foundation of your opinion?

A.   So I heard the testimony, but I also tested this for myself and I have my own experience, and I also studied the

disclosures.

Let's imagine that Web & App Activity is on, even though this board says it's off.  So say it's on and then that button there, that blue button, the blue font bolded button would say "Turn off."

So what would happen when we turn that off is we get an automatic pop-up.  And that pop-up, I like to think of it -- in user experience or user interface design, it would be called a guardrail.  It would be something that would pop up designed to make sure that users wouldn't make a mistake or an error.

And so what will happen is this pop-up will show up and it will explain -- and I like to think of it colloquially as "Are you sure?"  So the pop-up will come up and it will say, "You really want to do that?"  And it will explain what will happen if you do that.

Q.   So your colloquial term is "Are you sure?"  Do you remember what Mr. Monsees referred to that pop-up as?  It was a longer word.

A.   I think, yeah, like revocation.  Yeah, something jargony, yes.

Q.   Why is the timing of that pop-up, that "Are you sure" button, important from a UI design perspective?

A.   Well, the idea in general behind, you know, human-computer interaction, which we know from research, and then the application field is user design and user interface, is that

you need to provide people the information they need when they need it in the context that they need it in.

And so in this case, if you want to turn off a button and you're provided this high-level information about the controls and what they might do, you would want information about the impact of what will happen when you turn it off.

MS. AGNOLUCCI:  Okay.  Brooklyn, can you please display Exhibit 574.

And for the record, this is the document the parties were discussing this morning that we stipulated to add a page to and enter into evidence.  Originally, we discussed calling it 574.R2, and then we decided, I think with Ms. Hom, to just replace 574 in its entirety.

And if you could go to the last page, Brooklyn, page 22.

BY MS. AGNOLUCCI:

Q.   All right.  Professor Hoffman, do you recognize this document?

A.   Yes, I recognize it.

Q.   What is it?

A.   This is a screenshot, I think, from -- if I'm not mistaken, from 2018 to 2019.  That is an example of the pop-up, of what I'm calling the "Are you sure" pop-up, which is the example of the guardrail, saying:  Here's what's going to happen if you turn this off.  So we want to make sure you understand so that you know what you're doing.

Q.    Here's what's going to happen if you turn this off.

And I actually have created a demonstrative board to aid you and the jury.  This is the less --

MS. AGNOLUCCI:  Do we have the clearer version or is this the only one we have?  Let me just take a look.

This can be fine.

Nope.  Nope.

Okay.  We're going to use this one.

Your Honor, may I display to the jury a blow-up of Exhibit 574, which has been admitted?

THE COURT:  Yes.

MS. AGNOLUCCI:  Thank you.

BY MS. AGNOLUCCI:

Q.    All right.  Professor Hoffman, what are we looking at here?

A.    So this looks like a blow-up of the screen that you've shown me -- that I can see on my screen, which is the pop-up.

Q.    The "Are you sure?"

A.    Yes.

Q.    Or the revocation text, if we're going to --

A.    Yes.

Q.    -- use big words.

Okay.  So you were talking about the fact that this provides further information to the user when they're turning WAA off.

And I want to direct your attention to the language here at the bottom. Can you read to the jury what it says right here?

A. Yes. It says -- I'm going to read it over here. It's a little bit easier with my glasses. It says [as read]:

"Visit account.google.com to change this and any other Google Account settings and learn about the data that Google continues to collect and why at policies.google.com."

Q. So when a user turns WAA off, they immediately get this pop-up and they are told that they can go somewhere to learn about the data that Google is continuing to collect; is that right?

A. Yes. And, actually, I think it's important to note that Google -- Google's design is offering two links here. So one is basically saying, "Well, if you don't like this, go back to your account, account.google.com, and then you can toggle whatever you want to toggle and learn more about that."

But it also tells you: We're going to keep continue collecting data even if you turn this off. And if you want to know why that's happening, then you need to go to privacy -- privacy and terms, which is linked at policies.google.com. And as I said, some people will click it; some people will not click it.

Q. So why is what we're looking at on the board and on the

screen an example of progressive disclosure?

**A.**   Because you can see -- you know, there's a lot of information here; right?  There's a fair amount of text. Particularly, most people use mobile devices these days and screen real estate is at a premium, particularly on mobile.  It would be a little bit different on desktop.  But you cannot put all this information on a single screen or even a few screens that, you know, you might have to scroll down.  It could be difficult in terms of cognitive overload.

And so by using an application of progressive disclosure, it allows users to choose, "Yeah, I'm going to click that link. I'd like to know more about that.  What exactly are you collecting," and so on.  And so this allows the user to control their navigational path according to their own preferences.

**Q.**   All right.  And just so it's clear again, so the user who says, "I want to learn more about what Google's continuing to collect," they can click on policies.google.com.

And did you, as part of your work on this case, investigate where that then takes the user?

