**Volume 8**

**Pages 1417 - 1614**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,          )
individually and on behalf of   )
all others similarly situated,  )
                                )
          Plaintiffs,           )
                                )
  VS.                           )   **NO. 3:20-CV-04688 RS**
                                )
GOOGLE LLC,                     )
                                )
          Defendant.            )
_____)

San Francisco, California
Thursday, August 28, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    BOIES SCHILLER FLEXNER LLP
                    333 Main Street
                    Armonk, New York 10504
               BY:  **DAVID BOIES, ATTORNEY AT LAW**
                    **ALEXANDER BOIES, ATTORNEY AT LAW**
                    **M. LOGAN WRIGHT, ATTORNEY AT LAW**

                    BOIES SCHILLER FLEXNER LLP
                    2029 Century Park East, Suite 1520n
                    Los Angeles, California 90067
               BY:  **ALISON L. ANDERSON, ATTORNEY AT LAW**
                    **SAMANTHA D. PARRISH, ATTORNEY AT LAW**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiffs:

BOIES SCHILLER FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131
BY:   **JAMES W. LEE, ATTORNEY AT LAW**

BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, California 94104
BY:   **MARK C. MAO, ATTORNEY AT LAW**
**BEKO O.R. REBLITZ-RICHARDSON**

SUSMAN GODFREY LLP
One Manhattan West, 50th Floor
New York, New York 10001
BY:   **WILLIAM C. CARMODY, ATTORNEY AT LAW**
**RYAN SILA, ATTORNEY AT LAW**
**ALEXANDER P. FRAWLEY, ATTORNEY AT LAW**

SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
BY:   **AMANDA BONN, ATTORNEY AT LAW**

MORGAN & MORGAN COMPLEX LITIGATION GROUP
201 North Franklin Street, Seventh Floor
Tampa, Florida 33602
BY:   **RYAN McGEE, ATTORNEY AT LAW**

For Defendant:

COOLEY LLP
Three Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
BY:   **BENEDICT Y. HUR, ATTORNEY AT LAW**
**EDUARDO E. SANTACANA, ATTORNEY AT LAW**
**SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
**JONATHAN PATCHEN, ATTORNEY AT LAW**
**NAIARA TOKER, ATTORNEY AT LAW**
**THILINI L. CHANDRASEKERA**
**ATTORNEY AT LAW**

COOLEY LLP
4401 Eastgate Mall
San Diego, California 92121
BY:   **MICHAEL A. ATTANASIO, ATTORNEY AT LAW**

Also Present:      **Steve Ganem, Google**
**Julian Santiago**

**I N D E X**

Thursday, August 28, 2025 - Volume 8

|                                            | PAGE | VOL. |
|--------------------------------------------|------|------|
| Plaintiffs Rest After Reopening            | 1525 | 8    |

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|-----------------------|------|------|

| RUEMMLER, CHRISTOPHER PHILIP               |      |      |
|--------------------------------------------|------|------|
| (SWORN)                                    | 1431 | 8    |
| Direct Examination by Mr. Carmody          | 1432 | 8    |
| Cross-Examination by Ms. Agness            | 1511 | 8    |
| Redirect Examination by Mr. Carmody        | 1519 | 8    |

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|-----------------------|------|------|

| KNITTEL, CHRISTOPHER ROLAND        |      |      |
|------------------------------------|------|------|
| (SWORN)                            | 1525 | 8    |
| Direct Examination by Mr. Hur      | 1525 | 8    |
| Cross-Examination by Ms. Bonn      | 1573 | 8    |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|----------------|------|------|------|
| PX3A           | 1447 | 1448 | 8    |
| G0104          | 1526 |      | 8    |
| PX118          |      | 1438 | 8    |
| PX388          | 1430 |      | 8    |
| PX389          | 1430 |      | 8    |
| PX390          | 1430 |      | 8    |

**Thursday - August 28, 2025**                                    **8:08 a.m.**

                            **P R O C E E D I N G S**

                                ---o0o---

      (Proceedings were heard out of the presence of the jury.)

            **THE COURTROOM DEPUTY:**  Please remain as you are and court will come to order.

            **THE COURT:**  Good morning.

            **ALL:**  Good morning, Your Honor.

            **THE COURT:**  Let's see.  I did get your new round of jury instructions.  Thank you.  I'll incorporate or consider those.

      And then it looks like I will be able to get you a set of -- a draft set which we can use to have our discussions tomorrow and a verdict form as well.

      Okay.  There's an issue of some kind; correct?

            **MR. SANTACANA:**  Yes, Your Honor.

            **THE COURT:**  What is it?

            **MR. SANTACANA:**  We received a disclosure last night, Your Honor, of two rebuttal witnesses, if you wanted to talk about that.

            **THE COURT:**  Do I want to talk about that?

                            (Laughter.)

            **THE COURT:**  I think you want to rephrase that.  I will talk about that.

            **MR. SANTACANA:**  We'd like to talk about that.

THE COURT:  All right.

MR. SANTACANA:  So there is a small but material chance that at least the first one would be called today, and so we thought we would --

THE COURT:  Okay.

MR. SANTACANA:  -- raise it with you now.

The two rebuttal witnesses that were disclosed to us are Mr. Lasinski and Dr. Hochman, plaintiffs' affirmative technical and damages experts.  We asked for an explanation as to what the basis would be to recall the affirmative experts, but haven't received one.

Our technical and damages experts have not yet testified, so I don't know if it's just a reservation of rights.  But the rule for -- especially in the expert space, but even for a regular witness, is if they put the witness on in their case-in-chief and then everything stays within the boundaries of the rebuttal experts' opinion on the defense side, then there's no basis to recall, basically restart your case-in-chief.

THE COURT:  Otherwise, there's an endless loop of expert testimony.

MR. SANTACANA:  Exactly, Your Honor.

THE COURT:  Mr. Boies?

MR. DAVID BOIES:  The first part of it is that we are going to listen to their experts, and they will be prepared to

rebut those experts.

The second thing, and we went through this with Dr. Hoffman yesterday, she testified to a great many things that were not in her report because what the Court ruled was that she could rebut the testimony that had come in. We didn't --

**THE COURT:** She was more limited than her report, I think.

**MR. DAVID BOIES:** Well, no, Your Honor. For example, as the deposition cross-examination showed, she had never test- -- never put in her report anything about believing that they had disclosed that when sWAA was off, they nevertheless collected data. She didn't know that at the time of the -- she had no opinion of that at the time of her report. She had no opinion of that at the time of the deposition.

She -- and she testified about how after her deposition, she'd done all this work and formed these additional views. And she was repeatedly asked by counsel, "Even though you didn't have an opinion then, do you have an opinion now?"

So she was rebutting not only the -- she couldn't have been rebutting our expert because our expert stayed within their bounds, and the expert that she was originally supposed to rebut didn't even appear.

So this was not a question of her rebutting people outside of their bounds or even rebutting somebody from their

testimony.

THE COURT: Well, okay.

MS. AGNOLUCCI: Your Honor, I don't want to get into a sideshow about Professor Hoffman, but that's false. Everything that she said yesterday was within the corners of her report. Counsel had the opportunity to cross-examine her about whether it was in her report. They didn't cross-examine her about her report once.

They showed deposition testimony about whether she could opine on technical details of what happened to the data. That is clearly outside the scope of what she was there to do.

But as for her opinions about progressive disclosure and about the disclosures, those were in her report. Yes, they were in the form of rebuttal to Schneier, but those were not new or surprise opinions.

And -- but, anyway, this is beside the point of what we're here to talk about now.

THE COURT: Well, I'm not sure it's entirely beside the point.

But I need to see from you, Mr. Boies -- I'm concerned that I don't think a rebuttal case, in my experience, is the open door for the endless loop of one expert rebutting the other, rebutting the other, rebutting the other. In my experience, ordinarily, you've got the -- you've got experts and you've got rebuttal experts, and you hear them and you're

done.

So you need to give me some case support for the idea that in a rebuttal case, you bring your experts back to rebut the last experts.  That, I have not seen.  So if you've got some cases to show me, maybe so.

But in my experience, the rebuttal case is a very limited case that pertains to rebutting fact witnesses, not the endless loop of expert rebutting expert rebutting expert.  I haven't seen that, so show it to me.

**MR. DAVID BOIES:**  Okay.  Let's give you something, Your Honor, but -- and we'll give you something on Dr. Hoffman because I don't agree with counsel that she was as limited as she says.

**THE COURT:**  I guess I'm not clear on -- Hoffman said she wasn't particularly -- before her report, she wasn't aware, and now she's aware of something.

Is she giving an expert opinion on -- all you're talking about is the switch on and off, and I don't see what she adds to this process.

**MR. DAVID BOIES:**  Well, that was part of our argument to keep her off the stand, Your Honor.

**THE COURT:**  Well, okay.  But she was on there.  But I don't think it particularly advanced the ball with respect to that issue.  So I'm not sure what you're rebutting but...

**MR. DAVID BOIES:**  We'll give you --

THE COURT:  Okay.

MR. DAVID BOIES:  We'll give you something, Your Honor.

THE COURT:  All right.  So if we, by some chance, finish off the -- and all that's left is whether or not we're going to have rebuttal witnesses, we can adjourn for the day, and then I'll tell them to come back for tomorrow and it'll be a very short day and they won't be -- in other words, it doesn't have -- even if you get to the point that this decision is upon us, because things have gone well today in terms of getting things done, that's okay.  Don't worry about it.

If I think a rebuttal case is -- further rebuttal case is appropriate, they'll come back tomorrow.  So don't worry about rushing for me to decide this before the end of the trial day today.  I want to get something.

You're looking perplexed at what I'm saying.

MS. AGNOLUCCI:  Well, I was -- because tomorrow's Friday, and my understanding was that the evidence was coming in tomorrow.  I wasn't clear if Your Honor --

THE COURT:  What evidence?

MS. AGNOLUCCI:  That we were finishing with witnesses tomorrow.

THE COURT:  That's my hope.

MS. AGNOLUCCI:  Yeah.  So it wasn't clear to me when Your Honor was going to -- was intending to rule on these

rebuttal witnesses.

THE COURT:  Well, what I'm trying to say is if --
Mr. Santacana said, "Maybe we may actually be done today."
And so if we are, don't feel that you have to expand things or something.  In other words, we'll end whenever we end today; and if, God willing, we actually have your case complete and the only issue is whether or not to have this rebuttal, you don't have to rush and say, "Oh, he's going to decide it right now."  I will adjourn for the day, and we will then have a thoughtful process of whether or not this rebuttal will happen.

You understand what I'm saying?

MS. AGNOLUCCI:  I do, Your Honor.

THE COURT:  Okay.

MR. SANTACANA:  And I just wanted to add, Your Honor, we do have cases on this if Your Honor would like to --

THE COURT:  I do want to --

MR. SANTACANA:  -- receive them.

THE COURT:  I do --

MR. SANTACANA:  Okay.

THE COURT:  -- which is why I don't -- I know you're busy right now; but, I mean, I don't want to rush it and just, off the top of my head, decide this issue.

I want to see something on it.

MR. SANTACANA:  We appreciate it.

THE COURT:  Okay.

**MR. DAVID BOIES:**  Thank you.  Thank you, Your Honor.

**THE COURT:**  Yeah.  Good.

How are you feeling today, Mr. Carmody?

**MR. CARMODY:**  Better.  Thank you, Your Honor.

**THE COURT:**  Good.

**MR. CARMODY:**  One last issue, Your Honor, I did want to bring to the Court's attention before the jury arrives.

We are resting once we're done with Mr. Ruemmler, and --

**THE COURT:**  Yes.

**MR. CARMODY:**  -- what we talked to counsel about is we're going to make an offer of all the privacy policies and help pages that Google has produced that were in effect during the class period.  And didn't think there's any objection there.  We've given them the notice of what the exhibits are so we can get that done so the record is clear.  Then, of course, we're going to pass our case.

So I just wanted to give the Court a heads-up because I think they're in agreement, but if they're not, it's something I think we should take out of the presence of the jury unless the Court wants us to do it in front of the jury.

**MS. AGNOLUCCI:**  Your Honor, we -- this is an issue that the parties have been going back and forth about on for weeks.  We absolutely agree and, in fact, it was our proposal to put in versions of the privacy policy and certain Help Center pages.  The parties had prepared indexes of those

and were debating.  And plaintiffs' counsel's positions was, "These are too many.  We need to narrow it down."  We went to a representative sample, went back and forth.

I just, 30 seconds before we got up with Your Honor, received a table from counsel.  We need to cross-check these, and so we're happy to take a look.  We can't do it in 30 seconds.  We'll do it at some point later today.  I don't think it matters whether this happens before they rest or after they rest.  We will, of course, meet and confer in good faith and review these, but we need to double-check which ones they've chosen and whether we have any to add.

THE COURT:  Okay.

MR. CARMODY:  And all we did, Your Honor, from what we had back and forth, is we eliminated all the duplicates.  So it's a narrowed-down list, and counsel can look at it.

But I just want to make clear on the record that when we do rest after Mr. Ruemmler, it's subject to just getting in, during the class period, all the non-deduplicates of the privacy policies that Google had and Google's help pages.

THE COURT:  But that concept, everybody agrees on.

MR. CARMODY:  Yes, I think so.

THE COURT:  It's just the logistics of how you do it.

MS. AGNOLUCCI:  Yes.  And I don't want these admitted without us having had the chance to review this list.  Like I said, we've been trading lists for weeks, and it's not

something that can be sprung on us with no notice.  So we're happy to do that at the end of the day today, Your Honor.

THE COURT:  Well, okay.

MS. AGNOLUCCI:  And it can be deemed admitted in their case.  We're not going to object to any of that.

THE COURT:  All right.  Well, I think you can probably work this out in some protocol of some kind.  So, okay.

MR. CARMODY:  Thank you, Your Honor.

MS. AGNOLUCCI:  Thank you, Your Honor.

THE COURT:  We'll do the -- if we're not at a break point when Mr. Ruemmler is done and there is a motion, we'll just do it at the sidebar.

MS. AGNOLUCCI:  Yes, Your Honor.

THE COURT:  Okay.

MR. HUR:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Is there an issue about identifying the --

MS. PARRISH:  Good morning, Your Honor.  Samantha Parrish for the plaintiffs.

We just had one last housekeeping item that we wanted to clear up with the Court.

We wanted to mark for identification the three video clips that were played, the testimony from Mr. Miraglia marked as, for identification, PX388, the video clip from Mr. Kearns marked for identification as PX389, and Mr. Pichai's

congressional testimony clip marked for identification PX390.

**MR. ATTANASIO:** We understand they're being marked for identification to assist the court reporter and the Court, for the record, but not being moved into evidence; and with that, we have no objection, Your Honor.

**THE COURT:** Okay.

**MS. PARRISH:** Understood. Thank you.

**THE COURT:** And you're going to do this -- are you proposing simply to mark this, or are you doing something? Are you -- no.

**MS. PARRISH:** This concludes it.

**THE COURT:** Okay. Very good.

**MS. PARRISH:** We've handed up to Ms. Hom and that should take care of it. Thank you, your Honor.

**THE COURT:** Very good.

(Trial Exhibits PX388, PX389, and PX390 marked for identification.)

**THE COURT:** So we'll start up again, hopefully, as soon as they're all here promptly at 8:30.

(Recess taken at 8:21 a.m.)

(Proceedings resumed at 8:37 a.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** Please remain as you are. Court will come to order.

**THE COURT:** Are we ready to have them come out?

**MR. CARMODY:**  Yes.

**MS. AGNOLUCCI:**  Yes.

(Proceedings were heard in the presence of the jury.)

**THE COURT:**  Good morning, members of the jury.

Ready to proceed, Mr. Carmody?

**MR. CARMODY:**  Thank you, Your Honor.

We're going to call our next witness, Mr. Chris Ruemmler --

**THE COURT:**  And --

**MR. CARMODY:**  -- Google employee.

**THE COURT:**  And let me just remind you, members of the jury, as I indicated to you before, the plaintiffs had completed their case with one witness remaining.  We then had the defense beginning to present their case.

Now we are reopening the plaintiffs' case for this additional witness because we had some witness scheduling issues.  So we are now back in plaintiffs' case for this witness, and then we'll go back to the defense case once we've finished this witness's testimony.

(Witness steps forward to be sworn.)

**THE COURTROOM DEPUTY:**  Could you please raise your right hand.

<u>**CHRISTOPHER PHILIP RUEMMLER**</u>,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

THE WITNESS:  Yes.

THE COURTROOM DEPUTY:  Thank you.  Make sure you don't fall off the stairs there.

Okay.  Go ahead, have a seat.  Make sure you speak clearly into the microphone for our court reporter and slowly.

THE WITNESS:  Okay.  Can you hear me?

THE COURTROOM DEPUTY:  Please state your full name for the record and spell your last name.

THE WITNESS:  Okay.  Christopher Philip Ruemmler. It's R-e-u-m-m-l-e-r.

THE COURTROOM DEPUTY:  Thank you.

THE WITNESS:  It's like a long mic.

### DIRECT EXAMINATION

BY MR. CARMODY:

Q.   We've got some homework for you there.

A.   Thank you.

Q.   Are you ready, sir?

A.   Yes.

Q.   I'm Bill Carmody.  We haven't met, have we?

A.   No.

Q.   Okay.  You have been at Google for 15 years; fair?

A.   Correct.

Q.   And you're still there today?

A.   Correct.

Q.   And you are a senior software engineer; fair?

**A.**   Yes.

**Q.**   And before that, you worked at Hewlett-Packard for about 20 or so years; correct?

**A.**   Correct.

**Q.**   And during the operative time frame in our case, you were Google's tech lead in security, trust, and privacy; fair?

**A.**   In the workspace organization, correct.

**Q.**   And "security" means making things secure; correct?

**A.**   Correct.

**Q.**   "Trust" means earning the trust of Google users; correct?

**A.**   Correct.

**Q.**   And "privacy" is making sure user data is private; fair?

**A.**   For identifiable data, yes.

**Q.**   Okay.  Now, I'm going to do something a little bit different.  I'm going to ask you if you agree or disagree on some basic principles of privacy.  Okay?

**A.**   Okay.

**Q.**   Do you agree that it's important for Google to respect users' privacy?

**A.**   Yes, of course.

**Q.**   Do you agree that a user should be able to choose whether Google obtains their data?

**A.**   What do you mean, "Google obtains their data"?  What do you mean by that?

**Q.**   Does the user have a choice?

**A.** They have a choice if they have a signed-in account and they did supply data to Google, yeah.

**Q.** My question is a little bit different, sir. My question was: Do you believe users should get to choose whether or not Google collects their data?

**A.** They -- they agree to a privacy policy when they sign up for a Google Account; and whatever the privacy policy says and they've agreed to, that's -- that's what happens.

**Q.** Do you agree that users, Google users, should have a meaningful choice that clearly explains what Google is collecting from them?

**A.** They agree to a privacy policy, and what's stated in the privacy policy is what they've agreed to.

**Q.** And to make that choice meaningful, you would agree with me that Google should explain to its users what data it collects from them; correct?

**A.** Correct.

**Q.** And what Google's going to do with that data; correct?

**A.** Correct.

**Q.** And is it fair to say, when we look at your writings today, it'd be fair to interpret your writings consistent with your beliefs about Google's privacy?

**A.** Yes.

**Q.** Okay. Now, you certainly have prepared with counsel to give your testimony today; right?

**A.**    That's correct.

**Q.**    Three years ago, just about three years ago, a little -- a little more maybe --

**A.**    Uh-huh.

**Q.**    -- you gave a deposition in this case; fair?

**A.**    That's correct, yeah.

**Q.**    And you were under oath then, as you're under oath today; correct?

**A.**    Correct.

**Q.**    And you prepared several days then, at least three days, to get ready for that sworn deposition; fair?

**A.**    Yes.

**Q.**    Okay.  And I'm guessing you prepared a whole lot more to be here and give your best testimony today; correct?

**A.**    Correct, yeah.

**Q.**    And you've looked over a lot of documents with counsel, haven't you?

**A.**    Yes, correct.

**Q.**    Okay.  And you certainly looked over, and closely, at the email exchange that the jury's seen in this case between you and Mr. David Monsees in July of 2019; correct?

**A.**    Yes.

**Q.**    You've looked at that document for hours; fair?

**A.**    Yeah, I have.

**Q.**    All right.  Now, just to clarify for the record, we

haven't prepared together?  I mean, you haven't worked with the plaintiffs in this case; correct?

A.    Correct, yes.

Q.    And you have a master's in computer science from Berkeley; correct?

A.    That is correct.

Q.    So in addition to your employment experience, the 20 years with Google and 15 years -- excuse me -- 20 years with Hewlett-Packard and 15 years with Google as a senior software engineer, you would agree with me that you are in at least as good a position as a Google user to understand how WAA works; correct?

A.    I probably have more internal knowledge, yes, for sure.

Q.    Okay.  So why don't we now turn to Plaintiffs' Exhibit 3, which is already in evidence, and this is what we talked about a little bit ago.

A.    Yes.

Q.    And this contains emails back and forth, and there's five total, between you and Mr. Monsees, and it's back in July 24th and 25th of 2019; correct?

A.    Correct.

Q.    And if we look at this email, we can see that when you write to him and he writes to you, the responses you have back and forth are kind of mixed together; fair?

A.    Yeah.  It's a threaded reply, yeah.

Q.   So it makes it difficult for someone who wasn't either you or Mr. Monsees to come in after the fact and try to figure out who said what to whom, when; correct?

A.   Correct.  It even makes it difficult for me to understand.

Q.   That's why we're going to take a minute now, before I actually question you on the document --

A.   Yeah.

Q.   -- to make sure we can figure out who said what to whom, when.

A.   Okay.

Q.   So with that background, what I want to do is tell you that I've -- between the sworn testimony of yourself and Mr. Monsees, I think we figured it out.

So what we're going to do, if it's okay, sir, is we're going to go through this email and we're going to highlight what you said in yellow, what Mr. Monsees said in a pinkish color.  We're going to do it on the screen --

A.   Okay.

Q.   -- so I won't go tamper with your documents.

A.   Okay.

Q.   We're going to do it on the screen.  And then we're going to label whether it's the first email in a chain or the second or the third so everybody's on the same wavelength to understand who said what to whom, when.  Okay?

A.   Okay.

Q.   So what I'm going to do first is leave Exhibit 3 just for a moment.

A.   Okay.

Q.   We're going to look at Plaintiffs' Exhibit 118.  And the reason I want to do that, sir, is because while there's five emails back and forth between you and Mr. Monsees in PX3, in Exhibit 118, we just have the first two emails.  So I think it's going to be easier for you to set the stage that away.  Okay?

A.   Okay.

Q.   Let's turn to Plaintiffs' 118, please.

Now, what we're looking at here, you can see, is an email exchange between you and Mr. Monsees; correct?

A.   Yes.

THE COURTROOM DEPUTY:  Has this been admitted?

MR. CARMODY:  It's not yet.  I think it's just being shown to the jury -- I mean, to the witness right now.  And -- well, let me just offer 118 to make it real simple.

MS. AGNOLUCCI:  No objection.

THE COURT:  118 will be admitted.

(Trial Exhibit PX118 received in evidence.)

BY MR. CARMODY:

Q.   So what we see, sir, when we look at --

A.   Yes.

Q.   -- Exhibit 118, it's fair to say that we can tell, by the

dates, we're looking at the first two emails in sequence of what we know as Exhibit PX3; correct?

A.   I'm trying to figure out the sequences here.

(Witness examines document.)   Okay.   Yeah, there's one -- there's one email below, okay.   Yes.

Q.   You send one to Mr. Monsees.   He responds and sends one to you; correct?

A.   Right.   This is from David.

Q.   Yes.   Mr. Monsees, I thought.

A.   Yeah.

Q.   Okay.   Wonderful.

Why don't we start -- just so we can start to color-code this now, let's start with your email because you send the very first one.   We can see it here.   It's from you on July 24th, 2019; correct?

A.   Yes.

MR. CARMODY:   And if we highlight in yellow, we start with "David" and go all the way down to the end of the page where it says "Note."   Take a look right there.   Keep going.

THE WITNESS:   Mm-hmm.

MR. CARMODY:   Keep going, Mr. Boles.   Thank you.

All the way through the word "Note."

BY MR. CARMODY:

Q.   Now, that was all part of your very first email to him; correct?

A.   I don't know if "ever," but my first email in this string.

Q.   I'm sorry.  Yes, sir.  To be sure about it, on July 24th --

A.   Yes.

Q.   -- this is your first email to Mr. Monsees --

A.   Yes.

Q.   -- correct?

A.   Yes.

Q.   Okay.  And now we're going to turn over to the next page, because your email continues, and it continues in the third paragraph that says "But that" and continues the next three, I guess it's maybe four paragraphs, up to "By some interpretations."

     And -- no, that's Mr. Monsees.

          (Reporter interrupts to clarify the record.)

          THE WITNESS:  Oh, I'm sorry.  I was just saying the same thing that Bill was saying.

BY MR. CARMODY:

Q.   So what we can see here, again, sir, this, what we're looking at on the big screen that's highlighted, is all part of your first email to Mr. Monsees; correct?

A.   Yep.

Q.   Okay.  And then, finally -- we have a little bit more to go -- beginning with "So it appears" and the next two paragraphs, ending with "their activity."  Do you see that,

sir?

A.   Yes, I do.

Q.   Again, the next two highlighted paragraphs are all part of your first email to Mr. Monsees; correct?

A.   Correct.

Q.   So what we're going to do is, I'm going to have Mr. Boles here bracket that, and we're going to call it CR1.  CR to denote yourself.

A.   Mm-hmm.

Q.   And 1 to denote that this is the very first email in the chain.  Okay?

A.   Okay.

          MR. CARMODY:  Okay.  Let's do that, please, Mr. Boles.
     Do we have it all done?

BY MR. CARMODY:

Q.   Okay.  So then I'd like to go now to Mr. Monsees' response to you.  And we can see that on the next day, Mr. Monsees responds, and from "Hi, Chris" all the way down to "other comments in line..."; correct?

A.   Correct.

Q.   And then if we go to the bottom of the page, we can see that "Critical to note."  That's also from Mr. Monsees; correct?

A.   Correct.

Q.   And if we turn to the top of the next page, we can see

"That scope is defined."

Those two paragraphs, again, are from Mr. Monsees; correct?

A.   Correct.

Q.   And, finally, if we look in the middle of the page, "By some interpretations," that paragraph and, finally, the paragraph beginning with "Today," that's all part of Mr. Monsees' response to your July 24th email; fair?

A.   Fair.

Q.   Okay.  So what we're going to do is I'm going to ask Mr. Boles now to mark this as "DM" for David Monsees, "2" being the second email in this chain.  Okay?

A.   Yep.  Sounds great.

Q.   Great.

(Pause in proceedings.)

MR. CARMODY:  All set?

BY MR. CARMODY:

Q.   So we can see everything Mr. Boles has done here is accurate; fair?

A.   Yes.  So just the yellow is me, but my initials got lost.

Q.   What's that?

A.   My initials aren't on there anymore.  I thought my initials --

Q.   Oh, they should be.

MR. CARMODY:  Can you please go back?

BY MR. CARMODY:

Q.   I'm so sorry.  You're exactly right.

A.   Yeah.

        MR. CARMODY:  Now, if you will, Mr. Boles -- it looks like you're done.  Will you let Mr. Ruemmler please see, and go through it slowly, so we're not doing anything too fast.

BY MR. CARMODY:

Q.   Make sure, sir, you're looking at the big screen or the screen, it's easier, right in front of you.

A.   I can't see that screen, so...

Q.   Yeah.  And if you just make sure that we have properly identified your initial email to Mr. Monsees, everything you said in that email, and his kind of interlined response to you.

A.   Right.  Can you go back to the first page?

Q.   Yes, sir.

        MR. CARMODY:  It would be the second -- okay.  You got it?

BY MR. CARMODY:

Q.   Make sense?

A.   Yeah.

Q.   Okay.

A.   Yellow is me.

Q.   Good.

     Now, what I want to do, with that done, I want to go back to Plaintiffs' Exhibit 3, if we can.

**A.**    Okay.

**Q.**    And what we're going to do is take what we've already gotten from Plaintiffs' Exhibit 118 and pop that right into Plaintiffs' Exhibit 3.

**A.**    Okay.

**Q.**    Are you done?  Looks like it.

So do you agree so far, sir, that what we've done is taken what we've learned, to who said what to whom, when between you and Mr. Monsees in the first two emails, and now we've put that color-coding sequence into Plaintiffs' Exhibit Number 3?

**A.**    Okay.  Can you go to the third page?

**Q.**    Of course.  It'll be the last page.

**A.**    Yes, that looks correct.

**Q.**    Thank you, sir.

Now what we're going to do is we're going to finish off the last three emails in this chain together.

**A.**    Okay.

**Q.**    The next one we see in order would be your response, and we can see it on the middle of page 1.  And it says, "On July 25th of 9:08 a.m."  Do you see that?

**A.**    Mm-hmm.

**Q.**    Where you say "David," comma?

**A.**    Yes, correct.

**Q.**    Okay.  And underneath that, sir, if we go from "The activity controls" all the way to the bottom of the page, we

can see that is what you wrote to Mr. Monsees; correct?

A.   Correct.

Q.   Okay.  And then if we turn to the next page, we can see you wrote the last -- or, excuse me -- the top two paragraphs and signed off with "Chris."

A.   Correct.

Q.   So what I'd like to do here is ask Mr. Boles to denominate this with the same brackets you've been using as CR3, referring to yourself, Chris Ruemmler.  And this is the third email we have in this chain; correct?

A.   Correct.

Q.   Now, let's turn back to the first page, and we're going to get the two final emails, which are pretty short.

Okay.  What we can see here now, sir, in response to your third email in the chain, Mr. Monsees, on kind of the -- there we are -- where he says, "Hi, Chris," and he goes right to the end, he says, "Cheers" and "Dave."  That would be Mr. Monsees responding to your July 25th 9:08 a.m. email; correct?

A.   Correct.

MR. CARMODY:  And let's denominate this, if we can, please, as DM4.

BY MR. CARMODY:

Q.   Finally, let's take a look.  The last email here we have is from you back to Mr. Monsees, and we can see it's just two lines.  And that is the fifth email in this chain; correct?

**A.**   Correct.  I'll take your word for it.  I'm not counting, but yeah.

        **MR. CARMODY:**  Why don't you denominate that, if you will, then, Mr. Boles, as CR5.

**BY MR. CARMODY:**

**Q.**   To reflect your initials and the fifth email in the chain.  Okay?

**A.**   Yeah.

**Q.**   Now, would you agree, we've taken some time to do this --

**A.**   This is great.  Thank you.

**Q.**   -- but -- thank you.

        But what we've done, you would agree with me, is accurate; correct?

**A.**   Yes, the way you --

**Q.**   It's helpful --

**A.**   Yeah, very helpful.  Thank you.

**Q.**   It's helpful for all of us --

**A.**   Yeah.

**Q.**   -- to go back and to be able to see who said what to whom, when --

**A.**   Yep.

**Q.**   -- correct?

**A.**   Exactly.

        **MR. CARMODY:**  What I'd like to do, Mr. Boles, is have you, with your little printer there, print out this color-coded

version.  I'd like you to mark it Exhibit 3A.

(Trial Exhibit PX3A marked for identification.)

BY MR. CARMODY:

Q.   So it's the same exhibit as Exhibit 3.  The only difference is we've color-coded who said what to whom, when, and we have the brackets to tell us; correct?

A.   Correct.

Q.   Okay.

THE COURT:  Can we move those easels away?

MR. CARMODY:  Oh, yes, we can.

THE COURT:  Thank you.

MR. CARMODY:  Are you ready?  I'm waiting for the little printer to work here.

(Pause in proceedings.)

MR. CARMODY:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. CARMODY:

Q.   There you are, sir.

A.   Oh, thank you.

Q.   You're welcome.

What I'd like to do --

MS. AGNOLUCCI:  Can we have copies as well?

MR. CARMODY:  Oh, yes.  I'm sorry.

MS. AGNOLUCCI:  Thank you.

MR. CARMODY:  Do we have a copy for the Court?

Thank you.

(Document handed up to the Court.)

MR. CARMODY:  What I'd like to do now, Your Honor, is offer Exhibit 3A into evidence.

MS. AGNOLUCCI:  Your Honor, we have no objection to this being used as a demonstrative aid.  We don't think it should go back to the jury in evidence as marked up by counsel.

MR. CARMODY:  Well, of course it's not hearsay.  It's an in-court statement.  And we're doing this, Your Honor -- obviously, you have broad discretion under Rule 611, but this is for us to aid the jury so they don't have to have a photographic memory.

THE COURT:  I get it.  I get it.  I will admit 3A.

MR. CARMODY:  Thank you, Your Honor.

(Trial Exhibit PX3A received in evidence.)

BY MR. CARMODY:

Q.   Now, what I'd like to do, sir, is go through Exhibit 3A together.  Okay?

A.   Okay.

Q.   And because it's a long email, we're not going to go through every single thing, but we're going to go through parts of it.  Okay?

A.   Sounds good.

Q.   Let's begin on page 2 with the very first email in sequence, which is CR1.

This is what you said to Mr. Monsees back in July 24th of 2019.  You wrote [as read]:

          "Bryan Horling said" --

     Well, you started off with "David."  Then you said [as read]:

          "Bryan Horling said that you are the one responsible for determining how to change the wording...."

     And then you put a link there; correct?

A.   Correct.

Q.   We've been through this document with Mr. Monsees, and we know that link is the Google help page; correct?

A.   Correct.

Q.   Which has been admitted into evidence, I can assure you, as Exhibit -- Plaintiffs' Exhibit 113.

A.   Okay.

Q.   We'll see that in a moment.

     And to complete your sentence, though, you have [as read]:

          "Mr. Horling said you're the one responsible for determining how to change the wording at" -- this link -- "to properly reflect how Google handles the user's Web & App Activity when the WAA bit is disabled and enabled."

     Do you see that?

A.   "Disabled" -- can you read that again?  Which part are you

referring to?

Q.   I'm reading, sir, the very first sentence that you sent to Mr. Monsees.  Do you see that?

A.   After the link?

Q.   Excuse me?

A.   After the link?

Q.   After the link.

     [As read]:

          "... to properly reflect how Google handles the user's Web & App Activity when the WAA bit is disabled" --

A.   Disabled.

Q.   -- "and enabled."

A.   Yes, correct.

Q.   And the WAA bit we're talking about are the WAA controls and the sWAA controls; correct?

A.   I'm talking about the WAA controls here.

Q.   Okay.  And enabled is on and disabled is off; correct?

A.   WAA on and WAA off, yes, correct.

Q.   Okay.  And what you say in the very next sentence -- before I do that, why don't I turn to this link that you sent. It's Exhibit 113.  I think we have an easel here to make sure we can go through it together.

                    (Pause in proceedings.)

          MR. CARMODY:  I think it's best, Your Honor, to do

what's been -- okay.

(Pause in proceedings.)

MR. CARMODY:  Thanks, guys.

BY MR. CARMODY:

Q.   I guess two things.  Number one, sir, you can see that okay?  And you have it -- should have it on your screen too.

A.   Sorry.

Q.   I just want to make sure, before we continue, that you can see Exhibit 113 there and you can see it in your book, whatever is easier.  Okay?

A.   Correct.  Yeah.

Q.   I want to make sure everybody in the jury gets to see it either on the screen or up here.  Okay?

     And you mentioned the WAA bit a little bit ago.  Do you remember that?

A.   Mm-hmm, yeah.

Q.   And you would agree with me that when WAA is turned off, automatically sWAA is turned off too; correct?

A.   Correct.

Q.   Okay.  So now let's take a look and look at the link that you -- and, by the way, you chose to send this to Mr. Monsees; correct?

A.   Correct.

Q.   Okay.  So if we take a look up top, the very two top lines, I thought it would be clearer, but I can barely see

this, but the top two lines say [as read]:

"If Web & App Activity is turned on, your searches and activity from other Google services are saved in your Google Account," it goes on to say, "so you may get more personalized experiences, like faster searches and more helpful app and content recommendations."

Did I read that accurately?

A.   Yes.

Q.   Then it goes on to say, below that [as read]:

"When Web & App Activity is on, Google saves information like:"

And then there's a listing of four different little bullets.  Do you see that?

A.   Yes.

Q.   Okay.  And then after that, we can go below and see it also says [as read]:

"Google can save information like:"

And then there's a listing of several bullets as well; correct?

A.   Correct.

Q.   And, finally, sir, below that it says [as read]:

"To let Google save this information," it says, "WAA & App activity must be on."

That's the WAA toggle you talked about; correct?

**A.**    Correct.  And it's to save to your account.

**Q.**    Yes.  And it says -- well, it doesn't say "save to your account there."  You just said that, but it doesn't say it right here; correct?

**A.**    WAA is all about saving to your account.

**Q.**    No, I hear you.

**A.**    Okay.

**Q.**    Listen, and you've been prepped, I know, for, gosh, days and days and days.  But I'm saying right here, back in real life, before you met with the Google lawyers, if we look at what you said -- or, excuse me -- what you commented on, it doesn't use the words "Google Account"; correct?

**A.**    [As read]:

          "If you got your Google Account through work or
          school, you could need to contact your administrator
          or turn on the Web & App Activity additional service
          for your organization."
          It says "Google Account" right there at the top.

**Q.**    Yeah.  I'm looking right here, where we were just reading from.  It says [as read]:

          "To let Google save this information, Web & App
          Ac-" -- excuse me -- "Web & App Activity must be on."
          Do you see that?

**A.**    Yes.

**Q.**    Right there on that line, there's certainly no reference

to anything else; fair?

A.    Fair, on that line, yes.

Q.    Now, if we go below that, we can see the sWAA button.  It says [as read]:

        "The box" --

      It says [as read]:

        "To let Google save this information:  The box next to 'Include Chrome history and activity from sites, apps, and devices that use Google services' must be checked."

      And you know that refers to sWAA; correct?

A.    Yes, sWAA.

Q.    Okay.  And when it says "to save this information," it's fair to say it's all the information in the bullets above; correct?

A.    Correct.

Q.    Okay.  Now, with that background, we're going to get going.

      Now, I want to turn back.  Now we've looked at the help page, the link that you sent Mr. Monsees, and now I want to get back to your email if we can do that together.

      So what you say here, we've read the first sentence; and then you, in your second sentence, say [as read]:

        "The above text actually doesn't describe what happens when the bit is disabled."

"The above text" is referring to PX113, the help page link that you sent Mr. Monsees; fair?

A.   In the context of what I was discussing in this email about the WAA-off logging, yes.

Q.   And the next thing we can see it says is [as read]:

"The above text doesn't accurate" -- excuse me -- "doesn't describe what happens when the bit is disabled."

And you're referring to when WAA is off; correct?

A.   In the context of the WAA-off change, yes.

Q.   Now, we see [as read]:

"... given the way on/off works, one has to assume that disabled" -- and you say that means off -- "would be the exact opposite of what is described for what happens when the WAA bit is on."

Those were your words back in July 24th of 2019 --

A.   Correct.

Q.   -- correct?

Okay.  And when you used the word "one," you're referring to a Google user; correct?

A.   Probably, yeah.

Q.   Okay.  And you're looking at this.

[As read]:

"... given the way on and off works, one has to assume that off would be the exact opposite of on."

You're looking at this, that is, Exhibit 113 here, from a layperson's perspective; fair?

A.   No.  I was looking at it from internally.  I'm an internal Googler.  I'm looking at it as an internal person.

Q.   Okay.  So when you talked about "one then has to assume," aren't you at the time meaning "one" to be a Google user?

A.   It could be.  But I'm doing an analysis here of an internal issue.

Q.   And you have an -- by the way, I want to make sure.  I know you've done tons of prep, but you're telling us that's exactly what you thought -- you have an independent recollection of that's what you thought back in July of '19, or is that your recollection after you've been prepped?

A.   To be honest, July 2019 is, like, six years ago; right?  So --

Q.   That's my point.

A.   -- I don't know what the hell I was thinking all the time; right?  So --

Q.   That's --

A.   Yeah.

Q.   That's my point.

A.   Yeah.

Q.   I mean, in fairness, we are left just with your words of July 2019 --

A.   Yes.

**Q.**   -- six years ago, when, as you say, you don't exactly remember --

**A.**   Yeah.

**Q.**   -- what you -- what you meant then.

**A.**   Correct.

**Q.**   And we know you were prepped a whole lot, days and days and days, and you've had lots of time to look at this specific email.

But my point is:  In fair- -- wouldn't it be fair for us to rely on what's in your own writings six years ago and be able to rely on that versus some memory which you tell us you don't really have, a six-year-old memory?

        **MS. AGNOLUCCI:**  Objection.  This is argumentative. Counsel is testifying about the witness's preparation and making improper suggestions to the jury.

        **THE COURT:**  Sustained.

        **MS. AGNOLUCCI:**  Thank you.

**BY MR. CARMODY:**

**Q.**   Is it fair for us, sir, to rely on your written words of six years ago?

**A.**   In the context of what I was discussing.

**Q.**   And in fairness, you don't remember now exactly what you were discussing.  You said you don't have an independent memory of it; fair?

        **MS. AGNOLUCCI:**  Objection.  Argumentative.

THE COURT:  Overruled.

THE WITNESS:  I remember some things about this email, yes, distinctly.

BY MR. CARMODY:

Q.   Okay.  Now, you go on to say [as read]:

"Today, we don't accurately describe what happens when WAA is off."

Do you see that?

A.   (Witness examines document.)  Which page is it on?

Q.   Oh, it's -- I'm just following, sir, the next sentence. It's on the second page.

A.   Oh, okay.  Oh, okay.  I see it.  Sorry.

Q.   Okay.  Those were your words back in July 24th of 2019; correct?

A.   Correct.

Q.   And you meant what you said; correct?

A.   Again, this was discussing this WAA-off feature.  So in terms of the WAA-off feature, this is what I was discussing.

Q.   Yeah.  We can hold you to your words; fair?

A.   Right.  Right.

Q.   Okay.  So "today" meant as of July 24th of 2019; correct?

A.   I suppose, yeah.

Q.   Okay.  "We" is referring to Google, "We don't accurately describe."  Do you see that?

A.   Mm-hmm.

Q.   Is that a "yes"?

A.   I see that in the email, yeah.

Q.   Is "we" referring to Google?

A.   I assume so, yes.

Q.   Okay.  So as of July 24th of 2019, Google doesn't accurately describe what happens when WAA is off.  You're referring to the link you put to Mr. Monsees, the help page, PX113; fair?

A.   In the context of the WAA-off proposal, yes.

Q.   And you understood at the time that this link here, this was one of Google's public disclosures to all of its users; correct?

A.   Correct.

Q.   And you knew right then and there that when WAA is off, sWAA is automatically off; correct?

A.   That's just the way it works, yes.  When WAA is off, sWAA is off.

Q.   But you knew that back in July of 2019?

A.   I'm actually not sure if I knew that back in July of 2019.

Q.   You really don't know?

A.   I don't know.

Q.   Okay.

A.   I don't know when I became aware of that, yes, because this whole period, I was going through and understanding more about how WAA and sWAA and all these controls worked, yes.

Q.    We're going to get to that.

A.    Okay.

Q.    What we can see what you did, though, is say [as read]:

            "For instance, we" --

      And, again, referring to Google.  Do you see that?

A.    "We," yes.

Q.    [As read]:

            -- "we state the following for the 'on' state:"

      And you're referring to WAA on; correct?

A.    WAA on, yes.

Q.    And then what you do is you attach -- you cut and paste some bullets that we can see that came from the help page link, Exhibit 113; correct?

A.    Correct.

Q.    Okay.  And then below that, you say [as read]:

            "So when WAA is off, I'd expect the opposite to
      happen.  The opposite of the above is:  When WAA is
      off, Google does not save information like:"

      And then, again, you go back and cut and paste some bullets from the WAA help page; fair?

A.    Yes.  Does not save information tied to the user's identity in their account.

Q.    Again, you didn't say that right there; right?

A.    There's no words there, but that's what this whole email is about.

**Q.** And you knew that back in July of 2019, you're telling us?

**A.** I -- oh, this email is about the WAA-off change, yes.

**Q.** Now, look to the top of the next page. You go on and you say [as read]:

"Today" --

Or let me -- excuse me. You say [as read]:

"But that is not what is done either today or what is proposed going forward."

And you refer to GAIA temp logs. Do you see that?

**A.** Yes, I do.

**Q.** Okay. So when you used the word "today," you're referring, again, to July 24th of 2019; correct?

**A.** Right.

**Q.** And then you're also referring to what was then a proposed project, a future project that Google called the GAIA Temp Logs Project; is that fair?

**A.** It wasn't a future project. It was being developed.

**Q.** Okay.

**A.** The project was being developed.

**Q.** You want to describe it for us so we can all understand what it was?

**A.** Yeah. So there was change being proposed so instead of logging -- when WAA is off -- let's go from when WAA is on. So when WAA is on, your data -- data you collect, like in searches, is stored in your Google Account, so tied to your

identity. Your Google Account is like your janedoe@gmail.com. So you can go into My Activity, you can see all the searches and stuff you've done and things like that, and you can delete them if you want, and it's a transparency option.

So when WAA is off, data is not saved to your Google Account, your janedoe@gmail.com. It's -- it doesn't mean it's not saved. If it's not saved to your account, it's not saved to your identity; right? So it's de-identified and stored that way so Google can do ad revenue and all this other stuff. So that was with the WAA off.

So the change was, which I was very upset about, was: Oh, we're going to change it so instead of de-identifying it, we're going to keep it identified and store it for a temporary period of time, 60 days, and then delete it so that they can do some other things around some other issues with WAA.

And I go: That would be very bad because now WAA off is the same as WAA on for 60 days. You're storing the data identified to the user, to their janedoe@gmail.com account, yet they can't see this data. So that would be very bad.

And I go: You can't do that. Right? So you have to de-identify the data if that WAA is off. You can't have WAA off and store identifiable data to the Google -- you know, the user's account.

Q. So back in July 24th of 2019, you understood what the word "de-identified" meant; correct?

**A.**    Yes.  And it says in here, I reference de-identified.

**Q.**    Okay.  So you go on, then, to say --

        **MR. CARMODY:**  So before we go on, so to see what we just said, would you circle the word "or"?

**BY MR. CARMODY:**

**Q.**    [As read]:

        "But that is not what is done today or what is

        proposed going forward."

**A.**    Right.

**Q.**    And so it looks like we have two separate thoughts by you; correct?

**A.**    Correct.  It appears that way.

**Q.**    Okay.  Then you go on to say [as read]:

        "The line 'Ads you click on, or things you buy

        on an advertiser's site' we probably don't want to

        lose ever as that is how we charge for Ads."

        And you have a little smiley face.  Do you see that?

**A.**    Yeah.  We don't want to go out of business.

**Q.**    So you have here your -- again, this is a bullet that you've taken from the WAA help page; correct?

**A.**    What's the bullet?  Oh, "Ads you click on, or things you

do on an advertiser's site."

**Q.**    Yes.

**A.**    Yes.

**Q.**    Okay.  And when you talk about -- the word "we" is

referring to Google; correct?

A.    Mm-hmm, correct.

Q.    And how we charge for ads is how Google makes money; correct?

A.    One way they make money, yes, correct.

Q.    How they make money with -- when users turn off their WAA button; correct?

A.    They make money when users have their WAA button on too.

Q.    I get that.

A.    Either way.

Q.    Either way, WAA on or WAA off, Google makes money from it; correct?

A.    Correct.

Q.    Okay.  So now we -- let's go down below.  See where it starts with "So, it appears"?  You write [as read]:

        "So, it appears we have a real problem here with
    accurately describing what happens when WAA is
    disabled."

    Referring to when WAA is off; correct?

A.    In the context of the change -- of the WAA-off change, yes.

Q.    No, forget in the context of the change because we're going to get to that in the next sentence.

    This first sentence refers to your thoughts at the time, your concerns back in July 24th of '19 about the accuracy of

the WAA help page; fair?

**A.**   In terms of describing what happens when the WAA-off change is implemented.

**Q.**   Well, let's see that, sir.  The next sentence says [as read]:

"We should fix the current wording to reflect reality...."

Do you see that?

**A.**   Yes.

**Q.**   And then it has "and" --

   **MR. CARMODY:**  And maybe you need to circle the word "and."

**BY MR. CARMODY:**

**Q.**   [As read]:

"... and if we make the change to temp GAIA logging, then we need to be very clear about what data is collected with WAA off."

Did I read that accurately?

**A.**   Yes.

**Q.**   So before the word "and," it looks like -- and "the current wording" -- let me go back to "the current wording" because that was your word at the time; correct?

**A.**   Well, this is my email at the time, yes.

**Q.**   Yes.

**A.**   Yeah.

Q.   And "current wording," you were referring to the wording in this WAA help page that Google sent to all of its users, the current wording as of July 24th of 2019; fair?

A.   Right.  And that would need to be changed if what they were proposing was going to go through.

Q.   Well, no.  You say something different.  You say [as read]:

"We should fix the current wording to reflect reality...."

And reflecting reality, by the way, is when WAA is off, Google is still collecting the user's data; correct?  That was the current reality?

A.   When WAA is off, they're collecting de-identified data, yes.

Q.   As of July 25th of 2019; correct?

A.   Right.

Q.   And you knew that at the time?

A.   Right.

Q.   Okay.

A.   This email indicates that at the time, yeah.

Q.   And then you say:  And if we make the change to temp GAIA logging, then we need to be very clear -- if and then, we need to be very clear about what happens when this collected -- excuse me -- what is collected when WAA is off.

To be fair about it, this GAIA temp logging project never,

ever happened; correct?

A.   Yeah.  But at this time, it was proposed to happen.

Q.   I get it.  We're going to see your next paragraph.  It says [as read]:

      "The temp GAIA logging solution also" -- and
   maybe you want to circle the word "also" -- "also
   does not feel good to me as we are giving the user no
   way to exclude logging from their search activity."
   And if we stop there, in context, when you used the word "also," it seems like you're referring to fixing the current problem and voicing your concern that if you go forward with this GAIA logging project, you're not feeling so good about that disclosure either; fair?

A.   I'm definitely not feeling good about the GAIA logging change, yeah.

Q.   And you go on to say [as read]:

      "It seems like the best solution is to
   de-identify (as we do today)" --

A.   Yes.

Q.   [As read]:

   -- "but not keep the data forever (eliminate it in 30
   days) when WAA is off."
   So what we can see here is that in July 24th of 2019, you knew Google collected WAA-off users' data and it was de-identified; correct?

A.   Yes.

Q.   And "de-identified," we can agree it means pseudonymous; correct?

A.   Correct.

Q.   You knew all that as of July 24th of 2019; fair?

A.   Yes.  From this email, it appears that way, yes.

Q.   Okay.  And then you go on to say [as read]:

        "We still would need" -- circle the words "would need" -- "to modify the help article above" --

     And you're referring to, again, this PX113 we've been looking at; correct?

A.   Mm-hmm.

Q.   [As read]:

        -- "to indicate that WAA off is identical to being not logged in your account," and you say, "(data logged, but not tied to your account)."

     Correct?

A.   Correct.

Q.   That was your understanding --

A.   When WAA is off, the data should not be stored and tied -- stored tied to your account.

Q.   And you knew all that in July 24th of 2019; correct?

A.   Yes.

Q.   Now let's go and take a look at Mr. Monsees' response to what you say.

MR. CARMODY: Let's go to the beginning, if we can, Mr. Boles. It's the page -- there you go. It's where DM2 starts.

BY MR. CARMODY:

Q. So we have Mr. Monsees responding to you on July 25th at 8:42 a.m., and he says [as read]:

"Hi, Chris. Thanks for the thoughts!"

He goes on to say [as read]:

"Nick Linkow and I have discussed rewrites of all the UDC help center articles," and he says, "(including WAA/sWAA)" --

Do you see that?

A. Yes.

Q. [As read]:

-- "to create a more consistent structure to explain he kind of 'if it's on' versus 'if it's off' points you bring up."

Mr. Monsees goes on to say [as read]:

"Right now, my focus is on the actual consent language."

And he gives you a link there. Do you see that?

A. Yes.

Q. And with all the prep you've done, you know that link, and you can see it right here, it's to the Google My Activity page; correct?

**A.**   Correct.

        **MS. AGNOLUCCI:**   Objection.  Argumentative.

        **THE COURT:**   Stop the commentary about all the prep he's done.  Okay?

        **MR. CARMODY:**   Okay.

**BY MR. CARMODY:**

**Q.**   You understand, sir, that that is to the WAA activity page?

**A.**   Correct.

**Q.**   Okay.  And now he says:  Well, if we do that, we'll want those changes to flow down to the Help Center.

        Do you see that?

**A.**   Yes.

**Q.**   Let's go to the next page.  And you can see in the bottom of the page what Mr. Monsees says.  He says [as read]:

        "It's critical to note that WAA..."

        And in the parenthetical is other user data settings or control settings; right?

**A.**   Yes.

**Q.**   So he says [as read]:

        "Critical to note is that WAA (and these other
        settings) control saving of activity to your
        Google Account" -- and he has that in capital
        letters -- "(as they are account settings) for the
        primary purpose of a more personalized experience

across Google services."

Do you see that?

A.   Yes, I do.

Q.   And that's what you understood to be what Mr. Monsees said at the time.  There was no confusion; correct?

A.   No.

Q.   Okay.  He goes on to say [as read]:

"That scope" --

And he's referring to the scope of the WAA control; correct?

[As read]:

-- "is defined in the UDC" -- user data control -- "consent flows and" -- and circle the word "and," if you don't mind, Mr. Boles -- "and at the very top of the help center article...."

And he has -- it's the link he sent to you; correct?

A.   Correct.

Q.   Okay.  And just to be sure about it, that scope is referring to the scope of the WAA control that he says is defined at the very top of the Help Center article.

MR. CARMODY:  And can you underline that, Mr. Boles?

BY MR. CARMODY:

Q.   Do you see that?  No.  That's -- it's another link we're going to get to momentarily.

A.   Huh?  What?

Q.   I think you're looking at 113.  This is another link.

A.   Isn't that the Help Center article?

Q.   Excuse me?

A.   Isn't that the Help Center article?

Q.   No.  It's the WAA App & Activity.

A.   (Witness examines document.)  But you're saying Help Center article here.

Q.   Yeah.  At the very top of the WAA Help Center article, you know that is if WAA activity is turned on, your searches and activity from other Google services are saved in your Google Account so you may get a more personalized experience. Do you see that?

A.   Yes, but I'm trying to -- what is this article?  This is -- I thought this was a Help Center article.

Q.   We're going to go to, I think, what he's describing.  It's Exhibit 84.  Let me see if we can't get this.

         MR. CARMODY:  Is it still here, guys?  84 used in the opening statement.

         MS. AGNOLUCCI:  You mean the activity controls?

         MR. CARMODY:  Yeah.

         THE WITNESS:  Oh.  So you're talking about activity controls?

         THE COURT:  Just a second.

         THE WITNESS:  Okay.

         MR. CARMODY:  Can we pop this thing up?  Thank you.

**BY MR. CARMODY:**

Q.   Why don't we do this, sir.  Let's move on to your response.  Take a look --

         MR. CARMODY:  Go back, if we can, Mr. Boles, to the very first page.

**BY MR. CARMODY:**

Q.   And let's see the response you say here.

A.   Okay.  So this -- this is what Dave was talking about, you're saying; right?

Q.   No.  I'm --

A.   This is not the Help Center.

Q.   I'm moving on a second, sir.

A.   Okay.

Q.   What we're looking at is -- do you see the link he sent you that says "My Google Account activity controls"?  Do you see that?

         MR. CARMODY:  Why don't you circle that.

         THE WITNESS:  Yeah, yeah.  That's this one.

**BY MR. CARMODY:**

Q.   Exactly.

A.   Okay.

Q.   So in context, you send an email to Mr. Monsees; he sends an email back?

A.   Mm-hmm.

Q.   And in his email back to you, he acknowledges the if it's

on and if it's off, points you bring up, but then he puts a link.

MR. CARMODY:  Circle that link.

BY MR. CARMODY:

Q.   The link Mr. Monsees sent you is what we know as the link that you're looking up.  It's been marked in this case as PX84, but it's --

A.   Okay.

Q.   -- on the chart right here; correct?

A.   Correct.

Q.   Okay.  And now we see, right below, your response back to him, the third email in the chain; fair?

A.   Okay.  Yes.

Q.   Okay.  You write [as read]:

"The activity controls wording isn't any better."

Do you see that?

A.   Yes.

Q.   Any better than PX13, the help page you first brought up in your first email; correct?

A.   In the context of the WAA-off changes, yes.

Q.   And you say [as read]:

"I see how the wording here is very deceptive."

And "the wording here" is referring to the wording on Plaintiffs' Exhibit 84, which you're looking at in both,

you know, your book and on the big -- on the foam board here; correct?

A.    Correct.

Q.    Okay.

[As read]:

"The problem is it states:"

And then what you did is you cut and pasted from Plaintiffs' Exhibit 84 some certain words.  Do you see that?

A.    Yeah.  "The data saved in your account," that part?

Q.    Yes, sir.

So if we kind of circle that, "The data saved in your account helps...."

What we have, to give us all some context of what's going on, is the exhibit that was used in the opening statement has these exact same words on the very top; correct?

A.    Correct.

Q.    And so when you say, "The activity controls wording isn't any better.  I see how the wording here is very deceptive," "the wording here" is referring to what you just cut and pasted below the top two lines or three lines of Plaintiffs' Exhibit 84; fair?

A.    Yes, in context of the WAA-off change.

Q.    And then you write [as read]:

"The problem is it states:"

And you quote from the link that says [as read]:

"The data saved in your account helps give you more personalized experiences across all Google services.  Choose which settings will save data in your Google Account."

And the word "Google Account" is in capitals there; correct?

A.   Correct.

Q.   And then we have a paragraph that you write right below that; correct?

A.   Correct.

Q.   And that paragraph is where you voice your concerns with what you describe here; correct?

A.   In the context of the WAA-off change.

Q.   And what you say is [as read]:

"'Your Google Account' means your data, not Google's."

Do you see that?

A.   Yes.

MR. CARMODY:  And if you circle the word "Google Account" there.

BY MR. CARMODY:

Q.   And from what Mr. Monsees cites to you in PX184, that link --

MR. CARMODY:  And do it right above, if you don't mind, Mr. Boles.  Nope, that's not it.  I'm sorry.  It's the

words "Google Account."  There you go.

**BY MR. CARMODY:**

Q.   I want to be sure about it.  When Mr. -- when you copied from that link and you talked about "'Your Google Account' means your data, not Google's," you were referring to your -- and circle the word "your" too on both -- you're referring to the link; correct?  Your Google Account?

A.   Yeah, your Google Account --

Q.   Okay.

A.   -- like janedoe@gmail.com.

Q.   And you write "means your data, not Google's"; correct?

A.   What's stored in your account is your data.  You have access to it.  You can see it.  That's what My Activity exists for.

Q.   Now let's look at the second sentence you write.  You say [as read]:

        "If I choose not to store my data" -- excuse me.
    I didn't -- it doesn't say "my."
     [As read]:
        "If I choose not to store data in my account,
    then Google should not have access to the data either
    as the data should not be in the account."
    Those were your words; correct?

A.   Correct, in the context of the WAA-off change, yes.

Q.   Excuse me?

**A.**   In context of the WAA-off change, yes.

**Q.**   Are you saying this only has to do with this GAIA temp logging project that never happened?

**A.**   Correct.

**Q.**   Okay.  But we can't see those words anywhere in this -- in these sentences we're reading; correct?

**A.**   You can't, but this whole thread is about that -- that issue.

**Q.**   I hear you saying that now.  But in your deposition, do you remember when we went over that second sentence, you said, "I don't know what I meant"?  Do you remember that?

**A.**   Yeah.  I remember this distinctly because this email, I didn't even know what it was about.  And it's funny, because I was going through this deposition again, and I can see that I'm -- I'm deciphering what I'm understanding.  I didn't even know about the WAA-off change here when I -- at the deposition. I was, like, "What the hell is" -- it seems like we want to have a change.

I go -- it's funny.  It goes -- in the deposition, I go, "It seems like we're logging data tied to the user's identity and not showing it to them.  That seems really bad."

And I gave the example of, like, in Gmail, if you received a Gmail -- or sent a Gmail e-message tied to your identity and then Google hid that from you, that would be extremely bad because it's tied to your identity in your account and you

can't have access to it.

So that's what this whole WAA-off change was about, and that's why I was so concerned.

Q.   My question was, three years ago in your deposition was three years closer to what you wrote in this Exhibit Number 3; correct?

A.   Yes, that's correct.

Q.   And when we asked you in your deposition when you were -- after you prepped for three days and were sworn under oath what the second sentence here meant, you didn't know; correct?

A.   I didn't know about this.

Q.   Let's pop --

A.   You can do this, yeah.  But I went through and read the deposition, and it's obvious I hadn't seen this --

Q.   Sir, let's take a look --

A.   -- this document.

MS. AGNOLUCCI:  Let's let the witness finish his answer.

THE COURT:  No.  Let's wait.

Go ahead.  Question.

BY MR. CARMODY:

Q.   Let's look at page 105 and lines 4 to 19 [as read]:

"QUESTION:  So what scenario did you have in mind when you wrote about choosing not to store data in My Account?"

Your answer at the time was [as read]:

"ANSWER:  Like I said, I don't know, actually, what that means.  It's like a logged-in or logged-out experience; right?  So if you're logged in, you can associate data with my -- with my GAIA ID; right?  And the data is logged in, and My Activity is associated with a GAIA ID because you can go and manipulate it, you can delete it, you can change retention and all that stuff; right?"

And so then the question is [as read]:

"QUESTION:  So did you say that you don't know what the sentence you wrote means?"

And your sworn answer three years ago is [as read]:

"ANSWER:  I don't recall what I was writing back then. Sorry."

Correct?

A.   In the context, because I didn't have the context that this was about the WAA-off change.

Q.   Since then, you've had context after meeting with counsel; fair?

A.   Correct.

Q.   Okay.  Now, let's take a look at the words going back to PX -- or to your paragraph here for -- in the second sentence you say -- you wrote [as read]:

"If I choose not to store data in my account, then Google should not have access to it either as the data should not be in the account."

Do you see that?

A.   Right.  "Not in the account" means -- sorry.  Can I go?

"Not in the account" means not tied to my -- you know, it can't be tied to my GAIA ID.

Q.   Sir, choosing not -- when the user chose not to store data in the account, it's because the user had the WAA-off button on; correct?

A.   Correct.

Q.   Okay.  And you understand that whether WAA was on or off, Google always collected a user's activity; correct?

A.   In the WAA-off case, it was collected not tied to their identity.  In the WAA-on case, it's collected tied to their identity.

Q.   And --

A.   There's a distinction there between tied to your identity or not tied to your identity.

Q.   And you say you knew that at the time; correct?

A.   It appears I know that at the time now because -- I know at the time now.

Q.   Okay.

A.   Whether I knew it back then or not, I don't know, especially based on this email; right?

Q.   What we see here, sir, is in this paragraph -- and we're in the second sentence -- you're referring to, again, what you define, what you describe as your Google Account.  Do you see

that?

A.   Yes.

Q.   And when you write this second sentence, "If I choose not to store data in my account, then Google should not have access to it either as the data should not be in the account," and what you're talking about is why the wording in Plaintiffs' Exhibit 84 is deceptive; fair?

A.   No, I don't think so.  I'm talking about the WAA-off logging change.

Q.   Oh.

A.   This whole paragraph is about the WAA-off logging change.

Q.   But those words don't appear in the first sentence, the second sentence, the third sentence, the fourth sentence, the fifth sentence.  Those words, what you're saying now --

A.   Yes.

Q.   -- don't appear in these sentences we're going over now; fair?

A.   I don't think they have to appear.

Q.   Okay.  They didn't appear and they don't appear in what you wrote back in real life before the lawsuit; correct?

A.   What I wrote back in 2019?  Yeah, they don't have to appear there.

Q.   So are you saying now that the words you write are clear; they're not deceptive?

A.   The words I wrote?

Q.   Yeah.  I mean, what you're saying, if we go back in real life and see what you wrote, is [as read]:

        "The activity controls wording isn't any

     better."

     You said -- that was comparing PX84 with PX113 help page. And you said [as read]:

        "I see how the wording here," referring to

     Mr. Monsees' link to you, "is very deceptive."

     And it was very deceptive to you as of July 25th of 2019; fair?

A.   In the context of the WAA-off logging change, yes.

Q.   Okay.  But all you quote below and cut and paste is the top of PX84, and you don't mention there, or anywhere that I can see up on a big screen now, the WAA -- excuse me -- this temporary logging project; correct?

A.   It's implied in this paragraph.  There's all sorts of hints in here that it's implied to that.

Q.   Hints.

A.   I mean, there's all sorts of statements in here.  So I say [as read]:

        "Seems sort of silly to turn them off as I'm no

     safer with them off than on."

Q.   Couldn't everything you say here, sir, refer exactly to what you call the very deceptive wording in Plaintiffs' Exhibit 84?

**A.**    No.

**Q.**    Oh, okay.  So what you're saying now -- and, by the way, Plaintiff's Exhibit 84 is the last thing any user sees before they decide to put WAA on or WAA off; correct?

**A.**    Is this 84?

**Q.**    Yes.

**A.**    Okay.

**Q.**    Or sWAA on or sWAA off; correct?

**A.**    I don't know if it's the last thing they see.  I don't know if it's the last thing they see or not.  You can go just change this on the web page or wherever, yeah.  There's a consent moment at some point.  I don't know what happens during the consent moment.

**Q.**    Back in real life, you didn't go and click on anything here.  You just commented on and sent to Mr. Monsees what you read from PX84; fair?

**A.**    Yes.

**Q.**    Okay.  So you're telling us now when you wrote, "'Your Google Account' means your data, not Google's," you meant it only to refer, not to this Plaintiffs' Exhibit 84, this link we're looking at, but only in the context of this future GAIA logging project that didn't happen; fair?

**A.**    No.  This -- this would be invalid if the proposed change went through because no -- we would be logging data tied into their account when WAA was off.

**Q.**   Do you understand, sir, that this Web Activity page was in existence years and years and years --

**A.**   Right.

**Q.**   -- before the GAIA logging project even came into someone's brain at Google?

In other words, this Web & Activity page has been there from the beginning of the class period to eight years and two months later, when the class period ended.  You understand that?

**A.**   I understand that, yeah.

**Q.**   Okay.  And it existed in -- with the same words we're looking at without regard to some proposed GAIA temp project that never happened; fair?

**A.**   Yeah.

**Q.**   Okay.  So we're going back now.  We're looking at what you wrote.  And then you continue to say -- oh, and so just to be clear about it --

**A.**   Mm-hmm.

**Q.**   -- when you wrote, "I chose not to store data in my account" -- excuse me -- "If I choose not to store data in my account, then Google should not have access to the data either as the data should not be in the account," were you referring to the words from -- that you cut and pasted from PX84?

**A.**   Your account is My Activity.  So if I choose -- if I choose to store data in my account that says, "I don't want my

data logged, so I'm going to have WAA off," then Google should not have access to this tied to my identity.

Q.   Sir, remember my question?

A.   I was answering your question.

Q.   Is the answer to my question "yes"?

A.   Can you repeat your question?

Q.   Of course I can.

When you wrote, "If I choose not to store data in my account, then Google should not have access to the data either as the data should not be in the account," were you then referring to what's written above in PX84?

A.   I was referring to the account when the user has the WAA on.

Q.   How could the user --

A.   And in the context of the WAA-off change --

THE COURT:   Don't talk over each other.

Question.

BY MR. CARMODY:

Q.   Sir, it can't be in the context of WAA on because your words were, "If I choose not to store." You're referring to a user, and you said this about ten minutes ago, when the user clicks WAA off; correct?

A.   Correct.

Q.   Okay.  But my question to you is:  This second sentence you wrote stems from the link you posted above, the top two

lines of PX84; fair?

A.   But I'm talking about the WAA logging change.

Q.   Okay.

A.   So it's all in context.

Q.   I see.

A.   You can't take stuff out of context.

Q.   I agree.

A.   Okay.

Q.   Let's take a look at the third sentence.

[As read]:

"What you are stating is WAA" --

And when you say "you," you're referring to Dave Monsees; correct?

A.   Correct.

Q.   What Dave Monsees is stating is that WAA or any of the other controls does not actually control what is stored by Google but simply what the user has access to.

MR. CARMODY:  Would you circle the word "what."

BY MR. CARMODY:

Q.   And that was a true statement at the time?  That's what -- as of July 25th of 2019, that's what Dave Monsees had said to you; correct?

A.   That's me writing this right here.

Q.   Yeah.  What you wrote is [as read]:

"What you" --

You're referring to Dave Monsees; correct?

A.    Yes.

Q.    [As read]:

     "What you are stating is WAA (or any of the other controls) does not actually control what is stored by Google , but simply what the user has access to."

     So that's -- can we agree that's what Mr. Monsees told you?

A.    No, I don't think so.  Again, this is in the context of this WAA-off change.

Q.    Okay.  So when you wrote, "What you are stating is WAA (or any of the other controls) does not actually control what is stored by Google, but simply what the user has access to," that wouldn't have been an accurate sentence; correct?

A.    No.  It's accurate because it's -- then I say [as read]:

     "This is really bad."

     Then I go on to say more stuff.  So it's all about this, yeah.

Q.    We're going to get to what's really bad.  Let's hold on one second, though.

     So can we finally agree that this is what Dave Monsees told you, this third sentence, that this is what Dave Monsees told you as of July 25th of 2019?

A.    I'm just not going to -- sorry.  I can't agree to that.

Q.   Okay.  The fourth sentence, you wrote [as read]:

          "This is really bad."

     Do you see that?

A.   Yes.

Q.   Okay.  And when you say, "This is really bad," it sounds like you were concerned; correct?

A.   Definitely concerned, yes.

Q.   Okay.  And you're using the words "This is really bad" because it refers to the third sentence right before that; correct?

A.   Yes.

Q.   Because the user doesn't have any control what data Google's collecting even when the WAA button is off; correct?

A.   Tied to their identity.  If the data is tied to their identity, they have no control over it.

     If it's not tied to their identity, we don't even know what user it is.  So how can they, you know, control it?  How can they have access to it?  We don't even know who it is.

Q.   I'm a little confused here because you knew, when you were writing this email -- we established in your very first email, you knew WAA-off users still had their information collected but it wasn't tied to their, quote/unquote, "Google Account." You called it de-identified data in a pseudonymous account; correct?

A.   Correct.

Q.   Okay.  So a day later, your memory didn't change; right?

A.   Correct.

Q.   Okay.  So when you say, "This is really bad," you're referring, by the way, to the sentence that came right before that, your third sentence; correct?

A.   Right.

Q.   Okay.  And you agree, you wrote "really bad" because the user didn't have control over what data was stored by Google; correct?

A.   In their account.

Q.   It doesn't -- what do you mean by "their account"?

A.   I say "your Google Account" all around here.  It's tied to your identity.  So if you store data that's tied to someone's identity but the person doesn't have access to that data and they gave you that data, that is really bad.

Q.   Okay.  Let's stop one second.  WAA-on data goes -- we've learned WAA-on data goes to someone's account; correct?

A.   Correct.

Q.   WAA-off data is taken by Google but doesn't go to the person's account --

A.   Right.

Q.   -- correct?

A.   It's de-identified.

Q.   And you're referring to that de-identified data when you say "What you are stating is that WAA does not actually control

what is stored"?  You're referring to the WAA button being off and Google still controlling or taking information from the user; correct?

A.    With regard to the change that went into the log with the identity when the WAA was off.

Q.    And you're saying, again, this relates to this GAIA logging project that didn't happen?

A.    Correct.

Q.    And it's not relating to what was currently going on, the words that existed in PX84?

A.    Correct, it's not.

Q.    Okay.

A.    It's all related to this GAIA logging project.

Q.    Okay.

A.    This whole paragraph.

Q.    And is that what you said under oath in your deposition?

A.    Under oath, I didn't even know what this email was about, and I was trying to decipher the whole thing.

Q.    So you figured out what it's about after preparing with your counsel for your testimony; correct?

A.    Correct.

Q.    Okay.

A.    Because I had more information available to me than just a random email that was presented to me in deposition.

Q.    Now that you've had time to prepare with your counsel, you

understand the plaintiffs' position in this case and the defendant's position; fair?

A.   Yes.

Q.   Okay.  You go on to say [as read]:

        "If we're storing data the user does not have

     access to, we need to be clear about that fact."

     Do you see that?

A.   Yes.

Q.   You believed back in July 25th of 2019 that Google wasn't being clear about that fact; correct?

A.   If we were tying the data -- if we were using data that was tied to the Googler's identity -- the Google identity, the Google Account identity, then, yeah, that was not correct.

Q.   Forget that.  Pay -- look at PX84.

A.   Yeah.

Q.   At the time you wrote this back in July 25th, 2019 -- we're looking at the fifth sentence together -- "If we" -- if Google -- "is storing data that the user does not have access to, we need to be clear about that fact," you were referring to Plaintiffs' Exhibit 84; fair?

A.   In context of this GAIA temp logging change, yeah.

Q.   Then you go on to say [as read]:

        "In this case, the user has a false sense of

     security that their data is not being stored at

     Google when it is."

Do you see that?

A.   In the context of the GAIA change, yes.  If it's tied into their -- if it's stored with their GAIA ID and the user doesn't have access to it, that's very bad.

Q.   It says [as read]:

     "In this case, the user has a false sense of
     security that their data is not being stored at
     Google."
     These would be the users who had the WAA-off button; correct?  They turned WAA off?

A.   Yes.

Q.   Okay.  Then you say [as read]:

     "Have we performed any studies to see what
     customers think is happening when their" -- "with
     their data when they disable these controls?"
     Those were your words then; correct?

A.   Correct.

Q.   And you say [as read]:

     "It would be good to do a study and know if what
     is written is being properly interpreted by our
     users."
     Correct?

A.   Right, in the context of this WAA-off change.

Q.   Well, so you just couldn't --

A.   Sorry.  Would the user expect Google -- when WAA is off,

would the user expect Google to save the data tied to their identity and not show that to them?

Q.   Sir, a user didn't even know about some internal GAIA logging project that hadn't yet happened; fair?

A.   Right.

Q.   Okay.  Then you say [as read]:

"I have a fear it most likely is not."

And that was your belief then; correct?

A.   Are we talking about the proposal to do a study?

Q.   You said [as read]:

"I have a fear it most likely is not."

Do you see those words?

A.   Oh, yeah.  So I have a definite fear that users would not expect their GAIA-tied data, their account, their identifiable data to be stored and not have access to it.

Q.   You know there were no studies done, sir, ever in the history of Google to see what users thought of a potential GAIA logging project that never, ever happened; fair?

A.   I don't know that.

Q.   Okay.  And then you go on to conclude here [as read]:

"I for one didn't realize Google actually stored
    all of My Activity even if those controls were off
    and I work at Google!"

And you put an exclamation point.  Do you see that?

A.   Yes, I do.

Q.   Those controls referred to the WAA button; correct?

A.   Yes.

Q.   "All of My Activity" referred to WAA-on and WAA-off activity; correct?

A.   Yes.

Q.   You were voicing your concern as of July 25th, 2019; correct?

A.   Correct.

Q.   Now, let's move on and -- well, let's stop a second, I guess.

You wrote right above [as read]:

"The wording here is very deceptive."

Do you see that?

A.   Can you point it out?  Which --

Q.   Oh, yeah.  I have it underlined on the big screen, but it'd be in your book, sir.  Do you see where you start this?

A.   In this email screen, or where is it at?

Q.   I'm sorry.  It's -- I'm going back to the very first sentence in your third email in the chain.

You say --

A.   Okay.

Q.   -- [As read]:

"I see how the wording here is very deceptive."

Correct?

A.   Uh-huh, correct.

Q.   You did not say, "I think the wording is okay now, but I think it will become very deceptive only if we move forward with the GAIA logging project"; correct?

A.   Correct.

Q.   Okay.  So let's stop a second.

You're a fella who had 20 years at Hewlett-Packard, 10 years at Google at this time; correct?

A.   Correct.

Q.   You got a master's in computer science from Berkeley; right?

A.   Yes.

Q.   You agree -- would you agree with me that as of July 25th of 2019, that a Google user may not know, if they have their toggle off, their WAA toggle off, that Google is still collecting their activity?

A.   They shouldn't expect it to be tied to their account if they're collecting activity, no.

Q.   My question was a tad different.  My question is:  Would it be fair that a Google user --

A.   Uh-huh.

Q.   -- if they had WAA off, could think, "Hey, Google's not taking my -- all my activity from third-party sites"?  Is that a fair statement?

A.   No.

Q.   Okay.  Now, moving on, let's go to the top of the next

page.  You continue with recommendations to Mr. Monsees back in July 25th.  You know that; right?

A.   We're looking at the next page?

Q.   Top of the next page.  I'm sorry.

A.   The continuation from the previous page?

Q.   Yes, sir.  Yes, sir.

And, in fact, one thing I will tell you, if we end -- let me go back to the first page because we can see -- you've mentioned GAIA logging a lot today.

A.   Yeah.

Q.   And the only mention I see of it in this entire email that we're looking at is the last sentence, but let's look at what happens before that.

So we went over the first ten sentences, the one ending with your exclamation on the second-to-last line; correct?

A.   Correct.

Q.   Then you say [as read]:

     "Seems sort of silly to turn them off" --

You're talking about the WAA controls; correct?

A.   Yeah, WAA control off.

Q.   [As read]:

     -- "as I'm not safer with them off than on."

Those were your words then; correct?

A.   In context of the WAA-off logging change, yes.

Q.   And you write [as read]:

"Google will still give up any information," and you put in paren, "(such as my location) for any legal investigation against me because it has the data available (for up to 60 days)."

And you're referring to when the WAA button is off; correct?

A.   With the proposed change, yes.  That's what was so bad about the proposed change.

Q.   And you conclude with [as read]:

"I'm probably better off having WAA on and deleting the activity immediately versus having WAA set to off if Google moves to this temporary logging project."

Do you see that?

A.   Correct.

Q.   And that's the only mention we see of Google moving to a GAIA temporary logging project in this entire third email in the chain; correct?

A.   Right.  So if I put that at the beginning, I guess, maybe it would have made it more clear; but, you know, I had it at the end.

Q.   Okay.  And was that purposely that you did it that way?

A.   I was just writing this email.  I don't -- I was just writing an email at the time.  You know, I could write it one way or another.  I'm maybe not the best at English.  I don't

know.

Q.   I'm not criticizing your English.  I'm just asking you:
Did you purposely choose not to refer to the GAIA logging
project earlier on in your email?

A.   I have no idea.

Q.   Okay.  And then what you write is [as read]:
        "Google needs to be really clear about what user
   content we are logging and what we don't
   store/keep/log."
   Do you see that?

A.   Yes.

Q.   And then you say [as read]:
        "I am" -- "The WAA and other controls imply we
   don't log the data, but we obviously do."
   Now, when you're referring to "we," "but obviously we do,"
you're referring to the state of affairs as of July 25th of
2019; fair?

A.   I think this is still in reference to the WAA-off change.

Q.   I understand.  But remember my question?

A.   This -- you're taking it out of context.

Q.   Oh, no.  Let's go back.  I'm just looking at your words
when you say --

A.   Okay.

Q.   -- "but obviously we do," and what preceded that is the
"WAA and other controls imply that we don't log the data, but

obviously we do."

You're referring to obviously what Google was doing as of July 25th of 2019; fair?

A.    With the proposed change.

Q.    Well, there was no --

A.    I feel like you're trying to put words in my mouth here, like -- I know what I wrote here.

Q.    Okay.  I'm just trying to -- maybe if you disagree, you can disagree.

A.    I disagree.

Q.    But if you agree, you can agree.

My question is:  When you wrote, "The WAA and other controls imply we don't log the data, but obviously we do," your meaning -- you meant we log the user's data; correct?

A.    Yes.  But it depends whether it was tied to the account or not tied to the account.

Q.    You logged the user's WAA-off data; correct?

A.    You log -- yes, Google logs user's WAA-off data, yes.

Q.    And, excuse me.  Google logged a user's WAA-off data as of July 25th of 2019; correct?

A.    At that point, it was logged de-identified, yes.

Q.    And at two thousand- -- excuse me.  At July 25th of 2019, this GAIA logging project hadn't happened; fair?

A.    It was proposed.  That's what we're discussing here.

Q.    It hadn't happened; fair?

**A.**   It had not happened yet.  It was proposed, yes.

**Q.**   Okay.  Now, you go on to say [as read]:

        "We need to change the description to indicate
    even with the control off, Google retains this data
    and uses it for X purposes."

    And you say [as read]:

        "We" --

    You're meaning Google; correct?

**A.**   Yes.

**Q.**   [As read]:

    -- "need to change the description."

    You're referring to the description in Plaintiffs'
Exhibit 84, the link that you pasted here; correct?

**A.**   Correct.

**Q.**   Okay.

    [As read]:

        "And to indicate even when the WAA control is
    off, Google retains this data."

    You're referring to Google retaining a user's data and
what they use it for; correct?

**A.**   If it was retained tied to their identity, yes, it would
be a problem.

**Q.**   Well, we know that the WAA-off data was never, ever tied,
you told us, to a user's identity.  Well, let me back up.

    You understand that WAA-off data is connected to a

unique -- a unique device identifier?

A.    It's de-identified.

Q.    That wasn't my question.

A.    Yeah.

Q.    Do you understand that every user has a device that has a unique device identifier?

A.    Correct.

Q.    You understood that at the time; right?

A.    I don't know if I understood it at the time, but I understand that, yeah.

Q.    Okay.  And you understand, whether WAA is on or WAA is off, that unique device identifier goes along with other information that a user has from going on apps and sites that goes into a Google server; correct?

A.    I guess.  I don't work in that area.  I work in identified data -- identifiable data.

Q.    Well, you understand now that it goes into a Google server and then Google does a consent check to say, "Is the WAA toggle on or off"; fair?

A.    The WAA toggle is tied to your account, so you have to be signed in for the WAA toggle to work.

Q.    I was asking about when Google is doing the consent check process.  Do you know that or not?

A.    No.  I don't work on WAA.

Q.    Okay.  Go back, since you said -- and you're telling us

[as read]:

         "We need to change the description to indicate

     even with the control off, Google retains this data

     and uses it for X purposes."

     Do you see that?

A.    Yes.

Q.    And you're telling us you believed at the time you wrote this because this is only referring, and referring to nothing but a proposed future project; correct?

A.    Correct.

Q.    Okay.  Go back to the first email sequence.  It's the third page, it's the sixth paragraph, and it's the second sentence -- or, actually, it's the fifth paragraph, second sentence.

A.    The first CR1, I'm looking at?

Q.    Yes, sir.

A.    Okay.  Can you highlight where it is?

Q.    Yes.  Second sentence.

A.    Where at?

         MR. CARMODY:  If you want to underline "Possibly," the second sentence.  It'd be the fifth paragraph.  There you go.

     And to give some -- do you see that, Matt?  It's the sentence that begins with "We should fix."  If you just -- right there.  You got it.  Thank you.  And you can underline that whole sentence.

BY MR. CARMODY:

Q.   But to give context, because I'm starting with the second sentence -- maybe I should start with the first.  Because before you wrote the email we were talking about a day earlier, you said [as read]:

> "So it appears we have a real problem here with
> accurately describing what happens when WAA is
> disabled."

And that was, you told us, when WAA is off?

A.   Yes.

Q.   [As read]:

> "We should fix the current wording to reflect
> reality...."

And that was reality as of July 24th of 2019; correct?

A.   Correct.

Q.   And fixing -- and the WAA help page then, PX113; correct?

A.   Correct.

Q.   And then after the word "and" --

         MR. CARMODY:  Circle -- I'm sorry.  See the word "and"?  Maybe just circle that.

BY MR. CARMODY:

Q.   You then said [as read]:

> "... and if we make the change to temp GAIA
> logging, then we need to be very clear about what
> data is collected...."

Right?

A.   Correct.

Q.   Okay.  And, again, that change never happened; right?

A.   Correct.

Q.   Okay.  So going back to your second recommendation on PX3, what we see is you're telling -- making a suggestion --

MR. CARMODY:  I'm sorry.  It's the very first page -- or top of the second page.

There you go.  Second paragraph, last sentence, "We need."

BY MR. CARMODY:

Q.   This is from you to David Monsees.  It's July 25th of 2019?

A.   Mm-hmm.

Q.   You're saying [as read]:

"We need to change the description" --

Referring to PX84?

A.   Correct.

Q.   [As read]:

-- "to indicate even with the control off, Google retains this data and uses it for X purposes."

And Google had -- you knew, as of July 25th, when the control was off, Google was still collecting WAA-off user data; right?

A.   Yeah, de-identified data.

Q.   Okay.  Thank you.

Now let's look at the response Mr. Monsees sends to you right above that.

He sends a response that very same day, and when he sends a response to you.  He doesn't respond to any request to change WAA disclosures; correct?

A.   Correct.

Q.   He doesn't respond and talk about your concerns about a user's false sense of security when WAA is off; correct?

A.   Correct.

Q.   He doesn't respond and talk about Google's studies; correct?

A.   Correct.

Q.   He doesn't respond and say, "Chris, Google relies on progressive disclosures."  He doesn't say that here; correct?

A.   Correct.  What's a progressive disclosure?

Q.   What's that?

A.   What's a progressive disclosure?

Q.   That's my point.  In all your time at Google, you've never heard the term "progressive disclosures"; fair?

A.   Right.  I'm a software engineer.

Q.   Right.  But you've never heard the term?

A.   No.

Q.   Okay.  That's what I thought.

THE COURT:  Let's take our break.

And, first of all, can someone on your team remove these

so the jury can get out?

MR. CARMODY:  Yes.

THE COURT:  Members of the jury, remember my admonitions to not discuss this amongst yourselves or with anyone else, and we will try to start up around 10:30.

(Recess taken at 10:15 a.m.)

(Proceedings resumed at 10:34 a.m.)

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  Is everybody ready?

MR. SANTACANA:  Yes, Your Honor.

THE COURT:  Great.

(Proceedings were heard in the presence of the jury.)

THE COURT:  The jury is present.

Mr. Carmody.

BY MR. CARMODY:

Q.   Are you ready, sir?

A.   Yes.  Yes.

Q.   We're getting very close to the end.

MR. CARMODY:  Would you please put up Exhibit 3A again.

BY MR. CARMODY:

Q.   And we're getting to -- we were just at Mr. Monsees' response to you.  And what Mr. Monsees did is he copied Leslie Liu and asked you if you wanted to grab 30 minutes to have a meeting with himself and Leslie Liu; correct?

**A.**    Correct.

**Q.**    You knew Leslie Liu was a Google lawyer; correct?

**A.**    I don't know who she is now, actually.

**Q.**    Okay.  Mr. Monsees said you met with yourself and Leslie Liu.  Did that ever happen?

**A.**    I don't recall.

**Q.**    Okay.

**A.**    So it could have happened.  It could -- I don't remember. It was six years ago.

**Q.**    You do understand, from your preparation in this case, that when you do meet with lawyers, you can keep -- you can keep communications confidential?

            **MS. AGNOLUCCI:**  Objection.  Argumentative.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  Yeah.

**BY MR. CARMODY:**

**Q.**    Okay.  Now, you wrote at the top, you responded back and you said [as read]:

            "Thanks, David.  I'm well aware of that
      retention documentation.  I set up a meeting to
      discuss my concerns."

      Do you see that?

**A.**    Yes.

**Q.**    And the concerns you had were the concerns that we've gone over in your first and third emails in this Plaintiffs'

Exhibit 3A; fair?

A.   With regard to the WAA-off logging, yes.

Q.   And your concerns were about Google's disclosures, its public disclosures, Plaintiffs' Exhibit 113, the help page, and Plaintiffs' Exhibit 84, which was the WAA activity page; correct?

A.   On how those would need to change with WAA-off changes, yes -- need to be modified if we were going to do the WAA-off changes.

Q.   And your sworn testimony today --

A.   Mm-hmm.

Q.   -- is everything you said in this entire exhibit, Plaintiffs' Exhibit 3A, which is identical to Plaintiffs' Exhibit 3, everything you said was in the context of GAIA logging project; correct?

A.   I don't know if a hundred percent was, but, yeah, it was mostly about that, yeah.

Q.   And it was not -- you're telling us it was not in the context of you pulling up Exhibit 113, the help page, or you -- and saying, "That has inaccurate descriptions as of July 24th of 2019"; correct?

A.   With regard to the GAIA changes, yeah.

Q.   That's all.

     Okay.  And I want to make sure.  And Plaintiffs' Exhibit 84, when you're looking at that and saying, "That's

very deceptive" as of July 25th, 2019, you're saying that was only in the context of this future GAIA logging project; correct?

A.    It would be if it didn't get changed for the GAIA -- you know, if they launched the GAIA logging project and they didn't change the wording, it would be very deceptive, yes.

Q.    So what we're left with, your testimony is:  Since the GAIA logging project never happened, the emails we're looking at here in Plaintiffs' Exhibit Number 3 and 3A don't have any application; correct?

A.    Right.  So no change needed to be made to the stuff because nothing happened.

Q.    To be fair about it, that's not what you said in your sworn deposition; correct?

A.    I don't know.

Q.    Okay.  And, in fact, what Mr. Monsees said is, after the meeting with the lawyer, you and he never had any more messy emails.

My question to you, sir, is:  After July 25th of 2019, did you ever question Mr. Monsees again in an email about Google's disclosures to its users?

A.    I don't know.

        MR. CARMODY:  Okay.  I'll pass the witness.

        THE COURT:  Ms. Agnolucci?

                    (Pause in proceedings.)

**CROSS-EXAMINATION**

**BY MS. AGNOLUCCI:**

**Q.**   Good morning, Mr. Ruemmler.

**A.**   Good morning.

**Q.**   Counsel for the plaintiffs spent a lot of time asking you questions about the preparation that you did to be here today. Do you remember that?

**A.**   Yes.

**Q.**   Including meeting with me to prepare for your testimony today; right?

**A.**   Correct.

**Q.**   Counsel appeared to be suggesting that I or we told you what to say to this jury.

     And I want to ask you:  Are you here to tell the truth to this jury, Mr. Ruemmler?

**A.**   Yes, totally.

**Q.**   And are you here to tell this jury what you have to say?

**A.**   Yes, completely.

**Q.**   You spent a lot of time looking at the email that counsel spent probably an hour and a half questioning you about; right?

**A.**   Correct.

**Q.**   And in your preparation to be here today, you also spent a lot of time looking at that email; right?

**A.**   Correct.

**Q.**   How long ago did you write that email?

**A.**   Six years ago.

**Q.**   Six years ago.  That was one of probably many emails that you've written in your 35 years as a software engineer?

**A.**   I've probably written hundreds of thousands of emails.

**Q.**   Did you ever think that one out of hundreds of thousands of emails that you wrote would be the subject of an hour and a half of cross-examination?

**A.**   No.

**Q.**   But you spent time reviewing the email before you came here today; right, Mr. Ruemmler?

**A.**   Correct.

**Q.**   Why did you do that?

**A.**   Because I wanted to understand what the -- what I was trying to get across here.  I wanted to know what the truth was and what I was, you know, trying to get at.

**Q.**   Mr. Ruemmler, you said you've worked at Google for 15 years?

**A.**   Correct.

**Q.**   Do you like working at Google?

**A.**   I love working at Google.  It's an amazing place to work at.  There's lots of smart engineers and lots of very challenging projects to work on.

**Q.**   What products have you worked on throughout your time at Google?

**A.**   I worked on mostly Workspace, which is a productivity and

communication app similar to Microsoft Office.  It has first-party apps like Gmail and Google Calendar and Google Drive.

**Q.**   And when you talk about first-party apps like Gmail, Google Calendar, and Drive, is that different than third-party apps?

**A.**   Yeah.  First-party apps are apps that Google produces and maintains and controls and provides to the users; and third-party apps are things like, you know, Uber or Netflix, things like that.

**Q.**   Did you spend any time working specifically on third-party apps when you were at Google?

**A.**   No, never.  I've worked only on Workspace.

**Q.**   And in the context of the email that we were discussing today, was that about your work on first-party or third-party apps?

**A.**   First-party apps.

**Q.**   When a user is signed in to their Google Account and using a first-party app, what is your understanding of what happens when WAA is on?

**A.**   If they're signed in and they're using a first-party app, WAA is on, it records what activity that WAA records.  When they're on, it stores it to their account.

**Q.**   And what's your understanding of what happens when WAA is off?

**A.**   When WAA is off, then the data is de-identified and stored in a not identifiable manner, so it's no longer associated with the user.

**Q.**   And part of your role at Google was to work on privacy; right?

**A.**   Correct.

**Q.**   Do you have privacy concerns about de-identified data when WAA is off?

**A.**   No, because it's not associated to any user.  It's not the same.  Identified data, yes, I have major concerns about how you handle identified data, but de-identified data is not tied to any user.

**Q.**   When we were talking about the email that counsel had up on the screen and asked you about for an hour and a half, was your concern about identified data or de-identified data?

**A.**   Identifiable data.

**Q.**   Counsel highlighted the email and showed you lots of different places where you said, "This is really bad.  I'm concerned.  I'm worried."

What were you talking about?  Can you explain that context to the jury in your own words?

**A.**   Yeah.  I explained it during the other testimony, but I'll reexplain it again.

So the proposed change for this WAA-off logging change was to store the data in an identifiable form when WAA was off,

versus a de-identified form, and only store it for 60 days, a temporary period, and then get rid of it.

And I'm going:  Well, you can't do that because it's -- now WAA on and WAA off look the same, so -- for 60 days.  So how is the user going to know that their data is being stored in an identifiable manner versus a, you know, de-identifiable manner?  Right?

So storing de-identified data is not risky to the user because it's not identified with any user.  Google doesn't know what user that data belongs to versus identifiable data, yeah, you know exactly the user that data is associated with.

Q.    Okay.  So just so I'm sure that I understand, the proposal that was on the table at the time was never implemented?

A.    Correct.

Q.    And that proposal was that when WAA was off, the user's data would be stored tied to their identity?

A.    Correct.

Q.    Why did you have a problem with the data being stored tied to their identity?

A.    Because it wasn't going to be shown to the user, so you couldn't go to My Activity and see that data.  It was like -- because WAA off, you shouldn't have any data.  So that's why I said, "Hey, they don't have access to this data.  That's bad. It's tied to their identity.  They need to be able to delete it."

That's why I also said:  You know, I'd be safer, you know, with it on, to having WAA on and be able to delete it myself so at least I know what was recorded against me.  Right?  What searches I had done against my account.  But if you go and make WAA off such that it's tied to your identity but you don't have access to it, that's really bad.

Q.   Counsel spent a lot of time trying to, as you said, put words in your mouth and try to get you to say that that email was about de-identified data.

A.   Right.

Q.   As you sit here today, do you believe that email was about de-identified data?

A.   No, it was not about de-identified data.

Q.   As you sit here today, do you have concerns about Google storing de-identified data when WAA is off?

A.   No.  It's not associated with a user.

Q.   Why does that matter, that it's not associated with a user?

A.   Because it's -- it's -- if it was associated with the user, it would be the user's data; but if it's not associated with the user, it's anonymous.  It's -- you can't go back and associate it in any way.

Q.   From a privacy perspective as a privacy professional at Google, why does the fact that it's anonymous matter to you?

A.   Because it's not associated with a user.

**Q.**   Mr. Ruemmler, counsel spent a lot of time asking you about this poster board.  I'm just going to grab it here.

And I think you may remember he tried to get you to say that this disclosure had nothing to do with the Google Account. Do you remember that?

**A.**   Yes.

        **MS. AGNOLUCCI:**  May I mark the poster board, Counsel?

        **MR. CARMODY:**  Of course.

        **MS. AGNOLUCCI:**  Thank you.

**BY MS. AGNOLUCCI:**

**Q.**   I'm going to circle some of the references to the Google Account on this document.

This marker is not great, Mr. Ruemmler, but I've underlined the various places in that poster where there's reference to a Google Account.  Do you see that?

**A.**   Yes.

**Q.**   Do you have any doubt that the disclosure in front of you is clearly about what information is saved to a user's Google Account?

**A.**   No.  It clearly says "in your account."

**Q.**   And what does it mean when something is saved in your account?

**A.**   It means it's saved with your -- to your identity.  So if you have a Google Account like janedoe@gmail.com, that data is saved to the account called janedoe@gmail.com.

Q.   And your concern with the WAA-off logging proposal was that the plan was to save the data and do what with it?

A.   Save the data and associate it with janedoe@gmail.com, associate it with your account.  So if that was going to happen and they went through with the logging change, then this document needed to be changed to indicate that when WAA is off, we're still collecting your data and tying it to your account but we're, you know, doing limited purposes.  That was the purpose is X., there's -- where there's only so many purposes we're going to use this data for, even though it's tied to your account.

Q.   Mr. Ruemmler, you testified on cross about a consent moment.  I don't know if you remember that.  Do you remember that?

A.   A little bit, yeah.

Q.   You were being asked if a document was the last -- if that board over there that I'm pointing to, PX84 --

A.   Right.

Q.   -- the activity controls, was the last thing that a user sees before they turn sWAA off.

     Do you remember that?

A.   Yes.

Q.   And you said that you believed there was a consent moment.  Do you remember that?

A.   Yes.

Q.   When's the last time that you saw the language a user sees when they turn sWAA off?

A.   I don't know.

Q.   You don't remember it, as you sit here today?

A.   Right, no.

Q.   So you don't know, one way or the other, what Google tells the user, when they're choosing to turn sWAA off, about its collection of data?

A.   Right.  I don't work on sWAA, so...

Q.   Do you think WAA is a fake button, Mr. Ruemmler?

A.   What do you mean by "fake button"?

Q.   Does the button work?

A.   Well, when WAA is on, we collect data and it stores to your Google Account.  When WAA is off, data is not stored to your Google Account.

        MS. AGNOLUCCI:  No further questions.
Thank you, Mr. Ruemmler.

        THE WITNESS:  Thank you.

        MR. CARMODY:  Is this working now?

                 **REDIRECT EXAMINATION**

BY MR. CARMODY:

Q.   Okay.  You were saying a moment ago, sir, that it's no big deal to collect WAA-off information and activity because it's all de-identified; right?

A.   Correct.

Q.   And Google -- it's not personal to the user.  Is that what you're saying?

A.   It's not associated with the user anymore, right.

Q.   It's not personal information?

A.   I don't know about that.

Q.   Is it personal or not?

A.   It's no longer associated with an individual.

Q.   So is it the user's personal information or is it not?

A.   It can't be, by definition, because it's no longer associated with the user.

Q.   Bingo.

Take a look at 67, Plaintiffs' Exhibit 67.  It's in evidence.

MS. AGNOLUCCI:  Counsel, may I have a copy, please? It's not in my binder.

MR. CARMODY:  Of course.

(Pause in proceedings.)

BY MR. CARMODY:

Q.   What we're looking at, sir -- let me wait.

MR. CARMODY:  Did you get it, Counsel?

MS. AGNOLUCCI:  I did not.

MR. CARMODY:  I just did this on the fly.  I'm sorry. We don't have a hard copy.  Also, I'll --

THE COURT:  This was admitted; correct?

MR. CARMODY:  It's been admitted, oh, yeah.

THE COURT:  All right.

MR. CARMODY:  I didn't plan on using it.

THE COURT:  Well, then you see it on the screen.  Go ahead.

MR. CARMODY:  Okay.

BY MR. CARMODY:

Q.   So Plaintiffs' Exhibit 67 is one of Google's privacy policies; correct?

A.   Yes.  This privacy policy is meant to help you understand, yeah.

Q.   And it's effective July 1st of 2020; correct?

A.   Yep.

Q.   And this is while you're working at Google; correct?

A.   Correct.

Q.   And writing the emails we've seen?

A.   Yeah.

Q.   Turn to page 16.  We take a look at page 16, what we see here is Google identifies right in the middle -- I'm sorry, Mr. Boles, right in the middle -- Google itself defines the personal information it collects.  Do you see that?

A.   Yes.

Q.   Okay.  What Google defines as personal, the very first thing is [as read]:

        "Identifiers, such as your name, phone number, and address, as well as unique identifiers to the

device you're using."

Do you see that, sir?

A.    Yes.

Q.    You've told us that this WAA-off -- well, you understand, I hope, that this WAA-off data contains the user's unique device identifier; correct?

A.    I don't know that.  I don't work on WAA.

Q.    Okay.  You don't know that Google collects the unique device identifier for everybody who turns the WAA button off?

A.    No, I don't.

Q.    Okay.  And I'm guessing, then, before today, you didn't know that Google defined that as personal information to the user; correct?

A.    Correct.

MR. CARMODY:  Okay.  I'll pass, Your Honor.

MS. AGNOLUCCI:  No further questions, Your Honor.  Thank you.

THE COURT:  You may step down.

THE WITNESS:  Okay.  Thank you.

(Witness excused.)

MR. HUR:  Your Honor, Google calls -- oh, should we do a sidebar, Your Honor?

THE COURT:  Well, do you want to go to the side?

MR. HUR:  Yes.  Thank you.

THE COURT:  And also, were you going to move in

some -- Mr. Carmody, were you moving in some items?

**MR. CARMODY:**  Yes.

**THE COURT:**  Okay.

**MR. CARMODY:**  What I wanted to do, Your Honor, is -- should I say it in front of the Court?

**THE COURT:**  Yes.

**MR. CARMODY:**  We are going to rest, subject to admitting the exhibits we talked about.

**THE COURT:**  All right.  And so the record was clear, I did -- I said they were admitted; correct?

**MR. HUR:**  Your Honor, we had agreed that we would talk to the other side and make sure we're aligned on which of them, but we understand that they're not resting until they're in.

**THE COURT:**  I see.  You're still working on the list.

**MR. HUR:**  Yes, Your Honor.

**THE COURT:**  Okay.  Fine.

Do you want to go to the side?

**MR. HUR:**  Yes, Your Honor.

**THE COURT:**  And we will need you, Ana.

(The following proceedings were heard at the sidebar:)

**MR. PATCHEN:**  Jonathan Patchen, Cooley, on behalf of Google.

Good morning, Your Honor.

Google moves pursuant to Rule 50(a) for JMOL on all of the plaintiffs' claims, CDAFA, intrusion upon seclusion, and

invasion of privacy, as well as on each element discussed below, including damages.  We intend to file a memorandum of points and authorities in support to further explain.

At the beginning, the plaintiffs have a burden in this class action to prove their claims across the entire class. There is no assumption or preference or presumption based on class certification.

THE COURT:  Actually, you are going to file a further --

MR. PATCHEN:  Yes.

THE COURT:  -- submission, so you've made the record.

MR. PATCHEN:  Okay.

THE COURT:  I don't -- and I'm going to deny the motion, but that doesn't preclude you from submitting further materials; and then it can be renewed, of course, once the jury has done its work, if that is applicable.  Okay?

MR. PATCHEN:  Very good.  We will file by -- is there a time that you want it by?

THE COURT:  Well, it has to be --

MR. PATCHEN:  Before the jury -- we'll file it by Friday, end of the day Friday.

THE COURT:  I mean, it's up to you.

MR. PATCHEN:  Okay.

MR. DAVID BOIES:  We don't care, Your Honor.

THE COURT:  I know you don't care, and I know you

oppose it.

MR. DAVID BOIES:  Yes, we do oppose it.

(The following proceedings were heard in open court:)

THE COURT:  Just to remind you, members of the jury, the plaintiffs have now rested.  We had the out-of-order witness.  They've now rested, so it's back to the defense case.

Mr. Hur.

MR. HUR:  Thank you, Your Honor.

Google calls Dr. Christopher Knittel.

(Witness steps forward to be sworn.)

**CHRISTOPHER ROLAND KNITTEL**, called as a witness for the Defendant, having been duly sworn, testified as follows:

THE WITNESS:  Yes.

THE COURTROOM DEPUTY:  Thank you.  Go ahead and have a seat, and make sure you don't slide off the chair.  There's water there if you need it.

And could you please state your full name for the record and spell it.

THE WITNESS:  Christopher Roland Knittel.  Last name is K-n-i-t-t-e-l.

THE COURTROOM DEPUTY:  Thank you.

**DIRECT EXAMINATION**

BY MR. HUR:

Q.  Good morning, Professor Knittel.

A.   Good morning.

Q.   Professor Knittel, what do you do for a living?

A.   I'm a professor at the Massachusetts Institute of Technology.

Q.   What is your title at MIT?

A.   So I have two titles:  the George P. Schultz Professor of Energy Economics and a Professor of Applied Economics.

Q.   How long have you been a professor at MIT?

A.   Since 2011.

Q.   Can you please tell the jury what you teach at MIT?

A.   I teach mainly three classes.  The first is an energy and economics policy class that I teach to undergraduates, M.B.A. students and Ph.D. students, from across campus.

     And then, basically, our core micro class to full-time M.B.A. students, and then the core micro class to what are known as executive M.B.A. students.

Q.   Dr. Knittel, did you prepare a slide deck in preparation for your testimony today?

A.   I did.

          MR. HUR:  Your Honor, we plan to show as GO104 the slide deck prepared by Professor Knittel.

          THE COURT:  For identification, yes.

     (Trial Exhibit GO104 marked for identification.)

BY MR. HUR:

Q.   Professor Knittel, could you please tell the jury about

your educational background?

**A.**    Sure.  So working from most recent to backwards, I received a Ph.D. in economics from UC Berkeley; prior to that, a master's degree in economics from UC Davis; and then a bachelor's degree in economics and political science from Cal State Stanislaus.

**Q.**    Professor Knittel, what was your -- what was the focus of your Ph.D. from Berkeley?

**A.**    So when you get a Ph.D. in economics, you choose two subfields of economics, and my two subfields were industrial organization, which is the study of how consumers and firms make decisions and then how those decisions come together in a marketplace; and what's known as econometrics, and that's basically the economics use of data and statistics to answer questions of relevance to economics.

**Q.**    Professor Knittel, in addition to your teaching responsibilities at MIT, do you have any other positions?

**A.**    I do.  So I'm the director of a new -- a new center on campus known as the MIT Climate Policy Center.  That was endowed last year and is based off of an idea that I've had over the last three or four years.

I'm also the associate dean for climate energy and sustainability at the MIT Sloan School of Management.

And outside of MIT, I'm a research associate and a co-director -- the co-director of the environmental and energy

economics group at an organization known as the National Bureau of Economic Research.  We call it NBER.

Q.   Professor Knittel, is NBER known for anything in particular?

A.   Well, outside of economics, it's probably most known for -- it's the official entity that defines when a recession starts and when a recession ends.

Q.   Professor Knittel, you're not responsible for calling the recessions?

A.   No, I'm not.  No.

Q.   Have you published any of your work in academic journals?

A.   Yes, of course.

Q.   Can you give us some examples of some of the work that you've published?

A.   So I've -- again, industrial organization is trying to think about how consumers and firms make decisions.  I've written papers broadly, obviously, given my titles, in the energy and environmental space, but I've also written papers on other industries as well.  We have a recent paper on data centers.  I've worked a lot, actually, in banking and credit cards.  I've done some work on how consumers make decisions around cars; pharmaceuticals, how pharmaceutical companies price their products.

So my research spans quite a number -- number of industries.

Q.   Have any of those articles been peer-reviewed?

A.   The vast majority have been peer-reviewed.

Q.   What does it mean for articles to be peer-reviewed?

A.   So in academics, you know, you write a research paper; you want to publish it in a journal; you send it -- you send it to the journal.  It gets on the editor's desk, and the editor reads it; decides, first, whether or not to send it out for a referee.  If he or she decides to send it out to a referee, they choose, at least in economics, two or three referees, and they're experts in the field -- in that field on that topic.

And the editor sends it to those referees.  The referees critique it.  They also say, every once in a while, nice things about the paper and, ultimately, give the editor a recommendation as to whether or not it should be published, rejected, or what's called revised and resubmitted.

And if it's revised and resubmitted, "Here's a laundry list of things that I would like you to do."

Q.   Professor Knittel, how many of your articles have been peer-reviewed and published?

A.   So I believe I've published around 80 -- 80 papers or so, and I would imagine 80 percent of those have been peer-reviewed.

Q.   Professor Knittel, no offense.  Some of your papers sound a little boring.  Is there any of your work that was recognized in the popular press?

**A.** Well, I -- yeah. So I would say my most famous paper, certainly outside of economics, is a few years ago we actually ran a field trial where we had MIT undergraduates go out and take 1500 Uber and Lyft rides, and we established that Uber and Lyft drivers discriminate based on the race of the passengers. And that, you know, hit the full press coverage.

**Q.** Was there any follow-up to your work?

**A.** Yeah. So I would say -- so to Uber's credit, actually, they reached out to us and said, "Hey, how about we design another experiment to see what we can do to get rid of this discrimination?"

And there, they devoted, I would say, significant resources recoding their platform. And we ran that experiment, I think it was, over a three- to six-month period in four cities across the U.S.

**Q.** What was the change that you recommended and Uber made?

**A.** Yeah. So one of the results of that study -- and that's working its way through the journals right now -- is that we found that if you increase the font size of the passenger's rating so that drew the eyes away from the name, which is their basis for the discrimination, to the rating, it eliminated the discrimination.

**Q.** Professor Knittel, have you studied advertising or advertising technology?

**A.** Yes, I have.

**Q.**   And do you teach about digital advertising?

**A.**   We do, yeah.

**Q.**   Do you teach -- is conversion tracking or conversion measurement something that comes up in your teaching?

**A.**   It does, yes.

**Q.**   How so?

**A.**   Well, so when we teach -- the core micro class at Sloan is really teaching the students a set of skills that they can go out into the real world and apply those skills to any industry. And one of the skills that we teach the M.B.A. students, especially at a school like MIT, is how to optimize decision-making; and, obviously, data or conversion tracking is going to enter into that optimization program, if you will.

**Q.**   Professor Knittel, have you -- do you have prior experience as an expert witness?

**A.**   I do.

**Q.**   Can you tell the jury a little bit about that?

**A.**   So I've worked in a variety of cases, starting mostly around class action -- or, I'm sorry -- patent infringement damage cases, where my job in the case is typically to value the patent, if you will.  So there's some alleged infringement of that patent, and I bring to the court measures of how much that infringement was worth to the infringing -- allegedly infringing party.

I've also worked in class action cases, such as these,

where, there, I'm thinking about damages and how to use economic tools and that econometrics that I talked about before on how to estimate damages.

And I've also worked in several antitrust cases associated with antitrust or alleged mergers and acquisitions, potential collusion, and other antitrust issues.

Q.   Have you worked for both plaintiffs and defendants?

A.   Yes, I have.

Q.   Have you also worked for the Government?

A.   Yes.  So I've worked with the Government on three cases, two dealing with the Department of Justice and, one, the IRS.

Q.   Professor Knittel, have you ever worked for Google before?

A.   No, I have not.

Q.   Does your opinion change based on who hires you?

A.   Absolutely not.

Q.   How do you view your job as an expert witness?

A.   So my job as an expert witness is kind of like the referee that I talked about earlier.  It's to provide an opinion on the positives and the negatives of issues around -- around the case.

Q.   Have your opinions been accepted by other courts?

A.   Yes, they have.

Q.   Dr. Knittel, what was the focus of your assignment in this case?

A.   So my assignment in this case was to effectively read and

react to Mr. Lasinski's reports and try to understand whether they're economically viable, consistent with economic theory, whether or not his assumptions were realistic and whether or not his data were accurate and reliable.

Q.   What did you conclude?

A.   So, in my view, Mr. Lasinski's damages are grossly overstated and unreliable.

Q.   Professor Knittel, what is your hourly rate?

A.   For cases like this, or for consulting more generally, I charge $950 an hour.

Q.   And about how much have you been directly paid for your work on this case?

A.   I believe I've billed roughly 80 to a hundred hours.

Q.   Do you also receive a portion of the work that is billed by other economists who you work with on this case?

A.   Yeah.  So with cases like this, I work with a large economic consulting group known as Analysis Group.  I actually have a relationship -- a peer relationship with them.  I've only worked with them in these contexts.  And they have a team of Ph.D.s, master's degrees, undergraduates who assist me in the cases, and I do get a portion of what they charge.

Q.   And approximately how much have you received from the Analysis Group on this case?

A.   I would have to look at my bank records, but it's probably about $150,000.

Q.   So just approximately, how much have you been paid overall for your work on this case?

A.   Probably around $240,000 since 2023.

Q.   Does your compensation depend on your testimony before this jury?

A.   No.  I get paid the same, regardless of the outcome.

Q.   Professor Knittel, based on your education, experience, and research, do you believe you're qualified to offer expert opinions on economic damages methodologies in this case?

A.   I do.

Q.   Why is that?

A.   Well, this is like exactly what I've been trained to do. So damages deal with the decisions that firms and consumers make.  And to come up with a damage estimate in a case like this, you need to use data, and that's when econometrics comes in.  And that's exactly what I've done my entire career.

         MR. HUR:  Your Honor, Google offers and tenders Professor Knittel as an expert in the areas of economics, industrial organization, and econometrics, including the analysis of damages methodologies in class action litigation.

         MS. BONN:  No objection, Your Honor.

         THE COURT:  Very well.  You will be so -- the witness will be so designated.

BY MR. HUR:

Q.   Professor Knittel, can you tell the jury what we're going

to be talking about here today?

**A.**   Sure.  So I've put together a slide deck to talk about three main points.  The first set of slides will talk about Mr. Lasinski's actual -- what he calls actual damage estimates.

And then after that, I promise it'll be a very brief primer on Google's ad business and how it actually works.

And then we'll end with talking about Mr. Lasinski's unjust enrichment opinion and the flaws that exist with that.

**Q.**   Now, Professor Knittel, before we get into this, do you have an opinion on whether Google's actually liable for any conduct here?

**A.**   No.  My job in this case is to think about damages conditional on liability being upheld.

**Q.**   Do you understand that Mr. Lasinski also is not offering an opinion on whether Google is liable in this case?

**A.**   Yes.  I believe he said that in his testimony, and I also believe he says that in his reports as well.

**Q.**   Do you understand Google's position here is that Google is not liable in this case?

**A.**   Yes, I understand that.

**Q.**   And what should the jury do with your opinion and Mr. Lasinski's opinion if the jury, in fact, finds that Google is not liable?

**A.**   Well, from an economist's perspective at least, if Google is found not liable, there would be no damages.

Q.   Let's talk about your Item Number 1 on your roadmap, Professor Knittel.

     Can you explain Mr. Lasinski's actual damages opinion to the jury?

A.   Yeah.  So Mr. Lasinski comes up with what he calls an actual damage number, which is trying to reflect what he thinks is the market value of the data that is at issue in this -- in this case.

Q.   And what is the basic approach of his theory?

A.   So he takes a number, which is the price that the user would sell the data for, if you will, and multiplies that, in his case, by the number of devices for which that data is being shared to Google.

Q.   I think you said what the user would sell the data for?

A.   Yeah.

Q.   What do you mean by that?

A.   So the user has these data, the alleged data, the non-identifiable data, and how much is the user -- how much would I have to pay the user for them to voluntarily sell that data.

Q.   And what are your opinions about whether Mr. Lasinski's actual damages calculation is correct?

A.   Yeah.  So he's -- he's taken this $3 number and he's multiplying it by this $174 1/2 million number, but both numbers are too high.

So if you've ever done -- you know, or just start playing around with some multiplication, if you increase the size of both of the numbers, actually the product of those two numbers grows even faster, and that makes his final number even less reliable and less accurate.

Q.   Professor Knittel, let's start with the first item in Mr. Lasinski's calculation, which is, as you said, this $3 payment per class member device.  What does Mr. Lasinski base that opinion on?

A.   So that $3 comes from the Screenwise Panel that he discussed.  And the Screenwise Panel is a small group of survey participants, basically where Google paid those survey participants to hand over all of their data associated with online activity.

Q.   Professor Knittel, do you know whether or not Screenwise collects personally identifiable information?

A.   Oh, it certainly does, yeah.

Q.   And how does that compare to the sWAA-off data in this case?

A.   Yeah.  So as we'll see, you know, the Screenwise data is -- you know, it may be partly overstated, but it's basically everything about you that you put on the Internet.

That is completely at odds with the data at issue in this case, which is effectively a random sequence of letters and numbers tied to whether or not you downloaded an app or made a

purchase in an app.  It's apples to oranges.

Q.   And I think what you're referring to there are the Android and Apple device IDs?

A.   That's right.

Q.   And why do you focus on those two identifiers?

A.   Well, that's -- that's the data at issue in this case.

Q.   And are those the data that are at issue when measuring conversions?

A.   That's correct.

Q.   Let's talk a little bit more about the Screenwise Panel.

Now, what compensation do Screenwise Panel recipients receive?

A.   So they -- so they tie a mobile or an Internet device to their identity within the Screenwise Panel.  They then download an electronic meter.  It's not an actual physical meter.  And they're paid, as I understand from Mr. Lasinski, $3 a month for those -- the link of that device to the Screenwise Panel.

Q.   Do you understand how the data that the Screenwise Panel receives is -- can be used?

A.   Basically, Google could do whatever it wants with it.  It can analyze the data.  It can write research papers based on the data.  It can link it to other data that they have on you.  It's -- it's very comprehensive in terms of what they're allowed to do with the data.

Q.   How does that compare to how Google uses the sWAA-off data

in this case?

A.   So as we've heard in this case, on the sWAA-off data, it's -- first, it's been de-identified.  So that's one of the key differences between that and the Screenwise data.  They're not allowed to link that to any other data about you.  They can't because it's been de-identified.  And they're just using that data to record a record of something like an app download.

Q.   So how would you compare the scope and privacy of the Screenwise data compared to what is at issue in this case?

A.   I think apples to oranges is too soft.  I'm trying to think of a better metaphor, but it's just not comparable.

Q.   Can you tell the jury a little bit about the types of data that the Screenwise meter captures?

A.   Yeah.  So if you dive into the privacy policy of the Screenwise Panel, you realize it's not just like what websites you went to or things like that.  It also collects biometric data.  So they -- from what I understand, they track where you're looking at on the screen.  So they're tracking your eyes.  They can do facial recognition.  If you do, like I have, you know, a fingerprint way to looking into your computer, they would collect those -- those -- that information as well.

So not even from a pure, what we tend to think about data as numbers and words and so on, but from a physical standpoint too, they're collecting much more comprehensive data.

Q.   Have you seen anything in the record suggesting that

biometric data is captured and used by Google relating to sWAA-off data?

A.   No.

Q.   Now, how extensive is the monitoring that Google does through the Screenwise Panel?

A.   Yeah.  So when you put this meter on the device, it collects everything.  So from what I understand, if you write a text, it knows what you wrote.  If you receive a text, it knows what you received.  If there's a photo attached to that text, it knows that as well.

If you go to a website and you type in a credit card number, it now has your credit card number.  If you go to a website and type in your Social Security number, it has your Social Security number.

So everything on your online activity, not just the data, like I said, but biometrics, and so on, is collected.

Q.   How does that compare to the sWAA-off data at issue in this case?

A.   So in this case, what Google is sending is a random sequence of letters and numbers that is not at all tied to your identity.

Q.   Professor Knittel, what were Screenwise participants required to do in order to participate in the Screenwise Panel?

A.   Yeah.  So not only are they collecting more comprehensive data, but they're limiting what you can do outside of the data

collection, if you will.

So you're not allowed to opt out of any advertising or marketing; you know, toggles, if you will.  You're not allowed to add an ad blocker to your browser.  You're not allowed to turn off geocoding of where you go.  So they collect a lot more data, and then they also limit your other behavior that could -- could in some way limit data that is transmitted to the Screenwise Panel.

Q.   And are you aware of any such limits on users relating to the sWAA-off data in this case?

A.   Not at all.

Q.   You mentioned previously that in the Screenwise Panel, the data can be combined with basically all the other information that Google may have.  Are you aware of whether that's true about the sWAA-off data in this case?

A.   So from my understanding in this case, since it's been de-identified, there's no way that Google can -- actually, we've heard -- or I've heard several times there's no way they could even reidentify it.  So if you can't identify it, there's not going to be a way you can link it to other data that Google might have about you.

Q.   And to be fair, Professor Knittel, you're not a technical expert in this case?

A.   I am not, no.

Q.   Professor Knittel, this is my last slide on Screenwise.

I think everybody in this room has probably heard enough about Screenwise, so I'll let you summarize what's going on here before moving on.

But just summarize for the jury your views on the Screenwise meter compared to the data at issue in this case.

A.   Yeah.  It's not -- it's not comparable for really three -- three reasons.  The thing that sticks out at me, at least, is just the data that's being collected is not at all similar.

But it also is more time-consuming -- it's more of a burden to you to be in Screenwise.  You have to download this meter.  You have to agree to a bunch of different restrictions. From time to time, you have to check your device and make sure you're logged in to Google.  You respond to surveys and questionnaires.

And then on top of all that, they say you can't do certain things that you might be -- that you might want to do.  And I mentioned those:  the adding the ad blockers, turning off location services, and so on.

Q.   Professor Lasins- -- Professor Knittel, did Mr. Lasinski do anything to try to value individual parts of the data that the Screenwise meter collects?

A.   Not at all.

Q.   Could he have done that?

A.   He could have.

Q.   Tell the jury how Mr. Lasinski might have been able to do

that.

A.   So one thing he could have done -- I'm not sure this would be a useful exercise, but let's say you wanted to start with this $3 number.  The $3 number is paying for completely different data.  It's paying for completely different behavior and so on.

You could try to parse out or -- parse out, you know, the value, how much of that $3 is the same data that is at issue in this case.  Right?  So the data at issue in this case is, you know, I downloaded an app, so Google knows I downloaded an app.

So let's take that $3 as a starting point and basically chop it up into a pie chart to say:  How much of this $3 is going to the fact that you now have my Social Security number?  How much is going to the fact that you now have my credit card numbers, my fingerprint, and so on and so forth?  And keep splitting up the pie, if you will.  And then what size is the sliver of that pie that's paying for you now know which apps I download on my mobile device?

Q.   Professor Knittel, did Mr. Lasinski rely on any other comparables or indicators when assessing what he thought the actual damages should be in this case?

A.   He talks about two, but at least in my reading of his reports and viewing of his testimony, he quickly eliminates those.

Q.   You heard Mr. Lasinski testify earlier this week; right?

**A.**   I did.

**Q.**   Should he have considered the fact that sWAA-off data is not used for personalized advertising in evaluating the value of that sWAA-off data?

**A.**   He should have considered, you know, at least insofar as it relates to this $3 number, you know, how much of that $3 is coming from allowing Google to personalize advertisements.

**Q.**   Based on the opinions that you've seen from him, did he do that?

**A.**   No.

**Q.**   So, Professor Knittel, can you just summarize for the jury why you think that Mr. Lasinski's conclusion that $3 per class member device as the appropriate amount of actual damages is overstated?

**A.**   It's overstated for all of the reasons that I just talked about.  It's not comparable at all to what's happening or the data that's being transmitted in this case.

**Q.**   Let's talk about the second reason that you criticize Mr. Lasinski's actual damages opinion about, and it's the number of class member devices.

Can you just tell the jury what you understand Mr. Lasinski means by "class member devices"?

**A.**   Yeah.  So you might remember from his testimony, he gets to that number by first estimating the number of class members in this case -- and I believe that is 98 million -- and then he

takes some estimates of a survey.  I might misremember his name.  Mr. Keegan, is it?

**Q.**    That's right.

**A.**    Mr. Keegan.  The number of devices the typical person in Mr. Keegan's survey has.  And I believe that number was something like 1.86 devices per person.

So he takes this 98 million.  He splits that into adults and children.  So for children he assumes they just have one device.  He hasn't met my son.  And then for adults, he multiplies that by this 1.86 number, and that leads to 174 million.

**MR. HUR:**  Brooklyn, can you please put up Mr. Lasinski's Slide 45.

**BY MR. HUR:**

**Q.**    Is this basically what you just described --

**A.**    It is.

**Q.**    -- Professor Knittel?

**A.**    Yeah.

**MR. HUR:**  Thank you, Brooklyn.

**BY MR. HUR:**

**Q.**    Now, Mr. Lasinski counts harm per device rather than per individual; is that right, Professor Knittel?

**A.**    That's right.

**Q.**    And can one person have multiple devices on which they use apps?

**A.**   Of course.

**Q.**   And if a person has, for example, three devices, how would Mr. Lasinski's damages calculation count them?

**A.**   Yeah.  So by virtue of doing this by device instead of by class member, he's effectively assuming the damages scale with the -- linearly or proportionally with the number of devices. So that person with three devices, under Mr. Lasinski's damage model, is damaged three times as much as the person with one device.

**Q.**   Does Mr. Lasinski provide any basis for asserting that people with three devices use apps more than people with, for example, just one iPhone?

**A.**   No.  He certainly doesn't show that it scales proportionally, that that person with three devices uses the Internet three times as much as the person with one device.

**Q.**   Does he show anything to identify whether people with more than one device use apps less or more than people with only one device?

**A.**   Not that I can recall.

**Q.**   Professor Knittel, what is your overall opinion on the number of class member devices that Mr. Lasinski relies upon?

**A.**   Yeah.  So by virtue of that magnification going from the 98 million to the 174 1/2 million, he's overstating the damages here.

        We know -- you know, we know that it doesn't -- it can't

scale proportionally forever.  Right?  There's only 24 hours in the day.  So at some point we know that breaks down.

He should have showed that, you know, it does scale proportionally, at least maybe from one to two devices or something like that, but he makes no attempt to justify that assumption.

So -- but that assumption is generating 75 percent more damages from -- from his -- given his analysis.

Q.   And that's because he has -- he counts 174.5 million class member devices, but the class is how big?

A.   The number of class members, according to Mr. Lasinski, is 98 million.

Q.   Let's go to your second opinion, Professor Knittel.  And you did promise the jury you would be brief, so I'm going to hold you to that.

They've heard a little bit about how the ad ecosystem works.  So just please provide the jury with a quick refresh on how apps advertise with Google.

A.   Yes.  And you've actually seen this slide but in a more detailed basis yesterday.

So Google -- Google's what's called a matchmaker, basically.  The ad tech and a lot of the most exciting industries, at least from an economic standpoint these days, are what are called two-sided markets.  So in this context, on the one side you have advertisers; on the other side, you have

publishers.  Two-sided markets are like you have Uber drivers and you have passengers.  So a lot of the exciting markets are like this.

And what Google is doing is it's bringing together one of the sides of the market, the advertisers, with the other side of the market, the publishers.

And the way it's doing that is it's first taking the publishers.  So if I have an app, I can tell Google, "Hey, I've got this space on my app, you know, that I'm willing to place an ad on."  It collects that space and then it accepts bids.

So the advertisers are bidding for that space.  So you and I might be bidding for a space in the Nike app.  You submit the amount that you're willing to pay to place your ad, and I submit my amount, and then Google is choosing the winner of that auction and then placing the ad.

Q.    How does Google get paid in this process?

A.    So in this context, Google's paid for clicks and impressions.  So you end up getting -- placing your ad on that Nike app; and if I walk around and I see that ad, then that's an impression and you would pay Google for that impression.

Q.    "You" meaning the advertiser?

A.    The advertiser.

Q.    And does Google share a portion of that amount with the publisher?

A.    It does, yeah.

Q.   And what about what's happening on the right here, the conversion measurement?

A.   So separate from that, so separate from the money changing hands, which is being generated from the clicks and the impression, Google also offers a free service, which has been referred to in this case as conversion measurement.  And that's trying to measure something else, not clicks and not impressions, but trying to measure downloads or purchases within an app.

Q.   Now, Professor Knittel, now that we've given the jury this brief primer, how does that relate to Mr. Lasinski's unjust enrichment opinion?

A.   So his second way of measuring damages in this case is what's called unjust enrichment.  And so what he's trying to do here is measure how much more money Google made from doing that conversion tracking, from providing that free service that was off to the side.

Q.   So it sounds like the -- what he's trying to measure is the alleged profit Google made from conversion tracking; right?

A.   That's correct.

Q.   He's not arguing that Google was unjustly enriched by the actual serving or clicking on ads; right?

A.   That's right.  So it's isolated to the conversion tracking, that free service that Google offers.

Q.   Can you remind the jury what Mr. Lasinski's unjust

enrichment opinion is?

**A.** So he presented two numbers during his testimony. The one is across all accounts, and that number comes to $1.5 billion across all accounts.

And then he provides a second number where he takes out what are called supervised accounts. So these are -- you might remember them referred to as unicorns, which are children, and dashers, which are enterprise accounts. And so when he takes out those, the number falls to 1.35 billion.

**Q.** Tell us about what unjust enrichment is trying to measure.

**A.** So unjust enrichment is the added profits that Google made in and above what they would have made otherwise. The key here is, it's profits.

**Q.** And how does one calculate profit?

**A.** So profits, the economic definition of profits are revenues minus -- minus costs.

**Q.** What are the main reasons why you found Mr. Lasinski's unjust enrichment analysis not credible?

**A.** So I have two. One is that he -- in order to do the unjust enrichment -- so the enrichment part is the profits that you made in and above the just profits; right? So in order to do that, you need what we call a but-for world. You could think of it as a counterfactual world or a baseline profit level, which is the profit you would have made had you not done the unjust activity.

And the second is when he's doing that -- those calculations, the revenues minus costs, he just doesn't do those consistent with basic economics.

Q.   And are these two opinions independent, or do they depend on each other?

A.   So we could do them both.  So when I talk about the faulty assumptions, I'm basically going to be setting aside the unrealistic but-for world.

So, you know, you could kind of think of it as a tree. I'm going to argue that he's not using the right but-for world. But even if you set that aside and agree that he's doing the right but-for world, you then have to do the calculations correctly.  So the second set of critiques is going to be based off of him doing those incorrectly.

Q.   Please tell the jury a little bit more about what a but-for world is and why it has to be realistic.

A.   So, again, the -- and both words are key, "unjust enrichment"; right?  So the unjust part is, you know, how much money you made from the bad activity.  The enrichment part is the increase in the profits that came from that bad activity.

So you have to take a stand on what the baseline profit levels would have been absent that unjust behavior.  And, of course, that has to be a realistic alternative, realistic baseline or realistic counterfactual; or a more technical term, a realistic but-for world.

Q.   And why does the but-for world matter?

A.   Well, because it's setting that baseline; right?  It's setting how much Google would have made if they didn't use this sWAA-off activity for conversion tracking.

Q.   I believe Mr. Lasinski testified on Monday that he -- he was focused on the real world and didn't engage in the but-for world.  What is your response to that?

A.   He does.  He implicitly does.  Right?  So he purports to calculate the profits Google made from offering this free service, this conversion tracking.

If you stop there, if you calculate the profits that you made from the unjust activity, then your implicit assumption is the just profits, the profits you would have made had you not done the conversion tracking, is zero -- right? -- because you're not subtracting off anything.  The enrichment part is the entire profits from the conversion tracking.

Q.   So what assumption does Mr. Lasinski implicitly make about the but-for world relating to what Google would have done if it didn't have the sWAA-off data that's at issue in this case?

A.   Yeah.  So by defining the just profits as zero, he's effectively assuming that if we couldn't offer this free conversion tracking service to sWAA-off users, all the ads that we served them would not have been served.  Not only Google would have walked away from this activity, but the advertisers would have walked away and the publishers would have walked

away.  So, basically, the market just obliterates.

Q.   What would you have expected Mr. Lasinski to consider when evaluating what might have happened in the but-for world?

A.   Well, a more realistic but-for world.

Q.   Did Mr. Lasinski consider any alternatives to just completely shutting down the Mobile Ads business?

A.   No.  That's the only analysis he does.

Q.   Are there reasonable alternatives that Google could have considered in the but-for world or Mr. Lasinski could have considered in the but-for world?

A.   There are, and, in fact, we've heard -- we've heard at least one in this case already.

Q.   Tell us about the one that the jury's heard about in this case.

A.   So yesterday, in fact, the plaintiffs' lawyers -- I think it was Ms. Langner on the stand -- the plaintiffs' lawyers asked about another but-for world.  The plaintiffs' lawyers said, "What would have happened if Google didn't do the conversion tracking and instead relied on third-party conversion trackers?"  That's a but-for world.

Q.   And what is your recollection of Ms. Langner's response to that?

A.   She said Google would have made the same amount of money.

Q.   Did Mr. Lasinski, in his analysis, consider third-party conversion measurement providers in evaluating the profit that

Google allegedly made from the sWAA-off data?

A.   No.

Q.   Should he have?

A.   Yes.  So this is the realistic part of the but-for world. You know, you have to look -- in order to come up with the realistic but-for world, you have to analyze the organization of the industry.  You have to understand who are the players, who are alternative players, who are the consumers, and who are the firms.

Q.   Now, in addition to what Ms. Langner said, you also looked at some documents about third-party measurement providers, and what did you see in terms of the role that third-party measurement providers play in the ads ecosystem?

A.   Yeah.  So even in my research and analysis is consistent with Ms. -- Ms. Langner's in the sense that these third-party conversion trackers are pretty robust, that about 80 percent of ads placed use these third-party conversion trackers.

Q.   To be fair, Professor Knittel, you didn't evaluate whether or not Google would make more or less money if it couldn't use the sWAA-off data for conversion measurement; is that right?

A.   I did not.

Q.   Why didn't you do that?

A.   I wasn't asked to.  I'm responding to what Mr. Lasinski is doing, so I, you know, stayed within my lane.

Q.   If Mr. Lasinski had offered an opinion, would you have

responded to that?

A.   Yes.

Q.   Now, what economic principle does Mr. Lasinski's failure to consider what third-party measurement tools could have provided violate?

A.   Well, it's violating, you know, the basic premise that we know this activity is valuable.  We know that not just Google, but the advertisers and the publishers want to see this activity done.  And there's a set of other firms out there that could have done that activity.

So markets generate when there's valuable activity that could potentially exchange hands.  That's the basics of capitalism and the basics of how markets form.

Q.   So, Professor Knittel, what are your conclusions about Mr. Lasinski's but-for world?

A.   So they're extreme.  Right?  Everybody walks away from this valuable activity.  And, more importantly, you know, we can point to other firms that already exist in the market that could provide that activity.  So that just makes his entire calculations unreliable.

Q.   Professor Knittel, I haven't asked you this before. You know, I'm riveted by this.  What do you do in class sort of when there's a lull and you're about to talk about a lot of numbers?  How do you keep your students engaged?

A.   Can you repeat the question?  I'm sorry.

Q.   Sure.

A.   I wasn't --

Q.   If you're in class and you're about to get into the numbers, how do you make sure your students stay engaged?

A.   I've been known to do all sorts of things, yeah. Sometimes you throw things at students.  Sometimes you hop on the desk.  Yeah, you've got to wake them up.

Q.   Okay.  Well, don't throw anything, please.  No jumping on desks.  That won't work either.

Okay.  What is your second unjust enrichment opinion?

A.   Yeah.  So, you know, now we're going to set aside the unrealistic but-for world.  Obviously, I don't think you should do that, but we're going to do that; right?  So you set that critique aside.

And now I still have to calculate profits.  Right?  I still have to calculate the unjust profit levels with this exercise.  And I'm going to talk a little bit about the extreme assumptions that he made in that case.

Q.   What are the primary errors that Mr. Lasinski made in calculating Google's alleged profits from the sWAA-off data, even if you assume the premise of his analysis is correct?

A.   Yeah.  So even if you take the unrealistic but-for world as given, you still have to calculate profits.  So you have to take revenues and you have to subtract off costs.  He didn't do that correctly.

And then, second, he -- he effectively assumes that the sWAA-off users behave the same way as the sWAA-on users, and there's evidence to suggest that that's not the case.

And then, third, he ignores this fact that after iOS 14 Plus -- 14.5 Plus, iPhone users have this second degree of ability to turn off conversion tracking.  He doesn't take that into account when he calculates his unjust profits.

And then for the calculations where we have to take out dashers and unicorns, he doesn't calculate the percentage of dashers and unicorns relevant to this case correctly.

**Q.**   Okay.  Let's go through each one of these.

Let's start with the failure to deduct costs.  What are the costs that Mr. Lasinski ignores in calculating profits?

**A.**   Basically, all of them.  So Mr. Lasinski just subtracts off one component of costs, what's known as traffic acquisition costs you heard Ms. Langner talk about.  So that's how much they're paying the publishers of the ads.

But, of course, running a business like this, you incur a lot more costs than just that.  You're obviously hiring engineers to do coding.  You're using data centers.  And within those data centers, you're using computers.  Within those computers, Ms. Langner talked about cores.  Those are the CPUs within the data centers.

You have a full sales and marketing team to convince the advertisers and the publishers to play in this market.  And

sometimes things go wrong in markets, so you need a customer service team as well.

So all of those costs would be deducted from your revenues in what are called, you heard, the P&Ls, the profit and loss calculations.

So he's only taking out one of the costs and ignoring all of the others.

Q.   I mean, to be fair, Professor Knittel, the traffic acquisition costs are a big cost; right?

A.   Sure.

Q.   But he's ignoring the operating costs and machine costs?

A.   Yeah.  So in this table, you can see, actually, you know, just how important those other costs are.  So the net revenue is after taking off the traffic and acquisition costs.

But if you take out all the relevant costs, you know, that -- just to use -- point to the -- in 2017 App Promo, the $490 million number, that's what Mr. Lasinski would use; but if you subtracted off all the other relevant costs, that $490 million goes down to $94 million.  He's ignoring all of those relevant costs.

Q.   Why is it important to include all costs when calculating profits?

A.   Well, so Mr. Lasinski, he admits that profits are revenues minus costs.

Q.   Do you agree with that?

**A.**   Yes.

**Q.**   Let's talk about your second reason why Mr. Lasinski incorrectly assumes sWAA-off -- I'm sorry.

Let's talk about your second reason for why you think Mr. Lasinski's unjust enrichment opinion is unreliable.

Professor Knittel, I'm going to ask you to try to break this down and keep this simple.  This one is a little more complicated, but what is your second opinion?

**A.**   Sure.  So he's trying to calculate the profits associated with conversion tracking, associated with the sWAA-off customers, and the way he does that is he calculates the share of users that are sWAA off.  Okay?  But really, that's not the relevant number.  What you really want is the share of advertising value that's sWAA off.  Right?

And there's evidence to suggest that sWAA-off customers or users act very differently than sWAA-on users.  So because he's just using the share of accounts that are sWAA off, his implicit assumption is sWAA-off users behave the same way as sWAA-on users.  But here, I've compiled some data that shows that that's not accurate.

So the first column here is that at three -- three months in the past, the share of accounts that are sWAA off.  Okay?  So that's what Mr. Lasinski is using in his report.  The second column is the share of impressions that are sWAA off.  So these are users see the ad.  Right?

And what we see is the share of accounts that are sWAA off is much larger than the share of impressions.  Why?  Because what that directly shows you is sWAA-off users are different than sWAA-on users.  Right?  If sWAA-off users were the same as sWAA-on users, then the share of impressions would be exactly the same as the share of accounts.

Q.   I'm going to interrupt you, Professor Knittel, just to make it clear.

So what numbers would you expect to be the same on this chart if sWAA-off users behaved the same way as sWAA-on users?

A.   We would expect the three columns to be the same.  Right?  So if sWAA-off users saw the same number of ads, then the share of impressions would be the same as the share of accounts that are sWAA off.

If sWAA-off users clicked on the same -- at a same rate as sWAA-on users, then we would expect that third column to be the same as that first column.  And the fact that the columns are falling as we move from left to right is telling you that sWAA-off users are less engaged with advertising.

Q.   So just -- you're the math guy, but if I'm looking at the far right column, it looks like the sWAA-off opt-out rate on Google display advertising stacks or the number of clicks is about half compared to the first column; is that right?

A.   That's correct.

Q.   Or a little bit less than half?

**A.**   A little bit less than half, yeah.

**Q.**   Now, how does Mr. Lasinski use the information in Column 1 in his unjust enrichment calculation?

**A.**   Yeah.   So remember, he's calculating the -- well, first, he's assuming the value of the advertising is coming from the conversion tracking so -- which is faulty.   But he's then taking this amount that's conver- -- of the advertisement that is using Google's conversion tracking and he's determining the share of that that is associated with sWAA-off users.

So he's going to take that, and if the share of users that are sWAA-off users is 13 percent, he's going to take that big pie and say 13 percent of that pie is due to sWAA-off users.

**Q.**   Okay.   So just to summarize, what I think you've said is that if all the numbers in Column 1 matched all the numbers in Column 2 and Column 3, then you wouldn't be criticizing Mr. Lasinski on this basis; is that right?

**A.**   That's right.

**Q.**   And you're criticizing him because the numbers in Column 2 and Column 3 are significantly lower than the numbers in Column 1?

**A.**   That's right.   This strongly suggests that sWAA-off users behave differently than sWAA-on users.

**Q.**   And how does the impact of that difference affect his unjust enrichment calculations?

**A.**   So if you use the last column instead -- and I think we

could have a discussion about should you use the second one or the third one.  But if you use the last column, it would effectively cut his -- the profits in half.

Q.   Professor Knittel, why are you talking about clicks and impressions when Mr. Lasinski is talking about a different process than clicking on ads?  He's talking about conversion measurement.

A.   Yeah.  So, you know, Mr. Lasinski has this other leap -- right? -- which is the conversion tracking isn't generating revenue.  It's the clicks and the impressions that are generating the revenues.

His mental model is basically that the clicks and the impressions lead to conversions, and then that effectively means that Google unjustly profited from those clicks and conversions that ultimately led to -- clicks and impressions that ultimately led to a conversion.

Q.   And you've seen evidence in this case that clicks and impressions lead to Google getting paid; right?

A.   Well, that's the first diagram.  That's how they're paid.

Q.   And you've seen evidence in this case that Google does not get paid when a user later downloads the app; right?

A.   No.  That's a free service, or it doesn't get paid, and then the tracking of that that Google offers is a free service.

Q.   And it's that second download that's the conversion tracking; right?

**A.**   Correct.

**Q.**   Let's talk about Mr. Lasinski's third -- the third error in Mr. Lasinski's report that you identify, and it has to do, I think, Professor Knittel, with iOS 14.5; is that right?

**A.**   That's right.

**Q.**   What is iOS?

**A.**   So that's the operating system that runs on iPhones.

**Q.**   On iPhones?

**A.**   Yes.

**Q.**   So fair to say that when you're talking about iOS, you're really talking about iPhones and iPads?

**A.**   Yeah, iPads too.  It runs on iPads.  I should have said that in the first place, yeah.

**Q.**   And what does 14.5 mean?

**A.**   So that's the version.  The number after iOS is the version of the operating system.

**Q.**   So if you have an iPhone and, you know, you get that message from Apple that says "Update your operating system," that's the number that you're referring to?

**A.**   Yeah.  That number is increasing either the number after the decimal point and, for big -- big improvements, the number before the decimal point.

**Q.**   And so what is the point of referencing iOS 14.5 here?

**A.**   So after iOS 14.5 -- and if you're an iPhone user, you've probably seen this -- periodically -- and I'm not a

technical expert, so I can't tell you how frequently this happens.  It might just be the first time you use an app.

But at some point when you use an app, this thing pops up that says -- you know, you're able to click it, that says, "Ask app not to track you."  And if you click that, then it's not going to use -- from what I understand, Google is not going to be able to use the data that comes from anything you do in that app for conversion tracking.

**Q.**   And, Professor Knittel, do you recall Mr. Lasinski testifying on Monday about the market share of iPhones versus Android devices in the U.S.?

**A.**   I do, yeah.  I can't remember the context, but I do remember that.

**MR. HUR:**  Can we pull up Mr. Lasinski's Slide 33. And, Brooklyn, would you mind highlighting or pulling out that market share column on the left there.

**BY MR. HUR:**

**Q.**   Do you recall, does this refresh your memory as to whether Mr. Lasinski was telling the jury that Android had about half the market share in the U.S.?

**A.**   Yes, I remember that.

**Q.**   And do you remember him saying that, essentially, Apple has a little less than half?

**A.**   Yes.

**Q.**   Have you seen and relied upon documents that have

different percentages?

**A.**   Yes.  So the data that -- the previous table that was in my slide suggests that the Apple devices are a larger share than Android devices.

          **MR. HUR:**  Can we go back to Professor Knittel's slides.

**BY MR. HUR:**

**Q.**   Where did you get this information?

**A.**   So this -- these data come from a data compilation website called Statista, which collects data from multiple sources. The source that generates these actual numbers is a company called StatCounter.  And StatCounter has a little bit of HTML code that it adds to the bottom of a website that tracks who's coming to their website -- to a particular website.  I actually used to have that on my website so I could see, you know, where the URLs are of the visitors.

     But also what it collects is the operating system of the device that came to your website.  And if it's a mobile device, it could tell you whether it's iOS or an Android device.

     And StatCounter has -- on their website at least, they advertise that they have this on -- I think it's over one and a half million websites across the world.  These data are coming from the U.S. websites.  And I think they say they've been able to collect, you know, 5 billion visits from that.

     So what they -- they use that data then to say, you know,

what share of traffic is coming from iPhones versus Android-type phones, and that number is closer to 60 percent iPhones and 40 percent Android devices.

Q.   How does that compare to what Mr. Lasinski relied upon?

A.   So Mr. Lasinski's using the survey that Mr. Keegan performed and, you know, I don't know exactly how Mr. Keegan got the participants in that survey, but I know it's certainly much smaller than 5 billion or 1.5 million.

Q.   Was it about a thousand?

A.   It was about a thousand.  But I don't -- I think more important when you do a survey is, you know, how do you -- how do you get the participants, an unbiased group of participants?

Q.   Okay.  So it sounds like you think Mr. Lasinski overstated the percentage of the Android market.  That's one issue; right?

A.   Well, certainly compared to the StatCounter data, which is more inclusive.

Q.   And also he didn't take into account that iPhone users, after Version 14.5, could tell Apple not to allow third parties to track conversions?

A.   Yeah.  So more important for his unjust enrichment -- or this discussion is the fact that Mr. Lasinski ignores the fact that after 14.5, iOS 14.5, you can stop Google from doing conversion tracking.

Q.   When did that -- when did 14.5 get released?

A.   I believe it was late -- or in 2021.  Sometime in 2021.

Oh, it's right there.

THE COURT:  Is this a good time to take a break?

MR. HUR:  Yes.

THE COURT:  And, R.J., can you move the...

Members of the jury, remember my admonitions.  Do not discuss this amongst yourselves or with anyone else.  We'll be back in about 15 minutes.

(Recess taken at 12:08 p.m.)

(Proceedings resumed at 12:31 p.m.)

(Proceedings were heard out of the presence of the jury.)

THE COURTROOM DEPUTY:  Please remain as you are. Court will come to order.

THE COURT:  Okay?  I think so.

(Proceedings were heard in the presence of the jury.)

THE COURT:  The jury is present.

Mr. Hur?

MR. HUR:  Thank you, Your Honor.

BY MR. HUR:

Q.   Professor Knittel, just a few more questions about the Apple software change.

You see in this first bullet that you say [as read]:

"Mr. Lasinski used pre-iOS 14.5 data to project class members through December 2022."

Do you see that?

A.   Yes.

Q.   And he didn't correct this error in his initial report; right?

A.   He didn't take it into account.

Q.   And he didn't take it into account for the entire class period; right?

A.   That's correct.

Q.   Now, you think Mr. Lasinski should cut out all iPhone users after 2021; right?

A.   That's correct.

Q.   But not everyone chose to not allow third parties to track users after the software update was released; right?

A.   That's correct.

Q.   Why do you include people who didn't opt out of App Tracking Transparency?

A.   So the pop-up is you either -- you're now able to opt out, but the alternative is to opt in.  So if you opt out, then Google is not collecting your data for conversion tracking, so you shouldn't be part of the damage estimates.  And if you opt in, you've just said it's okay to do it, and you should also not be included in the damage estimates.

Q.   Now, Professor Lasins- -- Professor Knittel, you initially had an error in your report about this opinion; right?

A.   So I first heard, mistakenly, that it was after iOS 14. I've since learned that it was 14.5, is when the actual -- that actual pop-up came to be.

**Q.** Why did you correct that error?

**A.** So I always say in my -- or in my initial report, I say if I've learned new information, I'm going to take that new information into account and update my numbers.

**Q.** Professor Knittel, the next few slides summarize the conclusions you drew about Mr. Lasinski's unjust enrichment analysis. What is the impact of the first error that you identified?

**A.** Yeah. So we start with the 1.5 billion, and if we subtract off the actual costs associated with this activity, that almost gets cut in half, a 46 percent reduction. So we're now at 800 million as opposed to 1.5 billion.

**Q.** And this is just if Mr. Lasinski had included all the costs in measuring profit; right?

**A.** That's correct. So I'm going to isolate each individual criticism and show you how they compound.

**Q.** How does his miscalculation of sWAA-off traffic impact his unjust enrichment analysis?

**A.** Yeah. So now we turn to the other thing that I was talking about, which is the sWAA-off users are different than the sWAA-on users. So they click on ads at about half the rate as the sWAA-on users. So if you account for that, we get another, basically, 50 percent reduction. So now we're at a total 76 percent reduction in his original number.

**Q.** And what is the impact of his failure to adjust for the

software change on Apple iPhones?

**A.** Yeah. So now I'm just going to just take out the 14.5 users from his damage estimates, and then that reduces it further to $218 million. So on net, after accounting for all three factors, you get an 85 percent reduction in his bottom-line number.

**Q.** Now, what does this $218.7 million number represent, Professor Knittel?

**A.** So I would argue that it's still an overstatement for two reasons. One is that it's based off of an unrealistic but-for world. Remember, I said we're going to go down the path where we believe his but-for world.

And then more fundamentally, remember, he's calculating this profit that's coming from a free service. So we can't ignore that as well.

**Q.** You also -- the last error that you have highlighted in your presentation is -- has something to do with the enterprise accounts, or the dashers, and the child accounts, or the unicorns. Why does Mr. Lasinski understate the dashers and unicorns that should be excluded from two of the claims in this case?

**A.** Yeah. So Mr. Lasinski himself wants to do this alternative calculation, which is let's throw out or ignore, among the sWAA-off -- signed-in sWAA-off customers, let's ignore the unicorn and dasher accounts. So what he wants to do

is take out the percentage of signed-in sWAA-off accounts that are unicorns and dashers.

He uses instead the percentage of all accounts that are unicorns and dashers, which is 10 percent.  But if you focus only on the signed-in sWAA-off, which are the relevant users in this case, it's actually 50 percent of those users are unicorns and dashers.

Q.   So I think what you're saying is that on the left is Mr. Lasinski's assumption and on the right is the true number; is that right?

A.   That's correct.

Q.   And the true number is that about half of dashers and unicorns have sWAA off?

A.   About half of the sWAA-off customers are dashers and unicorns.

Q.   About half of the sWAA-off customers are dashers and unicorns?

A.   I'm sorry.  I'm saying "customers."  I probably should say "users" but...

Q.   Okay.  So what does -- if you add on this mistake as it relates to dashers and unicorns, how does it affect Mr. Lasinski's overall unjust enrichment calculation?

A.   So if we add that as the fourth mistake -- so we're still going to do the first three -- then it reduces it further.  So that 1.3 billion bottom-line number goes all the way down to --

I think we should just skip to the bottom -- to about 130 million.

Q.   Professor Knittel, if you had assigned this as one of your assignments to your M.B.A. students to calculate lost profits and this is the analysis you received, what would you have done with that analysis?

A.   I would have asked them to do it again.

MR. HUR:   You can take that down, Brooklyn.

Thank you.

BY MR. HUR:

Q.   Just to wrap up here, Professor Knittel, based on your testimony today, your research, and your experience, what is your conclusion about Mr. Lasinski's damages analysis in this case?

A.   So regardless of whether you want to use his actual damage number or the unjust enrichment number, they're -- both numbers are grossly overstated, I would say unreliable, and really shouldn't serve as a basis for damages in this case.

Q.   And in your decades of experience, how does this analysis compare to others you've reviewed?

A.   I think there's fundamental basic errors in economics that Mr. Lasinski performed.  And, you know, there's a saying in data analysis, you know, garbage in/garbage out.  I think ultimately that's what comes out of this.

Q.   And, finally, Professor Knittel, if the jury finds that

Google is not liable in this case, what should the jury do with all of this damages analysis?

**A.**    They can ignore both Mr. Lasinski and I.  There's no damages.

         **MR. HUR:**  Thank you.  I pass the witness.

         **THE COURT:**  Ms. Bonn?

                   (Pause in proceedings.)

         **MS. BONN:**  Thank you, Your Honor.

                   **<u>CROSS-EXAMINATION</u>**

**BY MS. BONN:**

**Q.**    Good afternoon, Professor Knittel.  Do you prefer professor or doctor?

**A.**    Professor.

**Q.**    Okay.  Thank you, sir.

         You and I have never met before; is that true?

**A.**    That's correct.

**Q.**    Okay.  I want to talk through, first, your opinion about the profits calculation and talk about some of the bases for that opinion.  After that, we can turn to Screenwise.  I have a feeling we may run into tomorrow, but let's start with the profits calculation.  Okay?

         And you had, I think, four key opinions you offered on direct, and I want to make sure I understand them.

         The first -- well, let's talk about the deductions.  The first is that Mr. Lasinski, in your view, should have deducted

more expenses; fair?

A.   Correct.

Q.   You have another opinion that he should have made a further deduction because -- for clicks and impressions because sWAA-off users, you think there's evidence that they're less engaged with ads; is that fair?

A.   That's fair.

Q.   Okay.  Number three that you mentioned is you think that he should have excluded from his calculations all the Apple iOS 14.5 users because they were unaffected by the alleged conduct in this case?

A.   Sure.  They were either -- they either said, "Don't track me," or they said, "You can track me."

Q.   And then your Opinion Number 4 on the profits deduction is that you think Mr. Lasinski didn't deduct a large enough share for dashers and unicorns and he understated it based on the data; is that fair?

A.   That's fair.

Q.   Okay.  Let's start by talking about the Apple iOS opinion that you have.

        MS. BONN:  And if we could pull up Slide 34 from Professor Knittel's deck, please.

BY MS. BONN:

Q.   Okay.  And I want to make sure that I understand some key aspects of the opinion that you offered on direct examination.

So if you look at the title of the slide, you wrote [as read]:

"After which Google could not collect sWAA-off

data from most iOS users."

Sir, are you offering the opinion that the ATT App Tracking Transparency, from 14.5 on in iOS, prevented Google from collecting any sWAA-off data from those users?  Is that your opinion?

A.    My opinion is they're not using those data for conversion tracking.

Q.    My question was a little bit different.

Is your opinion that after the iOS 14.5 change with ATT, Google actually stopped collecting all sWAA-off data from those users?  Is that your opinion?

A.    No.  That misstates my opinion.

Q.    Okay.  So when you wrote in the title of this slide "After which Google could not collect sWAA-off data from most iOS users," that's inaccurate.  Is that your testimony?

A.    I think if I could make the title longer, it would be "sWAA-off data for conversion tracking" because, remember -- but we were in the -- in this slide deck, we're talking about Mr. Lasinski's measures of damages, which is the share of profits that he's attributing to conversion tracking.

Q.    So just looking at this title, you now agree with me that even after the change to iOS 14, Google continued to collect sWAA-off data from iOS users who chose "I don't want to be

tracked"; correct?

**A.** So I hesitate to agree with you because I'm thinking of what's happening after 14.5 in the context of conversion tracking. I would have to go back to see -- not being a technical expert, I'd have to see what -- whether or not they're collecting any other data.

**Q.** Okay. So let's set aside what Google collects from what Google does with the data it collects. Okay? And we'll talk about what Google does with the data it collects in a moment, but right now I'm just focused on what data Google collects.

Do you agree with me that even after this change to iOS with the ATT, App Tracking Transparency, feature, even when someone said, "Nope, I don't want to be tracked on those apps," Google continued to collect sWAA-off data from those devices?

**A.** So, again -- excuse me -- I can't agree with that.

Oh, man. Sorry.

**THE COURT:** Go ahead.

(Pause in proceedings.)

**THE WITNESS:** I don't want to agree about that because I'm not a technical expert.

**BY MS. BONN:**

**Q.** So you're not sure -- you're not sure --

**A.** From my -- from my calculations, the relevant number or the relevant information is whether or not they're using it for conversion tracking.

Q.    Okay.

A.    So I don't have an opinion on anything else outside of that for this.

Q.    So let me just go back.

Setting aside what Google collects from what use Google puts to the data it collects, do you know one way or another, sir, whether Google still collects sWAA-off data from iOS 14.5 users onward, even when they have said "I don't want to be tracked" through ATT?  Do you know one way or the other?

A.    I do not.

Q.    You don't know; correct?

A.    Correct.

Q.    Okay.  Were you here in court when Ms. Langner testified yesterday that what happens when a user on an iOS device has enabled that ATT tracking feature is that the IDFA identifier tied to the device is set to zero and so Google receives a signal in the data they collect that the IDFA for that device shows as a zero?  Did you hear that?

A.    I did hear that.

Q.    Okay.

A.    I believe I heard that, yeah.

Q.    Okay.  Looking further down at the slide -- well, let me back up for another minute.

Do you understand that plaintiffs' theory of liability in this case is that when sWAA was off, Google should not have

collected sWAA-off app activity data?  You understand that; right?

A.    I believe I understand that.  My focus was on Mr. Lasinski's calculations --

Q.    Okay.

A.    -- so it's not something I focused on.

Q.    And you agree that it's important for any damages analysis to start with the premise that the plaintiffs' theory of liability has prevailed, and then you ask the question:  If so, what would the damages be?  That's what you said on direct; right?

A.    Yeah.  I guess I would go a little stronger and say that if liability is not found, you don't need the two of us.

Q.    And when it says, at the bottom of the slide, "Significance by ignoring iOS 14.5, Mr. Lasinski's model wrongly includes users who generated no trackable data," do you see that?

A.    Yes.

Q.    What did you mean when you wrote on this slide that iOS 14.5 users and onward who used the App Tracking Transparency generated, quote, "no trackable data"?

A.    So what I mean in this context is, you know, basing -- what we're talking about is Mr. Lasinski's damage calculations. His damage calculations start with the premise that the share of what he calls unjust profits that are associated with

conversion tracking are the damages.

So if you can't track or do conversion tracking with a user that's using 14.5, then that would come out of -- out of his share or out of the unjust profits that he calculates.

Q.   Do you have an understanding -- well, let me back up.

You understand that Google treats sWAA-off data it collects as signed-out data?  Do you understand that?

A.   I believe I have that understanding.

Q.   And isn't it true -- and you've been in court for various witnesses' testimony in this case; correct, sir?

A.   I have.

Q.   And so you've heard that when Google says they treat it as signed out, what they mean is they still collect it, they still use it for conversions, but they just save it somewhere separate from what they call a user's Google Account?  You understand that that's the difference between how Google treats signed-in traffic and how it treats signed-out traffic; correct?

MR. HUR:  Objection.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  At least from what I understand, I would just add one more provision there, which is that it's saved as de-identified.

BY MS. BONN:

Q.   And in your deposition, sir, you had a different

understanding of what happened when Google could tell a user was signed out; isn't that fair?

A.   My deposition was three years ago.  I'm happy to look.

Q.   Is it fair that at the time of your deposition, you were under the misimpression that when someone signed out, that meant Google didn't collect their data at all?

A.   I may have.  We'd have to go back to the record.  I'm happy to.

Q.   And do you remember if, at the time of your deposition, you were under the misimpression that when a user has iOS 14.5 and they have sWAA off and they've opted into this App Tracking Transparency, that meant Google collected no data on them?

A.   I may have.  I've learned a lot over this past week; that's for sure.

MS. BONN:  Okay.  Let's please show the witness page 37 of his deposition, at lines 1 through 13.

I think we maybe need to go up a little bit for the fair context of the question.  Can we go to the prior page?  Thank you.

BY MS. BONN:

Q.   And my colleague Mr. Sila, who's here, was the one who was asking you questions at your deposition; true, sir?

A.   Yes.

Q.   Okay.  And if we look at the question --

MS. BONN:  No.  No, no, no.  The question at the top

of the second page.

BY MS. BONN:

Q.   He asks you [as read]:

"QUESTION:  Individuals who only used iOS devices after App Tracking Transparency was rolled out cannot be class members.  Is that your opinion?"

And your answer was [as read]:

"ANSWER:  It's my understanding that Google treats those users as signed off.  And even if we -- Mr. Lasinski's first adjustment in his damage calculations is to throw out everybody who's signed off.  So consistent with that and consistent with my own understanding that if you're signed off, Google's not collecting the alleged data, yes, I'm offering that opinion that they're not part of the class."

Do you see that?

A.   I do.

Q.   And so at the time of your deposition, it was your own understanding that when Google talks about treating people as signed off or signed out, that meant they weren't collecting the alleged data at all; correct, sir?

A.   Yeah.  I think, from the answer to that question, that's fair.

Q.   And your understanding has changed, having sat through the trial and heard a whole lot of testimony, that when Google says

someone's signed out, they're still collecting that data. They're just putting it somewhere else that they don't call your Google Account; right, sir?

A.    I think you forgot the key provision too, which is that it's de-identified.

Q.    Okay.  So your understanding now is very different from the understanding you had at the time of your deposition, based on what you answered here; correct?

A.    With respect to that issue, I think that's fair.

Q.    Okay.  And you wrote your initial report in this case prior to your deposition; correct?

A.    Yes.

Q.    Okay.  So the understanding you had at your deposition about what the impact was on Google's data collection of people being signed off or signed out or treated that way, that's the same understanding you had when you wrote your report prior to your deposition; correct, sir?

A.    It is, but it wouldn't have affected my calculations.

Q.    Okay.  And on the basis of the understanding that you had at the time, you said:  Well, if Google's not collecting the alleged data for these iOS users, then, therefore, they're not injured, they're not part of the class.

That was your understanding at the time of your deposition and your original report; correct, sir?

A.    I wouldn't agree with that.

**Q.** Okay. Now, you've also been in this trial and you've heard about two different ways that Google can attribute conversions to two data points that they receive from their collected data; right?

**A.** I would ask for a little bit more context.

**Q.** Sure.

So when Google is collecting data -- okay? -- and let's take other users, Android users -- and they can see, on the one hand, over here we've got ad interaction data, someone clicked on an ad; and over here we collected a second data point, you know, let's say that ad was for Nike shoes, someone actually went into a Nike app and purchased a Nike shoe. Okay?

Google can then take those two data points and do something that they call conversion measurement when they have the device ID available, like the IDFA or the Android device ID. They say, "Aha, the same device ID is turning up in both places, the ad interaction data and the conversion data"; right?

**A.** I would agree to all of that except for the acronyms. Even though those are -- I've been trying to learn the acronyms during this week. But, sure, the general principle, yes.

**Q.** And that is something that Google calls deterministic conversion tracking, and they use a term "conversion measurement" for that kind of deterministic conversion.

We can tell that the same device ID that clicked the ad is

the same device ID that bought the thing in the Nike app;
right?

**A.**   Are you offering --

**Q.**   I'm asking if you understand that, sir.

**A.**   No, I don't think I've heard that term.

**Q.**   You don't know one way or the other?

**A.**   No.

**Q.**   Okay.  Now, in certain cases -- and you were here for
Ms. Langner's testimony that it's the case with this app
tracking change on Apple, Google still receives the ad click
and they still receive that someone bought a shoe in the Nike
app, but because of that ATT change, the IDFA, the device
identifier that Apple sends to Google, the device sends, is
zeroed out; it becomes a zero.

     You heard that testimony from Ms. Langner yesterday, sir;
right?

**A.**   I may have.  That's -- yeah, I may have.

**Q.**   Let's just pull up the daily, just to remind ourselves, at
page 1295 to 1296.

     Okay.  And you see the question [as read]:

     **"QUESTION:**  And are there certain instances when Google
     cannot see the IDFA?"

     Do you see that?  That was Mr. Hur's question, Google's
counsel's question.  Do you see that?

**A.**   To Ms. Langner?

Q.   Correct.

A.   Okay.

Q.   And her answer is [as read]:

     "ANSWER:  Yes.  In the Apple or in the iPhones, there is something called ATT prompt, or App Tracking Transparency prompt.  This is a prompt that is shown to you the first time you open the app if the developer wants to be able to access IDFA."

     Do you see all of that?

A.   I do.

Q.   And then she says [as read]:

     "As a user, you have a choice to say that you would like the app to track you or you could also tell that app you don't want them to track you."

     Do you see that?

A.   I do.

Q.   Then Google's counsel asks [as read]:

     "QUESTION:  Now what happens if the user selects 'Ask app not to track'?"

     Do you see that, sir?

A.   Yes.

Q.   And her answer was that [as read]:

     "ANSWER:  In that case, Google and the developer would not be able to access the IDFA."

     Do you see that, sir?

**A.** Yes.

**Q.** Okay. We can take that down.

Now, were you also here for the testimony of Mr. Ganem?

**A.** For parts of it.

**Q.** Okay. Were you here when Mr. Boies was cross-examining Mr. Ganem?

**A.** For parts of it.

**Q.** And did you hear the discussion with Ganem that, in addition to that kind of deterministic conversion tracking where Google can tell, "Aha, this device identifier like the IDFA definitely links these two events," Google has other ways of attributing a conversion if the device identifier is missing? Did you hear the portion of Mr. Boies' cross-examination about that, sir?

**A.** I'm worried I didn't because I don't -- I don't remember that term. I might have, but I don't remember that term, which makes me think I wasn't here or might not have been here.

**Q.** And did you hear the discussion about how if Google has these two data points, the ad click data and the purchase of the shoe, but they're missing the device identifier, Google can use other data they collect and other things they know about patterns, about the device, about its activities, and it can infer a link between those two events? Did you hear that testimony?

**A.** I may have. I certainly remember something like that,

sure.

Q.   And Google uses a different terminology for that type of conversion attribution between these two data points they collect when they are inferring the link using other data and patterns rather than determining it was the same device.  They call that conversion modeling; correct, sir?

A.   I remember that phrase more than deterministic, "conversion tracking."

Q.   Okay.

A.   But I can't tie it to a particular discussion.

Q.   Okay.  And do you know, one way or another, sir, whether when a user is using an iOS device after 14.5, they're shopping on it, they're doing their third-party app activity, they've got their sWAA button off, Google's collecting data but that IDFA, as Ms. Langner said, is set to zero, do you know whether, in that instance, Google attributes conversions using the modeling or the patterns that Mr. Ganem testified about?  Do you know one way or another, sir?

A.   Only from what you've just offered, which would suggest they're doing modeling, but that's coming from you.

Q.   Okay.  So you're just not sure; fair?

A.   That wasn't part of my assignment, no.

Q.   Okay.  But it's your opinion in this case that after this iOS change, if I understand it correctly, that there was no trackable data generated for Google to conversion track at all?

Wasn't that the opinion you offered on your direct examination, sir?

A.   It was my opinion that they're not doing conversion tracking.

Q.   Are you using --

A.   Once you hit the "Do not track" or "Do not" -- yeah, "Do not track," that they're not using conversion tracking from that device.

Q.   And when you use the word "conversion track," are you using that to encompass both of the forms of conversion attribution we just discussed, the deterministic tracking and the pattern-based or modeled tracking?

A.   I would use it -- the first, the first one.

Q.   Oh.  So when you said on your direct examination that after this app tracking changed, they generated no trackable data, you just meant that out of the two methods Google uses to attribute conversions, the deterministic method may no longer have been available?  Is that what your opinion is, sir?

A.   So it's my opinion that once you hit "Do not track," it is most consistent with the way that Mr. Lasinski's measuring damage to not include those users in his calculation.

Q.   Well, let me -- I want to make sure I understand and that it's very clear.

     Does Google -- or do you know whether Google still collects sWAA-off data from those iOS users, still collects the

ad click data and the in-app activity data and still attributes conversions but using the other method I discussed, modeling? Do you know whether they do that or not with respect to the iOS data after this change?

A.    I do not know directly, no.

Q.    And that's because -- and, sir, that's consistent with your understanding at your deposition, because at your deposition, when we asked you a similar question, you said you didn't know whether or not they did conversion tracking based on that data, one way or another.

A.    I'm happy to look.  I can't remember that specific conversation.

          MS. BONN:    Let's take a look at the deposition.

                    (Pause in proceedings.)

          MS. BONN:    And let's go to page 39.  Let's zoom in a little bit.

BY MS. BONN:

Q.    So there's a question [as read]:

     "QUESTION:    Is it your understanding that Google did not use the data from sWAA-off users for the purposes you just referenced if Google treats those users as signed out?"

     Okay.  And your answer was [as read]:

     "ANSWER:    It's my understanding if they were signed off, they did not use the data."

     Do you see that, sir?

**A.**   Yeah.  Could we go up?  Just because I referred to the purposes we were just talking about.

**Q.**   Of course.

      **MS. BONN:**  Let's go up to page 38, please.  Maybe that will help.  38, starting at line 4.

**BY MS. BONN:**

**Q.**   So the question was [as read]:

      **"QUESTION:**  Was it your opinion that an individual can only be a class member if Google treats them as signed in?"

      And you said [as read]:

      **"ANSWER:**  It's my understanding that the alleged behavior only takes place when Google is -- let me say the alleged behavior does not take place if the user is signed out.  So if Google treats them as signed out, I would conclude the alleged behavior also does not take place."

      Do you see that?

**A.**   Yes.

**Q.**   Then there's some follow-up questions [as read]:

      **"QUESTION:**  What's your understanding of the alleged behavior?"

      And you said [as read]:

      **"ANSWER:**  It's my understanding plaintiffs feel or allege that Google used data for certain purposes that, according to plaintiffs, should not have been used if the sWAA

button was turned off."

Do you see that?

A.   Yes.

Q.   Let's scroll down.  It was in that context -- let's scroll down -- that you said [as read]:

"It's my understanding if they were signed off, they did not use the data.  And if they were signed on but using a device with iOS 14 -- you're offering 14.5, so I'll take your word on 14.5 or later -- Google treated them as signed off for all intended purposes."

Do you see that?

A.   Right.

Q.   Okay.  So you thought, at the time of your deposition, that Google was not using any of the sWAA-off data from these iOS users for any purpose, for all intended purposes, sir; right?

A.   Within the context of what we were just talking -- where I -- I forget my exact language, but I said something like: The plaintiffs allege Google couldn't use the sWAA-off data for certain activity.  So it's those activities that I was talking about.

And in this context, when we're talking about Mr. Lasinski's damage estimates that are the unjust profits that come from conversion tracking, that alleged activity is

the conversion tracking.

Q.   Now, I'll follow up on that in just a minute, but while we're right here, it's a good opportunity.

On your direct examination, you said that you had made a mistake in your report about when this iOS change rolled out. And you said:  I thought it rolled out in 14.  I later learned 14.5.  And it's very important to me to promptly correct errors when I become aware of them; correct?

A.   I'm not sure those were my exact words, but that's the spirit, sure.

Q.   The spirit of it; right?

A.   Yeah.

Q.   And, sir, the people who pointed out to you that you were in error were Mr. Lasinski and my colleague Mr. Sila, at your deposition right here, sir, years ago.  Mr. Sila asked you a number of questions about whether you had made that mistake, and that's what you're referring to in this answer where you say, "And you're offering 14.5, so I'll take your word on it." Do you see that?

A.   Yes.

Q.   Okay.  After your deposition, which was in July of 2023 -- first of all, that was about two years ago; fair?

A.   Yeah.  I said three, sure.

Q.   And after that deposition, you have served a supplemental report; correct, sir?

**A.**    Correct.

**Q.**    But even after you were corrected about this issue at your deposition and you served a supplemental report, you didn't fix the issue in your supplemental report, did you, sir?

**A.**    I think I was probably still confirming things.  You know, like I said in my deposition, at that stage, you're offering. I have to go confirm it.

**Q.**    When did you serve your supplemental report, sir?

**A.**    It was this year, I believe.

**Q.**    Okay.  So your deposition's in July '23.  We mentioned this issue to you.  You served your supplemental report this year, 2025, but you were still trying to confirm whether we were right about this issue?

**A.**    I think that's fair.

**Q.**    Okay.  And then after your supplemental report, in preparation for trial, I think in June of this year, you prepared slides, and there was disclosure between both sides of expert slides in advance; right?

        **MR. HUR:**  Objection, Your Honor.  This relates to exchanges between counsel.

        **MS. BONN:**  It's impeachment with the slides he prepared, Your Honor.

        **THE COURT:**  Overruled.

BY MS. BONN:

**Q.**    Did you prepare slides that were disclosed in June in

preparation for the trial?

A.    I prepared slides.  The disclosure part is --

Q.    Okay.  That's fair.

A.    Yeah.

Q.    That's perfectly fair.

And do you know if in the slides that you served as late as June of this year, your error of saying iOS 14 versus 14.5 was still there?

A.    I can't remember.

Q.    You don't remember when you fixed that error, sir?

A.    Not specifically, no.

Q.    Sitting here today, you have no opinion and you're not sure whether Google still collects app activity data from iOS users who are both signed out and who have chosen not to be tracked via ATT, collects that data and models conversions? You don't know; is that fair?

A.    Models conversions?  You would have to define "models," yeah.

Q.    Okay.  Let's go back to the definition we talked about a moment ago.

We talked about conversion measurement, where Google makes a deterministic link with the device identifier.  Then we talked about a second type of conversion attribution, conversion modeling, where they take the two data points and they infer the link through patterns and other things they know

about the device and the activity if they can't make a deterministic link with an identifier.

So that's the definition I'm using of "conversion modeling."

A.    So in that second case, they don't know the device?

Q.    Yeah.  Let's back up.  Let's give an example.

So you heard Ms. Langner's testimony that with this iOS change, a user who has said, "I'm using this ATT prompt.  I don't want to be tracked," that that causes the device identifier, the IDFA, to show as a zero?

A.    Correct.

Q.    Right.  Now --

A.    They no longer know the device.

Q.    They don't have the device identifier.

Now, do you know whether Google is still collecting the ad clicks and the in-app purchases and, in the absence of knowing the device identifier, applying patterns, models, their sophisticated algorithms and saying, "What can we infer this device was?"  Do you know, one way or another, whether Google still does that, even when a user has sWAA off and has said "I don't want to be tracked" on their Apple iPhone?

A.    I can't say one way or the other.

Q.    Okay.  Now, let's talk about another of your opinions, which is that Mr. Lasinski should have reduced his profit calculation because of a data point you had seen that you

thought suggested that folks who choose sWAA off are less engaged with ads and, therefore, sort of generate less ad traffic and ad revenue for Google.  Do you remember that?

A.    Yes.

Q.    Okay.  Now, you showed a slide about that on your direct examination, and I'd like to pull it up just to sort of orient ourselves.  Slide 32, please.

And this is the slide that you showed to illustrate that aspect of your opinion; correct, sir?

A.    That's correct.

Q.    Okay.  And I think, if I understand what you were saying, you were saying the column on the left shows the share of monthly accounts with sWAA off on these three months, March, April, and May of 2022; correct?

A.    That's correct.

Q.    And then you said the column on the right shows the sWAA opt-out rate on Google display advertising stack based on clicks; correct?

A.    Correct.

Q.    And you said if you look at the column on the right, it appears to be about half, you know, maybe less than half of the column on the left, and that is what suggested to you this diminished ad engagement from sWAA-off users; fair?

A.    Well, the only thing -- that's certainly the data part. I think there's also just economic arguments and rationales as

to why it would be true as well.

Q.   Okay.  Now, you based -- first of all, let's start with one point.

March, April, and May of 2022 were after the iOS ATT change we were just discussing; correct?

A.   Yes.

Q.   And you're aware that Google's position is that after that app tracking change -- okay? -- because the IDFA was zeroed out, when Google collected the data from those folks, they couldn't tell anymore whether someone had sWAA on or sWAA off? You understand that's what Google's position is; right?

A.   That's venturing into technical -- I don't want to offer or opine on Google's positions on technical matters.  I'm afraid I might misrepresent them.

Q.   Okay.  I have a slide that you prepared and that was served in July, on July 26th of this year.  It's Slide 35 from that deck.

        MS. BONN:  I'm going to mark it for identification as Plaintiffs' Knittel Demonstrative 1.  If we can please pull that up.

        MR. HUR:  Objection, Your Honor.  Foundation.  Outside the scope.  Now we're showing slides that weren't even used.

        MS. BONN:  It's impeachment, Your Honor.  I'm going to his understanding based on slides he created a month ago.

        THE COURT:  So this is a slide that was created by the

defense but you ended up not using it?

MR. HUR:  It was part of an initial exchange.  We exchanged more.  We cut things down.

MS. BONN:  I'm just asking about the first bullet point and his understanding, Your Honor.

THE COURT:  Do you need this slide to ask about this issue?

MS. BONN:  Well, we could take it down and show the witness only.  I just want to make sure that the witness understands.

Why don't we take it down.

THE COURT:  Why don't you ask the question first --

MS. BONN:  Sure.

THE COURT:  -- and then if he needs to --

MS. BONN:  Thank you.

THE COURT:  -- he needs to refresh his --

BY MS. BONN:

Q.   Sir --

THE COURT:  Yes, proceed.

BY MS. BONN:

Q.   -- was it your understanding, as of July 26, 2025, that after the release of iOS 14, Google could no longer detect iOS users signed in or sWAA status?  Was that your understanding?

A.   That's consistent with my recollection.

Q.   Okay.  So your recollection is that after this iOS change,

when that IDFA device identifier was zeroed out, Google, when they collected data from those devices, could not tell if they were sWAA on or off; fair?

A.   No.  It's fair to say that that was my recollection.

Q.   Okay.  That was your recollection?

A.   Yeah.

Q.   Okay.  Let's go back to the Slide 32 that you showed in your presentation.

Now, if it's true, sir, that Google could no longer detect, after this iOS change, whether someone had sWAA on or off, you can't rule out the possibility that the right-hand column here understates the amount of sWAA-off traffic that was received because Google could no longer identify a portion of it as being sWAA off?

A.   From iOS users?

Q.   Correct.

A.   So that's certainly directionally the same.  I'm -- what I'm trying to do in real time -- and you shouldn't do math in real time -- is I have some understanding of the share that's iOS -- I'm trying to back out the extremes of the share of the 14.5 to see if it's at all possible to get to 6 percent, given what I know about the shares.

Q.   Right.  I guess here's my question.  Let's imagine there's a pie --

A.   Yep.

Q.   -- of sWAA-off data that came into Google in March, April, and May of '22; but for all the traffic that came in from iOS devices, and let's just, for purposes of simplicity, say that's about half, they couldn't tell if it was sWAA-off.

Are you with me on the premise?

A.   Okay.

Q.   Okay.  You can't rule out the possibility that these numbers in the right-hand column that are showing 6 percent, that that's not a result of the fact that for half the incoming data, Google simply wasn't tagging it as sWAA off in their logs; correct, sir?

A.   Yeah.  I think -- so we'd have to do the conditional probabilities, and that's what I'm trying to do in real time.

But, you know, I would say over -- the overarching opinion, as it relates to this table, is this is something that Mr. Lasinski should have definitely considered.  Here's some data consistent with something that's also just *a priori* economically consistent that sWAA-off users interact with the Internet and advertisers differently.

Q.   Okay.  And let's just assume for a moment that my premise is correct, that in March, April, May of '22, there's a pie of data coming in -- okay? -- and for half of the sWAA-off data coming in, Google simply can't tell that it's sWAA off.

A.   Okay.

Q.   You can't rule out the possibility that that column should

effectively be doubled, can you?

A.   Again, and I apologize for not wanting to do math in real time.  I have some understanding of the amount of people that hit the "Do not track," which is less than a hundred percent.  So that's where I'm trying to say, well, actually, we might know a little bit more than -- about that half than you're providing, and that's what I don't want to do in real time.

Q.   Okay.  And the source of this data that you relied upon was an interrogatory response by Google; correct, sir?

A.   Yes.

Q.   Okay.  The source of this data that you relied upon came from Google's Second Supplemental Objections and Responses to Plaintiffs' Interrogatories Set 6; correct, sir?

A.   I wouldn't remember all those numbers, no.

     MS. BONN:  Okay.  Let's go to Professor Knittel's report, at paragraph 104.  It's on pages 65 to 66.

     THE COURT:  This is not to be shown to the jury.

     MS. BONN:  No.  Just to the witness.  Thank you, Your Honor.

BY MS. BONN:

Q.   And you can see I think there's -- this is where you are discussing this opinion that sWAA-off users are less likely to engage with advertising activities than sWAA-on users, and you have a Footnote 229.  Do you see that, sir?

A.   Yes.

Q.    Let's go down to the Footnote 229 and see what is cited.

And we can see that -- there we go, "See Figure 1 above." Do you see that?

A.    Yes.

MS. BONN:  All right.  Let's go up to Figure 1 above. We're around paragraph 90.  There we go.

BY MS. BONN:

Q.    And you see the same table that you had on your slide; correct?

A.    Yes.

Q.    And you have a source for that table, Figure 1, which is Footnote 189; correct, sir?

A.    Yes.

Q.    And if we look at Footnote 189, we then see that you cite a schedule from Mr. Lasinski's report and then you cite an interrogatory response by Google; correct?

A.    Yes.

Q.    And you cite the Interrogatory Response Set 6, Second Supplemental Response to Interrogatory Number 17, pages 21 to 24; correct, sir?

A.    Yes.

MS. BONN:  Okay.  Let's please pull up those interrogatories.  And this is Interrogatory Number 17.  Let's go ahead and pull ahead to page 19, where the second supplemental response appears.

BY MS. BONN:

Q.   Okay.  And, sir, this is the beginning of the second supplemental response that you relied upon in order to reach a conclusion that sWAA-off users are less engaged with advertising products; fair?

A.   That's fair.

Q.   Okay.  Now, looking at this, we can see that what Google wrote and you relied on says [as read]:

"Google identified a log called 'Sampled Ad Events Queries' that indicates WAA and sWAA status alongside ad interactions, e.g., views and clicks, on App Campaigns designated App Install Campaigns."

Do you see that?

A.   Yes, I do.

MS. BONN:  And may I publish the interrogatory response, please, Your Honor, the basis of his opinion and a party admission?

MR. HUR:  Your Honor, I don't see the relevance.  There's no foundation for this particular document.

THE COURT:  Yeah, I don't see any -- no, you cannot publish it.

MS. BONN:  Okay.

BY MS. BONN:

Q.   Sir, when you reviewed this interrogatory response, you didn't know what the sampled ad events queries log was;

correct, sir?

**A.**   Certainly not in every detail, sure.

**Q.**   Okay.  And you didn't have any basis to know why, out of all the logs that sWAA-off data appears in, Google chose this one to look at; fair?

**A.**   That's fair, sure.

**Q.**   Okay.  And you did know that Google said they queried this data source, which maintains ad interaction information with varying degrees of reliability?  Do you see that?

**A.**   Yes.

**Q.**   And you didn't really know what it meant by "varying degrees of reliability"; true?

**A.**   That's probably fair.

**Q.**   You didn't know if they meant like the reliability is like 0 to 5 percent or if they meant the reliability is like 95 to a hundred percent?  You had no idea; right?

**A.**   As a statistician, I don't think I would think of reliability in that way, but I kind of get your gist.

**Q.**   And you just didn't know if they meant it's unreliable but of varying degrees of unreliability or it's super reliable but the degree of just how reliable goes up and down?  You didn't know which of those two it was or somewhere in between; fair?

**A.**   Well, I knew it was data from Google on a point or an issue that's of relevance to the trial, sure.

**Q.**   But you didn't know what varying degrees of reliability

signified; fair?

**A.**   I think it's fair to say that if I was in Mr. Lasinski's shoes, I would -- I would probably want to confirm the reliability as well as certainly take this into account or at least consider it.

**Q.**   You understand that Mr. Lasinski can't just pick up the phone and call Google and ask them what this meant; right?

        **MR. HUR:**  Objection.  Argumentative.

        **THE COURT:**  Overruled.

**BY MS. BONN:**

**Q.**   Right?

**A.**   He can't?

**Q.**   Right.

**A.**   He can't call Google?

**Q.**   Right.

**A.**   Oh.

**Q.**   But you can; right?  They're your client, sir.

**A.**   I don't have clients, ma'am.

**Q.**   Oh.  Who is paying the bills to Analysis Group and to you for your work in this case?

**A.**   I wouldn't refer to Google as a client but...

**Q.**   My question's a little different.  Who's paying the bills for the over 8,000 hours that Analysis Group billed and your work on this matter?

        **MR. HUR:**  Objection.  Foundation --

**THE COURT:**  Who's paying the bills?

**MR. HUR:**  -- as to the number of hours, Your Honor.

**THE COURT:**  Well, all right.

As to the number of hours, who's paying the bills?  You can answer that question.

**THE WITNESS:**  Yeah, that's the first time I've heard the number of hours but --

**BY MS. BONN:**

**Q.**  I apologize.  I thought you said that number on direct. If I misunderstood, I apologize.

**A.**  Oh, I didn't say that number on direct.

**Q.**  I apologize.

**A.**  Okay.

**Q.**  I misunderstood.

Who is paying the bills for Analysis Group and your work on this matter?

**A.**  Google is paying.

**Q.**  Okay.  Was anything stopping you from picking up the phone and saying, "I see this.  I want to use this data in my report, but I'm troubled by this comment about varying degrees of reliability.  Who can I talk to at Google to find out more about this?"  Was anything stopping you from doing that?

**A.**  I don't think nothing's stopping me from it, but I don't think -- again, the point of this table or these data is to shine a light on an issue that Mr. Lasinski ignored that might

very well be really important, and I think the data is sufficient to shine that light.

Q.   If this data was very important -- you were here for parts of Mr. Ganem's testimony and parts of Ms. Langner's.  Did either of them talk about this data and how it was generated and its reliability in court in this trial?

MR. HUR:  Objection.  Foundation.  Relevance.

THE COURT:  Well, I think asking him about --

MS. BONN:  Okay.  Fair.

THE COURT:  -- what the totality of these examinations, he's indicated he came in and out, I don't think that's appropriate.

MS. BONN:  Okay.  Fair, Your Honor.  Thank you.

BY MS. BONN:

Q.   Let's look at what you had at the time.  It also said that what they did in pulling this data, it says for the WAA and sWAA opt-out rates on 25 random days over the last five years.  Do you see that?

A.   Correct.

Q.   Okay.  So what Google said it was doing was querying a log to pull data for 25 random days over the last five years; correct?

A.   That's -- or that's consistent with that sentence, yes.

Q.   And, yet, if we look at the table of data underneath it and we look at all of the dates on this page that were pulled,

each and every date is the first of the month.  Do you see that, sir?

**A.**   I do.

**Q.**   And that raises some questions about whether Google could have actually queried 25 random days over the last five years; fair?

**A.**   Yeah.  It would depend on how they're defining "random." It could be random within the day, and they -- so that's fair. Your -- your suggestion is fair, sure.

          **THE COURT:**  I think we've now reached --

          **MS. BONN:**  Thank you, Your Honor.

          **THE COURT:**  -- the point of conclusion.

     Members of the jury, remember my admonitions.  Do not discuss this amongst yourselves or with anyone else.  Put this all aside.  No research, nothing like that.  I will see you tomorrow at 8:30 in the morning.

     (Proceedings were heard out of the presence of the jury.)

          **THE COURT:**  Okay.  We're outside the presence of the jury.

     You can step down.

          **THE WITNESS:**  Okay.

          **THE COURT:**  So we'll continue the cross-examination of Professor Knittel and then any redirect.  And then we'll have Mr. Black.

     And then other than the issue of whether or not there's

anything further from the plaintiffs, do we have anything further from the defense?

MR. HUR:  That is our plan, Your Honor.  Black and then we plan to rest.

THE COURT:  Okay.  And are you still seeking -- is there still a request for something in a rebuttal case?

MR. DAVID BOIES:  Yes, Your Honor.

THE COURT:  And that is again?

MR. DAVID BOIES:  It is Professors/Drs. Lasinski and Hochman.  Now, if for some reason the Court were to rule that experts couldn't be brought in in rebuttal, we'd try to find a fact witness to bring in.  What we're doing is we're dealing with a lot of fact witness testimony here that we think the experts are the right people to rebut.

THE COURT:  Well, I'm not sure I agree with you.

But Lasinski, I don't understand why you would call him back up.  It would just be for him to say, "No, that witness was wrong.  I'm right."  I mean, I -- that, I don't see.  This idea, then, that there is facts that came in through an expert --

MR. DAVID BOIES:  No, not through an expert, Your Honor.  If I could ask, let us give you, this afternoon, some references to the transcript.

THE COURT:  Okay.  All right.

MR. DAVID BOIES:  Because I think that you will see

that there was a lot of reference to what Mr. Lasinski and Mr. Hochman testified to that were not in the expert reports, that were not anything they could have rebutted before.  It came in during the plaintiffs' case.

And if -- the purpose of giving us a rebuttal is for us to be able to attack the things that come up in the plaintiffs' case.

**MS. BONN:**  Defendant's case.

**THE COURT:**  You can attack -- it has to be something that is effectively unexpected, that your witnesses were not in a position to testify to.  You can't just use the rebuttal case to reiterate your case.

**MR. DAVID BOIES:**  I understand that.

**THE COURT:**  So as long as we all understand that, I will take a look.

I have to tell you, in the interest of full disclosure, Mr. Boies, I'm quite skeptical about your -- the prospect that you can call your two experts back up on the stand in a rebuttal case, but I'll look if you've got something for me.  I have an open mind.  I'll look, but I think it's -- you're going to have to convince me.

And sooner, the better that you get -- it doesn't have to be a beautiful brief.  Just if you've got cases or whatever, get it to me, and then I'll try to give you an answer as soon as we can.

MR. DAVID BOIES:  We will try to -- as soon as we get back --

THE COURT:  Great.

MR. DAVID BOIES:  -- we'll prepare something and get it to you this afternoon.

THE COURT:  All right.

MR. SANTACANA:  And we will file as well, Your Honor, a tight little brief with cases that confirm Your Honor's comments are exactly how the case law looks at it.

THE COURT:  All right.  Now, Mr. Boies then said, "Well if it's not experts, maybe we'll find a fact witness or two."  What's your view of that?

MR. SANTACANA:  I don't know.  I mean, like on the street?  Or I don't understand what --

MR. DAVID BOIES:  It would have to be -- I think it would be to have a Google witness.

MR. SANTACANA:  Are they hiding at the Ritz?  I don't know.

(Laughter.)

MR. DAVID BOIES:  It may be that we have to call Mr. Ganem back to the stand.  It may be that we have to call a Google witness.

THE COURT:  Well, I won't anticipate a problem if we haven't gotten one yet, so -- but, okay.

So it sounds pretty probable, even if there was some

rebuttal case, that we are going to be done tomorrow.

MR. DAVID BOIES:  Yes, Your Honor.

MR. SANTACANA:  I think that's right, Your Honor.

THE COURT:  Okay.  So what I'm going to do at the end of tomorrow -- and if it's early, more the better -- I'm going to tell the jury that when they come in on Tuesday, they should clear their calendar and plan to start spending the whole day.

So that you know, that's my plan.  When we get to instructions, closing arguments, and all that, it's not going to be 8:30 to 1:30.  It's going to be the day.  And then they start deliberating, hopefully.

And then you've got time left.  I'm not going to constrain you on your closing arguments because I know you're excellent lawyers and you're going to know that there's a certain point of diminishing returns.  So I'll leave it to you for that.

I just want to confirm -- oh, and then we're going to get you, this afternoon is my hope and plan, to get you a jumping-off set of instructions and verdict form, and then we'll have our session tomorrow afternoon.

Just to -- we're looking at what you've submitted, and I just want to confirm, because there wasn't any discussion about it, you are withdrawing the affirmative defense statute of limitations instruction; is that right?

MR. SANTACANA:  That's correct, Your Honor.

THE COURT:  Okay.  I just wanted to make sure that I

read that right.

Okay.  Anything else?

MR. DAVID BOIES:  Not from us, Your Honor.

MR. HUR:  Your Honor, do you intend to start the conference tomorrow sort of whenever we're done with the evidence, or is there a set time you'd like to begin that?

THE COURT:  Well, if we go all the way to 1:30, I wanted to then have an opportunity for all of us to have something to eat.  I was thinking we'd start at 2:30.

If we finish early, we'll move the lunch hour to earlier and we can start earlier.  I don't -- it's not set it has to be 2:30.

MR. HUR:  Thank you, Your Honor.

THE COURT:  It'll be after a lunch break.

MR. HUR:  Sounds good.

THE COURT:  Okay.

MR. DAVID BOIES:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Court stands in recess.

UNIDENTIFIED SPEAKER:  Time?

THE COURT:  Oh, yes.

THE LAW CLERK:  Plaintiffs have 6 hours, 31 minutes, and 21 seconds.  Defendant has 6 hours, 47 minutes, and 21 seconds.

THE COURT:  We'll take bets.

(Laughter)

**THE COURTROOM DEPUTY:**  Now, we're in recess.

(Proceedings adjourned at 1:38 p.m.)

---o0o---


## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Friday, August 29, 2025


_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter