**Volume 9**

**Pages 1615 - 1830**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,          )
individually and on behalf of  )
all others similarly situated, )
                               )
          Plaintiffs,          )
                               )
  VS.                          )  **NO. 3:20-CV-04688 RS**
                               )
GOOGLE LLC,                    )
                               )
          Defendant.           )
_____)

                    San Francisco, California
                    Friday, August 29, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    BOIES SCHILLER FLEXNER LLP
                    333 Main Street
                    Armonk, New York 10504
               BY:  **DAVID BOIES, ATTORNEY AT LAW**
                    **ALEXANDER M. BOIES, ATTORNEY AT LAW**
                    **M. LOGAN WRIGHT, ATTORNEY AT LAW**

                    BOIES SCHILLER FLEXNER LLP
                    2029 Century Park East, Suite 1520n
                    Los Angeles, California 90067
               BY:  **ALISON L. ANDERSON, ATTORNEY AT LAW**
                    **SAMANTHA D. PARRISH, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiffs:

    BOIES SCHILLER FLEXNER LLP
    100 Southeast Second Street, Suite 2800
    Miami, Florida 33131
    BY:   **JAMES W. LEE, ATTORNEY AT LAW**

    BOIES SCHILLER FLEXNER LLP
    44 Montgomery Street, 41st Floor
    San Francisco, California 94104
    BY:   **MARK C. MAO, ATTORNEY AT LAW**

    SUSMAN GODFREY LLP
    One Manhattan West, 50th Floor
    New York, New York 10001
    BY:   **WILLIAM C. CARMODY, ATTORNEY AT LAW**
    **RYAN SILA, ATTORNEY AT LAW**

    SUSMAN GODFREY LLP
    1900 Avenue of the Stars, Suite 1400
    Los Angeles, California 90067
    BY:   **AMANDA BONN, ATTORNEY AT LAW**

For Defendant:

    COOLEY LLP
    Three Embarcadero Center, 20th Floor
    San Francisco, California 94111-4004
    BY:   **BENEDICT Y. HUR, ATTORNEY AT LAW**
    **EDUARDO E. SANTACANA, ATTORNEY AT LAW**
    **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
    **JONATHAN PATCHEN, ATTORNEY AT LAW**
    **ISABELLA M.M. CORBO, ATTORNEY AT LAW**
    **MICHAEL B. MORIZONO, ATTORNEY AT LAW**
    **THILINI L. CHANDRASEKERA**
    **ATTORNEY AT LAW**

    COOLEY LLP
    4401 Eastgate Mall
    San Diego, California 92121
    BY:   **MICHAEL A. ATTANASIO, ATTORNEY AT LAW**

Also Present:   **Steve Ganem, Google**

# INDEX

Friday, August 29, 2025 - Volume 9

|                                          | PAGE | VOL. |
|------------------------------------------|------|------|
| Defense Rests                            | 1780 | 9    |
| Plaintiffs Rest Rebuttal                 | 1781 | 9    |
| Charging Conference                      | 1784 | 9    |

**PLAINTIFFS' WITNESSES**                         PAGE   VOL.

**MIRAGLIA, ERIC**
By Video Deposition                               1781   9

**DEFENDANT'S WITNESSES**                         PAGE   VOL.

**KNITTEL, CHRISTOPHER ROLAND (RECALLED)**
(PREVIOUSLY SWORN)                                1632   9
Cross-Examination resumed by Ms. Bonn             1632   9
Redirect Examination by Mr. Hur                   1676   9

**BLACK, JOHN**
(SWORN)                                           1685   9
Direct Examination by Mr. Santacana               1686   9
Cross-Examination by Mr. David Boies              1732   9
Redirect Examination by Mr. Santacana             1778   9

# EXHIBITS

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|----------------|------|------|------|
| PX4            | 1781 | 1781 | 9    |
| PX421          |      | 1664 | 9    |
| PX453          |      | 1712 | 9    |
| PX453.A        |      | 1719 | 9    |

**Friday - August 29, 2025**                                    **8:20 a.m.**

                          **P R O C E E D I N G S**

                                 ---o0o---

THE COURT:  Good morning.

ALL:  Good morning, Your Honor.

THE COURT:  Okay.  I just want to confirm with everyone.  Did you get the -- you got our draft set of jury instructions and also our special verdict form.

Everybody got that?

MR. HUR:  We did, Your Honor.

MR. DAVID BOIES:  Yes, Your Honor.

THE COURT:  All right.  So I have various items that you've put on the docket for me.

First of all, it's the question of the rebuttal case.  I did read, with some care, each side's submissions on this issue.

The bottom line is, I did find Google's brief quite persuasive.  I do think that this is not appropriate rebuttal testimony.  It would be cumulative.  I think there was a full opportunity to cross-examine on the issues that were identified for me as these matters that the plaintiffs think they need to have rebuttal on.

I remain concerned about using experts for this purpose, but beyond that, I don't think it's appropriate, and I think, at the end of the day, it would be a rehash of the experts'

testimony. So I'm going to preclude that aspect of the rebuttal.

There is now, as I understand it, another issue, which is with respect to Exhibit 4, which was the communication where I denied it, denied its admission. I think it does qualify as an admission against interest. I think it would come in but for the uncertainty of who the "Dave" was.

And now plaintiffs have pointed me to a reply brief that was in the summary judgment motions where the Google side identifies it as a response by Dave Monsees, or identifies the applicable quotation.

So who wants to talk about this?

**MS. CHANDRASEKERA:** Good morning.

**THE COURT:** So, go ahead.

**MS. CHANDRASEKERA:** Good morning, Your Honor. Thilini Chandrasekera for Google.

Your Honor, even though the reply brief to our summary judgment motion discussed this document, identified the speaker as Dave Monsees, we have reviewed the Miraglia deposition transcript, looked back on this document, and for the same reasons that Your Honor just described and for the same reasons that you previously held that it was uncertain, we feel that, having reviewed the transcript, that it is uncertain who the speaker is.

**THE COURT:** Well, the transcript -- Miraglia's

transcript is, he doesn't know.  Right?

MS. CHANDRASEKERA:  Yes, Your Honor.

THE COURT:  But then at the time you filed the reply brief, you were under the impression it was Dave Monsees.  Now, I don't know how you came to that conclusion, but you came to that conclusion.

So Miraglia's uncertainty doesn't necessarily undercut this representation by counsel.  What am I to do with it?  I mean, I assume when an attorney says to me "This is so-and-so's response," I take it at their word.  So I don't -- I mean, I can't plumb the depths of why your side said it, but you said it.  So what am I supposed to do with this?

MS. CHANDRASEKERA:  Your Honor, the time for this has come and passed.  That reply was on file at the time we first discussed, and second discussed, PX4.

THE COURT:  Well, I'll be the first to admit, I didn't remember -- I haven't committed this all to memory, so I didn't remember that you had said that in your reply brief, quite candidly.

The one thing that is clear, to me, is that the reason I said it couldn't come in, unlike Exhibit 31, which I did allow to come in, was because of the uncertainty.

If I had been satisfied, and if I'm satisfied today, that that uncertainty is no longer the impediment, then I think it comes in as an admission.  I don't -- there are all sorts of

other arguments why it wouldn't come in.  I didn't find those convincing.  But I did think because of, frankly, the significance of the item, that the uncertainty was a problem, and it wasn't fair to Google at that point for it to come in with that uncertainty hanging over the document.

But I don't know what I do with this.

MS. CHANDRASEKERA:  Well, Your Honor, first of all, also speaking candidly, had not -- I argued this earlier and had not realized that that was in our reply at the time.  But that was also available as information to plaintiffs, who have been litigating this case, who were here for the MSJ, who litigated that document in the MSJ.

And additionally, the relevance of the document has not changed since this was first brought before Your Honor or second brought before Your Honor.

THE COURT:  Well, I thought it was quite relevant.  I never thought it wasn't relevant.  I thought it was uncertain as to identify, but I had no problem thinking -- if I had been convinced at the time this came up that we knew it was Mr. Monsees, I would have admitted this document.

So the only thing is -- the only issue right now for me is:  Does this move it across the goal line in terms of identity?

Okay.  Go ahead.

MR. SANTACANA:  Well, it's just, Your Honor, I think I

wrote this, and so I thought I would stand here as the attorney who made the representation in the brief and say that based on my memory, I was basing it on the transcript and assumed that --

THE COURT:  Whose transcript?

MR. SANTACANA:  The Miraglia transcript.

And I assumed the "Dave" was Dave Monsees.  I didn't have independent knowledge beyond that.  And I may have made a mistake.  I don't know.  And if you hold that against us, I understand.  But I just wanted to be clear about where the representation came from.

THE COURT:  Okay.  Well, I don't fault you, Mr. Santacana, whatever happens.  But there are consequences to representations.  So...

MR. SANTACANA:  And we understand that too.

THE COURT:  Yes, go ahead.

MR. DAVID BOIES:  I don't have anything to add. I think --

THE COURT:  Well, let's assume for -- let me ask you this.  You've been a respected lawyer for a long time, and I've been a judge now for a long time.  People make mistakes.

MR. DAVID BOIES:  Sure.

THE COURT:  And how much should I -- why should I say -- and I appreciate Mr. Santacana's, I think, honest response that he was writing a brief and he said, in writing

it, "It was this fella," and now he's had an opportunity to take a look at it.

Why should they be, for want of a better way to phrase it, hoisted on this reference in a reply brief?

**MR. DAVID BOIES:**  Well, I think there are a couple of things.

If this were a situation where we didn't know whether this was coming from Google or not, I think that it might be a different situation.

Here, the uncertainty was whether it was coming from David Monsees or from Mr. Warren, both of whom are at Google.  And --

**THE COURT:**  And Mr. Warren, he's more low down? Wasn't there some questions about his level in the company for purposes of making a corporate --

**MR. DAVID BOIES:**  Well, I think he was clearly identified as somebody with respect to whom this would have been within the scope of what he was doing.  I think he was -- and I could be wrong about this.

**MS. BONN:**  Mr. Warren was identified by Mr. Miraglia as the lead writer for the content on the consent bump, which related to Google Account.  That was in the deposition of Mr. Miraglia.  And Mr. Warren is on the email thread itself.

Thank you, Your Honor.

**MR. DAVID BOIES:**  And --

**THE COURT:**  Okay.

**MR. DAVID BOIES:** And I think representations do have consequences. I think if this were a situation where we were debating whether this came from Google or some other party, I'm not sure I'd feel as strongly as I do about holding them to it.

**THE COURT:** Okay. If this is presented in rebuttal, there was some discussion that it would -- how were you proposing to present it to the jury?

**MR. DAVID BOIES:** I could just have it admitted and publish it, or I could call Mr. Ganem, who is here, to the stand and examine him about it.

**THE COURT:** Well, I thought there was a third alternative, which was to play a part of Miraglia where it's identified.

**MR. DAVID BOIES:** Yes.

**THE COURT:** But I have to go back and look.

**MR. DAVID BOIES:** We have that in court, available to do.

**THE COURT:** Can I look at what -- what would be -- I mean, the concern I have, I think, with an admission, you can just say it to the jury.

**MR. DAVID BOIES:** Right.

**THE COURT:** But I think for context, it's nice for the jury to know why somebody is throwing a document at them.

**MR. DAVID BOIES:** Sure.

THE COURT:  So is there -- can I see the Miraglia excerpt where this comes up?

MS. CHANDRASEKERA:  May I respond, Your Honor?

THE COURT:  You can, but let me look at this first.

MR. WRIGHT:  I've got it on my computer, and I'll also print a copy if that works.

THE COURT:  Either way is fine with me.  You can hand me your computer, if you don't mind, to speed it up.  I won't look at anything else on your computer.

(Laughter.)

THE COURT:  Well, what's your name?

MR. WRIGHT:  Logan.

THE COURT:  Logan, you're going to have to help me.

(Laughter.)

THE COURT:  It's either R.J. or you, so come here.

I just want to see the -- what am I looking at?

MR. WRIGHT:  So, sure.  So this is the exhibit.  This is PX4.  And then this is him talking about it.

THE COURT:  Okay.  All right.  Thank you.

MR. WRIGHT:  Sure.

(Pause in proceedings.)

THE COURT:  So you would suggest going to -- it would be through 118:3?

MR. DAVID BOIES:  118.

MS. ANDERSON:  We can include their --

**MR. DAVID BOIES:**  I would -- yes, but I'm happy to play whatever they want to.

**THE COURT:**  And then there's counter-designations.  So I'd want to know if you would want more than this.

**MS. CHANDRASEKERA:**  May I first respond to take a step back?

**THE COURT:**  Yes.

**MS. CHANDRASEKERA:**  Your Honor, the same foundation issue does still exist here.  The only thing that's changed is this reply brief.

As Mr. Santacana just told you, the statement in that reply brief was based on the transcript that you're looking at now.  And that transcript shows that the speaker of this document, the underlying link that is quoted in the email is not clear.  Dave Warren is a possibility.  Dave Monsees is a possibility.

Plaintiffs have designated -- they brought in PX31 through this.  The speaker there was a Dave Kleidermacher.  It's a very common name.

The speaker remains unknown, given that Mr. Santacana's statement was based on the transcript before you, and that transcript makes clear the speaker is unknown.

**THE COURT:**  Well, at the time I didn't admit it, I recognize this argument was probably made in some form; but Mr. Boies' argument, as I'm now thinking about it, it is a

different situation than one where we think, we don't know who it is and one alternative is somebody that wouldn't even be arguably an admission by the party.

Here, it's Dave Warren or it's Dave Monsees. I've heard nothing that suggests it's somebody else. So at that point -- and I know this was known to me when I said no the first time, but I reserved the right to reassess. I think that's a rather compelling argument.

**MS. CHANDRASEKERA:** Your Honor, the issue is that it isn't necessarily one of those two Daves. For example, as I just mentioned, there is a third Dave in this very same transcript, David Kleidermacher.

**THE COURT:** Also a Google person.

**MS. CHANDRASEKERA:** But the scope of their employment, which is what matters to a party admission --

**THE COURT:** True.

**MS. CHANDRASEKERA:** -- is not clear.

**THE COURT:** Well, but for it to be a party admission, it doesn't need -- it needs to be a responsible official within the company. It doesn't have to be Mr. Pichai to have it come in.

So assuming I am going to let this come in on rebuttal, there were cross designations in the Miraglia deposition. So if I am going to say, okay, and I want you to do it through the Miraglia excerpts so the jury has context, what do you want

counter-designated?

MS. CHANDRASEKERA: We would want all of our current counter-designations. And I would like the opportunity to look through the clip report that Mr. Boies has on hand to confirm the statements where Mr. Miraglia says he does not know who was speaking, and anything else we would like to include about --

THE COURT: Well, if I'm reading this correctly, it seems that it would take you down to about 118, either 03 or 07, but -- okay. Do that. Tell me what the counter-designation is.

So I will permit you to do a rebuttal case for the purpose of admitting Exhibit 4, and I would prefer to do that through the excerpt of the Miraglia deposition. And you guys work together on the -- I will permit the Google folks to counter-designate in this context. So work together and do that.

MR. DAVID BOIES: We will, Your Honor.

THE COURT: Okay.

MS. CHANDRASEKERA: Thank you, Your Honor.

THE COURT: So I can give this back to somebody. Or, no, I'll just keep it.

All right. There was another issue, I was told.

MS. BONN: Yes, Your Honor. During my cross-examination of Professor Hoffman, I did three short video impeachments that were not transcribed because they were by

video.

THE COURT:  Right.

MS. BONN:  We have the transcript of those clips marked for identification as PX414, and I wanted to provide it to the court reporter so it could be appended with the transcript.

MR. ATTANASIO:  This is not a big issue.  We were just confused.  We have Mr. Pichai.  We have Mr. Kearns.  We have Mr. Miraglia.  Those were played as affirmative evidence, and those transcripts were provided to the court reporter.

These are impeachment.  We've had many impeachments, many refreshing of recollection.  We haven't been marking those transcripts, and it just seems odd to me and not something that's customary.  We didn't want to burden the Court or the record with impeachment clips.  We'd have to do that for --

THE COURT:  Actually, I think Mr. Attanasio is right.

If it's impeachment, you impeach the witness in real time.  You did that.  I don't think it then gets marked for identification in the same way.  I don't -- this is truly not an issue.

MS. BONN:  No, it's not.

THE COURT:  This is just what goes to the Ninth -- in what form it goes to the Ninth Circuit.  I mean, I don't think we should spend any time on this.  But I don't see a need to have it marked for identification.

**MS. BONN:**  The only reason we're asking, Your Honor, is had I shown her the transcript and read it in, there would be a record in the transcript of what was said around the question and answer that the Ninth Circuit could look at; and here, there would be nothing because I played it under the impression that the court reporter would not take it down. So --

**THE COURT:**  Well, I see --

**MS. BONN:**  -- that's my point.

**THE COURT:**  I understand.  So it's the nature of the format of the impeaching item --

**MS. BONN:**  Correct.

**THE COURT:**  -- which is, it's a video; it's not a transcript.

It's such a minor issue that I just --

**MR. ATTANASIO:**  Whatever the Court prefers.

**THE COURT:**  You know, I've got to tell you.  I don't care.

**MR. ATTANASIO:**  You know what?  I don't either.

**THE COURT:**  I really don't care.

**MR. ATTANASIO:**  I was just confused.  We don't --

**THE COURT:**  I agree with -- I think your confusion is understandable.  I kind of view it the same way you do.

But with video clips, it's all sort of so murky.  I really -- I'm not going to mark it for identification.  I think

if the Ninth Circuit gets down to this level of granularity and wants to look at the video, God bless them.

(Laughter.)

MS. BONN:  It's going to be the singular issue on appeal, Your Honor.

MR. ATTANASIO:  Thank you, Your Honor.

THE COURT:  All right.

THE COURTROOM DEPUTY:  Don't you guys have one more? 453?  Don't you have one more?  453?  That's the big data.

MS. ANDERSON:  This should be real quick and easy because we have an agreement, but 453 --

MR. MAO:  Yeah.  If you recall, Your Honor, we were --

THE COURT:  Yes.

MR. MAO:  -- going to end -- Mr. Santacana?

So we do have an agreement.  They gave us a number of samples.  The main issue right now is just an administrative one, which is that it needs to be printed, tabbed, inserted into the folder.  But I think that since, Your Honor, you already have the folder, we're just going to give you, I guess, the additions along with the tabs.

MR. SANTACANA:  Yeah.  Why don't I move it.  I can move it in during Dr. Black.

THE COURT:  Okay.

MR. SANTACANA:  And we'll get you a digital copy and have it printed by Tuesday.

THE COURT:  All sounds fine.

MR. MAO:  Thank you, Your Honor.

MR. SANTACANA:  Great.

(Recess taken at 8:41 a.m.)

(Proceedings resumed at 8:46 a.m.)

(Proceedings were heard out of the presence of the jury.)

THE COURTROOM DEPUTY:  Please remain as you are. Court is back in order.

THE COURT:  Okay.  Are we ready to have them come out?

MS. BONN:  Yes, Your Honor.

(Proceedings were heard in the presence of the jury.)

THE COURT:  Good morning, members of the jury.

Ms. Bonn, we can resume when we find the witness.

**CHRISTOPHER ROLAND KNITTEL**,

called as a witness for the Defendant, having been previously duly sworn, testified further as follows:

THE COURT:  Good morning, Mr. Knittel.  And you understand you remain under oath?

THE WITNESS:  I do, Your Honor.

**CROSS-EXAMINATION**   (resumed)

BY MS. BONN:

Q.   Good morning, Professor Knittel.

A.   Good morning.

Q.   You have not discussed the substance of your testimony with anyone after court yesterday, correct, sir?

**A.**   That's correct.

**Q.**   Okay.  Thank you.

Let's just reorient ourselves to where we left the afternoon yesterday.  We were talking about -- why don't I turn on my microphone first.  Is that better?

We were talking about a deduction that you say Mr. Lasinski ought to have made because you thought that sWAA-off users were less engaged with ads; correct?

**A.**   The empirical evidence and the economic evidence suggests so, yes.

**Q.**   Okay.  And the empirical evidence that you're referring to is the interrogatory response you relied upon and that we were looking at yesterday; correct?

**A.**   That's correct.

**Q.**   You would call that empirical evidence?

**A.**   "Empirical" means data to we economists.

**Q.**   Okay.

        **MS. BONN:**  Well, let's go ahead and please show the witness the interrogatory response we were looking at yesterday.  That's the question.  Let's go to the response.

**BY MS. BONN:**

**Q.**   And we talked about the fact that while Google's response said that they had sampled 25 random days, it appeared that all of the days were the first of the month; correct?

**A.**   I don't know if we can conclude that.  I know we talked

about that, but they're reporting the data by month and sometimes, at least I've done this, when you have a set of random days within a month, you assign it to a month.

It might have been more clear if they omitted the 01 and just had 2016-04, which would represent these are days in April of 2016.  But I don't know if they did that or if they randomized which day of the month they selected these data and that just so happened to be on the first of the month.

Q.   All of those possibilities are simply your speculation; correct, sir?

A.   For sure.

Q.   Okay.  All we know for a fact is that Google says they sampled 25 random days and yet they've listed entries for dates that all appear to be the first of the month; true, sir?

A.   Well, I'll go back to my first comment, that they list them by month and, yes, they -- when they're defining April of 2016, they also have the first of -- the first day on there. But as I'm speculating, I don't know if that's just representing the fact that there's some random days in April and we're going to call that 4/1/2016.

Q.   You don't know one way or the other, sir; correct?

A.   That's correct.

Q.   You never inquired of Google; true, sir?

A.   That's correct.

Q.   And then if we just look at the entries on this first page

for the first of the month from April 2016 to August of 2017, we can see that there are null entries for every single date for the WAA opt-out rate on Google display advertising and WAA opt-out rate on YouTube advertising stack; correct, sir?

A.   That's correct.

Q.   And you don't know why there are null entries, do you, sir?

A.   It's been a while.  I know there's a bunch of other tables here.  I don't know -- it's been a long time since I've looked at these.  But if we could scroll down, I'm just wondering if this table is only showing numbers for the first column and none on the second column, and there's some other table that shows numbers on the second column but none on the first and third and so on.

MS. BONN:  Why don't we scroll a little bit?  And, Your Honor, so that the jury can understand the basis of his opinion, I'd ask to publish Google's sworn interrogatory response, please.

MR. HUR:  Your Honor, same objection as yesterday. Foundation.

MS. BONN:  It's a party admission, Your Honor, and the basis for his opinion.  I think it's difficult for the jury to understand the basis without seeing it.

MR. HUR:  He's not a party witness.

MS. BONN:  The admission is the Google interrogatory

response.

THE COURT:  I'll permit you to do it.  Go ahead.

MS. BONN:  Thank you.

THE COURTROOM DEPUTY:  It should be coming up.

MS. BONN:  Thank you.

BY MS. BONN:

Q.   Okay.  So this is the chart that we've been talking about that you relied upon for your opinion that there should be a reduction in the calculation of profits because sWAA-off users were less engaged with ads; correct?

A.   It's one of the reasons that I relied on, yes.

Q.   Okay.  And then we can see -- just so the jury can catch up a little bit, we see the date column on the left with entries for the first of the month; correct?

A.   Correct.

Q.   We see two columns with null entries for WAA opt-out rate on Google display advertising stack and WAA opt-out rate on YouTube advertising stack; correct?

A.   That's correct.

Q.   And if we look above in the answer, we also see that it says [as read]:

"Google queried this data source, which maintains ad interaction information with varying degrees of reliability."

Do you see that?

**A.**   That's correct.

**Q.**   Okay.  Now, the question that I had was that you do not know what these null entries represent; correct, sir?

**A.**   Well, and I -- I asked if we could scroll down.

**Q.**   We certainly can, sir.

**A.**   Okay.

**Q.**   Why don't we scroll a little bit.

But just the null entries you see right here, you don't know what they represent; true?

**A.**   Well, if we scroll to the other tables, I might be able to tell.

**Q.**   I'm asking you about this table right now.

**A.**   Well --

**Q.**   I'm happy to show you the other ones, but on this table you don't know what the null entries represent; true?

**A.**   Again, if we scroll to the other tables, one thing that the null might represent is that this table is only showing data for the first column --

**Q.**   Sir --

**A.**   -- and the second table would only show data for the second column, and a third table would only show data for the third column.  Without seeing the document, I can't say that that's the case.  I'm just asking if we could scroll down to see if that's one --

**Q.**   We will in a moment.

A.   -- potential reason.

Q.   Do you remember being asked this exact same question in your deposition, sir?

A.   I remember talking about these data, yes.

        MS. BONN:   Let's please show the witness his deposition transcript at page 106, lines 15 through 19.

    You were asked [as read]:

    "QUESTION:   Do you know what 'null' means?

    "ANSWER:   'Null' can mean -- 'null' can mean lots of

        things in data queries.

    "QUESTION:   Do you know what it means in this data query?

    "ANSWER:   Not specifically, I think, but it certainly

        means it's not available."

    Let's please go back to the interrogatory response.

Q.   Now, you also see that there appears to be an entry on October 1st of 2016 where there's a 100 percent entry for the WAA opt-out rate on Google Search advertising stack.  Do you see that, sir?

A.   Yes.

Q.   You can't explain that, can you, sir?

A.   Well, I don't have all of the underlying data.  From a statistician's point of view, I could explain it.

Q.   Okay.  And that would appear, on its face, to suggest that 100 percent of the ads on that date on the Google Search advertising stack were served on WAA-off users; correct, sir?

**A.**   For that -- again, within October on some random date potentially on some random time period, yes.

**Q.**   Now, this was pulled from a sampled log; correct?  We see up top it says the log was called "Sampled Ad Events Queries"; correct?

**A.**   That's correct.

**Q.**   And as an expert, you would only want to rely on a sample if it's reliable and representative; correct?

**A.**   I would -- I would certainly rely on it if it's reliable and representative.  Would I rely on it if we took one of those away?  I think it would depend on the context.

**Q.**   Okay.  You don't know the size of the data sample in this log, sir?

**A.**   That's correct.

**Q.**   You don't know anything about the makeup of the sample in this log; true, sir?

**A.**   Other than the column headers?  I think that's fair.

**Q.**   Okay.  And you understand that the class period in this case is about 98 months, or somewhere in the neighborhood of 3,000 days; true?

**A.**   That sounds right.

**Q.**   Okay.  And if we look at the slide that you showed yesterday -- let's go to Professor Knittel's Slide Number 32 -- you relied on three days; correct, sir?

**A.**   Three months?

**Q.** Well, sir, you pulled three specific dates out of these tables; correct, sir?

**A.** Right. But as we were talking about before, it's unclear whether or not there's multiple days within each of those months.

**MS. BONN:** Let's go back to the interrogatory response, please, and let's scroll down.

**BY MS. BONN:**

**Q.** What we can see is that it says, "Google sample data on 25 random days"; correct, sir?

**A.** Correct.

**Q.** And then in the table we see a column that just says "Date"; correct, sir?

**A.** That's correct.

**Q.** And the date doesn't say, for example, April 2016; it says April 1st, 2016. Correct, sir?

**A.** Yes, that's correct.

**Q.** You have no basis to know that this table, rather than reflecting particular days, actually somehow reflects data over a period of months; correct, sir?

**A.** Well, I think you're misrepresenting what I was suggesting. So I guess we could count to see if there's 25 entries. But, for example, suppose there was 20 entries in this table and we know there's 25 days; then that would say that, at least in some months, multiple days were sampled.

Q.   Let's just scroll down.

We can see, at least on this page, there's one date listed per month between April 2016 and August 2017; correct?

A.   There's one day listed, yes.

Q.   Correct.

And if we scroll down to the next page, we can see that that continues.  One day per month for several months all the way down until we get into 2022; correct, sir?

A.   That's correct.

Q.   Okay.  Let's keep scrolling a little bit.

We can see that there's more dates, but it's always sort of one day per month; right, sir?

A.   That's correct.

Q.   Okay.  We can scroll some more.

A.   It's one date listed per month.

Q.   Yeah.

A.   Again, I'm trying to reverse engineer this table.  There may very well be the case that more than one day was sampled in that month.

Q.   So far we haven't seen any evidence to suggest that.  Merely your speculation; true, sir?

A.   For sure.

Q.   Thank you.

Let's continue scrolling.

Okay.  Now let's stop right here.

We can see that there are entries at the bottom of page 22 for March 1st, 2022.  Do you see that, sir?

Let's highlight the March 1st, 2022, entry and the April 1st, 2022, entry.

Do you see that, sir?

A.   Yes.

Q.   Let's scroll down a little bit further so we can see the May entry.

And there's also an entry for May 1st of 2022; correct?

A.   Correct.

Q.   And we can see that the middle column has percentages that say 9.45 percent, 9.52 percent, 9.39 percent.  Do you see that, sir?

A.   Correct.

Q.   Let's now turn to your Slide Number 32.

Now, we can see that you have listed entries that you denoted as being March 22, April 22, and May 22.  Do you see that?

A.   Yes.

Q.   And we can see in the middle column the percentages you've listed -- 9.45 percent, 9.52 percent, 9.39 percent -- match the entries that we just saw in the interrogatory response; correct?

A.   Yes.

Q.   Now, in the interrogatory response, it didn't say it was

for March 22.  It said it was for March 1st, '22; correct?

A.    That's correct.

Q.    You changed that when you created the slide and listed the date.  You used a different kind of date entry to denote that it was for the entire month of March 2022; correct, sir?

A.    I agree I changed it.  I think you're trying to infer something from that change that I would not agree with.

Q.    And, sir, on this chart, these dates, you then took what you thought these data points represented in terms of a potential difference in the number of clicks, and you said that should hold across the entire class period in this case in order to reduce the profits over the entire class period; correct, sir?

A.    No.  I think you're misrepresenting my calculations and the point of those calculations.

Q.    Now, isn't it true that given some of the questions raised by the interrogatory that you relied on, you are not criticizing Mr. Lasinski necessarily for not using those data; correct?

A.    So I would say my main criticism is he ignores this issue completely.  There is empirical evidence to suggest it may be important, and there's certainly economics evidence or economic theory that would suggest it's important.  I raise the concern and he continues to ignore it.

          MS. BONN:  Let's, please, show Professor Knittel his

deposition at page 132, lines 10 through 20.

BY MS. BONN:

Q.   Okay.  There's a question [as read]:

"QUESTION:  Sorry.  I think I'm really confused because on the one hand, you're not willing to represent that the data in the charts you cite is representative of any relevant population and, on the other hand, you're criticizing Mr. Lasinski for not using this data.  Can you please square those two positions?"

Your answer was [as read]:

"Yes, I'm not criticizing him necessarily for not using this data.  I'm criticizing him for using his data, which we know is not the number he wants."

Do you see that, sir?

A.   I do.

Q.   Okay.  Now --

MR. HUR:  Objection, Your Honor.  This is not impeachment of the prior questions.

THE COURT:  As I've said before, when counsel uses an item that they say is impeaching, it's for the jury to decide whether or not it's impeaching.  So that objection is overruled.

Go ahead.

BY MS. BONN:

Q.   And, in addition, sir, isn't it true that at your

deposition -- we can take that down -- at your deposition you also indicated you are not opining that the figures in this chart, the interrogatory, are any more reliable than the percentages Mr. Lasinski used; true?

A.   I would like to see that.

MS. BONN:  Let's, please, show Professor Knittel his deposition, page 110, lines 1 through 6.

BY MS. BONN:

Q.   [As read]:

"QUESTION:  But you're not sure if these numbers are more reliable; right?

"ANSWER:  I am not putting these numbers up as more reliable.  I'm putting these numbers up as illustrating the importance of understanding accounts versus traffic."

Do you see that, sir?

A.   I do.

Q.   Okay.  Now, this adjustment that you made on the basis of the charts we just looked at in Google's interrogatory response, I think you said yesterday would result in a 50 percent cut to the profits; is that true?

A.   That's correct.

Q.   Okay.  Now, let's go ahead and talk about another one of the cuts that you think should be made to the profits for claims 2 and 3 based on the exclusion of dashers and unicorns. Okay?

Now, just to reorient ourselves, in claim 1, you agree that dashers, which mean business accounts, and unicorns, which mean certain minors' accounts, are included in Class 1; correct, sir?  Excuse me, claim 1.

A.   That is really close to -- if that's what the Court has said, then sure.

Q.   Okay.  And do you understand that it is only with respect to claims 2 and 3 in this case that one would even need to exclude the enterprise, or dasher, accounts and the unicorn, or children, accounts?

MR. HUR:  Objection.  Foundation.

THE COURT:  I don't think this is the witness to ask about --

MS. BONN:  Okay.

THE COURT:  -- legal questions of what's excluded or not excluded.

MS. BONN:  Okay.

BY MS. BONN:

Q.   You did two sets of calculations, sir; correct?

A.   Yes, I did.

Q.   And I think you showed yesterday on Slide 36 -- let's go to Slide 36, please -- in this set of calculations, where you say that Mr. Lasinski's profits number should be reduced from 1.498 billion to 218 million, that particular method does not do anything to reduce dashers and unicorns; correct?

**A.**   That's correct.

**Q.**   Then you did a second calculation on Slide 39 where, in addition to other cuts that we are going to talk about, here you make the adjustment you say should be made for dashers and unicorns; true, sir?

**A.**   You used cuts in plural, but there's just one additional cut here.

**Q.**   Thank you, sir.

Okay.  Now, in order to determine what share of the profits should be excluded for dasher and unicorn accounts, both Mr. Lasinski and you relied on certain data that Mr. Monsees testified earlier in this case he supervised pulling from the Footprints database; true, sir?

**A.**   I don't remember specifically some of those terms, but that's my understanding.

**Q.**   Okay.

　　　　**MS. BONN:**   Let's just show the witness PX405, which is in evidence, and let's go to the spreadsheet.

**BY MS. BONN:**

**Q.**   Okay.  And this looks familiar to you, sir?  This is one of the two spreadsheets that Google produced which shows, by month, the number of active accounts, the number of those active accounts that have sWAA enabled or WAA enabled; true, sir?  This is familiar to you?

**A.**   Yes.

Q.   And you're aware that, in this case, Google produced two spreadsheets on this topic.  First, they produced a spreadsheet that excluded the dashers and unicorns.  It was only adult accounts.  And then later they produced another version of the spreadsheet that included the dashers and unicorns and also reported the statistics for later periods during the class.  Correct, sir?

MR. HUR:  Objection.  Foundation as to what --

THE COURT:  Yeah.  Ask -- you can ask what he saw, but --

MS. BONN:  That's my question.

THE COURT:  -- issues about what they produced or didn't produce --

MS. BONN:  Sure.

THE COURT:  -- he's not the witness --

MS. BONN:  Sure.

THE COURT:  -- on that.

BY MS. BONN:

Q.   Sir, you relied on two spreadsheets:  one that included dashers and unicorns and a second that excluded them; correct, sir?

A.   That's my recollection.

Q.   And the one that included dashers and unicorns also reflected latter time periods in the class; correct, sir?

A.   As I -- as of this morning, I can't remember that for

certain.

Q.   Let's -- and now you, then, used these spreadsheets to calculate between the two the difference in the number of active accounts and also the difference in the sWAA-off accounts; correct, sir?

A.   That's correct.

          MS. BONN:   Okay.  Let's please show the witness his Schedule 11C from his supplemental report.

BY MS. BONN:

Q.   Okay.  Now, this is the schedule where you compare these two spreadsheets and you calculate the difference -- you calculate the sums in both of them; right?

     We see on the left some tallies that you did, including dashers and unicorns, the Lasinski method, and then on the right-hand side excluding dashers and unicorns; correct?

A.   Yes.

Q.   Okay.  Now let's look at the bottom row, and let's just start by looking at monthly active accounts.  Okay?

A.   Okay.

Q.   All right.  In the spreadsheet that included enterprise and children accounts, there are 38 billion or so monthly active accounts in total; correct, sir?

A.   Yes.

Q.   Okay.  In the spreadsheet that did not include those children and business accounts, it was limited to adults only,

there were about 36 billion monthly active accounts; true, sir?

**A.**   Adults and also subtracting enterprise accounts -- or subtracting kids and enterprise.

**Q.**   Correct, sir.

So the difference between these two spreadsheets in terms of overall accounts, overall active accounts, is a little bit over 2.2 billion accounts; right?

**A.**   Yes.

**Q.**   Okay.

**MS. BONN:**   Let's show a demonstrative just so we can make sure we understand what we're looking at.  Let's go to my pie chart demonstrative.  We'll call it Knittel Cross Slide 4.

**BY MS. BONN:**

**Q.**   Okay.  So I'm showing on the left the total additional dasher and unicorn accounts, based on what we just saw, at a maximum is 2.2 billion and change; right?  We just saw that; correct, sir?

**A.**   Okay.

**Q.**   Okay.  Now, if a hundred percent of those were all sWAA off, the outer limit on what the difference in sWAA-off accounts should be between the two spreadsheets is the same, 2.27; right?

**A.**   Yes.

**Q.**   Okay.  Now -- but some of those accounts, some of the enterprise accounts and unicorn accounts may have sWAA on, so

it could be less than 2.2 billion that are the incremental sWAA off; right?

**A.**    That's fair.

**Q.**    Okay.  Let's go back to the schedule.

Now, let's look at the columns titled "Monthly Accounts With sWAA Off."  If we look at the spreadsheet that includes the adults, the enterprise and the children accounts, it's about 10.3 billion monthly accounts; correct, sir?

**A.**    That's correct.

**Q.**    If you look at the spreadsheet on the right that is limited to adults but excludes the business and children accounts, there are 6.9 billion monthly sWAA-off accounts.  Do you see that, sir?

**A.**    Yes.

**Q.**    The difference between those two numbers is approximately 3.4 billion; true, sir?

**A.**    Yes.

**Q.**    It is not possible for the difference between the sWAA-off accounts in these two spreadsheets to be 3.4 billion when the difference in the incremental total accounts is only 2.27 billion, sir, if the only difference between the two is one includes dashers and unicorns and the other doesn't?  Those two numbers can't be true at the same time, can they?

**A.**    Yeah, that's true.  We don't know that that's the only difference, but --

Q.   Right.   There could be other differences between the spreadsheet Google produced that includes the dashers and unicorns and the spreadsheet Google produced that excludes the dashers and unicorns; correct, sir?

A.   That's possible.

Q.   Okay.   And one possibility is that in the spreadsheet Google produced that excluded the dashers and unicorns, for some reason they understated the sWAA-off rates and then corrected that in the spreadsheet that included the dashers and unicorns.   That would be a possible explanation; correct, sir?

A.   It may.   I haven't thought about it except for in real time, yeah.

Q.   And if, in fact, what's going on here is not only that the second set of spreadsheets include the dashers and unicorns but also that it corrects for the fact that in the earlier spreadsheet the number of sWAA-off accounts were understated, it wouldn't be appropriate to use the difference in sWAA-off accounts as an indicator, in its entirety, of the difference in dashers and unicorns; true?

A.   I think both Mr. Lasinski and I would probably want to confirm a couple things, sure.

Q.   Okay.   And you know Mr. Lasinski, in order to determine what share of dashers and unicorns should be excluded, relied in part on the difference in the total accounts between the two spreadsheets.   You're aware of that, sir; correct?

**A.**   That's correct.  He doesn't have the data he wants, so he has to rely on the totals.

**Q.**   Okay.  And you were here for Mr. Lasinski's testimony, sir; correct?

**A.**   Yes.

**Q.**   Okay.

          **MS. BONN:**  Let's please just show the witness Lasinski Demonstrative 12.  And let's zoom into the middle -- the middle box on this demonstrative.  Let's highlight the line that says "Share of monthly accounts with sWAA off, 69 percent," and then all the way to the right.

       Thank you.

**BY MS. BONN:**

**Q.**   Okay.  Now, this is a schedule from Mr. Lasinski's report where he's applying the share of accounts with sWAA off for each of the years listed here between 2016 and 2024; correct?

**A.**   That's correct.

**Q.**   And we can see that in the years 2018, 2019, and even 2020, the sWAA-off rates are at their lowest; true, sir?

**A.**   Yes.  It's at the lowest in 2019, followed by 2018.

**Q.**   And then the sWAA-off rates increase and are higher in these latter years covered by the latter spreadsheet that Google provided and they get as high, again, as 27 percent, 27.13 percent; true, sir?

**A.**   Yes.

**Q.** That might be consistent with the possibility that I just posited, that Google's initial production of data may have understated the rate of sWAA-off accounts; correct, sir?

**A.** I'm not following that.

**Q.** Okay. If Google's production of data initially, in the spreadsheet that excluded dashers and unicorns, understated the rate of sWAA-off accounts, that would have caused a reduction in Mr. Lasinski's calculation of profits; correct?

**A.** Mechanically, yes.

**MS. BONN:** Let's turn -- let's take this down.

**BY MS. BONN:**

**Q.** We're going to turn back to the issue of operating costs and the operating cost deduction you made. Okay?

And you agree with me that the operating cost deductions you made were based on P&L documents that you reviewed from Google's production; correct?

**A.** That's correct.

**Q.** And you agree with me that in terms of the three areas that make up Mr. Lasinski's profits calculation -- App Promo, AdMob, and Ad Manager -- App Promo is the largest driver of the profits that he calculates; correct, sir?

**A.** That's what I remember, yes.

**Q.** Now, because you've been here and you've looked at these issues yourself, you've come to understand that there is a difference of opinion between Mr. Lasinski on the one hand and

Google on the other, based on Ms. Langner's testimony, about what exactly the App Promo P&L documents are showing; correct, sir?

A.   I don't want to speculate.  I -- I can't say for certain on that, no.

Q.   Okay.  In your supplemental report, you opined that you believed the App Promo P&Ls that Google produced were global P&Ls; correct, sir?

A.   If you could show it to me, I would love to review it.

Q.   You don't know, sitting here, whether you said that they were global P&Ls?

A.   No.

Q.   Okay.

        MS. BONN:  Let's go ahead and show the witness Lasinski Demonstrative Slide 15.

BY MS. BONN:

Q.   Okay.  Do you remember Mr. Lasinski showing this slide and then Ms. Langner commenting on it as well?

A.   Yes, I do.

Q.   Okay.  And do you remember that Mr. Lasinski testified that he believes the P&Ls that Google produced for the years 2017 through 2021 had U.S. revenue, and yet he started having concerns that they perhaps reflected global costs?  Do you remember that?

A.   I remember that, yes.

Q.   Okay.  And then you were here for Ms. Langner's testimony; correct, sir?

A.   I was.

Q.   And so you heard her testify Mr. Lasinski's got it all wrong; the P&Ls are global but they're limited to DVA only and that's why there's this difference.  Do you remember that?

A.   I don't remember that acronym.  I don't remember her saying he's got it all wrong.

Q.   Okay.

       MS. BONN:  Let's please show --

BY MS. BONN:

Q.   You were here for Ms. Langner's testimony; true, sir?

A.   I was.

Q.   Okay.

       MS. BONN:  Let's please show Professor Knittel the daily at 1323, line 22, through 1324, line 3.

     Okay.

       MR. HUR:  Your Honor, what is the purpose of this?

       THE COURT:  Yeah, what is the purpose?  Is this to refresh his recollection --

       MS. BONN:  It is.

       THE COURT:  Or what?

       MS. BONN:  It is.  We can show the witness.

       THE COURT:  What's the independent value of his recollection of some witness's testimony?

MS. BONN:  Because, Your Honor, what I'd like do is inquire about the cost deductions he made.

THE COURT:  Then inquire about it.

MS. BONN:  Correct.

THE COURT:  What --

MS. BONN:  Okay.

BY MS. BONN:

Q.  Sir --

THE COURT:  That's not based on --

MS. BONN:  That's fine.

THE COURT:  -- what other witnesses were talking about here.

BY MS. BONN:

Q.  Sir, do you know if the P&Ls that you relied upon for your cost deduction reflected global costs against U.S. revenue?

A.  I don't believe they do, no.

Q.  Okay.  Why don't you believe they do?

A.  Because I've never seen a firm do something like that in P&Ls.

Q.  It would be rather unusual for a firm to keep a P&L in the ordinary course of business that deducts global costs against U.S. revenue; correct, sir?

A.  It would be unusual relative to the set of P&Ls that I've seen.

MS. BONN:  Okay.  Let's please show the witness PX419

in evidence.

BY MS. BONN:

Q.    All right.  Sir, this is one of the P&Ls for App Promo that you relied upon and Mr. Lasinski relied upon; correct?

A.    It looks familiar, yes.

Q.    Okay.  And let's just take a look at 2020, and you can see that the global -- excuse me -- you can see that the revenue reported, booked revenue, is listed as 3.764, 3.7 billion; correct, sir?

A.    Yes.

Q.    Okay.  And it's your belief that that is a global number; is that your testimony?

A.    Again, I testified just a second ago I'm not certain.  I would -- I would have to look up the background material for these.

Q.    Okay.  So you're not certain if the revenue on here is global or U.S.; true, sir?

A.    As I'm sitting here right now --

Q.    Okay.

A.    -- I'm not certain.

Q.    In addition to the P&Ls, you also reviewed and relied upon a financial data pull that Google produced; correct?

A.    That sounds correct, yes.

Q.    Okay.

        MS. BONN:  Let's please show the witness Exhibit G590,

which is in evidence.

THE COURTROOM DEPUTY:  Do you want the jury to see it too?

MS. BONN:  Yes.  It's in evidence.  Thank you.

BY MS. BONN:

Q.   Now, the data tab here, you understand is stipulated to be U.S. data; correct, sir?

MR. HUR:  Objection.  Foundation.

MS. BONN:  Let's please show the witness the stipulation, Docket 481, at paragraph 2.

BY MS. BONN:

Q.   Okay, sir.  You're aware that there's a stipulation that the data tab on this spreadsheet ending in Bates 743 is from App Promo ads served to users in the United States?  Do you see that, sir?

A.   Yes, I do.

MS. BONN:  Okay.  Now let's go back to the data tab on G590.  Okay.  And let's, please, filter by year 2020, and let's sum up the App Promo quarterly revenues.

BY MS. BONN:

Q.   Okay.  So according to this financial data pull from Google that you relied on, in 2020, U.S. App Promo revenues for DVA, Search, and YouTube were 3.765 billion; correct, sir?

A.   Yes.

MS. BONN:  Let's do a side by side with the P&L we

were just looking at, PX419, and let's scroll over to 2020.

BY MS. BONN:

Q.   It's very close, sir, to the booked revenue shown in the P&L at PX419 for 2020 of 3.764 billion; correct, sir?

A.   Yes, it's very close.

Q.   Okay.  And so looking at the data point on the right, you would agree it's at least consistent with the 2020 revenue entry in the P&L on the left being U.S. App Promo for DVA, Search, and YouTube; correct, sir?

A.   It's consistent, yes.

Q.   Okay.  Now let's look at 2019 on the P&L.

You see there's also an entry for 2019 that says 2.781 billion; correct, sir?

A.   Yes.

MS. BONN:  Let's please show Lasinski Slide -- the Lasinski slide number, you'll have to give it to me -- comparing this to the global revenue.

BY MS. BONN:

Q.   Okay.  You saw Mr. Lasinski's testimony about this Slide 9.

MS. BONN:  Let's zoom in to the middle -- yeah. Thank you.

BY MS. BONN:

Q.   You recall him testifying that a document in Google's production that we're looking at here showed that global

App Promo revenue in 2019 was 10 billion; correct?

**A.**   He may have.  I can't remember that specifically.

**Q.**   And you're looking at it now.  It also shows that the Americas portion of the global revenue is about 10 billion -- excuse me -- 30 percent of 10 billion; correct?

**A.**   That's what the chart says, yes.

**Q.**   You would expect that U.S. drives most, but not all, of the Americas component of this App Promo revenue; true, sir?

**A.**   I don't have a basis to answer that.

**Q.**   You're --

**A.**   You mean of all Northern and Southern -- North and South America?

**Q.**   Yeah.  You don't know?

**A.**   I don't know.

**Q.**   Okay.  You can't rule out that it's consistent, if Americas was 30 percent of 10 billion App Promo, that the 2019 figure in the P&L of 2.781 would represent U.S. revenue for App Promo; correct, sir?

**A.**   Can you repeat that?

**Q.**   Sure.

Let's go back to the P&L just so we can look at it in context, PX419.

I mean, you can't rule out that, similarly, this 2019 figure of 2.781, 2.781 billion, reflects U.S. revenue for App Promo, DVA, Search, and YouTube just like the 2020 entry

does; correct, sir?

A.   I can't rule that out, no.

Q.   And, in fact, just as you said a moment ago, it would be highly unusual for a firm to keep a P&L that puts global costs against U.S. revenue.  It would also be pretty unusual to have a P&L like this that has annual revenue columns but be jumping around between global and U.S. revenue without saying so.  That would be unusual too; right?

A.   I guess.  It would depend on the context.

Q.   Okay.  Now, sitting here today -- well, why don't we back up.

Let's take a look at a second P&L for App Promo that Google produced for 2021.

MS. BONN:  I'm going to need an exhibit number.

Let's go to G591.

BY MS. BONN:

Q.   Okay.  And this appears to be a similarly formatted P&L; correct?

A.   Yes.

Q.   Okay.  Except this one is for App Promo 2021; correct?

A.   Yes.

Q.   Okay.  And let's go ahead -- you can see the entry for booked revenue; correct?

A.   I can.

Q.   We're going to do a comparison to something that's served

revenue, so let's click the dropdown and let's look at served revenue.  You see that the 2021 P&L report served revenue of 6.392 billion?

A.   Yes.

Q.   Okay.

MS. BONN:  Let's, please, show the witness only PX421.

BY MS. BONN:

Q.   And, sir, this is another financial data pull that both Mr. Lasinski and you relied upon; correct, sir?

A.   Yes.

MS. BONN:  Let's go to the stipulation at paragraph -- let's show 3 through 5.

And we can see the Number 3, the spreadsheet produced by Google and numbered with the Bates 189, is authentic and admissible.  Your Honor, I offer PX421 in evidence.

MR. HUR:  Your Honor, hearsay for this witness.

MS. BONN:  There's a stipulation as to authenticity and admissibility of their financial data pull, and I'm asking to move it in.

THE COURT:  About the hearsay objection?

MS. BONN:  It's an admission by a party opponent, Your Honor, and it's also a business record on the basis of Ms. Langner's testimony about how the data pulls were done.

MR. HUR:  Your Honor, they could have used it with that witness.

THE COURT:  I will admit it.

(Trial Exhibit PX421 received in evidence.)

THE COURT:  Are you getting close to --

MS. BONN:  Yes.

THE COURT:  -- the end of the examination?

MS. BONN:  Yes.  Thank you, Your Honor.

BY MS. BONN:

Q.  Okay.  Now, let's go to the follow-up output tab.

And, sir, this is a global data pull; correct?

A.  I hesitate to confirm that as I'm just staring at a --

Q.  Let's go back to the stipulation, paragraph 5.

You see where it says, "Follow-up output tab is global served revenue from App Promo"?

A.  Okay, yes.

Q.  Okay.  Now, if we go to the follow-up output tab, let's filter to 2022, DVA only, and let's sum up the revenue. 11.692 billion, do you see that, sir?

A.  I do.  I'm just trying to catch up.  Sorry.

Q.  Of course.

A.  (Witness examines document.)  Okay.

Q.  Okay.  Let's do a side by side with the '21 P&L.

Okay.  Now, if we assume, as Ms. Langner testified, that the 2021 P&L reflects global revenue for DVA only and we look at the right and we know that the follow-up output tab now reflects global revenue DVA only for 2022, that would imply

that there was somehow a near doubling in the global DVA-only revenue between these two years; correct, sir?

A.    So -- I'm sorry.  So on the right, we're looking at 2022?

Q.    Correct, sir.

A.    Okay.  Certainly the numbers are doubled.  You know, I haven't done these -- these calculations, so I'm -- I hesitate to, you know, confirm or deny anything that's going on in real time.

Q.    Okay.  Understood.

Why don't we take it down for a moment, and let me just ask a couple of follow-ups, and then we're just going to get close to wrapping up.

Sir, based on what we've seen, you can't rule out that these P&Ls that we've heard about that Google produced reflect U.S. only App Promo revenue for DVA, Search, and YouTube; correct, sir?

A.    We're swaying pretty far from my report and my testimony.

Q.    Okay.  And, sir, you used the costs that were reported on those P&Ls as the basis for the deduction that you made; correct, sir?

A.    I used the costs based on those P&Ls for the basis of the deduction.  The overwhelming point, however, is not impacted by what we've been talking about.

Q.    And if they were global costs deducted against U.S. revenue, okay, you would agree it wouldn't be appropriate to

deduct global costs against U.S. revenue; true, sir?

A.   So Mr. Lasinski assumes that we don't need to subtract off any costs.

Q.   Right.

A.   Right?  And my point is that we're talking about profits. Profits are revenues minus costs.

Q.   Right.  But --

A.   He hasn't justified his assumption that we don't need to think about costs.

Q.   I just want to come back to my question, which is:  It wouldn't be appropriate, in any circumstance, to deduct the global costs against U.S. revenue in this case; correct, sir?

A.   We'd have to understand where the global cost numbers are coming from.  It certainly wouldn't be appropriate to ignore costs generally either.

Q.   Okay.  Thank you, sir.

     Now, stepping back for a minute, let's set aside the profits deduction.  I think we've talked about some of the areas of disagreement.  Let's turn to the damages and Screenwise.  Okay?

     And you testified yesterday that you disagreed that the Screenwise Panel was a reliable basis on which to value class members' data; correct, sir?

A.   That's correct.

Q.   Okay.  And one of the reasons that you gave was that the

Screenwise meters may collect much more information than the sWAA-off data that's at issue in this case; correct, sir?

A.   For sure.

Q.   And you're aware, sir, that -- I think you discussed yesterday some of the Google privacy policies and the policy documents that apply to the Screenwise meter when you were discussing your testimony; correct, sir?

A.   Yeah.  I think they're representative of Screenwise privacy policies.  I don't think they say Google, but...

Q.   Excuse me.  Let me make that correction.

And, sir, are you aware that in Screenwise, users were actually told that they could pause the meter on their device at any time to stop the collection if they thought some information was particularly sensitive?

A.   That's correct.

Q.   Okay.  Now, someone's a Screenwise participant.  They have a phone that they agree Google can collect whatever information is subject to the agreement, but they have a right to hit a pause button at any time.

Do you know if that pause button would stop Google from collecting the data from the phone when the pause button was hit?

A.   That seems reasonable.

Q.   Okay.  So for a Screenwise participant who's got a phone and they put a meter on and they're told Google's going to

collect all sorts of information, they are still given the right to hit a button and say, "Pause right now.  This information, I do not want Google to collect at all"; correct, sir?  That's your understanding?

A.   That's my understanding, yes.

Q.   It is also your understanding that in this case, as to sWAA-off data, even if users hit the button and turn sWAA off, that would not stop Google from collecting the data; true, sir?

A.   It would stop it from produce -- or collecting Social Security numbers and credit card numbers.

Q.   My question's a little different.

Whatever data Google's collecting in sWAA off, when users hit that button, it didn't stop Google from collecting the data; true?

A.   The data at issue in this case?

Q.   Correct, sir.

A.   True, yes.

Q.   Okay.  Now, you also talked about how, you know, the volume of information at issue in Screenwise, the types of data and the amount of data you think are different from the sWAA-off data here; correct, sir?

A.   They are different.

Q.   Okay.  But you don't think that in Screenwise, Google was, like, paying per gigabyte of data; correct?

A.   No.  They were paying for all of the data.

**Q.**   Right.  And when a person is making a decision whether Google could take the data or not, it's not, well, if you take 5 gigs of data, it'll be this much and if it's 10, it'll be that much.  It's a decision based on the totality of comfort with giving up privacy; right, sir?

**A.**   Could you repeat that?  I'm sorry.

**Q.**   Sure.

When someone is deciding, "Do I want to participate in Screenwise, take all the other payments that are at issue and the $3 for this device," it's a reflection of, "Hey, this is a price I'm comfortable with giving up my privacy, giving up part of my choices."  It's not, "Well, hey, let me parse the data into this data piece and that data piece and assign a specific price to each one," is it?

            **MR. HUR:**  Objection.  Foundation.  Speculation.

            **THE COURT:**  Sustained.

BY MS. BONN:

**Q.**   Sir, do you know the answer to that question?

            **THE COURT:**  I said sustained.

            **MS. BONN:**  Okay.  I apologize, Your Honor.

BY MS. BONN:

**Q.**   Sir, when you were considering Screenwise in the basis of your opinion, was it your opinion that Screenwise participants were basing their decision by assigning a certain price point to each specific segment or quantity of data at issue?

**A.**    That's certainly consistent with how we tend to model consumer behavior and consumer choices.  So I would say, given my past research in other topics and just the general economics field, that is -- I'm partially basing it on that, yes.

**Q.**    Okay.  You would agree, in this case, that if it's true that the class members turned sWAA off and yet their data was collected anyway, there is some measure of harm; true?

**A.**    I believe there could be a measure of harm, sure.

**Q.**    In fact, you would expect that directionally that's correct, that if a class member turned sWAA off and yet their data was collected without permission, there would be some harm; true, sir?

**A.**    I believe there could be some harm, yes.

**Q.**    Now I want to just end, and I've just got a few more questions, about this but-for world opinion that you've offered, that Mr. Lasinski failed to account for a but-for world.

And one of the opinions you offered is that in a but-for world, even if Google didn't collect this data and measure conversions to profit off of it, some other third party could have; right?

**A.**    That's correct.

I do want to correct a -- Mr. Lasinski is assuming a but-for world.  You suggested, I believe, he's not.  That's --

**Q.**    I didn't mean to imply that, sir.  I just want to ask a

question.

Now, one of the but-for worlds you think he should have considered is that even if Google couldn't have collected this data and done conversion modeling or tracking on it, some other third party could have; right?

A.    That's correct.

Q.    You're not aware of any other third party that offered a sWAA-off button to these users; correct, sir?

A.    That's correct.

Q.    Okay.  And one of the but-for worlds that you posited in your report was that even if Google weren't allowed to collect this data, then its parent company, Alphabet, would just set up another subsidiary, like a sister to Google, and they would collect the same data.  Do you remember offering that but-for world?

A.    I do.

Q.    Okay.  And so it's your opinion that one way or another, if Google could, they would just continue collecting this data, even going so far as for their parent company to set up a sister corporation?

A.    That's not my opinion, no.

Q.    Okay.  Now, you talked about third parties like Kochava that offer a conversion measurement service; is that true, sir?

A.    Yes.

Q.    Okay.  Third parties like Kochava have to partner with

Google, correct, and they do?

**A.**    They do.  I don't -- I'm not intimately involved in their business decisions.  I don't know if they have to.

**Q.**    Okay.  And that's because Kochava is in a very different position in the marketplace from Google when it comes to the volume and types of clicks that they can collect; correct, sir?

**A.**    I could imagine they are.  I don't know that for sure.

**Q.**    Because Google has a very dominant position in publisher-side advertising; correct, sir?

**A.**    Yes.

**Q.**    They also have a very dominant position in online search; correct, sir?

**A.**    That's correct.

**Q.**    They also offer YouTube, Maps, Gmail; correct, sir?

**A.**    Yes.

**Q.**    Okay.  And Kochava doesn't do any -- doesn't -- doesn't have a search function, a Gmail function, a video function, and a dominant position on the publisher-side ad tech; correct?

**A.**    That's correct.  What I'm struggling with is Kochava could also team up with non-Google -- Google partners; and if you sum up those non-Google partners, I don't know how they would compare to the Google-only data.

**Q.**    But Kochava alone, you don't disagree, just simply doesn't have access, standing by itself, to the same broad array of ad interaction and conversion data that Google has by virtue of

that dominant position across the Web that we just discussed?

A.    That may be the case, but what I'm -- again, I'm struggling with is Kochava has some Google data, they have Facebook data, they have metadata, and I don't know what the sum of -- whereas Google just has Google data, so I just don't have a basis to answer your question.

Q.    Okay.  Now, finally, there was another data point on the value of data that Mr. Lasinski relied upon, which was the AT&T Gigabit or Gigapower study where users paid $29 less for Internet use if they agreed for AT&T to track them; correct?

A.    That's correct.

Q.    Okay.  And you opined in your report that you thought that was also not a good comparator; is that true?

A.    Yes.

Q.    In your report, you also relied upon, for several of your opinions, another expert retained by Google named Professor or Dr. Ghose.  Do you recall that?

A.    Yes.

Q.    And do you know Professor Ghose?

A.    I'm sure we've met each other at a conference, but I'm glad he's not here.  I can't say I -- I know him personally, but I would imagine I've shaken his hand at some point.

Q.    Okay.  And you relied on his expert report in this case in forming some of your opinions in this case as well; true?

A.    That's correct.

**Q.** And were you aware of the fact that Professor Ghose has written a book called *Tap: Unlocking the Mobile Economy* where he himself addressed the very same AT&T $29 study?  Were you aware of that?

**A.** I was not aware of that.

**Q.** Okay.  Were you aware of whether in doing so, Professor Ghose actually described the AT&T Gigapower program as reflecting what might be the start of data as currency?

**MR. HUR:** Objection.  Foundation.  Relevance.

**THE COURT:** Overruled.

**BY MS. BONN:**

**Q.** Were you aware of that, sir?

**A.** I haven't read that book, no.

**Q.** Okay.

**MS. BONN:** May I approach?

**THE COURT:** You may.  But how much are you --

**MS. BONN:** This is the last thing, Your Honor, and then I'm done.  Thank you.

**BY MS. BONN:**

**Q.** Okay.  And, sir, can you turn to page 40?  And could you look toward the bottom of the second paragraph?

You see that Professor Ghose discusses the very same AT&T program where users got a $29 discount from AT&T for their Internet service if they allowed their data to be tracked.  Do you see that?

**A.**    On page 40?

**Q.**    Bottom of page 40.

**A.**    Oh, on the bottom.

**Q.**    Yes, sir.

**A.**    But you said second paragraph.

**Q.**    Oh, I apologize.  Bottom of page 40.

**A.**    Okay.  Now, I'm with you.

(Witness examines document.)  Okay.

**Q.**    Okay.  Now, when you wrote your report and criticized Mr. Lasinski's use of the $29 survey, you weren't aware that Professor Ghose himself had cited it in his book; correct?

**A.**    This has no bearing on my criticisms of Mr. Lasinski for using this.

**Q.**    My question's a little different, sir.

When you criticized Mr. Lasinski, you were unaware that Professor Ghose had cited the same study in his book; correct, sir?

**A.**    Yes.

**Q.**    And you were unaware that he said that this might be an example of a pricing model that captures the concept of a privacy premium; correct, sir?

**A.**    That's fair.

**Q.**    You were unaware of the fact that he had said a writer for *The Atlantic* summed it up well in saying [as read]:

"If that's the data barter economy, give up your

personal data and get convenient services in return,

then we're seeing the start of data as currency.

Give up your personal data, and you will be rewarded

in actual dollars"?

You weren't aware of that?

**A.** I was not.

**Q.** Okay. Thank you.

> **MS. BONN:** No further questions.

> **THE COURT:** Mr. Hur.

> **MR. HUR:** Thank you, Your Honor.

**REDIRECT EXAMINATION**

BY MR. HUR:

**Q.** Good morning, Professor Knittel.

**A.** Good morning.

**Q.** You haven't read this? Professor Knittel, did you read everything that Dr. Ghose has written?

**A.** Well, obviously, not. I haven't read this book.

**Q.** Did what Ms. Bonn read to you change your opinion about the applicability of the AT&T gigabyte survey?

**A.** Not at all.

**Q.** Why is that?

**A.** Well, quite a few reasons. One is, you notice this is all your Internet activity, so it's very similar to my objection with Screenwise.

The other is, I believe, and I'd like to confirm this --

or let's say one should see if they're actually still offering this.  They might not offer it, which suggests that there wasn't demand for it.

Q.   Professor Knittel, you were asked a lot of questions about whether Kochava has a search functionality.  Does it matter to your analysis whether Kochava has a search functionality?

A.   Not at all.

Q.   Why not?

A.   The only point of what Kochava would do in this but-for world is do conversion tracking.  They don't need a search functionality to do conversion tracking.

Q.   Does Kochava need YouTube to do conversion tracking?

A.   No.

Q.   Does Kochava need any other service that Google offers in order to do conversion tracking?

A.   No.

Q.   Does Kochava have additional data that Google doesn't have when measuring conversions?

A.   Well, that's what I was getting at.  Because Kochava partners with Meta and Facebook, that's why I -- it was difficult for me to answer the question of whether or not Kochava has less data.  They might have more data because they partner with non-Google partners.

Q.   And do these questions about services that Kochava doesn't offer that Google offers change your opinion as to the

suitability of Kochava or AppsFlyer to substitute in for Google Analytics for Firebase if the sWAA-off data was not available?

A.   Not at all.

Q.   Professor Knittel, I believe you testified on direct that you're not opining on liability; right?

A.   That's correct.

Q.   And so you're not opining on whether there's actually been harm in this case; right?

A.   That's correct.

Q.   You're opining that if the jury finds there's harm, is there an economic measure of that harm; right?

A.   Is there an economic measure and has Mr. Lasinski measured it correctly.

Q.   You were asked some questions about the Screenwise Panel. Do you recall that?

A.   Yes.

Q.   And you were -- Ms. Bonn asked you about the fact that Screenwise, you know, participants can, if they choose, hit pause on the meter; right?

A.   Yes.

Q.   Did Mr. Lasinski offer any analysis as to how often that button is used?

A.   No.

Q.   Did he offer any analysis as to where that button is even

located?

A.    No.

Q.    Did he offer any analysis as to whether that button is prominently displayed on the user's device?

A.    No.

Q.    Did he offer any opinions on how a user would navigate to that button?

A.    No.

Q.    Did he offer any opinion as to how often it was used?

A.    No.

Q.    Would that analysis have been helpful in determining the impact of the pause button on the data that Google was able to obtain from the Screenwise meter?

A.    Could you repeat that one more time?  Sorry.

Q.    Would any of that information have been helpful in your analysis as to whether the pause button had a material impact on the data Google was able to collect through the Screenwise Panel?

A.    For sure.

Q.    You were shown a bunch of financial documents that I didn't show you on direct.  Did you rely on additional financial documents beyond what Mr. Lasinski relied upon?

A.    I'd have to go back and check, but I'm not -- I don't believe so.

Q.    Are all the documents that you were shown documents that

Mr. Lasinski also relied upon?

A.   Yes.

        MR. HUR:  I'd like to show Lasinski Slide 15, please.

BY MR. HUR:

Q.   Professor Knittel, were the opinions that Mr. Lasinski offered on Monday about the two dark green bars on the right, do you recall them being described in his report?

A.   Not that I remember.

Q.   And, in fact, you heard Ms. Langner testify about those two dark green bars on the right.  Do you recall that?

A.   Yes.

Q.   And she was referencing, I believe, another exhibit that the plaintiffs' lawyer just showed you, Exhibit 421.

        MR. HUR:  Can we put that up, please.

BY MR. HUR:

Q.   Do you recall Ms. Langner testifying that these numbers include Play revenue, Google Play revenue?

A.   That's what I recall, yeah.

        MR. HUR:  You can take that down.

     If we could put up your Slide 32, Knittel 32.  Knittel 32, please.

BY MR. HUR:

Q.   Professor Knittel, I think that plaintiffs' counsel was trying to say that you didn't include the day in the date row of this spreadsheet.  Does that matter for your analysis?

A.   No.

Q.   Why not?

A.   I can't even -- it's hard for me to answer that.  I can't even imagine how it would matter, so...

Q.   Would it matter if it said March 1st, 2022 --

A.   No.

Q.   -- versus March '22?

A.   No.

Q.   You also said you -- that counsel was misrepresenting your opinion about this and you wanted to clarify.  Can you please now clarify for the jury what your concern was with the framing of the question?

A.   Yeah.  Well, so, again, as, hopefully, I got across in my direct, what these data are showing is that there's at least some evidence on the record -- in the record that suggests sWAA-off users behave very differently with respect to ads than sWAA-on users.  And, in fact, you could almost go a step further.

    Remember, Mr. Lasinski, what he really wants his conversions -- and that's not -- that's not on this table.  Right?  In many ways, in terms of the way a user would make decisions, the conversions is the next step.  Right?  You see an ad; that's the impressions.  You click on the ad; that's the click.  What's at issue in this case is the conversion.  Then you download the app or you make a purchase within the app.

And if you notice, it's -- not to use a fancy word, but it's monotonically decreasing; right?  So the first step is impressions; that's 9 percent.  Then's clicks, 6 percent.  Then we get to conversions.  If it continued to fall in that way, conversions would be even lower than 6 percent, and that's actually the number that Mr. Lasinski wants.  He wants conversions.

So if it followed that monotonicity, that general downward trend, my decrease would be conservative.  You'd want to decrease it even more.

So I think that's what I would have liked to have gotten -- gotten across, yes.

Q.    Does it make sense to you that sWAA-off users may interact with ads less?

A.    Definitely.

Q.    Why is that?

A.    So there's two kind of economic reasons.  So we talked about this being empirical evidence.  The theoretical evidence is -- well, clearly, once a -- a user who hits sWAA off is in many ways signaling to the marketplace that they are different and that they're more protective about their data.  And it stands to reason that if they're more protective about their data, they may not behave the same way with respect to ads and downloading apps and so on and so forth.

And the second reason is, I believe it's

non-controversial, that the sWAA-off customers or users, their ads aren't personalized. Right? So personalization, I think it would also be non-controversial, is effective. If you can personalize an ad, it's more likely to be clicked on; it's more likely to be seen.

So that's another clear reason why sWAA-off customers/users would behave differently with respect to ads because the ads that they're seeing aren't as effective. So that's totally consistent with these data.

Q.   Can you give an example of why a user would be less likely to click on a non-personalized ad versus a personalized ad?

A.   Well, just not to use -- well, so one of my hobbies is mountain biking. If Google shows me a mountain bike ad, I'm much more likely -- because they know that one of my hobbies is mountain biking, I'll tell you, I'm way more likely to click on that than if they show me an ad for some hobby that I'm not interested in.

Q.   And the data that this was based on, Professor Lasinski, did you choose basically the latest, most recent dates that were available to you?

A.   You did it again, sir.

Q.   Now, the third time I've called you "Lasinski." My apologies.

Professor Knittel, did you rely upon the most recent data that was available in Interrogatory 17?

**A.**    Yes.

**Q.**    Professor Lasinski -- I need more sleep.

Professor Knittel, you were retained as a technical expert in -- you were not retained as a technical expert in this case; right?

**A.**    That's correct.

**Q.**    You were asked some technical questions yesterday; right?

**A.**    That's correct.

**Q.**    You're not providing any technical opinions to this jury; right?

**A.**    That's correct.

**Q.**    Was -- anything you were shown today, does any of it change your opinions as to your criticisms of Mr. Lasinski?

**A.**    Not at all.

**MR. HUR:**    I have nothing further.

**THE COURT:**    Very well.

**MS. BONN:**    Nothing further.

**THE COURT:**    Very well.  You may step down.

**THE WITNESS:**    Thank you.

(Witness excused.)

**MR. SANTACANA:**    I was just going to ask for a caffeine break, Your Honor.

**THE COURT:**    Okay.  Members of the jury, we'll take a break.  Remember my admonitions to not discuss this among yourselves or with anyone else, and we'll see you back in

15 minutes.

(Recess taken at 9:58 a.m.)

(Proceedings resumed at 10:16 a.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  Okay.  Are we ready for them?

**MR. SANTACANA:**  Home stretch.

**THE COURT:**  Yes, I hope so.

**THE LAW CLERK:**  Shall I get them?

**THE COURT:**  Yes.

(Proceedings were heard in the presence of the jury.)

**THE COURT:**  The jury is present.

Mr. Santacana.

**MR. SANTACANA:**  Your Honor, for Google's final witness, it calls Dr. John Black.

(Witness steps forward to be sworn.)

**THE COURTROOM DEPUTY:**  Good morning, Mr. Black.

**THE WITNESS:**  Good morning.

**THE COURTROOM DEPUTY:**  Please be careful of that stair and the chair there.

**JOHN BLACK, Ph.D.**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

**THE WITNESS:**  I do.

**THE COURTROOM DEPUTY:**  Great.  Thank you.

Go ahead and have a seat.  There's water there if you

should need it.  Make sure you speak clearly into the microphone for our court reporter.

And I just have one last thing.  Please state your name for the record and spell your last name.

**THE WITNESS:**  My name is John Black, like the color, B-l-a-c-k.

**THE COURTROOM DEPUTY:**  Thank you.

<u>**DIRECT EXAMINATION**</u>

BY MR. SANTACANA:

Q.   Good morning, Dr. Black.

A.   Good morning.

Q.   Just as a reminder for everyone, my name is Eduardo Santacana and I represent Google.  Thank you for being here.

Can you please tell the jury why you're here today?

A.   I'm here to respond to the opinions that we heard from Dr. Hochman, which was last week.  He was the technical expert for the plaintiffs, and he submitted a report in this matter, and I'm here to offer opinions responding to his report, the opinions in his report.

Q.   Do you like Doctor or Professor?

A.   I mean, usually it's just John, but I'll let you choose either one.  Whatever you prefer.

Q.   I'll go with Professor.

A.   Okay.

Q.   So we've heard the term in this trial "rebuttal expert."

Can you just explain to the jury your understanding of what that is?

A.   Sure.

So in many cases, parties in a lawsuit will hire expert witnesses, and the plaintiff will often have their expert submit a report that enumerates numerous opinions about what he or she thinks about the case based on facts and evidence.  And then the rebuttal expert would examine that report, evaluate the same data, usually evaluate those opinions and then respond.

Q.   Dr. Black, what do you do primarily as your vocation?

A.   I'm a professor of computer science at the University of Colorado in Boulder.

Q.   Is your main profession to provide expert witness testimony?

A.   No.  My main profession is I'm a professor.

Q.   As a professor and in your work as an academic, are you ever called upon to analyze the work of other academics and critique it?

A.   Sure.  Of course I grade the homework of grad students as well as undergrads, but also as part of my job, I will review -- it's called refereeing.  You review papers submitted to conferences or journals and you give feedback, and if you find an error, you call it out.

Q.   In your review of Dr. Hochman's work in this case, did you

apply the same methods that you apply as an academic when you critique other academics' work as a referee?

A.    That's the same approach I used, yes.

Q.    And did you prepare anything to help the jury understand your conclusions and work?

A.    Just like every other expert, I've got some slides to share.

Q.    I've printed them for you so that you can have them.

        MR. SANTACANA:  May I approach, Your Honor?

        THE COURT:  You may.

BY MR. SANTACANA:

Q.    If you don't mind, Professor, I'm going to hold on to the clicker, but you just guide me through if you want me to go forward or back.

      Okay.  Please tell the jury a little bit about your work experience, sir.

A.    Sure.  So I was a professional programmer for six years in the late '80s, early '90s.  And then -- it's missing here -- I actually lived in my car for a year in '94 so that I could be a rock climber in Yosemite and work on search and rescue and climb all the big cliffs there.

      And then I came back to civilization and got a Ph.D., became an assistant professor over in Reno for two years and then moved to my current home in Boulder, where I'm now an associate professor of computer science at the University of

Colorado.

I also took some leave from 2015 to 2018 to start a company that was involved in education for cybersecurity professionals.

Q.   Where did you grow up, Professor?

A.   Actually, I grew up in Oakland, which is just across the Bay here.  I went to Oakland High School.

Q.   And how long have you been working in the field of computer science?

A.   If you count when I worked for my dad's typewriter repair store and we started selling computers and programming them, maybe 40 -- 45 years, something like that.

Q.   Do you do any work other than as a professor and sometimes testifying as an expert witness?

A.   I do.  Sometimes I'll do consulting, typically over the summers because school's out.  And I've worked for a consulting group near my home that does IOT, Internet of things, you know, embedded thermostat software, dog collars, other kinds of things.  I did an Android app for music at one point.

Q.   And can you explain to the jury a little bit about your work as a teacher?

A.   Sure.  So one of the main responsibilities as a professor is, obviously, you teach classes.  I've taught anything from the 500-person introduction to computer science class all the way to graduate courses in quantum cryptography and almost

everything in between.

Q.   Now, you told us a little bit about your -- my clicker is -- there we go -- about your consulting work.  Have you worked on anything that the members of the jury might know from their everyday lives?

A.   Yeah.  So I worked on an algorithm early 2000s to keep certain information secure when it's transmitted, and that ended up getting adopted by EMV, which is Europay, Mastercard, Visa.  And so every time you use tap to pay with your credit card chip or your phone and it goes "bloop," sucks the money out of your account, my algorithm is being used.

Q.   What's it being used for?

A.   It's being used to authenticate the information when it sends the information from in the chip to the payment network.

          MR. SANTACANA:  Your Honor, at this time we offer Dr. Black as a rebuttal expert in computer science with specialized expertise in cryptography, data security, and network architecture.

          MR. DAVID BOIES:  No objection, Your Honor.

          THE COURT:  He will be so designated.

BY MR. SANTACANA:

Q.   Professor, could you please tell us about your assignment in this case?

A.   Sure.  So I started working on this case about four years ago; and when I read the complaint, I saw that there was this

allegation that the sWAA button didn't work.  And I thought, "Oh, there must be some bug, there must be something wrong.  It still personalizes your search and your maps and your ads even when sWAA is off."

But then when I received Dr. Hochman's report and I reviewed his opinions, I saw that that wasn't actually the case, the allegations, actually, that there's a theoretical risk that he had identified that he felt was concerning enough to merit the allegation.

So I got ahold of his report.  I got ahold of all the data, the deposition testimony, the technical descriptions from Google, and all the information that he talked about in his -- in his testimony; and I went through and did my own analysis and checked his results, and then I responded to those in my report.

Q.   Now, since then, did you provide any testimony?

A.   On this case?

Q.   Mm-hmm.

A.   I was deposed and so that, I guess, would count as testimony.

Q.   And have you -- were you able to listen to Dr. Hochman testify during trial?

A.   Yes.  I've been here the entire trial, so I heard his testimony.

Q.   So have you heard all the witnesses at trial?

A.    I think I may have missed a little bit of the damages stuff but, for the most part, I've been here throughout.

Q.    Okay.  Now, Professor, were you paid for your work in this case?

A.    Yes.

Q.    What is your hourly rate?

A.    It's 625 an hour.

Q.    In total, what would you estimate you've billed to Google in this case?

A.    I last checked, not including this month but up till now, I think it was 240,000 over the four years.

Q.    Do you only work for defendants, sir?

A.    No.  I've worked both sides, plaintiff and defendant.

Q.    And do you only work for big tech companies?

A.    No.  I've worked for individuals and some of the small cities around Boulder when they had legal troubles.

Q.    Do you accept every expert engagement that comes your way?

A.    No.  Sometimes I'm approached by someone interested in hiring me, and I find that our -- how shall I say? -- our ethics don't line up.  Sometimes I'm just too busy.  I don't have the bandwidth.  Sometimes my expertise doesn't really fit for what they're looking for, so I would decline in that case too.

Q.    And, sir, just because it might come up on cross-examination, have you and I worked together before?

A.   You were at a different law firm and you were a brand-new lawyer about ten years ago, and I don't think we worked directly together, but we were on the same team.  2016, I think.

Q.   Okay.  So I want to ask you about your opinions in the case.  Could you just summarize for the jury the opinions you've reached in this case?

A.   Sure.

So they're summarized here on the slide.  It's basically that Google's technology operates differently when sWAA is on or off.  In other words, it's not a fake button.  It's a button that actually does some things, and it does something fairly significant, as we'll see.

Also, Google's technology isn't designed to collect or use PII, personally identifiable information.  That is not the design or purpose of Google's technology.

And, finally, this sWAA-off data that we've been talking about for two weeks does not lead to profit for Google, at least not directly.

Q.   Now, I want to ask you first about something you didn't put on that slide.

Did you hear Dr. Hochman testify about what he thinks the WAA disclosures mean to him?

A.   I did.  I was here.

Q.   Are you here to testify about what the WAA disclosures

mean to you?

A.    So I know this is a disappointment, but I don't plan to put up the privacy policy for everyone again.  I'm not going to talk about the terms of use or any of the disclosures.  I don't really feel that it's appropriate for a computer scientist to really say what those documents suggest, so I'm going to steer clear of that.

Q.    Now, just to be fair, in your report responding to Dr. Hochman, you did address his opinions about what these documents -- these privacy policies and disclosures suggest.  Is that fair to say?

A.    I did in my report.  I just don't plan to offer those opinions here.

Q.    Okay.

All right.  Let's take a look at your first opinion.

So we've talked a lot about Google Analytics in the trial.  Can you just explain where Google AdMob fits into our discussion of Google Analytics?

A.    Sure.

And we've heard this a number of times, but I'll go through it once more.  There are these SDKs, and they're given away for free by Google, and you can choose to use them or not as a developer, as a third party.  And they're really nice to have because they streamline your work.  You don't have to start from scratch.

You can take Firebase, which is this very featured set of powerful libraries.  Part of that is GA4F, Google Analytics for Firebase.  You can either get that as part of the overall Firebase SDK or you can just take the AdMob SDK, which is the thing that lets developers serve ads on Google's network.  And GA4F is part of that, so you get it automatically.  But the developer can choose to use these SDKs or not.  It's up to them.

Q.   So, Dr. Black -- Professor Black, with respect to -- it's hard for me to call you "professor" actually.  I've always called you doctor.

So with respect to the data at issue in Dr. Hochman's report, is all of the data in question in this case, one way or another, analytics data?

A.   That's my understanding, yes.

Q.   All right.  Now I want to ask you about a concept called unique identifier.  Can you please demystify for the jury what unique identifier means in computer science?

A.   Sure.

So an identifier is typically, in computer science, a string, meaning like some letters and numbers or it could just be letters or just numbers, that are assigned sometimes to an object or a piece of memory or to a person or to a device.  So there are many different kinds of identifiers.

A personal identifier would be something that points to

you as a person. So, typically, like your email address, your name, your phone number.

And then there are what we've been calling pseudonymous identifiers, which "pseudonymous" is already kind of a strange word that we don't normally use in everyday language, but it's related to pseudonym. You get a number in place of your personal identifier as a pseudonymous identifier. And for it to be pseudonymous, it needs to not be linked to any personal identifier.

So a pseudonymous identifier might be just like your AdId, which we've talked about. That's linked to a device but it's not linked to your person. Or App Instance ID. Mr. Ganem talked about that. They typically just look like a long string of random-looking numbers and letters.

Q. Are unique identifiers used outside of computer science?

A. Sure. Like, I mean, I'm not an expert in medical studies; but I've read some papers where they say, you know, Patient Number 1 is a male and here are his results in the study. They use "Patient Number 1" to replace his identity to try and preserve who he is.

Q. Now, is any particular identifier, random string of numbers, inherently personal or pseudonymous?

A. Not inherently. It just depends on whether it is linked to an identity or deliberately often not linked to anybody's identity.

**Q.** So let me use an everyday example.

You buy a refrigerator. It has a serial number on it. At the time that you buy it, is that serial number a personal identifier or a pseudonymous identifier before you've registered it with Whirlpool?

**A.** I guess it depends on if there's a record that links the serial number to your name. So if you bought it from an appliance store, they might have a linkage. Maybe if you bought it from Craigslist, there's no record of your purchase.

**Q.** So with respect to the identifiers at issue in this case, you've already talked about the GAIA on the left, the App Instance and AdId on the right. I'd like you to now explain to the jury why there are chips on the bottom of the slide.

**A.** Okay. So --

**MR. SANTACANA:** We need the screen for the jury, Ms. Hom. Thank you.

**THE WITNESS:** Is it back? Okay?

Sometimes we want to share or transmit something that's sensitive, like a personal identifier, but we want to protect the value of that identifier, and so what we can do is encrypt it.

For example, right now if I showed you my encrypted Social Security number, it would be meaningless to you. It would be meaningless to anyone because it's encrypted. That

protects it.

And so we've heard testimony about an encrypted GAIA.  So here your GAIA is sensitive.  It links to your identity, but we -- when Google encrypts it, then they need not worry about it being exposed because even if a bad guy got ahold of it, it wouldn't be useful.

The one that's been named is called the DSID, and I think Mr. Ganem said that's called -- internally it's called the Doritos identifier, and so I think it's easy to remember and that's why I have a chip on my slide.

**BY MR. SANTACANA:**

**Q.**   In computer science, what is the purpose of encrypting a personal identifier?

**A.**   You encrypt it in order make sure that no one can understand what the actual value of the identifier is.

**Q.**   So in this case, when the jury goes to consider the evidence, how can they tell, when they're looking at the evidence, whether a particular identifier is personal or pseudonymous?

**A.**   They would have to ask themselves:  Is this something that is linked to the person's identity or just is the person's identity?  Or if it's something that is set aside, is separate, and is not tied to any personal identifiers.

**Q.**   Okay.  Can you please explain to the jury what you've done here?

**A.**   Yeah.  This is the trip of the Doritos.  It's pretty cool, actually.  So, once again, when a user is using a third-party app with GA4F and he does something, presses a button or sometimes does nothing and just is engaged, sits on a screen for a few seconds, it generates what's called an event.  And these events are packaged up by the SDK and then transmitted to Google's servers from that device.

**Q.**   What else is packaged up there?

**A.**   Okay.  So this is meant to show what's inside that bundle, event data, the kind of event.  Is it that, you know, someone's first opening the app for the first time; they're showing a certain screen; they've clicked on a button?  Those can be events that are captured and sent.

And then the DSID, that's the Doritos, that's the GAIA which is tied to the user's identity but it's encrypted.  So even if somebody got ahold of it, it would be meaningless essentially.

And then there's the AdId, that's the advertising ID for Android, and the App Instance ID, which Mr. Ganem explained was an identifier that was generated for that install of that app on that device.

And then there's some user properties, which I'll talk about in a second.

**Q.**   So if I were to get ahold of this number one bundle of data, would I be able to determine whose Google Account the

data belongs to?

**A.** No. I assume you don't have -- this is not your phone, so you wouldn't be able to link the AdId to the GAIA, even though you have both, because the GAIA is encrypted and that makes it undiscernible.

**Q.** Let's move forward.

Can you just explain what's going on here?

**A.** Right. So I have this animation to show what's going on after the packet is transmitted from the phone, over the Internet, to Google's analytic server. It's received by one of the computers in this rack diagram.

**Q.** Professor Black, we've heard the plaintiffs say a number of times that Google takes analytics data from users' phones. From your perspective as a computer scientist, is Google taking the data from the user's phone?

**A.** I don't think I'd phrase it that way. That kind of evokes this image that the server is going out and seizing things from the phones. And the server is passively just sitting there, waiting for information to come in. Just like -- you know, I'm old enough that I used to send mail using a letter and drop it in a mailbox. And I'd go to the mailbox and put it in the slot. I would never describe that as the mailbox is out taking people's letters. It's just receiving letters that are being sent or deposited into it.

**Q.** Which person or entity is responsible for causing the data

to be sent from the phone to the Google server?

A.   The phone initiates the sending and the server is just there as a recipient to receive that information.

Q.   And if an app developer chooses not to incorporate Google Analytics for Firebase, would the data be sent from the phone to the server?

A.   No.  You would have to -- you have to install the SDK.

Q.   Now, at this stage of the process, is the data in question saved by the server?

A.   It's not -- it's not saved to disk.  Of course, when it's received by the server, it's in memory.  That's just how computers work.  If you receive information, it's in memory, but I wouldn't call that saving.  Saving suggests that it's written to persistent medium like hard disk or something.

Q.   Dr. Hochman testified that at the point during this consent check process where the server receives the data, there's a copy made.  Do you recall that?

A.   I do.

Q.   Would you call -- based on your understanding of how this system works, would you agree with him?

A.   Since data in a computer -- I know some people code here, so you'll relate to this.  But when data moves through a computer, typically it's given from one function to another.  That inherently creates a duplicate because that's just how computers work, but I wouldn't say that it's making a copy.

That, again, suggests that it's being written to disk in two different forms or something like that. This is just information moving through a computer.

Q. And just to be perfectly clear, Professor, what is the difference between holding something in memory and writing it to disk?

A. So usually if you just keep something in RAM, as we all know, if you turn off the power, it's gone. It's called volatile storage.

Q. I don't know that we all know that, but --

A. Okay.

Q. -- go ahead.

A. You have RAM, which is this ephemeral temporary storage. If the power is lost, everything is gone.

If you want to keep something, if you want to save something long term, you write it to disk and then it's persistent.

Q. Okay. Now, what does the number three on your slide indicate?

A. All right. So this is the first step of the process. Once Google's servers receive the information, then the DSID, the Dorito, is taken out and separated from the rest of the information, which has to stay put on the analytics server.

Q. All right. Then what happens?

A. So then the Dorito is sent to the consent check server by

itself with no -- with no friends.  It's just alone on this consent check server.

And then and only then it's decrypted.  So "decrypted" means you undo the encryption and reveal the GAIA ID now.  That's because the consent check server has the key to do the decryption, and no other entity in Google has that key, is my understanding.

Q.   Does this design pattern -- are you familiar with it from computer science?

A.   I am.  This is a typical technique.  When handling sensitive data where you don't want two things to be associated, you would use what's called isolation.  So here, the sensitive information, the GAIA or the Dorito, is being isolated so that there's not a strong chance of intermixing two things that should never be put together.

Q.   Would there be an advantage to implementing this isolation design if Google did not intend to respect the difference between sWAA on and sWAA off?

A.   I mean, it would be a massive waste; right?  You would go through all these steps to isolate, to have separate servers, to have your engineers build, design, and implement this system; and if it didn't matter, it would be kind of a wasteful exercise.

Q.   Okay.  So tell us what happens next in this process.

A.   All right.  So in this first case, I'm illustrating what

happens if the GAIA on the consent check server goes to Footprints.  It's been two weeks, but Mr. Monsees told us about Footprints.  That's the source of truth for whether sWAA is on or off for someone's identity, for someone's account.

And in this example, I'm saying, "Okay.  It's thumbs-up." SWAA is on.  Consent is given.  And in that case, indication would come back.

Now, the GAIA is not being sent back.  Only the thumbs-up is being sent back to the analytics server.  So it only learns that whatever Doritos was indicating, it was a thumbs-up. That's all it finds out.

Q.   And just to be clear, while all this has been going on on the consent check server, where is the analytics and app activity data stored?

A.   That's still waiting back on the analytics server for the consent check to come back.  I mean, this is all lots of steps. This is going to happen in a couple of milliseconds at most.

Q.   And at this point, has the data -- the app activity data been saved?

A.   It's been secured on the analytics server, and it's not going anywhere pending the results of the consent check.

Q.   Is it still in temporary memory, or is it in long-term memory at this stage?

A.   It won't be saved until the results of the consent check come back.

**Q.**    Now, Dr. Hochman suggested, when he was testifying, that Google should check consent on the device rather than using this isolation system to check consent.  Do you have a response to that?

**A.**    Mr. Ganem explained why Google ultimately decided this was better.  He said it was closer to the source of truth where you do the check.

I also, as a security person, wouldn't want sensitive information being handled on the device.  Devices can be compromised much more readily than something secure inside of Google's server warehouse.

**Q.**    Okay.  So I think you said already thumbs-up, this is a WAA-on packet of data.  So please explain what happens next.

**A.**    So since consent is given, thumbs-up, this information can be stored in the user's Google Account, can be used to personalize ads and Search and Maps and so forth.

**Q.**    Now, tell us what happens if it's thumbs-down and the consent check server reports that WAA or sWAA are off.

**A.**    Sure.  So in that case this is a sWAA-off user; and as we've heard many, many times, the data is de-identified and then stored into a separate pseudonymous log not tied to the user's identity.

**Q.**    What happens to the GAIA ID if it's thumbs down?

**A.**    The GAIA ID is not stored in the pseudonymous events log.  Instead, there's just pseudonymous identifiers.

**Q.** So if a user is sWAA off, does Google save the app activity data before or after the consent check server has determined that the user is sWAA off?

**A.** It's only saved here at the end of the process, after the consent check.

**Q.** Can you explain to the jury now what you mean with this Number 5?

**A.** Sure. So, as part of the de-identification process -- and we've heard about this already -- but there's some fuzzing. That means you add some fuzz to the data to make it less accurate on purpose, to hide the accuracy. For timestamps you would say, "Add a few seconds forward or backward" to make it less accurate. And it's also scrubbed of certain kinds of identifiers, IP addresses. It's encrypted and then it's stored securely. So it's fuzzed, scrubbed, and then encrypted and stored.

**Q.** Did the consent check process differ on iOS since 2021?

**A.** Yes. I think we heard this as well, that Apple instituted a new policy starting in 2021, in iOS 14.5. And anybody who uses an iPhone probably has seen this a hundred times, but iPhone users can click on "Ask app not to track," and that means the device ID called IDFA is not sent in that case; or it can say, "Allow," and then the IDFA is still sent.

**Q.** Now, if the user clicks "Ask app not to track," is Google able to determine whether the iPhone is owned by a Google

user?

A.    No.    There's no way to track that on the Google side.    It has no way of determining if it is or isn't.

Q.    And does that mean that they are or are not able to determine whether the owner of that phone has sWAA on or off?

A.    If this is a third-party app and Google receives the analytics data, there is no way for Google to determine the consent because it doesn't have the Doritos.    It's not going to be sent, so it can't do the consent check that we just talked about.

Q.    What if the user clicks "Allow" and is okay with the third-party app tracking?    At that point is Google able to determine whether the iPhone is owned by a Google user?

A.    There's still no Dorito.    It does have an IDFA, so there's a device ID that can be used for tracking, but Google is still unable to determine is this a sWAA-on or sWAA-off user.

Q.    Why can't Google just use the IDFA to map it and figure out which device every iPhone owner has?

A.    That's a good question.    Google does not have a mapping table from device ID to GAIA.    That would violate one of the core principles of not mixing together a pseudonymous identifier with an identity.

Q.    Now, Professor, I want to ask you about personalized advertising.

Does Google personalize advertising with sWAA-off data

based on the evidence you reviewed in this case?

A.    No.  I don't think -- neither I nor Dr. Hochman is claiming that ads are personalized for sWAA off.

Q.    Now, while Dr. Hochman was testifying, the jury was shown Exhibit 442, which they'll have in the jury room during their deliberations.  Can you explain what this exhibit demonstrates?

A.    This is a UUAD log and this is sWAA on.  So this is not sWAA-off data.

Q.    So when they look at Exhibit 442 in the jury room, is any of the data in that exhibit sWAA-off data that belongs to one of the class members?

A.    No.  And I'm relying on several Google engineers who all testified that this is sWAA-on data.

Q.    Now, you've said that Google doesn't personalize advertising.  Nevertheless, is Google able to select ads based on some characteristic of the device even when users have sWAA off?

A.    They are.  That's not usually called personalized advertising.  This is called contextual advertising.  So the images I'm using here is, you know, if you're driving over the bridge and there's a billboard that's placed there, the advertiser knows that -- nothing about you.  It doesn't know how tall you are, what shoe size you wear.  It knows only that you're in that place.  And so it gives ads relevant based on the knowledge that you just happen to be driving over the

bridge.

The one on the bottom is in Paris.  Obviously, a very different kind of billboard is placed there.  That's based on context.  It's not based on knowing who you are.

Q.   So applying your billboard analogy to Dr. Hochman's opinions, do you agree or disagree with him about the role of contextual advertising in this case?

A.   I think I agree.  I believe he said that contextual advertising was not the same as personalized advertising, and we have, I think, the same opinion there.

Q.   And just to be clear, sir, does contextual advertising rely on the historical app activity data of the user being shown the ad?

A.   It doesn't use any historical data.

Q.   All right.  Now I want to ask you about the analytics data, some of which the jury will also have in the jury room.

A.   Yes.

Q.   Can you explain what user properties are in the data?

A.   Sure.

So this is going back to that yellow square that I was saying got sent across the Internet.  Part of that, the bottom part I called -- I didn't call it -- Google calls user properties, and user properties can have certain kinds of information.

User properties are persistent, so they typically are not

changing very much for each of those event packets that come across.  There can be things like the size of your screen, so the advertiser knows what size ad to give you.  It could be the model of your phone.  In this case, it could be some demographic information.

And in the course of this litigation, two months of plaintiffs' information was produced from November -- from October 2021 till December, and it amounted to 123,000-plus events that were produced in the case.  About half had no age information, half had no gender information, and zero had precise location information.

Q.  I want to ask you about something you just mentioned there.

How do you know that the data you were reviewing, which is sWAA-off data, came from the plaintiffs' devices?

A.  Because when the plaintiffs requested from Google to see all this data, they had to unmask themselves.  They had to provide their device IDs alongside their names and say -- Mr. Rodriguez said, "This is my AdId."  And Google could use that to pull up the appropriate pseudonymous log entries.

Q.  So if Mr. Rodriguez had not himself cooperated with Google and with you to pull this data, could Google have just gone into its database and said, "Oh, this is your data in the sWAA-off records"?

A.  No.  I mean, if Mr. Rodriguez had said, "My name is Anibal

Rodriguez," and that's it, no AdId, Google wouldn't be able to find these log entries because his name is not in there.  Well, except that we're going to talk about some spurious entries where it is, but...

**Q.**   So the jury will also have an exhibit numbered 453 in the jury room?  This exhibit --

          **MR. DAVID BOIES:**  This has not been admitted yet.

          **MR. SANTACANA:**  Well, that's fine.  Let's talk about Exhibit 453 for a moment, and then we'll offer it for admission.

**BY MR. SANTACANA:**

**Q.**   So can you just explain what Exhibit 453 is?

**A.**   Sure.

     So there is this voluminous data production that I just described, 123,000 records.  The plaintiffs and the defendants have agreed to supply the jury with some excerpts, I think 52 total examples of this kind of data, and that is what forms Exhibit 453.

**Q.**   Did you select any of the 52 examples?

**A.**   I selected 26 and then someone on the other side selected the other 26.

**Q.**   Are the 52 examples a representative sample of the entire volume of data?

**A.**   They, in a sense, are representative because they're examples, but there are some with PII, a number of them with

PII that is vastly out of proportion with the appearance of PII in the overall dataset.

Q.   How were the tabs in Exhibit 453 that contain PII out of proportion with the whole dataset selected for the jury?

A.   Okay.  So in rare instances, PII, like Mr. Rodriguez's name or his email, does appear in that large set of data but it's extraordinarily rare.

     But in the examples the jury's going to get, four, I think, four out of the 52 examples will be examples of that. And so 4 over 52 is not as small as the actual percentage if you look at the data.

Q.   Do you know who chose to give the jury a disproportionate amount of spurious PII examples in the jury room?

          MR. DAVID BOIES:  Objection, Your Honor.

          MR. SANTACANA:  He knows.  He knows.

          THE COURT:  Sustained.

BY MR. SANTACANA:

Q.   Did you -- in your 26 tabs that you chose, did you choose any with spurious PII?

A.   In the 26 I chose, I didn't choose any with PII.

Q.   Okay.

          MR. SANTACANA:  Your Honor, I offer into evidence Exhibit 453, with 52 tabs on which the parties have agreed.

          THE COURT:  Exhibit 453 will be admitted.

     (Trial Exhibit PX453 received in evidence.)

BY MR. SANTACANA:

Q.   Now, Professor, did you prepare any other exhibit to help the jury understand the data they will see in Exhibit 453?

A.   I think -- I don't know the number.  Is it 453A that we're talking about?

Q.   Dot A, yes.

A.   Yes, I have that.

Q.   Okay.  Can you just explain what Exhibit 453.A is?

A.   Sure.

     So this is one of the 52 different entries, and it's verbatim the same thing except it's got some colored squares around certain portions of that entry.

Q.   And are you responsible for the colored squares?

A.   Yes.

Q.   And why are they there?

A.   Because they're the more interesting parts.  A lot of this thing is basically just saying "not set" over and over and over, which is not very interesting.  So the places where there's actual data, I tended to highlight.

     MR. SANTACANA:  For the moment, Your Honor, I'd like to publish Exhibit 453.A to the jury as a demonstrative.

     THE COURT:  You may.

BY MR. SANTACANA:

Q.   Okay.  So this is exactly what the jury is going to see except for the colored squares?

**A.**   This is one of the 52 they'll see without the squares.

**Q.**   Let's take a look at your yellow square first.  Can you just explain to the jury what they're going to see there?

**A.**   Sure.  So this is the data produced in a way that's intended for human consumption.  It's called JSON.  Maybe some people have used JSON before.  It's basically the name of the field, descriptor of data item, and then the value.

So there's the date and that's what?  October 29th, 2021. The name space, that's the name under which all of the event data will be collected is anonymous.  Stream ID I won't get into.  Property ID, that names the app.  The third-party app has a certain ID.

**Q.**   Let me stop you there.

So we've talked about an apartment building with apartments where each one is assigned to an app.  Does property ID relate to that?

**A.**   Exactly.  So Mr. Ganem used an analogy of different locked apartments where pseudonymous information would be segregated and stored into, and the property ID is essentially the apartment name, apartment number.

**Q.**   All right.  And what is user ID?

**A.**   User ID is a number that the third-party app generates. It's up to the app on what it means and how it's generated, and it doesn't mean anything to Google.

**Q.**   Okay.  Now, why don't we look at your green square next.

**A.**    Okay.

**Q.**    So can you explain to the jury what we see in the green square?

**A.**    This is demographics information.  In this case, it says "Unknown."  As I indicated, about half the time there is information in the green square.  In this example, there's not.

**Q.**    When the information in the green square does end up in there, what does it look like?

**A.**    Age would be a range.  So I think this is a guess made by analytics based on what app it is, who you might be.  If you're playing a first-person shooter, it might guess male, you know, versus female for other types of apps, that kind of thing.

**Q.**    How accurate are the guesses?  Do you know?

**A.**    It really varies.  Mr. Rodriguez has records in there saying he's 18 to 24.  I'm not sure if that's accurate, but I'm guessing probably not, since he has teenage kids.

**Q.**    And this example says "Unknown," but will the jury be able to see examples in Exhibit 453 where these are filled in?

**A.**    They -- the guesses I indicated will be in some of the examples that the jury will review.

**Q.**    Okay.  Let's look at the orange square next.

**A.**    This describes the event.  Most of this says "not set," but it says event name is "Push notification received."

A push notification is when the server sends a message. Like you get a pop-up when you get a new text or something like

that, and this is an event saying it was received.  If you dismiss it, that's another event, it says "Push notification rejected."

Q.   Why are there so many "not sets"?

A.   So all of this code, all of this JSON data was produced by a program that went in and said, "Is this set?  Is that set?"  In the vast majority of cases, there was nothing there, so it formats it into a list of not sets for most of these values.

MR. SANTACANA:  Let's go back out to the page and, Brooklyn, if you wouldn't mind just slowly thumbing through a couple of pages so the jury can see some more of these not sets.

Go ahead and keep thumbing through page after page.

BY MR. SANTACANA:

Q.   Now, Professor, on the computer on the server, is this what the data looks like, "not set," "not set," "not set"?

A.   No.  Once again, this is because the program is querying to see if a value is there and if it's absent, then it'll fill it in with "not set."  In other words, I couldn't find anything.  So it does create the impression that there's a lot going on here, but really, it's saying there's nothing here and it's trying to represent that.

Q.   It's just a bunch of empty pages, basically?

A.   It's equivalent to that.

MR. SANTACANA:  Okay.  Let's stop, Brooklyn, when you

get to page 24, please.

**BY MR. SANTACANA:**

Q.   All right.  Can you explain this rectangle for us?

A.   This is -- as I indicated earlier, sometimes Google can learn the type of device that's being used.  This is a Samsung Galaxy Note 9.  The model name is there.  It's running Android 10.  That's often useful for the app developer to learn what kind of devices their users are using, just for general information, to know where their user base is.

Q.   Let's look at the rectangle on page 27.

So when the jury is looking at the data, what should they interpret from this?

A.   So this is geo, geographical information.  This is inferred from the IP address.  So everywhere you go with your phone, you've got an IP address assigned if you're on the Internet, and there's a way to look up IP addresses and find out roughly what city you're in.  And so this is really a determination of what city.  The city here is Roseville, California.

Q.   Okay.  Now, I notice it says latitude and longitude at the bottom.  Is that a precise location of the device?

A.   No.  It looks like it is because it's got lots of precision after the decimal point, but that is just the center of Roseville, California.  So even if the user is moving around, it's still going to give those same latitude/longitude

coordinates, despite the movement.

Q.    Okay.  Last one, page 32, there's another rectangle.  Can you explain to the jury what they can expect to see here?  Are you missing a page?

A.    Well, I'm seeing 31.  There's a box in 32.

Q.    Oh, I see.  Let's look at 31.  I skipped one.  Sorry.

A.    This is, again, a user ID that is -- that is something that means something to the app and not to Google.

Q.    So Google doesn't have an interpretation of who the user ID belongs to?

A.    That's right.  That's meaningful to the app, the third-party app.  Google just saves it as a courtesy as part of its analytics service.

Q.    In the analogy of the apartment building, where does this get saved?

A.    This is, I believe, a segment within the apartment.

Q.    Where does all of this get saved in that analogy?

A.    This entire record would be -- would be encrypted and then stored into the appropriate apartment according to what app we're talking about.

Q.    Okay.  Now, we can go to the last one on 32.  If you're missing the page, I think you can just see it on the monitor.

What should the jury expect to see on this page?

A.    This tells us that the app ID is *New York Times*, so that's the app that's sending Google the information.  There's some

timestamps.  This is actually the number of microseconds since January 1st, 1970.  This looks like it's the middle of 2022, I think.

Q.   Okay.  Let's move on.  If we can flip back to your slides.

MR. SANTACANA:  And, Your Honor, I'd like to admit into evidence now Exhibit 453.A to aid the jury in their understanding based on their memory of Dr. Black's testimony.

MR. DAVID BOIES:  I have no objection as a demonstrative, but we're not admitting the demonstratives into evidence.

MR. SANTACANA:  Your Honor, as you may recall yesterday, the plaintiffs marked up an email and we admitted it after it was marked up when the witness explained it.

THE COURT:  All right.  I'll admit 453.A.

(Trial Exhibit PX453.A received in evidence.)

MR. SANTACANA:  Thank you, Your Honor.

BY MR. SANTACANA:

Q.   Now, Professor Black, there's been some discussion in this trial about the appearance of PII in the analytics records that Google receives.  Did you do any work in this case to understand how often that happens?

A.   I did.  I looked through -- I didn't manually look through, but I searched through using a computer -- the 123,000 records produced for the named plaintiffs, and I looked for things like their names, their phone number, their email.

Q.    What did you find about the appearance of a user's name in the records from those two months?

A.    Sure.

So I found that certain apps, which are misbehaving because they're not supposed to send PII but did so anyway, would send -- in the top example, Alta was sending Susan Harvey's name.  She's one of the plaintiffs.

The Uno game was setting Pete Rodriguez and its analytics data.

The last one, Virtue, that just says "Anibal" but I counted it anyway as a disclosure of the user's name.

Q.    What about the appearance of emails in these records?

A.    Again, fairly rare.  I think .34 percent of the time of the 132,000 had email.  In every instance, these are all Anibal Rodriguez's email address.  Once again, these apps aren't supposed to be sending this information and these four did so.

Q.    What about the appearance of phone number in these records?

A.    The phone number was the rarest of all.  There were only six occurrences of a phone number throughout the entire dataset.

Q.    Now, Professor Black, what is the fate of the email and phone number and name that gets sent to Google Analytics improperly?  What happens to it?

A.    The analytics server receives this information and doesn't

look at it, encrypts it, stores it in the appropriate apartment for that app, and Google never uses it.

Q.    Does Dr. Hochman -- in his report, did he opine that Google ever uses it?

A.    No.  He agreed that, despite its presence there, Google never uses that information.

Q.    Did you see any evidence in the case that Google ever enters the locked apartment of a particular app to read and understand the name or email or phone number that they sent into Google Analytics?

A.    No.  Every witness has said Google does not do that.  Both experts agree Google does not do that.  The only entity that could possibly access that information is the app that set it -- put it there in the first place.

Q.    From your perspective as a computer scientist, would it make sense for Google to attempt to go into these apartments, identify PII, and scrub it?

A.    It could, and I believe Mr. Ganem said that's an ongoing project they're attempting to do.  It isn't as straightforward as it might sound.  Things that look like names might not be names.  Things that look like phone numbers might be something else.  Even emails -- in this dataset, there are lots of at signs, not just emails.  So you have to be careful not to scrub off information that the app wanted to retain that wasn't PII.  So you need to be very careful in how you do this.

Q.   And just to be clear, though I think we've heard it many times, but did you, as the person reviewing the evidence and a computer scientist, did you see any evidence that Google combines data from the different apartments?

A.   No.  I've seen no evidence that they try to cross-reference or combine data from different isolated silos or apartments.  I mean, nor would they be able to because these are encrypted under different keys.  So even if things would match up, if they were not encrypted, once they're encrypted, they look -- even a match would look like a mismatch because of the encryption.

Q.   Well, let me ask you about that.

I think Dr. Hochman said something about if even one of these rare instances leaked out of the apartment into the wild, like a hack or something, that that could theoretically harm users.  Do you have a response to that?

A.   Yeah.  Because each apartment is encrypted under a different key, then even if the information were acquired by a bad guy, this cross-referencing wouldn't be possible.

And so if, you know, one of these misbehaving apps had PII, which they do, then exposing the encrypted version -- the encrypted information that goes with that PII doesn't tell you where Mr. Rodriguez' information is in every other apartment because it's encrypted differently.

Q.   Now, you explained to the jury that the latitude and

longitude in the data that you reviewed matches to the center of the city where the device was located.  Did you prepare anything to explain to the jury how that works?

**A.**   I did.  So this -- in this example --

**MR. DAVID BOIES:**  Your Honor, objection.  Not in his report.

**MR. SANTACANA:**  Your Honor, he just put the latitude and longitude that's in the data that's in his report on a map.

**THE COURT:**  All right.  I'll let him proceed.

Go ahead.  Don't get too far afield in this.

**MR. SANTACANA:**  No, Your Honor.

**BY MR. SANTACANA:**

**Q.**   Sorry.  Professor Black, can you just explain to the jury what the latitude and longitude in the data means?

**A.**   Sure.

So, once again, and Dr. Hochman also explained this, that if you know the city, for convenience you can give a latitude/longitude pair that's the center of that city.  It's the same thing as saying what the city is because it's just the city center.

So in this case, Ms. Harvey had a number of records that placed her in the city of Sacramento.  So her latitude/longitude was always at the red pin for every one of those events.

And I think if we can go forward, it places her location

information, her exact location, at the center of this intersection because that happens to be the middle of Sacramento.

And there were, I think -- can we go forward? -- 4600 events placed her at this exact location.  Of course, she very likely wasn't just standing in the intersection for 4,600 events.  That's just where the latitude/longitude says. Because if we go forward, if you look up the city centroid -- "centroid" means the polygon's center of mass -- that's right there if you look it up in a separate database.

Similarly, Mr. Rodriguez had a number of events logged where he's -- I think this is actually standing in the water. So I don't think he was really standing in the water.  This is just the center of Apollo Beach, Florida, and so the latitude/longitude coordinates placed him there, and that's because the city center of Apollo Beach is essentially in the same spot.

Q.    So just to put a fine point on it, Professor Black, can you explain what you've done here?

A.    Sure.

So this is an example.  As I've explained, if you're anywhere in Sacramento, you're going -- your position is going to be reported at a city center.  So even if you're driving around, every reported event is going to place you there until you change cities, and then now you're at the center of

West Sacramento.

**Q.**   Now, Dr. Hochman opines that there are no technical barriers to Google relinking pseudonymous data back to the user.  Do you agree with that?

**A.**   I don't agree.  There are formidable technical barriers, as well as policy barriers, to reidentification.  We've seen a number of those policies.  For example, you're not allowed to fingerprint.  You're not allowed to intermix certain kinds of data to create what are called join risks.  So this is a very strict rule within Google, from what I can tell from the testimony.

**Q.**   Did you see, in the evidence in this case, or in Dr. Hochman's report, that any person out of the 97,992,376 class members was reidentified by Google or anyone else using their pseudonymous data?

**A.**   No.  He and I agree that there's no evidence showing this has ever happened.

**Q.**   Did you see any evidence in this case, for that matter, that any of the pseudonymous data in question was misused by anyone or otherwise leaked outside of the apartments that are locked down?

**A.**   I don't think there's any evidence of that ever happening.

**Q.**   Now, you mentioned a theoretical risk.  Can you please explain to the jury what you mean by "theoretical risk"?

**A.**   Dr. Hochman has an opinion that he believes that, in

theory, joining certain information could lead to disclosure or the reidentifying of certain individuals.  He gave some ideas in his report about how that might happen.  But, once again, we both agree there's no evidence showing it has happened.  And so he's offering what is, more or less, a theoretical opinion and admits that no actual reidentification has ever occurred, according to the evidence.

**Q.**    I'm going to shorten you up a little bit.

**A.**    That's fine with me.

**Q.**    So, Professor Black, can you explain to the jury what you're trying to convey with this slide?

**A.**    Sure.

So there are a number of reasons that in a third-party app, data is being sent to Google, and we've heard about all of these in the trial.  The number one that we've heard over and over is analytics.  That's when GA4F is sending data on behalf of the app itself, and Google's providing a free service to receive and collate that information so that the developer can look at it later.  That's called analytics.

Fraud prevention, Mr. Ganem talked about it to some extent.  If a bad guy can simulate clicking on a button a thousand times a second and get revenue, they will do that.  In fact, they do try to do that sort of thing.  Google is very vigorous in preventing that, in stopping the fraudsters.

Google also has an accredited ad program.  Their ads are

accredited by the Media Rating Council.  They go through an audit at least once a year.  They need to have the receipts to show.  So both for fraud prevention and accreditation, they need to collect data.  You can't stop the bad guys if you're not even allowed to look at what they're doing.

The third thing we've also heard about is conversion measurement attribution.  That's something that the advertisers are interested in.

And then, finally, the last one, which we've heard about for the full two weeks, that's the sWAA button.  If you don't want personalized content, you can turn that off.

Q.   So, Professor, do end users have any way -- are you aware of any way they can turn off analytics?

A.   Analytics is an agreement between the user and the app. They have to agree they're going to be sending this information to Google or not.  Some apps let you partly opt out.  Some apps have a button that says -- for the user to click that says, "Don't send analytics.  I don't want it."  But that's between the user and the app.  Google, once again, is passively receiving whatever analytics comes its way as a service to the app and its user.

Q.   Professor, I don't -- you're not an expert in agreements or contracts; right?

A.   No.

Q.   So let's stay away from that language.

I just want to understand, as a technical matter -- well, let me put it this way:  Does Google Analytics provide code for apps to put analytics opt outs in their apps?

A.    They do.

Q.    So the Google Analytics for Firebase code permits apps to program an opt out of the analytics sending?

A.    That's right.  There's an option in the analytics SDK to say, "If the user opts out, don't send the analytics data."

Q.    What about fraud?  Are you aware of any buttons made available to Google users to prevent the prevention of fraud?

A.    Obviously we don't want a "turn off fraud detection" button anywhere because if fraudsters get away with what they're doing, that harms all of us.  So that's not something you can turn off.

Q.    Is there a button end users can do to opt out of conversion and attribution?

A.    There is.  On Android it's called -- this was briefly mentioned, it's called OOOAP.  It stands for opt out of ads personalization.  It zeros out your AdId, your device ID.  On Apple, it's called LAT, limit ad tracking.  That zeros out the IDFA.

So, in essence, either of those, it's device level, it's not account level, unlike sWAA, and it disables conversion tracking based on device ID.  Obviously, there's different ways you could also still do conversion tracking.

Q.   Let's move on, sir, to your final opinion here.

Can you just explain to the jury, or summarize, I should say, your final opinion?

A.   Sure.

So I'm saying that Google does not profit from the sWAA-off data.  This is to say that measuring conversions, there's no charge for that step.  The charge in ad campaigns is made from, like, showing ads or getting a click on an ad; but measuring the conversion, which is saying, "Where is that user journey, where is it coming from," that's something that Google doesn't charge for.

Q.   Sir, did you do any work in this case to understand what other options there are in the market for apps to measure conversions if Google weren't able to do it?

A.   I did.  In my report I surveyed a number of different third-party services that do similar things that also do ad measure- -- conversion measurement or attribution, and there are plenty of other ones.  AppsFlyer's been mentioned. Kochava, I believe, was mentioned.  There are a bunch of other options.

Q.   Can you explain what's on this slide?

A.   Yeah.  This is AppsFlyer.  I think Mr. Ganem said this was the number one conversion measurement product out there.  It has advantages over Google.  It can -- it can work over more than just Google's network.  It can go over TikTok's network or

Meta's network.  And it uses a variety of techniques to do conversions.

And what I'm highlighting here is there's a third box that says, "Probabilistic modeling."  And for AppsFlyer, what that means is they're doing something in a privacy gray area, which is called fingerprinting.  So they're using, like, "I know your device ID" -- I'm sorry -- "I know your device model number, the language, the time zone, the other things about your device, and so I can build a profile to track you from what's called your fingerprint."  That's a no-no for Google, as, obviously, we've heard.  They do not do that.  There's a policy against it.

AppsFlyer is not quite as aggressive about protecting user privacy, so they do these things that are a little bit gray.

Q.   Okay.  And, finally, Professor Black, can you explain how the App Tracking Transparency regime that came in in 2021 on iPhones, how does that impact the measuring of conversions by Google?

A.   My understanding is many, if not nearly all, people will click on "Ask app not to track."  The ad industry was like, "We can't use IDFA anymore.  We have to use something else."

This is a picture of Apple's in-device conversion measurement for what's called SKAdNetwork.  There are other ways to do it.  Even if you can't use sWAA-off data to measure conversions, there are other techniques that are out there.

This is one example.

Q.   Since 2021, has Google been using the raw analytics data we've been talking about throughout this trial to measure conversions on iOS?

A.   I don't think so.  Sorry.

Q.   No.  And I should clarify my question.

My question -- a caveat to the question is if the user has asked the app not to track.

A.   Thank you.  Yeah, I needed that piece.

If there's no IDFA, then there's no way to track the device using the device ID because it's missing, so you can't measure conversions that way.

Q.   In that instance, is Google able to model conversions?

A.   Yeah.  They can use conversion modeling, which is a whole other topic.  But, briefly, you can build a model based on sWAA-on data -- and this is like machine learning, like ChatGPT kind of AI technology -- to tell you if you get a batch of sWAA-off data, roughly what percentage of those are conversions based on an ad campaign even though you don't know for sure.

Q.   Did Dr. Hochman identify any evidence that Google built these models with sWAA-off data?

A.   I've read his report several times.  I don't believe he provided any such evidence.

Q.   Okay.  And my final question, Professor Black:  Did you see any evidence in Dr. Hochman's report or anyone -- anywhere

else measuring the impact of Google Analytics on batteries and whether or not that impact is anything greater than minimal?

A.   No, I did not.

Q.   I have no further questions, sir.

A.   Thank you.

THE COURT:  Mr. Boies.

MR. DAVID BOIES:  Thank you, Your Honor.

### CROSS-EXAMINATION

BY MR. DAVID BOIES:

Q.   Good morning, Dr. Black.

A.   Good morning, sir.

Q.   We haven't met, but my name is David Boies.  You understand I represent the plaintiffs?

A.   I do.

Q.   Let me begin with what you were talking about in terms of conversions.

Is it your understanding that Google uses sWAA-off data for conversion purposes?

A.   In certain cases.  We just described an instance where it can't, but --

Q.   Where it can or can't?

A.   In certain cases it cannot, but in certain cases it can.

Q.   Okay.  Now, just to orient ourselves, because we're using a lot of acronyms here, I'll put up our Demonstrative Exhibit Number 1.

We've been talking about sWAA as a user's third-party Web & App Activity.  Is that the way you understand sWAA?

A.   Only because of this lawsuit.  I never heard the word. That's an internal Google term.

Q.   But in terms of your work, do you understand that that is the way Google uses it?

A.   Correct.

Q.   Okay.  And sWAA data is data from a user's third-party Web & App Activity, correct, as Google uses the term?

A.   I don't know that I've heard "sWAA data."  I've heard "sWAA-on data" and "sWAA-off data."

Q.   Okay.

A.   Maybe -- you can pull them together maybe.

Q.   Yes.  I would have thought sWAA data was sWAA off and sWAA on combined; but if you don't know that, we'll go on.

SWAA-off data is data from a user's third-party Web & App Activity and it's collected while the sWAA control is off; fair?

A.   Agreed.

Q.   Okay.  Now, you understand, and I think we're in agreement, that whether sWAA is on or off, Google initially collects and copies the same data from a person's use of third-party apps; correct?

A.   The same data is transmitted from the app regardless of whether sWAA is on or off and it's sent to Google.

**Q.**   Sent to Google.  And when it comes in, Google makes a copy of that; correct, sir?

**A.**   I mean, I said on direct, technically, when it moves data, that does create a copy.

**Q.**   It does make a copy?

**A.**   It's inherent in how computers operate, so yes.

**Q.**   And that initial copy has all of the personal identifiers in it; correct?

**A.**   Could you clarify "personal identifiers"?

**Q.**   In your work, did you talk with Google about personal identifiers?

**A.**   Would you include counsel when you say I spoke to Google?

**Q.**   Well, let's talk about Google other than their counsel first.

**A.**   Okay.  I spoke only to Mr. Ganem prior to writing my report.

**Q.**   Okay.

         **MR. DAVID BOIES:**  Now, perhaps we can put up, just for the witness, Mr. Ganem's testimony at 1206, lines 13 to 16. Let's make it 13 to 20.

**BY MR. DAVID BOIES:**

**Q.**   Now, you see here, where Mr. Ganem testifies [as read]:

         **"QUESTION:**  When Google first receives the sWAA-off data
         from the app" --

         **MR. SANTACANA:**  Objection, Your Honor.  He's reading

trial testimony in the record.  It's not the same as refreshing recollection.

MR. DAVID BOIES:  I'm not refreshing his recollection. I'm directing the witness's attention to an admission by Mr. Ganem, who he said he relied on for this.

MR. SANTACANA:  I don't think it's appropriate to read trial testimony in the record.

THE COURT:  I actually think Mr. Santacana is right. You can't just read in trial testimony.  If -- I'm not sure why you need this.  Are you -- what are you asking?  Try another question.

MR. DAVID BOIES:  Sure.

BY MR. DAVID BOIES:

Q.   Let me try it this way:  Did Mr. Ganem tell you that when Google first receives sWAA-off data from the app, whatever it is, it has all the personal identifiers in it?  Did he tell you that?

A.   I mean, our conversation was years ago.  I don't recall if he used those words or close to those words.

Q.   Do you understand, whether Mr. Ganem told you that or not, that that is a fact; that when Google first receives sWAA-off data from the app, it has all the personal identifiers in it?

A.   If Mr. Ganem said exactly that, I would ask him to clarify because I don't know what it means to just say "personal identifiers."

**Q.**   Let me ask you this:  How do you define "personal identifiers"?

**A.**   Once again, it would heavily depend on context; and if used out of the blue, I would ask for a clarification:  Do you mean a personally identifying identifier, or do you mean a pseudonymous identifier?  That's important.

**Q.**   Well, do you understand -- or let me ask you this:  Do you consider a device ID to be a personal identifier?

**A.**   It's a device identifier.  It identifies the device but not the human being who owns that device.

**Q.**   Do you understand or believe that by identifying a person's device, you're identifying, in many cases, the person?

**A.**   I don't think so.  If I gave you my device ID right now, you wouldn't know it was John Black.

**Q.**   I might not know it, but I could get somebody to figure that out, couldn't I, sir?  I can buy that from -- on the -- online; correct?

**A.**   Not from Google.

**Q.**   No, not from Google.  But you can go online and you can -- from a data broker, you can get people's email addresses if you give them the device ID; correct, sir?

          **MR. SANTACANA:**  Objection. Lacks foundation.  Outside scope of the direct.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I'm aware, in my work, there's some

shady people out there that will collect information on you and sometimes can correlate those two together.  It's not something Google would ever do obviously, but there are people who are less ethical than Google.

**BY MR. DAVID BOIES:**

Q.    Okay.  Now, you're also aware that Google knows what devices its users are using; correct?

A.    When you say "what device," do you mean the ID, or do you mean the model number?

Q.    The device ID.  That is, Google knows, for every one of its account holders, what the device ID is that those users are using; correct?

A.    Not always.  As I explained in my direct, in cases, there is no device ID sent.  In case it's sent, then Google would receive it.

Q.    My question was a little different.  I'm not talking about whether the device ID is in the app data that is sent.  I'm just talking generally.

Google knows what the devices are -- the device IDs are for each one of its account holders; correct?

A.    So, sir, you're suggesting within the Google Account, there is a device ID stored alongside the user's identity?

Q.    Yes.

A.    No.  They have a policy of divorcing the identity from the device ID.

**Q.** When you say they have a policy of divorcing it, you don't mean that they don't have a table that connects it, do you, sir?

**A.** I'm not aware of any table that, alongside the GAIA, lists the device ID.

**Q.** You're not aware of that at all?

**A.** I haven't been shown any evidence where that's the case.

**MR. DAVID BOIES:** Can somebody try to find Ganem's deposition testimony? See if we can put this to the witness.

**BY MR. DAVID BOIES:**

**Q.** Let me see if I can get something that can refresh your recollection.

In the meantime, just as background, back in June you prepared a number of charts, correct, for your testimony?

**A.** I don't recall. Back in June, you're asking?

**Q.** June of this year.

**A.** I prepared a number of charts in this lawsuit.

**Q.** Yes, sir. And gave -- and they were presented to us. Do you recall that?

**A.** I'm sorry, I don't. It was a number of months ago, and I work all the time.

**Q.** Well, do you recall that just in the last week or ten days, you prepared a set of charts that were given to us?

**A.** Maybe the word "chart" is the trouble we're having.

**Q.** A slide, the kinds of demonstratives that you were using

here.

**A.**   I've prepared slides, absolutely.

**Q.**   Okay.  And in those slides that were prepared like a week or ten days ago, you said you had five opinions; correct?

**A.**   Oh, you're asking me about a draft of my presentation?  Is that where -- are we on the same page now?

**Q.**   I don't know whether it was a draft or whether it was your presentation.  I simply know what we were given, representing them to be your charts that you were going to use.

**A.**   I think "charts" is the place where we're crossing --

**Q.**   Or slides.  Is "slides" a better term?

**A.**   I think now I understand what you're asking.

**Q.**   Okay.  So the slides that we got a week or ten days ago had five opinions that you were going to testify to; correct?

**A.**   I think in a draft of my presentation, there was a point at which I had listed five opinions.

**Q.**   Okay.  And those -- those slides that set out your opinions, those have changed; correct?  You're not -- you are no longer offering those five opinions; is that fair?

**A.**   I'm sorry.  I don't remember what the five were and whether I just collapsed them or decided not to offer them to the jury in some cases.  There may be some overlap.

        **MR. DAVID BOIES:**  Can we put up, just to the witness, his Demonstrative Number 10 that we got recently?

\\\

**BY MR. DAVID BOIES:**

Q.   Do you recall that?  This was the summary of your opinions that we were given --

A.   No, sir.

Q.   -- that you prepared?

A.   This says Mr. Hochman on it.

Q.   It should be the next chart.  This is Number 9.  It should be Number 10.

Do you recall that this is the slide that you prepared to be given to us as the summary of your opinions a week, ten days ago?

A.   I think this looks right.

Q.   Okay.

Now, okay, let me show you pages 69 and 70 of Mr. Ganem's deposition, and go to line -- start at line 17 of 69.

Now, would you just read that -- well, let me just point you to -- let me point you to lines 23 and 24.

You see where Mr. Ganem refers to a table that associates their IDFA with GAIA?

A.   I do.

Q.   And IDFA is a device ID; correct?

A.   For Apple, yes.

Q.   And GAIA would be the user ID; correct?

A.   The Google user ID.

Q.   And so he's referring here to a table that associates

their IDFA with GAIA; correct?

**A.**   Correct.

**Q.**   Until I showed you this, you were not aware of that table?

**A.**   I was.  This is a long time ago.  I mean, Google did this a long time ago.  This is in my report.  They've stopped the practice because it's not pro privacy.

**Q.**   When did they stop that practice, according to you?

**A.**   I believe right around iOS 14, is my recollection.  It's not present in my memory.  A few years ago.  Maybe five or -- years ago or something.

**Q.**   But it hadn't stopped as of the time of Mr. Ganem's deposition; correct?  Because he's talking about what happened at that time, the date of the deposition.

       **MR. DAVID BOIES:**  When was the deposition?

**BY MR. DAVID BOIES:**

**Q.**   This was October 28th, 2022.

**A.**   I'm hesitant to characterize Mr. Ganem's testimony.  I don't know the exact, but he seems to be speaking in the present tense.  I just -- my recollection is that they discontinued that table prior to this date, but I don't remember.

**Q.**   But you really don't know?

**A.**   I would have to check my report.

**Q.**   Okay.  And in your report, you say when they terminated the table?

**A.**    I believe I note that they, in the past, had this table and then they terminated it.

**Q.**    And what I'm saying is, you say that.  That's in your report?

**A.**    My recollection is that I do talk about this table in my report and its termination.

**Q.**    Okay.  Well, perhaps your counsel will pull that out if we have a chance to do that.

Now, in terms of use that Google makes, you had a chart which you said Google doesn't profit from this data.  Do you recall that?

**A.**    A slide, yes.

**Q.**    A slide.

**A.**    Right.

**Q.**    I apologize.

**A.**    I'm with you now, though, on the "chart" word.

**Q.**    We've got the terminology right.

Now, you don't dispute that this sWAA-off data is used for conversion purposes, do you?

**A.**    In some cases, as I mentioned.

**Q.**    And what is the value to Google of using that for conversion purposes?

**A.**    The way you asked it, it sounds like I'm supposed to say what the value to Google is?  I mean, I can say from a technology -- from a technical standpoint, that it's helpful to

advertisers to learn where their spend is effective, and Google provides assistance in measuring that effectiveness of their ad campaigns by using that data.

Q.   But you said that -- in your testimony that Google didn't profit from the sWAA-off data.  Do you recall that?

A.   Yes.

Q.   Okay.  Now, if Google is using sWAA-off data, as you just said they were, for conversion purposes, they're profiting from it; correct?

A.   I mean, they don't get paid for doing it, but you maybe could argue that they provide a benefit that, at some downstream point, it's helpful because making good products is helpful.

Q.   When you say they don't get paid for that, did you talk to Mr. Ganem about that?

A.   Doubtful.  He's CEO of analytics, and probably Ms. Langner would be the authority there, who I didn't speak to but I read her deposition.

        MR. DAVID BOIES:  Let me see if I can -- let me show the witness Mr. Ganem's testimony at page 1211, lines 19 to 22.

BY MR. DAVID BOIES:

Q.   You were here during Mr. Ganem's testimony; correct?

A.   Yes.

Q.   And did you hear him testify that as the term --

        MR. SANTACANA:  Objection, Your Honor.  We're reading

the trial transcript again.

THE COURT:  I'm not sure you need to just ask him about what Ganem testified.  Why don't you just ask him the question?  And then if he needs to be refreshed with that testimony, you can try to refresh his recollection.

MR. DAVID BOIES:  Okay.

BY MR. DAVID BOIES:

Q.   Do you recall that at trial, when you were here, Mr. Ganem testified that advertisers paid more money because an ad resulted in a conversion?

A.   I don't recall him saying they were paid more money based on that.

Q.   Okay.  Now, would you look at lines 10 to 12 on page 1211.  And does this refresh your recollection that as the term "conversions," as used within Google, applied to advertising, there are instances --

MR. SANTACANA:  Objection, Your Honor.  He's reading it again.

THE COURT:  Well, he's not reading it right now.  Does that refresh your recollection or not with respect to the question that he asked you?

THE WITNESS:  I think if we could start over, that would be helpful.

BY MR. DAVID BOIES:

Q.   Sure.

I asked you whether you recall him testifying that there were instances where advertisers paid more money if there was a conversion.  Do you recall that?

A.    Yeah.  It's, in fact, what I --

Q.    You said you didn't remember that.

A.    -- what I said a minute ago.

Q.    And you didn't remember that?  You so told me.

A.    The way you characterized it sounds different from what Mr. Ganem said.

Q.    What is different?

A.    Whether an advertiser pays for a conversion is different from they pay more money because they believe that their ad has resulted in a conversion.

Q.    Well, he didn't say "believes."  He said -- "believe" is nowhere here; correct?

        THE COURT:  What he said isn't really the issue here. He testified.  The jury heard him.  I don't know why -- if you want to find what this witness thinks about these issues, that's fine.  But, you know, just reading him Ganem's testimony is not useful.

BY MR. DAVID BOIES:

Q.    Well, let me ask you this:  Do you remember him testifying that one of the benefits of proving conversion or establishing a conversion was that Google would get more advertising dollars?  Do you recall him saying that?

**A.**   I don't, but I would agree.

**Q.**   Okay.  You'd agree with that?

**A.**   Broadly, yes.

**Q.**   And do you also agree that in order to get a conversion, you need to link up two events?  You need to link up the ad, and you need to link it up to the conversion event; correct?

**A.**   Well, no, because we've heard other ways.  That's one way to do it, though.

**Q.**   And when you talk about the other ways, you're talking about modeling; is that right?  Machine learning and the like?

**A.**   And there are several others, including Apple's technique that we reviewed briefly.

**Q.**   And in order to do these conversions, the sWAA-off data is used; correct?

**A.**   Once again, sometimes, not -- when we do the modeling, it's not; but in certain cases, it is used.

**Q.**   Well, when you say in the modeling, it's not, to begin with, the first event is the clicking of the ad or something like that; correct?

**A.**   It depends on the campaign type.  Sometimes it's just presenting the ad.  That's different from requiring clicks. Advertisers can pay for different kinds of ad campaigns.

**Q.**   And sometimes they pay on a cost per action; correct, CPA?

**A.**   Correct.

**Q.**   And you didn't know what CPA was at the time of your

deposition, but you've since looked that up; correct?

A.   We had about an hour back and forth where I was unclear what I was being asked about CPA.  That did clarify eventually.

Q.   All right.  And a CPA is where an advertiser pays for a particular action.  The "A" in CPA is action; correct, sir?

A.   That's correct.

Q.   And an action, as it's used in Google, is the same as what we've been talking about as a conversion; correct, sir?

A.   For CPA, the action would be the conversion.

Q.   Okay.  And you know that sometimes advertisers pay per CPA; correct?

A.   That's correct.

Q.   So what they are doing is they are paying for a particular conversion; correct?

A.   Like an install of an app or something like that.

Q.   Okay.  And in order to get those payments, Google has to convince the advertiser that there has been this action or conversion; correct?

A.   I'm not sure if they have to convince.  They need to do the proper accounting in order to validate the billing.

Q.   Right.  They have to validate their billing; correct?

A.   I think that's their responsibility, yes.

Q.   And one of the ways they do that is to use sWAA-off data sometimes; correct?

A.   I think in the example you're giving, which is a CPA, then

it's between AdMob, the click ID, and the Play Store, the

Google Play Store, which provides or refer to the Ad Network

and then posts back, but there's no Google Analytics involved

in this -- in this situation you're describing, there's no

sWAA-off data.

Q.   Are you saying that they can prove -- first, in a sWAA-off

instance, they can prove the conversion without using the

sWAA-off data?

A.   The measurement of -- the conversion measurement could use

sWAA-off data in the advertiser's app, but the install that's

paid for is being done via a different stream of interactions

that's not related to analytics or sWAA-off data.

Q.   Leave analytics aside.  We're talking about the sWAA-off

data.  That is predominantly done based on the device

identification; correct?

A.   In some instances, it's using the device ID.

Q.   Well, that's the primary way it's done; correct?

A.   I don't know that I have a -- I've done a survey on the

preponderance of one method over another.

Q.   Do you have a view on that one way or the other?  Have you

done a study on that?  Have you done an analysis?  Have you

come up with something that you have confidence in?

A.   I have a sense of it, but I haven't done a study.

Q.   Okay.  Did you listen to Mr. Ganem's testimony about that?

A.   I did.

Q.   And do you recall what he said?

A.   I'm not recalling the details just now.

Q.   Now, you testified that Google does not reidentify people; correct?

A.   I said there's no -- I've seen no evidence that they reidentify people.

Q.   You've seen no evidence of that.

The -- you don't have any doubt that Google could reidentify people if they wanted to?

A.   I think, as Mr. Ganem said, if they redesigned their systems and changed their policies and became essentially a different company, they absolutely could.

Q.   By being a different company, you mean they would redesign their systems and policies?  Is that what you're saying?

A.   Yeah, they'd have to reinvent themselves to engage in that practice.

Q.   They wouldn't have to reinvent themselves.  They'd just have to change their policies and the design of their systems; correct, sir?

A.   Well, I was going to say and the culture, but I can't really testify about their culture.

Q.   Okay.  Now, does Google use or have the capacity to use machine learning to reidentify de-identified data?

A.   You mean in the present system or if they redesign their systems.

Q.   In the present day, if Google wanted to, they could use machine learning to reidentify users for the data that they have; correct, sir?

A.   Potentially.  They'd have to also somehow keep the encryption keys that are rotating and -- and they'd have to violate their policies, obviously, to overcome the anti-fingerprinting stuff, but maybe.

Q.   You mentioned fingerprinting a couple of times.  Is it your testimony that Google did not do fingerprinting during the class period?

A.   I've seen limited evidence on this, but what I have seen is they have a policy forbidding fingerprinting techniques from identifying a device or a user.

Q.   I'm sorry.  Say that again, sir.

A.   My understanding -- I've seen limited evidence, but what I have seen is they have policies forbidding the use of that technique to identify a device or a user.

Q.   First, did they do fingerprinting during the class period?

A.   Just to be clear, you don't mean scanning someone's fingerprint.  We're talking about this general technique of trying to track someone using metadata?

Q.   Yes.  I'm talking about fingerprinting in the sense you were using fingerprinting.

     And fingerprinting is using a variety of data to try to figure out who somebody is when you don't know who they are;

fair?

**A.**   Or a device.

**Q.**   Or the device.

**A.**   Fair.

**Q.**   And did Google use fingerprinting during this class period?

**A.**   Once again, the evidence I've seen forbids it.  I haven't seen evidence that they've done it.

**Q.**   Have you seen any -- you've not seen any evidence that they use fingerprinting; is that right?

**A.**   Not to my recollection.

**Q.**   Have you seen any evidence that Google is planning to do fingerprinting in the future?

        **MR. SANTACANA:**  Objection.  Relevance.  Vague as well.

        **THE COURT:**  What was the second?

        **MR. SANTACANA:**  It's also vague, sir, as to the sWAA off/sWAA on.

        **THE COURT:**  Well, he can answer the question if he knows.

    Go ahead.

        **THE WITNESS:**  I'm sorry.  Could you repeat it, Mr. Boies?

**BY MR. DAVID BOIES:**

**Q.**   Yes.

    You said Google doesn't do fingerprinting.  Have you seen

anything that indicates Google is going to do fingerprinting?

A.    Just to be careful, I didn't say Google has never done fingerprinting.

Q.    Oh, okay.

A.    I said I've seen no evidence, and I've only seen evidence proscribing the use of that technique.

Q.    Thank you for the clarification.

Now, have you seen any evidence that Google is planning to do fingerprinting?

A.    I don't recall ever seeing such evidence.

Q.    Let me show you a document which hasn't been marked as an exhibit yet.

MR. DAVID BOIES:    What's our next exhibit?    Anybody know?

But that, I will hand to counsel.

BY MR. DAVID BOIES:

Q.    And this is just to try to refresh your recollection, sir.

I think that's got my thing on.

Did you see this article, sir?

A.    I don't recall ever seeing this before.

Q.    So this doesn't refresh your recollection; is that right?

A.    You say "refresh"?    This is February 2025.    You're asking me if I just organically ran across it at that time?

Q.    Or later or anybody brought it to your attention.

A.    I read a lot of articles, but I don't remember this one.

**Q.**   Do you know the author of this article?

         **MR. SANTACANA:**  Objection, Your Honor.

         **THE COURT:**  I think the question was whether or not --
this is an item that's been shown to you.  The question was if
you had ever seen anything about prospective fingerprinting.

    Does this -- take a look at it.  Does this refresh your
recollection or not?  If it doesn't, that's the answer.  We'll
move on.

         **THE WITNESS:**  I don't know the author.

**BY MR. DAVID BOIES:**

**Q.**   Okay.  Now, are you familiar with quasi-identifiers?

**A.**   Quasi-identifiers?  Sure.  I mean, it's a very vague term,
but I can imagine what you might mean.

**Q.**   Well, is that a term you're familiar with?

**A.**   If someone used it, I'd ask, "What do you mean?"  But
I think I've heard people use it.

**Q.**   You've heard people use it?

**A.**   I think.

**Q.**   And when you've heard people use it, have you had an
understanding of what it means?

**A.**   If I was given the proper context, I might.

**Q.**   Is it a way to reidentify people?

**A.**   It's not an algorithm, so I wouldn't say it's a way of
doing anything.

**Q.**   Is it a process of reidentifying people?

A.    I don't think of a quasi-identifier as a process, no.

Q.    Does it have anything to do, in your mind, with reidentifying people?

A.    Well, there, I can say yes.  I think, once again, we're just using different words.

Q.    I don't want to get hung up on words.  I'm just trying to get your testimony.

And is this -- does this have anything to do with reidentifying people, as far as you know?

A.    It would depend on the context.  If it's used in this article, I'd read the article and then I could probably give you a better answer.

Q.    Without reading the article, and I don't even know that that's used in the article, do you -- as you sit here now on the stand, as an expert for Google, does that have anything to do with enabling reidentification?

A.    It would depend on the context.  I can imagine different contexts where it would or wouldn't.

Q.    You can imagine contexts where it would?

A.    Where it would?

Q.    Where it would.

A.    Yes.

Q.    What are those contexts?

A.    If someone's talking about an identifier that is maybe not immediately linked to an identity but with enough diligence

maybe it's not too hard to link it to an identity, it lives in sort of a gray area between pseudonymous and an explicit identifier.

Q.   And does pattern recognition have anything to do with reidentifying people?

A.   Sure.  Fingerprinting is one form of pattern recognition, in fact.

Q.   And there are other forms of pattern recognition; correct?

A.   Sure.  Fingerprint scanners are pattern recognizers.

Q.   And have you come across, in your work, the term "mosaic" in terms of reidentifying people?

A.   Maybe there's a product called Mosaic that I've heard of. I'm not sure -- I can't recall.

Q.   You haven't seen that in -- within Google?

A.   Something called Mosaic within Google?

Q.   Yeah.

A.   I don't think I've heard of that.

Q.   Okay.  By the way, do you use Gemini?

A.   Very carefully.

Q.   Did you ever think about asking Gemini whether Google could reidentify people at a --

        MR. SANTACANA:  Objection.  Relevance and 403.

        THE COURT:  What's your response to that?

        MR. DAVID BOIES:  I'm just inquiring whether he's done it, Your Honor.  I think that --

THE COURT:  How about the relevance issue?

MR. DAVID BOIES:  Well, relevance is Google Gemini --

THE COURT:  Well, we need to take a break, so why don't I let the jury go, and then you can explain this to me.

Members of the jury, remember my admonitions not to discuss this amongst yourselves or with anyone else, and we'll be back in 15 minutes.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  All right.  We're out of the presence of the jury.

What is this about?

MR. DAVID BOIES:  Well, Gemini, you know, talks about all the ways that they can reidentify -- talks about all the ways that Google can reidentify people.

THE COURT:  What is Gemini?

MR. DAVID BOIES:  Gemini is their AI.  Gemini is --

THE COURT:  Google's AI?

MR. DAVID BOIES:  Yeah.

THE COURT:  Can you just step down for a moment? Thank you.

MR. DAVID BOIES:  Gemini is the Google artificial intelligence thing.  It's like ChatGPT but it's from Google.

THE COURT:  All right.

MR. DAVID BOIES:  And that would be an easy way for anybody who really wanted to find out whether they could

reidentify.

He's testified -- you know, the witness has testified the way he has about identification and reidentification.

THE COURT:  Right.

MR. DAVID BOIES:  And he has, you know, testified --

THE COURT:  You're asking the theoretical question of whether or not you could use Gemini to reidentify people?

MR. DAVID BOIES:  That's one thing, and also what Gemini says about the ease of reidentification.

THE COURT:  Well, okay.

Mr. Santacana.

MR. SANTACANA:  Your Honor, I think you can understand where he's headed.  If you look at what was put in my binder, I think it was put in yours in the opening flap, is Exhibit 49.

We don't stipulate to the authenticity of this, but it looks like somebody typed into Gemini a question about what Google can and can't do with its technology, and they want to admit its response into this trial.

Now, I don't know if this has ever been done, but I don't think this should be the first time.  I have an authenticity objection, a 403 objection, a relevance objection.  It's a chatbot.  It's not evidence.

THE COURT:  You can ask him -- because he's gone into the question of how difficult it is or impossible to reidentify, and you can ask him whether or not -- you can probe

that and say, "Could you do it by this way or this way?" That's okay.

But you're not going to start introducing a whole line of inquiry about AI and what AI might be able to do someday. That, you're not going to do.

So but if you just -- you know, you can ask -- what's wrong with him asking whether or not this Google product could theoretically reidentify somebody?

MR. SANTACANA:  I don't have an objection to that, Your Honor.  It's not in their opening report, and I assume -- I don't know if he's in the room --

THE COURT:  Well, but he's kind of probing something he did testify about --

MR. SANTACANA:  Yeah.

THE COURT:  -- which is the difficulty of reidentification.

MR. SANTACANA:  Yeah, I don't have an objection to him asking that question.  Obviously, this is post-class period, but Your Honor overruled an earlier objection on that.

THE COURT:  Okay.

MR. DAVID BOIES:  And perhaps we --

THE COURT:  But we're not going to -- don't even try me on --

MR. DAVID BOIES:  Yes, sir.  We will leave to another day whether that's a party admission.

**THE COURT:**  Okay.  Well, we don't have any other days.

So I've just gotten a binder with a lot of stuff in it.  I am really counting on us being able to conclude all evidence today.

**MR. DAVID BOIES:**  We will do that, Your Honor.

**THE COURT:**  Right?

**MR. SANTACANA:**  Yes, as far as I'm concerned.

**THE COURT:**  I mean, because otherwise we're going to have closing arguments on Tuesday; and I think, for everybody, it's better not to have, like, an hour or 45 minutes of testimony and then go into closing.  So let's really try to --

**MR. SANTACANA:**  We have no more evidence.

**THE COURT:**  -- to clean it -- okay.

Good.  Thank you.

**MR. DAVID BOIES:**  Thank you.

(Recess taken at 12:07 p.m.)

(Proceedings resumed at 12:21 p.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  Okay.

**MR. SANTACANA:**  Good afternoon, Your Honor.

**THE COURT:**  We're outside the presence of the jury.

**MR. SANTACANA:**  Your Honor, I would like to raise one more issue with respect to Gemini.  If I could just have a moment.

We've consulted with our client and other counsel, and we

have a serious objection to the line of questioning on 403 grounds.

We're here at the end of this trial.  Gemini and AI have never come up.  There's no evidence about it, and my concern -- our collective serious concern is that Mr. Boies' line of questioning is designed to invite members of the jury to ask Google's chatbot about what's going on in this case.

There was already one question about what could be queried of the chatbot, and an exhibit in your binder is a query that the plaintiffs put in that says, "Could Google reidentify data using machine learning?"  And they apparently intended to admit that into evidence.  The response of this chatbot, which we all know, like ChatGPT, are prone to all kinds of things that are not reliable.

So my request, Your Honor, is that Mr. Boies be ordered to move on.  It's not relevant.  It's post-class period.  It's prejudicial, and it may invite the jury to do things they shouldn't be doing.

He can prove his points in a variety of ways if he'd like, but not in a way that invites members, people who -- I mean, we've all talked about AI for two years, people who may be tempted to take his advice and actually ask Gemini what they apparently wanted to put into evidence.

**MR. DAVID BOIES:**  I think I can move on, Your Honor.

**THE COURT:**  Very good.  That takes care of that.

Thank you.

Yeah, I think it's a good -- it's a good decision on your part.

MR. DAVID BOIES:  Okay.

MR. SANTACANA:  Thank you, Your Honor.

THE COURT:  All right.  Let's bring in the jury.

MR. DAVID BOIES:  Someday I do want to bring it in as an admission.

THE COURT:  I admire your efforts.

(Proceedings were heard in the presence of the jury.)

THE COURT:  The jury is present.

Mr. Boies.

MR. DAVID BOIES:  Thank you, Your Honor.

BY MR. DAVID BOIES:

Q.   Let me try and move through this as quickly as I can.

First, you talked about Exhibit 442.  Do you recall that?

A.   The UUAD log, yes.

Q.   And you described that as showing sWAA-on data.  Do you recall that?

A.   Correct.

Q.   Now, that was data that was collected from the plaintiffs; correct?

A.   It was collected from Google corresponding to the plaintiffs.

Q.   That is, it is Google's collection of data from the

plaintiffs?

**A.**   I'm just troubled by the wording "from the plaintiffs." It sounds like it's coming from the plaintiffs.  It's coming from Google corresponding to the plaintiffs.

**Q.**   Google collected this data from the plaintiffs' devices and then, during this lawsuit, gave it to us; correct?

**A.**   It was sent to Google.  I suppose you could say it was collected by Google, and then it was produced in the lawsuit.

**Q.**   Right.

And do you understand that the data that Google collected with respect to our plaintiffs' use of third-party apps was data collected when the plaintiffs had sWAA turned off?

**A.**   Sometimes.  Mr. Rodriguez had 12 email accounts, and he testified that he would toggle sWAA on and off.  So I think we have a mixture of sWAA-on and sWAA-off data in the record.

**Q.**   The data that was in 442, that was sWAA-off data, was it not, sir?

**A.**   I believe it's sWAA-on data, not sWAA-off.

**Q.**   And you think that was -- you think the plaintiffs had sWAA on when that data was being collected by Google initially?

**A.**   That's what plaintiffs testified to, that they occasionally would have sWAA on on certain email logins on the same device.

**Q.**   Which plaintiffs do you think had sWAA on when 442 data was being collected?

**A.**    Mr. Rodriguez.

**Q.**    Mr. Rodriguez?

**A.**    Yes, sir.

**Q.**    And do you know when this data was collected?

**A.**    2022-ish time frame is my recollection.

**Q.**    It was only collected over like a one-and-a-half-month period or one-month or two-month period; correct?

**A.**    That's true of the big exhibit.  I think this one might have been a shorter -- you're testing my memory.  I think this was a shorter time span.

**Q.**    Now, during that time span, Mr. Rodriguez had his sWAA-off button off -- either WAA or sWAA, he had one of those two off during the period that the data was collected; correct, sir?

**A.**    He had 12 accounts.  Each one could have a different setting.

**Q.**    Could have but it didn't, did it?

**A.**    Are you representing that on all 12 accounts, he had sWAA off?

**Q.**    What I'm saying is during the period of time that the data was collected, he had -- there was no data being collected from Mr. Rodriguez' -- any Rodriguez device that had sWAA on.  Do you agree with that, sir?

**A.**    I think the presence of data in UUAD shows that that's not true.

**Q.**    And that's because there is data that shouldn't be there

if sWAA was off; correct?

A.   If sWAA is off for a given account, it would not be in that log.

Q.   Let's just be absolutely clear.

In 442, there is data that should not be there if sWAA was off; correct?

A.   It would not be there if sWAA was off.

Q.   Okay.  Now -- and are you referring -- are you inferring that because the data is there, sWAA must have been on?

A.   Once again, as I testified on direct, I'm relying on Google engineers who said that this would be collected only if sWAA is on.

Q.   You're relying on Google engineers that said the data was only collected when sWAA was off?

A.   No, sir.  Data in that log is only collected if the corresponding account logged into that device has sWAA on.

Q.   Okay.  So let me just be sure I understand what you're saying.

You have this Exhibit 442.  It's got data that you believe would not be there except for the fact sWAA was on; correct?

A.   That's my opinion, sir, yes.

Q.   And -- but you don't know or have any information about whether the plaintiffs had sWAA turned on or off during the period the data was collected; correct?

A.   I only have Mr. Rodriguez's testimony to go on, but he

didn't testify, "On this date, at this time, I toggled this way," so I don't have that granularity of testimony.

Q.   So you don't know, one way or another, whether this is a sWAA-on or a sWAA-off log, except for inferring that it must be sWAA on because there's sWAA-on data in there; correct?

A.   No.  I said I'm relying on Google engineers who described the function of that log.  That's not an inference.

Q.   And what -- and the Google engineers that you're relying on, did they describe that as a sWAA-on log or a sWAA-off log?

A.   SWAA on.

Q.   What Google engineers described -- this is a UUAD log; correct?

A.   Yes, sir.

Q.   And what Google engineers described the UUAD log as being a sWAA on?

A.   That would be in my report.  I read many deposition transcripts.  I don't recall which engineers confirmed that.

Q.   Were you here -- let me show you a chart that you didn't use today, but my understanding is it's a chart you prepared.

     MR. DAVID BOIES:  Could you show the jury -- not the jury -- to the witness Chart Number 60 from the production last June?

BY MR. DAVID BOIES:

Q.   Did you prepare this chart, sir?

A.   I believe so.

Q.    Okay.  And you say there [as read]:

             "To personalize advertising for a pseudonymous
      user profile, Google uses UUAD."

      Do you see that?

A.    I do see that.

Q.    And that would be where sWAA was off; correct?  Because
it's a pseudonymous user; correct?

A.    If -- if they're logged out, which is yet a different
dimension of all this.

Q.    But this would not be a sWAA-on situation; correct, sir?

A.    This is -- this would be when Google doesn't know the sWAA
status because the user is not logged in.

Q.    Right.

      So what I'm asking you, is it still your testimony that
the UUAD is a sWAA-on log?

A.    That's correct.  Using the log is not the same as storing
information in the log.  Right?

Q.    But you wouldn't store the information -- what -- are you
saying that the UUAD is a log that stores only sWAA-on data?

A.    That's correct, yes.

Q.    And tell me again who told you that.

A.    I can't remember the names off the top of my head.  I'd
have to look at my report.

Q.    These are not people who testified here in court?

A.    I don't know.  I don't think so.  There are probably ten

depositions or more that I reviewed, and some of the engineers did not appear here.

Q.   Did you hear any testimony at all in this case that suggested that UUAD was a log that only stored sWAA-on data?

A.   I think everything I heard was consistent with that, except perhaps with the exception of Dr. Hochman.

Q.   Did you ever, in your analysis, look at the UUAD data yourself personally?

A.   Yes.

Q.   Okay.  And was all of the stuff that you saw there consistent with it being a solely sWAA-on log?

A.   Yes.

Q.   If it is a sWAA-on log -- and sWAA on has personalized data in it; correct?

A.   Not necessarily.  sWAA off doesn't have personalized data is the more important point.

Q.   But the sWAA on is designed to have personalized data; correct, sir?

A.   SWAA on, that issue is immaterial; right?  Because --

Q.   That's not my question.

SWAA on is designed -- I think the jury has heard a number of times that sWAA on was designed to allow people to personalize things.  Is that consistent with your understanding?

A.   With all respect, the question doesn't make sense the way

that you phrased it.

Q.   Okay.  I think I will leave it at that, sir.

Well, maybe just one more question.

How much of the data that was collected from our plaintiffs and produced to us by Google, during that period of time that they produced data to us, was sWAA-on data?

A.   Very little.  The vast majority was sWAA off.

Q.   And was it your understanding that 442 was designed to be a representative sample of all the data that was collected?

A.   I believe it was the entirety of that data for the time frame for Mr. Rodriguez.

Q.   And if that is true, if that's the entirety of the data in 442, and if almost all of the time they had sWAA off, then most of the data in 442 is going to be sWAA-off data; correct, sir?

A.   442 is quite short.  There's not much there.

Q.   Now, sir, this data was, as you know, collected in 2021 and you participated in it; correct?

A.   I did not participate in the collection, no.

Q.   You didn't?

A.   No, sir.

Q.   Do you know when it was collected?

A.   It's time stamped -- well, there are several different collection periods.

Q.   Yep.

A.   The large one that we've been talking about was October to

December of 2021, but I didn't participate in that process.

**Q.**   Okay.  Now, you said -- you said that Mr. Rodriguez toggled his things on and off.  Do you recall that?

**A.**   Yes.

**Q.**   Okay.  Let me ask -- and he had -- as you say, he had a number of accounts.

Let me show you and the jury a document that I believe is in evidence as Google Exhibit 941.R2.

And this is a status of Mr. Rodriguez's accounts; correct?

**A.**   I mean, it's partially that.  Two of the accounts seem to be here.

**Q.**   It shows -- it shows when Mr. Rodriguez had sWAA on or off; correct, sir?

**A.**   For these two accounts, on the dates listed, yes.

**Q.**   Well, it's not just these two accounts.  It's --

        **MR. DAVID BOIES:**  Let me hand up a copy of the document.

You've probably got this, but...

        **MR. SANTACANA:**  Thank you.

**BY MR. DAVID BOIES:**

**Q.**   Now, this shows Mr. Rodriguez' account.  The first account is Thefightingbunny account.  Do you see that?

**A.**   Yes.

**Q.**   Now, that account was off in 2021.  SWAA was off; correct?

**A.**   Assuming this is a complete record, then it looks like

2019 onward, it would have been paused, which means off.

Q.   Yeah.  And this -- you were here when this exhibit was introduced by Google's counsel; correct, sir?

A.   I believe I was here, yes.

Q.   Okay.  And there wasn't any suggestion by them that this was not a complete and accurate depiction; right?

A.   I don't recall any such suggestion.

Q.   Okay.  Now let's go to the next one, Peteysake.  Okay? That was off in July -- it was off the entirety of 2021; correct?

A.   I think the UUAD log is 2022, but I would agree with your statement about 2021 as well.

Q.   But it is off -- whether it's 2021 or 2022, I think you said it was collected in 2021, and I think that was accurate.
     But whether it's 2021 or 2022?

A.   The larger log was 2021.  The UUAD log, I believe, is 2022.

Q.   But either way, it had sWAA off; correct?

A.   For his main account, which is called Peteysake.

Q.   I'm going through the accounts one by one.  The first one we went through was fighting bunny.  The second one we went through was Peteysake, and I agree that's the main account.

A.   Yes, sir.

Q.   And that was off from 2020 on; correct?

A.   2020 onward.

Q.   Correct?

A.   Yes.

Q.   Okay.  Next one, Nathan Rodriguez.  That was off after 2020; correct?

A.   Yes.

Q.   And mcmxcthrift, the next account, that was off; correct?

A.   Yes.

Q.   And if you look at all the rest of his accounts, they were all off after 2020; correct, sir?

A.   The last one, Anibal Rodriguez, it just says "NA," so that's one that doesn't say paused.

Q.   None of them were on; correct?

A.   I just -- given I don't know the answer for the last one, I can't confidently say "yes" or "no."

Q.   Did you hear Mr. Rodriguez testify about who that was? Whose account that was?  Who Anibal Rodriguez was?

A.   I'm sorry.  You're asking me who is Anibal Rodriguez?

Q.   I'm asking you whether you were here and heard the testimony that Mr. Rodriguez gave as to who that was?

A.   I don't remember if he described who each of these accounts was, no.

Q.   Okay.  But it was not his account; correct?

A.   You're representing that Anibal Rodriguez is not an account of Anibal Rodriguez?

Q.   No.  What I'm asking you is:  Did you hear him testify --

his testimony about who that account was for?

**A.**    I was here for the entirety of his testimony, but I don't recall if he gave an answer to that question.

**Q.**    But there's no account here that's listed as being on in 2021 and 2022; correct?

**A.**    That, I can agree with.

**Q.**    Okay.  And does that cause you to conclude that the plaintiffs' data that was collected had to be collected when sWAA was off?

**A.**    No.

**Q.**    Okay, sir.  Let me go to another subject.

Do you understand that Google was able to produce the plaintiffs' data that Google had collected when sWAA was off once the plaintiffs gave Google their device IDs?

**A.**    That's correct.

**Q.**    So if somebody had a device ID, they could get the data that sWAA off had -- that Google had collected when sWAA was off?

**A.**    I'm not sure I understand.

**Q.**    Okay.  If you could tie a person to a device ID, you could then get all of the data that Google had collected from that device; correct?

**A.**    "You" being a regular user?

**Q.**    Let's say Google.

**A.**    Google.  Okay.  That changes things.

Q.   So Google.  Let's start with Google.

Google can get -- I know the policies are against it, everybody from Google says, but Google could connect a device ID to a person and then collect all of the sWAA-off data that was linked to that device ID; correct?

A.   First, you wouldn't need to connect it to a person.  If you had the device ID and then you overcame the technical barriers that we've been describing as well as got permission from legal to overcome the policy proscriptions, obviously it's possible, since it was done in the course of this lawsuit.

There had to be a special program written, it was 400 lines of C, in order to go and actually extract that data to make the production.  It was a series of steps with much approval needed, but it is obviously possible.

Q.   It's obviously possible?

A.   It was done.

Q.   Now, in addition, you are aware that Google has had issues with respect to employees misusing user data; correct?

A.   You're speaking of the data relevant in this case or just generally?

Q.   Well, let's take just generally.

The issue is whether everybody's going to abide by these policies.  And you're aware that Google has had people who don't abide by their policies in terms of how user data should be treated; correct?

MR. SANTACANA: Objection. Relevance. 403. He said he didn't want to talk about the data at issue.

THE COURT: Sustained.

BY MR. DAVID BOIES:

Q.   Now, did you examine what the risks were of data breaches at Google?

A.   You mean as an independent exercise, just generally the risk?

Q.   In connection with your testimony here, did you examine that at all?

A.   I didn't conduct a security audit of Google in any shape or form, no.

Q.   I'm not asking whether you conducted a security audit. What I'm asking you is whether you investigated or analyzed whether there were serious risks of data breaches at Google. You either did or you didn't.

A.   As part of my engagement?

Q.   Yes.

A.   No.

Q.   Okay.

MR. DAVID BOIES: Now, if -- if I can pull up your chart just briefly, I think it was Chart 13. Yes, Chart 13.

Let's go -- the number on that is different than the number that I was given by counsel.

Let's go to the next chart.

**BY MR. DAVID BOIES:**

**Q.** Now, this is a chart that you prepared; correct, sir?

**A.** Yes.

**Q.** And this is to illustrate what happens when consent is given?

**A.** In this case, this is, yes, consent given.

**Q.** And let's go to the next chart.

And this is where it's not given. And what you say is it's -- now the data is stored in a separate log, a pseudonymous events log. Do you see that?

**A.** Yes.

**Q.** Now, you didn't mean to imply to the jury that that's the only place WAA-off data was stored, did you?

**A.** This is for sWAA-off analytics data. Fraud collection, I believe, is somewhat different from this.

**Q.** There are other places that Google stores sWAA-off data; correct?

**A.** From memory -- I didn't testify to that; but from memory, I think there are some other logs, once again, for fraud detection and so forth.

**Q.** Do you know how many logs?

**A.** Do I know how many logs that Google has?

**Q.** How many logs, yes. How many logs are used to store sWAA-off data?

**A.** I believe, from memory, in my report, I talk about a

handful of other ones as well.

Q.    A handful of other ones.

Do you know what uses Google makes of the sWAA-off data?

A.    Yeah.  I enumerated a number of them.  Like I said, fraud detection and analytics and attribution.

Q.    And also improving products, developing new products; is that right?

A.    I don't recall mentioning that at all, no.

Q.    Well, do you know that they do that?

A.    You're really testing my memory.  I might talk about that in my report.  I don't remember if they use only sWAA-on or if they use sWAA-off data for product improvement.

Q.    Do you know how many logs in Google contain sWAA-off data?

A.    I could only talk about the ones that are relevant to my report.

Q.    Well, was it relevant -- you testified that Google doesn't profit from sWAA-off data.  Do you recall that?

A.    Yes.

Q.    And I guess I need to understand what you mean by "profit."

In your terms, is benefit different than profit?

A.    "Profit" evokes to me this idea of monetary gain. "Benefit" maybe is broader.

Q.    So when you said Google doesn't profit from this, you were saying that what Google didn't do, it didn't get a direct

monetary gain from a particular thing; is that right?

**A.**   That's what I was intending to say.

**Q.**   So you understand that it's valuable to Google to develop new products?

**A.**   Good products or new products?

**Q.**   New products and improve existing products.

**A.**   Of course.

**Q.**   And to the extent that Google uses sWAA-off data to do that, that's valuable; correct?  That's a benefit even though they may not be paid directly for it?

**A.**   I would agree that making products better is a benefit, broadly taken, yes.

**Q.**   And did you -- do you recall Mr. Ganem testifying that they use sWAA-off data for machine learning?

**A.**   I don't recall.

**Q.**   If they used sWAA-off data for machine learning, that would also be a benefit to Google; correct?

**A.**   Unless the machine learning were used only to benefit the developer, the third-party app developer.  I know there's machine learning within the apartment that works to benefit the developer.

**Q.**   Google wouldn't be using machine learning to benefit the developer unless Google believed that that was in turn going to benefit Google; fair?

          **MR. SANTACANA:**  Objection.

THE COURT:  Sustained.  Sustained.

BY MR. DAVID BOIES:

Q.  Did you ever try -- when you say Google didn't profit, did you ever try to quantify in any way the value to Google of the sWAA-off data that it got?

A.  I didn't do any kind of economic quantification.

MR. DAVID BOIES:  No more questions, Your Honor.

THE COURT:  Mr. Santacana.

## REDIRECT EXAMINATION

BY MR. SANTACANA:

Q.  Professor Black, I just have a couple of questions.  I'll just stay right here.

You were asked about paying per conversion.  Do you know whether the types of ad campaigns for which the plaintiffs are seeking damages are the types of ad campaigns that charge by conversion, or are they the types that only charge by click or serve?

A.  I believe it's the latter category.

Q.  You were asked a number of questions about this document, the plaintiffs' sWAA settings, 941.R2.  I believe Mr. Boies suggested to you that the data in the UUAD log was put there when these plaintiffs had sWAA off.

Can you say, again, the year that the UUAD log entries are from?

A.  I'd have to check, but I thought it was 2022.

Q.    Do you, sir, know whether or not the dates here end in 2021?

A.    (Witness examines document.)  I don't see on the document whether the -- there's a limit, an upper bound to the dates for this data.

Q.    Right.  There's no data in here past 2021; right?

A.    I don't think there's any data past 2020, from a glance.

Q.    And the UUAD log was pulled after that?

A.    A couple of years later.

Q.    So do you know, one way or another, whether after the dates in here, whether the plaintiffs turned WAA on again at some point after 2020?

A.    This log wouldn't show that.

Q.    Okay.  Now, Professor Black, can you just -- you've heard the plaintiffs characterize the sWAA button as a fake button during this trial?  You've heard that?

A.    I have, yes.

Q.    Based on the evidence that you reviewed in this case, as a computer scientist, is the sWAA button a fake button?

        MR. DAVID BOIES:  Objection.  Outside the scope.

BY MR. SANTACANA:

Q.    Does it do nothing?

        THE COURT:  Outside the scope.

BY MR. SANTACANA:

Q.    Does it do nothing?

THE COURT:  Well, all right.  You can ask him -- go ahead.

THE WITNESS:  No.  I mean, obviously, turning that button on or off invokes all kinds of extra machinery.  As we saw, we stepped through it, there's a fairly elaborate consent check that has to be undertaken; and if sWAA is off, then there are further steps that have to be undertaken in order to scrub and fuzz and encrypt and store the data.

MR. SANTACANA:  Thank you, Professor Black.

I have no further questions.

THE COURT:  You may step down.

(Witness excused.)

THE COURT:  Anything further from the defense?

MR. HUR:  No, Your Honor.  Google rests.

THE COURT:  All right.  Mr. Boies, there was some rebuttal you told me you were going to do?

MR. DAVID BOIES:  Yes.  We are going to play a brief section from Mr. Miraglia's deposition and offer one document.

THE COURT:  All right.  And did you -- the counter-designations have been worked out?  Okay.

MR. HUR:  Yes, Your Honor.

THE COURT:  Very good.  We're now -- members of the jury, the defense has now rested.  The plaintiffs have a brief what's called rebuttal case.

Go ahead, Mr. Boies.

(Video was played but not reported.)

MR. DAVID BOIES:  This is now marked as Plaintiffs' Exhibit 4.

THE COURT:  Plaintiffs' Exhibit 4.

(Trial Exhibit PX4 marked for identification.)

(Video was played but not reported.)

MR. DAVID BOIES:  That concludes our rebuttal case, Your Honor.

THE COURT:  Very well.

MR. DAVID BOIES:  Oh, and I offer Plaintiffs' Exhibit 4.

THE COURT:  Oh, and Exhibit 4 will be admitted.

(Trial Exhibit PX4 received in evidence.)

MR. DAVID BOIES:  And we also have the privacy policies that we are working with --

THE COURT:  Yes.

MR. DAVID BOIES:  -- counsel on.

THE COURT:  And that will be worked out and we're going to --

MS. AGNOLUCCI:  Yes, Your Honor.  My understanding is that our colleagues reached agreement today while we were in here, so we won't have an issue there.

THE COURT:  Okay.  All right.

So, members of the jury, I have great news for you. Thanks to the diligent work of counsel, we're considerably

ahead of schedule, so much so that on Tuesday, after the Labor Day holiday, we will have instructions from me and closing arguments and the case will be in your hands for deliberation all on Tuesday.

What I do request that you do in light of that is that -- we've been at the 8:30 to 1:30 schedule.  Now, in order to give you an opportunity to do your work expeditiously, I'm going to go to an 8:30 to 4:00 schedule because you're going to get the case on Tuesday, and we can have you deliberate up through until 4:00.

So I know it's a change, but it will facilitate your opportunity to get your work done and for us, on Tuesday, to complete the instructions and closing arguments.

We are going to have lunch instead of -- well, I think you get the snacks.  You continue to get the snacks, such as they are, but you're also going to get lunch in addition, starting on Tuesday.

So we now have a three-day break, so bear with me.  I have to redouble my efforts to tell you, do not talk about this amongst yourselves or with anyone else.  Do not do any research.  Do nothing associated with the case for the Labor Day holiday.  No investigation, no analysis of any of this.

The evidence has now all been concluded, and we will then have the instructions, closing arguments, and the case, on Tuesday, will be in your hands.

In the meantime -- yes?

**A JUROR:**  Is the 8:30 to 4:00 only for Tuesday or --

**THE COURT:**  And then, as I say, it will be up to you. I will want -- my request is that you use the full time so that you can complete your work.  But I will ask you, when we formally deliver the case to you, to tell us, and you'll hear this on Tuesday, two things, who your foreperson will be and then, secondly, what the schedule will be for the deliberation. But I very much encourage you to use the full time, the 8:30 to 4:00, so that you can get your work done.

Okay.  So with that, have a wonderful weekend, Labor Day weekend.  Enjoy it, barbecue, whatever else you do, watch football, and we'll see you on Tuesday at 8:30.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  We're out of the presence of the jury.

Thank you to counsel for -- I know I was prodding everyone along, but thank you very much for getting it completed in a timely fashion, more than timely.

Okay. Let's get some lunch.  And how about if we -- how about 2:15 we can resume and do our instruction conference?

**MS. AGNOLUCCI:**  That's fine, Your Honor.

**MR. DAVID BOIES:**  Yes, Your Honor.

**THE COURT:**  Thank you.

**THE COURTROOM DEPUTY:**  Court stands in recess.

(Luncheon recess was taken at 1:07 p.m.)

**Afternoon Session**                                                **2:27 p.m.**

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  So this is our instruction conference.

Let me begin with just some corrections.  You probably have all already picked it up.  Sorry about that, but we wanted to get this to you in a timely fashion, so there were a couple of things that we would have picked up, I think.

Number 17 refers back to 14.  It should refer back to 16.

And 19, again, it should also be referring back to 16.

And I think also you said -- and then it's 18; right?  So it's both referring back and referring forward; right?  Yeah.

So 19 should be adjusted to make the references to 16 and 18.

The verdict form, Question 7, refers back to Question 5.  It should refer back to Question 6.

And we also are aware there are a few instances where we have repeated words.  We just didn't pick them up.  So we will do our best to clean all those up.

Okay.  What I was proposing to do is to just -- this is what I usually do, is to have somebody from each side be up here, and then as we -- I know -- we could do this conceptually at various places.  I don't think that is helpful.

What I want to do is just march through the instructions, and you each tell me when we get to -- one or the other of you

or both has something you want to tell me, we will stop and deal with it.

And I know, because you just do all the things I ask you to do and I very much appreciate it, you are going to pick your fights and not decide that every single instruction needs to be ventilated.

And then I want to talk about the verdict form, which is always, I think, in some ways our biggest challenge.

So with that, can I have one person from each side? That doesn't mean you can't tag team. I don't have a problem with that, but I just want somebody up here.

MR. PATCHEN:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

Okay.  So what is the first instruction -- Mr. Boies, what's your first one you want to talk about?

MR. DAVID BOIES:  Well, it's deep into the instructions, Your Honor.

THE COURT:  That's good.  I like that.

(Laughter.)

MR. PATCHEN:  11 is our first, I believe, Your Honor.

THE COURT:  Okay.  So do you have anything before 11?

MR. DAVID BOIES:  No, Your Honor.

THE COURT:  Okay.

MR. PATCHEN:  9.  I apologize.  Yes.  I apologize.

THE COURT:  Okay.  So Number 9 is, "Evidence was

presented to you in the form of admissions to the truth of certain facts," and it goes on.

Hi.

MS. CORBO:  Hi.  How are you?

THE COURT:  Good.

MS. CORBO:  I think it's quite simple.  We didn't receive any evidence in the form of RFAs during the course of trial, and so we don't that think this is necessary.

THE COURT:  So I was sort of thinking that this might also cover -- we had a lot of references to stipulations at various points along the path, and I was wondering if it's -- well, it does use admissions to the truth of certain facts.

MR. DAVID BOIES:  We could substitute it to "stipulations" for "admissions."

THE COURT:  Were the stipulations -- yeah, we did have some stipulations to facts.

MS. CORBO:  Yeah.

THE COURT:  So how about if we just say, "Evidence was presented to you in the form of stipulations to certain facts"?

MS. CORBO:  That's okay with us.

THE COURT:  Okay.  Let me make sure it then carries through.

"These stipulations," twice, "were given in writing before the trial in response to requests that were submitted under established court procedures."

And I don't have a separate stipulation instruction? There is a pattern one, but I think I just gave it while we were going along.  I don't want to give two stipulations -- two instructions about stipulations.  Is there another one in there that talks about stipulations?  I don't think so.

**MS. CORBO:**  I don't believe so.

**THE COURT:**  Okay.

Okay.  Number 9, that's the fix.

Next one you want to talk about?

**MR. PATCHEN:**  11, Your Honor.

**THE COURT:**  Okay.  I think Mr. Boies said he didn't have anything before 11.  Okay.

**MR. DAVID BOIES:**  And I don't have anything on 11 either.

**THE COURT:**  You're singing my tune, Mr. Boies.

Okay.  This is that class action instruction.  I did read the back-and-forth on this, so I know that it's not one that Google -- Google has things that they would want.  So it was a conscious decision for me not to include it, but go ahead, Mr. Patchen.

**MR. PATCHEN:**  So from the Google perspective, Your Honor, is we see two sort of issues, and it's all around the language that says, "You may apply the evidence at this trial to all class members."

**THE COURT:**  Right.

**MR. PATCHEN:**  Two issues with that, the first of which is it doesn't instruct the jury that they are not deciding the class representatives' claims but they have to be deciding the class as a whole, the class members' claims.

And the particular challenge that we have is in that paragraph above, you have the capitalized "P" for plaintiff, and that carries through for the remainder of the instructions. It has the capitalized "P."  But it's the class representatives -- right? -- one or more plaintiffs on behalf of a larger group.

And if you read the instructions, it suggests -- right? -- only the class representatives need to prove their claim.  And, obviously --

**THE COURT:**  Well, first of all, this is CACI 115.

**MR. PATCHEN:**  It is CACI -- part of it is CACI 115. You improved a little bit on the error that CACI 115 has, but --

**THE COURT:**  Well, I'm not sure I agree that it has an error.

Judge Chen gave a similar instruction in a recent case, and so I was taking that into account as well.

**MR. PATCHEN:**  And if I may comment on that.

I did think that if the Court was going to choose something, I thought that Judge Chen's "If it is appropriate, you may apply the evidence," because that's our second concern.

THE COURT:  I don't know what that means.  I mean, I read that in Judge Chen's instruction, but when is it -- I don't know what that adds to the analysis.

MR. PATCHEN:  Our concern, Your Honor, is the language, whether it's "You may assume," which was in CACI, or "You may apply," is a permission granting without the jury having to make a decision; that they find that the evidence that was presented at the trial is common and is applicable to all class members.

I think that what Judge Chen added, the "If you find it appropriate," does have that decision-making criteria that is what we're asking the jury to do.  *Tyson* --

THE COURT:  The problem -- I certified the class, so it's not for the jury to decide class certification, which, in a sense, is kind of what that invites to me, a backhanded way of, well, really -- I made the decision, rightly or wrongly, that there's typicality, commonality, all the requisites were there.

So I don't submit that to the jury.  I don't say, "Tell me if you think I was right on Rule 23 certification."  But that's what that "if appropriate" kind of suggests to me.

MR. PATCHEN:  What I'm saying, Your Honor, I agree that you shouldn't submit the 23(a) and (b)(3) criteria to the jury.  But what *Dukes* says and *Tyson* says is the question as to whether or not the evidence as presented does establish common

proof.

I think your class certification order, if you read *Olean* from the Ninth Circuit, all that says is that you've held that it is capable of common proof; not that, as a matter of law, it is established that the proof that the class representatives put on should be read and considered to be common proof.  It is up to them, at trial, to actually come forward with the common proof.

And that's the consideration that we have there.  That's why we think that the language that we had proposed, or something similar, that getting to the jury making that determination is important.

THE COURT:  Okay.  Mr. Boies.

MR. DAVID BOIES:  With one possible modification. I think that the instruction here is appropriate and consistent with the normal instruction.

I think the one thing that might clarify, you know, at least one of counsel's points is in the very -- in the second line, where it says "brought by one or more plaintiffs," you could say "one or more class representatives on behalf of a larger group of people who have similar legal claims.  All these people together are called a class or plaintiffs."

THE COURT:  You want "class representatives" there?

MR. PATCHEN:  I would take that.  I still would stand on the objection but take that.  It makes it a little better.

**MR. DAVID BOIES:**  Yeah.

**THE COURT:**  Okay.  How about, Mr. Boies, the additional language that my friend and colleague Judge Chen added, the "if appropriate" language?

**MR. DAVID BOIES:**  I think that's confusing because I don't think it's clear what "if appropriate" means.

Now, I would say that I think that if appropriate -- it's confusing and uncertain, but I don't think it's terribly prejudicial.  I think that --

**THE COURT:**  You're not going to die on that hill.

**MR. DAVID BOIES:**  Yeah.  It's a --

**THE COURT:**  I may think -- it sounds like I may have more problems with it than you do, but okay.  I think I know enough on that.

By the way, where this is all going to lead, I'm not going to rule on some of these.  I'm going to go back and consider this and then give you another set.

I know you want it as soon as you can, but I will work over the holiday, but I won't -- what I'll tell you is I'll get it to you on Monday, and then you can use it as you wish in your closing arguments.  But I'll certainly get it to you before Tuesday, but I can't promise anything more than that.

**MR. PATCHEN:**  I can guarantee the rest of our team won't be working over the weekend, Your Honor.

**THE COURT:**  They will be.  They will not?  That would

shock me.  And I know the Ritz-Carlton is full.

MR. PATCHEN:  That is what I heard.

THE COURT:  That much I know from --

MR. PATCHEN:  One other -- there's one issue, Your Honor, with 11, and it's this:  Which is the class -- both Class 1 and Class 2 have, for the CDAFA claim, what I think is like the bubble edition; right?  The enterprise and the supervised accounts are part of both classes for the CDAFA claim but not for the invasion of privacy and intrusion and seclusion.

And there was a lot of testimony about, you know, the dasher accounts and unicorn accounts over the last couple of days, and that fits nowhere else.  And so we had proposed some language.  I don't know if counsel objected to that language in terms of inclusion, but there's just no mention of it anywhere else in the instructions, which I think should be.

(Discussion off the record between the law clerk and the Court.)

THE COURT:  A good point was raised to me.

Well, let me first find out what your reaction to the language is, and then I have a placement question about where this would go.

MR. DAVID BOIES:  That's my question as well, Your Honor.  I don't have any objection to saying this.

THE COURT:  It should go with the CDAFA claim.

MR. DAVID BOIES:  Yeah, that's what I think, or perhaps with the other ones.  I agree it needs to go someplace --

THE COURT:  Okay.

MR. DAVID BOIES:  -- and I'd leave up to you where.

(Discussion off the record between the law clerk and the Court.)

MS. BONN:  "If the exclusion would be."

THE COURT:  Oh, I see.

Actually, we have an instruction that introduces the claim.  It's that instruction that says, "What you're going to hear is" -- where is that one?  It's before the specific instructions on the elements of the claim.

Let's see, oh, "I will now explain the substantive law applicable" --

MR. DAVID BOIES:  Yes.

THE COURT:  -- this is Number 12, "to the claims brought in this action on behalf of class as plaintiffs assert three claims against Google."  And then there's the three claims.  Then do you think we could put it in there?

MR. DAVID BOIES:  You could put it in there or when you get to the -- starting on 17, when you get to invasion of privacy.  I think you could put it either place, Your Honor.

THE COURT:  Okay.

MR. PATCHEN:  It does make sense.  I could see 12,

because it comes right after 11, where you've talked about class, but who knows what juries do with the instructions.

THE COURT:  Okay.  I will -- well, I said I wasn't going to rule on these things.  I will take -- I will put that language in, and I'll put it in probably not in 11 but maybe 12, and I'll look and see if I want it in a different place.

Okay.  Anything else on 11?

MR. DAVID BOIES:  The only thing I would -- looking at this, the only thing I would suggest is it might be confusing to go into 12.  I mean, 12 you're talking about what the claims are, and I think it might be confusing to start now parsing that.

THE COURT:  So you would put it -- where would you put it?

MR. DAVID BOIES:  I think because it is something that is excluded from the privacy claims but not from CDAFA, I would probably put that in 17 or one of the -- one of the instructions that deal with the privacy claims.  Somewhere I think there is a --

THE COURT:  Wouldn't it go into 13?  Because it applies to CDAFA, doesn't it?  The language is applicable to CDAFA --

MR. PATCHEN:  I --

THE COURT:  -- not to the other claims.

MR. PATCHEN:  I agree.  I view it as, like, there's

the base class and then there's the CDAFA add-on.  And so I think it makes sense, if we're going to talk about it, it would be somewhere in 13.

THE COURT:  Yeah, I think it would be 13 rather than the privacy and seclusion instructions.

MR. DAVID BOIES:  I'm comfortable with that, Your Honor.

THE COURT:  Okay.  All right.

Okay.  So going back to 11, are we done with the discussion of 11?

MR. DAVID BOIES:  I am.

MR. PATCHEN:  We are, yes.

THE COURT:  Okay.  So 12 is just the generic, "Here are the claims."

What's the next one, Mr. Patchen, that you have?

MR. PATCHEN:  13, Your Honor.

THE COURT:  Okay.  I'm there.

MR. PATCHEN:  So our -- we have at least two objections.  I know of two.  The first one is, we think that it's inappropriate to have "mobile devices or," that language, in one and two; and the reason for that is that the claim that the plaintiffs have brought here is a 502(c)(2) claim, knowingly access and, without permission, access data.  And 502(e) says that the owner or lessor of the data can bring the claim.

As drafted -- and it allows the standing question of 502(e), the ownership, to be answered with the mobile devices instead of asking whether the plaintiffs own the data, and it -- that disjunct between the two causes the problem of where the entire claim here is -- right? -- we own the data, it has a value, we should get the value of the data back -- that we had our data taken, the data was valuable, we should get paid actual damages for the data.

THE COURT:  I'm recalling correctly at some point I thought it was -- Google wasn't disputing that it was the plaintiffs' data.

MR. PATCHEN:  No.  The dispute -- there's no dispute that they are the owners of the mobile devices.  That's where there's no dispute.

THE COURT:  But there is a dispute about whether or not they're the owners of the data?

MR. PATCHEN:  Correct.

And if you can -- if you don't have to own the data to bring a claim for the recovery of the value of the data, that just writes 502(e) completely out.  There's other claims, 502(c)(7), which is about knowingly accessing a device, which maybe ownership of the device is a relevant question, but it's not the relevant ownership question for a 502(c)(2) claim.

THE COURT:  Is the only way to violate the statute if you own the data?

MR. PATCHEN: Or lease it. You're the owner or lessor of the data.

And there's a couple of cases, this is the *Garabrandts* case that we cited in what we submitted to Your Honor on the ownership question, which is what actually raised this in our mind.

The fight in *Garrabrants* was whether the bank CEO, whose data -- whose financial data was being held by the bank, brought a 502(c)(2) claim, and the California Court of Appeals reversed a verdict in his favor, saying, "You didn't prove that you were the owner of the data because the bank may be the owner of the actual documents that were taken."

THE COURT: I'm trying to -- the reason I asked about is this disputed, I'm thinking back on all of the stages of this protracted thing, and I didn't think that you -- the plaintiffs had taken that position earlier on, that -- is that something that you've always maintained through this case, that the plaintiffs are not the owners of the data?

MR. PATCHEN: I don't believe it's been particularly litigated. I didn't see any evidence of that in the summary judgment briefing, but it's still -- I mean, if you look the Penal Code -- even the model instructions, they have to prove their ownership; right? That is an element.

THE COURT: Well, ownership of what? I mean, are they -- I've got the CACI 1812. Is it plaintiff is the owner

of the computer, computer system, computer network, computer program, and/or data?

**MR. PATCHEN:** I'm sorry, Your Honor. Yes, it's the CACI 18 instruction. It says -- and it says, "Fill in what is at issue" -- right? -- in the italics --

**THE COURT:** Yeah.

**MR. PATCHEN:** -- what is the thing that is at issue. Clearly what is at issue in this case is the data. They don't have an expert that said, "You put software on our mobile devices, and that caused it to not work anymore."

**THE COURT:** I'll hear from Mr. Boies on this.

**MR. DAVID BOIES:** First of all, my recollection is this was agreed to previously by us, by both sides, when we submitted things to you.

**THE COURT:** When you submitted the instructions?

**MR. DAVID BOIES:** Yeah. The -- but, I mean, there's several things about this.

First, (e)(1) says, "The owner or lessee of the computer, computer system, computer network, computer program, or data"; and the -- and if you look at (3), the thing -- I don't entirely understand what counsel's point is, because (1) and (2) talk about being owners or lessees of mobile devices or data. (2), knowingly access mobile devices or data. And then (3), we also have to show took, copied, or made use of data from those plaintiffs' mobile devices without plaintiffs'

permission.  So I think that all of that is entirely accurate.

THE COURT:  Could you violate -- if you owned a phone that was -- you just bought the phone and you didn't do anything, you just bought it and you gave it to your best friend, and then all the data that gets populated onto that phone, which you own but you've given it off to your friend, is your friend's data, would you violate -- could you be -- if they take the data, if they take it, have they violated the statute vis-à-vis you, the owner of the phone?

MR. DAVID BOIES:  I think they -- I think they have, but I think that you wouldn't have damage or loss to that owner of the phone at that point.

THE COURT:  Because the valuable item that, as you claim, is being taken is the data.

MR. DAVID BOIES:  Right.  Now, you might have a CDAFA claim for the degradation of the phone with this extra, you know, nominal-damage-type thing.

But what this instruction, I think, properly points out is that the question of taking, copying, or making use of the data is different from who the owners of the mobile device is.

And that, in turn, is separate from Point 4, which is suffer damage or loss.

MR. PATCHEN:  If I may, Your Honor.

THE COURT:  One more round.  I understand the issue. I'm just going to have to think about it.

Go ahead.

MR. PATCHEN: I will say two things about that, the first of which, when you said -- when you said violates the statute, it's important to recognize that 502(c) has 14 subsections; right? And (e) uses that long string of -- right? -- computer, computer system, computer network and data, because it captures all of 1 through 14.

They could have written -- the legislature could have written an (e) clause underneath every one of those, but that would make no sense, so it has the long list.

But what is critical, if you look at the definitive article, frankly, it says, "the owner or lessor of the data, computer network, computer." It's the "the." You just can't be an owner of a mobile device.

THE COURT: Let me ask one more question, and then I'm going to move to the next one, just in terms of who agreed to what.

When the proposed instructions were submitted, was there agreement on this, as Mr. Boies suggests?

MR. PATCHEN: There was. And then when we did the supplemental instructions that were proposed, one of the arguments that was made against the ownership suggestion that we had proposed was, "Oh, wait. You guys have conceded the first element," which we don't believe we have. And I now understand where that disjunct is coming from.

So, yes, but apologies that we hadn't recognized that that would be an issue, that they would say, "You've" -- that the plaintiffs have satisfied ownership by saying they own the phone without having to say that they own the data that's on the phone.

And your example, Your Honor, is the exact right one but add a third party; right?  It's your clerk's phone, your photos, and I access it.  Now, if I access that phone and take the photos, your clerk does not have a suit against me because I took your photos, even if it was on his phone.  That's the whole point of (e).  But he may have a claim against me under, say, for example, 502(c)(7) for accessing his device without permission, but those are two separate claims.

THE COURT:  What is the state of the record -- what's the state of -- and then I'll give you a chance too -- but what is the state of the record on who owns the data?  Is there any evidence in the record that plaintiffs own the data?  I'm trying to think of what the -- what the evidence was on that point.

MR. PATCHEN:  Mr. Santiago testified that he owns the data.

THE COURT:  Okay.

MR. PATCHEN:  I'm sorry.  Mr. Rodriguez did.  He said that.

THE COURT:  Do we have any other evidence?

**MR. DAVID BOIES:**  I think only the evidence that it was -- is that the data related to the plaintiffs' use of third-party apps.  In other words, it is inherently their data because it is what they are -- what Google is collecting from the plaintiffs' use of the third-party apps.  It's on their phone and it is, you know, their data, as one of our plaintiffs' representatives testified.

**THE COURT:**  As was pointed out to me a moment ago in my note, and it's a good question, what was the point to stipulating to the fact that plaintiffs own the phones if you think that didn't make any difference here?

**MR. PATCHEN:**  Because there's the secondary element of the "from"; right?  502(c)(2) says "knowingly accessed the data from a computer or a mobile device."  And by stipulating "from the mobile device," A, it takes that issue out of class proof; right?  And, second, it establishes the element; right?  (c)(2) doesn't apply if I go into your chambers and steal data from your filing cabinet.  It removes the need to prove electronic.

The one other point I would make in terms of record evidence, Your Honor, and this is important, is obviously the plaintiffs moved motion in limine to get rid of all of the terms of service between plaintiffs and the class and the various apps.

Frankly, the *Garrabrants* case says that's going to be the best evidence of who owns the data; right?  These are people

who put their information into an app.  Who owns that data may not be very meaningful for the invasion of privacy or the seclusion, which doesn't have an ownership requirement but CDAFA does.

THE COURT:  Okay.  You had something you wanted to say?

MR. DAVID BOIES:  Yes.  What it is -- what we say in Number 3 --

THE COURT:  Yeah.

MR. DAVID BOIES:  -- is that Google took, copied, or made use of data.  So if this is our requirement, I don't think the points he's making about (1) and (2) really relate to anything.

The -- and this is data -- I mean, they can argue to the jury that the data about the plaintiffs' use of third-party apps that's on their phone is not somehow their data, but we have to -- we have to establish --

THE COURT:  Well, can you -- do you think -- is it a fair inference if you own the device, that you own the data?

MR. DAVID BOIES:  I think so, Your Honor.

THE COURT:  Why is that not an inference you could draw?

MR. PATCHEN:  Well, it's an inference they can argue for.  I would -- you know, putting on my advocate's hat, I would make arguments as to why that's insufficient as a matter

of evidence, but I think they can make that.  It's a fair inference.

THE COURT:  Right.  Okay.

Okay.  It's an interesting question, very interesting. I'm going to have to think -- that's one of the ones I'm going to have to think about.

MR. PATCHEN:  Obviously, Your Honor, if you accept our position here, that's why we put in the proposed ownership language, is because that's how we had been conceiving of the case.  It's not in, but that's why we had done that.  So just companioning those two together.

THE COURT:  All right.  What's the next?

MR. PATCHEN:  Well, there's one other one in terms of CDAFA.  I apologize, Your Honor.

THE COURT:  Okay.

MR. PATCHEN:  Ms. Agnolucci has it.

MS. AGNOLUCCI:  Your Honor, this relates to an additional jury instruction that we had submitted, that Your Honor didn't adopt, about without permission.

THE COURT:  Yes.

MS. AGNOLUCCI:  This was in the packet that we submitted yesterday.  So rather than doing it as --

THE COURT:  Is this the knowingly business?

MS. AGNOLUCCI:  Yes.

THE COURT:  Right.  I'm not -- I'm not going to add

"knowingly" to the "without permission."  Element 3 for -- I forget which element.  Yeah.  I don't think it -- knowingly goes into 2 and it's there, I don't think you have to -- I think -- I don't think it's knowing -- knowingly without plaintiffs' permission.  I don't think it applies.

MS. AGNOLUCCI:  Your Honor, in that joint submission, the plaintiffs themselves agreed that we could, at a minimum, say "should have known," as Your Honor did on page 15 of your MSJ order.

THE COURT:  One thing I'll give you some advice on.  Don't tell me that, "In a summary judgment order you did this or you did that."  That was then; this is now.  It doesn't --

MS. AGNOLUCCI:  Understood.

THE COURT:  -- bind me, and I wouldn't waste time on invoking it because it was important in the moment.  We got past summary judgment.  I know you didn't think we should, but we did, but I'm not bound by anything that was said in that order, so...

MS. AGNOLUCCI:  Understood, Your Honor.  And we would --

THE COURT:  But you said they agreed to it?

MS. AGNOLUCCI:  Yes, Your Honor.

THE COURT:  That's a different proposition.

MS. AGNOLUCCI:  It's Document 650, page 13.

So the parties were debating this additional instruction.

We cited the *Facebook Power Ventures* case, where the Ninth Circuit applied a knowing standard to whether the defendant knew that they were accessing the data without permission.  It was the knowledge of permission that the Court considered important there.

Plaintiffs said [as read]:

"At a minimum, if the Court is inclined to instruct the jury on this element, the instruction must include the 'should have known' portion of the Court's reasoning."

So it was the plaintiffs there who were citing Your Honor's summary judgment order, which was citing the case -- the *Facebook/Power Ventures* case that we would ask Your Honor to take a look at.

THE COURT:  Remember, for each of you, if one of your arguments is the other side agreed, then you're -- each one of you is now taking the position that that shouldn't bind the process in one form or another, so --

MS. AGNOLUCCI:  We're willing to live with that here, Your Honor.

THE COURT:  I understand.

MR. DAVID BOIES:  Your Honor, the only thing --

THE COURT:  Yes, go ahead.

MR. DAVID BOIES:  The only thing I'd point out is we did not agree here.  What we said is it shouldn't happen; but

if it were going to happen, if you were going to do something.

THE COURT:  It's an alternative argument.

MR. DAVID BOIES:  Right.

THE COURT:  And it has been pointed out to me it's plaintiffs dispute.

MR. DAVID BOIES:  Yeah.

MS. AGNOLUCCI:  Yes.

THE COURT:  Okay.  Let's move on to -- let's see, we were at -- we're done with, I hope -- or I'm done with talking about 13.

MR. DAVID BOIES:  Yes.

THE COURT:  So what's next?

MR. PATCHEN:  On the bidding, we have 18.

THE COURT:  Yes.  And do you have anything before 18?

MR. DAVID BOIES:  I think the -- and I don't know -- I don't know where it goes, but at some point, with respect to the CDAFA claim, I think it's important that the Court make the instruction that we've talked about a number of times about how the discussions, communications with app developers doesn't relate to our permission.  And I think that needs to go somewhere, and I don't know where -- where -- where it goes.  And I think where it goes, I'm happy to have the Court decide, but I do think that needs to be somewhere.

THE COURT:  Why does it have to be in the instruction?  You can just say -- what you just said, you can say to the jury

in closing argument.  I don't -- but that's not the key, and they'll read the instruction and see there's nothing that says the affirmative of what you just said.  So why does it have to be an instruction?

MR. DAVID BOIES:  Well, we can argue it.

THE COURT:  Yes.

MR. DAVID BOIES:  But I think, as the Court recognized earlier, that that was -- and I don't mean to -- I'm not tying you to anything you said before, but I think what you said before was right, which is that this is a legal matter; that as a legal matter, this is not relevant to the permission.

And I think as a result, the jury -- the jury should be told that and not left up to us to argue it.

THE COURT:  Okay.  You can respond.

MR. PATCHEN:  Disagree, Your Honor, for -- obviously, preserve our objection that it is highly relevant to consent and all of that.

But from our perspective, a specific instruction that says, "Don't read this language or this piece of evidence in a certain way," when it would be the only one in the instructions, would be highly prejudicial.

As Your Honor yourself described, that same evidence is relevant to knowledge in terms of Google's knowledge of lack of permission, regardless of consent.  It's relevant to questions of offensiveness and egregious conduct.

If Google is taking these steps to make sure that app developers have it, that's relevant to Google's state of mind, Google's malicious conduct for punitive damages. And so to suggest that it has any less relevance -- we don't intend to violate the order on what we can use to argue with -- I would not -- at the closing; but to give weight to that, we think would be unduly prejudicial.

**MR. DAVID BOIES:** And we don't object to saying it's relevant -- whatever the Court thinks it's relevant to. But the Court is aware that they spent a lot of time on these communications with app developers, and we asked the Court at that time to give, you know, an instruction as to relevance and, you know, the Court declined to do that.

I think that the Court, at least at that point, intended to and said it intended to give such an instruction in the final jury instructions so that it would be clear, and I think that would be -- that would be a desirable thing to do.

**THE COURT:** Another one that I will think about.
Okay.

**MR. DAVID BOIES:** And one more.

**THE COURT:** Yes.

**MR. DAVID BOIES:** And this doesn't go to a particular place, but one of the things they've argued is that the jury should infer permission from the various disclosures that they gave, and we ask for an instruction that said that if there's

any ambiguity, it ought to be construed against the person.

THE COURT: Right.

MR. DAVID BOIES: And we believe that ought to be in here someplace.

THE COURT: I think if this was sort of a contract case, we would -- it's not really a contract case.

MR. DAVID BOIES: It's not really.

THE COURT: A different area. You're arguing it's not. It's a civil rights, invasion of privacy case, not a commercial contract type of context.

Inferring against the drafter is more, in my mind, a concept that comes out of contract rather than a privacy case.

I understand the argument, but -- and I'll think about it. But, I mean, again, this was presented before. But, okay, I hear you.

MR. DAVID BOIES: And the other way to look at it --

THE COURT: Yeah.

MR. DAVID BOIES: -- if -- and I agree that it typically comes up in contract cases, but they're using this to interpret what it meant for people to continue to use their service after seeing this.

But the other way to approach it is to approach it the way the Court did previously, which is to say it has to be clear, that this is not something that can be not explicit.

So I would ask the Court to look at one -- one way of

dealing -- for example, the Court, I think, in the consent area, took a different approach than we proposed but an approach that I understand.

And if we -- and -- but permission is hanging out there without any further explication, and I think it deserves that either in terms of the kind of language that the Court put in with respect to consent or, alternatively, this kind of, you know, construe it against the person who said it if there's ambiguity.

THE COURT:  Okay.

MR. SANTACANA:  Your Honor, if you are considering that instruction, I would like to be heard.

THE COURT:  Yeah, well, why don't you tell me why you disagree.

MR. SANTACANA:  There's a couple of reasons, Your Honor.  The first is we do already have an instruction that says consent must be explicit.  So that's covered.  You've put that in here from *Calhoun*, I think.

THE COURT:  So that's correct.  So he's talking about without permission.

MR. SANTACANA:  Yes.  So "without permission," under the case -- and, actually, Mr. Patchen, I think, has gone deep into this case law.  But "without permission" is not the same scope of concept as a breach of contract case.  Is it or is it not breached?  Is the term clear or not?

Ambiguity actually is not necessarily construed against the defendant on this criminal statute.  If permission is ambiguous, the defendant's state of mind actually matters.

The other problem is the instruction that's being proposed may confuse the jury as to the highly offensive and intent and knowledge elements of these claims because an ambiguous -- if you instruct the jury that they should hold ambiguity against us, as Google, but there's evidence that actually Google tried, and the jury might otherwise say, "Well, you tried but it was ambiguous so we find no intent or no highly offensive conduct," your instruction may override their desire to do that and confuse them.

MR. PATCHEN:  And to emphasize the point that Mr. Santacana was saying, the Penal Code -- CDAFA is a Penal Code.

THE COURT:  Right.

MR. PATCHEN:  It has to be read in precisely that way. And the knowledge is of Google's knowledge.  It's not the plaintiffs' knowledge.  The notion that a plaintiff could subjectively think "I'm revoking permission" and not communicate that or ambiguously communicate that and there's criminal liability for a defendant is highly -- and those messages are construed against the defendant, I don't think that that is permissible in any interpretation of a statutory requirement in terms of "without permission."

If we pick one aid of construction, I'm going to want all of the rules of construction in there.  Let's talk about everything.  You don't get to choose what is, in California case law and statute, the very last interpretive aid, which is if everything else goes away when you're interpreting a contract, then you construe it against the drafter.  That's how the law works.  But I don't get everything above it?  That would be problematic.  We shouldn't be putting contractual interpretation provisions into -- and means of interpretation into jury instructions.

THE COURT:  How does this relate -- we have an Instruction 20 about the affirmative defense of consent.  So in that context, is it your position "consent" and "without permission," are they different?  Are they the same thing?

MR. PATCHEN:  As I read the case law, "without permission" is from the perspective of the defendant.  That is what you -- I mean, not to hold it against Your Honor, but that is what you wrote in the summary judgment order.  It's from the defendant's perspective.  Consent is from the reasonable objective plaintiffs' perspective.  And so those are differing perspectives.  That's one.

Two, the ambiguity, the construed against the drafter ambiguity is already answered in 20.  As Mr. Santacana said, it has to be explicit.  Explicit consent is unambiguous consent.  If it's -- if it's ambiguous, which is the only time construe

against the drafter comes into play at all, you've already messed -- we've already fallen short of explicit consent.  So it doesn't help on consent and it can't possibly work on CDAFA.

THE COURT:  Okay.  Let's move off of that.

So where I stopped was 18 because somebody said they had something about 18.  Is there anything more here that we need to deal with on --

MR. PATCHEN:  Very minor.

THE COURT:  What's the problem?

MS. CORBO:  Your Honor, this pertains to Ninth Circuit Model Instruction that the parties had agreed on jointly in one of the draft sets that we sent you that Your Honor had not included in the submission that you sent last night, which clarifies that corporations are entitled to equal treatment and are considered to be people under the law.

And this -- the absence of this instruction becomes relevant with respect to Instruction 18 because Instruction 18 tells the jury to consider the extent to which other persons had access to the data at issue.  And we've heard testimony throughout this trial about how other companies, including third-party apps and other analytics companies, have access to the data at issue here.  And that access is relevant to the context of whether plaintiffs had an objectively reasonable expectation of privacy.

THE COURT:  Which Circuit's instruction are you

referring to?

MS. CORBO:  It's Ninth Circuit.  It was a combination of Numbers 4.1 and 4.2.

THE COURT:  Okay.

MS. CORBO:  I have a copy.

THE COURT:  No, I have it here.

Well, that's kind of a generic instruction.

And the other side didn't have a problem with it, Mr. Boies?

MR. DAVID BOIES:  Well, I think if we're going to get into what a corporation is, I think there is an instruction about how a corporation, you know, is bound by the acts of its people.

THE COURT:  That's 4.2.

MR. DAVID BOIES:  Right.

THE COURT:  And so 4.1 is they're equal before the law and they're entitled to fair treatment.  4.2 -- that's 4.1. 4.2 is, "A corporation is considered to be a person.  It can only act through its employees, agents, directors, or officers."  You might want that because we've had so much discussion about admissions by corporate officials.

MR. DAVID BOIES:  Yes.

THE COURT:  So both sides want 4.1 and 4.2?

MS. CORBO:  That's correct.

THE COURT:  All right.  I think we can add those.

**MR. DAVID BOIES:**  Yes.

**THE COURT:**  Where would you put those?

**MS. CORBO:**  I think it would make sense to put it after 10, which is the end of the suite of instructions that are about broadly different types of evidence.

**THE COURT:**  Okay.

**MR. DAVID BOIES:**  I think it goes sensibly there.

**THE COURT:**  Okay.  After 10.

Okay.  So can we move on to the next one that you want to talk about, which would be?  Who has the next one?

**MR. DAVID BOIES:**  I don't --

**MR. PATCHEN:**  We had --

**MR. DAVID BOIES:**  I don't think I have any more that I need to press today.

**THE COURT:**  Mr. Boies is banking his challenges and you're about to run out, so okay.

**MR. PATCHEN:**  Yeah, it's like passing on the peremptories.

24 is what we had.  I don't think we have much more.

**THE COURT:**  Okay.  Let me go to 24.  Now, we're in the damages world.  These were -- these were a challenge.  Okay.

**MS. CORBO:**  So the addition that we would propose to make here is one that we put in the draft instructions that we submitted to the Court on the Wednesday or, I guess, early Thursday of this week.

And it would just be to include the total class size, which is 97,992,376.  And the reason for that is that there are some individuals who are double-counted, so if you add the --

THE COURT:  Double-counted because they're in both Class 1 and Class 2?

MS. CORBO:  Correct.

THE COURT:  You don't want Class 1 and Class 2.  You want just one number?

MS. CORBO:  I think we would want to put all three. We would want to say, "The estimated class sizes are 54.9 million members for Class 1" -- sorry -- "54.9 million members for Class 1" -- I'm rounding -- "59.5 million members for Class 2, and the total class size is 97,992,376."

MR. DAVID BOIES:  I think that's confusing.  I don't have any problem with the way it is now, and I wouldn't have any problem if they wanted to just put in the total.

THE COURT:  Well, we need to divide up --

MR. DAVID BOIES:  We do need to divide it up.

THE COURT:  Yeah, because they're going to be asked to divide it up in the damages calculation.

Okay.  I hear what you want.  I'll think about it and see what I want to do with it.

MR. DAVID BOIES:  Thank you.

THE COURT:  Okay.  Next one the people want to talk about?

MR. PATCHEN:  We didn't have anything further, Your Honor, on the instructions.  So we're passing there as well.

THE COURT:  Okay.  Anything else from you, Mr. Boies?

MR. DAVID BOIES:  No, no, Your Honor.

THE COURT:  Okay.  Let's see, and then that includes, I had a page break for you because I give the main instructions, then you argue, and then there are a few housekeeping instructions I give at the end.  They're Number 26, is the first one, so you know -- you understand where the break is.

By the way, you're probably not going to care much, but my practice is that as I read the instructions, I have Ms. Hom scroll them on -- as I'm reading, she's scrolling what I'm reading so they can see it.

I don't want to give them -- they get a set of the instructions when they go back there, but I don't want to give them the instructions now because they're going to start reading other instructions when I'm trying to tell them.  So that's why I do the scrolling.  So don't be surprised if you see it scrolling away on the screen.

Okay.

MR. PATCHEN:  One clarification, Your Honor, on 19.

THE COURT:  19.

MR. PATCHEN:  When you were saying the

cross-references, I just want to make sure I put my notes in right. The first cross-reference should say to 18 and the second one should be 16?

THE COURT: Let me go back here.

MR. PATCHEN: I apologize, Your Honor.

THE COURT: Okay. I'm on 19 now. And 19 refers to -- it should be 16. Oh, these numbers are all going to change, again, remember.

MR. PATCHEN: Fair point, you're right.

THE COURT: I mean, I don't -- yeah, okay.

Okay. So are we going to the verdict form now?

MR. DAVID BOIES: Yes, Your Honor.

THE COURT: All right. That, I've already bored you with my orations about the verdict form, and it's a function of having been burned, both as a lawyer and as a judge, on verdict forms. So I spent a lot of time on them, and R.J. and I have spent a lot of time on this.

But that doesn't mean we necessarily have gotten it right. So I'll start with you, Ms. Agnolucci.

MS. AGNOLUCCI: Thank you, Your Honor.

So our overarching suggestion for the verdict form is that we break out the elements of --

THE COURT: And I appreciate your request. I understand it. I'm not going to do it.

MS. AGNOLUCCI: And let me just add one more thing.

We thought it was particularly confusing in this case, with all the cross-referencing and the consent defense, for the jury to be going back and forth.

THE COURT:  Do you have a better way to do it?

MS. AGNOLUCCI:  Yes, Your Honor.  I have it right here, actually.

We suggested breaking them out into one page for each of the privacy claims.  So Privacy Claim 1 on its own page, Privacy Claim 2 on its own page, and CDAFA on its own page, and then folding the consent instruction into the two privacy claims so that it's very, very clear.

May I hand this up to Your Honor?

THE COURT:  Sure.  I'll take whatever.

MS. AGNOLUCCI:  Thank you.  I have a copy for counsel as well.

(Document handed up to the Court.)

MS. AGNOLUCCI:  I really do think it's clearer this way.  We're going to know what the jury did.  And we folded consent into 2 and 3, as Your Honor can see.

THE COURT:  Well, I guess let me be clear on this.  I don't have a problem with the -- the train has left the station on breaking these into the component parts.  It's going to be one question for claim 1, one question for claim 2, and one question for claim 3.  Yes or no.  I don't want to break it into this.

But I am quite amenable, if there's a better way on your affirmative defense, to weave that in because that was a big challenge, and I didn't -- because it doesn't apply to all of the claims, it became messy.  And so if you have a better way to do that.  But I am not going to break it into these elements.  That's the bottom line.

MS. AGNOLUCCI:  Sure.  So -- understood, Your Honor.

Another way to do it might be to have the CDAFA claim as Question 1, without the elements broken out, and then the consent defense underneath each of Question 2 and 3 as an additional subpart of that one.

THE COURT:  Yeah, we tried that out, and I -- I think -- I was pushing that at one point, and it was like, for example, 1 and then 1A.  It would be an affirmative defense, and then you'd go back to 2.  And then for the claims that the consent, that the affirmative defense applied to, I tried to build it into that.  It became -- it didn't seem to improve the situation.

But I will look at it again if that's what you're suggesting would be better.

MS. AGNOLUCCI:  We would appreciate that, Your Honor.

And then we had just a couple of other things.

THE COURT:  And just so I'm clear, your concern is that it's too busy to have too much direction?

MS. AGNOLUCCI:  Yeah.  I found the back-and-forth at

the bottom of the suggested page 1 a little bit confusing with respect to, "If you answered 'yes,' go here. If you answered 'no,' go there." And so I thought it would be clearer for them to have everything on one page for each of the three claims.

THE COURT: You're talking about the -- and I don't disagree with you. The discussion below 3? Maybe it's below 4. I'm struggling and I would get -- I would invite suggestions.

What I -- I want to do something that's somewhat in conflict with what you're pointing out. I want to be as literal as possible to the jury so that there is absolutely no -- that they don't have to use common sense as to where to go on a form. I want them to -- almost insult their intelligence by saying, "You know, you don't have to make any calls. You just do what I tell you to do."

And that's because I've had problems where they've jumped around and they haven't answered questions and they don't know where they're supposed to go.

However, I do think this is too busy, and I -- I'm sure a juror is going to look at this and say, "This hurts my head to worry about this."

So I'll look at this to see if maybe breaking the affirmative defense to underneath the particular claims to which it applies will make it better. I'll look.

MS. AGNOLUCCI: Thank you, Your Honor.

**MR. DAVID BOIES:**  My instinct is it's going to make it worse.  I agree that this is complicated because we've got three claims and they have some different elements.  But I actually think the way this verdict form goes, while it takes -- you've got to spend a little time to follow it, I think it's very clear.  I think this will avoid any jury confusion.

And I would -- maybe there's another way to do it as well, but I think the virtue of this -- and we've got a pretty good jury here --

**THE COURT:**  I think so.

**MR. DAVID BOIES:**  -- and I think they're capable of following these instructions, and I think these instructions have the virtue of, if you look at them, it's very clear how you proceed.  And I think that's -- I think that's an important virtue.  I might feel differently with a different jury, but I think this is a pretty intelligent jury.

**THE COURT:**  Well, let me fiddle with it a little more and see.  I appreciate you giving me yours.  I'm going to make a couple of versions, and we'll kind of play act through it and see how it goes.

**MS. AGNOLUCCI:**  Thank you, Your Honor.

**THE COURT:**  So Mr. Boies reminded me, in the interest of full disclosure, our one female juror asked me on the way out, I knew this might come, "Oh, I've been counting on 8:30 to

1:30 and this is just going to be very difficult for me," and all this sort of stuff.

So I said, "I really need you to be available through -- past 1:30 on Tuesday," because I don't want to chop your closings into two days.

But we'll just have to see.  I'm going to encourage -- and I also told her -- she had something about her employer.  I said, "Have your employer call me," which sometimes works.

But, so just, we may have to go back to 8:30 to 1:30 for deliberation.  We'll see what happens.  Okay?

MS. AGNOLUCCI:  Understood.

And, Your Honor, we did have two other things on the verdict form, if we may.

THE COURT:  Yes.

MS. AGNOLUCCI:  One is a point of clarification.

So Your Honor, at the beginning, came out with commentary about what I think was then Question 7.  So that we understand, it's Your Honor's intent to direct the jury to consider nominal damages only if they have said no to compensatory but not if they have said no to disgorgement.

THE COURT:  Correct.

MS. AGNOLUCCI:  Understood.

And then for the next line item where we provide the estimated class sizes, we would like to do something similar to what we're proposing in the jury instructions, and it's in the

packet that I handed up to Your Honor.

We'd like to give the total estimated number of class members as well. And if Your Honor thinks that's confusing, we can add a sentence that says that there's overlap. But what we don't want to do is invite a double award of nominal damages because there is a delta of about 16 million, which, of course, is significant to us.

THE COURT: And I know you think it's confusing to have the --

MR. DAVID BOIES: I think putting both numbers in is confusing. I think that if they were to put in just the class size on nominal damages, we could allocate it -- assuming we win, obviously -- but we could allocate it, as part of the allocation scheme, in proportion to the individuals in Class 1 and 2.

So I think one possibility would be to not do the verdict form by class here; do it by the combination number, and just with the expectation that when it came to allocating that amount between the people in the two classes, it would be allocated based on this ratio.

MS. AGNOLUCCI: There's been evidence at this trial about differences between and among Android and iOS users, so we would like to give the jury the option to choose.

THE COURT: Okay. I'll leave it broken down, and then I will consider your request with the objection -- Mr. Boies'

objection, I shouldn't, if I've broken it down, add a total number.  I'll think about that and decide.

MS. AGNOLUCCI:  It also could be solved by doing what Your Honor suggests and then doing the math on the back end the other way; in other words, accounting for the double-counting if they were to insert the total number of Android and total number of iOS.

THE COURT:  The jury?  Who would be inserting the number?

MS. AGNOLUCCI:  If the jury completed this form with 59 and 54 --

THE COURT:  Yes.

MS. AGNOLUCCI:  -- for example, and we could -- actually, never mind.  That wouldn't work.

THE COURT:  Okay.

Okay.  When you get the set from me, if you want -- I think there's been a fairly extensive record of what you've proposed, and now we've had the conference and you've given me your positions, but I don't foreclose.

Once you get the final set, if you want to file a -- to preserve your objections, you want to -- because in the back and forth, sometimes it gets a little unclear if you've agreed or not agreed to things.  If you want to file something, that's fine.

But I'm not going to have a further -- in other words, I'm

going to send you the thing on Monday afternoon and we're done.

MS. AGNOLUCCI:  Understood.

THE COURT:  And then you can use that.

Not to cause the left side, from where I'm sitting, panic, but if the jury were to come back and answer not only with the award of damages, as would trigger it, and then a "yes" to the availability of punitive damages, we would then have to go into the phase.  And we have an instruction that would then tell them what they needed to do.

But what kind of presentation would you contemplate if we have to -- if we end up being there?

MS. AGNOLUCCI:  We haven't gone that far, Your Honor.

MR. DAVID BOIES:  I think it would be relatively brief.

THE COURT:  I would think a summary proceeding of some kind.

MR. DAVID BOIES:  And I think the main thing that we would do is the amount of their assets, profits, that sort of thing; and then the pattern and practice that you're excluded on the liability phase, but which is relevant to the punitive phase.

THE COURT:  Well, if there's a punitive phase, at that point, because I've built in the question at the first phase, I would really -- the punitive phase would be the amount.

MR. DAVID BOIES:  Just the amount.

THE COURT:  It wouldn't be a discussion of reprehensibility because they would have already found that they thought that had been satisfied; that entitlement to punitive damages, they have said "yes"; and so then it's just an amount.  And that's why the instruction that I would propose for that phase is you've got to calculate the amount.

MR. DAVID BOIES:  No, no, I understand that they're only calculating the amount.  But what I'm saying is the amount of punitive damages --

THE COURT:  Yes.

MR. DAVID BOIES:  -- maybe is intended to figure out what do they need to do to deter this conduct.  And what I'm saying is the deterrence has something to do with the nature of the conduct and something to do with the amount -- how rich the defendant is, but that those are two aspects of what does it take to deter these people.

THE COURT:  And I guess my thought is that they've already satisfied aspect one, which is the conduct, deeming the conduct to be sufficiently reprehensible as to warrant punitives.

So at that point -- what I want to avoid, obviously, is an extended procedure.  If you're there, I want to be able to say to the jury, "You have one more task to do, and it's going to be a limited task."  And that is what I have in mind.

But I know this is not something you guys want to think

about, but just to have it in mind so that we wouldn't have to, then, kind of have an, "Oh, my God, what do we do now" problem.

MS. AGNOLUCCI:  Understood, Your Honor.

MR. DAVID BOIES:  We'll focus on that and maybe even talk among ourselves.

THE COURT:  Yeah, that would be good.

MS. AGNOLUCCI:  I think we should talk among ourselves.

THE COURT:  Okay.  Good.  Well, hopefully, you'll get a little bit of rest and relaxation.  In fact, I want you to because I don't want you to be sitting around thinking of things to file.

(Laughter.)

THE COURT:  I don't want you to do that.  So go and enjoy yourself.

MS. AGNOLUCCI:  And, Your Honor, we will be here at 8:00 on Tuesday morning?

THE COURT:  Yes, I think so.

MS. AGNOLUCCI:  All right.  Thank you, Your Honor.

THE COURT:  Okay.  Yes, and R.J. is going to give you the calculation.

MR. DAVID BOIES:  Excellent.

THE LAW CLERK:  I didn't want to leave you guys disappointed.

(Laughter)

THE LAW CLERK:  Plaintiffs, it would be a long closing argument, but you have 4 hours, 21 minutes, and 37 seconds.

THE COURT:  Don't do that to us.

MR. DAVID BOIES:  No way.  For one thing, the jury would kill me before you did.

THE COURT:  Oh, yeah, I think it would not be a smart move.

THE LAW CLERK:  Defendant has 5 hours, 24 minutes, and 44 seconds.

THE COURT:  Okay.  And I won't even ask because it doesn't really matter who's going to be doing what.  You have also a rebuttal argument.  You have the burden.  So you can divide that up.  It doesn't have to be the same person.  That's up to you.  And I assume it's the same -- one person is going to be your representative.

MS. AGNOLUCCI:  There will be one person.

THE COURT:  Okay.  All right.

MR. DAVID BOIES:  Thank you, Your Honor.

THE COURT:  Thank you.  Have a good weekend.

THE COURTROOM DEPUTY:  Court stands in recess.

(Proceedings adjourned at 3:34 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Saturday, August 30, 2025

_Ana Dub_

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter