Volume 10

Pages 1831 - 1982

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,          )
individually and on behalf of      )
all others similarly situated,     )
                                   )
            Plaintiffs,            )
                                   )
  VS.                              )    NO. 3:20-CV-04688 RS
                                   )
GOOGLE LLC,                        )
                                   )
            Defendant.             )
_____)

San Francisco, California
Tuesday, September 2, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    BOIES SCHILLER FLEXNER LLP
                    333 Main Street
                    Armonk, New York 10504
               BY:  **DAVID BOIES, ATTORNEY AT LAW**
                    **ALEXANDER M. BOIES, ATTORNEY AT LAW**
                    **M. LOGAN WRIGHT, ATTORNEY AT LAW**

                    BOIES SCHILLER FLEXNER LLP
                    2029 Century Park East, Suite 1520n
                    Los Angeles, California 90067
               BY:  **ALISON L. ANDERSON, ATTORNEY AT LAW**
                    **SAMANTHA D. PARRISH, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Plaintiffs:

                  BOIES SCHILLER FLEXNER LLP
                  100 Southeast Second Street, Suite 2800
                  Miami, Florida 33131
        BY:  **JAMES W. LEE, ATTORNEY AT LAW**

                  BOIES SCHILLER FLEXNER LLP
                  44 Montgomery Street, 41st Floor
                  San Francisco, California 94104
        BY:  **MARK C. MAO, ATTORNEY AT LAW**

                  SUSMAN GODFREY LLP
                  One Manhattan West, 50th Floor
                  New York, New York 10001
        BY:  **WILLIAM C. CARMODY, ATTORNEY AT LAW**
             **RYAN SILA, ATTORNEY AT LAW**

                  SUSMAN GODFREY LLP
                  1900 Avenue of the Stars, Suite 1400
                  Los Angeles, California 90067
        BY:  **AMANDA BONN, ATTORNEY AT LAW**

                  MORGAN & MORGAN COMPLEX LITIGATION GROUP
                  201 North Franklin Street, Seventh Floor
                  Tampa, Florida 33602
        BY:  **RYAN McGEE, ATTORNEY AT LAW**

For Defendant:

                  COOLEY LLP
                  Three Embarcadero Center, 20th Floor
                  San Francisco, California 94111-4004
        BY:  **BENEDICT Y. HUR, ATTORNEY AT LAW**
             **EDUARDO E. SANTACANA, ATTORNEY AT LAW**
             **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
             **ISABELLA M.M. CORBO, ATTORNEY AT LAW**
             **MICHAEL B. MORIZONO, ATTORNEY AT LAW**
             **ARGEMIRA FLOREZ, ATTORNEY AT LAW**
             **THILINI CHANDRASEKERA, ATTORNEY AT LAW**

                  COOLEY LLP
                  4401 Eastgate Mall
                  San Diego, California 92121
        BY:  **MICHAEL A. ATTANASIO, ATTORNEY AT LAW**

Also Present:        **Steve Ganem, Google**
                  **Julian Santiago**

1          **I N D E X**

2

3     Tuesday, September 2, 2025 - Volume 10

4

5                                                    **PAGE**  **VOL.**

6     Jury Instructions                             1843   10
      Closing Argument by Mr. David Boies           1858   10
7     Closing Argument by Mr. Hur                   1913   10
      Rebuttal Argument by Mr. David Boies          1960   10
8     Final Jury Instructions                       1976   10

9

10

11                **E X H I B I T S**

12    | TRIAL EXHIBITS | IDEN | EVID | VOL. |
      | --- | --- | --- | --- |

13    | PX82  |   | 1960 | 10 |
14    | PX91  |   | 1841 | 10 |
15    | PX93  |   | 1841 | 10 |
16    | PX94  |   | 1841 | 10 |
17    | PX99  |   | 1841 | 10 |
18    | PX101 |   | 1841 | 10 |
19    | PX105 |   | 1841 | 10 |
20    | PX106 |   | 1841 | 10 |
21    | PX107 |   | 1841 | 10 |
22    | PX108 |   | 1841 | 10 |
23    | PX111 |   | 1841 | 10 |
24    | PX112 |   | 1841 | 10 |
25    | PX114 |   | 1841 | 10 |

1

# I N D E X

2

## E X H I B I T S

3

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| PX115 | | 1841 | 10 |
| PX117 | | 1841 | 10 |
| PX181 | 1842 | | 10 |
| G903 | | 1841 | 10 |
| G906 | | 1841 | 10 |
| G933 | | 1841 | 10 |
| G0934 | | 1841 | 10 |
| G947 | | 1841 | 10 |
| G952 | | 1841 | 10 |
| G956 | | 1841 | 10 |
| G959 | | 1841 | 10 |
| G963 | | 1841 | 10 |
| G967 | | 1841 | 10 |
| G982 | | 1841 | 10 |
| G986 | | 1841 | 10 |
| G1003 | | 1841 | 10 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **Tuesday - September 2, 2025**                              **8:09 a.m.**

2                        **P R O C E E D I N G S**

3                            ---o0o---

4        (Proceedings were heard out of the presence of the jury.)

5            **THE COURT:**  Good morning.

6            **ALL:**  Good morning, Your Honor.

7            **THE COURTROOM DEPUTY:**  You may be seated.

8            **THE COURT:**  The preliminary matters that you brought

9    to my attention, I have reviewed.

10       We also have the final set of instructions that we will

11   give to you, and they are the same as you received.  I don't

12   want to have argument on any of these things.  It's beyond

13   that.  We've -- I've -- you've been very good about briefing

14   all these things, and I don't need more discussion.

15       The motions that Google filed to decertify and then the

16   Rule 50 motions for both sides, those have been filed.  They're

17   received.  I'm not going to rule on them at this juncture.

18       The objections to the instructions, I've received the

19   objections.  I've considered them, but I'm going to overrule

20   those objections.  I'm going to give the instructions that were

21   sent out to you; and, actually, R.J. has a final set he can

22   give to each of you.

23       With respect to the Motion in Limine Number 19 that I

24   received from Google, with respect to that motion, on the

25   subpoena abortion reference, I'm going to grant the motion.  I

**PROCEEDINGS**

1    don't think there should be any reference to that.  I don't

2    think there's really any evidence in that regard.  And I know

3    that there were questions to Mr. Ganem, but I don't think

4    that's sufficient.

5         And then the data breach, I'm going to grant the motion

6    with respect to data breach.  But I'm going to deny the motion

7    with respect to AI.  I think you can make reference -- the

8    plaintiffs can make reference to the fact that Google's using

9    AI to train machine learning, the conversion models, using

10   sWAA-off data.  So I think they can make reference to that.

11        So that's the ruling of the Court.

12        I'm going to start as soon as the jury gets here.  We will

13   take a break -- I'll give the instructions.  We'll start -- is

14   it --

15        Mr. Boies, you're going to be giving the closing?

16        **MR. DAVID BOIES:**  Yes, Your Honor.

17        **THE COURT:**  All right.  We'll need to take a break at

18   some point.  I don't know how long your initial closing is

19   going to be.  Do you have a sense of it?

20        **MR. DAVID BOIES:**  Slightly more than an hour,

21   Your Honor.

22        **THE COURT:**  Okay.  I don't want to interrupt your

23   flow.  At the same time, that probably will mean we'll need to

24   have a -- we may need to have a break before you're done.

25        **MR. DAVID BOIES:**  Sure.

PROCEEDINGS

```
 1          THE COURT:  But I'll try to get an idea of a good time
 2   with you.
 3          MR. DAVID BOIES:  You just tell me when you'd like to
 4   break.  I will arrange my presentation so that --
 5          THE COURT:  Well, if we can get started at 8:30, I
 6   would like to break at 10:15.
 7          MR. DAVID BOIES:  10:15.
 8          THE COURT:  Yes.
 9          MR. DAVID BOIES:  I will arrange to break within two
10   or three minutes of that.
11          THE COURT:  Okay.  That's good.
12      Now, you all have a right, which I will not certainly
13   suggest you should be divested of, to object if you feel that
14   there's something that needs to be objected to; but just like
15   with opening statements, my personal view is that I really want
16   each side to give the other the opportunity to -- not to break
17   their flow.  And so if you have to, you have to; but keep in
18   mind that it's, I think, better for the jury not to have
19   closings disrupted.
20      Okay.
21          MR. HUR:  I'm sorry, Your Honor.  Might I suggest that
22   if Mr. Boies's closing is a little over an hour, that we let
23   him finish the closing before the break?  It sounds like we'll
24   be just about at 10:15.  And then when we switch, it'll be --
25   you know, there's going to be some transition time.
```

PROCEEDINGS

1      **THE COURT:**  That would be my preference, but -- that's

2  fine; but when we get much more after 10:15, people need a

3  break.

4      **MR. HUR:**  Understood, Your Honor.

5      **THE COURT:**  So I understand, and I would like to --

6  I think it would be good if -- if it's going to be five more

7  minutes or something, I'm not going to call the -- what I'm

8  saying to you is, when we hit around 10:15, at that point I'm

9  just going to kind of assess things, and I may just say, "We've

10  got to take a break."  So be aware of it, that it's coming.

11      **MR. DAVID BOIES:**  I'm going to be make sure that

12  before we get beyond, I will either be finished or I will --

13      **THE COURT:**  Say, "We need a break."

14      **MR. DAVID BOIES:**  I will suggest a break.

15      **THE COURT:**  Either one is fine by me.

16      **MR. HUR:**  Thank you, Your Honor.

17      And then just for the rest of the schedule, mine's

18  probably about the same.  Is Your Honor's thought that we

19  would, after the break, do the defense closing, the rebuttal,

20  and then let the jury go, or is the Court considering some

21  lunch break?

22      **THE COURT:**  Well, I was -- I will certainly not let

23  them go.  I'm hoping that they will start to deliberate.

24      **MR. HUR:**  That's what I meant, Your Honor.

25      **THE COURT:**  But if your question is are we hoping that

**PROCEEDINGS**

 1    we can get all the closings in and then have the lunch break,

 2    that would be wonderful, but I -- that's fairly ambitious, but

 3    that would be good.

 4        In that regard, we may not take the lunch break until,

 5    like, 12:30 or even a little -- it would be nice to have ended

 6    all final instructions for me, lunch break, they start to

 7    deliberate or they say, "We're coming back tomorrow."

 8        **MR. HUR:**  Yes, Your Honor, that would be our

 9    preference too.  And presuming that the rebuttal is, you know,

10    a reasonable length, that seems doable.

11        **THE COURT:**  Okay.  Good.

12        **MS. CORBO:**  Your Honor, just one point of

13    clarification on Google's Motion in Limine Number 19.

14        With respect to the artificial intelligence point, I just

15    want to clarify that any reference in plaintiffs' closing

16    argument would be limited to machine learning for conversion

17    modeling and not to Gemini or --

18        **THE COURT:**  Yes.

19        **MS. CORBO:**  -- generative AI.

20        **MR. DAVID BOIES:**  It is more than just for conversion.

21    They were talking -- he talked about machine learning for a

22    number of subjects.  I'm not going to mention Gemini.

23        **THE COURT:**  All right.  I'll take that.

24        **MR. DAVID BOIES:**  But he mentioned machine learning

25    for a number of --

PROCEEDINGS

1          **THE COURT:**  Not just conversion.

2          **MS. CORBO:**  I believe that the testimony was limited

3    to --

4          **THE COURT:**  I'm not arguing this.  Really, we're not

5    going down this path.  So, okay.

6          **MS. CORBO:**  Thank you.

7          **MS. BONN:**  And, Your Honor -- excuse me -- we have two

8    housekeeping issues.

9          One is, the party's reached an agreement on the

10    privacy-type policy documents to move in.  So with the

11    stipulation, I'd like to read them into the record.

12          **THE COURT:**  Yes.

13          **MS. BONN:**  Plaintiffs offer Google privacy policy

14    Exhibit G0934.

15          Plaintiffs are about to offer a series of WAA help pages,

16    and the parties have agreed that I can read the following

17    language in [as read]:

18              "The parties have met and conferred and agreed

19          that these versions of the WAA help page constitute a

20          fair and accurate representative sample of the

21          versions of the WAA help page that were displayed to

22          users during the class period."

23          Plaintiffs offer PX91, PX93, PX94, PX99, PX101.

24          PX104 is already in evidence.

25          Plaintiffs offer PX105, PX106, PX107, PX108, PX111, PX112.

1          PX113 is already in evidence.

2          Plaintiffs offer PX114, PX115, G1003, PX117, G906, G930.

3          Plaintiffs also offer the following, which are the "How

4     Google uses information from sites and apps that use our

5     services" policy documents.  They are G982, G986.

6          PX123 is already admitted in evidence.

7          Plaintiffs offer G947, G952, G956, G959, G963, G967.

8          Plaintiffs offer the following Google Analytics for

9     Firebase/Google Analytics Terms of Service, Exhibit G933.

10         I think that's it.

11         **MS. FLOREZ:**  That's correct.

12    Argemira Florez with Cooley.

13         **THE COURT:**  Okay.  Those exhibits will be admitted.

14    (Trial Exhibits PX91, PX93, PX94, PX99, PX101, PX105,

15    PX106, PX107, PX108, PX111, PX112, PX114, PX115, PX117, G0934,

16    G1003, G0906, G0930, G0982, G0986, G0947, G0952, G0956, G0959,

17    G0963, G0967, and G0933 received in evidence.)

18         **MS. BONN:**  Thank you, Your Honor.

19         And then we've also prepared and marked for identification

20    as PX181 the clip report for the Miraglia deposition video clip

21    that was played in plaintiffs' rebuttal case, which we'd like

22    to provide the court reporter and have appended to the

23    transcript.

24         **THE COURT:**  Very well.  It'll be so marked and

25    appended to the transcript.

1    (Trial Exhibit PX181 marked for identification.)

2        **MS. BONN:**  Okay.  Thank you.

3        **THE COURT:**  Okay.

4        **MR. DAVID BOIES:**  Your Honor --

5        **THE COURT:**  Yes.

6        **MR. DAVID BOIES:**  -- I want to clarify just one thing.

7    I will not make any reference to Mr. Ganem's testimony

8    about subpoenas and the --

9    I will not make any reference to Mr. Ganem's testimony at

10   around 1243 about the subpoena and the woman in the abortion

11   state.

12   However, I do intend, unless the Court tells me not to, to

13   refer to his general testimony, not about subpoenas, but when I

14   asked him did he understand that people might be uncomfortable

15   with Google having this information, even though they said it

16   was unidentified.  It seems to me that that is entirely

17   appropriate.

18       **THE COURT:**  Yes, you can ask that.  You can make those

19   statements.

20       **MR. DAVID BOIES:**  Thank you, Your Honor.

21       **MS. CORBO:**  Okay.  I think that's fair.

22       **THE COURT:**  Okay.  So we'll see where they are, if

23   they're all here, and we'll get started as soon as we can.

24       **THE COURTROOM DEPUTY:**  Court stands in brief recess.

25                (Recess taken at 8:19 a.m.)

```
 1              (Proceedings resumed at 8:39 a.m.)

 2       (Proceedings were heard out of the presence of the jury.)

 3            THE COURT:  Okay.  Are we all ready to have them come

 4   out?

 5            MR. DAVID BOIES:  Yes, Your Honor.

 6            MR. HUR:  Yes, Your Honor.

 7            THE COURT:  Okay.

 8       (Proceedings were heard in the presence of the jury.)

 9            THE COURT:  Good morning, members of the jury.

10   Welcome back.  Hopefully, you had an enjoyable Labor Day.

11            As I mentioned to you on Friday when we concluded, what's

12   going to happen is today I'm going to read you the final

13   instructions for your use in your work, and then we will have

14   closing arguments from counsel.  I'll give you some final

15   instructions after that, and then the case will be in your

16   hands for deliberation.

17                        JURY INSTRUCTIONS

18            THE COURT:  Members of the jury, now that you have

19   heard all the evidence, it is my duty to instruct you on the

20   law that applies to this case.

21            Each of you will receive a copy of these instructions,

22   which will be sent to the jury room for you to consult during

23   your deliberations.

24            It is your duty to find the facts from all the evidence in

25   the case.  To those facts you will apply the law as I give it
```

1    to you.  You must follow the law as I give it to you, whether

2    you agree with it or not.  Do not allow personal likes or

3    dislikes, opinions, prejudices, sympathy, or bias to influence

4    you.

5        You must follow all these instructions and not single out

6    some and ignore others.  They are all important.

7        Please do not read into these instructions or into

8    anything I may have said or done any suggestion as to what

9    verdict you should return.  That is a matter entirely up to

10    you.

11        If any juror is exposed to any outside information, please

12    notify the Court immediately.

13        When a party has the burden of proving any claim or

14    affirmative defense by a preponderance of the evidence, it

15    means you must be persuaded by the evidence that the claim or

16    affirmative defense is more probably true than not true.

17        You should base your decision on all the evidence,

18    regardless of which party presented it.

19        The evidence you are to consider in deciding what the

20    facts are consists of, one, the sworn testimony of any witness;

21    two, the exhibits that are admitted into evidence; three, any

22    facts to which the lawyers have agreed; and, four, any facts

23    that I have instructed you to accept as provided -- as proven.

24        In reaching your verdict, you may consider only the

25    testimony and exhibits received in evidence at trial.  The

following things are not evidence, and you may not consider them in deciding what the facts are:

Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they may say in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by my ruling on it.

Testimony that is excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition, some evidence has been received only for a limited purpose.  If I instructed you to consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

Anything you may have seen or heard when the court was not in session is not evidence.  You are to decide the case solely on the evidence received at trial.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.

 1  Circumstantial evidence is proof of one or more facts from

 2  which you could find another fact.  You should consider both

 3  kinds of evidence.  The law makes no distinction between the

 4  weight to be given to either direct or circumstantial evidence.

 5  It is for you to decide how much weight to give to any

 6  evidence.

 7      Certain charts and summaries not admitted into evidence

 8  have been shown to you in order to help you -- help explain the

 9  contents of books, records, documents, or other evidence in the

10  case.  Charts and summaries are only as good as the underlying

11  evidence that supports them.  You should, therefore, give them

12  only such weight as you think the underlying evidence deserves.

13      Certain other charts and summaries have been admitted into

14  evidence to illustrate information brought out in the trial.

15  Charts and summaries are only as good as the testimony or other

16  evidence that supports them.  You should, again, therefore,

17  give them only such weight as you think the evidence deserves.

18      Those exhibits received in evidence that are capable of

19  being displayed electronically will be provided to you in that

20  form, and you will be able to view them in the jury room.  A

21  computer, tablet, projector, printer, or accessory equipment

22  will be available to you in the jury room.

23      Evidence was presented to you in the form of answers from

24  one of the parties to written interrogatories submitted by the

25  other party -- the other side.  These answers were given in

 1   writing and under oath before the trial in response to

 2   questions that were submitted under established court

 3   procedures.  You should consider the answers, insofar as

 4   possible, in the same way as if they were made from the witness

 5   stand.

 6      Evidence was presented to you in the form of stipulations

 7   to the truth of certain facts.  These stipulations were given

 8   in writing before the trial in response to requests that were

 9   submitted under established court procedures.  You must treat

10   those facts as having been proved.

11      You have heard testimony from Jonathan Hochman, Michael

12   Lasinski, Donna Hoffman, Christopher Knittel, and John Black,

13   all of whom testified about their opinions and the reasons for

14   those opinions.  This opinion testimony is allowed because of

15   the specialized knowledge, skill, experience, training, or

16   education of these witnesses.

17      Such opinion testimony should be judged like any other

18   testimony.  You may accept it or reject it and give it as much

19   weight as you think it deserves, considering the witness's

20   specialized knowledge, skill, experience, training, or

21   education, the reasons given for the opinion, and all the other

22   evidence in the case.

23      All parties are equal before the law, and a corporation is

24   entitled to the same fair and conscientious consideration by

25   you as any party.  Under the law, a corporation is to be

considered a person.  It can only act through its employees,
agents, directors, or officers.  Therefore, a corporation is
responsible for the acts of its employees, agents, directors,
and officers performed within the scope of their authority.

This case is a class action lawsuit.  A class action is a
lawsuit that has been brought by one or more class
representatives on behalf of a larger group of people who have
similar legal claims.  All of these people together are called
a "class" or "Plaintiffs."  The class representatives who bring
this action are Julian Santiago, Anibal Rodriguez, and Susan
Harvey.

In a class action, the claims of many individuals can be
resolved at the same time instead of requiring each class
member to sue separately.  You may apply the evidence at this
trial to all class members.  All members of the class will be
bound by the results of this trial.  The fact that this case is
proceeding as a class action does not mean any decision has
been made about what your verdict should be.

In this case, there are two classes.  Class 1 is the
"Android Class" and consists of all individuals who, during the
period beginning July 1st, 2016, and continuing through
September 23rd, 2024, (a) had their "Web & App Activity" and/or
"Supplemental Web & App Activity" setting turned off and
(b) whose activity on a non-Google-branded mobile app was still
transmitted to Google from (c) a mobile device running the

1  Android operating system because of the Firebase Software

2  Development Kit (SDK) and/or Google Mobile Ads SDK.

3      Class 2 is the "Non-Android Class" and consists of all

4  individuals who, during the period beginning July 1st, 2016,

5  and continuing through September 23, 2024, (a) had their

6  "Web & App Activity" and/or "supplemental Web & App Activity"

7  setting turned off and (b) whose activity on a

8  non-Google-branded mobile app was still transmitted to Google

9  from (c) a mobile device running a non-Android operating system

10  because of the Firebase Software Development Kit (SDK) and/or

11  Google Mobile Ads SDK.

12      I will now explain the substantive law applicable to the

13  claims brought in this action.

14      On behalf of the classes, plaintiffs assert three claims

15  against Google.  One, plaintiffs' first claim is violation of

16  the Comprehensive Computer Data Access and Fraud Act, CDAFA;

17  two, plaintiffs' second claim is invasion of privacy; and,

18  three, plaintiffs' third claim is intrusion upon seclusion.

19      For purposes of the plaintiffs' first claim, for violation

20  of the California Comprehensive Computer Data Access and Fraud

21  Act, the classes include all types of Google accounts,

22  including not only ordinary consumer accounts, but also

23  accounts for organizations like businesses and schools, called

24  "enterprise" accounts, and accounts for children under the age

25  of 13, which are called "supervised" accounts.

1    For purposes of plaintiffs' second and third claims, for

2    invasion of privacy and intrusion upon seclusion, the classes

3    include neither enterprise accounts for businesses and schools

4    nor supervised accounts for children.

5    Plaintiffs' first claim is that Google violated the

6    Comprehensive Computer Data and Access Fraud Act, sometimes

7    referred to as "CDAFA."  To establish this claim, plaintiffs

8    must prove all of the following:

9    One, plaintiffs are owners or lessees of mobile devices or

10   data.

11   Two, Google knowingly accessed plaintiffs' mobile devices

12   or data.

13   Three, Google took, copied, or made use of data from those

14   plaintiffs' mobile devices without plaintiffs' permission.

15   Four, plaintiffs suffered damage or loss.

16   And, five, Google's conduct was a substantial factor in

17   causing plaintiffs' damage or loss.

18   Some of the terms used in these elements have specific

19   meanings.  I will now explain them to you.

20   With respect to the first, second, and third elements of

21   plaintiffs' CDAFA claim, the term "mobile devices" includes

22   cell phones and tablets.

23   With respect to the second element of plaintiffs' CDAFA

24   claim, the term "access" means to gain entry to, instruct,

25   cause input to, cause output from -- output from, cause data

1  processing with or communicate with the logical, arithmetical,

2  or memory function resources of a mobile device, computer,

3  computer system, or computer network.

4      A person can access a mobile device, computer, computer

5  system, or computer network in different ways.  For example,

6  access can be accomplished by sitting down at a computer and

7  using the mouse and keyboard or by using a wireless network or

8  some other method or tool to gain remote entry.

9      With respect to the fifth element of plaintiffs' CDAFA

10 claim, the phrase "substantial factor in causing damage or

11 loss" means a factor that a reasonable person would consider to

12 have contributed to the damage or loss.  It must be more than a

13 remote or trivial factor to be a substantial factor.  A

14 substantial factor does not have to be the only cause of the

15 damage or loss.

16     Plaintiffs' second claim is for invasion of privacy.  To

17 establish this claim, plaintiffs must prove all of the

18 following elements:

19     One, that plaintiffs had an objectively reasonable

20 expectation of privacy.

21     Two, that Google's conduct was highly offensive, that is,

22 a shocking or outrageous breach of social norms regarding

23 online data.

24     Three, that plaintiffs sustained injury, damage, loss, or

25 harm.

1       And, four, that Google's conduct was a substantial factor

2   in causing plaintiffs' injury, damage, loss, or harm.

3       Some of the terms used in these elements have specific

4   meanings.  The term "substantial factor" has the meaning

5   described -- that I described to you in Instruction Number 17,

6   the prior instruction.  The term "objectively reasonable

7   expectation of privacy" is a term that I now will explain to

8   you.

9       For the first element, in deciding whether plaintiffs had

10  an objectively reasonable expectation of privacy, you should

11  consider, among other factors, the following:

12      One, the customs, practices, and physical or digital

13  settings surrounding Google's conduct.

14      Two, the extent to which other persons had access to the

15  data at issue.

16      And, three, the means by which the intrusion, if any,

17  occurred.

18      Plaintiffs' third claim is for intrusion upon seclusion.

19  To establish this claim, plaintiffs must prove all of the

20  following elements:

21      One, that plaintiffs had an objectively reasonable

22  expectation of privacy that Google would not collect, save, or

23  use the data at issue.

24      Two, that Google intentionally intruded upon the

25  plaintiffs' objectively reasonable expectation of privacy by

1    its conduct.

2         Three, that Google's conduct was highly offensive; that

3    is, a shocking or outrageous breach of social norms regarding

4    online data.

5         Four, that plaintiffs sustained injury, damage, loss, or

6    harm.

7         And, five, that Google's conduct was a substantial factor

8    in causing Google's injury -- plaintiffs' injury, damage, loss,

9    or harm.

10        Some of these terms have special meanings which I have

11   already defined for you.  I explained that the term

12   "objectively reasonable expectation of privacy" has the meaning

13   described in Instruction 19.  The term "substantial factor" has

14   the meaning described in 17.

15        Google asserts an affirmative defense of consent.  It has

16   the burden of proving its affirmative defense by a

17   preponderance of the evidence.  Plaintiffs deny this defense.

18        Google's affirmative defense of consent applies only to

19   the invasion of privacy and intrusion upon seclusion claims.

20   Under this defense, Google is not responsible for plaintiffs'

21   injury, damage, loss, or harm, if any, if Google proves that,

22   one, plaintiffs were explicitly notified of Google's particular

23   at-issue conduct; and, two, plaintiffs voluntarily consented to

24   Google's particular at-issue conduct or to substantially the

25   same conduct by words or conduct.

1    Consent should be evaluated from the perspective of an

2    objectively reasonable user regarding Google's disclosures.

3    It is now my duty to instruct you about the measure of

4    damages.

5    If you decide that plaintiffs have proven any of their

6    claims against Google, you also must decide how much money,

7    known as damages, will reasonably and fairly compensate the

8    plaintiffs for any injury you find Google caused.  By

9    instructing you on damages, I do not mean to suggest for which

10   party your verdict should be rendered.

11   Plaintiffs must prove the amount of damages by a

12   preponderance of the evidence.  At the same time, plaintiffs do

13   not have to prove the exact amount of damages that will provide

14   reasonable compensation for the harm.  It is for you to

15   determine what damages, if any, have been proven.  Your award

16   must be based upon evidence and not upon speculation,

17   guesswork, or conjecture.

18   First, plaintiffs claim compensatory or actual damages

19   based on the economic value of allowing access to the data at

20   issue.

21   In calculating any actual damages, you should consider the

22   evidence and any reasonable inferences you may draw from the

23   evidence.  Any actual damages amount should be calculated

24   separately from the calculation of any other category of

25   damages.

1    You may award actual damages only if you find plaintiffs

2    have proved all the elements of their first claim, violation of

3    CDAFA, or their third claim, intrusion upon seclusion.

4    Plaintiffs also seek a distinct category of damages

5    referred to as unjust enrichment or disgorgement.  This relief

6    may allow them to recover any profits that Google earned from

7    collecting, saving, and/or using the at-issue data.

8    To recover under this theory, plaintiffs must prove by a

9    preponderance of the evidence each of the following:  One,

10   Google received a benefit that it otherwise would not have

11   achieved but for the at-issue data; and, two, that it would be

12   unjust for Google to retain that benefit without compensating

13   plaintiffs.

14   If you find disgorgement is appropriate, you must

15   calculate the amount.  To do so, one, determine Google's total

16   revenue by collecting, saving, and/or using the at-issue data;

17   two, determine Google's expenses in obtaining that gross

18   revenue; and, three, deduct Google's expenses from the total

19   revenue.

20   It is Google's burden to prove the amount of expenses and

21   plaintiffs' burden to prove the amount of gross revenue.

22   You may award disgorgement only if you find plaintiffs

23   have proved all of the elements of their first claim, violation

24   of CDAFA; second claim, invasion of privacy; and/or third

25   claim, intrusion upon seclusion.

1    If you find that plaintiffs proved any of their claims but

2    you find that plaintiffs have failed to prove actual damages,

3    you may award nominal damages to compensate for any injury,

4    damage, loss, or harm that you determine plaintiffs to have

5    suffered.  These may include battery degradation, loss of the

6    right to control one's data, or emotional distress.

7    Nominal damages may not exceed $1 per class member.  This

8    means that the total amount of nominal damages will equal the

9    amount of nominal damages you award multiplied by the amount of

10   people per class.  The estimated class sizes by subclass are

11   54,923,146 members for Class 1, the Android class; and

12   59,565,930 members for Class 2, the non-Android class.

13   You may award nominal damages only if you find plaintiffs

14   have proved all of the elements of their first claim, violation

15   of CDAFA; second claim, invasion of privacy; and/or third

16   claim, intrusion upon seclusion.

17   Another category of damages that plaintiffs seek are

18   punitive damages.  If you decide that Google is liable with

19   respect to plaintiffs' first claim, under CDAFA, or their third

20   claim, under intrusion upon seclusion, you must also decide

21   whether Google's conduct justifies an award of punitive

22   damages.

23   The purposes of punitive damages are to punish a wrongdoer

24   for the conduct that caused the injury, damage, loss, or harm

25   and to discourage similar conduct in the future.  The amount of

1    punitive damages, if any, will be decided later.

2        To determine whether Google's conduct justifies punitive

3    damages, you must decide whether plaintiffs have proved by

4    clear and convincing evidence that Google engaged in the

5    conduct at issue with malice, oppression, or fraud.

6        This standard contains several terms that I will now

7    define for you.

8        "Clear and convincing evidence" means that the party must

9    present evidence that leaves you with a firm belief or

10   conviction that it is highly probable that the factual

11   contentions of the claim or defenses -- or defense are true.

12   This is a higher standard than preponderance of the evidence,

13   but it does not require proof beyond a reasonable doubt.

14       "Malice" means that Google acted with intent to cause

15   injury or that Google's conduct was despicable and was done

16   with a willful and knowing disregard of the rights or safety of

17   another.  A person or entity acts with knowing disregard when

18   they are aware of the probable consequences of their conduct

19   and deliberately fails to avoid those consequences.

20       "Oppression" means that Google's conduct was despicable

21   and subjected plaintiffs to cruel and unjust hardship in

22   knowing disregard of their rights.

23       "Fraud" means that Google intentionally misrepresented or

24   concealed a material fact and did so intending to harm

25   plaintiffs.  Fraud includes disclosing some facts but

1  intentionally failing to disclose other facts, making the

2  disclosure deceptive.

3     We now have reached the point, members of the jury, where

4  we will have closing arguments.  The plaintiff begins the

5  closing arguments.

6     Mr. Boies.

7        **MR. DAVID BOIES:**  Thank you, Your Honor.

8                    **<u>CLOSING ARGUMENT</u>**

9        **MR. DAVID BOIES:**  Good morning, members of the jury.

10    When I had an opportunity to speak to you several days

11 ago, I told you what evidence I thought we were going to be

12 able to prove.  Today I'm going to go through the evidence that

13 I believe we have proved.

14    I want to apologize at the beginning.  This is going to be

15 a little longer than I would like, but I want you not only to

16 hear my summary of the evidence, but I want you to see the

17 evidence itself.  I want you to see the words from documents.

18 I want you to see the words from testimony.

19    Now, as the Court has just indicated, we have three

20 claims.  And if I can make this work...

21        **THE COURTROOM DEPUTY:**  It's coming up.  It just takes

22 time.

23        **MR. DAVID BOIES:**  Now is it working?  Thank you very

24 much.

25    We have three claims:  the California Comprehensive

1  Computer Data Access and Fraud Act, which I'm going to refer to

2  as CDAFA; invasion of privacy; and intrusion upon seclusion.

3      Now, this was the jury instruction that you just heard,

4  and the first element is that plaintiffs are the owners or

5  lessees of mobile devices or data.

6      It's stipulated that the plaintiffs own their mobile

7  devices.  I think there won't be any dispute that this is their

8  data.  It comes from their personal devices, and it relates to

9  their personal use of third-party apps.

10     The second element is knowingly access plaintiffs' mobile

11  devices or data.  Again, I don't think there's going to be any

12  dispute about that.  As the evidence has shown, Google put out

13  these SDKs that, when used, took data directly from the mobile

14  devices to Google.

15     Third -- and I want to emphasize this one -- Google took,

16  copied, or made use of data from those mobile devices without

17  plaintiffs' permission.

18     Now, there are two aspects of that:  one, that Google

19  took, copied, or made use of the data.  And I emphasize there

20  it's "or."  Any one of those three.  I think the evidence will

21  show they did all of those three, but to have a violation, they

22  only have to do one.  And, second, it's without plaintiffs'

23  permission.

24     And then, of course, we've got to prove damage or loss.

25     So there are really three things we have to do.  We have

1    to prove that they collected, copied, or used; that they didn't

2    have permission; and that plaintiffs were damaged and we need

3    to prove how much.

4         Now, CDAFA does not say that it may be okay to collect,

5    copy, or use plaintiffs' data if you de-identify it.  It

6    doesn't say it may be okay to collect, copy, or use plaintiffs'

7    data depending on where you store it.  It does not say it may

8    be okay if you need it for your business or for your

9    advertisers or your app developers.  What it says is that you

10   can't take, copy, or use plaintiffs' data without their

11   permission or consent.

12        Now, Google actually in this trial -- and you'll see the

13   testimony and the exhibits -- admits it takes, copies, and uses

14   sWAA-off data.

15        Mr. Monsees, who plaintiffs described as the CEO of sWAA

16   and WAA [as read]:

17        "QUESTION:  We know as of that date, as of July 25th of

18        2019, he spoke the truth.  Right then and there -- forget

19        about future proposals.  Right then and there, we know

20        Google was collecting users' WAA-off data; right?

21        "ANSWER:  Correct."

22        Google's own expert witness, Mr. Black, said the same

23   thing.

24        Mr. Ganem, Google's corporate representative at this

25   trial, testified that when Google first receives this sWAA-off

1  data from the app, whatever it is, it has all the personal

2  identifiers in it.

3      So I respectfully submit that Google's own witnesses admit

4  that plaintiffs [sic] takes the data.

5      Now, in addition, their own witnesses admit Google copies

6  plaintiffs' data.  This is Mr. Ganem [as read]:

7      "QUESTION:  Now, when Google first receives this sWAA-off

8      data from the app, whatever it is, it has all the personal

9      identifiers in it?

10     "ANSWER:  Yes.

11     "QUESTION:  And Google makes a copy of that; correct?  The

12     first thing that happens is it goes into the memory of

13     your server; correct?

14     "ANSWER:  Yes."

15     And then a little while later [as read]:

16     "QUESTION:  So the sWAA-off data comes in, and then it's

17     copied into memory.  A second copy is made, and those two

18     copies are separated; correct?

19     "ANSWER:  Yes."

20     And only then do they perform the consent check.

21     Now, the amount of data, you've heard, is very

22  substantial.  The sWAA-off data for just two class

23  representatives for just two months, because that's all the

24  data that Google produced to us, just for two months, two class

25  representatives, 30 stories high.  A huge amount of data.

1    For all of the class members, it would be -- and I can't

2    quite figure out what this number is -- but it's

3    4.5 quadrillion pages.  If you stacked it up, three times the

4    distance to the sun and back and to the sun again.  An enormous

5    amount of data, sWAA-off data, that is being collected.

6        Now, also, Google uses plaintiffs' sWAA-off data.  Again,

7    Mr. Ganem -- and you'll see, I will, again and again today, be

8    quoting their experts and quoting their executives.  I'm

9    showing you what they admit so that there's no doubt about what

10   the facts are.

11       Mr. Ganem, their corporate representative [as read]:

12       "QUESTION:  I'm just trying to establish a simple point

13       that I think you agree with, which is that the sWAA-off

14       data that Google collects has a lot of value to Google;

15       fair?

16       "ANSWER:  Potentially.

17       "QUESTION:  Well, when you say 'potentially,' Google uses

18       that sWAA-off data; correct?

19       "ANSWER:  Yes.

20       "QUESTION:  And it uses it now, not just in theory but in

21       practice?

22       "ANSWER:  Yes.

23       "QUESTION:  Now, it also uses that data to inform machine

24       learning models; correct?

25       "ANSWER:  Yes."

1    And then again, Mr. Ganem [as read]:

2    ▪**QUESTION:**  And you use sWAA-off data for conversion

3    tracking; correct?

4    ▪**ANSWER:**  Yes."

5    And Belinda Langner is the second witness that Google

6    brought to the witness stand [as read]:

7    ▪**QUESTION:**  Now, does Google use sWAA-off data for any

8    purpose?

9    ▪**ANSWER:**  We use sWAA-off data for measurement with

10    de-identified data.

11    ▪**QUESTION:**  When you say 'measurement,' are you talking

12    about conversion measurement?

13    ▪**ANSWER:**  Correct, conversion measurement."

14    Jonathan Hochman, our expert, testimony [as read]:

15        "It's also used for product development and

16    improvement.  They analyze the data and they use it

17    to develop their products."

18    Now, this is their interrogatory.  This is what Google

19    says in response to our Interrogatory Number 14.  We asked them

20    where is all of the logs that contain this data, this sWAA-off

21    data, and they say [as read]:

22        "It is not practical or relevant to account for

23    every single potential data source (including logs)

24    that may contain such data because there are various

25    downstream users of the pseudonymous data described

1      in response to Plaintiffs' Interrogatory Number 1."

2      There are too many users of this for them even to be able

3  to identify it in Interrogatory 14 -- in response to

4  Interrogatory 14.

5      So the evidence is, from their own mouth, that they take,

6  copy, and use sWAA-off data.  Google did not get plaintiffs'

7  permission or consent.

8      First, this is Mr. Ganem again [as read]:

9      "QUESTION:  What I'm asking is:  Is it your position that

10     Google needs to have clear user consent to collect any

11     data from their activity?  Yes or no?

12     "ANSWER:  Yes.

13     "QUESTION:  Okay.  And in order for users to give consent,

14     would you agree that they have to have notice as to what

15     you're proposing to collect?

16     "ANSWER:  Yes."

17     So in order to get -- give permission or consent, first

18  there's got to be notice.  Google has got to describe what it

19  wants to collect.  And, second, it has to have clear user

20  consent to that.

21     And I respectfully suggest to you that they didn't do

22  either one.  They never gave clear notice as to what they were

23  proposing to collect, and they never got a clear user consent.

24  I don't think they got any user consent, but whatever they got,

25  it wasn't clear.

1      This is Mr. Monsees, Google's CEO for WAA and sWAA [as

2  read]:

3      **"QUESTION:**  We agree that a user's consent has to be

4  meaningful; fair?

5      **"ANSWER:**  Yes, I agree.

6      **"QUESTION:**  And you agree that for a user's consent to be

7  meaningful, Google should clearly disclose what data

8  they're collecting; fair?

9      **"ANSWER:**  Yes.

10     **"QUESTION:**  And why Google's collecting that data; fair?

11     **"ANSWER:**  I agree."

12     So you have Google's top people admitting that they have

13 an obligation to give clear notice of what they plan to collect

14 and get clear consent and permission for them to do so.

15     I also want you to take a look at Jury Instruction

16 Number 21 about what "consent" means.  And the Court just read

17 you that plaintiffs have to be explicitly notified of Google's

18 particular at-issue conduct, explicitly notified, and they've

19 got to notify particularly what conduct they're going to do,

20 what they're going to collect, save, or use.

21     And, second, plaintiffs then need to voluntarily consent

22 to Google's particular at-issue conduct by words or conduct.

23     Google never got that permission or consent.  Here is a

24 striking admission from Mr. Monsees, the CEO of WAA and sWAA

25 [as read]:

1    "QUESTION:  We know as of that date, July 25, 2019 --

2    right then and there, we know Google was collecting users'

3    sWAA-off data; right?

4    "ANSWER:  Correct.

5    "QUESTION:  And Google wasn't then disclosing that to

6    users, that 'I'm using your sWAA-off data' and for what

7    purpose; fair?

8    "ANSWER:  Fair."

9    I think you can decide this case on that concession alone.

10   He agrees they're collecting the data.  He agrees they were not

11   disclosing to users that they were using the data and for what

12   purpose, what both he and Mr. Ganem admitted they were required

13   to do.

14   Now, on the contrary to getting clear or explicit

15   permission or consent, Google falsely told users that they

16   could control, see, and delete the data Google collected from

17   their activity.

18   December 2018, Google's CEO, quote [as read]:

19       "Today, for any service we provide our users, we

20       go to great lengths to protect their privacy and we

21       give them transparency, choice, control."

22   He goes on later to say [as read]:

23       "They can clearly see what information we have,

24       and we give them clear toggles by category where they

25       can decide whether information is collected or

1    stored."

2    And you recall that Mr. Monsees said this was something

3    that was consistent with the privacy policies and was an

4    expression of those policies and that this was something that

5    users could be expected to rely on.

6    Google Exhibit 561.  This is Google's exhibit.  And this

7    is the privacy policy to which app developers are told to

8    direct users of their app.  You recall that app developers were

9    told to direct users of the app to a particular Google

10    document.  And in that document, under a heading that says "How

11    you can control the information" -- "How you can control the

12    information collected by Google on these sites and apps," and

13    it says [as read]:

14         "If you are signed in to your Google Account,

15         and depending on your account settings, My Activity

16         allows you to review and control data that's created

17         when you use Google services, including the

18         information we collect from the sites and apps you

19         have visited.  You can browse by date and by topic,

20         and delete part or all of your activity."

21    "Delete part or all of the activity."  That's their

22    Exhibit 561.

23    The Google privacy policy, Plaintiffs' Exhibit 62, page 1,

24    quote [as read]:

25         "And across our services, you can adjust your

1        privacy settings to control what we collect and how

2        your information is used."

3            Now, you remember Mr. Heft-Luthy, one of the Google people

4    who testified here.  I asked him about a statement by

5    Mr. Warren.  And Mr. Warren, you will recall, was one of the

6    lead people who was writing up stuff about sWAA and WAA.  And I

7    said [as read]:

8        "QUESTION:  Now, when Mr. Warren says 'If we're pushing

9        the control story'" -- which is one of the things

10       Mr. Warren said -- "what is he talking about when he's

11       talking about 'pushing the control story'?

12       "ANSWER:  I don't know.

13       "QUESTION:  Well, isn't it the case, sir, that at this

14       time Google was trying to convince its users that they had

15       control over the data that Google collected and used?"

16       Answer from Google's witness [as read]:

17            "I would say that would be fair."

18           Google was trying to convince its users that they had

19    control over the data that Google collected and used.  And

20    you've just seen that they didn't have that control.  Even

21    after sWAA was turned off, even after sWAA had been

22    deliberately turned off by users, their data from their use of

23    third-party apps was still collected, stored, copied, and used.

24           Again, a statement from Google's CEO [as read]:

25            "When you use our services" --

 1      No.  This is from the Google privacy policy [as read]:

 2          "When you use our services, you're trusting us

 3      with your information.  We understand that this is a

 4      big responsibility and we work hard to protect your

 5      information and put you in control."

 6      Page 2 of the Google privacy policy, Plaintiffs'

 7  Exhibit 62 [as read]:

 8          "The information Google collects, and how that

 9      information is used, depends on how you use our

10      services and how you manage your privacy controls."

11      And this is a statement by the Google CEO in December of

12  2018.  He talks about how in the last -- just the last 28 days

13  from when he was testifying, 100 million users went to the

14  My Account settings.  And he testifies that going there, they

15  can, quote, "clearly see what information we have."

16      And he says [as read]:

17          "We give clear toggles, by category, where they

18      can decide whether that information is collected or

19      stored."

20      And he says [as read]:

21          "We actually give, you know, show it back to

22      them."

23      And I also wanted to direct your attention to the -- I'm

24  showing you a chart.  At the top, this is another statement

25  from the CEO.  Quote [as read]:

1        "Today, for any service we provide our users, we

2    go to great lengths to protect their privacy and we

3    give them transparency, choice, and control."

4        Now, this case is about a promise from Google to give

5    their users control:  control over what was collected,

6    control over what was saved, control over what was used,

7    control so that they could see the data that they were

8    collecting, control to delete the data that was collected.

9        None of that is true.  This is a situation in which people

10   were given a purported choice but no control.

11       Again, Google's CEO [as read]:

12       **QUESTION:**  If a consumer tells you not to collect their

13   data, then you do not collect that data; is that correct?

14       **ANSWER:**  That's right."

15       And this is Mr. Monsees, Google's CEO for WAA and sWAA [as

16   read]:

17       **QUESTION:**  You agree that Mr. Pichai's testimony" -- you

18   recall Mr. Pichai is, obviously, the CEO of Google -- "was

19   consistent with Google's privacy policy?

20       **ANSWER:**  Yes, I do.

21       **QUESTION:**  And you heard Mr. Pichai discuss clear toggles

22   that allows Google's users to decide whether their

23   information is collected or stored; correct?

24       **ANSWER:**  That's right.  I believe he was talking about

25   activity controls.

1    **"QUESTION:**  WAA; correct?

2    **"ANSWER:**  WAA is one of them, that's correct.

3    **"QUESTION:**  And you agree it would be fair for the

4    American people to rely on what Mr. Pichai is telling

5    Congress about; correct?

6    **"ANSWER:**  Yes."

7    Google's statement from Plaintiffs' Exhibit 116, page 1,

8    "What's saved as Web & App Activity," and it goes through

9    everything that is saved.  And then it says [as read]:

10    "To let Google save this information, Web & App

11    Activity must be on and the sWAA box must be

12    checked."

13    That's what they're telling users.  Choice without

14    control.  A purported choice without any control.

15    Now, and this is important when you get to punitive

16    damages.  Rather than giving its users clear notice of what

17    Google was collecting, Google intentionally obscured what it

18    was collecting.

19    First, even Google's own retained technical expert did not

20    understand sWAA.

21    [As read]:

22    **"QUESTION:**  So at the time of your deposition" --

23    And at the time of his deposition, he'd already spent a

24    lot of hours studying this.  He'd already been paid a lot of

25    money.  He'd already been prepared for several days by Google's

1    lawyers.

2        [As read]:

3        **"QUESTION:** And so at the time of your deposition, it was

4        your own understanding that when Google talks about

5        treating people as signed off or signed out, that meant

6        they weren't collecting the alleged data at all; correct,

7        sir?

8        **"ANSWER:** Yeah. I think, from the answer to that

9        question, that's fair."

10       Even he couldn't figure that out.

11       As you've heard testimony a lot, Google's own engineers

12   and executives thought their, quote, "Google Account," closed

13   quote, included all of the data concerning plaintiffs'

14   activities that Google had.

15       Mr. Ruemmler, who testified here, quote [as read]:

16       "I for one didn't realize Google actually stored

17       all of my activity even if those controls were off,

18       and I work at Google!  Seems sort of silly to turn

19       them off as I'm not any safer with them off than on."

20       Or Mr. Laaker, Google director of user experience in the

21   office of Google's CEO [as read]:

22       "I don't have the faintest idea what Google has

23       on me."

24       And [as read]:

25       "If I can't see, I don't know what I should be

1    worried about."

2        Now, Google set out to make its disclosures intentionally

3    vague and hard to parse.  This is Exhibit 4, page 2.  The

4    subject of this exhibit is "Effect of flipping sWAA."  Quote

5    [as read]:

6            "In English, we're intentionally vague because

7        the technical details are complex and it could sound

8        alarming to users (for something that we feel

9        shouldn't sound alarming)."

10       So in order not to alarm users, they're intentionally

11   vague.  Rather than giving the clear, explicit notice of what

12   they plan to collect, they're intentionally vague.

13       And you remember the PrivacyNative project that several

14   witnesses talked about.  This is Plaintiffs' Exhibit 18,

15   page 2, under the heading, which is the first heading of this

16   document, "Broad Permissions."  And immediately after that, it

17   says [as read]:

18           "It's difficult for people to fully/meaningfully

19       give permission.  Not only are the implications of

20       WAA extremely broad and varied, but people use Google

21       in such diverse ways.  Much of the language intended

22       to be comprehensive feels vague and hard-to-parse for

23       non-engineers/lawyers."

24       They knew that.  They intended it to be intentionally

25   vague.  Rather than giving what they admitted they were

1  obligated to do, what the Court, in its instructions, has said

2  they were obligated to do, which is to give clear, explicit

3  notice of what they were going to do, they were intentionally

4  vague and had language that was hard to parse for non-engineers

5  and non-lawyers.

6      And this is from Plaintiffs' Exhibit 42 at page 1.  And

7  they're talking here about two alternative ways of approaching

8  permission and user trust.  The first is [as read]:

9          "User trust and affect - giving users a

10     *sense*" -- and "sense" is in italics -- "of the system

11     as working to their benefit.  Important but gameable,

12     without actually improving any of the underlying

13     condition, remains our higher-level goal."

14     Giving users a sense of control, but not actual control; a

15  purported choice, but no real control.

16     Now, I think the evidence is clear to everybody, after the

17  last several days, that users cannot control, see, or delete

18  whether Google takes, copies, or uses their sWAA-off data.

19     You heard Mr. Miraglia's deposition, saying that he's not

20  aware of any setting that would prevent a user from having

21  their activity tracked.

22     [As read]:

23     **QUESTION:**  Now, does Google offer any switch at the

24     device or account level where a user would have confidence

25     in not having activity tracked in any app?

1      **"ANSWER:**  I'm not aware of any setting that's scoped to

2      what you just said."

3      And Mr. Ganem [as read]:

4      **"QUESTION:**  Now, is there a privacy setting that a user

5      can use to stop Google from collecting the sWAA-off data

6      that Google currently collects?

7      **"ANSWER:**  With Google Analytics specifically, no."

8      Again, question -- and this is Mr. Monsees again [as

9   read]:

10      **"QUESTION:**  And let's talk about what the user has access

11      to.  We can agree that when Google takes WAA off from a

12      user, the user can't go anywhere online anywhere in life

13      to go see what Google has, can they?

14      **"ANSWER:**  Correct."

15      An admission from the Google CEO of sWAA that contrary to

16   what Google promised repeatedly, a user cannot go and see what

17   Google has on them.

18      Also, they can't delete the data.  Remember?  Both

19   Google's privacy policy and Google's CEO repeatedly said users

20   can delete their data; they can go see the data; they can

21   delete the data.

22      This is Mr. Ganem, their corporate representative, who sat

23   through this trial [as read]:

24      **"QUESTION:**  And you also agree there's no way for a Google

25      user to delete the sWAA-off data that Google has collected

1    and saved; correct?

2        **"ANSWER:**  The sWAA-off data that's collected into

3        Google Analytics?  No, there's no way for them to delete

4        that data that's de-identified.

5        **"QUESTION:**  And you also agree there's no way for a Google

6        user to delete the sWAA-off data that Google has collected

7        and saved; correct?

8        **"ANSWER:**  The sWAA-off data that's collected into

9        Google Analytics?  No, there's no way for them to delete

10       that data that's de-identified."

11       Choice, purported choice, but no control.

12       Now, Google's response is two things.  First, they play

13   what's really a word game with the term "Google Account."

14   Google says it told users that it would not save sWAA-off data

15   in their Google Account, as if that were somehow equivalent to

16   warning users that Google would save that data somewhere else.

17       But Google never suggested to users, never, that it saves

18   sWAA-off data anywhere or even that there was anywhere other

19   than Google Account where data was saved.

20       Think about that.  They tell you in this trial that, well,

21   they're talking about what's saved in the Google Account.  But

22   as Mr. Ruemmler said, he thought that the Google Account was

23   all there was.  He didn't know that there was any place other

24   than the Google Account where anything was saved.

25       And you remember that Google's CEO, their privacy policy,

1    all talk about Google giving users the ability to control

2    whether data was collected and saved and used, not where it was

3    collected, saved, and used.  Whether, not where.

4        And this is Mr. Ruemmler talking about the activity

5    control wording, quote [as read]:

6            "The activity controls wording isn't any better.

7        I see how the wording here is very deceptive.  The

8        problem is it states:  'The data saved in your

9        account helps give you more personalized service

10       across all Google services.  Choose which data" --

11       "Choose which settings will save data in your

12       Google Account.'"

13           "Your Google Account" means your data, not

14       Google's.  If I choose not to store data in my

15       account, then Google should not have access to that

16       data either as the data should not be in the account.

17       And, again [as read]:

18           "What you are saying is sWAA does not actually

19       control what is stored by Google, but simply what the

20       user has access to.  This is really bad."

21       And he goes on to say that [as read]:

22           "The user has a false sense of security that

23       their data is not being stored at Google, when, in

24       fact, it is."

25       Now, you heard Mr. Ruemmler on the stand, after being

1    prepared, trying to say that this only related to a future

2    proposal; it didn't relate to what was actually going on.

3         Every statement here that I've just showed you is in the

4    present tense.  Yes, he is talking about -- at one point he's

5    talking about a future proposal, but he's also talking about

6    what is actually going on.

7         And let's go further with Mr. Ruemmler, and let me go to

8    the one at the bottom, where he says [as read]:

9              "So, it appears we have a real problem here with

10             accurately describing what happens when sWAA" --

11             "when WAA is disabled.  We should fix the current

12             wording" -- "the current wording" -- "to reflect

13             reality and if we make the change," that they're

14             talking about, "then we need to be very clear."

15        But he's talking about current wording.  He couldn't be

16   any clearer here.

17        And it was -- it was, in a sense, sad to see Mr. Ruemmler,

18   an honest engineer who honestly tried to get Google to do the

19   right thing, being put in a position where he had to get on the

20   stand and try to convince you that his words didn't mean what

21   he wrote.  But the words are here.

22        And as I said in my opening, I urge you to look at what

23   Google said internally, when they didn't think anybody was

24   looking, and not to their arguments now, when they're trying to

25   defend a billion-dollar lawsuit.

1        Now, Mr. Ruemmler said he thought his Google Account had

2   everything.  No Google witness ever showed you a definition of

3   "Google Account" that suggested that there was anyplace else

4   that Google was saving information from people's Web activity.

5        Now, second, Google says it de-identified the data.

6   De-identified the data.  Now, there are a lot of problems with

7   this.

8        First, you just saw that the data that is initially

9   collected is not de-identified in any way.  When it comes in

10  and those first two copies are made, they have all the personal

11  identifications in them.

12       Second, the data is never really de-identified.

13       Third, Google can reidentify the data at any time.

14       Fourth, the data is already tied to plaintiffs' device

15  IDs, which Google, or anyone else who gets their hands on the

16  data, can connect to a user.

17       And, in any event -- I want to go back to what I

18  started with -- Google violated CDAFA by taking, copying, or

19  using sWAA-off data regardless of whether it is de-identified.

20  Whether or not they de-identify it and how they do it and what

21  they use it for, that may all go to damages, but that does not

22  go to liability.

23       They took, copied, and used sWAA-off data without

24  permission or consent.  That is the violation.  What Google

25  does with it afterwards may be considered for damages, but it's

1  not relevant to whether they are liable or not.

2      Now, you recall Mr. Ganem.  I showed you this before.

3  When they get the sWAA-off data, when they make a copy of it,

4  it has all the personal identifiers in it.

5      Now, remember, in its opening statement, Google said this

6  case was about whether it collected, quote, personal

7  information.  Now, Google defines, itself, what constitutes

8  personal information; and it includes -- this is from

9  Plaintiffs' Exhibit 72, pages 16 and 17.  And you're going to

10  have all these exhibits in the jury room.

11      But it talks about all of the ways that information can be

12  personal information, and that includes the device you're

13  using, as well as the interaction of your apps and your

14  activity on third-party sites and apps.  Those are all

15  considered personal information.

16      And Google does not dispute that it regularly collects

17  personal information like device ID, app name, geolocation by

18  city, device description.  All of these things that Google

19  itself internally describes as "personal information" they

20  collect.

21      Now, for purposes of this case, they say, "Well, that's

22  not really personal information."  The only thing that's really

23  personal information is your email and name and a couple of

24  other things that they so-call de-identify.  But before this

25  lawsuit, Google recognized that this was personal information

1    too, and this was the kind of thing that it told users they had

2    a right and a power to control whether Google collected it.

3        Now, in addition, while Google does de-identify with

4    respect to name, email address, you saw that plaintiffs' data,

5    his sWAA-off data, his data collected by Google when sWAA was

6    off included his name, email address, and other personal

7    information.  This is in Plaintiffs' Exhibit 453.  And nobody

8    disputes that this was collected when sWAA was off.

9        There was a -- there was an Exhibit 591.R2, a Google

10   exhibit, Google 591.R2 that showed when they turned sWAA off --

11   and you heard Mr. Rodriguez testify that he left it off the

12   entire period after 2018, and yet they collected all of this

13   data.

14       Now, in addition to 453, there's 442.  And you remember

15   Mr. Hochman -- or Mr. -- first, Mr. Black.  Mr. Black, their

16   expert, their expert testified that [as read]:

17       "QUESTION:  In 442, there is data that should not be there

18       if sWAA was off; correct?"

19       And he says [as read]:

20       "ANSWER:  In 442, there is data that would not be there if

21       sWAA was off."

22       He has a circular reasoning by which he concludes that

23   because there is data that should not be there, it must be that

24   sWAA was on.  He also said that there was an engineer who told

25   him that, but he couldn't remember the engineer's name.

1    Now, going back to 442 for a second, based on his circular

2    reasoning, he testified on direct that the UUAD log that had

3    this information must have been a sWAA-on log.  But then I

4    confronted him with the fact that there was no account that was

5    on in '21 or '22.  And I asked him [as read]:

6    **"QUESTION:**  Okay.  Does that cause you to conclude that

7        the plaintiffs' data that was collected had to be

8        collected when sWAA was off?"

9    He says, "No."

10   Completely inconsistent with what the record evidence is.

11   There is no evidence, none, that Mr. Rodriguez had his sWAA on

12   after '21 and '22.  All the testimony is to the contrary.

13   Their own exhibit is to the contrary, and yet Mr. Black won't

14   accept that.

15   Now, what they do say is:  Well, only a few of the data

16   had email addresses on it.  But as Mr. Hochman explained, the

17   problem with that is that if you have it on only one record, if

18   you have the email address in only one record tied to a device,

19   you can then tie that email to every device with that same

20   device ID.

21   So the fact that this doesn't happen that many times

22   doesn't mean that they cannot reidentify and, indeed, that

23   they're not even really de-identified.

24   Now, in any event, no matter how de-identified it is,

25   Google can always reidentify the data.  This is from Google

 1    Exhibit 929, quote [as read]:

 2        "Despite the name 'Dynamic Anonymization,' this

 3    framework performs de-identification rather than true

 4    anonymization."

 5    So they're talking here about de-identification.  And it

 6    says [as read]:

 7        "It's important to remember that Sawmill data is

 8    sensitive and potentially reidentifiable, even with

 9    the scrubbing described here."

10    And I asked Mr. Ganem about that [as read]:

11    "QUESTION:  And one of the things that you talked about

12    with your counsel was Google Exhibit 929, the scrubbing

13    policies?

14    "ANSWER:  Yes.

15    "QUESTION:  I'd like to direct your attention to a note

16    right at the top of the page."

17    And I read it.

18    "QUESTION:  And by 'reidentifiable,' you mean you've

19    de-identified somebody and now you reidentified them;

20    correct?"

21    He says, "Yes."

22    Same thing true -- this is Google Exhibit 926 -- about

23    device fingerprinting.  It says [as read]:

24        "This policy," which is limiting it, "does not

25    apply to identification of users across devices based

1          on characteristics such as location, router

2          IP address, or web history (also known as

3          cross-device linking, behavioral pattern linking, or

4          probabilistic heuristic device association)."

5          In other words, they're saying that when they limit device

6     fingerprinting, that does not apply to all these other ways

7     they have of linking people to data.

8          And I asked Mr. Ganem about that.  We read those words.

9          [As read]:

10         "QUESTION:  And those are all ways by which you use

11         modeling or some kind of algorithm to try to connect

12         people and data; correct?

13         "ANSWER:  Possibly.

14         "QUESTION:  Now, when Google first receives this sWAA-off

15         data from the app, whatever it is, it has all the personal

16         identifiers?

17         "ANSWER:  Yes."

18         And then, in summary, with respect to this, I asked

19     Mr. Ganem [as read]:

20         "QUESTION:  You know you can reidentify.  You say there

21         are policies against it, but Google can do it; right?

22         "ANSWER:  Google would have to change the way its systems

23         are designed in order to do it.

24         "QUESTION:  But Google can do that; right?

25         "ANSWER:  In theory, if it made those changes.

1    "QUESTION:  Yes.  And making those changes is within

2    Google's power; correct?

3    "ANSWER:  Technically."

4    And Mr. Black is asked [as read]:

5    "QUESTION:  Google could connect a device ID to a person

6    and then collect all of the sWAA-off data that was linked

7    to that device ID; correct?"

8    And he said [as read]:

9    "ANSWER:  First, you wouldn't need to connect it to a

10    person.  If you had the device ID and then you overcame

11    the technical barriers that we were describing as well as

12    got permission from Legal, obviously it's possible, since

13    it was done in the course of this lawsuit."

14    And, in addition, Mr. Black admitted that there was a

15    table that associates device ID with GAIA, the so-called Google

16    ID.

17    [As read]:

18    "QUESTION:  You see where Mr. Ganem refers to a table that

19    associates their IDFA," which is a device ID, "with GAIA?

20    "ANSWER:  I do.

21    "QUESTION:  And IDFA is a device ID; correct?

22    "ANSWER:  For Apple, yes.

23    "QUESTION:  And GAIA would be the user ID; correct?

24    "ANSWER:  The Google user ID.

25    "QUESTION:  And so he's referring here to a table that

1         associates their IDFA with GAIA; correct?

2         **ANSWER:**  Correct."

3         Now, in any event, whether it's de-identified,

4    reidentified, or what, again, that doesn't affect the question

5    of liability here because they did not get permission to

6    collect this data.  And if they collect, copy, or use it, which

7    they obviously did, that is a violation.

8         And, again, this is -- I showed you this before, but I

9    want to show it to you again -- Mr. Monsees saying that [as

10   read]:

11        **QUESTION:**  Google was collecting users' sWAA-off data?

12        **ANSWER:**  Correct.

13        **QUESTION:**  And Google wasn't, then, disclosing to the

14        users that 'I'm using your WAA-off data' or for what

15        purpose; fair?"

16        Was not disclosing.

17        **ANSWER:**  Fair."

18        Now, users expected their sWAA-off data not to be

19   collected and not to be saved.

20        Question to Mr. Ganem, again, the corporate representative

21   [as read]:

22        **QUESTION:**  And do you understand that some users might be

23        uncomfortable with your having their data even though you

24        say you've got policies that are not going to reidentify

25        it?  Do you understand that?

1    **"ANSWER:**  I suppose."

2    Indeed, "I suppose."

3    Now, Google's internal documents confirmed that they knew

4    that users expected Google not to collect their data when WAA

5    was turned off.  Now, this is important in two respects.

6    First, it's important because it shows that there was no

7    permission.  There was no consent because the users didn't even

8    know what was going on.

9    But, second, it's important to the punitive damages phase

10    and to the highly offensive issue that we're going to come to

11    because it shows that Google knew, at the time, that it was

12    misleading people.  It knew, at the time, it was misleading

13    people.

14    Now, Google's expert admitted that the only way to

15    reliably determine users' understanding was to do a survey.

16    She didn't do a survey.  She studied surveys.  She knew how to

17    do surveys, she testified, but she didn't do a survey.

18    Google did a survey.  Google did a survey about what WAA

19    was interpreted as meaning, and it found -- this is PX2,

20    page 20 -- quote [as read]:

21        "All participants expected turning off toggle to

22        stop their activity from being saved."

23    Google knew that users believed that off meant off, and

24    they had a survey which their expert says is the best way, best

25    way to determine what users believe.  Google had this survey,

 1  and what Google found from the survey was that all users

 2  believed that off meant off.

 3      Now, a few months after that -- that was in April of

 4  2020 -- in June of 2020, Google prepared another survey.  The

 5  question they were going to ask is:  What do most respondents

 6  believe the effect of turning off WAA will have on the amount

 7  of data collected?

 8      And what Google believed at the time, this would show, was

 9  that, quote -- this is from a Google document.  This is from

10  Google Exhibit -- I mean, from Plaintiffs' Exhibit 9, page 6

11  [as read]:

12          "Most respondents will believe that turning off

13      WAA will result in no data being collected from their

14      activity."

15      No data being collected.  Not "We'll collect some

16  de-identified data."  Not that "We'll collect some data but we

17  won't use it to personalize ads."

18      [As read]:

19          "Most respondents will believe turning off WAA

20      will result in no data being collected from their

21      activity."

22      Now, Google won't say what happened.  What did that

23  June 2020 survey show?  Or if they killed it, why did they kill

24  it?  What we do know is what Google believed, quote [as read]:

25          "Most respondents will believe that turning off

1    WAA will result in no data being collected from their

2    activity."

3    Plaintiffs' Exhibit 6, page 43, from Google's Ms. Park,

4    quote [as read]:

5    "Every time we run these studies, we learn that

6    users don't get us and we don't know what to do."

7    The users -- they run these studies, and every time they

8    run these studies, they see that the users don't understand it.

9    I've already mentioned Mr. Ruemmler saying he didn't

10    realize that Google collected this data when WAA was off.

11    And this is J.K. Kearns, Google product manager, saying

12    the same things [as read]:

13    "I think teams should not use user data at all

14    if WAA is off, regardless if there is user data that

15    was collected when WAA was on.  It's a much cleaner

16    story and what I would think most users expect."

17    They know what users expect.  The class representative

18    testified the same thing.  Off means off.

19    And you've seen this before.  I won't go through it in

20    detail, but Google repeatedly admitted internally it knew,

21    quote [as read]:

22    "I see how the wording here is very deceptive."

23    Quote [as read]:

24    "We don't accurately describe what happens when

25    WAA is off."

1    Quote [as read]:

2         "WAA and other controls imply we don't log the

3    data, but we obviously do."

4    Quote [as read]:

5         "The user has a false sense of security."

6    Quote [as read]:

7         "There is no way users will understand what is

8    happening."

9    Quote [as read]:

10        "They (the users) don't understand what is going

11   on, and nobody is talking to them about it."

12   Quote [as read]:

13        "We have gaps in how our system works and what

14   we promise to people."

15   Quote [as read]:

16        "At Google we still seem to believe in that

17   fantasy that users agreed to this."

18   Brian Horling from Google, Plaintiffs' Exhibit 6, page 31

19   [as read]:

20        "What are the main privacy challenges that users

21   face today?"

22   Quote [as read]:

23        "Everyone is concerned about their data being

24   collected.  They don't know about it and they don't

25   know how to control it."

1    Now, the second and third claims we have for invasion of
2    privacy, intrusion on exclusion [sic], we have to prove -- and
3    these are in Jury Instruction 18 for invasion of privacy -- in
4    addition to what we've proven in terms of reasonable
5    expectation of privacy and damage, we've got to prove that it's
6    highly offensive.
7    And the evidence that they took, copied, and used
8    plaintiffs' private information without permission, I think
9    that's highly offensive, but you have to determine that.
10    Misleading users as to whether they had control and the
11    ability to decide whether Google collected data from their use
12    of third-party apps, misleading users as to whether they could
13    see the data that Google collected, misleading users as to
14    whether they could delete data Google collected, knowing that
15    users were misled but continuing to make promises that Google
16    knew were untrue, making disclosures intentionally vague, very
17    deceptive, too convoluted to be comprehensible to people, all
18    things the evidence shows, those, we respectfully submit to
19    you, are highly offensive.
20    Now, we seek four types of damages.  The Court told you
21    that.  I told you that in the beginning.  The first is
22    compensatory damages, the value of the data Google improperly
23    collected and used.
24    And as the Court instructed in Instruction Number 22, we
25    have to prove damages by a preponderance of the evidence; but

**CLOSING ARGUMENT / DAVID BOIES**

1    at the same time, plaintiffs do not have to prove the exact

2    amount of damages that will provide reasonable compensation.

3    And in calculating actual damages, you should consider the

4    evidence and any reasonable inferences you may draw from the

5    evidence.

6         Now, actual damages, compensatory damages, has three

7    elements:  the number of plaintiffs or the number of

8    plaintiff devices, the value per month of the data collected,

9    the number of months Google collected sWAA-off data.

10        I think the evidence is pretty clear that there were

11   174.5 million devices.  There were about 98 million class

12   members.  That's because many class members have more than one

13   device.

14        Now, the evidence from plaintiffs' expert that you heard

15   was that $3 per month was conservative as to the value that

16   sWAA-off data had.  The value of the data, the value of

17   tracking the users, the value of being able to incorporate what

18   they learned into their products, all of that created value

19   that existed.

20        Now, and there was a Screenwise study from Google.  The $3

21   came, actually, from Google itself.

22        Now, there were other valuations, higher valuations.

23   There was a valuation of $15 per month, five times what our

24   expert said.  There was a valuation of $50 per year, which is

25   $4.16 per month.  There was a valuation of $29 per month.

 1      And one of the things you're going to have to decide is

 2  what is the right value per month.  I think you will find that

 3  $3 a month is pretty conservative and that a higher amount

 4  might be justified.

 5      Now, what we have is the number of devices, we have a

 6  value, and then we need the number of months.  I told you,

 7  during the opening, that perhaps the most important finding you

 8  would have to make was the number of months that Google

 9  collected sWAA-off data from plaintiffs.

10      And there are a lot of ways to look at this.  The evidence

11  is that the number of devices is slightly larger than the

12  number of Google Accounts.  The number of months in which

13  Google Accounts had sWAA off was, according to Google's

14  numbers, a little over 10 billion.

15      If you divide 10.382 billion by the number of plaintiffs'

16  devices, 174.5 million, that shows that the average number of

17  sWAA-off months would be 59.5.

18      Now, if the average plaintiff had sWAA off for only one

19  month per year, that would be slightly more than eight months.

20      Now, I told you I was going to ask everybody what the

21  right number of months was, and -- but nobody from Google wants

22  to say.  This is Mr. Ganem [as read]:

23      "QUESTION:  Now, you were here during the opening

24      statements; correct?

25      "ANSWER:  Yes.

CLOSING ARGUMENT / DAVID BOIES

1   "QUESTION:  And you recall that I told the jury that one

2   of the key things that they were going to have to decide

3   was how many average months people kept WAA off.  Do you

4   recall that?

5   "ANSWER:  I recall that.

6   "QUESTION:  As the corporate representative of Google and

7   the CEO of Google Analytics, what is your testimony as to

8   what's the average number of months people keep sWAA off?

9   "ANSWER:  I don't --"

10  Pause.

11  [As read]:

12  "QUESTION:  You're the corporate representative of Google;

13  correct?

14  "ANSWER:  Yes.

15  "QUESTION:  And you're here to present Google's position;

16  fair?

17  "ANSWER:  That's fair.

18  "QUESTION:  Okay.  And you're the CEO, you described, of

19  Google Analytics?

20  "ANSWER:  Yes, that's fair.

21  "QUESTION:  Now, I ask you, what's the average number of

22  months people keep sWAA off?

23  "ANSWER:  I don't recall, or I'm not sure.

24  "QUESTION:  About how many?

25  "ANSWER:  I honestly don't know.

1    **"QUESTION:** Just approximately?

2    **"ANSWER:** I don't know.

3    **"QUESTION:** Did you look that up at all?

4    **"ANSWER:** I don't recall.

5    **"QUESTION:** Did you try to find that out?

6    **"ANSWER:** I don't recall.

7    **"QUESTION:** You don't recall whether you tried to find it

8    out?

9    **"ANSWER:** No."

10   I also said during the opening that there was evidence

11   that the average was 56 months per device.  I suggest to you

12   that if Google had any evidence that the number of months was

13   less than 56, they would have told you.

14   I suggest to you that the reason they're not answering

15   this question is the answer is not good for them.  It is large.

16   It is high.  If they had any evidence at all that it was less

17   than 56 months, I suggest to you, you would have heard it.

18   And I suggest to you that the testimony by Mr. Ganem here

19   that, despite having sat through this whole trial, despite

20   knowing what questions I was going to ask him, that he doesn't

21   recall whether he looked that up is not credible.

22   Now, if you took just one month -- and I don't think

23   anybody -- there's no evidence that people just kept it off for

24   one month, but if you took just one month, it would be

25   $523 million.  If it were eight months, it would be

1   4.19 billion.  If it were 59.5 months, which is the only hard

2   evidence that's in the record, it's 31.15 billion.

3       Now, of course if you find the monthly value of the data

4   was less, or more, than $3 per month, which is within your

5   discretion, you can adjust those damages up or down.

6       So these calculations assume that $3 a month is the right

7   number.  That's for you to decide.  It could be more; it could

8   be less.  You've got to decide it based on the evidence and

9   your judgment.

10      But using those dollars as the value, this is what the

11  numbers come out to be.  Now, these are very large numbers, but

12  they're large for three or four reasons:  one, the many

13  billions of dollars of Google's business using plaintiffs'

14  data; two, the 98 million people who turned sWAA off but still

15  had their data from their use of third-party apps collected by

16  Google and the large number of devices they had; three, how

17  much data Google collected; and, four, how long this went on.

18      If Google had stopped collecting this data in 2020, most

19  of these damages would have been eliminated.  These damages are

20  so high because even after getting the surveys that told them

21  in black and white that users were being misled, even knowing

22  from Mr. Ruemmler and others that people were being misled and

23  didn't understand it, even after this lawsuit was filed, they

24  still continued to collect all this data, and they continued to

25  deny to their users that they were.

1    Now, this compensatory damage needs to be broken up by

2    classes.  And if you -- Class 1, if you had eight -- had only

3    one month a year, it would be 2.1 billion for Class 1 and

4    15.88 billion for Class 1 if it were 59.5 months.

5        And then for Class 2, it would be a little bit less,

6    2.052 billion for 8 months and 15 -- a little over 15 billion

7    for 59.5 months.

8        So the total number is going to have to be broken up by

9    class, the Android class and the non-Android class.

10        Now, I want to go back just for a minute.  Although this

11    number is large, even at $31 billion, that's only $317 per

12    person and only $178 per device.  So this is so large because

13    the class is so large and because it went on so long.

14        Now, in addition, we're seeking disgorgement, or unjust

15    enrichment.  And as the Court has instructed you in Instruction

16    Number 24, this is a distinct category of damages.  And the

17    first thing you have to do is figure out:  Did Google receive a

18    benefit?

19        And Mr. Monsees, the CEO of sWAA [as read]:

20        "QUESTION:  The truth is, users' sWAA-off data has value;

21        correct?

22        "ANSWER:  Yes.  It's essential to providing the ad

23        services."

24        The ad services is where Google makes all its money, and

25    he's telling you that the sWAA-off data not only has value, but

 1   it's essential to providing the ad services.  And one of those

 2   important services is conversion tracking.

 3        And Mr. Ganem [as read]:

 4        "QUESTION:  And you use sWAA-off data for conversion

 5        tracking; correct?

 6        "ANSWER:  Yes.

 7        "QUESTION:  And that is -- again, is valuable to Google.

 8        It's valuable to Google because it allows you to get more

 9        advertising dollars; fair?

10        "ANSWER:  It can."

11        And Mr. Ganem [as read]:

12        "QUESTION:  And you also use SDKs to capture data to

13        enhance Google's products; correct?

14        "ANSWER:  It's, again, potential.  It depends on if the

15        developer allows us to use it that way.

16        "QUESTION:  And developers do allow that; correct, sir?

17        "ANSWER:  Yes."

18        And Mr. Black says the same thing [as read]:

19        "QUESTION:  And to the extent that Google uses sWAA-off

20        data to improve their products or create new products,

21        that's valuable; correct?  That's a benefit, even though

22        they may not be paid directly for it?

23        "ANSWER:  I would agree that making products better is a

24        benefit, broadly taken, yes."

25        Now, there was some testimony, some suggestion that they

1  didn't get money directly from conversions, Google didn't get

2  money directly conversions.  And Mr. Ganem -- I want you to

3  think about this.  Mr. Ganem, their corporate representative,

4  the CEO of Google Analytics, this is his testimony [as read]:

5      ▪**QUESTION:**  As you use the term 'conversions' within

6      Google, applying to advertising, are there instances where

7      advertisers pay more because an ad has resulted in a

8      conversion?

9      ▪**ANSWER:**  Yes.

10     ▪**QUESTION:**  Okay.  That's what I was trying to get at.

11     And so one of the benefits to Google of proving a

12     conversion, or establishing a conversion, is that it will

13     get more advertising dollars; correct?

14     ▪**ANSWER:**  Yes.

15     ▪**QUESTION:**  Okay.  And in order to get a conversion, you

16     need to link up two events.  You need to link up the ad

17     and you need to link it up to the conversion event;

18     correct?

19     ▪**ANSWER:**  Yes.

20     ▪**QUESTION:**  And you use sWAA-off data for conversion

21     tracking; correct?

22     ▪**ANSWER:**  Yes."

23     That's not only a clear value to Google, it is an

24  extremely valuable value to Google.

25     And, again, Mr. Ganem testifying that they use sWAA-off

1   data [as read]:

2       **"QUESTION:**  I'm just trying to establish a simple point

3       that I think you agree with, which is that the sWAA-off

4       data that Google collects has a lot of value; fair?"

5       That's the question [as read]:

6       **"ANSWER:**  Potentially.

7       **"QUESTION:**  Well, when you say 'potentially,' Google uses

8       that sWAA-off data; correct?

9       **"ANSWER:**  Yes.

10      **"QUESTION:**  Okay.  And it uses it now, not just in theory

11      but in practice?

12      **"ANSWER:**  Yes."

13      Now, from Jury Instruction 24, again, if you find

14  disgorgement is appropriate, you must calculate the amount; and

15  to do so, one, you have got to determine Google's revenue from

16  using the data; two, what are the expenses.  Then you deduct

17  the expenses from revenue.

18      But here is a key part.  Okay?  It is Google's burden to

19  prove the amount of expenses and plaintiffs' burden to prove

20  the amount of gross revenue.  So they have the burden to prove

21  expenses.

22      Now, the evidence is that Google earned $51 billion of

23  revenue from just three products that use sWAA-off data.  At

24  least 4.6 billion of that, or 9 percent, was derived as a

25  result of the use of plaintiffs' sWAA-off data.

**CLOSING ARGUMENT / DAVID BOIES**

1      Now, you saw that the number of sWAA-off accounts was

2  about 25 percent, and 9 percent is obviously much lower than

3  that.  That's because the $4.6 billion is a very conservative

4  number.  We know that it's bigger than that.  We don't know how

5  much bigger.  We don't have the information from Google.  But

6  we know that it's at least $4.6 billion, and that testimony and

7  that evidence is in the trial.

8      It's also worth understanding how conservative this number

9  is, that neither the 51 billion nor the 4.6 billion includes

10  the benefit to Google of many uses of sWAA-off data other than

11  in just these three products, including their use in machine

12  learning and other things.  So this is a very conservative

13  number, but you can start with at least $4.6 billion.

14      Then the question is:  What is the costs?  Now, you heard

15  the testimony here that they, Google, gave us.  This only

16  relates to U.S. revenue and profits.  Google gave us only

17  global numbers.  And you heard the testimony that they

18  subtracted global costs from U.S. revenue.  So the numbers are

19  suspect, let me say as neutrally as I can.

20      Now, if you conclude that they have not carried their

21  burden of costs, then you must award the entire revenue number,

22  4.6.

23      Alternatively, our expert made an estimate of costs which

24  would take it down, if you accepted his estimate, to

25  2.32 billion.

1      So I respectfully suggest that -- I don't -- I don't think
2  you can find evidence that they presented about real costs.  I
3  don't think you can find credible evidence of costs.  So I
4  really think the number ought to be $4.6 billion; but at a
5  minimum, it ought to be the $2.32 billion.
6      And they gave you these P&Ls that were created for a
7  lawsuit.  Now, they claimed that they were drawn from their
8  documents, but you never saw the documents they were drawn
9  from.  These P&Ls have no metadata in them.  You'll have to
10 decide whether there's any reliability to that or not.  And
11 their own expert testified that the data that he saw was
12 consistent with different numbers.
13     Now, in terms of unjust enrichment, for the Android class,
14 it would be 1.466 billion; for the non-Android class,
15 899.1 million.
16     Now, this is based on accepting Google's traffic
17 acquisition costs as they reported it to us.  And as you heard
18 from both our expert and their expert, there are a lot of
19 problems with those numbers.
20     On the one hand, they stipulated that the relationship to
21 revenue and traffic acquisition costs were the same from --
22 throughout the period.  On the other hand, the numbers they
23 gave us have traffic acquisition costs of 68 percent for years
24 2016 to 2021, and 23 to 25 percent for the years 2022 to 2024.
25     You heard Mr. Hochman, our expert, testify that he thought

1    that those 68 numbers were too high, but he accepted them

2    because he didn't have other numbers.  So based on those

3    assumptions, those are the -- those would be the unjust

4    enrichment numbers.

5        And now, those numbers --

6            THE COURT:  Mr. Boies, just so that I can plan the

7    break --

8            MR. DAVID BOIES:  I'm sorry, Your Honor.

9            THE COURT:  -- how much longer would you --

10           MR. DAVID BOIES:  I promised to take a break, and I --

11           THE COURT:  That's okay.  How much longer would you

12   estimate?

13           MR. DAVID BOIES:  Probably about another, I would say,

14   10 or 15 minutes.

15           THE COURT:  Okay.  Well, I think we --

16           MR. DAVID BOIES:  Absolutely.

17           THE COURT:  -- better take a break.

18       Members of the jury, remember my admonitions.  Do not

19   discuss this amongst yourselves or with anyone else.  We'll be

20   back in 15 minutes.

21       (Proceedings were heard out of the presence of the jury.)

22           THE COURT:  We're out of the presence of the jury.

23       I will -- when Mr. Boies finishes, if you want, like, a

24   five-minute break to get set up, we'll take a quick second

25   break so you can get set up.

1      **MR. HUR:**  Thank you, Your Honor.

2      **THE COURT:**  Okay.

3      **MS. CORBO:**  Your Honor, could I just raise one issue

4  with respect to the verdict form?

5      **THE COURT:**  It's a little late.  I would have

6  appreciated it quite earlier than this.  But, what?

7      **MS. CORBO:**  I apologize.

8    So for Question 7, which is the punitive damages question,

9  I think that it would be prudent to include an instruction that

10 the jury should only answer that if they find liability on

11 Claims 1 or 3, but not on Claim 2.  I don't think it's clear

12 from the current form.

13      **THE COURT:**  Well, I'll go back and look at it.

14      **MS. CORBO:**  Thank you.

15              (Recess taken at 10:22 a.m.)

16           (Proceedings resumed at 10:39 a.m.)

17     (Proceedings were heard out of the presence of the jury.)

18      **THE COURT:**  Okay.  We're back on the record outside

19 the presence of the jury.

20    I will make the change that was suggested by the Google

21 side.

22    Is that fine with the --

23      **MS. CORBO:**  Thank you.

24      **MR. DAVID BOIES:**  Yes, Your Honor.

25      **THE COURT:**  All right.

1          **MS. CORBO:**  We looked at the form, and it looks

2     correct.

3          **THE COURT:**  Okay.

4          **MS. CORBO:**  Thank you.

5          **THE COURT:**  Are we ready to bring them out?

6          **MR. DAVID BOIES:**  Yes, Your Honor.

7          **THE COURT:**  Okay.

8      (Proceedings were heard in the presence of the jury.)

9          **THE COURT:**  The jury is present.

10     Mr. Boies, you may continue.

11         **MR. DAVID BOIES:**  Thank you, Your Honor.

12     Just before the break, we were talking about unjust

13     enrichment or disgorgement, and we had gone over Claim 1, the

14     class, the Android class, at 1.46 billion, and the non-Android

15     class at about 900 million.

16         Now, this is Claim 1, and you'll recall that the judge

17     instructed that with respect to Claim 1, the class was all

18     sWAA-off users.

19         But with respect to the Claims 2 and 3, we excluded what

20     Google calls dashers and unicorns.  Dashers are the company

21     accounts and unicorns are the children.  And so by excluding

22     those, the damages come down.  The unjust enrichment comes

23     down.  So it's about $1.3 billion for Class 1 and about

24     $800 million for Class 2.

25         So when you address the issue of unjust enrichment, you're

 1   going to have to look at Claim 1 and Claims 2 and 3 separate.

 2   For Claim 1, it is the -- excuse me.  For Claim 1, it is the

 3   1.466 billion for Android and the 899 million for non-Android;

 4   but for Claims 2 and 3, it's 1.32 billion for Android and

 5   809 million for non-Android.

 6       Now, the third type of damages are nominal damages, and as

 7   the Court has instructed in Instruction Number 25, if you find

 8   that we've proved any of our claims but you find that

 9   plaintiff -- we have failed to prove actual damages, you can

10   award nominal damages, which -- like a dollar a class member.

11   And the Court provides the number of class members in Class 1

12   and the number of class members in Class 2.  Obviously, I hope

13   you don't come to nominal damages because I hope that you

14   address the damages that we went forward earlier.

15       Now, the fourth type of damages are punitive damages.  And

16   as the Court instructs in Instruction Number 26, the purpose of

17   punitive damages are to punish and deter conduct.  And I

18   respectfully submit to you that the conduct that is at issue

19   here is exactly the kind of conduct that is important to deter

20   and to punish.

21       The evidence is clear that Google knowingly misled

22   millions of Americans using, quote, "very deceptive," closed

23   quote; quote, "intentionally vague," closed quote; quote, "hard

24   to parse," closed quote; quote, "tangled," closed quote; quote,

25   "convoluted," closed quote, language so that, quote, "the user

1    has a false sense of security that their data is not being

2    stored at Google when, in fact, it is."

3         We've gone through a lot of the internal documents.  This

4    was a situation in which Google failed to stop its conduct and

5    failed to revise its disclosures, even after it knew in 2020,

6    quote, "All participants expected turning off toggle to stop

7    their activity from being saved."  That's Plaintiffs'

8    Exhibit 2, page 20.  It's the survey that they did in April.

9         And, quote, "Most respondents will believe that turning

10   off WAA will result in no data being collected from their

11   activity," closed quote.  Plaintiffs' Exhibit 9, page 6.  That

12   was the, you know, statement in the survey that they planned to

13   do but either never did or, if they did do it, have never

14   produced the results of it.

15        But Google knew this.  They knew from Mr. Ruemmler.  They

16   knew from all the other people that we've quoted to you.  They

17   knew internally that people were being misled.  Their survey

18   said people were being misled, and yet they continued to do it

19   year after year.  That is exactly the kind of corporate culture

20   that needs to be punished, that needs to be deterred.

21        And it would have been easy for Google to stop misleading

22   users.  Mr. Ganem admitted that they could have performed

23   consent checks on the device without ever taking in the data,

24   without ever taking in the data, but he said that would be an

25   inferior design.

CLOSING ARGUMENT / DAVID BOIES

 1        Now, of course it also would have prevented them from
 2   getting the data, and what they wanted was they wanted that
 3   data because of its value.
 4        Mr. Ganem also agreed it would have been very easy to just
 5   say, "If sWAA is off, we are still going to collect and save
 6   information."
 7        They could have stopped taking the data.  They could have
 8   performed the consent check on the device.  They could have
 9   given an accurate disclosure.  All of that was very easy to do.
10        They didn't do it because they were afraid of alarming, in
11   their language, users, of discouraging users from using Google.
12   The more users that use Google, the more money Google makes
13   because the more advertising dollars it gets.  It has a
14   powerful economic incentive to keep people using their service.
15        And you saw again and again where they admitted internally
16   that if they gave people the illusion of control, the feeling
17   of control, the belief that they had control, people would
18   trust them and they would use their services.
19        And yet, that control was not really a choice.  It was
20   not -- it was not real control.  They didn't have control over
21   what was collected, they didn't have control over what was
22   copied, and they didn't have control over what was used or how
23   it was used.
24        And they continue this even after the lawsuit.  As
25   Mr. Hansson said at Plaintiffs' Exhibit 6, page 50 [as read]:

1              "We really resist the idea that anyone can tell

2         us what to do."

3         Plaintiffs' Exhibit 6, again Mr. Hansson [as read]:

4              "I'm sure this is happening across the company.

5         Lawyers telling us that something is unwise to do,

6         and then we ask how unwise is it?"

7         Again, an example of the kind of conduct, the kind of

8    mindset that has to be punished, has to be deterred.

9         This is something I told you when I spoke to you the first

10   time, that you had an opportunity to make an impact.  And

11   whatever you do is going to have an impact.  If you conclude

12   that this is conduct that's perfectly fine, that companies

13   ought to engage in, that's going to be your decision.  If you

14   decide that this is conduct that is not acceptable, that needs

15   to be stopped, you have the -- you have the power to do that.

16        Ms. Kim, a Google senior director, at PX6, page 24 [as

17   read]:

18             "What might the challenge be to position us

19        better to privacy?  I see a lot of us doing what

20        Larry and Sergey wanted us to do which is pushing the

21        boundaries and then dealing with the consequences."

22        Pushing the boundaries and then dealing with the

23   consequences.

24        [As read]:

25             "I don't know if you can change the company

1    fundamental because this is the dynamic."

2         That is a dynamic that has to change, I respectfully

3    suggest to you.  That is a dynamic of pushing the boundaries,

4    of them dealing with the consequences, is the kind of conduct

5    that punitive damages are designed to deal with.

6         Now, there are six questions -- actually, more, but there

7    are six questions that I want to focus on that Google has tried

8    to avoid addressing throughout this trial.

9         Number one, why didn't Google simply say, "We collect

10   sWAA-off data but we promise to de-identify it"?  They could

11   have said that.  They have -- you're going to have in the jury

12   room all the policy -- privacy policies.  They go on for

13   thousands and thousands of words.  They should have had room

14   for five or six words that just told people that they collected

15   sWAA-off data.  They could say anything they wanted to do about

16   maybe they were going to identify it, de-identify it, however

17   they did it, but they could have at least told users.  Why

18   didn't they?  I think that's a question that Google needs to

19   answer for you.

20        Number two, why didn't Google simply say, "We don't save

21   your data in your Google Account but we do save it elsewhere"?

22   They could have said that.  Very simple to say.  Why didn't

23   they?

24        Number three, what happened to that June 2020 survey?  Did

25   Google or the lawyers kill it?  If so, why?  If they didn't

CLOSING ARGUMENT / DAVID BOIES

1    kill it, where are the results?  I think you're entitled to an

2    answer to that question.

3         Number four, what was the average number of months users

4    turned sWAA off?  That's a critical damage component.  We have

5    some data on that.  Why didn't they give you an answer to that?

6    I think the answer, your common sense tells you, is because

7    they don't have an answer that's good for them.

8         What is Google's best estimate of the monthly value of the

9    sWAA-off data it collected?  We know that we took $3 from the

10   Screenwise.  We know that there was other estimates of $15 a

11   month, other estimates of $29 a month, other estimates of $50 a

12   year.  Google's never told you what they think the number is.

13        And what is the revenue Google received as a result of its

14   collection of sWAA-off data?  And what are the total U.S.

15   costs?  Not the global costs, the U.S. costs.  I think common

16   sense will tell you that Google, with all its technology, knows

17   how much its revenue and costs are in the United States; that

18   this story that you are getting about how they only keep global

19   costs and global revenues, I think your common sense will tell

20   you that's not true.  So what is their revenue?  What are their

21   U.S. costs as a result of this sWAA-off data?

22        I think these are the kind of questions that you're

23   entitled to answers to.  And I'll tell you, if they think there

24   are any questions that I haven't answered for you -- they're

25   going to have a chance now to come and talk to you; and if they

1   identify any questions they think I haven't answered during

2   this trial that you ought to know, I'm going to get a chance to

3   talk after they do, and I'll answer those questions.

4       But I think they have -- I think they ought to answer

5   these basic kinds of questions that, I think, will be helpful

6   to you in your deliberations.

7       Thank you for your time.  I really appreciate it.

8           THE COURT:  Thank you.

9       Members of the jury, we just did take a break not long

10  ago, but I want to give the defendant an opportunity to get set

11  up for their closing argument.  So we'll take a short one this

12  time, a five-minute break.  And so let's try to shoot for not

13  much past 11:00 to be back.

14                  (Recess taken at 10:54 a.m.)

15              (Proceedings resumed at 11:01 a.m.)

16      (Proceedings were heard out of the presence of the jury.)

17          THE COURT:  Are we ready?

18          MR. HUR:  Yes, Your Honor.

19          MR. ATTANASIO:  No.  Oh, there he is.  Sorry.

20                          (Laughter.)

21          MR. SANTACANA:  He's hiding in a cocoon.

22          THE COURT:  Okay.

23          MR. HUR:  I'm here.

24          THE COURT:  Oh, we need Karen.

25          THE LAW CLERK:  We can't do anything without Karen.

1            (Pause in proceedings.)

2        **THE COURTROOM DEPUTY:**  Please rise for the jury.

3        (Proceedings were heard in the presence of the jury.)

4        **THE COURT:**  The jury is present.

5    Mr. Hur?

6        **MR. HUR:**  Thank you, Your Honor.

7                    <u>**CLOSING ARGUMENT**</u>

8        **MR. HUR:**  Good morning, members of the jury.

9        You heard the plaintiffs testify in this case that sWAA is

10    a fake button.  You heard plaintiffs' counsel allude to that in

11    their opening.

12        And if sWAA is a fake button, plaintiffs should win; but

13    if sWAA is not a fake button, plaintiffs must lose.  And that

14    is because in order to prove their case, they have to prove

15    that the conduct here was highly offensive, was outrageous, was

16    the kind of conduct where Google acted knowingly and without

17    permission.

18        Just listen to the words of the claim:  invasion of

19    privacy, intrusion upon seclusion, Comprehensive Computer Data

20    Access and Fraud Act.  These are claims with high standards,

21    and plaintiffs have come nowhere close to meeting them.

22        Now, it seems like they've pivoted because, like you, they

23    heard the evidence for the last two weeks.  They heard about

24    how sWAA actually works.  They know, like you do, after

25    listening to the evidence, that when sWAA is on, data is saved

1    in a user's Google Account.  When sWAA is off, it's not.

2        You know as well as they do that when sWAA is on, data is

3    used to personalize experiences and ads.  When sWAA is off,

4    it's not.

5        When sWAA is on, the data is tied to a user's identity;

6    and when sWAA is off, it is not.

7        These facts are undisputed, and they matter.  They matter

8    to users that the data is not tied to their identity.   It

9    matters that when sWAA is off, they're not getting personalized

10   ads.  And it matters to Google too.  As you heard, Google makes

11   less money when people turn sWAA off, but it offers that

12   setting anyway.

13       You heard it from Mr. Ganem.  You heard it from

14   Mr. Monsees.  You heard it from the experts.  There's no

15   dispute that the sWAA button is real.

16       I also want to talk to you about Google's disclosures

17   because you saw a bunch of emails and quotes, you saw a bunch

18   of questions, but there's something that you didn't see.  You

19   didn't see it in the plaintiffs' opening.  You didn't see the

20   plaintiffs mention it.  You didn't see them use it with any

21   witness.  You didn't see their expert talk about it.  You

22   didn't even see it in closing.

23       Mr. Boies asked for five words that would tell users that

24   they were collecting information; that when this setting is

25   turned off, that Google ought to tell users that they're still

1   collecting data.  He asked for five words.

2       What he didn't tell you is that when users hit that

3   button, right at the time of deciding to turn sWAA off, they

4   are told [as read]:

5           "Visit account.google.com to change this and

6       your other account settings and learn about the data

7       Google continues to collect and why."

8       It's more than five words, but Google tells users that

9   even when sWAA is off, at the moment they're turning it off,

10  you can learn more about the data it continues to collect even

11  when sWAA is off and why.

12      That's the answer to his main question, and they refused

13  to show it to you, even though it's in evidence in this case.

14  That is at several exhibits, and I will give you the numbers:

15  G574.R2 and G607.

16      And you heard Mr. Monsees testify that he looked at the

17  source code and pulled this out from the source code.  Google

18  tells users that even when sWAA is off, they're going to

19  continue to collect the data.  Now, it's in de-identified form.

20  It's used for different purposes.  You heard all about that

21  during the trial.  But Google tells users exactly what the

22  plaintiffs' lawyers said they didn't.

23      What about Mr. Rodriguez?  You heard a lot about

24  Mr. Rodriguez and how many accounts he had and how often he

25  turned sWAA on and off.  Dozens of times, he seemed to turn it

1   on and off.  So he saw it that many times.  Okay?  This was

2   available before this lawsuit was filed.

3        Plaintiffs' counsel said, "If they had just told users,

4   before the lawsuit is filed, that Google is collecting the

5   data, there wouldn't be damages here.  They just need five

6   words."

7        It's right there.  Google told users what happens when

8   sWAA is off.

9        And it doesn't just say it here.  I'll show you the other

10  disclosures where Google tells users what can be saved in their

11  Google Account and what cannot, what Google tells users about

12  Google Analytics and app activity data.

13       But this is one that Professor Donna Hoffman talked about.

14  She called it the "Are you sure" screen.  So at the moment

15  you're pressing that button to turn sWAA off, "Are you sure?"

16  And here's what Google continues to do even when sWAA is off.

17       I think you know what's going on here.  This is a gotcha

18  case:  parsing emails that don't have anything to do with the

19  data Google Analytics receives or how sWAA controls that data;

20  parsing disclosures saying a word should be added here or

21  there; dissecting six-year-old emails that have to do with a

22  project that's not at issue in this case.

23       This is not a case where there's actually wrongful

24  conduct.  This is not a case where data was leaked.  This is

25  not a case where Google was deceptive about what it was telling

1   users about sWAA or used the data irresponsibly.  There is no

2   harm in this case.

3        You didn't hear that from Mr. Ganem.  You didn't hear it

4   from Mr. Ruemmler.  You didn't hear it from Mr. Monsees.  You

5   didn't even see a single email in this case, of all the ones

6   that plaintiffs' counsel put up, you didn't see a single one

7   about Google Analytics for Firebase or how Google Analytics for

8   Firebase uses data or suggesting that that data was misused.

9   Not a single email.

10       They want to show you general emails about concerns that

11  people had about irrelevant products in the hopes that you're

12  just going to turn a blind eye; that you're going to say,

13  "Well, people at Google had some concerns about privacy

14  generally, and that's enough to prove liability in this case."

15  That is their theme.

16       But I know you took an oath.  You took an oath to follow

17  the law, to listen to the facts in evidence, and apply that

18  law -- those facts in evidence faithfully to the law.

19       Not one word of testimony, not one document.  No one was

20  harmed here.  97,992,376 class members, zero members harmed.

21  You didn't see any evidence to the contrary.

22       I'm going to cover these five topics with you.  First, I'm

23  going to talk to you about what Google disclosed and how users

24  consented.  I'm going to talk to you about how Google Analytics

25  does not invade user privacy.  I'm going to talk to you about

1    how Google acted in good faith.  I'm then going to talk to you

2    about why plaintiffs can't meet the high burden of their claims

3    and why they shouldn't be rewarded with bogus damages.

4        Google disclosed and users consented to how sWAA works.

5        Now, plaintiffs tried to suggest throughout this case that

6    Google buries the truth, but what you have seen is that Google

7    puts the important facts right up front.

8        On the activity control screen, right at the very top,

9    Google tells users [as read]:

10            "You can control what is saved in your

11        Google Account.  Choose which settings will save data

12        in your account."

13        Three times Google mentions "your account" in the activity

14    control screen.

15        At the time of choosing WAA or sWAA, users cannot miss

16    this disclosure.  They are forced to look at it and see what

17    Google can still do even when sWAA is off.

18        Now, you heard Professor Hoffman.  She got down from the

19    stand and talked to you about some of Google's disclosures.

20    And you heard her tell you that Google can't put everything on

21    one screen.  It tries to put the most important stuff so that

22    people who skip disclosures will be at least forced to see the

23    most important stuff and skimmers as well.  And if there are

24    readers, people who want to really dive deep, Google provides

25    links to those disclosures so that they can see more about how

1    Google describes these various settings.

2        She testified that that is a sign of effective design.

3    That is a sign of effective design because, just imagine if you

4    have a giant page of disclosures and it's six-point font and

5    it's in legalese.  Nobody's going to be able to read and

6    understand that.  Google is trying to give users a chance to

7    digest the information they may want and choose to learn more

8    if they so desire.  And that is the way that Google made its

9    disclosures.

10       What else did you hear from Mr. Monsees?

11       [As read]:

12           "We've had over 3 billion users across the

13       world, all kinds of different backgrounds.  Some

14       users have different expectations, different

15       perceptions, and we regularly try to improve and make

16       these settings clear for all users."

17       I mean, imagine, Google is trying to write these

18   disclosures for a lot of people.  They're going to be,

19   hopefully, clear to everyone, but Google can't ensure that

20   every single person who reads this disclosure is going to

21   understand it exactly the same way.

22       What did Professor Hoffman say?  [as read]:

23           "Different people have different preferences for

24       privacy.  Even the same person could have different

25       preferences on different occasions."

1    And this comports with our experience.  Sometimes you may

2    want to read more; sometimes you may be in a hurry and you may

3    not.  That is why Google and companies who care about good

4    design and letting users know what's happening use progressive

5    disclosure, meaning tell them the important stuff up-front, let

6    them click through if they want more information.

7        Now, I was mentioning to you that this "Are you sure"

8    screen appears on both WAA and sWAA, and the reason I'm

9    mentioning the one on WAA is because, as you might recall, you

10   can turn sWAA off by turning WAA off.  So if WAA is off, sWAA

11   is off.  And you can also turn sWAA off directly even if WAA is

12   on.  So it's important to note that this "Are you sure" screen

13   appears on both WAA, when you turn it off -- again, this is

14   Exhibit G574.R2 at page 22 -- and the "Are you sure" screen is

15   also on the sWAA page.

16       When a user clicks "Turn it off," they see that same

17   disclosure.  That's G607 at pages 6 and 7.  And as Mr. Monsees

18   testified, this comes from the source code.

19       But there's more.  Users want to dig into the privacy

20   policy?  Here's what they see.  Your activity on other sites

21   and apps.  This is what this case is about.  Your activity on

22   other sites and apps.

23       And what does Google say?  [as read]:

24           "Many websites and apps partner with Google.

25       For example, a website might use our advertising

1          services (like AdSense) or analytics tools (like

2          Google Analytics).  These services may share

3          information about your activity with Google and," in

4          addition, "depending on your account settings, the

5          products in use (for instance, when a partner uses

6          Google Analytics in conjunction with our advertising

7          services), this data may be associated with your

8          personal information."

9          And I know you've seen this many times, and I'm sorry that

10   I'm -- I have to keep showing it to you.  But this case, the

11   plaintiffs want to make this case about disclosures, and it is

12   very clear that Google tells users about Google Analytics, that

13   it can collect data and, in addition, if users select certain

14   settings, it can be associated with their personal information.

15         Google doesn't stop there.  If users want to learn even

16   more, they can learn "How Google Uses Information from Sites or

17   Apps That Use Our Services."

18         Again, Google Analytics [as read]:

19              "For example, when you visit a website that uses

20         advertising services like AdSense, including

21         analytics tools like Google Analytics, or embeds

22         video content from YouTube, your web browser

23         automatically sends certain information to Google."

24         Google is telling users more and more about

25   Google Analytics and what happens on third-party sites and apps

 1    that use Google's services if the user wants more.

 2        Now, Mr. Boies tried to suggest that Mr. Monsees was

 3    somehow thinking -- saying that these disclosures were unclear.

 4    But he was asked in his testimony [as read]:

 5        **QUESTION:**  Has Google disclosed that it collects activity

 6        data from other sites and apps, like analytics tools, from

 7        2016 to 2024, in its privacy policy?

 8        **ANSWER:**  Yes, it has.

 9        **QUESTION:**  Again, Google is saying sites and apps do send

10        Google data?

11        **ANSWER:**  Correct, of course, because the disclosures say

12        it."

13        What about Mr. Miraglia?  They quoted him as suggesting

14    that some language about a Dutch translation was intentionally

15    vague.  But when he was asked, he answered [as read]:

16        **ANSWER:**  The pathways users have through Google Systems,

17        we work really hard to make that clear at the relevant

18        moments.

19        **QUESTION:**  Fair to say that you don't know who wrote this

20        sentence; is that correct?"

21        That's the intentionally vague sentence.

22        [As read]:

23        **ANSWER:**  I don't.

24        **QUESTION:**  Do you agree that the phrase 'more information

25        will be visible in your Google Account' is vague about

1     where the data that wasn't visible was?

2        **"ANSWER:**  No, I wouldn't agree that it's vague."

3        They are putting words in people's mouths and talking

4     about facts that are not relevant to how Google Analytics uses

5     sWAA-off data, which is the data at issue in this case.

6        Now, Mr. Boies also mentioned an email from

7     Mr. Heft-Luthy, but he didn't show you what Mr. Heft-Luthy

8     actually said about that email.

9        [As read]:

10       **"QUESTION:**  Now, where do you -- what do you mean by

11       'gameable' there?

12       **"ANSWER:**  We wanted to make sure we weren't doing that.

13       We knew we could just throw a bunch of messages to the

14       user, saying, 'Privacy, privacy, privacy,' and then people

15       would trust Google more.  But we knew that wasn't enough,

16       so we knew we could use -- we could gain user effect

17       without actually improving privacy controls, and we wanted

18       to make sure we weren't doing that."

19       That was his testimony about that email.

20       Another ambiguity you've seen in this case is that

21    plaintiffs are telling you that users really aren't in control,

22    even though the truth is that users control their personal

23    data.  You didn't see this disclosure in the closing or the

24    opening from the plaintiffs.

25       What does Google say about "You're in control"?

1   [As read]:

2          "Depending on your account settings, some of

3       this data may be associated with your Google Account

4       and we treat this data as personal information."

5       What users are in control of is data saved in their

6   Google Account that they treat as personal information, not

7   de-identified data that isn't tied to the individual.

8       And the definition of "personal information."  Okay?

9   This, I believe, is the last disclosure I'm going to show you,

10  but this is how the privacy policy actually defines personal

11  information [as read]:

12         "This is information that you provide to us

13      which personally identifies you, such as your name,

14      your email address, your billing information, or

15      other data that can be reasonably linked to such

16      information by Google, such as information we

17      associate with your Google Account."

18      Device identifiers?  You heard the testimony from

19  Mr. Ganem.  Google does not reidentify users based on

20  device ID.  There have been zero instances of reidentification

21  of the class members' data.  You heard that from

22  Professor Black, and I will show you some of the quotes.

23      As I said in the opening, this case is about de-identified

24  data, data that isn't tied to an individual's name, their email

25  address, their billing information.  It's not used for personal

1  advertising when sWAA is off.

2      This case is not about personal data, which is the data

3  that's saved to your Google Account if a user chooses to turn

4  sWAA on.

5      Let's talk about why Google Analytics for Firebase does

6  not invade user privacy.  The myth is that sWAA is a fake

7  button, when the truth is that sWAA controls personalization.

8  This is not disputed.

9      You heard it admitted by Dr. Hochman, who's plaintiffs'

10  expert.  We can't do that.  Google Analytics doesn't work that

11  way.  They don't provide data about individual users.

12      He also admits that there's no personalized advertising

13  when sWAA is off [as read]:

14      "QUESTION:  Google does not use sWAA-off data to

15      personalize advertising; is that fair?

16      "ANSWER:  That's my understanding."

17      And as a reminder, what is personalized advertising?  When

18  sWAA is on, Google can use information that individuals put in

19  their apps, their app activity, to give them an ad that's

20  targeted to that activity.

21      So, for example, if a user made a reservation at a burger

22  restaurant, they might get an ad for a discount at that

23  restaurant.  If sWAA is off, that information is not used to

24  serve the ad.  It's a generic ad that doesn't have to do with

25  that user's activity.

1    Google makes more money on the left, with sWAA on, than

2    when sWAA is off.  Okay.  These are real differences that the

3    sWAA setting controls.

4    You remember -- you may remember Mr. Rodriguez testifying

5    earlier in this case -- I don't see him now -- where he said

6    [as read]:

7        "It's okay that Target gets my information.

8    It's okay even that Google gets my information.  What

9    I don't like is that Google can put the puzzle pieces

10   together and get a complete picture of who I am based

11   upon all my app activity, not just the app activity

12   to Target, but the app activity that I engage with

13   with other apps."

14   That was his theory.  That was his alleged harm.  But what

15   did you hear from the actual witnesses who know about the

16   technology?  Google Analytics separates and isolates the data.

17   This is Mr. Rodriguez's testimony [as read]:

18   **"ANSWER:**  It's like pieces of a puzzle.  They have my

19   device ID.  Another piece would be the apps I downloaded,

20   which ones I opened.  Another would be my gender.  Another

21   would be my age.  When you put it all together, they know

22   it's me."

23   What did Mr. Ganem say?  SWAA-off data stays locked away

24   in its own individual apartment.

25   [As read]:

1    ▪**ANSWER:**  When sWAA is off, these puzzle pieces remain in

2    the apartments, locked.  They're not combined by Google to

3    form a complete picture.

4    ▪**QUESTION:**  Does the data in each apartment from each

5    different app, can the data intermingle?

6    ▪**ANSWER:**  No.  In Google Analytics, no."

7    For Google Analytics, every app has their own apartment

8    that they lock, and a user's data when sWAA is off can be in

9    each apartment, but they are not intermingled.  Each of the

10   puzzle pieces stays in its own locked apartment and is not

11   combined.

12   What is the evidence in this case?  97,992,376 class

13   members; zero profiles put together.

14   What about reidentification?  You heard plaintiffs'

15   counsel suggest that, "Oh, Google could reidentify."  What did

16   Dr. Hochman, plaintiffs' expert, say about that?  [as read]:

17   ▪**ANSWER:**  I am not offering the opinion that Google has

18   relinked sWAA-off data with GAIA data."

19   GAIA, again, is the Google Account information.  He is not

20   opining that Google has relinked sWAA-off data with GAIA data.

21   ▪**ANSWER:**  I don't say that Google has done that.  Google

22   says they don't, and that's where I have to leave it."

23   There is no evidence in this case that Google reidentified

24   any user.

25   Now, it is true that as part of the litigation,

1   Mr. Rodriguez and Mr. Santiago gave Google their device ID and

2   said it was theirs, swore under -- swore with the signing of a

3   document, saying it was their device.  So, yes, if Google knows

4   the device and knows the name, and can put them together, then

5   they can get the data.  That's why we had Mr. Rodriguez's and

6   Mr. Santiago's data.

7        But there is no evidence, zero, in this case that Google

8   did that for the class members.  They only did it in the course

9   of litigation because it was asked for in discovery.  Google

10  does not reidentify the data.

11       Professor Black, he agrees [as read]:

12       **"ANSWER:**  I've seen no evidence that they reidentify

13       people."

14       97,992,376 class members; zero reidentifications.

15       Another myth you heard in this case is that Google

16  Analytics uses personally identifiable information.  But you

17  know the facts.  Google Analytics does not want or use PII.

18       And you don't have to take any witness's testimony for it.

19  You can look at the agreement that Google has with every app

20  developer.  Every app developer is required to agree to this to

21  use Google Analytics.  And what does Google say?

22       [As read]:

23            "You will not and will not assist or permit any

24       third party to pass information to Google that Google

25       could use or recognize as personally identifiable

1    information."

2    Sending PII is prohibited by the agreement that every app

3  reaches with Google Analytics for Firebase.  It's true that

4  some apps broke the rules and sent a minuscule amount of data

5  relating to Mr. Rodriguez.  Okay.  This isn't 33 percent.  This

6  is 0.33 percent of the apps sent Google -- broke the rules and

7  sent Mr. Rodriguez's name to Google.  0.34 percent broke the

8  rules and sent an email address for Mr. Rodriguez.

9  0.05 percent broke the rules and sent phone numbers.

10    But what else did you hear about this?  Mr. Ganem, the

11  head of Google Analytics, told you [as read]:

12         "Google does not use that information for

13         anything.  It's like putting your name in the

14         category for this type of burger or which burger is

15         most popular.  Google Analytics has no way of using

16         that information, and it is stored in the app's

17         locked apartment and not used."

18    What about location?  You heard Mr. Rodriguez, and

19  I believe Mr. Santiago, say that it's sensitive that Google has

20  my location information.

21    What did Dr. Hochman admit?  [As read]:

22         **ANSWER:**  So I just want to be clear.  I'm aware that the

23         latitude and longitude that Google eventually puts in the

24         logs may be city level; in other words, it may not be

25         precise.  I'm aware of that."

1    Members of the jury, if he knew it was precise, if he had

2    any evidence of that, of course he would have told you that,

3    but the evidence showed that it's just the city center.

4    Wherever someone is, it'll just go to the city center.

5    Susan Harvey, who didn't come to trial, lives in the

6    eastern part of California, and she had the same intersection

7    in Sacramento, the city center, listed 4,640 times.  Okay?

8    Google is not getting the location of where these users are.

9    Battery loss.  This is something that the plaintiffs have

10   thrown in.  You know, you heard a question thrown in near

11   the -- as part of their exams about, "Oh, yeah, didn't it cost

12   battery too?"

13   Did their expert, Dr. Hochman, provide any evidence about

14   the battery loss?

15   [As read]:

16   "QUESTION:  You did not document anything that you did to

17       measure the degree, if any, of battery degradation caused

18       by Google Analytics for Firebase?

19   "ANSWER:  Correct.

20   "QUESTION:  You have not disclosed to us any work that you

21       have done to try and measure the degree of battery

22       degradation, if any, caused by Google Analytics for

23       Firebase?

24   "ANSWER:  I haven't disclosed that."

25   It is their burden to show damage and harm here.  Their

 1   expert could have done this, and they did not.

 2       And let's just use our common sense here.  I mean, the

 3   user is using the app.  The app has -- Google Analytics has

 4   probably several analytics providers.  What would be the

 5   evidence that Google Analytics caused some measurable loss of

 6   battery?  There's none in this case.  No record of that in this

 7   case at all.

 8       We should also think about whether the plaintiffs' story

 9   about being harmed here makes sense, because you heard that

10   Google Analytics actually leads the industry in privacy.

11       Mr. Ganem was asked [as read]:

12       "QUESTION:  Are you aware of any major analytics SDK that

13       you compete with that provides users the ability to opt

14       out of the identification of their analytics data?

15       "ANSWER:  No."

16       He is not aware of any analytics provider that provides

17   this kind of sWAA-off functionality.  No provider that he is

18   aware of allows users to prevent the analytics provider from

19   getting their personal information.  Yet, Mr. Rodriguez is fine

20   with Target getting his information, some analytics provider

21   called Crazy Egg, Adobe Analytics.  It doesn't make any sense.

22       [As read]:

23       "ANSWER:  Facebook Analytics did offer more rich insights

24       to their app developers because they shared their identity

25       graph."

1    Facebook provided more information than Google.

2    [As read]:

3    "QUESTION:  Would you want to be the head of

4    Google Analytics if you were ordered by Google to do it

5    the Facebook way?

6    "ANSWER:  I would quit."

7    Google leads the industry, Google Analytics leads the

8    industry in privacy protection for data; and when sWAA is off,

9    unlike any analytics provider that Mr. Ganem knows of, it does

10   not identify that data.

11   In light of that, what do you make of Mr. Rodriguez's

12   testimony?

13   [As read]:

14   "QUESTION:  Do you remember testifying in your deposition

15   that Google's collection of de-identified data about you

16   when WAA was off was the equivalent of someone profiting

17   off of a naked photo of you?

18   "ANSWER:  That's just another way of describing it."

19   Does this seem like a naked photo?  De-identified data

20   about app activity, not tied to any individual.  It's not like

21   any photo at all.

22   What about Mr. Santiago?

23   [As read]:

24   "QUESTION:  You've said that the idea of Google receiving

25   your app data is extremely psychologically distressing; is

1    that correct?

2    ▪**ANSWER:**  It's difficult, yes.

3    ▪**QUESTION:**  You think about it every day; correct?

4    ▪**ANSWER:**  It's something I have to deal with on a daily

5    basis."

6    I think the actions speak louder than the words.  You

7    heard him testify he still uses the apps with Google Analytics:

8    ESPN Fantasy Football because his friends wouldn't go to a

9    different platform; Twitter/X; Map My Ride, which is another

10   app that he wouldn't agree to change; Target.  We know he used

11   Target.

12   He also told you that he lets Google track his YouTube

13   activity.  So Google can see all the videos he's watching, but

14   not his de-identified app activity data.

15   First, it's a fake button.  Then it's a naked picture.

16   Then it's emotional, psychological distress.  These are

17   desperate attempts to try to manufacture some kind of harm in

18   this case so that they can get over the hurdle.  Okay?  There's

19   no evidence of that here.

20   I want to talk to you about how Google acted in this case

21   and why Google acted in good faith, because plaintiffs have to

22   prove that Google intended to do something wrong here.  Okay?

23   They have to prove that Google acted outrageously or in a

24   highly offensive way or that Google knowingly accessed the data

25   without permission.  Okay?  They need to prove invasion of

1  privacy, intrusion upon seclusion, violation of the

2  Comprehensive Computer Data Access and Fraud Act.  And to do

3  that, they need to show wrongful intent.

4      Now, what is the evidence of that?  What did you see?  You

5  saw Google using the data responsibly.  You saw Google treating

6  sWAA-off data differently than sWAA-on data.  You saw

7  Mr. Monsees tell you why he thought the words meant what they

8  mean.  He told you how he went about putting those words

9  together.

10      You heard Professor Hoffman talk to you about how Google

11  puts these disclosures together, why progressive disclosure

12  makes sense.

13      You heard Mr. Ganem say that they never even considered

14  that de-identified data couldn't be used by Google Analytics.

15      Okay?  There was no intent here to do something wrongful.

16  And that's the myth, that Google wanted to get data without

17  permission, even though the truth is that Google wanted, and

18  obtained, permission for the data.

19      Now, you saw a lot of emails in plaintiffs' presentation.

20  You saw some emails from Sam Heft-Luthy.  You saw some emails

21  from Mr. Ruemmler, some from Mr. Monsees.

22      And I want to start with Mr. Heft-Luthy.  He hasn't worked

23  for Google for a few years, and most of the emails that you

24  were shown in plaintiffs' presentation relate to an Exhibit PX6

25  that is a series of interview notes that Mr. Heft-Luthy

 1    conducted.  And what did Mr. Heft-Luthy say about those

 2    interview notes?  [as read]:

 3        "QUESTION:  Were the interviews about WAA or sWAA

 4        specifically?

 5        "ANSWER:  No.

 6        "QUESTION:  Were they focused on Google Analytics for

 7        Firebase?

 8        "ANSWER:  No.

 9        "QUESTION:  Was the purpose of the interviews to determine

10        if Google was invading its users' privacy by how it

11        handled the sWAA switch?

12        "ANSWER:  No.

13        "QUESTION:  Did you ever believe that Google was deceiving

14        its users when it comes to privacy and the sWAA button?

15        "ANSWER:  No."

16        There's no evidence that Sam Heft-Luthy was even thinking

17    about the sWAA button when he was conducting these interviews

18    or Google Analytics for Firebase data.  They didn't show you a

19    single quote about alleged misuse about Google Analytics for

20    Firebase data in that entire document.

21        They also didn't bring in any of the witnesses who were

22    supposedly quoted in this document or provide you any context

23    about what they were talking about.  They just want to throw

24    those quotes up for you and say, "Aha, look at concerns that

25    these Google people had many years ago about products that

1    aren't at issue in this case."

2         Another myth is that Google intended to treat sWAA-off

3    data the same as sWAA on.  Right?  That's a highlight of their

4    theory, that it's the same when it's on as when it's off, even

5    though the truth is that Google treats this data differently.

6         And their favorite exhibit is PX3, where Mr. Ruemmler and

7    Mr. Monsees are having an email conversation.  And I'm not

8    going to talk too much about this.  I think you've seen plenty

9    of this email, but there are a few key points that I need to

10   make sure I get across.

11        Mr. Ruemmler made clear that this -- he was not concerned

12   about de-identified data.  He was concerned about the

13   identified data that would be saved to a user's Google Account.

14        [As read]:

15        "QUESTION:  Do you have privacy concerns about

16        de-identified data when WAA is off?

17        "ANSWER:  No, because it's not associated with any user.

18        It's not the same."

19        What about Mr. Monsees?

20        [As read]:

21        "ANSWER:  It's pretty clear that Mr. Ruemmler's concern

22        here is about data saved to your account without you

23        having transparency or control over it when WAA is off."

24        Mr. Ruemmler was not concerned about de-identified data in

25   that email.  That email is not about de-identified data.  And,

1  look, he was up there for -- I don't know -- 90 minutes,

2  two hours.  That email was the subject of, I think, 90 minutes

3  of questioning by the plaintiffs' counsel.

4       And what Mr. Ruemmler was trying to communicate was that

5  he was concerned about a proposal that was never implemented,

6  in large part because he expressed his concern to Mr. Monsees.

7  Google was considering logging information when a user had sWAA

8  off -- had WAA off, even though that would have violated

9  Google's policies at that time and would require changes if

10 made.

11      But Mr. Ruemmler was against it, regardless of changes

12 that Google could make to the policies, and he tried to tell

13 counsel this repeatedly.  Many times he tried to clarify:  This

14 is in the context of the WAA-off proposal.  This is in the

15 context of the WAA-off change.  That's what he understood his

16 email to be about.

17      And think about this for a moment.  I mean, people write

18 hundreds of emails.  This guy's a software engineer.  Who among

19 us, when writing one of hundreds of emails, couldn't have some

20 ambiguity found by a skilled lawyer who spent enough time and

21 effort looking for it?

22      Mr. Ruemmler was telling you what he believed this email

23 was about, this six-year-old email, and it wasn't about whether

24 this language was ambiguous.

25      What did he say?  [As read]:

1    "**ANSWER:** I feel like you're trying to put words in my

2    mouth."

3    I want to say something about the user studies that

4    plaintiffs referenced. Mr. Monsees was asked [as read]:

5    "**QUESTION:** Were these participants asked about

6    de-identified data during the course of this study?

7    "**ANSWER:** No, they were not."

8    In their Google Account, it's a Google Account setting

9    study, so I think that context is important. The reason why

10   Mr. Monsees was happy that people understood that when WAA is

11   off, their data would not be saved to their account is because

12   it was a study about WAA and what is saved in the user's

13   Google Account. This was not a study about de-identified data.

14   And Mr. Monsees testified that they have not studied

15   de-identified data.

16   Now, plaintiffs' counsel said, "Well, you saw Donna

17   Hoffman, Professor Hoffman. Why didn't she conduct a survey

18   about what people thought the WAA and sWAA buttons meant?"

19   Members of the jury, the plaintiffs have the burden here.

20   They actually had an expert in disclosures who they chose not

21   to present to you. That expert didn't do a survey. That

22   expert apparently didn't have anything to say, despite being a

23   disclosed expert. It is not Google's burden to come up with

24   some expert's survey here. It is the plaintiffs' burden to

25   show you that Google made misrepresentations.

 1    Now, if Google meant for sWAA data to just be treated the

 2   same whether sWAA was on or off, why would Google build this

 3   separate system to check whether sWAA is on or off?  If the

 4   plan was just, "Oh, tell users that, you know, they have

 5   control, but then just treat it the same," why would Google go

 6   through this trouble?

 7    Why would Google check the device IDs or the DSID for

 8   consent, the Doritos cookie; check the privacy settings and, if

 9   consent is not given, store the data separately?  Why would

10   Google do that if it was going to treat the data the same?

11    Why would Google put in technical safeguards to prevent

12   data from being relinked, like fuzzing the timestamps so they

13   can't be compared, having key access control with limited

14   access, and encrypting the data?  Why would Google do that if

15   its entire intent was to just treat the data the same?

16    I think you know the answer and that it is:  They

17   wouldn't.

18    Now, I'm not sure I heard it correctly, but I think the

19   plaintiffs' counsel is trying to tell you, because of this

20   consent check process, aha, Google has to copy the data in

21   order to consent -- check the consent; that even before Google

22   knows whether there's consent, Google has to copy it to

23   determine whether it's a Google user who has sWAA on or off.

24    Now, what Professor Black told you was Google has to put

25   that data in temporary memory so that it can check the setting

1    and determine the sWAA-off status.  And if it's off, they will

2    discard it.  If it's on, then they will link it.

3         It is not credible that Google Analytics would not be able

4    to get any data because the consent check process, of course,

5    requires putting the data in temporary memory first.  Okay?

6    That is not copying.  That is like you're thinking of something

7    in your brain before writing it down.

8         Google doesn't do it on the device because, as Mr. Ganem

9    testified, that would be less secure and it would be less

10   accurate because the device setting may not have the user's

11   most updated setting.  Google checks the consent in the most

12   secure and accurate way it can, and you did not hear any

13   testimony to the contrary.

14        Why would Google go to the trouble of storing the data in

15   each app separate apartment locker if it was just going to

16   treat the data the same?

17        You heard Mr. Ganem testify that when sWAA is on, these

18   puzzle pieces in the apartments, they can all go to the user's

19   Google Account and Google can put them together to serve

20   personalized ads; but when sWAA is off, they're kept in their

21   own individual apartments.

22        And the final myth is that Google didn't want users to

23   know about Google Analytics, even though Google told users and

24   required apps to do the same.

25        You saw it in this disclosure, the "Are you sure?"  Right

 1  at the time of having to choose to turn sWAA off, Google tells

 2  users, "Learn about data Google continues to collect and why at

 3  policies.google.com."

 4      What about the one I started with at the very beginning of

 5  the trial?  Activity controls [as read]:

 6          "The data saved in your account helps give you

 7          more personalized experiences.  Choose which settings

 8          will save data in your Google Account.  You control

 9          what data gets saved to your Google Account."

10      Google tells users repeatedly what sWAA and WAA does and

11  what is saved, what they can and can't save to their

12  Google Account.

13      And then this:  Every single app that uses

14  Google Analytics is required to tell every single one of their

15  users about Google Analytics and how it collects and uses data.

16      How could Google have intended to mislead about the

17  collection of data by Google Analytics if it required every

18  single app to tell every single one of their users?

19      So if you're a user and you have 50 apps, every single one

20  of those 50 apps was required to tell the user about

21  Google Analytics and how it collects data.  How in the world --

22  even if Google wanted to mislead, how could they do that in

23  light of that disclosure?

24      Let's talk about the claims because plaintiffs cannot meet

25  the high standard of them.  You heard Judge Seeborg read to you

1  this instruction about the burden of proof.  And for the

2  claims, for the three claims at issue -- CDAFA, invasion of

3  privacy, and intrusion upon seclusion -- the plaintiff bears

4  the burden of proof.  And what does that mean?  That means if

5  you're back there in the jury room and, for some reason, you're

6  on the fence, you must find for Google.  That's what the burden

7  of proof means.

8       Let's talk about the first claim, the Comprehensive

9  Computer Data and Access Fraud Act, sometimes referred to as

10  CDAFA.

11      Are plaintiffs owners or lessees of mobile devices or

12  data?  Now, I concede that plaintiffs are owners of their

13  mobile devices, but they're not owners of their data.  You

14  didn't see any evidence that they own that data.  And think

15  about it.  It's de-identified data not tied to who they are

16  that is given to the app.  So if you make this case about data,

17  they have not proven the first element.

18      Second, Google knowingly accessed plaintiffs' mobile

19  devices or data.  We've talked a lot about this.  Google did

20  not knowingly access this data without permission.  They

21  certainly thought they had permission.  Google was not

22  intending to break into these devices and get data.  Okay?

23  They had agreements with the apps for doing this.  They did not

24  knowingly access plaintiffs' mobile devices or data.

25      Did Google take, copy, or make use of data from those

1  plaintiffs' mobile devices without permission?  You've seen the

2  disclosures.  You saw what Google told users about what could

3  be saved in their Google Account or what couldn't.  And you

4  know about the "Are you sure?"  The "Are you sure?" that even

5  when sWAA is off, Google will continue to collect data.  Learn

6  more about how and why.  Google certainly had permission to do

7  this.

8      Now, one thing I want to make clear about this, because it

9  is a little confusing, for this claim, it is plaintiffs' burden

10 to show lack of permission.  Okay?  It is not Google's burden

11 to show it had permission.  It is plaintiffs' burden to show

12 lack of permission.  They have to prove to you that Google

13 actually lacked permission in light of these disclosures.

14     Plaintiffs suffered damage or loss.  There's no harm here.

15 You've looked at all the evidence.  You've been here for

16 two weeks.  You know there's no harm here.  This is not a

17 measure of harm.  This is whether any harm existed, and it

18 didn't, and so you need to find for Google because there is no

19 harm.

20     And, of course, Google's conduct wasn't a substantial

21 factor in causing harm because there was no harm; but even if

22 there was, they haven't showed that Google caused it.

23     Now, when you're back there in the jury room, you're going

24 to have a verdict form, and I'll show you what that looks like.

25 But the elements are not listed on the verdict form.  So what

1    you're going to have to do, for example, for this claim, is put

2    the Jury Instruction Number 14 next to the verdict form, and

3    you're going to have to tick through each of these elements.

4    And only if you answer "yes" to all five questions would you

5    answer "yes" on the verdict form.  Okay?  If you put

6    an X through any one of these five, you cannot find for Google.

7    Okay.  So when you're back there, make sure you've got the jury

8    instruction next to the verdict form.

9         I'm only going to talk about one other claim because

10   invasion of privacy and intrusion upon seclusion have very

11   similar claims.  So I'm going to go through the invasion of

12   privacy claim just like I did with CDAFA.

13        The plaintiffs have to prove that they had an objectively

14   reasonable expectation of privacy.  And what does that mean?

15        Brooklyn, can we pull up Instruction 19.

16        For the first element, objectively reasonable expectation

17   of privacy, you should consider, among other factors, the

18   following:  the customs, practices, and physical or digital

19   settings surrounding Google's conduct; the extent to which

20   other persons had access to the data at issue; and the means by

21   which the intrusion, if any, occurred.

22        Let's start with the first one.  The customs, practices,

23   and physical or digital settings surrounding Google's conduct.

24   This is de-identified data.  This is data that companies

25   typically use.

 1          What about the second one?  The extent to which other

 2     persons had access to the data at issue.  It is undisputed that

 3     every single one of these apps was using this data to analyze

 4     what their users were doing and what they were doing on the

 5     app.  Okay?  Lots of other people, all the apps had access to

 6     this data.  There's no reasonable expectation of privacy in

 7     this de-identified data.

 8          Thank you, Brooklyn.

 9          This one, this one, it is so clear.  Google's conduct was

10     highly offensive, that is, shocking or an outrageous breach of

11     social norms regarding online data.  In a case with no breach,

12     no leak, no misuse of data, no sharing of data, no selling of

13     data?  I mean, are you kidding me?  There is no highly

14     offensive conduct here.

15          As we've talked about, there's no harm, there's no loss,

16     and Google did not contribute to any harm or loss.

17          Google does have the burden of proving its affirmative

18     defense of consent.  Okay?  And consent is relevant only to the

19     second and third claims, the invasion of privacy and the

20     intrusion upon seclusion.

21          And I'm not going to belabor these disclosures again.

22     I think you may know them by heart by now.  But Google does

23     disclose to users how WAA and sWAA works and got consent as a

24     result.

25          But, in addition, look at Number 2, Google can show

1  consent by words or conduct.  And the plaintiffs, they

2  continued to use these apps.  They continued to use these apps.

3  That is the conduct that shows consent under Number 2, in

4  addition to the explicit consent in Number 1.

5      Okay.  You have been listening a long time.  I do have to

6  talk about damages because the plaintiffs are seeking them, but

7  you should not award damages in this case.  You only get here

8  if you find liability on any of these three claims, and

9  plaintiffs have not met their burden.

10     If you answer "no" to these first three questions, you are

11  done.  You don't have to answer any more.

12     But if you answer "yes," you do have to answer the

13  question about actual damages.  And the question is [as read]:

14          "Have plaintiffs proved, by a preponderance of

15      the evidence, that they are entitled to compensatory

16      damages here?"

17      The answer is "No."

18     22 is really important.  Okay?  Because if you look at 22

19  in the middle, it says [as read]:

20          "Your award must be based upon evidence and not

21      upon speculation, guesswork, or conjecture."

22      Okay?  It can't be based on speculation, guesswork, or

23  conjecture.  And the reason that's important is that

24  Mr. Lasinski's entire opinion on actual damages, remember,

25  basing it on that Screenwise Panel, is based entirely on

1    speculation, guesswork, and conjecture.

2        Professor Knittel, when asked about Mr. Lasinski's

3    analysis, said [as read]:

4            "The Screenwise data is basically everything

5        about you on the Internet.  That is completely at

6        odds with the data at issue in this case.  I think

7        apples and oranges is too soft.  I'm trying to think

8        of a better metaphor, but it's just not comparable."

9        And that comports with your common sense.  The Screenwise

10   Panel is like putting a camera on your eyeballs.  Okay?  When

11   that meter is on, everything you look at on your phone is

12   getting recorded and shared, and it allows Google to use that

13   data for any purpose it wants.  Personally identified, used for

14   advertising, there are basically no limits on how it can be

15   used.  And you know this sWAA-off data is de-identified and,

16   for purposes of these damages, only used for conversion

17   measurement.

18       If on the left is all of the Screenwise data, next to it

19   is the app activity data from all of the apps, even less is the

20   Google Analytics data that's received, even less is the

21   de-identified sWAA-off data that Google Analytics receives, and

22   even less is the data about conversion measurement.  Okay?

23   This is what they're seeking damages for, measuring whether

24   conversions happen.  It is just not comparable.

25       And what did Mr. Lasinski say about it?  He was paid over

1    a million dollars.  He spent -- him and his team spent

2    4,000 hours.  And I asked a simple question [as read]:

3        **"QUESTION:**  You didn't compare the data obtained by the

4        Screenwise meter to the sWAA-off data in your report;

5        right?

6        **"ANSWER:**  I did not in my report, no."

7        He did not analyze the data.  He did not do any study.  He

8    didn't do any comparison, didn't do any experiment to try to

9    compare the data collected by Screenwise and what the value of

10   the sWAA-off data should be.  Just put his finger in the wind

11   and said, "Well, I see $3 per month here.  I'll just say $3 on

12   a one-time basis.  That seems -- that seems pretty good."

13       That's not analysis.  That is speculation, conjecture, and

14   guesswork, and it should not be credited.

15       He just concludes [as read]:

16       **"QUESTION:**  You believe that a one-time payment of $3 per

17       device is the appropriate amount; right?

18       **"ANSWER:**  I believe that's a conservative baseline that

19       can be used to determine what compensatory damages are,

20       yes."

21       I pressed him [as read]:

22       **"QUESTION:**  You believe $3 is the appropriate amount;

23       right?

24       **"ANSWER:**  $3, yes."

25       Okay?  There's no support for that.  And 523 million is,

1    itself, a completely unsupported number.

2        But think about what you just heard.  You just heard from

3    Mr. Boies, and I'll get to this in a moment, that he wants a

4    lot more than that.

5        The other thing about this damages analysis that you need

6    to think about is that Mr. Lasinski multiplies this $3 by the

7    total number of devices, but he never explains why that makes

8    sense.  He never explains that people with an iPhone and an

9    iPad use apps more than a person with just an iPhone.  He

10   could have studied that, but he didn't.  There's no basis, even

11   if you were to credit this one-time $3 payment, to do it based

12   on the number of devices rather than the number of class

13   members.

14       So a plaintiffs' expert says in this case that it should

15   be 523 million based on $3 -- one-time payment of $3 times

16   174 million devices, even though the evidence is zero.

17       But what did you just hear?  The plaintiffs' lawyer,

18   without any evidence and even after paying this expert over a

19   million dollars, is proposing a number to you that is -- what

20   is that?  60 times bigger than their expert was willing to go?

21   I mean, this is even bigger than the number in opening.

22       You know, I initially last night had this slide at

23   29 billion because that's what he said in opening.  I mean,

24   he's tacked on $2 billion in the last two weeks.  I mean, at

25   this rate, what is it going to be next week?  This is

1    completely outrageous, members of the jury.  There is no

2    support for that.

3         And you know what he's doing.  I think some of you know

4    what he's doing.  He's anchoring.  Anchoring is a psychological

5    concept where if you throw out a really big number, it makes

6    the lower numbers look reasonable; so that he thinks you're

7    going to go back there and see 31 billion and say, "You know

8    what?  523 million isn't that bad."

9         That's what he's doing.  I hope that doesn't work on you

10   because there's no support for 523 million, and 31 billion is

11   truly outrageous.

12        And you know what else?  When you see numbers like this,

13   it should make you wonder, "Can I trust anything this lawyer

14   says?"

15        What about unjust enrichment?

16        [As read]:

17             "Have plaintiffs proved, by a preponderance of

18        the evidence, that they are entitled to disgorgement,

19        also known as unjust enrichment?"

20        The answer there is "No" as well.  There are several

21   reasons.  I'm going to walk through them with you.

22        The first, most basic one is that Mr. Lasinski doesn't

23   even understand conversion measurement.  This is what they're

24   basing their unjust enrichment on.  He tried to provide a

25   pretty simple diagram, but it's not even right.

CLOSING ARGUMENT / HUR

1    And you heard Ms. Langner, the CEO of App Campaigns,

2  explain why that's wrong [as read]:

3      ▪**QUESTION:**  When does Google get paid for the ad?

4      ▪**ANSWER:**  Google gets paid when a user clicks.

5      ▪**QUESTION:**  When does the conversion occur?

6      ▪**ANSWER:**  After the click."

7    Okay.  Google gets paid when a user clicks on an ad or

8  sees an impression.  If a user later downloads an ad [sic],

9  there's no additional payment.  There's no commission.  There's

10  no payment.

11    Mr. Lasinski had a fundamental misunderstanding of how

12  conversion tracking worked.  Like Ms. Langner said:  An ad is

13  clicked by a user.  An advertiser pays Google in Step 2.  A

14  user downloads an app in Step 3.  The payment happens in

15  Step 2, not in Step 3.

16    What else did you hear from Ms. Langner?  80 percent of

17  app advertisers already use third parties for conversions.  Why

18  is that important?  Because these third-party app providers

19  would step in if Google Analytics for Firebase couldn't use app

20  activity for measuring conversions because they already do.

21    Ms. Langner was asked [as read]:

22      ▪**QUESTION:**  Do you think Google would lose money if

23      advertisers couldn't use Google Analytics to measure

24      conversions?

25      ▪**ANSWER:**  No.

1    "QUESTION:  Why not?

2    "ANSWER:  They would simply use the third party to measure

3    the conversions."

4    And the reason advertisers use these third parties is

5    because they don't want to trust Google to grade their own

6    performance.  That's why they use third parties.

7    But, look, I am not saying that conversion tracking has no

8    value.  I'm not saying that.  It does have value.  And, in

9    fact, you heard Ms. Langner say it.  You heard Mr. Ganem say

10    it.  You heard Mr. Monsees say it.  Conversion tracking has

11    value.  It is part of the ecosystem.  It is part of Google's

12    virtuous cycle to try to eventually convince advertisers that

13    their ads are effective in the hopes that they buy more ads.

14    That is true.

15    But there is no direct payment for conversion tracking,

16    and Mr. Lasinski does not justify how this virtuous cycle

17    actually leads to damages in this case.

18    Now, setting aside that fundamental error, you heard

19    Professor Knittel explain what Mr. Lasinski's numbers are.

20    [As read]:

21    "ANSWER:  There are fundamental basic errors in economics

22    that Mr. Lasinski performed.  And, you know, there's a

23    saying in data analysis, 'garbage in/garbage out.'"

24    If you deduct the operating costs, which he showed you

25    during his testimony, you'd lop off 702 million.

1    The second category is the sWAA-off versus sWAA-on data,

2   and just one quick statement about this to help you remember.

3   People with sWAA on interact with ads more, and that comports

4   with your common sense because that ad is personalized.  It's

5   designed to try to cause you to click on it more.  When sWAA is

6   off, that ad is not personalized, so of course users click on

7   it less.  He doesn't account for that.

8    And the third and final category is this change to

9   iOS 14.5.  That's Apple.  That's the software change where

10   Apple introduced a setting that allowed users to say, "Do not

11   track my app activity."  And when that happened, neither Google

12   nor any third party could get the device identifier that is

13   used for conversion tracking, and Mr. Lasinski doesn't account

14   for it.

15    Now, you heard this morning the number 4.6 billion.

16   4.6 billion.  You didn't see that from Mr. Lasinski.  What you

17   saw from Mr. Lasinski -- can you show Slide 34, Brooklyn? --

18   was 1.5 billion.

19    Now, in the last two weeks or, actually, the last week,

20   because Mr. Lasinski testified Monday, that number has gone

21   from 1.5 to 4.6.  It's not a $2 billion increase like with

22   actual damages.  It's now a $3 billion increase in a week.

23   It's just not credible.

24    Thank you, Brooklyn.

25    One final change to Mr. Lasinski's analysis, even if you

1    decided to credit it, is that he fails to count for dashers and

2    unicorns in the correct way.  He uses as a baseline the total

3    number of accounts rather than the number of sWAA-off accounts;

4    and if you put all that together, that would amount to

5    $128.5 million.

6        Can you put up Slide 35, Brooklyn?

7        This is also from Mr. Lasinski's testimony last week,

8    eight days ago.  Eight days ago he said [as read]:

9            "Excluding dashers and unicorns, the number is

10        1.4 billion."

11       Again, compare that to the 4 1/2 billion that counsel is

12   now asking you for.

13       Okay.  You can take that down.  Thank you.

14       Finally, there is one alternative that he put out there.

15   He said, "Oh, remember those two green bars on the far right?

16   Somehow Google's profits for those two years skyrocketed

17   compared to the prior years."

18       You heard Ms. Langner explain why that is, because that

19   data contains Play, Search, YouTube revenue that is not at

20   issue in this case.

21       There are no damages here.  Okay?  I'm sorry that I had to

22   walk through all of that with you, but it is required in the

23   event that you get to that point.  You shouldn't.  There's no

24   basis for it.

25       But if you do find liability, you can also -- if you find

1  no actual damages, you can award what's called nominal damages,

2  and that can include things like battery degradation, loss of

3  right to control one's data, or emotional distress.  And if you

4  find that, you can award nominal damages that don't exceed $1.

5  Okay.  That means it can be between a cent and a dollar per

6  class member.

7      Nothing has been proved.  You shouldn't even get to this.

8  All of these should be zero.  But if somehow you think damages

9  are appropriate here, these are the numbers you should use.

10     For actual damages, it should be $3 on a one-time basis

11  times the total number of class members, not devices.  That

12  would be 294 million.

13     For unjust enrichment for Claim 1, it would be

14  218.7 million and, for Claims 2 and 3, 128.5 million.

15     And for nominal damages, it would be up to you, but it

16  would be between 980,000 and 98 million.  It's supposed to be

17  nominal, but that's what the -- that's what the range would be.

18     And the last question, if you get to it, is punitive

19  damages.

20     [As read]:

21         "Have plaintiffs proved, by clear and convincing

22     evidence, that Google engaged in the conduct at issue

23     with malice, oppression, or fraud?"

24     I'm not even going to provide an argument about this.  The

25  answer is clearly "No."

 1    I want to leave you with this:  Finding for Google in this

 2   case doesn't mean you don't care about data privacy.  It

 3   doesn't mean you think everything the tech industry does is

 4   perfect.  It doesn't even mean you think Google's perfect.  I

 5   will tell you, Google is not perfect.

 6    But it means you're not going to be fooled.  It means

 7   you're not going to be fooled into relying upon six-year-old

 8   emails and interviews that have nothing to do with the conduct

 9   at issue here, that you're not going to let these plaintiffs'

10   counsel create outrage about other products or other issues

11   that aren't about the Google Analytics data that Google

12   collects and uses when sWAA is off.

13    Finding for Google means you're not going to ignore the

14   "Are you sure" screen that tells users what happens even when

15   sWAA is off right at the time that they're turning it off.

16    Finding for Google means you're not going to ignore the

17   activities control screen that tells users that these controls

18   are about what is saved to your Google Account, not what can be

19   saved generally.

20    Finding for Google means you're not going to give in to

21   scare tactics, hypotheticals about reidentifications that never

22   happened, hypotheticals about puzzle pieces putting together

23   that never happened, hypotheticals about how Google could use

24   the data that have never happened.

25    Finding for Google means you understand that sWAA is not a

 1  fake button, that it's a real button that has real consequences

 2  for both users and Google.

 3      Finding for Google means you recognize this is a gotcha

 4  case.  This is a gotcha case where lawyers are parsing emails

 5  and disclosures to the nth degree without showing you any

 6  wrongful conduct, any harm to any users.

 7      Finding for Google means you understand that Google was

 8  trying to do the right thing here; that even if you think this

 9  word should go there and that word should go there or

10  Mr. Ruemmler should have said this word instead of that word or

11  the "and" should have been in a different place, that Google

12  was trying to do the right thing here; that Google did not have

13  the intent to violate these claims.

14      And finding for Google also means you're not going to hold

15  it against Google for being successful.

16      My parents came here because they thought it was the land

17  of opportunity where individuals, even corporations, if they

18  worked hard, if they were able to put out good products, if

19  they were able to build cool things that users liked, that they

20  could succeed; that corporations and individuals are going to

21  be held accountable in courts of law but they're also going to

22  be treated fairly; where, in America, justice prevails; where,

23  in courtrooms, people actually believe that juries will listen

24  to the evidence, use their common sense, and exercise fairness.

25      And as I mentioned to you at the very beginning of this

 1    trial, for this case, in this courtroom, over these two to

 2    three weeks, you are the people empowered to uphold that ideal,

 3    and I know that you will.

 4        The only thing standing between you and finally getting to

 5    talk to each other about this case is a short rebuttal from the

 6    plaintiffs' counsel and a few more instructions from

 7    Judge Seeborg.

 8        And when Mr. Boies gets up here, I want you to see if he

 9    answers these questions.  He posed some questions to me.  I

10    answered the main one.  See if he's willing to answer these

11    questions:

12        Why isn't he talking about the "Are you sure" screen that

13    comes up as soon as a user turns sWAA off?  Why have we been

14    here for two weeks and it wasn't mentioned in opening, it

15    wasn't mentioned with the plaintiffs, it wasn't mentioned with

16    the witnesses?  It took until Google's case, after plaintiffs

17    rested, for you to see this.  And even then, it wasn't

18    mentioned in closing.

19        Why isn't he talking about how Google Analytics actually

20    uses data?  I mean, did he even mention -- he barely mentioned

21    Google Analytics, it seemed, or certainly not the technology,

22    in his closing.  He didn't mention it at all in his opening.

23        Where is the actual evidence that anything sensitive was

24    sent to Google and tied to a user's name?

25        Why didn't Lasinski do any analysis comparing the data at

1    issue here to Screenwise?

2        Why would you believe anything this lawyer says after he

3    asked for far more money than his million-dollar expert was

4    willing to say was appropriate?

5        Yesterday, when I wrote this bullet, it seemed pretty

6    outrageous; but you saw today, actual damages have gone up

7    2 billion in two weeks and unjust enrichment has gone up

8    3 billion in one week.  It's just not credible.

9        You have been an incredibly patient jury.  Thank you for

10   your time and considered attention to this case.  Thank you.

11       **THE COURT:**  Members of the jury, let's take, again, a

12   short break.  We are getting very close to the case being in

13   your hands; more immediately, lunch being in your hands.

14       But for right now, continue the do not discuss this

15   amongst yourselves, anyone else.  Very soon you will be able to

16   discuss it amongst yourselves.  But let's try to be back at

17   12:30.

18              (Recess taken at 12:19 p.m.)

19           (Proceedings resumed at 12:34 p.m.)

20   (Proceedings were heard out of the presence of the jury.)

21       **THE COURT:**  Okay.  Ready to bring them out?

22       **MS. PARRISH:**  Your Honor, just one housekeeping item

23   before we bring the jury back in, if I may.

24       Samantha Parrish for plaintiff.

25       We had one exhibit, Exhibit 82, PX82, that was omitted

1   from our admissions list.  We'd like to admit that into the

2   record.

3          **MS. FLOREZ:**  No objection, Your Honor.

4          **THE COURT:**  Exhibit 82 it is; right?

5          **MS. PARRISH:**  Correct.

6          **THE COURT:**  82 is admitted.

7      (Trial Exhibit PX82 received in evidence.)

8          **MS. PARRISH:**  Thank you.

9          **THE COURT:**  Thank you.

10     Okay.  Are we ready to bring them out?

11     (Proceedings were heard in the presence of the jury.)

12         **THE COURT:**  The jury is present.

13     Brief rebuttal, Mr. Boies.

14         **MR. DAVID BOIES:**  I'll try to be as brief as I can,

15  Your Honor.

16     Could we put up those questions that counsel was asking?

17                    **REBUTTAL ARGUMENT**

18         **MR. DAVID BOIES:**  First question:  Why aren't we

19  talking about the "Are you sure" screen?  Well, let's talk

20  about this screen.

21     First, keep in mind that there was no dispute that they

22  took, copied, and used sWAA-off data.  Some dispute about how

23  they used it, what they did with it; no dispute that they took,

24  copied, and used the data.

25     And there was no mention of the CEO saying, "You have

 1   transparency, control, ability to delete."  There was no

 2   mention of all the policies, all of the privacy policies that

 3   gave people -- promised control, promised the ability to see

 4   the data, promised the ability to delete the data.  Didn't

 5   mention that at all.  Instead, what have they done?  They give

 6   you what they call an "Are you sure" chart.

 7        And when you pause WAA -- and, remember, when you're

 8   pausing WAA, you're doing two things.  You're pausing both WAA

 9   and sWAA.  You're pausing both the collection of activity from

10   Google apps and from third-party apps.  You're doing both of

11   those.

12        And what do they say?  Well, they say if you turn it off,

13   turn off WAA, your Chrome history will still be saved.  Okay?

14   They're talking about that's going to go on.  And they say your

15   Android usage, diagnostics, battery system errors, that's all

16   going to be saved.  They say pausing, in this sentence, doesn't

17   delete any of your past data.

18        You don't see anywhere on here where it says if you pause

19   WAA, sWAA data is going to continue to be collected.  You don't

20   see anywhere there.

21        And when it says here, this is a link; and when it sends

22   you, it doesn't say anything at all about sWAA data being

23   continued to be collected.  I guarantee you if it had, they

24   wouldn't have shown you this chart.  They would have shown you

25   the chart where it said that.

1    There is nothing here, nothing anywhere, not in this link,

2  not here, that says anything at all about them collecting sWAA

3  data when you turn sWAA off.

4    And these are the kinds of things that continue to be

5  collected, but there is no mention here of anything from

6  non-Google app activity.

7    He says, number two:  Why isn't he talking about how

8  Google Analytics actually uses data?

9    Well, for two reasons.  First, how they use it after they

10  take it, copy it, and use it in some ways is not really part of

11  the case.  He likes to think that it is better that they didn't

12  personalize it.  That's good.  But if you steal something, if

13  you take something that's not yours, the fact that you didn't

14  take something more is not a defense.  It's not a defense to

15  what you did that you didn't do something worse.

16    And what this case is about, what it's always been about,

17  is:  Did they take, copy, or use this data?

18    Now, we get to how they used it, what they did with it, we

19  get to that when we get to damages.  But here, in terms of

20  liability, you'll look at the Court's instructions.  You'll

21  look at the instructions that Judge Seeborg gave you.  There's

22  nothing in there about how you use the data.  It's take, copy,

23  or use the data.  There's nothing in there about how you use

24  it.

25    In addition to that, we're not just talking about

1   Google Analytics.  We're talking about Google.  And, remember,

2   Mr. Ganem, the CEO of Google Analytics, said he didn't even

3   know where else outside of Google Analytics this stuff was

4   kept.

5       Their response to Interrogatory 14 said it was kept in so

6   many different places, there were so many different logs, there

7   were so many different uses of it that they couldn't even

8   categorize those in an interrogatory.  They couldn't even tell

9   us all the places they used the data.

10      So it's not a question about how Google Analytics uses the

11  data.  It's a question of how Google uses the data.

12      What is the actual evidence that anything sensitive was

13  sent to Google and tied to a user's name?  Well, first, you

14  have that in the evidence that came in with respect to

15  Mr. Rodriguez and Mr. Santiago.  You showed sensitive

16  information about their personal life, their personal

17  activities that was tied to their name.  Now, I'm not saying

18  that Google does that as a practice.  Okay?  But you did see

19  that happen.

20      The other thing is:  What's sensitive?  Well, it's tied to

21  the user's device.  Think how significant your personal phone

22  is to you and how closely that ties it to you.  And in addition

23  to that, we know from the undisputed evidence that they can --

24  they've got a table that they can connect the device ID to the

25  GAIA ID, to your name and email address.  You know that from

1    the undisputed evidence.

2        So the actual evidence is that (a) it collects directly

3    the email in some instances; but in addition to that, and more

4    important, it always collects the device ID.  And because it

5    collects the device ID and because the device ID is always

6    readily connectible to a person's email, I think that's

7    sensitive.

8        Four, why didn't Lasinski do any analysis comparing the

9    data at issue here to Screenwise?  He did.  You'll remember

10   when he testified, he testified that there were some

11   differences in both directions.  Sometimes more information was

12   collected in Screenwise.  But in Screenwise, you had an ability

13   to pause.  Remember?  You had an ability to pause, to stop.  If

14   sensitive information was being collected in Screenwise, the

15   Screenwise person could just pause it and not have it

16   collected.

17       The sWAA-off user didn't have that ability because the

18   sWAA-off user didn't know that there was not -- there wasn't a

19   button ever given him that would effectively prevent the

20   collection of that data.

21       He also noted that for the Screenwise people, they were

22   willing to transfer their data.  The sWAA-off people weren't.

23   There aren't any sWAA-off people on the jury because they

24   couldn't serve.  And so what you have to do is you have to put

25   yourself in their mindset.  These are people that cared about

1   their privacy.  Not everybody does.  But these are people who

2   cared about their privacy, and these -- and taking people's

3   data when they care about their privacy is more valuable than

4   for people who are willing to sell it.

5        So he did analyze the Screenwise, and he did a number of

6   other things that you remember.

7        But in addition to that, not only did he compare the $3 to

8   the Screenwise, but he talked about the different other

9   valuations, the $15 a month, the $29 a month, and the $50 a

10  year, which is a little over $4 a month.  So Lasinski did do an

11  analysis.  What didn't happen is you didn't see any analysis

12  from the other side.

13       Number five, why should you believe anything the lawyer

14  says after he asked you for more money than his million-dollar

15  expert was willing to say was appropriate?  Well, first of all,

16  I don't want you to believe anything I say.  I want you to

17  believe what the evidence says.  I want you to believe what the

18  evidence in this case is.

19       This is not about the lawyers.  It's not about argument.

20  It's not about what we say.  It's about what the evidence says.

21  And what the evidence says is that they took, copied, and used

22  this data, they made a lot of money from it, and they told

23  people that they weren't going to do that, they told people

24  they were going to give control, and they internally recognized

25  it.

**REBUTTAL ARGUMENT / DAVID BOIES**

1    Now, I answered those questions.  Now, he said he answered

2  my questions.  Let me put up 117.

3    Now, he says he answered these questions.  Well, maybe you

4  heard him.  I didn't.

5    Why didn't Google simply say, "We collect sWAA-off data,

6  but we promise to de-identify it"?  Did you hear him answer

7  that question?

8    Two, why didn't Google simply say, "We don't save your

9  data in your Google Account, but we do save it elsewhere"?  Did

10  you hear him answer that question?

11    Three, what happened to the June 2020 survey?  If Google

12  or its lawyers killed it, why?  If Google didn't kill it, where

13  are the results?  Did you hear him answer that question?

14    Four, what was the average number of months users turned

15  sWAA off during the class period?  Did you hear him answer that

16  question?

17    Five, what is Google's best estimate of the monthly value

18  of the sWAA-off data it collected?  He told you $3 wasn't

19  right, but what was Google's best estimate?

20    Five, what is the revenue Google received as a result of

21  its collection of sWAA-off data and what are its total U.S.

22  costs?  Did you hear him even begin to answer that question?

23    Now, he says that we've got to prove, in order to recover,

24  that they were highly offensive, doing terrible, terrible

25  things.  For our second and third cause of action, we do.

 1         We don't have to do that for CDAFA.  There's nothing in
 2    the CDAFA instructions -- and you'll see the instructions.
 3    You'll have them with you.  There's nothing in there that
 4    suggests it has to be highly offensive.  This is very simple.
 5    CDAFA says:  Did you take, copy, or use it?  Two, did you have
 6    permission?
 7         They took, copied, and used it, and they didn't have
 8    permission.  And it has to -- the permission, the consent has
 9    got to be explicit; it's got to be clear.  They didn't have it
10    at all, but it certainly wasn't explicit; it certainly wasn't
11    clear.
12         They say we're trying to put words in people's mouth.
13    We're not putting any words in people's mouth.  We're reading
14    what the documents said.  We're reading what the testimony
15    said.  We're reading the points that they made themselves.
16         And what you heard today was exactly what I told you you
17    would hear several days ago.  They want you to ignore what they
18    said -- and he says it's six years ago -- ignore -- it's like
19    you ought to ignore it because it's six years ago.  He keeps
20    saying, "You're talking about six-year-old emails."  Well, of
21    course you're talking about six-year-old emails because that's
22    when this was happening.  That's when people were still writing
23    emails about this.  That was where -- before they started
24    talking to the lawyers.
25         Remember, Mr. Ruemmler was taken off to the woodshed with

 1    a lawyer and, all of a sudden, all the communications stopped?

 2    Once the lawyers got involved, no more of these frank emails.

 3        But this is something that is -- you have, time after time

 4    after time, frank language from honest people within Google

 5    trying to make the company do the right thing.  It's ignored,

 6    but that is what they knew.

 7        They don't tell you -- you didn't hear anything from them

 8    about the survey that they actually did, the survey within

 9    Google.  Yes, we have the burden of proof; but one of the ways

10    that we can follow that burden of proof is by using their own

11    evidence.

12        You don't see anything about their surveys.  They don't

13    tell you what their answer is.  What they really want to do is

14    get you to rewrite the evidence.

15        I had a -- something I wanted to -- wanted to show you.

16    Let me put up R23.

17        And this is PX2, page 20, and it's the language that

18    you've seen all many times.  "Turning WAA Off" is the heading.

19    And this is the survey, and this is a survey that Mr. Monsees

20    told you was done according to best practices.  It was a survey

21    that they relied on.  It was a survey that they didn't have any

22    basis for undermining.  And it says [as read]:

23            "All participants expected turning off toggle to

24        stop their activity from being saved."

25        Now, what they want to do is they want to add to that

1  "Except to a place you've never heard of, can't access, can't

2  control, and can't delete."

3      The same thing with PX9.  This is the June survey that

4  they either killed or buried.  They say [as read]:

5          "Most respondents will believe that turning off

6      WAA will result in no data being collected from their

7      activity."

8      Again, they want to add "except to a place that they have

9  never heard of, can't access, can't control, and can't delete."

10 Obviously, they would never have wanted to say that because, as

11 they recognize, that would be alarming to users.

12     Now, counsel again represented to you that Mr. Ruemmler

13 was really only talking about a proposal that never happened.

14 That's what they got him to say on the stand, and that's what

15 he just told you was the case.

16     I'd like to pull up Plaintiffs' Exhibit 3, if I could.

17     Excuse me just a minute.

18          (Co-counsel confer off the record.)

19     **MR. DAVID BOIES:**  I want to pull up Exhibit 3, and I

20 want to try to blow that up, if I can.

21     And let me go to the very beginning of the chart -- the

22 very beginning of the email, which is on, like, the third page.

23     And I'm going to walk over to this one.

24     **THE COURT:**  Go ahead.

25     **MR. DAVID BOIES:**  Now, go on down to -- go all way

1    down to the bottom, to the beginning.  Okay.

2        Now, he says here [as read]:

3            "So it appears we have a real problem here with

4        accurately describing what happens when WAA is

5        disabled."

6        Okay?

7        And then if we go back up -- let me try to see if I can

8    highlight this.

9        If we go to page 2, and this is the first email,

10   July 24th, 2019, and -- and then go down to the top of the

11   third page.  Here, they're quoting the language that we've just

12   seen.  We've quoted the language from the help page.

13       And now go to the top page, the top of it.

14       [As read]:

15           "But that is not what is done either today or

16       what is proposed."

17       "Either today or what is proposed."  This is not something

18   that is simply talking about a proposal that never happened.

19   This is what he's talking about today.

20       And down here, where he says, "We have a real problem," he

21   says [as read]:

22           "We should fix the current wording to reflect

23       reality; and if we make the change, we need to be

24       very clear."

25       "We should fix the current wording to reflect reality."  I

1  respectfully suggest there is no way you can interpret that as

2  him simply talking about the future.

3      There are a number of other -- you'll have this in the

4  jury room with you, and there are a number of other instances

5  where you can absolutely -- it's absolutely clear that he is

6  talking about the present tense.

7      Now, he said that developers were told not to send

8  personally identifiable information.  Now, that's a word game,

9  again, because they're told to send the device ID.  They're

10 told to send the location by city.  They're told to send a lot

11 of that information.  By "personally identifiable," they've --

12 he's saying they're not told to send the name or email, but

13 that's not the issue with respect to CDAFA.  The issue with

14 CDAFA:  Are they taking data?  Are they copying it?  Are they

15 using it?

16     They suggested to you that Plaintiffs' Exhibit 4, where

17 they say they are intentionally vague, I think they were

18 suggesting to you that that was maybe something from

19 Mr. Miraglia.  You have the exhibits.  You will see that that

20 is not something that's in Dutch.  It's talking about, in

21 English, "We're intentionally vague."

22     And it is true that Mr. Heft-Luthy and others tried to

23 walk away from their emails, but, again, I urge you, consider

24 which is more reliable:  what they wrote when they didn't

25 think anybody was looking or what they now come into court and

1    try to say defending against a billion-dollar lawsuit?

2        Now, counsel says we couldn't put anything on one screen.

3    Well, you put a lot on this screen.  But not only did you not

4    put it on this screen, you didn't put it on any screen.  And

5    you had these policies that were 5,000 words long,

6    5-and-more-thousand words long.  It's not in any of those.

7    They had -- this is not a situation where they didn't have

8    enough room to tell people what was happening.

9        Let me just...

10        Oh, with respect to damages, with respect to damages,

11    first, he said that -- he was unhappy that we were asking for

12    all this money.

13        I told you at the beginning.  I asked you whether you

14    would be prepared to follow the evidence.

15        And he says:  Why are you asking for money by device as

16    opposed to person?  You could do it by person.  You could do it

17    by person if you think that's a better way to do it.  But

18    either way, the number is going to be very large because there

19    are so many people.  You've got 98 million people.  You've got

20    174 million devices.

21        If you -- if I could go to the chart that shows -- well, I

22    don't -- I'll skip over that.  You remember it well enough.

23        The chart that shows how much damage is caused, whether it

24    is one month or eight months or 59 1/2 months, that shows you

25    how little the damages are per person or per device.  At the

1    most, you're talking about about $300 per person and less than

2    $200 per device.

3       So the reason these numbers are large, you know, has

4    nothing to do with inflation, us trying to put large numbers

5    up; it simply has to do with how long this went on, how many

6    people were involved, how many billions of dollars Google made

7    from this.

8       Now, he said that we'd gone from $1.4 billion to

9    $4.6 billion in unjust enrichment.  Now, those two numbers

10   don't have anything to do with each other.  The $4.6 billion is

11   a revenue number.

12      And if we go to Chart 101, Google made $51 billion in

13   revenues from just three products.  $4.6 billion, a minimum of

14   $4.6 billion was from the sWAA-off data.  And I had the -- I

15   had the question and answer.

16      He also told you the $4.6 billion wasn't in the record.

17      Can you pull up again the transcript page where that was

18   in the record?

19      But the $4.6 billion was testified to by Mr. Hochman, and

20   so that started as a revenue figure.

21      We then have to come to the profits.  And if we go to

22   102 -- or are you pulling up the transcript?

23      Okay.

24      [As read]:

25      ▪QUESTION:  And if you take that 51 billion revenue and

1    say, 'I just want to know how much of that revenue was

2    from the signed-in users sWAA off and bid against the

3    relevant conversion types,' what would that revenue number

4    be?

5    **"ANSWER:** That would be about $4.6 billion."

6    Now, as Judge Seeborg has instructed, they have the burden

7    of coming up with the costs. You didn't hear anything from

8    them about the costs. Nothing. No estimate of U.S. costs.

9    Nothing. If they fail that burden, that's the right number

10   under the judge's instructions, and you'll have the judge's

11   instructions.

12   Also, if you took our expert's estimate of the costs, it

13   would be about $2.32 billion. But if they have failed in their

14   burden -- and it's their burden on costs, our burden on

15   revenue. We've carried that burden. They've not disputed that

16   $4.6 billion. They have the burden on costs, and I

17   respectfully suggest to you they did not -- they did not carry

18   that burden.

19   There is much more that I could say, but I suspect I would

20   start being repetitive to what you've already heard.

21   And as you can tell, there's a lot that I disagree with

22   with Google, including whether people ought to trust me or not.

23   But one thing I do agree with him on is that this case is now

24   in your hands, and you have the power to make a difference.

25   For eight years, the plaintiffs have been in Google's

1    hands.  For eight years, they haven't had any control.  They

2    were promised control; they haven't had any control.  And it's

3    now -- it's now in your hands to do the right thing, whatever

4    you decide that is.

5         The two things I would just ask you to carry back to the

6    deliberations with you is to consider how long this went on and

7    how long it went on with them knowing that the users were being

8    misled.

9         It is true they didn't personalize ads.  It is true that

10   to some extent things were de-identified, although they could

11   be reidentified.  It is true that they did not use this data in

12   certain ways.

13        But the question is not:  What worse things did they not

14   do?  The question is:  Did what they did create liability?  And

15   if so, how much?  And I respectfully suggest that they took,

16   copied, and used, and they did not have permission or consent.

17   And even if the damages are very small per person or per

18   device, they are inevitably very large because of the size of

19   the class.

20        And I ask you to follow the evidence.  I ask you to give

21   these people justice.

22        But I also ask you, when you're thinking about punitive

23   damages, to make a difference in terms of how this goes

24   forward.  It's not too late to stop this kind of conduct.  It's

25   not too late to make large, very powerful companies follow the

1  law.  That's all we're asking.  Just follow the law.

2      Thank you very much for your time and attention.  As we

3  said at the beginning, this couldn't happen without you, and I

4  know that Google does agree with me on this point in terms of

5  the importance of what you are doing and our appreciation for

6  it.  Thank you very much.

7                    **FINAL JURY INSTRUCTIONS**

8      **THE COURT:**  Just a few final instructions, members of

9  the jury.  Then it will be a matter in your hands.

10     Before you begin your deliberations, elect one member of

11  the jury as your presiding juror.  The presiding juror will

12  preside over the deliberations and serve as the spokesperson

13  for the jury in court.

14     You shall diligently strive to reach agreement with all of

15  the other jurors if you can do so.  Your verdict must be

16  unanimous.

17     Each of you must decide the case for yourself, but you

18  should do so only after you have considered all of the

19  evidence, discussed it fully with the other jurors, and

20  listened to their views.

21     It is important that you attempt to reach a unanimous

22  verdict but, of course, only if each of you can do so after

23  having made your own conscientious decision.  Do not be

24  unwilling to change your opinion if the discussion persuades

25  you that you should do so.  But do not come to a decision

1   simply because other jurors think it is right or change an

2   honest belief about the weight and effect of the evidence

3   simply to reach a verdict.

4       Because you must base your verdict only on the evidence

5   received in the case and on these instructions, I remind you

6   that you must not be exposed to any other information about the

7   case or to the issues it involves.

8       Except for discussing the case with your fellow jurors

9   during your deliberations, do not communicate with anyone in

10  any way, and do not let anyone else communicate with you in any

11  way about the merits of the case or anything to do with it.

12  This includes discussing the case in person, in writing, by

13  phone, tablet, computer, or any other means, via email, via

14  text messaging, or any Internet chat room, blog, website, or

15  application, including but not limited to Facebook, YouTube,

16  Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other

17  form of social media.  This applies to communicating with your

18  family members, your employer, the media or press, and the

19  people involved in the trial.  If you are asked or approached

20  in any way about your jury service or anything about this case,

21  you must respond that you have been ordered not to discuss the

22  matter and report the contact to the Court.

23      Do not read, watch, or listen to any news or media

24  accounts or commentary about the case or anything to do with

25  it.  Do not do any research, such as consulting dictionaries,

**FINAL JURY INSTRUCTIONS**

1  searching the Internet, or using other reference materials, and

2  do not make any investigation or in any other way try to learn

3  about the case on your own.  Do not visit or view any place

4  discussed in this case, and do not use Internet programs or any

5  other devices to search for or view any place discussed during

6  the trial.  Also, do not do any research about this case, the

7  law, or the people involved, including the parties, the

8  witnesses, or the lawyers, until you have been excused as

9  jurors.  If you happen to read or hear anything touching on the

10  case in the media, please turn away and report it to me as soon

11  as possible.

12      These rules protect each party's right to have this case

13  decided only on the evidence that is presented -- has been

14  presented here in court.  As you know, witnesses here in court

15  take an oath to tell the truth, and the accuracy of their

16  testimony is tested through the trial process.  If you do any

17  research or investigation outside of the courtroom or gain any

18  information through improper communications, then your verdict

19  may be influenced by inaccurate, incomplete, or misleading

20  information that has not been tested by the trial process.

21  Each of the parties is entitled to a fair trial by an impartial

22  jury, and if you decide the case based on information not

23  presented in court, you will have denied the parties a fair

24  trial.  Remember, you have taken an oath to follow the rules,

25  and it's very important that you do so.

**FINAL JURY INSTRUCTIONS**

1   A juror who violates these restrictions jeopardizes the

2   fairness of these proceedings, and a mistrial could result that

3   would require the entire trial process to start over.  If any

4   juror is exposed to any outside information, please notify

5   the Court immediately.

6   If it becomes necessary during your deliberations to

7   communicate with me, you may send a note through our Courtroom

8   Deputy, Ms. Hom, signed by any one or more of you.  No member

9   of the jury should ever attempt to communicate with me except

10  via signed writing.  I will not communicate with any member of

11  the jury on anything concerning the case except in writing or

12  here in open court.  If you do send out a question, I will

13  consult with the lawyers before answering it, which may take

14  some time.  You may continue your deliberations while waiting

15  for the answer to any question.  Remember -- and this is very

16  important -- that you are not to tell anyone, including me or

17  my staff, how the jury stands, whether in terms of vote count

18  or otherwise, until after you have reached a unanimous verdict

19  or have been discharged.

20  Now, there's been some discussion -- in fact, you've seen

21  it.  The parties have shown you a verdict form that we've

22  prepared for you.  Please read the instructions on the verdict

23  form carefully.  After you have reached unanimous agreement on

24  a verdict, your presiding juror should complete the form

25  according to your deliberations, sign and date it, and advise

1    Ms. Hom that you're ready to return to the courtroom.

2        I realize that the verdict form is involved.  It has a lot

3    of direction in it, and we've worked very hard to try and make

4    it as straightforward as we can.  Please work through it

5    methodically.  There's a lot of direction.  When you see it,

6    you may say, "Oh, my God."  But it really is designed to give

7    you a clear roadmap of how to deal with it.  So I ask you to do

8    that.

9        So you're about to go off to begin your deliberations,

10   have lunch.  You always -- when you're deliberating, you all

11   need to be together.  You can't deliberate in groups.  You've

12   got to all be together when you're deliberating.

13       You have two questions to answer for us right out of the

14   box.  The first one is, discuss who you want as your

15   foreperson, and please tell us who the foreperson is.  And the

16   second is to give us your schedule.

17       Now, as I said before last -- I think it was Friday, about

18   your schedule, it's my preference that you take advantage now

19   of the full court day because that will allow you to

20   expeditiously do your work, and the full court day is 8:30 to

21   4:00, and we will be providing you lunch as necessary.

22       But it is for you to set your schedule.  So you caucus

23   about that, and then send out, along with the name of the

24   foreperson, the schedule that you're proposing to undertake.

25       And, again, today there is lunch provided.  You're

1    encouraged to use all the way up to 4 o'clock for deliberation

2    and then successive days as necessary.

3        So with that, you have my thanks and good wishes on your

4    deliberations.  We will now excuse you to begin that process,

5    and Ms. Hom will show you how to get organized.

6        (At 1:15 p.m. the jury retired to commence deliberations.)

7        (Proceedings were heard out of the presence of the jury.)

8            **THE COURT:**  We are out of the presence of the jury.

9        The rule, as you all know, is to be within ten minutes of

10   the courtroom.  If you actually want to be using the courtroom,

11   staying here, it's okay certainly today and also tomorrow.  But

12   if you are venturing forth, have a representative here so that

13   we can find you.  Or just out in the hall.  You don't have to

14   sit in the courtroom.

15       Just a comment or two now that we are in the position

16   where we don't know what's going to happen.  This is the

17   perfect time for me to say thank you to all of you.  I have to

18   say that it has been a delight to preside over this trial.  The

19   professionalism that has been displayed here is extraordinary,

20   and we mixed it up from time to time, but always respectfully

21   and professionally.

22       The lead lawyers, of course, were superb, but that doesn't

23   mean that I am not fully aware that there are a very large

24   number of people behind the fine lead lawyers.  And some of you

25   didn't have an opportunity to stand up, but I know how hard

**PROCEEDINGS**

1   you've been working.  I was there once in antique times, and I

2   know how hard the work you've done is.  And I want to tell all

3   of you associates, again, who didn't have the opportunity, you

4   did excellent work.  The briefing was just first rate and a

5   great pleasure.

6        And then, finally, the support staff did a wonderful job.

7   The folks that were doing the tech work, it was seamless.  We

8   never had to stop everything and have all sorts of fits and

9   starts.  It was great.  And I know there are a lot of demands

10  on you because you're expected to just do it all perfectly, but

11  it did really work that way.

12       So thank you, all.  And we will hear what they have to

13  say.

14            **MR. DAVID BOIES:**  Thank you, Your Honor.

15            **MR. HUR:**  Thank you, Your Honor.

16            **MR. SANTACANA:**  Thank you, Your Honor.

17            **THE COURTROOM DEPUTY:**  Court stands in recess.

18            (Proceedings adjourned at 1:17 p.m.)

19                      ---o0o---

20

21

22

23

24

25

## <u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Wednesday, September 3, 2025

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter