# EXHIBIT 6

# TRIAL TRANSCRIPT
# AUGUST 29, 2025

**Volume 9**

**Pages 1615 - 1830**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

```
ANIBAL RODRIGUEZ, et al.,        )
individually and on behalf of    )
all others similarly situated,   )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )  NO. 3:20-CV-04688 RS
                                 )
GOOGLE LLC,                      )
                                 )
          Defendant.             )
_____)
```

San Francisco, California
Friday, August 29, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        BOIES SCHILLER FLEXNER LLP
        333 Main Street
        Armonk, New York 10504
  **BY: DAVID BOIES, ATTORNEY AT LAW**
      **ALEXANDER M. BOIES, ATTORNEY AT LAW**
      **M. LOGAN WRIGHT, ATTORNEY AT LAW**

        BOIES SCHILLER FLEXNER LLP
        2029 Century Park East, Suite 1520n
        Los Angeles, California 90067
  **BY: ALISON L. ANDERSON, ATTORNEY AT LAW**
      **SAMANTHA D. PARRISH, ATTORNEY AT LAW**

REPORTED BY: Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1  **Q.** So if a user is sWAA off, does Google save the app
2  activity data before or after the consent check server has
3  determined that the user is sWAA off?
4  **A.** It's only saved here at the end of the process, after the
5  consent check.
6  **Q.** Can you explain to the jury now what you mean with this
7  Number 5?
8  **A.** Sure. So, as part of the de-identification process -- and
9  we've heard about this already -- but there's some fuzzing.
10 That means you add some fuzz to the data to make it less
11 accurate on purpose, to hide the accuracy. For timestamps you
12 would say, "Add a few seconds forward or backward" to make it
13 less accurate. And it's also scrubbed of certain kinds of
14 identifiers, IP addresses. It's encrypted and then it's stored
15 securely. So it's fuzzed, scrubbed, and then encrypted and
16 stored.
17 **Q.** Did the consent check process differ on iOS since 2021?
18 **A.** Yes. I think we heard this as well, that Apple instituted
19 a new policy starting in 2021, in iOS 14.5. And anybody who
20 uses an iPhone probably has seen this a hundred times, but
21 iPhone users can click on "Ask app not to track," and that
22 means the device ID called IDFA is not sent in that case; or it
23 can say, "Allow," and then the IDFA is still sent.
24 **Q.** Now, if the user clicks "Ask app not to track," is Google
25 able to determine whether the iPhone is owned by a Google

1 user?
2 **A.** No. There's no way to track that on the Google side. It
3 has no way of determining if it is or isn't.
4 **Q.** And does that mean that they are or are not able to
5 determine whether the owner of that phone has sWAA on or off?
6 **A.** If this is a third-party app and Google receives the
7 analytics data, there is no way for Google to determine the
8 consent because it doesn't have the Doritos. It's not going to
9 be sent, so it can't do the consent check that we just talked
10 about.
11 **Q.** What if the user clicks "Allow" and is okay with the
12 third-party app tracking? At that point is Google able to
13 determine whether the iPhone is owned by a Google user?
14 **A.** There's still no Dorito. It does have an IDFA, so there's
15 a device ID that can be used for tracking, but Google is still
16 unable to determine is this a sWAA-on or sWAA-off user.
17 **Q.** Why can't Google just use the IDFA to map it and figure
18 out which device every iPhone owner has?
19 **A.** That's a good question. Google does not have a mapping
20 table from device ID to GAIA. That would violate one of the
21 core principles of not mixing together a pseudonymous
22 identifier with an identity.
23 **Q.** Now, Professor, I want to ask you about personalized
24 advertising.
25 Does Google personalize advertising with sWAA-off data

1  PII that is vastly out of proportion with the appearance of PII
2  in the overall dataset.
3  **Q.**   How were the tabs in Exhibit 453 that contain PII out of
4  proportion with the whole dataset selected for the jury?
5  **A.**   Okay.  So in rare instances, PII, like Mr. Rodriguez's
6  name or his email, does appear in that large set of data but
7  it's extraordinarily rare.
8       But in the examples the jury's going to get, four,
9  I think, four out of the 52 examples will be examples of that.
10 And so 4 over 52 is not as small as the actual percentage if
11 you look at the data.
12 **Q.**   Do you know who chose to give the jury a disproportionate
13 amount of spurious PII examples in the jury room?
14          **MR. DAVID BOIES:**  Objection, Your Honor.
15          **MR. SANTACANA:**  He knows.  He knows.
16          **THE COURT:**  Sustained.
17 **BY MR. SANTACANA:**
18 **Q.**   Did you -- in your 26 tabs that you chose, did you choose
19 any with spurious PII?
20 **A.**   In the 26 I chose, I didn't choose any with PII.
21 **Q.**   Okay.
22          **MR. SANTACANA:**  Your Honor, I offer into evidence
23 Exhibit 453, with 52 tabs on which the parties have agreed.
24          **THE COURT:**  Exhibit 453 will be admitted.
25       (Trial Exhibit PX453 received in evidence.)

1  **Q.**   What did you find about the appearance of a user's name in
2  the records from those two months?
3  **A.**   Sure.
4       So I found that certain apps, which are misbehaving
5  because they're not supposed to send PII but did so anyway,
6  would send -- in the top example, Alta was sending Susan
7  Harvey's name.  She's one of the plaintiffs.
8       The Uno game was setting Pete Rodriguez and its analytics
9  data.
10      The last one, Virtue, that just says "Anibal" but I
11 counted it anyway as a disclosure of the user's name.
12 **Q.**   What about the appearance of emails in these records?
13 **A.**   Again, fairly rare.  I think .34 percent of the time of
14 the 132,000 had email.  In every instance, these are all Anibal
15 Rodriguez's email address.  Once again, these apps aren't
16 supposed to be sending this information and these four did so.
17 **Q.**   What about the appearance of phone number in these
18 records?
19 **A.**   The phone number was the rarest of all.  There were only
20 six occurrences of a phone number throughout the entire
21 dataset.
22 **Q.**   Now, Professor Black, what is the fate of the email and
23 phone number and name that gets sent to Google Analytics
24 improperly?  What happens to it?
25 **A.**   The analytics server receives this information and doesn't

**Q.** And just to be clear, though I think we've heard it many times, but did you, as the person reviewing the evidence and a computer scientist, did you see any evidence that Google combines data from the different apartments?

**A.** No. I've seen no evidence that they try to cross-reference or combine data from different isolated silos or apartments. I mean, nor would they be able to because these are encrypted under different keys. So even if things would match up, if they were not encrypted, once they're encrypted, they look -- even a match would look like a mismatch because of the encryption.

**Q.** Well, let me ask you about that.

I think Dr. Hochman said something about if even one of these rare instances leaked out of the apartment into the wild, like a hack or something, that that could theoretically harm users. Do you have a response to that?

**A.** Yeah. Because each apartment is encrypted under a different key, then even if the information were acquired by a bad guy, this cross-referencing wouldn't be possible.

And so if, you know, one of these misbehaving apps had PII, which they do, then exposing the encrypted version -- the encrypted information that goes with that PII doesn't tell you where Mr. Rodriguez' information is in every other apartment because it's encrypted differently.

**Q.** Now, you explained to the jury that the latitude and