**BOIES SCHILLER FLEXNER LLP**
David Boies (admitted pro hac vice)
Alexander Boies (admitted pro hac vice)
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200
dboies@bsfllp.com
aboies@bsfllp.com

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No.
238027
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com

James Lee (admitted pro hac vice)
Rossana Baeza (admitted pro hac vice)
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Alison L. Anderson, CA Bar No. 275334
M. Logan Wright, CA Bar No. 349004
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Tel.: (213) 995-5720
alanderson@bsfllp.com
mwright@bsfllp.com

**SUSMAN GODFREY L.L.P.**
Bill Carmody (admitted pro hac vice)
Shawn J. Rabin (admitted pro hac vice)
Steven M. Shepard (admitted pro hac vice)
Alexander Frawley (admitted pro hac vice)
Ryan Sila (admitted pro hac vice)
One Manhattan West, 50th Floor
New York, NY 10001
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com
rsila@susmangodfrey.com

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: (310) 789-3100
abonn@susmangodfrey.com

**MORGAN & MORGAN**
John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)
Michael F. Ram, CA Bar No. 104805
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com
mram@forthepeople.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

ANIBAL RODRIGUEZ, JULIAN
SANTIAGO, and SUSAN LYNN
HARVEY, individually and on behalf of all
others similarly situated,

     Plaintiffs,

 v.

GOOGLE LLC,

     Defendant.

Case No.: 3:20-cv-04688-RS

**PLAINTIFFS' MOTION FOR
PERMANENT INJUNCTION AND
DISGORGEMENT OF PROFITS**

Judge: Hon. Richard Seeborg
Trial Date: August 18, 2025

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 2

II.   BACKGROUND ................................................................................................. 4

   A. Google Collected, Saved, and Used sWAA-Off App Activity Data – And
     Continues To Do So ....................................................................................... 4

   B. Google's Collection, Saving, and Use of sWAA-Off Data Is Intentional, Highly
     Offensive, Harmful, And Without Consent ................................................... 6

   C. Google Does Not Permit Users to Stop this Collection Or Delete this Data ................. 7

   D. Google Can Stop this Collection and Delete the Data It Has Collected ....................... 7

III.  LEGAL STANDARDS ........................................................................................ 8

IV.   ARGUMENT REGARDING INJUNCTIVE RELIEF ......................................... 9

   A. Plaintiffs' Requested Injunctive Relief .......................................................... 9

   B. Plaintiffs Are Entitled to Injunctive Relief .................................................... 9

     1. Plaintiffs Suffered and Will Continue to Suffer Irreparable Injury ....................... 9

     2. Money Damages Are Inadequate ......................................................... 11

     3. The Balance of Hardships Supports Injunctive Relief ................................... 12

     4. Public Policy Strongly Favors Injunctive Relief ....................................... 13

   C. The Proposed Injunctive Relief Is Appropriately Tailored ................................... 13

     1. Limiting Future Collection of sWAA-Off Data ......................................... 13

     2. Deleting sWAA-Off Data Google Already Collected ................................... 14

     3. Remediation of Products That Used sWAA-Off Data ................................... 15

     4. Appointment of Third Party to Assist with Compliance ................................. 16

     5. Other Provisions ............................................................................ 17

V.   ARGUMENT ON UNJUST ENRICHMENT AND DISGORGEMENT ........................ 17

A. The Law Requires an Independent Assessment of Plaintiffs' Request ........................ 17

B. Google Should Be Ordered to Disgorge Net Profits Attributable to Its Use of Plaintiffs' sWAA-Off Data During The Class Period ................................... 18

    1. California Law Requires Disgorgement ................................................ 18

    2. Net Profits Is the Appropriate Measure of Disgorgement ................................... 19

    3. The Court Has Jurisdiction to Award Disgorgement ............................................ 20

C. The Court Should Order Google to Disgorge $2.36 Billion As a Supported and Conservative Measure of Net Profits ........................................................ 21

    1. Legal Standard: "Reasonable Approximation" of Net Profits;
    Not But-For Causation ........................................................ 22

    2. Gross Revenue: Google During The Class Period Earned At Least $4.14 Billion From Its Use of Plaintiffs' sWAA-Off Data ................................... 23

    3. Deducting the Most Reasonable Approximation of Google's Incremental Costs (Its TACs) Results in Net Profits of $2.36 Billion from Google's Illegal Conduct ........................................................ 31

    4. Google's Other Claimed "Deductions" Fail As a Matter of Law ........................ 35

    5. If This Court Is Unsure of the Amount to Award, Then a Special Master Should Be Appointed to Conduct an Accounting ................................................ 39

VI.  CONCLUSION ........................................................ 40

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Adkins v. Facebook, Inc.*,
   2021 WL 1817047 (N.D. Cal. May 6, 2021) ................................................... 16

*Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*,
   770 F. Supp. 1014 (E.D. Pa. 1991) ............................................................. 39

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
   786 F. Supp. 3d 647 (S.D.N.Y. 2025) ......................................................... 10

*Anderson v. Apple Inc.*,
   500 F. Supp. 3d 993 (N.D. Cal. 2020) ......................................................... 21

*Ashland v. Ling-Temco-Vought, Inc.*,
   711 F.2d 1431 (9th Cir. 1983) ................................................................ 18

*Barrett v. Optimum Nutrition, Inc.*,
   2022 WL 3452791 (C.D. Cal. July 18, 2022) ................................................. 21

*CFPB v. Gordon*,
   819 F.3d 1179 (9th Cir. 2016) ................................................................ 37

*City of Fresno v. Turner*,
   2025 WL 2721390 (N.D. Cal. Sept. 23, 2025) ................................................. 9

*City of Oakland v. Oakland Raiders*,
   83 Cal. App. 5th 458 (2022) ............................................................. 8, 18

*Commonwealth of Pa. v. Google LLC*,
   (1st Jud. Dist. Pa. Nov. 10, 2022) ........................................................... 16

*Criswell v. W. Air Lines*,
   514 F. Supp. 384 (C.D. Cal. 1981) ............................................................ 18

*CTC Real Estate Servs. v. Lepe*,
   140 Cal. App. 4th 856 (2006) ................................................................ 18

*Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*,
   57 Cal. App. 5th 1108 (2020) ........................................................... 19, 22

*DISH Network L.L.C. v. Fineman*,
   2017 WL 2060010 (C.D. Cal. Mar. 22, 2017) ................................................. 12

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ......................................................................... 8

*Elhalwani v. Bourji*,
   2020 WL 1230578 (C.D. Cal. Feb. 28, 2020) ................................................. 11

*Facebook, Inc. v. Power Ventures, Inc.*,
  252 F. Supp. 3d 765 (N.D. Cal. 2017) ................................................................ 10, 12, 13

*Facebook, Inc. v. Solonchenko*,
  2022 WL 18491616 (N.D. Cal. Dec. 29, 2022) ................................................................ 13

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
  772 F.2d 505 (9th Cir. 1985) ................................................................ 37

*Garcia v. Cnty. of Alameda*,
  150 F.4th 1224 (9th Cir. 2025) ................................................................ 13

*Goorin Bros. v. GoldStarHat LLC*,
  2025 WL 2458868 (N.D. Cal. Aug. 26, 2025) ................................................................ 12

*Greenley v. Kochava*,
  684 F. Supp. 3d 1024 (S.D. Cal. 2023) ................................................................ 18

*Hansen v. Safeway, Inc.*,
  2010 WL 2593611 (N.D. Cal. June 22, 2010) ................................................................ 17

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017)) ................................................................ 9

*In re California Gasoline Spot Market Antitrust Litig.*,
  2021 WL 1176645 (N.D. Cal. Mar. 29, 2021) ................................................................ 21

*In re Facebook Internet Tracking Litig.*,
  2022 WL 16902426 (N.D. Cal. Nov. 10, 2022) ................................................................ 14

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020) ................................................................ *passim*

*In re Google Inc. Street View Elec. Commc'ns Litig.*,
  21 F.4th 1102 (9th Cir. 2021) ................................................................ 14

*In re Google Play Store Antitrust Litig.*,
  20-cv-05671, Dkt. 702 (N.D. Cal. Oct. 7, 2024) ................................................................ 16

*In re TikTok, Inc., Consumer Priv. Litig.*,
  565 F. Supp. 3d 1076 (N.D. Ill. 2021) ................................................................ 15

*In re Yahoo Mail Litig.*,
  2016 WL 4474612 (N.D. Cal. Aug. 25, 2016) ................................................................ 14

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  2020 WL 4212811 (N.D. Cal. July 22, 2020) ................................................................ 16

*In the Matter of Everalbum, Inc.*,
  (May 6, 2021) FTC Dkt. No. C-4743 ................................................................ 15

*Index Newspapers LLC v. United States Marshals Serv.*,
  977 F.3d 817 (9th Cir. 2020) ................................................................ 9

*Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*,
   886 F.2d 1173 (9th Cir. 1989)....................................................... 39

*Kamar Int'l, Inc. v. Russ Berrie & Co.*,
   752 F.2d 1326 (9th Cir. 1984)....................................................... 37

*Kansas v. Nebraska*,
   574 U.S. 445 (2015)....................................................... 20

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
   941 F.2d 970 (9th Cir. 1991)....................................................... 8

*Maadanian v. Mercedes-Benz USA, LLC*,
   2024 WL 1579658 (W.D. Wash. Apr. 11, 2024)....................................................... 21

*Martinez v. ZoomInfo Techs. Inc.*,
   2022 WL 1078630 (W.D. Wash. Apr. 11, 2022)....................................................... 21

*Meister v. Mensinger*,
   230 Cal. App. 4th 381 (2014) ....................................................... 20, 22, 35

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012)....................................................... 9, 13

*Melendres v. Skinner*,
   113 F.4th 1126 (9th Cir. 2024)....................................................... 39

*Meyer v. Portfolio Recovery Assocs., LLC*,
   707 F.3d 1036 (9th Cir. 2012)....................................................... 10

*Miller v. Fairchild Indus., Inc.*,
   885 F.2d 498 (9th Cir. 1989)....................................................... 17

*N.K. Collins, LLC v. Wm. Grant & Sons, Inc.*,
   472 F. Supp. 3d 806 (D. Haw. 2020)....................................................... 20

*Novell, Inc. v. Network Trade Ctr., Inc.*,
   25 F. Supp. 2d 1233 (D. Utah 1998)....................................................... 39

*Oracle Am., Inc. v. Google Inc.*,
   2016 WL 1743154 (N.D. Cal. May 2, 2016)....................................................... 37

*Oracle USA v. Rimini Street*,
   324 F. Supp. 3d 1157 (D. Nev. 2018)....................................................... 11

*Playboy Enters., Inc. v. Baccarat Clothing Co.*,
   692 F.2d 1272 (9th Cir. 1982)....................................................... 3, 20

*Pyro Spectaculars North, Inc. v. Souza*,
   861 F. Supp. 2d 1079 (E.D. Cal. 2012)....................................................... 12

*Ruiz v. Estelle*,
   679 F.2d 1115 (5th Cir. 1982)....................................................... 39

*SEC v. Sripetch*,
    --- F.4th ---, 2025 WL 2525848 (9th Cir. Sept. 3, 2025) .......................................... 8, 9, 19

*SEC. v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010)................................................................ 22, 35

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020)................................................................... 20

*Title Tyrrell Promotions Ltd. v. Exoto Inc.*,
    2013 WL 12575619 (C.D. Cal. Apr. 23, 2013) ...................................... 40

*United States v. Hempfling*,
    2008 WL 2357192 (E.D. Cal. June 6, 2008)........................................... 16

*United States v. Kurbo Inc.*,
    22-cv-00946, Dkt. 15 (N.D. Cal. Mar. 3, 2022)..................................... 15

*United States v. Miami Univ.*,
    294 F.3d 797 (6th Cir. 2002)................................................................... 11

*United Transportation Union Local 1745 v. City of Albuquerque*,
    2001 WL 37124769 (D.N.M. Oct. 3, 2001)........................................... 40

*Uzyel v. Kadisha*,
    188 Cal. App. 4th 866 (2010) ...................................................... 4, 22, 37

*Vendavo, Inc. v. Long*,
    397 F. Supp. 3d 1115 (N.D. Ill. 2019) ................................................... 12

*Ward v. Taggart*,
    51 Cal. 2d 736 (1959) ............................................................................ 20

*Yuga Labs, Inc. v. Ripps*,
    2023 WL 7089922 (C.D. Cal. Oct. 25, 2023) ....................................... 20

**Rules**

Fed. R. Civ. P. 52(a)(1) ...................................................................................... 18

Fed. R. Civ. P. 53 ............................................................................................... 39

**Other Authorities**

9 Fed. Prac. & Proc. Civ. § 2335 (West 4th ed.) ................................................. 3

Rebecca Kelly Slaughter, Janice Kopec & Mohamad Batal, *Algorithms and Economic Justice: A Taxonomy of Harms and a Path Forward for the Federal Trade Commission*, 23 Yale J.L. & Tech. 1 (2021) ......................................................................................... 16

Restatement (Third) of Unjust Enrichment ............................................... *passim*

PLEASE TAKE NOTICE that, at a day and time to be determined by the Court, the undersigned will appear before the Honorable Richard Seeborg of the United States District Court for the Northern District of California to move the Court for a permanent injunction against Defendant Google, LLC ("Google") and an order requiring disgorgement of profits from Google.

This Motion is based upon this Notice of Motion and Motion, the incorporated Memorandum of Points and Authorities, the Declaration of Mark C. Mao and accompanying exhibits, the Declaration of Michael J. Lasinski, the Declaration of Jonathan Hochman, the Declaration of Alexander Frawley, all other materials in the Court's record and docket activity, argument of counsel, and such other matters as the Court may consider.

## ISSUES PRESENTED

Following the jury's determination that Google invaded the privacy and intruded upon the seclusion of Plaintiffs and class members, what is the appropriate (1) injunctive relief and (2) amount of disgorgement?

## RELIEF REQUESTED

Plaintiffs respectfully request that the Court enter a permanent injunction to (1) enjoin Google from in the future collecting and saving sWAA-off data; (2) require Google to delete the sWAA-off data it has already collected; (3) require Google to destroy the algorithms, models, and services created or modified using sWAA-off data; and (4) appoint an independent third-party to monitor and ensure Google's compliance with the injunction. Plaintiffs further respectfully request that Google be ordered to disgorge to Plaintiffs the $2.36 billion in net profits attributable to Google's collection and use of sWAA-off data during the class period.

Dated: October 22, 2025

By */s/ Mark Mao*
Mark C. Mao (CA Bar No. 236165)
mmao@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293 6858

## I.    INTRODUCTION

Google has for many years violated the privacy rights of tens of millions of Americans ("Plaintiffs").  Trial focused on what Google called its "privacy controls": "Web & App Activity" ("WAA") and Supplemental Web & App Activity ("sWAA").  Google told its users that these privacy controls "must be on" for Google to save data generated from users' interactions with third-party apps ("app activity data").  As proven at trial, Google's representations were false.  Google has for years collected, saved, and used app activity data from Plaintiffs' devices while Plaintiffs had WAA or sWAA turned off ("sWAA-off data")—despite its own employees' concerns about this "very deceptive" conduct.  PX-3 at 1.  Google earned billions of dollars from Plaintiffs' sWAA-off data.  The jury found that Google's conduct was highly offensive, harmful, and without consent.  Plaintiffs now seek permanent injunctive relief and an order requiring Google to disgorge $2.36 billion—a conservative approximation of Google's net profits from its misconduct during the class period.

*First*, permanent injunctive relief is necessary and appropriate.  Even after Plaintiffs filed this lawsuit in 2020, Google chose to continue accessing Plaintiffs' devices to collect, save, and use sWAA-off data—disregarding Google's internal study of users' expectations as well as concerns expressed by its own employees.  Even worse, Google's misconduct has persisted after the jury's verdict.  Google refused to change its Privacy Policy and its other WAA and sWAA promises, and users remain unable to stop Google's persistent collection from their devices for most non-Google apps.  The jury found Google's conduct unlawful, highly offensive, harmful, and without consent.  Google could have changed its practices but Google chose business as usual.  The jury's damages award is clearly insufficient to remedy the ongoing and irreparable harm that Google's conduct continues to inflict.  Injunctive relief is not only appropriate; it is necessary to stop Google from violating the law.

The requested permanent injunctive relief sought is narrowly tailored to address Google's unlawful conduct.  First, Plaintiffs ask that the Court enjoin Google from continuing to collect and save this sWAA-off data.  Google continues to collect app activity information when sWAA

is off, even while Google is telling people they are in control.  Injunctive relief is necessary to stop that.  Second, even if Google stopped collecting this information, injunctive relief is *also* necessary to ensure that Google deletes the data it improperly collected.  Third, consistent with the relief obtained in other cases, Google should be required to destroy the algorithms, models, and services created or modified using sWAA-off data.  Fourth, Plaintiffs seek appointment of an independent third-party to monitor and ensure Google's compliance.

*Second*, Google must also be ordered to disgorge the net profits it earned during the class period from its unlawful conduct.  These net profits vastly exceed the jury's damages award.  If Google is allowed to keep these profits, the lesson it and other tech companies will learn from this long litigation is this: privacy torts are sound business decisions; consumers and courts are powerless to stop them; and the cost of defending lawsuits like this one are just "judicial expenses" to be budgeted for and incurred along the way.  Both equity and public policy demand that the nation's largest and most powerful organizations be required to disgorge the profits they earn by violating Americans' privacy rights. *See Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1274–75 (9th Cir. 1982) (district court abused discretion in declining to award disgorgement because, without an order to disgorge profits, "a profit seeking business person" would be incentivized to violate the law).

As the Court has held, the issue of disgorgement is for the Court to decide.  The law is clear that the Court must make the decision regarding disgorgement, and "the use of an advisory jury is of no binding legal significance and the decision-making responsibility remains with the judge." 9 Fed. Prac. & Proc. Civ. § 2335 (West 4th ed.).  An advisory jury may be helpful for the Court where the jury has made factual findings.  Here, the facts that are relevant for purposes of deciding disgorgement are either favorable to Plaintiffs based on the evidence (e.g., evidence demonstrating the value of the data taken by Google) or are findings made in connection with the claims that support Plaintiffs' request (e.g., Google's intent, harm, and the lack of consent).  The relevance of an advisory verdict is at its lowest when it concerns an issue of law or a mixed issue of fact and law.  Given the factual findings and facts that are not in dispute, it is

essentially a question of law, and at most a mixed question of law and fact, whether Plaintiffs are entitled to disgorgement. This is not like a situation where the Court was seeking an advisory verdict on whether the data was valuable or whether there was consent. Those facts are clear, and it is just a question of applying the law. This is even more true here where the jury did not have the advantage of understanding all the legal complexities that the Court will need to apply to this issue. For example, the jury was not instructed on the difference between but-for causation and the standard for disgorgement. As a legal matter, but-for causation is *not* required. *Uzyel v. Kadisha*, 188 Cal. App. 4th 866, 894 (2010) ("[t]he presence or absence of but-for causation is not necessarily determinative of unjust enrichment"). And Google bears the "[r]esidual risk of uncertainty in calculating net profit." Restatement (Third) of Unjust Enrichment § 51(5)(d).

A conservative approximation of Google's net profits is $2.36 billion. That amount represents the portion of Google's revenue from ad conversions with three products during the class period attributable to Plaintiffs' sWAA-off data, less a reasonable approximation of Google's incremental costs (its "traffic acquisition costs" or TACs) attributable to those conversions. Due to Google's shifting representations about its own financial statements, there was some confusion at trial over the amount of Google's TACs. This brief describes three alternative ways to estimate the TACs and explains why the most reasonable estimate results in a $2.36 billion calculation of Google's net profits. This $2.36 billion measure is conservative because it does not account for all the other ways in which Google was unjustly enriched by Plaintiffs' sWAA-off data. But if this Court were to believe that more information is necessary to make an estimate of Google's net profits, Plaintiffs respectfully request appointment of a special master to make that determination.

## II.    BACKGROUND

### A.    Google Collected, Saved, and Used sWAA-Off App Activity Data – And Continues To Do So

Google has for many years collected, saved, and used app activity data involving third-party apps when people have sWAA off ("sWAA-off data"). As one Google employee wrote,

"WAA and other controls imply we don't log the data, *but obviously we do*." PX-3 at 2 (emphasis added); *see also* PX-3 at 1 ("the user has a false sense of security that their data is not being stored at Google, *when in fact it is*") (emphasis added). At trial, Google's own employees and technical expert confirmed this data collection. Tr.[1] 319:24–320:3 (Monsees); Tr. 1206:13–20 & 1207:17-–2 (Ganem); Tr. 1733:20–25 (Black).

Plaintiffs' technical expert Jonathan Hochman explained how, even with sWAA off, Google "takes data from the users' devices and gives that data to Google." Tr. 584:23–585:5, 594:25–595:3 (Hochman). Google copied 4.5 quadrillion pages of sWAA-off data from Plaintiffs' devices during the class period. Tr. 618:19–619:3 (Hochman). Google then uses sWAA-off data for various purposes, including conversion tracking, building machine learning models, and developing other products. Tr. 617:5–22 & 631:12–632:12 (Hochman). Google's own witnesses admitted to these uses of sWAA-off data. Tr. 1195:14–1196:1 (Ganem); Tr. 1340:4–9 (Langner).

Google continued to collect and exploit sWAA-off data even after Plaintiffs filed the lawsuit, in 2020, and Google has continued to do so even after the verdict. Declaration of Jonathan Hochman ("Hochman Decl.") ¶ 4. Yet Google still promises users "control" in its Privacy Policy and continues to represent on the WAA Help Page that WAA and sWAA "must be on" to "let Google save this information." Declaration of Mark Mao Ex. 1 at 1 and Ex. 2 at 3.[2] These are the same Google representations that were considered by the jury, upon which the jury found that Google's conduct was highly offensive and that Plaintiffs did not consent to Google's conduct. *See, e.g.*, PX-62 at 1 (May 2018 Privacy Policy); PX-113 (WAA Help Page in effect in July 2019).

---

[1] Unless otherwise noted, "Tr." refers to the trial transcripts.

[2] Unless noted otherwise, exhibit references in this brief are exhibits to the Mao declaration.

**B.** **Google's Collection, Saving, and Use of sWAA-Off Data Is Intentional, Highly Offensive, Harmful, And Without Consent**

By finding Google liable for invasion of privacy and intrusion upon seclusion, the jury found that Google's conduct was intentional, highly offensive, and without consent. Dkt. 666 at 21-22 (Instructions 20 & 21). Those findings were fully supported by the evidence.

Google conducted a study of its users to determine whether users understood, based on Google's disclosures, what WAA would do. PX-2. In the study, Google showed users the description of WAA on Google's "Activity Controls" page. *Id.* at 9. Every single user believed that turning off WAA would "*stop their activity from being saved*." *Id.* at 20 (emphasis added). Consistent with that earlier study, Google planned a further study, based on the hypothesis that "Most respondents will believe that turning off WAA will result in *no data being collected from their activity*." PX-9 at 6 (emphasis added)).

Google employees expressed concerns about Google's conduct. Chris Ruemmler, a senior software engineer, wrote that users had a "false sense of security" their data "is not being stored at Google, when in fact it is." PX-3 at 1. Other Google employees shared similar concerns, stating there "is no way users will truly understand what is happening" (PX-6 at 41) and lamenting about "Google having data about users that they can't say no to" (PX-6 at 33). They said Google "should not use user data at all if WAA is off" (PX-10 at 1) and described how "[a]t Google we still seem to believe in that fantasy that users agreed to this" (PX-6 at 49).

Google made the intentional decision to collect sWAA-off data from Plaintiffs' devices because doing so was valuable for Google. Google designed its systems to collect and use this data to "drive their ad revenue, to support their advertising system," and to contribute to "product development and improvement." Tr. 631:6–632:12 (Hochman). Google employees echoed Dr. Hochman's testimony. Dave Monsees confirmed that sWAA-off data "has value" and that "Google made money from it." Tr. 300:11–14, 301:9–14. Steve Ganem also agreed that sWAA-off data "has a lot of value" for Google. Tr. 1194:21–24; *id.* 1195:14–20. Mr. Ruemmler wrote in 2019 that Google "probably do[esn't] want to lose" data about "[a]ds you click on, or things

1    you buy" because "that is how we charge for Ads," including when sWAA is off.  PX-3 at 3.  Mr.

2    Ruemmler elaborated at trial: "We don't want to go out of business."  Tr. 1463:13–18.

3        A conservate measure of Google's net profits from its collection and use of sWAA-off

4    data from Plaintiffs' devices during the class period is $2.36 billion.  *Infra* § V.C.  That amount

5    far outstrips the jury's $425 million damages award, which means that unless this Court grants

6    equitable relief, Google will have profited from its illegal conduct.  This damages measure is

7    conservative because even Google does not know the full extent to which it stores and uses this

8    data.  Plaintiffs served an interrogatory asking Google where the company saves sWAA-off data

9    and how Google uses that data.  Google responded by claiming that it would be too burdensome

10   and not "practical" to provide an answer "because there are various downstream users" of the

11   data.  Ex. 3 at 8; Tr. 617:5–22 (Hochman discussing Google's interrogatory response).  Mr.

12   Monsees confirmed that sWAA-off data is saved to "a lot of different systems," including ones

13   that he even could not identify.  Tr. 320:16–25.

14       **C.    Google Does Not Permit Users to Stop this Collection Or Delete this Data**

15       Google's witnesses confirmed that users have no power to stop Google from collecting

16   sWAA-off data from their devices.  Tr. at 469:8–12 (Monsees); Ex. 5 (PX-388) (Miraglia

17   deposition testimony played to the jury) at 126:09–127:01, 128:21–129:03.  Google's witnesses

18   also confirmed there is no way for users to delete the sWAA-off data Google has collected, nor

19   view the sWAA-off data that Google is storing.  Tr. 311:22–312:3 (Monsees); Tr. 1214:3–8,

20   1253:17–25 (Ganem); *see also* Tr. 629:11–16 (Hochman).  These admissions are all the more

21   alarming given the prevalence of Google's tracking code.  As revealed at trial, Google collects

22   the at-issue data on 97 percent of the most popular Android apps and over 50 percent of the most

23   popular iOS apps—making it impossible to avoid Google.  Tr. 586:4–10 (Hochman).

24       **D.    Google Can Stop this Collection and Delete the Data It Has Collected**

25       By contrast, Google can stop collecting this data, a point confirmed by its employees.

26   Before collecting and storing any data, Google can check the user's sWAA status (i.e., whether

27   sWAA is "on" or "off") and then cease data collection and storage if sWAA is off.  Tr. 1207:23–

1208:2 (Ganem).  For example, when sWAA is off, Google will not collect user data via its separate App Indexing product.  *See* Tr. 602:25–603:24; 615:16–616:1 (Hochman); *see also* Ex. 4 (Monsees Dep.) Tr. 303:1–10 (confirming the same).  Mr. Hochman provided unrebutted testimony that Google "could apply that technology" from the App Indexing product to the analytics and advertising products at issue in this case.  Tr. 615:16–22, 633:22–634:2.

Google could also delete the sWAA-off data it has saved.  Google already identified certain logs that contain sWAA-off data, which means Google can delete the sWAA-off data in those logs.  *See, e.g.*, Dkt. 314-5 (Hochman Rep.) § VII.B.3, ¶ 207; *see also id.* § VII.B.1, ¶ 141; *id.* § VII.K.  Tellingly, when Plaintiffs at class certification raised data deletion as an appropriate remedy, Google did not dispute its ability to delete the data; instead, Google argued that data deletion "would require Google to contravene is policies." Dkt. 329 at 25.

### III.  LEGAL STANDARDS

**Permanent Injunction:**  A plaintiff seeking a permanent injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The "district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction."  *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

**Unjust Enrichment / Disgorgement:**  This Court also has the authority to order Google to disgorge the profits it earned from its "intrusion upon seclusion and invasion of privacy."  *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600, 601 (9th Cir. 2020).  Disgorgement is another form of equitable relief, as this Court already held.  Dkt. 587 at 11.  California and federal courts follow the Restatement (Third) of Restitution and Unjust Enrichment (the "Restatement").  *City of Oakland v. Oakland Raiders*, 83 Cal. App. 5th 458, 479 (2022) (collecting cases); *SEC v. Sripetch*, --- F.4th ---, 2025 WL 2525848, at *1 (9th Cir. Sept. 3, 2025).

1  When a "conscious wrongdoer" is "enriched by misconduct," "the unjust enrichment ... is the net

2  profit attributable to the underlying wrong." *Sripetch*, 2025 WL 2525848, at *1 (quoting

3  Restatement § 51(1), (3), (4)).

4  **IV.   ARGUMENT REGARDING INJUNCTIVE RELIEF**

5       **A.   Plaintiffs' Requested Injunctive Relief**

6       As reflected in the proposed injunction, Plaintiffs seek the same injunctive relief they

7  identified in their certification motion. Dkt. 315 at 7. The proposed injunction, Ex. 6, includes

8  four key parts: (1) enjoin Google from collecting and saving sWAA-off data; (2) require Google

9  to delete the sWAA-off data it has collected; (3) require Google to destroy the algorithms,

10  models, and services created or modified using sWAA-off data; and (4) appoint an independent

11  third-party to monitor and ensure Google's compliance. Each part is separately necessary and

12  appropriate. Consistent with the Court's prior orders and the jury's verdict, the proposed

13  injunction appropriately excludes Dasher and Unicorn accounts.

14       **B.   Plaintiffs Are Entitled to Injunctive Relief**

15       All four *eBay* factors strongly support entry of the proposed permanent injunction.

16            **1.   Plaintiffs Suffered and Will Continue to Suffer Irreparable Injury**

17       Plaintiffs have suffered and without a permanent injunction will continue to suffer

18  irreparable injury from Google's unlawful collection and use of their sWAA-off data.

19       *First*, irreparable harm exists because the "the deprivation of constitutional rights

20  'unquestionably constitutes irreparable injury.'" *Index Newspapers LLC v. United States*

21  *Marshals Serv.*, 977 F.3d 817, 837 (9th Cir. 2020) (quoting *Melendres v. Arpaio*, 695 F.3d 990,

22  1002 (9th Cir. 2012)). The jury found that Google violated the right to privacy under the

23  California Constitution. Any continued violation of that constitutional right constitutes

24  irreparable harm. *Id.*; *see also City of Fresno v. Turner*, 2025 WL 2721390, at *19 (N.D. Cal.

25  Sept. 23, 2025) (Seeborg, C. J.) ("deprivation of constitutional rights 'unquestionably constitutes

26  irreparable injury.'" (quoting *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017))).

27       *Second*, courts in this Circuit have repeatedly found irreparable harm based on privacy

violations involving impermissible data collection or use. *See, e.g.*, *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1045 (9th Cir. 2012) (affirming entry of preliminary injunction because class members would suffer irreparable harm from continuing violations of their "right to privacy"); *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), (granting permanent injunction, including because an unlawful "acquisition of data" constitutes "irreparable harm"), *aff'd*, 749 F. App'x 557 (9th Cir. 2019).

*Third*, irreparable harm exists due to the "increased risk to cybersecurity" and "risk of cybersecurity breaches" resulting from Google's past and ongoing misappropriation of Class Members' devices and illegal data collection. *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 693 (S.D.N.Y. 2025) (granting preliminary injunction in connection with disclosure of data to DOGE). Google has repeatedly suffered cybersecurity breaches, including one that Google admitted to just before trial. *See, e.g.*, Dkt. 474-4 (Schneier Supp. Rep.) at 10-12; Ex. 7 (article from shortly before trial describing Google data breach). These risks are heightened because sWAA-off data contains personal information, including names, email addresses, and phone numbers. *E.g.*, Tr. 610:3–23 (Hochman). Even a small number of such records infect the entire data set. *Id.* 701:13–701:19 (Hochman).

*Fourth*, the highly sensitive nature of the sWAA-off data demonstrates irreparable harm. While Plaintiffs were mindful of the Court's instructions "not to make this case about a particular app" (Dkt. 587 at 19), the truth is that Google has collected data that reveals users' interactions with medical apps like GoodRx, religious apps like Islam360, dating apps like Tinder and Grindr, and reproductive-health apps like NaturalCycles, Premom, and Planned Parenthood Direct. Dkt. 474-4 (Schneier Supp. Rep.) at 7–10 (listing examples of third-party apps where Google is collecting data); *see also* Tr. 479:18–23 (Santiago) (Google collected data from his apps including "Cash App, Discord, eBay, Facebook, Map My Ride, Twitter, Venmo").

*Fifth*, this irreparable harm is ongoing. Google has not made any material changes to its Privacy Policy or to its disclosures regarding WAA and sWAA. Google's current Privacy Policy (dated July 2025) still falsely assures users they are in "control." Ex. 1 at 1. Similarly, Google

has not revised its "very deceptive" (PX-3 at 1) "Activity controls" page, nor the WAA Help Page, which Google employees described as a "real problem" (PX-3 at 1). *Compare* Ex. 8 (current Activity controls page) and Ex. 2 (current WAA Help Page), *with* PX-84 (September 2022 Activity controls page) *and* PX-113 (July 2019 WAA Help Page). Even if Google were to change its disclosures, absent an injunction, nothing prevents Google from reverting back to the disclosures presented to the jury (or worse).

### 2.    Money Damages Are Inadequate

The second factor also supports Plaintiffs. As for the invasion of privacy claim, damages are obviously inadequate because this Court already held that Plaintiffs may *only* seek equitable relief (not damages) for their invasion of privacy claim. Dkt. 666 (Final Jury Instructions) at 24 ("You may award actual damages only if you find Plaintiffs have proved all of the elements of their first claim (violation of CDAFA) or their third claim (intrusion upon seclusion)."). As for intrusion upon seclusion, the jury's award of money damages does not preclude entry of a permanent injunction. *See, e.g.*, *Elhalwani v. Bourji*, 2020 WL 1230578, at *6 (C.D. Cal. Feb. 28, 2020); *Oracle USA v. Rimini Street*, 324 F. Supp. 3d 1157, 1172 (D. Nev. 2018).

An injunction is especially warranted in data-privacy cases because "a loss of privacy … [is] difficult to calculate." *United States v. Miami Univ.*, 294 F.3d 797, 819 (6th Cir. 2002) (affirming grant of permanent injunction). That was true in this case: this jury's ability to award money damages was limited, in part, because Google did not preserve or produce much of the data it collected. *See* Dkt. 185 (denying Plaintiffs' motion for a preservation order). That made it difficult for Plaintiffs' damages expert to calculate with certainty the number of months during which Google collected data from each class member, which led him to conservatively calculate damages based on a *single month* of data collection per person. Tr. 940:13–25, (Lasinski); *see also* Ex. 9 (Lasinski Dep.) at 57:10–58:7. Ultimately, while the jury found Google liable, it essentially awarded damages for only a single month's data collection. Because Google's profits from sWAA-off data significantly exceed the jury's award, *see infra*, §V.C, an award of damages alone will not suffice to deter Google from continuing to violate users' privacy rights.

The *ongoing* nature of Google's misconduct further demonstrates why monetary damages are inadequate.  *See, e.g.*, *Power Ventures, Inc.*, 252 F. Supp. 3d at 783 (entering permanent injunction in addition to compensatory damages given "reasonable likelihood of defendant's future violations"); *DISH Network L.L.C. v. Fineman*, 2017 WL 2060010, at *3 (C.D. Cal. Mar. 22, 2017) (granting permanent injunction in addition to statutory damages because "money damages alone are inadequate because they do not prevent future piracy").

### 3.    The Balance of Hardships Supports Injunctive Relief

The third factor also strongly supports Plaintiffs.  There is no undue hardship to Google, but the harm to Plaintiffs is significant.

An injunction requiring a defendant to obey the law is not an undue hardship.  *See, e.g.*, *Goorin Bros. v. GoldStarHat LLC*, 2025 WL 2458868, at *6 (N.D. Cal. Aug. 26, 2025) (Seeborg, C.J.) (granting request for permanent injunction in trademark case where injunction "would only bring Defendant into compliance with the law"); *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1145 (N.D. Ill. 2019) ("[W]here the injunctive relief sought primarily focuses on prohibiting a defendant from using information he should not have taken in the first place, the balance of harms weighs heavily in favor of granting an injunction."); *Pyro Spectaculars North, Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012) (no hardship to defendant where relief "would essentially only require him to abide by existing law").

By contrast, were the Court to deny an injunction, the hardship to Plaintiffs would be significant.  Plaintiffs have a legally protected interest in their sWAA-off data, which Google continues to violate.  *See e.g.*, *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 598 ("[V]iolations of the right to privacy have long been actionable at common law.").  Notwithstanding the jury's verdict, Google is still collecting and exploiting detailed personal information about users' activity on most third-party apps, including data tied to politics, religion, sexuality, finances, and other private matters.  These circumstances support injunctive relief.

Plaintiffs' Motion for Permanent Injunction and Disgorgement of Profits
3:20-cv-04688-RS

### 4. Public Policy Strongly Favors Injunctive Relief

The fourth factor also strongly favors Plaintiffs. It "is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002; *see also Garcia v. Cnty. of Alameda*, 150 F.4th 1224, 1234–35 (9th Cir. 2025) (quoting same and reversing denial of preliminary injunction). Relatedly, "[t]he public has an interest in ensuring that computers are not accessed without authorization." *Power Ventures, Inc.*, 252 F. Supp. 3d at 785; *see also Facebook, Inc. v. Solonchenko*, 2022 WL 18491616, at *8 (N.D. Cal. Dec. 29, 2022) ("The public interest is served by an injunction addressing . . . the protection of user data."). Here, an injunction will stop Google from taking and using data in ways proven to be offensive, harmful, and without consent, in violation of users' right to privacy.

Google's culture of ignoring privacy concerns further supports injunctive relief. Google's co-founders encouraged employees to "push[] the boundaries and then deal[]with the consequences." PX-6 at 24. Google employees "resist the idea that anyone can tell us what to do" (PX-6 at 50), and when lawyers suggest that "something is unwise to do," the response is to "ask how unwise is it" (PX-6 at 50). Google also instructs its employees to "make money" and often "the way for these teams to make money is to use data in some dubious way." PX-6 at 49. Google's "higher-level goal" is to foster a "gameable" sense of privacy among consumers "without actually improving any of the underlying conditions." PX-42 at 1. In an era when "millions of Americans conduct their affairs increasingly through electronic devices," any assertion "that federal courts are powerless to provide a remedy when an internet company surreptitiously collected private data . . . is untenable." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 598–99. This Court should now order the injunctive relief set forth below as a remedy for Google's ongoing "surreptitious[] collect[ion] [of Plaintiffs'] private data." *Id.*

### C. The Proposed Injunctive Relief Is Appropriately Tailored

### 1. Limiting Future Collection of sWAA-Off Data

Paragraph 5 of the proposed injunction limits Google's future collection of sWAA-off data. With this relief, Plaintiffs appropriately seek to hold Google to its own promises, including

CEO Sundar Pichai's testimony before Congress. Mr. Pichai testified that Google gives users a "choice" to "decide *whether* information is collected, stored." Ex. 10 (PX-45) at 23:25–24:01, 24:24–25:02 (emphasis added). When asked to clarify whether "if a consumer tells you not to collect their data, then *you do not collect the data*," Mr. Pichai responded, "*that's right*." PX-45 at 150:19–22 (emphasis added). At trial, Mr. Monsees confirmed that Mr. Pichai's Congressional testimony "was consistent with Google's Privacy Policy," Tr. 288:10–12, which has for years promised that users can adjust their "privacy settings to control what we collect and how your information is used." PX-62 at 1. *Google* can abide by these promises and refrain from collecting sWAA-off data (*see supra* § II.D), and that is precisely what Google should be ordered to do. *See In re Google Inc. Street View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1117 (9th Cir. 2021) (describing injunctive relief in settlement agreement that required Google to "refrain from collecting or storing additional payload data"); *In re Yahoo Mail Litig.*, 2016 WL 4474612, at *1 (N.D. Cal. Aug. 25, 2016) (describing injunctive relief in settlement providing that "Yahoo will no longer intercept, scan, and analyze email that is 'in transit ….'"). As Mr. Ruemmler wrote, "If I choose not to store data in my account, then *Google should not have access to the data either.*" PX-3 at 1 (emphasis added). Plaintiffs agree.

### 2. Deleting sWAA-Off Data Google Already Collected

Paragraph 6 of the proposed injunction requires Google to delete the at-issue sWAA-off data that it had already collected. This is separate from Google's ongoing data collection, requiring Google to delete data it collected in the past. Data deletion is common, including in cases against Google. For example, as part of the settlement agreement in *Brown v. Google*, Google agreed to delete billions of records. *See* Dkt. 1097-4 (Settlement Agreement) at 8, Case No. 20-cv-03664 (N.D. Cal. April 1, 2024); *see also In re Google Street View*, 21 F.4th at 1117 (with settlement, injunctive relief required Google to "destroy all Acquired Payload Data"); *In re Facebook Internet Tracking Litig.*, 2022 WL 16902426 at *4 (N.D. Cal. Nov. 10, 2022) (with settlement, "Defendant must expunge the data at issue"), *aff'd sub nom. In re Facebook, Inc. Internet Tracking Litig.*, 2024 WL 700985 (9th Cir. Feb. 21, 2024); *In re TikTok, Inc., Consumer*

14

*Priv. Litig.*, 565 F. Supp. 3d 1076, 1082 (N.D. Ill. 2021) (with settlement, defendants required to "delete all pre-uploaded user-generated content collected from domestic users who did not 'save' or 'post' the content").

Deleting this data is crucial because of the ongoing risks created by Google storing this data.  Google has a long history of data breaches and also routinely produces data in response to subpoenas.  *See* Dkt. 314-6 (Schneier Rep.) ¶¶ 222–230 (data breaches), ¶¶ 140 (subpoenas); Dkt. 474-4 (Schneier Supp. Rep.) ¶¶ 15, 22–28 (data breaches), ¶ 14 (subpoenas); *see also* Ex. 1 (current Google Privacy Policy) at 14 ("We will share personal information outside Google if we have a good-faith belief that disclosure of that information is reasonably necessary to: Respond to any applicable law, regulation, legal process, or enforceable governmental request"); *see also* PX-11 (Google engineer discussing "joinability risks" for "app events collected by GA4F to GAIA ID even if end users turn off WAA," including a "Subpoena").

Deletion is also necessary to ensure that Google does not make further use of previously collected sWAA-off data in other unconsented ways, such as developing AI products.  Google claimed at trial that Plaintiffs had not shown any use of the data in connection with Google's large language models ("LLMs").  *See* Dkt. 657 (Google MIL No. 19) at 1–2.  Regardless of whether Google has used this data with LLMs in the past, the proposed injunction prevents any future use of that data with LLMs or other products.

### 3.    Remediation of Products That Used sWAA-Off Data

Paragraph 7 of the proposed injunction requires Google to remediate its past use of sWAA-off app activity data by destroying algorithms, models, and services created or modified using this ill-gotten data.  Here again, such relief is common in data-privacy cases.  *See, e.g.*, Stipulated Order for Permanent Injunction and Civil Penalty Judgment, *United States v. Kurbo Inc.*, 22-cv-00946 (N.D. Cal. Mar. 3, 2022), Dkt. 15, at 8 (settlement requiring deletion of models and algorithms built with improperly obtained data); Decision and Order, *In the Matter of Everalbum, Inc.*, (May 6, 2021) FTC Dkt. No. C-4743, at 5 (settlement requiring deletion of facial recognition algorithms developed using photos and videos without consent).  As explained

by an FTC commissioner: "when companies collect data illegally, they should not be able to profit from either the data or any algorithm developed using it."  Rebecca Kelly Slaughter, Janice Kopec & Mohamad Batal, *Algorithms and Economic Justice: A Taxonomy of Harms and a Path Forward for the Federal Trade Commission*, 23 Yale J.L. & Tech. 1, 39 (2021).

### 4.    Appointment of Third Party to Assist with Compliance

Paragraph 8 of the proposed injunction calls for the appointment of a third-party monitor to ensure Google's compliance with the ordered injunctive relief.  Appointment of such monitors is common.[3]  The Court should rely on its inherent equitable powers (rather than Rule 53) to make this appointment and order Google to cover all costs, including any attorneys' fees and costs, incurred for enforcing compliance with the injunctive relief.  *E.g.*, *United States v. Hempfling*, 2008 WL 2357192, at *3 (E.D. Cal. June 6, 2008) ("[D]istrict courts have discretion to order the enjoined party to pay the costs of past noncompliance, including fees and costs associated with enforcement.").

Appointment of a third party is especially important given the limits Google imposed on discovery.  As the Court may recall, Google refused to produce class member data.  *See* Dkt. 427 (Oct. 3, 2024, Case Management Statement) at 13 (describing how Google resisted production of a data sample because "Plaintiffs can ask the jury to draw certain inferences using the information Google did produce.").  Google also refused to provide details regarding all the precise ways in which Google used and stored this data.  Ex. 3 at 8.  While such details were

---

[3] *See, e.g.*, Permanent Injunction at 3, *In re Google Play Store Antitrust Litig.*, 20-cv-05671, Dkt. 702 (N.D. Cal. Oct. 7, 2024) (with court-ordered permanent injunction, directing parties to work together to recommend a "three-person Technical Committee" that would "review disputes or issues relating to the technology and processes required" by the injunction); Assurance of Voluntary Compliance at 5, *Commonwealth of Pa. v. Google LLC* (1st Jud. Dist. Pa. Nov. 10, 2022) (with settlement, Google agreeing to an "independent third-party professional" to ensure compliance); *see also, e.g.*, *Adkins v. Facebook, Inc.*, 2021 WL 1817047, at *6 (N.D. Cal. May 6, 2021) (describing settlement that required "independent monitor" to "ensur[e] that Facebook maintains the security measures"); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 WL 4212811, at *10 (N.D. Cal. July 22, 2020) (approving "annual third-party assessments to ensure compliance"), *aff'd*, 2022 WL 2304236 (9th Cir. June 27, 2022).

1   unnecessary to prove Google's liability at trial, those details will be highly relevant to ensure

2   compliance with any injunction.  A third-party monitor with audit powers is crucial.

3                              **5.    Other Provisions**

4           The other provisions in the proposed injunction are also appropriate and consistent with

5   the permanent injunction recently entered by Judge Donato in *In re Google Play Store*.  Paragraph

6   1 ensures the injunction applies not only to Google LLC but also to any related and affiliate

7   companies.  *See In re Google Play Store*, Dkt. 702 ¶ 1.  That is especially important in this case,

8   where Google's expert suggested that Google might otherwise set up an affiliate to collect the

9   same data from the same devices.  Tr. 1671:10-16 (Knittel).[4]  As with the *Play Store* injunction,

10  Plaintiffs also seek a nationwide scope and ask the Court to retain jurisdiction to hear motions to

11  enforce or modify the injunction.  *See In re Google Play Store,* Dkt. 702 ¶¶ 3, 14.

12  **V.    ARGUMENT ON UNJUST ENRICHMENT AND DISGORGEMENT**

13          **A.    The Law Requires an Independent Assessment of Plaintiffs' Request**

14          In deciding Plaintiffs' request for disgorgement, this Court is "bound by all factual

15  determinations made by the jury in deciding the [legal] claims."  *Miller v. Fairchild Indus., Inc.*,

16  885 F.2d 498, 507 (9th Cir. 1989); *see also Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir.

17  2016) (in deciding equitable claims post-trial, "the trial judge must 'follow the jury's implicit or

18  explicit factual determinations'" rendered in the jury's verdict on legal claims).

19          The jury's finding that Plaintiffs "are not entitled to disgorgement," Dkt. 670 (Question

20  4), is not a factual determination—as such, it is merely advisory and is not binding on this Court.

21  It is a legal question whether Plaintiffs are entitled to disgorgement and thus, this Court must

22  "make its own *independent* assessment of" Plaintiffs' request, *Hansen v. Safeway, Inc.*, 2010 WL

23  2593611, at *3 (N.D. Cal. June 22, 2010) (emphasis added), and then "find the facts specially

24  _____

25  [4] *See also* Ex. 11 (Knittel Depo. Tr.) at 184:3–21 ("Q. Is it your understanding that it would be
    realistic that in response to a court order requiring Google to stop collecting, saving, and using

26  sWAA-off data, Alphabet would actually just incorporate its conversion-tracking operation under
    a different name memorialized on a new piece of paper, and keep going as is?...[A.] I would say

27  that in the event the Court says that they could do this, then I would say it's probably likely.").

and state its conclusions of law," Fed. R. Civ. P. 52(a)(1). The Ninth Circuit will review this Court's findings "as if there had been no verdict from an advisory jury." *Ashland v. Ling-Temco-Vought, Inc.*, 711 F.2d 1431, 1438 (9th Cir. 1983).

In making its "independent assessment" of Plaintiffs' disgorgement request, this Court is not limited to the trial record before the jury. This Court can and should consider additional evidence "relevant on the issues of whether or not equitable relief [is] proper and, if so, the scope of such relief." *Criswell v. W. Air Lines*, 514 F. Supp. 384, 387 n.3 (C.D. Cal. 1981).

**B.    Google Should Be Ordered to Disgorge Net Profits Attributable to Its Use of Plaintiffs' sWAA-Off Data During The Class Period**

**1.    California Law Requires Disgorgement**

In certifying the classes, this Court held that California law authorizes Plaintiffs to seek, and this Court to order, an award of disgorgement. Dkt. 352 at 21. California follows the Restatement. *Oakland*, 83 Cal. App. 5th at 479. Section 44(1) of the Restatement provides:

> A person who obtains a benefit by conscious interference with a claimant's legally protected interests . . . is liable in restitution as necessary to prevent unjust enrichment, unless competing legal objectives make such liability inappropriate.

Google's proven invasion of privacy and intrusion upon seclusion constitute "interference with [Plaintiffs'] legally protected interests." *See id.* § 44(2) (defining that phrase to include "conduct that is tortious"); *id.* cmt. b ("Profitable interference with . . . the claimant's right of privacy[]" may "give[] rise to a claim" for unjust enrichment). Consistent with the Restatement, courts have held that California law requires an award of disgorgement for violations of privacy rights. *See*, *e.g.*, *Facebook*, 956 F.3d at 600; *Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1038 (S.D. Cal. 2023); *CTC Real Estate Servs. v. Lepe*, 140 Cal. App. 4th 856, 859–62 (2006).

None of the exceptions to Section 44 apply. *See* Restatement § 44(3)(a)–(d). Section 44(3)(a) does not apply because, as explained above, an injunction is warranted. Nor would unjust enrichment "result in an inappropriate windfall" to Plaintiffs or "otherwise be inequitable." *Id.* § 44(3)(b). This Court can eliminate any double recovery by tailoring its final judgment to be equal to the greater of the jury's damages award or the Court's disgorgement award; that

adjustment will prevent any "inappropriate windfall." *Id.* And, as described below, it is possible to "adequately measure[]" the "benefit" that Google "derived" from its violations, *id.* § 44(3)(c). Finally, disgorgement would not "conflict with" any "liabilities or penalties" that are "provided by other law." *Id.* § 44(3)(d). California courts have repeatedly called for an award of disgorgement in just this situation. *See, e.g. In re Facebook*, 956 F.3d at 601.

### 2. Net Profits Is the Appropriate Measure of Disgorgement

The jury's verdict establishes that Google was a "conscious wrongdoer." Section 51(3) of the Restatement defines "conscious wrongdoer" as "a defendant who is enriched by misconduct and who acts (a) with knowledge of the underlying wrong to the claimant, or (b) despite a known risk that the conduct in question violates the rights of the claimant." Here, the jury found that Google "*intentionally* intruded upon the Plaintiffs' objectively reasonable expectation of privacy," and that Google's "conduct was *highly offensive*—that is, a *shocking or outrageous* breach of social norms regarding online data." Dkt. 666 (Instruction No. 20) (emphases added). Those findings are now binding. *Teutscher*, 835 F.3d at 944.

Because Google was a "conscious wrongdoer," the proper measure of unjust enrichment is Google's "net profit attributable to the underlying wrong." Restatement § 51(4); *see also id.* § 49(3) (where, as here, "restitution is intended to strip the defendant of a wrongful gain," the appropriate measure is "not the value of the benefit conferred but the amount of the profit wrongfully obtained"). Under Section 51(4), the Court should order disgorgement of "the net profit attributable to the underlying wrong." *Id.* § 51(4). "Net profit" is the appropriate measure of unjust enrichment whenever the defendant is a "conscious wrongdoer." *Id.*

In *Sripetch*, the Ninth Circuit reaffirmed the use of Section 51(4)'s "net profit" measure to calculate the disgorgement owed by defendants who violated federal securities law. 2025 WL 2525848, at *3. California courts routinely apply Section 51(4)'s "net profits" measure in cases of conscious wrongdoing. *Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*, 57 Cal. App. 5th 1108, 1127 (2020) (applying Section 51(4)'s "net profits" measure to defendants who breached their fiduciary duties to plaintiff); *Meister v. Mensinger*,

230 Cal. App. 4th 381, 399 (2014) (same); *Ward v. Taggart*, 51 Cal. 2d 736, 741 (1959) (a conscious wrongdoer should not be permitted "to take advantage of his own wrong").

Sound principles of equity and public policy require that the "net profits" measure be used to deter conscious wrongdoing in future. The Supreme Court, the Ninth Circuit, and many district judges have explained that ordering disgorgement of the wrongdoer's "net profit" is necessary to ensure that wrongdoing is not profitable for the specific defendant or for others who might be tempted to break the law. *See, e.g.*, *Kansas v. Nebraska*, 574 U.S. 445, 462–64 (2015) (awarding disgorgement of profits for violation of interstate compact because, otherwise, the defendant state "can take water . . . pay [the plaintiff state] actual damages, and still come out ahead," which was a "nearly a recipe for breach"); *Playboy Enters.*, 692 F.2d at 1274–75 (holding that district court abused its discretion in declining to award disgorgement because otherwise "a profit seeking businessperson" would be incentivized to violate the law).[5] To prevent the inequitable result of Google keeping money that it made from its illegal conduct in excess of the jury's compensatory damages award, Google must be ordered to disgorge the "net profits" attributable to its wrongdoing.

### 3. The Court Has Jurisdiction to Award Disgorgement

The Court has "equitable jurisdiction" to award disgorgement because the jury's damages award is not a "plain, adequate, and complete remedy" for Google's wrongdoing. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 842 (9th Cir. 2020). The Court instructed the jury that Plaintiffs' damages were limited to "the economic value of allowing access to the data at issue." Dkt. 666 at 24 (Instr. 24). We know, however, that Google made substantially more than $425 million in net profit from its use of Plaintiffs' sWAA-off app activity data. *See infra* § V.C. It

---

[5] *Yuga Labs, Inc. v. Ripps*, 2023 WL 7089922, at *10–12 (C.D. Cal. Oct. 25, 2023) (awarding disgorgement to "assist in deterring Defendants from continuing to infringe on Plaintiff's trademarks" and to ensure "that Defendants do not profit from their unlawful infringement"); *N.K. Collins, LLC v. Wm. Grant & Sons, Inc.*, 472 F. Supp. 3d 806, 830–31 (D. Haw. 2020) (holding that "the mere availability of some figure of tort damages" for defendant's invasion of plaintiff's privacy "does not by itself preclude an award founded on unjust enrichment," because "the objectives of the two remedies are different").

is well established that *Sonner* does not bar equitable disgorgement where, as here, a defendant's net profits exceed the amount of compensatory damages awarded at law. *See e.g., Barrett v. Optimum Nutrition, Inc.*, 2022 WL 3452791, at *1 (C.D. Cal. July 18, 2022) (court may award disgorgement if it "would go beyond the damages available to [the plaintiff], or that restitution would be more certain, prompt, or efficient than legal remedies"); *In re California Gasoline Spot Market Antitrust Litig.*, 2021 WL 1176645, at *8 (N.D. Cal. Mar. 29, 2021) (holding that *Sonner* does not bar disgorgement when there is "a difference between the money damages sought and restitution claimed"). Similar cases abound.[6]

Plaintiffs' legal remedy is also not adequate or complete because monetary damages in this case are difficult to calculate. That difficulty was especially true in this case. *See supra* § IV.B.2 (discussing Lasinski's conservative measure of damages).

### C. The Court Should Order Google to Disgorge $2.36 Billion As a Supported and Conservative Measure of Net Profits[7]

Google does not dispute that it earned profits from its use of Plaintiffs' sWAA-off data. The parties' dispute, rather, is over the *amount* of profits that must be disgorged. In Section C.1, Plaintiffs set forth the legal standard: a "reasonable approximation" is all that is required, and Google bears the burden to prove any deductions from the gross revenue. But-for causation is *not* required. In Section C.2, Plaintiffs demonstrate that Google's gross revenues from sWAA-off data were at least $4.14 billion. In Section C.3, Plaintiffs turn to the deductions for Google's incremental costs (the so-called "traffic acquisition costs") and explain why Google's discovery

---

[6] *Maadanian v. Mercedes-Benz USA, LLC*, 2024 WL 1579658, at *10 (W.D. Wash. Apr. 11, 2024) (denying motion to dismiss claim for disgorgement because that "relief likely varies from that available under law"); *Martinez v. ZoomInfo Techs. Inc.*, 2022 WL 1078630, at *7 (W.D. Wash. Apr. 11, 2022) (denying motion to strike request for equitable restitution because "restitution might require disgorgement of profits, which could be greater than the fair market value of her likeness"); *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1009 (N.D. Cal. 2020) (explaining that under *Sonner*, plaintiffs would still be entitled to equitable disgorgement if that remedy "would go beyond the damages available to them" at law).

[7] Plaintiffs will also seek pre- and post-judgment interest for compensatory damages and unjust enrichment amounts after judgment is entered.

misconduct has rendered this deduction much more complex than it should have been.  Under the record as it stands, the best estimate of TACs renders a net profits figure of $2.36 billion.  If this Court wishes to give Google another chance to prove the relevant TACs (which is Google's burden) then the Court should appoint a special master to do an accounting.  In Section C.4, Plaintiffs explain why the other costs, which Google seeks to deduct from the sWAA-off revenue, are neither appropriate nor justified by the evidence.  In C.5, Plaintiffs request (solely in the alternative) the appointment of a special master to conduct an "accounting" of Google's profits.

### 1.   Legal Standard: "Reasonable Approximation" of Net Profits; Not But-For Causation

Plaintiffs' burden is to "present evidence of the total or gross amount of [Google's] benefit, or a reasonable approximation thereof." *Meister*, 230 Cal. App. 4th at 399  (paraphrasing Restatement § 51(4)).  Plaintiffs can do this by proving "any form of use value, proceeds, or consequential gains that is identifiable and measurable and not unduly remote." *Id.* (quoting Restatement § 51(5)(a)).

It is Google's burden to present "evidence of costs, expenses, and other deductions to show the actual or net benefit [it] received." *Meister*, 230 Cal. App. 4th at 399; *Healthcare*, 57 Cal. App. 5th at 1127 (defendant has the burden to prove deductions); *see also SEC. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) ("burden shifts to the defendants to 'demonstrate that [plaintiffs'] disgorgement figure was not a reasonable approximation'").

As the wrongdoer, Google bears "the residual risk of uncertainty in calculating net profit." Restatement § 51(5)(d).  This Court has discretion to "assign such evidentiary burdens, as reason and fairness dictate, consistent with the object of restitution." *Id.* § 51(5).  And the "object" of restitution is "to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty." *Id.* § 51(4).

Plaintiffs are *not* required to prove a but-for causal link between Google's wrongful collection of their (s)WAA-off data and Google's subsequent net profits. *Uzyel*, 188 Cal. App. 4th at 894.  Comment f to Section 51 of the Restatement states that a plaintiff is not required to

prove that the "wrong is the exclusive or even the predominant source of the defendant's profit" that is to be disgorged. "Absence of but-for causation does not necessarily exonerate the wrongdoer . . . . [A] finding that the defendant would have realized the profit in any event does not compel the conclusion that the defendant, under the circumstances, has not been unjustly enriched." *Id.*; *see also* CACI 1821 (omitting but-for causation standard for disgorgement of profits from misuse of plaintiff's name or likeness).

Nor are Plaintiffs required to meet a still-higher burden of "tracing" their particular sWAA-off data through Google's internal processing to tie specific profits to that specific data. That task would be impossible, including because Google (over Plaintiffs' objection) refused to produce this data during the course of this litigation. *See* Dkt. 185 (denying Plaintiffs' motion for a preservation order). In any event, comment b to Section 51 of the Restatement expressly states that the Section 51 "net profits" measure contains "no requirement of tracing by the rules of §§ 58–59."

### 2. Gross Revenue: Google During The Class Period Earned At Least $4.14 Billion From Its Use of Plaintiffs' sWAA-Off Data

Google's witnesses agreed at trial that Google has used sWAA-off data for conversion tracking and modeling.[8] "Conversion tracking" means determining that a particular ad caused the user (or the user's device) to do something valuable to the advertiser, like purchasing the advertised product. Tr. 611:24–612:21 (Hochman). Proving that ads served by Google caused conversions is "how Google justifies value to the advertiser" and "incentiv[izes]" the advertiser "to spend more money" on Google ads. Tr. 619:12–15 (Hochman); *see also* Tr. 1211:9–18 (Ganem) ("one of the benefits to Google of proving a conversion . . . is that it will get more advertising dollars").

---

[8] Tr. 1212:25–1213:6 (Ganem) (discussing conversion tracking); Tr. 1340:4–9 (Langner) (discussing conversion tracking); 1341:6–16 (Langner) (discussing conversion modeling). Mr. Monsees described that data as "essential" to Google's ad services (Tr. 300:11–13), and Mr. Ganem testified that there are instances where advertisers pay more money because of conversions (Tr. 1211:9–22, 1212:25–1213:2).

To "track conversions," Google needs to know (a) which ads were shown to a particular person or device *and* (b) the later activity by that person or device.  Tr. 620:17–621:20 (Hochman).  Google needs that information "to connect the dots"—"to connect this ad to this ad to this ad, [and] finally to the purchase."  Tr. 621:16–21 (Hochman).  Tracking Plaintiffs' conversions required Google to use Plaintiffs' sWAA-off data. Tr. 612:1–17 (Hochman).

### a)    Gross Revenue: Lasinski Calculates $4.14 Billion

Mr. Lasinski calculated Google's gross revenues from Plaintiffs' sWAA-off data, during the class period, as approximately $4.14 billion.  To calculate that amount, Mr. Lasinski relied on internal analyses that Google itself used to quantify revenues attributable to specific types of data.  Specifically, Mr. Lasinski: (1) identified Google's total U.S. revenues from three products (App Promo, AdMob and Ad Manager) that used sWAA-off data to track ad conversions during the class period; (2) estimated the portion of those U.S.-based revenues attributable to Plaintiffs; and then (3) multiplied those revenues by Google's stated percentage of revenue attributable to conversions.[9]  Further details about this analysis are found in his Initial Report's discussion of what he there called "Scenario One."[10]  Dkt. 314-7 ¶¶ 81–91 (App Promo), 92–103 (AdMob), and 104–107 (Ad Manager).  Updated calculations incorporating data through the end of the class period are presented in his Second Supplemental Report. Ex. 12 ¶¶ 6–9.  Google's gross revenue from ad conversions from all Plaintiffs was about **$4.6 billion**.  Tr. 922:9–18 (Lasinski).

That amount should be adjusted downward to exclude revenue Google earned from ads with the supervised ("Unicorn") and enterprise ("Dasher") accounts.  This Court ruled that those accounts are excluded from Plaintiffs' common-law claims for intrusion upon seclusion and

---

[9] Tr. 889:2–16. Mr. Lasinski relied on Google's own data for each of these inputs.  Tr. 890:9–891:7, 914:7–20, 919:20–920:18 (revenue); Tr. 903:4–18 (signed-in percentage); Tr. 904:6–905:10 ((s)WAA-off percentage); Tr. 907:17–913:5, 916:12–918:14, 919:20–25 (percentage of revenue attributable to advertisements linked to a conversion).

[10] Lasinski's reports also disclose a "Scenario Two" for unjust enrichment, which included all the unjust enrichment in Scenario One, plus additional unjust enrichment from Google's "ads revenues" from AdMob and Ad Manager. Dkt. 314-7 (Initial Rep.) ¶¶ 113–129.  Plaintiffs did not present Scenario Two at trial and are not now seeking disgorgement based on Scenario Two.

invasion of privacy.  Dkt. 384.  Mr. Lasinski estimated the percentage of Unicorn and Dasher accounts by using spreadsheets Google produced—some of which *included* those account types (PX-404, PX-405), and some of which *excluded* them (PX-403).  Tr. 927:2–17.  That analysis showed that Unicorn and Dasher accounts were about 10% of the total number of accounts.  Tr. 927:7–13; *see* Ex. 12 (Lasinski Second Supp. Rep.) at SS1.2.  Accordingly, Mr. Lasinski estimated that about 10% of Google's at-issue revenue (i.e., about $460 million) was derived from Unicorn and Dasher accounts.  Tr. 927:2–17.  Subtracting that amount from $4.6 billion revenue yields **$4.14 billion** of revenue from ad conversions from all remaining Plaintiffs, i.e., from U.S.-based sWAA-off users with regular accounts.

Finally, the Court must divide that $4.14 billion in revenue between Class 1 (the Android Class) and Class 2 (the non-Android Class).  Mr. Lasinski found that Android users are responsible for approximately 62% of signed-in, sWAA-off app activity, while non-Android users are responsible for the other 38%.  Tr. 923:5–924:20; Dkt. 314-7 (Lasinski Initial Rep.) sch. 1.5.[11]  Accordingly, Google's gross revenue during the class period from Class 1 (the Android Class) was approximately **$2.82 billion**, and from Class 2 (the non-Android Class) was approximately **$1.32 billion**.

### b)    Google's Criticisms of Lasinski's Gross Revenue Calculations Lack Merit

Google's damages expert, Dr. Christopher Knittel, made four criticisms of Lasinksi's revenue calculations.  None are supported by the evidence.

### (1)    Unicorn and Dasher accounts

First, Dr. Knittel contended that *half* of Google's revenue is derived from Unicorn and Dasher account types—much more than Lasinski's estimate of 10%.  Tr. 1570:16–1571:19; Ex. 13 (Knittel Supp. Rep.) ¶¶ 47–51.  Dr. Knittel opined that disgorgement award should thus be reduced by 35%.  Ex. 13 (Knittel Supp. Rep.) ¶ 51.

---

[11] Survey evidence found that there is a roughly even split between Android and non-Android (mostly iOS) mobile devices.  However, Android users are signed in at a much higher rate than non-Android users.  Tr. 923:5–924:20.

On cross examination, that assertion disintegrated. Dr. Knittel admitted "[i]t is not possible" for there to be as many sWAA-off Unicorn and Dasher accounts as he claimed. Tr. 1649:10–1651:25. The spreadsheets he relied on reflect 2.2 billion *total* monthly active Unicorn and Dasher accounts. Tr. 1649:10–1650:23. Yet somehow, Dr. Knittel calculated *3.4 billion* Unicorn and Dasher accounts with sWAA off. Tr. 1651:5–17. That is impossible, as Dr. Knittel conceded. *Id.* Because Dr. Knittel conceded that his first criticism is based on an "impossible" interpretation of the data, that criticism is entirely unreliable and this Court should disregard it.

### (2)    Post-2021 revenues

Next, Dr. Knittel contended that all revenues after 2021 attributable to Class 2 (the non-Android class) must be subtracted from the disgorgement award. Most Class 2 members used Apple iPhones. In 2021, Apple updated its operating system ("iOS") to version 14.5. That update included an "App Tracking Transparency" feature. This feature causes the iPhone to redact a single device identifier (called IDFA) from the app-activity data the iPhone transmits to Google. Tr. 943:17–944:14, 1295:16–1296:4, 1706:17–23. The feature did not do this for all iPhones, however; if the user "allows" an app to track activity, then the IDFA is not redacted from the data stream to Google. Tr. 1706:17–23.[12] Dr. Knittel is a damages expert; not a technologist. He simply assumed it to be true that Apple's new feature prevented Google from performing any conversion tracking on iPhones after 2021. Tr. 1579:25–1582:12.

Dr. Knittel's assumption was wrong because the redacted identifier (IDFA) is not necessary for Google to track iPhone conversions. Although Google uses the IDFA identifier for conversion tracking when it is available, Tr. 1326:23–1327:1, Google also uses *other* information to track conversions whenever the IDFA is *not* available. This process is called "conversion modeling." Mr. Ganem agreed that Google uses "conversion modeling" for

---

[12] Dr. Knittel claims that iPhone users who allowed this transmission of the IDFA must have consented to Google's conduct, Tr. 1568:7–20, but that is not true. Those class members may have permitted "the *app* to track" their activity, Tr. 1295:16–24, but they did not permit *Google* to do so, since they turned sWAA off, *see, e.g.*, Tr. 771:1–772:2.

"conversion event[s] that . . . can't [be] tie[d] directly to a device ID [by] us[ing] other things that [Google] know[s] about that device . . . to infer that it is the same" device that saw a relevant ad. Tr. 1212:9–17. Ms. Langner also conceded Google uses "a variety of modeling techniques to try to tie those two devices"—*i.e.*, the device that saw the ad and the device that bought the product or performed some other conversion event—"together, even though [Google] do[esn't] have a specific identification." Tr. 1341:6–16. In forming his opinion about post-2021 revenues, Dr. Knittel failed to consider Google's use of "conversion modeling." Tr. 1587:11–1588:13.

The evidence thus flatly contradicts the fundamental assumption Dr. Knittel made when opining that Google cannot have earned any revenue from performing "conversion tracking" on iPhones after 2021. Google *has* collected data from iOS devices after 2021, and it *has* used that data to track and attribute conversions. Because Dr. Knittel himself conceded that his second criticism is premised on a clearly false assumption, this Court should disregard it.

### (3) Speculation that class members clicked on fewer ads

Third, Dr. Knittel opined that sWAA-off users "click on ads at about half the rate as the sWAA-on users," and that therefore Google's revenues from Plaintiffs' sWAA-off data should be reduced by "basically, 50 percent." Tr. 1569:17–24. But this opinion is worthless because it is based entirely on a made-for-litigation "log" that Google created, which purportedly reflects sWAA-off data collected during three days in March, April, and May 2022.[13] Google produced hardly any information about this log in discovery. Google never produced any witness to testify to the log's reliability, and Google made no effort at trial to lay a foundation for the log. And Google admits that it "maintains ad interaction information with ***varying degrees of reliability***." Ex. 14 (Google's 2d Supp. Resp. to Plaintiffs' Interrogatories, Set Six) at 19 (emphasis added). Dr. Knittel himself has no idea what Google means by "varying degrees of reliability." Tr. 1604:7–13.

---

[13] Tr. 1569:17–24; 1595:23–1596:15, 1602:18–1603:14; 1645:17–21; Dkt. 470-4 (Knittel Rep.) ¶¶ 90 & 110; Ex. 14 (Google's 2d Supp. Resp. to Interrogatories, Set Six) at 19–24.

Moreover, Dr. Knittel disclaimed any opinion that this log is more reliable than Mr. Lasinski's data.  Tr. 1644:25–1645:16 (admitting he is "not putting these numbers up as more reliable" than Lasinski's numbers); *see also* Tr. 1643:16–1644:15 (admitting that he was "not criticizing [Mr. Lasinski] necessarily for not using this data" in the log).  Those disclaimers were wise, since Dr. Knittel "do[esn't] know the size of the data sample" in the log and "do[esn't] know anything about the makeup of the sample . . . [o]ther than the column headers."  Tr. 1639:12–17.  Nor could Dr. Knittel confirm, at his deposition, that the "sample" log was "representative of sWAA-off user activity across the class period."  Ex. 11 (Knittel Dep.) at 106:22–110:6.  For all Dr. Knittel knows, the sample includes data from desktop computers, which are not in the class.  *Id.* at 100:13–14.

Upon examination, the log contains obvious indicators of *un*reliability.  Most of Google's queries of this log returned "null" entries, rather than usable data.  Ex. 14 (Google's 2d Supp. Resp. to Interrogatories, Set Six) at 19–24.  The log reports that somehow, every single Google Search ad on October 1, 2016, was served to a WAA-off user—even though less than half of Google's active users had WAA turned off at this time.  Tr. 1638:15–1639:2; Ex. 14 (Google's 2d Supp. Resp. to Interrogatories, Set Six) at 19; PX-403 at row 16.  And the log purports to show that the percentage of ads served to WAA-off users somehow doubled between December 2019 and March 2020, even though the percentage of active users with WAA off declined during that time.[14]

Moreover, there is an obvious reason (uncorrected-for by Google or Dr. Knittel) for why this log would be expected to show fewer ad clicks by sWAA-off users.  The reason is that this log was created in 2022, *after* Apple's iOS 14.5 update rolled out the App Tracking Transparency feature.  As discussed above, this feature redacts the phone's IDFA identifier from the data sent

---

[14] Ex. 14 (Google's 2d Supp. Resp. to Interrogatories, Set Six) at 20 (percent of WAA-off ads increased from 4.21% to 10.72% during this time); PX-403 at rows 54, 57 (percent of active users with WAA on increased from 92.16% to 92.98% during this time, indicating a slight decrease in the number of WAA-off users).

Plaintiffs' Motion for Permanent Injunction and Disgorgement of Profits
3:20-cv-04688-RS

1  to Google.  Tr. 1566:17–1568:25.  That matters because Google claims to use the IDFA to tell

2  whether the phone's user has set sWAA to "off."  Tr. 1295:16–1296:4; *see also* Ex. 15 (Ganem

3  30(b)(6) Dep.) at 70:4–73:3.  So if this log was generated using the IDFA identifier without

4  accounting for any conversion modeling, and if that identifier was missing from many of the

5  sWAA-off iPhones' data collected in 2022, then that explains why the log undercounts the ad

6  "clicks" by "sWAA-off" users.  Dr. Knittel conceded on cross that the log "understates the

7  amount of sWAA-off traffic that was received because Google could no longer identify a portion

8  of it [from iOS users] as being sWAA off."  Tr. 1599:9–22.[15]

9       Because Dr. Knittel's third criticism of Lasinski's revenue calculation is based entirely

10  on a made-for-litigation log that is unreliable on its face and for which Google has laid no

11  foundation, this opinion should be disregarded.

12                    **(4)    US-based revenue**

13       As discussed above, Mr. Lasinski's method required him to obtain the *U.S.-based* revenue

14  for Google's App Promo service since Plaintiffs are U.S.-based users.  There is no dispute about

15  the revenue numbers for 2020 through the end of the class period.  Mr. Lasinski obtained App

16  Promo U.S.-based revenue for 2020 and 2021 from G590 (GOOG-RDGZ-00185743),[16] and

17  Google stipulated that G590 reports revenue "from App Promo ads served to users in the United

18  States."  Dkt. 481 ¶ 2.  He obtained revenue numbers for 2022 from PX-421 (GOOG-RDGZ

19  02111189),[17] and Google stipulated that PX-421 reports "revenue from App Promo ads served

20  to users in the United States."  Dkt. 481 ¶ 4.  He obtained revenue numbers for 2023 through

21

22  _____

23  [15] Dr. Knittel testified that he could not quantify the impact of his error because "you shouldn't do math in real time." *Id.*; 1600:7–19. But he didn't *have* to do math in real time.  Dr. Knittel was asked about this issue during his deposition *two years ago*, and he gave the same answer.

24  Ex. 11 (Knittel Dep.) at 115:3–116:21 (answering that he "do[esn't] like doing conditional probabilities in real time").  Yet at trial, Dr. Knittel still hadn't run whatever "conditional

25  probabilities" he believed necessary to correct his opinion.

26  [16] *See* Ex. 12 (Second Supp. Rep.), SS2.2, note 2.

27  [17] *Id.* SS8.4 note 1.

Plaintiffs' Motion for Permanent Injunction and Disgorgement of Profits
3:20-cv-04688-RS

2024 from GOOG-RDGZ-02111196,[18] and Google stipulated that this document shows "revenue from App Promo ads served to users in the United States."  Dkt. 481 ¶ 11.

For earlier years of the class period (2017 through 2019), Mr. Lasinski obtained App Promo's U.S.-based revenue from PX-419 (GOOG-RDGZ-00184247).  This document is the source of much confusion—both as to its revenue numbers and also its "traffic acquisition costs" (TACs).  It is therefore necessary here to describe its provenance.

During discovery Plaintiffs requested Google produce documents sufficient to show its U.S-based revenue and profits relating to "the use" of sWAA-off data, including "conversion tracking."  Ex. 16 at 19–20 (Request 257(a) & (e)).  Google offered to meet and confer.  *Id.* (response to request 257).  Following those meet-and-confers, Google produced purported profit-and-loss statements for App Promo.  Frawley Decl. ¶¶ 6–7.  This led to the production of PX-419, which reports revenue and TACs for App Promo in 2017, 2018, 2019, and 2020:

| | | 2017 App Promo | 2018 App Promo | 2019 App Promo | 2020 App Promo |
|---|---|---|---|---|---|
| 4 | | | | | |
| 5 | | | | | |
| 26 | | | | | |
| 27 | Booked Revenue | 1,395 | 2,396 | 2,781 | 3,764 |
| 28 | TAC | 905 | 1,683 | 1,921 | 2,604.1 |

After receiving the original version of the App Promo P&L, Plaintiffs asked Google whether the document showed *global* revenues and costs or *U.S.-based* revenues and costs.  Counsel for Google responded: "These are USA-only figures."  Ex. 17 (#2).

PX-419 was not created in the ordinary course of business; rather, it was created specially for this litigation.  Tr. 1315:16–1317:8, 1318:2–11 (Langner).  We do not know who created it because that person did not testify at trial or deposition.  Not even Ms. Langner could say who that person was.  "[S]omebody other [than her] took information from some database or document and prepared [PX-419]."  Tr. 1317:9–11.

---

[18] *Id.* SS2.2, note 4.

Plaintiffs' Motion for Permanent Injunction and Disgorgement of Profits
3:20-cv-04688-RS

Two other Google documents confirm that PX-419 states Google's U.S.-based revenues for App Promo. *First*, the 2020 revenue figure in PX-419 is confirmed by G590, discussed above. Google stipulated that G590 shows U.S.-based revenue figures. It reports U.S.-based App Promo revenues for 2020 as $3.765 billion.[19] That is nearly identical to what PX-419 reports in cell I27: $3.764 billion. *Second*, the 2019 revenue figure in PX-419 is confirmed by a November 2019 internal Google PowerPoint presentation titled "Google Ads & Analytics." *See* Ex. 18. This Google document states that, as of July 2019, global App Promo annualized revenues were approximately $10 billion. *Id.* at -403; *see also* Tr. 892:10–13 (Lasinski describing and relying on this document). That $10 billion figure undermines Google's claim that PX-419 contains global revenues, since PX-419 reports 2019 revenues as just $2.78 billion—far less than the $10 billion reported in Exhibit 18. *See* PX-419 (Cell G27). Exhibit 18 also supports Mr. Lasinski's assumption that the $2.78 billion revenue figure from PX-419 is specific to the United States because Exhibit 18 states that approximately 30% of global app promo revenues come from the "Americas." Ex. 18 at -403. Approximately 30% of the $10 billion global total from Exhibit 18 is approximately $3 billion, which is consistent with Mr. Lasinski's assumption that the $2.78 billion figure in PX-419 is specific to the United States.

### 3. Deducting the Most Reasonable Approximation of Google's Incremental Costs (Its TACs) Results in Net Profits of $2.36 Billion from Google's Illegal Conduct

Mr. Lasinski appropriately sought to calculate Google's net profit by subtracting, from the U.S.-based App Promo revenues just described, App Promo's U.S.-based incremental costs. The relevant costs are Google's traffic acquisition costs, or TACs. Mr. Lasinski considered whether other costs should be subtracted from revenues, and he determined that they should not be subtracted because they were fixed costs, not incremental costs. Tr. 894:4–11; 941:25–942:9.

---

[19] This figure is the sum of all the entries for 2020 in column E of G590. Plaintiffs' counsel did this exercise with Dr. Knittel and he agreed that, according to G590, Google's US-only App Promo revenues for 2020 were $3.765 billion. Tr. 1659:21–24. Dr. Knittel also agreed that this takeaway from G590 "is consistent" with PX-419 representing U.S. App Promo revenues. Tr. 1660:3–10.

TACs are Google's payments to publishers (e.g., app developers) for ads displayed on their platforms. Dkt. 314-7 (Lasinski Initial Rep.) ¶ 84. For example, if Nike (an advertiser) pays $1 to Google to place a Nike ad on the ESPN app, Google will typically pay some portion of that $1 to ESPN (the publisher); that payment is a TAC. Mr. Lasinski attempted to estimate TACs for the relevant services. *Id.* ¶¶ 84–86 (App Promo), ¶¶ 96–99 (AdMob); ¶¶ 106–07 (Ad Manager). Mr. Lasinski only had available to him the TACs for App Promo and AdMob; he inferred the net profits attributable to Ad Manager based on the relationship between AdMob and Ad Manager app ads revenue. *Id.* ¶¶ 106–07. Those inferences are not in dispute.

What is in dispute is the correct amount of the App Promo TACs for ads shown to US-based users. Google claims that its "2022–2024 accounting structure does not track, report, or otherwise maintain country-specific records of Google's traffic acquisition costs for App Promo ads." Dkt. 481 ¶ 14. Google also claims that PX-419 (the document used by Mr. Lasinski for the U.S.-based App Promo revenue figures for 2017 to 2019) reports *global* TACs, rather than *U.S.-based* TACs. Tr. 1328:3–5 (Langner). Therefore, the most reasonable way to estimate U.S.-based TACs is to use the ratio of Google's *global* App Promo revenues to Google's *global* App Promo TACs, and to assume that this ratio was roughly the same in the United States. This is Option C, described further below and in the supporting Lasinski declaration.

Because of the confusion engendered by PX-419 (and by Google's counsel's representation that PX-419 contains "USA-only figures"), Mr. Lasinski previously disclosed two other options for calculating App Promo's U.S.-based TACs. *See* Lasinski Decl. ¶¶ 9–11 (describing these earlier options, with citations to relevant portions of his report and trial testimony). We discuss each option in turn, in chronological order.

a)    **Three options for estimating US-based App Promo TACs**

***Option A: Google's US-based App Promo TACs are approximately 68% of Google's US-based App Promo revenues for the entire class period (result: $1.35 billion of net profits).*** As discussed in Lasinski's declaration, his damages model uses, as one input, the ratio of App Promo's U.S.-based TACs to App Promo's U.S.-based revenues. *See* Lasinski Decl. ¶ 9. In his

Plaintiffs' Motion for Permanent Injunction and Disgorgement of Profits
3:20-cv-04688-RS

initial report, Mr. Lasinski used PX-419 (and a similar document, G591[20]) to calculate these ratios for 2017–2021, on the assumption that these documents' TAC figures are the U.S.-based TACs.  *See* Lasinski Decl. ¶ 9.  That was a reasonable approach at the time.[21]

        If PX-419's and G591's TAC figures are (like their revenue figures) the US-based TACs, then it is simple math to calculate that during these years (2017–2021), App Promo's US-based TACs were about 68% of App Promo's US-based revenues.[22]  In his Second Supplemental Report, Mr. Lasinski holds the 2021 TAC percentage constant in the later years of the class period (2022 through 2024).   Lasinski Decl. ¶ 10.  Based on that projection, he calculates Google's net profits as $835,272,294 for Class 1 and $511,841,020 for Class 2: about $1.35 billion in total. Ex. 12 (Lasinski Second Supp. Rep.) SS.1.2; *see* Tr. 894:3–8, 895:16–896:1.[23]  This Option A is the most favorable of the three options for Google, because the TACs are the highest.   As explained below, Plaintiffs now believe that the 68% TAC-to-revenue ratio is wildly off, and that PX-419 actually states App Promo's *global* TACs rather than App Promo's *US-based* TACs.

        ***Option B: Google's US-based App Promo TACs are approximately 68% of Google's US-based App Promo revenues for 2017-2021 but are just 23%-25% for 2022-2024 (result:***

---

[20] G591 (GOOG-RDGZ-00185744) has an identical format to PX-419; it gives the revenues and TACs for App Promo in 2021.  Google produced G591 on September 1, 2022.  Mr. Lasinski used G591 for the App Promo U.S.-based TAC-to-revenue ratio in 2021.  Ex. 12 (Second Supp. Rep.), SS2.2., note 6.

[21] As discussed above, Google's counsel had represented that PX-419 was "USA-only" and, moreover, other documents indicate that PX-419 reported U.S.-based revenue.  It would make no sense, and would be contrary to all standard accounting principles, for a profit-and-loss statement to compare U.S.-based revenue to *global* costs.  Google's own witness Dr. Knittel admitted that he has "never seen a firm do something like that in P&Ls."  Tr. 1657:14–19.

[22] For example, PX-419 reports that App Promo revenues for 2017 were $1.395 billion, and that Google incurred $905 million in App Promo TACs.  Dividing $905 million by $1.395 billion yields a 64.1% TAC rate for that year.  Performing similar simple division on the figures for 2018 through 2021 yields, respectively: 70.2%, 69.1%, 69.2%, and 67.9%  The average across all five years is about 68%.

[23] Mr. Lasinski's testimony gave higher numbers because he was including Dasher and Unicorn accounts, since those accounts were included in the CDAFA claim that was then before the jury.  The amounts stated above in text are taken from his schedule, which contains a separate calculation (not presented at trial) in which the Dasher and Unicorn accounts are excluded.

1  ***$2.13 billion of net profits).***  In July 2024, after the close of fact discovery, Google produced

2  PX-421 (GOOG-RDGZ 02111189).    As discussed above, PX-421 is another financial

3  spreadsheet containing data for two of the later years in the class period (2022 and 2023).  PX-

4  421 contains *global* App Promo revenues and *global* App Promo TACs for those later years.  PX-

5  421 (at "Follow Up Output" tab).[24]  Google stipulated to this.  Dkt. 481 ¶¶ 5–6.

6        In Option B, Lasinski continues to accept the disputed P&Ls (PX-419 and G591) as

7  accurate statements of US-based App Promo TACs for 2017–2021.  Option B's disgorgement,

8  for those years, is thus identical to Option A.  But unlike Option A, Option B does not project

9  the 68% TAC figure from G591 forward into the later years (2022–2024).  Instead, Option B

10 estimates the US-based App Promo TACs, for these later years, based on the *global* TAC-to-

11 revenue ratio disclosed in PX-421 (just 23%–25%).  Lasinski disclosed Option B in his Second

12 Supplemental Report and testified about it at trial.  *See* Lasinski Decl. ¶¶ 10–11 (describing, with

13 citations to reports and trial testimony, where Option B was disclosed and discussed).  Under this

14 Option B, Google's net profits are $1,319,046,648 for Class 1 and $808,289,927 for Class 2:

15 about $2.13 billion in total.  Ex. 12 (Lasinski Second Supp. Rep.) SS.1.2-II; *see* Tr. 922:25–

16 923:4.[25]

17      ***Option C: Google's US-based App Promo TACs are 25% of Google's US-based App***

18 ***Promo revenues for 2017-2021 and 23%-25% for 2022-2024 (result: $2.36 billion of net***

19 ***profits).***  This option is identical to Option B in the later years (2022 to 2024).  But it discards

20 the unreliable TAC figures for 2017–2021 that are disclosed in PX-419, since those figures

21 appear to be *global* TACs rather than *US-based* TACs.  Instead, this Option C takes the global

22

23 [24] The 23% and 25% percentages are calculated by summing up, for each of 2022 and 2023, the

24 TAC figures reported in column H of tab "Follow Up Output" (header: tac_floating_usd) and

25 dividing that total by the sum of the revenue figures reported in column G of the same tab (header: gross_revenue_floating_usd).

26 [25] As with Option A, Lasinski's trial testimony contains a higher number because at trial he was

27 presenting disgorgement for all account types including Dasher and Unicorn, which have now been excluded based on the jury's verdict.  *See supra* note 23.

TAC percentage for 2022 (25% of global revenue) and holds it constant in each year from 2017 through 2021. Lasinski presents and defends this option in paragraphs 12 through 24 of his attached declaration. This option is the most favorable to Plaintiffs, because the TACs are lowest.

Under this Option C, Google's net profits are $1,463,670,754 for Class 1 and $896,913,182 for Class 2: about $2.36 billion in total. *See* Lasinski Decl. ¶¶ 4, 16.

        **b)**      **Option C is the most reasonable approximation of US-based App Promo TACs**

This Court should reject Options A and B because both of those options are based on Mr. Lasinski's initial (and incorrect) assumption that PX-419 and G591 state the *U.S.-based* TACs for App Promo. In fact, these documents report *global* TACs. Ms. Langner testified that these documents "reflect the global P&L for App Promo." Tr. 1316:11–13 (PX-419); *see* 1321:24–1322:12 (G591). She confirmed this on cross. Tr. 1328:3–5.

It would not be proper, when measuring Google's profits from U.S.-based users' sWAA-off data, to permit Google to deduct expenses it incurred in serving ads to users located in *other* countries, who by definition are not members of the classes. The Court should instead adopt Option C, which estimates the U.S.-based App Promo TACs by using the ratio of *global* App Promo TACs to *global* App Promo revenues, and assuming that this ratio holds constant in the United States. That global ratio is disclosed in PX-421 for 2022 (25%). *See* Lasinski Decl. ¶ 18.

It is Google's burden to prove "evidence of costs, expenses, and other deductions." *Meister*, 230 Cal. App. 4th at 399; *Platforms Wireless*, 617 F.3d at 1096. As the wrongdoer, Google bears "the residual risk of uncertainty in calculating net profit." Restatement § 51(5)(d). Google has not provided any way of estimating App Promo U.S.-based TACs, besides inferring those TACs based upon the ratio of *global* App Promo TACs to *global* App Promo revenues.

       **4.**     **Google's Other Claimed "Deductions" Fail As a Matter of Law**

Dr. Knittel also contended that Google's "net profit" should be reduced by two additional "deductions," namely: profits Google claims it would have earned anyway, and Google's overhead. Neither deduction should be applied; both fail as a matter of law.

a)   **Google is not entitled to credit for profits it might have earned in some imagined but-for world in which Google did not violate Plaintiffs' privacy rights**

Dr. Knittel proposed to subtract, from Lasinski's "net profits" calculations, the profits he thinks Google might have made in some "counterfactual," "but-for world" in which Google did not engage in the "bad activity." Tr. 1550:17–1554:24. His theory is that if *Google* had not used Plaintiffs' sWAA-off data to track conversions, then publishers would have used some other third-party to do so instead. Tr. 1553:8–20. In that world, according to Dr. Knittel, Google would have earned the same profits because, after relying on the third-party company, advertisers would still have spent the same amount of money on Google ads. Tr. 1553:13–1554:17.

Google's claim to a credit for "counterfactual profits" is pure speculation. Dr. Knittel did not identify any real-world examples where Google earned profits from a conversion even though the proof of the conversion came from some third party. Nor did he provide any evidence that a third party is able to track conversions with anything like Google's accuracy. Google's tracking leverages huge amounts of data drawn from its dominant position in multiple parts of the market. No third-party comes anywhere close.

Moreover, this proposed deduction for "counterfactual profits" would violate the principles of equity that the disgorgement remedy is intended to serve. If a trustee were to misuse trust funds for a personal investment, and then make a profit from that investment, the trustee would not be heard to argue, in equity, that he should keep the profit because he would have made the same investment (with his own money) and would have earned the same profit, in the counterfactual world in which he did not embezzle from the trust. *See* Restatement § 51 cmt. f. It is "obvious" that the trustee must return all the profits earned. *Id.* Caselaw confirms this. In *CFPB v. Gordon*, the Ninth Circuit held that the defendant should be required to disgorge *all* fees earned from clients who received the defendant's fraudulent misrepresentations, even the "fees paid by 'satisfied' consumers," who presumably would have been willing to pay those fees regardless of defendant's fraud. 819 F.3d 1179, 1195–96 (9th Cir. 2016). If Google were permitted to evade disgorgement by hypothesizing some alternative way it might have generated

the same profits, data companies "would rarely be discouraged from" from violating users' privacy, "and the purpose of the disgorgement remedy would be eviscerated." *Oracle Am., Inc. v. Google Inc.*, 2016 WL 1743154, at *4 (N.D. Cal. May 2, 2016). "The law cannot be read to permit [a wrongdoer] to short circuit the disgorgement analysis in this manner." *Id.*; *see also Uzyel*, 188 Cal. App. 4th at 894 ("[I]n deciding whether the defendant's profits are properly attributable to misconduct, the court should consider not only justice between the parties but also the incentives to be created for others.") (citing Restatement § 51(4)(d)).

### b)     Google does not get a credit for "overhead" costs

Dr. Knittel's other proposed deductions are for Google's "overhead" costs. Tr. 1557:11–1558:7. But it is well-established that "the defendant will not be allowed to deduct expenses (such as ordinary overhead) that would have been incurred in any event." Restatement § 51 cmt. h. The Ninth Circuit "allow[s] a deduction for overhead only when the [wrongdoer] can demonstrate it was of actual assistance" in the unlawful commercial enterprise. *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332 (9th Cir. 1984). The defendant must also explain how it allocated overhead to the conduct and apply a "reasonably acceptable formula." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985) (holding that district court clearly erred by deducting overhead costs, since the defendant failed to prove that these overhead costs "actually contributed to sales of the infringing work"). Here, like the defendant in *Frank Music*, Google has not "explain[ed], [even] in general terms, how [its] claimed overhead actually contributed" to the collection, saving, and use of sWAA-off app activity data. *Id.*

Nor has Google presented a "reasonably acceptable formula" to allocate overhead costs to sWAA-off data or the relevant products. *Id.* At trial, Google's witnesses did not even mention allocation of costs. Google cannot supplement the record now, because Google did not even disclose its allocation methodology in discovery. Dr. Knittel simply added up the other costs (besides TACs) listed in the P&L documents, PX-419 and G591. *See* Ex. 13 (Knittel Supp. Rep.), Fig. 1.1 & Ex. 2A. But as discussed above, those documents state *global* costs. Google should not get any deduction for costs incurred to serve ads to non-class members in other countries.

When confronted with this fatal flaw in his analysis, Dr. Knittel's only excuse was that he had assumed these P&Ls contained U.S.-based costs, since he had "never seen a firm" compare U.S.-based revenues to global costs. Tr. 1657:14–24.

Google's SEC filings also undermine Google's claimed cost deductions. PX-419 purports to show that App Promo's operating profits were just 6.7% to 13.8% in 2017 to 2020. PX-419, row 121. By contrast, Google reported overall profit margins of over 50% in its 2020 annual 10-K. Ex. 19 at 38. How can Google possibly have such a low operating profit on its advertising business, which Google itself states is its leading profit center? *See id.* at 40 (table showing that "Google Services" is Google's most profitable business segment); *id.* at 90 ("Google services" includes "ads"). The only reasonable explanation is that Google produced a made-for-litigation "P&L" that included U.S. revenue figures and *global* costs. That explanation is the only one that is consistent with Google's financial data pulls and Ms. Langner's own testimony about the provenance of PX-419.

Google's witnesses identified four types of overhead costs: engineers, data centers, sales and marketing, and customer service. Tr. 1320:11–18, 1321:2–21, 1557:11–1558:7. Google presented no evidence that it incurred any amount of these additional costs to earn money from Plaintiffs' sWAA-off data. Dr. Hochman testified that "Google's data processing operation is so massive" that sWAA-off data "doesn't impose an additional cost on them"—"[t]hey've already got" "all the[] data centers and all the fiber" they need. Tr. 634:3–15. The most Google could muster in response was conclusory testimony from Ms. Langner that "if Google was to continue losing money on the product . . . we would want to reduce the costs" by "laying off some of the folks that are working on the product or trying to lower our machine costs." Tr. 1321:2–12. That hopelessly vague and speculative testimony fails to carry Google's burden to prove that the overhead contributed to its collection, saving and use of sWAA-off data.

In addition to those four reasonably specific categories of overhead, Dr. Knittel also claims Google should get a credit for opaque line items such as "EngPM," "Machine/Network," "Other COS," "G&A" and "GBO." Ex. 13 (Knittel Supp. Rep.) Supp. Ex. 2A. These inscrutable

38

labels account for more than half of the overhead that Dr. Knittel claims should be deducted. *Id.* Dr. Knittel offers no evidence whatsoever that these overhead costs contributed in any way to Google's monetization of Plaintiffs' sWAA-off data—nor any basis to determine what portion of these global costs were actually incurred in the U.S.

### 5. If This Court Is Unsure of the Amount to Award, Then a Special Master Should Be Appointed to Conduct an Accounting

If this Court is uncertain of the correct amount of disgorgement, then Plaintiffs respectfully request that the Court appoint a special master to conduct an accounting. Under Rule 53, "[a] district court has discretion in appointing a special master, and may decide the extent of his duties." *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1176 (9th Cir. 1989) (citing Fed. R. Civ. P. 53). Those duties may include calculating the profits a defendant should disgorge to a plaintiff. *See, e.g.*, *Novell, Inc. v. Network Trade Ctr., Inc.*, 25 F. Supp. 2d 1233, 1236 (D. Utah 1998) (following a liability finding for plaintiff, affirming special master's computation of the defendant's net profits attributable to its wrongdoing and awarding those profits to plaintiff); *Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 770 F. Supp. 1014, 1024 (E.D. Pa. 1991) (following liability finding for plaintiff, appointing a special master to calculate the defendant's profits attributable to its illegal conduct). This Court may also order an independent accounting under its inherent equitable power. "Rule 53 does not terminate or modify the district court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy." *Melendres v. Skinner*, 113 F.4th 1126, 1134 (9th Cir. 2024) (quoting *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982)).

This path is particularly appropriate given Google's reliance on demonstrably unreliable "P&Ls" that were made-for-litigation and that raise concerning questions on their face—concerns that no Google witness adequately explained. In *Title Tyrrell Promotions Ltd. v. Exoto Inc.*, 2013 WL 12575619, at *6 (C.D. Cal. Apr. 23, 2013), after finding that the defendant's "Profit & Loss Statement [was] unworthy of credence," the court ordered the parties to "stipulate to an independent auditor or submit nominations for an auditor to be chosen," to "independently

audit [defendant's] books and records to determine the profits resulting from [the challenged conduct]." *Id.* at **6–7. Similarly, in *United Transportation Union Local 1745 v. City of Albuquerque*, 2001 WL 37124769, at *2 (D.N.M. Oct. 3, 2001), the court appointed a special master under Rule 53 to oversee the post-merits damages calculation after plaintiffs complained that they could not "itemize [their] damages because the [defendant's] records were inadequate." *Id.* The court explained that "the adequacy of these records can best be determined by a Special Master in the context of his/her review of figures in the process of determining amounts necessary to compensate" the plaintiffs. *Id.* At a minimum, the same outcome is warranted here.

## VI.    CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court enter the proposed permanent injunction and order Google to disgorge $2.36 billion of net profits.

Dated: October 22, 2025

By */s/ Mark Mao*
Mark C. Mao (CA Bar No. 236165)
mmao@bsfllp.com

Beko Reblitz-Richardson (CA Bar No. 238027)
brichardson@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293 6858
Facsimile (415) 999 9695

David Boies (*pro hac vice*)
dboies@bsfllp.com
Alexander Boies (*pro hac vice*)
aboies@bsfllp.com
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200

James W. Lee (*pro hac vice*)
jlee@bsfllp.com
Rossana Baeza (*pro hac vice*)
rbaeza@bsfllp.com
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street, Suite 2800

Plaintiffs' Motion for Permanent Injunction and Disgorgement of Profits
3:20-cv-04688-RS

Miami, FL 33130
Telephone: (305) 539-8400
Facsimile: (305) 539-1304

Alison Anderson (CA Bar No. 275334)
aanderson@bsfllp.com
M. Logan Wright, CA Bar No. 349004
mwright@bsfllp.com
BOIES SCHILLER FLEXNER LLP
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: (213) 995-5720
Facsimile: (213) 629-9022

Amanda Bonn (CA Bar No. 270891)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

Bill Christopher Carmody (*pro hac vice*)
bcarmody@susmangodfrey.com
Shawn J. Rabin (*pro hac vice*)
srabin@susmangodfrey.com
Steven Shepard (*pro hac vice*)
sshepard@susmangodfrey.com
Alexander P. Frawley (*pro hac vice*)
afrawley@susmangodfrey.com
Ryan Sila (*pro hac vice*)
rsila@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY  10001
Telephone: (212) 336-8330

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
Kenya J. Reddy (*pro hac vice*)
kreddy@forthepeople.com
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

Michael F. Ram, CA Bar No. 104805

41

1    mram@forthepeople.com
     MORGAN & MORGAN
2    711 Van Ness Ave, Suite 500
     San Francisco, CA 94102
3    Telephone: (415) 358-6913

4    *Attorneys for Plaintiffs*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27