COOLEY LLP
MICHAEL A. ATTANASIO (151529)
(mattanasio@cooley.com)
BENEDICT Y. HUR (224018)
(bhur@cooley.com)
SIMONA AGNOLUCCI (246943)
(sagnolucci@cooley.com)
EDUARDO E. SANTACANA (281668)
(esantacana@cooley.com)
JONATHAN PATCHEN (237346)
(jpatchen@cooley.com)
ARGEMIRA FLOREZ (331153)
(aflorez@cooley.com)
NAIARA TOKER (346145)
(ntoker@cooley.com)
HARRIS MATEEN (335593)
(hmateen@cooley.com)
THILINI CHANDRASEKERA (333672)
(tchandrasekera@cooley.com)
ISABELLA MCKINLEY CORBO (346226)
(icorbo@cooley.com)
CHELSEA HU (357212)
(chu@cooley.com)
MICHAEL B. MORIZONO (359395)
(mmorizono@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone:    (415) 693-2000
Facsimile:    (415) 693-2222

Attorneys for Defendant
GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANIBAL RODRIGUEZ, et al. individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>GOOGLE LLC,<br><br>        Defendant. | Case No. 3:20-CV-04688-RS<br><br>**GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION AND DISGORGEMENT OF PROFITS**<br><br>Dept:    3, 17th Fl.<br>Judge:   Hon. Richard Seeborg<br><br>Date Action Filed: July 14, 2020<br>Trial Date: August 18, 2025 |

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ............................................................................................................ 2

   A.   Google Analytics for Firebase Benefits Developers and Users ............................ 2

   B.   Google's Infrastructure Prevents Joinability of GA4F Data .................................. 3

   C.   Google Does Not Profit From sWAA-Off Data ..................................................... 4

III. LEGAL STANDARD ..................................................................................................... 5

   A.   Injunctive Relief.................................................................................................... 5

   B.   Disgorgement ........................................................................................................ 5

IV. ARGUMENT ................................................................................................................. 6

   A.   Plaintiffs Are Not Entitled to Injunctive Relief .................................................... 6

       1.   Google has made changes to its privacy disclosures to address future concerns, so there is no continued harm. .......................................... 6

       2.   Plaintiffs have sufficient remedies at law. .................................................. 8

       3.   The balance of hardships tips sharply in Google's favor. ........................... 9

           a.   The Court should not enjoin Google from collecting and saving sWAA-off data. ........................................................... 10

           b.   Requiring Google to delete sWAA-off data is unduly burdensome. ...................................................................... 10

           c.   The request to "destroy the algorithms, models, and services created or modified" is unduly burdensome. ................. 13

           d.   A third party monitor is unduly burdensome and unnecessary. ............................................................................ 14

           e.   Applying this injunction to any entity other than defendant Google LLC is not narrowly tailored. ........................................... 15

       4.   Public policy does not favor injunctive relief. ......................................... 15

   B.   Equitable Disgorgement is Not Available to Plaintiffs ........................................ 16

       1.   Without a CDAFA claim, disgorgement here is a legal remedy .............. 16

           a.   The Court's two reasons for finding disgorgement an equitable remedy no longer apply. ................................................. 17

           b.   If disgorgement is even available for the other two claims, it is only as a legal remedy. ........................................................ 19

           c.   As a legal remedy, the jury verdict controls. .................................. 20

       2.   Even if considered an equitable remedy, disgorgement is not available. ................................................................................................... 20

           a.   The Court does not have jurisdiction to award equitable disgorgement because Plaintiffs' legal remedies are adequate.......................................................................................... 20

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- i -

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|

|  |  | |
|---|---|---|
| | b. | Monetary relief, including disgorgement, is not available for the constitutional claim. ........................................................ 23 |
| | c. | CUTSA also precludes disgorgement as a remedy. ...................... 24 |
| | d. | The jury's factual findings likewise preclude disgorgement. ....... 27 |
| 3. | | Google's profits are not sufficiently tied to the alleged conduct. ............. 31 |
| 4. | | In any event, Plaintiffs' figures are incorrect and grossly overstated. ...... 32 |
| | a. | Plaintiffs' revenue figure of $4.14 billion is untethered to reality.......................................................................................... 32 |
| | | i    The $51 billion starting point is built on errors and bad assumptions. ........................................................... 33 |
| | | ii   The $4.6 billion Mr. Lasinski attributes to conversion tracking related to signed-in, sWAA-off users is not reasonable.............................................. 36 |
| | | iii  Mr. Lasinski hugely underestimates the percentage of minors and business accounts to be excluded from the class. ............................................................... 37 |
| | b. | Mr. Lasinski fails to deduct the proper expenses. ........................ 38 |
| | | i    Plaintiffs calculate TACs incorrectly. ............................... 38 |
| | | ii   Plaintiffs fail to deduct other expenses. ............................ 40 |
| V. | CONCLUSION | ................................................................................................ 40 |

Cooley LLP
Attorneys at Law
San Francisco

- ii -

Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-cv-04688-RS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. Facebook, Inc.*,
  2021 WL 1817047 (N.D. Cal. May 6, 2021) .......................................................................... 14

*Aetna Life Ins. Co. v. Young*,
  2024 WL 5182638 (C.D. Cal. Sept. 25, 2024) ....................................................................... 19

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
  786 F. Supp. 3d 647 (S.D.N.Y. 2025) ...................................................................................... 8

*Anderson v. Apple Inc.*,
  500 F. Supp. 3d 993 (N.D. Cal. 2020) ................................................................................... 22

*Armstrong v. Brown*,
  768 F.3d 975 (9th Cir. 2014) ................................................................................................... 12

*Artec Grp., Inc. v. Klimov*,
  2016 WL 8223346 (N.D. Cal. Dec. 22, 2016) ....................................................................... 25

*Barker v. Insight Global, LLC*,
  2017 WL 10504692 (N.D. Cal. Nov. 21, 2017) ............................................................... 25, 34

*Barrett v. Optimum Nutrition, Inc.*,
  2022 WL 3452791 (C.D. Cal. July 18, 2022) ........................................................................ 22

*Bernhardt v. L.A. Cnty.*,
  339 F.3d 920 (9th Cir. 2003) ................................................................................................... 15

*Brown v. Google*,
  Dkt. 1097-4, No. 20-cv-03664 (N.D. Cal. Apr. 1, 2024) ...................................................... 12

*In re Cal. Gas Spot Mkt. Antitrust Litig.*,
  2021 WL 1176645 (N.D. Cal. Mar. 29, 2021) ....................................................................... 22

*City of L.A. v. Lyons*,
  461 U.S. 95 (1983) ..................................................................................................................... 6

*Clark v. Yodlee, Inc.*,
  2023 WL 12097898 (N.D. Cal. July 20, 2023) ........................................................... 21, 22, 23

*Compare Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
  778 F.3d 1059 (9th Cir. 2015) ................................................................................................. 19

*Cook v. Baker Equip. Eng'g Co., Inc.*,
  582 F.2d 862 (4th Cir. 1978) ................................................................................................... 28

Cooley LLP
Attorneys at Law
San Francisco

- iii -

**Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-CV-04688-RS**

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Digital Envoy, Inc. v. Google, Inc.*,
370 F. Supp. 2d 1025 (N.D. Cal. 2005) ................................................................. 26

*DISH Network L.L.C. v. Fineman*,
2017 WL 2060010 (C.D. Cal. Mar. 22, 2017) ......................................................... 9

*Doe v. Regents of Univ. of Cal.*,
672 F. Supp. 3d 813 (N.D. Cal. 2023) .................................................................... 23

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .......................................................................................... 5, 13

*Erdmark Auto, Inc. v. Zurich Am. Ins. Co.*,
2019 WL 1002952 (D. Idaho Mar. 1, 2019) .......................................................... 18

*Erhart v. BofI Holding, Inc.*,
612 F. Supp. 3d 1062 (S.D. Cal. 2020) ............................................................ 25, 26

*In the Matter of Everalbum, Inc.*
FTC Dkt. No. C-4743 (May 6, 2021) ..................................................................... 13

*In re Facebook Internet Tracking Litig.*,
2022 WL 16902426 (N.D. Cal. Nov. 10, 2022) .......................................... 12, 24, 32

*Facebook, Inc. v. OnlineNIC Inc.*,
2022 WL 2289067 (N.D. Cal. Mar. 28, 2022) ........................................... 5, 12, 15

*Facebook, Inc. v. Power Ventures, Inc.*,
252 F. Supp. 3d 765 (N.D. Cal. 2017) ...................................................... 7, 9, 15

*Facebook, Inc. v. Solonchenko*,
2022 WL 18491616 (N.D. Cal. Dec. 29, 2022) ...................................................... 15

*Fredericks v. Travelers Cas. Ins. Co. of Am.*,
521 F. Supp. 3d 1009 (D. Nev. 2021) .................................................................... 28

*Glam & Glits Nail Design, Inc. v. #NotPolish, Inc.*,
2021 WL 2317410 (S.D. Cal. June 7, 2021) .......................................................... 26

*In re Google Inc. St. View Elec. Commc'ns Litig.*,
21 F.4th 1102 (9th Cir. 2021) ....................................................................... 10, 12

*In re Google Play Store Antitrust Litig.*,
Dkt. 702, No. 20-cv-5761 (N.D. Cal.) .................................................................... 14

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) ...................................................................................... 17, 18

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- iv -

**GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS**

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*GS Holistic, LLC v. Puff N Go Gift Shop LLC*,
   2023 WL 4146232 (N.D. Cal. June 22, 2023) ............................................................ 9

*Guzman v. Polaris Indus.*,
   49 F.4th 1308 (9th Cir. 2022) .................................................................. 20, 21, 22

*Hansen v. Safeway, Inc.*,
   2010 WL 2593611 (N.D. Cal. June 22, 2010) .......................................................... 28

*Heller v. Cepia, L.L.C.*,
   2012 WL 13572 (N.D. Cal. Jan. 4, 2012) .......................................................... 25, 26

*Homampour v. Blue Shield of Cal. Life & Health Ins. Co.*,
   2016 WL 4539480 (N.D. Cal. Aug. 31, 2016) .......................................................... 18

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   2008 WL 350638 (N.D. Cal. Feb. 2, 2008) .......................................................... 27

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   609 F. Supp. 2d 951 (N.D. Cal. 2009) .......................................................... 6, 8, 13

*Katzberg v. Regents of Univ. of Cal.*,
   29 Cal. 4th 300 (2002) .......................................................... 23

*Ketayi v. Health Enrollment Grp.*,
   2021 WL 2864481 (S.D. Cal. July 8, 2021) .......................................................... 22

*Kirola v. City & Cnty. of S.F.*,
   2021 WL 1334153 (N.D. Cal. Mar. 12, 2021) .......................................................... 5, 10, 13

*Kwikset Corp. v. Super. Ct.*,
   51 Cal. 4th 310 (2011) .......................................................... 24

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
   762 F.3d 867 (9th Cir. 2014) .......................................................... 5, 9

*Language Line Servs., Inc. v. Language Servs. Assoc., Inc.*,
   944 F. Supp. 2d 775 (N.D. Cal. 2013) .......................................................... 25

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*,
   2009 WL 1082175 (N.D. Cal. Apr. 22, 2009) .......................................................... 6, 28

*Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*,
   478 U.S. 421 (1986) .......................................................... 14

*Maadanian v. Mercedes-Benz USA, LLC*,
   2024 WL 1579658 (W.D. Wash. Apr. 11, 2024) .......................................................... 22

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- v -

**GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS**

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Marina Tenants Assn. v. Deauville Marina Dev. Co.*,
181 Cal. App. 3d 122 (1986)..........................................................................................24

*Martinez v. ZoomInfo Techs. Inc.*,
2022 WL 1078630 (W.D. Wash. Apr. 11, 2022) .............................................................22

*Meyer v. Cnty. of S.D.*,
2025 WL 449747 (S.D. Cal. Feb. 10, 2025) ....................................................................23

*Meyer v. Portfolio Recovery Assocs., LLC*,
707 F.3d 1036 (9th Cir. 2012)...........................................................................................7

*MHC Fin. Ltd. P'ship Two v. Santee*,
182 Cal. App. 4th 1169 (2010).........................................................................................23

*Monroe v. Jeffreys*,
2021 WL 50490 (S.D. Ill. Jan. 6, 2021) ..........................................................................14

*Montanile v. Bd. of Tr. of the Nat'l Elevator Indus. Health Benefit Plan*,
577 U..S. 136 (2016) ........................................................................................................18

*Nat'l Org. for Reform of Marijuana L. (NORML) v. Mullen*,
112 F.R.D. 120 (N.D. Cal. 1986) .....................................................................................14

*NetApp, Inc. v. Nimble Storage, Inc.*,
41 F. Supp. 3d 816 (N.D. Cal. 2014) ...............................................................................25

*New Show Studios LLC v. Needle*,
2014 WL 2988271 (C.D. Cal. June 30, 2014) .................................................................26

*Onnyx Pharms., Inc. v. Bayer Corp.*,
2011 WL 4527402 (N.D. Cal. Sept. 21, 2011) ................................................................27

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*,
632 F.3d 1111 (9th Cir. 2011)...........................................................................................7

*Riaz v. Fahoum*,
2025 WL 3123736 (Cal. Ct. App. Nov. 7, 2025)..............................................................24

*Shulman v. Group W Prods., Inc.*,
18 Cal. 4th 200 (1998) .....................................................................................................26

*Silvaco Data Sys. v. Intel Corp.*,
184 Cal. App. 4th 210 (2010)...........................................................................................24

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020)...........................................................................20, 21, 22

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*SunPower Corp. v. SolarCity Corp.*,

4

2012 WL 6160472 (N.D. Cal. Dec. 11, 2012) ................................................................. 25, 26

5

*Synopsys, Inc. v. Real Intent, Inc.*,
2024 WL 4557334 (N.D. Cal. Oct. 2, 2024)........................................................................... 27

6

7

*Teutscher v. Woodson*,
835 F.3d 936 (9th Cir. 2016)............................................................................................... 5, 6

8

9

*In re TikTok, Inc. Consumer Priv. Litig.*,
565 F. Supp. 3d 1076 (N.D. Ill. 2021) ..................................................................................... 12

10

*Top Agent Network, Inc. v. Zillow, Inc.*,
2015 WL 10435931 (N.D. Cal. Aug. 6, 2015) (Seeborg, J.) ................................................... 25

11

*Total Recall Techs. v. Luckey*,

12

2016 WL 199796 (N.D. Cal. Jan. 16, 2016) ........................................................................... 25

13

*Traxler v. Multnomah Cnty.*,
596 F.3d 1007 (9th Cir. 2010)................................................................................................... 6

14

15

*Turrey v. Vervent, Inc.*,
2023 WL 6390620 (S.D. Cal. Sept. 29, 2023) ........................................................................ 22

16

17

*UCAR Tech. (USA), Inc. v. Li*,
2018 WL 2555429 (N.D. Cal. June 4, 2018) .......................................................................... 25

18

*United States v. Kama*,

19

394 F.3d 1236 (9th Cir. 2005)................................................................................................. 20

20

*United States v. Kurbo Inc.*,
Dkt. 15, No. 22-cv-00946 (N.D. Cal. Mar. 3, 2022)............................................................... 13

21

*United States v. Miami University*,

22

294 F.3d 797 (6th Cir. 2002)..................................................................................................... 9

23

*Vasquez v. Rackauckas*,
734 F.3d 1025 (9th Cir. 2013)................................................................................................. 12

24

25

*In re Yahoo Mail Litig.*,
2016 WL 4474612 (N.D. Cal. Aug. 25, 2016)........................................................................ 10

26

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
2020 WL 4212811 (N.D. Cal. July 22, 2020)......................................................................... 14

27

28

*z4 Techs., Inc. v. Microsoft Corp.*,
434 F. Supp. 2d 437 (E.D. Tex. 2006) .................................................................................... 15

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- vii -

**GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS**

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Statutes**

Cal. Penal Code
  § 502 ............................................................................................................ 7
  § 502(e)(1) ................................................................................................. 17

**Other Authorities**

U.S. Const. amend. VII ............................................................................... 5, 27

California Constitution
  Article I, § 1 ................................................................... 17, 23, 24, 26
  Article I, § 3 ................................................................................. 23

Fed. R. Civ. P. 53 ........................................................................................ 14

Rest. (Third) of Restitution & Unjust Enrichment
  § 4 cmt. d (2011) ............................................................................ 18, 19

CooLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- viii -

**GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS**

## I.    INTRODUCTION

Plaintiffs propose a permanent injunction that is wildly disproportionate, technically infeasible, and contrary to the public interest. This extraordinary relief should be denied. Injunctive relief is prospective and requires a showing of imminent, irreparable harm. Here, there is none. This jury's liability finding turned on users' consent, centering on whether Google's disclosures regarding Web & App Activity ("WAA") and Supplemental Web & App Activity ("sWAA") adequately informed users about data collection by Google Analytics when those settings were off. The jury also found that Google's conduct did not violate CDAFA. Yet Plaintiffs do not acknowledge the jury's narrow verdict and seek no amendment to any of the disclosures that formed the evidentiary basis for the liability finding. Even if they did, their request would be moot — Google has proactively and preemptively amended the relevant WAA and sWAA privacy disclosures, which were the subject of extensive testimony and arguments made at trial.

The proposed injunction instead demands that Google cease collecting data essential for Google Analytics for Firebase ("GA4F"), which, as the evidence at trial showed, would cripple a service relied upon by millions of app developers in order to deliver a functional analytics product to consumers. It also demands the deletion of historical, pseudonymized data, something that is (1) technologically impossible without dismantling the very infrastructure designed to protect user privacy by preventing the re-identification of de-identified data, or (2) unduly burdensome by requiring complex coordination between 98 million class members and over one million app developers to obtain the necessary identifiers. These requests, and the other components of the proposed injunction, are unduly burdensome, unnecessary to prevent future harm, and not narrowly tailored to the issues heard by the jury at trial. Plaintiffs fail to meet the stringent standards for a permanent injunction, and their motion should therefore be denied.

Plaintiffs' demand for equitable disgorgement fares no better. *First*, the jury's dismissal of their California Comprehensive Computer Data Access and Fraud Act ("CDAFA") claim shifts the nature of disgorgement in this case from an equitable remedy to a legal one, such that the jury's advisory verdict finding no disgorgement becomes binding. *Second*, even if the remedy is considered equitable, Plaintiffs fail to establish equitable jurisdiction because their legal remedies

Cooley LLP
Attorneys at Law
San Francisco

1

Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-CV-04688-RS

were entirely adequate–as evidenced by Plaintiffs' request at trial for over ***$31 billion dollars*** in compensatory damages. The fact that the jury awarded less than Plaintiffs want is not a basis for finding an inadequate remedy in law, as would be required for equitable jurisdiction. *Third*, disgorgement is not available as a remedy for Plaintiffs' constitutional claim, which does not permit monetary relief; independently, California's Uniform Trade Secret Act ("CUTSA") provides an exclusive remedy for Plaintiffs' remaining claims and thus precludes disgorgement. *Fourth*, the jury's factual findings here should be followed, and likewise preclude disgorgement. *Lastly*, Plaintiffs' actual calculations of revenues, expenses, and profits are all wildly flawed.

## II.    BACKGROUND

### A.    Google Analytics for Firebase Benefits Developers and Users

GA4F is a Google product that helps mobile app developers analyze trends in user engagement with their applications. Trial Tr. ("Tr.") Aug. 26 (Ganem) 1129:11–21. The GA4F data that developers gain is highly valuable because it provides insight into how users interact with their apps and which features or content resonate most. *Id*. These insights allow developers to refine and improve their products—benefiting both developers, by supporting the growth of their businesses, and users, by delivering more functional and effective apps. *Id*. Google thus serves as a data processor, analyzing app-level trends to provide developers with aggregated metrics.

How GA4F data is stored on Google's servers depends on each user's consent settings. When Web & App Activity ("WAA") or Supplemental Web & App Activity ("sWAA") is turned off, Google does not collect the user's unique Google domain identifier ("GAIA ID") and does not save app event activity to that user's Google Account. *See, e.g.*, Tr. Aug. 19 (Monsees) 307:10–14; Tr. Aug. 26 (Ganem) 1137:4–15. Instead, the information is stored in pseudonymous, de-identified logs. Tr. Aug. 26 (Ganem) 1162:1–4. If sWAA is on, the data is stored separately in logs with identifying information, and Google may associate app-activity data with the user's account. *Id*. As Google's witnesses explained, "[i]f the data is de-identified, we wouldn't know who to show it to because there's no ID associated with it. We wouldn't know [if] it's your data or my data." Tr. Aug. 19 (Monsees) 312:1–3; *see also* Tr. Aug. 26 (Ganem) 1167:8–12 ("If sWAA is off, we don't collect Google's identifier GAIA, and we don't save that user's activity to their Google Account.").

Cooley LLP
Attorneys at Law
San Francisco

2

**Google's Opp. to Pls.' Mot. for Perm. Inj. and Disgorgement 3:20-cv-04688-RS**

### B.    Google's Infrastructure Prevents Joinability of GA4F Data

Google's infrastructure is specifically designed to protect user privacy, and Google has constructed a complex system to ensure that users' privacy choices are respected. The GA4F data collection system conducts consent checks, allowing Google to determine if a specific data packet from a particular app on a given phone is associated with a user who has a Google Account with WAA and/or sWAA-off. Tr. Aug. 26 (Ganem) 1167:13-1168:18. On a technical level, the process works like this: Each GA4F data packet contains an encrypted identifier for that user that can only be decrypted by Google's consent-check server. *Id*. As part of the consent check, that encrypted identifier is separated from the data packet immediately upon reaching Google's servers such that the user's activity data and their decrypted identifier are never combined without permission. *Id*. The consent-check server maps that token to a user's account to check its WAA and sWAA settings, and Google does not store or log this data while the consent check is underway. *Id*. Once the consent check is complete, the consent server returns that result back to the Google Analytics server so that it knows what it can or cannot do with that user's data. *Id*.

If Google retains the requisite permissions to store the GA4F data generated by user activity on apps, this data is then stored in accounts that are created by GA's app developer customers. At trial, Google's witnesses described this data storage using the analogy of an apartment building, where each individual apartment corresponds to a business that created a Google Analytics account. Tr. Aug. 26 (Ganem) 1131:4-11. Once app developers send this GA4F app event data to Google's servers, Google compartmentalizes the data and keeps each app developer's data separate from the GA4F data Google receives from other developers. *Id.* at 1131:12-14. There are technical barriers in place to compartmentalize the data and ensure that there is no unintentional or intentional intermingling of the data, including encryption protocols, that limit who can access this data. *Id*.; *see also id.* at 1133:23-1134:15. For example, Google uses different encryption keys to encrypt the data in each "apartment," so that even where pseudonymous identifiers are common among different apps, the identifiers stored within each apartment are different. *Id*. Furthermore, Google uses a technique called "scrubbing," which makes sure that there is no possible way to link identifiers across sWAA-on and sWAA-off logs. *Id.* at 1178:7-22. These designs ensure that it is

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    technologically impossible to re-identify users based on their de-identified data. No witness at trial

2    identified a single instance of sWAA-off data ever being re-identified.

3    ### C.    Google Does Not Profit From sWAA-Off Data

4    Plaintiffs theorized at trial that Google profited from tracking ad conversions using sWAA-

5    off data. *See, e.g.*, Tr. Sept. 2 (Closing Argument) 1897:14-1898:2. The evidence, however,

6    demonstrated that Google does not. Multiple witnesses testified at trial that Google does not charge

7    for conversions in connection with any of the challenged ad campaigns encompassed by Plaintiffs'

8    theories; Plaintiffs did not dispute this fact. *See, e.g.*, Tr. Aug. 26 (Ganem) 1143:13–1144:2 (stating

9    that conversion measurement is a free product available to all app developers; *id.* at 1175:4–10

10   (testifying that Google does not make any more or less money based on whether an ad results in a

11   conversion); Tr. Aug. 29 (Black) 1729:5–11 (similar). Belinda Langner, Google's director of

12   product management for App Campaigns, explained the process of conversion measurement to the

13   jury, clarifying that Google gets paid when a user is served an ad or clicks on it (which is *not* a

14   conversion event), but is not paid upon conversion events like app downloads.

15   Ms. Langner also explained (repeatedly) that a conversion event is one where an advertiser

16   gets a user to eventually take an action within the advertiser's app. *See* Tr. Aug. 27 (Langner)

17   1330:19–1337:5. Specifically, an interaction with an advertiser's *ad* (such as an ad click) is distinct

18   from a resulting interaction with an advertiser's *app* (the ad conversion). *See, e.g.*, *id.* at 1334:11–

19   17. As Ms. Langner testified, Google is paid for the initial interaction with an ad (whether simply

20   serving the ad to a user or something like a click), and simply measures and reports to the advertiser

21   any subsequent conversion. *See id.* at 1291:1–1292:1, 1298:2–1299:2.

22   Further, Ms. Langner informed the jury that Google's statistic of the "percent of ad revenue

23   [] attribut[able] to Google Analytics for Firebase conversion measurement" is not a figure about

24   *Google's* revenues or profits derived from conversion tracking (a free service); rather, it is a statistic

25   for advertisers about the percentage of the *advertiser's upfront ad* spending that eventually results

26   in a desired conversion event. *See id.* at 1313:19-1314:7. Accordingly, the linchpin of Plaintiffs'

27   disgorgement numbers is baseless and cannot support their numbers.

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

### III.    LEGAL STANDARD

#### A.    Injunctive Relief

"Injunctive relief, whether temporary or permanent, is an 'extraordinary remedy, never awarded as of right.'" *Kirola v. City & Cnty. of S.F.*, 2021 WL 1334153, at \*27 (N.D. Cal. Mar. 12, 2021), *aff'd in part, rev'd in part*, 2023 WL 2851368 (9th Cir. Apr. 10, 2023) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008)). An injunction "is a precise tool to fix a precise injury," and "should be 'narrowly tailored' to remedy the specific harm a plaintiff has identified 'rather than to enjoin all possible breaches of the law.'" *Facebook, Inc. v. OnlineNIC Inc.*, 2022 WL 2289067, at \*17 (N.D. Cal. Mar. 28, 2022), *rep. & rec. adopted*, 2022 WL 17371092 (N.D. Cal. Oct. 17, 2022) (quoting *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)). A plaintiff seeking a permanent injunction must demonstrate that "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "While '[t]he decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court,'" equitable principles "demand a fair weighing" of these factors, "taking into account the unique circumstances of each case." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 880 (9th Cir. 2014) (quoting *eBay*, 547 U.S. at 391). "It is important to consider the totality of circumstances bearing on whether a permanent injunction is appropriate equitable relief." *Id.*

#### B.    Disgorgement

The Seventh Amendment requires that courts "abide by the jury's findings of fact in making any subsequent rulings" following a trial. *Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016) (citation omitted). "[I]n a case where legal claims are tried by a jury and equitable claims are tried by a judge, and those claims are based on the same facts, the trial judge must follow the jury's implicit or explicit factual determinations in deciding the equitable claims." *Id.* (quoting *L.A. Pol. Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993)) (citation modified).

Beyond the requirement that the Court accept the jury's findings of fact underlying a verdict

Cooley LLP
Attorneys at Law
San Francisco

5

Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-cv-04688-RS

on a legal claim, the Court may also be guided by the jury's advisory verdict on an equitable issue, so long as it independently makes the ultimate decision. *See Traxler v. Multnomah Cnty.*, 596 F.3d 1007, 1013 (9th Cir. 2010); *see also Teutscher*, 835 F.3d at 957 n.16 ("[T]he question of equitable front pay could perhaps have been tried to the district court with an advisory jury . . . so that the district court would be guided by the jury's non-binding front pay finding should reinstatement prove infeasible.") (citing *Traxler*, 596 F.3d at 1013); *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 2009 WL 1082175, at *1 (N.D. Cal. Apr. 22, 2009) ("The Court is free to accept or reject the advisory jury's findings, in whole or in part, and is obligated to make its own independent assessment of the issues submitted to the advisory jury.") (citations omitted), *rev'd on other grounds*, 633 F.3d 1158 (9th Cir. 2011).

## IV.    ARGUMENT

### A.    Plaintiffs Are Not Entitled to Injunctive Relief

#### 1.    Google has made changes to its privacy disclosures to address future concerns, so there is no continued harm.

"By its nature, injunctive relief is prospective." *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 968 (N.D. Cal. 2009) (denying permanent injunctive relief). This remedy is "unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983).

It's hard to remember after reading their brief, but Plaintiffs' complaint at trial was that Google's WAA and sWAA *disclosures*, and in particular its Activity Controls page and revocation text, did not *adequately warn* users that Google could continue to collect data through Google Analytics when sWAA was off. *See, e.g.*, Tr. Aug. 25 (Rodriguez) 816:15–23; Tr. Aug. 20 (Santiago) 490:16-491:14; *see also* PX-084 (Activity Controls Page); PX-104 (sWAA disclosure); PX-113 (same); *see also* Dkt. 289 (Fourth Amended Complaint) ¶¶ 96-97 (alleging that "[b]ased on Google's disclosures . . . Plaintiffs and Class Members could not possibly have consented to Google's collection of their communications and other interactions with apps on their mobile devices when they turned the 'Web & App Activity' switch to off"). This was never a freestanding

Cooley LLP
Attorneys at Law
San Francisco

6

Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-CV-04688-RS

privacy case; it was tied to a claim that Google misled users and failed to obtain consent. Now, Google has amended the language of its WAA and sWAA disclosures on the Activity Controls page to emphasize that even when the WAA and/or sWAA settings are toggled to "off," Google may still collect and use data that is not associated with a user's account.[1] *See* Declaration of David Monsees ("Monsees Decl."), ¶¶ 5-13; *see also* Mot. 10-11 (claiming irreparable harm because "Google has not made any material changes" to its relevant disclosures). This change to the privacy disclosures at the heart of this case moots Plaintiffs' request for injunctive relief, since it eliminates any "continued violation"—and thus the threat of class members being prospectively harmed. *See* Mot. 9; *see also Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*, 632 F.3d 1111, 1123 (9th Cir. 2011) (quoting *S.E.C. v. Koracorp Indus., Inc.,* 575 F.2d 692, 701 (9th Cir. 1978)) ("there is '[n]o per se rule requiring the issuance of an injunction upon the showing of [a] past violation.'"). With adequate disclosure, Google's collection and use of sWAA-off data is not *per se* "impermissible." Mot. 9-10. In light of the changes to Google's disclosures, Google's collection and use of sWAA-off data cannot be said to cause irreparable prospective harm.[2]

Even absent disclosure changes, Plaintiffs fail to show how any class member could be irreparably harmed going forward. sWAA-off users were directly informed that "Plaintiffs allege that regardless of whether Class Members had [the WAA and sWAA] settings paused or turned off, Google collected app activity data using certain code embedded within many non-Google apps." *See* https://www.googlewebappactivitylawsuit.com/. In other words, post-Class Notice, class members were aware of Plaintiffs' allegations. *See* Dkt. 440 (Order Modifying the Notice Period and Deadlines) at 2 (setting class notice deadline of December 22, 2024); *see also* Dkt. 465 (Azari Decl.) (describing class notice as complete as of March 20, 2025). Any collection of Google

---

[1] As the trial testimony showed, even before these recent changes were made, this data collection was nonetheless disclosed to users at the moment they opted to turn their WAA or sWAA settings off. Tr. Aug. 27 (Hoffman) 1380:14-1381:24; 1388:1-1389:21.

[2] Plaintiffs cited cases also find that irreparable harm involving data collection occurs only absent consent. Since Google has updated its disclosures to clarify its data collection for users, there is no ongoing harm. *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1044 (9th Cir. 2012) (finding class members would suffer irreparable harm due to data collection "**without their consent**") (emphasis added); *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019) (finding "Facebook has suffered irreparable harm because of Defendants' violations of the CFAA and § 502. Specifically, in accessing Facebook's computers **without authorization**") (emphasis added).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

Analytics data from class members was consented to at least from the date of class notice forward.

Plaintiffs' other arguments regarding irreparable harm also fail. Despite Plaintiffs' repeated attempts to invoke the specter of cybersecurity risks, this case is simply not about a data breach, and any argument regarding the irreparable harm of any such hypothetical breach should be soundly disregarded. *See* Mot. 10. Dr. Hochman, Plaintiffs' technical expert, testified that he was "not here to testify that there was a data breach of the data in question in this case," (Tr. Aug. 21 (Hochman) 711:22-23), and that he knew "of no incident where sWAA-off data collected by Google has been leaked," (*id.* at 749:13-16). *See also* Tr. Aug. 20 (Santiago) 546:6-11. And in fact, Plaintiffs ultimately declined to call Mr. Schneier, their expert who would have testified about the cybersecurity risk of data breaches. Their cited case is easily distinguishable for multiple reasons: (1) it concerns the risk of breaches obtaining data of the same type at issue in that case, (2) it deals with a situation where "improper access … [had] already been granted," and (3) the court there found the defendants to have a "careless approach toward cybersecurity[,]" which is not a finding that has been made here against Google. *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 682 (S.D.N.Y. 2025). To the contrary, Google maintains sophisticated infrastructure specifically designed to protect user privacy. Tr. Aug. 26 (Ganem) 1167:13-1168:18. Finally, Plaintiffs argue that the "highly sensitive nature" of the data demonstrates irreparable harm. Mot. 10. But the data collected when sWAA is off is de-identified and stored in logs that are separate from any user account information. Tr. Aug. 26 (Ganem) 1137:7-15; *see also id.* at 1130:24-1131:14 (describing how the data Google Analytics stores for apps is kept separately from Analytics data belonging to other apps).

### 2. Plaintiffs have sufficient remedies at law.

Because Plaintiffs' harm is not ongoing, an injunction is an inappropriate remedy. *See supra* at Section IV(A)(1); *Hynix Semiconductor*, 609 F. Supp. 2d at 968 ("By its nature, injunctive relief is prospective."). The jury's damages award is adequate to compensate Plaintiffs and class members for any past harm. Dkt. 670 ("Verdict"), at Q.5 (awarding $425,651,947.00 in monetary damages). Injunctive relief is unnecessary and should not be granted. Plaintiffs claim that "this jury's ability to award money damages was limited" due to their expert's calculation of damages based on a

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

single month of data collection per class member. Mot. 11. But after sitting and listening to opening arguments, seven days of evidence, and closing arguments, the jury was explicitly instructed to award a damages amount that "will reasonably and fairly compensate the Plaintiffs for any injury you find Google caused." Dkt. 666 ("Jury Instructions") at Inst. No. 22. And Plaintiffs' counsel asked the jury in no uncertain terms to award far more than the $425 million on the final verdict, by adjusting both the amount per month and the number of months for which damages were warranted. Tr. Sept 2 (Closing Argument) 1896:1-9. In fact, Plaintiffs' counsel told the jury during closing arguments that "the only hard evidence that's in the record" indicated that there were "59.5 months" of data collection, and that the jury should therefore award "[$]31.15 billion" in damages. *Id*. at 1896:1-2. The jury understood that it was within the bounds of their charge to award a higher amount in damages. They chose not to. Indeed, the jury did exercise its discretion in assigning damage amounts, awarding $4.50 per class member for Class 1, and $2.99 per class member for Class 2, amounts different from the expert's calculation of $3 per individual. *See* Verdict Q.5. The jury could have awarded more in damages if it saw fit. Their award is adequate to compensate Plaintiffs and class members for Google's conduct.

Plaintiffs' cited cases are inapposite. *United States v. Miami University* is inapplicable since that court found injunctive relief appropriate in a case where it was "nearly impossible to obtain voluntary compliance." 294 F.3d 797, 819 (6th Cir. 2002). Here, Google can remedy the claimed harm by amending its relevant disclosures (which it has done). Nor is there a "reasonable likelihood of defendant's future violations[,]" given Google's affirmative steps to amend its disclosures. *Power Ventures, Inc.*, 252 F. Supp. 3d at 783, *aff'd*, 749 F. App'x 557 (citation omitted); *see also DISH Network L.L.C. v. Fineman*, 2017 WL 2060010, at *3 (C.D. Cal. Mar. 22, 2017).

### 3. The balance of hardships tips sharply in Google's favor.

Plaintiffs seek four primary measures of injunctive relief, each of which is unduly burdensome and not narrowly tailored. These requests should be denied. *See La Quinta Worldwide*, 762 F.3d 867 at 880 ("the traditional principles of equity' demand a fair weighing of the factors[,] taking into account the unique circumstances of each case."); *see also GS Holistic, LLC v. Puff N Go Gift Shop LLC*, 2023 WL 4146232, at *6 (N.D. Cal. June 22, 2023), *rep. & rec. adopted*, 2023

Cooley LLP
Attorneys at Law
San Francisco

9

Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-cv-04688-RS

WL 6933625 (N.D. Cal. Aug. 23, 2023) ("Injunctive relief . . . should be narrowly tailored").

### a. The Court should not enjoin Google from collecting and saving sWAA-off data.

Plaintiffs' request to "enjoin Google from collecting and saving sWAA-off data" is improper and not narrowly tailored. Mot. 9. As previously discussed, there is nothing unlawful about Google's collection and use. *See supra* at 6–7. Instead, the language of Google's privacy disclosures determines whether or not this collection and use is proper, and although this continued data collection was previously disclosed to users, Google has made further changes to its disclosures in order to further clarify this. Monsees Decl. ¶¶ 5, 7, 9, 11, 13; *see also supra* at 7 & n.1. Moreover, as explained above, Class Notice remedied any ambiguity or uncertainty in Google's disclosures, rendering any go-forward collection a consented-to collection. *Supra* at 7–8. Thus, Plaintiffs' requested relief is unduly burdensome and should be denied. Plaintiffs cite two cases, both of which are readily distinguishable because they reference the terms of a settlement agreement, not an injunction ordered by a court. *In re Google Inc. St. View Elec. Commc'ns Litig.* ("*St. View*"), 21 F.4th 1102, 1108 (9th Cir. 2021); *In re Yahoo Mail Litig.*, 2016 WL 4474612, at *3 (N.D. Cal. Aug. 25, 2016). A court's injunction is an "extraordinary remedy" that is held to a higher standard than a settlement voluntarily entered by a party. *Kirola*, 2021 WL 1334153, at *27.

### b. Requiring Google to delete sWAA-off data is unduly burdensome.

Plaintiffs ask for Google to be required "to delete the sWAA-off data it has collected." Mot. 9. This request is unduly burdensome and should be denied for at least three reasons.

**First**, ordering Google to delete all existing sWAA-off data of class members would be unduly burdensome, including because it would require Google to re-engineer its systems infrastructure. *See* Tr. Aug. 26 (Ganem) 1167:13-1168:18. To protect user privacy, Google maintains various technical barriers to avoid re-identifying de-identified user data, barriers that would need to be dismantled and fundamentally restructured in order to comply with any court order along the lines Plaintiffs request. *Id.*; *see also* Tr. Aug. 27 (Ganem) 1254:1-1255:6. Requiring Google to make these changes would be an absurd result, particularly in light of the nature of the claims at issue here, since these barriers are in place to *protect* user privacy.

Cooley LLP
Attorneys at Law
San Francisco

10

Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-CV-04688-RS

For the main analytics and ads logs in question, the only ways Google could determine that any individual entry was made when the Google user had sWAA off would be either to (1) rejoin pseudonymous and GAIA-tied data Google-wide using some type of new, non-existent technological solution, causing a privacy incident of unprecedented scale, or to (2) ask each and every user to provide Google with their unique pseudonymous identifiers, as the named Plaintiffs did here, for the limited purpose of deleting data associated with them (followed by a process of query and deletion also unprecedented in scale). *See* Dkt. 391-1 (Google's 4th Suppl. R&Os to Interrogatories, Set 1) at 11-13 (describing the duplication of logs during the consent check process and noting that "[t]he result is that the two logs don't overlap identifiers that could be used to join the logs together"); *see also* Dkt. 364-20 (Expert Rep. of John Black) ¶¶ 99, 102; Tr. Aug. 26 (Ganem) 1206:13-1207:22; *Id*. Aug. 27 (Ganem) 1254:1-1255:6.[3] Just collecting these identifiers from the 98 million putative class members would be a massive and unduly burdensome logistical undertaking. Taking 98 million+ identifiers and querying Google's logs to remove only entries associated with them would be even more burdensome and logistically impossible. And compounding this difficulty, many class members had WAA or sWAA off sporadically at various points throughout the class period (including Plaintiffs), which makes it even more difficult to determine which data was collected when sWAA was toggled off. Tr. Aug. 20 (Monsees) 407:4-7; *Id*. (Santiago) 501:17-502:25; *Id*. Tr. Aug. 21 (Rodriguez) 769:4-770:11. Google would have to not only query logs for 98 million+ identifiers, but then also map that onto the times when the user had sWAA off, confirm the user had the same device at the time, and then query the logs. *See* Dkt. 391-1 (Google's 4th Suppl. R&Os to Interrogatories, Set 1) at 11-13.

*Second*, Plaintiffs' proposal contravenes the jury's finding that Google had permission to collect the data. The jury's verdict was narrow: while it found privacy violations, it rejected CDAFA violations. *See* Verdict. In other words, while the jury found that Google had not proven its affirmative defense of consent, it found that Plaintiffs failed to prove that Google had acted "without permission." *Id*. The Court's injunctive relief should be consistent with that narrow result.

---

[3] However, even if class members *did* provide Google with their identifiers, Google could not even re-identify this data for post-iOS 14.5 users who turned Apple's App Tracking Transparency feature off. Tr. (Langner) 1295:18-1296:4.

Cooley LLP
Attorneys at Law
San Francisco

11

Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-CV-04688-RS

1  Ordering Google to delete past-collected data—data the jury *disagreed* was collected "without

2  permission"—would eviscerate the jury's narrow, balanced approach toward Google's conduct.

3  **Third**, the at-issue GA4F data Plaintiffs want deleted is not owned by Google—

4  contractually, it belongs to app developers. *See* Tr. Aug. 26 (Ganem) 1130:24-1131:3. At trial,

5  Plaintiffs' technical expert Dr. Hochman testified that there are "2.3 million different apps out

6  there," and that the average user's chance of using an app containing GA4F during the class period

7  "is better than 99.9 percent." Tr. Aug. 21 (Hochman) 585:22-586:24. Under the GA4F terms,

8  Google would need to seek permission from each of the many app developers who use GA4F to

9  delete subsets of their GA4F data. Tr. Aug. 26 (Ganem) 1130:24-1131:3. Managing outreach and

10 deletion with each app developer, for each of the 97,992,376 Class Members, would be extremely

11 burdensome. And, again, this would only be possible *after* Google had re-structured its

12 infrastructure, or collected identifiers from 98 million individuals and then mapped those identifiers

13 with any relevant data. *Id*.; *see also* Tr. Aug. 27 (Ganem) 1254:1-1255:6. Alternatively, to satisfy

14 Plaintiffs, the Court would have to override the settled expectations of those app developers under

15 contract, and order their property deleted without providing them notice and an opportunity to be

16 heard. *Armstrong v. Brown*, 768 F.3d 975, 979–80 (9th Cir. 2014) (before issuing injunctive relief,

17 the court must provide the affected party with notice and an opportunity to be heard); *Vasquez v.*

18 *Rackauckas*, 734 F.3d 1025, 1045 (9th Cir. 2013) (due process principle regarding hearing applies

19 also to non-parties, and a "permanent [injunction] … compounds the deprivation" of rights).

20 Plaintiffs' analogies to settlement agreements are inappropriate here also, as settlement

21 agreements are distinct from Court-ordered permanent injunctions. *See* Mot. 14 (citing Settlement

22 Agr. at 8, *Brown v. Google*, No. 20-cv-03664 (N.D. Cal. Apr. 1, 2024), Dkt. 1097-4 ; *St. View*, 21

23 F.4th at 1108; *In re Facebook Internet Tracking Litig.*, 2022 WL 16902426 at *4 (N.D. Cal. Nov.

24 10, 2022); *In re TikTok, Inc. Consumer Priv. Litig.*, 565 F. Supp. 3d 1076, 1082 (N.D. Ill. 2021).

25 Plaintiffs' references to any hypothetical risks of data breaches are misplaced. *See supra* at 8.

26 References to the risk of artificial intelligence should be disregarded. Permanent injunctive relief

27 must be "narrowly tailored" rather than levied to "enjoin all possible breaches of the law."

28 *Facebook, Inc.*, 2022 WL 2289067, at *17; Mot. 15. An argument based on the conjectural and

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

hypothetical harm of Google potentially, one day, using sWAA-off data for LLM training, with nothing but speculation as support, is designed only to inflame and should be given no weight.

### c. The request to "destroy the algorithms, models, and services created or modified" is unduly burdensome.

Plaintiffs' request for Google "to destroy the algorithms, models, and services created or modified using sWAA-off data" is incomprehensible. Their motion devotes no more than a single paragraph—notably devoid of any real detail—to this request. Mot. 15-16.  Plaintiffs also overlook the fact that their own damages model—which the jury relied on in making its award—is based on the alleged value of data, including any use of that data to build algorithms, models and services. *See, e.g.*, Tr. Aug. 25 (Lasinski) 955:16-18. Any past usage is thus adequately remedied by the jury's damages award. Because "injunctive relief is prospective" and any prospective usage of sWAA-off data has been disclosed to users in Google's updated disclosures, Plaintiffs' request for an injunction is moot. *Hynix Semiconductor Inc.*, 609 F. Supp. 2d at 968; Monsees Decl. ¶¶ 5, 11, 13; *see also supra* at Section IV(A)(1).

This request is conjectural, unrelated to the jury's findings in this case, and seeks "extraordinary" relief for a hypothetical injury. *Kirola*, 2021 WL 1334153, at *27 (citing *Winter*, 555 U.S. at 24).[4] It is therefore an inappropriate basis for injunctive relief and should be rejected out of hand. *See, e.g.*, *eBay*, 547 U.S. 388 at 391 (injunctive relief is appropriate only if a "plaintiff . . . demonstrate[s] . . . it has suffered an irreparable injury"). It would be unreasonable to destroy and rebuild any such product from scratch—not to mention impractical, disruptive to Google's users, and burdensome, with no actual benefit to users. Tr. Aug. 26 (Ganem) 1155:23-1156:1. And it would be contrary to the jury's narrow approach that rejected CDAFA liability. *Supra* at 11–12.

Plaintiffs again rely on settlement agreements, which are distinguishable from Court-ordered permanent injunctions. Settlements are not fair precedent here because they reflect a negotiated compromise, not a judicial determination of wrongdoing or entitlement to relief. Order at 8, *United States v. Kurbo Inc.*, No. 22-cv-00946 (N.D. Cal. Mar. 3, 2022), Dkt. 15, at 8; Decision at 5, *In the Matter of Everalbum, Inc.*, (May 6, 2021) FTC Dkt. No. C-4743.

---

[4] Indeed, Plaintiffs' own technical expert testified that Google in fact uses de-identified data for fraud protection. Tr. Aug. 21 (Hochman) 716:23-717:6.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

### d.    A third-party monitor is unduly burdensome and unnecessary.

This Court should deny Plaintiffs' request for injunctive relief outright. If, however, Plaintiffs' request is granted, no third-party monitor should be appointed to police compliance. The appointment of a monitor is an extraordinary remedy reserved for defendants who have demonstrated an unwillingness to comply with court orders or have proved resistant or intransigent, neither of which is the case here. Indeed, Google *already* modified its disclosures in advance of the briefing in this matter. *See Monroe v. Jeffreys*, 2021 WL 50490, at *2 (S.D. Ill. Jan. 6, 2021) (declining to appoint monitor where defendants were "working diligently to implement the Court's" ordered injunctive relief); *cf. Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 422 (1986) (appointing monitor due to "established record of resistance to prior state and federal court orders"); *Nat'l Org. for Reform of Marijuana L. (NORML) v. Mullen*, 112 F.R.D. 120, 121 (N.D. Cal. 1986) (appointing special master where there was "evidence of noncompliance with an injunction that first issued nearly a year earlier"); *see also* Fed. R. Civ. P. 53 Adv. Comm. Notes to 2003 Amendment ("Reliance on a master is appropriate when a complex decree requires complex policing, particularly when a party has proved resistant or intransigent."). Under the Federal Rules, the "appointment of a master must be the exception and not the rule." Fed. R. Civ. P. 53 Adv. Comm. Notes to 2003 Amendment (describing this limit as "[t]he core" of Rule 53).

Plaintiffs' claim that such appointment is "common" and their encouragement that this Court "rely on its inherent equitable powers (rather than Rule 53) to make this appointment" is merely an attempt to circumvent this guidance. Mot. 16. In any event, Plaintiffs have adduced no evidence that Google is "resistant or intransigent" to complying with a proper court order.[5] A monitor would only create administrative burden and drive up costs, and should be denied.[6]

---

[5] Plaintiffs cite as support the injunction entered by Judge Donato in *In re Google Play Store Antitrust Litig.*, which required the appointment of a monitoring committee. No. 20-cv-5761 (N.D. Cal.), Dkt. 702, at 3-4. But that case was a complex multidistrict litigation with an injunction requiring extensive technological changes. Plaintiffs again also cite settlement agreements as support for their request for a court-ordered permanent injunction. These circumstances are distinct for the reasons explained above, and these examples should be disregarded. *Supra* at 12–13; *Adkins v. Facebook, Inc.*, 2021 WL 1817047, at *6 (N.D. Cal. May 6, 2021); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 WL 4212811, at *10 (N.D. Cal. July 22, 2020).

[6] Indeed, Plaintiffs request that Google be ordered to cover all costs, "including any attorneys' fees and costs," serves only to generate more fees for plaintiffs' counsel and should be disregarded. Mot. 16. Even the injunction in *In re Google Play Store Antitrust Litig.*, which Plaintiffs cite, does not

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

1

**e.    Applying this injunction to any entity other than defendant Google LLC is not narrowly tailored.**

Plaintiffs' request that this injunction apply "to Google LLC and each of its parent, affiliated, and subsidiary entities" should be rejected as overbroad. Dkt. 700-5 (Prop. Injunction) at 1 ¶ 1. Permanent injunctive relief must be "narrowly tailored" rather than levied to "enjoin all possible breaches of the law." *Facebook, Inc.*, 2022 WL 2289067, at *17. The defendant in this case was Google, LLC, not Google's parent company Alphabet nor any of Google's subsidiaries. *See* Dkt. 54 (granting stipulated dismissal of all claims against Alphabet). There is no evidence in the record that Google has ever actually set up a new entity just to shirk a court order, *see* Mot. 17; any injunction based on pure speculation is improper and should be denied.

**4.    Public policy does not favor injunctive relief.**

The Court must "look at [the public interest] factor separately, not simply as part of the balancing of hardships," and this inquiry "primarily addresses impact on non-parties rather than parties." *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003). Here, two large groups of non-parties—the app developers who rely on tools like GA4F to improve their products for consumers, and the consumers who rely on these apps—would be harmed by Plaintiffs' requested injunctive relief. Even though this data is stored by Google, it belongs to the app developers. Tr. Aug. 26 (Ganem) 1130:24-1131:3. The injunctive relief sought by Plaintiffs would severely damage GA4F, harming app developers by denying them essential metrics and thereby harming consumers. Tr. Aug. 26 (Ganem) 1142:19-1143:12. These "potential negative effects on the public weigh . . . against granting an injunction." *z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 444 (E.D. Tex. 2006) (denying proposed injunctive relief).

Plaintiffs claim that there is a public policy in favor of ensuring that any data access is consensual, but this concern is remedied by Google's preemptive disclosure changes. *See Power Ventures*, 252 F. Supp. 3d at 785; *Facebook, Inc. v. Solonchenko*, 2022 WL 18491616, at *8 (N.D. Cal. Dec. 29, 2022). And contrary to Plaintiffs' assertions, Google does not have "a culture of

---

place the entire financial burden on Google. No. 20-cv-05671 (N.D. Cal.), Dkt. 702, at 3-4 (requiring each party to "bear the cost of compensating their respective party-designated" monitor, and to pay the third monitor's fees "in equal share").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

1    ignoring privacy concerns." The evidence at trial demonstrates the opposite: Google is a company

2    where leadership prioritizes user privacy and strives to create a clear privacy landscape. *See, e.g.*,

3    Tr. Aug. 20 (Monsees) 401:18-19 (testifying that Google "updated our descriptions, tried to make

4    them, you know, clearer for users"); Tr. Aug. 27 (Ganem) 1263:14-17 (testifying that if Google

5    started to mishandle data by reidentifying pseudonymized information, he "would quit"). Plaintiffs

6    grossly mischaracterize PX-42, an email sent by former employee Sam Heft-Luthy, to suggest that

7    Google's goal is to pull the wool over users' eyes, when Mr. Heft-Luthy actually testified at trial

8    that Google "wanted to make sure we weren't just doing that." Tr. Aug. 26 (Heft-Luthy) 1063:15-

9    22. And Plaintiffs once again place outsized importance on PX-6, a compendium of unauthenticated

10   hearsay that documented conversations at a "very high level" and was not intended to analyze the

11   WAA or sWAA settings. *See* Tr. Aug. 26 (Heft-Luthy) 1082:21-1083:6; *see also* PX-6 at 2

12   (describing "always working with the Privacy Council to make sure they do the right thing").

### B.    Equitable Disgorgement is Not Available to Plaintiffs

14        Plaintiffs' motion for the Court to grant them equitable disgorgement of $2.36 billion fails

15   for myriad reasons: (1) disgorgement—a remedy that is inherently difficult to categorize—has

16   shifted to be a legal remedy that the Court cannot grant; (2) the Court does not have equitable

17   jurisdiction to grant disgorgement even if it were still an equitable remedy; (3) Plaintiffs'

18   constitutional claim does not support a remedy involving monetary relief; (4) Plaintiffs' claims are

19   superseded by—and no remedy is available because of— CUTSA; (5) the jury's implicit factual

20   findings should be honored; and (6) Plaintiffs' calculations are entirely unreliable.

### 1.    Without a CDAFA claim, disgorgement here is a legal remedy.

22        The Court last addressed the issue of whether disgorgement is a legal or equitable remedy

23   in this case in its omnibus pre-trial order, which denied Google's motion *in limine* to preclude

24   evidence and arguments regarding disgorgement. *See* Dkt. 587 ("Pre-Trial Order"), at 9–12. The

25   Court reasoned that although disgorgement "appeared" to be an equitable remedy here, such that

26   the ultimate determination of any award would rest with the Court, there was sufficient uncertainty

27

28

Cooley LLP
Attorneys at Law
San Francisco

16

**Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-CV-04688-RS**

as to the nature of the remedy to warrant an advisory jury verdict on the issue. *See id.* at 11.[7]

That uncertainty is now resolved. The jury delivered a verdict that Google is *not* liable under CDAFA, thereby removing the only claim in this case that supported an equitable disgorgement remedy. In addition, Plaintiffs did not—and continue assert that they need not—trace any particular profits to particular data, which is the form of disgorgement that sits in equity. Lastly, the remaining claims for which Google was found liable are privacy claims sounding in the California constitution and in tort law, for which any disgorgement is, at most, a legal remedy. Accordingly, disgorgement was a *legal* issue properly before the jury, and the jury's verdict that Plaintiffs are not entitled to disgorgement must be upheld.

### a.    The Court's two reasons for finding disgorgement an equitable remedy no longer apply.

The Court's pre-trial determination that disgorgement appeared to be an equitable remedy rested on two bases, neither of which applies post-trial. *First*, the Court agreed with Google that the language of CDAFA necessarily made disgorgement an equitable remedy. *See* Dkt. 520 ("MIL No. 2")[8], at 3–5; Pre-Trial Order 10–11 ("[T]he only statutory claim in this case permits 'compensatory damages and injunctive relief or other equitable relief,' *see* Cal. Penal Code § 502(e)(1), suggesting that the *only* way disgorgement could be granted on that claim would be as equitable relief."). The jury found that Google did not violate CDAFA. *See* Verdict Q.1. Accordingly, the CDAFA claim and its remedies are no longer at issue here, and disgorgement may not be deemed equitable on that account. *See Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) (explaining that whether remedies like disgorgement are "legal or equitable depends on 'the basis for the plaintiff's claim' and the nature of the underlying remedies sought") (quoting *Reich v. Cont. Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994) (citation modified)).

*Second*, the Court understood that Plaintiffs "intend[ed] to argue that particular funds Google has—*i.e.*, those it generates through use of their data []—are traceable to the particular data that Defendant allegedly collected and used without Plaintiffs' permission or consent." Pre-Trial

---

[7] In denying the motion *in limine*, the Court also found there might be overlap between the elements of Plaintiffs' CDAFA claim and the disgorgement inquiry. Pre-Trial Order at 11.

[8] Google's MIL No. 2 was premised on the equitable nature of disgorgement as a remedy for a CDAFA violation, and did not address Plaintiffs' other claims. *See generally* MIL No. 2.

Cooley LLP
Attorneys at Law
San Francisco

17

Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-cv-04688-RS

Order 10. "Traceability" generally implies an equitable remedy—"ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Great-W. Life & Annuity Ins.*, 534 U.S. at 213; *see also* Pre-Trial Order 10 (same). But "[i]f restitution to the claimant is accomplished exclusively by a judgment for money, without resort to . . . remedial devices" such as constructive trust or equitable lien, which are "traditionally available in equity but not at law, the remedy is presumptively legal." Rest. (Third) of Restitution & Unjust Enrichment § 4 cmt. d (2011); *see Erdmark Auto, Inc. v. Zurich Am. Ins. Co.*, 2019 WL 1002952, at *5 (D. Idaho Mar. 1, 2019) (denying motion *in limine* to exclude evidence regarding disgorgement and unjust enrichment from the jury because "any judgment ... for disgorgement will solely be for money; there is no need to resort to constructive trusts or other legal figments").

At trial, Plaintiffs did *not* argue that "particular funds Google has—i.e., those it generates through use of their data []—are traceable to the particular data that Defendant allegedly collected and used." Pre-Trial Order 10. Plaintiffs continue to disclaim that argument to this day, asserting that they are not "'tracing' their particular sWAA-off data . . . to tie specific profits to that specific data." Mot. 23. The Supreme Court has explained that even an equitable lien on a specific fund— perhaps the most quintessentially equitable suit—becomes a suit for a *legal* remedy if circumstances (including wrongful conduct) destroy traceability and require relief from a defendant's general assets. *See Montanile v. Bd. of Tr. of the Nat'l Elevator Indus. Health Benefit Plan*, 577 U..S. 136, 144–45 (2016) ("A defendant's expenditure of the entire identifiable fund on nontraceable items . . . destroys an equitable lien. The plaintiff [] may have a personal claim against the defendant's general assets—but recovering out of those assets is a *legal* remedy[.]"). Plaintiffs' admission that they cannot trace their data "through Google's internal processing to tie specific profits to that specific data" eviscerates the only remaining basis for concluding that disgorgement here is equitable. *See* Mot. 23; *cf. Homampour v. Blue Shield of Cal. Life & Health Ins. Co.*, 2016 WL 4539480, at *7–8 (N.D. Cal. Aug. 31, 2016) (noting claim for equitable disgorgement of profits was likely foreclosed by *Montanile* due to "question [of] whether plaintiffs will be able to identify such a [specific] fund" for recovery, but permitting claim to proceed at pleading stage).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

In one sense, Plaintiffs are maintaining internal consistency with their prior arguments to the Court. Back when Plaintiffs thought that presenting their disgorgement numbers to the jury would net them the billions of dollars they seek, they argued that disgorgement was a legal remedy *because they were not seeking traceable funds*. *See* Dkt. 545, at 6–7 ("Plaintiffs are not seeking specific funds held by Google—any money . . . will do."); *see also* Dkt. 584, at 47:3–6 ("[I]t depends on whether you're seeking to recover a specific property, a specific sum . . . . That's not what's at issue here in terms of disgorgement[.]"). Plaintiffs now argue that they are entitled to an equitable disgorgement amount that "far outstrips the jury's $425 million damages award," Mot. 7, but do not even acknowledge (let alone explain) their about-face on disgorgement. *See generally* Mot. The argument that disgorgement is equitable in this case only made sense in the context of a viable CDAFA claim and that position is not available following the jury's verdict.

### b. If disgorgement is even available for the other two claims, it is only as a legal remedy.

The two claims at issue post-verdict are Plaintiffs' constitutional claim for invasion of privacy and their tort claim for intrusion upon seclusion. Even if disgorgement were an equitable remedy here, it is not available to Plaintiffs for those claims. *See infra*, at Section IV(B)(2). But the Court need not even reach that analysis, because disgorgement is not an equitable remedy here.

It is undisputed that disgorgement of profits is a longstanding equitable remedy in some contexts, but as a known legal remedy in others. *Compare Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc*., 778 F.3d 1059, 1075 (9th Cir. 2015) ("A claim for disgorgement of profits under § 1117(a) is equitable, not legal."), *with Aetna Life Ins. Co. v. Young*, 2024 WL 5182638, at *7 (C.D. Cal. Sept. 25, 2024) ("In rejecting the ERISA claim, the court noted that the disgorgement remedies the plaintiff sought 'were in effect legal remedies granted by an equity court[.]'") (quoting *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 664 (9th Cir. 2019)). This shifting landscape reflects the "protean" nature of restitution (including unjust enrichment and profit disgorgement), which is "not easily characterized as legal or equitable, because it acquired its modern contours as the result of an explicit amalgamation of rights and remedies drawn from both systems." Rest. (Third) of Restitution and Unjust Enrichment § 4, cmts. b, c (2011).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

As the Court has recognized, it appears that California courts may consider disgorgement from privacy violations (other than for CDAFA) to be a jury issue. *See* Pre-Trial Order 11; *see also* CACI No. 1821 (instructing jury to award difference between defendant's revenue and expenses, *i.e.*, profit). Given the Court's prior reasoning, and without the countervailing arguments regarding CDAFA and traceability, any disgorgement remedy in this case would have to be a legal one.

### c.    As a legal remedy, the jury verdict controls.

The Court invited the advisory verdict for the very reason that there was "some prospect that the disgorgement requested could ultimately be deemed legal in nature[,]" such that "the decision to treat disgorgement as an equitable consideration raise[d] the possibility of a necessary re-trial" without one. Pre-Trial Order 11. This matter is now in exactly such a situation, as the trial and resulting verdict have changed the nature of the disgorgement sought. Because disgorgement must be characterized as a legal remedy for the two remaining claims, the Court must accept as true the jury's finding on the matter: that Plaintiffs are not entitled to disgorgement. *See* Verdict Q.4.

### 2.    Even if considered an equitable remedy, disgorgement is not available.

If the Court agrees that disgorgement is now a legal remedy, it need not reach this section. But even assuming that disgorgement remains an equitable remedy, it is not available to Plaintiffs.

### a.    The Court does not have jurisdiction to award equitable disgorgement because Plaintiffs' legal remedies are adequate.

"In order to entertain a request for equitable relief, a district court must have equitable jurisdiction, which can only exist under federal common law if the plaintiff has no adequate legal remedy." *Guzman v. Polaris Indus.*, 49 F.4th 1308, 1313 (9th Cir. 2022). Plaintiffs bear the burden of establishing that they lack an adequate legal remedy. *See United States v. Kama*, 394 F.3d 1236, 1237 (9th Cir. 2005); *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 839, 844 (9th Cir. 2020).

Plaintiffs' only argument attempting to meet their burden is a suggestion that compensatory damages were capped at some amount lower than Google's profit and therefore they had an inadequate remedy at law. *See* Mot. 20. This argument is factually baseless and legally irrelevant. First, the Court did the opposite of cap Plaintiffs' compensatory damages: it expressly denied Google's request to limit Plaintiffs' counsel from seeking compensatory damages that were almost

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

60 times greater than what Plaintiffs' expert asserted was appropriate. *See* Dkt. 614; *see also supra* at Section IV(A)(2) (addressing same argument made by Plaintiffs in requesting permanent injunction, and explaining that jury was in no way hamstrung in awarding damages).

Plaintiffs therefore had free rein to present the jury with testimony and argument based on which the jury could have determined damages of over $31 billion dollars. That is, Plaintiffs presented this absurd figure not as Google's profits, but rather as Plaintiffs' actual damages based on the *value of their data had it been sold*, monthly, by each class member, at the $3 Ipsos Screenwise monthly rate, for 59.5 months. *See* Tr. Sept. 2 (Closing Arguments) 1895:22–1896:7; *see* Tr. Aug. 25 (Lasinski) 906:13–17, 934:17–935:5, 939:22–940:25, 962:21–963:10; Mot. 11 ("[The jury] essentially awarded damages for only a single month's data collection."). Given the saga of the parties' arguments before the Court about the monthly rates that could be presented to the jury, Plaintiffs should not now be heard to complain that their requested $31 billion in damages were "limited" or less than the $2.36 billion allegedly available via disgorgement. *See* Mot. 20–21.

Second, the jury already weighed the value of the data and returned a verdict that, while disappointing to Plaintiffs, nevertheless represents the jury's factual determination of the market value of the data. Whether Plaintiffs' compensatory damages were "capped" is legally irrelevant because their requests for damages and disgorgement seek to remedy the same harm. *See Clark v. Yodlee, Inc.*, 2023 WL 12097898, at *1 (N.D. Cal. July 20, 2023) ("[T]he pertinent question is not whether [Google] would pay different amounts depending on . . . damages or disgorgement but instead is whether Plaintiffs address the same harm through their legal and equitable claims."). As the Ninth Circuit has made clear, the existence at any point of a legal remedy robs federal courts of equitable jurisdiction, regardless of whether that legal remedy is even available at the time of suit, let alone would permit the same amount of recovery. *See Sonner*, 971 F.3d at 845 (affirming dismissal of equitable claims where plaintiff strategically dropped legal claims, and denying leave to re-allege legal claims); *Guzman*, 49 F.4th at 1311-12 (affirming dismissal of equitable claim because legal claim had once existed, though now time-barred).

Here, Plaintiffs "ignore that they *had* a legal remedy . . . , *i.e.*, the potential to recover[] more than" $2.36 billion (in fact, more than $31 billion) "in damages, and instead argue that the

Cooley LLP
Attorneys at Law
San Francisco

21

Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-cv-04688-RS

*amount* awarded by the jury rendered the remedy inadequate." *Turrey v. Vervent, Inc.*, 2023 WL 6390620, at *3 (S.D. Cal. Sept. 29, 2023) (rejecting argument that defendant's profit was factually and legally distinct from compensatory damages where Plaintiffs could seek the same amount of recovery (there, $51 million) under each theory). Plaintiffs' frustration is clear: they think Google "made substantially more than $425 million in [] profit," and they want a higher award via disgorgement. Mot. 20. But the argument that "disgorgement would reach a different sum of money" or would capture "unjust profit" is not enough to show an inadequate legal remedy. *See Clark*, 2023 WL 12097898, at *1 (dismissing request for disgorgement on invasion of privacy claim because plaintiffs could not "clearly articulate" inadequacy of legal remedies). Here, Plaintiffs do not and cannot explain any difference in the harm (the collection and use of their data) they seek to remedy by each theory; they don't even make the attempt. *See* Mot. 20–21. And unsurprisingly, none of Plaintiffs' cited cases in support of their jurisdictional argument involve a situation where plaintiffs sought two forms of monetary relief for the same claim, received the form of relief that had a far higher cap but in a lower amount, and then pursued the other form of relief.[9]

In sum, Plaintiffs' request would eviscerate the doctrine that plaintiffs cannot maintain equitable claims in federal court where they have an adequate remedy at law. *See Turrey*, 2023 WL 6390620 at *3–4 ("Notably silent from Plaintiffs' briefing is any appreciable discussion of *Sonner* and *Guzman* . . . Thus, while Plaintiffs desire to recoup 'restitution' through the UCL what the jury did not award under RICO in damages, the Court lacks jurisdiction . . . because Plaintiffs had an adequate legal remedy[.]"); *Ketayi v. Health Enrollment Grp.*, 2021 WL 2864481, at *10 (S.D. Cal. July 8, 2021) ("It would be anomalous for [*Sonner*]'s rule to be avoidable merely because of the reality that claims for restitution and damages often will result in different recoveries.").

---

[9] *See Barrett v. Optimum Nutrition, Inc.*, 2022 WL 3452791, at *1 (C.D. Cal. July 18, 2022) (plaintiff failed to plead inadequate remedy at law despite dropping damages claim to attempt to cure failure for restitution); *In re Cal. Gas. Spot Mkt. Antitrust Litig.*, 2021 WL 1176645, at *8 (N.D. Cal. Mar. 29, 2021) (restitution of unfairly priced contracts allegedly differed from non-restitutionary profit disgorgement, and remedies were not available under the same claims); *Maadanian v. Mercedes-Benz USA, LLC*, 2024 WL 1579658, at *10 (W.D. Wash. Apr. 11, 2024) (finding premature dismissal of equitable claims before determining viability of legal claims; implying disgorgement was likely greater than legal remedies) (citing *Martinez v. ZoomInfo Techs. Inc.*, 2022 WL 1078630, at *7 (W.D. Wash. Apr. 11, 2022)); *Martinez*, 2022 WL 1078630, at *7 (assuming disgorgement would be greater than legal remedy); *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1009 (N.D. Cal. 2020) (dismissing restitution for failure to plead inadequate legal remedy).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

Plaintiffs had an adequate remedy at law: damages about 15 times greater than they seek in disgorgement. That they received only $425 million does not satisfy their burden to establish equitable jurisdiction; it just means the jury disagreed with their estimation of the value of the data.

### b. Monetary relief, including disgorgement, is not available for the constitutional claim.

Independently, Plaintiffs cannot seek monetary relief under the constitutional claim. *See Doe v. Regents of Univ. of Cal.*, 672 F. Supp. 3d 813, 820 (N.D. Cal. 2023) (noting that plaintiffs "can seek to enjoin [defendants] but cannot seek damages" under "Article 1, Section 1 of the California Constitution"); *Meyer v. Cnty. of S.D.*, 2025 WL 449747, at *26 (S.D. Cal. Feb. 10, 2025) (same); *see also Clark*, 2023 WL 12097898, at *1–2 (dismissing request for disgorgement on invasion of privacy claim while noting that defendant "made clear that it does not move . . . with respect to Plaintiffs' request for injunctive relief"). In fact, California law generally does not recognize money as a remedy for violations of its constitution, unless the constitutional provision itself contemplates such relief. *See Katzberg v. Regents of Univ. of Cal.*, 29 Cal. 4th 300, 311 (2002) ("[O]nly two decisions, each filed two decades ago, have recognized an action for damages to remedy a violation of the state Constitution. All subsequent decisions addressing the issue have declined to find such an action for damages."). Following the framework established in *Katzberg*, which requires assessment of the availability of adequate alternative remedies, California courts have found mandamus, declaratory, and injunctive relief to be adequate remedies for various alleged constitutional harms. *See, e.g.*, *MHC Fin. Ltd. P'ship Two v. Santee*, 182 Cal. App. 4th 1169, 1187 (2010) (finding money damages an inappropriate remedy for violation of Article I, Section 3(a) of the California constitution, including due to availability of declaratory and injunctive relief). Google is not aware of a California case suggesting that disgorgement or other equitable monetary relief is considered an available and proper alternative remedy to damages.

Plaintiffs attempt to elide the question of whether disgorgement is available to them by waving toward the Court's order denying Google's *Daubert* motion to exclude Mr. Lasinski's opinion (and granting Plaintiffs' motion for class certification, including with respect to the availability of class-wide relief). *See* Mot. 18 (citing Dkt. 352 ("*Daubert* Order")). But the parties,

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   and thus the Court, did not address the contours of relief available for asserted violations of the

2   California constitution. *See Daubert* Order 21; *see also* Dkt. 326, 331, 332 (briefing regarding

3   same). The Court thus held only that for *Daubert* purposes, Google had not shown that

4   disgorgement was limited to CDAFA claims, and that Mr. Lasinski's opinion established Plaintiffs'

5   standing burden and overall theory of unjust enrichment. *Daubert* Order 21.

6       Now, however, Plaintiffs are requesting that the Court provide a type of monetary relief that

7   is unavailable for the constitutional claim, and have not provided the Court with "any basis for

8   concluding" that the remedy "was contemplated or reasonably might be inferred" from the

9   constitution. *Riaz v. Fahoum*, 2025 WL 3123736, at *1 (Cal. Ct. App. Nov. 7, 2025); *see also*

10  *Marina Tenants Assn. v. Deauville Marina Dev. Co.*, 181 Cal. App. 3d 122, 134 (1986) (rejecting

11  unjust enrichment theory of recovery that was "wholly derivative of the third-party beneficiary

12  claim" because "a court of equity ... cannot create new rights under the guise of doing equity")

13  (citations omitted). And though Plaintiffs will doubtless rely on *In re Facebook, Inc. Internet*

14  *Tracking Litigation*, the Ninth Circuit there discussed disgorgement entirely separately from the

15  constitutional or privacy tort claims, with no indication that disgorgement would be an available

16  remedy for either claim at issue. *See* 956 F.3d 589, 598–600 (9th Cir. 2020) (affirming that plaintiffs

17  had standing to bring invasion of privacy and intrusion upon seclusion claims due to adequately

18  alleged privacy harms, and, separately, that right to disgorgement provided standing for common

19  law trespass to chattels, fraud, statutory larceny, and CDAFA claims).

20              **c.    CUTSA also precludes disgorgement as a remedy.**

21      Plaintiffs' request for disgorgement independently fails because the remedy is superseded

22  by CUTSA as to both the intrusion upon seclusion and (if the Court finds that monetary relief is

23  available) the invasion of privacy claim. CUTSA provides an exclusive remedy for conduct falling

24  within its terms. *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 236 (2010), *disapproved*

25  *on other grounds by Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 337 (2011). CUTSA supersession

26  applies beyond mere repackaged trade secret claims: it extends to all claims "based on the taking

27  of information that, though not a trade secret, was nonetheless of value to the claimant." *Id.* at 239

28  n.22 ("[A] prime purpose of the law was to sweep away the adopting states' bewildering web of

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

1  rules and rationales and replace it with a uniform set of principles for determining when one is—

2  and is not—liable for acquiring, disclosing, or using 'information . . . of value.'"). As Judge Koh

3  explained in *SunPower Corp. v. SolarCity Corp.*, "[i]f the basis of the alleged property right is in

4  essence that the information . . . is 'not . . . generally known to the public,' then the claim is

5  sufficiently close to a trade secret claim that it should be superseded notwithstanding the fact that

6  the information fails to meet the definition of a trade secret." 2012 WL 6160472, at *5 (N.D. Cal.

7  Dec. 11, 2012) (citing Cal. Civ. Code § 3426.1(d)(1)). In short, a claim that seeks to "impose

8  liability . . . for 'acquiring, disclosing, or using' confidential information of purported value" is

9  superseded by CUTSA. *Erhart v. BofI Holding, Inc.*, 612 F. Supp. 3d 1062, 1118 (S.D. Cal. 2020).

10  Many courts in this district—including this Court—have adopted *Silvaco*'s broad

11  understanding. *See Top Agent Network, Inc. v. Zillow, Inc.*, 2015 WL 10435931, at *4–5 (N.D. Cal.

12  Aug. 6, 2015) (Seeborg, J.); *Language Line Servs., Inc. v. Language Servs. Assoc., Inc.*, 944 F.

13  Supp. 2d 775, 781 (N.D. Cal. 2013) (Seeborg, J.); *UCAR Tech. (USA), Inc. v. Li*, 2018 WL 2555429,

14  at *4 (N.D. Cal. June 4, 2018) ("[M]isappropriation of unspecified, intangible, non-trade secret

15  'computer data,' 'proprietary information and work product'" was superseded); *Artec Grp., Inc. v.

16  Klimov*, 2016 WL 8223346, at *7 (N.D. Cal. Dec. 22, 2016) ("The majority of district courts that

17  have considered Silvaco have held that CUTSA supersedes claims based on the misappropriation

18  of information that does not satisfy the definition of trade secret under CUTSA."); *Total Recall*

19  *Techs. v. Luckey*, 2016 WL 199796, at *8 (N.D. Cal. Jan. 16, 2016); *Heller v. Cepia, L.L.C.*, 2012

20  WL 13572, at *7 (N.D. Cal. Jan. 4, 2012) (claims based on "the wrongful taking and use of

21  confidential . . . information," whether or not trade secrets, "are superseded").

22  Plaintiffs' decision not to bring a CUTSA claim does not avoid supersession. *See NetApp,*

23  *Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 840 (N.D. Cal. 2014) (finding "meritless" the

24  argument that supersession applies only if a CUTSA claim is actually pleaded); *Barker v. Insight*

25  *Global, LLC*, 2017 WL 10504692, at *4 (N.D. Cal. Nov. 21, 2017) ("[T]here is no reason why

26  preemption turns on and off depending on whether a trade secret claim is actually pled."); *Erhart*,

27  612 F. Supp. 3d at 1118.

28  Plaintiffs' disgorgement theory for their tort and constitutional claims is superseded by

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

CUTSA, as the remedy theory for both claims is to "impose liability . . . for 'acquiring, disclosing, or using' confidential information of purported value." *Erhart*, 612 F. Supp. 3d at 1118. The "reasonable expectation" of privacy element means that any such information in which Plaintiffs claim a privacy interest is not known to the public. *See Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 231–32 (1998). Indeed, the supposed "confidentiality" of Plaintiffs' data is at the heart of their case, and their central theory is that Google takes "private," Tr. Aug. 20 (Santiago) 555:1–21, "data from millions of people that obviously has value, and Google profited from that data," *id.* at 499:11–18. But so too for trade secret claims. *See, e.g.*, *SunPower*, 2012 WL 6160472, at \*5.

As for the purported value, Plaintiffs expressly claim that disgorgement should be decided based on "evidence demonstrating the value of the data taken by Google," Mot. 3; proof of "any form of use value, proceeds, or consequential gains that is identifiable and measurable and not unduly remote," *id.* at 22; and evidence of "revenues attributable to specific types of data," *id.* at 24; *see also, e.g.*, Tr. Aug. 25 (Lasinski) 878:3–13; 878:20–879:13. These are precisely the kinds of claims CUTSA was intended to–and does–supersede. *See New Show Studios LLC v. Needle*, 2014 WL 2988271, at \*5, \*9–11 (C.D. Cal. June 30, 2014) (holding that CUTSA superseded an "invasion of privacy" claim that was based on defendant allegedly "gain[ing] access to confidential and sensitive information"); *Glam & Glits Nail Design, Inc. v. #NotPolish, Inc.*, 2021 WL 2317410, at \*2, \*5, \*9–11 (S.D. Cal. June 7, 2021) (CUTSA superseded claims arising from defendant's acquisition of customers' and distributors' "non-public personal cellphone numbers," "each customer's account purchasing history, the pricing for each account, and an understanding of unique, customer-specific product preferences"); *Heller*, 2012 WL 13572, at \*7 (unjust enrichment); *Digital Envoy, Inc. v. Google, Inc.*, 370 F. Supp. 2d 1025, 1035 (N.D. Cal. 2005) (Seeborg, J.) (unjust enrichment)

With respect to the constitutional claim, even if the California Supreme Court were to recognize some form of recoverable damages, it should take the Legislature's guidance on CUTSA supersession into account when deciding what types of monetary remedies are available. The California Supreme Court would not disregard the Legislature and choose to introduce disuniformity by recognizing a "value of data" monetary remedy for violations of Article I, Section

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

26

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

1. As such this Court should conclude that the constitutional claim does not provide a remedy based on the "value of data" disgorgement theory proffered by Plaintiffs.

### d.      The jury's factual findings likewise preclude disgorgement.

Even if the Court arrives at this step of the analysis—*i.e.,* if the Court determines that disgorgement is an equitable remedy in this case; that Plaintiffs have established the Court's equitable jurisdiction; that monetary relief is available for the constitutional claim; and that CUTSA supersession does not apply—the Seventh Amendment requires, as Plaintiffs concede, that the Court "'follow the jury's implicit or explicit factual determinations' rendered in the jury's verdict on legal claims." Mot. 17 (quoting *Teutscher*, 835 F.3d at 944). In finding no liability on Plaintiffs' CDAFA claim, the jury rejected both that Google "[k]nowingly accesse[d] and without permission" took, copied or made use of Plaintiffs' data and that Plaintiffs were entitled to disgorgement. *See* Inst. No. 14; Verdict, at Question 1. The jury's implicit linkage between those two appears clear: if Google was not knowingly acting without permission, then it is not "unjust" for Google to retain the benefits of the data access. Given the resultant Seventh Amendment risk, the Court should not depart from the jury's verdict on disgorgement.

In addition, where jury and non-jury issues "arise out of one set of facts," it is well within a court's discretion to entrust a jury with both issues even where there is no right to a jury trial. *See Synopsys, Inc. v. Real Intent, Inc.*, 2024 WL 4557334, at *3 (N.D. Cal. Oct. 2, 2024) (citing *Fitzgerald v. U.S. Lines Co.*, 374 U.S. 16, 21 (1963)); *see also Onnyx Pharms., Inc. v. Bayer Corp.*, 2011 WL 4527402, at *3 (N.D. Cal. Sept. 21, 2011) (explaining that the plaintiff's "colorable arguments regarding its right to a jury trial weigh against bifurcation" of the legal and equitable issues).[10] Courts consider juries to be particularly suitable for determining issues such as witnesses' credibility; community norms; and damages. *See, e.g.*, *Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 350638, at *3 (N.D. Cal. Feb. 2, 2008) (empaneling an advisory jury in part because the "evaluation of a fraud claim involves judgments of credibility for which a jury is particularly

---

[10] And as Plaintiffs themselves have argued, neither party has a right to a bench trial on this issue. *See* Dkt. 545, at 7–8 (citing *Parker v. N.C.*, 397 U.S. 790, 805 n.8 (1970) (Brennan, J., concurring in part); *Fitzgerald*, 374 U.S. at 20; *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959); *Anhing Corp. v. Viet Phu, Inc.*, 671 Fed. App'x 956, 958–59 (9th Cir. 2016)).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

27

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

1    suited"); *Fredericks v. Travelers Cas. Ins. Co. of Am.*, 521 F. Supp. 3d 1009, 1015–16 (D. Nev.

2    2021); *Cook v. Baker Equip. Eng'g Co., Inc.*, 582 F.2d 862, 865 (4th Cir. 1978). Given that

3    disgorgement appears now to be a legal issue (or at least far more likely to be one than at the time

4    the Pre-Trial Order was issued, which itself indicated that the question was a close call), there is

5    ample reason to give greater weight to the jury's findings. With an advisory verdict, the Court is

6    "free to accept" the jury's findings, although it must still make an independent assessment of the

7    issue. *Hansen v. Safeway, Inc.*, 2010 WL 2593611, at *3 (N.D. Cal. June 22, 2010); *see also Levi*

8    *Strauss & Co.*, 2009 WL 1082175, at *1.

9         Here, the jury held that Plaintiffs had failed to show that (1) "Google received a benefit that

10   it otherwise would not have achieved but for the at-issue data"; and (2) "it would be unjust for

11   Google to retain that benefit without compensating Plaintiffs." Inst. No. 24. Although the Court is

12   not strictly *required* to follow the implicit factual findings underpinning that holding, there is good

13   reason to do so. First, in determining that Plaintiffs were not entitled to disgorgement (or unjust

14   enrichment), the jury appears to have found credible Ms. Langer's testimony that advertisers often

15   use third-party tools to measure conversions, such that Google was not a major player in the

16   conversion measurement arena. *See, e.g.*, Tr. Aug. 27 (Langner) 1300:1–25, 1310:25–1311:11.

17   This finding undercuts the foundation for Plaintiffs' disgorgement request. *See* Mot. 24 (explaining

18   that Lasinski arrived at gross revenue numbers by multiplying revenues by asserted "percentage of

19   revenue attributable to conversions"). Ms. Langner–whose role it is to drive revenues related to

20   finding users for mobile apps through advertising, *see* Tr. Aug. 27 (Langner) 1282:18–1283:10–

21   explained that conversion measurement is like a "report card to advertisers about how well their

22   advertising is working relative to their goals," *id.* at 1268:15–20, such that using Google Analytics

23   (also referenced as GA4F) to measure conversions on ads placed by Google is akin to Google

24   grading its own report card on its ads, *id.* at 1300:22–1301:2. As one might expect, and as the jury

25   implicitly believed, it is "very natural to want to have a third party take a look and see what they

26   say." *Id.* In fact, about "80 percent of advertisers are using some sort of third party" to measure

27   conversions, with AppsFlyer and Kochava being "by far the biggest." *Id.* at 1301:14–20.

28        In addition, the jury implicitly found Google's witnesses to have credibly testified that

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

28

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

Google does not profit from sWAA-off data because Google does not actually charge for conversions. For example, Dr. Black testified that "there's no charge" for conversion tracking, and that the "charge in ad campaigns is made from . . . showing ads or getting a click on an ad." Tr. Aug. 29 (Black) 1729:5-11. Ms. Langner also explained the process of conversion measurement, clarifying for the jury that Google gets paid when a user is served an ad or clicks on it (which is *not* a conversion event), but is not paid upon conversion events like app downloads. *See* Tr. Aug. 27 (Langner) 1291:1–25, 1298:1–25.

Putting together the jury's finding that Google is liable for compensatory damages "based on the economic value of allowing access to the data at issue," Inst. No. 23, but that Google did not "receive[] a benefit that it otherwise would not have achieved but for the at-issue data," Inst. No. 24, the logical implication is that the jury found the data to have some "economic value," but that credible witnesses demonstrated that Google didn't profit from it through conversion measurement (or otherwise). Additionally, and contrary to Plaintiffs' suggestion, there is no reason to think that the jury applied an improper standard for causation. *See* Mot. 4. The Court properly instructed the jury in its threshold damages instruction that if they found liability, they should award the amount for any "injury you find Google caused," and that Plaintiffs, though bearing the burden of proof of the amount of damages, were not required to "prove the *exact* amount of damages that will provide reasonable compensation for the harm." Jury Instructions at Inst. No. 22.[11] Plaintiffs have taken no issue with those instructions.

Plaintiffs did not at trial, and do not now, present evidence rebutting the evidence that Google does not earn a profit from conversion tracking. Google disagrees with Plaintiffs' assertion that it "does not dispute that it earned profits from its use of Plaintiffs' sWAA-off data," such that the "parties' dispute . . . is [only] over the *amount* of profits that must be disgorged." Mot. 21. This inaccurate statement is made without citation. As Google has explained for years, its collection of sWAA-off data is basic record-keeping on the ads it serves, not a profit mechanism. *See, e.g.*, Dkt.

---

[11] The disgorgement instruction provides that Plaintiffs must prove that Google "received a benefit that it otherwise would not have achieved but for the at-issue data," but Plaintiffs do not suggest that this instruction was erroneous and would not have a basis to do so. *See* Jury Instructions at Inst. No. 24; *see generally* Mot.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

29

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

326, at 1; *Daubert* Order at 2 ("Google admits that it collects this data but, for sWAA-off users, it does so only for 'basic record-keeping' of its advertising services[.]"); *see also* Tr. Aug. 29 (Black) 1776:16–1777:12 (explaining that Google does not profit from sWAA-off data, but that it is valuable to Google to develop new products and improve existing products).

Throughout this case, and as became clear to the jury at trial, Plaintiffs labored under a misapprehension of (1) what a conversion event (and thus conversion tracking) *is*, and (2) the meaning of a statistic that Plaintiffs still assert is a "percentage of revenue attributable to conversions" or conversion measurement. *See, e.g.*, Mot. 24. For example, Ms. Langner had to explain repeatedly that a conversion event—where an advertiser gets a user to eventually take an action within the advertiser's app—by definition does not take place in the property where the ad is shown. *See* Tr. Aug. 27 (Langner) 1330:19–1337:5. Specifically, an interaction with an advertiser's *ad* (such as an ad click) is distinct from a resulting interaction with an advertiser's *app* (the ad conversion). *See, e.g.*, *id.* at 1334:11–17. As Ms. Langner explained, Google is paid for the initial interaction with an ad (whether simply serving the ad to a user or something like a click), and simply measures any subsequent conversion. *See id.* at 1291:1–25, 1298:1–25.

Presumably due to their misunderstanding of conversions, Plaintiffs also misunderstand what they believed was a key statistic indicating that Google makes revenue that it attributes to ad conversions. *See, e.g.*, Tr. Aug. 25 (Lasinski) 881:18–19 ("[W]e'll see that Google attributes revenue to conversion measurement."); *id.* at 889:2–16 (explaining profit calculation process as involving "the share of the profit that Google attributes to certain conversion types"); *id.* at 917:16–19 ("[Y]ou can see [the demonstrative is] talking about calculating conversion tracking; and in the bottom right, it shows the 52 percent for conversions[.]")[12]; *see also* Mot. 24 n.9 (citing latter two passages). Plaintiffs argued to the jury that the conversion tracking percentage could be applied to a calculation of profits attributable to sWAA-off users (as described below, these calculations are deeply flawed) to isolate profits Google made from "conversion tracking." *See* Tr. Aug. 25 (Lasinski) 889:2–16. But Ms. Langner explained that a percentage "attributable to conversion

---

[12] The document on which Lasinski's demonstrative and testimony relied was not admitted into evidence, and there is no witness testimony as to its purpose or meaning.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

30

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

1  measurement" meant—using 55% as an example—that "Google Analytics confirmed that 55

2  percent of the revenue from ad clicks ultimately led to a conversion event." Tr. Aug. 27 (Langner)

3  1313:19–24; *see also* Tr. Aug. 25 (Lasinski) 984:23-985:11. If an advertiser spent $100 on ads and

4  Google stated that 55% of that revenue was attributable to conversion tracking, then "$55 of ad

5  clicks did ultimately lead to the event that the advertiser was trying to measure; so, for example, an

6  app download." Tr. Aug. 27 (Langner) 1313:25–1314:7. That is, the percentage "attribution" to

7  conversion tracking is not a calculation of Google's revenue or profit deriving from conversion

8  tracking; instead, it is a piece of information about the performance of the advertiser's campaign.

9  Given Plaintiffs' myriad weaknesses in their "profit" calculations, of which the conversion

10  tracking misunderstanding is perhaps the most glaring because it is the direct basis for suit, it is no

11  surprise that the jury found that whatever value Plaintiffs' data had, it was not tied to so-called

12  "profits" derivable from conversion tracking. The Court should follow the jury's sound lead.

### 3.    Google's profits are not sufficiently tied to the alleged conduct.

14  The jury found that Plaintiffs had not proved they were entitled to disgorgement. The Court

15  should so find as well, because Plaintiffs cannot show the first element of the remedy: that Google

16  received a benefit that it otherwise would not have achieved. *See* Inst. No. 24. That Plaintiffs believe

17  Google's App Promo, Ad Mob, and Ad Manager profits are due to conversion tracking is based,

18  once again, in their misunderstanding of what conversion tracking is.

19  As explained above, Google receives payments—*i.e.*, revenue—for serving ads. Plaintiffs

20  argue that conversion tracking is valuable because advertisers learning that their ads were placed

21  well by Google (i.e., resulting in higher conversion rates) will make those advertisers place more

22  ads with Google, thereby increasing revenue. What Plaintiffs have never been able to explain away

23  is that advertisers learn about conversion rates from several companies besides Google. As Ms.

24  Langner explained, "[a]bout 80 percent of advertisers are using some sort of third party" for

25  conversion tracking. Tr. Aug. 27 (Langner) 1301:14–18. Dr. Knittel explained that "not just

26  Google, but the advertisers and the publishers want to see this [conversion tracking] activity done.

27  And there's a set of other firms out there that" can do the conversion tracking sought by the market,

28  whether or not Google also provides an analytics tool. Tr. Aug. 28 (Knittel) 1555:3–10. If the

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

31

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

1    advertisers received the same information with or without Google's conduct here, there is nothing

2    to suggest that their likeliness to place ads with Google would have changed, *i.e.*, that Google's

3    profit was at all tied to the conversion tracking. This is a fatal flaw in Plaintiffs' disgorgement

4    theory, and they continue to fail to address it. *See* Mot. 36–37.

5          **4.    In any event, Plaintiffs' figures are incorrect and grossly overstated.**

6          Should the Court conduct a profit calculation—which the parties agree consists of revenue

7    less expenses—Plaintiffs' pie-in-the-sky revenue figures and arbitrary expense numbers do not

8    stand up to scrutiny, and thus do not result in a "reasonable approximation" of any profit number.

9          There are two inaccuracies or potential points of confusion in Plaintiffs' Motion regarding

10   Mr. Lasinski's methodology that should be cleared up at the outset.[13] Both are contained in the

11   initial assertion that Mr. Lasinski identified U.S. revenues, estimated the portion of revenues

12   attributable to Plaintiffs, and multiplied those revenues by a percentage he believed attributable to

13   conversions. *See* Mot. 24. For one, Mr. Lasinski identified U.S. revenues, *subtracted costs*, and

14   only then estimated the portion of those net proceeds (not revenues in the strict sense, which is

15   evident in Mr. Lasinski's testimony and report but not Plaintiffs' Motion) attributable to Plaintiffs

16   and then attributable to conversion tracking. *See* Tr. Aug. 25 (Lasinski) 889:7–16; Dkt. 314-7

17   ("Lasinski Rep.") ¶¶ 98–129. The second error is the description of the final multiplier as a

18   percentage of revenues attributable to "conversions." Putting aside the parties' dispute about the

19   meaning of this statistic, *see supra* at 29–31, the financial figures at issue are those attributable to

20   Google's alleged conduct of conversion *tracking* (or conversion measurement) using sWAA-off

21   data, rather than to users' conversion events or any other interpretation of "conversions." *See* Tr.

22   Aug. 25 (Lasinski) 881:13–19; *see also* Lasinski Rep. ¶¶ 103, 111.

23         **a.    Plaintiffs' revenue figure of $4.14 billion is untethered to reality.**

24         Although not made clear in the Motion, the starting point for Mr. Lasinski's gross revenue

25   figure of $4.14 billion was his testimony on the stand that Google's total U.S. revenue for the App

26   _____

27   [13] Google does not suggest these statements were intentional and is not seeking to make petty
     corrections. It points out these two threshold errors because they would change the calculation. For
28   example, $(X - Y) * Z * A$ is not equal to $(X * Z * A) - Y$. One would generally expect the former
     (what Mr. Lasinski actually did) to be smaller than the latter (the calculation described in the
     Motion), as the main growth vector in the formula is the multiplication.

Cooley LLP
Attorneys at Law
San Francisco

32

Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-CV-04688-RS

Promo, Ad Mob, and Ad Manager product lines over the class period totaled $51 billion. *See* Tr. Aug. 25 (Lasinski) 922:9–13. Mr. Lasinski then opined that of that $51 billion, $4.6 billion was attributable to signed-in sWAA off users and "bid against the relevant conversion types." *See id.* at 922:14–18. Mr. Lasinski then assumes that 10% of the revenue was related to users with supervised or enterprise accounts (i.e., minors or businesses) who are not part of the class of the remaining two claims, and accordingly subtracts $460 million from the $4.6 billion, to arrive at $4.14 billion in gross revenue. *See* Mot. 24–25. Each of these three steps is flawed.

<blockquote>

**i      The $51 billion starting point is built on errors and bad assumptions.**

</blockquote>

Mr. Lasinski's opinion that Google's United States total revenues for App Promo, Ad Mob, and Ad Manager total $51 billion for the class period is unsound. Mr. Lasinski arrived at this figure by (1) adding up various revenue statements that he (incorrectly) claims show United States revenue numbers for App Promo over the class period; (2) then deriving his Ad Mob figure by (a) incorrectly estimating *App Promo*'s ratio of United States to global revenue numbers for 2018, (b) applying that ratio to 2018 global Ad Mob numbers to derive a (poor) estimate of United States Ad Mob revenue for that year, (c) calculating the ratio of Ad Mob to App Promo United States revenue for that year, (d) applying the same ratio to all the other years of (incorrect) App Promo United States revenue to derive (unreliable) Ad Mob United States revenues for those years, (e) purporting to derive an estimate of overlapping revenue between App Promo and Ad Mob based on an (unrelated) model of a breakdown of revenue from app- and web-based ads following a nudge to turn on an (unrelated) privacy setting, and (f) subtracting that (unreliable) estimate of the revenue overlap; and (3) lastly (a) assuming that Ad Manager United States revenues were 34% of Ad Mob revenues every year based on a single presentation indicating this ratio in 2019, and (b) applying a similar estimate of overlapping revenue as described in steps (2)(e)–(f). *See* Lasinski Rep. ¶¶ 83–107; *see also* Dkt. 699-6 ("Lasinski Suppl. Rep.") at SS2.2.[14]

*Geographic Error.* The most egregious error, which Plaintiffs try to bury as the final flaw

---

[14] This convoluted path does not include all of Mr. Lasinski's assumptions, such as that he could apply the 34% ratio between Ad Mob and Ad Manager *revenues* (from a single presentation for 2019) to Ad Mob *profits* (revenue less certain costs) and derive Ad Manager *profits* (*i.e.*, that the cost ratio was the same within each product line). *See* Lasinski Rep. ¶ 107 & Fig. 30.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

they discuss, *see* Mot. 29–31, is the initial assumption that all App Promo revenue numbers Mr. Lasinski used were for the United States. This incorrect assumption poisons all the subsequent calculations. Ms. Langner explained that the numbers in the Profit and Loss (P&L) report that Mr. Lasinski used for 2017 through 2019 United States revenue amounts are in fact global revenues for a segment of App Promo called DVA. *Compare id.* Tr. Aug. 27 (Langner) 1315:16–1316:13 (testifying PX-419 (GOOG-RDGZ-00184247) showed "global P&L for App Promo for the periods 2017 to 2020" for "DVA App Promo"), *with* Mot. 30 ("For earlier years of the class period (2017 through 2019), Mr. Lasinski obtained App Promo's U.S.-based revenue from PX-419[.]").

Plaintiffs' main responses are to undermine the veracity of PX-419 as not being created in the ordinary course of business, and to suggest prejudice because counsel for Google once told them—unfortunately, mistakenly—in a 2022 email that the document showed United States figures. *See* Mot. 30. Neither holds water. First, the Court admitted this document into evidence after Ms. Langner testified that the P&L was "the same as the P&L used in the regular course of business at Google." Tr. Aug. 27 (Langner) 1318:21–1319:9. Second, as the Court stated when sustaining Google's objection at trial to Plaintiffs' attempt to introduce counsel's email, a "back-and-forth between counsel" is not a verified interrogatory or any sort of party admission in the discovery process. *See id.* at 1346:6–1348:2. To the extent Plaintiffs' dispute is a discovery dispute, that is water under the bridge. Counsel regrets the mistake, but informal e-mail correspondence spanning six years in a complex litigation is unfortunately bound to contain several mistakes on both sides. Thankfully, four months after the email at issue, Ms. Langner corrected the mistake at her deposition, testifying that GOOG-RDGZ-00184247 (*i.e.*, PX-419) reflected *global* figures. *See* Declaration of Eduardo Santacana, Ex. H (12/15/22 Langner Dep. Tr. at 231:22–24). It was Plaintiffs' obligation to ensure they relied on verified, accurate information obtained in discovery through formal means.

Plaintiffs also assert that two other documents corroborate the assertion that PX-419 reflects United States revenues. *See* Mot. 31. These arguments fare no better. The first document, G590, includes not only DVA but also "Search" and "YouTube" revenue within App Promo. *See* G590, at "Data" tab. As noted above, PX-419 reflects global revenues for DVA only, which is the relevant

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

34

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

1    data in this case.[15] Plaintiffs' focus on the similarity between the 2020 revenues reflected in G590

2    ($3.765 billion) and PX-419 ($3.764 billion) actually undermines their argument that PX-419

3    reflects United States figures; this would mean that the United States revenue from DVA, Search,

4    and YouTube was the same as the United States revenue from DVA only. (In fact, summing only

5    the DVA revenue lines for 2020 in G590 results in a total of $2.272 billion in the United States,

6    which is consistent with PX-419 reflecting a larger, global DVA revenue that year.) Similarly, it

7    appears that the presentation slide cited by Plaintiffs involves App Promo revenue across all product

8    lines, rather than DVA only. *See* Mot. 31 & Pls.' Ex. 18, at -403.

9          More broadly, Mr. Lasinski does not explain in his reports and did not testify at trial as to

10   why he believes his various estimates can provide even a "reasonable approximation" of Google's

11   total App Promo, Ad Mob, and Ad Manager revenues. As just one example, even putting aside the

12   issue that Mr. Lasinski does not consistently use United States revenue numbers for App Promo,

13   there is no explanation of why anyone should assume that the fraction of Ad Mob's United States

14   revenue (out of global revenue) in every year of the class period is the same as App Promo's 2018

15   United States-to-global revenue proportion.

16         ***Failure to Consider Apple Software Update.*** In addition to the badly flubbed geographic

17   numbers, Mr. Lasinski's revenue numbers are inflated because he included revenues attributable to

18   non-Android users (who are mostly Apple iPhone users) after 2021, despite Apple's operating

19   system update that redacted information sent to Google and prevented conversion tracking. *See* Tr.

20   Aug 27 (Langner) 1295:11–1296:9. Plaintiffs argue that Dr. Knittel does not have technical

21   expertise to point out this error, but yet assert that a device identifier is not necessary to track

22   conversion events on iPhones because Google would be able to model the same information. *See*

23   Mot. 26–27. They were unable to establish support for this statement at trial. Mr. Ganem discussed

24   conversion modeling generally, but never spoke of the ability to use it on iPhones where Google

25   never receives a device identifier. *See* Tr. Aug. 26 (Ganem). Ms. Langner also explained that

26   conversion modeling is an attempt to use past information to predict whether a device that was

27

28

---

[15] Plaintiffs' suit concerns ads shown on third-party apps, not those shown on apps like Search and YouTube that are owned and operated by Google. *See, e.g.*, Tr. Sept. 2 (Closing) 1868:20-23; Tr. Aug. 27 (Langner) 1354:3-8.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

35

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

served an ad also later performed a conversion event, where there is no device identifier. *See* Tr. Aug. 27 (Langner) 1341:6–16. But she did not provide any testimony suggesting that conversion modeling is performed on iPhones by taking app activity data from the phone and tying it to future activity; indeed, modeling is the opposite of that: it exists for situations when app activity data *isn't* available. There is no evidentiary support for Plaintiffs' bare assertion that "Google *has* collected data from iOS devices after 2021, and it *has* used that data to track and attribute conversions." Mot. 27. To the contrary, the evidence shows that Google cannot perform conversion tracking on post-2021 iPhones where users deny it permission to do so, and revenue must be appropriately reduced. *See* Tr. Aug 27 (Langner) 1295:11–1296:9; Tr. Aug. 28 (Knittel) 1567:19–1568:20.

Plaintiffs thus fail to provide a "reasonable approximation" even of Google's starting overall revenue across the relevant products.

### ii    The $4.6 billion Mr. Lasinski attributes to conversion tracking related to signed-in, sWAA-off users is not reasonable.

Mr. Lasinski admitted at trial that he assumed that 82% of Google's profits from the alleged conduct was attributable to signed-in users, and that the *only* source for this assumption was an "impact tracker model" forecasting the financial impact of foregoing *personalized advertising* in Europe. *See* Tr. Aug 25 (Lasinski) 979:16–19, 981:7–982:20. Personalized advertising is not at issue in this case; this is not in dispute. The financial impact of losing such advertising is obviously non-zero; but the impact tracker says nothing about the impact of losing conversion tracking for sWAA-off users for which no personalization is permitted. *See* Tr. Aug. 27 (Langner) 1299:18–21.

Mr. Lasinski knew that his 82% estimate came from an entirely different privacy setting in a different geographic area; he conceded that the document on which he relies includes a comment asking about creating an equivalent model *for WAA* that would provide the "% impact of turning WAA off," and admitted that he did not analyze potential differences between residents of the United States and Europe related to privacy settings (or anything else). *See* Tr. Aug. 25 (Lasinski) 981:7–16, 982:2–6. Again, there is no explanation for why this percentage can provide a reasonable approximation of revenue attributable to signed-in, sWAA-off users in the United States.

Mr. Lasinski uses another irrelevant statistic to estimate revenues attributable to conversion

Cooley LLP
Attorneys at Law
San Francisco

36

Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-CV-04688-RS

1    tracking. *See id.* at 917:13–19. That is, he admitted at trial that he used a percentage from a study

2    that evaluated "what would happen if all conversion tracking on *websites* was disabled for Google

3    and third parties," rather than "app activity data." *Id.* at 989:5–16 (emphasis added). Once more, he

4    does not explain why it is reasonable to apply the same ratio to app activity, particularly in

5    circumstances—as here—where apps would still be able to receive conversion tracking information

6    from third parties. *See id.* at 989:17–990:16 (agreeing that Plaintiffs were not alleging that third

7    parties should be disabled from tracking app conversions).

8        More broadly, in attempting to estimate the percentage of revenue "attributable" to

9    conversion tracking, Mr. Lasinski subscribes to the same misunderstanding as Plaintiffs and their

10   counsel: he does not seem to understand that conversion tracking does not generate revenue. That

11   is, Google is paid when an ad is served, and specifically does not receive a payment based on

12   tracking conversions. *See, e.g.*, Tr. Aug. 27 (Langner) 1291:1–25, 1298:1–25. Yet at trial, Mr.

13   Lasinski testified that it was his understanding that Google serves ads, and then "[i]f something

14   converts, they do track it," and then Google is paid. Tr. Aug. 25 (Lasinski) 994:2–11; *see also id.*

15   at 998:1–4 (confirming his opinion was "based in part on what you heard from [Plaintiffs' technical

16   expert] Mr. Hochman, that many advertisers pay Google on the basis of conversions").

17            iii       **Mr. Lasinski hugely underestimates the percentage of minors**
18                      **and business accounts to be excluded from the class.**

19       Because the Court has held that the constitutional and tort claim classes cannot include

20   supervised accounts belonging to minors or enterprise (business) accounts—also called,

21   respectively, unicorn and dasher accounts—revenue attributable to these accounts must be

22   excluded. Mr. Lasinski estimates that a mere 10% of total accounts belong to such users, and

23   therefore reduces his $4.6 billion revenue estimate by $460 million. *See* Mot. 24–25; Tr. Aug. 25

24   (Lasinski) 927:2–17. But as Dr. Knittel explained, that 10% figure is the percentage of unicorn and

25   dasher accounts out of all sWAA-off users, whether signed in or signed out. *See* Tr. Aug. 28

26   (Knittel) 1570:22–1571:7. When looking only at signed-in sWAA-off users, about 50% of them

27   are dashers and unicorns. *See* Tr. Aug. 28 (Knittel) 1571:12–17. Plaintiffs take issue with a

28   derivative calculation of Dr. Knittel's, intended to correct the overstatement of profit resulting from

Cooley LLP
Attorneys at Law
San Francisco

37

**Google's Opp. to Pls.' Mot. for**
**Perm. Inj. and Disgorgement**
**3:20-CV-04688-RS**

the initial issue with overestimating the percentage of signed-in sWAA-off users who were neither dashers nor unicorns. *See* Mot. 26. But Plaintiffs do not and cannot dispute Dr. Knittel's initial criticism that Mr. Lasinski's 10% figure considers both signed-in and signed-out sWAA-off users.

### b.    Mr. Lasinski fails to deduct the proper expenses.

The expenses portion of the Motion shows that Plaintiffs are completely at sea. They do not understand Google's traffic acquisition costs ("TACs"), which are Google's payments to the apps (also called publishers) that provide ad space for Google to serve ads to users. *See* Tr. Aug. 27 (Langner) 1320:2–7. Plaintiffs therefore go through three scenarios of net profits, concluding— unsurprisingly—that the highest net amount is the most appropriate. Mr. Lasinski also failed to deduct other proper expenses from his profit analysis.

### i    Plaintiffs calculate TACs incorrectly.

Two documents in evidence show TACs: a P&L for the years 2017 through 2021 for DVA only (PX-419) and a P&L for the years 2022 and 2023 for DVA, Search, and YouTube (PX-421). *See* Mot. 32–35. Both of these P&Ls reflect global figures. *See* Tr. Aug. 27 (Langner) 1316:11–15, 1324:23–1325:10. Plaintiffs accept that PX-421 presents global figures, *see* Mot. 34, but continue to have trouble accepting that PX-419 reflects global numbers with respect to both revenue and costs. *See, e.g.*, Mot. 33 n.21 (examining possibility, never raised by Google, that PX-419 might show United States revenue and global costs). There are no documents in evidence showing TACs specific to the United States, as Google does not perform accounting in this manner. *See* Tr. Aug. 27 (Langner) 1326:12–13 ("Our P&Ls are produced at the global level and not at a country level.").

PX-419 shows global TACs of about 68% across the relevant years, and PX-421 shows global TACs of 23% to 25%. *See* Mot. 33–34. Mr. Lasinski's main disgorgement model applied the 68% ratio across all years; he also included a footnote in his supplemental report applying the lower TACs to increase the profit calculation. *See* Lasinski Suppl. Rep. at 3 n.9. Plaintiffs' three scenarios for measuring TACs can be summarized as follows: (1) use the 68% figure for all years; (2) use 68% for the years covered by PX-419 and 23-25% for the years covered by PX-421 as well as 2024; and (3) use 23-25% for all years. *See* Mot. 32–35. All three of Plaintiffs' scenarios assume without explanation that global TACs can be used in place of United States TACs.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

First, Google submits that Plaintiffs are bound to the calculations in Mr. Lasinski's report, which used the 68% TAC ratio from PX-419 and which was the basis for Dr. Knittel's rebuttal. This result would be the most consistent with the entire procedural history of the case, including trial, where the Court ruled that Mr. Lasinski's demonstratives were "to reflect [] his initial conclusion[] [t]hat's in his report" (*i.e.*, using TACs of 68% throughout), despite Plaintiffs' contention that "his report was only the result of the poor information from Google."[16] *See* Tr. Aug. 25 (Evidentiary Argument) 794:3-18. The Court permitted Mr. Lasinski to testify as to his calculations involving PX-421, but required that they be strictly characterized as alternative assumptions that were not his main opinion. *See id.* at 795:11-25.

Second, if PX-421 is to be used at all, then both PX-419 and PX-421 should be used for their relevant years, with the average PX-421 TAC proportion also used for 2024. That is, there is no reason to exclude PX-419, which provides the global TACs for 2017 through 2021 for DVA, and replace its figures with those in PX-421, which provides global TACs for 2022 and 2023 for DVA, Search, and YouTube. Relatedly, if the PX-421 figures are used, Plaintiffs' calculation of the TAC percentage must be corrected, as they do not isolate the DVA product line of App Promo. As Ms. Langner testified, DVA is the category of "apps not owned by Google, so what we would call third-party apps." Tr. Aug. 27 (Langner) 1325:19–1326:2. The 68% TAC figure is "about what [Google] would pay to [third-party] publishers." Tr. Aug. 27 (Langner) 1354:10–13. Google's TACs are lower (if they exist at all) for serving ads on spaces owned by Google, such as Search and YouTube. *See id.* at 1353:20–1354:8. Only third-party apps are at issue in this action.

PX-419 is already limited to DVA. *See id.* at 1315:16–23. But PX-421 is a P&L for DVA, Search, and YouTube. *See* PX-421, at Follow Up Output Tab. Plaintiffs' 23-25% calculation of TAC as a proportion of revenue is for all three categories, and is thus too low because the lower TACs for Search and YouTube bring down the overall TAC ratio. Accounting only for DVA, the TAC for 2022 is 36.00% and the TAC for 2023 is 33.34%, with a total average of 34.67%. *See id.*

Accordingly, the Court should deduct TACs of 68% from all years, as both Mr. Lasinski

---

[16] Plaintiffs' request to conduct more discovery should not be entertained. They have been on notice since Ms. Langner's deposition in December 2022 that only global TACs were available to them, and chose not to seek more discovery.

1    and Dr. Knittel did. But if the Court were to use both PX-419 and PX-421, the most logical solution

2    is to use TACs of 68% for 2017 through 2021, 36% for 2022, 33% for 2023, and 35% for 2024.

3                    **ii      Plaintiffs fail to deduct other expenses.**

4          Plaintiffs repeat *ad nauseum* that Google should be forced to disgorge any profit it made,

5    while also seeking to redefine the meaning of the term profit. Profits are revenues less costs, and

6    the same P&Ls on which Plaintiffs rely for the TAC figures also show that Google incurred other

7    costs—such as operating costs and machine costs—in serving ads. *See* PX-419; PX-421; Tr. Aug.

8    28 (Knittel) 1557:12–1558:7. Plaintiffs appear to suggest that these costs are general "overhead"

9    costs that Google might have incurred for any other part of its business but just happened to include

10   in its P&Ls for App Promo. *See* Mot. 37.

11         Not so. Ms. Langner explained that the operating expenses shown in the P&Ls are the costs

12   to run that specific portion of Google's business, such as salaries of engineers who "helped develop

13   the product" and the "machine costs to run our business"—and that, if App Promo revenues

14   decreased, Google would try to reduce the specific related costs, such as by having to lay off

15   employees or operating machines and code processes more efficiently. *See* Tr. Aug. 27 (Langner)

16   1320:11–1321:1. As for Plaintiffs' complaint that these figures are global, if the parties and Court

17   are already in the realm of assuming that global and United States revenues and costs are

18   proportional, there is no reason to stop doing so only for operating expenses.

19         Incorporating all of these corrections (including assuming TACs of 68% for all years),

20   Plaintiffs' unjust enrichment should be no higher than $130 million, as Dr. Knittel testified at trial.

21   *See* Tr. Aug. 28 (Knittel) 1571:20–1572:2. However, as Dr. Knittel warned, these adjustments are

22   made to calculations that are flawed from the start because (1) Mr. Lasinski assumes that Google's

23   profit is due to advertisers benefitting from Google's conversion tracking, even though third-party

24   tools provide the same information, and (2) "fundamentally, . . . he's calculating this profit that's

25   coming from a free service." *Id.* at 1570:7-15; *see also* Dkt. 699-7 (Knittel Rep.) ¶¶ 27–35.

26   **V.    CONCLUSION**

27         For the foregoing reasons, Google respectfully requests that the Court deny Plaintiffs'

28   Motion for Permanent Injunction and Disgorgement of Profits.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

40

GOOGLE'S OPP. TO PLS.' MOT. FOR
PERM. INJ. AND DISGORGEMENT
3:20-CV-04688-RS

1    Dated: November 19, 2025                    Respectfully submitted,

2                                                COOLEY LLP

3

4                                                By: */s/ Benedict Y. Hur*
                                                    Michael A. Attanasio
5                                                   Benedict Y. Hur
                                                    Simona Agnolucci
6                                                   Eduardo E. Santacana
                                                    Jonathan Patchen
7                                                   Argemira Flórez
                                                    Naiara Toker
8                                                   Harris Mateen
                                                    Thilini Chandrasekera
9                                                   Isabella McKinley Corbo
                                                    Chelsea Hu
10                                                  Michael B. Morizono

11                                               *Attorneys for Defendant*
                                                 *Google LLC*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cooley LLP
Attorneys at Law
San Francisco

41

Google's Opp. to Pls.' Mot. for
Perm. Inj. and Disgorgement
3:20-CV-04688-RS