**BOIES SCHILLER FLEXNER LLP**
David Boies (admitted *pro hac vice*)
Alexander Boies (admitted pro hac vice)
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200
dboies@bsfllp.com
aboies@bsfllp.com

Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
mmao@bsfllp.com
brichardson@bsfllp.com

James Lee (admitted *pro hac vice*)
Rossana Baeza (admitted *pro hac vice*)
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
jlee@bsfllp.com
rbaeza@bsfllp.com

Alison L. Anderson, CA Bar No. 275334
M. Logan Wright, CA Bar No. 349004
725 S. Figueroa St., 31st Floor
Los Angeles, CA 90017
Tel.: (213) 629-9040
alanderson@bsfllp.com
mwright@bsfllp.com

**SUSMAN GODFREY L.L.P.**
Bill Carmody (admitted *pro hac vice*)
Shawn J. Rabin (admitted *pro hac vice*)
Steven M. Shepard (admitted *pro hac vice*)
Alexander Frawley (admitted *pro hac vice*)
Ryan Sila (admitted *pro hac vice*)
One Manhattan West, 50th Floor
New York, NY 10001
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com
rsila@susmangodfrey.com

Amanda K. Bonn, CA Bar No. 270891
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: (310) 789-3100
abonn@susmangodfrey.com

**MORGAN & MORGAN**
John A. Yanchunis (admitted *pro hac vice*)
Ryan J. McGee (admitted *pro hac vice*)
Michael F. Ram, CA Bar No. 104805
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com
mram@forthepeople.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

ANIBAL RODRIGUEZ, JULIAN SANTIAGO, and SUSAN LYNN HARVEY, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

Case No.: 3:20-cv-4688-RS

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION AND DISGORGEMENT OF PROFITS (DKT. 700)**

Judge: Hon. Richard Seeborg
Trial Date: August 18, 2025

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    ARGUMENT ON INJUNCTIVE RELIEF ......................................................... 1

   A.    Plaintiffs Are Entitled to Injunctive Relief ................................................. 1

   B.    Monetary Damages Are Inadequate ............................................................. 4

   C.    The Balance of Hardships Strongly Favors Injunctive Relief ..................... 4

     1.    Enjoining Further Collection Is Appropriate and Narrowly Tailored ............... 5

     2.    Deleting sWAA-Off Data Is Appropriate and Narrowly Tailored ................... 5

     3.    Destruction of Algorithms, Models, and Services Created or Modified With sWAA-Off Data Is Appropriate and Narrowly Tailored ................... 7

     4.    Google's Intransigent Conduct Warrants the Requested Monitor ....................... 8

     5.    The Injunction Should Apply to Google's Parent, Affiliates, and Subsidiaries ................. 8

   D.    Public Policy Favors Injunctive Relief ....................................................... 8

III.   ARGUMENT ON DISGORGEMENT ................................................................ 9

   A.    Disgorgement Is Available to Plaintiffs ...................................................... 9

   B.    Disgorgement Is an Equitable Remedy That This Court Must Decide ............... 11

   C.    Disgorgement Does Not Require Strict Tracing .......................................... 12

   D.    This Court Has Equitable Jurisdiction To Decide Disgorgement ................ 13

   E.    CUTSA Does Not Preclude Disgorgement .................................................. 16

   F.    The Jury's Findings Do Not Preclude Disgorgement .................................. 17

   G.    Google Should Be Ordered to Disgorge a Minimum of $2.36 Billion ................ 17

     1.    Legal Standard: "But For" Causation Is Not Required .......................... 17

     2.    Google Profited from Using sWAA-Off Data for Conversion Tracking ............ 18

     3.    Google's Criticisms of Lasinski's $4.14 Billion Revenue Calculation Lack Merit .......... 19

     4.    Lasinski Accounted for Appropriate Expenses ........................................ 23

   H.    Alternatively, This Court Should Appoint a Special Master To Decide the Amount ........... 24

IV.    CONCLUSION .................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Cases**

*Asdale v. Int'l Game Tech.*,
549 Fed. App'x. 611 (9th Cir. 2013) ......................................................................5

*Ashland v. Ling-Temco-Vought, Inc.*,
711 F.2d 1431 (9th Cir. 1983) ...........................................................................17

*Brown v. Google, LLC*,
2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ......................................................24

*Calhoun v. Google LLC*,
113 F.4th 1141 (9th Cir. 2024) .......................................................................1, 3

*Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*,
494 U.S. 558 (1990) ......................................................................................11

*City of Fresno v. Turner*,
2025 WL 2721390 (N.D. Cal. Sep. 23, 2025) ..........................................................9

*Clark v. Yodlee, Inc.*,
2023 WL 12097898 (N.D. Cal. July 20, 2023) ...................................................10, 15

*Clark v. Yodlee, Inc.*,
No. 20-cv-5991-SK (N.D. Cal. Sep. 15, 2023), Dkt. No. 356 ..............................10, 15, 16

*Erhart v. BofI Holding, Inc.*,
612 F. Supp. 3d 1062 (S.D. Cal. 2020) ................................................................16

*Feltner v. Columbia Pictures Television, Inc.*,
523 U.S. 340 (1998) ......................................................................................11

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
778 F.3d 1059 (9th Cir. 2015) ...........................................................................11

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
772 F.2d 505 (9th Cir. 1985) ............................................................................24

*Friends of the Earth, Inc. v. Laidaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......................................................................................2

*Goddard v. DHL Exp. (USA), Inc.*,
357 Fed. App'x. 80 (9th Cir. 2009) ......................................................................5

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) ......................................................................................12

*Greenley v. Kochava, Inc.*,
    684 F. Supp. 3d 1024 (S.D. Cal. 2023) ..................................................................6, 10

*GSI Tech., Inc. v. United Memories, Inc.*,
    721 F. App'x 591 (9th Cir. 2017) ......................................................................... 11

*Guzman v. Polaris Indus. Inc.*,
    49 F.4th 1308 (9th Cir. 2022) ............................................................................... 15

*Hadley v. Kellogg Sales Co.*,
    2019 WL 3804661 (N.D. Cal. Aug. 13, 2019) ..................................................... 16

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*,
    28 F.4th 35 (9th Cir. 2022) ................................................................................... 11

*Hendricks v. Aetna Life Insurance Company*,
    344 F.R.D. 237 (C.D. Cal. July 25, 2023). .........................................................2, 3

*Howard v. Aetna Life Ins. Co.*,
    2024 WL 1098789 (C.D. Cal. Feb. 27, 2024).......................................................... 3

*In re California Gasoline Spot Mkt. Antitrust Litig.*,
    2021 WL 1176645 (N.D. Cal. Mar. 29, 2021) ..................................................... 14

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) .....................................................................9, 10, 14

*Index Newspapers LLC v. United States Marshals Servs.*,
    977 F.3d 817 (9th Cir. 2020) .................................................................................. 9

*Kamar Int'l, Inc. v. Russ Berrie & Co.*,
    752 F.2d 1326 (9th Cir. 1984) ............................................................................... 24

*Kansas v. Nebraska*,
    574 U.S. 445 (2015)............................................................................................... 11

*Ketayi v. Health Enrollment Group*,
    2021 WL 2864481 (S.D. Cal. July 8, 2021) .......................................................... 15

*Kewanee Oil v. Bicron*,
    416 U.S. 470 (1974)................................................................................................. 9

*Liu v. SEC*,
    591 US. 71 (2020)............................................................................................11, 13

*MAI Sys. Corp. v. Peak Comput., Inc.*,
    991 F.2d 511 (9th Cir. 1993) ................................................................................... 4

iii

*Marina Tenants Assn. v. Deauville Marina Dev. Co.*,
    181 Cal. App. 3d 122 (1986) ........................................................................ 12

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ........................................................................ 9

*Metro-Goldwyn-Mayer Studios v. Grokster*,
    518 F. Supp. 2d 1197 (C.D. Cal. 2007) .................................................... 4, 8

*Meyer v. Portfolio Recovery Assocs., LLC*,
    707 F.3d 1036 (9th Cir. 2012) ...................................................................... 9

*Montanile v. Board of Trustees of the National Elevator Indus. Health Benefit Plan*,
    577 U.S. 136 (2016) ................................................................................ 12, 13

*Moon v. Board of Trustees of PAMCAH-UA Loc. 675 Pension Fund*,
    319 F. Supp. 3d 1193 (N.D. Cal. 2018) ...................................................... 14

*Onyx Pharms., Inc. v. Bayer Corp.*,
    2011 WL 4527402 (N.D. Cal. Sept. 21, 2011) .......................................... 20

*Osborn v. Griffin*,
    865 F.3d 417 (6th Cir. 2017) ................................................................... 11, 12

*Patterson v. United HealthCare Ins. Co.*,
    76 F.4th 487 (6th Cir. 2023) ........................................................................ 13

*Phillip Morris USA Inc. v. Shalabi*,
    352 F. Supp. 2d 1067 (C.D. Cal. 2004) ........................................................ 4

*Rearden, LLC v. Walt Disney Pictures*,
    152 F.4th 1058 (9th Cir. 2025) .................................................................... 12

*Rodriguez v. Mondelez Glob. LLC*,
    703 F. Supp. 3d 1191 (S.D. Cal. 2023) ...................................................... 13

*Rosemere Neighborhood Ass'n v. U.S. Envt. Protection Agency*,
    581 F.3d 1169 (9th Cir. 2009) ...................................................................... 2

*Ruiz v. Bradford Exch., Ltd.*,
    153 F.4th 907 (9th Cir. 2025) ...................................................................... 13

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
    580 U.S. 328 (2017) ...................................................................................... 11

iv

*SEC v. Camarco*,
   2021 WL 5985058 (10th Cir. Dec. 16, 2021) .................................................................. 13

*SEC v. Cavanagh*,
   445 F.3d 105 (2d Cir. 2006) ............................................................................................ 11

*SEC v. de Maison*,
   2021 WL 5936385 (2d Cir. Dec. 16, 2021) .................................................................... 13

*SEC v. First Pac. Bancorp*,
   142 F.3d 1186 (9th Cir. 1998) ........................................................................................ 12

*SEC v. Huffman*,
   996 F.2d 800 (5th Cir. 1993) ................................................................................... 11, 14

*SEC v. Navellier & Assocs., Inc.*,
   108 F.4th 19 (1st Cir. 2024) ........................................................................................... 13

*SEC v. Rind*,
   991 F.2d 1486 (9th Cir. 1993) ........................................................................................ 11

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) .......................................................................................... 15

*Synopsys, Inc. v. Real Intent, Inc.*,
   2024 WL 4557334 (N.D. Cal. Oct. 22, 2024) ................................................................ 17

*Tull v. United States*,
   481 U.S. 412 (1987) ........................................................................................................ 11

*Turrey v. Vervent, Inc.*,
   2023 WL 6390620 (S.D. Cal. Sept. 29, 2023) .......................................................... 13, 15

*Utne v. Home Depot U.S.A.*,
   2022 WL 1443339 (N.D. Cal. May 6, 2022) .................................................................. 13

*Valenzuela v. Nationwide Mutual Ins. Co.*,
   2023 WL 5266033 (C.D. Cal. Aug. 14, 2023) ................................................................. 6

*z4 Techs., Inc. v. Microsoft Corp.*,
   434 F. Supp. 2d 437 (E.D. Tex. 2006) .............................................................................. 8

**Statutes**

Cal. Civ. Code § 3426.1(d) ................................................................................................. 16

Cal. Civ. Code § 3426.7(b) ................................................................................................. 16

**Other Authorities**

2 D. Dobbs, Law of Remedies, § 4.3(5) (2d ed. 1993) ........................................................ 17

Restatement (Third) of Restitution and Unjust Enrichment § 44 ................................... 9, 10

Plaintiffs' Reply In Support of Motion for Permanent Injunction and Disgorgement of Profits
3:20-cv-04688-RS

## I.   INTRODUCTION

A jury found that Google intentionally invaded the privacy of 98 million Americans by exploiting their private app activity data. Google now asks this Court to bless its ongoing exploitation of that data based on two sentences Google added to one of its many sWAA disclosures—revisions which simply perpetuate the "intentionally vague" "Google Account" argument the jury already heard and rejected. PX-4. Google also claims it should get to keep and continue to use the data it was never supposed to collect in the first place because it would be too difficult to delete the data. But the truth is that Google maintains specific logs and fields that can isolate sWAA-off data, making that data easy to delete. Google also wants to keep the billions in ill-gotten profits earned from its illegal conduct. So Google *now* argues this Court cannot decide that issue, after previously arguing that the Court must do so. Meanwhile, Google insists that it made no money from class members' data, despite documents and testimony confirming the opposite, not to mention Google's plea to keep this allegedly useless data. The Court should now enjoin Google from further engaging in its harmful behavior and disgorge Google of its illicit profits. Any contrary ruling would send a troubling message—that privacy violations are sound business decisions and even after a jury has found a company liable for those violations, Americans remain powerless to avoid them.

## II.   ARGUMENT ON INJUNCTIVE RELIEF

### A.  Plaintiffs Are Entitled to Injunctive Relief

The Ninth Circuit has held that to obtain consent to collect user information, Google's disclosures must "explicitly notify" users of the "particular conduct" at issue with only one plausible interpretation. *Calhoun v. Google LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024). Google's new "disclosure" remains vague. It is still unclear what Google is collecting and not collecting when sWAA is "off." There is neither explicit notification nor actual consent. *Id.*

Google's self-serving interpretation of the new language is just the latest iteration of the consent defense it peddled to the jury, which the jury rejected. Indeed, the first of the two new sentences states, "Google always collects, uses, and processes data *in accordance with the Google Privacy Policy* [hyperlink removed]." Dkt. 703-1 ¶ 5 (emphasis added). When a user clicks on the

1

"Google Privacy Policy" hyperlink, she is taken to the Privacy Policy language, which still states, "we…work hard to…put you in control" and "across our services, you can adjust your privacy settings to control whether we collect some types of data." Ex. 1.[1] This is the same "control" language Google submitted to the jury, which the jury found insufficient to support Google's defense.

The second sentence fares no better. Google states that it "can collect and use data *that is not associated with your account*." Dkt. 703-1 ¶ 5 (emphasis added). This sentence merely rehashes the "My Account" argument that Google made at trial, which the jury also rejected. *See, e.g.*, Tr. 1918:8–17. Here, Google again uses "my account [not capitalized]" and "My Account [capitalized]" interchangeably without a meaningful definition of either. This is the same type of "intentionally vague" language Google has been using for years. PX-4 ("Google Account" description is "intentionally vague"); PX-3 ("activity controls wording … is very deceptive" and gives "a false sense of security that their data is not being stored at Google, when in fact it is").

In addition, even if these new disclosures were adequate (which they are not), Google's changes do not remedy the sWAA-off data that Google collected and saved, before November 13, 2025, the day Google allegedly published the revisions, and Google still fails to provide users with a meaningful choice.

Disclosure changes are also insufficient because Google remains free to undo those changes. To evade injunctive relief, Google bears "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). "Put another way, the burden is not on [Plaintiffs] to show [they] *will* file another complaint. The burden is on [Google] to show that [Plaintiffs] *will not* do so." *Rosemere Neighborhood Ass'n v. U.S. Envt. Protection Agency*, 581 F.3d 1169, 1174 (9th Cir. 2009). Google does not come close to carrying that burden.

*Hendricks v. Aetna Life Insurance Company* is instructive. In *Hendricks*, the plaintiffs filed a class action challenging Aetna's general policy of denying coverage for surgeries that it unilaterally

---

[1] This is an exhibit to the original Mao Declaration dated October 22, 2025 (Dkt. 700-1). The remaining exhibit references in this brief are exhibits to the 2d Mao Declaration filed with this brief.

determined were "experimental or investigational" and thus not covered by the policy. 344 F.R.D. 237, 240 (C.D. Cal. July 25, 2023). The court certified, among others, an injunctive class, which Aetna argued should be decertified because any request for injunctive relief was "rendered moot by [its] changes to" the policy at issue. *Id.* The court rejected Aetna's argument. The "formidable burden" standard required Aetna to prove that "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (citing *LaidLaw*, 528 U.S. at 190). Aetna failed to carry that "formidable burden" because "[n]othing prevents Aetna from returning to its old ways, so the injunction is still viable notwithstanding Aetna's change of heart." *Id.* (citing *FTC v. Affordable Media*, 179 F.3d 1228, 1237–38 (9th Cir. 1999)).

In a follow-on class action, Aetna was sued for denials of benefits for other surgeries under the same offending policy language. *Howard v. Aetna Life Ins. Co.*, 2024 WL 1098789, at *1 (C.D. Cal. Feb. 27, 2024). Aetna again challenged entitlement to injunctive relief and sought to distinguish *Hendricks* by submitting a sworn corporate representative declaration that Aetna "does not currently intend to change its current policy." *Id.* at *8. The *Howard* court still found that Aetna failed to meet its "formidable burden" because "[c]urrent intent does not evidence future intent. It is still true that '[n]othing prevents Aetna from returning to its old ways[.]'" *Id.* (quoting *Hendricks*, 344 F.R.D. at 246, and citing *Affordable Media*, 179 F.3d at 1237–38).

Here, as in *Howard*, "nothing prevents [Google] from returning to its old ways"—meaning Google could undo its disclosure changes at any time. Google cannot be trusted with self-compliance. Case in point: Google makes the absurd argument that the class notice website obtained user consent for its collection of sWAA-off data. Opp'n at 7. Setting aside that Google denied the allegations and merits of this lawsuit on that website,[2] Google's persistence with proffering different forms of the same losing arguments only demonstrates the lengths Google will go to avoid responsibility for its unlawful conduct. Only an injunction will suffice.

---

[2] At Google's insistence, the website's homepage contains an unequivocal statement that "Google denies Plaintiffs' legal claims and does not admit to any wrongdoing." *See* https://www.googlewebappactivitylawsuit.com/. That is the opposite of the "explicit" notification required for consent. *Calhoun*, 113 F.4th at 1147.

## B.  Monetary Damages Are Inadequate

Google did not ask for nor secure a license to use class members' devices and sWAA-off data into perpetuity. The jury was only asked to compensate class members for *past harm. See* Dkt. 666 (Jury Instructions Nos. 18–22) (instructions for causes of action and damages phrased in the past tense to address Google's past conduct and the attendant harms); Dkt. 670 (Question 5) (awarding compensatory damages for past harms). Even Google acknowledges that Plaintiffs requested relief solely for past harms. Opp'n at 9 (citing Plaintiffs' counsel's request that the jury "compensate the Plaintiffs for any injury you find Google *caused*." (emphasis added)). So, while the jury award may remedy *past harm*, that award has no relationship to Google's *future* use.

Besides, any monetary award is inadequate where a tortfeasor continues to possess and use unlawfully obtained data. *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 520 (9th Cir. 1993) ("As a general rule, a permanent injunction will be granted when . . . there is a threat of continuing violations."). The ongoing nature of Google's collection and use of the data makes it "untenable for Plaintiffs to track and proceed against every [time Google collects, saves, and uses their data]" because "[t]here is no way to know how many times this [data] has been accessed and downloaded . . . [b]ecause of the nature of [Google's] trackers." *Metro-Goldwyn-Mayer Studios v. Grokster*, 518 F. Supp. 2d 1197, 1220 (C.D. Cal. 2007). "The only realistic method for remedying such future harm resulting from [Google's unlawful conduct] is by way of a permanent injunction." *Id.*

## C.  The Balance of Hardships Strongly Favors Injunctive Relief

Enjoining Google from continuing to engage in unlawful conduct does not itself create an undue hardship. *See, e.g.*, *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1075 (C.D. Cal. 2004) (hardship attendant to enjoining unlawful activity does not weigh against injunction); Opening Br. at 12 (collecting additional cases). Here, all parts of the proposed injunction are narrowly tailored to prohibit Google from further violating class members' privacy.

### 1. Enjoining Further Collection Is Appropriate and Narrowly Tailored

Google does not dispute that it has the technical means to stop this collection. The jury found a privacy violation based on Google collecting, saving, and using sWAA-off data, and the most straightforward approach is for the Court to order Google to stop. Google's addition of two sentences is insufficient to establish consent (*see supra*, § II.A.), and asking the Court to assume the responsibility of crafting and approving language that would adequately notify users of Google's ongoing collection, saving, and use of this sWAA-off data (especially where all uses are still unknown) is not reasonable. The appropriate relief is telling Google to stop.

Contrary to Google's argument, there was no "jury[] finding that Google had permission to collect the data." Opp'n at 11. The jury instructions for the CDAFA claim listed five separate elements (Dkt. 666 at Instruction 14), and Google contested every element.[3] There is no way to divine a jury finding on any one element, such as the "no permission" element. Google's speculation about the jury's verdict is inappropriate. *Asdale v. Int'l Game Tech.*, 549 Fed. App'x. 611, 614 (9th Cir. 2013) (where "the jury used a general verdict form [the court] cannot speculate about the jury's thought process"); *see also Goddard v. DHL Exp. (USA), Inc.*, 357 Fed. App'x. 80, 81 (9th Cir. 2009) ("It is well settled that courts . . . cannot, by way of speculation, pierce the general verdict to reach conclusions contended for by one party or another . . . ."). Indeed, if we were to speculate, the fifth note from the jury would suggest that the jury's focus was on whether "damage or loss" under CDAFA was narrower than "harm" for the privacy claims. Dkt. 671 at 6. In any event, what we do know for certain is that the jury, in finding Google liable for violating the common law and the California Constitution, explicitly found that Plaintiffs did not consent to Google's collection and use of their data. Dkt. 670 (Questions 3–3a).

### 2. Deleting sWAA-Off Data Is Appropriate and Narrowly Tailored

Google's argument that deletion inappropriately affects hypothetical third parties is contrary to Google's own admissions and the jury's findings. As the Court recognized, the case is about whether Google is authorized as an intermediary to collect the data, when WAA/sWAA is off. Dkt.

---

[3] Tr. 1942:11–1944:22 (Google during closing disputing all five elements of the CDAFA).

352 at 17 ("the relevant question concerns *Google*'s disclosures about the sWAA button, not third-party disclosures to users") (emphasis original); *see also* Dkt. 445 at 16 (rejecting Google's consent-through-third-party defense). The correct inquiry is whether Google had consent to take sWAA-off data from class members' devices. Google presented evidence supporting its argument throughout trial (Tr. 1130:23–1131:11) and during closing (Tr. 1919:17–1922:1); the jury responded to Google's contentions with "No." Dkt. 670 (Questions 2–3a). Courts have declined to find consent under similar circumstances. *See, e.g.*, *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1039 (S.D. Cal. 2023); *Valenzuela v. Nationwide Mutual Ins. Co.*, 2023 WL 5266033, at *6–7 (C.D. Cal. Aug. 14, 2023). The jury found that Google lacked consent to collect, save, and use the sWAA-off data for any purpose, and as a matter of law, no agreements with third-party app developers changes that. Google's own presentation at trial supported this point. Google argued that its Google Analytics customers had to sign agreements that required that they adhere to the Google Privacy Policy. *See* Tr. 1202:5–1204:21 (Ganem); G933; PX-123. And Google acknowledged that it had to use class member's resources (e.g., their mobile devices) to collect sWAA-off data. *See* Ex. 21 at 10–11 (acknowledging that Google's data collection utilizes device battery); Tr. 1278:5–8 (Ganem) (data "comes directly from a device to Google"); Tr. 584:23–585:4 (Hochman) (Google SDKs take "data from the users' device and gives that data to Google").

So when the jury found that Google violated class members' privacy, it expressly rejected Google as an authorized intermediary to collect sWAA-off data.

Google's burden arguments are also overblown. In discovery, Google identified logs that contain sWAA-off data, which also "contain[] one or more bits and/or fields that reliably shows whether specific event-level traffic was generated while WAA was off." Dkt. 314-5 (Hochman Rep.) § VII.I, ¶ 358. This means Google has fields that can be used to filter sWAA-off data and then Google can delete that sWAA-off data without deleting any other data. Google can do this without having to "rejoin" any data or "ask each and every user" for their information. Opp'n at 11; Opening Br. at 8 (citing Hochman Rep. § VII.K, ¶¶ 415–16). The requested third-party monitor could also oversee efforts to identify more data sources that contain these reliable indicators. Opening Br. at 16.

Google fails to prove that any amount of deletion—big or small—is an undue burden. Plaintiffs' technical expert has already shown that most of the deletion and remediation needed is rather straightforward and simple. Second Declaration of Jonathan Hochman ("Hochman 2d Decl.") ¶¶ 5–7. And as Plaintiffs demonstrated at trial, Google has logs and data sources to which it copied and propagated sWAA-off data. Google has offered nothing to show that these data sources and logs are necessary for Google's business or the supposed business of its customers. *Id.* ¶ 6. Google could have explained how each of these logs were important during discovery and at trial, but Google refused to do so. It gambled by keeping secret where and how sWAA-off data is stored, and then it took the case to trial and lost. Now Google wants the Court and Plaintiffs to simply take it at its word, claiming that deleting any data is impossible.[4] Google cannot have it both ways—if it refuses to identify and explain how each of the logs and data sources are different, Google cannot blame the Court if they are all treated the same. Deletion from every one of these data sources is appropriate and narrowly tailored, especially if overseen by a third party. There are certainly other ways to remediate this data as the settlement in *Brown v. Google LLC* demonstrated, where Google agreed to delete or remediate billions of data entries containing Incognito data rather than proceed to trial. *See Brown v. Google LLC*, No. 20-cv-03664-YGR (N.D. Cal. Apr. 1, 2024), Dkt. 1097-4.

### 3. Destruction of Algorithms, Models, and Services Created or Modified With sWAA-Off Data Is Appropriate and Narrowly Tailored

For the same reasons that Google lacks consent to continue using sWAA-off data, Google lacks consent to continue using any algorithms, models, and services that were developed with sWAA-off data. Any actual damages award was for *past* harm. There is nothing "conjectural" about Google's *ongoing* use of sWAA-off data to create and improve its algorithms, models, and services. Tr. 631:6–632:12 (Hochman); Dkt. 314-5 (Hochman Rep.) § VII.F.3, ¶ 297 (Google admitting that "user data [is] collected via GA for Firebase across teams for product development, improvement, and diagnostics" and that sWAA-off data is used "for improving Google products and services, enabling technical support, benchmarking, and sharing with Account Specialists"); *see also* Tr.

---

[4] Notably, Google concedes it can delete data if it "re-engineer(s) its systems." Opp'n at 10.

1777:3–12 (Black) (confirming that Google derives valuable benefits from developing and improving existing products with sWAA-off data).

### 4. Google's Intransigent Conduct Warrants the Requested Monitor

Google concedes that stubborn actors need a third-party monitor (Opp'n at 14), and Google's intransigent conduct demonstrates this remedy is warranted here. The request for a monitor is based on the Court's inherent equitable powers, not merely Rule 53. Opening Br. at 16. Google employees have for years been sounding the alarm to fix Google's misrepresentations concerning WAA. Rather than address them, Google put profits over privacy. Nothing about Google's conduct before this case was filed, during litigation, or after the verdict suggests that a monitor is unnecessary. It is apparent that Google intends to continue to collect and use WAA/sWAA off data without explicit disclosure or valid consent. Absent this remedy, which allows for transparency, consumers would have no other recourse but to file a "multiplicity of suits" to (after years of litigation) obtain discovery and ascertain exactly what Google is doing to comply with the injunction. *Grokster*, 518 F. Supp. 2d 1197, 1220 (C.D. Cal. 2007).

### 5. The Injunction Should Apply to Google's Parent, Affiliates, and Subsidiaries

Google's argument that it has never "actually set up a new entity just to shirk a court order" (Opp'n at 15) misses the point. Google's expert suggested that Google could set up another company to shirk any injunctive relief the Court awards (Tr. 1671:10–16 (Knittel)) and that course of conduct would be "probably likely." Dkt. 699-4 (Knittel Depo Tr.) at 184:3–21. Applying the injunction to each parent, affiliate, and subsidiary appropriately ensures that Google cannot evade the injunction.

### D. Public Policy Favors Injunctive Relief

Google relies on one case to suggest that the "potential negative effects on the public weigh . . . against granting an injunction." Opp'n at 15 (citing *z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 444 (E.D. Tex. 2006)). But Google conveniently omits that the court there was "unaware of any negative effects that might befall the public in the absence of an injunction" and accordingly found that public policy disfavored injunctive relief. *z4 Techs.*, 434 F. Supp. 2d at 444. Here, by contrast, millions of class members are suffering ongoing irreparable harm because Google

8

continues to violate their constitutional rights. Public policy supports this request for injunctive relief. *Index Newspapers LLC v. United States Marshals Servs.*, 977 F.3d 817, 837 (9th Cir. 2020); *see also City of Fresno v. Turner*, 2025 WL 2721390, at *19 (N.D. Cal. Sep. 23, 2025). It "is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *see also Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1045 (9th Cir. 2012) (affirming preliminary injunction based on continuing violations of class members' "right to privacy"). Google never had consent to collect, save, and use class members' sWAA-off data, and Google's belated revisions to the WAA/sWAA-toggle screen does nothing to change that. *Supra*, § II.A.

A "most fundamental human right, that of privacy, is threatened when industrial espionage is condoned or is made profitable; the state interest in denying profit to such illegal ventures is unchallengeable." *Kewanee Oil v. Bicron*, 416 U.S. 470, 487 (1974). Absent an injunction that holds Google accountable to the jury's verdict and sends a clear message that an on/off switch should actually do something, Google will continue to deprive class members of their constitutional right to be free of Google invading their privacy.

## III.    ARGUMENT ON DISGORGEMENT

### A. Disgorgement Is Available to Plaintiffs

Google does not seriously contest that disgorgement is a remedy for at least Plaintiffs' intrusion upon seclusion claim. *See* Opp'n at 23–24 (arguing only that disgorgement "is not available for the constitutional claim"). There is no dispute that California law follows the Restatement (Third) of Restitution and Unjust Enrichment ("Restatement"), and the Restatement plainly allows disgorgement of unjustly earned profits through "conscious interference with a claimant's legally protected interests." Restatement § 44. Consistent with the Restatement, "California law *requires* disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff' monetary harm. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020) (emphasis added). "That is because 'the public policy of [California] does not permit one to take advantage of his own wrong regardless of whether the other party suffers actual damage.'" *Id.*

(quoting *County of San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 542 (2007)). "California law recognizes that individuals maintain *an entitlement* to unjustly earned profits" where "as between the two parties, it is unjust for [Google] to retain it." *In re Facebook*, 956 F.3d at 600 (emphasis added).

Google ignores the Restatement and the caselaw consistent with it. Google's only rejoinder is that *In re Facebook* "discussed disgorgement entirely separately from the constitutional or privacy tort claims." Opp'n at 24. But as Google itself points out, the discussion in *In re Facebook* applied to a gamut of different common law and statutory claims—"common law trespass to chattels, fraud, statutory larceny, and CDAFA claims." Opp'n at 24. California's public policy of preventing wrongdoers from keeping ill-gotten gains applies with equal force to Plaintiffs' privacy claims. Google's highly offensive violation of Plaintiffs' privacy rights is precisely the type of "conscious interference with a claimant's legally protected interests" that demands a disgorgement remedy. Restatement § 44(1); *see Greenley*, 684 F. Supp. at 1037 (finding plaintiffs had standing to bring invasion of privacy and other claims because "California law recognizes 'an entitlement to unjustly earned profits'" (quoting *In re Facebook*, 956 F.3d at 600)).

Google's contention that disgorgement is unavailable for its proven constitutional invasion of privacy violation is both late and unsupported. Google never argued disgorgement was unavailable until now. Indeed, the Court's advisory jury instruction allowed the jury to award disgorgement if "Plaintiffs have proved all of the elements of their . . . second claim (invasion of privacy), and/or third claim (intrusion upon seclusion)." Dkt. 666 (Instruction No. 24) at 25. This contention is waived.

Google's argument is also unsupported. Google's cited cases are either wholly inapplicable or hold only that monetary *damages* are unavailable for a constitutional violation.[5] None foreclose a court from using its broad equity powers to order disgorgement of profits as a means of remedying

---

[5] Google cites *Clark v. Yodlee, Inc.*, 2023 WL 12097898 (N.D. Cal. July 20, 2023), but as discussed *infra*, pp. 15–16, the court allowed plaintiffs to seek disgorgement for its invasion of privacy claim. *See Clark v. Yodlee, Inc.*, No. 20-cv-5991-SK (N.D. Cal. Sep. 15, 2023), Dkt. No. 356. Google also relies on a case that is not about constitutional claims at all but rather a contract claim. *See Marina Tenants Assn. v. Deauville Marina Dev. Co.*, 181 Cal. App. 3d 122, 134 (1986). And Google's own gloss on the remaining cited cases show that those cases relate only to damages, not disgorgement. *See* Opp'n at 23–24.

constitutional violations. In any event, at a minimum, it is undisputed that disgorgement is available as a remedy for Google's intrusion upon the class members' seclusion.

### B. Disgorgement Is an Equitable Remedy That This Court Must Decide

Google previously argued that "[a]ctions for disgorgement are equitable in nature and must be tried to the Court." Dkt. 520 (Google's MIL No. 2) at 3. Google now contends those representations only referred to the statutory CDAFA claim and not the common-law and constitutional claims. Opp'n at 16–17. But Google's latest position—that the Court may not decide disgorgement in this case for these claims—is flatly contradicted by Supreme Court and Ninth Circuit precedent, including that on which Google previously relied.

Disgorgement is an equitable remedy. In *Liu v. SEC*, the Supreme Court held that disgorgement of profits was relief "typically available in equity" and therefore constituted "equitable relief" under 15 U.S.C. § 78u(d)(5). 591 U.S. 71, 78–79 (2020). The Court pointed out that "[e]quity courts have routinely deprived wrongdoers of their net profits from unlawful activity, even though that remedy may have gone by different names." *Id.* at 79. That is because disgorgement reflects a "foundational principle: It would be inequitable that a wrongdoer should make a profit out of his own wrong." *Id.* at 79–80 (cleaned up). *Liu* cited a long line of Supreme Court cases stating that disgorgement is an equitable remedy.[6] *Id.* at 81. The Ninth Circuit and other courts of appeals have likewise repeatedly deemed disgorgement an equitable remedy.[7] Google previously relied on these

---

[6] *See, e.g.*, *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 341 (2017); *Kansas v. Nebraska*, 574 U.S. 445, 453, 475 (2015); *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998); *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 570 (1990); *Tull v. United States*, 481 U.S. 412, 424 (1987).

[7] *See, e.g.*, *GSI Tech., Inc. v. United Memories, Inc.*, 721 F. App'x 591, 594 (9th Cir. 2017) ("Profit disgorgement is an equitable remedy that is within the sound discretion of the trial court and, therefore, outside the province of the jury."); *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015) ("[T]he current law recognizes that actions for disgorgement of improper profits are equitable in nature." (collecting cases))); *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993) ("[T]he fact that disgorgement involves a claim for money does not detract from its equitable nature" because "the court is not awarding damages to which plaintiff is legally entitled but is exercising the chancellor's discretion to prevent unjust enrichment" (internal quotation marks and citations omitted)); *see also Osborn v. Griffin*, 865 F.3d 417, 461 (6th Cir. 2017); *SEC v. Cavanagh*, 445 F.3d 105, 120 (2d Cir. 2006); *SEC v. Huffman*, 996 F.2d 800, 803 (5th Cir. 1993); *see also Harbor*

1   cases to persuade this Court that the disgorgement Plaintiffs seek is equitable in nature. *See* Dkt. 520

2   (Google's MIL No.2) at 3.

3   　　Google's current arguments rest entirely on two Supreme Court decisions pre-dating *Liu* that

4   do not involve disgorgement of profits *at all*. In *Great-West Life & Annuity Insurance Company v.*

5   *Knudson*, the plaintiff sought restitution of monies it believed it was contractually owed under a health

6   plan, not disgorgement of profits. 534 U.S. 204, 204 (2002). The Supreme Court specifically noted

7   that "accounting for profits" is "a form of *equitable* restitution that is not at issue in this case." *Id.* at

8   214 n.2 (emphases added). Thus, *Great-West* "is not on point, and does not cast doubt on the wealth

9   of authority holding that disgorgement is an equitable remedy." *Osborn*, 865 F.3d at 462. Google's

10  reliance on *Montanile v. Board of Trustees of the National Elevator Industry Health Benefit Plan* is

11  misplaced for the same reason—*Montanile* did not involve any allegation that the defendant made

12  profits from those funds and therefore did not implicate disgorgement. 577 U.S. 136, 144 (2016).

13  The remaining district court cases Google cites include reasoning that is now foreclosed by *Liu*.

14  　　**C.  Disgorgement Does Not Require Strict Tracing**

15  　　Equitable disgorgement does "not require[] [Plaintiffs] to trace every dollar of the . . .

16  proceeds" Google made from using the class members' sWAA-off data. *SEC v. First Pac. Bancorp*,

17  142 F.3d 1186, 1192 n.6 (9th Cir. 1998). Plaintiffs need only show the amount of disgorgement is "a

18  reasonable approximation of profits causally connected to" Google's wrongdoing. *Id.* Google's

19  insistence on requiring strict traceability between its wrongful use of Plaintiffs' data and particular

20  Google funds is based entirely on *Montanile*. *See* Opp'n at 18. *Montanile* is inapposite because it

21  states the requirements of an equitable lien, not disgorgement.[8] Plaintiffs have never asserted an

22  equitable lien. Plaintiffs seek an entirely different equitable remedy, that of disgorgement, which "has

23

24

25  _____

    *Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 28 F.4th 35, 39 (9th Cir. 2022); *Rearden, LLC*

26  *v. Walt Disney Pictures*, 152 F.4th 1058, 1074 (9th Cir. 2025).

27  [8] An equitable lien "give[s] a security interest . . . to a plaintiff who was, in the eyes of equity, the

28  true owner" of money or property. *Great-West*, 534 U.S. at 213.

_____

no tracing requirement." *Liu*, 591 U.S. at 98 (Thomas, J., dissenting). Post-*Liu*, several courts of appeals have explained that disgorgement does not require tracing to a particular property or fund.[9]

Nor do Google's cited cases indicate that Plaintiffs cannot seek disgorgement of profits merely because Plaintiffs require "relief from a defendant's general assets." Opp'n at 18. As *Montanile* itself indicated, even for equitable liens, "commingling" of funds still "allowed the plaintiff to recover the amount of the lien from the entire pot of money." 577 U.S. at 148; *accord Patterson v. United HealthCare Ins. Co.*, 76 F.4th 487, 498 (6th Cir. 2023) (finding money "potentially susceptible to recovery under [disgorgement and equitable restitution], even if commingled with other funds.").

### D. This Court Has Equitable Jurisdiction To Decide Disgorgement

Google's objection to this Court's equitable jurisdiction is waived. A defendant can waive an objection to a federal court's equitable jurisdiction, *Ruiz v. Bradford Exch., Ltd.*, 153 F.4th 907, 915 (9th Cir. 2025), including if it "fails to object seasonably," *Rodriguez v. Mondelez Glob. LLC*, 703 F. Supp. 3d 1191, 1214 (S.D. Cal. 2023) (cleaned up).

Google failed to object seasonably and then some. This Court previously indicated that "if [a] case were even a smidgen more advanced" than a few months before trial, a waiver argument based on the defendant's failure to timely object to equitable jurisdiction "would have to be addressed." *Utne v. Home Depot U.S.A.*, 2022 WL 1443339, at *2 (N.D. Cal. May 6, 2022) (Seeborg, C.J.). Plaintiffs have long made clear they intended to pursue *both* compensatory damages and disgorgement.[10] *See, e.g.*, Dkt. 289 (Fourth Amended Complaint) at 76. Yet Google has never

---

[9] *See, e.g.*, *SEC v. Navellier & Assocs., Inc.*, 108 F.4th 19, 43 (1st Cir. 2024) ("The SEC need only establish that the amount of disgorgement sought is a reasonable approximation of profits causally connected to the violation."); *SEC v. de Maison*, 2021 WL 5936385, at *2 (2d Cir. Dec. 16, 2021) (summary order) ("*Liu* did not disturb this Court's longstanding principle that specific tracing is unnecessary in ordering disgorgement for securities fraud." (alteration adopted) (internal quotation marks and citation omitted)); *SEC v. Camarco*, 2021 WL 5985058, at *14 (10th Cir. Dec. 16, 2021) (nonbinding order and judgment) (explaining that a "strict tracing requirement . . . would not further the goals of disgorgement" because it can benefit "a savvy embezzler").

[10] This case is therefore unlike *Turrey v. Vervent, Inc.*, where the defendants' "belated objection" to equitable jurisdiction after a jury trial was not waived "under the circumstances" because the plaintiffs

questioned this Court's jurisdiction until now. *See, e.g.*, Dkt. 427 (Joint Case Management Statement) at 1 ("[T]he Court has jurisdiction over this matter."). Google further waived the argument through its prior request that this Court decide disgorgement, which is "inconsistent with an intent to enforce the right" to challenge equitable jurisdiction. *Moon v. Board of Trustees of PAMCAH-UA Loc. 675 Pension Fund*, 319 F. Supp. 3d 1193, 1196 (N.D. Cal. 2018) (Seeborg, C.J.).

Regardless, Google's objection fails on the merits. According to Google, the jury's damages award is an adequate legal remedy that defeats equitable jurisdiction because Plaintiffs' "requests for damages and disgorgement seek to remedy the same harm." Opening Br. at 21. That is wrong. Damages and disgorgement do not remedy the same harm. The jury's award of damages compensates Plaintiffs for the "market value of the data." Opp'n at 21; *accord* Dkt. 666 (Jury Instruction Nos. 22 & 23) at 23–24. By contrast, disgorgement of profits "is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs," and "does not aim to compensate the victims of the wrongful acts." *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993); *accord* Dkt. 666 (Jury Instruction No. 24) at 25; Dkt. 595 (Google's Proposed Jury Instruction No. 47) at 92 (explaining that disgorgement "may allow [Plaintiffs] to recover any profits that Google received from the use of the data at issue that have not already been taken into account with regard to . . . damages").

California law recognizes that Plaintiffs "maintain an entitlement to unjustly earned profits" where "as between [Plaintiffs and Google], it is unjust for [Google] to retain it," *even if Plaintiffs suffered no economic injury*. *In re Facebook*, 956 F.3d at 600 (emphasis added). Thus, compensatory damages are neither an "adequate" or "complete" legal remedy here because they do not include Google's profits from the privacy violations. *See, e.g.*, *In re California Gasoline Spot Mkt. Antitrust Litig.*, 2021 WL 1176645, at *8 (N.D. Cal. Mar. 29, 2021) (declining to find an adequate legal remedy where plaintiffs sought "non-restitutionary disgorgement of the financial profits that [d]efendants obtained as a result of their unjust conduct" and noting "the defendant may be under a duty to give to the plaintiff the amount by which [the defendant] has been enriched").

---

only "plead[ed] in the alternative and requested equitable relief 'only in the event [statutory] damages are not granted.'" 2023 WL 6390620, at *5 (S.D. Cal. Sept. 29, 2023) (quoting complaint).

The Ninth Circuit's equitable jurisdiction precedents are not to the contrary. *Sonner v. Premier Nutrition Corporation* stands for the unremarkable proposition that a plaintiff does not lack an adequate legal remedy if she "seeks the same sum in equitable restitution . . . as she requested in damages to compensate her for the same past harm." 971 F.3d 834, 844 (9th Cir. 2020). Plaintiffs' request for *nonrestitutionary* disgorgement here renders *Sonner* and district court cases like it inapposite.[11] *Guzman v. Polaris Industries Inc.* held that a district court cannot grant equitable relief "when an equivalent legal claim would have been available but for a time bar." 49 F.4th 1308, 1312 (9th Cir. 2022). That is not at issue here, either.

In this case the jury has found Plaintiffs' legal remedy is limited to $425.65 million. Dkt. 670 (Question 5). As discussed below, Google's illicit gains are much higher. Google attempts to circumvent this reality by arguing that whenever a plaintiff's legal *requested* remedy results in a claim for legal damages (measured by the harm to the plaintiff) that exceeds the plaintiff's claim for *equitable disgorgement* (measured by the net profits the wrongdoer earned from its wrongdoing) then that equitable claim must be dismissed for lack of equitable jurisdiction. That is a radical new position that has no basis in Ninth Circuit caselaw.

The only authority Google cites for this radical proposition is *Clark v. Yodlee, Inc.*, 2023 WL 12097898, at *1 (N.D. Cal. July 20, 2023). **What Google fails to tell this Court is that the district court subsequently reversed course.**[12] After initially dismissing the plaintiffs' claim for nonrestitutionary disgorgement, the district court then granted the plaintiffs' motion to file an amended complaint repleading that claim. *See Clark v. Yodlee, Inc.*, No. 20-cv-5991-SK (N.D. Cal. Sep. 15, 2023), Dkt. No. 356. The *Clark* plaintiffs alleged damages were an inadequate legal remedy

---

[11] In *Ketayi v. Health Enrollment Group*, the restitution and damages plaintiffs sought were just "different avenues of making injured parties whole." 2021 WL 2864481, at *10 (S.D. Cal. July 8, 2021). In *Turrey*, the plaintiffs sought "the same amount of recovery, $51,509,051, based on the same facts and harm under two distinct theories: damages under RICO, and restitution under the UCL." 2023 WL 6390620, at *4. The district court also explained that plaintiffs' attempt to characterize the jury damages award as "disgorgement" was "inaccurate as [p]laintiffs sought damages under RICO and the jury was so instructed." *Id.* at *4, n.3.

[12] For the Court's convenience, the opinion is attached. Ex. 22.

"to reach the profits that [d]efendant earned from its allegedly unauthorized misappropriation and sale of [p]laintiffs' sensitive private data, a distinct harm whose value is distinct from that of [p]laintiff's alleged damages." *Id.* at 6. The district court agreed, explaining that the "nonrestitutionary disgorgement of [d]efendant's profits . . . is a categorically different remedy that does not seek to compensate [plaintiffs] for the same harm as monetary damages." *Id.* at 12. The district court concluded that "[t]he inability of legal remedies to reach [d]efendant's allegedly illicit profits is sufficient to invoke this Court's equitable jurisdiction under *Sonner* and *Guzman* to request nonrestitutionary disgorgement." *Id.* at 13.

### E.  CUTSA Does Not Preclude Disgorgement

Google's contention that the California Uniform Trade Secrets Act ("CUTSA") preempts Plaintiffs' disgorgement remedy, made for the first time after trial, is also waived. *See Hadley v. Kellogg Sales Co.*, 2019 WL 3804661, at *13 (N.D. Cal. Aug. 13, 2019) (refusing to allow defendant "to sandbag [p]laintiff with a new preemption defense").

In any event, CUTSA does not preempt "other civil remedies that are not based upon misappropriation of a trade secret." Cal. Civ. Code § 3426.7(b). Plaintiffs have never alleged that their sWAA-off data constitute "trade secrets." CUTSA itself defines a trade secret as information that "[d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use." *Id.* at § 3426.1(d). sWAA-off data is economically valuable in part because it *is* disclosed to those who can obtain economic value from its use. This case is nothing like the cases Google cites. *See* Opp'n at 25–26 (citing only cases involving misappropriation of proprietary business information).

Google's own cited case recognized this distinction. In *Erhart v. BofI Holding, Inc.*, the district court found that while CUTSA preempted an employer's claims that a former employee wrongfully accessed "confidential business and proprietary information," it did not preempt the claims based on the former employee's taking of "non-public customer financial information" and "non-public personal information of [defendant's] employees" because they were "more akin to a data breach claim." 612 F. Supp. 3d 1062, 1118–19 (S.D. Cal. 2020).

16

### F.  The Jury's Findings Do Not Preclude Disgorgement

There is no "Seventh Amendment risk" here, which Google argues based on a claimed "implicit linkage" between the jury's findings on the CDAFA claim and the jury's advisory verdict on disgorgement. Opp'n at 27. Google focuses on the "no permission" element of the CDAFA claim (*id.*), but as noted above there is no way to tell which of the five CDAFA elements the jury found that Plaintiffs failed to prove. *Supra*, § II.C.1. More relevant is the jury's finding that there was no consent.

Google cites no case supporting its contention that the Court should give "greater weight" to jury findings where the issue is one to be decided by the Court. Opp'n at 28.[13] Google's unsubstantiated contention flows from the false premise that "disgorgement appears now to be a legal issue." Opp'n at 28. The Court already found it is an equitable issue. Moreover, the complex profit calculations here make disgorgement unsuitable for jury determination. *See* 2 D. Dobbs, Law of Remedies, § 4.3(5) (2d ed. 1993); *cf. Synopsys, Inc. v. Real Intent, Inc.*, 2024 WL 4557334, at *3 (N.D. Cal. Oct. 22, 2024) (observing that one reason not to send an issue to the jury is if there are likely "deeply complicated problems beyond the jury's purview . . . ."). None of Google's cases remotely suggest that such complicated accounting determinations are well suited for a jury to make.

In any event, Google concedes that the advisory verdict does not preclude Plaintiffs' request for disgorgement, admitting this Court "is obligated to make its own independent assessment." Opp'n at 6. That means the Ninth Circuit will review this Court's findings "as if there had been no verdict from an advisory jury[.]" *Ashland v. Ling-Temco-Vought, Inc.*, 711 F.2d 1431, 1438 (9th Cir. 1983).

### G.  Google Should Be Ordered to Disgorge a Minimum of $2.36 Billion

#### 1.  Legal Standard: "But For" Causation Is Not Required

Google agrees that Plaintiffs need only present a "reasonable approximation" of Google's net Profits. Opp'n at 32. Google also does not dispute that it has the burden to present evidence of costs, expenses, and other deductions. *See* Opening Br. at 22 (citing three cases in support, which Google ignores). But Google wrongly claims that but-for causation is required for disgorgement. It is not.

---

[13] *Onyx Pharmaceuticals, Inc. v. Bayer Corporation*, does not support Google's position. 2011 WL 4527402, at *2 (N.D. Cal. Sept. 21, 2011). Opp'n at 27. The court denied the motion to bifurcate as "untimely." *Id.*

Plaintiffs' Opening Brief made this point, relying on four authorities. *See* Opening Br. at 22, 35–36. Google **ignores** these authorities and does not cite any contrary authority. Google instead falls back on the jury instruction for disgorgement, claiming Plaintiffs never challenged this instruction. Opp'n at 29 n.11 (citing Instruction No. 24, Dkt. 666). Not true. Dkt. 595 at 94 (jury instruction briefing). In any event, that is irrelevant. No but-for causation is required. Opening Br. at 22, 35–36.

### 2.    Google Profited from Using sWAA-Off Data for Conversion Tracking

The parties agree that Google uses sWAA-off data to track conversions.[14] Yet Google claims there are no profits to disgorge because "Google does not actually charge for conversions" and advertisers only pay "when a user is served an ad or clicks on it," not upon conversions. Opp'n at 29.

In fact, Google *does* charge advertisers per conversion. A publicly available Google webpage informs advertisers that "You can *choose to pay for conversions, rather than clicks or interactions* . . . . Paying for conversions means *you only pay when customers convert on your website or app.*" Ex. 23 at 1 (emphases added).[15] Google's Head of Analytics Steve Ganem agreed there are "instances where advertisers pay more money because an ad has resulted in a conversion." Tr. 1211:9–18.

Conversion tracking also contributes to Google's revenues when the advertiser pays per ad or per click (rather than per conversion). As Ms. Langner testified: "Google benefits from conversion measurement by demonstrating that the ads are effective. When advertisers see that their ads are effective, they will want to buy more ads with Google." Tr. 1298:12–17. In a 2020 internal financial study, relied on by Lasinski, Google determined that it would lose revenue if it could no longer track conversions, and Google applied a 52% reduction for "conversion-based autobidding." Tr. 884:9–886:2, 917:13–19; Ex. 24 at -73 (copy of the analysis, titled "ChromeGuard"); Dkt. 314-7 (Lasinski Initial Rep.) ¶¶ 68–70. Google states in footnote 12, page 30, that this document "was not admitted into evidence, and there is no witness testimony as to its purpose or meaning." But that is true of many documents on which experts may rely. Google does not dispute the document's authenticity.

---

[14] *See* Tr. 1212:25–1213:1 (Ganem agreeing Google "use[s] sWAA-off data for conversion tracking")

[15] Mr. Lasinski relied on this webpage in his expert report. Dkt. 314-7 (Lasinski Initial Rep.) n.43.

18

Google next argues it would not lose any money in a world where Google could not track sWAA-off conversions because advertisers would rely on third-party companies to track those conversions and then use that data to guide their ad spending with Google. Opp'n at 31–32. This argument is legally irrelevant because Plaintiffs are not required to prove a but-for causal link between Google's conduct and Google's profits. *Supra*, § III.G1.

In any event, Google is wrong on the facts. The third-party conversion-tracker would be unable to track conversions without knowing which ads were shown to sWAA-off users. And *that* information is only available from the sWAA-off data at issue in this case, which Google obtained in violation of class members' privacy rights. Google's technical expert Dr. John Black confirmed during his deposition that other conversion tracking providers have only "half of what you need" to track conversions and that the missing half is "data from the ad network" (i.e., Google):

> If you're a third party and you've convinced a developer to integrate your SDK, like AppsFlyer, that's half of what you need. You've got the conversions now that you can catalog on your back end. ***But you also need the ad network to provide you with all of the ads that it supplied*** that users may have interacted with so you can try and figure out where those attributions occur.

Ex. 25 (Black Dep. Tr.) 34:8–16. Without the sWAA-off data at issue in this case, advertisers would have no way to track conversions for the class members. Without conversion tracking (by *someone*) advertisers would have paid far less for Google's ad services (or nothing at all) because the value of advertising through Google would not have been provable. *See, e.g.*, Tr. 1176:13–16 (Ganem) (testifying that loss of this data would "cripple" Google Analytics); Tr. 300:11–21 (Monsees) (testifying that this data is "essential to providing the ad services").

### 3. *Google's Criticisms of Lasinski's $4.14 Billion Revenue Calculation Lack Merit*

Google criticizes Plaintiffs' reliance on certain documents and data but never proffers any alternative data. If there were more accurate data that helped Google, the Court may infer it would have seen it. In any event, Google's criticisms of Plaintiffs' data are without merit.

#### a. App Promo Revenues: U.S. or Global

This dispute turns on whether PX-419 contains U.S. revenues (as Plaintiffs contend) or global revenues (as Google contends). Opp'n at 34; Opening Br. at 30. Google admits its own counsel told

19

Plaintiffs that it contains U.S. figures, shortly after the document was produced. Opp'n at 34. Google now disavows that representation as a "mistake" and claims Ms. Langner "corrected the mistake." *Id.* But Google does not dispute that Ms. Langner played no role in creating PX-419, which is a made-for-litigation document. We have no idea who created PX-419 because Google did not identify that person, much less provide a declaration from that person attesting to what the exhibit contains. Other evidence confirms Plaintiffs' interpretation of PX-419, including the G590 spreadsheet, which everyone agrees contains U.S. App Promo revenues. Opening Br. at 31; Opp'n at 35. For the sole overlapping full year across both spreadsheets (2020), the revenue figure in G590 ($3.765 billion) lines up with the revenue figure in PX-419 ($3.764 billion). Opening Br. at 31. Google acknowledges this match but tries to explain it away as a coincidence. Opp'n at 35. This would be an extraordinary coincidence for which there is no support.

In any event, this dispute over whether PX-419 contains U.S. revenues or global revenues is not a major driver of the disgorgement calculation. This dispute is confined to the years 2017–2019, when revenues were lowest. Opening Br. at 30; Opp'n at 34. If those three years were removed, the final disgorgement number would still be $2.29 billion. Dkt. 314-7 (Lasinski Initial Rep.) Schedule DS1.3–III.

Google also criticizes Lasinski for assuming "that the fraction of Ad Mob's United States revenue (out of global revenue) in every year of the class period is the same as App Promo's 2018 [fraction])." Opp'n at 35. Lasinski's assumption was justified because Google only produced *global* Ad Mob revenue figures. Dkt. 314-7 (Lasinski Initial Rep.) ¶ 95. Dr. Knittel did not point to any other data Lasinski could have relied on for estimating U.S.-based revenues, nor does Google now identify such data. Lasinski's assumption was also conservative. According to Google's public disclosures, the proportion of Alphabet U.S. revenues to global revenues during the class period was 45.7% to 47.7%. *Id.* Lasinski's assumption, based on the 2018 ratio Google criticizes, was lower—just 30%. *Id.*

20

### b. Revenue Attributable to Post-2021 iPhone Users

There are at least two problems with Google's challenge to Mr. Lasinski's inclusion of post-2021 revenues for iPhone users based on the App Tracking Transparency ("ATT") change. Opp'n at 35–36. *First*, even assuming ATT reduced Google's revenues, any reduction was accounted for because Lasinski conducted a top-down analysis. Lasinski began by identifying "total" revenues from three products before isolating the portion of those revenues attributable to Google's misconduct in this case. Opening Br. at 24. If ATT caused a decline in Google's revenues, that decline is baked into Lasinski's starting point. Any further reduction would be inappropriate.

*Second*, Google created a workaround for users who clicked "yes" to the ATT prompt— meaning users who said they did not want to be tracked. This workaround is called "conversion modeling," which Google employs when the device identifier (e.g., the IDFA identifier for iPhones) is not available. *See* Opening Br. at 26–27 (citing testimony from Google employees). Google claims that no testimony expressly addressed Google's "ability to use [conversion modeling] on iPhones where Google never receives a device identifier." Opp'n at 35. But Google's technical expert was specifically asked about the "impact[]" of ATT on Google "measur[sing] conversions," and he confirmed that Google can "model conversions" to mitigate the impact of ATT. Tr. 1730:15–1731:19.

### c. Lasinski's Reliance on Other Financial Analyses

There is no basis for Google's criticisms regarding the use of these two Google financial analyses. The first analysis is the "GAP" study. *See* Exs. 26, 27. This study addressed a different "on" / "off" toggle (called GAP) that purported to control whether Google could show personalized ads to users. Google analyzed how much revenue it would lose if Google made this toggle "off" by default— meaning no personalized ads. Lasinski relied on one statistic found in this study—that approximately 82% of Google's revenues are from signed-in users (as opposed to signed-out users). Dkt. 314-7 (Lasinski Initial Rep.) ¶¶ 62–64. It does not matter whether this study focused on "an entirely different privacy setting" (Opp'n at 36) because the 82% statistic is not specific to GAP. And this 82% statistic is relevant here because users must be signed in to toggle sWAA to "off." To isolate sWAA-off revenues, Lasinski therefore had to exclude revenues from signed-out users. *Id.* Google also

complains this study was focused on Europeans (*id.*) but nowhere explains why nationality would materially change the 82% input.

The second analysis is the 2020 "ChromeGuard" study, which measured the revenue Google would lose if it stopped using third-party cookie trackers within "Incognito." *Supra*, p 18. Google says Lasinski erred by applying the ratio used in that study to isolate revenues attributable to conversion tracking here, Opp'n at 36–37, but this statement is partially incorrect as a factual matter. For App Promo, Lasinski relied on separate ratios provided by Google's interrogatory response in this case, not the ChromeGuard ratio. Dkt. 314-7 (Lasinski Initial Rep.) ¶ 91; *see id.* ¶¶ 102, 110 (Lasinski only relied on the ChromeGuard ratio for his Ad Mob and Ad Manager calculations.). Google says the ChromeGuard ratio is inapposite because the change contemplated there would affect third parties who track conversions whereas here third parties could continue tracking conversions even if Google had to stop. Opp'n at 37. But as noted above, third parties *could not* track sWAA-off conversions without first obtaining sWAA-off ad impression and click data *from Google*. *Supra*, § III.G.2.

### d.   Percentage of Minors and Business Accounts to be Excluded

Google next claims that Mr. Lasinski erred by applying a 10% deduction to exclude Unicorn (child) accounts and Dasher (business) accounts, rather than a 50% deduction, as Google's damages expert proposed. Opp'n at 37. This criticism fails for the same reason Plaintiffs identified in their Opening Brief: Google's expert conceded on cross that "[i]t is not possible" for there to be as many sWAA-off Unicorn and Dasher accounts as he claimed. Opening Br. at 26 (quoting Tr. 1649:10–1651:25 (Knittel)). This problem with Dr. Knittel's analysis is not some unrelated "derivative" calculation, as Google contends. Opp'n at 37–38. The cross-examination established that Dr. Knittel's 50% figure could only hold up if there were 3.4 billion Dasher and Unicorn accounts with sWAA off, which is not possible because there are only 2.2 billion *total* Dasher and Unicorn accounts. Google also cites Dr. Knittel's testimony to argue that Lasinski erred by including "signed out" sWAA-off within his calculations. Opp'n at 37. But the testimony Google cites says nothing about "signed out" users; the testimony just repeats the proposed "50 percent" cut that fell apart on cross.

---

### 4. Lasinski Accounted for Appropriate Expenses

Lasinski appropriately deducted Google's traffic acquisition costs (TACs) from the $4.14 billion in gross revenues, resulting in $2.36 billion in net profits. Lasinski also correctly found that it would be inappropriate to deduct any additional expenses.

#### a. Lasinski Properly Deducted Google's Traffic Acquisition Costs (TACs)

Plaintiffs explained how there are three options for quantifying TACs (Opening Br. at 32–35, describing Options A, B, and C), and Google asks the Court to select Option A, which has the highest TACs and therefore the lowest net profits. Plaintiffs urge Option C—the opposite.

The Court should reject Option A. Google's only argument is that Plaintiffs should be "bound to the calculations in Mr. Lasinski's [initial] report" used in Option A. Opp'n at 39. That argument fails because "the Court permitted Mr. Lasinski to testify" to his Option B calculations. Opp'n at 39.

The Court should also reject Google's plea to modify Option B by raising the TACs. Opp'n at 38–39. Google claims that "DVA" (i.e., display ads on third-party apps) is the only relevant component of App Promo, and that the other components (Search and YouTube) are irrelevant because "only third-party apps are at issue in this action." *Id* at 39. Google then points out that TACs are "lower" for Search and YouTube since those "spaces [are] owned by Google"—meaning Google would be paying TACs to itself—and Google claims that Lasinski's inclusion of those lower TACs artificially deflates the overall TAC rate. *Id.* Google says that only the higher TAC rate for "DVA" should count. *Id.*

The problem with Google's arguments regarding Option B is that Search and YouTube App Promo ads *are* relevant to this case. For App Promo ad campaigns, the purpose of the ad is to entice the user to download the advertiser's app, which is a non-Google app. Tr. 1334:1–17 (Langner). Even if the ad is first shown to the user on Google Search, that data becomes relevant when Google matches that data with the conversion event that occurs on the third-party app (the app download). For App Promo, Google is making money by connecting the dots between Search and YouTube data, on the one hand, and sWAA-off app activity data, on the other hand.

Option C is superior to Option B. Recall that, for Option B, the early portion of the class period uses a 68% TAC rate, which comes from the disputed P&L spreadsheet—PX-419. Google has now confirmed that the TACs in PX-419 are global TACs. Opp'n at 38. That means there is a mismatch; PX-419 applied global TACs to U.S. revenues, thus creating an artificially high TAC rate. *See supra*, § III.G.3.a. (proving that PX-419 contains U.S. revenues). Option C corrects that issue; for each year, it derives the TAC rate by dividing global TACs from global revenues.

In any event, the choice between Option B and Option C has a small impact on the final disgorgement calculation. Under Option B, the Court would award $2.13 billion in disgorgement. Opening Br. at 33–34. Under Option C, the Court would award $2.36 billion. *Id.* at 34–35.

### b.  No Other Expense Deductions Are Warranted

Google alludes to "other expenses" that it claims should be deducted, such as "operating costs" like employee salaries as well as "machine costs." Opp'n at 40. This cursory discussion falls far short of meeting Google's burden to prove costs paid for items or services that were "of actual assistance" to Google's collection of sWAA-off data. Google also has not met its burden to apply a "reasonably acceptable formula" to determine what *fraction* of these costs were attributable to its sWAA-off data collection. Opening Br. at 37 (quoting *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332 (9th Cir. 1984); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985)). Google ignores these cases. Google also ignores Dr. Hochman's testimony that "Google's data processing operation is so massive" that sWAA-off data "doesn't impose an additional cost" (Tr. 634:3–15, cited in Opening Br. at 38) and Plaintiffs' explanation of why Google's SEC filings undermine Google's claimed deductions (Opening Br. at 38); *Brown v. Google, LLC*, 2022 WL 17961497, at *6 (N.D. Cal. Dec. 12, 2022) (discussing admission from Google employee that costs would not "vary" if Google stopped collecting certain data).

### H.  Alternatively, This Court Should Appoint a Special Master To Decide the Amount

Google **ignored** Plaintiffs' alternative request for a special master, as well all six cases that Plaintiffs cited to support the request. Opening Br. at 39. If the Court believes that more evidence is

necessary to calculate Google's net profits from sWAA-off data, then the Court should appoint a special master to obtain it, analyze it, and present a report to the Court.

## IV.    CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court enter Plaintiffs' proposed permanent injunction and order Google to disgorge $2.36 billion in net profits.

Dated: December 4, 2025                     Respectfully submitted,


                                            By: */s/ Mark Mao*
                                            Mark C. Mao (CA Bar No. 236165)
                                            mmao@bsfllp.com
                                            Beko Reblitz-Richardson (CA Bar No. 238027)
                                            brichardson@bsfllp.com
                                            BOIES SCHILLER FLEXNER LLP
                                            44 Montgomery Street, 41st Floor
                                            San Francisco, CA 94104
                                            Telephone: (415) 293-6800
                                            Facsimile (415) 293-6899

                                            David Boies (*pro hac vice*)
                                            dboies@bsfllp.com
                                            BOIES SCHILLER FLEXNER LLP
                                            333 Main Street
                                            Armonk, NY 10504
                                            Telephone: (914) 749-8200
                                            Facsimile: (914) 749-8300

                                            James Lee (*pro hac vice*)
                                            jlee@bsfllp.com
                                            Rossana Baeza (*pro hac vice*)
                                            rbaeza@bsfllp.com
                                            BOIES SCHILLER FLEXNER LLP
                                            100 SE 2nd Street, Suite 2800
                                            Miami, FL 33131
                                            Telephone: (305) 539-8400
                                            Facsimile: (305) 539-1307

                                            Alison L. Anderson (CA Bar No. 275334)
                                            alanderson@bsfllp.com
                                            M. Logan Wright (CA Bar No. 349004)
                                            mwright@bsfllp.com
                                            BOIES SCHILLER FLEXNER LLP
                                            725 S. Figueroa St., 31st Floor

25

Los Angeles, CA 90017
Telephone: (213) 629-9040
Facsimile: (213) 629-9022

Bill Carmody (*pro hac vice*)
bcarmody@susmangodfrey.com
Shawn J. Rabin (*pro hac vice*)
srabin@susmangodfrey.com
Steven Shepard (*pro hac vice*)
sshepard@susmangodfrey.com
Alexander P. Frawley (*pro hac vice*)
afrawley@susmangodfrey.com
Ryan Sila (*pro hac vice*)
rsila@susmangodfrey.com
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330

Amanda Bonn (CA Bar No. 270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
Ryan J. McGee (*pro hac vice*)
rmcgee@forthepeople.com
Kenya J. Reddy (*pro hac vice*)
kreddy@forthepeople.com
MORGAN & MORGAN, P.A.
201 N Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736

Michael F. Ram (CA Bar No. 238027)
mram@forthepeople.com
MORGAN & MORGAN, P.A.
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 358-6913
Facsimile: (415) 358-6923

*Attorneys for Plaintiffs*

26