UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIBAL RODRIGUEZ, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GOOGLE LLC,<br><br>　　　　Defendant. | Case No. 20-cv-04688-RS<br><br>**ORDER DENYING MOTION FOR EQUITABLE RELIEF AND DENYING MOTION TO DECERTIFY THE CLASS** |

In this privacy action, a class of Google users (Plaintiffs) sued Google for collecting their anonymized data in contravention of Google's privacy disclosures. A jury found Google liable for invasion of privacy under the California Constitution and intrusion upon seclusion, and it awarded Plaintiffs $425,651,947 in compensatory damages.

Plaintiffs think that is not enough. They move for a permanent injunction and disgorgement of $2.36 billion—a figure they characterize as a "conservative approximation of Google's net profits from its misconduct during the class period." Dkt. 700 (ER Mot.), at 9. Google thinks it is too much. It moves to decertify the class because, in its view, the evidence presented at trial makes clear that liability turned on individualized proof. *See* Dkt. 698 (Decert. Mot.). Once the class is decertified, Google argues that the jury verdict must be vacated.

Both motions are denied. As to the former, Plaintiffs have failed to establish prospective irreparable harm, making a permanent injunction inappropriate. They have also failed to show entitlement to disgorgement, both because their legal remedy is adequate and because their estimate of Google's profits is insufficiently supported. As to the latter, Google's argument rests

on a misapprehension of Plaintiffs' theory of offensiveness—a misapprehension spun up out of a few stray comments made by a single witness. The core of Plaintiffs' theory is and always has been that Google's decision to collect certain data *after it said it would not* was inherently offensive. That theory is perfectly susceptible to collective proof.

## I. BACKGROUND

This case is about whether Google adequately disclosed its data collection policies. Plaintiffs are members of two sub-classes—one composed of Android users, and one composed of non-Android users—who turned off the supplemental Web App and Activity (sWAA) setting in their Google accounts. The sWAA button governs information regarding a user's "[Google] Chrome history and activities from sites, apps, and devices that use Google services." Plaintiffs averred that Google collected anonymized data when Plaintiffs accessed third-party apps and used that data for commercial purposes, despite representing that turning the sWAA button off would stop Google from doing so. Plaintiffs asserted three claims under California law: violation of the Comprehensive Computer Data Access and Fraud Act (CDAFA), invasion of privacy under the California Constitution, and common law intrusion upon seclusion. They sought money damages (actual, punitive, and nominal), disgorgement of profits, and injunctive relief.

The jury heard evidence for three weeks and ultimately returned a mixed verdict. It found Google not liable for violating CDAFA but liable for invasion of privacy and intrusion upon seclusion. In so finding, it rejected Google's affirmative defense of consent. The jury awarded the two sub-classes $425,651,947 in actual damages, but it declined to award punitive or nominal damages. The jury also determined that Plaintiffs were not entitled to disgorgement, though that conclusion was only advisory as, in a pre-trial motion in *limine*, disgorgement was tentatively determined to be an equitable remedy to be awarded at the discretion of the court. *See* Dkt. 587, at 9–11.

The parties now seek to augment and upset the verdict in various ways. First, Plaintiffs ask for a permanent injunction (1) enjoining Google from collecting and saving sWAA-off data in the future; (2) requiring Google to delete the sWAA-off data it has already collected; (3) requiring

Google to destroy the algorithms, models, and services created or modified using sWAA-off data; and (4) appointing an independent third-party to monitor and ensure Google's compliance with the injunction. Second, Plaintiffs request Google be ordered to disgorge $2.36 billion in net profits attributable to Google's collection of sWAA-off data during the class period. *See* ER Mot., at 1. Finally, Google requests that the class be decertified, which would require vacatur of the jury verdict. *See* Decert. Mot., at 2.

## II. LEGAL STANDARD

a. *Permanent Injunction*

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." *Id.*

b. *Disgorgement*

Under California law, disgorgement (also referred to as unjust enrichment) is available where (1) the defendant received a benefit, and (2) the retention of the benefit at the expense of another is unjust. *See Peterson v. Cellco P'ship*, 164 Cal.App.4th 1583, 1593 (2008). The requirement that the retention be unjust "requires wrongful conduct on the part of the party receiving the benefit." *Shum v. Intel Corp.*, 630 F. Supp. 2d 1063, 1073 (N.D. Cal. 2009), *aff'd*, 633 F.3d 1067 (Fed. Cir. 2010).

c. *Decertification*

Under Federal Rule of Civil Procedure 23(c)(1)(C), "[a]n order that grants or denies class certification may be altered or amended before final judgment." "Thus, a district court's order denying or granting class status is inherently tentative," and decertification is appropriate if the

strictures of Rule 23 are no longer met. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.11 (1978); *see Abante Rooter and Plumbing, Inc., et al. v. Alarm.Com Incorporated,* 2018 WL 558844, at *2 (N.D. Cal. Jan. 25, 2018) ("District courts have a responsibility to review continually the appropriateness of a certified class in light of developments subsequent to class certification.") (internal quotation marks omitted). Even where a defendant moves to decertify a class, it is the party that originally sought certification that bears the burden of demonstrating that the requirements of Rule 23 continue to be satisfied. *See Marlo v. United Parcel Service, Inc.*, 639 F.3d 942, 947 (9th Cir. 2011).[1]

### III. DISCUSSION

a. Permanent Injunction

The most basic requirement for a permanent injunction is the existence of prospective, irreparable harm. Plaintiffs assert that Google continues illegally to collect sWAA-off data. They claim they are irreparably harmed because that collection violates their legal rights and exposes them to the risk that their data will be misappropriated or misused.

However, as Google points out, collecting sWAA-off data is not problematic in isolation—the legal violation here stemmed from Google's misrepresentations about its data collection practices. That concern has been ameliorated. First, Google has submitted a declaration from a WAA product manager explaining that, post-trial, Google amended its privacy disclosures to reflect its data-collection practices accurately. *See* Dkt. 703, Monsees Decl. Specifically, the top of the Activity Control page on a user's Google account page now says:

> These settings help tailor your experiences across Google services when you use your Google Account.
>
> Google always collects, uses, and processes data in accordance with the Google Privacy Policy. *For example, regardless of these settings, Google can collect and use data that is not associated with your account*.

---

[1] To the extent that resolving Plaintiffs' requests for injunctive relief and/or disgorgement require findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a), this Order constitutes those findings and conclusions.

*Id.*, at 2 (emphasis added). This change now tells Google's users what they need to know. Namely, *regardless of whether they switch sWAA off or not*, Google will "collect and use data" that is not tied to the user's account—*i.e.*, data that is anonymized.

Plaintiffs think this is not enough. They argue that the disclosure is still impermissibly vague, and they accuse Google of attempting to revive the consent argument it offered at trial. Those concerns are misplaced. At trial, Google argued that by telling its users that they "can control what is saved in your Google Account," those users would have known that the sWAA button did *not* control Google's use of app-tracking data *outside* of the Google Account. Trial Tr. at 1918:8–17. The jury rejected that argument, perhaps because to know precisely what Google was doing, the users would have had to draw the correct negative inference from its disclosures.

The new amendment eliminates the need to draw any inference. Instead of saying "users *can* control what account-specific data is collected," Google now says "users *cannot* control what non-account-specific data is collected." Even if, as Plaintiffs argue, Google could more precisely define what it means for data to be "associated with your account," it has cured the core problem with its initial disclosure.

Next, Plaintiffs argue that the disclosure remains misleading because it uses the word "can" instead of "will." This choice, combined with Google's choice to keep the sWAA-off button without a new disclosure specific to the button, leaves the impression, Plaintiffs say, that users can still disable Google from collecting their anonymized data by turning sWAA off. No reasonable user would understand the disclosures that way. Google warns its users that it "can" collect data "*regardless of these settings*,"—that is, regardless of whether sWAA and other related settings are switched on or off. For a user to be confused in the manner Plaintiffs suggest, he would have to ignore the first half of the new disclosure. Moreover, even if the word "can" implies some uncertainty over whether the data will be collected, it does not imply that *Plaintiffs control* the collection. The much more natural reading is that *Google* will decide whether it will collect the data. Maybe it will; maybe it won't, but either way, the user has no say.

Plaintiffs also contend that injunctive relief is necessary because Google is free to undo the

changes to its privacy policy. They claim that Google "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000), but that is not the law. *Laidlaw* articulated the test for deciding if a case is moot within the meaning of Article III, not for deciding whether injunctive relief is appropriate as a matter of equitable discretion. In exercising that discretion, courts are doubtless permitted to consider the likelihood that the defendant will simply revert back to its old ways once the litigation concludes. Here, that likelihood is exceedingly small. Google's old policy has already been adjudged illegal, and it has been made to pay more than $400 million to compensate for the violation. Its decision to alter its conduct also appears relatively costless, making it unlikely that Google is simply hoping to run out the clock on this litigation before it can go back to doing business as it did before.

Even if *some* injunctive relief were appropriate, Plaintiffs' proposal is far too broad. They ask for an order enjoining Google from collecting and saving sWAA-off data in the future even though, as explained, collecting and saving sWAA-off data is not in and of itself illegal. They also ask Google to delete all the sWAA-off data it already collected and to destroy the algorithms, models, and services created or modified using sWAA-off data. The parties debate how feasible that is in practice, but feasibility is beside the point. Plaintiffs have failed to demonstrate how precisely they are *irreparably* harmed by Google's continued possession of that data. They are correct that nothing prevents Google from continuing to make commercial use of the sWAA-off data that it illegally collected, but Plaintiffs have already been compensated for that harm. The jury verdict reflected the value of the illegal taking. Much of that value stems from Google's ability to monetize the data, and there is no reason to think that the jury considered only backward-looking monetization when calculating damages.

True, Plaintiffs point to some cases that speak in broad language about the irreparable harm of ongoing data collection or use, *see, e.g.*, *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1045 (9th Cir. 2012) (affirming preliminary injunction where defendant would continue to violate "right to privacy"); *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d

ORDER DENYING EQUITABLE RELIEF AND CLASS DECERTIFICATION
CASE NO. 20-cv-04688-RS

765, 782 (N.D. Cal. 2017), but those cases must be understood in their context. In *Facebook*, the court determined that absent a permanent injunction, "it is very likely that . . . Defendants will again attempt to access Facebook's servers without authorization," a conclusion stemming from Defendant's "bad faith conduct that indicates that they will not easily be deterred." 252 F. Supp. 3d at 782. Likewise, in *Meyer*, the Ninth Circuit affirmed the injunction because, at that early stage of the litigation, the defendant had failed to "acknowledge the wrongful nature of its conduct" and had continued violating the law as to other individuals even though it had stopped as to the plaintiff. 707 F.3d at 1045. Google, by contrast, actively changed its behavior to reflect the jury's liability finding. Plaintiffs have not demonstrated that Google is a bad faith actor and that it will continue misrepresenting its privacy practices in the absence of injunctive relief. Because Plaintiffs' have failed to demonstrate irreparable harm, there is no need to address the remaining factors. Plaintiffs' request for a permanent injunction is denied.

   b. *Disgorgement*

Analytically, Plaintiffs must show three things to obtain $2.36 billion in disgorgement: (1) that disgorgement is an equitable remedy in this case, (2) that they lack an adequate remedy at law (and thus that there is equitable jurisdiction), and (3) that $2.36 billion is a reasonable approximation of Google's profits from the legal violation.

   i.   <u>Disgorgement is an Equitable Remedy</u>

On the first point, the parties find themselves in an awkward position. Before trial, Plaintiffs—presumably because they thought a jury was likely to award disgorgement—contended they were not seeking the return of specific property unjustly possessed by Google and thus that disgorgement was a legal remedy. Google—presumably because it read the winds the same way—argued that disgorgement was an equitable remedy and thus no evidence on disgorgement should be presented to the jury.

As it turns out, the parties are poor prognosticators. The jury found liability on two of Plaintiffs' three claims, but it declined to award any disgorgement. So, unsurprisingly, the parties have switched sides. Plaintiffs want the court to decide the amount of disgorgement; Google wants

ORDER DENYING EQUITABLE RELIEF AND CLASS DECERTIFICATION
CASE NO. 20-cv-04688-RS
7

the jury's advisory verdict transformed into a binding one. Each side also accuses the other of flip-flopping and waiver, but those charges ring hollow in light of the record.

In any event, the question of whether disgorgement is legal or equitable in this case must be answered. The order resolving motion in *limine* no. 2 tentatively concluded that disgorgement is equitable in this case. *See* Dkt. 587, at 9–11. That was because, to be considered equitable, Plaintiffs needed to "seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002). By "argu[ing] that particular funds Google has—i.e., those it generates through use of their data in programs like App Promo, Admob, and Ad Manager—are traceable to the particular data that [Google] allegedly collected and used without Plaintiff's permission or consent," Plaintiffs purported to do so. Dkt. 587, at 10.

Google offers two reasons to depart from that conclusion. First, it claims that the CDAFA claim was the "only claim in this case that supported an equitable disgorgement remedy," and by finding no liability on that claim, the jury eliminated the only equitable disgorgement request in the case. Yet, from the inception of this case, Plaintiffs have sought disgorgement as a remedy for all three causes of action. *See* Dkt. 289 (Fourth Amended Complaint), at 76. That request was reflected in the jury instructions, which advised the jury that it could award disgorgement "only if [it found] Plaintiffs have proved all of the elements of their first claim (violation of CDAFA), second claim (invasion of privacy), and/or third claim (intrusion upon seclusion)." Dkt. 666, at 25 (jury instruction no. 24); *see also* Dkt. 670 (verdict form).

This argument, moreover, fails to contend with the availability of disgorgement for common law intrusion upon seclusion under California law. California courts generally follow the Restatement Third of Restitution and Unjust Enrichment, *see, e.g., American Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal.App.4th 1451, 1486, fn. 23 (2014), and section 51 of the Restatement permits recovery of "the net profit attributable" to certain "misconduct." Among that "misconduct" is "conscious interference with a claimant's legally protected interests." Restatement Third of Restitution and Unjust Enrichment § 44(1). Plaintiffs' intrusion upon

seclusion claim here averred precisely that: Google consciously interfered with their legally protected interest in their personal data. Thus, California law permits disgorgement of the net profits attributable to that misdeed, which is what Plaintiffs have sought from the start.

Google's second argument is that Plaintiffs have abandoned their attempt to trace their illegally harvested sWAA-off data to specific Google profits, making the request for disgorgement legal. *See Great-West Life*, 534 U.S. at 214. However, Plaintiffs do not need to trace the collection of their data to precise dollars sitting somewhere in a Google bank account, they must merely offer "a reasonable approximation of profits causally connected to the violation." *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1192 n.6 (9th Cir. 1998) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996)). Plaintiffs have attempted to do just that by isolating the profits Google earned from the commercial uses of Plaintiffs' sWAA-off data. Therefore, their request for disgorgement of profits is equitable.

ii.   Equitable Jurisdiction is Lacking

Because disgorgement is an equitable remedy in this case, Plaintiffs may only seek it in federal court if they lack an adequate remedy at law. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 837 (9th Cir. 2020). Plaintiffs argue that the compensatory damages award is insufficient because Google "made substantially more than $425 million in net profits for its use of Plaintiffs' sWAA-off app activity data." ER Mot. at 20.[2]

By focusing on the difference between the jury's damages award and the alleged quantum of ill-gotten gains, Plaintiffs appear to concede (albeit implicitly) that the legal remedy would have been adequate had the jury awarded them more than $2.36 billion. In that case, the equitable aims

---

[2] Plaintiffs argue that Google waived this argument by failing to assert it until this late stage of the litigation. However, consideration of this argument is proper for two reasons. First, Google included the availability of an adequate legal remedy as a defense in its answer to Plaintiffs' Fourth Amended Complaint. *See* Dkt. 305, at 40. Second, disgorgement was tentatively deemed equitable through the resolution of motion in *limine* no. 2. If that decision went the other way, equitable jurisdiction would not have been an issue. Once it went the way that it did, it became clear that the bulk of the fight over disgorgement was going to happen *post-trial*, making it reasonable for Google to sit on the equitable jurisdiction argument until this point.

of disgorgement—to ensure that a wrongdoer does not profit from his misdeed—would have been satisfied, and disgorgement on top of the damages award would serve only to punish Google.

That concession presents a problem. If there was *some* legal remedy out there that would have been adequate, the equitable jurisdiction of the federal courts cannot be invoked unless that remedy is *unavailable*. *See Sonner*, 971 F.3d at 837. Plaintiffs' argument reduces unavailability to uncertainty—that is, they appear to claim that equitable relief is appropriate so long as the jury might (or in this case, did) award less than complete and adequate relief via damages.

That is an anomalous proposition. For one, it would seem to create an equitable backstop in cases that are just not litigated well. If plaintiffs calls a damages expert that a jury finds not credible, they can fall back on their equitable claim after the jury declines to award damages. Indeed, some version of that happened here. Throughout trial, Plaintiffs put on evidence quantifying their injury and, during closing statements, asserted they were owed $31.15 billion—more than 13 times the amount they now claim Google made off their data. The jury simply did not buy it. At bottom, the purpose of federal equitable jurisdiction is to act as a gap filler where legal remedies are inadequate, not to give a plaintiff a second bite at the apple.

Plaintiffs rely at length on cases, such as *In re Facebook, Inc. Internet Tracking Litigation*, which say that disgorgement is proper under California law even when a plaintiff suffers no injury at all. 956 F.3d 589, 599 ("California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss."). *Facebook* stands for the uncontroversial proposition that a plaintiff that *concedes* he was not harmed has standing to seek disgorgement for a common law privacy tort in federal court, so long as disgorgement is available under state law. *See id.* at 600. It does not answer the considerably harder question of what residual entitlement to disgorgement a plaintiff has if he or she tries but fails to establish damages.

Indeed, Plaintiffs have failed to identify any case from any court in which a claimant has been permitted to pursue an equitable remedy *after* a jury partially rejected their otherwise adequate legal remedy. They seem to claim that *Clark v. Yodlee*, No. 20-cv-5991-SK (N.D. Cal.

ORDER DENYING EQUITABLE RELIEF AND CLASS DECERTIFICATION
CASE NO. 20-cv-04688-RS

Sep. 15, 2023) (Dkt. 356) is such a case, but it is not. In *Clark*, a class of plaintiffs asserting a data-privacy claim sought disgorgement of profits. *See id.*, at 1. At the pleading stage, they averred that money damages were an inadequate remedy because the defendant "monetized Plaintiffs' data in ways that do not involve Plaintiffs, and do not necessarily give rise to damages." *Id.*, at 5. That was enough for their disgorgement request to proceed, the court explained, because it clarified why damages were incapable of divesting the defendant from the profits of its misconduct. *See id.*, at 6.

The salient difference, of course, is that the *Clark* plaintiffs identified something structural about the legal remedy that made it inadequate *before trial*. They did not assert an entitlement to damages in excess of the defendant's unjust enrichment but nonetheless ask the court for permission to keep disgorgement in their back pockets as a failsafe. Because Plaintiffs have failed to establish that they lack an adequate remedy at law, their request for disgorgement is denied.

### iii. Plaintiffs' Profit Estimate is Unsupported

There is a further reason disgorgement is inappropriate here: Plaintiffs have failed to offer a supportable approximation of the net profits Google earned from the misconduct. Under California law, the burden of production on "benefit" (*i.e.*, revenue) falls on Plaintiffs, while the burden of production on "costs, expenses, and other deductions to show the actual or net benefit the defendant received" falls on Google. *See Meister v. Mensinger*, 230 Cal. App. 4th 381, 399 (2014). To arrive at the asserted net benefit of $2.36 billion, Plaintiffs begin with a revenue estimate of $4.14 billion. That figure comes from their expert, Lasinski, who determined that Google made money from the collection of sWAA-off data by tracking "conversions," or the frequency with which an ad caused a user to do something valuable with the advertiser, such as purchase the advertiser's product. Conversion tracking is valuable because advertisers want to know that their ads are well-placed. By providing evidence that Google is successfully placing their ads, Google is able to entice advertisers to place more ads through Google. Thus, to isolate revenues attributable to the collection of sWAA-off data, Lasinski (1) identified Google's total U.S. advertising revenues from products that used sWAA-off data to track ad conversions during

the class period; (2) estimated the portion of those revenues attributable to Plaintiffs (*i.e.*, signed-in, sWAA-off users); and (3) multiplied those revenues by Google's estimated percentage of revenue attributable to conversions.

Before addressing the failings of Lasinski's analysis, an aside about the role of the advisory jury verdict is appropriate. Plaintiffs acknowledge that, by awarding damages of $425 million and declining to award any disgorgement, the jury necessarily concluded that Google did not profit from its conduct by more than $425 million. If it did, the jury would have been legally obligated to award disgorgement. Plaintiffs thus accept, as they must, that they are asking this court to depart from the jury's determination in awarding disgorgement.

Google thinks that is not permissible. In its view, the Seventh Amendment requires acceptance of the implicit factual conclusions the jury made in evaluating the legal claims, and it contends that the jury's rejection of liability under CDAFA means it must have thought Google either did not "knowingly access[] Plaintiffs' mobile devices" or did not "t[ake], cop[y], or ma[ke] use of data from those . . . devices without Plaintiffs' permission." Jury Inst. No. 14 (CDAFA). If that is so, Google argues, then it cannot be "unjust" for Google to retain the benefits of the data access—which is why the jury declined to award disgorgement.

Google's position presents several problems. First, it focuses on the jury's CDAFA determination to the exclusion of the jury's intrusion upon seclusion and invasion of privacy determinations. Even if it is true the jury concluded that Google did not use Plaintiffs' data "without [their] permission," it *also* concluded that Google "*intentionally* intruded upon Plaintiffs' objectively reasonable expectation" that Google "would not collect, save, or use the data at issue." Jury Inst. 20 (intrusion upon seclusion) (emphasis added). In light of that finding, it is impossible to say with certainty that the jury thought it was just for Google to retain the benefits of the data access.

In fact, it seems much more likely that the jury concluded that it would be unjust for Google to retain those benefits but that the $425 million damages award sufficed. That is, it appears the jury thought that Google made less than $425 million in profits from the illegally

acquired data, notwithstanding Plaintiffs' evidence to the contrary. That conclusion is not binding at this stage because it is relevant *only* to Plaintiffs' request for *equitable* disgorgement; it was of no moment in the jury's evaluation of the *legal* claims. Consequently, the Seventh Amendment does not require the jury's conclusion on that point be given any deference.

That said, there would be no point in impaneling an advisory jury on disgorgement if the jury's determinations could not even be considered. The court must "make its own independent assessment of the issues submitted to the advisory jury," *Hansen v. Safeway, Inc.*, 2010 WL 2593611, at *3 (N.D. Cal. June 22, 2010), and the Ninth Circuit will review those findings "as if there had been no verdict from [the] advisory jury," *Ashland v. Ling-Temco-Vought, Inc.*, 711 F.2d 1431, 1438 (9th Cir. 1983). However, in making that determination, the advisory verdict can be among the many factors considered.

On the merits, there are good reasons to be skeptical of Lasinski's analysis—as the jury evidently was. Lasinski arrived at his revenue figure by starting with the total U.S. revenues from App Promo, AdMob, and Ad Manager during the class period. He then attempted to isolate the revenues attributable to signed-in users and then insolate again the revenues attributable to the subset of signed-in users that had the sWAA button off. From there, he attempted to identify the revenues earned from conversion tracking with sWAA-off data before stripping out the revenues from two accounts—Dasher and Unicorn—that were not part of the class.

The biggest vulnerability in Lasinski's analysis is in his identification of the revenues attributable to conversion tracking with sWAA-off data. Lasinksi represented that he used the percentage of revenue that "Google attributes . . . to conversion measurement." However, Google's expert, Ms. Langner, explained that the percentage of revenue that Google "attributed to . . . conversion measurement" was simply the percentage of ad spend that ultimately led to a conversion. Trial Tr. at 1313:18–24. So, for example, if an advertiser spends $100 on ads with the goal of getting its app downloaded, and $55 of that ad spend results in the app being downloaded, Google will "attribute" 55% of its ad revenues to "conversion measurement." That, of course, does not mean that $55 of ad revenue came from Google's collection of sWAA-off data and the

ORDER DENYING EQUITABLE RELIEF AND CLASS DECERTIFICATION
CASE NO. 20-cv-04688-RS
13

resultant conversion tracking. The $55 is spent *before* any conversion tracking is done; the conversion tracking is simply a measure of the success of the ad on Google.

In truth, Google makes money from conversion tracking very indirectly. As Langner testified, conversion tracking helps Google demonstrate to advertisers that their ads were successful, which in turn induces those advertisers to spend more on ads with Google. *See* Trial Tr. at 1298:12–17 ("Google benefits from conversion measurement by demonstrating that the ads are effective. When advertisers see that their ads are effective, they will want to buy more ads with Google."). Therefore, to isolate properly the impact of the sWAA-off data, Plaintiffs would need to compare two figures: (1) the amount advertisers spent with Google after being shown conversion analytics generated with sWAA-off data and (2) the amount those advertisers would have spent had the conversion analytics generated with sWAA-off data not been available.

Plaintiffs failed to engage in that exercise. In their reply brief, they argue that, absent conversion tracking, advertisers would have paid less—or potentially "nothing at all"—because they would not have understood the return on their investment, but the evidence does not substantiate that assertion. Plaintiffs point to the testimony of Steve Ganem, who testified that the loss of sWAA-off data would "cripple" Google Analytics. Trial Tr. at 1176:17–22. Maybe so, but *Google Analytics* is simply a tool for advertisers to track the performance of those ads. Crippling Google Analytics does not imply that the antecedent ad spending would go to zero. It is true that David Monsees testified that sWAA-off data is "essential to provide the ad services," Trial Tr. at 300:13–14, but it is quite the leap to go from that testimony to the conclusion that all ad spend that resulted in a conversion would have gone away without sWAA-off data.

Moreover, other evidence suggests that Google may not have lost that much if it did not collect sWAA-off data. Langner testified that roughly 80 percent of advertisers use a third-party conversion tracking service to audit ad efficacy, allowing those advertisers confidently to place ads with Google even if *Google* could not tell them how effective the ad was. *See* Trial Tr. at 1298:20–24. Ganem testified that those third-party providers are often preferred by advertisers because they can measure ad performance across platforms—such as Google, Meta, and TikTok—

whereas Google can only measure it within its own platform. *See* Trial Tr. at 1176:4–12. To be sure, Plaintiffs contend that those third-party conversion tracking services would be rendered ineffective because they too rely on sWAA-off data to assess which ads came from where and, therefore, how to attribute conversions. *See* Ex. 25 (Black Dep. Tr.) at 34:8–16. However, that does not appear to have been Ganem's understanding. When he was asked whether advertisers could "use a different product to measure ad performance" if Google could not measure conversions, he said: "Yes. They would probably use AppsFlyer or one of the other ad measurement tools." Trial Tr. at 1177:6–9. If Plaintiffs were right that loss of the sWAA-off data would impact all conversion tracking providers, that answer would make no sense.

Even if Lasinski's high-level approach to calculating revenues derived from sWAA-off data were accepted, more specific problems abound. For instance, the parties hotly dispute whether the revenue figures that Lasinski used for DVA App Promo (one of the tools Google offered to advertisers) were for the United States or the entire world. Langner explained that the P&L report Lasinski relied on for 2017 to 2019 contained *global* revenue figures, which of course would undermine that portion of the calculation because it would mean the subsequent analytical steps were done on a much higher baseline revenue number. *See* Trial. Tr. at 1315:16–1316:13. Plaintiffs have various arguments to suggest Google's expert is mistaken, including an admission (which was later corrected) by Langner that these numbers were for the United States. Plaintiffs also argue that the exhibit used to show Lasinski's error was made for litigation, making it inherently unreliable.

At a minimum, these disputes highlight the ambiguity over how much money Google made from the collection of sWAA-off data. Ambiguity in this instance redounds to Plaintiffs' disadvantage, as it is *their* burden to establish the revenue Google obtained from the misconduct. For all the reasons articulated above, they have not met that burden.

c. *Decertification*

Google contends that decertification is appropriate because there are no common issues as to whether its collection of Plaintiffs' data was highly offensive—a necessary element of both the

ORDER DENYING EQUITABLE RELIEF AND CLASS DECERTIFICATION
CASE NO. 20-cv-04688-RS

15

invasion of privacy claim and the intrusion upon seclusion claim. Specifically, Google argues that the evidence at trial revealed that the offensiveness of the intrusion stemmed from the type of data that it collected. Because the class members used different third-party apps which collected different data on different types of users, assessing offensiveness using common proof is impossible.

To demonstrate that Plaintiffs' theory of offensiveness turned on the specific data that a third-party app collected about a specific user, Google homes in on the testimony of Anibal Rodirguez, the named plaintiff. Rodriguez testified about the various apps he used on his phone and whether he found the collection of anonymized data from those apps to be offensive. As to some—including the NightOwl Companion app (which was used to manage sleep apnea), the MIPC camera app (which connected to the cameras inside his home), and the Career Karma app (which assisted in finding employment)—he testified that the data collected was highly personal and private. *See* Trial Tr. at 812:23–814:1 ("Q: Do you want Google knowing all these things? A: No. They shouldn't."). However, Rodriguez seemed not to be troubled by the collection of data from other apps—he testified that "the Target app sharing [his] data with Google Analytics" was "[n]ot a big deal." *Id.* at 843:12–16.

Moreover, Rodriguez testified that he was troubled by Google's ability to piece together a comprehensive picture of his private life from the constellation of collected data. As he put it, Google's data collection practices allowed it to "put the pieces of the puzzle together and know who [he is]." *Id.* at 857:21–858:4. This admission proves the inappropriateness of class-wide treatment, Google claims, because the intrusion turns on which puzzle pieces Google had access to, which in turn is determined by which apps each individual class member downloaded.

Google's argument rests on a constricted view of the Plaintiffs' theory of offensiveness. Plaintiffs presented ample evidence from which a jury could have determined that Google's decision to collect sWAA-off data was highly offensive *because it misled users about its plan to do so*. For instance, Plaintiffs introduced a Google-commissioned survey in which the participants revealed an expectation that "turning off [the sWAA-off] toggle [would] stop their activity from

being saved." PX-002, at 20. Plaintiffs also put forth evidence from Google employees acknowledging that Google's disclosures gave users a "false sense of security that their data is not being stored at Google, when in fact it is." PX-003, at 1. In that same email, the Google employee described the wording of Google's disclosure as "very deceptive." *Id.*; *see also* PX-004, at 2 (acknowledging that sWAA disclosures were "intentionally vague").

In his testimony, Rodriguez concurred that Google's dishonesty made the collection of his data offensive. He explained that he had "a problem" with the collection of data from "any app" because "if [he said] not to collect any data," he "expect[ed]" his data "not to be collected." Trial Tr. at 836:4–9. To substantiate that expectation, Rodriguez testified expansively about his interpretation of Google's privacy policy. He expressed dismay at "why [Google] would use th[e] term [privacy control]" when, in fact, he had "no control over" what data was collected. *Id.* at 810:18–811:2. He further testified that he was "pretty pissed" that Google "promised something that wasn't really real." *Id.* at 816:24–817:8. That testimony leaves little doubt that Rodriguez found Google's conduct offensive because it was misleading.

At best, Google has established that the nature of the data collected played a supporting role in Plaintiffs' theory of offensiveness. That, however, does not mean that an individualized inquiry is necessary to determine if Google's conduct was highly offensive. Rodriguez expressed unease at Google collecting various "puzzle pieces" about his life from the different apps on his phone. He acknowledged that some pieces, like that from NightOwl Companion, might have been bigger than others, like that from Target, but he nevertheless thought it important that each piece got Google closer to a full picture of his private life. For that reason, he explained that the data collected from his alarm clock app (which, of course, is independently innocuous) would be "just as private as a naked picture." Trial Tr. at 836:4–12.

Properly understood, Plaintiffs' theory of offensiveness is well-suited to class-wide treatment. The questions were (1) whether Google lied about its data-collection practices and (2) whether the anonymized data was of a kind that allowed Google to build a fuller picture of the user—even if Google never put that picture together. Neither question requires individualized

inquiry. The first can be answered by evaluating Google's class-wide disclosures and data-collection practices, and the second can be answered by evaluating the nature of anonymized data. The jury ultimately answered both questions in the affirmative, and there is no reason to upset those determinations now.

Google offers two additional reasons to decertify the class. First, it contends that the inclusion of personally identifiable information in sWAA-off data was not an issue common to the class. As Google sees things, a "central contention" of Rodriguez's testimony was that his name, email address, and phone number were included in the data. *See* Trial Tr. at 826:10. It is true that Rodriguez expressed discomfort about the collection of this personal information, but it is not true that Plaintiffs' theory of offensiveness turned in any way on that being a common experience. As Plaintiffs explain, one of the reasons that the (undisclosed) collection of *anonymized* data is highly offensive is that it creates a *risk* that deanonymized information may slip through the cracks. Whether that risk materialized for some members of the class is beside the point; what mattered is that Google lied to its users regarding their ability to assume that risk or not.

Second, Google argues that there were significant differences within the iOS class that preclude collective treatment. Specifically, Google points out that roughly halfway through the class period, Apple implemented a new feature within iOS which pushed to users a pop-up that asked whether they wanted the app they were using "not to track." If the user said yes, Google would not be sent the user's device ID. If the user said no, Google would continue tracking sWAA-off data as it had previously. In Google's view, this selection sheds light on consent and Plaintiffs' expectation of privacy.

This argument fails to establish that common issues do not predominate over individual ones. As to consent, Google fails to articulate precisely how permitting the app to track within iOS gave *Google* consent to collect sWAA-off data. Even those members of the iOS class that answered no to the prompt (and thus permitted the app "to track") had the sWAA button turned off and, therefore, had an expectation that *Google* was not collecting any data. That was, evidently, the conclusion of the jury, which rejected Google's consent defense even though it heard evidence

about the pop-up that Apple pushed out to its users.

Counterintuitively, Google also seems to think that those who answered yes to the prompt (*i.e.*, those that asked the app "not to track") may have consented to Google's collection of their anonymized data. This theory rests on a negative implication: Because users understood the "tracking" in the iOS prompt to refer only to identified data, they implicitly consented to the collection of anonymized data. However, both Google's premise and its conclusion lack a basis in the evidence. It has not pointed to anything suggesting that iOS users understood the tracking prompt to cover only identified data, nor did they put on any testimony indicating that those users—had they understood the prompt in the way Google presses—were consenting to the collection of anonymized data. Decertification requires more than speculation.

The core of Plaintiffs' theory of offensiveness has remained consistent throughout this litigation: Google collected Plaintiffs' data after it said it would not. The nature of the data collected mattered, but its import could be assessed without delving into the apps that each class member downloaded. Class-wide treatment remains appropriate.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for injunctive relief is denied, Plaintiffs' request for disgorgement is denied, and Google's motion to decertify the class is denied.

**IT IS SO ORDERED**.

Dated: January 30, 2026

_____
RICHARD SEEBORG
Chief United States District Judge