**Pages 1 - 59**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

| | |
|---|---|
| ANIBAL RODRIGUEZ, et al., )<br><br>Plaintiffs, )<br><br>VS. )<br><br>GOOGLE, LLC, )<br><br>Defendant. )<br>_____ ) | **NO. C 20-04688 RS** |

San Francisco, California
Wednesday, January 21, 2026

**TRANSCRIPT OF PROCEEDINGS**

<u>**APPEARANCES**</u>:

For Plaintiffs:

> BOIES, SCHILLER & FLEXNER LLP
> 333 Main Street
> Armonk, New York 10504
> **BY: DAVID BOIES, ATTORNEY AT LAW**
>
> BOIES, SCHILLER & FLEXNER LLP
> 44 Montgomery Street - 41st Floor
> San Francisco, California  94612
> **BY: MARK C. MAO, ATTORNEY AT LAW**
>
> BOIES, SCHILLER & FLEXNER LLP
> 2029 Century Park East - Suite 1520
> Los Angeles, California  90067
> **BY: ALISON L. ANDERSON, ATTORNEY AT LAW**
>
> SUSMAN GODFREY LLP
> 1900 Avenue of the Stars - Suite 1400
> Los Angeles, California  90067
> **BY: AMANDA K. BONN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
U.S. District Court - Official Reporter

**APPEARANCES:**  (continued)

For Plaintiffs:

          MORGAN & MORGAN
          201 North Franklin Street - 7th Floor
          Tampa, Florida  33602
    BY:  **JOHN A. YANCHUNIS, ATTORNEY AT LAW**

For Defendant:

          COOLEY LLP
          Three Embarcadero Center - 20th Floor
          San Francisco, California  94111
    BY:  **BENEDICT Y. HUR, ATTORNEY AT LAW**
         **JONATHAN A. PATCHEN, ATTORNEY AT LAW**
         **THILINI CHANDRASEKERA, ATTORNEY AT LAW**
         **EDUARDO E. SANTACANA, ATTORNEY AT LAW**
         **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**

**Wednesday - January 21, 2026**                              **9:35 a.m.**

                          **P R O C E E D I N G S**

                              ---oOo---

          **THE CLERK:**  The United States District Court for the Northern District of California is now in session.  The Honorable Richard Seeborg now presiding.  You may be seated.

          Counsel, just a reminder, if you are the main speaker, you are going to need to come up to the podium because my court reporter is remote, so you cannot see her but she can see you. So, you just need to make sure you stand at the podium and speak clearly into the microphone and identify yourself.

                          (Pause in proceedings.)

          **THE CLERK:**  Okay.  We are calling case number 20-CV-4688, Rodriguez versus Google.  Appearances, please, starting with the Plaintiff side and then we will do Defendant.

          **MR. BOIES:**  Good morning, Your Honor, David Boies of Boies Schiller and Flexner for the Plaintiffs.

          **THE COURT:**  Good morning.

          **MS. BONN:**  Good morning, Your Honor, Amanda Bonn, Susman Godfrey, for the Plaintiffs.

          **THE COURT:**  Good morning.

          **MR. MAO:**  And, Your Honor, Mark Mao for the Plaintiffs.

          **THE COURT:**  Good morning.

          **MS. ANDERSON:**  Good morning, Alison Anderson, for the

Plaintiffs, thank you.

**THE COURT:**  Good morning.

**MR. YANCHUNIS:**  Finally, good morning, Your Honor, John Yanchunis with Morgan & Morgan.

**THE COURT:**  Good morning.

**MS. AGNOLUCCI:**  Good morning, Your Honor, Simona Agnolucci for Google.

**THE COURT:**  Good morning.

**MR. HUR:**  Good morning, Your Honor, Ben Hur from Cooley for Google.

**THE COURT:**  Good morning.

**MR. PATCHEN:**  Good morning, Your Honor, Jonathan Patchen of Cooley for Google.

**THE COURT:**  Good morning.

**MS. CHANDRASEKERA:**  Good morning, Your Honor, Thilini Chandrasekera with Cooley for Google.

**THE COURT:**  Good morning.

**MR. SANTACANA:**  Good morning, Your Honor, Eduardo Santacana for Google.

**THE COURT:**  Good morning.  Very nice to see all of you again.  Welcome back.

So, we have a few motions on calendar; the motion to decertify, the motion for permanent injunction and for disgorgement.

Why don't we start with the motion to decertify.  I will

tell you by way of just preliminary thoughts on this, I'm skeptical of that motion.  I do think that effectively the arguments are kind of cherry-picking a few comments from Mr. Rodriguez, but I think we did have common questions that -- for which we got common answers.

So, I am -- as I say, my tentative view is not positive with respect to that motion, but why don't I start with the Defendants.  And who wants to speak on the motion? Mr. Patchen, go ahead.

**MR. PATCHEN:**  Thank you.  Good morning, Your Honor, Jonathan Patchen of Cooley on behalf of Google.

I appreciate the Court's tentative view, skeptical, and I would agree on some level that there is -- maybe it's cherry-picking; but when there's only two cherries in the tree, that's all you have to pick.

**THE COURT:**  Well, they are not just two cherries in the tree.  We had other evidence in this case.  We had evidence from the executives from your company -- your client's company, which I think are supportive of the notion here.  So, I don't think you can confine it to we only look at the two named Plaintiffs' testimony and that's it.

**MR. PATCHEN:**  So, I think the way that you look at it, Your Honor, is you say, is the common evidence capable of proving highly offensiveness on a classwide basis.  And the only evidence of actual -- of anybody feeling offended or not

by just Google's sole conduct -- irrelevant of what the nature of the app was, the nature of the data --

THE COURT:  No.  Let's go back, though.  Why can't I take into account that, say, a Google executive says internally, "We are concerned.  This is going to be misleading to the public."

MR. PATCHEN:  Uh-huh.

THE COURT:  Why can't I consider that when I'm considering whether or not when the jury finds something is highly offensive, that's part of the equation?

MR. PATCHEN:  I agree.  And the testimony at trial from Mr. Rodriguez is that he knew that as well, and he still considered the anodyne data collection from Target to be not a big deal.

THE COURT:  I think that's a bit of cherry-picking.

MR. PATCHEN:  Okay.

THE COURT:  He does different things at different points in time.  And I admire the spirited cross-examination. I'm not saying there was any -- anything wrong about highlighting that because you-all did a good job on that; but I -- I think it was fine lawyering that got certain admissions that if you look at all of his testimony, there certainly is some direct testimony that goes the other way.

So, I don't -- and the jury heard it and the jury made its decision and here we are.

**MR. PATCHEN:**  So, with respect to what the jury made its decision, I think Your Honor has the obligation under *Olean* to conduct your --

**THE COURT:**  I do.

**MR. PATCHEN:**  -- own independent rigorous examination of the evidence.

**THE COURT:**  I do.

**MR. PATCHEN:**  And I do think that when a plaintiff testifies -- named plaintiff, class representative, testifies that they know all the same facts that you just identified -- what the Google representative said.  And that's the testimony from Mr. Rodriguez -- knowing what I know now, he says, it was not a big deal.  We also know that the nature of the apps by his own testimony and the data --

**THE COURT:**  Don't you think --

**MR. PATCHEN:**  -- matters.

**THE COURT:**  -- there are places, though, where he says one can conclude that writ large he is offended by the fact that he was told that it wasn't going to be used and it got used.  It got collected and used.  Isn't -- I mean, you can -- that's why I say it is cherry-picking.  There are aspects of -- some answers that he gave -- and I understand why you are making the argument -- but there are other answers that he gave that I think gave more of a big picture approach of his reaction and I think it was that he was offended.

**MR. PATCHEN:** And I would submit, Your Honor, that he said that in the context of the puzzle pieces analogy, and he made very clear in his testimony that we cite, that that's what he saw the problem was and that's what he was offended about, was the when you take data from this app and that app and this app and you put all of the pieces together and that's the puzzle. That's what he said, not that he was offended because of Target.

And that's the problem, Your Honor, is if his testimony is puzzle pieces, Your Honor's summary judgment ruling is very clear. Hypothetical possibilities are not enough for highly offensive conduct. And there is no testimony, there is no evidence in the record, that this puzzle pieces was ever done by Google. In fact, all of the evidence, as we papered, is uniform to the contrary. So, that can't be the basis for highly offensive.

So, you have to ask yourself across the class with various different apps -- various different types of apps and data, is it highly offensive across the apps or across the entire class just based on what Google said and people having sWAA off, and we know that's not the case across the class because of what he said -- what Mr. Rodriguez said about Target, about what Mr. Rodriguez said about he is not requiring his sons to stop using gaming data on their phones because they are not adults. It is a different kind of app. It is not as important.

So, even though even with all of the facts, he testifies he turned off sWAA off of his kids' phone but he still let them use it, that is clear evidence that other information, other relevant facts, are what are material to demonstrate highly offensiveness as the Ninth Circuit said in the *Popa* decision, which was issued mid-trial, it is the particular circumstances, of each individual that is relevant here.  Is it offensive?  Is it invasive?  Or as the *Popa* court described it, is it involving sensitive medical or financial information?

The testimony at trial was that that's what really matters.  Mr. Rodriguez testified about Credit Karma and his sleep apnea app and was offended by those.

But in order for there to be class certification, it has to be true in every instance.  A Target app has to be just as highly offensive.  It has to clear that bar just as much as a Credit Karma or a medical app.  And the testimony at trial was that that bar was not cleared.

THE COURT:  Okay.  On the certification issue who would like to address it on the Plaintiffs' side?  Mr. Boies.

MR. BOIES:  First, I think the Court is exactly right; that Mr. Rodriguez's testimony taken in whole demonstrates that what he was taking about in terms of offensiveness was the fact that he was lied to.

THE COURT:  He did say, as Mr. Patchen says, that he let his children continue to use it.  So, is that somewhat

inconsistent with the idea that --

**MR. BOIES:**  No.

**THE COURT:**  -- he was highly offended?

**MR. BOIES:**  No, because what he said was they were just using it for games.  He was saying at that age they were just using it for games.  And -- and, for example, the testimony about not a big deal had nothing to do with Google.  That had to do with Target.  And what he explicitly said is Target told me that they were going to do this and I consented.

Google lied to me and that's what was offensive.  And he repeatedly -- I mean, we have -- I have got a chart, 32, that maybe we can put up on the screen that has his testimony.

Google gave me a choice to have them stop collecting my information, and it wasn't true.  And when I learned that, I was pretty upset.  I was pissed off about it.  He goes on to talk about why it was offensive.

And we tried this case.  Both sides tried this case entirely on a classwide basis.  If I can put up my closing charts.  They are charts 16 and 17.  Sixteen first.  This was my chart -- I think it was 78 in the closing -- and this is the evidence that I said showed Google's conduct was highly offensive.

And if you go down that, each one of those -- each one of those is classwide comments, all about taking and copying without permission, misleading, misleading, misleading,

saying -- knowing that users were misled, making disclosures that were intentionally vague, too convoluted to be comprehensible for people.  That's what we told the jury was the basis of our offensive.  All of those are common issues.

If you go to the next chart, 17:  Mr. Santiago, what would you like Google to know, if anything, through this lawsuit?

You can't mislead people.  You can't take information without their permission.  You can't make a false button that deceives people and get away with it.

And it was not just the Plaintiffs that were saying this. Let me go to a chart -- chart 18.  This is a -- what they argued in closing.  If sWAA is a fake button, Plaintiffs should win.  But if sWAA is not a fake button, Plaintiffs must lose. This was all tried -- it was argued to the jury by both sides on a classwide basis, whether -- was this a fake button or not a fake button.  It was all about what was Google's conduct. That's what the Court charged the jury about what was Google's conduct, not about the apps.

In fact, the Court stopped me from going into the apps. So, you know, Your Honor, this was all done -- even if there were some individual issues, even if it was more offensive, that doesn't affect predominance as the Court ruled in class certification.  It's still the common issues predominant.

This was about -- and Google said right at the beginning of the case in discovery -- if I go to chart 2, they said the

central questions in the case are what Google represented to users and the actual technical functioning of the accused technology.  That's what they said.  That's the way the case was tried.  What did Google do and say?  What did Google knew [sic]?

The -- if you go to my chart 39, the key factual determinations made by the jury were all these common questions.  What did Google tell class members?  What would an objectively reasonable person think?  What did Google actually do?  What did Google believe?  Whether Google's conduct was highly offensive to a reasonable person.  What were Plaintiffs' damages?  And Plaintiffs' damages, again, were presented on a classwide basis.  We had one month and it was one month regardless of what apps anybody used.

So, all of this stuff was common.  Everybody knew it at the time.  That's the way we argued it.  That's the way we presented the evidence.  And the fact that one of the class representatives with respect to an entirely different situation involving Target where Target told him what they were doing, I don't think that has anything to do with what was really at issue.  And maybe the best proof of that is that we both told the jury -- both sides told the jury that in closing.

THE COURT:  Okay.  Mr. Patchen.

MR. PATCHEN:  I don't disagree that based on the nature of the certification, that's how the case was tried.

The question is not -- this is a Rule 50 analysis.  This is a question of whether based on the evidence that was presented, is it sufficient -- is it capable of class resolution?  And our submission is, it is not.  And I think if Your Honor just looks -- and I -- you can hang me that it's cherry-picking but oftentimes that is the key point.  A key admission shows you exactly where the line is.

If you look at what Mr. Rodriguez said -- and this is on trial transcript 842 through 843.  This is docket 698-3, page 9 -- the question was asked:  "Part of your deal with Target was that Target was sharing your data with third parties including Google Analytics."

Mr. Rodriguez says "right."

Then he was asked:  "Are you okay with all of that?"  That's line 22.  And he says, "They are just getting my -- they are just getting my data from Target alone.  I mean, they are not -- they are not saying they are getting all of my app information from my phone.  So going back, it's like you said, my deal with Target and Google.  So, if Google is -- if I made a deal with Google saying don't collect data from the specific app or all apps on my phone, I think Google should honor that."

So, there he is.  I have made a deal, he says.  Google should honor that.  Then the question was asked:  "You have no problem with Target app sharing your data with Google Analytics, Dolby Analytics and Crazy Egg" -- so Google

violating the deal that they think he should honor.  He says, "If I understand how, how I see things and what I learned, I don't think it was a big deal."

So, here we have all of the facts that supposedly would establish for any class member highly offensive conduct, a deal with Google, the belief that Google should honor that deal, Google not honoring that deal by getting the data through the Target app, and Mr. Rodriguez saying "that's not a big deal."

He explains what is the big deal in the very next answer. Ms. Agnolucci asked:  "Not a big deal?"

And he says, "Not with sharing my Target information, my Target activity with the analytics company.  I don't think that's an issue.  I think again it is more -- we are talking about what the problem here is.  It's more Google gathering all the data from all my apps to kind of paint the picture of who I am."

Class certification rises or falls on Mr. Rodriguez giving the exact opposite testimony, which is Google violated its deal -- as Mr. Boies said -- "I'm pissed off about that." That's not okay.  It has to be not okay in all circumstances regardless of whether it is a sleep apnea app, a health app or an anodyne Target app -- or as Mr. Boies said -- just a gaming app for Mr. Rodriguez's son.  The fact that it varies based on the app and based on the data is exactly why class decertification should be granted.

**THE COURT:**  Okay.

**MR. PATCHEN:**  Thank you, Your Honor.

**THE COURT:**  Let's move on to the next set of motions and those are the motion for permanent injunction and the motion for disgorgement.  I know that it's -- you know, each side has accused the other of changing their position on whether or not it is illegal or equitable.  It was sort of amusing to read the back-and-forth.

Let me give you my thoughts on this motion as well.  On the last motion I was inclined to view with skepticism the decertification motion.  I'm inclined to view with scepticism, the motion for permanent injunction and for disgorgement.

With respect to permanent injunction, that plainly is an equitable remedy; but I do think that the fix, if you will -- the language that Google has now -- addresses the situation; and I don't see the need for a -- demonstration for the need for a permanent injunction.

The big question, the big disgorgement question, whether or not one views the jury's advisory read -- it was certainly presented or it was the intention of all of us as we went into it -- it was an advisory opinion.  My having concluded that it was equitable relief is nonetheless a very important piece of information.

And the long story short is, I think the jury got it right.  So, I -- as I say, I'm disinclined on the disgorgement

issue.  I will also say that there is a good deal of discussion now -- less so before trial -- about adequate remedy at law and what's invoked in that discussion is the *Sonner* case.  I am the Judge that had the *Sonner* case, and the *Sonner* case -- I devoted a lot of my judicial life to the *Sonner* case moving along, back and forth, up and down.  So, I have spent a lot of time with it; and I think it is an important issue for us to address because I think there is a big question as to whether or not there was an adequate remedy at law.

So, that being said, I see Mr. Boies is standing up and that's because my tentative is going in a direction he doesn't want.  So, it's appropriate for him to be the first one to speak.  So, Mr. Boies.

**MR. BOIES:**  Thank you, Your Honor.  Let me go to the injunctive relief first.  Let me go to my chart number 6 here.

I think it's important to understand what those disclosures would have been.  I mean, first, Google's terms of service, no changes.  Google's privacy policy -- and this is maybe the most important part -- no changes to the privacy policy; Google's account management page, no changes; Google's data and privacy screen, no changes; Google's web and activity controls page added three sentences but did not change any of the language that we challenged at trial.

**THE COURT:**  But the new language -- and I think I have got it right is Google can collect and use data that is not

associated with your account.

**MR. BOIES:**  Right.

**THE COURT:**  You know, that's the critical information.

**MR. BOIES:**  But --

**THE COURT:**  As long as the users know what they intend -- what Google intends to do, that's pretty much what the problem was --

**MR. BOIES:**  But --

**THE COURT:**  -- in my view.  So, I don't see the need necessarily for changing of the policy as long as there's disclosure to the public users as to what Google is planning to do.

**MR. BOIES:**  Let me go to that --

**THE COURT:**  Okay.

**MR. BOIES:**  -- actual language, which is on my chart 17 where it says:  "For example, regardless of these settings, Google can collect and use data that is not associated with your account."

Now, first of all, I want you to look at the sentence that immediately precedes that.  Google always collects, uses and processes data in accordance with the Google privacy policy.

Now, that's the privacy policy that is unchanged and tells the user you are in control, you are always in control.  Now, this is also when it says they can collect.  It doesn't say they will collect.  It says they can collect.

And if you go to my chart 21 for just a second, um, what they did not do with web and app activity is change the language where they say "for Google to save this information web and app activity must be on."

Now, this is exactly what the Google people said repeatedly -- and we put it in the trial record -- was misleading.  What the Google -- go back to 17.  Google can collect and use data that is not associated with your account. They never define what "account" is there.  They never tell them -- this is what everybody in Google was saying was misleading.  It was intentionally vague.

They could have said -- they could simply have said -- and I asked their corporate representative this -- in -- I have got a chart where he testified about that.  Chart 24 I think it is.

"Question:  And it would have been very easy just to say if sWAA is off, we are still going to collect and save this information; right?"

And he says, "I suppose that's one way to explain it."

I respectfully say, Your Honor, that this is something in which they could say this very clearly, very simply.  They haven't done that.  They haven't done it for the exact same reason that they were intentionally vague before is that they want people to think they still have privacy.

The jury found that this was, you know, intentional invasion, highly offensive and there ought to be a court

certified injunctive relief class.  And if they are doing something that's wrong, they ought to stop doing what's wrong.

Now, part of what's doing is wrong is misleading people. And what the jury found was that all of these statements about "you are in control, you can decide, we put you in control," created at most an intentional vagueness that led people to believe that people were not having their data collected when sWAA was off.

All they have to do is either get rid of that fake button or tell people that even when sWAA is off, this is the information we collected.  This is how we use it.

They shouldn't have this button if they are not going to -- if it doesn't mean something to them.

THE COURT:  Could you review for me your -- your proposal or your requested injunctive relief is more than just a language change.

MR. BOIES:  It was, Your Honor.

THE COURT:  Can you just summarize for me again what you think the injunctive remedy should be.

MR. BOIES:  First of all, we think that they ought to either get rid of the button or they ought to make explicit that they collect -- even when sWAA is off -- what they collect and when they collect it, not that they can collect it or they might collect it but they actually do collect it.

Second, there is sWAA data that has been collected in the

past.  Our expert went through how that could be remediated, how they could eliminate that data from their products, how they could change the products if they had used this -- improperly used this data.

And we are not asking them to do anything impossible. We -- they made a lot of claims about how something is impossible.  There is no evidence that that stuff is possible. The evidence from our expert is that it's -- it is possible. It is practical.  He laid out exactly how you would do it.  If there is any doubt about that, the Court could appoint a special master to supervise the remediation.  That's been done before.

So, all we are asking in the injunctive relief is that they either get rid of the fake button or they tell users explicitly even when sWAA is off, "We are going to collect this information; this is what we are going to do with it."  Now, they can tell the users if they want, "We are going to not associate your name with it."  You know, I'm not saying that they can't justify what they are doing; but they need to tell the users that this data is going to be collected because that's what the jury found was wrong.  And it is simple to do.

**THE COURT:**  Thank you.  Why don't we -- I want to hear from Defendant on the injunctive relief, and then we will go to disgorgement.

**MS. AGNOLUCCI:**  Thank you, Your Honor, Simona

Agnolucci for Google.

I will start by addressing the discussion of the disclosure changes that Google made proactively following the trial, which we rolled out promptly within a couple of months of the trial.

Mr. Boies just spent a lot of time talking about why they were inadequate; but notably in their briefing, the Plaintiffs actually said that it would be impossible and not reasonable to craft adequate disclosures.  That's on page 5 of their reply brief.  They are saying we need all these other things because you can't possibly craft the disclosures in a way that is adequate.

That is really striking because their drumbeat at trial was how hard would it be for the activity controls page to say that when sWAA is off, Google still continues to collect data?  And that is exactly what we did.

Your Honor heard witness after witness saying, Well, why can't Google just add a sentence here that says we are still going to collect data when sWAA is off?  And that's exactly what we did.  Mr. Boies didn't highlight that sentence.  But if it would be helpful to Your Honor, I have printouts of the various places where Google made changes to its disclosures, which I would be happy to hand up.

THE COURT:  He is correct, though, that the policy -- the privacy policies haven't changed; correct?

**MS. AGNOLUCCI:**  Yes, Your Honor, that's true.  We didn't change the general prefatory language, the first sentence of the privacy policy because instead what we did was modify the disclosures in the moment when the user is interacting with them, where it matters and where the specific conduct that was complained of at trial is occurring.

So, we did it in six places.  Those are all attached to the Monsees' declaration, but the most important ones are the activity controls page, which was up on the big foam board, and we put there the language that Mr. Boies highlighted; but most importantly the last sentence, which he didn't read, says, "For example, regardless of these settings, Google can collect and use data that is not associated with your account."

Google made the same change to the sWAA revocation text, which was what we referred to at trial as the "are you sure button," the button that pops up when a user turns off sWAA. That same language was added.  And it says, "Even when the setting is off, Google may still collect and use data that is not associated with your account."

We also added that to the WAA revocation, and we added it for fair measure to the invocation as well.  So, you see it when you turn on the setting, when you turn off the setting and when you first land on the activity controls page.

**THE COURT:**  Is there a reason Mr. Boies pointed out that it's -- the language is conditional?  It's, we may do

this.  Maybe we won't.  Shouldn't it, perhaps, be "this is what we are doing.  We are collecting"?

MS. AGNOLUCCI:  Well, I think, Your Honor, it depends on the circumstances and Google wanted to leave it more open because it's better that way, frankly.  I mean, we don't want to be absolute about the language.  I don't think it is confusing to a user to read, okay, this could be happening to me.  If I don't want it to happen, I can take action.

THE COURT:  But it does suggest that you could collect, you may not collect.

MS. AGNOLUCCI:  Well --

THE COURT:  And, in fact, there is no intention, as I understand it, to stop collecting.  So, I'm not suggesting this is necessarily in my mind some extremely significant difference; but I'm just curious about it.

MS. AGNOLUCCI:  Well, so, for example, a user may not use apps but may enable or disable that setting.  And in that circumstance, it wouldn't be accurate to say that information is being collected.  It's also not accurate because information is not being collected while the user has the setting enabled or disabled but happens to not be using any apps.  So, it is not a constant collection.  So, it's -- I think it is more accurate the way that it's phrased.

And so, I think the point is here, Plaintiffs' reply brief suggests that it is essentially impossible to cure a disclosure

in a privacy related tort case and Plaintiffs pivot to ask for all of these other types of relief, which are, frankly, unnecessary as Your Honor noted, in light of the fact that we went and fixed the exact issue that was being complained of at trial.

And with respect to Plaintiffs' other requests -- like the deletion of data, stop collecting the web and app activity -- I mean, first and foremost, there were adequate money damages available to the class. And, in fact, the jury awarded money damages to the class. It compensated the class members for the value of the data, and that was for the value of the data, the economic value of allowing access to the data at issue.

So, that has cured the alleged wrong of collection of the data. On a forward looking basis, we have modified our disclosures. If Your Honor is entertaining any of the alleged -- any of the requested injunctions that the Plaintiffs are requesting, I'm happy to go into them one by one.

**THE COURT:** Why don't you give me your view on them.

**MS. AGNOLUCCI:** Sure. So, first and foremost, because there were adequate money remedies available, we don't meet the standard for requiring an injunction; but setting that aside, if we go one-by-one through all of them, the first one is a request to enjoin data -- Google from collecting the data at all. They are basically saying stop the entire program of Google analytics. That is obviously not a narrowly tailored

request.  The collection of the data is not, per se, unlawful. The unlawfulness is the alleged inadequate disclosure, which Google has since fixed.

And it's not reasonable to ask us to cripple the entire analytics and app ecosystem and hurt app developers and app users when we have already addressed the issue.

With respect to deleting all existing sWAA off data, Mr. Boies noted that we didn't say it was impossible to delete it.  And that is true.  What we said was that Google would need to completely reengineer its systems.  We describe that at length in our brief, and that is because the data for the sWAA off users is kept mingled with the data for the sWAA on users but divorced from the identifiers that would allow us to know whether a particular packet of data belonged to somebody who had sWAA on or off.

So, in order to engage in the remediation that the Plaintiffs are asking for, we would have to get the identifiers, rejoin the data, determine who had sWAA off, and then delete that data.  That's the first problem.

The second problem is that it's not our data.  The data belongs to the app developers.  It belongs to the Targets and the Ubers and the Lyfts of the world, and Google doesn't have a legal and contractual right to just delete it.

So, those --

THE COURT:  I take it you are also -- part of your

argument is the holders of the data have now been compensated, so you have kind of paid for the data, if you will.

**MS. AGNOLUCCI:**  That goes back to the first point --

**THE COURT:**  Right.

**MS. AGNOLUCCI:**  -- which is there was an adequate monetary remedy.

**THE COURT:**  Right.

**MS. AGNOLUCCI:**  And if Your Honor looks back at the jury instruction, it was very clear that the Plaintiff class was compensated for the value of the data, full stop; right. So, you don't get to pay somebody for the thing that you allegedly stole and give it back to them.  The data has been paid for.

They also ask -- Mr. Boies didn't talk about this -- it is a sentence in their brief.  Frankly, it seems like a throwaway request but they asked for the deletion of all algorithms, models and services that use the data.  This is clearly a hypothetical request.  There was no testimony about this at trial.  It is not even clear what they are asking for, but the case that was tried to the jury was about Google analytics.

And, finally, they ask for a monitor, which is -- it is an extraordinary remedy that's used for recalcitrant defendants. It is hardly appropriate here where Google proactively took steps to enhance its disclosures.

And then, finally, Your Honor, the last factor is the

public interest, which clearly favors the continued functioning of app ecosystems and the availability of Google analytics to developers and to app users.

But the short version is all of these requests for relief have nothing to do with the disclosure. That is what they were complaining of at trial. That's what we addressed. That is what we fixed. We also compensated the class for the alleged money damage that they suffered for the value of their data, and there is no forward-looking ongoing harm that would merit an injunction.

**THE COURT:** Mr. Boies, any further comments on the injunctive relief issue before we move to the disgorgement issue?

**MR. BOIES:** Yes, Your Honor. I think that it's important to understand that just at the outset, that as Counsel just said, you see this if you are turning it on or turning it off. People who are just leaving it off don't ever see this; okay. I mean, this is not a situation in which they are advising people that their disclosures were false before. Somebody who turned it off and leaves it off doesn't even see this.

The second thing is, you know, I need to go back to this language on page -- on chart 20 that she referred to it, which contrary to what she said I did quote, it's the Court. When it says can -- there are several things wrong with this. I mean,

first of all, where it is is wrong.  It's not on these first --
you know, it is not on the first screens that come up.  It is
not on anything that somebody who turned it off and leaves it
off is going to see.  It doesn't change the privacy policy,
which this directs them -- it's -- you have got two sentences
here that are intentionally vague.  "Google always collects,
uses and processes data in accordance with the Google privacy
policy."

And the Google privacy policy doesn't say anything about
them continuing to collect data if sWAA is off.  And then, "For
example, regardless of these settings, Google can" -- not
will -- and to say that they want to preserve flexibility, if
they want to preserve flexibility, they can change it later.
We know right now --

**THE COURT:**  But why does that mislead the reader?  I
mean, if they are being told that this can happen, isn't it a
bit of a distinction without a difference as to whether or not
it is or is not?  They know it can be and they now have the
information they need to make their decision.

**MR. BOIES:**  But they say they can.  And yet in the
sWAA off place, it says in order for Google to collect this
information, sWAA must be on.  Now, a user could easily -- a
reasonable user could easily conclude, yes, you can collect it;
but you won't collect it when I turn the button off.

The basic point, Your Honor, is why can't they just say

that this button doesn't stop them from collecting data.  They continue to have that misleading language in -- with respect to sWAA off.  It is very -- I can't think of any reason why we ought to be parsing this and say, well, maybe it can be -- they could interpret "can" to be "will."  Why don't they just say it directly what they do?

**THE COURT:**  Yeah, but the question I don't think is I'm not -- I'm not opining on what I think is the perfect language to use.  What I am asked to decide is whether or not the fix -- whether or not it could be done better is not really the question.  Is the fix responding to the problem?  And, as I say, even if I think -- and I'm not presumptuous enough to think that I could run their company.

**MR. BOIES:**  Right.

**THE COURT:**  But, you know, if I thought it would be better if they use this language or whatever, I'm not sure that's what I should be deciding.  They have made a decision that they are going to use certain language.  The question is, you know, not whether or not it could be done better.  It is does it address the problem?  Do you agree with my formulation?

**MR. BOIES:**  I don't for the following reason.

**THE COURT:**  Okay.

**MR. BOIES:**  I think there is a difference between whether -- if they had used this language originally and we came into court and challenged it, whether this was perfect or

not.  I agree with Your Honor's formulation if that's what we were talking about.  But here we are talking about a remedy for something that has been found to be improper.  And I think when --

THE COURT:  Well, if you can remediate even better is that a reason to then enjoin the process?  In other words, if the party comes in and says this is our fix, the question is does it -- does it fix the problem.  It is not:  Is that the best you can do?  Could you do even better?  That's really not what I'm deciding on injunctive relief.

MR. BOIES:  But when they have misled people, I think in terms of looking at what they have to do to say don't be misled anymore is different than what they would have to say to avoid misleading them in the first place.

For example, I mean, take the following things:  You have had all these statements to the public not just in the disclosures but in testimony to Congress, public statements, advertisements that people are in control, the jury found that this was misleading.  It put in one sentence where you say they can do it, and they talk about they can do it not associated with your account.  That is -- that's exactly the kind of language that Google's internal people were saying was misleading.  You can collect and use data that is not associated with your account.

Now, that says they can't collect and use data that is

associated with your account.  They never say and they never explain what is and what is not associated with your account. Particularly given the fact that this is a remedy stage and they are required to remedy what they did; okay.

And I respectfully suggest they need to do that clearly, and they need to do it in a way that everybody sees.  The people who turn sWAA off and left it off never see this language.

THE COURT:  Let me actually ask Ms. Agnolucci to comment on that particular point.

MS. AGNOLUCCI:  The point that --

THE COURT:  The point that Mr. Boies says that this language is all well and good.  But if you have left the sWAA off, you are not going to read it, you are not going to see it.

MS. AGNOLUCCI:  Well, aren't those people class members, Your Honor, who would have received the class notice?

THE COURT:  Is that -- I'm asking you for --

MS. AGNOLUCCI:  Yes, I'm sorry.

THE COURT:  -- your answer.

MS. AGNOLUCCI:  Yes, Your Honor.  Those people in May would have received the class notice, which informed them of the alleged misconduct.  I'm sure that the Plaintiffs who represented the class in connection with that notice aren't going to argue that the notice didn't appropriately apprise the Plaintiff class of the nature of the allegations.

**MR. BOIES:** I certainly don't think the class notice that was sent out is anything that gives the people a remedy for the thing that was ultimately found to be a violation, Your Honor.

I don't think the class notice was intended to do that. I don't think it was read to do that. I don't even think all of the people who are, you know, class members would have even received the class notice. We did the best we could, but it was not our job in the class notice to remedy a violation that hadn't even been found yet.

**MS. AGNOLUCCI:** The remedy, Your Honor, would have been the money that was awarded to the class members for the value of accessing the data. They were made whole.

**THE COURT:** Let's move on to the disgorgement issue. Who would like to speak on that?

**MR. BOIES:** Again, Your Honor, I will do that.

Now, you know, I begin by, you know, accepting the Court's observation that we are now arguing the opposite of what we argued before. On the other hand --

**THE COURT:** They are too, so --

**MR. BOIES:** They are too. We both are. But I have the advantage of arguing what the Court found, and the Court found this to be an equitable remedy that is responsive -- that the Court has to decide.

And if it is -- and I believe that there's a lot of

evidence -- you know, a lot of case support for the Court's position.  Then the Court has to make an independent judgment about this.  And if I could --

THE COURT:  And part of that independent judgment, though, is it -- do you agree with me that I can take into account what the jury said because that was the whole point of submitting it to an advisory jury?  They give me the opportunity -- they give me the option to do that.  I opted to do that.  They made a determination.  I'm not -- this is not inconsistent with your view that I have to make an independent determination.  But in making that determination, I don't need to -- it's not right for me to ignore the advisory jury.

MR. BOIES:  Well, Your Honor, I think it's -- I think that is a more complicated question.  And, for example, if you go to my chart 10, I reference *Ashland versus Ling-Temco* where the Ninth Circuit says that it reviews the Court's findings, and that's referring to a district court, quote, as if there had been no verdict from an advisory jury.

THE COURT:  Right, but that's what the Ninth Circuit is doing, not what the district judge who has -- who is making the decision is deciding, and the district judge -- my question is:  Can the district judge take into account -- I have to rise or fall if, indeed, this is an equitable and not an at-law issue and I make my conclusion, the Ninth Circuit is exactly right.  I rise or fall -- they look at my decision, not the

advisory jury's decision; but that doesn't mean that I can't look at the advisory jury's decision in making my determination. That's my question.

MR. BOIES: Uh-huh.

THE COURT: Because otherwise what's the point of having an advisory jury?

MR. BOIES: I --

THE COURT: At the end of the day we should just get rid of it if I'm not allowed to even consider it.

MR. BOIES: I think the question is what consideration do you give it. And I think the -- maybe an analogy is when the Court has a magistrate judge make a report and recommendation on a dispositive issue, that has to be reviewed de novo.

THE COURT: It does.

MR. BOIES: But the benefit of it is that the magistrate has organized the information and has given you the view of a respected colleague.

THE COURT: Correct.

MR. BOIES: And so, I think it is always complicated as to why do you have a magistrate make a report and recommendation on dispositive issue, and I think the same thing is true with respect to an advisory jury.

THE COURT: I agree with the way you have described it. Another way to possibly look at it is if one of my

district judge colleagues makes a decision, it rises or falls on its persuasive value.  It is not precedential, but I often take those into account if I think it is persuasive.

MR. BOIES:  Right.

THE COURT:  Perhaps the same thing with an advisory jury.

MR. BOIES:  And I think that's --

THE COURT:  Okay.

MR. BOIES:  I understand that, Your Honor.

Now, I do think that -- one point to take into account, okay, is that the advisory jury was advised -- the jury was advised -- instructed that they had to find but-for causation. We disagreed with that in terms of an instruction.

I think if you look at the law, the -- that for a disgorgement, you don't need but-for causation.  I mean, if you go to my chart 13, citing the *Kadisha*, California appeals case, quote, the presence or absence of but-for causation is not necessarily determinative of unjust enrichment.

And if you look at the Restatement and Section 50 -- unjust enrichment Section 51, which is on my chart 14, it says, "Absence of but-for causation does not necessarily exonerate the wrongdoer because a finding that the defendant would have realized the profit in any event does not compel the conclusion that the defendant under the circumstances has not been unjustly enriched."

If you go to my chart 15, it is clear that California and the federal courts follow the Restatement here.

And if you go to my chart 16, again quoting the Restatement, quote, To take an obvious example, a trustee who makes a profit from the personal use of assets could not escape liability in restitution by proving that he could have and would have made the same profit legitimately supposing that his access to the trust assets had been hindered in some way.

So, the mere fact that there was not but-for causation doesn't preclude a finding of disgorgement.  But, as indicated on chart 17, jury instruction 24 told them that.

Now, that doesn't necessarily mean that the advisory jury verdict is necessarily irrelevant; but I do think that the Court needs to -- in making its decision needs to focus on the fact that the jury was told something that I think under the law is not applicable when the Court is making -- making the decision.

**THE COURT:**  So, the adequate remedy at law issue, why don't you give me your view on how that impacts this issue, whether or not -- disgorgement can't be a mechanism to if you have asked for X amount and a jury awards less than that, the -- you don't then say, well, the delta can be -- should be supplied through disgorgement by the court.

**MR. BOIES:**  Well -- well, that's true if there is no unjust enrichment; but I think the law is quite clear that if

you have damages of a hundred and unjust enrichment of 200, the plaintiff gets the 200.  The -- for example, if you go to my chart number 2 quoting the Ninth Circuit's decision in *Facebook*, quote, California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff monetary harm even if there was no monetary harm.  If there is unjust enrichment, California law requires the disgorgement of that.

And like chart number 3 -- quoting *County of San Bernardino* -- quote, the public policy of California does not permit one to take advantage of his own wrong regardless of whether the other party suffers actual damage.

So, while I agree with you --

**THE COURT:**  Well, in this case, though, you asked for disgorgement under all three of the claims that were submitted to the jury; correct?

**MR. BOIES:**  Yes.

**THE COURT:**  Yes.  And so the jury considered that, and they didn't award $3.2 billion.  They awarded 425 million.  So, they made a determination about disgorgement, haven't they, and whether or not there's unjust enrichment here in that sense.

**MR. BOIES:**  Yes.  I agree with the Court.  The jury made a decision on unjust enrichment, and I'm asking the Court to make a different decision on unjust enrichment.  However, if the Court agrees with me that there was unjust enrichment, then

the fact that the jury only awarded a certain amount of damages doesn't have anything to do with our entitlement to that unjust enrichment.

The law is clear, I think, that unjust enrichment has to be disgorged even if damages had been awarded or even if there are no damages that -- as the California courts said in the places I just quoted -- unjust enrichment has to -- is disgorged for a whole variety of reasons including deterrence and the fact that the wrongdoer can't keep unjust profits.

And I agree with the Court, that I'm asking the Court to do something that's contrary to the jury verdict.  I think that -- I think if you look at the evidence, you have to see that they made a lot of profits from this.  I can go through that evidence in some detail.

**THE COURT:**  Well, in that sense you are kind of -- if I recall the testimony, it is lumping a lot of Google's activities and programs and things, it -- the profit you are talking about is more extensive than the activity that was at issue in the case, isn't it?

**MR. BOIES:**  No, Your Honor.  I mean, for example --

**THE COURT:**  $3.2 billion is not all ascribable to the data associated with sWAA off, sWAA on.

**MR. BOIES:**  Well, the amount of the unjust enrichment, there is $4.14 billion revenue down to about $2 billion of profits.

**THE COURT:**  Okay.

**MR. BOIES:**  Now -- the way it worked -- the way it worked -- and I have got a way of sort of laying this out but if you look at -- look at my chart 53 -- and this follows our expert testimony at trial -- there was $51 billion -- this is what our expert testified at trial and he went through this in detail and --

**THE COURT:**  Is this Mr. Lasinski's testimony?

**MR. BOIES:**  Yeah -- yes, Your Honor.  And there was -- started off with $51 billion of revenue.  Maybe the better chart to do, I'm reminded, is my chart 32.  It may be a little simpler.  The total U.S. revenues from three products for the class period was $51 billion.

**MR. HUR:**  Your Honor, may we get a copy of these slides?  We haven't seen these.

**MR. BOIES:**  Let me -- I will give a copy of all three books.  We should have done this at the beginning.  I apologize.

**MR. HUR:**  Yeah, we have three disgorgement binders.

**MR. BOIES:**  You should have --

(An off-the-record discussion was had.)

**THE CLERK:**  Are they all the same?

**MR. BOIES:**  There is one binder for each of the --

**THE COURT:**  Okay.

(Pause in proceedings.)

**THE COURT:**  Okay.  Okay.  Go ahead.

**MR. BOIES:**  That's the injunction.

**THE COURT:**  Thank you.

**MR. BOIES:**  Okay.  So, and the only one I think the Court needs to focus on is the disgorgement binder now.

**THE COURT:**  Yes.

**MR. BOIES:**  And chart 32.

**THE COURT:**  Okay.

**MR. BOIES:**  And, as I say, this follows the testimony from Mr. Lasinski and the documents.  You start with the total U.S. revenues from three products for the class period, which is $51 billion.  Then you reduce that to $42 billion attributed to signed in user data.

Then you isolate the revenues attributable to just sWAA off user data.  That takes you down to $10.9 billion.  Then what he did was he reduced it even further to $4.6 billion based on what was attributable to conversion tracking.

And, as he testified, that was a very conservative reduction because he could have used a $10.91 billion number, but -- so now you are down to $4.6 billion; and then you exclude revenues from Dasher and Unicorn accounts -- the enterprise and the children accounts -- and that takes you down to 4.14.

So, what -- and remember, you know, $4.14 billion, that's over the entire class period.  And this is really a tiny

fraction of Google's revenue over that period, so, what he has done is he has isolated that.

Then what he has done is to subtract costs. Now, the subtraction of costs is their burden, but he subtracts costs to get down to the approximately $2 billion number.

So, I mean, that is the way of the -- that he did it, and I think -- respectfully, I think that -- I think there can't be any doubt based on the testimony that this was an important valuable thing for Google. I mean, they did it in the face of this lawsuit. They did it in the face of all of the things that their employees were telling them about how misleading it was. They didn't do it without good reason, good financial incentive, and this is a very conservative estimate of what that unjust enrichment is.

Now, if you conclude that there was this unjust enrichment, as I think the evidence is, then I think you are obligated under the law to provide an unjust enrichment remedy.

And I think that however much respect you give to the jury verdict, this is a decision that you need to make independently. And if looking at independently you conclude that there was this unjust enrichment based on the evidence -- you know, that we describe here and that we described in our briefs and that the Court is aware of from the trial itself -- then I think -- I think you are required -- I think this part is not discretionary. I think you are then required to make an

award of unjust enrichment.

**THE COURT:** Thank you.  Let me hear from Mr. Hur.

**MR. HUR:** Hur thank you, Your Honor.  Your Honor, Ben Hur for Google.

I too appreciate, Your Honor, that we are arguing a different position than we argued on the motion in limine. And, Your Honor, I -- I agree with Mr. Boies that what matters is the reasoning.  And when Your Honor issued your order on the MILs, Your Honor explicitly relied on the CDAFA claim as a basis for equitable disgorgement.  That's what we argued in our motion.  We focused on CDAFA.  Our position then and now was that there shouldn't be disgorgement at all under the other two claims.

**THE COURT:** Under instruction number 24, the jury -- the fact that the jury had a verdict in your favor on CDAFA can't be then the conclusion of the -- of the issue of disgorgement because they then found liability on the other claims, and you -- and there was disgorgement that was requested under those claims as well.  And they were told that.

So, to the extent you're arguing, well, once CDAFA went down, end of story, that -- that's not necessarily so because there is a disgorgement option with respect to the other claims.

**MR. HUR:** I understand, Your Honor.  I'm merely making that assertion to explain why our position now is consistent

with what we were arguing before because our position was that it had to be equitable under CDAFA.  We didn't think disgorgement was appropriate on the other two claims.  The Court disagreed.  I agree that if the Court is going to allow the jury -- the Court did allow the jury to consider disgorgement on the other two claims.  And so, the question is: Is that legal or equitable?

What Your Honor did in your October 22nd order was -- also explained the rationale for the difference between legal and equitable disgorgement.  And one of the things you relied upon was whether the Plaintiff was trying to trace particular funds to particular data.  That is what you said in your order.  And that is a correct statement of the law.  That is what we argued.  Plaintiffs suggested otherwise.

When we got to trial, it was clear that they were not, in fact, arguing that they could trace particular data to particular funds.  We all sat through the trial and we saw that, Your Honor.

But in addition even now in their brief, they state it would have been impossible to do so.  That's at page 23, lines 9 and 10 of their motion.

So, if it was impossible to trace -- and what we are talking about here is disgorgement that was not traceable -- then this was -- this was legal disgorgement.  The jury has decided it, and that's the end of the story.

If the Court is to consider whether or not -- if the Court believes that this was still equitable disgorgement -- despite those facts and that law -- the Court raised the issue of an adequate remedy of law in *Sonner*.  Mr. Boies didn't address *Sonner* in his comments.  He instead raised *In Re: Facebook*, which did not address inadequate remedy at law.

Your Honor, *Sonner* is directly on point.  And the fact that the Plaintiffs here did not actually obtain the legal damages that they sought is not relevant to the analysis.  As Your Honor knows, in *Sonner* because the plaintiffs were asking for legal damages that were the same as their equitable relief, the Court found that there was an adequate remedy at law.

Here, they asked for an amount fifteen times more than their equitable damages.  So, of course, there is an adequate remedy at law.  The fact that they didn't end up getting it is not relevant.  That's clear from *Sonner*, Your Honor.  I think that's also clear from *Guzman*.  It doesn't -- there is no case they cite that says if we don't get the actual damages we seek, then somehow our remedy is no longer adequate.

I would also note, Your Honor, that they claim that we somehow waived this argument.  We included it in our answer to the fourth amended complaint three years ago.  It is docket 305.  I will note that the Plaintiffs did not allege that they had an inadequate remedy at law.

Your Honor, so even then they didn't say it.  At trial it

was clear they weren't taking the position they had an inadequate remedy at law when they asked for 35.1 billion.  So, Your Honor, I think it is quite clear that there is an adequate remedy at law here.

Mr. Boies raised this issue of but-for causation and took issue with your jury instruction where you explained that the -- that the profits need to be connected to the data, and he cites *Uzyel versus Kadisha* for that point.  I will note that that case -- and I quote -- says (as read:) "The claimant who seeks disgorgement of profits must establish a chain of causation between the wrong complained of and the profits sought to be recovered."

Your Honor provided the correct instruction to the jury, and it is -- if the Court considers this legal, it is the same law the Court should follow in evaluating disgorgement.

Your Honor, on this question of non-restitutionary disgorgement, again, in order for non-restitutionary disgorgement to ever be considered -- to ever make the legal remedy inadequate, they have to say that the legal remedy is inadequate.  It can't be that if the legal remedy is much more than the equitable remedy, that somehow the fact that the disgorgement is non-restitutionary makes a difference.  And, Your Honor, I think that's clear from the cases that we cited.

Your Honor, I want to address CUTSA supersession.  CUTSA supercedes the remedy here.  As Your Honor is well aware --

because I know you have applied *Silvaco* many times.  Under *Silvaco* if a claim involves confidential information and the claim is for the value of that information, CUTSA supercedes that relief.  Your Honor, that's clear from *Silvaco* and from cases applying it.

And here, what you have is a situation where the Plaintiffs claim they had confidential data; and their whole case was about the value of that data and that they should be compensated for the value of that data.

Your Honor, that is just plainly precluded by CUTSA -- superceded by CUTSA.  And I want to provide an example of this because there is a case called *UCAR vs. Li* from this district that helps explain how a court should evaluate whether a remedy is really going after the value of the data or something else.

If it is something else, it is super -- it is not superceded.  But if it is for the data, it is superceded.

And Your Honor in *UCAR versus Li*, the court was considering a few different types of conversion claims.  The first was conversion of trade secrets.  Clearly superceded by CUTSA.  The second was information -- confidential information that didn't rise to trade secrets.  And that too was superceded.

So, Your Honor, we don't have to prove that these -- that the information was a trade secret in order to demonstrate that it was confidential information and that the Plaintiffs were

seeking the value of that information.

The only part of the claim in *UCAR* that was not superceded by CUTSA was for tangible property.  So in that case there were USB drives, there were phones, there were physical things that the defendant had converted; and those things, of course, would not be superceded.

So, for example, Your Honor, if this was a case where the Plaintiffs' data was on a hard drive, Plaintiffs could not seek relief for the value of the data on the hard drive.  They could, of course, seek relief for the hard drive itself, for the value of the hard drive.

So, Your Honor, not only is there no inadequate remedy at law.  CUTSA also supercedes the relief Plaintiffs seek here.

What is Plaintiffs' response to CUTSA?  They first say that Google waived.  Your Honor, Google did not waive CUTSA's supersession and I will explain why.

Affirmative defenses in diversity cases are a question of state law.  Under state law, CUTSA supersession is not an affirmative defense.  It is an argument that is failure to state a claim.

And, Your Honor, that is clearly established in the case called *PHL Associates versus Superior Court of Yolo County*. And, Your Honor, I'm going to give you the cite because they raised this issue for the first time on reply, so we haven't had a chance to raise it.  I did send the case to opposing

counsel yesterday.  The cite is 2020 Westlaw 4012763.

And, Your Honor, what *PHL* says is that -- specifically about CUTSA supersession, that it is an affirmative defense and it can be raised for the first time at trial -- I'm sorry.  It is not an affirmative defense and it can be raised for the first time at trial.  And, Your Honor, we did raise it at trial in our Rule 50 motion.  So, there is no waiver of CUTSA supersession.

The other argument is a little bit more challenging for me to follow, but they seem to be suggesting that the value of the Plaintiffs' data is derived from being exploited or shared.

Your Honor, I'm not -- I don't understand why that would matter.  As *Silvaco* makes very clear, it doesn't have to be a trade secret in order for CUTSA supersession to apply.  Clearly they argue that the data -- that their data was confidential and that it had value.  I mean, that was the entire scope and focus of their damages case.

So, really, Your Honor, I do not see from them any substantive argument as to why CUTSA supersession should not prevent the remedy they are seeking if this is, in fact, an equitable remedy.

Your Honor, finally the facts didn't show that disgorgement was appropriate at trial.  You seem to have, in your opening comments, suggested you agreed with that.  I can certainly go through the evidence.  I'm prepared to do so.

THE COURT:  Well, why don't you -- you know, Mr. Lasinski's calculations, why don't you just give me the very summary argument that -- why if I got to that point in the process, why he doesn't carry the day.

MR. HUR:  Your Honor, my colleague Ms. Chandrasekera is going to address Mr. Lasinski's specific points.  I will address some of the higher-level points --

THE COURT:  Okay.

MR. HUR:  -- with respect to his arguments.  Your Honor, I think the evidence showed pretty clearly from Ms. Langner, Mr. Ganem also, the experts, that Google does not get paid for conversions.  The theory of the damages was that Google profited from conversion tracking, and the evidence at trial was that Google gets paid when an ad is served, not when a conversion is measured.

And what Ms. Langner also explained was that the value to Google is that if Google could show third parties that their ads were working.  So, there is no -- there certainly is no monetary value that Google receives from the conversion, but it certainly gets some value by the fact that it can tell advertisers --

THE COURT:  Otherwise, they wouldn't do it.

MR. HUR:  -- that the ad works.  But what Ms. Langner also explained was that Kochava and AppsFlyer dominate this market and that these third-party advertisers are using those

products to evaluate the efficacy of the ads even on Google's ad network.

And what Ms. Langner explained was that makes sense.  An advertiser isn't going to -- doesn't want to fully rely on Google to tell them that the ad is effective on the Google ad network.  They much prefer to have a third party who can say that.

What Ms. Langner also said -- and Mr. -- Dr. Black did as well -- is that Kochava and AppsFlyer -- the dominant players in the market -- have the benefit of seeing how ads perform on TikTok and Facebook too.  So, they can compare for the advertiser how the ads are doing on the Google ad network versus TikTok and Facebook.  Google analytics can't do that.  Google can only do it on the Google ads network.

So, Your Honor, the value to advertiser is already being achieved, whether or not Google analytics can perform the conversion tracking.  And, Your Honor, that was our argument and our basis for why there should be no disgorgement at all.  You don't even have to get to the numbers because they haven't established the predicate basis for disgorgement.

Now, what does Plaintiffs say about those two points?  Well, they point to two things that weren't presented to you at trial.  They point to Exhibit 23, which is a help page about a product that does, in some circumstances, allow advertisers to pay for conversions; but that wasn't at issue in the trial and

Dr. Black makes clear in his testimony that it doesn't use sWAA off data.  Let me get you the cite for that, Your Honor.

(Pause in proceedings.)

**MR. HUR:**  That is trial transcript 1747 to 1748.  The exhibit was not presented at trial.  In fact, I don't think it was even on the exhibit list.  Mr. Boies did ask Mr. Black about it, not about the document but about this cost per action, and Mr. Black testified unequivocally that it doesn't involve sWAA off data.

The other thing that the Plaintiffs point to is Exhibit 25, which is depo testimony from Dr. Black, where they try to suggest that Dr. Black was suggesting that third parties cannot see the ads that were served on the Google ad network.

Your Honor, that is -- the testimony at trial could not have been clearer.  Dr. Black testified unequivocally that third parties like AppsFlyer and Kochava do have access and can attribute ads to the Google ad network.  The expert on it -- the fact expert on it, Ms. Langner, testified to the same.

Your Honor, the evidence at trial was that AppsFlyer and Kochava can see the ads that were searched on the Google ad network just like they can on TikTok and Facebook.

So, Your Honor, I mean, you wouldn't even need to get to the numbers even if you sort of put aside all of our other previous arguments because they didn't even meet the factual predicate for demonstrating disgorgement.  Let me --

**THE COURT:** Did -- Ms. Chandrasekera wanted to say something?

**MR. HUR:** Yes, let me turn it over to her.

**THE COURT:** Okay. Why don't you come on up. Go ahead.

**MS. CHANDRASEKERA:** Good morning, Your Honor, Thilini Chandrasekera for Google. You asked for a very brief summary of the issues with Mr. Lasinski's actual numbers. Again, you don't need to get here, but in brief there are four main issues.

First, Mr. Lasinski misinterprets multiple financial statements. That affects both his $51 billion initial overall revenue calculation. It also affects the costs that he deducts from those who eventually get to his $2.36 billion profit calculation.

Second, Mr. Lasinski fails to account for the fact that an entire category of devices at issue, which is iPhones or other iOS devices after 2021, were not amenable to conversion tracking which is the challenged conduct. So, any revenue that could potentially be attributable to them -- to those devices, he doesn't take that into account and doesn't deduct that out from his numbers.

Third, Mr. Lasinski takes two totally unrelated studies and applies percentages from those studies to his calculation here in order to try to isolate both signed in users and some

percentage of revenue attributable to conversion tracking.  And neither of those two studies is apt here.

And then fourth, there are two entire categories of Google accounts, which are for minors, children and enterprise businesses.  Those are also called Dashers and Unicorns, and those Your Honor decided were not in the class for either the constitutional or the tort claims and must be excluded. Mr. Lasinski insufficiently or incorrectly calculates the percentage that must be included.

So, Your Honor there's -- I'm happy to go into detail on any of those; but overall, Plaintiffs don't meet their burden to reasonably approximate the disgorgement that they seek.  So, this $2.36 billion number can't actually be trusted.

**THE COURT:**  Thank you.  Final comments, Mr. Boies.

**MR. BOIES:**  Yes, Your Honor.  I mean, first of all, as I think the testimony at trial made clear and as I tried to show in the chart that I showed the Court earlier, Dasher and Unicorn were taken out.  They took each out of -- each one of those things that she said was accounted for at the testimony at trial.  The Court can look at that testimony, can look at what we presented in our briefs and make a decision.  I think you will see what Mr. Lasinski did was very focused and very conservative in taking it down to a tiny fraction of what the actual revenue was; and that they produced no evidence essentially that was reliable and that their witnesses could

testify to about what their costs were.  So, that the number that we came down to is, I think, a really lower bond.

Now, Counsel said they didn't get any money from conversions.  If you turn to my chart 38, this is what the actual testimony was at trial.  This is from their corporate representative; okay.

Okay, so as you use the term "conversions" within Google applying to advertising, are there instances where advertisers pay more money because an ad has resulted in a conversion?

Answer:  Yes.

That was the trial testimony, Your Honor, from Google's expert John Black.  This is at chart 39.

Question:  A CPA is where an advertiser pays for a particular action.  The A in CPA is action, correct, sir?

Answer:  That's correct.

And an action as it's used in Google is the same as what we have been talking about as a conversion; correct?

Answer:  For CPA the action would be the conversion.

Question:  Okay.  And you know that sometimes advertisers pay per CPA; correct?

That's correct.

If you skip to chart 41, this is Exhibit 23 to our motion, and this is a -- an excerpt from Google's own website.  Use, pay for conversions in display campaigns.  Quote, you can choose to pay for conversions rather than clicks or

interactions.  Paying for conversions means you only pay when the customers convert on your website or app.

I mean, the testimony at trial and the facts as shown by their website is they do pay for conversions.

Now, with respect to whether there is an adequate remedy at law, that issue is related to the conversion pricing and related to the disgorgement, but -- as the cases that we have cited and I went over with you before -- if there is unjust enrichment that is greater than the legal remedy -- we are not saying that there was no legal remedy here.  We are saying that the remedy was inadequate because it wasn't complete, but we are not saying there was no legal remedy.  There were legal damages.  But the cases that I went over with you on, you will expressly -- and the Restatement deals expressly with a situation where you have got legal damages but you also have unjust enrichment that is greater than what the legal damages are.

And that's where we say --

**THE COURT:**  Wasn't the jury asked to consider whether or not there was a disgorgement amount that should be awarded and they declined to do so?

**MR. BOIES:**  Well, what they decided -- they decided against us on disgorgement.

**THE COURT:**  Correct.

**MR. BOIES:**  Now --

**THE COURT:** And you are saying -- are you saying, well, they weren't considering it under the rubric of unjust enrichment?

**MR. BOIES:** No, I'm not saying that. What I'm saying is three things. First I'm saying -- I'm asking you to disregard that because you are the decision maker on that.

**THE COURT:** I understand that part, yes.

**MR. BOIES:** Second, I'm asking you to disregard that because they were told that there was a but-for --

**THE COURT:** I understand that issue also.

**MR. BOIES:** Okay. And third, the fact that they held that we were not entitled to disgorgement is related to but does not necessarily mean that there was not unjust enrichment.

**THE COURT:** Well, let's hypothetically say I don't agree with you on one and two. And so, we are at three of the three points you just made.

**MR. BOIES:** Um --

**THE COURT:** At that point, it does run into this concern that I have that you can't use disgorgement if I'm -- if you are wrong about but-for and the issue -- what was your number one again?

**MR. BOIES:** Number one was you are the decision maker.

**THE COURT:** I'm the decider, okay. If the jury is in the position to make this call, it cannot be that the jury declines to award a disgorgement, and the argument to me is,

well, there is a delta between what the jury found and what we really should receive.  So, you, Judge, need to supply the rest of it.  It can't be that.

**MR. BOIES:**  Your Honor, I think -- I think I agree with you that if you conclude --

**THE COURT:**  Okay.

**MR. BOIES:**  -- that -- let's just say you conclude you were bound by the jury.

**THE COURT:**  Right.

**MR. BOIES:**  I mean, I understand that you are going to take it -- just take it into account, but if you conclude you were bound by the jury --

**THE COURT:**  And I don't think I am.

**MR. BOIES:**  -- or if you concluded that the jury was right about what they did, then we lose.

**THE COURT:**  That's a problem you have with the second one you just said but okay.

**MR. BOIES:**  But what I'm trying to say is you need to make an independent judgment and I think --

**THE COURT:**  I understand.

**MR. BOIES:**  -- and I'm saying don't give the jury too much --

**THE COURT:**  I understand.

**MR. BOIES:**  -- because -- not only because you are the independent decision maker but also because they were told this

but-for causation, and I do ask you to just look at the law on that.

**THE COURT:** I will look at that. I will look at that.

**MR. HUR:** Can I just really briefly?

**THE COURT:** Real briefly Mr. Hur.

**MR. HUR:** Your Honor, I just want to point you to the slide that Mr. Boies just pointed you to, slide 39, were he uses it to suggest that Dr. Black said that sometimes advertisers pay using cost per action.

Your Honor, what he didn't show you was the rest of the line of questioning and specifically a half page later what Mr. Black says -- Dr. Black says (as read:) "In this situation you are describing there is no sWAA off data. The cost per action is irrelevant because it doesn't involve conversions that relate to sWAA off data, and those who use CPH" -- to the extent they are used at all. And, again, there was no evidence what is used, how much used, how it related to the calculation of damages; but what Dr. Black says is there is no sWAA off data. So, it is irrelevant, Your Honor. And they are pointing to slides, again, focusing on documents that weren't even exhibits at trial and should not be considered by, Your Honor.

**THE COURT:** Okay.

**MR. HUR:** Thank you.

**THE COURT:** Thank you. Both sides, as always have done a fine job. We will have to -- I'm going to have to do my

work and then give you an order.  When I do that, there will be, as I understand it, further motion practice in the form of post-trial motions.

What I would encourage you-all to do once you get my order is to meet and confer and come up with a briefing schedule and do that.

I -- I haven't decided this for sure, but I don't think I'm going to need further argument.  I will miss you all.  But, you know, at this point, I think for that next waive of motion practice, I may decide that I want to see you-all, but don't be surprised if I say at this point I'm going to decide these issues on the papers.  And then, you know, off you go to a grander place and they can tell me how many ways I was wrong.

(Laughter)

**THE COURT:**  So, very good.  Again, my thanks as superb lawyers on both sides.  It's such a pleasure.  And I will get you an order.

**MR. BOIES:**  Thank you, Your Honor.

**MR. HUR:**  Thank you, Your Honor.

**THE COURT:**  Thank you.

**THE CLERK:**  Court stands in recess.

(Proceedings adjourned at 11:10 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    January 26, 2026




_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter