# Exhibit #10

**PAGES 1 - 126**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al., )
Plaintiffs, )
vs. ) **No. 3:20-cv-04688-RS**
GOOGLE LLC, et al., )
Defendants. )

San Francisco, California

Wednesday, July 30, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

Boies Schiller and Flexner
333 Main Street
Armonk, NY 10504
**BY: DAVID BOIES, ATTORNEY AT LAW**
**ALEXANDER BOIES, ATTORNEY AT LAW**

Boies Schiller Flexner LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
**BY: MARK C. MAO, ATTORNEY AT LAW**
**BEKO RICHARDSON, ATTORNEY AT LAW**

Boies Schiller Flexner LLP
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
**BY: ALISON L. ANDERSON, ATTORNEY AT LAW**

(Appearances continued on the following page)

**REPORTED BY: April Wood Brott, CSR No. 13782, Official United States Reporter**

**APPEARANCES (continued):**

For Plaintiffs:

Boies Schiller Flexner
100 SE 2nd Street, Suite 2800
Miami, FL 33131
**BY: JAMES W. LEE, ATTORNEY AT LAW**

Boies Schiller Flexner LLP
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
**BY: ALISON L. ANDERSON, ATTORNEY AT LAW**
**SAMANTHA D. PARRISH, ATTORNEY AT LAW**

For Defendants:

Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
**BY: BENJAMIN Y. HUR, ATTORNEY AT LAW**
**EDUARDO E. SANTACANA, ATTORNEY AT LAW**
**SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
**ARGEMIRA FLOREZ, ATTORNEY AT LAW**
**HARRIS MATEEN, ATTORNEY AT LAW**
**ISABELLA M. CORBO, ATTORNEY AT LAW**
**NAIARA TOKER, ATTORNEY AT LAW**

Cooley LLP
10265 Science Center Drive
San Diego, CA 92121
**BY: MICHAEL ATTANASIO, ATTORNEY AT LAW**

**Wednesday - July 30, 2025 9:40 A.M.**

**P R O C E E D I N G S**

**---o0o---**

**THE CLERK:** All rise. The United States District Court for the Northern District of California is now in session. The Honorable Richard Seeborg is presiding.

You may be seated. We are calling Case Number 20-CV-4688, Rodriguez, et al., versus Google. Appearances please, starting with the plaintiff and then the defendant, if you want to come up to the podium, please.

**MR. BOIES:** Good morning, Your Honor. David Boies of Boies Schiller & Flexner on behalf of the plaintiff class. With me today are my colleagues, Alison Anderson, Alex Boies, Mark Mao, James Lee, Beko Richardson, and Samantha Parrish.

**THE COURT:** Good morning.

**MR. BOIES:** Good morning.

**MR. HUR:** Good morning, Your Honor. Ben Hur from Cooley for Google. I'm here with my colleagues, Mike Attanasio, Simona Agnolucci, Eduardo Santacana, Argemira Florez, Harris Mateen, Naiara Toker, and Isabella Corbo.

**THE COURT:** Good morning. So we have a lot to cover today. I always like pretrial conferences. It's kind of a -- you feel like you get a lot done. You actually do the nuts and bolts of it all.

What I'm going to do, just to give you a roadmap of what

we're going to be discussing, I want to first just talk about the logistics, how I conduct trials, in particular the jury selection day, and we'll go through all of that.

Then we'll go to the -- some of the substantive issues in the form of the motions in limine, and then kind of related to the motions in limine, they cover certain areas that I want to talk about conceptually about how we're going to proceed in this case.

But I do want to start just with, you know, the nuts and bolts of jury selection on the day we begin, and I did confer with our jury office. There was some concern at one point that we had too many jury selections on that day, but it looks like on the 18th -- 18th or 19th?

**THE CLERK:** 18th.

**THE COURT:** That we can move forward on the 18th and pick a jury that day.

So first order of business is about my law clerk, who is sitting there, and his name is RJ. RJ has worked with me through this case. And not to embarrass him. He's a superb law clerk.

So at the time that he -- when he was working on this case, he accepted an offer at the Cooley firm in New York. At that time, as you all know, Cooley had nothing to do with this case, and he labored away. Then the defense team -- same defense team, but different place of work -- they are now at

the Cooley firm.

You know, I checked with our Washington ethics folks and the like, and I don't think it's a problem. Not only me, but all of you will have benefit from having RJ to continue to work on this case. So he is going to continue to work on this case. But I thought I should tell you in case someday you see him in New York in a restaurant with Cooley people and wonder what's going on. So I thought you should know.

Okay. So let's first talk about the jury questionnaire. That will go out. The responses will come back during the week of August 10th. What my practice is is to share the responses with you and then have a meeting, by Zoom is fine, on Friday before trial at 9:30. And at that meeting with counsel, we'll go over -- and it will be confined to hardship issues. And that way, there are certain jurors that don't -- we can tell them they don't need to come in.

And just as I think we all know, the hardships are things like caregiver responsibilities, either childcare or elderly care; full-time student; people with travel, prearranged travel plans during the period of time. I don't include -- well, we can talk about it on that Friday.

If someone has a financial hardship -- and these are sometimes the toughest ones. As we all know, the self-employed people who tell you, you know, "If I can't work, I can't pay my rent" kind of thing. Because I run 8:30 to 1:30, sometimes we

can work around that. So I don't have a blanket excuse, but we will talk about that and see what the circumstances are.

Now, we can -- and I don't feel strongly about it. It would make life a little easier. I can ask the jury office to prescreen for three weeks; in other words, just using the criteria I just said, full-time student, travel plans, caregiver issues, that they can simply exclude the people that fall into those buckets and can't do a three-week commitment.

If you want me to not do that, it sometimes means it's a little dicier in terms of the numbers calling in and will we have a jury. But it's up to the parties. I like to prescreen for a three-week or more trial, but if there's a strong negative view upon doing that, I won't do it.

Let's start with you, Mr. Boies.

**MR. BOIES:** Not from us, Your Honor. We think that makes sense.

**MR. HUR:** Your Honor, Ben Hur for Google.

We don't have an objection to that. We do have some concerns about the size of the panel in general, Your Honor. Given how many class members are likely in this potential jury pool, how many people use this setting, we do think it will depend in part on how big this pool is and who else might be pre-excluded as part of this process.

**THE COURT:** Right. Well, the benefit of doing the prescreening for three weeks is that then if it looks like lots

are going, we can put more people in. But -- and I will ask for the most I can ask. As you can appreciate, I'm getting counterpressure, budgetary counterpressure, that -- you know, don't bring in more than you need. And I also don't like to -- I mean, you know, I don't want to inconvenience people in the sense of bringing in way too many and then have them all go.

I am planning to ask for about 60. And, you know, we're going to get an eight-person jury. So that's my current notion. I think even more reason why we should perhaps prescreen and get people -- not have in the 60 people who we're going to just have to say, "Okay. You're gone." So I hear your concern, and I'm attuned to it, but I take it I can -- I think I'm going to do the prescreening for the three weeks, ask the jury office to do that.

**MR. HUR:** Your Honor, that makes sense.

**THE COURT:** Okay.

**MR. HUR:** A related question. Are you -- do you prescreen for other questions as well? You know, for example, there is a question on the jury questionnaire that really gets to the heart of whether someone has a financial interest in the case.

**THE COURT:** I -- oh. They have a financial interest --

**MR. HUR:** Because they would --

**THE COURT:** -- meaning they're a class member?

**MR. HUR:** Yes.

**THE COURT:** I'm not going to -- I won't -- they may be wrong about what they think they're part of or not. I think I -- I want the jury office only to prescreen on very easy-to-follow, kind of ministerial criteria. So that -- I'm not going to ask them to prescreen that because that's asking them to make some calls that, you know, maybe inquire about, well, do you really think you're a class -- you know, I don't want to get into that.

All the jury office is doing is somebody says, "Listen, I'm going to, you know, Cabo San Lucas on a prepaid family holiday. Here's the ticket during that three-week period. That's the kind of thing that they are, you know, saying, "Okay. You don't have to show up."

**MR. HUR:** Your Honor, it would be the answer to a yes-or-no question on the agreed square, and the benefit would be that if they answered that question yes -- and it could be a significant part of the pool -- they would not have to come in, and thereby, you would again, save those resources you were discussing by having someone come in and clearly --

**THE COURT:** Well, I don't know. Mr. Boies, do you want -- if they answer yes, do you want me to just let the jury off and say don't bother?

**MR. BOIES:** If they say yes to which question, Your Honor?

**THE COURT:** What's the question?

**MR. HUR:** Your Honor, the question is on the jury questionnaire "Do you turn off WAA or sWAA for privacy when using Google apps, products, devices, or services?" It was on the agreed questionnaire.

**THE COURT:** Well, I suppose there's also during what period of time, but -- in terms of whether or not you're a class member. But do you want people that say yes -- Mr. Hur is asking for me just to exclude them from the pool that we then consider? What's your view on that?

**MR. BOIES:** Well, I think it's complicated, Your Honor. On the one hand, jurors would have to be excluded from the class, and I think that one of the things that I think that it is appropriate to do is to tell the jurors that if they are a juror, they will not be in the class.

I think there is an issue an issue with respect to excluding just the people who turn it off and not excluding the people who turned it on. One of the things that is going to -- it's a little bit like death penalty cases, you know, asking whether they believe in the death penalty or not.

One of the issues here is going to be the privacy, how people feel about privacy. Obviously people who turned it on feel differently than people who turned it off. If you exclude all the people who turned it off but leave on all the people who turned it on, you're getting a skewed jury.

On the other hand, Google is so pervasive that if you exclude everybody who turned it on and everybody who turned it off, that could make getting a jury more complicated.

**MR. HUR:** Your Honor, if I may?

**THE COURT:** Let's -- go ahead.

**MR. HUR:** The class is only people who had it off, Your Honor. So that's why we're asking about it off.

**THE COURT:** I think I'm going to -- let's not have the jury office automatically remove people. But you've convinced me maybe I'll increase the numbers that I'm asking to have come in. Maybe go up to 70. But I don't want to -- I don't think -- let's cross this bridge later on. I will not automatically exclude those people from even showing up. We'll have to deal with it, so. Okay.

**MR. HUR:** Thank you, Your Honor.

**THE COURT:** Thank you.

So jury selection and what will happen. When the jurors come in -- and this is obviously we've had our Zoom meeting on Friday. We've gone through the list. I share with -- for counsel the order, the list that shows the order in which people will be called. So I don't keep that from you. You'll know the order.

Karen will take the roll of the jurors. Then once that's all done, I come out. I'll make preliminary remarks in -- about jury service, thanking them, all of that. I do want a

case -- a neutral, short -- meaning paragraph or less -- case description, both for telling the jurors in the near -- at the beginning, and then also, I'll need it for the preliminary jury instruction that has brackets for us to include. And that's 1.5, which I will give.

I give the Ninth Circuit pattern introductory jury instructions. We'll talk about that a little later. But I will need to get from counsel an agreed statement. I know it's hard sometimes to get an agreed statement, but this is truly just the, you know, 60,000 feet, this is what this case is. It's a case about privacy. And so I will figure out a time for when I want you to provide that to me.

So I call forward fourteen people that go into the box. It's much easier in civil cases than in criminal cases because of the numbers. So we'll have fourteen people right out of, you know, the beginning. I'll call them forward. I will share with them a printed list at the appropriate time of the witnesses anticipated to be called and ask them if they know any of those people.

So make sure you give me as complete a list as you contemplate. You know, we want to be overinclusive rather than under-inclusive. And I tell them, "Don't worry." You know, they'll look and say, "Oh, my god. I'll be here for ten years." I'll -- you know, I'll tell them, "Not all of these people may be called, but look at it, and if you think you know

somebody, raise your hand," and then we'll determine what the deal is.

I introduce lead counsel on each side, and then I look to the person I've introduced to introduce the other people who will be at counsel table with them.

So I'm assuming you, Mr. Boies.

And then is it you, Mr. Hur?

**MR. HUR:** Yes, Your Honor.

**THE COURT:** Okay. And then you will introduce the people, and I'll say, "Does anybody know any of these people?"

You know, you're on TV, Mr. Boies, so maybe we'll get some responses, but -- I saw you last night on TV actually.

So we go through that whole process. I also pass out a printed schedule that the jurors get, the fourteen that are called forward. They have a little calendar, and it shows the days that we are going to anticipate the case will go, and then I'll tell them.

And I tell them, "But then the case is tendered to you, and it's up to you how long, but this is the schedule of what we anticipate is going to be the days in which trial proceedings will be conducted." And I tell them, you know, "It's not exact. This is our best sense of how it's going to be."

Okay. Then we go through the -- I ask the questions. I use the questionnaire, and what I do is I go to -- I want each

of the prospective jurors to speak. So I will -- I'll do, you know, follow-up with each of the fourteen. Then I will turn to counsel, and you have limited follow-up. I've looked at the voir dire questions that you've submitted to me. They're fine. And each -- 15, 20, minutes on each side with the first fourteen, and you can do that.

Then we will have a sidebar with the for cause challenges. Depending on that process, when I do excuse a juror for cause, I replace that juror. So in other words, we don't move the pool around. If, let's say, juror number 3 is excused for cause, the next juror goes and sits in that seat and becomes juror number 3.

And then I do a streamlined set of questions with them, ask them, you know, if anything they've heard, they would need to raise their hand, do they know any of the people that were introduced, all of that.

Then with the new jurors, the new ones that have been replaced because of the for cause, I will permit the counsel to do a very short follow-up only with respect to the new jurors that have been called.

Then we'll do another sidebar, do another for cause challenge process, replace the jurors in the same process we go forward with. And then once we've passed the fourteen for cause, you each have three peremptories. So we know out of the fourteen, you're going to have your jury of eight people. And

remember, federal court. We don't have alternates. You have to have a unanimous jury. But you can get down to -- you can have a jury with six. And in fact, if you stipulate, it could be even less, but hopefully we won't need that.

Okay. Any questions thus far?

**MR. HUR:** Your Honor, just to clarify that the for cause will be first. Once we have fourteen, they don't have a cause issue, then we'll do the peremptories?

**THE COURT:** Correct.

**MR. HUR:** Thank you.

**THE COURT:** And the way that works is Karen will give you a form. She can show you the form. And it gets traded back and forth. Remember that if you pass, you don't burn a challenge. However, you risk the fact that if the other side passes, you're done. So, you know, that's the strategy you all get paid the big bucks for, and I leave it to you to do that. But that's how it works.

So any other questions? Then I want to talk about the preliminary instructions for a moment. Okay.

**MR. BOIES:** No, Your Honor.

**THE COURT:** Very good.

With respect to preliminary instructions -- and I know this will answer at least one of the motions in limine, I give instruction 1.3 of the civil instructions of the Ninth Circuit, 1.5, which is the one I want some help from the parties on

their brackets that we need to supply.

1.6, which is the preponderance instruction -- I don't think we have a standard on any of the claims that's different than preponderance. I think it's only preponderance. So I give the clear and convincing instruction.

I give 1.9 to 1.18. This will -- 1.19 is the one that implicates the motion in limine.

I do not solicit questions or encourage questions from jurors. Maybe it's back from my AUSA days. Nothing good can come of it, in my view. However, they may ask a question. They may fill out a -- they'll have the form that we use, once they start deliberating, for questions. They may fill out a question.

It's certainly happened, and I will share that with the parties, and we'll deal with it. But I do not encourage them to do it. So in fact, I'm more of the discourage point. So that does take care of one of the motions in limine, I know. So I don't give 1.19, which is questions from jurors.

1.20 and 1.21, I do give.

Timekeeping. You have 20 hours per side, as we discussed. RJ will be the timekeeper. At the end of each day, he'll give us the word. If you're speaking -- this doesn't go to the point of, you know, if you speak for -- make an objection, the clock is counting. But if you're speaking in the sense of examining a witness, the clock is running. If you're

cross-examining witness, the clock is running, and as I say, at the end of each day, we'll hear where we stand. There is no appeal from his decision. Okay.

Karen asked me to remind you -- and this is my error. Error is not the right word, but I've got to revise my standing orders. Standing orders talk about all sorts of paper exhibit binders that I want. I don't want them anymore, and I need to change my standing orders. We're in a different age. I don't need all the paper. I need one set, and I think you've all provided a set, but I don't want more paper exhibits after that.

What I do like -- I don't mandate it, but I do like it -- is witness binders so that if, when a witness is called, if you hand up a binder for me that does have the paper exhibits -- I know I'm going to see them on the screen, but I have to admit, just as a matter of personal preference, I kind of like having it in a binder in front of me. But that's the only paper. Don't do any other paper. Okay.

Let's see. Other logistics. 8:30 to 1:30. I try to do -- it's not precise, but I try to have two breaks along the path. We don't have a lunch break, but I try to do, you know, about every hour and a half to two hours, take a break for about 15 minutes, and then that gets us to 1:30.

Try to minimize the side bars, but I know they happen. I tell the jury, you know, we're going to try to minimize them,

Case 3:20-cv-04688-RS Document 758-4 Filed 08/31/25 Page 17 of 127


but, you know, sometimes we need to do them.

A plea for mercy -- you know, and you know this. There are a lot of you, and you're all very good, and there are two of us. Sometimes I get my other clerk to help out too, but primarily there are two of us. Motions in limine or last-minute motions that come in at 5:00 o'clock that expect a determination before we start the next day -- please don't do that.

I mean, I know there will be times when it can't be avoided, and I understand that, and I don't go to the extent of my colleague, who I'm really tempted because she's a superb judge, Judge Freeman in San Jose. And she has a policy no more than five motions in limine, and I will not give you an answer if you file something and expect -- it's something like 48 hours or something like that.

I don't do that, but I'm tempted. But please just do keep in mind that I know each side could create -- the minds out there could create all sorts of motions, and I am counting on your -- the lead on each side not to say, "Your mission -- we're done for the day. Now go and find four or five motions for us." Please keep in mind we have a limited crew, and I would appreciate it if you keep it to the absolute minimum.

If there is something you want to talk to me about before we start that particular day, I'll look to you to tell Karen, and we can try to take it up between 8:00 and 8:30. So I want

everybody here by 8:00. And sometimes in the afternoon, you know, when we're done and the jury is done for the day, we can talk about issues. But I also, you know, you're doing other things, and I'm doing other things as well. So I want to keep that to a minimum.

I do tell the jury -- and I'm pretty particular about this. I tell the jury when it hits 1:30, we're done for the day. I want them -- and they appreciate it. Every time I have a trial, they thank me at the end of the process and say, "Thank you for keeping it to the 1:30 and not letting it slip to 2:00 or 2:30 or, you know, "Oh, we could be done with this witness if we just had another 15 minutes" or whatever.

I find that we get jurors who otherwise would have a problem serving if I can really commit to them, "You're gone at 1:30." So don't be surprised when the clock hits 1:30, you know, the jury is relieved of the day. So that's how we're going to proceed.

Okay. Before I now go into the substantive issues and some of the motions in limine, any questions at this point about our process or...

**MR. HUR:** Your Honor, one question about what the jury is going to take back with them. Do you prefer the exhibits electronically on a computer? Will they go back with paper? How do you prefer to handle that?

**THE COURT:** They usually -- they will get the paper

Case 3:20-cv-04688-RS Document 728-14 Filed 08/21/25 Page 19 of 128


set, but I also -- we also make it available to them. We usually -- the last few trials I've had, they've had a monitor back there, and they -- we can give them some instruction before they start deliberating as to how to find things.

I'm glad you said that because that also -- an important thing I wanted to mention is I really want the parties, as the case progresses in trial, to work together to put an index together of -- as exhibits are admitted, and some are not admitted, to have an index because in several trials, when I hadn't done that, the one comment I've gotten from the jury is "Well, we can't find anything." You know, so we need an index for them.

Now, to answer your question about having it in digital form, my intention is to make it available to them in digital form.

**MR. HUR:** Sounds good, Your Honor. We can help prepare that and provide a searchable index too, where, if they can click on the item in the index, they can go to the document.

**THE COURT:** Right, and we'll have one of our IT people, before they start deliberating -- obviously the IT person can't be in there, but they can, before they start, tell them how they can access, how it works, and then leave obviously before they start.

**MR. HUR:** Thank you, Your Honor.

**MR. BOIES:** A related question, Your Honor. When a document is admitted, the jury will obviously be able to see it on their screen. What is the Court's view as to whether it's appropriate to hand the jurors copies of the admitted exhibit for them to hold and look at?

**THE COURT:** I don't do -- I haven't done that in the past. The monitors seem to work just fine. And no -- none of the jurors have asked for a binder or paper. If there is a particular exhibit that you think, for whatever reason, you know, the tactile process of it. I'm not averse to having you say, "Well, with this exhibit, we would request that it be circulated." That's fine. But I don't want to load them up with --

**MR. BOIES:** Sure.

**THE COURT:** -- paper.

**MR. BOIES:** Understood.

**MR. HUR:** I do worry, Your Honor, that once that door is open, suddenly there is a lot of paper and lots of exhibits --

**THE COURT:** Yeah. I don't want to --

**MR. HUR:** -- that are passed.

**THE COURT:** -- go down that path. But I also -- I mean, I don't know, but there may be some reason why the paper is of consequence. I can't think of it now, but I'm not foreclosing it. But no. It will be on the -- it will be

digital.

In addition to the monitors that you see there in the front row, we usually turn one of the big monitors around. I want to make sure it doesn't block you folks, but we position it so that people, particularly at that end of the jury box, can see. If they don't want to look on the little, smaller monitors, they can look on the big monitor.

**MR. HUR:** Your Honor, where do you typically position that big monitor?

**THE COURT:** Where those folks are sitting, you know -- yes. The person that is holding up her hand, that's about where the monitor would be. But I'm happy to work with -- I mean, if counsel can agree where they want it. I mean, I also want -- you know, the audience is entitled to look, and one of the monitors, by the way, is turned to the public. We have two. One is turned to the public so that they can see as exhibits are admitted. Yes.

And obviously -- this goes without saying, I think. We don't publish anything to the jury until the document is admitted. So we will all see it. Karen is very good at this. We'll all see it on our monitor. You'll move to admit it. If it's admitted, then it can be published to the jury. I'm not a stickler about counsel saying, "May we now publish," but that's fine. If you want to do it, it's up to you.

**MR. MAU:** Just a --

**THE COURT:** Yes.

**MR. MAU:** -- question for Your Honor. Mr. Mau for the plaintiffs. Is that also a projector?

**THE COURT:** It is a projector. It is primarily used now if somebody needs to put something on the Elmo. It's not -- I've used it in many trials. It's not particularly helpful because it's too -- even though it's big, it's too far away.

**MR. MAU:** Okay.

**THE COURT:** So, you know, it will not be, in the ordinary course, used unless, again, we need it for the Elmo or something like that. But I don't -- you can try it out, and I -- you know, are you going to come in and do a tech visit? When you do that, feel free to look at it. I don't think -- we can't -- our system will not put it on there, in other words. But the Elmo, it would. Okay.

**MR. BOIES:** The Elmo will also put it on their screens; is that right?

**THE CLERK:** Yes.

**THE COURT:** Yes.

**MR. BOIES:** Your Honor, I noticed that the screens are all in the front row.

**THE COURT:** Yes.

**MR. BOIES:** How, in your experience --

**THE COURT:** Well, it's big enough --

**MR. BOIES:** How does that work with the people in the

back?

**THE COURT:** -- that it hasn't -- you will see a lot of leaning by the back row. I don't like this. We used to have smaller monitors that were more like airplane, you know, monitors, and that got changed. I don't like it, but it's our reality. It actually does work. I haven't had any instances where the back row said they can't see, and that's also why the large monitor is helpful. But you will see jurors leaning forward looking.

**MR. BOIES:** Now, we'll only have one juror in the back; is that right?

**THE COURT:** No.

**MR. BOIES:** We've got seven --

**THE COURT:** We'll have eight jurors, so.

**MR. BOIES:** We've got seven seats in the front.

**THE COURT:** Three, four, five, six. Well, I suppose that's right. They might feel a little strange if it's only one person sitting back there, but I'll give them the option if they want to do that. So we could have seven in the front row and the eighth person at the end so that they're closest to the big monitor.

**MR. BOIES:** Yeah. I think that would make a lot of sense.

**THE COURT:** All right.

**MR. HUR:** No objection.

**THE COURT:** That's fine. We'll do that.

**MR. HUR:** Other than loneliness.

**THE COURT:** Other than loneliness.

**MR. HUR:** Your Honor, just two other questions.

**THE COURT:** Go ahead.

**MR. HUR:** Do you have a tech test day that you prefer us to come in?

**THE COURT:** I leave that to Karen. She's in charge.

**THE CLERK:** We can get the 14th.

**MR. HUR:** Okay. Thank you.

**THE CLERK:** I'll talk to you during the break.

**MR. HUR:** Okay. And then my other question, Your Honor, is for addressing the jury, do you have a preference as to where attorneys can do that?

**THE COURT:** You are not wedded to the podium. Some of my colleagues, as you know, do that. But it's a rule of reason. I mean, you can move around, but don't get too close to them. And you're all, you know, skilled lawyers, and you know not to cross the divide of invading their space. But other than that, you can -- I'm not a stickler about that.

**MR. HUR:** Thank you, Your Honor.

**THE COURT:** And even "may I approach" and all of that, I think it's nice, and I think sometimes the jury likes it, although over time, it can get kind of -- you know, they may get tired of it. It's up to you what style you want. But I

don't come down hard on you about "Oh, my god. You went up to the witness, and you didn't ask me." I mean, I don't care, so.

**MR. HUR:** Thank you.

**THE COURT:** Okay. Obviously, I mean, it goes without saying, if you're making an objection in federal court, you stand. You don't do it from a seated position.

**MR. HUR:** Understood.

**THE COURT:** Mr. Santacana.

**MR. SANTACANA:** I'm not standing to make an objection, Your Honor, but two more quick items.

**THE COURT:** You're not promising you won't do that.

**MR. SANTACANA:** One is that someone is trying to watch this on the Zoom, but I think the Zoom is not open, or it hasn't been activated. Is there any way to activate that? It's our --

**THE COURT:** Right now, you mean?

**MR. SANTACANA:** -- client from Google, yeah. I think he thought it would be on the webinar.

**THE CLERK:** Because we didn't have a remote reporter and the reporter was in person --

**MR. SANTACANA:** Okay.

**THE CLERK:** -- there was no --

**MR. SANTACANA:** Understood. Understood.

**THE CLERK:** Yeah.

**MR. SANTACANA:** And then the other point, Your Honor,

is your comments made me think about something the parties are still negotiating, which is the procedure for disclosing to each other the exhibits we intend to use a couple nights before they're going to be used.

And in those negotiations, we have discussed filing something with the Court, not so that you would be ruling necessarily by the next morning, but I wanted to know if you think two nights before is reasonable, if we need to be filing something for your review.

**THE COURT:** This is a motion?

**MR. SANTACANA:** These would be, you know, short pocket briefs about exhibits we could not agree on where we're maintaining objections to them rather than --

**THE COURT:** For exhibits?

**MR. SANTACANA:** For exhibits.

**THE COURT:** Well, I mean, that's sort of a different motion because that doesn't necessarily mean I need to rule on it before you offer the exhibit.

**MR. SANTACANA:** True.

**THE COURT:** But if you're giving me some advance notice of what the disputed exhibits will be, I think that's, yes, two days would be fine.

**MR. SANTACANA:** Okay.

**THE COURT:** Yes.

**MR. SANTACANA:** Thank you. That's all.

**THE COURT:** Okay. All righty. Why don't I launch into the next area, and we'll probably take a break about quarter of 11:00.

So we're now going into more of the substantive part of this, and I've been thinking about it. I looked at your motions in limine and then the other briefing that's come in, and I sort of want to start by giving you a sense of how I think the structure of the case would proceed, and this does implicate some of the big questions -- you know, disgorgement, who decides punitives, things of that nature.

But I thought maybe one way to approach this is to give you a concept of how I think the structure might go, and then we can go back into issues -- I'll talk about the particular motions in limine, but the big issues -- you know, bifurcation, disgorgement, nominal damages, all those issues, we can talk about.

Oh, and one other thing. Verdict form and instructions. My practice is for us to -- about the point at which Plaintiffs are concluding their case in chief, for us to have an initial -- and maybe we'll have to have two -- jury instruction conferences.

And along with jury instruction, verdict form. In my experience, verdict forms often get shorter shrift than they deserve. I think they're incredibly important, and I spend a lot of time on them because it's the trap for the unwary.

Things go off the rails if the verdict form is not clear.

Plaintiffs have suggested a very short verdict form. The defendants have a more detailed one, but however it ends up, I want it to be very literal about "Okay. Answer question 1. Go to question 2," or jump over question 2 to 3. I don't want any uncertainty for the jury. They really need to be, you know, led down the path in a very literal way, or else it goes off the rails, and it's a disaster.

So spend time on that. But that would be the point at which I would anticipate having an instruction conference. What I like to do -- I can't promise. It depends upon the press of business. If I can do it, I like to give you -- I have the benefit of what you've submitted.

And by the way, thank you very much. I like the way you've teed it up for me in terms of what's in dispute and what isn't. What I like to do is give the parties a "Okay. Here's a working draft" from me that we can use as the jumping off point. I'll try to do that. I can't promise it. We'll see how we're doing. But we'll try.

Okay. So what I see playing out here is, you know, the liability case, we start out, and Plaintiffs will present their damage theories. The disgorgement issue, I want to talk about. It's a big question of whether or not it's for me or it's for the jury, but the basic way I would anticipate it would run is we go through that.

The jury would have a verdict form that asks the question, and it's -- we have a pattern jury instruction in the Ninth Circuit whether or not they think punitive damages -- if they do find for the plaintiff and they award damages, and we'll talk about compensatory versus nominal in a moment, then they are asked in the liability phase do they think punitive damages are warranted.

If they answer yes, I do think bifurcation would be appropriate, and we would then, if they come back, they find for the plaintiffs, and they say yes to the availability of punitive damages, we go into a very short punitive damage phase that is limited to the financials. And also, anticipating one of the motions in limine, the Google financials, not the Alphabet financials.

And so the punitive damage phase is purely the question of, having already determined that the conduct meets the punitive damage standards, what needs to be awarded for punitive purposes. And it's only a -- it's a financial assessment at that point, that the bifurcated punitive proceeding would not be a proceeding about whether or not, you know, evidence introduced at that stage about egregiousness and all that.

That, to the extent that that is part of the case, they will have already assessed whether or not it's reached that level of egregiousness to warrant punitive damages. Then the

question that's running through this is also, you know, the equitable relief. And that would be the injunctive relief, and that's for me to decide, and I will be hearing that, and I can decide that after the jury does its work.

I don't think that necessarily needs to be a further bench proceeding, but perhaps it does, and then depending upon how it comes out on disgorgement, whether or not the jury will -- in advisory or legal capacity will have determined the disgorgement question, but if it's for me to decide.

Again, I would think in the liability phase, the evidence will have come in that will -- I could use if it's a decision for me to make. So I know that is a very broad-brush notion of how it proceeds, and that does already answer some of the questions in the motions in limine like bifurcation and the like.

I do think with respect to the question to the jury about the availability of punitive damages, that that has to be keyed to particular claims because the common law privacy invasion claim doesn't, I think, have -- or the constitutional claim does not permit punitive damages.

So the question to the jury with the punitive damage instruction would be as to claims 2 and 3 or whatever they are, do you think the threshold has been met that triggers punitive damages or not.

And that question is after they've decided. And again,

the verdict form would say -- if they're not going with Plaintiffs, they won't ever get to that question. It will be you're done. But if they've awarded under the claims that have punitive availability, then they go to the question of whether or not punitives are in the mix or not. And then if they say yes, when they come back, they have the bad news that they have to do some further work.

Okay. So let me stop there and hear from the parties, and then we will, as I said, get maybe a little bit more deeply into the questions of disgorgement and nominal damages and all that. Who wants to talk to me?

**MR. BOIES:** Your Honor, I thought that was very clear. I understand it. I don't really have any questions.

**MR. SANTACANA:** Thank you for explaining that, Your Honor. It sounds like you've made a decision about bifurcation, and I understand that.

**THE COURT:** There was some -- and the reason that I'm sort of inviting some comments. Bifurcation could mean a bunch of different things.

**MR. SANTACANA:** Right.

**THE COURT:** And I've made a decision to the extent that I think, when the question is being presented of -- that would implicate the Google financials. And I won't -- by the way, I'm not necessarily precluding -- and Mr. Boies can give me an argument.

I'm not saying that the Google financials couldn't possibly come in earlier, in the liability determination, if they can -- Plaintiffs can prove to me that they think it's relevant, and I know what some of their theories of relevance are.

I'm not addressing that question right now. What I am addressing though is that for assessment of punitive damages, I envision that stage of the case being focused on -- if we get there, on Google's financials.

**MR. SANTACANA:** Yes. Understood.

**THE COURT:** Okay.

**MR. SANTACANA:** Understood. And as you know, in our motion for bifurcation, we requested to also bifurcate the question of entitlement to punitives.

**THE COURT:** Yes.

**MR. SANTACANA:** We have motions in limine that I think get at what would be my objection to the Court's preference here, and so perhaps we should discuss those before we come back to this. But the objection really is the financials are set aside potentially. That is part of what we ask for.

The other piece we ask for is what we saw from the plaintiffs' exhibit list is an intent to bring in lots of evidence about other things that don't have to do with this case and build an argument that Google is a habitual privacy violator, I think is what they've said in their papers, or that

Google has had to enter settlements with the government or with private entities or attorneys general and that that should all come in to prove oppression or malice in some sense under entitlement to punitives.

So we have motions in limine that say, at least as to the claims and liability, that is all irrelevant and prejudicial.

**THE COURT:** Aren't those issues though in some ways -- separate and apart from the structure I'm talking about, those are objections that -- you just don't think that evidence should come in in any phase of the trial?

**MR. SANTACANA:** Yes.

**THE COURT:** So I'm not sure it really implicates the structure I'm talking about.

My problem with what you suggested is that, in my experience, when I have bifurcated and cut punitives to another phase, I don't recall having that proceeding be one where we're talking about egregiousness. We're only talking about what it would take to punish the --

**MR. SANTACANA:** Yes.

**THE COURT:** -- party. And I -- so I don't really conceptually see how the jury -- it doesn't seem to be a very logical way to proceed because I think in the part of the case before the jury does its work, the jury has to be asked are we going to get there or not. And I don't quite get your proposal. But I hear your objection isn't addressed by my

structure necessarily. You are saying this shouldn't come in.

Now, you do have the problem, I think, that you want to bring in some -- you want to take the position that Google really cares a lot about privacy. So if that is the way you're going, there's going to be an argument from Mr. Boies that you're opening the door. If you're saying, "We care so much about privacy," they're going to say, "No, they don't. Look at all of this other activity," and I'm going to have to assess what comes in and what doesn't, but --

**MR. SANTACANA:** Yeah.

**THE COURT:** -- isn't that going to be fought over in the case in chief part one way or the other?

**MR. SANTACANA:** I think the concern is based on how they wrote their oppositions to some of our motions in limine where they say even if evidence of some settlement with the government weren't admissible for the claims, it would be admissible for punitive damages entitlement because the standard for malice is different from the standard for the claims of highly offensive and intent, which I think should be focused on the facts of the case.

And so to the extent there's a delta between those two, that's where our concern --

**THE COURT:** Well, do you have a case for me in which the punitive phase has been an inquiry into whether or not the conduct has been -- is egregious or not? Because even the jury

instructions sort of contemplate that as the threshold question goes to the jury, and that tells you whether or not you're ever going to get to the punitive phase. So I'm not even --

**MR. SANTACANA:** Yes.

**THE COURT:** -- sure if I adopted kind of your approach, is it -- and in some ways, I wouldn't think you'd want this. If the jury awards damages to the plaintiffs, then we won't know whether or not they think -- we automatically go into the punitive phase, whereas if they're asked and they say no, they say, you know, "Okay. We've awarded compensatories and nominal and whatever, but we don't think this rises to the level of a punitive situation," I would think you would kind of want that because then you cut off -- under your theory, don't we -- if they award any damages, we have to go into a punitive phase.

**MR. SANTACANA:** Your Honor, I think you are effectively right, and it's also right that typically what you see is just the amount of punitives bifurcated, though we do have some case law when sometimes you do the entitlement bifurcated as well when it threatens prejudice. And that's why I say, you know, maybe we argue the motions in limine and, if necessary, come back to this.

But our only concern is that the plaintiffs think or that the Court might adopt a view that there's some evidence of other wrongs that can come in on the question of entitlement to

punitives that wouldn't otherwise come in, which, by its nature, is prejudicial. We don't think it should come in at all, but if it's going to come in on the grounds that it's relevant solely to punitives, then we have an objection because now what we're saying is that a jury that may not award --

**THE COURT:** It's solely -- it's relevant to the decision of whether or not punitive damages are something that we're going to consider or not. It's not the award of punitive damages. The bifurcation concept protects you -- the reason to bifurcate is that the jury might be unfairly prejudiced by knowing in this instance how rich, how wealthy the defendant is.

**MR. SANTACANA:** Right.

**THE COURT:** Although I really question in this -- I mean, I really do think in some ways it's a bit of an ironic discussion. For good or for bad, everybody knows that Google is a very, very substantial corporate entity. So the idea that the actual amount of its assets -- I'm not -- you're the lawyer, but I --

**MR. SANTACANA:** Well, yeah.

**THE COURT:** I wonder if it's --

**MR. SANTACANA:** It's more about how hard Mr. Boies intends to hammer on it during the liability --

**THE COURT:** Well, he's going to --

**MR. SANTACANA:** -- phase that matters.

**THE COURT:** Oh, okay.

**MR. SANTACANA:** But Your Honor, my only point here is I don't think there is some special category of evidence that comes in solely on the question of entitlement to punitives that otherwise would never come in. I don't think because someone's on trial for A, you get to talk about B, C, and D every time --

**THE COURT:** Right.

**MR. SANTACANA:** -- punitives are there. If Your Honor disagrees with that, then we are setting up a situation where you would be admitting other evidence about other wrongs solely because there's punitives on the table.

**THE COURT:** But isn't -- what I asked you before --

**MR. SANTACANA:** Yeah.

**THE COURT:** Aren't you -- and maybe I'm misreading what you're doing to be saying, but I did think some of what you were going to be saying is "We care a lot about privacy at Google. We really respect privacy."

And if you're going to be taking that position, that doesn't mean everything comes in. I mean, I'm not prejudging if some, as you characterize it, bad acts or however you want to -- that the plaintiffs are going to seek to admit. It doesn't automatically mean everything comes in, but there is an opening of the door there to some extent.

**MR. SANTACANA:** You're totally right that the door

could be opened, and we don't intend to open it, and I think we're prepared to address it in the context of the motion in limine on that subject.

But to answer your question directly, I don't think anything that we put on would justify or constitute opening the door to evidence like what the plaintiffs have put on their exhibit list like settlements with the FTC that are 20 years old and press releases about what other people think Google did wrong in other contexts.

**THE COURT:** Right, but there may be other -- I mean, the objection on some of that is not that it isn't -- I mean, like, 20 years old. I may say, "That's too old. I'm not going to let that in," but those are, like, specific objections to particular evidence.

**MR. SANTACANA:** Yes.

**THE COURT:** The concept of "We care about privacy," Plaintiff saying, "No, they don't," is going to be relevant in this case probably.

**MR. SANTACANA:** I mean, it's up to us to open the door if that's going to be Your Honor's ruling, but for now, I think you know, we have a motion that identifies specific exhibits we think should be excluded, and we will take your guidance on what you think constitutes opening the door.

But, you know, one person saying we care about privacy, I don't think, should mean that 10 of their 20 hours are spent on

other wrongs.

**THE COURT:** Well, yeah. But that's -- you know, that's a different -- that's really not an issue, again, in my mind about -- that's -- maybe it's cumulative. Maybe it's too old. Maybe it's all sorts of things. It's not that it's not relevant, but we'll -- okay.

**MR. SANTACANA:** Sure.

**THE COURT:** I hear you.

**MR. SANTACANA:** It's a prejudice issue.

**THE COURT:** I got you.

**MR. SANTACANA:** Yeah.

**THE COURT:** Any comments?

**MR. BOIES:** No, Your Honor.

**THE COURT:** Okay.

**MR. SANTACANA:** Thank you.

**THE COURT:** All right. So perhaps the best thing to do now is to turn to some of these -- well, we can either do the motions in limine, or you can talk a bit about some of these big issues, one of which is let's start with disgorgement, and I know it does implicate some of the motions in limine.

The big question that I've been looking into that you've teed up for me is, you know, is this a legal question or an equitable question. I'd like to hear from you on that. So let's -- who wants to talk about this question?

**MR. SANTACANA:** It's my short straw again, Your Honor.

**THE COURT:** Okay.

**MR. SANTACANA:** Eduardo Santacana for Google.

I think in their opposition to our motion, the plaintiffs say -- they talk about how the legal and equitable divide bedevils courts, and it's a chameleon, and it's so hard, and it's so hard you should just give it to the jury and not worry about it because then that will -- you'll protect yourself. And I understand the argument, but it's, of course, the argument you would expect to hear every time. I actually don't --

**THE COURT:** It would -- I mean, at the very least, I could do it as an advisory.

**MR. SANTACANA:** Right. That's their argument. It makes things easier and more conservative for you, and I understand that. The problem is I don't think this one is that hard, for a couple of reasons. One is the statute in question and the Supreme Court's decision in Great-West Life talks about just look to the statute.

The CDAFA statute is very clear that there's three categories -- compensatory, injunctive, and equitable relief. And what's interesting about the Great-West Life case is that it says if the statute says equitable relief, then the only way that you can get disgorgement is through an equitable remedy. The legal remedy for disgorgement is now off the table.

So there's a little bit of a problem for the plaintiffs in this. The Supreme Court is backing them into a corner and saying, "Well, are you seeking equitable relief under CDAFA?" If so, there's no jury right to that. That is an equitable disgorgement. So for that claim, I think it's actually very straightforward. It's just like the statute the Supreme Court analyzes in that case.

And they can't argue that it's legal disgorgement because if they argued that, then they run into this problem in the Great-West Life case, where it says if it's equitable, you can't ever have legal disgorgement. More generally, because we do have the tort where the plaintiffs argue for disgorgement as well, I think the same Supreme Court case sets up a simple task, which is are you trying to recover something that you say you have a stake in.

And in Your Honor's summary judgment ruling and even in the plaintiffs' opposition brief to this very motion, you both say that the plaintiffs' disgorgement claim is a claim for their, quote, stake in the value of the misappropriated data, proceeds from which Google now has. So -- and they say that all over their damages expert report too, and they will say it in opening, in closing, and when then they present this damages expert.

That's their theory. "You took my data, and you made money with it." Under Great-West Life, that is an equitable

remedy. "I want the money back. You took my painting. I want the painting back. You sold my painting. I want the proceeds from the painting." It's very simple.

In their opposition brief, for the first time, they say no. They say it because they need to. "No, we want disgorgement because we want to deter and punish," which is the purpose of a legal remedy. There's a problem with that argument, which is the Facebook internet tracking case. The Facebook internet tracking case says you have standing for disgorgement because it can constitute damage or loss.

That's the only reason this case is still alive, is because they are here on the disgorgement theory to keep standing in the case. It's for -- to prove damage or loss, the loss of the thing, my painting that you sold, and now I bet the profits back. If this were about deterrence or punishment, then that couldn't serve as a basis for standing, and that's how we know that the remedy they're asking for is equitable in nature under Great-West Life.

The last thing I'll say, Your Honor, is their opposition is actually mostly focused -- it's less focused on legal versus equitable and mostly focused on "Some of the evidence I want to bring in is relevant to the claims separate and apart from disgorgement. I want to prove Google profited, to prove that it was highly offensive or that Google had intent." And to that, I say fair enough. I understand that that is, to some

degree, relevant.

What's not going to work under this framework though is for them to present a damages model through an expert to the jury and say, "This is the amount the class was damaged, which should be returned to the plaintiff class." So we don't want a line on the verdict form, and we don't want them arguing at trial, through expert or counsel, that there should be a return of the ill-gotten gains, as they would call them, because of a damages model that Lasinski came up with.

That model is for you, Your Honor, to look at and decide, and it's ultimately an accounting question. Lasinski says, "This is how much you made," and our guy says, "These are the expenses," and Your Honor can decide, as judges do every day in disgorgement and accounting cases, which expenses are you going to deduct or not.

**THE COURT:** And I appreciate your candor at the beginning of this when you were talking about an advisory jury. At some point, the decision -- I have to make the decision as to whether or not this is a jury issue or an issue for me. But do you agree that it wouldn't be error if I -- part of your argument, I understand, is well, it's prejudicial to us if this being a jury question -- or a judge question, that, you know, evidence may come in on the disgorgement theory that because it's for you, the jury shouldn't hear it.

The problem you have is there isn't -- as I see it, there

isn't any prohibition at the very least, on my having an advisory jury on this question. And if I do have an advisory jury on this question, implicitly there wouldn't be any error in the jury hearing the evidence for that purpose. So if an advisory jury is available, then is there really an argument that there's unfair prejudice to you with this evidence coming in?

**MR. SANTACANA:** The advisory question, the prejudice question, I think, are actually separate. There's absolutely prejudice, but I'll answer your question directly, which is yeah. I think in the opposition brief, the quote from one of the cases -- your decision to use an advisory jury is virtually unreviewable insofar as it goes.

Now, is the evidence that's admitted at trial prejudicial to us if it is not a jury question is, I think, a slightly different analytical question, and the problem is here, their actual damages model is $523,000,000 in damages. They have disgorgement theories that get up into the 2-something billions. So the problem we have is a classic, you know, trial lawyer issue: "I could ask for this much, but I'll only ask for this much. Isn't that so reasonable?"

It's the same problem we have with their total revenue -- their intention to submit the total revenue. We got their demonstrative slides, and they have bar charts showing "Oh, Google makes so much. This is so little. It's no big deal."

That's the same problem with this. The prejudice is they wouldn't otherwise have a right to ask the jury for 2.2 billion dollars or 2.5 billion dollars.

But you might submit it as an advisory jury, so now they're asking them for that. The jury might balk at that very large number, but it suddenly makes their 523 suddenly seem so, so reasonable, which, you know, I think that number should be weighed on its merits and not on how it compares to something four times as large that they don't have the right to ask the jury for in the first place.

**THE COURT:** Mr. Boies?

**MR. BOIES:** First of all, let me just be clear. As I think everybody in the courtroom understands, we're not asking for 523. We're asking for 523 times the number of months. This is the argument that we had with the Court, and the Court decided that we could go to the jury, to the extent we had evidence --

**THE COURT:** You couldn't have Mr. Lasinski --

**MR. BOIES:** I could not have the expert --

**THE COURT:** -- say that.

**MR. BOIES:** I could not have the expert do it, but I guarantee that we're going to be asking the jury for more in terms of compensatory damages.

**THE COURT:** I understand that, and I know they oppose that.

**MR. BOIES:** Yeah.

**THE COURT:** I know that was one of the issues.

**MR. BOIES:** Yeah.

**THE COURT:** I don't -- I think that you can argue to the jury that "This is the analysis the expert had, and we encourage you to utilize this and come up with whatever figure you want." But he cannot say to the jury, "In my opinion, you should jump off from 500 million and multiply away."

**MR. BOIES:** I understand that completely, Your Honor.

**THE COURT:** All right.

**MR. BOIES:** Now, first of all, with respect to prejudice, the evidence that he's talking about is going to come in on offensiveness in any event. So I think there are a couple of reasons why there's no prejudice.

**THE COURT:** You're saying the disgorgement --

**MR. BOIES:** Disgorgement. You know, how much profit they made, what their -- it goes to the motive, goes to the intent, goes to the context. Goes to all the factors that go to offensiveness. So I think in addition to the fact that the Court could easily have an advisory jury on this, even if the Court decided not to have an advisory jury, we would still argue to the Court that we're entitled to put all this evidence in in terms of our liability phase.

Now, with respect to the Seventh Amendment question, I think that there isn't that much difference between us in terms

of what the standard is. One of the things they say in their motion is that it depends whether -- under federal law, which is what is applicable here, it depends on whether you're seeking to recover a specific property, a specific sum that belongs to the plaintiff that somehow has been taken. That's not what's at issue here in terms of disgorgement or unjust enrichment.

What we're seeking -- and they even say this in their charts from their expert -- is that the unjust enrichment is the revenue minus costs equals the profits. It is not a sum of what the plaintiff took from the plaintiff -- what the defendant took from the plaintiff and is withholding.

The way the restatement puts it -- and the way the Supreme Court, the United States Supreme Court case that counsel cites puts it -- is that if all you're looking for is a particular amount from the defendant, and it doesn't require constructive trust or any of the equitable considerations that go into disgorgement when you are applying constructive trust and the like, that it's a legal remedy.

It's not an equitable remedy in terms of jury -- in terms of what you're entitled to a jury trial on. The --

**THE COURT:** Let me back you up a bit.

**MR. BOIES:** Yeah.

**THE COURT:** The claims -- your claims that would -- under your theory are entitling you to an unjust enrichment

award are your -- now, you said it's a matter of federal law. Isn't it a matter of -- I mean, these are state -- there's a state claim.

**MR. BOIES:** It is a state claim, but whether you're entitled to a jury trial on the issue is a question of federal law, and I think we cited some of those --

**THE COURT:** Okay.

**MR. BOIES:** -- cases in our brief.

**THE COURT:** But don't I look, for example, in -- under the statute, the state statute that you are proceeding on when we look at analogous state statutes, the one about likeness, utilizing likeness --

**MR. BOIES:** Yes.

**THE COURT:** -- and the like, that has a CACI instruction, proposed instruction, that indicates that is for the jury to decide. But in the statute you're proceeding under, it -- there isn't any indication that that -- at least that state statute contemplates it being a jury question, is it? Unless the -- we're talking about --

**MR. BOIES:** Are you talking about CACI instruction 1821?

**THE COURT:** I don't --

**MR. BOIES:** Is that --

**THE COURT:** I don't remember. I think it's 1800, but --

**MR. BOIES:** Well, there is a CACI 1821 that talks about instructing the jury how to calculate taking revenue, subtracting expenses, coming to profits.

**THE COURT:** Yeah.

**MR. BOIES:** The -- I didn't recall that that was specifically related to the name, image, and likeness. It may be.

**THE COURT:** You're right. It is 1821, damages for use of names or likeness.

**MR. BOIES:** Yeah. And the -- I think that the fact that there's not a comparable instruction --

**THE COURT:** Right.

**MR. BOIES:** I don't know exactly what you draw from that.

**THE COURT:** That was the question.

**MR. BOIES:** Yeah.

**THE COURT:** Here, there is a particular instruction that indicates to me that under -- for damages for use of name or likeness, it is a jury question.

**MR. BOIES:** Yes.

**THE COURT:** But we don't have a comparable instruction under the statutes you're proceeding under. So does that indicate that it is not a jury question?

**MR. BOIES:** I don't think so, Your Honor. Obviously I yield to the Court in terms of how to interpret the --

**THE COURT:** No. I'm asking --

**MR. BOIES:** -- CACI instructions, but it seems to me that the instructions, you know, deal -- you know, are drafted deal with questions that people present. The fact that it has not been dealt with one way or the other with respect to this statute, I don't think tells you anything. I think what the Court has to do is look at the statute itself, as the Court did in our motions for summary judgment in class certification and as the Ninth Circuit did in the Facebook tracking case.

So I think when you look at the statute itself and what constitutes damage or loss, as the Court found -- as this court found in this case and as the Ninth Circuit found in the Facebook tracking case, then what you have here is something that, under United States Supreme Court precedent and under the restatement, is something that ought to go to the jury.

Now, I think that if the Court has some dubiety about that, I think in terms of having, you know, an appropriate record, there is some rationale to say, "Send it to the jury. I will decide after the fact whether it is advisory or whether I'm bound by it."

And if this goes up to the Court of Appeals, the Court of Appeals will at least have it. So if the Court of Appeals decides that it was a jury question, you then have a full record.

Now, it's always possible that, depending upon what the

jury finds, we might reverse our positions when it comes to arguing it to the Court.

**THE COURT:** It's very possible the jury finds something and you say, "Well, this is something for you to decide."

**MR. BOIES:** Right.

**THE COURT:** Yeah. I understand.

Okay. Why don't we take a break so our court reporter can rest her hands, and we'll come back in about five minutes or so.

**MR. BOIES:** Thank you, Your Honor.

**MR. SANTACANA:** Thank you.

**THE CLERK:** Court stands in recess.

(Recess taken from 10:55 - 11:11 A.M.)

**THE CLERK:** Please remain seated and come to order.

**THE COURT:** Okay. I think probably the best way to proceed now is just to go to the motions in limine. You know, some of the issues we've already talked about are implicated by some of these, and so we may be repeating some things. I will be planning to give you an order, a written order on the motions in limine probably maybe next week. I hope to get something out to you.

Okay let me start with the plaintiffs' motions.

**MR. SANTACANA:** Your Honor --

**THE COURT:** Yes.

**MR. SANTACANA:** If I may just comment on one thing before the break.

**THE COURT:** Sure.

**MR. SANTACANA:** You and Mr. Boies had a back and forth about the limits of his expert's --

**THE COURT:** Yes.

**MR. SANTACANA:** -- ability to multiply his opinion and counsel's ability to multiply the opinion, and I think what I heard you say was the plaintiffs can encourage the jury to draw their own conclusions, which I think is how you phrased it in your order as well.

We've seen the slides, some of them, because we had the disclosure already, and it's pretty clear to us that they would go beyond what you've said and that their intent is to actually explicitly ask the jury in argument to multiply by 98 or even do the math for them, which gets them from 523 to almost 52 billion dollars, by presenting effectively a new calculation. And our view is that that undermines the spirit of the order, which is this is not a damages model in the case.

The juries can draw their own conclusions. They can present them the evidence, including that the class period is 98 months long, but there's a line, we think, between that and "Hey, jury, we are now asking you to multiply by 98."

**THE COURT:** But how -- you know, if it doesn't have the imprimatur of an expert saying this is the right

calculation, how can you really cut off -- I mean, and also of course the jury is told lawyers arguments' are that. It's not evidence. Why -- what would be the basis of saying that the lawyer can't say, "I encourage you to multiply by X" or -- you know, I mean, I don't quite --

**MR. SANTACANA:** Yeah.

**THE COURT:** -- understand why the lawyer should be constrained in asking the jury not just to make -- not just to multiply, if you will, but to multiply to a particular place. Why not?

**MR. SANTACANA:** Well, we know, Your Honor, that lawyers, even in argument, aren't permitted to invite juries to speculate or to base their verdict on something that isn't factual. We also know they're not allowed to tell juries things that would be prejudicial or that weren't disclosed in discovery.

And our view is that the logic of permitting them to cross that line I was talking about in the mine run of trials would effectively mean that there's no purpose to the disclosures that happen during discovery because at closing, a plaintiffs' lawyer can always just come up with a new number. Today it's multiplied by 98, or maybe he says it's multiplied by 3 because that's the number I feel like today or multiply by a thousand. There's no limit.

And I know Your Honor will say, "Well, he might look kind

of silly doing that" --

**THE COURT:** That's the first one. You're reading my mind.

**MR. SANTACANA:** But --

**THE COURT:** That's true, and the other reason -- you know, the thing that I think -- the reason I ruled in your favor on that is that I think if, you know, a witness, an expert who will be designated as an expert has all the, you know, stature of that on the stand is a very different proposition than a lawyer, and, you know, not only is there the you look bad concept, but I suspect you will get up and argue and say, you know, they're just making -- they're asking you to give them the moon and the stars, and it's offensive and whatever else you want to say.

I'm just -- I'm sort of loathe to constrain the lawyer argument. I agree with you that -- and I think it's different -- a lawyer can't make up facts and can't mislead the jury on the laws and that kind of thing, but that's not what's going on here.

What's going on here is a lawyer saying your experts say, you know, calculate out to 500 million, and he told you how he did it. We think you should take that, and you should, you know, award much more.

It's not new facts. It's just an argument. But I hear you, and I haven't decided the question. I'll think about it.

If you have some specific -- now that you've exchanged it, if there's something to crystalize this by showing me the proposed, you know, PowerPoint or what have you, I'll take a look at it.

Do you want to comment on this, Mr. Boies?

**MR. BOIES:** No, Your Honor. Let me just briefly. The Court ruled that our expert couldn't testify to it.

**THE COURT:** Right.

**MR. BOIES:** But that the expert had provided them with notice this was a monthly figure, and he only had information -- didn't have information himself. He said how many months, so he took one because he knew it was at least one, but if we had in the record evidence that it was more than one month, we could ask the jury for those more than one month. That's what I'm going to do.

And I'm not going to risk my credibility with a jury by just making up a number. I'm going to show the jury where in the evidence I think there is basis for them to decide that it's not one month. Maybe it's five months. I'm not going to ask for a hundred months. I think that wouldn't be credible for the jury.

But I think part of my job and part of my right is to look at the evidence and tell the jury what I think the evidence leads them to do.

**THE COURT:** Is this one of your numbered in limine

motions?

**MR. SANTACANA:** It's not, Your Honor. It's not.

**THE COURT:** Okay.

**MR. SANTACANA:** Because it's sort of coming up in the context of the slide exchange.

**THE COURT:** Okay. Well, why don't you supplement what you have already submitted in the form of an additional -- you can label it whatever you want. But, you know, it's an important enough question. Why don't you give me something in writing that explains the constraints and what you think you're entitled to, and then Mr. Boies and his colleagues can respond, and I'll look at it.

**MR. SANTACANA:** Thank you, Your Honor. We will.

**THE COURT:** Okay. Let's go back to the plaintiffs' motions in limine, and several of these, we've already kind of dealt with. But the first one, I don't really think -- and you can correct me -- come on up.

**MS. AGNOLUCCI:** Simona Agnolucci for Google. Good morning, Your Honor.

**THE COURT:** Good morning.

**MS. AGNOLUCCI:** So I will deal with 1 through 3 of the plaintiffs' motions, which I think are intertwined. I think the parties are largely in agreement about all three of those. We don't intend to discuss how much money the lawyers are making in this case. We don't intend to comment on the fact

that this is lawyer-driven litigation or to use those words.

I think the only daylight between the parties at this point has to do with our intent to ask the named plaintiffs how they came to learn of this litigation, what they did to investigate their claims and related questions, which I think are plainly allowed, but there does seem to be disagreement about that one point.

Other than that, I think we are on the same page with respect to Plaintiff's motions 1 through 3.

**THE COURT:** Just as a point of guidance here, the -- one of my least favorite cases that seems to never end, although it looks like there's an ending. In that case, this issue came up, and I was reminded that what I said at that time, and it makes sense to me now, is that the named plaintiff can -- it was a she.

How she can -- they can inquire, the defense can inquire, how she became involved in the case and whether she was dissatisfied with the product before learning of the case. In an attorney advertisement. It's the Montera vs. Nutrition case. And that's kind of my view. So I think it's actually consistent with what you just said.

But go ahead.

**MR. RICHARDSON:** Good morning, Your Honor. Beko Richardson. And I think I agree with counsel. We're largely in agreement on 1, 2, and 3. Motion in limine 2 is where i

think we have a little bit of a disagreement. And the problem that we see with motion in limine 2 is that even though Google is agreeing not to use the words "lawyer-driven," to not say those words, if you read the brief, what they're really trying to do is present a picture of the case being lawyer-driven.

And if you look at the testimony in the footnotes, footnotes 2, 3, and 4, you'll see that it actually doesn't track with what they're saying in the brief. And so they're trying to say that these clients were solicited by advertisements. We didn't run any advertisements in this case. What Ms. Harvey said at her deposition was that she saw a news article about the case after --

**THE COURT:** Well, that's fine.

**MR. RICHARDSON:** And that's absolutely fine. We agree.

**THE COURT:** So that's what you -- that's what the examination will be. But the point is that while they won't be permitted to say, "This is just a plaintiff lawyer construct." The class plaintiffs -- it's certainly appropriate for them to ask questions about how they became involved. And you're saying it wasn't as a result of an advertisement. They could certainly ask that question. If it's that she read an article, they can ask about that.

And if the suggestion they're trying to leave with the jury is that these plaintiffs aren't really committed to this

or that they're really trying to get a fast buck or whatever, then, you know, that's okay. The class representatives are open season to them. But I think we're -- I don't think there's a real dispute here.

**MS. AGNOLUCCI:** I agree, Your Honor.

**THE COURT:** Okay. All right. So then we've got -- number 4 is exclude evidence and argument about former plaintiffs who were voluntarily dismissed. I think it really only implicates Cataldo, the most recent one.

You guys may want to make your appearance. It's a new cast, so go ahead and make your appearance.

**MS. FLOREZ:** Good morning. Argemira Florez for Google.

**MR. LEE:** Good morning. James Lee.

**THE COURT:** Good morning.

**MR. LEE:** For the plaintiffs.

**THE COURT:** Okay. So we're really talking about the Cataldo deposition. Is that what we're talking about?

**MR. LEE:** That's right, Your Honor.

**THE COURT:** Okay. So it's Plaintiffs' motion. So why don't you start.

**MR. LEE:** Sure.

So Judge, what's going on here is that we have dismissed or we're going to dismiss Mr. Cataldo from the case. He will not testify in Plaintiffs' case in chief. What Google has done

is said, "Well, even if he's not coming to trial, we want to designate testimony from his deposition." And if you look at what they've designated, they're using him solely for the purposes of impeachment, which they can't do.

He's not coming in for any substantive. It's really just calling him, playing his video so that they can impeach him. So let me give you some examples. If you look at the designations, they try to suggest that -- again, this is sort of a lawyer driven case, that he himself is a lawyer, and there's a lot of back and forth when he turned the WAA feature off. His testimony is that he remembers doing it years ago, and they confront him with documents that suggest he turned it off later after he joined the lawsuit.

And that has no bearing on what the jury is going to decide, right? And the fear is that once they play those clips and then they hear that this was a class representative, and now he's not -- what happened? What is the jury left to speculate on why that is? Why was he played? Why was he dismissed?

And I think they're hoping that the jury will branch onto this, reach this conclusion that this is lawyer-driven and this was brought by a lawyer, and he got caught with something he shouldn't have on his WAA feature, and so he dismissed the case.

That really has no place for the jury on any of the

claims, any of the elements of our case. So I think that's the problem, is it's going to lead to a lot of jury confusion, and the prejudice is that what will the jury be left to conclude about Mr. Cataldo.

**THE COURT:** Okay.

**MS. FLOREZ:** Thank you, Your Honor. I'd start by saying that Mr. Cataldo is currently a named plaintiff. There hasn't been any dismissal, and I would also add that we have communicated our intention -- we subpoenaed Mr. Cataldo, and we also communicated our intention to play his deposition testimony, and we think that that's not controversial. It's permitted under the Rules of Evidence.

And to Mr. Lee's point, his testimony is clearly relevant. It's not only for impeachment purposes. We designated a ton of testimony, and I actually read testimony from the record. But Plaintiffs in this case must show that they had a reasonable expectation of privacy in the data at issue, as we know, for all of their invasion of privacy claims. But as part of its defense, Google has to demonstrate that Plaintiffs didn't have that reasonable expectation, and Mr. Cataldo's testimony goes to that very issue.

At deposition, he demonstrated that he understood a difference between the sWAA setting and the ad personalization setting. He understood that he couldn't use sWAA or ads personalization to prevent Google from serving ads at all. So

he distinguished the two settings in a way that other plaintiffs didn't. So his testimony is very unique, and I think Mr. Lee is really focusing on a small subset of the testimony that we designated to kind of play up the last motion.

**THE COURT:** Just in sort of a bigger question, what's the relevance of a former class representative, however that person perceived the case, how they got involved and all of that? Once they're out of the case -- and I understand you said they haven't formally gotten them out. But doesn't it cease to be kind of relevant anymore what that person -- anything about that person?

**MS. FLOREZ:** Well, I think Mr. Cataldo was uniquely situated. He's been part of this since 2020, the first amended complaint. The parties have built their case around his testimony and the arguments he made. I'm sorry. The factual -- you know, his understanding of the disclosures, and I think what's more important to focus on here is that courts in this district have found that even former plaintiffs have relevant testimony.

If it's relevant to the outstanding factual disputes, there's really -- there's no reason not to let it in. We're not trying to, you know, point out that he's a former plaintiff and dismissed his claims, and he dismissed his claims because --

**THE COURT:** Well, I guess what I'm getting at is if somebody is in a case as class representative and then, you know, if it's done, right. They're no longer involved. They're out of the case. They're almost -- like, just the relevance of their views about anything is kind of like pick somebody off the street and ask them what they think of something. I mean, it's -- they've almost exited relevance, if you will.

And I hear you saying -- and I don't disagree with you that there could be circumstances in which there is relevance, but the particular views, say, of Mr. Cataldo -- I don't really know why they're relevant anymore.

**MS. FLOREZ:** Well, Mr. Cataldo was a class representative. So I would distinguish him from the example you gave of anybody that we would, you know, pick up off the street. He accepted that role when he joined this case, and so his testimony specifically about the highly offensive nature of the harm and -- or of Google's alleged conduct, and his understanding of the disclosures is very relevant to the outstanding disputes.

So I think that, different from anybody we pick up, you know, off the street and ask these questions to -- the fact that he was a class representative really distinguishes him from anyone else.

**THE COURT:** Okay. I think --

**MR. LEE:** You got it?

**THE COURT:** I think I got it. Okay.

**MR. LEE:** Okay.

**THE COURT:** And as I say, I'll give you an order on all of these. I don't think I'm going to rule necessarily on --

**MR. LEE:** Thank you, Judge.

**THE COURT:** -- a whole lot here.

**MS. FLOREZ:** Your Honor?

**THE COURT:** Yes.

**MS. FLOREZ:** If I may, I just wanted to put on the record that I do oppose -- that Google does oppose Mr. Cataldo's dismissal from the case. That changes many things.

**THE COURT:** Oh, the dismissal out of the case?

**MS. FLOREZ:** Yes.

**THE COURT:** Okay. What would be the basis of you trying to block someone from saying, "I want out"?

**MS. FLOREZ:** Sure, your Honor. A few reasons. First, we do think that there would be legal prejudice for us for certain defenses that we'd be making.

In addition, we think that, you know, this dismissal was on the eve of trial. We were informed of Mr. Cataldo's intention to be dismissed on June 24th just hours before we were filing the pretrial conference statement. We subpoenaed Mr. Cataldo, and Plaintiffs ignored that subpoena. So we think

that we suffered legal prejudice, and really this -- it just seems like gamesmanship at this point.

**THE COURT:** Well, is there any authority that I can force a person to stay in a case if they tell me they want to be gone?

**MS. FLOREZ:** Well, Your Honor, I think that you can condition his dismissal on a few things, and there's a lot of case law on conditioning dismissal, and so we would -- we'd be happy to see, you know, Plaintiffs' motion trying to seek dismissal, and we would be happy to oppose it and provide case law that explains our prejudice.

**THE COURT:** Okay. Are you -- is there a pending motion, or are you planning a pending motion to actually formally --

**MR. LEE:** We're going to formally do that this week.

**THE COURT:** Okay. All right. Well, then --

**MR. LEE:** I'll just say, Judge, that I think based on that, it just underscores the fact of why they want to do this, right? They want to impeach him.

**THE COURT:** I understand.

**MR. LEE:** And that's just not proper here. I think you're right. Maybe he once was a class rep, but once he's not a class rep --

**THE COURT:** Okay.

**MR. LEE:** -- he's a guy off the street.

Case 3:20-cv-04688-RS Document 728-14 Filed 08/21/26 Page 66 of 128


**THE COURT:** Well, we want to accelerate the back and forth on this. So when you file your motion, can you promptly give me your response so that I can rule on this in this time. Okay.

**MR. LEE:** Thank you, Your Honor.

**MS. FLOREZ:** Absolutely. Thank you.

**THE COURT:** The next one is number 5.

**MR. MATEEN:** Good morning, Your Honor. Harris Mateen.

So the majority of cases that Plaintiffs cited -- they referenced instances in which a party was trying to bring in the specifics of an old claim or the fact that something was dismissed or entering a motion for summary judgment or the nuances of an appeal or something like that. We're not trying to do that at all.

The thing that we're trying to do is that there are certain factual allegations in the original complaint. Those were then changed over time as discovery came in, and we think that it's relevant to ask plaintiffs their view of how outrageous what they originally pled was versus how outrageous what they currently plead is.

And there is plenty of authority that's showing that these are prior admissions of plaintiffs. They're not binding on them, but they are prior admissions of them, and we, I think, should be able to impeach them on them.

**THE COURT:** Mr. Boies?

**MR. BOIES:** Your Honor, I think the cases that we cite are cases that involve exactly what's involved here, which is where they're trying to use prior allegations to say, "You didn't prove these allegations," and it takes us down a pathway where we're going to have another trial on allegations that are not in front of the jury. The cases they cite are cases in which what is being used from the past is an admission of a fact. It's an admission against interest, something that they want to prove.

They don't want to prove these allegations. They dispute these allegations. This is not a situation which they're using the complaint to establish a relevant fact. This is a situation in which they're trying to use the complaint to say, "You made these claims before, and you're not making those claims now, and why not?"

That takes us down a pathway that is both going to elongate the trial, it's going to be confusing to the jury, and it is fundamentally irrelevant. The allegations that were made in the past, except if they are an admission that they want to introduce for the truth of the matter asserted are irrelevant to the issues that are being tried now.

**THE COURT:** Okay. Let me move to the next one, and that's about CDAFA, and it references to it being an anti-hacking statute. I take it suggesting the concern that the plaintiffs have is suggesting that the -- defense is

suggesting a misuse, if you will, of a statute that really has a very different purpose.

So yes. You may start --

**MR. RICHARDSON:** Yes, Your Honor. Mr. Richardson.

**THE COURT:** -- your motion. Go ahead.

**MR. RICHARDSON:** You have it exactly right. We had briefing for your court, for Your Honor where Google referred to the CDAFA as an anti-hacking statute. That wasn't an issue before the Court. In front of the jury, the jury should be focused on the instructions from the Court and what the elements are for the claim.

There's no mention of hacking in either the CDAFA or the pattern jury instruction, which is CACI 1812. And if you look at Google's opposition to this motion in limine number 6, they're talking about what the scope of the law is, what the intent of the law is, and we think that would be quite a sideshow and a distraction and prejudicial to the plaintiffs for us to be going down the path of making arguments or trying to present evidence regarding what the legislative intent was or what the scope of the law is.

They talk about the amendment to the law. I looked back at that, the 1987 amendment to this law. The whole purpose of that was to expand the scope, and they added Cal Penal Code 502(a)(1), which is specifically talking about the broad scope of the law. It's never meant to be limited to hackers or

hacking. And so using that sort of framing with the jury is to falsely suggest that the law is narrower than it is.

**THE COURT:** What is the point of labeling it at all? I mean, the statute is the statute, and there will be instructions, but why do we have to characterize it one way or the other?

**MS. TOKER:** Good morning, Your Honor. Naiara Toker for Google.

We think that Google is entitled to call the statute what it is. It is an anti-hacking statute. Courts in the Ninth Circuit have universally referred to it --

**THE COURT:** Well, it's --

**MS. TOKER:** -- as an anti --

**THE COURT:** Its name -- I mean, you can refer to it by the name of the statute, which is, you know, probably a better way to do it. To give it a nickname is -- I mean, I don't quite get the point.

**MS. TOKER:** We think it provides appropriate context for the jury's decision about whether Google's conduct, its disclosures, the fact that it requires third-party apps to disclose the use of Google Analytics, whether all of that constitutes without knowingly accessing Plaintiffs' computer or data without permission, and the Ninth Circuit in U.S. v. Christensen actually relied on the fact that it's an anti-hacking statute in interpreting the statute.

So the Court there was -- relied on the fact that by definition, hacking involves accessing something without permission to say that therefore, without permission has to also include accessing a computer with a valid password and subsequently taking the data improperly.

**THE COURT:** Those are sort of arguments as to whether or not the plaintiff satisfies the elements of the statute in this case. What this likens to me -- and I don't know if there's law going one way or the other. I'll tell you what my inclination would be. We often hear in the press all the time when someone is charged with a RICO violation, and somebody gets up there and says, "The RICO statute is a mob statute. It's directed towards anti-mob activity, and it's being misused."

I don't think I would let anybody in court say to the jury in a RICO case, "Well, it's -- it was originally intended for the mob. So this is a misuse of the statute." Is this really different, what you're proposing to do here?

**MS. TOKER:** Well, I don't think we're saying that it's intended for hackers. It -- courts have referred to it as an anti-hacking statute.

**THE COURT:** Okay. But the fact that it's maybe being referred to that way -- what you want to say -- I mean, in fairness, you want to say to the jury, "They took a statute that is intended for a particular purpose, and they're misusing

it." I mean, that's the reason they want to say it's an anti-hacking statute.

And I'm not -- I'm wrestling with the idea of whether or not that's a legitimate argument to say to the jury, because the statute is what it is. It either fits or it doesn't. And the sort of notion that maybe legislators were looking at -- the particular harm they're trying to address is hacking, that doesn't mean the statute doesn't apply. Just as in RICO, you know, a lot of people get convicted of RICO, and they're not mob people. So I'm not sure how that's any different than this, but...

**MS. TOKER:** Well, again, I think the fact that the Ninth Circuit relied on the fact that it's a hacking statute to decide what "without permission" means that the jury should also have that context.

**THE COURT:** Okay. All righty.

**MR. RICHARDSON:** Unless you have further questions, I think --

**THE COURT:** No.

**MR. RICHARDSON:** Okay. Thank you, Your Honor.

**THE COURT:** Okay. Number 7 is excluding evidence that the app developers consented to sharing data with Google or the argument that developer Google agreements could establish consent. This is a big issue, third-party involvement through the third-party users here, or customers, however we want to

characterize them.

This goes to the question of how do we proceed in the case. I do think that you rise or fall, meaning Google in this case, on going back to the basics, what reasonable consumers think they do when they turn off the switch. And is it -- do they think that overrides everything else, or is it unreasonable to think that?

And so I think sort of the agreements with the third-party vendors, users, whatever label we want to put on them may well come into evidence. And it's an appropriate piece of evidence, but it isn't, at the end of the day, about whether or not there's consent vis-à-vis third-party users or whether or not Google says to the third parties, "You go and tell your users that" -- you know, get consent from them.

It's going to turn on whether or not Plaintiffs can prove that a reasonable consumer would think that they turned everything off when they said they want it off, or it's unreasonable to think that that should trump third-party consent issues.

So that's kind of my sense of the case. Now, I don't know which way that then impacts this particular motion in limine, although I think, of the relative importance of these motions, that one's a fairly important one. So I'll start with plaintiffs because you're the moving party.

**MR. MAU:** Thank you, Your Honor. This is Mr. Mau, for

the plaintiffs, Boies Schiller and Flexner.

So I'm actually a little unsure, Your Honor, because we've been meeting and conferring on this, and I think we may actually have an agreement.

**THE COURT:** Okay.

**MR. MAO:** But let me just state now my understanding.

**THE COURT:** Do you want to caucus with Mr. Hur off the --

**MR. MAU:** No.

**THE COURT:** -- record for a moment?

**MR. MAU:** I think we can do this on the record.

**THE COURT:** All right. Okay.

**MR. MAU:** My understanding is that Defendants have not and they don't intend to introduce any third-party privacy policies or terms from an app developer. They certainly have not identified any as such in their exhibits, and my thinking is this may allow the parties to strike out a compromise on this motion and possibly motion in limine number 10 for Google as well, which relates to similar issues, but theirs is more on compliance.

Ours is on the discussion of third-party policies, and I will let Mr. Hur explain his understanding as to where we are because I'm sure you can appreciate, Your Honor, there were a lot of issues. There were moving pieces and parts, but I do know that they do not have an exhibit regarding -- or showing a

third-party policy or terms.

**THE COURT:** Mr. Hur.

**MR. HUR:** Thank you, Your Honor.

I think, to answer your question about which way the case cuts, I do think it weighs in favor of denying this motion because even if it's just about the reasonableness of the class members' view of the WAA setting and the sWAA setting and what it means, that is impacted by what they also learned from the app itself when they agreed to those terms of service in order to download the app.

The apps were required by Google to disclose the use of Google Analytics. So if a user, having previously agreed to WAA, then reads the disclosure for the app, and it says, "We use Google Analytics, and we will process your data," that is relevant to their interpretation of WAA.

**THE COURT:** I don't disagree with you, but can I back you up --

**MR. HUR:** Yes.

**THE COURT:** -- for a moment? Because my ears always perk up when I hear there may be an agreement between the parties about something. Is that not your understanding, or what's the situation there?

**MR. HUR:** Your Honor, I think there are -- it sometimes appears we have common ground about how these arguments can be raised, and I think to fully understand the

scope of what Mr. Mau is now suggesting, I think we'd also have to address Google's MIL 10 and likely 11.

But if they're not disputing that we can argue and present evidence about what Google requires the app developers to disclose and explain why we think that provides both consent and a lack of reasonableness, then perhaps we don't have an issue.

**MR. MAU:** Just to be clear, Your Honor, may I further venture that we have a further agreement, which is that in the meet and confer on the exhibits, Defendants also agree that there's not a single third-party policy or term that actually specifically identification WAA or what happens when WAA is turned off? That is also not going to be in the exhibits because it's simply not in existence.

Given that, those two -- and I'll let Mr. Hur state whether or not he disputes the second because it doesn't sound like he disputes the first one, if those two are true, I don't see how Plaintiffs' motion wouldn't be granted because then otherwise, they would simply be speculating as to what third-party policies out there may say but don't, in fact, say regarding WAA?

**THE COURT:** I think what Mr. Hur was just talking about --

**MR. MAU:** Right.

**THE COURT:** -- was not the third-party agreements. It

was Google and third. So that was a little different than third-party agreements with users.

**MR. MAU:** And this is the part where I agree with Mr. Hur, on the record, which is that it interplays with motion number 10 of Google, which I think is what Your Honor is talking about. Our motion relates to the relevance of third-party policies in which they don't even have any exhibits.

**THE COURT:** Okay. Let's stop on that one.

**MR. MAU:** Right.

**THE COURT:** On that issue, not what Google is telling the third parties, but the third parties' agreements with the users, he's saying there's no evidence about that at all anyway, so you can't go there.

**MR. HUR:** Your Honor, I think it depends on what he means by "You can't go there." It is true that we do not have third-party app agreements on the exhibit list because the class was certified for all apps. I mean, for that to be meaningful, we'd have to put in 2 million of those. What we are asserting is that Google requires the apps to do that, and for purposes of this trial, where you can't distinguish between the apps, we should basically assume that the apps comply.

**THE COURT:** Well, why should we assume anything?

**MR. HUR:** Or that at least Google required the apps --

**THE COURT:** That part --

**MR. HUR:** -- to make that disclosure.

**THE COURT:** That's a -- those are two different things, that Google required them to do that. That's step 1. Whether or not they do it, we have no evidence. We have no evidence of whether or not they do it. And we can't say -- I know you wanted me to, but I can't say to the jury, "Assume that they all did what Google asked them to do." I don't think we can do that.

**MR. HUR:** Well, we can say -- I think we can say, Your Honor, that we required this.

**THE COURT:** Yes.

**MR. HUR:** And there are -- you know, two million apps in this that are covered by this class, and what we don't want is a situation -- and this is part of our motion -- where the plaintiffs are saying, "Well, there's no evidence that the third parties agreed or not."

So the fact of the -- the fact that third parties have to have agreements with the plaintiffs, I think is something that we will get into evidence or that we will certainly push to get into evidence because that is the basis for the requirement that Google has with app developers. They cannot use Google Analytics unless they have an agreement with their users that discloses Google Analytics.

We're not going to prove that two million apps did it, and the truth is that the apps do it in different ways --

**THE COURT:** Well --

**MR. MAO:** -- and the language is very different.

**THE COURT:** -- I mean, neither -- I mean, there are two sides of the coin. You're saying, well -- or you asked me at one point that I should in one way or another tell the jury we should assume they all complied with your request, and I am uncomfortable doing that because there's no evidence to that.

At the same time, I don't think then the plaintiffs can suggest well, the defense has failed to show any compliance with any -- by any third-party. I just don't think what the third parties do is just -- it's not the issue here one way or the other. Either they 100 percent complied or nobody complied. We don't know.

And they can't say -- I'm hearing you be concerned that they might suggest it was your burden to go and show every one of these third parties complied with your directive, and I wouldn't let them say that. At the same time, I'm not going to let you say, "Well, let's assume it's 100 percent compliance." Neither of those is --

**MR. HUR:** Understood, Your Honor.

**THE COURT:** Is correct.

**MR. MAU:** Sorry, Your Honor.

**THE COURT:** Go ahead.

**MR. MAU:** Yeah. Okay. This is why I pointed out fact number 2, that I do believe that we have an agreement, or at

least a tacit one, which is that there are no third-party policies that discuss web and app activity and what happens when it turns off.

Regardless of whether that's a compliance issue, if the parties agree on that, I don't see why that does not obviate a lot of the concerns of Mr. Hur because, again, this case is about the representations by Google with the consumers and the class members.

**THE COURT:** Well, I take it his concern is to cut off an argument by you that -- in response to the fact that Google is directing the third parties to obtain the consent, your argument then being that that's -- you know, that's really an ephemeral request, because they don't do -- you know, there's no evidence that anybody did anything on this. So, you know, it doesn't make any -- it's entitled to no significance that Google directs third parties to do this.

And you can argue that it doesn't obviate the basic turn-off by Google of the switches, and that's what I understand to be your principal argument. But I don't think you can argue well, one of Google's additional mistakes here or problems or liability is they didn't follow up with their third-party people in terms of getting consents from the users.

**MR. MAU:** I guess I feel like there's a little bit of a passing of ships by night --

**THE COURT:** Perhaps.

**MR. MAU:** -- going on here because their -- these third-party compliance policies that Mr. Hur is referring to, respectfully, do not get into disclosures regarding WAA and what happens with data when WAA is off.

**THE COURT:** Right.

**MR. MAU:** And therefore, I'm not seeing the import of Mr. Hur's points because --

**THE COURT:** Well, let me ask this, and I'll ask both of you this.

**MR. MAU:** Yeah.

**THE COURT:** Is there any disagreement that Google may introduce its directive to the third parties? Do you have a problem with that?

**MR. BOIES:** Your Honor, may I? I apologize, because I was supposed to argue their motion number 10 --

**THE COURT:** Yeah.

**MR. BOIES:** And we probably should have the same person argue from our sides.

**THE COURT:** You can tag team it as far as I'm concerned.

**MR. BOIES:** Okay. The issue here is they want to put in the fact that they had these agreements with their app developers, but they don't want us to be able to put in what the app developers then did.

**THE COURT:** Right.

**MR. BOIES:** Now, what is going to be relevant to whether our plaintiffs were reasonable in believing that when they turned off, it meant off, is what they were told. It's not what Google told the app developers. It's what our customers heard from the app developers.

Going to the issue of what was reasonable for our plaintiffs to interpret, that's got to be what goes to our plaintiffs. What goes from Google to the app developers is irrelevant, except maybe to the issue of their good faith. But even with respect to that, they then know what the app developers do, and if the app developers are not doing it, I don't think they can make that -- even that good faith argument.

But the basic point is that what's relevant is what comes to our plaintiffs, and they can't introduce evidence of what they told the app developers for that proposition.

**THE COURT:** Well, so it sounds to me you don't have any agreement at all on this.

**MR. BOIES:** I think --

**THE COURT:** So hope springs eternal. When you first said you had something -- now I think you're completely at odds on this question. But okay.

One more comment from you, and then I want to move on to other ones. So Mr. Hur.

**MR. HUR:** Yes, Your Honor. This is exactly the

problem and, I think, where the dispute lies. Yes. The document that we are trying to admit are the Google Analytics terms of service that tell the app developers what to tell their users about Google Analytics.

**THE COURT:** Yeah.

**MR. HUR:** And we should be able to argue that that is what the app developers are required to do. What I heard Mr. Boies trying to say --

**THE COURT:** And articulate for me from your perspective what the relevance of that is.

**MR. HUR:** The relevance --

**THE COURT:** For when you're analyzing the reasonableness of Plaintiff's understanding when they say, "I want the switches off."

**MR. HUR:** So imagine you are a member of this class. You have turned -- you're a Google accountholder. You're signed in. You've turned sWAA off. You later want to download an app. Every time you download an app, you agree to their terms of service, and as part of those terms, they were required by Google to disclose Google Analytics.

So we believe arguing that whatever that user may have thought WAA meant, it is not reasonable at the time they download that app, where the app is required to tell them about Google Analytics, that they would have thought that this other setting somehow overrode the disclosure about Google Analytics.

And Your Honor, I can see that there is a reasonable dispute here where the plaintiffs can argue, well, that disclosure that Google required apps to make should have mentioned sWAA. They can make that argument. That is a legitimate dispute.

But what they're trying to do is prevent us from even telling the jury that apps were required to tell the class members about Google Analytics, and that is a critical element to whether or not their view of sWAA is reasonable, not to mention consent.

**MR. BOIES:** I think what's relevant is what goes to our plaintiffs. If the things they downloaded said something about WAA, that would be relevant, but what they want to do is they don't want to rely on what the app developers told our plaintiffs.

They want to rely on what they told the app developers, and they want the jury then to assume that the app developers did what they agreed to. That is what makes what they're asking to do irrelevant.

**MR. HUR:** Your Honor, if you'll just indulge me for just one moment.

**THE COURT:** You have one more --

**MR. HUR:** Okay.

**THE COURT:** -- comment. Yeah. Go ahead.

**MR. HUR:** Thank you.

Your Honor, in many of these cases -- and I have a lot of these Google Analytics cases -- it's about one app. And so those disclosures are in evidence, and we look at what the disclosure said. They have a certified class here of millions of apps.

And so the idea that we can't talk about what app developers were required to tell their users because we didn't put in 2 million different disclosures -- Your Honor, I do not think it's credible or fair or consistent with how this class was certified.

**THE COURT:** Okay.

**MR. MAU:** Just one --

**MR. BOIES:** Stop. Stop. Stop.

**THE COURT:** Okay. But this is it. This is truly it.

**MR. BOIES:** Go ahead.

**MR. MAU:** Sorry.

**THE COURT:** Go ahead.

**MR. MAU:** Short leash here.

Your Honor, I can assure you, they also don't have any evidence showing that they actually told app developers that when WAA is off, it's still collecting data. So that's why I was saying there's no ships in the night.

**THE COURT:** Okay. Let's go on to number 8, which is excluding evidence that Plaintiffs continued using Google products and services after filing suit.

You know, I'm going to give you an order, and I'm going to think about a lot of these, but this one, I do think that they should be entitled to show that Plaintiffs continued to use it. I mean, it goes to, you know -- it goes to several things. But you're the moving party. Go ahead.

**MR. A. BOIES:** Sure. Well, I obviously understand the arguments. We've read the briefs and can understand why Google's arguing they're irrelevant. The problem is largely on the prejudice side, which is, as Google knows, full well Plaintiffs had to keep using apps after filing a lawsuit.

**THE COURT:** Well, and you can make that point.

**MR. A. BOIES:** In general yes, but it's difficult with a jury trial because the context that's being omitted, the context that's left out is something about Article III standing and the requirement of the plaintiffs to continue using apps in order to ask Your Honor for an order requiring Google to change its practices, something that the jury is not going to decide.

And so we could try to elicit that testimony through a fact witness. It would be challenging. We could try to get the jury to understand. I mean, it's challenging for third-year law students, issues of Article III standing, so that would be hard too. And I certainly understand the inclination to let Google, you know, make its defense, and we can argue about it.

But it puts us at a disadvantage because the context

that's missing is not context that's easily drawn out in front of a jury as opposed to in front of Your Honor. And in the class certification order, Your Honor recognized it's kind of what -- I think you quoted --

**THE COURT:** So it's your position it's not Google's ubiquitous and therefore, they don't have a choice. It's that they have to keep using it so they maintain their standing? That's actually a rather dangerous argument because that goes right into the issues of the motivation of these plaintiffs.

**MR. A. BOIES:** So it's certainly part of it. Part of it is the probative value of their continued use, but this is something that we briefed at class certification. Your Honor cited the Yahoo Mail case about the catch-22 --

**THE COURT:** Yeah, I understand, and I think I did that in the Arizona Ice Tea and some other cases, but, you know, can they -- when they're exploring why Plaintiffs are doing certain things, shouldn't it be available to them if a plaintiff has said the reason I'm continuing to use it is because I want to have this case against you? Are they allowed to ask that question?

**MR. BOIES:** Your Honor, if I could take it, I think one of the problems here is that this has -- given what the Court has already found about the lack of choice, this has very little probative value. And what it does is it takes us into exactly the kind of questions that the Court is thinking about.

And for example, do we really want the jury to hear from the plaintiff "Well, I had to keep using it because I don't have any choice because Google is a monopoly"? And in addition, I was told that if I stopped using it, then we couldn't get the injunctive relief to stop them from doing it because part of what this case is about is trying to get a finding from the jury that there's liability, and then the judge can order them to stop it.

**THE COURT:** Yeah.

**MR. BOIES:** This is -- for very little probative value, this takes us into areas that I think are going to be very complicated.

**THE COURT:** Okay.

**MS. CORBO:** Good afternoon. Isabella Corbo on behalf of Google.

First, I would say that this is not a standing issue to Google. We do think that this has probative value. This information is relevant to the degree of harm that these plaintiffs suffered and how offended they were by Google's conduct.

In their depositions, these plaintiffs testified that they continued using these applications and continued using their phones in the exact same manner even when there were alternatives available, and we should be permitted to ask them these questions on cross-examination, and then counsel can

rehab their plaintiffs if they so choose, which I'm sure they will, but we shouldn't be precluded from asking those questions.

**THE COURT:** Would you seek to preclude the answer if an aspect of the answer is "I need to maintain my claim because we're also trying to get injunctive relief against Google"? Would you be -- will I be hearing from your side saying they shouldn't be allowed to go into that?

**MS. CORBO:** I don't believe that's an argument that we'll be making.

**THE COURT:** So you think it's fine if they say that? In answer to the question, you know, "Why did you continue to use Google," are you comfortable with letting them say -- because otherwise the jury doesn't know that this claim is seeking injunctive relief. You don't care if the jury knows that?

**MS. CORBO:** No, we're not comfortable with that. I don't -- I don't think that it's proper also for a witness to be testifying about their legal conclusions when they're not a lawyer.

**THE COURT:** But that would be the truthful answer, right? I mean, if you say, "Well, we should be able to ask the question to a plaintiff," you know, "why did you keep using this," but at the same time, what you're asking me to do then is to say they can answer the part that Google is ubiquitous or

whatever, but they can't say, "Because we want to maintain our injunctive relief claim." I just want to know what you're asking me to do here.

**MR. HUR:** Sorry, Your Honor. Ben Hur.

We are not contesting that they can seek injunctive relief, and so their legal conclusion or their perceived legal conclusion about what they can or can't seek is not relevant. We've asked them these questions in deposition. They have provided answers.

**THE COURT:** Yeah.

**MR. HUR:** They didn't say, "Oh, it's because we want injunctive relief," and certainly we are not contesting that if they had stopped using, they couldn't get injunctive relief. So Your Honor, I think that is a red herring, and I don't think that ought to come in, and it wouldn't be relevant.

If they want to say, "Look, we love our Android phones" or "We feel like we have no choice. Most apps" -- you know, "All our apps seem to use this," I mean, that's a different thing, but making a legal conclusion is -- should be out of bounds.

**THE COURT:** I think on the standing issue -- I'd have to go back and look at my decisions, but I think I ruled that you didn't have to keep using to maintain your right to injunctive relief. If I recall correctly, I went the other way on that question.

**MR. A. BOIES:** So if I just -- if I may, Your Honor --

so Google made this argument before at class certification. They pointed to the exact same testimony that they're relying on now. And if you look at the class certification order, pages 12 and 13, Your Honor said, "Look. This is not a fair argument because to embrace this argument creates a catch-22."

Either they continue using their mobile apps, as our plaintiffs did, and they get hit with these arguments about "Well, that destroys your claims. It must not be offensive. It must not be damaging. Your claims, you know, just don't survive"; or they stop using apps, and Google says, "Well, you don't have standing to pursue injunctive relief."

**THE COURT:** Right. I think I ruled that I wouldn't agree with that position.

**MR. A. BOIES:** Which -- sorry. Which position, Your Honor?

**THE COURT:** That if you stop using it, you don't lose your standing to seek injunctive relief.

**MR. A. BOIES:** That may be so, but, you know, we're operating in a world of uncertainty with -- you know, I don't think we have a ruling from Your Honor on that issue in this case.

**THE COURT:** True.

**MR. A. BOIES:** And so, you know, the actions that our Plaintiffs took throughout the litigation aren't necessarily bound by any of your orders.

**THE COURT:** I hear what you're saying.

**MR. A. BOIES:** And so for Google to say they're not disputing that our plaintiffs have standing to pursue injunctive relief, correct, because our plaintiffs continued using mobile apps to maintain that standing.

So I don't even understand the -- they're punishing Plaintiffs with the other side of the catch-22 that because Plaintiffs continued using their mobile apps, they are not disputing injunctive relief. But they're punishing them on the merits of their claims, which is not fair because it excludes the whole predicament that the plaintiffs are in.

**THE COURT:** Okay.

**MR. A. BOIES:** And just to point just briefly about the testimony from our plaintiffs about the reasons that they continued, I mean, each one of our plaintiffs testified they continued using apps as they had before because of this litigation. They said, you know, "I want to make sure everything's investigated."

They said, "I needed to keep what I had so my behaviors are still the same. In order for this to continue, I want to make sure you know that I still have the same behaviors."

They said and they admitted that they're continuing to use apps consistently in order to find out what Google is doing wrong in order to keep this case going. So it's not true this never came up before, and the plaintiffs were deposed before

class certification obviously.

**THE COURT:** Okay.

**MR. A. BOIES:** So anyway.

**THE COURT:** I think want to move to the next batch of motions, which are the defendants' motions. Okay. Number 1 is the testimony of Blake Lemoine. Frankly, I don't want to hear argument on that. I'm going to grant the motion. That one wins.

Okay. Number 2 is to exclude plaintiffs' introduction of emotional distress and arguments regarding disgorgement. I mean, that -- we've kind of dealt with that one way or the other. I don't think we need any more discussion about that. I just need to make some calls.

Number 3 is excluding evidence -- or reference to evidence about leaks or misuse of unrelated data or other litigation and investigations into Google's privacy practices. There are specific documents that are associated with some of this, and I guess it also implicates a later motion. Okay. So let's start with the moving party, Defendants.

**MS. AGNOLUCCI:** Thank you, Your Honor. Simona Agnolucci for Google.

Obviously we had a colloquy about a similar issue at the Daubert hearing, and I recognize Your Honor's ruling there. When we discussed this at the Daubert hearing, counsel told us that the parade of horribles that we were concerned would

emerge from Mr. Schneier's testimony was not going to happen and that perhaps discussion of Roe v. Wade would come up as, quote, one example.

Since then, we've looked at demonstratives that Mr. Schneier intends to use in his testimony, which are very heavy with information about data leaks, about data incidents, about litigation involving Google where Google settled and did not admit liability about totally unrelated issues about, for example, women being criminally prosecuted in states in the aftermath of Dobbs after receiving data about having abortions.

All of this, Your Honor, really proves that the plaintiffs here don't intend to keep their word about what they told us Mr. Schneier would testify about, and we're concerned not just about Schneider's testimony but about many of the documents that were attached to these briefs.

So we're asking Your Honor to make two rulings. The first is that evidence of data leaks and, you know, privacy incidents and similar information not be admitted. And then the second has to do with litigation and settlements that Google has entered into about totally different products, totally different allegations, obviously not admissions of liability and obviously highly inflammatory.

**THE COURT:** Okay.

**MR. LEE:** I think it's best to put this in two buckets, data leaks and then the other matters. With data

leaks, it's a bit of déjà vu, Your Honor. You've already heard everything on the data leaks at the last Daubert regarding Professor Schneier. Counsel made the exact same arguments then. You heard argument from both of us extensively. You ruled. I think you should stick to that ruling.

To the extent there are particular demonstratives, which I don't know what they are, that they object to from Professor Schneier's demonstratives -- we just sent them -- we can take that up with you at the right time. This is not it. This is essentially a way to try to relitigate the Daubert issue, which is already kind of long past. That's bucket one.

Bucket two are the other matters. They really split into two different cases. It's the Brown incognito case, which my junior partner Dave Boies is going to handle later. So I'll -- that's the subject of his motion. So I'll just stick to the smaller group of cases which is the Arizona vs. Google case and the Texas vs. Google case.

Both of them are fairly similar. They're both about another privacy control that Google offered called location tracking. And Google promised when you turned off location tracking, Google won't track you. Of course, they did using WAA data, right? So location tracking and WAA are sort of inextricably tied in these two cases.

Now, why else does it matter? It goes to pattern and practice, Judge. So pattern and practice evidence is

admissible under 404(b)(2). It's admissible if relevant to prove motive; opportunity; intent; and, importantly, lack of accident. So the evidence here with these other privacy controls is going to demonstrate that WAA is not the only one, right? This is a feature, not a bug in Google's design of its privacy controls.

Now, why that matters is because when Google comes up and says "Hey, this isn't offensive," right? "Maybe it was a mistake. WAA is a one-off. We got this one wrong maybe." But we have to be able to rebut that by saying, "You know what? This is actually part of a bigger design," right? "Here's incognito, here's location history, here's privacy controls, and here's what's happened with litigation behind them." So that's why it comes in.

**MS. AGNOLUCCI:** Thank you, Your Honor.

So first point on the Arizona and Texas cases, which we had the honor of litigating and resolving, they are not probative of anything except for the fact that two state attorneys general and others chose to litigate against Google, and those cases were resolved.

It doesn't mean that Google did anything wrong. Google certainly did not admit liability in those cases. So I don't agree that it's probative of a pattern and practice. It's probative of allegations.

But second of all, those cases had nothing to do with the

allegations here. Those cases, as Mr. Lee said, had to do with a location setting and with what happened when that location setting was turned off and whether WAA separately had some location-related information stored in it.

That is an absolute sideshow from the allegations in this case, which have to do with sWAA being off. And what we don't want to do is waste our precious 20 hours of time going down the rabbit hole of mini trials about what did and didn't happen in Arizona and Texas.

We have to defend ourselves if the plaintiffs are going to bring up those allegations. We have to explain to the jury why that has nothing to do with what we're here to talk about. What we're here to talk about is not a settlement that Google entered into with Arizona and Texas.

**THE COURT:** Okay. Let's move on to 4, and that's about non-U.S. customers. I suppose it's Defendants' motion, so I'll ask you. At the very least, doesn't this go to knowledge, offensiveness? Obviously class members are not all in the U.S., but isn't this one of those that you can deal with on cross and direct and -- I mean, I don't -- why should it be precluded?

**MS. TOKER:** So this is a case about a specific disclosure and how that disclosure interacted with a specific set of data, and there's no evidence that that specific disclosure in English was what was being studied in any of the

research studies that were conducted outside of the United States.

These are studies that were conducted, as you say, on populations that are not members of these two classes about disclosures that, in many cases, aren't even in English.

**THE COURT:** But can't you deal with that on cross-examination?

**MS. TOKER:** Well, we just think that it's easier to get rid of the evidence now.

**THE COURT:** Okay. All right.

**MR. MAU:** Well, Your Honor, we agree with your sentiments regarding Defendants getting rid of evidence, and I'll just point out two points real quick, which is that the very evidence they're trying to get rid of, their own expert relies on the same people who are writing and studying that. That is on our page 8 of our opposition.

And the second point is that this evidence actually relates to a global study in which they were doing -- to try to make sure that it wasn't language differences, for example, that was not causing the users to understand that, you know, the specific buttons that were at issue were not operating or doing something, which Google wanted to study whether or not they get.

Most important thing, Your Honor, is that I do know that these exhibits are now actually in your possession, and you can

take a look, and you will see. You will see that.

I do want to point out one, I would say, task-keeping thing, which is that if you look at their request, it is rather vague as to which exhibits they're trying to exclude. They only point to 4. And I just want to make sure that this is not one of those broad strokes of getting rid of the evidence in such a way that is, as you said, Your Honor, would be much better dealt with one at a time at the point of examination and introduction into evidence.

**THE COURT:** Okay. Let's skip over 5. It's sort of a grab bag of various exhibits, and I'll just go through them, and I understand, I think, the issues, and I'll make the call and give you guidance.

6 also, I know what I need to know on 6. I don't want to have any discussion on that further.

So let's go to 7, which is the incognito mode issue and implicates my colleague, Judge Gonzales Rogers' case, Brown case.

So Mr. Boies. Actually, I'll go -- let me let the defense start on this one.

**MS. AGNOLUCCI:** Thank you, Your Honor. As Your Honor noted that the Brown case was another case involving Judge Gonzalez Rogers, and that was a case about the incognito mode manner of browsing. It didn't have to do with apps, it didn't have to do with sWAA. And what plaintiffs are seeking to

introduce are a series of incendiary emails about that case, which they, of course, litigated.

This -- incognito mode never came up in discovery, it was not the focus of the expert reports in this case, and I understand Plaintiffs' argument to be well, this goes to Google's motive and intent, but the question Your Honor has to ask --

**THE COURT:** But it does, in fairness, pertain in a more general sense to privacy issues, right? I mean, the fact that it may not be specific to the WAA world and deal with a different arena, if you will, a different area, it still implicates some of the big questions in the case, doesn't it?

**MS. AGNOLUCCI:** I wouldn't say implicates some of the big questions in this case. I would acknowledge that it implicates privacy, and so do many, many, many cases that are brought and litigated and settled against Google. But that is not what this case is about.

And so just because Plaintiffs are able to find a collection of, you know, emails that they think are interesting and potentially inflammatory and incendiary in some other privacy litigation does not mean, again, that we can make this case a sideshow.

**THE COURT:** Okay. Mr. Boies?

**MR. BOIES:** First, just to be clear, this doesn't have anything to do with bringing in the Brown litigation. This

simply has to do with specific documents that are Google's documents. We think those documents are relevant for a number of purposes. These are particularly relevant to pattern and practice.

This is a situation that didn't involve WAA off but involved a situation in which Google had very, very similar kind of disclosures and, again, told people that they could control their data, they could control what Google kept. And the CEO at the time was Mr. Schmidt, who's not, you know, the current CEO, but Mr. Schmidt. He testified in front of Congress, gave very similar testimony. People watched it and said, "That's wrong," but they never corrected it. So it is a very similar pattern and practice to what we have here.

In addition, it goes to their claim they try to protect people's privacy. It completely refutes that. It is certainly something that the jury ought to be able to consider.

**THE COURT:** Any final comments?

**MS. AGNOLUCCI:** Yeah. I mean, Your Honor, I would first of all say that the documents are from the Brown docket. Only one of them was even produced in this case. So they're not documents that were given over to the plaintiffs in this case because they are relevant to these claims.

And looking at the documents, I would encourage Your Honor to read these emails because they are very long. They are very dense. They're going to be very difficult for a juror to

understand and contextualize, and to the extent that counsel wants to rely on, you know, catch phrases here and there in these emails, we're going to have to explain them. And again, this creates side shows and mini trials when really we ought to be focusing on what this case is about, sWAA and Google Analytics.

**THE COURT:** Okay. Number 8 is about -- I'm not sure there's a dispute here -- meet and confer communications. I mean...

**MS. TOKER:** Naiara Toker for Google.

We are in the process of agreeing to a stipulation. Plaintiffs sent us an idea of a stipulation last night. Our position is that the underlying factual information is admissible as a stipulated fact but the surrounding meet and confer communications are completely irrelevant and inadmissible. So I'm confident that we can reach agreement on this, but if we do not, that is our position.

**THE COURT:** Well, can I just put this one to one side and let you see if you can work it out.

**MR. BOIES:** I think we can do that, Your Honor.

**THE COURT:** Okay. Good.

The next one is excluding evidence and arguments about Plaintiffs' emotional distress. Who's up for that one from the defense side?

**MS. FLOREZ:** Argemira Florez for Google.

**THE COURT:** You may proceed.

**MS. FLOREZ:** Your Honor, Google is seeking to exclude testimony from Plaintiffs about their alleged emotional harm because it can't be proven class-wide without going into individualized inquiries. We've explained why this exclusion is necessary. It's supported by the law. We cited three reasons:

First, Plaintiffs haven't put forth a damages model that would be able to quantify emotional harm class-wide; second, the Court hasn't certified such a model; and third, introducing individualized evidence on emotional harm at this stage would just waste time confusing the jury.

**THE COURT:** Does it go to nominal damages though under these claims that have nominal damage --

**MS. FLOREZ:** Well, Your Honor --

**THE COURT:** -- option --

**MS. FLOREZ:** Sorry, Your Honor.

**THE COURT:** Go ahead.

**MS. FLOREZ:** Yeah. We think that Plaintiffs' desire to introduce evidence of emotional distress to get nominal damages shows a grave misunderstanding of when nominal damages are actually appropriate. Nominal damages are not awarded in response to an injury like compensatory damages are, and we also think it's really notable that Plaintiffs have already conceded that they can't prove emotional damages class-wide.

We think it's -- first, it's inconsistent with their representations to this court and to us for them to be trying to do that now, but it's also inconsistent with Supreme Court case law. In Comcast, Justice Scalia held that the class was improperly certified where the damages model didn't measure damages resulting from the particular injury on which liability was premised.

So we think the injury in this case -- also the emotional distress, the emotional harm -- can't be properly measured, and without an appropriate model of emotional distress, you know, it just can't be proven class-wide. So we think that what Plaintiffs are trying to do here is improper.

**THE COURT:** I would agree. I mean, I think it's pretty clear that emotional distress is not a class-wide -- would defeat class certification because it's an individualized inquiry, but that doesn't mean it doesn't come in otherwise on issues like offensiveness or other issues that might be relevant. So putting aside the class concern that you've identified with the emotional distress, why can't it come in on another basis?

**MS. FLOREZ:** Well, Your Honor, a couple reasons. First, I'd start by saying that, you know, what we're requesting is that the Court require Plaintiffs to present evidence of claims that can actually be proven on a class-wide basis. What they're trying to do is introduce evidence of, you know, four

Case 3:20-cv-04688-RS Document 728-4 Filed 08/31/25 Page 105 of 128


Plaintiffs' complaints about anxiety and fear, and they're trying to group that in with harm and offensiveness.

And it's improper. It's improper to ask the jury to generalize the -- you know, the emotional harm for Plaintiffs across the entire class. That's inconsistent with the Supreme Court precedence. It's inconsistent with how these damages work.

We also think, you know, to the point about creating mini trials and wasting time, I mean, to introduce the evidence of -- to have to investigate and ask about each Plaintiff's emotional distress and harm and whether, you know, they had any at all. I mean, there's a sideshow that's inappropriate.

I mean, they didn't put forth the damages model. They didn't -- Your Honor has already found that Plaintiffs have offered no models or explanations for how these harms apply across the classes. So there's just no reason to include it at this stage.

**THE COURT:** Mr. Boies.

**MR. BOIES:** This doesn't have anything to do with the damages model. We're not claiming damages on a class-wide basis. We are claming nominal damages for this violation, and emotional distress certainly goes to issues of offensiveness, and it goes to liability issues. We need to prove liability in order to get nominal damages.

We are not going to be seeking to introduce class-wide

damages. All we are seeking for emotional distress is nominal damages. I think we've made that clear. We're entitled obviously to prove our liability case. Emotional distress is part of offensiveness. It's part of our liability case, and it goes to our justification to get nominal damages.

**THE COURT:** Okay. We're down to the last three. The motion by Defense is to exclude evidence about third-party app compliance and GA4F terms of service. We kind of covered some of these issues, but --

**MR. BOIES:** I think we've covered the --

**THE COURT:** I think we have too. Anything else, Mr. Hur, on this?

**MR. HUR:** Your Honor, I think we've covered it as well.

**THE COURT:** Okay. The next one is excluding evidence and arguments regarding sensitive apps and data. We also kind of talked about this a little bit. But -- so Mr. Hur?

**MR. HUR:** Thank you, Your Honor.

We are trying to be reasonable here about how apps are actually used in the trial, but we are concerned that an emphasis on any one app or type of app is going to run the risk of the jury making a determination based upon facts that apply only to a subset of the class. And it's kind of a similar issue to what was just argued about emotional distress. The plaintiffs' emotional distress isn't really relevant in a

class-wide case where they're determining what should happen to the class.

And it's similar with the apps, Your Honor. If they're going to point to, for example, a period tracking app and say this is why the conduct was highly offensive because Google got data about a period tracking app, well, that runs the risk of a decision that's not based on class-wide issues. So we are trying to come up with a way where the parties can talk about how apps work without focusing on any one app or type of app.

**THE COURT:** Isn't that something that can be controlled by virtue of -- it's almost a cumulative concept. You can't -- you can't just, as you say, focus or harp on one thing. And isn't that for me to control it by saying, "Okay. We've heard enough about this particular incendiary app, if you will. You know, move on. Isn't it that kind of issue, in a sense?

**MR. HUR:** Your Honor, it is sort of that kind of issue. We're concerned that by the time the Court gets to that, the damage may have been done and the focus may have already been provided. And then we think there are prophylactic measures the Court can take in order to avoid that problem entirely.

If the plaintiffs will just agree we're not going to focus on any of these, you know, highly sensitive areas that run this risk, we can certainly agree on apps or categories of apps that

can be presented and used as examples. And if the plaintiffs want to deviate form that, we can sidebar and talk about that perhaps. But I think having some more guardrails will prevent the prejudice that --

**THE COURT:** Well --

**MR. HUR:** -- we're concerned about.

**THE COURT:** But the guardrails create more problems than they solve if -- you know, let's take for example, some abortion app or something. You know, I'm not going to make a ruling that they're precluded to make any reference to any app that might be perceived as sensitive.

But if they did it more in passing as an example, I'd say they can't keep going there. So I'm not sure how the guardrails -- I'm not -- I guess what I'm trying to say is I'm not averse to the concept you're talking about, but I'm a little concerned that if there is -- if preclusion from referring to anything sensitive, that that would create even more problems than it solves. But okay. Go ahead.

**MR. MAU:** Mr. Mau for the plaintiffs.

So Your Honor, we agree with your general sentiments, and I will just point out that if we're being honest here, this is a fate and abate here for us in terms of wanting to control the framing. We disagree.

So the way we frame the case is that these -- the buttons are framed as Google controls, Google privacy controls. That's

how they're labeled, that's how they're presented to the users, and we are not second guessing as to what the users may think one way or the other about --

**THE COURT:** Right, but --

**MR. MAO:** What apps are sensitive or not.

**THE COURT:** -- I think Google is entitled to have some concern that you will pick three or four of the most incendiary issues, if you will, that a person would say, you know, "my medical history" or whatever is and just spend the whole time harping on that. And they have some concern that the relevance will be outweighed by the unfair prejudice in the 403 type of thing.

And so, you know, I don't fault them. I'm not going to say I'm going to grant or deny their motion, but it's a real concern for them.

**MR. MAU:** So Your Honor, we understand and we certainly appreciate that you will help control that with 403 objections at the time in which they are run. But as Your Honor had indicated, some of this may go to other things such as offensiveness, for example, right, or pattern and practice or the liability elements that otherwise pervade in the case.

And we are going to be at least entitled to introduce some of those things in order to talk about why this is important to people who have taken Google's offer of privacy controls, their own label, regardless of whether they think their apps are

sensitive or not.

**THE COURT:** Okay. I get issue.

The final one we've talked about it a little bit, but it's -- we didn't get to -- I'm going to grant it as to Alphabet.

But as to Google's financials, at the beginning, as you will recall, of this proceeding, I was talking about it coming in in the light of a punitive phase, but I acknowledged that there might be an argument -- and I've read some of the defense argument, or the Plaintiffs' argument -- that it's relevant, some of the financial information is relevant on other issues.

You know, when I was talking about this, it's almost like the argument I'm understanding the plaintiffs to make. It kind of goes to their claim that Google is being callous in some fashion or another, that, you know, it's -- these are such -- for a massive, rich company, it shows a certain callousness if they don't care about the little guy's privacy or something. I assume that's one of the themes.

**MR. BOIES:** Yeah.

**THE COURT:** So but at the same time, I have some concern that the -- that, you know, the revenue that Google is making isn't really relevant until we get to the punitive damage phase.

So let me start with Mr. Santacana. It's his motion.

**MR. SANTACANA:** Sure, Your Honor.

I think that you've read correctly their argument, which I

Case 3:20-cv-04688-RS Document 758-14 Filed 08/31/26 Page 111 of 128

have to say is clever and lawyerly in that they're saying the amount of profit they want disgorged is so small compared to the total revenue, and how could Google sacrifice the privacy of users for so little money in its on context?

Imagine we were in the opposite situation and actually, it was 90 percent of Google's total revenue. We know Mr. Boies would say it's relevant because it was existential for Google. They really it's heads, I win and tails, you lose. They want to get the --

**THE COURT:** They like those arguments.

**MR. SANTACANA:** They want to get this total revenue in not matter what, and they will make an argument about how it's relevant. The question is whether it's unduly prejudicial. This is why we bifurcate as a matter of routine. It's because everybody knows it's unduly prejudicial. They say, "Well, everybody knows Google's rich. What's the big deal?"

And I said earlier the problem is how hard does Mr. Boies intend to hammer on that is really what indicates how unduly prejudicial it is. There's a difference between a juror knowing Google's a big company and every time the plaintiffs' counsel get up, talking about it and hammering our witnesses about how rich it is because it makes money, for example, from cloud service infrastructure. It provides to other enterprise services. That has nothing to do with this case.

The other point I'll make, and then I can turn it over, is

the other reason they're using it, based on the slides we've already seen, has nothing to do with the argument they put in their brief. The other argument they very clearly intend to make is the damages they're asking for aren't reasonable in context to how much money Google has. "It won't hurt them so bad" is basically the argument.

And there's a line in their opposition that hints that they are going to do this, but I think that's actually the primary reason they want to say, and I think the line in the opposition says, "Jurors might find it a little bit eye-watering to award a billion dollars, but it might be easier for them -- they say this in their brief -- if they knew that Google made 200 billion dollars last year.

**THE COURT:** Although if they get to the punitive phrase, they're going to switch that argument. You're going to have to switch the argument entirely.

**MR. SANTACANA:** Exactly. But that's --

**THE COURT:** Well --

**MR. SANTACANA:** -- at the punitive phase. I mean --

**THE COURT:** -- doesn't that mean maybe they're not going to make the exact argument that you're suggesting?

**MR. SANTACANA:** It's what they wrote it in their brief, Your Honor. They said, "A juror might think it's a lot of money until they learn how much money Google makes," and they say, from their perspective, "We're concerned jurors will

have hesitancy awarding so much money. So want to give them a little bit less hesitancy.

That's classic prejudice, Your Honor. That's not an admissible purpose or an appropriate purpose for admitting what is otherwise prejudicial information.

**MR. BOIES:** I don't think we said that we want to diminish their hesitancy.

I agree, in part, that even Google's total revenue is not going to be something that we are going to be stressing at the liability phase before we get to punitive damages, if we ever get to punitive damages. To the extent that we use those numbers at all -- it will be as a starting point for various allocations that our experts make.

And I think that even there, we are not going to start with Google's total revenues. We'll start with Google's advertising revenues, because that's a step in getting to profits, and it's a step towards getting to the significance of what's going on.

So I think in terms of even Google's total revenues, which is what they direct their motion to, technically I don't think we're going to be talking about their total revenues. And we're certainly not going to be talking, pre-punitive damage phase by saying, "Google has got all this money, so they can spare some for our plaintiffs."

We are going to be talking about the size of their

advertising revenue because that was what was critical to their wanting to keep people using the service and wanting to get the data, and we are going to be talking about the profitability of that data to Google. But that goes directly to the kind of issues that we have, and if there's an issue where they think that something that we're offering is irrelevant, the Court can rule on it --

**THE COURT:** So you're not making the argument that this is so minuscule to Google that it shows that they -- it shows it's egregious?

**MR. BOIES:** No. We are arguing that, but not in relationship to their total revenue. In other words, he's right that even Google has activities that are unrelated to, you know, search and advertising.

**THE COURT:** Sure.

**MR. BOIES:** For example, included within Google, I think, is YouTube.

**THE COURT:** YouTube, correct.

**MR. BOIES:** And so we're not arguing that somehow YouTube or even cloud services, for example, are something that ought to be taken into account here.

What we are saying is that Google had this enormous advertising because, and what they were gaining from this, while a lot of money to us, was not a lot of money to Google. And nevertheless, they were prepared for this relatively modest

increase in their bottom line from this business. They were prepared to mislead people, invade their privacy, and that goes to offensiveness. It goes to egregiousness. It goes to their motive.

So I think it is relevant there, and the only thing that I'm saying is that -- what we're saying is relevant is the revenues from the search business and advertising, not from things like YouTube and probably cloud service as well.

**MR. SANTACANA:** Your Honor, just a couple points please.

**THE COURT:** Yes.

**MR. SANTACANA:** This is important for us.

First, I do want to, if you'll indulge me, read to you three sentences from their opposition on this MIL because --

**THE COURT:** Go ahead.

**MR. SANTACANA:** -- I don't think that the answer you just received is accurate.

It says, "Google has repeatedly complained" -- this is the Plaintiffs' writing -- "that the billions of dollars requested on behalf of the class members is somehow necessarily unreasonable.

Google's complaints seemingly indicate the parties agree on at least one point, that Plaintiffs' claims for actual damages and for disgorgement are both large enough as an absolute matter to create an undue risk that the jury will be

skeptical of Plaintiffs' damages models.

"Given this risk, it is reasonable to provide the jury with the perspective necessary to fairly evaluate Plaintiffs' claims, namely evidence of Google's annual revenues during the class period."

Now, regardless of what position Mr. Boies is taking today, I think the Court should rule in response to our motion that that argument is impermissible because that is a classic prejudice argument, and here -- I don't have it printed because I didn't expect this, but this is what the slide looks like, Your Honor. This is the slide that they intend to show to the jury when the damages expert is on the stand. There's a pile of money on the left.

**THE COURT:** Okay.

**MR. SANTACANA:** It says a thousand dollars Alphabet revenue, and there's a single dollar bill on the right, and it says unjust enrichment, the amount they're asking for. Now, that's very obviously not allowed. So I don't know if they intend to exactly use this slide, but that's why we filed the motion.

The other point I wanted to make, the final point, is Mr. Boies, I think, is negotiating with you a little bit and saying, "Well, can we just get the ad revenue total in, not the *total* total?" It didn't say that in their opposition, but my question is why can't they just stick to the products and

verticals at issue? It is a lot of money still.

Why can't they stick to the products and verticals instead of trying to get Your Honor to allow them to put in numbers that relate to products, ad products, that aren't at issue in the case when we all know that that type of evidence is typically considered unduly prejudicial? They haven't said what prejudice would flow to them from exclusion, and they aren't really identifying why, for example, ads on the Google search page that have nothing to do with this are somehow relevant to the jury's determination.

**MR. BOIES:** The reason --

**THE COURT:** One more round.

**MR. BOIES:** The reason I focused on it was because their motion is directed to Alphabet and Google's total revenue. That's what their motion -- they didn't move to exclude evidence about their advertising revenue, and what I was saying is that I was in agreement with the total revenue issue prior to the punitive damages. I was making clear that that did not mean that I wasn't going to talk about their --

(Overlapping speakers.)

**MR. BOIES:** What?

**THE COURT:** They were reacting to, as I understand it, what you were showing you planned to use, and he just showed me that. First of all, that's not going to be permitted in any event --

**MR. BOIES:** Right.

**THE COURT:** -- because you're not doing Alphabet, but that's why he showed it.

**MR. BOIES:** That -- yeah. If he moved, you know, just on that, we wouldn't have had this argument.

**THE COURT:** Okay.

**MR. BOIES:** Any chart that we have that has total revenue comparisons prior to the punitive damages phase, we ought to change to what I think is relevant, which is the advertising. They haven't moved about that.

**THE COURT:** Well, although because before today, as Mr. Santacana mentioned, it wasn't clear that that -- you had reduced it down to that. I do think it's fair -- I take it that, and he's told me, he doesn't even like your reduced amount. So it's not like they haven't -- I'm not going to say well, I'm not going to rule on it because you didn't move on the subset.

**MR. BOIES:** Yeah.

**THE COURT:** I think it's fair they moved on what was in front of them, and I will accept that he's still moving on the reduced presentation based on the ad revenue, right.

**MR. SANTACANA:** Yes, Your Honor.

**THE COURT:** I got it.

**MR. SANTACANA:** I think the total they should show is total ad revenue on the products and services at issue.

**THE COURT:** I got it. Okay.

**MR. BOIES:** And I think it's perfectly fair for the Court to --

**THE COURT:** Okay.

**MR. BOIES:** -- rule on that.

**THE COURT:** Okay.

**MR. BOIES:** I would say that we do have charts that use the advertising revenue too.

**THE COURT:** Okay.

**MR. BOIES:** I mean, it's not like we haven't put in --

**THE COURT:** Well --

**MR. BOIES:** -- charts on that.

**THE COURT:** -- I understand the issue. You need a ruling from me one way or the other, and I will do that. I'll go back and work on this. The parties, each side, are going to win some and lose some, but that's the nature of the game. So -- yes.

**MS. AGNOLUCCI:** Your Honor, may I make one more brief comment having to do with the motion 5 that we didn't argue, and then 7 and 3, Google's motions?

**THE COURT:** Okay. And I also know there's a motion to quash that is enveloped in the motions in limine. I'm going to deal with both of them at the same time. Yes. Go ahead.

**MS. AGNOLUCCI:** So 5 had to do with the primarily Sundar Pichai-related documents --

**THE COURT:** Yes.

**MS. AGNOLUCCI:** -- that Your Honor mentioned you were going to go through one by one, and then of course we talked about 3 and 7 having to do with data breaches and the incognito case. To the extent the Court's concerned with all of these because I hear you asking us well, aren't the plaintiffs entitled to comment about privacy in general?

So to the extent the Court's concern is that Google is planning to get up and say, "Here at Google, we love privacy generally. Here at Google we are consumer-centric generally," we are absolutely willing to cabin those discussions to the products at issue in this case, their functionality, why they're protective, and not make those sweeping statements.

**MR. BOIES:** I think if they limit what they say, we will probably limit what we say. Now, what we have to do is not merely respond to what they say but also make our affirmative case, and some of this stuff is relevant to our affirmative case. So some of it is in response to the affirmative case. If they narrow what they say, they may have better objections to some of our affirmative case. I think that's what the Court is going to have to deal with at the time we get to trial.

**THE COURT:** So in other words, there isn't -- it's probably a fool's errand to ask you to see if you can stipulate to "We don't say this. You won't say that." We just need to

barrel ahead.

**MR. BOIES:** Yeah. I think --

**THE COURT:** Okay.

**MR. BOIES:** I think so, Your Honor. Could I raise one other issue?

**THE COURT:** Sure.

**MR. BOIES:** And this is to get the Court's guidance.

Last month, they served a 40-page supplemental expert report after obviously the Daubert motions had been ruled on. Now, in what we got from them, the additional points that were made in this expert report are not in their demonstrative exhibits. So we're not sure how much of this is going to come in to the trial or not.

**THE COURT:** Which expert are we talking about?

**MR. BOIES:** What?

**THE COURT:** Which expert are we talking about?

**MR. BOIES:** This was Knittel.

**THE COURT:** Okay.

**MR. BOIES:** Knittel. And the -- we obviously object to their supplementing their expert report at this stage, and I guess the issue is should we bring a formal motion for the Court to decide? Is that something that the Court wants to discuss now?

**THE COURT:** Well, Mr. Hur, what are you going to -- go ahead.

**MR. HUR:** Thank you, Your Honor.

It sounds like there is a dispute about something that our expert said in that report. I think, Your Honor, we should meet and confer. We have some concerns about what their expert said. So I think we should meet and confer, and if we need a motion, we can agree --

**THE COURT:** Okay. If you are going to file -- if the meet and confer fails to resolve these questions, I want you to file any motions that are going to pertain to supplementing the expert reports on either side promptly. So I would want -- if you're going to -- if this isn't going to resolve in some other way, then I want the motion by early next week because time is fleeting, and I want to get as much done as we can get done in advance.

So plan to file it, say, by Tuesday of next week if you're going to have, you know, a dispute with respect to either side's supplemental expert documents. And the only other, as I'm trying to think back on what we talked about today is going to be -- what was the other motion that I'm anticipating?

**MR. HUR:** We were going to file a motion in limine --

**THE COURT:** Well, one is to -- with respect to Mr. -- whatever his name is, your representative.

**MR. BOIES:** Cataldo.

**MR. HUR:** Cataldo.

**THE COURT:** Yeah. So that's going to be a motion.

And then supplemental expert. Anything else that I'm --

**MR. HUR:** I thought there was one motion.

**MR. SANTACANA:** And a motion in limine, Your Honor, that you invited earlier today.

**THE COURT:** And remind me what it's about.

**MR. SANTACANA:** I need to remind myself.

Your Honor, this is about multiplying the damages by 98 months.

**THE COURT:** Oh, yes. Okay. I'm going to get a motion on that, that's right.

**MR. SANTACANA:** Yes.

**THE COURT:** And then as I said -- I said this, but I'll repeat it. There is a subpoena. This goes to number 6, and I will deal with the motion to quash and the motion in limine together, and you'll get an order on that issue. Okay.

And as Karen reminds me, I think everybody agrees with this, witnesses are excluded until -- yeah, that's way we operate. Okay?

So I will be giving you written orders on the motions in limine, and I will then rule on these additional items that you submit, but otherwise, I think we're just ready to go, I think.

Any settlement discussions going on? I just want to know. I don't want to know anything about them. I just want to know if they're going on.

**MR. BOIES:** We have had them, Your Honor, and I think

it's safe to say they're over.

**THE COURT:** They're over?

**MR. BOIES:** Yeah.

**THE COURT:** Okay. I shouldn't make vacation plans in August. Okay.

**MR. BOIES:** Thank you, Your Honor.

**THE COURT:** All right.

**MR. HUR:** Your Honor, one housekeeping issue that relates to something you mentioned at the beginning, which is the juror questionnaires. And we understand they're coming back the week of the 10th and that we'll have a call the Friday before trial.

If the questionnaires indicate that -- for example, that question we were discussing, half the people clicked yes, is there a mechanism for us to try to communicate with the Court earlier, or would there be --

**THE COURT:** Well --

**MR. HUR:** -- a way to get more jurors if needed?

**THE COURT:** First of all, if they say yes, as I was hearing from the plaintiffs' side, does that automatically mean they're -- they may not be a member of the class because it depends upon timing, right? Because the class is the defined period of time. Is it automatic that they're off the jury? Is it a for cause challenge automatically or what?

**MR. HUR:** Your Honor, I think we would have a basis to

get them off the jury for being class members subject, you're right, to some time limitation. What we were trying to think through, Your Honor, is because the class is so big, how do we have a jury with a reasonable number of people that doesn't necessarily exclude every single class member?

And so one thing that we were thinking is that okay. Well, if they are actively turning WAA on and off, then these people -- there's a higher risk that these people are going to bring, you know, facts that weren't presented at trial into the jury room. If they turned it off seven years ago and they don't even know, then that's not a big deal, and we could have them --

**THE COURT:** Okay. Well, that's why I don't think the yes or no can -- we can call the question based on the yes or no. If it's seven years ago, I don't think it would automatically be they'd be off the jury, but...

**MR. BOIES:** I agree with that, Your Honor. I also -- I mean, since this was raised, I've been thinking about it, and it seems to me that one thing to consider is simply excluding from the class anybody -- just like Your Honor, if you used off, you'd be out of the class. It would be to exclude any jurors from the class.

**THE COURT:** Well, I would be a little -- I'm a little concerned about, you know, a negotiation with a prospective juror that, you know, to sit on this jury, you understand you

can't be a member of this class. You know, I think going down that road is not a good one.

First of all, I'd think I'd hear an argument that perhaps, from one side or the other, that's going to affect how that juror looks at this. But beyond that, it's -- a juror shouldn't be put in that position. I mean, a juror shouldn't have to give up anything to be on a jury.

**MR. BOIES:** I do understand that, Your Honor.

**THE COURT:** So I'm troubled by that. So I don't think I want to do that.

I think the more -- the reason I'm more averse to just calling the question on a yes is that I think once we find out why they said yes, it may be they turned something else off that didn't have to do with this, or it was, you know, long before this class. So that's why I don't want to just automatically say -- tell them not to show up. But I understand that this is, you know, a lot of people that are potentially class members here.

So back to square one. Where does that leave us? I know you want me just to probably call in more people.

**MR. HUR:** Well, Your Honor, that's just my concern. You suggested you might call in maybe ten more people, but if it turns out from the questionnaires that there are a lot more yeses than perhaps you expected, is there a mechanism to --

**THE COURT:** Well --

**MR. HUR:** -- get more?

**THE COURT:** Now that you ask me, we will be attuned to that, and as soon as they come in, I'm not sure what the jury office can do in terms of hauling in some new people and having them, you know, fill out the questionnaire when they come here, but I'll give it some thought, and I'll look into it, and maybe I'll increase the numbers. We'll do that.

**MR. HUR:** Thank you, Your Honor.

**THE COURT:** Okay.

**MR. BOIES:** Thank you very much, Your Honor.

**THE COURT:** See you later.

**THE CLERK:** Court stands in recess.

(The proceedings concluded at 12:57 P.M.)

---o0o---

Case 3:20-cv-04688-RS Document 728 Filed 08/31/25 Page 127 of 127

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Saturday, August 2, 2025

___________________________________________

April Wood Brott, CSR No. 13782