# Trial Transcript Excerpts

# Plaintiffs' Opposition to Google's JMOL Mot.

**Volume 1**

**Pages 1 - 174**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

```
ANIBAL RODRIGUEZ, et al.,        )
individually and on behalf of    )
all others similarly situated,   )
                                 )
          Plaintiffs,            )
                                 )
   VS.                           )   NO. 3:20-CV-04688 RS
                                 )
GOOGLE LLC,                      )
                                 )
          Defendant.             )
_____  )
```

San Francisco, California
Monday, August 18, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, New York 10504
BY: **DAVID BOIES, ATTORNEY AT LAW**
**ALEXANDER BOIES, ATTORNEY AT LAW**


BOIES SCHILLER FLEXNER LLP
2029 Century Park East, Suite 1520n
Los Angeles, California 90067
BY: **ALISON L. ANDERSON, ATTORNEY AT LAW**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiffs:

        BOIES SCHILLER FLEXNER LLP
        100 Southeast 2nd Street, Suite 2800
        Miami, Florida 33131
    BY:   **JAMES W. LEE, ATTORNEY AT LAW**

        BOIES SCHILLER FLEXNER LLP
        44 Montgomery Street, 41st Floor
        San Francisco, California 94104
    BY:   **MARK C. MAO, ATTORNEY AT LAW**

        SUSMAN GODFREY LLP
        One Manhattan West, 50th Floor
        New York, New York 10001
    BY:   **WILLIAM C. CARMODY, ATTORNEY AT LAW**

        SUSMAN GODFREY LLP
        1900 Avenue of the Stars, Suite 1400
        Los Angeles, California 90067
    BY:   **AMANDA BONN, ATTORNEY AT LAW**

For Defendant:

        COOLEY LLP
        101 California Street, Fifth Floor
        San Francisco, California 94111
    BY:   **BENEDICT Y. HUR, ATTORNEY AT LAW**
        **EDUARDO E. SANTACANA, ATTORNEY AT LAW**
        **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
        **ISABELLA M.M. CORBO, ATTORNEY AT LAW**

        COOLEY LLP
        4401 Eastgate Mall
        San Diego, California 92121
    BY:   **MICHAEL A. ATTANASIO, ATTORNEY AT LAW**

Also Present:       **Josh Dubin, Consultant**
        **David Klein, Consultant**
        **Steve Ganem, Google**

**I N D E X**

Monday, August 18, 2025 - Volume 1

|                | PAGE | VOL. |
|----------------|------|------|
| Jury Voir Dire | 27   | 1    |

is what the sWAA toggle controls.  Let's look at an example.

Let's say that you have a user named Jim.  And Jim wants to use the burger restaurant app that we've been talking about.  Goes on the app, he wants to make a reservation.  He types in his name -- you can see his name at the top -- his email address, and his phone number.  And then there's some information at the bottom that isn't tied to his identity.  It's a property ID for the burger restaurant; it's a user ID that's associated with the app; and then there is a reservation, the behavior that the app engages in.

Google Analytics gets the information that is not tied to the user, it's not tied to the user's identity.  Google Analytics doesn't get the name, the email address, or the phone number.

Now, what Google does is it developed an extensive consent check process so that it could determine whether or not this de-identified ID is a Google Account holder who has sWAA on.

And if sWAA is on, then the data that Jim provided to the restaurant app that he made a reservation can be saved in the user's Google Account.  And why would Jim want to do that?  For example, if a user does that, Google Maps might recommend directions to the restaurant.  At the time of the restaurant, Google Maps might suggest, "Hey, you should leave.  It's going to take you 20 minutes to get there."

Those are the kinds of experiences that having sWAA on can

provide to Jim based upon information that is saved to his Google Account.

What happens when sWAA is off?  When sWAA is off, it's a similar process.  Jim makes the reservation.  The data that isn't tied to Jim is provided to Google Analytics for Firebase.  But after the consent check process, Google determines that sWAA is off, so no data is associated with Jim's Google Account.  The information is not saved in his account and cannot be used to personalize his experiences.

Look, I'll be candid with you.  Google makes more money when users have sWAA on because personalized experiences mean people are on Google more and, as I'll show you in a moment, it can lead to targeted ads for which Google -- for which Google profits more; that is true.

But this case, every class member in this case had sWAA off.  That's why all the data in this case is not personally identifiable.  It is non-personal data.

Now, I want to take this opportunity to explain to you what plaintiffs' theory is because I don't think it was very clear from what you heard earlier.

Plaintiffs' theory is that when sWAA is off, Google can't even get this information, information that isn't tied to a particular person's identity.

Now, what would that mean for the burger app?  If Google Analytics for Firebase could not get information about

every reservation that was made on its app by its users, then it couldn't rely on Google Analytics to process all of its information and give it the kind of aggregated statistics that would be valuable.

Remember this?  We saw this slide.  Plaintiffs' theory is that if 10,000 of these users had sWAA off, Google Analytics wouldn't even know that those users were using the app.  So instead of reporting 25,000 users, Google Analytics would report to this app 15,000 users, which would be inaccurate.

How long do you think this app would use Google Analytics? And the theory is that Google designed this sWAA setting in a way that would essentially render Google Analytics completely worthless.

Now, you can quibble with the words that Google provides to users, and I'll show you the disclosures and show you what Google says, but the idea that Google intended for sWAA to work in a way that would render Google Analytics inoperable is not credible.  That's what the evidence will show.

I mentioned ads to you.  There are no personalized ads when sWAA is off.  When sWAA is on and depending on other account settings, a user can make a reservation and they can get a targeted ad.  So, for example, if you've made a reservation at the restaurant, you may get an ad for a discount coupon when you go.

When sWAA is off, that cannot happen.  The information

software engineer for Data Governance and Risk, and he too will tell you about his communications with Mr. Monsees and what his concerns were about WAA and sWAA.

And, Brooklyn, can you please put up 43.

This is an email that the plaintiffs' counsel put up. What Mr. Ruemmler will explain is that this was about a proposal that Google made that Mr. Ruemmler objected to; and based on Mr. Ruemmler's objection, Google decided not to go forward with the proposal. Okay? This has nothing to do with what is at issue in this case.

You can take that down. Thank you.

And both Mr. Ruemmler and Mr. Monsees will tell you that all of those emails that you saw in the plaintiffs' presentation, none of them had to do with Google Analytics for Firebase or the data that is collected by Google Analytics for Firebase. And maybe that's why you didn't hear about that product, because those emails are not about the data and the product that is at issue in this case.

Let's talk about the Google Account, and I'm going to show you some of the disclosures that Google makes to its users about Google Analytics and about what data can be saved in the user's Google Account.

Now, as I mentioned, the Google Account is a consumer product directed to individual users, and Google allows people to save activity in their Google Account, and there are many

types of activity that I will walk through with you.  This is going to take a few moments because there are several disclosures that Google makes to its users about what can be saved in a Google Account and how that data is used.

So the activity you keep helps Google make services more useful for you, like helping you rediscover the things you searched for, read, and watched.  You can see and delete your activity using the controls on this page.

When you create a Google Account, like most things on the Internet today, you agree to the privacy and terms.  So to create a Google Account, you'll need to agree to the terms of service; and, in addition, when you create a Google Account, you agree to the privacy policy.  Not a surprise.

Later in the privacy and terms, Google talks about the data you're in control of.  Depending on your account settings, some of this data may be associated with your Google Account, and we treat this data as personal information.

What Google is telling users they're in control of is data that's tied to their personal information because that is their data.  Now, you heard or you saw a couple of slides about Google's CEO talking about the data that users are in control of.  This is what he's talking about.  Users are in control of personal information.

And just think about how this would work under the plaintiffs' theory.  If Google could not collect any

information, if a user had WAA off, for example, that would mean that a person who did a Google search wouldn't get any results if they had WAA off.  Or if they wanted to watch a YouTube video, they wouldn't be able to log in and see it.

Of course Google is going to return search results even when WAA is off, but it's not going to be tied to a person's identity or associated with their personal information.  That is what Google is talking about in the Google Account and their activity.

You saw some parts of the privacy policy, but there are some key parts that you didn't see.

The activity controls.  Now, the activity controls in the privacy policy tells users that they can decide what type of activity you'd like saved in your account.  For example, you can turn on location history if you want traffic predictions for your daily commute, or you can save your YouTube watch history to get better video suggestions.

So what is this activity and how does Google define what the activity involved is?

Your activity -- again, this is in the privacy policy -- and here is where Google is describing the types of activity that users can save in their Google Account.  What does Google say right at the top?

[As read]:

"We collect information about your activity in

click the button on the left to turn it off; correct?

A.    Yeah.  Whether it's on or off, this is how a user --

Q.    This is it?

A.    -- can change it in both directions.

Q.    Okay.  And below that, we can see subsettings; correct?

A.    That's correct.

Q.    And the first subsetting talks about -- this is what we learned to be the sWAA button; correct?

A.    That's correct.

Q.    And that stands for supplemental Web & App Activity; correct?

A.    That's right.

Q.    And this is what a user can click on or not click on to have sWAA on or off for their visits to third-party apps; correct?

A.    That's right.  If their Web & App Activity is on, they could choose to check and turn on sWAA, and it would show a pop-up that would give them that additional information of extending their Web & App Activity.

Q.    So we're going to talk about how to turn these settings on and off for a minute, but right now I just want to focus on the differences between WAA and sWAA.

So broadly, WAA has to do and covers what people do with a Google product, and we talked about that earlier, like Google Search and Google Maps; correct?

**A.** That's right. It says here that it's --

**Q.** And, sir --

**A.** -- the things you do on Google sites and apps.

**Q.** -- just to move it a little faster because we're going to have some fair time together, I would ask you if you can -- if my question is a "yes," if you need to explain it, sure; but if you don't need to and because you're going to have some time with your own counsel, my question to you, though, just to kind of get through some of this background stuff, is that this sWAA setting -- subsetting covers the third-party apps; correct?

**A.** That's right. Specifically devices, sites, and apps that use Google services, yeah.

**Q.** So now let's talk about how users can adjust the settings.

When a regular consumer creates an account, the WAA setting is automatically on; correct?

**A.** The WAA setting is preselected, and a user can --

**Q.** Is that a "yes" --

**A.** -- change it --

**Q.** -- sir?

**A.** Sorry. I'm just trying to clarify that a user can change it during account creation. We preselect the "on" option. They can change it to "off." And that all happens while a consumer is creating their account.

**Q.** But as a default, it's on. Are you telling me there's a step between this?

A.    No.  By the default, it is selected to the on --

Q.    That's what I thought.

A.    -- and the user can change.

Q.    Okay.

A.    Yeah.  Correct.

Q.    So we agree everything starts off with WAA on; correct?

A.    Unless the user changes it, that's correct.

Q.    Okay.  And one of the ways to turn sWAA off is just to turn WAA off; correct?  It's like a master switch?

A.    That's right.  Since sWAA extends WAA, WAA has to be on for sWAA to be on.

Q.    And yet another way that we've learned, and I just want to clarify it with you, that even if WAA is on, if the subsetting below button is on off, then sWAA is on off; fair?

A.    Yes.  If that checkbox here is unchecked, that would mean that sWAA is off.

Q.    Now, you know some of Google's users, of course, turn sWAA off; correct?

A.    That's right.

Q.    And Google tracks which users turn off sWAA; correct?

A.    Yes, we do.

Q.    And you can look up a user's sWAA setting in an internal Google system called Footprints; correct?

A.    That's right.

Q.    And you're the lead manager for Footprints?

A.    Yes.  I'm the product manager.

Q.    And what I'm going to do is have you take a look at 403, 404, and 405 in your binder or on the screen to you.

MR. CARMODY:  And I'm going to move in, Your Honor, 403, Plaintiffs' 404, and Plaintiffs' 405.

MR. SANTACANA:  I'm sorry, Your Honor.  I just need a moment.  I don't have them.

THE COURT:  Okay.

MR. SANTACANA:  Your Honor, I think he should lay some foundation.  He's displaying it before it's been admitted.

THE COURT:  Well, it shouldn't be.

MR. CARMODY:  It shouldn't be.

THE COURT:  It's not his fault.  I don't think it's being displayed to the jury.

Can you see anything on the screen?  No.

MR. SANTACANA:  Okay.  Great.

I think he should lay some foundation, Your Honor.

THE COURT:  All right.  Why don't you just provide us with some foundation.

BY MR. CARMODY:

Q.    Sir, you've been designated by Google as the witness who can testify about these very documents; fair?

A.    Sorry.  About these documents?

Q.    Yes.  You have been designated by Google to testify on these reports; correct?

**A.**   I definitely have prepared a lot of slide presentations, and I could see how one may have been then presented to Sundar as part of preparation, but I don't recall being part of that process.

**Q.**   Okay.  You know his testimony before Congress was televised; right?

**A.**   Yes.

**Q.**   I mean, people at work were talking about it; correct?

**A.**   Yeah.

**Q.**   You watched it; correct?

**A.**   I did.  I think I watched most of it.

**Q.**   Okay.  Do you remember what Mr. Pichai said?

**A.**   I -- I vaguely remember him talking about the different types of services that Google provides, the different kind of opportunities those services create for our users and for the different businesses that use those services.

I recall the team that I worked with at that time being very proud that he talked about some of the privacy controls that we service.  I don't think he mentioned some of my settings directly, but he definitely, I think, showed that Google cares and invests a lot in the space, which made my team very excited.

**Q.**   Let's play -- we have about five minutes --

**A.**   Okay.

**Q.**   -- to play of Mr. Pichai's testimony.

Can we do so now?  Would you watch it?

A.   Sure.

MR. CARMODY:  Good.

Ma'am, we'll get you a transcript so it's on the record.

THE COURT:  Fine.

(Video was played but not reported.)

BY MR. CARMODY:

Q.   I think we're finished there, sir.

A.   Okay.

Q.   You agree that Mr. Pichai's testimony was consistent with Google's privacy policy?

A.   Yes, I do.

Q.   And you heard Mr. Pichai discuss clear toggles that allows Google's users to decide whether their information is collected or stored; correct?

A.   That's right.  I believe he was talking about activity controls.

Q.   Yeah.  WAA; correct?

A.   WAA is one of them, that's correct.

Q.   Okay.  And it's important, obviously, for Google's CEO, Mr. Pichai, to be accurate and complete when he's testifying before Congress; fair?

A.   That's fair.

Q.   Okay.  And it's -- you agree that it would be fair for the American people to rely on what Mr. Pichai is telling Congress

about; correct?

A.   Yes.

Q.   And what Google's doing with user privacy settings; fair?

A.   That's fair.

Q.   Okay.  Now, we know Mr. Pichai testified before Congress in December of '18.

I want you to take a look at PX3 on your screen, please. This is a grouping, an email string between yourself and Chris Ruemmler, another Google employee.  And this is in July of 2019; correct?

A.   Yes.  I see that here.

Q.   This is about eight months or so after Mr. Pichai's testimony before Congress; fair?

A.   That is fair.

Q.   And Mr. Ruemmler was then the tech lead on Google's Security Trust and Privacy Team; fair?

A.   Yes, I believe specifically for the Google Workspaces Team, like Gmail.

Q.   And you guys were discussing Google's disclosures to its users about WAA; correct?

A.   That -- that's right.

          MR. CARMODY:  Okay.  I move in PX3.

          MR. SANTACANA:  No objection, Your Honor.

          THE COURT:  Exhibit 3 will be admitted.

     (Trial Exhibit PX3 received in evidence.)

talking about the help page in Exhibit Plaintiffs' 113 that we looked at where he says, "We're not disclosing what we're collecting when WAA is on off"; correct?

A.   I mean, I think just to clarify, he's speaking about the Help Center page that we were looking at --

Q.   Exactly.

A.   -- which is about Web & App Activity specifically and the data in your Google Account, and so he's kind of writing the opposite here.

Q.   So the answer to my question was "yes"?

A.   Yes, but just specifically --

Q.   Okay.

A.   -- in the scope of the setting that we're talking about here.

Q.   Then Mr. Ruemmler continues, and he says [as read]:

      "The line 'Ads you click, or things you buy on
      an advertiser's site' we probably don't want to lose
      ever as that is how we charge for Ads."
      And then we see a little smiley face; right?

A.   Yes.

Q.   "We charge for Ads" is how Google charges for ads; correct?

A.   Yes.   The "we" meaning Google.

Q.   And Mr. Ruemmler goes on to say [as read]:

      "If everybody turned off WAA, then we would not

know who clicked on Ads which would be bad."

So then he says [as read]:

"So, obviously, the opposite of on is not really the way it should work."

Correct?

A.   Yes.   That's what he's saying here --

Q.   That's the words.

A.   -- yeah.

Q.   Well, let's stop here, though, and dissect this for a minute.

I mean, the truth is, users' WAA-off data has value; correct?

A.   Yes.   It's essential to providing the ad services Mr. Ruemmler describes here.

Q.   Google was making money from it during the entire class period; correct?

A.   Well, I mean, without this data that we save about ads interactions, not only would Google not know what to charge, we wouldn't know what to pay website and app developers that run our ads.   It's essential to the operation of ads business whether WAA is on or off, and that's why we save the data, as Mr. Ruemmler is mentioning, not against their Web & App Activity, not against their Google Account.   We save it as de-identified information.

Q.   Was the answer to my question "yes"?

A.   Yes.  But, I'm sorry.  Trying to give you the context because --

Q.   Let me ask it again in a simple way.

A.   -- I think it's important.

(Simultaneous cross-talk.)

(Reporter interrupts to clarify the record.)

**THE WITNESS:**  Because I think it's important.

**BY MR. CARMODY:**

Q.   My question is simple.  Throughout the class period, which is about eight years and two months --

A.   Okay.

Q.   -- Google made money from the class members WAA-off data; fair?

A.   That -- that's fair.

Q.   Okay.

A.   We made money through the normal course of providing our services.

Q.   Now, let's take a look here and see on the bottom of this very -- right around there, yes.  So -- thank you.

So Mr. Ruemmler continues, and he says [as read]:

"So, it appears we have a real problem here with accurately describing what happens when WAA is disabled."

When WAA is off; correct?

A.   Yes, I see that.

Q.   He says [as read]:

     "We" -- as in Google -- "should fix the current wording" --

     That's the wording as of July 24th, 2019; correct?

A.   That's correct.

Q.   [As read]:

     "We should fix the current wording to reflect reality...."

     And then he goes on to talk about this temporary GAIA project, something different; correct?

A.   Yes.  However, I think he's talking about the -- the temporary GAIA logging solution that we're talking about here specifically is the problem that we need to correct.

Q.   Yeah.  There's -- let's talk about the problem you think we need to correct --

A.   Okay.

Q.   -- because what's happening is if we take a look --

     MR. CARMODY:  And, in fact, if there's any way, Mr. Boles, to put the whole page so we can all together kind of dissect this document in the context of what Mr. Ruemmler is saying.

BY MR. CARMODY:

Q.   When he says "So" --

     There you go.  Thank you.

     [As read]:

Do you see that?

A.   Yes, I do.

Q.   And then what he cites -- and I wish we had it.  Oh, here we have it.

The wording he focuses on is the wording we see right up here, which was talked about this morning.

Were you in opening statement?

A.   No, I was not.

Q.   Okay.  There was discussion about a disclosure that the data saved in your account helps give you, the Google user, more personalized experiences across all Google services and choose which settings you will save in your Google Account.  Do you see that?

A.   Yes, I do.

Q.   Mr. Ruemmler takes that exact language, and what he says is [as read]:

"I see how the wording here is very deceptive."

He goes on to say [as read]:

"The problem is it ... 'your Google Account' means your data, not Google's."

Those were his words back in July 25th of 2019; correct?

A.   Yes.

Q.   And he goes on to say in that next sentence [as read]:

"If I choose not to store data in my account, then Google should not have access to the data either

as the data should not be in the account."

Those were his words; correct?

**A.** Correct.

**Q.** And so Mr. Ruemmler is saying, way back when "'your Google Account' means your data," and he is referring "your" being the user data; correct?

**A.** That's right.

**Q.** The data of all the Google users; fair?

**A.** Correct. Like my search history is my search history.

**Q.** Mr. Ruemmler goes on to say [as read]:

"What you" --

And the word "you" is referring to you, sir, Mr. Monsees?

**A.** I believe so.

**Q.** Okay.

[As read]:

"What you are stating is WAA (or any of the other controls) does not necessarily control what is stored by Google, but simply what the user has access to."

Do you see that?

**A.** Yes, I do.

**Q.** And let's talk about what the user has access to.

We can agree that when Google takes WAA off data from a user, the user can't go anywhere online anywhere in life to go see what Google has, can they?

**A.**   Correct.  If the data is de-identified, we wouldn't know who to show it to because there's no ID associated with it.  We wouldn't know it's your data or my data.

**Q.**   So the answer is a "yes" on that one; correct?

**A.**   Yes.

**Q.**   Okay.  And there's no way for that user -- Google has the data, just to be sure about it.  So user has -- collects the user's WAA-off data.  As Mr. Ruemmler said, it's stored by Google; correct?

**A.**   That's correct.

**Q.**   What he said was accurate then and accurate now; correct?

**A.**   I think it might be a little bit more complicated.

**Q.**   Let me -- can we just focus?  Because you're going to have a chance with your counsel to say basically anything you want.

But my question is simply this:  When WAA was off, as Mr. Ruemmler says, Google is still storing the user's WAA-off information; fair?

**A.**   Google would still store some WAA-off information.  I mentioned before not everything's the same.

**Q.**   And Google does it today, as we sit here today; right?

**A.**   And Google does that today, but --

**Q.**   Okay.

**A.**   -- as I mentioned, that WAA-off data is never going to be saved against your account, which I believe is what Mr. Ruemmler and I are talking about in this email.

Q.   We're going to get into that too.

A.   Okay.

Q.   But what Mr. Ruemmler talks about is transparency; right?
Mr. Ruemmler says [as read]:

        "What you are stating is that the WAA does not

     actually control what is stored by Google, but simply

     what the user has access to.  That is really bad."

     You would agree with me, I think, two things.  First, if
Google -- well, it's not "if."  It's Google is storing user's
WAA-off data, and the user can't go -- know what it is.  They
can't look at it.  They can't get online, like with this thing,
and hit My Activity and stuff and go try to look at it; right?
The user can't do that?

A.   Yes.  As I mentioned, though, because it's not associated
with the user, we wouldn't know what to show you.

Q.   So the user couldn't delete it either?

A.   That's correct, because there's no connection to a user.

Q.   The only --

                    (Cell phone interruption.)

        MR. CARMODY:  I thought it was my chorus.

        THE WITNESS:  It wasn't me.

BY MR. CARMODY:

Q.   So let's continue with what Mr. Ruemmler says.  He says
[as read]:

        "If we are storing data that the user does not

"We need to change the description to indicate even with the control off...."

And he's talking about with WAA toggle on off; right?

A.   That's right.

Q.   [As read]:

"... Google retains this data and uses it for X purposes."

Do you see that?

A.   I do.

Q.   Google has not told its users "We're logging your data and we're using it to make money off it"; correct?

A.   I mean, I think if -- we skipped a paragraph.  If we look just right above, it's pretty clear that Mr. Ruemmler's concern here is about data saved to your account without you having transparency and control over it when WAA is off.  And we agreed.  We changed this proposal based on feedback from folks like Chris.

Q.   I'm not talking -- sir, do you remember my question, first of all, or no?

A.   Yes.  I'm saying I would have a concern, but I think we skipped an important paragraph above it.

Q.   I'm not talking about a proposal that was once discussed and then maybe have been tabled.  What I'm talking about is where he says [as read]:

"We need to change the description to

indicate...."

He's talking about the current disclosures as of July 25th of 2019; correct?

A.   I think -- unfortunately, I have to disagree with you. I think from literally the sentence above it, Mr. Ruemmler is talking about the change.  Because what he's describing above about "any legal investigation against me because it has the data available (for up to 60 days)," he's exactly describing what could have been this project that, as you've mentioned, we tabled.

So I think his sentence here is saying:  We would obviously have to change the descriptions.  I agree with Chris if we did the proposal that he's talking about just on the sentence above it.

Q.   He doesn't say, "We would need," the word you just used. He said, "We need."

[As read]:

"We need to change the description to indicate even with the control off, Google retains this data and uses it for X purposes."

So let me stop there.

First of all, did I read that correctly?

A.   Yes, you did.

Q.   We know as of that date, as of July 25th of 2019, he spoke the truth.  Right then and there -- forget about future

proposals.  Right then and there, we do know Google was collecting user's WAA-off data; fair?

A.   Correct.

Q.   And Google wasn't then disclosing that to the users, that "I'm using your WAA-off data" and for what purpose; fair?

A.   Fair.

Q.   Okay.  Now, let's take a look and now look at your response back to him.

And even to this day, sir, do you know where all this WAA-off data is?

A.   Where all the WAA-off data is?

Q.   Yeah.

A.   I'm aware of different systems that store de-identified data; but normally, folks like Chris come to talk to me about identified, the stuff against your Google Account.

Q.   My question is a simple one.  As you sit here today, do you know where all this WAA-off data is?

A.   I probably know where a lot of different systems would be, but it doesn't relate to what I work on.  So I'm trying to answer your question very honestly.

Q.   Do you know --

A.   I know where a lot of it probably is and the systems within Google that I would go to look at, but because I focus primary on the data saved to your account, not de-identified data, I know a lot more about the account-type data.

Q.   What we have, sir, here is your response, returning back to page 1, and we're seeing July 25th of 2019, and we say -- we see you write [as read]:

     "Hi, Chris.  You can read more about how deletes are processed, which includes how temporary personal logs are processed, and other purposes in the retention article I mentioned."

     And you give a link; correct?

A.   That's correct.

Q.   And then you go on to say [as read]:

     "I would be happy to discuss further."

     Please feel free to grab 30 minutes with yourself and Leslie Liu.  Correct?

A.   Correct.

Q.   And here's the important part.  Leslie Liu was a Google lawyer; right?

A.   Yes, she was.

Q.   So we have you -- I mean, Chris Ruemmler in his email, we can agree, is raising some thorny issues to you; right?

A.   Right.

Q.   His recommendation of how to change the WAA disclosures, that Google's giving users a false sense of security, questioning you about whether Google has performed studies. You don't answer any of those questions in your response; fair?

A.   Correct.

(Trial Exhibit PX2 received in evidence.)

BY MR. CARMODY:

Q.   So let's turn to page 6.

It says "Research Questions," and there's four of them, and they've got little parts and stuff underneath.  But let's just focus on the very top one.

And the context here, by the way, timewise, is this is just what?  Nine months after your exchanges with Mr. Ruemmler; correct?

A.   Yeah.

Q.   Okay.  So we're going back.  And the very first question says -- and this is -- this is an internal Google research study; correct?

A.   Correct.

Q.   [As read]:

"What do WAA users expect turning off WAA to mean?"

That was the question, the very first thing we see?

A.   Yeah, one of the objectives of the study.

Q.   Okay.  And if we now turn to the next page -- or it's actually page, I want to say, 7, it talks about the methods and the procedure, how Google's going to go about doing it; right?

A.   Correct.

Q.   Okay.  And if we take a look here on the left side, it says there's going to be nine participants, five female and

four male.  They're going to each have 30-minute interviews.

And then as to the procedure, we can turn to the right.
Do you see that?

A.   Yes.

Q.   And underneath that, sir, we see five things:  "Background questions," "Reaction to the Activities Control page" -- PX84; correct?

A.   Correct.

Q.   "Expectation of WAA Off"; correct?

A.   Correct.

Q.   "Retention Flow walkthrough"; correct?

A.   Correct.

Q.   And the finale is "WAA off and No Data Scenario"; correct?

A.   Correct.

Q.   Now turn to page 8, and we're looking at the people themselves.  And it looks like we have a fair cross-section of people; correct?

A.   I think so.

Q.   I mean, some are knowledgeable, very knowledgeable about tech issues.  Some are -- some people are somewhat knowledgeable.  We have male and female.  We have folks from different ages.  Fair?

A.   Fair.

Q.   And this research resulted in the 50-page presentation that we're looking at now; correct?

A.    That's correct.

Q.    This research was approved by Google?

A.    It was conducted by Google.

Q.    I mean, you followed all the normal standards that Google wants its researchers to follow to come out with a legitimate bona fide study; correct?

A.    Oh, I see.  I understand.

There's a lot of different kinds of studies that we do.  I would assume that Nava, who's very familiar with this, would be following whatever best practices Google has.

Q.    In fairness, before this lawsuit, nobody ever suggested that this study or its results were somehow inappropriate; correct?

A.    Correct.

Q.    Okay.

A.    I've never heard that.

Q.    Let's take a look at the results.  Let's turn to page 20. If you -- why don't we go top left in the big -- the big lettering [as read]:

        "All participants expected turning off the
    toggle to stop their activity from being saved."

Do you see that?

A.    Yes, I do.

Q.    And the toggle they're referring to is the very toggle behind me here in the courtroom.  I'm pointing to a foam board

of PX84; correct?

A.   Correct.

Q.   And the toggle is this turn on here and turn off here; correct?

A.   Correct.

Q.   Okay.  And what these users say -- and let's even step back a second.

In fairness, Chris Ruemmler's concerns were well-founded, his fears where he said he asked you three questions about a research study.  Remember that?

A.   Yes, I do.

Q.   And he feared people like him wouldn't understand what WAA off means.

In fairness, Mr. Ruemmler was vindicated.  I mean, this is what we see; correct?

A.   No.  This study is testing a very different concept. Actually, it's cool that we have the foam core up here because if you look, it's a little bit below the table there, but it's the auto delete section.  We were creating a brand-new type of control and that's what we were adding here.

What Mr. Ruemmler was discussing on the last email chain --

Q.   Yeah.

A.   -- that we were looking at was about, remember that proposal for changing the way WAA-off logging would work.

Q.   Okay.  Do you recall reading this document?

A.   I do.  I remember it.

Q.   Did you do that before joining the lawsuit?

A.   Before.

         MR. LEE:  May I move PX116 into evidence, Your Honor?

         MR. ATTANASIO:  No objection.

         THE COURT:  116 will be admitted.

     (Trial Exhibit PX116 received in evidence.)

BY MR. LEE:

Q.   All right.  Now let's take a look, I think it starts a little on the next page, where -- beginning with "Info about your browsing" --

A.   Mm-hmm.

Q.   -- and then some of those bullets below.

A.   Okay.

Q.   Based on this disclosure, what activity does Google say that it saves when WAA is on?

A.   If WAA is on, based on this, Google will be saving info about your browsing and other activity on sites, apps, and devices that use Google services, along with activity from sites and apps that partner with Google to show ads, and activity from sites and apps that use Google services, including data that apps share with Google.

Q.   Now, do you see below that where Google states [as read]:

         "To let Google save this information, Web & App

Activity must be on"?

A.   Yes.

Q.   Do you see that?

A.   I see that.

Q.   Mr. Santiago, what is the opposite of on?

A.   Off.

Q.   So based on this disclosure, what understanding did you have regarding what app activity Google is not allowed to save when WAA is turned off?

A.   Well, if WAA is turned off, Google should not be saving activity from sites and apps that partner with Google to show ads, and Google should not be saving activity from sites and apps that use Google services, including data that apps share with Google.

Q.   Now, after you read the privacy policy and specifically the privacy control that we're looking at here, WAA, what did you do next?

A.   After reading this, I turned WAA off.

Q.   When you turned WAA off, did that subsetting that we looked at, sWAA, also turn off?

A.   Yes.

Q.   All right.  Where did you turn WAA off from?

A.   From the activity controls page.

Q.   All right.  And do you recall when that was?

A.   That was mid-September of 2020.

Q.   Why do you remember turning it off in mid-September of 2020?

A.   Well, a few reasons.  I had just gotten a new laptop when I started a new job, and like a lot of us do when we get a new device, you know, I was setting up my personal preferences, and that included some of the privacy stuff.

And a big one was that I had just recently seen the documentary that had just come out on Netflix, *The Social Dilemma*; and this documentary talked about how big tech companies, like Google, were collecting endless amounts of information on us and profiting greatly from that information, and that was a big eye-opener for me.  After seeing that documentary, I began to take my privacy much, much more seriously.

Q.   And how much time after seeing *The Social Dilemma* in early September 2020 did you review Google's privacy policy and WAA disclosures and turn WAA off?

A.   Pretty much immediately after.

Q.   And when did you learn about this lawsuit?

A.   In late September of 2020.

Q.   Did you learn about this lawsuit -- I'll strike that.

How did you learn about this lawsuit?

A.   Well, I was out to dinner with my girlfriend at the time, my now wife, and her family and celebrating a birthday; and as we often do at dinners and gatherings, we talk about shows,

so it takes a little while to adjust.  But, hopefully, we'll be able to do that.

Okay.  Mr. Attanasio, you may proceed.

MR. ATTANASIO:  Thank you, Your Honor.

BY MR. ATTANASIO:

Q.   Mr. Santiago, when we took our break, we had established that you turned off your WAA and sWAA settings on your Google accounts in September 2020; correct?

A.   Yes.

Q.   Let's go forward from there, if we could.

You did that because privacy is important to you; yes?

A.   Privacy is, yes.

Q.   Because privacy is important to you, you did not want Google collecting any of your data; correct?

A.   That's correct.

Q.   So you turned those buttons off; yes?

A.   Yes.

Q.   There was an exception; correct?

A.   An exception?

Q.   Yes.

A.   Which was?

Q.   You left on -- do you remember what you left on?

A.   I turned WAA off.

Q.   Yes.  Do you remember specifically that you left on WAA and sWAA intentionally for YouTube?

A.   That's correct.  I spoke about that at my deposition.

Q.   Yes, you did.

A.   I left YouTube available for some of the things that Mr. Monsees spoke about, that I may have searches on my YouTube available to me.

Q.   No.  Mr. Monsees talked about how, when sWAA is off, Google needs to be able to continue to count views and viewership so that they know what's going on with those videos even though the user has turned it off.  That's what he testified about, sir.

You left it on; correct?

A.   I left YouTube on, yes --

Q.   Who owns YouTube?

A.   -- but WAA was turned off.

Q.   Who owns YouTube?

A.   Google does.

Q.   Pardon me?

A.   Google.

Q.   Are you aware -- did you look at the YouTube privacy policy?

A.   I looked at what was on the Google privacy policy, where YouTube is one of the options.

Q.   Yes.  Did you look at the YouTube privacy policy?

A.   I reviewed it, but not as thoroughly as Google's because Google is owned -- or YouTube is owned by Google.

Q.    Right.  Exactly.

So -- and your passionate interest about privacy caused you to turn off the Google WAA and sWAA; correct?

A.    Google WAA and sWAA turned off, yes.

Q.    But over here, owned by Google is YouTube, which you intentionally left on, knowing that it would track your activity; correct?

A.    That's correct.  I was allowing YouTube to continue to be tracked.  Everything else on Google services and my apps, which this case is about our -- the third-party apps, that would not be tracked.

Q.    Exactly.  Are you aware that the YouTube privacy policy states, "We adhere to Google's privacy principles"?  Did you read that at the time?

A.    I don't recall that specifically.

Q.    Are you aware that the YouTube privacy controls map to the Google-wide controls, including WAA, but are separate?  In other words, if you leave them on, you've left them on?  Are you aware of that?

A.    Can you repeat that, please?

Q.    Yes.  Are you aware that there's a WAA link on YouTube as well?

A.    The -- the WAA that we're talking about is from Google's privacy policy.  There's WAA and there's sWAA, and one of the options is for YouTube, and I gave Google permission to keep

developers, which they would want to use; but the SDKs also came with Google Analytics for Firebase, which is a product within the SDK that gathers data, it takes data from the users' devices and gives that data to Google.

Q.   I understand there's two different kinds of SDKs here Google released that's at issue in this case.  Can you explain a little bit about these two different kinds of SDKs?

A.   Sure.  There's the Firebase SDK, which is -- provides a bunch of different utilities and data collection.  And there's also Google Mobile Ads, which is an SDK that allows a publisher to put ads into their app.  And Google Mobile Ads interfaces with a couple of Google's advertising services.  One is AdMob and the other is Ad Manager.

Q.   And what about the Firebase SDK in this case?  Can you tell me a little bit more about that?

A.   Sure.  Firebase provides a number of useful features for developers.  Importantly, it provides Google Analytics for Firebase, which will give some reports to app developers so they can understand how the app is being used, and -- but it also is collecting event-level data, granular data that Google saves.

Q.   If we could move on to the next slide, what is a third-party app, Doctor?

A.   A third-party app is an app that's not published by Google.  So it could be -- well, there's Starbucks, Disney,

Bank of America, Reddit, *New York Times*.  There's a whole bunch of third-party apps.  There's, in fact, 2.3 million different apps out there.

Q.    And how prevalent are the two types of Google SDKs in this case on the various apps in the various mobile phone stores?

A.    So these two SDKs are very prevalent.  Firebase is used in 97 percent of Android apps.  It's extremely prevalent in the top thousand Android apps, 97 percent.  And it has presence in 54 percent of the top thousand iOS apps.  Those are the apps for the Apple iPhone.

Q.    What about Android?

A.    In Android, it's 97 percent of the top thousand apps.

Q.    You said in your expert report in this case that all the class members are exposed to Google Firebase and Mobile Ads SDK.  What is the basis for that opinion?

A.    So the basis for the opinion is that all of these users have a Google Account and they are using a smartphone.  And if you look at probability of an app being -- of the Firebase SDK being present in an app, even if you underestimate it, say it's just in 50 percent of apps -- that's a low estimate -- if you think about the average person, over the class period, which is 98 months, if you use just ten apps during that period, the chance of running into this SDK is about -- is better than 99.9 percent.

Q.    If we move on to the next slide, what is your second

opinion that you're presenting here today, Dr. Hochman?

A.    The second opinion is that I established a baseline.  In order to do my testing, I had to understand what I was testing against.  So my baseline is that Google had created this expectation that people could control whether Google was taking their data and copying it and using it, and that when the Web & App Activity switch was off or when the supplemental Web & App Activity switch was off, when either switch was off, Google wouldn't take their third-party app data and use it.

Q.    What type of materials did you consider to decide and evaluate this technical baseline that you were testing for?

A.    So I looked at the Android screens that describe the controls.  I looked at Google's privacy policy and related pages.  I also considered statements by Google's employees from top to bottom.  And those were some of the things that informed what I should be testing against.

        MR. MAO:  Your Honor, I'd like to move into exhibit Exhibit -- it's PX120A.  And the reason why it's "A" as opposed to 120 is because I think the 120 we had before was a little bit hard to read.

    Obviously, you're free to examine it.  The language, I represent, is exactly the same.  Are there any issues with this?

        MR. SANTACANA:  Is that in here?

        MR. MAO:  Yes.

**A.**   So my third opinion is that throughout the class period, Google was taking, copying, and using users' third-party app activity data regardless of the position of the switches.

**MR. MAO:**   Your Honor, I actually had a question, if we can just go off the record for a moment, on use of interrogatories.  I just want to know how they make it, actually, to a jury.  I'm going to put up Interrogatory Number 1.

**THE COURT:**   I'm not sure I understand what you're asking.

**MR. MAO:**   Okay.  Well, let me try that, sure.

**THE COURT:**   Just ask questions and then --

**MR. MAO:**   Sure, sure.

**THE COURT:**   -- we'll deal with it.

**MR. MAO:**   If we can put up the slide on Exhibit -- on Interrogatory Number 1.

**THE COURTROOM DEPUTY:**   Should this be displayed to the jury?

**MR. MAO:**   Yes.  It's -- we've stipulated to this.

For the record, this is Plaintiffs' Interrogatory Number 1, I believe Supplemental Responses Number 4, page 9.

Do you have any objections?

**MR. SANTACANA:**   Sorry.  I don't think -- what are you asking?

**MR. DAVID BOIES:**   Is this Interrogatory Number --

MR. WRIGHT:  Interrogatory Number 1.

Sorry, Your Honor.

(Co-counsel confer off the record.)

MR. MAO:  Okay.  Sure.

BY MR. MAO:

Q.   Doctor, have you seen this interrogatory response before?

A.   Yes.

Q.   Did you consider it for the purposes of rendering your technical opinion?

A.   Yes, I did.

Q.   Okay.  Can you tell me a little bit about what this is in terms of the Google response?  What does it describe?

A.   Yeah.  This is a schematic that describes technically how Google is taking data about third-party app activity from users' phones.

Q.   Can we focus on the left-hand side here.

Can you explain to the jury what this Google response is telling us in terms of how the data flowed and what data was being collected?

A.   Sure.  The first box represents what's going on on the user's phone.  So -- so through the Firebase SDK, the app interaction data generated by the user interacting with the app is going to be gathered, and it's gathered into a data bundle.

And Google -- that data bundle includes some things.  It includes the event data.  Okay.  An event is like something

you've done on your phone.  All right?  It could be, you know, starting an app or selecting a different app screen, clicking to a different screen.  There are probably 25 different events. We can look at those maybe in more detail.

The data bundle also includes some identifiers.  It says here some acronyms.  Those are identifiers.  Those are unique personal identifiers.  They identify that phone and the person who's carrying it.

There's also some further IDs, some Google IDs, that may be included.

And there are also user properties.  These are like demographics, like age, gender, location, other things.  We also could go into those in more depth too if you want to.

Q.   Yes.  Let's stay here for a moment.

Let me just understand.  What exactly is an event data? What is event data?

A.   Event data is one event that's happening in the app on the user's phone.  So it's one thing the user has done, one step.

Q.   Is event data aggregated data?

A.   No.

Q.   So Google -- is Google here collecting event data or aggregated data?

A.   Google is collecting event data.

Q.   So in a typical, for example, action in which I'm, for example, viewing a page on an app, how many event datas might

that collect?

A.   Well, it depends what you do on the page, but it could generate multiple events.  And if you're using an app -- you know, you open an app and you do a variety of things in the app -- you could generate dozens of events, maybe even hundreds.

Q.   If I open an SDK-using app, does that generate an event?

A.   Yes.

Q.   If I'm looking at a specific page on an app, does that generate an event?

A.   Yes.

Q.   If I then move to a different page, does that generate an event?

A.   That's another event.

Q.   When I stop, go to another app, does that generate an event?

A.   Yes.

Q.   When I come back, then, to that app to do something else, does that generate an event?

A.   Yes.

Q.   And does that continue tracking me, collecting events, as long as that SDK is on that app?

A.   Yes.  As long as one of Google's SDKs, either Firebase or Google Mobile Ads, is in the app, those events are being collected.

**Q.**   And all of those events are not aggregated data; isn't that correct, Doctor?

**A.**   No.  They're collected, actually, as individual events, and they're loaded into the data bundle as individual events.

**Q.**   Sir, I apologize.  I interrupted you.

Can you tell us why -- or what is happening here before it goes to that next step called consent checks?  What is that?

**A.**   Okay.  So there's that sort of bold arrow.  That's showing Google taking the data bundle from the user's phone.  That data bundle goes across the Internet and it comes to the second box, which is one of Google's servers.  That's where Google does a variety of processing on that data packet.

So the first thing they do when the data packet arrives is Google makes a copy of the packet.  It duplicates it.  So one packet is received and then Google copies it, and now there are two packets there.

After that's done, Google performs a consent check.

**Q.**   So let me make sure I understand this.

Google collects and copies the data before it checks for consent; is that correct?

**A.**   That's right.

**Q.**   And that is what this graph is actually showing; is that correct?

**A.**   Yes.  And it's doing this regardless of the position of the WAA and sWAA switch.  The position of the switch doesn't

change the collecting or the copying.  That happens every time, all the time.

Q.   So all of the systems designed to check for consent, the data is duplicated before it even does that; is that correct?

A.   Correct.

Q.   Doctor, going back to the second step right here, is DSID a personal identifier?

A.   Yes, it is.

Q.   Is DSID a pseudonym?

A.   Yes, it is.

Q.   How could the DSID both be a pseudonym and personal information?

A.   Okay.  So I'll have to -- I'll have to explain a little bit about that.

It's personal information because it's an identifier. It's a unique identifier for each person.  Each person, each device has one DSID.  And the device is personal.  Your phone is in your pocket.  It's you.  It's very personal.

The DSID is also a pseudonym because it's not your proper name.  It's just, like, a number.

Q.   I see that there's other IDs noted here on this data bundle.  Are those other IDs also personal information?

A.   The IDFA is, because it's also a device identifier.  And the other IDs also are.  Some of the other IDs are -- one of them is an app instance ID.  It's a mouthful.  But the app

instance ID is like a serial number for your app.

Firebase generates a unique app instance ID for each copy of the app.  All right?  So the same way, like, your refrigerator has a serial number that's different from all the other refrigerators, even though they all look the same, it's like a serial number that identifies your copy of the app.

Q.   Can we show the next slide, which is Interrogatory Response -- just page 11, that same interrogatory.

The interrogatory is a sworn statement by Google.  Is that your understanding?

A.   Yes.

Q.   Did you consider this sworn statement response by Google for the purposes of rendering your technical opinion?

A.   I did.  I read it very carefully.

Q.   And what is this response telling you?

MR. SANTACANA:  Objection, Your Honor.  We've objected to the designation of this interrogatory response as incomplete.  There's more to this.

THE COURT:  Well, why don't you put up the entire response.

BY MR. MAO:

Q.   Go ahead.

A.   Sure.  A preliminary step before the consent check occurs is data duplication.

Q.   Okay.

**A.**   And the data referred to there is that packet full of event data and identifiers.

**Q.**   Can you explain the data duplication process here?

**A.**   Yes.  It's copying.  The data is copied.  A single copy of the data packet received from a user's mobile device is made. So one copy is made.  There's an original and now there's a copy.

**Q.**   Do you have any understanding as to why Google decided to make these copies before consent check is actually done?

**A.**   I mean, my inference is that it's -- it's done -- they're creating a copy because that just helps them do what they're trying to do.

**Q.**   Okay.  Dr. Hochman, are there other Google Firebase products that actually checks for consent before the data is actually sent?

**A.**   Could I just add to the prior answer?

**Q.**   Sure.  Please.

**A.**   So, actually, the next sentence is a little bit helpful.

[As read]:

"This is done to facilitate the eventual data logging" -- okay? -- "that respects user consent choices."

**Q.**   Okay.

**A.**   Yes.

**Q.**   So going back to my question, is there -- are there any

Q.    And this was naturally generated by one of the plaintiffs; isn't that correct?

A.    Yes.

Q.    What else was peculiar about this specific event, Doctor?

A.    This event, I believe, showed up in the -- let's just take a look at what log it's in.  Can we go back out?

So if I'm not mistaken, I think this one showed up in the UUAD log.

Q.    Okay.  And what is a UUAD log, Doctor?

A.    It's the unified user app data.

Q.    Just so I understand, is that in the pseudonymous logs or in the personal logs?

A.    Well, to my mind, it's personal because -- I think Google might classify it as pseudonymous, but it's personal because it's user app data.  It's for the user.

Q.    Assuming that this is in the pseudonymous side of Google's logs, does the -- what does the label "unified user app data" actually suggest to you?

A.    "Unified" means all of it together.  "User" means it's data about users' app activity.

Q.    So looking at this particular event -- and this is just one event; is that correct?

A.    Just one.

Q.    Okay.  Looking at this particular event, Doctor, was Google able to reidentify the same user in a subsequent event?

**A.** Yes. User -- Google is able and is doing this for conversion tracking so that they can see the user who sees an ad is the same as the user who makes the purchase. That's critical for them to be able to connect those two together.

**Q.** What is your understanding -- sorry.

Did you consider Dr. Black, Google's expert's report?

**A.** Yes.

**Q.** What is your understanding from Dr. Black as to what UUAD was supposed to do when sWAA's off?

**A.** Dr. Black, I think, said that the sWAA-off data would not appear in UUAD.

**Q.** On the UUAD side when sWAA is off? Are you sure?

**A.** I think that's what he said, yeah.

**Q.** Okay. So does this event surprise you when sWAA is off?

**A.** Yes.

**Q.** If you don't mind, let's go back to the flow chart for Interrogatory Number 1.

So looking at this process, how much data did you receive for our plaintiffs?

**A.** We received 2 gigabytes of data for two plaintiffs over a period of two months.

**Q.** Okay. If their sWAA is off, looking at this process, were they still able to tell who the user was?

**A.** Absolutely.

**Q.** And how would they know that looking at this process,

Doctor?

**A.**   There are tons of identifiers in -- attached to each event.

**Q.**   And looking at the next process, consent checks, how does Google go about doing consent checks?

**A.**   Well, Google knows exactly who the user is in order to do a consent check because they have to look up the position of the user's switches and those are associated with the user's Google ID.

**Q.**   So this type of consent checking happens whether WAA is on or off?  Are you sure?

**A.**   Yes.

**Q.**   And you verified this; is that correct?

**A.**   Yes.  I verified it by Google's own technical answers and by our own testing.

**Q.**   Right.  But my understanding also is that they didn't have to first send a bundle and duplicate before they checked for consent; is that correct?

**A.**   No, they didn't need to do that because the App Indexing service demonstrates that they have the capability to check for consent on the device and stop the taking of data if there's no consent.

**Q.**   And what was the basis for your opinion and understanding of how App Indexing worked?

**A.**   It was Google's -- it was actually, I think, Mr. Monsees

gave some deposition testimony that informed us about that.

Q.   Okay.  Going back to plaintiffs' data for a moment, how much data was produced for the plaintiffs?

A.   I said it was 2 gigabytes.  And if we were to try to print that out, we calculated it, give or take, about a million pages.  That's a stack of paper 30 stories high.

Q.   That is part of the reason why there were so many exhibits that you wanted me to admit; isn't that correct?

A.   Yeah, I guess so.

Q.   Okay.  But do you know whether or not that was all the data that was collected?

A.   For those people?  No.  That was just the slice that Google gave us.  But it looks like there's potentially much more data that Google has, or at least many copies of it.

          MR. MAO:  Can we put up Slide 14.

     Oh, sorry.  If you don't mind just going back, just for the purposes of the record -- I have a note here -- that UUAD slide.  If you can go back to the UUAD slide.  It had a number on that.  It was Exhibit Number 443 -- or 442.  I just want to make sure we have that for the record.

     Okay.  Sorry.  For plaintiffs' data.

BY MR. MAO:

Q.   What is your understanding, from Google's sworn responses back to you, as to whether or not they have produced all of plaintiffs' data?

**A.**   No.   They said they -- it was impractical for them to produce all of plaintiffs' data.

**MR. MAO:**   Can we put up that interrogatory.

**BY MR. MAO:**

**Q.**   Okay.   Can you read into the record the Interrogatory Number 14.

**A.**   Yes.

[As read]:

"Please identify every data source (including logs) that includes or during the class period included WAA-off data.   For each such data source, please include a list of field names and descriptions, the retention period, and how such data sources are used."

**Q.**   And what was their response that you selected, Doctor?

**A.**   So it's -- Google's response was [as read]:

"... it is not practical or relevant to account for every single potential data source (including logs) that may contain such data because there are various downstream users of the pseudonymous data described in response to Plaintiff's Interrogatory Number 1."

**MR. SANTACANA:**   Your Honor, I object.   We counterdesignated the full paragraph.   If it's going to be read into the record, it should all be read into the record.

THE COURT:  Let me see the rest of the --

MR. SANTACANA:  This is the full paragraph on the screen here.

THE COURT:  Well, so you're -- the only part that hasn't been read into the record is the last sentence?

MR. SANTACANA:  No.  He hasn't read above or below the highlight.

THE COURT:  Well, you can ask him, then, on -- when you cross-examine.

MR. SANTACANA:  Okay.  I will.

BY MR. MAO:

Q.   They didn't produce all of your data, did they?

A.   Oh, no.

Q.   Do you have an idea whether or not this is happening to the entire class?

A.   Yes.  This is happening to the entire class because the system, it's systemic.  It's processing these events the same way for everybody.

Q.   Just based on the data that's been produced for the plaintiffs, the limited data that you identified, how much data are we actually talking about in terms of what they've collected on the class, in your estimate?

A.   Just doing some thumbnail math, there's 98 million plaintiffs, 98 months.  They have 174 million devices because some people have more than one device.  If you multiply that

all out, we get 4.5 quadrillion pages.  That's a big stack of paper.  If you start stacking it up, it'll go all the way to the sun from the earth three times.

Q.   Does the event data also include location data?

A.   Yes.

Q.   So with things like location, your background, and also the various IDs that Google has, is Google able to reidentify the user?

A.   Absolutely.

Q.   I want to just go back to this concept of conversions really fast before I go on to the next section.

Why is conversions important for Google's business?

A.   Conversions are how Google justifies value to the advertiser.  It's what gives the advertiser the incentive to spend more money.

Not only that, some of Google's advertising products are actually charged per conversion.  So an advertiser can go out and buy an app promo ad.  If they want to stimulate people to download and use their app, they can place ads and they can pay Google a bounty every time someone sees the ad and responds to it and downloads and launches the app.

Q.   What is the difference between an app promo ad and Google Mobile Ads?  It might help the jurors.

A.   Sure.  App promo ad is one kind of ad.  And also the app promo ads tend to be priced -- because they're priced often

per conversion, they tend to be -- that price is much higher than the price of just buying someone to view or click your ad, because you're buying a result.

Q.    Is a price per conversion different than other types of prices which Google might charge advertisers?

A.    Yes.  It could be -- you know, it could be a thousand times more than the price of just merely showing someone an ad because you're paying for a result.  If you're advertising, sometimes you have to show your ad thousands and thousands of times to get a result.  But with a conversion, you just pay when someone -- when you've gotten the result.

Q.    And what type of ad events are more valuable to Google and its advertisers?  Serving the ad or actually getting a result?

A.    The advertisers are focused -- having worked with many advertisers over a couple decades, my experience is that the advertisers are very focused on results.

Q.    In order for you to be able to track a conversion, do you need more than one data point?

A.    You do.

Q.    What kind of data points do you need?

A.    Well, there's not only conversion; there's also attribution.

Q.    Okay.

A.    I'll have to digress a little to explain that.

Google not only wants to tell advertisers that this ad led

to this sale; they want to be about able to show:  Look, there's a whole sequence of ads.  View-through conversions is what they call them.  But they want to be able to attribute value to all the different interactions that person has before they make a purchase, for example.  Okay?

The path to the purchase is often not a straight line.  It's like a pretzel.  Right?  The person does some searching online.  They might do something on their phone.  They might talk about it with someone else.  They might go do another search.  It could be -- they could be wending around for a while, especially for a big-ticket purchase.

And the advertiser wants to be able to influence them at the various stages -- okay? -- at the point where they're considering, where they're trying to make a decision, where they're gathering more information.

So Google wants to be able to present information and data about that whole consumer journey.  In order to do that, they need to be able to connect the dots.  They need to be able to connect this ad to this ad to this ad, finally to the purchase over here.

**Q.**   Is there any dispute in this case that Google uses sWAA-off data for conversions?

**A.**   No.

**MR. MAO:**  I want to just move on to -- if you don't mind putting up Exhibit Number 72.

is on or off, is the data which Google has identified as personal and pseudonymous, are they stored together or are they stored separately?

A.   Sometimes -- there's some places where they're stored separately, and there's some places where they're stored together.

Q.   Okay.  When they are stored together, do you know the places -- all the places in which they are stored?

A.   I know some of them, but Google has said that they have other places this data goes that they can't even enumerate, it's so many.

Q.   And you have asked for that in this litigation, for the places -- for all the places in which that data is stored?

MR. SANTACANA:  Objection, Your Honor.  403.  It's a discovery dispute.

THE COURT:  Sustained.

BY MR. MAO:

Q.   You're not aware of all the places in which all the data is stored; isn't that correct?

A.   That's correct.

Q.   Whether for sWAA-on or sWAA-off users; isn't that correct?

A.   Correct.

Q.   And you're currently not aware of any way for any of those users to be able to access all of their data; isn't that correct?

**A.**   That's correct.

**Q.**   Are you aware of any way for all of those users to be able to control all the data which Google has stored on them for sWAA-off activity?

**A.**   No.

**Q.**   If I can move on to the "What Google Does When sWAA Is Off" slide.

Did you design and write this slide, Doctor?

**A.**   I did.

**Q.**   Okay.  Can you explain to me what you are trying to show here?

**A.**   This is a maybe more user-friendly schematic.

So there's the phone and there's an app, and Firebase is in that app or Google Mobile Ads is in that app or maybe both of them are in that app.

And those are some of the things that are being taken by Google:  the user information, like age, gender, and interest; the device information, like the operating system, the version of the operating system; what type of device it is; who the manufacturer is; there's app usage data -- that's that event data -- there's a timestamp; and then there's also location data.

And all that stuff is being taken by Google.  It goes to Google's server, which then is copying and further processing the data.  And that data ends up in a bunch of logs in Google's

data warehouse and it gets stored by Google, and it's used to drive their ad revenue, to support their advertising system, to do things like conversion tracking and attribution.  It's also used for product development and improvement.  They analyze the data and use it to help develop their products.

And Google uses the data to train AI because Google's advertising system is -- heavily utilizes machine learning in order to be able to do predictions about which ads a person is going to respond to, in order to do personalization, in order to advise advertisers how to bid as efficiently as possible. So they have automated bidding that's driven by machine learning.  So all this data feeds into that AI use.

**Q.**   In terms of this advertising revenue corner that you're talking about, can Google link device ID and other sWAA-off data to, for example, a user's email address?

**A.**   Could they tie it to a user's email address?

**Q.**   Yes.

**A.**   They could.

**Q.**   There is nothing technically preventing Google from linking or joining any of these different IDs, is there, on a technical level?

**A.**   No, there's no technical thing that stops Google from doing it.

**Q.**   Have you seen any documents, disclosures, or representations from Google to any of its users that it won't

relink any of this?

MR. SANTACANA:  Objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I haven't seen any such document.

BY MR. MAO:

Q.   And there's no technical barriers to all of this data being relinked, isn't it?

A.   That's correct.

Q.   Okay.  Looking at the ad revenue component here for a moment, are there any technical barriers for the purposes of that part of the business?

A.   One second.  I'm going to ask you to reask the question because this is important --

Q.   Sure.

A.   -- and I want to be sure it's got all my attention.

Could -- just could you ask it again?

Q.   Go ahead.  Just...

For ad revenue, is there any technical barriers for Google to not be able to collect sWAA-off data?

A.   Is there any technical barrier for Google to not be able -- in other words -- I don't think so.

Q.   For all of Google's business, are they able to switch on the technology which they use for App Indexing, for example, where they actually check for consent before they collect the data?

**A.**   Yeah.   They could apply that technology to the other SDKs and have them work the same way.

**Q.**   Does Google incur any noticeable incremental costs from the taking, copying, and using of WAA-off and sWAA-off data?

    **MR. SANTACANA:**  Objection, Your Honor.   There's no disclosed opinion on the costs.

    **MR. MAO:**  I'm talking about technical costs.

    **THE COURT:**  I'll allow it.   Overruled.

    **THE WITNESS:**  Yes.   I've given the opinion that Google's data processing operation is so massive that even though this sWAA-off data is quite voluminous, it's still just a little piece of their total data operations.   And, therefore, they've got all these data centers and all the fiber, it's all in place so -- and it's not -- it doesn't impose an additional cost on them.   They've already got it.

**BY MR. MAO:**

**Q.**   In sworn statements, Google has admitted that it does join different pseudonymous records for the purposes of ad interactions and ad conversions; isn't that correct?

**A.**   Yes, they have.

**Q.**   Okay.   Can we put up the Supplemental Response to Interrogatory Number 15?

Did you review and look at this interrogatory response for the purposes of rendering your professional opinion?

**A.**   I did.

A.   This was over a two-month time period.

Q.   Okay.  So, go ahead.  Can you finish your description?

A.   Sure.  This report is for Plaintiff Harvey, non-Google app activity with sWAA off.  Okay.  And this is -- actually, it's very clearly stated:  October 15th, 2021, to December 20th, 2021.  So it's two months and five days.  Okay?

And this is also broken down by the app -- which app, the number of records per app.

Q.   And, again, is this event data or is this aggregate data?

A.   This is event data.

Q.   Okay.

A.   It's a count of the event data.

MR. MAO:  Your Honor, I'd like to move in the exhibit, Exhibit PX489.

MR. SANTACANA:  No objection.

THE COURT:  489 will be admitted, and it may be published to the jury.

(Trial Exhibit PX489 received in evidence.)

MR. MAO:  If we can put up 491.

Sorry.  Can we show 489?

THE COURT:  Right.

MR. MAO:  Can we go back to 489 just so they can see it -- so the jurors can see it?

BY MR. MAO:

Q.   Just so I understand, Dr. Hochman, your understanding is

that this is a natural collection?  This wasn't a test; right?  This is their past data; is that correct?

A.   Yeah, this is a natural -- well, I would call it a natural test.  This is their natural activity that we then collected and analyzed.

Q.   And, again, by the number of records, you mean the number of event records?

A.   Correct.

Q.   Okay.  If we can go now on to 491.

Doctor, can you explain 491 so I can introduce it into evidence?

A.   Yes.  This is another summary.  For whatever reason, when Google produced the data to us, it came in two files, so we -- we tallied them separately.

Q.   So did you prepare 491 as well?

A.   Yes.

Q.   Okay.  And can you explain what exactly you did?

A.   Yeah.  It's the same thing I did with the other one.  We filtered out any non- -- any sWAA-on activity.  So we were looking at sWAA-off activity only, sorted it by app, and then took a count.

MR. MAO:  Okay.  I'd like to offer into exhibit Number 491, Your Honor.

MR. SANTACANA:  No objection.

THE COURT:  491 will be admitted.

(Trial Exhibit PX491 received in evidence.)

BY MR. MAO:

Q.    Okay.  Can you explain to me, is this aggregated data or is this event-level data?

A.    All right.  This is event-level data.  It's a count of the event-level data.

Q.    And from what period to what period was this?

A.    This is October 15th, 2021, to December 20th, 2021.

Q.    Was this natural or was this test data?

A.    It's the same as before.  It's the natural activity.

Q.    Okay.  And was this with WAA on or WAA off?

A.    This is with -- the sWAA is off, which means either WAA is off or sWAA is off.

Q.    Okay.  I'd like to introduce 492.  Before we show it to the jury, just talk about the preparation.

Okay.  So 492, were you involved in the preparation of this?

A.    Yes.

Q.    How did you go about preparing this?

A.    The same as with the other ones.  Filter out any irrelevant activity.  This is -- and this is the sWAA-off data for Plaintiff Rodriguez between October 15th, 2021, and December 20th, 2021.

Q.    Again, is this aggregate or event-level data?

A.    This is event-level data.  It's a count of the number of

events per app.

MR. MAO:  I'd like to move -- sorry.  Can I see what exhibit we're on?

THE COURT:  492.

MR. MAO:  Okay.  I'd like to move into exhibit Number 492.

MR. SANTACANA:  No objection.

THE COURT:  492 will be admitted.

(Trial Exhibit PX492 received in evidence.)

BY MR. MAO:

Q.   Okay.  Can you explain to me what we have here for 492?

A.   Yeah.  This is the second list for Plaintiff Rodriguez.

As I said before, because the data was produced to us in two files, we just compiled two separate lists.

Q.   And, again, this is event-level data for each of these different apps; is that correct?

A.   Yes, this is event-level data.  It's a count of the number of events that we have.

Q.   So looking at Exhibit 492, which I think is shown to the jury now, can you give me a sense of how large is the volume generated by the records referenced in this exhibit?

A.   In this exhibit -- well, let's scroll down to the bottom, and let me look at the total and see if it's accurate.

Yeah, it looks like there's 49,000 events that were in that record.

Q.   And just exactly -- what exactly is that kind of volume we're talking about?

A.   49,000 events?

Q.   Yes.

A.   Well, there's, like, 14 pages per event.  So if you want to multiply that out --

Q.   I see.

A.   -- well, it's a lot of pages.

Q.   Okay.

MR. MAO:  All right.  And then lastly, Your Honor, I just want to proffer 493 and discuss that real fast to lay a foundation.  493 should be the last 1006.

BY MR. MAO:

Q.   Doctor, were you involved in the preparation of Exhibit 493?

A.   Yes.

(Co-counsel confer off the record.)

BY MR. MAO:

Q.   Were you involved in the preparation of 493?

A.   Yes.

Q.   Can you tell us what exactly you were trying to do here?

A.   Well, again, this is a count, by app ID, of the number of events that were in the file.

Q.   Again, with sWAA off; is that correct?

A.   Yes, this is sWAA-off data.

MR. MAO:  Your Honor, I'd like to move into evidence Exhibit Number 493.

MR. SANTACANA:  No objection.

THE COURT:  493 will be admitted.

(Trial Exhibit PX493 received in evidence.)

MR. MAO:  Okay.  If we could display that to the jury.

BY MR. MAO:

Q.   Is this aggregate-level data or event-level data?

A.   This is event-level data.

MR. MAO:  Okay.  Can we just scroll down to the bottom so that we get a sense of the volume.

THE WITNESS:  Can you scroll back up to the top?

BY MR. MAO:

Q.   Sure.

A.   Hold there.

Okay.  Yeah, I think it's about 9,000 records.

Q.   Okay.  So looking at this, this is the type of volume of data that's being collected at an event level that's causing things like depletion of battery life; is that correct?

A.   Yes.

Q.   And this is being collected directly from the devices; isn't that correct?

A.   Yes.

Can you give me one more second?  I just want to look at this --

Q.   Sure.

A.   -- the numbers a little more.

     (Witness examines document.)  Yeah.  Okay.  Thank you.

          MR. MAO:  We have one more record, Your Honor, that we'll just deal with later, if you don't mind.

BY MR. MAO:

Q.   I'm just going to -- can you please explain the difference between aggregate and event-level data?

A.   Yes.  Aggregate data would be, like, a total.  So Google might report to an app developer and say, "Your total number of daily active users for a certain day was 50,000 users."  That's an aggregate statistic.  It's not saying who those 50,000 users are.  It's just giving them a total, like this is the size of the population of people who used your app or who -- you know, who downloaded and installed the app today.  It would be some sort of business metric in aggregate, total statistic.

Q.   For the purposes of the technology that we're talking about here, why does that difference between aggregate versus event-level data matter?

A.   Well, what matters is that the data that's taken from the phone is event-level data; and Google's taking that data, they're copying it, and they're using it.

     The aggregate data is what's reported out to the app developer.  They don't get the event-level data.  That's Google's data.  They keep that.  Actually, it's the user's data

that Google's got possession of.

Q.   Did the WAA and sWAA technology operate as it was described -- as it was described, question mark?

A.   No, according to my test, it did not operate as described.

Q.   Why, in your opinion, did it not operate the way it was described?

A.   Well, the fundamental issue is that the data would be taken and copied before the consent check was done.  So there's no possibility of that consent check affecting whether the data would be taken and copied because Google didn't even look until after they'd already taken and copied the data.

Q.   Is the data taken and copied, is it de-identified?

A.   No.  The data is personally identified.  It's absolutely -- Google, upon receiving the data, knows who that user is.

Q.   And can that data, the sWAA-off data, can that be reconnected?

A.   Yes.

         MR. MAO:  That's all I have for direct, Your Honor.

         THE COURT:  Mr. Santacana?

         MR. SANTACANA:  Your Honor, I'm handing up Dr. Hochman's deposition transcript and expert report for your reference during the examination.

     You got your binders?  Mr. Mao, are you ready?

         MR. MAO:  Yes, please.

**CROSS-EXAMINATION**

**BY MR. SANTACANA:**

**Q.**   Okay.  Good morning, Dr. Hochman.

**A.**   Good morning.

**Q.**   It's nice to see you again.  You and I have met before; right?

**A.**   Yes.

**Q.**   We met at your deposition?

**A.**   Yes.

**Q.**   We spent a day together, and you testified that day under oath?

**A.**   Yes.

**Q.**   And that day you did your best to tell the truth under oath; right?

**A.**   Yes.

**Q.**   And we haven't met since then until right now?

**A.**   I think that's correct.

**Q.**   Great.

Now, you agree, Dr. Hochman, that your role here as an expert is the role of someone who is attempting to be neutral. Is that fair to say?

**A.**   Yes.

**Q.**   Your job here is to explain the facts as accurately as you can; right?

**A.**   Yes.

well, here's some switches and they should do what they say, and there's Google Analytics, which provides me with aggregated data. I didn't see an immediate contradiction.

Q. You did not see an immediate contradiction when you joined the case. That's exactly what you said in your deposition; right?

A. Well, it's great that I remembered it, yes.

Q. Now, this case focuses on data that's collected by analytics SDK, which is the Firebase SDK and the Google Mobile Ads SDK. Fair to say?

A. Yeah. I'll just be super precise so that no one gets confused. It's collected by Google Analytics for Firebase, which is the product within that Firebase SDK, and also in Google Mobile Ads SDK, yes.

Q. The SDKs in apps that we are talking about, they are installed by the app developer, not Google; right?

A. Correct.

Q. Google doesn't go to Reddit and say, "I'm putting this SDK in your app"?

A. All right. There's a little wrinkle. I just want to be clear. There was a time when Google pushed out an update of the SDK, one of these SDKs, and actually inserted Google Analytics for Firebase into the SDK. So just to be clear, I think I've documented that in my report.

Q. Are you giving the opinion that Google forced developers

to use any of these SDKs?

A.   No.

Q.   Okay.  Now, Google Analytics has features that are on automatically and it has features that are customized by the app developer; right?

A.   That's right.

Q.   Developers can choose which types of information to send to Google, can they not?

A.   That's correct.

Q.   There are events that are automatically collected; right?

A.   Yes, that's right.  They're called the default events.

Q.   The default events.  Earlier we saw one called first open. That's a default event; right?

A.   Yes.

Q.   But developers can create custom events to add on more information; right?

A.   That's correct.

Q.   And they do that because there might be something in the app that they want to track and understand how it's working that's not offered by Google as a default?

A.   Yes, that's right.  There are custom events.

Q.   Developers can also choose which user parameters go along with these custom events; right?

A.   Yes.

Q.   Google has no role in choosing those.  There's some

default ones, but developers can send a lot more; right?

A.   Yes.  The developers can choose what data they send to Google, and Google can choose whether to accept that data and save it or not.

Q.   Now, you are not aware of any evidence in this case that Google does anything to try and understand what a developer's custom event actually means?  You're not aware of any such evidence; right?

A.   That's right.  I'm not aware of Google attempting in any way to implement safeguards against developers uploading information that's against policy.

Q.   You -- let's talk about the logs that you discussed with Mr. Mao.

When sWAA is turned off, you concede that Google logs the app activity data in question into a non-GAIA log.  You concede that; right?

A.   I've said that.  I don't -- yes, I've said that.

Q.   And you concede that Google Analytics actually doesn't even log IP address; right?

A.   Wait a second.  Google Analytics is the product that displays the data to the Web developer.  Do you mean Google Analytics for Firebase?  If so --

Q.   I do mean that.

A.   Okay.  I believe the IP address is sent along in the data packet.  I believe we've seen it in the packet.  After the data

Q.   You also have done nothing to study how frequently this happens; right?

A.   Right.  I haven't done a statistical survey.  This is just something -- this was like an incidental finding.  We just accidentally found this happening.  I think there were two sites I remember, Career Karma and *Washington Post*.

And then in our test app, we actually tried to do it ourselves to see if maybe it wasn't repeatable, but it was repeatable.  We were also able to do the same -- cause the system to do the same behavior.

Q.   So just to be totally clear with this jury, Google, by default, in Google Analytics, does not collect email addresses; right?

A.   I'll just -- I want to be clear.  It's in Google Analytics for Firebase, which is part of the Firebase SDK, and Google Mobile Ads SDK.  Those products are not, by default, taking the email address in this form.

Q.   Google's SDKs at issue in this case were not designed to collect email addresses; correct?

A.   They're not the default -- they're not part of the default data that is collected.

Q.   Nor does the default design result in the collection of names; right?

A.   The default design is not to send the user's name, no.

Q.   Nor does the default design result in the collection of

phone numbers; right?

A.   Correct.

Q.   Addresses; right?

A.   Correct.

Q.   Billing information?

A.   Well, as far as addresses are concerned, just the default does collect location information, which can be very identifying.  But it's not collecting the user's mailing address; it's not collecting billing information, no.

Q.   Okay.  I want to make sure I got your testimony very clear because we're going to come back to this.

Your testimony is that the location information that comes with Google Analytics data is very identifying?  That's your testimony under oath?

A.   Yes.  If you have a sequence of location information, even if it's been approximated, that sequence forms an indication of -- that can be specific to a user.

Q.   Okay.  I'm glad that you made that clear.

You mentioned that Google Analytics for Firebase somehow also involves information about the interests of users.  Do you recall that?

A.   Yes.

Q.   You have no idea how the interest information in the data that you reviewed was generated; right?

A.   Well, I wouldn't put it that way.

Q.   Well, you didn't disclose any such idea in your expert report, did you?

A.   Just to be clear, that data, that interest information, somehow the app gets it.  I'm not concerning myself with how the app got that information.  But if the information is there in the app, Google Analytics for Firebase will extract it from the app and put it into that data bundle, and Google then takes that data bundle on its server and it starts, you know, copying it and processing it and doing everything that we've discussed.

So the thing that's happening is Google is taking that data from the phone.  Now, how it got in there, I'm not saying how it got there.

Q.   You do not know?

A.   Well, I think that it's sort of not -- that's not my opinion of how it got there.  It's just that the data, if it's in the app, Google Analytics for Firebase will collect that interest data by default and send it along.

Q.   Okay.  Now, I think you mentioned that Dr. Black, who responded to your expert report, did some math about this incidental amount of email addresses and names that comes through Google Analytics.

A.   Yes.

Q.   And just to put numbers on it, the incidental amount, he found that for one of the plaintiffs, 16,009 out of the 16,163 entries in the data had no such toxic data in them; right?

one the YouTube video counter because that would open it up to fraud, would it not?

A.   Again, this is a -- this is a different problem.  It's a different matter.

Q.   You are a very smart man.  I'm sure you can think through this one.

A.   I'm not going to shoot from the hip and redesign Google's ad and video auditing systems while I sit here on the stand.  I can't do that.

Q.   Do you recall earlier today when you said that the location data that Google Analytics sends is very identifying?  Do you remember you said that?

A.   Yes, it could be.

Q.   And I asked you to confirm that that was your under-oath testimony; right?

A.   Yes, and I explained it in further detail.

Q.   I also asked you, at the very beginning of this examination, if you discovered a mistake in your opinions, you would correct it; right?

A.   Yes.

Q.   Okay.  You personally observed location data in the form of latitude and longitude in the data that you reviewed; right?

A.   Yes.

Q.   And you summarized the records that had latitude and longitude in them, and in that summary, you put in -- you put

in how many records were associated with each latitude and longitude; right?

A.   Let's take a look at the document because I -- wow, there were a lot of documents in this case.

Q.   Well, let me ask you this:  Is it your testimony today that the latitude and longitude that you observed in, for example, Plaintiff Susan Harvey's pseudonymous log data that was provided by Google to you, that that latitude and longitude was very identifying?  Is that your testimony?

A.   Ah.  So I just want to be clear.  I'm aware that the latitude and longitude that Google eventually puts in the logs may be city level; in other words, it may not be precise.  I'm aware of that.

The point I'm making is a little different point than the one you're, I think, trying to fix, which is that when you look at someone's history, when there is many, many readings --

Q.   Uh-huh.

A.   -- you can say the person was in this city, then they were in this city, and now they're in that city, and people have patterns.  Over time, this pattern is identifying.  You develop a unique signature of your travels.  That's the point I'm making.  It's a subtle point and it's a different point than one, I think, you're trying to get at.

Q.   Well, I want to make sure it's clear for the jury because I don't think it was clear when you were testifying earlier.

The latitude and longitude data that is sent to Google when sWAA is off from these SDKs is the city center of the city the user's device is in; correct?

A.   I absolutely agree with you.  That's correct.

Q.   It is the center -- if they're in Sacramento, like Susan Harvey was, that latitude and longitude tracks to the center of Sacramento; right?

A.   Yes.

Q.   She could be on the very edge of Sacramento and the latitude and longitude is the center of Sacramento?

A.   Yes.

Q.   So your testimony is that if she moves around cities a lot, someone who is a nefarious actor might somehow form a -- find a pattern in that and figure out that it's Susan Harvey who did that.  That's your testimony?  That's what you're worried about?

A.   Well, essentially the facts of it are, if you have a sequence of location data, and especially if you overlay it with some of the other rich data that's in the record, it can form a signature, an indicator of who that is.

Q.   Now, I want to make sure you're very clear because you said it was very identifying, and I want to make sure the jury understands.

You are not saying here today that Google uses the data from these SDKs to figure out where devices are or to whom they

belong, when sWAA is off, based on the city center that is in that data packet?  You haven't seen evidence that Google is taking steps to do that; right?

A.   No.

Q.   Okay.  Now, in the course of your work analyzing all of the data in this case, you actually found no evidence that Google has ever joined together, in the same log, a user's device ID and that user's GAIA ID?

A.   I'm just thinking if there may be an exception to that.  I mean, the key thing is that I haven't seen all the logs that Google keeps.

Q.   I don't think that is the key thing, Dr. Hochman.  The key thing is that I asked you a very specific question and you didn't answer it.  So I'm going to ask it again.

You have found no evidence that Google has ever joined together, in the same log, a user's device ID and their GAIA ID; correct?

A.   I don't think I've -- I don't recall whether I found that or not, but I don't recall having found it.

Q.   And you also found no evidence that Google actually did join sWAA-off data together with a GAIA ID, no evidence of that?

A.   I understand that Google claims to have a policy against doing that.

Q.   In fact, in your words, Google actually has the best

intentions of keeping that data apart.  You've said that under oath; right?

A.    I think I said something, but we should probably look at what exactly I said.

Q.    Do you doubt -- based on your review of the design of Google's systems, the consent check on different servers, the separation of pseudonymous data, do you doubt that Google's design is there to separate GAIA ID from analytics data when sWAA is off?

A.    My understanding is that Google is attempting to separate the data.  At the same time, that's at the downstream point.  But at the same time, when the data is actually collected by Google, all of the data, as it comes in, Google knows exactly who that is at the time it's being taken and copied before even the consent check is done.  And that, I think, is important to keep in mind.

          MR. SANTACANA:  Your Honor, I move to strike everything in that response beginning with the phrase "At the same time."

          THE COURT:  Overruled.  These questions are --
overruled.

BY MR. SANTACANA:

Q.    Dr. Hochman, you were asked earlier if Google is able to reidentify the user using sWAA-off data.  Do you recall that question?

**A.**   Yes.

**Q.**   If Google is able to, and you said absolutely.  Do you remember that?

**A.**   Yes.

**Q.**   You are not giving this jury the opinion that Google has ever, in fact, reidentified the user; right?

**A.**   In terms of has Google done that?  I don't have -- I don't say that Google has done that.  Google says that they don't, and that's where I have to leave it.

**Q.**   You also said there is nothing technically preventing Google from relinking all of this data together.  Do you remember saying that?

**A.**   Yes.

**Q.**   Now, in order to relink all of this data together, which you say is technically possible, would you agree with me that to do that, Google would have to change the way its systems work?  That is not how they work now.

**A.**   Okay.  So you're asking me to make a categorical statement about how all Google systems work, which I haven't observed.  So I'm not going to contradict you, but I'm not going to confirm your assertion either.

**Q.**   Well, you made a categorical statement when you said that nothing is technically preventing Google from relinking all of this data.  You remember saying that?

**A.**   Yes.  The data, by its nature, by being rich data, full of

identifiers and full of details about the person, lends itself to reidentification, and preventing reidentification is a very hard problem.  And as a result, my opinion is that nothing stops Google from reidentifying it.

Q.   But Google hasn't done it.  You're just saying it's technologically possible.

A.   Well, I mean, I also observe that Google has a policy against doing it, and one has a policy because one is trying to prevent something from happening that could happen.  If it was impossible, then there would be no need for a policy.  They would just -- it would never happen.

        MR. SANTACANA:  I move to strike the answer as nonresponsive, Your Honor.

        THE COURT:  Overruled.

BY MR. SANTACANA:

Q.   Dr. Hochman, you are not offering the opinion in the case, I want to be very clear, that Google has actually relinked sWAA-off data; right?

A.   I'm not offering the opinion that Google has relinked sWAA-off data with the GAIA data.

        MR. SANTACANA:  I have no further questions, Your Honor.

                    REDIRECT EXAMINATION

BY MR. MAO:

Q.   Good afternoon, Dr. Hochman.  I will try to make this

quick.

You were just asked a number of questions about battery depletion.

Can I put up the battery depletion interrogatory just so we can put that into the record?

Can you -- have you seen this interrogatory response before?

A.   I have.

Q.   Did you consider this interrogatory response for the purposes of rendering your opinion in this case?

A.   Yes.

Q.   And where in this interrogatory response does it tell you that battery depletion is an issue for Google when it's collecting sWAA-off data, notwithstanding sWAA button being off?

A.   Sure.  Let's look at the second paragraph [as read]:

"For Android apps with Google Play services enabled, GA for Firebase data is collected from all apps into a central file called App Measurement DB, which is periodically uploaded to Google's servers. Google does this because it saves battery for users whose devices would otherwise be initiating more uploads every day.  On iOS devices this is not possible, so each GA for Firebase-enabled app periodically transmits the data to Google's servers

individually."

Q.   How does this response, on Google's response to Interrogatory Number 1, a sworn statement, how does this show battery depletion?

A.   It shows that battery depletion is something that they have to think about because it's material.  It's meaningful or they wouldn't have had to talk about it here when they explained how their system works.

Q.   Moving on from this, if we could go to Exhibit 72, slide.

THE COURTROOM DEPUTY:  Did you say Exhibit 172?

MR. MAO:  Sorry.  PX72, yes.

THE COURTROOM DEPUTY:  That's been admitted; right?

MR. MAO:  That's been moved into evidence, yes.

BY MR. MAO:

Q.   You were asked a number of questions about Google Account and also personal information.  Okay?

I believe that when we were talking about personal information, we were trying to figure out whether or not the type of data specified under this definition of "personal information" was something which you actually saw in Google systems.  Do you recall that?

A.   Yes.

Q.   Okay.  Looking at the type of data with the type of IDs in the system, is there anything within the pseudonymous IDs, the Google pseudonymous IDs, that does not fulfill the definition

of "personal information" on a technical level?

A.   No.

Q.   And why is that, Dr. Hochman?

A.   Because all of that information, Google could link it back to the user if they decided to do so.

Q.   Under this definition, is there anything from this definition that requires Google to say that the only thing that personally identifies you is the GAIA ID?

A.   No.

Q.   The other IDs we talked about -- Google's device ID, the app instance ID, and other IDs which you enumerated -- can those things be things in which Google decides to personally identify you?

A.   Yes.

Q.   And, in fact, Google does that for the purposes of ad measurements; isn't that correct?

A.   Yes.  When they collect data in certain logs for ad activity, they do link these up in order to count conversions and to do ad attribution.  I talked about that earlier.

Q.   And you haven't actually seen all of the logs which Google has on the plaintiffs; isn't that correct?

A.   Correct.  There's more that's unseen.

Q.   Right.  And defense counsel accused you of undersampling, but the fact is that you didn't get that which you asked for; isn't that correct?

MR. SANTACANA:  Objection, Your Honor.

MR. MAO:  He opened the door, Your Honor.

THE COURT:  I'm going to sustain that objection.

Go ahead.

BY MR. MAO:

Q.   Okay.  Did you get all the logs which you requested?

A.   No.

MR. SANTACANA:  Objection, Your Honor.

THE COURT:  Yeah, don't.

MR. MAO:  Okay.

THE COURT:  What was discovered in the discovery process is not for this witness.

Go ahead.

BY MR. MAO:

Q.   Were there other logs that you -- that would have been relevant to your investigation?

A.   Yes.

Q.   Were you able to get your hands on those?

MR. SANTACANA:  Objection, Your Honor.

THE COURT:  Don't ask those questions.  The last question was appropriate, not this one.

MR. MAO:  Okay.  Yes, Your Honor.

BY MR. MAO:

Q.   Moving on here, defense counsel talked about the opening statements.

on, starting at the top there?

**A.**   Sure.   Info about your browsing and other activities on sites, apps, and devices that use Google services.

**Q.**   And what about the two bullets there?

**A.**   Yeah.   Sites and apps that partner with Google to show ads and sites and apps that use Google -- service -- services, including data apps that share with Google.

**Q.**   And do you see in the box below, it says, "To let Google save this information, Web & App Activity must be on"?

**A.**   Yes.

**Q.**   So what should happen when you turn Web & App Activity off?

**A.**   Like before, everything that it says it would save, it should not save.

**Q.**   All right.   You mentioned that you have a specific memory of reading the Google privacy policy and disclosures about WAA --

**A.**   Right.

**Q.**   -- and turning off WAA in 2018?

**A.**   Right.

**Q.**   Okay.   So let's just set the stage for that.   Let's take a look at DX 941.R2, which is already in evidence.

        This document was shown during Mr. Monsees' examination, as well as Mr. Santiago's examination.   Do you remember that?

**A.**   Yes.

Q.   Both times that this document was shown, did they ever go to the second page of this document?

A.   I don't recall, no.

Q.   Okay.  Let's focus on the peteysake08@gmail account.  Do you see that?

A.   Yes.

Q.   And is that the Gmail address associated with your Android phone?

A.   It is.  It's on my phone.

Q.   And has that been the case for how long?

A.   A very long --

Q.   That would be since 2016?

A.   Yeah.  A very long time.

Q.   All right.  Let's flip to the second page.

And so at the top there, you can see that the account email section is blank because it's still peteysake from the first page.

A.   Right.

Q.   Do you see that?

A.   Mm-hmm.  Yes.

Q.   And you see the timestamp for WAA shows that you turned WAA off November 4th, 2018.  Do you see that?

A.   I do, yes.

Q.   And sWAA is also off?

A.   Yes.

Q.   And then you see that in 2018, it turns back on?

A.   Yeah.  I'm not too sure why.  I don't know why that would happen.  It's happened before, but I can't explain why.  But sWAA is still off.

Q.   And did you see -- did you turn the WAA button back on when you noticed that it was turned on?

A.   I'm sorry.  Say it again.

Q.   Did you turn -- I'm sorry.

     Did you turn the WAA button off again when you noticed that it was back on?

A.   Yes.

Q.   Okay.  Now let's focus on the sWAA column, since the case is about third-party apps.

     Has sWAA been continuously off since November 4, 2018?

A.   Yes.  It looks like, yes.

Q.   And does it remain off to this day?

A.   Yes.

Q.   Now, if you take that -- and keep the document, but let's minimize the blowup part, the pop-up.  Thank you.

     You see that there was a couple of other Gmail addresses on this page, and I think there was one on the prior page too.

A.   Right.

Q.   Are these the accounts that you were referencing earlier today?

A.   Yes.

A.   That's what it says here, yeah.

Q.   And it also says that you agreed to Target sharing your data with an analytics company called Crazy Egg.  Do you see that?

A.   Yes.

Q.   Do you know what Crazy Egg is?

A.   I don't.

Q.   You don't?

A.   I don't know what Crazy Egg is.

Q.   But you agree that the language you are looking at on the screen was part of your deal with Google -- with Target?

A.   With -- with Target, right.

Q.   I keep calling Target Google.  I'm sorry.

A.   That's okay.

Q.   Part of your deal with Target was that Target was sharing your data with third parties, including Google Analytics?

A.   Right.

Q.   And Crazy Egg?

A.   Right.

Q.   And Adobe Analytics?

A.   Right.

Q.   And you were okay with all of that?

A.   They're just getting my -- they're just getting my data from Target alone.  That's -- I mean, they're not -- they -- they're not saying they're getting all my app information from

my phone.

So -- and, again, going back, it's -- it's like you said, my deal was with Target and Google.  So if Google is -- if I made a deal with Google, saying, "Don't collect data from this specific app or all apps on my phone," I think Google should honor that.

Now, if we're talking about the other analytics companies that are within this here, if they're sharing that with that company, it's just that data from Target alone, not all my apps.  So I wouldn't see a problem specifically for the Target app.

Q.   You had no problem with the Target app sharing your data with Google Analytics, Adobe Analytics, or Crazy Egg; right?

A.   If -- if -- understanding how -- how I see things and what I learned, I don't think it was a big deal.

Q.   Not a big deal?

A.   Not with -- not sharing my Target information, my Target activity, with the analytics company.  I don't think that's an issue.  I think, again, it's more -- if we're talking about what the problem here is, it's more Google gathering all the data from all my apps to kind of paint a picture of who I am.

Q.   You testified on Thursday -- I got it right -- that you're starting a new job this week; right, Mr. Rodriguez?

A.   Yes.

Q.   And you took professional development courses to help you

with your job search?

A.   Yes.

Q.   Do you remember signing up for and taking professional development courses from Google?

A.   Yes.

Q.   In fact, from November 2024 to February 2025, six months ago, you took a course offered by Google called "Data Data Everywhere."  Do you remember that?

A.   Right.

Q.   And after taking that course, you got a certificate in Google data analytics?

A.   Right.

Q.   And you posted that on your LinkedIn so that employers would know that you were qualified for potential jobs; right?

A.   Right.

Q.   And you also received a certificate on foundations of cybersecurity offered through Google; right?

A.   Right.

Q.   That was in December of 2024?

A.   Mm-hmm.

Q.   You learned about security controls and safeguards designed to keep data safe; right?

A.   Right.  It's -- it was very preliminary.  I didn't finish the courses.  I finished a part of the course, that -- the full course.  So I didn't really get to learn beyond that, so I

Google Accounts, and your Android phones; right?

A.   To me, right.

Q.   But you allowed your son to use his Android phone after you filed this complaint the same way he had used it before; right?

A.   What do you mean?  Like, after I found out about this, I let him use the phone?

Q.   In the same way that he had always used it; right?

A.   Right.  He's very young.  They're not using any apps like I am.  They really just used it for playing games and watching videos and stuff like that.

Q.   Well, you remember testifying in your deposition that he did use apps and that you didn't ask him to change his behavior on any of those apps?  Do you remember that?

A.   I know it's video games.  I'm not sure what apps he was using.

Q.   You're not sure what apps he was using?

A.   Right.  The apps that you're saying that I said in my deposition, I'm not sure what was said there.

Q.   And do you remember being asked if you allowed your sons to install new apps since filing your complaint?

A.   Yes.  So I do -- me and my wife, we both make sure that when they're doing stuff on their phones or downloading stuff, I am aware.  And I do periodically look at his phone just to make sure that, you know, it's nothing crazy going on.  And,

again, he's young.  They're both young.  And me and my wife both do the same thing.  So I think, you know, we do a good job.

I don't -- I mean, and I apologize.  I know you mentioned that you don't -- want to be sensitive here, but it's kind of like I feel like you're saying that I'm a bad father of some sort, and I don't agree with that.

**Q.**   Mr. Rodriguez, I have no idea what apps are on my children's phones, so I'm not casting any aspersions.

I'm just trying to understand and confirm the deposition testimony that you allowed them to install apps, you didn't tell them to change their behavior, and you weren't really checking which apps were being installed.  And that's just my last question.

**A.**   I did check what was being installed, and I believe I did turn off WAA and sWAA on their phones.

But, again, I mean, these are their phones.  This is what they do.  They play on their phones.  They play games.  They watch videos.  And really I don't understand, how can I prevent that?

I mean, right now I would say at that time, if there's any data being collected, it's a five-year-old and a ten-year-old at the time.  And, again, they're not using the phone the same way as I would, where you can kind of put the pieces of the puzzle together and know who I am.  I think you would say it's

a five-year-old and a ten-year-old, and I don't think there's much information that you can actually gather from that.  It's just kids playing on a phone.  It's not using apps like an adult uses an app.

MS. AGNOLUCCI:  No further questions, Mr. Rodriguez.  Thank you.

THE COURT:  Mr. Lee?

**REDIRECT EXAMINATION**

BY MR. LEE:

Q.   Just one moment, Mr. Rodriguez.  Bear with me.

A.   Hurry up.  Just playing.

(Pause in proceedings.)

BY MR. LEE:

Q.   Okay.  I'm just going to try and tick through these as quickly as possible to get you out of here.

A.   Okay.

Q.   All right?

You were asked by Google's counsel whether you remembered what -- whether you recognize what sWAA, or supplemental app activity, was during your deposition.  Do you remember her asking about that?

A.   Right.

Q.   And you understand that the lawyers talk about WAA and sWAA at this trial, and sometimes Google calls it supplemental app activity.  You remember that; right?

A.   Right.

Q.   Is that what's in the actual disclosures?  Does it say "sWAA"?

A.   No.

Q.   Does it even say "supplemental"?

A.   No.

Q.   Let's take a look at PX84.  It's in evidence.

        MR. LEE:  Can we get PX84?

        THE COURTROOM DEPUTY:  It's coming up.

        MR. LEE:  Oh, thank you.

     Let's scroll down to the subsetting.

BY MR. LEE

Q.   So do you see the subsetting that we've been all calling sWAA during this trial?

A.   Yes.

Q.   At the time of your deposition, did you just understand this as the subsetting?

A.   Right.

Q.   Did Google's lawyer, at your deposition, ever refer to this as the subsetting?

A.   No.

Q.   All right.  You were asked if you knew what the word, I think it was, "egregious breach of social norms" was, and I think we agreed that it meant something outrageous.

A.   Right.

issues we talked about with the Court when we objected.  No objection.

THE COURT:  Okay.  Exhibit 6 will be admitted.

(Trial Exhibit PX6 received in evidence.)

BY MR. DAVID BOIES:

Q.   And after this document was prepared, was any action taken based on this document?

A.   To my recollection, we prepared a few perspective documents that we presented back to leadership as part of the next phase of the project.

Q.   So you then -- based on the work that you did, you presented some proposals to leadership; is that correct?

A.   I don't recall if there were specific proposals at the level of this control should be different, but we presented a summary of some of the perspectives that we heard.

Q.   Is it fair to say, without going through all of these conversations, that a number of people expressed unhappiness, discomfort with Google's privacy policies at that time?

A.   I would say people talked about the challenges that Google was facing as part of the work, yes.

Q.   Well, in terms of challenges, it was more than challenges, was it not, sir?  People were saying that there were problems with Google's privacy policy; correct?

A.   I think they would have talked about some of the problems that they had with Google's work.

**HEFT-LUTHY - DIRECT / DAVID BOIES**

Q.   Not just Google's work.  Google's privacy policies; correct?

A.   Google's privacy tools that it would offer to users, yes.

Q.   For example, people said that they couldn't figure out what information Google was keeping on them; correct?

A.   I -- I don't know which specific you would be referring to.  That there was a conversation where that came up, you're asking?

Q.   Yes, that's what I'm asking.

A.   I believe there was something where somebody said something to that effect, yes.

Q.   Okay.  So my point is simply that there were a number of people here that were expressing concerns and what they saw as problems with Google's privacy policy; fair?

A.   I would say -- I would say, yes.

Q.   Now, did the PrivacyNative team, that you were part of, propose any changes to Google's privacy policies as a result of this effort?

A.   Not to my recollection.

Q.   I'm sorry, sir?

A.   Not to my recollection.

Q.   Okay.  Now, this was initially intended to be something that would focus on a five-year time horizon; correct, sir?

A.   Yes.

Q.   Did this continue after 2020?

A.    I don't remember the timeline, but I believe after we presented some of the follow-up work, it didn't -- it wasn't an ongoing part of our work after that.

Q.    It stopped, in other words?

A.    Yes.

Q.    And what -- you mentioned that your proposals were presented to leadership.  Who was that leadership?

A.    I don't recall who we would have presented it to as part of the program.

Q.    You were part of the presentation; correct?

A.    Yes.

Q.    And you don't recall any of the people that you presented to?

A.    No.

Q.    Let me ask you to look at Plaintiffs' Exhibit 18, which is behind Tab 2.  And this is a PrivacyNature [sic] scratchpad; correct?

A.    Yes.

Q.    And scratchpad is a term used within Google; correct?

A.    It would be a term referring to -- yes.  Yes, it would have been.

Q.    And what does it mean?  What are scratchpads within Google?

A.    To my recollection, this doc would be just an open space where anybody working on the project could throw content in

A.   This -- I don't know when -- this deposition would have been taken probably about a year after I had left; right?

Q.   Yes.

A.   So I think I had just not been thinking about it very much just because I had left the company a while ago.

Q.   So you weren't thinking about it very much after you left the company for a year, but you were thinking about it more when you were gone, during the time that you were being prepared for this case by Google's lawyers; is that your testimony?

A.   I wouldn't say that that's a fair statement.

Q.   Okay, sir.

Now, if you stay with this deposition for a minute, if you go back to page 44, line 21, there's a question [as read]:

"QUESTION:   Is it true that turning WAA off does not stop Google from saving, in this case, search log data?"

Do you see that?

A.   Yes.

Q.   And your answer, which is at lines 7 through 10 of the next page, says [as read]:

"ANSWER:   I wouldn't be able to say in specificity what data is or isn't collected.  It's been a while since I worked at Google, and I don't have a full knowledge of the technological architecture."

Do you see that?

A.    Yes.

Q.    And is it still the case that you would not be able to say in specificity, one way or the other, whether data is or isn't collected when WAA is turned off?

A.    I think that's a slight restatement of what you said, but the statement here about search log data, I would still say I don't -- I don't know.

Q.    You don't know?

A.    I don't know.

Q.    Okay.  Now, based on your work since you left Google, have you come to understand that when WAA or sWAA is turned off, Google still collects data from users' use of third-party apps?

A.    I would say that is something that I would have understood.  It was part of our common understanding of the work we were doing, yes.

Q.    That even when sWAA and WAA are turned off, Google still collects data from users' use of third-party apps; correct?

A.    Yes, but in the context of how those third-party apps are working and not connecting over to the Google Account for the Google Account purposes.

Q.    Well, let's try to stay with my question.  Okay?

Are we in agreement that even when WAA and sWAA are turned off, Google still collects data from users' use of third-party apps?

A.    Yes.

Q.    Okay.  And are we in agreement that there is no place that a user can go to see what data has been collected with WAA and sWAA off?

A.    I don't know.

Q.    You don't know one way or the other?

A.    No.

Q.    Do you agree that there is no way for a user to stop Google from collecting the Google data that Google now collects when sWAA and WAA are turned off?

A.    No.

Q.    You don't agree with that?

A.    No.

Q.    Okay.  How does a user stop Google from collecting the data that Google is currently collecting?

A.    So to my understanding there would be settings that would be relevant to the particular third-party apps or services for which Google would be processing that data on behalf of that third-party service.  So it would be with the third-party service.

Q.    And who told you that?

A.    That was a high-level understanding that I would have at least for my time at work -- while I was at Google.

Q.    Is there any document that you've seen -- they showed you a lot of your documents, correct, in preparation?

A.    Yes.

**A.**    Yes.

**Q.**    That you personally made?

**A.**    Yes.

       **MR. DAVID BOIES:**  I would offer Plaintiffs' Exhibit 213, Your Honor.

       **MR. ATTANASIO:**  No objection.

       **THE COURT:**  213 will be admitted.

    (Trial Exhibit PX213 received in evidence.)

**BY MR. DAVID BOIES:**

**Q.**    And there is a comment on the second page by Mr. Posner. Do you see that?

**A.**    Yeah.  This would have been Rajni Posner.

**Q.**    And who was he?

**A.**    She was a marketing -- product marketing manager for Google at the time.

**Q.**    And was she a part of the Privacy Advisor review?

**A.**    Again, I don't recall this specific review, what this meeting would have been, but she would have been somebody that we would have talked to about the project as we were developing it.

**Q.**    Mm-hmm.  And she says, if we could highlight this [as read]:

       "I might suggest moving into passive tense here
    so it doesn't feel as dramatic that Google is saving
    it."

Referring to data; correct?

A.    It's saying what data Google saves and uses, yes.

Q.    And -- and there's a comment by Mr. Warren, David Warren. Who is David Warren?

A.    David Warren was a user experience writer at or working with the PDPO.  I don't recall.

Q.    Now, when Mr. Warren says, "If we're pushing the control story," what is he -- what's he talking about when he's talking about "pushing the control story"?

A.    I don't know.

Q.    Well, isn't it the case, sir, that at this time Google was trying to convince its users that they had control over the data that Google collected and used?

A.    I would say that would be fair.

Q.    Okay.  And -- and when you saw this at the time, is it fair to say you understood that that's what Mr. Warren was referring to when he talked about "pushing the control story"?

A.    I don't know.

Q.    Let me ask you to -- well, before I do that, you're aware, are you not, that the chief executive officer of Google testified in front of Congress in December of 2018?

A.    Yes.

Q.    And you watched that at the time; right?

A.    Yes.

Q.    Now, when did you remember watching it at the time?

A.    I -- to my recollection, I was asked about it in my deposition; and in reviewing documents from my deposition, I had a memory once I got to look at the actual testimony.

Q.    Because during your deposition, you said you didn't recall watching it; correct?

A.    That's correct.

Q.    And -- and during your deposition, you were showed a clip of it; correct?

A.    Yes.  I -- I -- I believe that or reading a transcript.  I don't -- I don't remember which.

Q.    And when you were confronted with this, you said at your deposition you didn't even know whether that was Mr. Pichai; correct?

A.    I believe when we were reading the chat transcript out of context, yes.

Q.    When you say "reading the chat out of context" --

A.    There was a chat discussing the testimony, yes.

Q.    So -- and at that time, it was your testimony under oath that you didn't even know whether the Sundar referred to there was Mr. Pichai; correct?

A.    Yes.

Q.    And that wasn't true, was it, sir?

A.    I don't think that's fair.

Q.    There's only one Sundar at Google that you know of; correct?

both Nike and McDonald's, that by virtue of us using different encryption keys and encrypting this data, the numbers that we actually store in each of these accounts, these apartments, are actually different from one another.

Q.   So if I -- and I won't pull my phone out, but if I pulled my phone out and I used the Nike app and I used the Uber app and I used the Reddit app, are you saying that the numbers that are recorded associated with my phone for those three apps would be the same or different?

A.   Those would be different for your pseudonymous user identifiers.

Q.   Is Google Analytics able to translate those three blue numbers to figure out that each one of them came from the same phone?

A.   Only for providing the service to the app developer.

Q.   So, Mr. Ganem, did you hear Mr. -- Mr. Rodriguez's testimony yesterday concerning puzzle pieces?

A.   Yes, I did.

Q.   Do you have an understanding of the point Mr. Rodriguez was trying to make when he was talking about puzzle pieces?

A.   I think I do.

Q.   What is your understanding of his analogy?

A.   Combining the two analogies, my understanding is that each of these apartments represents what he believes to be a piece of the puzzle that describes him.

Q.   What do you think of his analogy?

A.   I don't think that's unfair to say that each of these apartments individually characterizes some description of his behavior.

Q.   Does Google put -- under any circumstance, does Google put the puzzle pieces together?

A.   I would say that it does for sWAA-on users.  That's effectively the expectation we set, and the value of sWAA on is putting it together so that your content is personalized based on these signals.

Q.   Continuing with the puzzle analogy, Mr. Ganem, what happens when sWAA is off?

A.   When sWAA is off, these puzzle pieces remain in the apartments, locked and not -- they're not combined by Google to form a complete picture.

Q.   Let's look at the next slide, please.

     You made this slide as well?

A.   That's right.

Q.   Can you please explain to the jury what you're trying to convey on this sWAA-on slide?

A.   So similar to before, there are still these apartments that are locked where the data is only available to each analytics customer.  But in this case, the data is being shared with Google for those users who have sWAA enabled, and the analytics data from the apps they use are -- is saved to their

Google Account.

Q.   And you testified just a moment ago that the three blue numbers are actually different when it comes from the same phone.  Is there some process by which Google is able to put pieces of data, when sWAA is on, into Jim Doe's Google Account despite those numbers being different?

A.   When sWAA is on and the user gives us the permission to associate or save their app activity from third-party apps to their Google Account, and once we confirm that we have that consent, we are able to both decrypt the device IDs and export this information or the associated information to their Google Account.

      The device IDs, by the way, don't get saved to the Google Account, but the app activity does.  Let me clarify.

Q.   Why is that?

A.   We want to make sure that we don't -- we actually, by policy, do not associate your Google Account with your device IDs so that we don't break this promise to users with sWAA off that we would know their identity.  We're trying to keep the identity of the sWAA-off users completely off the table for Googlers.

Q.   Let's go back to Slide Number 1.

      So since this case is about sWAA off, I want to stick with this slide for a moment, Mr. Ganem.

      Is Google able to profit from the data in these apartments

about Google.  You understand that?

A.    Right.  I'm just representing Google Analytics, so I want to make sure that's -- that part's clear.

Q.    Well, when you were talking about Google Analytics today, were you talking just about Google Analytics, or were you talking about Google in its entirety?

A.    I was talking about how the privacy settings relate to the use of Google Analytics.

Q.    Just Google Analytics?

A.    In particular.

Q.    What?

A.    In particular.

Q.    But were you only talking about how the privacy settings affected Google Analytics?

A.    I was talking how they apply to Google Analytics and products that -- to which Google Analytics sends data, like Google Ads.

Q.    Okay.  But only Google Analytics, is what I'm saying.

A.    Okay.

Q.    Okay.  Now, you said you were the person most responsible for Google Analytics.

      Are you also the person most responsible for the WAA and sWAA controls?

A.    No, not at Google.  I'm most responsible for how those settings apply to data collected in Google Analytics.

**Q.**   Who is the person most responsible for the WAA and sWAA controls at Google?

**A.**   I believe that would be Dave Monsees, who testified earlier.

**Q.**   Now, you agree with me that even with sWAA off, Google today collects a considerable amount of data with respect to users' use of third-party apps; correct?

**A.**   I would.

**Q.**   And you would also agree with me that that data that they collect has a lot of value to Google.  Indeed, I think you said if you didn't have it, it would create a huge hole; correct?

**A.**   It offers huge value to app developers; and if we didn't have that data, Google Analytics would be -- wouldn't be very valuable to them.

**Q.**   And Google Analytics is very valuable to Google; correct, sir?

**A.**   I'd like to believe so.

**Q.**   Because Google Analytics does a lot of stuff.  It helps get people to use your SDKs; correct?

**A.**   Customers use our SDK to use Google Analytics.

**Q.**   Yes.  And the SDKs have a lot of value to Google; correct?

**A.**   Potentially.

**Q.**   I mean, for example, they're an automatic source of structured app data; correct?

**A.**   They do collect structured app data.

Q.   And that's valuable to Google; correct?

A.   Potentially.

Q.   Well, not just potentially.  It's actually valuable; correct?

A.   When sWAA is off, the value is really for the app developer to understand their users.

Q.   Well, you use -- Google uses sWAA-off data; correct?  Not the app developer.  Google uses sWAA-off data; correct?

A.   For advertising measurement?  Yes.

Q.   Yes.  And that advertising measurement is important to Google's profitability; correct, sir?

A.   Advertising measurement in general is; but as I testified earlier, the vast majority of our app advertisers actually use other services besides Google Analytics for advertising measurement.

Q.   Sir, you're not saying that the use that Google makes of sWAA-off data isn't valuable to Google, are you?

A.   Could you repeat that?  I couldn't tell if you said sWAA on or off.

Q.   Let me rephrase it because I had a double negative.

     You would agree with me that the sWAA-off data that Google uses, not the app developer, that Google uses has a lot of value to Google; correct, sir?

A.   In theory.

Q.   I'm sorry?

**A.**    In theory.

**Q.**    Well, but not in theory but in practice; correct?  We're not just talking about theory here.

**A.**    We believe -- I mentioned a couple of ways that Google Analytics -- may I explain?

**Q.**    No.  What I'm just trying to get at, and your counsel --

**A.**    My answer is potentially.

**THE COURT:**  Wait, wait, wait.

**THE WITNESS:**  Sorry.

**THE COURT:**  One at a time.

**BY MR. DAVID BOIES:**

**Q.**    Your counsel is going to have another chance to examine you.

I'm just trying to establish a simple point that I think you agree with, which is that the sWAA-off data that Google collects has a lot of value to Google; fair?

**A.**    Potentially.

**Q.**    Well, when you say "potentially," Google uses that sWAA-off data; correct?

**A.**    Yes.

**Q.**    Okay.  And it uses it now, not just in theory but in practice?

**A.**    Yes.

**Q.**    Now, it also uses that data to inform machine learning models; correct?

**A.**    Yes.

**Q.**    And those machine learning models are also very valuable to Google; correct?

**A.**    It depends which ones you mean, to be honest.  Can you be more specific?

**Q.**    Well, let me show you a document that we've marked as Plaintiffs' Exhibit 163, and that will be in your binder and it will be behind Tab 8.

          **THE COURTROOM DEPUTY:**  Is this already in evidence?

          **MR. DAVID BOIES:**  This is a -- no, this is not.

**BY MR. DAVID BOIES:**

**Q.**    This is an exhibit that you've seen before; correct, sir?

**A.**    May I take a moment to look at it?

**Q.**    Certainly.

**A.**    (Witness examines document.)  It does look vaguely familiar.  It's from, looks like, 2016, so some of the details may be fuzzy.

**Q.**    And if you look at the last page, you see it was produced to us by Google from your files.  Do you see that?

**A.**    I'll take your word for it.

**Q.**    And this was a part of Firebase Analytics; is that correct?

**A.**    Yes.

**Q.**    And this is part of what you're responsible for; correct?

**A.**    Yes.

MR. DAVID BOIES:  I would offer Plaintiffs' Exhibit 163.

MR. SANTACANA:  Objection, Your Honor.  It lacks foundation because of the time period and the lack of author.

THE COURT:  163 will be admitted.

(Trial Exhibit PX163 received in evidence.)

BY MR. DAVID BOIES:

Q.   Now, if you turn to page 30 of the document.

A.   (Witness examines document.)  I'm there.

Q.   You see at the top it says, "What is the value of Google ads of scaled Firebase Analytics penetration?"  Do you see that?

A.   I do.

Q.   And it says [as read]:

     "In-app data to inform UAC machine learning
     models."

     Do you see that?

A.   Yes.

Q.   And what is UAC?

A.   That is universal app campaigns.

Q.   And -- and the data that you get for this UAC machine learning models is important to Google; correct, sir?

A.   Yes.  For advertisers who link Google Analytics to Firebase and -- sorry -- Google Analytics to ads and use analytics conversions, it's important.

Q.    And you also use SDKs to capture data to enhance Google's products; correct?

A.    It's, again, potential.  It depends on if the developer allows us to use it that way.

Q.    And developers do allow that; correct, sir?

A.    Yes.

Q.    Okay.  Now, let me go back to the Exhibit 62, the privacy policy.

      And on the first page, we've gone over this a lot of times, but the sentence, "Across our services, you can adjust your privacy settings to control what we collect."

      And you expected users to rely on that; correct, sir?

A.    Yes.

Q.    Now, counsel for Google directed your attention to a number of pages here, and I'd like to go through them as well.

      For example, he directed your attention to page 5 where, under "Develop New Services," it says [as read]:

          "We use the information we collect in existing
      services to help us develop new ones."

      Do you see that?

A.    Yes.

Q.    And that's limited to the information that Google collects; correct?

A.    Yes.

Q.    And the next page, page 6, there was a sentence that says

that [as read]:

"When you visit sites that use Google Analytics" -- this is under "Measure Performance" -- "Google and Google Analytics customers may link information about your activity from that site."

Do you see that?

A.   Yes.

Q.   It says "may"; correct?

A.   Yes.

Q.   And it doesn't say it will.  It says "may."

And is there any place in here or, in fact, in this entire policy where Google says, "We do this even if you have sWAA off"?

A.   No, it doesn't say that in that section.

Q.   It would have been really easy to say that; correct?

A.   If we --

Q.   You could have said may link -- may --

THE COURT:  Wait.  Don't argue with each other.  One at a time.

Go ahead.

BY MR. DAVID BOIES:

Q.   You could have said right here, "may, even with sWAA off"; correct?

A.   We could have.

Q.   And it also -- he directed your attention to page 22.  Do

THE WITNESS:  Sorry.

BY MR. DAVID BOIES:

Q.   You don't have any doubt that that's what this is; correct?

A.   No.

Q.   Okay.  Do you see, at the bottom of the page in big bold letters, [as read]:

     "How you can control the information collected by Google on these sites and apps"?

A.   Yes.

Q.   And if you -- if you look at the bottom of the page, it says "My Activity" right at the very bottom of the page [as read]:

     "My Activity allows you" -- speaking of the user, "to review and control data that's created when you use Google services, including the information we collect from the sites and apps you have visited."
     Do you see that?

A.   Yes.

Q.   And you expected users to rely on that, did you not, sir?

A.   Yes.

Q.   Now, we agree that Google collects data from the users' use of third-party apps even when sWAA is turned off; correct?

A.   Yes.

Q.   But you say that it is de-identified; correct?

A.    I do.

Q.    And one of the things that you talked with your counsel about was Google Exhibit 929, the scrubbing policies?

A.    Yes.

Q.    Do you recall that?

A.    Yes.

Q.    I'd like to direct your attention to a note that's right at the top of the page.  Can you read that note to the jury, please?

A.    [As read]:

        "Despite the name 'Dynamic Anonymization,' this framework performs deidentification rather than true anonymization.  It's important to remember that sawmill data is sensitive and potentially reidentifiable even after the scrubbing described here."

Q.    And by "reidentifiable," you mean you've de-identified somebody and now you reidentified them; correct?

A.    Yes.

Q.    The -- you also talked to your counsel about Google Exhibit 926.  Do you recall that?

A.    Yes.

Q.    And under "Purposes of the Policy," right at the very top, do you see where it says, "This policy does not," in italics? Do you see that?

A.    I do.

Q.    Could you read that to the jury?

A.    It says [as read]:

        "This policy does not apply to identification of users across devices based on characteristics such as location, router IP address, or Web history (also known as cross-device linking, behavioral pattern linking, or probabilistic heuristic device association)."

Q.    And those are all ways by which you use modeling or some kind of algorithm to try to connect people and data; correct?

A.    Possibly.

Q.    Now, when Google first receives this sWAA-off data from the app, whatever it is, it has all of the personal identifiers in it; correct?

A.    Yes.

Q.    And Google makes a copy of that; correct?  The first thing that happens is it goes into the memory of your server; correct?

A.    Yes.

Q.    Okay.  And you then perform -- after that happens, after this copy is made, you perform the consent check; correct?

A.    I think you skipped the copy step.  You said it arrives at the server but before it's written to any disk, a duplicate is made.

Q.   Before it is written, a duplicate is made?

A.   Before it's logged or saved anywhere in disk.

Q.   Well, when you save, it's saved in memory.

A.   It's in memory.

Q.   Right.  I mean, when it first comes in, the data comes in as electrons and it's put in -- a copy of that is put into your memory; right?

A.   Yes, short-term memory.

Q.   Right.  Now, once it's in there, another copy is made; is that correct?

A.   Yes, for this consent check.

Q.   And that second copy is what is de-identified, and the first copy is going to be destroyed; correct?

A.   I don't know about destroyed.  It separates the --

Q.   It's separated?

A.   Yeah.

Q.   Okay.  So the sWAA-off data comes in, and then it's copied into memory.  A second copy is made, and those two copies are separated; correct?

A.   Yes.

Q.   Now, you then perform the consent check; correct?

A.   That's right.

Q.   And you said that you could perform the consent check on the device and never bring in the identified information; correct?

**A.** Yes, though I noted that I believe that's an inferior design.

**Q.** But you thought that was inferior?

**A.** Yes.

**Q.** It wouldn't be as good for Google; correct?

**A.** It wouldn't be as good for Google or the app developer that's using our service.

**Q.** But what you're concerned about is what's good for Google; correct?

**A.** What's good for the app developer is what's good for Google because of the virtuous cycle.

**Q.** You want it to be good for the app developer because that's going to help Google make more money; correct?

**A.** I want to make the best product for our customers.

**Q.** But that's not just an eleemosynary impulse. You're just not a charitable institution. You're doing it because you want to make money from it; correct?

**A.** It's a business, so certainly we want to succeed.

**Q.** Right.

**A.** Yeah.

**Q.** I'm not suggesting there's anything wrong with trying to make money. I'm just saying that that's what -- that's why you are using this data, to make money for Google; right?

**A.** Ultimately, we believe that Google will benefit when app developers benefit.

correct?

A.    Yes.

Q.    Okay.  And that is -- and that, again, is valuable to Google because it allows you to get more advertising dollars; fair?

A.    It can.

Q.    Now, you understand that when somebody turns off WAA, it automatically turns off sWAA?

A.    I do.

Q.    And you understand that a number of people leave WAA on but turn sWAA off; correct?

A.    I presume.  I don't know the numbers, but I know that's a possibility.

Q.    And would you agree that people who turn off WAA or sWAA are people that are particularly concerned with their privacy?

A.    I mean, I don't know all their intentions, but that's a possibility.

Q.    Well, but that's something that Google believes; correct? That's why you have these.

A.    We offer the control because we believe there are people out there who want more control over what's collected and how it's used.

Q.    Yes.  And you agree that there's no way, under the present system, that a Google user with sWAA off can see what data Google has collected about their use of third-party mobile

apps; correct?

A.   This de-identified data?  No.  There's -- I agree.

Q.   And you also agree there's no way for a Google user to delete the sWAA-off data that Google has collected and saved; correct?

A.   The sWAA-off data that's collected into Google Analytics? No, there's no way for them to delete that data that's de-identified.

Q.   Now, let me just follow up with that answer.  You said there was no way to delete what was in Google Analytics.

The sWAA-off data is saved in a number of logs; correct?

A.   It -- it's saved in the logs and then processed and stored in Google Analytics.

Q.   That's what I'm asking.

The -- there are a number of logs in Google Analytics that contain either sWAA-off data or the results of sWAA-off data; correct?

A.   I wouldn't -- I don't know about logs, but there are tables of data to support Google Analytics where sWAA-off data may be.

Q.   Well, are there also logs?

A.   Yes.

Q.   Okay.  Now, are there logs outside of Google Analytics that also contain sWAA-off data?

A.   SWAA-off data from Google Analytics?

**Q.**   Let me start with that.

**A.**   For conversion measurement.

**Q.**   Okay.

**A.**   I'm not sure if they're logs; but for the purposes of conversion measurement, this data that Google Analytics sends to ads is presumably stored over there for that purpose.

**Q.**   Now, in addition to the sWAA-off data that comes from Google Analytics, are there other places in Google, outside of Google Analytics, that have this sWAA-off data?

**A.**   I'm not an expert on those other areas of Google.

**Q.**   Did you try to find that out before testifying here?

**A.**   I don't recall.

          **THE COURT:**  I think we've reached the 1:30 point.

     Members of the jury, we've come the end of the day. Remember my admonitions.  Do not discuss this with anyone or amongst yourselves.  Do no research, nothing associated with the case.  Put it aside.  Enjoy the rest of the day, and we'll see you tomorrow at 8:30.

     (Proceedings were heard out of the presence of the jury.)

          **THE COURT:**  Okay.  We're out of the presence of the jury.

     What's the roster for tomorrow?

          **MR. DAVID BOIES:**  For once, I don't have to answer, Your Honor.

                         (Laughter)

copy of the data in memory.  Can you explain what you mean by "in memory"?

A.   What I mean is in short-term memory in the computer as opposed to as a file on the disk or in a log.

Q.   And why is that a significant distinction to you, the difference between in memory or saved to disk?

A.   Well, the user expectation with sWAA is that it governs the saving of their Web & App Activity specifically to their Google Account, and that's not what's happening when you copy this data in short-term memory for the purposes of looking up the consent.

Q.   Do you -- just to be clear, do you consider making a copy in short-term memory a form of saving?

A.   No.

Q.   And just explain why not.

A.   It's just when you -- for those who do computer science, in order to make these API calls, the data needs to be in memory.  It's just, in the course of looking up the consent status, it's something you would have to do.

Q.   While it's in -- how long is it in short-term memory for?

A.   No more than a few minutes.

Q.   And while it's in short-term memory, while the server is checking for consent, let's say the power goes out.  What would happen to the data?

A.   It would disappear.

Q.    So -- and I just want to clarify one thing.  I got a note here to make sure to clarify, Mr. Ganem.

When you said that the Doritos cookie goes to the server and that it can send a GAIA back if sWAA is on, can you just remind us what you mean when you say "GAIA"?

A.    GAIA is the identifier associated with a Google Account.

Q.    So do you consider that GAIA identifier to be a personal identifier?

A.    Yes.

Q.    Okay.  You were asked --

MR. SANTACANA:  We can take that down.  Thank you, Brooklyn.

BY MR. SANTACANA:

Q.    You were asked yesterday about the deletion of data.  Do you remember that?

A.    You'll have to refresh my memory.

Q.    Well, I believe the question was something along the lines of:  Does Google allow end users to delete the de-identified data that came from their devices?

Do you remember that?

A.    Yes.

Q.    And can you just remind us your answer?

A.    Google does not.  The My Activity control that we offer only allows them to delete the data associated with their Google Account.

Q.   Now, I just want to think about this for a moment, Mr. Ganem.  What would it take if you wanted to give end users the ability to delete de-identified data that came from their devices?

A.   Well, the first thing you'd have to do is reidentify them so that when they submit this request, you would know -- you would then know what data is associated with them.

Q.   Does Google have, right now, as far as you know, the technology built to reidentify users whose data is de-identified?

A.   No, it doesn't.  In fact, we -- our designs are such that that's technically impossible.

Q.   Is that part of, for example, why those servers are separated?

A.   That's right.

Q.   Are there other technical barriers to reidentifying de-identified data at Google?

A.   Yes.

Q.   Can you give us some examples?

A.   So, for example, Google Analytics does not log or store the full IP address.  It removes about a quarter of the information before any of that information is stored.

Another would be that as timestamps come in, we modify these, adding random numbers to jitter them so that they can't possibly be personally identifiable.

THE COURT:  Microphone exchange?

MR. DAVID BOIES:  Well, I'll be short enough, so I'll try to use this one, Your Honor.

Could we put up Plaintiffs' Exhibit 11 on the screen.

**RECROSS-EXAMINATION**

BY MR. DAVID BOIES:

Q.  Counsel asked you about this, and he said that this related to another document, and he said I didn't show you that document.  Do you recall that?

A.  Yes.

Q.  Now, he didn't show you that document either; right?

A.  No.

Q.  Have you ever seen that document?

A.  Yes.

Q.  Have you seen the document in preparation for this case?

A.  I think in preparation for deposition.

Q.  So your counsel has it available to them?

A.  I don't know.

Q.  Well --

A.  I presume so.

Q.  -- they showed it to you in connection with the deposition, you said?

A.  I presume so, yes.

Q.  Because they prepared you for your deposition?

A.  Yes.

Q.   And that was one of the documents they showed you?

A.   I don't recall.  It was years ago.  Maybe.

Q.   I thought you just said that you have seen it in connection with your deposition.

A.   I read through a lot of those documents on my own, but whether or not it was used in preparation, I don't know.

Q.   Do you know if that document was even produced to us in this case?

A.   I --

     MR. SANTACANA:  Objection, Your Honor.  Lacks foundation, and counsel knows it was produced.

     THE COURT:  Sustained.  I don't think this witness can go into that.

BY MR. DAVID BOIES:

Q.   Now, you testified to your counsel that in order to give people the ability to delete their information, you'd have to reidentify them.  Do you recall that?

A.   Yes.

Q.   Now, one of the things that you save in the so-called de-identified information is the device ID; correct?

A.   Yes.

Q.   And you could communicate with that device; correct?

A.   Yes.

Q.   Okay.  So you could -- if you wanted to, you could send to the device what information you'd collected and give that

device a chance to delete it; correct?  Technically, you could do that?

A.   Perhaps.  That's not the way the systems are designed, and I think you're talking about data on a server.

Q.   Well, first of all, when the information comes to you, the sWAA-off data comes to you, it comes directly from a device to Google; correct?

A.   That's correct.

Q.   That is, it doesn't pass through the app.  It comes directly from the device to Google; correct?

A.   It is from the app on the device to Google.

Q.   But it's being sent from the device --

A.   That's correct.

Q.   -- correct?

     From the person's phone; correct?

A.   Yes.

Q.   And so you could -- because you save that phone's device ID, you could send back to that phone at any time what you'd collected and give them a chance to delete it; correct?

A.   Sending the data from the server to the device to delete it on the device?  Yes.

Q.   Yes.  Okay.

          MR. DAVID BOIES:  That's all I have, Your Honor.

          THE COURT:  Very well.

     Anything further?

<u>FURTHER REDIRECT EXAMINATION</u>

BY MR. SANTACANA:

Q.   Going -- I apologize.  I don't have that document in my binder, but do you recall that document?

A.   The -- I recall the design for IID because I was intimately involved with it.

Q.   Can you just say what it is?

A.   This was a design to allow app developers to send push notification to their users based on their analytics data.

Q.   What is -- what is a design document?  Is it going to describe more information?

A.   This is how engineers intend to design the system in order to offer that feature.

Q.   Okay.  So do you need to see that document to understand PX11?

A.   No.

Q.   You have a personal memory of this project?

A.   Yes.

Q.   Just to remind the jury, what decision did you make with respect to this project?

A.   We decided that we would honor the user's consent before storing this data.

        MR. SANTACANA:  No questions.

        THE COURT:  Okay.

        MR. DAVID BOIES:  Nothing further, Your Honor.

Q.    -- same thing would be true?

A.    We would mark the conversion, yes.

Q.    Now, I thought I heard you say -- and I want to be sure. Did you say that sWAA-off data was not used to track conversion events?

A.    SWAA-off data is used in the de-identified -- with de-identified data to measure conversions.

Q.    And did I understand you to say that if that didn't happen, Google would not lose any money?

A.    Google -- advertisers would choose to use a different measurement provider.

Q.    My question was:  If you didn't have sWAA-off data to track conversion events, are you saying that would not cost Google any more money?

A.    This is a hypothetical situation, but I generally think that Google would have mechanisms to enable advertisers to measure the effectiveness of their ads, and we would also likely use some sort of conversion modeling to fill in the gaps.

Q.    So it's your testimony that Google doesn't really need the sWAA-off data; is that correct?

A.    Not for conversion measurement purposes.

Q.    Well, do they need it for some other purpose?

A.    As I mentioned earlier, Google Analytics does enable better ads personalization.

**Q.**    I'm talking about sWAA-off data, not sWAA-on data.
SWAA-off data.  Do you understand that?

**A.**    Correct.

**Q.**    Okay.  Now, does Google use sWAA-off data for any purpose?

**A.**    We use sWAA-off data for measurement with de-identified
data.

**Q.**    When you say "measurement," are you talking about
conversion measurement?

**A.**    Correct, conversion measurement.

**Q.**    Okay.  So you're using sWAA-off data for conversion
measurement.  Is that your testimony?

**A.**    We use de-identified data for conversion measurement, yes.

**Q.**    And that's sWAA-off, what you call de-identified data;
correct?

**A.**    Correct.

**Q.**    Okay.  Now, is it fair to say that there's some value to
Google of using this sWAA-off data?

**A.**    It's valuable to show -- for Google to show how our ads
are performing.

**Q.**    Okay.  And do you have an estimate of how much value is
created for Google by having this sWAA-off data?

**A.**    I've never measured that, Mr. Boies.

**Q.**    Have you tried to?

**A.**    To the best of my knowledge, we have not tried to measure
the value of sWAA-off data.

Q.   Do you have any estimate at all, as you sit here now?

A.   No, not right now.

Q.   Could it be a billion dollars?  Could it be $10 billion?

A.   I mean, you're throwing out some big numbers, Mr. Boies.
I don't know right now.

Q.   Okay.  Now, you talked about conversion modeling.  Do you
recall that?

A.   Correct.

Q.   And that's where you don't have something that directly
ties a device that showed the ad to a device that did the
conversion event; correct?

A.   Correct.

Q.   And what you do is you use a variety of modeling
techniques to try to tie those two devices together, even
though you don't have a specific identification; correct?

A.   Correct.

Q.   And you said that AdId and IDFA were not tied to any
particular person; correct?

A.   Correct.

Q.   But they are tied to particular devices; correct?

A.   Correct.

Q.   And Google knows what particular device belongs to what
particular person; correct?

A.   We do not try to identify a user's GAIA account with a
device ID.

A.    My opinion is that Google's account settings inform users that even with the settings off, their data will still be collected.

Q.    When did you come to that opinion?  Before or after your deposition in this case?

A.    So my deposition was a couple of years ago, and I don't recall exactly.  But since my deposition, I have been studying the disclosures more than I did for my deposition.  So I've definitely had the opinion since then, and I don't recall if I had the opinion in my deposition.

Q.    You wrote a report, spanning 60 to 80 pages, all about Google's disclosures before your deposition; correct, ma'am?

A.    I think it was a little longer than that, but, yes, that's correct.

Q.    And you spent over 20 hours personally reviewing the disclosures, the evidence in this case, editing that report; correct?

A.    Yes, that's correct.

Q.    Fair to say you had significantly more time spent reading, studying, analyzing Google's disclosures before your deposition than any Google user, whether they're a skipper, a skimmer, or a -- I forget the third one you mentioned, but is that a fair statement?

A.    It's a reader.

      And do you mind if I ask your name so I can refer to you

by your name?

Q.   If you'd like, my name is Amanda Bonn.

A.   Ms. Bonn, thank you.

Q.   So is it fair to say that prior to your deposition, you had spent considerably more time studying and analyzing all of Google's disclosures about sWAA than the typical Google user, whether they be a skimmer, a skipper, or a reader?  Is that fair?

A.   Well, I think it's a little bit of a mischaracterization because my -- and I'm hesitating because I'm not sure what I'm allowed to say.

     But my report was a rebuttal report to a specific expert, and I had a specific assignment, and I followed that assignment.  So I did spend time reviewing disclosures, the academic literature, and things of that nature, but I followed my assignment.

          MS. AGNOLUCCI:  Your Honor, we would request a sidebar if this line of questioning is going to go on because of the shifting nature of Professor Hoffman's testimony due to recent developments in who the plaintiffs have chosen to call.

          THE COURT:  I want to hear the next -- where you're going.  Go ahead.

BY MS. BONN:

Q.   Having spent time reviewing Google's disclosures, writing a more-than-80-page report, responding to the opinions of

others, and appearing in your deposition, at the time of your deposition, you yourself were not sure whether when WAA or sWAA are turned off, Google would still collect data, sWAA-off data, but save it outside the Google Account; isn't that true?

A.   So that was a couple of years ago.  I don't recall exactly what I said.  Could we review my deposition?

Q.   Absolutely.

A.   So then I can see exactly what I said.

Q.   Absolutely.

MS. BONN:  Let's, please, play page 82, lines 1 through 12, from Professor Hoffman's deposition.

(Pause in proceedings.)

THE COURTROOM DEPUTY:  Is it published to the jury?

MS. BONN:  Yes, please.  It's for impeachment. Thank you.

(Video was played but not reported.)

BY MS. BONN:

Q.   And, ma'am, in addition to that testimony, isn't it also true that at the time of your deposition, based on your review of Google's privacy policy and the time you spent in the case, you still did not know whether Google ever saves data somewhere else outside of what they call a Google Account?

A.   So I feel like you're mischaracterizing what I said.

Q.   Please answer my question, ma'am.  My question is very specific.

A.   I'm trying to.

Q.   Isn't it --

THE COURT:  Don't argue back and forth.  Question, answer.

BY MS. BONN:

Q.   Yes or no?

A.   My --

Q.   Is it yes or no, ma'am?  Is it true that at the time of your deposition, based on your review of Google's privacy policy, you did not know whether Google ever saved data somewhere else, outside of what they called a Google Account?

A.   So my answer was that I didn't know technically, because I believe, in the clip you played, I knew that data was saved; it just wasn't saved to the account.

I believe that I understood the question to be technically what happens to it.  I'm not a technical expert, and that was my response.

MS. BONN:  Let's, please, play page 269, lines 13 through 19, of the deposition.

(Video was played but not reported.)

BY MS. BONN:

Q.   Ma'am, isn't it also true that at the time of your deposition, you had no opinion about what it means for Google to log data without tying it to someone's Google Account?

A.   Well, that sounds like a technical question, and I'm not a

MS. AGNOLUCCI:  Objection, Your Honor.  May we have a sidebar?

THE COURT:  Overruled.  No.

Go ahead.

THE WITNESS:  I'm sorry.  I don't think I understand the question.

BY MS. BONN:

Q.   Do you recall that when asked at your deposition whether Google's various progressive disclosures were clear or ambiguous to users, your answer was that the only way for an expert in your field to know that would be to conduct a consumer research survey, which you had not done?

A.   I do recall that, and that is in the context of Google applying what I believe to be good UI design practices.

But Mr. Frawley said, "Well, at the end of the day, we don't really know if consumers are confused or not, do we?"

And I have to agree that at the end of the day, if we want to know if consumers are confused, for example, we would have to conduct a survey.  And I had not conducted that survey.  But I did opine that I thought the disclosures were user-friendly.

MS. BONN:  I've just got about 30 seconds, and then I think we'll be done with the witness, if that's okay, Your Honor, rather than bring her back tomorrow.  Less than a minute.

THE COURT:  It's not 1:30 yet.  Ask the question.

MS. BONN:  Perfect.  Thank you.

BY MS. BONN:

Q.   Ma'am, Google hired you in this case and paid you 950 to 1200 dollars an hour, and your expertise, in part, is in conducting such user surveys; correct?

A.   That's one of my expertise.  I have a number of related ex- -- you know, expertises.

Q.   Yet, you were not asked by Google to conduct such a study of whether these progressive disclosures were clear or ambiguous in this case; correct?

A.   Well, I was hired as a rebuttal witness, and the person I was rebutting did not conduct a survey, and so I did not conduct an affirmative survey, and nor was I asked to because I was rebutting someone else's opinions who himself had not conducted a survey.

Q.   Okay.  And, ma'am, you talked a little bit on your exam about how everybody can have different privacy preferences; correct?

A.   Well, I said people have different privacy pref- -- different people have different privacy preferences.

Q.   One thing that all of the adults in this class have in common is that they revealed a preference by turning the sWAA button from the default on state to off; correct?

A.   Yes, that's my understanding.

MS. BONN:  That's it.  Thank you.

THE COURT:  If you want this witness for redirect, she comes back tomorrow.

MS. AGNOLUCCI:  I can do it in one minute, or we can bring her back.

THE COURT:  One minute.

### REDIRECT EXAMINATION

BY MS. AGNOLUCCI:

Q.   Professor Hoffman, we're going to go without the mic.

At the time of your deposition, you had a different scope of your assignment; right?

A.   Yes.

Q.   Why?

A.   Because I was rebutting another expert who had written a very specific report, and my assignment was to rebut specific aspects of his report.

Q.   Did the plaintiffs bring that expert to testify in this trial?

A.   Not that I'm aware.

Q.   Ms. Bonn asked you about the sWAA revocation language, and she showed you the Exhibit G607 and asked you whether it was the same language as in the pop-up on the board.

Did you see the same critical language in both the sWAA revocation and the WAA revocation?

A.   Yes, I did.

Q.   What was that language?

identity.  Your Google Account is like your janedoe@gmail.com. So you can go into My Activity, you can see all the searches and stuff you've done and things like that, and you can delete them if you want, and it's a transparency option.

So when WAA is off, data is not saved to your Google Account, your janedoe@gmail.com.  It's -- it doesn't mean it's not saved.  If it's not saved to your account, it's not saved to your identity; right?  So it's de-identified and stored that way so Google can do ad revenue and all this other stuff.  So that was with the WAA off.

So the change was, which I was very upset about, was:  Oh, we're going to change it so instead of de-identifying it, we're going to keep it identified and store it for a temporary period of time, 60 days, and then delete it so that they can do some other things around some other issues with WAA.

And I go:  That would be very bad because now WAA off is the same as WAA on for 60 days.  You're storing the data identified to the user, to their janedoe@gmail.com account, yet they can't see this data.  So that would be very bad.

And I go:  You can't do that.  Right?  So you have to de-identify the data if that WAA is off.  You can't have WAA off and store identifiable data to the Google -- you know, the user's account.

Q.   So back in July 24th of 2019, you understood what the word "de-identified" meant; correct?

A.   Yes.  And it says in here, I reference de-identified.

Q.   Okay.  So you go on, then, to say --

        MR. CARMODY:  So before we go on, so to see what we just said, would you circle the word "or"?

BY MR. CARMODY:

Q.   [As read]:

        "But that is not what is done today or what is proposed going forward."

A.   Right.

Q.   And so it looks like we have two separate thoughts by you; correct?

A.   Correct.  It appears that way.

Q.   Okay.  Then you go on to say [as read]:

        "The line 'Ads you click on, or things you buy on an advertiser's site' we probably don't want to lose ever as that is how we charge for Ads."

     And you have a little smiley face.  Do you see that?

A.   Yeah.  We don't want to go out of business.

Q.   So you have here your -- again, this is a bullet that you've taken from the WAA help page; correct?

A.   What's the bullet?  Oh, "Ads you click on, or things you do on an advertiser's site."

Q.   Yes.

A.   Yes.

Q.   Okay.  And when you talk about -- the word "we" is

referring to Google; correct?

A.    Mm-hmm, correct.

Q.    And how we charge for ads is how Google makes money; correct?

A.    One way they make money, yes, correct.

Q.    How they make money with -- when users turn off their WAA button; correct?

A.    They make money when users have their WAA button on too.

Q.    I get that.

A.    Either way.

Q.    Either way, WAA on or WAA off, Google makes money from it; correct?

A.    Correct.

Q.    Okay.  So now we -- let's go down below.  See where it starts with "So, it appears"?  You write [as read]:

        "So, it appears we have a real problem here with
    accurately describing what happens when WAA is
    disabled."

    Referring to when WAA is off; correct?

A.    In the context of the change -- of the WAA-off change, yes.

Q.    No, forget in the context of the change because we're going to get to that in the next sentence.

    This first sentence refers to your thoughts at the time, your concerns back in July 24th of '19 about the accuracy of

the WAA help page; fair?

A.   In terms of describing what happens when the WAA-off change is implemented.

Q.   Well, let's see that, sir.  The next sentence says [as read]:

        "We should fix the current wording to reflect

     reality...."

     Do you see that?

A.   Yes.

Q.   And then it has "and" --

        MR. CARMODY:  And maybe you need to circle the word "and."

BY MR. CARMODY:

Q.   [As read]:

        "... and if we make the change to temp GAIA

     logging, then we need to be very clear about what

     data is collected with WAA off."

     Did I read that accurately?

A.   Yes.

Q.   So before the word "and," it looks like -- and "the current wording" -- let me go back to "the current wording" because that was your word at the time; correct?

A.   Well, this is my email at the time, yes.

Q.   Yes.

A.   Yeah.

Right?

A.   Correct.

Q.   Okay.  And, again, that change never happened; right?

A.   Correct.

Q.   Okay.  So going back to your second recommendation on PX3, what we see is you're telling -- making a suggestion --

MR. CARMODY:  I'm sorry.  It's the very first page -- or top of the second page.

There you go.  Second paragraph, last sentence, "We need."

BY MR. CARMODY:

Q.   This is from you to David Monsees.  It's July 25th of 2019?

A.   Mm-hmm.

Q.   You're saying [as read]:

"We need to change the description" --

Referring to PX84?

A.   Correct.

Q.   [As read]:

-- "to indicate even with the control off, Google retains this data and uses it for X purposes."

And Google had -- you knew, as of July 25th, when the control was off, Google was still collecting WAA-off user data; right?

A.   Yeah, de-identified data.

Q.   Okay.  Thank you.

Now let's look at the response Mr. Monsees sends to you right above that.

He sends a response that very same day, and when he sends a response to you.  He doesn't respond to any request to change WAA disclosures; correct?

A.    Correct.

Q.    He doesn't respond and talk about your concerns about a user's false sense of security when WAA is off; correct?

A.    Correct.

Q.    He doesn't respond and talk about Google's studies; correct?

A.    Correct.

Q.    He doesn't respond and say, "Chris, Google relies on progressive disclosures."  He doesn't say that here; correct?

A.    Correct.  What's a progressive disclosure?

Q.    What's that?

A.    What's a progressive disclosure?

Q.    That's my point.  In all your time at Google, you've never heard the term "progressive disclosures"; fair?

A.    Right.  I'm a software engineer.

Q.    Right.  But you've never heard the term?

A.    No.

Q.    Okay.  That's what I thought.

        THE COURT:  Let's take our break.

And, first of all, can someone on your team remove these

so the jury can get out?

MR. CARMODY:  Yes.

THE COURT:  Members of the jury, remember my admonitions to not discuss this amongst yourselves or with anyone else, and we will try to start up around 10:30.

(Recess taken at 10:15 a.m.)

(Proceedings resumed at 10:34 a.m.)

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  Is everybody ready?

MR. SANTACANA:  Yes, Your Honor.

THE COURT:  Great.

(Proceedings were heard in the presence of the jury.)

THE COURT:  The jury is present.

Mr. Carmody.

BY MR. CARMODY:

Q.   Are you ready, sir?

A.   Yes.  Yes.

Q.   We're getting very close to the end.

MR. CARMODY:  Would you please put up Exhibit 3A again.

BY MR. CARMODY:

Q.   And we're getting to -- we were just at Mr. Monsees' response to you.  And what Mr. Monsees did is he copied Leslie Liu and asked you if you wanted to grab 30 minutes to have a meeting with himself and Leslie Liu; correct?

protects it.

And so we've heard testimony about an encrypted GAIA.  So here your GAIA is sensitive.  It links to your identity, but we -- when Google encrypts it, then they need not worry about it being exposed because even if a bad guy got ahold of it, it wouldn't be useful.

The one that's been named is called the DSID, and I think Mr. Ganem said that's called -- internally it's called the Doritos identifier, and so I think it's easy to remember and that's why I have a chip on my slide.

**BY MR. SANTACANA:**

**Q.**    In computer science, what is the purpose of encrypting a personal identifier?

**A.**    You encrypt it in order make sure that no one can understand what the actual value of the identifier is.

**Q.**    So in this case, when the jury goes to consider the evidence, how can they tell, when they're looking at the evidence, whether a particular identifier is personal or pseudonymous?

**A.**    They would have to ask themselves:  Is this something that is linked to the person's identity or just is the person's identity?  Or if it's something that is set aside, is separate, and is not tied to any personal identifiers.

**Q.**    Okay.  Can you please explain to the jury what you've done here?

**A.** Yeah. This is the trip of the Doritos. It's pretty cool, actually. So, once again, when a user is using a third-party app with GA4F and he does something, presses a button or sometimes does nothing and just is engaged, sits on a screen for a few seconds, it generates what's called an event. And these events are packaged up by the SDK and then transmitted to Google's servers from that device.

**Q.** What else is packaged up there?

**A.** Okay. So this is meant to show what's inside that bundle, event data, the kind of event. Is it that, you know, someone's first opening the app for the first time; they're showing a certain screen; they've clicked on a button? Those can be events that are captured and sent.

And then the DSID, that's the Doritos, that's the GAIA which is tied to the user's identity but it's encrypted. So even if somebody got ahold of it, it would be meaningless essentially.

And then there's the AdId, that's the advertising ID for Android, and the App Instance ID, which Mr. Ganem explained was an identifier that was generated for that install of that app on that device.

And then there's some user properties, which I'll talk about in a second.

**Q.** So if I were to get ahold of this number one bundle of data, would I be able to determine whose Google Account the

data belongs to?

**A.**   No.   I assume you don't have -- this is not your phone, so you wouldn't be able to link the AdId to the GAIA, even though you have both, because the GAIA is encrypted and that makes it undiscernible.

**Q.**   Let's move forward.

Can you just explain what's going on here?

**A.**   Right.   So I have this animation to show what's going on after the packet is transmitted from the phone, over the Internet, to Google's analytic server.   It's received by one of the computers in this rack diagram.

**Q.**   Professor Black, we've heard the plaintiffs say a number of times that Google takes analytics data from users' phones. From your perspective as a computer scientist, is Google taking the data from the user's phone?

**A.**   I don't think I'd phrase it that way.   That kind of evokes this image that the server is going out and seizing things from the phones.   And the server is passively just sitting there, waiting for information to come in.   Just like -- you know, I'm old enough that I used to send mail using a letter and drop it in a mailbox.   And I'd go to the mailbox and put it in the slot.   I would never describe that as the mailbox is out taking people's letters.   It's just receiving letters that are being sent or deposited into it.

**Q.**   Which person or entity is responsible for causing the data

happens if the GAIA on the consent check server goes to Footprints.  It's been two weeks, but Mr. Monsees told us about Footprints.  That's the source of truth for whether sWAA is on or off for someone's identity, for someone's account.

And in this example, I'm saying, "Okay.  It's thumbs-up."  SWAA is on.  Consent is given.  And in that case, indication would come back.

Now, the GAIA is not being sent back.  Only the thumbs-up is being sent back to the analytics server.  So it only learns that whatever Doritos was indicating, it was a thumbs-up.  That's all it finds out.

Q.   And just to be clear, while all this has been going on on the consent check server, where is the analytics and app activity data stored?

A.   That's still waiting back on the analytics server for the consent check to come back.  I mean, this is all lots of steps.  This is going to happen in a couple of milliseconds at most.

Q.   And at this point, has the data -- the app activity data been saved?

A.   It's been secured on the analytics server, and it's not going anywhere pending the results of the consent check.

Q.   Is it still in temporary memory, or is it in long-term memory at this stage?

A.   It won't be saved until the results of the consent check come back.

Q.    Now, Dr. Hochman suggested, when he was testifying, that Google should check consent on the device rather than using this isolation system to check consent.  Do you have a response to that?

A.    Mr. Ganem explained why Google ultimately decided this was better.  He said it was closer to the source of truth where you do the check.

I also, as a security person, wouldn't want sensitive information being handled on the device.  Devices can be compromised much more readily than something secure inside of Google's server warehouse.

Q.    Okay.  So I think you said already thumbs-up, this is a WAA-on packet of data.  So please explain what happens next.

A.    So since consent is given, thumbs-up, this information can be stored in the user's Google Account, can be used to personalize ads and Search and Maps and so forth.

Q.    Now, tell us what happens if it's thumbs-down and the consent check server reports that WAA or sWAA are off.

A.    Sure.  So in that case this is a sWAA-off user; and as we've heard many, many times, the data is de-identified and then stored into a separate pseudonymous log not tied to the user's identity.

Q.    What happens to the GAIA ID if it's thumbs down?

A.    The GAIA ID is not stored in the pseudonymous events log. Instead, there's just pseudonymous identifiers.

**Q.** So if a user is sWAA off, does Google save the app activity data before or after the consent check server has determined that the user is sWAA off?

**A.** It's only saved here at the end of the process, after the consent check.

**Q.** Can you explain to the jury now what you mean with this Number 5?

**A.** Sure. So, as part of the de-identification process -- and we've heard about this already -- but there's some fuzzing. That means you add some fuzz to the data to make it less accurate on purpose, to hide the accuracy. For timestamps you would say, "Add a few seconds forward or backward" to make it less accurate. And it's also scrubbed of certain kinds of identifiers, IP addresses. It's encrypted and then it's stored securely. So it's fuzzed, scrubbed, and then encrypted and stored.

**Q.** Did the consent check process differ on iOS since 2021?

**A.** Yes. I think we heard this as well, that Apple instituted a new policy starting in 2021, in iOS 14.5. And anybody who uses an iPhone probably has seen this a hundred times, but iPhone users can click on "Ask app not to track," and that means the device ID called IDFA is not sent in that case; or it can say, "Allow," and then the IDFA is still sent.

**Q.** Now, if the user clicks "Ask app not to track," is Google able to determine whether the iPhone is owned by a Google

else measuring the impact of Google Analytics on batteries and whether or not that impact is anything greater than minimal?

A.    No, I did not.

Q.    I have no further questions, sir.

A.    Thank you.

THE COURT:    Mr. Boies.

MR. DAVID BOIES:    Thank you, Your Honor.

<u>CROSS-EXAMINATION</u>

BY MR. DAVID BOIES:

Q.    Good morning, Dr. Black.

A.    Good morning, sir.

Q.    We haven't met, but my name is David Boies.    You understand I represent the plaintiffs?

A.    I do.

Q.    Let me begin with what you were talking about in terms of conversions.

    Is it your understanding that Google uses sWAA-off data for conversion purposes?

A.    In certain cases.    We just described an instance where it can't, but --

Q.    Where it can or can't?

A.    In certain cases it cannot, but in certain cases it can.

Q.    Okay.    Now, just to orient ourselves, because we're using a lot of acronyms here, I'll put up our Demonstrative Exhibit Number 1.

We've been talking about sWAA as a user's third-party Web & App Activity.  Is that the way you understand sWAA?

A.    Only because of this lawsuit.  I never heard the word. That's an internal Google term.

Q.    But in terms of your work, do you understand that that is the way Google uses it?

A.    Correct.

Q.    Okay.  And sWAA data is data from a user's third-party Web & App Activity, correct, as Google uses the term?

A.    I don't know that I've heard "sWAA data."  I've heard "sWAA-on data" and "sWAA-off data."

Q.    Okay.

A.    Maybe -- you can pull them together maybe.

Q.    Yes.  I would have thought sWAA data was sWAA off and sWAA on combined; but if you don't know that, we'll go on.

SWAA-off data is data from a user's third-party Web & App Activity and it's collected while the sWAA control is off; fair?

A.    Agreed.

Q.    Okay.  Now, you understand, and I think we're in agreement, that whether sWAA is on or off, Google initially collects and copies the same data from a person's use of third-party apps; correct?

A.    The same data is transmitted from the app regardless of whether sWAA is on or off and it's sent to Google.

Q.   Sent to Google.  And when it comes in, Google makes a copy of that; correct, sir?

A.   I mean, I said on direct, technically, when it moves data, that does create a copy.

Q.   It does make a copy?

A.   It's inherent in how computers operate, so yes.

Q.   And that initial copy has all of the personal identifiers in it; correct?

A.   Could you clarify "personal identifiers"?

Q.   In your work, did you talk with Google about personal identifiers?

A.   Would you include counsel when you say I spoke to Google?

Q.   Well, let's talk about Google other than their counsel first.

A.   Okay.  I spoke only to Mr. Ganem prior to writing my report.

Q.   Okay.

     MR. DAVID BOIES:  Now, perhaps we can put up, just for the witness, Mr. Ganem's testimony at 1206, lines 13 to 16. Let's make it 13 to 20.

BY MR. DAVID BOIES:

Q.   Now, you see here, where Mr. Ganem testifies [as read]:

     "QUESTION:  When Google first receives the sWAA-off data
     from the app" --

     MR. SANTACANA:  Objection, Your Honor.  He's reading

trial testimony in the record.  It's not the same as refreshing recollection.

MR. DAVID BOIES:  I'm not refreshing his recollection. I'm directing the witness's attention to an admission by Mr. Ganem, who he said he relied on for this.

MR. SANTACANA:  I don't think it's appropriate to read trial testimony in the record.

THE COURT:  I actually think Mr. Santacana is right. You can't just read in trial testimony.  If -- I'm not sure why you need this.  Are you -- what are you asking?  Try another question.

MR. DAVID BOIES:  Sure.

BY MR. DAVID BOIES:

Q.   Let me try it this way:  Did Mr. Ganem tell you that when Google first receives sWAA-off data from the app, whatever it is, it has all the personal identifiers in it?  Did he tell you that?

A.   I mean, our conversation was years ago.  I don't recall if he used those words or close to those words.

Q.   Do you understand, whether Mr. Ganem told you that or not, that that is a fact; that when Google first receives sWAA-off data from the app, it has all the personal identifiers in it?

A.   If Mr. Ganem said exactly that, I would ask him to clarify because I don't know what it means to just say "personal identifiers."

Q.   Let me ask you this:  How do you define "personal
identifiers"?

A.   Once again, it would heavily depend on context; and if
used out of the blue, I would ask for a clarification:  Do you
mean a personally identifying identifier, or do you mean a
pseudonymous identifier?  That's important.

Q.   Well, do you understand -- or let me ask you this:  Do you
consider a device ID to be a personal identifier?

A.   It's a device identifier.  It identifies the device but
not the human being who owns that device.

Q.   Do you understand or believe that by identifying a
person's device, you're identifying, in many cases, the person?

A.   I don't think so.  If I gave you my device ID right now,
you wouldn't know it was John Black.

Q.   I might not know it, but I could get somebody to figure
that out, couldn't I, sir?  I can buy that from -- on the --
online; correct?

A.   Not from Google.

Q.   No, not from Google.  But you can go online and you can --
from a data broker, you can get people's email addresses if you
give them the device ID; correct, sir?

        MR. SANTACANA:  Objection.  Lacks foundation.  Outside
scope of the direct.

        THE COURT:  Overruled.

        THE WITNESS:  I'm aware, in my work, there's some

shady people out there that will collect information on you and sometimes can correlate those two together.  It's not something Google would ever do obviously, but there are people who are less ethical than Google.

**BY MR. DAVID BOIES:**

Q.   Okay.  Now, you're also aware that Google knows what devices its users are using; correct?

A.   When you say "what device," do you mean the ID, or do you mean the model number?

Q.   The device ID.  That is, Google knows, for every one of its account holders, what the device ID is that those users are using; correct?

A.   Not always.  As I explained in my direct, in cases, there is no device ID sent.  In case it's sent, then Google would receive it.

Q.   My question was a little different.  I'm not talking about whether the device ID is in the app data that is sent.  I'm just talking generally.

Google knows what the devices are -- the device IDs are for each one of its account holders; correct?

A.   So, sir, you're suggesting within the Google Account, there is a device ID stored alongside the user's identity?

Q.   Yes.

A.   No.  They have a policy of divorcing the identity from the device ID.

Q.   When you say they have a policy of divorcing it, you don't mean that they don't have a table that connects it, do you, sir?

A.   I'm not aware of any table that, alongside the GAIA, lists the device ID.

Q.   You're not aware of that at all?

A.   I haven't been shown any evidence where that's the case.

MR. DAVID BOIES:   Can somebody try to find Ganem's deposition testimony?  See if we can put this to the witness.

BY MR. DAVID BOIES:

Q.   Let me see if I can get something that can refresh your recollection.

In the meantime, just as background, back in June you prepared a number of charts, correct, for your testimony?

A.   I don't recall.  Back in June, you're asking?

Q.   June of this year.

A.   I prepared a number of charts in this lawsuit.

Q.   Yes, sir.  And gave -- and they were presented to us.  Do you recall that?

A.   I'm sorry, I don't.  It was a number of months ago, and I work all the time.

Q.   Well, do you recall that just in the last week or ten days, you prepared a set of charts that were given to us?

A.   Maybe the word "chart" is the trouble we're having.

Q.   A slide, the kinds of demonstratives that you were using

here.

A.    I've prepared slides, absolutely.

Q.    Okay.  And in those slides that were prepared like a week or ten days ago, you said you had five opinions; correct?

A.    Oh, you're asking me about a draft of my presentation?  Is that where -- are we on the same page now?

Q.    I don't know whether it was a draft or whether it was your presentation.  I simply know what we were given, representing them to be your charts that you were going to use.

A.    I think "charts" is the place where we're crossing --

Q.    Or slides.  Is "slides" a better term?

A.    I think now I understand what you're asking.

Q.    Okay.  So the slides that we got a week or ten days ago had five opinions that you were going to testify to; correct?

A.    I think in a draft of my presentation, there was a point at which I had listed five opinions.

Q.    Okay.  And those -- those slides that set out your opinions, those have changed; correct?  You're not -- you are no longer offering those five opinions; is that fair?

A.    I'm sorry.  I don't remember what the five were and whether I just collapsed them or decided not to offer them to the jury in some cases.  There may be some overlap.

        MR. DAVID BOIES:  Can we put up, just to the witness, his Demonstrative Number 10 that we got recently?

\\\

**BY MR. DAVID BOIES:**

Q.   Do you recall that?  This was the summary of your opinions that we were given --

A.   No, sir.

Q.   -- that you prepared?

A.   This says Mr. Hochman on it.

Q.   It should be the next chart.  This is Number 9.  It should be Number 10.

Do you recall that this is the slide that you prepared to be given to us as the summary of your opinions a week, ten days ago?

A.   I think this looks right.

Q.   Okay.

Now, okay, let me show you pages 69 and 70 of Mr. Ganem's deposition, and go to line -- start at line 17 of 69.

Now, would you just read that -- well, let me just point you to -- let me point you to lines 23 and 24.

You see where Mr. Ganem refers to a table that associates their IDFA with GAIA?

A.   I do.

Q.   And IDFA is a device ID; correct?

A.   For Apple, yes.

Q.   And GAIA would be the user ID; correct?

A.   The Google user ID.

Q.   And so he's referring here to a table that associates

their IDFA with GAIA; correct?

A.    Correct.

Q.    Until I showed you this, you were not aware of that table?

A.    I was.  This is a long time ago.  I mean, Google did this a long time ago.  This is in my report.  They've stopped the practice because it's not pro privacy.

Q.    When did they stop that practice, according to you?

A.    I believe right around iOS 14, is my recollection.  It's not present in my memory.  A few years ago.  Maybe five or -- years ago or something.

Q.    But it hadn't stopped as of the time of Mr. Ganem's deposition; correct?  Because he's talking about what happened at that time, the date of the deposition.

        MR. DAVID BOIES:  When was the deposition?

BY MR. DAVID BOIES:

Q.    This was October 28th, 2022.

A.    I'm hesitant to characterize Mr. Ganem's testimony.  I don't know the exact, but he seems to be speaking in the present tense.  I just -- my recollection is that they discontinued that table prior to this date, but I don't remember.

Q.    But you really don't know?

A.    I would have to check my report.

Q.    Okay.  And in your report, you say when they terminated the table?

A.   I believe I note that they, in the past, had this table and then they terminated it.

Q.   And what I'm saying is, you say that.  That's in your report?

A.   My recollection is that I do talk about this table in my report and its termination.

Q.   Okay.  Well, perhaps your counsel will pull that out if we have a chance to do that.

Now, in terms of use that Google makes, you had a chart which you said Google doesn't profit from this data.  Do you recall that?

A.   A slide, yes.

Q.   A slide.

A.   Right.

Q.   I apologize.

A.   I'm with you now, though, on the "chart" word.

Q.   We've got the terminology right.

Now, you don't dispute that this sWAA-off data is used for conversion purposes, do you?

A.   In some cases, as I mentioned.

Q.   And what is the value to Google of using that for conversion purposes?

A.   The way you asked it, it sounds like I'm supposed to say what the value to Google is?  I mean, I can say from a technology -- from a technical standpoint, that it's helpful to

advertisers to learn where their spend is effective, and Google provides assistance in measuring that effectiveness of their ad campaigns by using that data.

Q.   But you said that -- in your testimony that Google didn't profit from the sWAA-off data.  Do you recall that?

A.   Yes.

Q.   Okay.  Now, if Google is using sWAA-off data, as you just said they were, for conversion purposes, they're profiting from it; correct?

A.   I mean, they don't get paid for doing it, but you maybe could argue that they provide a benefit that, at some downstream point, it's helpful because making good products is helpful.

Q.   When you say they don't get paid for that, did you talk to Mr. Ganem about that?

A.   Doubtful.  He's CEO of analytics, and probably Ms. Langner would be the authority there, who I didn't speak to but I read her deposition.

         MR. DAVID BOIES:  Let me see if I can -- let me show the witness Mr. Ganem's testimony at page 1211, lines 19 to 22.

BY MR. DAVID BOIES:

Q.   You were here during Mr. Ganem's testimony; correct?

A.   Yes.

Q.   And did you hear him testify that as the term --

         MR. SANTACANA:  Objection, Your Honor.  We're reading

Q.   Correct?

A.   Yes.

Q.   Okay.  Next one, Nathan Rodriguez.  That was off after 2020; correct?

A.   Yes.

Q.   And mcmxcthrift, the next account, that was off; correct?

A.   Yes.

Q.   And if you look at all the rest of his accounts, they were all off after 2020; correct, sir?

A.   The last one, Anibal Rodriguez, it just says "NA," so that's one that doesn't say paused.

Q.   None of them were on; correct?

A.   I just -- given I don't know the answer for the last one, I can't confidently say "yes" or "no."

Q.   Did you hear Mr. Rodriguez testify about who that was?  Whose account that was?  Who Anibal Rodriguez was?

A.   I'm sorry.  You're asking me who is Anibal Rodriguez?

Q.   I'm asking you whether you were here and heard the testimony that Mr. Rodriguez gave as to who that was?

A.   I don't remember if he described who each of these accounts was, no.

Q.   Okay.  But it was not his account; correct?

A.   You're representing that Anibal Rodriguez is not an account of Anibal Rodriguez?

Q.   No.  What I'm asking you is:  Did you hear him testify --

his testimony about who that account was for?

A.   I was here for the entirety of his testimony, but I don't recall if he gave an answer to that question.

Q.   But there's no account here that's listed as being on in 2021 and 2022; correct?

A.   That, I can agree with.

Q.   Okay.  And does that cause you to conclude that the plaintiffs' data that was collected had to be collected when sWAA was off?

A.   No.

Q.   Okay, sir.  Let me go to another subject.

Do you understand that Google was able to produce the plaintiffs' data that Google had collected when sWAA was off once the plaintiffs gave Google their device IDs?

A.   That's correct.

Q.   So if somebody had a device ID, they could get the data that sWAA off had -- that Google had collected when sWAA was off?

A.   I'm not sure I understand.

Q.   Okay.  If you could tie a person to a device ID, you could then get all of the data that Google had collected from that device; correct?

A.   "You" being a regular user?

Q.   Let's say Google.

A.   Google.  Okay.  That changes things.

Q.   So Google.  Let's start with Google.

Google can get -- I know the policies are against it, everybody from Google says, but Google could connect a device ID to a person and then collect all of the sWAA-off data that was linked to that device ID; correct?

A.   First, you wouldn't need to connect it to a person.  If you had the device ID and then you overcame the technical barriers that we've been describing as well as got permission from legal to overcome the policy proscriptions, obviously it's possible, since it was done in the course of this lawsuit.

There had to be a special program written, it was 400 lines of C, in order to go and actually extract that data to make the production.  It was a series of steps with much approval needed, but it is obviously possible.

Q.   It's obviously possible?

A.   It was done.

Q.   Now, in addition, you are aware that Google has had issues with respect to employees misusing user data; correct?

A.   You're speaking of the data relevant in this case or just generally?

Q.   Well, let's take just generally.

The issue is whether everybody's going to abide by these policies.  And you're aware that Google has had people who don't abide by their policies in terms of how user data should be treated; correct?

MR. SANTACANA: Objection. Relevance. 403. He said he didn't want to talk about the data at issue.

THE COURT: Sustained.

BY MR. DAVID BOIES:

Q.   Now, did you examine what the risks were of data breaches at Google?

A.   You mean as an independent exercise, just generally the risk?

Q.   In connection with your testimony here, did you examine that at all?

A.   I didn't conduct a security audit of Google in any shape or form, no.

Q.   I'm not asking whether you conducted a security audit. What I'm asking you is whether you investigated or analyzed whether there were serious risks of data breaches at Google. You either did or you didn't.

A.   As part of my engagement?

Q.   Yes.

A.   No.

Q.   Okay.

MR. DAVID BOIES: Now, if -- if I can pull up your chart just briefly, I think it was Chart 13. Yes, Chart 13.

Let's go -- the number on that is different than the number that I was given by counsel.

Let's go to the next chart.

users about sWAA or used the data irresponsibly.  There is no harm in this case.

You didn't hear that from Mr. Ganem.  You didn't hear it from Mr. Ruemmler.  You didn't hear it from Mr. Monsees.  You didn't even see a single email in this case, of all the ones that plaintiffs' counsel put up, you didn't see a single one about Google Analytics for Firebase or how Google Analytics for Firebase uses data or suggesting that that data was misused.  Not a single email.

They want to show you general emails about concerns that people had about irrelevant products in the hopes that you're just going to turn a blind eye; that you're going to say, "Well, people at Google had some concerns about privacy generally, and that's enough to prove liability in this case."  That is their theme.

But I know you took an oath.  You took an oath to follow the law, to listen to the facts in evidence, and apply that law -- those facts in evidence faithfully to the law.

Not one word of testimony, not one document.  No one was harmed here.  97,992,376 class members, zero members harmed.  You didn't see any evidence to the contrary.

I'm going to cover these five topics with you.  First, I'm going to talk to you about what Google disclosed and how users consented.  I'm going to talk to you about how Google Analytics does not invade user privacy.  I'm going to talk to you about

how Google acted in good faith.  I'm then going to talk to you about why plaintiffs can't meet the high burden of their claims and why they shouldn't be rewarded with bogus damages.

Google disclosed and users consented to how sWAA works.

Now, plaintiffs tried to suggest throughout this case that Google buries the truth, but what you have seen is that Google puts the important facts right up front.

On the activity control screen, right at the very top, Google tells users [as read]:

"You can control what is saved in your Google Account.  Choose which settings will save data in your account."

Three times Google mentions "your account" in the activity control screen.

At the time of choosing WAA or sWAA, users cannot miss this disclosure.  They are forced to look at it and see what Google can still do even when sWAA is off.

Now, you heard Professor Hoffman.  She got down from the stand and talked to you about some of Google's disclosures. And you heard her tell you that Google can't put everything on one screen.  It tries to put the most important stuff so that people who skip disclosures will be at least forced to see the most important stuff and skimmers as well.  And if there are readers, people who want to really dive deep, Google provides links to those disclosures so that they can see more about how

Google describes these various settings.

She testified that that is a sign of effective design. That is a sign of effective design because, just imagine if you have a giant page of disclosures and it's six-point font and it's in legalese.  Nobody's going to be able to read and understand that.  Google is trying to give users a chance to digest the information they may want and choose to learn more if they so desire.  And that is the way that Google made its disclosures.

What else did you hear from Mr. Monsees?

[As read]:

> "We've had over 3 billion users across the
> world, all kinds of different backgrounds.  Some
> users have different expectations, different
> perceptions, and we regularly try to improve and make
> these settings clear for all users."

I mean, imagine, Google is trying to write these disclosures for a lot of people.  They're going to be, hopefully, clear to everyone, but Google can't ensure that every single person who reads this disclosure is going to understand it exactly the same way.

What did Professor Hoffman say?  [as read]:

> "Different people have different preferences for
> privacy.  Even the same person could have different
> preferences on different occasions."

And this comports with our experience.  Sometimes you may want to read more; sometimes you may be in a hurry and you may not.  That is why Google and companies who care about good design and letting users know what's happening use progressive disclosure, meaning tell them the important stuff up-front, let them click through if they want more information.

Now, I was mentioning to you that this "Are you sure" screen appears on both WAA and sWAA, and the reason I'm mentioning the one on WAA is because, as you might recall, you can turn sWAA off by turning WAA off.  So if WAA is off, sWAA is off.  And you can also turn sWAA off directly even if WAA is on.  So it's important to note that this "Are you sure" screen appears on both WAA, when you turn it off -- again, this is Exhibit G574.R2 at page 22 -- and the "Are you sure" screen is also on the sWAA page.

When a user clicks "Turn it off," they see that same disclosure.  That's G607 at pages 6 and 7.  And as Mr. Monsees testified, this comes from the source code.

But there's more.  Users want to dig into the privacy policy?  Here's what they see.  Your activity on other sites and apps.  This is what this case is about.  Your activity on other sites and apps.

And what does Google say?  [as read]:

"Many websites and apps partner with Google.

For example, a website might use our advertising

services (like AdSense) or analytics tools (like Google Analytics).  These services may share information about your activity with Google and," in addition, "depending on your account settings, the products in use (for instance, when a partner uses Google Analytics in conjunction with our advertising services), this data may be associated with your personal information."

And I know you've seen this many times, and I'm sorry that I'm -- I have to keep showing it to you.  But this case, the plaintiffs want to make this case about disclosures, and it is very clear that Google tells users about Google Analytics, that it can collect data and, in addition, if users select certain settings, it can be associated with their personal information.

Google doesn't stop there.  If users want to learn even more, they can learn "How Google Uses Information from Sites or Apps That Use Our Services."

Again, Google Analytics [as read]:

"For example, when you visit a website that uses advertising services like AdSense, including analytics tools like Google Analytics, or embeds video content from YouTube, your web browser automatically sends certain information to Google."

Google is telling users more and more about Google Analytics and what happens on third-party sites and apps

that use Google's services if the user wants more.

Now, Mr. Boies tried to suggest that Mr. Monsees was somehow thinking -- saying that these disclosures were unclear. But he was asked in his testimony [as read]:

"QUESTION:  Has Google disclosed that it collects activity data from other sites and apps, like analytics tools, from 2016 to 2024, in its privacy policy?

"ANSWER:  Yes, it has.

"QUESTION:  Again, Google is saying sites and apps do send Google data?

"ANSWER:  Correct, of course, because the disclosures say it."

What about Mr. Miraglia?  They quoted him as suggesting that some language about a Dutch translation was intentionally vague.  But when he was asked, he answered [as read]:

"ANSWER:  The pathways users have through Google Systems, we work really hard to make that clear at the relevant moments.

"QUESTION:  Fair to say that you don't know who wrote this sentence; is that correct?"

That's the intentionally vague sentence.

[As read]:

"ANSWER:  I don't.

"QUESTION:  Do you agree that the phrase 'more information will be visible in your Google Account' is vague about

**CERTIFICATE OF REPORTER**

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Thursday, September 4, 2025

_____

Lee-Anne Shortridge, RMR, CRR

CSR No. 9595, Official United States Reporter

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter