# EXHIBIT 1

# TRIAL TRANSCRIPT
# AUGUST 20, 2025

**Volume 3**

**Pages 341 - 562**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,          )
individually and on behalf of  )
all others similarly situated, )
                               )
          Plaintiffs,          )
                               )
  VS.                          )  **NO. 3:20-CV-04688 RS**
                               )
GOOGLE LLC,                    )
                               )
          Defendant.           )
_____)

San Francisco, California
Wednesday, August 20, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    BOIES SCHILLER FLEXNER LLP
                    333 Main Street
                    Armonk, New York 10504
               BY:  **DAVID BOIES, ATTORNEY AT LAW**

                    BOIES SCHILLER FLEXNER LLP
                    2029 Century Park East, Suite 1520
                    Los Angeles, California 90067
               BY:  **ALISON L. ANDERSON, ATTORNEY AT LAW**

                    BOIES SCHILLER FLEXNER LLP
                    100 Southeast Second Street, Suite 2800
                    Miami, Florida 33131
               BY:  **JAMES W. LEE, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES:**   (CONTINUED)

For Plaintiffs:

        BOIES SCHILLER FLEXNER LLP
        44 Montgomery Street, 41st Floor
        San Francisco, California 94104
BY:   **MARK C. MAO, ATTORNEY AT LAW**

        SUSMAN GODFREY LLP
        One Manhattan West, 50th Floor
        New York, New York 10001
BY:   **WILLIAM C. CARMODY, ATTORNEY AT LAW**
     **RYAN SILA, ATTORNEY AT LAW**

        SUSMAN GODFREY LLP
        1900 Avenue of the Stars, Suite 1400
        Los Angeles, California 90067
BY:   **AMANDA BONN, ATTORNEY AT LAW**

        MORGAN & MORGAN COMPLEX LITIGATION GROUP
        201 North Franklin Street, Seventh Floor
        Tampa, Florida 33602
BY:   **RYAN McGEE, ATTORNEY AT LAW**

For Defendant:

        COOLEY LLP
        Three Embarcadero Center, 20th Floor
        San Francisco, California 94111-4004
BY:   **BENEDICT Y. HUR, ATTORNEY AT LAW**
     **EDUARDO E. SANTACANA, ATTORNEY AT LAW**
     **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
     **THILINI L. CHANDRASEKERA**
     **ATTORNEY AT LAW**

        COOLEY LLP
        4401 Eastgate Mall
        San Diego, California 92121
BY:   **MICHAEL A. ATTANASIO, ATTORNEY AT LAW**

Also Present:       **Steve Ganem, Google**
        **Anibal "Pete" Rodriguez**
        **Julian Santiago**

intended to cover?

**A.** Well, I think we can just see -- I don't know if everyone can see it, but just on the top -- they're actually underlined, I think -- the very description of what the activity controls are for, so not just Web & App Activity, is to save this type of data in your account to give you those more personalized experiences.

Just to explain that just for a second, we can't personalize your experience if we don't know who you are. So this only works when you're signed in and this data is saved.

And I think it's that account piece that ends up being so critical because this is like your personal profile, your history that goes with you so that the things you've done in the past can improve the things you do in the future.

**Q.** And so just for absolute clarity, when a user turns WAA or sWAA off, does data collected from users go into their profile at Google?

**A.** When you turn those settings off, that data does not go into your profile at Google. It would not be saved against your account.

**Q.** Yesterday you were asked a number of questions about an email that you received and responded to from Mr. Ruemmler. I'd like to take a look at that because it sounded like there was something you wanted to explain about it.

Can we look at Exhibit Number 3? And let's just take a

look at the top here.

Now, before we get deeper into this email, Mr. Monsees, can you just tell the jury a little bit more about Mr. Ruemmler's role with respect to the work that you have done with him?

A.   Yeah.  I believe I stated before that Mr. Ruemmler is an engineer on the Privacy Team for Google Workspaces.  And Google Workspaces, if you haven't heard the term, basically means your Gmail, your Google Drive, your Google Docs, that kind of family of services.

And as part of Chris's role over there -- or my interactions, I should say, with Chris have often been about reviewing and ensuring the policies that Google has internally are being enforced with the safe handling and collection of Google Workspace data.

Q.   Do you respect Mr. Ruemmler's opinion?

A.   Yes, I do.

Q.   And have you taken his opinion seriously when deciding what to do with this control?

A.   Yes.

Q.   I noticed yesterday that you mentioned several times that the discussion that you and Mr. Ruemmler were having in this exhibit had to do with the concept of data saved to a Google Account.

Are you -- as you worked at Google, in charge of WAA, are

you in the habit of clarifying, every time you say "data," that you mean data saved to a Google Account?

A.   No.  Almost everyone that comes and talks to me, like when Chris and I work, I know that they're talking about Google Account data because that is primarily the role that I do.

Q.   Your role is about Google Account data?

A.   Exactly.

Q.   When you see -- when you have writings that you receive and people talk about data, in your experience, do the people who are writing to you always attach the words "in your account" behind the word "data" whenever they say "data"?

A.   No.  I think that would be kind of silly to repeat that all the time.

Q.   What sort of data does Mr. Ruemmler work with at Google?

A.   I mentioned that he works with Gmail data -- predominantly that's what Chris and I would talk about -- and how that Gmail data is used to enable various cool features.  Like, you could ask Google Assistant, "Is my flight on time?"  And it would know, "Oh, you have a flight confirmation from Southwest," and it could answer that using your Gmail data.

Q.   You mentioned yesterday that this email thread had something to do with, I think you said, a WAA-off logging proposal.  Do you remember that?

A.   Yes, I do.

Q.   Can you just explain briefly for the jury what the WAA-off

logging proposal is?  I don't think you got a chance to explain it.

A.   Sure.  So I believe it was around 2019, maybe even late 2018, we had had discussions to change the way WAA works when it's turned off.

In the past, when you turned Web & App Activity off, it basically stopped all personalization from happening, not just on historic -- history, like your Web & App Activity data, but even if you told Google your home address so you could say, like, "Directions home" when you're in the car, that, because it's personal, we would require Web & App Activity because we want to ensure that the logs that are created -- you can't really de-identify a log if it has your home address in it; right? -- so we would just say, "We'll disable those."

And we had spent a lot of time trying to find a different solution so we could enable those types of personal features, particularly on things like the Assistant, which is meant to be very personal, without also requiring you to save your Web & App Activity.

Q.   So just so I understand your example, can you just spell it out for us, who are not embedded in it?  What is it that was not working for users when WAA was off that you were trying to address?  Just give us one example.

A.   Sorry.  I think, basically, simply it's that when WAA was off, non-history-based personal features just couldn't work for

users, and that would greatly limit some of the products that we use.

**Q.**   So if somebody said "Find me cafes in your home" on Google Search and WAA was off, would that have worked?

**A.**   That would work.  But I'll give you an example of something that used to annoy my wife a lot --

**Q.**   Okay.

**A.**   -- is I have, you know, Google Assistants in my home and I have my lights controlled -- some of the lights controlled by voice.

When WAA was off, you couldn't say, "Hey, Google, turn off the lights," because that needed personal account information to work and that was blocked when WAA was off.  That was very frustrating.

**Q.**   Is that kind of -- it sounds like a pretty significant bug from the experience of the user.  Why would Google have disabled your ability to turn off the lights when WAA was off?

**A.**   Well, like in my example of using home address, we did it to try to check -- protect user privacy.  We wanted to make sure that personal data wouldn't be logged in the de-identified logs when WAA is off.  So what we did is we engineered a solution that could update that policy so that we could enable these features.  You could turn off your lights.  You could get directions home without requiring Web & App Activity to be on.

**Q.**   Okay.  And so this sort of first-draft proposal is the one

Mr. Ruemmler is expressing concerns about?

**A.**   Yes.  I believe we worked on this project for more than two years, at least another year after this discussion with Chris.

**Q.**   It took two years to fix this light problem?

**A.**   Yes.

**Q.**   Why did it take so long?

**A.**   There are a lot of systems at Google that are very complicated, and we need to be very careful when we're making changes to user privacy controls.  We don't want a system to break and accidentally collect or mishandle user data.

**Q.**   Wouldn't an easy proposal -- wouldn't an easy solution have been to just let the Google Assistant know where you live? It's in your house.

**A.**   It would be, but the concern that we had is that if that data, like your home address, went into our de-identified logs, it might make those identifiable, which would go against our policies.

**Q.**   So what is it about this technical proposal that Mr. Ruemmler was telling you he didn't like?

**A.**   Yeah.  So in this first proposal, the first proposal was very simple.  It was:  Well, what if instead of writing against a de-identified log when a user has WAA off, we'll just still write it to the user's Google Account, we'll just automatically delete it.

The catch, though, as Mr. Ruemmler is very aware with being so technically involved, is that it takes Google Systems a little bit of time to delete.

And so the concerns that he's raising in a couple places here is that it would mean that we would still have the data, your Web & App Activity, against your Google Account even when the setting is off just for a little bit of time.  But his point was, I think, valid.  We would still have it, and he was concerned about how we would explain that to users.

**Q.**   So just to be absolutely clear, this proposal would have allowed Google to know where your Google Assistant is even when WAA is off temporarily?

**A.**   That's correct.

**Q.**   And he didn't like that because?

**A.**   Because I think, as he explains in quite some detail in this exhibit we were looking at, he was worried that it would -- we would be misrepresenting to users.  Basically, we wouldn't be explaining clearly what WAA actually does when it's off.

And you see him, I recall, reference a couple of times the GAIA temp.  That's what he's talking about, is writing to a Google Account temporarily.

**Q.**   So let's look at the last paragraph of this first page. I think you were shown some of the statements in this paragraph yesterday, but not all of them.

Could you just take a look, Mr. Monsees, to the second sentence and read it to the jury?

A.   Sure.  Chris is saying here [as read]:

"If I choose not to store data in my account, then Google should not have access to the data either as the data should not be in the account."

Q.   So he's saying to you in this email that Google should be concerned about data that should not be in the account?

A.   What he's saying --

MR. CARMODY:  A little bit of hearsay is okay, but he's getting into all these conversations he had.

MR. SANTACANA:  Your Honor, he was questioned for a long time yesterday about what Mr. Ruemmler thinks.

THE COURT:  This document is in evidence.  You can certainly ask about it.  Stay away from what did Mr. Ruemmler mean or what is in his mind because, obviously, he can't testify to that.

MR. SANTACANA:  I will.

THE COURT:  But you can proceed.

MR. SANTACANA:  Thank you, Your Honor.

BY MR. SANTACANA:

Q.   So, Mr. Monsees, just to rephrase my question, what did you understand this sentence to mean when he says to you that he's concerned about whether data should not be in the account?

A.   Given that the proposal that Chris was talking about would

have temporarily saved data in a user's account, I read this to mean that that data shouldn't be saved in the user's account, meaning he disagreed with the proposal.

Q.   Let's take a look at the end of this paragraph, which is at the top of the next page.

Now, could you just read that last -- the only full sentence there for me?

A.   Yeah.  He says [as read]:

> "I'm probably better off having WAA on and deleting the data immediately versus having WAA set to off if Google moves it to GAIA temp logging."

Q.   Is GAIA temp logging a reference to the same proposal you were discussing?

A.   That's exactly the proposal, yeah.

Q.   Can you explain briefly your understanding of why a user would be better off having WAA on and deleting immediately versus having WAA off if you had adopted this first-draft proposal?

A.   Yeah.  I think what Chris is saying is that if WAA had been on and you deleted immediately, at least you would see it and it would run through a different system to remove it from our system -- you know, from Google Systems.  So, basically, we'd remove it from your account faster, is what he's saying, than the temporary plan.

Q.   Let's look at your response to Mr. Ruemmler, which is on

page 3, just about a third of the way down, the paragraph that starts "By some interpretations."

And if you could just read the only full sentence -- or the second sentence here.

A.    Sure.  It says [as read]:

"With the move to temp personal logs" --

And just to clarify, that's the GAIA temp thing we've been talking about.

Q.    So that's the third label for the same thing?

A.    Yeah.  Clearly, a confusing project.  Sorry.

[As read]:

-- "WAA off will retain less data than signed out; however, signed out is and was never associated with an identity, so the risk balance is different."

Q.    So just to be clear, Mr. Monsees, this email is from 2019. That's before this lawsuit was filed?

A.    That's correct.

Q.    And in 2019, before this lawsuit was filed, you were drawing a distinction between data associated with an identity and data that's not associated with an identity?

A.    Yes.  I always have.

Q.    Okay.  Now, let's look at the last paragraph here in this page, where it says -- starts with the word "Today."

So this is another paragraph you wrote?

A.    Yes.

**Q.**   Let's look -- so just read the first sentence for us.

**A.**   Sure.

[As read]:

"Today (in Search, Maps, Assistant, et cetera) WAA off is logged the same as being signed out."

**Q.**   Can you just explain to the jury what you mean by that?

**A.**   Yeah.  The -- what this would mean is when you use products like Google Search, when you had WAA off, we would log those logs generated -- right? -- what responses the products gave, but always to a de-identified ID that happened to be the exact same ID as when you're using Google signed out of your Google Account.

**Q.**   Now, can you read the next sentence?  It's a little long, but we'll break it down.

**A.**   Sure.

[As read]:

"What the WAA-off temp personal logs project will do" --

**Q.**   Sorry.  I think that's the fourth label for the same project?

**A.**   Yes.  Sorry.  A lot of the same words, though.

What this project will do is [as read]:

-- "change that behavior to be aligned with what YouTube, Play, Apps, and many other teams have done for years with GAIA temp logs.  Instead of creating a

pseudonymous archival log, we will create a temporary (30- to 60-day, Sawmill deletion window) limited purpose log."

Q.   Okay.  Can you just explain what you meant when you said "instead of creating a pseudonymous archival log"?

A.   Internally, Google will often use the term "pseudonymous" or "pseudonym" to mean the same thing basically as de-identified.  A pseudonym is just like a replacement name; right?  So instead of saving to a Google Account, which is this GAIA ID we've seen come up a couple of times, we would save to another random string of numbers and letters that could never be associated back to you.

Q.   And why did you say "instead of creating a pseudonymous archival log"?

A.   Because that is what Search, Maps, and Assistant had been doing to this point, the same pseudonymous or de-identified log that we use signed out.  This proposal was to change it, write it to the Google Account, but only temporarily.

Q.   In the end, in response to Mr. Ruemmler, did you make a decision about whether to adopt this proposal?

A.   Yes, we did.  Thanks to discussions with Chris and others, we actually dramatically changed the proposal; and what we eventually launched in late 2020, maybe early 2021, was a new different type of pseudonymous ID to maintain the same de-identified behavior.

Q.   Let's look at the top of page 1, that email or that paragraph that starts "Thanks, David" -- or, excuse me.  What I mean, actually, is your email where you say, "Hi, Chris.  You can read more..."  And then the paragraph [as read]:

        "I would be happy to discuss further.  Feel free
     to grab 30 minutes with Leslie Liu and myself."
     Who is Leslie Liu?

A.   Leslie Liu was my lawyer at the time on this team.

Q.   Why did you invite her to this conversation?

A.   Because Leslie knows a lot about this space and Google's internal policies, and so if we were going to have a discussion about policies with Chris, I thought it would be helpful to have her there.

Q.   At the end of this process and these discussions, your decision was not to adopt this proposal.  Is that what you said?

A.   That's correct.

Q.   Now, I think you said the ultimate thing you did do was another type of pseudonymous log.

A.   That's right.

Q.   Which is another way of saying another type of de-identified log?

A.   That's correct.

Q.   As far as you know, Mr. Monsees, was Mr. Ruemmler satisfied with your solution of using a de-identified log to

fix the lights in your house?

**A.** Yes, I believe so.

**Q.** He's never complained to you that --

**MR. CARMODY:** Your Honor, this is more of the hearsay.

**THE COURT:** Well, why don't you ask -- you're going to call that witness, so you can ask that witness.

**BY MR. SANTACANA:**

**Q.** Has Mr. Ruemmler ever complained to you --

**MR. CARMODY:** Objection.

**THE COURT:** He can answer that question.

Yes, you can go ahead with that question.

**MR. SANTACANA:** Thank you, Your Honor.

**BY MR. SANTACANA:**

**Q.** Has Mr. Ruemmler ever complained to you that the use of de-identified data in response to this project is inconsistent with the activity controls description?

**A.** No, he has not.

**Q.** Now, let's take a look at the user study you talked about yesterday. That's Exhibit Number 2.

It sounded to me like you wanted to explain a little bit more about what this study is about. Could you just take a moment briefly to do that for the jury now?

**A.** Sure. Actually, can we move to the next slide? Is that possible?

**Q.** Of course.

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Thursday, August 21, 2025




*Ana Dub*

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter