# Trial Transcript Excerpts

**Volume 1**

**Pages 1 - 174**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

ANIBAL RODRIGUEZ, et al.,        )
individually and on behalf of    )
all others similarly situated,   )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )    **NO. 3:20-CV-04688 RS**
                                 )
GOOGLE LLC,                      )
                                 )
          Defendant.             )
_____)

                          San Francisco, California
                          Monday, August 18, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    BOIES SCHILLER FLEXNER LLP
                    333 Main Street
                    Armonk, New York 10504
               BY:  **DAVID BOIES, ATTORNEY AT LAW**
                    **ALEXANDER BOIES, ATTORNEY AT LAW**


                    BOIES SCHILLER FLEXNER LLP
                    2029 Century Park East, Suite 1520n
                    Los Angeles, California 90067
               BY:  **ALISON L. ANDERSON, ATTORNEY AT LAW**




REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Plaintiffs:

> BOIES SCHILLER FLEXNER LLP
> 100 Southeast 2nd Street, Suite 2800
> Miami, Florida 33131
> BY:  **JAMES W. LEE, ATTORNEY AT LAW**

> BOIES SCHILLER FLEXNER LLP
> 44 Montgomery Street, 41st Floor
> San Francisco, California 94104
> BY:  **MARK C. MAO, ATTORNEY AT LAW**

> SUSMAN GODFREY LLP
> One Manhattan West, 50th Floor
> New York, New York 10001
> BY:  **WILLIAM C. CARMODY, ATTORNEY AT LAW**

> SUSMAN GODFREY LLP
> 1900 Avenue of the Stars, Suite 1400
> Los Angeles, California 90067
> BY:  **AMANDA BONN, ATTORNEY AT LAW**

For Defendant:

> COOLEY LLP
> 101 California Street, Fifth Floor
> San Francisco, California 94111
> BY:  **BENEDICT Y. HUR, ATTORNEY AT LAW**
> **EDUARDO E. SANTACANA, ATTORNEY AT LAW**
> **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
> **ISABELLA M.M. CORBO, ATTORNEY AT LAW**

> COOLEY LLP
> 4401 Eastgate Mall
> San Diego, California 92121
> BY:  **MICHAEL A. ATTANASIO, ATTORNEY AT LAW**

Also Present:          **Josh Dubin, Consultant**
                       **David Klein, Consultant**
                       **Steve Ganem, Google**

**I N D E X**

Monday, August 18, 2025 - Volume 1

|  | PAGE | VOL. |
|---|---|---|
| Jury Voir Dire | 27 | 1 |

"We need to change the description to indicate even with the control off...."

And he's talking about with WAA toggle on off; right?

A.   That's right.

Q.   [As read]:

"... Google retains this data and uses it for X purposes."

Do you see that?

A.   I do.

Q.   Google has not told its users "We're logging your data and we're using it to make money off it"; correct?

A.   I mean, I think if -- we skipped a paragraph.  If we look just right above, it's pretty clear that Mr. Ruemmler's concern here is about data saved to your account without you having transparency and control over it when WAA is off.  And we agreed.  We changed this proposal based on feedback from folks like Chris.

Q.   I'm not talking -- sir, do you remember my question, first of all, or no?

A.   Yes.  I'm saying I would have a concern, but I think we skipped an important paragraph above it.

Q.   I'm not talking about a proposal that was once discussed and then maybe have been tabled.  What I'm talking about is where he says [as read]:

"We need to change the description to

indicate...."

He's talking about the current disclosures as of July 25th of 2019; correct?

A.   I think -- unfortunately, I have to disagree with you. I think from literally the sentence above it, Mr. Ruemmler is talking about the change.  Because what he's describing above about "any legal investigation against me because it has the data available (for up to 60 days)," he's exactly describing what could have been this project that, as you've mentioned, we tabled.

So I think his sentence here is saying:  We would obviously have to change the descriptions.  I agree with Chris if we did the proposal that he's talking about just on the sentence above it.

Q.   He doesn't say, "We would need," the word you just used. He said, "We need."

[As read]:

        "We need to change the description to indicate
        even with the control off, Google retains this data
        and uses it for X purposes."

So let me stop there.

First of all, did I read that correctly?

A.   Yes, you did.

Q.   We know as of that date, as of July 25th of 2019, he spoke the truth.  Right then and there -- forget about future

proposals.  Right then and there, we do know Google was collecting user's WAA-off data; fair?

A.   Correct.

Q.   And Google wasn't then disclosing that to the users, that "I'm using your WAA-off data" and for what purpose; fair?

A.   Fair.

Q.   Okay.  Now, let's take a look and now look at your response back to him.

And even to this day, sir, do you know where all this WAA-off data is?

A.   Where all the WAA-off data is?

Q.   Yeah.

A.   I'm aware of different systems that store de-identified data; but normally, folks like Chris come to talk to me about identified, the stuff against your Google Account.

Q.   My question is a simple one.  As you sit here today, do you know where all this WAA-off data is?

A.   I probably know where a lot of different systems would be, but it doesn't relate to what I work on.  So I'm trying to answer your question very honestly.

Q.   Do you know --

A.   I know where a lot of it probably is and the systems within Google that I would go to look at, but because I focus primary on the data saved to your account, not de-identified data, I know a lot more about the account-type data.

Q.   What we have, sir, here is your response, returning back to page 1, and we're seeing July 25th of 2019, and we say -- we see you write [as read]:

"Hi, Chris.  You can read more about how deletes are processed, which includes how temporary personal logs are processed, and other purposes in the retention article I mentioned."

And you give a link; correct?

A.   That's correct.

Q.   And then you go on to say [as read]:

"I would be happy to discuss further."

Please feel free to grab 30 minutes with yourself and Leslie Liu.  Correct?

A.   Correct.

Q.   And here's the important part.  Leslie Liu was a Google lawyer; right?

A.   Yes, she was.

Q.   So we have you -- I mean, Chris Ruemmler in his email, we can agree, is raising some thorny issues to you; right?

A.   Right.

Q.   His recommendation of how to change the WAA disclosures, that Google's giving users a false sense of security, questioning you about whether Google has performed studies. You don't answer any of those questions in your response; fair?

A.   Correct.

understanding have you come to about -- thank you.

Let me put it this way:  What concerns did he raise to you about Web & App Activity, in your own words?

**A.**   I think Chris really had two concerns.  Chris oversaw privacy for Google Workspace products.  It's like your Gmail data.  And Chris was very concerned about where Gmail data would go and how Gmail data would be used.

For example, Chris was very concerned that when a user was using certain products, Gmail data might be saved in the Web & App Activity data and then could be used by ads, which would go against some of the Gmail Team's policies.

Chris was also concerned about what it would mean when Web & App Activity was off and if data would still be saved to a user's Google Account.

I think what's important to remember is that Gmail only ever works with a Google Account.  There's no de-identified version of Gmail.  You can't use email signed out.

So I think in Chris's world, he's very familiar with everything being assumed against an account, and that's not true for a lot of our products at Google, like Search or Maps.

**Q.**   Yesterday you were asked a number of questions about, quote, "user data," that term "user data."  Is Gmail data user data?

**A.**   Yes, it is.

**Q.**   Is de-identified data user data --

A.    It's --

Q.    -- within -- as people talk about it within Google?

A.    I think if it comes from users, we tend to think of it as user data, though it's not personal information.

Q.    Okay.  So there's a user data and then there's de-identified user data?  Is that how you talk about it at Google?

A.    That's correct.

Q.    You were also shown a user study yesterday, and we'll take a look at it in a moment, Mr. Monsees.  But have you ever seen a user study that showed that users expected that this control, Web & App Activity, could control the flow of de-identified data?

A.    No, I have not.

Q.    The user study we saw yesterday doesn't qualify, in your mind?

A.    No.  All of these studies are focused on data saved to a user's account, and that's where we see the confusion sometimes come up.

Q.    What about Google Analytics data?  Have you seen a user study -- well, let me back up for a second.

      You request user studies or they're just provided to you?

A.    Yeah.  I -- a product manager will request user studies, particularly if we're launching a new feature, like the auto delete feature we've been discussing here.  I'll request maybe

multiple studies to try to make sure it makes sense to as many of our users as possible.

Q.   Are you in charge of how the user study is performed?

A.   No, I'm not.  Google has these Google experience researchers.  They're the ones that are kind of the experts in how to pick the right study.  They run the studies, and then they provide reports back to us.

Q.   And what do you do with the reports when you get them?

A.   We'll often meet with the researcher and discuss how the study went.  They'll give us their overview, and then we take that feedback.

Q.   So is it fair to say that interpreting these user studies is one of your job responsibilities?

A.   Yes, that's fair.

Q.   Okay.  So in the 12 years you've been in charge of WAA, have you ever requested and then received a user study that indicated to you that users were under the impression that Web & App Activity controls the flow of Google Analytics data when it's de-identified?

A.   No, I have not.

Q.   Now, you were asked by the plaintiffs' lawyer yesterday whether Google shows its users their user data.  Does Google show users their user data?

A.   Yes, it does.

Q.   How does it do that?

A.    No.

Q.    Are you aware of any place where Google publicly tells people which apps have Google SDKs that take this data?

A.    No.

Q.    How did you learn that Google was taking your data through these apps?

A.    Well, it wasn't until after we filed this lawsuit that Google -- we asked Google to provide that information.  I told Google what apps I use, and Google told us which of those apps had the Google SDKs.

And then at that point, our expert was able to do his work and confirm that Google was, indeed, collecting data across all these apps even with WAA turned off.

Q.    Collecting your data?

A.    Yes, from the apps.

Q.    Now, do you want someone knowing everything you're browsing on your apps at all times?

A.    No, absolutely not.

Q.    Why not?

A.    Well, it's invasive.  You know, you don't -- I don't want Google knowing what I'm doing across every app, what I'm shopping for, what I'm reading online.  It's a lot, it's everything, and it's uncomfortable.

Q.    Do you know what Google is doing with that information?

A.    No.  We have no idea.

Q.   Do you know what Google will do with that information?

A.   No.

Q.   Mr. Santiago, is your iPhone password protected?

A.   Yes.

Q.   All right.  These apps that were on your phone that we talked about, do you use them regularly?

A.   Yeah.  I use a handful of them every day and a few of them a couple times a week.  It varies.

Q.   Which ones would you say that you use regularly?

A.   Well, I use the Calm app, Duolingo, Map My Ride, some of the sports ones, Target, a few of them -- you know, Weather Channel.  Being in South Florida, we have hurricanes, so that's a common one.

Q.   And your regular use of these apps, does that go all the way back to 2016?

A.   Yes.

Q.   Since 2016 to now, have you owned multiple smartphones and tablets?

A.   Yeah, I'd say so.

Q.   Okay.  And in that time period, did you ever own a smartphone or tablet that you purchased, used for just one month, and then never used again for one reason or another?

A.   No.  That wouldn't make much sense.  I -- you know, these devices are expensive.  You try to get the most use out of them you can.

Q.   Did you use all your smartphones or tablets that you've owned since 2016 at least -- at least on a monthly basis?

A.   Yeah.  I'd use them on a daily basis.

Q.   And do you understand that the relevant time period in this case is the 98 months between July 2016 and September 2024?

A.   Yes, I understand that.

Q.   Okay.  And during that 98-month period, which -- what is your best estimate, in terms of the number of months, that you use one or more of these apps that are listed here?

A.   I'd say I used them every one of those months.

Q.   Let's talk about how you manage your privacy settings to control Google's collection of your app activity.  Okay?

A.   Okay.

Q.   Have you heard of the privacy control called Web & App Activity or WAA?

A.   Yes.

Q.   We've talked a lot about it here.

A.   I've seen it quite a bit here.

Q.   Okay.  Who called the WAA button a privacy control?

A.   That's what Google called it.

Q.   And did you ever turn the WAA button off?

A.   Yes.

Q.   When did you first remember turning the WAA button off?

A.   I remember in September of 2020, which we also saw

earlier.

Q.   Okay.  And we'll get more to it in a bit, but I just want to be very clear up-front.  Did you turn the WAA button off before or after you joined this lawsuit?

A.   After.

Q.   No.  Did you turn the WAA button off before or after you joined this lawsuit?

A.   Beforehand.

Q.   Thank you.  You scared me.

Now, when you turned the WAA button off, did you expect Google would continue to collect and save your app browsing activity?

A.   No.

Q.   All right.  Before you turned the WAA button off, did you review Google's privacy policy?

A.   Yes.

Q.   Is there a particular reason you reviewed Google's privacy policy?

A.   Well, Google's a very large company.  I wanted to have an understanding of what Google would be collecting and what my rights were in terms of privacy.

Q.   Now, I'm showing you what's been premarked as Plaintiffs' Exhibit PX67.

Mr. Santiago, do you recognize this document?

A.   Yes.

that collect?

A.   Well, it depends what you do on the page, but it could generate multiple events.  And if you're using an app -- you know, you open an app and you do a variety of things in the app -- you could generate dozens of events, maybe even hundreds.

Q.   If I open an SDK-using app, does that generate an event?

A.   Yes.

Q.   If I'm looking at a specific page on an app, does that generate an event?

A.   Yes.

Q.   If I then move to a different page, does that generate an event?

A.   That's another event.

Q.   When I stop, go to another app, does that generate an event?

A.   Yes.

Q.   When I come back, then, to that app to do something else, does that generate an event?

A.   Yes.

Q.   And does that continue tracking me, collecting events, as long as that SDK is on that app?

A.   Yes.  As long as one of Google's SDKs, either Firebase or Google Mobile Ads, is in the app, those events are being collected.

Q.   And all of those events are not aggregated data; isn't that correct, Doctor?

A.   No.  They're collected, actually, as individual events, and they're loaded into the data bundle as individual events.

Q.   Sir, I apologize.  I interrupted you.

Can you tell us why -- or what is happening here before it goes to that next step called consent checks?  What is that?

A.   Okay.  So there's that sort of bold arrow.  That's showing Google taking the data bundle from the user's phone.  That data bundle goes across the Internet and it comes to the second box, which is one of Google's servers.  That's where Google does a variety of processing on that data packet.

So the first thing they do when the data packet arrives is Google makes a copy of the packet.  It duplicates it.  So one packet is received and then Google copies it, and now there are two packets there.

After that's done, Google performs a consent check.

Q.   So let me make sure I understand this.

Google collects and copies the data before it checks for consent; is that correct?

A.   That's right.

Q.   And that is what this graph is actually showing; is that correct?

A.   Yes.  And it's doing this regardless of the position of the WAA and sWAA switch.  The position of the switch doesn't

change the collecting or the copying.  That happens every time, all the time.

Q.   So all of the systems designed to check for consent, the data is duplicated before it even does that; is that correct?

A.   Correct.

Q.   Doctor, going back to the second step right here, is DSID a personal identifier?

A.   Yes, it is.

Q.   Is DSID a pseudonym?

A.   Yes, it is.

Q.   How could the DSID both be a pseudonym and personal information?

A.   Okay.  So I'll have to -- I'll have to explain a little bit about that.

It's personal information because it's an identifier. It's a unique identifier for each person.  Each person, each device has one DSID.  And the device is personal.  Your phone is in your pocket.  It's you.  It's very personal.

The DSID is also a pseudonym because it's not your proper name.  It's just, like, a number.

Q.   I see that there's other IDs noted here on this data bundle.  Are those other IDs also personal information?

A.   The IDFA is, because it's also a device identifier.  And the other IDs also are.  Some of the other IDs are -- one of them is an app instance ID.  It's a mouthful.  But the app

instance ID is like a serial number for your app.

Firebase generates a unique app instance ID for each copy of the app. All right? So the same way, like, your refrigerator has a serial number that's different from all the other refrigerators, even though they all look the same, it's like a serial number that identifies your copy of the app.

Q. Can we show the next slide, which is Interrogatory Response -- just page 11, that same interrogatory.

The interrogatory is a sworn statement by Google. Is that your understanding?

A. Yes.

Q. Did you consider this sworn statement response by Google for the purposes of rendering your technical opinion?

A. I did. I read it very carefully.

Q. And what is this response telling you?

MR. SANTACANA: Objection, Your Honor. We've objected to the designation of this interrogatory response as incomplete. There's more to this.

THE COURT: Well, why don't you put up the entire response.

BY MR. MAO:

Q. Go ahead.

A. Sure. A preliminary step before the consent check occurs is data duplication.

Q. Okay.

**A.**   And the data referred to there is that packet full of event data and identifiers.

**Q.**   Can you explain the data duplication process here?

**A.**   Yes.  It's copying.  The data is copied.  A single copy of the data packet received from a user's mobile device is made. So one copy is made.  There's an original and now there's a copy.

**Q.**   Do you have any understanding as to why Google decided to make these copies before consent check is actually done?

**A.**   I mean, my inference is that it's -- it's done -- they're creating a copy because that just helps them do what they're trying to do.

**Q.**   Okay.  Dr. Hochman, are there other Google Firebase products that actually checks for consent before the data is actually sent?

**A.**   Could I just add to the prior answer?

**Q.**   Sure.  Please.

**A.**   So, actually, the next sentence is a little bit helpful.
    [As read]:
        "This is done to facilitate the eventual data
    logging" -- okay? -- "that respects user consent
    choices."

**Q.**   Okay.

**A.**   Yes.

**Q.**   So going back to my question, is there -- are there any

Google Firebase products that checks for consent before it logs and transmits the data?

A.   Yes.

Q.   And what are those?

A.   There's a product within Firebase.  So Firebase is like a collection of products.  It's a -- I said it was a collection of different things that it could do.  So one of those things is called the App Indexing service.

Q.   What exactly is the App Indexing service?

A.   It's a service that allows a developer to put tags in their apps and then make those apps searchable from the search box on the Android phone so that when you search on your Android phone, you can get a result that's, like, within an app.

Q.   And your understanding from Google's technical responses in this case is that that process is set up for App Indexing, but not for this app SDK -- sorry -- for this SDK?

A.   That's right.

Q.   Did you ever receive any responses as to why there's this type of difference?

A.   No.  I've received no explanation as for why the App Indexing service is checking for consent on the device and the other S- -- the other services are not checking for consent before the data is taken off the device.

        MR. MAO:  So going back to the prior chart.  Yes.

**A.**   Yes.   User -- Google is able and is doing this for conversion tracking so that they can see the user who sees an ad is the same as the user who makes the purchase.   That's critical for them to be able to connect those two together.

**Q.**   What is your understanding -- sorry.

Did you consider Dr. Black, Google's expert's report?

**A.**   Yes.

**Q.**   What is your understanding from Dr. Black as to what UUAD was supposed to do when sWAA's off?

**A.**   Dr. Black, I think, said that the sWAA-off data would not appear in UUAD.

**Q.**   On the UUAD side when sWAA is off?   Are you sure?

**A.**   I think that's what he said, yeah.

**Q.**   Okay.   So does this event surprise you when sWAA is off?

**A.**   Yes.

**Q.**   If you don't mind, let's go back to the flow chart for Interrogatory Number 1.

So looking at this process, how much data did you receive for our plaintiffs?

**A.**   We received 2 gigabytes of data for two plaintiffs over a period of two months.

**Q.**   Okay.   If their sWAA is off, looking at this process, were they still able to tell who the user was?

**A.**   Absolutely.

**Q.**   And how would they know that looking at this process,

Doctor?

A.    There are tons of identifiers in -- attached to each event.

Q.    And looking at the next process, consent checks, how does Google go about doing consent checks?

A.    Well, Google knows exactly who the user is in order to do a consent check because they have to look up the position of the user's switches and those are associated with the user's Google ID.

Q.    So this type of consent checking happens whether WAA is on or off?  Are you sure?

A.    Yes.

Q.    And you verified this; is that correct?

A.    Yes.  I verified it by Google's own technical answers and by our own testing.

Q.    Right.  But my understanding also is that they didn't have to first send a bundle and duplicate before they checked for consent; is that correct?

A.    No, they didn't need to do that because the App Indexing service demonstrates that they have the capability to check for consent on the device and stop the taking of data if there's no consent.

Q.    And what was the basis for your opinion and understanding of how App Indexing worked?

A.    It was Google's -- it was actually, I think, Mr. Monsees

gave some deposition testimony that informed us about that.

Q.   Okay.  Going back to plaintiffs' data for a moment, how much data was produced for the plaintiffs?

A.   I said it was 2 gigabytes.  And if we were to try to print that out, we calculated it, give or take, about a million pages.  That's a stack of paper 30 stories high.

Q.   That is part of the reason why there were so many exhibits that you wanted me to admit; isn't that correct?

A.   Yeah, I guess so.

Q.   Okay.  But do you know whether or not that was all the data that was collected?

A.   For those people?  No.  That was just the slice that Google gave us.  But it looks like there's potentially much more data that Google has, or at least many copies of it.

MR. MAO:  Can we put up Slide 14.

Oh, sorry.  If you don't mind just going back, just for the purposes of the record -- I have a note here -- that UUAD slide.  If you can go back to the UUAD slide.  It had a number on that.  It was Exhibit Number 443 -- or 442.  I just want to make sure we have that for the record.

Okay.  Sorry.  For plaintiffs' data.

BY MR. MAO:

Q.   What is your understanding, from Google's sworn responses back to you, as to whether or not they have produced all of plaintiffs' data?

**A.**   No.  They said they -- it was impractical for them to produce all of plaintiffs' data.

        **MR. MAO:**  Can we put up that interrogatory.

**BY MR. MAO:**

**Q.**   Okay.  Can you read into the record the Interrogatory Number 14.

**A.**   Yes.

        [As read]:

            "Please identify every data source (including logs) that includes or during the class period included WAA-off data.  For each such data source, please include a list of field names and descriptions, the retention period, and how such data sources are used."

**Q.**   And what was their response that you selected, Doctor?

**A.**   So it's -- Google's response was [as read]:

            "... it is not practical or relevant to account for every single potential data source (including logs) that may contain such data because there are various downstream users of the pseudonymous data described in response to Plaintiff's Interrogatory Number 1."

        **MR. SANTACANA:**  Your Honor, I object.  We counterdesignated the full paragraph.  If it's going to be read into the record, it should all be read into the record.

data warehouse and it gets stored by Google, and it's used to drive their ad revenue, to support their advertising system, to do things like conversion tracking and attribution.  It's also used for product development and improvement.  They analyze the data and use it to help develop their products.

And Google uses the data to train AI because Google's advertising system is -- heavily utilizes machine learning in order to be able to do predictions about which ads a person is going to respond to, in order to do personalization, in order to advise advertisers how to bid as efficiently as possible.  So they have automated bidding that's driven by machine learning.  So all this data feeds into that AI use.

Q.   In terms of this advertising revenue corner that you're talking about, can Google link device ID and other sWAA-off data to, for example, a user's email address?

A.   Could they tie it to a user's email address?

Q.   Yes.

A.   They could.

Q.   There is nothing technically preventing Google from linking or joining any of these different IDs, is there, on a technical level?

A.   No, there's no technical thing that stops Google from doing it.

Q.   Have you seen any documents, disclosures, or representations from Google to any of its users that it won't

relink any of this?

MR. SANTACANA:  Objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I haven't seen any such document.

BY MR. MAO:

Q.   And there's no technical barriers to all of this data being relinked, isn't it?

A.   That's correct.

Q.   Okay.  Looking at the ad revenue component here for a moment, are there any technical barriers for the purposes of that part of the business?

A.   One second.  I'm going to ask you to reask the question because this is important --

Q.   Sure.

A.   -- and I want to be sure it's got all my attention.

     Could -- just could you ask it again?

Q.   Go ahead.  Just...

     For ad revenue, is there any technical barriers for Google to not be able to collect sWAA-off data?

A.   Is there any technical barrier for Google to not be able -- in other words -- I don't think so.

Q.   For all of Google's business, are they able to switch on the technology which they use for App Indexing, for example, where they actually check for consent before they collect the data?

**A.**   Yeah.   They could apply that technology to the other SDKs and have them work the same way.

**Q.**   Does Google incur any noticeable incremental costs from the taking, copying, and using of WAA-off and sWAA-off data?

**MR. SANTACANA:**  Objection, Your Honor.   There's no disclosed opinion on the costs.

**MR. MAO:**  I'm talking about technical costs.

**THE COURT:**  I'll allow it.   Overruled.

**THE WITNESS:**  Yes.   I've given the opinion that Google's data processing operation is so massive that even though this sWAA-off data is quite voluminous, it's still just a little piece of their total data operations.   And, therefore, they've got all these data centers and all the fiber, it's all in place so -- and it's not -- it doesn't impose an additional cost on them.   They've already got it.

BY MR. MAO:

**Q.**   In sworn statements, Google has admitted that it does join different pseudonymous records for the purposes of ad interactions and ad conversions; isn't that correct?

**A.**   Yes, they have.

**Q.**   Okay.   Can we put up the Supplemental Response to Interrogatory Number 15?

Did you review and look at this interrogatory response for the purposes of rendering your professional opinion?

**A.**   I did.

something, whatever it is you're doing on a Google product, the better they are able to predict what you want, the more effective they can make their product.

MR. MAO: I want to go on to the last slide, if possible.

Actually, before I go there, can we go back to the last slide.

BY MR. MAO:

Q. I had a question for you, Dr. Hochman. These benefits -- ad revenue, Google product development, train AI -- is this for the sake and the benefit of app developers or somebody else?

A. This is for the benefit of Google.

Q. Anybody else?

A. Google is benefiting from this. Google gets the ad revenue, they get the value of their products, and they -- it's their AI.

MR. MAO: Next slide, please.

Oh, sorry. The last slide, Google trackers.

I apologize. If we could go back to Supplemental Response, Interrogatory Number 15.

BY MR. MAO:

Q. Okay. Could you just read into the record the last two lines there?

A. Sure.

[As read]:

"DeviceID-keyed advertising interactions with an advertiser, such as views and clicks of the advertiser's ads, are joined to conversions recorded in that advertiser's app" --

Q.   Can you break that down for me?  What does that mean?

        MR. DAVID BOIES:  Finish the sentence.

        THE WITNESS:  Oh, sorry.

     [As read]:

        -- "using Firebase (or other third-party conversion tracking products or services)."

     I'm sorry.  I got thrown off by the horizontal line.

BY MR. MAO:

Q.   Last slide.  What did you intend to show with this slide?

A.   I'm trying to show something that Google told us in their answer to our technical questions, which is that the data collection by Google, when they're taking data from the user's phone, it uses up the phone's bandwidth.  Some people are on metered plans.  It also uses energy because taking the data requires the phone to make a radio transmission, and this reduces the power in the battery.  So it means that the phone will die sooner.

     Now, it might seem like one ad interaction, well -- one app interaction; well, maybe that's not so much.  But, actually, if you think about how much data -- each app event is like 14 pages of data.  And when there are dozens of them

happening when you use an app, it becomes a considerable amount of power and bandwidth.

And when the battery goes dead sooner, not only is your phone dead at the end of the day, your phone only has so many recharge cycles. Okay? Like, for example, an iPhone is rated as good for 500 recharge cycles. After that, the battery is going to be -- fall below 80 percent capacity, and that's when people start to say, "This phone is getting kind of old and not working so good," and they might go out and buy a new phone.

So -- so these Google software development kits that are taking people's app activity data are imposing a real cost on people. They're imposing a cost in terms of bandwidth and in terms of wearing out the phone and making the phone not as good.

MR. MAO: Thank you.

Before we end, Judge, I just want to make sure that the bulk admissions actually gets into the record.

THE COURT: Right. Well, why don't we take a break. I want to talk about that with you for a moment.

MR. MAO: Sure.

THE COURT: And this is a good time for our break anyway.

Members of the jury, remember my admonitions not to discuss this amongst yourselves.

Q. What's that app for, Mr. Rodriguez?

A. It's an app for sleep apnea.

Q. Do you consider your sleep apnea a private and personal matter?

A. Definitely it is.

Q. Did you ever use the MIPC camera app while sWAA was off?

A. Yes.

Q. And is that app for like home security?

A. Yes. It connects to my cameras in my home.

Q. Do you consider what you do for home security a private and personal matter?

A. Oh, yeah, definitely.

Q. Did you ever use the Career Karma app while sWAA was off?

A. Yes.

Q. And what's that for?

A. That's an app that has -- it's a company that helps you switch careers, and you get assigned a coach and they basically help you with that.

Q. Do you consider whether you're looking for a new job something that's private and personal to you?

A. Yes.

Q. Do you consider the name of your coach, your Career Karma coach, private and personal to you?

A. Oh, yeah.

Q. Do you want Google knowing all these things?

**A.**   No.  They shouldn't.

**Q.**   Let me ask a different question.  Did you have an Android Samsung Galaxy phone in 2021 to 2022?

**A.**   Yes.

**Q.**   Was sWAA off on that phone the entire time period?

**A.**   Yeah, it was.

**Q.**   Which email account did you sign in on for that phone?

**A.**   It's Peteysake08@gmail.com.

**Q.**   Did you ever sign out of that account on your phone?

**A.**   No.

**Q.**   Did you sign into another account on your phone?

**A.**   No.

**Q.**   Did you ever let your kids sign in on that phone?

**A.**   No.

**Q.**   Did you ever let your kids download apps on your phone?

**A.**   No.

**Q.**   Did you let anyone else use your phone?

**A.**   No.

**Q.**   How much did you pay for your current phone?

**A.**   I'm not sure.  They range anywhere from -- I mean, because you pay monthly, so I would say me, $500, but I've paid 8- to -- 800 to a thousand dollars on previous phones.

**Q.**   And what's your current monthly bill that you pay for your service carrier?

**A.**   About $45 a month.

Q.   Is it an easy thing, Mr. Rodriguez, for you to have to buy a new phone every couple of years?

A.   No, it's not.

Q.   Is that something you have to save up for as a family?

A.   Yeah.  I would say so, yes.

Q.   Do you have your phone in your pocket right now?

A.   I do.

Q.   Who owns the phone in your pocket?

A.   I do.

Q.   Who owns the apps on your phone?

A.   I do.

Q.   What about the data?  Who owns the data on your phone?

A.   I do.

Q.   Who owns all the activity on your phone?

A.   I do.

Q.   Do you like other people looking through your phone?

A.   No.  No.  I think, you know, anybody's first instinct, when someone's trying to grab your phone from the table, is to protect it and -- no.

Q.   Let me ask you a question.  Would you rather give a stranger your name and email address or access to your phone?

A.   I would not give my phone.

Q.   The jury's heard testimony about the term "Google Account."  Do you remember that?

A.   Yes.

Q.    Now that you've heard Google's interpretation of that term at this trial, do you think Google's interpretation is reasonable?

A.    No, at all.  And the reason why is because the way I look at is if -- if they say that I have control over what they collect and how they use it and it's not being collected on my Google Account but, yet, still being saved somewhere else, then I don't have control and I don't have -- know what they collect or how they use it.  So I don't agree with that, no, at all.

Q.    Should Google be saving your sWAA-off data somewhere outside of your Google Account, in a place that you can't see?

A.    No.

Q.    In a place you don't know about?

A.    No.

Q.    Did you see anything in the Google disclosures, whether disclosures we showed the jury or disclosures you've seen otherwise, that clearly stated what was and what was not saved in your Google Account?

A.    No, I didn't.

Q.    Did you see anything in any Google disclosures that clearly stated that your data would still be saved somewhere outside of your so-called Google Account?

A.    There is nothing.

Q.    Now that you know that Google was collecting saving and using this data the entire time, how has that affected you?

bottom and page 37 at the top.

Q.    Can you please explain to the jury where in this section of the contract you require that app developers disclose Google Analytics to their own users?

A.    Yes.  So there's a sentence that starts "You must," and it reads [as read]:

> "You must post a Privacy Policy and that Privacy Policy must provide notice of your use of cookies, identifiers for mobile device (e.g. Android Advertising Identifier or Advertising Identifier for iOS) or similar technology that are used to collect data.  You must disclose the use of the service, and how it collects and processes data.  This can be done by displaying a prominent link to the site 'How Google uses data when you use your partners' sites or apps,'" -- located at this URL -- "or any other URL Google may provide from time to time."

Q.    Would you mind reading the next sentence as well, Mr. Ganem?

A.    [As read]:

> "You will use commercially reasonable efforts to ensure that a user is provided with clear and comprehensive information about and consents to the storing and accessing of cookies or other information on the user's device where such activity occurs in

connection with the service and where providing such

information and obtaining such consent is required by

law."

Q.   Has this requirement been in the contract between Google

and app developers for Google Analytics since 2016?

A.   Yes.

Q.   And you've been the head of Google Analytics for, I guess,

three years now approximately?

A.   Yes.

Q.   In those three years, what has been your intent in

including this in the terms of service?  Why is it there?

A.   The intent is really clear.  We want to make sure that

Google users who use these apps, or users in general,

understand that these apps use our service, and when they

have -- and that these identifiers are collected as a part of

it, and to link to our Privacy Policy, to understand how Google

treats that data.

Q.   At any time, Mr. Ganem --

          **MR. DAVID BOIES:**  May we approach, Your Honor?

          **THE COURT:**  Very well.

     (The following proceedings were heard at the sidebar:)

          **MR. DAVID BOIES:**  The witness just testified that the

reason for putting paragraph 7 -- or Section 7 into the

agreement with app developers was to ensure that the users

understood what was being collected.  That is exactly what

the Court has said they are not permitted to do.  This is not about consent.

THE COURT:  Well, it's going to be clear in the jury instructions that consent vis-à-vis the third-party apps is not a defense.  So to the extent that you think that suggestion has been made, it will be clear that that's not the defense in this case, and that's what we discussed at great length.

What is your reason for going into this?  Because you agree that I've said quite clearly --

MR. SANTACANA:  Yes.

THE COURT:  -- that's out.

MR. SANTACANA:  Yes, Your Honor.  And you also said that it goes to whether Google's conduct was highly offensive.

THE COURT:  Right, right.

MR. SANTACANA:  And it goes to Google's intent.

Each question I asked him was:  What was Google's intent in including this in the contract?  Google's intent here is an element in each of the three claims, and they have to prove that Google intended to take things without permission.

Mr. Ganem is testifying that at least from his perspective as head of the product, he did not intend that.

THE COURT:  Okay.  As long as he keeps it on what Google's intent is in terms of its -- that's fine.  And I haven't heard him yet suggest that somehow, if there's consent vis-à-vis the third-party apps, that that somehow takes them

off the hook.  As long as you stay away from that and hew to, as you said, whether or not your conduct is egregious and ignoring people's privacy concerns and the like, you can continue.

MR. DAVID BOIES:  Your Honor, would the Court consider an instruction to make clear to the jury, that closing statements are a ways away, and the jury can get confused as to what this is going to.  In other words, the jury hasn't heard all of this, and what they think this is about is consent.

THE COURT:  Well, you gave me a proposed limiting instruction.  I'd have to go back and look at it.  I was not comfortable with that limiting instruction.  But I'm not adverse to possibly giving one if you could encapsulate what I just -- the parameters that I think are appropriate here.

So -- well, you want it now, obviously.

What's your view on it?

MR. SANTACANA:  We do object, Your Honor.  The jury doesn't know what the legal elements are yet.  They haven't been charged.  If you start talking about highly offensive, intent, consent, whose consent, that, actually, I think was confusing.

THE COURT:  Well, not that necessarily, but phrased in a different way, what it's not going in for.  Not trying to say:  You can consider it for this.  You can consider it for that.  Alternatively, just say:  You can't consider this for

purposes of determining whether or not -- you'd have to figure out how to phrase it.  Focus on what is not permitted rather than:  You can consider it for this.  You can consider it for that.

I understand why you don't want that all now, but how about something that says this cannot be considered for purposes of consent?

**MR. SANTACANA:**  I worry, Your Honor, that that prejudices Google more because it suggests that we have somehow misled the jury as to the relevance of the information.  To just say "Everything you just heard doesn't go to consent" is going to leave them wondering what it goes to.

**THE COURT:**  Well, okay.  I think -- I understand your point, but I think in the final instructions, it can be made quite clear.  And you then also will have an opportunity in closing argument.  There's a lot of opportunity to discuss this.  And I think to weigh in now with a limiting instruction would just cause confusion.

So I will overrule that objection.  But stay close --

**MR. SANTACANA:**  I will.

**THE COURT:**  Hew close to what we've talked about.

**MR. DAVID BOIES:**  The only thing I would ask is, as you listen to the testimony, if you believe that there is going to be some confusion, disclose the consent, I would just asking you to consider it, saying what it doesn't go to.

THE COURT:  If I think he's gone too far, then I might weigh in with a limiting instruction.

So he can count on you, Mr. Boies, to object because you'll keep it on the straight and narrow.

MR. DAVID BOIES:  Okay.  Thank you, Your Honor.

MR. SANTACANA:  Thank you, Your Honor.

(The following proceedings were heard in open court.)

THE COURT:  Members of the jury, thanks for your patience.  We've kept these to a minimum, but every once in a while, we have to do them.

BY MR. SANTACANA:

Q.   Sorry about that, Mr. Ganem.

So we were talking about the contract between Google and the app developers who install Google Analytics.

I want to ask you about the first sentence here now.  We talked earlier about personally identifiable information that sneaks its way into Google Analytics.  Can you please read the first -- the first sentence of this Privacy section?

A.   It says [as read]:

"You will not, and will not assist or permit any third party to, pass information to Google that Google could use or recognize as personally identifiable information."

Q.   Why do you include this sentence in your terms of service?

A.   Again, we really don't want customers to do that.  It

gives the false impression that Google would --

Google Analytics wants or uses this data or Google could use it

or wants to use it to identify their users.

Q.   Do app developers sometimes violate this sentence?

A.   Yes.

Q.   What do you do about it?

A.   So we have a process in place when we become aware of it. We kick off this process to first investigate to confirm whether or not they're doing it; second, to notify the customer that they're in violation of our contract.  Typically, we give them some amount of time to fix the problem; and at the end of that period that we give them, we either let them off the hook or terminate their account.

Q.   Mr. Ganem, have you ever intended to mislead end users with respect to whether or not Google Analytics is present in any particular app?

A.   No.

Q.   Until this lawsuit was filed, had it ever occurred to you, sir, that the WAA control should determine whether your product is able to operate as it does?

A.   Never.

Q.   Why not?

A.   Because that would be -- if you want a working analytics product that gives businesses an understanding of their users, that would leave huge gaping holes in their data that make the

A.   I do.

Q.   And one of the things that you talked with your counsel about was Google Exhibit 929, the scrubbing policies?

A.   Yes.

Q.   Do you recall that?

A.   Yes.

Q.   I'd like to direct your attention to a note that's right at the top of the page.  Can you read that note to the jury, please?

A.   [As read]:

     "Despite the name 'Dynamic Anonymization,' this framework performs deidentification rather than true anonymization.  It's important to remember that sawmill data is sensitive and potentially reidentifiable even after the scrubbing described here."

Q.   And by "reidentifiable," you mean you've de-identified somebody and now you reidentified them; correct?

A.   Yes.

Q.   The -- you also talked to your counsel about Google Exhibit 926.  Do you recall that?

A.   Yes.

Q.   And under "Purposes of the Policy," right at the very top, do you see where it says, "This policy does not," in italics?  Do you see that?

A.    I do.

Q.    Could you read that to the jury?

A.    It says [as read]:

        "This policy does not apply to identification of users across devices based on characteristics such as location, router IP address, or Web history (also known as cross-device linking, behavioral pattern linking, or probabilistic heuristic device association)."

Q.    And those are all ways by which you use modeling or some kind of algorithm to try to connect people and data; correct?

A.    Possibly.

Q.    Now, when Google first receives this sWAA-off data from the app, whatever it is, it has all of the personal identifiers in it; correct?

A.    Yes.

Q.    And Google makes a copy of that; correct?  The first thing that happens is it goes into the memory of your server; correct?

A.    Yes.

Q.    Okay.  And you then perform -- after that happens, after this copy is made, you perform the consent check; correct?

A.    I think you skipped the copy step.  You said it arrives at the server but before it's written to any disk, a duplicate is made.

Q.    Before it is written, a duplicate is made?

A.    Before it's logged or saved anywhere in disk.

Q.    Well, when you save, it's saved in memory.

A.    It's in memory.

Q.    Right.  I mean, when it first comes in, the data comes in as electrons and it's put in -- a copy of that is put into your memory; right?

A.    Yes, short-term memory.

Q.    Right.  Now, once it's in there, another copy is made; is that correct?

A.    Yes, for this consent check.

Q.    And that second copy is what is de-identified, and the first copy is going to be destroyed; correct?

A.    I don't know about destroyed.  It separates the --

Q.    It's separated?

A.    Yeah.

Q.    Okay.  So the sWAA-off data comes in, and then it's copied into memory.  A second copy is made, and those two copies are separated; correct?

A.    Yes.

Q.    Now, you then perform the consent check; correct?

A.    That's right.

Q.    And you said that you could perform the consent check on the device and never bring in the identified information; correct?

**Wednesday - August 27, 2025**                                    **8:22 a.m.**

                              **P R O C E E D I N G S**

                                   ---o0o---

(Proceedings were heard out of the presence of the jury.)

          **THE COURT:**  Good morning, everyone.

          **ALL:**  Good morning, Your Honor.

          **THE COURT:**  A few small matters.  I did get what you submitted in terms of what's in store.  I appreciate it.  It's always helpful.

     Let me first mention the situation with respect to instructions.  My hope and intention is that by tomorrow afternoon, what you'll receive is a draft set of instructions and a verdict form, which we've been working on, utilizing what each side submitted to us.

     I would like to then schedule, for Friday afternoon, a conference to go over the instructions and the verdict form.  We'll end at 1:30.  So let's get something to eat so we all don't pass out.  Maybe 2:30 or even 3:00 for a conference.

     What you're going to get is, as you will expect, something that neither side will be happy with.  Each side won some, lost some, and we created some things probably neither side wanted.  So I understand that both sides are going to probably have some objections.

     What I would ask, when you're planning for Friday afternoon, is you -- each side submitted very helpful briefing

and materials to me. I actually very much appreciated how you did it. It made my life a lot easier in terms of having -- where the rubber met the road in terms of the disputes. It was very helpful.

But I think you've preserved your objections if the instructions aren't consistent with what you've submitted, but I appreciate the fact that you may want to, either in written form or otherwise, make clear which ones you object to. Of course you can do that.

In the conference, though, if you can, please don't just reargue everything that you've already submitted in written form. I have -- we've been diligent in considering it. So you may want to just bookmark it, but we don't have to go through a full-fledged argument. If there's a real problem, if you think, "Oh, my God, there's an enormous error looming there," of course I want to know that.

Okay. So that's that.

I was advised that with respect to the Harvey deposition, that's gotten worked out, or not?

**MR. SANTACANA:** Your Honor, we won't be playing that deposition today, and we do have a deal. So I don't think you need to pay any further attention to the counters and objections.

**THE COURT:** Okay. The other issue, which pertains to -- is it Ms. Langner? Ms.?

MR. SANTACANA:  Yes, Your Honor, Ms. Langner.

THE COURT:  Ms. Langner.  There's some foundation objections.  I'll just see how the foundation gets presented.

I will say, I think I'm inclined to -- I think they're going to be able to do it.  I don't think it's necessary for every witness to have been the one that pulled the underlying financial documents that are being sought if they otherwise have a basis to say these are what are kept in the ordinary course of business and et cetera, et cetera.  So I'll just hear how the foundation goes.

Were there any other issues?

MR. SANTACANA:  There's two exhibits to put on the record, Your Honor.

Yesterday the plaintiffs asked about Exhibit 31.  We stipulate.  You did overrule the objection, so it was a short look, and it should be admitted.

THE COURT:  Okay.  Do we need to do that in front of the jury?

MR. DAVID BOIES:  No.

MR. SANTACANA:  I don't think so, Your Honor.

THE COURT:  All right.  Exhibit 31 will be admitted.

(Trial Exhibit PX31 received in evidence.)

MR. SANTACANA:  The second exhibit in question is 574.R2, which is a revised version of 574, which is already admitted.  There were two pages missing, and we're tacking them

Q.   And that was one of the documents they showed you?

A.   I don't recall.  It was years ago.  Maybe.

Q.   I thought you just said that you have seen it in connection with your deposition.

A.   I read through a lot of those documents on my own, but whether or not it was used in preparation, I don't know.

Q.   Do you know if that document was even produced to us in this case?

A.   I --

       MR. SANTACANA:  Objection, Your Honor.  Lacks foundation, and counsel knows it was produced.

       THE COURT:  Sustained.  I don't think this witness can go into that.

BY MR. DAVID BOIES:

Q.   Now, you testified to your counsel that in order to give people the ability to delete their information, you'd have to reidentify them.  Do you recall that?

A.   Yes.

Q.   Now, one of the things that you save in the so-called de-identified information is the device ID; correct?

A.   Yes.

Q.   And you could communicate with that device; correct?

A.   Yes.

Q.   Okay.  So you could -- if you wanted to, you could send to the device what information you'd collected and give that

device a chance to delete it; correct?  Technically, you could do that?

A.   Perhaps.  That's not the way the systems are designed, and I think you're talking about data on a server.

Q.   Well, first of all, when the information comes to you, the sWAA-off data comes to you, it comes directly from a device to Google; correct?

A.   That's correct.

Q.   That is, it doesn't pass through the app.  It comes directly from the device to Google; correct?

A.   It is from the app on the device to Google.

Q.   But it's being sent from the device --

A.   That's correct.

Q.   -- correct?

From the person's phone; correct?

A.   Yes.

Q.   And so you could -- because you save that phone's device ID, you could send back to that phone at any time what you'd collected and give them a chance to delete it; correct?

A.   Sending the data from the server to the device to delete it on the device?  Yes.

Q.   Yes.  Okay.

        MR. DAVID BOIES:  That's all I have, Your Honor.

        THE COURT:  Very well.

Anything further?

## FURTHER REDIRECT EXAMINATION

BY MR. SANTACANA:

Q.   Going -- I apologize.  I don't have that document in my binder, but do you recall that document?

A.   The -- I recall the design for IID because I was intimately involved with it.

Q.   Can you just say what it is?

A.   This was a design to allow app developers to send push notification to their users based on their analytics data.

Q.   What is -- what is a design document?  Is it going to describe more information?

A.   This is how engineers intend to design the system in order to offer that feature.

Q.   Okay.  So do you need to see that document to understand PX11?

A.   No.

Q.   You have a personal memory of this project?

A.   Yes.

Q.   Just to remind the jury, what decision did you make with respect to this project?

A.   We decided that we would honor the user's consent before storing this data.

        MR. SANTACANA:  No questions.

        THE COURT:  Okay.

        MR. DAVID BOIES:  Nothing further, Your Honor.

the base class and then there's the CDAFA add-on.  And so I think it makes sense, if we're going to talk about it, it would be somewhere in 13.

THE COURT:  Yeah, I think it would be 13 rather than the privacy and seclusion instructions.

MR. DAVID BOIES:  I'm comfortable with that, Your Honor.

THE COURT:  Okay.  All right.

Okay.  So going back to 11, are we done with the discussion of 11?

MR. DAVID BOIES:  I am.

MR. PATCHEN:  We are, yes.

THE COURT:  Okay.  So 12 is just the generic, "Here are the claims."

What's the next one, Mr. Patchen, that you have?

MR. PATCHEN:  13, Your Honor.

THE COURT:  Okay.  I'm there.

MR. PATCHEN:  So our -- we have at least two objections.  I know of two.  The first one is, we think that it's inappropriate to have "mobile devices or," that language, in one and two; and the reason for that is that the claim that the plaintiffs have brought here is a 502(c)(2) claim, knowingly access and, without permission, access data.  And 502(e) says that the owner or lessor of the data can bring the claim.

As drafted -- and it allows the standing question of 502(e), the ownership, to be answered with the mobile devices instead of asking whether the plaintiffs own the data, and it -- that disjunct between the two causes the problem of where the entire claim here is -- right? -- we own the data, it has a value, we should get the value of the data back -- that we had our data taken, the data was valuable, we should get paid actual damages for the data.

**THE COURT:**  I'm recalling correctly at some point I thought it was -- Google wasn't disputing that it was the plaintiffs' data.

**MR. PATCHEN:**  No.  The dispute -- there's no dispute that they are the owners of the mobile devices.  That's where there's no dispute.

**THE COURT:**  But there is a dispute about whether or not they're the owners of the data?

**MR. PATCHEN:**  Correct.

And if you can -- if you don't have to own the data to bring a claim for the recovery of the value of the data, that just writes 502(e) completely out.  There's other claims, 502(c)(7), which is about knowingly accessing a device, which maybe ownership of the device is a relevant question, but it's not the relevant ownership question for a 502(c)(2) claim.

**THE COURT:**  Is the only way to violate the statute if you own the data?

MR. PATCHEN:  Or lease it.  You're the owner or lessor of the data.

And there's a couple of cases, this is the *Garabrandts* case that we cited in what we submitted to Your Honor on the ownership question, which is what actually raised this in our mind.

The fight in *Garrabrants* was whether the bank CEO, whose data -- whose financial data was being held by the bank, brought a 502(c)(2) claim, and the California Court of Appeals reversed a verdict in his favor, saying, "You didn't prove that you were the owner of the data because the bank may be the owner of the actual documents that were taken."

THE COURT:  I'm trying to -- the reason I asked about is this disputed, I'm thinking back on all of the stages of this protracted thing, and I didn't think that you -- the plaintiffs had taken that position earlier on, that -- is that something that you've always maintained through this case, that the plaintiffs are not the owners of the data?

MR. PATCHEN:  I don't believe it's been particularly litigated.  I didn't see any evidence of that in the summary judgment briefing, but it's still -- I mean, if you look the Penal Code -- even the model instructions, they have to prove their ownership; right?  That is an element.

THE COURT:  Well, ownership of what?  I mean, are they -- I've got the CACI 1812.  Is it plaintiff is the owner

So, yes, but apologies that we hadn't recognized that that would be an issue, that they would say, "You've" -- that the plaintiffs have satisfied ownership by saying they own the phone without having to say that they own the data that's on the phone.

And your example, Your Honor, is the exact right one but add a third party; right?  It's your clerk's phone, your photos, and I access it.  Now, if I access that phone and take the photos, your clerk does not have a suit against me because I took your photos, even if it was on his phone.  That's the whole point of (e).  But he may have a claim against me under, say, for example, 502(c)(7) for accessing his device without permission, but those are two separate claims.

THE COURT:  What is the state of the record -- what's the state of -- and then I'll give you a chance too -- but what is the state of the record on who owns the data?  Is there any evidence in the record that plaintiffs own the data?  I'm trying to think of what the -- what the evidence was on that point.

MR. PATCHEN:  Mr. Santiago testified that he owns the data.

THE COURT:  Okay.

MR. PATCHEN:  I'm sorry.  Mr. Rodriguez did.  He said that.

THE COURT:  Do we have any other evidence?

**MR. DAVID BOIES:**  I think only the evidence that it was -- is that the data related to the plaintiffs' use of third-party apps.  In other words, it is inherently their data because it is what they are -- what Google is collecting from the plaintiffs' use of the third-party apps.  It's on their phone and it is, you know, their data, as one of our plaintiffs' representatives testified.

**THE COURT:**  As was pointed out to me a moment ago in my note, and it's a good question, what was the point to stipulating to the fact that plaintiffs own the phones if you think that didn't make any difference here?

**MR. PATCHEN:**  Because there's the secondary element of the "from"; right?  502(c)(2) says "knowingly accessed the data from a computer or a mobile device."  And by stipulating "from the mobile device," A, it takes that issue out of class proof; right?  And, second, it establishes the element; right?  (c)(2) doesn't apply if I go into your chambers and steal data from your filing cabinet.  It removes the need to prove electronic.

The one other point I would make in terms of record evidence, Your Honor, and this is important, is obviously the plaintiffs moved motion in limine to get rid of all of the terms of service between plaintiffs and the class and the various apps.

Frankly, the *Garrabrants* case says that's going to be the best evidence of who owns the data; right?  These are people

who put their information into an app.  Who owns that data may not be very meaningful for the invasion of privacy or the seclusion, which doesn't have an ownership requirement but CDAFA does.

THE COURT:  Okay.  You had something you wanted to say?

MR. DAVID BOIES:  Yes.  What it is -- what we say in Number 3 --

THE COURT:  Yeah.

MR. DAVID BOIES:  -- is that Google took, copied, or made use of data.  So if this is our requirement, I don't think the points he's making about (1) and (2) really relate to anything.

The -- and this is data -- I mean, they can argue to the jury that the data about the plaintiffs' use of third-party apps that's on their phone is not somehow their data, but we have to -- we have to establish --

THE COURT:  Well, can you -- do you think -- is it a fair inference if you own the device, that you own the data?

MR. DAVID BOIES:  I think so, Your Honor.

THE COURT:  Why is that not an inference you could draw?

MR. PATCHEN:  Well, it's an inference they can argue for.  I would -- you know, putting on my advocate's hat, I would make arguments as to why that's insufficient as a matter

of evidence, but I think they can make that.  It's a fair inference.

THE COURT:  Right.  Okay.

Okay.  It's an interesting question, very interesting. I'm going to have to think -- that's one of the ones I'm going to have to think about.

MR. PATCHEN:  Obviously, Your Honor, if you accept our position here, that's why we put in the proposed ownership language, is because that's how we had been conceiving of the case.  It's not in, but that's why we had done that.  So just companioning those two together.

THE COURT:  All right.  What's the next?

MR. PATCHEN:  Well, there's one other one in terms of CDAFA.  I apologize, Your Honor.

THE COURT:  Okay.

MR. PATCHEN:  Ms. Agnolucci has it.

MS. AGNOLUCCI:  Your Honor, this relates to an additional jury instruction that we had submitted, that Your Honor didn't adopt, about without permission.

THE COURT:  Yes.

MS. AGNOLUCCI:  This was in the packet that we submitted yesterday.  So rather than doing it as --

THE COURT:  Is this the knowingly business?

MS. AGNOLUCCI:  Yes.

THE COURT:  Right.  I'm not -- I'm not going to add

"knowingly" to the "without permission."  Element 3 for -- I forget which element.  Yeah.  I don't think it -- knowingly goes into 2 and it's there, I don't think you have to -- I think -- I don't think it's knowing -- knowingly without plaintiffs' permission.  I don't think it applies.

MS. AGNOLUCCI:  Your Honor, in that joint submission, the plaintiffs themselves agreed that we could, at a minimum, say "should have known," as Your Honor did on page 15 of your MSJ order.

THE COURT:  One thing I'll give you some advice on.  Don't tell me that, "In a summary judgment order you did this or you did that."  That was then; this is now.  It doesn't --

MS. AGNOLUCCI:  Understood.

THE COURT:  -- bind me, and I wouldn't waste time on invoking it because it was important in the moment.  We got past summary judgment.  I know you didn't think we should, but we did, but I'm not bound by anything that was said in that order, so...

MS. AGNOLUCCI:  Understood, Your Honor.  And we would --

THE COURT:  But you said they agreed to it?

MS. AGNOLUCCI:  Yes, Your Honor.

THE COURT:  That's a different proposition.

MS. AGNOLUCCI:  It's Document 650, page 13.

So the parties were debating this additional instruction.

We cited the *Facebook Power Ventures* case, where the Ninth Circuit applied a knowing standard to whether the defendant knew that they were accessing the data without permission.  It was the knowledge of permission that the Court considered important there.

Plaintiffs said [as read]:

"At a minimum, if the Court is inclined to instruct the jury on this element, the instruction must include the 'should have known' portion of the Court's reasoning."

So it was the plaintiffs there who were citing Your Honor's summary judgment order, which was citing the case -- the *Facebook/Power Ventures* case that we would ask Your Honor to take a look at.

THE COURT:  Remember, for each of you, if one of your arguments is the other side agreed, then you're -- each one of you is now taking the position that that shouldn't bind the process in one form or another, so --

MS. AGNOLUCCI:  We're willing to live with that here, Your Honor.

THE COURT:  I understand.

MR. DAVID BOIES:  Your Honor, the only thing --

THE COURT:  Yes, go ahead.

MR. DAVID BOIES:  The only thing I'd point out is we did not agree here.  What we said is it shouldn't happen; but

packet that I handed up to Your Honor.

We'd like to give the total estimated number of class members as well.  And if Your Honor thinks that's confusing, we can add a sentence that says that there's overlap.  But what we don't want to do is invite a double award of nominal damages because there is a delta of about 16 million, which, of course, is significant to us.

THE COURT:  And I know you think it's confusing to have the --

MR. DAVID BOIES:  I think putting both numbers in is confusing.  I think that if they were to put in just the class size on nominal damages, we could allocate it -- assuming we win, obviously -- but we could allocate it, as part of the allocation scheme, in proportion to the individuals in Class 1 and 2.

So I think one possibility would be to not do the verdict form by class here; do it by the combination number, and just with the expectation that when it came to allocating that amount between the people in the two classes, it would be allocated based on this ratio.

MS. AGNOLUCCI:  There's been evidence at this trial about differences between and among Android and iOS users, so we would like to give the jury the option to choose.

THE COURT:  Okay.  I'll leave it broken down, and then I will consider your request with the objection -- Mr. Boies'

objection, I shouldn't, if I've broken it down, add a total number.  I'll think about that and decide.

MS. AGNOLUCCI:  It also could be solved by doing what Your Honor suggests and then doing the math on the back end the other way; in other words, accounting for the double-counting if they were to insert the total number of Android and total number of iOS.

THE COURT:  The jury?  Who would be inserting the number?

MS. AGNOLUCCI:  If the jury completed this form with 59 and 54 --

THE COURT:  Yes.

MS. AGNOLUCCI:  -- for example, and we could -- actually, never mind.  That wouldn't work.

THE COURT:  Okay.

Okay.  When you get the set from me, if you want -- I think there's been a fairly extensive record of what you've proposed, and now we've had the conference and you've given me your positions, but I don't foreclose.

Once you get the final set, if you want to file a -- to preserve your objections, you want to -- because in the back and forth, sometimes it gets a little unclear if you've agreed or not agreed to things.  If you want to file something, that's fine.

But I'm not going to have a further -- in other words, I'm

going to send you the thing on Monday afternoon and we're done.

MS. AGNOLUCCI:  Understood.

THE COURT:  And then you can use that.

Not to cause the left side, from where I'm sitting, panic, but if the jury were to come back and answer not only with the award of damages, as would trigger it, and then a "yes" to the availability of punitive damages, we would then have to go into the phase.  And we have an instruction that would then tell them what they needed to do.

But what kind of presentation would you contemplate if we have to -- if we end up being there?

MS. AGNOLUCCI:  We haven't gone that far, Your Honor.

MR. DAVID BOIES:  I think it would be relatively brief.

THE COURT:  I would think a summary proceeding of some kind.

MR. DAVID BOIES:  And I think the main thing that we would do is the amount of their assets, profits, that sort of thing; and then the pattern and practice that you're excluded on the liability phase, but which is relevant to the punitive phase.

THE COURT:  Well, if there's a punitive phase, at that point, because I've built in the question at the first phase, I would really -- the punitive phase would be the amount.

MR. DAVID BOIES:  Just the amount.

## CERTIFICATE OF REPORTER

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Thursday, September 4, 2025

_____

Lee-Anne Shortridge, RMR, CRR

CSR No. 9595, Official United States Reporter

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter