

FILED

JUL 29 2026

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

**Michael Gonzalez**
Meta Art Project
P.O. Box 12471
San Antonio, TX 78212
(956) 660-9901
map.inc.mailbox@gmail.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIBAL RODRIGUEZ, JULIAN SANTIAGO, and SUSAN LYNN HARVEY, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No. 3:20-cv-04688-RS <br><br> **CLASS MEMBER'S OBJECTION TO CLASS COUNSEL'S FEE APPLICATION AND REQUEST TO DENY OR DEFER THE PROPOSED 33% COMMON-FUND AWARD** |

**TO THE HONORABLE COURT:**

I received the Court-authorized notice stating that I am a member of one or both certified Classes in *Rodriguez et al. v. Google LLC*, Case No. 3:20-cv-04688-RS. I submit this objection pursuant to that notice and Federal Rule of Civil Procedure 23(h).

I do not contend that Class Counsel should receive no reasonable compensation. Counsel undertook years of contingent work, incurred substantial expense, preserved class-wide adjudication, and obtained an important verdict. I object to deducting one-third of the Classes' compensatory judgment, including accrued interest, on a record that does not yet establish the exceptional monetary or structural benefit invoked to support that premium.

The Ninth Circuit identifies the benefit obtained for the class as the touchstone of fee reasonableness. The present application therefore requires more than recognition of counsel's labor, risk, and performance. Class Counsel asks the Court to treat the result as historic, exceptional, and worthy of repetition. Dkt. 739 at 3-4, 13-15. That institutional claim makes it necessary to determine what benefit the Classes actually or realistically stand to receive.

The unresolved structural questions arise from the present record itself. Their examination logically begins with focused adversarial briefing on Dkt. 721: whether the existing order rests upon a complete conception of cure, compensation, prospective injury, and narrower relief, and whether the existing record is sufficient to resolve those issues. A limited factual inquiry of the kind described in Exhibit A would become relevant only if further development is procedurally available and the existing record is insufficient.

The objection does not purport by itself to impose an injunction, award disgorgement, or initiate that inquiry. It asks the Court to determine the claimed class benefit on a record adequate to support the determination before treating the present result as exceptional, replicable, and deserving of an institutional premium.

## I. CLASS BENEFIT IS THE TOUCHSTONE, AND THE PRESENT RECORD DOES NOT ESTABLISH EXCEPTIONAL BENEFIT ON EITHER MONETARY OR STRUCTURAL GROUNDS

Federal Rule of Civil Procedure 23(h) permits only reasonable attorneys' fees. In *Lowery v. Rhapsody International, Inc.*, the Ninth Circuit held that "[t]he touchstone for determining the reasonableness of attorneys' fees in a class action is the benefit to the class." 75 F.4th 985, 988 (9th Cir. 2023). The court must

principally consider the actual or realistically anticipated class benefit rather than a hypothetical maximum, while giving appropriate value to meaningful injunctive or other nonmonetary relief actually obtained. *Id.* at 988-89, 994-95.

Class Counsel's documented labor, expense, contingency risk, and results actually obtained warrant a reasonable fee commensurate with those considerations. They do not, however, substitute for proof of the class benefit necessary to justify an enhancement, nor do they independently establish either the amount of any enhancement or the source from which it should be paid.

Where counsel invokes monetary recovery, disclosure changes, deterrence, institutional significance, and replication as reasons for an above-benchmark award, the Court must determine what value those asserted benefits actually or realistically provide to the Classes.

The asserted exceptional benefit appears to take one or both of two forms: monetary benefit and nonmonetary benefit, principally structural remediation. Monetary benefit depends upon what remains after deductions, how the fund will be administered, how many Class Members will receive payment, and what payments they will realistically receive. The claimed structural benefit depends upon what remediation the litigation actually produced: whether disclosure changes restored meaningful control, whether continuing and derivative consequences were addressed, and whether the adjudicated privacy boundary is functionally protected rather than merely assigned a finite price.

That distinction becomes especially important in light of the parties' different interests in the present posture. Class Counsel has a legitimate interest in recovering the cost and contingency risk of enforcement from the monetary judgment, while Google receives a practical benefit if the consequence of liability remains confined to a finite monetary charge and the denial of structural relief remains operative. The Classes' interest is not identical to either position. It lies in obtaining meaningful remediation of any continuing or derivative consequences of the adjudicated violation and in receiving compensation that can actually be distributed; to the extent meaningful remediation is unavailable, the practical adequacy of that compensation becomes correspondingly more important.

The Court's fee ruling is itself part of the institutional effect under review. Class Counsel does not seek compensation only for this litigation; it asks the Court to encourage future lawyers to reproduce the model represented by this result. Dkt. 739 at 13-15. Approval of an exceptional premium while structural relief remains denied or unresolved and the premium is taken from a recovery that may provide nominal or economically impracticable compensation would validate more than counsel's past performance. It would risk signaling that an infrastructural defendant may retain the operative architecture after paying finite damages, while the exceptional cost of overcoming that architecture is charged against the injured class and the resulting allocation is treated as a model for repetition. The Court should therefore determine both the realistically distributable monetary benefit and the structural benefit actually obtained before lending institutional approval to that cycle.

This does not allege collusion, bad faith, or an absence of formal adversity. It explains why the benefit to the Classes cannot be inferred solely from the litigating parties' present incentives, procedural positions, or descriptions of the result. Determining whether the requested premium rests upon an exceptional monetary benefit, an exceptional structural benefit, or neither therefore requires examination of both the proposed distribution and the unresolved remedial posture.

## II. THE PRESENT RECORD DOES NOT ESTABLISH EXCEPTIONAL MONETARY BENEFIT

The Court-authorized notice states that the verdict plus interest totaled approximately $440,345,685.40 as of March 2, 2026, and that the certified Classes encompass approximately 98 million people. An equal pro rata allocation would represent approximately $4.49 per Class Member before attorneys' fees, expenses, service awards, administration, or distribution costs.

After the requested 33% fee, $12,422,374.42 in expenses, and $135,000 in service awards, approximately $282.5 million would remain using the notice's March 2 figure, or about $2.88 per Class Member before administration. The application thus relies upon the unreduced judgment as evidence of

exceptional class success while seeking to remove approximately one-third of the only completed remedy before the practical value of the remainder has been established.

The Blue Cross Blue Shield antitrust settlement illustrates the practical significance of this arithmetic. Its court-approved distribution used a $5 minimum-payment threshold to prevent processing resources from becoming disproportionate to the value of an individual payment. That settlement does not control this case, and its allocation and claims procedures differ. It nevertheless demonstrates that a large aggregate fund may yield no direct compensation where an individual payment falls below an administrability threshold. See Blue Cross Blue Shield Antitrust Settlement, Frequently Asked Questions and Final Approval Materials, www.bcbssettlement.com.

The possible use of a claims-made or otherwise concentrated process changes the problem rather than resolving it. Broad distribution risks nominal or economically undistributable payments. Concentrated distribution may produce larger payments only because many adjudicated Class Members receive nothing. In neither circumstance does the gross judgment, standing alone, establish an exceptional realized monetary benefit to the Classes.

Before treating the judgment as exceptional monetary benefit, the Court should require Class Counsel to disclose the proposed distribution method, estimated number and percentage of recipients, anticipated claims or participation rate, projected net payment, administration and delivery costs, minimum-payment thresholds, treatment of failed or unclaimed payments, treatment of residual funds and non-claimants, and any possibility of reversion. That disclosure is not collateral administration. It is one necessary branch of the *Lowery* inquiry into the benefit actually or realistically available to the Classes.

## III. THE PRESENT RECORD DOES NOT ESTABLISH EXCEPTIONAL STRUCTURAL OR NONMONETARY BENEFIT

Plaintiffs sought permanent injunctive relief, deletion and remediation of Class data, destruction or disabling of affected algorithms, models, and services, independent monitoring, and disgorgement. Dkt. 700. The Court denied that relief. Dkt. 721. Class Counsel nevertheless relies upon disclosure changes and the institutional significance of the verdict while preserving the right to pursue additional equitable relief through further review. Dkt. 739 at 4 n.8, 10, 14. The same equitable posture should not operate simultaneously as an unresolved object of further review and as a completed structural success warranting an immediate premium.

### A. Revised disclosure does not necessarily establish complete cure

The jury found Google liable for invasion of privacy and intrusion upon seclusion and rejected Google's consent defense. Dkt. 721 at 2. Dkt. 721 nevertheless concluded that revised language cured the "core problem," stated that collection was "not problematic in isolation," and attributed the violation to Google's misrepresentations. *Id.* at 4-5.

However, the general verdict did not allocate exclusive or indispensable weight to the misleading disclosure among the intersecting circumstances supporting liability. Yet Dkt. 721 itself described the jury as having resolved both whether Google misrepresented its practices and whether the collected information could contribute to a fuller picture of the user. *Id.* at 17-18. The absence of disaggregated findings did not establish the inverse proposition that continuing collection became lawful or non-injurious once the wording changed.

California constitutional privacy doctrine does not treat notice as invariably dispositive. In *Hill v. National Collegiate Athletic Ass'n*, the court relied upon advance notice, informed written consent, and an actual opportunity to refuse. It further concluded that the consequence of refusal—exclusion from intercollegiate athletics—did not make consent involuntary because participation was neither a government benefit nor an economic necessity. 7 Cal. 4th 1, 42–43 (1994). That reasoning treated both the existence and practical meaning of refusal as part of the consent analysis.

Here, the revised disclosure identified in Dkt. 721 does not obtain affirmative consent or provide an operative means of refusal through the relevant setting. Moreover, in rejecting Google's earlier argument that Plaintiffs' continued use undermined harm or established consent, the Court recognized that the ubiquity of phones and the number of applications incorporating Google SDKs made withdrawal impracticable,

described phones as necessities rather than luxuries, and concluded that continued use of Google's products and services did not equate to consent. Dkt. 352 at 12–13.

That reasoning creates a tension with the later conclusion that revised notice cured the prospective problem: the Court had previously recognized that withdrawal from the relevant infrastructure was not a practicable means of refusal and that continued use did not establish consent, yet Dkt. 721 treated clearer notice of continued collection—under circumstances in which the user "has no say"—as sufficient cure.

## B. Damages do not themselves establish comprehensive remediation

The damages verdict compensated the injury adjudicated at trial. It did not itself adjudicate that continuing use was lawful, establish that downstream systems possessed provenance independent of the violation, or convert the award into consideration for every future and derivative consequence of the adjudicated collection, saving, and use.

Dkt. 721 acknowledged that nothing prevents Google from continuing to make commercial use of the unlawfully collected data, but concluded that the Classes had already been compensated for that harm. Id. at 5–6. The order reasoned that the verdict reflected the value of the illegal taking, that much of that value arose from Google's ability to monetize the data, and that there was no reason to think the jury considered only backward-looking monetization. Id.

The possibility that the jury considered future monetization in general does not establish the affirmative scope attributed to the award. The verdict did not identify the continuing uses considered, the systems through which those uses would occur, the period over which they might remain productive, the derivative capacities they may have created or improved, or whether those consequences possessed provenance independent of the violation. The absence of a reason to assume that the jury considered only past monetization is therefore not equivalent to a record-based determination that the award comprehensively valued every continuing and causally traceable derivative consequence.

Whether any such uncompensated or continuing consequence supports prospective relief is a separate question. The verdict alone does not establish that no such consequence remains.

## C. Denial of an overbroad request does not establish that narrower remediation is unavailable

The prospective-injury inquiry and the breadth of Plaintiffs' proposed order are separate. If continuing collection, retention, use, or derivative exploitation remains capable of perpetuating consequences of the adjudicated invasion or producing prospective injury traceable to it, the breadth of the requested injunction concerns the permissible tailoring of relief. It does not itself establish that prospective injury has ceased or that no narrower functional remedy is available.

Objector does not contend that the Court was required to redesign Plaintiffs' proposal sua sponte. The narrower point is that rejection of that proposal should not be treated at the fee stage as proof that meaningful structural remediation was obtained, that no remediable consequence remains, or that narrower relief was technically infeasible.

## D. The absence of a developed technical record does not establish that continuing consequences are independent of the violation

Sections B and C leave an antecedent factual question: whether any continuing use, derivative capacity, or downstream effect is causally traceable to the adjudicated collection or instead arose from an independent lawful source. That distinction determines both the existence and permissible scope of any narrower remedy. Relief could not properly extend to a system or use shown to possess an origin and authority independent of the violation; conversely, independence cannot be presumed merely because the relevant technical lineage was not developed in the existing record.

Google controls the system lineage, retention records, SDK pathways, model history, use records, and technical classifications necessary to make that distinction. Plaintiffs retain the burden of establishing entitlement to relief. The absence of a developed technical map, however, does not itself establish that downstream effects are independent of the violation, that no continuing effect exists, or that narrower

remediation is infeasible. Those propositions require evidence rather than an inference drawn from the absence of evidence principally controlled by Google.

Exhibit A uses "provenance" as shorthand for this limited causal inquiry: whether an identified use, system, capacity, or gain is materially derived from the adjudicated violation or possesses an independent lawful source. Whether focused production is procedurally available or necessary is addressed separately. The point here is only that the unresolved technical lineage bears directly upon whether the damages were comprehensive, whether prospective consequences remain, and how any narrower remedy could be lawfully confined.

### E. Developer consent does not establish independent provenance for materially different Google-directed uses

The Court previously distinguished developers' consent to employ Google Analytics for Firebase from users' consent to Google's challenged collection and use, and the jury later rejected Google's consent defense. Dkt. 109 at 7–11; Dkt. 721 at 2. Developer authorization may support a valid app-directed function that the developer is entitled to request. It does not, without more, establish user consent or independent provenance for materially different Google-directed retention, cross-context association, modeling, commercialization, or derivative use.

The issue is not whether a developer lawfully selected Google's SDK, but whether that authorization extended to the particular subsequent use for which Google claims independent provenance. The technical route by which the information entered Google's systems therefore does not resolve the scope of authority governing each subsequent use. Compensation for the adjudicated intrusion does not supply the consent the jury found absent or establish an independent source of authority for causally traceable downstream consequences.

Exhibit A develops these premises, distinguishes adjudicated facts from questions requiring proof, and explains why a limited provenance and system-lineage inquiry may become relevant to narrower injunctive relief and causally apportioned disgorgement. It does not presume that every Google system was affected, that additional equitable relief is available, or that Rule 23(h) independently authorizes technical discovery.

### IV. FOCUSED ADVERSARIAL BRIEFING SHOULD PRECEDE ANY TECHNICAL INQUIRY

Objector does not purport to move under Rule 60(b) on Plaintiffs' behalf or ask the Court immediately to vacate Dkt. 721. The fee application nevertheless places the institutional meaning of that order before the Court. The Court need not treat this objection as a post-judgment motion to request the parties' positions on whether the claimed non-monetary and institutional value invoked to support a premium rests upon a correct conception of cure, compensation, prospective injury, and remedial tailoring.

Exhibit A identifies authority bearing on whether a judicial legal mistake may be examined under Rule 60(b)(1), the circumstances in which a district court may initiate consideration with notice and an opportunity to be heard, and the limits on that authority. See Exhibit A §§ ~~XXXX~~; *Kemp v. United States*, 596 U.S. 528, 533–39 (2022); *Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d 347, 351–52 (9th Cir. 1999); *Snell v. Cleveland*, 316 F.3d 822, 826–27 (9th Cir. 2002). Whether the Court may or should modify Dkt. 721 after briefing remains a separate procedural and merits determination.

*[handwritten margin note: Exhibit A § VII]*

Focused briefing should address whether the general verdict's lack of disaggregated findings permitted the conclusion that misleading wording was indispensable to the adjudicated privacy injury; whether revised notice without affirmative consent or a legally meaningful opportunity to refuse is sufficient under the governing California privacy standards; whether the damages verdict comprehensively compensated continuing use and causally traceable derivative consequences; whether developer consent can establish independent provenance for materially different Google-directed uses extending beyond the developer-requested function; whether rejection of Plaintiffs' proposed formulation leaves narrower functional relief unresolved; and whether Plaintiffs' initial disgorgement burden may be satisfied through a

reasonable approximation tied to an identifiable violation-affected capacity, subject to later apportionment, costs, and deductions.

The parties should also address whether the existing record is sufficient to resolve those questions; whether further factual development is procedurally available; and whether Plaintiffs intend to pursue the denied remedies in this Court, preserve them solely for appeal, or decline to pursue them.

That briefing should first permit the Court to determine whether the existing record is sufficient. If it is not, and if a procedurally cognizable basis for further development exists, the limited technical inquiry described in Exhibit A could identify the adjudicated pathways, continuing or materially equivalent routes, downstream data and system lineage, independent provenance, technical separability, and net benefit causally attributable to violation-derived capacity. The inquiry would test the scope and feasibility of remedy; it would not retry liability or inspect Google in the abstract.

Such briefing would not commit the Court to vacating its order, ordering an audit, granting equitable relief, or denying Class Counsel reasonable compensation. It would permit the Court to leave Dkt. 721 unchanged, clarify its scope, entertain a properly presented request for limited further proceedings, or determine that appellate review is preferable. What should not occur without examination is the simultaneous treatment of the structural posture as unresolved for purposes of further review and as an exceptional completed benefit supporting an immediate premium from the Classes' recovery.

## V. FORMIDABLE PERFORMANCE DOES NOT YET ESTABLISH EXCEPTIONAL CLASS BENEFIT

Under the percentage method, the Ninth Circuit generally treats 25% of a common fund as a benchmark that may be adjusted when the record warrants a departure. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-50 (9th Cir. 2002). The requested one-third award therefore requires a reasoned explanation tied to counsel's risk and performance, the results actually obtained, the relationship between the percentage and counsel's lodestar, the practical class benefit, and the possibility of disproportionate compensation.

Class Counsel's investigation, financing, trial preparation, and adjudicative performance may fairly be described as formidable. Counsel established the factual record, preserved class-wide adjudication, obtained a substantial verdict, and created the predicate upon which the narrower provenance and remedial inquiry described in Exhibit A now depends. Those accomplishments warrant serious consideration in determining a reasonable fee.

Formidable performance, however, is not synonymous with exceptional benefit actually obtained for the Classes. The present result includes no approved distribution plan, no injunction, no disgorgement, no completed provenance inquiry, and no demonstrated remediation of continuing or derivative consequences. The existence of remedial potential made possible by counsel's work does not establish that the potential has been, or will be, realized as an exceptional class benefit.

Nor can the deficiency be cured by moving between monetary and structural characterizations of the result. If the asserted exceptional benefit is monetary, the Court needs the distribution plan. If it is structural or nonmonetary, the Court needs sufficient examination of what remediation was actually obtained and whether the premises of Dkt. 721 remain sound. If counsel relies upon both forms of value, both inquiries are necessary. Counsel's labor, expense, risk, and trial performance remain relevant, but they cannot substitute for the missing proof on either branch of the controlling benefit inquiry.

Class Counsel's documented labor, expense, contingency risk, and results actually obtained warrant reasonable, commensurate compensation. The requested premium presents a separate question. Those considerations do not automatically justify taking one-third of the Classes' compensatory judgment, including accrued interest, while the application relies upon the gross judgment as proof of exceptional success. The fee request would materially reduce the only remedy presently obtained while treating the unreduced amount as the principal evidence supporting the premium. The relevant monetary benefit is what remains and can realistically be delivered after fees, expenses, administration, and distribution—not the headline judgment in isolation.

The requested premium also cannot be justified merely by asserting that it will encourage future enforcement. The relevant question is what form of enforcement the award would encourage: one that produces practically realizable compensation or meaningful remediation for the class, or one in which exceptional counsel compensation is repeatedly extracted from nominal class recoveries while potentially violation-derived advantages remain unresolved. Because Class Counsel expressly invokes replication as a reason for the premium, the Court should evaluate the complete remedial model it would be rewarding.

The Court should therefore deny or defer the requested percentage, or award only the reasonable compensation presently supported, while reserving any additional percentage, multiplier, or premium dependent upon exceptional class benefit until both the monetary and structural branches of that assertion can be evaluated on an adequate record.

## VI. THE COST AND SOURCE OF EXCEPTIONAL PERFORMANCE SHOULD BE EXAMINED SEPARATELY FROM THE CLASSES' COMPENSATION

The fee application attributes exceptional cost to the legal, technical, informational, financial, and institutional capacity required to litigate against Google. That disparity may support reasonable compensation for counsel. It does not answer whether the injured Classes should bear that cost through a one-third deduction from their compensatory judgment, particularly where the deduction itself intensifies the uncertainty whether the only completed remedy can be meaningfully distributed.

Google's accumulated financial, technical, informational, and institutional capacity enabled it to sustain resistance throughout discovery, class certification, notice, summary judgment, trial, and post-trial proceedings at a scale Class Counsel could meet only through unusually costly legal, technical, expert, and financial commitments. Dkt. 739 describes Google's informational and financial advantages, its access to extensive engineering and technical personnel, its resistance to substantial discovery and notice efforts, and the extensive motion, expert, and trial practice required to obtain the verdict.

Those costs did not arise independently of Google's entrenched position and control of the architecture under examination. The same accumulated resources, technical control, and informational asymmetries that made the challenged conduct difficult to identify, trace, and adjudicate also made enforcement exceptionally expensive. Counsel's formidable performance in overcoming those conditions may warrant substantial compensation for labor, expense, contingency risk, and results actually obtained.

The fee-source question nevertheless remains distinct. If the exceptional cost of overcoming Google's entrenched capacity is charged principally against the Classes' compensatory judgment while Google retains the durable institutional capacity that generated the enforcement burden, the injured population bears both the adjudicated invasion and a substantial share of the extraordinary cost required to make that invasion legally cognizable. Google's entrenchment may explain why counsel's performance was ~~exceptional~~ formidable; it does not, without more, establish that an exceptional premium should be deducted from the Classes' compensation.

California Code of Civil Procedure section 1021.5 expressly requires consideration of whether, in the interest of justice, fees should be paid from the recovery. Because Plaintiffs obtained judgment on California-law claims, that statutory framework leaves open a distinct question whether section 1021.5 or another defendant-paid fee authority is available, subject to a proper motion, notice, satisfaction of the statutory requirements, and Google's opportunity to oppose. See *Mangold v. California Public Utilities Commission*, 67 F.3d 1470, 1478 (9th Cir. 1995); *Klein v. City of Laguna Beach*, 810 F.3d 693, 701–02 (9th Cir. 2016); *Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1407, 1413–18 (1991).

Objector does not move for a section 1021.5 award on Plaintiffs' behalf or ask the Court to impose one without adversarial briefing. The narrower request is that the Court distinguish three related questions: the reasonable compensation warranted by the present record, whether any separately justified enhancement is warranted, and the proper source of payment. Counsel's formidable performance warrants reasonable compensation commensurate with its labor, expense, risk, and results actually obtained. Whether that performance also warrants an enhancement under applicable law remains a distinct question; neither reasonable compensation nor a separately justified enhancement would itself establish that the Classes' compensatory judgment is the appropriate source.

If Class Counsel elects to seek defendant-paid fees and satisfies the governing requirements, that allocation may better align the source of compensation with both the exceptional cost of privately prosecuting the Classes' claims and the replicable model of class representation that the requested enhancement is intended to support. Counsel may receive reasonable—and, if independently justified, enhanced—compensation; the Classes may retain compensation awarded for their injuries; and the liable defendant may bear the portion of the litigation cost that applicable law permits the Court to assign to it.

The accounts should remain distinct: damages compensate the Classes; structural relief addresses continuing and derivative consequences; attorneys' fees compensate the enforcement capacity necessary to obtain relief. An exceptional verdict should establish an exceptional consequence for the party found liable, not an exceptional deduction from the compensation of those injured.

## VII. REQUESTED RELIEF

For these reasons, Objector respectfully requests that the Court:

1. deny or defer the proposed one-third common-fund award;

2. require Class Counsel to disclose the proposed distribution method and timing; the projected number and percentage of Class Members who will receive payment; the anticipated participation or claims rate; the expected net payment; administrative and delivery costs; minimum-payment thresholds; the treatment of failed, unclaimed, or economically undistributable payments; the treatment of non-claimants and residual funds; and any possibility of reversion;

3. direct Class Counsel and Google to submit focused briefing on whether Dkt. 721 rests upon mistaken or incomplete legal premises concerning cure and prospective injury, including whether:

   a. the general verdict's lack of disaggregated findings was treated as affirmative support for the proposition that revised wording cured the privacy injury;

   b. revised notice without affirmative consent or a legally meaningful opportunity to refuse is sufficient under the governing California privacy standards, particularly in light of the Court's prior recognition in Dkt. 352 that withdrawal from the relevant infrastructure was not practicable and that continued use did not establish consent;

   c. the damages verdict comprehensively compensated continuing and causally traceable derivative consequences;

   d. developer consent establishes independent provenance for materially different Google-directed uses extending beyond the developer-requested function; and

   e. rejection of Plaintiffs' requested formulation leaves narrower functional relief unresolved;

4. require Class Counsel to state whether it intends to seek relief from or clarification of Dkt. 721 in this Court, pursue the denied equitable issues on appeal, preserve them without present action, or decline to pursue them;

5. determine after briefing whether the existing record is sufficient and, if not, whether limited factual development is procedurally available and necessary to evaluate continuing or derivative use, independent provenance, technical separability, the feasibility and scope of narrower functional injunctive relief, and—if disgorgement remains legally available—net benefit causally attributable to any capacity shown to have been materially derived from the adjudicated violation;

6. reserve any additional percentage, multiplier, or premium premised upon exceptional class benefit, completed remediation, deterrence, or institutional replication until the Court has sufficient information to evaluate both the actual or realistically anticipated monetary benefit and the claimed structural or nonmonetary benefit;

7. require Class Counsel to justify the requested one-third award, including the departure from the ordinary percentage benchmark and the application of that percentage to accrued interest, in relation

to counsel's lodestar, its formidable litigation performance, the results actually obtained, and the monetary and structural benefits actually or realistically available to the Classes;

8. Permit Class Counsel, if procedurally appropriate and if Counsel elects to do so, to supplement or amend its application through a proper motion seeking defendant-paid fees under California Code of Civil Procedure section 1021.5 or other applicable authority, including any independently justified enhancement, subject to satisfaction of all governing requirements, notice, Google's opportunity to oppose, and safeguards against duplicative compensation.; and

9. alternatively, award only the reasonable fee supported by the present record and reserve any enhancement dependent upon the unresolved benefit, remedial, and fee-source inquiries.

Exhibit A is submitted in support of this objection. It identifies the potentially incomplete premises underlying Dkt. 721, the focused adversarial briefing through which those premises may be examined, and the derivative-capacity and independent-provenance inquiry relevant to narrower injunctive relief and causally apportioned disgorgement.

The Appendix to Exhibit A presents collateral public records bearing upon Google's entrenchment, its documented response to formal constraints, the durability and foreseeable class-side value of the revised disclosure, and whether that asserted nonmonetary benefit independently supports the requested fee enhancement. Together, those materials distinguish the benefit actually or realistically available to the Classes from counsel's formidable performance and from the separate question of the legally appropriate source of counsel's compensation.

I have not hired any lawyer to represent me concerning this objection. No current or former lawyer is being paid or may be paid for any reason related to this objection.

Respectfully submitted,

_Michael Gonzalez_

Michael Gonzalez
Objector and ~~Absent~~ Class Member
Date: __July 21__ , 2026

## CERTIFICATE OF SERVICE

I certify that on __July 21__ , 2026, I caused identical copies of the foregoing Class Member's Objection and Exhibit A to be sent by United States Mail to the following recipients at the addresses specified in the Court-authorized notice:

| COURT | CLASS COUNSEL | NOTICE ADMINISTRATOR |
|---|---|---|
| Clerk of the Court | Mark C. Mao | Notice Administrator |
| United States District Court | Beko Reblitz-Richardson | P.O. Box 2749 |
| Northern District of California | BOIES SCHILLER FLEXNER | Portland, OR 97208-2749 |
| Phillip Burton Federal Building | LLP | |
| 450 Golden Gate Avenue | 44 Montgomery Street, 41st Floor | |
| San Francisco, CA 94102 | San Francisco, CA 94104 | |

Michael Gonzalez
Date: __July 21__ , 2026

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIBAL RODRIGUEZ, JULIAN SANTIAGO, and SUSAN LYNN HARVEY, individually and on behalf of all others similarly situated,<br>*Plaintiffs,*<br><br>v.<br><br>GOOGLE LLC,<br>*Defendant.* | **Case No. 3:20-cv-04688-RS**<br><br>**EXHIBIT A**<br><br>**MEMORANDUM REGARDING THE REMEDIAL RECORD, GENERAL VERDICT,**<br>**AND LIMITED FURTHER INQUIRY** |

## PURPOSE AND SCOPE

This memorandum is submitted as Exhibit A to a Class Member's objection to Class Counsel's fee application. The objection addresses the reasonableness of the proposed common-fund fee by asking what monetary and nonmonetary benefit the Classes have actually or realistically obtained. This memorandum performs the narrower record function necessary to that inquiry: it identifies the remedial theory presented before and after trial, the findings the jury necessarily made, the limits of the general verdict, the reasoning by which Dkt. 721 denied equitable relief, and the factual questions that remain unresolved.

The memorandum does not add a cause of action, retry liability, move independently to alter the judgment, state or limit Class Counsel's appellate position, or presume technical facts that require proof. It distinguishes among party contentions, provisional class-certification determinations, the final jury instructions, the verdict, and the Court's equitable findings. The question presented is not whether the Court was forbidden to consider Google's revised disclosures. The record confirms that the disclosures were materially relevant. The narrower question is whether the existing record supports treating that change as a complete cure of prospective injury and continuing consequences, and whether rejection of Plaintiffs' requested formulation resolved the availability of narrower relief.

Plaintiffs sought cessation of collection, storage, and use; deletion of previously collected data; remediation of products, services, algorithms, or models developed or improved using that data; independent verification; and disgorgement. Dkts. 315, 352, 700. The Court denied equitable relief. Dkt. 721. Class Counsel now invokes the verdict and the disclosure changes as exceptional results supporting a one-third fee, while preserving the right to pursue additional equitable relief on appeal. Dkt. 739 at 3-4 & n.8, 10, 13-15. That position makes the nature and limits of the remedial result relevant to the present fee inquiry without converting the objection itself into a post-judgment motion.

## I. PROCEDURAL AND REMEDIAL CHRONOLOGY

### A. The structural-remedy theory preceded trial

Plaintiffs' remedial theory was not confined to correction of misleading wording. In their class-certification motion, Plaintiffs sought an injunction that would stop further collection, storage, and use of sWAA-off data; require deletion of previously collected data; remove products, services, or algorithms developed or improved using that data; and appoint an independent third party to verify continuing compliance. Dkt. 315 at 7, 25. The requested relief was therefore directed both to the collection practice and to retained or derivative consequences.

The class-certification order did not decide entitlement to those remedies. It did, however, reject the proposition that the remedial request was too indeterminate for certification. The Court held that Plaintiffs had convincingly identified the 'general contours' of classwide relief, rejected Google's certification-stage objection to deletion, and certified a Rule 23(b)(2) class while leaving Google free to renew merits and feasibility objections later. Dkt. 352 at 18-19. The order accordingly establishes that deletion, derivative-product remediation, and independent verification were part of the certified action before trial; it does not establish that Plaintiffs later proved the causal and technical facts necessary for every requested measure.

Dkt. 352 also addressed consent and continued participation. The Court identified the relevant user conduct as the decision affirmatively to switch WAA or sWAA off, rejected the inference that continued use of Google-integrated apps established consent, and recognized that requiring withdrawal from ubiquitous phone and application infrastructure could impose an unreasonable or impossible burden. Id. at 12-13. Those conclusions did not predetermine permanent injunctive relief, but they became record premises relevant to any later claim that clearer notice plus continued participation rendered the condition voluntary.

**B. The pretrial merits record treated disclosure as central but not exhaustive**

At summary judgment, the Court treated Google's WAA and sWAA disclosures as central to the objectively reasonable expectation of privacy. Dkt. 445 distinguished authority in which advance disclosure defeated an asserted expectation because the more specific WAA and sWAA language here could reasonably be read to promise that the information at issue would not be collected or saved when the setting was off. Dkt. 445 at 13-18. That ruling provides a coherent basis for concluding that later, materially clearer language could change the expectation governing future conduct. The relevance of disclosure was not first introduced after the verdict.

The same order nevertheless treated highly offensive intrusion as a separate, holistic inquiry. It identified the degree and setting of the intrusion, the nature of the information, likely harm, Google's motives and objectives, countervailing interests, social norms, and alleged commercial benefit as relevant circumstances. Id. at 18-22. The disclosures and apparent privacy control could bear on both elements: they helped define the boundary a reasonable user understood and could make intentional disregard of that boundary more offensive. The record also contained allegations and evidence concerning the nature, purpose, risks, and uses of the data that were not reducible to the wording alone.

Dkt. 445 further declined to treat 'pseudonymous' or 'not associated with an account' as necessarily equivalent to anonymous. It recognized uncertainty concerning Google's terminology, the use of device identifiers, and the possibility that information could remain personal, private, or linkable without being stored in a named Google account. Id. at 9-13, 20-22. That distinction bears on Dkt. 721's later discussion of 'anonymized' data and on any future inquiry into the actual character and use of information described as non-account data.

During trial-related motion practice, Plaintiffs also argued that the jury could consider evidence of breach and leakage risk, reidentification and subpoena exposure, machine-learning use, conversion prediction, automated bidding, response optimization, and commercially useful AI capacity in determining whether Google's conduct was highly offensive. Dkt. 659. As an opposition to a motion in limine, Dkt. 659 establishes that Plaintiffs placed those theories and identified supporting trial evidence before the Court. It does not by itself establish the ruling on every evidentiary issue, the content of closing argument, the jury's reliance on a particular item, or continuation of any particular use after trial.

**C. The instructions, verdict, and post-verdict motion define different parts of the record**

The final instructions did not submit misrepresentation as an independent element of either privacy claim. For constitutional invasion of privacy, the jury was instructed to determine whether

the Classes possessed an objectively reasonable expectation of privacy, whether Google's conduct was highly offensive, injury, and causation. For intrusion upon seclusion, the jury was instructed to determine whether Class Members reasonably expected Google not to collect, save, or use the data and whether Google intentionally intruded upon that expectation through highly offensive conduct. Dkt. 666 at 18-25. Consent was submitted separately as Google's affirmative defense, requiring explicit notification of the particular conduct and voluntary consent to that conduct or substantially the same conduct. Id. at 25-27.

The signed verdict found Google liable for constitutional invasion of privacy and intrusion upon seclusion, rejected Google's consent defense as to both claims, found no CDAFA liability, awarded $425,651,947 in compensatory damages, declined to find the heightened predicate for punitive damages, and answered 'No' to disgorgement on the question submitted to the jury. Dkt. 670. Because the damages instructions permitted compensatory damages upon CDAFA liability or intrusion upon seclusion, and the jury rejected CDAFA, the monetary award necessarily proceeded through the intrusion-upon-seclusion finding.

After the verdict, Plaintiffs sought substantially the same structural relief previously identified: cessation of collection and saving, deletion, remediation or destruction of affected algorithms, models, and services, independent monitoring, and disgorgement. Dkt. 700 at 1-9. Plaintiffs asserted that collection, retention, use, and exploitation continued and that damages did not end the prospective injury. Dkt. 700 therefore establishes Plaintiffs' post-verdict remedial position; it does not itself prove continuation, causation, technical separability, or entitlement.

Dkt. 721 denied injunctive relief because Plaintiffs had not established prospective irreparable harm, treated the revised disclosure as curing or ameliorating the core representational problem, reasoned that the verdict compensated continuing commercial use, and found Plaintiffs' proposed injunction far too broad. Dkt. 721 at 3-6. It separately denied disgorgement because the legal remedy was adequate and Plaintiffs' estimate of attributable profits was insufficiently supported. Id. at 6-15. Dkt. 739 then described the verdict and disclosure changes as exceptional results supporting the fee request while preserving additional relief for appeal. The resulting fee question is what benefit the disclosure change actually accomplished and what unresolved remedial matters remain.

## II. WHAT THE JURY NECESSARILY DECIDED - AND WHAT THE GENERAL VERDICT DID NOT DECIDE

Dkts. 666 and 670 establish a defined set of binding findings. The jury found that the Classes possessed protected privacy interests under the circumstances tried; that Google intentionally intruded upon an objectively reasonable expectation that it would not collect, save, or use the data; that the conduct was highly offensive; that injury and causation were established; and that Google failed to prove its consent defense. Those findings concern the challenged course of conduct under the disclosures, settings, practices, evidence, and class period presented at trial.

The expectation and offensiveness elements were legally distinct but factually interdependent. Google's representations and the apparent privacy control helped define what a reasonable user understood and expected. Intentional collection beyond the apparent boundary could also help characterize the intrusion as offensive. At the same time, the jury was permitted to assess the broader digital setting, means of intrusion, nature of the information, risks, purposes, and uses. The record therefore does not support treating disclosure as irrelevant to offensiveness, but neither does the general verdict identify misleading wording as its exclusive or indispensable basis.

The rejection of consent establishes that Google did not prove both explicit notification of the particular conduct and voluntary consent to that conduct or substantially the same conduct. It does not reveal whether the jury found notice inadequate, voluntariness absent, the scope of any purported authorization insufficient, or some combination of those matters. Nor does it decide whether a post-trial disclosure, standing alone, would establish future notice, voluntary consent, both, or neither.

The verdict form contains no interrogatory asking whether Google made a misrepresentation, whether misleading wording was indispensable to either privacy violation, whether collection with accurate notice would be lawful or non-injurious, or whether the injury would disappear if the disclosures changed. Dkt. 721's statement that the legal violation 'stemmed from Google's misrepresentations' is therefore a judicial characterization of the theory litigated, not an express jury finding appearing on the verdict form.

The verdict likewise does not disaggregate which evidence the jury relied upon in finding highly offensive conduct. Dkt. 659 demonstrates that Plaintiffs identified substantive circumstances extending beyond disclosure, but it does not establish that the jury accepted every asserted risk or use. The correct inference is limited: uncertainty concerning the basis of a general verdict cannot itself establish either that misleading wording was the sole source of liability or that future collection under materially revised disclosures would constitute the same privacy violations or establish prospective injury warranting equitable relief.

The damages award establishes compensation for the intrusion-upon-seclusion injury adjudicated at trial. The verdict form does not identify the continuing uses considered, the systems through which those uses might occur, the period over which they might remain productive, the derivative capacities considered, or the portion of the award assigned to any past or future consequence. The possibility that the jury considered future monetization does not establish that it comprehensively valued every continuing and causally traceable consequence.

The advisory disgorgement answer must also be stated accurately. The jury answered 'No' to disgorgement. Dkt. 721 explains that disgorgement had been treated as an equitable remedy for the Court's independent determination, so the advisory answer was considered but was not binding. Dkt. 721 at 6-8. The present memorandum does not treat the jury as having awarded disgorgement or as having been silent. It examines only whether the Court's independent equitable and valuation analysis leaves questions suitable for focused briefing.

The boundary of the verdict is therefore material. It establishes an intentional, highly offensive intrusion upon an expectation against collection, saving, or use and a failure of Google's consent defense. It does not establish that misrepresentation was the sole wrong, and it does not decide the legal effect of materially different future disclosures. Dkt. 721's cure analysis had to operate within both sides of that boundary.

## III. DKT. 721'S DISCLOSURE-BASED CURE ANALYSIS

### A. Revised disclosure could materially affect both expectation and offensiveness

Dkt. 445 supports treating the revised Activity Controls language as a materially changed circumstance. If the former specific language reasonably implied that the relevant data would not be collected or saved, an express statement that Google may collect and use non-account data regardless of the settings can change what a reasonable user expects. Because defeating a misleadingly presented control also contributed to the alleged offensiveness, removal of that misleading implication can alter the offensiveness analysis as well. The record-based objection is not that the Court considered the new disclosure; it is whether the order treated that change as resolving the entire prospective showing without separately addressing what remained.

Dkt. 721 interpreted the revised language to mean that Google determines whether the data will be collected and 'the user has no say.' Id. at 4-5. The object of that lack of control matters. The user has no operative say over whether Google will collect and use information notwithstanding the setting that previously appeared to define the relevant boundary. That is the same category of collection, saving, and use addressed by the instructions and verdict, although the revised disclosure may change the legal expectation governing future instances.

Clearer notice therefore may remove an important circumstance from the adjudicated course of conduct. It does not itself establish affirmative consent, restoration of an operative means of refusal,

cessation of collection, deletion of previously collected data, or termination of continuing uses. Dkt. 352 is relevant here not because it compelled an injunction, but because it rejected continued participation as proof of consent and recognized the impracticability of market exit. Dkt. 721 did not hold that the new disclosure produced consent; its cure reasoning accordingly depends on notice and changed expectation rather than notice plus voluntary authorization.

## B. The record identified additional circumstances bearing upon offensiveness and prospective injury

The broader record prevents the disclosure revision from being treated, without explanation, as the only material change. Dkt. 445 described offensiveness as a holistic inquiry. Dkt. 659 identified alleged reidentification, joinability, security and subpoena exposure, machine-learning use, conversion prediction, automated bidding, response optimization, and commercial exploitation as evidence bearing upon offensiveness. Dkt. 700 asserted that continuing collection, retention, use, and derivative systems perpetuated the injury after trial.

Those materials do not establish that each asserted risk occurred, that every use continued, or that any one circumstance would independently satisfy California privacy law under the revised disclosure. They do establish that Plaintiffs' trial and remedial theories extended beyond inaccurate words. A complete cure analysis therefore required either a determination that the disclosure-related feature was indispensable to the entire prospective injury or a separate explanation why the remaining nature, use, risks, purposes, and consequences no longer established irreparable harm.

The terminology used for the information also remains material. Dkt. 721 referred to 'anonymized' data in discussing classwide offensiveness and decertification. Dkt. 445 had recognized that device-specific or pseudonymous information could remain personal and linkable without being associated with a named account. The revised phrase 'not associated with your account' therefore should not itself resolve whether the data is anonymous, reidentifiable, joinable, or capable of contributing to a fuller picture of the user. Those are factual characteristics rather than consequences of the label.

## C. The damages verdict does not itself map or value every continuing consequence

Dkt. 721 acknowledged that nothing prevents Google from continuing to make commercial use of unlawfully collected sWAA-off data, but concluded that the Classes had been compensated for that harm because the verdict reflected the value of the illegal taking and there was no reason to assume the jury considered only backward-looking monetization. Id. at 5-6. The jury could consider evidence of value and monetization. The unresolved question is the affirmative scope attributed to its undifferentiated award.

The verdict did not identify which continuing uses were presented or accepted, which systems retained effects of the data, whether those systems possessed independent provenance, the period of future use valued, or the amount assigned to any such consequence. Absence of a basis to assume that the jury considered only past use is not equivalent to a record-based determination that the award comprehensively compensated every continuing and derivative use. A conclusion of comprehensive compensation requires evidence identifying the consequences said to have been valued and guarding against both undercompensation and duplication.

This point does not imply that damages and prospective relief may compensate the same injury twice. Teutscher and ordinary anti-duplication principles require the Court to respect the jury's factual and monetary determinations. The question is antecedent: whether the record identifies the future or derivative effects included in the award with enough specificity to determine that any proposed additional relief would duplicate compensation rather than address a distinct continuing condition.

**D. Rejection of an overbroad request does not determine whether narrower relief is unavailable**

The Court also concluded that Plaintiffs' proposed injunction was far too broad. Dkt. 721 at 5. That conclusion may be correct as to the requested formulation. Rule 65 requires specificity, and equitable relief must be causally tied to the adjudicated wrong, prospective injury, and technically feasible compliance. Plaintiffs retained the burden to propose and prove relief satisfying those requirements.

The breadth determination is nonetheless analytically distinct from the threshold conclusion that prospective injury had ceased. Denial of an overbroad proposal does not establish that no narrower order could be directed to identified continuing retention, use, derivative effects, or materially equivalent routing. Objector does not contend that the Court was required to redesign Plaintiffs' injunction sua sponte. The narrower fee-stage point is that rejection of Plaintiffs' formulation should not be credited as proof that complete structural remediation was obtained or that a narrower remedy was technically impossible.

Dkt. 721 may ultimately withstand focused examination. The record supports treating revised disclosure as material, and Plaintiffs may have failed to carry their burden concerning continuation, irreparable harm, causation, or tailoring. The present concern is that the order's cure, compensation, and breadth rationales may have resolved different questions without a developed explanation connecting them to the full trial and remedial record.

## IV. THE GENERAL VERDICT CONSTRAINED BUT DID NOT ELIMINATE THE COURT'S INTERPRETIVE ROLE

When legal claims are tried to a jury and overlapping equitable issues remain for the Court, the Seventh Amendment requires the Court to abide by the jury's express and implicit factual findings in deciding both equitable liability and relief. Teutscher v. Woodson, 835 F.3d 936, 944-46 (9th Cir. 2016). The Court may not make a contrary factual determination merely because the requested remedy is equitable.

Teutscher also recognizes that an ambiguous verdict may support more than one evidence-based interpretation. When several theories were litigated and the verdict does not reveal which one the jury accepted, a district court may determine the basis of the verdict from the evidence and shape equitable relief consistently with that interpretation. Id. at 954-56. The Court need not avoid conflict with every conceivable interpretation, but it must avoid contradicting the findings implicit in the interpretation it adopts.

The requirement is therefore one of grounded interpretation and explanation, not abstention from interpretation. Teutscher observed that a district court should explicitly determine the basis attributed to an ambiguous verdict and explain how the equitable ruling comports with that basis. Id. at 956. A lack of explanation can prevent meaningful evaluation of whether the equitable decision rests on facts consistent with the jury's findings.

Applied here, Dkt. 445 supplies record support for a disclosure-centered interpretation. The reasonable expectation at trial was materially shaped by the WAA and sWAA representations, and the apparent privacy control also bore on offensiveness. Dkt. 721 therefore did not invent the relevance of disclosure when it considered Google's post-trial revision.

The potential difficulty lies in the breadth of the interpretation. Dkt. 721 stated that the legal violation stemmed from misrepresentations, suggested the jury rejected Google's earlier disclosure argument 'perhaps because' users had to draw a negative inference, identified that inferred defect as the core problem, and treated its removal as cure. Dkt. 721 at 4. The word 'perhaps' accurately acknowledges ambiguity; it does not by itself establish constitutional error. The question is whether the selected interpretation was sufficiently grounded and explained in light of the instructions, the

separate offensiveness finding, the rejected consent defense, Dkt. 659's broader trial proffer, and Dkt. 700's continuing-use theory.

A colorable Reexamination Clause issue would arise only if the Court's interpretation contradicted a fact necessarily found by the jury - for example, if it treated conduct necessarily found independently offensive as non-problematic solely because the wording changed. The present record memorandum does not assert that violation as established. The general verdict and the overlap of the evidence leave room for a permissible disclosure-centered interpretation. They also leave a substantial question whether Dkt. 721 sufficiently identified that interpretation and reconciled it with the broader findings and record.

Focused briefing should therefore address whether Dkt. 721's cure analysis represents a permissible evidence-supported interpretation under Teutscher; which facts were necessarily resolved by Dkts. 666 and 670; what role the Court attributed to the separate expectation and offensiveness findings; and whether the damages and equitable rulings can coexist without contradiction or duplication. That inquiry would clarify the order's premises without presuming that the Court lacked authority to decide equitable relief.

## V. THE RECORD SUPPORTS A LIMITED INQUIRY INTO CONTINUING USE AND DERIVATIVE CAPACITY

The term 'derivative capacity' is used here descriptively. It means an identifiable technical or informational capability materially created, calibrated, preserved, or improved through data acquired by the adjudicated collection practices. It does not import a criminal exclusionary rule, presume that every Google system was affected, or convert every downstream use into a new privacy tort.

The inquiry has a record foundation. Dkt. 315 sought removal of products, services, or algorithms developed or improved using the data. Dkt. 659 placed machine-learning models, conversion prediction, automated bidding, response optimization, reidentification, and commercial use before the Court as matters bearing upon offensiveness. Dkt. 700 renewed deletion, algorithm and model remediation, and monitoring after the verdict. The proposed inquiry is therefore a refinement of the litigation's longstanding remedial theory, not a new cause of action supplied by the Objector.

Those docket entries also establish the limits of the present showing. A requested remedy and an evidentiary proffer are not findings that a particular model was affected, that the effect remained after trial, or that every asserted downstream use was unauthorized. Plaintiffs retain the burden to identify a continuing consequence and connect it to the adjudicated conduct. A system shown to possess an origin and authority independent of the violation would fall outside any violation-based remedy.

'Provenance' is used as shorthand for that causal and authority inquiry. Technical provenance asks where the information traveled, whether it was copied, combined, transformed, or used to modify an identifiable system, and whether the resulting effect remains separable. Authority provenance asks what actor authorized the material use, for what purpose, and within what scope. Both questions are necessary because the technical route by which data entered Google's systems does not itself establish lawful authority for every materially different downstream use.

The developer-consent distinction illustrates the point. At the pleading stage, the Court treated developers' consent to employ Google Analytics for Firebase as distinct from users' consent to Google's challenged collection and use. Dkt. 109 at 7-11. The jury later rejected Google's user-consent defense. Developer authorization may support a valid app-directed function the developer was entitled to request. It does not, without more, establish user consent or independent authority for materially different Google-directed retention, cross-context association, modeling, commercialization, or derivative use.

This does not mean that each continuing use requires a new act of user consent or is independently unlawful. It means that a claim of independent provenance cannot rest solely on the existence of developer-selected infrastructure. The relevant record must identify the subsequent function and the source and scope of authority asserted for it. Compensation for the original intrusion does not itself supply missing authority, although it may preclude duplicative monetary or equitable relief for consequences already valued.

Much of the internal evidence necessary to make these distinctions—including evidence concerning system lineage, retention history, SDK routing, model history, use, and internal classifications—is principally within Google's possession, custody, or control. That asymmetry does not shift Plaintiffs' burden or permit an inference that hidden effects occurred. It does mean that absence of a developed map should not itself be treated as affirmative proof of independent provenance, complete compensation, or technical infeasibility where a procedurally valid basis for focused production exists.

The purpose of any further factual development would therefore be discriminating rather than expansive: to identify affected pathways and systems, exclude independent systems, determine technical separability, and permit a remedy - or a finding that no further remedy is available - on an evidence-based record. The inquiry would not inspect Google generally or reopen the jury's liability determination.

## VI. DISGORGEMENT PRESENTS A SEPARATE EQUITABLE AND VALUATION QUESTION

The advisory jury declined to award disgorgement. The Court independently treated disgorgement as equitable, held that California law could permit net-profit disgorgement for intrusion upon seclusion, but denied relief because Plaintiffs possessed an adequate legal remedy and because their estimate of attributable profits was insufficiently supported. Dkt. 721 at 6-15. Those rulings must be confronted separately from the request for injunctive relief.

Dkt. 721 recognized that Plaintiffs were required to offer a reasonable approximation of profits causally connected to the violation, after which the defendant would bear the burden of demonstrating costs, expenses, and other deductions. Id. at 8, 10-15; see Meister v. Mensinger, 230 Cal. App. 4th 381, 399 (2014). The order concluded that Plaintiffs' methodology did not adequately connect the proposed revenue base to the incremental advertiser spending caused by sWAA-off conversion measurement.

The present memorandum does not contend that Google's total advertising revenue, total revenue from products touching sWAA-off data, or every commercial advantage associated with its ecosystem was attributable to the violation. Apportionment must remain causal, and equitable disgorgement cannot become punitive or duplicate compensatory damages. The advisory 'No,' the adequacy ruling, and the evidentiary deficiencies all weigh against treating additional disgorgement as established.

The narrower valuation question is whether the advertiser-spending counterfactual applied in Dkt. 721 was the only permissible object of Plaintiffs' initial approximation. If the adjudicated data materially created, preserved, accelerated, or improved an identifiable analytics, attribution, measurement, targeting, or integration capability, the economic yield associated with the affected capability may present a gross-benefit pool subject to causal apportionment, independent-input proof, legitimate costs, and deductions.

A capacity-based approximation would still require proof. Plaintiffs would need to identify the affected system; demonstrate a material contribution; connect a proposed revenue, avoided cost, developmental acceleration, replacement cost, or other benefit measure to that contribution; and avoid attribution of lawful or independently productive inputs. Google could then establish separable

revenue, independent causation, lawful inputs, costs, expenses, and deductions demonstrating that the attributable net gain was smaller or zero.

This distinction matters to the fee-stage characterization of the remedial result. Dkt. 721's rejection of Plaintiffs' submitted estimate establishes that the presented record did not justify their requested disgorgement. It does not constitute a finding that the violation produced no derivative or architectural benefit. Whether another legally sufficient approximation is procedurally available is a question for Plaintiffs, Google, and the Court, not a conclusion the Objector asks the Court to assume.

Any renewed disgorgement theory would also have to address the adequacy of the damages remedy, the advisory verdict, election and duplication concerns, timeliness, and the source and permissible use of any recovered funds. The same technical evidence may inform both continuing-use and valuation questions, but it would not itself establish equitable entitlement.

## VII. FOCUSED ADVERSARIAL BRIEFING SHOULD PRECEDE ANY FURTHER INQUIRY

Objector does not purport to move under Rule 60(b) on Plaintiffs' behalf or ask the Court immediately to vacate Dkt. 721. Rule 23(h) nevertheless requires the Court to assess the benefit supporting the fee request, and Dkt. 739 places the disclosure change and the asserted institutional significance of the present result before the Court. The Court may request the parties' positions on those premises without first treating the objection as an independent motion for equitable relief.

If a party seeks relief from Dkt. 721 based on legal mistake, Rule 60(b)(1) includes judicial errors of law within the term 'mistake.' Kemp v. United States, 596 U.S. 528, 533-39 (2022). Such a motion must be filed within a reasonable time and no later than one year after entry of the challenged order. Fed. R. Civ. P. 60(c)(1). Dkt. 721 was entered January 30, 2026, but timeliness and entitlement would remain for the Court to determine on a properly presented request.

The Ninth Circuit has held that a court may initiate Rule 60(b) consideration in the same action when the affected parties receive notice and a fair opportunity to be heard. Kingvision Pay-Per-View Ltd. v. Lake Alice Bar, 168 F.3d 347, 351-52 (9th Cir. 1999). Snell v. Cleveland, Inc., 316 F.3d 822, 826-27 (9th Cir. 2002), cautions against extending that authority to collateral alteration of a judgment in a separate, closed action. The safer present course is therefore briefing concerning availability and party intent, not immediate sua sponte modification.

Focused briefing should address, at least, the following questions:

1. What factual matters Dkts. 666 and 670 expressly or necessarily resolved, and whether Dkt. 721's interpretation of the general verdict is supported and adequately explained under Teutscher.

2. Whether the revised disclosure materially changed both reasonable expectation and offensiveness, and whether the remaining lack of control, continuing use, data characteristics, purposes, risks, or derivative consequences support prospective injury under the governing California standards.

3. Whether the damages record identifies the continuing and derivative consequences included in the award sufficiently to determine comprehensive compensation and avoid duplication.

4. Whether rejection of Plaintiffs' proposed injunction resolved only that formulation or also established that no narrower functional relief is legally and technically available.

5. Whether the existing record is sufficient to determine continuation, provenance, separability, and attributable benefit; and, if not, whether further factual development is procedurally available.

6. Whether Plaintiffs intend to seek relief in this Court, preserve the issues solely for appeal, or decline further pursuit, and how that choice affects the nonmonetary benefit asserted in support of the fee application.

Such briefing would not commit the Court to vacating its order, conducting technical discovery, granting an injunction, or awarding disgorgement. It would permit the Court to leave Dkt. 721

unchanged, clarify its scope, entertain a properly presented request for limited further proceedings, or conclude that appellate review is the appropriate forum. If an appeal is docketed before the Court can grant requested relief, Rule 62.1 supplies the indicative-ruling procedure.

## VIII. SCOPE OF ANY LIMITED TECHNICAL INQUIRY AND POTENTIAL NARROWER RELIEF

A technical inquiry would become relevant only if the Court first identifies a procedurally cognizable basis for further development and determines that the existing record is insufficient. Its function would be to test scope and feasibility, not to retry liability or investigate Google in the abstract. The mandate should be confined to the collection practices adjudicated at trial and materially traceable consequences.

A focused inquiry could determine:

1. What WAA or sWAA-off activity was acquired from Class Members through Firebase, the Google Mobile Ads SDK, or other pathways adjudicated at trial, and during what periods.

2. Where that data was retained, copied, transferred, associated, aggregated, transformed, or made available after collection, and whether the adjudicated pathways or materially equivalent routes remain operative.

3. Which identifiable profiles, analytics, conversion-measurement systems, targeting tools, models, developer services, or products were materially created, calibrated, preserved, or improved through the adjudicated data.

4. What measurable contribution the data made to coverage, accuracy, identity resolution, attribution, measurement completeness, prediction, efficiency, development time, or a commercially offered function, and what records demonstrate that contribution.

5. Whether an identified use or system possesses technical and authority provenance independent of the violation, including the actor, purpose, function, and scope of any developer authorization on which Google relies.

6. Whether processing necessary to provide a user-requested service is technically separable from continuing retention, inference, association, measurement, targeting, optimization, commercialization, training, or other derivative use.

7. What revenue, avoided acquisition or development cost, acceleration, lawful replacement cost, or other measurable economic consequence is causally connected to a demonstrated contribution, subject to independent inputs, apportionment, costs, and deductions.

8. What measures could separate, terminate, delete, retrain, quarantine, or independently verify termination of an identified continuing or derivative effect while preserving necessary service.

The inquiry should determine whether potentially affected systems or uses possess independent lawful provenance. Systems shown to possess independent provenance must be excluded from any violation-based remedy. A failure to establish independent provenance does not itself establish violation-derived causation or authorize relief; nor may the absence of a developed record be treated as affirmative proof of independence. Any relief must remain limited to systems for which Plaintiffs establish the required causal connection, following such focused production as the Court lawfully authorizes. A change in terminology, pathway, identifier, or form should not establish independence where substantially the same affected collection, use, or derivative capacity remains operative. Any anti-evasion provision would remain subject to Rule 65's requirements of specificity and reasonable detail.

### A. Neutral technical assistance

If neutral assistance is warranted, Federal Rule of Evidence 706 permits appointment of a court expert, and Federal Rule of Civil Procedure 53 permits a master for appropriate post-trial matters that cannot effectively and timely be handled by the Court or a magistrate judge. Any appointment should

have a defined mandate, access limited to necessary records, party participation, disclosure of methodology and findings, opportunity for examination and objection, protection of legitimate confidentiality interests, and judicial review.

## B. Narrow functional relief

A developed record could support an order directed to identified continuing retention, use, or derivative effects causally connected to the adjudicated conduct and shown to present prospective injury. Possible measures include cessation of a defined pathway, deletion with verification, technical segregation, retraining, phased implementation, or independent monitoring. The record may instead establish that no continuing effect exists, that the effect has independent provenance, or that the requested measure would be infeasible or disproportionate.

Temporary quarantine should not be presumed and would not be punitive. It could be considered only for specifically identified data, outputs, or systems where a causal connection has been shown and the record does not yet establish whether the violation-attributable effect can be separated or removed. Necessary service continuity should be evaluated directly: the Court should determine which processing is required for the user-requested function, which additional uses are distinct, and what disruption separation would cause.

## C. Disgorgement remains separate

The same record may provide evidence relevant to product lineage, revenue attribution, replacement cost, and net benefit. It would not itself establish disgorgement. Any renewed request would remain subject to the advisory verdict, equitable jurisdiction, adequacy of legal remedies, reasonable approximation, apportionment, deductions, timeliness, and anti-duplication requirements.

## CONCLUSION

The docket presents a narrower and more supportable issue than the proposition that disclosure was irrelevant. Dkt. 445 confirms that Google's former language materially shaped the reasonable-expectation inquiry and that offensiveness required a separate, holistic assessment. Dkt. 659 shows that Plaintiffs presented the defeat of the apparent privacy boundary, together with the nature, risks, purposes, and uses of the data, as bearing upon offensiveness. Revised disclosure could therefore materially change both inquiries. The record does not clearly establish, however, that misleading presentation was the exclusive or indispensable source of prospective injury, that the damages verdict comprehensively valued every continuing consequence, or that rejection of Plaintiffs' broad proposal resolved the availability of narrower relief.

Dkts. 315, 352, 659, 666, 670, and 700 show that the case's remedial and evidentiary record extended to cessation, deletion, derivative systems, monitoring, substantive risks and uses, an intentional and highly offensive intrusion, and a rejected consent defense. Dkt. 721 may ultimately be sustained as a permissible interpretation of that record and as a determination that Plaintiffs failed to prove entitlement. Before the present posture is credited as completed exceptional nonmonetary benefit, focused briefing should identify the interpretation adopted, reconcile it with the verdict and remedial chronology, and determine whether the existing record is sufficient.

Only if a procedurally valid basis for further development exists and the current record is inadequate should the Court consider a limited technical inquiry. Properly confined, that inquiry would distinguish affected systems from independently sourced systems, determine continuation and separability, inform any narrower remedy, and avoid both speculative overreach and a presumption of clean provenance from the absence of evidence controlled principally by Google.

## AUTHORITIES PRINCIPALLY RELIED UPON

Fed. R. Civ. P. 23(h), 53, 60(b)(1), 60(c)(1), 62.1, and 65; Fed. R. Evid. 706; eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006); Kemp v. United States, 596 U.S. 528 (2022); Teutscher

v. Woodson, 835 F.3d 936 (9th Cir. 2016); Kingvision Pay-Per-View Ltd. v. Lake Alice Bar, 168 F.3d 347 (9th Cir. 1999); Snell v. Cleveland, Inc., 316 F.3d 822 (9th Cir. 2002); Meister v. Mensinger, 230 Cal. App. 4th 381 (2014); and Dkts. 109, 315, 352, 445, 659, 666, 670, 700, 721, and 739.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ANIBAL RODRIGUEZ, JULIAN SANTIAGO,
and SUSAN LYNN HARVEY, individually and
on behalf of all others similarly situated,

*Plaintiffs,*

v.

GOOGLE LLC,

*Defendant.*

Case No. 3:20-cv-04688-RS

APPENDIX TO EXHIBIT A

## PUBLIC RECORDS BEARING ON THE FEE-STAGE VALUE OF THE REVISED DISCLOSURE: ENTRENCHMENT, NON-EVASION, AND REMEDIAL INVERSION

### PURPOSE AND FEE-STAGE RELEVANCE

The Objection establishes the governing fee inquiry and the relief requested. Exhibit A addresses the case-specific record concerning the verdict, Dkt. 721, the revised disclosure, continuing and derivative consequences, and disgorgement. This Appendix does not repeat those matters or independently request modification of the judgment, injunctive relief, disgorgement, discovery, or sanctions.

Its narrower purpose is to present collateral public records bearing upon the value reasonably attributable to the revised disclosure as nonmonetary relief. Class Counsel relies upon the disclosure change as part of an exceptional result supporting the requested fee. Causation of a textual revision, however, does not by itself establish a benefit to the Classes. The operative question is whether the revision provides accurate, practically meaningful, durable, and rights-preserving remediation, or instead leaves Google in control of the collection function and retained institutional value while supplying more defensible terms for continuing substantially the same operation.

The records collected here bear upon that distinction. They document Google's treatment of formally imposed constraints over more than a decade; the foreseeable risk of semantic, technical, and functional evasion even under stronger binding and monitored remedies; the role of data, scale, integration, learning, and feedback in producing entrenched institutional value; and the safeguards used in other proceedings to determine whether a technical remedy constrains the operative function rather than merely changing its description.

These records do not establish: that Google will violate the revised disclosure, that conduct in another proceeding proves liability here, or that the fee objection independently authorizes additional equitable relief. They establish why the revision's durability and class-side value cannot be presumed from changed wording alone. That question is material because a result cannot support enhancement as exceptional non-monetary relief to the extent it preserves the collection function embedded in the adjudicated violation, retained value, and practical control for Google, or converts an adverse verdict into clearer terms for continued operation.

For purposes of this Appendix, 'entrenchment' means the conversion of accumulated data, scale, technical integration, distribution control, network effects, switching costs, institutional knowledge, and market position into a self-reinforcing capacity to preserve or reproduce a material function.

'Non-evasion' means functional coverage of materially equivalent substitutes, successor products and pathways, indirect action, and derivative capacity, supported by a means of verification independent of the regulated actor.

'Remedial inversion' means a result in which an adverse adjudication supplies the party found liable with a legally or operationally improved means of preserving the material function embedded in the adjudicated violation, while that defendant-side value is characterized as exceptional relief to the injured class.

## I. TEXTUAL REVISION DOES NOT BY ITSELF ESTABLISH CLASS-SIDE REMEDIAL VALUE

### A. Changed words are not necessarily meaningful information.

Exhibit A explains why notice, voluntary consent, and practical refusal remain distinct under California privacy law. This Appendix addresses the further valuation problem. A change in wording proves that the words changed. It does not by itself prove that the resulting statement accurately and completely describes the operative collection; that users can understand the technical category employed; that the category remains stable across products and pathways; or that any person outside Google can determine whether the statement corresponds to the underlying system.

The revised language identified in Dkt. 721 states, in substance, that Google can collect and use information not associated with an account regardless of the settings. The language is discretionary rather than definite, employs a technical category whose boundaries Google controls, and does not identify the relevant pathways, uses, retention, association, or derivative effects. The Court construed it to mean that Google decides whether collection occurs and that the user has no say. A clearer statement of Google's claimed discretion is not, without more, meaningful remediation of the Classes' loss of control.

### B. Notice cannot perform the work of consent, refusal, or relinquishment of the right.

Knowledge that another party intends to disregard an asserted privacy boundary is not equivalent to authorization of the conduct or abandonment of the boundary. Treating an announcement of continued collection as sufficient cure would permit the actor constrained by the right to influence the future scope of that right through notice of its own intended non-observance. The user would lose the practical force of the expectation not because the user consented, obtained an effective means of refusal, or surrendered the interest, but because the collecting party declared that the attempted boundary would not govern its conduct.

The concern is therefore not limited to whether the same intrusion remains highly offensive after clearer notice. It is whether unilateral notice becomes an instrument of practical alienation of inalienable rights: the protected interest formally remains with the individual, while authority over its operative boundary shifts to the party found to have violated it. A constitutional privacy right constrains the actor seeking access; it is not presumptively converted into a disclosure condition administered by that actor.

### C. The revision may improve Google's position while restoring no class control.

The revision may narrow the discrepancy between Google's description and its asserted practice, reduce uncertainty concerning future reasonable-expectation arguments, and clarify how Google may continue the collection while avoiding the wording defect identified by the Court. Those consequences may have substantial legal and operational value to Google. The Classes, by contrast, receive no affirmative consent mechanism, no operative means of refusal through the relevant setting, no cessation, no deletion, no treatment of derivative capacity, and no independent verification.

> Proposition: The fact that litigation caused Google to revise its language does not establish that the revision supplied a class-side benefit. Where the revision principally announces that Google retains the collection decision, its value depends on what control, constraint, and durable protection it actually created - not on the existence of new words.

## II. A LONGITUDINAL RECORD OF NONCOMPLIANCE MAKES SEMANTIC AND FUNCTIONAL EVASION FORESEEABLE

### A. The 2011 Google Buzz order established an express privacy-compliance baseline.

In 2011, the Federal Trade Commission entered a company-wide consent order arising from Google's rollout of Google Buzz. The order prohibited misrepresentations concerning privacy and confidentiality, required affirmative express consent before certain new sharing contrary to prior promises, required a comprehensive privacy program, and imposed biennial independent assessments for twenty years. *In re Google Inc.*, FTC Dkt. No. C-4336, Decision and Order pts. I-IV (Oct. 13, 2011).

The order matters as a baseline rather than merely as an old enforcement action. By 2011, Google was formally constrained concerning representations about user control, actual information practices, consent, internal privacy governance, and independent assessment. The later record can therefore be evaluated against a defined obligation rather than against an undeveloped expectation of voluntary improvement.

### B. The Safari proceeding directly invoked breach of that baseline.

In 2012, the United States, acting on referral from the FTC, charged that Google misrepresented to Safari users that the browser's default settings would block tracking cookies while Google employed a mechanism that placed cookies and collected browsing information. The government expressly alleged that the conduct violated the 2011 Buzz order. Google resolved the action through a stipulated permanent injunction and a $22.5 million civil penalty. *United States v. Google Inc.*, No. 3:12-cv-04177-SI, Order Approving Stipulated Order for Permanent Injunction and Civil Penalty Judgment 1-3 (N.D. Cal. Nov. 16, 2012).

The stipulated resolution was not a merits trial and should not be described as a judicial finding after contested adjudication. Its significance is nonetheless direct: the formal enforcement theory was violation of a named prior privacy constraint concerning representations about user control, and the resulting judgment imposed a substantial penalty and additional injunctive terms. The record therefore demonstrates that a comprehensive order, privacy program, and independent assessments did not eliminate a later control-versus-tracking dispute framed as breach of that order.

### C. The French proceedings show repeated noncompliance, semantic restriction, impaired refusal, and obstruction of verification.

The French neighboring-rights proceedings concern a different right and legal regime, but they provide a more recent and formally adjudicated sequence concerning Google's response to external constraint. In April 2020, the Autorite de la concurrence imposed interim measures requiring good-faith negotiation and specified information. In July 2021, the Autorite found that Google failed to comply with multiple injunctions, imposed a EUR 500 million penalty, ordered compliance, and attached a daily penalty to delay. Decision No. 21-D-17 (July 12, 2021); Decision No. 22-D-13 paras. 9-14 (June 21, 2022).

The 2021 findings were not limited to complete refusal. The Autorite found that Google neutralized negotiations, narrowed the scope of the protected right, adopted an excessively restrictive conception of attributable revenue, partially and belatedly disclosed information needed to evaluate its offers, and linked remuneration for current uses to participation in new Google services. Decision No. 22-D-13 at 2-3, 15-16, 21. The proceeding therefore illustrates how an obligation may be addressed through restrictive definitions, controlled information, alternative commercial leverage, and technically responsive conduct that preserves the actor's operative advantage.

In June 2022, the Autorite made detailed commitments binding, including transparency and information duties, separate negotiations, neutrality obligations, and supervision by an independent monitoring trustee. Decision No. 22-D-13. In March 2024, the Autorite concluded that Google failed to comply with Commitments 1, 2, 4, and 6 and with its cooperation obligation toward the monitoring trustee. The decision found opaque methodology notes, incomplete information, continued information asymmetry, failure to disclose the use of protected content by Bard, and failure to provide information necessary for monitoring. Decision No. 24-D-03 at 1-2, paras. 196-97, 302-05, 321-24 (Mar. 15, 2024).

The 2024 decision also found that Google supplied no technical means for publishers to refuse use of their content by Bard without opposing crawling across Search, Discover, and Google News. The nominal means of refusal therefore burdened materially separate participation. Id. at 2, paras. 171-74. This is directly relevant to the distinction between a formal statement of choice and a practical ability to exercise a protected boundary without forfeiting unrelated access.

### D. The fee-stage inference concerns foreseeable value, not propensity.

These proceedings do not establish that Google will violate the Rodriguez revision or that neighboring-rights violations prove a privacy violation here. They establish a longitudinal and institutionally specific basis for foreseeability. Across more than a decade, Google has faced an express privacy order, an enforcement action alleging breach of that order, interim injunctions, a EUR 500 million noncompliance penalty, detailed binding commitments, an independent monitor, and a later EUR 250 million noncompliance decision. The response documented in those records includes restrictive semantic interpretation, incomplete or opaque information, alternative pathways, impaired practical refusal, and failure to provide information necessary for independent verification.

That record contradicts any presumption that a Google-administered change in wording supplies durable class value merely because it is more explicit. Where substantially stronger constraints have not reliably displaced Google's operative control, the foreseeable benefit of a voluntary, non-anti-evasive, un-monitored revision must be demonstrated rather than inferred from its adoption.

## III. ENTRENCHMENT IS RETAINED VALUE, NOT MERELY A REASON TO PREFER STRONGER RELIEF

### A. Judicial findings identify data, scale, integration, and feedback as productive advantages.

The federal ad-tech liability opinion supplies judicial findings concerning the economic and technical character of Google's institutional advantage. The court described a self-reinforcing positive feedback loop in which more advertisers attracted more publishers and more publishers attracted more advertisers. *United States v. Google LLC*, No. 1:23-cv-00108-LMB-JFA, Memorandum Opinion 26-27 (E.D. Va. Apr. 17, 2025).

The court further found that Google's unmatched scale allowed faster product testing and higher-quality publisher-advertiser matching, and that its repositories of data concerning advertisers, publishers, and users, combined with scale and technical sophistication, would further benefit its business as ad-tech products integrated artificial intelligence and machine learning. Id. at 39-40. It also found that transaction volume, data, and indirect network effects created scale advantages and barriers to entry; large customer groups supplied auction and targeting data usable for rapid experimentation, machine-learning training, and improved matching. Id. at 82-83.

### B. Entrenchment is a category of value that persists beyond an immediate revenue transaction.

Those findings establish more than market size. They identify mechanisms through which information becomes continuing productive capacity: improved experimentation, model training, matching quality, integration, customer dependence, and feedback. The resulting value may persist as infrastructure, calibrated systems, learned parameters, operational knowledge, commercial relationships, and barriers to entry even when a particular collection pathway or wording changes. In their combined form, those retained advantages are entrenchment.

Exhibit A explains that the jury answered 'No' to the advisory disgorgement question and that the Court independently denied disgorgement on adequacy and evidentiary grounds. This Appendix does not renew the rejected request or assume that Plaintiffs can satisfy another approximation. It identifies the public-record basis for treating entrenchment as a concrete category of retained value rather than an abstract synonym for corporate power.

**C. The denial of the submitted disgorgement and structural requests did not establish absence of retained value.**

Dkt. 721 rejected the disgorgement approximation and the equitable showing presented. It did not make an affirmative finding that the adjudicated collection produced no technical, informational, institutional, or market advantage, or that every such advantage was fully surrendered through damages and revised wording. The distinction matters at the fee stage even if no further remedy is available: a result may be substantial in damages while leaving the principal value-producing capacity in the defendant's possession.

The external antitrust findings do not establish that the Rodriguez data caused Google's monopolies or that every Google system was affected by the adjudicated conduct. They establish why the object of valuation cannot be confined automatically to immediately traceable advertising dollars. Where data and scale can create self-reinforcing capability, preservation of the architecture, system learning, and institutional position may constitute retained value relevant to whether the total remedial result delivered an exceptional benefit to the Classes.

> *Proposition: Entrenchment is not merely the environment that makes remediation difficult. It is the durable productive advantage that may remain with Google after damages are paid and language is revised.*

## IV. NON-EVASION AND INDEPENDENT VERIFICATION ARE MEASURES OF REMEDIAL DURABILITY

**A. A remedy controlled in meaning, implementation, and verification by the regulated actor cannot be presumed durable.**

The French sequence demonstrates that binding language, financial penalties, and even an independent monitor do not make compliance self-proving where Google controls the methodology, technical system, classifications, and information supplied to affected parties and the monitor. A remedial statement can be formally responsive while remaining opaque, incomplete, difficult to verify, or implemented through a choice that burdens unrelated participation.

The present revision is weaker in each relevant respect. It is a voluntary disclosure rather than a court-defined command; it uses discretionary and technically controlled terminology; it supplies no independent access to the system; it restores no practical refusal; it does not address legacy data or derivative capacity; and it contains no express protection against equivalent collection through another setting, identifier, product, affiliate, processor, or successor technology.

**B. The federal search judgment demonstrates that anti-circumvention and technical supervision are administrable remedial concepts.**

The December 5, 2025 Final Judgment in the federal search-monopoly action created a five-person Technical Committee with expertise including software engineering, information retrieval, artificial intelligence, economics, behavioral science, and data privacy and security. The Committee received access to documents, systems, equipment, source code, algorithms, personnel, complaints, and recurring reporting. *United States v. Google LLC*, No. 1:20-cv-03010-APM, Final Judgment sec. VII.A (D.D.C. Dec. 5, 2025).

The judgment expressly required immediate notice when the Committee had reason to believe Google was failing to comply or attempting to circumvent a provision or the judgment's intended purposes, and it required continuing status reports to the Court. Id. sec. VII.A.6(g), VII.E. The point is not that Rodriguez requires the same remedy. It is that successor coverage, technical access, independent expertise, continuing verification, and circumvention review are judicially intelligible measures of durability in an integrated and evolving Google system.

*C. Their absence identifies what remains unproven in the claimed benefit.*

Non-evasion is not an accusation that future violation is certain. It is a valuation criterion. The claimed benefit is stronger if it governs materially equivalent substitutes, preserves practical refusal, reaches legacy and derivative effects where legally appropriate, and can be verified independently. It is weaker if Google may define the operative categories, change pathways or terminology, and remain the sole source of evidence concerning whether the words match the system.

The Objection and Exhibit A identify the case-specific questions and any procedural steps requested. This Appendix does not propose an injunction. It demonstrates why the absence of functional coverage and independent verification prevents the revision's durability from being presumed when counsel asks that revision to support enhancement-level credit.

## V. REMEDIAL INVERSION: AN ADVERSE VERDICT SHOULD NOT BECOME AN ASSET OF CONTINUED OPERATION

*A. Ordinary finality differs from verdict-derived preservation of the adjudicated function.*

An adverse judgment may legitimately give a defendant finality, clearer legal boundaries, and an opportunity to conform future conduct to law. Those ordinary consequences are not themselves objections. Remedial inversion arises where the judgment defining the violation supplies the defendant with a legally or operationally improved means of preserving the material function embedded in that violation, retaining the value produced by the underlying architecture, and weakening future enforcement of the same protected boundary.

Here, the claimed nonmonetary relief may tell Google that the core problem can be cured by stating more clearly that the settings do not control the relevant collection. If collection continues, Google retains the architecture and entrenched capacity while receiving clearer guidance concerning the wording under which it may argue that users can no longer reasonably expect the setting to prevent the conduct. The verdict then operates partly as a compliance-engineering asset for Google rather than solely as an additional vindication for the Classes.

*B. The constitutional paradox is practical alienation of the right through unilateral notice.*

The jury found liability for invasion of privacy and intrusion upon seclusion and rejected Google's consent defense. The fee-stage question is not whether the revised wording is automatically unlawful. It is whether treating Google's announcement of continued collection as exceptional class relief would invert the adjudicated relationship. A privacy right ordinarily places the boundary in the rights-holder and constrains the actor seeking access. If the actor can diminish the practical force of that boundary by declaring that attempted refusal will not be honored, the actor acquires practical authority to define the expectation against which its own conduct will later be judged.

That is not merely continued offensiveness. It is the risk that the right is functionally alienated while formally preserved: users retain the abstract privacy interest, but Google controls the collection, the terminology, the available means of participation, and the disclosure used to determine whether continued expectation remains reasonable. A verdict against the violation should not become the mechanism by which the party found liable acquires more defensible control over the right's future operation.

*C. Defendant-side value created by remedial inversion cannot be counted as exceptional class benefit.*

Counsel may properly receive credit for formidable performance, causation of the revision, and the substantial damages verdict. Those matters are addressed in the Objection. The separate enhancement premise is whether the revision itself delivered exceptional additional value to the Classes. To the extent it preserves Google's collection function and entrenched capacity, restores no practical control, remains semantically and technically evasible, and improves Google's future legal or operational position, that defendant-side value cannot be counted as an exceptional benefit delivered to the Classes.

The relevant asymmetry is therefore not that litigation incidentally benefits both sides. It is that the party found liable may receive from the adjudication a more stable means of retaining the function and value associated with the adjudicated conduct, while the same result is invoked to justify taking an enhanced fee from the Classes' compensatory recovery. That proposition bears directly upon the magnitude and direction of the incremental nonmonetary benefit claimed.

## VI. CONCLUSION: FEE-STAGE CONSEQUENCE

The public record does not permit the revised disclosure to be valued merely as a successful change in wording. Google has operated under express privacy, consent, non-misrepresentation, compliance, monitoring, information, and reporting obligations, yet later proceedings have charged breach of a prior privacy order and formally found noncompliance with injunctions and binding monitored commitments. The French record further demonstrates that supplied information may remain opaque, technically controlled, unrelated to the operative methodology, incapable of independent verification, or coupled to a form of refusal that requires surrender of materially separate participation. Semantic and functional evasion are therefore documented remedial risks, not abstract possibilities.

The anti-trust findings establish why those risks possess economic and institutional significance. Google's information, scale, integration, experimentation, machine-learning capacity, feedback effects, and control of market infrastructure constitute productive advantages that can persist after immediate conduct or terminology changes. In their combined form, those advantages are entrenchment: retained capacity capable of reproducing value beyond a discrete transaction, revenue line, or class period. Exhibit A explains why denial of the submitted disgorgement request did not amount to an affirmative finding that no such retained capacity or benefit existed.

The revised disclosure contains no independent verification, practical means of refusal, fixed functional definition, successor-pathway protection, legacy or derivative remediation, or anti-evasion mechanism comparable even to safeguards that have previously proved insufficient to secure durable compliance. Google retains control of the terminology, technical system, collection decision, and information necessary to determine whether the words correspond to operative conduct.

The resulting fee-stage concern is remedial inversion. An adverse verdict ordinarily constrains the party found liable. It should not become an asset through which that party preserves the collection function embedded in the adjudicated violation, retains the value produced by the underlying architecture, and improves the terms under which it may resist future enforcement of the same protected boundary. To the extent the revision performs that function, its defendant-side value cannot be counted as an exceptional benefit delivered to the Classes.

This Appendix supplies no independent request for relief. It provides the collateral public-record basis for the benefit inquiry already presented in the Objection and the unresolved case-record questions identified in Exhibit A. Those materials demonstrate that the revision's class-side value, durability, practical agency, effect upon retained entrenchment, and potential role in regularizing continued collection must be established rather than assumed. Absent that showing, the revision should not furnish an independent basis for enhancement-level credit as exceptional nonmonetary relief.

## SCHEDULE OF COLLATERAL PUBLIC RECORDS

The case-specific docket and governing fee authorities are identified in the Objection and Exhibit A and are not repeated here. This schedule contains only the collateral public records relied upon for the Appendix's institutional and remedial analysis. Hyperlinked titles point to official agency or court-hosted records where available.

| No. | Record and status | Fee-stage proposition | Limitation |
|---|---|---|---|
| 1 | *Binding FTC consent order* | Established a company-wide baseline concerning privacy representations, affirmative express consent in specified circumstances, a comprehensive privacy program, and twenty years of independent assessments. | Does not itself establish breach in any later matter. |

| No. | Record and status | Fee-stage proposition | Limitation |
|---|---|---|---|
| 2 | | Directly links a later tracking and user-control representation dispute to the 2011 privacy constraint and a $22.5 million penalty. | Resolved by stipulation rather than contested merits findings; limited to the charged Safari conduct. |
| | *Stipulated federal judgment resolving an express prior-order violation charge* | | |
| 3 | *Formal noncompliance decision* | Found failure to comply with 2020 interim injunctions and imposed a EUR 500 million penalty; documents restrictive scope, incomplete information, and commercial leverage in response to constraint. | Different substantive right and legal regime; used for remedial mechanics and foreseeability. |
| 4 | *Binding commitments with independent monitoring trustee* | Shows escalation from injunction and penalty to detailed transparency, information, neutrality, and monitoring obligations. | The decision making commitments binding did not itself establish their later breach. |
| 5 | *Formal commitment-noncompliance decision* | Found noncompliance with four commitments and the monitor-cooperation obligation; identifies opaque information, maintained asymmetry, impaired refusal, and withheld monitoring information. | Different market and right; not offered as propensity evidence or proof of future violation here. |
| 6 | *Federal antitrust liability decision* | Judicial findings concerning self-reinforcing feedback, data and scale advantages, experimentation, machine-learning training, matching quality, integration, barriers to entry, and monopoly power. | Does not establish that the Rodriguez conduct caused the adjudicated monopolies or affected every Google system. |
| 7 | *Federal antitrust final judgment* | Demonstrates administrable use of independent technical expertise, system and source-code access, continuing reporting, complaint review, and express circumvention monitoring in an evolving Google system. | Not proposed as an identical or mandatory remedy in Rodriguez. |

Procedural labels are deliberate. The Safari matter is described as a stipulated judgment resolving an express order-violation charge; the French 2021 and 2024 matters are described as formal noncompliance decisions; and the antitrust opinions are used only for the findings and remedial design stated above.



**UNITED STATES POSTAL SERVICE** ®

**PRIORITY MAIL**



UNITED STATES POSTAL SERVICE.

Retail

**P**

US POSTAGE PAID

**$12.90**

Origin: 78201
07/21/26
4879530201-20

PRIORITY MAIL®

0 Lb 6.10 Oz

**PE**

RDC 03

EXPECTED DELIVERY DAY: 07/25/26

C017

SHIP
TO:

450 GOLDEN GATE AVE
SAN FRANCISCO CA 94102-3661

USPS TRACKING® #



9505 5147 0132 6202 4232 85



023



UNITED STATES POSTAL SERVICE ®

**PRIORITY®**
MAIL

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

FROM:

Michael Gonzalez
Meta Art Project
P.O. Box 12471
San Antonio, TX 78212

TO:

Clerk of the Court
United States District Court
Northern District of California
Phillip Burton Federal Building
450 Golden Gate Ave
San Francisco, CA 94102

Label 228, December 2023          FOR DOMESTIC AND INTERNATIONAL USE

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 20 lbs.

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED

**PRESS FIRMLY TO SEAL**          **PRESS FIRMLY TO SEAL**



**UNITED STATES POSTAL SERVICE**® | **PRIORITY MAIL**®

MG  7/21

**FROM:**

- Expected delivery date specified for domestic use.
- Domestic shipments include $100 of insurance (restrictions apply).*
- USPS Tracking® service included for domestic and many international destinations.
- Limited international insurance.**
- When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at *http://pe.usps.com*.

** See International Mail Manual at *http://pe.usps.com* for availability and limitations of coverage.

**RECEIVED**

JUL 2 9 2026

CLEH          r
NORTHERN DISTRICT OF CALIFORNIA

**TO:**

## FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



**USPS.COM/PICKUP**

## TRACKED ■ INSURED



PS00001000014

EP14F October 2023
OD: 12 1/2 x 9 1/2



PAPER POUCH

how2recycle.info

This package is made from post-consumer waste. Please recycle - again.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; October 2023; All rights reserved.