**A.**   I did.

**Q.**   And what did you conclude?

**A.**   So if you click policies.google.com, I think, as I said, you are taken to the privacy and terms page.  From the privacy and terms page, there are a number of links that are offered. One is the privacy policy.  So then you can click on the

privacy policy, and then you can look for information about Web & App Activity and your account, things like that.

Q.   All right.

MS. AGNOLUCCI:   You can take that down, Brooklyn.

BY MS. AGNOLUCCI:

Q.   So we've been looking at a screenshot of the -- what we're going to call the "Are you sure" disclosure.

Do you recall Mr. Monsees testifying about a document that I'm going to put up now as Exhibit G0607, page 6, please?

A.   Yes, I recall that.

MS. AGNOLUCCI:   Brooklyn, can you navigate to page 6?

BY MS. AGNOLUCCI:

Q.   Professor Hoffman, what do you -- what did you learn from Mr. Monsees about the document that the jury's looking at now?

THE COURTROOM DEPUTY:   607?

MS. AGNOLUCCI:   G0607, which has already been admitted into evidence, and it's page 6.

THE WITNESS:   I think this is the same text, although I don't recall exactly how he said he prepared this historical document, how he, you know, scraped it or, you know, got it off from Google to show the historical evolution.

But the text on -- that's marked 10/17/2019, that's the same text that we see here.

MS. AGNOLUCCI:   And, Brooklyn, can you please underline the part at the bottom that says "learn about the

data Google continues to collect and why"?

BY MS. AGNOLUCCI:

Q.   Does the text shown here on page 6 match the text on the screenshot that is in evidence, Professor Hoffman?

A.   Yes, with the exception that the -- you know, there's jargon for the links, but -- and the links here are just shown as hyperlinks, but, yes, it's the same.

Q.   Do you recall Mr. Monsees explaining why you're going to see the links displayed that way on the page?  Do you recall him saying what the source of this information was?

A.   I can't -- I don't recall exactly, but I think he said something about how he had to collect it and that's why it looks like -- why it has these characters on the exhibit.

       MS. AGNOLUCCI:  We can take that down.

   Let's put up Professor Hoffman's demonstrative slides and let's go to page 6, please, Brooklyn.

BY MS. AGNOLUCCI:

Q.   All right.  Professor Hoffman, what are we looking at now?

A.   So I prepared this slide to talk about Google's evolution in its design of the WAA disclosures.  So this is over time.

Q.   And specifically, are we looking at the "Are you sure" text?

A.   Yes.

Q.   Let's start with the left side.  It says "January 2017 to October 2018."  What did Google tell users during that time

period about pausing Web & App Activity?

**A.**   So in that particular period, the WAA disclosures talk about that it will still temporarily -- if you turn WAA off, it will still temporarily store your searches in order to continue to try to improve your search for you.

     And then it also tells you that:  Even if you turn it off, we won't delete any of your previous activity.

**Q.**   Let's now move to the middle version, which is marked 2018 to 2019.

     Is that the same as the one that we're looking at now on the board?

**A.**   Yes.

          **MS. AGNOLUCCI:**  And, Brooklyn, if you could please blow up the part at the bottom.

**BY MS. AGNOLUCCI:**

**Q.**   [As read]:

          "Visit account.google.com to change this and any
     other Google Account settings, and learn about the
     data that Google continues to collect...."

     Do you see that, Professor Hoffman?

**A.**   Yes, I see it.

**Q.**   How is that an example of progressive disclosure?

**A.**   Well, so as we've been discussing, first of all, this page pops up automatically when you attempt to turn off WAA, so the user sees it.

And then it says very clearly that, you know, "If you don't like this or you want to do some other things while you're here, go back to your account and you can toggle all those things."

Additionally, it says -- it tells you, "We are going to continue to collect your data; and if you want to know more about that, then you can click the link."  And it's cut off here, but there's a link to policies.google.com.

Q.   And then, finally, we have the 2023 version on the right.

MS. AGNOLUCCI:  And, Brooklyn, can you please blow up for the jury, in the 2023 version, the language that matches the language we were looking at just now.

THE WITNESS:  I don't think it's that one.

BY MS. AGNOLUCCI:

Q.   Yeah.  It's the same words but it -- there we go.

A.   Yes.

Q.   Thank you.

A.   So this -- I believe this -- if I'm not mistaken, this policy went into effect -- or this text went into effect in 2023, and I believe it's still in effect.  And this text says [as read]:

"You can control other settings that save your data in your Google Account and learn about the data Google continues to collect and why at policies.google.com."

Q.   Professor Hoffman, in your expert opinion, what was the significance of reviewing these disclosures side by side?  Why did you create this slide this way?

A.   Well, I first wanted to show that there is evolution in disclosures and notices, which is another hallmark of good UI design, the fact that the company, in this case Google, is continuing to update, presumably on the basis of research, user feedback and things like that.

And the other thing I wanted to show is that regardless of how you look at it, Google is informing you that it's going to continue collecting your data.

Q.   Is there a word for the type of pop-up or layer to disclosure that we've been looking at that you're familiar with from the academic literature?

A.   I'm not sure what you mean.

Q.   We can move on.  I want to talk now about sWAA.

     MS. AGNOLUCCI:  You can take that down, Brooklyn.

BY MS. AGNOLUCCI:

Q.   Professor Hoffman, you've been sitting through this trial. You're very familiar with Google's disclosures.  Do you know what sWAA or sWAA is?

A.   Yes.  It's the subsetting WAA.  Although I thought it was interesting, I think I heard some testimony that one of the Googlers said he'd never heard subsetting used, but we'll call it sWAA.

**Q.**   Okay.  And let's put up page 6 of Exhibit G0607.

This is the document we were just looking at, and do you see where it says, "sWAA Activity Controls Revocation Text"?

**A.**   Yes, I see that.

**Q.**   Do you remember from the testimony in this case what we are looking at?

**A.**   So I think this is, again, something that Mr. Monsees had collected and is showing what these particular user interface disclosures look like at the particular time in question.  And I believe this one is -- was established in 2019 and is still what it looks like.

   **MS. AGNOLUCCI:**  Brooklyn, can you please display page 7, blowing up "learn about the data Google continues to collect"?

**BY MS. AGNOLUCCI:**

**Q.**   Professor Hoffman, can you read the language that you see there to the jury?

**A.**   So it says again [as read]:

   "Visit the Google Accounts link" -- which is set
   here in that format with characters -- "to change
   this and your other Google Account settings and learn
   about the data Google continues to collect and
   why...."

And then it provides another link, which is to the privacy and terms page.

Q.   Okay.  So for a user who goes and turns sWAA off, like the plaintiffs in this case, and gets this pop-up, how is what we're seeing here on the screen an example of progressive disclosure?

A.   So, once again, it is the primary information.  So we took -- we took it down, but the first foam board is the primary, most important information in the context of progressive disclosure.

It explains that you're now in the domain of your account. You're in the domain of the activity controls.  We're going to give you two settings -- we're going to give you a couple of settings to control your Web & App Activity, but there's a lot of information about your Web & App Activity and those controls and what happens to those controls when you toggle them.

So in the interests of providing functionality and making it easy to use but not trying to get consumers to feel overloaded, you know, cognitively -- in other words, it's really hard to think about this; it's difficult to process -- the thinking behind progressive disclosure is then to provide links to the additional information that someone can, if they want, drill down and learn what they want to learn.

Q.   If a person is a reader and they see either the WAA pop-up that we talked about a minute ago or the sWAA pop-up that we're talking about now and they want to learn exactly what Google continues to collect, what can they do?

**A.**   Well, if they're -- let's talk about a hypothetical reader.  So a reader would likely, in my opinion, click at least some of these "Learn more" buttons, and a reader would likely click the policy button to find out what is being collected and why.

**Q.**   And you haven't surveyed skippers, skimmers, and readers in this case to determine how they would behave in this interface; right?

**A.**   I have not done that, no.

**Q.**   So what is the basis for your professional opinion?

**A.**   Well, I have 30 years of academic experience.  I run lots of experiments myself.  I've built my own online lab.  I work with -- I've worked with a number of companies.  Our lab has been corporate sponsored through various points in time, and many of those companies have come, asking for help -- for example, Walmart.com was one of our sponsors -- for how to design their websites in order to enhance navigation and make it easy for consumers to find the things that they are looking for without being overloaded.

So I've done research on this, I've consulted on this, and I have a great deal of experience in this space.

**Q.**   You heard the plaintiffs' testimony that when they turned off WAA or they turned off sWAA, Google didn't notify them that it would continue to collect other information.

In your professional experience, what is your rebuttal

opinion to that testimony?

**A.**   Well, I guess one way to look at it would be they didn't click the links, because, in my opinion, it's not true that Google doesn't notify you.  Google uses application of a principle from UI design called progressive disclosure, which provides the information to users who are interested in accessing it.

**Q.**   And would they even need to click a link to see the "Are you sure" text?

**A.**   Well, that's an automatic pop-up because that's an example of a guardrail in order to try to minimize mistakes or errors.  And in that case, they would -- you know, they -- I mean, I don't know if they would read it, but it's there in front of you; and, you know, it's up to the user to read it.

**Q.**   All right.  Let's take that down.  And we're going to go through one last document, and then I promise to move towards getting you out of here.

Exhibit PX62, please, the privacy policy.

All right.  We've seen this document a lot.

**MS. AGNOLUCCI:**  Brooklyn, if you could please go to page 22, to the page titled "Your activity on other sites and apps" and blow that up.

**BY MS. AGNOLUCCI:**

**Q.**   All right.  So, Professor Hoffman, we're now looking at the privacy policy.

Whether a user gets here through the path that you just described or whether they get here when they're setting up their Google Account or in some other way, is the text on page 22 an example of progressive disclosure?

**A.**   It definitely is an example.  I think this text -- so this would -- there are a lot of ways to get to these different pages.  And this page, I think, is under the section under the privacy and terms.  It depends on if you're accessing from a desktop or a mobile device how the -- if there's going to be a left navigation bar or if it's -- how it's going to look.

But, in any event, you could click through.  You can learn about the technology.  And, in this case, this very clearly gives even more detail because now it explains things like, for example, advertising and Google Analytics, and it tells you that your information, for example -- I'll just read it.

[As read]:

"These services may share information about your activity with Google and, depending on your account settings" --

And notice that's a hyperlink so, again, progressive disclosure.  You can click back and go, "Yeah, I need to check that.  I'm not sure I like that"

[as read]: -- "and the products in use," so, for example, when -- "(for instance, when a partner uses Google Analytics in conjunction with our advertising

services), this data may be associated with your personal information."

So what that means is:  We're collecting data, and depending on your account settings, we might put it in your account and it will be associated with you.

Q.   And how does what we're looking at here cater to the skipper, the skimmer, and the reader?

A.   Well, let's say you have someone who has read the privacy policy.  So that caters to the reader because that's someone who's interested in learning more of the detail about their data, whereas a skipper is not likely going to click through and see that.  And it's possible a skimmer would see it if they were interested in those particular aspects.

Q.   And what about the blue "account settings" language?  How is that an example of progressive disclosure?

A.   Well, I think, again, as I said, if you want to know more about how -- you know, whether that information will be shared, it's telling you it's related to your account.  So you would need to go and check your account to see:  Is that going to be associated with my personal information, or is that going to be de-identified?

Q.   And, finally, there's a blue "Learn more" link at the bottom, Professor Hoffman.  Did you click through that "Learn more" link as you were studying Google's disclosures in connection with your work on this case?

A.    Yes, I did.

Q.    Do you remember where that took you?

A.    I think that takes you to another -- I can't remember which page it is, but it's a page that discusses in more detail Google Analytics.

        MS. AGNOLUCCI:  Brooklyn, can you please display Exhibit PX123 to the jury.

BY MS. AGNOLUCCI:

Q.    Professor Hoffman, is this the page that a user gets guided to if they want to learn more?

A.    Yes.  And this page is linked from the privacy policy page.  This is a page about -- that Google calls "Technology," and this page discusses in more detail what is -- what is happening.

        MS. AGNOLUCCI:  Brooklyn, can you please blow up the part starting with "For example, when you visit a website." There we go.

BY MS. AGNOLUCCI:

Q.    And so the reader who has clicked through because they want to learn all there is to learn after the "Are you sure" button, they make it to the privacy policy or they've gone to the privacy policy in some other way, what do they learn when they view this screen?

A.    Well, they're now learning a lot more detail because they are finding out that if the website that you're on is using a

Google ad product, in this example called AdSense, or it's using Google Analytics or it's embedding content from YouTube, then it's telling you that your browser's automatically going to send that information to Google, and it tells you what is going to be sent.

And then it's also telling you that they might put cookies on your browser, or if you have cookies in your browser, it's going to read those cookies.

And then it's explaining that apps that are using Google's advertising services will share that information with Google and then it will explain what that is.

And I believe you can -- you can keep clicking and learn more.  So you can, you know, drill down quite a bit.

**Q.**  Professor Hoffman, one more time for the jury.  How does Google use progressive disclosure, in general -- we can take that screen down -- to explain to users that when WAA and sWAA are off, Google still collects information through Google Analytics?

**A.**  So, generally speaking, when you are on your account page and you are setting your activity controls and you are making a decision of whether, for example, to turn WAA off, you -- it doesn't tell you right on that page, because that could potentially lead to cognitive overload, and it wants to present the information in such a way that it can be processed by individuals so they will understand it and know what they're

getting into.  And so when you click that, an automatic pop-up will show up and explain to you that your data is being collected.

Then, by applying principles of progressive disclosure, Google allows for different people who have different privacy preferences at different periods of time or in different contexts to drill down if they want or not.

Q.   In your professional experience, how does this user interface design stack up?

A.   Well, I think it's an example of good UI design.

MS. AGNOLUCCI:  Thank you.  No further questions.

THE COURT:  Ms. Bonn.

MS. BONN:  Thank you, Your Honor.

### CROSS-EXAMINATION

BY MS. BONN:

Q.   Good afternoon, Professor Hoffman.

A.   Good afternoon.

Q.   You and I have never met before; correct?

A.   No, we've never met.

Q.   Okay.  Hearing your testimony just now, do I understand it to be your opinion that Google's sWAA disclosures make clear to users that Google is still going to collect their sWAA data even when they turn the button off, but they'll just put it somewhere other than their Google Account?  Is that the opinion I'm understanding you to be offering?

A.   My opinion is that Google's account settings inform users that even with the settings off, their data will still be collected.

Q.   When did you come to that opinion?  Before or after your deposition in this case?

A.   So my deposition was a couple of years ago, and I don't recall exactly.  But since my deposition, I have been studying the disclosures more than I did for my deposition.  So I've definitely had the opinion since then, and I don't recall if I had the opinion in my deposition.

Q.   You wrote a report, spanning 60 to 80 pages, all about Google's disclosures before your deposition; correct, ma'am?

A.   I think it was a little longer than that, but, yes, that's correct.

Q.   And you spent over 20 hours personally reviewing the disclosures, the evidence in this case, editing that report; correct?

A.   Yes, that's correct.

Q.   Fair to say you had significantly more time spent reading, studying, analyzing Google's disclosures before your deposition than any Google user, whether they're a skipper, a skimmer, or a -- I forget the third one you mentioned, but is that a fair statement?

A.   It's a reader.

     And do you mind if I ask your name so I can refer to you

by your name?

Q.   If you'd like, my name is Amanda Bonn.

A.   Ms. Bonn, thank you.

Q.   So is it fair to say that prior to your deposition, you had spent considerably more time studying and analyzing all of Google's disclosures about sWAA than the typical Google user, whether they be a skimmer, a skipper, or a reader?  Is that fair?

A.   Well, I think it's a little bit of a mischaracterization because my -- and I'm hesitating because I'm not sure what I'm allowed to say.

     But my report was a rebuttal report to a specific expert, and I had a specific assignment, and I followed that assignment.  So I did spend time reviewing disclosures, the academic literature, and things of that nature, but I followed my assignment.

          MS. AGNOLUCCI:  Your Honor, we would request a sidebar if this line of questioning is going to go on because of the shifting nature of Professor Hoffman's testimony due to recent developments in who the plaintiffs have chosen to call.

          THE COURT:  I want to hear the next -- where you're going.  Go ahead.

BY MS. BONN:

Q.   Having spent time reviewing Google's disclosures, writing a more-than-80-page report, responding to the opinions of

others, and appearing in your deposition, at the time of your deposition, you yourself were not sure whether when WAA or sWAA are turned off, Google would still collect data, sWAA-off data, but save it outside the Google Account; isn't that true?

A.   So that was a couple of years ago.  I don't recall exactly what I said.  Could we review my deposition?

Q.   Absolutely.

A.   So then I can see exactly what I said.

Q.   Absolutely.

MS. BONN:  Let's, please, play page 82, lines 1 through 12, from Professor Hoffman's deposition.

(Pause in proceedings.)

THE COURTROOM DEPUTY:  Is it published to the jury?

MS. BONN:  Yes, please.  It's for impeachment. Thank you.

(Video was played but not reported.)

BY MS. BONN:

Q.   And, ma'am, in addition to that testimony, isn't it also true that at the time of your deposition, based on your review of Google's privacy policy and the time you spent in the case, you still did not know whether Google ever saves data somewhere else outside of what they call a Google Account?

A.   So I feel like you're mischaracterizing what I said.

Q.   Please answer my question, ma'am.  My question is very specific.

**A.**   I'm trying to.

**Q.**   Isn't it --

        **THE COURT:**  Don't argue back and forth.  Question, answer.

**BY MS. BONN:**

**Q.**   Yes or no?

**A.**   My --

**Q.**   Is it yes or no, ma'am?  Is it true that at the time of your deposition, based on your review of Google's privacy policy, you did not know whether Google ever saved data somewhere else, outside of what they called a Google Account?

**A.**   So my answer was that I didn't know technically, because I believe, in the clip you played, I knew that data was saved; it just wasn't saved to the account.

    I believe that I understood the question to be technically what happens to it.  I'm not a technical expert, and that was my response.

        **MS. BONN:**  Let's, please, play page 269, lines 13 through 19, of the deposition.

            (Video was played but not reported.)

**BY MS. BONN:**

**Q.**   Ma'am, isn't it also true that at the time of your deposition, you had no opinion about what it means for Google to log data without tying it to someone's Google Account?

**A.**   Well, that sounds like a technical question, and I'm not a

technical expert.  And so I provided answers in my deposition that -- my assignment was not concerned with technically where the data is saved, and so I answered I did not review that and I didn't know.

MS. BONN:  Let's please play page 200, line 18, through 201, line 6, of the deposition.

(Video was played but not reported.)

BY MS. BONN:

Q.   Isn't it also true, ma'am, that at the time of your deposition, you did not have any opinion on whether Google's WAA and sWAA disclosures were accurate?

A.   Do you mind playing that so I can see what I said?

MS. BONN:  Let's please play page 35, lines 1 through 9, of the deposition.

(Pause in proceedings.)

MS. BONN:  Okay.  If we can -- excuse me.

Let's zoom into the top half of the page, at lines 1 through 9.

[As read]:

"QUESTION:  So you don't have any opinion on the accuracy of Google's WAA and sWAA disclosures?

"ANSWER:  My report does not concern the technical specifications of Google's disclosures or how different aspects of Google work under the hood.  That was not the focus of my rebuttal."

BY MS. BONN:

Q.   Now, today you showed a couple of blowups.

     MS. BONN:  And may I just approach to adjust the demonstratives?

     THE COURT:  Yes.

     MS. BONN:  Thank you.

     Why don't I move this back here.

BY MS. BONN:

Q.   Now, ma'am, if I understood you correctly, you said that when a user checks this button down here, the sWAA button, that is the pop-up that pulls up "Are you sure about that?"

A.   I said --

     MS. AGNOLUCCI:  Objection.  Mischaracterizes the testimony.

     THE COURT:  Well, she can answer the question.

     Go ahead.

     THE WITNESS:  I said when sWAA is on and the blue button says "Turn off," that is the pop-up.

BY MS. BONN:

Q.   Ma'am, isn't it true that that pop-up that says "Pause Web & App Activity" is a pop-up that relates not to the sWAA subsetting down here but to the Web & App Activity button above?

A.   Yes.  That was what I testified.

Q.   And you understand that the sWAA button, the subsetting

down here, is what relates to Google's collection of data from third-party, or non-Google, apps; correct, ma'am?

A.   Yes, I understand that.

Q.   And you understand that this Web & App Activity button up above relates to Google's collection of data when a user is deliberately going to a Google app or a Google property, like Google Search or YouTube or Maps; correct?

A.   Yes, I understand that.

Q.   Okay.  With that in mind, let's look at the language on the pop-up that's now on the board that is from the Web & App Activity button and not the sWAA subsetting.

So under this Web & App Activity pop-up, you showed earlier the third paragraph down, where it says [as read]:

"Even when this setting is paused, Google may temporarily use information from recent searches in order to improve the quality of the active search session."

Do you remember that?

A.   Yes.

Q.   And "searches," that refers to people who go to Google Search and conduct an Internet search; correct, ma'am?

A.   Yes.

Q.   It's not about someone's activity on a non-Google or third-party app; correct?

A.   Search is -- in this context, is not, no.

Q.   Okay.  And yet, and yet, when someone turns off the Web & App Activity button about their activity on Google sites, here Google tells them, "Even if you turn the Web & App Activity button off, we may still have some information about your searches temporarily"; right?

A.   In this particular disclosure.  But I've showed an evolution of disclosures, and the language does change over time.

Q.   Okay.  And let's please turn to G607, which you were shown by Google's counsel.  And if we could please turn to the bottom -- well, why don't we turn to page 6, please.

So this is the document that you testified earlier shows some of the changes in Google's disclosures over time; correct?

A.   Yes.

Q.   And the top half of the page has a section about "WAA Activity Controls Revocation Text"; right?

A.   Yes.

Q.   And that is the language that's similar to the big blowup that is behind you that you talked about a moment ago; correct?

A.   Yes.

Q.   But if you scroll down lower in the page, there is a separate section about the "sWAA Activity Controls Revocation Text"; correct?

A.   Yes.

Q.   And that continues onto the next page of the document;

correct?

**A.**   Yes.

**Q.**   Okay.  Now, if we look at yet -- thank you so much.

Okay.  If you look at this disclosure, the sWAA revocation text, do you see, about halfway through the disclosure, it says [as read]:

> "If your Android usage and diagnostic setting is
> turned on, your device may still share information
> with Google, like battery level, how often you use
> your device and apps, and system errors.  View Google
> settings on your Android device to change this
> setting"?

Do you see that?

**A.**   Yes.

**Q.**   You don't see the language that you pointed to earlier on the WAA pop-up that says, "Even when this setting is paused, Google may temporarily use information from recent searches in order to improve the quality of the active search session"; correct?

**A.**   No.  I see it.

**Q.**   Ma'am, please look at the pop-up to your left.  You see where it says [as read]:

> "Even when this setting is paused, Google may
> temporarily use information from recent searches in
> order to improve the quality of the active search."

Do you see that?

**A.** Oh, so maybe I'm confused. You're asking me if in the WAA pop-up, do I see the temporary search information over here on the sWAA revocation text?

**Q.** Correct, ma'am.

**A.** I'm sorry. I misunderstood your question, because I do see that it says Google continues to collect data and that it provides the same link. So --

**Q.** That there, ma'am, but I'm asking a different question.

**A.** -- you're right I don't see --

THE COURT: Don't argue. Don't interrupt.

MS. BONN: I apologize.

THE COURT: Okay. Let her finish the answer.

Please finish your answer.

THE WITNESS: I think I've lost my train of thought.

THE COURT: Start over.

BY MS. BONN:

**Q.** Okay. Ma'am, my question is very specific. The paragraph on the pop-up behind you, "Even when this setting is paused, Google may temporarily use information from recent searches in order to improve the quality of the active search session," that specific language does not appear in the sWAA revocation text; correct?

**A.** No, I don't see it.

**Q.** Okay. And if you look at the paragraph that I've

highlighted, that talks about specific information from an Android device that Google might still collect.  Do you see that?

A.    Yes, I do.

Q.    Okay.  It doesn't say anything in that paragraph about specific information that could be collected from an iPhone device; correct?

A.    It doesn't say that in that paragraph you've highlighted, no.

Q.    And in that specific paragraph about the Android devices, it doesn't say anything about continuing to collect one's browsing activity on third-party apps that use a Google SDK; correct, ma'am?

A.    It doesn't say anything about that in that paragraph.

Q.    Thank you.

Now, the bottom of the page says that you could visit a link to change this and your other Google Account settings and learn more about the data Google continues to collect and why. Do you see that?

A.    Yes, I see that.

Q.    And you know that Google may collect data from users apart from their sWAA data based on other activity they take on the Internet; for example, visiting Google.com on a web browser; correct?

A.    Yes.

**Q.** Visiting YouTube.com on a web browser; correct?

**A.** Yes.

**Q.** Visiting Google Maps on a web browser; correct?

**A.** Yes.

**Q.** Okay. And there is no specific language on this sWAA revocation text that says, "When you turn the sWAA button off, Google will continue to collect your app activity data from non-Google apps"; correct?

**A.** Well, it doesn't use that language; but as I testified, you can click through the links and you can learn that.

**Q.** Ma'am, you're not aware of anywhere in Google's privacy policy where they say, "We, Google, will continue to collect your third-party app activity data even when you turn sWAA off"; correct?

**A.** So I'll have to go back and look because I don't know if they use that exact language.

**Q.** Okay. Do you remember being asked something very similar at the time of your deposition?

**A.** I'd be happy if you want to show it to me.

**Q.** Okay.

                    (Pause in proceedings.)

          **MS. BONN:** Let's go to page 269:13 through 269:19.

                (Video was played but not reported.)

**BY MS. BONN:**

**Q.** So, ma'am, at the time of your deposition, you did not

know whether Google's privacy told users that they would ever collect data and save it somewhere other than their Google Account; correct?

A.   So my recollection is in the deposition, I believe it was Mr. Frawley asked a lot of questions about the technical aspects, and I testified that I was not a technical expert and that I -- my rebuttal opinion in my report did not concern those technical details.

Q.   Sitting here right now, you can't think of a place in Google's privacy policy that says, "We will still collect your third-party app activity data even when sWAA is turned off," can you?

A.   I cannot think of a place that uses that exact language, sitting here right now.

Q.   Okay.  And at the time of your deposition, you were asked whether you thought there was any ambiguity in Google's disclosures about WAA and sWAA.  And do you remember what your answer was?

A.   It was two years ago, Ms. Bonn.  I don't remember, but I'd be happy to watch the video.

Q.   Would it make sense to you that your answer was that, as a scientist in the field of behavioral research, the only way to know whether Google's disclosures were ambiguous to users would be to conduct a user survey or a study and that you had not done that in this case?

**MS. AGNOLUCCI:**  Objection, Your Honor.  May we have a sidebar?

**THE COURT:**  Overruled.  No.

Go ahead.

**THE WITNESS:**  I'm sorry.  I don't think I understand the question.

**BY MS. BONN:**

**Q.**   Do you recall that when asked at your deposition whether Google's various progressive disclosures were clear or ambiguous to users, your answer was that the only way for an expert in your field to know that would be to conduct a consumer research survey, which you had not done?

**A.**    I do recall that, and that is in the context of Google applying what I believe to be good UI design practices.

But Mr. Frawley said, "Well, at the end of the day, we don't really know if consumers are confused or not, do we?"

And I have to agree that at the end of the day, if we want to know if consumers are confused, for example, we would have to conduct a survey.  And I had not conducted that survey.  But I did opine that I thought the disclosures were user-friendly.

**MS. BONN:**  I've just got about 30 seconds, and then I think we'll be done with the witness, if that's okay, Your Honor, rather than bring her back tomorrow.  Less than a minute.

**THE COURT:**  It's not 1:30 yet.  Ask the question.

MS. BONN: Perfect. Thank you.

BY MS. BONN:

Q. Ma'am, Google hired you in this case and paid you 950 to 1200 dollars an hour, and your expertise, in part, is in conducting such user surveys; correct?

A. That's one of my expertise. I have a number of related ex- -- you know, expertises.

Q. Yet, you were not asked by Google to conduct such a study of whether these progressive disclosures were clear or ambiguous in this case; correct?

A. Well, I was hired as a rebuttal witness, and the person I was rebutting did not conduct a survey, and so I did not conduct an affirmative survey, and nor was I asked to because I was rebutting someone else's opinions who himself had not conducted a survey.

Q. Okay. And, ma'am, you talked a little bit on your exam about how everybody can have different privacy preferences; correct?

A. Well, I said people have different privacy pref- -- different people have different privacy preferences.

Q. One thing that all of the adults in this class have in common is that they revealed a preference by turning the sWAA button from the default on state to off; correct?

A. Yes, that's my understanding.

MS. BONN: That's it. Thank you.

**THE COURT:** If you want this witness for redirect, she comes back tomorrow.

**MS. AGNOLUCCI:** I can do it in one minute, or we can bring her back.

**THE COURT:** One minute.

## REDIRECT EXAMINATION

**BY MS. AGNOLUCCI:**

**Q.** Professor Hoffman, we're going to go without the mic.

At the time of your deposition, you had a different scope of your assignment; right?

**A.** Yes.

**Q.** Why?

**A.** Because I was rebutting another expert who had written a very specific report, and my assignment was to rebut specific aspects of his report.

**Q.** Did the plaintiffs bring that expert to testify in this trial?

**A.** Not that I'm aware.

**Q.** Ms. Bonn asked you about the sWAA revocation language, and she showed you the Exhibit G607 and asked you whether it was the same language as in the pop-up on the board.

Did you see the same critical language in both the sWAA revocation and the WAA revocation?

**A.** Yes, I did.

**Q.** What was that language?

**A.**    That language was that Google will continue to collect data, and if you want to know more about it, you should visit the link provided.

**Q.**    Ms. Bonn asked you whether the privacy policy disclosed to users that when sWAA is off, Google may continue to collect information through Google Analytics, and you said that you did not see that exact language.  Do you recall that?

**A.**    Yes.

**Q.**    Do you believe that that concept is communicated to users in the privacy policy?

**A.**    Yes, I do.

**Q.**    Last question.  You were shown some deposition testimony about what happens to the data that Google collects.

Was it your job or assignment to know what happens to the data, where it is logged or how Google uses it?

**A.**    No, it's not my job or my assignment, and it's also not my technical expertise.  I don't have that expertise.

        **MS. AGNOLUCCI:**  Thank you, Professor Hoffman.

No further questions.

        **THE COURT:**  You may step down.

        **THE WITNESS:**  Thank you.

                    (Witness excused.)

        **THE COURT:**  Members of the jury, we're done for the day.  Remember my admonitions.  Do not discuss this amongst yourselves or with anybody else.  Don't do any research.  Do

nothing associated with the case.  Put it all aside.  Have a lovely afternoon, and we'll see you at 8:30 tomorrow morning.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  We're out of the presence of the jury.

Who is on the list for tomorrow?  I know it's Ruemmler first; right?

MS. AGNOLUCCI:  Yes, Your Honor.

MR. SANTACANA:  Yes, Your Honor.

THE COURT:  And I will tell the jury that we're reopening the plaintiffs' case.

And then once we've completed Mr. Ruemmler's testimony, we can, either at the break or at the sidebar -- I know you want to make your Rule 50 motion.  I'll let you do that.  I'm not going to have discussion or argument about it, but you can make it.

And then who's next?

MR. HUR:  Your Honor, the next witness will be Dr. Knittel.

THE COURT:  Knittel?

MR. HUR:  Yes.

THE COURT:  Okay.  And then you're going to play -- and you're going to work out the Harvey deposition, and will we be playing that after Knittel?

MR. HUR:  Your Honor, if we play it, yes, I believe it

will be tomorrow.  We're working out whether we are going to play it at all.

MR. LEE:  Yeah.  To be clear, Your Honor, they're either going to play it with all of our counters, or they're not going to play anything.  They just have to make that decision.

MR. HUR:  That's right, Your Honor.

THE COURT:  And then on my witness list there are, like, two or three people left, and I don't think -- who's testifying out of this list?  After you finish with Knittel, whatever you do with Harvey, who's left?

MR. HUR:  Your Honor, our plan at the moment is to just have Professor Black testify --

THE COURT:  Okay.  All right.

MR. HUR:  -- after that.

THE COURT:  Okay.  And then if you have some rebuttal folks, they should be raring to go; right?

MR. DAVID BOIES:  We will.  We will -- given this information, we will get them ready right now, Your Honor.

THE COURT:  Okay.

MR. DAVID BOIES:  It's moving a little faster than we thought, but we will adapt to it.

THE COURT:  Okay.  Very good.  Thank you.

MS. AGNOLUCCI:  And what does Your Honor understand to be the rule about the disclosure of the rebuttal witnesses?

**PROCEEDINGS**

Because it was covered by our three-day protocol, but I think now we're maybe operating in a different world.

**THE COURT:** Well, at this point, because we may be even implicating a 24-hour rule, I think you should tell them who your rebuttal witnesses are.

**MR. DAVID BOIES:** We will do that tonight, Your Honor.

**THE COURT:** All right.  Okay.

**MR. DAVID BOIES:** We will do that.

**THE COURT:** Okay.  Very good.

**ALL:** Thank you, Your Honor.

**THE COURTROOM DEPUTY:** Do you want the time?

**THE COURT:** Oh, yes.  Wait.  The time.  I don't want to take R.J.'s moment away.

**THE LAW CLERK:** Thank you.

Plaintiffs have 9 hours, 1 minute, and 22 seconds. Defendant has 8 hours, 13 minutes, and 41 seconds.

**ALL:** Thank you.

(Proceedings adjourned at 1:35 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Thursday, August 28, 2025

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter